1  TERREE A. BOWERS
   United States Attorney
2  ROBERT L. BROSIO
   Assistant United States Attorney
3  Chief, Criminal Division
   MANUEL A. MEDRANO
4  Assistant United States Attorney
   Chief, Asset Forfeiture Section
5  JOHN L. CARLTON
   Assistant United States Attorney
6  Deputy Chief, Narcotics Section
       1400 United States Courthouse
7      312 North Spring Street
       Los Angeles, California 90012
8      Telephone:  (213) 894-0609

9  Attorneys for Plaintiff
   United States of America
10



FILED

NOV 27 1992

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY_____DEPUTY

11              UNITED STATES DISTRICT COURT

12          FOR THE CENTRAL DISTRICT OF CALIFORNIA

13  UNITED STATES OF AMERICA,        )   CR 87-422(G)-ER
                                     )
14                  Plaintiff,       )   TRIAL MEMORANDUM
                                     )
15        v.                         )   [18 U.S.C. § 1959(a)(1):
                                     )   Violent Crimes in Aid of
16  RAFAEL CARO-QUINTERO, et al.,    )   Racketeering; 18 U.S.C. §
                                     )   1959(a)(5): Conspiracy to
17                  Defendants.      )   Commit Violent Crimes In
                                     )   Aid of Racketeering; 18
18                                   )   U.S.C. § 1201(c):
                                     )   Conspiracy to Kidnap A
19                                   )   Federal Agent; 18 U.S.C. §
                                     )   1201(a)(5): Kidnapping of a
20              )   Federal Agent; 18 U.S.C. §§
                                     )   1111, 1114: Felony Murder of
21                                   )   a Federal Agent; 18 U.S.C.
                                     )   § 2: Aiding and Abetting; 18
22                                   )   U.S.C. § 3: Accessory After
                                         the Fact

23

24
                              I
25
                    STATUS OF THE CASE
26
        A.    Trial is set for December 1, 1992, at 9:30 a.m. before
27

28

1   the Honorable Edward Rafeedie, United States District Judge.

2       B.   Estimated time for trial is four to six weeks.

3       C.   Defendants Ruben Zuno-Arce and Dr. Humberto

4   Alvarez-Machain are in custody.   Fourteen co-defendants remain

5   fugitives.

6       D.   Trial by jury has not been waived.

7       E.   Interpreters will be required.

8       F.   The government expects to call approximately fifty to

9   sixty witnesses.

10                              II

11                    APPLICABLE STATUTES

12      A.   Violent Acts in Support of Racketeering

13      Counts Three and Four of the indictment charge defendants

14  Ruben Zuno-Arce and Humberto Alvarez-Machain with conspiracy to

15  commit violent crimes in aid of racketeering, and the commission

16  of violent crimes in aid of racketeering.

17      Title 18, United States Code, Section 1959, provides in

18  pertinent part as follows:

19          (a) Whoever, as consideration for the receipt of, or as

20          consideration for a promise or agreement to pay, anything of

21          pecuniary value from an enterprise engaged in racketeering

22          activity, or for the purpose of gaining entrance to or

23          maintaining or increasing position in an enterprise engaged

24          in racketeering activity, murders, kidnaps, or conspires so

25          to do . . . in violation of the laws . . . of the United

26

27                              2

28

States . . . shall be punished --

>     (1) for murder or kidnapping, by imprisonment for
>     any term of years or for life or a fine of not more
>     than [$250,000], or both.

As used in Section 1959 --

"anything of pecuniary value" means anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage.

18 U.S.C. § 1958(b)(1).

The term "enterprise" as defined in 18 U.S.C. § 1959(b)(2) includes "any . . . union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce."

The term "interstate commerce," as used in Title 18, includes "commerce between one State, Territory . . . and another State, Territory . . . ." 18 U.S.C. § 10.

The term "foreign commerce," as used in Title 18, includes commerce with a foreign country. 18 U.S.C. § 10.

The term "racketeering activity" as defined by Title 18, United States Code, Section 1961(1)(D) includes

>     any offense involving . . . the felonious manufacture,
>     importation, receiving, concealment, buying, selling,
>     or otherwise dealing in narcotic or other dangerous
>     drugs, punishable under any law of the United States

3

1

2     . . . .

3     The importation or smuggling into the United States,

distribution, and possession of marijuana, cocaine, and heroin

are punishable under Title 21 of the United States Code.

**B.    Conspiracy To Kidnap, Kidnapping, and Aiding and**

**Abetting**

Count Six charges defendants Ruben Zuno-Arce and Humberto

Alvarez-Machain with conspiracy to kidnap a federal agent, and

directly participating and aiding and abetting the kidnapping of

DEA Special Agent Camarena.

Title 18, United States Code, Section 1201 provides in

pertinent part as follows:

(a)   Whoever unlawfully seizes, confines, inveigles,

decoys, kidnap, abducts, or carries away and holds

for ransom or reward or otherwise any person,

except in the case of a minor by the parent

thereof, when:

(5)   the person is among those officers and employees

designated in Section 1114 of this title [e.g., an

employee or agent of the Drug Enforcement

Administration] . . . on account of, the

performance of official duties . . . shall be

punished by imprisonment for any term of years or

for life.

*        *        *        *

4

(c) If two or more persons conspire to
violate this section and one or
more of such persons do any overt
act to effect the object of the
conspiracy, each shall be punished
by imprisonment for any term of
years or for life.

Title 18, United States Section 2 provides in pertinent part
as follows:

(a) Whoever commits an offense against the United
States or aids, abets, counsels, commands, induces or
procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done
which if directly performed by him or another would be
an offense against the United States, is punishable as
a principal.

C.   Felony-Murder

Count Eight charges defendant Humberto Alvarez-Machain with
murder in the first degree under the felony-murder rule.

Title 18, United States Code, Section 1111 provides in
pertinent part:

(a) Murder is the unlawful killing of a human
being with malice aforethought. Every murder . . .
committed in the perpetration of . . . kidnapping . . .
is murder in the first degree. [Whoever is guilty of

5

murder in the first degree shall be sentenced to life imprisonment (because of current status of unconstitutionality of federal statutes providing for capital punishment)].

Title 18, United States Code Section 1114 provides in pertinent part:

Whoever kills or attempts to kill . . . any officer or employee of the Drug Enforcement Administration . . . engaged in or on account of the performance of his official duties [shall be punished as provided under 18 U.S.C. § 1111].

### III

### STATEMENT OF FACTS

#### Introduction

The years 1982 to 1985 saw the rise in Guadalajara, Jalisco, Mexico, of one of the most powerful international narcotics cartels in the world.  Its leaders included, among others, traffickers Juan Ramon Matta-Ballesteros ("Matta"), Miguel Angel Felix-Gallardo ("Felix"), Rafael Caro-Quintero ("Caro") and Ernesto Fonseca-Carrillo ("Carrillo").  The Guadalajara Narcotics Cartel engaged in the importation and distribution of multi-ton quantities of marijuana and cocaine in Mexico, Colombia, the Central District of California, and elsewhere.

