1    Timothy M. Thornton
     Goldberg, Scott, Belfield & Cohen
2    A Professional Corporation
     12424 Wilshire Boulevard, Suite 1200
3    Los Angeles, California  90025
     (310) 207-7400
4

5    Jack R. Luellen
     Brega & Winters P.C.
     One Northwest Center
6    1700 Lincoln Street, Suite 2222
     Denver, Colorado  80203
7    (303) 866-9400

8    James E. Blancarte
     Law Offices Of James E. Blancarte
9    1875 Century Park East, Suite 700
     Los Angeles, California  90067
10   (310) 788-2760

11   Attorneys for Defendant
     Ruben Zuno Arce

12

FILED
CLERK, U.S. DISTRICT COURT

JUN - 1 1998

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

4:00 PM

13

14            UNITED STATES DISTRICT COURT

15          CENTRAL DISTRICT OF CALIFORNIA

16

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. CR-87-422(G)-ER |
|        Plaintiff-Respondent, ) | [§2255 Case No. CV-98-2930-ER] |
|       vs. ) | EXHIBITS IN SUPPORT OF COMPREHENSIVE REPLY TO ALL GOVERNMENT OPPOSITIONS FILED IN CONNECTION WITH DEFENDANT-PETITIONER'S MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255 |
| RUBEN ZUNO ARCE, ) | |
|      Defendant-Petitioner. ) | |
| ) | |
| ) | |
| ) | Date:  To be scheduled |
| ) | Time:  To be scheduled |
| _____ ) | Place:  Courtroom 1 |

ENTER ON ___

JUN 2 1998

2251

**TABLE OF EXHIBITS**

The following exhibits are submitted in support of defendant-petitioner Ruben Zuno Arce's comprehensive reply to all government oppositions filed in connection with his motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255:

A.  Tulsky, "Evidence Casts Doubt On Camarena Case Trials", *Los Angeles Times* (October 26, 1997)

B.  Docket, *United States v. Kojayan*, Case No. CR-91-00622-ER

C.  Curriden, "Secret Threat To Justice", *The National Law Journal* (February 20, 1995)

D.  Mexican Warrant For The Arrest Of Rene Lopez Romero For His Involvement In The Murder Of Special Agent Camarena

E.  Agreement Between The United States Government And Rene Lopez Romero

F.  Tulsky, "Allegation Was Excised In Camarena Case", *Los Angeles Times* (October 29, 1997)

G.  Tulsky, "U.S. Drops 1989 Murder Charges Against Mexican Drug Trafficker", *Los Angeles Times* (December 16, 1997)

Dated: June 1, 1998

Respectfully submitted,

Timothy M. Thornton
Goldberg, Scott, Belfield & Cohen
A Professional Corporation

Jack R. Luellen
Brega & Winters P.C.

James E. Blancarte
Law Offices Of James E. Blancarte

By_____
Timothy M. Thornton

Attorneys for Defendant
Ruben Zuno Arce

2

# EXHIBIT A



Sunday, October 26, 1997

## Evidence Casts Doubt on Camarena Case Trials

■Drugs: Probe suggests perjury helped convict three in DEA agent's murder. U.S. lawyer confident of staff integrity.

*By FREDRIC N. TULSKY, Times Staff Writer*

PREV STORY

NEXT STORY

Twelve years after a U.S. drug agent was kidnapped, tortured and murdered in Mexico, evidence has emerged that federal prosecutors relied on perjured testimony and false information, casting a cloud over the convictions of three men now serving life sentences.

The evidence suggests that the U.S. government, in its zeal to solve the heinous killing of Enrique Camarena, induced corrupt former Mexican police to implicate top officials there in a conspiracy to plan his kidnapping.

Their statements not only were critical to winning convictions against the three, including the brother-in-law of a former president, they also have tarnished the reputations of Mexican political figures and strained relations between the two countries.

Attorneys for one of the implicated officials developed new information that prompted The Times to undertake its own examination of the Camarena case four months ago. Results of that inquiry raise questions about the integrity of the Drug Enforcement Administration investigation and prosecutions in Los Angeles:

* A star prosecution witness says he perjured himself after U.S. law enforcement officials coached him into falsely accusing the three defendants and Mexican officials of plotting the kidnapping.

* Portions of the testimony by key witnesses appear false. For example, two witnesses said the kidnapping was plotted in a Guadalajara hotel suite, but a recent visit to the hotel indicates no such suite exists.

* Key informants received more financial and legal help than the jury was told about. Some informants were provided final lump-sum payments of thousands of dollars after the trial had ended. And records show that a DEA agent helped another witness escape prosecution on felony charges of spousal abuse.

* The DEA operative who helped investigate Camarena's murder and bring witnesses to this country says some members of the prosecution team were so eager to build their case that they ignored warnings that certain witness statements were suspect.

John Gavin, the former U.S. ambassador to Mexico who oversaw the early Camarena investigation, has come to believe that witnesses falsely implicated an ally of his in the drug wars, who held a top government post.

"My record in the war against illegal drugs and the corruption they engender is known," Gavin said. "In this instance, however, I am saddened and embarrassed to note that it is officials within the U.S. Justice Department who are dead wrong. It is another example of how drugs corrupt on both sides of the border."

Based on the allegations, the DEA recently launched an internal investigation into the Camarena probe, which was officially closed in 1995. Deputy Director James Milford said the agency could not comment about any aspect of the case until the review is completed.

Officials at the U.S. attorney's office in Los Angeles said that whatever new evidence has developed will be thoroughly reviewed.

Chief Assistant U.S. Atty. Richard E. Drooyan said his office is constrained from discussing details of the case because they are likely to become issues in court.

Expressing "great confidence" in the "integrity and judgment" of the trial prosecutors, he said they would never knowingly encourage perjury and would have taken steps to ensure that all testimony was truthful.

Attorneys for the convicted men said they are preparing to seek retrials based on the new evidence.

The revelations mark the latest chapter in one of the most far-reaching murder investigations in U.S. history. From the start, it has provoked strong emotions, both for agents who wanted justice for a slain colleague and for Mexican officials who felt the integrity of their government was under attack.

At issue now is testimony that "Kiki" Camarena's abduction was planned at meetings attended by drug traffickers, corrupt police and high-ranking Mexican officials. Among the alleged conspirators was former Government Minister Manuel Bartlett Diaz, who held a post second only to the president. He and other officials also allegedly were present when Camarena was tortured in a drug lord's home.

At the ex-ambassador's urging, Bartlett hired former U.S. Justice Department attorney Michael Lightfoot, who has worked for three years to clear his client's name. "This is a matter of honor," said Bartlett, now governor of Puebla state. "There is no truth to these allegations. They are scandalous. They are absurd."

When the star witness came forward this summer and alleged that U.S. authorities encouraged him to lie, Lightfoot arranged a polygraph examination, which reports say the witness passed. To further test his credibility, the attorney set up a meeting between the witness and Terrence Burke, a 20-year DEA veteran who briefly headed the agency during the Camarena case.

"Based on my interview with him and my attempt to identify what his motive was, I concluded that these

allegations are extremely serious, and they appear to be credible," Burke said. "They require a thorough investigation."

The Feb. 7, 1985, abduction of Camarena stirred intense passion among U.S. officials. The 37-year-old agent was walking to his car near the U.S. Consulate in Guadalajara when men grabbed him in broad daylight. Then, testimony showed, he was driven to a drug lord's home, where he was interrogated about DEA activities, tortured with burning cigarettes and beaten to death.

The outrage was heightened because the DEA concluded that Mexican police were withholding evidence and actively helping the traffickers who killed Camarena. Such concerns caused the U.S. to embark on its own investigation.

Mexico eventually convicted more than two dozen people, including drug lords Ernesto Fonseca Carrillo and Rafael Caro Quintero, who now are serving 40-year sentences. Three U.S. trials between 1988 and 1992 resulted in convictions of six men in connection with Camarena's death.

Although Bartlett has not been charged, his attorney has been urging the government to clear him based on the new information.

The Times independently reexamined that evidence and developed additional information as well. Dozens of interviews were conducted in Mexico and the United States, and more than 30,000 pages of internal DEA reports, court records and other documents were studied.

The reexamination demonstrated the difficulty in establishing who is telling the truth. But what emerged is the story of a complex case built largely on the word of several paid informants with unsavory backgrounds, questionable credibility and much to gain from cooperating.

**The DEA Operative**

DEA agents had long suspected that Camarena's kidnapping involved top officials of the Mexican government. But, records and interviews show, evidence of a broad conspiracy did not develop until after the first U.S. trial when Antonio Garate Bustamante joined the 10-member DEA team assigned to the case in Los Angeles.

Garate, 61, a former Mexican police commander with ties to drug cartel members, said he knew people who were privy to what had happened to Camarena. Soon the investigation focused on prominent Mexicans, including Bartlett and Ruben Zuno Arce, the brother-in-law of Luis Echeverria, who was president of Mexico in the early 1970s.

Bartlett oversaw an agency that employed several corrupt police officers implicated in the Camarena case. And Zuno, a wealthy businessman and rancher, once owned the house where the DEA agent was tortured.

Garate said he had his own reasons to distrust both men: He believed that Bartlett was behind the murder of a journalist and that Zuno was behind the slaying of two police officers years earlier. And he said he once saw the drug lord Caro Quintero--a diamond-studded pistol on his hip--dismount a

dancing horse and embrace Zuno during a party.

While Zuno was in the U.S. on business in August 1986, DEA agents surrounded him, told him he was needed as a grand jury witness and whisked him to Los Angeles.

Zuno was asked the question that would deepen his troubles: Did he know Caro Quintero?

"I don't think that I ever met him," he responded.

Zuno would be indicted for perjury after a man known as Lawrence Victor Harrison told the grand jury that he too had seen the drug lord dismount the horse and hug Zuno.

There were reasons to question Harrison's reliability: The mysterious 6-foot-8 DEA informant had used several names and birth dates. By his own account, he also practiced law without a license for several years before developing radio communications systems, first for Garate and then for drug lords.

After Zuno was released on bail, he went home to Mexico. Then, as he returned to the U.S. for trial three months later, the businessman was arrested again. This time, the charge was murder.

### The Star Witness

A crucial new informant had come to the DEA. He was Hector Cervantes Santos, who worked for one of the drug barons as a sort of butler-with-bullets. It was his job to guard the house, admit visitors and make sure a pet lion got fed.

In 1989, Cervantes contacted Garate, his former boss on the state police riot squad, and agreed to cooperate with the Camarena probe. Soon he became the key witness against Zuno and two other men.

His testimony depicted Zuno as a Guadalajara drug cartel member who conspired with drug lords to kill Camarena and later was notified by telephone that the DEA agent was dead.

To attack the witness' credibility, defense attorneys produced phone company statements that there was no service in the neighborhood where the call allegedly was made.

But the jury was not persuaded. Zuno and two other defendants were convicted of conspiracy based on Cervantes' testimony.

One was Juan Bernabe Ramirez, a bodyguard for a drug trafficker. Bernabe was sentenced to life after Cervantes placed him at one planning meeting; he received two 10-year concurrent sentences based on other testimony.

Also sentenced to life was Honduran drug kingpin Juan Ramon Matta Ballesteros, who also received life for a separate drug conviction. Cervantes quoted him as saying during a planning meeting: "A closed mouth catches no flies." In addition, the prosecution alleged that hair consistent with Matta's was found at the Camarena murder scene and that agents saw him leave Guadalajara a few days after the killing.

Cervantes' explosive allegations went beyond the defendants, implicating the heads of the Mexico City Police Department, Interpol and the country's anti-drug agency, as well as the police commander initially responsible for solving

Camarena's murder.

Although he stopped short of naming Bartlett as a conspirator, the witness quoted another Mexican official as saying DEA operations were "causing trouble for Bartlett Diaz--a stop should be put to the trouble."

While the drug dealers began serving life terms, the judge threw out Zuno's conviction, ruling that Assistant U.S. Atty. Manuel Medrano had mischaracterized evidence against him during closing arguments.

### An Accuser Recants

In a startling twist, the DEA informant came forward this June to charge that his testimony was a lie devised by the prosecution. Medrano and the chief investigator wanted him to implicate Zuno and Bartlett in a conspiracy with drug dealers, he said in interviews with The Times and in a sworn declaration for Bartlett's attorney.

Cervantes, 37, said he told investigator Hector Berrellez "that I had never seen either Zuno or Bartlett in person in my life."

"Berrellez repeated that I had to have seen them, but I just didn't remember. They told me that they would give me a few days so that I could remember."

Cervantes said that the investigator and prosecutor wrote a script for him to follow at trial and that Medrano jokingly told him to sleep with a photograph of Zuno under his pillow "so that I would not forget his face."

In interviews with The Times, Cervantes said he also had falsely implicated Zuno's co-defendants, Matta and Bernabe, at the instructions of the U.S. government.

Medrano, now a television reporter, said last week that what Cervantes described never happened: "The allegation is absolutely false." The investigation, he said, "was conducted in an ethical and professional manner. I am absolutely fully confident of that. If [the allegation] is a subject of any motion, I am confident a judge will find the allegation incredible."

Berrellez, who is now retired, said through a DEA spokesman that he did not wish to comment.

Cervantes also said he lied when he testified that he was receiving only $3,000 a month, plus expenses, from the government.

As a reward for his cooperation, Cervantes said, he and his family actually were paid more than $500,000 over six years.

In addition to $6,000 monthly payments, he said the government promised $200,000 upon completion of the trial. But he said Medrano told him not to reveal that unusual arrangement if asked by defense attorneys.

