1 | ROBERT C. BONNER
United States Attorney
2 | ROBERT L. BROSIO
Assistant United States Attorney
3 | Chief, Criminal Division
JIMMY GURULE
4 | Assistant United States Attorney
Major Narcotics Section
5 |      1400 United States Courthouse
312 North Spring Street
6 | Los Angeles, California 90012
Telephone:  (213) 894-6579
7 |
Attorneys for Plaintiff
8 | United States of America



FILED
CLERK, U.S. DISTRICT COURT

MAY ❡ 6 1988
3:50

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

9

UNITED STATES DISTRICT COURT

10

FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR 87-422(B)-ER |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S OPPOSITION TO |
| | ) | DEFENDANT'S MOTION TO DISMISS |
| v. | ) | FIRST SUPERSEDING INDICTMENT DUE |
| | ) | TO CONSCIENCE SHOCKING GOVERNMENT |
| RAFAEL CARO-QUINTERO, et al., | ) | ACTIVITY AND DEFENDANT'S MOTION |
| | ) | TO SUPPRESS EVIDENCE; MEMORANDUM |
| Defendants. | ) | OF POINTS AND AUTHORITIES; |
| | ) | AND EXHIBITS |
| | ) | |
| _____ | ) | |

18      Plaintiff, United States of America, as represented by the

19  undersigned Assistant United States Attorney, hereby files the

20  Government's Opposition To Defendant's Motion To Dismiss First

21  Superseding Indictment Due To Conscience Shocking Government

22  Activity and Defendant's Motion To Suppress Evidence.

23  //

24  //

25  //

26  //

27  //

28  JG:jc:bzb



ENTERED ON COURTRAN

MAY 1 1 1988

166

1   The Government's Opposition is based on the attached

2   Memorandum of Points and Authorities, the attached exhibits, and

3   the records and files in the case.

4   DATED:  This 5th day of May, 1988.

5

6                                  Respectfully submitted,

7                                  ROBERT C. BONNER
                                   United States Attorney

8                                  ROBERT L. BROSIO
                                   Assistant United States Attorney
9                                  Chief, Criminal Division

10

11

12   JIMMY GURULE
     Assistant United States Attorney
13   Major Narcotics Section

14                                     Attorneys for Plaintiff
                                       United States of America

15

16

17

18

19

20

21

22

23

24

25

26

27                          —  2  —

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

PAGE

MEMORANDUM OF POINTS AND AUTHORITIES                                    3

TABLE OF AUTHORITIES                                                   ii

I.      INTRODUCTION                                                    3

II.     PROCEDURAL BACKGROUND                                          4

III.    STATEMENT OF FACTS                                             6

IV.     THE ISSUE REGARDING WHETHER
        DEFENDANT VERDUGO'S DUE
        PROCESS RIGHTS WERE VIOLATED
        AS THE RESULT OF HIS
        APPREHENSION IN MEXICO HAS
        BEEN LITIGATED AND IS
        THEREFORE BARRED FROM
        RELITIGATION UNDER THE
        DOCTRINE OF COLLATERAL
        ESTOPPEL                                                        7

V.      DEFENDANT VERDUGO'S DUE PROCESS
        RIGHTS WERE NOT VIOLATED UNDER
        TOSCANINO                                                      10

VI.     A HAIR SAMPLE WAS OBTAINED FROM
        DEFENDANT VERDUGO AFTER HE WAS
        LAWFULLY PLACED UNDER
        ARREST AND CONSENTED TO GIVING
        THE HAIR SAMPLE                                                20

VII.    CONCLUSION                                                     24

1

**TABLE OF AUTHORITIES**

2

PAGE

3

CASES:

4

Frisbie v. Collins, 342 U.S. 519 (1952)                10

5

Ker v. Illinois, 119 U.S. 436 (1886)                   10, 13,
                                                        14
6

Mapp v. Ohio,
7       367 U.S. 643 (1961)                             11

8

Schmerber v. California,
        384 U.S. 757 (1966)                             21

9

Schneckloth v. Bustamonte,                             23
10      412 U.S. 218 (1973)

11

Rochin v. California, 342 U.S. 165 (1952)              11

12

United States ex rel. Lujan v. Gengler,
        510 F.2d 62 (2d Cir.), cert. denied,
13      421 U.S. 1001 (1975)                            13, 15

14

United States v. Cordero,
        668 F.2d 32 (1st Cir. 1981)                     18

15

United States v. Crooks,
16      804 F.2d 1441 (9th Cir. 1986)                   7

17

United States v. Fielding,
        645 F.2d 719 (9th Cir. 1981)                    18

18

United States v. Hernandez,
19      572 F.2d 218 (9th Cir. 1978)                    7, 9

20

United States v. Lara,
        539 F.2d 495 (5th Cir. 1976)                    18

21

United States v. Licavoli,
22      604 F.2d 613 (9th Cir. 1979)                    23

23

United States v. Lira,
        515 F.2d 68 (2d Cir. 1975)                      16

24

25

26

27

28

**TABLE OF AUTHORITIES** (CONT'D)

PAGE

United States v. Lopez,
    542 F.2d 283 (5th Cir. 1976)                    18

United States v. Lovato,
    520 F.2d 1270 (9th Cir.) (per curiam),
    cert. denied, 423 U.S. 985 (1975)               14

United States v. Marzano,
    537 F.2d 257, 270-71 (7th Cir. 1976)            18

United States v. Mendenhall,                        23
    446 U.S. 544, 571 (1980)

United States v. Orsini,
    424 F. Supp. 231 (E.D.N.Y. 1976)                19

United States v. Palmer,
    536 F.2d 1278 (9th Cir. 1976)                   21

United States v. Russell,
    411 U.S. 423 (1973)                             11

United States v. Schartz,
    785 F.2d 673 (1986)                             7

United States v. Sorren,
    605 F.2d 1211, 1215 (1st Cir. 1979)             12

United States v. Toscanino,
    500 F.2d 267 (2d Cir. 1974)                     11, 12, 13
                                                    15, 16, 17,
                                                    19

United States v. Valot,
    625 F.2d 308 (9th Cir. 1980)                    15

RULES

18 U.S.C. § 1952(a)(3)                              5

18 U.S.C. § 2                                       5

**TABLE OF AUTHORITIES** (CONT'D)

PAGE

21 U.S.C. § 841(a)(1)                  4, 5, 21

21 U.S.C. § 841(b)(6)                  4, 5

21 U.S.C. § 843(b)                     4, 5
                                       21,

21 U.S.C. § 846                        4, 21

21 U.S.C. § 848                        5, 21

21 U.S.C. § 952, 960 and 963           5

31 U.S.C. § 316 and 5322(b)            5

iv

MEMORANDUM OF POINTS AND AUTHORITIES

I

INTRODUCTION

Defendant Rene Verdugo has filed a motion to dismiss the indictment due to alleged "conscience shocking" government activity.  The alleged "conscience shocking" government activity involves the apprehension of defendant Rene Verdugo on January 24, 1986, in San Felipe, Mexico, by Mexican police officers. Defendant Verdugo was thereafter turned over to United States federal agents at the international border near the Port of Entry at Calexico and placed under arrest.  Defendant Verdugo maintains that the government's involvement in his apprehension and the manner in which Verdugo was apprehended violated his Due Process rights.

Defendant Verdugo has further filed a motion to suppress evidence wherein he seeks to suppress:  (1) evidence seized from his residence in Mexicali, Mexico; (2) evidence seized from his vehicle in Mexicali, Mexico; (3) hair exemplars; and (4) voice exemplars obtained after his arrest.  Defendant Verdugo argues that his arrest on narcotics charges was a sham.  Defendant alleges that his arrest was therefore unlawful and any evidence seized pursuant to his unlawful arrest should be suppressed. Defendant's Motion To Dismiss First Superseding Indictment Due To Conscience Shocking Government Activity and Motion To Suppress Evidence are both frivolous and without merit and therefore should be denied.

- 3 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

II

PROCEDURAL BACKGROUND

On August 3, 1985, United States Magistrate Roger Curtis McKee, United States District Court, Southern District of California issued a warrant of arrest for defendant Rene Martin Verdugo-Urquidez (hereinafter "Verdugo"). Defendant Verdugo was charged by complaint with conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 846, and the unlawful use of a communication facility to facilitate a narcotics felony in violation of 21 U.S.C. § 843(b). (See Exhibit A). On January 24, 1986, defendant Verdugo was arrested in San Felipe, Mexico by Mexican law enforcement personnel. The Mexican police officers thereafter drove defendant Verdugo to the international border a short distance from the Port of Entry at Calexico. Defendant Verdugo was met at the border by United States Deputy Marshals who placed defendant in custody pursuant to the outstanding arrest warrant.

On January 28, 1986, defendant Verdugo was indicted in the United States District Court, Southern District of California, in case number 86-0107-JLI, and charged in three counts with Conspiracy to Possess Marijuana with Intent to Distribute in violation of 21 U.S.C. § 846; Possession of Marijuana In Excess of 1,000 Pounds With Intent to Distribute in violation of 21 U.S.C. § 841(a)(1) ; and Use of a Communication Facility (telephone) to Facilitate a Narcotics Felony in violation of 21 U.S.C. § 843(b). (See Exhibit B). Defendant Verdugo is presently awaiting trial in United States District Court, in San Diego on a Second Superseding

- 4 -

indictment which was returned August 10, 1986. The Second
Superseding indictment, case number 86-0107-JLI, charges defendant
Rene Verdugo and 38 other defendants in a 40 count indictment with
violations of 21 U.S.C. § 952, 960 and 963: Conspiracy to Import
a Controlled Substance; 21 U.S.C. § 841(a)(1) 841(b)(6), 841(b)(B)
and 846: Conspiracy to Possess With Intent to Distribute a
Controlled Substance; 18 U.S.C. § 1952(a)(3), 371: Conspiracy To
Travel in Intestate and Foreign Commerce To Promote Unlawful
Activity; 21 U.S.C. §§ 841(a)(1), 841(b)(6), 841(b)(1)(B):
Possession with Intent to Distribute a Controlled Substance; 21
U.S.C. § 843(b): Use of a Communication Facility in Committing a
Controlled Substance Offense; 18 U.S.C. § 1952(a)(3): Travel in
Interstate and Foreign Commerce To Promote Unlawful Activity; 31
U.S.C. § 316 and 5322(b); Transportation of Monetary Instruments
Without a Filing Report Required by Law; and 18 U.S.C. § 2:
Aiding and Abetting. Defendant Verdugo is further charged with
conducting a continuing criminal enterprise in violation of
21 U.S.C. § 848. (See Exhibit C).

On April 4,1986, a hearing was held before the Honorable
J. Lawrence Irving, United States District Judge, United States
District Court, Southern District of California, on defendant's
motion to dismiss based on the manner in which defendant Verdugo
was apprehended in Mexico, the same motion, involving the same
issue, which defendant Verdugo seeks to relitigate before this

- 5 -

1  Court.[1/]  Judge Irving denied the motion to dismiss and on April
2  11, 1986, issued a Memorandum Decision and Order.  (See Exhibit
3  D).[2/]

4      Defendant's Motion to Dismiss Second Superseding Indictment
5  Due To Conscience Shocking Government Activity is frivolous and
6  the relitigation of this issue is barred by collateral estoppel.
7  Defendant's Motion To Suppress Evidence is furthermore without
8  merit and should also be denied.

9                            III

10                   STATEMENT OF FACTS

11     The government adopts and incorporates by reference herein
12  Judge Irving's Memorandum Decision and Order.  Judge Irving's
13  findings of fact are adopted herein as the government's statement
14  of facts.

15

16

17

18  _____

19  1/  At the hearing before District Court Judge Irving, the court
    further considered defendant Verdugo's motion to suppress
20  identification evidence, motion to change in custody status and
    motion to disclose the identity of the government's confidential
21  informants.

22  2/  The only "conscience shocking" activity involved in this
    matter is defense counsel's blatant omission and failure to advise
23  this Court that the issue regarding defendant Verdugo's
    apprehension in Mexico has been litigated in the United States
24  District Court, Southern District of California, and denied by
    Judge Irving.  Failure to notify the court of Judge Irving's
25  ruling and Memorandum Decision and Order serves to mislead the
    court, and creates the impression that the issue regarding
26  defendant Verdugo's arrest is being litigated for the first time
    in the United States District Court for the Central District of
27  California.

28                      -  6  -

IV

THE ISSUE REGARDING WHETHER DEFENDANT VERDUGO'S

DUE PROCESS RIGHTS WERE VIOLATED AS THE RESULT

OF HIS APPREHENSION IN MEXICO HAS BEEN LITI-

GATED AND IS THEREFORE BARRED FROM RELITIGATION

UNDER THE DOCTRINE OF COLLATERAL ESTOPPEL

The Ninth Circuit in United States v. Schartz, 785 F.2d 673
(1986), discussed the three step inquiry which is to be followed
when analyzing the application of collateral estoppel in criminal
cases:

> First, the issues in the two actions are
> identified so that we may determine whether
> they are sufficiently similar and material to
> justify invoking the doctrine.  Second, we
> examine the first record to determine whether
> the issue was fully litigated.  Finally, from
> our examination of the record, we ascertain
> whether the issue was necessarily decided.

Id. at 681.  Citing from United States v. Hernandez, 572 F.2d
218 (9th Cir. 1978).  See United States v. Crooks, 804 F.2d 1441
(9th Cir. 1986).

As applied to the instant case, the first question involves
whether the issues in both cases are sufficiently similar.  The
government has attached defendant's Notice of Motion and Motion
for Dismissal of Indictment and Request for Evidentiary Hearing
which was filed on March 24, 1986, in the United States District
Court, Southern District of California, in case CR 86 0107-JLI.

1  (See Exhibit E).  Defendant's motion on page one, line 21-26,
2  states:

3          Defendant bases this motion for dismissal on
4          the following grounds:
5              (1)  the government's involvement with the
6              defendant's abduction from Mexico to the
7              United States violates the defendant's
8              constitutional rights, including due
9              process of law.

10  In examining defendant's motion to dismiss filed in the
11  San Diego case, it is clear that the precise issue presently
12  before this court has previously been raised before the United
13  States District Court, Southern District of California.  The
14  issues raised in the San Diego case and the present case involve
15  the apprehension of defendant Verdugo in Mexico.  In both cases,
16  defendant Verdugo seeks the same relief, dismissal of the
17  indictment for violation of due process rights.  The issues raised
18  in both cases are therefore "sufficiently similar."

19  The second step in the collateral estoppel analysis is whether
20  the same issue has been "fully litigated".  Defendant Verdugo's
21  Motion for Dismissal of Indictment and Memorandum of Points and
22  Authorities, which has been attached to the government's
23  opposition as Exhibit E, clearly establishes that the issue was
24  fully briefed and litigated by defendant Verdugo in federal court
25
26
27                          -  8  -
28

1   in San Diego.$\underline{3/}$  Moreover, as to step three of the analysis,

2   whether the same issue was "necessarily decided", Judge Irving's

3   Memorandum Decision and Order establishes both that the issue

4   regarding Verdugo's apprehension was both fully litigated and

5   necessarily decided by Judge Irving in the San Diego narcotics

6   case.  Relitigation of the same issue in therefore barred by the

7   doctrine of collateral estoppel.  Defendant's Motion To Dismiss

8   First Superseding Indictment Due To Conscience Shocking Government

9   Activity should therefore be denied:

10      The Ninth Circuit in United States v. Hernandez, 572 F.2d 218

11  (1978), further stressed that new evidentiary facts may not be

12  brought forward to force relitigation of the issue after the issue

13  has been litigated and decided.

14              An issue on which relitigation is foreclosed

15              may be one of evidentiary fact, of ultimate

16              fact (i.e., the application of law to fact), or

17              of law . . . Thus, for example, if the party

18              against whom preclusion is sought did in fact

19              litigate an issue of ultimate fact and suffered

20              an adverse determination, new evidentiary facts

21              may not be brought forward to obtain a

22

23  _____

24  3/  It is interesting to note that in Verdugo's related Motion to
    Suppress Evidence, declarations by defendant Verdugo and defense
25  counsel Michael Pancer have been attached.  Those same
    declarations were filed in support of Defendant's Motion To
26  Dismiss which was denied by Judge Irving.  It therefore appears
    that defendant's argument in the present case is nothing more than
27  a rehash of what Judge Irving considered in denying defendant's
    prior motion to dismiss.

28                          -  9  -

1    different determination of the ultimate

2    fact . . . (Restatement of Law, 2d, Judgment,

3    supra, § 68, Comment l.)

4  Id. at 221.

5    While defendant Verdugo does not appear to be alleging any new

6  facts in support of his second motion to dismiss.  New evidentiary

7  facts would nevertheless not justify relitigation of this issue.

8  Defendant's Motion to Dismiss First Superseding Indictment Due to

9  Conscience Shocking Government Activity should therefore be denied.

10                              V

11            DEFENDANT VERDUGO'S DUE PROCESS RIGHTS WERE

12                 NOT VIOLATED UNDER TOSCANINO

13    It is a general rule of law that when a person accused of a

14  crime is found within the territorial jurisdiction that has

15  charged him, and when that person is held under process legally

16  issued from a court of that jurisdiction, the jurisdiction of the

17  court is not impaired by the fact that the person was forcibly

18  apprehended to bring him into the charging jurisdiction.  This

19  rule has come to be known as the Ker-Frisbie doctrine, named for

20  the two Supreme Court decisions that established it, Ker v.

21  Illinois, 119 U.S. 436 (1886) and Frisbie v. Collins, 342 U.S. 519

22  (1952).  The Ker court reasoned that due process of law is not

23  jeopardized by "mere irregularities in the manner in which [a

24  defendant] may be brought into the custody of the law" assuming

25  the existence of a proper indictment or complaint.  119 U.S. at

26  440.  The Frisbie court further explained that Ker and its progeny

27                          -  10  -

28

1    rest on the sound basis that due process of law
2    is satisfied when one present in court is
3    convicted of a crime after having been fairly
4    apprised of the charges against him and after a
5    fair trial in accordance with constitutional
6    procedural safeguards. There is nothing in the
7    Constitution that requires a court to permit a
8    guilty person rightfully convicted to escape
9    justice because he was brought to trial against
10   his will.

11  Id. at 522.

12      Virtually all courts since Frisbie applied and followed this
13  general rule without question until 1974 when the Second Circuit
14  sought to reinterpret the doctrine and created an exception for
15  cases in which defendants suffered extreme brutality as part of a
16  plan to transport them to the United States for prosecution. In
17  United States v. Toscanino, 500 F.2d 267 (2d Cir. 1974), the court
18  created an exception to the absolute doctrine of the Ker-Frisbie
19  rule by applying the expanded interpretation for due process
20  recognized in Rochin v. California, 342 U.S. 165 (1952); Mapp v.
21  Ohio, 367 U.S. 643 (1961); and United States v. Russell, 411 U.S.
22  423 (1973), to the permissible methods for obtaining personal
23  jurisdiction over defendants found outside the United States.
24  From the facts alleged by Toscanino, it was clear to the Second
25  Circuit that the circumstances of his capture and transfer to the
26  United States "shocked the conscience" and, if proven, would
27  constitute a denial of due process that should result in dismissal
28  of the indictment against him.

1      Toscanino claimed that he and his pregnant wife were lured

2  from his home in Uruguay by a telephone call from a Uruguayan

3  policeman acting as a paid agent of the United States, that he was

4  abducted by Uruguayan authorities, knocked unconscious with a gun,

5  bound and blindfold, driven to the Brazilian border and

6  surrendered to Brazilian authorities.  Brazilian authorities

7  allegedly tortured him by denying him food, water and sleep,

8  forcing him to walk up and down a hallway for eight hours at a

9  time, then beating and kicking him, pinching his fingers with

10  metal pliers, flushing alcohol and other fluids into his eyes,

11  nose and anal passage, attaching electrodes to has extremities and

12  administering shock treatments.  Toscanino claimed that he was

13  then transported to Rio de Janeiro, drugged by Brazilians, put on

14  board an airplane bound for New York, arrested on the aircraft and

15  then brought to the Assistant United States Attorney when he

16  arrived in New York.  On the basis of these allegations, the

17  Second Circuit remanded the case to the district court to conduct

18  an evidentiary hearing to explore the methods by which Toscanino

19  was brought to New York.$\underline{\frac{4}{}}$

20

21

----

22  4/  On remand, the district court considered an 11-page affidavit
submitted by Toscanino alleging the specifics of his abduction.
The court, however, determined that the defendant had submitted no

23  credible evidence of United States participation in the abduction
or torture and as a result, declined to hold a further evidentiary

24  hearing.  398 F. Supp. 916, 917 (E.D.N.Y. 1975).  It is
significant to note, therefore, that even under the Second

25  Circuit's Toscanino opinion, when the government denies complicity
in an abduction, a defendant must first offer credible supporting

26  evidence in response to this denial before a district court, in
its discretion, holds an evidentiary hearing.  Accord United

27  States v. Sorren, 605 F.2d 1211, 1215 (1st Cir. 1979) (Court of

28  [footnote continued on next page]

1  The Second Circuit in Toscanino used the particularly

2  outrageous allegations presented to create an exception from the

3  Ker-Frisbie rule where personal jurisdiction over a defendant has

4  been acquired "as the result of the government's deliberate,

5  unnecessary and unreasonable invasion of the accused's

6  constitutional rights." 500 F.2d at 275. Cases since Toscanino

7  in all Circuit Courts of Appeal, including the Second Circuit,

8  however, have sharply limited the scope of this exception. In

9  United States ex rel. Lujan v. Gengler, 510 F.2d 62 (2d Cir.),

10 cert. denied, 421 U.S. 1001 (1975), the Second Circuit explained

11 that Toscanino was not intended to overrule the Ker-Frisbie

12 doctrine:

13          [I]n recognizing that Ker and Frisbie no longer

14          provide a carte blanche to government agents

15          bringing defendants from abroad to the United

16          States by the use of torture, brutality and

17          similar outrageous conduct, we did not intend

18          to suggest that any irregularity in the

19          circumstance of defendant's arrival in the

20          jurisdiction would vitiate the proceedings of

21          the criminal court. In holding that Ker and

22

23          _____

24  4/  [footnote continued from previous page]

    Appeals recognizes that review a of decision not to hold an
25  evidentiary hearing is merely a review of the exercise of
    discretion dependent upon particular facts before the district
26  court). It is also significant that in the majority of cases
    which have been reviewed, evidentiary hearings on allegations
27  presented by defendants were not granted.

28                          -  13  -

1          Frisbie must yield to the extent they were

2          inconsistent with the Supreme Court's more

3          recent pronouncements we scarcely could have

4          meant to eviscerate the Ker-Frisbie rule, which

5          the Supreme Court has never felt impelled to

6          disavow.

7  510 F.2d at 65 (emphasis in text, footnote omitted).

8      Lujan, a co-defendant of Toscanino's, attempted to challenge

9  the indictment on the same basis as Toscanino, but the Second

10  Circuit found that the government conduct of which Lujan

11  complained "pale[d] by comparison with that alleged by

12  Toscanino." Id. at 66. Lujan, a pilot, had merely been duped

13  into flying from Argentina to Bolivia by a person who claimed to

14  have a business interest in Bolivia but who actually had been

15  hired by American agents to lure Lujan to Bolivia. Once in

16  Bolivia, Lujan was taken into custody by Bolivian police, held for

17  five days, and then placed on a plane bound for New York. Id. at

18  63. The Lujan court noted that there were no claims of torture,

19  terror or custodial interrogation of any kind and thus, there was

20  no evidence of "shocking governmental conduct sufficient to

21  convert" an illegal abduction into a violation of due process.

