1  ROBERT C. BONNER
   United States Attorney
2  ROBERT L. BROSIO
   Assistant United States Attorney
3  Chief, Criminal Division
   JIMMY GURULE
4  Assistant United States Attorney
   Major Narcotics Section
5      1400 United States Courthouse
       312 North Spring Street
6      Los Angeles, California 90012
       Telephone:  (213) 894-6579
7
   Attorneys for Plaintiff
8  United States of America

9              UNITED STATES DISTRICT COURT

10        FOR THE CENTRAL DISTRICT OF CALIFORNIA

11  UNITED STATES OF AMERICA,    )  NO. CR 87-422(B)-ER
                                 )
12              Plaintiff,       )  GOVERNMENT'S OPPOSITION
                                 )  TO DEFENDANT'S MOTION FOR
13          v.                   )  SEVERANCE OF DEFENDANTS
                                 )  AND COUNTS; MEMORANDUM OF
14  RAFAEL CARO-QUINTERO, et al., )  POINTS AND AUTHORITIES;
                                 )  EXHIBIT
15              Defendants.      )
                                 )
16  _____)

17      Plaintiff, United States of America, as represented by the

18  undersigned Assistant United States Attorney, hereby files with

19  this Honorable Court the Government's Opposition to Defendant's

20  Motion for Severance of Defendants and Counts.

21      The government's opposition is based on the attached

22  Memorandum of Points and Authorities, the attached Exhibits, and

23  the records and files in the case.

24      DATED:    May 6, 1988.

25                          Respectfully submitted,

26                          ROBERT C. BONNER
                            United States Attorney
27

28  JG.bzb:jc

ROBERT L. BROSIO
Assistant United States Attorney
Chief, Criminal Division


JIMMY GURULE
Assistant United States Attorney
Major Narcotics Section

Attorneys for Plaintiff
United States of America

# TABLE OF CONTENTS

Page

Table of Authorities     iii

Memorandum of Points and Authorities     3

I.     Introduction     3

II.     General Law on Severance     4

III.     The Introduction At Trial Of Admissions by Co-defendant Lopez to Undercover Agent Reynoso Does Not Violate Confrontation Clause     8

IV.     Evidence Of Other Crimes Is Admissible When It is Necessary For A Full Presentation Of The Case     19

V.     Defendant Verdugo's Proffer Regarding Co-Defendant Lopez's Exculpatory Testimony Is Insufficient To Justify A Severance     26

VI.     A Rule 14 Motion To Sever Counts Based On Defendant's Desire To Testify To Some, But Not All Counts, Is Granted Only Under Very Narrow Circumstances Which Are Not Present In This Case     30

    A.     Defendant Verdugo Has Failed To Make The Required Showing Of "Strong Need To Refrain From Testifying" To Justify Severance     30

    B.     Defendant Has Failed To Show Prejudice From The Joinder Of Counts Since Evidence Of Each Of The Counts Would Be Admissible In Seperate Trials     35

VII.     The Alleged "Spill-Over" Effect Of Evidence To Be Introduced At Trial Against Co-defendant Jesus Felix-Gutierrez Is Insufficient to Justify Severance     43

i

1       **TABLE OF CONTENTS CONTINUED**

2                                                                    Page

3    VIII. Defendant Verdugo's Motion For
         Severance Under Kotteakas Is Misplaced
4        Since He Has Not Been Charged With
         Being a Member Of A Narcotics
5        Conspiracy, But Rather Is Charged
         As Being A Member Of A Narcotics
6        "Enterprise"                                               45

7    IX.   Conclusion                                              51

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page(s)

CASES

Baker v. United States,
    401 F.2d 958 (D.C. Cir. 1981)    35

Braverman v. United States,
    317 U.S. 219 (1942)    47

Bruton v. United States,
    391 U.S. 123 (1968)    8, 10, 11,
    13, 14, 15

Cross v. United States,
    335 F.2d 987 (D.C. Cir. 1964)    35, 36

Harrison v. United States,
    392 U.S. 219 88 S.Ct. 2008 L. Ed.
    2d 1047 (1968)    33

Holmes v. Gray,
    526 F.2d 622 (7th Cir. 1975),
    cert. denied, sub nom    34

Holmes v. Israel,
    434 U.S. 907 S.Ct. 308,
    54 L.Ed. 2d 194 (1977)    34

Kotteakos v. United States,
    328 U.S. 750 (1946)    48

Moran v. Burbine,
    475 U.S. ____, ____,
    106 S.Ct. 1135 ____,
    89 L.Ed. 20 410 (1986)    17

United States v. Adams,
    581 F.2d 198 (9th Cir.),
    cert. denied, 439 U.S. 1006 (1978)    5

United States v. Anderssen,
    642 F.2d 281 (9th Cir. 1981)    38

United States v. Bario-Hernandez,
    655 F.Supp. 1069
    (D. Puerto Rico 1987)    13

United States v. Becker,
    585 F.2d 703 (4th Cir. 1978)    30

## TABLE OF AUTHORITIES CONTINUED

Page(s)

United States v. Beechum,
    582 F.2d 898 (5th Cir.),
    (en banc), cert. denied,
    440 U.S. 920, 99 S.Ct.
    1244, 59 L. Ed. 2d 472 (1979)          21, 23

United States v. Benz,
    740 F.2d 903 (11th Cir. 1984)          37

United States v. Bloom,
    538 F.2d 70407 (5th Cir. 1976),
    cert. denied, 429 U.S. 1074,
    97 S. Ct. 804, 50 L.Ed. 2d
    792 (1977)                             22, 24

United States v. Connors,
    825 F.2d 1384 (9th Cir. 1987)          6

United States v. Cook,
    745 F.2d 1311 (10th Cir. 1984),
    cert. denied, 469 U.S. 1220 (1984)     22

United States v. Disla,
    805 F.2d 1340 (9th Cir. 1986)          6, 36

United States v. Doe,
    455 F.2d 920 (9th Cir. 1980)           7, 30

United States v. Douglas,
    780 F.2d 1472 (9th Cir. 1986)          7, 25, 26, 44

United States v. Elliott,
    571 F.2d 880 (5th Cir. 1980)           47, 51

United States v. Ford,
    632 F.2d 1354, 1372 (9th Cir. 1980)    37

United States v. Gaines, 563 F.2d
    1352, 1355 (9th Cir. 1977)             7

United States v. Gay, 567 F.2d 916,
    919 (9th Cir.), cert. denied,
    435 U.S. 999 (1978)                    28, 30

United States v. Gonzales,
    661 F.2d 488 (5th Cir. 1981)           13, 22

## TABLE OF AUTHORITIES CONTINUED

Page(s)

United States v. Haro-Espinoza,
619 F.2d 789 (9th Cir. 1979)                27, 30

United States v. Hendrix,
752 F.2d 1226 (7th Cir.),
cert. denied, sub nom.                      7

United States v. Hernandez-Berceda,
572 F.2d 680 (9th Cir. 1978),
cert. denied, 436 U.S. 949                  27

United States v. Hoelker,
765 F.2d 1422 (9th Cir. 1985)               37, 42

United States v. Hoyos,
573 F.2d 1111 (9th Cir. 1978)               30

United States v. Jenkins,
785 F.2d 1387 (9th Cir.),
cert. denied, 107 S. Ct. 192 (1986)         43

United States v. Kaplan,
554 F.2d 958 (9th Cir. 1977),
cert. denied, 434 U.S. 956 (1978)           27

United States v. McKoy,
171 F.2d 1207 (9th Cir. 1985)               23

United States v. Mills,
704 F,.2d at 1559, (11th Cir. 1983)         20, 23, 24

United States v. Monks,
774 F.2d 945 (9th Cir. 1985)                7, 19

United States v. Nadler,
698 F.2d 995 (9th Cir. 1983)                22

United States v. Nolan,
700 F.2d 479 (9th Cir. 1983),
cert. denied, 103 S.Ct. 3095                31, 33, 34

United States v. O'Conner,
737 F.2d 814 (9th Cir. 1984)                22

United States v. O'Neal,
F.2d      (9th Cir. 1987)                    7

v

## TABLE OF AUTHORITIES CONTINUED

Page(s)

United States v. Peters,
791 F.2d 1270 (7th Cir. 1986),
cert. denied, 103 S.Ct. 3095                7, 33

United States v. Polizzi,
801 F.2d 1543 (9th Cir. 1986)              5, 43, 44

United States v. Ramirez,
710 F.2d 535 (9th Cir. 1983)               6

United States v. Satterfield,
743 F.2d 827 (11th Cir. 1984),
cert. denied, 471 U.S. (1985)              12

United States v. Sears,
663 F.2d 896, 900 (9th Cir. 1981),
cert. denied, 455 U.S. 1027 (1982)         5, 13

United States v. Tierney,
424 F.2d 643 (9th Cir. 1970)               38

United States v. Tillett,
763 F.2d 628 (4th Cir. 1985)               48, 49

United States v. Vacarro,
816 F.2d 443, at 448 (9th Cir. 1987)       6, 43

United States v. Valles—Valencia,
811 F.2d 1232 (9th Cir. 1987)              6, 7, 12

United States v. Vigil,
561 F.2d 1316 (9th Cir. 1977)              29

United States v. Wilson,
578 F.2d 67 (5th Cir. 1978)                22, 24

United States v. Wyatt,
807 F.2d 1480 (9th Cir. 1987)              6

Statutes:

18 U.S.C. 1201(c)                          8

18 U.S.C. 1201(a)(5)                       8, 31

18 U.S.C. 1348                             8, 20, 31, 36, 37

vi

### TABLE OF AUTHORITIES CONTINUED

|  | Page(s) |
|---|---|
| 18 U.S.C. § 1951 | 37 |
| 18 U.S.C. § 1952B | 4, 30, 38, 46 |
| 18 U.S.C. § 1952A | 4, 8, 46 |
| 18 U.S.C. § 1952B(b)(2) | 4, 38, 46 |
| 18 U.S.C. § 1962(c) and (d) | 47, 48 |
| 18 U.S.C. § 922(h) | 31 |
| 18 U.S.C. § 1111, 1114, 2 | 20, 31 |
| 18 U.S.C. § 1961 | 46, 48 |
| 21 U.S.C. § 841(a)(1) | 36 |
| 21 U.S.C. § 963, 952(a), 960(a)(1) and 846 | 25 |

RULES

| | |
|---|---|
| Rule 14 | 5 |
| Rule 404(b) | 22, 23, 42 |
| Rule 8(a) | 4, 35 |
| Rule 8(b) | 4 |

MEMORANDUM OF POINTS AND AUTHORITIES

I

INTRODUCTION

In defendant Verdugo's motion to sever defendants and counts, defendant seeks to have both co-defendant Raul Lopez-Alvarez and Jesus Felix-Gutierrez (hereinafter "Jesus Felix") severed from the trial. As to co-defendant Lopez, defendant Verdugo makes three arguments: (1) the admission at trial of statements made by co-defendant Lopez during undercover meetings with Special Agent Abel Reynoso, Drug Enforcement Administration (hereinafter "DEA"), where Lopez admits his participation in the kidnapping and murder of Special Agent Camarena would constitute a denial of the Confrontation Clause; (2) statements made by co-defendant Lopez to undercover agent Reynoso regarding Lopez' willingness to murder a United States Customs Service Special Agent would be unduly prejudicial; and (3) defendant Verdugo intends to call co-defendant Lopez to testify on his behalf at trial.

Regarding the motion to sever co-defendant Jesus Felix, defendant Verdugo argues: (1) evidence submitted at trial regarding co-defendant Felix's role as an accessory-after-the fact to the murder along with evidence that Jesus Felix used false names and a false passport would be unfairly prejudicial; and (2) the government has charged co-defendant Felix in an unrelated conspiracy to distribute cocaine, and evidence of the cocaine conspiracy would be unfairly prejudicial to defendant Verdugo at trial.

- 3 -

1    Finally, defendant Verdugo seeks to have counts one and two

2  of the second superseding indictment which charge violations of

3  18 U.S.C. § 1952B: violent crimes in aid of racketeering,

4  severed from the remaining counts. Defendant alleges that he

5  wishes to testify to the remaining counts, but does not want to

6  testify as to counts one and two. Furthermore, defendant Verdugo

7  maintains that he does not want to be cross-examined by the

8  government on counts one and two, and denial of the motion to

9  sever counts would constitute a violation of his Fifth Amendment

10  rights. Defendant Verdugo's motion to sever defendants and sever

11  counts is without merit and should be denied.

12                                II

13                    GENERAL LAW ON SEVERANCE

14    Fed. R. Crim. P., Rule 8(a), governs the joinder of offenses

15  in a single indictment. Rule 8(a) provides in pertinent part:

16              Two or more offenses may be charged in the same

17              indictment or information in a separate count

18              for each offense if the offense charged,

19              whether felonies or misdemeanors or both, are

20              of the same or similar character or are based

21              on the same act or transaction or on two or

22              more acts or transactions connected together or

23              constituting parts of a common scheme or plan.

24    Fed. R. Crim. P., Rule 8(b), governs the joinder of the

25  defendants in a single indictment. Rule 8(b) provides in

26  pertinent part:

27
                              -  4  -
28

1
2
3
4
5

> Two or more defendants may be charged in the
> same indictment or information if they are
> alleged to have participated in the same act or
> transaction or transactions constituting an
> offense or offenses . . . .

6
7

Fed. R. Crim. P., Rule 14, governs the severance of
defendants or charges. Rule 14 states in pertinent part:

8
9
10
11
12
13
14
15

> If it appears that a defendant or the
> government is prejudiced by a joinder of
> offenses or of defendants in an indictment or
> information or by such joinder for trial
> together, the court may order an election or
> separate trial of counts, grant a severance of
> defendants or provide whatever other relief
> justice requires . . .

