ROBERT C. BONNER
United States Attorney
ROBERT L. BROSIO
Assistant United States Attorney
Chief, Criminal Division
ROEL C. CAMPOS
Assistant United States Attorney
Major Narcotics Section
    1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-6682

Attorneys for Plaintiff
United States of America



FILED
CLERK, U.S. DISTRICT COURT

MAY 1 1 1988
3 40

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,      )    NO. CR 87-422(B)-ER
                               )
            Plaintiff,         )    GOVERNMENT'S OPPOSITION TO
                               )    DEFENDANT VERDUGO URQUIDEZ'
        v.                     )    MOTION FOR PRE-TRIAL HEARING
                               )    RE AUTHENTICITY AND ADMISSI-
RAFAEL CARO-QUINTERO, et al.,  )    BILITY OF TAPE RECORDINGS
                               )    AND THE ACCURACY OF GOVERN-
            Defendants.        )    MENT'S PROPOSED TRANSCRIPTS;
                               )    MEMORANDUM OF POINTS AND
                                    AUTHORITIES; DECLARATIONS

ENTERED ON COURTRAN

MAY 1 2 1988

DATE:  June 6, 1988
TIME:  1:30 P.M.

     The government hereby respectfully files its opposition to

defendant Verdugo Urquidez' motion for a pre-trial hearing

regarding authenticity.

     The government's opposition is based on the attached

Memorandum of Points and Authorities, the attached Declarations

and the records and files in the case.

     DATED:  This //th day of May, 1988.

                              Respectfully submitted,

                              ROBERT C. BONNER
                              United States Attorney

//

ROBERT L. BROSIO
Assistant United States Attorney
Chief, Criminal Division

ROEL C. CAMPOS
Assistant United States Attorney
Major Narcotics Section

   Attorneys for Plaintiff
   United States of America

-2-

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES                                              iii

I          INTRODUCTION                                            3

    A.     The Kidnappers Recorded Their
           Interrogation of SA Camarena                            4

    B.     Defendant's Objections to the
           Admissibility of the Interrogation
           Tapes are Meritless                                     6

II         ARGUMENT                                                8

    A.     Under The Federal Rules The Issue For
           The Trial Judge Is Whether There Is
           Prima Facie Evidence That The
           Challenged Item Is What It Is Purported
           To Be                                                   8

    B.     The Trial Court Has Wide Discretion
           To Admit Recordings Even If Portions
           Are Unintelligible Or Inaudible                         11

    C.     Evidence May Be Authenticated By
           Distinctive Characteristics                             14

    D.     Authentication May Occur By Voice
           Identification                                          17

III        THE GOVERNMENT HAS MET THE BURDEN OF
           AUTHENTICATING THE TAPES                                19

    A.     The Contents Of The Interrogation
           Tapes Establish Authenticity                            19

           1.    First Cassette (Copia 2)                          20

           2.    Second Cassette (Copia 4)                         23

    B.     The Voice Indentifications Also
           Establishes Authentication                              27

IV         THERE IS A PRESUMPTION OF REGULARITY
           WHEN EXHIBITS ARE HANDLED BY PUBLIC
           OFFICIALS                                               28

- i -

1

**TABLE OF CONTENTS** (cont'd)

2

3                                                                    PAGE

4    V       ANY GAPS IN THE CHAIN OF EVIDENCE GO
5            TO THE WEIGHT TO BE GIVEN THE EVIDENCE
             NOT TO ITS ADMISSIBILITY AND AFFIRMATIVE
6            EVIDENCE OF TAMPERING MUST BE MADE TO
             RAISE THE POSSIBILITY OF EXCLUSION        30

7    VI      IN THIS CIRCUIT, TAPE RECORDINGS HAVE
8            BEEN ADMITTED IN CIRCUMSTANCES SIMILAR
             TO THE ONE AT HAND                        34

9    VI      CONCLUSION                                35

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                  - ii -

28

# TABLE OF AUTHORITIES

PAGE

Cape v. United States,
283 F.2d 430, 435 (9th Cir. 1960)                13

Dawson, Inc. v. NLRB,
586 F.2d 1300 (9th Cir. 1978)                  9, 13

Gallego v. United States,
276 F.2d 914 (9th Cir. 1969)                   31

People of the Territory of Guam v. Ojeda,
758 F.2d 403 (9th Cir. 1985)                   33

Stubbs v. United States,
428 F.2d 885 (9th Cir. 1970)                   32

Texas Department of Community Affairs v. Burdine,
450 U.S. 248, 254 (1981)                      10

United States  Reyes,
383 F.2d 734 (9th Cir. 1967)                   15

United States of America v. Benedict,
647 F.2d 928 (9th Cir. 1981),
cert. denied, 454 U.S. 1087 (1982)            29

United States v. Basey,
613 F.2d 198 (9th Cir. 1979),
cert. denied, 446 U.S. 919 (1980)             18

United States v. Biggins,
551 F.2d 64, 66-67 (5th Cir. 1977)            12, 30

United States v. Black,
767 F.2d 1334 (9th Cir. 1985),
cert. denied, 474 U.S. 1022 (1986)            10, 11, 12

United States v. Bourjaily,
107 S. Ct. 2775, 2781, fn. 2 (1987)           31

United States v. Bright,
630 F.2d 804 (5th Cir. 1980)                  32

United States v. Cabral,
430 U.S. 902 (1977)                          10

- iii -

<center>**TABLE OF AUTHORITIES** (cont'd)</center>

PAGE

United States v. Coades,
549 F.2d 1303 (9th Cir. 1977)          33, 34

United States v. De Gudino,
722 F.2d 1351 (9th Cir. 1983)          14, 15, 16, 17

United States v. De La Rosa,
450 F.2d 1057 (3rd Cir. 1971),
cert. denied, 405 U.S. 957 (1972)      34

United States v. Gerhart,
538 F.2d 807, 809 and fn. 3 (8th Cir. 1976)  12, 30

United States v. Gordon,
634 F.2d 639 (9th Cir. 1980)           15

United States v. Haldeman,
559 F.2d 31, 107 (D.C. Cir. 1976)      31

United States v. Hurd,
642 F.2d 1179 (9th Cir. 1981)          13, 33, 34

United States v. Jefferson,
714 F.2d 689 (7th Cir. 1983)           31

United States v. King,
587 F.2d 956, 961 (9th Cir. 1978)      11, 12, 13

United States v. Knohl,
379 F.2d 427, 440 (2nd Cir. 1966),
cert. denied, 389 U.S. 973 (1967)      12

United States v. Lane,
514 F.2d 2d 22 (9th Cir. 1975)         13

United States v. Mouton,
617 F.2d 1379 (9th Cir. 1980),
cert. denied, 449 U.S. 860 (1981)      12, 13

United States v. One 56-Foot Motor Yacht Named
the Tahuna,
702 F.2d 1276 (9th Cir. 1983)          15

United States v. Scully,
546 F.2d 255 (9th Cir. 1976)           10, 13

<center>- iv -</center>

**TABLE OF AUTHORITIES** (cont'd)

PAGE

<u>United States v. Sliker,</u>
    <u>751 F.2d 477 (2nd Cir. 1984),</u>
    <u>cert. denied,</u> 105 S.Ct. 1772 (1985)          10

<u>United States v. Stearns,</u>
    <u>550 F.2d 1167 (9th Cir. 1977)</u>               15, 17

<u>United States v. Thomas,</u>
    <u>586 F.2d 123 (9th Cir. 1978)</u>                17, 18

<u>United States v. Turner,</u>
    <u>528 F.2d 143, 163 (9th Cir. 1975),</u>
    <u>cert. denied,</u> 423 U.S. 996 and
    <u>429 U.S. 837 (1975)</u>                         10, 12, 18, 19

<u>United States v. Weiner,</u>
    <u>578 F.2d 757 (9th Cir. 1978),</u>
    <u>cert. denied,</u> 439 U.S. 981 (1978)
    <u>and 439 U.S. 1135 (1978)</u>                    32

<u>United States v. White,</u>
    <u>569 F.2d 263, 266 (5th Cir. 1978)</u>           31

<u>RULES:</u>

Rule 104(b)                                     8

Rule 602                                        11

Rule 901                                        8, 9, 11

Rule 901(a)                                     8, 11, 12

Rule 901(b)(4)                                  11, 14, 15, 19, 36

Rule 901(b)(5)                                  17, 18, 36

Rule 1004                                       29, 30

Rule 1008                                       11

I

## INTRODUCTION

On February 7, 1985, Drug Enforcement Administration ("DEA") Special Agent ("SA") Enrique (Kiki) Camarena was serving the last few weeks of his tour of duty in Guadalajara, Mexico. He and his family had been making preparations to leave Guadalajara and return to the United States. On that particular day, he made plans to meet his wife for lunch at a restaurant that was located near the DEA offices at the America Consulate. At approximately 1:00 p.m., SA Camarena told the office staff that he was leaving to have lunch with his wife and walked out of the building onto the street. SA Camarena never arrived at the restaurant where his wife was waiting for him.

About one month later on March 5, 1985, his decomposing body was found after it had been dumped in a rural area outside of Guadalajara. SA Camarena had been severely and brutally beaten to death. A large hole in his skull indicated that an instrument such as a metal pipe had been driven into and pulled out of his head. SA Camarena had been bound, gagged and blindfolded before he was finally killed.

Next to SA Camarena's body was also found the battered body of Alfredo Zavala-Avelar. Mr. Zavala-Avelar had been a pilot and a cooperating individual for DEA in Mexico and had worked extensively with SA Camarena on various investigations. Mr. Zavala-Avelar had also been kidnapped on the same day as SA Camarena. Forensics evidence would later show that both men had been buried at another site and later exhumed.

-3-

A.   The Kidnappers Recorded Their

Interrogation of SA Camarena

The government will present evidence that SA Camarena was abducted by a group of men as he walked from the American Consulate to meet his wife for lunch.  He was taken to a large estate home in Guadalajara that had the dual addresses of 881 Lope de Vega and El Sol #2492, Jardines Del Bosque.  There SA Camarena was tortured and physically beaten to death or near death.  He was also interrogated about his knowledge regarding the large drug trafficking organization headed by defendants Rafael Caro-Quintero and Ernesto Fonseca-Carrillo.  The individuals who conducted the interrogation recorded portions of the interrogation.  Those recordings are on two cassettes:  Copia 2 having thirty minutes of the interrogation on one side and Copia 4 having thirty minutes of interrogation on each side.  (Hereinafter, referred to collectively as the "interrogation tapes").  The recordings were apparently intended to preserve and to communicate to various members of the drug ring the information that the abductors were able to force out of SA Camarena.

On those tapes, SA Camarena can be heard groaning in pain.  One can actually hear SA Camarena's voice fade as his strength gives out.  At several points his captors tell SA Camarena that they will stop beating him if he will simply answer their questions.  At another point on the tapes, SA Camarena asks his interrogators to loosen his bindings and, in agony, states that he is suffering "shooting pains" through his body.

-4-

1    The interrogation was conducted in Spanish.  The government
2  has filed English translations of the interrogation tapes for the
3  court's review.  A review of the transcripts indicates that the
4  recordings are intelligible and that the interrogation sequence is
5  logical.  Occasionally there are background voices, and it is
6  obvious that others are listening in the background.  There are
7  pauses on the recordings.  Apparently during the interrogation the
8  recorder was turned off when SA Camarena was being beaten and
9  tortured (to force him to provide additional information) and
10  while the interrogators talked among themselves.  Those pauses do
11  not affect the listener's ability to understand the tapes or their
12  probative value.

13    Most of the questioning on the interrogation tapes concerns
14  what SA Camarena and the DEA knew about drug kingpins Rafael
15  Cara-Quintero and Ernesto Fonseca-Carrillo.  As will be explained,
16  references on the tapes to "Rafael" are to defendant Caro-Quintero
17  and references to "Ernesto" are to Ernesto Fonseca-Carrillo.
18  Defendants Caro-Quintero and Fonseca-Carrillo are in custody in
19  Mexico City.

20    As explained below, the government does not know who
21  originally recorded the interrogation.  (Clearly the interrogation
22  was recorded by someone working for the drug organization on
23  orders from the captors.)  The government does not know what type
24  of equipment was orginally used.  As also explained below, the
25  originals of the two cassettes that were seized have been
26  accidently destroyed while in the custody of the Attorney General
27  of Mexico.  As such, the government's copies are the best evidence

-5-

28

1 of the interrogation. The contents of the cassettes, moreover,
2 are so unique that they are self-authenticating.

3 B. **Defendant's Objections to the Admissibility of the**
4 **Interrogation Tapes are Meritless**

5 Defendants object to the introduction of the interrogation
6 tapes into evidence.[1/] Defendant Verdugo-Urquidez specifically
7 claims that the tapes should not be admitted into evidence because
8 they cannot be properly authenticated. Further, without providing
9 any basis whatsoever, defendant Verdugo-Urquidez speculates in his
10 papers that there exists a possibility that the tapes were somehow
11 tampered or altered. That contention is completely unwarranted
12 and meritless.

13 In the first instance, the tapes, by their content, are
14 self-authenticating. There simply can be no issue as to what
15 those tapes are: a recording of a portion of the interrogation
16 and torture of SA Camarena. Several witnesses, including his
17 wife, will identify the victim's voice in the recordings as that
18 of SA Camarena. Moreover, as discussed below, much of the
19 specific information that is coerced from SA Camarena consists of
20 details of events and information that only a DEA agent in
21 Guadalajara would have known. Furthermore, two DEA special agents
22 have identified the voices of two of the interrogators of SA
23 Camarena as being those of defendants Rafael Caro-Quintero and
24 Sergio Espino-Verdin. (Neither is in United States custody or

25

26 _____

1/ Defendant Verdugo-Urquidez' motion is entitled Motion For
27 Pretrial Hearing Re: Authenticity And Admissibility of Tape
Recordings And The Accuracy of Government's Proposed Transcripts.
28 -6-

1  before this court.)  Under these circumstances it is inconceivable
2  that anyone could have orchestrated a false production resulting
3  in these tapes.  Predictably, none of the defendants present any
4  rational theory as to how or who would have tampered with those
5  tapes.  As discussed below, it is settled law that mere
6  speculation as to the possibility of tampering is an insufficient
7  challenge to authenticity.  It is incumbent upon defendants to
8  present evidence of tampering and to present some cogent theory
9  regarding how the tampering occurred and how they are thereby
10  prejudiced.  Even if there were evidence of tampering, the tapes
11  are still admissible if on the whole they have probative value.

12  The law is clear that the government need only present a prima
13  facie case of authenticity for the tapes to be admitted into
14  evidence.  The ultimate decision regarding authenticity is for the
15  jury (the trier of fact).  Defendants' arguments against
16  authenticity only go to the weight of the evidence and can be
17  presented to the jury.

18  This opposition demonstrates that the tapes are properly
19  authenticated and admissible under the Federal Rules through
20  (1) the content of the tapes themselves and (2) through voice
21  identification.  The government also provides the court evidence
22  as to how the tapes came into United States custody.  The
23  government further provides the court ample evidence of the tapes'
24  authenticity in the form of declarations.  The government submits
25  that it has met its prima facie burden and that the court should
26  find the tapes admissible for the jury to determine the ultimate
27  question of authenticity.  Defendants have presented no evidence

-7-

28

whatsoever to the court to challenge authenticity.  As such, there
is no basis for even conducting an evidentiary hearing.

## II

## ARGUMENT

A.  Under The Federal Rules The Issue For The Trial Judge Is
    Whether There Is Prima Facie Evidence That The Challenged Item
    Is What It Is Purported To Be.

The Federal Rules of Evidence (FRE) treat authenticity and
identification under  Rule 901 as simply "a special aspect of
relevancy."  Fed. R. of Evid. 901(a) Advisory Committee Notes.
Under FRE 901, the condition of fact to be satisfied is whether
there is sufficient evidence that the item proffered is what the
proponent claims.

The Advisory Committee Notes to FRE 901 state that the
requirement of showing authenticity or identity falls in the
category of "relevancy dependent upon fulfillment of a condition
of fact and is governed by the procedure set forth in Rule 104(b)."

The notes of the Advisory Committee to FRE 104(b)[2/] are
explicit on the procedure to be followed by a trial court:

---

2/  FRE 901(a) provides for the same standard as in FRE 104(b):
      "[t]he requirement of authentication or
      identification as a condition precedent to
      admissibility is satisfied by evidence
      sufficient to support a finding that the matter
      in question is what the proponent claims."

    FRE 104(b) provides:

        "When the relevancy of evidence depends upon
        the fulfillment of a condition of fact, the
        court shall admit it upon, or subject to, the
        introduction of evidence sufficient to support
        a finding of the fulfillment of the condition."

-8-

> The judge makes a preliminary determination
> whether the foundation evidence is sufficient
> to support a finding of fulfillment of the
> condition.  If so, the item is admitted.  If
> after all the evidence on the issue is in, pro
> and con, the jury could reasonably conclude
> that fulfillment of the condition is [not]
> [sic] established, the issue is for them.  If
> the evidence is not such as to allow a finding,
> the judge withdraws the matter from their
> consideration. . . .  The order of proof here,
> as generally, is subject to the control of the
> judge.

The Ninth Circuit liberally permits items challenged on authenticity to be admitted into evidence.  For example in Dawson, Inc. v. NLRB, 586 F.2d 1300, 1302 (9th Cir. 1978), the Court of Appeals found the following:

> The issue for the trial judge under Rule 901 is
> whether there is prima facie evidence,
> circumtantial or direct, that the document is
> what it is purported to be.  If so the document
> is admissible in evidence . . . .  It then
> remains for the trier of facts to make its own
> determination of the authenticity of the
> admitted evidence and the weight which it feels
> the evidence should be given.  [Citations
> omitted].

-9-

1 Citing, <u>United States v. Scully</u>, 546 F.2d 255, 269 (9th Cir.
2 1976), <u>vacated and remanded on other grounds, sub. nom, United
3 States v. Cabral</u>, 430 U.S. 902 (1977) (in narcotics prosecution,
4 defendants objected that tape recordings were improperly
5 authenticated; court found that "a <u>prima facie</u> case that the tapes
6 were what the government said they were made out by proof adduced
7 on the procedures followed."). <u>See also United States v. Turner</u>,
8 528 F.2d 143, 163 (9th Cir. 1975), <u>cert. denied</u>, 423 U.S. 996 and
9 429 U.S. 837 (1975) (in narcotics prosecution, recordings were
10 held admissible; once a <u>prima facie</u> case is established, identity
11 becomes an issue for the trier of fact); and <u>United States v.</u>
12 <u>Sliker</u>, 751 F.2d 477 (2nd Cir. 1984), <u>cert. denied</u>, 105 S.Ct. 1772
13 (1985) (under FRE 104(b), judge listened to tapes and determined,
14 based on his own comparison of voices, that there was sufficient
15 evidence of prior fact to admit the tapes for the jury to hear).

16 More recently, the Ninth Circuit has again held that when
17 proffered evidence is challenged on grounds of authenticity or
18 identity, the evidence will be admitted once the government makes
19 a <u>prima facie</u>[3/] showing of authenticity. <u>United States v.</u>
20 <u>Black</u>, 767 F.2d 1334, 1342 (9th Cir. 1985), <u>cert. denied</u>, 474 U.S.
21 1022 (1986). As stated in <u>Black</u>, the trial judge's decision is

22

23

24 3/ In this context the term <u>prima facie</u> is used to describe the
proponent's burden of producing enough evidence to permit the
25 trier of fact to infer the fact at issue. <u>Texas Department of</u>
<u>Community Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981). <u>See also</u>
26 Black's Law Dictionary, 4th Ed. Rev. (1972 edition), p. 1353,
<u>prima facie</u> evidence is "evidence good and sufficient on its face;
27 such evidence as, in the judgment of the law, is sufficient to
establish a given fact. . . ."
28 -10-

1   simply whether "sufficient proof has been introduced so that a

2   reasonable juror could find in favor of authenticity or

3   identification."[4/]  Black, 765 F.2d at 1342, citing 5 J.

