ROBERT C. BONNER
United States Attorney
ROBERT L. BROSIO
Assistant United States Attorney
Chief, Criminal Division
JIMMY GURULE
Assistant United States Attorney
Deputy Chief, Major Narcotics Section
    1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-6579

Attorneys for Plaintiff
United States of America

FILED
CLERK, U.S. DISTRICT COURT
MAY 13 1988
CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | No. CR 87-422(B)-ER |
| Plaintiff, ) | GOVERNMENT'S OPPOSITION TO |
| ) | DEFENDANT'S MOTION TO DISMISS |
| v. ) | FIRST SUPERSEDING INDICTMENT |
| ) | FOR VIOLATION OF EXTRADITION |
| RAFAEL CARO-QUINTERO, et al. ) | TREATY; MEMORANDUM OF POINTS |
| ) | AND AUTHORITIES; EXHIBITS |
| Defendants. ) | |

Plaintiff, United States of America, as represented by the undersigned Assistant United States Attorney, hereby files the Government's Opposition To Defendant's Motion to Dismiss First Superseding Indictment For Violation of Extradition Treaty.

The Government's Opposition is based upon the attached Memorandum of Points and Authorities, the records and files in the case, and any oral argument that may be presented at the hearing on this matter.

DATED:  This 5th day of May, 1988.

ENTERED ON COURTRAN
MAY 17 1988

Respectfully submitted,

ROBERT C. BONNER
United States Attorney

JG:mnm:arm:rog

ROBERT C. BONNER
United States Attorney


JIMMY GURULE
Assistant United States Attorney
Deputy Chief, Major Narcotics Section

Attorneys for Plaintiff
United States of America

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES    ii

MEMORANDUM OF POINTS AND AUTHORITIES    3

I.   INTRODUCTION    3

II.  ABSENT AN OBJECTION OR PROTEST BY MEXICO,
DEFENDANT VERDUGO HAS NO STANDING TO RAISE A
VIOLATION OF INTERNATIONAL LAW    4

III. THE GOVERNMENT'S FAILURE TO REQUEST THE EXTRADITION OF
DEFENDANT VERDUGO DID NOT VIOLATE THE EXTRADITION
TREATY    9

IV.  CONCLUSION    15

# TABLE OF AUTHORITIES

CASES:                                                                    PAGE

Fiocconi v. Attorney General of the United States,
    462 F.2d 475 (2nd Cir.),
    cert. denied, 409 U.S. 1059 (1972)                                     8

Frisbie v. Collins,
    342 U.S. 519 (1952)                                                   10

Ker v. Illinois,
    119 U.S. 436 (1886)                                                 9, 10

Ker—Frisbie doctrine                                                  9, 10, 11

Myers v. Rhay,
    577 F.2d 504 (9th Cir.),
    cert. denied, 439 U.S. 968 (1978)                                     10

Shapiro v. Ferrandina,
    478, F.2d 894 (2nd Cir.),
    cert. dismissed, 414 U.S. 884 (1973)                                   8

Stevenson v. United States,
    381 F.2d 142 (9th Cir. 1967)                                     12, 14, 15

United States Ex Rel. Lujan v. Gengler,
    510 F.2d 62 (2nd Cir. 1975)                                            5

United States v. Cordero,
    668 F.2d 32 (1st Cir. 1981)                                         4, 13

United States v. Cotten,
    471 F.2d 744 (9th Cir.),
    cert. denied, 411 U.S. 936 (1973)                                     10

United States v. Evans,
    667 F.Supp. 974 (S.D. N.Y. 1987)                                       7

United States v. Fielding,
    645 F.2d 719 (9th Cir. 1981)                                          10

United States v. Jetter,
    722 F.2d 371 (8th Cir. 1983)                                           8

- ii -

1

TABLE OF AUTHORITIES

2

CASES:                                                                PAGE

3

United States v. Lovato,
4        520 F.2d 1270 (9th Cir.),
         cert. denied, 423 U.S. 985 (1975)                          5, 10

5
United States v. Mann,
6        829 F.2d 849 (9th Cir. 1987)                                   7

7   United States v. Reed,
         639 F.2d 896 (2nd Cir. 1981)                          4, 6, 7, 14

8
United States v. Rosenthal,
9        793 F.2d 1214 (1984)                                           7

10  United States v. Valot,
         625 F.2d 308 (9th Cir. 1980)                              Passim

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

I

### INTRODUCTION

On January 24, 1986, defendant Rene Martin Verdugo-Urquidez (hereinafter "Verdugo") was apprehended in Mexico by Mexican law enforcement officials.  Defendant Verdugo was immediately transported to the United States international border near the Port of Entry at Calexico.  Defendant Verdugo was thereafter placed under arrest by the United States Marshal based on an outstanding arrest warrant which was issued August 5, 1985, by United States Magistrate Roger Curtis McKee, United States District Court, Southern District of California. [1]/

Defendant argues that the court should dismiss the present indictment because the government failed to secure his presence in the United States through the extradition process.  Defendant Verdugo maintains that the government's failure to request defendant's extradition to stand trial in another federal district, the Southern District of California, for federal narcotics violations alleged in a different indictment, case number 86-0107-JLJ-CRIM, requires dismissal of the present indictment which was returned by a federal grand jury in Los Angeles.

_____

1/  The facts surrounding defendant Verdugo's apprehension in Mexico and subsequent arrest in the United States are fully detailed in the Memorandum Decision and Order issued by the Honorable J. Lawrence Irving, United States District Judge, Southern District of California, in the case number 86-0107-JLI-CRIM.  (See Exhibit A).  Judge Irving in his Memorandum Decision and Order, denied defendant Verdugo's motion to dismiss the indictment based upon the circumstances surrounding his apprehension in Mexico.

-3-

Defendant's motion is frivolous and therefore should be denied by the court.

