ROBERT C. BONNER
United States Attorney
ROBERT L. BROSIO
Assistant United States Attorney
Chief, Criminal Division
ROEL C. CAMPOS
Assistant United States Attorney
Major Narcotics Section
1400 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-6682

Attorneys for Plaintiff
United States of America

FILED
CLERK, U.S. DISTRICT COURT
MAY 17 1988
3:15
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

ENTERED ON COURTRAN
MAY 18 1988

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

RAFAEL CARO-QUINTERO, et al.,

Defendants.

NO. CR 87-422(B)-ER

GOVERNMENT'S OPPOSITION TO DEFENDANT VERDUGO-URQUIDEZ' MOTION TO COMPEL VOICE EXEMPLARS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION

DATE: June 6, 1988
TIME: 1:30 P.M.

The government hereby respectfully files its opposition defendant Verdugo-Urquidez' Motion to Compel Voice Exemplars.

The government's opposition is based on the attached Memorandum of Points and Authorities, the Declaration of Bruce Koenig, and the records and files in the case.

DATED: May 17, 1988.

Respectfully submitted,

ROBERT C. BONNER
United States Attorney

150

//

RCC:mil

ROBERT L. BROSIO
Assistant United States Attorney
Chief, Criminal Division

ROEL C. CAMPOS
Assistant United States Attorney
Major Narcotics Section

Attorneys for Plaintiff
United States of America

MEMORANDUM OF POINTS AND AUTHORITIES

I

INTRODUCTION

In his motion to compel voice exemplars, defendant Verdugo-Urquidez argues that the court should order that voice exemplars be provided him for (1) Jorge Gomez-Espana; (2) Raul Lopez-Alvarez; (3) any other informant/witness who purports to have been present during the interrogation of Enrique Camarena; and (4) any recorded voice exemplar of Drug Enforcement Administration ("DEA") Special Agent ("SA") Enrique Camarena. The government submits that this motion is a "backdoor" attempt to circumvent the court's protective order for government witnesses and an attempt to obtain early Jencks statements, also circumventing the court's current order. With respect to Mr. Gomez-Espana, defendant is conducting the predictable "fishing expedition."

By requesting voice exemplars of Mr. Gomez-Espana, defendant Verdugo-Urquidez, in effect, forces the government to confirm whether he is a witness and to indicate what his testimony would be. In these papers, the goverment does not confirm whether Mr. Gomez-Espana is or is not a government witness. The government does not confirm or deny the accuracy of a newspaper article that appeared regarding Mr. Gomez-Espana's role. Defendant Verdugo-Urquidez claims that he needs to know whether Mr. Gomez-Espana was one of the interrogators of SA Camarena. However, apart from the newspaper article, defendant presents no evidence that Mr. Gomez-Espana was one of the interrogators. In

fact, the government has no evidence that Mr. Gomez-Espana was one of the interrogators. Certainly defendant could not possibly argue that every potential government witness should give voice exemplars to enable defendants to see if they are interrogators. Without a greater showing, there is no reason to distinguish Mr. Gomez-Espana from other potential witnesses.

Moreover, there is a glaring flaw in defendant Verdugo-Urquidez' argument that he could impeach a witness who claims to have been at the interrogation, but whose voice is not on the tapes. An individual, for exemple, could have been at the interrogation as an observer or in another role and not said anything that was recorded. After all, certain individuals certainly provided "muscle" and performed the beating and torture, but were not allowed to interrogate SA Camarena. Other interested parties very likely were in the background and listened to see if SA Camarena provided information that concerned them.

Defendant's request for recorded exemplars of SA Camarena's voice is also not justified. The emotional and physical stress that is evident in SA Camarena's voice on the interrogation tapes will make the voice comparison with an existing recorded telephone conversation (where he is in a secure setting) not meaningful.

By requesting separately the voice exemplars of any government informant who was at the interrogation, defendant Verdugo-Urquidez also attempts to force the government to disclose confidential informants, in effect, compelling the

government to waive its privileges not to disclose their identities under United States v. Roviaro. Finally, as discussed below, voiceprint identification is a suspect procedure and its results could be more confusing than beneficial.

The government submits that defendant Verdugo-Urquidez requests should be denied as premature, since no evidence is before the court regarding any government witness being an interrogator. Further, in light of the questionable reliability of any voiceprint analysis, defendant's motion should also be denied.

II

VOICEPRINT ANALYSIS IS NOT

SCIENTIFICALLY RELIABLE

Defendant Verdugo-Urquidez wants the voice exemplars so that his expert may conduct a voiceprint analysis, also known as spectrograph analysis. However, there are serious questions as to whether that type of analysis can produce meaningful results and whether that type of evidence should be admissible at all. At least on federal circuit has held that such evidence is not admissible. United States v. McDaniel, 538 F.2d 408 (D.C. Cir. 1976) (it was error to admit testimony of comparing spectrograms of unknown parts to telephone conversation with known voice exemplars of defendant). See also general discussion in 97 ALR.3d 294, Voice Print Evidence - Admissibility, and cases cited therein. The government's research revealed no Ninth Circuit cases on the subject. However, many California state courts have

held that voiceprint testimony should not be admitted.[1/] In the ALR article referred to, the author characterized the present trend as "against admissibility" of voiceprint evidence as evidence against voiceprint analysis grows. Id. at 304.

As indicated by FBI expert Bruce Koenig, the FBI also does not consider voiceprint analysis as a scientifically reliable method of identification. (Decl. of B. Koenig, ¶ 5). Moreover, the proposed use of the voice exemplars by defendants further complicates the process and diminishes the potential for useful results from this effort.

For example, the typical use for voice exemplars would be to try to match an exemplar to a particular recorded voice. That process is sufficiently complicated by itself. Defendant Verdugo-Urquidez, however, proposes to match voice exemplars with all the voices in the interrogation tape -- which number six or more. That process would involve an extraordinary amount of effort and would be extremely time consuming - with only a small prospect for a useful result. Much depends upon the quality of the recorded interrogation as to whether a useful comparison could even be made.

---

1/ E.g., People v. Kelley, 17 Cal. 3d 24, 130 Cal. Reptr. 144, 549 P.2d 1240 (1976) (evidence insufficient to establish reliability of voiceprint evidence); People v. Law, 40 Cal. App 3d 69, 114 Cal. Rptr 708 (5th Dist., 1974) (conviction reversed where admission of voiceprint evidence was error because procedure not reliable with respect to disguised mimicked voices); People v. King, 266 Cal. App. 2d 437, 72 Cal. Rptr. 478 (2nd Dist., 1968).

Defendant Verdugo-Urquidez also claims that he seeks to show that the voices of Mr. Gomez-Espana or other witnesses are not on the recordings, thereby showing that they were not at SA Camarena's interrogation. That objective is meaningless, since an individual could have been at the interrogation of SA Camarena but not said anything that was recorded. In fact, there are no reported cases of an attempt being made to introduce testimony that two voices were not the same. 97 ALR.3d at 298, fn.7. Defendant, therefore, proposes a novel use of voiceprint analysis.

There are extraordinary problems from a technical standpoint with using voiceprint analysis with respect to SA Camarena. Obviously he was murdered and cannot provide a voice exemplar. However, as indicated by FBI SA Koenig, the preferred method for accomplishing voiceprint analysis is to obtain a verbatim exemplar of the words that will be compared, preferably in the same context. (Decl. of B. Koenig, ¶ 6). The FBI procedure requires that at least twenty words for comparison to produce results that have any potential for reliability. As an added complication, SA Camarena's interrogation is in Spanish.

The government possesses tape recordings of a telephone conversation between SA Camarena and a confidential informant. (Transcripts of those recorded telephone conversations were produced.) Initially, from a technical standpoint, it will be difficult to find words of sufficient quality on the recorded telephone conversation to match words on the interrogation tapes.

A much larger problem exists in making allowances for voice variation from the calm setting of SA Camarena's recorded

telephone conversation to the severe stress and fear that SA Camarena experienced when he was beaten and tortured. SA Koenig explains that individuals can have voice characteristics variations when they experience different emotions. The government submits that comparing voiceprints from the recorded telephone conversation with his coerced interrogation could be extremely misleading. At least one court has found troublesome that no studies had been performed to determine the effect of stress in the production and interpretation of spectrograms, in holding that the reliability voiceprint process had not been established. People v. Collins, 94 Misc.2d 704, 405 NYS.2d 365 (1978), 97 ALR.3rd at 319-320. Consequently, the government submits that the voiceprint process with respect to making comparisons of SA Camarena's telephone conversation and his interrogation has almost no chance of producing meaningful results.

III

DEFENDANT MAKES NO SHOWING AS TO WHY WHY MR. GOMEZ-ESPANA'S VOICE EXEMPLAR SHOULD BE ORDERED

Defendant Verdugo-Urquidez states in his papers that a particular newspaper article stated that Mr. Jorge Gomez-Espana was actually present during the interrogation of SA Camarena. Defendant Verdugo-Urquidez states that the requested exemplars will be used to determine whether Mr. Gomez-Espana's voice matches any of the voices on the interrogation tapes. In that way, he claims he will be able to impeach Mr. Gomez-Espana.

First, the government does confirm that the article regarding Mr. Gomez-Espana is accurate or whether he is even a witness for the government. However, the government states that it has no information or evidence that Mr. Gomez-Espana or any of its witnesses for that matter were interrogators of SA Camarena. Thus, there is no prospect of finding Gomez-Espana's voice on the interrogation tapes. Defendant Verdugo-Urquidez, however, contends that if he can alternatively show that Mr. Gomez-Espana is not on the tapes that will aid him to impeach Mr. Gomez-Espana's claim that he was at the interrogation. However, apart from the questionable reliability of voiceprint analysis, there is a fundamental flaw in defendant's logic. If Mr. Gomez-Espana were actually at the interrogation, there is no reason to expect that he would have spoken during the interrogation. He could have been a mere observer allowed into the interrogation room. The interrogation of SA Camarena was undoubtedly conducted by several men who acted as "muscle" who held him against his will and administered the beatings and torture. They were not permitted to ask questions and only the designated interrogator would do so. From the interrogation tapes, background noises indicate that other individuals are listening to the interrogation, supporting the effort.

Consequently, it is irrelevant if Mr. Gomez-Espana's voice is not on the tapes. That fact would not be probative that he was not a witness to the interrogation. Defendant Verdugo-Urquidez' expert can be expected not to find Gomez-Espana's voice on the interrogation tapes -- an entirely inconsequential result.

Defendant Verdugo-Urquidez ultimately makes no showing as to why Mr. Gomez-Espana should be ordered to produce voice exemplars. In the end, such an order will only serve potentially to harass Mr. Gomez-Espana. Therefore, defendant's request for Mr. Gomez-Espana should be denied at this time.

IV

GOVERNMENT HAS NO STANDING TO OBJECT TO VOICE EXEMPLARS OF DEFENDANT LOPEZ-ALVAREZ

The government does not have standing to object to defendant Lopez-Alvarez providing a voice exemplar. That is the function of his counsel, if defendant objects at all. If a voice exemplar is ordered, however, the government requests a copy.

V

DEFENDANT'S REQUEST FOR VOICE EXEMPLARS OF SA CAMARENA SHOULD ALSO BE DENIED

The government previously discussed the inherent unreliability of voiceprint analysis, especially when trying to compare an exemplar that is not verbatim. The government's recorded telephone conversation between SA Camarena and an informant is in a relaxed setting far different from the life threatening anxiety and suffering that he experienced during his interrogation. The government submits that it is extremely unlikely that there could be a meaningful comparison of the spoken words between the two recordings.

However, besides the extreme technical difficulty of performing an accurate voiceprint comparison, there exists another serious problem if the government were compelled to

provide defendant Verdugo-Urquidez a copy of the said SA Camarena telephone conversation. The person with whom SA Camarena converses (a confidential informant) could be compromised. Defendant himself could possibly recognize the informant's voice from the recording. When the government disclosed its transcripts, it took care not to disclose the informant's identity. It would be extremely impractical for the government to mask the informant's voice on the recorded telephone conversation. Thus, to provide the said telephone recording as a voice exemplar of SA Camarena would be tantamount to forcing the government to waive its privilege and potentially to disclose its confidential informant. For this reason as well, the government submits that it should not be ordered to provide SA Camarena's telephone recording as a voice exemplar.

VI

GOVERNMENT HAS NO INFORMATION THAT ANY OF ITS WITNESSES WAS AN INTERROGATOR OF SA CAMARENA

The request for voice exemplars of all informants who are purported to have been the at the interrogation is an attempt to circumvent the court's protective order of witnesses' identities and to obtain early Jencks material. The request constitutes the grossest form of speculation. In any event, the government has no evidence or any information that any of its witnesses were interrogators of SA Camarena. That moots defendant's request in this category.

VII

CONCLUSION

For the foregoing reasons, the government respectfully requests that the court deny defendant's requests for voice exemplars.

DECLARATION OF BRUCE E. KOENIG

I, BRUCE E. KOENIG, declare as follows:

1. I am a Supervisory Special Agent for the Federal Bureau of Investigation ("FBI"). I have been a Special Agent with the FBI since 1970. I am currently assigned to the Engineering Research Facility, Newington, Virginia, which is part of FBI Headquarters.

2. The majority of my work is devoted to forensic examinations tape enhancement, voice comparison, signal analysis and tape authenticity. However, I also have supervisory responsibilities for testing and purchasing laboratory equipment, magnetic tape, and tape recorders for the FBI worldwide. I have conducted tape examinations for numerous Federal, State, and local law enforcement agencies in all 50 states, the District of Columbia, Puerto Rico, the Virgin Islands, Guam, and foreign countries. In total, I have conducted tape investigations in over 2,400 cases involving over 6,000 separate tape recordings. I have published various articles in my field. I have testified as an expert in this field on numerous occasions. I have also lectured before various scientific and legal organizations on numerous occasions.

3. My formal education is as follows:

B.S. Physics & Mathematics, University of Maryland, 1968.

Electronic course through DeVry Institute of Techinoloy, 1974.

Masters in Forensic Science, George Washington University, 1977.

Additional scientific courses at the University of Utah, Northern Virginia College, and George Mason University.

I am also a member of the Audio Engineering Society, Acoustical Society of America, and American Institute of Physics.

