ROBERT C. BONNER
United States Attorney
ROBERT L. BROSIO
Assistant United States Attorney
Chief, Criminal Division
JIMMY GURULE
Assistant United States Attorney
Major Narcotics Section
    1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-6579

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. CR 87-422(B)-ER |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR DISCLOSURE OF INDEPENDENT GOVERNMENT SOURCE; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF DOUGLAS W. KUEHL, JIMMY GURULE; AND EXHIBITS |
| v. | ) | |
| JESUS FELIX-GUTIERREZ, et al., | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff, United States of America, as represented by the undersigned Assistant United States Attorney, hereby files the Government's Opposition to Defendant's Motion For Independent Government Source.  The Government's Opposition is based upon the attached Memorandum of Points and Authorities, the Declarations of Douglas W. Kuehl and Jimmy Gurule, the exhibits, and any oral argument that may be presented at the hearing on this matter.

        DATED:    May 19th, 1988.

                        Respectfully submitted,

                        ROBERT C. BONNER
                        United States Attorney





1

2

ROBERT L. BROSIO
Assistant United States Attorney
Chief, Criminal Division

3

4

JIMMY GURULE
Assistant United States Attorney
Major Narcotics Section

5

6

   Attorneys for Plaintiff
   United States of America

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2

3                                                                    PAGE

4   TABLE OF AUTHORITIES                                             ii

5   MEMORANDUM OF POINTS AND AUTHORITIES                              3

6   I          INTRODUCTION                                          3

7   II         DEFENDANT'S REQUEST FOR A KASTIGAR HEARING
               IS UNWARRANTED WHERE THE INFORMATION PROVIDED
8              BY DEFENDANT WAS FALSE, SELF-SERVING, OR
               PREVIOUSLY KNOWN TO THE GOVERNMENT THROUGH
9              INDEPENDENT SOURCES                                   4

10         A.  Defendant's Association With Inez Calderon-
               Quintero And Rafael Caro-Quintero                     7
11
           B.  Meeting In Arizona                                    8
12
           C.  That Defendant Felix Learned About Camarena
13             From The Media Was Of No Evidentiary Value             9

14         D.  Meeting In Costa Rica With Jesus Felix,
               "Rudolfo", Albino Bazan-Padilla And Celman
15             Barrenechea                                           9

16         E.  La Quinta Residence Burglarized                      10

17         F.  Werner Lotz at La Quinta In March 1985               10

18         G.  Defendant Felix Present In Costa Rica In
               1981                                                 10
19
    III        CONCLUSION                                           11
20
    DECLARATION OF DOUGLAS W. KUEHL                                 12
21
    DECLARATION OF JIMMY GURULE                                     17
22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**

PAGE

Kastigar v. United States,
    406 U.S. 441 (1972)                                    4, 5, 7

United States v. Byrd,
    765 F.2d 1524 (1985)                                   5

United States v. Caporale,
    806 F.2d 1487 (11th Cir. 1986)                         7

United States v. Crowson,
    828 F.2d 1427 (9th Cir. 1977)                          4, 5

United States v. Provenzano,
    620 F.2d 985 (3rd Cir. 1980)                           5

United States v. Rogers,
    722 F.2d 557, 560 (9th Cir. 1983)                      4

United States v. Zielezinski,
    740 F.2d 727 at 733 (9th Cir. 1984)                    5, 10

- ii -

# MEMORANDUM OF POINTS AND AUTHORITIES

I

## INTRODUCTION

Defendant Jesus Felix-Gutierrez (hereinafter "Jesus Felix") has filed a Motion For Disclosure of Independent Government Source.  Defendant Jesus Felix states that on February 7, 1987, defendant was granted use immunity.  Defendant Felix further maintains that in the presence of his attorney Robert Ramsey, he was interviewed by government prosecutors and Special Agents of the Drug Enforcement Administration.  Defendant Jesus Felix alleges that he provided information to the government that:  (1) defendant Jesus Felix was acquainted with co-defendants Rafael Caro-Quintero and Ines Calderon-Quintero; (2) he was present in Costa Rica in 1981 and again in 1985; (3) he introduced "Rodolfo" and Albino Bazan-Padilla to Mr. Barrenechea to discuss real estate investments in Costa Rica; (4) he discussed a meeting in Arizona; (5) he saw Werner Lotz in Costa Rica in March 1985; (6) he was aware that Rafael Caro-Quintero was in the marijuana business. Defendant Jesus Felix argues that the information he provided was used by the government to support the pending filed charges against him in the present case.

Defendant's motion is groundless and should be denied.  During the interview defendant Jesus Felix denied any participation in the kidnapping and murder of Special Agent Enrique Camarena. Defendant further never acknowledged any involvement in narcotics trafficking.  Defendant's responses to questions were evasive, untruthful and self-serving.  Moreover, the information provided

-   3   -

1   by defendant Jesus Felix was either already known to the
2   government, or was of no value in the investigation.

3                                  II

4            DEFENDANT'S REQUEST FOR A KASTIGAR HEARING IS
5            UNWARRANTED WHERE THE INFORMATION PROVIDED BY
6            DEFENDANT WAS FALSE, SELF-SERVING, OR PREVIOUSLY
7            KNOWN TO THE GOVERNMENT THROUGH INDEPENDENT SOURCES

8        In Kastigar v. United States, 406 U.S. 441 (1972), the Supreme
9   Court held that when a defendant provides information to the
10  government under a promise of use immunity, the government bears
11  the burden of proving that information was not used in a
12  subsequent prosecution against defendant.  See United States v.
13  Crowson, 828 F.2d 1427 (9th Cir. 1977).  In Kastigar, the Supreme
14  Court held that before trial, the government must show that the
15  evidence it intends to present was derived from a source
16  independent from the information obtained from the defendant.  Id.
17  406 U.S. at 453.  The government must prove the independent source
18  by a preponderance of the evidence, and the district court's
19  findings will be upheld unless clearly erroneous.  United States
20  v. Crowson, 828 F.2d 1427, 1429 (9th Cir. 1987); United States v.
21  Rogers, 722 F.2d 557, 560 (9th Cir. 1983).  The government is
22  therefore only required to show that the evidence more likely than
23  not was derived from a source independent of defendant's
24  statements.

25       The Ninth Circuit has held that the government may satisfy its
26  burden of showing an independent source by establishing that the
27  information provided by defendant was previously known to the

28                              -  4  -

government.  United States v. Crowson, 828 F.2d 1427, 1429 (9th

Cir. 1987); United States v. Byrd. 765 F.2d 524 (11th Cir. 1985).

