ROBERT C. BONNER
United States Attorney
ROBERT L. BROSIO
Assistant United States Attorney
Chief, Criminal Division
ROEL C. CAMPOS
Assistant United States Attorney
Major Narcotics Section
    1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-6682

Attorneys for Plaintiff
United States of America



FILED

JUN 6 1988

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR 87-422(B)-ER |
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT LOPEZ-ALVAREZ'S MOTION TO DISMISS INDICTMENT FOR OUTRAGEOUS GOVERNMENT CONDUCT; MEMORANDUM OF POINTS AND AUTHORITIES |
| v. | |
| RAFAEL CARO-QUINTERO, et al., | |
| Defendants. | |
| | DATE:   June 20, 1988 |
| | TIME:   1:30 p.m. |

Plaintiff, United States of America, as represented by the undersigned Assistant United States Attorney, hereby files with this Honorable Court the Government's Opposition to Defendant's Motion to Dismiss Indictment for Outrageous Government Conduct.

The government's opposition is based on the attached Memorandum of Points and Authorities, the records and files in the case, and any argument that may be presented in open court.

DATED:  June 6, 1988.



ENTERED ON COURTRAN

JUN - 7 1988

Respectfully submitted,

ROBERT C. BONNER
United States Attorney

207

ROBERT L. BROSIO
Assistant United States Attorney
Chief, Criminal Division


ROEL C. CAMPOS
Assistant United States Attorney

Attorneys for Plaintiff
United States of America

- 2 -

# TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| TABLE OF AUTHORITIES | | ii |
| I. | INTRODUCTION | 3 |
| II. | STATEMENT OF FACTS | 3 |
| III. | ARGUMENT | 9 |
| | A. The Due Process Challenge of Outrageous Government Conduct is Extremely Limited | 9 |
| | B. The Facts In The Instant Case Are Distinguishable From Those Cases Where Government Conduct Held To Be Outrageous | 14 |
| | C. The Government May Target Someone Who Is Not Engaged or Contemplating Criminal Activity | 19 |
| | D. The Informant Disengaged From the Venture, Therefore There Is No Issue Regarding Coercion | 21 |
| IV. | CONCLUSION | 22 |

- i-

TABLE OF AUTHORITIES

                                                              PAGE

Beverly v. United States,
     723 F.2d 11 (3rd Cir. 1983)                               11

Greene v. United States,
     454 F.2d 783 (9th Cir. 1971)                              11

Hampton v. United States,
     425 U.S. 484 (1976)                                       10

United States v. Batres-Santolino,
     521 F.2d Supp. (744 N.D. Cal. 1981)                      17, 18

United States v. Bogart,
     783 F.2d 1428 (9th Cir. 1986)                             11

United States v. Citro,
     842 F.2d 1149 (9th Cir. 1988)                             21

United States v. Emmert,
     829 F.2d 805 (9th Cir. 1987)                           11, 12, 16
                                                            19, 20, 21

United States v. Jannotti,
     673 F.2d 578 (3rd Cir.),
     cert. denied, 457 U.S. 1106 (1982)                        12

United States v. Kelly,
     707 F.2d 1460 n.13 (D.C. Cir.),
     cert. denied, 464 U.S. 908 (1983)                         11

United States v. Lomas,
     706 F.2d 886 (9th Cir. 1983),
     cert. denied, 104 S.Ct. 720 (1984)                       13, 17

United States v. McCown,
     711 F.2d 1441 (9th Cir. 1983)                             13

United States v. Mcguin,
     612 F.2d 1193 (9th Cir.),
     cert. denied, 445 U.S. 995 (1980)                         13

- ii -

TABLE OF AUTHORITIES (Cont'd)

PAGE

United States v. Prairie,
    572 F.2d 1316 (9th Cir. 1978)                14

United States v. Ramirez,
    710 F.2d 535 (9th Cir. 1983)                 11

United States v. Reynoso-Ulloa,
    548 F.2d 1329 (9th Cir. 1977),
    cert. denied, 436 U.S. 926 (1978)            14

United States v. Russell,
    411 U.S. 423 (1973)                          9

United States v. Ryan,
    548 F.2d 782 (9th Cir.),
    cert. denied, 429 U.S. 939 (1976)            10

United States v. Simpson,
    813 F.2d 1462 (9th Cir.),
    cert. denied, 108 S.Ct. 233 (1987)           13, 21

United States v. So,
    755 F.2d 1350 (9th Cir. 1985)                10

United States v. Stenberg,
    803 F.2d 422 (9th Cir. 1986)                 9, 10, 11

United States v. Twigg,
    588 F.2d 373 (3rd Cir. 1978)                 11, 14, 15
                                                 16, 17

United States v. West,
    511 F.2d 1083 (3rd Cir. 1975)                11

- iii -

## MEMORANDUM OF POINTS AND AUTHORITIES

I

## INTRODUCTION

Defendant Lopez-Alvarez claims that the government's conduct in its sting operation against him was outrageous.  The government is puzzled as to why defendant Lopez-Alvarez has filed this motion, since the identical motion is pending before Judge Rymer. It is not clear whether the court has been placed on notice regarding the pendency of the motion before Judge Rymer.  It would appear that defendant Lopez-Alvarez is posturing himself for the proverbial "two bites at the apple" should Judge Rymer's decision not be to his liking.  The government submits that such a tactic is entirely improper and that one court "should not be "played off the other."  The government submits that this court should not even consider this motion or, at least, some coordination with Judge Rymer is called for.

In any event, should the court determine to reach the merits the government briefs the issues for the court and opposes defendant's motion.

II

## STATEMENT OF FACTS

Between March, 1985 and July, 1986, defendant Lopez-Alvarez was incarcerated in a Mexican prison for his suspected involvement in the kidnap, torture and murder of DEA Special Agent ("S/A") Enrique Camarena.  Sometime thereafter, DEA Special Agent Bill Terrazas, stationed in Guadalajara, Mexico and the Agent responsible for controlling a confidential informant named Reyes Garcia, ("CI"), had received information from the CI that

Lopez-Alvarez was a member of the Ernesto Fonseca-Carrillo drug organization and that Lopez-Alvarez was looking for customers for drugs.  The DEA had been investigating that organization for some time and was aware that Fonseca-Carrillo was smuggling a substantial quantity of drugs into the United States.

On or about August 12, 1987, Garcia met with DEA Special Agent Reynoso in Guadalajara, Mexico, and told them that Lopez-Alvarez was a member of the Ernesto Fonseca-Carrillo narcotics organization; that defendant Lopez-Alvarez had been released from prison in Mexico where he had been detained in connection with the kidnap and murder of S/A Camarena; and that he was looking, on behalf of Fonseca, for customers for cocaine.  (Kuehl Aff. ¶ 4).

S/A Reynoso asked the CI to see if he could invite defendant Lopez-Alvarez to meet with him in Los Angeles to do a drug deal. S/A Reynoso told the CI to refer to him as a major drug trafficker looking for new suppliers.  (Reynoso Testimony).  Reynoso also understood that Lopez-Alvarez had information about the Camarena murder.  Defendant Lopez-Alvarez was approached in Guadalajara by the CI, whom he had previously met in prison.  Garcia proposed that they travel to Los Angeles to meet with a cocaine buyer, DEA S/A Abel Reynoso, and pose as drug traffickers with access to large quantities of cocaine, and convince the buyer to "front" them money.  (Lopez-Alvarez Decl., ¶¶ 3, 5.)  On August 12, 1987, CI Garcia contacted S/A Terrazas in Guadalajara, Mexico, and told him that Lopez-Alvarez had accepted his (the CI's) invitation to travel to Los Angeles, California for the purpose of meeting S/A Reynoso, whom he had told defendant was interested in buying large amounts of cocaine.  (Terrazas Decl., ¶ 2.)

- 4 -

DEA S/A Terrazas instructed Garcia that his "official role" was only to set up a meeting and introduce defendant to S/A Reynoso in Los Angeles. (Terrazas Decl., ¶ 3.) The DEA never instructed the CI to discuss a contract-murder with the defendant or to pretend that he wanted to "rip off" S/A Reynoso. (Terrazas Decl., ¶ 5.) The CI was told he was not to handle cocaine, discuss price or quantity, or engage in any illegal activities to further the investigation. (Id.)

Lopez-Alvarez testified that the CI coached him to impress S/A Reynoso by boasting about his connections with known drug traffickers and his detention in Mexico on the Camarena murder charges. (Lopez-Alvarez Decl., ¶¶ 8,9.) However, in his declaration, S/A Terrazas stated that CI Garcia denied that he deceived or coached Lopez-Alvarez, or purchased the cocaine sample for him. (Terrazas Decl., ¶ 7.) The government asserted its privilege not to disclose the CI and defendant Lopez-Alvarez chose not to subpoena him or compel his appearance. Therefore no rebutting testimony from the CI was introduced by the government.

The DEA through the CI paid the defendant's travel expenses from Guadalajara, Mexico to Los Angeles. (Lopez-Alvarez Decl., ¶ 6; Terrazas Decl. ¶ 3.). The defendant also stated in his declaration and testified at trial that Garcia purchased a street sample of cocaine in Guadalajara, and gave it to Lopez-Alvarez to provide the buyer. (Lopez-Alvarez Decl., ¶ 7.) Garcia denied having done so to SA Terrazas.

The CI, Lopez and S/A Reynoso meet for the first time September 3, 1987 at the Quiet Cannon restaurant. Defendant Lopez

- 5 -

1   discussed details of the Camarena murder.  Defendant Lopez-Alvarez
2   and S/A Reynoso discussed doing a narcotics deal, defendant
3   Lopez-Alvarez then informed S/A Reynoso that doing enforcement
4   work was his specialty.  Defendant Lopez-Alvarez then asked S/A
5   Reynoso whether he had any enforcement work that he wished
6   defendant Lopez-Alvarez to do.  (Transcripts pp. 54-55, Ex. A.)
7   S/A Reynoso indicated that he had problems with an individual and
8   that money was no problem if the defendant could take care of that
9   individual.

10   After the September 3, 1987 meeting, the defendant and the CI
11   returned to Mexico together.  Lopez-Alvarez testified that "the CI
12   suggested that if the buyer was not to 'front' the money for the
13   cocaine deal, he might do so for a kidnapping."  (Lopez-Alvarez
14   Decl., ¶ 11.)  Again, the CI told S/A Terrazas that he never
15   suggested to Lopez-Alvarez that he do a kidnapping.  The DEA
16   instructed the CI on or about October 6 not to see or speak to
17   Lopez until Lopez approached him.  Undercover agent Reynoso, in
18   response to defendant Lopez-Alvarez's solicitation, asked
19   defendant Lopez-Alvarez whether he could do a job "like Camarena."

20   Undercover Agent Reynoso stated that there was an officer
21   giving his organization trouble.  On October 14, and 15, 1987, S/A
22   Reynoso explained that the intended victim was a United States
23   Customs agent.  Undercover agent Reynoso, however, explained to
24   defendant Lopez-Alvarez that he did not know how to do such a job
25   and asked defendant Lopez-Alvarez how it could be done.  Defendant
26   Lopez-Alvarez provided the undercover agent excruciating details
27   of how such a job could be done.  (Ex. A, Ex. B).

28

Defendant Lopez-Alvarez said, for instance, that the victim Customs agent should be abducted at gun point on a day on which he was not on duty. In that way, the customs agent would not be missed at his office. Defendant Lopez-Alvarez stated that he would need the assistance of another individual to abduct the Customs agent at gunpoint. The agent would then be put inside a commercial-looking van without windows. (Ex. A and Ex. B). In that way no one could look inside the van. Defendant Lopez-Alvarez then indicated that the victim customs agent would need another accomplice to drive the van. Defendant Lopez-Alvarez explained that he and his two accomplices would then take the Customs agent to a house in an isolated area. There they would conduct the beating. Defendant Lopez-Alvarez said that they would ultimately bury the Customs agent in the yard of the house, after they killed him.

Undercover agent Reynoso asked defendant Lopez-Alvarez how he could obtain information of what he knew about his fictitious narcotics organization from the Customs agent. Defendant Lopez-Alvarez explained that they could beat him and torture him in a way in which he would divulge what he knew. Defendant Lopez-Alvarez suggested that they record the interrogation, as had been done with Camarena. Defendant Lopez-Alvarez specifically mentioned giving the victim electrical shocks to his testicles and to his anus. (Ex. A, p. 69). Defendant Lopez-Alvarez also described another torture technique in which carbonated mineral water would be agitated and then released into the victim's nose, when the victim's mouth was gagged. (Ex. B, pp. 87-88).

- 7 -

Defendant Lopez-Alvarez himself described all of the tools and weapons that he would need. He specified that he would need a commercial Van and an isolated house. The undercover agent agreed to purchase those. With respect to the weapons, defendant specified that he wanted an automatic rifle (preferably an Uzi), two .38 caliber handguns and a .45 caliber handgun. Initially defendant Lopez-Alvarez was going to obtain the weapons from an individual that he knew. (Ex. C, pp. 97-98). Later, he asked the undercover agent to obtain them for him because his source could not supply him. Defendant Lopez-Alvarez also indicated that the weapons would be more expensive in Mexico. Id.

After the initial September3, 1987 meeting, Lopez-Alvarez made two more trips between Guadalajara, Mexico and Los Angeles during which the discussion increasingly turned to a kidnap, torture and murder of a United States Customs Agent. S/A Reynoso supplied travel and expense money. Lopez recruited two associates, Quintero-Maldonado and Jimenez-Martinez, to come with him to Los Angeles. Defendant Lopez-Alvarez testified that after an October 15, 1987 meeting with the undercover agent, he no longer met with the CI. In fact, he testified that the CI told him to go at it "alone." Indeed, defendant Lopez-Alvarez testified that he only planned to share his fee with the two accomplices.

At a meeting October 23, 1987, Lopez, his associates and S/A Reynoso discussed meeting to finalize plans for the kidnap, torture and murder. On October 26 at a meeting among Lopez, Quintero-Maldonado, Jimenez-Martinez and S/A Reynoso to finalize details, Reynoso supplied weapons, a photo of the victim United

- 8 -

States Customs agent a list of interrogation questions, a map of a fictitious safe house, and made-up details of the victim's routine. Defendants discussed details of the kidnap/murder plan and inspected the weapons he had brought. The weapons were then retrieved by S/A Reynoso. After Reynoso left the room but before defendants had done anything further, they were arrested.

