UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

HONORABLE EDWARD RAFEEDIE, JUDGE PRESIDING

- - -

FILED

JUN 6 1989

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| PLAINTIFF, | ) |
| VS. | ) NO. 87-422(A)-ER |
| JESUS FELIX-GUTIERREZ, RAUL LOPEZ-ALVAREZ, RENE MARTIN VERDUGO-URQUIDEZ, ET AL., | ) |
| DEFENDANTS. | ) |

885462

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

WEDNESDAY, AUGUST 10, 1988

VOLUME 12

Title 28
Copy

VELMA B. THOMAS, CSR, RPR
OFFICIAL COURT REPORTER
406 U. S. COURT HOUSE
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA 90012
(213) 629-4874
CSR NO. 2683

APPEARANCES:


FOR PLAINTIFF:

        ROBERT C. BONNER
        UNITED STATES ATTORNEY
        ROBERT L. BROSIO
        ASSISTANT UNITED STATES ATTORNEY
        CHIEF, CRIMINAL DIVISION
        JIMMY GURULE
        ASSISTANT UNITED STATES ATTORNEY
        MAJOR NARCOTICS SECTION
        ROEL CAMPOS
        ASSISTANT NUITED STATES ATTORNEY
        1400 UNITED STATES COURTHOUSE
        312 NORTH SPRING STREET
        LOS ANGELES, CALIFORNIA 90012


FOR DEFENDANT FELIX-GUTIERREZ:

        OVERLAND, BERKE, WESLEY, GITS, RANDOLPH &
        LEVANAS
        BY:  DONALD C. RANDOLPH
        2566 OVERLAND AVENUE
        SEVENTH FLOOR
        LOS ANGELES, CALIFORNIA

        BARRY TARLOW, ESQ.
        9119 SUNSET BOULEVARD
        LOS ANGELES, CALIFORNIA 90069


FOR DEFENDANT LOPEZ-ALVAREZ:

        PETER M. HORSTMAN
        FEDERAL PUBLIC DEFENDER
        YOLANDA M. BARRERA
        CHIEF DEPUTY FEDERAL PUBLIC DEFENDER
        ELSA LEYVA
        DEPUTY FEDERAL PUBLIC DEFENDER
        1503 UNITED STATES COURTHOUSE
        312 NORTH SPRING STREET
        LOS ANGELES, CALIFORNIA 90012-4758

APPEARANCES (CONTINUED):


FOR DEFENDANT VERDUGO-URQUIDEZ:

        MICHAEL PANCER, ESQ.
        625 BROADWAY
        SUITE 1135
        SAN DIEGO, CALIFORNIA 92101

        JUANITA R. BROOKS, ESQ.
        108 IVY STREET
        SAN DIEGO, CALIFORNIA 92101


SPANISH INTERPRETERS:

        IRMA GARCIA
        JOSE OROZCO
        LENNE GRUSKY

## I N D E X

PROCEEDINGS                                                      PAGE

WEDNESDAY, AUGUST 10, 1988
        MORNING SESSION                                         12-2
        AFTERNOON SESSION


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SALVADOR LEYVA | | | | |
| BY MS. LEYVA | | 12-2 | | 12-21 |
| BY MR. TARLOW | | 12-6 | | |
| BY MR. CAMPOS | | | 12-20 | |
| JOSE REYES GARCIA-ALVAREZ | | | | |
| BY MR. CAMPOS | 12-24 | | | |
| BY MS. BARRERA | | 12-58 | | |

12-2

LOS ANGELES, CALIFORNIA, WEDNESDAY, AUGUST 10, 1988, 9:30 A.M.

1    (JURY PRESENT.)

