1

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

- - - - -

HONORABLE EDWARD RAFEEDIE, DISTRICT COURT JUDGE PRESIDING

- - - - -

Title 28
Copy

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| VS. ) | CASE NO:  CR 87-422(F)-ER |
| ) | |
| JUAN RAMON MATTA-BALLESTEROS ) | |
| DEL POZO, RUBEN ZUNO-ARCE, ) | |
| JUAN JOSE BERNABE-RAMIREZ, ) | |
| AND JAVIER VASQUEZ-VELASCO, ) | |
| ) | |
| DEFENDANTS. ) | |
| _____ ) | VOLUME 5 |


REPORTERS' TRANSCRIPT OF PROCEEDINGS

TUESDAY, MAY 22, 1990

LOS ANGELES, CALIFORNIA


JULIE CHURCHILL, CSR
SUSAN A. LEE, CSR
OFFICIAL REPORTERS
U.S. DISTRICT COURT, 442-C
312 N. SPRING STREET
LOS ANGELES, CA  90012
(213) 626-6353
(213) 617-8227

ENTERED ON COURTRAN

## APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:

GARY A. FEESS,
UNITED STATES ATTORNEY
BY:   MANUEL A. MEDRANO
          JOHN L. CARLTON
ASSISTANT U.S. ATTORNEYS
1200 UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA   90012
(213) 894-0619/894-6682


FOR DEFENDANT JUAN RAMON MATTA-BALLESTEROS DEL POZO:

MARTIN R. STOLAR
MICHAEL J. BURNS, ESQ.
ADOLFO Z. AGUILAR, ESQ.
ATTORNEYS AT LAW
351 NORTH BROADWAY, 4TH FLOOR
NEW YORK, NEW YORK   10013
(212) 219-1919; (213) 855-8888 EXT. 314

FOR DEFENDANT RUBEN ZUNO-ARCE:

MITCHELL, SILBERBERG & KNUPP
BY:   EDWARD M. MEDVENE, ESQ.
          DONALD DI NICOLA, ESQ.
          JAMES BLANCARTE, ESQ.
11377 WEST OLYMPIC BOULEVARD
LOS ANGELES, CALIFORNIA   90064-1683
(213) 312-3150

FOR DEFENDANT JUAN JOSE BERNABE-RAMIREZ:

MARY KELLY
ATTORNEY AT LAW
827 MORAGA DRIVE
BEL AIR, CALIFORNIA     90049
(213) 472-7121
          AND
BRIDGMAN, MORDKIN, GOULD & SHAPIRO, INC.
BY:  MICHAEL S. MEZA, ESQ.
17050 BUSHARD STREET, STE. 200
FOUNTAIN VALLEY, CALIFORNIA   92708
(714) 898-0461; (213) 924-6606

APPEARANCES (CONTINUED):

     FOR DEFENDANT JAVIER VASQUEZ-VELASCO:

          FEDERAL LITIGATORS GROUP
          BY:  GREGORY NICOLAYSEN, ESQ.
          8530 WILSHIRE BOULEVARD, STE. 404
          BEVERLY HILLS, CALIFORNIA 90211
          (213) 854-5135

ALSO PRESENT:

          DOUGLAS KUEHL, SPEC.AGT., D.E.A.

          SPANISH INTERPRETERS

5-4

1          LOS ANGELES + CALIFORNIA   TUESDAY, MAY 22, 1990

2                    + 9:30 A.M.

3

4          (JURY PRESENT.)

5          THE COURT:  GOOD MORNING.

6          THE COURTROOM:  GOOD MORNING.

7          THE COURT:  YOU MAY CALL YOUR NEXT WITNESS.

8          MR. MEDRANO:  THANK YOU, YOUR HONOR.  AT THIS TIME

9   THE GOVERNMENT WOULD CALL MR. ROBERT FULKERSON TO THE STAND.

10

11       ROBERT HUGH FULKERSON + PLAINTIFF'S WITNESS, SWORN

12

13          THE CLERK:  PLEASE BE SEATED.  PLEASE STATE YOUR FULL

14   NAME FOR THE RECORD AND SPELL YOUR LAST NAME.

15          THE WITNESS:  ROBERT HUGH FULKERSON,

16   F U L K E R S O N.

17

18                    DIRECT EXAMINATION +

19   BY MR. MEDRANO:

20   Q.   GOOD MORNING, MR. FULKERSON.  WHO ARE YOU EMPLOYED BY,

21   SIR?

22   A.   I AM AN EMPLOYEE OF THE ARIZONA DEPARTMENT OF PUBLIC

23   SAFETY CRIME LABORATORY LOCATED IN PHOENIX, ARIZONA.

24   Q.   HOW LONG HAVE YOU SERVED WITH THE DEPARTMENT OF PUBLIC

25   SAFETY?

5-5

1   A.   13 YEARS.

2   Q.   THIS IS IN THE STATE OF ARIZONA?

3   A.   YES.

4   Q.   WHAT ARE YOUR SPECIFIC DUTIES IN YOUR EMPLOYMENT WITH THE

5   DEPARTMENT OF PUBLIC SAFETY?

6   A.   I PERFORM CHEMICAL ANALYSIS OF SUSPECTED DRUG SUBSTANCES.

7   Q.   JUST A LITTLE BIT ABOUT YOUR BACKGROUND.  DO YOU HAVE

8   HIGHER EDUCATION?

9   A.   YES.  I GRADUATED FROM THE UNIVERSITY OF ILLINOIS IN 1966

10   WITH A BACHELORS DEGREE IN CHEMISTRY.

11   Q.   OTHER THAN YOUR SERVICE WITH THE DEPARTMENT OF PUBLIC

12   SAFETY, HAVE YOU HAD ANY OTHER FORM OF EMPLOYMENT WITH REGARD

13   TO DRUG ANALYSIS?

14   A.   I PRACTICED ANALYTICAL CHEMISTRY FOR EIGHT YEARS BEFORE I

15   BECAME EMPLOYED WITH THE DEPARTMENT OF PUBLIC SAFETY.

16   Q.   WAS THAT IN A PUBLIC SECTOR THAT YOU DID THAT?

17   A.   SOME WAS PUBLIC, SOME WAS PRIVATE.

18   Q.   AND HAVE YOU RECEIVED ANY OTHER ADDITIONAL TYPE OF

19   TRAINING WITH REGARD TO CONDUCTING DRUG ANALYSIS?

20   A.   WHEN I HIRED ON WITH THE DEPARTMENT OF PUBLIC SAFETY, I

21   RECEIVED OVER 700 HOURS OF TRAINING IN DRUG ANALYSIS AT THE

22   DEPARTMENT OF PUBLIC SAFETY CRIME LABORATORY.

23        IN ADDITION, I HAVE HAD TRAINING IN MOLECULAR

24   SPECTROSCOPY AT ARIZONA STATE UNIVERSITY.

25        I HAVE HAD TRAINING AT MASS SPECTROMETRY FROM HEWLETT

5-6

1   PACKARD CORPORATION, TRAINING IN FORENSIC LAPROSCOPY THROUGH

2   THE MECHRONE RESEARCH INSTITUTE, TRAINING IN CHROMATOGRAPHIC

3   ANALYSIS WITH THE UNIVERSITY OF VIRGINIA, AND TRAINING IN DRUG

4   ANALYSIS FROM THE DRUG ENFORCEMENT ADMINISTRATION.

5   Q.   FINALLY, HAVE YOU BEEN QUALIFIED IN STATE AND FEDERAL

6   COURT AS AN EXPERT IN THE AREA OF DRUG ANALYSIS?

7   A.   YES.

8   Q.   APPROXIMATELY HOW MANY TIMES HAVE YOU TESTIFIED IN THAT

9   CAPACITY?

10  A.   OVER A HUNDRED TIMES.

11          MR. MEDRANO:   YOUR HONOR, AT THIS TIME WE OFFER MR.

12  FULKERSON AS AN EXPERT IN THE AREA OF DRUG ANALYSIS.

13          MR. STOLAR:  NO OBJECTION.

14          MR. NICOLAYSEN:  NO OBJECTION, YOUR HONOR.

15          THE COURT:  VERY WELL.

16  BY MR. MEDRANO:

17  Q.   LET ME DIRECT YOUR ATTENTION, MR. FULKERSON, TO ABOUT

18  AUGUST OF 1984.  IN AUGUST AND SEPTEMBER OF 1984, DID YOU

19  RECEIVE AT ANY TIME ITEMS OF EVIDENCE CONTAINING A WHITE

20  POWDER?

21  A.   YES, I DID.

22  Q.   DID THIS RELATE TO AN INVESTIGATION IN ARIZONA WHERE THE

23  NAMES OF THE SUSPECTS AT THAT TIME WERE -- LAST NAMES -- LAGER,

24  EARLS AND KROGSLAND?

25  A.   YES.

5-7

1    Q.   AND DID YOU, AFTER RECEIVING ITEMS OF EVIDENCE IN AUGUST

2    AND SEPTEMBER OF 1984, CONDUCT DRUG ANALYSIS OF THOSE

3    PARTICULAR ITEMS?

4    A.   YES.

5    Q.   AND WAS THIS DONE AT THE SPECIFIC REQUEST OF ANY LAW

6    ENFORCEMENT OFFICIALS IN THE STATE OF ARIZONA?

7    A.   YES, OF COURSE.

8    Q.   WHO WOULD THAT BE?

9    A.   THAT WAS REQUESTED BY BYRON MILLS OF THE GILA COUNTY

10   SHERIFF'S OFFICE.

11   Q.   IN AUGUST AND SEPTEMBER OF 1984, DO YOU RECALL

12   APPROXIMATELY HOW MANY ITEMS OF EVIDENCE YOU RECEIVED INITIALLY

13   BEFORE YOU CONDUCTED YOUR DRUG ANALYSIS?

14   A.   THERE WERE 25 ITEMS.

15   Q.   I'D LIKE TO BREAK THOSE DOWN, IF I MAY.

16        COULD YOU GIVE US SOME GENERAL IDEA OF WHAT THESE

17   ITEMS OF EVIDENCE CONSISTED OF?

18   A.   THE FIRST 21 ITEMS CONSISTED OF LARGE TRUNK-LIKE

19   SUITCASES, WHICH WERE FILLED WITH PLASTIC BAGS CONTAINING WHITE

20   POWDER.

21        ITEMS 22 THROUGH 25 WERE BOXES CONTAINING BAGS OF

22   WHITE POWDER.

23   Q.   AT ANY TIME, MR. FULKERSON, WITH REGARD TO ITEMS 1 THROUGH

24   25, DID YOU CONDUCT ANY TYPE OF CHEMICAL ANALYSIS ON THE WHITE

25   POWDER DISCOVERED IN THESE ITEMS OF EVIDENCE?

5-8

1    A.   YES, I DID.

2    Q.   COULD YOU JUST IN LAYMAN'S TERMS, WALK US THROUGH EXACTLY

3    WHAT YOU DID TO CONDUCT YOUR CHEMICAL ANALYSIS?

4    A.   FOR EACH OF THE 25 ITEMS, I SAMPLED FIVE BAGS FROM EACH

5    ITEM.   THIS WOULD BE A TOTAL OF 125 BAGS BEING SAMPLED.

6         AND WITH THOSE, I PERFORMED A CHEMICAL COLOR TEST AND

7    A MICROCRYSTAL TEST AS A SCREENING TEST.   TO SIX OF THE ITEMS,

8    I USED ADDITIONAL TESTING, WHICH INCLUDED AN ULTRAVIOLET

9    SPECTROSCOPY TEST, AN INFRARED SPECTROSCOPY, A GAS

10   CHROMATOGRAPH MASS SPECTROMETER TEST, AN ADDITIONAL

11   MICROCRYSTAL TEST, A GRAVIMETRIC EXTRACTION AND A

12   CHROMATOGRAPHIC QUANTITATION.

13   Q.   IS THE POINT OF ALL THESE TYPES OF TESTS, MR. FULKERSON,

14   TO DETERMINE WHAT SUBSTANCE THE WHITE POWDER WAS THAT YOU

15   DISCOVERED INSIDE ITEMS 1 THROUGH 25?

16   A.   ALL BUT THE GRAVIMETRIC EXTRACTION WERE DETERMINATIONS --

17   OR USED TO DETERMINE WHAT WAS IN IT.   THAT PARTICULAR TEST IS A

18   PROCEDURE THAT REFLECTS UPON PERCENTAGE CONTENT.

19   Q.   PERCENTAGE OF NARCOTIC SUBSTANCE?

20   A.   YES.

21   Q.   QUALITY, IN OTHER WORDS?

22   A.   YES.

23   Q.   NOW, CAN YOU GIVE US THE CONCLUSIONS THAT YOU ACHIEVED FOR

24   ITEMS 1 THROUGH 25?

25   A.   I DETERMINED THAT THEY CONTAINED COCAINE.

5-9

1   Q.   AND YOU MENTIONED SIX ITEMS FOR WHICH YOU CONDUCTED THESE

2   ADDITIONAL TESTS.   WHAT WERE THE RESULTS OF THOSE ADDITIONAL

3   TESTS ON THOSE SIX OTHER ITEMS?

4   A.   I FOUND THAT THEY WERE HIGH PURITY COCAINE.   MY FINDINGS

5   RANGED FROM 97 TO 99 PERCENT PURITY.

6   Q.   COCAINE?

7   A.   YES.

8   Q.   DID YOU HAVE AN OPPORTUNITY TO WEIGH THE COCAINE, THE

9   ACTUAL WHITE POWDER IN ITEMS 1 THROUGH 25, MR. FULKERSON?

10  A.   YES, I DID.

11  Q.   WERE YOU INVOLVED PERSONALLY IN THE WEIGHING OF THE WHITE

12  POWDER?

13  A.   YES.

14  Q.   COULD YOU GIVE US YOUR RESULTS OF THE ITEMS 1 THROUGH 25,

15  MR. FULKERSON?

16  A.   THE TOTAL NET WEIGHT OF THE POWDER IN THOSE ITEMS WAS

17  1200.7 POUNDS.

18  Q.   WHAT WOULD THAT BE IN KILOGRAMS?

19  A.   THAT WOULD BE 544 AND A HALF KILOGRAMS.

20  Q.   IS IT ABOUT 2.2 POUNDS PER KILO?

21  A.   YES.

22  Q.   LET ME DIRECT YOUR ATTENTION NOW TO ABOUT APRIL OF 1985,

23  MR. FULKERSON.   AT THAT TIME DID YOU RECEIVE ADDITIONAL ITEMS

24  OF EVIDENCE PERTAINING TO THIS IDENTICAL INVESTIGATION?

25  A.   YES.

5-10

1    Q.   APPROXIMATELY HOW MANY MORE ITEMS OF EVIDENCE DID YOU

2    RECEIVE?

3    A.   I RECEIVED WHAT WAS NUMBERED ITEMS 26 THROUGH 37.

4    Q.   AND JUST BRIEFLY, WHAT DID ITEMS 26 THROUGH 37 CONSIST OF?

5    A.   THEY WERE BOXES CONTAINING PLASTIC BAGS WHICH, IN TURN,

6    CONTAINED WHITE POWDER.

7    Q.   DID YOU CONDUCT ANY TYPE OF CHEMICAL ANALYSIS ON THE WHITE

8    POWDER WITHIN ITEMS 26 THROUGH 37?

9    A.   YES.

10   Q.   DID YOU REACH ANY CONCLUSION AS TO WHAT THAT POWDER WAS?

11   A.   I DETERMINED THEY CONTAINED COCAINE.

12   Q.   AND DID YOU TEST ANY ONE OF THOSE SPECIFIC ITEMS IN A MORE

13   DETAILED FASHION TO DETERMINE THE QUALITY OR PURITY?

14   A.   ON WHAT IS NUMBERED ITEM 33 I DID A GRAVIMETRIC

15   EXTRACTION.

16   Q.   THAT IS THE QUALITY OR PURITY TEST?

17   A.   IT REFLECTS ON THAT, YES.

18   Q.   WHAT WAS YOUR RESULT WITH REGARD TO THAT ADDITIONAL TEST?

19   A.   IT INDICATED THE PURITY TO BE APPROXIMATELY 99 PERCENT.

20        MR. MEDRANO:  YOUR HONOR, THAT WOULD CONCLUDE DIRECT

21   OF THIS WITNESS.

22        THE COURT:  ANY QUESTIONS FOR THIS WITNESS?

23        MR. NICOLAYSEN:  NONE, YOUR HONOR.

24        MR. STOLAR:  A COUPLE.

25        THE COURT:  ALL RIGHT.

5-11

CROSS-EXAMINATION +

BY MR. STOLAR:

Q.   GOOD MORNING, MR. FULKERSON.

A.   GOOD MORNING.

Q.   YOU HAVE INDICATED THAT THE FIRST SERIES OF TESTS THAT IS YOU RAN WERE ON THINGS THAT YOU RECEIVED SOMETIME IN SEPTEMBER OF 1984?

A.   AUGUST AND SEPTEMBER, YES.

Q.   AUGUST AND SEPTEMBER.  BY THE WAY, I SEE YOU WERE USING YOUR -- YOU WROTE SOME REPORTS CONCERNING THIS; DID YOU NOT?

A.   YES, I DID.

Q.   YOU'RE USING THAT TO REFRESH YOUR RECOLLECTION?

A.   YES.

Q.   IT IS A TOTAL OF FOUR PAGES, FIVE PAGES YOU HAVE IN FRONT OF YOU?

A.   ONE PAGE -- ONE REPORT IS THREE PAGES, THE OTHER IS TWO.

Q.   THANK YOU.  FROM WHOM DID YOU RECEIVE THE SUBSTANCE OF THE BAGS IN SEPTEMBER OF 1984?

A.   PURSUANT TO THE FIRST SERIES OF ITEMS WHICH I EXAMINED IN AUGUST AND SEPTEMBER, I RECEIVED THEM FROM THE PROPERTY EVIDENCE UNIT AT THE DEPARTMENT OF PUBLIC SAFETY.

Q.   AND DO YOU KNOW OR DO YOU HAVE ANY INDICATION FROM WHOM THEY RECEIVED THEM?

A.   I DON'T HAVE THE DOCUMENTATION WITH ME.  I UNDERSTAND THEY RECEIVED IT FROM THE SHERIFF'S OFFICE.

5-12

1   Q.   BUT YOU DON'T KNOW FROM WHOM; IS THAT CORRECT?

2   A.   I DON'T KNOW THE PARTICULAR COURIER OFFHAND.

3   Q.   AND YOUR REPORTS DO NOT INDICATE WHEN THIS PARTICULAR

4   COCAINE WAS RECEIVED, DO THEY?

5   A.   NO, THEY DO NOT.

6   Q.   NOW, YOU THEN RECEIVED SOME ADDITIONAL PACKAGES FOR

7   TESTING IN APRIL OF 1985; IS THAT RIGHT?

8   A.   YES.

9   Q.   AND YOU PROCEEDED TO DO YOUR TESTS THEN, CORRECT?

10  A.   YES.

11  Q.   FROM WHOM DID RECEIVE THE APRIL 1985 EVIDENCE?

12  A.   AGAIN, I RECEIVED THE EVIDENCE FROM THE PROPERTY EVIDENCE

13  UNIT AT THE DEPARTMENT OF PUBLIC SAFETY.

14  Q.   AND AGAIN, THERE IS NO INDICATION IN YOUR RECORDS AS TO

15  FROM WHOM THAT WAS SEIZED OR, INDEED, WHEN IT WAS SEIZED, IS

16  THERE?

17  A.   I HAVE A RECORD, BUT NOT WITH ME, OF THAT.

18  Q.   ALL RIGHT.  THE TOTAL WEIGHT, NET WEIGHT OF THE POWDERS

19  CONTAINING COCAINE WAS 1368.3 POUNDS; IS THAT CORRECT?

20  A.   YES, COUNTING ITEMS 1 THROUGH 37 ALL TOGETHER.

21  Q.   YOU ADD UP 1200.7 AND 167.6, AND IF MY MATH IS CORRECT,

22  YOU GET 1368.3?

23  A.   YES.

24  Q.   AND THAT IS ALSO 620.4 KILOGRAMS; IS THAT RIGHT?

25  A.   YES.

5-13

1    Q.   IF YOU ADD THEM ALL TOGETHER; IS THAT CORRECT?

2    A.   THAT SOUNDS RIGHT, YES.

3    Q.   YOU ALSO INDICATED THAT YOU TESTIFIED ROUGHLY 100 TIMES IN

4    STATE AND FEDERAL COURT; IS THAT CORRECT?

5    A.   THAT'S RIGHT.

6    Q.   HAVE THOSE BEEN IN CASES WHERE A PARTICULAR DEFENDANT WAS

7    CHARGED WITH POSSESSION AND DISTRIBUTION OF THE COCAINE THAT

8    YOU HAD EXAMINED?

9    A.   PARDON ME?

10   Q.   WERE THOSE CASES WHETHER THE PERSON WAS CHARGED WITH

11   POSSESSION OR DISTRIBUTION OF THE COCAINE OR THE SUBSTANCE THAT

12   YOU HAD EXAMINED?

13   A.   MANY OF THEM ARE.

14          MR. STOLAR:  ALL RIGHT.  THANK YOU, SIR.

15          THE COURT:  DOES ANYONE ELSE HAVE ANY QUESTIONS FOR

16   THIS WITNESS?

17          MS. KELLY:  NO, YOUR HONOR.

18          MR. MEDRANO:  NO REDIRECT, YOUR HONOR.

19          THE COURT:  YOU MY STEP DOWN.

20          THE WITNESS:  AM I EXCUSED?

21          THE COURT:  YES.

22          (WITNESS EXCUSED.)

23          MR. CARLTON:  THE GOVERNMENT CALLS ANTHONY CEYALA,

24   YOUR HONOR.

25              THE COURT:  COME FORWARD, PLEASE.

5-14

1          THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

2

3          ANTONIO A. CELAYA + PLAINTIFFS WITNESS, SWORN

4

5          THE CLERK:  PLEASE BE SEATED.  PLEASE STATE YOUR FULL

6    NAME FOR THE RECORD AND SPELL YOUR LAST NAME.

7          THE WITNESS:  ANTONIO A. CELAYA.  THE SPELLING OF THE

8    LAST NAME:  C E L A Y A.

9

10                      DIRECT EXAMINATION +

11   BY MR. CARLTON:

12   Q.   GOOD MORNING, MR. CELAYA.

13   A.   GOOD MORNING, SIR.

14   Q.   WHAT IS YOUR CURRENT EMPLOYMENT?

15   A.   I AM THE ADMINISTRATOR FOR ADMINISTRATIVE INVESTIGATIONS

16   FOR THE DEPARTMENT OF CORRECTIONS, STATE OF ARIZONA.

17   Q.   HOW LONG HAVE YOU BEEN EMPLOYED IN THAT POSITION?

18   A.   TWO YEARS IN THAT POSITION, FOUR YEARS FOR THE DEPARTMENT

19   OF CORRECTIONS.

20   Q.   WERE YOU EVER EMPLOYED BY THE DRUG ENFORCEMENT

21   ADMINISTRATION?

22   A.   YES, SIR.

23   Q.   DURING WHAT PERIOD?

24   A.   I STARTED WITH IT -- WITH THE FEDERAL BUREAU OF NARCOTICS

25   IN 1963 AND REMAINED IN THE NARCOTIC ENFORCEMENT FIELD WITH ITS

5-15

1    PREDECESSORS UNTIL 1985 WHEN I RETIRED.

2    Q.   WAS THE FEDERAL BUREAU OF NARCOTICS A PREDECESSOR OF THE

3    D.E.A.

4    A.   YES, SIR.

5    Q.   DID YOU RETIRE FROM THE D.E.A.?

6    A.   YES, SIR.

7    Q.   WHAT WAS YOUR POSITION UPON RETIREMENT FROM THE D.E.A.?

8    A.   I WAS A SPECIAL AGENT CRIMINAL INVESTIGATOR.

9    Q.   NOW, DRAWING YOUR ATTENTION TO NOVEMBER OF 1984, WHAT WAS

10   YOUR ASSIGNMENT AT THAT TIME?

11   A.   I WAS ASSIGNED TO THE ERADICATION TASK FORCE MARIJUANA AND

12   OPIUM PROGRAM IN NORTHERN MEXICO.

13   Q.   COULD YOU EXPLAIN GENERALLY WHAT THE ERADICATION TASK

14   FORCE WAS AT THAT TIME?

15   A.   THE UNITED STATES GOVERNMENT HAD FURNISHED THE GOVERNMENT

16   OF MEXICO WITH AIRCRAFT AND EQUIPMENT TO LOCATE, PLOT, DESTROY

17   OPIUM AND MARIJUANA FIELDS THAT WERE GROWING IN THE AREAS --

18   UNCONTROLLED AREAS OF MEXICO.

19          AMERICAN AGENTS, D.E.A. AGENTS WERE ASSIGNED TO THE

20   ERADICATION GROUPS AND WE FLEW WITH THE MEXICAN PILOTS AND

21   FEDERAL AGENTS LOCATING, REPORTING AND VERIFYING THE

22   DESTRUCTION OF FIELDS.

23   Q.   MR. CELAYA, COULD YOU PLEASE PERHAPS MOVE THE MICROPHONE

24   TO THE SIDE?

25          THE COURT:   JUST MOVE IT TO THE SIDE A LITTLE BIT.

5-16

1    YOU DON'T NEED TO BE ON TOP OF IT.

2             THE WITNESS:  ALL RIGHT.

3    BY MR. CARLTON:

4    Q.    SO YOU FLEW WITH MEXICAN PILOTS; IS THAT CORRECT?

5    A.    YES, SIR.

6    Q.    WHO WOULD DESTROY THE FIELDS?

7    A.    IT WAS ALL DONE BY THE GOVERNMENT OF MEXICO EMPLOYEES, THE

8    FEDERAL AGENTS AND THE SOLDIERS.

9    Q.    AND HOW WERE FIELDS GENERALLY DESTROYED?

10   A.    IN TWO WAYS.  THEY WERE DESTROYED MANUALLY; THAT IS, BY

11   PULLING UP EACH INDIVIDUAL PLANT, STACKING IT UP, POURING

12   DIESEL OR KEROSENE OR ANY COMBUSTIBLE ON IT AND BURNING IT.

13            THE SECOND WAY WOULD BE TO EQUIP THE HELICOPTERS OF

14   THE TASK FORCE WITH HERBICIDE SPRAYERS AND SPRAY SOME TYPE OF

15   HERBICIDE ON THE PLANTS.

16   Q.    NOW, DID YOU HAVE ANY PERSONS UNDER YOUR SUPERVISION IN

17   NOVEMBER OF 1984?

18   A.    I WAS WORKING IN COOPERATION WITH APPROXIMATELY 9 CREW

19   MEMBERS OF THE NORTHERN TASK FORCE.

20   Q.    WHAT EQUIPMENT DID YOU HAVE AVAILABLE TO YOU?

21   A.    I HAD TWO HELICOPTERS AND ONE FIXED WING AIRCRAFT, A GAS

22   TRUCK, AND THAT WAS BASICALLY IT.

23   Q.    WHO FURNISHED THE CREWS FOR THE VARIOUS AIRCRAFT?

24   A.    THE GOVERNMENT OF MEXICO, THE FEDERAL JUDICIAL POLICE.

25   Q.    WERE YOU RESPONSIBLE FOR OVER FLYING A PARTICULAR AREA IN

1   MEXICO?

2   A.   MY GENERAL ASSIGNMENT WAS THE STATES OF NORTHERN SINALOA,

3   SONORA, PARTS OF DURANGO.

4   Q.   AND TO WHOM DID YOU REPORT?

5   A.   I REPORTED TO THE TASK FORCE MANAGER IN MEXICO CITY, WHICH

6   WOULD HAVE BEEN -- EDDIE HEATH WAS THEN IN CHARGE OF -- THE

7   COUNTRY ATTACHE, AND CHARLIE LUGO WAS THE MANAGER OF THE

8   PROGRAM.

9   Q.   DID THERE COME A TIME IN NOVEMBER OF 1984 WHEN YOU WERE

10  ORDERED TO THE STATE OF CHIHUAHUA?

11  A.   YES, SIR, THERE WAS.

12  Q.   DO YOU RECALL WHEN THAT WAS?

13  A.   I WAS -- IT WAS ON NOVEMBER 8.  I WAS IN NOGALES, SONORA

14  WITH A CREW.  I RECEIVED A PHONE CALL TO REPORT TO CHIHUAHUA

15  CITY, CHIHUAHUA.

16  Q.   AND WERE YOU INFORMED WHY YOU WERE ORDERED TO CHIHUAHUA?

17  A.   YES, SIR.

18  Q.   WHAT WAS THE REASON?

19  A.   WE WERE TO BACK UP SOME OTHER UNITS ON ERADICATION OF SOME

20  LARGE FIELDS AND SOME MARIJUANA PROCESSING CAMPS.

21  Q.   DID YOU, IN FACT, GO TO CHIHUAHUA CITY?

22  A.   YES, WE DID.

23  Q.   WHEN DID YOU DO THAT?

24  A.   WE LEFT ON THE 9TH OF NOVEMBER.

25  Q.   WHEN YOU SAY WE, WHO ARE YOU REFERRING TO?

5-18

1   A.   THE TWO HELICOPTERS AND FIXED WING AIRCRAFT CREW, AND THE

2   GAS TRUCK MECHANIC.

3   Q.   WHEN DID YOU ARRIVE IN CHIHUAHUA CITY?

4   A.   THE 9TH OF NOVEMBER.

5   Q.   WHAT DID YOU DO WHEN YOU GOT THERE?

6   A.   ONCE WE SECURED OUR AIRCRAFT, I THEN WENT TO FIND THE

7   OTHER D.E.A. AGENTS WHO HAD ARRIVED AHEAD OF ME TO GET A

8   BRIEFING.

9   Q.   DID YOU, IN FACT, RECEIVE A BRIEFING?

10  A.   YES, SIR.  I DID.

11  Q.   DID YOU RECEIVE ANY INSTRUCTIONS AS TO WHAT YOU SHOULD DO

12  NEXT?

13  A.   MY BASIC INSTRUCTIONS WERE TO CONTINUE MY OPERATION OF

14  COORDINATION AND COOPERATION WITH THE UNITS THAT WERE ALREADY

15  THERE.

16  Q.   AFTER YOU RECEIVED THIS BRIEFING, DID YOU MAKE A

17  DETERMINATION AS TO WHAT YOU SHOULD DO NEXT?

18  A.   YES, SIR.  I DID.

19  Q.   WHAT WAS THAT?

20  A.   I HAD TO DEVELOP MORE INFORMATION, I HAD TO BRIEF MY CREWS

21  AND MAKE ASSIGNMENTS.

22  Q.   NOW, WHAT WAS IT OR WHAT WERE YOU INFORMED HAD OCCURRED IN

23  THIS AREA AT THE TIME YOU WERE DEBRIEFED?

24  A.   I WAS TOLD THAT A TASK FORCE HAD LOCATED NUMEROUS LARGE

25  FIELDS SOUTH OF CHIHUAHUA -- SOUTH OF CHIHUAHUA CITY NEAR AN

5-19

1    AREA CALLED BUFALO.   THEY HAD ALSO LOCATED LARGE CAMPS WHERE

2    MARIJUANA WAS BEING PROCESSED AND LARGE AMOUNTS OF DRYING

3    MARIJUANA.

4    Q.    NOW, WHEN DID ALL THIS OCCUR?

5    A.    THIS OCCURRED ON THE 8TH.

6    Q.    PRIOR TO YOUR ARRIVAL?

7    A.    PRIOR TO MY ARRIVAL, YES.

8    Q.    UPON LEARNING THIS, DID YOU DIRECT YOUR CREWS TO DO

9    ANYTHING?

10   A.    YES, I DID.

11   Q.    I DIRECTED THEM TO -- BASED ON SOME ADDITIONAL INFORMATION

12   I DEVELOPED WHILE IN THE CITY THAT EVENING, THE FOLLOWING

13   MORNING I DIRECTED MY CREWS TO FLY EAST AND NORTH OF THE CITY.

14   Q.    THE CITY OF CHIHUAHUA?

15   A.    YES, SIR.

16   Q.    DID THEY, IN FACT, DO THAT?

17   A.    YES, SIR, THEY DID.

18   Q.    AND DID YOU RECEIVE ANY INFORMATION BACK FROM THOSE CREWS?

19   A.    YES, I DID.

20   Q.    WHAT WERE YOU INFORMED?

21   A.    ON THE 10TH OF NOVEMBER, I RECEIVED RADIO COMMUNICATION

22   FROM MY FIXED WING AIRCRAFT THAT THEY HAD LOCATED SOME LARGE

23   MARIJUANA FIELDS NORTH AND EAST OF CHIHUAHUA CITY,

24   APPROXIMATELY 70 MILES.

25            THEY HAD ALSO FOUND WHAT THEY BELIEVED TO BE AT LEAST

1   TWO CAMPS SIMILAR TO THOSE AT BUFALO.

2   Q.   NOW, WHAT HAD CAUSED YOU TO SEND YOUR CREWS INTO THAT

3   PARTICULAR AREA?

4   A.   BASED ON THE BRIEFING I HAD RECEIVED FROM THE AGENTS WHO

5   HAD BEEN AT BUFALO, PART OF THE INFORMATION WAS THAT THE

6   WORKERS AT THESE CAMPS HAD BEEN ISSUED BLUE OR GRAY BLANKETS,

7   WOOL BLANKETS, WHITE METAL CUPS AND METAL PLATES.

8         DURING -- WHILE I WAS IN CHIHUAHUA CITY ON THE

9   EVENING OF THE 9TH, I OBSERVED A LOT OF MEN FITTING THAT

10  PROFILE ON THE HIGHWAYS AND AT THE BUS STATIONS AND IN VARIOUS

11  PUBLIC PLACES.

12        AND I TALKED TO THEM.  AND IN TALKING TO SOME OF

13  THESE PEOPLE, I DETERMINED THAT THESE PEOPLE DID NOT, FOR THE

14  MOST, PART COME FROM CAMPS IN THE SOUTH, BUT CAME FROM CAMPS TO

15  THE EAST AND THE NORTH.

16  Q.   NOW, IN FACT, DID YOU GO TO THE LOCATIONS ABOUT WHICH YOU

17  HAD BEEN INFORMED ON THE 10TH OF NOVEMBER BY YOUR PILOT?

18  A.   NO, SIR, I DID NOT.

19  Q.   DID YOU BOARD AN AIRCRAFT AT ANY TIME AND GO LOOKING FOR

20  SOME OF THESE LOCATIONS?

21  A.   I DID NOT ON THE 10TH, SIR.

22  Q.   I'M NOT REFERRING TO THE 10TH.  AT ANY TIME?

23  A.   YES, I DID.

24  Q.   WHEN WAS THAT?

25  A.   ON THE 11TH I WENT -- I WENT IN ONE OF MY HELICOPTERS AND

1   FLEW TOWARD THE CAMPS LOCATED IN THE CHOREACHIC MOUNTAINS,

2   APPROXIMATELY 70 MILES FROM THE CITY OF CHIHUAHUA.

3   Q.   WHILE FLYING IN THE HELICOPTER THEN, DID YOU SEE ANYTHING

4   OF SIGNIFICANCE TO YOU?

5   A.   YES, I DID.

6   Q.   WHAT DID YOU SEE?

7   A.   WHEN I WAS APPROXIMATELY 55 MILES NORTHEAST OF THE CITY OF

8   CHIHUAHUA, FLYING OVER THE DESERT AREA, I OBSERVED WHAT

9   APPEARED TO BE THOUSANDS OF PEOPLE IN THE DESERT AREA, WAVING

10  AND RUNNING ABOUT.

11         AND I ORDERED MY HELICOPTER SET DOWN AWAY FROM THE

12  GROUP TO DETERMINE WHAT THE SITUATION WAS.

13  Q.   AND DID YOU OBTAIN ANY INFORMATION FROM ANY OF THOSE

14  INDIVIDUALS?

15  A.   YES, I DID.

16  Q.   AS A RESULT OF THAT INFORMATION, DID YOU DETERMINE TO DO

17  SOMETHING ELSE?

18  A.   YES, I DID.

19  Q.   WHAT DID YOU DETERMINE TO DO?

20  A.   I DETERMINED -- THE INFORMATION I FOUND WAS THE GENERAL

21  DIRECTION OF THE CAMPS WHERE THESE PEOPLE HAD BEEN HELD OR HAD

22  BEEN STAYING FOR PERIOD OF TIME, RANGING FROM 20 DAYS TO THREE

23  MONTHS, WHERE THEY HAD BEEN WORKING ON BALING AND PROCESSING

24  MARIJUANA, AND JUST BEING HELD THERE, BEING UNABLE TO LEAVE.

25         I WAS TOLD THAT ON THE EVENING OR LATE HOURS OF THE

5-22

1   8TH OF NOVEMBER, THEY WERE ORDERED OUT BY GUARDS AND TOLD TO GO

2   INTO THE DESERT.  I TALKED TO NUMEROUS PEOPLE THERE AND THEY

3   IDENTIFIED TEN PEOPLE WHO THEY SAID WERE THE GUARDS WHO HAD

4   HELD THEM CAPTIVE IN THE CAMPS.

5          THEY ALSO YOU TOLD ME THAT OTHER GUARDS AND OTHER

6   PEOPLE IN CHARGE OF THOSE CAMPS HAD FLED ON THE EVENING OR LATE

7   HOURS ON THE 8TH OF NOVEMBER.

8   Q.   AS A RESULT OF OBTAINING THAT INFORMATION, DID YOU ATTEMPT

9   TO LOCATE THESE CAMPS?

10  A.   YES, I DID.

11  Q.   WHAT DID YOU DO IN THAT REGARD?

12  A.   I THEN -- AFTER WE COUNTED THE PEOPLE, I BOARDED MY

13  AIRCRAFT AND FLEW TO THE CAMP, WHICH I CALLED CAMP NUMBER 1.

14  Q.   HOW MANY PEOPLE DID YOU FIND THERE?

15  A.   5,857.

16  Q.   HOW DID YOU COUNT THESE PERSONS?

17  A.   I HAD THE COMANDANTE BREAK THE GROUPS UP INTO GROUPS BY

18  STATE.  THEN BY STATE, WE BROKE THOSE GROUPS DOWN FURTHER INTO

19  GROUPS FOR TOWNS AND PUEBLITOS, WHICH MEANS VILLAGES.

20          AND WE FOUND A LITERATE PERSON IN EACH GROUP.  I HAD

21  THEM TAKE THE NAMES OF ALL THE PERSONS IN EACH GROUP.  WE THEN

22  HAD THE NAMES.  THE COMANDANTE RECEIVED ALL THE NAMES, WE

23  TALLIED THEM, AND THAT'S HOW WE CAME UP WITH OUR FIGURE.

24  Q.   DID YOU MAKE A DETERMINATION AS TO HOW MANY STATES THESE

25  PEOPLE ORIGINATED FROM?

5-23

1   A.   THEY WERE FROM NUMEROUS STATES THROUGHOUT MEXICO, WITH THE

2   BULK OF THEM COMING FROM SONORA, SINALOA, BUT THEY WERE

3   THROUGHOUT MEXICO.

4   Q.   NOW, YOU MENTIONED A CAMP NUMBER 1.  WHEN DID YOU FIND

5   THIS?

6   A.   ON THE 11TH, AFTER I LEFT THE DESERT AREA WHERE I HAD

7   COUNTED THESE PEOPLE.

8   Q.   DID YOU LAND AT CAMP NUMBER 1?

9   A.   I DID.

10  Q.   WHAT DID YOU FIND THERE?

11  A.   UPON APPROACHING, I OBSERVED 12 OR 13 LARGE, FRAME

12  BUILDINGS COVERED WITH A BLACK, RIGID TAR PAPER, WITH TWO

13  SMALLER BUILDINGS SET ON A SMALL RISE NEAR THE CAMP.

14       THE CAMP WAS SET IN A GEOLOGICAL BOWL THAT MADE IT

15  DIFFICULT TO SEE FROM THE HORIZON.  IF YOU WERE ON THE GROUND,

16  YOU WOULDN'T SEE THE CAMP.  HOWEVER, ONCE YOU LANDED INSIDE,

17  THE AREA WAS QUITE LARGE, BIG ENOUGH TO FIT THE -- SO THAT ALL

18  THE BUILDINGS FIT.

19       THE BUILDINGS WERE ARRANGED FROM 300 BY 50 FEET --

20  300 FEET IN LENGTH, 50 FEET WIDE.  THEY VARIED IN SIZE.  THEY

21  WERE CONSTRUCTED OF LUMBER FRAMING WITH HEAVY BLACK CORRUGATED

22  TAR PAPER; BOTH THE ROOF AND ON THE SIDE.

23       SOME OF THE BUILDINGS WERE OPEN WITH JUST A FRAME

24  WITH THE ROOF, AND SOME HAD PLASTIC TARPS HANGING OFF THE SIDE.

25       IN ALL OF THE BUILDINGS I FOUND MARIJUANA DEBRIS,

1    PARAPHERNALIA USED IN PROCESSING MARIJUANA.

2    Q.   WERE YOU ABLE TO DETERMINE WHAT THE PURPOSES OF THESE

3    BUILDINGS WERE, WHAT THEY WERE USED FOR?

4    A.   YES, SIR, I WAS.

5    Q.   WHAT WERE THE BUILDINGS USED FOR?

6    A.   MOST OF THE BUILDINGS WERE USED FOR PROCESSING, PACKING

7    MARIJUANA.

8    Q.   HOW COULD YOU TELL THAT?

9    A.   FROM THE PARAPHERNALIA FOUND.

10   Q.   WHAT PARAPHERNALIA DID YOU FIND?

11   A.   I FOUND WOODEN MOLDS FOR MAKING THE MARIJUANA BLOCKS.  I

12   FOUND PACKAGED MARIJUANA, WRAPPED MARIJUANA.  IN THE PACKETS,

13   IN BALES OF APPROXIMATELY 20 TO 25 POUNDS.  I FOUND HUNDREDS OF

14   LARGE ROLLS OF MATERIAL SUCH AS SARAN WRAP, COUNTLESS NUMBERS

15   OF ROLLS OF MASKING TAPE, SCREENS, MARIJUANA DEBRIS EVERYWHERE,

16   PILES OF MARIJUANA OUTSIDE OF BUILDINGS, TRUCKS LOADED WITH

17   PACKAGED MARIJUANA, AND MARIJUANA DRYING ALL AROUND THE CAMP.

18   Q.   HOW LARGE WERE THE PILES OF MARIJUANA THAT YOU SAW?

19   A.   THE TALLEST -- WELL, AS YOU APPROACH THE CAMP, THERE WAS A

20   SMALL ROAD LEADING IN.  AND ON BOTH SIDES OF THIS ROAD, IN SOME

21   PLACES TO A HEIGHT OF 10 FEET AND 8 FEET WIDE -- RAN FOR A

22   QUARTER OF A MILE, A HALF A MILE ON BOTH SIDES OF THE ROAD.

23   Q.   THESE ARE PILES OF MARIJUANA?

24   A.   YES, SIR.

25   A.   THERE WAS ALSO MARIJUANA DRYING TWO OR THREE FEET DEEP ON

5-25

1    THE HILLSIDES, AND THERE WAS MANICURED MARIJUANA PILED 7, 8

2    FEET HIGH, 10 FEET WIDE, 30, 40, 50 FEET LONG.  SEVERAL OF THEM

3    THROUGHOUT THE CAMP.

4    Q.    NOW, YOU MENTIONED THAT YOU SAW SCREENS.  WHAT WOULD

5    SCREENS HAVE BEEN USED FOR?

6    A.    THEY'RE USED IN TAKING OUT TWIGS, THE STEMS AND SO ON,

7    MANICURING AND REFINING THE MARIJUANA.

8    Q.    LIKE A SIFTING PROCESS?

9    A.    YES, SIR.

10   Q.    NOW, DID YOU SEE ANY BUILDINGS AT THIS CAMP THAT APPEARED

11   TO HAVE BEEN USED FOR SOMETHING OTHER THAN THE PROCESSING OF

12   MARIJUANA?

13   A.    YES.

14   Q.    WHAT OTHER USES WERE THE BUILDINGS PUT TO THERE?

15   A.    THE TWO SMALL BUILDINGS ON TOP OF THE RISE HAD BEEN USED

16   FOR LIVING QUARTERS.  AND IN QUESTIONING SOME OF THE PEOPLE WHO

17   WERE STILL IN THE CAMP, I DETERMINED THAT THIS WAS WHERE THE

18   PERSONS IN CHARGE, THE GUARDS AND THE PERSON THEY CALLED THE

19   COMANDANTE, LIVED.

20        THERE WAS ONE BUILDING THAT WAS USED FOR STORING

21   SUPPLIES AND ONE BUILDING THAT WAS USED AS A COOK SHACK.

22        THE REASON I DETERMINED THIS COULD BE THE COOK

23   SHACK -- THERE WAS ONE AREA APPROXIMATELY 40 BY 40 THAT HAD

24   ABOUT A FOOT IN DEPTH OF PINTO BEANS, SACKS, NUMEROUS SACKS OF

25   RICE, CASES OF FISH, AND MEXICAN MADE MAALOX, AND SOME OTHER

1    STAPLES.

2         THE ROOM WHERE THERE WERE TIN CUPS, METAL PLATES AND

3    STORAGE ROOM.

4    Q.   DID YOU FIND ANY VEHICLES AT THIS CAMP?

5    A.   YES, I DID.

6    Q.   AND HOW MANY VEHICLES DID YOU FIND?  DO YOU RECALL?

7    A.   I DON'T RECALL THE EXACT NUMBER, BUT SOMETHING AROUND TEN.

8    THERE WERE TWO LARGE TRUCKS, TANDEM AXEL TRUCKS, RIGHT IN THE

9    CAMP AND SEVERAL MORE OUTSIDE.

10        THERE WERE SOME FOUR-WHEEL DRIVE VEHICLES, SOME 350

11   FORDS, A WATER TRUCK IN AND AROUND THE CAMP.  THE VEHICLES WERE

12   BEING SEIZED BY THE SOLDIERS AND BY THE POLICE AT THE TIME.

13   Q.   NOW, I'D LIKE TO DIRECT YOUR ATTENTION TO YOUR RIGHT ON

14   THE EASEL, WHAT HAS BEEN MARKED FOR IDENTIFICATION AS EXHIBIT

15   31 -- IS A MAP.

16        DO YOU SEE THE EASEL TO THE RIGHT OF THE EXHIBIT BOX

17   THERE?

18   A.   YES, SIR.

19   Q.   MR. CELAYA, WOULD YOU PLEASE GO TO THAT MAP, WITH THE

20   COURT'S PERMISSION.

21        THE COURT:  YES.

22        (WITNESS MOVING FROM WITNESS STAND TO EASEL.)

23   BY MR. CARLTON:

24   Q.   COULD YOU INDICATE FOR THE LADIES AND GENTLEMEN OF THE

25   JURY, JUST BY POINTING, WHERE THE CITY OF CHIHUAHUA IS ON THAT

5-27

1    MAP.

2    A.    THIS IS THE CITY OF CHIHUAHUA HERE IN THE CENTER OF THE

3    MAP.

4    Q.    NOW, COULD YOU ALSO IDENTIFY FOR THE LADIES AND GENTLEMEN

5    OF THE JURY WHAT THAT IS A MAP OF?

6    A.    THIS IS -- THE WHITE AREA IS A MAP OF THE STATE OF

7    CHIHUAHUA, MEXICO.

8    Q.    COULD YOU INDICATE, PLEASE, WITH YOUR FINGER THE AREA IN

9    WHICH YOU FOUND CAMP 1?

10    A.    IT WOULD BE INSIDE OF THE CIRCLE ON THIS -- IN THIS AREA

11    HERE.

12    Q.    NOW, MR. CELAYA, HAVE YOU PREVIOUSLY MARKED THAT MAP WITH

13    THE CIRCLE THAT YOU JUST POINTED TO?

14    A.    YES, SIR, AND MY INITIALS APPEAR BY IT.

15            MR. CARLTON:   ALL RIGHT.   THANK YOU VERY MUCH.

16            (WITNESS RESUMED THE WITNESS STAND.)

17            MR. CARLTON:   I MOVE THAT EXHIBIT 31 BE RECEIVED.

18            THE COURT:   THAT MAY BE RECEIVED.

19            (EXHIBIT # 31 RECEIVED IN EVIDENCE.)

20    BY MR. CARLTON:

21    Q.    MR. CELAYA, I BELIEVE IN THE CART NEXT TO THE WITNESS

22    STAND SHOULD BE SOME PHOTOGRAPHS.   IF YOU WOULD, PLEASE FIND

23    THE PHOTOGRAPH THAT HAS BEEN MARKED AS NUMBER 33-A.

24    A.    I HAVE FOUND IT.

25    Q.    DO YOU RECOGNIZE THAT PHOTOGRAPH?

5-28

1    A.   YES, I DO.

2    Q.   AND WHAT IS IT?

3    A.   IT IS A PHOTOGRAPH OF THE INTERIOR OF ONE OF THE BUILDINGS

4    AT CAMP NUMBER 1 THAT I TOOK.  I TOOK THIS PHOTOGRAPH.

5    Q.   AND I DON'T BELIEVE THAT'S LARGE ENOUGH, BUT COULD YOU --

6    MAY WE HAVE THIS RECEIVED, YOUR HONOR?

7            THE COURT:  YES.  IT MAY BE RECEIVED.

8            (EXHIBIT # 33-A RECEIVED IN EVIDENCE.)

9            MR. CARLTON:  IT'S PROBABLY NOT LARGE ENOUGH TO SHOW

10   TO THE JURY.  WHY DON'T WE JUST MOVE ON.

11           (DISCUSSION OFF THE RECORD BETWEEN COUNSEL.)

12           MR. CARLTON:  YOUR HONOR, MAY WE HAVE PERMISSION TO

13   PUBLISH THIS PHOTOGRAPH TO THE JURY?

14           THE COURT:  IT IS NOT NECESSARY NOW.  THE JURY WILL

15   SEE IT IN DUE COURSE.

16   BY MR. CARLTON:

17   Q.   ALL RIGHT.  CAN YOU LOOK AT WHAT HAS BEEN MARKED FOR

18   IDENTIFICATION AS EXHIBIT 33-B.  DO YOU SEE THAT?

19   A.   YES, SIR.

20   Q.   WHAT IS THAT?

21   A.   THAT'S A PHOTOGRAPH OF STACKS OF BALED MARIJUANA.  THERE

22   IS ALSO A SCALE ON THE RIGHTHAND SIDE OF THE PHOTOGRAPH THAT

23   APPEARS TO HAVE BEEN TAKEN INSIDE OF A BUILDING.

24           THIS APPEARS TO BE ONE OF THE PHOTOGRAPHS THAT I ALSO

25   TOOK AT CAMP NUMBER 1.

5-29

1  Q.   ALL RIGHT.   WOULD YOU LOOK AT THE PHOTOGRAPH THAT HAS BEEN

2  MARKED AS 33-C.

3  A.   YES, SIR.

4          THE COURT:  DO YOU WANT TO OFFER THAT?

5          MR. CARLTON:  I WILL GO THROUGH THESE AND OFFER THEM

6  ALL AT ONCE, YOUR HONOR.

7          THE COURT:  ALL RIGHT.

8  BY MR. CARLTON:

9  Q.   DO YOU SEE THAT?

10  A.   YES, SIR.

11  Q.   WHAT IS THAT?

12  A.   THIS IS A PHOTOGRAPH OF BALES OF MARIJUANA LYING IN WHAT

13  APPEARS TO BE THE BED OF A TRUCK.

14          THIS IS A PHOTOGRAPH THAT I TOOK OF A TRUCK THAT WAS

15  PARKED AT THE CAMP NUMBER 1.

16  Q.   AND WOULD YOU LOOK AT 33-D.

17  A.   YES, SIR.

18  Q.   DO YOU RECOGNIZE THAT?

19  A.   YES, SIR.

20  Q.   WHAT IS IT?

21  A.   THIS IS A PICTURE TAKEN BY ME AT CAMP NUMBER 1 SHOWING

22  PART OF ONE OF THE BUILDINGS.  IT SHOWS PILES OF CARDBOARD

23  BOXES AND A PILE OF MARIJUANA -- MANICURED MARIJUANA ON THE

24  RIGHTHAND SIDE.

25          THIS WAS TAKEN BY ME AT CAMP NUMBER 1.

5-30

1   Q.   WHAT WERE THE CARDBOARD BOXES BEING USED FOR?

2   A.   PACKING THE BALED MARIJUANA.

3   Q.   I WOULD ASK YOU TO LOOK AT WHAT HAS BEEN MARKED AS 33-E.

4   A.   YES, SIR.

5   Q.   DO YOU RECOGNIZE THAT?

6   A.   YES, I DO.

7   Q.   WHAT IS IT?

8   A.   THIS IS A PHOTOGRAPH TAKEN BY ME OF A PILE OF MARIJUANA,

9   PARTIALLY MANICURED WITH A LARGE SCREEN, WHICH WAS USED IN

10  SIFTING THE MARIJUANA.

11       THERE IS A HELICOPTER IN THE BACKGROUND.

12  Q.   DO YOU KNOW WHAT THE PURPOSE OF THAT HELICOPTER WAS?

13  A.   THAT WAS ONE OF MY HELICOPTERS THAT WAS SUPPORTING MY

14  OPERATION AT THAT TIME.

15       (BRIEF INTERRUPTION.)

16       THE CLERK:  THE INTERPRETERS CAN'T HEAR THE WITNESS,

17  YOUR HONOR.

18       MR. CARLTON:  PERHAPS, MR. CELAYA, YOU COULD SPEAK UP

19  A BIT.

20       THE WITNESS:  YES, SIR.

21  BY MR. CARLTON:

22  Q.   HOW LARGE WAS THE PILE OF MARIJUANA DEPICTED IN THAT

23  PHOTOGRAPH?

24  A.   AT THE TOP, THE TALLEST PART, 7 FEET, PERHAPS 8 FEET.

25  Q.   DID YOU SEE OTHER PILES OF MARIJUANA SUCH AS THAT?

5-31

1    A.    YES, SIR, I DID.

2    Q.    IS THAT AT CAMP NUMBER 1?

3    A.    YES, SIR, I DID.

4    Q.    DO YOU HAVE A KNOWLEDGE AS TO HOW MANY OF THOSE OTHER

5    PILES YOU SAW?

6    A.    I'D ESTIMATE OVER 30.

7    Q.    IF YOU WOULD NOW LOOK AT WHAT HAS BEEN MARKED AS EXHIBIT

8    33-F.

9    A.    YES.

10   Q.    DO YOU SEE THAT?

11   A.    YES.

12   Q.    DO YOU RECOGNIZE IT?

13   A.    YES, I DO.

14   Q.    WHAT IS THAT?

15   A.    THIS IS A PICTURE TAKEN BY ME OF THE CAMP SHOWING THE

16   BUILDINGS THAT I DESCRIBED, THE FRAME BUILDINGS WITH THE

17   CORRUGATED TAR PAPER COVERING, WITH ANOTHER BUILDING ON THE

18   RIGHTHAND SIDE COVERED WITH TARP, WHERE THE -- AND THEN THERE

19   IS TWO PERSONS WALKING IN THIS PICTURE.

20         I TOOK THIS PICTURE AT CAMP NUMBER 1.

21   Q.    WOULD YOU LOOK AT WHAT HAS BEEN MARKED AS 33-G?

22   A.    YES, SIR.

23   Q.    DO YOU RECOGNIZE THAT PHOTOGRAPH?

24   A.    YES, I DO.

25   Q.    WHAT IS IT?

5-32

1   A.   THIS IS A PHOTOGRAPH OF THE CAMP NUMBER 1 TAKEN BY ME

2   SHOWING MARIJUANA, PILES OF MARIJUANA IN THE BACKGROUND.  AND

3   IN THE FOREGROUND, THERE ARE FOUR MEN.  THERE ARE WASHTUBS

4   SITTING ON ROCKS.

5          I TOOK THIS PICTURE.   THERE IS -- WHEN I -- I

6   OBSERVED THAT IN -- THE WASHTUBS WERE FILLED WITH HALF-COOKED

7   BEANS, AND THIS WAS IN THE COOKING AREA OF THE CAMP.

8   Q.   WOULD YOU PLEASE LOOK AT WHAT HAS MARKED AS EXHIBIT 33-H,

9   WHICH SHOULD BE IN THE STACK JUST TO YOUR RIGHT, PERHAPS ON THE

10  BOTTOM.  THE SMALLER PHOTOGRAPH.

11  A.   I HAVE IT.

12  Q.   DO YOU RECOGNIZE THAT?

13  A.   YES, I DO.

14  Q.   WHAT IS THAT?

15  A.   THIS IS A PHOTOGRAPH TAKEN BY ME OF SOME OF THE MEN THAT I

16  FOUND IN THE DESERT NEAR CAMP NUMBER 1 SHOWING -- ONE OF THE

17  INDIVIDUALS HAS ONE OF THE GRAY BLANKETS I PREVIOUSLY

18  DESCRIBED.

19  Q.   AND DID YOU SEE ANY BLANKETS SIMILAR TO THAT IN THE

20  POSSESSION OF ANY OF THE OTHER INDIVIDUALS THAT YOU HAD

21  INTERVIEWED IN RELATION TO THIS CAMP?

22  A.   YES, I DID, BOTH HERE WHERE I TOOK THIS PHOTOGRAPH AND

23  ALSO IN CHIHUAHUA CITY.

24  Q.   THESE WERE COMMON BLANKETS AMONG THOSE PERSONS?

25  A.   YES, SIR.

5-33

1   Q.   WOULD YOU PLEASE LOOK AT WHAT HAS BEEN MARKED AS EXHIBIT

2   33-I?

3   A.   THIS IS A PHOTOGRAPH OF WHITE METAL CUPS, GREEN METAL

4   PLATES AND BOXES.  I DON'T RECALL IF I TOOK THIS PHOTOGRAPH OR

5   SOMEONE ELSE DID, BUT I SAW SIMILAR COLLECTIONS OF CUPS AND

6   PLATES IN MY AREA.

7   Q.   AT CAMP NUMBER 1?

8   A.   YES, SIR.

9   Q.   DID YOU SEE THE WORKERS IN THE DESERT THAT YOU HAD

10  PREVIOUSLY TALKED TO IN THE POSSESSION OF CUPS AND PLATES SUCH

11  AS THOSE?

12  A.   BOTH IN THE DESERT AND IN CHIHUAHUA CITY WHEN I

13  INTERVIEWED PEOPLE.  THEY CARRIED CUPS, AND IN SOME CASES, THE

14  PLATE.  VERY DISTINCT PLATE AND CUPS.

15          MR. CARLTON:   YOUR HONOR, I WOULD MOVE THAT EXHIBITS

16  33-B THROUGH 33-I BE RECEIVED.

17          THE COURT:  THEY MAY BE RECEIVED.

18          (EXHIBITS # 33-B THROUGH 33-I RECEIVED IN EVIDENCE.)

19  BY MR. CARLTON:

20  Q.   NOW, MR. CELAYA, WHEN YOU LANDED AT CAMP NUMBER 1, DID YOU

21  FIND ANY WORKERS IN THAT CAMP?

22  A.   YES, I DID.

23  Q.   DO YOU KNOW HOW MANY?

24  A.   NO, SIR.  I DON'T RECALL THE NUMBER.  THERE WEREN'T TOO

25  MANY.

5-34

1   Q.   DID YOU -- WHAT DID YOU DO AFTER YOUR REVIEW OF CAMP

2   NUMBER 1?

3   A.   I TRIED TO INVENTORY THE EQUIPMENT THERE, I TALKED TO SOME

4   OF THE PEOPLE IN THE CAMP, I TOOK PHOTOGRAPHS, I MADE

5   MEASUREMENTS, AND THEN RETURNED TO CHIHUAHUA CITY.

6   Q.   AND AT SOME POINT DID YOU HAVE OCCASION TO FLY OVER

7   ANOTHER CAMP?

8   A.   YES, I DID.

9   Q.   WHEN WAS THAT?

10  A.   THAT WAS -- I FLEW -- OVER FLEW WHAT I CALLED CAMP NUMBER

11  2 ON TWO OCCASIONS.  I OVER FLEW IT, I BELIEVE, THAT DAY.

12         I JUST DID A QUICK OVER FLIGHT, GENERALLY FROM A

13  DISTANCE, OBSERVING -- I FORGET THE EXACT NUMBER OF BUILDINGS,

14  BUT BUILT BASICALLY THE SAME AS CAMP NUMBER 1, OF THE FRAME AND

15  TAR PAPER.  I DID NOT LAND.

16         I ALSO OVER FLEW THAT AREA LATER ON, TWO OR THREE

17  DAYS LATER, IN A FIXED WING AIRCRAFT.

18  Q.   DID YOU SEE ANY PILES OF MARIJUANA AT CAMP NUMBER 2 AS

19  WELL?

20  A.   YES, I DID.

21  Q.   DID YOU -- HOW LONG DID YOU PARTICIPATE IN THIS OPERATION

22  IN CHIHUAHUA?

23  A.   I STAYED ON APPROXIMATELY FIVE OR SIX MORE DAYS.

24  Q.   AND DID PART OF THIS OPERATION INVOLVE THE DESTRUCTION OF

25  THE MARIJUANA THAT WAS FOUND?

1    A.   YES.

2    Q.   AND DID IT ALSO INVOLVE THE DESTRUCTION OF THE BUILDINGS

3    AND OTHER MATERIALS THAT WERE FOUND?

4    A.   YES, IT DID.

5    Q.   DID YOU, IN THE COURSE OF YOUR WORK, HAVE OCCASION TO

6    VERIFY WHETHER THIS DESTRUCTION HAD OCCURRED?

7    A.   I DID.

8    Q.   DID YOU EVER DEVELOP AN ESTIMATE AS TO THE AMOUNT OF

9    MARIJUANA THAT WAS DESTROYED AS A RESULT OF YOUR ASPECT OF THIS

10    OPERATION?

11    A.   YES, I DID.

12    Q.   WHAT WAS THAT ESTIMATE?

13    A.   I ESTIMATED APPROXIMATELY 6,000 TONS AT CAMP 1 AND 2.

14    Q.   IN THE COURSE OF YOUR INVOLVEMENT HERE, YOU INTERVIEWED A

15    NUMBER OF THE WORKERS; IS THAT CORRECT?

16    A.   YES, SIR.

17    Q.   AND DID YOU OBTAIN ANY INTELLIGENCE INFORMATION FROM THESE

18    INDIVIDUALS THAT YOU PASSED TO YOUR SUPERIORS IN MEXICO CITY?

19    A.   YES, I DID.

20    Q.   AND DID YOU SPECIFICALLY PASS THAT INFORMATION ON TO YOUR

21    SUPERIORS IN THE ERADICATION PROGRAM?

22    A.   YES, I DID.

23    Q.   DID YOU OBTAIN INTELLIGENCE INFORMATION AS TO THE

24    OWNERSHIP OF THESE FIELDS?

25    A.   YES, I DID.

1  Q.   WHAT WAS THAT INFORMATION?

2  A.   I RECEIVED INFORMATION THAT THE FIELDS -- THE OPERATION

3  WAS OWNED BY RAFAEL CARO QUINTERO.

4         I ALSO RECEIVED INFORMATION THAT PERHAPS SOME

5  GOVERNMENT OFFICIALS HAD PART IN THE OPERATION.

6  Q.   ANY PARTICULAR GOVERNMENT OFFICIALS?

7  A.   THEY SAID THE POLICE, THE FEDERAL POLICE.

8  Q.   AND THE PERSONS PROVIDING THIS INFORMATION WERE THE

9  WORKERS IN THE FIELDS?

10  A.   YES.

11  Q.   DID YOU OBTAIN ANY INTELLIGENCE INFORMATION CONCERNING THE

12  MILITARY?

13  A.   YES, I DID.

14  Q.   WHAT WAS THAT?

15  A.   SOME OF THE WORKERS TOLD ME THAT THEY HAD OBSERVED

16  MILITARY OFFICERS FLY IN IN HELICOPTERS, LAND AND WALK AROUND

17  THE CAMPS WHILE THEY WERE WORKING.

18  Q.   WERE YOU ABLE TO DETERMINE FROM YOUR INSPECTION OF CAMP

19  NUMBER 1 WHERE THE WORKERS WERE HOUSED?

20  A.   YES, I WAS.

21  Q.   WHERE WAS THAT?

22  A.   THEY HAD BUILT SOME OF THE FRAME BUILDINGS THAT WERE

23  STANDING.  THEY HAD TAKEN AND PUT TARP OVER THE BUILDINGS, AND

24  THIS IS WHERE THEY SLEPT.  THEY SLEPT ON THE LEE SIDE, ON THE

25  PROTECTED SIDE OF SOME OF THE MARIJUANA PROCESSING BUILDINGS.

5-37

1    AND IN SOME CASES, THEY BUILT SMALL SHACKS,

2    SO-CALLED, OUT OF CARDBOARD BOXES OR ANY MATERIAL THAT WAS

3    BEING THROWN OUT.  THEY SLEPT ON THE GROUND AND ANYWHERE WHERE

4    THEY COULD GET SHELTER.

5    Q.   WERE YOU -- DID YOU FIND ANYONE IN CAMP NUMBER 1 WHO WAS

6    IDENTIFIED AS A SUPERVISOR OR MANAGER OF THIS OPERATION?

7    A.   NOT -- NO, SIR, I DID NOT.

8         MR. CARLTON:  MAY I HAVE A MOMENT, YOUR HONOR?

9         (DISCUSSION HELD OFF THE RECORD BETWEEN COUNSEL.)

10        MR. CARLTON:  NOTHING FURTHER, YOUR HONOR.

11        THE COURT:  YOU MAY CROSS-EXAMINE THE WITNESS.

12

13                    CROSS-EXAMINATION +

14   BY MR. STOLAR:

15   Q.  GOOD MORNING, SIR.

16   A.  GOOD MORNING.

17   Q.  JUST OUT OF CURIOSITY, COULD YOU TELL ME WHAT AN

18   ADMINISTRATOR FOR ADMINISTRATIVE INVESTIGATIONS DOES?

19   A.   YES, SIR.  I DIRECT THE ACTIVITIES OF THE INTELLIGENCE,

20   BACKGROUND, POLYGRAPH AND INTERNAL AFFAIRS UNITS FOR THE

21   ARIZONA DEPARTMENT OF CORRECTIONS.

22   Q.   OKAY.  THANK YOU.

23        YOU INDICATED THAT YOU FOUND APPROXIMATELY 5800

24   PEOPLE IN THE DESERT THAT HAD COME FROM CAMP NUMBER 1; IS THAT

25   CORRECT?

1   A.   I BELIEVE THEY CAME FROM BOTH CAMPS 1 AND 2.

2   Q.   IN TOTAL, COULD YOU ESTIMATE HOW MANY PEOPLE WERE EMPLOYED

3   OR WERE WORKING THERE AT BOTH CAMPS?

4   A.   PROBABLY ANOTHER 3,000, 2,000 MORE THAN WHAT I FOUND

5   THERE.  SO SOMETHING CLOSE TO 9,000.

6   Q.   SOMETHING CLOSE TO 9,000 PEOPLE --

7   A.   YES, SIR.

8   Q.   --IN BOTH CAMPS?

9   A.   YES, SIR.

10  Q.   WERE THERE ANY OTHER CAMPS IN THAT AREA?

11  A.   NOT IN MY AREA, BUT AT LEAST ONE OTHER CAMP WAS FOUND IN

12  THE BUFALO AREA.

13  Q.   AND THAT WAS --

14  A.   FURTHER SOUTH.

15  Q.   FURTHER SOUTH?

16  A.   YES.

17  Q.   DO YOU KNOW HOW MANY PEOPLE WERE WORKING IN THAT CAMP?

18  A.   ANOTHER FOUR OR 5000.  I DID NOT PARTICIPATE IN THAT

19  OPERATION.

20  Q.   OKAY.  NOW, THIS IS A CAMP THAT YOU UNDERSTOOD WAS AN

21  OPERATION THAT WAS RUN BY MR. CARO QUINTERO; IS THAT RIGHT?

22         OWNED BY HIM?

23  A.   YES.

24  Q.   YOU ALSO HEARD THAT SEVERAL OF THE GUARDS ASSASSINATED

25  SOME OF THE WORKERS IN THAT CAMP; DIDN'T YOU?

5-39

1   A.   YES, I DID.

2   Q.   AND THAT SOMETIME EVEN WHEN THE CAMPESINOS, THE PEASANTS

3   OR WORKERS WERE TAKEN OUT OF THE CAMP ON NOVEMBER 8TH, THEY

4   WERE PUT ON THE FORCED MARCH, WHICH IS THE ONES YOU FOUND IN

5   THE DESERT; ISN'T THAT RIGHT?

6   A.   YES, SIR.

7   Q.   AT LEAST FOUR OF THOSE PEOPLE YOU HEARD WERE SHOT BY THE

8   GUARD DURING THAT FORCED MARCH; ISN'T THAT RIGHT?

9   A.   YES, I DID.

10   Q.   YOU ALSO DETERMINED WHO THE OWNERS OF THE LAND WAS WHERE

11   THESE MARIJUANA FARMS WERE; DID YOU NOT?

12   A.   YES, I DID.

13   Q.   JESUS OJEDA RIVERA; IS THAT ONE OF THEM?

14   A.   I DON'T RECALL THE NAME, SIR.

15   Q.   DO YOU HAVE A REPORT THAT WOULD REFRESH YOUR RECOLLECTION?

16   A.   I DID READ A REPORT.

17        MR. STOLAR:   MAY I OFFER THIS TO THE WITNESS TO

18   REFRESH HIS RECOLLECTION, YOUR HONOR?

19        THE COURT:   ALL RIGHT.

20        (DOCUMENT TENDERED TO THE WITNESS.)

21   BY MR. STOLAR:

22   Q.   DOES THAT REFRESH YOUR RECOLLECTION?

23   A.   YES, SIR, IT DOES.

24   Q.   COULD YOU TELL US WHO THE OWNERS OF THE LAND WERE?

25   A.   ACCORDING TO THE REPORT, THE OWNERS WERE:   JESUS OJEDA

1    RIVERA.  THE OWNER OF THE RANCH KNOWN AS SANTA CRUZ DE NEIRA,

2    MUNICIPIO JIMINEZ IN THE JURISDICTION OF COLONIAS BUFALO.

3            BALDOMERO ANGULO NUNEZ, OWNER OF THE RANCH EL ALAMO

4    OF THE CAMPS.

5            FEDERICO CANDIA FRANCO, ARTURO LOPEZ RAMIREZ, RODOLFO

6    LERMA CASTILLO, OWNERS OF THE AREA KNOWN AS EX-HACIENDA

7    CORRALES, ALSO CAMPS.

8            NOEL RODRIGUEZ BARRAZA, APOLONIO VALENCIA RODRIGUEZ,

9    JULIAN MALDONADO LIANA, EPIFANIO DE ANDA, OWNERS OF THE LAND

10   WHERE THE FIELDS WERE LOCATED.

11   Q.   THANK YOU.  NOW, HOW LONG HAD YOU BEEN WORKING ON THE

12   ERADICATION PROGRAM IN MEXICO?

13   A.   ON THAT PARTICULAR CAMPAIGN SINCE LATE SEPTEMBER.

14   Q.   AND HOW LONG HAD YOU BEEN WORKING IN MEXICO?

15   A.   IN MY CAREER, I WORKED MEXICO ON AND OFF ALMOST

16   CONTINUALLY.

17   Q.   HAVE YOU EVER SEEN A MARIJUANA OPERATION AS LARGE AS THIS

18   ONE?

19   A.   NEVER.

20   Q.   THIS WAS THE BIGGEST; IS THAT RIGHT?

21   A.   THAT'S CORRECT.

22   Q.   AND YOU TESTIFIED IT WAS APPROXIMATELY 6,000 TONS IN BOTH

23   CAMPS OR ONLY IN THE FIRST ONE?

24   A.   I ESTIMATED 6,000 IN CAMP 1 AND 2.

25   Q.   ONE AND TWO?

5-41

1    A.    YES.

2    Q.    THAT'S APPROXIMATELY 12 MILLION POUNDS; IS IT NOT?

3    A.    YES, SIR.

4    Q.    AND 192 MILLION OUNCES.  THAT'S A LOT OF MARIJUANA; ISN'T

5    IT?

6    A.    YES, SIR.

7    Q.    AND THERE WAS -- BY THE WAY, THERE WAS ALSO A TREMENDOUS

8    AMOUNT OF EQUIPMENT THAT WAS CONFISCATED THERE TOO, WASN'T

9    THERE?

10    A.    YES, THERE WAS.

11    Q.    ALL THE TRUCKS AND CARS AND FOUR-WHEEL DRIVE VEHICLES;

12    THAT WAS ALL TAKEN; IS THAT RIGHT?

13    A.    YES.

14    Q.    ALL THE COOKING UTENSILS, EVERYTHING THAT HAD TO DO WITH

15    THAT OPERATION WAS EITHER CONFISCATED BY THE MEXICAN POLICE, IS

16    THAT RIGHT, OR BURNED; IS THAT CORRECT?

17    A.    BY THE MEXICAN POLICE AND THE ARMY.

18    Q.    AND THE ARMY?

19    A.    YES.

20    Q.    THE ENTIRE OPERATION WAS -- BASICALLY EVERYTHING WAS TAKEN

21    AND EVERYTHING ELSE WAS BURNED; IS THAT CORRECT?

22    A.    THAT IS CORRECT.

23         MR. STOLAR:  THANK YOU, SIR.  NOTHING FURTHER.

24         THE COURT:  ANY OTHER QUESTIONS FOR THIS WITNESS?

25         MR. NICOLAYSEN:  NOTHING, YOUR HONOR.

5-42

1        MS. KELLY:  NOTHING, YOUR HONOR.

2        THE COURT:  ANY REDIRECT?

3        MR. CARLTON:  NOTHING, YOUR HONOR.

4        THE COURT:  YOU MAY STEP DOWN.

5        (WITNESS EXCUSED.)

6        THE COURT:  CALL YOUR NEXT WITNESS.

7        MR. CARLTON:  YOUR HONOR, THE GOVERNMENT CALLS

8   CHARLES LUGO.

9

10        CHARLES A. LUGO + PLAINTIFFS WITNESS, SWORN

11

12        THE CLERK:  PLEASE STATE YOUR FULL NAME FOR THE

13   RECORD AND SPELL YOUR LAST NAME.

14        THE WITNESS:  CHARLES, INITIAL A., LUGO, L U G O.

15

16        DIRECT EXAMINATION +

17   BY MR. CARLTON:

18   Q.   GOOD MORNING, MR. LUGO.

19   A.   GOOD MORNING.

20   Q.   WHAT IS YOUR PRESENT EMPLOYMENT?

21   A.   I'M THE SUPPLIER FOR INTELLIGENCE FOR THE DRUG ENFORCEMENT

22   ADMINISTRATION, LOS ANGELES FIELD DIVISION.

23   Q.   HOW LONG HAVE YOU BEEN EMPLOYED BY THE D.E.A.?

24   A.   WITH ITS PREDECESSOR AGENCY, SINCE 1972.

25   Q.   AT ANY POINT DURING YOUR CAREER WERE YOU ASSIGNED TO THE

1    COUNTRY OF MEXICO?

2    A.    YES, I WAS.

3    Q.    DURING WHAT PERIOD?

4    A.    1977 TO 1985.

5    Q.    DRAWING YOUR ATTENTION TO -- WELL, DURING THE PERIOD THAT

6    YOU WERE ASSIGNED TO MEXICO, WHAT ASSIGNMENTS DID YOU HAVE

7    THERE?

8    A.    FOR THE MAJORITY PART OF THE EIGHT YEARS I WAS THERE, I

9    WAS IN CHARGE OF THE INTELLIGENCE GROUP IN MEXICO CITY AT THE

10   U.S. EMBASSY.

11   Q.    WHAT WERE YOUR RESPONSIBILITIES AS HEAD OF THE

12   INTELLIGENCE GROUP?

13   A.    TO OBTAIN INFORMATION FROM DIFFERENT SOURCES WITHIN THE

14   COUNTRY OF MEXICO, OTHER THIRD COUNTRIES AND THE UNITED STATES,

15   ANALYZE THIS INTELLIGENCE AND DISSEMINATE IT TO THE PROPER

16   CONSUMER.

17   Q.    IN GENERAL, WHO WAS THE PROPER CONSUMER?

18   A.    IT WOULD DEPEND ON THE TYPE OF INFORMATION WE RECEIVED.

19   IT WOULD EITHER BE THE MEXICAN GOVERNMENT, U.S. GOVERNMENT OR

20   DOMESTIC OFFICES IN THE UNITED STATES OR ALL OVER THE WORLD.

21   Q.    NOW, DRAWING YOUR ATTENTION TO NOVEMBER OF 1984, WHAT

22   POSITION DID YOU OCCUPY AT THAT TIME?

23   A.    I WAS ACTING AS SUPERVISOR FOR THE REGION OF MEXICO AND I

24   WAS ALSO IN CHARGE OF THE PROJECT THAT WE HAD DOWN THERE CALLED

25   "OPERATION VANGUARD".

1   Q.    WHAT WAS OPERATION VANGUARD?

2   A.    OPERATION VANGUARD WAS THE PROGRAM DESIGNED TO VERIFY

3   INFORMATION REGARDING THE ERADICATION OF MARIJUANA CROPS AND

4   POPPY CROPS.  THAT'S OPIUM, HEROIN CROPS IN MEXICO.

5   Q.    WAS OPERATION VANGUARD A D.E.A. OPERATION?

6   A.    IT'S WAS A BILATERAL PROJECT THAT WE HAD WITH THE COUNTRY

7   OF MEXICO.

8   Q.    WHAT WAS ITS ORGANIZATION?

9   A.    AS FAR AS D.E.A. WAS CONCERNED, I WAS IN CHARGE OF THE

10  PROJECT.  I HAD 20 SOME ODD AGENTS UNDER MY CONTROL.  I HAD 10

11  FIXED WING AIRCRAFT AT MY DISPOSAL AND ANYWHERE FROM 20 TO 30

12  HELICOPTERS.

13          AS FAR AS THE MEXICAN GOVERNMENT WAS CONCERNED, THEY

14  PROVIDED EQUIPMENT AND PILOTS, AND IT WAS RUN BY THE OFFICE OF

15  INSPECTIONS IN MEXICO.

16  Q.    WAS THIS PROGRAM PARTIALLY FUNDED BY THE UNITED STATES?

17  A.    I WOULD SAY ALMOST TOTALLY FUNDED.

18  Q.    NOW, YOU HAVE SAID THAT OPERATION -- THE PURPOSE OF

19  OPERATION VANGUARD WAS TO VERIFY ERADICATION EFFORTS?

20  A.    PRIMARILY, SIR.

21  Q.    WHAT ERADICATION EFFORTS WERE YOU ATTEMPTING TO VERIFY?

22  A.    THE INFORMATION WE HAD RECEIVED REGARDING CROPS.

23  Q.    I'M NOT PARTICULARLY REFERRING TO ANYTHING, JUST IN

24  GENERAL WHAT ERADICATION EFFORTS?

25  A.    THE ERADICATION OF THE MARIJUANA AND OPIUM POPPY CROPS.

5-45

1  Q.   WHO WAS RESPONSIBLE FOR THOSE ERADICATION EFFORTS?

2  A.   THE MEXICAN GOVERNMENT.

3  Q.   NOW, AT SOME POINT DURING 1984, DID YOU RECEIVE

4  INTELLIGENCE INFORMATION CONCERNING MARIJUANA GROWING IN THE

5  STATE OF CHIHUAHUA?

6  A.   YES, WE DID.

7  Q.   WHAT WAS THE NATURE OF THE INTELLIGENCE INFORMATION THAT

8  YOU RECEIVED?

9  A.   IT WAS OBTAINED FROM THREE DIFFERENT SOURCES THAT THERE

10  WAS LARGE AMOUNTS OF MARIJUANA BEING GROWN IN THE STATE OF

11  CHIHUAHUA AND -- WHICH EMPLOYED ANYWHERE FROM 8,000 TO 10,000

12  WORKERS TO GET THE CROP OUT.

13  Q.   WHEN DID YOU FIRST RECEIVE THIS INFORMATION?

14  A.   THE FIRST TIME LATE OCTOBER.

15  Q.   OF 1984?

16  A.   OF 1984, SIR.

17  Q.   THERE WERE THREE SOURCES FOR THIS INFORMATION?

18  A.   YES, SIR.

19  Q.   WHAT WERE THOSE SOURCES?

20  A.   THE SOURCES WERE THE DEVELOPED IN EL PASO, TEXAS, TUCSON,

21  ARIZONA AND HERMOSILLO, SONORA, MEXICO.

22  Q.   ALL OF THIS INFORMATION WAS THEN FUNNELED TO YOU?

23  A.   YES.

24  Q.   DID YOU MAKE ANY EFFORTS TO CORROBORATE OR CONFIRM THE

25  INTELLIGENCE INFORMATION YOU HAD RECEIVED?

5-46

1   A.   YES, SIR.

2   Q.   AND WERE YOU ABLE TO -- WELL, STRIKE THAT.

3        WHAT DID YOU DO TO ATTEMPT TO CONFIRM THAT

4   INFORMATION?

5   A.   ORIGINALLY, WE DISPATCHED TWO D.E.A. AGENTS FROM OUR

6   HERMOSILLO OFFICE TO CHIHUAHUA TO ATTEMPT TO SOLICIT

7   COOPERATION FROM THE MEXICAN GOVERNMENT TO CONFIRM THESE

8   REPORTS.

9   Q.   WHEN YOU SAY YOU SENT THEM TO CHIHUAHUA, DO YOU MEAN THE

10  CITY OF CHIHUAHUA?

11  A.   THE CITY OF CHIHUAHUA, CHIHUAHUA, MEXICO.

12  Q.   AND WERE THOSE AGENTS ABLE TO CONFIRM THE INFORMATION, THE

13  INTELLIGENCE INFORMATION THAT YOU HAD RECEIVED?

14  A.   NO, SIR.

15  A.   DO YOU KNOW WHY?

16  A.   LACK OF COOPERATION ON THE PART OF THE MEXICAN GOVERNMENT.

17  Q.   AFTER THESE EFFORTS TO CONFIRM THAT INFORMATION FAILED,

18  DID YOU -- WHAT DID YOU DO NEXT?

19  A.   I DISCUSSED IT WITH MY SUPERVISOR IN MEXICO CITY AT THE

20  U.S. EMBASSY AND WE DECIDED TO CONTACT AN OFFICIAL OF THE

21  MEXICAN GOVERNMENT TO SOLICIT HIS COOPERATION.

22  Q.   WHO WAS YOUR SUPERVISOR IN MEXICO CITY?

23  A.   THE ORIGINAL DIRECTOR, MR. EDWARD HEATH.

24  Q.   WHO DID YOU DECIDE TO CONTACT IN THE MEXICAN GOVERNMENT

25  WITH THIS INFORMATION?

1  A.   THE DIRECTOR OF THE MEXICAN JUDICIAL POLICE, MANUEL

2  IBARRA.

3  Q.   DID YOU, IN FACT, BRING THIS INFORMATION TO DIRECTOR

4  IBARRA'S ATTENTION?

5  A.   YES, I DID.

6  Q.   WHEN WAS THAT?

7  A.   I BELIEVE IT WAS NOVEMBER THE 6TH ON A TUESDAY EVENING.

8  Q.   OF 1984?

9  A.   OF 1984, SIR.

10  Q.   DID YOU ACTUALLY MEET WITH DIRECTOR IBARRA?

11  A.   YES, I DID.

12  Q.   WAS ANYONE ELSE PRESENT AT THAT MEETING?

13  A.   MR. HEATH.

14  Q.   WHERE DID THE MEETING TAKE PLACE?

15  A.   IN THE DIRECTOR OF THE FEDERAL JUDICIAL POLICE OFFICE,

16  IBARRA'S OFFICE, IN MEXICO CITY.

17  Q.   WHAT INFORMATION DID YOU PROVIDE TO DIRECTOR IBARRA AT

18  THAT TIME?

19  A.   I INFORMED HIM OF THE INTELLIGENCE THAT WE HAD AT THAT

20  TIME REGARDING THE LARGE CROPS OF MARIJUANA BEING GROWN

21  SOMEWHERE OUTSIDE THE VICINITY OF OF CHIHUAHUA, THE CITY OF

22  CHIHUAHUA, AND THE AMOUNT OF WORKERS, AND INFORMATION WE HAD

23  REGARDING TONS OF MARIJUANA BEING DIVERTED FROM THAT AREA INTO

24  THE UNITED STATES.

25  Q.   WAS IT UNUSUAL FOR YOU TO MEET DIRECTLY WITH DIRECTOR

1    IBARRA WITH THIS KIND OF INFORMATION?

2    A.    NO, SIR.

3    Q.    WHAT WAS DIRECTOR IBARRA'S RESPONSE TO THIS INFORMATION?

4    A.    FIRST HE EXHIBITED AMAZEMENT OVER THE LARGE AMOUNT THAT

5    WAS MENTIONED, AND THEN ASKED US WHAT WE REQUESTED OF HIM.

6    Q.    WHAT DID YOU REQUEST OF HIM, IF ANYTHING?

7    A.    WE SOLICITED HIS COOPERATION IN PROVIDING MANPOWER TO

8    ASSIST US IN THE ERADICATION OF THE CROP AFTER LOCATING IT.

9    Q.    AND DID HE AGREE TO PROVIDE THAT ASSISTANCE?

10   A.    YES, HE DID.

11   Q.    DID HE DO ANYTHING IN FURTHERANCE OF OBTAINING THAT

12   ASSISTANCE AT THAT MEETING?

13   A.    YES, SIR.  WE WERE PRESENT AS HE DETAILED SEVERAL MEXICAN

14   FEDERAL POLICE TO CHIHUAHUA CITY TO STAY UNTIL FURTHER

15   INSTRUCTIONS.

16   Q.    NOW, DID YOU HAVE ANOTHER MEETING WITH OTHER

17   REPRESENTATIVES OF THE MEXICAN GOVERNMENT ABOUT THIS MATTER?

18   A.    YES, I DID.

19   Q.    WHEN WAS THE NEXT MEETING?

20   A.    IT WAS THE FOLLOWING MORNING.

21   Q.    THIS WOULD BE NOVEMBER 7TH?

22   A.    NOVEMBER 7TH, 1984.

23   Q.    WHERE DID THIS SECOND MEETING TAKE PLACE?

24   A.    IN THE OFFICE OF THE DEPUTY ATTORNEY GENERAL OF MEXICO,

25   LUIS OCTAVIO PORTE PETIT.

5-49

1    Q.    WHO ELSE PARTICIPATED IN THIS MEETING?

2    A.    MR. HEATH, MYSELF, THE DEPUTY ATTORNEY GENERAL, MR. SAMUEL

3    LOPEZ, WHO WAS IN CHARGE OF THE ERADICATION PROGRAM IN MEXICO,

4    AND APPROXIMATELY FOUR OF HIS SUBORDINATES.

5    Q.    WHAT INFORMATION DID YOU PROVIDE TO THE MEXICAN OFFICIALS

6    DURING THIS MEETING?

7    A.    I REPEATED ESSENTIALLY WHAT I TOLD MR. IBARRA, OF THE

8    INFORMATION WE HAD REGARDING LARGE CROPS OF MARIJUANA BEING

9    GROWN IN THE STATE OF CHIHUAHUA NEAR CHIHUAHUA CITY, CHIHUAHUA.

10   Q.    AND DID YOU REITERATE YOUR REQUEST FOR ASSISTANCE?

11   A.    YES, I DID.

12   Q.    WAS THAT REQUEST GRANTED?

13   A.    NOT ORIGINALLY, NO.

14   Q.    WHAT WAS THE RESPONSE OF THE MEXICAN OFFICIALS TO THE

15   INFORMATION YOU PROVIDED?

16   Q.    ORIGINALLY, IT WAS THAT THEY COULD NOT FATHOM THAT AMOUNT

17   OF MARIJUANA COULD BE GROWN SO OPENLY IN SUCH AN AREA, AND

18   THEREFORE, OUR INTELLIGENCE REGARDING THIS CROP WAS PROBABLY

19   OVEREMPHASIZED.

20   Q.    DID THE ERADICATION COORDINATOR, SAM LOPEZ, SAY THAT HE

21   WOULD DO ANYTHING IN RESPONSE TO THE INFORMATION YOU GAVE HIM?

22   A.    NOT AT THAT PARTICULAR MOMENT, NO, SIR.

23   Q.    ALL RIGHT.  WHAT HAPPENED NEXT?

24   A.    AFTER LONG DELIBERATION AND OUR INSISTENCE THAT WE SHOULD

25   AT LEAST VERIFY THIS INTELLIGENCE, MR. PORTE PETIT, THE DEPUTY

5-50

12

1    ATTORNEY GENERAL, STATED THAT, IN FACT, IF WE COULD VERIFY IT,

2    WHAT IS IT THAT WE COULD NEED FROM THEM.

3         WE ADVISED THEM THAT NATURALLY WE NEEDED LOGISTICS,

4    MANPOWER, AIRCRAFT, HELICOPTERS.

5    Q.   WHEN DID YOU WISH FOR THIS ASSISTANCE TO BE MADE

6    AVAILABLE?

7    A.   AT THAT PARTICULAR MOMENT.

8    Q.   HOW DID THEY RESPOND TO THAT?

9    A.   THE DEPUTY ATTORNEY GENERAL ASKED HIS SUBORDINATE, SAM

10   LOPEZ, IN CHARGE OF THE ERADICATION PROGRAM IF HE COULD PROVIDE

11   THIS ASSISTANCE, TO WHICH MR. SAM LOPEZ STATED THAT HE WOULD

12   NEED ANYWHERE FROM 7 TO 10 DAYS TO BE ABLE TO PROVIDE THE

13   LOGISTICS AND THE MANPOWER.

14   Q.   DID HE SAY WHETHER THAT NUMBER OR THE NUMBER OF

15   HELICOPTERS SUFFICIENT FOR THIS OPERATION WERE AVAILABLE?

16   A.   HE SAID THEY WERE NOT AVAILABLE.

17   Q.   NOW, DID YOU HAVE INFORMATION TO CONTRADICT THAT?

18   A.   YES, I DID.

19   Q.   WHY DID YOU HAVE THAT INFORMATION?

20   A.   THAT WAS PART OF MY JOB IN MEXICO CITY, AS THE HEAD OF

21   INTELLIGENCE, TO DETERMINE THE CRITICAL AREAS WHERE CROPS WERE

22   GROWING, AND OBVIOUSLY, COINCIDE THIS WITH THE PROPER EQUIPMENT

23   TO BE STAGED TO PARTICULAR AREAS SO THEY WOULD BE AVAILABLE TO

24   ERADICATE THE CROPS.

25   Q.   SO WERE YOU FAMILIAR WITH THE NUMBERS AND LOCATIONS OF

5-51

1    HELICOPTERS AVAILABLE TO THE ERADICATION PROGRAM?

2    A.   YES, SIR.

3    Q.   HOW DID YOU RESPOND TO SAM LOPEZ'S COMMENTS THAT

4    HELICOPTERS WERE NOT AVAILABLE?

5    A.   I INFORMED HIM THAT I WAS AWARE THAT THERE WERE SEVERAL

6    HUNDRED HELICOPTERS IN DURANGO THAT COULD BE AVAILABLE.  BUT

7    MORE SO, THAT IN CULIACAN, THAT AT THAT PARTICULAR MOMENT, THEY

8    HAD ANYWHERE FROM 30 TO 40 HELICOPTERS THAT COULD PROBABLY BE

9    USED.

10   Q.   NOW, AT THAT POINT, DID THE MEXICAN OFFICIALS AGREE TO

11   PROVIDE THE ASSISTANCE YOU WANTED?

12   A.   HE FIRST CONFIRMED MY INFORMATION BY CALLING CULIACAN AND

13   DETERMINED THAT I WAS RIGHT.

14   Q.   WHAT HAPPENED NEXT?

15   A.   HE STATED THAT EVEN THOUGH THEY MIGHT HAVE THE HELICOPTERS

16   AVAILABLE, THAT FUEL WAS NOT AVAILABLE.

17   Q.   AND AGAIN, DID YOU KNOW WHETHER THAT STATEMENT WAS TRUE OR

18   FALSE?

19   A.   THAT WAS A FALSE STATEMENT.

20   Q.   DID YOU INFORM THE MEXICAN OFFICIALS THAT FUEL WAS

21   AVAILABLE?

22   A.   YES, SIR.

23   Q.   DID TELL THEM WHERE IT WAS AVAILABLE?

24   A.   YES, SIR.  I HAD INFORMATION WHERE IT COULD BE OBTAINED

25   AND HOW FAST IT COULD BE TRANSPORTED IN THAT PARTICULAR AREA.

1        I INFORMED THEM THAT I WAS AWARE THAT IT WAS

2   SUFFICIENT FUEL TO BE BROUGHT INTO THE AREA.

3   Q.   AND DID THEY THEN MAKE EFFORTS TO CONFIRM THE INFORMATION

4   YOU PROVIDED ABOUT THE AVAILABILITY OF FUEL?

5   A.   THEY DID, SIR.

6   Q.   DID THEY, IN FACT, CONFIRM THE INFORMATION YOU PROVIDED?

7   A.   THEY DID, SIR.

8   Q.   NOW, AT THAT POINT, DID THEY AGREE TO PROVIDE THE

9   ASSISTANCE YOU WANTED?

10  A.   NO, SIR.

11  A.   WHAT HAPPENED THEN?

12  A.   AT THAT PARTICULAR MOMENT, THEY SAID THAT THEY PROBABLY

13  WOULD NOT HAVE THE MANPOWER, SUFFICIENT MANPOWER TO HAVE THEM

14  DISPATCHED TO THIS PARTICULAR AREA ON SUCH SHORT NOTICE.

15  Q.   DID YOU KNOW BETTER?

16  A.   YES, SIR.

17  Q.   WHY WAS THAT?

18  A.   I WAS AWARE OF THE MAN-HOURS THAT WE'RE USED TO ON THIS

19  PARTICULAR PROGRAM, AND HOW MANY PILOTS THEY HAD AVAILABLE AT

20  CERTAIN LOCATIONS AT CERTAIN TIMES AND HOW THEY COULD BE MADE

21  AVAILABLE ON VERY SHORT NOTICE TO HIM.

22  Q.   DID YOU MAKE ANY SUGGESTIONS AS TO WHERE ADDITIONAL

23  MANPOWER COULD BE FOUND?

24  A.   YES, SIR.

25  Q.   WHAT DID SUGGEST?

5-53

1    A.    DUE TO MY FLYING ASSIGNMENTS AND MY AUTHORITIES ALL OVER

2    MEXICO, I KNEW WHERE MOST OF THE PILOTS WERE STATIONED AND THE

3    HELICOPTERS WERE STATIONED, WHERE THE FIXED WING AND THE FUEL

4    WAS.

5    Q.    DID YOU EVER SUGGEST THAT THE M.F.J.P. SHOULD BE INVOLVED?

6    A.    NOT UNTIL THEY AGREED THAT THEY COULD PROVIDE THE

7    MANPOWER, BUT THEY FELT THAT THAT WAS STRICTLY ADMINISTRATIVE

8    TYPE OF MANPOWER AND WOULD NEED, OBVIOUSLY, PEOPLE TO ERADICATE

9    THE CROP.

10         AND THERE IS NO WAY THEY COULD HAVE THE PEOPLE THAT

11   COULD HELP US ERADICATING THE CROP AND ACTUALLY GOING INTO THE

12   AREA.

13   Q.    WHAT DID YOU SAY IN RESPONSE TO THAT?

14   A.    I ASKED HIM TO CONTACT THE DIRECTOR OF THE MEXICAN FEDERAL

15   JUDICIAL POLICE TO SEE IF HE COULD PROVIDE THE MANPOWER.

16   Q.    WHAT WAS THEIR RESPONSE TO YOUR REQUEST?

17   A.    THE DIRECTOR HAD NOT BEEN INVITED TO THAT MEETING, SO HE

18   WAS NOT AWARE THAT WE WERE HAVING THIS MEETING UPSTAIRS.

19         THEY CALLED HIM AND HE WAS SUMMONED UP TO THE

20   MEETING.

21   Q.    WHAT HAPPENED AT THAT POINT?

22   A.    HE WAS ASKED HOW MANY AGENTS HE COULD PROVIDE TO THIS

23   PARTICULAR PROJECT AND HOW SOON HE COULD RALLY THEM TO BE

24   ASSIGNED TO THE CITY OF CHIHUAHUA.

25   Q.    WHAT DID HE SAY?

13

1    A.   HE SAID THAT HE COULD HAVE THE MAJORITY OF A HUNDRED

2    PEOPLE IN THE CITY OF CHIHUAHUA, CHIHUAHUA BY THAT EVENING.

3    Q.   AND AT SOME POINT WAS A DECISION MADE THEN TO RAID THESE

4    FIELDS?

5    A.   AT THAT PARTICULAR MOMENT, THEY DECIDED THAT WE HAD ALL

6    THE RESOURCES AVAILABLE AND ASKED WHEN WE WOULD LIKE TO VERIFY

7    THIS INFORMATION.

8         I INFORMED HIM I WAS READY IMMEDIATELY TO FLY OUT

9    THAT INSTANT, IF NECESSARY.

10   Q.   WHAT WAS THE RESPONSE TO THAT?

11   A.   THEY STATED THAT THEY NEEDED AT LEAST THREE OR FOUR HOURS

12   SO THEY COULD GET THEIR PEOPLE TOGETHER, AND WE AGREED TO MEET

13   AT THE AIRPORT IN MEXICO CITY THAT EVENING AND FLY OUT TO

14   CHIHUAHUA CITY.

15   Q.   WHEN YOU SAY "WE AGREED TO MEET", WHO ARE YOU REFERRING

16   TO?

17   A.   MR. PORTE PETIT, THE DEPUTY ATTORNEY GENERAL, GAVE

18   INSTRUCTIONS TO THE SUBORDINATES THERE TO PROVIDE THE PEOPLE

19   AVAILABLE AND MAKE THEM AVAILABLE AT THE AIRPORT THAT EVENING.

20        THE COURT:  WE'LL TAKE OUR MORNING RECESS AT THIS

21   TIME.

22        THE CLERK:  PLEASE RISE.

23        (JURY EXCUSED.)

24        (BRIEF RECESS.)

25   /

1          (JURY PRESENT:)

2              THE COURT:  YOU MAY CONTINUE.

3                  DIRECT EXAMINATION + (RESUMED)

4    BY MR. CARLTON:

5    Q   AGENT LUGO, AT SOME POINT DID YOU THEN FLY TO CHIHUAHUA

6    CITY?

7    A   YES, I DID, SIR.

8    Q   WHEN DID YOU DO THAT?

9    A   THE EVENING OF THE SEVENTH.

10   Q   WHAT WAS THE PURPOSE OF YOUR GOING TO CHIHUAHUA CITY?

11   A   AS PREVIOUSLY AGREED WITH THE ATTORNEY GENERAL'S' OFFICE,

12   WE MET AT THE AIRPORT TO FLY TO CHIHUAHUA CITY, CHIHUAHUA, TO

13   MEET WITH THE CONTINGENT OF THE MEXICO FEDERAL JUDICIAL POLICE

14   DOWN THERE TO SET OUT A PLAN FOR THE ERADICATION OF THE CROP.

15   Q   SO AT THE TIME THAT YOU FLEW TO CHIHUAHUA, DID YOU HAVE A

16   PLAN FOR THE RAID?

17   A   ONLY WITH REGARDS TO THE LOGISTICS AND MANPOWER.

18   Q   DID YOU KNOW AT THAT TIME WHO WAS GOING TO BE COMMANDING

19   THE M.F.J.P. CONTINGENT?

20   A   YES, SIR.

21   Q   WHO WAS THAT?

22   A   THE DIRECTOR OF THE FEDERAL POLICE IN GUADALAJARA INFORMED

23   ME I WAS TO MEET WITH THE COMANDANTE FROM THE INTERPOL,

24   COMANDANTE MIGUEL ALDANA, IN CHIHUAHUA CITY THAT EVENING.

25   Q   DID YOU ALREADY KNOW COMANDANTE ALDANA?

1   A   YES, SIR.

2   Q   HOW DID YOU PREVIOUSLY KNOW HIM?

3   A   THROUGH MY DUTIES IN MEXICO CITY, MY EXCHANGES OF

4   INFORMATION, BILATERAL OPERATIONS THAT WE HAD WITH THE MEXICO

5   FEDERAL JUDICIAL POLICE THAT HE WAS INVOLVED IN AND I WAS

6   INVOLVED IN.

7   Q   HOW LONG HAD YOU KNOWN HIM AT THAT POINT?

8   A   APPROXIMATELY EIGHT YEARS.

9   Q   SO WHEN YOU FLEW TO CHIHUAHUA CITY, DID YOU GO WITH ANYONE

10  ELSE?

11  A   YES, I DID.

12  Q   WHO DID YOU GO WITH?

13  A   THE SUBORDINATES FROM THE ATTORNEY GENERAL'S OFFICE.

14  Q   FROM THE MEXICO ATTORNEY GENERAL'S OFFICE?

15  A   FROM MEXICO CITY.

16  Q   AND WERE YOU TO MEET COMANDANTE ALDANA THERE?

17  A   YES, SIR.

18  Q   DO YOU KNOW WHERE HE WAS COMING FROM?

19  A   YES, SIR.  I BELIEVE HE WAS ON A DETAIL IN TIJUANA AT THAT

20  TIME.

21  Q   NOW, WHEN YOU GOT TO CHIHUAHUA CITY, WHAT DID YOU DO?

22  A   WHEN I ARRIVED, I WENT IMMEDIATELY TO THE HOTEL WHERE THE

23  D.E.A. AGENTS WERE, TO MEET WITH THEM.

24  Q   HOW MANY D.E.A. AGENTS WERE ALREADY ON THE SCENE?

25  A   AT THAT PARTICULAR TIME, THERE WERE TWO FROM HERMOSILLO;

5-57

1   AND WITHIN A HALF-HOUR, 45 MINUTES, ANOTHER ONE ARRIVED FROM

2   HERMOSILLO.

3   Q   DID YOU EVENTUALLY MEET WITH COMANDANTE ALDANA?

4   A   YES, I DID.

5   Q   WHEN DID THAT OCCUR?

6   A   APPROXIMATELY TWO HOURS AFTER I ARRIVED IN CHIHUAHUA CITY.

7   Q   DO YOU HAVE ANY IDEA WHAT TIME?

8   A   IT WOULD BE VERY CLOSE TO ABOUT 10:00 P.M.

9   Q   AND IN THE COURSE OF YOUR MEETING WITH COMANDANTE ALDANA,

10  DID YOU DEVELOP A PLAN FOR RAIDING THE FIELDS?

11  A   YES, WE DID.

12  Q   AND WHAT WAS THAT PLAN?

13  A   WE DETERMINED THE AREA TO BE NEAR A MUNICIPALITY IN

14  CHIHUAHUA CALLED BUFALO.  AND IN LOOKING AT THE MAP, WE NOTICED

15  IT WAS KIND OF A TRIANGULAR TYPE OF GEOGRAPHICAL AREA, WHERE

16  THEY HAD A MOUNTAIN BACKDROP.  AND THEREFORE, WE DECIDED TO

17  COME IN FROM THE ROAD AREAS, FROM THE CIUDAD JIMENEZ AND

18  CAMARGO.

19  Q   CAN YOU STEP OUT OF THE WITNESS BOX PLEASE, WITH THE

20  COURT'S PERMISSION, AND GO TO THE MAP WHICH IS AT THE EASEL

21  EXHIBIT 31.

22          THE COURT:  FOR WHAT PURPOSE, COUNSEL?

23          MR. CARLTON:  I WOULD LIKE HIM TO INDICATE, THE

24  WITNESS TO INDICATE, WHERE THE FORCES WERE BEING DEPLOYED.

25          THE COURT:  (NODS HEAD UP AND DOWN.)

5-58

1        THE WITNESS:  (AT MAP:)  AS I STATED, THIS IS THE

2    TRIANGULAR AREA I REFERRED TO UP HERE, A CITY CALLED BUFALO.

3        YOU'LL NOTICE HERE, THIS AREA DOWN HERE, THERE IS A

4    MOUNTAIN BACKDROP, WHICH WE'RE NOT CONCERNED WITH.

5        THEREFORE, WE DECIDED TO STAGE IT IN THE CITY OF

6    CUIDAD CAMARGO, JIMENEZ AND HIDALGO DEL PARRAL.

7        YOU'LL NOTICE, AS I'VE INDICATED RIGHT HERE, THIS WILL

8    GIVE US A TRIANGULAR APPROACH, WITH THE MANPOWER GOING THERE,

9    AND BE A LITTLE LESS DANGEROUS THAN COMING FROM IN FROM ALL THE

10   AREAS.  WE DIDN'T HAVE THE MANPOWER TO DO THAT, ANYWAY.

11   BY MR. CARLTON:

12   Q    AGENT LUGO, HAVE YOU PREVIOUSLY CIRCLED BUFALO ON THAT MAP?

13   A    YES, I HAVE, SIR.

14   Q    AND THAT CIRCLE'S MARKED WITH YOUR INITIALS?

15   A    YES, SIR.

16   Q    ALL RIGHT.  THANK YOU VERY MUCH.

17   A    (RETURNS TO WITNESS STAND.)

18   Q    SO, WHERE WERE THE HELICOPTERS AND THE AIRCRAFT TO MEET?

19   A    IT WAS DECIDED THAT WE WOULD STAGE IN A CITY CALLED HIDALGO

20   DEL PARRAL.

21   Q    AND WERE THERE GROUND FORCES TO BE STAGED AT ANOTHER

22   LOCATION?

23   A    YES, SIR.

24   Q    AND WHAT LOCATION WAS THAT?

25   A    THAT WAS JIMENEZ, CIUDAD JIMENEZ.

5-59

1   Q   WHEN WERE THESE RAIDS IN JIMENEZ?

2   A   DAYBREAK, IN THE MORNING.

3   Q   NOVEMBER 8TH?

4   A   NOVEMBER THE 8TH, SIR.

5   Q   WHAT DID YOU DO ON THE MORNING OF NOVEMBER 8TH?

6   A   WE FLEW TO HIDALGO DEL PARRAL.  WE STAYED DOWN THERE TO

7   AWAIT THE ARRIVAL OF THE OTHER HELICOPTERS AND THE MANPOWER

8   BEING BROUGHT INTO THAT AREA, THAT WERE GOING TO BE FLOWN INTO

9   THE AREA WHERE THE MARIJUANA WAS GROWING.

10          WE FLEW DOWN TO THAT AREA AND STAGED -- AND WE MET

11   THERE AT THE AIRPORT.

12   Q   WHEN YOU SAY WE SAY "WE" WENT TO HIDALGO DEL PARRAL, WHO

13   ARE YOU REFERRING TO?

14   A   I'M REFERRING TO COMANDANTE ALDANA, MYSELF AND HIS

15   SUBORDINATES.

16   Q   HOW MANY AIRCRAFT WERE AVAILABLE TO YOU AT THAT LOCATION?

17   A   I BELIEVE AT THAT PARTICULAR TIME, WE HAD CLOSE TO 10

18   FIXED-WING.  WE HAD AT LEAST FIVE HELICOPTERS, BEST OF MY

19   RECOLLECTION.

20   Q   WHAT WERE THE FIXED-WING AIRCRAFT TO BE USED FOR?

21   A   WELL, WHAT WE DO IS, IN CASES LIKE THIS, WHAT WE DO IS WE

22   TAKE THE MAP OF THE AREA AND WE GRID IT, SO TO SPEAK, AND THEN

23   WE OVERFLY IT.  SO THE FIXED-WING WAS USED FOR THAT PARTICULAR

24   PURPOSE.

25   Q   WHAT WERE THE HELICOPTERS TO BE USED FOR?

5-60

1    A    HELICOPTERS ARE TO TRANSPORT THE MANPOWER TO THOSE

2    PARTICULAR AREAS.

3    Q    TO THE FIXED-WING WERE TO BE USED FOR OBSERVATION?

4    A    RIGHT.  RIGHT, SIR.

5    Q    AND DID YOU TARGET THAT PARTICULAR AREA FOR OBSERVATION

6    BECAUSE OF THE INTELLIGENCE INFORMATION THAT YOU HAD PREVIOUSLY

7    RECEIVED?

8    A    PLUS EYE WITNESS ACCOUNTS.

9    Q    NOW, DID YOU PARTICIPATE IN FLYING OVER THE AREA THAT YOU

10   WERE INTERESTED IN?

11   A    YES, SIR.

12   Q    AND WAS THAT IN A HELICOPTER OR A FIXED-WING AIRCRAFT?

13   A    A HELICOPTER.

14   Q    WHAT WAS YOUR ROLE TO BE IN FLYING THAT HELICOPTER?

15   A    MY ROLE WAS EXACTLY WHAT THE OTHER HELICOPTERS WERE

16   SUPPOSED TO DO:  WE WERE SUPPOSED TO FLY INTO THOSE AREAS THAT

17   WE HAD INFORMATION ON THAT THE CROPS WERE GROWING, OVERFLY THEM

18   AND DETERMINE WHAT THE CROPS WERE, WHAT THE OBSTACLES WERE WE

19   MIGHT MEET ON THE GROUND.

20   Q    DID YOU MAKE A PROPOSAL TO COMANDANTE ALDANA AS TO HOW MANY

21   HELICOPTERS SHOULD BE USED?

22   A    YES, SIR.

23        WHAT WAS YOUR PROPOSAL?

24   A    WELL, AT THAT TIME WE HAD FIVE AVAILABLE, BUT IT WAS

25   DECIDED THAT WE WOULD ONLY TAKE THREE INITIALLY.

1   Q   AND WHO WAS TO GO IN THOSE HELICOPTERS?

2   A   COMANDANTE ALDANA WAS TO BE IN ONE HELICOPTER, I WAS TO BE

3   IN THE OTHER HELICOPTER, AND ONE FROM THE DEPUTY ATTORNEY

4   GENERAL'S OFFICE WAS TO BE IN THE OTHER HELICOPTER.

5   Q   SO THREE HELICOPTERS?

6   A   YES, SIR.

7   Q   WAS THAT YOUR SUGGESTION?

8   A   YES, SIR.

9   Q   AND DID COMANDANTE ALDANA AND THE REPRESENTATIVE OF THE

10   ATTORNEY GENERAL'S OFFICE ACCEPT THAT SUGGESTION?

11   A   EVENTUALLY; YES, SIR.

12   Q   AND YOU WERE SUPPOSED TO FLY AT DAYBREAK?

13   A   YES, SIR.

14   Q   DID YOU IN FACT TAKE OFF AT THAT TIME?

15   A   NO, SIR.

16   Q   DO YOU KNOW WHY?  WHY?

17   A   YES.  BECAUSE THEY WERE DELAYING OUR DEPARTURE BY INFORMING

18   ME THAT THEY HAD NOT RECEIVED STRICT INSTRUCTIONS FROM MEXICO

19   CITY, AND THEREFORE WERE WAITING FOR INSTRUCTIONS FROM MEXICO

20   CITY.

21   Q   HOW LONG DID THIS DELAY LAST?

22   A   IN THE EXCESS OF TWO HOURS.

23   Q   WHAT DID COMANDANTE ALDANA DO DURING THIS TWO-HOUR PERIOD?

24   A   HE INFORMED ME THAT HE HAD TO CALL MEXICO CITY.  SO HE

25   WOULD GO TO WHERE THE PHONES WERE, HE'D COME BACK; AND THEN THE

5-62

1    OTHER REPRESENTATIVE FROM THE ATTORNEY GENERAL'S OFFICE, HE

2    WOULD TELL ME THAT HE HAD PHONE CALLS TO MAKE, AND HE WOULD GO

3    OVER THERE; AND THEY'D BOTH COME BACK, AND THEN THEY'D SAY THAT

4    THEY WERE WAITING FOR A PHONE CALL FROM MEXICO, AND JUST

5    CONTINUOUSLY DELAYING THE DEPARTURE.

6    Q    THIS CONTINUED FOR ABOUT TWO HOURS?

7    A    YES, IN EXCESS.

8    Q    AND AT THE END OF THAT, DID YOU SAY THE THREE OF YOU

9    EVENTUALLY GOT IN YOUR HELICOPTERS AND TOOK OFF?

10   A    ONLY TWO OF US.

11   Q    WHO DID NOT GO?

12   A    THE REPRESENTATIVE FROM THE ATTORNEY GENERAL'S OFFICE

13   STATED THAT HE STILL HAD NOT RECEIVED HIS INSTRUCTIONS;

14   THEREFORE HE WAS NOT GOING FLY.

15   Q    SO YOU AND COMANDANTE ALDANA TOOK OFF IN THE HELICOPTERS?

16   A    YES, WE DID.

17   Q    NOW, AFTER YOU WERE AIRBORNE, DID YOU RECEIVE SOME RADIO

18   COMMUNICATION FROM COMANDANTE ALDANA?

19   A    YES, SIR.  WE WERE AIRBORNE APPROXIMATELY 15 MINUTES WHEN

20   COMANDANTE ALDANA RADIOED TO MY HELICOPTER AND INFORMED ME HE

21   HAD LOCATED A LARGE FIELD IN HIS VICINITY.

22   Q    DID YOU ALSO LOCATE A FIELD?

23   A    YES.  AT THAT PARTICULAR TIME, HE TOLD ME THAT HE WAS GOING

24   TO LAND.  AND I HAD THOUGHT ABOUT GOING TO HIS AREA, BUT I

25   FOUND A FIELD OVER WHERE I WAS.  SO I RADIOED TO HIM AND TOLD

3

5-63

1   HIM THAT I HAD A FIELD WHERE I WAS AND THAT I WAS GOING TO LAND

2   WHERE I WAS.

3   Q   NOW, WHAT WAS THE TERRAIN LIKE AT THIS POINT?

4   A   FLAT.

5   Q   WAS IT DESERT?

6   A   FLAT DESERT.

7   Q   WHAT WAS THIS FIELD THAT YOU SAW?

8   A   I'M SORRY?

9   Q   WHAT DID THIS FIELD LOOK LIKE, THAT YOU SAW?

10  A   WELL, DUE TO THE FACT THAT IT WAS A VERY FLAT, DESOLATE

11  DUSTY AREA, THE FIELD ITSELF WAS VERY GREEN AND VERY

12  CONSPICUOUS SITTING IN THAT TYPE OF TERRAINE.

13  Q   ABOUT HOW LARGE WAS IT?

14  A   THE ONE THAT I LANDED ON WAS ANYWHERE FROM 80 TO 100

15  HECTARES -- HECTARES.

16  Q   DO YOU KNOW HOW MANY ACRES ARE IN A HECTARE?

17  A   APPROXIMATELY 2.4, 2.5.

18  Q   SO THIS MAY BE UP TO 200 ACRES IN SIZE?

19  A   YES, SIR.

20  Q   YOU LANDED RIGHT IN THE MIDDLE OF THE FIELD?

21  A   NO, SIR.

22  Q   ON THE EDGE?

23  A   THE EDGE.

24  Q   DID YOU FIND ANY WORKERS AT THE FIELD?

25  A   VERY FEW.

5-64

1    Q    WHEN YOU SAY "VERY FEW," WHAT DO YOU MEAN BY THAT?

2    A    AS I RECALL, ABOUT 10, 15.

3    Q    WERE THERE MARIJUANA PLANTS GROWING IN THIS FIELD?

4    A    YES, SIR.

5    Q    WHAT SIZE WERE THEY?

6    A    THEY RANGED FROM THE MATURE ONES, ABOUT 5 TO 7 FEET, TO THE

7    SMALLER ONES, THAT WERE 3 TO 4 FEET.

8    Q    HOW WERE THEY PLANTED IN THIS FIELD?

9    A    IN ROWS, LIKE AGRICULTURAL ROWS, LIKE CORN CROPS.

10   Q    DID YOU NOTICE WHETHER THE FIELD WAS IRRIGATED?

11   A    YES, THEY WERE.

12   Q    DID YOU NOTICE HOW IT WAS IRRIGATED?

13   A    YES, SIR.  THEY HAD SITUATED SOME WATER PUMPS IN EITHER

14   SIDE OF THE FIELDS AND HAD DIESEL POWERED MOTORS TO MAN-MADE

15   WELLS, WHICH WOULD BRING THE WATER OUT, AND THEY THEN THEY

16   WOULD SET UP THE IRRIGATION.

17   Q    WERE THERE ANY BUILDINGS IN THIS AREA?

18   A    YES, SIR.

19   Q    HOW MANY BUILDINGS DID YOU SEE?

20   A    AT THIS PARTICULAR CAMP, THERE WAS APPROXIMATELY FIVE.

21   Q    WHAT WERE THE SIZES OF THESE BUILDINGS?

22   A    THE LARGEST ONE WAS THE EXCESS OF A HUNDRED YARDS.  THE

23   OTHER ONES WERE SMALLER.

24   Q    WHAT DID THEY LOOK LIKE?

25   A    JUST -- BARRACKS.

1   Q   WERE YOU ABLE TO DETERMINE THE PURPOSENESS FOR WHICH THESE

2   BUILDINGS WERE USED?

3   A   YES, SIR.

4   Q   AND WHAT WERE THEY BEING USED FOR?

5   A   PRINCIPALLY, THEY WERE USED TO HEADQUARTER THE PEOPLE THAT

6   WERE WORKING THERE.  THERE WAS A DORMITORY, SLEEPING QUARTERS.

7   THERE WERE KITCHENS AND OTHER AREAS WHICH WERE STORAGE AREAS

8   WHERE THE MARIJUANA'S MANICURED, AND THEY WERE DRYING THE

9   MARIJUANA IN SOME AREAS ON TOP OF THE ROOF AND THE IMMEDIATE

10  AREA.

11  Q   SO THERE WAS MARIJUANA DRYING ON TOP OF THE ROOFS?

12  A   YES, SIR.

13  Q   DID YOU SEE OTHER MARIJUANA IN THIS CAMP?

14  A   YES, SIR.

15  Q   WHERE DID YOU SEE THIS?

16  A   IN SOME OF THE HUTS, THE BARRACKS.  THIS WAS WHAT WE CALL

17  MANICURED MARIJUANA.

18  Q   WERE THERE PILES OF MARIJUANA?

19  A   YES, SIR.  SEVERAL THOUSAND.

20  Q   ABOUT HOW LARGE WERE THEY?

21  A   OH, I'D SAY APPROXIMATELY 10 FEET HIGH.  AND OBVIOUSLY, YOU

22  KNOW, MANICURED IS KIND OF LIKE GRAIN OR SAND; YOU CAN ONLY GET

23  IT SO HIGH AND IT STARTS SPREADING THIS WAY.  SO THEY COULD GET

24  TO ABOUT 10 FEET HIGH.

25  Q   NOW, AFTER YOU INSPECTED THIS LOCATION, DID YOU AGAIN

5-66

1    CONTACT COMANDANTE ALDANA?

2    A    YES, SIR.

3    Q    HOW DID YOU DO THAT?

4    A    BY RADIO.

5    Q    DID HE COME TO YOUR FIELD?

6    A    HE DID.

7    Q    DID YOU HAVE A CONVERSATION WITH HIM AT THAT TIME?

8    A    YES, I DID.

9    Q    AND WHAT WAS THE SUBSTANCE OF THAT CONVERSATION?

10   A    MAINLY THAT HE WAS VERY PLEASED THAT WE WERE VERY

11   SUCCESSFUL, CONGRATULATED ME ON THE INFORMATION, AND D.E.A. IN

12   PARTICULAR.

13   Q    AND DID YOU THEN RESUME YOUR EFFORTS TO LOCATE OTHER

14   FIELDS?

15   A    NO.  AT THAT PARTICULAR TIME, COMANDANTE ALDANA FELT THAT

16   WE HAD LOCATED THE FIELDS THAT WE WERE LOOKING FOR.

17   Q    DID YOU SUGGEST THAT YOU SHOULD CONTINUE YOUR EFFORTS TO

18   FIND MORE FIELDS?

19   A    YES, SIR.

20   Q    WHAT WAS HIS RESPONSE TO THAT?

21   A    HIS RESPONSE WAS THAT THE FIELD THAT HE HAD FOUND AND THE

22   ONE THAT I LOCATED WAS OF SUCH MAGNITUDE THAT IT PROBABLY

23   CONFORMED WITH THE INTELLIGENCE THAT WE HAD REGARDING THE SIZE

24   OF THE FIELDS IN THE AREA AND THAT PROBABLY WE HAD LOCATED THE

25   MAJORITY OR THE MAJOR PART OF THE CROPS THAT HAD CONFIRMED OUR

5-67

1    INTELLIGENCE.

2    Q    DID HE SAY WHETHER HE WAS WILLING TO GO BACK UP AND LOOK

3    FOR MORE?

4    A    HE DIDN'T FEEL LIKE THERE WAS ANY MORE.  HE SAID THAT MAYBE

5    SINCE WE HAD BEEN SUCCESSFUL, ALREADY FOUND THE MAIN ONES, THAT

6    WE'D DONE OUR JOB.

7    Q    WHAT DID YOU SAY IN RESPONSE TO THAT?

8    A    I INFORMED HIM THAT I'D NOT CONFIRMED ALL MY INFORMATION,

9    THAT I HAD INFORMATION THAT THERE WERE LARGER SIZE FIELDS OUT

10   THERE, AND THAT WAS THERE WAS MORE PEOPLE WORKING OUT THERE.

11   Q    AND DID HE THEN AGREE TO GO BACK UP AND LOOK FOR MORE

12   FIELDS?

13   A    NO, SIR.

14   Q    DID YOU TELL HIM ANYTHING ELSE?

15   A    YEAH.  I TOLD HIM THAT WE SHOULD GO UP AGAIN AND HE AGAIN

16   INSISTED THAT WE HAD DONE OUR JOB AND MAYBE WE SHOULD GO BACK

17   TO MEXICO CITY, AT WHICH TIME I INFORMED HIM THAT I HAD NOT

18   CONFIRMED ALL MY INTELLIGENCE AND THAT, THEREFORE, WHEN I

19   RETURN TO MEXICO CITY, THAT ONE OF MY PRIMARY RESPONSIBILITIES

20   IS TO ADVISE THE AMBASSADOR OF THE UNITED STATES OF AMERICA AS

21   TO WHAT WE HAD ACCOMPLISHED, AND THAT HE WOULD NOT BE VERY

22   PLEASED BECAUSE WE HAD NOT COMPLETED OUR MISSION.

23   Q    AT THAT TIME DID COMANDANTE ALDANA AGREE TO GO UP AND LOOK

24   FOR MORE FIELDS?

25   A    YES, SIR.

5-68

4

1   Q   DID YOU THEN GET IN YOUR HELICOPTERS, GO UP AND CONTINUE

2   YOUR SEARCH?

3   A   WE WENT TO OUR RESPECTIVE HELICOPTERS, AND HE WAVED AT ME

4   AND TOLD ME WAIT.  HE CAME BACK AND TOLD ME THAT HIS PARTICULAR

5   HELICOPTER WAS OUT OF FUEL.

6   Q   WHAT DID YOU DO IN RESPONSE TO THAT?

7   A   I SUGGESTED THAT HE GO WITH ME IN MY HELICOPTER.

8   Q   AND DID HE DO THAT?

9   A   WELL, HE ASKED THE PILOT ABOUT WHAT HIS STATUS AS FAR AS

10  FUEL WAS, AND THE PILOT SAID THAT --

11  Q   YOUR PILOT?

12  A   THE PILOT THAT WAS IN MY HELICOPTER.

13  Q   YES.

14  A   HE ASKED HIM WHAT HIS STATUS WAS FUEL-WISE, AND HE SAID

15  THAT HE WAS VERY LOW, TOO.

16  Q   DID YOU KNOW WHETHER YOUR HELICOPTER HAD ENOUGH FUEL TO

17  CONTINUE THE SEARCH.

18  A   YES, SIR?

19  Q   HOW DID YOU KNOW THAT?

20  A   BEFORE I BOARDED THE HELICOPTER BACK AT THE STAGING AREA, I

21  REQUESTED FROM THE HELICOPTER PILOT AS TO HOW MANY HOURS'

22  FLYING TIME HE HAD, AND HE TOLD ME ANYWHERE FROM THREE HOURS TO

23  THREE AND A HALF HOURS.  AND WE HAD ONLY FLOWN LIKE 15, 20

24  MINUTES.

25  Q   WELL AFTER YOUR PILOT SAID THAT HE WAS LOW ON FUEL, WHAT

5-69

1   DID YOU DO?

2   A   I ADVISED HIM THAT I WAS AWARE THAT HE WAS NOT LOW ON FUEL.

3   Q   DID YOU EVENTUALLY GET BACK INTO YOUR HELICOPTER AND GO UP

4   AGAIN?

5   A   AFTER COMANDANTE ALDANA AND THE PILOT AGREED THAT WE STILL

6   HAD SOME FLYING TIME, WE BOARDED THE AIRCRAFT AGAIN, YES.

7   Q   NOW, AFTER YOU RESUMED YOUR FLIGHT, DID YOU LOCATE ANOTHER

8   FIELD?

9   A   YES, SIR.

10  Q   HOW LONG AFTER YOU WENT BACK UP IN THE AIR DID YOU LOCATE

11  THIS OTHER FIELD?

12  A   APPROXIMATELY 15 TO 20 MINUTES.

13  Q   NOW, WHAT DID YOU SEE FROM THE AIR?

14  A   AGAIN, WHAT COULD BE PROPERLY DESCRIBED AS AN OASIS IN THE

15  MIDDLE OF A DESERT.

16  Q   DID YOU DETERMINE THAT MARIJUANA PLANTS WERE BEING

17  CULTIVATED?

18  A   YES, SIR.

19  Q   HOW LARGE WAS THE FIELD THAT YOU SAW?

20  A   THIS PARTICULAR FIELD WAS CLOSE TO 200 HECTARES.

21  Q   DID YOU SEE ANY WORKERS?

22  A   YES, SIR.

23  Q   WHERE WERE THESE WORKERS?

24  A   THEY WERE MILLING AROUND, THEY WERE SPRAWLED IN THE

25  COUNTRYSIDE, THEY WERE WITHIN THE CONFINES OF THE FIELD.

5-70

1   Q   DID YOU EVER DETERMINE HOW MANY WORKERS WERE AT THIS

2   LOCATION?

3   A   IN THIS PARTICULAR FIELD, I ESTIMATED CLOSE TO 3,000.

4   Q   DID YOU LAND?

5   A   YES, SIR.

6   Q   WHERE DID YOU LAND?

7   A   ON THE PERIMETER OF THE FIELD.

8   Q   THEN DID YOU INSPECT THE FIELD AND THE FACILITIES THERE?

9   A   I DID, SIR.

10   Q   WHAT DID YOU FIND?

11   A   I FOUND MANY PEOPLE THAT WERE BEING HELD CAPTIVE IN AN

12   INFIRMARY TYPE OF AREA.

13   Q   HOW COULD YOU HELD THEY WERE BEING HELD CAPTIVE?

14   A   BECAUSE THEY WERE TIED AND BOUND.

15   Q   AND WHAT ELSE DID YOU FIND?

16   A   SOME VERY SICK PEOPLE THERE.  I FOUND AN AREA WHICH THEY

17   REFERRED TO AS THE DOCTOR'S QUARTERS, WHERE THEY HAD A DOCTOR,

18   WOULD COME IN TO VISIT THE CAMP ON A DAILY BASIS.  I FOUND

19   KITCHEN AREAS, FOUND EQUIPMENT AND SUPPLY AREAS.

20   Q   WERE THERE ANY BUILDINGS AT THIS LOCATION?

21   A   SEVERAL BUILDINGS.

22   Q   WHAT KINDS OF BUILDINGS WERE THEY?

23   A   THEY WERE ESSENTIALLY THE SAME TYPE THAT I DESCRIBED

24   PREVIOUSLY, OF THE OTHER FIELD THAT WE LANDED ON.  THEY WERE

25   LONG BARRACK-LIKE HUTS WITH CORRUGATED ROOFS.

5-71

1    Q    WERE YOU ABLE TO DETERMINE WHAT THEY WERE BEING USED FOR?

2    A    THE PURPOSE WAS MAINLY TO HOUSE THE PEOPLE THAT WERE

3    WORKING THERE.  THERE WERE SLEEPING QUARTERS, DORMITORIES.

4    Q    DID YOU SEE ANY VEHICLES IN THE AREA?

5    A    YES, SIR.

6    Q    HOW MANY?

7    A    AS I RECALL, THERE WAS APPROXIMATELY -- I DIDN'T COUNT THEM

8    PERSONALLY, BUT THERE WAS ABOUT 35, WHAT THEY CALL TARTAN

9    TRUCKS.

10   Q    WHAT KIND OF TRUCKS ARE TARTAN TRUCKS?

11   A    THEY'RE FLATBEDS WITH RAILINGS AROUND THEM.  THEY'RE

12   SUPPOSED TO BE A 20,000 CAPACITY, WHICH HAD BEEN MODIFIED TO A

13   30,000-TON CAPACITY.

14   Q    WERE ANY OF THESE TRUCKS LOADED WITH ANYTHING?

15   A    NOT THOSE THAT I LOCATED FIRST.  BUT ON THAT NIGHT, WE DID

16   SEIZE A TRUCK THAT WAS LOADED THAT CAME INTO THE AREA THAT

17   NIGHT.

18   Q    NOW, DID YOU SEE ANY MARIJUANA, OTHER THAN THE MARIJUANA

19   GROWING IN THE FIELD, AT THIS LOCATION?

20   A    YES, SIR.

21   Q    WHERE DID YOU SEE IT?

22   A    DIFFERENT AREAS OF THE CAMP.

23   Q    CAN YOU DESCRIBE SOME OF THOSE AREAS?

24   A    YES.  THEY WERE WITHIN THE PROXIMITY OF MOST OF THE

25   BUILDINGS.  THERE WERE JUST ROWS AND ROWS OF MANICURED

1    MARIJUANA.

2         AGAIN, MANICURED MARIJUANA IS WHAT WE REFERRED TO AS

3    SAND-LIKE, SPRAWLING, BEEN REFINED FROM THE ORIGINAL PRODUCT

4    INTO THIS TYPE WE CALLED MANICURED.

5    Q    DID YOU SEE CHOPPED MARIJUANA?

6    A    I SAW CHOPPED MARIJUANA.

7    Q    PLANTS?

8    A    I SAW MARIJUANA AT ALL STAGES, FROM SEEDLINGS TO MATURE

9    STAGE, TO MANICURED, TO DRYING.

10   Q    NOW, IF YOU WOULD, I'D LIKE YOU TO LOOK AT ONE OF THE

11   PHOTOGRAPHS, WHICH SHOULD BE JUST IN FRONT OF YOU THERE, WHICH

12   HAS BEEN MARKED FOR IDENTIFICATION AS EXHIBIT 32 A.

13   A    YES, SIR.

14   Q    DO YOU SEE THAT?

15   A    I DO, SIR.

16   Q    DO YOU RECOGNIZE THAT PHOTOGRAPH?

17   A    I DO, SIR.

18   Q    WHAT IS IT?

19   A    IT'S A PICTURE OF THE FIELDS THAT WE LOCATED IN THE

20   MUNICIPALITY CALLED BUFALO.

21        MR. MEZA:  I'M SORRY.  I DIDN'T HEAR THAT ANSWER.

22        THE WITNESS:  IT IS A PICTURE OF THE FIELDS THAT WERE

23   LOCATED OUT OF THAT MUNICIPALITY CALLED BUFALO, THE THIRD

24   FIELD.

25        MR. MEZA:  THANK YOU.

5-73

1   BY MR. CARLTON:

2   Q   AGENT LUGO, I SHOULD POINT OUT WHEN YOU TURN YOUR HEAD TO

3   THE JURY, WE LOSE YOU ON THE MICROPHONE.

4   A   (MOVES MICROPHONE.)

5   Q   THANK YOU.  NOW, IF YOU WOULD LOOK AT EXHIBIT 32 B, DO YOU

6   SEE THAT?

7   A   I DO, SIR.

8   Q   DO YOU RECOGNIZE THAT?

9   A   I DO, SIR.

10   Q   WHAT DOES IT DEPICT?

11   A   THIS IS ALSO A PICTURE OF THE FIELD THERE AT THE

12   MUNICIPALITY CALLED BUFALO, AND IT SHOWS THE DRYING OF THE

13   MARIJUANA ON TOP OF THE HUTS AND SOME OF THE WORKERS MILLING

14   AROUND.

15   Q   WOULD YOU PLEASE LOOK AT WHAT HAS BEEN MARKED FOR

16   IDENTIFICATION AS EXHIBIT 32  C.

17   A   YES, SIR.

18   Q   DO YOU RECOGNIZE THAT?

19   A   I DO, SIR.

20   Q   WHAT IS IT?

21   A   ALSO ANOTHER PICTURE OF THE BUFALO FIELDS, DEPICTING THE

22   HUTS AND STORAGE AREAS FOR MARIJUANA.

23   Q   NOW, WHEN YOU SAY "THE BUFALO FIELDS," YOU'RE REFERRING TO

24   THE FIELDS THAT YOU'VE DESCRIBED HERE TODAY?

25   A   YES, SIR.

1   Q   AND, I'M SORRY, WHAT NUMBER WAS THAT PHOTOGRAPH?

2   A   32 C.

3   Q   ALL RIGHT.  WOULD YOU PLEASE LOOK AT 32 D?

4   A   YES, SIR.

5   Q   WHAT DOES THAT DEPICT?

6   A   ALSO SHOWS MOUNDS OF MARIJUANA THAT WERE LOCATED IN THAT

7   AREA, SHOWS THE BOXES THAT WERE BEING USED TO CRATE IT IN.  AND

8   THE TOP OF THE PICTURE, YOU SEE THE WORKERS THAT WERE COMING

9   BACK TO THE FIELDS.

10  Q   WOULD YOU PLEASE LOOK AT WHAT HAS BEEN MARKED FOR

11  IDENTIFICATION AS EXHIBIT 32 E.

12  A   YES, SIR.

13  Q   DO YOU RECOGNIZE THAT?

14  A   I DO, SIR.

15  Q   AND WHAT DOES IT SHOW?

16  A   AGAIN THESE ARE THE QUARTERS OR THE BARRACKS THAT WERE

17  BEING UTILIZED THERE BY THE WORKERS.  IT SHOWS ONE OF THE

18  TARTAN TRUCKS THAT I DESCRIBED EARLIER AND ANOTHER VEHICLE, A

19  PICKUP THAT WE SEIZED.

20  Q   WOULD YOU PLEASE LOOK AT 32 F.

21  A   YES, SIR.

22  Q   WHAT DOES THAT ME?

23  A   SHOWS PICTURES OF THE CAMPESINOS THAT WERE WORKING IN THE

24  AREA THERE.

25  Q   NOW, WAS THE MARIJUANA THAT YOU FOUND AT THESE LOCATIONS

5-75

1    DESTROYED?

2    A    YES, SIR.

3    Q    HOW WAS IT DESTROYED?

4    A    WE BURNED IT.

5    Q    WERE THE BUILDINGS, THE BARRACKS THAT YOU FOUND, WERE THOSE

6    ALSO DESTROYED?

7    A    YES, SIR.

8    Q    HOW ABOUT THE EQUIPMENT THAT YOU FOUND?  WHAT HAPPENED TO

9    DO THAT?

10    A    THE TRUCKS WERE MAINLY GIVEN TO THE ARMY.  THE M.F.J.P.

11    KEPT SOME OF THE TRUCKS, AND WITHIN THE ADMINISTRATION OF THE

12    MEXICAN GOVERNMENT, THEY DISBURSED THE REST OF IT, SO SPEAK.

13    Q    THEY WERE SEIZED?

14    A    THEY WERE SEIZED.

15    Q    NOW, IF YOU WOULD, PLEASE LOOK AT EXHIBIT 32 H.

16    A    YES, SIR.

17    Q    DO YOU RECOGNIZE THAT?

18    A    I DO, SIR.

19    Q    AND WHAT IS IT?

20    A    IT IS A PICTURE OF THE HUTS BEING BURNED AT THE FIELDS.

21    Q    AND IF YOU WOULD LOOK AT 32 I, PLEASE.

22    A    YES, SIR.

23    Q    DO YOU RECOGNIZE THAT PHOTOGRAPH?

24    A    YES, SIR.

25    Q    AND WHAT IS THAT?

5-76

1   A   IT'S ALSO A PICTURE OF THE HUTS BEING BURNED DOWN THERE,

2   WITH THE MARIJUANA INSIDE THEM.

3   Q   NOW, DID YOU HAVE AN OPPORTUNITY TO INTERVIEW ANY OF THE

4   WORKERS AT THESE LOCATIONS?

5   A   YES, SIR.

6   Q   DID YOU NOTICE THAT ANY OF THEM HAD WITH THEM BLANKETS?

7   A   YES, SIR.

8   Q   WAS THERE A SORT OF -- DID YOU EVER NOTICE WHETHER THESE

9   WORKERS HAD BLANKETS THAT WERE THE SAME OR SIMILAR?

10  A   YES, SIR.  THEY WERE ALL THE SAME PATTERNS, SEEMED TO BE A

11  MAJOR PURCHASE, THE SAME PLACE.

12  Q   DID THEY ALL APPEAR TO BE NEW?

13  A   THEY WERE ALL BRAND-NEW.

14  Q   NOW, IF YOU WOULD, PLEASE, LOOK AT EXHIBIT 33 H.  IT'S A

15  SMALL PHOTOGRAPH.  IT MAY BE AT THE VERY BOTTOM.  IT'S IN A

16  GLACINE ENVELOPE.

17  A   I'M SORRY.  WHAT NUMBER, SIR?

18  Q   33 H.

19  A   33 H?

20  Q   YES.

21  A   IT'S NOT AVAILABLE.

22          MR. CARLTON:  AND, MADAM CLERK, I'LL ALSO BE SHOWING

23  33 I.

24          (EXHIBITS PROVIDED TO WITNESS.)

25          THE WITNESS:  YES, SIR.

5-77

1   BY MR. CARLTON:

2   Q   NOW, LOOKING AT 33 H, DO YOU SEE A BLANKET OF THE SORT THE

3   WORKERS AT YOUR LOCATION HAD?

4   A   YES, SIR.

5   Q   AND WHERE IN THAT PICTURE DO YOU SEE THAT?

6   A   RIGHT IN THE FOREGROUND.  THERE'S A GENTLEMAN SITTING

7   THERE.  HE'S GOT A BLANKET WRAPPED AND HIM, VERY SIMILAR TO ALL

8   THE BLANKETS THAT I NOTICED IN THE CAMP AREAS.

9   Q   WHEN YOU INTERVIEWED THE WORKERS AT THESE LOCATIONS, DID

10  YOU NOTICE THAT THEY HAD WITH THEM ANY PARTICULAR UTENSILS?

11  A   YES, SIR.

12  Q   WHAT KIND OF UTENSILS DID THEY HAVE?

13  A   JUST CUPS, FORKS, KNIVES.  THEY ALL APPEARED TO BE THE SAME

14  MANUFACTURER.

15  Q   WAS THERE SOMETHING DISTINCTIVE ABOUT THESE CUPS?

16  A   YEAH.  THEY WERE WHITE WITH A BLACK BORDER TRIM.

17  Q   NOW, LOOKING AT EXHIBIT 33 I, WERE THOSE THE KINDS OF CUPS

18  THAT THE WORKERS HAD WITH THEM?

19  A   THAT'S EXACTLY THE SAME, SIR.

20          MR. CARLTON:  YOUR HONOR, I WOULD MOVE AT THIS TIME

21  THAT EXHIBITS 32 A  THROUGH I BE RECEIVED.

22          THE COURT:  THOSE MAY BE RECEIVED.

23          (EXHIBITS 32 A-I # RECEIVED IN EVIDENCE.)

24  BY MR. CARLTON:

25  Q   AGENT LUGO, DID YOU CONTINUE YOUR EFFORTS TO FIND FIELDS ON

5-78

1    NOVEMBER 8?

2    A    YES, SIR.

3    Q    AND WERE YOU ABLE TO FIND ANY MORE FIELDS ON THAT DATE?

4    A    YES, SIR.

5    Q    HOW MANY?

6    A    I CANNOT REFER TO THEM AS FIELDS BECAUSE OF THE MAGNITUDES

7    OF PERSONS WE FOUND.  SO I KIND OF REFERRED TO THEM AS PLOTS,

8    BECAUSE THEY WERE SMALLER SIZES, AND THEY WERE SPREAD WITHIN

9    THE VICINITY OF THIS PARTICULAR FIELD, THE LARGE ONE IN BUFALO.

10   Q    I SEE.

11   A    THEY WERE WITHIN THEM -- SEVERAL WITHIN WALKING DISTANCE

12   FROM THEM.

13   Q    WERE THESE PLOTS ALSO DESTROYED?

14   A    YES, SIR.

15   Q    HOW LONG DID YOU CONTINUE YOUR INVOLVEMENT IN THIS

16   OPERATION, ACTUALLY ON THE LOCATION?

17   A    I REMAINED THERE THE ENTIRE DAY AND RETURNED AT DAYBREAK

18   AGAIN.

19   Q    DAYBREAK THE FOLLOWING DATE?

20   A    THE FOLLOWING DATE.

21   Q    NOVEMBER?

22   A    THE FOLLOWING DAY; YES, SIR.

23   Q    DID YOU FIND ANY FIELDS ON THAT DAY?

24   A    NO, SIR.

25   Q    HOW LONG -- STRIKE THAT.

1          WHAT DID YOU DO AFTER THE 9TH OF NOVEMBER?

2   A   AFTER?

3   Q   DID YOU LEAVE THE FIELDS?

4   A   ON THE 9TH?   WOULD THAT BE -- THAT WOULD BE THE THIRD DAY?

5   Q   YES.

6   A   COMANDANTE ALDANA AND MYSELF, WE BOARDED THE HELICOPTER

7   AGAIN AND TRAVELED NORTH TO LOOK FOR SOME MORE FIELDS, AND WE

8   WERE ABLE TO LOCATE SEVERAL PEASANTS OUT IN THE DESERT, IN

9   CROWDS OF MAYBE 50 HERE, A HUNDRED HERE, 50, A HUNDRED, JUST

10  ALL OVER THE DESERT, JUST WALKING.

11  Q   AND DID YOU OBTAIN ANY INTELLIGENCE INFORMATION FROM THESE

12  WORKERS AND PEASANTS THAT YOU PASSED ALONG TO YOUR SUPERIORS IN

13  MEXICO CITY?

14  A   YES, SIR.

15  Q   DID ANY OF THAT INFORMATION INCLUDE INFORMATION ABOUT THE

16  OWNERSHIP OF THOSE FIELDS?

17  A   YES, SIR.

18  Q   WHAT WAS THE INFORMATION?

19          MS. KELLY:  OBJECTION, YOUR HONOR.  HEARSAY.

20          THE COURT:  SUSTAINED.

21  BY MR. CARLTON:

22  Q   DID YOU PROVIDE ANY INSTRUCTIONS TO AN AGENT CELAYA AS TO

23  HIS INVOLVEMENT IN THE OPERATION?

24  A   YES, SIR.

25  Q   WHAT DID YOU INSTRUCT HIM TO DO?

1  A   INSTRUCTED HIM TO COME TO CHIHUAHUA CITY.  HE WAS ASSIGNED

2  AT THAT TIME TO HERMOSILLO.

3         I INSTRUCTED HIM TO COME TO CHIHUAHUA CITY TO ASSIST

4  OTHER AGENTS THAT I WAS BRINGING IN THERE, TO GIVE RELIEF TO ME

5  AND THE OTHER AGENTS FOR A FEW DAYS.

6  Q   DID YOU EVER DEVELOP AN ESTIMATE AS TO THE TOTAL AMOUNT OF

7  MARIJUANA THAT WAS DESTROYED AS A RESULT OF THESE OPERATIONS?

8  A   YES, SIR.

9  Q   AND WHAT WAS THAT ESTIMATE?

10        MR. MEZA:  OBJECTION.  THIS IS CUMULATIVE EVIDENCE.

11        THE COURT:  YES.  IS THIS REPEATING WHAT THE OTHER

12  WITNESS TESTIFIED?

13        MR. CARLTON:  NO, YOUR HONOR.  THE OTHER WITNESS

14  TESTIFIED ABOUT FIELDS THAT WERE NORTH OF THE CITY.

15        THE COURT:  WELL, THEN MAYBE YOU SHOULD SPECIFY THAT,

16  THE FIELDS THAT YOU'RE ASKING ABOUT.

17        MR. CARLTON:  ALL RIGHT.

18  Q   DID YOU EVER DEVELOP AN ESTIMATE AS TO THE AMOUNT OF

19  MARIJUANA THAT WAS DESTROYED IN THE LOCATIONS THAT YOU

20  PARTICIPATED IN ERADICATING?

21  A   YES, SIR.

22  Q   AND WHAT WAS THAT ESTIMATE?

23  A   ABOUT 5,000 METRIC TONS.

24  Q   NOW, AGENT LUGO, AT THE TIME THAT THIS OCCURRED, WERE YOU

25  FAMILIAR WITH THE WHOLESALE PRICE OF MARIJUANA IN MEXICO?

5-81

1    A    YES, SIR.

2    Q    WHAT WAS THAT PRICE?

3    A    WE ESTIMATED AT THAT PARTICULAR TIME IT WAS ABOUT $250.00 A

4    KILOGRAM.

5    Q    DID YOU EVER DEVELOP AN ESTIMATE FOR THE WHOLESALE VALUE OF

6    THE MARIJUANA DESTROYED AT THE LOCATIONS THAT YOU PARTICIPATED

7    IN ERADICATING AND ALSO THE LOCATIONS THAT AGENT CELAYA WAS

8    INVOLVED WITH?

9    A    YES.

10   Q    WHAT WAS THE ESTIMATE THAT YOU HAD OF THE WHOLESALE VALUE

11   OF THAT AMOUNT OF MARIJUANA?

12   A    ABOUT 5 BILLION DOLLARS.

13           MR. CARLTON:  MAY I HAVE A MOMENT, YOUR HONOR?

14   (PAUSE.)

15           NOTHING FURTHER, YOUR HONOR.

16           THE COURT:  YOU MAY CROSS-EXAMINE.

17                        CROSS-EXAMINATION +

18   BY MR. STOLAR:

19   Q    GOOD MORNING, SIR.

20   A    GOOD MORNING SIR.

21   Q    WOULD IT BE FAIR TO SAY THAT YOU PREPARED AND SUBMITTED

22   SOME  REPORTS TO YOUR SUPERIORS, OR EVEN TO THE AMBASSADOR OR

23   WASHINGTON, CONCERNING THIS RAID?

24   A    DID I?

25   Q    YES.

5-82

1    A    NO, SIR.

2    Q    NONE WHATSOEVER?

3    A    NO, SIR.

4    Q    NOTHING IN WRITING AT ALL TO YOUR SUPERIORS OR ANYONE ELSE?

5    A    NO, SIR.

6    Q    YOU INDICATED YOU RECEIVED SOME INFORMATION, THE

7    INTELLIGENCE INFORMATION YOU RECEIVED, FROM INFORMANTS IN LATE

8    OCTOBER.  LATE OCTOBER 84; IS THAT CORRECT?

9    A    THAT'S CORRECT, SIR.

10   Q    WHO WERE THESE INFORMANTS?

11            MR. CARLTON:  OBJECTION, YOUR HONOR.  THAT'S

12   IRRELEVANT.

13            THE COURT:  OVERRULED.

14            THE WITNESS:  THE INFORMATION, THAT IS HEAD OF

15   INTELLIGENCE, MEXICO CITY.  I RECEIVED REPORTS FROM OUR

16   DOMESTIC OFFICE.  SO THEREFORE I DON'T PERSONALLY INTERVIEW THE

17   INFORMANTS.  I RECEIVED INFORMATION, AND THE INFORMATION CAME

18   IN CABLES FROM THOSE OFFICES?

19   BY MR. STOLAR:

20   Q    THERE WERE TWO DOMESTIC OFFICES AND ONE WAS IN MEXICO CITY,

21   I BELIEVE YOU MENTIONED?

22   A    THAT'S CORRECT.

23   Q    THE IDENTITY OF THE INFORMANT WAS NOT REVEALED --

24   A    IT WAS NOT REPORTED.

25   Q    -- TO YOU?

5-83

1   A   NOT TO ME.  IT WASN'T IMPORTANT.

2   Q   BUT DO YOU KNOW IT?  DID YOU LEARN IT, EVER?

3   A   THE INFORMANT IN EL PASO/TUCSON?

4   Q   YES, SIR.

5   A   NO, SIR.

6   Q   AND WHAT ABOUT THE ONE IN MEXICO?

7   A   YES, SIR.

8   Q   WHAT WAS THE INFORMANT?

9   A   DON'T RECALL HIS NAME.

10  Q   IS THERE ANYTHING YOU MIGHT HAVE WITH YOU THAT MIGHT

11  REFRESH YOUR RECOLLECTION?

12  A   NO.  I WAS NOT REFERRED AS TO WHO HE WAS.  HE WAS UNDER THE

13  CONTROL OF THE OTHER AGENTS.

14  Q   I SEE.  WHAT OFFICE WAS THAT OUT OF?

15  A   HERMOSILLO.

16  Q   HERMOSILLO.  YOU ALSO INDICATED THAT YOU HAD AN EYE WITNESS

17  ACCOUNT, ALSO, OF WHAT THESE FIELDS WERE ABOUT; IS THAT RIGHT?

18  A   THAT'S RIGHT.

19  Q   WHO WAS THAT INFORMANT?

20  A   THE INFORMANT OUT OF HERMOSILLO.

21  Q   YOU SPOKE WITH THAT PERSON?

22  A   PARDON, SIR?

23  Q   YOU SPOKE WITH THAT PERSON?

24  A   DID I SEE HIM?

25  Q   DID YOU SPEAK WITH HIM?

5-84

1    A    DID I SPEAK WITH HIM.

2    Q    YES.

3    A    OH.  YES, SIR.

4    Q    OKAY.  AND YOU DON'T KNOW THE NAME?

5    A    NO, SIR.  THAT'S THE ONE REFERRED TO HERMOSILLO.  HE'S

6    UNDER THE CONTROL OF THE OTHER AGENTS THERE.

7         THEY DID TELL ME HIS NAME.  I JUST DON'T RECALL.

8    Q    BUT YOU PERSONALLY SPOKE TO HIM, AS WELL?

9    A    YES, SIR.

10   Q    WHEN WAS IT?  HOW LONG BEFORE YOU WENT TO THE FIELDS DID

11   YOU SPEAK TO HIM?

12   A    I SPOKE TO HIM THAT EVENING WHEN HAVE I ARRIVED IN

13   CHIHUAHUA CITY.

14   Q    YOU ALSO SEIZED EQUIPMENT; IS THAT RIGHT?  EQUIPMENT WAS

15   SEIZED, VARIOUS -- EVERYTHING THAT WASN'T BURNED, THAT IS, WAS

16   SEIZED; IS THAT RIGHT?

17   A    THAT'S CORRECT.

18   Q    WERE THERE REPORTS PREPARED CONCERNING THE ESTIMATED VALUE

19   OF THE EQUIPMENT THAT WAS SEIZED THERE AT THE BUFALO FIELDS

20   WHERE YOU WERE?

21   A    I BELIEVE THERE WERE, SIR.

22   Q    DO YOU RECALL WHAT THE TOTAL AMOUNT OF VALUE THAT WAS PUT

23   ON THE EQUIPMENT WAS?

24   A    NO, I DON'T, SIR.

25   Q    WELL OVER A MILLION DOLLARS, WOULD YOU AGREE WITH THAT?

1    A    I'M NOT VERY GOOD AT ESTIMATING EQUIPMENT, BUT THAT COULD

2    BE; YES, SIR.

3    Q    AND THE SAME IS TRUE FOR THE EQUIPMENT THAT WAS SEIZED IN

4    THE NORTHERN FIELDS, NORTH AND EAST OF CHIHUAHUA?

5    A    I WAS NOT AT THOSE FIELDS.  I WAS TOLD; YES, SIR.

6    Q    BUT, I MEAN, TALKING ABOUT TWO OR THREE MILLION DOLLARS'

7    WORTH OF EQUIPMENT?

8    A    CUMULATIVE; YES, SIR.

9    Q    CAMPER, TRACTOR-TRAILER TRUCKS, FORD BRONCOS, SCALES,

10   CLOTHING, MEDICAL SUPPLIES, FOOD; ALL THOSE THINGS, RIGHT?

11   A    RIGHT.

12   Q    AND ALL OF IT SEIZED; IS THAT CORRECT?

13   A    THAT'S CORRECT.

14   Q    THERE WERE ALSO WATER WELLS THAT HAD BEEN DUG IN THE

15   GROUND; IS THAT CORRECT?

16   A    THAT'S CORRECT, SIR.

17   Q    WERE THOSE ALSO DESTROYED?

18   A    IN THAT PARTICULAR AREA OF BUFALO WHERE I WITNESSED, YES,

19   SIR.

20   Q    AND DO YOU KNOW WHERE THEY WERE DESTROYED IN THE FIELDS

21   THAT WERE NORTH AND EAST OF CHIHUAHUA?

22   A    I ASSIGNED SOME AGENTS TO MAKE SURE THAT THEY WERE.  I

23   PERSONALLY DIDN'T OBSERVE IT, NO.

24   Q    YOU INDICATED THAT THE AMOUNT OF MARIJUANA THAT WAS BURNED

25   IN THE RAIDS THAT YOU WERE A PART OF WAS AN ESTIMATED 5,000

5-86

1    METRIC TONS; IS THAT CORRECT?

2    A   YES.

3    Q   HOW MANY POUNDS IN A METRIC TON?

4    A   HOW MANY POUNDS IN A METRIC TON?.

5    Q   YES, SIR.

6    A   2,201.   MULTIPLY THAT BY A HUNDRED.

7    Q   2,201.   SO IT'S NOT A REGULAR TON:   2,000 POUNDS A TON.

8    IT'S 2200 POUNDS; IS THAT RIGHT?

9    A   YES, SIR.

10   Q   SO HOW MANY REGULAR TONS -- NOT METRIC TONS -- IS THAT?   DO

11   YOU KNOW WHAT THE NUMBER IS?

12   A   I'M SORRY, SIR?

13   Q   DO YOU KNOW WHAT THE NUMBER OF NONMETRIC TONS IS?

14   A   NONMETRIC TONS?

15   Q   YES, ONES WITH 2,000 POUNDS.

16   A   YES.   THAT WOULD BE A TON.

17   Q   OKAY.   NEVER MIND.

18        WOULD IT BE FAIR TO SAY THAT IT WAS DETERMINED THAT

19   THIS BUFALO OPERATION WAS CONTROLLED BY RAFAEL CARO QUINTERO?

20   A   YES, SIR.

21   Q   AND ALTOGETHER, THEN, BETWEEN YOUR FIELDS AND THE NORTHEAST

22   FIELDS, YOUR ESTIMATE WAS, AT THE WHOLESALE VALUE OF $250.00

23   POUND, A LOSS OF 5 BILLION DOLLARS WHOLESALE IN MARIJUANA; IS

24   THAT RIGHT?

25   A   NO, SIR.

5-87

1    Q    THAT'S ONLY YOUR FIELD?

2    A    NO.  IT'S $250.00 A KILOGRAM.

3    Q    A KILOGRAM.  I'M SORRY.

4         5 BILLION DOLLARS IN THE ENTIRE RAID, OVER THE COURSE

5    OF THE FEW DAYS THAT IT WAS DONE; IS THAT CORRECT?

6    A    YES, SIR.

7    Q    PLUS A FEW MILLION DOLLARS IN EQUIPMENT?

8    A    RIGHT, SIR.

9    Q    AND KNOCKING OUT THE CAPACITY OF THOSE FIELDS TO BE USED

10   AGAIN, BECAUSE THE WATER WAS KNOCKED OUT, ALSO; ISN'T THAT

11   RIGHT?

12   A    I'M SORRY, SIR?

13   Q    KNOCKING OUT THE ABILITY OF THOSE FIELDS TO BE USED AGAIN,

14   BECAUSE THE WATER WELLS HAD ALSO BEEN DESTROYED?

15   A    NO.  I'M SURE THEY COULD BE USED AGAIN.

16   Q    THEY'D HAVE TO DIG THE WELLS, THOUGH; RIGHT?

17   A    PROBABLY SO.

18   Q    AND HOW LONG HAD YOU BEEN IN MEXICO AT THE TIME THIS

19   OCCURRED?

20   A    CLOSE TO EIGHT YEARS.

21   Q    HAD YOU EVER SEEN AN OPERATION AS BIG AS THIS IN ALL OF THE

22   TIME THAT YOU WERE THERE?

23   A    AT THAT PARTICULAR TIME, IT WAS A RECORD SEIZURE AND STILL

24   REMAINS A RECORD SEIZURE FOR ALL OVER THE WORLD.

25        MR. STOLAR:  THANK YOU, SIR.

1          THE COURT:  ANY FURTHER QUESTIONS?

2                  CROSS-EXAMINATION +

3  BY MR. MEZA:

4  Q    HOW MANY AGENTS, D.E.A. AGENTS, WERE INVOLVED IN THIS

5  BUFALO SEIZURE?

6  A    ORIGINALLY?  FOUR OF US.

7  Q    AND WERE THERE OTHER AGENTS THAT JOINED YOU?

8  A    AFTERWARDS; YES, SIR.

9  Q    HOW MANY?

10  A    AT LEAST FOUR TO FIVE.

11  Q    SO THAT TOTALED, WHAT:  ABOUT 8 TO 10 AGENTS WERE INVOLVED

12  IN THIS SEIZURE AT BUFALO?

13  A    NOT AT THE SAME TIME.

14  Q    ALL RIGHT.  BUT OVER THE COURSE OF THE THREE OR FOUR DAYS

15  IT TOOK PLACE?

16  A    YES, SIR.

17  Q    AND AGENT CAMARENA WAS NOT INVOLVED IN THE SEIZURE, WAS HE?

18  A    NO, SIR.

19  Q    "NO, SIR," YOU MEAN, MEANING HE WAS NOT INVOLVED IN THE

20  SEIZURE; IS THAT CORRECT?

21  A    THAT'S CORRECT.

22          MR. MEZA:  ALL RIGHT.  THANK YOU.

23          THE COURT:  ANY OTHER DEFENSE COUNSEL WISH TO

24  CROSS-EXAMINE.

25          DEFENSE COUNSEL:  NO, YOUR HONOR.

1          THE COURT:  ANY REDIRECT?

2          MR. CARLTON:  JUST BRIEFLY, YOUR HONOR.

3                    REDIRECT EXAMINATION +

4    BY MR. CARLTON:

5    Q   THE INFORMATION AVAILABLE TO YOU WAS THAT THESE FIELDS WERE

6    OWNED BY CARO QUINTERO, RAFAEL CARO QUINTERO?

7    A   THAT'S CORRECT, SIR.

8    Q   DID YOU EVER HAVE ANY INFORMATION THAT HE WAS THE ONLY

9    PERSON INVOLVED IN THE OWNERSHIP OF THESE FIELDS?

10         MS. KELLY:  OBJECTION.

11         MR. NICOLAYSEN:  OBJECTION.  HEARSAY.

12         MS. KELLY:  LACK OF FOUNDATION, YOUR HONOR.

13         THE COURT:  SUSTAINED.

14         MR. CARLTON:  NOTHING FURTHER.

15         THE COURT:  YOU MAY STEP DOWN.

16         CALL YOUR NEXT WITNESS.

17

18         MR. CARLTON:  YOUR HONOR, THE GOVERNMENT CALLS EUGENE

19   HOLLESTELLE.

20         (WITNESS SUMMONED TO COURTROOM.)

21         THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

22

23      EUGENE J. HOLLESTELLE + PLAINTIFF'S WITNESS, SWORN

24

25         THE CLERK:  PLEASE BE SEATED. PLEASE STATE YOUR FULL

1   NAME FOR THE RECORD AND SPELL YOUR LAST NAME.

2           THE WITNESS:  EUGENE J. HOLLESTELLE, H  O  L  L  E  S

3   T  E  L  L  E.

4                    DIRECT EXAMINATION +

5   BY MR. CARLTON:

6   Q   MR. HOLLESTELLE, WHAT IS YOUR PRESENT EMPLOYMENT?

7   A   I RUN A CAR WASH.

8   Q   HOW LONG HAVE YOU BEEN INVOLVED IN THAT?

9   A   IT'S BEEN A LITTLE OVER TWO YEARS NOW.

10  Q   AT SOME POINT IN YOUR LIFE, WERE YOU INVOLVED IN MARIJUANA

11  TRAFFICKING?

12  A   YES, I WAS.

13  Q   AND WERE YOU INVOLVED IN TRAFFICKING MARIJUANA WITH AN

14  INDIVIDUAL NAMED DONALD WALTERS?

15  A   YES, I WAS.

16  Q   DURING WHAT PERIOD OF TIME WERE YOU INVOLVED IN THAT?

17  A   I BELIEVE IT WAS EARLY 83 UNTIL LATE 1985, 84.

18  Q   WHEN DID YOU FIRST MEET DONALD WALTERS?

19  A   IT WAS EARLY 83, APRIL.  APRIL OF 83.

20  Q   AND WHERE DID YOU MEET HIM?

21  A   IN LOS ANGELES HERE.

22  Q   WHAT WAS THE PURPOSE OF YOUR MEETING HIM AT THAT TIME?

23  A   THROUGH A FRIEND OF MINE, TO DISCUSS MARIJUANA, GETTING

24  INTO MARIJUANA TRAFFICKING.

25  Q   HAD YOU PREVIOUSLY BEEN INVOLVED IN MARIJUANA TRAFFICKING?

5-91

1   A   NO.

2   Q   DID YOU DISCUSS MARIJUANA TRAFFICKING WITH DONALD WALTERS?

3   A   YES, I DID.

4   Q   WAS ANYONE ELSE PRESENT AT THAT MEETING?

5   A   YES.   THERE WERE THREE OTHER INDIVIDUALS BESIDES MYSELF AND

6   WALTERS.

7   Q   WHO WERE THEY?

8   A   BRIAN LUSCHEN, STEVE LUSCHEN AND MIKE JOHNSON.

9   Q   AND DID DONALD WALTERS MAKE A PROPOSAL TO YOU AT THAT TIME?

10  A   YES, HE DID.

11  Q   WHAT DID HE PROPOSE?

12  A   HE JUST TOLD ME WHAT I WOULD BE PAID AND WHAT IT WOULD

13  ENTAIL WAS UNLOADING PLANES OF MARIJUANA COMING IN FROM ANOTHER

14  COUNTRY.

15  Q   WHERE WOULD THESE PLANES TO BE COMING FROM?

16  A   SOMEWHERE IN MEXICO.

17  Q   WHAT WAS YOUR INVOLVEMENT TO BE?

18  A   UNLOAD THE PLANELOADS AND THEN DRIVE IT TO THE HOUSE WHERE

19  IT WOULD BE STORED.

20  Q   DID YOU ACCEPT THIS PROPOSAL?

21  A   YES, I DID.

22  Q   DID YOU ACTUALLY PARTICIPATE IN OFF-LOADING SOME MARIJUANA

23  AS A RESULT OF YOUR ACCEPTING THIS JOB?

24  A   YES, I DID.

25  Q   WHEN WAS THE FIRST TIME THAT YOU WERE INVOLVED IN

1    OFF-LOADING MARIJUANA?

2    A   I BELIEVE IT WAS LATE APRIL OF 83.

3    Q   WHERE DID THIS OCCUR?

4    A   OUT CLOSE TO THE CALIFORNIA-ARIZONA BORDER; AROUND PARKER,

5    ARIZONA.

6    Q   AND HOW WAS THE MARIJUANA DELIVERED ON THAT OCCASION?

7    A   FROM MEXICO?

8    Q   WELL, HOW WAS IT DELIVERED TO THE LOCATION WHERE YOU

9    OFF-LOADED IT?

10   A   OH.  DONALD WALTERS HAD A SMALL AIRPLANE THAT HE FLEW IT

11   ACROSS WITH.

12   Q   AND WHERE WAS THE LANDING STRIP LOCATED?  IN THE DESERT,

13    WAS IT?

14   A   YES.  YES.  IN THE DESERT.

15   Q   HOW MUCH MARIJUANA DID YOU UNLOAD ON THAT OCCASION?

16   A   IT WAS RIGHT AROUND A THOUSAND POUNDS THAT FIRST TIME.

17   Q   WHERE DID YOU PUT THE MARIJUANA AFTER YOU UNLOADED IT FROM

18   THE AIRPLANE?

19   A   WE PUT IT IN THE BACK OF THE PICKUP TRUCK.

20   Q   FROM THERE, WHERE DID YOU TAKE IT?

21   A   TO RIVERSIDE, CALIFORNIA.

22   Q   WHAT WAS DONE IN RIVERSIDE?

23   A   WE WENT AHEAD AND WEIGHED IT AND PUT IT IN BOXES, AND THEN

24   IT WAS DISTRIBUTED TO DIFFERENT PEOPLE.

25   Q   AND WERE YOU PAID, PAID FOR YOUR WORK ON THAT PARTICULAR

5-93

1    UNLOADING?

2    A    YES, I WAS.

3    Q    NOW, AT SOME POINT, DID YOU DISCUSS WITH DONALD WALTERS THE

4    PURCHASE OF A HELICOPTER?

5    A    YES, I DID.

6    Q    WHEN DID YOU FIRST TALK ABOUT THAT WITH HIM?

7    A    I BELIEVE THAT WAS AROUND JUNE OR JULY OF 83.

8    Q    AND WHAT WAS THE PURPOSE OF -- WELL, IN YOUR DISCUSSION,

9    WHAT WAS THE PURPOSE OF BUYING A HELICOPTER?

10   A    THERE WERE A NUMBER OF DIFFERENT PURPOSES; OF COURSE, THE

11   FIRST ONE BEING WE COULD BRING IN MORE.  THEN, IF IT WAS EVER

12   DETECTED, OF COURSE, THE HELICOPTER COULD BE SET DOWN A LOT

13   EASIER THAN AN AIRPLANE, SO THE PEOPLE COULD GET AWAY.

14   Q    DID YOU HAVE A PARTICULAR CARGO CAPACITY THAT YOU WERE

15   TALKING ABOUT IN THE HELICOPTER?

16   A    WELL, YES.  WE'D SEEN A HELICOPTER DOWN IN LONG BEACH THAT

17   WE FIGURED COULD HOLD 3- OR 4,000 POUNDS.  SO WHEN WE STARTED

18   LOOKING, THAT WAS WHAT WE WERE LOOKING FOR, SOMETHING SIMILAR

19   TO THAT.

20   Q    DID YOU KNOW AN INDIVIDUAL NAMED RENE VERDUGO?

21   A    YES, I DO.

22   Q    AND I WOULD ASK YOU, MR. HOLLESTELLE, TO LOOK IN THE CART

23   NEXT TO THE WITNESS BOX, I BELIEVE.  THERE SHOULD BE A

24   PHOTOGRAPH MARKED 34.  DO YOU SEE THAT?

25   A    YES.

5-94

1    Q    AND WOULD YOU PLEASE LOOK AT IT.

2    A    (COMPLIES.)

3    Q    DO YOU RECOGNIZE THAT PHOTOGRAPH?

4    A    YES.  IT'S RENE VERDUGO.

5         MR. CARLTON:  YOUR HONOR, I WOULD ASK THAT EXHIBIT 34

6    BE RECEIVED.

7         THE COURT:  IT MAY BE RECEIVED.

8         (EXHIBIT 34 # RECEIVED IN EVIDENCE.)

9    BY MR. CARLTON:

10   Q    MR. HOLLESTELLE, WOULD YOU PLEASE SHOW THAT PHOTOGRAPH TO

11   THE LADIES AND GENTLEMEN OF THE JURY?

12   A    (COMPLIES.)

13   Q    NOW, WHEN DID YOU FIRST -- YOU CAN PUT IT BACK.

14        WHEN DID YOU FIRST MEET RENE VERDUGO?

15   A    I BELIEVE IT WAS IN JULY OF 83.

16   Q    WHERE DID YOU MEET HIM?

17   A    A RESTAURANT DOWN IN SAN PEDRO CALLED NIZATICHE'S.

18   A    WAS ANYONE ELSE PRESENT DURING THIS MEETING?

19   A    YES.  IT WAS MYSELF, DONALD WALTERS, RENE VERDUGO AND

20   TERESA VERDUGO.

21   Q    AFTER THIS MEETING AT THE RESTAURANT, DID YOU GO TO DONALD

22   WALTERS' HOUSE?

23   A    YES, WE DID.

24   Q    DID ALL OF YOU GO THERE?

25   A    YES, WE DID.

1    Q    AND DID YOU SEE A BRIEFCASE THERE?

2    A    EXCUSE ME?

3    Q    DID YOU SEE A BRIEFCASE THERE?

4    A    YES, I DID.

5    Q    AND DID RENE VERDUGO BRING THAT BRIEFCASE TO WALTERS'

6    HOUSE?

7    A    YES.

8    Q    DID YOU HAVE AN OPPORTUNITY TO LOOK INSIDE THE BRIEFCASE ON

9    THAT OCCASION?

10   A    YEAH.  I BELIEVE IT WAS LATER ON THAT NIGHT OR THE NEXT

11   MORNING.

12   Q    WHAT DID YOU SEE INSIDE THE BRIEFCASE?

13   A    THERE WAS $500,000.00 IN THERE.

14   Q    NOW, HOW DO YOU KNOW THERE WAS $500,000.00 IN THE

15   BRIEFCASE?

16   A    BECAUSE IT HAD TO ALL BE COUNTED.

17   Q    AND DID YOU PARTICIPATE IN COUNTING IT?

18   A    YES, I DID.

19   Q    AND DID YOU SEE WHAT WAS DONE WITH THE MONEY AT THAT

20   MEETING?  WAS IT GIVEN TO SOMEONE?

21   A    WELL, IT WAS GIVEN TO PAT SCIALAMPO.

22   Q    WHO WAS PAT SCIALAMPO?

23   A    DONALD WALTERS' SECRETARY.

24   Q    AND DO YOU KNOW WHAT WORK SHE PERFORMED OR WHAT KINDS OF

25   TASKS SHE PERFORMED FOR DONALD WALTERS?

1    A    SHE TOOK CARE OF PAYING HIS RENT, PAYING ALL HIS BILLS.

2    WHEN PEOPLE WOULD BRING MONEY FOR MARIJUANA, THEY WOULD USUALLY

3    BRING IT TO PAT, IF DONALD WALTERS WASN'T IN TOWN.

4    Q    SO WHAT WAS THIS $500,000.00 TO BE USED FOR?

5    A    THE PURCHASE OF A HELICOPTER.

6    Q    DID YOU EVENTUALLY PARTICIPATE IN PURCHASING SOME CASHIER'S

7    CHECKS?

8    A    YES, I DID.

9    Q    WHEN DID THAT OCCUR?

10   A    I BELIEVE THAT PROBABLY STARTED AROUND AUGUST OF 83.

11   Q    AND WHAT WAS THE TOTAL AMOUNT OF CASHIER'S CHECKS THAT YOU

12   ASSISTED IN PURCHASING AT THAT TIME?

13   A    $375,000.00.

14   Q    WHAT DID YOU USE TO BUY THOSE CASHIER'S CHECKS?

15   A    THE CASH IN THE BRIEFCASE.

16   Q    WHAT WAS THE PURPOSE OF YOUR PURCHASING THESE CASHIER'S

17   CHECKS?

18   A    TO PAY FOR THE HELICOPTER.

19   Q    DO YOU RECALL WHO THESE CASHIER'S CHECKS WERE PAYABLE TO?

20   A    DICK SAWYER INTERNATIONAL.

21   Q    DID YOU BUY THESE CASHIER'S CHECKS IN ANY PARTICULAR

22   INCREMENTS?

23   A    WELL, EVERYTHING WAS KEPT AROUND 6- OR $7,000.00, OF

24   COURSE, TO AVOID THE REPORTING REQUIREMENTS FROM THE I.R.S.

25   Q    DID ANYONE ELSE ASSIST YOU IN BUYING THESE CASHIER'S

5-97

1    CHECKS?

2    A    YES.  DAVID DIETER, BRIAN LUSCHEN BOUGHT SOME, LARRY

3    HUTCHINSON, AND I BELIEVE THAT PAT SCIALAMPO PURCHASED SOME.

4    Q    NOW, DID YOU EVER ACTUALLY PARTICIPATE IN BUYING A

5    HELICOPTER?

6    A    YES, I DID.

7    Q    AND WHAT WAS THE FIRST THING THAT YOU DID IN ACTUALLY

8    PURCHASING A HELICOPTER?

9    A    EXCUSE ME?

10    Q    DID YOU EVER GO TO YUKON, OKLAHOMA?

11    A    YES, I DID.

12    Q    WHAT WAS THE PURPOSE OF YOUR GOING THERE?

13    A    TO BRING CASHIER'S CHECKS AND CASH TO DICK SAWYER

14    INTERNATIONAL.

15    Q    WAS DICK SAWYER INTERNATIONAL A BUSINESS?

16    A    YES.  THEY SOLD HELICOPTERS AND AIRPLANES.

17    Q    WHEN DID YOU GO THERE?

18    A    I BELIEVE IT WAS PROBABLY AROUND SEPTEMBER OR OCTOBER OF

19    1983.

20    Q    WAS THERE A PARTICULAR HELICOPTER THAT YOU WERE INTERESTED

21    IN PURCHASING THERE?

22    A    YES, THERE WAS.

23    Q    WHAT KIND OF HELICOPTER WAS IT?

24    A    IT WAS A SIKORSKY S58T.

25    Q    DO YOU RECALL THE PURCHASE PRICE OF THAT HELICOPTER?

5-98

1   A   $425,000.00.

2   Q   AND WHEN YOU WENT TO OKLAHOMA ON THIS OCCASION THAT YOU'VE

3   JUST DESCRIBED, DID YOU TAKE SOME CASHIER'S CHECKS WITH YOU?

4   A   YES.  I BELIEVE I BROUGHT HALF THE CASHIER'S CHECKS AND

5   HALF THE MONEY.

6   Q   AND WHAT DID YOU DO WITH THOSE CASHIER'S CHECKS AND THAT

7   MONEY?

8   A   IT WAS PICKED UP AT THE AIRPORT BY DICK SAWYER, AND THEN

9   TURNED THINGS OVER TO HIM.

10   Q   WAS THAT FOR THE PURCHASE OF THIS PARTICULAR HELICOPTER YOU

11   DESCRIBED?

12   A   YES, IT WAS.

13   Q   DID ANYONE ELSE ACCOMPANY YOU ON THAT PARTICULAR TRIP?

14   A   ON THE FIRST TRIP, NO, I DON'T THINK SO.

15   Q   SO ON THAT FIRST TRIP THAT DESCRIBED, YOU DID NOT PROVIDE

16   ALL OF THE PURCHASE PRICE TO DICK SAWYER INTERNATIONAL?

17   A   NO.

18   Q   DID YOU HAVE OCCASION TO MAKE ANOTHER TRIP --

19   A   YES.

20   Q   -- TO DICK SAWYER INTERNATIONAL?

21   A   YES, I DID.

22   Q   WHAT WAS THE NEXT TRIP?

23   A   SHORTLY AFTER THE FIRST TRIP, MAYBE TWO OR THREE WEEKS.

24   Q   AND DID YOU TAKE ANY CASHIER'S CHECKS WITH YOU ON THAT

25   TRIP?

5-99

1   A   YES.  I TOOK OTHER HALF OF THE CASHIER'S CHECKS AND THE

2   OTHER HALF OF THE MONEY.

3   Q   YOU SAID, "THE OTHER HALF OF THE MONEY."  WHAT AMOUNT OF

4   MONEY ARE YOU TALKING ABOUT?

5   A   THE PURCHASE PRICE WAS 425,000.  THERE WAS 375,000 TO BE

6   PAID IN CASHIER'S CHECKS AND 50 THOUSAND IN CASH.

7   Q   AND DID YOU TURN ALL OF THAT MONEY OVER TO DICK SAWYER

8   INTERNATIONAL AT THAT TIME?

9   A   YES, I DID.

10  Q   DID ANYONE ELSE ACCOMPANY YOU ON THIS SECOND TRIP TO DICK

11  SAWYER?

12  A   YES.  TED CASH.

13  Q   WHO WAS TED CASH?

14  A   A GENTLEMAN THAT DONALD WALTERS HAD HIRED TO FLY THE

15  HELICOPTER.

16  Q   DID YOU AND MR. CASH INSPECT THE HELICOPTER DURING THIS

17  VISIT?

18  A   YES, WE DID.

19  Q   AND HAVING PAID THE FULL PURCHASE PRICE, DID YOU TAKE THE

20  HELICOPTER BACK WITH YOU TO CALIFORNIA?

21  A   NO, WE DID NOT.

22  Q   WHY WAS THAT?

23  A   THERE WERE SOME IMPROVEMENTS THAT TED CASH WANTED MADE ON

24  THE HELICOPTER.

25  Q   DID YOU RETURN TO CALIFORNIA THEN BY YOURSELF?

1    A    YES, I BELIEVE I DID.

2              MR. CARLTON:   NOW -- YOUR HONOR, PERHAPS THIS MIGHT BE

3    AN APPROPRIATE TIME TO INTERRUPT.  I HAVE QUITE A BIT MORE TO

4    ASK OF THIS WITNESS.

5              WOULD THIS BE AN APPROPRIATE TIME TO TAKE THE LUNCH

6    BREAK?

7              THE COURT:   WE'LL TAKE OUR AFTERNOON RECESS AT THIS

8    TIME.   YOU MAY STEP DOWN.

9              THE CLERK:   PLEASE RISE.

10              (NOON RECESS.)

11                            ---0---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5-101

10

1          LOS ANGELES + CALIFORNIA, TUESDAY, MAY 22, 1990

2                        + 1:30 P.M.

3          (JURY PRESENT:)

4          THE COURT:  YOU MAY CONTINUE.

5

6     EUGENE J. HOLLESTELLE + PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

7

8                        DIRECT EXAMINATION + (RESUMED)

9     BY MR. CARLTON:

10    Q    NOW, MR. HOLLESTELLE, IN RELATION TO THIS HELICOPTER

11    PURCHASE, DID YOU PARTICIPATE IN LOCATING A LANDING SITE FOR

12    THE HELICOPTER?

13    A    YES, I DID.

14    Q    AND WHAT WAS THE NATURE OF YOUR INVOLVEMENT IN LOCATING

15    THAT LANDING SITE?

16    A    I WAS THE ONE THAT LOCATED IT.

17    Q    WHERE WAS IT?

18    A    IT WAS BY CASA GRANDE, ARIZONA, IN A PLACE CALLED STANFIELD

19    ROAD.

20    Q    IS THAT OUT IN THE MIDDLE OF THE DESERT?

21    A    YES, IT WAS.

22    Q    DID YOU ACTUALLY CONSTRUCT A LANDING SITE AT THAT LOCATION?

23    A    WELL, WE TOOK DOWN A FEW PLANTS AND SUCH.  THERE REALLY

24    WASN'T THAT MUCH THAT NEEDED TO BE DONE JUST TO LAND A

25    HELICOPTER.

5-102

1   Q   NOW, WHAT WAS YOUR ROLE IN THE OPERATION ONCE THE

2   HELICOPTER BECAME INVOLVED?

3   A   I WAS THE GROUND CREW LEADER, THEY CALLED IT.  I WAS IN

4   CHARGE OF GETTING IT UNLOADED, AND MAKING SURE TRUCKS WERE OUT

5   THERE TO MEET IT, AND EVERYTHING LIKE THAT.

6   Q   WHEN WAS THE -- DID YOU ACTUALLY SEE THE HELICOPTER LAND AT

7   THIS SITE?

8   A   YES.

9   Q   WHEN WAS THE FIRST TIME THAT YOU SAW IT LAND AT THE SITE?

10  A   I BELIEVE IT WAS PROBABLY AROUND THE END OF OCTOBER, MAYBE

11  THE MIDDLE OF NOVEMBER, OF 1983.

12  Q   AND WHAT WAS THE OCCASION?

13  A   AT THAT TIME, WE WERE JUST DOING A TRIAL RUN OF SORTS, TO

14  MAKE SURE THAT, YOU KNOW, EVERYTHING WENT FINE AND PEOPLE KNEW

15  WHAT THEY WERE DOING.

16  Q   AND DID IT GO WELL ON THAT OCCASION?

17  A   NO, NOT REAL WELL AT ALL.

18  Q   WHAT HAPPENED?

19  A   MR. WALTERS AND THEN CASH WERE LATE GETTING THERE, SO I

20  WENT OUT TO CALL THEM.  AND THEY GOT JUST AS I WAS GETTING

21  BACK, AND THEY HAD SOME PROBLEMS.

22  Q   WHEN YOU SAY THEY WERE LATE IN GETTING THERE, WHO WAS

23  FLYING THE HELICOPTER?

24  A   TED CASH.

25  Q   AND WAS DONALD WALTERS WITH HIM?

5-103

1    A    YES, HE WAS.

2    Q    ALL RIGHT.

3    A    AND THE TRUCKS WERE HID AND NO ONE KNEW TO GET THE TRUCKS

4    OUT AND THEY WERE A LITTLE UPSET ABOUT THAT.  THEY COULDN'T SEE

5    WHERE TO LAND.

6    Q    DID THEY EVENTUALLY LAND?

7    A    OH, YES.

8    Q    AND WERE YOU ABLE EVENTUALLY TO SMOOTH OUT THE OPERATION?

9    A    YES.

10   Q    WAS THE HELICOPTER ACTUALLY USED, THEN, TO BRING IN

11   MARIJUANA?

12   A    YES, IT WAS.

13   Q    AND WHEN WAS THE FIRST TIME THAT HAPPENED?

14   A    I BELIEVE IT WAS LATE NOVEMBER.

15   Q    OF 1983, STILL?

16   A    YES.

17   Q    NOW, WHAT WAS THE METHOD THAT WAS USED TO UNLOAD THIS

18   HELICOPTER?  LET ME REPHRASE THAT.

19        HOW MANY UNLOADINGS DID YOU ACTUALLY PARTICIPATE IN?

20   A    I BELIEVE THERE WAS AROUND 40.

21   Q    AND WAS THE METHOD OF OPERATION USUALLY THE SAME?

22   A    YES.

23   Q    HOW MANY GROUND CREW MEMBERS DID YOU SUPERVISE?

24   A    I BELIEVE THE MOST WE HAD AT ONE TIME WAS SIX, POSSIBLY

25   SEVEN.

1   Q   AND WHEN DID THE HELICOPTER NORMALLY ARRIVE?

2   A   USUALLY ONCE AT DUSK, ONCE AT DAWN.

3   Q   SOMETIMES TWICE A DAY?

4   A   YES.  MOST OF THE TIME, TWICE A DAY.

5   Q   AND WHEN THE HELICOPTER LANDED, WHERE WAS THE MARIJUANA

6   UNLOADED INTO?

7   A   IT WAS THEN LOADED INTO PICKUP TRUCKS.

8   Q   HOW WOULD THE PICKUP TRUCKS MEET THE HELICOPTER?

9   A   WE USUALLY WENT THROUGH AND SET THEM UP, SET THE TRUCKS UP,

10   IN A SORT OF A V  SHAPE BEFORE THE HELICOPTER GOT THERE, TO

11   MAKE IT EASY ACCESS WHEN WE WERE UNLOADING.

12   Q   NOW, IN RELATION TO THE POINT OF THE V, HOW WOULD THE

13   TRUCKS BE HEADED?

14   A   THE TRUCKS WOULD BE OUT THIS WAY.  (INDICATING.)  TWO ENDS

15   WOULD TOUCH ABOUT LIKE THIS AND THE OPEN END OF THE TRUCK, OF

16   COURSE, AROUND ON THIS SIDE, SO THAT WE COULD JUST THROW IT OUT

17   OF THE HELICOPTER INTO EITHER TRUCK THAT WE WANTED TO.

18   Q   HOW MANY TRUCKS DID YOU USE?

19   A   TWO FOR CARRYING MARIJUANA.  THERE WAS ONE EQUIPMENT TRUCK

20   AND A FUEL TRUCK, ALSO.

21   Q   WHAT KIND OF TRUCKS DID YOU USE?

22   A   THEY WERE FOUR-WHEEL DRIVE PICKUPS.

23   Q   CAN YOU DESCRIBE THAT ONES THAT YOU USED, THE TRUCKS THAT

24   YOU USED?

25   A   WE HAD A TAN 76 CHEVY, FOUR-WHEEL DRIVE.  THERE WAS A GRAY

5-105

1    79 FORD.  THERE WAS A DARK BROWN 78 CHEVY.  AND WE HAD A GREEN

2    82 CHEVY.

3    Q   WAS THE HELICOPTER GUIDED TO THIS LOCATION THROUGH THE USE

4    OF A RADIO IN SOME WAY?

5    A   THAT'S THE WAY WE COMMUNICATED, TO LET THE PILOTS KNOW THAT

6    EVERYTHING WAS ALL RIGHT.  AFTER THE FIRST COUPLE OF TRIPS,

7    THEY KNEW WHERE THEY WERE GOING, SO IT WASN'T REALLY GUIDED IN

8    BY THAT.

9    Q   DID YOU USE SOME SORT OF CODE TO LET THEM KNOW THAT IT WAS

10   ALL RIGHT TO LAND?

11   A   YES, WE DID.

12   Q   WHAT WAS THE CODE?

13   A   THEY WOULD ASK HOW EVERYTHING WAS, AND I WOULD SAY, "NOT

14   WORTH A SHIT."

15   Q   DID THAT MEAN THAT IT WAS ALL RIGHT TO LAND?

16   A   IT MEANT EVERYTHING WAS FINE.

17   Q   NOW, ONCE THE MARIJUANA WAS UNLOADED FROM THE HELICOPTER,

18   WHAT WOULD THE HELICOPTER DO?

19   A   WHILE IT WAS ON THE GROUND, OF COURSE, WE WOULD REFUEL IT

20   AND THEN WE WOULD LEAVE.

21   Q   WHAT WOULD THE TRUCKS DO?

22   A   THE TRUCKS THEN BEGAN THE PROCESS EVER GETTING EVERYTHING

23   LOCKED DOWN AND GETTING ON THE ROAD BACK TO THE STASH HOUSE.

24   Q   NOW, HOWEVER -- WELL, WAS THIS LANDING SITE CLOSE TO A

25   PAVED ROAD?

5-106

1   A   YES.  IT WAS ABOUT THREE MILES OFF THE ROAD.

2   Q   ONCE YOU DROVE FROM THE LANDING SITE TO THE PAVED ROAD,

3   WOULD YOU DO ANYTHING AT THE PAVED ROAD BEFORE ACTUALLY GETTING

4   ONTO IT AND DRIVING AWAY?

5   A   WELL, NORMALLY, WHAT I DO IS I DRIVE OUT FIRST IN THE FUEL

6   TRUCK, AND I'D GO DOWN THE ROAD THREE OR FOUR MILES, MAKING

7   SURE EVERYTHING WAS OKAY.

8        WE WERE ABOUT TWO MILES INSIDE THE INDIAN RESERVATION,

9   SO WE KNEW WE DIDN'T HAVE ANY PROBLEMS THERE.  IT WAS JUST, I

10  WANTED TO GET UP TO THE EDGE AND MAKE SURE THERE WAS NO ONE

11  SITTING THERE WAITING FOR US.

12       THEN I WOULD CALL BACK ON THE RADIO WITH A PREARRANGED

13  CODE AND LET THEM KNOW IF IT WAS OKAY TO COME OUT.

14  Q   OKAY.  AND ONCE YOU GOT ON THE ROAD, WHERE DID YOU GO?

15  A   THEN WE'D GO BACK TO THE STASH HOUSE IN TUCSON.

16  Q   NOW, WHAT IS A STASH HOUSE?

17  A   WELL, IT'S WHERE ALL THE MARIJUANA WAS STAGED THAT WE HAD

18  PULLED OFF THE HELICOPTER.  AND THEN FROM THAT POINT, IT WENT

19  OUT TO DIFFERENT -- IT WAS DISTRIBUTED TO DIFFERENT PEOPLE.

20  Q   SO THE MARIJUANA WAS STORED AT THIS LOCATION?

21  A   YES.

22  Q   WHERE WAS THE STASH HOUSE LOCATED?

23  A   IT WAS ON LA CHOLLA ROAD IN TUCSON.

24  Q   WHEN YOU SAY "THE STASH HOUSE," WERE THERE SEVERAL

25  BUILDINGS ON THE PARTICULAR PARCEL OF PROPERTY?

5-107

1    A    YES.  IT WAS 10-ACRE PIECE OF PROPERTY, AND I BELIEVE THERE

2    WERE FOUR OR FIVE BUILDINGS ON IT.

3    Q    WHICH OF THOSE BUILDINGS WOULD YOU USE TO STORE THE

4    MARIJUANA?

5    A    THERE WAS A BUILDING, AS WE WENT OUT THE BACK DOOR, IT WAS

6    KIND OF OFF TO THE LEFT AND BEHIND THE HOUSE.

7    Q    ACTUALLY, BEFORE WE GET INTO THIS, CAN I ASK YOU TO LOOK AT

8    ONE OF THE PHOTOGRAPHS THAT HAS BEEN MARKED AS EXHIBIT 35 D?

9    IT SHOULD BE IN FRONT OF YOU, I BELIEVE.

10   A    (COMPLIES.)

11   Q    DO YOU RECOGNIZE THAT PHOTOGRAPH?

12   A    YES, I DO.

13   Q    AND WHAT IS IT?

14   A    THAT'S A PICTURE OF THE PROPERTY, THE LOCATION WHERE THE

15   MARIJUANA WAS STORED.

16           MR. CARLTON:  ALL RIGHT.  I MOVE THAT EXHIBIT 35 D  BE

17   RECEIVED.

18           THE COURT:  YES.  IT MAY BE RECEIVED.

19           (EXHIBIT 35 D # RECEIVED IN EVIDENCE.)

20   BY MR. CARLTON:

21   Q    WOULD YOU PLEASE SHOW THAT TO THE LADIES AND GENTLEMEN

22   JURY?

23   A    (COMPLIES.)

24   Q    NOW, IF POSSIBLE, COULD YOU INDICATE BY POINTING TO THE

25   PHOTOGRAPH WHERE THE MARIJUANA WAS STORED?

1    A    (COMPLIES.)

2    Q    HAVE YOU MARKED, MR. HOLLESTELLE, ON THAT PHOTOGRAPH

3    A    YES, I HAVE.

4    Q    AND WITH YOUR INITIALS, HAVE YOU MARKED ONE OF THE

5    BUILDINGS WHERE THE MARIJUANA WAS STORED?

6    A    YES.  AN X  AND MY INITIALS.

7    Q    ALL RIGHT.  NOW, I'D ALSO LIKE TO YOU LOOK AT WHAT HAS BEEN

8    MARKED FOR IDENTIFICATION AS EXHIBITS 35 A, 35 B  AND 35 C.

9    A    (COMPLIES.)

10   Q    DO YOU SEE THOSE?

11   A    RIGHT.

12   Q    LOOKING FIRST AT 35 A, DO YOU RECOGNIZE THAT?

13   A    YES, I DO.

14   Q    AND WHAT ARE THOSE?

15   A    BALES OF MARIJUANA.

16   Q    ARE THOSE BALES OF THE SORT THAT YOU UNLOADED FROM THE

17   HELICOPTER?

18   A    EXCUSE ME?

19   Q    ARE THOSE BALES OF THE SAME KIND THAT YOU UNLOADED FROM THE

20   HELICOPTER?

21   A    YES.

22   Q    AND LOOKING AT EXHIBIT 35 B, DO YOU RECOGNIZE THAT?

23   A    YES, I DO.

24   Q    WHAT IS THAT?

25   A    THAT'S A SIKORSKY HELICOPTER THAT I PURCHASED.

5-109

1      MR. CARLTON:  ALL RIGHT.  AND YOUR HONOR, I WOULD MOVE

2  THAT EXHIBITS 35 A  AND B  BE RECEIVED.

3      THE COURT:  THEY MAY BE RECEIVED.

4      (EXHIBIT 35 A-B # RECEIVED IN EVIDENCE.)

5      MR. STOLAR:  THE ONE, 35 A, WHICH IS THE MARIJUANA, HE

6  SAYS IT "LOOKS LIKE MARIJUANA," NOT THAT IT IS MARIJUANA.  SO I

7  OBJECT ON THAT BASIS.

8      THE COURT:  OVERRULED.

9  BY MR. CARLTON:

10  Q   AND WOULD YOU PLEASE SHOW EXHIBIT 35 B  TO THE LADIES AND

11  GENTLEMEN OF THE JURY?

12  A   (COMPLIES.)

13  Q   AND WOULD YOU ALSO LOOK NOW AT EXHIBIT 35 C?

14  A   (COMPLIES.)

15  Q   DO YOU RECOGNIZE THAT?

16  A   YES, I DO.

17  Q   AND WHAT IS THAT?

18  A   THAT'S THE AIRWORTHINESS CERTIFICATE FOR THE HELICOPTER.

19  Q   AND WAS THAT KEPT IN THE HELICOPTER?

20  A   YES.  IT WAS DOWN IN THE CARGO HOLD.

21  Q   APPROXIMATELY WHAT SIZE WERE THE LOADS THAT THIS HELICOPTER

22  CARRIED?

23  A   WE'D USUALLY CARRY 3- TO 4,000 POUNDS.

24  Q   WHEN WAS THE FIRST SUCH LOAD DELIVERED?

25  A   LATE NOVEMBER OF 83.

5-110

1   Q   NOW, BETWEEN THAT DATE AND CHRISTMAS OF 1983, HOW MANY

2   LOADS WERE DELIVERED THAT YOU HAD PARTICIPATED IN?

3   A   WE EITHER DID 9 OR 14.  THERE WAS A PERIOD AFTER ABOUT

4   MARCH, WE DID 23 LOADS.  THEY WERE BROKEN UP.

5        WE EITHER DID 14 BEFORE CHRISTMAS OR 9 BEFORE

6   CHRISTMAS; I DON'T REMEMBER WHICH.

7   Q   NOW, AFTER THE MARIJUANA WAS DELIVERED TO THE STASH HOUSE,

8   WHAT WOULD YOU DO WITH IT THERE?

9   A   WE WOULD WAIT FOR A CALL FROM MR. WALTERS OR RENE VERDUGO,

10  AND THEN THEY WOULD TELL US THAT SOMEONE WOULD BE BEEPING US.

11  AND WHEN WE GOT A BEEP, WE'D CALL THAT NUMBER AND GO GET A

12  TRUCK AND JUST BRING IT BACK AND FILL IT UP AND BRING THE TRUCK

13  BACK TO THESE PEOPLE.

14  Q   WOULD YOU EVER WEIGH THE MARIJUANA?

15  A   YES.  THAT WAS DONE RIGHT BEFORE WE GOT BACK, BEFORE WE

16  ACTUALLY PUT IT BACK IN THERE TO STORE IT.

17  Q   AND WAS THE SAME METHOD OF OPERATION YOU DESCRIBED USED FOR

18  ALL OF THE 23 LOADS BETWEEN NOVEMBER OF 83 AND MARCH OF 1984?

19  A   IT WENT PRETTY MUCH THE SAME ALL THE TIME, YEAH.

20  Q   AND DID YOU HAVE AN UNDERSTANDING AS TO THE SOURCE OF THE

21  MARIJUANA THAT YOU WERE UNLOADING FROM THE HELICOPTER?

22  A   YES.

23  Q   AND WHAT WAS THE SOURCE OF THAT MARIJUANA?

24  A   THE ORIGINAL SOURCE WAS SUPPOSEDLY RAFAEL CARO QUINTERO.

25  Q   AND YOU RECEIVED IT FROM RENE VERDUGO?

5-111

1   A   YES.

2   Q   NOW, WAS THERE A TIME DURING 1984 WHEN YOU ASSISTED IN

3   UNLOADING MARIJUANA FROM A DIFFERENT SOURCE?

4   A   YES.

5   Q   WHEN DID THAT OCCUR?

6   A   IT WAS, I BELIEVE, IN AUGUST OR SEPTEMBER OF 84.

7   Q   AND WHERE DID THIS MARIJUANA COME FROM?

8   A   RENE HAD GOTTEN THIS.  IT WAS THAI MARIJUANA.  I DON'T KNOW

9   WHERE HE GOT IT.

10  Q   HOW MANY LOADS OF THAI MARIJUANA DID YOU PARTICIPATE IN

11  UNLOADING?

12  A   I BELIEVE WE DID FIVE.

13  Q   AND LIKEWISE, WERE THESE 3- TO 4,000 POUND LOADS?

14  A   YES.

15  Q   AND AT SOME POINT DURING 1984, DID YOU RESUME UNLOADING

16  MEXICAN MARIJUANA?

17  A   YES, WE DID.

18  Q   AND WHEN DID THAT OCCUR?

19  A   I BELIEVE IT WAS AROUND THE END OF OCTOBER OF 84.

20  Q   AND HOW MANY LOADS DID YOU PARTICIPATE IN UNLOADING

21  BEGINNING IN THE END OF OCTOBER 1984?

22  A   I IMAGINE THERE WAS PROBABLY 15 OF THEM.

23  Q   AND WERE THESE LOADS THE SAME SIZE AS THE LOADS THAT HAD

24  BEEN UNLOADED EARLIER IN THE YEAR?

25  A   YEAH.

5-112

1    Q    DID YOU USE THE SAME METHOD OF OPERATION TO UNLOAD THIS

2    MARIJUANA?

3    A    YES.

4    Q    THE SAME METHOD OF DISTRIBUTION FROM THE STASH HOUSE?

5    A    YES.

6    Q    WHEN WAS THE LAST LOAD THAT YOU WERE INVOLVED WITH?

7    A    DECEMBER OF 84.

8    Q    DO YOU RECALL THE DATE?

9    A    DECEMBER 5TH.

10   Q    NOW, DO YOU HAVE ANY ESTIMATE OF THE TOTAL AMOUNT OF

11   MARIJUANA THAT YOU WERE INVOLVED IN UNLOADING FROM THIS

12   HELICOPTER?

13   A    SOMEWHERE AROUND 60 TONS, I BELIEVE.

14   Q    DO YOU KNOW AN INDIVIDUAL NAMED MANUELA CARO QUINTERO?

15   A    I MET HIM.

16   Q    IS IT A MAN OR A WOMAN?

17   A    ARE YOU TALKING ABOUT MANUEL OR MANUELA QUINTERO?

18   Q    MANUELA.

19   A    MANUELA.  YES.  OKAY.

20   Q    PARDON ME?

21   A    THAT'S A WOMAN.

22   Q    WHEN DID YOU MEET HER?

23   A    I BELIEVE IT WAS PROBABLY AROUND SEPTEMBER OF 84.

24   Q    WHERE WERE THE CIRCUMSTANCES?

25   A    HER AND TERESA VERDUGO WERE IN LOS ANGELES SHOPPING.

5-113

1   Q    DID YOU RECEIVE ANY INSTRUCTIONS FROM RENE VERDUGO AS TO

2   HOW TO TREAT MANUELA CARO QUINTERO?

3   A    YES.  SHE EXPLAINED THAT SHE WAS THE BIG GUY'S -- SHE

4   ALWAYS CALL HIM -- SISTER.

5   Q    TO WHOM WAS SHE REFERRING TO?

6   A    RAFAEL CARO QUINTERO.

7   Q    NOW, MR. HOLLESTELLE, WERE YOU ARRESTED IN AUGUST OF 1986

8   IN RELATION TO THIS MARIJUANA SMUGGLING OPERATION?

9   A    YES, I WAS.

10  Q    AND WERE YOU CONVICTED?

11  A    YES, I WAS.

12  Q    DO YOU RECALL WHAT YOU WERE CONVICTED OF?

13  A    THREE COUNTS OF CONSPIRACY.

14  Q    HAVE YOU BEEN SENTENCED?

15  A    NO, NOT YET.

16  Q    AND DID YOU ENTER INTO A COOPERATION AGREEMENT WITH THE

17  UNITED STATES GOVERNMENT?

18  A    I AGREED TO COOPERATE WITH THE GOVERNMENT, YES.

19  Q    DID THE GOVERNMENT AGREE TO BRING YOUR COOPERATION TO THE

20  COURT'S ATTENTION AT THE TIME OF SENTENCING?

21  A    YES, THEY DID.

22  Q    WERE YOU ALSO CONVICTED IN SOUTH DAKOTA IN 1985?

23  A    YES, I WAS.

24  Q    WHAT WAS THAT CONVICTION FOR?

25  A    THAT WAS AN ASSAULT CHARGE.

5-114

1    Q    WHAT WAS YOUR SENTENCE?

2    A    I PAID A $50.00 FINE.

3    Q    WERE YOU ARRESTED IN COLORADO IN SEPTEMBER OF 1984?

4    A    YES, I WAS.

5    Q    AND DID THAT RESULT IN A CONVICTION?

6    A    YES.

7    Q    WHAT WAS THAT FOR?

8    A    POSSESSION OF COCAINE.

9    Q    HOW MUCH COCAINE?

10   A    ONE OUNCE.

11   Q    AND WHAT SENTENCE DID YOU RECEIVE?

12   A    (NO AUDIBLE RESPONSE.)

13   Q    WHAT SENTENCE DID YOU RECEIVE?

14   A    I WAS GIVEN THREE YEARS' PROBATION.

15   Q    NOW, AT SOME POINT DURING THE TIME THAT YOU WERE INVOLVED

16   IN THIS MARIJUANA SMUGGLING OPERATION, DID YOU ACTUALLY SELL

17   SOME OF THE MARIJUANA YOURSELF?

18   A    YES, I DID.

19   Q    HOW MUCH OF IT DID YOU SELL FOR YOURSELF?

20   A    I WOULD SUPPOSE SOMEWHERE BETWEEN 6 AND 10 TONS.

21   Q    AND DID YOU PAY DONALD WALTERS AND RENE VERDUGO FOR THE

22   MARIJUANA?

23   A    YES, I DID.

24   Q    AND YOU KEPT THE PROFIT?

25   A    YES.

5-115

1   Q   AT SOME POINT, DID YOU TAKE SOME OF THE THAI MARIJUANA THAT

2   HAD BEEN BROUGHT IN?

3   A   YES, I DID.

4   Q   AND DID YOU PAY RENE VERDUGO FOR THAT, AS WELL?

5   A   WELL, I PAID DONALD WALTERS.

6   Q   AT SOME POINT, DID YOU ASSIST DONALD WALTERS IN REMOVING

7   THE MARIJUANA FROM THE STASH HOUSE?

8   A   YES, I DID.

9   Q   AND WHAT WAS THE PURPOSE OF MOVING IT?

10  A   WELL, DONALD WALTERS HAD HAD SOME PEOPLE GET ARRESTED WITH

11  A TRUCK OF MARIJUANA COMING OUT OF THE SITE IN ARIZONA AND

12  WANTED TO GET THE MARIJUANA OUT OF THE STASH HOUSE.

13  Q   WHEN DID THAT ARREST OCCUR?

14  A   THAT WAS IN FEBRUARY OF 85.

15  Q   SO DID YOU HELP HIM TAKE THE MARIJUANA OUT AT SOME POINT

16  AFTER THAT?

17  A   WELL, YES.  I TOOK MARIJUANA FROM HIM.  I DIDN'T HELP HIM

18  TAKE IT OUT OF THE HOUSE.

19          I MEAN, IT WAS DELIVERED TO ME IN THE SAME WAY THAT

20  THE WE HAD ALWAYS DELIVERED IT TO PEOPLE EARLIER WHEN I WAS

21  WORKING WITH MR. WALTERS.

22  Q   THEN WHAT HAPPENED TO THAT MARIJUANA?

23  A   THAT WAS SOLD.

24  Q   AND DID YOU EVENTUALLY PAY FOR IT?

25  A   YES.

5-116

1    Q    MR. HOLLESTELLE, HAVE YOU DEALT DRUGS SINCE THE AGE OF --

2    WELL, DID YOU DEAL DRUGS PRIOR TO YOUR INVOLVEMENT IN THIS

3    HELICOPTER SMUGGLING OPERATION?

4    A    YES.  I'VE BEEN INVOLVED IN MARIJUANA, SELLING AND THINGS,

5    SINCE I WAS ABOUT 14.

6    Q    HAVE YOU BEEN INVOLVED WITH DRUG DEALING SINCE YOUR ARREST

7    ON THIS CHARGE?

8    A    BEFORE I WAS CONVICTED, YES.

9    Q    SINCE YOUR CONVICTION?

10   A    SINCE MY CONVICTION, NO.

11   Q    AND AT SOME POINT, DID YOU SELL SOME COCAINE WHILE YOU WERE

12   INVOLVED -- I'M SORRY.  DID YOU SELL SOME COCAINE?

13   A    YES.

14   Q    AND DURING WHAT PERIOD DID THAT OCCUR?

15   A    THAT WAS PROBABLY ABOUT APRIL OF 85 UNTIL, I BELIEVE, MARCH

16   OF 87.

17   Q    AND HOW MUCH MONEY DID YOU MAKE IN THOSE SALES?

18   A    I DON'T HAVE ANY IDEA HOW MUCH MONEY I MADE ON THAT.

19          MR. CARLTON:  NOTHING FURTHER, YOUR HONOR.

20          I'M SORRY, YOUR HONOR.  MAY I HAVE ONE MOMENT?

21          THE COURT:  YOU MAY CROSS-EXAMINE THE WITNESS.

22          MR. NICOLAYSEN:  NOTHING, YOUR HONOR.

23          THE COURT:  DO YOU HAVE ANY QUESTIONS YOU WISH TO ADD?

24          MR. STOLAR:  JUST A COUPLE.

25          MR. CARLTON:  YOUR HONOR, MAY I MOVE THAT EXHIBIT 35 C

5-117

1    BE RECEIVED?

2            THE COURT:  YES.  IT MAY BE RECEIVED.

3            (EXHIBIT 35 C  # RECEIVED IN EVIDENCE.)

4                    CROSS-EXAMINATION +

5    BY MR. STOLAR:

6    Q    GOOD AFTERNOON, SIR.

7    A    GOOD AFTERNOON TO YOU.

8    Q    YOU YOU INDICATED YOU FIRST MET RENE VERDUGO IN 83; IS THAT

9    RIGHT?

10   A    YES.

11   Q    AND WHEN YOU STARTED DOING BUSINESS WITH HIM, YOUR

12   UNDERSTANDING WAS THAT HIS SOURCE OF MARIJUANA, THE ROUGHLY 60

13   TONS YOU SAID THAT YOU MOVED, WAS RAFAEL CARO QUINTERO; IS THAT

14   RIGHT?

15   A    YES.

16   Q    EVEN -- HE WAS ALSO THE SOURCE OF THE THAI MARIJUANA?

17   A    NO, HE WAS NOT.

18   Q    WHO WAS THE SOURCE OF THE THAI MARIJUANA?

19   A    LIKE I SAID, I DON'T KNOW WHAT THE SOURCE ON THAT WAS.

20           MR. STOLAR:  MOVE TO STRIKE THE TESTIMONY ON THE THAI

21   MARIJUANA, YOUR HONOR.

22           THE COURT:  DENIED.

23   BY MR. STOLAR:

24   Q    THEN, IT WAS OCTOBER 84 THAT THE MEXICAN MARIJUANA BEGAN

25   AGAIN; IS THAT RIGHT?

5-118

1   A   SOMETIME AROUND OCTOBER, YES.

2   Q   DO YOU HAVE ANY IDEA IF IT WAS EARLY OCTOBER, LATE OCTOBER?

3   A   I DON'T KNOW.

4   Q   DID IT CONTINUE THROUGH NOVEMBER?

5   A   YES.

6   Q   DECEMBER?

7   A   DECEMBER 5TH.

8   Q   DECEMBER 5TH; RIGHT?

9   A   (LAUGHTER.)

10   Q   HOW MANY LOADS, ROUGHLY, WAS THAT?

11   A   I BELIEVE AT THAT TIME, THERE WERE AROUND 15 LOADS.

12   Q   WOULD IT BE FAIR TO SAY THAT YOU GOT SOMEWHAT SOPHISTICATED

13   IN BEING ABLE TO JUDGE THE QUALITY OF MARIJUANA?  WOULD THAT BE

14   SO?  DIFFERENCES IN WHERE IT WAS GROWN, PERHAPS?

15   A   NO.

16   Q   WAS THERE ANY DIFFERENCE BETWEEN THE MEXICAN MARIJUANA THAT

17   YOU GOT IN OCTOBER, NOVEMBER, DECEMBER OF 84, AND WHAT YOU HAD

18   BEEN RECEIVING BEFORE?

19   A   NO.

20   Q   SAME STUFF?

21   A   I CAN'T SAY "SAME STUFF," BUT I MEAN, YOU KNOW, IT WAS THE

22   SAME QUALITY, SAME LOOKS.

23   Q   I MEAN, THERE ARE DIFFERENT TYPES OF MARIJUANA, ARE THERE

24   NOT?

25   A   YES.  YES, THERE ARE.

5-119

1    Q    DID THERE COME A TIME -- I'M SORRY.

2         YOUR UNDERSTANDING WAS THAT THAT WAS ALSO CARO

3    QUINTERO'S MARIJUANA?

4    A    YES.

5    Q    THAT HE WAS THE SOURCE?

6    A    YES.

7    Q    DID THERE COME A TIME WHEN RENE VERDUGO TOLD YOU ABOUT THE

8    D.E.A. AGENT, CAMARENA, WHO HAD BEEN BEATEN UP?

9    A    HE DIDN'T TELL ME, NO.  I WAS IN DONALD WALTERS' CAR AND HE

10   WAS TALKING WITH DONALD WALTERS AND I HAPPENED TO OVERHEAR THE

11   CONVERSATION.

12   Q    AND WHAT WAS THE CONVERSATION?

13   A    RENE WAS TALKING ABOUT THE FACT THAT -- SOMETHING ABOUT A

14   NARC.  AND HE HAD SAID THE GUY WAS BEAT TO SHIT; HE WAS CRYING,

15   BEGGING.

16   Q    AND WHEN WAS THAT CONVERSATION?

17   A    I BELIEVE THAT WAS IN APRIL OF 85, 85 OR MAY, RIGHT AROUND

18   THAT PERIOD OF TIME.  I HAD WENT UP TO LOS ANGELES TO MEET WITH

19   DONALD WALTERS AND HAD NO IDEA THAT RENE VERDUGO WOULD BE

20   THERE.

21   Q    THIS IS AFTER YOU WERE ARRESTED; RIGHT?

22   A    NO.

23   Q    WHAT -- OKAY.  WAS PART OF THAT CONVERSATION INDICATING

24   THAT RENE'S SOURCE OF INFORMATION ABOUT THAT WAS CARO QUINTERO?

25   A    FROM WHAT I UNDERSTOOD, RENE VERDUGO WAS IN THE ROOM.

5-120

1    Q   ALL RIGHT.  YOU TESTIFIED AGAINST RENE VERDUGO --

2    A   YES, I DID.

3    Q   AT HIS TRIAL?  YOU CAME INTO THE COURTROOM AND TESTIFIED

4    AGAINST HIM; IS THAT RIGHT?

5    A   I DON'T THINK IT WAS THIS COURTROOM.  THE CHAIR WAS A

6    LITTLE MORE COMFORTABLE IN THE OTHER ONE.

7             COURTROOM:  (LAUGHTER.)

8             MR. STOLAR:  ALL RIGHT.  THAT'S ABOUT IT.

9    Q   OH.  THERE IS ONE OTHER THING I'M CURIOUS ABOUT.

10            YOU INDICATED THAT ORIGINALLY, WHEN YOU WENT BACK, YOU

11   BROUGHT THE BRIEFCASE THAT CAME FROM RENE VERDUGO THAT HAD A

12   HALF MILLION DOLLARS IN IT THAT WAS TO GO BUY THE HELICOPTER?

13   A   YES.

14   Q   THE HELICOPTER COST 425,000?

15   A   YES.

16   Q   WHAT HAPPENED TO THE OTHER 75?

17   A   DONALD WALTERS, I BELIEVE, STUCK THAT IN HIS OWN POCKET.

18   Q   YOU DIDN'T GET ANY OF IT?

19   A   NOPE.

20            MR. STOLAR:  OKAY.  THANK YOU.

21            THE COURT:  ANY OTHER QUESTIONS?

22            DEFENSE COUNSEL:  NO, YOUR HONOR.

23            THE COURT:  DO YOU HAVE ANY REDIRECT EXAMINATION?

24            MR. CARLTON:  JUST ONE QUESTION.

25                      REDIRECT EXAMINATION +

5-121

1    BY MR. CARLTON:

2    Q    MR. HOLLESTELLE, YOUR INVOLVEMENT IN THIS OPERATION ENDED

3    ON DECEMBER 5TH OF 1984?

4    A    YES, IT DID.

5    Q    DID THE OPERATION ITSELF CONTINUE BEYOND THAT DATE?

6    A    YES.  MY CREW UNLOADED ONE MORE LOAD FOR DONALD WALTERS ON

7    DECEMBER 6TH.  AND THEN AFTER THE NEW YEAR, DONALD WALTERS WENT

8    AHEAD AND PUT TOGETHER A TOTALLY DIFFERENT CREW AND GOT ONE

9    LOAD IN AND THE SECOND LOAD WAS BUSTED.

10   Q    THAT WAS THE FEBRUARY 5TH ARREST YOU PREVIOUSLY DESCRIBED?

11   A    YES.

12           MR. CARLTON:  NOTHING FURTHER.

13           THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN.

14           CALL YOUR NEXT WITNESS.

15           MR. CARLTON:  YOUR HONOR, THE GOVERNMENT CALLS RICHARD

16   MESSER.

17           (WITNESS SUMMONED TO COURTROOM.)

18           THE COURT:  COME FORWARD, PLEASE.

19           THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

20

21           RICHARD MESSER + PLAINTIFF'S WITNESS, SWORN

22

23           THE CLERK:  PLEASE BE SEATED.  PLEASE STATE YOUR FULL

24   NAME FOR THE RECORD AND SPELL YOUR LAST NAME.

25           THE WITNESS:  MY NAME IS RICHARD MESSER, M  E  S  S

1   E R.

2                    DIRECT EXAMINATION +

3   BY MR. CARLTON:

4   Q   MR. MESSER, WHAT IS YOUR CURRENT EMPLOYMENT?

5   A   I'M A SUPERVISOR IN CHARGE OF THE U.S. CUSTOMS OFFICE IN

6   MARCH AIR FORCE BASE.

7   Q   WHAT ARE YOUR RESPONSIBILITIES IN THAT POSITION?

8   A   I HAVE 12 PILOTS AND INVESTIGATORS THAT WORK FOR ME OUT OF

9   THAT OFFICE.

10  Q   HOW LONG HAVE YOU BEEN EMPLOYED WITH THE CUSTOMS SERVICE?

11  A   SINCE 1974.

12  Q   YOU SAY YOU HAVE A NUMBER OF PILOTS AND INVESTIGATORS

13  WORKING FOR YOU OUT OF THE OFFICE THAT YOU'RE NOW ASSOCIATED

14  WITH.   WHAT DO YOU AND THEY DO?

15  A   WELL, WE'RE IN CHARGE, RESPONSIBLE FOR PROVIDING AIRCRAFT

16  TO INTERCEPT SMUGGLERS, ILLEGAL BORDER CROSSERS, COMING INTO

17  THE UNITED STATES AND BASICALLY ALONG THE SOUTHERN BORDER AND

18  THE THE CALIFORNIA AND ARIZONA BORDER AREAS ARE THE AREAS OF MY

19  RESPONSIBILITY.

20  Q   WHAT METHODS DO YOU USE TO LOCATE AND INTERCEPT SMUGGLERS?

21  A   WE UTILIZE AIRBORNE RADAR/GROUND-BASED RADAR TO INTERCEPT

22  THE TARGETS WITH.

23  Q   NOW, ONCE YOU'VE IDENTIFIED A POSSIBLE SMUGGLING TARGET,

24  WHAT DO YOU THEN DO?

25  A   I'M SORRY?

5-123

1    Q    ONCE YOU'VE IDENTIFIED A POSSIBLE SMUGGLER ON YOUR RADAR,

2    WHAT DO YOU DO ABOUT IT?

3    A    WE MAKE ATTEMPTS TO ASCERTAIN WHETHER OR NOT THE TARGET IS

4    LEGAL.  ONCE WE CANNOT COME UP WITH A KNOWN FLIGHT PLAN ON THAT

5    INDIVIDUAL, WE WILL FOLLOW THAT AIRCRAFT TO WHERE IT'S

6    LOCATE -- WHERE IT LANDS.

7    Q    ONCE YOU FIND IT AND HAVE REASON TO BELIEVE THAT IT IS

8    INDEED A SMUGGLER, WHAT DO YOU DO THEN?

9    A    WE WILL LAND BEHIND THE SUSPECT OR -- IF THERE'S ROOM OR IF

10   WE CAN DO THAT, AND MAKE AN APPREHENSION, OR WE WILL CALL IN

11   LOCAL LAW ENFORCEMENT OFFICERS ON THE GROUND ASSIST US TO MAKE

12   STOP.

13   Q    NOW, MR. MESSER, ARE YOU A PILOT YOURSELF?

14   A    YES, I AM.

15   Q    AND WHAT ARE YOU RATED TO FLY?

16   A    I'M RATED IN BOTH HELICOPTERS AND FIXED-WING AIRCRAFT, JET

17   AIRCRAFT.

18   Q    HOW LONG HAVE YOU BEEN A PILOT?

19   A    FOR 25 YEARS.

20   Q    HAVE YOU EVER FLOWN HELICOPTERS?

21   A    YES, I HAVE.

22   Q    HOW LONG HAVE YOU FLOWN HELICOPTERS?

23   A    FOR ABOUT 25 YEARS.

24   Q    ARE YOU FAMILIAR WITH A HELICOPTER KNOWN AS A SIKORSKY

25   S58T?

1   A   YES, I AM.

2   Q   HOW ARE YOU FAMILIAR WITH THAT?

3   A   THE S58T IS SIMILAR TO AN AIRCRAFT THAT I USED TO FLY IN

4   THE MILITARY, THE H34.  AND THE S58T IS A MODERNIZED VERSION OF

5   THAT AIRCRAFT WITH TURBINE ENGINES, JET ENGINES.

6   Q   SO YOU'RE FAMILIAR WITH ITS APPEARANCE?

7   A   YES.

8   Q   AND ITS FLIGHT CHARACTERISTICS?

9   A   YES.

10   Q   DO YOU KNOW HOW MUCH OF A LOAD THE S58T CAN NORMALLY CARRY?

11   A   IT'LL CARRY BETWEEN 5- AND 6,000 POUNDS, DEPENDING ON HOW

12   MUCH FUEL IT'S CARRYING.

13   Q   DIRECTING YOUR ATTENTION TO FEBRUARY OF 1985, WHAT WAS YOUR

14   ASSIGNMENT AT THAT TIME?

15   A   I WAS FLYING AS A CO-PILOT/RADIO OPERATOR ON A CESSNA

16   CITATION OUT OF TUCSON, ARIZONA.

17   Q   WHERE WERE YOU FLYING TO?

18   A   WE WERE EN ROUTE TO SAN DIEGO/NORTH ISLAND TO STAND BY FOR

19   A SUSPECT TARGET THAT WE EXPECTED TO CROSS BACK INTO THE U.S.

20   Q   NOW, WHAT DATE ARE WE TALKING ABOUT?

21   A   THE DAY THAT YOU MENTIONED.

22   Q   FEBRUARY 5TH --

23   A   YES, SIR.

24   Q   -- 1985?  WHAT WAS YOUR PURPOSE OF YOUR FLIGHT TO NORTH

25   ISLAND?

5-125

1   A   WE WERE STANDING BY FOR A SUSPECT TARGET THAT WAS EXPECTED

2   TO CROSS BACK INTO THE UNITED STATES IN THE AFTERNOON, IN

3   FEBRUARY.

4           THAT SUSPECT NEVER SHOWED UP, AND WE DEPARTED SAN

5   DIEGO AND RETURNED TO TUCSON.

6   Q   WAS THE CESSNA CITATION AIRCRAFT IN WHICH YOU WERE FLYING

7   EQUIPPED WITH RADAR?

8   A   YES.

9   Q   AND DID IT HAVE ANY OTHER DETECTION EQUIPMENT ON IT?

10  A   IT ALSO CARRIES A FORWARD LOOKING INFRARED.

11  Q   CAN YOU DESCRIBE WHAT THE FUNCTION OF THAT PIECE OF

12  EQUIPMENT IS?

13  A   A FORWARD LOOKING INFRARED IS A DEVICE THAT WILL ALLOW US

14  TO SEE IN THE NIGHT BY PAINTING A PICTURE OF THE INFRARED

15  SPECTRUM OF ANYTHING WITH HEAT.

16          IT WILL PAINT A PICTURE ON A TELEVISION SCREEN.  IT

17  WILL APPEAR TO BE A BLACK-AND-WHITE PICTURE AND JUST SIMILAR TO

18  A BLACK-AND-WHITE TELEVISION.

19  Q   WERE THERE OTHER CREW MEMBERS ON THIS FLIGHT WITH YOU?

20  A   YES.  THERE WERE TWO OTHERS INDIVIDUALS IN THE AIRPLANE.

21  THERE'S A PILOT IN COMMAND AND A RADAR OPERATOR.

22  Q   DO YOU RECALL WHAT TIME YOU LEFT NORTH ISLAND TO RETURN TO

23  TUCSON?

24  A   IT WAS LATE AFTERNOON, EARLY EVENING.  I DON'T REMEMBER THE

25  SPECIFIC TIME.

5-126

1    Q    WHILE YOU WERE IN THE AIR, DID YOU GO TO THE BACK OF THE

2    PLANE?

3    A    YES.  I -- WE WERE IN A NEW AIRCRAFT.  IT HAD A NEW RADAR,

4    AND I WAS NOT COMPLETELY FAMILIAR WITH THIS PARTICULAR RADAR

5    FROM THE BACK END.  I HAD WORKED THE RADAR FROM THE FRONT OF

6    THE AIRCRAFT, BUT NOT FROM THE REAR.

7         SO THAT EVENING, I WENT INTO THE BACK OF THE AIRPLANE

8    TO FAMILIARIZE MYSELF WITH THE EQUIPMENT IN THE BACK.  AND I

9    WAS OPERATING THE RADAR AND THE FLARE THAT EVENING.

10   Q    WHILE DOING THAT, DID YOU NOTICE SOMETHING OF SIGNIFICANCE

11   TO YOU ON THE RADAR?

12   A    YES.  I KEPT PICKING UP ON A TARGET THAT WAS TO THE RIGHT

13   OF MY NOSE, IN MEXICAN AIR SPACE.  THE TARGET KEPT REAPPEARING

14   ON THE RADAR.  I'D BREAK LOCK AND IT WOULD COME BACK INTO MY

15   RADAR.

16   Q    WAS THERE A MOVING TARGET?

17   A    YES.

18   Q    COULD YOU TELL IN WHAT DIRECTION IT WAS MOVING?

19   A    THE TARGET WAS CONTINUALLY MOVING FROM SOUTH TO NORTH.

20   Q    AND DID THAT MEAN THAT IT WAS FLYING FROM MEXICO TO THE

21   UNITED STATES?

22   A    YES.

23   Q    WERE YOU ABLE TO -- WELL, WHAT WAS IT ABOUT THIS TARGET

24   THAT DREW YOUR ATTENTION?

25   A    ITS EXTREMELY LOW ALTITUDE.  WE HAVE A RADAR READOUT THAT

5-127

1    INDICATES THE ALTITUDE OF THE TARGETS.

2           THIS TARGET WAS -- ALTITUDE WAS RANGING FROM ZERO TO

3    100 FEET.

4    Q    AND WHAT WAS SIGNIFICANT ABOUT THAT TO YOU?

5    A    WELL, IT WAS JUST EXTREMELY LOW.  WE VERY RARELY SEE

6    TARGETS FLYING THAT FLOW.

7    Q    DID YOU USE THE FORWARD LOOKING INFRARED DEVICE TO LOOK AT

8    THAT, AS WELL?

9    A    YES.  AS -- WE PICKED UP THE TARGET 30 SOME MILES AWAY.  AS

10   WE GOT IN CLOSER, TO ABOUT 20 MILES, WE COULD PICK UP SOMETHING

11   ON THE INFRARED, WHICH IS KIND OF UNUSUAL FOR NORMAL

12   RECIPROCATING ENGINE AIRCRAFT.  THEY DON'T PRESENT AS HOT AN

13   IMAGE.

14          BUT THIS PARTICULAR TARGET, WE COULD SEE A DOT AS FAR

15   AWAY AS 20 SOMETHING MILES.

16          AS WE MOVED IN ON THE TARGET, I COULD SEE THAT IT WAS

17   THE OUTLINE OF A HELICOPTER.

18   Q    WERE YOU ABLE TO DETERMINE FROM THE IMAGE ON YOUR FORWARD

19   LOOKING INFRARED DEVICE WHAT KIND OF HELICOPTER IT WAS?

20   A    YES.  IT WAS THE H  34 BODY LINES THAT I WAS FAMILIAR WITH.

21   I COULD TELL THAT IT WAS THE TURBINE ENGINE VERSION BECAUSE OF

22   THE EXCESSIVE HEAT COMING FROM THE EXHAUST SIDE OF THE

23   AIRCRAFT.

24   Q    DID YOU FOLLOW -- CONTINUE TO FOLLOW THIS AIRCRAFT?

25   A    YES, WE DID.

5-128

1    Q    HOW LONG DID YOU FOLLOW THEM?

2    A    WE FOLLOWED UNTIL HE LANDED AT A LOCATION IN THE DESERT,

3    CENTRAL ARIZONA, ABOUT 10 MILES, 15 MILES SOUTH OF STANFIELD,

4    ARIZONA, NEAR THE INDIAN RESERVATIONS.

5    Q    DID YOU MAKE ANY EFFORT TO CONTACT THE HELICOPTER BY RADIO?

6    A    YES.  AT FIRST WE THOUGHT THAT IT COULD POSSIBLY BE A

7    MILITARY AIRCRAFT ON MILITARY MANEUVERS IN THAT AREA, SO WE

8    CALLED OUT ON THE EMERGENCY FREQUENCY, MILITARY FREQUENCY, FOR

9    ANY MILITARY AIRCRAFT IN THE AREA AND TO RESPOND TO US.

10        NOBODY DID.

11   Q    DID YOU NOTICE ANYTHING ELSE ABOUT THIS HELICOPTER THAT

12   CAUSED TO YOU SUSPECT IT MIGHT BE SMUGGLING?

13   A    IT WAS FLYING WITHOUT LIGHTS.

14   Q    DID THE HELICOPTER ENGAGE IN ANY MANEUVERING THAT

15   REINFORCED YOUR SUSPICIONS?

16   A    JUST PRIOR TO THE LANDING, THE AIRCRAFT DID MAKE A

17   360-DEGREE TURN.  THEN IT PROCEEDED FURTHER NORTH, ABOUT

18   ANOTHER FOUR OR FIVE MILES, WHERE --

19   Q    WHAT IS THE SIGNIFICANCE OF THAT TO YOU?

20   A    IT'S PRETTY COMMON FOR AIRCRAFT SMUGGLERS TO MAKE EVASIVE

21   MANEUVERS RIGHT BEFORE THEY LAND, TO SEE IF THEY HAVE ANYONE

22   TAILING THEM AND TO TRY THROW THEM OFF.

23   Q    NOW, DID YOU EVENTUALLY CONTACT ANY OTHER LAW ENFORCEMENT

24   AGENCIES IN RELATION TO THIS HELICOPTER?

25   A    WE HAD CALLED OTHER U.S. CUSTOMS UNITS, AS WELL AS STATE

5-129

1   AND LOCAL OFFICERS, TO ASSIST US IN THE AREA WITH GROUND UNITS.

2   Q   DID YOU SEE THE HELICOPTER LAND?

3   A   YES, I DID.

4   Q   AND WERE YOU ABLE TO SEE WHAT HAPPENED ON THE GROUND JUST

5   AFTER THE HELICOPTER LANDING?

6   A   AS HE TOUCHED DOWN ONTO THE GROUND, WE COULD SEE, IN THE

7   FLARE, TRUCKS BACKING INTO THE -- AROUND THE AIRCRAFT ON THE

8   CARGO DOOR SIDE IN A U  SHAPE, V  SHAPE.  THERE WERE THREE

9   PICKUP TRUCKS ON THE GROUND.

10  Q   DID YOU SEE ANY PEOPLE ON THE GROUND?

11  A   YES.  WE COULD SEE HOT SPOTS, PEOPLE MOVING BACK AND FORTH

12  FROM THE HELICOPTER TO THE TRUCKS.

13  Q   DID YOU REPORT THIS INFORMATION TO ANY OTHER AGENCIES ON

14  THE GROUND?

15  A   YES.  WE WERE IN CONTACT BOTH THE HIGHWAY PATROL AND THE

16  LOCAL SHERIFF'S OFFICERS, AS WELL AS CUSTOMS AGENTS IN THE

17  AREA.

18  Q   WHAT DID YOU SEE THE HELICOPTER DO NEXT?

19  A   THE HELICOPTER DEPARTED TO THE SOUTH.  WE WATCHED HIM ON

20  THE FLARE FOR A MINUTE OR TWO, NOT VERY LONG; AND WE DETERMINED

21  THAT WE NEEDED TO KEEP OUR ATTENTION TO THE GROUND VEHICLES, AS

22  WE HAD ASSUMED THAT ANYTHING THAT WAS OFF-LOADED WAS ON THE

23  GROUND VEHICLES AT, SO WE STAYED WITH THEM.

24  Q   WHAT DID YOU SEE THEM DO?

25  A   THEY DEPARTED THE AREA WHERE THE HELICOPTER HAD LANDED.  IT

1   WAS ON A TRAIL THAT WAS HEADING OUT NORTH TO A MAIN ROAD,

2   LEADING TOWARDS STANFIELD, ARIZONA.

3   Q   WERE YOU ABLE TO SEE WHETHER THESE TRUCKS WERE INTERCEPTED

4   BY THE POLICE?

5   A   YES.  JUST SOUTH OF THE INTERSTATE, THE SHERIFF/HIGHWAY

6   PATROL STOPPED THE VEHICLES ON THE MAIN ROAD LEADING UP TO THE

7   INTERSTATE.

8   Q   WHAT DID YOU SEE, IF ANYTHING, AFTER THIS OCCURRED?

9   A   SAW SEVERAL SUSPECTS RUN FROM THE TRUCKS WITH LAW

10   ENFORCEMENT OFFICERS IN PURSUIT.

11   Q   NOW, AGENT MESSER, IF I CAN CALL YOUR ATTENTION TO WHAT HAS

12   BEEN MARKED AS EXHIBIT 36, WHICH I BELIEVE SHOULD BE IN THE BIN

13   JUST NEXT TO YOU, ON THE RIGHT-HAND SIDE.

14   A   (RETRIEVES EXHIBIT.)

15   Q   DO YOU RECOGNIZE EXHIBIT 36?

16   A   (DISPLAYS.)  YES.

17   Q   AND WHAT IS THAT?

18   A   IT'S A MAP OF THE SOUTHWESTERN UNITED STATES, COVERING

19   PARTS OF NEW MEXICO, ARIZONA AND SOUTHERN CALIFORNIA.

20   Q   HAVE YOU DRAWN ON THAT MAP?

21   A   YES, I DID.

22   Q   AND WHAT DID YOU DRAW ON THE MAP?

23   A   I DREW A LINE FROM WHERE WE DEPARTED EARLIER IN THE DAY

24   FROM SAN DIEGO/NORTH ISLAND AND THE ROUTE OF FLIGHT THAT WE

25   TOOK ALONG THE BORDER, REPRESENTING THIS SOLID LINE.

5-131

1   Q    THE RED LINE?

2   A    YES.

3   Q    DID YOU ALSO MARK ON THE MAP THE LOCATION WHERE YOU FIRST

4   SPOTTED THIS HELICOPTER?

5   A    YES.  WHERE I HAVE THE NO. 1, THE INDICATION DOWN HERE, IS

6   APPROXIMATELY WHERE WE OBSERVED THE SUSPECT TARGET IN MEXICO.

7   Q    DID YOU ALSO MARK ON THE MAP WHERE YOU OBSERVED THE

8   HELICOPTER TO LAND?

9   A    YES.  THE DOTTED LINE REPRESENTS HIS APPROXIMATE PATH

10  NORTHBOUND.  WHERE THE NO. 2 IS IS THE AREA THAT HE LANDED.

11          MR. CARLTON:  YOUR HONOR, I WOULD MOVE THAT EXHIBIT 36

12  BE RECEIVED.

13          THE COURT:  IT MAY BE RECEIVED.

14          (EXHIBIT 36 # RECEIVED IN EVIDENCE.)

15  BY MR. CARLTON:

16  Q    DID YOU HAVE OCCASION, AGENT MESSER, TO RETURN TO THE

17  LANDING SITE AT A LATER TIME?

18  A    YES.  THE FOLLOWING MORNING, THE LOCAL OFFICERS WANTED

19  ASSISTANCE BACK IN THE AREA, TO LOOK AT THE AREA.

20          WE TOOK OFF IN A SMALL HELICOPTER AND FLEW BACK INTO

21  THE AREA TO LOOK AT/TAKE PICTURES OF THE LANDING SITE.

22  Q    AND WHEN YOU ARRIVED AT THE LANDING SITE, DID YOU NOTICE

23  ANYTHING OF SIGNIFICANCE TO YOU?

24  A    WE COULD SEE THE TIRE TRACKS WHERE THE HELICOPTER LANDED

25  THAT EVENING, AS WELL AS THE VEHICLE TRACKS.

5-132

1   Q   WHAT WAS THE NATURE OF THE SURFACE ON WHICH THE HELICOPTER

2   HAD LAND?

3   A   IT WAS DESERT TERRAIN; DUSTY, SANDY TERRAIN.

4       WHEN IT LANDED, IT LEFT TIRE TRACKS FROM THE WHEELS ON

5   THE HELICOPTER.

6   Q   NOW, HOW DOES A HELICOPTER SUCH AS THIS LAND?

7   A   WELL, MOST PEOPLE ASSUME THAT HELICOPTERS TAKE OFF AND LAND

8   VERTICALLY.  BUT A HEAVY HELICOPTER WITH A LOAD WILL GENERALLY

9   MAKE A RUN-ON LANDING TO ASSIST IT.

10      AND SINCE THIS PARTICULAR HELICOPTER HAS WHEELS,

11  THAT'S THE TYPE OF LANDING THAT IT GENERALLY WILL MAKE.

12  Q   DID YOU ENGAGE IN SOME SORT OF MEASUREMENTS OF THESE TIRE

13  TRACKS?

14  A   YES.  WE MEASURED THE TIRE TRACKS AT THEIR WIDTH TO ASSIST

15  US IN DETERMINING, AND JUST FOR RECORD, THAT IT WOULD BE A

16  WHEEL TYPE HELICOPTER, FITTING THE S58T CATEGORY.

17  Q   AND WERE THE MEASUREMENTS THAT YOU MADE CONSISTENT WITH AN

18  S58T?

19  A   YES.

20  Q   NOW, DID YOU ASSIST THE STATE POLICE IN ANY OTHER REGARD?

21  A   FOLLOWED -- WE WENT BACK TO THE STATE POLICE COMPOUND,

22  OBSERVED THE VEHICLES THAT HAD BEEN LOADED WITH MARIJUANA THAT

23  EVENING, AND THEN WE ASSISTED UNLOADING THOSE BALES OF

24  MARIJUANA.

25  Q   THE SAME VEHICLES THAT YOU HAD SEEN FROM THE AIR?

5-133

1    A    EXCUSE ME.  I DIDN'T HEAR YOU.

2    Q    THESE WERE THE SAME VEHICLES THAT YOU HAD SEEN FROM THE

3    AIR?

4    A    WELL, THEY WERE TRUCKS.

5    Q    LET ME ASK YOU TO DIRECT YOUR ATTENTION TO WHAT HAS BEEN

6    MARKED AS EXHIBIT 35 A.  IT SHOULD BE IN THE BIN NEXT TO YOU.

7    A    (RETRIEVES EXHIBIT.)  THIS IS 170 A.

8    Q    ALL RIGHT.  WELL, WE CAN ADDRESS THAT ONE FIRST.

9         DO YOU RECOGNIZE THAT?

10   A    (DISPLAYS.)  YES.  THIS IS ONE OF THE TRUCKS THAT WAS

11   LOADED WITH MARIJUANA THAT WAS IN THE COMPOUND.

12   Q    EACH OF THESE TRUCKS HAD A CAMPER SHELL?

13   A    YES.

14   Q    WOULD YOU NOW LOOK AT WHAT HAS BEEN MARKED AS 170 B.

15   A    (DISPLAYS EXHIBIT.)

16   Q    DO YOU RECOGNIZE THAT?

17   A    YES.  IT'S ONE OF THE BALES OF MARIJUANA.

18   Q    THAT WAS IN THE --

19   A    THAT WAS IN THE CAMPER TRUCKS.

20   Q    I THINK EXHIBIT 35 A  MAY BE IN THE STACK OF PHOTOGRAPHS IN

21   FRONT OF YOU.

22        YOUR HONOR, I WOULD MOVE THAT 170 A  AND B  BE

23   RECEIVED.

24        MR. STOLAR:  NO OBJECTION.

25        THE COURT:  THEY MAY BE RECEIVED.

5-134

1              (EXHIBIT 170 A-B # RECEIVED IN EVIDENCE.)

2              THE WITNESS:  I HAVE IT HERE.

3      BY MR. CARLTON:

4      Q   DO YOU RECOGNIZE THAT, AGENT MESSER?

5      A   YES.  THIS IS THE MARIJUANA THAT WAS STACKED UP IN THE

6      COMPOUND.

7      Q   HOW MUCH MARIJUANA WAS REMOVED FROM THESE TRUCKS?

8      A   IT WAS OVER 4,000 POUNDS.  I BELIEVE 4,300, IN THAT

9      VICINITY.

10             MR. CARLTON:  ONE MOMENT, YOUR HONOR.

11             (GOVERNMENT COUNSEL CONFER OFF THE RECORD.)

12     BY MR. CARLTON:

13     Q   AGENT MESSER, I BELIEVE IN THE STACK IN FRONT OF YOU, YOU

14     SHOULD HAVE AN EXHIBIT MARKED 35 B.

15     A   (DISPLAYS.)  35 B.

16     Q   DO YOU RECOGNIZE THAT?

17     A   YES.  THIS IS AN S58T HELICOPTER; S58T MODEL, TURBINE

18     ENGINE.

19     Q   NOW, DID YOU EVER HAVE OCCASION TO SEE THE HELICOPTER

20     AGAIN?

21     A   I NEVER DID.  ONLY IN PICTURES.

22             MR. CARLTON:  I SEE.

23             NOTHING FURTHER, YOUR HONOR.

24             THE COURT:  YOU MAY CROSS-EXAMINE THE WITNESS.

25                      CROSS-EXAMINATION +

5-135

1    BY MR. STOLAR:

2    Q    I JUST HAVE ONE QUESTION.  GOOD AFTERNOON, AGENT.

3         DID YOU MAKE ANY WRITTEN REPORTS CONCERNING YOUR

4    CONDUCT, ABOUT WHAT YOU DESCRIBED HERE, WHAT YOU DID?

5    A    YES.

6    Q    DO YOU HAVE THEM WITH YOU?

7    A    NO, I DO NOT.

8    Q    DO YOU KNOW WHERE THEY ARE?

9    A    IN A CASE FILE IN ARIZONA; IN TUCSON, ARIZONA.

10   Q    WERE YOU ASKED TO BRING THEM OUT HERE?

11   A    NO.

12   Q    AND IT COVERS WHAT YOU TESTIFIED TO TODAY?

13   A    YES.

14        MR. STOLAR:  NOTHING FURTHER, YOUR HONOR.

15        THE COURT:  ALL RIGHT.  ANY OTHER QUESTIONS?

16        DEFENSE COUNSEL:  NO, YOUR HONOR.

17        THE COURT:  YOU MAY STEP DOWN.

18        THE WITNESS:  OKAY.  YES, SIR.

19        THE COURT:  CALL YOUR NEXT WITNESS.

20        MR. CARLTON:  THE GOVERNMENT CALLS MANUEL CRETIN, YOUR

21   HONOR.

22        (WITNESS SUMMONED TO COURTROOM.)

23        THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

24

25        MANUEL CRETIN  + PLAINTIFF'S WITNESS, SWORN.

5-136

1

2          THE CLERK:  PLEASE BE SEATED.  PLEASE STATE STATE YOUR

3    FULL NAME FOR THE RECORD AND SPELL YOUR LAST NAME.

4          THE WITNESS:  (NO AUDIBLE RESPONSE.)

5          THE COURT:  STATE YOUR FULL NAME AND SPELL YOUR LAST

6    NAME.

7          THE WITNESS: MANUEL CRETIN.

8          THE COURT:  DOES THIS WITNESS REQUIRE AN INTERPRETER?

9          MR. CARLTON:  THAT'S A MATTER OF HIS CHOICE, YOUR

10   HONOR.  WE HAVE A INTERPRETER AVAILABLE SHOULD HE CHOOSE TO

11   UTILIZE HER.

12          THE COURT:  IF YOU HAVE ANY DIFFICULTY UNDERSTANDING

13   ANY OF THE QUESTIONS, THEN YOU MAY REQUEST THE USE OF AN

14   INTERPRETER.

15          OTHERWISE, IF YOU FEEL COMFORTABLE ANSWERING IN

16   ENGLISH, YOU MAY DO SO.

17          THE WITNESS:  I NEED AN INTERPRETER.

18          THE COURT:  YOU NEED AN INTERPRETER?

19          THE WITNESS:  YES, SIR.

20          THE COURT:  THE INTERPRETER IS HERE.

21          I'M GOING TO ASK YOU TO SPEAK UP, KEEP YOUR VOICE UP,

22   SO WE CAN HEAR YOU .

23          THE WITNESS:  (THROUGH INTERPRETER:)  OKAY.

24                    DIRECT EXAMINATION +

25   BY MR. CARLTON:

5-137

1    Q    MR. CRETIN, ARE YOU A MEXICAN CITIZEN?

2    A    YES.

3    Q    MR. CRETIN, WERE YOU CONVICTED OF NARCOTICS TRAFFICKING IN

4    SEPTEMBER OF 1985?

5    A    THAT IS CORRECT.

6    Q    AND WAS THAT PURSUANT TO A PLEA OR DID YOU GO TO TRIAL?

7    A    I PLED GUILTY.

8    Q    WHAT SENTENCE DID YOU RECEIVE?

9    A    SEVEN YEARS.

10   Q    DO YOU RECALL WHEN IT WAS THAT YOU RECEIVED THAT SENTENCE?

11   A    IT WAS SEPTEMBER 19TH OF 85.

12   Q    AT SOME POINT AFTER THAT, DID YOU DECIDE TO COOPERATE WITH

13   THE GOVERNMENT?

14   A    THAT IS CORRECT.

15   Q    AND AS PART OF THAT COOPERATION, DID YOU LATER TESTIFY AT

16   ANOTHER TRIAL?

17   A    YES.

18   Q    WERE YOU EVENTUALLY RELEASED FROM CUSTODY?

19   A    YES.

20   Q    WHEN DID THAT OCCUR?

21   A    I DON'T REMEMBER THE DATE EXACTLY.

22   Q    APPROXIMATELY?

23   A    87, I THINK.

24   Q    HAVE ANY PROMISES BE MADE TO YOU IN RETURN FOR YOUR

25   TESTIMONY HERE TODAY?

5-138

1    A    ABSOLUTELY NOTHING.

2    Q    WERE YOU ALSO CONVICTED OF A CRIME IN 1972?

3    A    THAT IS CORRECT.

4    Q    WHAT WAS THAT FOR?

5    A    IT WAS BECAUSE OF MARIJUANA.

6    Q    WHAT SENTENCE DID YOU RECEIVE?

7    A    IT WASN'T A SENTENCE.  IT WAS TIME SERVED.

8    Q    ALL RIGHT.  AND WERE YOU PLACED ON PROBATION AS A RESULT OF

9    THAT CONVICTION?

10    A    YES.

11    Q    WHAT PERIOD OF PROBATION?

12    A    THREE YEARS.

13    Q    AT SOME POINT AFTER YOUR 1972 CONVICTION, DID YOU RETURN TO

14    MEXICO?

15    A    YES, THAT'S CORRECT.

16    Q    AND DID YOU RESUME NARCOTICS TRAFFICKING AFTER YOU DID

17    THAT?

18    A    YES.

19    Q    DO YOU KNOW AN INDIVIDUAL NAMED VICTOR VIDAL?

20    A    YES.

21    Q    WHEN DID YOU FIRST MEET HIM?

22    A    IN TIJUANA, IN 76, I BELIEVE.

23    Q    DID YOU FORM A PARTNERSHIP WITH HIM?

24    A    YES.

25    Q    AND WHAT WAS THE PURPOSE OF THAT PARTNERSHIP?

5-139

1   A    WELL, TO WORK TOGETHER AND FIND CLIENTS FOR HIM.

2   Q    WHAT KIND OF CLIENTS WERE YOU LOOKING FOR?

3   A    BUYERS.

4   Q    OF?  (PAUSE.)  BUYERS OF WHAT?

5   A    MARIJUANA, AND SOME FOR COCAINE.

6        MR. STOLAR:  CAN WE ASK THE WITNESS TO SPEAK UP,

7   PLEASE?

8        THE COURT:  YES.  SPEAK UP.  DIRECT YOUR ANSWER TO

9   COUNSEL WHEN ANSWERING THE QUESTIONS.

10       THE WITNESS:  FINE.

11  BY MR. CARLTON:

12  Q    NOW, WHERE WOULD YOU AND VICTOR VIDAL OBTAIN THE MARIJUANA

13  AND COCAINE THAT WERE DISTRIBUTED.

14  A    WELL, IN THE YEAR 76, IT WAS IN A PART -- IN SOUTHERN

15  MEXICO.

16  Q    AND AT SOME POINT, DID YOU OBTAIN MARIJUANA FROM

17  GUADALAJARA?

18  A    THAT IS CORRECT.

19  Q    AND WHERE WOULD YOU DISTRIBUTE IT?

20  A    IN THE SAN DIEGO AREA.

21  Q    AND DURING WHAT PERIOD OF TIME DID YOU CONTINUE TO TRAFFIC

22  IN MARIJUANA WITH VICTOR VIDAL IN THIS FASHION?

23  A    FOR HOW LONG?

24  Q    YES.

25  A    FROM 76 TO 84, APPROXIMATELY.

5-140

1    Q    AT SOME POINT DURING THAT PERIOD, DID YOU MEET AN

2    INDIVIDUAL NAMED RENE VERDUGO?

3    A    THAT IS CORRECT.

4    Q    WHEN DID YOU FIRST MEET HIM?

5    A    APPROXIMATELY IN 78.

6    Q    AND DID YOU EVER COME TO DO SOME BUSINESS WITH RENE

7    VERDUGO?

8    A    YES, WE DID.

9    Q    WHEN DID THAT BEGIN?

10   A    APPROXIMATELY IN 81.

11   Q    WHERE WERE YOU LIVING IN 1981?

12   A    IN TIJUANA.

13   Q    DID YOU HAVE OCCASION THEN TO MEET WITH RENE VERDUGO IN LOS

14   ANGELES?

15   A    THAT IS CORRECT.

16   Q    WHAT WAS THE PURPOSE OF YOUR MEETING WITH VERDUGO IN LOS

17   ANGELES?

18   A    FOR THE PURPOSE OF SEEING SOME MERCHANDISE -- THAT IS TO

19   SAY, SOME MARIJUANA -- TO SEE IF WE COULD SELL IT.

20   Q    AND WERE YOU ABLE TO DO ANY BUSINESS WITH RENE VERDUGO AT

21   THAT TIME?

22   A    WE CAME TO AN AGREEMENT TO DO A DEAL, YES.

23   Q    AND DID YOU ACTUALLY DO A DEAL WITH RENE VERDUGO THEN?

24   A    YES, WE DID.

25   Q    AND WHAT WAS IT?

5-141

1    A    MARIJUANA.

2    Q    HOW MUCH MARIJUANA WAS INVOLVED?

3    A    THE FIRST ONE WAS APPROXIMATELY 80 TO 100 POUNDS.

4    Q    WHEN DID THAT OCCUR?

5    A    I DON'T REMEMBER REALLY WELL.  IT WAS APPROXIMATELY IN THE

6    YEAR -- IT WAS IN 81.

7         IT WAS IN 81.  EXCUSE ME.

8    Q    DID YOU DO ANY OTHER BUSINESS WITH RENE VERDUGO BETWEEN

9    THEN AND, SAY, NOVEMBER OF 1983?

10   A    YES.

11   Q    AND DID YOU HAVE A MEETING WITH RENE VERDUGO IN NOVEMBER OF

12   1983?

13   A    YES.  WE GOT TOGETHER.

14   Q    WHERE DID YOU GET TOGETHER?

15   A    IN EL CENTRO, CALIFORNIA.

16   Q    WHO ELSE PARTICIPATED IN THIS MEETING?

17   A    VICTOR VIDAL WAS THERE, RENE VERDUGO, HIS WIFE, AND I.

18   Q    WHERE DID THIS MEETING TAKE PLACE?

19   A    IT WAS AT THE GOLF CLUB.

20   Q    DID VICTOR VIDAL AND RENE VERDUGO LEAVE YOU AT SOME POINT

21   DURING THE MEETING?

22   A    YES, THAT IS CORRECT.

23   Q    WHAT DID THEY DO?

24   A    THEY WENT OUT TO CHAT ON THE GOLF GREEN.

25   Q    WHEN VICTOR VIDAL CAME BACK, DID HE GIVE YOU SOME

5-142

1    INSTRUCTIONS?

2    A    YES.   HE MENTIONED TO ME WHAT THEY HAD SPOKEN ABOUT.

3    Q    WHAT WAS THAT?

4    A    THEY HAD AGREED TO GO TO PICK UP ONE TON IN THE STATE OF

5    ARIZONA.

6    Q    WHEN YOU SAY "ONE TON," WHAT ARE YOU REFERRING TO?

7    A    2,000 POUNDS.

8    Q    OF WHAT?

9    A    MARIJUANA.

10   Q    AND WERE YOU SUPPOSED TO DO SOMETHING IN RELATION TO

11   PICKING UP THIS TON OF MARIJUANA?

12   A    ONLY TO COME UP WITH TRANSPORTATION.

13   Q    AND DID YOU ATTEMPT TO ARRANGE THAT TRANSPORTATION?

14   A    YES.   VIDAL AND I DID.

15   Q    WHAT DID YOU DO?

16   A    WE WENT AND SAW ALFREDO GALLEGOS.

17   Q    WHAT DID YOU GO TO SEE ALFREDO GALLEGOS FOR?

18   A    FOR THE PURPOSE OF -- HE HAD A PERSON WHO COULD DRIVE, WHO

19   COULD DRIVE THE TRUCK.

20   Q    DID YOU EVENTUALLY CONTACT THAT PERSON?   WAS HE CONTACTED?

21   A    THAT IS CORRECT.

22   Q    WHO WAS THIS OTHER INDIVIDUAL?

23   A    I THINK HIS NAME IS MARK.   MARK WITSCHGER

24   Q    I BELIEVE THAT'S W  I   T  S   C  H   G  E  R.

25        NOW, WAS MARK WITSCHGER THEN DIRECTED BY VIDAL TO PICK

5-143

1    UP THIS MARIJUANA?

2    A    THAT IS CORRECT.

3    Q    WHERE WAS HE SUPPOSED TO GO TO PICK IT UP?

4    A    TUCSON, ARIZONA.

5    Q    DID HE ACTUALLY GO TO DO THAT?

6    A    THAT IS CORRECT.

7         MR. STOLAR:  OBJECTION.  FOUNDATION.

8         THE COURT:  SUSTAINED.

9         MR. STOLAR:  THANK YOU.

10   BY MR. CARLTON:

11   Q    WHEN, MR. WITSCHGER GOT TO TUCSON, WHAT WAS HE SUPPOSED TO

12   DO?

13   A    TO DRIVE THE TRUCK COMING BACK, TO WAIT THERE FOR IT TO BE

14   LOADED, AND TO BRING IT.

15   Q    WAS HE SUPPOSED TO CONTACT SOMEONE IN ARIZONA?

16   A    NOT HE DIRECTLY.  HE WAS SUPPOSED TO GET IN TOUCH WITH US,

17   FOR US TO TELL VERDUGO THAT HE WAS THERE.

18   Q    NOW, DID YOU SEND ANYONE TO ARIZONA WITH MARK WITSCHGER?

19   A    YES.  TWO PEOPLE.

20   Q    WHO WERE THEY?

21   A    ADOLFO HOLGUIN -- NO, I'M SORRY.

22        ALFREDO GALLEGOS, AND FITO, THAT'S ALL.  ADOLFO

23   HERNANDEZ.

24   Q    NOW, DID YOU EVENTUALLY GO TO SEE SOME MARIJUANA AT MARK

25   WITSCHGER'S HOUSE?

1    A    YES.

2    Q    WHY DID YOU GO TO SEE MARIJUANA AT MARK WITSCHGER'S HOUSE?

3    A    WE WENT TO SEE IF IT HAD ARRIVED WELL AND IF THE LOAD WAS

4    COMPLETE.

5    Q    WAS THIS THE LOAD THAT HE WAS SUPPOSED TO HAVE PICKED UP IN

6    TUCSON?

7    A    CORRECT.

8    Q    WHERE WAS MARK WITSCHGER'S HOUSE?

9    A    IN THE AREA OF ESCONDIDO.  I THINK IT'S FALLBROOK.

10   Q    WHO DID YOU GO TO THE HOUSE WITH?

11   A    THERE WAS ADOLFO HERNANDEZ, ALFREDO GALLEGOS, VICTOR VIDAL,

12   AND I.

13   Q    AND WHERE WAS THE MARIJUANA KEPT AT THE HOUSE?

14   A    AT THE TIME, IT WAS IN A U-HAUL.

15   Q    DID YOU HAVE SOME DIFFICULTY IN OPENING THE U-HAUL TRUCK?

16   A    YES.  WE HAD TO USE A BLOWTORCH TO BREAK OPEN THE PADLOCK.

17   A    WHAT DID YOU SEE INSIDE?

18   A    2,000 POUNDS OF MARIJUANA.

19   Q    WAS IT PACKAGED IN SOME WAY?

20   A    YES.  IT WAS WRAPPED IN PLASTIC.

21   Q    DID YOU PAY MARK WITSCHGER FOR HIS SERVICES?

22   A    (NO AUDIBLE RESPONSE.)

23   Q    DID YOU PAY MARK WITSCHGER FOR HIS SERVICES?

24   A    THAT IS CORRECT.

25   Q    AND HOW MUCH DID YOU PAY HIM?

5-145

1   A   $20,000.00.

2   Q   DID YOU TAKE THE MARIJUANA?

3   A   YES.

4   Q   WHERE DID YOU TAKE IT TO?

5   A   ONE OF THE DRIVERS TOOK IT TO MARK WHEAT'S HOUSE.

6   Q   I BELIEVE IT'S W H E A T.

7       NOW, WERE YOU SELLING MARIJUANA TO MARK WHEAT?

8   A   YES.

9   Q   DID YOU SELL THE ENTIRE TON OF MARIJUANA TO HIM?

10  A   THAT IS CORRECT.

11  Q   HOW MUCH DID HE PAY YOU FOR THAT?

12  A   $850,000.00.

13  Q   DID YOU ACTUALLY RECEIVE THE MONEY FROM MARK WHEAT?

14  A   THE FIRST HALF, YES.

15  Q   AND WHAT DID YOU DO WITH IT?

16  A   THE MONEY WAS GIVEN TO VICTOR VIDAL, AND FROM THERE IT WAS

17  SENT OR GIVEN TO RENE VERDUGO.

18  Q   NOW, DID YOU ARRANGE ANY OTHER LOADS OF MARIJUANA TO BE

19  OBTAINED FROM ARIZONA?

20  A   THAT IS CORRECT.

21  Q   HOW MANY IN TOTAL?

22  A   THERE WAS SEVEN, TOTAL.

23  Q   DOES THAT INCLUDE THE FIRST ONE YOU'VE JUST DESCRIBED?

24  A   THAT IS CORRECT.

25  Q   WHEN DID THE NEXT LOAD ARRIVE?

5-146

1   A   THE FIRST LOAD WAS DURING THE FIRST WEEK OF JANUARY -- NO,

2   THE SECOND.  EXCUSE ME.

3   Q   AND DID YOU USE THE SAME METHOD OF HAVING THE MARIJUANA

4   TRANSPORTED TO CALIFORNIA FROM ARIZONA?

5   A   NO.  THIS TIME, A SEMI-TRAILER WAS USED.

6   Q   DID YOU USE A DIFFERENT DRIVER?

7   A   YES.

8   Q   AND WHERE WAS THE MARIJUANA -- OH.  I'M SORRY.

9       WHO WAS THE NEW DRIVER?

10  A   IT WAS JOHN HALL AND SOMEBODY CALLED LARRY.

11  Q   HOW BIG WAS THE SECOND LOAD?

12  A   THE SAME AMOUNT:  2,000 POUNDS.

13  Q   AND WHERE WAS THIS LOAD OF MARIJUANA TRANSPORTED TO?

14  A   TO ESCONDIDO.

15  Q   DID YOU SELL THIS LOAD, ALSO?

16  A   YES.

17  Q   TO WHOM DID YOU SELL THE SECOND LOAD?

18  A   TO THE SAME PERSON.

19  Q   THAT WAS MARK WHEAT?

20  A   THAT'S CORRECT.

21  Q   DID THAT OCCUR IN JANUARY OF 1984?

22  A   THAT IS CORRECT.

23  Q   YOU WERE INVOLVED IN -- BESIDES THESE FIRST TWO LOADS, IN

24  FIVE OTHER LOADS; CORRECT?

25  A   YES.

5-147

1 Q   AND DURING WHAT PERIOD OF TIME WERE THESE FIVE OTHER LOADS

2 ARRANGED?

3 A   EXCUSE ME.  CAN YOU ASK THAT AGAIN?

4 Q   YES.  WHEN WAS -- WELL, WHEN WAS THE LAST OF THESE SEVEN

5 LOADS?

6 A   I THINK IT WAS IN THE MONTH OF APRIL.

7 Q   WERE EACH OF THESE -- WHAT WAS THE SIZE OF EACH OF THESE

8 LOADS?

9 A   THE FIRST SIX WERE 2,000 POUNDS.  THE LAST ONE WAS 4,000

10 POUNDS.

11 Q   AND DID YOU USE THE SAME PROCEDURE IN BRINGING EACH OF

12 THESE LOADS INTO CALIFORNIA?

13 A   YES.  THE SAME SEMI-TRAILER.

14 Q   LET ME DRAW YOUR ATTENTION, THEN, TO THE 6TH LOAD THAT YOU

15 BROUGHT IN.  DO YOU RECALL WHEN THAT LOAD ARRIVED?

16 A   I THINK IT WAS TOWARD THE MIDDLE OF MARCH.

17 Q   WAS SOMETHING WRONG WITH THE MARIJUANA THAT WAS INVOLVED IN

18 THAT LOAD?

19 A   YES.  IT WAS MOLDY.

20 Q   AND HOW DID YOU LEARN ABOUT THAT?

21 A   BECAUSE THAT MARIJUANA WAS RETURNED.

22 Q   BY WHOM?

23 A   MARK WHEAT DID.

24 Q   AND WHERE WAS THE MOLDY MARIJUANA TAKEN TO?

25 A   IT WAS TAKEN TO MARK WITSCHGER'S HOUSE, IN THE END.

5-148

1   Q   DID YOU EVER GO TO INSPECT IT?

2   A   YES.

3   Q   AND WHAT DID YOU NOTICE ABOUT IT?

4   A   WELL, IT WAS MOLDY; IT WAS STINKING.

5   Q   DID YOU INFORM RENE VERDUGO OF THAT FACT?

6   A   YES.

7   Q   DID HE EVER COME TO INSPECT THAT MARIJUANA, THAT YOU KNOW

8   OF?

9   A   YES.

10  Q   DID YOU GO TO PICK RENE VERDUGO UP SO THAT HE COULD VIEW

11  THIS MARIJUANA?

12  A   THAT IS CORRECT.

13  Q   WHERE DID YOU GO TO PICK HIM UP?

14  A   WE AGREED TO MEET IN SAN DIEGO, BY THE LA PLAZA HOTEL.

15  Q   AND DID YOU IN FACT MEET RENE VERDUGO THERE?

16  A   YES.

17  Q   WAS ANYONE ELSE WITH HIM?

18  A   (IN SPANISH:)  SI.

19  Q   WAS ANYONE ELSE WITH HIM?

20        THE INTERPRETER:  WITH "HIM"?

21        MR. CARLTON:  WITH "HIM," RENE VERDUGO.

22  A   (THROUGH INTERPRETER:)  YES.

23  Q   WHO WAS WITH HIM?

24  A   MIGUEL CARO QUINTERO.

25  Q   AND WHO WAS MIGUEL CARO QUINTERO?

5-149

1   A   THE BROTHER OF RAFAEL CARO QUINTERO.

2   Q   AND AFTER YOU PICKED THEM UP, WHERE DID YOU GO?

3   A   WE WENT TO SEE THE MERCHANDISE, THE MARIJUANA, AT MARK

4   WITSCHGER'S HOUSE.

5   Q   AND DID YOU COME TO SOME SORT OF AGREEMENT WITH RENE

6   VERDUGO AT THAT POINT?

7   A   YES.

8   Q   WHAT DID YOU AGREE TO DO?

9   A   THAT THE MARIJUANA WAS GOING TO BE RETURNED IN THE END, BUT

10   HE ASKED ME TO HELP HIM CLEAN IT AND TO TRY SELL WHATEVER WAS

11   ALL RIGHT.

12   Q   AND YOU AGREED TO DO THAT?

13   A   YES.

14   Q   NOW, AFTER THAT VIEWING OF THE MARIJUANA AT MARK

15   WITSCHGER'S HOUSE, DID YOU TAKE MIGUEL CARO QUINTERO SOMEWHERE?

16   A   YES.  WE TOOK HIM BACK TO THE SAME PLACE WHERE WE HAD GONE

17   TO PICK HIM UP.

18   Q   WHEN YOU DROPPED HIM OFF, WAS HE MET BY SOMEONE?

19   A   YES.

20   Q   BY WHOM WAS HE MET?

21   A   TWO FEDERAL POLICEMEN.

22   Q   DID RENE VERDUGO ACCOMPANY YOU IN DROPPING MIGUEL CARO

23   QUINTERO OFF AT THAT LOCATION?

24   A   YES.

25   Q   AND AFTER YOU DROPPED OFF MIGUEL CARO QUINTERO, DID YOU

1    HAVE A CONVERSATION WITH RENE VERDUGO?

2    A   I THINK SO, YES.

3    Q   DID YOU DISCUSS PURCHASING MORE MARIJUANA FROM VERDUGO?

4    A   WE DID TALK ABOUT THE POSSIBILITY OF BUYING MORE, YES.

5          THE COURT:  WE'RE GOING TO TAKE OUR AFTERNOON RECESS

6    AT THIS TIME.  THE JURY MAY BE EXCUSED.

7          THE CLERK:  PLEASE RISE.

8          (JURY ABSENT:)

9          THE COURT:  MR. CARLTON --

10          MR. CARLTON:  YES, YOUR HONOR.

11          THE COURT:  PLEASE BE SEATED.

12          THE CLERK:  YOU MAY BE SEATED.

13          THE COURT:  -- WE'RE SPENDING A GREAT DEAL OF TIME

14    ELICITING DETAILS ABOUT TRANSACTIONS WHICH ESSENTIALLY DO NOT

15    APPEAR TO BE DISPUTED, SO I'M WONDERING WHY IT IS NECESSARY TO

16    GO INTO ALL THIS DETAIL.

17          MR. CARLTON:  I'M ALMOST FINISHED, YOUR HONOR.

18          THE COURT:  WELL, I SUGGEST, THOUGH, THAT YOU REVIEW

19    YOUR OTHER WITNESSES AND DETERMINE IF YOU WANT TO FOLLOW THAT

20    PROCEDURE IN THE FUTURE OR WHETHER YOU NEED THE WITNESSES AT

21    ALL.

22          I DIDN'T SEE ANY REASON TO HAVE THAT CHEMIST FROM

23    ARIZONA IN HERE TODAY.

24          MR. MEDRANO:  WELL, YOUR HONOR, DEFENSE COUNSEL

25    REFUSED TO SIGN THE STIPULATION ON THAT POINT.  WE WERE

5-151

1    PREPARED TO GO WITH THAT.

2           THE COURT:  I STILL DON'T THINK YOU NEED IT.

3           SO LET'S REVIEW THE WITNESS LIST TO DETERMINE IF YOU

4    NEED ALL THESE WITNESSES AND, HAVING DONE THAT, DETERMINE HOW

5    MUCH YOU WANT TO ELICIT FROM ALL THESE WITNESSES.

6           I SUGGEST THAT IF YOU'RE SIMPLY ELICITING EVIDENCE OF

7    TRANSACTIONS THAT DON'T SEEM TO BE DISPUTED, IT'S NOT NECESSARY

8    TO HAVE ALL THIS DETAIL.

9           MR. CARLTON:  VERY GOOD, YOUR HONOR.

10          DO YOU WANT TAKE SOMETHING UP WITH THE COURT?

11          MR. NICOLAYSEN:  YOUR HONOR, IS THERE A STATUS REPORT

12   REGARDING THAT JUROR THAT HAD ORIGINALLY ASKED THE COURT TO BE

13   RELIEVED?

14          THE COURT:  YES.  HE'S ON.  INDEED, HIS EMPLOYERS HAVE

15   AGREED TO ALLOW HIM TO SERVE, TO CONTINUE AS A JUROR.

16          MR. STOLAR:  IS THAT JUST THE MAGIC THAT YOU HAVE --

17          MR. MEZA:  I WOULD LIKE TO LODGE AN OBJECTION TO THE

18   GOVERNMENT INFORMANTS COMING TO THE TRIAL BEING ESCORTED IN BY

19   APPARENT BODYGUARDS OF THEIR OWN.  UNLESS THERE'S SOME PROBLEM

20   WE KNOW ABOUT, I WOULD OBJECT TO THEM BEING ESCORTED IN IN

21   FRONT OF THE JURY.

22          THE COURT:  THE OBJECTION IS OVERRULED.

23          THE CLERK:  PLEASE RISE.  THIS COURT IS NOW IN RECESS.

24          (BRIEF RECESS.)

25

5-152

1          (JURY PRESENT.)

2          THE COURT:   DO YOU HAVE SOME FURTHER QUESTIONS FOR

3   THIS WITNESS?

4          MR. CARLTON:   JUST A FEW, YOUR HONOR.

5   BY MR. CARLTON:

6   Q.   MR. CRETIN, I BELIEVE WHEN WE LEFT OFF, YOU WERE

7   DESCRIBING A CONVERSATION YOU HAD WITH RENE VERDUGO AFTER

8   DROPPING RAFAEL CARO QUINTERO OFF.

9          DID MR. VERDUGO INDICATE WHETHER HE WOULD HAVE ANY

10  DIFFICULTY SUPPLYING YOU WITH ANY ADDITIONAL MARIJUANA?

11  A.   YES.

12  Q.   DID HE SAY HE WOULD HAVE DIFFICULTY OR WOULD NOT HAVE

13  DIFFICULTY?

14  A.   NO.   THAT THERE WOULD BE NO DIFFICULTY, BUT THAT FIRST,

15  THE OTHER MERCHANDISE WOULD HAVE TO BE SOLD, THE OTHER

16  MARIJUANA.

17  Q.   AND DID RENE VERDUGO TELL YOU WHO HIS SOURCE OF SUPPLY FOR

18  THE MARIJUANA WAS?

19  A.   YES.

20  Q.   WHO WAS THAT?

21          MS. KELLY:   OBJECTION, YOUR HONOR, HEARSAY.

22          THE COURT:   THE OBJECTION IS OVERRULED.

23          THE WITNESS:   IT WAS RAFAEL CARO QUINTERO.

24  BY MR. CARLTON:

25  Q.   NOW, MR. CRETIN, YOU WERE EVENTUALLY ARRESTED; WERE YOU

5-153

1   NOT?

2   A.   YES.

3   Q.   AND WHAT WAS THAT IN RELATION TO?

4   A.   CONSPIRACY.

5   Q.   DID THAT HAVE TO DO WITH ANY OF THE MARIJUANA THAT WAS

6   BROUGHT IN FROM TUCSON?

7   A.   THAT'S CORRECT.

8   Q.   AND WHAT MARIJUANA WAS THAT?

9   A.   THAT BELONGING TO RENE VERDUGO.

10  Q.   WAS IT THE MARIJUANA AT MARK WITSCHGER'S HOUSE?

11  A.   YES, EXACTLY.

12          MR. CARLTON:   NOTHING FURTHER, YOUR HONOR.

13          THE COURT:  CROSS EXAMINE.

14

15                  CROSS-EXAMINATION +

16  BY MR. STOLAR:

17  Q.   GOOD AFTERNOON, SIR.

18  A.   GOOD AFTERNOON.

19  Q.   DO YOU KNOW A GENTLEMAN BY THE NAME OF -- OR DID YOU KNOW

20  A GENTLEMAN BY THE NAME OF GOMEZ BARAJAS?

21  A.   WHAT IS HIS FIRST NAME?

22  Q.   I DON'T KNOW.  WAS HE A SUPPLIER OF MARIJUANA?

23  A.   IF YOU'RE REFERRING TO JUVENAL GOMEZ BARAJAS, YES.

24  Q.   YOU USED HIM AS A SOURCE OF SUPPLY IN 1984?

25  A.   NOT I, EXACTLY, BUT THROUGH VICTOR VIDAL.

5-154

1   Q.   SO HE SUPPLIED VICTOR VIDAL WITH MARIJUANA, WHICH YOU AND

2   VICTOR THEN SOLD?

3   A.   THAT IS CORRECT.

4   Q.   ALSO, I BELIEVE YOU INDICATED THAT YOU SOLD A TON OF

5   MARIJUANA FOR $850,000; IS THAT RIGHT?

6   A.   YES, IT IS.

7   Q.   HOW MUCH DID YOU PAY FOR THAT?

8   A.   WELL, EXACTLY -- VICTOR WAS THE ONE WHO DEALT DIRECTLY

9   WITH VERDUGO.

10  Q.   DO YOU KNOW HOW MUCH VICTOR PAID VERDUGO FOR IT?

11  A.   HE WAS SUPPOSED TO PAY 450 PER POUND, BUT HE SOLD IT FOR

12  425 A POUND.

13  Q.   HE LOST MONEY AT IT?

14  A.   VICTOR, YES.

15  Q.   VICTOR WAS YOUR PARTNER?

16  A.   THAT IS CORRECT.

17  Q.   HOW LONG DID HE STAY YOUR PARTNER?

18  A.   WELL, THE FIRST TIME -- WELL, THE SALES CONTINUED, BUT WE

19  DIDN'T FIND THAT OUT UNTIL THE LAST TRIP, THE AMOUNT THAT HE

20  WAS PAYING.

21  Q.   SO YOU LOST MONEY ON ALL OF THESE TRANSACTIONS?

22  A.   NOT EXACTLY.  WELL, WE WOULD SELL IT FOR MORE, AND HE WAS

23  WORKING SORT OF ON CREDIT WITH VERDUGO.

24  Q.   HOW MUCH MONEY WOULD YOU ESTIMATE YOU AND VICTOR VIDAL

25  MADE IN YOUR PARTNERSHIP?

5-155

1    A.    APPROXIMATELY SOME $250,000.

2    Q.    OVER THE COURSE OF ALL THE TIME YOU WERE DEALING

3    MARIJUANA?

4    A.    YES.

5    Q.    AND IS THAT YOUR SHARE OR WAS THAT THE PARTNERSHIP SHARE?

6    A.    THE PART BELONGING TO THE PARTNERSHIP.

7    Q.    SO HALF OF IT BELONGED TO YOU THEN?

8    A.    THAT IS CORRECT.

9    Q.    AND WHEN YOU AGREED TO COOPERATE WITH THE GOVERNMENT, DID

10   YOU AGREE TO MAKE GOOD ON YOUR BACK TAXES OWED ON THAT MONEY?

11   A.    THE QUESTION AGAIN, PLEASE?

12   Q.    DID YOU AGREE WITH THE GOVERNMENT TO PAY TAXES THAT YOU

13   MIGHT OWE ON THE MONEY THAT YOU MADE FROM DEALING MARIJUANA?

14   A.    THERE NEVER WAS AN AGREEMENT; NEITHER YES NOR NO.

15   Q.    HAVE YOU BEEN ASKED TO PAY YOUR TAXES ON YOUR PROFITS?

16   A.    NO.

17   Q.    NOW, THERE DID COME A TIME, DID THERE NOT, IN JULY OF 1987

18   WHERE YOU ENTERED THE WITNESS SECURITY PROGRAM; ISN'T THAT

19   RIGHT?

20   A.    THAT IS CORRECT.

21   Q.    WITH YOUR FAMILY, A TOTAL OF FIVE PEOPLE; IS THAT RIGHT?

22   A.    6.

23   Q.    6 PEOPLE?

24   A.    YES.

25   Q.    INCLUDING YOU?

5-156

1    A.   THAT IS CORRECT.

2    Q.   AND THE GOVERNMENT HAS BEEN PAYING FOR SUBSISTANCE,

3    HOUSING, MEDICAL CARE?

4    A.   THAT IS CORRECT.

5    Q.   TRAVEL?

6    A.   YES.

7    Q.   RELOCATION?

8    A.   CORRECT.

9    Q.   MOVING EXPENSES?

10   A.   THAT IS CORRECT.

11   Q.   AND OVER THE COURSE OF TIME FROM -- AND YOU'RE STILL IN

12   THE WITNESS PROGRAM; IS THAT RIGHT?

13   A.   THAT'S CORRECT.

14   Q.   IS IT FAIR TO SAY THE GOVERNMENT HAS LAID OUT BETWEEN JULY

15   OF '87 AND THE END OF MAY THE 21ST OF THIS YEAR, $202,719 IN

16   EXPENSE MONEY?

17   A.   I HAVEN'T FIGURED IT OUT, BUT IF THAT'S WHAT IT IS, I

18   THINK SO.

19   Q.   NONE OF YOUR TESTIMONY HAS ANYTHING TO DO WITH MR. MATTA

20   BALLESTEROS; DOES IT?

21   A.   ABSOLUTELY NOT.

22          MR. STOLAR:  THANK YOU, SIR.

23          THE COURT:  ANY FURTHER QUESTIONS FOR THIS WITNESS?

24          MS. KELLY:  NO, YOUR HONOR.

25          MR. NICOLAYSEN:  NOTHING YOUR HONOR,

1          THE COURT:  ANY REDIRECT?

2          MR. CARLTON:  JUST A FEW, YOUR HONOR.

3

4              FURTHER REDIRECT EXAMINATION +

5  BY MR. CARLTON:

6  Q.   MR. CRETIN, FOR YOUR PARTICIPATION IN THE WITNESS SECURITY

7  PROGRAM, DO YOU RECEIVE A MONTHLY AMOUNT OF MONEY?

8  A.   YES.

9  Q.   HOW MUCH IS THAT?

10  A.   APPROXIMATELY $1600.

11  Q.   FROM THAT AMOUNT DO YOU PAY ALL OF THE EXPENSES OF YOUR

12  FAMILY OF SIX?

13  A.   YES, WITHOUT INCLUDING MEDICAL.

14  Q.   NOW, WHEN YOU HAVE BEEN REIMBURSED FOR TRAVEL EXPENSES, IS

15  THAT TRAVEL IN RELATION TO MAKING COURT APPEARANCES?

16  A.   NO, THAT'S APART.  THAT'S ASIDE FROM IT.

17  Q.   WHEN YOU REFER TO TRAVEL EXPENSE, WHEN YOU'RE REIMBURSED

18  FOR THAT, WHAT TRAVELING IS REFERRED TO?

19  A.   EXCUSE ME, I MISUNDERSTOOD.  THEY ARE THE ONES WHO PAY FOR

20  MY TRIPS.

21  Q.   TO COURT, CORRECT?  TO THE COURT?

22  A.   THAT IS CORRECT.

23  Q.   NOW, YOU'VE HAD TO CHANGE THE LOCATION OF YOUR RESIDENCE;

24  IS THAT CORRECT?

25  A.   YES.

5-158

1   Q.   WHY DID YOU DO THAT?

2        MR. STOLAR:  OBJECTION TO THE QUESTION.

3        THE COURT:  SUSTAINED.

4        MR. CARLTON:  NOTHING FURTHER, YOUR HONOR.

5        THE COURT:  ALL RIGHT.

6

7                  FURTHER RECROSS-EXAMINATION +

8   BY MR. STOLAR:

9   Q.   THE MEDICAL EXPENSES THAT YOU HAD COME TO ALMOST $15,000

10  OVER THE PAST COUPLE OF YEARS; ISN'T THAT RIGHT?

11  A.   I DON'T KNOW.

12  Q.   IS THERE ANY REASON TO DOUBT THAT FIGURE?

13       DOES IT SOUND ACCURATE?

14  A.   I'VE NEVER REALLY THOUGHT ABOUT IT.  I HAVE NOT BEEN

15  INTERESTED.

16  Q.   BECAUSE THE GOVERNMENT PAYS IT DIRECTLY TO WHATEVER

17  MEDICAL CARE OR PRESCRIPTION DRUGS YOU NEED; IS THAT RIGHT?

18  A.   THAT IS CORRECT.

19  Q.   ALL RIGHT.  WHEN YOU MOVE, WHEN YOU HAVE MOVING EXPENSES,

20  DOES THAT COME OUT OF YOUR $1600 SUBSIDY?

21  A.   YOU MEAN MOVING, AS IS IN MOVING THE HOUSEHOLD?

22  Q.   YES.

23  A.   WELL, WHEN I MOVE, IT'S BECAUSE THEY WANT ME TO MOVE.

24  Q.   AND THEY PAY FOR THE EXPENSES?

25  A.   YES.

Case 2:87-cr-00422-JAK   Document 3136   Filed 09/25/90   Page 159 of 189   Page ID #:23415/

Q.   ALSO, THEY ALSO PROVIDE DOCUMENTS FOR YOU AND YOUR FAMILY; DON'T THEY?

A.   THAT IS CORRECT.

Q.   THAT IS, THEY GIVE YOU EACH A DIFFERENT IDENTITY THAN YOUR TRUE IDENTITY AND DOCUMENTATION TO BACK THAT UP?

A.   THAT'S CORRECT.

Q.   AND THAT ALSO IS PAID FOR DIRECTLY BY THE GOVERNMENT; ISN'T THAT RIGHT?

A.   I IMAGINE SO.

Q.   BECAUSE YOU NEVER PAY FOR IT, RIGHT?

A.   NOPE.

          MR. STOLAR:   OKAY.  THANK YOU, SIR.

          THE COURT:  YOU MAY STEP DOWN.

          (WITNESS EXCUSED.)

          MR. CARLTON:  YOUR HONOR, THE GOVERNMENT CALLS CESARIO GARCIA BUENO.

          (WITNESS SUMMONED TO THE COURTROOM.)


   CESARIO GARCIA BUENO MONCAYO + PLAINTIFFS WITNESS, SWORN


          THE CLERK:  PLEASE STATE YOUR FULL NAME FOR THE RECORD.

          THE WITNESS:  (TESTIFYING THROUGH INTERPRETER) CESARIO GARCIA BUENO MONCAYO.

          THE CLERK:  AND SPELL YOUR LAST NAME.

5-160

1          THE WITNESS:  (WITHOUT INTERPRETER) G A R C I A,

2    B U E N O.

3    BY MR. CARLTON:

4    Q.   GOOD AFTERNOON, MR. GARCIA BUENO.

5          MR. GARCIA BUENO, ARE YOU A CITIZEN OF MEXICO?

6    A.   (WITHOUT INTERPRETER) YES.

7          THE COURT:  ARE YOU ABLE TO UNDERSTAND -- TO SPEAK

8    AND UNDERSTAND ENGLISH?

9          THE WITNESS:  (WITHOUT INTERPRETER) I UNDERSTAND

10   ENGLISH, BUT I WOULD RATHER SPEAK IN SPANISH.

11          THE COURT:  YOU WOULD PREFER TO HAVE AN INTERPRETER.

12          THE WITNESS:  (WITHOUT INTERPRETER) OKAY.

13          THE COURT:  THEN YOU MUST LET THE INTERPRETER ANSWER

14   FOR YOU.  YOU ANSWER IN SPANISH.

15          THE WITNESS:  (THROUGH INTERPRETER) I SEE.  OKAY.

16

17                     DIRECT EXAMINATION +

18   BY MR. CARLTON:

19   Q.   MR. GARCIA BUENO, WHAT IS YOUR PROFESSION?

20   A.   I'M AN ATTORNEY.

21   Q.   AND ARE YOU LICENSED AS AN ATTORNEY IN MEXICO?

22   A.   YES, SIR.

23   Q.   WHEN DID YOU BEGIN TO PRACTICE AS AN ATTORNEY IN MEXICO?

24   A.   IN 1969, WHILE I WAS STILL A STUDENT, AND IN 1972, ONCE I

25   OBTAINED MY LICENSE.

5-161

1    Q.    WHERE DID YOU STUDY LAW, MR. GARCIA BUENO?

2    A.    IN GUADALAJARA AND MORELIA, MICHOACAN.

3    Q.    AND WHEN YOU BEGAN TO PRACTICE LAW, WHERE WAS THAT?

4    A.    IN GUADALAJARA, JALISCO.

5    Q.    DID YOU OPEN AN OFFICE IN GUADALAJARA?

6    A.    YES, SIR.

7    Q.    WHEN DID YOU DO THAT?

8    A.    IN 1971.

9    Q.    HOW LONG DID YOU MAINTAIN THAT OFFICE?

10   A.    TEN YEARS.

11   Q.    AT SOME POINT DID YOU OPEN ANOTHER OFFICE IN ANOTHER CITY?

12   A.    YES.  I OPENED ONE IN MORELIA, AND I HAD ONE IN

13   GUADALAJARA AND ONE IN MORELIA.

14   Q.    NOW, HOW FAR FROM GUADALAJARA IS MORELIA?

15   A.    APPROXIMATELY 200 KILOMETERS.

16   Q.    DID YOU HAVE OTHER PERSONS WORKING FOR YOU IN THIS LAW

17   OFFICE?

18   A.    YES, SIR.

19   Q.    HOW MANY?

20   A.    THERE WERE FOUR WORKING IN GUADALAJARA, AND NINE IN

21   MORELIA.

22   Q.    WHAT KIND OF LAW DID YOU PRACTICE?

23   A.    EVERY KIND OF LAW, BUT I SPECIALIZE MOSTLY IN CRIMINAL

24   LAW.

25   Q.    HOW LONG DID YOU CONTINUE TO PRACTICE AS A LAWYER?

5-162

1   A.   UNTIL 1984.

2   Q.   AT SOME POINT DURING THAT TIME, DID YOU BEGIN PROVIDING

3   INFORMATION OR ASSISTANCE TO THE DRUG ENFORCEMENT

4   ADMINISTRATION?

5   A.   YES, I WAS ASKED TO DO SOME SPECIAL INVESTIGATIVE WORK --

6   OR I WAS ASKED FOR SOME DOCUMENTS.

7   Q.   WHEN DID YOU FIRST PROVIDE SOME ASSISTANCE TO THE D.E.A.?

8   A.   IN 1978, '79.

9   Q.   AND HOW DID THIS COME TO HAPPEN?

10  A.   AN AGENT BY THE NAME OF ANDRES AMADOR ASKED ME TO FIND

11  SOME PEOPLE FOR HIM WHO COULD HELP HIM WITH HIS WORK IN

12  MICHOACAN.

13  Q.   HE WAS A D.E.A. AGENT?

14  A.   YES, SIR.

15  Q.   AND DID YOU PROVIDE THAT INFORMATION TO MR. AMADOR?

16  A.   YES, I PUT HIM IN TOUCH WITH SOME PEOPLE.

17  Q.   WERE YOU PAID FOR THE HELP THAT YOU GAVE TO HIM?

18  A.   NO, SIR.

19  Q.   DID YOU PROVIDE ANY OTHER ASSISTANCE TO AGENT AMADOR AFTER

20  THAT FIRST OCCASION?

21  A.   NO, I JUST -- I WAS JUST THERE IN CASE HE WOULD ASK ME FOR

22  SOME HELP OR SOMETHING.

23       WE BECAME FRIENDLY.  WE WERE LIKE FRIENDS.

24  Q.   AT SOME POINT DID YOU BEGIN TO DO WORK WITH AGENT AMADOR

25  ON AN INVESTIGATION OF A PARTICULAR INDIVIDUAL?

5-163

1   A.   YES.   IN MY HOUSE IN GUADALAJARA, SOMEBODY MOVED IN ACROSS

2   THE STREET FROM MY HOUSE AND AMADOR WAS INTERESTED IN FINDING

3   OUT ABOUT THAT PERSON.

4   Q.   WHAT WAS THAT PERSON'S NAME?

5   A.   JUVENAL GOMEZ BARAJAS.

6   Q.   NOW, AT SOME POINT, DID AGENT AMADOR LEAVE THE OFFICE OF

7   THE D.E.A. IN MEXICO?

8   A.   YES.

9   Q.   AT THE TIME YOU WERE WORKING WITH HIM, WAS HE WORKING OUT

10  OF THE GUADALAJARA OFFICE OF THE D.E.A.?

11  A.   YES.

12  Q.   AND DID AGENT AMADOR INTRODUCE YOU TO HIS REPLACEMENT?

13  A.   YES, SIR.

14  Q.   WHO WAS THAT?

15  A.   ENRIQUE CAMARENA.

16  Q.   WHEN DID -- WHEN WERE YOU INTRODUCED TO AGENT CAMARENA?

17  A.   IN 1979.

18  Q.   AND THEREAFTER, DID YOU PROVIDE ASSISTANCE AND INFORMATION

19  TO AGENT CAMARENA?

20  A.   ONLY ON SOME OCCASIONS.   WE BECAME FRIENDS AND WE SAW EACH

21  OTHER FREQUENTLY UNTIL I CAME ON VACATION TO SAN DIEGO AND I

22  FOUND SOME PEOPLE THAT HE WAS INTERESTED IN.

23  Q.   NOW, UP TO THAT POINT, MR. GARCIA BUENO, WERE YOU EVER

24  COMPENSATED FOR THE HELP YOU PROVIDED TO THE D.E.A.?

25  A.   NO.   I ONLY STARTED TO RECEIVE IT ONCE I NEEDED TO USE MY

5-164

1    PROFESSION AS AN ATTORNEY TO DO CERTAIN THINGS.

2    Q.   NOW, DID YOU CONTINUE THE INVESTIGATION OF JUVENAL GOMEZ

3    BARAJAS WITH AGENT CAMARENA?

4    A.   YES.  AT ONE POINT THAT INVESTIGATION WAS TERMINATED

5    BECAUSE ANOTHER INVESTIGATION, AS FAR AS ANOTHER PERSON, WAS

6    BEGUN.

7    Q.   WHAT WAS THE OTHER INVESTIGATION?  WHO WAS THE TARGET OF

8    THAT?

9    A.   JUAN JOSE QUINTERO PAYAN.

10   Q.   HOW DID YOU BECOME INVOLVED IN THE INVESTIGATION OF JUAN

11   JOSE QUINTERO PAYAN?

12   A.   I WAS ASKED FOR A SPECIFIC JOB.  I WAS ASKED TO FIND OUT

13   ABOUT THE PROPERTIES OF THIS PERSON.

14   Q.   WHO ASKED YOU TO DO THAT?

15   A.   I WAS FIRST CALLED FROM THE GUADALAJARA OFFICE, AND LATER

16   I WAS CALLED FROM SAN ANTONIO, TEXAS.

17   Q.   WHEN DID YOU FIRST BECOME INVOLVED IN THIS INVESTIGATION

18   OF JUAN JOSE QUINTERO PAYAN?

19   A.   FIRST IN 1981.  AND LATER ON WHEN SOME BANK ACCOUNTS WERE

20   FOUND, THAT WAS IN 1983 AND '84.

21   Q.   NOW, IN ALL OF THIS INVESTIGATION OF JUAN JOSE QUINTERO

22   PAYAN, WERE YOU WORKING WITH AGENT CAMARENA?

23   A.   YES.

24   Q.   AT SOME POINT DID YOU BEGIN TO RECEIVE MONEY FROM THE

25   D.E.A. IN RETURN FOR THE HELP THAT YOU PROVIDED?

5-165

1   A.   YES.  I WAS GIVEN MONEY FOR MY TRIPS, FOR THE HOTELS, AND

2   FOR THE TIME I SPENT.

3   Q.   DO YOU RECALL WHEN THAT FIRST HAPPENED?

4   A.   IT MAY HAVE BEEN IN 1982.

5   Q.   AT SOME POINT, ALSO, DID YOUR FAMILY MOVE TO THE SAN DIEGO

6   AREA?

7   A.   NO.  MY PARENTS LIVED HERE BEFORE THAT.  IN 1980 I BROUGHT

8   MY CHILDREN TO GO TO SCHOOL IN SAN DIEGO.

9   Q.   AND DID YOU CONTINUE TO MAINTAIN YOUR LAW PRACTICE IN

10  MEXICO?

11  A.   YES, SIR.

12  Q.   NOW, MOVING TO EARLY 1984, DID YOU OBTAIN SOME INFORMATION

13  ABOUT JUAN JOSE QUINTERO PAYAN?

14  A.   YES.  ENRIQUE CAMARENA CALLED ME AND HE SAID THAT THERE

15  WAS AN ARREST WARRANT OUT FOR JUAN JOSE QUINTERO PAYAN, AND HE

16  ASKED ME WHETHER I COULD FIND HIM.

17  Q.   FIND WHO?

18  A.   JUAN JOSE QUINTERO PAYAN.

19  Q.   DID HE ASK TO YOU FIND HIS ADDRESS?

20  A.   NO, NOT JUST HIS ADDRESS, BUT WHETHER I COULD FIND OUT THE

21  DAY WHEN HE WAS GOING TO BE AT THAT ADDRESS.

22  Q.   AND WERE YOU ABLE TO OBTAIN THAT INFORMATION?

23  A.   YES, SIR.

24  Q.   DID YOU PROVIDE IT TO AGENT CAMARENA?

25  A.   YES, SIR.

1    Q.   AND WHAT WAS THE PURPOSE OF YOUR OBTAINING THIS

2    INFORMATION?

3    A.   FOR THE ARREST WARRANT TO BE EXECUTED AGAINST HIM.

4    Q.   WAS THAT ARREST WARRANT EXECUTED?

5    A.   YES, IT HAPPENED THE SAME DAY WHEN I CALLED ENRIQUE

6    CAMARENA.

7    Q.   DRAWING YOUR ATTENTION TO APRIL OF 1984, WERE YOU ASKED TO

8    COME TO GUADALAJARA AT THAT TIME?

9    A.   YES, SIR.

10   Q.   WHO ASKED YOU TO DO THAT?

11   A.   ENRIQUE CAMARENA AND JAIME KUYKENDALL.

12   Q.   FOR WHAT PURPOSE?

13   A.   TO GO WITH THEM TO SAN ANTONIO, TO SPEAK WITH THE AGENTS

14   OF THE D.E.A. AND THE I.R.S.

15   Q.   WAS THIS IN RELATION TO A PARTICULAR INVESTIGATION?

16   A.   YES.   THE MONEY THAT HAD BEEN FOUND IN JUAN JOSE

17   QUINTERO'S ACCOUNT.

18   Q.   WHAT MONEY WAS THAT?

19   A.   IT WAS SOME MONEY THAT THE AMERICAN GOVERNMENT TOOK AWAY

20   FROM JUAN JOSE QUINTERO.

21   Q.   NOW, DID YOU, IN FACT, GO TO MEET WITH AGENT CAMARENA AT

22   THAT TIME?

23   A.   YES.

24   Q.   WHERE DID YOU MEET WITH HIM?

25   A.   IN GUADALAJARA.

5-167

1    Q.    AND DID AGENT CAMARENA ASK YOU FOR SOME ASSISTANCE IN

2    RELATION TO THE INVESTIGATION OF JUAN JOSE QUINTERO PAYAN?

3    A.    HE ASKED ME TO GO TO SAN ANTONIO.  AND IN SAN ANTONIO, THE

4    AGENTS ASKED ME TO DO A SPECIFIC JOB.

5    Q.    WHAT SPECIFIC JOB WERE YOU ASKED TO DO?

6    A.    TO OBTAIN BIRTH AND MARRIAGE CERTIFICATES OF SOME PEOPLE.

7    AND TO FIND OUT ALL THE PROPERTIES IN THE NAME OF THE QUINTERO

8    PAYAN FAMILY.

9    Q.    NOW, WHOSE BIRTH CERTIFICATES AND MARRIAGE CERTIFICATES

10   WERE YOU ASKED TO --

11          THE INTERPRETER:  EXCUSE ME, COUNSEL, MAY I CHECK

12   WITH THE WITNESS?  I MAY HAVE MISHEARD.

13          (DISCUSSION BETWEEN THE INTERPRETER AND THE WITNESS.)

14          THE INTERPRETER:  THE LAST ANSWER WAS CORRECTLY

15   TRANSLATED.

16   BY MR. CARLTON:

17   Q.    WHOSE BIRTH CERTIFICATES AND MARRIAGE CERTIFICATES WERE

18   YOU ASKED TO OBTAIN?

19   A.    FOR JUAN JOSE QUINTERO, EMILIO QUINTERO, THE WIVES,

20   ERNESTO FONSECA CARRILLO, RAFAEL CARO QUINTERO, AND SOME OTHER

21   MEMBERS OF THE QUINTERO FAMILY.

22   Q.    WERE JUAN JOSE AND EMILIO QUINTERO PAYAN RELATED IN SOME

23   WAY TO RAFAEL CARO QUINTERO?

24          MR. MEZA:  OBJECTION, YOUR HONOR. FOUNDATION.

25          THE COURT:  SUSTAINED.

1    BY MR. CARLTON:

2    Q.    DID YOU KNOW JUAN JOSE QUINTERO PAYAN?

3    A.    YES, SIR.

4    Q.    AND EMILIO QUINTERO PAYAN?

5    A.    YES, SIR.

6    Q.    DID THEY EVER INFORM YOU WHETHER THEY WERE RELATED IN SOME

7    WAY TO RAFAEL CARO QUINTERO?

8    A.    NOT THEY EXACTLY, BUT SOME OF THEIR FAMILY MEMBERS.

9           MR. MEZA:   OBJECTION, YOUR HONOR, AND MOVE TO STRIKE

10   EVERYTHING AFTER "NOT THEY EXACTLY" AS NONRESPONSIVE AND

11   HEARSAY.

12          THE COURT:   OVERRULED.

13   BY MR. CARLTON:

14   Q.    WERE YOU, IN FACT, ABLE TO OBTAIN THE BIRTH CERTIFICATES

15   AND MARRIAGE CERTIFICATES THAT YOU WERE ASKED TO OBTAIN?

16   A.    YES, SIR.

17   Q.    NOW, IS THAT SOMETHING THAT ONLY -- IN MEXICO -- THAT ONLY

18   A LAWYER CAN DO?

19   A.    NO, SIR.

20   A.    ANYBODY CAN, BUT YOU HAVE TO HAVE SOME KNOWLEDGE?

21   A.    IN ORDER TO DO IT IN A WAY THAT WHERE IT IS NOT

22   APPARENT -- WHERE IT IS NOT VERY NOTICEABLE THAT IT IS BEING

23   DONE.

24   Q.    NOW, DID YOU PROVIDE THESE BIRTH CERTIFICATES AND MARRIAGE

25   CERTIFICATES THEN TO SOMEONE AT THE D.E.A.?

5-169

1    A.   YES, SIR.

2    Q.   WHO WAS THAT?

3    A.   TO ENRIQUE CAMARENA.

4    Q.   DID AGENT CAMARENA EVER ASK YOU IF YOU COULD HELP HIM

5    OBTAIN SOME TELEPHONE TOLLS?

6    A.   YES, SIR.

7    Q.   WHEN WAS THAT?

8    A.   IN APRIL OR MAY OF '84.

9    Q.   WHOSE TELEPHONE TOLLS DID HE ASK YOU FOR HELP IN

10   OBTAINING?

11          THE COURT:   JUST A MOMENT.

12   BY MR. CARLTON:

13   Q.   WHOSE TELEPHONE TOLLS DID HE ASK YOU FOR HELP IN

14   OBTAINING?

15   A.   SOME THE PHONES BEING USED BY FONSECA, CARO QUINTERO, AND

16   SOME TELEPHONES THAT WERE IN THE NAMES OF OTHER PEOPLE BUT THAT

17   WERE BEING USED BY THEM.

18   Q.   WERE YOU ABLE TO PROVIDE SOME ASSISTANCE TO AGENT CAMARENA

19   IN THAT REGARD?

20   A.   YES.  I PUT HIM IN TOUCH WITH THE MANAGER OF TELEPHONES IN

21   MEXICO.

22   Q.   NOW, DID YOU ALSO TAKE AGENT CAMARENA TO SEE SOME HOUSES?

23   A.   YES, I SHOWED HIM SOME ADDRESSES.

24   Q.   AND WHAT ADDRESSES DID SHOW TO HIM?

25   A.   THE NEW HOUSES THAT JUAN JOSE QUINTERO HAD MOVED TO,

5-170

1   ERNESTO FONSECA AND MIGUEL FELIX.

2   Q.   AND DID AGENT CAMARENA PHOTOGRAPH THOSE HOUSES?

3   A.   YES, SIR.

4   Q.   AFTER YOU PROVIDED TO AGENT CAMARENA THE BIRTH

5   CERTIFICATES AND MARRIAGE CERTIFICATES THAT YOU OBTAINED, WERE

6   YOU ASKED TO PROVIDE ANY FURTHER ASSISTANCE IN THIS

7   INVESTIGATION?

8   A.   YES.  I WAS ASKED FROM THE START TO FIND OUT THE LOCATION

9   OF ALL THE PROPERTIES.

10  Q.   WHEN YOU SAY ALL THE PROPERTIES, WHAT DO YOU MEAN BY THAT?

11  A.   BELONGING TO THE QUINTERO FAMILY.

12  Q.   AND DID YOU OBTAIN INFORMATION ABOUT THOSE PROPERTIES?

13  A.   YES.  I OBTAINED A LIST OF ALL THE PROPERTIES THAT THEY

14  HAD IN THE STATE.

15  Q.   THE STATE OF WHAT?

16  A.   JALISCO.

17  Q.   DURING WHAT PERIOD DID YOU OBTAIN THAT INFORMATION?

18       WHEN WERE YOU DOING THAT?

19  A.   IN APRIL AND JUNE OF 1984.

20  Q.   DID YOU ALSO PROVIDE THAT INFORMATION TO AGENT CAMARENA?

21  A.   YES, SIR.

22  Q.   AT SOME POINT THEN DID YOU RETURN TO SAN ANTONIO?

23  A.   YES.  WE RETURNED TO SAN ANTONIO WITH THIS INFORMATION.

24  Q.   WHEN YOU SAY WE, WHO DO YOU MEAN?

25  A.   JAIME KUYKENDALL AND ENRIQUE CAMARENA AND I.

5-171

1   Q.   DID YOU MEET WITH SOMEONE IN SAN ANTONIO?

2   A.   YES, WITH HOWARD -- HE'S A D.E.A. AGENT, AND WITH SOME

3   PEOPLE FROM CUSTOMS, I.R.S., AND IRS AGENTS, AND A

4   GOVERNMENT -- A FEMALE GOVERNMENT ATTORNEY.

5   Q.   WERE YOU ASKED AT THAT MEETING TO OBTAIN EVEN MORE

6   INFORMATION?

7   A.   I WAS ASKED TO OBTAIN SOME CERTIFIED COPIES OF THE TITLES

8   TO THE PROPERTIES.

9   Q.   DID YOU, IN FACT, DO THAT?

10  A.   YES, SIR.

11  Q.   AND HOW DID YOU GO ABOUT DOING THAT?

12  A.   I STARTED SOME PRELIMINARY PROCEEDINGS IN A COURT, AND I

13  WAS ABLE TO GET THE JUDGE TO GIVE THOSE CERTIFICATES.

14  Q.   WHAT DO YOU MEAN BY PRELIMINARY PROCEEDINGS?

15  A.   THESE ARE THE PRELIMINARY STEPS TOWARD CIVIL PROCEEDINGS.

16  Q.   WHERE WAS THIS THAT YOU HAD TO GO TO OBTAIN THIS

17  INFORMATION?

18  A.   TO A CIVIL COURT IN GUADALAJARA.

19  Q.   HOW LONG DID IT TAKE YOU TO OBTAIN THE INFORMATION?

20  A.   FROM TWO WEEKS TO A MONTH.  IT WAS ON VARIOUS DATES.

21  Q.   WERE YOU ALSO ASKED TO OBTAIN INFORMATION ABOUT BANK

22  ACCOUNTS?

23  A.   YES.  THAT INFORMATION WAS OBTAINED AT THE SAME TIME WHEN

24  I GOT THE INFORMATION IN REGARD TO THE LOCATION OF THE

25  PROPERTIES.

5-172

1    Q.   AND WHOSE BANK ACCOUNTS WERE THESE PERTAINING TO?

2    A.   JUAN JOSE QUINTERO, EMILIO QUINTERO, THEIR WIVES, AND SOME

3    OTHER PERSONS NOT RELATED TO THEM, BUT WHERE I WAS ALSO ASKED.

4    Q.   AFTER YOU OBTAINED THESE CERTIFIED COPIES OF THE PROPERTY

5    RECORDS THAT YOU HAVE DESCRIBED, WHAT DID YOU DO WITH THOSE?

6    A.   I TURNED IT OVER TO MR. KUYKENDALL AND ENRIQUE CAMARENA.

7    Q.   AND DO YOU KNOW WHAT THE PURPOSE OF YOUR OBTAINING THOSE

8    DOCUMENTS WAS?

9    A.   TO PUT A LIEN AGAINST THE MONEY IN A BANK IN TEXAS.

10   Q.   WHOSE MONEY WAS THAT?

11   A.   JUAN JOSE QUINTERO PAYAN.

12   Q.   DO YOU KNOW AN INDIVIDUAL NAMED -- STRIKE THAT.

13        WHEN DID YOU PROVIDE THE CERTIFIED COPIES OF THE

14   PROPERTY RECORDS TO AGENTS KUYKENDALL AND CAMARENA?

15   A.   THE END OF AUGUST OR BEGINNING OF SEPTEMBER OF 1984.

16   Q.   DO YOU KNOW AN INDIVIDUAL NAMED HUMBERTO ZENDEJAS

17   ZENDAJAS?

18   A.   YES, SIR.

19   Q.   WHEN DID YOU FIRST MEET HIM?

20   A.   APPROXIMATELY IN JULY OF 1984.

21   Q.   AND DID YOU BELIEVE THAT MR. ZENDEJAS WOULD HAVE

22   INFORMATION USEFUL TO THE INVESTIGATION THAT YOU WERE WORKING

23   ON?

24   A.   YES.  HE DID PROVIDE US WITH SOME INFORMATION.

25   Q.   WHY DID YOU BELIEVE THAT HE WOULD HAVE ACCESS TO

5-173

1    INFORMATION USEFUL TO THE INVESTIGATION?

2    A.   BECAUSE HE MAINTAINED OR HE SAID THAT HE WAS WORKING FOR

3    MIGUEL FELIX, AND THAT HE KNEW ALL OF THE QUINTEROS.

4    Q.   AND DID YOU INFORM AGENT CAMARENA OF THIS INFORMATION?

5    A.   YES, SIR.

6    Q.   DID HE ASK YOU TO FOLLOW UP ON IT?

7    A.   YES, BUT WE ONLY WANTED TO FIND OUT JUAN JOSE QUINTERO

8    PAYAN'S NEW ADDRESS.

9    Q.   DID YOU HAVE OTHER MEETINGS WITH MR. ZENDEJAS IN

10   ATTEMPTING TO OBTAIN THAT INFORMATION?

11   A.   YES.  I SAW HIM ABOUT FOUR OR FIVE TIMES.

12   Q.   DID YOU EVER SEE HIM IN THE COMPANY OF D.F.S. AGENTS?

13   A.   ALMOST ALL THE TIME.

14   Q.   DID YOU ACTUALLY SEE THE CREDENTIALS OF THOSE INDIVIDUALS?

15   A.   NO, BUT I KNEW THAT THEY WERE WORKING FOR THAT

16   DIRECTORATE.

17   Q.   HOW DID YOU KNOW THAT?

18   A.   WELL, BECAUSE THEY SHOW OFF IN THAT REGARD.  THEY HAD THE

19   CARS AND THEY WOULD BE ARMED AT ALL TIMES.

20   Q.   NOW, DID YOU MEET WITH MR. ZENDEJAS ON SEPTEMBER 29TH OF

21   1984?

22   A.   YES, SIR.

23   Q.   WHAT WAS THE PURPOSE OF THAT MEETING?

24   A.   TO ASK HIM GAIN WHETHER HE KNEW JUAN JOSE'S ADDRESS.

25   Q.   HAD AGENT CAMARENA ASKED YOU TO MAKE THIS EFFORT?

1    A.   YES, BECAUSE TWO DAYS LATER I WAS TO RETURN TO THE UNITED

2    STATES.

3    Q.   AND DID YOU TELL MR. ZENDAJAS WHY YOU WANTED THAT

4    INFORMATION?

5    A.   YES.  I TOLD ZENDEJAS THAT I NEEDED TO FIND JUAN JOSE

6    QUINTERO BECAUSE I HAD TO GIVE SOME DOCUMENTS TO HIM HAVING TO

7    DO WITH THE PROPERTY AND THE HOUSE.

8    Q.   WHAT HOUSE WERE YOU REFERRING TO?

9    A.   IT WAS A HOUSE BELONGING TO MY FATHER, WHICH WE HAD SOLD

10   TO JUAN JOSE QUINTERO FOR HIM TO -- SO THAT SOME PEOPLE WORKING

11   FOR HIM COULD LIVE IN IT.

12   Q.   NOW, WHAT DID MR. ZENDAJAS TELL YOU AFTER YOU ASKED FOR

13   THIS INFORMATION?

14   A.   THAT HE WAS GOING TO ASK HIS BOSS AND THAT THE FOLLOWING

15   DAY HE WAS GOING TELL ME WHERE IT WAS.

16   Q.   DID YOU ARRANGE TO MEET WITH HIM AT ANY PARTICULAR

17   LOCATION THE NEXT DAY?

18   A.   AT THE BAR MANOLO RESTAURANT.

19   Q.   WHERE IS THAT LOCATED?

20   A.   IN GUADALAJARA.

21   Q.   DID YOU, IN FACT, GO TO MANOLO'S BAR THE FOLLOWING DAY?

22   A.   THAT IS CORRECT.

23   Q.   THAT IS SEPTEMBER 30TH OF 1984?

24   A.   THAT IS CORRECT, AT 5:30 IN THE AFTERNOON.

25   Q.   WAS MR. ZENDEJAS THERE WHEN YOU ARRIVED?

5-175

1    A.    NO.  I WAS WAITING FOR ABOUT 40 TO 45 MINUTES.

2    Q.    WHAT WERE YOU DOING WHILE WERE YOU WAITING THERE?

3    A.    I WAS CHATTING WITH A FRIEND THAT I RAN INTO THERE.

4    Q.    DID MR. MR. ZENDAJAS EVENTUALLY ARRIVE AT THE BAR?

5    A.    YES.

6    Q.    WHAT DID HE DO WHEN HE GOT THERE?

7          MR. STOLAR:  I'D LIKE TO LODGE AN OBJECTION NOW TO

8    THE TESTIMONY THAT IS ABOUT TO BE PRESENTED.  I BELIEVE THE

9    COURT KNOWS WHAT IT IS.  IT IS THE SUBJECT OF A MOTION THAT WE

10   FILED.

11         THE COURT:  WHEN WAS THE MOTION FILED?

12         MR. STOLAR:  AT THE VERY BEGINNING OF THE TRIAL.  IT

13   HAD TO DO WITH UNCHARGED CRIMES.

14         THE COURT:  WAS THERE A RULING ON THE MOTION?

15         MR. STOLAR:  NOT YET, BECAUSE THIS IS THE FIRST TIME

16   THIS COMES UP REALLY.

17         THE COURT:  WELL, THEN YOU'D BETTER PASS THIS,

18   COUNSEL.

19         MR. CARLTON:  PASS IT IN ORDER TO RETURN TO IT, YOUR

20   HONOR?

21         THE COURT:  YES, DEPENDING ON THE RULING.

22         MR. CARLTON:  MAY I HAVE A MOMENT?

23         THE COURT:  WAS THERE A MOTION?

24         MR. CARLTON:  I DON'T RECALL A MOTION.

25         THE COURT:  I DON'T RECALL ANY SUCH MOTION.

5-176

1      MR. STOLAR:  IT WAS A MOTION THAT HAD TO DO WITH

2  CERTAIN TRIAL EVIDENCE THAT YOU CALLED SOMEWHAT THIN, BUT I

3  HAVE FILED IT TO BRING TO YOUR ATTENTION.

4      THE COURT:  DO YOU HAVE A COPY OF IT?

5      MR. STOLAR:  I'M I'M LOOKING FOR IT.

6      MR. CARLTON:  I WOULD SAY, YOUR HONOR, THAT THIS

7  INCIDENT IS SPECIFICALLY ALLEGED IN THE INDICTMENT.

8      MR. STOLAR:  IT IS NOT A CRIME THAT IS ALLEGED IN THE

9  INDICTMENT AND THAT'S WHY I MADE MY MOTION.

10      THE COURT:  JUST A MOMENT.

11      (BRIEF PAUSE.)

12      (COPY OF MOTION TENDERED TO THE COURT.)

13      THE COURT:  LET'S ADJOURN TODAY AND I'LL LET THE JURY

14  BE EXCUSED.  LET ME ADVISE THE JURY AND COUNSEL OF A CHANGE IN

15  OUR SCHEDULE FOR FRIDAY OF THIS WEEK.

16      WE'LL BE CONVENING THIS CASE AT 8:30 A.M. ON FRIDAY

17  AND ADJOURNING AT 1:00 P.M.  AND THE FOLLOWING FRIDAY, THE

18  COURT WILL NOT CONVENE ON THIS CASE, THE ONE AFTER THAT.

19      NOW, YOU MAY BE EXCUSED AT THIS TIME.  PLEASE KEEP IN

20  MIND YOUR DUTY NOT TO DISCUSS THIS CASE WITH EACH OTHER OR WITH

21  ANYONE ELSE AND NOT TO FORM OR EXPRESS ANY OPINION OR

22  CONCLUSION ABOUT IT AND TO AVOID READING, HEARING OR SEEING

23  ANYTHING BY WAY OF PUBLICITY RELATING TO THIS CASE.

24      YOU MAY BE EXCUSED NOW.

25      (JURY EXCUSED.)

5-177

1    MR. CARLTON:  YOUR HONOR, MAY THE WITNESS BE EXCUSED?

2    THE COURT:  YES.

3    (WITNESS EXCUSED.)

4    THE COURT:  ALL RIGHT.  COUNSEL, NOW WHAT IS THE

5    TESTIMONY THAT YOU'RE OBJECTING TO ON THIS?

6    MR. STOLAR:  THIS GENTLEMAN IS ABOUT TO DISCUSS THE

7    POINT NUMBER 4 OF UNCHARGED CRIME EVIDENCE.  HE IS THE

8    CONFIDENTIAL INFORMANT WHO WAS SHOT BY MR. ZENDAJAS IN THE

9    MANOLA BAR IN GUADALAJARA IN SEPTEMBER.

10    THE COURT:  IS THERE EVIDENCE THAT YOUR CLIENT SHOT

11    HIM?

12    MR. STOLAR:  NO, SIR, AND IT'S NOT A CRIME CHARGED IN

13    THE INDICTMENT EITHER.

14    THE COURT:  BUT ORDINARILY, THIS BUSINESS OF OTHER

15    CRIMES IS RELATED TO OTHER CRIMES OF A PARTICULAR DEFENDANT.

16    MR. STOLAR:  I UNDERSTAND THAT.  THE REASON I RAISED

17    IT AND TRIED TO PUT SOME OF THIS -- AT LEAST THIS PARTICULAR

18    STUFF, IN A TRIAL MEMO IS THE SPECIFIC VIOLENCE IN AID AFTER

19    RACKETEERING THAT IS CHARGED IN THE INDICTMENT IS THE

20    KIDNAPPING AND HOMICIDE OF AGENT CAMARENA.

21    THAT IS THE CRIME THAT IS PARTICULARLY CHARGED WITH

22    WHICH MR. MATTA IS CHARGED.

23    THIS WITNESS WILL TESTIFY ABOUT A CRIME COMMITTED BY

24    A GENTLEMAN NAMED ZENDEJAS, WHO HE HAS IDENTIFIED AS BEING

25    EMPLOYED BY MR. CARO OR FONSECA OR MR. FELIX GALLARDO.

1          SO IF THE TESTIMONY IS PERMITTED TO COME IN, IF IT'S

2     BECAUSE IT'S AN UNCHARGED CRIME, A LIMITING INSTRUCTION SHOULD

3     BE GIVEN THAT IT MAY NOT BE USED AS ANY EVIDENCE AGAINST MY

4     CLIENT FOR ANY PURPOSE.  IT IS NOT SOMETHING WITH WHICH HE'S

5     CHARGED, IT IS NOT SOMETHING WHICH IS NECESSARY TO MAKE THE

6     RACKETEERING PATTERN OR THE VIOLENCE.  IT IS NOT THE CHARGE OF

7     VIOLENCE.

8          THE COURT:  DO YOU WISH TO RESPOND TO THAT?

9          MR. CARLTON:  YES, JUST BRIEFLY, YOUR HONOR.

10          THE INDICTMENT CHARGES THAT THE MURDER OF JOHN WALKER

11     AND ALBERTO RADELAT AND THE KIDNAPPING AND MURDERS OF AGENT

12     CAMARENA AND ZAVALA WERE THE CULMINATION OF A SERIES OF

13     RETALIATORY ACTS BY THE CARTEL AGAINST THE D.E.A. AND PERSONS

14     WORKING WITH THEM.

15          WE ARE NOT INTRODUCING THIS EVIDENCE ABOUT THE

16     SHOOTING OF MR. GARCIA BUENO AS A CRIME WITH WHICH MR. MATTA OR

17     ANY OF THE OTHER DEFENDANTS ARE SPECIFICALLY CHARGED, BUT WE

18     ARE INTRODUCING IT AS EVIDENCE OF THE RETALIATORY MOTIVE OF THE

19     CARTEL, RETALIATING --

20          THE COURT:  WHY IS EVIDENCE OF MOTIVE NECESSARY?

21     MOTIVE IS NOT AN ELEMENT OF THE CRIME.

22          MR. CARLTON:  MOTIVE IS AN ELEMENT, YOUR HONOR,

23     CERTAINLY OF KIDNAPPING OF A FEDERAL AGENT.

24          THE COURT:   MOTIVE IS NOT AN ELEMENT OF THAT CRIME.

25          MR. CARLTON:  KIDNAPPED ON ACCOUNT OF THE PERFORMANCE

5-179

1   OF HIS OFFICIAL DUTIES.  THERE IS AN INTENT ELEMENT IN RELATION

2   TO THAT.

3           THE COURT:  THAT MAY BE AN INTENT ELEMENT, BUT MOTIVE

4   IS NEVER AN ELEMENT OF A CRIME.

5           MR. CARLTON:  CERTAINLY MOTIVE IS INDICATIVE THAT IT

6   WAS THE INDIVIDUALS THAT WE HAVE CHARGED, MEMBERS OF THE CARTEL

7   AND THE CARTEL ITSELF, IF WE CAN ESTABLISH THAT THE CARTEL HAD

8   A MOTIVE TO DO THIS AND WAS ACTUALLY CARRYING OUT A SERIES OF

9   ACTIONS IN FURTHERANCE OF THAT MOTIVE, THAT IS PROBATIVE OF THE

10  INVOLVEMENT OF THE CARTEL IN THE SPECIFIC CRIMES THAT WERE

11  CHARGED.

12          THE COURT:  DID YOU RESPOND TO THIS MOTION THAT WAS

13  FILED?

14          MR. CARLTON:  NO, YOUR HONOR.

15          THE COURT:  WHY NOT?

16          MR. CARLTON:  APPARENTLY, IT WAS PROVIDED TO US, BUT

17  I HAVE TO SAY WE WERE NOT AWARE OF IT UNTIL JUST NOW.

18          MR. STOLAR:  THERE WAS, INDEED, EVEN A HEARING DATE

19  OF MAY 22 PUT ON THE MOTION.  THAT'S TODAY.

20          THE COURT:  WELL, THIS EVIDENCE IS CHARGED AND IS

21  ALLEGED TO BE ADMISSIBLE AS RELEVANT TO ESTABLISH THE EXISTENCE

22  OF A RACKETEERING ENTERPRISE AND THE MOTIVES FOR THE VIOLENT

23  ACTS CHARGED AGAINST THE DEFENDANT, ISN'T IT?

24          MR. STOLAR:  I DON'T THINK THAT'S QUITE THE CASE.

25  AGENT CAMARENA'S KIDNAPPING AND HOMICIDE ARE THE CRIMES

1    CHARGED.  THAT IS THE PATTERN OF RACKETEERING, MEANING DEALING

2    IN NARCOTICS, WHICH, AS WE HAVE SEEN PROVEN, OR AT LEAST

3    EVIDENCE HAS BEEN BROUGHT BEFORE -- THERE HAS BEEN DEALING IN

4    MARIJUANA, DEALING IN COCAINE -- TO THE EXTENT THAT THOSE

5    THINGS OVERLAP, THERE MAY BE SOMETHING CALLED THE GUADALAJARA

6    NARCOTICS CARTEL.

7         THE SPECIFIC CRIME CHARGED THEN IS THE KIDNAPPING AND

8    HOMICIDE OF AGENT CAMARENA IN ORDER TO KEEP THAT CARTEL GOING.

9    THAT THIS GENTLEMAN WAS SHOT BY SOMEBODY NAMED ZENDEJAS, WHO'S

10   NOT A NAMED DEFENDANT, NOR HAS HE OTHERWISE BEEN LINKED TO THE

11   CARTEL, A SUCH, EXCEPT THROUGH HEARSAY BY THIS WITNESS -- WAS

12   SHOT -- DOES NOT COME IN AS EVIDENCE TO PROVE THE VIOLENCE, THE

13   KIDNAPPING AND THE HOMICIDE OF AGENT CAMARENA IN ORDER TO KEEP

14   THE GROUP TOGETHER.

15        IF IT DOES COME IN FOR ANY PURPOSE -- AND THERE OUGHT

16   TO BE A LIMITING INSTRUCTION, BECAUSE IT IS AN UNCHANGED CRIME

17   WHICH IS OF A SPECIAL NATURE -- IT IS NOT JUST A PIECE OF

18   DISCONNECTED PROOF; IT'S AN UNCHARGED CRIME.

19        AND UNCHANGED CRIMES, GENERALLY, ARE NOT ADMISSIBLE

20   EXCEPT TO SHOW THROUGH THE VARIOUS THINGS THAT THE RULES ALLOW.

21   BUT CERTAINLY MR. MATTA IS NOT CONNECTED IN ANY WAY, SHAPE,

22   FORM OR MANNER WITH THIS UNCHARGED CRIME.

23        THERE IS NOT A CONSPIRACY THAT LINKS HIM TO IT, THERE

24   IS NO PINKERTON THEORY THAT MAKES HIM LIABLE FOR IT, NOTHING.

25   SO I WANT, AT LEAST, A LIMITING INSTRUCTION, IF THE COURT

5-181

1    PERMITS IT TO COME IN FOR ANY PURPOSE, THAT IT CANNOT BE USED

2    AS EVIDENCE TO PROVE MR. MATTA'S GUILT.

3           MR. MEDRANO:  ON THAT SUBJECT, YOUR HONOR, WITH YOUR

4    PERMISSION, JUST AS YOU FOUND IT APPROPRIATE LATE LAST WEEK NOT

5    TO GIVE A LIMITING INSTRUCTION AS TO THE CO-CONSPIRATOR-TYPE

6    STATEMENTS BECAUSE THOSE WERE BEING ADMITTED SUBJECT TO A

7    MOTION TO STRIKE IF WE FAIL TO ESTABLISH A NARCOTICS

8    ENTERPRISE, ANALOGOUSLY, YOUR HONOR, THIS SITUATION IS NO

9    DIFFERENT.

10          WITH TIME, WE'LL SHOW THERE IS A CARTEL, A NARCOTICS

11   ENTERPRISE, THAT EVERY DEFENDANT IN THIS COURTROOM IS A MEMBER

12   OF THAT ENTERPRISE, AND THAT, THEREFORE, EVERY MEMBER OF THIS

13   CARTEL IS RESPONSIBLE NOT ONLY FOR THE CO-CONSPIRATORS'

14   STATEMENTS, WHICH HAVE BEEN ADMITTED SUBJECT TO A MOTION TO

15   STRIKE, BUT SIMILARLY, ARE RESPONSIBLE FOR THESE OTHER ACTS,

16   YOUR HONOR, BECAUSE --

17          THE COURT:  ARE YOU GOING TO SHOW WHO COMMITTED THESE

18   OTHER ACTS?

19          MR. MEDRANO:  WE CAN SHOW, YOUR HONOR, WHAT LED UP TO

20   THEM.  AND THE INFERENCE THAT CAN BE GLEANED FROM THOSE ACTIONS

21   IS THAT THEY WERE RETALIATORY ACTS.

22          THE COURT:  HOW DO WE KNOW THAT THIS MAN WASN'T SHOT

23   BY A JEALOUS HUSBAND?

24          MR. CARLTON:  YOUR HONOR, MAY I JUST ADDRESS THIS

25   VERY QUICKLY?

5-182

1        AS MR. GARCIA BUENO TESTIFIED TODAY, HE WAS WORKING

2   THROUGHOUT MOST OF 1984 WITH AGENT CAMARENA ON AN INVESTIGATION

3   OF JUAN JOSE AND EMILIO QUINTERO PAYAN, THE UNCLES OF RAFAEL

4   CARO QUINTERO, AND HE WAS ALSO OBTAINING INFORMATION ON ERNESTO

5   FONSECA AND CARO QUINTERO HIMSELF, AND THEIR VARIOUS WIVES.

6        THIS WAS THE WHOLE FOCUS OF HIS INVESTIGATION UP

7   UNTIL THIS POINT AT THE END OF AUGUST AND EARLY SEPTEMBER.

8        THE COURT:  YOU'RE NOT ADDRESSING THE QUESTION.

9   HOW DO WE KNOW WHO SHOT HIM AND WHY?

10        MR. CARLTON:  I'M GETTING TO THAT POINT.  MR.

11   ZENDEJAS -- THE TESTIMONY WILL SHOW THAT MR. ZENDEJAS WALKS IN

12   AND SHOOTS THE VERY MAN HE HAD ASKED FOR FURTHER INFORMATION

13   RELATING TO JUAN JOSE QUINTERO PAYAN, WHO SAID HE WORKED FOR

14   FELIX AND HAD TO GO TALK TO HIS BOSS.

15        HE WALKS IN AND SHOOTS HIM, AND THEN SAYS, AS MR.

16   GARCIA BUENO IS FALLING TO THE FLOOR, "YOU'RE DYING BECAUSE

17   YOU'RE A SNITCH."

18        AND THE EVIDENCE WILL SHOW THAT THE ONLY LAW

19   ENFORCEMENT AGENCY THAT MR. GARCIA BUENO WAS WORKING WITH WAS

20   THE D.E.A., AND THE D.E.A. WAS INVESTIGATING THE VERY

21   RINGLEADERS OF THIS CARTEL.

22        THAT WAS WHAT HE WAS WORKING ON SPECIFICALLY AND

23   DIRECTLY, AND I THINK THE RETALIATORY MOTIVE IS OBVIOUS.

24        THE COURT:   WHAT IS THE THEORY OF ADMISSIBILITY?

25   WHAT IS THE PURPOSE OF THIS EVIDENCE?  WHAT IS IT INTENDED TO

5-183

1    SHOW?

2            MR. CARLTON:  THE EVIDENCE IS INTENDED TO SHOW, YOUR

3    HONOR -- MUCH LIKE THE EVIDENCE OF THE ZACATECAS OPERATION AND

4    THE BUFALO OPERATION -- THESE WERE ACTIVITIES THAT THE D.E.A.

5    WAS UNDERTAKING TO INVESTIGATE THE RINGLEADERS OF THE CARTEL IN

6    GUADALAJARA AND ELSEWHERE.

7            AND THE D.E.A. WAS HAVING AN EFFECT THAT RESULTED IN

8    THE LOSSES IN ZACATECAS AND BUFALO AND RESULTED IN THE D.E.A.

9    OBTAINING VARIOUS INFORMATION ABOUT THE RINGLEADERS OF THE

10   CARTEL THROUGH MR. GARCIA BUENO.

11           AS YOU WILL HEAR, THE INFORMATION THAT MR. GARCIA

12   BUENO PROVIDED RESULTED IN A $6.8 MILLION SEIZURE IN LAREDO,

13   FOR WHICH HE WAS EVENTUALLY REWARDED.

14           BUT WE WOULD SUBMIT, YOUR HONOR, THAT THE EVIDENCE

15   JUST IS VERY STRONG THAT HE WAS SHOT BECAUSE OF HIS COOPERATION

16   WITH THE D.E.A.   IT WAS THE SAME KIND OF RETALIATORY MOTIVE

17   THAT RESULTED IN LESS THAN TWO WEEKS WITH THE SHOOTING OF THE

18   CAR OF ANOTHER AGENT, WHO WAS ALSO INVESTIGATING THE CARTEL,

19   AND THEN LATER ON, IN THE MURDERS OF RADELAT AND WALKER BECAUSE

20   THEY WERE D.E.A. AGENTS, AND THEN SHORTLY AFTER THAT, THE

21   KIDNAPPING OF AGENT CAMARENA AND CAPTAIN ZAVALA BECAUSE OF THE

22   WORK THEY WERE DOING WITH THE D.E.A.

23           IT IS ALL A CONTINUUM OF ACTIVITY RESULTING IN THE

24   SPECIFIC CRIMES CHARGED; THESE ACTIONS HERE BEING FURTHER

25   EVIDENCE OF THE MOTIVE AND IDENTITY OF THE PERSONS WHO

1    COMMITTED THE ACTUAL CRIMES.

2            MR. STOLAR:  THE PROOF OF THE MARIJUANA PLANTATION,

3    THE MARIJUANA FIELDS, AND WHO WAS INVOLVED IN THOSE AND WHO

4    OWNED THEM, THAT IS ALL REQUIRED ELEMENTS TO MAKE THE PATTERN

5    OF RACKETEERING ACTIVITY IN ORDER TO SUPPORT THE ENTERPRISE

6    THEORY ON THE VIOLENCE IN AID OF RACKETEERING.

7            THE COURT:  SHOOTING YOUR ENEMY MIGHT BE A PART OF

8    THE RACKETEERING ACTIVITY.

9            MR. STOLAR:  IT IS NOT CHARGED AS SUCH.  THE

10   RACKETEERING ACTIVITY IS DEALING IN COCAINE AND MARIJUANA.

11   THAT IS THE RACKETEERING ACTIVITY THE INDICTMENT SPECIFICALLY

12   ALLEGES.

13           THE SHOOTING OF THIS GENTLEMAN MIGHT VERY WELL BE A

14   SEPARATE CRIME.  VIOLENCE IN AID OF RACKETEERING ACTIVITIES

15   CHARGED AS A SEPARATE CRIME, JUST LIKE WALKER AND RADELAT AND

16   CAMARENA AND THE PILOT ARE ALL SEPARATE 1959 CHARGES.

17           THE SHOOTING OF THIS GENTLEMAN COULD ALSO HAVE BEEN

18   SUCH, BUT THE GOVERNMENT CHOSE NOT TO CHARGE IT IN THE

19   INDICTMENT.  THEREFORE, THEY'RE BRINGING IN SOMETHING THAT

20   COULD HAVE BEEN A CHARGED CRIME IN ORDER TO, WHAT, SHOW THAT

21   SOMEBODY HAD A GREATER LIKELIHOOD THAT IF THEY COMMITTED CRIME

22   A THAT THEY WOULD COMMIT CRIME B?

23           AND YET, THE GENTLEMAN WHO'S GOING TO DO THE SHOOTING

24   IS THIS GUY ZENDEJAS.  AND ZENDEJAS -- EVEN FROM MY LIMITED

25   POINT OF VIEW -- ZENDEJAS SAYS I'M WORKING FOR FONSECA, FOR

5-185

1    FELIX GALLARDO.  MR. MATTA DOESN'T COME INTO THIS AT ALL, NOT

2    IN THE SLIGHTEST.

3             SO THAT'S WHY I'M ASKING THAT IF IT'S EVIDENCE OF AN

4    UNCHANGED CRIME, IT NOT BE PERMITTED IN EVIDENCE, PARTICULARLY

5    AGAINST MY CLIENT.

6             MR. MEDRANO:  ONE FINAL CLARIFICATION, YOUR HONOR,

7    WITH YOUR PERMISSION.

8             I WOULD LIKE TO POINT OUT TO YOU THAT THE TESTIMONY

9    THAT YOU HAVE HEARD TO DATE, FROM AMONG OTHER PEOPLE, AUGUSTIN

10   BUENO GONZALEZ AND FRANK RETAMOZA, THE FIRST COUSIN OF FELIX

11   GALLARDO, PUTS MATTA IN THIS CARTEL BY THE TIME THIS INCIDENT

12   OCCURS IN LATE SEPTEMBER OF 1984, SO HE IS IN THE CARTEL

13   ALREADY.

14            MR. STOLAR:  NO.  THE EVIDENCE THAT YOU HAVE HEARD,

15   IF BELIEVED, PUTS MATTA IN THE COCAINE BUSINESS WITH MR. FELIX

16   GALLARDO.  NOTHING ELSE.  IT DOESN'T PUT HIM IN THE COCAINE

17   BUSINESS WITH MR. CARO OR ANY OF THE CARO QUINTERO FAMILY.

18            THE COURT:  ALL RIGHT.  THAT'S ENOUGH.  THE COURT

19   WILL RULE ON THIS IN THE MORNING.

20            MS. KELLY:  YOUR HONOR, I WOULD JUST LIKE THE RECORD

21   TO REFLECT THAT WE JOIN IN THAT AND REQUEST THAT THE COURT

22   EXCLUDE IT UNDER 403 AS MORE PREJUDICIAL THAN PROBATIVE, AS

23   WELL AS RULE 404 --

24            MR. NICOLAYSEN:  AND I JOIN ON THE SAME GROUNDS, YOUR

25   HONOR, ON BEHALF OF DEFENDANT VASQUEZ.

5-186

1      MR. MEDVENE:   WE JOIN ON THE SAME GROUNDS, YOUR

2  HONOR.

3           THE COURT:   ALL RIGHT.

4           (COURT STANDS IN RECESS UNTIL WEDNESDAY, MAY 23,

5  1990, AT 9:30 A.M.)

INDEX:   U.S. VS. MATTA, ET AL.      PAGE 5-187

|                              |                                        | PG  | LN |
|------------------------------|----------------------------------------|-----|----|
| (EXHIBIT #                   | 31 RECEIVED IN EVIDENCE.)              | 27  | 19 |
| (EXHIBIT #                   | 33-A RECEIVED IN EVIDENCE.)            | 28  | 8  |
| (EXHIBITS #                  | 33-B THROUGH 33-I RECEIVED             | 33  | 18 |
| (EXHIBITS 32 A-I #           | RECEIVED IN EVIDENCE.)    BY           | 77  | 23 |
| (EXHIBIT 34 #                | RECEIVED IN EVIDENCE.)    BY           | 94  | 8  |
| (EXHIBIT 35 D #              | RECEIVED IN EVIDENCE.)    BY           | 107 | 19 |
| (EXHIBIT 35 A-B #            | RECEIVED IN EVIDENCE.)                 | 109 | 4  |
| (EXHIBIT 35 C #              | RECEIVED IN EVIDENCE.)                 | 117 | 3  |
| (EXHIBIT 36 #                | RECEIVED IN EVIDENCE.)    BY           | 131 | 14 |
| (EXHIBIT 170 A-B #           | RECEIVED IN EVIDENCE.)                 | 134 | 1  |
|                              |                                        |     |    |
|                              |                                        |     |    |
| LOS ANGELES +                | CALIFORNIA   TUESDAY, MAY              | 4   | 1  |
| MAY 22, 1990 +               | 9:30 A.M.                              | 4   | 2  |
| ROBERT HUGH FULKERSON +      | PLAINTIFF'S WITNESS, SWORN             | 4   | 11 |
| DIRECT EXAMINATION +         | BY MR. MEDRANO:   Q.                   | 4   | 18 |
| CROSS-EXAMINATION +          | BY MR. STOLAR:   Q.                    | 11  | 1  |
| ANTONIO A. CELAYA +          | PLAINTIFFS WITNESS, SWORN              | 14  | 3  |
| DIRECT EXAMINATION +         | BY MR. CARLTON:   Q.                   | 14  | 10 |
| CROSS-EXAMINATION +          | BY MR. STOLAR:   Q.  GOOD              | 37  | 13 |
| CHARLES A. LUGO +            | PLAINTIFFS WITNESS, SWORN              | 42  | 10 |
| DIRECT EXAMINATION +         | BY MR. CARLTON:   Q.                   | 42  | 16 |
| DIRECT EXAMINATION +         | (RESUMED)  BY MR. CARLTON:             | 55  | 3  |
| CROSS-EXAMINATION +          | BY MR. STOLAR:   Q  GOOD               | 81  | 17 |
| CROSS-EXAMINATION +          | BY MR. MEZA:   Q  HOW                  | 88  | 2  |
| REDIRECT EXAMINATION +       | BY MR. CARLTON:   Q  THE               | 89  | 3  |
| EUGENE J. HOLLESTELLE +      | PLAINTIFF'S WITNESS, SWORN             | 89  | 23 |
| DIRECT EXAMINATION +         | BY MR. CARLTON:   Q  MR.               | 90  | 4  |
| LOS ANGELES +                | CALIFORNIA, TUESDAY, MAY               | 101 | 1  |
| MAY 22, 1990 +               | 1:30 P.M.            (JURY             | 101 | 2  |
| EUGENE J. HOLLESTELLE +      | PLAINTIFF'S WITNESS,                   | 101 | 6  |
| DIRECT EXAMINATION +         | (RESUMED)  BY MR. CARLTON:             | 101 | 8  |
| CROSS-EXAMINATION +          | BY MR. STOLAR:   Q  GOOD               | 117 | 4  |
| REDIRECT EXAMINATION +       | BY MR. CARLTON:   Q  MR.               | 120 | 25 |
| RICHARD MESSER +             | PLAINTIFF'S WITNESS, SWORN             | 121 | 21 |
| DIRECT EXAMINATION +         | BY MR. CARLTON:   Q  MR.               | 122 | 2  |
| CROSS-EXAMINATION +          | BY MR. STOLAR:   Q  I                  | 134 | 25 |
| MANUEL CRETIN +              | PLAINTIFF'S WITNESS, SWORN.            | 135 | 25 |
| DIRECT EXAMINATION +         | BY MR. CARLTON:   Q  MR.               | 136 | 24 |
| CROSS-EXAMINATION +          | BY MR. STOLAR:   Q.                    | 153 | 14 |
| REDIRECT EXAMINATION +       | BY MR. CARLTON:   Q.                   | 157 | 3  |
| RECROSS-EXAMINATION +        | BY MR. STOLAR:   Q.   THE              | 158 | 6  |
| GARCIA BUENO MONCAYO +       | PLAINTIFFS WITNESS, SWORN              | 159 | 18 |
| DIRECT EXAMINATION +         | BY MR. CARLTON:   Q.                   | 160 | 16 |
|                              |                                        |     |    |
|                              |                                        |     |    |
| FOR IDENTIFICATION AS        | EXHIBIT  31 -- IS A MAP.               | 26  | 14 |
| TO THE RIGHT OF THE          | EXHIBIT  BOX THERE?   A.               | 26  | 16 |

INDEX:  U.S. VS. MATTA, ET AL.        PAGE 5-187

| | | | PG | LN |
|---|---|---|---|---|
| CARLTON:  I MOVE THAT | EXHIBIT | 31 BE RECEIVED. | 27 | 17 |
| ( | EXHIBIT | # 31 RECEIVED IN | 27 | 19 |
| ( | EXHIBIT | # 33-A RECEIVED IN | 28 | 8 |
| FOR IDENTIFICATION AS | EXHIBIT | 33-B.  DO YOU SEE | 28 | 18 |
| HAS BEEN MARKED AS | EXHIBIT | 33-F.    A.    YES. | 31 | 7 |
| AT WHAT HAS MARKED AS | EXHIBIT | 33-H,  WHICH SHOULD | 32 | 8 |
| HAS BEEN MARKED AS | EXHIBIT | 33-I?  A.    THIS IS | 33 | 1 |
| I WOULD MOVE THAT | EXHIBIT | S 33-B THROUGH 33-I | 33 | 15 |
| ( | EXHIBIT | S # 33-B THROUGH 33-I | 33 | 18 |
| A.    FIRST HE | EXHIBIT | ED AMAZEMENT OVER THE | 48 | 4 |
| WHICH IS AT THE EASEL | EXHIBIT | 31.       THE | 57 | 21 |
| FOR IDENTIFICATION AS | EXHIBIT | 32 A.    A   YES, SIR. | 72 | 12 |
| IF YOU WOULD LOOK AT | EXHIBIT | 32 B, DO YOU SEE | 73 | 5 |
| FOR IDENTIFICATION AS | EXHIBIT | 32  C.    A    YES, | 73 | 16 |
| FOR IDENTIFICATION AS | EXHIBIT | 32 E.    A    YES, SIR. | 74 | 11 |
| WOULD, PLEASE LOOK AT | EXHIBIT | 32 H.    A    YES, | 75 | 15 |
| PLEASE, LOOK AT | EXHIBIT | 33 H.   IT'S A SMALL | 76 | 14 |
| 33 I.      ( | EXHIBIT | S PROVIDED TO | 76 | 24 |
| Q   NOW, LOOKING AT | EXHIBIT | 33 I, WERE THOSE THE | 77 | 17 |
| AT THIS TIME THAT | EXHIBIT | S 32 A   THROUGH I BE | 77 | 21 |
| ( | EXHIBIT | S 32 A-I # RECEIVED | 77 | 23 |
| I WOULD ASK THAT | EXHIBIT | 34 BE RECEIVED. | 94 | 5 |
| ( | EXHIBIT | 34 # RECEIVED IN | 94 | 8 |
| HAS BEEN MARKED AS | EXHIBIT | 35 D?  IT SHOULD BE | 107 | 8 |
| RIGHT.  I MOVE THAT | EXHIBIT | 35 D  BE RECEIVED. | 107 | 16 |
| ( | EXHIBIT | 35 D # RECEIVED IN | 107 | 19 |
| FOR IDENTIFICATION AS | EXHIBIT | S 35 A, 35 B  AND 35 | 108 | 8 |
| Q   AND LOOKING AT | EXHIBIT | 35 B, DO YOU | 108 | 22 |
| I WOULD MOVE THAT | EXHIBIT | S 35 A  AND B  BE | 109 | 2 |
| ( | EXHIBIT | 35 A-B # RECEIVED IN | 109 | 4 |
| WOULD YOU PLEASE SHOW | EXHIBIT | 35 B   TO THE LADIES | 109 | 10 |
| YOU ALSO LOOK NOW AT | EXHIBIT | 35 C?   A | 109 | 13 |
| MAY I MOVE THAT | EXHIBIT | 35 C   BE RECEIVED? | 116 | 25 |
| ( | EXHIBIT | 35 C   # RECEIVED IN | 117 | 3 |
| HAS BEEN MARKED AS | EXHIBIT | 36, WHICH I BELIEVE | 130 | 12 |
| A   (RETRIEVES | EXHIBIT | .)   Q   DO YOU | 130 | 14 |
| DO YOU RECOGNIZE | EXHIBIT | 36?   A   (DISPLAYS.) | 130 | 15 |
| I WOULD MOVE THAT | EXHIBIT | 36 BE RECEIVED. | 131 | 11 |
| ( | EXHIBIT | 36 # RECEIVED IN | 131 | 14 |
| HAS BEEN MARKED AS | EXHIBIT | 35 A.   IT SHOULD BE | 133 | 6 |
| YOU.   A   (RETRIEVES | EXHIBIT | .)   THIS IS 170 A. | 133 | 7 |
| B.   A   (DISPLAYS | EXHIBIT | .)   Q   DO YOU | 133 | 15 |
| TRUCKS.   Q   I THINK | EXHIBIT | 35 A   MAY BE IN THE | 133 | 20 |
| ( | EXHIBIT | 170 A-B # RECEIVED IN | 134 | 1 |
| YOU SHOULD HAVE AN | EXHIBIT | MARKED 35 B.   A | 134 | 14 |

## REPORTERS' CERTIFICATION

WE, THE UNDERSIGNED REPORTERS, HEREBY CERTIFY THAT THE
FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF
PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.


*Julie A. Churchill*                    DATED: *May 31, 1990*
JULIE A. CHURCHILL, CSR
OFFICIAL COURT REPORTER


*Susan A. Lee*                          DATED: *May 31, 1990*
SUSAN A. LEE, CSR
OFFICIAL COURT REPORTER