Corruption amongst Mexican high ranking government and law enforcement officials was pervasive.  Law enforcement officials

6

1  were on the traffickers' payroll, and facilitated matters by

2  providing protection for marijuana and cocaine loads, and

3  escorting marijuana shipments being transported and smuggled into

4  the United States.  Also on the traffickers' payroll were high

5  ranking politicians and military officials, who, in conjunction

6  with the corrupt law enforcement officials, permitted the

7  traffickers to grow and distribute narcotics without substantial

8  interference from legitimate law enforcement agencies.  The high

9  ranking officials who aided the traffickers were, among others,

10 Enrique Alvarez del Castillo, former governor of Jalisco, Manuel

11 Bartlett-Diaz, former Secretary of Gobernacion, Manuel Ibarra-

12 Herrera, former director of the Mexican Federal Judicial Police,

13 Miguel Aldana-Ibarra, former director of Mexican Interpol, and

14 Juan Arevalo-Gardoqui, the former Minister of Defense.

15      In 1983 and 1984 Drug Enforcement Administration ("DEA")

16 investigative and eradication efforts in Mexico were adversely

17 affecting the activities and interests of the Guadalajara

18 Narcotics Cartel.  In June, 1984, for example, DEA agents

19 identified and participated in the eradication of over 100 acres

20 of marijuana in Zacatecas, Mexico, belonging to the cartel.  DEA

21 Special Agent Enrique Camarena-Salazar ("Camarena") participated

22 in the investigation in an undercover capacity and was directly

23 responsible for the destruction of the marijuana.  Special Agent

24 Camarena's identity as a DEA agent was disclosed to the

25 traffickers at the time.  Alfredo Zavala-Avelar ("Zavala") was a

26

27                                  7

28

1  pilot who assisted the DEA by flying Special Agent Camarena to

2  locate the Zacatecas marijuana fields.  In November, 1984, five

3  months after the destruction of the Zacatecas fields, DEA agents

4  identified and participated in the eradication of 10,000 tons of

5  marijuana (worth approximately $5 billion) in Bufalo, Chihuahua,

6  Mexico.  The Bufalo fields also belonged to the cartel.

7      Contemporaneous with these marijuana eradication efforts,

8  DEA instituted in 1984 a significant investigative program,

9  Operation Padrino, to gather intelligence information about

10 developing cocaine ties between Mexican and Colombian

11 traffickers.  Operation Padrino lead to the identification of

12 defendants Felix and Matta as key players in the burgeoning

13 Mexican/Colombian cocaine trade.  Intelligence information

14 gleaned from Operation Padrino resulted in significant seizures,

15 including $4.1 million in June, 1984, in Anaheim, California.

16     These investigative efforts of DEA adversely affected the

17 operation of the Guadalajara Narcotics Cartel.  In response,

18 starting in 1984, members of the cartel engaged in a series of

19 actions the purpose and intent of which was to retaliate against

20 the DEA, its agents and informants in Mexico, and to learn the

21 nature and extent of the DEA's knowledge of the membership and

22 operations of the cartel.  Such actions included the following:

23     (a)  On September 30, 1984, a DEA confidential informant was

24 shot in Guadalajara by members of the Guadalajara narcotics

25 cartel.

26

27                              8

28

1    (b)   On October 10, 1984, members of the Guadalajara
2  Narcotics Cartel machine-gunned an automobile belong to a DEA
3  agent in Guadalajara.

4    (c)   On January 30, 1985, defendants Caro, Fonseca, and
5  other members of the Guadalajara Narcotics Cartel, were having a
6  private party at La Langosta restaurant (owned by defendant
7  Fonseca) in Guadalajara.  In the early evening, American tourists
8  John Walker and Alberto Radelat inadvertently walked into the
9  restaurant.  Believing them to be DEA agents conducting
10 surveillance of their meeting, defendants Caro, Fonseca and
11 others ordered their interrogation and murder.

12   (d)   Finally, one week later, on February 7, 1985, Special
13 Agent Camarena and Zavala were kidnapped and taken to defendant
14 Caro's residence at 881 Lope de Vega, Guadalajara, where they
15 were interrogated.  On March 5, 1985, the bodies of Special Agent
16 Camarena and Zavala were found together in Zamora, Michoacan,
17 Mexico.  On June 17, 1985, the bodies of John Walker and Alberto
18 Radelat were found together in a makeshift grave at La Primavera
19 Park in Guadalajara.

20   (A)   Guadalajara Narcotics Cartel

21   From 1983 to 1984 the DEA engaged in investigative efforts
22 in Mexico and elsewhere that culminated in 1984 in stunning
23 narcotics and monetary seizures.  The financial losses to the
24 cartel resulting from these seizures were in the billions of
25 dollars.

26

27                                  9

28

### (i)  Zacatecas -- Marijuana

Between approximately November, 1983, and June, 1984, Special Agent Camarena was involved in an undercover operation investigating the cultivation of multi-ton quantities of marijuana by the Guadalajara Narcotics Cartel in Zacatecas, Mexico.  A confidential informant ("CI") will testify that he was recruited by Special Agent Camarena to infiltrate the Zacatecas operation.  The CI will testify that co-defendant Caro was the head of the Zacatecas narcotics operation and that the CI saw co-defendant Caro in Zacatecas on more than one occasion where defendant Caro met with the supervisor of the marijuana fields. The CI will further testify that he introduced Special Agent Camarena in an undercover capacity to the supervisor of the Zacatecas marijuana fields.  The Zacatecas supervisor thereafter negotiated a six ounce heroin deal and the future sale of seventy (70) kilograms of heroin with Special Agent Camarena and one other DEA agent.  Special Agent Camarena negotiated the purchase of ninety (90) tons of marijuana which was to be distributed in Zacatecas.  The CI will further testify regarding the purchase of tractors, trucks and tons of fertilizer to be used to cultivate the marijuana fields.

The Zacatecas investigation was terminated during the latter part of May, 1984.  In a joint operation, DEA and the Mexican Federal Judicial Police ("MFJP") seized approximately ten (10) tons of manicured marijuana, 6,500 pounds of marijuana (enough to

1  plant 6,500 acres of marijuana), and 200 liters of hashish oil.

2  Approximately 100 acres of marijuana were eradicated.  The

3  supervisor of the Zacatecas operation was also arrested as the

4  result of Special Agent Camarena's investigation.[1]  Special

5  Agent Camarena's investigation therefore cost the Guadalajara

6  Narcotics Cartel millions of dollars.

7           (ii) Operation Padrino and the Seizure of $4.1

8                Million in Anaheim, California

9       A CI will testify that in 1983 he was present when several

10 members of the Guadalajara Narcotics Cartel met at a residence of

11 defendant Caro in Guadalajara.  Present were, among others,

12 defendants Caro, Fonseca, Felix, Matta, Jesus Felix-Gutierrez,

13 Rene Calderon-Quintero and others.  Felix and Caro were protected

14 by numerous bodyguards consisting of MFJP agents and Jalisco

15 State Judicial Police officers.

16      The co-conspirators discussed the importation of ton

17 quantities of cocaine from South America to Mexico for ultimate

18 distribution in the United States.  The co-conspirators discussed

19 ton quantities of cocaine and prices.  Shortly after this meeting

20 the CI and co-conspirator Jesus Felix-Gutierrez began receiving

21 via aircraft in Riverside, California, large quantities of

22 cocaine.  The shipments averaged approximately 1,000 kilograms of

23

24  _____

        [1]    Zavala was employed by DEA during this time period to fly
25 DEA agents to attempt to locate the marijuana fields that were
   being cultivated in Zacatecas.
26

27                          11

28

1  cocaine, and were stashed at residences in the Los Angeles area.

2  In 1984 the DEA's investigative program, Operation Padrino,

3  gathered significant intelligence information about developing

4  cocaine ties between Mexican and Colombian traffickers.

5  Defendants Matta and Felix were identified as significant

6  traffickers. An informant will testify that he transported to

7  Matta and Felix in Guadalajara approximately $150 million in

8  proceeds from sales of the cartel's cocaine in the southwestern

9  United States.

10  By the summer of 1984 Operation Padrino had resulted in

11  significant inroads on narcotics trafficking activities of the

12  Guadalajara Narcotics Cartel. For example, in June, 1983,

13  Operation Padrino resulted in the seizure of approximately $4.1

14  million belonging to the Guadalajara Narcotics Cartel in a hotel

15  in Anaheim, California.

16  (iii) Chihuahua -- Marijuana

17  In November, 1984, approximately six months after the

18  Zacatecas investigation and approximately three months before

19  Special Agent Camarena and Zavala were kidnapped, the DEA located

20  and subsequently eradicated approximately 10,000 tons of

21  marijuana being cultivated, manicured and packaged by the

22  Guadalajara Narcotics Cartel in the area of Bufalo, Chihuahua.

23  Witnesses will testify regarding the size of the Chihuahua

24  narcotics operation. During the marijuana seizure over 5,000

25  field workers were detained. Consequently, with the Bufalo

26

27  12

28

seizure the Guadalajara narcotics cartel suffered yet another multi-billion dollar loss at the hands of the DEA.