One reason he recently came forward, Cervantes said, is that he received only half of his final payment.

Medrano denied promising Cervantes in advance that he would get a final payment or telling him to withhold any details of his government remuneration from the jury.

Medrano's co-counsel, Assistant U.S. Atty. John Carlton, said witnesses were promised monthly payments for an

indefinite period and received lump sums in 1995 when the monthly support ended. But he said he is not aware of any witnesses who were promised the final payments in advance.

Not everything Cervantes says squares with the defense case. Cervantes now denies knowing a defense witness who had testified at trial that they used to deal drugs together.

To test Cervantes' recantation, defense attorneys had him take a polygraph test administered by Edward Gelb, a former Los Angeles Police Department lieutenant who has taught an FBI polygraph course.

Gelb asked whether Cervantes had seen Zuno with drug dealers, whether he had seen Bartlett with drug dealers, and whether the prosecutor and investigator encouraged him to falsely implicate the two men. He concluded that Cervantes showed no deception in his answers.

Chances are remote, Gelb said, that Cervantes could have beaten the test three times. "I am as confident as the scores indicate," he said.

Former DEA chief Burke, who spent hours talking to Cervantes, said the recantation is troublesome whether he is telling the truth now or not. It raises questions, he said, about whether the prosecution should have relied so heavily upon him.

**New Trial, New Witness**

Three new witnesses had surfaced by the time Zuno was retried in December 1992. Like Cervantes, they were former Mexican policemen who had worked as bodyguards for drug lords before becoming paid DEA informants.

But they implicated even more government officials as well as a Guadalajara gynecologist who was arrested after Garate directed a DEA-funded team to abduct him and bring him to the U.S.

When Dr. Humberto Alvarez Machain and Zuno went on trial together, the government did not call Cervantes or another informant.

But one who did testify was Rene Lopez Romero. He was wanted by Mexico, court records show, and had admitted helping kidnap Camarena and being present during his torture. He also had admitted being present when four Jehovah's Witnesses, who made the mistake of knocking on a drug lord's door, were tortured and shot to death.

It is unclear how and why Lopez became a witness rather than a defendant. The chief investigator, DEA agent Berrellez, had once assured grand jurors he took steps to ensure that witnesses had not themselves been involved in Camarena's abduction.

Berrellez later helped arrange Lopez's immunity in all five murders, plus tens of thousands of dollars in government support.

Records show that the agent also came to his assistance when Lopez was charged with wife beating: Days before Zuno's 1992 trial, Lopez was released without bail after Berrellez intervened. Later prosecutors dropped the abuse

charges altogether after the agent wrote them seeking their help in "Mr. Lopez's current situation."

Another new government witness was Jorge Godoy Lopez, who had spent 28 months in Mexican jail for his involvement in Fonseca's drug ring.

Although Godoy was not present during Camarena's kidnapping, records show he has offered various versions about what he did know: Originally, he did not mention Zuno or Bartlett when he told Mexican authorities the names of the conspirators. Later, he recanted his allegations, saying he was a mere rug cleaner, not a bodyguard.

Finally, he contended that Zuno and Bartlett attended several meetings with drug traffickers, the defense minister, an army general and others.

The first, the witnesses said, unfolded in the fall of 1984 at Las Americas Hotel in Guadalajara. In a suite stocked with cocaine-laced cigarettes, the dealers allegedly complained about losing too many marijuana fields to the DEA. And Zuno, according to Godoy, suggested that the agent who was responsible should be kidnapped and killed, if he could not be bought.

Several months later Camarena was tortured inside a walled Spanish-style compound in Guadalajara. Lopez testified that he saw gynecologist Alvarez washing out syringes in the kitchen area and drug lords meeting for four hours with Zuno and 21 officials--including Bartlett--elsewhere in the house.

Once again Zuno was convicted. But the judge ruled that the case against Alvarez was speculative and dismissed charges against the doctor, who is now suing the DEA and those who abducted him in Mexico.

The trial brought condemnation from the Mexican attorney general, who said the U.S. had acted "irresponsibly and immorally" in building false accusations through offers of money, immunity and protection to unreliable witnesses.

Zuno, 67, interviewed at a prison in Texas where he is serving a life sentence, insisted that he was not connected to the Guadalajara drug dealers and was wrongly convicted. "I do not want a pardon," he said. "I want justice."

### Evidence Contradicted

The recent reexaminations by Bartlett's attorney and The Times cast doubt on some portions of the informant testimony, including accounts that numerous people had gathered in a suite at Las Americas Hotel.

Godoy described it as a first-floor suite with two bedrooms, a living room, reception area, bar and patios. But the manager recently permitted a reporter to see the largest first-floor rooms, and none fit that description.

In addition, Bartlett maintains that he was not in Guadalajara at all in late 1984 or early 1985 when witnesses said the conspirators met. He insists he was attending meetings in Mexico City, about 300 miles away, the entire day that Camarena was tortured--an assertion supported by Mexican officials.

Prosecutors said that they had made every effort to corroborate the testimony of witnesses but that they were unable to obtain many records readily available in the United States, such as credit card receipts.

Medrano said it was a "very difficult prosecution under very difficult circumstances, with very little assistance from the Mexican government."

Since the trial, Bartlett's two accusers have purchased new tract homes in Southern California. Contacted recently, Lopez declined to talk, and Godoy did not respond to messages left at his home.

Now Garate, the key DEA operative, expresses concerns that the agency was too quick to believe whatever they said. DEA officials, he said, chastised him for aggressively challenging potential witnesses.

During hours of interviews, Garate stopped short of contending that Bartlett and Zuno are innocent. But he identified several portions of testimony that he said are not credible. When he raised concerns, said Garate, DEA agents challenged him: "How do you know? Were you there?"

Former Ambassador Gavin is convinced that Bartlett and other high officials never attended meetings to plan the kidnapping or interrogation. "That high government officials, members of the president's Cabinet, would attend a torture session of an American agent in a drug baron's house at a moment's notice hundreds of miles from Mexico City is preposterous on its face," said Gavin, who served from 1983 through 1986.

The most recent U.S. ambassador, James Jones, said he had asked DEA agents assigned to the embassy in Mexico to assess testimony that Bartlett attended the torture session. "They advised me they did not believe it," he said.

Bartlett attorney Lightfoot wrote to a top Los Angeles prosecutor last year, complaining that the government's 10-year investigation "produced not one conviction of any of the actual kidnappers or masterminds of the plot."

Instead of prosecuting the one person in U.S. custody who admitted a role, Lightfoot wrote, officials gave him immunity and used him to provide testimony that served only "to ruin the reputation of Gov. Bartlett."

* * *

### The Camarena Murder Case

After U.S. drug agent Enrique "Kiki" Camarena was kidnapped and murdered in Guadalajara, the Mexican government successfully prosecuted drug lords Ernesto Fonseca Carrillo and Rafael Caro Quintero and numerous others. But the U.S. government, fearing corruption in Mexico's judicial system, had embarked on a parallel probe. The following chronicles the investigations and aftermath:

February 1985--Camarena is kidnapped near the U.S. consulate in Guadalajara, along with his pilot, and tortured and killed.

November 1987--The first U.S. indictments are issued in Los Angeles.

December 1989--In Mexico, Caro Quintero and 20 others are convicted. In the United States, Ruben Zuno Arce, former owner of the house where Camarena was tortured, is charged with murder.

August 1990--Based largely on testimony from Hector Cervantes, Zuno is convicted of murder along with Honduran drug trafficker Juan Ramon Matta-Ballasteros and Juan Bernabe Ramirez, bodyguard for drug lord Fonseca Carrillo. Zuno's codefendants get life sentences.

May 1991--Zuno's conviction is overturned because of prosecutorial error, and a retrial is ordered.

August 1991-September 1992--Three new witnesses--all former Mexican policemen--come forward, alleging that Zuno, former interior secretary Manuel Bartlett Diaz and others were present for meetings regarding the murder. One of the witnesses himself had participated in Camarena's abduction.

December 1992--Zuno is retried, but charges are dismissed against his codefendant, Humberto Alvarez Machain, a Guadalajara gynecologist who was abducted by the DEA in Mexico and brought to the United States. Zuno is convicted and later sentenced to life in prison.

October 1997--The DEA is investigating allegations that the prosecutions were marred by perjury and false information from paid informants with serious credibility problems. Defense attorneys plan to challenge the conviction.

\* \* \*

### A Witness Recants

Hector Cervantes Santos, a drug dealer's butler and security guard, came forward this summer and recanted his testimony against defendants in the 1985 murder of U.S. drug agent Enrique Camarena. In this portion of his sworn declaration, he accuses a prosecutor, Manuel Medrano, and the chief investigator, Hector Berrellez, of coaching him to falsely implicate Mexican businessman Ruben Zuno Arce and Mexican politician Manuel Bartlett Diaz in the murder conspiracy. Medrano has denied the allegations and Berrellez could not be reached.

\* \* \*

### Key Players

THE VICTIMS: Enrique "Kiki" Camarena, agent of the Drug Enforcement Agency, and his pilot, Alfred Zavalla

THE DRUG DEALERS: Rafael Caro Quintero and Ernesto Fonseca Carrillo, who allegedly plotted the murder with others.

THE CHIEF INVESTIGATOR: Hector Berrellez, a 17-year DEA veteran who was decorated for heroism

THE PROSECUTOR: As co-counsel, Assistant U.S. Atty.

Manny Medrano, now a television reporter, worked closely with key witnesses.

THE DEA OPERATIVE: Antonio Garate Bustamante, who retrieved witnesses from Mexico and now believes the government ignored danger signals in building its case.

THE WITNESS: Hector Cervantes, who has recanted testimony that politicians, police and others plotted with drug lords to kill Camarena.

OTHER WITNESSES: Rene Lopez Romero and Jorge Godoy Lopez, policemen turned bodyguards for drug dealers, who testified that planning meetings preceded the Camarena kidnapping.

THE POLITICIAN: Manuel Bartlett Diaz, once a rising political star in Mexico and now governor of Puebla, who says his name was heavily damaged by an irresponsible U.S. prosecution.

THE CRITICS: Terrence Berke, former DEA chief who says his own agency's investigation went seriously awry and alleged perjury should be examined. John Gavin, former U.S. ambassador who said the allegations against Bartlett Diaz are absurd, casting doubt on the rest of the government's case.

Search the archives of the Los Angeles Times for similar stories. You will not be charged to look for stories, only to retrieve one.

Copyright Los Angeles Times

PREV STORY

NEXT STORY

| News | GO | Site Index | GO |
|------|----|-----------|----|

EXHIBIT B

## CourtLink Details for ** Case: 2:91cr00622 **

Date Printed: 5/31/1998 2:26:35 PM
Court: Federal District Court -- Central (Criminal) District of California (Western Div.)
Case: USA v. Kalfayan, et al
Judge: Judge Edward Rafeedie
Filed On: 07/12/91
Note: Dkt# in other court: None

### Summary

Search Name:      Kojayan
Case Updated:     03/10/94

### Names

| Litigant | Litigant's Attorney |
|---|---|

HRATCH KALFAYAN (1)
defendant

CHAKE KOJAYAN (2)
defendant

U. S. Attorneys:

NONE

### Docket

| Sub # | Date | Description |
|---|---|---|
| | | Docket as of September 6, 1995 10:37 pm |
| -- | 4/16/92 | Case transfer frm Dec-10, please refer to micro-fiche frm previous dkt sheet as to Hratch Kalfayan. (rm) [Entry date 07/14/92] |
| 90 | 4/17/92 | As of 2-6-92 the above named dft in cust at FCI Seagoville. I certify that the info stated above was obtained and verified via telephone w/the following bop official Paul Juster on 4-17-92 paper work was processed by Maria Corrales as to Hratch Kalfayan (rm) [Entry date 07/14/92] |
| 1 | 4/27/92 | Recvd receipt for cert mail re reconveyance of property. date of delivery 6-4-92, Ltr previously mailed out by admin office to prop owner for full reconveyance. Property owner Karnig and Josephine Kalfayan property address 8317 Reading ave. as to Hratch Kalfayan (rm) [Entry date 06/23/92] |
| 91 | 6/29/92 | Lodged ord from 9th CCA appellee's motn for le to file the answering brief late is granted. Appellee's brief, already received, is ord fld The reply brief is ord fld Appellant shall monitor the issuance of the cert of record. (rm) [Entry date 07/14/92] |
| -- | 10/5/92 | RECORD on Appeal forwarded to 9th CCA 3 volumes orig clerks file, FWD to 9th CCA 8 volumes C/R transcripts, exhs: 1 brown exhib folder. (rm) [Entry date 10/06/92] |
| 92 | 11/30/93 | Govt's EX PARTE Application for the rel of trial exhs. Lodged Ord. (lj) [Entry date 12/01/93] |