22  Id. at 66.

23      The Ninth Circuit decision in United States v. Lovato, 520

24  F.2d 1270 (9th Cir.) (per curiam), cert. denied, 423 U.S. 985

25  (1975), is dispositive of the present case. In that case the

26  defendant was forcibly expelled from Mexico by Mexican law

27  enforcement personnel into the awaiting arms of United States

28

- 14 -

federal agents.   The Ninth Circuit held the <u>Ker-Frisbie</u> doctrine applied unless the defendant

> makes a strong showing of grossly cruel and
> unusual barbarities inflicted upon him by
> persons who can be characterized as paid agents
> of the United States.

<u>Id</u>. at 1271.

The Ninth Circuit held that there was no evidence of brutality like that present in <u>Toscanino</u>.   The Ninth Circuit therefore denied Lovato's motion to dismiss on due process grounds.

In <u>United States v. Valot</u>, 625 F.2d 308 (9th Cir. 1980), defendant was taken to the Bangkok airport by Thai immigration officials where he was met by two DEA agents.   Over defendant's protest he was handcuffed and taken aboard a flight to Honolulu. When defendant arrived in Honolulu he was placed under arrest.   In denying defendant's motion to dismiss under <u>Toscanino</u>, the Ninth Circuit stated that only where the defendant alleges governmental conduct "of the most outrageous kind" will due process be violated and the court required to divest itself of jurisdiction.   <u>Id</u>. at 310, <u>citing</u> <u>United States v. Ex Rel. Lujan v. Gengler</u>, 510 F.2d 62, 65-66 (2nd Cir.), <u>cert</u>. <u>denied</u>, 421 U.S. 1001 (1975).

As applied to the facts of the present case, once defendant Verdugo's allegations are stripped of Verdugo's personal opinions, suspicions, and conclusions, defendant's allegations amount to no more than that he was apprehended, handcuffed against his will, a jacket placed over his head, and then turned over to United States

- 15 -

1  federal agents.[5/]  There is no evidence of any beatings or

2  torture.  There is no evidence that he was interrogated prior to

3  being turned over to United States authorities.  Defendant Verdugo

4  simply does not allege the kind of conduct found shocking to the

5  conscience in Toscanino.

6  Moreover, where there have been allegations of serious

7  physical abuse carried out by foreign law enforcement personnel,

8  the courts have been unwilling to dismiss the indictment absent a

9  finding that American agents directly participated in or directed

10  the torture.  It is important to note that courts carefully

11  consider whether there is "independent" evidence of American

12  complicity in such misconduct.  Perhaps the most glaring example

13  of abusive treatment where the defendant attempted to implicate

14  American agents is United States v. Lira, 515 F.2d 68 (2d Cir.

15  1975).  Lira alleged that he was beaten, strapped nude to a box

16  spring and tortured with electrical shocks by Chilean police while

17  he heard English spoken.  He was then held for three weeks in

18  another Chilean prison, during which time he was also beaten.  The

19  Chilean Naval Prosecutor forced him to sign a decree expelling

20  himself from Chile.  Lira was photographed by Chilean agents and

21  was told that Americans expected to receive his photograph.

22  Furthermore, Lira told the district court that outside the Chilean

23

24

25  5/  It should be emphasized that an affidavit by defendant Verdugo
has not been attached to defendant's Motion to Dismiss First
Superseding Indictment Due to Conscious Shocking Government
26  Activity.  Defendant only submits some newspaper articles
involving unrelated cases which are not competent evidence and
27  should be stricken by the court.

28

1 Prosecutor's office, he saw two men who were identified as DEA
2 special agents by a fellow prisoner. When he was taken to the
3 airport, Lira said he was given some pills by a man he thought was
4 an American physician, and he was accompanied to New York by DEA
5 agents and eight Chilean policemen. Id. at 69-70.

6 At the evidentiary hearing held in the district court, one of
7 the two DEA agents testified that DEA had requested Chile to
8 arrest the defendant, had received a report of the defendant's
9 arrest and was kept aware of his incarceration, but denied ever
10 meeting the defendant before boarding the plane to New York and
11 denied any involvement with the Chilean investigation. Id. at
12 70. The Second Circuit found that although a suspicion of United
13 States involvement in the Chilean police actions may have arisen,
14 no proof of American participation or acquiescence to the
15 misconduct had been shown at the evidentiary hearing. Id. In
16 dismissing the due process challenge, the Lira court refused to
17 apply Toscanino, reasoning that:

18         Where the United States Government plays no
19         direct role or substantial role in the
20         misconduct and foreign police have acted not as
21         United States agents but merely on behalf of
22         their own government, the imposition of penalty
23         would only deter United States representatives
24         from making a lawful request for the defendant
25         and would not deter any illegal conduct. Since
26         our Government has no control over the foreign
27         police, extension of Toscanino to the present
28         case would serve no purpose.

1 | <u>Id.</u> at 71.

2     Thus, in cases where there is a lack of evidence as to United
3 | States participation in the abusive conduct by foreign law
4 | enforcement personnel, courts will not impute that conduct to
5 | American agents nor dismiss the indictment, regardless of the
6 | level of mistreatment described by defendants. See, e.g., United
7 | States v. Cordero, 668 F.2d 32, 37 (1st Cir. 1981) (American law
8 | enforcement authorities not responsible for poor conditions in
9 | Panamanian jails; only link between United States and Panamanian
10 | authorities was defendant's sighting of DEA agent on two occasions
11 | and on one visit from American consul); United States v. Fielding,
12 | 645 F.2d 719, 723-24 (9th Cir. 1981) (treatment in Peruvian jail
13 | admittedly "outrageous" but defendant's attempts to connect
14 | federal agents to mistreatment "were at best ephemeral, and were
15 | contradicted by the agent in place"); United States v. Lara, 539
16 | F.2d 495 (5th Cir. 1976) (per curiam) (United States agents played
17 | "no direct role" in "torture admittedly administered by the
18 | Panamanian authorities" and "defendant failed to prove that a
19 | government agent was even present"); United States v. Marzano, 537
20 | F.2d 257, 270-71 (7th Cir. 1976) (defendants arrested by local
21 | authorities on Grand Cayman Island in presence of FBI agents; FBI
22 | agents were told they could not carry weapons on the Island,
23 | interrogate or take defendants into custody but were invited to
24 | accompany local authorities on investigation; defendants
25 | ultimately sent to Miami, court determined that "[m]ere presence
26 | of federal officers is not sufficient to make [them] participants"
27 | in the investigation and search of defendants); United States v.
28

-  18  -

Lopez, 542 F.2d 283, 284 (5th Cir. 1976) (defendant asserted he was held incommunicado, tortured and interrogated by Dominican Republic authorities for eight days at instigation of United States; court found he failed to allege "with any factual specificity" that United States agents played direct role in either torture or interrogation; and United States v. Orsini, 424 F. Supp. 231 (E.D.N.Y. 1976) (court denied defendant's attempt to establish that bribe had been paid to Senegalese officials by American agents to secure defendant's return to the United States, since proof of such a bribe would not show that Americans inflicted or directed inhumane treatment).

As applied to the present case, no credible evidence has been presented to establish that defendant Verdugo was subjected to the type of physical abuse and torture found constitutionally objectionable in Toscanino. Consequently, an evidentiary hearing on the subject is not warranted. Furthermore, since the treatment complained of by Verdugo doesn't rise to the level of a Toscanino violation, an evidentiary hearing to determine the alleged complicity by DEA agents is likewise not warranted. Defendant's Motion to Dismiss First Supeseding Indictment Due to Conscience Shocking Government Activity and Motion for Evidentiary Hearing are meritless and should be denied.

VI

## A HAIR SAMPLE WAS OBTAINED FROM DEFENDANT
## VERDUGO AFTER HE WAS LAWFULLY PLACED UNDER
## ARREST AND CONSENTED TO GIVING THE HAIR SAMPLE

In defendant's Motion to Suppress Evidence, he argues that his arrest was merely a sham to obtain evidence from Verdugo regarding his involvement in the Camarena murder. Defendant Verdugo maintains that his arrest was unlawful and therefore evidence seized at his residence and from his vehicle in Mexicali, as well as hair samples and voice exemplars taken from defendant Verdugo after his arrest, should be suppressed. Defendant Verdugo files a lengthy memorandum of points and authorities in support of his motion to suppress, twenty pages of which are spent discussing the legality of the search of Verdugo's residence and vehicle in Mexicali. It should be emphasized that approximately two months prior to the filing of defendant's motion to suppress, defendant inquired whether the government intended to introduce at trial evidence seized by Mexican law enforcement officials from Verdugo's residence and vehicle in Mexicali. The government represented then, and reiterates once again, that no evidence seized from either defendant's residence or vehicle in Mexico will be introduced at trial. Consequently, the use of evidence seized from defendant's residence and vehicle in Mexicali are not at issue. Moreover, on more than one occasion the government has represented to defendant that the Verdugo's voice exemplars would not be introduced at trial. Therefore, the use of voice exemplars at trial is not at issue. Defendant's lengthy motion to suppress

1 evidence can therefore be pared down to one issue, the

2 admissibility of the hair samples taken by the government from

3 defendant Verdugo.[6]/

4    Defendant Verdugo begins his argument by imputing bad faith to

5 the government and alleges that the arrest of Verdugo on narcotics

6 charges was a sham.[7]/  As previously stated, a criminal

7 complaint and arrest warrant were issued on August 3, 1985,

8 charging defendant alone in a three count complaint with

9 violations of 21 U.S.C. § 846:  conspiracy to possess marijuana

10 with intent to distribute; 21 U.S.C. § 841(a)(1):  possession of

11 marijuana with intent to distribute; and 21 U.S.C. § 843(b):  use

12 of a communication facility to facilitate a narcotics felony.  The

13 Verdugo narcotics investigation however has not remained static.

14 Defendant Verdugo at present has been indicted in the United

15 States District Court, Southern District of California, along with

16 38 other defendants in a 40 count indictment charging numerous

17 violations of the federal narcotics laws under Title 21.  (See

18 Exhibit D).  Defendant Verdugo has further been charged with

19 conducting a continuing criminal enterprise, 21 U.S.C. § 848, for

20 his role in supervising at least 38 defendants in a massive

21 marijuana narcotics enterprise.  Defendant Verdugo is further

22

23 _____

24 6/  The taking of hair samples does not violate the privilege
against self-incrimination guaranteed by the Fifth Amendment.

25 Schmerber v. California, 384 U.S. 757 (1966); United States v.
Palmer, 536 F.2d 1278, 1281 (9th Cir. 1976).

26 7/  It should be emphasized that defendant does not challenge the
probable cause to arrest Verdugo.  That issue is therefore not

27 before this Court.

28                          -  21  -

1 facing a possible mandatory life sentence. The narcotics
2 investigation of defendant Verdugo has been aggresively pursued by
3 the United States Attorney's Office in San Diego. The prosecution
4 of Verdugo on narcotics charges in case number CR 86-0107-JLI, is
5 clearly not a sham.

6     In challenging the admissibility of the hair samples,
7 defendant Verdugo creates the impression that the hair samples
8 were forcibly taken from defendant incident to his arrest in the
9 United States. In fact, on January 30, 1986, six days after his
10 arrest, defendant Verdugo appeared before a federal grand jury
11 empaneled in Washington, D.C. Defendant Verdugo appeared with
12 counsel and was allowed to consult with his attorney outside the
13 grand jury room. Defendant Verdugo testified before the grand
14 jury and consented to furnish agents of the Federal Bureau of
15 Investigation and the Drug Enforcement Administration samples of
16 his hair, handwriting, printing, finger and palm prints, and voice
17 exemplars. (A copy of the grand jury transcript has been attached
18 as Exhibit F.)

19     During the grand jury proceeding defendant Verdugo was
20 questioned as follows:

21 The Foreman: Will you state your name, please.

22 The Witness: Rene Martin Verdugo-Urguidez.

23 The Foreman: Sir, Mr. Verdugo will you agree to furnish
24            to the grand jury, through the agents and
25            technicians of the FBI or/and of the Drug
26            Enforcement Administration, the following
27            items. These are the items: samples of

28

your hair; samples of you blood; exemplars
of your handwriting; exemplars of your
printing; prints of the palms of both your
hands; tape-recorded exemplars of your
voice, reading phrases which will be
furnished to you to read by agents of the
FBI and/or the DEA.  Now, in order to
accomplish this, do you agree to furnish
these samples at the earliest possible
time in the offices of the DEA and/or the
FBI?

The Witness:  Yes, sir.

The Foreman:  Thank you.

(See grand jury transcript at p. 2-3).

The following day on January 31, 1986, defendant Verdugo
voluntarily consented to allow Special Agent Michael P. Malone, a
hair and fibers expert with the Federal Bureau of Investigation,
to take a hair sample.  Defendant Verdugo does not dispute that he
knowingly and voluntarily consented to furnish the hair samples.
Once again, defendant Verdugo fails to bring to the court's
attention matters which are material and have a direct bearing on
his motion before the court.  Defendant Verdugo knowingly and
fully consented to furnish the hair sample to the government.
United States v. Mendenhall, 446 U.S. 544, 571 (1981); Schneckloth
v. Bustamonte, 412 U.S. 218, 227 (1973).

-  23  -

1  Defendant's Motion to Suppress is therefore without merit and
2  should be denied.[8/]

3                                VII

4                            CONCLUSION

5      For the reasons stated herein, Defendant's Motion to Dismiss
6  First Superseding Indictment Due to Conscience Shocking Government
7  Activity and Defendant's Motion to Suppress Evidence, should be
8  denied.

---

[8/]  Defendant's request for an evidentiary hearing is merely an
attempt to obtain discovery which he is not otherwise entitled.
The question of whether an evidentiary hearing is appropriate is a
matter left to the discretion of the court.  United States v.
Licavoli, 604 F.2d 613 (9th Cir. 1979).  The government submits
that an evidentiary hearing is not required.

SOUTHERN DISTRICT OF CALIFORNIA

78-0127-0287-E

| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) |
| RENE VERDUGO | ) |
| | ) |

| WARRANT ISSUED ON THE BASIS OF: | | Magistrate's Case No. |
| __ Failure to Appear   __ Order of Court | | 885291324 |
| __ Indictment          __ Information | | **WARRANT FOR ARREST** |
| _x_ Complaint | | |

**TO:**

| | | NAME AND ADDRESS OF PERSON TO BE ARRESTED: |
| Any U.S. Marshal or other | ) | RENE VERDUGO |
| authorized officer | ) | |
| | ) | |

| DISTRICT OF ARREST: | | CITY OF ARREST: |
| Southern District of California | ) | |

YOU ARE HEREBY COMMANDED to arrest the above-named person and bring that person before the United States District Court to answer to the charge(s) listed below.

## DESCRIPTION OF CHARGES

Conspiracy to possess marijuana with the intent to distribute; unlawful use of a communication facility

ORDERED SEALED BY COURT

| IN VIOLATION OF | UNITED STATES CODE TITLE 21 | SECTION 841(a)(1), 846, 843(b) |
| BAIL $100,000 | OTHER CONDITIONS OF RELEASE | |
| ORDERED BY | | DATE ORDERED |
| The Honorable Roger Curtis McKee, United States Magistrate | | August 2, 1985 |
| CLERK OF COURT/U.S. MAGISTRATE | BY | DATE ISSUED |

## RETURN

THIS WARRANT WAS RECEIVED AND EXECUTED WITH THE ARREST OF THE ABOVE-NAMED PERSON.

| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE |
| DATE EXECUTED | | |

Note: The arresting officer is directed to serve the attached copy of the charge on the defendant at the time this warrant is executed.

# EXHIBIT A

Ex.A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA           )
                                   )
           v.                      )
                                   )
RENE VERDUGO                       )
                                   )
                                   )    Magistrate Case No.:   85 2912 M
                                   )
                                   )    COMPLAINT FOR VIOLATION OF
                                   )
                                   )    U.S.C. Title 21
                                   )
                                   )    Sections 841(a)(1), 846, 843(b)

FILED
ENTERED
LODGED
RECEIVED

AUG - 5 1985

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                     DEPUTY

The undersigned complainant being duly sworn states:

That on or about December       , 1983 , at San Diego, California,

                                                                    in the

Southern        District of California

(1)  Rene Verdugo

did (2) conspire to possess marijuana with the intent to distribute and did

unlawfully use a communication facility in the furtherance of a narcotics

offense.

   And the complainant states that this complaint is based on  see attached affidavit.

   And the complainant further states that he believes that

AUG 5 12 37 PM '85
RECEIVED
U.S. MARSHAL
SOUTHERN DISTRICT OF
CALIFORNIA

are material witnesses in relation to this charge.

                                            _____
                                            Signature of Complainant.

                                            AUG - 3 1985      Official Title.

Sworn to before me and subscribed in my presence,_____, 19____

that the foregoing document is a full, true and correct
copy of the original on file in my office and in my       ROGER CURTIS McKEE
legal custody.

          WILLIAM W. LUDDY                                      United States Magistrate
(1) Insert name of accused.         CLERK, U.S. DISTRICT COURT
(2) Insert statement of the essential facts constituting the offense charged.
          SOUTHERN DISTRICT OF CALIFORNIA
     By _____

ORDERED SEALED BY THE COURT

**A F F I D A V I T**

STATE OF CALIFORNIA )
                     )   ss.
COUNTY OF SAN DIEGO )

I, DAVID P. GAUTHIER, having been duly sworn, do hereby state and depose as follows:

1. I am a Special Agent of the United States Drug Enforcement Administration (DEA) and have been a federal narcotics enforcement officer for 14 years. In my capacity as a Special Agent, I have received specialized training in the enforcement of laws concerning controlled substances as found in Title 21, United States Code. As a result of my training and experience and in connection with my office, I have provided testimony before judicial officers involving prosecutions of individuals accused of violating laws concerning controlled substances.

2. I have personally participated in this investigation and am thoroughly familiar with the information contained in this affidvit either through personal investigation or through discussions with other specials agents of the DEA, Internal Revenue Service, and United States Customs Service.

3. Victor Vidal has stated that in mid-December 1983 he received a telephone call from Rene Verdugo stating that he (Rene Verdugo) had approximately 2,000 pounds of marijuana in Tucson, Arizona, ready for Vidal. Vidal then arranged for Mark Witschger to go to Tucson to pick up the 2,000 pounds of marijuana. Vidal has further stated that he has known Rene Verdugo since at least

//

MEL:mk:1
08/02/85

1979, during which time he and Verdugo have dealt in multi-ton loads of marijuana.

4. Manuel Cruz Antuna has stated that Victor Vidal told him, in December 1983, that Rene Verdugo had approximately one ton of marijuana ready in Tucson, Arizona.

5. Mark Witschger has stated that he was paid approximately $20,000 in December 1983 for transporting approximately one ton of marijuana from Tucson, Arizona, to Vista, California, for Victor Vidal.

```
                              _____
                              DAVID P. GAUTHIER
                              Special Agent
                              Drug Enforcement Administration
```

SWORN AND SUBSCRIBED to before me
this second day of August, 1985.

```
_____
ROGER CURTIS McKEE
UNITED STATES MAGISTRATE
```

-2-

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### November 1985 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Criminal Case No. 850107JLI |
| Plaintiff, | ) |
| | ) **I N D I C T M E N T** |
| v. | ) |
| RENE MARTIN VERDUGO-URQUIDEZ, | ) Title 21, U.S.C., Sec. 841(a)(1), 841(b)(6), and 846 - Conspiracy to Possess Marijuana in Excess |
| Defendant. | ) of 1,000 Pounds with Intent to Distribute; Title 21, U.S.C., Secs. 841(a)(1) and 841(b)(6) - Possession of Marijuana in Excess of 1,000 Pounds with Intent to Distribute; Title 21, U.S.C., Sec. 843(b) - Unlawful Use of Communication Facility |

The grand jury charges:

### Count 1

Beginning on or about December 1, 1983, and continuing up to and including June 27, 1984, within the Southern District of California, elsewhere, defendant RENE MARTIN VERDUGO-URQUIDEZ did knowingly and intentionally combine, conspire, and agree together with other persons known and unknown to the grand jury to knowingly and intentionally commit offenses against the United

MEL:sk:San Diego County
1-28-86

# EXHIBIT B

(Ex. B)

1  States, namely, to knowingly and intentionally possess marijuana,

2  a Scheduled I Controlled Substance, in a quantity in excess of

3  1,000 pounds with intent to distribute; in violation of Title 21,

4  United States Code, Sections 841(a)(1), and 841(b)(6).

5  OVERT ACTS

6  In the furtherance of said conspiracy and to effect the

7  objects thereof, the following overt acts, among others, were

8  committed within the Southern District of California, and else-

9  where:

10  1.  On or about December 20, 1983, defendant RENE MARTIN

11  VERDUGO-URQUIDEZ telephoned Victor Vidal, in Bonita, California,

12  and directed him to pick up approximately 2,240 pounds of

13  marijuana in Tucson, Arizona.

14  2.  On or about December 20, 1983, Victor Vidal arranged

15  for Mark Witschger to drive from San Diego, California, to

16  Tucson, Arizona, in order to pick up the 2,240 pounds of

17  marijuana.

18  3.  On or about December 22, 1983, Mark Witschger trans-

19  ported approximately 2,240 pounds of marijuana from Tucson,

20  Arizona to his residence at 520 Holly Lane, Vista, California.

21  4.  On or about December 23, 1983, Alfredo Gallegos and

22  Manuel Cruz Antuna transported the approximately 2,240 pounds

23  of marijuana from the Holly Lane residence to the residence of

24  Mark Wheat at 1144 Via Conejo, Escondido, California.

25  5.  On or about May 10, 1984, defendant RENE MARTIN VERDUGO-

26  URQUIDEZ and another male travelled to Mark Witschger's

27  residence at 520 Holly Lane, Vista with Adolfo Holguin and

28  inspected approximately 2,000 pounds of marijuana.

-2-

1         All in violation of Title 21, United States Code, Section

2 846.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                              -3-

Count 2

On or about May 10, 1984, within the Southern District of California, defendant RENE MARTIN VERDUGO-URQUIDEZ did knowingly and intentionally possess with intent to distribute approximately 2,000 pounds of marijuana, a Schedule I Controlled Substance; in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(6).

-4-

## Count 3

On or about December 20, 1983, within the Southern District of California, the defendant RENE MARTIN VERDUGO-URQUIDEZ did knowingly and intentionally use a communication facility, namely, a telephone, in committing and in causing and facilitating in the commission of controlled substance offenses, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, that is conspiracy to possess with intent to distribute marijuana, a Schedule I Controlled Substance; in violation of Title 21, United States Code, Section 843(b).

DATED:  January 29, 1986.

A TRUE BILL:

_____
Foreperson

PETER K. NUNEZ
United States Attorney


By: _____
       MICHAEL E. LASATER
       Assistant U.S. Attorney

-5-

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

November 1985 Grand Jury

UNITED STATES OF AMERICA,

                Plaintiff,

       v.