16
17
18
19
20
21
22
23
24
25
26
27

The law strongly favors the joint trial of co-defendants and
counts that are jointly charged. "Defendants jointly indicted
ordinarily should be jointly tried." United States v. Polizzi,
801 F.2d 1543, 1553 (9th Cir. 1986); United States v. Sears, 663
F.2d 896, 900 (9th Cir. 1981), cert. denied, 455 U.S. 1027
(1982). In a Rule 14 motion to sever, the defendant bears the
heavy burden of showing prejudice. United States v. Adams, 581
F.2d 198 (9th Cir.), cert. denied, 439 U.S. 1006 (1978). The
party seeking reversal of a decision denying severance has the
burden of proving "clear," "manifest," or "undue" prejudice from
the joint trial that violates one of his substantive rights, so
that the prejudice is of "such magnitude that the defendant was

28

1 denied a fair trial." United States v. Connors, 825 F.2d 1384
2 (9th Cir. 1987).

3    The Ninth Circuit in United States v. Vaccaro, 816 F.2d 443
4 (1987), has stated:

5        The prejudice of a joint trial must be such as
6        to violate a defendant's fair trial rights:
7        i.e., unavailability of full cross-examination,
8        lack of opportunity to present an individual
9        defense, denial of the right of confrontation,
10       lack of separate counsel among defendants with
11       conflicting interests, or failure to instruct
12       the jury properly on the admissibility of
13       evidence as to each defendant.

14 Id. at 449.

15    The party bearing the burden must establish that joinder was
16 "so manifestly prejudical that it outweighed the dominant concern
17 of judicial economy and compelled exercise of the court's
18 discretion to sever." United States v. Disla, 805 F.2d 1340,
19 1353 (9th Cir. 1986). "The test for determining whether the
20 district court abused its discretion is whether a joint trial was
21 so manifestly prejudicial as to require the trial judge to
22 exercise his discretion in but one way, by ordering a separate
23 trial." United States v. Valles-Valencia, 811 F.2d 1232 (9th
24 Cir. 1987), United States v. Wyatt, 807 F.2d 1480 (9th Cir.
25 1987); United States v. Ramirez, 710 F.2d 535, 545 (9th Cir.
26 1983).

27    In ruling on a motion to sever, the primary consideration is
28 "whether the jury can reasonably be expected to compartmentalize

- 6 -

1 | the evidence" applicable to each count.  United States v. O'Neal,
2 | 834 F.2d 862 (9th Cir. 1987).  Moreover, a defendant is not
3 | entitled to severance merely because the evidence against a
4 | co-defendant is more damaging than the evidence against him.
5 | United States v. Monks, 774 F.2d 945 (9th Cir. 1985); United
6 | States v. Peters, 791 F.2d 1270 (7th Cir. 1986), cert. denied,
7 | 103 S.Ct. 3095; and United States v. Hendrix, 752 F.2d 1226, 1232
8 | (7th Cir.), cert. denied, sub non. Merritt v. United States, 105
9 | S.Ct. 2032 (1985) .

10 | The Ninth Circuit has acknowledged that joinder "expedites
11 | the administration of justice, reduces the congestion of trial
12 | dockets, conserves judicial time, lessens the burden upon
13 | citizens to sacrifice time and money to serve on juries, and
14 | avoids the necessity of recalling witnesses who would otherwise
15 | be called upon to testify only once."  United States v. Gaines,
16 | 563 F.2d 1352, 1355 (9th Cir. 1977).

17 | The trial court's ruling on a severance motion is a matter of
18 | almost complete discretion.  The court's ruling will rarely be
19 | disturbed on appeal.  United States v. Valles-Valencia, 811 F2.d
20 | 1232 (9th Cir. 1987); United States v. Douglas, 780 F.2d 1472,
21 | 1478 (9th Cir. 1986); United States v. Doe, 655 F.2d 920, 926
22 | (9th Cir. 1981).

- 7 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

III

THE INTRODUCTION AT TRIAL OF

ADMISSIONS BY CO-DEFENDANT LOPEZ TO UNDERCOVER

AGENT REYNOSO DOES NOT VIOLATE THE CONFRONTATION CLAUSE

The first argument made by defendant Verdugo is that the admission in a joint trial of statements made by co-defendant Lopez to undercover Drug Enforcement Administration (hereinafter "DEA") agent Reynoso would violate defendant's right to confrontation under Bruton. Bruton v. United States, 391 U.S. 123 (1968). Co-defendant Lopez' statements are not facially incriminating and therefore do not violate Bruton. Defendant's motion to sever on this basis should therefore be denied.

Co-defendant Raul Lopez-Alvarez was indicted in the case of United States v. Raul Lopez-Alvarez, et al., CR 87-919-PAR, and charged with violations of 18 U.S.C. § 1201(c), § 1201(a)(5), § 1114, and § 1117, conspiracy to kidnap and murder a United States Customs Service Special Agent, and with interstate and foreign travel in aid of racketeering in violation of 18 U.S.C. § 1952A. Co-defendant Lopez was convicted of the above charges after a three (3) week jury trial before the Honorable Pamela A. Rymer. Briefly, co-defendant Lopez engaged in numerous meetings with DEA undercover agent Abel Reynoso. Co-defendant Lopez initially met with Special Agent Reynoso to negotiate the distribution of cocaine. During the undercover meetings co-defendant Lopez stated that he was an ex-State judicial police officer in Guadalajara, Mexico. As a Mexican State police

– 8 –

1 officer co-defendant Lopez stated that he provided protection and
2 security for co-defendants Rafael Caro-Quintero and Ernesto
3 Fonseca-Carrillo in Guadalajara.

4 After the negotiations to distribute cocaine stalled,
5 co-defendant Lopez offered his services as a "hit man" to Special
6 Agent Reynoso. Co-defendant Lopez stated that he was a "hit man"
7 for Caro-Quintero and Fonseca in Guadalajara and offered to take
8 care of any "collection" problems agent Reynoso's fictitious
9 narcotics organization might have. During the conversations
10 where co-defendant Lopez discussed working for Caro-Quintero and
11 Fonseca as a "hit man," and offered his services as a "hit man"
12 to Special Agent Reynoso, co-defendant Lopez also discussed his
13 participation in the kidnapping and murder of Special Agent
14 Camarena. Co-defendant Lopez stated that he was present at 881
15 Lope de Vega, defendant Rafael Caro-Quintero's residence in
16 Guadalajara, Mexico, where Special Agent Camarena was taken after
17 he was abducted. Co-defendant Lopez admitted his participation
18 in the torture and tape recorded interrogation of Special Agent
19 Camarena at the 881 Lope de Vega residence. Finally,
20 co-defendant Lopez stated that on February 9, 1985, two days
21 after Special Agent Camarena was abducted, Lopez was present at
22 the Guadalajara International Airport where he assisted defendant
23 Rafael Caro-Quintero in avoiding apprehension by Mexican Federal
24 Judicial Police officers DEA Special Agents. Co-defendant Lopez
25 stated that he attempted to warn Caro-Quintero that Mexican
26 federal police officers and DEA Special Agents were going to the
27 airport to arrest him. When co-defendant Lopez arrived at the

28

- 9 -

Guadalajara International Airport, he further stated that he positioned himself behind the Mexican police officers and DEA agents so that Lopez could shoot them in the back if a violent confrontation with the narcotics traffickers developed.[1]

Defendant Verdugo in his motion to sever maintains that the admission at trial of co-defendant Lopez' statements which detail Lopez' involvement in the Camarena murder would violate Verdugo's Sixth Amendment right to confront witnesses against him. Defendant Verdugo further argues that the admission of the Lopez' statements are prohibited under the Bruton rule.

There is one glaring flaw in defendant Verdugo's argument. During co-defendant Lopez' tape recorded conversations with Special Agent Reynoso, Lopez never mentions defendant Verdugo nor does he even indirectly imply that defendant Verdugo had anything to do with the kidnapping and murder of Special Agent Camarena. Consequently, co-defendant Lopez' statements do not incriminate Verdugo. Since co-defendant Lopez is not a witness against Verdugo, there is no Confrontation Clause problem.

It is well settled that a defendant is deprived of his rights under the Confrontation Clause when a non-testifying co-defendant's confession naming the defendant as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider the confession only against the

_____

1/ It should be noted that at trial in United States v. Raul Lopez-Alvarez, et al., CR 87-919-PAR, Lopez took the stand in his defense and denied any involvement in the Camarena kidnapping and murder.

- 10 -

1   co-defendant.  Bruton v. United States, 391 U.S. 123 (1968).  It

2   should be emphasized however that in Bruton, co-defendant Evans

3   orally confessed to a postal inspector and stated that he and

4   Bruton had committed the armed robbery.  Id., at 124, n.1.  Thus,

5   at the time that the confession was introduced at trial there was

6   not the slightest doubt that it would prove "powerfully

7   incriminating" as to defendant Bruton.  Id., at 135.  The holding

8   in Bruton is therefore limited to the admission of a facially

9   incriminating confession by a non-testifying co-defendant.

10      In the present case, co-defendant Lopez' statements are not

11  facially incriminating as to defendant Verdugo.  Moreover,

12  co-defendant Lopez never mentioned or referred to defendant

13  Verdugo either directly or indirectly in his conversations with

14  Special Agent Reynoso.  Furthermore, Verdugo does not argue that

15  he was ever mentioned by name or directly implicated during the

16  undercover conversations between co-defendant Lopez and

17  undercover agent Reynoso.[2/]

18      Defendant Verdugo, however, maintains that when co-defendant

19  Lopez discusses the kidnapping and murder of Special Agent

20  Camarena, and refers to other participants in the kidnapping and

21  murder by the use of the word "they", that Verdugo is thereby

22  incriminated.  Moreover, defendant Verdugo argues that

23

24

25  2/  It should be noted that the conversations between defendant
    Verdugo and Special Agent Reynoso were tape recorded.
26  Transcripts of the taped conversations have been prepared and
    disclosed to defense counsel.  It is clear from the transcripts
27  that co-defendant Lopez does not incriminate defendant Verdugo.

28                        -  11  -

1  co-defendant Lopez admits that he worked for co-defendants Rafael
2  Caro-Quintero and Ernesto Fonseca-Carrillo. Co-defendant Lopez
3  thereafter referred to Caro-Quintero and Fonseca as "the
4  bosses". Defendant Verdugo concludes that while these statements
5  are not facially incriminating, "[t]hese statements, taken
6  together with the allegations of the indictment, directly
7  incriminate defendant Verdugo-Urquidez." (See Defendant's Motion
8  To Sever, p. 75).

9      Defendant Verdugo's argument suffers from two major
10 weaknesses. First, the use of the word "they" by co-defendant
11 Lopez is not facially incriminating as to Verdugo, or for that
12 matter incriminating as to anyone else. Furthermore, the
13 government maintains that numerous other individuals who have yet
14 to be indicted are suspects in the kidnapping and murder. Lopez
15 could be referring to any of those individuals. In addition,
16 defendant Verdugo concedes that when co-defendant Lopez uses the
17 words "the bosses", he is referring to co-defendants
18 Caro-Quintero and Fonseca, and therefore not Verdugo.
19 Consequently, co-defendant Lopez' use of the words "the bosses"
20 does not incriminate Verdugo.

21     To justify a severance the co-defendant's statements must be
22 clearly inculpatory standing alone. United States v.
23 Valles-Valencia, 811 F.2d 1232 (9th Cir. 1987); United States v.
24 Satterfield, 743 F.2d 827 (11th Cir. 1984), cert. denied, 471
25 U.S. (1985). It should further be emphasized that the Ninth
26 Circuit has upheld the admissibility of a redacted confession by
27 a non-testifying co-defendant where the co-defendant confessed
28

- 12 -

that he and "some others" had robbed a savings and loan.   In

United States v. Sears, 633 F.2d 896 (1981), the Ninth Circuit

denied defendant's motion to sever under Bruton and held that

where the co-defendant's confession was redacted and the words

"some others" were used to refer to other participants in the

crime, defendant was not unfairly prejudiced.

In United States v. Gonzales, 749 F.2d 1329 (1984), the Ninth

Circuit held that the admissions of a non-testifying co-defendant

substituting the words "the other man" for the name of defendant

Patino, when naming his accomplice in the bank robbery, did not

violate the Confrontation Clause.   Clearly, the use of the word

"they" by co-defendant Lopez is no more incriminating than the

use of the words "some others" or "the other man" which have been

upheld by the Ninth Circuit as not violating the Confrontation

Clause.   Co-defendant Lopez' reference to other participants in

the kidnapping and murder by the use of the word "they" does not

incriminate defendant Verdugo and therefore does not violate the

Confrontation Clause.   See United States v. Bario-Hernandez, 655

F.Supp. 1069 (D. Puerto Rico 1987), where the co-defendant

volunteered a statement to Coast Guard members prior to his

arrest and in front of other co-defendants that there was

marijuana on board the vessel.   The court denied the motion to

sever under Bruton and held that the statement did not inculpate

any other defendant.

Next, defendant Verdugo maintains that when co-defendant

Lopez' statements are linked with allegations in the indictment,

these statements are incriminating.   The United States Supreme

Court has recently confronted this issue in Richardson v. Marsh,

107 S.Ct. 1702 (1987) . In Marsh, the Supreme Court held that
when a confession by a non-testifying co-defendant is not
incriminating on its fact but defendant is nonetheless linked to
the confession by evidence properly admitted against him at
trial, the Confrontation Clause is not violated. In Richardson
v. Marsh, respondent Marsh, Williams and Martin were charged with
assaulting Cynthia Knighton and murdering Knighton's 4-year old
son and Knighton's aunt. Respondent Marsh and Williams were
tried jointly. Martin remained a fugitive at the time of trial.