4   Weinstein & M. Berger, Weinstein's Evidence, ¶ 901(a)[01], at

5   901-16 to -17 (1983).  The credibility or probative force of the

6   evidence offered is, ultimately, an issue for the jury.  Black,

7   767 F.2d at 1342.

8   B.   The Trial Court Has Wide Discretion To Admit Recordings Even

9        If Portions Are Unintelligable Or Inaudible

10       The Ninth Circuit has adopted a flexible standard to determine

11  whether a proper foundation is established for the admission of

12  sound recordings.  In United States v. King, 587 F.2d 956, 961

13  (9th Cir. 1978), the court noted that "authenticity and general

14

15  4/  As explained by Professor Weinstein, a preliminary finding of

16  admissibility by the trial court (as are all questions of
    conditional relevance under Rule 104(b)) will subject the evidence

17  to the jury's ultimate determination as to its genuineness.  Id.
    The opposing party may introduce evidence disputing genuineness

18  and argue the point to the jury.  Once the evidence is admitted
    the question becomes one of credibility and probative force and

19  the trier may ultimately disbelieve the proponent's proof and
    entirely disregard or substantially discount the persuasive impact

20  of the evidence admitted.  Id., ¶ 901(a)(01) at 901-16 to-17.

21       According to Weinstein, this approach reflects the Rules
    generally liberal preference for admission of evidence.  Moreover,

22  Rule 901 simply recognizes that where the question is one of
    probative force or credibility -- as it necessarily always is with

23  questions of authenticity and identity -- the jury is as competent
    as the court.  The jury is constituted expressly for the purpose

24  of applying common sense and community mores to disputed issues of
    fact where the principal question is almost always one of

25  credibility.  In Rules 104(b), 602, 901(a) and the second sentence
    of Rule 1008 the court is told to admit where a reasonable juror

26  might find for the proponent on the issue of relevancy.  In
    deciding whether to admit, issues of credibility are decided in

27  favor of the proponent.  5 J. Weinstein & M. Berger, Weinstein's
    Evidence, ¶ 901(a)[02], at 901-22 (1983).

28                                  -11-

1 trustworthiness are the keystones of a proper foundation." The

2 court in King rejected a formalistic approach and observed that

3 "'[t]he foundation which must be laid for the introduction of

4 recordings of conversations -- its nature and extent -- differs

5 widely. It is largely a matter within the good discretion,

6 judicially exercised, of the trial judge.'" Id.

7 The court in King cited with approval language from United

8 States v. Biggins, 551 F.2d 64, 66-67 (5th Cir. 1977), noting that

9 a trial judge's discretion to admit evidence was "not to be

10 sacrificed to a formalistic adherence to the standard we

11 establish." The court further approved of language in Biggins

12 that if there is independent evidence of the accuracy of the tape

13 recordings admitted a trial, "we shall be extremely reluctant to

14 disturb the trial court's decision even though at the time that

15 decision was made the government had not carried its

16 particularized burden of going forward."$\frac{5}{}$ King, 587 F.2d at

17

18 _____
5/ The court in King, 587 F.2d at 961 and in Mouton, 617 F.2d at
19 1384 both state that the "burden is properly on the offering party
-- here the Government -- 'to produce clear and convincing
20 evidence of authenticity and accuracy as a foundation for the
admission of . . . recordings'" Both cases cite the foregoing
21 language from United States v. Knohl, 379 F.2d 427, 440 (2nd Cir.
1966), cert. denied, 389 U.S. 973 (1967).
22
The Knohl case was decided before the adoption of the Federal
23 Rules of Evidence. Accordingly, the "clear and convincing"
standard does not comport with the Federal Rules and later cases
24 that only require that prima facie evidence of authenticity be
produced to admit the evidence. In fact the Eighth Circuit
25 expressly ruled that the standard for the trial court to admit
evidence under FRE 901(a) is not clear and convincing evidence and
26 that the Knohl case should not be followed as to that standard
because it was decided before the Federal Rules. United States v.
27 Gerhart, 538 F.2d 807, 809 and fn. 3 (8th Cir. 1976). (See cases
previously cited, Black, 767 F.2d at 1342, Turner, 528 F.2d at
28
[footnote continued on next page]
-12-

961.  See also United States v. Mouton, 617 F.2d 1379, 1384 (9th Cir. 1980), cert. denied, 449 U.S. 860 (1981) (following King and noting that an evidentiary ruling would not be overturned unless the court is "convinced that the decision constituted an abuse of discretion").

In the Ninth Circuit, it has long been held that a recorded conversation is generally admissible unless the unintelligible portions of the recording are so substantial that the recording as a whole is untrustworthy.  United States v. Lane, 514 F.2d 2d 22, 27 (9th Cir. 1975) (trial judge reviewed transcripts, found some portions were unintelligible and inaudible, nonetheless it was proper to admit the recording).

Even if part of the tape is inaudible or missing, it is admissible if the trial judge believes that it has probative value.  United States v. Hurd, 642 F.2d 1179, 1183 (9th Cir. 1981).  See also Cape v. United States, 283 F.2d 430, 435 (9th Cir. 1960) (partial inaudibility in recorded tapes is no more valid reason for excluding than failure of a personal witness to overhear all of a conversation should exclude testimony as to those parts he did hear).  In United States v. Hurd, 642 F.2d 1179, 1183 (9th Cir. 1981) (discussed more fully below), the court

5/  [footnote continued from previous page]

163, Scully, 546 F.2d at 269, Dawson, Inc., 586 F.2d at 1302, Sliker, 751 F.2d at 477 , and Weinstein, at ¶ 901(a)[01], at 901-16 to – 17.)  Consequently, "clear and convincing" in King and Mouton should be read to mean prima facie.

In any event, the government submits that its evidence regarding authenticity is clear and convincing.
-13-

of appeals affirmed the trial court's admission into evidence of tape recordings that allegedly were tampered and that actually had omissions suggesting erasures.

As discussed by SA Kuykendall, the interrogation tapes are intelligible and the interrogation sequences are logical. (Decl. of J. Kuykendall, ¶ 6). Most of the actual beating and torture of SA Camarena was not recorded. The various pauses appear to be periods during which those beatings occurred. The interrogation tapes are easily understood and there are no serious problems with their being audible or with background noises interfering with understanding the content of the tapes.

C. Evidence May Be Authenticated By Distinctive Characteristics

FRE 901(b)(4) permits for authentication by a showing of distinctive characteristics:

> Distinctive characteristics and the like.
> Appearance, contents, substance, internal
> patterns, or other distinctive characteristics,
> when in conjunction with circumstances.

The distinctive characteristics method of authentication has often been approved in this circuit. For example, in a prosecution for illegal smuggling, the court of appeals found that the contents of "pollo" lists (names of smuggled aliens, sponsors, dates, telephone numbers, dollar figures, and records of payment) supported with testimony outlining smuggling techniques "provided prima facie evidence that they were written by someone involved in the smuggling conspiracy," and were admissible even if the author of the list was unknown. United States v. De Gudino, 722 F.2d

-14-

1351, 1355 (9th Cir. 1983). Furthermore, the court in De Gudino

found that the fact that the lists were seized from the house used

for the headquarters of the operation provided further evidence of

authentication. See also United States v. Gordon, 634 F.2d 639,

643 (9th Cir. 1980) (in prosecution for mail fraud, letters that

on their face appeared to have been generated by defendant and

caused defendant to receive reply letters were sufficiently

distinctive to be admitted under FRE 901(b)(4)); United States

Reyes, 383 F.2d 734 (9th Cir. 1967) (bank robbery hold-up note was

unique and readily identifiable and government under no obligation

to produce as witnesses all persons who handled note); and United

States v. One 56-Foot Motor Yacht Named the Tahuna, 702 F.2d 1276

(9th Cir. 1983) (a diary was properly authenticated under

901(b)(4) because it contained distinctive aliases, records of

meetings, names of crewmen, places passed during the voyage,

including a rendesvous with another ship, indicating the author of

the diary).

Perhaps one of the most instructive cases regarding

authentication by distinctive characteristics is United States v.

Stearns, 550 F.2d 1167 (9th Cir. 1977). In Stearns, the

defendant, convicted of theft, objected that five photographs

introduced against her at trial were not properly authenticated as

to place and time. The photographs were used by the government to

rebut the defendant's story that she and her boyfriend found the

ketch Sea Wind (that she was accused of stealing) abandoned on

Palmyra, an island in the Pacific south of Hawaii. Defendant

claimed that she and her friend had taken the Sea Wind and towed

1  their damaged vessel Iola, but that the Iola had stranded on a
2  reef and sunk just outside the channel entrance to Palmyra.  The
3  photographs were seized from the defendant while she was in jail
4  awaiting trial.  There was no testimony regarding who took the
5  photographs or regarding the technical accuracy of the
6  photographs.  The crucial photograph showed the Iola on the open
7  sea with the rigging of the Sea Wind in the foreground.  The
8  government demonstrated that the Iola originally had been equipped
9  with a red net to prevent defendant's dogs from falling
10 overboard.  In the said photograph, the same red net was now on
11 the Sea Wind.  The government's circumstantial evidence showed
12 that the Sea Wind could not have been equipped with the Iola's red
13 net until its return voyage to Hawaii.  Accordingly, the
14 government argued that defendant's story about the Iola being
15 stranded before it reached the open sea was not true.

16     The court in Stearns held that "[e]ven if direct testimony as
17 to foundational matters is absent, the contents of a photograph
18 itself, together with such other circumstantial or indirect
19 evidence as bears upon the issue, may serve to explain and
20 authenticate a photograph sufficiently to justify its admission
21 into evidence."  550 F.2d at 1171.  The court also held that a
22 photograph could "be used to make inferences bearing on its own
23 foundation."  Id.

24     The interrogation tapes in the instant case actually record
25 the crime in progress.  Consequently, its contents are even more
26 significant than the "pollo" list in De Gudino in which the list
27 was found to present strong evidence of the conspiracy, or the
                                      -16-
28

photographs in <u>Stearns</u>. The interrogation tapes also far exceed the reliability of the photographs found admissible in <u>Stearns</u>. In <u>Stearns</u>, there was a serious issue as to whether the photographs could have been taken prior to the two ships returning to Hawaii from Palmyra, which would have made the photographs entirely irrelevant and inadmissible. With the interrogation tapes, there is no question that the only kidnapping of SA Camarena that ever occurred is the one that is recorded. Further, in <u>De Gudino</u> and in <u>Stearns</u> it was held unimportant that the author and photographer were not available as witnesses. In the same way, it is not significant in this case that the person who actually controlled the recorder is unavailable as a witness. Finally, like the "pollo" list in <u>De Gudino</u> and the photographs in <u>Stearns</u>, the interrogation tapes were found in the possession of one of the defendants, providing an extra element of reliability and trustworthiness as to their authenticity.

D. Authentication May Occur By Voice Identification

FRE 901(b)(5) also permits authentication by means of voice identification and provides as follows:

> Identification of a voice whether heard first-hand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.

In <u>United States v. Thomas</u>, 586 F.2d 123 (9th Cir. 1978), defendant was convicted of narcotics violations and contended that

-17-

a DEA Agent's testimony identifying his voice on certain taped
conversations was improper. The court in Thomas, however,
rejected defendant's contention and relied upon FRE 901(b)(5)
noting that voice identification to determine the admissibility of
recorded conversations could be made by one who had heard the
voice "at any time under circumstances connecting it with the
alleged speaker." Id. at 133. Moreover, the court held that
"[l]ay opinion on this issue is permissible so long as the witness
testifying has the requisite familiarity with the speaker." Id.
In Thomas, the prosecution established prior to the introduction
of the relevant tapes that a particular DEA Agent had conversed
with defendant on three separate occasions. Consequently, the
court found that the said DEA agent could properly testify and
render his lay opinion that defendant was a speaker in the
relevant tapes -- thus satisfying authenticity under FRE 901(b)(5).

In United States v. Turner, 528 F.2d 143, 163 (9th Cir. 1975),
cert. denied, 423 U.S. 996 (1975) and 429 U.S. 837 (1976),
narcotics agents had talked with defendants (in some cases only by
telephone) or had conducted court authorized intercepts. Based
upon their conversations they identified the voices on the tapes
received in evidence as those of defendants. The court held that
such voice identification was proper because a "basis on which to
make a reasonably accurate identification [was] shown." Turner,
528 F.2d at 163.

It is also settled law that voice identification from tape
recordings may be accomplished by direct or circumstantial
evidence. United States v. Basey, 613 F.2d 198, 201 (9th Cir.

-18-

1979), cert. denied, 446 U.S. 919 (1980) (along with a DEA agent's identification of defendant's voice from recorded conversations, circumstantial evidence regarding defendant's nickname and telephone register information established defendant's identity). See also Turner, 528 F.2d at 163, (once a prima facie case of voice authorship is established, the identity of the particular speaker is an issue of fact for the jury and may be established by circumstantial evidence, alone).

### III

### THE GOVERNMENT HAS MET THE BURDEN

### OF AUTHENTICATING THE TAPES

A.    The Contents Of The Interrogation Tapes Establish Authenticity

In the case at hand, the contents and distinctive characteristics of the interrogation tapes provide for self authentication under FRE 901(b)(4). The evidence at trial will show that SA Camarena was kidnapped on February 7, 1985. Forensics evidence will show that SA Camarena was present at the residence at 881 Lope de Vega (El Sol #2492, Jardines Del Bosque). Testimony by SA Kuykendall establishes that SA Camarena was never subjected to a kidnapping and interrogation before February 7, 1985 and also establishes that SA Camarena was never present at the said residence prior to February 7, 1985. Evidence will also show that SA Camarena was probably dead on or before February 9, 1985. Those facts support the inference that SA Camarena was interrogated, beaten and tortured at that residence after his kidnapping.

-19-

1  Several DEA special agents identify the victim's voice on the
2  interrogation tapes as that of SA Camarena.  SA Camarena himself
3  indicates on the interrogation tapes that he had suffered several
4  severe beatings at the hands of the individuals who are
5  interrogating him.  It is clear from those interrogation tapes
6  that SA Camarena is in great pain and agony.  Also, as discussed
7  in the section below, SA Camarena provided information that only
8  he or perhaps other agents in the DEA office in Guadalajara would
9  know.

10  The contents of the interrogation tapes when taken in
11  conjunction with the circumstantial evidence of the kidnapping and
12  the voice identification (also discussed below) constitute
13  evidence far in excess of the prima facie requirement for
14  admissibility of the tapes.  To demonstrate to the court how the
15  contents of the interrogation tapes are self authenticating, the
16  government discusses herein several incidents and details provided
17  by SA Camarena in the interrogation tapes.

18  1.  First Cassette (Copia 2)

19  Copia 2 has approximately thirty (30) minutes of SA Camarena
20  being interrogated.  The tape begins with SA Camarena describing
21  how to arrive at a house that he believes to be owned by defendant
22  Ernesto Fonseca-Carrillo.

23  SA James Kuykendall (SA Camarena's Supervisor in Guadalajara)
24  describes in his declaration that those directions are given from
25  the point of reference of the house at 881 Lope de Vega (El Sol
26  #2492, Jardines Del Bosque) in Guadalajara.  SA Kuykendall states
27  that he drove the route described by SA Camarena on the first page
28
-20-

of Copia 2 and came upon the house that SA Camarena described.   SA
Kuykendall confirms in his declaration that the said house was
indeed a house that he and his fellow agents believed belonged to
defendant Ernesto Fonseca-Carrillo.

Significantly, the directions given by SA Camarena also
indicate that he knew where in Guadalajara he was being held.   SA
Kuykendall explains in his declaration that if SA Camarena had
been in another part of Guadalajara, the directions he gave would
not have made sense or led to the particular house.   Unless he was
at or near the house at 881 Lope de Vega, the number of traffic
lights as well as the particular major street (Mariano Otero)
would not have been appropriate or meaningful.   (Decl. of J.
Kuykendall, ¶9).   The government submits that those directions in
and of themselves are probative of the cassettes being what the
government purports them to be.   They indicate that SA Camarena
knew where he had been taken.

There are many other items of information provided by SA
Camarena to his captors that further authenticate the
interrogation tapes.   They include:

a.   On the second page (2265), line 24, SA Camarena
referred to the beating that he had just received.   On the same
page, line 28, SA Camarena pleaded for his family.   On page 3
(2266), line 40, SA Camarena referred to "Mr. Kuykendall" (his
supervisor) and stated that the Municipal President was a friend
of SA Kuykendall.   SA Kuykendall explains that he was referring to
the Mayor of Santa Anita Village who was indeed SA Kuykendall's
friend.   That information would not have been known or been an

-21-

1 | item commonly known by those who were not close associates of SA
2 | Kuykendall.  (Decl. of J. Kuykendall, ¶10a).

3 |        b.   On page 4 (2267), lines 50-63, SA Camarena explained
4 | that one of the new DEA special agents Victor Wallace lived at the
5 | golf course community of Santa Anita.  SA Camarena described SA
6 | Wallace's home and how to reach it.  Except for DEA members and
7 | perhaps a few close friends, that information would not have been
8 | known.  (Decl. of J. Kuykendall, ¶10b).

9 |        c.   On page 6 (2269), lines 90-92, SA Camarena revealed
10 | that an individual named Jesus Alvarez provided information that
11 | someone named Samuel had "shot up" an agent's car.  As explained
12 | by SA Kuykendall, the Jesus Alvarez was a DEA informant.  No one
13 | outside of the DEA agents in Guadalajara knew that he had provided
14 | information to DEA.  (Decl. of J. Kuykendall, ¶10c).  Further, the
15 | information regarding an agent's car being shot up referred to an
16 | actual incident in which Guadalajara DEA SA Roger Knapp's car was
17 | shot full of bullets a few months prior to SA Camarena kidnapping.

18 |        d.   On page 9-10 (2272-73), the interrogator pressed SA
19 | Camarena for information regarding any individuals whom he knew to
20 | be associates of "Rafael" (defendant Caro-Quintero).  SA Camarena
21 | then mentioned defendant Rene Verdugo as a person who smuggles
22 | marijuana for Caro-Quintero in Mexicali.  (p. 10 (2273), ln.
23 | 155).  SA Camarena explained that he knew of Verdugo from reports
24 | sent from Calexico.  (ln. 168).  SA Kuykendall states in his
25 | declaration that reports from Calexico were indeed their source of
26 | information about Rene Verdugo.  (Decl. of J. Kuykendall, ¶10d).

27 |
28 |

-22-

e.    On page 11-12 (2274-75), SA Camarena described a Japanese restaurant named "Isao" that he believed defendant Ernesto Fonsenca-Carrillo owned with an individual named Manuel Salcido.  That information comported with the intelligence that DEA possessed.  (Decl. of J. Kuykendall, ¶10e).

f.    On page 15 (2278), line 238, SA Camarena described an incident regarding DEA SAs Rogelio Knapp and Miguel Acuna. Again, that incident would only have been known to DEA agents. (Decl. of J. Kuykendall, ¶10f).

g.    On Page 16 (2281), lines 282-284, the interrogator again tells SA Camarena that "no one will hit you now" and that no one will pursue the persons that SA Camarena mentions.