II

## ABSENT AN OBJECTION OR PROTEST BY MEXICO, DEFENDANT VERDUGO HAS NO STANDING TO RAISE A VIOLATION OF INTERNATIONAL LAW

Extradition treaties are made for the benefit of the governments concerned. "[U]nder international law, it is the contracting foreign government, not the defendant, that would have a right to complain about a violation." United States v. Cordero, 668 F.2d 32, at 38 (1st Cir. 1981); United States v. Reed, 639 F.2d 896, 902 (2nd Cir. 1981).  In United States v. Valot, 625 F.2d 310 (9th Cir. 1980), appellant was arrested in Thailand by Thailand police officials on a marijuana charge. Appellant was subsequently taken by Thai immigration officials to the Bangkok Airport and turned over to Special Agents of the Drug Enforcement Administration.  Valot, over his protest, was placed aboard a flight to Honolulu.  Appellant was thereafter arrested on an outstanding arrest warrant upon his arrival in Hawaii. Valot argued that his removal from Thailand violated the extradition treaty between the United States and Thailand.  In rejecting appellant's argument and affirming his conviction, the Ninth Circuit reasoned:

> "Even where a treaty provides certain benefits for nationals of a particular state . . . 'individual rights are only derivative through the

-4-

> states.'"  [ALI, Restatement (Second) of
> Foreign Relation Law of the United
> States], § 115, comment e (1945)."
>
> United States Ex Rel. Lujan v. Gengler,
> supra 510 F.2d at 67 (dictum).

Id. at 310.  See United States v. Lovato, 520 F.2d 1270 (9th Cir.), cert. denied, 423 U.S. 985 (1975).

In United States Ex Rel. Lujan v. Gengler, 510 F.2d 62, 67 (2nd Cir. 1975), Lujan, a licensed pilot, was duped into flying from Argentina to Bolivia by a person who claimed to have a business interest in Bolivia, but who actually had been hired by American agents to bring Lujan to Bolivia.  Once in Bolivia, Lujan was taken into custody by Bolivian police, held for five days, and then placed on a plane bound for New York.  Appellant was arrested by United States federal agents upon his arrival in New York. Lujan claimed his arrest violated the charters of the United Nations and the Organization of American States.  The Second Circuit held that the failure of either Argentina or Bolivia to protest or object to Lujan's abduction was fatal to his reliance on the charters.  The Second Circuit held:

> The provisions in question are designed to
> protect the sovereignty of states, and it is
> plainly the offended states which must in the
> first instance determine whether a violation
> of sovereignty has occurred, or requires
> redress.  (citations omitted). . . .  Thus,
> the failure of Bolivia or Argentina to object

-5-

1
2
3

        to Lujan's abduction would seem to preclude
any violation of international law which might
otherwise have occurred.[2/]

4

<u>Id</u>. at 67.

5
6
7
8
9
10
11
12
13
14
15
16

    Moreover, in <u>United States v. Reed</u>, 639 F.2d 896 (2nd Cir. 1981), appellant did not appear for court on the date set for his trial, and a bench warrant was issued for his arrest. Appellant was later located in Bimini where he was enticed by Federal agents posing in an undercover capacity to board a private plane for Nassau. The plane in fact transported appellant to Fort Lauderdale, Florida, where Reed was placed under arrest. The Second Circuit rejected appellant's claim that the circumstances surrounding his apprehension violated the extradition treaty between the United States and the Bahamas, and held that appellant lacked standing to raise a violation of international law. The Second Circuit emphasized:

17
18
19
20
21
22
23

        The fact that the United States has an extradition treaty with the Bahamas does not make any difference at all. The Bahamian government has not sought his return or made any protest – nor is it likely to, since Reed is an American citizen. As we pointed out in <u>Lujan</u>, absent protest or objection by the

24
25

26
27

2/ The Second Circuit in <u>Lujan</u>, further stated that in order to support this claim Lujan would have to prove that the foreign government registered an official protest with the United States Department of State. <u>Id</u>. at 67 n.8.

28

-6-

offended sovereign, Reed has no standing to
raise violation of international law as an
issue. 510 F.2d at 67-68; See Toscanino, 500
F.2d at 279.

Id. at 902. See United States v. Mann, 829 F.2d 849 (9th Cir.
1987), citing with approval, United States v. Reed, 639 F.2d 896
(2nd Cir. 1981).

In United States v. Rosenthal, 793 F.2d 1214 (1984), the
Eleventh Circuit dismissed appellant's argument that the manner of
his apprehension in Colombia violated the extradition treaty
between the United States and Colombia. The Eleventh Circuit
reasoned that appellant lacked standing to complain about a
violation of international law:

Nor do we find merit in Rosenthal's argument
that the actions of the United States violate
this country's extradition treaty with
Colombia. Under international law it is the
contracting foreign government that has the
right to complain about a violation. United
States v. Reed, 639 F.2d 896, 902 (2nd Cir.
1981).

Id. at 1232.

Finally, in United States v. Evans, 667 F.Supp. 974 (S.D. N.Y.
1987), the district court held:

We note at the outset that defendants have not
pointed us to any applicable treaty provision
conferring judicially enforceable right on

-7-

1    defendants.  Under these circumstances, the
2    court must agree with the government's
3    contention that absent protest by Bermuda as
4    to violation of international law and where
5    Bermuda has not sought defendants' return,
6    defendants have no standing to assert that a
7    fraud has been committed upon Bermuda.  See,
8    e.g., <u>United States v. Davis</u>, 767 F.2d 1025,
9    1030 (2nd Cir. 1985); <u>United States v. Reed</u>,
10   639 F.2d 896, 902 (2nd Cir. 1981).  The rights
11   arising out of treaties and applying in cases
12   of extradition are rights belonging to be
13   asylum state, with rights accruing to
14   individuals being, at most, derivative through
15   the state.  (citation omitted).<u>3/</u>

16   <u>Id</u>. at 979.