4. I have received substantial specialized training in magnetic tape analysis. Beyond the intensive training afforded me by personnel in the Technical Services Division and FBI Laboratory, I have attended numerous schools and seminars in the magnetic tape analysis field. These include instruction at Voice Identification, Inc., Somervile, New Jersey, in the use of spectrograms in tape analysis; training in digital analysis equipment at Spectral Dynamics Corp., San Diego, California; instruction in digital signal processing at the University of Utah in Salt Lake City; and attendance at conferences of the Audio Engineering Society, Acoustical Society of America, and the National Association of Broadcasters. I have studied extensively in the field of voiceprint analysis (spectograms) and with other specialist, at the FBI Forensics Laboratory, have conducted research in the field and published results. I keep current with all developments in the field. I have frequently lectured in the area.

5. I have been asked to comment upon defendant's intention to conduct voiceprint analysis. Based upon our own studied assessment and research in the area, the FBI does not consider

voiceprint analysis to be a scientifically reliable method of identification. Consequently, it is FBI policy not to provide testimony in any type of court proceedings as to the results of a voiceprint examination for identification. However, I have testified extensively upon the technique, uses, and limitations of spectograms. In certain situations the FBI will perform voiceprint examinations as an investigative tool. In those situations, the results are only to provide law enforcement officers another indicator in the investigation and not to develop evidence for trial.

6. In performing a voiceprint analysis, it is preferrable to have a verbatim exemplar containing the words pronounced in the same manner that are sought to be compared. It is also necessary that the recording to which the exemplars are compared be of sufficient quality to be able to conduct a meaningful comparison. A poor recording, for example, can easily mask voice characteristics. In performing a voiceprint analysis, the number of words that will be compared needs to be sufficient to provide some reliability. We usually look for at least twenty (20) comparable words in the same context to have an examplar that can potentially provide useful results.

7. A person may exhibit different voice characteristics under different situations. A person's emotional condition, for example, will cause some individuals to portray different voice characteristics. In the case at hand, SA Camarena, was purportedly being beaten and tortured. That factor could

//

certainly affect his voice characteristics in a spectogram study. In our laboratory, it is not uncommon for two trained analysts to reach completely opposite conclusions regarding voice identification from voiceprints or spectograms.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATE: ____________________ ______________________________

BRUCE KOENIG

# ANNOTATION

## ADMISSIBILITY AND WEIGHT OF VOICEPRINT EVIDENCE

*by*

*James O. Pearson, Jr., J.D.*

---

I. PRELIMINARY MATTERS

§ 1. Introduction:
[a] Scope
[b] Related matters
§ 2. Background, summary, and comment:
[a] Generally
[b] Practice pointers
§ 3. Weight

II. ADMISSIBILITY ON BASIS OF GENERAL ACCEPTANCE ("FRYE") TEST

§ 4. In criminal trial:
[a] Held admissible

### TOTAL CLIENT-SERVICE LIBRARY® REFERENCES

29 Am Jur 2d, Evidence §§ 368, 832, 1143; 31 Am Jur 2d, Expert and Opinion Evidence §§ 122, 131, 179

2 Am Jur Proof of Facts 2d 433, Reliability of Scientific Devices—Telephone Calling Line Identification; 19 Am Jur Proof of Facts 423, Spectrogram Voice Identification

3 Am Jur Trials 427, Preparing and Using Experimental Evidence

7 Fed Proc Forms, Criminal Procedure §§ 20:511 et seq.

28 USCS Appendix, Federal Rules of Evidence, Rules 702, 703, 901 USCS Federal Rules of Criminal Procedure, Rules 16(a)(1)(D), 16(b)(1)(B)

US L Ed Digest, Evidence §§ 547, 776.5, 851.5, 874, 913

ALR Digests, Evidence §§ 724, 855.5, 923, 1173, 1391, 1392, 1404, 1427.5, 1508, 1521.5, 1623

L Ed Index to Annos, Evidence; Identification; Wiretapping

ALR Quick Index, Experiments or Tests; Expert and Opinion Evidence; Scientific Instruments and Tests; Sound Spectrograph; Voice

Federal Quick Index, Evidence; Experiments and Tests; Identity or Identification; Sound Recordings; Voice

**Consult POCKET PART in this volume for later cases**

Case 2:87-cr-00422-JAK Document 3027 Filed 05/17/88 Page 18 of 50 Page ID #:20998

[b] Held not admissible
[c] Held admissible for limited purpose
§ 5. In preliminary hearing to establish probable cause of commission of crime
§ 6. In civil case

III. ADMISSIBILITY ON BASIS OF RELIABILITY TEST

§ 7. In criminal trial:
[a] Held admissible
[b] Held not admissible
[c] Held admissible for limited purpose
§ 8. In revocation of probation proceeding
§ 9. In hearing to determine probable cause for arrest and search warrant
§ 10. In civil case

---

INDEX

Arrest and search warrant, admissibility on basis of reliability test for, §§ 7[c], 9
Arson, admissibility on basis of general acceptance test in case involving, § 4[b]
Assault on police officer, admissibility on basis of general acceptance test in case involving, § 4[b]
Attempted larceny, admissibility in case involving, §§ 4[b], 7[b]
Background, § 2
Bomb threat by telephone, admissibility in case involving, §§ 4[b], 7[a, c]
Bribery of juror, admissibility in preliminary hearing to establish probable cause in case involving, § 5
Civil case, admissibility in, §§ 6, 10
College president, admissibility on basis of general acceptance test in case involving threatening life of, § 4[a]
Comment, § 2
Conspiracy to commit various narcotic offenses, admissibility on basis of reliability test in case concerning, § 7[a]
Corroborating other identification evidence, admissibility on basis of reliability test for, §§ 7[c], 9
Court-martial based on making obscene telephone calls, admissibility on basis of reliability test in case concerning, § 7[a]
Criminal cases, admissibility in, §§ 4, 5, 7-9
Drug or narcotic offense, admissibility in case involving, §§ 4[b], 7[a]
Extortion, admissibility on basis of general acceptance test in case involving, § 4
False bomb threat or report, admissibility in case involving telephoning of, §§ 4[b], 7[a, c]
"Frye" test, admissibility on basis of, §§ 4-6
Gambling, admissibility on basis of general acceptance test in case involving, § 4[b]
General acceptance "Frye" test, admissibility on basis of, §§ 4-6
Hearing to determine or establish probable cause, adissibility in, §§ 5, 9
Heroin sale, admissibility on basis of general acceptance test in case involving, § 4[b]
Identification, admissibility for limited purpose of, §§ 4[c], 7[c]
Impeachment, admissibility for on basis of reliability test in hearing to determine probable cause for arrest and search warrant, § 9
Interstate commerce, admissibility on basis of reliability test in case involving interference with, § 7[a]
Introduction, § 1
Juror's bribery, admissibility in prelimi-

Property of the U.S.

nary hearing to establish probable cause concerning, § 5
Kidnapping, admissibility on basis of general acceptance test in case involving, § 4[a]
Larceny, admissibility in case involving attempted, §§ 4[b], 7[b]
Limited purpose, admissibility for, §§ 4[c], 7[c]
Matrimonial action, admissibility in case involving, §§ 6, 10
Murder, admissibility in case involving, §§ 4[a, b], 9
Narcotic offenses, admissibility in case involving, §§ 4[b], 7[a]
Obscene telephone calls, admissibility on basis of reliability test in court-martial based on making, § 7[a]
Phone calls, admissibility in case involving making of threatening or obscene, §§ 4[a, b], 7[a, c]
Practice pointers, § 2[b]
Preliminary hearing to establish probable cause of commission of crime, admissibility in, § 5
Preliminary matters, §§ 1, 2
Probable cause, admissibility in hearing to determine or establish, §§ 5, 9
Probation proceeding, admissibility in revocation of, § 8
Rape and related offenses, admissibility on basis of general acceptance test in case involving, § 4[b]
Related matters, § 1[b]
Reliability test, admissibility on basis of, §§ 7-10
Revocation of probation proceedings, admissibility in, § 8
Robbery, admissibility on basis of general acceptance test in case involving, § 4[b]
Scope of annotation, § 1[a]
Search and arrest warrant, admissibility on basis of reliability test for, §§ 7[c], 9
Sexual offense, admissibility on basis of general acceptance test in case involving, § 4[b]
Sniper murder of policeman, admissibility on basis of reliability test in, § 9
Summary, § 2
Tape recorder at wrong speed, effect on admissibility, § 4[b]
Telephone, admissibility in case involving threats or obscenity in use of, §§ 4[a, b], 7[a, c]
Television documentary film, admissibility as to identification of speaker incriminating himself in, § 4[b]
Threatening phone calls, admissibility on basis of general acceptance test in case involving, §§ 4[a, b], 7[a, c]
Warrant, admissibility on basis of reliability test in case of arrest and search, §§ 7[c], 9
Weight, § 3
Wrong speed of tape recorder, effect on admissibility, § 4[b]

## TABLE OF JURISDICTIONS REPRESENTED

**Consult POCKET PART in this volume for later cases**

**US:** §§ 2[b], 3, 4[a], 7[a], 8
**Cal:** §§ 2[a, b], 4[b], 5
**DC:** §§ 2[a, b], 4[a, b]
**Fla:** §§ 2[b], 3, 7[c]
**Me:** §§ 7[a]
**Md:** §§ 2[a, b], 4[b]
**Mass:** §§ 2[a, b], 3, 4[a, c]
**Mich:** §§ 2[b], 4[b]
**Minn:** §§ 2[b], 3, 7[c], 9
**NJ:** §§ 2[b], 4[b], 6, 7[a], 10
**NY:** §§ 2[b], 3, 4[a, b], 7[b]
**Ohio:** §§ 4[c]
**Pa:** §§ 2[b], 4[b]

## I. Preliminary matters

### § 1. Introduction

#### [a] Scope

This annotation[1] collects and discusses the state and federal cases in which the courts have considered the admissibility of evidence relating[2] to

1. This annotation supersedes the one at 49 ALR3d 915.

voice spectrograms, commonly referred to as "voiceprints," as well as the weight to be given such evidence. Constitutional issues involving the obtaining of the samples to be compared by spectrographic analysis are beyond the scope of the present annotation,[3] as are questions as to the sufficiency of evidence which includes voiceprint analysis to support a verdict.

Since relevant statutes and rules of evidence are considered herein only to the extent that they are reflected in the reported cases, the reader is advised to consult the latest enactments for the jurisdiction of interest.

**[b] Related matters**

Admissibility of hypnotic evidence at criminal trial. 92 ALR3d 442.

Admissibility of polygraph evidence on issue of voluntariness of confession by accused. 89 ALR3d 230.

Sufficiency of identification of participants as prerequisite to admissibility of telephone conversation in evidence. 79 ALR3d 79.

Admissibility in evidence of sound recording as affected by hearsay and best evidence rules. 58 ALR3d 593.

Omission or inaudibility of portions of sound recording as affecting as admissibility in evidence. 57 ALR3d 746.

Requiring suspect or defendant in criminal case to demonstrate voice for purposes of identification. 24 ALR3d 1261.

Admissibility, as against hearsay objection. of reports of tests or experiments carried out by independent third party. 19 ALR3d 1008.

Admissibility, in criminal prosecution, of evidence secured by mechanical or electronic eavesdropping device. 97 ALR2d 1283.

Testing qualifications of expert witnesses, other than handwriting expert, by objective tests or experiments. 78 ALR2d 1281.

Admissibility of evidence as to extrajudicial or pretrial identification of accused. 71 ALR2d 449.

Identification of accused by his voice. 70 ALR2d 995.

Fingerprints, palm prints, or bare footprints as evidence. 28 ALR2d 1115.

Requiring submission to physical examination or test as violation of constitutional rights. 25 ALR2d 1407.

Proof of identity of person or thing where object, specimen, or part is taken from a human body, as basis for admission of testimony or report of expert or officer based on such object, specimen, or part. 21 ALR2d 1216.

Admissibility of sound recording as evidence in federal criminal trial. 10 L Ed 2d 1169.

◆

Greene, Voiceprint Identification: The Case in Favor of Admissibility. 13 Am Crim L Rev 171, Fall 1975.

Jones, Danger, Voiceprints Ahead. 11 Am Crim L Rev 549, Spring 1973.

Decker and Handler, Voiceprint Identification and Evidence—Out of the Frye Pan and Into Admissibility. 26 Am U L Rev 314, Winter 1977.

Siegel, Cross-Examination of a

2. For purposes of inclusion within this annotation, no distinction has been made on the basis of whether the evidence sought to be introduced involved the spectrograms themselves or voice identification testimony based on an analysis of them.

3. See annotation entitled "Requiring suspect or defendant in criminal case to demonstrate voice for purposes of identification," at 24 ALR3d 1261.

Property of the U.S.

"Voiceprint" Expert: A Blueprint for Trial Lawyers. 12 Crim Law Bull 509, Sept.-Oct 1976.

Thomas, Voiceprint—Myth or Miracle (The Eyes Have It). 3 U San Fernando Valley L Rev 15, 1974.

Boren, Voiceprint—Staging a Comeback. 3 U San Fernando Valley L Rev 1, 1974

◆

Gard, Jones on Evidence, 6th ed, 1972, §§ 14:4, 15:15.

Louisell and Mueller, Federal Evidence, 1977, §§ 105, 106.

Torcia, Wharton's Criminal Evidence, 13th ed, 1973, § 189.

## § 2. Background, summary, and comment

### [a] Generally

The sound spectrograph, invented in 1941, produces, by an electrical process, a pictorial representation of sounds, called a sound spectrogram or "voiceprint."[4] The voiceprint process is based on the fundamental premise that everyone's voice is different. Accordingly, its validity as a means of personal identification rests on the proposition that the sound patterns produced in speech are unique to the individual and that the spectrogram accurately and efficiently displays this uniqueness.[5]

Many of the cases involving the admissibility of voiceprint evidence are similar in several respects. The similarities are described here in order to avoid duplication in the summaries of the cases found later in the annotation.[6]

The typical factual situation in the cases within this annotation involved a telephone conversation during which the caller either committed a crime by the conversation itself, such as by making a bomb threat, or at least implicated himself in a crime. A recording was made of this, or of a subsequent, conversation. After the police found a suspect and an exemplar was made of his voice, the recordings were sent to the Voice Identification Unit of the Michigan State Police where spectrograms were made and analyzed to determine if the two voices were identical. If the identification was positive,[7] an attempt was then made to introduce the testimony of the examiner for the police department, at which time objection was made and the issue of voiceprint admissibility raised.