Furthermore, where the documents submitted to the Court by the

government demonstrate prior knowledge, a Kastigar hearing is not

required.  In United States v. Provenzano, 620 F.2d 985 (3rd Cir.

1980), the Court held:

>    If the Government's documents conclusively
>    demonstrate prior knowledge, we know of no
>    reason why a hearing must be held.

Id. at 1006.

Moreover, the Ninth Circuit has approved of the government

filing documents with the court in camera "to protect grand jury

secrecy."  United States v. Zielezinski, 740 F.2d 727 at 733 (9th

Cir. 1984); United States v. Crowson, 828 F.2d 1427, 1429 (9th

Cir. 1987).  In Crowson, the Ninth Circuit stated:

>    [T]he district court inspected all of the grand
>    jury transcripts in camera before ruling that
>    an independent, prior source of evidence
>    existed for all but two of the substantive
>    statements.

Id at 1429.

In United States v. Byrd, 765 F.2d 1524 (1985), the Eleventh

Circuit upheld the filing of evidence in camera.  The Court

emphasized.

>    While the Kastigar hearing is generally
>    intended to be an evidentiary and adversary
>    hearing, see, United States v. Gregory, 730

- 5 -

F.2d 692 (11th Cir. 1984); <u>United States v.</u>
<u>Seiffert</u>, 501 F.2d 974 (5th Cir. 1974), courts
have in fact considered <u>in camera</u> evidence when
claims of <u>Kastigar</u> violations are raised prior
to trial.  <u>See</u>, e.g. <u>United States v. Sockwell</u>,
699 F.2d 213, 217 (5th Cir. 1983), <u>cert.</u>
<u>denied</u>, 461 U.S. 936, 103 S.Ct. 2106, 77 L.Ed.
2d 311 (1983); <u>Little Rock School District, v.</u>
<u>Borden, Inc.</u>, 632 F.2d 700, 705 (8th Cir.
1980); <u>United States v. Bianco</u>, 534 F.2d 501,
509 n.11 (2nd Cir. 1976), <u>cert. denied</u>, 420
U.S. 822, 97 S.Ct. 73, 50 L.Ed. 84 (1976).  <u>See</u>
<u>also</u> <u>United States v. Provenzano</u>, 688 F.2d 94,
203 (3rd Cir. 1982), <u>cert. denied</u>, 459 U.S.
1071, 103 S.Ct. 492, 74 L.Ed. 2d 634 (1982)
(<u>Kastigar</u> hearing unnecessary where
government's documents demonstrated prior
knowledge of evidence used against defendant).
This is particularly reasonable where grand
jury testimony is relied upon.  As noted in
<u>United States v. Zielezinski</u>, 740 F.2d 727,
733-34 (9th Cir. 1984), the "district court is
free to restrict the [Kastigar] hearing as
necessary to protect grand jury secrecy,"

. . . .

It should first be emphasized that at the interview on
February 7, 1987, defendant Felix emphatically denied any

- 6 -

1  participation in the kidnapping and murder of Enrique Camarena.

2  Felix stated that the only knowledge he possessed was obtained

3  from radio, television, and newspaper reports.  Defendant Jesus

4  Felix further never admitted any participation in narcotics

5  trafficking.  (See Decl. of Jimmy Gurule).  Defendant Felix simply

6  attempted to minimize his criminal involvement in the Camarena

7  murder and his role in the narcotics enterprise.  Defendant

8  Felix's statements were self-serving and untruthful.  (See Decl.

9  of Jimmy Gurule).  Information provided by defendant Jesus Felix

10  was known by the government prior to February 7, 1987.  There has

11  therefore been no improper use of information obtained from

12  defendant under a promise of use immunity.

13  A.   Defendant's Association With Inez Calderon-

14       Quintero And Rafael Caro-Quintero

15       Defendant Jesus Felix maintains that on February 7, 1987, he

16  discussed his relationship with Ines Calderon-Quintero, and that

17  he (Felix) knew that Rafael Caro-Quintero distributed marijuana.

18  As previously stated, defendant Jesus Felix never admitted to

19  being involved in the distribution of controlled substances.  (See

20  Declaration of Douglas W. Kuehl).  While defendant Felix

21  acknowledged knowing Ines Calderon-Quintero, he never admitted

22  being involved in distribution of narcotics with Ines

23  Calderon-Quintero.  Defendant Felix's statement in this regard

24  were self-serving and of no real value in the investigation.

25  Consequently, defendant's claim of a Kastigar violation is

26  misplaced.  See United States v. Caporale, 806 F.2d 1487 (11th

27  Cir. 1986).

28

- 7 -

1   In addition, defendant Jesus Felix's association with Ines

2   Calderon-Quintero was known to the Drug Enforcement Administration

3   ("DEA") prior to February 7, 1987.  One of the independent

4   government sources of this information was Obdulia Molina, the

5   girlfriend of defendant Jesus Felix and mother of two of his

6   children.  Defendant Jesus Felix was arrested in Los Angeles on

7   December 24, 1986.  Ms. Molina was interviewed by Special Agents

8   of the DEA on the date of the arrest.  Ms. Molina stated that

9   defendant Jesus Felix distributed marijuana, and in the early

10  1980's became involved in the distribution of cocaine.  (See

11  Exhibit A).[1]/  Ms. Molina further stated that defendant Felix

12  began distributing cocaine about the same time he became involved

13  with Ines Calderon-Quintero.  Ms. Molina acknowledged defendant

14  Felix's prior association with Ines Calderon-Quintero.

15  B.   Meeting In Arizona

16      Defendant Felix maintains that he discussed with the

17  government a meeting in Arizona.  Defendant Felix's discussion on

18  this point was very unclear.  Defendant Felix was vague as to the

19  time of the meeting; the location of the meeting in Arizona; the

20  purpose of the meeting in Arizona; and who was present.

21  Consequently, that information proved to be of no value to the

22  investigation.  (See Decl. of Douglas W. Kuehl).