Lopez-Alvarez intended to attempt to kidnap, torture and murder a United States Customs Agent. (That was the finding by the jury in convicting defendant Lopez-Alvarez of conspiracy to kidnap and murder the Customs agent.) Finally, no crimes, coercion or other unconscionable conduct by a government agent occurred during the course of the undercover operation.

III

ARGUMENT

A. The Due Process Challenge of Outrageous Government Conduct is Extremely Limited.

The defense of outrageous government conduct derives from dictum in justice Rehnquist's opinion in United States v. Russell, 411 U.S. 423, 431-32 (1973) (denying an entrapment defense to a defendant who was supplied the contraband necessary to commit the crime by government agents).[1/] Situations "in which the conduct of law enforcement officers is so outrageous that due process

---

[1/] The Ninth Circuit has explained that while there may be an overlap between entrapment and outrageous government conduct, the inquiry is different: entrapment focuses on the defendant's predisposition, and outrageous government conduct on the government's conduct. United States v. Stenberg, 803 F.2d 422, 428-29 (9th Cir. 1986).

- 9 -

principles would absolutely bar the government from invoking judicial processes to obtain a conviction". 411 U.S. at 431-32; accord Hampton v. United States, 425 U.S. 484, 492-93 (Powell, J. concurring).

The Supreme Court has never elaborated on what conduct by law enforcement agents would be "so outrageous" that due process principles would apply. Three years after Russell, Justice Rehnquist, writing for a plurality of the Court in Hampton v. United States, 425 U.S. 484, 489-91 (1976), disparaged the constitutional basis for the outrageous conduct defense, holding that the "remedy of the criminal defendant with respect to the acts of Government agent lies solely in the [quasi-statutory] defense of entrapment." 425 U.S. at 490 (Rehnquist, J., joined by White, J. and Burger, C.J.).

Although the due process outrageous government conduct defense survived the Court's review in Hampton, the Ninth Circuit has repeatedly acknowledged that "the due process channel which Russell kept open is a most narrow one." United States v. Stenberg, 803 F.2d 422, 429 (9th Cir. 1986); United States v. Ryan, 548 F.2d 782, 789 (9th Cir.), cert. denied, 429 U.S. 939 (1976) and 430 U.S. 965 (1977). Such a defense focuses on the government's actions and is only available where the government "is so involved in the criminal endeavor that it shocks our sense of justice." United States v. So, 755 F.2d 1350, 1353 (9th Cir. 1985).

The Ninth Circuit has noted that constitutionally unacceptable conduct includes "situations where law enforcement agents employ

unwarranted physical or mental coercion," where "government agents engineer and direct the criminal enterprise from start to finish "and where the government essentially manufactures new crimes in order to obtain the defendant's conviction." United States v. Stenberg, 803 F.2d at 429, citing United States v. Bogart, 783 F.2d 1428, 1438, vacated 790 F.2d 802 (9th Cir. 1986) and United States v. Ramirez, 710 F.2d 535, 539 (9th Cir. 1983). The defense is generally unavailable, however, where "the criminal enterprise was already in progress before the government became involved" or where the defendant was "involved in a continuing series of similar crimes during the government conduct at issue." Id. Government agents may even approach people not engaged in or contemplating criminal activity. United States v. Emmert, 829 F.2d at 812.

While both the Supreme Court and this circuit have recognized the existence of such a defense, only two circuits in three reported opinions have found government conduct to be outrageous: The Ninth Circuit in Greene v. United States, 454 F.2d 783 (9th Cir. 1971) and the Third Circuit in United States v. Twigg, 588 F.2d 373 (3rd Cir. 1978) and United States v. West, 511 F.2d 1083 (3rd Cir. 1975).$^{2/}$ In addition, only one reported district court has applied the defense without reversal. United States v. Batres-Santolino, 521 F. Supp. 744 (N.D. Cal. 1981). Compare United States v. Kelly, 707 F.2d 1460, 1476 n.13 (D.C. Cir.) (per

2/ The Third Circuit has questioned the continuing validity of Twigg and West in light of Hampton. Beverly v. United States, 723 F.2d 11, 12 (3rd Cir. 1983).

- 11 -

curium) (reversing district court dismissal for outrageous conduct in Abscam case), cert. denied, 464 U.S. 908 (1983); United States v. Jannotti, 673 F.2d 578, 610 (3rd Cir.), cert. denied, 457 U.S. 1106 (1982), and 469 U.S. 880 (1984) (reversing district dismissal because of outrageous government conduct because defendant lacked standing to challenge the government's conduct).

Each case where the defense was successfully asserted involved an a extreme set of facts, entirely absent here, where the government went far beyond offering defendants an opportunity to commit a crime. In those cases the government's activity was so pervasive that the government's participation in the criminal activity dwarfted that of the defendants. In Greene, for example, the undercover agent reestablished contact with the defendant after his release from confinement for bootlegging. The government initiated the scheme and sustained it over a two year period. The government agent provided 2,000 pounds of raw material at wholesale prices, offered to provide a still, a still site, equipment and an operator. The government was also the only customer. The Ninth Circuit concluded that the government could not involve itself so directly and continuously for such a long period of time and then prosecute its "collaborators". 454 F.2d at 787.

This court has recently distinguished as "fundamentally different" the situation where the government was "on only one side of the transaction" and the defendants supplied the narcotics. United States v. Emmert, 829 F.2d at 813. As discussed below, Emmert is applicable to the facts of the instant case.

1    Similarly, in both Twiggs and West, the government agent was

2    essentially instrumental in both setting up the defendant's

3    illegal drug operation and ensuring its smooth and successful

4    operation.  In Twigg, the Third Circuit found outrageous conduct

5    where an informant initiated contact, suggested establishing a

6    drug laboratory, supplied materials, expertise and capital, and

7    actually ran the laboratory.  The court distinguished this

8    situation from  the sale of an illegal drug, "a much more fleeting

9    and elusive crime to detect," where more extreme methods of

10   investigation might be proper.  Twigg, 588 F.2d at 380-81, 378.

11   This circuit has narrowly limited the holdings in Greene and

12   Twigg, suggesting that the outrageous conduct defense can succeed

13   only where defendants "would not have had the capacity to commit

14   the crimes with which they were charged without the government's

15   assistance."  United States v. Lomas, 706 F.2d 886, 891 (9th Cir.

16   1983), cert. denied, 104 S.Ct. 720 (1984); see also United States

17   v. McCown, 711 F.2d 1441, 1449-50 (9th Cir. 1983).

18   The Ninth Circuit has only sparingly permitted the defense.

19   In all the cases since Greene, this court refused to apply it.

20   For example, in United States v. Simpson, 813 F.2d 1462 (9th

21   Cir.), cert. denied, 108 S.Ct. 233 (1987), the court found that

22   the continued use by the FBI of an informant after learning of her

23   sexual involvement with an informant was not outrageous conduct.

24   See also United States v. Mcquin, 612 F.2d 1193, 1195 (9th Cir.),

25   cert. denied, 445 U.S. 995 (1980), (where the informant allegedly

26   threatened to have the defendant killed unless he carried through

27   with the robbery as planned, the threat was not outrageous

28

- 13 -

1  conduct); United States v. Reynoso-Ulloa, 548 F.2d 1329, 1338 (9th

2  Cir. 1977) cert. denied, 436 U.S. 926 (1978) (threats by

3  government informant held "not so outrageous that principles of

4  due process require reversal of his conviction"); United States v.

5  Prairie, 572 F.2d 1316, 1319 (9th Cir. 1978) (rejecting due

6  process argument: "it is clear that the use of paid informants

7  and undercover police officers to ferret out drug dealers is not

8  violative of due process principles").

9  B.  The Facts In The Instant Case Are Distinguishable From Those

10     Cases Where Government Conduct Held To Be Outrageous

11     Defendant claims that the Twigg case is like the case at

12  hand.  That is completely wrong – Twigg presented a far different

13  situation.

14     In United States v. Twigg, 588 F.2d 383 (3d Cir. 1978), an

15  informant initiated contact, suggested establishing a drug

16  laboratory, supplied essential materials, arranged for the site of

17  the laboratory, provided expertise and capital, and ran the

18  laboratory.  When defendant encountered difficulties consummating

19  the crime, government agents assisted in finding solutions.  Id.

20  at 375, 381.  The court in Twigg held that the government agents

21  were so involved that their conduct "generated new crimes by

22  defendant merely for the sake of pressing criminal charges against

23  him when, as far as the record reveals, he was lawfully and

24  peacefully minding his own affairs."  588 F.2d at 381.  The

25  holding in Twigg does not depend upon the latter phrase in the

26  foregoing quotation of the court's holding – that "he was

27  peacefully minding his own affairs."  The court thought it

28

- 14 -

outrageous that the government's involvement was so extensive – to the point of actually running the laboratory by the informant that "fundamental fairness" required that a "crime so fomented by them" would be barred.

In the instant case, the government initially targeted defendant Lopez Alvarez to do a drug deal.  Information from its informant was that defendant Lopez Alvarez was looking for customers that he could supply with cocaine.  When the undercover agent met with defendant Lopez Alvarez, defendant offered to do enforcement work.  When the agent proposed a job "like Camarena," defendant Lopez Alvarez seized the opportunity and provided minute details of how such a plan could be carried out.  The details of how to implement came entirely from defendant.  It was defendant who determined that the agent would be tortured to obtain information, and that the body would be buried at the house where the torture was done.  Indeed, it was defendant who decided that he needed two accomplices to perform the job.  The undercover agent never suggested that defendant obtain other accomplices.  Defendant himself went to Mexico and found his two accomplices and brought them to the United States.  In finding defendant Lopez-Alvarez and his two co-defendants guilty of conspiracy to murder and kidnap the intended Customs Agent, the jury concluded that defendant Lopez Alvarez and his two accomplices intended to follow through with the plan.

Significantly, the government had no involvement in the actual crime charged of conspiracy.  Unlike Twigg where the government actually ran the laboratory, the government never even suggested

– 15 –

that defendant Lopez Alvarez use accomplices. For the conduct in this case to equal the government involvement in Twigg, the government would have had to recruit defendant Lopez Alvarez's accomplices and then persuaded them to join in the conspiracy. Obviously, the government never did this. The government provided the opportunity - the offer to do the kidnap/murder for hire and defendant Lopez Alvarez and his accomplices engaged in the conspiracy by themselves.

The government supplied cash for air fare and expenses and ultimately provided weapons. That type of assistance have frequently been approved by reviewing courts as necessary in acting out the undercover role. E.g., see Emmert, 829 F.2d at 812 (intimidation, large sums of money are necessary to create credible cover for undercover agents). In any event, defendant Lopez Alvarez himself demanded the specific weapons that he wanted. The reason the undercover agent obtained the weapons was because it was more convenient for him to do so. In his undercover role, it would have been difficult to insist that defendant Lopez Alvarez obtain them, when it was obviously easier for the undercover agent in his role as a drug trafficker in Los Angeles to obtain them. By supplying the weapons, the government also maintained a higher degree of safety during the course of the investigation than might otherwise have been the case. (The weapons were inoperable).

In any event, the weapons were not critical to the crime charged. Defendant Lopez Alvarez ultimately could have obtained his own weapons. Moreover, as graphically explained by defendant

- 16 -

1   Lopez-Alvarez and his accomplices during video-taped
2   conversations, they were very capable of killing without
3   sophisticated weapons.  They demonstrated on the October 26, 1987
4   videotaped meeting their ability to suffocate a victim.
5   Consequently, the weapons supplied by the government are not
6   analogous to the critical ingredients necessary to run a
7   methamphetimine laboratory as in Twigg.  The conspiracy and its
8   overt acts existed and would have gone forwarded without the
9   government supplying the weapons.  As the court instructed in the
10  Lomas case, the case at bar is not one where the defendants "would
11  not have had the capacity to commit the crimes with which they
12  were charged without the governments assistance".  Lomas, 706 F.2d
13  at 891.  Again defendant Lopez Alvarez would have been able to
14  modify his plans with his accomplices to obtain their own weapons,
15  if the government had not provided them.  The weapons did not
16  interfere with his capacity to conspire and his ability to carry
17  out the plan ultimately.

18      Defendant also relies upon United States v. Batres Santolino,
19  521 F.2d Supp. (744 N.D. Cal. 1981).  In the first instance that
20  case is not controlling upon this court.  Secondly, the facts of
21  Batres-Santolino are significantly different than the case at
22  hand.  In Bartres-Santolino the court's most significant finding
23  was that the defendants were utterly incapable of being able to
24  accomplish the objective of importing cocaine into the United
25  States and thereafter to distribute that cocaine.  The court found
26  that no criminal enterprise involving defendants existed until
27  contacted by the informant and "the defendants had no organization

28                          - 17 -

1  or ability to smuggle drugs into the United States." 521
2  Fed.Supp. at 752. The court found that defendants had had no
3  foreign sources of supply of their own whatsoever. "As obvious
4  novices, it [was] inconceivable that they could have entered the
5  secretive world of international drug smuggling on their own."
6  Id. The government in that case was actually on both sides of the
7  transaction. The government agents proposed suppliers to
8  defendants and they indicated that they could help with the
9  distribution of the drugs once in the United States. Id. at 749.

10  Obviously the facts of Batres-Santolino are far different than
11  the ones presented by this case. The government had information
12  that defendant Lopez Alvarez was looking for cocaine customers.
13  The government had information that defendant Lopez Alvarez was
14  involved in the Camarena murder. When defendant Lopez Alvarez
15  solicited the undercover agent for enforcement work, the agent
16  provided an opportunity. Defendant Lopez Alvarez, on his own,
17  without the assistance or prodding of an informant, recruited his
18  accomplices and traveled to the United States. The jury found
19  that the three intended to commit the kidnapping and murder of the
20  Customs agents. As indicated previously, Lopez Alvarez was
21  extremely capable of performing the acts of kidnapping, torture,
22  and murder. His capacity never depended upon the government's
23  involvement. The government's facilitation through airline
24  tickets and weapons did not establish the defendant's capacity to
25  do the crime. He already possessed that capacity. Consequently,
26  the Bartres-Santolino case is also inapposite.