2  SALVADOR LEYVA, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

3    THE COURT:  GOOD MORNING.

4    MR. GURULE:  GOOD MORNING, YOUR HONOR.

5    MS. LEYVA:  GOOD MORNING, YOUR HONOR.

6    THE COURT:  YOU MAY CONTINUE YOUR CROSS-

7 EXAMINATION.

8    MS. LEYVA:  THANK YOU, YOUR HONOR.

9    CROSS EXAMINATION (CONTINUED)

10 BY MS. LEYVA:

11 Q MR. LEYVA, WHEN YOU ARRIVED AT THE AIRPORT, AT THE

12 GUADALAJARA AIRPORT, WHERE DID EVERYONE PARK THEIR CARS

13 WHEN THEY FIRST GOT THERE?

14 A IF I MAY REFER TO THE PICTURE --

15    THE COURT:  CAN YOU JUST VERBALLY DESCRIBE WHERE

16 IT WAS?

17 Q BY MS. LEYVA:  WAS IT NEAR THE HANGAR AREA?

18 A YES.

19 Q ABOUT HOW FAR AWAY FROM THE HANGAR AREA WAS IT?

20 A IT WAS IN THE HANGAR AREA.

21 Q IT WAS ALREADY INTO THE HANGAR AREA?

22 A YES, MA'AM.

23 Q SO YOU WERE NOT OUT ON THE AIRSTRIP?

24 A NO.

25 Q AND WHEN YOU PARKED YOUR CARS AND FOLLOWED PAVON-

12-3

1    REYES, DID YOU PARK -- LET ME BACK UP.

2              WHEN YOU PARKED YOUR CARS, WERE YOU BLOCKING THE

3    JET?

4    A    NO, WE WERE NOT.

5    Q    SO YOU PARKED OFF THE SIDE WHERE THE JET WAS NOT

6    BEING BLOCKED?

7    A    THAT'S CORRECT.

8    Q    SO THAT IS WHY THE JET WAS ABLE TO TAXI WITHOUT YOU

9    HAVING TO MOVE YOUR CARS?

10   A    THAT'S CORRECT.

11   Q    ABOUT HOW FAR WERE YOUR CARS FROM THE JET?

12   A    OH, 40 YARDS.

13   Q    AND WHEN YOU FOLLOWED PAVON-REYES OUT OF THE CARS,

14   WERE YOU IMMEDIATELY BEHIND PAVON-REYES?

15   A    YES, I WAS.

16   Q    HOW FAR IN BACK OF HIM WERE YOU STANDING?

17   A    FROM HERE TO WHERE THE JUROR WITH THE RED SHIRT IS.

18   Q    I AM NOT GOOD AT ESTIMATES.  WOULD YOU SAY ABOUT

19   SEVEN, EIGHT FEET?

20   A    SEVEN FEET.

21   Q    SO YOU WERE ABOUT SEVEN FEET BEHIND PAVON-REYES.

22   CORRECT?

23   A    CORRECT.

24   Q    AND AT THE TIME THAT PAVON-REYES WAS SPEAKING WITH

25   THE PERSON YOU IDENTIFIED AS CARO-QUINTERO, YOU COULD

12-4

1    OVERHEAR THAT CONVERSATION?

2    A    NO, I COULD NOT.

3    Q    OKAY.  SO YOU ARE NOT SURE WHAT WAS SAID DURING THE

4    CONVERSATION THAT YOU HAVE DESCRIBED?

5    A    I COULD HEAR WHAT THEY WERE SAYING AT THE BEGINNING,

6    BUT THEN WHEN COMANDANTE PAVON APPROACHED CARO-QUINTERO, I

7    COULDN'T HEAR WHAT THEY WERE SAYING.

8    Q    SO YOU COULD INITIALLY HEAR THEM, AND THEN PAVON-

9    REYES WALKED AWAY CLOSER TO THE PERSON YOU IDENTIFIED AS

10   CARO-QUINTERO, AND THEN YOU COULD NO LONGER HEAR?

11   A    THAT IS CORRECT.

12   Q    NOW, AT SOME POINT YOU DID HEAR THE PERSON YOU HAVE

13   IDENTIFIED AS CARO-QUINTERO TELL ONE OF HIS PEOPLE, PEOPLE

14   WHO WERE WITH HIM, "I WANT YOU TO CALL THE COMANDANTE AND

15   FIND OUT WHAT THE HELL IS GOING ON HERE."  RIGHT?

16   A    THAT'S CORRECT.

17   Q    AND THAT WAS BEFORE PAVON-REYES WENT TO THE HANGAR TO

18   MAKE A TELEPHONE CALL.  CORRECT?

19   A    NO.  PAVON TURNED AROUND AND STARTED WALKING IS WHEN

20   CARO-QUINTERO MADE THAT STATEMENT.

21   Q    HE MADE THAT TO ONE OF HIS MEN?

22   A    CORRECT.  THE ONE TO HIS LEFT.

23   Q    NOW, AT THE END OF ALL OF THIS, PAVON-REYES TOLD YOU

24   THAT THE PERSON HE HAD SPOKEN WITH AT THE AIRPORT THERE

25   WAS ROGELIO MUNOZ.  IS THAT CORRECT?

12-5

1    A    THAT IS CORRECT.

2    Q    AND YOU KNOW ROGELIO MUNOZ IS A COMANDANTE WITH THE

3    DIRECCION FEDERAL DE SEGURIDAD.  IS THAT CORRECT?

4    A    TO MY UNDERSTANDING.

5    Q    OKAY.  HAVE YOU EVER MET ROGELIO MUNOZ, TO THE BEST

6    OF YOUR KNOWLEDGE?

7    A    NO, I HAVEN'T.

8    Q    WERE YOU EVER SHOWN A PHOTOGRAPH OF ROGELIO MUNOZ TO

9    SEE WHETHER IN FACT ROGELIO MUNOZ MAY HAVE BEEN AT THE

10   AIRPORT?

11   A    I CAN'T RECALL.

12   Q    YOU CAN'T RECALL WHETHER YOU WERE SHOWN A PHOTOGRAPH

13   OF ROGELIO MUNOZ?  IS THAT YOUR TESTIMONY?

14   A    THAT'S CORRECT.

15   Q    BUT YOU WERE SHOWN PHOTOGRAPHS OF PEOPLE WHO MAY HAVE

16   BEEN AT THE AIRPORT.  CORRECT?

17   A    THAT'S CORRECT.

18   Q    BUT YOU WERE NOT SHOWN A PICTURE OF ROGELIO MUNOZ TO

19   SEE IF YOU COULD IDENTIFY THIS COMANDANTE FROM THE DFS AS

20   BEING ONE OF THE MEN WITH CARO-QUINTERO?

21   A    I WAS SHOWN SOME PICTURES A LONG TIME AGO.  I CANNOT

22   SPECIFICALLY RECALL WHETHER OR NOT I WAS ASKED TO IDENTIFY

23   COMANDANTE ROGELIO MUNOZ.

24   Q    OKAY.  BUT DURING THE COURSE OF YOUR INVESTIGATION,

25   YOU HAVE TRIED TO IDENTIFY THOSE INDIVIDUALS THAT WERE

12-6

1   WITH CARO-QUINTERO ON THAT PLANE.  CORRECT?

2   A    THAT'S CORRECT.

3   Q    OKAY.  AND TO THE BEST OF YOUR KNOWLEDGE, YOU JUST

4   DON'T RECALL WHETHER ROGELIO MUNOZ WAS POINTED OUT TO YOU

5   IN THE PHOTO.  RIGHT?

6   A    THAT'S CORRECT.

7   Q    NOW, DURING THAT TIME THAT YOU WERE WATCHING PAVON-

8   REYES AND CARO-QUINTERO, YOU DIDN'T SEE CARO-QUINTERO

9   SPEAK WITH ANYONE OTHER THAN THE COMANDANTE PAVON-REYES?

10  A    HE TALKED WITH SOME PEOPLE, BUT I CAN'T RECALL WHO.

11  IF I COULD EXPLAIN.

12  Q    YES.

13  A    YES.  HE TALKED TO OTHER PEOPLE.

14  Q    BUT YOU DON'T KNOW WHO HE TALKED TO?

15  A    CORRECT.

16        MS. LEYVA:  NO FURTHER QUESTIONS, YOUR HONOR.

17        THE COURT:  ANY OTHER CROSS-EXAMINATION OF THIS

18  WITNESS?

19        MS. BROOKS:  NO, YOUR HONOR.  THANK YOU.

20        MR. TARLOW:  YES, YOUR HONOR.

21                    CROSS EXAMINATION

22  BY MR. TARLOW:

23  Q    SIR, YOU MENTIONED THAT COMANDANTE PAVON WAS A FIRST

24  COMANDANTE.  CORRECT?

25  A    THAT'S CORRECT.

12-7

1    Q    YOU CALLED HIM WHAT -- PRIMER?

2    A    PRIMER COMANDANTE.

3    Q    PRIMER COMANDANTE.  AND THESE PEOPLE WHO ARE CALLED

4    PRIMER COMANDANTES ARE SOME OF THE HIGHEST RANKING

5    COMANDANTES IN MEXICO.  CORRECT?

6    A    THAT'S CORRECT.

7    Q    AND THERE ARE VERY FEW PEOPLE IN THE MEXICAN FEDERAL

8    JUDICIAL POLICE WHO ARE PRIMER COMANDANTES.  CORRECT?

9    A    THAT'S CORRECT.

10    Q    IN FACT, AS YOU UNDERSTAND THE STRUCTURE OF THE

11    MEXICAN FEDERAL JUDICIAL POLICE FROM BEING DOWN THERE, A

12    PRIMER COMANDANTE HAS MAYBE 100, 150 COMANDANTES UNDER HIS

13    CONTROL.  CORRECT?

14    A    NOT THAT MANY, TO MY KNOWLEDGE.

15    Q    HE WAS FROM MEXICO CITY.  CORRECT?

16    A    TO THE BEST OF MY KNOWLEDGE.

17    Q    AND YOU ALSO UNDERSTAND THAT A PRIMER COMANDANTE FROM

18    MEXICO CITY IS SOMEBODY WHO IS MORE IMPORTANT AND HAS A

19    HIGHER STRUCTURE IN THE MEXICAN FEDERAL JUDICIAL POLICE

20    THAN SOMEBODY WHO IS FROM SOME OTHER SMALL TOWN IN MEXICO.

21    CORRECT?

22    A    I DON'T UNDERSTAND YOUR QUESTION.

23    Q    IN THE POWER STRUCTURE WITHIN THE MEXICAN FEDERAL

24    JUDICIAL POLICE, ARE THE PEOPLE WHO ARE THE PRIMER

25    COMANDANTES AND SIT AT THE FEET OF MANUEL IBARRA IN THE

12-8

1    STRUCTURE OF THE MEXICAN FEDERAL JUDICIAL POLICE, THOSE

2    ARE THE MOST POWERFUL COMANDANTES.  CORRECT?

3    A    THAT'S CORRECT.

4    Q    NOW, BY THE WAY, YOU TOLD US THAT YOU WENT TO

5    GUADALAJARA AND PARTICIPATED IN THE DEA INVESTIGATION.  IS

6    THAT CORRECT?

7    A    THAT'S CORRECT.

8    Q    NOW, CAN YOU TELL US WHETHER YOU DID ANY

9    INVESTIGATION OF THE MASSACRE AT THE BRAVO RANCH?

10            MR. CAMPOS:  OBJECTION, YOUR HONOR.  THAT GOES

11   BEYOND THE SCOPE OF THE DIRECT, AND IT IS IRRELEVANT.

12            MR. TARLOW:  I AM TRYING TO SAVE A LITTLE TIME

13   RATHER THAN HAVE HIM COME BACK FROM MEXICO, YOUR HONOR.

14            THE COURT:  THE OBJECTION IS SUSTAINED.  WE WILL

15   HAVE HIM COME BACK IF NECESSARY.

16   Q    BY MR. TARLOW:  NOW, YOU TOLD US THAT AT THE -- THAT

17   WHEN COMANDANTE PAVON APPROACHED CARO-QUINTERO, THEY

18   GREETED EACH OTHER.  CORRECT?

19   A    THAT'S CORRECT.

20   Q    AND AFTER A LITTLE CONVERSATION, THEY GREETED EACH

21   OTHER WARMLY.  CORRECT?

22   A    THAT'S CORRECT.

23   Q    THEY SHOOK HANDS?

24   A    YES.

25   Q    AND IN FACT CARO-QUINTERO PUT HIS ARM AROUND

12-9

1    COMANDANTE PAVON?

2    A    THAT'S CORRECT.

3    Q    NOW, AFTER THAT -- AND THIS IS IN THE MIDDLE OF WHILE

4    THESE ARMED PEOPLE ARE THERE.  CORRECT?

5    A    THAT'S CORRECT.

6    Q    AND THEN WHEN CARO-QUINTERO PUT HIS ARM AROUND

7    COMANDANTE PAVON, SOME OF CARO-QUINTERO'S GUARDS BEGAN TO

8    TALK -- TO GREET THE MEXICAN FEDERAL JUDICIAL POLICE IN A

9    FRIENDLY WAY.  CORRECT?

10   A    NO, THAT IS NOT CORRECT.

11   Q    THAT DIDN'T HAPPEN?

12   A    NOT AT THE TIME YOU ARE SUGGESTING.

13   Q    WHICH TIME DID THAT HAPPEN?

14   A    AFTER COMANDANTE PAVON CAME BACK FROM MAKING THE

15   PHONE CALL, CARO-QUINTERO RELAXED; HIS FACIAL EXPRESSIONS

16   CHANGED TO PLEASANT.  HE WAS NOT AFRAID ANYMORE, AND HE

17   CONVEYED THAT TO THE REST OF HIS PEOPLE, AND THEN THEY

18   TALKED.

19   Q    DID YOU NOTICE ANY FEAR OR CONCERN WHEN HE HAD HIS

20   ARM AROUND COMANDANTE PAVON?

21   A    YES.  EVEN THOUGH HE WAS SMILING, YOU COULD SEE -- IT

22   WAS LIKE A FAKE SMILE, BUT HE WAS TRYING TO BE FRIENDLY.

23   Q    IN OTHER WORDS, LATER ON HE HAD A REAL SMILE ON.

24   CORRECT?

25   A    A MORE RELAXED SMILE.

12-10

1   Q    THAT IS AFTER THEY WENT AROUND IN BACK OF THE PLANE.

2   RIGHT?  BACK OF THE TAIL OUT OF YOUR SIGHT?

3   A    NO.  THEY WERE IN MY SIGHT.  I COULD SEE THEM.

4   Q    OH, YOU COULD SEE WHAT THEY WERE DOING IN BACK OF THE

5   TAIL?

6   A    THEY WERE TALKING.  YES.

7   Q    DID YOU SEE CARO-QUINTERO WRITING ANYTHING?

8   A    NO, I DID NOT.

9   Q    WE WILL GET TO THAT IN A MINUTE.  NOW, YOU TALKED

10  ABOUT SOME PICTURES THAT WERE SHOWN TO YOU.  CORRECT?

11  A    THAT'S CORRECT.

12  Q    WAS THAT AN ATTEMPT TO HAVE YOU IDENTIFY PEOPLE WHO

13  WERE THERE?

14  A    THAT'S CORRECT.

15  Q    AND ABOUT WHEN DID THAT HAPPEN?

16  A    I CAN'T RECALL.  IT WAS A LONG TIME AGO.

17  Q    WELL, COULD YOU DO ANY BETTER THAN THAT?

18  A    (NO RESPONSE.)

19  Q    I DON'T MEAN YOU HAVE TO GIVE ME A WEEK OR SOMETHING.

20  JUST THREE MONTHS?  SIX MONTHS?  A YEAR?  TWO YEARS?

21  THREE YEARS?  JUST GIVE US A BALLPARK NUMBER.

22  A    I AM TRYING TO THINK.  POSSIBLY TWO YEARS AGO.

23  Q    AND WHO WAS IT THAT SHOWED YOU THE PICTURES?

24       MR. CAMPOS:  YOUR HONOR, I OBJECT FOR RELEVANCE.

25  THIS IS A FISHING EXPEDITION.

12-11

1    THE COURT:  OVERRULED.

2    THE WITNESS:  I CAN'T RECALL, SIR.

3    Q    BY MR. TARLOW:  WELL, THE PURPOSE WAS FOR YOU TO SEE

4    IF YOU COULD IDENTIFY PEOPLE WHO WERE THERE.  CORRECT?

5    A    THAT'S CORRECT.

6    Q    AND HOW MANY PICTURES DID YOU LOOK AT?

7    A    MANY.

8    Q    DO YOU REMEMBER WHAT YOU SAID?

9    A    WHAT I SAID?

10   Q    YEAH.  I MEAN, YOU ARE A TRAINED AGENT.  RIGHT?

11   A    THAT'S CORRECT.

12   Q    SO WHEN SOMEONE GIVES YOU A PICTURE, THEY SHOW YOU

13   PICTURES AND ASK YOU, "DO YOU RECOGNIZE THIS PERSON?  DO

14   YOU RECOGNIZE THIS PERSON?  TELL US WHAT YOU KNOW ABOUT

15   THAT PERSON."  CORRECT?

16   A    THAT'S RIGHT.

17   Q    SO DO YOU REMEMBER NOW WHAT YOU SAID WHEN YOU WERE

18   SEEING THOSE PICTURES?

19   A    I LOOKED AT THE PICTURES.  I DIDN'T SAY ANYTHING.  I

20   JUST LOOKED AT SOME PICTURES.

21   Q    DID YOU MAKE ANY IDENTIFICATIONS?

22   A    I CAN'T RECALL.

23   Q    WELL, LET ME ASK YOU THIS.  YOU CAN'T RECALL WHAT YOU

24   SAID.  YOU CAN'T RECALL WHETHER YOU MADE ANY

25   IDENTIFICATION.  CAN YOU RECALL WHO SHOWED YOU THE BOOK OF

12-12

1    PICTURES?  EXCUSE ME.  WAS IT A BOOK?

2    A    NO.

3    Q    A PICTURE SPREAD OR A PHOTO LINE-UP.  CAN YOU TELL US

4    WHO SHOWED YOU THE PHOTO LINE-UP?

5    A    I CAN'T RECALL.

6    Q    ALL RIGHT.  WAS IT A DEA AGENT?

7    A    YES, IT WAS.

8    Q    OKAY.  NOW, IT IS OFFICIAL DEA PROCEDURE THAT A

9    REPORT WOULD BE MADE.  CORRECT?

10   A    OF WHAT, SIR?

11   Q    ASSUMING YOU SHOW A WITNESS PICTURES AND THE WITNESS

12   PICKS OUT SOME PICTURES OR DOESN'T PICK OUT SOME PICTURES

13   OF PEOPLE WHO ARE IN A CRIME SCENE, THE OFFICIAL DEA

14   PROCEDURE IS THAT YOU MAKE A REPORT ABOUT THAT.  CORRECT?

15   A    NOT TO MY KNOWLEDGE, NO.

16   Q    SO, IN OTHER WORDS, IF YOU GO OUT AND INTERVIEW A

17   WITNESS TO FIND OUT WHO WAS PRESENT IN AN IMPORTANT PIECE

18   OF THE CASE, AND THE WITNESS POINTS TO A PICTURE AND SAYS

19   SOMETHING ABOUT THIS PICTURE -- SAYS THAT THIS PERSON WAS

20   THERE OR THIS PERSON WASN'T THERE -- YOU ARE SAYING THAT

21   IT IS NOT DEA POLICY TO MAKE A REPORT ABOUT THAT?

22   A    IN THE FASHION THAT YOU ARE MENTIONING RIGHT NOW,

23   YES, IT IS.

24   Q    WELL, YOU WERE A WITNESS.  RIGHT?

25   A    THAT'S CORRECT.

12-13

1    Q    BUT YOU ARE SAYING THAT WHEN YOU WERE A WITNESS, IT

2    IS NOT THE POLICY TO MAKE A REPORT OF WHAT YOU SAID IN

3    THIS SITUATION?

4    A    I AM SORRY.  I DON'T THINK I UNDERSTAND.

5    Q    I AM TRYING TO FIND OUT WHAT YOU DID WHEN YOU SAW

6    THOSE PICTURES.  NOW, THE FIRST THING I'D LIKE TO KNOW

7    IS -- YOU CAN'T TELL US WHETHER A REPORT WAS MADE.  IS

8    THAT WHAT YOU ARE SAYING?

9    A    I AM SAYING I DID NOT MAKE A REPORT.

10   Q    NOT YOU.  NO.  NO.  NO.  SOMEONE WAS SHOWING YOU THE

11   PICTURES.  RIGHT?

12            THE COURT:  ALL RIGHT.  LET'S NOT KEEP

13   REPEATING.

14   Q    BY MR. TARLOW:  I AM NOT ASKING YOU ABOUT MAKING A

15   REPORT.  I AM TALKING ABOUT THE PERSON WHO WAS SHOWING YOU

16   THE PICTURES.  ISN'T IT HIS POLICY TO MAKE A REPORT?

17            MR. CAMPOS:  YOUR HONOR, IT HAS BEEN ASKED AND

18   ANSWERED AND COVERED.

19            THE COURT:  OVERRULED.

20            DO YOU KNOW WHETHER OR NOT A REPORT WAS MADE OF

21   YOUR VIEWING OF THOSE PICTURES?

22            THE WITNESS:  I HAVE NO KNOWLEDGE, SIR.

23            THE COURT:  ALL RIGHT.

24   Q    BY MR. TARLOW:  AND OTHER THAN THIS ONE TIME OF

25   LOOKING AT THE PICTURES, WAS THERE ANY OTHER TIME YOU WERE

12-14

1    ASKED TO LOOK AT ANY PICTURES?

2    A    I CAN'T RECALL.

3    Q    AND CAN YOU TELL US WHO YOU IDENTIFIED IN THOSE

4    PICTURES?

5    A    I IDENTIFIED CARO-QUINTERO.

6    Q    ANYBODY ELSE?

7    A    NOT TO MY KNOWLEDGE.

8    Q    OKAY.  CAN YOU TELL ME THE NAMES OF PEOPLE WHOSE

9    PICTURES YOU WERE LOOKING AT?

10   A    NO, I CANNOT.

11   Q    CAN YOU TELL ME THE NAMES OF ANY ONE PERSON WHOSE

12   PICTURE WAS THERE?

13   A    I CAN'T RECALL.

14   Q    NOW, BESIDES THE GUNMAN WHO WERE LINED UP -- BY THE

15   WAY, HOW MANY PEOPLE WERE STANDING IN FRONT OF CARO-

16   QUINTERO'S PLANE GUARDING THE PLANE?  FIVE.  CORRECT?

17   A    HOW MANY PEOPLE WERE STANDING --

18   Q    GUARDING THE PLANE.

19   A    MORE THAN FIVE.

20   Q    NOW, IS IT CORRECT THAT YOU CAN'T TELL US WHO WAS

21   INSIDE THE PLANE?

22   A    YES, THAT IS CORRECT.

23   Q    NOW, IT IS ALSO CORRECT THAT YOU DO NOT KNOW WHETHER

24   FELIX GALLARDO WAS AT THE AIRPORT.  IS THAT CORRECT?

25   A    THAT'S CORRECT.

12-15

1   Q     NOW, THESE GUNS THAT CARO-QUINTERO'S MEN HAD, ARE

2   THESE CALLED CUERNO DE CHIVO?   PARDON MY PRONUNCIATION.

3   A     YES.

4   Q     ALL RIGHT.   WOULD YOU PRONOUNCE THAT FOR US?

5   A     CUERNO DE CHIVO.

6   Q     I DIDN'T DO THAT BAD, DID I?

7           ALL RIGHT.   THAT IS GOAT'S HORNS OF SOME KIND,

8   ISN'T IT?

9   A     THAT IS RIGHT.

10   Q     NOW, I WANT TO ASK -- NOW, YOU TOLD US ABOUT

11   COMANDANTE PAVON GOING AND MAKING A TELEPHONE CALL.

12   CORRECT?

13   A     THAT IS CORRECT.

14   Q     NOW, IN THE COURSE OF YOUR INVESTIGATION, WAS IT

15   TRACED DOWN THAT THAT CALL WAS TO MANUEL IBARRA'S OFFICE?

16   A     I'D HAVE NO KNOWLEDGE OF THAT.

17   Q     DO YOU HAVE THE PHONE RECORDS OF THAT CALL?

18   A     I DO NOT.

19   Q     DO YOU KNOW WHAT AGENT DOES?

20   A     I DO NOT.

21   Q     NOW, YOU HEARD ONE END OF THE PHONE CONVERSATION.

22   CORRECT?

23   A     THAT'S CORRECT.

24   Q     NOW, AM I CORRECT THAT IN THE MEXICAN FEDERAL

25   JUDICIAL POLICE -- WELL, YOU TOLD US THAT IN THE MEXICAN

12-16

1    FEDERAL JUDICIAL POLICE THERE ARE NOT TOO MANY PEOPLE WHO

2    WOULD BE OVER OR ABOVE COMANDANTE PAVON.  CORRECT?

3    A    I DIDN'T SAY THAT.

4    Q    ARE THERE A WHOLE LOT OF PEOPLE WHO ARE?

5    A    YES.

6    Q    MANUEL IBARRA IS ONE.  RIGHT?  MANUEL IBARRA, THE

7    DIRECTOR OF THE FEDERAL JUDICIAL POLICE IS SOMEBODY THAT

8    WAS OVER HIM IN THE POWER STRUCTURE.  RIGHT?

9    A    RIGHT.

10   Q    NOW, YOU HEARD COMANDANTE PAVON TALKING ON THE PHONE.

11   RIGHT?

12   A    THAT'S CORRECT.

13   Q    AND YOU HEARD HIM SAYING, "YES, SIR."  CORRECT?

14   A    THAT'S CORRECT.

15   Q    AND YOU HEARD HIM REPEATING THAT SEVERAL TIMES.

16   CORRECT?

17   A    THAT'S CORRECT.

18   Q    SO, BASED ON THAT AND BASED ON YOUR KNOWLEDGE OF THE

19   MEXICAN FEDERAL JUDICIAL POLICE, YOU BELIEVED HE WAS

20   TALKING TO ONE OF HIS SUPERIORS.  RIGHT?

21           MR. CAMPOS:  OBJECTION, YOUR HONOR.  THAT CALLS

22   FOR SPECULATION.

23           THE COURT:  SUSTAINED.  THE WITNESS'S BELIEF IS

24   NOT RELEVANT.

25   Q    BY MR. TARLOW:  ALL RIGHT.  BASED ON YOUR

12-17

1   OBSERVATIONS, YOU OBSERVED HIM TALKING IN A VERY

2   RESPECTFUL TONE.  IS THAT CORRECT?

3   A    THAT'S CORRECT.

4   Q    NOW, COMANDANTE PAVON THEN RETURNED TO THE PLANE.

5   CORRECT?

6   A    THAT'S CORRECT.

7   Q    AND DIDN'T HE GO OUT OF YOUR SIGHT AT SOME POINT?

8   A    NO.

9   Q    LET ME ASK YOU THIS.  DID YOU OBSERVE RAFAEL CARO-

10  QUINTERO WRITING THE $251,000 BRIBE CHECK?

11           MR. CAMPOS:  OBJECTION, YOUR HONOR.  HE IS

12  SEEKING TO INTRODUCE EVIDENCE THAT IS --

13           THE COURT:  SUSTAINED.

14           MR. TARLOW:  THAT IS IN THE RECORD ALREADY, YOUR

15  HONOR, THAT THE CHECK WAS WRITTEN.  I AM ONLY ASKING IF HE

16  SAW IT.

17           THE COURT:  THE FORM OF THE QUESTION WAS

18  IMPROPER.  YOU MAY ASK HIM IF HE OBSERVED HIM TO WRITE

19  ANYTHING.

20           MR. TARLOW:  ALL RIGHT.

21  Q    DID YOU OBSERVE HIM WRITING ANYTHING?

22  A    WHO?

23  Q    CARO-QUINTERO.

24  A    NO, I DID NOT.

25  Q    YOU DIDN'T OBSERVE HIM HAND ANYTHING, EITHER?

12-18

1    A    NO, I DID NOT.

2              MR. TARLOW:  YOUR HONOR, MAY I HAVE A MOMENT TO

3    CHECK SOMETHING?

4              (PAUSE.)