### (iv) Co-conspirator Rene Martin Verdugo-Urquidez's Marijuana Operation

The government will establish that co-conspirator Rene Martin Verdugo-Urquidez ("Verdugo") was co-defendant Caro's "right-hand" man in the Guadalajara Narcotics Cartel.  Witnesses will testify that between 1984 and 1985, Verdugo arranged the importation into the United States from Mexico of multi-ton quantities of marijuana.  Co-defendant Caro was the source of the marijuana.  Marijuana would be transported via helicopter from Caborca, Mexico, to Arizona.  The helicopter was equipped to transport approximately 3,000 pounds of marijuana per flight. The marijuana would be stored at stash houses in Arizona and thereafter transported in trucks for distribution in Southern California and elsewhere.  On February 5, 1985, authorities in Arizona seized approximately two (2) tons of marijuana that had just been delivered by Verdugo's helicopter.

### (B)   Retaliatory Acts

These tremendous narcotic and monetary losses suffered in Zacatecas, California and Chihuahua provided the motive for the retaliatory acts perpetrated by the Guadalajara Narcotics Cartel against the DEA.

### (i)   Pre-Murder Acts of Intimidation

In 1983 and 1984 Operation Padrino resulted in the

13

1  identification of several key players in the developing

2  association between Mexican and Colombian traffickers for the

3  distribution of cocaine.  As part of this investigation

4  Guadalajara DEA agents frequently conducted surveillance of

5  traffickers, with sometimes frightening consequences for the

6  agents.

7      For example, during the Spring of 1984, DEA Special Agent

8  Roger Knapp was conducting surveillance of defendant Felix's

9  office in Guadalajara.  Special Agent Knapp was driving a 1982

10 four door LTD Crown Victoria.  As Special Agent Knapp attempted

11 to leave, men bearing credentials of the Directorate of Federal

12 Security ("DFS") stopped and harassed Special Agent Knapp.

13 Special Agent Knapp was the agent in charge in Guadalajara of the

14 Padrino investigation.  He regularly used the Crown Victoria to

15 pick up and transport tapes of wiretaps of Felix's hotel and

16 office.  In October, 1984, the Ford LTD was machine-gunned in

17 front of Special Agent Knapp's residence in Guadalajara.  Special

18 Agent Knapp and his family were evacuated by the DEA the

19 following day.

20     In July, 1984, DEA Special Agent James Kuykendall was

21 conducting surveillance of defendant Felix in Guadalajara.  After

22 being detected by armed bodyguards of defendant Felix, Special

23 Agent Kuykendall was stopped and questioned.

24     In 1984 a confidential informant, at the specific request of

25 Special Agent Camarena, was attempting to obtain information

26

27                              14

28

1  about the family of co-defendant Caro.  On September 30, 1984,
2  the confidential informant was shot five times by a member of the
3  Guadalajara Narcotics Cartel.  The confidential informant was
4  evacuated to the United States immediately after the
5  assassination attempt and is now a paraplegic.

6      In November, 1984, DEA agents were taking photographs of
7  defendant Felix's hangar at the Guadalajara airport when they
8  were spotted by defendant Felix.  As the agents attempted to
9  leave their path was blocked by armed guards of Felix.  The DEA
10  agents had to retreat to a building, contact the DEA office at
11  the American consulate and wait for the arrival of MFJP agents so
12  they could be escorted from the premises.

13                  (ii) Murder of John Walker and Alberto Radelat
14      From early afternoon to early evening on January 30, 1985,
15  several members of the Guadalajara Narcotics Cartel were having a
16  private party at La Langosta, a seafood restaurant in Guadalajara
17  owned by defendant Fonseca and frequented by the traffickers.
18  Numerous traffickers and bodyguards were present, including
19  defendants Zuno, Caro, Fonseca and Javier Barba-Hernandez.

20      At approximately 7:00 p.m. American tourists John Walker and
21  Alberto Radelat inadvertently walked into La Langosta restaurant.
22  Realizing that the restaurant was closed to the public, they
23  attempted to leave only to be pulled violently back into the
24  restaurant.  Believing the tourists to be undercover DEA agents
25  conducting surveillance, numerous men then pounced upon the two

26

27                          15

28

Americans and began savagely beating them with their fists and guns. The assailants lifted the two men and began carrying them in the direction of the storage room in the rear of the restaurant. Walker and Radelat were tortured and murdered.

Later that evening, co-defendants Javier Barba-Hernandez and Antonio Vasquez-Ochoa arrived at Barba-Hernandez's house. Both had blood on their shirts, pants and shoes. Barba-Hernandez and Vasquez-Ochoa both admitted to a confidential informant that they and others had caught two American "gringos" spying on them at the restaurant and that the two spies had been beaten and murdered.

On June 17, 1985, the bodies of John Walker and Alberto Radelat were found together in a makeshift grave at La Primavera park in Guadalajara.

(C) Planning of Camarena Kidnapping

Beginning in 1984 members of the Guadalajara Narcotics Cartel began meeting to discuss what retaliatory effort would be taken against the DEA.

Eyewitness testimony will establish that the Guadalajara Narcotics Cartel held a series of meetings starting in the fall of 1984, and continuing until the eve of Special Agent Camarena's kidnapping. At these meetings defendant Zuno was an active participant. The subject of the meetings was the adverse impact the DEA's investigative efforts were having on the cartel, and what was to be done about it. In particular, the defendants

16

1 talked about picking up and questioning a DEA agent who was
2 causing the problems.

3     In addition to defendant Zuno, these meetings were attended
4 by traffickers and representatives of every Mexican government
5 agency that had an interest in the cartel's operations and
6 success.  Among the traffickers at most of the meetings were
7 Rafael Caro-Quintero, Ernesto Fonseca-Carrillo, Miguel Angel
8 Felix-Gallardo and Manuel Salcido (aka "Cochiloco").  Prominent
9 politicians were also present at some of the meetings, including
10 Enrique Alvarez del Castillo, the governor of Jalisco, Manuel
11 Bartlett-Diaz, the Secretary of Gobernacion, and Javier Garcia-
12 Paniagua, the president of the Partido Revolucionario
13 Institucional ("PRI") political party.[2]  Key law enforcement
14 personnel in attendance included Manuel Ibarra-Herrera, the
15 Director of the MFJP, and Miguel Aldana-Ibarra, the Mexican Head
16 of Interpol.  Finally, the military was also represented through
17 the presence of Juan Arevalo-Gardoqui, the Minister of Defense.

18     (D)  <u>Kidnapping and Murder of Camarena and Zavala</u>

19     On February 7, 1985, Special Agent Camarena left the
20 American consulate in Guadalajara at approximately 2:00 p.m. to
21 join his wife for lunch.  He was abducted on the way to his
22 vehicle, and was never seen alive again by his family or DEA
23 agents.

24

25     [2]   From 1976 to 1982 Garcia-Paniagua served as Secretary of
26 State under former President Jose Lopez-Portillo.

27                           17

28

1    On the same date that Special Agent Camarena was abducted,
2    Alfredo Zavala-Avelar was also kidnapped at the Guadalajara
3    airport at approximately 4:00 p.m.  Zavala was a pilot employed
4    by the Mexican Department of Agriculture and Water Resources in
5    Guadalajara.  Zavala was established by DEA in 1977 as a
6    confidential informant.  Zavala was regularly employed by DEA to
7    fly DEA agents to attempt to locate marijuana fields being
8    cultivated in Mexico.  Prior to his abduction, Zavala had been
9    working with Special Agent Camarena investigating the cultivation
10   of multi-ton quantities of marijuana by the Guadalajara Narcotics
11   Cartel in Zacatecas, Mexico.

12       (E)   **Flight From the Guadalajara Airport**

13       The disappearance of Special Agent Camarena was not reported
14   by anyone until Camarena's wife telephoned Special Agent Victor
15   Wallace at 6:30 a.m. on February 8, 1985.  DEA agents began
16   arriving in Guadalajara on February 8 to assist with the
17   investigation of Camarena.