| Sub # | Date | Description |
|-------|------|-------------|
| 93 | 11/30/93 | NOTICE of fil and spread of jgm of Crt of Appeals as to Hratch Kalfayan, Chake Kojayan, USA set 12/20/93 at 1:30 pm before Judge Rafeedie. It will be necessary for the dft adn all cnsl to be present at that date and time. (lj) [Entry date 12/02/93] |
| 94 | 12/8/93 | ORDER by Judge Edward Rafeedie granting pltf's ex parte applic [92-1] for order as to Hratch Kalfayan, Chake Kojayan --- It is ORD that the Clerk's Office shall rel cust of all exhs marked in the trial in the above-entitled matter to the U S Atty's Office for the purpose of permit the U S Atty's Off to prepare exhs for trial in the case of U S v. Hratch Kazandjian, CR 93-=916-WJR. It is also ORD that the U S Atty's Office shall preserve the current condition of the exhs and that any new exh tabs shall be stapled or otherwise placed over the ucrrest exh tabs in a manner which preserve the current exh tabs. IT IS SO ORD. (cc: all counsel) (lj) [Entry date 12/09/93] |
| 98 | 12/9/93 | Receipt for permanent rel of exhs - to AUSA Brenda K Sannes - Med govt's blow-up charts rel along w/ 1 brownfolder of govt' exhs - as to Hratch Kalfayan, Chake Kojayan, (lj) [Entry date 12/14/93] |
| 95 | 12/10/93 | EX PARTE Application by defendant Chake Kojayan for authorization to obtain investigative services. Lodged Ord. (lj) [Entry date 12/13/93] |
| 96 | 12/10/93 | NOTICE of fil under seal by defendant Chake Kojayan (lj) [Entry date 12/13/93] |
| -- | 12/10/93 | RECORD on Appeal returned from 9th CCA 3 volumes original clerks file, 9 volumes C/R transcripts, exhibits returned: n (lj) [Entry date 12/15/93] |
| 99 | 12/15/93 | ORDER by Judge Edward Rafeedie DENYING dft Kojayan's ex parte applic of auth services of a investigator int he amnt not to exceed $3,000 [95-1] for order as to Chake Kojayan (cc: all counsel) (lj) [Entry date 12/16/93] |
| 100 | 12/16/93 | Status conf rpt for fil and spreading by defendant Chake Kojayan (lj) [Entry date 12/20/93] |
| 101 | 12/20/93 | MINUTES: Status hearing held filing and spreading mandate of the 9th cir crt of appeals in crt. The crt ords that the mandate of the 9th cirt crt of appeals vacating and remanding. Crt and cnsl confer. Dft to file and serve motn to dismiss nlt 1-27-94; response due 2-10-94, reply due 2-17-94 and status hearing cont to 2/28/94 at 10:00 a.m. re motn C/R: Edith Schwartz by Judge Rafeedie (rm) [Entry date 12/28/93] |
| 102 | 12/20/93 | CERTIFIED Copy of judgment from USCA this cause came on to be heard on the transc of the record frm the U.S. Dist Crt for the CDC, L.A. and was duly submitted. It is ord and adjudged by this Crt, that the judgment of the said Dist Crt in this cause be, and hereby is vacated ad remanded. (cc: all counsel) (rm) [Entry date 12/28/93] |
| 103 | 1/25/94 | Dft Kojayan's stip to cont filing dates for dft's mot to dism. Lodged ord (mei) [Entry date 01/27/94] |

CourtLink Details for ** Case: 2:91cr00622 **                                                              Page 3

| Sub # | Date | Description |
|---|---|---|
| 104 | 1/31/94 | Dft's notc of mot and MOTION to dism the indict w/ prej purs to this crt's supervisory powers by Chake Kojayan, returnable on 02/28/94 at 10:00 am (mei) [Entry date 02/02/94] |
| 105 | 2/2/94 | Dft's re-notc and addendum to dft's mot to dism the indict w/ prejudice as to Chake Kojayan (mei) [Entry date 02/07/94] |
| 106 | 2/15/94 | Govt's EX PARTE Application lv to fil overside brief and leave to fil late brief as to dft Kojayan. Lodged Ord.l (lj) [Entry date 02/17/94] |
| 107 | 2/22/94 | REPLY by dft Chake Kojayan to govt's opp to her mot to dism the indict w/prej purs to this crt's supv powers and for outrageous govt misconduct; decl of Ronald J. Nessim (mc) [Entry date 02/23/94] |
| 108 | 2/25/94 | NOTICE of Joinder by dft Hratch Kalfayan joining mot to dism the indict w/prej purs to this crt's supervisory powers by Chake Kojayan, [104-1] (mc) [Entry date 02/25/94] |
| 109 | 2/28/94 | MINUTES:  before Judge Edward Rafeedie  granting  motion to dism the indict w/ prej  by Chake Kojayan, [104-1]  - The Crt having read and considered all pleadings submitted and having heard stmnt of cnsl, mot dft Chake Kojayan to dism the indict w/ prej and joinder of co-dft Hratch Kalfayan is GR as to each dft.  Dft Kojayan's airline ticket and passport which were marked as exhs during trial, shall be returned to the dft. Each dft is ord discharged.  See release #'s 2822/3. dismissing counts as to Hratch Kalfayan and Chake Kojayan (cc: all counsel) (lj) [Entry date 03/07/94] |
| 110 | 3/9/94 | Judgment of Discharge by Judge Edward Rafeedie the Crt has gr mot dft to dism the indict w/ prej and joinder of co-dft Kalfayan as to Hratch Kalfayan, bond exonerated as to Hratch Kalfayan - no bond posted. (ENT 3/10/94) (cc: all counsel) (lj) [Entry date 03/10/94] |
| 111 | 3/9/94 | Judgment of discharge by Judge Edward Rafeedie for the Crt has GR mot dft to dism the indict w/ prej and joinder of co-dft Kalfayan as to dft Chake Kojayan, bond exonerated as to Chake Kojayan - no bond posted. (ENT 3/10/94) (cc: all counsel) (lj) [Entry date 03/10/94] |

*** End of Docket ***

## Complaints

| Complaint | Disposition of Complaint |
|---|---|

HRATCH KALFAYAN (1)
defendant

Pending Counts:

NONE

Terminated Counts:

NONE

CourtLink Details for ** Case: 2:91cr00622 **                                                        Page 4

| Complaint | Disposition of Complaint |
|---|---|

Complaints:

NONE


CHAKE KOJAYAN (2)
defendant

Pending Counts:

NONE

Terminated Counts:

NONE

Complaints:

NONE

EXHIBIT C

# THE NATIONAL
# LAW JOURNAL

© 1995 THE NEW YORK LAW PUBLISHING COMPANY

*The Weekly Newspaper for the Profession*

PRICE $3.00 • MONDAY, FEBRUARY 20, 199



**NLJ SPECIAL REPORT**

**Invented Informant**

Boston Police Detective Carlos Luna is sentenced for perjury after his lies on a warrant [...] partner' death.

# Secret Threat to Justice

### There are few controls over the hidden alliance of agents and informers.

**BY MARK CURRIDEN**
SPECIAL TO THE NATIONAL LAW JOURNAL

PICTURE A SOCIETY where the government employs thousands of its citizens to inform on their friends, family members and business associates; where tens of millions of dollars in government funds are spent annually paying those who inform; where police obtain warrants to search and seize private property based on reports from hidden sources; where the only way to win early release from prison is to tell stories about others.

Welcome to the United States, 1995.

Today's criminal justice system is addicted to informants. Some have made headlines lately, such as Michael Fitzpatrick, the longtime informant at the heart of the alleged plot by Malcolm X's daughter to assassinate Louis Farrakhan, and Emad Salem, the main witness in the terrorist conspiracy trial in New



**THE INFORMANT TRAP**

First in a series

York, who prosecutors sa was paid more than $1 millio for his help.

But the big cases, in whic the methods and reliability c informants are receiving sus tained scrutiny, are the oddi ties in a system in which much is secret.

Throughout the country, law enforce ment's reliance on informants has grow to almost Orwellian proportions, a snitches exert growing control ove agents and judges fail to impose an checks or balances.

A nine-month investigation by Th

[SEE 'SNITCH' PAGE A28]

# Few Checks on a Shadowy Alliance

## Federal Payments to Informants

*Amounts in millions of dollars. Total amount includes figures from the Bureau of Alcohol, Tobacco and Firearms, U.S. Customs Service, Drug Enforcement Administration, Federal Bureau of Investigation, Immigration and Naturalization Service, Internal Revenue Service, U.S. Marshals Service and Secret Service.*



xx ATF
/// Customs
DEA
FBI
IRS
Total

\$100 \$90 \$80 \$70 \$60 \$50 \$40 \$30 \$20 \$10 \$0

1985 1988 1989 1990 1991 1992 1993

*Sources: Department of Justice, U.S. House Judiciary Subcommittee on Crime and Criminal Justice, the individual agencies.*

[SNITCH FROM PAGE A1]

National Law Journal has found that abuses by informants and law enforcement threaten the rights and the safety of innocent people, as well as the integrity of the courts.

The war on drugs is the engine driving this development. New forfeiture laws have made drug busts a law enforcement prize generating lots of cash both to pay informants and to increase their own operating budgets. Even more important, perhaps, mandatory sentencing laws and crushing prison terms adopted in the 1980s have created powerful incentives for criminals to go to any lengths to avoid jail.

The chief of the Criminal Division in the Reagan Justice Department, now a judge on the 9th U.S. Circuit Court of Appeals, offers this chilling warning in lectures to federal prosecutors:

"Criminals are likely to say and do almost anything to get what they want, especially when what they want is to get out of trouble with the law," Judge Stephen S. Trott says. "This willingness to do anything includes not only truthfully spilling the beans on friends and relatives, but also lying, committing perjury, manufacturing evidence, soliciting others to corroborate their lies with more lies and double-crossing anyone with whom they

come into contact, including—and especially—the prosecutor."

Along with instances of abuse by out-of-control informants and the agents who rely on them, the NLJ has found that existing rules for controlling the use of informants are often flouted. In today's practice, there is almost no independent judicial oversight of the symbiotic relationship between agents and their highly paid snitches. And when the details of these shadowy alliances do come to light, it is usually because something has gone horribly, fatally wrong.

Among the NLJ's findings are these:

■ Between 1980 and 1993, the number of federal search warrants relying exclusively on an unidentified snitch nearly tripled, from 24 percent to 71 percent, according to the NLJ's examination of 1,212 warrants in four selected cities.

■ Cash paid to informants has exploded. Government records disclosed to the NLJ show that in 1985, federal agents paid snitches \$25 million; by 1993, that figure had climbed to \$97 million.

■ Other bankrolls, such as the 25 percent slice of forfeitures available for payment as a bounty to informants, are harder to measure, but by some esti-

[SEE 'SNITCH' PAGE A30]

■ Reckless informants threaten cities, citizens' rights. Pg. 12 Phony evidence puts postal inspectors in the spotlight. Pg. 8 A drug raid gone wrong highlights ideas for reforms.

THE INFORMANT TRAP

# Informants, Investigators Depend on Each Other

[SNITCH FROM PAGE A25]

mates they amount to millions. And all state and local law enforcement agencies have separate budgets to reward their informants as well.

■ Interviews with more than 50 judges and magistrates in Alabama, Georgia and Tennessee found that none ever had required a law enforcement officer to produce an informant.

The apparent consequences?

■ In Boston, a narcotics detective was fatally shot during a "no-knock" search inspired by allegations in a warrant from a snitch his partner had invented.

■ An unreleased report by the Drug Enforcement Administration obtained by the NLJ says agents knew before breaking into the house of a San Diego computer executive that the informant they were relying on was lying. The homeowner was shot during a gun battle with Customs and DEA agents.

"The integrity of the criminal justice system is at stake," Judge Trott said in an interview. "There needs to be better control and better supervision of informants, and it should come from law enforcement, and soon. If it doesn't, you can bet Congress or the courts will step in."

## Necessary Evils

The use of snitches by police is not new. Ever since Judas accepted 30 pieces of silver, law enforcement has relied on informers as a means of gathering underworld intelligence.

But while the practice once was reserved for cases involving organized crime, the Ku Klux Klan and major drug rings—in which infiltration by an undercover detective was too risky—today, nearly all drug and vice investigations revolve around the use of informants.

Informants come in two varieties: those who remain confidential and those who agree to testify. The latter commonly are referred to as cooperating witnesses; they often are one-time co-defendants who have  turned on colleagues in return for lesser sentences or other consideration. It is those in the first category—confidential informers who cooperate for money or some other benefit, and who often continue committing crimes while working with law enforcement—whose numbers have soared as the war on crime has intensified.

**Who's Boss?** Ex-agent Celerino Castillo sees informants in control.

"I can't tell you the last time I heard a drug case of any substance in which the government did not have at least one informant," says U.S. District Judge Marvin H. Shoob of Atlanta. "Most of the time, there are two or three informants, and sometimes they are worse criminals than the defendant on trial."

To police and prosecutors, informants are a necessary evil. But defense lawyers—and some in law enforcement—see them as a growing class of criminals who are being given a free ride through the justice system, even receiving payment whether or not their information is accurate.

Yet regulations governing who can be an informant and how informants may operate often are ignored. And most lower-level judges and magistrates—the officers who sign the majority of search warrants—admit they do little to assess the trustworthiness of the informants on whom the affidavit relies.

"The government's informants program is out of control," says Celerino Castillo, a 12-year veteran agent of the Drug Enforcement Administration who retired in 1992. "Let there be no mistake; informers are running today's drug investigations, not the agents. They are paid two or three times as much as the agents, and agents have become so dependent on informers that the agents are at their mercy."

It is, however, a two-way street; informants depend on agents for both freedom and money. Says San Diego criminal defense attorney Eugene G. Iredale, a sole practitioner: "The informants know they've got to produce numbers and make cases for agents, or their source dries up."

## CIs and Warrants

"Problems with informants is an ongoing issue for us," says Mary Jo White, U.S. attorney for the Southern District of New York, whose office is using Mr. Salem to prosecute the alleged conspiracy to bomb several targets in New York. "But the use of informants is essential to intelligence. In many cases, using informants is the only way to proceed."

Other prosecutors clearly agree. The NLJ surveyed search warrants filed in federal courts in Atlanta, Boston, Cleveland and San Diego in 1980, 1988 and 1993, and found law enforcement has grown dependent on anonymous snitches to an alarming degree.