RENE MARTIN VERDUGO-
  URQUIDEZ (1),
SERGIO SANCHEZ-MUNOZ (2),
DONALD LEE WALTERS (3),
RICK THOMPSON (4),
JOHN DOE (5),
  aka "Walters,"
VICTOR RAMIREZ VASQUEZ (6),
STEPHEN KENT HILLYER (7),
LAWRENCE HUTCHINSON (8),
JOHN GEORGE COOK (9),
ALEJANDRO DIAZ GUERRERO (10),
EDUARDO ALVAREZ BARRON (11),
ADOLFO HERNANDEZ (12),
LARRY TURNER (13),
  aka "Larry,"
HAROLD ALLEN HUGHES (14),
  aka Michael Cooper,
MICHAEL WARD (15),
  aka Michael Duncan,
DAVID DIETER (16),
RONALD RODEMAN (17),
  aka "Ron,"
JOE NEIL OTTER (18),
  aka Joe Bob Hunter,

(continued on next page)
WPR:jlb:pfn:San Diego:3
08/10/86

Criminal Case No. 86-0107-JLI

I N D I C T M E N T
(Superseding)

Title 21, U.S.C., Secs. 952, 960 and 963
(Conspiracy to Import a Controlled
Substance);

Title 21, U.S.C., Secs. 841(a)(1), 841(b)(6),
841(b)(1)(B) and 846
(Conspiracy to Possess with Intent to
Distribute a Controlled Substance);

Title 18, U.S.C., Secs. 371 and 1952(a)(3)
(Conspiracy to Travel in Interstate and
Foreign Commerce to Promote Unlawful
Activity);

Title 21, U.S.C., Secs. 841(a)(1), 841(b)(6),
and 841(b)(1)(B)
(Possession with Intent to Distribute a
Controlled Substance);

Title 21, U.S.C., Sec. 843(b)
(Use of Communication Facility in Commit-
ting a Controlled Substance Offense);

Title 18, U.S.C., Section 1952(a)(3)
(Travel in Interstate and Foreign Commerce
to Promote Unlawful Activity);

EXHIBIT C

(Ex. C)

| | |
|---|---|
| 1 | RICARDO MUNOZ (19), ) Title 31, U.S.C., Secs. 5316 and 5322(b) |
| 2 | JORGE FRANCO (20), ) (Transportation of Monetary Instruments<br>ALBERTO CRETIN (21), ) Without Filing Report Required by Law); |

RICARDO MUNOZ (19),                    )   Title 31, U.S.C., Secs. 5316 and 5322(b)
JORGE FRANCO (20),                     )   (Transportation of Monetary Instruments
ALBERTO CRETIN (21),                   )   Without Filing Report Required by Law);
THEODORE CASH (22),                    )
    aka "Teddy Carson",               )   Title 18, U.S.C., Sec. 2
EUGENE HOLLESTELLE (23),               )   (Aiding, Abetting, and Causing
CORBIN WELSCH (24)                     )   Commission of Offense);
MARK LOWENBERG (25)                    )
RENATO CUEVAS (26),                    )   Title 21, U.S.C., Sec. 848
JOE ARTHUR CUEVAS (27)                 )   (Continuing Criminal Enterprise)
JOHN DOE (28),                         )
    aka "Ted",                        )
JOHN DOE (29),                         )
    aka "Russ",                       )
JOHN DOE (30),                         )
    aka "Tom",                        )
JOHN DOE (31),                         )
    aka "Mike",                       )
JOHN DOE (32),                         )
    aka "Dave",                       )
JOHN DOE (33),                         )
    aka "Ricky",                      )
JOHN DOE (34),                         )
    aka "Marty",                      )
PATRICIA SCIALAMPO (35),               )
DARLA COE (36),                        )
MANUEL RENATO                          )
    CRETIN-LIMON (37),                )
RAYMOND LYNN WELCH (38),               )
MICHAEL WHEELIHAN (39)                 )
                                       )
        Defendants.            )
_____)

The grand jury charges:

## Count 1

Beginning on a date unknown to the grand jury and continuing through February 1986, within the Southern District of California, and elsewhere, defendants RENE MARTIN VERDUGO-URQUIDEZ; SERGIO SANCHEZ-MUNOZ; DONALD LEE WALTERS; RICK THOMPSON; JOHN DOE, aka "Walters;" VICTOR RAMIREZ VASQUEZ; STEPHEN KENT HILLYER; LAWRENCE HUTCHINSON; JOHN GEORGE COOK; ALEJANDRO DIAZ GUERRERO; EDUARDO ALVAREZ BARRON; ADOLFO HERNANDEZ; LARRY TURNER, aka "Larry;" HAROLD ALLEN HUGHES, aka Michael Cooper; MICHAEL WARD, aka Michael Duncan; DAVID DIETER; RONALD RODEMAN, aka "Ron;" JOE

1  NEIL OTTER, aka Joe Bob Hunter; RICARDO MUNOZ; JORGE FRANCO; ALBERT

2  CRETIN; THEODORE CASH, aka "Teddy Carson;" EUGENE HOLLESTELLE; CORBII

3  WELSCH; MARK LOWENBERG; RENATO CUEVAS; JOE ARTHUR CUEVAS; JOHI

4  DOE, aka "Russ;"JOHN DOE, aka "Tom;" JOHN DOE, aka "Mike;" JOHN DOE, ak

5  "Dave;" JOHN DOE, aka "Ricky;" JOHN DOE, aka "Marty;" PATRICIA SCIALAMPO

6  DARLA COE; MANUEL RENATO CRETIN-LIMON; RAYMOND LYNN WELCH; an

7  MICHAEL WHEELIHAN  did knowingly and wilfully combine, conspire, and agre

8  together and with each other and with divers other persons known and unknown to th

9  grand jury to commit offenses against the United States, namely, to knowingly and

10  intentionally import marijuana, a Schedule I Controlled Substance, into the United

11  States; in violation of Title 21, United States Code, Sections 952 and 960.

12      2.    It was a part of the conspiracy that defendant RENE MARTIN VERDUGO-

13  URQUIDEZ would and did obtain multi-ton quantities of marijuana from major Mexican

14  marijuana producers for export to the United States by air and ground transportation.

15      3.    It was further a part of the conspiracy that defendant RENE MARTIN

16  VERDUGO-URQUIDEZ would and did procure aircraft and employ a group of pilots,

17  including defendants DONALD LEE WALTERS, RICK THOMPSON and THEODORE

18  CASH for the airlift of multi-ton quantities of marijuana from Mexico to clandestine

19  landing strips in remote areas of Southern California and Arizona.

20      4.    It was further a part of the conspiracy that defendant RENE MARTIN

21  VERDUGO-URQUIDEZ and other coconspirators would and did locate sites for and clear

22  landing strips in remote areas in Southern California and Arizona.

23      5.    It was further a part of the conspiracy that defendant RENE MARTIN

24  VERDUGO-URQUIDEZ and other coconspirators would and did procure aircraft navi-

25  gational equipment, night flying aids, portable landing strip illumination and marking

26  systems, portable radio communication systems, portable aircraft refueling equipment,

27

28

-3-

1 and other accessories to facilitate the transportation and delivery of marijuana fro
2 Mexico to the United States by aircraft.

3    6.   It was further a part of the conspiracy that defendant RENE MARTI
4 VERDUGO-URQUIDEZ and other coconspirators would and did employ ground crews
5 set up landing strip lighting and communications equipment, meet arriving aircraft lade
6 with marijuana, unload such aircraft and transport the marijuana to secret stas
7 locations.

8    7.   It was further a part of the conspiracy that defendant RENE MARTI
9 VERDUGO-URQUIDEZ would and did organize, supervise and otherwise manage, wit
10 the assistance of defendant DONALD LEE WALTERS and others, the smuggling of multi
11 ton quantities of marijuana into the United States by aircraft and other means.

12    8.   It was further a part of the conspiracy that upon importation of the
13 marijuana, defendant RENE MARTIN VERDUGO-URQUIDEZ would and did organize,
14 supervise and otherwise manage the bulk distribution of said marijuana through Victor
15 Vidal, defendant HAROLD ALLEN HUGHES and other distributors unknown to the grand
16 jury.

17    9.   It was further a part of the conspiracy that defendant RENE MARTIN
18 VERDUGO-URQUIDEZ and other coconspirators would schedule and coordinate the
19 withdrawal of marijuana from said secret stash locations for delivery to bulk distri-
20 butors, such as Victor Vidal and defendant HAROLD ALLEN HUGHES or their represen-
21 tatives.

22    10.  It was further a part of the conspiracy that defendant RENE MARTIN
23 VERDUGO-URQUIDEZ would and did utilize various coconspirators, including defendant
24 RICARDO MUNOZ and HAROLD ALLEN HUGHES to collect from bulk distributors
25 hundreds of thousands to millions of dollars from the sale of marijuana imported and
26 delivered as described above.
27 //
28

-4-

## OVERT ACTS

In furtherance of said conspiracy and to effect the objects thereof, the followi
overt acts, among others, were committed within the Southern District of Californi
and elsewhere:

1a. In May 1981, coconspirators Victor Vidal and Manuel Cretin drove fro
San Diego, California, to the office of defendant DONALD LEE WALTEI
near Huntington Beach, California.

1b. In May 1981, at the office of defendant DONALD LEE WALTERS ne
Huntington Beach, California, coconspirators Victor Vidal and Manuel Cret
met with defendants RENE MARTIN VERDUGO-URQUIDEZ, DONALD LE
WALTERS, MICHAEL WARD and VICTOR RAMIREZ VASQUEZ.

1c. In May 1981, defendant RENE MARTIN VERDUGO-URQUIDEZ agreed t
provide marijuana to coconspirator Victor Vidal and asked defendan
DONALD LEE WALTERS to have defendant MICHAEL WARD take Victo
Vidal to the marijuana stash.

1d. In May 1981, defendant MICHAEL WARD drove coconspirator Victor Vida
from Huntington Beach to a ranch.

1e. In May 1981, at the ranch, defendant MICHAEL WARD and an unidentifie
male took coconspirator Victor Vidal to a barn-like structure which containe
approximately 1,000 pounds of marijuana, from which Victor Vidal selecte
approximately 100 pounds.

1f. In May 1981, in San Diego, California, defendant JORGE FRANCO purchase
marijuana from coconspirator Victor Vidal.

2a. In or before September 1982, in a remote area near Blythe, California,
coconspirators unknown to the grand jury cleared an aircraft landing strip.

2b.  During the period from September 1982 to March 1983, coconspirato unknown to the grand jury landed aircraft in the landing strip near Blyth California, and were met there by unknown coconspirators in motor vehicles

3a.  On or about March 14, 1983, near Blythe, California, defendants STEPHE KENT HILLYER, LAWRENCE HUTCHINSON, VICTOR RAMIREZ VASQUE; JOHN GEORGE COOK, ALEJANDRO DIAZ GUERRERO and EDUARD ALVAREZ BARRON traveled to the vicinity of the airstrip.

3b.  On or about March 14, 1983, defendants RENE MARTIN VERDUGO URQUIDEZ and DONALD LEE WALTERS caused an aircraft loaded wit approximately 1,100 pounds of marijuana to be flown from Mexico to th airstrip in a remote area near Blythe, California.

3c.  On or about March 14, 1983, defendant DONALD LEE WALTERS caused the aircraft loaded with approximately 1,100 pounds of marijuana to be flown over the Southern District of California back to Mexico.

4.  In mid-November 1983, defendant RENE MARTIN VERDUGO-URQUIDEZ placed a telephone call to coconspirator Victor Vidal at Vidal's residence in Chula Vista, California, regarding the sale and purchase of  marijuana he imported and possessed at an undisclosed location.

5.  In mid-November 1983, coconspirator Federico Sanchez traveled to the vicinity of Huntington Beach, California, to receive marijuana from defen- dant DONALD LEE WALTERS.

6.  In mid-November 1983, near Riverside, California, defendant DONALD LEE WALTERS delivered approximately 150 pounds of marijuana to coconspirator Federico Sanchez, who transported it to the residence of coconspirator Mark Wheat in Escondido, California.

7.  In mid-November 1983, coconspirator Mark Wheat paid coconspirator Victor Vidal over $300,000 for marijuana previously delivered, which money was

-6-

transported by defendant RICARDO MUNOZ from the United States defendant RENE MARTIN VERDUGO-URQUIDEZ in Mexico.

8a. In November 1983, defendant RENE MARTIN VERDUGO-URQUIDEZ procured the purchase of a Sikorsky helicopter through a Delaware corporatio. Mid-Atlantic Airlift, for use in transporting multi-ton quantities of marijuar. from Mexico to the United States.

8b. On or about November 17, 1983, in Oklahoma City, Oklahoma, defendan THEODORE CASH took delivery of the Sikorsky helicopter from Rick Sawye International, Inc.

8c. In or about late October or early November 1983, defendant DONALD LE: WALTERS gave cash to defendant EUGENE HOLLESTELLE to rent propert; on La Cholla Drive, Tucson, Arizona, for the storage of marijuana to b airlifted from Mexico to the United States.

8d. In about late October or early November 1983, near Casa Grande, Arizona, defendants EUGENE HOLLESTELLE and LAWRENCE HUTCHINSON located a site for a clandestine landing strip to be used by aircraft carrying marijuana to the United States from Mexico.

8e. In about mid-November 1983, defendants DONALD LEE WALTERS and THEODORE CASH flew the Sikorsky helicopter, containing about 3,000 pounds of marijuana supplied by defendant RENE MARTIN VERDUGO-URQUIDEZ, from Mexico to the clandestine airstrip near Casa Grande, Arizona.

8f. From about mid-November to mid-December 1983, defendants DONALD LEE WALTERS and THEODORE CASH using the Sikorsky helicopter, flew about eight additional loads of marijuana from Mexico to the clandestine airstrip

near Casa Grande, Arizona, each load weighing approximately 3,000 pound: Defendant RENE MARTIN VERDUGO-URQUIDEZ supplied all of such mari juana.

8g. From about mid-November to mid-December 1983, near Casa Grande Arizona, defendants EUGENE HOLLESTELLE (the ground crew leader) LAWRENCE HUTCHINSON, JOHN DOE, aka "Ted," JOHN DOE, aka "Russ, and ALEJANDRO DIAZ GUERRERO participated in meeting and unloading the marijuana-laden Sikorsky helicopter on approximately nine occasions, and in transporting such marijuana (a total of approximately 30,000 pounds) to the La Cholla Drive property.

9. In mid to late December 1983, defendant RENE MARTIN VERDUGO-URQUIDEZ placed a telephone call from Mexico to the residence of Victor Vidal in Chula Vista, California, and informed him of the availability of ten tons of marijuana he imported and possessed in Tucson, Arizona.

10. On or about December 20, 1983, coconspirators Mark Witschger and Alfredo Gallegos, along with defendant ADOLFO HERNANDEZ, traveled from San Diego, California, to Tucson, Arizona, to pick up approximately 2,000 pounds of marijuana.

11. On or about December 21, 1983, in Tucson, Arizona, defendants RENE MARTIN VERDUGO-URQUIDEZ and DONALD LEE WALTERS caused the delivery of approximately 2,000 pounds of marijuana to coconspirators Mark Witschger, Alfredo Gallegos, and defendant ADOLFO HERNANDEZ.

12. On or about December 21, 1983, defendant ADOLFO HERNANDEZ and coconspirators Alfredo Gallegos and Mark Witschger transported the approximately 2,000 pounds of marijuana from Arizona to San Diego, California.

-8-

13.   On or about December 22, 1983, in San Diego County, California, co conspirator Mark Wheat received the 2,000 pounds of marijuana from coconspirators Alfredo Gallegos and Manuel Antuna.

14.   During the week following December 22, 1983, coconspirator Mark Wheat delivered about $850,000 to coconspirators Victor Vidal and Manuel Cretin, a substantial portion of which was transported by defendants RICARDO MUNOZ and ALBERTO CRETIN from San Diego County to defendant RENE MARTIN VERDUGO-URQUIDEZ in Mexico.

15a.   From about early January to early February 1984, defendants DONALD LEE WALTERS and THEODORE CASH flew about eleven loads of marijuana in the Sikorsky helicopter, weighing approximately 3,000 pounds each, from Mexico to the clandestine airstrip near Casa Grande, Arizona.   Defendant RENE MARTIN VERDUGO-URQUIDEZ supplied all of such marijuana.

15b.   From about early January to early February 1984, near Casa Grande, Arizona, defendants EUGENE HOLLESTELLE, LAWRENCE HUTCHINSON, JOHN DOE, aka "Russ," MARK LOWENBERG, JOHN DOE, aka "Tom," and JOHN DOE, aka "Mike," participated in meeting and unloading the marijuana-laden Sikorsky helicopter on approximately eleven occasions, and transporting such marijuana (a total of approximately 35,000 pounds) to the La Cholla Drive property.

16a.   In January 1984, defendant RENE MARTIN VERDUGO-URQUIDEZ placed a telephone call to the residence of coconspirator Victor Vidal, in Chula Vista, California, and offered to sell him about one ton of marijuana he imported and possessed in Tucson, Arizona.

16b.   In January 1984, in San Diego, California, coconspirator Manuel Cretin made arrangements with defendants LARRY TURNER and ADOLFO HERNANDEZ,

-9-

and conspirators John Hall and Federico Sanchez to travel to Tucson, Arizona to pick up the ton of marijuana.

17. In January 1984, in Tucson, Arizona, defendants RENE MARTIN VERDUGO-URQUIDEZ; DONALD LEE WALTERS; and JOHN DOE, aka "Walters", caused the delivery of approximately one ton of marijuana to defendants LARRY TURNER and ADOLFO HERNANDEZ, and coconspirators John Hall and Federico Sanchez.

18a. In January 1984, defendants LARRY TURNER and ADOLFO HERNANDEZ and coconspirators John Hall and Federico Sanchez transported approximately one ton of marijuana from Tucson, Arizona, to the residence of coconspirator Adolfo Holguin in San Diego, California.

18b. In January 1984, in San Diego County, California, defendant MANUEL RENATO CRETIN-LIMON and coconspirator Manuel Antuna transported the approximately one ton of marijuana to a ranch.

18c. In January 1984, in San Diego, California, defendant ADOLFO HERNANDEZ and coconspirators Victor Vidal and Manuel Antuna transported the one ton of marijuana from the ranch to the residence of coconspirator Mark Wheat.

19. During the latter part of January 1984, in San Diego, California, co-conspirator Mark Wheat paid coconspirators Victor Vidal, Manuel Cretin and Federico Sanchez over $700,000 for the marijuana, $580,000 of which money was transported by defendant RICARDO MUNOZ to defendant RENE MARTIN VERDUGO-URQUIDEZ in Mexico.

20a. In about late January 1984, defendants LARRY TURNER and ADOLFO HERNANDEZ and coconspirator John Hall traveled from San Diego, California, to Tucson, Arizona, to pick up one ton of marijuana.

20b. In about late January 1984, in Tucson, Arizona, defendants RENE MARTIN VERDUGO-URQUIDEZ and DONALD LEE WALTERS caused the delivery of

-10-

approximately one ton of marijuana to defendants LARRY TURNER and ADOLFO HERNANDEZ and coconspirator John Hall.

20c. In about late January 1984, defendant LARRY TURNER transported approximately one ton of marijuana in a semi-truck and trailer from Tucson Arizona, to the residence of defendant RAYMOND LYNN WELCH i Fallbrook, California.

20d. In about late January 1984, in San Diego County, coconspirator Manue Antuna transported approximately one ton of marijuana to the residence o coconspirator Mark Wheat in Escondido, California.

21. In February 1984, defendant RENE MARTIN VERDUGO-URQUIDEZ placed telephone call to the residence of Victor Vidal in Chula Vista, California, an advised him regarding marijuana he imported and possessed in Tucson Arizona. It was agreed that coconspirator Victor Vidal would accept one ton

22. In February 1984, pursuant to the request of coconspirator Victor Vidal coconspirator Manuel Cretin arranged with defendant LARRY TURNER to travel to Tucson, Arizona, in a semi-truck and trailer to pick up the marijuana.

23. In February 1984, defendants LARRY TURNER and ADOLFO HERNANDEZ and coconspirators John Hall and Manuel Cretin traveled from San Diego, California, to Tucson, Arizona.

24. In February 1984, in Tucson, Arizona, defendants RENE MARTIN VERDUGO-URQUIDEZ and DONAL LEE WALTERS procured the delivery of approximately one ton of marijuana to defendants LARRY TURNER and ADOLFO HERNANDEZ and coconspirators John Hall and Manuel Cretin.

-11-

25.  In February 1984, defendants LARRY TURNER and ADOLFO HERNANDEZ and coconspirators John Hall and Manuel Cretin transported the approximately one one ton of marijuana from Tucson, Arizona, to Los Angeles County, California.

26.  In February 1984, coconspirator John Hall and an unknown coconspirator transported approximately one ton of marijuana from Los Angeles County to the residence of coconspirator Mark Wheat, in Escondido, California.

27.  In February 1984, in San Diego, California, coconspirator Mark Wheat delivered approximately $450,000 to coconspirator Victor Vidal, in payment for the marijuana, $420,000 of which was transported by defendant RICARDO MUNOZ to defendant RENE MARTIN VERDUGO-URQUIDEZ in Mexico.

28a.  In about late February or early March 1984, defendants LARRY TURNER and ADOLFO HERNANDEZ, and coconspirators John Hall and Federico Sanchex traveled from San Diego, California, to Tucson, Arizona, to pick up approximately one ton of marijuana.

28b.  In about late February or early March 1984, in Tucson, Arizona, defendants RENE MARTIN VERDUGO-URQUIDEZ and DONALD LEE WALTERS caused the delivery of approximately one ton of marijuana to defendants LARRY TURNER and ADOLFO HERNANDEZ, and coconspirators John Hall and Federico Sanchez.

28c.  In about late February or early March 1984, defendant LARRY TURNER transported approximately one ton of marijuana in a semi-truck and trailer from Tucson, Arizona, to a warehouse in Los Angeles, California.

28d.  In about late February or early March 1984, coconspirator Federico Sanchez transported approximately one ton of marijuana from Los Angeles County to the residence of coconspirator Mark Wheat in Escondido, California.

28e.  In about late March or early April 1984, defendnts LARRY TURNER and ADOLFO HERNANDEZ and coconspirators John Hall and Federico Sanchez

-12-

tra....d from San Diego, California, to Tucson, Arizona, to pick up approx
mately one ton of marijuana.

28f. In about late March or early April 1984, in Tucson, Arizona, defendants REN
MARTIN VERDUGO-URQUIDEZ and DONALD LEE WALTERS caused th
delivery of approximately one ton of marijuana to defendants LARR
TURNER and ADOLFO HERNANDEZ and coconspirators John Hall an
Federico Sanchez.

28g. In about late March or early April 1984, defendant LARRY TURNE
transported approximately one ton of marijuana in a semi-truck and traile
from Tucson, Arizona, to a warehouse in Los Angeles County, California.

28h. In about late March or early April 1984, coconspirator Federico Sanche
transported approximately one ton of marijuana to the residence of Mar
Wheat in Escondido, California.

28i. In about late March or early April 1984, coconspirator Mark Wheat accepte
approximately 400 pounds of the approximately one ton of marijuana an
rejected the remaining 1,600 pounds as being moldy.

28j. In about late March or April 1984, in San Diego County, defendants RENATO
CUEVAS and JOE ARTHUR CUEVAS cleaned approximately 1,528 pounds o
molding marijuana which had been transported from Arizona to San Diego a
described in Overt Acts 28f, 28g, 28h and 28i above.

28k. In about late March or early April 1984, in San Diego, California, defendan
RENE MARTIN VERDUGO-URQUIDEZ traveled to the residence of cocon
spirator Mark Witschger in Encinitas, California, and inspected approximatel
1,528 pounds of marijuana he had imported into the United States.

28L In about late April 1984, defendants LARRY TURNER and ADOLFC
HERNANDEZ and coconspirators John Hall and Federico Sanchez travellec

-13-

from San Diego, California, to Tucson, Arizona, to pick up approximately two tons of marijuana.

28m. In about late April 1984, in Tucson, Arizona, defendants RENE MARTIN VERDUGO-URQUIDEZ and DONALD LEE WALTERS caused the delivery of approximately 4,000 pounds of marijuana to defendants LARRY TURNER and ADOLFO HERNANDEZ and coconspirators John Hall and Federico Sanchez.

28n. In about late April 1984, defendant LARRY TURNER transported approximately 4,000 pounds of marijuana in a semi-truck and trailer from Tucson, Arizona, to Los Angeles County, California.

29a. During the summer of 1984, from about July to October of that year, defendant DONALD LEE WALTERS, and other coconspirator pilots unknown to the grand jury, flew approximately four loads of marijuana in the Sikorsky helicopter, averaging approximately 3,000 pounds each, from Mexico to the clandestine airstrip near Casa Grande, Arizona. Defendant RENE MARTIN VERDUGO-URQUIDEZ supplied all of such marijuana.