Knighton testified at trial incriminating respondent Marsh,
as well as Williams and Martin. In addition to Knighton's
testimony, the State introduced a confession given by
co-defendant Williams to the police shortly after his arrest.
The Williams' confession was redacted to omit all reference to
respondent Marsh. The confession corroborated Knighton's account
of the activities of persons other than respondent regarding
their participation in the assault and murders. Williams did not
testify at trial.

In applying the Bruton rule, the Supreme Court made a
distinction between a co-defendant's confession "expressly
implicating" the defendant as his accomplice, and a confession by
a co-defendant not incriminating to the defendant on its face,
and which became incriminating to defendant only when linked with
evidence introduced later at trial. Regarding a co-defendant's
confession incriminating to the defendant on its face, Justice
Scalia stated that the confession is not admissible under
Bruton. However, where the confession is not incriminating to
defendant on its face but becomes so when linked with evidence

- 14 -

1 later introduced at trial, there does not exist the overwhelming
2 probability of jurors' inability to disregard incriminating
3 inferences that constitutes the foundation of Bruton. If
4 redacted to omit any reference to the defendant, the confession
5 is admissible. Id. at 1709.

6 As applied to the present case, defendant Verdugo argues that
7 co-defendant Lopez' statements become incriminating when linked
8 with allegations set forth in the indictment. Therefore, under
9 Marsh so long as the Lopez admissions do not make any reference
10 to defendant Verdugo, the admission of the statements at trial
11 does not violate the Confrontation Clause. Defendant Verdugo
12 does not, and cannot cite any statement from the Lopez
13 transcripts which makes reference to defendant Verdugo, i.e.,
14 that is facially incriminating. Therefore, the statements become
15 incriminating when linked with evidence at trial, under the
16 Supreme Court's ruling in Marsh, admitting the statements does
17 not violate the Confrontation Clause.

18 In holding that the admission of the Williams confession did
19 not violate the Confrontation Clause, the Supreme Court went on
20 to stress the importance of joint trials:

21              One might say, of course, that a certain way of
22              assuring compliance would be to try defendants
23              separately whenever an incriminating statement
24              of one of them is sought to be used. This is
25              not as facile or as just a remedy as might
26              seem. Joint trials play a vital role in the
27              criminal justice system, accounting for almost
28

- 15 -

one third of federal criminal trials in the past five years. Memorandum from David L. Cook, Administrative Office of the United States Courts, to Supreme Court Library (Feb. 20, 1987). Many joint trials — for example, those involving large conspiracies to import and distribute illegal drugs-involve a dozen or more co-defendants. Confessions by one or more of the defendants are commonplace - and indeed the probability of confession increases with the number of participants, since each has reduced assurance that he will be protected by his own silence. It would impair both the efficiency and the fairness of the criminal justice system to require, in all these cases of joint crimes where incriminating statements exist, that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability - advantages which

1                  sometimes operate to defendant's benefit.  Even

2                  apart from these tactical considerations, joint

3                  trials generally serve the interests of justice

4                  by avoiding the scandal and inequity of

5                  inconsistent verdicts.  The other way of

6                  assuring compliance with an expansive Bruton

7                  rule would be to forgo use of co-defendant

8                  confessions.  That price also is too high,

9                  since confessions "are more than merely

10                'desirable'; they are essential to society's

11                compelling interest in finding, convicting, and

12                punishing those who violate the law."  Moran v.

13                Burbine, 475 U.S. ____, ____, 106 S.Ct.

14                1135 ____, 89 L.Ed. 20 410 (1986), (citation

15                omitted).

16  Id. at 1709.

17     In the present case, the government estimates that the trial

18  will last approximately 2 1/2 to 3 months.  The government

19  intends to call approximately 80 witnesses to testify at trial

20  and will seek to introduce hundreds of exhibits.  In a separate

21  trial against Verdugo the government would still bear the burden

22  of proving up the Rafael Caro-Quintero narcotics enterprise as

23  well as the kidnapping, torture, interrogation, and murder of

24  Special Agent Camarena.  This would result in having to recall in

25  a separate trial the vast majority of the government's

26  witnesses.  To try this case twice, as defendant Verdugo

27  proposes, or possibly three times, if co-defendant Jesus

28

Felix-Gutierrez were to be tried separately, could conceivably tie up the court for six to nine months. This would result in an enormous waste of the court's time and resources as well as inconveniencing a number of government witnesses who would have to repeat their testimony and be repeatedly subjected to the emotional trauma of having to testify regarding the details of the brutal murders of Enrique S. Camarena and Alfredo Zavala.

Finally, defendant Verdugo briefly discusses the admissibility of a post-arrest statement made by co-defendant Lopez shortly after he was arrested in case CR 87-919-PAR, the case involving a conspiracy to murder a Customs Agent. Defendant Verdugo maintains that the post-arrest statement is incriminating, and therefore violates his right to confront witnesses against him. A copy of this statement has been attached as attachment A. It is clear from the statement that co-defendant Lopez does not incriminate Verdugo. In fact, co-defendant Lopez recants his previous statements to undercover agent Reynoso and maintains that he did not participate in the kidnapping and murder of Special Agent Camarena. Co-defendant Lopez further denies ever going to 881 Lope de Vega. Co-defendant Lopez states therein that he made these statements to impress the undercover agent so that he would hire him to do the contract killing of the Customs Agent. Co-defendant Lopez further denies any intent to carry out the contract killing and states that he was merely going to "ripoff" the undercover agent. In his post-arrest statement, however, Lopez does admit his participation in assisting Caro-Quintero to avoid apprehension at the Guadalajara International Airport.

1   It is readily apparent from co-defendant Lopez' post-arrest
2   statements that they do not incriminate Verdugo. Co-defendant
3   Lopez' post-arrest statements therefore do not pose a Bruton
4   problem. Further, as to both Lopez' admissions during the
5   undercover meetings with Special Agent Reynoso, and Lopez
6   post-arrest statements, the trial court can caution the jury
7   during trial and again at the close of trial that Lopez'
8   statements are to be considered by the jury only as against
9   Lopez. In this manner any prejudice to defendant Verdugo can be
10  minimized. United States v. Monks, 774 F.2d 945 (9th Cir. 1985).

11                              IV

12          EVIDENCE OF OTHER CRIMES IS ADMISSIBLE WHEN

13       IT IS NECESSARY FOR A FULL PRESENTATION OF THE CASE

14      In defendant Verdugo's motion to sever, he argues that the
15  admission at trial of co-defendant Lopez' statements to
16  undercover agent Reynoso where he agrees to murder a United
17  States Customs Service agent would be unfairly prejudicial. It
18  is not enough however for defendant Verdugo to simply maintain
19  that evidence admitted at trial against a co-defendant would have
20  a "spill-over" effect, or that the evidence against a
21  co-defendant is greater than the evidence against the defendant,
22  to justify a severance. Defendant Verdugo has the heavy burden
23  of establishing that failure to sever would deny him his
24  constitutional right to a fair trial. United States v. Monks,
25  774 F.2d 945 (9th Cir. 1985).

26      The government maintains that the admission of evidence
27  regarding co-defendant Lopez' involvement in a conspiracy to
28

                        -  19   -

1 kidnap and murder a United States Customs Agent is highly
2 probative in establishing that Lopez, an employee of the Rafael
3 Caro-Quintero narcotics enterprise, was engaged in the common
4 practice of violence and murder. Furthermore, the evidence
5 surrounding Lopez' admissions is critical to provide the jury the
6 context, environment, and setting in which the admissions were
7 made, and to complete for the jury the story of the crime.

8 In United States v. Mills, 704 F.2d 1553 (11th Cir. 1983),
9 Mills was convicted of murder and conspiracy to murder a federal
10 prison inmate in violation of 18 U.S.C. § 1111 and 1117. The
11 prosecution's theory of the case was that the victim had been
12 murdered pursuant to an Aryan Brotherhood contract. The
13 prosecution offered evidence that in a drug transaction the
14 victim (Marzloff) had cheated Silverstein, an Aryan Brotherhood
15 "commissioner", and that Silverstein had put out a contract on
16 Marzloff. The government further maintained that Mills, also an
17 Aryan Brotherhood "commissioner", carried out the murder contract.

18 At the trial the government offered testimony regarding the
19 history, organization and activities of the Aryan Brotherhood,
20 including other murders and violent acts committed by the Aryan
21 Brotherhood. Defendant Mills objected to the admission of this
22 evidence as evidence improperly admitted under Fed. R. of Evid.
23 404(b). The government however maintained that the testimony was
24 intrinsic to the crime charged, and therefore only subject to the
25 admissibility standards of Fed. R. of Evid. 403.

26 In holding that the admission of the evidence regarding the
27 Aryan Brotherhood was not unduly prejudicial the Court of Appeals

28

- 20 -

1  stated:

2        Some of the evidence referred to illegal or

3        otherwise improper acts which did not

4        constitute elements of the crime charged in the

5        indictment, but all of it pertained to a chain

6        of events forming the context, motive, and set

7        up for the crime. To make the crime

8        comprehensible to a jury it was necessary for

9        the government to show how the Aryan

10       Brotherhood functioned, that Mills was a member

11       of the Aryan Brotherhood, that an affront to a

12       fellow member might serve as an adequate

13       motivation for Mills to kill a person whom he

14       barely knew, and that it was possible for a

15       member of the Brotherhood incarcerated in one

16       federal prison to communicate the murder

17       contract to another member in a different

18       prison, despite mail censorship and

19       restrictions on inter-inmate correspondence.

20  Id. at 1559.

21  The Court of Appeals further emphasized:

22       Such evidence, once deemed part of the res

23       gestae, is now considered proper if it is

24       linked together in time and circumstances with

25       the crime charged, United States v. Beechum,

26       582 F.2d 898 (5th Cir.), (en banc), cert.

27       denied, 440 U.S. 920, 99 S.Ct. 1244, 59 L. Ed.

28       2d 472 (1979), or if it forms an "integral and

–  21  –

1        natural" part of the account of the

2        circumstances of the crime, United States v.

3        Bloom, 538 F.2d 704, 707 (5th Cir. 1976), cert.

4        denied, 429 U.S. 1074, 97 S. Ct. 814, 50 L.Ed.

5        2d 792 (1977), or is necessary "in order to

6        complete the story of the crime on trial."

7        United States v. Wilson, 578 F.2d 67, 72 (5th

8        Cir. 1978).

9   Id. at 1559. See also United States v. Cook, 745 F.2d 1311, 1317

10  (10th Cir. 1984), cert. denied, 469 U.S. 1220 (1984) (courts have

11  admitted other crimes evidence when it is part of the

12  "environment," when needed "to complete the story" or when so

13  linked in time and circumstance as to be part of the res gestae);

14  United States v. Gonzales, 661 F.2d 488, 493 (5th Cir. 1981)

15  (Fifth Circuit has often acknowledged an exception permitting

16  proof of other acts when they form an integral and natural part of

17  the account of the circumstances regarding the charged offense).

18        The Ninth Circuit has also frequently admitted prior acts

19  without a rigorous Rule 404(b) analysis to show the background and

20  development of a charged conspiracy. See, e.g., United States v.

21  Nadler, 698 F.2d 995 (9th Cir. 1983) (evidence regarding a prior

22  counterfeit operation held admissible for the legitimate purpose

23  of showing a common scheme or plan and the background and

24  development of the conspiracy); United States v. O'Conner, 737

25  F.2d 814, 819 (9th Cir. 1984) (evidence about a prior narcotics

26  transaction not charged was necessary background to explain the

27  government's undercover operation).

28

                          -  22  -

1    In <u>United States v. McKoy</u>, 771 F.2d 1207 (9th Cir. 1985), the
2  Ninth Circuit found that the testimony of a co-conspirator that
3  he and defendant had dealt in stolen merchandise several times
4  before their arrest was admissible.  In <u>McKoy</u>, the Ninth Circuit
5  failed to reach the issue under Rule 404(b) of whether the
6  evidence of prior crimes was properly introduced to prove the
7  knowledge element of the crime charged, because it found "that
8  the challenged evidence was admissible to explain the nature of
9  the relationship between [the co-conspirator] and defendant, and
10  to put the transaction in context for the jury."  <u>Id</u>., 771 F.2d
11  at 1214.

12    In the case at hand, the government submits that the doctrine
13  of the "complete story of the crime" is the appropriate basis for
14  the admissibility of the evidence.  First, co-defendant Lopez'
15  admissions regarding his participation in the kidnapping and
16  murder of Special Agent Camarena and his agreement to murder a
17  Customs Agent are "linked together in time and circumstances."
18  <u>United States v. Mills</u>, 740 F.2d at 1559, <u>quoting</u> <u>United States</u>
19  <u>v. Beechum</u>, 582 F.2d 898 (5th Cir.) (<u>en banc</u>), <u>cert</u>. <u>denied</u>, 440
20  U.S. 920 (1979).  While Lopez discusses and negotiates the
21  contract to murder the Customs Agent, he relates his
22  participation in the Camarena murder.  Furthermore, redaction of
23  any discussions by co-defendant Lopez regarding his agreement to
24  murder a Customs Agent would make the conversation disjointed,
25  leaving major gaps in the conversations.  Redacting portions of
26  the conversation would therefore be confusing for the jury.  In
27  addition, the admissions by Lopez regarding the Customs Agent

28

                              -  23  -

1  constitute an "integral and natural" part of the account of the
2  circumstances of the crime, and are necessary "in order to
3  complete the story of the crime on trial." United States v.
4  Mills, 704 F,.2d at 1559, (11th Cir. 1983), quoting United States
5  v. Bloom, 538 F.2d at 707 (5th Cir. 1976), cert. denied, 429 U.S.
6  1074 (1977); and United States v. Wilson, 578 F.2d at 72 (5th
7  Cir. 1978).