2.    Second Cassette (Copia 4).

a.    On the first page of the second cassette, (2284), SA Camarena revealed a DEA confidential informant named Jesus Ramirez.  As stated by SA Kuykendall "Jesus Ramirez" was a code name for that informant.  No one outside DEA Guadalajara knew him by that name.  The information provided by SA Camarena as to where another individual named Javier Barba (pp. 1-2 (2284-85, lns 7-35) lived was accurate and in conformance with the information maintained by DEA in Guadalajara.  (Decl. of J. Kuykendall, ¶11a).

b.    On page 3 (2286), lines 44-54, SA Camarena revealed that a cooperating witness, a lawyer named Garciabueno provided information regarding Javier Barba, a suspected narcotics trafficker.  SA Camarena described a true incident in which Mr. Garciabueno was shot several times by another lawyer because Mr. Garciabueno was discovered to be cooperating with DEA.  (See

-23-

Decl. of Garciabueno, ¶11b). Mr. Garciabueno was taken to the Scripps Hospital in La Jolla, California for care. (p. 6(2289), lns 113-118). He in fact survived the shooting and is now a paraplegic. (See Decl. of Kuykendall, ¶11b). Mr. Garciabueno's whereabouts were highly confidential DEA information at the time and would not have been known other than to certain members of DEA.

c.  On page 7(2290), line 124, SA Camarena stated that the business of "Rafael" (Caro-Quintero) was handled by the Hermosillo office of DEA. That is also an accurate statement with respect to an incident in which acres of marijuana were eradicated. Only a DEA agent would know about the responsible office. (Decl. of J. Kuykendall, ¶11c).

d.  On the same page, lines 126-128, SA Camarena revealed that DEA did not have any photographs of either defendants Rafael Caro-Quintero or of Ernesto Fonseca-Carrillo. That was also an accurate statement that would not have been known except by DEA agents in Guadalajara. (Decl. of J. Kuykendall, ¶11d).

e.  On pages 9-10 (2292-93), SA Camarena provided the information possessed by DEA regarding the sister of defendant Rafael Caro-Quintero, including the boutique that she owned and where her mother lived. (See Decl. of James Kuykendall, ¶11e)

f.  On page 10 (2293), line 194, SA Camarena stated to his captors, "with the beating you have given me. . . Do you think that I am going to lie to you?"

g.  On p. 13-14 (2296-97), SA Camarena explained to his captors that DEA special agents in Mexico were not permitted to

-24-

pursue actively investigations or to carry firearms. That information was also not widely known. On p. 14 (2297), line 269, SA Camarena also added that Washington (headquarters) was unhappy with the results being obtained from Guadalajara. That information was true and would not and have been known to individuals outside of DEA. (Decl. of J. Kuykendall, ¶11g).

h. On p. 16 (2299), line 312, SA Camarena provided more DEA intelligence by stating that defendant Ernesto Fonseca-Carrillo owned a hotel called the "Venus" and described its location. On the same page, ln 312, SA Camarena also provided DEA intelligence that defendant Rafael Caro-Quintero had purchased a particular Ford dealership. Again, those details coincided with the information possessed by DEA at that time. (Decl. of J. Kuykendall, ¶11h).

i. On page 18-19 (2301-02), line 351-381, SA Camarena stated that his supervisor "James" (SA Kuykendall) was a friend in the previous owner or the Hotel Venus -- Mr. Ontiveros or Oliveros. SA Camarena explained that the previous owner had sold the Venus Hotel to defendant Fonseca-Carrillo. Again, that Mr. Oliveros was a friend of SA Kuykendall was not an item that would be known outside of the Guadalajara DEA office. (Decl. of J. Kuykendall, ¶11i)

j. On page 28 (2311) line 561, SA Camarena told his kidnappers that on the 25th of February moving people were "coming to pack my things, over at the house." SA Camarena did in fact have that appointment with a company to pack his family's possessions to move to the United States, (Decl. of J. Kuykendall, ¶11j).

-25-

k. On page 29 (2312), line 593, SA Camarena screamed in pain and asked that his ribs be bandaged. His request was ignored.

l. On p. 33-4 (lns 673-675), SA Camarena explained the areas of concentration of the Guadalajara DEA office. He explained that there were only four (4) agents and one from New York and that two of the agents flew airplanes everyday to see if they could find plantations (of marihuana). He explained that Agent Wallace was investigating Miguel Angel Felix Gallardo (another suspected kingpin) and that he (SA Camarena) was making preparations to leave Guadalajara. All of those details were an accurate description of the DEA's activities. The fact that SA Camarena was being transferred from Guadalajara was a fact that would only be known to his fellow workers. (Decl. of J. Kuykendall, ¶111).

m. On p. 37 (2320), line 735, SA Camarena mentioned that his pay check had not been deposited in his account. As a result, he wrote a number of checks that were not covered by sufficient funds and bounced. That was in fact true, and was caused by a processing error on the part of the payroll section of DEA. Again, that was another personal item of information that would only have been known by fellow DEA workers. (Decl. of J. Kuykendall, ¶11m).

The foregoing incidents are examples that demonstrate the uniqueness of the information provided in the interrogation tapes by the victim SA Camarena. As stated by SA Kuykendall, the information provided by SA Camarena as a result of brutal beatings was confidential DEA information that SA Camarena actually

-26-

possessed at that time. It was information that was available only to SA Camarena and perhaps to a few of the other agents in his office. SA Kuykendall also recognizes the voice of SA Camarena. With the information that SA Camarena provided and the identification of his voice, as well as the questions asked by his captors, SA Kuykendall concludes without any doubt whatsoever that the tapes are recordings of a portion of the interrogation of SA Camarena by his kidnappers. The government submits that the content of the interrogation tapes in conjunction with the voice identifications easily constitute the prima facie evidence of authentication necessary for the interrogation tapes to be admitted into evidence.

B. The Voice Indentifications Also Establishes Authentication

In the case at hand, DEA SAs Kuykendall, Castillo, Stinson, and Gonzalez, state in their declarations that they conversed with SA Camarena hundreds of times. Consequently, they identify his voice on the interrogation tapes as the victim. (See their Declarations).

SAs Castillo and Stinson state that they attended the interrogations by Mexican police officials of defendants Rafael Caro-Quintero and of Sergio Espino-Verdin. Consequently, they can identify the voices of defendants Caro-Quintero and Expino-Verdin as the interrogators in particular portions of the interrogation of SA Camarena.

The identification of the voices of defendant Rafael Caro-Quintero and Sergio Espino-Verdin as two of the interrogators also establishes the authenticity of the interrogation tapes. As

-27-

explained by SA Kuykendall, defendant Caro-Quintero was one of the kingpins of a large drug empire and many of the questions concerned what SA Camarena knew about Caro-Quintero. Defendant Espino-Verdin was a Mexican Federal Commandante known to work for Caro-Quintero.

IV

### THERE IS A PRESUMPTION OF REGULARITY

### WHEN EXHIBITS ARE HANDLED BY PUBLIC OFFICIALS

On April 8, 1985, defendant Ernesto Fonseca-Carrillo was arrested in one of his homes by local police in Puerto Vallarta, Mexico. The interrogation tapes were found in that residence by the police. (See Decl. of Joseph Gonzalez, ¶3). The tapes remained in constant Mexican government custody and were ultimately delivered to the Mexican Attorney General's Office. It was at that point that Deputy Attorney General Jose Maria Ortega-Padilla and his staff took custody and control of the tapes. The Deputy Attorney General thereafter ordered that copies of the tapes be made. On August 27, 1985, those copies were turned over to the DEA. (See Declarations of Joseph Gonzalez and Walter White). The interrogation tapes have been in constant United States government custody since that time. No alterations of any type have been made to the interrogation tapes by the United States government.

On March 28, 1988, Deputy Attorney General of Mexico Ortega-Padilla also informed American officials that the tapes (of which copies were made and given to DEA) had not been edited by Mexican authorities to conceal any portion of the Camarena interrogation. (See Decl. of Joseph Gonzalez, ¶5).

-28-

On March 28, 1988, Deputy Mexican Attorney General Ortega-Padilla also explained that the original interrogation tapes had been lost or accidently destroyed as a result of the massive earthquake that struck Mexico City in September, 1986. The original tapes were stored in a particular office building that was severely damaged.  In the huge clean-up process that followed, the original tapes were lost -- probably accidently thrown away by clean-up crews.  Consequently the originals of the interrogation tapes no longer exist.  (See Decl. of Joseph Gonzalez, ¶4).

In <u>United States of America v. Benedict</u>, 647 F.2d 928, 931 (9th Cir. 1981), <u>cert</u>. <u>denied</u>, 454 U.S. 1087 (1982), the Ninth Circuit approved of the use of secondary evidence (oral testimony, photographs, and photocopies) by the government because the Thai authorities refused to release physical evidence for use in the United States.

FRE 1004 states in relevant part as follows:

Admissibility of Other Evidence of Contents
The original is not required, and other
evidence of the contents of a writing,
recording, or photograph is admissible if--
(1)  Originals lost or destroyed.  All
originals are lost or have been destroyed,
unless the proponent lost or destroyed them in
bad faith[.]

As explained by one court, once an enumerated condition of Rule 1004 is met, the proponent may prove the contents of a

-29-

writing (or recording as in the instant case) by any secondary
evidence, subject to an attack by the opposing party not to its
admissibility but to the weight to be given the evidence, with
final determination left to the trier of fact.  United States v.
Gerhart, 538 F.2d 807, 809 (8th Cir. 1976), citing 5 J. Weinstein
Evidence, ¶ 1004 [01], at 1004-4--1004-5 (1975).  See also  Debose
v. United States Department of Agriculture, 700 F.2d 1262, 1268
(9th Cir. 1983)  (because of inadvertent destruction of original
entries on field sheets, testimony about original entries
permitted under FRE 1004).

    Similarly, in United States v. Biggins, 551 F.2d 64, 66-67
(5th Cir. 1977), the court approved the admission into evidence of
a re-recording (copy) of an original tape recording, even though,
the person who did the re-recording did not testify and no
testimony was presented that the re-recording was done
accurately.  The court found that external circumstantial evidence
was sufficient to admit the copy of the tape.

                                V

            ANY GAPS IN THE CHAIN OF EVIDENCE GO TO THE WEIGHT TO BE
            GIVEN THE EVIDENCE NOT TO ITS ADMISSIBILITY AND
            AFFIRMATIVE EVIDENCE OF TAMPERING MUST BE MADE TO RAISE
            THE POSSIBILITY OF EXCLUSION

    In the case at bar, the government has established a complete
chain of custody through the declarations of SAs Gonzalez, White

                              -30-

and Taylor.[6/] However, even if the chain of evidence is attacked, that is not a sufficient reason to keep the evidence from being admitted to the jury. Again, the Ninth Circuit's holdings in this area have long been very clear. In Gallego v. United States, 276 F.2d 914, 917 (9th Cir. 1969), the court noted that there is "no rule requiring the prosecution to produce as witnesses all persons who were in a position to come into contact with the article sought to be introduced in evidence".

The court in Gallego also noted that a trial judge, if satisfied that in "reasonable probability the article had not been changed in important respects" could permit its introduction in evidence. Id.[7/] The court further analyzed the situation by noting that a jury would be free to disregard such evidence if it determined the article was not properly identified or that there had been a change in its nature. Id.[8/] The court in Gallego

---

6/ It is clear that the court can accept the evidence proferred by the government. "For the technical rules of evidence are inapplicable to a hearing before the trial judge on the preliminary legal question of the admissibility of evidence." United States v. Haldeman, 559 F.2d 31, 107 (D.C. Cir. 1976). In Haldeman, the court held that the court could look to hearsay evidence to establish that President Nixon authorized the recording of conversations at issue. See also United States v. Bourjaily, 107 S. Ct. 2775, 2781, fn. 2 (1987) (in determining whether co-conspirator statements admissible, the trial court in making a preliminary factual determination may examine hearsay; in deciding preliminary questions of admissibility, a trial court is not bound by the rules of evidence except with respect to privileges, citing FRE 104 and 1101(d)(1)).

7/ See also United States v. Haldeman, 559 F.2d 31, 107 (D.C. Cir. 1976) (the possibility of adulteration need not be eliminated absolutely, but only as a reasonable probability).

8/ It is settled that alleged gaps in the chain of custody go to the weight of the evidence rather than to admissibility. United States v. Jefferson, 714 F.2d 689, 696 (7th Cir. 1983); United States v. White, 569 F.2d 263, 266 (5th Cir. 1978).

also held that a trial court's decision to admit an item into evidence could not be overturned except for "clear abuse of discretion." Id.

In this circuit, the court of appeals has found that a recording may be admitted into evidence even if it is not identified by the person who actually made the recording. Stubbs v. United States, 428 F.2d 885, 888 (9th Cir. 1970). In Stubbs, the court held that the admission of audiograph sound recording of defendant's appearance before a zoning commission was proper even though no testimony by the person responsible for the recording was offered. The court in that case found a sufficient basis for admitting the recording that the trial judge was satisfied that the location, approximate date, and principal speakers had been identified, and that the recording as a whole was accurate and sufficiently complete. Id. Those circumstances support a admission of the interrogation tapes in the case herein. See also United States v. Bright, 630 F.2d 804 (5th Cir. 1980) (where cooperating witness who made tape recording was dead at time of trial, it was enough that circumstantial evidence showed the accuracy of the tape for purposes of admitting it into evidence).

In another case in our circuit, United States v. Weiner, 578 F.2d 757 (9th Cir. 1978), cert. denied, 439 U.S. 981 (1978) and 439 U.S. 1135 (1978), the court found no error in the trial judge admitting audit work papers pertaining to several years even though the chain of custody for them was incomplete and even though the work papers themselves were incomplete. The court found that there was sufficient testimony from witnesses who knew

-32-

the workpapers or provided other evidence of authentication. In the same way, in the instant case any arguments regarding the chain of custody of the interrogation tapes or their completeness (i.e., that other portions of the interrogation were not recorded) do not keep the tapes from being admitted if they are otherwise more probative than not. Hurd, 642 F.2d at 1183.

In United States v. Coades, 549 F.2d 1303, 1306 (9th Cir. 1977), defendant argued that the lower court erred in admitting into evidence a microscopic piece of glass found in his leather jacket, since the chain of custody of the jacket was not sufficiently established to insure that the glass was not inadvertently introduced by someone handling the jacket subsequent to the crime. That argument is essentially what defendant Verdugo presents: that in the handling of the challenged tapes someone may have tampered with them.

In dealing with this issue, the court in Coades first noted that "[t]here is a presumption of regularity in the handling of exhibits by public officials." Id.[9/] The court then found that:

> A mere showing that an opportunity existed for
> unlawful tampering with the evidence is
> insufficient to justify exclusion; affirmative
> evidence of bad faith or actual tampering is
> required.

9/ See also People of the Territory of Guam v. Ojeda, 758 F.2d 403, 408 (9th Cir. 1985) (there is a presumption of regularity in the handling of exhibits by public officials)

-33-

1  Coades, 549 F.2d at 1306. See also United States v. De La Rosa,

2  450 F.2d 1057, 1069 (3rd Cir. 1971), cert. denied, 405 U.S. 957

3  (1972) (once government presents prima facie case, it is incumbent

4  upon defendants to come forward with evidence of tampering).

5  In the case at bar, defendants have presented no evidence to

6  the court that the challenged tape recordings have actually been

7  altered or tampered. As in Coades all that defendants present is

8  the possibility of tampering. No declaration by any expert was

9  ever submitted. Defendants, therefore, are unable to raise any

10  issue regarding tampering. As stated in the declaration of F.B.I.

11  Agent Bruce Koenig, the noises and clicks that defendant

12  Verdugo-Urquidez speculates indicate tampering more likely than

13  not have innocent explanations. Without any affirmative evidence

14  of tampering, the presumption of regularity in the handling of

15  exhibits by public officials, both Mexican and American, applies.

16                                    VI

17                    IN THIS CIRCUIT, TAPE RECORDINGS

18                    HAVE BEEN ADMITTED IN CIRCUMSTANCES

19                      SIMILAR TO THE ONE AT HAND

20  In this circuit, the admission of tape recordings over

21  allegations of tampering have been approved. For example, in

22  United States v. Hurd, 642 F.2d 1179, 1183 (9th Cir. 1981), in a

23  prosecution for illegal possession of firearms, defendant alleged

24  that tape recordings sought to be admitted by the government had

25  been tampered. In fact, the tapes in Hurd contained certain

26  omissions that suggested erasure. The defendant claimed that the

27  tapes must have been altered because the tapes did not reveal a

                                  -34-

28

statement the defendant claimed he had made that would have been exculpatory. The trial judge, found that the tapes had not been altered. The trial court relied exclusively upon the testimony of government agents who handled the tapes who testified that there was no tampering. The trial court even refused to have the tapes examined by an expert.

The court of appeals in Hurd acknowledged the law of the circuit that such a finding would be reversed "only if clearly erroneous." Hurd, 642 F.2d at 1183. Accordingly, the court held that it could not "[s]ay that the district court erred in discounting defendants' allegation of tampering and the finding that there was no tampering is not clearly erroneous." Id.

In the case at hand, defendants cannot even point to a particular problem with the interrogation tapes. Defendants have placed no evidence before the court of any tampering or alteration. As in Hurd, this court has before it the testimony of government agents that the tapes have not been altered while either in Mexican or United States government custody.

Moreover, there is no logical basis for any defendant to claim that any possible tampering was relevant to him. As in Hurd, because of the obvious validity and clear meaning of the interrogation tapes, there is not even a requirement for expert examination.

## VI

## CONCLUSION

For the foregoing reasons, it is respectfully requested that the court find that defendants present no basis for an evidentiary

-35-

1  hearing challenging authenticity and that the interrogation tapes
2  are admissible under Federal Rules of Evid. 901(a), 901(b)(4) and
3  901(b)(5).
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT Y**

## DECLARATIONS OF

1.    James H. Kuykendall

2.    Robert Castillo

3.    Dale Stinson

4.    Bruce E. Koenig

5.    Joseph Gonzalez

6.    Walter White

7.    Jack Taylor

1

## DECLARATION OF JAMES H. KUYKENDALL

2

I, JAMES H. KUYKENDALL, declare as follows:

3

1. I am a special agent ("SA") with the Drug Enforcement

4

Administration ("DEA"). I have been a DEA special agent since the

5

establishment of DEA in 1973. Prior to that time, I was a United

6

States Customs agent for seven years, concentrating primarily upon

7

drug enforcement. I am currently the Resident Agent in Charge

8

("RAC") of the DEA office in Laredo, Texas.

9

2. I served as the RAC for the Guadalajara DEA office from

10

February 15, 1982 until September 30, 1985. I was SA Enrique

11

("Kiki") Camarena's direct supervisor and knew him well. I

12

probably engaged in hundreds of conversations with SA Camarena.

13

On February 7, 1985, I was at our DEA office at the American

14

Consulate. I remember Kiki left at approximately 1:15 - 2:00 p.m.

15

and stated to the secretaries that if his wife called to tell her

16

that he was on his way to meet her for lunch. Kiki did not return

17

that afternoon to our offices. Since Kiki was scheduled to be

18

transferred from Guadalajara to the United States in the next two

19

- three weeks, I assumed that he was taking care of personal

20

matters. On the morning of February 8, 1985, I received a

21

telephone call from SA Victor Wallace. He told me that Kiki's

22

wife had called him to say that Kiki had not returned home that

23

night. I went to the DEA offices and began making inquiries,

24

including notifying my DEA supervisor in Mexico City, Walter

25

White. I also learned later, from his family that Mr. Alfredo

26

Zavala-Avelar had disappeared the previous day. Mr. Zavala-Avelar

27

28

1  was a pilot and a cooperating individual. He had worked
2  extensively with Kiki on several investigations. I eventually
3  notified the local authorities that SA Camarena was missing and
4  that we suspected foul play. We never found Kiki.

5   3.   On March 5, 1985, two bodies were found in a rural area
6  outside of Mexico. Eventually, through fingerprints and through
7  other physical means we were able to identify one of the bodies as
8  that of Kiki Camarena. The other body was later identified as
9  that of Alfredo Zavala-Avelar. Kiki Camarena's body showed that
10 he had been severely beaten. There was a large hole in his
11 skull. It appeared as though someone had driven a pipe into and
12 out of his head. The body of Alfredo Zavala-Avelar was also badly
13 beaten. Both had been tied and gagged.