17   As applied to the facts of the present case, the extradition
18   treaty between the United States and Mexico is for the benefit of
19   the governments concerned.  It is therefore the contracting

20

21

22   3/  Defendant Verdugo argues that even though he was not
extradited to the United States the doctrine of speciality is
23   applicable, and therefore he can only be prosecuted for the
criminal charges that were pending when he was apprehended in
24   Mexico and arrested in the United States.  Absent an objection or
protest by Mexico, defendant Verdugo lacks standing to object to
25   the prosecution in the present case as constituting a violation of
international law.  <u>United States v. Jetter</u>, 722 F.2d 371, 373,
26   (8th Cir. 1983); <u>Shapiro v. Ferrandina</u>, 478, F.2d 894, 906 (2nd
Cir.), <u>cert</u>. <u>dismissed</u>, 414 U.S. 884 (1973); <u>Fiocconi v. Attorney</u>
27   <u>General of the United States</u>, 462 F.2d 475, 480 (2nd Cir.), <u>cert</u>.
<u>denied</u>, 409 U.S. 1059 (1972).

28

-8-

governments, not defendant Verdugo, that would have a right to
complain about a violation of the extradition treaty. The
government of Mexico has not filed a formal protest with the
United States regarding the apprehension of defendant Verdugo in
Mexico. Furthermore, defendant offers no evidence, or any reason
to believe, that the Mexican government will be filing a formal
protest regarding an incident that occurred over two (2) years
ago. Defendant Verdugo therefore has no standing to object to an
alleged violation of international law when the purported
offended sovereign has not voiced an objection or protest.[4/]

                                III

            THE GOVERNMENT'S FAILURE TO REQUEST THE

            EXTRADITION OF DEFENDANT VERDUGO DID NOT

            VIOLATE THE EXTRADITION TREATY


     It is a general rule of law that when a person accused of a
crime is found within the territorial jurisdiction that has
charged him, and when that person is held under process legally
issued from a court of that jurisdiction, the jurisdiction of the
court is not impaired by the fact that the person was forcibly
apprehended to bring him into the charging jurisdiction. This
rule has come to be known as the Ker-Frisbie doctrine, named for
the two Supreme Court decisions upon which it is based, Ker v.

---

4/ It should further be emphasized that Judge Irving in his
Memorandum Decision And Order dismissed defendant Verdugo's
argument that his apprehension in Mexico violated the extradition
treaty. (Memo., Decision and Order at p. 14). Defendant Verdugo
is therefore barred under the doctrine of collateral estoppel from
relitigating this issue. United States v. Schwartz, 785 F.2d 673
(9th Cir. 1986).

-9-

1 <u>Illinois</u>, 119 U.S. 436 (1886) and <u>Frisbie v. Collins</u>, 342 U.S.
2 519 (1952). The <u>Ker</u> court reasoned that due process of law is
3 not jeopardized by "mere irregularities in the manner in which [a
4 defendant] may be brought into the custody of the law" assuming
5 the existence of a proper indictment or complaint. 119 U.S. at
6 440. The <u>Frisbie</u> court further explained that <u>Ker</u> and its
7 progeny:

8   . . . rest on the sound basis that due process
9 of law is satisfied when one present in court
10 is convicted of a crime after having been
11 fairly apprised of the charges against him and
12 after a fair trial in accordance with
13 constitutional procedural safeguards. There
14 is nothing in the Constitution that requires a
15 court to permit a guilty person rightfully
16 convicted to escape justice because he was
17 brought to trial against his will.

18 <u>Id</u>. at 522.

19 The Ninth Circuit has adhered to the <u>Ker-Frisbie</u> doctrine, as
20 established by a line of cases holding that the forcible return
21 to the jurisdiction of the United States does not constitute a
22 bar to prosecution once the defendant is found within the United
23 States. See <u>United States v. Fielding</u>, 645 F.2d 719, 723 (9th
24 Cir. 1981); <u>United States v. Valot</u>, 625 F.2d 308, 309 (9th Cir.
25 1980); <u>United States v. Lovato</u>, 520 F.2d 1270, 1271 (9th Cir.),
26 <u>cert</u>. <u>denied</u>, 423 U.S. 985 (1975); <u>United States v. Cotten</u>, 471
27 F.2d 744, 748 (9th Cir.), <u>cert</u>. <u>denied</u>, 411 U.S. 936 (1973);

28

Myers v. Rhay, 577 F.2d 504, 510 (9th Cir.), cert. denied, 439 U.S. 968 (1978).

The application of the Ker-Frisbie doctrine, however, is not limited to claims that the forcible apprehension in a foreign country constituted a violation of due process. The Ker-Frisbie doctrine is likewise applicable when a defendant maintains that his forcible removal from a foreign country violated the extradition treaty between the United States and the foreign sovereign. As previously stated, in United States v. Valot, 625 F.2d 308 (9th Cir. 1980), appellant challenged his removal from Thailand to the United States. In addition to his due process argument, Valot argued that his forcible removal from Thailand violated the extradition treaty between the United States and Thailand. In rejecting appellant's argument, the Ninth Circuit stated:

> Appellant argues that where an extradition
> treaty exists, it provides the exclusive means
> of returning the defendant to the United
> States. However, Ker v. Illinois, supra,
> decided the same day as Rauscher, involved the
> alleged abduction of a defendant from Peru by
> an official of the United States Government.
> Ker argued that the extradition treaty in
> effect between the United States and Peru had
> been violated, and that this barred
> prosecution. The Court held that there was no
> bar to Ker's prosecution in the Illinois
> courts.

1  Id. at 310.

2      In holding that the extradition treaty was not violated, the
3  Ninth Circuit stated:

4          This Court has held that where no demand for
5          extradition is made by the United States and
6          the defendant is deported by the authorities
7          of the other country which is a party to the
8          treaty, no "extradition" has occurred and
9          failure to comply with the extradition treaty
10         does not bar the prosecution. Stevenson v.
11         United States, 381 F.2d 142, 144 (9th Cir.
12         1947). See United States v. Lovato, supra,
13         520 F.2d at 1272.