Because of the newness of the voiceprint process, a small group of expert witnesses has appeared in two or more cases. These include Mr. Lawrence Kersta, Lt. Ernest Nash, Sgt. Lonni Smrkovski, Dr. Peter Ladefoged, and Dr. Oscar Tosi.

Mr. Kersta was the inventor of the process of using sound spectrograms for identification purposes. He conducted a series of experiments in 1961 and 1962, which allegedly demonstrated that the technique was 99 pecent accurate. However, the results of the Kersta study were quickly criticized by other scientists on the ground that his methodology failed to duplicate forensic conditions in the following ways: the examiners knew

4. For a more detailed discussion of the sound spectrograph and of the theory upon which voice identification is based, see 19 Am Jur Proof of Facts 423, Spectrogram Voice Identification, and references therein cited.

5. People v Law (1974, 5th Dist) 40 Cal App 3d 69, 114 Cal Rptr 708.

6. §§ 4–10, infra.

7. No case has been found in which an attempt was made to introduce testimony that the two voices were not the same.

in advance that the unknown voice matched one of the set of known spectrograms; the examiners were required to determine only which set of voiceprints was the best match; the recordings from which the spectrograms were made were produced at one session; and the recorded samples of the suspect used words taken in isolation, rather than in context.[8]

Lieutenant Nash[9] was in charge of the Voice Identification Unit of the Michigan State Police. As a result, he has examined most of the spectrograms involved in the cases in point and has attempted to testify in numerous cases concerning the results of his examinations. Sergeant Smrkovski[10] has apparently replaced Lieutenant Nash as the officer in charge of the Voice Identification Unit and has testified in the more recent cases concerning his spectrographic examinations. Dr. Ladefoged[11] He was an early opponent of the voiceprint technique who, after the completion of the experiments by Dr. Tosi, gave his qualified support to the technique.

Perhaps the most important witness has been Dr. Oscar Tosi[12] who, from 1968 to 1970, conducted a series of experiments, referred to hereafter as the Tosi study, which allegedly established the reliability of the voiceprint technique for identification purposes. Since the reliability that can be placed in the Tosi study is a major point in numerous cases, it is described in some detail here.

Dr. Tosi randomly selected 250 English-speaking males from the student body at Michigan State University and obtained voice samples of these students using nine clue words spoken in varying contexts. Different recording conditions were tested, and voice samples were taken on two separate occasions at least 1 month apart in order to account for "intraspeaker" variability. Over 34,000 trial were made, one-third of which were closed (the matching spectrogram is always in the group to be compared) and two-thirds of which were open (the matching spectrogram may or may not be in the set to be compared). The examiners, who were given a 1-month training course, were required to determine in each comparison

8. See Decker and Handler, Voiceprint Identification Evidence—Out of the Frye Pan and into Admissibility. 26 Am U L Rev 314, 322 (1977).

9. Lieutenant Nash has been associated with the voiceprint technique since 1967, having been trained in voiceprint analysis by Mr. Kersta. He studied audiology and speech sciences at Michigan State University and completed courses there in anatomy and the physiology of speech. He worked with Dr. Tosi in preparing and designing the Tosi study, and assisted Dr. Tosi in drafting a final report of the study.

10. Sergeant Smrkovski has a bachelor's degree in audiology and speech science from Michigan State University and was employed by the Michigan Department of State Police for 10 years.

11. Doctor Ladefoged has been a professor of phonetics at UCLA, and has a Master of Arts and a Ph. D in phonetics from the University of Edinburgh, Scotland. He has published a textbook on acoustic phonetics and has also published numerous articles on experiments dealing with spectographic and related acoustical analysis of speech.

12. Dr. Tosi has been a professor in the department of audiology and speech sciences and physics at Michigan State University. A publisher of two books and numerous papers in these fields, he holds two doctorates, one in audiology and speech sciences and electronics from Ohio State University, and the other in engineering and physics from Buenos Aires University.

Property of the U.S. United States Attorney

whether the matching spectrogram was within the set of unknown spectrograms, and they were allowed to express their degree of certainty.[13]

As a result of this study, Dr. Tosi concluded that if a trained nonprofessional examiner, using only visual inspection of spectrograms and excluding any kind of listening, is forced to reach a positive decision in each case within 15 minutes, the expected errors of false identification would be approximately 60 percent and the expected errors of false elimination would be approximately 13 percent.[14] And in numerous cases Dr. Tosi has testified that the reliability is even greater under forensic conditions, that is, where a professional examiner, using aural as well as visual inspection, is not forced to reach a positive decision in each case and is given an unlimited amount of time to complete the task.[15]

Turning to the cases in which the question of voiceprint admissibility has been raised, it appears that, even more than the actual evidence introduced on the question, the crucial factor is the test of admissibility applied by the court. Thus, when the test of admissibility, propounded in Frye v United States (1923) 54 App DC 46, 293 F 1013, 34 ALR 145.[16] (hereinafter referred to as the "Frye test"), has been applied, the courts have tended to exclude voiceprint evidence,[17] while there is an equally strong tendency for them to admit this type of evidence when the Frye test has not been applied.[18]

In the Frye case, the court, after pointing out that it was difficult to ascertain exactly when a scientific principle or discovery crossed the line between the experimental and demonstrable stages, declared that somewhere in this twilight zone the evidential force of the principle must be recognized, and that while courts would go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction was made must be sufficiently established to have gained general acceptance in the particular field in which it belonged. As is readily apparent, the Frye test requires more than a mere showing that a scientific technique or device is reliable; it requires the additional showing that its reliability is generally accepted by the relevant scientific community.[19] In the field of voiceprint identification, it has proved to be quite difficult for the party offering voiceprint evidence to establish this required general acceptance. Thus, there is considerable agreement among the courts applying the Frye test that voiceprint evidence is not admissible either in a criminal trial[20]

13. Voiceprints—The Admissibility Question: What Evidentiary Standards Should Apply? 19 St. Louis U L J 509 (1975), p. 513

14. Tosi, Oyer, Lashbrook, Pedrey, Nicol and Nash, Experiments on Voice Identification, 51 Journal of Acoustical Society of America 2030 (1972) p. 2041.

15. See, for example, Commonwealth v Lykus (1975) 367 Mass 191, 327 NE2d 671.

16. The Frye case involved the admissibility of lie detector test results, and thus is beyond the scope of the present annotation.

17. §§ 4–6, infra.

18. §§ 7–10, infra.

19. For discussion of what constitutes the "relevant scientific community," see § 2[b], infra.

20. § 4[b], infra.

or in a civil case.[21] However, the Frye test has been held satisfied and admissibility upheld in a case involving a preliminary hearing to establish probable cause that a crime had been commited.[22] Also, there is some judicial authority supporting admissibility in criminal trials even though the Frye test was applied,[23] although in some instances admissibility has been permitted for a limited purpose only.[24]

The Frye test has not gained universal acceptance.[25] In numerous cases involving the admissibility of voiceprint evidence, the courts have explicitly or implicitly rejected the Frye test[26] and, although often not specifically describing the test applied, have apparently adopted the approach advocated most notably by Professor McCormick, namely, that any relevant conclusion supported by a qualified expert witness should be received unless there are other reasons for exclusion.[27] Under this view, disagreement in the scientific community regarding the reliability of a scientific process affects the weight, not the admissibility, of scientific evidence. Since "relevancy" generally means a logical relation between the proposed evidence and a fact to be established,[28] the evidence in the cases applying the McCormick view has centered on the reliability of the voiceprint process, that is, on the establishment of a logical relation between the process and the identification of the defendant by his voice.[29] This view thus requires only the testimony of a qualified expert as to the reliability of the voiceprint process, rather than proof of its general acceptance. Accordingly, there is considerable authority among the courts adopting this view that voiceprint evidence is admissible in a criminal trial,[30] at least for identification purposes,[31] in a revocation of probation proceeding,[32] and in a hearing to determine probable cause for the issuance of an arrest and search warrant.[33] However, there are some cases involving both criminal[34] and civil[35] actions, in which the courts have held that the voiceprint process has not been shown to be sufficiently reliable to warrant its admissibility.

In some of the cases in which voiceprint evidence has been admitted, including some of the cases applying the Frye test, the courts have pointed out that the factfinder is not bound by the conclusion of the voiceprint analyst, but can determine for itself the weight to give to such evidence.[36] In fact, although many of the cases do not specifically involve the issue of the weight to be given to voiceprint evidence, no case has been

21. § 6, infra.

22. § 5, infra.

23. § 4[a], infra.

24. § 4[c], infra.

25. For a detailed summary of the criticisms of the Frye test, see the dissenting opinion in Reed v State (1978) 283 Md 374, 391 A2d 364, 97 ALR3d 201.

26. §§ 7–10, infra.

27. McCormick on Evidence 2d § 203.

28. See 29 Am Jur2d, Evidence § 252.

29. §§ 7–10, infra.

30. § 7[a], infra.

31. § 7[c], infra.

32. § 8, infra.

33. § 9, infra.

34. § 7[b], infra.

35. § 10, infra.

36. § 3, infra.

Property of the U.S. United States Attorney

found supporting the view that the factfinder is bound by the conclusion of the voiceprint analyst.

**[b] Practice pointers**

As noted previously,[37] the admissibility of voiceprint evidence is largely determined by the test applied by the court. Since the Frye test of general acceptance in the scientific community is the more difficult to satisfy, counsel for the defendant in a criminal case should argue in its favor if he desires to exclude the evidence, while the prosecutor should emphasize the weaknesses in the Frye test which have been cited by numerous commentators and courts,[38] and argue for a standard based on the relevancy and reliability of voiceprint evidence. In making this argument, the prosecutor should note that the type of proceeding involved might be a relevant consideration. For example, in one case the court refused to apply the Frye test in a revocation of probation proceeding, while not ruling on its use generally.[39]

Assuming that the Frye test is applied, counsel should note that an important issue which remains is the composition of the scientific community whose acceptance of the process must be established. Specifically, the issue is whether the "community" is composed of those scientists who have actually been engaged in working or experimenting with the voiceprint process, or whether it involves the larger body of scientists who, by their training and experience, are qualified to judge its reliability. The importance to counsel of this determination is reflected by the fact that in most of the relatively few cases in which courts applying the Frye test have held voiceprint evidence admissible, the "community" has been defined narrowly as including those scientists who would be expected to be familiar with the use of the voiceprint process.[40] This is to be contrasted with such declarations by courts holding voiceprints inadmissible as that the process must be accepted by the scientific community concerned with acoustical science,[41] or that the relevant scientific community includes those scientists whose background and training are sufficient to allow them to comprehend and understand the voiceprint process and form a judgment about it.[42]

A point of importance to counsel appealing from a decision on the admissibility of voiceprint evidence is whether this determination is purely a matter within the trial court's discretion or whether it is a question of law. Some courts, especially those applying a standard based on reliability and relevancy, have declared that the trial court has wide discretion in ruling on the admissibility of scientific

37. § 2[a], supra.

38. See, for example, Louisell and Mueller, Federal Evidence, 1977, §§ 105, 106, citing numerous cases.

39. United States v Sample (1974, ED Pa) 378 F Supp 44.

40. See Hodo v Superior Court of Riverside County (1973, 4th Dist) 30 Cal App 3d 778, 106 Cal Rptr 547; Commonwealth v Lykus (1975) 367 Mass 191, 327 NE2d 671; and People v Rogers (1976) 86 Misc 2d 868, 385 NYS2d 228.

41. Commonwealth v Topa (1977) 471 Pa 223, 369 A2d 1277.

42. See Reed v State (1978) 283 Md 374, 391 A2d 364, 97 ALR3d 201, in which the court specifically held that the trial court had improperly limited "community" to those experts actually engaged in use of voiceprint technique and in experimentation with it, rather than broad general scientific community of speech and hearing scientists.

evidence.[43] However, in a case applying the Frye standard, it was held that the initial question whether the voiceprint technique had gained general scientific acceptance within the relevant community was not a matter of the trial court's discretion, but was a matter of law, the court observing that once the voiceprint process had been found to have been generally accepted, the trial judge then had discretion, as in all other cases of expert testimony, to admit or not admit the testimony on the basis of such considerations as the helpfulness of the proposed testimony to the jury and the qualifications of the expert witness.[44]

Since a court's ruling on the admissibility of voiceprint evidence is based largely on the testimony of expert witnesses, counsel should exercise particular care in selecting and preparing these witnesses.[45] Specifically, he should consider such factors as the number of witnesses to call, their qualifications, and their impartiality. For example, with respect to number, it should be noted that several courts have concluded that one witness, however qualified, is insufficient to establish the general acceptance of the voiceprint process.[46] Another court, after considering the qualifications of Lt. Nash, pointed out that he was a technician rather than a scientist, and thus not qualified to testify concerning the general acceptance of the voiceprint technique within the scientific community.[47] And the same court questioned the impartiality of Lt. Nash in view of the fact that he had virtually built his career on the reliability of the voiceprint process,[48] while another court questioned the impartiality of both Lt. Nash and Dr. Tosi for the same reason.[49]

In addition to the question of the voiceprint process' general reliability or acceptance within the scientific

---

43. See, for example, United States v Jenkins (1975, CA6 Tenn) 525 F2d 819 and United States v Franks (1975, CA6 Tenn) 511 F2d 25, cert den 422 US 1042, 45 L Ed 2d 693, 95 S Ct 2656, 95 S Ct 2654 and cert den 422 US 1048, 45 L Ed 2d 701, 95 S Ct 2667 and (disagreed with United States v McDaniel 176 App DC 60, 538 F2d 408, infra § 4[b]).

44. Reed v State (1978) 283 **Md** 374, 391 A2d 364, 97 ALR3d 201. But see People v King (1968, 2d Dist) 266 **Cal** App 2d 437, 72 Cal Rptr 478, where the court stated that whether a scientific test has received 'general acceptance by experts in the field so as to justify admission of expert testimony based on the results of that test is primarily a question of fact for the trial court.

45. For an example of the points which should be covered by the prosecution in questioning the expert on voice spectrograms, see 19 POF 423, Spectrogram Voice Identification, § 13.