23

24  ────────────────

1/   Exhibit A is a DEA report of the interview of Obdulia Molina.
25  The DEA 6 report is dated January 5, 1987.  The said interview
    with Ms. Molina took place on December 24, 1986.  A copy of the
26  DEA 6 report was disclosed to Donald C. Randolph, attorney for
    defendant Jesus Felix, on May 8, 1987.  Therefore, the information
27  was known to DEA over six weeks before the discussion with Jesus
    Felix.
28
                         -   8   -

C.   That Defendant Felix Learned About Camarena From The Media Was
     Of No Evidentiary Value

     The government submits that defendant Jesus Felix's statement
that he only learned of Camarena from news accounts in the media
was false.   Evidence that it will present at trial will establish
the government's position.   Therefore, there was no investigative
value to the government from that statement.

D.   Meeting In Costa Rica With Jesus Felix, "Rudolfo",
     Albino Bazan-Padilla And Celman Barrenechea

     During the interview, defendant Felix maintains that he
discussed a meeting in Costa Rica.   Present at that purported
meeting were defendant Jesus Felix, "Rudolfo", Albino
Bazan-Padilla and Celman Barrenechea.   Defendant Jesus Felix
alleged that the purpose of the meeting was to discuss investing
in real estate in Costa Rica.   That information however was known
to DEA prior to the February 7, 1987.

     On August 8, 1986, Special Agent Sandalio Gonzales interviewed
Celman Barrenechea-Lizano in Costa Rica.   (See Exhibit B).   During
the interview Barrenechea stated that in late January 1985, he was
contacted by "Jesus Diaz", an alias used by defendant Jesus
Felix.   Defendant Felix asked Barrenechea if he knew anyone
interested in selling houses in Costa Rica.   Defendant Felix
stated that friends of his were interested in investing money in
Costa Rica.   Barrenechea thereafter discussed a meeting in
Costa Rica.   Present at the meeting were defendant Jesus Diaz
(defendant Jesus Felix), Albino Bazan-Padilla and Juan
Escobar-Meza (an alias for Rodolfo Lepe-Montes).   At the meeting

1  Barrenechea agreed to sell his cabin in Costa Rica to defendant
2  Felix, Bazan-Padilla and Escobar-Meza for $120,000. It is
3  therefore apparent that the meeting detailed by Barrenechea is the
4  same meeting referred to by defendant Felix during the February 7,
5  1987 interview. This information was therefore known to DEA from
6  an independent souce prior to February 7, 1978.

7  E.   La Quinta Residence Burglarized

8      Defendant Felix stated that he heard that "La Quinta, the
9  residence in San Jose, Costa Rica, where defendant Rafael
10 Caro-Quintero was arrested on April 4, 1985, was burglarized and
11 that some radio equipment was stolen from the residence. It
12 should be emphasized that this information had been disclosed to
13 DEA as early as October, 1986. Evidence establishing that fact
14 has been submitted to the Court in camera. See United States v.
15 Zielezinski, 744 F.2d 727, 733-34 (9th Cir. 1984).

16 F.   Werner Lotz at La Quinta In March 1985

17      Defendant Felix maintains that at the interview he stated he
18 saw Werner Lotz at La Quinta in San Jose, Costa Rica in March
19 1985. Defendant Felix alleges that he saw Lotz unloading
20 suitcases from the trunk of a Mercedez-Benz. That information was
21 also received by DEA through an independent government source
22 prior to February 7, 1987. Evidence establishing this fact has
23 also been submitted to the court in camera.

24 G.   Defendant Felix Present In Costa Rica In 1981

25      Again, this fact was known to DEA prior to the February 7,
26 1987 interview. Attached as Exhibits C and D are certified
27 Customs declarations obtained from the Ministry of Foreign Affairs

28

1  in San Jose, Costa Rica on November 24, 1986. The Customs

2  declarations are in the names of Jesus Diaz De Leon Zamorano, an

3  alias used by defendant Jesus Felix (Exhibit C), and Jesus

4  Felix-Gutierrez (Exhibit E), which reflect over 30 entries to

5  Costa Rica between 1980 and 1985. Consequently, DEA had prior

6  knowledge of defendant Jesus Felix being in Costa Rica in 1981.

7      Consequently, the information provided by defendant Jesus

8  Felix was of no value to the investigation. Defendant Felix

9  stated that he was not involved in the Camarena murder, and his

10  knowledge about the murder was limited to news media reports.

11  Defendant did not provide any information regarding his

12  involvement in narcotics trafficking. The vast majority if the

13  provided by defendant was previously known by DEA and obtained

14  through independent government sources. The information regarding

15  the meeting in Arizona was vague and general and therefore, of no

16  value. The government therefore has not improperly used

17  information obtained under a grant of use immunity.

18                                   III

19                               CONCLUSION

20      For the reasons stated herein, defendant's Motion For

21  Disclosure Of Independent Government Sources should be denied.

22

23

24

25

26

27

28                              -  11  -

1

## DECLARATION OF DOUGLAS W. KUEHL

2    I, Douglas W. Kuehl, declare as follows:

3    1.    I am a Special Agent (SA) with the Drug Enforcement
4  Administration (DEA) and have been so employed for approximately
5  eighteen years.

6    2.    For the past two years I have been assigned to the
7  investigation into the kidnap/torture/murder of DEA Special Agent
8  Enrique Camarena.

9    3.    On January 12, 1987, defendant Jesus Felix-Gutierrez was
10  indicted in case United States v. Jesus Felix-Gutierrez, et al.,
11  No. CR 87-15-ER, and charged with a conspiracy to possess with
12  intent to distribute and distribution of a controlled substance in
13  violation of Title 21, United States Code, Sections 846 and
14  841(a)(1); alien in possession of a firearm in violation of Title
15  18, United States Code, Section 922(g)(5); false identification
16  documents used to defraud the United Sates in violation of Title
17  18, United States Code, Section 1028(a)(4); and false statements
18  in violation of Title 18, United States Code, Section 1001.
19  Defendant was subsequently indicted in a First Superseding
20  Indictment and charged with conducting a continuing criminal
21  enterprise in violation of Title 21, United States Code, Section
22  848.

23    4.    Following the arraignment of Jesus Felix-Gutierrez, I
24  participated with Assistant United States Attorneys Jimmy Gurule
25  and Joyce Karlin in several converstions with Robert Ramsey,
26  attorney for drfendant Jesus Felix-Gutierrez, regarding
27  defendant's proposed cooperation with the government.

28

- 12 -

5. Mr. Ramsey and the government attorneys agreed that defendant Jesus Felix-Gutierrez would be interviewed on February 7, 1987 by Assistant United States Attorneys Joyce Karlin, Jimmy Gurule and Special Agents of the DEA at a place of my choosing in the presence of his attorney, Robert Ramsey.