27

28

- 18 -

C.  The Government May Target Someone Who Is Not Engaged or
    Contemplating Criminal Activity

Defendant argues that he was not engaged in criminal activity
and therefore that the government improperly targeted him.  As
indicated previously, the government possessed information that
defendant was looking for customers for cocaine and that he had
been involved in the Camarena murder.  It was entirely appropriate
to target him for a narcotics investigation.  When he offered his
services as a "hitman", it was entirely appropriate for the
government to target him also for a kidnap/murder.

In any event, the Ninth Circuit has held that it is not
outrageous when the government target an individual who is not
engaged in criminal activity or contemplating such activity and
who does not even have a criminal history.

In United States v. Emmert, 829 F.2d 805, 806-819 (9th Cir.
1987), an individual was initially targeted and the government had
no information of any wrongdoing on his part whatsoever.  In that
case an undergraduate college student named Thomas Powell was
approached by a confidential informant named Martin Mosteller.
Mosteller offered Powell a $200,000 finder's fee for locating a
substantial supply of cocaine.  Mosteller first approached Powell
to find a cocaine supplier "because he believed Powell attended a
party at which cocaine was used."  Id. at 807.  After several
inquiries by Mosteller about a supplier of commercial quantities
of cocaine, Powell introduced his roommate Walter Emmert to
Mosteller as a person who "might know" of someone that could help
find a supplier.  Mosteller at that particular meeting offered

- 19 -

both Powell and Emmert a $200,000 "finders' fee" for introducing him to someone who could sell him forty kilograms of cocaine. Powell later informed Mosteller that he and Emmert were incapable of putting together the proposed drug transaction.

Nonetheless, Mosteller persisted and arranged another meeting that was held in July 1984. The next day Emmert provided the undercover agent (who had been introduced by Mosteller as the buyer) with a sample of cocaine. Further meetings in August failed to produce a cocaine deal as had been discussed. In August, at a meeting, government undercover agents expressed anger that Powell and Emmert could not arrange to supply the cocaine and used threatening language against defendants. Even so, the deal could not go forward.

Afterwards, on September 6, 1984, Mosteller (the informant) tried to put the deal back together and threatened Powell that he and Emmert had one week to make the sale they previously discussed "or else." 829 F.2d at 807. Finally on October 23, 1984, a deal was consummated for which defendants were arrested. The Ninth Circuit rejected defendant's claims of outrageous government conduct. The court in Emmert was not bothered by the initial approached to Powell, an individual who was not engaged in any wrong doing whatsoever, other than possibly having attended a party where cocaine was available. In fact, the district court made a specific finding that there was no evidence that Emmert or Powell had been involved in prior drug transactions. Emmert was not initially targeted at all and only became a target when Powell introduced him to the informant.

- 20 -

The government submits that Emmert stands for the proposition that it is not outrageous conduct for the government initially to target an individual for whom the government has o evidence of wrongdoing. See also, United States v. Citro, 842 F.2d 1149 (9th Cir. 1988) (government informant raised idea with defendant regarding a credit card scheme; there was no evidence on the record that defendant was previously engaged in this activity; court found no outrageous conduct even though government raised the idea of illegal conduct and supplied counterfeit credit cards). Clearly under the holdings in Emmert and Citro, there is no basis for defendant's claim that targeting him was improper. In any event, the government has far more evidence for targeting Lopez-Alvarez than the government had in other cases.

D. **The Informant Disengaged From the Venture, Therefore There Is No Issue Regarding Coercion**

By defendant's own admission on cross-examination, the informant disengaged himself from the plan to kidnap and murder after October 15, 1988. The informant had no influence upon defendant Lopez Alvarez after that point. The informant did not participate in recruiting the accomplices nor did he conspire with them. (Defendant Lopez-Alvarez never mentioned even splitting the money to be received with the informant in his testimony.)

Consequently, defendant cannot claim mental or any other form of coercion. Even if the informant, in some way disregarded DEA's instructions, the situation would be similar to the Simpson case, where the government's informant had a sexual relationship with defendant and apparently used her personal influence to prod his

- 21 -

participation in the crime.  813 F.2d at 1462.  In that case the government was not held responsible for the informant's failure to observe the government's directions.

IV

CONCLUSION

For the foregoing reasons, the government respectfully requests the court to deny defendant's motion.

- 22 -

## DECLARATION OF BILL TERRAZAS

I, BILL TERRAZAS, hereby declare as follows:

1. I am a Special Agent (S/A) with the Drug Enforcement Administration (DEA). I am currently assigned to the resident office in Guadalajara, Jalisco, Mexico and have been so assigned for the past eighteen months. I was given the assignment of coordinating the informant's activity as controlling agent.

2. In August 1987, I was contacted in Guadalajara, Mexico, by the informant in this case. The informant had previously informed me and other agents that an individual named Raul Lopez-Alvarez was looking for buyers for cocaine that he would supply. He told me that Raul Lopez-Alvarez had accepted his invitation to travel to Los Angeles, California for the purpose of meeting S/A Abel Reynoso (Los Angeles DEA). The informant told me that he had told Raul Lopez-Alvarez that S/A Reynoso was interested in buying large amounts of cocaine. The informant realized S/A Reynoso would pose in an undercover capacity as a cocaine dealer.

3. The informant had previously been instructed that his "official role" was to set up a meeting and introduce defendant Lopez to S/A Reynoso in Los Angeles. I told him that he should travel with Lopez-Alvarez to Los Angeles, California. I told the informant that DEA would arrange for the travel expenses.

4. At this time I also told the informant that he was not to handle cocaine in any fashion, that he should not negotiate any prices or qualities of any drugs, and that he should not engage in any illegal activities to further the investigation. I also told

- 16 -

the informant that he was not to consider himself a DEA special agent nor act like one. I also told the informant that he should report all developments to me.

. 5. To my knowledge the informant followed the foregoing instructions explicitly. Neither I nor any special agent to my knowledge ever instructed or suggested in any way to the informant that a murder-for-hire be discussed with Raul Lopez-Alvarez.

Further, neither I nor any special agent to my knowledge ever instructed the informant to pretend that he wanted to "rip off" or simply steal money from the undercover agent. I have no knowledge or information that the informant ever tired to perpetrate such a scheme.

6. After October 6, 1987, I instructed the informant not to see or speak to Lopez-Alvarez unless he came to see him. To my knowledge, the last time the informant saw or spoke to Lopez-Alvarez was on October 6, 1987.

7. I reviewed with the informant all of the allegations contained defendant Lopez' declaration to support his motion for outrageous government conduct. The informant denied categorically all of Lopez' allegations that he somehow "tricked" or "set up" Raul Lopez-Alvarez. The informant denied that he originated the plan and that he somehow coached Lopez. The informant stated that he understood from Lopez that he (Lopez) intended to set up a drug deal with S/A Reynoso. The informant told me that he never told Lopez-Alvarez what to say to S/A Reynoso and that Lopez-Alvarez acted completely on his own. The informant also stated that

- 17 -

1

2   Lopez-Alvarez brought the sample of cocaine from Guadalajara by

3   himself.  The informant denied emphatically that he purchased the

4   cocaine himself.

5       I declare under penalty of perjury that the foregoing is true

6   and correct to the best of my knowledge.

7       DATED:    This _____ day of February, 1988.

8

9
                              _____
10                             BILL TERRAZAS

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                              —  18  —

28

## DECLARATION OF ABEL REYNOSO

I, ABEL REYNOSO, declare as follows:

1. I am a Special Agent with the United States Department of Justice, Drug Enforcement Administration assigned the Los Angeles Division for approximately 2 1/2 years.

2. On August 12, 1987 in Mexico City, I met with a confidential informant, and was told by this individual that he/she had knowledge of a person who could possibly provide large quantities of cocaine. At this time I asked the informant, if possible, to arrange with defendant a meeting with me in Los Angeles, California for the purpose of negotiating a drug deal.

3. During this meeting with the confidential informant a murder-for-hire was never discussed. I did not speak to the confidential informant again, until the actual meeting between Raul Lopez-Alvarez and myself took place on September 3, 1987 in Los Angeles, California.

4. The only other time in which I had an opportunity to speak with the informant was on September 30, 1987. During a tape recorded telephone conversation Raul Lopez-Alvarez agreed to return to Los Angeles for further narcotics negotiations. Also during this conversation, I told the informant to remain in Guadalajara, Mexico, and to allow me to continue the negotiations directly with Raul Lopez-Alvarez.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED: This _____ day of February, 1988.

_____
ABEL REYNOSO
- 19 -

UNITED STATES V. RAUL LOPEZ-ALVAREZ
CARLOS QUINTERO-MALDONADO
FABIAN JIMENEZ-MARTINEZ

NO. CR 87-919-PAR

Elsa Leyva, DFPD,
Office of Federal Public Defender
312 N. Spring Street
15th Floor
Los Angeles, CA 90012

Alan Rubin
5850 Canoga Avenue
Woodland Hills, CA 91367

Marcia Brewer
9911 W. Pico Blvd.
Los Angeles, CA 90035

# A F F I D A V I T

I, Douglas W. Kuehl, being duly sworn hereby depose and say:

1.    I am a Special Agent (SA) with the United States Department of Justice, Drug Enforcement Administration (DEA). I am currently assigned to the Los Angeles Field Division. I have been so employed by DEA for approximately eighteen years. I am assigned to the investigation into the kidnap/murder of DEA S/A Enrique Camarena.

2.    This affidavit is made in support of a complaint against Raul Lopez-Alvarez; Carlos Quintero-Maldonado and Fabian Jimenez-Martinez for Conspiracy to Murder a Federal Agent in violation of Title 18, United States Code, Sections 1117 and 1114.

3.    I have been made aware of the following by DEA SA Abel Reynoso: that on August 12, 1987, SA Reynoso debriefed a confidential informant (C/I) who stated that he/she had been approached by Raul Lopez-Alvarez, who had been recently released from a Mexican prison after serving approximately one (1) year for his participation in the kidnap/murder of DEA Special Agent Enrique Camarena in Guadalajara, Mexico in February of 1985.

4.    The C/I stated that Lopez was a member of the Ernesto Fonseca Organization in Mexico and was looking for customers to sell cocaine. SA Reynoso then asked the C/I if he could arrange a meeting between Lopez and SA Reynoso in Los Angeles, California. SA Reynoso would be posing as a prospective cocaine buyer in . Los Angeles.

5.   On September 1, 1987, I was notified by the Guadalajara DEA office that the C/I and Lopez would be travelling to Los Angeles, California to meet with SA Reynoso to negotiate for the purchase of a large amount of cocaine.  Lopez and the C/I arrived in Tijuana on September 2, 1987 and were surveilled from the Tijuana airport, to the San Ysidro Port of entry.  Lopez was followed by San Diego and Los Angeles DEA Agents to an apartment complex located at 616 Via Altamira #C, Montebello, California.

6.   On September 3, 1987 SA Reynoso met in an undercover capacity with the C/I, who introduced SA Reynoso to Raul Lopez-Alvarez.  The meeting took place at the "Quiet Cannon" restaurant in Montebello, California.

7.   During the meeting Lopez told SA Reynoso that he was in fact a member of the Ernesto Fonseca and Rafael Caro Quintero Organization and that he had been recently released from a Mexican prison for serving over one year for his involvement in the kidnap/murder of DEA Agent Camarena.

8.   Lopez said that he could supply SA Reynoso with any amount of cocaine because he was very well connected in Guadalajara, Mexico, and that his organization had large quantities of cocaine available to be delivered in Los Angeles, California.

9.   Lopez also said that before any deals could take place he would return to Mexico and would meet with Fonseca who is presently in a Mexico City prison for his role in the Camarena murder.  Lopez said that if Fonseca approved selling SA Reynoso

- 2 -

cocaine then the negotiations would continue.  Lopez also said that Fonseca had already spent over a million dollars in payoffs for his legal defense and still needed another $600,000 U.S. dollars to complete all payoffs.

10.  SA Reynoso then asked Lopez how much he would charge SA Reynoso for a kilogram of cocaine, keeping in mind that SA Reynoso was buying multi-kilograms.  Lopez said that he would have to discuss that with his people in Mexico, before giving SA Reynoso any prices, but that a kilogram of cocaine in Guadalajara was from $17,000 to $19,000 U.S. dollars.  Lopez said that delivery in Los Angeles would raise the price.

11.  During the conversation Lopez also said that he used to be a State of Jalisco Police Officer and he was also a bodyguard for Fonseca.  In fact, Lopez said he used to take care of undesirable individuals by kidnapping, torturing and then killing them.  Lopez said that he could help SA Reynoso if SA Reynoso had any need for his expert services.

12.  At this time SA Reynoso told Lopez that he might be able to use him, and SA Reynoso asked Lopez to tell him some more about his expertise as a "hit man".  Lopez said that he was an expert at kidnapping, torturing, and killing people, and that was his job when he was a Jalisco State police officer.  Lopez also said that when SA Reynoso was ready he would go back to Mexico and would bring two other individuals who were also experienced in this area to assist him.

13.  SA Reynoso then asked Lopez how much he would charge SA Reynoso for a job similar to the one of S/A Camarena.  Lopez said

cocaine then the negotiations would continue.  Lopez also said
that Fonseca had already spent over a million dollars in payoffs
for his legal defense and still needed another $600,000 U.S.
dollars to complete all payoffs.

10.  SA Reynoso then asked Lopez how much he would charge SA
Reynoso for a kilogram of cocaine, keeping in mind that SA Reynoso
was buying multi-kilograms.  Lopez said that he would have to
discuss that with his people in Mexico, before giving SA Reynoso
any prices, but that a kilogram of cocaine in Guadalajara was from
$17,000 to $19,000 U.S. dollars.  Lopez said that delivery in Los
Angeles would raise the price.

11.  During the conversation Lopez also said that he used to
be a State of Jalisco Police Officer and he was also a bodyguard
for Fonseca.  In fact, Lopez said he used to take care of
undesirable individuals by kidnapping, torturing and then killing
them.  Lopez said that he could help SA Reynoso if SA Reynoso had
any need for his expert services.

12.  At this time SA Reynoso told Lopez that he might be able
to use him, and SA Reynoso asked Lopez to tell him some more about
his expertise as a "hit man".  Lopez said that he was an expert at
kidnapping, torturing, and killing people, and that was his job
when he was a Jalisco State police officer.  Lopez also said that
when SA Reynoso was ready he would go back to Mexico and would
bring two other individuals who were also experienced in this area
to assist him.