5    Q    BY MR. TARLOW:  NOW, BASED ON -- WHAT OTHER AGENTS

6    WERE AT THE AIRPORT?

7    A    SPECIAL AGENT REYES, JOHN B. BROWN -- I CAN'T RECALL

8    THE NAME OF THE OTHER.  I CAN'T RECALL THE NAME.

9    Q    LET ME ASK YOU THIS, SIR.  ACCORDING TO YOUR

10   TESTIMONY, AM I CORRECT THAT CARO-QUINTERO WAS NEVER OUT

11   OF YOUR SIGHT SO THAT HE COULD NOT HAVE WRITTEN A $251,000

12   CHECK TO COMANDANTE PAVON AT THE AIRPORT?

13             MR. CAMPOS:  YOUR HONOR, I OBJECT TO THE FORM OF

14   THE QUESTION.

15             THE COURT:  THE FORM OF THE QUESTION IS

16   IMPROPER.  YOU ADDED ONE PHRASE TOO MANY.  YOU ASKED HIM

17   IF HE WAS NEVER OUT OF HIS SIGHT.  IS THAT THE QUESTION?

18             MR. TARLOW:  THAT'S A GOOD QUESTION, JUDGE.  I

19   WILL TAKE THAT ONE.  I CAN USE ALL THE HELP I CAN GET.  I

20   AM PERFECTLY SATISFIED WITH THE QUESTION.

21   Q    DO YOU HAVE THE QUESTION IN MIND?

22   A    NO.

23   Q    WAS COMANDANTE PAVON EVER OUT OF YOUR SIGHT?

24   A    NO, HE WAS NOT.

25   Q    SO CAN YOU, BASED ON THE OBSERVATIONS THAT YOU HAD,

12-19

1    THAT YOU MADE AT THE AIRPORT, IF WE HAVE HAD TESTIMONY IN

2    THIS CASE THAT --

3          THE COURT:  COUNSEL, THE FORM OF THE QUESTION IS

4    IMPROPER.  IT IS IMPROPER TO ASK THE WITNESS IF WE HAD

5    TESTIMONY IN THIS CASE.  IT IS A HYPOTHETICAL QUESTION.

6    Q    BY MR. TARLOW:  SINCE WE HAVE HAD TESTIMONY IN THIS

7    CASE THAT HE WROTE A $251,000 CHECK, CAN YOU GIVE US ANY

8    EXPLANATION AS TO WHEN THAT COULD HAVE OCCURRED WHEN YOU

9    WOULD NOT HAVE SEEN IT?

10          MR. CAMPOS:  OBJECTION, YOUR HONOR.  THE FORM IS

11   IMPROPER.  THERE SHOULD BE NO REFERENCE TO OTHER

12   TESTIMONY, AND IT CALLS FOR HEARSAY.

13          THE COURT:  THE QUESTION IS IMPROPER, BUT I

14   DIDN'T HEAR THE PROPER GROUNDS.

15          MR. CAMPOS:  SPECULATION AND IRRELEVANT.

16          THE COURT:  COUNSEL, RESTATE YOUR QUESTION

17   WITHOUT REGARD TO WHAT OTHER TESTIMONY MAY HAVE OCCURRED

18   IN THIS CASE.  THAT HAS BEEN HEARD BY THE JURY AND NEED

19   NOT BE REITERATED BECAUSE THEY ARE NOT ALWAYS ACCURATE

20   NECESSARILY.

21   Q    BY MR. TARLOW:  CAN YOU GIVE US -- ACCORDING TO YOUR

22   TESTIMONY, IS THERE ANY POINT IN TIME WHERE COMANDANTE --

23   WHERE CARO-QUINTERO COULD HAVE WRITTEN A $251,000 CHECK TO

24   COMANDANTE PAVON AND YOU WOULDN'T HAVE SEEN IT?

25          MR. CAMPOS:  OBJECTION, YOUR HONOR.  THAT CALLS

12-20

1   FOR SPECULATION.

2           THE COURT:  WHEN YOU WERE IN THE OFFICE WITH THE

3   COMANDANTE WHEN HE WAS MAKING A TELEPHONE CALL, WERE YOU

4   ALSO ABLE TO OBSERVE WHERE CARO-QUINTERO WAS AT THAT TIME?

5           THE WITNESS:  NO, SIR.

6           THE COURT:  YOU WEREN'T ABLE TO SEE HIM AT ALL

7   TIMES.  YOU WERE ABLE TO SEE COMANDANTE PAVON, BUT YOU

8   COULD NOT SEE CARO-QUINTERO AT ALL TIMES?

9           THE WITNESS:  THAT IS CORRECT, YOUR HONOR.

10          MR. TARLOW:  YOUR HONOR, I HAVE NO FURTHER

11  QUESTIONS.  I'D LIKE TO JUST RESERVE A LITTLE BIT OF CROSS

12  UNTIL I CAN CHECK SOMETHING, AND I MAY HAVE YOU EXCUSE

13  HIM.

14          THE COURT:  WELL, YOU WILL HAVE TO LET ME KNOW

15  RIGHT AWAY.

16          MR. TARLOW:  I WILL BE ABLE TO LET YOU KNOW BY

17  THE BREAK, YOUR HONOR.

18          THE COURT:  ALL RIGHT.

19          IS THERE ANY REDIRECT OF THIS WITNESS?

20          MR. CAMPOS:  JUST BRIEFLY, YOUR HONOR.

21                    REDIRECT EXAMINATION

22  BY MR. CAMPOS:

23  Q    SPECIAL AGENT LEYVA, YOU WERE ASKED ABOUT ITEMS IN

24  THE NEWSPAPERS.  DID YOU EVER READ ANYTHING IN THE

25  NEWSPAPER MAKING REFERENCE TO THE YELLOW CAR THAT YOU WERE

12-21

1    IN?

2    A    NO, SIR.

3    Q    DID YOU EVER READ ANYTHING IN THE NEWSPAPER MAKING

4    REFERENCE TO THE STATE JUDICIAL POLICE BEING BEHIND --

5    TAKING A POSITION BEHIND THE FEDERAL POLICE?

6    A    NO, SIR.

7    Q    DID YOU EVER READ ANYTHING ABOUT THE STATE JUDICIAL

8    POLICE BEING READY TO SUPPORT RAFAEL CARO-QUINTERO BY

9    FIRING AT THE FEDERAL POLICE?

10    A    NO, SIR.

11    Q    DID YOU EVER READ ANYTHING IN THE NEWSPAPER ABOUT THE

12    FATHER OF DEFENDANT LOPEZ-ALVAREZ BEING READY TO MARRY

13    SARA COSIO AND RAFAEL CARO-QUINTERO?

14    A    NO, SIR.

15         MR. CAMPOS:  NOTHING FURTHER, YOUR HONOR.

16         MS. LEYVA:  BRIEFLY, YOUR HONOR.

17                    RECROSS EXAMINATION

18    BY MS. LEYVA:

19    Q    THIS NEWSPAPER ACCOUNT THAT YOU READ ABOUT, WHEN DID

20    YOU READ IT?

21         MR. CAMPOS:  OBJECTION, YOUR HONOR.  THAT

22    MISSTATES THE EVIDENCE OR HIS TESTIMONY.

23         MS. LEYVA:  YOUR HONOR, HE WAS JUST ASKED

24    WHETHER HE READS THESE THINGS IN THE NEWSPAPER.  I AM

25    ASKING HIM WHEN HE READ THE NEWSPAPER ACCOUNTS.

12-22

1           MR. CAMPOS:  I THINK THAT ASSUMES FACTS NOT IN

2    EVIDENCE, YOUR HONOR.

3           THE COURT:  HE DIDN'T ASK HIM WHAT HE READ.  HE

4    ASKED HIM WHAT HE DIDN'T READ.  I THINK YOU INQUIRED OF

5    THIS WITNESS PREVIOUSLY ABOUT WHAT HE HAD READ ABOUT THIS

6    CASE, HADN'T YOU?

7    Q   BY MS. LEYVA:  DID YOU READ ABOUT RAFAEL CARO-

8    QUINTERO LEAVING THE GUADALAJARA AIRPORT IN THE NEWSPAPER?

9    A   I CAN'T RECALL THAT.

10   Q   CAN YOU RECALL READING THE NEWSPAPER ABOUT PAVON-

11   REYES BEING ARRESTED REGARDING THE GUADALAJARA AIRPORT

12   INCIDENT, THAT IS, WHERE RAFAEL CARO-QUINTERO WAS AT?

13   A   I DID NOT READ THE NEWSPAPER.  I READ A BOOK THAT WAS

14   SENT TO ME, AND IT HAD THINGS IN IT, BUT IT WAS MOSTLY

15   LATER.

16   Q   AND THE BOOK THAT YOU ARE TALKING ABOUT, WHAT IS THE

17   NAME OF THAT BOOK?

18   A   I CAN'T RECALL.

19   Q   WHEN YOU SAY A BOOK, ARE YOU TALKING SOMETHING ABOUT

20   A MAGAZINE TYPE?

21   A   NO.  IT WAS ACTUALLY A BOOK THAT WAS PUBLISHED IN

22   MEXICO IN SPANISH, AND IT HAD AN ACCOUNT OF WHAT HAPPENED

23   AT THE AIRPORT BRIEFLY, AND THAT IS WHAT I READ ABOUT THE

24   AIRPORT.

25   Q   AND SO WHAT YOU ARE TELLING US IS THAT YOU DIDN'T

12-23

1    READ ANY NEWSPAPER ARTICLES REGARDING THE INCIDENT AT THE

2    GUADALAJARA AIRPORT?  YOU PERSONALLY DID NOT READ ANY?

3    A    THAT'S CORRECT.

4    Q    SO YOU DON'T KNOW, THEN, IF ANY NEWSPAPER ARTICLES

5    REFERRED TO THE YELLOW CAR.  CORRECT?

6    A    NO, I DON'T.

7    Q    AND YOU DON'T KNOW IF ANY NEWSPAPER ARTICLES REFERRED

8    TO THE STATE JUDICIAL POLICE BEING BEHIND THE FEDERALES?

9    A    THAT IS CORRECT.

10   Q    AND YOU DON'T KNOW IF THESE NEWSPAPER ARTICLES

11   REPORTED ANYTHING ELSE ABOUT WHAT HAPPENED AT THE

12   GUADALAJARA AIRPORT.  CORRECT?

13   A    THAT'S CORRECT.

14   Q    AND IF THE NEWSPAPER ARTICLES IN FACT REPORTED ALL

15   THE DETAILS, YOU WOULDN'T KNOW THAT.  CORRECT?

16   A    I DIDN'T READ THEM.

17            MS. LEYVA:  NO FURTHER QUESTIONS, YOUR HONOR.

18            THE COURT:  VERY WELL.  YOU MAY STEP DOWN.

19            THE WITNESS:  THANK YOU, YOUR HONOR.

20            THE COURT:  CALL YOUR NEXT WITNESS.

21            MR. CAMPOS:  YES, YOUR HONOR.  THE GOVERNMENT

22   WOULD CALL REYES ALVAREZ.

23            MR. TARLOW:  I HAVE NOTHING FURTHER FOR THIS

24   WITNESS.

25            THE COURT:  VERY WELL.  THE WITNESS MAY BE

12-24

1    EXCUSED.

2              COME FORWARD, PLEASE.

3              DO YOU NEED AN INTERPRETER?

4              MR. CAMPOS:  YES, WE DO, YOUR HONOR.

5    JOSE REYES GARCIA-ALVAREZ, PLAINTIFF'S WITNESS, SWORN

6              THROUGH THE SPANISH INTERPRETER

7              THE CLERK:  PLEASE BE SEATED.

8              PLEASE STATE YOUR FULL NAME FOR THE RECORD AND

9    SPELL YOUR LAST NAME.

10   A    JOSE REYES GARCIA-ALVAREZ.

11             THE CLERK:  AND SPELL YOUR LAST NAME.

12             THE WITNESS:  GARCIA-ALVAREZ.

13             THE COURT:  I THINK WE CAN SPELL THAT.

14             YOU MAY PROCEED.

15             MR. CAMPOS:  THANK YOU, YOUR HONOR.

16                       DIRECT EXAMINATION

17   BY MR. CAMPOS:

18   Q    SIR, ARE YOU A CITIZEN OF MEXICO?

19   A    YES.

20   Q    AT THE BEGINNING OF 1985, THAT IS, IN JANUARY OF

21   1985, WERE YOU WORKING FOR THE MEXICAN FEDERAL JUDICIAL

22   POLICE?

23   A    YES.

24   Q    WERE YOU WORKING IN SALTILLO, MEXICO?

25   A    YES.

12-25

1    Q    IS SALTILLO IN THE NORTHERN PART OF MEXICO?

2    A    YES.

3    Q    WILL YOU TELL US WHAT STATE SALTILLO IS IN?

4    A    IT IS SALTILLO, COAHUILA, CLOSE TO MONTERREY.

5    Q    COAHUILA IS THE STATE?

6    A    YES.

7    Q    WHO WAS YOUR SUPERVISOR, YOUR COMANDANTE AT THE TIME?

8    A    RAMON COSIO DE LA MORA.

9    Q    AND THE PREVIOUS YEAR HAD YOU BEEN ASSIGNED TO

10   GUADALAJARA?

11   A    YES.

12   Q    NOW, SIR, DID YOU AND YOUR SUPERVISORS FROM TIME TO

13   TIME HELP CARO-QUINTERO MOVE LOADS OF MARIJUANA THROUGH

14   MEXICO?

15   A    YES, TO MEXICO.

16   Q    NOW, WILL YOU TELL THE JURORS WHAT IT IS THAT YOU AND

17   YOUR SUPERVISORS AND OTHER AGENTS WOULD DO TO HELP CARO-

18   QUINTERO MOVE THESE LOADS OF MARIJUANA?

19   A    WELL, WE WOULD GO FROM SALTILLO TO LA PONCHA TO BRING

20   LOADS OF MARIJUANA.  WE WOULD GO TO SALTILLO AND THEN TO

21   MONTERREY UP TO LAREDO OR TO CIUDAD MIEL.

22   Q    WOULD YOU PROTECT TRUCKS OR VEHICLES THAT WERE LOADED

23   WITH MARIJUANA?

24   A    YES.

25   Q    AND WOULD YOU PREVENT OTHER LAW ENFORCEMENT OFFICIALS

12-26

1   FROM STOPPING THEM?

2   A    WE WERE NEVER STOPPED.  THE COMMANDER, RAMON COSIO DE

3   LA MORA, WAS IN CHARGE.

4   Q    WOULD ONE OF YOUR FELLOW POLICE OFFICERS LEAD THE

5   TRUCKS?  THAT IS, WOULD THERE BE A CAR IN FRONT OF THE

6   TRUCKS?

7   A    YES.  A COMPANY WORKER WOULD BE UP AHEAD.

8   Q    AND WOULD THERE ALSO BE A CO-WORKER, ANOTHER OFFICER,

9   BEHIND THE TRUCKS?

10   A    YES.

11   Q    NOW, APPROXIMATELY HOW MANY TIMES DID YOU PARTICIPATE

12   IN ESCORTING MARIJUANA LOADS?

13   A    SOME FOUR OR FIVE TIMES.

14   Q    NOW, DID YOU DO ANY OTHER SERVICES FOR CARO-QUINTERO

15   THAT INVOLVED USE OF FORCE?

16   A    NO.  JUST THAT.  NO.  NO.  JUST THAT.

17   Q    NOW, SIR, DID THERE COME A TIME IN EARLY 1985 THAT

18   YOUR COMANDANTE, RAMON COSIO, WENT TO GUADALAJARA?

19   A    YES.

20   Q    AND DID HE RETURN FROM GUADALAJARA WITH A CHECK FROM

21   CARO-QUINTERO?

22   A    YES.

23   Q    HOW MUCH WAS THAT CHECK FOR?

24   A    SIXTY MILLION.

25   Q    IS THAT SIXTY MILLION PESOS?

12-27

1    A    PESOS, YES.

2    Q    WAS THE EXCHANGE RATE AT THAT TIME ABOUT 100 PESOS TO

3    THE DOLLAR?

4    A    I DON'T REMEMBER.

5    Q    VERY WELL.  WHAT WAS THAT CHECK FOR?

6    A    THE COMMANDER TOLD US IT WAS A GIFT GIVEN TO HIM FROM

7    RAFAEL CARO-QUINTERO FOR THE WORK DONE.

8    Q    WAS THAT FOR YOUR EFFORTS IN ESCORTING, THAT IS,

9    PROTECTING THE MARIJUANA LOADS?

10   A    YES.

11   Q    NOW, DID THERE COME A TIME WHEN YOU WERE ASKED TO

12   CASH THIS PARTICULAR CHECK?

13   A    YES.

14   Q    AND DID YOU HAVE SOME PROBLEMS IN CASHING THE CHECK

15   FOR THAT AMOUNT?

16   A    YES.  IT TOOK ME A WHILE TO CASH THE CHECK.  THEY DID

17   NOT WANT TO CASH IT.

18   Q    HAD YOUR COMANDANTE GIVEN YOU THE CHECK TO CASH?

19   A    YES.

20   Q    HOWEVER, AT SOME POINT WERE YOU ABLE TO GET CASH FOR

21   THAT CHECK?

22   A    LATER ON AN ORDER FOR PAYMENT ARRIVED IN MY NAME.

23   Q    WAS THAT IN A BANK IN SALTILLO?

24   A    YES, IN SALTILLO.

25   Q    THEN DID YOU RECEIVE THE SIXTY MILLION PESOS?

12-28

1    A    YES, SIR.

2    Q    DID YOU THEN DISTRIBUTE THOSE FUNDS?

3    A    YES.

4    Q    DID YOU GIVE PART OF THAT MONEY TO YOUR COMANDANTE?

5    A    TO THE COMANDANTE AND TO THE DISTRICT ATTORNEY'S

6    OFFICE.

7    Q    I BELIEVE YOU USED THE TERM USTEDIO PUBLICO?

8    A    YES.

9    Q    IS THAT AN OFFICIAL THERE IN SALTILLO?

10   A    YES.  HE IS A DEPUTY DISTRICT ATTORNEY THERE.

11   Q    NOW, DID YOU ALSO GIVE SOME OF THOSE FUNDS TO ANOTHER

12   COMANDANTE?

13   A    YES.

14   Q    WAS THAT THE COMANDANTE THAT WAS IN CHARGE OF YOUR

15   IMMEDIATE COMANDANTE?

16   A    YES, THE ONE SUPERIOR TO HIM.

17   Q    AND DO YOU RECALL THE AMOUNTS THAT YOU GAVE TO EACH

18   OF THE COMANDANTES AND TO THE OFFICIAL FROM THE MINISTRY?

19   A    YES.

20   Q    HOW MUCH WAS IT?