18       On February 9, 1985, DEA agents advised the MFJP that they
19   had learned that co-defendant Felix, a suspect in Special Agent
20   Camarena's kidnapping, was heading to the Guadalajara airport.
21   The DEA had to rent approximately twenty cars for the MFJP
22   agents, and fill them with gas, before the MFJP would cooperate.

23       The MFJP, under the command of defendant Primer Comandante

24

25

26

27                                    18

28

1  Armando Pavon-Reyes,[3] and MFJP agents, drove to the Guadalajara

2  airport.  DEA agents will testify that at the airport MFJP agents

3  confronted a jet surrounded by several men armed with AK-47

4  automatic weapons.  A tense stand-off resulted between the armed

5  men and the MFJP agents.  Co-defendant Caro then emerged from the

6  jet and met privately in a hangar with comandante Pavon-Reyes.

7  After five minutes the two emerged and comandante Pavon-Reyes

8  went to a different hangar to make a telephone call.  Pavon-Reyes

9  returned in a few minutes, and then met again with co-defendant

10 Caro in a hangar.  Minutes later they emerged, and hugged each

11 other as co-defendant Caro boarded his jet.  Co-defendant Caro

12 then turned to the MFJP agents and announced that he had come to

13 an agreement with comandante Pavon-Reyes and Caro was going to

14 give a "present" to all the MFJP agents.  Co-defendant Caro

15 toasted the MFJP agents with a bottle of champagne from the jet,

16 and remarked that the next time they (the MFJP agents) came

17 looking for him they should not be armed with "toys" (referring

18 to the semi-automatic weapons which the MFJP agents carried).

19 Co-defendant Caro then departed Guadalajara in the jet.[4]

20

21    [3]    Although inexperienced, Pavon-Reyes was handpicked by co-
   defendant Ibarra-Herrera to head the MFJP investigation of
22 Camarena's disappearance.

23

24    [4]    On February 12, 1985, DEA agents were conducting
   surveillance of the Plaza del Sol Hotel in Guadalajara because
   defendant Matta, a suspect in Camarena's kidnapping, was believed
25 to be registered there.  DEA agents will testify that they observed
   defendant Matta checking out of the hotel accompanied by numerous
26 armed bodyguards.  Prior DEA surveillance of defendant Matta in

27                               19

28

In a post-arrest statement given on April 3, 1990, in El Paso, Texas, defendant Alvarez has admitted to being at the Guadalajara airport with co-defendant Caro.  Defendant Alvarez has stated that he was ordered by Caro to take another doctor to the airport so he could fly out with Caro.

On April 5, 1985, at approximately 4:00 p.m., Costa Rican law enforcement officials arrested co-defendant Caro and four bodyguards at Caro's residence, "La Quinta," in San Jose, Costa Rica.  Several firearms were seized in the residence, including a jewelled semi-automatic handgun with Caro's radio call signal "R-1" inscribed.

(F)   Traffickers' Attempted Cover-up -- the Bravo
       Ranch Incident

After the abduction of Camarena and Zavala, and up to the time of the discovery of their bodies in early March, 1985, DEA officials were frantically following up on leads in Guadalajara in an effort to locate them.  Unbeknownst to the DEA, however, many of the Mexican officials that were purportedly assisting the DEA with its investigation had in fact been participants in many of the pre-abduction meetings where the plan to kidnap Camarena was discussed, or had actively supported the cartel by providing protection for the traffickers' activities.  For example, co-defendant Premier Comandante Armando Pavon-Reyes was appointed by

Guadalajara had established that he had a residence in Guadalajara.

20

1  co-defendant MFJP Director Manuel Ibarra-Herrera to head up the

2  Mexican investigation into the disappearance of Camarena.  Yet

3  both these officials were present for many of the meetings with

4  the traffickers where they planned the kidnapping of Camarena.

5       In the end of February, 1985, co-defendant Pavon-Reyes met

6  with DEA agents and showed them a letter which he claimed had

7  been received by Mexican authorities.  The letter, which bore a

8  Los Angeles postmark, stated that Camarena had been kidnapped by

9  mistake by a member of the Bravo family, and that authorities

10 should search the Bravo ranch outside of the town of Zamora in

11 the neighboring state of Michoacan.  Pavon-Reyes and the DEA

12 agents agreed to meet at 8:00 a.m. on the morning of March 2

13 prior to proceeding to the Bravo ranch.  However, when the agents

14 arrived at the appointed time, they found that the MFJP had

15 departed without them.

16      Mexican authorities sought to blame the Bravo family for

17 Camarena's kidnapping, and toward that end searched the Bravo

18 ranch on March 4, 1985, for the bodies of Camarena and Zavala.

19 Nothing was found.

20      (G)  Discovery of the Bodies

21      The next day, March 5, 1985, the bodies of Special Agent

22 Camarena and Zavala were found side by side near Zamora,

23 Michoacan, approximately sixty miles south of Guadalajara -- just

24 across the road from the Bravo ranch.  The bodies were

25 transported to a morgue.  DEA agents will testify as to their

26

27                              21

28

observations and the condition of the corpses at the morgue in Zamora, Michoacan.

(H) Autopsies

On March 5, 1985, the bodies of Special Agent Camarena and Zavala were transported by Mexican officials to the morgue in Guadalajara. On March 6, 1985, Special Agents of the FBI were allowed to inspect the bodies. As a result of the badly decomposed condition of the corpses the bodies were not readily recognizable. An agent of the FBI was able to lift a fingerprint from one of the bodies. This latent fingerprint was subsequently compared to a fingerprint from a set of fingerprint cards for Special Agent Camarena. The fingerprint from the corpse was positively identified as that of Special Agent Camarena. Evidence will further be introduced that the other body was subsequently identified through the fitting of a dental bridge as being that of Zavala.

An autopsy of the bodies of Special Agent Camarena was subsequently performed. The medical examiner will testify that Special Agent Camarena was repeatedly and severely beaten about the head and face with a blunt instrument. Camarena's cheekbones were fractured in three places and the top and base of the skull contained multiple fractures. A blunt instrument was driven through the top of Camarena's skull. The cause of death was determined to be a blow to the head with a blunt instrument.

Evidence will further establish that Zavala was also

22

severely beaten about the face, head and body.  An examination of the body revealed a skull with numerous fractures, and a broken arm.

(I)   Interrogation Tapes

Evidence will be introduced at trial that the torture/interrogation of Special Agent Camarena was tape recorded.  Witnesses will testify that Camarena's voice has been identified on the interrogation tapes, as well as the voices of co-defendants Caro and Sergio Espino-Verdin.  Co-defendant Espino-Verdin, a former comandante with the Directorate of Federal Security, has been identified as the primary interrogator of Special Agent Camarena.

Special Agent Camarena was interrogated at length regarding the identities of confidential informants working for DEA. Special Agent Camarena was further questioned about the DEA's role in the eradication of the Chihuahua marijuana fields.  He was extensively questioned about DEA's knowledge of co-defendant Caro and other members of the Guadalajara Narcotics Cartel. Special Agent Camarena is further heard on the interrogation tapes groaning in pain and pleading with his interrogator to provide him medical treatment.

(J)   Forensic Evidence

The government intends to introduce at trial forensic evidence that will establish that after they were abducted, Special Agent Camarena and Zavala were taken to the residence of

23

Rafael Caro-Quintero and Ruben Zuno-Arce at 881 Lope de Vega in Guadalajara.  The forensic evidence will further place co-defendant Sergio Espino-Verdin, the primary interrogator of Camarena, and co-defendant Rene Martin Verdugo-Urquidez at the residence.  The following are the conclusions of the FBI forensic experts:

1.  Hairs matching Special Agent Camarena's hairs were found at 881 Lope de Vega and inside a Volkswagen Atlantic which was found parked at Lope de Vega. Special Agent Camarena's hairs were also found inside a Mercury Marquis which was concealed inside a bricked-in carport.

2.  Hairs matching in all comparable characteristics the hairs of co-defendants Juan Ramon Matta-Ballesteros, Rene Martin Verdugo-Urquidez and Sergio Espino-Verdin were also found inside 881 Lope de Vega.