Practically all warrants now rely on information from CIs in some manner. In 1980, 46 percent of the warrants cited an informant's word; in 1993, 92 percent of them did.

More disturbing is a trend toward the use of only one confidential source by agents applying for warrants. Reliance on a single CI has jumped from 24 percent of the warrants in 1980 to 71 percent in 1993.

The danger in using informants comes when innocent people are victimized, often by informants who invent crimes and report them to law enforcement, or worse, by police who fabricate informants to further their investigations.

"The more informants are used, the more potential there is for abuse," says Milwaukee prosecutor E. Michael McCann, the chairman of the American Bar Association's Criminal Justice Section.

In Cleveland, Ohio, more than 30 postal workers were arrested in 1992 and charged with drug trafficking. All were fired and faced long prison terms. Prosecutors eventually discovered the informants used by postal inspectors had fabricated the whole thing. *McKoy v. Marshall*, 1:93 CV 2515 (N.D. Ohio).

■ Since 1988, seven death row inmates in Arkansas, California, Florida, Georgia and Texas have had their convictions reversed, according to the Death Penalty Information Center in Washington, D.C., after it was learned that informants had lied to the jury, or that police officers had pressured snitches to fabricate jailhouse confessions, or that prosecutors had failed to disclose payments to informants.

■ In Malibu, Calif., Los Angeles County sheriff's deputies broke into a millionaire's home in October 1992 in the middle of the night after an informant had told them the homeowner was growing more than 3,000 marijuana plants on his $5 million, 200-acre ranch. Startled by intruders, a sleepy and drunken Donald P. Scott emerged from his bedroom with a pistol in his hand. The agents opened fire and killed the 61-year-old heir to a European chemicals fortune. Despite a thorough search of his estate, no drugs

were found. After an independent investigation, Ventura County District Attorney Michael D. Bradbury reported the next year that the original search was nothing more than "a land grab" by officials hoping to seize and forfeit the estate. "This guy should not be dead," Mr. Bradbury said. (After separate inquiries, the sheriff's office and state attorney general disputed his conclusions, both finding no evidence of misconduct.)

## Informers on the Rise

Experts cite several explanations for the rise in informants.

Federal sentencing guidelines with mandatory minimums are a prime culprit. If agents have enough evidence to charge someone with a crime carrying a 20-year prison sentence, and the only way to remain free is to cooperate, the choice is easy.

Problems arise, however, when career criminals—whom Judge Trott describes as "remarkably manipulative and skillfully devious"—play on investigators' inexperience, laziness or unchecked ambition to generate cases that will get them off the hook.

"No doubt, reliance on informants has replaced good, solid police work like undercover operations and surveillance," says Michael Levine, a DEA and Customs agent for 25 years who retired in 1990 and wrote a memoir called "Deep Cover."

"All of the federal law agencies, and DEA in particular, have been hiring agents out of college with no previous investigative experience. These are people who have never been street-trained on how to deal with informants. That's where the problem is coming from," he says.

Attorneys and some agents argue that another big reason for the proliferation of snitches is simple ambition on the part of investigators.

"Let there be no mistake; the system operates on numbers," Mr. McCann says. "The more cases you make, the faster you get a promotion, and informants are the fastest way for a detective to make lots of cases."

The result, charges Mr. Levine, who worked as a DEA supervisor in New York for several years, is that the informants are able to control the process.

"The federal agents have allowed the informants to take over investigations, and the agents don't make a move without getting approval from their informants," he says. "Our agents as citizens and the United States Constitution have now, in the hands of a group of about 15,000 wild, out-of-control informants. If you get in their way, they will take you down, and the agents are ignorant enough or lazy enough to let them do it."

## Big Money

Some of that laziness may be explained by the recent availability of big money. To fight the war on crime, state and federal governments have dumped billions of dollars into law enforcement.

Through the Freedom of Information Act and other public records requests, the NLJ has obtained data on the amount of money federal law enforcement agencies pay informants. (Although the DEA and the FBI refused to give their budget figures, the Department of Justice and the U.S. House Judiciary Committee supplied statistics for those agencies.)

In 1985, slightly more than $23 million was paid to informers. By last year, that amount had jumped to $97 million. According to the Justice Department, the U.S. Customs Service, with $43 million, has by far the largest budget for informants. The DEA and FBI together spend another $44 million.

## Other Bankrolls

As high as these figures seem, criminal justice experts say these statistics do not come close to telling how much is spent on snitches nationwide.

Several million dollars a year is paid through the federal government's asset forfeiture program, under which a cooperating witness who aids a criminal investigation may be awarded up to 25 percent of the money and property seized in the investigation. The law imposes a cap of $250,000 per case.

Local federal prosecutors and, in some states, judges make the decision to award the money. The Justice Department says it does not keep records on those funds.

"That's where the big money is," says Atlanta criminal defense attorney Steven H. Sadow of Steven H. Sadow P.C. "The informant will get $1,000, $5,000, even $25,000 here and there, but then get the big cash payoff at the end of the case through the asset forfeiture program."

Another fund most departments have is for the purchase of evidence, or "buy money." From 1990 through the end of 1993, the FBI spent more than $16 million and the DEA more than $38 million from this category, according to Justice Department figures.

Messrs. Levine and Castillo say that while these funds are intended for undercover operations conducted by the agents, they frequently are diverted to informants who keep the cash instead of using it to buy drug evidence.

"For every $2 federal law enforcement pays informants, local and state authorities spend another dollar, according to local law enforcement officials in Atlanta, Boston, Cleveland and San Diego, as well as federal officials.

"The thing you must always remember about informants is that they know who is buttering their bread," San Diego's Mr. Iredale says. "I know of cases where informants have made up stories because they thought that's what the government wanted to hear. The informants know the bigger (the) story they tell, the more the government is going to give to them."

"And it leads to one place," adds Mr. Iredale. "Innocent people becoming the target of criminal investigations because of scheming informants." ■

---

## Search Warrant Requests Show Growing Reliance on Informants

*Combined number of federal search warrant applications in Atlanta, Boston, Cleveland and San Diego.*

| | Total warrants | Warrants citing informants | Warrants citing only informants |
|---|---|---|---|

*(Bar chart showing values for 1980, 1988 and 1993, with vertical axis marked 50, 100, 150, 200, 250, 300, 350, 400, 450, 500)*

Source: NLJ research

---

**Wary:** Forfeitures bring the big payoff, says Steven Sadow.

# EXHIBIT D

PODER JUDICIAL DE LA FEDERACION

en Guadalajara, Jalisco, a doce de junio de mil novecientos ochenta y cinco. - - - - - - - - - - - -

- - - Vistos los autos de la causa penal número -- 118/85, para resolver sobre la orden de aprehensión solicitada por el agente del Ministerio Público Fede ral en contra de Miguel Félix Gallardo, José Luis -- Gallardo y José Luis o René López, por el delito de- homicidio calificado y secuestro, previstos y sancio nados por los artículos 302, 309, 315, 316, 318, 319, 320 y 366 fracciones I, II, IV y V del Código Penal- Federal; de Juan Esparragoza Moreno alias "El Azul"- por el delito contra la salud en las modalidades de- siembra, cultivo, cosecha, elaboración, preparación- y acondicionamiento de paquetes de marihuana, pose- sión y tráfico del mismo vegetal, previsto y sanciona do por el artículo 197 fracción I del Código Penal- Federal, así como por el mismo ilícito contra la sa- lud en su variante de aportación de recursos económi cos para la siembra y cultivo de marihuana, que tipi fica el artículo 197 fracción III del Código puniti- vo invocado, de Jorge Luis Caro Quintero, de Fidel - Carrillo, de Mario Medina, de Manuel Alvarez y Da--- niel Acuña Figueroa, por el delito contra la salud - en las modalidades de siembra, cultivo, cosecha, ela boración, preparación y acondicionamiento de paque- tes de marihuana, posesión y tráfico de ese propio - estupefaciente, que sanciona el artículo 197 frac--- ción I de la precitada Ley Federal; de César Martí- nez Market, por el delito contra la salud en la moda lidad de venta de cocaína, previsto y sancionado ---- por el artículo 197 fracción I antes señalado; de -- Jaime Méndez por el delito contra la salud en la mo- dalidad de compra de marihuana, sancionado por el --

artículo ultimamente señalado; y, de Manuel Salas --
por el delito de asociación delictuosa, que contempla
el artículo 164 del Código Penal Federal, y - - - - -

R E S U L T A N D O :

1/o. - Mediante oficio número 17170, de fecha
once de abril de mil novecientos ochenta y cinco, el
Subdirector de Averiguaciones Previas remitió por du
plicado la averiguación previa número 2567/85, al ---
Juez Segundo de Distrito en el Distrito Federal en -
Materia Penal, poniendo a disposición a varios dete-
nidos, y solicitando el libramiento de la orden de -
aprehensión en contra de las personas y por los deli
tos señalados en el preámbulo de esta resolución. --
El citado juez federal al resolver la situación jurí
dica de las personas que le fueron consignadas, les-
decretó auto de formal procesamiento mediante inter-
locutoria de fecha quince de abril de mil novecien-
tos ochenta y cinco, en la cual además declinó su --
competencia para seguir conociendo de dicha causa --
en favor de este Juzgado de Distrito, misma que se -
admitió según determinación de diecisiete de mayo --
del corriente año. Por lo cual ahora se procede a --
resolver sobre la orden de aprehensión solicitada por
el agente del Ministerio Público Federal en contra -
de las personas y por los delitos que se mencionan -
al inicio de esta resolución. - - - - - - - - - - -

2/o. - Obran en el proceso las siguientes prue
bas:

a). - Parte informativo rendido por el Pri-
mer Comandante de la Policía Judicial Federal Floren
tino Ventura Gutiérrez, y por J. Miguel Rodríguez --
Lorrabaquio y Juan Granados Martínez, Primero y Se-
gundo Comandantes de la Policía Judicial Federal, --
respectivamente, en el cual sostienen que con motivo
de las investigaciones realizadas con motivo de los-

- 2 -

secuestros y asesinados del norteamericano Enri---
que Camarena Salazar y del mexicano Alfredo Zavala-
Avelar, hechos ocurridos en la ciudad de Guadalaja-
ra, Jalisco, el día siete de febrero del año en cur
so, procedieron a investigar a personas que fueron
detenidas por estar vinculadas con esos hechos; que
al entrevistar a Ernesto Rafael Fonseca Carrillo, -
reconoció expresamente dedicarse a actos relaciona-
dos con el narcotráfico, y tener relaciones con Ra-
fael Caro Quintero, a quien conoce desde que tenía
quince años, por ser originario del mismo poblado;
que a esta persona le fueron destruidos dos ranchos
con campamentos donde almacenaba y empaquetaba ma-
rihuana en el Estado de Chihuahua, en el municipio -
de Búfalo y Villa Ahumada, en donde perdió miles de
millones de pesos; que por tal motivo acordó con --
Caro Quintero llevar a cabo el secuestro del agente
del DEA Enrique Camarena Salazar, para enterarse de
quien le había puesto el dedo de los ranchos des---
truidos en Chihuahua, así como para enterarse de --
quien es el que les estaba creando problemas en Gua
dalajara; que el día siete de febrero, su lugarte--
niente Samuel Ramírez Razo, René López, Gerardo Ra-
món Torres Lepe y a bordo de un vehículo de José --
Luis alias "El Güero", secuestraron a Enrique Cama-
rena Salazar quien a base de golpes y torturas fue-
privado de la vida en el domicilio de Caro Quintero.
Sostienen los agentes policíacos, que al interrogar-
a Samuel Ramírez Razo, reconoció ser el lugartenien
te de Ernesto Fonseca Carrillo, a quien auxiliaba -
en sus actividades de siembra, cultivo, cosecha y--

venta de marihuana, en unos terrenos ubicados en --
Tolimán, y Mascota, Jalisco, en donde su patrón tie
ne ciento cincuenta hectáreas que le producen de --
sesenta a setenta toneladas de marihuana; admitió -
igualmente haber intervenido en el secuestro del --
agente del DEA Camarena Salazar, el cual llevaron -
al domicilio de Rafael Caro Quintero; que ya en el-
domicilio de éste también se dio cuenta de que te--
nían a otro sujeto, al parecer porque también era--
un "dedo"; que al día siguiente en compañía de Don
Neto ocurrió nuevamente al domicilio de Caro Quinte
ro, y éste le informó a su patrón que ya no tenía --
caso interrogar a Enrique Camarena porque ya no po-
día hablar. En el propio parte se asienta que Eze---
quiel Godínez al ser interrogado, manifestó que por
informes de sus compañeros tuvo conocimiento de que
su patrón Ernesto Fonseca estaba disgustado con Ra-
fael Caro por haber secuestrado a Enrique Camarena-
Salazar y a Alfredo Zavala Avelar, pues al parecer-
habían sido las soplones de los sembradíos de mari-
huana localizados en el Estado de Chihuahua, así co
mo por denunciar ciertas actividades del narcotráfi
co realizadas en Guadalajara. Que al interrogar a--
Asunción Valencia Serratos, les informó que por con
ducto de Ramón Lira y Gerardo Torres Lepe se enteró
de que dos personas habían sido secuestradas, que --
las había levantado la gente de Miguel Félix y las-
había entregado a Rafael Caro Quintero. Por su par-
te Juan José Bernabé Ramírez y Jorge Godoy López al
ser interrogados, manifestaron que por conducto de--
un compañero de nombre Torres Lepe, así como por --