29b. During the summer of 1984, from about July to October of that year, near Casa Grande, Arizona, defendants EUGENE HOLLESTELLE, LAWRENCE HUTCHINSON, JOHN DOE, aka "Russ," and DAVID DIETER participated in meeting and unloading the marijuana-laden Sikorsky helicopter on approximately four occasions, and the transportation of such marijuana (a total of approximately 13,000 pounds) to the La Cholla Dive property.

29c. From about October to December 1984, defendant DONALD LEE WALTERS, and other coconspirator pilots unknown to the grand jury, flew approximately ten loads of marijuana in the Sikorsky helicopter, averaging approximately 3,500 pounds each, from Mexico to the clandestine airstrip near Casa Grande, Arizona. Defendant RENE MARTIN VERDUGO-URQUIDEZ supplied all of such marijuana.

-14-

29d. From about October to December 1984, near Casa Grande, Arizona, defendants EUGENE HOLLESTELLE, JOHN DOE, aka "Russ," JOHN DOE, aka "Dave," CORBIN WELSCH and MARK LOWENBERG participated in meeting and unloading the marijuana-laden Sikorsky helicopter on approximately ten occasions, and the transportation of such marijuana (a total of approximately 35,000 pounds) to the La Cholla Drive property.

30a. In mid-November 1984, defendant MICHAEL WARD and coconspirator Donald Scelsa traveled from San Diego, California, to Tijuana, Baja California, Mexico, and met with defendant HAROLD ALLEN HUGHES to discuss the transportation of marijuana.

30b. In mid-November 1984 in San Diego, California, defendant MICHAEL WARD purchased a 1984 Chevrolet pickup truck with money he obtained from defendant HAROLD ALLEN HUGHES during their meeting in Tijuana, Baja California, Mexico.

31. In mid-November 1984, defendant HAROLD ALLEN HUGHES placed a telephone call to coconspirator Donald Scelsa in San Diego, California, during which he requested coconspirator Donald Scelsa to travel to Campo Mosqueda, Baja California, Mexico in connection with the transportation of marijuana.

32. In mid-November 1984, coconspirator Donald Scelsa traveled from San Diego, California, in the recently acquired 1984 Chevrolet pickup truck, to Campo Mosqueda, Baja California, Mexico.

33. In mid-November 1984, coconspirator Donald Scelsa met with defendant HAROLD ALLEN HUGHES who gave coconspirator Donald Scelsa directions regarding the transportation of marijuana from Tucson, Arizona, to Paso Robles, California.

-15-

34. In mid-November 1984, coconspirator Donald Scelsa traveled from Cam Mosqueda, Baja California, Mexico, to Tucson, Arizona.

35. In mid-November 1984, in Tucson, Arizona, defendants RENE MART VERDUGO-URQUIDEZ, DONALD LEE WALTERS, HAROLD ALLE HUGHES and DAVID DIETER procured the delivery of approximately 9 pounds of marijuana to coconspirator Donald Scelsa, which marijuana defe dants RENE MARTIN VERDUGO-URQUIDEZ and DONALD LEE WALTEF had imported from Mexico.

36. In mid-November 1984, coconspirator Donald Scelsa transported appro imately 936 pounds of marijuana in the 1984 Chevrolet pickup truck fror Tucson, Arizona, to Paso Robles, California, and delivered it to defendan JOE NEIL OTTER.

37. On or about December 7, 1984, coconspirator Donald Scelsa traveled t Tucson, Arizona, in the 1984 Chevrolet pickup truck.

38. On or about December 10, 1984, in Tucson, Arizona, defendants RENI MARTIN VERDUGO-URQUIDEZ; HAROLD ALLEN HUGHES DONALD LEE WALTERS, and DAVID DIETER procured the delivery of approximately 65( pounds of marijuana to coconspirator Donald Scelsa, which marijuana defen dants RENE MARTIN VERDUGO-URQUIDEZ and DONALD LEE WALTERS had imported from Mexico.

39. On or about December 10, 1984, coconspirator Donald Scelsa transportec from Tucson, Arizona, to Paso Robles, California, approximately 650 pounds of marijuana in the 1984 Chevrolet pickup truck and delivered it to defendant JOE NEIL OTTER.

40. In late January 1985, in San Diego, California, defendant MICHAEL WARD conferred with coconspirator Donald Scelsa regarding the transportation of marijuana in Arizona.

-16-

41. On or about January 28, 1985, defendant MICHAEL WARD, aka Micha Duncan, purchased a trailer in Castaic, California.

42. In about early February 1985, defendant MICHAEL WARD and coconspirato Donald Scelsa traveled from San Diego, California, to Phoenix, Arizona, th latter driving the 1984 Chevrolet pickup truck and recently acquired trailer.

43. In about early February 1985, in Phoenix, Arizona, defendants DONALD LE: WALTERS, MICHAEL WARD, JOE NEIL OTTER, MARK LOWENBERG RONALD RODEMAN and MICHAEL WHEELIHAN met with coconspirato Donald Scelsa.

44. In about early February 1985, in Phoenix, Arizona, defendants RENE MARTIN VERDUGO-URQUIDEZ HAROLD ALLEN HUGHES, DONALD LEE WALTERS RONALD RODEMAN and MICHAEL WHEELIHAN procured the delivery of about 900 pounds of marijuana to coconspirator Donald Scelsa, which marijuana defendants RENE MARTIN VERDUGO-URQUIDEZ and DONALD LEE WALTERS had imported from Mexico.

45. In about early February 1985, coconspirator Donald Scelsa transported about 900 pounds of marijuana from Phoenix, Arizona, to Flagstaff, Arizona.

46a. In about late January or early February 1985, defendant JOHN DOE, aka "Marty," replaced defendant EUGENE HOLLESTELLE as ground crew leader, and recruited coconspirators Robert Zuver (in Newport Beach, California) and Michael Ahnberg (in Sioux Falls, South Dakota) to participate in the unloading and transportation of marijuana flown from Mexico to the clandestine landing strip near Casa Grande, Arizona.

46b. On or about February 5, 1985, defendants RENE MARTIN VERDUGO-URQUIDEZ and DONALD LEE WALTERS caused the importation of about 4,300 pounds of marijuana from Mexico to Arizona in the Sikorsky helicopter.

-17-

47. On or about February 5, 1985, defendant JOHN DOE, aka "Marty," and coconspirators Robert Zuver and Michael Ahmburg removed about 4,300 pounds of marijuana from the helicopter and loaded it into waiting pickup trucks.

48. On or about February 9, 1985, defendant RICK THOMPSON flew the helicopter, containing marijuana residue, to Santa Rosa, New Mexico.

49. During the period from about November 1983 to about February 1985, when marijuana was being transported to and stored at the La Cholla Drive, Tucson, Arizona, property, as described in the overt acts above, defendant JOHN DOE, aka "Ricky," provided security for the marijuana at the La Cholla Drive property.

50. During the period from about November 1983 to about January 1985, in Tucson, Arizona, and elsewhere, when defendant EUGENE HOLLESTELLE participated in the unloading and transportation of marijuana flown from Mexico to the United States, as described in the overt acts above, defendant DARLA COE performed various duties in support of the marijuana transporting enterprise for defendant EUGENE HOLLESTELLE including conveying messages regarding the receipt and distribution of marijuana flown from Mexico to Arizona for distribution to the Southern District of California and elsewhere.

51. During the period from about November 1983 to about February 1985, in Tucson, Arizona, and elsewhere, while defendant DONALD LEE WALTERS participated in the imporation, possession and distribution of marijuana, as described in the overt acts above, defendant PATRICIA SCIALAMPO performed various duties in support of the marijuana trafficking enterprise for defendant DONALD LEE WALTERS, including (1) conveying messages regarding the receipt and distribution of marijuana flown from Mexico to

Arizona; and (2) the accounting for the receipt and distribution of such marijuana.

52.  During the period from about November 1983, to about February 1985, in Tucson, Arizona, and elsewhere, while marijuana was being flown from Mexico to Arizona, as described in the overt acts above, defendants RENE MARTIN VERDUGO-URQUIDEZ and DONALD LEE WALTERS took 300 pounds of marijuana from each load, as compensation for transporting the marijuana to the United States from Mexico.  At the direction of defendant RENE MARTIN VERDUGO-URQUIDEZ, the net proceeds of the sale of the marijuana, after payment of expenses, were delivered to him in the United States and Mexico.

53.  During the period from about November 1983, to about February 1985, while marijuana was being flown from Mexico to Arizona, as described in the overt acts above, the defendant RENE MARTIN VERDUGO-URQUIDEZ caused to he delivered to him in Mexicali, Baja California, Mexico, tally sheets reflecting the quantities of marijuana flown from Mexico to the United States.

All in violation of Title 21, United States Code, Section 963.

## Count 2

1.    Beginning on a date unknown to the grand jury and continuing through February 1986, within the Southern District of California, and elsewhere, defendants RENE MARTIN VERDUGO-URQUIDEZ; SERGIO SANCHEZ-MUNOZ; DONALD LEE WALTERS; RICK THOMPSON; JOHN DOE, aka "Walters;" VICTOR RAMIREZ VASQUEZ; STEPHEN KENT HILLYER; LAWRENCE HUTCHINSON; JOHN GEORGE COOK; ALEJANDRO DIAZ GUERRERO; EDUARDO ALVAREZ BARRON; ADOLFO HERNANDEZ; LARRY TURNER, aka "Larry;" HAROLD ALLEN HUGHES, aka Michael Cooper; MICHAEL WARD, aka Michael Duncan; DAVID DIETER; RONALD RODEMAN, aka "Ron;" JOE NEIL OTTER, aka Joe Bob Hunter; RICARDO MUNOZ; JORGE FRANCO;  ALBERTO CRETIN, THEODORE CASH, aka "Teddy Carson;" EUGENE HOLLESTELLE; CORBIN WELSCH; MARK LOWENBERG; RENATO CUEVAS; JOE ARTHUR CUEVAS; JOHN DOE, aka "Russ;" JOHN DOE, aka "Tom;" JOHN DOE, aka "Mike;" JOHN DOE, aka "Dave;" JOHN DOE, aka "Ricky;" JOHN DOE, aka "Marty;" PATRICIA SCIALAMPO; DARLA COE; MANUEL RENATO CRETIN-LIMON; RAYMOND LYNN WELCH; and MICHAEL WHEELIHAN did knowingly and wilfully combine, conspire, and agree together and with each other and with divers other persons known and unknown to the grand jury to commit offenses against the United States, namely, to knowingly and intentionally possess with intent to distribute in excess of 1,000 pounds of marijuana, a Schedule I Controlled Substance; in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(6), and 841(b)(1)(B).

2.    The grand jury by this reference realleges paragraphs 2 through 10 of Count 1.

//

//

//

//

-20-

## OVERT ACTS

In furtherance of the above conspiracy and to effect the objects thereof, all of th overt acts alleged in Count 1, and realleged herein by reference, were committed withi the Southern District of California, and elsewhere.

All in violation of Title 21, United States Code, Section 846.

## Count 3

1.    Beginning on a date unknown to the grand jury and continuing through February 1986, within the Southern District of California, and elsewhere, defendants RENE MARTIN VERDUGO-URQUIDEZ; SERGIO SANCHEZ-MUNOZ; DONALD LEE WALTERS; RICK THOMPSON; JOHN DOE, aka "Walters;" VICTOR RAMIREZ VASQUEZ; STEPHEN KENT HILLYER; LAWRENCE HUTCHINSON; JOHN GEORGE COOK; ALEJANDRO DIAZ GUERRERO; EDUARDO ALVAREZ BARRON; ADOLFO HERNANDEZ; LARRY TURNER, aka "Larry;" HAROLD ALLEN HUGHES, aka Michael Cooper; MICHAEL WARD, aka Michael Duncan; DAVID DIETER; RONALD RODEMAN, aka "Ron;" JOE NEIL OTTER, aka Joe Bob Hunter; RICARDO MUNOZ; JORGE FRANCO;   ALBERTO CRETIN; THEODORE CASH, aka "Teddy Carson;" EUGENE HOLLESTELLE; CORBIN WELSCH; MARK LOWENBERG; RENATO CUEVAS; JOE ARTHUR CUEVAS; JOHN DOE, aka "Russ;" JOHN DOE, aka "Tom;" JOHN DOE, aka "Mike;" JOHN DOE, aka "Dave;" JOHN DOE, aka "Ricky;" JOHN DOE, aka "Marty;" PATRICIA SCIALAMPO; DARLA COE; MANUEL RENATO CRETIN-LIMON; RAYMOND LYNN WELCH; and MICHAEL WHEELIHAN did knowingly and intentionally combine, conspire, and agree together and with each other and with divers other persons known and unknown to the grand jury to commit offenses against the United States, namely, to travel in interstate and foreign commerce with intent to promote, manage, establish and carry on an unlawful activity, the unlawful activity being a business enterprise involving a controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 846, 952, 960 and 963, and to thereafter perform and attempt to perform acts to promote, manage, carry on and facilitate the promotion, management and carrying on of the unlawful activity previously described; in violation of Title 18, United States Code, Section 1952(a)(3).

2.    The grand jury by this reference realleges paragraphs 2 through 10 of Count 1.

-22-

## OVERT ACTS

In furtherance of the above conspiracy and to effect the objects thereof, all of th overt acts alleged in Count 1, Overt Acts 1 through 53, realleged herein by reference were committed within the Southern District of California, and elsewhere.  In addition the following overt acts were committed within the Southern District of California an elsewhere.

54.  On or about July 5, 1985, defendant MICHAEL WARD, aka Michael Duncan traveled from San Diego, California to Baja California, Mexico, to deliver th cash proceeds of drug transactions to defendant HAROLD ALLEN HUGHES aka Michael Cooper.

55.  On or about July 29, 1985, defendant MICHAEL WARD, aka Michael Duncan, traveled from San Diego, California to Baja California, Mexico, to deliver the cash proceeds of drug transactions to defendant HAROLD ALLEN HUGHES, aka Michael Cooper.

56.  On or about August 27, 1985, defendant MICHAEL WARD, aka Michael Duncan, traveled from San Diego, California to Baja California, Mexico, to deliver the cash proceeds of drug transactions to defendant HAROLD ALLEN HUGHES, aka Michael Cooper.

57.  On or about December 6, 1985, defendant MICHAEL WARD, aka Michael Duncan, traveled from San Diego, California to Baja California, Mexico, to deliver the cash proceeds of drug transactions to defendant HAROLD ALLEN HUGHES, aka Michael Cooper.

All in violation of Title 18, United States Code, Section 371.

1

### Count 4

2    On or about March 14, 1983, within the Southern District of California, an

3 elsewhere, defendants RENE MARTIN VERDUGO-URQUIDEZ and DONALD LE

4 WALTERS did knowingly and intentionally possess with intent to distribute in excess o

5 1,000 pounds of marijuana, a Schedule I Controlled Substance; in violation of Title 21

6 United States Code, Sections 841(a)(1) and 841(b)(6).

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Count 5

In about mid-November 1983, within the Southern District of California, defendant RENE MARTIN VERDUGO-URQUIDEZ did knowingly and intentionally use a communication facility, namely, a telephone, in committing and in causing and facilitating in the commission of controlled substance offenses, in violation of Title 21, United States Code, Sections 952, 960, 963, 841 and 846, that is, conspiracy to import a controlled substance and conspiracy to possess with intent to distribute a controlled substance; in violation of Title 21, United States Code, Section 843(b).

## Count 6

In about late November to mid-December 1983, defendant RICARDO MUNOZ di

travel in foreign commerce from San Diego County, California, to Baja California

Mexico, with the intent to promote, manage, establish, carry on and facilitate th

promotion, management and carrying on of the unlawful activity, the unlawful activity

being a business enterprise involving a controlled substance, in violation of Title 21

United States Code, Sections 841(a)(1), 846, 952, 960, and 963, and the defendant did

thereafter perform and attempt to perform acts to promote, manage, carry on, and

facilitate the promotion, management, and carrying on of the unlawful activity pre-

viously described; in violation of Title 18, United States Code, Section 1952(a)(3); and

defendant RENE MARTIN VERDUGO-URQUIDEZ did knowingly and wilfully aid, abet,

counsel, command, induce, procure and cause the commission of the aforesaid offense, in

violation of Title 18, United States Code, Section 2.

## Count 7

In about late November to mid-December 1983, within the Southern District California, the defendant RICARDO MUNOZ did knowingly transport at one time fro San Diego County, California, to the Republic of Mexico, monetary instruments consis ing of more than $5,000, namely, $150,000 in U.S. currency; and in connection with suc transportation of monetary instruments, the defendant did wilfully fail to file a repor as required by Title 31, United States Code, Section 5316(b);

The grand jury further alleges that the defendant committed the above-describe violation while violating Title 21, United States Code, Sections 841, 846, 952, and 963 and as a part of a pattern of illegal activity involving transactions of more than $100,00 in a 12-month period;

All in violation of Title 31, United States Code, Sections 5316 and 5322(b); an defendant RENE MARTIN VERDUGO-URQUIDEZ did knowingly and wilfully aid, abet counsel, command, induce, procure and cause the commission of the aforesaid offense, ir violation of Title 18, United States Code, Section 2.

## Count 8

In about late November to mid-December 1983, defendant RENE MARTIN VERDUGO-URQUIDEZ did travel in foreign commerce from San Diego County, California, to Baja California, Mexico, with the intent to promote, manage, establish, carry on and facilitate the promotion, management and carrying on of the unlawful activity, the unlawful activity being a business enterprise involving a controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 846, 952, 960, and 963, and the defendant did thereafter perform and attempt to perform acts to promote, manage, carry on, and facilitate the promotion, management, and carrying on of the unlawful activity previously described; in violation of Title 18, United States Code, Section 1952(a)(3); and defendant RENE MARTIN VERDUGO-URQUIDEZ did knowingly and wilfully aid, abet, counsel, command, induce, procure and cause the commission of the aforesaid offense, in violation of Title 18, United States Code, Section 2.

1

### Count 9

2      In about late November to mid-December 1983, within the Southern District of

3  California, the defendant RENE MARTIN VERDUGO-URQUIDEZ did knowingly transport

4  at one time from San Diego County, California, to the Republic of Mexico, monetary

5  instruments consisting of more than $5,000, namely, $150,000 in U.S. currency; and in

6  connection with such transportation of monetary instruments, the defendant did wilfully

7  fail to file a report, as required by Title 31, United States Code, Section 5316(b);

8      The grand jury further alleges that the defendant committed the above-described

9  violation while violating Title 21, United States Code, Sections 841, 846, 952, and 963;

10  and as a part of a pattern of illegal activity involving transactions of more than $100,000

11  in a 12-month period;

12      All in violation of Title 31, United States Code, Sections 5316 and 5322(b).

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Count 10

In about mid to late December 1983, within the Southern District of California
defendant RENE MARTIN VERDUGO-URQUIDEZ did knowingly and intentionally use
communication facility, namely, a telephone, in committing and in causing and facili
tating in the commission of controlled substance offenses, in violation of Title 21, Unite
States Code, Sections 952, 960, 963, 841 and 846, that is, conspiracy to import
controlled substance and conspiracy to possess with intent to distribute a controlle
substance; in violation of Title 21, United States Code, Section 843(b).

-30-

## Count 11

On or about December 20, 1983, defendant ADOLFO HERNANDEZ did travel interstate commerce from San Diego County, California, to Tucson, Arizona, with th intent to promote, manage, establish, carry on and facilitate the promotion, managemer and carrying on of the unlawful activity, the unlawful activity being a business enterpris involving a controlled substance, in violation of Title 21, United States Cod Sections 841(a)(1), 846, 952, 960, and 963, and the defendant did thereafter perform an attempt to perform acts to promote, manage, carry on, and facilitate the promotion management, and carrying on of the unlawful activity previously described; in violatio of Title 18, United States Code, Section 1952(a)(3).

-31-

## Count 12

On or about December 22, 1983, within the Southern District of California, a elsewhere, defendant ADOLFO HERNANDEZ did knowingly and intentionally posse with intent to distribute in excess of 1,000 pounds of marijuana, a Schedule I Controll Substance; in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(6).

## Count 13

On or about December 22, 1983, defendant RICARDO MUNOZ did travel in foreign commerce from San Diego County, California, to Baja California, Mexico, with the intent to promote, manage, establish, carry on and facilitate the promotion, management and carrying on of the unlawful activity, the unlawful activity being a business enterprise involving a controlled substance, in violation of Title 21, United States Code Sections 841(a)(1), 846, 952, 960, and 963, and the defendant did thereafter perform and attempt to perform acts to promote, manage, carry on, and facilitate the promotion, management, and carrying on of the unlawful activity previously described; in violation of Title 18, United States Code, Section 1952(a)(3); and defendant RENE MARTIN VERDUGO-URQUIDEZ did knowingly and wilfully aid, abet, counsel, command, induce, procure and cause the commission of the aforesaid offense, in violation of Title 18, United States Code, Section 2.

Count 1(

In about the December 1983, within the Southern District of California, the defendant RICARDO MUNOZ did knowingly transport at one time from San Diego County, California, to the Republic of Mexico, monetary instruments consisting of more than $5,000, namely, $140,000 in U.S. currency; and in connection with such transportation of monetary instruments, the defendant did wilfully fail to file a report, as required by Title 31, United States Code, Section 5316(b);

The grand jury further alleges that the defendant committed the above-described violation while violating Title 21, United States Code, Sections 841, 846, 952, and 963; and as a part of a pattern of illegal activity involving transactions of more than $100,000 in a 12-month period;

All in violation of Title 31, United States Code, Sections 5316 and 5322(b); and defendant RENE MARTIN VERDUGO-URQUIDEZ did knowingly and wilfully aid, abet, counsel, command, induce, procure and cause the commission of the aforesaid offense, in violation of Title 18, United States Code, Section 2.

-34-

## Count 15

In January 1984, within the Southern District of California, defendant REN
MARTIN VERDUGO-URQUIDEZ did knowingly and intentionally use a communicatic
facility, namely, a telephone, in committing and in causing and facilitating in th
commission of controlled substance offenses, in violation of Title 21, United State
Code, Sections 952, 960, 963, 841 and 846, that is, conspiracy to import a controlle
substance and conspiracy to possess with intent to distribute a controlled substance; i
violation of Title 21, United States Code, Section 843(b).

1

## Count 16

2      In about January 1984, defendants LARRY TURNER, aka "Larry," and ADOLFO

3  HERNANDEZ did travel in interstate commerce from San Diego County, California, to

4  Tucson, Arizona, with the intent to promote, manage, establish, carry on and facilitate

5  the promotion, management and carrying on of the unlawful activity, the unlawful

6  activity being a business enterprise involving a controlled substance in violation of

7  Title 21, United States Code, Sections 841(a)(1), 846, 952, 960, and 963, and the

8  defendants did thereafter perform and attempt to perform acts to promote, manage,

9  carry on, and facilitate the promotion, management, and carrying on of the unlawful

10  activity previously described; in violation of Title 18, United States Code,

11  Section 1952(a)(3).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Count 17

In about January 1984, within the Southern District of California, and elsewhere defendants LARRY TURNER, "Larry," MANUEL RENATO CRETIN-LIMON and ADOLFO HERNANDEZ did knowingly and intentionally possess with intent to distribute in excess of 1,000 pounds of marijuana, a Schedule I Controlled Substance; in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(6).

## Count 18

In about January 1984, defendant RICARDO MUNOZ did travel in foreig commerce from San Diego County, California, to Baja California, Mexico, with th intent to promote, manage, establish, carry on and facilitate the promotion, managemen and carrying on of the unlawful activity, the unlawful activity being a business enterpris involving a controlled substance, in violation of Title 21, United States Code Sections 841(a)(1), 846, 952, 960, and 963, and the defendant did thereafter perform an attempt to perform acts to promote, manage, carry on, and facilitate the promotion management, and carrying on of the unlawful activity previously described; in violatior of Title 18, United States Code, Section 1952(a)(3); and defendant RENE MARTIN VERDUGO-URQUIDEZ did knowingly and wilfully aid, abet, counsel, command, induce, procure and cause the commission of the aforesaid offense, in violation of Title 18, United States Code, Section 2.