8      It is critical to the government's case against co-defendant
9  Lopez that the jury be presented evidence regarding the
10 background and surrounding circumstances leading up to Lopez'
11 admissions about his participation in the kidnapping and murder
12 of Special Agent Camarena. In evaluating the veracity of Lopez'
13 statements regarding Camarena, it is important for the jury to
14 understand the context within which these statements were made.
15 It is therefore imperative that the government be permitted to
16 introduce evidence regarding the "chain of events" leading up to
17 Lopez' admissions regarding Camarena in order for the jury to be
18 presented the "complete story of the crime."

19     Moreover, in addressing the issue of severance, it should be
20 emphasized that the ultimate question is not whether there is a
21 disparity in proof or damaging evidence admissible against less
22 than all of the defendants. It is whether "the jury can
23 reasonably be expected to compartmentalize the evidence as it
24 relates to separate defendants, in view of its volume and the
25 limited admissibility of some of the evidence." United States v.
26 Douglas, 780 F.2d at 1479, quoting United States v. Escalante,
27 637 F.2d at 1201. The prejudicial effect of evidence admitted
28 only against some of the defendants is generally held to be

1  neutralized by careful cautionary instructions by the trial

2  judge.  United States v. Douglas, 780 F.2d at 1479, quoting

3  United States v. Escalante, 637 F.2d at 1201.  In United States

4  v. Escalante, 637 F.2d 1197 (9th Cir. 1980) , Escalante was

5  convicted in a joint trial of conspiracy to import and distribute

6  heroin in violation of 21 U.S.C. § 963, 952(a), 960(a)(1) and

7  846.  Escalante complained that the trial court should have

8  severed him from his co-defendant Vila because evidence was

9  introduced against Vila showing his connection with organized

10  crime and his apparent participation in a murder.  The Ninth

11  Circuit affirmed the trial court's denial of defendant's motion

12  to sever, finding that the jury had been properly instructed and

13  that Escalante had failed to show why the jury had been unable to

14  follow the judge's instructions.  Id. at 1202; see also United

15  States v. Douglas, 780 F.2d at 1478 (no error in denying

16  severance even though evidence introduced in a joint trial showed

17  other drug transactions and defendant's willingness to kill

18  people).

19      Severance was denied in Escalante even though evidence of

20  another murder was introduced at a joint trial.  In the present

21  case, defendant Verdugo challenges the admissibility of

22  discussions by co-defendant Lopez regarding his agreement to kill

23  a Customs Agent.  Evidence of an agreement to murder (the present

24  case) is even less prejudicial than evidence of a murder

25  committed by a co-defendant which the Ninth Circuit in Escalante

26  held was properly cured by a cautionary instruction by the trial

27  court.  Furthermore, in Douglas, where as here, the co-defendant

28  discussed his willingness to kill someone, the Ninth Circuit held

-  25  -

1  that severance was not required. Severance was not required in
2  Escalante or Douglas. It is not required here.

3                                      V

4              DEFENDANT VERDUGO'S PROFFER REGARDING
5           CO-DEFENDANT LOPEZ'S EXCULPATORY TESTIMONY
6              IS INSUFFICIENT TO JUSTIFY A SEVERANCE

7      Defendant Verdugo maintains that a severance is necessary to
8  enable co-defendant Lopez to testify on defendant Verdugo's
9  behalf. Defendant Verdugo asserts that co-defendant Lopez has
10 information exculpating defendant Verdugo and would testify on
11 behalf of defendant Verdugo at a separate trial. Defendant's
12 argument suffers from two fatal flaws. First, defendant Verdugo
13 has not submitted a declaration by co-defendant Lopez stating
14 that he wishes to testify for defendant Verdugo and detailing
15 what Lopez' testimony would be. Consequently, there is no
16 evidence before the court that Lopez has agreed to testify for
17 Verdugo. At this time defendant Verdugo's claims is nothing more
18 than wishful thinking. The good faith basis for making this
19 claim is therefore highly suspect. Next, the purported evidence
20 which co-defendant Lopez allegedly possesses does not exculpate
21 defendant Verdugo either as to being a member of the Rafael
22 Caro-Quintero narcotics enterprise or as to his participation in
23 the kidnapping and murder of Special Agent Camarena.

24     In cases where, as here, the alleged prejudice is the
25 unavailability of the exculpatory testimony of a co-defendant,
26 the defendant moving for evidence must show: (1) the
27 co-defendant would be called to testify at a severed trial; (2)

28

1   the co-defendant would in fact testify; and (3) the testimony

2   would be favorable to the moving defendant. United States v.

3   Haro-Espinoza, 619 F.2d 789, 793, (9th Cir. 1979); United States

4   v. Hernandez-Berceda, 572 F.2d 680, 682 (9th Cir. 1978), cert.

5   denied, 436 U.S. 949.

6      In evaluating the sufficiency of the proffer of the

7   co-defendant, the Ninth Circuit has stated:

8          The trial court, in considering a motion to

9          sever based upon a defendant's insistence that

10        a co-defendant will provide exculpatory

11        testimony after severance, must weigh, inter

12        alia, the good faith of the defendant's intent

13        to have a co-defendant testify, the possible

14        weight and credibility of the predicted

15        testimony, the probability that such testimony

16        will materialize, the economy of a joint trial,

17        and the possibility that the trial strategy of

18        a co-defendant (a decision to plead guilty, for

19        example) will prejudice the defendant seeking

20        severance.

21   United States v. Kaplan, 554 F.2d 958, 966 (9th Cir. 1977), cert.

22   denied, 434 U.S. 956 (1978). The Ninth Circuit in Kaplan further

23   expressed a strong preference for supporting affidavits regarding

24   the proposed testimony.

25      It should also be emphasized that in the "great mass" of

26   cases, courts deny motions for severance despite the anticipatory

27   exculpatory testimony of a co-defendant. United States v. Gay,

28

567 F.2d 916, 919 (9th Cir.), cert. denied, 435 U.S. 999 (1978). The court in Gay further observed that:

> Motions for severance so that a defendant may be able to call a co-defendant to the stand are usually denied.

Id., quoting 1 C. White, Federal practice and Procedure: Criminal § 225.

In examining the "weight and credibility of the predicted testimony", defendant Verdugo proffers that co-defendant Lopez told undercover Agent Reynoso that co-defendant Lopez was at a party acting as security for the narcotics traffickers and that he saw Special Agent Camarena at the party and that he (Camarena) was posing as a "buyer" of narcotics. In defendant Verdugo's motion to sever at page 57, Verdugo states that according to co-defendant Lopez " . . . someone then contacts someone in Columbia [sic] and someone arrives at the conclusion that Camarena is not a buyer", and that thereafter Camarena is abducted. It is difficult to understand how this purported statement by co-defendant Lopez based on second and third-hand hearsay information can be perceived as "exonerating" defendant Verdugo. Furthermore, the relevance of Lopez' statement that an unidentified "someone" contacted another unidentified "someone" in Colombia and then a third unidentified "someone" somehow arrives at the conclusion that Special Agent Camarena was not a "buyer" is unclear at best.

Moreover, this statement by defendant Lopez does not serve to exculpate defendant Verdugo as to his holding a high level position in the narcotics enterprise and being a close confidant

1  of defendant Rafael Caro-Quintero. Furthermore, this statement
2  does not undermine in any way the fact that defendant Verdugo,
3  had a compelling interest in wanting to learn what Special Agent
4  Camarena knew about defendant Verdugo and other members of the
5  narcotics enterprise. This statement by co-defendant Lopez does
6  not explain why defendant Verdugo was in the same room at 881
7  Lope de Vega where Special Agent Camarena and DEA confidential
8  informant Zavala were being held and tortured. Consequently, the
9  present case is easily distinguishable from United States v.
10  Vigil, 561 F.2d 1316 (9th Cir. 1977), cited by defendant Verdugo,
11  where the co-defendant would have testified that the heroin was
12  his alone, thereby directly exculpating defendant regarding his
13  involvement in the narcotics transaction.

14  It should further be emphasized that since making the
15  statement which defendant Verdugo claims is "exculpatory,"
16  co-defendant Lopez has denied being present at the house where he
17  previously stated he had seen Special Agent Camarena. At the
18  trial in United States v. Raul Lopez-Alvarez, et al., CR
19  87-919-PAR, co-defendant Lopez testified in his defense and
20  denied any involvement in the Camarena murder. Lopez further
21  denied working for the narcotics traffickers. Co-defendant
22  Lopez' recent recanting of the statements therefore seriously
23  undermines the credibility of his anticipated testimony.
24  Furthermore, after testifying under oath at his trial it is
25  difficult to imagine that Lopez would testify at a separate trial
26  for Verdugo inconsistent with his prior trial testimony.

27
28

-  29  -

1    Finally, a co-defendant's willingness to testify in a
2    separate trial must be unconditional.  It cannot be conditional
3    on the order of trials, such as the co-defendant's trial
4    proceeding first so that his testimony in the moving defendant's
5    trial cannot be used against him in his own trial.  Where the
6    co-defendant's testimony is conditioned upon his trial taking
7    place first, the moving defendant's motion to sever should be
8    denied.  United States v. Gay, supra at 918-21.  Accord, United
9    States v. Doe, 455 F.2d 920, 926-27, (9th Cir. 1980); United
10   States v. Haro-Espinoza, supra at 792-93; United States v.
11   Becker, 585 F.2d 703, 706-707 (4th Cir. 1978); and United States
12   v. Hoyos, 573 F.2d 1111, 1114 (9th Cir. 1978).  Since
13   co-defendant Lopez' willingness to testify for defendant Verdugo
14   would be conditioned on Lopez' trial proceeding first, the motion
15   to sever should be denied.

16                                 VI

17       A RULE 14 MOTION TO SEVER COUNTS BASED ON DEFENDANT'S
18          DESIRE TO TESTIFY TO SOME, BUT NOT ALL COUNTS, IS
19            GRANTED ONLY UNDER VERY NARROW CIRCUMSTANCES
20                 WHICH ARE NOT PRESENT IN THIS CASE

21   A.   Defendant Verdugo Has Failed To Make The Required
22        Showing Of "Strong Need To Refrain From Testifying" To
23        Justify Severance

24       In the motion to sever, defendant seeks to sever counts one
25   and two of the second superseding indictment charging a violation
26   of 18 U.S.C. § 1952 B:  violent crimes in aid of narcotics
27   racketeering, from count three which charges a violation of 18
28   U.S.C. § 1201(C):  conspiracy to kidnap a federal agent; count

1   four which charges a violation of 18 U.S.C. § 1201(a)(5), § 2:
2   kidnapping a federal agent; and count five which charges
3   violations of 18 U.S.C. § 1111, 1114, 2: felony murder of a
4   federal agent. Defendant alleges that he desires to testify at
5   trial regarding the conspiracy to kidnap count and the
6   substantive kidnapping and felony murder of a federal agent
7   counts. Defendant argues that unless the violent crimes in aid
8   of narcotics racketeering counts are severed and tried
9   separately, defendant will be cross-examined by the government
10  regarding his involvement and participation in the Rafael
11  Caro-Quintero narcotics enterprise and this would constitute a
12  violation of defendant Verdugo's Fifth Amendment right against
13  self-incrimination. Defendant's argument is without merit and
14  therefore should be dismissed by the court.

15      In United States v. Nolan, 700 F.2d 479 (9th Cir. 1983),
16  cert. denied, 103 S.Ct. 3095, the Ninth Circuit discussed the
17  test to be applied when a defendant seeks a severance of counts
18  because he wishes to testify on some counts but not others. In
19  Nolan, appellant was charged by State authorities with murder.
20  Appellant was indicted federally and charged with multiple
21  weapons violations under 18 U.S.C. § 922(h): a convicted felon in
22  possession of a firearm. Count four of the indictment involved
23  the receipt of the firearm that was used in the State homicide
24  charge. At a trial on the federal weapons violations, Nolan
25  sought to sever count four of the federal indictment. Appellant
26  maintained that he desired to testify as to the other counts, but
27  could not testify as to count four because his testimony could be
28  used against him in the pending State murder trial. Appellant

1 argued that failure to sever count four would violate his Fifth

2 Amendment "right to testify."

3     In denying Nolan's motion to sever counts, the Ninth Circuit

4 stated:

5         If a defendant seeks severance because he

6         wishes to testify on some counts and not

7         others, he must show that he has important

8         testimony to give on some counts and a strong

9         need to refrain from testifying on those he

10         wants severed.$\underline{3/}$ Armstrong, 621 F.2d at 954.

11 Id. at 483.

12     Appellant's argument that his Fifth Amendment rights would be

13 violated if the counts were not severed because he would be

14 forced to give testimony that would be incriminating in the State

15 case was expressly rejected by the Ninth Circuit. The Ninth

16 Circuit held:

17         Although Nolan argues that his Fifth Amendment

18         right was violated, the government never forced

19         him to testify or in any way attempted to

20

21

---

22 3/ In defendant Verdugo's motion to sever, he makes reference to

23 an affidavit submitted to the court in camera setting forth a
proffer of his testimony on the motion to sever counts. Under

24 Nolan, defendant has the burden to show that he has important
testimony to give one some counts and a strong need to refrain

25 from testifying on those he wants severed. Id. at 483. The
government therefore must be able to examine the proffered

26 testimony to determine if it is sufficiently "important" to
satisfy the first prong of the Armstrong test. Defendant fails

27 to cite any authority to support an in camera filing of
defendant's proffered testimony. The affidavit should therefore

28 be stricken by the court.

1         coerce his exercise of Fifth Amendment rights.