14  4.   After Kiki Camarena's death, forensics evidence was
15 gathered that indicates that SA Camarena was present at a large
16 estate home with the dual address of 881 Lope de Vega (El Sol
17 #2492, Jardines Del Bosque). To my knowledge SA Camarena never
18 went to that residence prior to February 7, 1985. There was no
19 DEA business that Kiki conducted there nor is there any report
20 that indicates that Kiki ever went to that residence prior to
21 February 7, 1985. There is also no other instance before February
22 7, 1985, in which Kiki Camarena was subjected to a kidnapping and
23 interrogation against his will.

24  5.   I have listened several times to the tape recordings in
25 which SA Camarena is interrogated by his captors. There are two
26
27
28

1  cassettes: Copia 2 having thirty minutes of interrogation on one
2  side and Copia 4 having approximately thirty minutes of
3  interrogation on each side ("the interrogation tapes"). There is
4  absolutely no doubt in my mind that the voice of the victim on the
5  tapes is that of Kiki Camarena. After listening to the
6  interrogation tapes and studying the content of Kiki's responses,
7  there is also no doubt in my mind that the tapes are a recording
8  of a portion of the interrogation of SA Camarena that occurred
9  immediately after his kidnapping on February 7, 1985.

10  6.  The interrogation tapes are intelligible and can be
11  understood without great difficulty. They are in Spanish and I
12  speak Spanish fluently. The interrogation sequence on both copia
13  2 and copia 4 are logical and the questions and answers follow in
14  a normal and predictable pattern throughout the interrogation
15  tapes. There are two or three instances where the interrogation
16  sequence stops and a new sequence begins. I have extensive
17  knowledge of drug traffickers' interrogation and torture
18  techniques in Mexico. It appears to me that the stops and pauses
19  in the tapes were probably when Kiki was beaten to force him to
20  give more information. There are also voices and noises in the
21  background of the tape that lead me to conclude that others were
22  listening while the interrogation was being conducted.

23  7.  There are several people who interrogated SA Camarena.
24  SAs Castillo and Stinson recognize two of the interrogators as
25  drug kingpin Rafael Caro-Quintero and Comandante Sergio
26  Espino-Verdin. We had information that Comandante Espino-Verdin
27  had a working relationship with Caro-Quintero and
28

1  Fonseca-Carrillo. From the questions asked of SA Camarena on the
2  interrogation tapes, it is clear that the captors wished to know
3  what SA Camarena and DEA knew of the drug trafficking activities
4  of Rafael Caro-Quintero and Ernesto Fonseca-Carrillo. They are
5  mentioned several times as "Rafael Caro Quintero" and "Ernesto
6  Fonseca" and as "Rafael" and as "Ernesto." In Mexico, the second
7  last name is usually not used in conversational settings. The
8  questions of Kiki Camarena are persistent regarding what
9  associates he knew of Caro-Quintero and Fonseca-Carrillo and what
10 DEA knew of their houses and businesses.

11 8. There are many examples on the interrogation tapes of
12 information that Kiki Camarena provided that was either personal
13 to him or confidential DEA information.

14 9. For example in page 1 (2264) of copia 2, Kiki Camarena
15 gave directions to his interrogator of how to arrive at a house
16 belonging to Ernesto Fonseca. Those directions are given from the
17 point of reference of the house at 881 Lope de Vega (El Sol #2492,
18 Jardines Del Bosque) in Guadalajara. I actually drove the route
19 described by SA Camarena on the first page of Copia 2 and came
20 upon the house that SA Camarena described. That particular house
21 was indeed a house that I and the other DEA agents in Guadalajara
22 believed belonged to defendant Ernesto Fonseca-Carrillo.

23 The directions given by SA Camarena also indicate that he knew
24 where in Guadalajara he was being held. If SA Camarena had been
25 in another part of Guadalajara, the directions he gave would not
26
27
28

1 | have made sense or led to the particular house. Unless he was at
2 | or near the house at 881 Lope de Vega, the number of traffic
3 | lights as well as the particular major street (Mariano Otero)
4 | would not have been appropriate or meaningful.

5 |     10. There are many other items of information provided by SA
6 | Camarena to his captors that further indicate that the victim on
7 | the interrogation tapes is Kiki Camarena. They include:

8 |     a. On the second page (2265), line 24, SA Camarena
9 | referred to the beating that he had just received. On the same
10 | page, line 28, SA Camarena pleaded for his family. On page 3
11 | (2266), line 40, SA Camarena referred to "Mr. Kuykendall" (me) and
12 | stated that the Municipal President was my friend. He was
13 | referring to the mayor of the Santa Anita village, who was my
14 | personal friend. That information would not have been known or
15 | been an item commonly known by those who were not close associates
16 | of mine.

17 |     b. On page 4 (2267), lines 50-63, SA Camarena explained
18 | that one of the new DEA special agents Victor Wallace lived at the
19 | golf course community of Santa Anita. SA Camarena described SA
20 | Wallace's home and how to reach it. That would not have been
21 | information possessed by people outside the DEA.

22 |     c. On page 6 (2269), lines 90-92, SA Camarena revealed
23 | that an individual named Jesus Alvarez provided information that
24 | someone named Samuel had "shot up" an agent's car. Jesus Alvarez
25 | was a DEA informant. No one outside of the DEA agents in
26 | Guadalajara knew that he had provided us information. Further,

27

28

1 the information regarding an agent's car being shot up referred to
2 an actual incident in which Guadalajara DEA SA Roger Knapp's car
3 was shot full of bullets a few months prior to SA Camarenas
4 kidnapping.

5      d.   On page 9-10 (2272-73), the interrogator pressed SA
6 Camarena for information regarding any individuals whom he knew to
7 be associates of "Rafael" (defendant Caro-Quintero). SA Camarena
8 then mentioned defendant Rene Verdugo as a person who smuggles
9 marijuana for Caro-Quintero in Mexicali. (p. 10 (2273), ln.
10 155). SA Camarena explained that he knew of Verdugo from reports
11 sent from Calexico. (ln. 168). Reports from Calexico were indeed
12 our source of information about Rene Verdugo.

13      e.   On page 11-12 (2274-75), SA Camarena described a
14 Japanese restaurant named "Isao" that he believed defendant
15 Ernesto Fonsenca-Carrillo owned with an individual named Manuel
16 Salcido. That information coincided with the intelligence that
17 DEA possessed.

18      f.   On page 15 (2278), line 238, SA Camarena described
19 an incident regarding DEA SAs Rogelio Knapp and Miguel Acuna.
20 Again, that incident would only have been known to DEA agents.

21      g.   On Page 16 (2281), lines 282-284, the interrogator
22 told SA Camarena that "no one will hit you now" and that no one
23 will pursue the persons that SA Camarena mentions.

24    11.   There are also many similar instances on the second
25 cassette (Copia 4).

26
27
28

1           a.   On the first page of the second cassette, (2284), SA

2    Camarena revealed a DEA confidential informant named Jesus

3    Ramirez.  Jesus Ramirez was a code name for that informant.  No

4    one outside DEA Guadalajara knew him by that name.  The

5    information provided by SA Camarena as to where another individual

6    named Javier Barba (pp. 1-2 (2284-85, lns 7-35) lived was accurate

7    and in conformance with the information maintained by DEA in

8    Guadalajara.

9           b.   On page 3 (2286), lines 44-54, SA Camarena revealed

10   that a cooperating witness, a lawyer named Garciabueno provided

11   information regarding Javier Barba, who was a suspected drug

12   trafficker.  SA Camarena described a true incident in which Mr.

13   Garciabueno was shot several times by another lawyer, who told

14   him, as he shot him, that it was because he was an informant.  Mr.

15   Garciabueno was taken to the Scripps Hospital in La Jolla,

16   California for care.  (p. 6(2289), lns 113-118).  He in fact

17   survived the shooting and is now a paraplegic.  Mr. Garciabueno's

18   whereabouts were highly confidential DEA information at the time

19   and would not have been known other than to certain members of DEA.

20          c.   On page 7(2290), line 124, SA Camarena stated that

21   the business of "Rafael" (Caro-Quintero) was handled by the

22   Hermosillo office of DEA.  That is also an accurate statement

23   with respect to a Chihuaha incident in which acres of marijuana

24   were eradicated.  Only a DEA agent would know about the

25   responsible office.

26          d.   On the same page, lines 126-128, SA Camarena

27   revealed that DEA did not have any photographs of either

28

1  defendants Rafael Caro-Quintero or of Ernesto Fonseca-Carrillo.
2  That was also an accurate statement that would not have been known
3  except by DEA agents in Guadalajara.

4      e.   On pages 9-10 (2292-93), SA Camarena provided the
5  information possessed by DEA regarding the sister of defendant
6  Rafael Caro-Quintero, including the boutique that she owned and
7  where her mother lived.

8      f.   On page 10 (2293), line 194, SA Camarena stated to
9  his captors, "with the beating you have given me. . .  Do you
10 think that I am going to lie to you?"

11     g.   On p. 13-14 (2296-97), SA Camarena explained to his
12 captors that DEA special agents in Mexico were not permitted to
13 pursue actively investigations or to carry firearms.  That
14 information was also not widely known.  On p. 14 (2297), line 269,
15 SA Camarena also added that Washington (headquarters) was unhappy
16 with the results being obtained from Guadalajara.  That
17 information was true and would not have been known to individuals
18 outside of DEA.

19     h.   On p. 16 (2299), line 312, SA Camarena provided more
20 DEA intelligence by stating that defendant Ernesto
21 Fonseca-Carrillo owned a hotel called the "Venus" and described
22 its location.  On the same page, ln 312, SA Camarena also provided
23 DEA intelligence that defendant Rafael Caro-Quintero had purchased
24 a particular Ford dealership.  Again, those details coincided with
25 the information possessed by DEA at that time.

26
27
28

1    i.    On page 18-19 (2301-02), line 351-381, SA Camarena
2    stated that his supervisor "James" (me) was a friend of the
3    previous owner or the Hotel Venus -- Mr. Ontiveros or Oliveros.
4    Kiki Camarena explained that the previous owner had sold the Venus
5    Hotel to defendant Fonseca-Carrillo.  In fact it was Mr.
6    Oliveros.  That Mr. Oliveros was a friend of mine was not an item
7    that would be known outside of the Guadalajara DEA office.  He
8    would not have advertised our friendship because of potential
9    reprisals.

10    j.    On page 28 (2311) line 561, SA Camarena told his
11    kidnappers that on the 25th of February moving people were "coming
12    to pack my things, over at the house."  SA Camarena did in fact
13    have that appointment with a company to pack his family's
14    possessions to move to the United States.

15    k.    On page 29 (2312), line 593, SA Camarena screamed in
16    pain and asked that his ribs be bandaged.  His request was ignored

17    l.    On p. 33-4 (lns 673-675), SA Camarena explained the
18    areas of concentration of the Guadalajara DEA office.  He
19    explained that there were only four (4) agents and one from New
20    York and that two of the agents flew airplanes everyday to see if
21    they could find plantations (of marihuana).  He explained that
22    Agent Wallace was investigating Miguel Angel Felix Gallardo
23    another suspected kingpin and that he (SA Camarena) was making
24    preparations to leave Guadalajara.  Those details were an accurate
25    description of the Guadalajara DEA's activities.  The fact that SA
26    Camarena was being transferred from Guadalajara was a fact that
27    would only be known to his fellow workers.

28

1          m.    On p. 37 (2320), line 735, Kiki mentioned that his

2    pay check had not been deposited in his account.  As a result, he

3    wrote a number of checks that were not covered by sufficient funds

4    and bounced.  That was in fact true, and was caused by a

5    processing error on the part of the payroll section of DEA.

6    Again, that was another personal item of information that only a

7    few of us in the office knew about.

8          I declare under penalty of perjury that the foregoing is true

9    and accurate to the best of my ability.

10         DATED:    May _____, 1988.

11

12                                        _____
                                          JAMES H. KUYKENDALL
13                                        Special Agent, DEA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1       DECLARATION OF ROBERT CASTILLO

2       I, ROBERT CASTILLO, declare as follows:

3       1.    I am a special agent ("SA") with the Drug Enforcement

4  Administration ("DEA").  I am currently assigned to the DEA office

5  in Denver, Colorado.  I have been a DEA special agent for

6  approximately eight years.

7       2.    In April, 1985, I was serving my assignment with the DEA

8  office in Mexico City, Mexico.  On April 5, 1985, at approximately

9  11:30 p.m., at the Mexican Federal Judicial Police ("MFJP")

10 Interpol Headquarters in Mexico City, Mexico, I attended the

11 interrogation by MFJP officials of Jose Contreras-Subias.  During

12 that interview, Rafael Caro-Quintero was temporarily brought in

13 for questioning.  At that time I recorded that interrogation

14 session of defendant Caro-Quintero by the MFJP.  I had attended a

15 previous session on that day in which defendant Caro-Quintero was

16 more extensively interviewed.  However, I was not permitted to

17 record that session.

18      3.    On April 6, 1985, I again attended an interrogation

19 session of defendant Caro-Quintero by the MFJP at the Interpol

20 Headquarters in Mexico City.  I was not allowed to record that

21 session.

22      4.    On April 7, 1985, between 1:00 a.m. and 3:00 a.m.,

23 Caro-Quintero provided a declaration at MFJP Interpol Headquarters

24 in Mexico City to MFJP Director Florentino Ventura-Gutierrez.  I

25 recorded that particular session.

26      5.    On May 28, 1986, between 2:00 and 4:00 p.m., I attended

27 the interrogation of defendant Sergio Espino-Verdin at MFJP

28

1 Interpol Headquarters in Mexico City. I also recorded the
2 interrogation on two cassette tapes.

3     6.    I maintained personal custody of the above-mentioned
4 cassette tapes from the date of the recordings until October 8,
5 1987, when I submitted those tapes into evidence in Washington,
6 D.C. While in my custody, I periodically listened to them,
7 refreshing my familiarity with the voices of defendants
8 Caro-Quintero and Espino-Verdin. On October 6, 1987 and October
9 7, 1987, in DEA Headquarters in Washington, D.C., I reviewed the
10 tapes of the forced interrogation of SA Camarena to see if I could
11 identify any voices on the tapes. I also reviewed at one point
12 the tape recordings, I had previously made. I recognized Kiki
13 Camarena's voice immediately as the victim on the interrogation
14 tapes. I knew him and had spoken to him on many prior occasions.
15 I also recognized the voice of Caro-Quintero as one of the
16 interrogators on one portion of the coerced interrogation of Kiki
17 Camarena. I also recognized the voice of Sergio Espino-Verdin as
18 one of the individuals who conducted much of the interrogation of
19 SA Camarena.

20     I declare under penalty of perjury that the foregoing is true
21 and correct to the best of my knowledge.

22     DATED: This ___ day of May, 1988.

25                               ROBERT CASTILLO

1

## DECLARATION OF DALE STINSON

2

I, DALE STINSON, declare as follows:

3    1.   I am a Special Agent ("SA") with the Drug Enforcement
4  Administration ("DEA").  I am currently assigned to the DEA office
5  in Phoenix, Arizona.  I have been a DEA agent approximately six
6  years.

7    2.   In May, 1986, I was serving my assignment with DEA in
8  Mexico City.  On May 28, 1986, at the Mexican Federal Judicial
9  Police ("MFJP") Headquarters, I attended the interrogation by the
10  MFJP of Sergio Espino-Verdin.  Also present at the interrogation
11  were DEA SAs Robert Castillo and Victor Cortez.  SA Castillo
12  recorded that interview.

13    3.   In January of 1987, other DEA Special Agents and I
14  visited the Reclusorio Norte, a Mexican Federal Prison in Mexico
15  City.  When I was taken into a particular cell block area, I was
16  suddenly confronted by defendant Rafael Caro-Quintero.  For about
17  five to ten minutes, I was verbally abused and physically
18  threatened for being a member of DEA and for DEA being responsible
19  for his being in prison.  That encounter made quite an impression
20  on me.

21    4.   On December 8, 1987, at DEA Headquarters in Washington,
22  D.C., I reviewed the tape recordings of the forced interrogation
23  of SA Enrique Camarena.  I immediately identified the voice of SA
24  Kiki Camarena, whom I knew well and with whom I had worked
25  extensively.  I also identified the voice of defendant Rafael
26  Caro-Quintero as one of the interrogators.  I recognized defendant
27  Caro-Quintero's voice from my previous encounter with him at the

28

prison in Mexico City and from my prior review of the tape recordings of defendant Caro-Quintero's interrogations made by SA Robert Castillo.

5.   In the interrogation tapes of SA Camarena, I also recognized the voice of defendant Sergio Espino-Verdin as another individual who interrogated SA Camarena against his will.  I recognized defendant Espino-Verdin's voice from my attending his interrogation in Mexico City and from my listening to the tape recording of that session made by SA Robert Castillo.

I declare under penalty of perjury that the foregoing is true and correct.

DATED:   May _____, 1988.


_____
DALE STINSON

1

### DECLARATION OF BRUCE E. KOENIG

2

I, BRUCE E. KOENIG, declare as follows:

3

1.    I am a Supervisory Special Agent for the Federal Bureau

4

of Investigation ("FBI").  I have been a Special Agent with the

5

FBI since 1970.  I am currently assigned to the Engineering

6

Research Facility, Newington, Virginia, which is part of FBI

7

Headquarters.

8

2.    The majority of my work is devoted to forensic

9

examinations tape enhancement, voice comparison, signal analysis

10

and tape authenticity.  However, I also have supervisory

11

responsibilities for testing and purchasing laboratory equipment,

12

magnetic tape, and tape recorders for the FBI worldwide.  I have

13

conducted tape examinations for numerous Federal, State, and local

14

law enforcement agencies in all 50 states, the District of

15

Columbia, Puerto Rico, the Virgin Islands, Guam, and foreign

16

countries.  In total, I have conducted tape investigations in over

17

2,400 cases involving over 6,000 separate tape recordings.  I have

18

published various articles in my field.  I have testified as an

19

expert in this field on numerous occasions.  I have also lectured

20

before various scientific and legal organizations on numerous

21

occasions.

22

3.    My formal education is as follows:

23

B.S. Physics & Mathematics, University of Maryland, 1968.

24

Electronic course through DeVry Institute of Techinoloy,

25

1974.

26

27

28

1   Masters in Forensic Science, George Washington
2   University, 1977.

3       Additional scientific courses at the University of Utah,
4       Northern Virginia College, and George Mason University.
5   I am also a member of the Audio Engineering Society, Acoustical
6   Society of America, and American Institute of Physics.

7       4.   I have received substantial specialized training in
8   magnetic tape analysis.  Beyond the intensive training afforded me
9   by personnel in the Technical Services Division and FBI
10  Laboratory, I have attended numerous schools and seminars in the
11  magnetic tape analysis field.  These include instruction at Voice
12  Identification, Inc., Somervile, New Jersey, in the use of
13  spectrograms in tape analysis; training in digital analysis
14  equipment at Spectral Dynamics Corp., San Diego, California;
15  instruction in digital signal processing at the University of Utah
16  in Salt Lake City; and attendance at conferences of the Audio
17  Engineering Society, Acoustical Society of America, and the
18  National Association of Broadcasters.

19      5.   I have been asked to provide advice regarding the
20  interrogation tapes of DEA SA Enrique Camarena, cassette tapes
21  labeled as copia 2 and copia 4.  At the onset, the subject tapes
22  are copies of an original.  As such, scientific analysis will
23  probably not produce any conclusive results.  I have been asked
24  specifically to comment on the statements in the defendant's
25  motion regarding the tapes.