14 Id. at 310.

15     In Stevenson v. United States, 381 F.2d 142 (9th Cir. 1967),
16 appellant was arrested in the State of Sonora, Mexico, by Mexican
17 police, and was thereafter turned over to sheriff's deputies from
18 Maricopa County, Arizona, at the Lukeville, Arizona, Port of
19 Entry. Appellant moved to dismiss the proceedings on the grounds
20 that his surrender to United States authorities by Mexican
21 authorities violated the extradition treaty between Mexico and
22 the United States. The Ninth Circuit rejected appellant's claim
23 and affirmed the conviction. The Ninth Circuit held:

24         We do not find it necessary to consider the
25         asserted specific violation of the treaty
26         because we find that extradition, as
27         contemplated by the treaty, was not involved

28

-12-

1          in this case and that the treaty, is
2          therefore irrelevant.
3    Id. at 144.

4        In <u>United States v. Cordero</u>, 668 F.2d 32 (1st Cir. 1981),
5    appellants were arrested in Panama by Panamanian authorities and
6    returned to Puerto Rico where they were placed under arrest by
7    United States federal agents.  The First Circuit Court of Appeals
8    dismissed appellants argument that the procedures used to return
9    them to the United States violated the extradition treaty between
10   the United States and Panama.  The Court of Appeals held:

11          The short and conclusive answer to
12          appellants' claim, however, is that nothing
13          in these treaties suggests that the
14          countries involved <u>must</u> follow the
15          extradition procedures set out in the
16          treaties when they return criminal
17          defendants to the United States.
18          Extradition treaties normally consist of
19          commitments between governments to the
20          effect that each <u>will return</u> those accused
21          of crimes at the request of the other
22          (Citations omitted).  Nothing in the treaty
23          prevents a sovereign nation from deporting
24          foreign nationals for other reasons and in
25          other ways should it wish to do so. . . . To
26          hold that extradition treaties <u>forbid</u>
27          foreign nations to return criminal

28
                              -13-

1    defendants except in accordance with the

2    formal procedures they contain, would

3    insofar as we are aware, represent a novel

4    interpretation of those treaties.  Under any

5    such interpretation, extradition treaties

6    would hinder, rather than help serve, the

7    return of those accused of crimes within

8    American jurisdiction.  We therefore reject

9    applicant's argument.

10   Id. at 37-38.  (Emphasis added).

11        See United States v. Reed, 639 F.2d 8961 (1981), where the

12   Second Circuit held:

13        The existence of an extradition treaty

14        provides an individual with certain procedural

15        protections only when he is extradited.  And

16        abduction is no more or less objectionable

17        simply because of the existence of an

18        extradition treaty.

19   Id. at 902.

20        As applied to the present case, the Ninth Circuit's decisions

21   in Valot and Stevenson are dispositive of defendant Verdugo's

22   claim.  No demand was made for the extradition of defendant

23   Verdugo.  Consequently no "extradition" occurred.  Furthermore,

24   failure to comply with the extradition treaty does not bar

25   prosecution.  United States v. Valot, 625 F.2d 308, at 310 (9th

26   Cir. 1980).  As stated by the Ninth Circuit in Stevenson v.

27   United States, 381 F.2d 142 (1967), there is no reason to even

28                                -14-

consider the asserted extradition treaty violations when formal extradition has not been requested. The Ninth Circuit in Stevenson held that under these circumstances the existence of the extradition treaty was irrelevant. Id. at 144.

Failure to request defendant Verdugo's extradition is not required by the extradition treaty. The treaty furthermore does not provide the exclusive means to obtain Verdugo's presence in the United States. Failure to request defendant Verdugo's extradition extradition did not violate the extradition treaty, nor does it constitute a bar to prosecution. Defendant's Motion to Dismiss the First Superseding Indictment For Violation of the Extradition Treaty is therefore with no merit and should be denied by the Court.

IV

CONCLUSION

For the reasons above herein, defendant's Motion to Dismiss First Superseding Indictment For Violation of the Extradition Treaty, should be denied.

-15-

1

2

3

4

RECEIVED
SAN DIEGO, CA

APR 15  3 35 PM '86

U.S. ATTORNEY
DEPT. OF JUSTICE

86 APR 11  P 5: 14

CLERK, US DISTRICT COURT
SOUTHERN DISTRICT OF CA.
BY DEPUTY.

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10  UNITED STATES OF AMERICA,              )    Case No. 86-0107-JLI-Crim.
                                           )
11                    Plaintiff,           )
                                           )
12        v.                               )    MEMORANDUM DECISION
                                           )
13  RENE MARTIN VERDUGO,                   )    AND ORDER
                                           )
14  _____Defendant.    )

15      Defendant's motions to dismiss, to suppress identification evidence, for

16  change in custody status, for discovery and for revelation of confidential

17  informants came on for hearing April 4, 1986 before the Honorable J. Lawrence

18  Irving.  Michael Lasater appeared on behalf of the United States; Michael

19  Pancer appeared on behalf of defendant Verdugo.  The court ruled orally on all

20  motions at the hearing and apprised counsel of its intention to set forth in

21  writing its reasons for denying defendant's request for an evidentiary hearing

22  and motion to dismiss.

23      Having considered the pleadings and attached exhibits, oral argument of

24  counsel, sealed court exhibits A, B & C, and testimony received in camera, the

25  court issues the following memorandum decision.

26                          PROCEDURAL BACKGROUND

27      Due to the extraordinary manner in which the defendant came within this

28  court's jurisdiction and the unique procedures that followed, it is

/6

EXHIBIT A

1  necessary to outline the procedural background of the case.  Following his
2  arrival and arrest in the United States on January 24, 1986, an indictment was
3  returned against Verdugo on January 29, 1986 charging him with conspiracy to
4  possess marijuana in excess of 1,000 pounds in violation of 21 U.S.C. §§
5  841(a)(1), 841(b)(6) and 846, possession of marijuana in excess of 1,000
6  pounds with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and
7  841(b)(6) and unlawful use of a communication facility in violation of 21
8  U.S.C. § 843(b).