46. See, for example, People v Kelly (1976) 17 **Cal** 3d 24, 130 Cal Rptr 144, 549 P2d 1240; State v Cary (1967) 49 **NJ** 343, 230 A2d 384, 24 ALR3d 1255, on remand 99 NJ Super 323, 239 A2d 680, remanded 53 NJ 256, 250 A2d 15, later app 56 NJ 16, 264 A2d 209, infra § 4[b], and Commonwealth v Topa (1977) 471 **Pa** 223, 369 A2d 1277. But see United States v Brown (1973, **Dist Col** Super) 13 Cr L 2203, where the court, although acknowledging that it was difficult to gauge the degree of acceptance in the scientific community when only Dr. Tosi had testified, pointed out that the government was not required to produce any particular number of scientists and that Dr. Tosi's uncontroverted testimony was sufficient for this purpose.

47. People v Kelly (1976) 17 **Cal** 3d 24, 130 Cal Rptr 144, 549 P2d 1240.

48. People v Kelly (1976) 17 **Cal** 3d 24, 130 Cal Rptr 144, 549 P2d 1240.

49. People v Tobey (1977) 401 **Mich** 141, 257 NW2d 537.

Property of the U.S. United States Attorney

community, counsel should carefully examine the exact procedure used in the case at hand since in some instances error in the manner in which the voice comparison was made have been held to be sufficient to deny admissibility.[50] Also, counsel should note that there is some indication in the cases that the voiceprint technique is less reliable when female, or mimicked or disguised, voices are involved.[51]

Counsel should remember that although voiceprint evidence has been admitted, the fact finder is not bound by it, but instead can give such evidence whatever weight it desires,[52] based on a consideration of the same factors that determine admissibility, such as the qualifications of the expert witness and the reliability of the voiceprint process.[53] Since the admissibility of voiceprint evidence is sometimes decided in a pretrial hearing,[54] counsel for the defendant, if failing to keep the evidence out, should nevertheless utilize this opportunity to determine the nature of the voiceprint evidence that will be used and to prepare for later cross examination, all of which could have a substantial impact on the weight accorded to such evidence by the fact finder.

Finally, counsel should note that the question of the admissibility of voiceprint evidence is in a state of flux and that earlier decisions, although entitled to consideration, are not necessarily binding. The pattern into which the cases have fallen is one of having denied admissibility before the Tosi study,[55] followed by a trend to admit voiceprint evidence in the years immediately after the Tosi study.[56] At present, the tendency seems to be reversing itself once against as an increasing number of scientists voice concern about the Tosi study.[57] What the future will bring depends, of course, on what

50. See, for example, Brown v United States (1978, **Dist Col** App) 384 A2d 647 (Tape recorder used to record exemplar of defendant's voice was apparently defective because tape was recorded at wrong speed).

51. See, for example, United States v Addison (1974) 162 App **DC** 199, 498 F2d 741, where Dr. Ladefoged testified that voiceprint identification of females would probably be more difficult than identification of males. See also, People v Law (1974, 5th Dist) 40 **Cal** App 3d 69, 114 Cal Rptr 708, holding that the testimony presented failed to establish that the voiceprint technique satisfied the Frye standard in situations involving disguised and mimicked voices.

52. § 3, infra.

53. See, for example, United States v Baller (1975, CA4 W Va) 519 F2d 463, cert den 423 US 1019, 46 L Ed 2d 391, 96 S Ct 456 and (disagreed with United States v McDaniel 176 App DC 60, 538 F2d 408, infra § 4[b]).

54. See, for example the following cases:

**Dist Col**—United States v Brown (1973, Dist Col Super) 13 Crim Law 2203.

**NJ**—State v Andretta (1972) 61 NJ 544, 296 A2d 644.

**NY**—People v Rogers (1976) 86 Misc 2d 868, 385 NYS2d 228.

55. See, for example, People v King (1968, 2d Dist) 266 **Cal** App 2d 437, 72 Cal Rptr 478; and State v Cary (1968) 99 **NJ** Super 323, 239 A2d 680, remanded 53 NJ 256, 250 A2d 15, later app 56 NJ 16, 264 A2d 209, infra § 4[b].

56. See, for example, Worley v State (1972, **Fla** App D4) 263 So 2d 613; and State ex rel. Trimble v Hedman (1971) 291 **Minn** 442, 192 NW2d 432, 49 ALR3d 903.

57. See, for example, Reed v State (1978) 283 **Md** 374, 391 A2d 364, 97 ALR3d 201; and Commonwealth v Topa (1977) 471 **Pa** 223, 369 A2d 1277.

out, should never-
pportunity to de-
of the voiceprint
be used and to
ross examination,
have a substantial
ight accorded to
e fact finder.
should note that
e admissibility of
is in a state of
ier decisions, al-
consideration, are
ling. The pattern
have fallen is one
lmissibility before
llowed by a trend
evidence in the
after the Tosi
t, the tendency
rsing itself once
asing number of
nce out the
th ture will
course, on what

ple the following

tes v Brown (1973,
n Law 2203.
(1972) 61 NJ 544,

rs (1976) 86 Misc
8.

le, People v King
l App 2d 437, 72
e v Cary (1968) 99
2d 680, remanded
5, later app 56 NJ
§ 4[b].

le, Worley v State
3 So 2d 613; and
v Hedman (1971)
2d 432, 49 ALR3d

le, Reed v State
391 A2d 364, 97
nonwealth v Topa
A2d 1277.

additional experimentation and study reveals. Indeed, several of the courts denying admissibility have specifically stated that their decisions were not meant to preclude admissibility of voiceprint evidence in the future when additional research might be available concerning the reliability and general acceptance of the voiceprint process.[58] It is thus imperative that counsel keep abreast of the developments in this field.

## § 3. Weight

In the following cases in which the courts approved the admission of opinion evidence as to identity based upon voiceprint analysis, it was held that the factfinder was not bound by the identification, but could make its own determination from the evidence of what weight or credence to give the evidence.

US—United States v Williams (1978, CA2 NY) 583 F2d 1194, cert den 439 US 1117, 59 L Ed 2d 77, 99 S Ct 1025; United States v Jenkins (1975, CA6 Tenn) 525 F2d 819; United States v Baller (1975, CA4 W Va) 519 F2d 463, cert den 423 US 1019, 46 L Ed 2d 391, 96 S Ct 456 and (disagreed with United States v McDaniel 176 App DC 60, 538 F2d 408, infra § 4[b]); United States v Franks (1975, CA6 Tenn) 511 F2d 25, cert den 422 US 1042, 45 L Ed 2d 693, 95 S Ct 2656, 95 S Ct 2654 and cert den 422 US 1048, 45 L Ed 2d 701, 95 S Ct 2667 and (disagreed with United States v McDaniel 176 App DC 60, 538 F2d 408, infra § 4[b]); United States v Wright (1967) 17 USCMA 183, 37 CMR 447.

United States v Sample (1974, ED Pa) 378 F Supp 44.

Fla—Alea v State (1972, Fla App D3) 265 So 2d 96.

Mass—Commonwealth v Lykus (1975) 367 Mass 191, 327 NE2d 671.

Minn—State ex rel. Trimble v Hedman (1971) 291 Minn 442, 192 NW2d 432, 49 ALR3d 903.

NY—People v Rogers (1976) 86 Misc 2d 868, 385 NYS2d 228.

Thus, in United States v Baller (1975, CA4 W Va) 519 F2d 463, cert den 423 US 1019, 46 L Ed 2d 391, 96 S Ct 456 and (disagreed with United States v McDaniel 176 App DC 60, 538 F2d 408, infra § 4[b]); the court stated that the admissibility of spectrographic identification turned primarily on whether this theory had been sufficiently proved to allow a jury to give the evidence whatever weight it saw fit. Noting that unless an exaggerated popular opinion of the accuracy of a particular technique made its use prejudicial or likely to mislead the jury, it was better to admit relevant scientific evidence in the same manner as other expert testimony and allow its weight to be attacked by cross-examination and refutation, the court pointed out that the jury had been instructed that they could disregard the testimony of Lt. Nash if they decided that his opinion was not based on adequate educational experience or that the science of voiceprint identification was not sufficiently reliable, accurate, and dependable. The court concluded that the reliability and credibility of Lt. Nash's opinion was opened to refutation and that the question of its weight was fairly presented to the jury.

In People v Rogers (1976) 86 Misc 2d 868, 385 NYS2d 228, the court stated that the consideration of voiceprint evidence by a jury must be carefully shepherded by the court so that

58. See, for example, People v Tobey (1977) 401 Mich 141, 257 NW2d 537.

Property of the U.S. United States Attorney

no undue weight is given to the methodology because of its relative newness in the legal area, and that the jury must be given the opportunity to accept or reject the expert's opinion, or give it whatever weight it so finds it deserves.

## II. Admissibility on basis of general acceptance ("Frye") test

### § 4. In criminal trial

#### [a] Held admissible

In the following cases in which the court applied the Frye test of general acceptance in the scientific community, the courts held that the voiceprint process had been generally accepted by the relevant scientific community and that evidence based on such process was, therefore, admissible in a criminal trial.

Thus, in United States v Brown (1973, Dist Col Super) 13 Crim Law 2203, the defendant was convicted of threatening the life of a former college president, partly on the basis of voice identification testimony made by Lt. Nash from spectrographic analysis. Following a pretrial hearing to determine the admissibility of such evidence, at which both Lt. Nash and Dr. Tosi testified, the court applied the Frye standard of general acceptance and observed that the cornerstone on which such general acceptance rests is reliability, that is, the reliability of the underlying scientific principle that each human voice produces a unique spectrographic array. The court concluded from the uncontroverted testimony of Dr. Tosi that the voiceprint technique had become sufficiently established to have gained general scientific acceptance, that the technique appeared to have the requisite reliability which underlies such general acceptance, and that the testimony of Lt. Nash was, therefore, admissible. The court acknowledged that it was difficult to gauge the degree of acceptance in the scientific community when only Dr. Tosi had testified, but concluded that the government was not required to produce any particular number of scientists. The court stated that Dr. Tosi's uncontroverted testimony was sufficient evidence of the general acceptance of the voiceprint technique by the segment of the scientific establishment in a position to understand, appreciate, and pass judgment on voice identifications made by using spectrographic analysis.

In affirming a conviction for kidnapping, murder, and extortion, the court, in Commonwealth v Lykus (1975) 367 Mass 191, 327 NE2d 671, held, on the basis of the Frye test, that voice identification testimony given by Lt. Nash after examination of spectrograms was properly admitted, the court observing that its conclusion was based on relevant writings in scientific journals, the evidence produced at the trial as to reliability and general acceptance of the principle, and the decisions from other jurisdictions which showed a trend toward admissibility of voiceprint evidence. From the testimony of Dr. Tosi and Lt. Nash, the court concluded that it was shown that in "real life" the percentage of wrongful identification would be even less than the six percent rate found under laboratory conditions in the Tosi study.[59] Based on the considerable reliability proved by the Tosi study, the added reliability produced by having an experienced examiner working under forensic conditions, and the totality of

59. For a description of the Tosi study, see § 2[a], supra.

underlies such nd that the testi- s, therefore, ad- t acknowledged o gauge the de- in the scientific ly Dr. Tosi had ed that the gov- uired to produce er of scientists. Dr. Tosi's un- y was sufficient al acceptance of que by the seg- establishment in and, appreciate, n voice identifi- spectrographic

viction for kid- l extortion, the ea Lykus 32 2d 671, the Frye test, tion testimony er examination properly admit- ng that its con- relevant writ- rnals, the evi- he trial as to acceptance of decisions from hich showed a bility of voice- he testimony of the court con- vn that in "real wrongful iden- n less than the l under labora- e Tosi study.[50] able reliability udy, the added having an ex- working under d the totality of

the evidence which tended to minimize the importance and weight of adverse or skeptical writings, the court concluded that the general acceptability required by the Frye standard had been established. The court added that the requirement of the Frye rule of general acceptability was satisfied if the principle was generally accepted by those who would be expected to be familiar with its use.

In People v Rogers (1976) 86 Misc 2d 868, 385 NYS2d 228, an application for an order directing the defendant to furnish a voice exemplar for spectrographic analysis, the court, in rejecting various constitutional arguments and granting the order, stated that it was also necessary to make a preliminary decision as to the admissibility at trial of such evidence. Characterizing the Tosi study as conclusively demonstrating the reliability of speech spectrograms as an aid in the identification of unknown speakers, the court, although acknowledging that voiceprints did not have the infallibility of fingerprints, pointed out that their reliability was as great as, or greater than, numerous other scientific tests which were commonly held to be admissible, such as blood alcohol tests as evidence of intoxication, and tests for analysis of hairs and fibers. Applying the Frye test, the court further pointed out that at the United States District Court level 14 of 15 judges who had ruled on the issue of admissibility had accepted voiceprint evidence, and that all but two of the 37 state courts which had reached the issue had held such evidence admissible. The court thus concluded that voice identification by means of visual spectrogram analysis, when accompanied by aural examinations and comparisons, and when conducted by a properly qualified examiner, had reached the level of general acceptance by those who would be expected to be familiar with its use and was, therefore, admissible.

◆

In the following case the court, although not specifically applying the Frye test of general acceptance in the scientific community, held that voiceprint evidence was admissible by reason of its reliability and that reliability was nearly synomyous with general acceptance.

Thus, in United States v Franks (1975, CA6 Tenn) 511 F2d 25, cert den 422 US 1042, 45 L Ed 2d 693, 95 S Ct 2656, 95 S Ct 2654 and cert den 422 US 1048, 45 L Ed 2d 701, 95 S Ct 2667 and (disagreed with United States v McDaniel 176 App DC 60, 538 F2d 408, infra § 4[b]), the court rejected the defendant's contention that voiceprint analysis was too inaccurate to be admitted into evidence, where there was extensive inquiry into the expert witness' qualifications, and defense counsel were permitted ample opportunity to cross examine him, and where neither defendant produced a witness rebutting the government's claim that voiceprint analysis was sufficiently accurate to be admissible. In ruling that the trial judge was within his discretion in admitting voiceprint analysis, the court explained that general acceptance was nearly synonymous with reliability and that if a scientific process was reliable, or sufficiently accurate, the courts might also deem it generally accepted.

### [b] Held not admissible

Applying the Frye test of general acceptance in the scientific community, the courts in the following cases held that the voiceprint process had not been generally accepted by the relevant scientific community and that, therefore, evidence based on

Property of the U.S.

such process was not admissible in a criminal trial.