6. On Saturday, February 7, 1987, I caused defendant Jesus Felix-Gutierrez to be transported pursuant to a court order from FCI Terminal Island to the United States Coast Guard Station at Terminal Island. Present at this meeting were AUSA's Gurule and Karlin, Mr. Robert Ramsey and DEA SAs Mary Cooper, Lisa Binsack, Rogelio Guevara, David Herrera and myself.

7. During the conversation, of which most was conducted in Spanish, the government attorneys and DEA agents had agreed with Mr. Ramsey not to take any notes during, nor following the meeting nor to memorialize the meeting in any written or tape recorded manner.

8. From the onset of the meeting it became very clear to me that defendant Jesus Felix-Gutierrez was very suspicious of the DEA agents. He accused Agent Guevara of being a mexican law enforcement officer and demanded to see and then closely studied his DEA credentials. The meeting clearly began on a low point and never rose above that. Defendant Jesus Felix-Gutierrez claimed that he would assist DEA by setting up some drug arrests. He claimed that in order to do this he would need to be released from custody and return to Mexico. He attempted to convince those in attendance that he would return to the United States to assist in the drug arrests he would set up. It was my opinion that defendant Felix was not sincere in this offer.

- 13 -

9.  In response to Mr. Robert Ramsey's declaration dated
April 15, 1988 in which he states that defendant Felix made the
following statements/admissions:

a.  "That he had a relationship with Ines Calderon." I have
spoken to SAs Cooper and Binsack who advised me that they
interviewed Obdulia Molina the girlfriend of defendant
Felix.  This interview took place at DEA Los Angeles on
December 24, 1986.  During this interview Obdulia Molina
advised the agents of defendant Felix's narcotics
involvement beginning in the 1970's when he began dealing
marijuana.  In the early 1980's, after meeting Ines
Calderon, he began also dealing in cocaine.  Molina
identified a photograph of Ines Calderon and also stated
that defendant Felix's yearly income from narcotics was
about $1,000,000 a year, but that he was not flamboyant
with his money and did not like to appear to have money.

b.  "That he discussed a meeting in Arizona." I have spoken
to those government employees at the meeting concerning
any mention of Arizona and they recall nothing regarding
any such topic of conversation.  I vaguely recall
defendant Felix making some type of reference to a
residence in Arizona but cannot recall anything further
on the matter.  Nothing was pursued concerning this, nor
was the information utilized in any manner towards any
subsequent indictments.

c.  "That he learned of the Camarena incident from
newstories."  That statement was viewed as self serving

-  14  -

and contrary to DEA intelligence.  The evidence that will be presented at trial will refute that claim.  His statement, therefore, did not provide any investigative leads to the government.

d.   "That defendant Felix participated in a meeting regarding real estate in Costa Rica."  I have reviewed a DEA 6 by DEA SA Sandalio Gonzalez of his interview of Mr. Celman Barenechea on August 6, 1986 in Costa Rica.  Mr. Barrenechea related to SA Gonzalez his association with defendant Felix and Rolando (believed to be Ines Calderon) in Costa Rica in 1983-1985.  This relationship involved the attempted sale of the Playboy Hotel to defendant Felix in 1983 as well as the sale of properties to Felix, Jose Albino Bazan and Rodolpho Lepes Montes in 1985 in Costa Rica.

e.   "That defendant learned of the house at La Quinta being robbed."  The government submitted proof of its independent source in camera.

f.   "That he saw Werner Lotz at La Quinta."  The government submitted proof of its independent source in camera.

g.   "That defendant Felix had been in Costa Rica in 1981."  I have obtained certified copies of official entry-exit records of the government of Costa Rica Customs/ Immigration records.  These were obtained and certified at the American Embassy in San Jose, Costa Rica on November 21, 1986.  They reflect defendant Jesus Felix-Gutierrez, also known as Jesus Diaz De Leon

- 15 -

Zamorano entering Costa Rica as early as February 21, 1980 and as late as March 17, 1985 for a total of approximately 70 entries and exits.

h.  "That he was aware that Rafael Caro-Quintero sold marijuana." I do not recall defendant Felix ever stating that he had ever participated directly or indirectly in Rafael Caro-Quintero marijuana operation. He stated that he learned from the news media that Caro-Quintero sold marijuana. I have reviewed DEA files which reflect that Rafael Caro-Quintero has been associated with narcotics trafficking since 1964. He has been closely associated with other infamous Mexican narcotic traffickers in the 1970's and 1980's. DEA reports reflect he trafficked in marijuana, cocaine and heroin over this time period and that he amassed a large fortune.

10. During my investigation of S/A Camarena's kidnap/murder, I have determined that defendant Felix has also utilized the name Jesus Diaz De Leon-Zamareno for the past eight years. He has also utilized the nickname "Cachas" since at least 1976 up to 1985-1986.

I declare under penalty of perjury that the above-statements are true and correct.

DATED:  This _19TH_ day of May, 1988.



                                DOUGLAS W. KUEHL
                                Special Agent, DEA

                          -  16  -

1
## DECLARATION OF JIMMY GURULE

2
I, JIMMY GURULE, declare as follows:

3
1.    I am an Assistant United States Attorney for the Central
4
District of California.

5
2.    I, along with Assistant United States Attorney Roel C.
6
Campos, am assigned to prosecute the case of the United States v.
7
Rafael Caro-Quintero, et al., No. CR 87-422(B)-ER.

8
3.    On February 7, 1987, I was present along with Assistant
9
United States Attorney Joyce Karlin, Special Agent Douglas W.
10
Kuehl, and other special agents of the Drug Enforcement
11
Administration, during an interview of defendant Jesus
12
Felix-Gutierrez.  Defendant Felix was represented by counsel
13
Robert Ramsey during the interview.

14
4.    During the interview, defendant Felix denied any
15
involvement in the kidnapping and murder of Special Agent Enrique
16
Camarena.  Defendant Felix further stated that the only
17
information he had about the kidnapping and murder was what he
18
learned from radio, television and newspaper reports.

19
5.    Defendant Felix never admitted any involvement in
20
narcotics trafficking.  While defendant Felix stated that he knew
21
Ines Calderon-Quintero and Rafael Caro-Quintero, defendant Felix
22
never acknowledged any involvement in drug trafficking with these
23
individuals.

24
6.    In my opinion, during the interview defendant Jesus Felix
25
appeared nervous.  Defendant Felix's answers were vague,
26
self-serving, misleading, and false.