13.  SA Reynoso then asked Lopez how much he would charge SA
Reynoso for a job similar to the one of S/A Camarena.  Lopez said

- 3 -

that if the victim was a civilian it would probably cost $10,000 U.S. dollars. But if he was a police officer because of the risk involved it would cost $25,000 U.S. dollars.

14. SA Reynoso asked Lopez if he knew about S/A Camarena's case and if he could do something like that. Lopez said that it was a serious matter, but that he was a expert and he could do it. Lopez said that he would first kidnap the victim, with the help of his two associates, put him in a van, take him to a secluded house, where he would be first severely beaten to soften him up. Then depending on the victim's resistance to the torture they would pour soda water into his nose, with his mouth gagged. A cattleprod would be used, or a cut electrical extension cord to give electrical shocks in the genital area. If SA Reynoso wanted the victim to be blind for life they would cut a lemon in half, placing it on the victim's eyes. They would tape the lemon to the victim's eyes for four or five hours. Lopez said the citric acid would burn the eyes blinding the victim forever.

After the torture was over, Lopez said the victim would be shot in the head, once with a .45 caliber handgun; Lopez said that was his "trademark". They would then bury the body in the backyard of the torture site. Lopez said that these techniques were similar to the ones used on S/A Camarena. SA Reynoso told him he would discuss the matter with his superior and then SA Reynoso would get in touch with him.

15. SA Reynoso asked Lopez to bring him one kilogram of cocaine from Mexico. SA Reynoso promised to purchase it if he

- 4 -

would deliver it in Los Angeles. Also, by then SA Reynoso should know about the kidnapping to be performed by Lopez. Before leaving, Lopez handed SA Reynoso a small white paper bindle containing a white powder substance alleged to be cocaine. Lopez said that it was a free sample for SA Reynoso to see the quality of his product. Lopez also told SA Reynoso that he could contact Lopez at his mother's house telephone #(213) 725-2544 if he needed anything else. Lopez said he was staying there. Subsequently during a follow up investigation I learned that the above telephone number belonged to an apartment located at 616 Via Altamira #C, Montebello, California.

16. On September 30, 1987 SA Reynoso received a telephone call from Lopez from Guadalajara, Mexico. Lopez said that he was ready to do business, but that his people requested to have the money fronted for the first buy of a kilogram of cocaine. SA Reynoso told him that he would talk to his people, then SA Reynoso would give him the money if they agreed. SA Reynoso asked Lopez to come up to Los Angeles to pick up the money and to discuss the details of the kidnapping. Lopez said he would come up right away if SA Reynoso sent him the money. SA Reynoso told him that he would make arrangements for him soon.

17. On October 6, 1987 I was notified by the Guadalajara DEA Office that Lopez was on his way to meet SA Reynoso in Los Angeles. However Lopez did not contact SA Reynoso until October 8, 1987. Because of other previous committments SA Reynoso told Lopez that they would not be able to meet until October 14, 1987. Lopez agreed to wait saying that he was ready to deal.

- 5 -

18.  On October 14, 1987 Lopez called SA Reynoso and he asked him to meet SA Reynoso at the corner of 3rd Street and Broadway Street in downtown, Los Angeles.  At approximately 3:30 p.m. SA Reynoso picked up Lopez at the pre-arranged location and they went to the Bonaventure Hotel in Downtown Los Angeles.

19.  During the conversation Lopez told SA Reynoso that he was ready to sell him one kilo of cocaine, but he needed to have the money first, because his people wanted to be reassured that SA Reynoso was able to do large purchases.  Lopez said that once the first transaction took place, he would be able to deliver from (5) five to (10) ten kilograms per month in Los Angeles and SA Reynoso could pay him at the time of the delivery.

20.  Also during the conversation SA Reynoso asked Lopez if he had checked around for weapons to be used in the kidnapping. Lopez said he had, but it would be better if SA Reynoso could purchase them; SA Reynoso said he would check around.

21.  SA Reynoso then asked Lopez to tell him what would be needed to do a successful operation:  kidnap/torture/murder. SA Reynoso told him he was interested in having this law enforcement individual kidnapped and murdered in the same manner as S/A Camarena.  Lopez said he would need a business van with signs painted on the side, like bakery, plumbing etc.  That way it would be inconspicuous.  Lopez also wanted a four door police type vehicle.  The vehicle would be used for surveillance and the actual kidnapping of the officer.  Lopez also wanted three (3) guns, preferably .38 special revolvers and a machine gun, 9 mm UZI

- 6 -

fully automatic or a 223 rifle M16 with (4) clips.  Two silencers would also be needed.  Lopez said that if any problem developed during the kidnapping, the machine gun would be very useful because he and his men would not want to be taken alive.

22.  With regards to other items to be needed to perform the kidnapping, Lopez said that he would need a house, maybe in South Central Los Angeles where the officer would be taken to be tortured and murdered.  Lopez also requested that in the house he needed sufficient food supply for him and his men for the duration of the torture, i.e., a day and one half.

23.  Lopez also requested one cattleprod to give the victim electrical shocks during questioning.  Lopez said he would also need two (2) cases of unflavored soda water.  The soda would be given to the victim via his nose while his mouth was gagged.  Lopez also requested plastic handcuffs for restraining the victim.  Lopez said that the metallic handcuffs had serial numbers on them and could be traced.  In addition, Lopez requested bandages, a chair, a high intensity lamp.  Lopez further requested 9 body bags to put the victim's body in, once he was killed; one pick and (2) two shovels to dig a grave for the body, possibly in the back yard of the torture location.  Finally, Lopez asked SA Reynoso for a tape recorder for recording the torture; that way, SA Reynoso's bosses would be able to hear the answers to the questions.  Lopez said that S/A Camarena's torture was taped but that Lopez's bosses were present during the questioning.

24.  SA Reynoso then asked Lopez how much money would he estimate the total cost of the expense.  Lopez said that he would

need about $3,000 U.S. dollars to go to Mexico and return to the U.S. with his associates, because he would have to smuggle them through the border, and pay for hotel and clothing. Lopez then said the weapons if he purchased them would cost him about $1,500 U.S. dollars, and then he would need another $500.00 to purchase the other miscellaneous items. Lopez said that it would not be more than $5,000 U.S. dollars for expenses. SA Reynoso told him he would talk to his people, present them the plan and he would call him back the next day.

25.  Before leaving, Lopez insisted that SA Reynoso should not worry about anything because he was an experienced and responsible individual. Lopez said that he had done jobs like this one many times before. Lopez said that the people helping him are also very experienced in kidnapping, torturing and murdering, and that they were not afraid of anything.

26.  On October 15, 1987 SA Reynoso received a telephone call from Lopez saying that he had checked on the price of the weapons and it would cost him about $1,500 U.S. dollars. Lopez then insisted it would be cheaper, easier and less risky if SA Reynoso obtained the guns for him. During this conversation SA Reynoso asked Lopez again if he was sure that he knew what he was doing and if he was sure that he wanted to do the job. SA Reynoso told Lopez that the victim was a U.S. citizen, and a federal agent with the U.S. Customs. Lopez laughed and said it didn't matter, that it was fine that he and his men were ready. SA Reynoso told him that he could call him later that day to meet with him. Lopez said he would wait.

- 8 -

27.  On October 15, 1987 in the afternoon, SA Reynoso contacted Lopez via telephone and asked him to meet him at the Flower Street entrance of the Bonaventure Hotel at about 4:00 p.m.

28.  At approximately 4:00 p.m. Lopez arrived at the Bonaventure Hotel and SA Reynoso took him up to a DEA undercover room.  SA Reynoso asked Lopez if he was ready, Lopez said he was, and SA Reynoso asked him about the guns; Lopez said it would be better if SA Reynoso got them for him.  Lopez said that if SA Reynoso wanted the victim killed from a distance he had a 223 caliber rifle with the scope here in Los Angeles, but that the machine gun was hard for him to get.  Lopez said he would get the rest of the equipment for the torture if SA Reynoso would get him the money.

29.  SA Reynoso then again asked Lopez if he was sure that he wanted to do the job because the victim was a U.S. citizen and a federal agent.  Lopez said it was not a problem, that the U.S. is a big country and its easy to get lost.  Besides, Lopez said that getting killed was part of the job of law enforcement agents, it was not a big deal.

30.  SA Reynoso then asked Lopez how long would it take him to get ready to do the job.  Lopez said once he had the money he would go to Mexico and bring up his two associates, it would take him one week to return to Los Angeles.

- 9 -

31.  SA Reynoso again asked Lopez to tell him how he was going to make the victim talk.  Lopez said that the victim would be beaten to soften him up.  Soda water would be poured through his nose to suffocate him and electrical shocks would be given either with a cattleprod or a cut electrical extension wire plugged into a regular electrical socket.

32.  Lopez said he would need a list of questions to be asked of the victim during the torture.  SA Reynoso asked Lopez how was he going to ask the victim follow up questions, and Lopez replied that it would be better if one of SA Reynoso's people or SA Reynoso was present during the torture.  Lopez said that it didn't matter if the agent recognized SA Reynoso, because after the torture he would be killed anyway.

33.  SA Reynoso then gave Lopez $3,000 U.S. dollars for expenses.  Lopez took the money and said he would return in a week.  Lopez said he would try to leave Los Angeles the same night.  Lopez said that he would bring his two associates and would then contact SA Reynoso.

34.  On October 21, 1987 Lopez called SA Reynoso collect at the undercover telephone and told him that he was in Tijuana, Mexico with his two associates and, that he was going to try to cross the border that same night.  Once in the U.S. Lopez said he would call SA Reynoso.

35.  On October 22, 1987 Lopez called SA Reynoso and said that he had arrived in Los Angeles, with his associates.  Lopez said that they had a hard time crossing the border in Tijuana, so they

-  10  -

went to Yuma, Arizona to cross.  Lopez said that they would stay in a hotel overnight and that he would call SA Reynoso the next day; and that they were ready to do the job.

36.  On October 23, 1987 Lopez called SA Reynoso and asked him to meet with him.  SA Reynoso told Lopez he would call him later to give him a time and a location.  Later that day SA Reynoso called Lopez and he told him that he could meet him at 1:30 p.m. Lopez asked SA Reynoso to pick him and his men up at the corner of Garfield Avenue and Victory at the Victory Liquor store parking lot in Montebello, California.

37.  At approximately 1:30 p.m., SA Reynoso went to the agreed location and met Lopez and two other male Mexicans, who identified themselves as "Carlos" and "Fabian".  SA Reynoso picked them up and drove them to the parking lot of the Quiet Cannon Restaurant in Montebello, California.

38.  In the parking lot Lopez, Carlos and Fabian briefly discussed with SA Reynoso how they were going to do the kidnapping.  Fabian stated that Lopez was in charge and he would call the shots.  Fabian then asked SA Reynoso if he knew how the payment was going to take place, i.e., half in the morning before the job and the balance paid after the torture-murder.  Lopez said that SA Reynoso already knew.

39.  Carlos then said that they were ready.  He said "let's do it fast Sinaloa style", and motioning with his hands, as if he was firing a machine gun, making a simulated sound like that of an

- 11 -

automatic weapon. Carlos said that he wanted to kill the victim right away so they get it over with, and go back to Mexico.

40. Lopez said that they wanted the victim to talk first. Fabian said he would take care of that, that he would make the victim scream, that was his expertise. Carlos said not to waste time just kill him on the spot, but Lopez said they would wait to see what happened. If the victim resisted they would have to kill him on the spot.

41. SA Reynoso asked them if they were ready. They laughed and said that they were ready and that they had plenty of practice and experience and that they wanted to do this job quick so they could go back to Mexico, because they had a lot of work down there, that they made a lot more money. Carlos said that they were doing this one as a favor for Lopez because the money wasn't that great.

42. SA Reynoso then gave Lopez $800 U.S. dollars and $100 U.S. dollars each, to Carlos and Fabian. SA Reynoso told Lopez that he could buy the needed tools to do the job and should have everything for Monday. On Monday SA Reynoso would call Lopez to arrange a meeting to finalize all details. Lopez, Carlos and Fabian said they were ready and anxious to do it, and would wait for SA Reynoso's call. Before the meeting was over Carlos asked SA Reynoso if he could get him some marihuana. SA Reynoso told Lopez that he did not have a connection. Lopez said that he would

get them some for the weekend.  At this time SA Reynoso drove them back to the Victory Liquor parking lot.  Surveillance units thereafter followed them to 616 Via Altamira #C in Montebello, California, Lopez' mother's residence.

43.  On October 26, 1987, SA Reynoso met with Raul Lopez, Fabian Jimenez-Martinez and Carlos Quintero-Maldonado at the Vagabona Inn in Rosemead, California, to discuss details regarding the kidnapping and torture-murder of the U.S. Customs Agent.

44.  At this meeting, SA Reynoso displayed to Raul Lopez, Fabian Jimenez-Martinez and Carlos Quintero-Maldonado the weapons he had obtained for them.  All three individuals inspected the weapons and stated that they were ready to proceed with the plan to kidnap the federal agent that evening or the following morning.

45.  SA Reynoso also displayed to the three suspects a photo of the U.S. Customs Agent wearing his U.S. Customs uniform.  The three suspects each examined the photo.

46.  SA Reynoso shortly thereafter left the motel room.  The three suspects were then placed under arrest.


DOUGLAS W. KUEHL
Special Agent
Drug Enforcement Administration


Sworn and subscribed to before me

this _____ day of October, 1987.


United States Magistrate
Central District of California

- 13 -

# VOICES ON AUDIO TAPE

## SEPT 3, 1987

V-1    SA WAYNE SCHMIDT

V-2    UNK

V-3    S/A ABEL REYNOSO

V-4    C/I

V-5    RAUL LOPEZ - ALVAREZ

**EXHIBIT A**

## DISCLAIMER

The translation of these tape recorded materials is based upon the recording as heard on the particular transcribing equipment used and upon the context of the conversation as understood by the translator.

The different voices as heard by the translator are denoted as V1, V2, etc.   "UV" means "unidentifiable voice."

[un] indicates that the voice is unintelligible to the translator.

This transcript is a revision of the previously submitted transcript.

1-26-88
Date

Greg Clinton
Greg Clinton

V3:   Un paquetazo en un lugar aquí.

V5:   O allá más cerquita.

V3:   O allá.

V5:   Pero de este lado.

V3:   [un]

V5:   Es que todo [un] casos de que ha caído en casas [un] ha caído en la pinche -- en la mesa de comer. [un]

V3:   ¡Ay, cabrón! [un] perico ahí [un]

V5:   Así es.