21   A    THE FIRST COMMANDER, I GAVE HIM FIFTEEN MILLION.

22   Q    AND HOW MUCH DID YOU GIVE THE SECOND COMMANDER --

23   COMANDANTE, THAT IS?

24   A    AFTER THAT, I WENT TO THE DISTRICT ATTORNEY'S OFFICE.

25   I DELIVERED TWENTY MILLION.

12-29

1    Q    ALL RIGHT.

2    A    AND TO THE ONE HIGHER UP I GAVE HIM FIFTEEN MILLION.

3    Q    ALL RIGHT.  THAT LEFT TEN MILLION PESOS AFTER YOU HAD

4    MADE THIS PARTICULAR DISTRIBUTION?

5    A    YES.  I WAS LEFT WITH TEN MILLION PESOS.

6    Q    DID YOU KEEP SOME OF THAT YOURSELF?

7    A    YES, TEN MILLION.

8    Q    DID YOU ALSO GIVE SOME OF THAT TEN MILLION TO OTHER

9    OFFICERS?

10   A    WHEN MY COMMANDER ARRIVED, I GAVE THEM TO HIM IN

11   GUADALAJARA.

12   Q    AND DID THAT ALSO GO TO OTHER FELLOW POLICE OFFICERS?

13   A    JUST MY FELLOW OFFICERS.

14   Q    AND HOW MUCH DID YOU ULTIMATELY STAY WITH?

15   A    I WAS GIVEN ONE MILLION.

16   Q    WERE YOU ULTIMATELY ARRESTED IN MEXICO FOR RECEIVING

17   THESE PAYMENTS?

18   A    I WAS ARRESTED FOR HAVING CASHED THE SIXTY MILLION

19   PESOS CHECK.

20   Q    AND AS A RESULT OF YOUR PARTICIPATION IN WHAT YOU DID

21   TO GET THAT CHECK AS WELL.  ISN'T THAT RIGHT?

22   A    YES.

23   Q    NOW, DID YOU TELL THE AUTHORITIES THE EXTENT OF WHAT

24   YOUR INVOLVEMENT HAD BEEN?

25            MS. BARRERA:  I OBJECT TO THE LEADING QUESTION,

12-30

1   YOUR HONOR.

2            THE COURT:  OVERRULED.  YOU MAY ANSWER.

3            THE WITNESS:  COULD YOU REPEAT THE QUESTION?

4   Q    BY MR. CAMPOS:  WHEN YOU WERE ARRESTED, DID YOU TELL

5   THE OFFICIALS WHO ARRESTED YOU THE EXTENT OF YOUR

6   PARTICIPATION IN RECEIVING THIS MONEY?

7   A    YES.

8   Q    NOW, DID THERE COME A TIME WHEN YOU WERE PLACED IN A

9   PRISON IN WHICH --

10  A    YES.

11  Q    -- IN WHICH DEFENDANT RAUL LOPEZ-ALVAREZ WAS ALSO?

12  A    YES.

13  Q    WAS THAT IN MEXICO CITY?

14  A    YES, IN MEXICO CITY.

15  Q    DO YOU KNOW AN INDIVIDUAL NAMED RAUL LOPEZ-ALVAREZ?

16  A    YES.

17  Q    IS HE IN THE COURTROOM HERE TODAY?

18  A    YES, HE IS HERE.

19  Q    WOULD YOU POINT HIM OUT, PLEASE?

20  A    HE IS THE ONE (POINTING).

21            MR. CAMPOS:  MAY THE RECORD REFLECT THAT THE

22  WITNESS HAS IDENTIFIED THE DEFENDANT RAUL LOPEZ-ALVAREZ?

23            THE COURT:  YES.

24  Q    BY MR. CAMPOS:  NOW, DID YOU COME TO KNOW RAUL LOPEZ-

25  ALVAREZ WHILE YOU WERE IN PRISON TOGETHER?

12-31

1   A     I MET HIM THERE.

2   Q     AND DID YOU HAVE OCCASION TO SPEAK TO HIM OFTEN?

3   A     ON SEVERAL OCCASIONS.

4   Q     AND DID HE EVER TELL YOU ABOUT HIS INVOLVEMENT IN THE

5   KIDNAPPING OF DEA SPECIAL AGENT ENRIQUE CAMARENA?

6            MR. PANCER:  I THINK A LIMITING INSTRUCTION

7   WOULD BE APPROPRIATE AGAIN AT THIS TIME.

8            THE COURT:  YES.  ANY STATEMENTS THAT THIS

9   WITNESS STATES WHICH WERE MADE TO HIM BY MR. LOPEZ-ALVAREZ

10   CAN BE USED ONLY AS EVIDENCE AGAINST MR. LOPEZ-ALVAREZ,

11   NOT AGAINST THE OTHER TWO DEFENDANTS.

12            MS. BARRERA:  OBJECTION TO THE QUESTION IN TERMS

13   OF VAGUE AS TO TIME, YOUR HONOR.

14            THE COURT:  WELL, THAT IS TRUE.  YOU COULD LAY A

15   BETTER FOUNDATION AS TO TIME AND PLACE AND WHO ELSE WAS

16   PRESENT.

17            MR. CAMPOS:  VERY WELL, YOUR HONOR.  I SHALL.

18   Q     WHEN DID YOU FIRST ARRIVE AT THE PRISON IN WHICH RAUL

19   LOPEZ-ALVAREZ WAS ALSO --

20            THE COURT:  I THINK IT WOULD BE VERY HELPFUL IF

21   YOU WOULD ASK SHORT QUESTIONS.  WE DO HAVE AN INTERPRETER.

22   IN OTHER WORDS, WHEN DID YOU ARRIVE AT THE PRISON?

23            MR. CAMPOS:  I WILL TRY, YOUR HONOR.

24            THE COURT:  THESE COMPOUND QUESTIONS CREATE A

25   PROBLEM.

12-32

1    Q    BY MR. CAMPOS:   WHEN DID YOU ARRIVE AT THE PRISON?

2    A    I ARRIVED TOWARD THE END OF '85.

3    Q    AND WAS RAUL LOPEZ-ALVAREZ ALREADY IN PRISON AT THAT

4    TIME?

5    A    YES.  HE HAD BEEN THERE FOR YEARS ALREADY.

6    Q    DID YOU MEET HIM SOON AFTER YOU ARRIVED AT THE END OF

7    '85?

8    A    NO.  ABOUT A MONTH AND A HALF OR TWO MONTHS LATER IS

9    WHEN WE STARTED TO GETTING TOGETHER.

10    Q    AND WOULD YOU HAVE CONVERSATIONS WITH HIM OFTEN?

11    A    WE GOT TOGETHER ON SEVERAL OCCASIONS TO CHAT.

12    Q    ALL RIGHT.  ON ONE OF THOSE OCCASIONS DID HE TELL YOU

13    ABOUT ENRIQUE CAMARENA?

14    A    YES.

15    Q    WHERE WERE YOU WHEN THIS FIRST CONVERSATION ABOUT

16    ENRIQUE CAMARENA OCCURRED?

17    A    I WAS DETAINED IN THE RECLUSARIO ORIENTE IN MEXICO

18    CITY.

19    Q    WHERE IN THE PRISON DID YOU HAVE YOUR CONVERSATION

20    WITH RAUL LOPEZ?

21    A    HE WAS ALREADY WITH THE PRISON POPULATION, AND I HAD

22    JUST ARRIVED.

23         THE COURT:  THE QUESTION WAS "WHERE IN THE

24    PRISON DID YOU HAVE THE CONVERSATION?"

25         THE WITNESS:  IT IS A PLACE WITHIN THE PRISON

12-33

1    WHICH IS CALLED THE ENTRY HALL OR ROOM.

2    Q    BY MR. CAMPOS:  DID YOU HAVE THIS CONVERSATION WITH

3    RAUL LOPEZ ONLY BETWEEN YOURSELVES?

4           THE COURT:  THAT IS NOT VERY CLEAR.

5           WAS ANYONE ELSE PRESENT AT THIS CONVERSATION?

6           THE WITNESS:  WELL, THERE WERE SEVERAL PERSONS.

7    THERE WERE HIS FELLOW INMATES AND MINE.

8    Q    BY MR. CAMPOS:  DID RAUL LOPEZ TELL YOU SOMETHING

9    ABOUT ENRIQUE CAMARENA?

10   A    YES.

11   Q    WHAT DID HE TELL YOU ABOUT HIM?

12          MR. TARLOW:  I HAVE A CONTINUING OBJECTION ON

13   HEARSAY AND CONFRONTATION, WHICH THE COURT HAS ALREADY

14   OVERRULED.  IS THAT CORRECT?

15          THE COURT:  YES.

16          MR. PANCER:  WE JOIN, YOUR HONOR.

17          THE COURT:  DON'T INTERRUPT, WILL YOU PLEASE.

18   IF YOU WANT TO OBJECT TO A QUESTION, STATE YOUR OBJECTION

19   AND THE GROUNDS.

20          MR. TARLOW:  ALL RIGHT.  THE OBJECTION IS

21   HEARSAY AND CONFRONTATION.

22          THE COURT:  THE OBJECTION IS OVERRULED.

23          MR. PANCER:  I HAVE JOINED, YOUR HONOR.

24          THE COURT:  IT IS OVERRULED.

25   Q    BY MR. CAMPOS:  SIR, DO YOU REMEMBER THE QUESTION

12-34

1  THAT I JUST ASKED?

2  A    NO.  COULD YOU REPEAT IT FOR ME?

3  Q    YES.  WHAT DID RAUL LOPEZ TELL YOU ABOUT ENRIQUE

4  CAMARENA?

5  A    THAT HE AND HIS COMPANIONS HAD KIDNAPPED ENRIQUE

6  CAMARENA.

7  Q    DID HE TELL YOU HOW THEY KIDNAPPED HIM?

8  A    THAT THEY HAD GONE TO THE EMBASSY IN GUADALAJARA AND

9  THAT THEY HAD GONE THERE WITH THEIR COMPANIONS AND THAT

10  THEY HAD SHOWED HIM THEIR CREDENTIALS.

11  Q    ALL RIGHT.  EXCUSE ME.

12  A    THEY WERE ASKING FOR HIM.

13  Q    DID HE TELL YOU WHAT THEY DID AFTER THEY SHOWED THEIR

14  CREDENTIALS?

15  A    THAT THEY ASKED FOR HIM, FOR ENRIQUE CAMARENA, AND A

16  LITTLE WHILE LATER HE WAS COMING OUT.

17  Q    WHAT DID HE TELL YOU, IF ANYTHING, ABOUT WHAT THEY

18  DID WHEN HE WAS COMING OUT?

19  A    THAT THEY HAD A JOB FOR HIM.

20  Q    AND DID HE TELL YOU ANYTHING ABOUT -- WELL, STRIKE

21  THE QUESTION.

22       WHAT ELSE DID HE TELL YOU ABOUT SPECIAL AGENT

23  CAMARENA?

24  A    THAT THEY GOT HIM OUT OF THERE FOR THE PURPOSES OF

25  SOME JOB, WHICH WAS -- HAD TO DO WITH WHAT HE WAS DOING

12-35

1   THERE, AND THAT IS HOW THEY GOT HIM OUT.

2   Q    DID HE TELL YOU ANYTHING MORE ABOUT THE KIDNAPPING?

3   A    THAT THEY TOOK HIM OUT OF THERE, AND THEY TOOK HIM IN

4   A CAR TO A HOUSE BELONGING TO RAFAEL CARO-QUINTERO.

5   Q    DID HE TELL YOU WHAT KIND OF A CAR WAS USED?

6   A    IT WAS A CARIBE.

7   Q    IS THAT A VOLKSWAGEN, SIR?

8   A    YES, A VOLKSWAGEN.

9   Q    DID RAUL LOPEZ SAY ANYTHING TO YOU ABOUT WHAT

10  HAPPENED WHEN ENRIQUE CAMARENA WAS TAKEN TO THE RESIDENCE

11  OF CARO-QUINTERO?

12  A    THAT HE HAD BEEN TAKEN TO A HOUSE AND THAT THEN HE

13  GOT IN TOUCH WITH HIS BOSS.  HE CALLED RAFAEL CARO-

14  QUINTERO, SAYING THAT THEY ALREADY HAD HIM IN THE HOUSE,

15  THAT THEY HIM IN A HOUSE AND, YES, AND THAT HE WAS COMING

16  RIGHT OVER.

17  Q    WHEN YOU SAID HE WAS COMING RIGHT OVER, DID RAUL

18  LOPEZ TELL YOU WHO WAS COMING RIGHT OVER?

19  A    THAT RAFAEL CARO-QUINTERO WAS GOING TO GO.

20  Q    SO RAUL LOPEZ TOLD YOU THAT WHEN AGENT CAMARENA WAS

21  TAKEN TO THE HOUSE, CARO-QUINTERO WAS NOT THERE YET.  IS

22  THAT RIGHT?

23  A    NO, HE WASN'T THERE YET.

24  Q    DID RAUL LOPEZ TELL YOU WHAT HE DID WHEN HE GOT TO

25  CARO-QUINTERO'S RESIDENCE?

12-36

1    A    THAT HE STAYED THERE FOR A WHILE BEATING UP CAMARENA,

2    AND THERE WERE TWO OR THREE OTHER PERSONS ALONG WITH HIM

3    BEATING HIM AS WELL.

4    Q    DID RAUL LOPEZ SAY HE HIMSELF DID THE BEATING?

5    A    NO.   NO.   THAT HE WAS -- THAT HE WAS WATCHING THE WAY

6    THAT HE WAS BEING BEATEN.

7    Q    NOW, DID HE TELL YOU ABOUT WHETHER HE LEFT?

8    A    NO.   THAT HE HAD REMAINED THERE FOR SEVERAL DAYS

9    LOOKING AFTER HIM, HE ALONG WITH HIS COMPANIONS.

10   Q    DID HE TELL YOU ANYTHING ABOUT AN INCIDENT INVOLVING

11   ERNESTO FONSECA AND RAFAEL CARO-QUINTERO?

12   A    I THINK THAT SEVERAL DAYS LATER ERNESTO FONSECA

13   ARRIVED, AND HE WAS GOING INTO RAFAEL CARO-QUINTERO'S

14   HOUSE; THAT THE TWO STARTED ARGUING, AND FONSECA SLAPPED

15   CARO-QUINTERO, AND HE SAID, "GO SEE WHAT IS LEFT OF

16   CAMARENA.   GO SEE IF YOU CAN STILL GET TO SEE HIM."

17   Q    AND THAT IS WHAT RAUL LOPEZ TOLD YOU?

18   A    YES.

19   Q    DID RAUL LOPEZ TELL YOU WHETHER HE WORKED FOR ERNESTO

20   FONSECA?

21   A    YES.

22   Q    DID HE TELL YOU WHETHER HE ALSO WORKED FOR RAFAEL

23   CARO-QUINTERO?

24   A    YES.

25   Q    DID HE WORK FOR BOTH OF THEM?

12-37

1    A    YES.  HE TOLD ME THAT HE WORKED FOR BOTH.

2    Q    NOW, DID YOU HAVE OTHER CONVERSATIONS WITH DEFENDANT

3    LOPEZ-ALVAREZ AFTER HE LEFT PRISON?

4    A    YES.

5    Q    WHERE DID YOU HAVE THOSE CONVERSATIONS?

6    A    IN GUADALAJARA AND AT MY HOUSE ON SEVERAL OCCASIONS.

7    Q    WHEN DID YOU GET OUT OF PRISON?

8    A    A YEAR AFTER I HAD BEEN DETAINED THERE.  I WAS IN FOR

9    ONE YEAR.

10   Q    SO YOU WERE RELEASED SOMETIME IN LATE 1986?

11   A    YES.

12   Q    APPROXIMATELY WHEN DID YOU HAVE YOUR CONVERSATION IN

13   YOUR HOME WITH DEFENDANT RAUL LOPEZ-ALVAREZ?

14   A    ABOUT TWO OR THREE MONTHS AFTER I GOT OUT, I STARTED

15   TO HAVE CONVERSATIONS WITH HIM.

16   Q    AND DID YOU INVITE RAUL LOPEZ TO COME TO YOUR HOUSE?

17   A    HE WOULD COME TO MY HOUSE ON SEVERAL OCCASIONS.

18   Q    IN ANY OF THOSE OCCASIONS DID RAUL LOPEZ ALVAREZ ALSO

19   TELL YOU ABOUT ENRIQUE CAMARENA?

20   A    YES.  YES, AT MY HOUSE.

21   Q    DID HE GIVE YOU ANY INFORMATION DIFFERENT THAN WHAT

22   YOU HAVE TOLD US THAT HE TOLD YOU ABOUT IN PRISON?

23   A    THE SAME ONE ALWAYS, THE SAME ONE.

24   Q    THE SAME DETAILS.  IS THAT CORRECT?

25   A    YES.

12-38

1   Q    WHO LIVED WITH YOU IN YOUR HOME, SIR?

2   A    MY WIFE AND MY CHILDREN.

3   Q    AND WAS ANYONE ELSE PRESENT DURING THOSE

4   CONVERSATIONS BESIDES YOUR FAMILY?

5   A    JUST MY WIFE AND MY CHILDREN AND HE AND I.

6   Q    NOW, SIR, AT SOME POINT DID YOU GO TO THE DEA AND

7   OFFER INFORMATION?

8   A    I PROPOSED IT TO A FRIEND OF MINE, AND HE INTRODUCED

9   ME TO THE DEA PEOPLE.

10   Q    AND DID YOU PROVIDE INFORMATION OF YOUR OWN FREE WILL

11   TO THE AGENTS OF THE DRUG ENFORCEMENT ADMINISTRATION?

12   A    YES.

13   Q    AND DID THE DRUG ENFORCEMENT ADMINISTRATION OR ANY

14   OTHER GOVERNMENT OFFICIAL PROMISE YOU ANYTHING IN EXCHANGE

15   FOR YOUR TESTIMONY TODAY?

16   A    NO.  I HAVE NEVER BEEN PROMISED ANYTHING.  THEY

17   DIDN'T PROMISE MY ANYTHING.  THEY HAVE JUST BEEN HELPING

18   ME WITH EXPENSES.

19   Q    ARE YOU NOW IN A STATUS WHERE YOU REPORT TO THE DEA?

20   A    NO.

21   Q    THAT IS, THE DEA PROVIDED YOU MONEY FOR EXPENSES?

22   A    I AM BEING GIVEN MONEY FOR EXPENSES, FOR LIVING

23   EXPENSES.

24   Q    AND DO YOU KEEP IN CONTACT WITH A PARTICULAR DEA

25   AGENT?

12-39

1    A    WHEN I AM ASKED, YES.

2    Q    HAVE YOU RECEIVED, SIR, APPROXIMATELY, $30,000 IN

3    EXPENSES OVER THE COURSE OF A YEAR?

4    A    I THINK SO, MORE OR LESS.  I DON'T REMEMBER THE EXACT

5    AMOUNT, BUT I THINK IT IS THAT MORE OR LESS.

6         MR. CAMPOS:  MAY I HAVE A BRIEF MOMENT, YOUR

7    HONOR?

8         (DISCUSSION OFF THE RECORD.)