3.  Carpet fibers removed from Zavala's clothing, fibers from the blindfold tape taken from Special Agent Camarena, as well as from a portion of the burial sheet in which Camarena body was wrapped, were compared with carpet fibers taken by the FBI forensic team at 881 Lope de Vega and found to be consistent in all respects.

4.  A fabric sample of the burial sheet in which

24

Special Agent Camarena was found, a pillowcase taken from one of the bedrooms at 881 Lope de Vega, and a sample of the burial sheet and a sample of the pillowcase obtained from Mexican authorities at 881 Lope de Vega were compared and found to be consistent in all comparable characteristics.

5. Rope samples taken from the rope used to hog-tie Special Agent Camarena were found to match in every comparable characteristic a sample of rope obtained from Mexican authorities which was taken from 881 Lope de Vega.

6. Soil taken from the knee of the corpse of Camarena did not match the soil samples taken from where the bodies were found. The soil from the corpse however matched in every comparable respect soil from a burial site at La Primavera Park in Guadalajara.

7. In the bathroom of the guesthouse where Special Agent Camarena where held, FBI technicians found a syringe which contained traces of lidocaine. Lidocaine is a stimulant that can be used to revive someone whose heart begins to fibrillate, or vibrate without pumping any blood, a condition that can be caused by sustained physical beatings.

8.   Finally, FBI agents found in the residence several cleaners plastic bags, which later were determined to have defendant Alvarez's fingerprints.

(K)   881 Lope de Vega

The government will introduce evidence at trial that from at least the early 1970's to 1985, defendant Zuno owned 881 Lope de Vega in Guadalajara, the residence where Special Agent Camarena and Zavala were taken after their abduction.  The government will introduce evidence that the house was used by co-defendant Caro during 1984.

(L)   Defendant Dr. Humberto Alvarez-Machain

Evidence will also establish that defendant Alvarez was also a member of the Guadalajara Narcotics Cartel.  As a medical doctor defendant Alvarez would provide medical services to traffickers, including those who had been wounded.  Defendant Alvarez assisted traffickers during their interrogation and torture of Special Agent Camarena.

After waiving his constitutional rights, defendant Alvarez told DEA agents on April 3, 1990, in El Paso, Texas, that he was tired of hiding, and felt relieved that the time had come for him to straighten out his personal affairs.  Defendant Alvarez stated that he went to 881 Lope de Vega in February, 1985, and saw co-defendant Caro-Quintero interrogating Agent Camarena.  Defendant Alvarez says that he returned to 881 Lope de Vega the following day and again saw Camarena, who this time was unconscious and

26

barely alive.

The government possesses an undercover tape in which defendant Alvarez states to a confidential informant that he twice went to 881 Lope de Vega after Agent Camarena was abducted, the first time finding Camarena very sick, and the second time finding the tortured agent almost dead.

IV

## PERTINENT LAW

A.   Violent Acts In Support of Racketeering

1.   RICO Principles Apply

The government has charged defendants Zuno and Alvarez with committing violent acts in support of a narcotics "enterprise" engaged in "racketeering activity" under 18 U.S.C. § 1959.  Both terms are defined in the Section 1959 with reference to the RICO statutes.  In fact 18 U.S.C. § 1959 states that "racketeering activity" has the same meaning set forth in the RICO statute, 18 U.S.C. § 1961.  Under Section 1961, "racketeering activity" is defined as:

> The felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotics or other dangerous drugs punishable under any law of the United States . . .

Consequently, RICO principles under 18 U.S.C. § 1961, et al. apply in interpreting Section 1959.

2.   Congress Intended to Draft a Broad and Powerful Remedy

27

1    Against Organized Crime

2        It should first be emphasized that in enacting RICO,

3    Congress intended to provide "new remedies to deal with the

4    unlawful activities of those engaged in organized crime."  Pub.L.

5    91-452, § 1, 84 Stat. 922 (1970).  A primary concern was the

6    single prosecution of a "multi-faced, diversified conspiracy".

7    Until the enactment of the RICO statute traditional conspiracy

8    law prohibited the scope of the conspiracy and was limited by

9    reference to the agreement which defined and embraced its

10   objects.

11       Braverman v. United States, 317 U.S. 49, 53 (1942).

12   3.    An Enterprise As Defined Under RICO Is Broader Than a

13         Conspiracy and May Include Diversified Activities and

14         Different Crimes

15       Congress drafted the RICO statute and the definition of

16   "enterprise" to allow mass prosecution of highly diversified

17   criminal activities that could not be reached under traditional

18   conspiracy law.

19       United States v. Elliott, 571 F.2d 880, 899-901

20           (5th Cir. 1980) (RICO helps eliminate the restrictions

21           under conspiracy law requiring "single agreement or

22           common objective;" a single enterprise engaged in

23           diversified activities, including different and

24           unrelated crimes, fits comfortably within the

25           proscriptions of the statutes and common sense);

26

27                              28

28

1     <u>United States v. Tillett</u>, 763 F.2d 628, 631

2         (4th Cir. 1985);

3     <u>United States v. Mallah,</u> 503 F.2d 971, 976

4         (2nd Cir. 1974), <u>cert</u>. <u>denied</u>, 420 U.S. 995 (1975).

5     4.   <u>Government Must Prove Existence of Enterprise</u>

6     The existence of enterprise at all times remains a separate

7 element which must be proved by the government.

8     <u>United States v. Turkette</u>, 452 U.S. 576, 583 (1981).

9     The necessary elements to establish the existence of a RICO

10 enterprise are as follows:

11         (1)   The existence of an ongoing organization, formal

12             or informal;

13         (2)   that the various associates function as a

14             continuing unit;

15         (3)   that the enterprise has an existence separate and

16             apart from the pattern of activity in which it

17             engages.

18     <u>Turkette</u>, 452 U.S. at 583;

19     <u>United States v. Riccobene</u>, 709 F.2d 214, 221-222

20         (3rd Cir. 1983).

21     However, "the proof used to establish the separate elements

22 may in particular cases coalesce".

23     <u>Turkette</u>, 452 U.S. at 583.

24     The government may prove the existence of the enterprise

25 through circumstantial evidence.

26

27                 29

28

1  <u>Riccobene</u>, 709 F.2d at 225.

2  An "enterprise" under RICO may consist of separate

3  enterprises and corporations, which has been endorsed by the 3rd

4  and 4th Circuits.

5  <u>United Energy Owners v. United Energy Management</u>, 837

6  F.2d 356, 363 (9th Cir. 1988).

7  In order to establish an enterprise consisting of

8  individuals who are associated in fact, it need only be shown

9  that an organization, formal or informal, existed with a common

10 purpose of profiting from repeated criminal activity.

11 <u>United States v. Caguina</u>, 697 F.2d 915, 921-922

12 (11th Cir. 1983).

13 Moreover, it is not necessary to demonstrate that every

14 member of the enterprise participated in or knew about all of its

15 activities to demonstrate the enterprise's existence.

16 <u>Caguina</u>, 697 F.2d at 922;

17 <u>United States v. Hewes</u>, 729 F.2d 1302, 1311

18 (11th Cir. 1984).

19 The government need only show minimal nexus between the

20 enterprise's affairs and interstate or foreign commerce.

21 <u>United States v. Rone</u>, 598 F.2d 564, 573

22 (9th Cir. 1979) (interstate nexus established by

23 evidence that murder victim had purchased steel

24 manufactured outside state of California);

25 <u>United States v. Parness</u>, 503 F.2d 430,

30

439 n.11 (2nd Cir. 1974).

5.   **Statements In Furtherance of Enterprise Objectives Are Admissible**

Rule 801(d)(2)(E) permitting the admissibility of coconspirators' statements also functions in this case to permit the admissibility of statements in furtherance of the alleged Guadalajara Narcotics Cartel enterprise under the settled "joint venture" and "concert of action" exception.