- 3 -



ER JUDICIAL DE LA FEDERACIÓN

Rufo Solorio y Samuel, alias "El Samy", tuvieron co--
nocimiento que habían secuestrado a Enrique Camarena
Salazar, a quien llevaron al domicilio de Rafael Ca--
ro Quintero. Sostiene el segundo de los citados, que
también se enteró que a Alfredo Zavala Avelar lo se--
cuestro el agente apoderado "El Italiano" (fojas 7 a
la 40). Dicho parte informativo fue ratificado ante
el agente del Ministerio Público Federal por los ---
agentes que lo suscribieron (fojas 113 a 115). - - -

b). - El agente del Ministerio Público Fe-
deral dio fe de las armas, objetos, dinero y cocaí-
na recogida a Ernesto Rafael Fonseca Carrillo (foja
23 a la 250). - - - - - - - - - - - - - - - - - - -

c). - Declaración de Rafael Caro Quintero,-
vertida ante el agente del Ministerio Público Fede-
ral José Franco Villa, ante quien sostuvo que en el
año de mil novecientos setenta y siete se inició en
la siembra, cultivo, cosecha y tráfico de marihua--
na, en el rancho La Noria, vegetal que cosechaba y-
vendía a diversos clientes; que en el año de mil --
novecientos ochenta y dos, se asoció con su compa--
dre Ernesto Rafael Fonseca Carrillo y con Juan Espa
rragoza Moreno alias "El Azul", para la siembra, --
cultivo, cosecha, tráfico de marihuana, actividades
que realizaron en el rancho "La Ciénega" municipio-
de Caborca, Sonora, propiedad de Manuel Salas, así-
como en otro rancho denominado "Los Llanitos"; que-
en esos sitios sembraban treinta hectáreas por tem-
porada, que comprendía de los meses de julio a oc--
tubre; que a Manuel Salas le pagaban un millón de pe
sos anualmente por la renta de esos ranchos; que --

para efectuar la siembra, tanto Fonseca Carrillo, Es
parragoza Moreno, como el exponente, aportaban re-
-cursos por quince millones cada uno, por temporada;
que tales actividades las desarrolló con sus socios
y veinte empleados que tenía bajo sus órdenes; que
una vez cosechada la marihuana, la desahijaban, la
ponían a secar para acondicionarla y después la em-
paquetaban en cajas de cartón para huevo y se la
vendían a Jaime Méndez, vecino de Santa Ana, Sonora;
que durante los años de mil novecientos ochenta y
dos y mil novecientos ochenta y tres, sus socios y
él cosecharon trece toneladas y media de marihuana,
la cual vendieron ya empaquetada a razón de tres---
cientos cincuenta mil dólares la tonelada, obtenien
do una utilidad de cuatro millones setecientos ----
veinticinco mil dólares, que fueron repartidos por
partes iguales con sus socios Ernesto Fonseca y ---
Juan Esparragoza; que el primer dinero que obtuvo
para la siembra de la marihuana, lo obtuvo de la ---
venta de un rancho que era de su propiedad, denomi-
nado Las Olas, ubicado en Culiacán, Sinaloa, y que
vendió en doce millones de pesos a Manuel Alvarez;
que de la sociedad formada con Esparragoza y Fonseca
Carrillo le correspondió un millón doscientos mil
dólares, y fue entonces cuando ideó iniciar la siem
bra, cultivo, cosecha y tráfico de marihuana por su
propia cuenta en el Estado de Chihuahua; que para---
ésto su compadre Juan Esparragoza Moreno alias "El
Azul", le prestó la cantidad de cuatro millones de
dólares, suma que juntó con la que tenía de la uti-



- 4 -

lidad obtenida por la anterior siembra de marihuana
y por otras ventas que realizó a principios de mil-
novecientos ochenta y cuatro, convino con su hermano
Jorge Luis Caro Quintero en formar una sociedad pa-
ra la siembra, cultivo, cosecha y tráfico de mari--
huana, en la cual Jorge Luis iba a ser el adminis--
trador, y como jefes de cuadrilla Fidel Carrillo, -
Mario Medina, Marcial Fuentes y Manuel Alvarez, los
cuales a su vez fungían como capataces; continúa --
declarando, que Jorge Luis Caro se encargó de com--
prar cuatro terrenos alrededor del poblado Colonia-
Agrícola El Búfalo, municipio de Ciudad Juárez, Chi
huahua, en la suma de trece millones de pesos, un-
rancho denominado "El Vaquero" en Ojinaga, en el --
propio Estado, en ocho millones de pesos, así como -
el rancho "Los Pocitos" ubicado en Ciudad Jiménez,-
Chihuahua, en la suma de cuatro millones de pesos;-
que en los meses de julio a octubre de mil nove----
cientos ochenta y cuatro sembraron en los terrenos-
de Búfalo cincuenta hectáreas de marihuana, en el -
rancho El Vaquero cuarenta y cinco y en Pocitos ---
treinta y cinco hectáreas, de las cuales pensaba --
obtener alrededor de cien toneladas de marihuana --
que vendería a razón de trescientos cincuenta mil -
dólares la tonelada, misma que sería enviada a los-
Estados Unidos de Norte América; que su hermano y -
y los demás miembros de la banda, se encargaron de-
comprar la semilla y recolectar gente en Sonora y -
Sinaloa para la siembra del vegetal; que para ello-
aportó recursos por sesenta millones mensualmente,-
que eran enviados al través del Multi Banco Comer--

mex a su hermano Jorge Luis Caro Quintero; que de -
común acuerdo con éste obtuvo la protección de Da-
niel Acuña Figueroa, a quien le daban la cantidad -
de cinco millones de pesos para que le diera protec
ción; que dicho sujeto mandó varios agentes policía
cos a que acompañaran a Jorge Luis Caro a efecto de
protegerlo de otros jefes de la mafia u otras auto-
ridades que quisieran perjudicarlo; que llegaron a-
tener alrededor de ocho mil gentes en el rancho tra
bajando; que a principios de noviembre el declaran-
te y los demás miembros de su banda iniciaron el --
corte de marihuana, la cual fue secada, acondicionada
y otra más la empaquetada, pues ya la tenía apala--
brada para vendérsela a Jaime Méndez, a trescientos -
cincuenta mil dólares la tonelada, de cuya cosecha--
pensaba obtener la suma de treinta y cinco millones
de dólares. Afirma, que el siete u ocho de noviem--
bre pasado llegaron a los plantíos "una nube de agen
tes de la Policía Judicial Federal, elementos del -
ejército y otros del Gobierno, y destruyeron los --
plantíos así como la que se encontraba en los seca-
deros y empaquetada"; que debido a ello perdió ----
treinta y cinco millones de dólares. Que por la ---
amistad que tiene con Ernesto Rafael Fonseca Carri-
llo, quien también radica en Guadalajara, con fre-
cuencia se reunían para comentar sus problemas, y -
fue así como el día cinco de febrero de mil nove---
cientos ochenta y cinco, junto con sus elementos de-
nombres Octavio Ortiz y Manuel Salas, asistió a una
fiesta con motivo del cumpleaños de Víctor Manuel -
López Razón, a invitación de su compadre Ernesto --
Rafael Fonseca; que durante la fiesta Fonseca Carri

- 5 -

llo le comentó que había gente interesada en perjudi-
carlo, pues le estaban echando la tierra con el agen-
te del DEA Enrique Camarena Salazar, por lo que le --
solicitó a Ernesto mandera localizar a Camarena Sala-
zar para interrogarlo; que el día siete de febrero --
se entrevistó con Ernesto Fonseca, quien estaba acom
pañado de Samuel Ramírez Razo y Gerardo Manuel Torres-
Lepe, que es agente de la Policía Judicial del Estado,
y de René López; que veinte minutos después ocurrió-
a la casa de Mariano Otero José Luis Gallardo, miem-
bro de la mafia de Miguel Félix Gallardo, traficante
de drogas en gran escala, principalmente de cocaína-
que recibe de Sudamérica para introducir a los Esta-
dos Unidos; que José Luis les indicó que iba al con-
sulado americano, por lo cual Fonseca Carrillo le --
dijo que tratara de identificar a Enrique Camarena -
Salazar ya que quería hablar con él; que después de-
una hora regresó José Luis Gallardo y les dijo "ahi-
están, y entonces Fonseca Carrillo le ordenó a José-
Luis Gallardo, a Samuel Ramírez Razo, a Sergio alias-
"El Chino" y a René López, que fueran por él al ----
consulado y se lo trajeran, retirándose el exponente
a un negocio que tenía en el centro. Que al regre---
sar nuevamente a la finca de Mariano Otero, el mismo
siete de febrero, se percató que en el interior se-
encontraban doce o quince gentes armadas, todos ----
ellos gente de Miguel Félix Gallardo, entre los que-
pudo identificar a uno que le dicen El Chango, de --
apellido Alvarez, a Cuco, a Salvador alias "El Cha-
vo" y a "El Paco", los dos últimos gatilleros a suel
do; que al ver esto se retiró al centro de la ciu---

dad, en donde hizo unas compras, y de nuevo regresó a
la casa de Mariano Otero; que como a las catorce ho-
ras con cuarenta y cinco minutos llegaron los indivi
duos comisionados para secuestrar a Enrique Camarena
Salazar, al cual llevaban con la cabeza cubierta con
un saco de José Luis Gallardo; que le dijeron al ex-
ponente que ahí estaba la persona que les había orde
nado les trajeran, el cual condujo a una de las reca
maras, en donde lo amarraron con las manos en la es-
palda para mayor seguridad; como a las quince horas-
treinta minutos llegó Ernesto Fonseca, a quien Sa---
muel Ramírez le informó lo del secuestro de Camarena
Salazar; que momentos después Ramírez Razo le infor-
mó a Fonseca Carrillo que habían llevado a un "dedo",
que resultó ser el piloto aviador Alfredo Zavala Ave
lar, a quien seguramente mandó secuestrar Miguel Fé-
lix Gallardo; que considera que el antes citado es--
taba bien enterado de los planes, pues mandó a sus _
gentes a secuestrar al piloto aviador Alfredo Zava--
la a fin de sacrificarlo, como al efecto lo hicieron;
que Fonseca y Samuel Ramírez se retiraron de la casa
como a las diecinueve horas, con el compromiso de que
al día siguiente regresarían para hablar con Camarena
Salazar, responsabilizándolo a él y a todos los que-
estaban de la seguridad de esas personas; que duran-
te esa noche se quedaron a vigilar a los secuestra--
dos Salvador alias "El Chavo" y Francisco alias "El-
Paco", gente de Miguel Félix Gallardo; que al día si
guiente el exponente regresó a la casa en compañía -
de Manuel Salas y Octavio Ortiz, que enseguida llegó
su compadre Ernesto Rafael Fonseca, Samuel Ramírez -

- 6 -

Razo y el licenciado Javier Barba, preguntando el -
primero a un sujeto apodado "El Chango" de apellido
Alvarez, del grupo de Miguel Félix, que donde esta-
ban los detenidos, contestándole el Cuco que Camare
na y Zavala estaban muy golpeados, que no se podía-
hablar con ellos, circunstancia que molestó mucho a
Fonseca, quien comenzó a mentar madres contra todos
los presentes, reitrándose posteriormente ambos de-
la casa de Mariano Otero, y después de eso ya no --
volvió a ver a Fonseca Carrillo (fojas 251 a la 260).

d). - Declaraciones de Ernesto Rafael Fonseca
Carrillo rendidas tanto en actas de Policía Judicial
Federal, como ante el agente del Ministerio Público
Federal José Franco Villa, en las cuales reconoció-
que desde hace doce años se dedica al tráfico de es
tupefacientes, principalmente marihuana y cocaína,-
y su lugarteniente es Samuel Ramírez Razo; que el -
jueves cuatro de abril de mil novecientos ochenta y
cinco, fue detenido junto con toda su banda, compues
ta de veinte hombres, debidamente armados con pis--
tolas 45, 38 super y 23 fusiles, entre ellos metra--
lletas cuernos de chivo y R-15 calibre 223, armas--
que adquirió mediante compra que hizo a través de-
su sobrino Héctor Manuel Helenes, quien radica en -
Los Angeles, California, el cual le trajo todas las
armas en diversas partidas en un lapso de un año; -
que su sobrino falleció a fines del año anterior en
Nogales, Sonora; que por el armamento pagó alrededor
de seis millones de pesos. Reconoce además Fonseca-
Carrillo haber sido desapoderado de cocaína, obje--
tos personales, joyas y diez mil dólares que traía-

en efectivo; que los doscientos sesenta y cinco gramos de cocaína que le fueron asegurados, es de su propiedad, pues es parte del kilo que le compró a mediados de Marzo del corriente año a César Martínez Market, que radica en Guayaquil, Ecuador, en la suma de veinte mil dólares americanos; que de tres años a la fecha ha adquirido de dicho sujeto cuatro kilos de cocaína a razón de quince mil dólares el kilo, operaciones que se efectúan en esta ciudad de Guadalajara. Que en el año de mil novecientos ochenta y dos, se asoció con su compadre Rafael Caro Quintero y Juan Esparragoza Moreno alias "El Azul" para llevar a cabo actividades de siembra, cultivo y cosecha y tráfico de marihuana, en una superficie de treinta hectáreas en los ranchos denominados La Ciénega y Los Llanitos, ubicados en el municipio de Caborca, Sonora, terrenos propiedad de Manuel Salas, a quien le pagaban un millón de pesos mensuales por la renta de los mismos; que en dos temporadas que sembraron obtuvieron trece toneladas de marihuana, mismas que vendió Rafael Caro Quintero a Jaime Mendez en cuatro millones de dólares; que a él sus socios no le dieron ningún centavo, por lo cual decidió separarse y dar por terminada la sociedad. Que posteriormente comenzó a sembrar por su cuenta en terrenos ubicados en Jalisco y Michoacán. Y firma, que en lo relativo al secuestro de Enrique Camarena Salazar y Alfredo Zavala Avelar, tuvo conocimiento que algunas personas estaban mal informando al primero de ellos, y le atribuían al exponente diversos delitos contra la salud y, que por tal razón se pu-