## Count 19

In about late January 1984, within the Southern District of California, the defendant RICARDO MUNOZ did knowingly transport at one time from San Diego County, California, to the Republic of Mexico, monetary instruments consisting of more than $5,000, namely, $250,000 in U.S. currency; and in connection with such transportation of monetary instruments, the defendant did wilfully fail to file a report, as required by Title 31, United States Code, Section 5316(b);

The grand jury further alleges that the defendant committed the above-described violation while violating Title 21, United States Code, Sections 841, 846, 952, and 963 and as a part of a pattern of illegal activity involving transactions of more than $100,000 in a 12-month period;

All in violation of Title 31, United States Code, Sections 5316 and 5322(b); and defendant RENE MARTIN VERDUGO-URQUIDEZ did knowingly and wilfully aid, abet, counsel, command, induce, procure and cause the commission of the aforesaid offense, in violation of Title 18, United States Code, Section 2.

1

## Count 20

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In February 1984, within the Southern District of California, defendant RENE MARTIN VERDUGO-URQUIDEZ did knowingly and intentionally use a communication facility, namely, a telephone, in committing and in causing and facilitating in the commission of controlled substance offenses, in violation of Title 21, United States Code, Sections 952, 960, 963, 841 and 846, that is, conspiracy to import a controlled substance and conspiracy to possess with intent to distribute a controlled substance; in violation of Title 21, United States Code, Section 843(b).

1

### Count 21

2      In about February 1984, defendants LARRY TURNER, aka "Larry," and ADOLF

3  HERNANDEZ did travel in interstate commerce from San Diego County, California, t

4  Tucson, Arizona, with the intent to promote, manage, establish, carry on and facilitat

5  the promotion, management and carrying on of the unlawful activity, the unlawfu

6  activity being a business enterprise involving a controlled substance, in violation c

7  Title 21, United States Code, Sections 841(a)(1), 846, 952, 960, and 963, and th

8  defendants did thereafter perform and attempt to perform acts to promote, manage

9  carry on, and facilitate the promotion, management, and carrying on of the unlawfu

10  activity previously described; in violation of Title 18, United States Code

11  Section 1952(a)(3).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Count 22

In about February 1984, within the Southern District of California, the defendant RICARDO MUNOZ did knowingly transport at one time from San Diego County California, to the Republic of Mexico, monetary instruments consisting of more than $5,000, namely, $240,000 in U.S. currency; and in connection with such transportation of monetary instruments, the defendant did wilfully fail to file a report, as required by Title 31, United States Code, Section 5316(b);

The grand jury further alleges that the defendant committed the above-described violation while violating Title 21, United States Code, Sections 841, 846, 952, and 963; and as a part of a pattern of illegal activity involving transactions of more than $100,000 in a 12-month period;

All in violation of Title 31, United States Code, Sections 5316 and 5322(b); and defendant RENE MARTIN VERDUGO-URQUIDEZ did knowingly and wilfully aid, abet, counsel, command, induce, procure and cause the commission of the aforesaid offense, in violation of Title 18, United States Code, Section 2.

-42-

1

## Count 23

2        In about February to March 1984, within the Southern District of California, and

3    elsewhere, defendant ADOLFO HERNANDEZ did knowingly and intentionally possess

4    with intent to distribute approximately 900 pounds of marijuana, a Schedule I Controlled

5    Substance; in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(6).

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Count 24

In about March or April 1984, defendant RENE MARTIN VERDUGO-URQUIDEZ did travel in foreign commerce from Mexico to San Diego County, California, with the intent to promote, manage, establish, carry on and facilitate the promotion, management and carrying on of the unlawful activity, the unlawful activity being a business enterprise involving a controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 846, 952, 960, and 963, and the defendants did thereafter perform and attempt to perform acts to promote, manage, carry on, and facilitate the promotion, management, and carrying on of the unlawful activity previously described; in violation of Title 18, United States Code, Section 1952(a)(3).

-44-

## Count 25

In about March or April 1984, within the Southern District of California, an elsewhere, defendants RENE MARTIN VERDUGO-URQUIDEZ, RENATO CUEVAS an JOE ARTHUR CUEVAS did knowingly and intentionally possess with intent to distribut in excess of 1,000 pounds of marijuana, a Schedule I Controlled Substance; in violation o Title 21, United States Code, Sections 841(a)(1) and 841(b)(6).

## Count 26

In about mid-November 1984, defendant MICHAEL WARD, aka Michael Duncan, did travel in foreign commerce from Baja California, Mexico, to San Diego County, California, with the intent to promote, manage, establish, carry on and facilitate the promotion, management and carrying on of the unlawful activity, the unlawful activity being a business enterprise involving a controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 846, 952, 960, and 963, and the defendant did thereafter perform and attempt to perform acts to promote, manage, carry on, and facilitate the promotion, management, and carrying on of the unlawful activity previously described; in violation of Title 18, United States Code, Section 1952(a)(3); and defendant HAROLD ALLEN HUGHES, aka Michael Cooper, did knowingly and wilfully aid, abet, counsel, command, induce, procure and cause the commission of the aforesaid offense, in violation of Title 18, United States Code, Section 2.

Count 2.

In about mid-November 1984, within the Southern District of California, defendant HAROLD ALLEN HUGHES, aka Michael Cooper, did knowingly and intentionally use communication facility, namely, a telephone, in committing and in causing and facilitating in the commission of controlled substance offenses, in violation of Title 21, United States Code, Sections 952, 960, and 963, that is, conspiracy to import a controlled substance; in violation of Title 21, United States Code, Section 843(b).

-47-

## Count 28

In mid-November 1984, in Tucson, Arizona; Paso Robles, California; and elsewhere, Rene Martin Verdugo-Urquidez; Donald Walters; David Dieter; Joe Neil Otter, aka Joe Bob Hunter; and coconspirator Donald Scelsa did knowingly and intentionally possess with intent to distribute approximately 936 pounds of marijuana, a Schedule I Controlled Substance; in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B), and, within the Southern District of California, defendants HAROLD ALLEN HUGHES, aka Michael Cooper, and MICHAEL WARD, aka Michael Duncan, did knowingly and wilfully aid, abet, counsel, command, induce, procure and cause the commission of the aforesaid offense, in violation of Title 18, United States Code, Section 2.

-48-

Count 29

In December 1984, in Tucson, Arizona; Paso Robles, California; and elsewhere Rene Martin Verdugo-Urquidez; Donald Walters; David Dieter; Joe Neil Otter, aka Jo Bob Hunter; and coconspirator Donald Scelsa did knowingly and intentionally possess wit intent to distribute approximately 650 pounds of marijuana, a Schedule I Controlle Substance; in violation of Title 21, United States Code, Sections 841(a)(1) an 841(b)(1)(B), and, within the Southern District of California, defendants HAROLI ALLEN HUGHES, aka Michael Cooper, and MICHAEL WARD, aka Michael Duncan, di knowingly and wilfully aid, abet, counsel, command, induce, procure and cause th commission of the aforesaid offense, in violation of Title 18, United States Code Section 2.

-49-

## Count 30

On or about January 30, 1985, defendant MICHAEL WARD, aka Michael Duncan did travel in interstate commerce from San Diego County, California, to Phoenix Arizona, with the intent to promote, manage, establish, carry on and facilitate the promotion, management and carrying on of the unlawful activity, the unlawful activity being a business enterprise involving a controlled substance, in violation of Title 21 United States Code, Sections 841(a)(1), 846, 952, 960, and 963, and the defendant did thereafter perform and attempt to perform acts to promote, manage, carry on, and facilitate the promotion, management, and carrying on of the unlawful activity previously described; in violation of Title 18, United States Code, Section 1952(a)(3); and defendant HAROLD ALLEN HUGHES, aka Michael Cooper, did knowingly and wilfully aid, abet, counsel, command, induce, procure and cause the commission of the aforesaid offense, in violation of Title 18, United States Code, Section 2.

## Count 31

In early February 1985, in Arizona, and elsewhere, Rene Martin Verdugo-Urquidez; Donald Walters; David Dieter; Joe Neil Otter, aka Joe Bob Hunter; Ronald Rodeman, aka "Ron;" and coconspirator Donald Scelsa did knowingly and intentionally possess with intent to distribute approximately 900 pounds of marijuana, a Schedule I Controlled Substance; in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B), and, within the Southern District of California, defendants HAROLD ALLEN HUGHES, aka Michael Cooper, and MICHAEL WARD, aka Michael Duncan, did knowingly and wilfully aid, abet, counsel, command, induce, procure and cause the commission of the aforesaid offense, in violation of Title 18, United States Code, Section 2.

-51-

## Count 32

On or about July 5, 1985, defendant MICHAEL WARD, aka Michael Duncan, did travel in foreign commerce from San Diego County, California, to Baja California, Mexico, with the intent to promote, manage, establish, carry on and facilitate the promotion, management and carrying on of the unlawful activity, the unlawful activity being a business enterprise involving a controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 846, 952, 960, and 963, and the defendant did thereafter perform and attempt to perform acts to promote, manage, carry on, and facilitate the promotion, management, and carrying on of the unlawful activity previously described; in violation of Title 18, United States Code, Section 1952(a)(3); and defendant HAROLD ALLEN HUGHES, aka Michael Cooper, did knowingly and wilfully aid, abet, counsel, command, induce, procure and cause the commission of the aforesaid offense, in violation of Title 18, United States Code, Section 2.

-52-

Count 7

On or a      July 5, 1985, within the Southern District of California, the defendant MICHAEL WARD, aka Michael Duncan, did knowingly transport at one time from San Diego County, California, to the Republic of Mexico, monetary instruments consisting of more than $10,000, namely, $190,000 in U.S. currency; and in connection with such transportation of monetary instruments, the defendant did wilfully fail to file a report as required by Title 31, United States Code, Section 5316(b);

All in violation of Title 31, United States Code, Sections 5316 and 5322(b); and defendant HAROLD ALLEN HUGHES, aka Michael Cooper, did knowingly and wilfully aid, abet, counsel, command, induce, procure and cause the commission of the aforesaid offense, in violation of Title 18, United States Code, Section 2.

-53-

1

### Count 34

2    On or about July 29, 1985, defendant MICHAEL WARD, aka Michael Duncan, did

3   travel in foreign commerce from San Diego County, California, to Baja California,

4   Mexico, with the intent to promote, manage, establish, carry on and facilitate the

5   promotion, management and carrying on of the unlawful activity, the unlawful activity

6   being a business enterprise involving a controlled substance, in violation of Title 21,

7   United States Code, Sections 841(a)(1), 846, 952, 960, and 963, and the defendant did

8   thereafter perform and attempt to perform acts to promote, manage, carry on, and

9   facilitate the promotion, management, and carrying on of the unlawful activity pre-

10  viously described; in violation of Title 18, United States Code, Section 1952(a)(3); and

11  defendant HAROLD ALLEN HUGHES, aka Michael Cooper, did knowingly and wilfully

12  aid, abet, counsel, command, induce, procure and cause the commission of the aforesaid

13  offense, in violation of Title 18, United States Code, Section 2.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-54-

**Count 35**

On or about July 29, 1985, within the Southern District of California, the defendant MICHAEL WARD, aka Michael Duncan, did knowingly transport at one time from San Diego County, California, to the Republic of Mexico, monetary instruments consisting of more than $10,000, namely, $285,000 in U.S. currency; and in connection with such transportation of monetary instruments, the defendant did wilfully fail to file report, as required by Title 31, United States Code, Section 5316(b); .

All in violation of Title 31, United States Code, Sections 5316 and 5322(b); and defendant HAROLD ALLEN HUGHES, aka Michael Cooper, did knowingly and wilfully aid, abet, counsel, command, induce, procure and cause the commission of the aforesaid offense, in violation of Title 18, United States Code, Section 2.

-55-

## Count 36

On or about August 27, 1985, defendant MICHAEL WARD, aka Michael Duncan, did travel in foreign commerce from San Diego County, California, to Baja California, Mexico, with the intent to promote, manage, establish, carry on and facilitate the promotion, management and carrying on of the unlawful activity, the unlawful activity being a business enterprise involving a controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 846, 952, 960, and 963, and the defendant did thereafter perform and attempt to perform acts to promote, manage, carry on, and facilitate the promotion, management, and carrying on of the unlawful activity previously described; in violation of Title 18, United States Code, Section 1952(a)(3); and defendant HAROLD ALLEN HUGHES, aka Michael Cooper, did knowingly and wilfully aid, abet, counsel, command, induce, procure and cause the commission of the aforesaid offense, in violation of Title 18, United States Code, Section 2.

Count 37

On or ab.  August 27, 1985, within the Southern District of California, the defendant MICHAEL WARD, aka Michael Duncan, did knowingly transport at one time, from San Diego County, California, to the Republic of Mexico, monetary instruments consisting of more than $10,000, namely, $25,000 in U.S. currency; and in connection with such transportation of monetary instruments, the defendant did wilfully fail to file a report, as required by Title 31, United States Code, Section 5316(b);

All in violation of Title 31, United States Code, Sections 5316 and 5322(b); and defendant HAROLD ALLEN HUGHES, aka Michael Cooper, did knowingly and wilfully aid, abet, counsel, command, induce, procure and cause the commission of the aforesaid offense, in violation of Title 18, United States Code, Section 2.

-57-

## Count 31

On or about December 6, 1985, defendant MICHAEL WARD, aka Michael Duncan, did travel in foreign commerce from San Diego County, California, to Baja California, Mexico, with the intent to promote, manage, establish, carry on and facilitate the promotion, management and carrying on of the unlawful activity, the unlawful activity being a business enterprise involving a controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 846, 952, 960, and 963, and the defendant did thereafter perform and attempt to perform acts to promote, manage, carry on, and facilitate the promotion, management, and carrying on of the unlawful activity previously described; in violation of Title 18, United States Code, Section 1952(a)(3); and defendant HAROLD ALLEN HUGHES, aka Michael Cooper, did knowingly and wilfully aid, abet, counsel, command, induce, procure and cause the commission of the aforesaid offense, in violation of Title 18, United States Code, Section 2.

## Count 39

On or about December 6, 1985, within the Southern District of California, the defendant MICHAEL WARD, aka Michael Duncan, did knowingly transport at one time from San Diego County, California, to the Republic of Mexico, monetary instruments consisting of more than $10,000, namely, $100,000 in U.S. currency; and in connection with such transportation of monetary instruments, the defendant did wilfully fail to file a report, as required by Title 31, United States Code, Section 5316(b);

All in violation of Title 31, United States Code, Sections 5316 and 5322(b); and defendant HAROLD ALLEN HUGHES, aka Michael Cooper, did knowingly and wilfully aid, abet, counsel, command, induce, procure and cause the commission of the aforesaid offense, in violation of Title 18, United States Code, Section 2.

## Count 40

Beginning on a date unknown to the grand jury and continuing through February 1986, in the Southern District of California and elsewhere, defendant RENE MARTIN VERDUGO-URQUIDEZ did knowingly, intentionally, and unlawfully engage in a Continuing Criminal Enterprise, as follows:

1. He violated provisions of subchapters I and II of the Drug Abuse Control Act of 1970 (21 U.S.C. SS 801, et seq.), the punishment for which is a felony, as part of a continuing series of violations of said subchapters involving --

a. Conspiracy to import marijuana, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Sections 952, 960 and 963;

b. Importation of marijuana, in violation of Title 21, United States Code, Sections 952 and 963;

c. Conspiracy to possess with intent to distribute in excess of 1,000 pounds of marijuana, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(6), 841(b)(1)(B), and 846;

d. Possession with intent to distribute marijuana in amounts of from more than 50 kilograms to more than 1,000 pounds, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(6), and 841 (b)(1)(B); and

e. Use of a communication facility in committing and in causing and facilitating the commission of acts constituting felonies under said subchapters, in violation of Title 21, United States Code, Section 843(b).

2. The aforesaid series of violations consisted specifically of the following:

a. Beginning on a date unknown and continuing through February 1986, conspiracy to import marijuana, as set forth in Count 1, including the overt acts alleged therein;

//

//

-60-

b.   Beginning on a date unknown and continuing through February 1986, conspiracy to possess with intent to distribute in excess of 1,000 pounds of marijuana, as set forth in Count 2, including the overt acts alleged therein;

c.   In or before May 1981, importation of approximately 1,000 pounds of marijuana as set forth in Counts 1 and 2, Overt Acts 1a, 1b, 1c, 1d, and 1e;

d.   In May 1981, possession with intent to distribute approximately 1,000 pounds of marijuana as set forth in Counts 1 and 2, Overt Acts 1a, 1b, 1c, 1d, and 1e;

e.   On or about March 14, 1983, importation of approximately 1,100 pounds of marijuana, as set forth in Counts 1 and 2, Overt Acts 2a, 2b, 3a, 3b, and 3c;

f.   On or about March 14, 1983, possession with intent to distribute approximately 1,100 pounds of marijuana as set forth in Counts 1 and 2, Overt Acts 2a, 2b, 3a, 3b, and 3c; and Count 4;

g.   In about November 1983, importation of at least 150 pounds of marijuana, as set forth in Counts 1 and 2, Overt Acts 4, 5, 6, and 7;

h.   In about November 1983, possession with intent to possess about 150 pounds of marijuana, as set forth in Counts 1 and 2, Overt Acts 4, 5, 6, and 7;

i.   On or about November 15, 1983, use of a communication facility in committing a controlled substance offense as set forth in Counts 1 and 2, Overt Acts 4, 5, 6, and 7; and Count 5;

j.   From mid-November to mid-December 1983, importation on each of approximately nine occasions, of approximately 3,000 pounds of marijuana, totalling approximately 30,000 pounds, as set forth in Counts 1 and 2, Overt Acts 8a, 8b, 8c, 8d, 8e, 8f, 8g, 52 and 53;

k.   From mid-November to mid- December 1983, possession with intent to distribute approximately 30,000 pounds of marijuana, as set forth in counts 1 and 2, Overt Acts 8a, 8b, 8c, 8d, 8e, 8f, 8g, 9, 10, 11, 12, 13, 14, 52 and 53;

-61-

1    n or about December 15, 1.      use of a communication facility in

2  committing a controlled substance offense as set forth in Counts 1 and 2, Overt Acts 9

3  10, 11, 12, 13, and 14; and Count 10;

4        m.    From about January to early February 1984, the importation on each o

5  approximately eleven occasions, of about 3,000 pounds of marijuana, totalling approxi

6  mately 35,000 pounds, as set forth in Counts 1 and 2, Overt Acts 15a, 15b, 52 and 53;

7        n.    From about January to early February 1984, possession with intent to

8  distribute approximately 35,000 pounds of marijuana, as set forth in Counts 1 and 2

9  Overt Acts 15a, 15b, 16a, 16b, 17, 18a, 18b, 18c, 19, 20a, 20b, 20c, 20d, 21 22, 23, 24, 25

10  26, 27, 28a, 28b, 28c, 28d, 28e, 28f, 28g, 28h, 28i, 28j, 28k, 28l, 28m, 28n, 52, and 53;

11        o.    In January 1984, use of a communication facility in committing a

12  controlled substance offense as set forth in Counts 1 and 2, Overt Acts 16a, 16b, 17, 18.

13  19a, and 19b; and Count 15.

14        p.    In about February 1984, use of a communication facility in committing

15  a controlled substance offense as set forth in Counts 1 and 2, Overt Acts 21, 22, 23, 24.

16  25, 26, and 27; and Count 20;

17        q.    In March or April 1984, possession with intent to distribute approxi-

18  mately 1,528 pounds of marijuana, as set forth in Counts 1 and 2, Overt Act 28b; and

19  Count 25;

20        r.    In the summer of 1984, from about July to October of that year,

21  importation on each of approximately four occasions, of approximately 3,000 pounds of

22  marijuana, totalling approximately 13,000 pounds, as set forth in Counts 1 and 2, Overt

23  Acts 29a, 29b, 52 and 53;

24        s.    In the summer of 1984, from about July to October of that year,

25  possession with intent to distribute approximately 13,000 pounds of marijuana, as set

26  forth in Counts 1 and 2, Overt Acts 29a, 29b, 52 and 53;

27

28

                                    -62-

1   t        ·ing the period from abou        )ober 1984, to January 1985, the

2   importation on each of approximatly ten occasions, of approximately 3,500 pounds of

3   marijuana, totalling approximately 35,000 pounds, as set forth in Counts 1 and 2, Overt

4   Acts 29c, 52 and 53;

5        u.   During the period from about October 1984, to January 1985, the

6   possession with intent to distribute approximately 35,000 pounds of marijuana, as set

7   forth in Counts 1 and 2, Overt Acts 29c, 29d, 30a, 30b, 31, 32, 33, 34, 35, 36, 37, 38, 39,

8   40, 41, 42, 43, 44, 45, 52 and 53;

9        v.   On or about February 5, 1985, importation of approximately 4,300

10  pounds of marijuana, as set forth in Counts 1 and 2, Overt Acts 46a, 46b, 47, 52 and 53;

11       w.   On or about February 5, 1985, possession with intent to distribute

12  approximately 4,300 pounds of marijuana, as set forth in Counts 1 and 2, Overt Acts 46,

13  47, 52 and 53.

14       3.   Further, defendant RENE MARTIN VERDUGO-URQUIDEZ did undertake

15  such series of violations in concert with five or more other persons with respect to whom

16  the defendant occupied a position of organizer, supervisor, and other positions of

17  management;

18       4.   Further, defendant RENE MARTIN VERDUGO-URQUIDEZ did obtain sub-

19  stantial income and resources from such series of violations.

20       All in violation of Title 21, United States Code, Section 848.

21

22

23

24

25

26

27

28

-63-

Count ..

In about late January 1984, within the Southern District of California, an elsewhere, defendants LARRY TURNER, aka "Larry," RAYMOND LYNN WELCH an ADOLFO HERNANDEZ did knowingly and intentionally possess with intent to distribut in excess of 1,000 pounds of marijuana, a Schedule I Controlled Substance; in violation o Title 21, United States Code, Section 841(a)(1) and 841(b)(6).

DATED: August 12, 1986.

A TRUE BILL:

_____
Foreperson

PETER K. NUNEZ
United States Attorney

By: _____
WARREN P. REESE
Assistant U.S. Attorney

-64-

RECEIVED
SAN DIEGO, CA

APR 15   3 35 PM '86

U.S. ATTORNEY
DEPT. OF JUSTICE

86 APR 11  P 5: 14

CLERK, US DISTRICT COURT
SOUTHERN DISTRICT OF CA
BY DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 86-0107-JLI-Crim. |
| Plaintiff, | |
| v. | MEMORANDUM DECISION |
| RENE MARTIN VERDUGO, | AND ORDER |
| Defendant. | |

Defendant's motions to dismiss, to suppress identification evidence, for change in custody status, for discovery and for revelation of confidential informants came on for hearing April 4, 1986 before the Honorable J. Lawrence Irving.   Michael Lasater appeared on behalf of the United States; Michael Pancer appeared on behalf of defendant Verdugo.   The court ruled orally on all motions at the hearing and apprised counsel of its intention to set forth in writing its reasons for denying defendant's request for an evidentiary hearing and motion to dismiss.

Having considered the pleadings and attached exhibits, oral argument of counsel, sealed court exhibits A, B & C, and testimony received in camera, the court issues the following memorandum decision.