2         Every time a defendant decides whether to

3         testify, he must weigh the possibility that the

4         testimony he gives may later be used against

5         him. Harrison v. United States, 392 U.S. 219,

6         222, 88 S.Ct. 2008, 2010, 20 L. Ed. 2d 1047

7         (1968).

8 Id. at 483. See United States v. Peters, 791 F.2d 1270

9 (7th Cir. 1986).

10    In further holding that Nolan did not meet his burden of

11 establishing "a strong need to refrain from testifying", the

12 Ninth Circuit emphasized:

13         In effect, Nolan asks this court to allow him

14         to choose his strategic weapons without regard

15         to the needs of the judicial system. His

16         desire to preserve his options does not meet

17         the Armstrong standard of a "strong need to

18         refrain from testifying." Joinder was proper.

19 Id. at 483.

20    As applied to the facts of the instant case, defendant

21 Verdugo makes the same Fifth Amendment argument which was

22 expressly rejected by the Ninth Circuit in Nolan. The government

23 is not forcing defendant Verdugo to testify or coercing the

24 exercise of his Fifth Amendment rights. Defendant's Fifth

25 Amendment argument is therefore without merit.

26    As stated by the Seventh Circuit Court of Appeals in United

27 States v. Peters, 791 F.2d 1270 (1986):

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

> [S]everance is not mandatory every time
> defendant wishes to testify to one charge but
> to remain silent on another.  If that were the
> law, a court would be divested of all control
> over the matter of severance and the choice
> would be entrusted to the defendant.  Holmes v.
> Gray, 526 F.2d 622, 626 (7th Cir. 1975), cert.
> denied, sub non Holmes v. Israel, 434 U.S. 907,
> 98 S.Ct. 308, 54 L.Ed. 2d 194 (1977).  The
> defendant's showing of actual prejudice must be
> balanced against the policy of encouraging
> joint trials – especially when a conspiracy is
> charged – for judicial economy and to avoid
> lengthy and repetitious trials involving the
> same evidence and the same witnesses [citations
> omitted].

17  Id. at 1287.

18  By seeking a severance of counts, defendant Verdugo is simply
19  seeking to limit the evidence and the scope of the government's
20  cross-examination in a separate trial.  Defendant is pursuing a
21  particular trial strategy without regard to the needs of the
22  judicial system.  The Ninth Circuit in Nolan expressly held that
23  this does not constitute a showing of "strong need to refrain
24  from testifying".  Defendant Verdugo's motion to sever counts
25  should therefore be denied.

26
27
28

- 34 -

B.  Defendant Has Failed To Show Prejudice From The Joinder
    Of Counts Since Evidence Of Each Of The Counts Would Be
    Admissible In Separate Trials

In support of the motion to sever counts, defendant cites Cross v. United States, 335 F.2d 987 (D.C. Cir. 1964).[4/] The District of Columbia Court of Appeals' decision is easily distinguishable from the present case. In Cross, the defendant was charged with two counts of robbery. Defendant filed a motion to sever the robbery of a tourist home count from robbery of the church rectory count. While the Court of Appeals did not reach the issue, it is clear that the robbery counts were improperly joined in the first instance. The two offenses did not arise out of the same transaction, series of transactions, or continuing state of affairs, and therefore under Rule 8(a) joinder was improper.

In Baker v. United States, 401 F.2d 958 (D.C. Cir. 1981), the scope of the holding in Cross was discussed by the District of Columbia Court of Appeals. In Baker, fraudulent income tax return counts were joined with larceny counts. Baker desired to testify at trial as to some counts but not others. The District of Columbia Court of Appeals noted the considerable overlap of proof between the various counts. In denying the motion to sever counts the District of Columbia Court of Appeals, emphasizing the

---

4/  District of Columbia Court of Appeals decisions are not binding on this court. Defendant Verdugo further fails to cite any Ninth Circuit case authority to support his position.

1 overlap of evidence in separate trials, held that defendant Baker

2 had not been prejudiced by joinder:

3              Thus, the possibility of "criminal propensity"

4              prejudice or cumulation was not enlarged by

5              joinder of 1 and 2 with 8 and 9 since the

6              evidence of each would have been admissible in

7              a separate trial for the other.

8 Id. at 975.

9      Defendant Baker argued in support of the motion to sever that

10 under Cross, "a timely and bona fide election by the accused to

11 testify as to some counts and not as to others requires a Rule 14

12 severance." Id. at 976. (Emphasis added). The Court of Appeals

13 for the District of Columbia rejected this interpretation of

14 Cross and held:

15              We think this reading of Cross is far too

16              broad. Such a rule, in fact, would divest the

17              Court of all control over the matter of

18              severance and entrust it to defendant.

19 Id. at 976.

20      Consequently, the Cross case supports the government's

21 position that defendant's motion to sever should be denied. The

22 Cross case stands for the proposition that prejudice as the

23 result of joinder of counts is largely absent when evidence of

24 each of the joined offenses would be admissible in a separate

25 trial. Moreover, the Ninth Circuit in United States v. Disla,

26 805 F.2d 1340 (9th Cir. 1986), denied a motion to sever counts

27 where evidence of each of the counts would have been admissible

28

1   in a separate trial. In Disla, defendant had been charged with
2   wire fraud in violation of 18 U.S.C. 1348, and multiple narcotics
3   counts in violation of 21 U.S.C. § 841(a)(1) and 846. The wire
4   fraud charge arose out of Disla's use of a "blue box" at an
5   apartment to avoid paying phone bills. The government's theory
6   was that the "blue box" was used as part of the cocaine
7   conspiracy and that Disla's use of the "blue box" proved his
8   participation in the narcotics conspiracy. In his motion to
9   sever, Disla argued that he wanted to testify at trial in defense
10  of the drug charges, but did not want to be subjected to
11  cross-examination regarding the wire fraud count. In denying
12  defendant's motion to sever counts the Ninth Circuit held that
13  Disla's participation in cocaine trafficking would have been
14  relevant in a separate trial on the wire fraud count and
15  therefore Disla had failed to show prejudice. See also United
16  States v. Benz, 740 F.2d 903 (11th Cir. 1984).

17      In United States v. Hoelker, 765 F.2d 1422 (9th Cir. 1985)
18  (per curiam), defendant filed a motion to sever the Hobbs Act
19  extortion count, 18 U.S.C. § 1951, from the narcotics conspiracy
20  count. The Ninth Circuit denied the severance motion and held:

21              The attempted extortion and the drug offenses
22              were logically related by motive, United States
23              v. Ford, 632 F.2d 1354, 1372 (9th Cir. 1980),
24              and "arose out of the same series of
25              transactions." Id. at 1371. According to the
26              government's theory, Hoelker was in serious
27              financial trouble and was in danger of losing

28

                          -  37  -

1              his house because of a losing investment in

2              Lang's auto racing enterprise. Hoelker's need

3              for funds explained why Hoelker became involved

4              in plans to sell cocaine and coerced Lang into

5              signing an insurance policy on his life naming

6              Hoelker as the beneficiary. See United States

7              v. Tierney, 424 F.2d 643, 646-47 (9th Cir.

8              1970). The extortion and the narcotics

9              offenses occurred during the same brief time

10              span, involved many of the same participants,

11              and were connected by a large area of

12              overlapping proof. See United States v.

13              Anderssen, 642 F.2d 281, 284 (9th Cir. 1981).

14 Id. at 1425-26.

15     As applied to the case at bar, the government maintains that

16 the evidence relating to defendant Verdugo's participation in the

17 Rafael Caro-Quintero narcotics enterprise (the violent crimes in

18 aid of narcotics racketeering count) would be admissible in a

19 separate trial on the murder and kidnapping counts to establish

20 motive. Defendant Verdugo participated in the kidnapping to

21 learn what Special Agent Camarena knew about the narcotics

22 enterprise. Consequently, there would be a substantial overlap

23 of evidence if separate trials were held.

24     Defendant Verdugo has been charged with a violation of 18

25 U.S.C. § 1952B, which states in relevant part:

26              (a) Whoever, as consideration for the receipt

27              of, or as consideration for a promise or

28

               - 38 -

agreement to pay, anything of pecuniary value
from an enterprise engaged in racketeering
activity, or for the purpose of gaining
entrance to or maintaining or increasing
position in an enterprise engaged in
racketeering activity, murders, kidnaps . . . .
any individual in violation of the laws of any
State or the United States, or attempts or
conspires to do so, shall be punished . . .

(b)  As used in this section –

(1)  "racketeering activity" has the
meaning set for in section 1961 of this
title; and

(2)  "enterprise" includes any
partnership, corporation, association, or
other legal entity, and any union or group
of individuals associated in fact although
not a legal entity, which is engaged in,
or the activities of which affect;
interstate or foreign commerce.

Consequently, under Section 1952B the government must prove
the following elements beyond a reasonable doubt:

(1)  the existence of a narcotics enterprise;

(2)  the narcotics enterprise engaged in the
activities of interstate or foreign
commerce;

(3)  the narcotics enterprise engaged in
racketeering activity;

– 39 –

1
2
3
4
5
6

    (4)  defendant committed a violent crime, i.e.,
          kidnapping and/or murder; and

    (5)  defendant committed the kidnapping and/or
          murder for the purpose of increasing or
          maintaining his position in the narcotics
          enterprise.

7
8
9
10
11
12
13
14
15
16
17
18

The government therefore must not only prove the kidnapping and murder of Special Agent Camarena and Alfredo Zavala, but the existence of a narcotics enterprise engaged in a narcotics racketeering activity. The government must further prove the motive for the kidnapping and/or murder was to maintain or increase defendant's position in the narcotics enterprise. The evidence of the existence of a narcotics enterprise engaged in racketeering activity and defendant Verdugo's position in the narcotics enterprise are therefore critical elements of the offense. The commission of a violent crime, in this case the kidnapping and murder, is furthermore the gravemen of the offense.

19
20
21
22
23
24
25
26
27

It is the government's theory that Special Agent Camarena and DEA confidential informant Alfredo Zavala were kidnapped and murdered in retaliation for their efforts in causing the seizure and eradication of multi-ton quantities of marijuana belonging to defendant Rafael Caro-Quintero. Special Agent Camarena was tortured and interrogated by members of the Caro-Quintero narcotics enterprise to learn what Special Agent Camarena, and therefore DEA, knew about the Rafael Caro-Quintero narcotics enterprise. The government will introduce at trial two

28

- 40 -

interrogation tapes which show that Special Agent Camarena was tortured and interrogated to learn the identity of DEA confidential informants investigating the narcotics enterprise, the names and addresses of DEA special agents working in Mexico, and the nature of ongoing DEA investigations involving the Rafael Caro-Quintero narcotics enterprise.

At trial the government expects the evidence to show that defendant Rene Verdugo was a chief-lieutenant in the Rafael Caro-Quintero narcotics enterprise when Special Agent Camarena was kidnapped and murdered. As a member of narcotics enterprise Verdugo was responsible from importing multi-ton quantities of marijuana into the United States via helicopter for defendant Rafael Caro-Quintero. Consequently, defendant Verdugo had a special interest in wanting to learn what DEA knew about the narcotics enterprise. Specifically, Verdugo had an interest in wanting to know whether DEA informants had infiltrated the Caro-Quintero narcotics enterprise and whether DEA had thereby gathered incriminating evidence against defendant Verdugo.

In addition, it is expected that evidence at trial will establish that defendant Verdugo arrived in Guadalajara from Mexico on February 7, 1985, approximately two hours after Special Agent Camarena was abducted. Evidence will establish that on or about February 8, 1985, defendant Verdugo went to 881 Lope de Vega, Guadalajara, Jalisco, Mexico, the residence of defendant Rafael Caro-Quintero, where Special Agent Camarena had been taken after his abduction. Evidence of defendant Verdugo's involvement in the Caro-Quintero narcotics enterprise is relevant and

- 41 -

probative in establishing defendant Verdugo's motive for going to 881 Lope de Vega and to establish that his presence there was not accidental or coincidental. The government maintains that defendant Verdugo went to 881 Lope de Vega to directly participate in the interrogation and learn what Special Agent Camarena, and DEA, knew about the Rafael Caro-Quintero narcotics enterprise.

Moreover, during a portion of one of the interrogation tapes that will be introduced at trial, Special Agent Camarena was questioned specifically about defendant Rene Verdugo and what he (Camarena) knew about defendant Verdugo's role in the narcotics enterprise. Special Agent Camarena was being interrogated regarding the identity of other members of the Caro-Quintero narcotics enterprise. Special Agent Camarena admitted that he knew that defendant Verdugo distributed marijuana out of Mexicali for defendant Rafael Caro-Quintero. Defendant Verdugo's presence at 881 Lope de Vega shortly after Special Agent Camarena's abduction is intimately linked to Verdugo's role in the narcotics enterprise. Verdugo went to 881 Lope de Vega strongly motivated to find out what Special Agent Camarena knew about Verdugo and other members of the Rafael Caro-Quintero narcotics enterprise. Evidence regarding defendant Verdugo's role in the narcotics enterprise would therefore be admissible in a separate trial on the kidnapping and murder counts as evidence of motive under Rule 404(b). See United States v. Hoelker, 765 F.2d 1422 (9th Cir. 1985). Defendant Verdugo has therefore failed to establish prejudice as the result of the joinder of counts. Defendant's motion to sever should therefore be denied.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VII

## THE ALLEGED "SPILL-OVER" EFFECT
## OF EVIDENCE TO BE INTRODUCED AT TRIAL
## AGAINST CO-DEFENDANT JESUS FELIX-GUTIERREZ
## IS INSUFFICIENT TO JUSTIFY SEVERANCE

In defendant's motion to sever, Verdugo argues that he will be prejudiced by evidence introduced by the government at trial against co-defendant Jesus Felix. Specifically, defendant Verdugo claims that he will be prejudiced by evidence showing that co-defendant Jesus Felix arranged Rafael Caro-Quintero's flight from Mexico to Costa Rica to avoid prosecution, and that Jesus Felix arranged the purchase of residential properties in Costa Rica to provide Caro-Quintero a safe-haven from prosecution. In addition, defendant Verdugo alleges that he will be prejudiced by evidence that co-defendant Felix used false names and a false passport.