26
27
28

1    6.    In the first place, there is no opinion or conclusion
2  rendered that the tapes have been tampered in any way.  The most
3  that is stated is that there are items "that suggest that the tape
4  has possibly been tampered with or altered." (p. 8 of defendant's
5  motion).  The obvious response is that there are many more things
6  about the tapes that do not suggest tampering.  In my view, the
7  content of a tape recording and the flow of the conversation
8  therein are very significant indicators of authenticity.
9  Moreover, the items mentioned in the motion (by the unknown expert
10 who presents no evidence before the court) could have other
11 innocent explanations.

12        a.    Defendant points out "Loud clicking sounds" on side
13 A of copia 2 (p. 7 of defendant's motion).  There are many
14 innocent explanations for those sounds including someone
15 physically making noises near the microphone, that could explain
16 the clickings.  Defendant also notes that "subsequent to these
17 sound clickings, the sound level on the remainder of the tape
18 substantially increases."  Instead of tampering, a more likely
19 explanation would be that someone adjusted the controls on the
20 recorder that affected the "record" level.

21        b.    With respect to Copia 4, there are only general
22 references to "abnormalities" in defendant's motion.  (p. 8 of
23 defendant's motion).  The motion provides no specifics as to how
24 any of the abnormalities indicate tampering.  Defendant's expert
25 points out that there is a "brief burst of music" on a portion of
26
27
28

1 the tape. However, defendant's expert concedes that the music
2 could indicate that there was music on the audio tape used to
3 begin with. When the interrogation of SA Camarena was recorded,
4 that particular section containing music was not "recorded over".

5       c.   The "interruptions and clickings" on Copia 4
6 referred to (p. 8 of defendant's motion) are not necessarily
7 significant. Again, no explanation is provided in defendant's
8 motion as to how they indicate tampering or even where they are
9 located.

10     I declare under penalty of perjury that the foregoing is true
11 and correct.

12     DATED:   May _____, 1988.

13

14                                   _____
                                    BRUCE E. KOENIG
15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## DECLARATION OF JOSEPH GONZALEZ

2

I, JOSEPH GONZALEZ, declare as follows:

3

1.    I am an Inspector with the Drug Enforcement

4

Administration ("DEA").  I have been with the DEA since its

5

formation in 1973, serving as a Special Agent until my promotion

6

to Inspector.

7

2.    On March 28 and 29, 1988, I participated in a meeting in

8

Mexico City in which the Deputy Attorney General of Mexico Jose

9

Maria Ortega-Padilla at the offices of the Attorney General of

10

Mexico.  Representing the United States government were the

11

following individuals:

12

        a.    Robert C. Bonner, United States Attorney, Central

13

            District of California;

14

        b.    Jimmy Gurule, Assistant United States Attorney,

15

            Central District of California;

16

        c.    Paul Vaky, Department of Justice Attorney,

17

            International Affairs;

18

        d.    Edward A. Heath, Senior Agent-in-Charge, DEA Mexico

19

            City, Mexico, (at the arch 29, 1988 meeting only);

20

        e.    Joseph Gonzalez, Inspector Operation Leyenda; and

21

        f.    Richard Conas, Assistant Senior Agent-in-Charge, DEA

22

            Mexico City, Mexico, (at the March 28, 1988 meeting

23

            only).

24

3.    The Deputy Attorney General of Mexico informed us that

25

the original tape recordings of the interrogation of SA Enrique

26

Camarena (of which he had given copies to DEA on August 27, 1985)

27

28

1   were seized on April 8, 1985 from one of the houses of Ernesto
2   Fonseca-Carrillo in Puerto Vallarta, Mexico, where defendant
3   Fonseca-Carrillo was arrested.  The tapes then remained at all
4   times in official Mexican custody through the Mexican Federal
5   Judicial Police before being delivered to the Office of Attorney
6   General of Mexico.  At that point, Deputy Attorney General
7   Ortega-Padilla and his staff assumed custody of the tapes.

8       4.   Deputy Attorney General Ortega-Padilla explained to me
9   that the originals of the tape recordings of the interrogation of
10  SA Camarena, seized from defendant Fonseca-Carrillo's house in
11  Puerto Vallarta, had been accidentally lost or destroyed as a
12  result of the massive earthquake that struck Mexico City in
13  September 1986.  He explained that those tapes had been stored in
14  a particular office building that was severely damaged.  As a
15  result of the severe damage, the building was evacuated.  In the
16  huge clean-up process, the files and materials were removed from
17  the damaged building and stored at another location. Thereafter,
18  the tapes were completely lost and never recovered, perhaps
19  accidentally discarded by the clean-up crews.

20      5.   Deputy Attorney General Ortega-Padilla also informed us
21  that the original tapes (of which copies were made for the United
22  States government) were never edited or tampered by Mexican
23  authorities in any way.  He stated that no efforts were ever made
24  by anyone in the Mexican government to conceal any portion of the
25  Camarena interrogation.

26
27
28

1    6.    I have also listened to the interrogation tapes, Copias 2
2  and 4.  I recognize the voice of the victim to be that of SA
3  Enrique Camarena, whom I knew well.  I had worked with Kiki
4  Camarena often when I was assigned to the DEA Mexico City office
5  in 1984-5.

6         I declare under penalty of perjury that the foregoing is
7  true and correct.

8    DATED:    May _____, 1988.

9
10                                    _____
                                      JOSEPH GONZALEZ
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## DECLARATION OF WALTER WHITE

2      I, WALTER WHITE, declare as follows:

3      In August of 1985, I was the Assistant Special Agent-in-Charge
4 for the Drug Enforcement Administration (DEA) in Mexico City. I
5 am now retired from DEA. On August 27, 1985, I went to the office
6 of the Deputy Attorney General of Mexico, Lic. Jose Maria
7 Ortega-Padilla and received an envelope that contained five
8 cassettes, including the two cassettes, copia 2 and copia 4, which
9 were later determined to be the tape recordings of the
10 interrogation of SA Enrique "Kiki" Camarena. Once the cassette
11 recordings were in my possession, I ordered that the records for
12 the custody chain within DEA be maintained.

13      I declare under penalty of perjury that the foregoing is true
14 and correct.

15      DATED:    May _____, 1988.

16

17

18                                  _____
                                    WALTER WHITE

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF JACK TAYLOR

I, JACK TAYLOR, declare as follows:

1. I am a Senior Inspector with the Drug Enforcement Administration (DEA). At the current time I supervise the DEA investigation into the kidnapping and murder of DEA Special Agent Enrique Camarena.

2. I currently have in my custody in a secured file, the tape recordings that were turned over by the Mexican government on August 27, 1985 through the Deputy Attorney General of Mexico Jose Maria Ortega-Padilla to DEA SA Walter White. I have reviewed the records and logs maintained by the DEA. Those tapes have been in the secured custody of DEA or other government officials from the point in time of their receipt. To my knowledge, no one within DEA or any other government agency has tampered, edited, or altered those tapes in any way. With the security that has been maintained over the said tapes it would have been extremely difficult, if not impossible, for any tampering to have occurred.

3. Three of the five cassette tapes that were turned over by the Mexican government had nothing to do with the kidnapping/murder of SA Camarena. One tape was a recording of an

/

/

/

/

/

interception of DEA radio traffic.  Another was completely
unintelligible.  The third is a recording of an interrogation of
an individual that is not SA Camarena.

I declare under penalty of perjury that the foregoing is
true and correct.

DATED:    May _____, 1988.


_____
JACK TAYLOR

**EXHIBIT Z**

1

2264

## TRANSCRIPTION OF CASSETTE TAPE MARKED 'COPIA 2'

Interrogator = I.
Camarena = C.

1-    I.    Let's see, what is that house like?

2-    C.    It is on Topacio (street)..

3-    I.    Topacio?

4-    C.    Yes...

5-    I.    Which is..(unintelligible)..?

6-    C.    I can tell you how to get there...

7-    I.    Let's see, tell me...

8-    C.    You go along Mariano Otero (street)..

9-    I.    Yes...

10-   C.    One, two, three, the third traffic light, right?

11-   I.    Yes..

12-   C.    On the side lane you turn to the left, I don't know what the
            development is called (unintelligible) Sanchez, Manuel
            Ocampo or, you reach Manolo's which is on Mariano
            Otero...you..go, I think it is Topacio street..you reach the
            traffic circle..and exactly the...about two or three blocks
            from the circle..there is a house on the corner...it has..it
            has a stone wall...high and fenced...

13-   I.    Whose is this house?

14-   C.    It belongs to Ernesto...

15-   I.    Ernesto,s...um...what street was that..?

16-   C.    Topacio...

17-   I.    You don't know the number..?



2

2265

| | | |
|---|---|---|
| 18- | C. | I don't remember... |
| 19- | I. | I'm going to tell you how easy it is, why beat you? |
| 20- | C. | Well, I am remembering... |
| 21- | I. | Umm... |
| 22- | C. | You know what..can I tell you something? |
| 23- | I. | Tell me... |
| 24- | C. | Even though one might not want to, one remembers with the beating you have just given me...and as I am remembering I will tell everything I know... |
| 25- | I. | Let's see, remember another... |
| 26- | C. | Well, when they arrested Juan Jose Quintero...(unintelligible).. |
| 27- | I. | Um..hum.. |
| 28- | C. | When they arrested him and he arrived at the house he did not have any money...they started to beat him up there and..(unintelligible) that they gave you a chance..oh..oh..I am saying this to you because..well, don't hurt my family please... |
| 29- | I. | No one is going to hurt your family...forget about that...they are not to blame for anything...(pause)..you just keep on remembering, that is all..eh?..I am not going hit you or anything..okay? |
| 30- | C. | I am going to get comfortable... |
| 31- | I. | Another location ahead? |
| 32- | C. | Possibly?...this..these we have not located ourselves... |

2266

3

33-     I.     Let's see...

34-     C.     But look...I will try and tell you so that you know how it

was that we knew nothing about this...

35-     I.     Let's see, tell me...

36-     C.     There are some persons...some  masons from  Santa Anita..who

were engaged to go and build a wall at a farm..that is there

in Santa Anita...I don't know where, exactly..right?

37-     I.     Uh..huh...

38-     C.     It is going...passing the Santa Anita Club on the right hand

side...uh..these masons went to complain...I think...to the

Municipal President (mayor of the town), right?

39-     I.     Uh...

40-     C.     The Municipal President is a friend of Mr. Kuykendall...

and he spoke to him and gave him the information...as (un-

intelligible) I did not say anything to him, it is not

possible for me (unintelligible) with him...

41-     I.     (Unintelligible)...

42-     C.     Passing the Golf Club...(sneeze)

43-     I.     And that is a ranch there...or what is it?

44-     C.     It is a ranch, sort of a large farm...

45-     I.     Whose is it?

46-     C.     It is Miguel Angel's...

47-     I.     Why not (unintelligible) the ranch..?

48-     C.     Because he was always armed and I did not know who he was..

49-     I.     And you have this one located..?

4

50-    C.    For the same reason that one  has not  been located,  due to
fear, right?..I am not going to go over there, therefore
let them say that I don't know...

51-    I.    Do you play golf there at Santa Anita..?

52-    C.    Yes....

53-    I.    Do you live there?

54-    C.    No, I do not live there, I live (unintelligible)...

55-    I.    Do any of you live in, Santa Anita..?

56-    C.    One of the ones that have just arrived...

57-    I.    Who?

58-    C.    Victor Wallace...

59-    I.    Wallace..?...where does he live..?

60-    C.    I know how to get to the house, the number I don't know..
but it is registered at the entrance...(unintelligible)

61-    I.    What is the house like..?

62-    C.    It  is  small,  white...when  you  enter  you  turn
(unintelligible) from the street...you pass something like a
drain where water passes from the hills, because there is a
lake there...and  it is  the first house passing this on the
left.. (pause)... after the water course...

63-    I.    Let's see, more or less where is the house?

64-    C.    Look...ah..you know Santa Anita?...so that I  can explain to
you..?

65-    I.    Let's see, tell me more or less...

66-    C.    You enter...right?

5

7-    I.    Yes...

8-    C.    Turn to the right before entering the Club...and you keep to
            the right all the time, keeping to the right...you pass...
            passing various bumps...and there, there is a sort of small

            traffic·circle, you keep to the right all the time, and
            after turning round that circle...it is about half a kilo-
            meter from there...and passing that drain where the water
            comes out to the lake...it is the first house on the left...

69-   I.    He is not sold to anybody..?

70-   C.    No...he has just arrived...I mean he does not have any..
            (UI)...

71-   I.    And where has he come from..?

      C.    He came from Calexico...

3-    I.    And he also has done nothing, no?

74-   C.    No, he is new...

75-   I.    What is so strange to me is that you don't do anything...

76-   C.    Well, didn't I tell you that it is due to fear...that...I
            told you that...they do not let me carry my gun here...

77-   I.    Let's see, remember another one...uh...another location...
            give me one for Rafael...

78-   C.    Of Rafael...well, hardly...I mean..you have already asked me
            everything...

79-   I.    Yes...

80-   C.    No..no..I don't have anything...

1-    I.    Try and remember...of Ernesto...

6

82- C.  Of Ernesto...well I have already told you (UI) you see..

83- I.  Take your time...think...the one you say goes around with
        him...like...Samuel...you don't know where he lives..?

84- C.  I know he has an apartment over there at Cangrejo, behind
        the (UI) I don't know the number there..of the apartment..


85- I.  Another location for him?

86- C.  For Samuel..?

87- I.  Yes...try to remember...

88- C.  Well, no...

89- I.  Some report on him..?

90- C.  Well, only the one that Jesus Alvarez gave me...

91- I.  And before that?

92- C.  The report?...the report that Jesus Alvarez gave me that
        Samuel was the one who had shot up the agent's car.(UI)..

93- I.  What did he say..?

94- C.  That this Samuel had shot up the agent's car...

95- I.  But no report that there is somewhere...

96- C.  On Samuel.?

97- I.  Yes..that you can remember...

98- C.  We do not know the surname...it is the first time that it
        appears in our (UI)..that I know that (UI) the reason for
        this he threatened him because they shot up his car..that
        Samuel was coming and Rogelio was following him (UI).

99- I.  Look...(throat clearing) I am going to behave better with
        you...softly..eh?

0-    C.    Please...

01-   I.    Give me  a person of those who go around with Rafael..see if
            we can look for him...

102-  C.    There is an administrator...this was told to me directly by
            Lic. Garcia Bueno, right?

103-  I.    Yes....,

104-  C.    There is a brother of Quintero who throws himself (UI)..

105-  I.    Yes...              •

106-  C.    (UI) I only have some (UI) who lived there..and none (UI)
            as much (UI) they were just seen and that is all...

107-  I.    And that person goes around with him..?

108-  C.    Ha...I don't know...you remember that  I  said  that  he was
            had gone around (UI) he was the owner of the (UI)...

09-   I.    Don't you remember about the case..?

110-  C.    Pardon?

111-  I.    Don't you remember about the case, where it is..?

112-  C.    The house I told you about of Rafael...in the other commen-
            tary...that (UI)...in the direction of the (UI)...

113-  I.    But of one of those guys that go around with him...see if we
            can take him out and see if we can...

114-  C.    Well I don't know  anybody...as I  say, because  of the same
            fear, I tell you...well I am giving you everything I know..

115-  I.    Yes..yes..I understand you...

116-  C.    I am afraid...well of inventing something and then...

117-  I.    I also for that reason am behaving well with you...

8

118-    C.    And later on you investigate and then..right?

119-    I.    For that reason I am not now going to do **anything** to you,
              or anything..

120-    C.    Ohh...oh...oh..uh...(groaning)...

121-    I.    Eh..okay?...remember some report..some...something that you
              have heard somewhere...eh?

122-    C.    Who knows...?  (very weak)..

123-    I.    There must be something...something must be there...you know
              that something must be there...right?

124-    C.    Now..I know why...I can't get comfort...

125-    I.    Remember...I am going to give you time...eh? (pause) some-
              one of those who go around with him..therefore..eh?

126-    C.    Don't hit me any more...

127-    I.    No...no one will hit you...

128-    C.    Well, no (UI).

129-    I.    No, it is that..it is...because you can't see...you are ner-
              vous, but forget that, eh?..I am behaving well with you..yes
              ...?...eh?

130-    C.    I am very grateful to you...

131-    I.    Just give me more...a location of some guy of those that go
              around with him...that you have heard of somewhere....

132-    C.    Well the  only location  that I  have is  that of Mr. Vargas
              Salazar, information that I received in July **or** August...

133-    I.    And does he go around with Rafael?  (tape **pause**)..

134-    I.    He does not go around with Ernesto, you say.?

9

5-    C.    There is...(pause)

136-    I.    Relax well...eh?...no one is going to hit you...or anything.

137-    C.    (UI).

138-    I.    Some bum of those who go around with him often..eh?...some-
              thing that you have heard...or some report..or something...

139-    C.    (UI)

140-    I.    Remember..remember..I am going to give you time...

141-    C.    (UI; that of Rafael, but he never wanted to give us the fre-

              quencies...only because I learned through (UI) and with two
              radios he wanted to take away (UI) the Caro, right?..but I
              don't know...he never wanted to give us the frequencies of
              Rafael...and the frequencies he put, he says that it is not
              (UI)...

142-    I.    Are you afraid of Rafael?

143-    C.    That is not true...

144-    I.    Then with who do you say?

145-    C.    Pardon?

146-    I.    With who do you say?

147-    C.    To finsh with (UI) yes, well..I am supposing, right, as he
              (UI) allow a break with him, but never, we never did it with
              him...

148-    I.    But one of those that goes around with him...

149-    C.    I do not know...

150-    I.    He never has (UI)...

51-    C.    I don't know...(tape pause).....in Mexicali they say there



2273

10

is a person who helps him, right?...to pass the..the mari-

juana...

152-   I.   Who is it?

153-   C.   Ah...(pause)...I am trying to remember, but no...

154-   I.   Yes...remember...I give you your time...

155-   C.   Rene Verdugo..I think..(pause)...I am trying...

156-   I.   Try...you...you..you try...(long pause) (throat clearing)..

       (tape pause)...

157-   I.   What do you say he is called?


158-   C.   Manuel Sanchez...

159-   I.   Manuel Sanchez what?

160-   C.   I don't know the other surname...

161-   I.   And he goes around with the other...what did you say?

162-   C.   They go around together all the time...

163-   I.   That Rene, what is he like..?

164-   C.   I don't know him...

165-   I.   And Manuel..?

166-   C.   I don't know him either...

167-   I.   You don't know him either..?

168-   C.   No...it is from some reports that were sent from Calexico...

169-   I.   You don't have his location..?

170-   C.   No...

171-   I.   No..?

172-   C.   They...the only thing I know..is that they live in Mexicali.

173-   I.   They are the ones that pass (marihuana) for that guy...

4-    C.    Well, they help him pass it, right?

-75-   I.    Uh..huh..

176-   C.    It is my understanding that (background noise - someone
            brushing their teeth) they are in charge of passing the mer-
            chandise...from Mexicali...to..through Calexico...

177-   I.    And you do not remember any guys who go around with him..?

178-   C.    No...I am telling you this...

179-   I.    Yes...yes...

180-   C.    That I wish that I had...I wold give them to  you, sir..if I
            had any of Rafael's I would give them to you..I mean..it
            would not be worth lying to you...because you are going to
            check up on something which is not true...and you would give
            me another beating...right? I want you to understand that
            Ouch...that I don't want to lie to you..I don't want to in-
            vent anything that is not true...

181-   I.    No...this I  am asking you for a stop (coughing) right now I
            am going to stop...

182-   C.    (voice overlap) right now I told the man who was here in the
            room....

183-   I.    Yes, I know...

184-   C.    That I remembered another business that Ernesto has...

185-   I.    Yes...(coughing)...

186-   C.    It is the restaurant "Isao"..a restauran...a Japanese
            restaurant which is over on Avenida de los Arcos...

187-   I.    Is that Ernesto's?

188-   C.    They say that it is Ernesto's...and then another restaurant



12

that I remember...another business  but...this one  they say
is in partnership with Ernesto and Manuel Salcido...it is
called  "La  Langosta"..which  is  there  close to Plaza del
Sol...of the hotel...