9  Verdugo first appeared in this court on February 10, 1986 and advised
10 he intended to challenge the court's jurisdiction over this prosecution based
11 on his alleged illegal removal from his native country, Mexico, to the United
12 States.  Based in part on the many newspaper articles written about his arrest
13 and the information contained therein, Verdugo informed the court that six
14 Mexican persons were material witnesses to his removal from Mexico, to the
15 United States and that those six persons were presently within the United
16 States.  Verdugo charged that they had entered the United States with the
17 assistance of a federal law enforcement agency, though Verdugo could not
18 specify which agency had assisted their entry.  Verdugo urged the court to
19 take steps to preserve whatever testimony those six witnesses could provide
20 and to order the preservation of any internal government memoranda concerning
21 his apprehension.  On February 11, 1986 this court issued an order requiring
22 the government to preserve all internal memoranda concerning Verdugo's appre-
23 hension in Mexico and his delivery to the United States.  The court denied
24 defendant's request to incarcerate or depose the six witnesses in order that
25 their testimony should not be lost should they return to Mexico, following the
26 government attorney's assurance that the six witnesses would be available for
27 future motions hearings.  The court did however, order the government to serve
28 subpoenas on the six witnesses.  On February 14, 1986 the court further

-8-

1  ordered the government to make the six witnesses available for an in camera
2  interview with the court, should the court so order.  The court provided
3  Verdugo an opportunity to submit questions that he wished posed to the
4  witnesses.  Defendant did submit proposed questions for the in camera hearing,
5  many of which were ultimately asked of the witnesses.

6      The government moved the court to reconsider its order concerning the
7  in camera hearing.  Among the reasons enumerated by the government in support
8  of its motion, the government alerted the court to potential security problems
9  associated with an interview of the six witnesses.  Upon the court's
10  invitation, the government later submitted a document sealed by order of this
11  court setting forth a threat analysis of security problems created by a
12  meeting between the court and the six witnesses.  (Court Exhibit A)

13      In light of the attendant security problems, the court, without prior
14  announcement, interviewed in camera and on the record the six witnesses.  The
15  court ordered the record of the interviews sealed and has also ordered sealed
16  a memorandum prepared by the court of its observations of the witnesses and
17  its impressions of the interviews.

18      Though no formal evidentiary hearing has been conducted, and as discussed
19  below the court does not now order one, the court has received, and has con-
20  sidered for purposes of the Verdugo's motion to dismiss and for an evidentiary
21  hearing, much evidence and many offers of proof.  They include:  the oral
22  representations of counsel in court; factual statements contained in the
23  parties' briefs; affidavits attached as exhibits to parties' briefs; an in
24  camera submission of all government reports concerning Verdugo's apprehension
25  (Exhibit C); the government's "Factual Proffer Regarding the Arrest of Defen-
26  dant Verdugo" filed on March 12, 1986 and defendant's response and additional
27  response to the factual proffer filed on March 13, 1986 and March 20, 1986,
28  respectively; the in camera interview of witnesses described above; and, a

copy of the accusation against five Mexican state police officers dated March 25, 1986.

The court conducted a motion hearing on April 4, 1986. The court ordered that the confidential informants that will testify as government witnesses at trial be revealed and be made available for interview by the defense 14 days prior to trial. Verdugo's motion to suppress indentification was continued to a date prior to trial. The court denied Verdugo's motion for change in custody status, Verdugo's motion to dismiss and request for evidentiary hearing. Given the gravity of defendant's allegations and the extreme remedy sought by defendant, the court elected to set forth in writing the bases for its denial of the request for an evidentiary hearing and the motion to dismiss.

## FACTUAL ALLEGATIONS

The government alleges the facts surrounding Verdugo's apprehension [1]/ to be as follows. On August 3, 1985 a sealed complaint charging Rene Verdugo with a violation of 21 U.S.C. §§ 846, 841(a)(1) and 843(b) was filed in the Southern District of California and an arrest warrant was issued. Immediately after the issuance of this warrant the Drug Enforcement Administration (here-inafter "DEA") engaged in an extensive investigation in an attempt to apprehend Verdugo in the United States. Despite the fact that Verdugo had been a

[1]/ The government has characterized Verdugo's removal from Mexico as an "apprehension" while defendant has repeatedly referred to it as an "abduction" or a "kidnapping." The court's review of pertinent scholastic literature reveals that the term "irregular rendition" has also been used to describe those instances where an ad hoc agreement is entered into between law enforcement agents of the apprehending and asylum states whereby either through active cooperation or acquiescence by officials of the asylum state an individual is removed forcibly to the state seeking apprehension. See Abramovsky and Eagle, U.S. Policy in Apprehending Alleged Offenders Abroad: Extradition, Abduction, or Irregular Rendition?, 57 Or. L. Rev. 51, 52 n.˚1 & 2. (1977). Due to the legal connotations of the word "kidnapping" the court feels it is best to refer to Verdugo's removal to the United States as a "seizure" or an "apprehension."

1   frequent visitor to the United States prior to this time, extensive surveil-
2   lance failed to reveal his presence in the United States and confirmed that he
3   was residing in the Mexicali area of Baja California, Republic of Mexico.  In
4   December, 1985, DEA and United States Marshal's Service (hereinafter "U.S.
5   Marshals") personnel met and discussed the possibility of Verdugo's arrest in
6   Mexico by Mexican law enforcement officials.

7   In January, 1986, the government alleges that U.S. Marshal's personnel
8   contacted Mexican law enforcement personnel in the Mexicali area and inquired
9   as to whether Mexican authorities could arrest a Mexican citizen in Mexico
10  who was a United States drug fugitive and deliver that person to U.S. authori-
11  ties.    The Mexican law enforcement personnel informed the U.S. Marshal's
12  representative that an arrest could be effected if there were an outstanding
13  United States warrant for the United States' fugitive's arrest.    The U.S.
14  Marshal representative then advised the Mexican law enforcement personnel that
15  the person sought was Rene Martin Verdugo and showed him a copy of the arrest
16  warrant issued on August 3, 1985 in the Southern District of California.