Thus, in United States v Addison (1974) 162 App DC 199, 498 F2d 741, a prosecution for offenses involving assault on a police officer, the court held that admission of voice identification testimony by Lt. Nash, based on an examination of spectrograms, was error. Applying the Frye standard, the court concluded that the trial court had incorrectly focused more on the reliability of Lt. Nash's conclusion than on the general acceptance of his technique within the scientific community. Observing that the trial court had relied on the Tosi study and the testimony of Dr. Ladefoged who had adopted a more favorable stance regarding the technique after examining the Tosi study, the court pointed out that Dr. Ladefoged had stated only that the new evidence had moved him to cautiously reconsider the possibility of the use of spectrographic analysis in criminal trials and that he had expressed a number of continuing reservations, that his testimony simply reflected a position of abatement of skepticism towards the voiceprint, and not one of complete acceptance, a position which, according to his testimony, was shared by the community of scientists. Observing also that another expert had attacked the Tosi study as an inadequate basis from which to determine the validity of spectrogram identification of the broader voice population of the United States, the court concluded that it was clear that the technique had not attained the general acceptance of the scientific community to the degree required by the Frye test. However, the court affirmed a judgment of conviction against the defendant on the basis of other incriminating evidence.

It was held, in United States v McDaniel (1976) 176 App DC 60, 538 F2d 408, that it was error to admit the testimony of Lt. Nash that, after comparing the spectrograms of an unknown party to a telephone conversation with known voice exemplars of the defendant, he had concluded that the speakers were the same person. However, on the basis of other evidence, the court affirmed a judgment of conviction against the defendant for various offenses relating to gambling and robbery. Relying on the holding in United States v Addison (1974) 162 App DC 199, 498 F2d 741, supra, that techniques of speaker identification by voiceprint comparison had not attained the general acceptance of the scientific community to the degree required by the Frye case, the court held that absent a clear showing that the reliability of spectrographic voice identification and its general acceptability within the scientific community had changed drastically, it was bound by the Addison decision to hold that spectrographic voice identification evidence remained inadmissible. However, noting that two of three federal circuits, eight of nine state appellate courts, 14 of 15 United States district judges, and 35 of 37 state tribunals had concluded that voice print evidence was admissible, the court observed that it might well be that the time had come to reexamine the holding of the Addison decision.

Although affirming, on the basis of other evidence, a judgment of conviction for making threatening phone calls, the court, in Brown v United States (1978, Dist Col App) 384 A2d 647, held that the trial court had erred in admitting the voice identification testimony of Lt. Nash made on the basis of spectrographic analysis, where it was established that the tape recorder used to record an exemplar

76 App DC 60, 538
as error to admit
t. Nash that, after
ectrograms of an
telephone conver-
voice exemplars of
ad concluded that
the same person.
asis of other evi-
irmed a judgment
ist the defendant
relating to gam-
Relying on the
States v Addison
C 199, 498 F2d
niques of speaker
iceprint compari-
d the general ac-
ntific community
ired by the Frye
ld that absent a
the reliability of
ce identification
cep within
nity changed
und by the Addi-
ld that spectro-
fication evidence
le. However, not-
federal circuits,
appellate courts,
s district judges,
ibunals had con-
int evidence was
observed that it
e time had come
ling of the Addi-

on the basis of
gment of convic-
eatening phone
Brown v United
l App) 384 A2d
trial court had
e voice identifi-
. Nash made on
graphic analysis,
ed that the tape
rd an exemplar

of the defendant's voice was apparently defective because the tape was recorded at the wrong speed, and where Dr. Tosi testified that a reliable identification could thus not be made. Based upon this state of the record and a review of the decisions on the subject which revealed the absence of a clear trend on the issue of the admissibility of voiceprints, the court, without foreclosing an opposite result in the future, declined to adopt the trial court's ruling that voice spectrographic identification evidence was shown to be sufficiently reliable and accepted within the scientific community to permit its introduction in this criminal case.

Applying the "general acceptance" rule enunciated in the Frye case, the court, in People v Kelly (1976) 17 **Cal** 3d 24, 130 Cal Rptr 144, 549 P2d 1240, held that the evidence was insufficient to establish the reliability of voiceprint evidence, although it might be possible to do so in the future. In reversing a judgment against the defendant who was convicted of extortion on the basis, in part, of voiceprint evidence introduced at trial, the court reviewed the cases from California and other jurisdictions and concluded that these cases revealed no uniform trend either for or against the admissibility of voiceprint evidence and certainly did not establish, as a matter of law, the reliability of the voiceprint technique. The court distinguished the case of Hodo v Superior Court of Riverside County (1973, 4th Dist) 30 **Cal** App 3d 778, 106 Cal Rptr 547, infra § 5, in which voice prints were admitted, on the ground that the Hondo case involved the admissibility of such evidence at a preliminary examination, rather than at trial as in the present case. Turning to the expert testimony in favor of the reliability of the voiceprint technique, the court stated that it suffered from the following three weaknesses: (1) only Lt. Nash testified on the reliability issue 2nd, the court said, something more than the bare opinion of one man, however qualified, was required; (2) Lt. Nash's impartiality was questionable since he had virtually built his career on the reliability of the technique; and (3) Lt. Nash's qualifications, although impressive, were those of a technician and law enforcement officer, rather than a scientist, and did not qualify him to express an informed opinion on the view of the scientific community towards voiceprint analysis.

Holding that admission of opinion evidence as to identity based on voiceprints was ground for reversal of conviction of the defendant for arson where the main issue at trial was identification of the defendant as the speaker who incriminated himself in a television documentary film, the court in People v King (1968, 2d Dist) 266 **Cal** App 2d 437, 72 Cal Rptr 478,[60] recognized that whether a scientific test has received general acceptance by experts in the field so as to justify admission of expert testimony based on results of that test is primarily a question of fact for the trial court, but nonetheless concluded that the acknowledgment by Mr. Kersta, an inventor of the voiceprint process, who testified on the basis of voiceprints that the defendant and the speaker in the film were the same person, that his process was entirely subjective and founded on his opinion alone without general acceptance within the scientific community, re-

60. This case was distinguished in Hodo v Superior Court of Riverside County (1973, 4th Dist) 30 **Cal** App 3d 778, 106 Cal Rptr 547, infra § 5.

Property of the U.S. United States Attorney

Case 2:87-cr-00422-JAK Document 3027 Filed 05/17/88 Page 33 of 50 Page ID #:21013

quired a ruling that the voiceprint identification process had not reached a sufficient level of scientific certainty to be accepted as identification evidence in cases where the life or liberty of a defendant may be at stake. While Mr. Kersta asserted that his technique and equipment had the accuracy and infallibility of fingerprint identification, the court was unimpressed, noting, inter alia, that (1) while the theory upon which the uniqueness and constancy of an individual's voiceprint was asserted depended upon factors within the realm of the sciences of anatomy, medicine, physiology, physics, psychology, and linguistics, the witness, whose education was in the field of electrical engineering and physics, had no educational or employment background in those other sciences, (2) seven defense witnesses, including an experimental psychologist specializing in acoustics and phonetics, a sensory and physiological psychologist, a professor of phonetics, and a linguist, uniformly challenged the claim that the technique was practically infallible, (3) the claims for accuracy of the voiceprint identification process were founded on theories and conclusions not yet substantiated by accepted methods of scientific verification, (4) the ultimate identification was based on a subjective analysis not subject to confirmation, (5) even if the equipment and process possessed the claimed capability, there was no showing that the witness possessed sufficient capability and expertise to analyze the results with certainty, (6) the tests from which Mr. Kersta drew his conclusions as to accuracy had a very narrow statistical base, and (7) the Speech Communications Committee of the Acoustical Society of America had unanimously passed a resolution rejecting Mr. Kersta's claim of reliability of the process, the resolution stating that the sound spectrogram (voiceprint) did not contain sufficient information to identify individual speakers.

In People v Law (1974, 5th Dist) 40 Cal App 3d 69, 114 Cal Rptr 708, the defendant was convicted of telephoning a false bomb report largely on the basis of the opinion of Lt. Nash that voiceprints of the unknown telephone caller and of the defendant were made by the same person. However, the judgment of conviction was reversed on the ground that the testimony of Drs. Tosi and Ladefoged failed to establish that the voiceprint technique satisfied the Frye standard, where the voiceprints in question involved disguised and mimicked voices. The court pointed out that although Dr. Tosi, on the basis of his study, concluded that the voiceprint procedure was scientifically valid and accepted by the scientific community, both he and Dr. Ladefoged testified that more experimenting was necessary with respect to the effect of disguised and mimicked voices. Observing that Dr. Ladefoged was reluctant to express unconditional acceptance of the voiceprint method, the court pointed out that such reluctance was understandable in view of numerous scientific articles, of which the court took judicial notice, pointing to weaknesses in the Tosi study and concluding that voiceprints were not yet a reliable method of identification. Accordingly, the court declared that the conclusion was compelled that, with respect to disguised and mimicked voices in particular, the prosecution had not carried its burden of proof to demonstrate that the scientific principles pertaining to spectrographic identification were beyond the experimental and into the demonstrable stage.

Case 2:87-cr-00422-JAK Document 3027 Filed 05/17/88 Page 34 of 50 Page ID #:21014

In holding voice identification testimony by Lt. Nash inadmissible in a case in which the defendant was charged with making a bomb threat by telephone, the court, in People v Chapter (1973) Marin County California Super Ct, 13 Cr L 2479, concluded that the voiceprint technique had not received such general acceptance by recognized experts in the field as to justify the admission of expert testimony, the court observing that the "field" included many disciplines such as anatomy, physiology, psychology, linguistics, and the like. The court explained that the record clearly indicated the following: (1) that there was a substantial lack of agreement within the relevant scientific community as to the reliability and acceptability of voiceprints; (2) that the Tosi study did not consider or establish any application of the voiceprint technique to field conditions; (3) that the statement in the case of Hodo v Superior Court of Riverside County (1973, 4th Dist) 30 Cal App 3d 778, 106 Cal Rptr 547, infra § 5, to the effect that the voice print technique was generally accepted by experts in the field who would be expected to be familiar with its use, such as Dr. Ladefoged, was in fact not accurate as reflected by Dr. Ladefoged's testimony in the case; and (4) that in approximately 80 percent of the 25 cases in which voiceprint identification testimony was admitted there was no opposing expert testimony. The court added that regardless of the issue of admissibility, the voice identification testimony of Lt. Nash was not reliable in the case before it due to numerous mistakes and errors made during the procedure he employed.

A conviction for rape and related offenses, based in part on voice identification testimony made upon the analysis of spectrograms, was reversed, in Reed v State (1978) 283 Md 374, 391 A2d 364, 97 ALR3d 201, the court holding that at the present time spectrography had not achieved the general acceptance in the scientific community required under the Frye standard. The court emphasized the testimony of Dr. Tosi that there was a split in opinion among the scientists actually engaged in the field of sound spectrography, as well as the testimony of defense experts that spectography was neither a reliable process nor generally accepted within the scientific community, one of the experts stating that it amounted to a fraud. In addition, the court pointed to an article dealing with the Tosi study in which the authors had concluded that for the less-than-ideal conditions encountered in forensic situations, the indication was that the probability of error in voice identification would increase substantially. Finally, the court observed that in cases arising after the Tosi study, there was a sharp and fundamental division on the question of the admissibility of voiceprint evidence, and went to the very validity of the process itself. Noting that the "relevant scientific community," included those scientists whose background and training were sufficient to allow them to comprehend and understand the process and form a judgment about it, the court declared that the trial court had improperly limited the community to those experts actually engaged in the use of the voiceprint technique and in experimentation with it, rather than the broad general scientific community of speech and hearing scientists.

The voice identification testimony of Lieutenant Nash based on examination of spectrograms was held improperly admitted, in People v Tobey

Property of the U.S. United States Attorney

Case 2:87-cr-00422-JAK Document 3027 Filed 05/17/88 Page 35 of 50 Page ID #:21015

(1977) 401 **Mich** 141, 257 NW2d 537, the court reversing a conviction for sale of heroin. In holding that the Frye test still applied in Michigan despite recent criticism of it, the court declared that the required general scientific recognition could not be established without the testimony of disinterested and impartial experts, that is, scientists whose livelihood was not intimately connected with the new technique. Noting that Lt. Nash was a pupil of Mr. Kersta and had assisted Dr. Tosi in planning and conducting the Tosi study, the court concluded that neither Lt. Nash nor Dr. Tosi, whose reputations and careers had been built on their voiceprint work, could be said to be impartial or disinterested. The court added that its decision was not intended in any way to foreclose the introduction of voiceprint evidence in future cases if there was demonstrated solid scientific approval and support of this new method of identification.

The defendant in a murder trial had been ordered to submit to a recording of his voice so that the voiceprint process could be used to determine whether he was the speaker in a tape recording of a telephone call to police about the crime, and on an interlocutory appeal from that and another order, the court, in State v Cary (1967) 49 **NJ** 343, 230 A2d 384, 24 ALR3d 1255, on remand 99 NJ Super 323, 239 A2d 680, remanded 53 NJ 256, 250 A2d 15, later app 56 NJ 16, 264 A2d 209,[61] remanded the case for a finding whether the voiceprint process and equipment were sufficiently accurate to produce results admissible as evidence, adding that it felt that something more than the bare opinion of one man, however qualified, was required. On remand, in State v Cary (1968) 99 **NJ** Super 323, 239 A2d 680, after hearing testimony from Mr. Kersta and Dr. Tosi for the state (this occurred before the Tosi study, and Dr. Tosi testified as to the technique's promise, but noted the need for more experimentation) and Dr. Ladefoged and another witness for the defendant, Dr. Lagefoged having presented 39 letters from persons engaged in the science of speech sounds which showed the controversy concerning the scientific acceptance and reliability of the voiceprint technique, and after hearing evidence as to a test performed at the instance of the prosecutor in which recordings of the voices of five speakers were correctly matched, the court concluded that the voiceprint process had not met the legal criterion of "general scientific acceptance as a reliable means of ascertaining the truth," which criterion was said to be a prerequisite for a court to take judicial notice of the technique or aid involved, permitting its admissibility as evidence. The need for a high degree of scientific acceptance and reliability is vital when a criminal case is involved where the defendant's life or freedom may be at stake, the court pointed out, but here the only testimony as to the scientific acceptance and accuracy of the process was that of its innovator, whereas all the other evidence indicated that it was too early to tell whether the process was accurate and reliable and indicated that it lacked the required scientific acceptance. The state appealed the decision and at its request the court in State v Cary (1969) 53 **NJ** 256, 250 A2d 15, remanded the case for further expert

61. This case was distinguished in State v Andretta (1972) 61 **NJ** 544, 296 A2d 644, infra § 7.

97 ALR
testim
state
any n
decisi
the e
voice
State
A2d
Co
must
of s
fold
scie
icall
Fry
sho
cou
Mi
tha
tha
ra
ga
va
c
s
s
b
t
t

Case 2:87-cr-00422-JAK Document 3027 Filed 05/17/88 Page 36 of 50 Page ID #:21016

testimony, but after notice from the state that it was not able to furnish any new and significant evidence, the decision adverse to admissibility of the evidence of identity based on the voiceprint process was affirmed in State v Cary (1970) 56 NJ 16, 264 A2d 209.