27
7.    The interview of defendant Jesus Felix-Gutierrez and the
28
information provided was of no value to the investigation.

- 17 -

1    I declare under penalty of perjury that the above-statements
2  are true and correct.
3    DATED:   This _____ day of May, 1988.
4
5
                            _____
6                           JIMMY GURULE
                            Assistant United States Attorney
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
                              -  18  -
28

Index Of Exhibits To Government's Opposition
to Defendant Felix's Motion For Disclosure

Exhibit A

DEA 6, by SA Cooper, relating information that defendant Felix
knew Ines Calderon.

    Exhibit disclosed to defendants.

Exhibit B

DEA 6, by SA S. Gonzalez, relating to meeting in Costa Rica among
defendant and several other individuals.

    Exhibit disclosed to defendants.

Exhibit C & D

Costa Rican entry and exit records showing defendant Felix (under
aliases) enter and depart Costa Rica.

    Exhibits disclosed to defendants.

Exhibit E

In camera document, showing independent source regarding DEA
knowledge that house at La Quinta had been robbed.

Exhibit F

In camera document, showing independent source regarding DEA
knowledge that Werner Lotz was at La Quinta in March 1985.

5. BY: Mary Irene Cooper
AT: Special Agent
Los Angeles, CA.

7. ☐ Closed  ☐ Requested Action Completed
☐ Action Requested By:

9. OTHER OFFICERS:

S/A Lisa A. Binsack

6. FILE TITLE

8. DATE PREPARED

Janaury 5, 1987

10. REPORT RE:

Interview of Obdulia MOLINA on 12/24/86

## DETAILS:

1. On December 24, 1986, S/As Mary Irene Cooper and Lisa A. Binsack interviewed Obdulia MOLINA aka "TULLEY" pursuant to the arrest of Jesus FELIX-Gutierrez aka CACHAS and Carlos FELIX.

2. According to MOLINA, she met CACHAS during the latter years of the 1970s through her sister Ofelia VALDEZ. MOLINA stated that she had two daughters, Anastashia (5 YOA) and Paloma (3 YOA) who were fathered by CACHAS. After the second daughter was born, MOLINA said that she lost contact with CACHAS because he had wanted a son. According to MOLINA, CACHAS is married to Carmen FELIX who has one son and one daughter by CACHAS. MOLINA also stated that CACHAS was presently dating a young girl who was very attractive.

3. As to CACHAS' occupation, MOLINA was asked if he, CACHAS, was a shrimp salesman. MOLINA laughed and said no. MOLINA then stated that when she first met CACHAS in the 1970s, she thought that he was employed as a butcher. However, over time MOLINA became aware that CACHAS was involved in narcotics trafficking. In the early years of their relationship, MOLINA said that CACHAS was involved in marijuana. Then in the early 1980's, MOLINA stated that CACHAS became involved in cocaine trafficking. MOLINA further stated that this change from marijuana to cocaine occurred at the same time Ines CALDERON became associated with CACHAS. It should be noted that MOLINA positively identifed a photograph of Ines CALDERON under the alias of Rolando CERVANTES. MOLINA also said that Arturo DE LA TORRE and Jaime CASTANEDA were involved in the cocaine trafficking with CACHAS. When asked an approximation of CACHAS' yearly income from narcotics proceeds, MOLINA stated that it was about one million dollars a year. MOLINA then added that CACHAS was not flamboyant with his money and did not like to appear to have money.

11. DISTRIBUTION:
REGION
ARI: OPR
DISTRICT Los Angeles
OTHER

12. SIGNATURE (Agent)  Mary Irene Cooper, Special Agent
13. DATE  2/23/87
14. APPROVED (Name and Title)  David G. Herrera, Inspector
15. DATE  2/25/87

DEA Form - 6
(May 1980)

DEA SENSITIVE
DRUG ENFORCEMENT ADMINISTRATION
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.
Previous edition may be used.

EXHIBIT A

| REPORT OF INVESTIGATION | | | Page 1 of 2 | |
|---|---|---|---|---|
| **1. PROGRAM CODE**<br>SEO Leyenda | **2. CROSS FILE** | **RELATED FILES** | **3. FILE NO.** | **4. G-DEP IDENTIFIER** |
| **5. BY:** S/A Sandalio Gonzalez<br>**AT:** San Jose, Costa Rica | ☐<br>☐<br>☐<br>☐ | | **6. FILE TITLE** | |
| **7.** ☐ Closed ☐ Requested Action Completed<br>☐ Action Requested By: | | | **8. DATE PREPARED**<br>08-10-86 | |

**9. OTHER OFFICERS:**
Inv. Gonzalo Bado-Zuniga, Organismo de Investigacion Judicial

**10. REPORT RE:** Interview of Celman Barrenechea Lizano

DETAILS:

1. On 08-06-86, Special Agent Sandalio Gonzalez and Investigator
Gonzalo Bado-Zuniga interviewed Mr. Celman Barrenechea Lizano
regarding his dealings with Jesus DIAZ and other Mexican subjects
associated with Rafael CARO-Quintero in Costa Rica. The interview
took place in Mr. Bado's office in the headquarters building of the
Costa Rican Judicial Police, San Jose, Costa Rica.

2. Barrenechea stated that during late January 1985, he received a
telephone call from Jesus DIAZ, an individual he had met approximately
two years prior when DIAZ had been interested in purchasing the Hotel
Playboy in San Jose. During the telephone conversation, DIAZ again
expressed an interest in the hotel, but Barrenechea explained to him
that the conditions for the sale of the hotel had varied
considerably. DIAZ lost interest in the hotel, and asked if
Barrenechea knew anyone willing to sell houses, since some of his
friends were interested in investing money in Costa Rica.

3. Barrenechea said that he took the opportunity to offer his
mountain cabin for sale, and towards the end of January he went to his
cabin accompanied by three Mexicans for the purpose of showing them
the cabin and reaching an agreement on the price. The three persons
were Jesus DIAZ, Jose Albino BAZAN, and Juan ESCOBAR-Meza. At that
time it was agreed that the price would be $120,000. The following
day they went to see Attorney Carlos Mendez to complete the
transaction. The cabin was purchased and registered in the name of
Juan ESCOBAR Meza.

| **11. DISTRIBUTION:**<br>REGION Los Angeles<br><br>DISTRICT<br><br>OTHER DP OF AMRI | **12. SIGNATURE (Agent)**<br>Sandalio Gonzalez, Special Agent | **13. DATE**<br>8/13/86 |
|---|---|---|
| | **14. APPROVED (Name and Title)**<br>Robert J. Nieves, Country Attache | **15. DATE**<br>8/11/86 |

**DEA Form – 6**
(May 1980)

**DEA SENSITIVE**
**DRUG ENFORCEMENT ADMINISTRATION**
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.
Previous edition may be used.