V3:   Esto -- eso sí se puede hacer.

V5:   También.   ¿Verdad?

V3:   O sea, lo -- lo importante es poder hacer [un]

V5:   Mira, yo -- yo voy y hablo con él.   Si se hace.   Lo -- lo -- lo demás, a ver cómo le hacemos.   Si él dice que sí, sí nos arriesgamos.   Si él me dice vayan ustedes --

V3:   No, riesgo no hay.   ¿Sabes lo que pasa?   Yo no quiero riesgo. Lo que quiero es [un]

V5:   Eso es de parte de nosotros.

V3:   A package drop some place here.

V5:   Or over there closer by.

V3:   Or over there.

V5:   But on this side.

V3:   [un]

V5:   But every [un] cases of it falling on houses [un] has fallen on the darn -- on the dining table [un]

V3:   Oh, man! [un] parakeet there [un]

V5:   That's right.

V3:   This -- that could be done.

V5:   Also, right?

V3:   I mean, the -- the important thing is to be able to do [un]

V5:   Look, I -- I'll talk with him.   It'll be done.   The -- the -- the rest, we'll see how.   If he says yes, we'll risk it.   If he tells me for you to go --

V3:   No, there's no risk.   You know what happens?   I don't want risk.   What I want is [un]

V5:   That is on our part.

V3:  Si.

V5:  [un] que sea ahi.

V3:  Claro, no, pero ¿qué pasa si ustedes traen cola?  Nos agarran a nosotros también aquí también.  Ese es el problema. ¿Me entiendes?

V5:  No, no.  En cola -- en cola, pues ya tenemos nosotros experiencia en cola porque también [un] cola.

V3:  Eso es cierto.  [un] todo eso es bueno.

V5:  En todo eso, ya -- ya de [un]

V3:  Claro, de ahi [un] a trabajar.

V5:  Y al mismo tiempo [un]  Y también hacemos trabajitos acá de [un] cosas.

V3:  ¿Oh, si?  [un]

V5:  ¿Reyes no te molesta?

V3:  No, no. Reyes [un]

V5:  ¿Los quieres empaquetados?

V3:  Two more.

V6:  [un]

V3:  Yeah.

V6:  [un]

V3:  No, no.  I'm fine. Thanks.

V3:  Yes.

V5:  [un] be there.

V3:  Of course, no, but what happens if you're tailed?  They'd get us too as well here also.  That's the problem.  Understand?

V5:  No, no.  With tails -- with tails, we've got experience with tails because also [un] tail.

V3:  That's true.  [un] that's all good.

V5:  In all that, now -- now from there [un]

V3:  Of course from there [un] to work.

V5:  And at the same time [un]  And we also do little jobs here in [un] things.

V3:  Oh, really?

V5:  Does Reyes bother you?

V3:  No, no. Reyes [un]

V5:  Do you want them packaged?

V3:  Two more.

V6:  [un]

V3:  Yeah.

V6:  [un]

V3:  No, no.  I'm fine. Thanks.

V3:  No, pero ya ves en México
no pasa nada.

V5:  Pues, cierran las
ronteras.

V3:  No, pero -- pero [un]
jigo no [un] un pinche [un] alli
[un] una -- un trabajito como este,
entonces si que te compro o te mando
todo lo que quieres allá de equipo.

V5:  ¿Allá en México?

V3:  No, aquí.  Pero [un] allá
te mando todo.

V5:  [un]

V3:  Mándame el cargamento
ado [un] dinero.  Porque entonces
si operaria eso con más libertad

V5:  [un]

V3:  Uh-huh.

V5:  [un] diez mil dólares.

V3:  Ahorita te los doy.  Eso
no es problema.  Que eso -- a ver
cómo está porque no [un]

V5:  [un] es que traen pistola.

V3:  No, si, si, trae pistola.

V5:  O sea la -- la cosa es
ayarrarlo descuidado, subirlo al

V3:  No, but you know in Mexico
there nothing happens.

V5:  Well, they close the
borders.

V3:  No, but -- but [un] I mean
no [un] a darn [un] there [un] a --
a little job like this one; then I
would buy you or send you everything
you want there in equipment.

V5:  There in Mexico?

V3:  No, here.  But [un] there
I'd send you everything.

V5:  [un]

V3:  Send me the shipment when
[un] money.  Because then that would
operate with more liberty.

V5:  [un]

V3:  Uh-huh.

V5:  [un] ten thousand dollars.

V3:  I'll give them to you
right now.  That's no problem.
That -- see how it is because no
[un]

V5:  [un] the thing is they
carry guns.

V3:  No, yes, yes, he has a
gun.

V5:  I mean the -- the thing is
to catch him off his guard, get him

carro y ya tener una casa, un lugar

- ya definido dónde se va a

hacer [un]

V3:  ¿Cuántas casas necesitas?

O sea, cuando lo agarras, te lo

llevas a un solo lugar o mejor [un]


V5:  A un solo lugar.  Allí

se amarra, se le hace lo que tú

pediste, ¿verdad?  Y, este, dea ahi

[un]

V3:  Okay, mira -- pero, mira,

aquí no es México.  Aqui que hay

.a pinche gente [un] Bueno, seria

tión [un]

V5:  [un]

V3:  Si me interesa.  Eso me

interesa más --

V5:  O seria más fácil no más

darle -- seria más fácil no más [un]


V3:  [un]

V5:  Porque -- porque --

V3:  El problema --

V5:  Porque los problemas -- yo

no puedo porque si hay testigos, a

lo mejor forcejea a uno ahi [un] al

tarlo de agarrarlo vivo para

llevarlo a un lugar es más dificil

into the car and then to have a

house, a place already -- already

defined to do [un]

V3:  How many houses do you

need?  I mean, when you get him, do

you take him to just one place or

instead [un]

V5:  To just one place.  There

he's tied up, and what you asked for

gets done to him, right?  And, uh,

then [un]

V3:  Okay, look -- but, look,

this isn't Mexico.  Here where

there's a lot of fuckin' people [un]

Well, it would be a matter of [un]

V5:  [un]

V3:  I am interested.  That

interests me more --

V5:  Or it would be easier to

just give him -- it would be easier

to just [un]

V3:  [un]

V5:  Because -- because --

V3:  The problem --

V5:  Because the problems -- I

can't because if there are

witnesses, maybe there'd be a

struggle there [un] trying to get

him alive to take him some place is

acabarlo alli en el lugar. [un]

oresa [un] ahi aunque sea --
tiene que ser un cuarenta y
nco, una treinta y dos, treinta y
ho.  Nueve milimetros con un
lenciador.  En la noche que salga
su turno.

V3:  Si, pero [un] cabrones
la [un]

V5:  Pero allá le sacamos la
nformacion de que nunca [un]

V3:  Hm.

V5:  Entonces, ¿tú quieres
- lo mismo?

V3:  Yo pensaba que --

V5:  Sacarle la información de
qué es lo que sabe de ustedes.

V3:  Uh-huh.

V5:  [un] entonces, alli vamos
a tener que conseguir una van.  Una
van para -- para echarlo alli.

V3:  Porque ¿sabes qué pasa?
Si -- si lo -- o sea, si lo -- si lo
agarramos de -- si [un] no le
hacemos nada.

V5:  No más lo matan y ya.

V3:  Si, pero --

more difficult than finishing him
off on the spot.  [un] by surprise
[un] there even though -- it doesn't
have to be a forty-five, a thirty-
two, thirty-eight.  Nine millimeter
with a silencer. At night when he
gets off his shift.

V3:  Yes, but [un] fuckers
there [un]

V5:  But there we got the
information out of him that never
[un]

V3:  Hm.

V5:  So then, do you want to do
the same thing?

V3:  I was thinking that --

V5:  ~~Get the information out of
him of what he knows about you.~~

V3:  Uh-huh.

V5:  [un] so then, there we're
going to have to get a van.  A van
to -- to throw him in there.

V3:  Because you know what
happens?  If -- if he -- I mean, if
he -- if we get him by -- if [un] we
don't do anything to him.

V5:  Just kill him and that's
it.

V3:  Yes, but --

V5:  Te lo quitas de encima.

V3:  [un] un diez -- diez mil.
u..., y para hacer un trabajo
ejorcito [un]

V5:  [un]

V3:  [un] tenías que traer más
ente tú, ¿verdad?

V5:  Una -- una persona más.
Jna persona más.  Porque se van a
ocupar dos para agarrarlo [un] y --

V4:  Uno para manejar.

V5:  Y uno para manejar.
Porque él -- casi seguro que
pelear.

V3:  Oye, pero, bueno, bueno.

V5:  Hay que dominarlo.  Ahora
podemos [un]

V3:  [un]

V5:  Sí, sí, claro pero [un]
tenemos que dominarlo. [un]
inyección o algo así pero por
mientras hay que dominarlo entre dos
[un] otro que maneje.


V4:  [un]

V5:  [un] y vámonos.

V3:  [un] se puede hacer
¿cuándo? [un]

V5:  [un]

V5:  You get him off your back.

V3:  [un] a ten -- ten
thousand. [un] and to do a job a
little bit better [un]

V5:  [un]

V3:  [un] you would have to
bring more people, right?

V5:  One -- one more person.
One more person.  Because two will
be needed to grab him [un] and --

V4:  One to drive.

V5:  And one to drive.
Because he -- he's almost sure to
put up a fight.

V3:  Hey, but, okay, okay.

V5:  You have to overcome him.
Now we could [un]

V3:  [un]

V5:  Yes, yes, of course but
[un] we have to overcome him. [un]
injection or something like that but
in the meantime two guys would have
to overcome him [un] another guy to
drive.

V4:  [un]

V5:  [un] and we're off.

V3:  [un] when could it be
done? [un]

V5:  [un]

V3:   [un] un trabajo bien hecho

V5:   [un]

V3:   Yo te pago --

V5:   Y sacarle todo lo que sabe.

V3:   Si -- si se puede, se puede.

V4:   [un]

V3:   O sea [un]

V4:   [un]

V3:   [un] porque ellos [un] trabajo.

(voices unintelligible)

V3:   Entonces, una cosa similar [un] dinero está. [un] mi gente está [un]

V5:   Pues, yo pienso que [un] no menos [un] y ahí tenemos que empezar.

V3:   No, no, no, sí.  Bueno [un] necesitas --

V5:   [un]

V3:   ¿Cuánto tiempo necesitas para organizarte bien tú?

V5:   Una semana [un] no más conseguirnos la casa [un]

V3:   Lo más importante -- lo más importante es que ¿sabes qué?

V3:   [un] a job well done --

V5:   [un]

V3:   I'll pay you --

V5:   And get out of him everything he knows.

V3:   If -- if it can be done, it can be done.

V4:   [un]

V3:   I mean [un]

V4:   [un]

V3:   [un] because they [un] job.

(voices unintelligible)

V3:   So, something similar [un] the money's there. [un] my people are [un]

V5:   Well, I think that [un] no less [un] and there we have to start.

V3:   No, no, no, yes.  Okay [un] you need --

V5:   [un]

V3:   How much time do you need to get yourself well organized?

V5:   A week [un] just get us the house [un]

V3:   What's most important -- what's most important is you know

lo quiero que nadie sepa esto. [un]
er como [un]

V5:  Nadie va a saber aqui.
Inclusive la otra persona ni se te
va a presentar.

V3:  No quiero que vayas a --
por ejemplo que vayas allá a México
y le digas a toda la bola de
cabrones [un] entonces [un]

V5:  [un] el viejo [un]

V3:  Es cierto.  Es lo que --


V5:  [un] tampoco me conviene.


V3:  O sea, lo harías por tu
nta.

V5:  Si [un]

V3:  Porque yo no quiero [un]
¿No se puede hacer eso?  Se puede
hacer.  Eso si me interesa mucho.

V5:  Mira, inclusive, pues,
podemos invitar alguna persona de
ustedes interesada [un]

V6:  [un]

V3:  [un]

V6:  [un]

V3:  No [un]

V5:  Si puedes conseguir --
una -- alguna cama [un]

what?  I don't want anyone to know
about this. [un] it's like [un]

V5:  No one will know here.  In
fact the other person won't even be
introduced to you.

V3:  I don't want you going to
-- for example you going there to
Mexico and telling the whole bunch
of fuckers [un] then [un]

V5:  [un] the old man [un]

V3:  That's right.  That's what
--

V5:  [un] it doesn't behoove me
either.

V3:  You mean you would do it
on your own.

V5:  Yes [un]

V3:  Because I don't want [un]
Couldn't that be done?  It could be
done.  That interests me a lot.

V5:  Look, in fact, well, we
could invite one of your people
interested [un]

V6:  [un]

V3:  [un]

V6:  [un]

V3:  No [un]

V5:  If you could get --
a -- a bed [un]

V3:  Yo te consigo --

/5:  [un] un ranchito --

V3:  Eso yo te lo consigo [un]

V5:  Un ranchito --

V3:  Yo te pongo lo que quieras.

V5:  [un] una van.  Una van [un]

V3:  [un] me puedes traer una gente chingona que [un] trabajo.

V5:  [un] era mi trabajo [un]

V4:  Le dieron al otro compa [un]

V3:  [un]

V5:  [un] amarrado [un] este cabrón no está acostumbrado [un]

V3:  No, no, no, no.

V5:  [un] un pinche cable de ahi de la casa [un] ciento veinte, ciento diez.  No, ese cabrón [un] unos pinches toques en los huevos, en el ano, unos pinches [un] las uñas [un] caliente.

V3:  [un]

V5:  [un] puedo hacer solo.

V3:  Si pero [un] cabrón [un] que aguante [un]

V5:  No, claro [un] que lo agarre o que lo detenga.  De todos

V3:  I'll get you --

V5:  [un] a little ranch --

V3:  I'll get that for you [un]

V5:  A little ranch --

V3:  I'll get you whatever you want.

V5:  [un] a van.  A van [un]

V3:  [un] you could bring me some bad people to [un] job.

V5:  [un] was my job [un]

V4:  They gave the other compadre [un]

V3:  [un]

V5:  [un] tied up [un] this fucker's not used to [un]

V3:  No, no, no, no.

V5:  [un] a fuckin' cable from there from the house [un] one twenty, one ten.  No, that fucker [un] some fuckin' shocks on the balls, in the anus, some fuckin' [un] his fingernails [un] hot.