9         MR. CAMPOS:  NOTHING FURTHER, YOUR HONOR.

10        THE COURT:  WE WILL TAKE OUR MORNING RECESS AT

11   THIS TIME.

12        (THE JURY LEFT THE COURTROOM AND

13        PROCEEDINGS IN OPEN COURT.)

14        THE COURT:  DO YOU HAVE SOMETHING YOU WISH TO

15   TAKE UP WITH THE COURT?

16        MR. PANCER:  TWO MATTERS.  ONE INVOLVES A

17   WITNESS NAMED GOMEZ ESPANA, WHO WILL BE TESTIFYING --

18        THE COURT:  WHAT IS THE WITNESS'S NAME?

19        MR. PANCER:  GOMEZ ESPANA.

20        THE COURT:  HE WILL BE TESTIFYING TODAY?

21        MR. PANCER:  NEXT.

22        THE COURT:  WHAT IS THE PROBLEM?

23        MR. PANCER:  THERE WERE A NUMBER OF 404(B)

24   ISSUES, YOUR HONOR.  BY AGREEMENT WE TOOK CARE OF ALL BUT

25   ONE, AND I BELIEVE HE IS GOING TO TESTIFY THAT HE FIRST

12-40

1   MET RENE VERDUGO WHEN HE WAS LAUNDERING A GREAT DEAL OF

2   MONEY.  I THINK, YOUR HONOR, THAT HE WILL IMPLICATE, IF

3   NOT DIRECTLY, INDIRECTLY MR. VERDUGO IN THAT LAUNDERING

4   ATTEMPT.

5       I BELIEVE, YOUR HONOR, THAT, FIRST OF ALL, THE

6   GOVERNMENT SAID THEY WOULD ONLY USE OTHER MARIJUANA

7   TRANSACTIONS IN TERMS OF ANY OTHER BAD CONDUCT INVOLVING

8   MR. VERDUGO, NOT LAUNDERING.  I DON'T BELIEVE IT IS

9   NECESSARY TO GET INTO IT.  THEY CAN PUT IN THE BACKGROUND

10  OF HOW THEY MET AND WHERE THEY MET WITHOUT GETTING INTO

11  THE LAUNDERING.  IN ANY EVENT, RENE VERDUGO WAS NOT

12  DIRECTLY INVOLVED IN THIS LAUNDERING.

13      THE COURT:  WHAT IS IT YOU ARE ASKING THE COURT

14  TO DO?

15      MR. PANCER:  TO EXCLUDE EVIDENCE CONCERNING THE

16  LAUNDERING IN WHICH MR. ESPANA WAS INVOLVED AT THE TIME HE

17  MET MR. VERDUGO.

18      MR. GOMEZ ESPANA, I BELIEVE, HAS A CONVICTION IN

19  THAT MATTER, AND IF THE GOVERNMENT WANTS TO BRING THAT

20  OUT, I AM NOT ARGUING WITH THAT.  I AM JUST SAYING THAT

21  CONNECTING MR. VERDUGO TO IT -- THE PREJUDICIAL VALUE IS

22  GREAT, AND THERE IS NO PROBATIVE VALUE THAT I CAN THINK

23  OF.

24      MR. GURULE:  THAT IS VERY GENEROUS OF THEM ON

25  THE CONVICTION OF MR. GOMEZ ESPANA.  THE GOVERNMENT'S

12-41

1    POSITION, YOUR HONOR, IS THAT WE WOULD INTRODUCE EVIDENCE

2    REGARDING RENE VERDUGO'S INVOLVEMENT IN THE NARCOTICS

3    ENTERPRISE, SPECIFICALLY RELATED TO THE DISTRIBUTION OF

4    MARIJUANA, BUT WOULD NOT GET INTO TRANSACTIONS INVOLVING

5    COCAINE.

6            THIS PARTICULAR TRANSACTION, THIS MONEY, WE

7    BELIEVE, IS AN INTEGRAL PART OF THE NARCOTICS ENTERPRISE

8    RELATIVE TO THE MARIJUANA DISTRIBUTION, AND IN FACT IT IS

9    THE LIKELY PROCEEDS OF MARIJUANA TRAFFICKING.

10            WE CANNOT SAY THAT WE WOULD JUST LIMIT HIS

11   TESTIMONY TO MARIJUANA DISTRIBUTION, BUT WE WOULD LIMIT

12   THE EVIDENCE REGARDING RENE VERDUGO TO THE MARIJUANA

13   ENTERPRISE OR THAT ASPECT OF THE ENTERPRISE, AND NOT BE

14   BRINGING IN COCAINE.  THAT WAS THE SPECIFIC CHALLENGE AT

15   THAT TIME, AND THIS IS AN INTEGRAL PART.

16            IF THERE IS EVIDENCE, AND THERE WILL BE, THAT

17   MR. VERDUGO DELIVERED LARGE QUANTITIES OF MONEY TO

18   FACILITATE THE MARIJUANA OPERATION, THAT IS PART AND

19   PARCEL OF THE MARIJUANA OPERATION.  WE SHOULDN'T BE

20   FORCED -- BE LIMITED TO CUT OUT THAT PARTICULAR EVIDENCE

21   WHEN IN FACT IT IS RELEVANT TO HIS MEMBERSHIP AND

22   PARTICIPATION IN THE MARIJUANA OPERATION.

23            MR. PANCER:  I AM NOT OBJECTING TO THAT

24   EVIDENCE.  THIS EVIDENCE, YOUR HONOR, IS NOT THAT.  IF

25   THEY HAVE OTHER WITNESSES WHO SAY THAT RENE RECEIVED MONEY

12-42

1   FROM MARIJUANA DISTRIBUTION AND DELIVERED IT TO SOMEONE, I

2   UNDERSTAND THAT THEY CAN DO THAT.  THAT IS NOT THIS

3   WITNESS'S TESTIMONY, YOUR HONOR.  IT WASN'T RENE VERDUGO'S

4   MONEY, AND THERE IS AN INDIRECT REFERENCE, AND WE ARE

5   GOING TO END UP SPENDING MORE TIME ON IT FROM THE STAND

6   THAN IT IS REALLY WORTH.

7         THE COURT:  WELL, IF THIS WITNESS TESTIFIES TO

8   ACTIVITIES BY MR. VERDUGO INVOLVING MONEY LAUNDERING WHICH

9   ARE RELATED TO THE ENTIRE MARIJUANA OPERATION, THEN THAT

10  WOULD BE PERMISSIBLE WITHIN THE SCOPE OF THE COURT'S PRIOR

11  RULING.  IF IT IS UNRELATED, IF IT IS AN UNRELATED ACT OR

12  DOES NOT TIE IN TO THE ORGANIZATION'S ACTIVITY, IT SHOULD

13  BE EXCLUDED.

14        I TAKE IT WHAT YOU ARE SAYING IS THAT YOU INTEND

15  TO SHOW THROUGH THIS WITNESS THAT IT IS A RELATED AND

16  INTEGRAL PART OF THE ORGANIZATION'S ACTIVITIES.

17        MR. GURULE:  WHAT IT WILL BE SPECIFICALLY, YOUR

18  HONOR, AND I WILL KEEP IT VERY BRIEF, IS WHEN HE FIRST MET

19  RENE VERDUGO -- GOMEZ ESPANA -- HE HAD TRAVELED UP TO

20  MEXICALI FOR THE PURPOSE OF PICKING UP SOME MONEY, SOME

21  MONEY THAT WAS OWED TO A BUSINESS PARTNER OF HIS WHO WAS A

22  REAL ESTATE AGENT, AND THAT MONEY WAS FOR THE PAYMENT OF A

23  HOUSE THAT HAD BEEN PURCHASED BY RAFAEL CARO-QUINTERO.

24        THEY WENT TO RENE VERDUGO.  THEY MET WITH RENE

25  VERDUGO.  THEY TRIED TO CASH CASHIER'S CHECKS -- OR

12-43

1    PURCHASE CASHIER'S CHECKS IN MEXICALI AND WERE UNABLE TO

2    DO SO.  THEY THEN WENT TO MEXICALI, WHERE HE WAS DELIVERED

3    A LITTLE OVER A MILLION DOLLARS IN CASH.

4              THE COURT:  WHO WAS?

5              MR. GURULE:  GOMEZ ESPANA.

6              THE COURT:  WHO DELIVERED IT TO HIM?

7              MR. GURULE:  IT WAS ANOTHER INDIVIDUAL WHO WAS

8    PART AND PARCEL OF THIS TRANSACTION INVOLVING RENE VERDUGO

9    WHO COULDN'T PURCHASE THE CASHIER'S CHECKS AT THE BANK OF

10   MEXICALI.  IT WAS THEREFORE NECESSARY TO GO TO ANOTHER

11   BANK IN ANOTHER CITY TO PURCHASE THE CASHIER'S CHECKS.

12             THE COURT:  NO FURTHER ARGUMENT IS NECESSARY.

13   THE MOTION TO EXCLUDE THAT EVIDENCE IS DENIED.

14             MR. PANCER:  I HAVE ANOTHER MATTER, YOUR HONOR.

15   AS I INFORMED THE COURT YESTERDAY, ON MONDAY NIGHT I

16   RECEIVED MAYBE A THOUSAND, 1500, PAGES OF DISCOVERY.  YOUR

17   HONOR, WE ARE PREPARED TO CROSS-EXAMINE MR. GOMEZ ESPANA.

18   WE ARE PREPARED TO CROSS-EXAMINE MR. WITSGCHER.

19             WE ARE NOT PREPARED, AND WILL NOT, UNLESS THE

20   COURT SO ORDERS US, GO AHEAD WITH ANY OF THE OTHER

21   WITNESSES THAT ARE SCHEDULED TODAY FOR TWO REASONS.  ONE

22   OF THOSE REASONS, YOUR HONOR, IS THAT WE HAVE HAD BARELY

23   TIME TO READ THE OTHER MATERIAL.  WE HAVE NOT HAD TIME TO

24   DIGEST IT, NOR HAVE WE HAD TIME TO SHOW IT TO OUR CLIENT

25   FOR HIS INPUT THAT WE DESPERATELY NEED FOR SOME OF THE

12-44

1    ALLEGATIONS IN THAT MATERIAL.

2              TO DO THAT, YOUR HONOR, WE WOULD NEED AT LEAST

3    THE REST OF THE DAY.  THAT IS, IF WE TOOK A BREAK AT NOON,

4    I THINK WE COULD SIT DOWN WITH MR. VERDUGO AND GO OVER THE

5    MATERIAL.  TO ACCOMPLISH THAT, WE WOULD CERTAINLY NEED THE

6    REST OF THE DAY FROM NOON ON TO JUST ABSORB THE MATERIAL

7    OURSELVES AND HAVE OUR CLIENT ABSORB IT AND GET HIS

8    ASSISTANCE.

9              WE ARE ASKING FOR A BREAK LONGER THAN THAT, YOUR

10   HONOR, TO DO AN INVESTIGATION OF AT LEAST ONE OF THE

11   WITNESSES, A MR. BROWN, AND TO COMPLETE AN INVESTIGATION

12   OF ANOTHER WITNESS, A MR. HOLLESTELLE.

13             YOUR HONOR, UNLESS WE GET THIS TIME, I DON'T

14   THINK WE CAN EFFECTIVELY OR COMPETENTLY PROCEED IN THIS

15   CASE.  I DON'T THINK WE CAN EFFECTIVELY RENDER ASSISTANCE

16   TO OUR CLIENT, YOUR HONOR.

17             MR. GURULE:  YOUR HONOR, IF I MAY BE HEARD.  I

18   THINK THERE IS ONE VERY IMPORTANT ASPECT OF THIS THAT

19   MR. PANCER IS LEAVING OUT.  THAT IS THAT THESE PARTICULAR

20   WITNESSES THAT ARE GOING TO BE TESTIFYING TODAY, THIS

21   AFTERNOON, ARE IN FACT WITNESSES THAT ARE DEFENDANTS WITH

22   MR. VERDUGO IN SAN DIEGO, AND IN FACT MR. PANCER HAS KNOWN

23   ABOUT THESE PARTICULAR INDIVIDUALS FOR AN EXTENSIVE PERIOD

24   OF TIME.

25             IN FACT, ONE OF THE INDIVIDUALS WHO IS GOING TO

12-45

1   BE TESTIFYING, WE HAVE GIVEN HIM THE JENCKS, WE HAVE GIVEN

2   HIM THE NAME, DAVID DIETER, AND HE IN FACT TESTIFIED AT A

3   RELATED TRIAL, RELATED TO THE RENE VERDUGO CCE CASE IN SAN

4   DIEGO, AND IN FACT WAS CROSS-EXAMINED AT LENGTH BY JUANITA

5   BROOKS RELATIVE TO WHAT HIS TESTIMONY IS GOING TO BE

6   TODAY.  HIS TESTIMONY INVOLVES HIS INVOLVEMENT IN

7   NARCOTICS TRAFFICKING WITH RENE VERDUGO AND DONALD

8   WALTERS.

9          DONALD WALTERS WAS A DEFENDANT IN THAT CASE IN

10  SAN DIEGO, AND JUANITA BROOKS REPRESENTED DONALD WALTERS.

11  SO SHE HAS HAD AN OPPORTUNITY TO HAVE ALL THE JENCKS, I AM

12  SURE, IN THAT CASE RELATED TO DAVID DIETER, AND BASICALLY

13  WE HAVE MADE COPIES OF VIRTUALLY THE SAME MATERIAL AND

14  TURNED OVER TO THE DEFENSE.  THIS DAVID DIETER INCIDENT

15  OCCURRED, I MEAN, MONTHS AND MONTHS AGO.  IT WAS CLOSE TO

16  A YEAR AGO.

17         HOLLESTELLE WAS A DEFENDANT IN THAT PARTICULAR

18  CASE.  THE DEFENSE HAS KNOWN ABOUT SKIP HOLLESTELLE FOR

19  WELL OVER A YEAR.  HE WAS INDICTED IN THE CASE INITIALLY

20  WITH RENE VERDUGO.  THEY HAVE KNOWN ABOUT HIM.  THEY KNOW

21  ABOUT HIS ROLE.  THEY KNOW ABOUT HIS PARTICIPATION.  AND

22  THEN TO COME HERE AND CLAIM, WELL --

23         THE COURT:  HAVE THEY KNOWN THAT THESE PEOPLE

24  WERE GOING TO BE WITNESSES BEFORE THE OTHER DAY?

25         MR. GURULE:  THEY HAVE KNOWN ABOUT THEM FOR 48

12-46

1   HOURS, YOUR HONOR, AND THEY HAVE CERTAINLY HAD THE

2   DISCOVERY MATERIAL, OR AT LEAST THE GRAND JURY TRANSCRIPT

3   AND TRIAL TESTIMONY OF DAVID DIETER FOR AN EXTENSIVE

4   PERIOD OF TIME.

5           MR. PANCER:  IT WILL BE 48 HOURS AT 9:00 O'CLOCK

6   TONIGHT, I GUESS, YOUR HONOR.  BUT THAT IS REALLY NOT THE

7   POINT.  THE POINT IS THAT WE NEED THE TIME.

8           ALSO, YOUR HONOR, THE GOVERNMENT IS TRYING TO

9   HAVE THIS BOTH WAYS.  FIRST THEY SAY, "WE CAN'T TELL YOU

10  ABOUT ANY OF THESE INFORMANTS.  WE JUST CAN'T TELL YOU.

11  IT WOULD BE SO UNSAFE TO TELL YOU."  AND THEN THEY STAND

12  UP IN COURT AND SAY, "BUT YOU HAVE KNOWN ALL ALONG."  YOUR

13  HONOR, IF WE HAD KNOWN ALL ALONG, WHY DIDN'T THEY TELL US

14  A WEEK AGO THAT THEY WERE GOING TO CALL THESE PEOPLE IF

15  SAFETY REALLY ISN'T AN ISSUE.  THEY HIDE BEHIND THIS

16  SAFETY THING WHEN THEY WANT TO PLAY CLOSE TO THE VEST AND

17  GIVE US NO TIME TO PREPARE, AND THEN THEY STAND UP AND

18  SAY, "WELL, IT REALLY IS NOT A SAFETY ISSUE BECAUSE THEY

19  HAVE ALWAYS KNOWN THESE PEOPLE WERE GOING TO TESTIFY."

20          WE DIDN'T KNOW.  WE GOT THE INFORMATION AT 9:00

21  O'CLOCK MONDAY NIGHT.  THE GOVERNMENT IS TRYING TO HAVE IT

22  BOTH WAYS.  IT IS NOT FAIR.  WE DON'T HAVE TIME AND CAN'T

23  BE COMPETENT.

24          THE COURT:  ALL RIGHT.  THAT IS ENOUGH ARGUMENT.

25  HERE IS WHAT WE ARE GOING TO DO.  THESE WITNESSES WILL BE

12-47

1   CALLED.  AFTER THEIR DIRECT TESTIMONY IS PRESENTED, YOU

2   WILL HAVE TO DEMONSTRATE TO ME SOME SPECIFIC NEED THAT YOU

3   FEEL YOU ARE UNABLE TO MEET AT THIS TIME THAT REQUIRES

4   ADDITIONAL TIME.  I AM NOT GOING TO PUT OFF WITNESSES AND

5   GRANT ADDITIONAL TIME ON THIS GENERALIZED STATEMENT THAT

6   WE ARE NOT READY.  THIS CASE HAS BEEN PENDING FOR A LONG

7   TIME.  I UNDERSTAND THAT THE WITNESS WAS NOT DISCLOSED TO

8   YOU.  YOU HAVE HAD WHAT MATERIAL WAS NEEDED FOR THIS

9   WITNESS.  WHEN WAS THAT DISCLOSED?

10          MR. PANCER:  9:00 O'CLOCK MONDAY NIGHT.

11          THE COURT:  WHAT IS THERE IN THE MATERIAL?

12          MS. BROOKS:  YOUR HONOR, COULD THE RECORD

13   REFLECT THAT I AM HOLDING UP PROBABLY A FOOT WORTH OF

14   PAPERS, AND THAT IS JUST TWO OF THE WITNESSES.

15          THE COURT:  WELL, THAT IS AN EXAGGERATION.  IT

16   IS LESS THAN SIX INCHES.

17          MR. GURULE:  IT IS A GRAND JURY TRANSCRIPT.  IT

18   IS NOT HUNDREDS OF REPORTS.

19          THE COURT:  YOU HAVE THE TESTIMONY THAT THESE

20   WITNESSES GAVE BEFORE THE GRAND JURY.

21          MS. BROOKS:  SOME OF IT INVOLVES THAT AND SOME

22   OF IT IS DEA 6'S, YOUR HONOR.  ALL I CAN REPRESENT IS THAT