United States v. Coe, 718 F.2d 830, 835 (7th Cir. 1983);

United States v. Kendall, 665 F.2d 126, 130

(7th Cir. 1981) (where defendant claimed a
conspiracy was impossible, court noted that
"'conspiracy' as a concept of substantive law is not
coterminous with admissibility.  To distinguish the two
concepts, courts have referred to the evidentiary
principle as a 'joint venture' exception or a 'concert
of action' exception.") (citations omitted), cert.
denied, 455 U.S. 1021 (1982);

United States v. Lutz, 621 F.2d 940, 946

(9th Cir. 1980) ("out-of-court statements by
coparticipants in a mail or wire fraud scheme are
admissible according to the same rules."), cert.
denied, 449 U.S. 859, 1093 (1980);

United States v. Peralta, 941 F.2d 1003, 1008

(9th Cir. 1991) (same);

31

United States v. Fried, 576 F.2d 787, 793 n.6

  (9th Cir.) ("common criminal plan or venture"),

  cert. denied, 439 U.S. 895 1978);

United States v. DiRodio, 565 F.2d 573, 575 n. 3

  (9th Cir. 1970) (same);

United States v. Randall, 491 F.2d 1317, 1318-19

  (9th Cir. 1974).

It is also true that Rule 801(d)(2)(E) admissibility is not dependent on the presence of a conspiracy charge in the indictment.  In other words, coconspirators and joint venture statements are admissible even if a conspiracy or joint venture is not charged in the indictment.

United States v. Crawley, 630 F.2d 1345, 1350

  (9th Cir. 1980);

United States v. Lutz, 621 F.2d 940, 946-47;

United States v. Randall, 491 F.2d at 1318 n. 1

  (moreover, admissibility "is not to be confined to

  those who are co-defendants at the same trial.")

B. Conspiracy To Kidnap And Transport Person In Interstate and Foreign Commerce [18 U.S.C. § 1201(c)]

1. Elements

The crime of conspiracy has three elements:

  First: an agreement to accomplish an illegal

      objective;

  Second: one or more overt acts in furtherance of the

32

illegal purpose; and

  Third:  the requisite intent to commit the underlying
      substantive offense.

 United States v. Kiriki, 756 F.2d 1449, 1453

  (9th Cir. 1985) (18 U.S.C. § 371);

 The elements of conspiracy can be and usually must be proved
by circumstantial evidence.  The elements may be established by
"events too interlocked to constitute coincidence."

 United States v. Cole, 448 F.2d 415, 416

  (9th Cir. 1971), cert. denied, 405 U.S. 927 (1972).

 Circumstantial evidence alone is sufficient to prove the
elements of a conspiracy.

 United States v. Abushi, 682 F.2d 1289, 1293

  (9th Cir. 1982).

2. Agreement

 The government need not prove direct contact between
co-conspirators or the existence of a formal agreement.  Instead,
an agreement constituting a conspiracy may be inferred from the
acts of the parties and other circumstantial evidence indicating
concert of action for accomplishment of a common purpose.

 United States v. Ramirez, 710 F.2d 535, 548

  (9th Cir. 1983);

 United States v. Abushi, 682 F.2d 1289, 1293

  (9th Cir. 1982);

 United States v. Caplan, 633 F.2d 534, 542

33

(9th Cir. 1980).

3.   Over Act

An overt act need not itself be criminal, as its only function is to demonstrate that the conspiracy is operative.

United States v. Andreen, 628 F.2d 1236, 1248

(9th Cir. 1980);

United States v. Buckner, 610 F.2d 570, 573

(9th Cir 1979), cert. denied, 445 U.S. 961 (1980).

The government need prove only one of the overt acts charged in the conspiracy count of the indictment.

United States v. Lyman, 592 F.2d 496, 500 (9th Cir. 1978).

4.   Knowledge

The defendant's connection to the conspiracy must be shown to be knowledgeable; in other words, that the defendant knew of his connection to the charged conspiracy.

United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991);

United States v. Federico, supra, 658 F. 2d at 1344;

United States v. Smith, 609 F.2d 1294, 1299 (9th Cir. 1979).

5.   Participation In The Conspiracy

The government has the burden of proving beyond a reasonable doubt that a conspiracy did exist and that each defendant was a member of the conspiracy charged.

United States v. Friedman, 593 F.2d 109, 115

(9th Cir. 1979);

United States v. Peterson, 549 F.2d 654, 657

34

1        (9th Cir. 1977).

2     Once the existence of a conspiracy is shown, evidence

3 establishing beyond a reasonable doubt a defendant's connection

4 with the conspiracy - even if the connection is slight - is

5 sufficient to convict him of knowing participation in the

6 conspiracy.

7     United States v. Ramirez, supra, 710 F.2d at 548;

8     United States v. Fleishman, supra, 684 F.2d at 1340-41;

9     United States v. Abushi, supra, 682 F.2d at 1293;

10    United States v. Dunn, 564 F.2d 348, 357 (9th Cir, 1977).

11    It is not necessary for each defendant to participate in all

12 of the overt acts in a single conspiracy.  A single conspiracy

13 may exist though each defendant plays a different role in it.

14    United States v. Burrenson, 643 F.2d 1344, 1348

15         (9th Cir.), cert. denied, 454 U.S. 830

16         (1981);

17    United States v. Camacho, 528 F.2d 464, 470

18         (9th Cir.), cert. denied, 425 U.S. 995 (1976).

19    It is not necessary that each co-conspirator be shown to

20 know the identities of all other participants or the exact role

21 of each.  The government must show that each defendant knew, or

22 had reason to know, the scope of the criminal enterprise and that

23 each defendant knew or had reason to know, that the benefits to

24 be derived from the operation were probably dependent upon the

25 success of the entire venture.

26

27                 35

28

1    United States v. Abushi, supra, 682 F.2d at 1293;

2    United States v. Perry, 550 F.2d 524, 528-29

3        (9th Cir.), cert. denied, 434 U.S. 827 (1977).

4    A defendant is vicariously liable for the substantive acts

5    of his co-conspirators whether or not he directly participated in

6    such acts, so long as those acts are committed pursuant to and in

7    furtherance of the conspiracy.

8    United States v. Reed, 726 F.2d 570, 580

9        (9th Cir. 1984);

10   United States v. Saavedra, 684 F.2d 1293, 1300-01

11       (9th Cir. 1982);

12   United States v. Basey, 613 F.2d 198, 202

13       (9th Cir. 1979), cert. denied, 446 U.S.

14       919 (1980);

15   United States v. Beecroft, 608 F.2d 753, 757

16       (9th Cir. 1979).

17   A conspirator who joins a pre-existing conspiracy is bound

18   by all that has gone on before in the conspiracy.

19   United States v. Saavedra, supra, 684 F.2d at 1301;

20   United States v. Taylor, 656 F.2d 1326, 1337

21       (9th Cir. 1981).

22   A defendant can be guilty of conspiracy even if he does not

23   realize benefits directly from underlying substantive offenses,

24   but instead conspires to directly benefit others and only

25   indirectly benefit himself.

26

27                              36

28

1  United States v. Carruth, 699 F.2d 1017, 1021

2  (9th Cir.), cert. denied, 464 U.S. 1038

3  (1983).

4  6.  Proof Of Conspiracy

5  The elements of conspiracy can be proved by circumstantial

6  evidence alone.

7  United States v. Abushi, supra, 682 F.2d at 1293;

8  United States v. Diggs, 649 F.2d at 731, 736

9  (9th Cir.), cert. denied, 454 U.S. 970

10  (1981);

11  United States v. Friedman, supra, 593 F.2d at 115;

12  United States v. Testa, 548 F.2d 847, 853

13  (9th Cir. 1977).

14  Declarations by one co-conspirator during the course of and

15  in furtherance of the conspiracy may be used against another

16  conspirator because such declarations are not hearsay.

17  Rule 801(d)(2)(E), Federal Rules of Evidence.

18  Rule 801(d)(2)(E) requires a foundation that (1) the

19  declaration was in furtherance of the conspiracy; (2) it was made

20  during the pendency of the conspiracy; and (3) there is evidence

21  of the existence of the conspiracy and of the defendant's

22  connection thereto.

23  Bourjaily v. United States, 107 S.Ct. 2775, 2779 (1987).

24  When preliminary facts relevant to Rule 801(d)(2)(E) are

25  disputed the offering party must prove them by a preponderance of

26

27  37

28

the evidence ("more likely than not") that the conspiracy exists and defendant's involvement in the conspiracy.  If that burden is met, the coconspirator's statement is admissible.