- 7 -

sb de acuerdo con su compadre Rafael Caro Quintero
para secuestrar a Camarena Salazar y llevarlo a una
casa ubicada por Mariano Otero, habiendo estado de-
acuerdo en ello. Que el día siete de febrero comi-
sionó a Samuel Ramírez Razo, a José Luis Gallardo,-
a Gerardo Ramón Torres Lepe, a René López y a Ser-
gio "El Chino", para que llevaran ante él al referi
do Camarena Salazar; que como a las quince horas --
de esa fecha, los antes mencionados llegaron a la ca
sa de Mariano Otero, y de uno de los coches en que-
viajaban bajaron a Enrique Camarena y lo entregaron
a Rafael Caro Quintero, quien lo condujo a una de -
las habitaciones; que como a las dieciocho horas, en
compañía de Rafael Caro y Samuel Razo se dirigieron
a la recámara donde estaba Enrique Camarena, quien-
estaba acostado boca arriba, con las manos amarra--
das por la espalda; que no quizo hablar con él, ---
pues se sentía mal de salud, por lo cual se dirigió
a la recámara; que ya por la noche al salir de la -
casa de Mariano Otero, Samuel Ramírez le informó que
también se encontraba ahí una persona que habían --
llevado por "dedo", el cual resultó ser el piloto-
aviador Alfonso Zavala Avelar; que le recomendó a
Rafael Caro y a otras personas que trataran bien al
detenido. Que al día siguiente, o sea el ocho de-
febrero regresó a la casa de Mariano Otero como a -
las diecinueve horas, acompañado de su lugartenien-
te, y al entrevistarse con Rafael Caro le manifestó
que no tenía caso hablar con Camarena, pues estaba-
muy golpeado y se estaba muriendo, situación que le
molestó y empezó a mentar madres a todos los presen

tes, por lo cual optó por retirarse a su domicilio.-
Afirma, que veinticinco días después se enteró por-
la televisión de que habían encontrado dos cuerpos-
en estado de putrefacción y en bolsas de plástico -
en el rancho El Mareño, y que corresponden a Enri--
que Camarena y a Alfredo Zavala (fojas 261 a la ---
268). En posterior declaración que rindió Fonseca--
Carrillo ante el agente del Ministerio Público, agre
gó que el día siete de febrero cuando secuestraron-
a Camarena Salazar, el exponente se encontraba en -
una de las recámaras cuando escuchó la voz de su --
compadre Miguel Angel Félix Gallardo; que Samuel Ra
mírez Razo cuando habló con Camarena Salazar, -----
le informó que el DEA no tenía ningún problema con-
el exponente, que su atención estaba centrada sobre
Miguel Angel Félix Gallardo, quien se estaba movien
do muy fuerte don cocaína en los Estados Unidos, --
que en segundo lugar en importancia el DEA tenía se
ñalado a Rafael Caro Quintero, como principal intro
ductor de marihuana a los Estados Unidos, y que en-
tercer lugar estaba el exponente; que ésta informa-
ción también la escucharon sus compadres Miguel Fé-
lix y Rafael Caro, los cuales luego se separaron y-
se dirigieron a la recámara donde estaba Camarena,-
y posteriormente Samuel y el exponente se retiraron;
que a Miguel Angel Félix lo acompañaban Sergio alias
"El Chino" y otro apodado el "Fantasma", en tanto -
que Rafael Caro traía dos o tres personas con él, y
fue a él a quien le indicó cuidara a Camarena; que-
Samuel también le informó que en el cuarto de servi
cio se encontraba una persona señalada como "dedo",

- 8 -

que había llevado la gente de Félix Gallardo. Asegu-
ra, que el ocho de febrero por la tarde, se presentó-
nuevamente a la casa de Mariano Otero en compañía --
de Samuel y del licenciado Barba, y preguntó a Ra---
fael Caro Quintero por Camarena, contestándole que -
se estaba muriendo, porque la gente les había brincado
y bailado; que en ese momento se puso bastante moles
to y les rayó la madre porque había mucha gente que-
no era de Rafael Caro, sino al parecer de Miguel Fé-
lix Gallardo, pues entre ellos vió al Cuco, al Chan-
go Alvarez, al Paco y al Chavo, ayudantes de Miguel-
Angel Félix, personas que estaban cuidando al sujeto
que tenían en el cuarto de servicio. Que la casa ---
donde ocurrieron los hechos es propiedad de Miguel--
Félix Gallardo, quien estuvo de acuerdo en que --
Rafael Caro Quintero y el exponente hayan secuestra-
do a Camarena; que no intervino en la muerte de los-
secuestrados pero quien si debe saber quien fue es-
la gente de Miguel Félix Gallardo, pues es la gente-
que custodiaba a los detenidos (fojas 379). - - - --
e). - Declaraciones de Samuel Ramírez Razo -
vertidas en actas de policía judicial federal y ante
el agente del Ministerio Público Federal en las que,
en lo sustancial, se condujo en términos similares a-
los expresados por Ernesto Fonseca Carrillo, corrobo
rando lo narrado por éste (fojas 49 a la 54 y 269 a-
279). En posterior declaración que rindió Samuel Ra-
mírez Razo ante el agente del Ministerio Público Fe-
deral, agregó que el día ocho de febrero del año --
en curso, por encargo de su compadre Ernesto Fonseca
se entrevistó con el detenido Enrique Camarena Sala-

zar, y le preguntó que es lo que tenía el DEA contra
el antes citado, respondiéndole Camarena que no, que
toda la atención del DEA estaba centrada en Miguel -
Félix Gallardo, quien estaba metiendo cocaína a los-
Estados Unidos, pues, habían detenido dos avionetas -
con esa droga procedentes de México; que en segundo-
lugar en importancia era Rafael Caro Quintero, prin-
cipal introductor de marihuana al vecino país del --
norte, quien además de estar loco contaba con mucha-
gente con armamento, y que en tercer lugar estaba -
Ernesto Rafael Fonseca Carrillo; que una vez que tuvo
esta información se dirigió a la recámara donde esta-
ba Ernesto, en donde también estaban Miguel Félix --
Gallardo y Rafael Caro Quintero, que de inmediato-
procedió a informarle a su compadre los resultados -
del interrogatorio, observando que Miguel Félix se -
levantó y dijo que iba a interrogar a Camarena, al -
cual tenían amarrado de las manos por la espalda; --
que escuchó cuando Miguel Félix le preguntó a Camare-
na porque el DEA lo tenía considerado como el más im-
portante narcotraficante mexicano, respondiéndole Ca-
marena que por ser el principal introductor de cocaí-
na a los Estados Unidos; que al escuchar ésto Miguel
Félix sacó a quienes lo acompañaban y se quedó sola-
mente con Sergio alias "El Chino", que es su guarda-
espalda; que al ver esto se dirigió a la recámara en
donde se encontraban Ernesto Fonseda y Rafael Caro,-
y les informó que Félix Gallardo, Sergio "El Chino"-
y "El Fantasma" se habían quedado con Camarena; con-
testándole Ernesto que mejor se fuera porque se sen-
tía mal, y dirigiéndose a Caro Quintero lo hizo res-

- 9 -

ponsable de la seguridad del detenido, haciéndole--
notar que le pusieran guardias que lo respetaran y--
lo atendieran, retirándose enseguida. Afirma, que -
al pasar frente al cuarto de servicio que está sobre
el jardín, observó que estaba una persona amarrada,
y recostada sobre el piso, de complexión robusta, -
por lo que preguntó a uno de los custodios que quien
era, el cual le contestó "es un dedo que trajo Mi--
guel Félix Gallardo", y quien le informó esto fue --
"El Cuco", quien estaba acompañado del "Chango Alva-
rez", del "Chavo" y "El Paco", que son guardaespal-
das de Miguel Félix Gallardo y después supo que --
los antes citados se quedaron cuidando a Camarena y
al sujeto que tenían amarrado por ordenes directas-
de Miguel Angel Félix Gallardo. que al día siguien-
te al volver a la casa de Mariano Otero, Ernesto Fon
seca, el licenciado Barba y el exponente, encontraron
como a veinte gentes armadas, que pertenecían al --
grupo de Félix Gallardo; que también ahí estaba Ca-
ro Quintero y dos guarda espaldas; que fue en ese -
momento cuando Ernesto preguntó por Camarena y le -
contestaron que se encontraba muriéndose; que poste
riormente supo que la casa donde se desarrollaron -
los hechos es propiedad de Miguel Angel Félix Gallar
do, quien seguramente tuvo un acuerdo con Caro y --
con Fonseca para secuestrar a las personas menciona
das; que la gente de Félix Gallardo es quien verda-
deramente sabe quien fue el que materialmente gol--
peó a las víctimas (fojas 276 a la 278).- - - - - -

f). - Declaración de Ascención Valencia Se-
rratos, rendida en actas de Policía Judicial Federal,

en la cual relata que por voz de sus compañeros Ra-
món Lira y Gerardo Torres Lepe tuvo conocimiento que
Camarena Salazar y el piloto mexicano fueron secues
trados por gente de Miguel Angel Félix Gallardo, y-
conducidos y entregados al domicilio de Rafael Caro
Quintero (fojas 83 y 84). - - - - - - - - -

g). - Parte informativo rendido por el Pri-
mer Comandante de la Policía Judicial Federal J. --
Miguel Rodríguez Lorrabaquio, en el cual se contie-
ne las ampliaciones de declaraciones que ante el --
agente del Ministerio Público Federal rindieron ---
Samuel Ramírez Razo y Ernesto Rafael Fonseca Carri-
llo (fojas 370 a la 373). - - - - - - - - -

h). - Dictamen Químico formulado por Sara--
Mónica Medina Alegría y Misael Rivera de la Cruz, -
al través del cual se concluyó que el polvo blanco-
afecto a la presente causa, que le fue recogido a -
Ernesto Rafael Fonseca Carrillo es cocaína, al ----
igual que el polvo que se contiene en dieciséis ci-
garrillos de tabaco. En dicho dictamen se establecen
los múltiples exámenes practicados a las muestras -
enviadas para su análisis (fojas 169 a la 188). - -

i). - Dictamen en balística formulado por -
los peritos Jorge Macías Valdepeña e Ismael Marenco
Fernández, mediante el cual se concluye que las do--
ce pistolas de diversos calibres, veintiun fusiles,
una escopeta, una metralleta, trescientos ochenta -
cartuchos y cincuenta cargadores de diversos tipos y
calibres, decomisados a Ernesto Fonseca Carrillo y-
socios al momento de su detención, son de las armas-
y cartuchos reservados para el uso exclusivo del --

- 10 -

Ejército, Armada y Fuerza Aérea, de conformidad con
el artículo 11 inciso f) de la Ley General de Armas
de Fuego y Explosivos (fojas 151 a la 153). - - - -

- - - j). - Copia fotostática certificada de la--
averiguación previa número 219/85, entre las cua---
les existe, la inspección ocular y fe ministerial de-
los cadáveres de quienes en vida llevaron los nom--
bres de Enrique Camarena Salazar y Alfredo Zavala-
Avelar; las diligencias de identificación de los --
mismos y el certificado de necropsia, en el cual se
determinan las causas del fallecimiento de los aho-
ra occisos. - - - - - - - - - - - - - - - - - - -

k). - Copia fotostática certificada de la-
averiguación previa 241/84, integrada con motivo de
los campamentos y sembradíos de marihuana localiza-
dos en el Estado de Chihuahua, cuya propiedad se --
atribuyen a Rafael Caro Quintero, constancias en --
las que obra entre otras, fotografías de los sembra-
díos y campamentos en los que se encontró marihuana
en greña y empaquetada; la fe ministerial del vege-
tal encontrado, las actas de incineración del mis-
mo, y los dictámenes en los cuales se concluye la -
naturaleza de estupefaciente del vegetal decomisa-
do. - - - - - - - - - - - - - - - - - - - - - - -

C O N S I D E R A N D O :

I. - El artículo 16 de la Constitución Gene
ral de la República, establece: "... No podrá li---
"brarse ninguna orden de aprehensión o detención, -
"sino por autoridad judicial, sin que preceda denun
"cia, acusación o querella de un hecho determinado-
"que la ley castigue con pena corporal, y sin que -

"estén apoyadas aquellas por declaraciones, bajo --
"protesta, de persona digna de fe o por otros da--
"tos que hagan probable la responsabilidad del in-
"culpado...". - - - - - - - - - - - - - - - - - - -