PROCEDURAL BACKGROUND

Due to the extraordinary manner in which the defendant came within this court's jurisdiction and the unique procedures that followed, it is

EXHIBIT D

1　necessary to outline the procedural background of the case. Following his
2　arrival and arrest in the United States on January 24, 1986, an indictment was
3　returned against Verdugo on January 29, 1986 charging him with conspiracy to
4　possess marijuana in excess of 1,000 pounds in violation of 21 U.S.C. §§
5　841(a)(1), 841(b)(6) and 846, possession of marijuana in excess of 1,000
6　pounds with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and
7　841(b)(6) and unlawful use of a communication facility in violation of 21
8　U.S.C. § 843(b).

9　　　Verdugo first appeared in this court on February 10, 1986 and advised
10　he intended to challenge the court's jurisdiction over this prosecution based
11　on his alleged illegal removal from his native country, Mexico, to the United
12　States. Based in part on the many newspaper articles written about his arrest
13　and the information contained therein, Verdugo informed the court that six
14　Mexican persons were material witnesses to his removal from Mexico, to the
15　United States and that those six persons were presently within the United
16　States. Verdugo charged that they had entered the United States with the
17　assistance of a federal law enforcement agency, though Verdugo could not
18　specify which agency had assisted their entry. Verdugo urged the court to
19　take steps to preserve whatever testimony those six witnesses could provide
20　and to order the preservation of any internal government memoranda concerning
21　his apprehension. On February 11, 1986 this court issued an order requiring
22　the government to preserve all internal memoranda concerning Verdugo's appre-
23　hension in Mexico and his delivery to the United States. The court denied
24　defendant's request to incarcerate or depose the six witnesses in order that
25　their testimony should not be lost should they return to Mexico, following the
26　government attorney's assurance that the six witnesses would be available for
27　future motions hearings. The court did however, order the government to serve
28　subpoenas on the six witnesses. On February 14, 1986 the court further

1  ordered the government to make the six witnesses available for an in camera

2  interview with the court, should the court so order.  The court provided

3  Verdugo an opportunity to submit questions that he wished posed to the

4  witnesses.  Defendant did submit proposed questions for the in camera hearing,

5  many of which were ultimately asked of the witnesses.

6      The government moved the court to reconsider its order concerning the

7  in camera hearing.  Among the reasons enumerated by the government in support

8  of its motion, the government alerted the court to potential security problems

9  associated with an interview of the six witnesses.  Upon the court's

10  invitation, the government later submitted a document sealed by order of this

11  court setting forth a threat analysis of security problems created by a

12  meeting between the court and the six witnesses.  (Court Exhibit A)

13      In light of the attendant security problems, the court, without prior

14  announcement, interviewed in camera and on the record the six witnesses.  The

15  court ordered the record of the interviews sealed and has also ordered sealed

16  a memorandum prepared by the court of its observations of the witnesses and

17  its impressions of the interviews.

18      Though no formal evidentiary hearing has been conducted, and as discussed

19  below the court does not now order one, the court has received, and has con-

20  sidered for purposes of the Verdugo's motion to dismiss and for an evidentiary

21  hearing, much evidence and many offers of proof.  They include:  the oral

22  representations of counsel in court; factual statements contained in the

23  parties' briefs; affidavits attached as exhibits to parties' briefs; an in

24  camera submission of all government reports concerning Verdugo's apprehension

25  (Exhibit C); the government's "Factual Proffer Regarding the Arrest of Defen-

26  dant Verdugo" filed on March 12, 1986 and defendant's response and additional

27  response to the factual proffer filed on March 13, 1986 and March 20, 1986,

28  respectively; the in camera interview of witnesses described above; and, a

-3-

1  copy of the accusation against five Mexican state police officers dated
2  March 25, 1986.

3      The court conducted a motion hearing on April 4, 1986. The court ordered
4  that the confidential informants that will testify as government witnesses at
5  trial be revealed and be made available for interview by the defense 14 days
6  prior to trial. Verdugo's motion to suppress indentification was continued to
7  a date prior to trial. The court denied Verdugo's motion for change in
8  custody status, Verdugo's motion to dismiss and request for evidentiary
9  hearing. Given the gravity of defendant's allegations and the extreme remedy
10 sought by defendant, the court elected to set forth in writing the bases for
11 its denial of the request for an evidentiary hearing and the motion to dismiss.

12                          FACTUAL ALLEGATIONS

13     The government alleges the facts surrounding Verdugo's apprehension [1]/ to
14 be as follows. On August 3, 1985 a sealed complaint charging Rene Verdugo
15 with a violation of 21 U.S.C. §§ 846, 841(a)(1) and 843(b) was filed in the
16 Southern District of California and an arrest warrant was issued. Immediately
17 after the issuance of this warrant the Drug Enforcement Administration (here-
18 inafter "DEA") engaged in an extensive investigation in an attempt to apprehend
19 Verdugo in the United States. Despite the fact that Verdugo had been a

20

21

22     [1]/ The government has characterized Verdugo's removal from Mexico as an
"apprehension" while defendant has repeatedly referred to it as an "abduction"
23 or a "kidnapping." The court's review of pertinent scholastic literature
reveals that the term "irregular rendition" has also been used to describe
24 those instances where an ad hoc agreement is entered into between law enforce-
ment agents of the apprehending and asylum states whereby either through
25 active cooperation or acquiescence by officials of the asylum state an indivi-
dual is removed forcibly to the state seeking apprehension. See Abramovsky
26 and Eagle, U.S. Policy in Apprehending Alleged Offenders Abroad: Extradition,
Abduction, or Irregular Rendition?, 57 Or. L. Rev. 51, 52 n. 1 & 2. (1977).
27 Due to the legal connotations of the word "kidnapping" the court feels it is
best to refer to Verdugo's removal to the United States as a "seizure" or an
28 "apprehension."

1    frequent visitor to the United States prior to this time, extensive surveil-
2    lance failed to reveal his presence in the United States and confirmed that he
3    was residing in the Mexicali area of Baja California, Republic of Mexico. In
4    December, 1985, DEA and United States Marshal's Service (hereinafter "U.S.
5    Marshals") personnel met and discussed the possibility of Verdugo's arrest in
6    Mexico by Mexican law enforcement officials.

7      In January, 1986, the government alleges that U.S. Marshal's personnel
8    contacted Mexican law enforcement personnel in the Mexicali area and inquired
9    as to whether Mexican authorities could arrest a Mexican citizen in Mexico
10    who was a United States drug fugitive and deliver that person to U.S. authori-
11    ties. The Mexican law enforcement personnel informed the U.S. Marshal's
12    representative that an arrest could be effected if there were an outstanding
13    United States warrant for the United States' fugitive's arrest. The U.S.
14    Marshal representative then advised the Mexican law enforcement personnel that
15    the person sought was Rene Martin Verdugo and showed him a copy of the arrest
16    warrant issued on August 3, 1985 in the Southern District of California.

17      On January 24, 1986, the government alleges that a team of approximately
18    six Mexican law enforcement personnel arrested Rene Verdugo in San Felipe,
19    Mexico. Verdugo was blindfolded, handcuffed and placed in the back seat of an
20    automobile. The Mexican law enforcement personnel then drove Verdugo to the
21    international border at a point approximately eight miles west of the Port of
22    Entry at Calexico. Verdugo was met at this point by U.S. Marshal's personnel
23    who took him into custody pursuant to the outstanding warrant for arrest.
24    Verdugo was then transported to the U.S. Border Patrol station at Calexico,
25    California and held there until DEA personnel arrived. Upon the arrival of
26    DEA personnel, Verdugo was photographed and transported to the Metropolitan
27    Correctional Center (hereinafter "MCC"), San Diego.

28      With respect to the status of the Mexican law enforcement personnel

-5-

involved in the arrest of Verdugo, the government alleges that on January 27, 1986 they contacted the U.S. Marshal's service and stated that Verdugo's arrest was generating a substantial amount of pressure and that they were concerned about their safety. The U.S. Marshal's Service then contacted the DEA regarding the possibility of financially compensating the Mexican personnel for their assistance in Verdugo's arrest. DEA then agreed to furnish approximately $32,000 to be divided among the six individuals. This money was paid to the Mexican personnel on January 28, 1986. On February 2, 1986, the government alleges that the Mexican law enforcement authorities who assisted in Verdugo's arrest advised United States authorities that they were experiencing tremendous pressure and were receiving threats as a result of their participation in Verdugo's arrest. For their safety and the safety of their families, these individuals and their families were then admitted to the United States.

Defendant's factual allegations differ from the government's on some key points. Addressing first the logistics of Verdugo's apprehension, Verdugo alleges that he was driving his vehicle on a street in San Felipe, Baja California, Mexico, when he was forced to stop his vehicle by six armed men, who were in two separate vehicles. Verdugo alleges that he was forcibly removed from his vehicle by the six men and placed in the rear seat of one of the cars. He was handcuffed, blindfolded and his head was forced down below window level and a jacket was placed over his head. Verdugo alleges that his head was held down below the window level by one of the men. They drove away and the drive continued for approximately two and one-half hours.

Verdugo agrees with the government's version of the facts that the vehicle containing Verdugo proceeded north from San Felipe towards Mexicali and then to a point along the United States-Mexican border west of Calexico. Verdugo adds to his factual allegations that during the drive the men never

-6-

identified themselves, never informed him why he had been taken into their custody nor where they intended to bring him. Verdugo attests that during his capture and the ensuing drive in the auto he was fearful and believed that he was about to be murdered. Verdugo also alleges that he nearly suffocated during the drive in the car because fabric had been placed over his head and mouth.

Verdugo does not controvert the government's factual allegations regarding the events that surrounded his being taken into custody by United States officers after his crossing of the international border. Verdugo does, however, allege different circumstances surrounding the payment of monies to the six Mexican persons [2/] that participated in his apprehension. Verdugo alleges that sometime prior to his apprehension a United States representative met with six Mexican law enforcement personnel (defendant refers to these persons by name in his attorney's declaration filed March 21, 1986). At that meeting Verdugo alleges that United States agents discussed his kidnapping and removal to the Unites States and that the agents gave $50,000.00 to those six men to accomplish his kidnapping. Verdugo also alleges that the six men were promised another $50,000.00 payment when the "job was finished."

Verdugo's factual allegations also include references to a pending criminal investigation by Mexican authorities of the Mexican persons involved in Verdugo's apprehension. Verdugo has submitted a copy of an accusation against the six Mexican persons.

Verdugo makes two additional allegations which, though he proffers them as facts, go to the government's motive with respect to its actions of seeking Verdugo's arrest and its genuineness in inquiring of Mexican officials whether Verdugo's arrest could be accomplished outside the extradition

---

[2/] Verdugo alleges that two of the Mexican persons may have been civilians while the four others were Mexican Judicial Police officers.

1   process.  First, Verdugo claims that the government was eager to accomplish

2   his arrest not to prosecute him on narcotics charges, but rather, to question

3   him about the murder in Mexico of DEA agent Enrique Camerana.  Second, Verdugo

4   claims that when U.S. agents contacted someone in Mexico to inquire whether

5   law enforcement agents there could arrest Verdugo, they were aware that

6   Verdugo's arrest could only be legally obtained through the extradition

7   process.

8                                  FACTUAL FINDINGS

9        Based on all the evidence and representations before the court at this

10  time, the court makes the following factual findings, and bases its opinion on

11  these facts.  The court finds that prior to Verdugo's apprehension United

12  States agents contacted Mexican authorities and ultimately persuaded them to

13  apprehend Verdugo and bring him to the United States.  Prior to Verdugo's

14  apprehension, no consideration, including money, was promised to the six

15  persons to induce the task, nor was any promised upon its completion.

16       The court finds that Rene Verdugo was apprehended in San Felipe, Baja

17  California, Mexico on January 24, 1986.  United States agents were in the

18  vicinity but did not directly participate in the apprehension.  The automobile

19  which he was driving was halted by Mexican police officials, one of whom

20  displayed a police badge.  Verdugo exited his vehicle, was told he was under

21  arrest and placed in the backseat of their unmarked vehicle.  Verdugo was

22  handcuffed, covered with his jacket and told to keep his head down.  Verdugo

23  remained in this position during the approximately two hour ride to the

24  Mexican-American border, although the jacket was eventually removed and he was

25  blindfolded.  Upon arrival at the border, Verdugo was removed from the car

26  and walked to the border where United States Marshals arrested him.  At no

27  time was Verdugo beaten, tortured, physically struck or verbally threatened or

28  tormented.  The court believes that Verdugo was indeed frightened by his

                                      -8-

1   apprehension. The court adopts the government's uncontradicted representations
2   regarding his transfer from the Marshal's custody to the DEA's custody and his
3   removal to MCC.

4      Within a day or two, six Mexican policemen, four of whom had directly
5   participated in Verdugo's apprehension, were terminated from their jobs.
6   They ultimately made contact with the DEA and communicated their fear that
7   they would suffer retribution for their participation in Verdugo's arrest. On
8   January 28, 1986 the DEA gave the six of them collectively $32,000.00. A few
9   days later the DEA determined that their safety was in jeopardy and made
10  arrangements for the six men and their families to enter the United States.

11     To this date, the government of the Republic of Mexico has made no formal
12  protest or complaint that formal extradition proceedings had not been followed
13  to effectuate Verdugo's removal to the United States. A formal accusation has
14  been filed by a prosecutor in the State of Baja California, Mexico charging
15  the six men with kidnapping.

16     In addition to the findings set forth above, the court incorporates its
17  sealed findings and observations regarding its in camera interview with the
18  six witnesses (Court Exhibit E). The court feels that a substantial showing
19  of potential security threats to the six witnesses has been made and that it
20  is prudent at this time to keep the record of the court's interview and its
21  findings and observations sealed until further order of the court. The court
22  makes no findings with respect to the government's motives for seeking Verdugo's
23  arrest, nor does it feel that it is necessary to do so for purposes of deciding
24  the motions pending in this court.

25                              DISCUSSION

26  I.   Request for an Evidentiary Hearing

27     Defendant requests an evidentiary hearing to further elucidate the facts
28  concerning his apprehension in San Felipe and to question government officials

-9-

1    and agents about the United States government's solicitation of and
2    participation in his apprehension. The government argues that no hearing is
3    necessary since no remedy is available to this court even if it is determined
4    that the facts were exactly as defendant has alleged them.

5         The court feels that an evidentiary hearing is unnecessary. The court
6    has received what it feels to be sufficient evidence by way of affidavit and
7    in camera material in this case to rule upon the motion to dismiss.

8         The question of whether an evidentiary hearing is appropriate is a matter
9    left to the district court's discretion. United States v. Licavoli, 604 F.2d
10   613, 621 (9th Cir. 1979) citing United States v. Santora, 600 F.2d 1317, 1320
11   (9th Cir. 1979); United States v. Sorren, 605 F.2d 1211, 1215 (1st Cir. 1979).
12   In the context of a motion to suppress, an evidentiary hearing is required if
13   the moving papers are sufficiently detailed, specific and nonconjectural to
14   persuade the court that contested issues of fact going to the validity of the
15   search are in question. United States v. Licavoli, 604 F.2d at 621; United
16   States v. Ledesma, 499 F.2d 36, 39 (9th Cir.) cert. denied, 419 U.S. 1024
17   (1974). This court adopts a similar standard in its evaluation of the need
18   for an evidentiary hearing in the instant case. In light of the evidence
19   already received by the court and the factual allegations proffered to the
20   court, an evidentiary hearing would be required only if defendant presented to
21   the court detailed, specific and nonconjectural factual allegations concerning
22   his arrest which if later proven true would entitle him to dismissal of his
23   case or some other appropriate sanction. Defendant has presented no fact
24   outside of those acknowledged by the court that would alter the court's ruling
25   under the present state of the law. See United States v. Toscanino, 500 F.2d
26   at 281.(the court may, in its discretion, decline to hold an evidentiary
27   hearing if defendant fails to offer credible supportable evidence, including
28   specific evidence, that tortuous actions and abduction was taken by or at

-10-

1  direction of United States officials).

2  II. Motion to Dismiss

3         Relying exclusively on United States v. Toscanino, 500 F.2d 267 (2d Cir.
4  1974), defendant moves this court to divest itself of jurisdiction over the
5  instant prosecution.  Defendant argues that his removal to the United States
6  by the Mexican police officers at the request of United States agents so
7  violates his due process rights that divesture of jurisdiction and dismissal
8  of the indictment are the only appropriate sanctions.  The government opposes
9  defendant's motion arguing that based on the facts, even as Verdugo has
10 alleged them, the law affords no remedy for his seizure and return to the
11 United States.

12        Review of the case law demonstrates that the circumstances surrounding
13 Verdugo's apprehension do not necessitate the extreme remedy of divestiture of
14 jurisdiction.  The instant case falls within that area of the law governed by
15 the Ker-Frisbie doctrine, which holds that a defendant cannot defeat personal
16 jurisdiction by asserting the illegality of the procurement of his presence.
17 This doctrine takes its name from two Supreme Court cases in which defendants'
18 claims that they had been brought within the court's jurisdiction by force in
19 violation of due process were rejected.  See Ker v. Illinois, 119 U.S. 436
20 (1886); Frisbie v. Collins, 342 U.S. 519 (1952).  This circuit's adherence to
21 the Ker-Frisbie doctrine has been clearly established in a line of cases hold-
22 ing that forcible return to the jurisdiction of the United States constitutes
23 no bar to prosecution once the defendant is found within the United States. See
24 United States v. Fielding, 645 F.2d 719, 723 (9th Cir. 1981); United States v.
25 Valot, 625 F.2d 308, 309 (9th Cir. 1980); United States v. Lovato, 520 F.2d
26 1270, 1271 (9th Cir.), cert. denied 423 U.S. 985 (1975); United States v.
27 Cotten, 471 F.2d 744, 748 (9th Cir.), cert. denied 411 U.S. 936 (1973);

28                                -11-

1   Myers v. Rhay, 577 F.2d 504, 510 (9th Cir.), cert. denied, 439 U.S. 968
2   (1978).

3        Defendant seeks to come within an exception to the Ker-Frisbie doctrine
4   created by the Second Circuit in United States v. Toscanino, 500 F.2d 267. 3/
5   In Toscanino the court held that due process requires a federal court to
6   divest itself of jurisdiction under the factual circumstances alleged by the
7   defendant.  In Toscanino the defendant, an Italian citizen, alleged he had
8   been kidnapped from his home in Uruguay, subjected to three weeks of interro-
9   gations which included physical torture, beatings, electric shock treatment,
10  and had alcohol flushed in his eyes, nose and body cavities in a Brazilian
11  prison.  He was then ultimately brought to the United States.  Toscanino also
12  alleged that the U.S. Attorney's office had been aware of the torture while it
13  was occurring and that federal drug agents were present during, and partici-
14  pated in, the torture. A subsequent decision of that circuit clarified the
15  Toscanino holding, stating that only governmental conduct "of the most out-
16  rageous and reprehensible kind" will give rise to a due process violation
17  requiring a court to impose the remedy created in Toscanino.  United States ex
18  re. Lujan v. Gengler, 510 F.2d 62, 65-66 (2d Cir.), cert. denied, 421 U.S.
19  1001 (1975).

20       The facts in the instant case differ dramatically from those alleged in
21  Toscanino.  First, Verdugo was not tortured.  His liberty was restrained and
22  he may have believed that some physical harm would befall him, but he was not
23  beaten or physically brutalized. Lujan v. Gengler, 510 F.2d at 66 (defendant
24  disclaimed acts of torture, terror or custodial interrogation); United States
25  v. Valot, 625 F.2d at 310 (defendant alleged no shocking and outrageous conduct);
26  United States v. Lovato, 520 F.2d 1271-2 (no physical abuse alleged).

27

28        3/ The Ninth Circuit has not yet had occasion to apply the
    Toscanino rule.  United States v. Fielding, 645 F.2d at 723.

Second, United States agents did not directly participate in Verdugo's apprehension and removal to the United States. At the time Verdugo was seized, the men perpetrating his removal were employed as Mexican police officers. Knowledge on the part of United States agents that Verdugo's removal was occurring or about to occur does not raise Verdugo's apprehension to the level of an act so shocking the conscience that dismissal is warranted. While the facts demonstrate that Verdugo was apprehended at the suggestion of United States agents, the Mexican officers were not acting as paid agents of the United States. United States v. Fielding, 615 F.2d 923-4 (no showing that United States participated in torture and kidnapping); United States v. Lira, 515 F.2d 68, 71 (2d Cir.), cert. denied 423 U.S. 847 (1975) (no direct involvement of United States in defendant's torture could be proven); United States v. Lara, 539 F.2d 495 (5th Cir. 1976) (United States agents played no direct role in the torture allegedly administered by Panamanian authorities). A federal court need not impute vicarious liability to United States agents because they initiated foreign agents' interest in removing one of their own citizens from his country. See United States v. Lira, 515 F.2d at 71 (United States was not vicariously liable for torture and arrest where United States merely asked foreign government to arrest and expel defendant in accord with its own procedures). See also Di Lorenzo v. United States, 496 F. Supp. 79, 82 (S.D.N.Y. 1980). That the State of Baja California has now initiated criminal proceedings against those who were at the time acting under color of law does not change the circumstances at the time of Verdugo's apprehension. The actions of foreign authorities are not to be judged by the standards of our Constitution. See United States v. Maher, 645 F.2d 780, 782 (9th Cir. 1981); United States v. Rose, 570 F.2d 1358, 1361 (9th Cir. 1978); Stonehill v. United States, 405 F.2d 738, 743 (9th Cir.), cert. denied 395 U.S. 960 (1969).

1    Verdugo also argues that this court should dismiss his case because the
2    United States failed to secure his person in the United States through the
3    extradition process, and hence violated its own treaty as well as inter-
4    national law.  The United States has entered into an extradition treaty with
5    Mexico, through which, after formal request, it can secure persons who have
6    been charged in the United States with crimes listed in the extradition
7    treaty.  See Treaty of Extradition Between the United States of American and
8    United Mexican States, January 25, 1980, 31 U.S.T. 3059, T.I.A.S. NO. 9656.
9    Though this circuit has yet to address the issue, there is clear line of
10   second circuit cases which hold that abduction from another country violates
11   international law only when the offended state objects to the conduct.  Lujan
12   v. Gengler, 510 F.2d at 68 citing United States v. Toscanino, 500 F.2d at 267.;
13   United States v. Reed, 639 F.2d 896 (2d Cir. 1981); Di Lorenzo v. United
14   States, 496 F. Supp. at 82 n. 3; Cf. Waits v. McGowan, 516 F.2d 203, 208 & n.9
15   (3d Cir. 1975)(in case of international extradition, protection available to
16   extradited person exists primarily for benefit of asylum nation, precluding
17   extradited person from raising violations of rights afforded by demanding
18   nation). The court is unaware of any formal objection by the government of
19   Mexico and thus finds that the issue of the effect of violation of inter-
20   national law on Verdugo's criminal prosecution is not properly before the
21   court at this time.
22   ////
23   ////
24   ////
25   ////
26   ////
27   ////
28   ////

III. <u>Order</u>

    Accordingly, Verdugo's request for an evidentiary hearing and motion to dismiss are DENIED.

    IT IS SO ORDERED.

    DATED:  April 11, 1986.

J. LAWRENCE IRVING, JUDGE
UNITED STATES DISTRICT COURT

COPIES TO:

MICHAEL LASATER
Assistant U.S. Attorney
940 Front Street, Room 5-N-19
San Diego, CA  92189

MICHAEL PANCER
625 Broadway, Suite 1135
San Diego, CA  92101

-15-

MICHAEL PANCER
625 Broadway #1135
San Diego, Ca. 92101
(619)236-1826

Attorney for Defendant

RECEIVED
SAN DIEGO, CA

MAR 24  10 55 AM '86

U.S. ATTORNEY
DEPT. OF JUSTICE

FILED

MAR 21  P 3: 58

DISTRICT COURT
EPUTY  N DISTRICT OF CA

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Criminal No. 86-0107-JLI |
| ) | |
| v. ) | NOTICE OF MOTION AND MOTION |
| ) | FOR DISMISSAL OF INDICTMENT |
| RENE MARTIN VERDUGO, ) | AND REQUEST FOR EVIDENTIARY |
| ) | HEARING |
| Defendant. ) | |
| ) | |
| ) | Hearing: 4-4-86 2:00 p.m. |

TO:  PETER K. NUNEZ, UNITED STATES ATTORNEY

PLEASE TAKE NOTICE that defendant RENE VERDUGO, by
and through his attorney, Michael Pancer, will move this court
for an order dismissing the criminal Indictment being brought
against defendant, based upon this motion and points and
authorities in support thereof.