The test for severance is not simple prejudice. The Ninth Circuit has held that "prejudice is inherent in any joinder of defendants, if only 'some' prejudice is all that need be shown, few, if any, multiple defendant trials could be held." United States v. Vaccaro, 816 F.2d 443, at 448 (9th Cir. 1987). The Ninth Circuit has further held that the defendant has the difficult burden of demonstrating clear, manifest or undue prejudice from a joint trial. United States v. Polizzi, 801 F.2d 1543 (9th Cir. 1986). It is not enough that severance might provide the defendant a better chance of acquittal. United States v. Jenkins, 785 F.2d 1387, 1394 (9th Cir.), cert. denied,

1  107 S. Ct. 192 (1986). Defendant must show that joinder is so
2  manifestly prejudicial that it outweighs the dominant concern
3  with judicial economy. United States v. Douglas, 780 F.2d 1197,
4  1201 (9th Cir.), cert. denied, 449 U.S. 856 (1986).

5      As previously stated, the primary consideration is whether
6  the jury can reasonably be expected to compartmentalize the
7  evidence as it relates to co-defendants, in view of its volume
8  and the limited admissibility of some of the evidence.
9  Furthermore, "[t]he prejudicial effect of evidence relating to
10 the guilt of co-defendants is generally held to be neutralized by
11 careful instruction by the trial judge." United States v.
12 Escalante, 637 F.2d 1197, at 1201 (9th Cir. 1980). In United
13 States v. Polizzi, 801 F.2d 1543 (9th Cir. 1986), defendant's
14 motion to sever was denied. Evidence was introduced at trial
15 regarding co-defendant Matranga's involvement in the Mafia.
16 Polizzi claimed he was prejudiced by the introduction of this
17 evidence. In denying the motion to sever, the Ninth Circuit held
18 that the "trial court's cautionary instruction sufficiently
19 alerted the jury to its obligation to compartmentalize the
20 evidence, and the spill-over was not so great as to preclude the
21 jury from doing so." Id. at 1554.

22     In the present case, evidence introduced against a
23 co-defendant who is charged as an accessory-after-the-fact to the
24 murder (co-defendant Jesus Felix) is not unduly prejudicial to
25 defendant Verdugo who has been charged as principal to the murder
26 of Special Agent Camarena. Co-defendant Felix's role in
27 arranging Caro-Quintero's flight to Costa Rica and his
28

involvement in setting up a safe-haven in San Jose, Costa Rica can easily be compartmentalized by the jury. Moreover, defendant Verdugo has failed to articulate any reason why the jury would not be able to follow the trial court's cautionary instructions. Defendant's motion to sever is nothing more than an attempt to sever defendants to obtain a better chance of acquittal and as such should be denied.

Moreover, evidence regarding co-defendant Felix's use of false names and a false passport is not so unduly prejudicial that by its admission, Verdugo would be denied a fair trial. Granting defendant Verdugo's motion to sever on such a miniscule showing of prejudice is not warranted and does not overcome the compelling interest in judicial economy.

VIII

DEFENDANT VERDUGO'S MOTION FOR SEVERANCE

UNDER KOTTEAKAS IS MISPLACED SINCE HE

HAS NOT BEEN CHARGED WITH BEING A MEMBER

OF A NARCOTICS CONSPIRACY, BUT RATHER IS CHARGED

WITH BEING A MEMBER OF A NARCOTICS "ENTERPRISE"

Defendant Verdugo maintains that the government has charged in the second superseding indictment two unrelated conspiracies. Defendant Verdugo alleges that the government has charged defendant Verdugo with a conspiracy to distribute marijuana and co-defendant Jesus Felix with a conspiracy to distribute cocaine. Defendant Verdugo further maintains that he is not a

1  member of the conspiracy to distribute cocaine and therefore

2  would be prejudiced by evidence of the cocaine conspiracy in a

3  joint trial. Defendant Verdugo's argument shows a very basic

4  misunderstanding of the government's theory of the case.

5  The government has not charged a narcotics conspiracy.

6  Instead, the government has charged defendant Verdugo with being

7  a member of a narcotics "enterprise" engaged in "racketeering

8  activity" under 18 U.S.C. § 1952B. The term narcotics

9  "enterprise" is defined under 18 U.S.C. § 1952B(b)(2) as:

10              Any individual, partnership, corporation,

11          association, or legal entity, and any union or

12          group of individuals associated in fact

13          although not a legal entity, which is engaged

14          in, or the activities of which affect:

15          interstate or foreign commerce.

16  18 U.S.C. § 1952B states that "racketeering activity" has the

17  same meaning set forth in the RICO statute, 18 U.S.C. § 1961.

18  Under Section 1961, "racketeering activity" is defined as:

19          the felonious manufacture, importation,

20          receiving, concealment, buying, selling, or

21          otherwise dealing in narcotics or other

22          dangerous drugs punishable under any law of the

23          United States . . .

24  Consequently, there is a direct correlation between 18 U.S.C.

25  § 1952B, violent crimes in aid of racketeering, and the RICO

26  statute. In analyzing the terms "enterprise" and "racketeering

27  activity", it is appropriate to examine the legislative history

28

1 regarding the RICO statute and the body of case authority which
2 has been developed in applying and interpreting the RICO statute.

3 It should first be emphasized that in enacting RICO, Congress
4 intended to provide "new remedies to deal with the unlawful
5 activities of those engaged in organized crime." Pub.L. 91-452,
6 § 1, 84 Stat. 922 (1970). A primary concern was the single
7 prosecution of a "multi-faceted, diversified conspiracy. Until
8 the enactment of the RICO statute traditional conspiracy law
9 prohibited the scope of the conspiracy and was limited by
10 reference to the agreement which defined and embraced its
11 objects. Braverman v. United States, 317 U.S. 219 (1942). As
12 stated by the Fifth Circuit in United States v. Elliott, 571 F.2d
13 880 (1980) :

14 In the context of organized crime, this
15 principle inhibited mass prosecutions because a
16 single agreement or "common objective" cannot
17 be inferred from the commission of highly
18 diverse crimes by apparently unrelated
19 individuals. RICO helps to eliminate the
20 problem by creating a substantive offense which
21 ties together these diverse parties and crimes.

22 Id. at 902.

23 In Elliott, defendants had been charged under RICO, 18 U.S.C.
24 § 1962(c) and (d), with being members of an enterprise engaged in
25 a pattern of racketeering activity. The racketeering activity
26 included arson, theft of goods from interstate commerce,
27 obstruction of justice, murder and distribution of narcotics.

28

Each of the defendants charged did not participate in each of the predicate offenses. Defendants argued that while the indictment charged one conspiracy, the government's evidence at trial proved the existence of several conspiracies, resulting in a variance which substantially prejudiced their rights. See Kotteakos v. United States, 328 U.S. 750 (1946). In affirming the conviction the Court of Appeals held:

> The graveman of the conspiracy charge in this
> case is not that each defendant agreed to
> commit arson, to steal goods from interstate
> commerce, to obstruct justice, and to sell
> narcotics; rather it is that each agreed to
> participate, directly and indirectly, in the
> affairs of the enterprise by committing two or
> more predicate crimes. Under the statute, it
> is irrelevant that each defendant participated
> in the enterprise's affairs through different,
> even unrelated crimes, so long as we may
> reasonably infer that each crime was intended
> to further the enterprise's affairs.

In United States v. Tillett, 763 F.2d 628 (4th Cir. 1985), defendants were convicted under the RICO statute, 18 U.S.C. § 1961(c) and (d), with being members of a narcotics enterprise engaged in a pattern of racketeering activity involving the importation and distribution of marijuana. The purpose of the enterprise was making money through the importation and distribution of marijuana. On appeal defendants argued that the

Holland-Shure narcotics operation and the Holland-Canadian narcotics operation were separate and district conspiracies which could not be part of a single enterprise.

In affirming the conviction, the Court of Appeals in Tillett held:

> Even though the financers of the marijuana
> importation venture changed in 1980, the
> evidence showed that from 1976 through 1981,
> the common purpose of Holland and his
> financiers at any relevant time was making
> money in the illegal trafficking in marijuana.
> Aside from this direct evidence of common
> purpose of the participants in the marijuana
> importing venture, the common purpose is also
> shown by sufficient evidence that the operation
> was an ongoing organization in which the
> associates functioned as a continuing unit.
> Evidence of the ongoing nature of the
> organization related to the operational
> structure of the group. Although the faces in
> the group may have changed, there was
> substantial evidence of a structure within the
> group which the various associates operated
> according to their specific function with
> regard to the smuggling venture.

Id. at 631.

- 49 -

1    As applied to the present case, the government maintains that
2    the "affairs of the enterprise" include the cultivation,
3    importation and distribution of multi-ton quantities of marijuana
4    as well as the importation and distribution of cocaine.  The
5    essential plan of the Rafael Caro-Quintero Narcotics Enterprise
6    was to associate for the purpose of making money from trafficking
7    in controlled substances.  To that end, the evidence at trial
8    will establish that Rafael Caro-Quintero was the corporate
9    executive officer, the "CEO", of the narcotics enterprise.
10   Caro-Quintero purchased the ranches for cultivating marijuana and
11   he further hired the workers who planted and harvested the
12   marijuana.  Caro-Quintero thereafter caused the importation of
13   multi-tons of marijuana into the United States via defendant
14   Verdugo and co-defendant Jesus Felix, who acted as wholesale
15   distributors for Caro-Quintero.

16   Both defendant Verdugo and co-defendant Felix distributed
17   hundreds of millions of dollars worth of marijuana for
18   Caro-Quintero.  Verdugo's and Felix's narcotics activities were
19   related to the affairs of the narcotics enterprise in that:  (1)
20   Caro-Quintero was their common source of marijuana; (2) their
21   narcotics activities were proximate in time, 1983-84; (3) they
22   both distributed marijuana in the Southern California area: (4)
23   they both utilized common narcotics associates to facilitate the
24   distribution of the marijuana; and (5) Verdugo and Felix were
25   further associated with one another during this period of time.

26
27
28

-  50  -

As to trafficking in cocaine, the government need only prove that the cocaine distribution was related to the affairs of the narcotics enterprise. The cocaine distribution need not be directly related to defendant Verdugo's marijuana activities. United States v. Elliott, 571 F.2d 880 (5th Cir. 1980). The evidence at trial will show that the Rafael Caro—Quintero Narcotics Enterprise was also engaged in trafficking in cocaine. The evidence will further establish that co—defendant Jesus Felix was involved in the importation and distribution of cocaine with Caro—Quintero as well as other common participants in the narcotics enterprise, and that this occurred during the same period of time that defendant Verdugo was a member of the Rafael Caro—Quintero narcotics enterprise.

IX

CONCLUSION

For the reasons stated herein, defendant's Motion For Severance of Defendants and Severance of Counts should be denied.

- 51 -

| REPORT OF INVESTIGATION | | | | Page 1 of 10 |
|---|---|---|---|---|

| 1. PROGRAM CODE | 2. CROSS FILE | RELATED FILES | 3. FILE NO. | 4. G-DEP IDENTIFIER |
|---|---|---|---|---|
| 5. BY: Reynaldo O. Sepulveda, G/S AT: El Paso, Texas | ☒ ☐ ☐ ☐ ☐ | | 6. FILE TITLE LOPEZ-Alvarez, Raul | |
| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | | | 8. DATE PREPARED October 27, 1987 | |

9. OTHER OFFICERS:
Special Agents Bill Terrazas, Lance Williams and Joseph Gonzalez

10. REPORT RE:
Post Arrest Statements by Raul LOPEZ-Alvarez

SYNOPSIS:

On October 26, 1987, Raul LOPEZ-Alvarez was arrested in Rosemead, California and transported to the LAFD by/DEA agents. He made certain post arrest statements after he was advised of his rights to counsel and rights against self-incrimination. At at the LAFD LOPEZ-Alvarez made other statements.

DETAILS:

1. On October 26, 1987, after an undercover meeting with Special Agent Abel Reynoso, Raul LOPEZ-Alvarez was arrested with two other co-conspirators at a motel room in Rosemead, California. From the motel room LOPEZ-Alvarez was transported to the LAFD office by Special Agent Lance Williams, Special Agent Bill Terrazas and Group Supervisor Reynaldo O. Sepulveda. Enroute to the DEA Office, LOPEZ-Alvarez was advised of certain rights against self-incrimination and his right to counsel in the English and Spanish language by Special Agent Terrazas. LOPEZ-Alvarez acknowledged that he understood his rights (both in English and Spanish) and stated he was willing to talk to the agents without his attorney being present. LOPEZ-Alvarez also stated that he understood he was talking to DEA agents.

2. Special Agent Terrazas asked LOPEZ-Alvarez what he knew of the "Camarena case" and LOPEZ-Alvarez said he had no firsthand information. Special Agent Terrazas told him that he had been very vivid in his description of scenarios to Special Agent Reynoso and LOPEZ-Alvarez said he had done so to impress Special Agent Reynoso because he really "wanted the job" (clarified by LOPEZ-Alvarez as the job of kidnapping and murdering the victim that Special Agent Reynoso wanted taken care of).