189-  I.  The restaurant..what is it of?..this "La Langosta"?

190-  C.  It is a seafood restaurant...

191-  I.  And this Manuel what..?

192-  C.  Pardon?

193-  I.  This Manuel..?

194-  C.  Salcido...

195-  I.  And who else..?

196-  C.  And to Ernesto Fonseca..

197-  I.  Some...some business of Rafa..?

198-  C.  No..not him..the only...the business that I told you about,
sir, that I...that Jesus  Ramirez told  me about  is that he
had just bought the Ford dealership...the one I have already
told you about...right?

199-  I.  Um...hum...

200-  C.  That is the only business of his I know of...
(new interrogator)

201-  I.  Whose is it? the "Isao" restaurant..?

202-  C.  It belongs to Ernesto Fonseca...
(previous interrogator returns)

203-  I.  Let's see, give me people that go around with Caro...

204-  C.  What?

13

105-   I.   Give me people that go around with Caro...

206-   C.   I don't know anyone, Commander...

207-   I.   And I will stop...

208-   C.   If  I  knew  I  would  tell  you,  sir...(background noises-someone blowing their nose)..I tell you that I am here with fear..I tell you...and you  know that  one gets  into (voice overlap)

209-   I.   I am helping you...yes?

210-   C.   I know...I appreciate it...thank you...

211-   I.   Eh?

212-   C.   I appreciate it..

213-   I.   You just stop me and I will give you another stop..

214-   C.   If...if I  knew someone  who goes  around with him...all the time...look...something else that I remembered just now.. right?..this Jesus Alvarez...before going to Colima, I spoke to him...and he told me that he had the name of a person who is....Ouch..Ouch..who knows where Rafael is all the time but he did not want to give us the name because he wanted a. he wanted money..right?...and I  said to  him..well I..there is no money in the office to give you...and he went off annoyed...but he did say that if...this person knows where he is...he had the location...the address of this person.. that  this  person...he  did  not give me the name...that he knew at all times where Rafael is...but as I say...he did not give me the name...he went off annoyed...that last time that he went he  needed money  to go  to Colima,  and he was


given only $200.00 dollars...(throat clearing)...

215-  I.  And he is one of the people that goes around with...with
          all the time..?

216-  C.  The person that he did not give me the name of, Commander,
          if I knew the name I would give it to you, sir..you know
          that...

217-  I.  Didn't he give you some...some sign?

218-  C.  Nothing...nothing.!..didn't I tell you that he got angry be-
          cause he was only given 200 dollars...he wanted more money..
          it is...because they don't give him money for the protection
          of the candidate for Governor of Colima...he has to finance
          the security...and needs money...and as we only gave him 200
          dollars he went off disgusted... and no, no, no he did not
          give us that information...

219-  I.  That administrator you mentioned...would you know where he
          is..?

220-  C.  "El Leon"?

221-  I.  Yes...

222-  C.  Well I think so, sir...but I do not know how to locate him..

223-  I.  You don't know where he lives..? (sound of dripping water)

224-  C.  If you will let me go to the office I can get the data,
          right?...

225-  I.  You have them in the office..?

226-  C.  I imagine that they are filed there, but I don't remember at
          the moment, sir..(background noise of water dripping or run-



ning)  (pause)

227-    I.    Let's see, a house of his...where can that **bastard** be..?

228-    C.    I wish I could give you something, sir...(**pause**)

229-    I.    Rest a while more...and remember...

230-    C.    Well, I tell you everything I remember, sir..

231-    I.    Eh..?

232-    C.    Yes...I will tell you...ah..I have now remembered the..the
             street that I was saying that runs parallel to Cuauhtemoc...

233-    I.    Yes...

234-    C.    The one that is by the Hyatt, right?

235-    I.    Yes...

236-    C.    Chimalpopoca...

237-    I.    Yes...

238-    C.    That there...they  told us..well..there,  as I  told you, it
             was when Rogelio Knapp and this other agent from Mexico,
             Miguel  Acuna...and  Miguel  was...was  arriving  there..and
             there was another car behind him..and this car was the one
             that followed them and stopped them...that is why I know
             about that..right?..and I was not there...

239-    I.    And who does the house belong to..?

240-    C.    That..that it was..they were the offices of Miguel Angel...

241-    I.    And Caro does not have offices..?

242-    C.    I do not know of any offices of his...

243-    I.    Try to remember to see if..if you saw something somewhere..?

244-    C.    Don't make me dizzy...



245-   I.   I am not going to make you dizzy...eh?...just try to
            remember...to see if..to see if I can look for the bum...

246-   C.   Yes..I know...

247-   I.   Okay.?.

248-   C.   What I remember I will say, sir...

249-   I.   Or any of the bastards that go around with him...

250-   C.   I tell you that this Chuy Alvarez should know, sir...be-
            cause he did not want to give us that information..more
            than that, he said that...what he did say was that this
            person has a radio with which he can communicate with Rafael
            at any time...

251-   I.   Who?

252-   C.   The person who gave us the data..the one who wanted more
            money, right?

253-   I.   Who has the radio..?

254-   C.   Well of the frequencies he uses (background noise)..that Ra-
            fael uses, that frequency was never given to us by Ingeniero
            Aceves...

255-   I.   Try to remember some...some bastard of those that go around
            with him...

256-   C.   (overlap) well I tell you, sir...

257-   I.   Eh?..take your time amd remember...

258-   C.   I will tell you...

259-   I.   Yes...about something you have heard there...

260-   C.   I will tell you, sir...

261-    I.    Hm...

262-    C.    I am remembering little things in this way...but every time
              I remember I am telling you...

263-    I.    Yes...that's good...I am helping you...eh?...eh?...

264-    C.    Yes....

265-    I.    You continue behaving well...and I will too...

266-    C.    I cooperate with you, sir...

267-    I.    That's good..say no more....okay?

268-    C.    Yes...

269-    I.    Done...

270-    C.    Done...

271-    I.    Remember another one and tell me in a while...(overlap)

272-    C.    What I remember I will tell you...

273-    I.    Okay!..eh? (background noise)

274-    C.    In (UI) it is good, but I say...I don't know...

275-    I.    You don't know?...(mike noises, crackling)..

276-    C.    I don't know them by memory...I write them down and then I..
              or may be I have them in the  things I  have in  the..that I
              had in...in the pocket of..in the pocket of my shirt..but..
              as I say...only by seeing them, right?..seeing them..that is
              they are of...they are five numbers...they are two numbers,
              one after the other...

277-    I.    Do you remember about some bastard that goes around there
              with..with Caro..eh?

278-    C.    I wish I could give you a name...I would give it to you now.



18

279- I. Just try to remember...

280- C. As I say, sir...

281- I. Eh?...take your time...

282- C. As I say, one is working here with fear, sir, and one, well
will not go around...

283- I. No one will hit you now...

284- C. No one...no one will go around pursuing these persons, with
what, sir?

285- I. Take your time...(pause) (tape pause)...(background noise)

286- I. Where?

287- C. Forty six...like going towards Zacatecas...there is one..no.
no, I don't know the names of the streets..I think I could
find them..about two years ago I went there..it is a simple
house...

288- I. The Periferico..?

289- C. No..no, it is not on the Periferico, it is in..do you know
where the...where they had the Zapopan fair..do you know
where?

290- I. It is in Zapopan..?

291- C. Yes...

292- I. No..I don't know where the fair was...

293- C. Well it is in that direction..it is..you go  on the highway
going towards Zacatecas...

294- I. Yes..

295- C. And you turn to the left at the Periferico..the..I think it

is the first paved entrance..from there..one or two blocks
to the right and then to the left..as I say..It's a long
time since I went..I think I could find the place, right?

296-  I.  Is it going out on the highway?

297-  C.  No, it is by the highway, sir, it is a development that
there is there...

298-  I.  A new development..?

299-  C.  No, it is not new...

300-  I.  You take the highway to Zacatecas...

301-  C.  At the Periferico you turn to the left (speaking with dif-
ficulty)..

302-  I.  The highway, right?

303-  C.  Well, it is the Periferico..

304-  I.  You reach the Zacatecas exit, and turn on the Periferico...

305-  C.  Yes..

306-  I.  I continue on the Periferico?

307-  C.  Yes...until you reach..it is about one kilometer..turning to
the right..I think it is the street..that goes to where..
where they had the Zapopan fair..one or two blocks..there
you turn to the right..and I remember that we turned to the
left...

308-  I.  What..what is the house like..?

309-  C.  It is a bluish colored house..

310-  I.  Does it have one floor..?

311-  C.  Um..hum...

20

2283

| | | |
|---|---|---|
| 312- | I. | Does it have a garden in front or not..? |
| 313- | C. | No..it has a sort of parking area for cars..and it had one |
| | | of those metallic fences... |
| 314- | I. | Does it have a garage for cars? |
| 315- | C. | Yes... |
| 316- | I. | For how many..? |
| 317- | C. | For one... |
| 318- | I. | For one? |
| 319- | C. | This (UI) development where all the houses look alike... |
| 320- | I. | Is there another blue house there? (overlap) or is it the |
| | | only one? |
| 321- | C. | I could not tell you , sir... |
| 322- | I. | And does he still live there? |
| 323- | C. | I don't know if he lives there... |
| 324- | I. | And is he married..? you say? |
| 325- | C. | He is a bachelor.. |
| 326- | I. | And he lives there alone..? |
| 327- | C. | I think so... |

1.

*Copia C*
*new I series*

Camarena  =  C.

Interrogator  =  I.

1- C.   That is the person I told you about, Jesus Ramirez, who says that Javier
        Barba is one of the ones who is coming up, he is very...

2- I.   Jesus Ramirez has passed you a lot of information, and you have only
        seen him twice....

3- C.   Yes, sir...

4- I.   You are not lying..?

5- C.   No, because look, sir, remember that I told you that he worked with Ro-
        gelio, Roger Knapp, and I have seen him on two occasions, but as I do not,
        I go only as a witness, to see what he says...Right?
        But I have not dealt with him...I have never paid him a nickel...

   I.   Say something about this...what type of information does Jesus Ramirez
        provide to you...?

7- C.   That he is one of the ones who is coming up, that he works for Ernesto,
        that he is one of the ones we have to see....

8- I.   Yes...?

9- C.   Yes...

10- I.  How far had the investigation gone with him..? What help can you provide
        us in order to locate him..?

11- C.  Why...?   He lives right near Commander Espindola....

12- I.  Where does Commander Espindola live..?

13- C.  On Paseo del Prado, Commander Espindola lives at number 3021...

14- I.  Lies!!!!

15- C.  No, no, sir....

  - I.  That is not true!!

1.- C.  That is what was told us by Jesu....

1( :.  Well, you jerk, he would have disappeared.....

19-C.  No, no, Commander...please...

20-I.  Give me facts!

21-C.  That is what Jesus Ramirez told us, sir...

22-I.  What information.....?

23-C.  That he lived there....

24-I.  Omit that...go ahead...

25-C.  That he lived next to Commander· Espindola, he only knew that he was very active......that he was not showing anything any more, that he used to go around in luxury cars before, but now he was going around in an old car so as not to attract attention...but that he was very voracious and very daring, and that he is one of the ones who will rise very rapidly because he does not care who he flattens, who he kills and all that...

2o-I.  Why do they classify him in this way...? What do they know of him to.... to....

27-C.  Only what Jesus Ramirez is saying....

28-I.  How far have they gone with the investigation of this (Lic.) lawyer...?

29-C.  Only where he lives....that is all we know...

30-I.  How far have you gone in checking him out...?

31-C.  I have not even gone to look at the house, sir...

32-I.  Who has gone?...of your co-workers...?

33-C.  No one... I, as I tell you know the house because on one occasion I went to visit Commander Espindola at his home....
       (Note: voice in the background: 'back to the same thing!')
       No, well....

34-I.  And does this guy have people with him..?

35-C.  I do not know ....sir...



3.

2286

36- I.   What....and regarding his brother, how did you find out that he had died?

37- C.   In the newspaper....

38- I.   And did you go to check at the funeral..?

39- C.   No...no sir...why should I lie to you...we did not go...

40- I.   Are you sure you did not go..?

41- C.   Yes, sir...I never, no...no.I don't go to those because of the same
         problems, sir, that we....

42- I.   Don't tell me about your problems, speak of the information you can give
         us, you can provide us to finish with this bunch of jerks....

42- C.   Yes, sir. (very weak)  what more can I tell you, sir...?

43- I.   Since when have you known about this Licenciado Javier Barba...?

44- C.   The one who mentioned him was Licenciado García Bueno...

4    ..   What friendship does he have with you?  What relationship does Garcia
         Bueno have to you?

46- C.   He gave us information, sir...

47- I.   What kind of information..?  Is he an informer also..? does he cooperate
         with you?

48- C.   Yes, sir, he cooperated, because he was shot up...

49- I.   He died..?

50- C.   No, he is in the hospital, very grave...(background voice: They are all
         very grave...)

51- I.   Where did they shoot him?

52- C.   Here, at Manolo's on Niños Heroes...

53- I.   And who shot him..?

    C.   Licenciado Humberto Zendajas...

55  I.   Aren't they asking you about Lic. Barba..?

56- C.   Oh, well you asked me who...

4.

| | | |
|---|---|---|
| 57 | I. | Lic. Barba...? |
| 58- | C. | The only thing I know about Lic. Barba is that he lives... |
| 59- | I. | I'm telling you that...this Licenciado who is injured, what did he inform regarding Lic. Barba..? |
| 60- | C. | It was he who told me that he worked with Ernesto... |
| 61- | I. | What more did he tell you..? |
| 62- | C. | That he works with Ernesto, that he is an engineer..and for that... |
| 63- | I. | Nooo! |
| 64- | C. | No,pardon me, sir, I tell you this because he is an engineer, is that not true..?  Because it came from this person, if he is a lawyer then it is possible that I am mistaken... |
| 65- | I. | The Licenciado (lawyer) whose brother was killed... |
| | C. | Yes,..yes...yes... |
| 6 | I. | How did you find out that they had killed his brother..? |
| 68- | C. | Because it came out in the newspaper, sir... |
| 69- | I. | Why did you read it and concentrate on that..? |
| 70- | C. | Well look, sir, one of the things that we do every day is...(voice over-lap)... |
| 71- | I. | Why did you read it and concentrate on that...? |
| 72- | C. | Because we already knew the name of Lic. Barba...you see? |
| 73- | I. | What name? |
| 74- | C. | Well, that it was Barba...Javier Barba..? |
| 75- | I. | Yes... |
| 76- | C. | OK, and we knew he was working with Ernesto, and one of the things that we check at the office every day is the newspaper, specially the police section to see if a name comes out that we know... |
| 77- | I. | And who passed you the information on Javier Barba..? |
| 78- | C. | Lic. García Bueno... |

2288

79- I.   Who else..?

80- C.   And...this Jesus Ramirez...

81- I.   What did Jesus Ramirez tell you..?

82- C.   Well, that he is one of the ones who is coming up...he told us this a
         week ago...two weeks ago, the last time we saw each other in the Tapatio.

83- I.   When he talked to you did he speak of Samuel..?

84- C.   No...Jesus Alvarez spoke to me of Samuel..there are two Jesuses...

85- I.   Two Jesus Alvarez's..?

86- C.   No, no, no, there is one Je...two Jesuses...one Jesus Ramirez and one
         Jesus Alvarez...

87- I.   Then this Samuel has a relationship to this Lic. Barba...?

88- C.   I could not tell you...I do not know...I do not know this person...

   I.    Or relations with _____ person..?

90- C.   I did not understand you question.. (background voices: no, yes, not me
         now, no, no,...)

91- I.   Lic. Barba by you....(unintelligible)

92- C.   Look! The reason we were interested in this Samuel was because Jesus
         Alvarez was the one who told us that he was the one that had shot up
         Rogelio's car...

93- I.   What more did he say..?

94- C.   That he had an apartment over in Cangrejo...

95- I.   Yes, you already told me that!

96- C.   Yes, well, that is what I am telling you, sir...

97- I.   And, and you...(recording cut)

   C.    We do not have...(recording cut)

   I.    You already told me what he has done...

100- C.  Oh..bas...(exclamation)

**2289**

I.  (another interrogator): Well look...No, no, don't be stupid...what... who has... ?

102- C.  (speaking with difficulty) who goes around with (breathing hard) or who helps Ernesto Fonseca...

103- I.  And what else..?

104- C.  (again breathing hard and speaking with difficulty) that he is one of the ones who is rising at this time...

105- I.  And what do you know about him...?  what has he done..?

106- C.  I say, I... I do not know him...things he has done, sir...
(background voices: unintelligible)

107- I.  You don't know anything about him..?

108- C.  No, sir, I don't...I want you to understand sir, that I have my transfer, I was going and we are given six months to introduce to the new people those like Chuy Alvarez, like Jesus Ramirez, you see...

109- I.  Who told you about Lic. Barba..?

110- C.  Lic. Barba, who told me about him was Lic. García Bueno, who worked with Ernesto, Jesus Ramirez told me that he is one of the ones who is coming up a lot, that he is very voracious, that...that he is going to make a way to rise up...to be one of the largest here in Guadalajara...

111- I.  And his location..?

112- C.  That he lives next to Commander Espindola on Paseo del Prado...

113- I.  Where does Garcia Bueno live..?

114- C.  Garcia Bueno? the lawyer..?

115- I.  Yes...

116- C.  He is in hospital...at Scripps...

117- I.  Where..?

118- C.  In La Jolla....

119- I.  And the location of Samuel..? does he have...?

120- C. Only an apartment there by Cangrejo street which backs onto the Suchial, but I do not know the number...

121.- I. Any other location..?

122- C. It is...the only one I have, sir...

123- I. Are you sure...?

124- C. I swear it, sir...Oh ...I don't want...I will repeat again, sir, the business of Rafael was handled by the Hermosillo office, we did not handle it...so I don't have data on that, sir...the only data was what I gave you, that was given to us by Jesus Alvarez, where he lived, that is the house there at Cuauhtemoc and Chosil, by the Pra...Ruben Darío...

125- I. But you do know him...no..?

126- C. I have never seen him personally, we do not even have a photograph of him...

127- I. Then how can you recognize him..?

   - C. Ha...I..I...cannot, in the office there is no photograph of him, sir... There is no photograph of Ernesto either, the only one there is is an old photograph of Miguel Angel...you see...(voice overlap)...

129- I. Then why are you giving us data on Rafael at this time? his description?

130- C. Ah, because it is the description that Chuy Alvarez gave us, sir, Jesus Alvarez...

131- I. Let's see...give it to me again....

132- C. He is a person of about thirty three, thirty four years of age...about one eighty five, one eighty six tall, he is heavy, has a light complexion, light brown hair, that he is big, stocky, right?..he is from the state of Sinaloa, near to Badirajuato...

133- I. From what part..?

 4- C. No..I do not know the name of the Ranch, sir...



L3_ .  (New interrogator)  To Emilio what?

L36C.  Quintero...

L37I.  Yes, do you have a photograph of him..?

L38C.  No,..s ..the only photograph we have...uh..when an "Alarma" came out when
he was arrested in '79...

L39I.  Yes...?

L40C.  That is the only photograph.....

L41I.  And who is it who put the finger on that farm of Mr. Ernesto..?

L42C.  The one over on the periferico...?

L43I.  Yes...

L44C.  That was Garcia Bueno...

L45I.  Who is Garcia Bueno...?

L_  .  A lawyer who was shot....Cesario Garcia Bueno...

L47I.  Ah..hah...

L48C.  A lawyer they shot up in...

L49I.  Where..?

L50C.  In Manolo's, that restaurant that they have over by Niños Heroes...
(voice overlap)

L51I.  Listen,...who is it that put the finger on Rafael..?