17  On January 24, 1986, the government alleges that a team of approximately
18  six Mexican law enforcement personnel arrested Rene Verdugo in San Felipe,
19  Mexico.  Verdugo was blindfolded, handcuffed and placed in the back seat of an
20  automobile.  The Mexican law enforcement personnel then drove Verdugo to the
21  international border at a point approximately eight miles west of the Port of
22  Entry at Calexico.  Verdugo was met at this point by U.S. Marshal's personnel
23  who took him into custody pursuant to the outstanding warrant for arrest.
24  Verdugo was then transported to the U.S. Border Patrol station at Calexico,
25  California and held there until DEA personnel arrived.  Upon the arrival of
26  DEA personnel, Verdugo was photographed and transported to the Metropolitan
27  Correctional Center (hereinafter "MCC"), San Diego.

28  With respect to the status of the Mexican law enforcement personnel

1  involved in the arrest of Verdugo, the government alleges that on January 27,
2  1986 they contacted the U.S. Marshal's service and stated that Verdugo's
3  arrest was generating a substantial amount of pressure and that they were
4  concerned about their safety. The U.S. Marshal's Service then contacted the
5  DEA regarding the possibility of financially compensating the Mexican personnel
6  for their assistance in Verdugo's arrest. DEA then agreed to furnish approxi-
7  mately $32,000 to be divided among the six individuals. This money was paid
8  to the Mexican personnel on January 28, 1986. On February 2, 1986, the
9  government alleges that the Mexican law enforcement authorities who assisted
10 in Verdugo's arrest advised United States authorities that they were experien-
11 cing tremendous pressure and were receiving threats as a result of their
12 participation in Verdugo's arrest. For their safety and the safety of their
13 families, these individuals and their families were then admitted to the
14 United States.

15      Defendant's factual allegations differ from the government's on some key
16 points. Addressing first the logistics of Verdugo's apprehension, Verdugo
17 alleges that he was driving his vehicle on a street in San Felipe, Baja
18 California, Mexico, when he was forced to stop his vehicle by six armed men,
19 who were in two separate vehicles. Verdugo alleges that he was forcibly
20 removed from his vehicle by the six men and placed in the rear seat of one of
21 the cars. He was handcuffed, blindfolded and his head was forced down below
22 window level and a jacket was placed over his head. Verdugo alleges that his
23 head was held down below the window level by one of the men. They drove away
24 and the drive continued for approximately two and one-half hours.

25      Verdugo agrees with the government's version of the facts that the
26 vehicle containing Verdugo proceeded north from San Felipe towards Mexicali
27 and then to a point along the United States-Mexican border west of Calexico.
28 Verdugo adds to his factual allegations that during the drive the men never

identified themselves, never informed him why he had been taken into their custody nor where they intended to bring him. Verdugo attests that during his capture and the ensuing drive in the auto he was fearful and believed that he was about to be murdered. Verdugo also alleges that he nearly suffocated during the drive in the car because fabric had been placed over his head and mouth.

Verdugo does not controvert the government's factual allegations regarding the events that surrounded his being taken into custody by United States officers after his crossing of the international border. Verdugo does, however, allege different circumstances surrounding the payment of monies to the six Mexican persons $\underline{2}/$ that participated in his apprehension. Verdugo alleges that sometime prior to his apprehension a United States representative met with six Mexican law enforcement personnel (defendant refers to these persons by name in his attorney's declaration filed March 21, 1986). At that meeting Verdugo alleges that United States agents discussed his kidnapping and removal to the Unites States and that the agents gave $50,000.00 to those six men to accomplish his kidnapping. Verdugo also alleges that the six men were promised another $50,000.00 payment when the "job was finished."

Verdugo's factual allegations also include references to a pending criminal investigation by Mexican authorities of the Mexican persons involved in Verdugo's apprehension. Verdugo has submitted a copy of an accusation against the six Mexican persons.

Verdugo makes two additional allegations which, though he proffers them as facts, go to the government's motive with respect to its actions of seeking Verdugo's arrest and its genuineness in inquiring of Mexican officials whether Verdugo's arrest could be accomplished outside the extradition

---

$\underline{2}/$ Verdugo alleges that two of the Mexican persons may have been civilians while the four others were Mexican Judicial Police officers.

process.   First, Verdugo claims that the government was eager to accomplish his arrest not to prosecute him on narcotics charges, but rather, to question him about the murder in Mexico of DEA agent Enrique Camerana.   Second, Verdugo claims that when U.S. agents contacted someone in Mexico to inquire whether law enforcement agents there could arrest Verdugo, they were aware that Verdugo's arrest could only be legally obtained through the extradition process.

## FACTUAL FINDINGS

Based on all the evidence and representations before the court at this time, the court makes the following factual findings, and bases its opinion on these facts.   The court finds that prior to Verdugo's apprehension United States agents contacted Mexican authorities and ultimately persuaded them to apprehend Verdugo and bring him to the United States.   Prior to Verdugo's apprehension, no consideration, including money, was promised to the six persons to induce the task, nor was any promised upon its completion.

The court finds that Rene Verdugo was apprehended in San Felipe, Baja California, Mexico on January 24, 1986.   United States agents were in the vicinity but did not directly participate in the apprehension.   The automobile which he was driving was halted by Mexican police officials, one of whom displayed a police badge.   Verdugo exited his vehicle, was told he was under arrest and placed in the backseat of their unmarked vehicle.   Verdugo was handcuffed, covered with his jacket and told to keep his head down.   Verdugo remained in this position during the approximately two hour ride to the Mexican-American border, although the jacket was eventually removed and he was blindfolded.   Upon arrival at the border, Verdugo was removed from the car and walked to the border where United States Marshals arrested him.   At no time was Verdugo beaten, tortured, physically struck or verbally threatened or tormented.   The court believes that Verdugo was indeed frightened by his

1  apprehension. The court adopts the government's uncontradicted representations
2  regarding his transfer from the Marshal's custody to the DEA's custody and his
3  removal to MCC.