Concluding that the standard which must be applied to the admissibility of spectrographic analysis is the two-fold test of reliability[62] and general scientific acceptance (the court specifically rejected the contention that the Frye test of general acceptance should be the only test applied), the court, in People v Collins (1978) 94 Misc 2d 704, 405 NYS2d 365, held that the evidence failed to establish that the technique of sound spectrography for voice identification had gained general acceptance in the relevant scientific community which, the court stated, was not limited to those scientists who actually employed the spectrograph for voice identification, but rather, included all speech scientists familiar with the use of the spectrograph for other purposes in connection with the human voice. In refusing to admit voiceprint evidence against the defendants, who were charged with attempted larceny, the court declared that the absence of a replication of the Tosi study, or of other experiments on voiceprint identification, was by itself sufficient to rule the process inadmissible. However, the court also emphasized other evidence of lack of acceptance within the scientific community, namely, a 1973 paper in which the authors concluded that the Tosi study was not responsive to questions of reliability in forensic situations and a poll of the Acoustical Society of America which revealed that 89 members agreed with the paper's conclusion, 4 disagreed, and 7 did not respond. The court also pointed out that an expert for the defense testified that he had conversed with the six authors of the aforementioned paper during the last year, and that their views were the same as in 1973, and that while he knew of six scientists who supported spectrography for voice identification, he was able to recollect at least 40 scientists, all on the PhD level and in the relevant field of inquiry, who believed that voice identification by sound spectrography was not reliable.

In reversing a judgment of conviction for murder which was based in part on the voice identification testimony of Lt. Nash after analysis of spectrograms of an unknown telephone caller and the defendant, the court, in Commonwealth v Topa (1977) 471 Pa 223, 369 A2d 1277, held that it was error to permit the introduction of the voiceprint evidence at trial. Applying the Frye standard, the court, after observing that numerous scientific articles had contrasted fingerprints and spectograms, pointed out that spectrograms were comparable with lie-detector tests. Although Lt. Nash, who was the only expert witness, testified that mimicry of voices would not affect the accuracy of voiceprint identification, that voice analysis was made more reliable by the aural examination of tape recordings in conjunction with spectrogram interpretation, and that there was no possibility of two different people producing the same spectrogram, the court pointed out that his opinion alone did not establish the general acceptance of the technique's validity as required by the Frye stan-

62. The portion of the case dealing with the reliability of spectrographic analysis is treated in § 7[b], infra.

Property of the U.S. United States Attorney Los Angeles, Calif.

dard. Furthermore, the court concluded from a study of the cases and commentaries which had addressed the issue, that the reliability of the sound spectrograph and voiceprint identification had not as yet been generally accepted by the scientific community concerned with acoustical science.

**[c] Held admissible for limited purpose**

Although not holding that the Frye test had been satisfied, the court in the following case held that that test governed the admissibility of voiceprint evidence and that such evidence was admissible in a criminal trial for identification purposes only if properly qualified and shown to be reliable.

Thus, in affirming a judgment of contempt against a defendant, charged, inter alia, with extortion, for disobeying an order to submit to a voiceprint test, the court, in State v Olderman (1975) 44 **Ohio** App 2d 130, 73 Ohio Ops 2d 129, 336 NE2d 442, rejected the defendant's contention that since a voiceprint was inadmissible for identification or testimony purposes, the order requiring the furnishing of a voiceprint was erroneous. Observing that it could not then rule concerning whether the voice exemplar sought by the prosecution and ordered by the court would be admissible when and if it was offered in evidence, the court nevertheless concluded that voice exemplars were, when properly qualified, admissible, and that the Frye standard governed this determination. Observing that its conclusion was in accord with the growing weight of authority, the court declared that the prosecution's spectographic voiceprint exemplar was, if properly qualified and shown to be reliable, admissible for identification purposes only.

◆

In the following case in which the court held that voiceprint evidence was admissible in a criminal trial since the voiceprint process had been generally accepted by the relevant scientific community, the court warned that such evidence should be given the closest of judicial scrutiny in certain situations.

Thus, in Commonwealth v Lykus (1975) 367 **Mass** 191, 327 NE2d 671, supra § 4[a], the court, after holding on the basis of the Frye test that voice identification testimony given by Lt. Nash was properly admitted, cautioned that the admission of expert testimony as to spectrograph analysis should be subject to the closest of judicial scrutiny, particularly where there was not other evidence of voice identification or where, but for the voiceprint, there would be insufficient evidence to convict the defendant. However, the court did not specifically limit the admissibility of spectrographic evidence to situations where there was other evidence of the defendant's guilt.

**§ 5. In preliminary hearing to establish probable cause for commission of crime**

In the following case in which the court applied the Frye test of general acceptance in the scientific community, the court held that the voiceprint process had been generally accepted by the relevant scientific community and that evidence based on such process was, therefore, admissible in a preliminary hearing to determine if there was probable cause that a crime had been committed.

Thus, where the evidence at a preliminary hearing established probable cause that a juror had, by a telephone call, offered to receive a bribe and to render a verdict for a party, the court,

in Hodo v Superior Court of Riverside County (1973, 4th Dist) 30 Cal App 3d 778, 106 Cal Rptr 547,[62] denied the juror's petition for a writ of prohibition, the court holding that the testimony of Lt. Nash that voiceprints of the telephone caller and of the petitioner were identical had been properly admitted. After describing in detail the Tosi study, the court emphasized testimony of Dr. Tosi that when a professional examiner, as opposed to a student volunteer, had all the time he needed, as opposed to the 15 minutes allowed in the study, was responsible for his decision, and could listen to the voice samples as well as visually examine the voice spectogram (the examiners in the study saw only the spectogram), the voiceprint method of identification was extremely reliable. To establish general acceptance and reliability, the court again emphasized testimony of Dr. Tosi that although many people in the larger fields of acoustics and linguistics were not familiar with the voice technique, its reliability had generally been accepted by those experts in the field who would be expected to be familiar with its use, the court observing that Dr. Tosi had submitted an impressive list of those among his colleagues who now shared his present opinion as to the reliability of the voiceprint technique, including Dr. Ladefoged. The court distinguished People v King (1968, 2d Dist) 266 Cal App 2d 437, 72 Cal Rptr 478, supra § 4[b], in which the court had held that voice print identification was not admissible, on the ground that the King case occurred before the Tosi study and at a time when the scientific community, including Dr. Tosi himself, was not of the opinion that voiceprints were reliable.

## § 6. In civil case

Voiceprint evidence was held to be inadmissible in the following civil case where the evidence failed to establish that the voiceprint process had been generally accepted by the relevant scientific community.

Thus, in D'Arc v D'Arc (1978) 157 NJ Super 553, 385 A2d 278, a matrimonial action in which a wife sought to introduce the results of a voiceprint test comparing recordings of telephone conversations allegedly involving her husband a voice exemplar made by the husband, the court, applying the Frye test, held that the wife had failed to establish that the technique was generally accepted within the scientific community and that the results were thus inadmissible. The court emphasized the testimony of an expert for the husband that at least 30 close colleagues shared his view that the voiceprint technique could not validly identify an unknown speaker. In addition, the court pointed out, another expert witness for the husband challenged two basic assumptions behind the voiceprint technique; first, that every individual in the world was unique in his or her speech; and second, that their voices were so unique that they could be in and of themselves identified. This same expert, the court observed, also conducted two polls, the first showing that approximately 37 out of 41 scientists, and the second that 42 out of 50 scientists, said that the technique was not valid. Noting that Dr. Tosi and another expert testified for the wife, the court pointed out that Dr. Tosi's positive conclusions were based simply on his certainty of the

62. This case was distinguished in People v Kelly (1976) 17 Cal 3d 24, 130 Cal Rptr 144, 549 P2d 1240, and People v Chapter (1973 Marin County California Superior Court) 13 CR L 2479, both supra § 4[b].

Property of the U.S. United States Attorney Los Angeles Calif.

validity of his tests and that this was far different from his past declarations of acceptance by the scientific community. The court emphasized that neither of the wife's experts could testify as to any polls supporting acceptance of voiceprints by the scientific community.

## III. Admissibility on basis of reliability test

### § 7. In criminal trial

#### [a] Held admissible

In the following cases in which the courts applied, or apparently applied, a reliability test in determining whether voiceprint evidence was admissible in a criminal trial, it was held that such evidence was admissible where there was competent expert testimony as to the reliability of the voiceprint process.

Thus, stating that the admissibility of spectrographic identification turned primarily on whether the validity of this procedure had been sufficiently proved to allow a jury to give the evidence whatever weight it saw fit, the court, in United States v Baller (1975, CA4 W Va) 519 F2d 463, cert den 423 US 1019, 46 L Ed 2d 391, 96 S Ct 456 and (disagreed with United States v McDaniel 176 App DC 60, 538 F2d 408, supra § 4[b]), pointed out that the government's expert, Lt. Nash, was a pioneer of the technique and was a qualified practitioner of it; that the evidence demonstrated spectrography's probative value, despite doubts within the scientific community about its absolute accuracy; and that competent witnesses were available to expose its limitations. Stating that it is better to admit relevant scientific evidence in the same manner as other expert testimony and to allow its weight to be attacked by cross-examination and refutation, the court further pointed out that the jury had been instructed that they could disregard Lt. Nash's testimony if they decided that it was not based on adequate education or experience or that the science of voiceprint identification was not sufficiently reliable. In affirming a judgment of conviction for telephoning bomb threats, the court concluded that the trial court, in the exercise of its discretion to admit or exclude evidence, had adequately guarded against dangers inherent in the use of newly developed scientific tests.

The admission of a voice identification by Lt. Nash, who compared voiceprints derived from tape recordings of an unknown speaker with voiceprints derived from a taped voice exemplar given by the defendant, was held proper, in United States v Jenkins (1975, CA6 Tenn) 525 F2d 819, the court affirming a judgment of conviction for conspiracy to commit various narcotics offenses. Declaring that voiceprint analysis falls into the category of scientific evidence and that its admissibility is a matter within a trial judge's discretion, the court held that the trial court had committed no error, where Lt. Nash was accepted as an expert only after an extensive inquiry into his qualifications and the reliability of the scientific process which he used. The court pointed out that the required foundation was properly laid and that Lieutenant Nash's background and training, as well as the accuracy of the voiceprint method of analysis, were subjected to detailed scrutiny and lengthy direct examination and rigorous cross-examination.

Apparently rejecting the Frye test, and declaring that the admissibility of voiceprint evidence is based on an analysis of its reliability and tendency

to mislead, the court, in United States v Williams (1978, CA2 NY) 583 F2d 1194, cert den 439 US 1117, 59 L Ed 2d 77, 99 S Ct 1025, concluded that such evidence was reliable, did not have an undue tendency to mislead, and was thus admissible. Noting that spectrographic evidence need not be infallible to be reliable, the court based its conclusion that such evidence was reliable on the following factors: (1) the Tosi study arrived at a false identification rate of only 6.3 percent, which was reduced to 2.4 percent when doubtful comparisons were eliminated; (2) the International Association of Voice Identification required that 10 matches be found before a positive identification could be made; (3) the voiceprint technique had been applied with care and concern as evidenced by the fact that the prosecution's expert had rendered a positive identification in only 8 percent of the 200 cases in which he had been involved; (4) spectrographic analysis was analogous to other types of scientific techniques, the results of which were routinely admitted into evidence; and (5) factors such as poor quality in the original tapes, which could affect spectrogram comparisons, were more likely to result in different, rather than in similar spectrograms, and thus would work to the benefit. rather than the detriment, of the accused. With respect to the tendency of voiceprint evidence to mislead, the court pointed out that spectrographic analysis was a simple step of visual pattern-matching which could be easily comprehended, and that such objective components as the tapes and the spectrograms themselves could be examined, by a jury; that such factors as the expert's qualifications and the reliability of his equipment were subject to challenge on cross-examination; and that the jury could be instructed that the expert's opinion was solely for their assistance and was subject to their complete rejection if they considered it unreliable. Noting that the record in the present case demonstrated that virtually all of the aforementioned safeguards designed to assure reliability and to prevent a misleading of the jury were employed, the court concluded that it was not error to have admitted voiceprint evidence against a defendant charged and convicted of violations of federal narcotics laws.

Pointing out that voice identification of a person by human ear is a common-place experience and has long been recognized in the courts, and that what was new here was that the voice identification was made by a machine which produced a picture of the voice, and noting that here the tape recording sought to be identified and a test recording made by the defendant were both before the court-martial and played in open court so that the court members could thus determine for themselves the margin of error, if any, in the expert opinion of the voiceprint analyst, the court, in United States v Wright (1967) 17 USCMA 183, 37 CMR 447, held that there was no error in admitting voiceprint identification testimony in a general court-martial based on the making of obscene telephone calls to a female. The court said that the testimony of the voiceprint analyst, Mr. Kersta, established that his system of voice identification had, experimentally and in practical application, demonstrated a high degree of accuracy and showed that he was personally qualified to testify as an expert on comparisons of sound patterns made by human voices. Although expert witnesses for the defense had expressed reservations as to the complete reliability of

the analyst's system and procedures, and although there was some evidence of disagreement in the scientific community as to the reliability of the machine which made the prints and the validity of the criteria used to interpret them, admission of the voiceprint identification testimony was not thereby precluded, the court explained, since courts have consistently recognized the admissibility of the testimony of experts in areas where there is neither infallibility of results nor unanimity of opinion as to the existence vel non of a particular condition or fact, well-known examples being the admission of different opinions of psychiatrists as to the mental condition of a particular person and identification of the author of a questioned document by handwriting comparison.