**EXHIBIT B**

| REPORT OF INVESTIGATION | | | | Page 1 of 2 | |
|---|---|---|---|---|---|
| 1. PROGRAM CODE<br>SEO Leyenda | 2. CROSS FILE | RELATED FILES | 3. FILE NO. | | 4. G-DEP IDENTIFIER |
| 5. BY: S/A Sandalio Gonzalez<br>AT: San Jose, Costa Rica | ☐<br>☐<br>☐<br>☐ | | 6. FILE TITLE | | |
| 7. ☐ Closed ☐ Requested Action Completed<br>☐ Action Requested By: | ☐ | | 8. DATE PREPARED<br>08-10-86 | | |
| 9. OTHER OFFICERS:<br>Inv. Gonzalo Bado-Zuniga, Organismo de Investigacion Judicial | | | | | |
| 10. REPORT RE:  Interview of Celman Barrenechea Lizano | | | | | |

DETAILS:

1.  On 08-06-86, Special Agent Sandalio Gonzalez and Investigator Gonzalo Bado-Zuniga interviewed Mr. Celman Barrenechea Lizano regarding his dealings with Jesus DIAZ and other Mexican subjects associated with Rafael CARO-Quintero in Costa Rica. The interview took place in Mr. Bado's office in the headquarters building of the Costa Rican Judicial Police, San Jose, Costa Rica.

2.  Barrenechea stated that during late January 1985, he received a telephone call from Jesus DIAZ, an individual he had met approximately two years prior when DIAZ had been interested in purchasing the Hotel Playboy in San Jose.  During the telephone conversation, DIAZ again expressed an interest in the hotel, but Barrenechea explained to him that the conditions for the sale of the hotel had varied considerably.  DIAZ lost interest in the hotel, and asked if Barrenechea knew anyone willing to sell houses, since some of his friends were interested in investing money in Costa Rica.

3.  Barrenechea said that he took the opportunity to offer his mountain cabin for sale, and towards the end of January he went to his cabin accompanied by three Mexicans for the purpose of showing them the cabin and reaching an agreement on the price.  The three persons were Jesus DIAZ, Jose Albino BAZAN, and Juan ESCOBAR-Meza.  At that time it was agreed that the price would be $120,000.  The following day they went to see Attorney Carlos Mendez to complete the transaction.  The cabin was purchased and registered in the name of Juan ESCOBAR Meza.

| 11. DISTRIBUTION:<br>REGION  Los Angeles<br>DISTRICT<br>OTHER DP OF AMRI | 12. SIGNATURE (Agent)<br>Sandalio Gonzalez, Special Agent | 13. DATE<br>8/13/86 |
|---|---|---|
| | 14. APPROVED (Name and Title)<br>Robert J. Nieves, Country Attache | 15. DATE<br>8/17/86 |

DEA Form - 6<br>(May 1980)

DEA SENSITIVE<br>DRUG ENFORCEMENT ADMINISTRATION<br>This report is the property of the Drug Enforcement Administration.<br>Neither it nor its contents may be disseminated outside the agency to which loaned.<br>Previous edition may be used.

EXHIBIT B

REPORT OF INVES. .ATION
*(Continuation)*

| 1. FILE NO. | | 2. G-DEP IDENTIFIER |
|---|---|---|
| 3. FILE TITLE | | |

4.

Page 2 of 2

5. PROGRAM CODE

| 6. DATE PREPARED |
|---|
| 08-10-86 |

4. In view of the interest shown by the Mexicans in purchasing other properties, Barrenechea put them in touch with Mrs. Laura Collado who is a real estate broker. Barrenechea said he found out that Mrs. Collado showed the subjects various other houses, among them Quinta California. He said he also met another subject known to him only as ROLANDO (believed to be Ines CALDERON-Quintero AKA Rolando CERVANTES).

5. Barrenechea said that during the second half of March 1985, Jesus DIAZ called him to inquire if he knew of anyone wishing to sell a sports car. Barrenechea subsequently arranged a meeting between DIAZ and Octavio Manuel Silva Odio, who had a sports car for sale. Barrenechea later learned that DIAZ purchased the vehicle from Silva. Barrenechea emphasized that the only contact he had with these subjects was relative to the sale of the cabin and arranging the meeting with Silva.

6. Barrenechea identified the photograph of Jesus DIAZ de Leon Zamorano shown to him in a photo line-up. He stated he last saw DIAZ towards the end of March 1985, and that DIAZ lost $30,000 during the negotiations for the purchase of the Hotel Playboy. He recommended two Costa Rican attorneys to DIAZ, Franklin Matamoros and Manuel Emilio Rodriguez.

INDEXING SECTION:

1. Rafael CARO-Quintero -

2. Jesus DIAZ de Leon Zamorano AKA CACHAS -

3. Jose Albino BAZAN-Padilla -

4. Rodolfo LEPES-Montes AKA Juan ESCOBAR-Meza -

5. Ines CALDERON-Quintero AKA Rolando CERVANTES -

DEA SENSITIVE
DRUG ENFORCEMENT ADMINISTRATION
This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the Agency to which loaned.

Previous edition may be used.

ENTRADAS

SALIDAS

J.S. E:27-03-87 de Panamá
J.S. S:29-03-87 a Panamá
J.S. E:30-03-87 de Lscha
J.S. E: No se registra
J.S. E:03-04-87 a Panamá
J.S. S:03-04-87 de Panamá
J.S. E:05-04-87 a U.S.A.
J.S. S:05-04-87 de Panamá
J.S. E:16-04-87 a U.S.A.
J.S. E:17-04-87 de Panamá
... U.S.A.