V3:  [un]

V5:  [un] I can by myself.

V3:  Yes but [un] fucker [un] bear [un]

V5:  No, of course [un] get him or hold him.  Anyway he'll be tied

todos va a estar amarrado y vendado.

. el vato no va a ver -- no va a
ver -- no le vamos a dar tiempo --
en el momento que [un] se va a
vendar y se va a amarrar.

V3:   [un]

V5:   Hay que -- hay que
neutralizarlo.

V4:   [un]

V5:   Hay que -- hay que [un]


V4:   [un]

V5:   Y vendarlo.

V3:   [un]

V5:   Lo que no ve --

V4:   Y ya después [un]

V5:   Y de alli vámonos
derechito [un] ahi para trabajar a
gusto, pega de grito y la chingada.

V3:   No, si.  Eso no es
problema.

V4:   [un]

V5:   Ya -- ya con eso [un]


(voices unintelligible)

V3:   Están aqui no más,
¿verdad?

V4:   Si, aqui [un]

V3:   [un]

up and blindfolded.  [un] the guy
won't see -- won't see -- we won't
give him time -- at the moment [un]
he'll be blindfolded and he'll be
tied up.

V3:   [un]

V5:   You have to -- you have to
neutralize him.

V4:   [un]

V5:   You have to -- you have to
[un]

V4:   [un]

V5:   And blindfold him.

V3:   [un]

V5:   What he doesn't see --

V4:   And then later [un]

V5:   And from there we take off
right [un] there to work comfortably
-- shout and whatnot.

V3:   No, yes.  That's no
problem.

V4:   [un]

V5:   Then -- then with that
[un]

(voices unintelligible)

V3:   They're just here, right?

V4:   Yes, here [un]

V3:   [un]

# VOICES ON VIDEO/AUDIO TAPE

## ON OCT 14-87

V-1   SA WAYNE SCHMIDT

V-2       "              "

V-3    S/A ABEL REYNOSO

V-4    S/A NADINE TAKESHTA

V-5    RAUL LOPEZ-ALVAREZ

**EXHIBIT B**

## DISCLAIMER

The translation of these tape recorded materials is based upon the recording as heard on the particular transcribing equipment used and upon the context of the conversation as understood by the translator.

The different voices as heard by the translator are denoted as V1, V2, etc.

[un] indicates that the voice is unintelligible to the translator.

This transcript was made from the audio tape recording of the 10-14-87 meeting in the Bonaventure Hotel.

_11-12-87_
Date

_Greg Clinton_
Greg Clinton

e la balcony.  Pues, empiezan a

- balazos, [un] AR fifteens and

forty-sevens, ¿verdad?

V3:  Uh-huh.

V5:  Y, pues, sí lo sacaron de

n. a pero traíamos carros blindados,

verdad?

V3:  Uh-huh.

V5:  Y, pues, les tuvimos que

:orresponder todo hasta que los

etachamos y nos lo llevamos a él.

, ya ves que allá es otro -- otro

ambiente, ¿verdad?

V3:  Otra mentalidad.  Así aquí

. no vas a hacer eso.

V5:  No, no, no voy a [un]


V3:  Aquí no vas a hacer ese

show.  No, no.

V5:  No.

V3:  [un] Nos metemos en un

problema.  Esa es otra cosa, digo,

¿qué discreto lo puedes hacer?

V5:  Lo podemos hacer muy

discreto.  Te digo que en caso de

que se -- se ponga -- se ponga

tosco, pues, nos lo chingamos allí

m. , para que se acabe el

escandalo, ¿verdad?  ¿Verdad?  Es

him from the balcony.  So they start

firing shots [un] AR fifteens and

[un] forty-sevens, right?

V3:  Uh-huh.

V5:  And, well, they did get

him out but we had armored cars,

right?

V3:  Uh-huh.

V5:  And, well, we had to fire

back at them until we fought them

off and we took him away.  But you

know that there it's another -- it's

another world, right?

V3:  Another mentality.  Like

that here -- you won't do that.

V5:  No, no, I'm not going to

[un]

V3:  Here you're not going to

put on that show.  No, no.

V5:  No.

V3:  [un] We get in trouble.

That's another thing, I mean, how

discretely can you do it?

V5:  We could do it very

discretely.  I tell you that in case

it becomes -- it becomes difficult,

well, we could waste him right there

in order to stop the commotion,

right?  Right?  You see, it's a --

que es una -- es un plan B, ¿verdad?
El plan A es levantarlo así, put him
the back, cover his mouth,
entre dos personas, throw him in the
van, tie him up y vámonos, ¿verdad?
Ese es plan A.  Pero si por equis
motive, este, el señor no se deja
arrimar o -- o se pone suspicious --

V3:  No [un] no es [un]

V5:  No [un] pero he has a gun,
¿no?

V3:  Uh-huh.

V5:  ¿Verdad? ¿Verdad?
Entonces, eh, si la malicia -- o sea
que -- no, yo no [un] ¿Verdad?  El
oí  muchacho que voy a traer es muy
méndigo pero también has a baby
face, ¿no?  Y, o sea, no vamos a ir
con tejanas y boots y -- ¿verdad que
no?  El chiste es también es medio
disfrazarnos, ¿verdad?


V3:  Uh-huh.

V5:  Si es un delivery truck,
mejor.  Que diga "Carpets" or
"Bakery".

V3:  Oh, ¿quieres -- te
convendría mejor?

V5:  Es mejor.  Podemos

---

it's a plan B, right?  Plan A is to
pick him up like that, put him into
the back, cover his mouth, using two
people, throw him in the van, tie
him up and we're on our way, right?
That's plan A.  But if for X reason,
uh, the man doesn't let anyone near
or -- or if he gets suspicious --

V3:  No [un] he's not [un]

V5:  No [un] but he has a gun,
doesn't he?

V3:  Uh-huh.

V5:  Right?  Right?  So, uh, if
he suspects something -- I mean --
no, I don't [un] right?  The other
guy I'm going to bring is very
mendicant but he also has a baby
face, okay?  And, I mean, we're not
going to go there with Texans and
boots on and -- now are/we?  The
trick is to kind of disguise
ourselves, right?

V3:  Uh-huh.

V5:  It'd be better if it were
a delivery truck.  It should say
"Carpets" or "Bakery".

V3:  Oh, do you want -- that
would suit you better?

V5:  That's better.  We could

onernos unos overalls nosotros,
verdad? Y asi no da malicia,

     ad? Así es más dificil que la
- que la -- que la -- que la
alicie el muchach -- el señor,
verdad? Entonces, ya cuando se
ió cuenta you're on 'em, you know?
ind don't move and you know, vámonos
.ara arriba.

     V3: Es más facil asi entonces.

     V5: Es más facil, ¿verdad? Es
iás facil.

     V3: En -- en -- para -- para
:stimar los gastos, ¿qué es lo que
iecesitarias? ¿Qué es lo que tú --
lí    e [un] quisieras?


     V5: Mira, este, yo quisiera,
pues, yo me estoy acostumbrado a la
-- a la -- a la escuadra [un] a la
thirty-eight super. Thirty-eight
super.

     V3: ¿Cuántas gentes estamos
hablando?

          V5: Estamos hablando de tres.

          V3: Tres personas.

          V5: Yo y dos más.

          V3: Tú y dos más.

          V5: Porque dos personas tienen

put on some overalls, right? And
that way no one would suspect,
right? That way it would be less
likely that the -- that the -- that
the guy -- the man would suspect
something, right? So by the time he
realized it, you're on 'em, you
know? And don't move and you know,
up we go.

     V3: So it's easier that way.

     V5: It's easier, right? It's
easier.

     V3: In -- in -- in order to --
in order to estimate the expenses,
what is it you would need? What is
it that you -- what [uh] would you
want.

     V5: Look, eh, I would want,
well, I'm used to the -- to the --
to the square [un] to the
thirty-eight super. Thirty-eight
super.

     V3: How many people are we
talking about?

          V5: We're talking about three.

          V3: Three people.

          V5: Me and two others.

          V3: You and two others.

          V5: Because two people have to

se ir a recogerlo y otra persona
iere que manejar.

'3: No, espérame. Okay.
cay. Eh. ¿Qué quieres? ¿Un --
no que maneje?

V5: Yeah, one driver.

V3: Okay, and --

V5: Y yo y otro porque yo voy
-- yo voy a bajarla personalmente.

V3: Tú vas a hacer personal-
ente.

V5: Yo lo voy a hacer
ersonalmente porque no voy a tener
:onfianza -- si les tengo confianza
ie  /o, pues, yo soy el
·esponsable, ¿verdad? I have a -- a
sense of responsibility.

V3: Eso -- eso nos gusta a
nosotros. Que sea bien hecho [un] y
por eso te vamos a pagar. Okay, tú
quieres un -- bueno, él -- él sabe
manejar. No hay problema de que no
--

V3: No.

V5: No hay problema. ¿Qué --
okay, tres personas. Eh, ¿qué tipo
de -- de equipo? ¿Qué [un] equipo?

go pick him up and another person
has to drive.

V3: No, wait. Okay. Okay.
Eh. What do you want? A -- someone
to drive?

V5: Yeah, one driver.

V3: Okay, and --

V5: And me and someone else
because I'm going to -- I'm going to
take him down personally.

V3: You're going to do it
personally.

V5: I'm going to do it
personally because I'm not going to
trust -- I do trust them but I,
well, I'm the one who's responsible,
right? I have a -- a sense of
responsibility.

V3: That -- that's what we
like. It should be well done [un]
and that's why we're paying you.
Okay, you want a -- okay, he -- he
knows how to drive. There's no
problem of not --

V3: No.

V5: No problem. What --
Okay, three people. Uh, what type
of -- of equipment? What [un]
equipment?

V5:   Bueno, yo

V3:   ¿Qué es lo que quieres?

V5:   ¿De vehiculos?

V3:   Uh-huh.

V5:   Yo quisiera, este, una van on algúna especie de logotipo.

V3:   Okay.

V5:   Ah -- para que, eh, en the anel. Aunque sea viejita no le ace, pero que tenga alguna -- lguna, este, algún logotipo para p  'ts look less suspicious.

V3:   ¿Como qué, por ejemplo?

V5:   It could be "Bakery", 'P' ¬ber", puede ser "Pizza, We ie.. er." Eso puedes andar .iondequiera [un]

V3:   Okay.

V5:   "Carpets." Lo que -- lo que tú creas conveniente, ¿verdad?

V3:   Okay.

V5:   Y, este, eh, cuestión de armas, pues, este, eh --

V3:   ¿Qué tipo?

V5:   Pues, [un] es que tengo una three fifty-seven, seis -- seis pulgadas, you know.

V3:   ¿Tú tienes?

V5:   Si, pero no me -- no la

V5:   Well, I --

V3:   What do you want?

V5:   In the way of vehicles?

V3:   Uh-huh.

V5:   I would like, uh, a van with some sort of logo on it.

V3:   Okay.

V5:   Oh -- so that, uh, on the panel. Even if it's old it doesn't matter, but it should have some -- some, uh, some logo so that it looks less suspicious.

V3:   Like what, for example?

V5:   It could be "Bakery", "Plumber", it could be "Pizza, We deliver." That you can go anywhere [un]

V3:   Okay.

V5:   "Carpets." What -- whatever you think is best, right?

V3:   Okay.

V5:   And, uh, as for the weapons, well, uh --

V3:   What type?

V5:   Well, [un] you see I have a three fifty-seven, six -- six inch, you know.

V3:   You do?

V5:   Yes, but I'm not -- I'm

'oy a usar porque voy a tener que

r todo.  Este --


V3:  ¿No la puedes usar esa?

ues, luego te pagamos por otra.

[un] ¿Qué tipo de arma tienes?


V5:  Bueno, este --

V3:  Mejor dicho, ¿qué es lo

que te gusta? [un]

V5:  Mira.  Pues, me gusta

    la -- la escuadra pero, este,

uede ser, este, un thirty-eight

special para no hacerla muy --

t'  y-eight special, esa como cop,

como las pistolas de policía.

V3:  Okay.

V3:  ¿Verdad?

V5:  Pero sí me gustaría, eh --

V3:  Revólvers.

V5:  Revólvers.  Tres revólvers

Tres revólvers.  [un]

V3:  ¿Tres quieres?

V5:  Tres revólvers.  Porque

esos no se -- no se encasquillan.

V3:  Okay.

V5:  ¿Verdad?  No se

e  squillan.  Thirty-eight special

es muy, este --

not going to use it because I'm

going to have to throw everything

out.  Uh --

V3:  Couldn't you use it?  Then

later we'll pay you for another one.

[un] What kind of weapon do you

have?

V5:  Well, uh --

V3:  Rather, what do you like?

[un]

V5:  Look.  Well, I like the --

the square a lot but, uh, it could

be, uh, a thirty-eight special so

it's no so -- thirty-eight special,

that one like cop, like police guns.


V3:  Okay.

V3:  Right?

V5:  But I would like, uh --

V3:  Revolvers.

V5:  Revolvers.  Threee

revolvers.  Three revolvers. [un]

V3:  You want three?

V5:  Three revolvers.  Because

they don't -- they don't jam.

V3:  Okay.

V5:  Right?  They don't jam.

Thirty-eight special is very, uh --

V3: ¿Qué tamaño?

V5: ¿Qué?

V3: De --

V5: Oh, thirty-eight special
es como cop, como de policía.

V3: Oh, de cuatro pulgadas.

V5: Sí, seis pulgadas, cuatro
pulgadas.

V3: Okay.

V5: Y, este, lo más que si
quisiera, quisiera, este, una
metrallatita, por si hay problemas.

V3: [un]

V5: Para back-up.

V3: ¿Qué te gusta a ti? ¿Qué
es lo que tú has usado? [un]

V5: Yo he usado --

V3: Para que sepas qué tipo
de arma [un]

V5: Yo he usado mucho el A-R
fifteen.

V3: Okay.

V5: Espérate. Pero la Uzi es
muy buena. Si -- si puedes
conseguir una de las dos cosas, AR
fifteen o Uzi, este, mejor, ¿no?
De nueve milimetros y la otra es de
two twenty-three. La -- la Uzi es
nine milimeter y la AR is two

V3: What size?

V5: What?

V3: Of --

V5: Oh, thirty-eight special
is like cop, like a policeman's.

V3: Oh, a four inch.

V5: Yes, six inch, four inch.