23   WE HAVE BEEN UP UNTIL 2:00 AND 3:00 O'CLOCK IN THE MORNING

24   TRYING TO GO THROUGH THESE THINGS AND DIGEST THEM.

25          AND AS FAR AS MY REPRESENTATION OF MR. WALTERS,

12-48

1   YOUR HONOR, THAT WAS TOTALLY FOCUSED ON MR. WALTERS.  I

2   DIDN'T REPRESENT MR. VERDUGO.  I DIDN'T EVEN KNOW

3   MR. VERDUGO AT THAT POINT IN TIME, AND MY FOCUS FOR CROSS-

4   EXAMINATION NOW IS COMPLETELY DIFFERENT, YOUR HONOR.

5           THE COURT:  WHAT IS THERE IN THE TRANSCRIPT OF

6   THE GRAND JURY TESTIMONY THAT YOU FEEL, OTHER THAN YOU MAY

7   NOT LIKE IT, WHAT IS THERE ABOUT IT THAT YOU FEEL

8   PREJUDICES YOU OR PREVENTS YOU FROM CROSS-EXAMINING?

9           MS. BROOKS:  FIRST OF ALL, THERE ARE CERTAIN

10  INCIDENTS THAT ARE MENTIONED BY THE WITNESSES THAT I

11  DIDN'T KNOW ABOUT UNTIL I READ IT THAT INVESTIGATION, I

12  THINK, WOULD REVEAL ARE NOT TRUE OR COULD BE CONTRADICTED.

13          THE COURT:  INVOLVING YOUR CLIENT?

14          MS. BROOKS:  YES, YOUR HONOR.  SECONDLY, THERE

15  ARE -- THROUGH MY BLEARY EYES AT 1:00 O'CLOCK THIS MORNING

16  I STARTED SEEING INCONSISTENCIES BETWEEN THE TWO

17  WITNESSES, BUT I HAVEN'T HAD TIME TO SIT DOWN AND DIGEST

18  THAT AND SEE WHETHER THAT IS TRUE OR NOT.  I AM FLIPPING

19  THROUGH THOUSANDS OF PAGES AT A TIME TRYING TO FIGURE OUT

20  DO THEY REALLY CONTRADICT EACH OTHER.

21          MR. GURULE:  THOUSANDS OF PAGES?  WHAT AN

22  EXAGGERATION.  I CAN'T BELIEVE IT.  WE ARE TALKING ABOUT

23  TWO OR THREE WITNESSES THAT WE HAVE IDENTIFIED --

24          THE COURT:  I THINK I HAVE HAD ENOUGH DIALOGUE.

25  I HAVE RULED ON THIS.  THE WITNESSES WILL PRESENT THE

12-49

1  DIRECT TESTIMONY.  AFTER THAT IS DONE, I WILL HEAR YOU

2  OUTSIDE THE PRESENCE OF THE JURY, AND YOU CAN TELL ME WHY

3  YOU CANNOT PROCEED WITH THE CROSS-EXAMINATION.  THAT WILL

4  GIVE ME A BETTER OPPORTUNITY TO EVALUATE THE SITUATION.

5        MR. GURULE:  THANK YOU, YOUR HONOR.

6        MS. BARRERA:  YOUR HONOR, WITH REGARDS TO

7  ANOTHER MATTER, THE WITNESS THAT JUST FINISHED TESTIFYING,

8  ALL THAT WE HAVE ON HIM IN REGARDS TO JENCKS IS A PAYMENT

9  RECORD.

10        THE COURT:  WHICH WITNESS?

11        MS. BARRERA:  JOSE REYES GARCIA-ALVAREZ.

12        THE COURT:  THIS WITNESS WHO JUST TESTIFIED ON

13  DIRECT?

14        MS. BARRERA:  YES, YOUR HONOR.

15        THE COURT:  WHAT IS IT ALL THAT YOU HAVE ON HIM?

16        MS. BARRERA:  ALL WE HAVE ON HIM IS AN INFORMANT

17  PAYMENT RECORD, ONE SHEET, AND THEN WE HAVE A TWO-PAGE

18  REPORT WRITTEN BY AGENT BILL TERAZAS THAT INCLUDES ONLY

19  TWO PARAGRAPHS THAT DEAL WITH THIS PARTICULAR WITNESS OF

20  WHAT HE SAID.  80 PERCENT OF WHAT HE TESTIFIED TO IS NOT

21  IN THESE REPORTS, OR EVEN ANY HINT OF THAT.  SO I SURMISE

22  THAT THERE ARE SOME JENCKS MATERIALS SOMEWHERE WHICH HAVE

23  NOT BEEN TURNED OVER TO US.

24        WE HAVE NOT RECEIVED THE WRITTEN AGREEMENT, IF

25  THERE IS ONE, THAT WAS ENTERED INTO BETWEEN THIS WITNESS

12-50

1    AND THE GOVERNMENT.  WE HAVE NOT RECEIVED ANY REPORTS OF

2    ANY BRIEFING OF THE INFORMANT, AND I AM SURE THERE WAS

3    SOME TYPE OF BRIEFING OR NOTES BY AN AGENT WITH REGARDS TO

4    THAT.  AND THERE IS, OF COURSE, NO GRAND JURY, NO

5    EVIDENCE --

6             THE COURT:  NO WHAT?

7             MS. BARRERA:  NO GRAND JURY OF THIS WITNESS.  I

8    DON'T KNOW IF HE TESTIFIED BEFORE THE GRAND JURY.  I AM

9    MERELY NOTING THAT, AND WE DO NOT HAVE A RECORD OF HIS

10   CONVICTION IN MEXICO.  THE GOVERNMENT DID NOT TURN THAT

11   OVER TO US.

12            AND MOST IMPORTANTLY WE DIDN'T HAVE HIS NAME.

13   THE NAME THAT WE HAVE HAD, YOUR HONOR, IS REYES GARCIA,

14   WHICH IS APPARENTLY HIS MIDDLE NAME.  WE ASKED THE

15   GOVERNMENT FOR THE NAMES OF THE WITNESSES REPEATEDLY, AND

16   THAT IS THE ONLY NAME THAT HAS EVER BEEN GIVEN TO US.

17            IT NOW TURNS OUT THAT HIS NAME IS NOT REYES

18   GARCIA.  IT IS JOSE REYES GARCIA-ALVAREZ.  SO IN OUR

19   SEARCH FOR SOMEONE NAMED REYES GARCIA IT IS NOT SURPRISING

20   THAT WE COULD NOT FIND ANY INFORMATION SINCE WE WERE

21   LOOKING UNDER THE WRONG NAME, THE NAME GIVEN TO US BY THE

22   GOVERNMENT.

23            SO I AM MAKING A REQUEST FOR ALL BRADY, GIGLIO

24   MATERIALS AS WELL AS ALL JENCKS MATERIALS AT THIS TIME SO

25   I CAN DO A PROPER CROSS-EXAMINATION.

12-51

1          THE COURT:  FIRST, ARE THERE ANY STATEMENTS OF

2   THIS WITNESS THAT HAVE BEEN RECORDED?

3          MR. CAMPOS:  NO, YOUR HONOR, THERE AREN'T.  THEY

4   HAVE EVERYTHING THAT WE HAVE.

5          THE COURT:  THERE ARE NO REPORTS OTHER THAN WHAT

6   YOU HAVE GIVEN THEM?

7          MR. CAMPOS:  THE ONLY REPORTS THAT EXIST, AND I

8   DISCUSSED THIS WITH MS. BARRERA, ARE REPORTS THAT HAVE TO

9   DO WITH THE CUSTOMS CASE, THE CASE THAT WAS BEFORE JUDGE

10  RYMER, THAT PARTICULAR MATTER THAT YOUR HONOR HAS ALREADY

11  RULED WAS INAPPROPRIATE TO BRING INTO THE GOVERNMENT'S

12  DIRECT CASE.

13         THE COURT:  I RULED THAT YOU COULD NOT INTRODUCE

14  EVIDENCE OF MR. ALVAREZ'S PARTICIPATION IN THAT OFFENSE.

15         MR. CAMPOS:  THAT IS CORRECT, YOUR HONOR.

16         THE COURT:  THAT HAS NOTHING TO DO WITH

17  PROVIDING STATEMENTS THAT MAY BE RELATED TO THIS CASE.

18         MR. CAMPOS:  THOSE REPORTS DO NOT CONTAIN

19  STATEMENTS OTHER THAN WHAT HIS ROLE WAS IN THAT PARTICULAR

20  CASE.  IT HAS NOTHING TO DO --

21         THE COURT:  WHOSE ROLE?

22         MR. CAMPOS:  THIS PARTICULAR WITNESS.

23         THE COURT:  DID HE HAVE A ROLE IN THAT CASE,

24  ALSO?

25         MR. CAMPOS:  YES, SIR.  HE WAS A CI, AND HE

12-52

1   ACCOMPANIED DEFENDANT LOPEZ UP TO LOS ANGELES TO BEGIN THE

2   INVESTIGATION THAT AGENT ABEL REYNOSO TESTIFIED ABOUT

3   YESTERDAY.

4          THE COURT:  WHAT ABOUT THE TESTIMONY THAT HE HAS

5   GIVEN HERE TODAY.  HAS THAT BEEN REPORTED ANYWHERE BY ANY

6   AGENT?

7          MR. CAMPOS:  NO, SIR.  THAT HAS NEVER BEEN

8   REPORTED.  THERE ARE NO REPORTS.  THERE HAVE BEEN NO

9   INTERVIEW NOTES TAKEN ABOUT THAT.  I SEARCHED AS THOROUGHLY

10  AS POSSIBLE.  THEY HAVE EVERYTHING THERE IS ON HIM.

11         THE COURT:  THERE IS NO GRAND JURY TRANSCRIPT?

12         MR. CAMPOS:  HE NEVER APPEARED BEFORE A GRAND

13  JURY.

14         THE COURT:  WHAT ABOUT RECORD OF PRIOR

15  CONVICTION IN MEXICO, IF ANY?

16         MR. CAMPOS:  WELL, HE TESTIFIED AS TO HIS

17  CONVICTION.

18         THE COURT:  NO, HE DIDN'T.  HE TESTIFIED TO HIS

19  DETENTION, BEING ARRESTED.  HE NEVER ONCE SAID HE WAS

20  CONVICTED.  DO YOU KNOW IF HE WAS CONVICTED OF ANYTHING?

21         MR. CAMPOS:  HE WAS CONVICTED.

22         THE COURT:  OF WHAT?

23         MR. CAMPOS:  HE WAS CONVICTED OF ACCEPTING THAT

24  BRIBE, HIS PARTICIPATION IN THAT SIXTY MILLION PESOS THAT

25  HE MENTIONED.

12-53

1          THE COURT:  HE WAS CONVICTED OF ACCEPTING A

2   BRIBE.  DO YOU KNOW OF ANY OTHER CONVICTION?

3          MR. CAMPOS:  THAT IS THE ONLY CONVICTION THAT

4   THERE IS ANY INFORMATION ABOUT.  HE HAS TOLD US THAT IS

5   HIS ONLY CONVICTION.

6          THE COURT:  WHAT ABOUT THIS BUSINESS OF HIS

7   NAME?

8          WE ARE USING UP THE RECESS HERE.

9          MR. CAMPOS:  IN MEXICO I THINK THE COURT KNOWS

10  THAT THE TRUE LAST NAME IS GARCIA.  THAT HAS BEEN

11  DISCLOSED.  THE HYPHENATED NAME, THE LAST PART OF IT, HAS

12  TO DO WITH HIS MOTHER'S MAIDEN NAME.  THAT IS THE

13  CONVENTION THERE.

14         THE COURT:  WHAT NAME DID YOU GIVE?

15         MR. CAMPOS:  WELL, WE USED -- WE REVEALED AND

16  DISCLOSED THE REPORTS THAT THEY HAD ON THE PREVIOUS TRIAL,

17  REYES GARCIA.

18         THE COURT:  WHAT ABOUT JOSE?

19         MR. CAMPOS:  WELL, I THOUGHT REYES WAS HIS FIRST

20  NAME.  I DIDN'T REALIZE HE HAD ANOTHER NAME.

21         THE COURT:  IS THAT THE WAY YOU HAVE ALWAYS

22  IDENTIFIED HIM?

23         MR. CAMPOS:  THAT IS CORRECT.  AND THE DEFENSE

24  HAS KNOWN HIM AS THAT.

25         MS. BARRERA:  YOUR HONOR, IT SEEMS TO ME AT A

12-54

1   MINIMUM THAT THE GOVERNMENT HAS THE DUTY TO ASK A PERSON'S

2   NAME WHEN THEY ARE GOING TO TESTIFY IN A TRIAL SO THEY CAN

3   BE ABLE TO TELL THE DEFENSE WHAT THE NAME OF THE WITNESS

4   IS.  AND IT SEEMS TO ME INCREDIBLE THAT MR. CAMPOS CAN

5   REPRESENT THAT THIS WITNESS HAS NEVER BEEN INTERVIEWED

6   BECAUSE MR. CAMPOS WAS LEADING THE WITNESS.  I DID NOT

7   OBJECT TO HIS LEADING BECAUSE I DIDN'T KNOW WHAT THIS

8   WITNESS WAS GOING TO SAY.  I FELT THAT MR. CAMPOS WAS

9   TRYING --

10          THE COURT:  MAYBE MR. CAMPOS INTERVIEWED HIM

11   BEFORE HE PUT HIM ON THE STAND.

12          MS. BARRERA:  IT SEEMS AT A MINIMUM HE MUST

13   HAVE --

14          MR. CAMPOS:  I CONCEDE THAT --

15          MS. BARRERA:  SOMEONE PREPARED HIM TO TESTIFY IN

16   THIS TRIAL, SO SOMEONE TOLD MR. CAMPOS THAT THIS WAS A

17   WITNESS FOR THIS CASE.  SOMEONE INTERVIEWED HIM, AND THERE

18   MUST BE SOME NOTES, AND I THINK IT IS INCUMBENT ON THE

19   GOVERNMENT TO MAKE AN INQUIRY AS TO WHETHER THERE ARE ANY

20   NOTES.

21          THE COURT:  WHAT INQUIRY HAVE YOU MADE?

22          MR. CAMPOS:  YOUR HONOR, WE HAVE INQUIRED OF ALL

23   THE AGENTS WHO HAVE EVER DEALT WITH HIM.  WE HAVE LOOKED

24   AT THE RECORDS IN GUADALAJARA.  HE ONLY CAME FORWARD WITH

25   THIS INFORMATION LATE IN 1987.  IT IS NOT AS IF WE HAVE A

12-55

1    HUGE HISTORY.  HIS PARTICIPATION WITH THE GOVERNMENT IS

2    WELL KNOWN TO THE DEFENSE IN TERMS OF THAT PRIOR CASE.

3              THE COURT:  THIS MAN FIRST PRESENTED HIMSELF TO

4    THE DEA AND SAID, "I HAVE INFORMATION ABOUT THE CAMARENA

5    CASE."  ARE YOU SAYING THAT NO PERSON THERE INTERVIEWED

6    HIM AND MADE A RECORD OR REPORTED WHAT HE SAID?

7              MR. CAMPOS:  THAT REPORT IS DISCLOSED, YOUR

8    HONOR.

9              THE COURT:  PARDON ME?

10             MR. CAMPOS:  THAT REPORT IS DISCLOSED.  THAT IS

11   WHAT THEY HAVE.

12             THE COURT:  AND THAT IS THE ONLY REPORT TO YOUR

13   KNOWLEDGE THAT HAS BEEN MADE?

14             MR. CAMPOS:  THAT IS CORRECT, YOUR HONOR.  THAT

15   IS WHAT HAPPENED.  I REALIZE THAT DEFENSE COUNSEL THINK

16   THAT EVERY TIME A WITNESS IS INTERVIEWED, THERE ARE

17   EXTENSIVE REPORTS WHICH ARE PREPARED, BUT THAT ISN'T THE

18   CASE.

19             MS. LEYVA:  YOUR HONOR, IF I MAY.  I WAS COUNSEL

20   IN THAT OTHER CASE.  AGENT REYNOSO IN THAT OTHER CASE

21   TESTIFIED ABOUT A DEBRIEFING OF THIS WITNESS RELATED TO

22   RAUL LOPEZ-ALVAREZ.  DURING THE TESTIMONY OF AGENT REYNOSO

23   I ASKED HIM ABOUT HOW MANY TIMES HE HAD MET WITH THE CI,

24   AND HE SAID THAT HE HAD MET WITH HIM BEFORE WITH RESPECT

25   TO A DIFFERENT CASE, NOT THE CASE PENDING BEFORE JUDGE

12-56

1   RYMER, SO AT LEAST AGENT REYNOSO HAS TESTIFIED THAT HE MET
2   WITH THE CI FOR PURPOSES OF ANOTHER INVESTIGATION.  THAT
3   REPORT HAS NOT BEEN DISCLOSED.
4            FURTHERMORE, AGENT REYNOSO TESTIFIED THAT THIS
5   CI WAS NOT HIS CI.  IT WAS ANOTHER AGENT'S CI, AND
6   CERTAINLY IF ANOTHER AGENT -- IN FACT HE SAID ANOTHER
7   AGENT DEBRIEFED --
8            THE COURT:  WELL, WHAT IS THE POINT OF ALL THIS?
9            MS. LEYVA:  THAT AT LEAST ONE AGENT HAS
10  TESTIFIED.
11           THE COURT:  WHAT AGENT IS THAT?
12           MS. LEYVA:  YOUR HONOR, I BELIEVE THAT AGENT'S
13  NAME IS BILL TERAZAS.
14           THE COURT:  WHAT HAS HE TESTIFIED TO?
15           MS. LEYVA:  BILL TERAZAS DID NOT TESTIFY.  WHAT
16  I AM SAYING IS AGENT REYNOSO TESTIFIED THAT REYES GARCIA
17  WAS NOT HIS INFORMANT.  HE WAS ANOTHER AGENT'S INFORMANT,
18  AND THAT THE OTHER AGENT HAD DEBRIEFED THE INFORMANT AS TO
19  HIS CONVICTION, AS TO HIS ASSOCIATION WITH OTHER PEOPLE,
20  AND HE HAD NOT PARTICIPATED IN THAT DEBRIEFING.  THEREFORE
21  THAT IS WHY I WAS NOT ENTITLED TO THAT REPORT.
22           THE COURT:  IN YOUR SEARCH FOR REPORTS HAVE YOU
23  TALKED TO THIS AGENT?
24           MR. GURULE:  YES, YOUR HONOR.  WE HAVE ASKED
25  BOTH SPECIAL AGENT REYNOSO AND SPECIAL AGENT TERAZAS.  WE