Bourjaily, 107 S.Ct. at 2779.

In making the preliminary factual findings, under Rule 801(d)(2)(E), the court may consider the hearsay statements sought to be admitted.

Bourjaily, 107 S.Ct. at 2779.

The foundation for the admission of co-conspirator's statements may be established before or after the admission of the statements.  If a proper foundation has not yet been laid, the court may admit the statements with an admonition to counsel that the testimony will be stricken should the conspiracy not be shown by independent evidence.

United States v. Lujan, 936 F.2d 406, 411;

United States v. Kenny, 645 F.2d 1323, 1333-34

(9th Cir.);

United States v. Vargas-Rios, 607 F.2d 831, 837

(9th Cir. 1979).

"In furtherance of the conspiracy" is to be construed broadly to include:

--statements made to keep a conspirator

abreast of a co-conspirator's activity,

or to induce continued participation in

a conspiracy, or to allay the fears of

38

1   a co-conspirator are in furtherance of a

2   conspiracy.

3   United States v. Layton, 720 F.2d 548, 557;

4   United States v. Lopez, 803 F.2d 969 974 (9th Cir. 1984)

5   (a co-conspirator's testimony may serve dual purposes.

6   First, it may not be hearsay at all because it is not

7   offered to prove the truth or the conspirators'

8   statements, but instead to show the verbal acts which

9   brought the conspiracy into existence.  Second, if

10   offered for truth of the matter asserted, the

11   statements qualify for admission pursuant to Fed. R.

12   Evid. 801(d)(2)(E))

13   Rehearing Denied, 483 U.S. 1012 (1986).

14   United States v. Taylor, 802 F.2d 1108, 1117 (9th Cir 1986)

15   (although statements made by a co-conspirator after his

16   arrest cannot be used against fellow conspirators, the

17   converse is not true; statements made by an unarrested

18   co-conspirator who is still operating in furtherance of

19   the ongoing conspiracy may be introduced against the

20   arrested conspirator.)

21   We will not disturb the trial court's finding on this

22   question unless the judge could not reasonably have come to that

23   conclusion.

24   United States v. Miller, 771 F.2d 1219, 1233

25   (9th Cir. 1985).

26

27                              39

28

Drug dealer's statements to customer tending to identify dealer's source are considered to be in furtherance of conspiracy to sell narcotics and is admissible as a conconspirator's statement.

United States v. Paris, 812 F.2d 471, 476 (9th Cir. 1987).

C.    Kidnapping

Three essential elements are required to be proved in order to establish that defendants committed the offense of kidnapping as charged in Count Seven:

FIRST:    That an officer and employee of the United States, such as a Special Agent of the Drug Enforcement Administration, was unlawfully seized or confined or inveigled or kidnapped or carried away;

SECOND:    That any such act against an officer or employee of the United States was done while that person was engaged in, or on account of, the performance of official duties;

THIRD:    That defendants willfully participated or willfully aided and abetted such acts against the officer or employee of the United States.

2 Devitt & Blackmar, Federal Jury Practice and Instructions 254, § 43.06 (3d ed. 1977) [Essential Elements of Offense] [Modified]; 18 U.S.C. 1201(a)(5), 18 U.S.C. § 1114.

40

D. __Felony Murder__

The government must prove the following elements to establish felony-murder:

FIRST:   That Drug Enforcement Administration Special Agent Enrique Camarena-Salazar was killed;

SECOND:   That he was killed with malice aforethought;

THIRD:   That such act was done in the perpetration of the kidnapping, unlawful seizure, confinement or inveigling of Agent Enrique Camarena-Salazar; and

FOURTH:   That the defendants directly participated in such act or acts or aided and abetted the commission of such acts with the intent to perpetrate the kidnapping.

Ninth Circuit Model Jury Instructions, No. 8.24A [Murder – First Degree] (Modified); Title 18, United States Code, § 1111, 1114;

United States v. Mack, 151 U.S. App. D.C. 162, 466 F.2d 333, 338-339 (1972), cert. denied, 409 U.S. 952 (1952);

United States v. Lilly, 512 F.2d 1259, 1262-1263 (9th Cir. 1975).

Section 1111 of Title 18, United States Code, provides that a person commits first degree murder under the felony murder rule if a homicide is committed during the perpetration of, or attempt to perpetrate, a kidnapping.  In charging a felony-murder, there

41

is no requirement that the indictment allege "premeditation."
All that is required is an allegation that the homicide was
committed during the perpetration of, or an attempt to
perpetrate, the offenses enumerated under 18 U.S.C. § 1111.

>Ornelas v. United States, 236 F.2d 392, 393-394
>(9th Cir. 1956).

"Malice aforethought" under the felony murder rule is
supplied by the intent to commit the underlying felony.  In
effect, a legal fiction is created in which the malice to commit
the underlying felony (in this case kidnapping) is transferred to
the individual who commits the felony.

>United States v. Lilly, 512 D.2d 1259, 1262-1263
>(9th Cir. 1975);

>United States Branic, 495 F.2d 1066, 1069
>(D.C. Cir. 1974) (Congress intended that "malice" be
>implied from the commission of the felony).

Specific intent remains an essential element of felony
murder under 18 U.S.C. § 1111, since the specific intent to
commit the applicable felony (of kidnapping) supplies the
"premeditation" which is an essential element of first degree
murder.

>United States v. Lilly, 512 F.2d 1259, 1262
>(9th Cir. 1975).

An individual may simply aid a kidnapping by driving the
car.  Nonetheless, such an act makes that individual an

42

accomplice to the kidnapping and he/she may be found guilty of

first degree murder under the felony-murder rule.

    <u>Wallace v. Lockhart</u>, 701 F.2d 719, 728

        (8th Cir. 1983)

    Moreover, a defendant can be convicted of first degree

murder under the felony murder rule even if the homicide was

unintentional.

    <u>Wallace</u>, 701 F.2d 719, 728-729.

F.    <u>Evidentiary Issues</u>

    1.   <u>Recordings</u>

    An undercover agent or informant may lawfully use electronic

equipment to record his conversation with the defendant.

    <u>United States v. White</u>, 401 U.S. 745, 748-54 (1971).

    In situations where one of the parties to a conversation has

consented to the taping and monitoring of that conversation, the

tape recordings and monitored conversations are admissible in

evidence and do not violate the defendant's Fourth Amendment

rights.

    <u>United States v. White</u>, 401 U.S. 745, 748-54 (1971);

    <u>United States v. Zemek</u>, 634 F.2d 1159, 1164-65 n. 4

        (9th Cir. 1980), <u>cert</u>. <u>denied</u>, 450 U.S. 916 (1981).

    Taped conversations are competent evidence even if they are

partly inaudible and have gaps, if the trial judge believes the

tapes have probative value.

    <u>United States v. Hurd</u>, 642 F.2d 1179, 1183

43

(9th Cir. 1981).

The procedure for admitting tapes and transcripts is left to the sound discretion of the trial court.  There is no rigid set of foundational requirements.

United States v. Hurd, 642 F.2d 1179, 1183
       (9th Cir. 1981);

United States v. Hollingshead, 672 F.2d 751, 755 n. 3
       (9th Cir. 1982);

United States v. Mouton, 617 F.2d 1379, 1384
       (9th Cir. 1980).

Under FRE 901(b)(4) and (b)(5), the government may authenticate tape recordings by unique contents and separately or in conjunction with voice identifications.

FRE 901(b)(4) and (b)(5).

Under FRE 104(b), if in light of all the evidence, a reasonable juror can conclude that the recording are authentic, that is that they are what the government purports them to be, then they are admissible; any argument by defendants to the contrary go only to weight.  The trier of fact makes the ultimate determination.

United States v. Black, 767 F.2d 1334, 1342
       (9th Cir. 1985);

United States v. Turner, 528 F.2d 143, 163
       (9th Cir. 1975), cert. denied, 423 U.S. 496
       and 429 U.S. 837 (1975) (in narcotics prosecution,

44

recordings were held admissible once a prima facie
case was established; identity is properly an issue for
the jury);

United States v. Booker, 952 F.2d 247, 249-250 (1991)

(same).