       II. - Del análisis y estudio de las cons--
tancias integrantes de la presente causa, mismas -
que se transcriben en el resultando segundo de esta
resolución, se advierte que en la especie se en---
cuentran satisfechos los extremos exigidos por el-
precepto constitucional invocado para librar orden
de aprehensión en contra de Juan Esparragoza More-
no alias "El Azul", pues los datos que arroja la -
averiguación bastan para hacer probable su respon-
sabilidad penal en la comisión del delito contra -
la salud en las modalidades de siembra, cultivo,--
cosecha, elaboración, preparación, acondicionamien
to de paquetes de marihuana, posesión y tráfico --
del mismo estupefaciente, previsto y sancionado por
el artículo 197 fracción I del Código Penal Fede--
ral, así como del mismo ilícito de igual naturale-
za, consistente en la aportación de recursos econó
micos para la siembra y cultivo de marihuana, que-
contempla el numeral 197 fracción III del Código -
Punitivo Federal, pues de autos aparece que Espa--
rragoza Moreno en sociedad con Rafael Caro Quinte-
ro y Ernesto Rafael Fonseca Carrillo, sembró, cul-
tivó, cosechó, elaboró, preparó y acondicionó pa--
quetes de marihuana en los predios denominados ---
"La Ciénega" y "Los Llanitos" en Caborca, Sonora,-
terrenos que tenían una superficie de treinta hec-
táreas; que el propio Esparragoza tuvo en posesión



de trece toneladas y media de marihuana que obtuvie
ron de la cosecha, vegetal con el que luego ejerció
actos de tráfico, al venderlo a terceras personas.-
También se actualiza que Juan Esparragoza aportó re
cursos económicos para la siembra y cultivo de ma--
rihuana, al proporcionar a Caro Quintero cuatro mi-
llones de dólares para ese fin. De ahí que resulte-
procedente librar orden de aprehensión en contra de
Juan Esparragoza Moreno alias "El Azul", por el de-
lito y modalidades precisadas.- - - - - - - - -

III.- De las propias pruebas reseñadas se-
evidencia que existen datos suficientes para librar
orden de aprehensión en contra de Jorge Luis Caro -
Quintero, Fidel Carrillo, Mario Medina, Manuel Alva
rez y Daniel Acuña Figueroa, como presuntos respon-
sables del delito contra la salud en las modalida--
des de siembra, cultivo, cosecha, elaboración, pre-
paración, acondicionamiento de paquetes de marihua-
na, posesión y tráfico de ese estupefaciente, pues-
de autos se actualiza que los antes citados, por ór
denes de Rafael Caro Quintero, en unos terrenos ubi
cados en la Colonia Agrícola El Búfalo, Municipio -
de Ciudad Juárez, Chihuahua; en el rancho "El Vaque
ro", y en los "Pocitos", éstos últimos ubicados en-
Ojinaga y Ciudad Jiménez, en la propia Entidad, en-
los meses de julio y octubre de mil novecientos ---
ochenta y cuatro, sembraron, cultivaron, cosecharon,
elaboraron y acondicionaron la marihuana obtenida -
de ciento treinta hectáreas de ese estupefaciente --
que habían sembrado, vegetal que tuvieron en pose--
sión para traficar. Por tanto, al encontrarse satis

fechos los requisitos exigidos por el artículo 16-
constitucional, procede librar la orden de captura-
solicitada contra dichos indiciados. - - - - - -

IV.- En el caso también se satisfacen los
requisitos exigidos por el artículo 16 Constitucio
nal, para librar orden de aprehensión en contra de
Miguel Félix Gallardo, José Luis Gallardo y José-
Luis o René López, pues los datos que arroja la ave
riguación bastan para hacer probable la responsabi
lidad de los antes citados en la comisión de los
delitos de secuestro y homicidio calificado, en --
agravio del agente del DEA Enrique Camarena Sala-
zar y el piloto mexicano Alfredo Zavala Avelar, -
ilícitos previstos y sancionados por los artículos
366 fracciones I, II, IV y V, 302, 309, 315, 316,-
318, 319 y 320 del Código Penal Federal, ya que de
las declaraciones de Rafael Caro Quintero, Ernesto
Rafael Fonseca Carrillo, Samuel Ramírez Razo, del-
parte informativo rendido por los agentes policíacos,
aparece que los referidos indiciados tuvieron par-
ticipación directa en esos ilícitos, por lo cual -
se libra la orden de aprehensión solicitada. - - -
V.- En la especie también se cumplen los-
requisitos exigidos por el artículo 16 Constitu---
cional, para librar orden de aprehensión en contra
de César Martínez Marquet por el delito contra la-
salud en la modalidad de venta de cocaína, previs-
to y sancionado por el artículo 197 fracción I del
Código Penal Federal, pues los indicios que deri--
van de las declaración ministerial de Ernesto Ra-
fael Fonseca Carrillo, la fe ministerial del polvo

- 12 -



blanco consignado; y el dictamen químico al través-
del cual se determinó que es cocaína, bastan para -
hacer probable la responsabilidad de Martínez Mar-
ket en la variante de venta de cocaína, pues de ta-
les pruebas se actualiza que en el mes de marzo de-
mil novecientos ochenta y cinco, dicho indiciado le
vendió a Fonseca Carrillo un kilo de cocaína en la-
cantidad de veinte mil dólares, por ello es que se-
decreta la orden de aprehensión que se solicita en-
contra de César Martínez de Market. - - - - - - - -

VI.- Finalmente, resulta igualmente proce-
dente librar orden de captura en contra de Jaime --
Méndez y Manuel Salas, al primero por el delito de-
compra de marihuana, previsto y sancionado por el -
artículo 197 fracción I del Código Penal Federal, y
al segundo por asociación delictuosa, pues las prue-
bas reseñadas en el resultando segundo, arrojan in-
dicios suficientes que hacen probable la responsa--
bilidad penal de los indiciados en la comisión de -
tales ilícitos, ya que Jaime Méndez fue quien com---
a Rafael Caro Quintero, las tres toneladas y me
dia de marihuana que cosechó en compañía de sus so-
cios, en los predios "Los llanitos" y "La Ciénega",
en Caborca, Sonora, en la suma de cuatro millones -
de dólares; en tanto que Manuel Salas, formaba par-
te de la asociación que formó Rafael Caro Quintero-
para delinquir. Por tanto, se libra orden de aprehen-
sión en contra de Jaime Méndez y Manuel Salas, por-
los ilícitos que se les imputan. - - - - - - - - -

Por lo anteriormente expuesto, y con funda-
mento en el artículo 16 Constitucional, se resuelve:

PRIMERO. - Se libra orden de aprehensión en contra de Juan Esparragoza Moreno alias "El Azul", por el delito contra la salud en las modalidades de siembra, cultivo, cosecha, elaboración, preparación y acondicionamiento de paquetes de marihuana, posesión y tráfico de ese estupefaciente, previsto y sancionado por el artículo 197 fracción I del Código Penal Federal; así como por el diverso ilícito contra la salud consistente en aportar recursos económicos para la siembra y cultivo de marihuana, que contempla el numeral 197 fracción III del propio Ordenamiento. - - - - - - - - - - - - - - -

SEGUNDO. - Se libra orden de aprehensión en contra de Miguel Félix Gallardo, José Luis Gallardo, José Luis o René López, como presuntos responsables de los delitos de secuestro y homicidio calificado, previstos y sancionados por los numerales 366 fracción I, II, IV y V, 302, 309, 315, 316, 318, 319 y 320 del Código Punitivo Federal. - - - - - - - -

TERCERO. - Se decreta orden de aprehensión en contra de Jorge Luis Caro Quintero, Fidel Carrillo, Mario Medina, Manuel Alvarez y Daniel Acuña Figueroa, como presuntos responsables del delito contra la salud en sus variantes de siembra, cultivo, cosecha, elaboración, preparación y acondicionamiento de paquetes de marihuana, posesión y tráfico del propio estupefaciente, previsto y sancionado por el artículo 197 fracción I del Código Penal invocado. -

CUARTO. - Se libra orden de aprehensión en contra de César Martínez de Market, Jaime Méndez y Manuel Salas, como presuntos responsables, el prime



- 13 -

Exp. 118/85.

ro, del delito contra la salud en la modalidad de --
venta de cocaína, que sanciona el artículo 197 frac-
ción I del Código Penal Federal; el segundo, del de-
lito contra la salud en la modalidad de compra de --
marihuana, que también tipifica el precepto antes in
vocado; y, el último, del delito de asociación delic
tuosa, que prevé el numeral 164 del precitado ordena
miento legal. - - - - - - - - - - - - - - - - - - - -

QUINTO. - Remítase al agente del Ministerio-
Público Federal copia certificada de la presente re-
solución, para que proceda a la ejecución de las or-
denes de aprehensión decretadas. - - - - - - - - - -

Notifíquese, únicamente al agente del Minis-
terio Público Federal adscrito. - - - - - - - - - -

Así lo resolvió el C. licenciado Oscar Váz-
quez Marín, Juez Primero de Distrito en Materia Penal
en el Estado de Jalisco, ante su Secretario que au--
toriza y da fe. - - - - - - - - - - - - - - - - - -

OVM/sll'

El día 14 Junio 85 notifiqué la resolución que
antecede al C. Agente del Ministerio Público Federal adscrito y
acordado dió que la oye y firma para constancia.

con oficio 2150

EXHIBIT E

## RENE LOPEZ-ROMERO

-- The government has made the following agreements with Lopez-Romero:

    1... To provide security for himself and his family.

    2. To pay living expenses, including medical expenses, for himself and his family for the duration of judicial proceedings in this case, in the approximate amount of $3,000 per month.

    3. To obtain an INS work permit for him after judicial proceedings in this case are concluded.

-- Lopez was involved in the kidnapping of four American Jehovah's Witness missionaries, who were murdered at Guadalajara, Jalisco, Mexico in early December 1984.

-- In early December, 1984, the missionaries approached the front door of a residence of Ernesto Fonseca.

-- Fonseca became convinced that the missionaries were DEA personnel and ordered that they be abducted. They were made to partially undress, blindfolded, and interrogated. During the interrogation, the missionaries denied having any police affiliation and informed their captors that they were Jehovah's Witnesses from the United States, and that they were in Guadalajara, Jalisco, Mexico on a religious mission.

-- After the interrogation, the missionaries were taken to Loma Bonita, a residence of Fonseca, where they were tortured and interrogated further. Although now convinced that the missionaries were not informants of DEA, the traffickers continued to hold them captive at the residence until the late afternoon, at which time they were transported to the ranch of Fonseca's cousin, Antonio Fonseca-Uribe.

-- At Fonseca-Uribe's ranch, both female missionaries were taken into bedrooms, and one of the females was tortured further. The four missionaries were held captive in separate horse stables at the ranch until late that night. They were then transported to a location which is about a five-to-ten minute drive south of the City of Guadalajara.

-- At this location, the missionaries were made to stand next to a grave site, where they were shot. The four bodies were then buried in one grave.

-- While employed as a Jalisco State policeman, Lopez accepted a bribe offered by a suspect from whom Lopez had confiscated a weapon.

-- Lopez has been charged with obstruction of justice arising from an accidental shooting by a State Police colleague.

98



U.S. Department of Justice

United States Attorney
Central District of California

March 18, 1992

United States Courthouse
312 North Spring Street
Los Angeles, California 90012

Rene Martin Lopez-Romero


Re: United States v. Caro-Quintero, et al.,
    CR 87-422


Dear Mr. Lopez-Romero:

You have expressed a willingness to cooperate with the government in the above-referenced investigation, and have met with agents of the Drug Enforcement Administration on several occasions to provide information relevant to that investigation. The government may desire that you provide testimony under oath in connection with the investigation. Furthermore, the government may wish for you to testify at any trial that may be held in the case.

This letter is to assure you that, except as otherwise provided below, the government agrees that no testimony or other information given by you during any interviews, in testimony under oath, or at trial, will be used in the government's case-in-chief to incriminate you in any criminal case prosecuted by this office.

You understand and agree that you will respond truthfully and completely to any and all questions or inquiries that may be put to you during interviews, under oath, or at trial, by government agents and/or prosecutors.

Your complete truthfulness and candor are express material conditions to the undertakings of the government set forth in this letter. Therefore, if the government should ever conclude that you have knowingly withheld material information from the government or otherwise not been completely truthful and candid, the government may use against you for any purpose any statements made or other information provided by you. The government expressly reserves the right to use any statements or information provided by you in any prosecution for false statements, obstruction of justice or perjury, and for purposes of impeachment in any proceeding.

No understandings, promises, agreements and/or conditions have been entered into with respect to your cooperation other than those expressly set forth in this Agreement and none will be entered into unless in writing and signed by all parties.

99

I trust that you will find these terms and conditions to be fair and reasonable. If the foregoing terms meet with your approval, please sign below.

LOURDES G. BAIRD
United States Attorney

ROBERT L. BROSIO
Assistant United States Attorney
Chief, Criminal Division

_John L. Carlton_      March 18, 1992
JOHN L. CARLTON     Date
Assistant United States Attorney
Deputy Chief, Narcotics Section

The agreement contained in this letter has been read to me in Spanish.  I understand the contents of this letter, and it voluntarily and knowingly agree to it without force, threat or coercion.  No other promises or inducements have been made to me other than those contained or referenced in this letter.

El acuerdo contenido en esta carta se me ha sido leida en Espanol.  Entiendo el contenido de esta carta y voluntariamente y sin compromises estoy en acuerdo sin que me esten forzando o amenazando.  Ninguna otra promesa o incentivo se me ha hecho otra cosa que las que contiene o estan referidas en esta carta.

_R-L R_      March 19, 1992
RENE LOPEZ-ROMERO     Date

2

# EXHIBIT F



News    GO     Site Index    GO

UNITED AIRLINES
R I S I N G
CLICK HERE FOR SCHEDULES
AND MORE INFORMATION

MORE FLIGHTS FROM L.A. TO
JAPAN THAN ANY OTHER AIRLINE.

Wednesday, October 29, 1997

## Allegation Was Excised in Camarena Case

■ Trial: Documents show prosecutors withheld from defense an informant's charge that two Mexican leaders discussed DEA agent with drug lord before slaying. U.S. lawyer says the deletion was not sinister.