### MOTION

Defendant bases his motion for dismissal on the
following grounds:

1.  The government's involvement with the defendant's
abduction from Mexico to the United States violates the
defendant's constitutional rights, including due process of law.
The holding in <u>United States v. Toscanino</u>, 500 F.2d 167 (2nd



EXHIBIT E
EXHIBIT E

1   Cir. 1974), supports defendant's claim.

2       2.  The United States government violated the

3   extradition treaty between the United States and Mexico.

4       3.  The United States government violated

5   international law in illegally kidnapping the defendant from

6   Mexico.

7       This motion is based upon the files and records in

8   this case, the affidavits, Memorandum of Points and

9   Authorities, and other such matters as may be presented to the

10  court at the time of the hearing on the motion.

11  Dated: March 20, 1986

12

13      MICHAEL PANCER
        Attorney for Defendant

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## I

### STATEMENT OF FACTS

Sometime prior to January 24, 1986, agents or other representatives of the United States met with one or more of the following persons: Mohammed Ali Hoy Casas, Jose Luis Torres Alcala, Domingo Martinez Bueno, Antonio Escobedo, Renaldo Vegas Garcia, and Jose Luis Tindo. At this meeting, U.S. agents discussed the kidnapping of defendant VERDUGO and the transportation of VERDUGO from Mexico to the U.S. $50,000 was given to these six men in advance and a promise of another $50,000 was made with the understanding that it would be paid to the six men when the "job was finished".

On January 24, 1986, defendant was driving his vehicle on a street in San Felipe, Baja California, Mexico, when he was forced to stop his vehicle by the six men referred to above, who were in two separate vehicles.

Defendant was forceably removed from his car by the six armed men and placed into the rear seat of one of the cars. Defendant was handcuffed (hands behind his back), blindfolded, his head forced down below the windows and a jacket was placed over his head.

One of the kidnappers held Mr. VERDUGO's head down. Defendant remained in this position for about two and one-half hours as the vehicle he was in proceeded north from San Felipe towards Mexicali and then to a point along the U.S./Mexico border just west of Calexico. At this point, defendant was pushed through a hole in the fence and taken into custody by

-3-

officers of the U.S.

At various times during the two and one-half hour ordeal, defendant nearly suffocated due to the manner in which he was held captive. The last portion of the ride, prior to arrival at the border, was on a dirt road.

During the entire trip, defendant was in fear for his life and, when the vehicle in which he was being transported traveled on the dirt road, defendant felt certain he was about to be murdered. He was never told he was in the custody of law enforcement officers or for what purpose.

After being shoved through a hole in the fence, defendant was turned over to agents of the Drug Enforcement Administration in Calexico, and then transported to the Metropolitan Correctional Center in San Diego, California, where he is currently being held without bail.

The action of the six previously identified Mexican abductors was done at the request and under the direction of the Drug Enforcement Administration and the U.S. Marshal Service, all agencies of the U.S. Department of Justice. Not only were these six Mexicans paid to kidnap the defendant by these agencies, but the six kidnappers and their families are now in the U.S. under the protection of either the Drug Enforcement Administration or the U.S. Marshal Service.

It is defendant's belief that two of the Mexican abductors may have been civilians, while four of them were Mexican judicial police officers. (See attached Exhibit "A" and "B".)

-4-

II

DEF___  __'S DUE PROCESS RIGHTS WERE VIOLATED
BY THE UNIT__ STATES GOVERNMENT'S ROLE IN HIS ABDUCTION,
AND THEREFORE THIS COURT LACKS JURISDICTION OVER THE DEFENDANT.

Prior to 1974, the general rule regarding the extra-legal procurement of a potential defendant from another country had been regulated by the Ker-Frisbie doctrine.  This doctrine was named after two Supreme Court cases, Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1888), and Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952).  For years this doctrine has stood for the concept that the government's power to prosecute a defendant is not impaired by the illegality of the method by which it acquires jurisdiction over him.

In Ker, the defendant was residing in Peru while indicted by an Illinois grand jury for larceny and embezzlement.  At the request of the Governor of Illinois, the President, invoking the current treaty of extradition between the U.S. and Peru, issued a warrant authorizing a Pinkerton agent to take custody of Ker from the authorities in Peru.  The warrant, however, was never served, probably for the reason that by the time the agent arrived there, armed forces of Chile, then at war with Peru, were in control of Lima.  Instead Ker was forceably abducted by the agent, placed aboard an American vessel and eventually taken to the U.S. where he was tried and convicted in Illinois.

The Supreme Court rejected Ker's argument that he was entitled by virtue of the treaty with Peru to a right of . asylum there and held that the abduction of Ker did not violate the Due Process Clause of the Fourteenth Amendment, which was construed as merely requiring that the party be regularly

-5-

1   indicted and brought to trial according to the forms and modes

2   proscribed for such trials.  The Court accordingly held that

3   Ker might be tried by Illinois, regardless of the method by

4   which it acquired control over him.

5          Sixty-six years later the Supreme Court again faced

6   the question in Frisbie v. Collins, supra, in a slightly

7   different context.  There a Michigan State prisoner,

8   petitioning for habeas corpus, alleged that he had been brought

9   from Chicago, Illinois, to Michigan for trial only after he had

10  been kidnapped, handcuffed and blackjacked in Chicago by

11  Michigan police officers who had gone there to retrieve him.

12  Frisbie claimed that his conviction in Michigan violated the

13  Due Process Clause of the Fourteenth Amendment as well as the

14  Federal Kidnapping Act, and was therefore a nulity.

15         Rejecting the due process claim, the Supreme Court

16  explained "this Court has never departed from the rule

17  announced in Ker v. Illinois, that the power of a court to try

18  a person for a crime is not impaired by the fact that he had

19  been brought within the court's jurisdiction by reason of a

20  'forceable abduction'."  Ker at p. 522.

21         However, in 1974, in the case of United States v.

22  Toscanino, 500 F.2d 267 (2nd Cir. 1974), the absolute

23  protection provided by the Ker-Frisbie doctrine was limited.

24  Defendant argues that his situation falls squarely under the

25  protection of Toscanino, and relies extensively on this case.

26         In Toscanino, the defendant was lured from his home

27  in Urgway by a telephone call.  This call had been placed by or

28  at the direction of a member of the police in Urgway, who was

-6-

line of case law protecting due process rights of individuals accused of criminal activity.  In citing cases such as <u>Rochin v. California</u>, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952); <u>Mapp v. Ohio</u>, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); <u>Wong Sun v. United States</u>, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); <u>United States v. Russell</u>, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the <u>Toscanino</u> Court noted that "concurrent with these decisions the <u>Ker-Frisbie</u> rule has been criticized and its continued validity repeatedly questioned".  <u>Toscanino</u> at p. 272.

The <u>Toscanino</u> Court relied heavily on the theory and standard as developed in <u>Rochin</u>.  Defendant claims his case falls exactly within the parameters of "outrageous governmental misconduct" as found both in <u>Rochin</u> and <u>Toscanino</u>.  The entire scheme planned by the U.S. in securing his presence in the U.S. "shocks the conscience".  <u>Rochin</u> at p. 172.  The payment of money, the cavalier attitude by the U.S. towards Mexican laws, U.S.-Mexican treaties, and international law, the brutality and terroristic methods employed in the kidnapping all point to conduct, which like the forced vomitting of the defendant in <u>Rochin</u>, "offend those canons of decency and fairness which expressed the notions of justice of English-speaking people even towards those charged with the most heinous crimes".  <u>Rochin</u> at p. 172.

<u>Toscanino</u> also stands for the proposition that due process rights "extend to the pretrial conduct of law enforcement authorities".  <u>Toscanino</u> at p. 274.

-8-

1    Unlike the ability of the court to redress wrongs by

2    excluding evidence, such as in <u>Mapp</u>, <u>Miranda</u>, and <u>Wong Sun</u>,

3    defendant's case, like Toscanino, calls for dismissal of the

4    indictment. "Where suppression of evidence will not suffice,

5    however, we must be guided by the underlying principle that the

6    government should be denied the right to exploit its own

7    illegal conduct". <u>Toscanino</u> at p. 275. <u>Toscanino</u> found that

8    dismissal due to a due process violation in obtaining a person

9    before the court for jurisdiction or purposes was mandated by

10   "requiring a court to divest itself of jurisdiction over the

11   person of a defendant where it has been acquired as a result of

12   the government's deliberate, unnecessary, and unreasonable

13   invasion of the accused's constitutional rights". <u>Toscanino</u> at

14   p. 275.

15   Were the government's actions in the present case

16   "deliberate, unnecessary and unreasonable"? Defendant believes

17   the answer must be made in the affirmative. The deliberate

18   nature of the government's actions are evident in their

19   well-planned, orchestrated abduction of defendant on January

20   24, 1986. Contact was made by the U.S. government agents of

21   certain individuals who promised to deliver the defendant to

22   the fence at the U.S.-Mexican border. They were paid for the

23   abduction.

24   Defendant contends that flagrantly illegal actions

25   involving kidnapping and violence are <u>never</u> justified to secure

26   the presence of an individual before a U.S. court; However, in

27   this case, it is <u>especially</u> true that the government's actions

28   were unnecessary. There is in existence an extradition treaty

-9-

between the U.S. and Mexico.  The U.S. government could have requested a legal extradition from Mexico to obtain defendant's presence.  (See attached Exhibit "A".)

Were the procedures utilized by the government in abducting him reasonable?  Hardly.  Defendant was forceably stopped and removed from his car in San Felipe by six armed men.  The defendant was then handcuffed behind his back, blindfolded, and his head forced down below the windows with a jacket placed over his head.  The defendant could not breathe, and was in fear for his life.  The only explanation the defendant could arrive at for his abduction was the fact that he was about to be murdered.  The fact that the six paid agents of the U.S. who abducted the defendant were armed illustrates the extreme unreasonableness of the U.S. government's actions.  Death, or at least serious injury could have resulted from either defendant's resistence to the kidnapping, or the potential intervention of official Mexican authorities.

Following the Toscanino decision, neither the Ninth nor Second Circuit have found a case that meets the level of outrageous governmental conduct as found in Toscanino. However, these cases have not denied the fact that Toscanino is a viable case with concrete application.  In a Second Circuit case immediately following Toscanino, United States ex rel. Lujan v. Gengler, 510 F.2d 62 (2nd Cir. 1975), the Court stated that, although the facts in Lujan did not warrant judicial intervention as Toscanino did, Toscanino still stands for the principle that "whenever a foreign national is abducted or kidnapped from outside of the U.S. and is forceably brought

-10-

into this country by U.S. agents by means of torture, brutality or similar physical abuse, the federal court acquires no jurisdiction over him because of a violation of due process". Lujan at p. 69, J. Anderson concurring.

In Lujan the defendant was tricked into flying a plane from Argentina to Bolivia. When he landed, he was taken into custody by Bolivian police who were acting as paid agents of the U.S. After being held for approximately five days, Lujan was placed on a plane bound to New York, where he was formally arrested for conspiracy to import heroin. The Court, in distinguishing Lujan from Toscanino, noted "lacking from Lugan's petition is any allegation of that complex of shocking governmental conduct sufficient to convert an abduction which is simply illegal into one which sinks to a violation of due process". Lujan at p. 66. The Court went on to note that no guns were used, and that "[I]ndeed, Lujan disclaims any acts of torture, terror or custodial interrogation of any kind". Id. The Court also noted that "Lujan charges no deprivation greater than that which he would have endured through lawful extradition". Id.

Defendant alleges a much greater deprivation of due process rights than Lujan. Torture and terror were present. The defendant was in fear for his life when forceably abducted by six armed men whom he did not know. Unlike Lujan, he did not know he was being "extradicted". As far as the defendant was concerned, he was being placed in a car to be murdered. Indeed, when the car turned off on a dirt road, defendant had no doubt that he would be shot and his body would be hidden.

-11-

1   Such fear of impending death certainly amounts to mental

2   torture.  Physical torture was also present.  Defendant was

3   forceably abducted by six armed men, and thrown into the back

4   of a car.  He was handcuffed, blindfolded, and pushed down in

5   the seat so he would not be seen.  A jacket was placed over his

6   head and defendant nearly suffocated.  (See attached Exhibit "B".)

7          It is important to remember that the Toscanino and

8   Lujan Courts construed the standard as articulated in Rochin

9   not to be just a test to show a due process violation, but

10  rather a general principle:

11          . . .The relevance of the Rochin principle
            is not that it provides a test which may
12          easily be applied, (citation omitted), but
            that it embodies a perception which remains
13          viable - a court which would ordinarily stay
            its hand will intervene when government
14          conduct becomes so outrageous that
            conscience and justice demand a remedy.
15          Lujan, fn. 5, at p. 66.

16          Defendant argues that the circumstances of his

17  illegal kidnapping and armed abduction should be looked at as a

18  whole package of governmental misconduct.  Besides the physical

19  and mental harm incurred directly by the defendant, other facts

20  point clearly toward impermissible governmental conduct.

21  Defendant points out to this court the fact that the U.S.

22  government broke numerous Mexican laws relating to bribery,

23  kidnapping, unlawful use of firearms, and terrorism.  The

24  impunity in which these laws were ignored and violated runs

25  entirely contrary to the notions of decency and fair play.  The

26  U.S. government has insulted the Mexican government by its

27  actions, and should be punished.  The U.S. has acted

28  inconsistently with its own policies, and has entered the arena

-12-

of aggressive international terrorism.

Additionally, the six individuals that were paid for the abduction are being given shelter and protection in the U.S. by either the DEA or U.S. Marshal's office. Defendant believes that these six individuals may well never again be accepted back into Mexico, and will seek permanent residence in the U.S. This interference with the lives of these individuals is simply inexcusible. The U.S. was directly involved in employing these individuals in a criminal capacity, and now has inherited the responsibility for their safety.

The expense to the U.S. taxpayer is also at issue in this case. Besides a $100,000 payment directly to the kidnappers, the government is currently funding the stay of the kidnappers and their families in the U.S. This expense, coupled with the additional expense in defending its actions in court, are quite conceivably going to cost the U.S. taxpayers in the excess of $1,000,000. The expenditure of U.S. tax dollars for illegal purposes is an additional fact the court can consider.

In looking to Ninth Circuit decisions concerning situations somewhat similar to defendant's, it is admitted that no case has dismissed an indictment based upon improper methods of obtaining a defendant's presence before the court. This admission, however, in no way affects defendant's argument. Indeed, a fair reading of the Ninth Circuit cases following Toscanino show that the Ninth Circuit would, given the right fact situation, uphold Toscanino and dismiss an indictment based upon outrageous governmental conduct.

-13-

1    In <u>United States v. Lovato</u>, 520 F.2d 1270 (9th Cir.

2    1975), defendant alleged that Mexican army personnel, acting in

3    effect as agents of the U.S., engaged in misconduct in the

4    course of his expulsion from that country and delivery to the

5    U.S. officers at the border.  The Court, however, found that

6    defendant's allegations "amounted to little more than a senario

7    of a routine expulsion by Mexican officers of an undesirable

8    alien", and denied defendant's motion to dismiss.  <u>Lovato</u> at p.

9    1272.

10        The <u>Lovato</u> Court remained neutral on whether or not

11   it would follow <u>Toscanino</u> if given a similar set of facts.  The

12   Court did note that <u>Lujan</u> would, in light of <u>Toscanino</u>,

13   entertain a motion for dismissal if "the person claiming that

14   he was kidnapped makes a strong showing of grossly cruel and

15   unusual barbarities inflicted upon him by persons who can be

16   characterized as paid agents of the U.S.".  <u>Lovato</u> at p. 1271.

17        In <u>United States v. Valot</u>, 625 F.2d 308 (9th Cir.

18   1980), the defendant was arrested and incarcerated in Thailand

19   on a marijuana charge.  On the day of his release, Thai

20   immigration officials brought Valot to the immigration area and

21   forced him to remain there.  Two U.S. DEA agents arrived and

22   took him aboard a flight to Honolulu.

23        The <u>Valot</u> Court rejected the defendant's argument

24   that he had been illegally abducted from Thailand.  It did,

25   however, cite <u>Toscanino</u> and <u>Lujan</u>, noting that such a due

26   process claim must be accompanied by allegations of

27   governmental conduct "of the most shocking and outrageous

28   kind".  <u>Valot</u>, citing <u>Lujan</u> at p. 65-66.

In <u>United States v. Felding</u>, 645 F.2d 719 (9th Cir.
1981), the defendant claimed that he was kidnapped, tortured,
and mistreated in a Peruvian jail, and that federal agents were
involved.  The Court held that the defendant failed to show any
U.S. involvement, and was not entitled to dismissal of the
indictment.  In discussing <u>Toscanino</u>, the <u>Felding</u> Court at page
723 noted "[T]oscanino certainly did involve conduct shocking
to the conscience".  The Court further notes that the Ninth
Circuit "has <u>not</u> had occasion to apply the <u>Toscanino</u> rule".  <u>Id</u>.

### III

#### THIS COURT HAS THE INHERENT SUPERVISORY POWER TO DISMISS DEFENDANT'S INDICTMENT.

This court has the inherent supervisory power to
regulate the administration of criminal justice.  This power
has been recognized by a number of cases, including the case of
<u>McNabb v. United States</u>, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed.
819.  This power was developed to guard the judiciary against
participation with other governmental wrongdoing.  In
discussing this power, the <u>Toscanino</u> Court stated that:
"Clearly this power may legitimately be used to prevent
district courts from themselves becoming 'accomplices in
willful disobedience of law'".  Moreover, "the supervisory
power is not limited to the admission or exclusion of evidence,
but may be exercised in a manner necessary to remedy abuses of
a district court's process".  <u>Toscanino</u> at p. 276.

In <u>United States v. Owen</u>, 580 F.2d 365 (9th Cir.
1978), the Court held that "a federal court is empowered,
pursuant to its inherent supervisory power, to dismiss an

-15-

1    indictment in appropriate cases on the basis of governmental

2    misconduct". <u>Owen</u> at p. 357.

3             In <u>United States v. Hasting</u>, __U.S.__, 103 S.Ct.

4    1974, 76 L.Ed.2d 96 (1983), the Supreme Court listed three

5    purposes which may properly underlie use of the inherent

6    supervisory power:

7             1.   To implement a remedy for a violation of

8    recognized rights;

9             2.   To preserve judicial integrity by ensuring that a

10    conviction rests on appropriate considerations validly before

11    the jury; and

12             3.   As a remedy designed to deter illegal conduct.

13    <u>Hasting</u> at p. 1978-1979.

14             Defendant urges this court to punish the government

15    for its misconduct, to disassociate the court from the

16    government's misconduct, and to deter future governmental

17    misconduct of a similar fashion.   To allow this type of

18    kidnapping would in practical effect lend encouragement to the

19    commission of criminal acts by those sworn to enforce the law.

20             It is also within the supervisory power of this court

21    to denounce the method by which defendant's presence was

22    procured as nothing less than international terrorism.   In view

23    of the recent world tension regarding acts of terrorism, and

24    the strong denunciation of such terrorism by the U.S.

25    government, it is inconceivable that such an action would be

26    allowed.   The ramifications of such terrorist activity by the

27    U.S. in hiring Mexican officials to abduct a Mexican national

28    are extensive.   Certainly the U.S. would be outraged at any

1  reciprocal action by the Mexican government. Must not our

2  citizens now fear that Mexican law enforcement would assume

3  they would be within their rights if they came to the U.S.

4  and kidnapped a U.S. citizen who was a suspect in Mexico?

5       If it is indeed the policy of the U.S. to secure

6  non-U.S. citizens in such a fashion as defendant was obtained,

7  then this policy is entirely inconsistent with that of the

8  government's strong stand against international terrorism.

9  Indeed, it is an inconsistent position, and has the potential

10 for great backlash in the international community.

11      This terrorist activity falls directly within the

12 articulated protection of Toscanino.  No less than the pumping

13 of the stomach in Rochin, defendant's kidnapping and bribery

14 certainly "offends those canons of decency and fairness" upon

15 which American jurisprudence rests.  "It has long ceased to be

16 true that due process of law is heedless of the means by which

17 otherwise relevant and credible evidence is obtained.  Due

18 process of law, as a historic and generative principle,

19 precludes defining, and thereby confining, these standards of

20 conduct more precisely than to say that convictions cannot be

21 brought by methods that offend a sense of justice."  Toscanino

22 at p. 273, as quoting Rochin at p. 172-173 [emphasis added].

23      Although it is obvious that the government in this

24 case very strongly desired defendant's presence, and has

25 resulted to extra-legal means to obtain it, such desire or need

26 cannot furnish a rationale for violating defendant's

27 constitutional rights.  "Society is the ultimate loser when, in

28 order to convict the guilty, it uses methods that lead to

-17-

1  decreased respect for the law". United States v. Archer, 486

2  F.2d 670, 677 (2nd Cir. 1973).

3  Another important factor which calls for the

4  dismissal of defendant's indictment is the fact that the U.S.

5  violated numerous Mexican laws when it kidnapped the defendant.

6  First of all, the money paid to the kidnappers who were Mexican

7  judicial police officers constitutes bribery under Mexican law.

8  Indeed, it is believed that at least four of the kidnappers

9  were fired for somehow being connected to this criminal

10  enterprise. Secondly, the forceful taking of the defendant by

11  armed men constitutes the crime of kidnapping.

12  F i n a l l y, defendant alleges that the U.S. broke

13  numerous other Mexican laws, including laws relating to

14  assault, unauthorized possession of weapons, and battery. (See

15  attached Exhibit "C".)

16  In none of the cases dealing with this situation do

17  we have such a serious violation of foreign law as in

18  defendant's case. These unlawful acts, coupled with the

19  failure to comply with the extradition treaty between the U.S.

20  and Mexico, in violation of international law, bring defendant

21  within the protection afforded by Toscanino. These legal

22  violations fly in the face of the due process protection

23  articulated in Toscanino, and the cases contained within

24  Toscanino.

25  Additionally, when defendant's kidnapping is viewed

26  in the whole, it is easy to see that the situation could have

27  potentially generated much more violence than the torture in

28  Toscanino. This is true because of the violent nature in which

-18-

the defendant was kidnapped.  What if the defendant had been armed?  Certainly he had the right to resist an unlawful arrest.  Defendant could have been thinking only one possibility when he was kidnapped – danger to himself or his family.  It is entirely conceivable to invision a situation in which defendant confronted these men with equal force.

Continuing along these lines, what would have happened if Mexican authorities had stumbled on to this illegal plot?  Defendant shudders to consider the potential violence that might have occurred between the six armed kidnappers and several other Mexican policemen.  It is only fair to assume that individuals could have been killed, including innocent bystanders.  The U.S. government would then have been responsible for a tragic international incident, one which could have chilled U.S.-Mexican relations for a considerable amount of time.

Additionally, several U.S. laws have potentially been violated.  Defendant points out to the court that he was transferred across the border at a spot other than a designated border crossing.  Defendant also believes that Title 15, U.S.C. 78(dd-z), relating to foreign corrupt practices, was violated in that U.S. officials paid money in the form of a bribe in influencing and inducing the six Mexicans who kidnapped defendant.