3. Group Supervisor Sepulveda asked LOPEZ-Alvarez who he worked for and LOPEZ-Alvarez said he worked for "Don NETO" (clarified by him to be Ernesto FONSECA-Carrillo). LOPEZ-Alvarez also clarified that at the time of the Camarena incident he was employed by the Jalisco State Police as a homicide investigator. He added that his group supervisor, Ernesto PILIADO-Garza, often "got jobs" for him and others in his group with the

| 11. DISTRIBUTION: HQ | 12. SIGNATURE (Agent) | 13. DATE |
|---|---|---|
| REGION LAFD (OP LEYENDA) Los Angeles FD (Info) | | |
| DISTRICT San Diego FD (Info) DIO, OIE, OITF (Info) | 14. APPROVED (Name and Title) Reynaldo O. Sepulveda, Group Supervisor | 15. DATE 11-3-87 |
| OTHER Dallas (Info Only) | | |

DEA Form - 6
(May 1980)   ROS/aag/11/2/87

**DEA SENSITIVE**
DRUG ENFORCEMENT ADMINISTRATION

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.
Previous edition may be used.

# EXHIBIT A

| REPORT OF INVESTIGATION (Continuation) | 1. FILE | 2. G-DEP IDENTIFIER |
|---|---|---|
| | 3. FILE TITLE | |
| 4. Page 2 of 10 | LOPEZ-Alvarez, Raul | |
| 5. PROGRAM CODE | 6. DATE PREPARED October 26, 1987 | |

traffickers, among them CARO-Quintero and FONSECA-Carrillo. He explained that the jobs consisted of "protecting" the traffickers. When asked what he meant by "protecting" LOPEZ-Alvarez answered that he and his fellow police employees would use their badges (when the traffickers were involved in illegal activity) when they were approached by other law enforcement officers. LOPEZ-Alvarez also stated that PILIADO-Garza had introduced him to FONSECA-Carrillo in 1983 and that he has been on FONSECA-Carrillo's payroll since.

4. Special Agent Terrazas asked LOPEZ-Alvarez if he had been involved in the kidnapping of Special Agent Camarena and LOPEZ-Alvarez stated that he had not. He said on the day of the kidnapping he was on "guard duty" at the Homicide Squad at the Jalisco State Police and that the duty was for a 24 hour duration. LOPEZ-Alvarez said he was aware that on February 7, 1985 his group supervisor had dispatched two (2) homicide investigators, Gerardo TORRES-Lepe and Rene LOPEZ, to report to FONSECA for a job. LOPEZ-Alvarez said he would have gone except that he was on "guard duty" at the homicide squad.

5. LOPEZ-Alvarez stated that everything he knew of the kidnapping and eventual murder of Special Agent Camarena he learned from TORRES-Lepe. He said TORRES-Lepe, Rene LOPEZ, Samuel RAZO (Samuel RAMIREZ-Razo) and another person whom he could not remember the name but described as FONSECA's compadre who is heavy set and is presently in jail, and others he does not know, participated in the actual kidnapping of Special Agent Camarena and they delivered the agent to Rafael CARO-Quintero at a house in Colonia del Sol.

6. Special Agent Terrazas asked LOPEZ-Alvarez who was present at the house where Special Agent Camarena was taken and he answered that he learned from TORRES-Lepe that the following persons were at the house: Rafael CARO-Quintero, Ernesto FONSECA-Carrillo, Javier BARBA-Hernandez, Gerardo TORRES-Lepe, Rene LOPEZ, and many other body guards. LOPEZ-Alvarez said that TORRES-Lepe was present at the house where Special Agent Camarena was being held on the day after the kidnapping (February 8, 1985) when there had been a confrontation between CARO-Quintero and FONSECA-Carrillo. He said the scenario that he portrayed himself in earlier to Special Agent Reynoso actually took place but that he substituted himself into the role played by TORRES-Lepe. LOPEZ-Alvarez said he told Special Agent Reynoso that he had been present because he really wanted "the job" and the money that Special Agent Reynoso was offering.

7. Group Supervisor Sepulveda asked LOPEZ-Alvarez if he had been involved in moving the cadaver of Special Agent Camarena and Captain Zavala from Guadalajara to Michoacan. LOPEZ-Alvarez denied having been involved. He identified the person involved as Carlitos and further identified him, after being questioned, as Carlos MARTINEZ, a person who had been killed in the previous 10 or 15 days in Guadalajara during a shoot-out with the Guadalajara Municipal Police wherein four police officers had been killed. He said Carlos MARTINEZ had told him about the incident and also that the transfer of the cadavers was done on orders from Rafael CARO-Quintero.

DEA SENSITIVE
DRUG ENFORCEMENT ADMINISTRATION
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the Agency to which loaned.

Previous edition may be used.

| REPORT OF INVESTIGATION<br>*(Continuation)* | 1. FILE ▇ | 2. G-DEP IDENTIFIER |
|---|---|---|
| | 3. FILE TITLE<br><br>LOPEZ-Alvarez, Raul | |

| 4.      Page   3   of   10 | |
|---|---|

| 5. PROGRAM CODE ▇ | 6. DATE PREPARED<br>October 27, 1987 |
|---|---|

8. While still enroute to the DEA Office, LOPEZ-Alvarez said he and the other two persons arrested with him were going to split the $25,000.00 that Special Agent Reynoso was going to pay them in three equal parts. He said Special Agent Reynoso was going to pay them in two increments of $12,500, the first increment prior to the kidnapping and the other increment after the "job" was completed. He said that he hired the other two persons in Guadalajara. He said that he had known Carlos QUINTERO-Maldonado from before and knew him to be a second or third cousin of Rafael CARO-Quintero. He said he knew very little about the other person, Fabian JIMENEZ-Martinez.

9. LOPEZ-Alvarez was placed in a holding cell at the DEA Office. Shortly thereafter he was interviewed by Group Supervisor Sepulveda and Inspector Joseph Gonzalez. LOPEZ-Alvarez was again advised of certain rights against self-incrimination and his right to counsel by Inspector Gonzalez. LOPEZ-Alvarez again acknowledged that he understood his rights and elected to talk to the agents.

10. When asked to explain his involvement in the instant case, LOPEZ-Alvarez stated he had met Special Agent Abel Reynoso (who he now knew to be a DEA undercover agent) approximately a month ago when he was introduced to the agent, by _____ (he named the CI). He said that he and the CI had travelled to Los Angeles from Guadalajara in order to negotiate prices, etc., of cocaine that the agent wanted to purchase. LOPEZ-Alvarez said he was not a drug trafficker but that he had a lot of connections in Mexico. He admitted that he was no stranger to drugs and drug trafficking. He added that he was trusted in Guadalajara because he was an "ex-cop" and a responsible person who had done favors for the traffickers, specifically CARO-Quintero and FONSECA-Carrillo. He also said he had spent time in prison in Mexico with regard to the Camarena case and had not told his interrogators anything.

11. LOPEZ-Alvarez said he had mentioned to Special Agent Reynoso at the initial meeting that he could take care of "collection problems" if Special Agent Reynoso had any such problems. He said it was at this time that Special Agent Reynoso first discussed a person that was bothering the agent or giving him some sort of problems. He said that thereafter he had several meetings and/or conversations with Special Agent Reynoso where they discussed the person that the agent wanted "taken care of," and that he agreed to kidnap and kill this person. He added that he was to be paid $25,000 to be split three ways between he and his two helpers.

12. LOPEZ-Alvarez said that with regards to the final arrangements to do "the job" for Special Agent Reynoso, he contacted some "gentlemen" in Guadalajara (he was referring to Carlos QUINTERO and Fabian JIMENEZ). He added that the three of them took flight number 110 from Guadalajara to Tijuana on October 22, 1987. he

**DEA SENSITIVE**<br>DRUG ENFORCEMENT ADMINISTRATION<br>This report is the property of the Drug Enforcement Administration.<br>Neither it nor its contents may be disseminated outside the Agency to which loaned.<br><br>Previous edition may be used.

**REPORT OF INVESTIGATION**
*(Continuation)*

| | |
|---|---|
| **1. FILE** | **2. G-DEP IDENTIFIER** |

**3. FILE TITLE**

LOPEZ-Alvarez, Raul

**4.**   Page  4  of  10

**5. PROGRAM CODE**

**6. DATE PREPARED**
October 27, 1987

said they were unable to cross the border at Tijuana so they went to San Luis Rio Colorado,, Sonora, Mexico via bus and crossed the border into the United States illegally near San Luis, Arizona (near Yuma, Arizona). He said that they flew from Yuma, Arizona to Los Angeles on Sky West Airline Flight 5526 and eventually registered at the Com On Inn motel (room 218) in Monterrey Park, California under his name.

13.  LOPEZ-Alvarez said he had a couple of meetings with Special Agent Reynoso and on the final meeting he was arrested after he was shown some firearms. LOPEZ-Alvarez denied having killed anyone in the past, emphasizing that "this would have been his first job." When questioned as to why he had agreed to do the instant killing, LOPEZ-Alvarez said he needed the money.

14.  LOPEZ-Alvarez then talked about the Camarena case. He said he had initially been introduced to Ernesto FONSECA in 1984 by his group supervisor at the Jalisco State Police Homicide Squad, Ernesto PILIADO-Garza. He said the purpose of the introduction was so he could make money from the traffickers. He explained that it was common for police officers in the Jalisco State Police to use their official position to protect traffickers from arrest and to inform them of any information about the traffickers that came to the attention of the police. He added that he and others were also bodyguards for FONSECA and other traffickers. LOPEZ-Alvarez said that he has been on FONSECA's payroll since the 1984 introduction.

15.  LOPEZ-Alvarez was asked if he had contacted FONSECA prior to dealing with Special Agent Reynoso and he answered that he had. He added that he went to prison and talked to FONSECA about working on his own. He said FONSECA's initial reaction was rage but thereafter FONSECA told him that it was okay but for LOPEZ-Alvarez to be very careful.

16.  LOPEZ-Alvarez said he was present at a birthday party given by the traffickers for Victor LOPEZ-Razon at LOPEZ-Razon's house on February 4, 1985. He said that CARO-Quintero and FONSECA-Carrillo were present with their bodyguards. He said he remembers that aka PACO, aka AMADO, and aka LUISIO were among those present as were Ernesto PILIADO, Gabriel GONZALEZ-Gonzalez (Chief of the Homicide Squad) and Victor LOPEZ-Razon, the latter three being his co-workers at the Jalisco State Police. LOPEZ-Alvarez said his function was to guard the gate entrance to the residence and that at some time during the evening he was told by FONSECA that a person would be arriving via taxi and to allow this person to enter. He said that at 10:00 PM a taxi dropped off Special Agent Enrique Camarena who was carrying a paper sack. He added that Special Agent Camarena met privately with CARO-Quintero, FONSECA-Carrillo, and GONZALEZ-Gonzalez. He said it was obvious that they all knew each other. LOPEZ-Alvarez said that a short while later Special Agent Camarena left without the paper sack and thereafter

**DEA SENSITIVE**
DRUG ENFORCEMENT ADMINISTRATION
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the Agency to which loaned.

Previous edition may be used.

| REPORT OF INVESTIGATION | 1. FILE | 2. G-DEP IDENTIFIER |
| *(Continuation)* | 3. FILE TITLE | |
| | LOPEZ-Alvarez, Raul | |

**4.**  Page  5  of  10

**5. PROGRAM CODE**

**6. DATE PREPARED**
October 27, 1987

---

CARO-Quintero and FONSECA-Carrillo made several telephone calls to Colombia. (He added that the information about the telephone calls came from examining LOPEZ-Razon's phone bill.)

17. At this point of the interview, LOPEZ-Alvarez discussed the fact that he was aware of the recorded torture of Special Agent Camarena and of the existence of the tapes containing this recorded torture. LOPEZ-Alvarez was asked if the tapes bore the fact that Special Agent Camarena did not know either CARO-Quintero or FONSECA-Carrillo personally, was LOPEZ-Alvarez being untruthful about Special Agent Camarena being at the above described party. LOPEZ-Alvarez said if such was the case Special Agent Camarena lied to his tormentors when he said he did not know CARO-Quintero and FONSECA-Carrillo. When asked about the logic of kidnapping Special Agent Camarena on the 7th of February when on the 4th of February he voluntarily met with the group responsible for his eventual kidnapping LOPEZ-Alvarez said he had no answers.

18. LOPEZ-Alvarez said that what he knew about the kidnapping and torture of Special Agent Camarena he learned from TORRES-Lepe who also worked for the Jalisco State Police Homicide Squad. He said he was aware on February 7, 1985 that Comandante Gabriel GONZALEZ-Gonzalez had sent TORRES-Lepe and another Jalisco State Police Officer, Rene LOPEZ, to assist CARO-Quintero and FONSECA-Carrillo. He also said that he would have gone but he was the duty officer for that date.

19. LOPEZ-Alvarez said that on February 8, 1985 he had spent the day with his father in Guadalajara. He said TORRES-Lepe at some time after February 7, 1985 told him that he and Rene LOPEZ had accompanied Samuel RAZO, aka EL CHINO, and others that TORRES-Lepe didn't know, to near the American Consulate where they kidnapped an American official and thereafter delivered him to CARO-Quintero at a house on Calle Xochil in Colonia Plaza del Sol. He said they later learned the American official was DEA Special Agent Enrique Camarena.

20. LOPEZ-Alvarez stated that on February 8, 1985, according to TORRES-Lepe, CARO-Quintero and FONSECA-Carrillo had an armed confrontation at the house where Special Agent Camarena was being held. He said FONSECA-Carrillo had slapped CARO-Quintero because CARO-Quintero and his people had gone too far in beating Special Agent Camarena. According to TORRES-Lepe, CARO-Quintero's and FONSECA-Carrillo's people pointed weapons at each other during the confrontation and TORRES-Lepe was one those defending FONSECA-Carrillo.