L52C.  (speaking with difficulty) on Quintero...?  here the only person who has
given us information on Rafael is Jesus Alvarez and...Jesus Ramirez.

L53I.  Do you have the home address of Jesus Ramireaz..?

L54C.  No, sir...he gets in touch with the office from time to time when....the
last time that...(voice overlap)

.  What is he like?

L5_ .  Sir...he is a boy of twenty three or twenty four years of age...

L57I.  Oh, yes...? (recorder stop-start).

2292

| | | |
|---|---|---|
| 1- | C. | Ah...ah...ahh... |
| 159- | I. | Look,...just behave well and you will go home..... |
| 160- | C. | Uh...yes...but please man.... |
| 161- | I. | And...and...and what domicile has been located...? |
| 162- | C. | Ah...for Rafael..? |
| 163- | I. | Yes... |
| 164- | C. | Look...he...he...he had the location of the sister's boutique... |
| 165- | I. | Yes.. and what else..? |
| 166- | C. | I don't know if he is the fiancé of the sister..or..? |
| 167- | I. | Yes... |
| 168- | C. | I do not know.... |
| 169- | I. | Ah...hah... |
| 170- | C. | I think...I remember...that the sister has a boutique, I think her name is Manuela... |
| 1 - | I. | Yes.... |
| 172- | C. | I am not sure.... |
| 173- | I. | Yes... |
| 174- | C. | That it is a boutique that she has just bought...? |
| 175- | I. | Yes.... |
| 176- | C. | That is in front of Plaza del Sol, pardon me, Plaza Mexico... |
| 177- | I. | Ah, hah.... |
| 178- | C. | That she is the sister... I say... |
| 179- | I. | Of...of...where does she live..? |
| 180- | C. | I do not know...he did not say...he did not know... |
| 181- | I. | He does know... |
| 182- | C. | No, no, no, look...the other, now...that he is saying where she lives... I have been told, I have passed by there...that her mother lives at... |

what is the name of that street...the one that passes there by the Governor...(pause)....

183- I.  Eh...I don't know...

184- C.  You know... the street of...let me remember...Manuel Acuña...after passing Yaqui..after passing the next street....

185- I.  Yes....

186- C.  On the right hand side... number 2626 or 2636 or 26 something like that, you see... and exact...I know how to get to the house and which it is...

187- I.  What color is the house..? •

188- C.  Ah...I do not know...it has a fence...a wall...right..?

189- I.  Whose is it..?

190- C.  Uh...of hollow brick...I have seen a black Mustang outside..parked...

191- I.  But some locations of the (unintelligible)

-  C.  Look...

193- I.  Look...help us...

194- C.  No, no, I...sir..what more...hu...ha..with the beating you have given me...Do you think that I am going to lie to you..?..um...the only location we had was the one Jesus Alvarez provided us...that was the house of Cuauhtemoc...

195- I.  (another voice) Moctezuma..?

196- C.  Yes...Chosil..right?...and the other is on Pablo Neruda...Ruben Dario, pardon me...that this house had been bought from this person who was the owner of the Country Ford dealership...

197- I.  Yes...

198- C.  No, I do not remember the name of this person...and who recently bought the...Ford Dealership agency...apart from this I do not have another location...sir...

144- I. Well, it all came out well, eh..? (talking to someone else)...(another voice)...yes..according to that...

(Recorder stop-start) music (background noises--people talking)

Ask him if they gave him money...?

200- I. (New interrogator) Yes..?

201- C. I never paid him money...as I say, the last time, the last two times that...(voice overlap)...

202- I. Who paid him..?

203- C. I have not been there when he was paid...the last time...two times that I saw him...he was not given any money...

204- I. But how did you do it...how did you make contact with that friend (compadre)..?

205- C. He called and offered...

206- I. Oh...he offered..?

207- C. Yes...

208- I. And..?

209- C. He called and had some information he wanted to give us...

210- I. Ah..huh...

211- C. I tell you...he did not speak to me...when he called..he spoke to Rogelio...

212- I. Yes..? and what did he say..?  what had happened to him..?

213- C. He said that later on...

214- I. Yes.. and what did he say..?

215- C. Say...what of the shooting..?

216- I. What happened to him..?

217- C. In the shooting..?

218- I. Yes...?

219- C. Well, that he was making a call in a public telephone...

2      I.    Yes...?

22.-   C.    In the street...and a car passed and fired some shots at him...

222-   I.    Just like that..?

223-   C.    Yes...no, he said he did not know who they were...

224-   I.    Oh, and what else did he say....?

225-   C.    Well,...about Javier Barba...that...

226-   I.    Yes...?

227-   C.    That he wants to rise...?

228-   I.    Yes...?

229-   C.    That..I don't know how to tell you to describe him...you know... but
             he says that he is envious...and that he...doesn't give a damn...and he
             wants to rise to be the biggest trafficker...

230-   I.    And...and..what else did he comment on any other person...?

---    C.    On that day...?

2  -   I.    Yes..?

233-   C.    Well...um...he told us that the...the sister of Rafael had a boutique
             over at calle Mexico...in front of Plaza Mexico...

234-   I.    Yes...

235-   C.    I think that it is Manuela...I am not sure...

236-   I.    Yes...

237-   C.    And, what he spoke most about that day was...well he told me about the
             restaurant...you know...?

238-   I.    Yes...

239-   C.    That he is going to open a restaurant where they will have nothing but
             quail....

240-   I.    Uh..huh..

.1-    C.    But that he needed an incubator for...I think for the quail eggs..Right?

2  -   I.    Yes..?

| | | |
|---|---|---|
| | C. | And he asked us...or asked us to enquire to see how much it cost... to see if he could bring it down and all that... |
| 244- | I. | Uh..huh..so...what else did he say? about Caro..what did he say..? |
| 245- | C. | About Rafael Caro...? |
| 246- | I. | Yes... |
| 247- | C. | That he did not know where he was... |
| 248- | I. | That he did not know where he was..? |
| 249- | C. | No... |
| 250- | I. | (New interrogator)... But you say that he is a friend of the family..? |
| 251- | C. | Oh.!! you bastard..Oh!! |
| 252- | I. | Eh? |
| 253- | C. | It..I understood...I say, that is what he gave us to believe..you see..? that he knew the family because I believe he was courting one of the sisters... |
| 254- | I. | (New voice)  Oh..yes..? |
| 255- | C. | Yes... but I am not sure.... |
| 256- | I. | Yes.... |
| 257- | C. | That...that...Rogelio commented to me... (return to interrogator) |
| 258- | I. | Listen...if the bastard has given you so many locations why haven't you gone after him..? |
| 259- | C. | Look...as I explained to the Commander, we have laws in the United States... |
| 260- | I. | Yes... |
| 261- | C. | That we cannot participate actively in any investigation...that..well... we do not have authority to arrest persons in Mexico...we are not... who knows... we are not agents from here...you see...? |
| 2- | I. | Yes.... |

2297

2 - C.   We are agents of the United States, here we are prohibited from taking
          part in arrests also...

264- I.  Yes...and then who carries them out...?

265- C.  Well, when there is information it is passed to the Commander...

266- I.  To which...?

267- C.  The one whose turn it is who is here..you see..? and we give him the
          information... and if he wants to continue the investigation...well he
          decides....

268- I.  Yes....

269- C.  Hah...lately there has been no information...you won't believe me, but
          there are no...I'm telling you that we are being reprimanded from Wash-
          ington because according to them we are not working here...

   - I.  Uh..huh...

2,1- C.  As I say, well...who is going to do the work if they have one unarmed...

272- I.  Yes....   (new voice)  You do not have permission..?

273- C.  What...?

274- I.  You do not have permission...?

275- C.  No one has permission, as I tell you...to carry arms...(tape pause or
          break)

276- C.  It is on Manuel Acuña, it is 2636, it is two six or 2666, probably...I
          am not sure...I know which the house is...

277- I.  Have you placed a stake-out there..? (surveillance)

278- C.  No, you see... you won't believe this but it is very dangerous for us
          to conduct surveillance, as I say...we are unarmed...

279- I.  There is...(unintelligible)...

280- C.  And then...I would not take the risk...you know..a stake-out without
          anything..and then being alone...?

28  I.  Do you know the famous Manuela...?

282 C.  No,  I have never seen her....

283 I.  With the information passed to you...why didn't you go and check..?

284 C.  I went by the place where the boutique was, but we only passed by....
(background voice:"what a good thing").

285 I.  And, didn't they give you a description of this girl...?

286 C.  No, I don't, I don't know her...he only said that she was a sister...
of Jose....

287 I.  But he did not locate her..?

288 C.  Eh?

289 I.  Did he locate her for you..?

290 C.  The place..?

?   .  Her...?

292 C.  No..uh..uh..since he left the Tapatio we haven't, I tell you, we have not
seen him since...

293 I.  And when you pass by the house of the...the mother of this friend (com-
padre)...?

294 C.  No, no, I say, I passed by only once...no, no, as I say, who is going
to take the risk, as I say of setting up surveillance, and make a lot
of passes by there if one does not have an arm (firearm) and one is alone..

295 I.  What has happened is that you have not wanted to pass on the information
to Mexico...directly...

296 C.  What do you say..?

297 I.  Eh..?  You are selling yourself to these guys..?

    C.  No...I tell you...

29° I.  That is how the report arrived...

300 C.  No....(pause)..

I. Listen, don't you have the locations of the domiciles of....on the
part of this, engineer, this Barba...?

302- C. I don't understand...?

303- I. Yes, the one that you said a while ago that sold houses to....

304- C. Who handled properties for...for Fonseca....

305- I. Who handled properties..?

306- C. Yes... but the only one that I know of...is that hotel he bought...no..,
I do not remember the name of the hotel but it is at Gonzalez and Ce-
laya before getting to the traffic circle....there where the...those
Ganaderos are....

307- I. Yes....

308- C. On the right hand side....

309- I. Ah...(throat clearing) what other places do you know of his...?

- C. Not a one...um...yes, look, like a hotel, do you know it? it is a ho-
tel or condominiums, right? on Vallarta after crossing Americas...

311- I. Whose is it?

312- C. Ernesto's, ...ah, look, wait, wait...I think the hotel is called "Venus"

313- I. Yes...

314- C. Yes... it is the one that is there, going out to the highway...no the
highway by Gonzalez Gallo....

315- I. And properties of...of this...Rafael..?

316- C. No, the only...well, that is the other thing that this Ramirez told us..
that he also knows that he had just purchased the Country Ford...the
automobile dealership which is there on Lopez...I mean on Americas...
it is the only business that I know he has...

17- I. And it is his property..?

8- C. That he had just bought it... (pause)..

3˘   I.   This informant of yours has not told you of any other property..?

3˘   C.   No, they are the only ones I remember right now... -

321-  I.   Try and remember about another one...

322-  C.   I told you those....I don't know if they are condominiums or apart-
           ments...there by....by Vallarta avenue, after passing Mexico(avenue)...
           no, after passing Americas...

323-  I.   Are these all the properties you know of..?

324-  C.   Yes..sir....(pause)

325-  I.   Is that true..?

326-  C.   I can't remember    any others...

327-  I.   Not long ago other companions went....and others that I was not in the
           room....

328-  C.   I do not understand...?

  ˘   I.   At the ranch....

3__-  C.   I don't... I do not know the ranch...they showed me some photographs
           of commander Lorrabaqui...some photographs that were taken at a ranch...
           which is near...over by Puente Grande, but I do not, I do not know
           the place...I have never gone over there...

331-  I.   You don't know what it is called..?

332-  C.   The Ranch...?

333-  I.   Um...?

334-  C.   I have read it there but I do not remember right now...

335-  I.   Are you sure that that came out...?

336-  C.   I beg you pardon...?

337-  I.   Are you sure that that one came out...?

˘˘9-  C.   I do not know if in the newspaper...or the Federal Agents told me...

__9-  I.   You see how you are lying to me...?

340-  C.   No, no, why, why, would I be telling lies about that..?

3-1- C.    Do you believe...you are going to give me...I do not like...nobody
           likes to get beaten up...because, as I go remembering so I am telling
           you.....(pause)

342- I.    Don't you know the properties that he handles all the properties...that
           you don't have them located...?

343- C.    The properties....that he handles...?

344- I.    Of that Rafael and Ernesto...?

345- C.    No....

346- I.    That Barba handles...?

347- C.    Well...exactly, the...the...businesses or places, I do not know them...
           right...?...I say...that was what was men(mentioned)...what Lic. Garcia
           Bueno...that he handled the affairs of Ernesto Fonseca...

3- I.      But they do have them located...or not?

)- C.      No...

350- I.    Then how do you know about the hotel...how do you know about that....?

351- C.    That (cough) the hotel...I think it is called "Venus", no? which is
           over on Gonzalez Gallo....the head of the office is a friend of Mr.
           Oli...Oliveros...Ontiveros..?

352- I.    Of which office..?

353- C.    The head of my office....James...

354- I.    Yes...

355- C.    He is a friend of Mt. Ontiveros or Oliveros, I am not sure...who was
           the previous owner....

356- I.    You, through him learned that it belonged to...this Ernesto...

^57- C.    That he had sold it to Ernesto...

ง58- I.    Ontiveros, what is he called..?

ง.ง- C.    No, no I do not know what the other surname is, or if it is Ontiveros
           or Oliveros.....

```
    - I.    Then your commander is a friend of his..?

    1- C.   Oh, yes, of Ontiveros....will you give me another cigarette, please?

  362- I.   Yes...

  363- C.   (recorder on-off) and a half...

  364- I.   Yes....

  365- C.   Rogelio is the one who dealt with him.....

  366- I.   (New interrogator)  This commander...did he just come forward and speak.

  367- C.   He offered himself...

  368- I.   Yes...

  369- C.   A..hah..they made a date, and saw each other somewhere and talked...

  370- I.   And...what did they talk about...?

  371- C.   At that time about some plantations that there were over in Sonora...

  372- I.   Yes....

    - C.   He gave them the location more or less...right?

    4- I.   Yes...

  375- C.   Not exactly...but as...

  376- I.   Where...in what city..?

  377- C.   Close to Ciudad Juarez...no, ...Obregon...

  378- I.   Oh...when was this...?

  379- C.   I think it was in '83...

  380- I.   What did you say the one who put them (in contact) was called..?

  381- C.   Jesus Ramirez...  (pause)

  382- I.   And over there at the airport, apart from the locations of Miguel...
           those planes that Miguel has...don't you have other planes located..?

  383- C.   I think, I only know those two...that is...I said that one that had
           American registration, I understand that he sold it...

    4- I.   But haven't they given you Ernesto's planes...?
```

2303

385- C.   So, I don't know...

    I.    Oh..? the other one, the other one this Rafael?

3   · C.   They say that he has a Jet...

388- I.   Who..?

389- C.   Rafael...

390- I.   A jet...?

391- C.   Yes...

392- I.   And you don't know if...if he is here..?

393- C.   I do not know...

394- I.   Does he have the jet here...?

395- C.   Yes...it is in...in the hangar following the...the Cessna (hangar)...

396- I.   What is the color of that plane..?

397- C.   White with brown stripes, with stripes giving it an orange color...

398- I.   You have seen this plane..?

    · C.  I did see it once...

400- I.   And have you seen him in it..?

401- C.   (very weak)  No, sir...

402- I.   Who have you seen there..?

403- C.   Well, I saw when the plane passed, right, it was there in the hangar of
          the Proco...(Office of the Attorney General) and the plane passed..uh...

404- I.   Were there people in the plane...?

405- C.   (speaking with difficulty) I don't know...I could not tell you..ah...
          can I get in a comfortable position..?

406- I.   Yes...well aren't you an investigator..?

407- C.   Ouch...ouch...

408- I.   Eh..?

  - C.    Ouch...ouch...

41.-- I.  And you don't know if there were any people in the plane...?

411- C.  No...I Don't  know...look...Ouch..well...I saw the plane go into the
hangar...you see...but I did not follow it because of fear...also...

412- I.  But what did you see from afar?

413- C.  Only the pilot...

414- I.  Was he alone, then?

415- C.  Well I only saw the pilot.....I saw it land and then went to the hangar...

416- I.  And Ernesto's?

417- C.  His planes...?

418- I.  Yes...

419- C.  No, I do not know of any...

420- I.  Who else...who else of these has aircraft...?

4^^ C.  They are the only ones I know of...

4  . I.  Those of Miguel and Rafael Caro..?

423- C.  There were three of them before....

(End of Side # 1)

(Beginning of side #2)

424- I.  This pilot...who had the...the jet of Rafael...what is he like..?

425- C.  Well, he was sitting down, sir, in the plane when it passed...and well,
I saw the plane...but him...I did not pay attention to him, you see..?

426- I.  Is it a long time since you saw him..?

427- C.  About two or three months...

428- I.  And the pilots of this...of um...Miguel..?

429- C.  Ouch...

430- I.  Do you know him..?

.- C.  Personally...? no, no...

2305

2- I.    Who are they...?

433- C.    No, no, I don't know....

434- I.    You do know who they are...?

435- C.    There is a man who....in the reports I saw...I...I am trying to remember (several unitelligible words)...

436- I.    Who else is there?

437- C.    What?

438- I.    Who else..?

439- C.    Of pilots..?

440- I.    Um..humm...

441- C.    The...the men that I tell you...

442- I.    There must be more...if there are three planes....you belive that only one pilot..?

443- C.    I imagine so...

444- I.    Is that so..?

445- C    But I don't, I don't know them....

446- I.    You have not looked in the airport...have you..?

447- C.    That I can remember...another...another name of another pilot...(pause).

448- I.    And the pilot of the jet?

449- C.    Of the jet?

450- I.    He is not in the reports...?

451- C.    That I can remember, no, sir...

452- I.    Regarding the property that Ernesto has over at....some stables that you spoke of...?

1- C.    No, not him...(tape pause---Recorder on-off)

4- I.    What is it like there...?

455- C.    It is..uh...well, I have entered the stable, you see...?

Case 2:87-cr-00422-JAK   Document 3006   Filed 05/11/88   Page 111 of 128   Page ID #:20787 23.

2306

ᴺ-.-- I.   Yes...

4ᴖ/- C.   I have never entered further down....

458- I.   In what part, more or less, is the house..?

459- C.   Going..passing the periferico...going to Tepic on the highway, where it is divided...it is the first turn...where you can make a "u" turn, before getting to the Pemex station...

460- I.   And, which way from there...?

461- C.   What..?

462- I.   Which way from there?

463- C.   Well you enter in, and go down as it is a drop, right, turn on a flat.. which I was told remained at the first block, you turn to the left, and then one block more and turn again to the left and that it was on this little street, but I never looked...

.- I.   And, how long ago did you go there?

465- C.   What?

466- I.   How long ago did you go there..?

467- C.   Uh...about one year ago...

        (voice in background: EH!)

468- C.   Listen, about one year ago...I took my son to see the horses...they were...in that sport where they jump the horses...fences...

469- I.   Um..hum...

470- C.   That was when I was there...

471- I.   Isn't Ernesto there in that house...?

472- C.   (unintelligible)

473- I.   You haven't placed a surveillance there...

ᵼ- C.   What did you say..?

I. And you haven't carried out surveillance there...?

C. No...I tell you that without a gun, we are not allowed to carry a gun... it is suicide to set up surveillance...

477- I. And can't you check up in some other manner..?

478- C. Well the person who gave me the information was the one that they shot up and he was the only one who had told me about that...

479- I. Are there more people that might have gone over there..?

480- C. No...

481- I. Hasn't that house been reported..?

482- C. No, I never reported it...

483- I. But doesn't the commander know about it...?

484- C. I beg you pardon...?

485- I. Doesn't the commander know..?

C. I don't know...I don't remember if I told him...

I. Then who did they pass information to about this house...?

488- C. That was given to me by Lic. Garcia Bueno...

489- I. Only to you...?

490- C. Yes...

491- I. And you did not pass on the information..?