4      Within a day or two, six Mexican policemen, four of whom had directly
5  participated in Verdugo's apprehension, were terminated from their jobs.
6  They ultimately made contact with the DEA and communicated their fear that
7  they would suffer retribution for their participation in Verdugo's arrest. On
8  January 28, 1986 the DEA gave the six of them collectively $32,000.00. A few
9  days later the DEA determined that their safety was in jeopardy and made
10 arrangements for the six men and their families to enter the United States.

11     To this date, the government of the Republic of Mexico has made no formal
12 protest or complaint that formal extradition proceedings had not been followed
13 to effectuate Verdugo's removal to the United States. A formal accusation has
14 been filed by a prosecutor in the State of Baja California, Mexico charging
15 the six men with kidnapping.

16     In addition to the findings set forth above, the court incorporates its
17 sealed findings and observations regarding its in camera interview with the
18 six witnesses (Court Exhibit E). The court feels that a substantial showing
19 of potential security threats to the six witnesses has been made and that it
20 is prudent at this time to keep the record of the court's interview and its
21 findings and observations sealed until further order of the court. The court
22 makes no findings with respect to the government's motives for seeking Verdugo's
23 arrest, nor does it feel that it is necessary to do so for purposes of deciding
24 the motions pending in this court.

25                              DISCUSSION

26 I.   Request for an Evidentiary Hearing

27     Defendant requests an evidentiary hearing to further elucidate the facts
28 concerning his apprehension in San Felipe and to question government officials

1  and agents about the United States government's solicitation of and
2  participation in his apprehension.  The government argues that no hearing is
3  necessary since no remedy is available to this court even if it is determined
4  that the facts were exactly as defendant has alleged them.

5      The court feels that an evidentiary hearing is unnecessary.  The court
6  has received what it feels to be sufficient evidence by way of affidavit and
7  in camera material in this case to rule upon the motion to dismiss.

8      The question of whether an evidentiary hearing is appropriate is a matter
9  left to the district court's discretion.  United States v. Licavoli, 604 F.2d
10  613, 621 (9th Cir. 1979) citing United States v. Santora, 600 F.2d 1317, 1320
11  (9th Cir. 1979); United States v. Sorren, 605 F.2d 1211, 1215 (1st Cir. 1979).
12  In the context of a motion to suppress, an evidentiary hearing is required if
13  the moving papers are sufficiently detailed, specific and nonconjectural to
14  persuade the court that contested issues of fact going to the validity of the
15  search are in question.  United States v. Licavoli, 604 F.2d at 621; United
16  States v. Ledesma, 499 F.2d 36, 39 (9th Cir.) cert. denied, 419 U.S. 1024
17  (1974).  This court adopts a similar standard in its evaluation of the need
18  for an evidentiary hearing in the instant case.  In light of the evidence
19  already received by the court and the factual allegations proffered to the
20  court, an evidentiary hearing would be required only if defendant presented to
21  the court detailed, specific and nonconjectural factual allegations concerning
22  his arrest which if later proven true would entitle him to dismissal of his
23  case or some other appropriate sanction.  Defendant has presented no fact
24  outside of those acknowledged by the court that would alter the court's ruling
25  under the present state of the law.  See United States v. Toscanino, 500 F.2d
26  at 281.(the court may, in its discretion, decline to hold an evidentiary
27  hearing if defendant fails to offer credible supportable evidence, including
28  specific evidence, that tortuous actions and abduction was taken by or at

direction of United States officials).

II. Motion to Dismiss

Relying exclusively on United States v. Toscanino, 500 F.2d 267 (2d Cir. 1974), defendant moves this court to divest itself of jurisdiction over the instant prosecution. Defendant argues that his removal to the United States by the Mexican police officers at the request of United States agents so violates his due process rights that divesture of jurisdiction and dismissal of the indictment are the only appropriate sanctions. The government opposes defendant's motion arguing that based on the facts, even as Verdugo has alleged them, the law affords no remedy for his seizure and return to the United States.

Review of the case law demonstrates that the circumstances surrounding Verdugo's apprehension do not necessitate the extreme remedy of divestiture of jurisdiction. The instant case falls within that area of the law governed by the Ker-Frisbie doctrine, which holds that a defendant cannot defeat personal jurisdiction by asserting the illegality of the procurement of his presence. This doctrine takes its name from two Supreme Court cases in which defendants' claims that they had been brought within the court's jurisdiction by force in violation of due process were rejected. See Ker v. Illinois, 119 U.S. 436 (1886); Frisbie v. Collins, 342 U.S. 519 (1952). This circuit's adherence to the Ker-Frisbie doctrine has been clearly established in a line of cases holding that forcible return to the jurisdiction of the United States constitutes no bar to prosecution once the defendant is found within the United States. See United States v. Fielding, 645 F.2d 719, 723 (9th Cir. 1981); United States v. Valot, 625 F.2d 308, 309 (9th Cir. 1980); United States v. Lovato, 520 F.2d 1270, 1271 (9th Cir.), cert. denied 423 U.S. 985 (1975); United States v. Cotten, 471 F.2d 744, 748 (9th Cir.), cert. denied 411 U.S. 936 (1973);

-8-

96

Myers v. Rhay, 577 F.2d 504, 510 (9th Cir.), cert. denied, 439 U.S. 968 (1978).

Defendant seeks to come within an exception to the Ker-Frisbie doctrine created by the Second Circuit in United States v. Toscanino, 500 F.2d 267. 3/ In Toscanino the court held that due process requires a federal court to divest itself of jurisdiction under the factual circumstances alleged by the defendant.  In Toscanino the defendant, an Italian citizen, alleged he had been kidnapped from his home in Uruguay, subjected to three weeks of interrogations which included physical torture, beatings, electric shock treatment, and had alcohol flushed in his eyes, nose and body cavities in a Brazilian prison.  He was then ultimately brought to the United States.  Toscanino also alleged that the U.S. Attorney's office had been aware of the torture while it was occurring and that federal drug agents were present during, and participated in, the torture. A subsequent decision of that circuit clarified the Toscanino holding, stating that only governmental conduct "of the most outrageous and reprehensible kind" will give rise to a due process violation requiring a court to impose the remedy created in Toscanino.  United States ex re. Lujan v. Gengler, 510 F.2d 62, 65-66 (2d Cir.), cert. denied, 421 U.S. 1001 (1975).