Rejecting the Frye standard and applying instead the principle that so long as the proper expert was qualified and the probative value was not substantially outweighed by other considerations, the controlling criteria regarding the admissibility of expert testimony were whether the testimony was relevant and would assist the trier of fact to understand the evidence or to determine a fact at issue, the court, in State v Williams (1978, Me) 388 A2d 500, held that the trial court had properly admitted in evidence the testimony of Dr. Tosi and Lt. Smrkovski that, on the basis of the comparison of spectrographs, the defendant was the person who had called in a bomb threat. Noting that "relevant" was defined in the Maine rules of evidence to mean evidence having any tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence, the court concluded that the voice identification testimony was "relevant" in view of

the evidence of the reliability of the technique presented by Dr. Tosi. With respect to the testimony given by acoustical scientists who opposed the use of the spectrograph as evidence, the court explained that these experts focused only on the difficulties of comparison and the exercise of judgment and the failure of the experiments to account for many real world variables, but that none of them questioned the fact that recordings of different human voices varied more in time, frequency and intensity than recordings of the same voice and that the spectrograph could accurately plot these variables.

Distinguishing the case of State v Cary (1967) 49 NJ 343, 230 A2d 384, 24 ALR3d 1255, on remand 99 NJ Super 323, 239 A2d 680, remanded 53 NJ 256, 250 A2d 15, later app 56 NJ 16, 264 A2d 209, supra § 4[b], in which the court had refused to require the defendant to submit to a voiceprint test since the only evidence in favor of the technique's reliability was that of Mr. Kersta, the court having observed that something more than the bare opinion of one man, however qualified, was required, the court, in State v Andretta (1972) 61 NJ 544, 296 A2d 644, reversed an interlocutory order of the trial court and ordered the defendants, who had been indicted for threatening to do bodily harm, to submit to voiceprint tests since, at the hearing below, Drs. Tosi and Ladefoged, Lieutenant Nash, and other scientists had testified as to the reliability of the voiceprint technique, and since other jurisdictions had admitted voiceprint evidence since the Cary decision. The court declared that after the voiceprint test had been completed, and if the state desired to offer the results of the test at trial, the trial judge should hold an additional pre-trial

of the reliability of the
esented by Dr. Tosi.
to the testimony given
scientists who opposed
e spectrograph as evi-
rt explained that these
d only on the difficul-
son and the exercise of
he failure of the expe-
count for many real
, but that none of
d the fact that record-
human voices varied
equency and intensity
of the same voice and
ograph could accu-
variables.

the case of State v
J 343, 230 A2d 384,
on remand 99 NJ
2d 680, remanded
2d 15, later app 56
09, supra § 4[b], in
had refused to re-
nt to submit to a
e t y evidence
hn reliability
Kersta, the court
at something more
ion of one man,
was required, the
ndretta (1972) 61
644, reversed an
of the trial court
endants, who had
reatening to do
nit to voiceprint
ring below, Drs.
ed, Lieutenant
ntists had testi-
ty of the voice-
nce other juris-
voiceprint evi-
decision. The
fter the voice-
mpleted, and if
fer the results
he trial judge
ional pre-trial

hearing to determine whether any identification arrived at through the use of this method was sufficiently reliable to be admissible in light of the proofs which would be adduced as to what the test showed, and such cross-examination of the state's experts and such opposing proofs as the defendants might be able to offer.

◆

In the following case the court, in holding that voiceprint evidence was reliable and thus admissible, equated reliability with general acceptance.

Thus, where the trial court qualified the expert voiceprint witness only after an extensive inquiry into his qualifications and the reliability of the scientific process, and defense counsel were permitted to cross-examine the witness concerning both his purported role as an advocate of the process and the refusal of courts in other jurisdictions to admit voiceprint evidence, and where neither defendant produced a witness rebutting the government's claim that voiceprint analysis was sufficiently accurate to be admissible, the court, in United States v Franks (1975, CA6 Tenn) 511 F2d 25, cert den 422 US 1042, 45 L Ed 2d 693, 95 S Ct 2656, 95 S Ct 2654 and cert den 422 US 1048, 45 L Ed 2d 701, 95 S Ct 2667 and (disagreed with United States v McDaniel 176 App DC 60, 538 F2d 408, supra § 4[b]), rejected the defendants' contention that voiceprint analysis was too inaccurate to be admitted into evidence and thus affirmed their conviction for various offenses involving interference with interstate commerce. Observing that it had been established that there was a considerable area of discretion on the part of the trial judge in admitting or refusing to admit evidence based on scientific processes and that those opposing admissibility of scientific tests could direct their criticisms toward the weight of such evidence, the court ruled that the trial judge was within his discretion in admitting voiceprint analysis. The court explained that general acceptance was nearly synonymous with reliability and that if a scientific process was reliable, or sufficiently accurate, the courts might also deem it generally accepted.

**[b] Held not admissible**

It was held in the following case in which the court treated the test of reliability as a distinct and separate test from the Frye test of general acceptance, that voiceprint evidence had not been shown to be reliable and was thus inadmissible in a criminal trial.

Thus, concluding that the standard which must be applied to the admissibility of spectrographic analysis is the twofold test of reliability and general scientific acceptance,[63] the court, in People v Collins (1978) 94 Misc 2d 704, 405 NYS2d 365, held that the reliability of the voiceprint process had not been established and thus denied the state's motion for a ruling that voice identification by spectrographic analysis was sufficiently reliable to warrant its admission into evidence against the defendants who were charged with attempted larceny. The court's holding was based on the following factors: (1) There was an absence of proof to support the basic assumption upon which the voiceprint process was based, namely, that interspeaker variability was always greater than intraspeaker variability; (2) although testimony indicated that the

63. The portion of the case dealing with the test of general scientific acceptance is treated in § 4[b], supra.

Property of the U.S.

size of the voice sample was very important, the standard for determining the sufficiency of the spectrographic sample was entirely subjective; (3) aural examination of the voice sample, which played a significant role in the actual practice of analyzing spectrograms, was highly subjective, and the role it played in the process was not clear, the court noting that there existed a difference of opinion among the experts as to the role of aural examination; (4) the refinements which Dr. Tosi asserted would render the voiceprint technique more reliable in a forensic, rather than an experimental situation,[64] was characterized by the court as being highly speculative and depending largely on subjective conditions which would vary with each examiner; (5) there was an absence of evidence as to the actual effect of noise, distortion, and fidelity on spectrographic analysis; and (6) it was not clear whether it was necessary to compare voice samples where the subjects articulated the same words. Other relevant factors, which the court noted were not taken into account, were the effect of disguise and mimicry; the fact that female voices had not been the subject of serious study; and the fact that no studies had been done to determine the effect of stress in the production and interpretation of spectrograms. Noting that handwriting analysis was admissible in New York, the court pointed out that this process, unlike voiceprint analysis, did not involve a scientific "test", but rather involved a mental process which was fundamentally similar to the mental process of a lay witness who happened to be familiar with a particular handwriting specimen, so that it was to be presumed that the trier of fact could assimilate such expert testimony and accord it the weight it deserved.

**[c] Held admissible for limited purpose**

In the following cases, voiceprint evidence was held to be reliable and thus admissible in a criminal case, but only for the limited purpose of corroborating other identification evidence, or for impeachment.

Thus, in affirming a judgment of conviction for making false bomb threats by telephone, the court, in Worley v State (1972, Fla App D4) 263 So 2d 613, held that voiceprints were properly admitted to corroborate the identification of the defendant by other means, but declared that it was not deciding if voiceprint identification, standing alone, would be sufficient to sustain the identification and conviction of the defendant. Observing that Florida courts had enjoyed considerable discretion in the admittance of novel or experimental evidence, if they felt that certain standards of scientific reliability had been attained, the court concluded that such standards prevailed in this case on the basis of testimony by Dr. Tosi and Lt. Nash that, based on their extensive experiments with over 34,000 spectrographic comparisons, and on the work of others, trained examiners could reliably match voices in excess of 98 percent of the time by comparing voiceprints. The court further emphasized that since the date of earlier decisions from other jurisdictions in which the courts had refused to admit evidence of identifications based on voiceprint comparison, impressive scientific data had been amassed as to the voiceprint's reliability.

64. As to the nature of these refinements, see § 2[a], supra.

trier of fact could
xpert testimony and
ht it deserved.

le for limited pur-

g cases, voiceprint
to be reliable and
a criminal case, but
d purpose of cor-
identification evi-
chment.

g a judgment of
king false bomb
ne, the court, in
72, Fla App D4)
d that voiceprints
itted to corrobo-
n of the defen-
ns, but declared
ling if voiceprint
ng alone, would
n the identifica-
f the defendant.
ida courts had
dis n in the
or mental
hat certain stan-
bility had been
concluded that
ed in this case
ny by Dr. Tosi
ased on their
with over 34,-
nparisons, and
trained exam-
atch voices in
f the time by
The court fur-
ce the date of
other jurisdic-
s had refused
dentifications
nparison, im-
had been
int's reliabil-

See Alea v State (1972, **Fla** App D3) 265 So 2d 96, an appeal from a conviction of extortion after a nonjury trial, where it was held that it was not reversible error for the trial court to allow into evidence the testimony of Dr. Tosi and Lt. Nash, voiceprint experts, as to voice identification, nor was it error to admit into evidence the voiceprints upon which the experts' opinions were based. In support of its ruling, the court noted that aural voice identification is admissible, that several recent cases from other jurisdictions had held that voiceprints were admissible, and that in the case of Worley v State (1972, **Fla** App D4) 263 So 2d 613, supra, the court had held, in a case where the evidence was ample to sustain conviction even without the use of voiceprints, that voiceprints had been properly admitted to corroborate identification of the defendants by other means. Here the defendant's conviction did not rest on the evidence of the voiceprint experts alone, the court pointed out, but instead there was other substantial evidence to identify the defendant as the perpetrator of the crime, and his voice was also identified by two witnesses who testified without the aid of voiceprint identification.

In ruling that the testimony of Lt. Nash, based on spectrographic analysis, that the suspect was the person who had made a telephone call to the police was sufficient proof of probable cause to justify the issuance of an arrest and search warrant, the court, in State ex rel. Trimble v Hedman (1971) 291 **Minn** 442, 192 NW2d 432, 49 ALR3d 903, declared that, in view of the fact that identification by aural voice comparisons, including those based on telephone conversations or recordings by mechanical means, were generally held admissible and the fact that voice comparisons by spectograms corroborated identification by means of ear, spectrograms ought to be admissible even in the trial of the case, at least for the purpose of corroborating opinions as to identification by means of ear alone, and also for purposes of impeachment, if a sufficient foundation was laid to satisfy the trial judge that the expert whose opinion was sought was qualified to assist the factfinder in coming to the right conclusion, the court adding that where experts disagreed, it was for the factfinder to determine which was more credible and therefore more acceptable. The court observed that decisions from other jurisdictions in which the courts had not admitted voiceprint evidence had occurred before Dr. Tosi, on the basis of his study, had concluded that voiceprint analysis by a trained examiner was extremely reliable. Furthermore, the court pointed out that Dr. Ladefoged, in testifying for the defense in the case before it, had admitted that the human ear listing to voices, coupled with a skilled spectrograph operator analyzing spectrograms, definitely could be more accurate than the human ear alone.

### § 8. In revocation of probation proceeding

Voiceprint evidence was held admissible in the following probation revocation proceeding, where the court, after rejecting the Frye standard, held that the admissibility of such evidence depended on its relevancy and on the competency of the expert witness.

Rejecting the Frye test of general acceptance in a scientific community, at least in a probation revocation hearing, and applying the general rule governing the admissibility of expert opinion evidence, namely, that

Property of the U.S.

such evidence is admissible if it is relevant and the witness is qualified, the court, in United States v Sample (1974, ED Pa) 378 F Supp 44, held that the voiceprint identification testimony of Lt. Nash, based on a comparison of a spectrogram of a recorded telephone conversation between a government witness and a person alleged to be the defendant with a spectrogram of an exemplar of the defendant's voice, was admissible to corroborate the witness' testimony that the person to whom he was talking during the telephone conversation was the defendant. Based on the testimony of Lt. Nash, who had been shown to be qualified to testify as to the reliability of spectrogram analysis, and the acceptance of voiceprint evidence by other courts, as well as the fact that the defendant offered no evidence challenging the reliability of the voiceprint evidence, the court concluded that the technique was sufficiently reliable for purposes of this hearing, and revoked the defendant's probation.

### § 9. In hearing to determine probable cause for arrest and search warrant

The Frye standard was not applied in the following case involving a hearing to establish probable cause for the issuance of an arrest and search warrant, and the court held that voiceprint evidence was admissible for the purposes of impeachment and corroboration.

In ruling on the sufficiency of proof which had been presented to secure an arrest and search warrant on charges arising from the murder by a sniper of one of two policemen responding to a trap telephone call to police headquarters requesting assistance, where the information given to the magistrate to show probable cause for the warrant was the testimony of Lt. Nash that, after spectographic comparison of the tape recording made of the call to police headquarters with a tape recording of the voice of the woman for whom the warrant was sought, the voices on the two tapes were the same, the court, in State ex rel. Trimble v Hedman (1971) 291 Minn 442, 192 NW2d 432, 49 ALR3d 903, supra § 7, emphasizing that probable cause for arrest was something more than mere suspicion but something less than evidence which would sustain a conviction, held that the information submitted to the magistrate was sufficient to justify the issuance of the warrant. Emphasizing the testimony of Dr. Tosi and Lt. Nash as to the reliability of the voiceprint process and the fact that identification by aural voice comparison was admissible, the court concluded that spectograms ought to be admissible at least for the purpose of corroborating opinions as to identification by means of ear alone, and for the purpose of impeachment.

### § 10. In civil case

In the following civil case in which the court did not apply the Frye test of general acceptance in the scientific community, the court held that voiceprint evidence was not admissible where there was insufficient evidence to establish the reliability of the voiceprint technique.