...HOS REGISTROS DE EN-
...HOS

Republic of Costa Rica
Province and City of San José
Embassy of the United States
of America

I, ANNE McILVAIN VICE—
The _____ States of America at San José, duly ___ Consul at
com___ ___ and qualified, do hereby certify that
ILEANA DURAN BARUQUERO
whose true signature and official seal are, respec-
tively, subscribed and affixed to the foregoing
documents, was, on the __21ST__
day of __NOVEMBER__ 19_86_
the date thereof, OFFICIAL OF AUTH.
MINISTRY OF FOREIGN AFFAIRS
SAN JOSE, REPUBLIC OF
_____ Costa Rica,
duly commissioned and qualified, to whose official
acts faith and credit are due.
IN WITNESS WHEREOF I have hereunto set my
hand and affixed the seal of the Embassy at
San José, Costa Rica this ___26TH___ day
of __NOVEMBER__ 19_86_

_Anne M. Ibai_
ANNE McILVAIN
Consul of the United States of America
duel: San José, Costa Rica

## EL OFICIAL MAYOR DE SEGURIDAD PUBLICA
### CERTIFICA

Que la firma que antecede el presente documento es la de la señora Lilly Zúñiga Salas , Directora del Centro de Cómputo  de este Ministerio./././././././././././././././././././././L/./././././././T.

Dada en San José ,  a los diecinueve días del mes de noviembre de - mil novecientos ochenta y seis./././././././././././././././././.



LIC. MARINO SAGOT ARIAS
OFICIAL MAYOR
OFICIAL MAYOR
SAN JOSE, COSTA RICA

REPUBLICA DE COSTA RICA

MINISTERIO DE RELACIONES EXTERIORES Y CULTO

La firma que antecede del señor

Lic. Marino Sagot Arias
Oficial mayor de Seguridad

ES AUTENTICA

San José, 21 de nov. de 1986

Esta autenticación no implica responsabilidad en cuanto al contenido del documento.

ILEANA DURAN BARQUERO
Oficial de Autenticaciones

**CENTRO DE COMPUTO**



# M I N I S T E R I O   D E   S E G U R I D A D   P U B L I C A

## C E R T I F I C A N

QUE EL SEÑOR (A):  DIAZ DE LEON ZAMORANO JESUS        CONOCIDO:
DE NACIONALIDAD: MEXICANA        PORTADOR DEL PASAPORTE No.: A3492
Y ESTUDIADO DEL AÑO 01-80 AL 07-86   ; Y DE CONFORMIDAD CON NUESTROS REGISTROS DE EN-
TRADAS Y SALIDAS LE APARECEN LOS SIGUIENTES MOVIMIENTOS MIGRATORIOS:

| ENTRADAS | SALIDAS | ENTRADAS | SALIDAS | ENTRADAS | SALIDAS | ENTRADAS | SALIDAS |
|---|---|---|---|---|---|---|---|
| 12-09-80 | 15-09-80 | 26-10-80 | 28-10-80 | 13-01-81 | 22-01-81 | 07-03-81 | 07-03-81 |
| 17-03-81 | 25-03-81 | 17-04-81 | 06-05-81 | 07-05-81 | 10-05-81 | 21-06-81 | 22-06-81 |
| 14-07-81 | 16-07-81 | 29-07-81 | 11-09-81 | 28-08-81 | 10-09-81 | 09-10-81 | 22-10-81 |
| 22-11-81 | 02-12-81 | 00 00 00 | 19-12-81 | 00 00 00 | 09-02-82 | 11-02-82 | 11-02-82 |
| 05-03-82 | 08-03-82 | 15-03-82 | 25-03-82 | 27-03-82 | 29-03-82 | 30-03-82 | 00 00 00 |
| 03-04-82 | 05-04-82 | 16-04-82 | 17-04-82 | 22-04-82 | 23-04-82 | 21-06-82 | 01-07-82 |
| 05-10-82 | 07-10-82 | 08-11-82 | 11-11-82 | 12-11-82 | 20-11-82 | 11-12-82 | 12-12-82 |
| 07-05-83 | 14-05-83 | 18-05-83 | 28-05-83 | 28-02-85 | 05-03-85 | 08-03-85 | 08-03-85 |
| 17-03-85 | 23-03-85 | 00-00-00 | 00-00-00 | 00-00-00 | 00-00-00 | 00-00-00 | 00-00-00 |

Ultima linea

E: 12-09-80 de Panamá J.S. I.C.T 35353 E:29-07-81 de U.S.A. J.S. E:27-03-82 de Panamá
S: 15-09-80 a  U.S.A. J.S. I.C.T. ""    S:13-08-81 a  U.S.A. J.S. S:29-03-82  a Panamá
E: 26-10-80 de Panamá J.S. C.T 46638 E:28-08-81 de U.S.A. J.S. E:30-03-82 de Panamá
S: 28-10-80 a  Panamá J.S.  "   "    S:10-09-81 a  U.S.A. J.S. S: no se registra
E: 13-01-81 de U.S.A. J.S. C.T 66829 E:09-10-81 de U.S.A. J.S. E:03-04-82 de Panamá
S: 22-01-81 a  U.S.A. J.S.  "   "    S:22-10-81 a  U.S.A. J.S. S:05-04-82 a  Panamá
E: 07-03-81 de Panamá J.S. I.C.T 173848E:22-11-81 de U.S.A. J.S. E:16-04-82 de Panamá
S: 07-03-81 a  U.S.A. J.S. C.T 175848S:02-12-81 a  U.S.A. J.S. S:17-04-82 a  U.S.A.
E: 17-03-81 de U.S.A. J.S.  "   " E: no se registra E:22-04-82 de Panamá
S: 25-03-81 a  Panamá J.S.  "   " S:19-12-81 a  U.S.A. J.S. S:23-04-82 a  U.S.A.
E: 17-04-81 de U.S.A. J.S. 47160 E: no se registra E:21-06-82 de U.S.A.
S: 06-05-81 a  U.S.A. J.S.  "   " S:09-02-82 a  Panamá S:01-07-82 a  U.S.A.
E: 07-05-81 de U.S.A. J.S.  "   " E:11-02-82 de Panamá E:05-10-82 de U.S.A.
S: 10-06-81 a  U.S.A. J.S.  "   " S:11-02-82 a  U.S.A. S:07-10-82 a  U.S.A.P/5497
E: 21-06-81 de U.S.A. J.S.  "   " E:05-03-82 de Panamá E:08-11-82 de MEXICO P/73275497
S: 22-06-81 a  Panamá J.S.  "   " S:08-03-82 a  Panamá S:11-11-82 a  Panamá "     "
E: 14-07-81 de Panamá J.S.  "   " E:15-03-82 de Panamá E:12-11-82 de Panamá
S: 16-07-81 a  U.S.A. J.S.  "   " S:25-03-82 a  Panamá S:20-11-82 a  Panamá