V3: Okay.

V5: And, uh, what I'd most
like, I'd like, uh, a little machine
gun, in case there's trouble.

V3: [un]

V5: For backup.

V3: What do you like?  What
have you used? [un]

V5: I've used --

V3: So that you know what type
of weapon [un]

V5: I've used the AR fifteen a
lot.

V3: Okay.

V5: Wait.  But the Uzi is very
good.  If -- if you can get one of
the two, AR fifteen or Uzi, uh,
that'd be better, okay?  A nine
millimeter and the other is two
twenty-three.  The -- the Uzi is
nine millimeter and the AR is two

:wenty-three.  Este, preferible que

   automático, ¿verdad?  Como el

J.  .s automático, pues, este, ese

/a es de apoyo, ¿verdad?

    V3:  Uh-huh.

    V5:  Ya de -- de apoyo.

    V3:  Esa ¿quién la traería?

   V5:  Eh, la traería -- si no la

trago yo la trae mi amigo.

    V3:  Okay.

    V5:  El la -- él la trae.  Con

J  cuatro cargadores.

    V3:  Okay.

    V5:  Unos cuatro clips.  De a

ve  e tiros cada clip.  No más.

Con eso es más que suficiente para

el trabajo, ¿verdad?

    V3:  Es todo lo que necesitan,

entonces.

    V5:  Eso, por si nos metemos en

problemas, con la Uzi, olvídalo.

Nos aliviana mucho, ¿verdad?  Con

dos, tres bursts, ya, este --

    V3:  Se acaba todo el problema.

    V5:  Se acaba todo el problema,

¿verdad?  ¿Verdad?

    V3:  O sea, tú te sentirías

có  do con -- con cualquiera de esas

ar. .., pues.

twenty-three.  Uh, preferably

automatic, right?  Since the Uzi is

automatic, well, uh, that's for

support, right?

    V3:  Uh-huh.

    V5:  It' for -- for support.

    V3:  Who would carry it?

    V5:  Uh, carry it -- if I'm not

carrying it, my friend would.

    V3:  Okay.

    V5:  He -- he'd carry it.  With

around four clips.

    V3:  Okay.

    V5:  Around four clips.  With

twenty shots per clip.  That's all.

That's more than enough for the job,

right?

    V3:  That is all you will need,

then.

    V5:  That, in case we run into

trouble, with the Uzi, forget it.

It helps us a lot, right?  With two,

three bursts, now, uh --

    V3:  No more problems.

    V5:  No more problems, right?

Right?

    V3:  I mean, you would feel

comfortable with -- with anyone of

those weapons.

V5:  Si.

V3:  [un] un AR fifteen o una

V5:  El chatito, si puedes,
ara que no haga mucho bulto.

V3:  Para que no haga [un]

V5:  Hay un chatito, un AR
iftren --

V3:  Corto.

V5:  -- cortito.

V3:  Uno [un] que tiene en la
\`a que se mete.

V5:  Ah, ese -- yo traia de
:sos [un] pero hay tres modelos:  el
ior  one, medium size one y uno más
:ha,urrito todavia.

V3:  Permiteme.

V5:  El cañón como de five
inches [un]

V3:  Hello.

V3:  Hey.

V3:  Okay.

V3:  Okay, what -- okay, how
much?  How much and at what time?

V3:  Okay.  When you gonna
bring it?

V3:  Another, uh, another, uh,
le. . see.  She'll be back in about

---

V5:  Yes.

V3:  [un] an AR fifteen or an
Uzi.

V5:  The shorty, if you can, so
it's not so bulky.

V3:  So it's not so [un]

V5:  There's a shorty, an AR
fifteen --

V3:  Short.

V5:  -- shorty.

V3:  One [un] that has where it
goes into the butt.

V5:  Oh, that one -- I used to
have one of those [un] but there are
three models:  the long one, medium
size one and one that's even
shorter.

V3:  Excuse me.

V5:  The barrel around five
inches [un]

V3:  Hello.

V3:  Hey.

V3:  Okay.

V3:  Okay, what -- okay, how
much?  How much and at what time?

V3:  Okay.  When you gonna
bring it?

V3:  Another, uh, another, uh,
let's see.  She'll be back in about

en minutes.  Yeah.  Ten min -- ten

·tes she should be back and I'll

    ner to give you a call.

    V3:  Okay, yeah.

    V3:  Right.  No problem.  I

:ell you what.

    V3:  Right, right.  Let -- let

1e, uh, yeah.  As soon as she comes

)ack,  I'll tell her to give you a

:all.

    V3:  Okay, bye.  Bye-bye.

    V3:  Okay, entonces, estamos en

-- oh, me decias de los -- de los AR

fifteen.

    V5:  Sí.  Pero preferible una

Uz__  Es más facil.

    V3:  Una Uzi.  Preferible es

una Uzi.

    V5:  Porque es más facil.  Son

chuladas.  They're beautiful

machines.

    ·V3:  Okay.

    V5:  Avientan el chorro.

    V3:  ¿Si?

    V5:  Beautiful, beautiful.

    V3:  [un] como que te gustan

los [un]

    V5:  (laughs)

    V3:  [un]  Okay, entonces

ten minutes.  Yeah.  Ten min -- ten

minutes she should be back and I'll

tell her to give you a call.

    V3:  Okay, yeah.

    V3:  Right.  No problem.  I

tell you what.

    V3:  Right, right.  Let -- let

me, uh, yeah.  As soon as she comes

back,  I'll tell her to give you a

call.

    V3:  Okay, bye.  Bye-bye.

    V3:  Okay, then, we were on --

oh, you were telling me about the --

about the AR fifteen.

    V5:  Yes.  But preferably an

Uzi.  It's easier.

    V3:  An Uzi.  Preferably an

Uzi.

    V5:  Because it's easier.

They're beauts.  They're beautiful

machines.

    V3:  Okay.

    V5:  They let out a burst.

    V3:  Really?

    V5:  Beautiful, beautiful.

    V3:  [un] you sure like the

[un]

    V5:  (laughs)

    V3:  [un] Okay, then, generally

eneralmente lo que tenemos --

alguna otra cosa que me falte aqui

   o --

    V5:  No, no, no.  Nada.  [un]

an you get a silencer for the --

or the thirty-eight?

    V3:  ¿Cuál quieres?  ¿Para los

evolvers?  ¿Y funcionan?

    V5:  Para los revolvers.

    V3:  ¿Funcionan los silencers

)ara eso?

    V5:  Sí, igual.

    V3:  ¿Sí?  ¿Cuántos?  ¿Dos?

    V5:  Yeah, they're cheap.

Ti.  re not too expensive.

    V3:  Okay.

    V5:  Two.

    V3:  ¿Cuántos querías?

    V5:  No más dos.

    V3:  Okay.  ¿Qué más?

    V5:  No más.

    V3:  [un]

    V5:  Ah, pues, los vehículos,

¿verdad?

    V3:  ¿Cuántos carros quieres?

    V5:  Pues, no más la van y un

carro.

    V3:  Un carro.  ¿Qué tipo de

---

what we've got -- am I missing

anything else here that's not --

    V5:  No, no, no.  Nothing.

[un] can you get a silencer for the

-- for the thirty-eight?

    V3:  Which one do you want?

For the revolvers?  And do they

work?

    V5:  For the revolvers.

    V3:  Do silencers work for

that?

    V5:  Yes, the same.

    V3:  They do?  How many?  Two?

    V5:  Yeah, they're cheap.

They're not too expensive.

    V3:  Okay.

    V5:  Two.

    V3:  How many did you want?

    V5:  Just two.

    V3:  Okay.  What else?

    V5:  That's all.

    V3:  [un]

    V5:  Oh, well, the vehicles,

right?

    V3:  How many cars do you want?

    V5:  Well, just the van and a

car.

    V3:  A car.  What kind of car

arro te gustaria?

V5:  Pues, algún sedan low key.

le   no -- no --

V3:  ¿Mediano, grande?

V5:  Medium.  Medium.

V3:  [un] carro [un]

V5:  [un] que no -- que sea --


V3:  [un]

V5:  -- como los que traen los
olicias, un Torino -- esos -- ¿te
ir  das de esos viejitos -- ?

V3:  Sí.

V5:  Esos, eh, plain, you know.
fo  an get those at the auction --
type of car, you know.

V3:  ¿Quieres un tipo policial?


V5:  Ey.

V3:  Eso sería más facil, ¿no?


V5:  Ey, pues [un]

V3:  [un] tienen cara de -- de
chota.

V5:  Es todo.

V3:  Okay.  Todo lo que [un] ¿y
el lugar?

V5:  El lugar, pues, eh,
pr. .rible algún -- Chingado, ¿qué

would you like?

V5:  Well, some low key sedan.
No -- no -- no --

V3:  Medium, big?

V5:  Medium.  Medium.

V3:  [un] car, [un]

V5:  [un] not -- it should be
--

V3:  [un]

V5:  -- like the ones the
police have, a Torino -- those ones
-- remember those oldies?

V3:  Yes.

V5:  Those, uh, plain ones, you
know.  You can get those at the
auction -- type of car, you know.

V3:  Do you want the police
kind?

V5:  Yeah.

V3:  That would be easier,
wouldn't it?

V5:  Yeah, well [un]

V3:  [un] they have a face like
-- like a cop.

V5:  That's all.

V3:  Okay.  Everything that
[un] and the place?

V5:  The place, well, uh,
preferably some -- fuck, what could

odría ser?  Something that's be
economical.  Aquí en la ciudad se

　　hacer.  En the low area of --


　　V3:  ¿Qué -- qué zona?  Tú
oɔoces aquí Los Angeles.

　　V5:  Sí.  Puede ser en --

　　V3:  ¿Qué zona te gustaría?
'igo, para más o menos dar una idea
del lugar donde va a morir.


　　V5:  Pues -- la zona, por
,  .plo, allá pa' South LA, allá con
los negros.  Allá se puede rentar
una casa o un, este, run-down,
¿  .ad?  Este.

　　V3:  Okay.  ¿Alguna cosa en la
casa quieres en particular?

　　V5:  Oh, pues, comida.

　　V3:  ¿Comida, nada más?  Para
cuánto tiempo.

　　V5:  Pues, para un día.  Este,
puedes tenerme, este, esos para --
para cattle prongs que da toques.

　　V3:  Uh-huh.  Oh, ¿eso quieres?


　　V5:  Sí, uno de esos.

　　V3:  Okay.  ¿Cuántos?

　　V5:  No más uno.  No más uno.

it be?  Something that's be
economical.  Here in the city it
could be.  In the low area of
--

　　V3:  What -- what area?  You're
familiar here with Los Angeles.

　　V5:  Yes.  It could be in --

　　V3:  What area would you like?
I mean, to more or less have an idea
of the place where he's going to
die.

　　V5:  Well -- the area, for
example, over there in South LA,
there with the blacks.  There you
can rent a house or a, uh, run-down,
right?  Uh.

　　V3:  Okay.  Do you want
anything in the house in particular?

　　V5:  Oh, well, food.

　　V3:  Food, is that all?  For
how long?

　　V5:  Well, for a day.  Uh, can
you get me, uh, those things for --
for cattle prongs que give shocks.

　　V3:  Uh-huh.  Oh, you want
that?

　　V5:  Yes, one of those.

　　V3:  Okay.  How many?

　　V5:  Just one.  Just one.

V3: Okay.

V5: Este --

/3: ¿De algún tipo en articular?

V5: No, no, just shock --

V3: ¿Tiene nombre en articular o se llaman así?

V5: Cattle prong para adiarlas cuando van al rastro.

V3: Uh-huh.

V5: Uh, to given 'em shocks.

V3: ¿Dónde se consiguen [un]

V5: Yo creo en la hardware stɔ --.

V3: Okay.

V5: Este, eh, una -- dos -- dos -- dos racks de -- de refrescos.

V3: Oh, sí. ¿De qué tipo de refresco?

V5: De -- puede ser like mineral water pero con mucho gas. ¿Sí hay aquí Peñafiel Tehuacán?

V3: Sí, sí hay.

V5: Pues, mejor.

V3: ¿Cuánto quieres?

V5: Dos -- dos -- dos cases.

V3: Okay.

V5: Uh --

V3: Any type in particular?

V5: No, no, just shock --

V3: Does it have some particular name or is that what it's called?

V5: Cattle prong for zapping them when they go to the slaughter-house.

V3: Uh-huh.

V5: Uh, to given 'em shocks.

V3: Where do you get [un]

V5: I thing at he hardware store.

V3: Okay.

V5: Uh, one -- two -- two -- two racks of -- of soft drinks.

V3: Oh, yes. What kind of soft drink?

V5: Of -- it could be like mineral water but with a lot of bubbles. Do they have Peñafiel Tehuacan here?

V3: Yes they do.

V5: Well, that's better.

V3: How much do you want?

V5: Two -- two -- two cases.

los cases de Tehuacán de la -- sin

sr  r, eh.   Mineral water.

    V3:  ¡Ay, qué gacho!  Okay.

    V5:  Eso y, este --

    V3:  ¿Qué más?

    V5:  Unos, este, plastic

handcuffs. ¿Si las has oído mentar?

    V3:  Sí.  Como no.

    V5:  [un]

    V3:  [un]

    V5:  Plastic ones.  Mejor.

    V3:  [un] ¿Quieres?

    V5:  Sí, por que las de fierro

tienen serial number.

    V3:  Oh.

    V5:  And you could trace 'em.

    V3:  Oh, okay.

    V5:  And, mejor de plastic.

    V3:  ¿Cuántos quieres de eso?

    V5:  Pues, unas --

    V3:  Esos en un sercurity

store se pueden comprar.

    V5:  Sí, pues, compra una

bolsita.

    V3:  Okay.

    V5:  [un] muy barata.  Este,

---

Two cases of Tehuacan of the --

unflavored, uh.  Mineral water.

    V3:  Oh, that's mean.  Okay.

    V5:  That and, uh --

    V3:  What else?

    V5:  Some, uh, plastic

handcuffs.  You have heard of them

haven't you?

    V3:  Yes, of course.

    V5:  [un]

    V3:  [un]

    V5:  Plastic ones.  Better.

    V3:  [un] You want?

    V5:  Yes, because the iron ones

have a serial number.

    V3:  Oh.

    V5:  And you could trace 'em.

    V3:  Oh, okay.

    V5:  And plastic ones are

better.