12-57

1   HAVE ASKED BOTH OF THOSE AGENTS IF THEY HAD ANY REPORTS,

2   IF THEY KNEW OF ANY OTHER REPORTS THAT WERE PREPARED.

3           THE COURT:  ALL RIGHT.  THAT IS ENOUGH ARGUMENT.

4   COUNSEL, I CAN'T ORDER THE GOVERNMENT TO GO OUT AND

5   PREPARE REPORTS THEY DO NOT HAVE.  THEY DO NOT HAVE

6   REPORTS.  THEY HAVE MADE THAT REPRESENTATION TO THE COURT.

7   I KNOW THAT DEFENSE COUNSEL ARE NOT HAPPY ABOUT THAT, BUT

8   MAYBE THE GOVERNMENT IS GOING OUT OF THE REPORT-MAKING

9   BUSINESS TO AVOID THIS TYPE OF THING.  I DON'T KNOW.  HE

10  SAID THEY DON'T HAVE REPORTS, AND THEY MADE A DILIGENT

11  EFFORT TO FIND THEM, AND THEY DON'T HAVE ANY.

12          WE WILL TAKE A ONE-MINUTE RECESS.

13          MR. TARLOW:  WHEN ALL OF THIS STARTED -- WE CAN

14  DO IT LATER -- BUT I AM THE ONE THAT SORT OF WANTED TO

15  TALK.  I HAVE TWO MATTERS, YOUR HONOR.

16          (RECESS FROM 11:00 A.M. UNTIL 11:05 A.M.)

12-58

THE COURT:  YOU MAY CROSS-EXAMINE THE WITNESS.

MS. BARRERA:  THANK YOU, YOUR HONOR.

CROSS-EXMAINATION

BY MS. BARRERA:

Q    I BELIEVE YOU INDICATED, MR. GARCIA, THAT YOUR

EMPLOYMENT IN MEXICO WAS WITH THE MEXICAN FEDERAL JUDICIAL

POLICE.  IS THAT CORRECT?

A    YES.

Q    ARE YOU STILL SO EMPLOYED?

A    NO, NOT ANY LONGER.

Q    HOW LONG WERE YOU EMPLOYED WITH THE MEXICAN FEDERAL

JUDICIAL POLICE?

A    ABOUT TWO YEARS.

Q    AND COULD YOU TELL US WHAT YEARS THOSE WERE.

A    '83 AND '84.

Q    BEFORE WORKING WITH THE MEXICAN FEDERAL JUDICIAL POLICE,

WHERE WERE YOU EMPLOYED?

A    THE JALISCO STATE PREVENTIVE POLICE.

Q    IS THAT A STATE JUDICIAL POLICE OR SOME OTHER POLICE

FORCE?