The government intends to introduce into evidence
transcripts of the translated audio conversations between
defendant Alvarez and an informant.  Because these conversations
where in Spanish, the government proposes to present to the jury
English translations of the tapes.

United States v. Mendez, 612 F.2d 51, 54

(2d Cir 1979) (transcripts properly introduced by

defendant);

United States v. Vasquez, 605 F.2d 1269, 1272

fn. 4 (2d Cir.), cert. denied, 444 U.S. 981, 1019

(1979) (Spanish translations and transcripts

introduced into evidence);

United States v. Onori, 535 F.2d 938, 948

(5th Cir. 1976) (disputed versions of transcripts

may be presented to jury with additional evidence

supporting the accuracy of each version,

including testimony of transcriber);

United States v. Slade, 627 F.2d 293, 302

(D.C. Cir. 1980). cert. denied, 449 U.S. 1034

(1980).

45

Transcripts made from recordings of conversations are admissible as evidence when properly identified and where a foundation has been laid for their introduction.

Jordon v. United States, 428 F.2d 7, 10 (9th Cir.),

cert. denied, 400 U.S. 946 (1970);

Wright v. United States, 353 F.2d 363 (9th Cir. 1965);

Mendez v. United States, 349 F.2d 650 (9th Cir.), cert.

denied, 384 U.S. 1015 (1965).

Once admitted, transcripts may be used by the jury during the jury deliberations under certain circumstances after the case has been submitted.

United States v. Booker, 952 F.2d 247, 249-250

(9th Cir. 1991);

United States v. Turner, 528 F.2d 143, 167-68

(9th Cir. 1975);

Chavira Gonzalez v. United States, 314 F.2d 750, 752

(9th Cir. 1963);

United States v. Koska, 443 F.2d 1167, 1169

(2d Cir.), cert. denied, 404 U.S. 852 (1971).

A witness may testify competently as to the identification of a voice on a tape recording.  The witness' opinion testimony may be based upon his having heard the voice under circumstances connecting it with the alleged speaker.

Fed. R. Evid, 901(b)(5);

United States v. Booker, 952 F.2d 247, 249-250

46

(9th Cir. 1991);

United States v. Turner, 528 F. 2d 143, 163

(9th Cir.), cert. denied, 423 U.S. 996 (1975);

United States v. Goldstein, 532 F.2d 1305, 1315

(9th Cir. 1976).

2.   Chain of Custody

Before a physical exhibit is admitted into evidence at trial, there must be a showing that it is in substantially the same condition as when the crime was committed.

Gallego v. United States, 276 F.2d 914, 917

(9th Cir. 1960);

United States v. Jefferson, 714 F.2d 689,

695 (7th Cir. 1983).

This determination is to be made by the trial judge and will not be overturned except for a clear abuse of discretion.

United States v. Jefferson, 714 F.2d at 695.

Alleged gaps in a chain of custody go to the weight of the evidence rather than its admissibility.

United States v. Lampson, 627 F.2d 62, 65

(7th Cir. 1980).

When the exhibits are at all times in official custody, a presumption of regularity attends the discharge of official duties.

United States v. Jefferson, 714 F.2d at 696;

United States v. Aviles, 623 F.2d 1192, 1198

47

(7th Cir. 1980).

Factors to be considered in this determination include the nature of the article, the circumstances surrounding the preservation and custody of it and the likelihood of intermeddlers tampering with it.

United States v. Kaiser, 660 F.2d 724, 733

(9th Cir. 1981), cert. denied, 455 U.S. 956 (1982).

3.   Authenticity Of Documents

The authenticity of documents seized from or sent by the defendant may be proven by circumstantial evidence.

United States v. Natals, 526 F.2d 1160, 1173

(2d Cir. 1975), cert. denied, 425 U.S. 950 (1976);

United States v. King, 472 F.2d 1, 9-11

(9th Cir.), cert. denied, 414 U.S. 864 (1973).

Documents need not have been signed by the defendant nor examined by a handwriting expert.  The prosecution need only prove a rational basis from which the jury may conclude that the exhibits did, in fact, belong to the defendant.

Federal Rule of Evidence 401(a);

United States v. Blackwell, 694 F.2d 1325, 1330

(D.C. Cir. 1982);

United States v. Sutton, 426 F.2d 1202, 1207

(D.C. Cir. 1969).

4.   Opinion Testimony By Narcotics Agents

Admission of expert testimony or lay opinion testimony is a

48

matter within the broad discretion of the trial judge; decisions
on such issues will not be disturbed unless manifestly erroneous.

United States v. Fleishman, 684 F.2d 1329, 1335

(9th Cir. 1982); cert. denied, 459 U.S. 1044 (1982);

United States v. Skeet, 665 F.2d 983, 985

(9th Cir. 1982).

An opinion may be given even if it embraces an ultimate
issue to be decided by the trier of fact, unless the testimony
concerns defendant's mental state.

Federal Rules of Evidence, Rule 704;

United States v. Kinsey, 843 F.2d 383, 388

(9th Cir. 1988) (police detective's expert opinion that
defendant was involved in distribution of cocaine
properly admitted);

United States v. Fleishman, supra, 684 F.2d at 1335.

Government agents may testify as to the general practice of
criminals to establish the defendants' modus operandi.  Such
evidence alerts the jury to the possibility that a combination of
seemingly innocuous events may indicate criminal behavior.

United States v. Johnson, 735 F.2d 1200, 1202

(9th Cir. 1984).

A narcotics agent may testify as to his opinion even if that
opinion is based in part on information obtained from other
agents or hearsay.

United States v. Cuevas, 847 F.2d 1417, 1428

49

(9th Cir. 1988), <u>cert. denied.</u> 489 U.S. 1012 (1989);

<u>United States v. Golden</u>, 532 F.2d 1244, 1247-1248

(9th Cir. 1976).

Courts have admitted a variety of opinion testimony by agents including:

(a)  Opinion testimony that one of the defendants in a narcotics case acted as a "lookout" (<u>United States v. Fleishman</u>, <u>supra</u>, 684 F.2d at 1335);

(b)  Opinion testimony as to the market price of heroin in various markets (<u>United States v. Golden</u>, <u>supra</u>, 532 F.2d at 1247-48);

DATED:    November 27, 1992.

Respectfully submitted,

TERREE A. BOWERS
United States Attorney

ROBERT L. BROSIO
Assistant United States Attorney
Chief, Criminal Division

MANUEL A. MEDRANO
Assistant United States Attorney
Chief, Asset Forfeiture Section

JOHN L. CARLTON  by
Assistant United States Attorney
Deputy Chief, Narcotics Section

Attorneys for Plaintiff
United States of America

50

## CERTIFICATE OF SERVICE BY REGULAR MAIL

I, Noreen Neria, declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California; that my business address is Office of United States Attorney, Federal Building, Suite 7516, 300 North Los Angeles Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction the service by regular mail described in this Certificate was made; that on November 27, 1992, which was deposited in the mail in the Federal Building, Suite 7516, 300 North Los Angeles, California in the above-entitled action, in a envelope bearing the requisite postage, a copy of: Trial Memorandum
Addressed to:  SEE ATTACHED SERVICE LIST
at her/his last known address, at which place there is a delivery service by messenger.

This Certificate is executed on November 27, 1992, at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.


_Noreen Neria_
NOREEN NERIA

SERVICE LIST

Ed Medvene
Mitchell, Silberberg & Knupp
11377 West Olympic Boulevard
Los Angeles, California 90064

James E. Blancarte
Jeffer, Mangels, Butler & Marmaro
2121 Avenue of the Stars, 10th Floor
Los Angeles, California 90067

Robert K. Steinberg
9911 West Pico Blvd,
Eighth Floor
Los Angeles, California 90035

Alan Rubin
11835 West Olympic Blvd, Ste. 1235
Los Angeles, California 90064

Paul L. Hoffman
ACLU Foundation
1616 Beverly Blvd.
P.O. Box 26907
Los Angeles, California 90016-9938