By FREDRIC N. TULSKY, Times Staff Writer

PREV STORY

NEXT STORY

Federal prosecutors withheld a politically volatile allegation from attorneys who were defending two men accused in the 1985 killing of U.S. drug agent Enrique Camarena in Mexico, documents show.

An informant who helped build the 1992 criminal case in Los Angeles contended that Mexico's president at the time of the slaying and a former president discussed Camarena with a drug lord who allegedly ordered the agent's kidnapping and murder two months later.

The accusation against former Presidents Miguel de la Madrid and Jose Lopez Portillo was made by Ramon Lira, a former Mexican policeman who worked as a bodyguard for the drug trafficker, according to a Drug Enforcement Administration report.

But prosecutors provided only a sanitized version of the report, with the allegation excised, to attorneys for two defendants accused of conspiring with others to kill Camarena.

Lira was one of two paid informants who had placed both defendants at a Guadalajara house when Camarena was killed. But he was the only person to implicate the two ex-presidents in the plot--an allegation that some former U.S. ambassadors to Mexico call ludicrous.

Richard Drooyan, who is chief assistant U.S. attorney in Los Angeles, said "there was nothing sinister" about the deletion and suggested that it may have been made to avoid embarrassing Mexico's highest officials. He said there was no reason to think that the deletion harmed the defense in the case because the government ultimately did not call Lira to testify.

But legal scholars contacted by The Times said that withholding the information could have harmed the defense because Lira's allegation itself raises questions about the credibility of the U.S. government's informants. Several also questioned why the deletion was made in a manner that would not have signaled to defense attorneys that something was removed.

"There is reason to believe that they didn't want anybody to know they had deleted the information," said William J.

Genego, a former USC law professor who heads the rules committee of the National Assn. of Criminal Defense Lawyers. "There is no appropriate explanation for that, other than a bad explanation."

Lira's allegation, contained in his first formal statement to the DEA in September 1992, went far beyond those made by other informants in hundreds of pages of DEA reports released by the U.S. government. At the time, Mexican officials were already furious with the U.S. for relying on what they contended were unfounded allegations from unreliable sources.

After Lira made his explosive statement, the DEA went on to pay him thousands of dollars, move him and his family to the United States, arrange for him to receive immunity from prosecution and take several more statements from him, records show. Lira admitted involvement in Camarena's abduction as well as the kidnapping of four U.S. Jehovah's Witnesses who were tortured and killed after they knocked on the door of a Mexican drug lord's home.

The full version of Lira's initial statement was discovered recently during a Times review of 30,000 pages of government documents turned over last year to an attorney representing a defendant accused of other crimes connected to the Guadalajara drug cartel. By then, the investigation into Camarena's kidnapping had been closed and the trials concluded.

Although Lira was not called to testify, records show that he provided investigators with corroboration for allegations by the only witness who placed businessman Ruben Zuno Arce and gynecologist Humberto Alvarez Machain in the house while Camarena was tortured Feb. 7, 1985.

Lira recently told a reporter that he had been brought to the courthouse and was prepared to testify at the men's trial, but that government officials told him his testimony was not necessary.

The judge threw out charges against Alvarez. But Zuno, brother-in-law of former Mexican President Luis Echeverria, was convicted and is serving a life sentence in federal prison.

Four months ago The Times undertook an examination of new allegations regarding the case and turned up additional information. The findings raise questions about whether the government relied on perjured testimony and false information from paid informants. Based on the new information, the DEA is reviewing its own 10-year investigation, and defense attorneys say they plan to challenge the convictions.

Informants provided key testimony at two trials about alleged meetings where drug lords, corrupt police and government officials conspired to kidnap the DEA agent. The informants' statements were critical to the convictions of at least three defendants, including Zuno. They also implicated several Mexican government officials who were not part of the U.S. trials.

In his initial statement, Lira said Ernesto Fonseca Carrillo had told him to wait outside as the drug lord entered a house in

November 1984, about two months before Camarena was abducted. After an hour or so, Lira told the DEA, he opened the door for 15 to 20 seconds and saw President De la Madrid, former President Lopez Portillo and Gov. Enrique Alvarez del Castillo of Jalisco state sitting with the drug lord. Lira said that a pile of U.S. money was in front of the governor and that the group was talking about "Camarena" and the site of a recent DEA raid. Fonseca was one of more than two dozen people convicted in Mexico in the case.

John Gavin, ambassador to Mexico at the time Camarena was killed, has maintained that testimony implicating high-level Mexican officials in the kidnapping plot is false, in part because one of those officials was known to him as a staunch anti-drug ally.

As for the new information that Lira had implicated two former presidents, Gavin said, "There is no way such a thing happened. It is so false that not even the worst enemies" of the two men "would give it credibility."

One of Gavin's successors, John D. Negroponte, also said he had never before heard the allegation and did not believe it.

Alan Rubin, a former prosecutor who represented gynecologist Alvarez, said Lira's allegation was "so patently incredible [that] there is no doubt it would have been helpful to the defense. And it appears that is why [prosecutors] withheld it."

The statement, with the section implicating the two presidents removed, was turned over to attorneys for defendants Zuno and Alvarez during the trial. At the time, prosecutors had listed Lira as a witness they intended to call.

Deletions are common in reports that the government provides to defense attorneys. It is required to turn over only information that might help clear the defendants, and statements of prosecution witnesses to investigators.

What is striking in this case is that the excised passage was not blackened out, as is customary. The bottom of one page of Lira's statement was whited out and the next page was missing--but the pages were renumbered sequentially. Defense attorneys say it was not readily apparent that any information had been withheld.

One of the prosecutors, John Carlton, said he was unaware of the deletion until a reporter pointed it out. His co-counsel, Manuel Medrano, now a TV reporter, said he did not remember the document at all.

Drooyan, who is supervising prosecutor, said he did not know why the deletion was done in such an unusual manner, and added that he had some questions about it.

He said he has great confidence in the integrity and judgment of the trial prosecutors.

Search the archives of the Los Angeles Times for similar stories. You will not be charged to look for stories, only to retrieve one.

Copyright Los Angeles Times

PREV STORY

| News | | GO | | Site Index | | GO |
|------|--|----|--|-----------|--|----|

# EXHIBIT G

Los Angeles Times

| News | | Site Index | |
|---|---|---|---|

STATE & LOCAL

**Now whenever your schedule is open**

Tuesday, December 16, 1997

## U.S. Drops 1989 Murder Charges Against Mexican Drug Trafficker

. Court: Questions were raised about reliability of government witnesses, who also played role in Camarena case. Prosecutors say that was not a deciding factor.

*By FREDRIC N. TULSKY, Times Staff Writer*

PREV STORY

NEXT STORY

U.S. prosecutors dropped two murder charges earlier this year against a convicted drug trafficker implicated in the brutal slayings of several Americans a dozen years ago in Guadalajara, after questions were raised about the credibility of witnesses against him, records and interviews show.

The same paid government informants were among those used to obtain controversial convictions in the 1985 slaying of Drug Enforcement Administration Agent Enrique Camarena, which are now being challenged by defense attorneys and reviewed by the federal government.

Prosecutors say the decision to drop the murder charges was unrelated to questions raised about the witnesses' credibility. But the dismissal has been recently cited in a defense motion as further evidence that the government no longer has confidence in its witnesses.

At issue is the decision to drop charges against Ezequiel Godinez, 55, whose arrest in Texas last year initially had been portrayed as a major breakthrough for investigators of the violent Guadalajara drug cartel believed to be responsible for the kidnapping and murder of Camarena and his pilot, as well as the killings of six other U.S. residents.

Since 1989, Godinez had been sought on charges that he was part of a group who stabbed two U.S. residents with ice picks and beat them to death after they stumbled into a party of drug traffickers in a Guadalajara restaurant.

Witnesses also had linked Godinez to other slayings for which he was not charged: the murders of Camarena and his pilot and of four Jehovah's Witnesses snatched off the streets while selling religious books door-to-door.

In March, federal prosecutors in Los Angeles dropped the only murder charges against Godinez--those connected to the restaurant slayings. Instead they settled for his guilty plea to drug trafficking and prison escape charges, carrying a 26-year sentence.

Relatives of the murder victims had pressed the

government for years to solve the crimes. But they said they knew nothing about Godinez's arrest and reacted bitterly when told of the outcome. "This is only one more instance in which the government has shown that they did not care about the death of my husband," said Mary Evelyn Walker, whose husband was killed in the restaurant.

Godinez's lawyer said the government had told him that its case was based on the testimony of three informants who also were critical witnesses in the Camarena prosecutions. Statements from those eyewitnesses depict Godinez as taking part in six brutal slayings around the time of the Camarena kidnapping--a crime that triggered one of the most far-ranging U.S. investigations in history.

At least two of the witnesses said Godinez participated in the restaurant murders, according to witness statements obtained by The Times. Two also said that Godinez was present when Camarena was kidnapped, tortured and killed. And at least one said Godinez sexually assaulted the two female Jehovah's Witnesses, and then was ordered by a drug lord to kill the women and their husbands.

Godinez's attorney, William S. Harris, said prosecutors did not tell him that the credibility of those witnesses was challenged in a six-volume report a few months earlier by an attorney who alleged that they falsely implicated Mexican officials in the Camarena case.

Last week, Chief Assistant U.S. Atty. Richard Drooyan in Los Angeles said the decision to drop the charges was not based on concerns about witness credibility. He said prosecutors concluded that the dismissal was the "best way to handle it," given Godinez's age, the penalties he already was facing for drug trafficking, and the fact that the murders occurred so long ago.

One defendant convicted of murdering Drug Enforcement Administration Agent Camarena is citing the decision to drop the murder charges in his efforts to win a new trial.

The motion on behalf of Ruben Zuno Arce, the brother-in-law of a former Mexican president, contended that the dismissal shows that the government has reservations about its witnesses. "It is difficult to imagine why" the government would dismiss murder charges against Godinez unless officials now have "substantial doubts as to the credibility" of their informants, he said. Zuno is serving a life sentence in a federal prison in Texas.

The DEA and the Justice Department are conducting reviews of allegations that some prosecutions stemming from the investigation into Camarena's murder relied upon false testimony. The Times reported in October that its own independent examination demonstrated that some portions of the testimony appear false.

Although the government believes that a large number of drug traffickers took part in the restaurant killings, Javier Vasquez Velasco is the only person to have been convicted in the United States. His attorney requested a new trial last month after a government informant said his testimony at Vasquez's

U.S. Drops 1989 Murder Charges Against Mexica...                    Page 3 of 4

trial was false.

* * *

Federal authorities now believe that the Camarena slaying in February 1985 was part of a violent offensive by Mexican drug cartel members against people suspected of helping the DEA.

One of the early incidents occurred when the four Jehovah's Witnesses disappeared Dec. 2, 1984, while proselytizing near the home of an alleged drug lord.

On Jan. 30, 1985, Albert Radelat, a 27-year-old Cuban native who lived in Forth Worth, Texas, and John Walker, a 34-year old journalist from St. Paul, Minn., disappeared after they went out to dinner together. Officials say the two had entered La Langosta restaurant, where drug dealers were having a party, and did not came out alive.

The first indictments in the Camarena investigation were handed down in 1987. No bodies were recovered in the Jehovah's Witness slayings, and the five-year statute of limitations for bringing charges ran out in 1989. But that year officials announced a "major step" in the restaurant killings:

A witness told the grand jury he had been present at the Guadalajara restaurant when a large group of drug traffickers shouted that Radelat and Walker were from the DEA, cursed them, then pummeled them as they were carried to the back of the restaurant.

The grand jury indicted two alleged members of the drug cartel, as well as Godinez and two cousins, Javier Vasquez Velasco and Antonio Vasquez Velasco.

Several other informants made allegations against Godinez. According to a confidential DEA report, one member of the Vasquez Velasco family said he had seen Godinez "completely soaked in blood from the waist up" and quoted him as saying, "I had to kill the gringos, because no one else wanted to do it."

Godinez remained on the loose when Javier Vasquez Velasco was tried and convicted in 1990.

Later, the DEA recruited three new informants, who were given immunity and paid monthly stipends. The informants implicated Godinez in the restaurant and Jehovah's Witness slayings. Two of them implicated themselves as well.

* * *

The decision to drop the charges against Godinez is only the latest blow to the families of the victims.

From the start, they say, U.S. investigators seemed interested only in pursuing the Camarena case. So family members said they did what they could to seek justice on their own. They traveled to Mexico to talk to government officials and potential witnesses. They called members of Congress and the White House.

"We were a thorn in their side," said Florence Walker, John's mother, from Edina, Minn. "If it wasn't for us, nothing would have been done at all."

Walker's widow, Eve, said that she had resettled with her two young daughters in Mexico when, at the urging of prosecutors, she left her belongings behind and returned to the

U.S. Drops 1989 Murder Charges Against Mexica...

Page 4 of 4

United States to testify in 1990.

"I believed in our government, and that it was important to seek justice," said Walker, now a Pasadena resident. "I left my car, my home and my job. I was left to fend for myself."

Walker said she is particularly embittered when she thinks of the benefits that were provided to the paid informants. So too is Mercy Mascarenas of Ely, Nev., the mother of Jehovah's Witness Ben Mascarenas.

"I don't understand at all how they paid these murderers--these creeps--while our government lets us suffer this way," she said.

The idea that murder charges now have been dropped against Godinez only adds to that anguish. "They at least could have prosecuted him for the two murders," Mascarenas said. "It is such an injustice."

Search the archives of the **Los Angeles Times** for similar stories. You will not be charged to look for stories, only to retrieve one.

**Copyright Los Angeles Times**

PREV STORY

NEXT STORY

| News | | Site Index | |
|---|---|---|---|