Defendant's case is distinguishable from other cases cited herein in that the Mexican government was not involved officially in defendant's abduction.  In <u>Toscanino</u>, the defendant was tortured by Brazilian governmental agents.  In

-19-

all of the other cases, the government where the kidnapping
took place approved of the conduct, or participated in it.   In
defendant's case, however, the Mexican government was not
involved in any manner.   Instead, six individuals were paid by
U.S. agents to kidnap defendant and bring him to the U.S.
According to information obtained by the defendant, two of the
six kidnappers may have been civilians, and the remaining four,
who were Mexican judicial police officers, were fired as a
result of the kidnapping.

### IV

#### THE GOVERNMENT'S ACTION IN KIDNAPPING DEFENDANT VIOLATED THE U.S.-MEXICAN EXTRADITION TREATY.

Defendant claims that, besides violating defendant's
due process rights, the government failed to comply with the
existing U.S.-Mexican extradition treaty.   This treaty is the
Treaty of Extradition between the U.S.A. and United Mexican
States, February 22, 1899, 31 Stat. 1818, T.S.242.   A new
extradition treaty which entered into force on January 25,
1980, has superceded the 1899 treaty.   17 International Legal
Materials 1068 (1978).

These laws generally require a warrant from a U.S.
magistrate or judge requesting the Mexican federal government
to carry out extradition in accordance with the treaty.   Both
laws contain the legal procedures by which the transfer or
extradition of persons must be conducted, chiefly through the
diplomatic channels, according to Articles 9, 10, 11, 13, 14
and other related articles of the treaty, and 2, 5, 6, 7, 16,
17, 19, 20, 21, 22, 24, 30, 33, 34 and other related articles

of the law of extradition of Mexico.

Absent either (1) a warrant for defendant's arrest granted by a Mexican judge, or (2) the defendant being caught committing any illegal act by the police at the time of the said arrest, defendant could legally be procured only through a proper extradition request.

Instead, the Mexican government was never informed of the U.S. need for the defendant.  Instead of proceeding through the proper channels, the U.S. government elected to forceably kidnap defendant, therefore securing his presence illegally.

In addition, defendant claims that Title 18, U.S.C. 3184 requires that, when an extradition treaty is in force, actions of government officials and review by the court shall conform to those treaties.  "Extradition may be sufficiently defined to be the surrender by one nation to another of an individual accused or convicted of an offense outside of its own territory, and within the territorial jurisdiction of the other, which, being comitant to trying to punish him, demands the surrender".  <u>Terlinden v. Ames</u>, 184 U.S. 270, 22 S.Ct. 484, 46 L.Ed. 534 (1902).

The U.S.-Mexican extradition treaty provides for a regulated method of obtaining a citizen of the opposite country for presence before the charging court.  Article 4 of the Extradition Treaty, on its face, invests the executive branch of each treaty party with discretion to surrender its own nationals.  It states:

> Neither of the contracting parties shall be bound to deliver up its own citizens under the stipulations of this convention, but the executive authority of each shall have the

-21-

power to deliver them up, if, in its discretion, it be deemed proper to do so. Defendant contends that this process was not followed, and therefore, the jurisdiction obtained by this court over his presence is improper.

In Stevenson v. United States, 381 F.2d 142 (9th Cir. 1967), the defendants were arrested in Mexico on suspicion that they were in possession of a stolen vehicle. They were then deported by Mexican immigration authorities as undesirable aliens found in Mexican under suspicious circumstances. Defendants' claimed that their federal prosecution should be dismissed as the provisions of the Extradition Treaty between Mexico and the U.S. were not utilized.

The Court denied the relief, holding that (1) the removal of the defendants was not initiated by the U.S., (2) the defendants were deported by Mexican officials as undesirable aliens, and (3) it is the practice of Mexico to refuse such aliens to remain in Mexico.

This case is distinguishable from defendant's case. First of all, the U.S. government did in fact initiate the kidnapping of defendant. They bribed several Mexican federal police officers into kidnapping defendant. Secondly, defendant, unlike the defendants in Stevenson, is a Mexican national. He was not an undesirable alien being deported by Mexican officials. Finally, defendant's kidnapping in this case was implemented by individuals not acting as official Mexican authorities. Rather, they were nothing more than paid kidnappers acting on the advice and under the direction of the U.S. government.

-22-

It is important to note that the extradition is required to be made through diplomatic channels. Further, the Extradition Treaty provides certain rights for the subject of the extradition. To quote from <u>Ker v. Illinois</u>, <u>supra</u> at 443, the defendant herein is "clothed with the protection which the nature of such proceedings and the true instruction of the treaty gave him". And finally, the treaty puts certain restrictions upon the power of a court to deal with a party who has been placed in that court's jurisdiction via the extradition process. That the jurisdiction of court is limited by the Convention of Extradition, was clearly upheld in <u>United States v. Rauscher</u>, 119 U.S. 407 (1886).

As set forth in <u>United States v. Rauscher</u>, <u>supra</u> at 430, "the treaty is the supreme law of the land". See also, <u>Missouri v. Holland</u>, 252 U.S. 416 (1920). This rule goes far back in our system of jurisprudence to the pronouncements of Chief Justice John Marshall, see, <u>Foster v. Neilson</u>, 2 Pet.253, 314 (1929).

It is also clear that the power of extradition, the power to secure and transport a fugitive from a foreign country, is solely based upon the provision of a treaty. "It cannot be doubted that the power to provide for extradition is a national power. (Citation omitted.) But albeit, a national power, is not confided to the executive in the absence of a treaty or legislative provision". <u>Valenteni v. United States ex rel Niedecker</u>, 299 U.S. 5, 8 (1936).

Additionally, it is clear, that when a treaty is in force, it is the duty and function of the courts of this land

-23-

to so enforce that treaty as the supreme law of the land. "...
The construction of treaties is judicial in its nature, and
courts when called upon to act should be careful to see that
international engagements are faithfully kept and observed
. . . ." <u>Sullivan v. Kidd</u>, 254 U.S. 442 (1921).

As set forth above, the U.S. has treaties with the
Mexican government for extradition.  These treaties impose
certain obligations on the contracting countries and in
addition imbue the party with certain rights.  It is undeniable
that when a state transports a party from a foreign state
<u>against his will</u> and without invoking the treaty process of
extradition, that country has violated international law,
territorial sovereignty and the due process of law granted to
the party abducted.

Thus, the power of a nation to seek out and capture
fugitives outside of its border and return them to that country
is strictly limited by international law, territorial
sovereignty, and treaty rights.  To act outside of the power
and procedure of the treaty is to act in violation of these
national and individual rights.

V

THE U.S. VIOLATED INTERNATIONAL LAW IN KIDNAPPING
THE DEFENDANT FROM MEXICO.

Forceably removing individuals from a country outside
the legal extradition process violates international law.  See
<u>U.N. Charter, Article 2, paragraph 4</u>.  To act outside the power
and procedure of the Extradition Treaty is to act in violation
of individual and international rights.  See also "Memorandum

-24-

Relative to Applications for Extradition from Foreign Countries of Fugitives from Justice", Office of the Legal Advisor, Department of State, 63-2 American Journal of International Law, 799 (1969).

The Charter of the United Nations, the members of which include the U.S. and Mexico, specifically obligates "all members" to "refrain . . . from the threat or use of force against the territorial integrity of political independence of any state. . ." U.N. Charter, Article 2, paragraph 4. Additionally, the Charter of the Organization of American States, whose members also include the U.S. and Mexico, (see Department of State, Treaties in Force, 359 (1973)), provides that the "territory of a state is inviolable; it may not be the object, even temporarily, . . . of . . . measures of force taken by another state, directly or indirectly, on any grounds whatsoever. . . ." See O.A.S. Charter, Article 17.

In Toscanino at p. 277, the Court stated that: "International kidnapping such as the one alleged here violates the U.N. Charter". The Court refers to the Security Counsel debates following the illegal kidnapping in 1960 of Adolph Eichmann from Argentina by Israeli "volunteer groups". "In response to a formal complaint filed by the U.N. representative from Argentina pursuant to Article 35 of the U.N. Charter, the Security Counsel, by eight votes to none, adopted a resolution condemning the kidnapping and requesting 'the government of Israel to make appropriate reparation in accordance with the Charter of the United Nations and rules of international law . . .'" Toscanino at p. 277-78, quoting U.N. Document S/4349

-25-

(June 23, 1960), quoting from W.Friedmann, O.Lissitzyn and R.Pugh, International Law: Cases and Materials 497 (1969).

The Toscanino Court held that this resolution "merely recognized a long-standing principle of international law and that abductions by one state of persons located within the territory of another violate the territorial sovereignty of the second state and are redressable usually by the return of the person kidnapped". Toscanino at p. 278.

## VI

## CONCLUSION

Based upon the foregoing points and authorities, and legal argument, the defendant respectfully requests that this court grant his motion for dismissal, and order his release from custody. To allow the government to act in such an illegal and outrageous manner offends not only the law, but also common concepts of jurisprudential decency and integrity.

If ever there was a situation like that in Toscanino, it is present here. Defendant urges this court to draw the line at the government's outrageous conduct, and to deny them the fruits of their illegal kidnapping. As stated by Justice Brandeis in his famous dissent in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928):

> The court's aid is denied only when he who seeks it has violated the law in connection with the very transaction as to which he seeks legal redress. Then aid is denied despite the defendant's wrong. It is denied in order to maintain respect for the law; in order to promote confidence in the administration of justice; in order the preserve the judicial process from contamination. . . Decency, security and liberty alike demand that government officials shall be subject to the same rules

-26-

1

2

3

4

5

6

7

8

9

10

of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contageous. If the government becomes a lawbreaker, it breeds contempt for law; invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the mean - to declare that the government may commit crimes in order to secure the conviction of a private criminal - would bring terrible retribution. Against that pernitious doctrine this court should resolutely set its face. <u>Olmstead</u> at p. 484-485.

11

Dated: March 20, 1986

12

Respectfully submitted,

13

14

MICHAEL PANCER
Attorney for Defendant

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF DEFENDANT RENE MARTIN VERDUGO

NOW COMES RENE MARTIN VERDUGO and declares that he is the defendant in the above-entitled action.

Based on my personal knowledge of the below stated facts, and based upon my personal presence during the acts being attested to below, your declarant believes the following facts to be true and correct and pertinent to the instant proceeding:

1. On January 24, 1986, I was driving my vehicle on a street in San Felipe, Baja California, Mexico, when I was forced to stop my vehicle by six armed men, who were in two separate vehicles.

2. I was forceably removed from my car by the six armed men and placed into the rear seat of one of the cars. I was handcuffed (hands behind my back), blindfolded, my head forced down below the windows and jacket was placed over my head.

3. During this time, I was in fear for my life, as I believed that I was about to be murdered.

4. I was unaware of the reason for my abduction, and was never informed by the abductors as to their identity or purpose in abducting me.

5. My head was held down by one of the kidnappers during the 2-1/2 hour drive. The vehicle proceeded north from San Felipe towards Mexicali and then to a point along the U.S./Mexican border just west of Calexico. At this point, I was pushed through a hole in the fence and taken into custody by officers of the U.S.

**EXHIBIT**

6. During the entire trip, I nearly suffocated due to the fabric placed on my head and mouth. I was also in fear of my life, and suffered extreme physical strain, as well as -extreme emotional distress over what I thought was to be my death.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on March 21, 1986, at San Diego, Calif.

RENE MARTIN VERDUGO

## DECLARATION OF MICHAEL PANCER

NOW COMES MICHAEL PANCER and declares that he is the attorney of record for defendant RENE VERDUGO in the above-entitled matter.

Based on information and belief, your declarant believes the following facts to be true and correct and pertinent to the instant proceeding. Your declarant notes, however, that numerous factual disputes exist. This is primarily due to defense counsel's inability to obtain official information from the government concerning the method by which defendant's presence was obtained before this court. Until such time as an evidentiary hearing is held, your declarant relies upon the information he has been able to acquire due to his independent investigation of this matter. As to potential factual disputes, your declarant believes that an evidentiary hearing will be the only way of clearing any and all factual disputes.

1.   Sometime prior to January 29, 1986, agents or other representatives of the U.S. met with one or more of the following persons: Mohammed Ali Hoy Casas, Jose Luis Torres Alcala, Domingo Martinez Bueno, Antonio Escobedo, Renaldo Vegas Garcia, and Jose Luis Tindo. At this meeting, U.S. agents discussed the kidnapping of defendant VERDUGO and the transportation of VERDUGO FROM MEXICO TO THE U.S. $50,000 was given to these six men in advance and a promise of another $50,000 was made with the understanding that it would be paid to the six men when the "job was finished".

2.   The defendant was kidnapped on January 24, 1986,

**EXHIBIT**

1   and was shoved through a hole in the fence to the awaiting arms

2   of DEA agents.

3       3.   The method in which this kidnapping occurred is

4   stated in the attached Declaration of defendant VERDUGO.  Your

5   declarant affirmatively incorporates the facts as stated in

6   defendant's Declaration, as they were personally told to your

7   declarant as counsel of record for the defendant, and your

8   declarant believes them to be true and correct.

9       4.   The action of the six previously identified

10  Mexican abductors was done at the request and under the

11  direction of the Drug Enforcement Administration and the U.S.

12  Marshal Service, all agencies of the U.S. Department of

13  Justice.  Not only were these six Mexicans paid to kidnap the

14  defendant by these agencies, but the six kidnappers and their

15  families are now in the U.S. under the protection of either the

16  DEA or the U.S. Marshal Service.

17      5.   It is your declarant's belief that two of the

18  Mexican abductors may have been civilians, while four of them

19  were Mexican Judicial Police Officers.

20      6.   Your declarant has been informed on good

21  authority that there is currently an investigation pending in

22  Mexico, conducted by Mexican officials, concerning defendant's

23  abduction.

24      7.   Your declarant also believes that U.S.

25  authorities have been contacted concerning this Mexican

26  investigation, but declarant is not aware of the identity of

27  these U.S. officials.

28      8.   Your declarant states that it is his belief that,

-2-

*Plaza Vendome*
*Blvd. Agua Caliente 80.*
*Tijuana, B. C.   Tel. 88-26-31*

March 16, 1986

Mr. Michael Pancer, Esq.
625 Broadway
San Diego, CA  92101

Re: Rene Verdugo's Arrest in
Mexico.

Dear Mr. Pancer:

In response to your request for information and legal opinion
in my behalf, about whether a person can be extradited from
Mexico to face charges in the United States of America, and
whether there are legal procedures to carry out such extradi-
tion in the event the person in question is wanted to respond
to charges in a U.S.  Court, according to Mexican Law, I am
hereby informing you of the following:

First of all, articles 14 and 16 in relation with article 1
and 13 of the Mexican Constitution guarantee due process of
law to all individuals, according to the laws in Mexico.
Basicaly, that no one's life, freedom, possessions, proper-
ties and rights can be taken away, unless there is a trial
before a previously established Court, in which the essential
formalities of the law are observed, according to the laws
inacted before the fact, as article 14 of the Mexican Consti-
tution reads.  Article 16 of said Constitution says that no
individual or his family, domicile, papers or posseions can
be disturbed, except by virtue of a written mandate from the
competent authority, founding and motivating the legal cause
of the warrant.

Article 1 of the fundamental Mexican Law says that in Mexico
all individuals will enjoy the guaranties that the Constitu-
tion provides, which cannot be restricted nor suspended, but
only under the cases and conditions established by same.

Article 13 of the Law in question says that no one can be
judged by private Laws or special Courts.

The case that you mentioned, in which the arrest of Rene
Verdugo took place in Mexican Territory by Mexican policemen
(?) and then was thrown across the border or given to
American agents, is ilegal according to Mexican Law if there
was not a warrant for Mr. Verdugos' arrest granted by a
Mexican Judge, or was not caught committing an illegal act by
the police at the time of said arrest.  But there certainly
was no reazon why the Mexican police should give him to U.S.

**EXHIBIT "C"**

Page two
Rene Ver[

agents unless there was a warrant from a U.S.  Magistrate or Judge requesting the Mexican Federal Government to carry out his extradition in accordance with the International Treaty of Extradition signed by Mexico and the United States in Mexico City, May 4, 1978; and the Law of International Extradition of Mexico enacted on December 18, 1975.

Both laws contain the legal procedures by which the transfer or extradition of persons must be conducted, chiefly through the diplomatic channels, according to articles 9, 10, 11, 13, 14, and other related articles of the Treaty, and 2, 5, 6, 7, 16, 17, 19, 20, 21, 22, 24, 30, 33, 34, and other related articles of the Law of Extradition of Mexico.

Articles 89, section X and 119 of the Mexican Constitution are the foundations for the Treaty and the Law in review.

**Please take note that if Mr. Verdugo's detention was in fact carried out the way that you stated, it is, according to Mexican Law and the International Treaties, completely illegal.**

As for detaining Mr. Verdugo without a warrant for his arrest and literarally kidnapping him as you mentioned, those involved in this act are subject to punishment according to the articles 178 and 317 of the Penal Code of the State of Baja California.

If you have any more questions regarding this case, please do not hesitate to contact me at the telephone and address listed in the letterhead.

Sincerely,

Hel[ ]o Castaneda

JC

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
                               :
In re:  POSSIBLE VIOLATIONS OF :
                               :
       18 U.S.C. 1114, 1201    :
                               :
- - - - - - - - - - - - - - - x


                                  Grand Jury Room No. 2
                                  United States District Court
                                  3rd & Constitution, N.W.
                                  Washington, D.C.

                                  Thursday, January 30, 1986


        The testimony of RENE MARTIN VERDUGO-URQUIDEZ was

taken in the presence of a full quorum of Grand Jury 85-2,

impaneled on March 5, 1985, commencing at 11:06 a.m., before:


          JAMES WILSON, Esquire
          DANA D. BIEHL, Esquire
          Criminal Division
          U.S. Department of Justice


                 Baker, Hames & Burkes Reporting, Inc.
                          202 347-5865


                      EXHIBIT F

1                           P R O C E E D I N

2    Whereupon,

3                           LILI S. PACKER

4    the interpreter, was duly sworn to render all questions put to

5    the witness in the English language into the Spanish language

6    and all answers from the Spanish language into the English

7    language, to the best of her ability.

8              MR. WILSON:  Would you state your name for the

9    record, Ms. Packer.

10             THE WITNESS:  The name is Lili, L-i-l-i, Packer,

11   P-a-c-k-e-r.

12   Whereupon,

13                        RENE MARTIN VERDUGO-URQUIDEZ

14   was called as a witness, but was not immediately sworn.

15             THE FOREMAN:  Will you state your name, please.

16             THE WITNESS:  Rene Martin Verdugo-Urquidez.

17             THE FOREMAN:  Sir, Mr. Verdugo, will you agree to

18   furnish to the grand jury, through the agents and technicians

19   of the FBI or/and of the Drug Enforcement Administration, the

20   following items.  These are the items:  Samples of your hair;

21   samples of your blood; exemplars of your handwriting; exemplars

22   of your printing; prints of the palms of both your hands;

23   tape-recorded exemplars of your voice, reading phrases which

24   will be furnished to you to read by agents of the FBI and/or

25   the DEA.

1   order to accomplish s, do you agree to

2   furnish these samples at the earliest possible time in the

3   offices of the DEA and/or the FBI?

4   THE WITNESS: Yes, sir.

5   THE FOREMAN: Thank you.

6   At this time I will ask you to stand, please, and

7   I will swear you in as a witness.

8   Whereupon,

9   RENE MARTIN VERDUGO-URQUIDEZ

10  was duly sworn by the foreman of the grand jury, and was

11  examined and testified as follows:

12  BY MR. WILSON:

13  Q   Mr. Verdugo, I want to take this opportunity to

14  advise you of the following rights.

15  This grand jury is investigating possible violations

16  of federal criminal laws. You may refuse to answer any

17  question if a truthful answer to the question would tend to

18  incriminate you. Anything that you do say may be used against

19  you by the grand jury or in a subsequent legal proceeding.

20  If you have retained an attorney, the grand jury

21  will permit you a reasonable opportunity to step outside the

22  grand jury room to consult with counsel if you wish to do so.

23  Do you understand completely the rights of which you

24  have been advised?

25  A   Yes.

1      Q.    1       you.

2            Mr. Verdugo, would you tell us again your full name,

3      please.

4      A     It's Rene, R-e-n-e, Martin, M-a-r-t-i-n, Verdugo,

5      V-e-r-d-u-g-o, Urquidez, U-r-q-u-i-d-e-z.

6      Q     Mr. Verdugo, what is your date of birth?

7      A     December 13, 1951.

8      Q     Where were you born?

9      A     After having consulted with my attorney, I refuse

10     to answer the question for the reasons that I may be

11     incriminated.

12     Q     Mr. Verdugo, having invoked your right not to

13     incriminate yourself, will you answer any other questions, or

14     do you intend to invoke your right not to incriminate yourself

15     regardless of what question you're asked?

16     A     I am going to continue to invoke it.

17           MR. WILSON:  That's all we have.  I'm going to get

18     the marshals to escort Mr. Verdugo back downstairs.

19           I would only ask, and on the record, Ms. Packer, that

20     you explain to Mr. Verdugo that in the course of today and

21     probably part of tomorrow, he will meet with agents of DEA

22     in the presence of his counsel to furnish to us the samples

23     which he agreed to give.  Does he understand that?

24           THE WITNESS:  Yes.

25           MR. WILSON:  Thank you very much.

Baker, Hames & Burkes Reporting, Inc.
202 347-8865

1    witness and the interpreter were excused.)

2         (Whereupon, the proceedings in the above matter

3    were concluded.)

4                              *  *  *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Baker, Hames & Burkes Reporting, Inc.
202  347-8865

## CERTIFICATE OF REPORTER

6

I, Joyce Carr, the reporter for the United States Attorney's Office, do hereby certify that the witness whose testimony appears in the foregoing pages was first duly sworn by the foreperson or the deputy foreperson of the grand jury when there was a full quorum of the grand jury present; that the testimony of said witness was taken by me by stenomask and thereafter reduced to typewritten form; and that the transcript is a true record of the testimony given by said witness.

_____
Joyce Carr

1    CERTIFICATE OF SERVICE BY MAIL

2    I, <u>Bernadette Baskerville</u>, declare:

3    That I am a citizen of the United States and resident or

4    employed in Los Angeles County, California; that my business

5    address is Office of United States Attorney, United States

6    Courthouse, 312 North Spring Street, Los Angeles, California

7    90012; that I am over the age of eighteen years, and am not a

8    party to the above-entitled action;

9    That I am employed by the United States Attorney for the

10   Central District of California who is a member of the Bar of the

11   United States District Court for the Central District of

12   California, at whose direction the service by mail described in

13   this Certificate was made; that on <u>May 6, 1988</u>, I

14   deposited in the United States mails in the United States

15   Courthouse at 312 North Spring Street, Los Angeles, California, in

16   the above-entitled action, in an envelope bearing the requisite

17   postage, a copy of    GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
                           TO DISMISS FIRST SUPERSEDING INDICTMENT DUE TO
                           CONSCIENCE SHOCKING GOVERNMENT ACTIVITY AND
18                         DEFENDANT'S MOTION TO SUPPRESS EVIDENCE;
                           MEMORANDUM OF POINTS AND AUTHORITIES; AND
19   addressed to:         EXHIBITS

20          see attached list.

21   at <u>their</u> last known address, at which place there is a delivery

22   service by United States mail.

23   This Certificate is executed on <u>May 6, 1988</u> at

24   Los Angeles, California.

25   I certify under penalty of perjury that the foregoing is true

26   and correct.

27

28                            _Bernadette Baskerville_

UNITED STATES v. RAFAEL CARO QUINTERO, et al.,
NO. CR 87-422(B)-ER

Michael Pancer, Esq.
625 Broadway
Suite 1135
San Diego, CA 92101

Elsa Leyva, DFPD
Federal Public Defender's Office
312 N. Spring Street
15th Floor
Los Angeles, CA 90012

Don Randolph, Esq.
2566 Overland Avenue
7th Floor
Los Angeles, CA 90064