21. LOPEZ-Alvarez stated that others that he remembers that TORRES-Lepe mentioned were at the house where Special Agent Camarena was being held were: Javier BAROSA-Hernandez, aka AMADITO, and aka PACO.

---

DEA SENSITIVE
DRUG ENFORCEMENT ADMINISTRATION
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the Agency to which loaned.

Previous edition may be used.

**REPORT OF INVESTIGATION**

*(Continuation)*

| 1. FILE | 2. G-DEF IDENTIFIER |
|---|---|

3. FILE TITLE

LOPEZ-Alvarez, Raul

4.　　　Page　6　of　10

5. PROGRAM CODE

6. DATE PREPARED
October 27, 1987

22. LOPEZ-Alvarez said that on February 9, 1985 he knew Special Agent Camarena was dead. He said he learned this from Gabriel GONZALEZ-Gonzalez who said "the people" had killed him. He added that he understood "the people" to be CARO-Quintero and FONSECA-Carrillo.

23. LOPEZ-Alvarez said that on February 9, 1985 he and Ernesto PILIADO were on patrol duty when they received a radio message to dial a certain telephone number. He said that when he did it was answered by "EL GUERON," who he identified as being FONSECA-Carrillo's younger brother. "EL GUERON" wanted LOPEZ-Alvarez' father, Mariano ALVAREZ-Delgado (since deceased), to perform the marriage ceremony of CARO-Quintero and Sara Cosio. LOPEZ-Alvarez explained that his father was the equivalent of a Justice of the Peace in Guadalajara.

24. LOPEZ-Alvarez said that as a result of the phone call he met "EL GUERON" at his father's office and there learned that CARO-Quintero and Sara Cosio were at the Guadalajara airport waiting for the judge at CARO-Quintero's private Falcon jet. He said that he, PILIADO and the judge travelled in the patrol car in concert with "EL GUERON" and his body guard, ASUNCION (LNU) in another vehicle. Enroute to the airport, "EL GUERON" motioned for them to stop and at this time told them to forget everything because the wedding had been cancelled.

25. LOPEZ-Alvarez said he and PILIADO returned to their office because they had been called via radio by GONZALEZ-Gonzalez. They met with GONZALEZ-Gonzalez who told them that Mexican Federal Judicial Police (MFJP) Comandante Jorge Armando PAVON-Reyes had requested the assistance of the State officers. He said GONZALEZ-Gonzalez was not interested in helping the FEDS but decided that only the three of them would respond to the FED's call for help. LOPEZ-Alvarez said they went to lunch first and took their time responding to the MFJP office. He said that when they eventually arrived at the MFJP they met with PAVON-Reyes who had an entourage of Mexican Federal agents and a few DEA agents. He said that PAVON-Reyes told them they were going to check a group of people who were at the airport who might be involved in the disappearance of Special Agent Camarena. He said they travelled to the airport in a convoy of 10 to 15 Chevrolet Celebrities. He said he, GONZALEZ-Gonzalez and PILIADO travelled in a Citation.

26. LOPEZ-Alvarez said that while enroute to the airport he told GONZALEZ-Gonzalez of the earlier contact with "EL GUERON" and of the fact that CARO-Quintero was at the airport. He said GONZALEZ-Gonzalez said they had to make an effort to warn CARO-Quintero but they could not immediately leave the convoy because there was an MFJP vehicle behind them.

27. LOPEZ-Alvarez stated that when they arrived at the airport the convoy initially stopped at the MFJP office at the airport. He said it was at this time

**DEA SENSITIVE**
**DRUG ENFORCEMENT ADMINISTRATION**
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the Agency to which loaned.

Previous edition may be used.

| **REPORT OF INVESTIGATION**<br>*(Continuation)* | **1. FILE** | **2. G-DEP IDENTIFIER** |
|---|---|---|
| | **3. FILE TITLE** | |
| **4.**  Page  7  of  10 | LOPEZ-Alvarez, Raul | |
| **5. PROGRAM CODE** | **6. DATE PREPARED**<br>October 27, 1987 | |

that he went to a phone to attempt to call "EL GUERON" to warn CARO-Quintero of the MFJP presence.  He said he was unable to make contact.

28.  From the MFJP office, LOPEZ-Alvarez said that they went to a nearby hanger where they located a Falcon jet that he recognized as being CARO-Quintero's private aircraft.  He said he recognized the following persons at the Falcon jet:

ASUNCION (LNU)

EL GUERON

aka PACO

aka NINI

aka AMADITO

Rogelio MUNOZ-Rios

Two other persons whom he knows only as being EL GUERON's brothers-in-law

MARIANO (LNU) -- the pilot

Unidentified female -- the co-pilot

29.  LOPEZ-Alvarez said that the people near the jet were all armed with AK 47 automatic weapons as well as other weapons which were pointed at MFJP agents and DEA agents.  He said that for awhile CARO-Quintero's people and the MFJP pointed the weapons at each other.  During this confrontation PAVON-Reyes asked CARO-Quintero if he was CARO-Quintero and CARO-Quintero answered that he was not, that he was a DFS agent from Mexico City.  LOPEZ-Alvarez said CARO-Quintero's people refused to drop their weapons as ordered by PAVON-Reyes.  He said shortly thereafter Rogelio MUNOZ-Rios came out of the aircraft and met with PAVON-Reyes and they shook hands.  He said that PAVON-Reyes and MUNOZ-Rios walked together to the MFJP helicopter hanger where they remained for awhile then returned to where the rest of the group was located.  LOPEZ-Alvarez added that PAVON-Reyes said in a loud voice that the people at the Falcon jet were agents from Mexico City and a mistake had been made trying to arrest them.  He also said that CARO-Quintero had summoned him (LOPEZ-Alvarez) and GONZALEZ-Gonzalez to his location and shook hands with them.  He said shortly thereafter the group broke up and the Falcon jet took off.

**DEA SENSITIVE**<br>**DRUG ENFORCEMENT ADMINISTRATION**<br>This report is the property of the Drug Enforcement Administration.<br>Neither it nor its contents may be disseminated outside the Agency to which loaned.<br><br>Previous edition may be used.

| **REPORT OF INVESTIGATION** *(Continuation)* | 1. FILE | 2. G-DEP IDENTIFIER |
|---|---|---|
| | 3. FILE TITLE LOPEZ-Alvarez, Raul | |

| 4. Page 8 of 10 | |
|---|---|
| 5. PROGRAM CODE | 6. DATE PREPARED October 27, 1987 |

30. LOPEZ-Alvarez also said that PAVON-Reyes rode back to the MFJP office with him, GONZALEZ-Gonzalez, and PILIADO in the State car. While enroute to the MFJP office, PAVON-Reyes reiterated that the people at the Falcon jet were federal agents from Mexico City and they had almost made a big mistake in confronting them because someone could have been killed. LOPEZ-Alvarez was asked by Group Supervisor Sepulveda if he at any time told PAVON-Reyes that the person at the Falcon jet was Rafael CARO-Quintero and he answered that he had not. He was asked, why not?, and he responded that he was one of CARO-Quintero's people. He was reminded that he had said he was one of FONSECA's people and LOPEZ-Alvarez said CARO-Quintero and FONSECA-Carrillo "were one and the same," clarifying that they worked together.

31. LOPEZ-Alvarez said afterwards he went alone to FONSECA-Carrillos' house and found FONSECA-Carrillo in conference with Miguel FELIX-Gallardo. He said he told FONSECA-Carrillo of the incident at the airport and FONSECA-Carrillo and FELIX-Gallardo listened but made no comment except FONSECA-Carrillo said "ok" after LOPEZ-Alvarez finished relating the story. He said that he left right away and that he could not hear any of their conversation. He said that also present with FONSECA and FELIX-Gallardo was Colonel (FNU) CARMAN from the Mexican Army. According to LOPEZ-Alvarez, this Colonel was the Army contact with the Guadalajara traffickers.

32. LOPEZ-Alvarez said that he was told by GONZALEZ-Gonzalez that the MFJP were searching a lot of houses in Guadalajara during the time that Special Agent Camarena was missing and the situation was causing a lot of tension among the traffickers and an agreement was made where the cadavers of Special Agent Camarena and Captain Zavala would be exhumed from their graves in Guadalajara and discovered at the Bravo Ranch in Michoacan. He said a plan was orchestrated whereby the people at the Bravo Ranch would be murdered and the cadavers would be located at the Bravo Ranch later. He said the plan did not work because the cadavers were not delivered in time.

33. LOPEZ-Alvarez said that four or five months ago he spoke with Carlos MARTINEZ in Guadalajara and MARTINEZ said he had been in charge of moving the bodies of Special Agent Camarena and Captain Zavala from Guadalajara to near the Bravo Ranch. According to MARTINEZ, the bodies were in black plastic bags buried at the Xochil Street address. They were transported by MARTINEZ to Michoacan in a truck on orders from CARO-Quintero. MARTINEZ, according to LOPEZ-Alvarez, was vivid in his description of the appearance and odor of the bodies.

34. At this point of the interview, LOPEZ-Alvarez became concerned with what type of deal the agents could make with him for further cooperation. It was explained to LOPEZ-Alvarez that the agents had no authorization to make deals

DEA Form — 6a
(May 1980)

**DEA SENSITIVE**
**DRUG ENFORCEMENT ADMINISTRATION**
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the Agency to which loaned.

Previous edition may be used.

# REPORT OF INVESTIGATION
*(Continuation)*

| 1. FILE | 2. G-DEP IDENTIFIER |
|---|---|
| ▮▮▮▮▮ | ▮▮▮▮▮ |

3. FILE TITLE

LOPEZ-Alvarez, Raul

4.
   Page  9  of  10

5. PROGRAM CODE
   ▮▮▮▮▮▮

6. DATE PREPARED
   October 27, 1987

with him but his cooperation would be brought to the attention of the Assistant U.S. Attorney. LOPEZ-Alvarez said he had much more to offer and as examples he stated that he was directly involved in the murder of the two Americans, i.e., Radalat and Walker, and that he was indirectly involved in the murder of some religious missionaries in Guadalajara.

35. When it became apparent to LOPEZ-Alvarez that he could not deal with the agents he said he had never intended to follow through with the kidnap/murder for Special Agent Reynoso and that he was merely going to take the first payment and return to Mexico. The interview was then terminated.

## INDEXING SECTION:



1. ▮▮▮▮▮▮▮▮▮▮
2. ▮▮▮▮▮▮▮▮▮▮
3. ▮▮▮▮▮▮▮▮▮▮
4. ▮▮▮▮▮▮▮▮▮▮
5. ▮▮▮▮▮▮▮▮▮▮
6. ▮▮▮▮▮▮▮▮▮▮
7. ▮▮▮▮▮▮▮▮▮▮
8. ▮▮▮▮▮▮▮▮▮▮
9. ▮▮▮▮▮▮▮▮▮▮
10. ▮▮▮▮▮▮▮▮▮▮
11. ▮▮▮▮▮▮▮▮▮▮
12. ▮▮▮▮▮▮▮▮▮▮
13. ▮▮▮▮▮▮▮▮▮▮
14. ▮▮▮▮▮▮▮▮▮▮
15. ▮▮▮▮▮▮▮▮▮▮

DEA Form — 6a
(May 1980)

**DEA SENSITIVE**
**DRUG ENFORCEMENT ADMINISTRATION**
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the Agency to which loaned.

Previous edition may be used.

# REPORT OF INVESTIGATION
## (Continuation)

| | |
|---|---|
| 1. FILE | 2. G-DEP IDENTIFIER |
| 3. FILE TITLE | |

3. FILE TITLE

LOPEZ-Alvarez, Raul

4.

**Page  10  of  10**

5. PROGRAM CODE ▓▓▓▓▓▓▓

6. DATE PREPARED
October 27, 1987

16. ▓▓▓▓▓▓▓▓▓▓▓▓

17. ▓▓▓▓▓▓▓▓▓▓▓▓

18. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

19. ▓▓▓▓▓▓▓▓▓▓▓▓▓

20. ▓▓▓▓▓▓▓▓▓▓

21. ▓▓▓▓▓▓▓▓▓▓▓▓▓

22. ▓▓▓▓▓▓▓▓▓

23. ▓▓▓▓▓▓▓▓

24. ▓▓▓▓▓▓▓▓

25. ▓▓▓▓▓▓▓▓▓▓▓

26. ▓▓▓▓▓▓▓▓▓▓▓▓▓

DEA Form — 6a
(May 1980)

**DEA SENSITIVE**
**DRUG ENFORCEMENT ADMINISTRATION**
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the Agency to which loaned.

Previous edition may be used.

CERTIFICATE OF SERVICE BY MAIL

I, ____Bernadette Baskerville____, declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California; that my business address is Office of United States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction the service by mail described in this Certificate was made; that on ___May 6, 1988___, I deposited in the United States mails in the United States Courthouse at 312 North Spring Street, Los Angeles, California, in the above-entitled action, in an envelope bearing the requisite postage, a copy of GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR SEVERANCE OF DEFENDANTS AND COUNTS; MEMORANDUM OF POINTS AND AUTHORITIES; EXHIBIT

addressed to:    SEE ATTACHED

at _their_ last known address, at which place there is a delivery service by United States mail.

This Certificate is executed on ___May 6, 1988___ at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.

UNITED STATES v. RAFAEL CARO QUINTERO, et al.,
NO. CR 87-422(B)-ER
_____

Michael Pancer, Esq.
625 Broadway
Suite 1135
San Diego, CA 92101


Elsa Leyva, DFPD
Federal Public Defender's Office
312 N. Spring Street
15th Floor
Los Angeles, CA 90012

Don Randolph, Esq.
2566 Overland Avenue
7th Floor
Los Angeles, CA 90064