492- C. No, I never the (unintelligible)

493- I. Apart from that, those cases...which other ones do you know about..?

494- C. If I say....

495- I. Apart from the ones you have told me about...

496- C. That is the only (unintelligible) that I remember...

497- I. Try to remember another...

'08- C. I am trying....

.9- I. Try....

2308

(tape pause)   (Camarena in very low voice)

500- C.   Cuauhtemoc and Tepeyac, behind a seafood restaurant that was an antenna

or something like that...

501- I.   About fifty meters high...?   (another voice)

502- C.   About that....

503- I.   What is the antenna for? for Radio?

504- C.   Ouch...(very low) it seems to be for radio...Ouch...

505- I.   Whose is that house?

506- C.   It belongs to Ernesto....

507- I.   Ernesto...?

(Recorder on-off)

508- C.   It was on Plan de San Luis...where the family used to live, right?

the family of...

5 - I.   Of who? of Rafael?

510- C.   (unintelligible)

511- I.   How long ago was that..?

512- C.   Umm...two...three years ago when Commander Gerardo Serrano was here...

513- I.   What is the name of the street?

514- C.   Plan de San Luis...

515- I.   But Don?...more or less where is it?

516- C.   Eh?  Prolongacion de Lopez Mateos...ouch...for traffic, where the traf-

fic circle of Americas and Lopez Mateos is, you go one block on Circun-

valacion and then it is the first street, there is a traffic circle...

ouch...

5-- I.   Yes, go on...

5--- C.   Oh...Oh... Oh... (as if in pain)

5--- I.   We are not going to beat you...we are not going to do anything...we are

2309

only talking, well...Okay...?

(voices in the background to Camarena: Put your hands up...like that... see if it gives strength)

520- I.   Let's see, go on...where is it , more or less..?

521- C.   I said, then you take the traffic circle of...this one of Lopez Mateos and Americas, one block away there is another cicle, this, there is a restaurant that is called...I think it is Guamuchil....turning to the right, and that is Plan de San Luis, it is a long block and you turn to the right from Circunvalción, Plan de San Luis is on you left..about half way up the block, I think the address is 1060 or 1020 or 1061, something like that,...

522- I.   Who gave you this information...?

523- C.   That is...Jesus Ramirez...

      I.   He is the only one who gives you information...?

525- C.   He is the only one who has provided us with it, apart from...Jesus Alvarez...I think...I do not know if you think that there are a lot of people working, there is almost nobody, all of them are afraid...

526- I.   Of those who have told you that they are afraid?

527- C.   What?

528- I.   What have they told you?  Don't you talk to them..?

529- C.   (unintelligible)...well yes...

530- I.   (New voice) Well tell us about Chuy Ramirez...

531- C.   Yes....

532- I.   Does he say that he is not afraid..?

533- C.   Well I imagine that he must be afraid...because he is doing it, and I don't know why, because he is hardly paid any money...

534- I.   How much do you pay him, more or less?

| | C. | Ahh...pardon, ah..ahh...ah...can I settle myself? |
|---|---|---|
| 5 - | I. | Yes...settle yourself well... |
| 537- | C. | Ahh!...Ouch!!.ouch!! Jesus Ramirez showed me that house...on Paseo del Bosque... |
| 538- | I. | Paseo del Bosque..? |
| 539- | C. | I think that is the name of the street... |
| 540- | I. | Yes...where is it..? |
| 541- | C. | In Colina de San Javier... |
| 542- | I. | What is the name of that street? |
| 543- | C. | Paseo del Bosque... |
| 544- | I. | Paseo del Bosque..? |
| 545- | C. | Yes... |
| 546- | I. | And that street who is it..? |
| | C. | What..? |
| - | I. | Whose is it..?  Who does that house belong to..? |
| 549- | C. | Jesus said it belonged to Rafael...that he lived there at one time... |
| 550- | I. | He does not live there now...? |
| 551- | C. | No, sir, he moved.... |
| 552- | I. | On which side is Colima..? |
| 553- | C. | Do you...do you know which Pablo Neruda is..? |
| 554- | I. | Yes.... |
| 555- | C. | And Ruben Dario,..there are some giants there..? |
| 556- | I. | Yes... |
| 557- | C. | If one goes upwards up a hill and then reaches a circle...that is Acue- ducto, sir...I don't remember exactly, one turns there to the right, it is about six, to eight blocks downwards... one turns to the left on Pa- seo del Bosque...Ouch...and the house is on the left hand side...in the |

2311

first block...

558- I.   And haven't you carried out any investigations at this time...?

559- C.   No...as I say, I was asking for a transfer because things are very tough here...

560- I.   Then you are doing nothing, now...

561- C.   No...well, as I was saying, I was preparing myself to leave...the 25th of February they were coming to pack my things, over at the house...

562- I.   Let's see, another location that you remember, just like that..?

563- C.   Oh...wait..pardon...Oh..ah...

564- I.   Eh...?

565- C.   Ohh...oh...I am going to settle myself...eh?

566- I.   Settle yourself well, but give me another location....

567- C.   Ahh..ouch...

568- I.   Remember well...

569- C.   Ohhhh!...yes,...yes...oh...oh...(weakly) that it is that one...I believe that it is by Paseo del Prado, I am not sure of the street, I know how to get there....

570- I.   Whereabouts is the house, more or less...?

571- C.   Over there...in the same direction...where I told you of Pablo Neruda and...and...Ruben Dario...going upwards to the hill, one block before getting to the traffic circle you turn to the right...that...well it is the second house because before there was an empty lot there, now they are building there...it is the second house brick color, it has some sort of aluminum doors, but it...

572- I.   Whose is this one, then?

573- C.   It belongs to Juan José Quintero.....

574- I.   And, apart from all these people you have named, do you know any more?

2312

```
        · C.   No, sir...

576- I.   Eh..?

577- C.   No, sir...

578- I.   Are you sure...?

579- C.   Very sure...if I remember I will tell you the rest.....

580- I.   For example....this Juan Esparragoza...

581- C.   I don't know anything about him...

582- I.   What do you know about him..?

583- C.   That he only had a house there close to the Consulate, about three
          blocks away, but they did not find it...street or address..oh..oh..ouch.
          ouch...

584- I.   And about Manuel Salcido..?

585- C.   He...I do not know...the only thing I know of the man, his brother Ser-
          gio has a discotheque at the exit...over by Vallarta...over there in
          front of Tios.

586- I.   What discotheque..?

587- C.   I do not remember the name...it is on the left hand side...

588- I.   By Vallarta...

589- C.   Yes...Vallarta avenue...ah....

590- I.   Whose is it...?

591- C.   Ouch!!! eeeow...what..?

592- I.   Whose is that..?

593- C.   It is Sergio... the brother of Manuel...oh...oh...oh...ahhh...oh..ahh...
          Couldn't I ask you to have my ribs bandaged, please...?

594- I.   Well, I have treated you well...eh..right? ...now..let's see...now...
          you are going to tell me well...

595- C.   Well, I think that that is all of them, sir...

596- I.   All of them?
```

2313

5^^- C.   Yes,....I think so...

5^.- I.   Um...which ones have you told me about...?

599- C.   Look, I told you...about the one at ...Cuauhtemoc...

600- I.   Yes...

601- C.   You know which one I mean..? right?

602- I.   Yes, I know...you have repeated it many times...

603- C.   Well yes, well, they are the ones you asked me about...the house at
          Pablo Neruda...Ruben Dario...Oh!!! ...Oh!!! pardon...Oh...

604- I.   I am not going to hit you...

605- C.   No, it was that I am getting sharp pains...

606- I.   Let's see, continue telling me which ones....

607- C.   (unintelligible) Ruben Dario and Turin, this...the one at..eh...Plan de
          San Luis...the Ford Dealership and the one which is by Paseo del Bosque,
          four...four (unintelligible)...

   t    I.   Which other one, let's see...remember... try and remember, yes..I am
          not going to hit you but try to remember...Okay..?

609- C.   Okay...

610- I.   Look how he is, see..? (as if speaking to another person)(recorder on-
          off)...

611- C.   I was given a telephone (number) once...

612- I.   Whose..?

613- C.   Of Jesus Alvarez, at one time...which was a house where a brother of
          Rafael lived...I remember well the telephone was 41-94-98-95 more or
          less and the address was on Rio Plata, but I never, never found the
          address...we got hold of the telephone bill..right?

614- I.   Yes...

   -  C.   But there was no address 2555 Rio Plata, but we never found the address
          or the house...

2314

I.   How is it possible that you did not find the address...?

6`¯- C.   Yes, because look, sir....

618- I.   You found the receipt...

619- C.   Yes...look. sir...um...there from the Ford Dealership...

620- I.   Yes....

621- C.   Going along Americas...going until(you get to) Zapopan...it is the first
street, but it has a...a different name...another..of a river...that
one of Rio Plata we never found...I mean...I never found it....

622- I.   And how did you get that telephone bill..?

623- C.   From Mr. Cardenas...

624- I.   He gave it to you...?

625- C.   Yes...

626- I.   Did he give you any others...?

C.   Well, you see, as I told you....he is a Commander, right?

- I.   Uh..huh...

629- C.   We receive requests for telephones from other investigations in the
United States, and when they ask for a telephone...they don't explain
why..Right?...only that this one...that this tele...this...any telephone
number (unintelligible) comes out in an investigation, and if it is in
Guadalajara or in the areas we handle....they write a report...(voice
overlap)..

630- I.   Look!  did they request that telephone from over there..?

631- C.   No, sir, this one was given to me by Jesus Alvarez...

632- I.   Any other receipt Jesus may have given you..? that you remember..?

633- C.   No, sir, it is the only telephone...

- I.   It is the only telephone bill?

635- C.   It is the only telephone he gave me...he gave me a telephone also of the

2315

house at...at Cuauhtemoc...but I don't remember the number, sir...

636- I.   He gave you the telephone bill too?

637- C.   Yes...

638- I.   Any other receipt that you remember..?

639- C.   A receipt from the Hotel de las Americas, sir... but I don't remember the number...as I say, as I am now about to leave...the one who is in charge of this investigation is agent Wallace...

640- I.   Hmm...then this Alvarez passes information to all of them...?

641- C.   Yes..., what he knows...

642- I.   Does he know all of them..?

643- C.   I don't know if he knows all of them by sight...but he has people who work with him...as I explained...

    I.   And they work with them..?

645- C.   No sir,...I don't think so, sir...I think they are ex-agents of the Directorate of Public Security there from Zapopan...

646- I.   The people of the other one...?

647- C.   Pardon?

648- I.   You don't...know any of those agents?

649- C.   I have never had any dealings with them...the only one I have dealt with is Jesus Alvarez...

650- I.   Any businesses of theirs that you know of...?

651- C.   Of whose, pardon?

652- I.   Of Rafael?

653- C.   The only one I know of is the one Jesus told us about that he had just purchased the Ford Dealership...that is all...(unintelligible)...

    - I.   He must have some old business, no?

655- C.   No business of his has ever come out....

33.

2316

65__ - I.   And Ernesto does not have other businesses..?

6_ - C.   The only ones...ah...are the...the hotel, and the...the Hotel Venus,

the one I tell you is at the exit of Gonzalez Gallo and one that is

over by Vallarta...this on the left going on Vallarta...after passing

Americas...

658- I.   What other traffickers do you know about apart from those you have named?

659- C.   Well, that's about all...here the ones of Guadalajara...

660- I.   Ah...(cough) any other one you have located..?

661- C.   At this time, Commander I do not remember...

662- I.   Let's see...remember, I am treating you well...

663- C.   Yes, sir....

664- I.   Eh...any recent report..?  Haven't you done anything recently...?

665- C.   No, sir, ...look, I..I will explain...for more than a year I have not...

for almost a year I have not made a case...

t  - I.   Then what is it that you are doing there at the office..?

667- C.   Only preparing to leave, sir...

668- I.   Are you sure?

669- C.   Yes, sir...that is what...(unintelligible)

670- I.   What have you seen in the office...what have you checked?

671- C.   I did not understand your question...

672- I.   Yes, that is why I am asking you for more names...any other name?

some other report lately..?

673- C.   No, sir, as I say, at this time I am giving attention  in the office

to the business of Miguel Angel, as I explained...we had nothing to

do with the business of Chihuahua...what is being concentrated on...as

they have...look! do you remember that I told you that we are only four



agents and there is one here from New York..?.

6'   I.   Yes...

67   C.   Well, two of them fly the aircraft, the planes every day, to see if
          they can find plantations...eh...they go to the airport at seven in
          the morning and don't return until about twelve or one to the office...
          Agent Wallace is the one who is working on the investigation of Miguel
          Angel Felix Gallardo...he spends every day there in the office listen-
          ing to the radio...and he assists Mr. Kuykendall...I am preparing for..
          as I told you, they had given me my transfer...and now for some time
          they had told me that...I should prepare to leave...

676- I.   So you have not done anything now..?

677- C.   No, I have not (unintelligible).

678- I.   Where do you say that Juan lives...?

679- C.   Juan, José Quintero..?

6    I.   Esparragoza?

68-- C.   The only information this man has given us is that he has a house close
          to the Consulate, about three blocks away, but the person was not able
          to tell us in what...in what direction...

682- I.   Do you know him..?

683- C.   Only through his photograph...

684- I.   Where do you have his photograph..?

685- C.   At the office...

686- I.   What other location do you have of him..?

687- C.   Of Esparragoza..?

688- I.   Yes...

689- C.   This is the only one I know of...and as I say, I don't know where it is.

2318

690- I.   You must have heard of another somewhere...?

   - C.   No, sir, hardly...we never hear until the end of the job...

6.2- I.   (throat clearing)so the business of Chihuahua is not, they have now
          left it out...?

693- C.   We have..yes, sir...as I explain to you again...we did not have any-
          thing to do with that matter...?

694- I.   Then, what were you doing here..?

695- C.   I say...those two agents, the one from New York and the other one, are
          flying the aircraft, right? the planes in order to try and find...find
          plantations...huh...they have found practically nothing because they
          have small planes and you can't see well out of these plnes...

696- I.   Then are you getting money out of there..?

697- C.   From where...sir..?

698- I.   From the Chihuahua case...?

   - C.   I don't know...nobody that I know of...

700- I.   Then why are they closing the case..?

701- C.   Closing what, sir..?

702- I.   That case...?

703- C.   Let me explain, sir...that...we only pass on information to the Fede-
          ral Agents of the Federal Judicial (Police)...right? when there is
          information, in their turn of work, deal with it..oh..and then, after
          a seizure has been made...then..ah then the reports arrive..from the
          office in Hermosillo...but I explain to you once more...we had nothing
          to do with this matter...

704- I.   I am not asking you if you had anything to do..eh...why did they close
          the file...?

   - C.   They closed the file firstly because it was a matter that the office
          in Hermosillo worked on...(pause) as I explained, sir, that was the



jus...Chihuahua is dealt with by the office in Hermosillo...

706- I.   Why..? didn't they say that Rafael was somewhere around here?

707- C.   Pardon..?

708- I.   Didn't they say that Rafael was somewhere around here?

709- C.   That is what Jesus Alvarez said, but he did not put...but he did not say where...

710- I.   And you pretended to be the forgetful ones...?

711- C.   I don't understand your question...

712- I.   Hmmm....

713- C.   I did not understand your question...

714- I.   You did not investigate...?

715- C.   No, sir...

716- I.   Then, what work do you do...?

7     C.   Well..um...depending, to make cases, right, sir...get information on where there is merchandise, but we do not do it...we do not have the people to give us that information....

718- I.   Then is Rafael giving you money..?

719- C.   No, sir, to me no, sir...

720- I.   Then why don't you know anything about him..?

721- C.   Because, sir, the only thing I know is about the houses, those locations that Mr. Juan Alvarez gave me, right, look, I have passed by Cuauhtemoc but,..no, no, not in other matters, right?, when I say other matters, I mean that I go from one place to another, but, no, to conduct surveil-lance over there at the house, I have never, sir...for the same reason... that·, well...I am afraid...

I.   Then no one was investigating that...?

7  · C.   Rafael..? no, sir...

2320

72  I.  Then, Miguel is the only one who is being investigated..?

725- C.  He is the one that...is being investigated, sir...neither is Ernesto

being investigated, sir...

726- I.  Why...?

727- C.  We do not have people who will give us information about him...apart

from those I have already told you about....

728- I.  Then, if you have the locations of these others, why haven't you re-

ported them..?

729- C.  Who, sir...?

730- I.  Ernesto Fonseca and Rafael Caro....?

731- C.  That I have not...I have not reported them, sir, because, for the same

reason, that I don't...I did not want trouble...I just wanted to get out

of here...

73..- I.  What is your work then, as I have said...?

733- C.  Well, that of intelligence...answering the telephones...when they ask

for...

734- I.  It is that he is giving you money, is that not true..?

735- C.  No, sir, no, sir, I was explaining...to the Commander that...the DEA

did not deposit my cheque...and my cheques were bouncing...my salary...

736- I.  Give me a good location for Rafael...

737- C.  I don't have one, please!  What can I say if I don't have one...?

738- I.  Of Ernesto..?

739- C.  Well, Ernesto...the...those houses...but where he is...no, no, no,...

what I want to say is, that we do not go out on the street to find them,

because it is very dangerous....

7..0- I.  And, don't you have information, more or less, where they are...?

741- C.  No, sir...I..um...have information on the houses, but where they are, no

38.

2321

7'' I.   How is it possible that they could have gotten lost...?

74 - C.  I don't understand, sir.....

744- I.  How many people do you say that they have with them...?

745- C.  We are four here....and one....

746- I.  No, them?

747- C.  Ernesto?

748- I.  Yes...

749- C.  Well, Chuy Alvarez says that he has a number of armed men...right?

750- I.  About how many...?

751- C.  About twenty or thirty...

752- I.  And Rafael?

753- C.  Rafael has fifty, seventy, more or less....

754- I.  And do you think that this will not be noticed...?

# CERTIFICATE OF SERVICE BY MAIL

1

2  I, _____ Marta L. Larin _____, declare:

3      That I am a citizen of the United States and resident or employed in

4  Los Angeles County, California; that my business address is Office of United

5  States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles,

6  California 90012; that I am over the age of eighteen years, and am not a party

7  to the above-entitled action;

8      That I am employed by the United States Attorney for the Central District

9  of California who is a member of the Bar of the United States District Court for

10 the Central District of California, at whose direction the service by mail

11 described in this Certificate was made; that on __May 11, 1988__, I

12 deposited in the United States mails in the United States Courthouse at

13 312 North Spring St., Los Angeles, California, in the above-entitled action,

14 in an envelope bearing the requisite postage, a copy of GOVERNMENT'S OPPOSITION
   TO DEFENDANT VERDUGO URQUIDEZ' MOTION FOR PRE-TRIAL HEARING RE AUTHEN-
.15 TICITY AND ADMISSIBILITY OF TAPE RECORDINGS AND THE ACCURACY OF GOVERN-
   MENT'S PROPOSED TRANSCRIPTS; MEMORANDUM OF POINTS AND AUTHORITIES;
16 DECLARATIONS

17 addressed to

18              (SEE ATTACHED LIST)

19

20

21

22 at __THEIR__ last known address, at which place there is a delivery service by

23 United States mail.

24     This Certificate is executed on __May 11, 1988__ at

25 Los Angeles, California.

26     I certify under penalty of perjury that the foregoing is true and correct.

27

28                                      _Marta Larin_

USA-12c-240
(Rev. 1/3/77)                                                    DOJ

## SERVICE LIST

Elsa Leyva
Deputy Federal Public Defender
1500 U.S. Courthouse
312 North Spring Street
Los Angeles, California 90012

Donald C. Randolph, Esq.
2566 Overland Avenue
Suite 700
Los Angeles, California 90064

Michael Pancer, Esq.
Home Federal Building
Suite 1135
625 Broadway
San Diego, California