The facts in the instant case differ dramatically from those alleged in Toscanino.  First, Verdugo was not tortured.  His liberty was restrained and he may have believed that some physical harm would befall him, but he was not beaten or physically brutalized. Lujan v. Gengler, 510 F.2d at 66 (defendant disclaimed acts of torture, terror or custodial interrogation); United States v. Valot, 625 F.2d at 310 (defendant alleged no shocking and outrageous conduct); United States v. Lovato, 520 F.2d 1271-2 (no physical abuse alleged).

---

3/ The Ninth Circuit has not yet had occasion to apply the Toscanino rule.  United States v. Fielding, 645 F.2d at 723.

1  Second, United States agents did not directly participate in Verdugo's appre-
2  hension and removal to the United States. At the time Verdugo was seized, the
3  men perpetrating his removal were employed as Mexican police officers.
4  Knowledge on the part of United States agents that Verdugo's removal was
5  occurring or about to occur does not raise Verdugo's apprehension to the level
6  of an act so shocking the conscience that dismissal is warranted. While the
7  facts demonstrate that Verdugo was apprehended at the suggestion of United
8  States agents, the Mexican officers were not acting as paid agents of the
9  United States. United States v. Fielding, 615 F.2d 923-4 (no showing that
10 United States participated in torture and kidnapping); United States v. Lira,
11 515 F.2d 68, 71 (2d Cir.), cert. denied 423 U.S. 847 (1975) (no direct involve-
12 ment of United States in defendant's torture could be proven); United States
13 v. Lara, 539 F.2d 495 (5th Cir. 1976) (United States agents played no direct
14 role in the torture allegedly administered by Panamanian authorities). A
15 federal court need not impute vicarious liability to United States agents
16 because they initiated foreign agents' interest in removing one of their own
17 citizens from his country. See United States v. Lira, 515 F.2d at 71 (United
18 States was not vicariously liable for torture and arrest where United States
19 merely asked foreign government to arrest and expel defendant in accord with
20 its own procedures). See also Di Lorenzo v. United States, 496 F. Supp. 79,
21 82 (S.D.N.Y. 1980). That the State of Baja California has now initiated
22 criminal proceedings against those who were at the time acting under color of
23 law does not change the circumstances at the time of Verdugo's apprehension.
24 The actions of foreign authorities are not to be judged by the standards of
25 our Constitution. See United States v. Maher, 645 F.2d 780, 782 (9th Cir.
26 1981); United States v. Rose, 570 F.2d 1358, 1361 (9th Cir. 1978); Stonehill
27 v. United States, 405 F.2d 738, 743 (9th Cir.), cert. denied 395 U.S. 960
28 (1969).

1        Verdugo also argues that this court should dismiss his case because the

2  United States failed to secure his person in the United States through the

3  extradition process, and hence violated its own treaty as well as inter-

4  national law.  The United States has entered into an extradition treaty with

5  Mexico, through which, after formal request, it can secure persons who have

6  been charged in the United States with crimes listed in the extradition

7  treaty.  See Treaty of Extradition Between the United States of American and

8  United Mexican States, January 25, 1980, 31 U.S.T. 3059, T.I.A.S. NO. 9656.

9  Though this circuit has yet to address the issue, there is clear line of

10  second circuit cases which hold that abduction from another country violates

11  international law only when the offended state objects to the conduct.  Lujan

12  v. Gengler, 510 F.2d at 68 citing United States v. Toscanino, 500 F.2d at 267.;

13  United States v. Reed, 639 F.2d 896 (2d Cir. 1981); Di Lorenzo v. United

14  States, 496 F. Supp. at 82 n. 3; Cf. Waits v. McGowan, 516 F.2d 203, 208 & n.9

15  (3d Cir. 1975)(in case of international extradition, protection available to

16  extradited person exists primarily for benefit of asylum nation, precluding

17  extradited person from raising violations of rights afforded by demanding

18  nation). The court is unaware of any formal objection by the government of

19  Mexico and thus finds that the issue of the effect of violation of inter-

20  national law on Verdugo's criminal prosecution is not properly before the

21  court at this time.

22  ////

23  ////

24  ////

25  ////

26  ////

27  ////

28  ////

29

III. Order

Accordingly, Verdugo's request for an evidentiary hearing and motion to dismiss are DENIED.

IT IS SO ORDERED.

DATED:  April 11, 1986.


J. LAWRENCE IRVING, JUDGE
UNITED STATES DISTRICT COURT

COPIES TO:

MICHAEL LASATER                           MICHAEL PANCER
Assistant U.S. Attorney                   625 Broadway, Suite 1135
940 Front Street, Room 5-N-19             San Diego, CA  92101
San Diego, CA  92189

-13-

30

## CERTIFICATE OF SERVICE BY MAIL

I, __Bernadette Baskerville__, declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California; that my business address is Office of United States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction the service by mail described in this Certificate was made; that on __May 13, 1988__, I deposited in the United States mails in the United States Courthouse at 312 North Spring Street, Los Angeles, California, in the above-entitled action, in an envelope bearing the requisite postage, a copy of GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST SUPERSEDING INDICTMENT FOR VIOLATION OF EXTRADITION TREATY; MEMORANDUM OF POINTS AND AUTHORITIES; EXHIBITS

addressed to: SEE ATTACHED

at __their__ last known address, at which place there is a delivery service by United States mail.

This Certificate is executed on __May 13, 1988__ at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.

UNITED STATES v. RAFAEL CARO QUINTERO, et al.,
NO. CR 87-422(B)-ER

SERVICE BY MAIL

Elsa Leyva, DFPD
Federal Public Defender's Office
312 North Spring Street
15th Floor
Los Angeles, California  90012

Michael Pancer, Esq.
Home Federal Building
Suite 1135
625 Broadway
San Diego, California  92101

Donald C. Randolph, Esq.
2566 Overland Avenue
Suite 700
Los Angeles, California  90064