Thus, in D'Arc v D'Arc (1978) 157 NJ Super 553, 385 A2d 278, a matrimonial action, the court stated that in addition to the Frye test, New Jersey courts were authorized to use the test enunciated in the case of State v Andretta (1972) 61 NJ 544, 296 A2d 644, supra § 7, namely, whether the voiceprint method is sufficiently reliable to be admissible in light of the evidence both in favor of and against

Case 2:87-cr-00422-JAK Document 3027 Filed 05/17/88 Page 46 of 50 Page ID #:21026

it. In concluding that the technique was not sufficiently reliable, the court first noted that spectrography, unlike fingerprint identification, was really an art rather than a science, in view of the fact that speech had not been proven to be invariant, it could be disguised, and it was uncertain whether voices changed due to age or illness. The court further pointed out that there was a need for more major studies so that the results could be compared with the Tosi results, which was the only major study in the last 20 years. The court noted that the Tosi study did not duplicate the forensic setting in the following ways: the test examiners were to compare the unknown voice to a limited number of known voices; they had the advantage of voice exemplars made in a laboratory setting with modern equipment; and all of the exemplars were made at or about the same time. The court also questioned such factors as the reliability of the spectrograph as an instrument; lack of information as to whether the Tosi study involved persons of similar height, weight, age, and so forth, who might produce similar spectograms; the fact that the professional examiners had been trained and qualified by Kersta and Tosi and had never been tested by anyone else; and the lack of experimental verification of the basic assumption that no two persons make the same sound spectrogram. Finally, the court pointed out that when the one-third of the Tosi tests which had been performed in a forensic setting were examined, the rate of error for false identification rose from 6 percent to 16 percent.

Consult POCKET PART in this volume for later cases

Property of the U.S.
United States Attorney
Los Angeles, Calif.

ıere insurance carrier's psychiatrist testified ıt there was no recognizable link between ıimant's occupation as teacher and coach and s disability. Babyak v Board of Education 981, 3d Dept) 84 App Div 2d 627, 444 YS2d 269.

Worker's compensation board properly de- ed mental disability claim by teacher of emo- ınally disturbed children who alleged that he s singled out by his superiors for harassment d subjected to such treatment that he sus- ıned severe anxiety and mental anguish, ıere evidence was insufficient to establish that acher had been harassed by his employer or at he had an anxiety neurosis or anxiety action arising out of and in course of his ıployment. Alves v Hamilton, Fulton & ontgomery Counties BOCES (1986, 3d Dept) 7 App Div 2d 839, 498 NYS2d 733.

Workers compensation board erred in award- g compensation for mental distress in em- oyment where evidence showed that appli- nt experienced adverse reactions to stress any years before beginning subject employ- ent, suffered identical reactions to numerous onwork-related stresses during employment, d continued to suffer same effects of stress ter he left employment. State Acci. Ins. Fund orp. [illegible]hell (1983) 63 Or App 488, 664 2d [illegible]etition den 295 Or 617, 670 P2d 033.

Claimant's worsened psychological condition as not compensable where her underlying aladaptive personality disorder caused her to verreact to normal work environment, so that er honest perception of asserted job harass- ent was misperception of reality not flowing om objective work conditions. State Acci. Ins. und Corp. v Griffith (1984) 66 Or App 709, 75 P2d 1092, review den 296 Or 638, 678 2d 739.

Worker who contended that he was disabled due to anxiety neurosis which caused him to elieve that he suffered from silicosis was prop- erly denied Worker's Compensation, where octor testifying on behalf of claimant failed to nequivocally pinpoint cause of claimant's psy- hiatric disorder, while psychiatrist and neurol- gist who testified in rebuttal offered more redible conclusion that claimant suffered from gitated depression with paranoid features, but hat alleged illness was not causally related to mployment. Kitchen v Workmen's Compensa- tion Appeal Bd. (Mesta Machine Co.) (1983, Pa Cmwlth) 458 A2d 631.

Claimant who alleged he had suffered stress- induced, work-related nervous condition due to fear of losing his job was not entitled to bene- fits, notwithstanding that work-related stress can be compensable if based on something other than normal working conditions, where fear of losing one's job was not work-related stress for purposes of defining injury. Evans v

Workmen's Compensation Appeal Bd. (Anchor Hocking Corp.) (1985) 87 Pa Cmwlth 436, 487 A2d 477.

Chief executive officer of business was not entitled to worker's compensation benefits for mental disability incurred when business had financial difficulties where he was also founder and sole owner of business and there was evidence that cause of disability was loss of his investment of time, money and personal esteem in business. Klein v Workmen's Compensation Appeal Bd. (Plaza Home Center, Inc.) (1985, Pa Cmwlth) 496 A2d 1346.

Claimant was not entitled to worker's compensation benefits for anxiety and depression he claimed were related to work conditions where his counsel stipulated that work place was not noisy to others but was only noisy to claimant and claimant provided no objective evidence that he had been exposed to other than normal working conditions at his job. Russella v Workmen's Compensation Appeal Bd. (Nat. Foam Systems, Inc.) (1985, Pa Cmwlth) 497 A2d 290.

In workers' compensation action brought by chairman of board, president and sole stockholder of his construction company, for mental disturbance resulting from stress and strain of conducting contracting business, complaint failed to state claim for workers' compensation benefits where mental stimulus which precipitated plaintiff's anxiety fell within category of usual stress and strain encountered in operation of contracting business and did not amount to "injury by accident" sufficient to justify award for resulting mental or nervous disorder. Mayes v United States Fidelity & Guaranty Co. (1984, Tenn) 672 SW2d 773.

In worker's compensation case, worker's mental disorder, alleged to have been caused or aggravated by night shift work and inability to sleep in daytime, was not proven to have arisen out of and in course of employment, and permanent disability award was reversed, where worker's claim was beyond reasonable limits of statutorily adopted "injury by accident" doctrine, where worker's proof was insufficient to show mental disorder and inability to sleep arose out of and in course of employment, where shift or hours employer had available for employee could not be said to provide requisite causal connection between conditions under which work was performed and worker's inability to discipline own personal life, and where worker presented no medical testimony that he had permanent disability or disability to degree found by trial court. Henley v Roadway Express (1985, Tenn) 699 SW2d 150.

Worker who suffered headaches as a result of non-traumatic mental injuries arising chiefly from strained relations with fellow employees could not recover worker's compensation benefits where she failed to carry her burden of proving that she had been subjected to unusual workplace stress. Graves v Utah Power & Light Co. (1986, Wyo) 713 P2d 187.

---

## 97 ALR3d 294-323

### 97 ALR3d 294 § 1[b] [p. 297]

Admissibility in evidence of sound recording as affected by hearsay and best evidence rule. 58 ALR3d 598.

Right of indigent criminal defendant to polygraph test at public expense. 11 ALR4th 733.

Validity and construction of statute prohibiting employers from suggesting or requiring polygraph or similar tests as condition of employment or continued employment. 23 ALR4th 187.

Admissibility and weight, in criminal case, of expert or scientific evidence respecting characteristics and identification of human hair. 23 ALR4th 1199.

Admissibility of evidence of fingernail comparisons in criminal case. 40 ALR4th 575.

Admissibility of bare footprint evidence. 45 ALR4th 1178.

Admissibility, at criminal prosecution, of expert testimony on reliability of eyewitness testimony. 46 ALR4th 1047.

Foundation for telephone conversation. 36 Am Jur Proof of Facts 2d 605.

Hair analysis. 38 Am Jur Proof of Facts 2d 377.

**VERALEX™**: Cases and annotations referred to herein can be further researched through the VERALEX electronic retrieval system's two services, **Auto-Cite®** and **SHOWME™**. Use Auto-Cite to check citations for form, parallel references, prior and later history, and annotation references. Use SHOWME to display the full text of cases and annotations.

### 97 ALR3d 294 § 3 [p. 305]

Trial court properly instructed jury that it was not bound by testimony of expert, offered by accused regarding spectrographic voice analysis comparing voice of accused with voice of smuggler, but could make its own determination of weight to be accorded voice evidence based on all other evidence introduced at trial. United States v Love (1985, CA4 SC) 767 F2d 1052, 18 Fed Rules Evid Serv 1335, cert den (US) 88 L Ed 2d 890, 106 S Ct 848, 106 S Ct 849.

### 97 ALR3d 294 § 4[a] [p. 306]

Evidence of voice print would be admissible on grounds procedure was generally accepted in relevant scientific community and on

grounds procedure was reliable, where voice prints were more reliable than other scientific tests commonly held admissible, and where jury could evaluate expert testimony as to reliability of voice print. People v Bein (1982) 114 Misc 2d 1021, 453 NYS2d 343.

**97 ALR3d 294 § 4[b] [p. 307]**

Voice spectography techniques were not so generally accepted in scientific community as to render test result admissible in criminal prosecution. Cornett v State (1983, Ind) 450 NE2d 498.

**97 ALR3d 294 § 7[a] [p. 316]**

See People v Bein (1982) 114 Misc 2d 1021, 453 NYS2d 343, § 4[a].

---

## 97 ALR3d 338–340

Admissibility of expert or opinion testimony on battered wife or battered woman syndrome. 18 ALR4th 1153.

Admissibility at criminal prosecution of expert testimony on battering parent syndrome. 43 ALR4th 1203.

Validity, construction, and application of statute limiting physician-patient privilege in judicial proceedings relating to child abuse or neglect. 44 ALR4th 649.

**VERALEX™**: Cases and annotations referred to herein can be further researched through the VERALEX electronic retrieval system's two services, **Auto-Cite®** and **SHOWME™**. Use Auto-Cite to check citations for form, parallel references, prior and later history, and annotation references. Use SHOWME to display the full text of cases and annotations.

Where issue in malpractice action was conduct of treating physician and others prior to and at time of child's birth, court found it improper and irrelevant to compare any alleged negligence of pediatrician in not reporting alleged child abuse with any alleged negligence of treating physician on malpractice issue. Doran v Priddy (1981, DC Kan) 534 F Supp 30 (applying **Kan** law).

---

## 97 ALR3d 347–400

*New sections and subsections added:*

**§ 25.5 Other or unspecified motives or purposes**

---

**97 ALR3d 347 § 1[b] [p. 352]**

Race as factor in adoption proceedings. 34 ALR4th 167.

Necessity and sufficiency of consent to adoption by spouse of adopting parent. 38 ALR4th 768.

**VERALEX™**: Cases and annotations referred to herein can be further researched through the VERALEX electronic retrieval system's two services, **Auto-Cite®** and **SHOWME™**. Use Auto-Cite to check citations for form, parallel references, prior and later history, and annotation references. Use SHOWME to display the full text of cases and annotations.

**97 ALR3d 347 § 2[a] [p. 352]**

In divorce action, husband, who was stepfather of child in question, was properly denied custody of child where he had no standing to contest custody in that he had no biological relationship to child, in that he had not legally adopted child, and in that doctrine of equitable adoption had no application to action in which stepfather seeks custody against wishes of child's mother. Pierce v Pierce (1982, **Mont**) 645 P2d 1353.

**97 ALR3d 347 § 3[a] [p. 359]**

Also holding or recognizing that doctrine of equitable estoppel is applicable to allow equitably adopted child to inherit all or part of estate of adoptive parent:

**Cal**—Estate of Wilson (1980, 1st Dist) 111 Cal App 3d 242, 168 Cal Rptr 533.

**Fla**—Re Adoption of B. (1983, Fla App D4) 426 So 2d 1203.

**Tex**—Moore v Douglas (1979, Tex Civ App 10th Dist) 589 SW2d 862, writ ref n r e.

See Laney v Roberts (1982, **Fla** App D3) 409 So 2d 201 (citing annotation), § 20.

See Re Estate of Crossman (1985) 145 **Mich** App 154, 377 NW2d 850, § 26.

See Hickey v Johnson (1984, **Tex** App Houston (14th Dist)) 672 SW2d 33, § 20.

See Edwards v Haynes (1985, **Tex** App Houston (14th Dist)) 690 SW2d 50, § 29.

**97 ALR3d 347 § 3[b] [p. 365]**

Also recognizing that doctrine of equitable adoption was not applicable to allow child to inherit all or part of estate of adoptive parent:

**Fla**—J.E.W. v Estate of Doe (1983, Fla App D1) 443 So 2d 249, review den (Fla) 451 So 2d 848 and app dismd (US) 83 L Ed 2d 392, 105 S Ct 499.

**Ind**—Lindsey v Wilcox (1985, Ind App) 479 NE2d 1330.

See Defoeldvar v Defoeldvar (1984, **Tex** App Fort Worth) 666 SW2d 668, § 26.

Sisters who had been surrendered to couple by their natural parents when they were three years of age pursuant to understanding that

they would thereafter ha[...] cated by cou[...] them, were [...] children of [...] entitled to i[...] trine of equi[...] policy and p[...] that statuto[...] exclusive n[...] agreement [...] statutes of [...] Estate of K[...] 307 SE2d [...] Gordon (1[...] (citing annc[...]

97[...]

On certi[...] ment actio[...] permitted [...] from intest[...] of adoptive [...] doctrine of [...] considers [...] family me[...] adoption p[...] obtaining [...] legal fictio[...] that equit[...] tory treatn[...] adopted [...] adoptive p[...] or collater[...] Nat. Bank [...] 201 (citin[...]

In actio[...] that admi[...] equitable [...] making [...] adopted [...] heir sinc[...] inherit fr[...] estate be[...] Pouncy v[...] 626 SW2[...]

See Po[...] Dallas) 6[...]

Taxpa[...] dents an[...] of inheri[...] taxpayer [...] never he[...] son, tax[...] mally as [...] taxpayer [...] and the[...]

CERTIFICATE OF SERVICE BY MAIL

I, Marta I. Larin, declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California; that my business address is Office of United States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction the service by mail described in this Certificate was made; that on May 17, 1988, I deposited in the United States mails in the United States Courthouse at 312 North Spring St., Los Angeles, California, in the above-entitled action, in an envelope bearing the requisite postage, a copy of

GOVERNMENT'S OPPOSITION TO DEFENDANT VERDUGO-URQUIDEZ'S MOTION TO COMPEL VOICE EXEMPLARS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION

addressed to

SEE ATTACHED LIST

at their last known address, at which place there is a delivery service by United States mail.

This Certificate is executed on May 17, 1988 at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.

Marta Larin

UNITED STATES v. RAFAEL CARO QUINTERO, et al.,
                NO. CR 87-422(B)-ER


SERVICE BY MAIL


Elsa Leyva, DFPD
Federal Public Defender's Office
312 North Spring Street
15th Floor
Los Angeles, California   90012


Michael Pancer, Esq.
Home Federal Building
Suite 1135
625 Broadway
San Diego, California   92101


Donald C. Randolph, Esq.
2566 Overland Avenue
Suite 700
Los Angeles, California   90064