SE EXTIENDE LA PRESENTE CERTIFICACION EN LA CIUDAD DE SAN JOSE a los  de   o
DIAS DEL MES DE AGOSTO   DE MIL NOVECIENTOS OCHENTA Y SEIS   A SOLICITUD DEL INTERESA-
DO PARA EFECTOS DE: LEGALES

SE AGREGA Y CANCELA TIMBRES DE LEY



LIL                    AS                    HERNAN BORGE CARVAJAL
DIRECTORA GENERAL                           SUB-DIRECTOR

13-86-09-02155
FRE

## "EL CAMINO DEL FUTURO"



Republic of Costa Rica
Province and City of San José    ss.
Embassy of the United States
of America

, ANNE McILVAIN VICE—
                                    Consul of
t'      d States of America at San José, duly
c   ......oned and qualified, do hereby certify that
ILEANA DURAN BARUQUERO
whose true signature and official seal are, respec-
tively, subscribed and affixed to the foregoing
documents, was, on the ___21ST
day of ___NOVEMBER___ , 19 86
the date thereof, OFFICIAL OF AUTH.
MINISTRY OF FOREIGN AFFAIRS
SAN JOSE, REPUBLIC OF
_____ Costa Rica,
duly commissioned and qualified, to whose official
acts faith and credit are due.
    IN WITNESS WHEREOF I have hereunto set my
hand and affixed the seal of the Embassy at
San José, Costa Rica this ___26TH___ day
of ___NOVEMBER___ , 19 86

Anne McIlvain
ANNE McILVAIN
    Consul of the United States of America
Costa San José, Costa Rica

EL OFICIAL MAYOR DE SEGURIDAD PUBLICA
CERTIFICA

Que la firma que antecede el presente documento es la de la señora
Lilly Zúñiga Salas , Directora del Centro de Cómputo de este Minis
terio./././././././././././././././././././././././././././././.

Dada en San José , a los diecinueve días del mes de noviembre de mil
novecientos ochenta y seis./././././././././././././././././././.



LIC. MARINA SAGOT ARIAS
OFICIAL MAYOR
OFICIAL MAYOR
SAN JOSÉ, COSTA RICA



REPUBLICA DE COSTA RICA
TIMBRE
100 100
COLONES COSTA RICA

REPUBLICA DE COSTA RICA
MINISTERIO DE RELACIONES EXTERIORES Y CULTO

La firma que antecede del señor

*Lic. Marino Sagot Arias*
*Oficial Mayor de Seguridad*

ES AUTENTICA

San José, 21 de nov. de 198 6

Esta autenticación no implica responsabilidad en cuanto
al contenido del documento

ILEANA DURAN BARQUERO
Oficial de Autenticaciones

**CENTRO DE COMPUTO**

MINISTERIO DE SEGURIDAD PUBLICA

CERTIFICAN

QUE EL SEÑOR (A):   FELIX GUTIERREZ JESUS                    CONOCIDO:  JUAN FELIX
DE NACIONALIDAD:  MEXICANA                  PORTADOR DEL PASAPORTE No.:  A51512
Y ESTUDIADO DEL AÑO 01-90 AL 07-96   ; Y DE CONFORMIDAD CON NUESTROS REGISTROS DE EN-
TRADAS Y SALIDAS LE APARECEN LOS SIGUIENTES MOVIMIENTOS MIGRATORIOS:

| ENTRADAS | SALIDAS | ENTRADAS | SALIDAS | ENTRADAS | SALIDAS | ENTRADAS | SALIDAS |
|---|---|---|---|---|---|---|---|
| 21-02-80 | 00-00-00 | 26-01-85 | 02-02-85 | 09-02-85 | 15-02-85 | 00-00-00 | 00-00-00 |
| | | | Ultima linea | | | | |

Entro 21-02-80 Procedente de Panama por el Juan Santamaría con el I.C.T. #179462

No aparece la salida.
Entro 26-01-85 Procedente de los Angeles.U.S.A. P# a51512
salio 02-02-85 Hacia Panamá por Juan Santamaría, mismo # de pasaporte
Entró 09-02-85 Procedente de Panama, mismo puerto de ingreso y mismo pasaporte
Salió 15-0285  Hacia Los Angeles U.S.A. mismo puerto de ingreso y mismo pasaporte



MINISTERIO DE GOBERNACION Y SEGURIDAD PUBLICA

SE EXTIENDE LA PRESENTE CERTIFICACION EN LA CIUDAD DE SAN JOSE A LOS  DIECIOCHO
DIAS DEL MES DE AGOSTO    DE MIL NOVECIENTOS OCHENTA Y SEIS    A SOLICITUD DEL INTERESA-
DO PARA EFECTOS DE: LEGALES

SE AGREGA Y CANCELA TIMBRES DE LEY



LIC. _____ SABAL                          HERNAN BORGE CARVAJAL
DIRECTOR                                              SUB-DIRECTOR

13-86-08-02156
FRE                         **"EL CAMINO DEL FUTURO"**

## CERTIFICATE OF SERVICE BY MAIL

1

2        I, ___Marta I. Larin_____, declare:

3        That I am a citizen of the United States and resident or employed in

4    Los Angeles County, California; that my business address is Office of United

5    States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles,

6    California 90012; that I am over the age of eighteen years, and am not a party

7    to the above-entitled action;

8        That I am employed by the United States Attorney for the Central District

9    of California who is a member of the Bar of the United States District Court for

10   the Central District of California, at whose direction the service by mail

11   described in this Certificate was made; that on ___May 19, 1988_____, I

12   deposited in the United States mails in the United States Courthouse at

13   312 North Spring St., Los Angeles, California, in the above-entitled action,

14   in an envelope bearing the requisite postage, a copy of

15       GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR DISCLOSURE OF
         INDEPENDENT GOVERNMENT SOURCE; MEMORANDUM OF POINTS AND
16       AUTHORITIES; DECLARATIONS

17   addressed to

18           DONALD C. RANDOLPH, ESQ.
             2566 OVERLAND AVENUE
19           SUITE 700
             LOS ANGELES, CA 90064
20

21

22   at __their___ last known address, at which place there is a delivery service by

23   United States mail.

24       This Certificate is executed on ___May 19, 1988_____ at

25   Los Angeles, California.

26       I certify under penalty of perjury that the foregoing is true and correct.

27

28
     USA-12c-240
     (Rev. 1/3/77)