    V3:  How many of those do you

want?

    V5:  Well, around --

    V3:  You can buy those at a

security store.

    V5:  Yes, well, buy a bag.

    V3:  Okay.

    V5:  [un] very cheap.  Uh,

laza, band -- gaza ¿cómo se llaman?

   V3:  Oh, eh --

   V5:  Bandages.

   V3:  Bandages.

   V5:  Bandages.  Te traes unos :inco rolls, rollitos así [un] Eso ie pone en la boca --

   V3:  Uh-huh.

   V5:  -- y -- para que no -espiren y se mete el Tehuacán por l   riz. [un] and we have to blind-fold 'em too.  Because that's a ohsycological thing.

   V3:  Y ¿qué más quieres de la olindfold?

   V5:  No, las puras bandages. [un]

   V3:  ¿Con las puras bandages?

   V5:  Las puras bandages.

   V3:  Okay.  ¿Alguna otra cosa?

   J5:  Este --

   V3:  [un] ocurrir.

   V5:  Una chair.  Unas chairs.

   V3:  Okay.

   V5:  Este, una de esas lámparas que -- como en los old detective m   's.

   V5:  That works too, you know.

gauze, band -- gauze, what's it called?

   V3:  Oh, eh --

   V5:  Bandages.

   V3:  Bandages.

   V5:  Bandages.  Get around five rolls, little rolls like this [un] that goes in the mouth.

   V3:  Uh-huh.

   V5:  -- and -- so they don't breath and the Tehuacan goes up the nose.  [un] and we have to blindfold 'em too.  Because that's a phsycological thing.

   V3:  And what else do you want for the blindfold?

   V5:  No, just bandages [un]

   V3:  With just bandages?

   V5:  Just bandages.

   V3:  Okay.  Anything else?

   V5:  Uh --

   V3:  [un] ocurr.

   V5:  A chair.  Some chairs.

   V3:  Okay.

   V5:  Uh, one of those lamps that -- like in the old detective movies.

   V5:  That works too, you know.

V3:  ¿Sí?

V5:  Sí.

3:  ¿Si -- si funciona?

V5:  Yeah, it works.

V3:  Porque no más se ve en las

eliculas pero no [un]

V5:  No, yeah.

V3:  Okay.  ¿Qué más?

V5:  Es todo.  Es todo.

V3:  Okay.

V5:  Uh, and a body bag para

s.  ¿Eso lo puedes conseguir?

V3:  [un]

V5:  [un] un army surplus

.tr

V3:  Okay.

V5:  Con cierre, ¿no?

V3:  ¿Qué tipo?  ¿Grande, ¿no?

V5:  Pues, they're all the same

size.

V3:  Oh, okay.  ¿Cuántos

quieres de esos?

V5:  No más uno.  Bueno, no más

es uno, ¿no?

V3:  Sí, no más es uno.  Okay.

¿Qué más?  ¿Qué otra cosa podemos

necesitar?

V5:  Ahora, este, we need a

plac to -- to -- to -- to bury him.

V3:  It does?

V5:  Yes.

V3:  It really works?

V5:  Yeah, it works.

V3:  Because you just see that

on the movies but not [un]

V5:  No, yeah.

V3:  Okay.  What else?

V5:  That's all.  That's all.

V3:  Okay.

V5:  Uh, and a body bag for

afterwards.  Could you get that?

V3:  [un]

V5:  [un] an army surplus

store.

V3:  Okay.

V5:  With a zipper, okay?

V3:  What kind?  Big, right?

V5:  Well, they're all the same

size.

V3:  Oh, okay.  How many of

those do you want?

V5:  Just one.  Well, there's

only one, isn't there?

V3:  Yes, it's just one.  Okay.

What else?  What else might we need?

V5:  Now, uh, we need a place

to -- to -- to -- to bury him.

V3:  ¿Un qué?

V5:  Un lugar dónde enterrarlo.

V3:  ¿Dónde se puede?  Eso sí
no sé yo. ¿Dónde -- dónde tú -- tú
considerarías?  O ¿cómo -- cómo lo
vamos a hacer?  Eso de -- de --
enterrar -- enterrarlo.  No quiero
que le pase lo que le pasó a
Camarena, eh, me lo encuentran en el
campo ahorita luego luego.

V5:  No, no, no, no.  Eso se va
terrar.  Hasta me dan ganas de
enterrarlo en el mismo lugar.  In
the same place.  It's gonna be a
r   lar spot.  ¿Verdad?

V3:  [un]

V5:  Se hace un hoyo alli, este
--

V3:  Total la casa se mantiene
por unos dias, ¿no?

V5:  Ey.

V3:  Se mantiene por otros
dias más.

V5:  [un] una pick and un
shovel.

V3:  Okay.

V5:  Make it two shovels and a

V3:  Okay.  ¿Qué más?

V3:  A what?

V5:  A place to bury him.

V3:  Where could it be?  I
really don't know.  Where -- where
do you think?  Or how -- how are we
going to do it?  That about -- about
-- burying -- burying him.  I don't
want the same thing happening to him
that happened to Camarena, uh, they
find him in the field right away.

V5:  No, no, no, no.  That'll
be buried.  I even feel like burying
him in the same place.  In the same
place.  It's gonna be a regular
spot.  ¿Verdad?

V3:  [un]

V5:  You make a hole there, uh
--

V3:  Besides, you maintain the
house a few days, right?

V5:  Yeah.

V3:  You maintain it a few more
days.

V5:  [un] a pick and a shovel.

V3:  Okay.

V5:  Make it two shovels and a
pick.

V3:  Okay.  What else?

V5:  No más.

V3:  ¿Alguna otra cosa?

V5:  No, that's it.  Oh, and
una -- una tape recorder para --

V3:  Oh, para grabarlo.

V5:  -- para -- para grabarlo.

V3:  Oye, así que lo de
Camarena sí lo grabaron.

V5:  Sí.

V3:  ¡Ay, qué cabrón!

V5:  [un]

V3:  Sí, ay, pues, fíjate ni me
había dado cuenta [un]

V5:  No, estos muchachos ya
ti   n experiencia.  Ya tienen
experiencia en eso, ¿verdad?

V3:  [un] estos muchachos --
pero sí son -- otra cosa me
preguntaron.  ¿Sí saben lo que están
haciendo, ¿no?  Esos cuates, los que
tú vas a traer.

V5:  Bueno, mira, van -- va a
ser un jale de -- pero ellos no
saben [un] tú no vas a tratar con
ellos para nada.

V3:  No, no, yo no quiero.

V5:  No, no, no los vas a ver.

V3:  Okay.

V5:  That's all.

V3:  Anything else?

V5:  No, that's it.  Oh, and
a -- a tape recorder to --

V3:  Oh, to record it.

V5:  -- to --, to record it.

V3:  Hey, so they really
recorded it with Camarena.

V5:  Yes.

V3:  Oh, wow!

V5:  [un]

V3:  Yes, oh, well, you know I
didn't even realize [un]

V5:  No, these guys have
experience.  They've got experience
in that, right?

V3:  [un] these guys -- put
they are -- somthing else I was
asked.  They do know what they're
doing, don't they?  These guys, the
ones who you're bringing?

V5:  Well, look, they're going
-- it will be a job -- but they
don't know [un] you're not going to
deal with them at all.

V3:  No, no, I don't want to.

V5:  No, no, you won't see
them.

V3:  Okay.

V5:  ¿Verdad?  Ellos saben eso
no -- no van a ver a nadie.
:n conmigo y a mí me tienen
onfianza.

V3:  Okay.

V5:  ¿Verdad?  And that's it.
tope lo que tope.

V3:  Okay.

V5:  Y [un] no -- no te
>reocupes de que -- no se van a
arrepentir ni nada.  They're crazy.
es, no se --

V3:  Y si lo hacen.

V5:  Si lo hacen.

V3:  ¿Tienen experiencia
tamb¡én?

V5:  Sí [un] un chingo.

V3:  [un]

V5:  Pues, también, fíjate, yo
tengo miedo de -- de que -- el que
le tengo poquito de desconfianza es
a Reyes.

V3:  Es lo que te digo.

V5:  [un] porque es -- se me
hace medio too nice, ¿verdad?

V3:  Eso es lo que te digo yo.

V5:  El Reyes se me hace too
n.

V5:  Right?  They know they
won't -- they won't see anyone.
They come with me and they trust me.

V3:  Okay.

V5:  Right?  And that's it.
And come what may.

V3:  Okay.

V5:  And [un] don't -- don't
worry about -- they won't back out
or anything.  They're crazy.  So
it's,  it's not --

V3:  They will do it.

V5:  Yes they will.

V3:  Do they have experience
too?

V5:  Yes [un] a whole lot.

V3:  [un]

V5:  Well, also, you see I'm
afraid that -- that -- Reyes is the
guy I don't quite trust.

V3:  That's what I mean.

V5:  [un] because he's -- he
strikes me as a little too nice,
right?

V3:  That's what I say.

V5:  Reyes strikes me as being
too nice.

# VOICES ON AUDIO/VIDEO TAPE

## ON OCT 15 - 1987

V-1 - S/A KELLY McCLINTOC

V-2 - S/A ABEL REYNOSO

V-3 - RAUL LOPEZ - ALVAREZ

V-4 - WAITER

**EXHIBIT C**

DISCLAIMER

The translation of these tape recorded materials is
based upon the recording as heard on the particular
transcribing equipment used and upon the context of
the conversation as understood by the translator.

The different voices as heard by the translator are
denoted as V1, V2, etc.

[Un] indicates that the voice is unintelligible to the
translator.

This transcript was made from the audio tape recording
of the 10-15-87  meeting in the Bonaventure Hotel.

_11-16-87_
Date

Greg Clinton

puede dar su tiro de gracia.  O con
า cuchillo.  Como tú quieras.

    V2:  Uh-huh.

    V3:  Nosotros siempre usamos el
tiro de gracia en la cabeza.

    V2:  El tiro de gracia.

    V3:  En la cabeza.

    V2:  ¿Y a Camarena le pegaron
un tiro de gracia también?

    V3:  A él no, al otro.

    V2:  [un]

    V3:  Ey.  Todo -- siempre ha
sido nuestro trademark, este, el
tiro de gracia.  Así era forty-five
[un] más común.

    V2:  Okay.  Yo decía porque --
para que no quedara, tú sabes, como
balística [un]

    V3:  Pero, si no van a agarrar
las armas.

    V2:  Uh-huh.  Eso es cierto.
Okay, entonces, eh, tú preferirías
--

    V3:  O sea que en un sewer las
-- las entierras, melt them, lo que
tú quieras.

    V2:  Tú preferirías entonces
e nosotros te diéramos las armas.

    V3:  Sí.  Es que me va a ser

could be given his (shot of grace.) Or
with a knife.  However you want.

    V2:  Uh-huh.

    V3:  We always use the shot of
grace in the head.

    V2:  The shot of grace.

    V3:  In the head.

    V2:  And did Camarena get a
shot of grace too?

    V3:  Not him, the other guy.

    V2:  [un]

    V3:  Yeah.  Every -- it's
always been our trademark, uh, the
shot of grace.  So it was a forty-
five [un] most common.

    V2:  Okay.  I was saying
because -- so there wouldn't be
left, you know, like ballistic [un].

    V3:  But they're not going to
get the weapons.

    V2:  Uh-huh.  That's right.
Okay, so, uh, you would prefer --

    V3:  I mean in a sewer they --
you bury them, melt them, whatever
you want.

    V2:  You prefer then that we
give you the weapons.

    V3:  Yes.  Because it would be

mucho problema. Si las puedo conseguir allá pero están más caras allá. Y luego el problema de -- de -- del transporte. Todo se puede hacer. Todo se puede hacer, Abel.

V2: Uh-huh.

V3: Pero es que hay más riesgo, ¿verdad? Más factor de riesgo.

V2: Sí, yo lo que no quiero es poner mucha presión en ti para que tú no te sientas mal para [un] trabajo.

V3: Mira, te lo voy a poner facil. Las armas que puedes conseguir.

V2: Okay.

V3: Pero la uzi, si no te la perdono. Porque esa es mi --

V2: Esa es tu [un]

V3: Esa es, este -- me siento más seguro.

V2: Okay.

V3: Esa es para back-up en caso de que anything goes wrong.

V2: Okay.

V3: ¿Verdad? Con eso -- me da

a big problem for me. I could get them there but they're more expensive there. And then the problem of -- of -- transporting them. Anything's possible. Anything's possible, Abel.

V2: Uh-huh.

V3: But the thing is there's more risk, right? A greater risk factor.

V2: Yes, what I don't want is to put a lot of pressure on you so you don't feel bad so [un] job.

V3: Look, I'll make it easy on you. Whatever weapons you can get a hold of.

V2: Okay.

V3: But the uzi, I'm not going to excuse you from. Because that's my --

V2: That's your [un]

V3: That's, uh -- I feel safer.

V2: Okay.

V3: That's for backup in case anything goes wrong.

V2: Okay.

V3: Right? With that -- 1

## CERTIFICATE OF SERVICE BY MAIL

I, MARIA ORTEGA, declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California; that my business address is Office of United States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court·for the Central District of California, at whose direction the service by mail described in this Certificate was made; that on <u>June 6, 1988</u> , I deposited in the United States mails in the United States Courthouse at 312 North Spring Street, Los Angeles, California, in the above-titled action, in an envelope bearing the requisite postage, a copy of

GOVERNMENT'S OPPOSITION TO DEFENDANT LOPEZ-ALVAREZ'S
MOTION TO DISMISS INDICTMENT FOR OUTRAGEOUS GOVERNMENT
CONDUCT; MEMORANDUM OF POINTS AND AUTHORITIES

addressed to    SEE ATTACHED SHEET

at <u>their</u> last know address, at which place there is a delivery service by United States mail.

This Certificate is executed on <u>June 6, 1988</u> at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.

MARIA ORTEGA

UNITED STATES v. RAFAEL CARO QUINTERO, et al.,
NO. CR 87-422(B)-ER
_____

SERVICE BY MAIL


Elsa Leyva, DFPD
Federal Public Defender's Office
312 North Spring Street
15th Floor
Los Angeles, California  90012


Michael Pancer, Esq.
Home Federal Building
Suite 1135
625 Broadway
San Diego, California  92101


Donald C. Randolph, Esq.
2566 Overland Avenue
Suite 700
Los Angeles, California  90064