12-59

1  A   IT IS A STATE POLICE, BUT IT -- THEY WEAR UNIFORMS.

2  Q   HOW LONG WERE YOU EMPLOYED WITH THE PREVENTIVE POLICE?

3  A   THREE YEARS.  THREE OR FOUR YEARS.

4  Q   AND WHAT WERE YOUR DUTIES?

5  A   I WAS IN CHARGE OF TAKING THE CHIEF OF POLICE TO HIS

6  HOUSE.  THAT WAS ALL.

7  Q   FOR THREE TO FOUR YEARS THAT IS WHAT YOU DID?

8  A   YES.

9  Q   SO YOU WERE HIS DRIVER?

10  A   YES, DRIVER.

11  Q   SO AFTER WORKING WITH THE PREVENTIVE POLICE, YOU WERE

12  HIRED BY THE MEXICAN FEDERAL JUDICIAL POLICE?

13  A   I WAS COMMISSIONED TO THE FEDERAL JUDICIAL POLICE.

14  Q   WHAT DOES THAT MEAN?  YOU WERE COMMISSIONED?

15  A   PEOPLE FROM THE PREVENTIVE POLICE WERE COMMISSIONED TO

16  THE FEDERAL JUDICIAL POLICE BECAUSE THEY NEEDED PEOPLE.

17  THEY WERE SENT TO GO THERE.

18  Q   AND YOUR TITLE WITH THE MEXICAN FEDERAL JUDICIAL POLICE

19  WAS THAT OF A MADRINA, WAS IT NOT?

20       THE INTERPRETER:  EXCUSE ME.  I DID NOT HEAR THE

21  END OF THE QUESTION.

22       THE COURT:  REPEAT THE QUESTION.

23  BY MS. BARRERA:

24  Q   THE POSITION WITH THE MEXICAN FEDERAL JUDICIAL POLICE

25  WAS THAT OF A MADRINA, M-A-D-R-I-N-A?

12-60

1    A    WELL, I HAD THE CREDENTIALS OF A STATE JUDICIAL POLICE

2    FROM SALTILLO.

3    Q    YOU HAD THE CREDENTIALS OF A STATE POLICE OF SALTILLO

4    WHEN YOU WORKED WITH THE FEDERAL POLICE?

5    A    YES.

6    Q    SO YOU DID NOT HAVE FEDERAL CREDENTIALS.  IS THAT

7    CORRECT?

8    A    NO.

9    Q    AND THE TITLE THAT YOU HAD OR THE POSITION THAT YOU HAD

10   WITH THE FEDERAL POLICE WAS CALLED A MADRINA, WAS IT NOT?

11   A    NO.  I WAS A JUDICIAL POLICE DEPUTY.

12   Q    AND WHAT WERE YOUR DUTIES AS A POLICE OFFICER WITH THE

13   FEDERAL POLICE?

14   A    TO STOP VEHICLES TO SEE IF ANY DRUGS WERE FOUND, AND IF

15   ANY WERE FOUND, THEN THEY WOULD BE SEIZED.

16   Q    AND WAS YOUR JOB IN GUADALAJARA OR IN SALTILLO?

17   A    I WAS COMMISSIONED TO GUADALAJARA, AND I WAS SENT --

18   WE WERE SENT FROM GUADALAJARA TO SALTILLO.

19   Q    WHO WAS SENT?

20   A    COMMANDER RAMON COSIO DE LA MORA.  JUST HE.

21   Q    WAS HE YOUR COMMANDER?

22   A    YES.

23   Q    OKAY.  SO HE WAS SENT TO SALTILLO?

24   A    YES.

25   Q    YOU WERE NOT SENT TO SALTILLO WITH HIM?

12-61

1    A    NO.  HE INVITED ME TO SALTILLO.

2    Q    SO YOU ABANDONED YOUR POST IN GUADALAJARA AND WENT WITH

3    MR. COSIO, DID YOU NOT?

4    A    YES, I ASKED TO BE DISCHARGED IN GUADALAJARA, AND I

5    WENT TO SALTILLO.

6    Q    THE REASON YOU WENT WITH MR. COSIO WAS BECAUSE YOU KNEW

7    THAT HE WAS INVOLVED IN DRUG TRAFFICKING.  ISN'T THAT

8    CORRECT?

9    A    YES.

10   Q    AND YOU HOPED THAT BY GOING WITH MR. COSIO YOU WOULD BE

11   ABLE TO BENEFIT FROM THE DRUG TRAFFICKING?

12   A    YES.

13   Q    DO YOU KNOW WHERE MR. COSIO IS NOW?

14   A    NO.  EVER SINCE I GOT OUT I DON'T KNOW ANYTHING.

15   Q    WHILE YOU WERE IN GUADALAJARA, WERE YOU WORKING UNDER

16   THE DIRECTION OF MR. COSIO?

17   A    YES.

18   Q    AND WAS MR. COSIO INVOLVED IN DRUG TRAFFICKING IN

19   GUADALAJARA AS WELL?

20   A    WELL, WE WOULD GET OUR ORDERS FROM HIM, AND WE WOULD

21   GO OUT TO THE HIGHWAYS TO WORK.

22   Q    BUT THE ORDERS THAT YOU RECEIVED FROM MR. COSIO WAS TO

23   LET SOME OF THE PEOPLE CARRY DRUGS AND SOME NOT TO CARRY

24   DRUGS.  ISN'T THAT CORRECT?

25   A    WILL YOU REPEAT THE QUESTION.

12-62

1   Q    YOU SAID YOU RECEIVED INSTRUCTIONS FROM MR. COSIO.  IS

2   THAT CORRECT?

3   A    YES.

4   Q    NOW, THE INSTRUCTIONS THAT YOU RECEIVED FROM YOUR

5   COMMANDER, MR. COSIO, WERE TO ALLOW SOME PEOPLE TO CARRY

6   DRUGS.  ISN'T THAT CORRECT?

7   A    WELL, WE WOULD PLACE OURSELVES ON THE HIGHWAYS, AND

8   ACCORDING TO WHO WENT BY, WE WOULD STOP THEM.

9   Q    ACCORDING TO WHO WENT BY?  YOU WOULDN'T STOP EVERY CAR?

10  A    NO, NOT ALL OF THEM.

11  Q    SO WOULD YOU ONLY STOP THE CARS THAT YOUR COMMANDER TOLD

12  YOU TO STOP?

13  A    WELL, HE WOULD JUST SAY, "STOP THAT CAR FOR ME."

14  Q    YOU WERE AWARE, WERE YOU NOT, THAT MR. COSIO WAS

15  ENGAGED IN IDENTIFYING DRUG TRAFFICKERS IN GUADALAJARA?

16  A    NO, I WASN'T AWARE OF THAT.

17  Q    YOU WERE ONLY AWARE OF THAT WHEN MR. COSIO DECIDED TO

18  GO TO SALTILLO?

19  A    YES.

20  Q    MR. GARCIA, YOU HAVE NOT HAD ANY FORMAL TRAINING, I

21  TAKE IT, IN TERMS OF HOW TO BE A POLICE OFFICER, HAVE YOU?

22  A    WHICH POLICE?

23  Q    ANY POLICE.

24  A    MEXICAN?

25  Q    YES.

12-63

1   A   YES.

2   Q   AND WHAT TYPE OF TRAINING HAVE YOU RECEIVED?

3   A   WELL, AT THE ACADEMY THERE WERE CLASSES GIVEN, BUT JUST

4   AT THE PREVENTIVE POLICE ACADEMY.

5   Q   WAS THAT LIKE ON-THE-JOB TRAINING, OR WAS THAT AN

6   ACTUAL SCHOOL THAT YOU WENT TO?

7   A   A SCHOOL IN GUADALAJARA.

8   Q   AND HOW LONG DID YOU GO TO THIS SCHOOL?

9   A   SIX MONTHS.

10  Q   WHAT IS THE NAME OF THE SCHOOL?

11  A   IT IS JUST CALLED THE STATE PREVENTIVE SCHOOL.

12  Q   AND COULD YOU TELL US WHERE IT IS LOCATED IN

13  GUADALAJARA?

14  A   IT IS ON THE WAY TO SAN ANDREAS, GUADALAJARA.

15  Q   WHEN YOU BECAME A POLICE OFFICER, YOU TOOK AN OATH, I

16  TAKE IT.  IS THAT CORRECT?

17  A   YES.

18  Q   DO YOU REMEMBER WHAT THE OATH WAS THAT YOU TOOK?

19  A   I DON'T REMEMBER IT WELL.

20  Q   THE OATH WAS SOMETHING ALONG THE LINES OF PROTECTING

21  THE PEOPLE OF THE STATE OF JALISCO FROM ILLEGAL ACTIVITIES

22  OF OTHERS?

23  A   YES.

24  Q   AND WHEN YOU WENT TO SALTILLO TO WORK WITH MR. COSIO,

25  YOU VIOLATED THAT OATH, DID YOU NOT?

12-64

1   A     WELL, I HAD BEEN DISCHARGED IN GUADALAJARA, AND I HAD

2   TURNED OVER MY CREDENTIALS.

3   Q     DIDN'T YOU TELL US YOU HAD CREDENTIALS FROM SALTILLO AS

4   WELL?

5   A     YES, I HAD CREDENTIALS FROM SALTILLO.

6   Q     DID YOU BUY THOSE CREDENTIALS, OR WERE THEY GIVEN TO

7   YOU?

8   A     THEY WERE GIVEN TO ME BY THE COMMANDER.

9   Q     YOU DIDN'T HAVE TO TAKE AN OATH TO PROTECT THE PEOPLE

10  OF SALTILLO WHEN YOU WERE GIVEN THOSE CREDENTIALS?

11  A     NO.

12  Q     WHEN YOU WENT TO SALTILLO, YOU BECAME ENGAGED IN

13  ILLEGAL ACTIVITIES.  CORRECT?

14  A     ON SEVERAL OCCASIONS.

15  Q     LET'S TALK ABOUT WHAT SPECIFICALLY YOU DID.  YOU WERE

16  DRIVING TRUCKS, WERE YOU NOT?

17  A     I WAS DRIVING A CAR.

18  Q     OKAY.  AND WERE THERE TRUCKS IN BACK OF YOUR CAR?

19  A     YES.

20  Q     AND THESE TRUCKS WERE LOADED WITH MARIJUANA.  CORRECT?

21  A     YES.

22  Q     AND YOU KNEW THAT.  RIGHT?

23  A     ON SOME OCCASIONS I DID NOT KNOW.

24  Q     ON HOW MANY OCCASIONS DID YOU KNOW AND HOW MANY

25  OCCASIONS DID YOU NOT KNOW?

12-65

1   A    THERE WERE VERY FEW TIMES THAT THE PERSON CLOSEST TO

2   THE COMMANDER WOULD TELL ME, LIKE ONCE OR TWICE.

3   Q    YOU TESTIFIED THAT YOU ACTUALLY ESCORTED THE TRUCKS

4   LOADED WITH MARIJUANA FIVE TIMES.  ISN'T THAT CORRECT?

5   A    YES, BUT ON SEVERAL OCCASIONS THE COMMANDER WOULD NOT

6   TELL US.  HE WOULD JUST SAY, "JUST COME ALONG, AND WE ARE

7   GOING TO GO TO A CERTAIN PLACE."

8   Q    AND THEN YOU WOULD HAVE THE TRUCKS IN BETWEEN THE CARS.

9   CORRECT?

10  A    YES.

11  Q    YOU KNEW WHAT WAS IN THE THOSE TRUCKS EVEN IF YOU WERE

12  NOT TOLD.  ISN'T THAT CORRECT?

13  A    WELL, LIKE I SAID, ON SOME OCCASIONS I DID NOT KNOW

14  WHAT THEY WERE.  THE COMMANDER JUST TOLD US TO GO ALONG WITH

15  HIM.

16  Q    I AM NOT ASKING YOU WHAT YOU HAD BEEN TOLD.  BUT YOU

17  KNEW THAT THERE WAS MARIJUANA THERE EVEN IF YOUR COMMANDER

18  DIDN'T TELL YOU THAT THERE WAS MARIJUANA IN THOSE TRUCKS.

19  ISN'T THAT CORRECT?

20  A    WELL, I DIDN'T KNOW.  WE WERE JUST ACCOMPANYING THE

21  VEHICLE.  WE DIDN'T KNOW WHETHER IT CONTAINED ANY OR NOT.

22  Q    WELL, ISN'T THE REASON WHY YOU FOLLOWED YOUR COMMANDER

23  UP TO SALTILLO SO YOU COULD ENGAGE IN THAT TYPE OF

24  EMPLOYMENT?

25  A    COULD YOU REPEAT THE QUESTION.

12-66

1   Q    ISN'T THE REASON YOU FOLLOWED YOUR COMMANDER COSIO TO

2   SALTILLO WAS TO PARTICIPATE IN THAT TYPE OF ILLEGAL ACTIVITY?

3   A    WELL, HE INVITED ME TO GO TO SALTILLO BECAUSE I COULD DO

4   BETTER THAN I WAS IN GUADALAJARA.

5   Q    YOU WOULD DO BETTER BECAUSE YOU WOULD ENGAGE IN

6   ILLEGAL ACTIVITY.  ISN'T THAT CORRECT?

7   A    WELL, AS I HAVE TOLD YOU, ON SOME OCCASIONS, YES.

8   Q    HOW MUCH WERE YOU PAID AS A POLICE OFFICER?

9   A    WELL, HE WAS PAYING US, AND HE WOULD GIVE US 10 OR 15

10  A WEEK.

11  Q    10 OR 15 WHAT A WEEK?

12  A    15,000 PESOS.

13  Q    NOW, WHO WOULD GIVE YOU THAT? YOUR COMMANDER?

14  A    YES.

15  Q    DIDN'T YOU RECEIVE A CHECK FROM THE POLICE DEPARTMENT

16  ITSELF?

17  A    NO.

18  Q    SO YOU WOULD RECEIVE YOUR PAYMENT DIRECTLY FROM YOUR

19  COMMANDER?

20  A    YES.

21  Q    AND DO YOU KNOW WHAT 15,000 -- THAT IS PESOS?  CORRECT?

22  A    YES, PESOS.

23  Q    DO YOU KNOW WHAT 15,000 PESOS WOULD HAVE BEEN THEN IN

24  TERMS OF DOLLARS?

25  A    I DON'T REMEMBER.

12-67

1  Q    WERE YOU PAID THE SAME AMOUNT EVERY WEEK?

2  A    AT TIMES, AND AT TIMES NOT.

3  Q    AND WHEN YOU WOULD CARRY THE LOADS OF MARIJUANA, YOU

4  WOULD GET PAID MORE MONEY, WOULD YOU NOT?

5  A    WELL, THE LARGEST AMOUNT THAT I EVER RECEIVED WAS WHEN

6  I WAS GIVEN ONE MILLION PESOS.

7  Q    BUT THERE WERE OTHER TIMES WHEN YOU ALSO RECEIVED A

8  LARGE AMOUNT OF MONEY BESIDES THE ONE MILLION?

9  A    NO.  JUST THAT ONE.

10 Q    SO THE REST OF THE TIMES YOU WERE JUST PAID BY YOUR

11 COMMANDER ON A WEEKLY BASIS.  IS THAT CORRECT?

12 A    THAT'S CORRECT, YES.

13 Q    YOU SAID THERE CAME A TIME WHEN MR. COSIO SENT YOU TO

14 GUADALAJARA TO PICK UP A CHECK.  IS THAT CORRECT?

15 A    NO.

16 Q    WOULD YOU TELL US HOW IT WAS THAT THE CHECK CAME TO BE

17 IN YOUR HANDS.

18 A    COMMANDER RAMON COSIO WENT TO GUADALAJARA.  HE RECEIVED

19 THE CHECK AND TOOK IT WITH HIM TO SALTILLO.  HE GAVE THE

20 CHECK TO THE FIRST COMMANDER IN SALTILLO, AND --

21          MR. CAMPOS:  COULD WE HAVE SOME QUESTIONS, YOUR

22 HONOR.  IT IS A RATHER LONG NARRATIVE.

23          THE COURT:  LET'S TRY TO ASK THE WITNESS SHORT

24 QUESTIONS.

25          MS. BARRERA:  YES, YOUR HONOR.

12-68

1          THE COURT:   THE WITNESS IS DIRECTED JUST TO

2    RESPOND TO THE QUESTION, NOT TO ADD ANYTHING.

3    BY MS. BARRERA:

4    Q    SO I BELIEVE THE LAST STATEMENT WAS THAT THE CHECK WAS

5    GIVEN TO THE FIRST COMMANDER, AND HE GAVE IT TO YOU.  IS

6    THAT CORRECT?

7    A    NO.  HE GAVE IT TO RAMON COSIO.

8    Q    WELL, DIDN'T RAMON COSIO GIVE IT TO THE FIRST

9    COMMANDER?

10   A    WELL, HE GAVE IT TO HIM FIRST, AND HE KEPT IT FOR EIGHT

11   DAYS.

12   Q    AND THEN WHAT HAPPENED AFTER THE EIGHT DAYS?

13   A    EIGHT DAYS LATER I TRIED TO CASH IT, AND I WASN'T ABLE

14   TO, AND THEN AN ORDER FOR PAYMENT WAS SENT FROM GUADALAJARA

15   FOR ME.

16   Q    SO YOU WERE ABLE TO CASH IT?

17   A    YES.  WELL, IT WASN'T THE CHECK.  IT WAS AN ORDER OF

18   PAYMENT.

19   Q    RIGHT.  AND THEN YOU TOOK THE ORDER TO THE BANK, AND

20   THEY GAVE YOU THE MONEY.  RIGHT?

21   A    NO.  THE ORDER ARRIVED AT THE BANK IN MY NAME.

22   Q    AND WHERE DID YOU TAKE THE ORDER TO GET THE MONEY?

23   A    RIGHT THERE AT THE BANK?

24   Q    WAS THE CHECK MADE OUT TO YOU OR TO YOUR COMMANDER?

25   A    NO.  NO.  ANOTHER PERSON.

12-6⁹

1   Q    AND DID YOU HAVE IDENTIFICATION IN THAT OTHER PERSON'S

2   NAME?

3   A    NO.

4   Q    DID YOU SIGN THE OTHER PERSON'S NAME ON THE CHECK?

5   A    NO.

6   Q    YOU DIDN'T SIGN ANYTHING ON THE CHECK?  YOU JUST

7   PRESENTED IT?

8   A    NO.  I JUST PRESENTED IT.  I DIDN'T SIGN ANYTHING ON

9   THE CHECK.

10  Q    SO YOU JUST TOLD THE BANK TELLER YOU WANTED TO CASH THE

11  CHECK.  IS THAT RIGHT?

12       AND THEY DIDN'T ASK YOU FOR IDENTIFICATION OF ANY KIND?

13  A    IN ORDER TO CASH THE CHECK, NO.

14  Q    WHOSE NAME WAS ON THE CHECK?

15  A    I DON'T REMEMBER THE NAME ON THE CHECK.

16  Q    YOU DON'T REMEMBER, OR YOU DON'T WANT TO TELL US?

17  A    I DON'T REMEMBER.

18  Q    YOU SAID THIS CHECK WAS A CHECK FROM CARO-QUINTERO.

19  IS THAT CORRECT?

20  A    YES.

21  Q    HOW DID YOU KNOW THAT?

22  A    BECAUSE I WAS LATER TOLD BY SOMEBODY CLOSE TO THE

23  COMMANDER THAT THE CHECK HAD COME FROM HIM.

24  Q    SO YOU DON'T KNOW WHERE THE CHECK CAME FROM.  IS THAT

25  WHAT YOU ARE SAYING?

12-70

1  A    WOULD YOU REPEAT THE QUESTION.

2  Q    YES.  YOU HAVE NO PERSONAL KNOWLEDGE OF WHERE THE

3  CHECK CAME FROM, DO YOU?

4  A    I JUST KNEW THAT THE CHECK CAME FROM GUADALAJARA.

5  Q    HOW DO YOU KNOW THAT?

6  A    BECAUSE ANOTHER OFFICER, SOMEBODY CLOSE TO THE

7  COMMANDER, TOLD ME THAT IT HAD COME FROM GUADALAJARA AND

8  WAS FROM CARO-QUINTERO.

9  Q    BUT YOU HAVE NO PERSONAL KNOWLEDGE OF THAT, DO YOU?

10  A    NO.

11  Q    WAS THE CHECK SIGNED?

12  A    YES.

13  Q    AND WHO SIGNED THE CHECK?

14  A    I DON'T KNOW.  I DON'T REMEMBER.

15  Q    DID YOU KEEP A COPY OF THE CHECK?

16  A    NO.

17  Q    YOU SAID THE CHECK WAS A GIFT FOR YOUR COMMANDER,

18  MR. COSIO.  CORRECT?

19  A    THAT IT WAS A GIFT THAT HAD BEEN SENT FROM GUADALAJARA.

20  Q    IT WASN'T REALLY A GIFT; IT WAS A PAYMENT FOR SERVICES

21  RENDERED, WASN'T IT?

22  A    WELL, THAT IS NOT WHAT COMMANDER COSIO TOLD US.  HE

23  SAID IT WAS A GIFT.

24  Q    YOU AND THE COMMANDER AND OTHER PEOPLE IN SALTILLO HAD

25  SUPPOSEDLY BEEN TAKING CARE OF CARO-QUINTERO'S MARIJUANA

12-71

1  FOR THE PAST FEW MONTHS BEFORE THE CHECK ARRIVED, HADN'T YOU?

2  A    YES.

3  Q    YOU EXPECTED TO BE PAID FOR THAT, DIDN'T YOU?

4  A    WELL, I WAS JUST NOT EXPECTING FOR US TO GET PAID FOR

5  THAT.

6  Q    YOU WERE JUST DOING AN ILLEGAL ACTIVITY FOR FREE.  IS

7  THAT CORRECT?

8  A    NO, NOT FOR FREE.  I WAS RECEIVING MY ORDERS FROM THE

9  COMMANDER.

10  Q    SO IF YOUR COMMANDER TOLD YOU TO ENGAGE IN AN ILLEGAL

11  ACTIVITY, YOU WOULD DO IT.  IS THAT CORRECT?

12  A    WELL, HE WAS MY SUPERIOR, SO I WOULD HAVE TO RECEIVE

13  HIS ORDERS.

14  Q    AND IT NEVER OCCURRED TO YOU TO QUESTION THE ORDERS OF

15  YOUR COMMANDER AND HE WAS ASKING YOU TO ENGAGE IN DRUG

16  TRAFFICKING?

17  A    WELL, NO.

18  Q    AND YOU DID NOT IN FACT QUESTION HIM.  CORRECT?

19  A    NO.  WELL, LIKE I SAID, WE WOULD RECEIVE OUR ORDERS AND

20  GO OUT TO THE HIGHWAYS, AND WE WOULD NOT LET THOSE CARS GO

21  BY WHERE HE TOLD US NOT TO.

22  Q    AND YOU WOULD LET THOSE GO BY THAT HAD MARIJUANA IF YOUR

23  COMMANDER TOLD YOU TO?

24  A    YES.

25  Q    WHEN WERE YOU ARRESTED?

12-72

1   A    I DON'T REMEMBER THE DATE VERY WELL.

2   Q    DO YOU REMEMBER WHERE YOU WERE?

3   A    IN GUADALAJARA, JALISCO.

4   Q    WERE YOU BACK LIVING IN GUADALAJARA AGAIN?

5   A    YES.  I WENT BACK TO GUADALAJARA FROM SALTILLO BACK TO

6   MY FAMILY.

7   Q    WERE YOU STILL WORKING WITH THE FEDERAL JUDICIAL POLICE

8   IN GUADALAJARA?

9   A    NO, NOT ANYMORE.

10  Q    WHERE YOU WORKING THEN?

11  A    WELL, I WASN'T WORKING.  I WAS JUST STAYING AT HOME.

12  Q    YOU WERE JUST LIVING OFF THE ILLEGAL MONEY THAT YOU

13  HAD RECEIVED, THE ILLEGAL PESOS?

14  A    WELL, IT WASN'T A LOT.  IT WAS JUST A MILLION PESOS.

15  IT WAS A LITTLE.

16  Q    AND YOU WERE USING THAT MONEY TO LIVE ON.  IS THAT

17  CORRECT?

18  A    WELL, YES, TO LIVE.

19  Q    AND YOU WERE NOT ONLY ARRESTED, BUT YOU WERE CONVICTED

20  IN GUADALAJARA.  ISN'T THAT TRUE?

21  A    YES.

22  Q    DO YOU REMEMBER WHEN YOU WERE CONVICTED?

23  A    NO, I DON'T REMEMBER.

24  Q    AND BY CONVICTED, WE MEAN YOU WERE FOUND GUILTY OF

25  ACCEPTING A BRIBE?

12-73

1   A    WELL, NO.  I WAS ARRESTED BECAUSE I WENT TO CASH THE

2   ORDER FOR PAYMENT.

3   Q    YES.  BUT THERE IS NOTHING WRONG WITH CASHING A CHECK

4   NORMALLY.  RIGHT?

5   A    WHEN I WAS ARRESTED BY THE AGENTS FROM GUADALAJARA, I

6   WAS TOLD I WAS BEING ARRESTED BECAUSE I HAD CASHED  AN ORDER

7   FOR PAYMENT THAT WASN'T IN MY NAME.

8   Q    NOW, DID YOU GO THROUGH A TRIAL, OR DID YOU PLEAD

9   GUILTY?

10   A    I WAS TRIED.

11   Q    SO A JURY OR A JUDGE FOUND YOU GUILTY?

12   A    YES.

13   Q    AND DO YOU REMEMBER WHAT THEY TOLD YOU YOU WERE GUILTY

14   OF THEN?

15   A    WELL, I WAS TOLD THAT I WAS GUILTY FOR HAVING CASHED A

16   CHECK.

17   Q    YOU DON'T BY ANY CHANCE HAVE A COPY OF THE DOCUMENT

18   THAT THEY GAVE THIS COURT TELLING YOU WHAT IT IS THAT YOU

19   WERE FOUND GUILTY OF, DO YOU?

20   A    NO.

21   Q    DO YOU REMEMBER HOW MUCH OF A --

22        DO YOU REMEMBER WHAT SENTENCE YOU RECEIVED?

23   A    NO.  WELL, NO.  I WAS NEVER SENTENCED.  I WAS JUST

24   INCARCERATED FOR A YEAR.

25   Q    YOU WERE FOUND GUILTY.  SO YOU MUST HAVE BEEN SENTENCED.

12-74

1  ISN'T THAT CORRECT?

2  A    NO.  I WAS NOT SENTENCED.  WELL, I WASN'T FOUND GUILTY

3  BY THE FOUR JUDGES.  FOUR OF US -- THE FOUR OF US WERE NOT

4  FOUND GUILTY -- THE COMMANDER AND MYSELF AND A FEW OTHERS.

5  WE WERE LET GO.

6  Q    YOU WERE LET GO INTO THE PRISON.  RIGHT?

7  A    NO.  I GOT OUT FREE FROM THE PRISON IN SALTILLO.

8  Q    YOU WERE IN PRISON FOR ONE YEAR.  IS THAT CORRECT?

9  A    YES, ONE YEAR EXACTLY.

10 Q    OKAY.  HOW MUCH OF THAT TIME WAS IN THE PRISON IN

11 MEXICO CITY AND HOW MUCH OF THAT TIME WAS IN SALTILLO?

12 A    I WAS IN FOR THREE MONTHS IN MEXICO CITY, AND THEN IN

13 SALTILLO.

14 Q    AND WAS YOUR TRIAL IN SALTILLO OR IN MEXICO CITY?

15 A    IN SALTILLO.

16 Q    AND YOU ARE SAYING THAT AT THE TRIAL YOU WERE FOUND NOT

17 GUILTY?

18 A    NOT GUILTY.

19 Q    AND SO AT THE TIME YOU WERE FOUND NOT GUILTY, THEN YOU

20 WERE RELEASED AFTER YOU HAD BEEN IN CUSTODY FOR ONE YEAR?

21 A    YES.  YES.  I GOT OUT FREE.

22 Q    WHAT HAPPENED TO THE THREE CO-DEFENDANTS IN YOUR CASE?

23 WERE THEY ALSO FOUND NOT GUILTY?

24 A    NOT GUILTY.  THE FOUR OF US GOT OUT ON THE SAME DAY.

25 Q    WAS ANYONE BRIBED SO THAT THEY WOULD FIND YOU NOT

12-75

1   GUILTY?

2   A   I WASN'T AWARE OF THAT.  I JUST GOT OUT.

3   Q   NOBODY TOLD YOU ANYTHING ABOUT THAT?

4   A   NO.

5   Q   LET'S TALK ABOUT WHEN YOU WERE AT THE PRISON IN MEXICO

6   CITY.  WHAT IS THE NAME OF THAT PRISON?

7   A   IT IS CALLED RECLUSARIO ORIENTE.

8   Q   AND WERE YOU THERE FOR THREE MONTHS?  IS THAT CORRECT?

9   A   THREE MONTHS.

10   Q   THAT IS WHERE YOU MET RAUL LOPEZ-ALVAREZ?

11   A   YES.

12       THE COURT:  COUNSEL, WE ARE GOING TO ADJOURN AT

13   THIS TIME.  I HAVE ANOTHER MATTER TO TAKE CARE OF BEFORE

14   NOON, AND WE WILL RECONVENE THIS CASE AT 1:30.

15       THE JURY MAY BE EXCUSED.

16   (UNRELATED PROCEEDINGS.)

17   (NOON RECESS FROM 12:10 P.M. UNTIL 1:30 P.M.)

18       - - -

19       I CERTIFY THAT THE FOREGOING IS A CORRECT

20       TRANSCRIPT FROM THE RECORD OF PROCEEDINGS

21       IN THE ABOVE-ENTITLED MATTER.

22

23   _Velma B. Thomas_       _June 1, 1989_

24   OFFICIAL REPORTER       DATE

25