FILED 1259

MAY 25 1993

CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

90-50459

1      UNITED STATES OF AMERICA

2      CENTRAL DISTRICT OF CALIFORNIA

3    THE HON. EDWARD RAFEEDIE, JUDGE PRESIDING

4  THE UNITED STATES OF AMERICA,  )
                                   )
5            Plaintiff,            )
                                   )
6            vs.                   )    NO. CR-87-422-(G)-ER
                                   )
7  RAFAEL CARO-QUINTERO,           )
       RUBEN ZUNO-ARCE,            )
8      HUMBERTO ALVAREZ-MACHAIN,   )
                                   )
9            Defendants.           )
   _____)

11              REPORTER'S TRANSCRIPT OF PROCEEDINGS
                         December 14, 1992

13

14  APPEARANCES:

15  FOR THE PLAINTIFF:          United States Attorney
                                BY:  JOHN CARLTON, Asst.
16                                   MANUEL MEDRANO, Asst.
                                U.S. Courthouse, Room 1443
17                              312 N. Spring Street
                                Los Angeles, California  90012
18                              (213) 894-0619

19  FOR DEFENDANT ZUNO-ARCE:    EDWARD MEDVENE
                                JAMES BLANCARTE
20                              MARY FULGINITI
                                Los Angeles, California  90067
21                              (310) 201-3545

22  FOR DEFENDANT MACHAIN:      ALAN RUBIN
                                Los Angeles, California 90064
23                              (310) 473-6447

24  ORIGINAL                    LUCILLE M. LITSHEIM, CSR 2409
                                Official Federal Reporter
25                              (213) 894-6613

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

INDEX

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| RODRIGUEZ, Arthur | 1261 | 1288 | 1296 | | |
| CANALEZ, William (Continued) | 1299 1353 | 1359 | | | |
| CANALES, Maria | 1362 | 1374 | | | |
| LEYVA, Salvador | 1381 | 1404 | 1409 | | |

EXHIBITS

| EXHIBIT NO: | MARKED FOR IDENTIFICATION | RECEIVED IN EVIDENCE |
|---|---|---|
| 409 | | 1305 |
| 416 | | 1312 |

1260

1    LOS ANGELES, CALIFORNIA; MONDAY, DECEMBER 14, 1992; 9:50 A.M.

2                              -o0o-

3              THE CLERK:  You may be seated.

4              THE COURT:  I have received the opposition of the

5    government to the defendant's motion for judgment of

6    acquittal, as well as the defendant Alvarez's motion for

7    judgment of acquittal which I received this morning.

8              I have read them both and I am having some

9    research done.  I will announce my ruling on that later this

10   morning.  In the meantime, I would like to proceed with the

11   defendant's witnesses.

12             (Proceedings held in jury's presence.)

13             THE CLERK:  You may be seated.

14             THE COURT:  Good morning.

15             THE JURY:  Good morning.

16             THE COURT:  We will begin.  You may call your

17   first witness for the defendant Zuno.

18             MR. BLANCARTE:  Thank you, Your Honor.  Mr. Ruben

19   Zuno calls Mr. Art Rodriguez.

20             THE COURT:  Come forward, please.

21                        D E F E N S E   C A S E

22

23                        ARTHUR RODRIGUEZ,

24   called as a witness on behalf of the defendant, having been

25   first duly sworn, was examined and testified as follows:

1261

1     THE CLERK:  Please raise your right hand.

2     You do solemnly swear that the testimony you may

3  give in the cause now pending before this Court shall be the

4  truth, the whole truth, and nothing but the truth, so help

5  you God?

6     THE WITNESS:  I do.

7     THE CLERK:  Please be seated.

8     Please state your full name for the record and

9  spell your last name.

10     THE WITNESS:  I'm sorry.

11     THE CLERK:  Please state your full name for the

12  record and spell your last name.

13     THE COURT:  This will work better, sir, if you

14  just leave it to the side and in front of you.

15     THE WITNESS:  Okay, sir.

16     THE COURT:  You don't need to speak into it, just

17  speak straight ahead there.

18     THE WITNESS:  All right.

19     THE COURT:  All right.

20     THE WITNESS:  Thank you, sir.

21     Art Rodriguez.

22     THE COURT:  Spell your last name, please.

23     THE WITNESS:  R-o-d-r-i-g-u-e-z.

24                   DIRECT EXAMINATION

25  BY MR. BLANCARTE:

1262

1   Q.   Good morning, Mr. Rodriguez.  Would you please state for

2   us what city and state you currently reside in.

3   A.   I live in San Antonio, Texas.

4   Q.   Mr. Rodriguez, have you ever been in the U.S. military?

5   A.   Yes, sir.  I served in the United States Marine Corps

6   for about four years.

7   Q.   And approximately what were those four years?

8   A.   That was from 1958 through 1962.

9   Q.   Mr. Rodriguez, do you have any employment history and

10  experience in law enforcement?

11  A.   Yes, sir, I have approximately 24, 25 years.

12  Q.   And could you tell me briefly what those 25 years of law

13  enforcement background are.

14  A.   Yes, sir.  I served some as a city policeman and deputy

15  sheriff in Texas.  I was a Texas highway patrolman.  I served

16  with the Texas Rangers, and I served approximately 13, 14

17  years with the Drug Enforcement Administration.

18  Q.   And when did you first become a special agent for the DEA?

19  A.   I went to work for the Drug Enforcement Administration

20  back in 1974.

21  Q.   At the time you joined the DEA in 1974, did you have to

22  go through any kind of academy training, other kind of

23  specialized training?

24  A.   Yes, sir.  I attended the special agent training DEA

25  academy in Washington D.C.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1263

1   Q.   And how long did that training last, sir?

2   A.   It lasted three and a half, four months.

3   Q.   And would you briefly tell us the type of training you

4   received at the DEA academy.

5            MR. CARLTON:  Objection, Your Honor.  Relevance.

6            THE COURT:  Sustained.

7   Q.   BY MR. BLANCARTE:  Mr. Rodriguez, are you trained in

8   investigative techniques?

9   A.   Yes, sir.

10   Q.   Are you trained in surveillance?

11   A.   Yes, sir.

12   Q.   Are you trained in interrogation and interview

13   techniques?

14   A.   Yes, sir.

15            MR. CARLTON:  Objection; relevance, Your Honor.

16            THE COURT:  Yes.  Sustained.

17   Q.   BY MR. BLANCARTE:  In the course of your training and

18   work in law enforcement and as a DEA agent, did you develop

19   any professional background and experience in developing a

20   profile of major drug traffickers?

21            MR. CARLTON:  Objection, Your Honor; relevance.

22            THE COURT:  Sustained.

23   Q.   BY MR. BLANCARTE:  Mr. Rodriguez, have you ever known

24   anyone by the name of Enrique Camarena Salazar?

25   A.   Yes, sir, I have.

1264

Q.   And how do you know Mr. Camarena?

A.   Him and I attended the DEA academy together in 1974.

Q.   Was he a classmate of yours at the academy?

A.   Yes, sir, he was.

Q.   Did Agent Camarena have any nicknames when you knew him?

A.   Yes, sir.  We used to call him KiKi.

Q.   Did you and Agent Camarena graduate from the academy together?

A.   Yes, sir, we did.

Q.   And after you graduated from the DEA academy, did you maintain any contact with Agent Camarena?

A.   Yes, sir.  From time to time we would have telephone conversations.

Q.   By the way, do you remember any of the other classmates you had at the DEA academy?

        MR. CARLTON:   Objection; relevance, Your Honor.

        THE COURT:   Sustained.

Q.   BY MR. BLANCARTE:   Could you briefly tell us, Mr. Rodriguez, what your assignments were while you were with the DEA.

A.   I was stationed in San Antonio, Texas.  And also I was stationed in Eagle Pass, Texas.

Q.   Did you ever have any assignments outside of the United States?

A.   Yes, sir.  I worked in Mexico on a couple of assignments

1265

1    and I worked out at the Caribbean on one particular

2    assignment.

3    Q.   Mr. Rodriguez, do you know anyone by the name of Ruben

4    Zuno Arce?

5    A.   Yes, sir, I do.

6    Q.   Mr. Rodriguez, I'll ask you to look around the courtroom

7    and tell me if you see Mr. Zuno anywhere and, if you do,

8    would you please indicate where he is.

9    A.   Yes, sir.  That's the gentleman with the light blue

10   sweater and headphones.

11            MR. BLANCARTE:  Mr. Zuno, would you stand briefly

12   just a moment?

13            THE COURT:  That's not necessary.  He's indicated

14   Mr. Zuno.

15            MR. BLANCARTE:  Thank you.

16   Q.   Mr. Rodriguez, when did you first come to know who

17   Mr. Zuno is?

18   A.   I first met Mr. Zuno back in 1981 or 1982.

19   Q.   And how did you first meet Mr. Zuno?

20   A.   I met him through a mutual acquaintance of Mr. Zuno in

21   San Antonio.

22   Q.   And what is the name of that person?

23   A.   His name is Jeremiah Handy.  He was an assistant U.S.

24   attorney.

25   Q.   Mr. Rodriguez, while you were working in Mexico as a DEA

1266

1   agent, what type of work were you doing, sir?

2   A.    Well, we were -- I had two assignments in Mexico.   One

3   was in 1977, I was involved in the eradication program,

4   trying to destroy the poppy and marijuana fields in the State

5   of Guerrero.

6   Q.    Is Acapulco in the State of Guerrero, sir?

7   A.    Yes, sir, that's correct.

8   Q.    Any other assignments in Mexico, sir?

9   A.    During the disappearance of KiKi Camarena, I volunteered

10   to go to Guadalajara for approximately three months.

11   Q.    During the time that you knew Agent Camarena, did you

12   ever become aware of his being assigned to work in Mexico?

13   A.    Yes, sir.   I was aware of the fact that he had been

14   stationed in Mexico for sometime.   I would communicate with

15   him over the telephone from time to time, and once he came to

16   San Antonio and visited with me, him and his wife and me and

17   my wife went out to dinner at one point.

18   Q.    Is this while he was stationed in Mexico?

19   A.    While he was in Los Angeles.

20        MR. CARLTON:   Objection; relevance, Your Honor.

21        THE COURT:   Sustained.

22   Q.    BY MR. BLANCARTE:   How did you come to know that

23   Mr. Camarena was stationed in Mexico, sir?

24        MR. CARLTON:   Objection; relevance.

25        THE COURT:   Sustained.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1267

1   Q.   BY MR. BLANCARTE:   Do you recall anything else about the

2   occasion on which Agent Camarena and his wife visited with

3   you and your wife in San Antonio?

4             MR. CARLTON:   Objection; relevance.

5             MR. BLANCARTE:   Your Honor, I believe it's

6   relevant to the foundation that I'm laying.

7             THE COURT:   Well, I'll permit it.   I would like

8   you to get to the point, though.

9             MR. BLANCARTE:   Yes, sir.

10  Q.   You can answer, Mr. Rodriguez.

11  A.   What was the question?

12  Q.   Do you recall anything else about the occasion on which

13  Agent Camarena and his wife visited with you and your wife in

14  San Antonio, Texas?

15  A.   No.   He was in San Antonio to purchase a car and he used

16  my address to get the paperwork.   And he asked me to go ahead

17  and forward it to him when he got the rest of the paperwork

18  that he was getting.   And we just had dinner and visited

19  about -- mostly about the job.

20  Q.   Do you recall approximately the year when Agent Camarena

21  visited you in San Antonio?

22  A.   I'm not sure.   It was either '80, '81 or '82.

23  Q.   Mr. Rodriguez, at some point had you learned that Agent

24  Camarena had been reported missing by the Guadalajara office

25  of the DEA?

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1268

1    A.   Yes, sir, I did.

2    Q.   And how did you obtain that information, sir?

3              MR. CARLTON:  Objection.  Relevance.

4              MR. BLANCARTE:  Your Honor, it's --

5              THE COURT:  You may answer.

6              THE WITNESS:  Peter Hernandez, who was stationed

7    in El Paso, was also a classmate of KiKi Camarena and myself

8    and he called me and told me that KiKi was missing and that

9    they feared foul play.  That was either on the 7th or 8th of

10   February.  At first we joked that --

11             THE COURT:  You answered the question.

12             MR. BLANCARTE:  That's fine.

13             THE COURT:  You answered.

14   Q.   BY MR. BLANCARTE:  What year was that, sir?

15   A.   That was 1985, February of '85.

16   Q.   And did you do anything in response to getting the news

17   that Agent Camarena had been reported missing?

18   A.   Well, I, uh -- I got on the phone and called another

19   friend of ours in Washington and asked him if there was

20   anything that I could do, and volunteered my services to go

21   to Guadalajara if they needed some help.  In essence, I

22   volunteered.

23   Q.   And were you, in fact, ultimately assigned to be part of

24   the investigation searching for Agent Camarena?

25   A.   Yes, sir.  I had arrived in Guadalajara approximately

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1269

1   two days later.

2   Q.   How did you get to Guadalajara, sir?

3   A.   They, there was a DEA plane en route to Guadalajara.

4   They stopped in Eagle Pass, Texas, and picked me up.

5   Q.   Do you know approximately how many DEA agents were

6   involved in the investigation regarding Agent Camarena's

7   abduction at the time that you arrived in Guadalajara?

8   A.   There was approximately -- at one point there must have

9   been 15, 20 agents at the max.   There were some coming in,

10  some leaving; some of them would stay for a short period,

11  some of them would stay for a prolonged period.

12  Q.   Mr. Rodriguez, do you know someone by the name of James

13  Kuykendall?

14  A.   Yes, sir.   He is the agent in charge -- or, he was the

15  agent in charge of the Guadalajara office at the time that

16  KiKi Camarena was abducted and murdered.

17  Q.   And when you reported to the Guadalajara office of the

18  DEA to join the investigation of search of Agent Camarena, to

19  whom did you report, sir?

20  A.   Jaime Kuykendall or James Kuykendall.

21  Q.   And once you were in Guadalajara and joined the

22  investigation regarding the abduction of Agent Camarena, were

23  you given any assignments there, sir?

24  A.   Well, as far as our primary assignment was to try to

25  locate KiKi Camarena.   As time went on and we feared the

1  worse, then our priority was to try to locate some of the

2  suspects that we felt were involved in the kidnapping and

3  also try to obtain or find follow-up leads, develop

4  informants, try to get any type of evidence to where we would

5  be able to either locate KiKi Camarena or locate the body.

6  Q.   And how did you go about trying to develop informants,

7  sir?

8  A.   Well, we would have our own leads every morning and we

9  would get together and have a little get-together with Jaime

10  Kuykendall and the rest of the agents that was assigned to

11  work at that time and we would follow leads.  We would --

12  anybody that called --

13          We were getting some phone calls and getting some

14  information.  We would follow that information, try to

15  establish whether it was just information or it was some

16  leads that we could proceed with.

17  Q.   Were any of those leads as a result of any of the files

18  that Agent Camarena maintained?

19  A.   Yes, sir, they were.

20  Q.   And what type of leads were those, sir?

21  A.   It's addresses, telephone numbers.  There were reports

22  of investigation from Camarena and from the office of

23  Guadalajara.

24  Q.   And did Mr. Zuno's name appear on any of those

25  documents, sir?

1271

1   A.   Not that I know of.  I didn't go through all of -- all

2   the files -- or some of the files, but not that I know of.

3   Q.   Were you ever given any assignments to conduct any

4   searches?

5   A.   Yes, sir.  We would -- our mission was to coordinate our

6   information, whichever information we gathered, coordinate

7   that with the Mexican federal judicial police, follow up on

8   it.  And as a consequence, we would conduct raids and try to

9   locate suspects or defendants.

10  Q.   When you say you conducted raids, could you describe

11  what those raids were, sir.

12  A.   We would get the information, evaluate it, give it to

13  the Mexican feds and they would act on it.  We would go with

14  the raiding party, which was led by the Mexican federal

15  judicial police and we would accompany them on those raids.

16  Q.   Were you ever personally involved in those raids?

17  A.   Yes, sir, I was involved in several of them.

18  Q.   Do you remember approximately how many?

19  A.   I would say somewhere between 15 and 20, maybe.

20  Q.   And what type of occupancy did you raid?

21  A.   Well, they were -- there were residences, they were

22  ranches, there were haciendas, they were (pause) -- that type

23  of residences, or that type of.....

24  Q.   And please describe the type of residences that you

25  personally raided.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1    MR. CARLTON:  Objection; relevance, Your Honor.

2    MR. BLANCARTE:  It's relevant, Your Honor, to the

3  background and foundation the government has laid as to who

4  the suspects were, sir.

5    THE COURT:  Well, I will permit the evidence.

6    THE WITNESS:  Well, some of them were --

7    THE COURT:  You may answer.

8    THE WITNESS:  Some of them were very nice

9  residences.  Big houses, expensive furniture, television

10  sets, antennas.  Very, very nice homes.

11  Q.   BY MR. BLANCARTE:  And please describe the ranches and

12  haciendas that you were raiding.

13  A.   They were very similar.  The haciendas were 10, 15 room

14  houses with also expensive furniture and -- and very nice

15  houses.

16  Q.   The ranches and haciendas would they have, say, thorough-

17  bred horses or livestock?

18  A.   Yes.  On some of the ranches that we raided they were --

19  they had very, very nice ranches in the middle of nowhere.

20  They had horses and barns and stalls and were very well kept.

21  Q.   And in the course of raiding these houses and haciendas,

22  did you find any documents?  Did you search for documents?

23  A.   Yes, sir.  We were always looking for documents.  We --

24  uh, one of our main objectives was to try to gather any type

25  of information.  Sometimes we would not be able to keep it

1273

1  because the Mexican --

2            THE COURT:  I think you've answered the question.

3  Q.   BY MR. BLANCARTE:  What type of documents did you find

4  in your searches, sir?

5  A.    Well, we looked for photographs.  We looked for any type

6  of documents that would help us:  Address books, telephone

7  books, address books, photographs.  Anything that would help

8  us with our investigation.

9  Q.   And in the course of your searches, did you, in fact,

10  find photographs, telephone books and address books?

11  A.    Yes, sir, we did.

12  Q.   Did you find any financial records?

13  A.    I think we did find some, yes, sir.

14  Q.   To your personal knowledge, did Mr. Zuno's name ever

15  show up on any of those address books or phone lists?

16            MR. CARLTON:  Objection; lack of foundation,

17  hearsay.

18            MR. BLANCARTE:  I asked him his personal knowledge.

19            THE COURT:  Of the ones that he reviewed.

20            MR. BLANCARTE:  Yes, sir.

21            THE COURT:  You should ask him if he reviewed any.

22  Q.   BY MR. BLANCARTE:  Based on your personal knowledge of

23  the phone books and address books that you reviewed, did you

24  find Mr. Zuno's name on those?

25  A.    No, sir.

1274

1   Q.   And did you say you found photographs, sir?

2   A.   Of some of the defendants that would later become

3   defendants, some of the suspects.

4   Q.   And in those photographs of the suspects who later would

5   become defendants, did you find any photographs of Mr. Zuno

6   among those?

7   A.   No, sir.

8   Q.   And how did you get the leads that led you to the

9   various ranches and haciendas that you raided?

10  A.   Well, some of them came from -- through our efforts,

11  through our DEA efforts, through the agents that were working

12  there where it was -- through their contacts, their

13  interviewing the informants or the information fell through.

14  Some of them --

15        Very few leads were developed by the Mexican

16  federal judicial police.

17  Q.   And did any of these leads ever provide you with

18  information as to who was -- who owned these residences and

19  ranches?

20  A.   Most of the time when we got there, the suspects or the

21  owners of the houses and the residences, the haciendas and

22  the ranches, were -- had already fled.

23  Q.   But did any of the leads that you were provided with

24  lead you to who the owners or suspected owners were?

25  A.   In some cases, yes.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1275

1   Q.   And who were those people?

2   A.   Well, we -- in some of the residences, we would -- we

3   determined that some of the residences and ranches and

4   haciendas belonged to two of the major suspects in the

5   abduction and murder of KiKi Camarena.

6   Q.   And do you know their names, sir?

7   A.   Uh, there was Caro-Quintero and Fonseca, Mr. Ernesto

8   Fonseca.

9   Q.   Do you remember the names of any of the agents that you

10  worked with in Guadalajara during the investigation regarding

11  Agent Camarena's disappearance?

12  A.   Yes, sir, I do.

13  Q.   What names do you remember, sir?

14  A.   Well, I think Alan Bachelier was there.

15  Sal Leyva was there.  Bobby Gonzalez was there.  Shaggy

16  Wallace.  Peter Hernandez came later.  There was --

17         There was so many agents coming in and out that I

18  don't recall all of them.

19  Q.   Were any of those agents classmates of yours and Agent

20  Camarena?

21         MR. CARLTON:  Objection; relevance.

22         THE COURT:  Sustained.

23  Q.   BY MR. BLANCARTE:  Mr. Rodriguez, were you still in

24  Guadalajara working on the Camarena investigation when the

25  body of Agent Camarena was found?

1276

1   A.   Yes, sir, I was.

2   Q.   And after Agent Camarena's body was discovered, did you

3   and the other DEA agents in Guadalajara stop working on your

4   investigation?

5   A.   No, sir, I don't think that we ever quit working on the

6   investigation.

7   Q.   Did you continue to follow up on leads?

8   A.   Yes, sir.

9   Q.   Did you continue to gather intelligence?

10  A.   Yes, sir.  We -- we -- we did everything that we, uh --

11  that we were doing before except for the fact that we were

12  no longer looking for the body.  We just continued our

13  investigation.

14  Q.   Did you continue to interview confidential informants?

15  A.   Yes, sir, that's correct.

16  Q.   Mr. Rodriguez, how long were you personally involved in

17  Guadalajara in the investigation regarding the abduction of

18  Agent Camarena?

19  A.   I was there for approximately three months.

20  Q.   And while you were in Guadalajara working on the

21  Camarena investigation, what type of people did you use as

22  confidential informants?

23          MR. CARLTON:  Objection, Your Honor; relevance.

24          MR. BLANCARTE:  There's been a lot of --

25          THE COURT:  Overruled.  You may answer.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1277

1        THE WITNESS:  Well, we had different type of

2  informants.  We had some people that -- that wanted to help,

3  ordinary citizens.  At the time we had -- I think we had

4  placed a -- a reward on any information leading to the -- to

5  the arrest of any one involved in the kidnapping.  And we

6  were getting anywhere from three -- two to five calls to

7  15-20 calls a day at one point in there.

8  Q.   And would you and your fellow agents follow up on each

9  of those preliminary leads?

10 A.   Yes, sir.  I think that all the agents at one time or

11 another followed every lead that we possibly could.

12 Q.   And did any of those confidential informants to your

13 personal knowledge have backgrounds, criminal backgrounds?

14 A.   Some of them were, yes, they did.

15 Q.   And did they have -- did some of them have contacts with

16 the narcotics traffickers that you suspected were involved

17 with the abduction of Agent Camarena?

18 A.   Yes, sir, they did.

19 Q.   And were there any procedures that you would use in

20 following up on the information provided to you by

21 confidential informants who had that type of criminal

22 background?

23 A.   Well, all the information was evaluated.  We would --

24 we would interview or debrief the person that gave us

25 information.  We would try to corroborate their information,

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1278

1    and then we would make a decision whether it was good

2    information or bad information.

3    Q.    And what procedures would you use to try to corroborate

4    the information provided to you by these confidential

5    informants with a criminal background?

6    A.    That would depend on what type of information it was and

7    if it was, umm -- If it was information regarding a house, we

8    would try to corroborate whether we would locate the house,

9    if there was -- who was living there, what --

10              If there was a vehicle, we would try to locate the

11   vehicle, try to identify it.

12              It was different investigative methods that we

13   used depending on the circumstances of the investigation --

14   or the information, excuse me.

15   Q.    Did you ever try to locate independent individuals

16   without criminal backgrounds to corroborate the information

17   provided by the confidential informants who had ties to the

18   suspects?

19   A.    Yes, sir.  You always -- you always have to evaluate the

20   type of information any informant gives you, especially the

21   different types of informants.  You usually have to evaluate

22   and corroborate any information any informant gives you.

23   Q.    Why is that, sir?

24   A.    In law enforcement, you normally arrest a defendant that

25   has narcotics ties with the -- with the underground or the

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1279

1    traffickers.  And they always try to work a deal, and that
2    means that they're willing to cooperate with the law
3    enforcement agencies in lieu of some type of assistance that
4    you might be able to give them.
5            Or if it's information inspired by a reward,
6    monetary reward, then -- then that would -- that would try to
7    help them more to even come up with either good information
8    or fictitious information.
9    Q.   And is part of the reason you as a law enforcement
10   investigative technique develop independent corroboration
11   because the information provided by confidential informants
12   is sometimes unreliable?
13           MR. CARLTON:  Object to the leading question, Your
14   Honor.
15           THE COURT:  Overruled.
16           You may answer.
17           THE WITNESS:  Sometimes it's unreliable.  You have
18   to establish -- in most instances, you have to establish
19   their credibility.
20   Q.   BY MR. BLANCARTE:  And in your 25 years of law enforce-
21   ment, do you personally consider independent corroboration to
22   exist when one confidential informant with a criminal
23   background corroborates the information provided to you by
24   another confidential informant with a criminal background?
25   A.   It's a must.

1280

1  Q.   I'll repeat the question.   In other words, if you have

2  information provided by a confidential informant with a

3  criminal background, do you consider that independent

4  corroboration when another criminal suspect provides you with

5  information?   Is that independent corroboration, from your

6  experience?

7  A.   No, sir.   You have to -- the information has to be

8  corroborated by other evidence or agents or independent

9  persons not affiliated with the information, the initial

10 information, especially if it comes from a paid informant.

11 Q.   Sir, did you say how much money had been offered as a

12 reward in Guadalajara regarding the disappearance of Agent

13 Camarena?

14 A.   At one time I think it was -- when I first got there, I

15 think it was only 50,000.   It might have been raised to 100,000

16 later, and it might have been raised even more after that.

17 Q.   And that was, that initial reward was offered in 1985;

18 is that correct?

19 A.   Yes, sir.   It was early February and I think it was

20 somewhere in the $50,000 bracket.

21 Q.   As part of your involvement in the investigation regarding

22 the abduction of Agent Camarena in Guadalajara, did you

23 personally conduct any interviews?

24 A.   Yes, sir, I conducted quite a few.

25 Q.   Can you tell me approximately how many interviews you

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1281

1   personally conducted?

2   A.   I would say 20, 30, 40.  I am not sure.

3   Q.   Was that per day, per week, per month?

4   A.   Probably per week, depends on -- on -- Sometimes that's

5   just about the only thing we were doing.  Sometimes we would

6   be heading in other directions, maintaining surveillance of

7   some of the known narcotic traffickers' residences.  It was a

8   variety of assignments that we used to have.

9   Q.   And were the other agents working with you also

10  conducting interviews?

11  A.   Yes, sir.  Everybody.  All the agents there were working

12  anywhere from 12, 14, 16, 18 hours a day.

13  Q.   Did you personally ever conduct any interviews regarding

14  the Camarena investigation outside of Guadalajara?

15  A.   We had some assignments.  I went to Zacatecas on a lead

16  -- I think I might have gone to Mitchell farm on some

17  raids.  But mostly in Guadalajara.

18  Q.   You said you went on an investigation in Zacatecas.  Is

19  Zacatecas another state?

20  A.   Yes.  Zacatecas, Zacatecas is in Mexico.

21  Q.   And what type of investigation did you conduct in

22  Zacatecas?

23  A.   We had information that Mr. Camarena, KiKi Camarena and

24  the pilot, had been married -- buried in some caves in the

25  state of Zacatecas.  And myself, I accompanied a dozen

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1282

1   Mexican Federal Judicio Police to the scene where we looked

2   over the scene and tried to determine whether there was good

3   information or not.

4   Q.   And how had you come about obtaining the lead that led

5   you to the investigation in Zacatecas?

6   A.   I don't recall.  There was -- I don't know whether --

7   Q.   That's fine, sir, if you don't recall.

8            Mr. Rodriguez, while you were in Guadalajara

9   working on the Camarena investigation, did any of the people

10  who you mentioned who were suspected of being involved in

11  Agent Camarena's abduction, did any of them flee Guadalajara

12  or Mexico?

13  A.   Yes, sir.  Most of the traffickers were trying to flee

14  Guadalajara.

15  Q.   And did any of them try to leave Mexico?

16  A.   Yes, sir.  Quite a few of them tried to leave Mexico.

17  Q.   Mr. Rodriguez, at some point did you return to your

18  regular assignment in the United States?

19  A.   Yes.  It was May of -- sometime in late April or May

20  of '85 that I returned to my home base in Eagle Pass, Texas.

21  Q.   And what was your position with the DEA at your regular

22  assignment in Eagle Pass, Texas?

23  A.   Well, I -- I was one of the agents stationed there.

24  Q.   A special agent for the DEA?

25  A.   Yes, uh-huh.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1283

1   Q.    And, Mr. Rodriguez, when you left Guadalajara and

2   returned to your regular assignment in Eagle Pass, was

3   Supervising Agent James Kuykendall still the supervising

4   agent in charge of the Guadalajara office of the DEA and in

5   charge of the investigation regarding the abduction and

6   murder of Agent Camarena?

7   A.    I believe he was still the agent in charge, yes.

8   Q.    And after you left Guadalajara and returned to your

9   regular assignment as DEA agent in Eagle Pass, did you have

10  any further contact with Supervising Agent James Kuykendall?

11  A.    Yes, I maintained contact with him from time to time.

12  Q.    Can you briefly describe the occasions on which you

13  maintained contact with Agent Kuykendall?

14  A.    Well, I made --

15        MR. CARLTON:  Objection; relevance, Your Honor.

16        MR. BLANCARTE:  It is relevant, Your Honor, and

17  I'll bring it up quickly.

18        THE COURT:  The objection will be overruled.

19  Let's get to the point here, counsel.

20        MR. BLANCARTE:  Yes, Your Honor.

21  Q.    You may answer.

22  A.    We stayed in contact and tried to continue the

23  investigation.  We tried to develop leads and kept us each

24  other informed of any new developments in the case.

25  Q.    And in those contacts you maintained with Agent

1284

1    Kuykendall, did he ever ask you to follow up in any way on

2    the ongoing investigation of Agent Camarena's abduction?

3    A.    Yes, sir.  We were always following up on any type of

4    lead that we came across.

5    Q.    And did he ever ask you to do anything regarding that,

6    sir?

7    A.    From time to time he would ask me to follow leads and

8    keep me informed of what was happening.

9    Q.    Did you and Agent Kuykendall ever have a discussion

10   regarding Mr. Zuno?

11   A.    Yes, sir.  It was sometime in either August or September

12   that I had either talked to Jaime or I had met him.  I met

13   him in Laredo on a couple of times and I think I might have

14   met him in San Antonio at least once or twice, and at one

15   point he, he asked me -- they had -- by then they had

16   discovered the house where KiKi Camarena had been abducted

17   and murdered and he mentioned the name Ruben Zuno, said he

18   would certainly like to talk to him.  I said, "Well, let me

19   see if I can get him to see if he would talk to you," and he

20   asked me to try to contact him and talk to him and see if he

21   would stand -- or be available for an interview regarding the

22   Lope de Vega address.

23   Q.    And did you try to locate and contact Mr. Zuno?

24   A.    Yes, sir.  We tried -- we contacted him in Mexico.  And

25   what Agent Kuykendall and myself had thought that we might

1285

1    travel to Guadalajara to interview Mr. Zuno.  But Mr. Zuno

2    said that, that he was -- he was coming to San Antonio the

3    following week and that he would make himself available to

4    Agent Kuykendall for an interview.

5    Q.   For an interview in the United States?

6    A.   Yes, sir.  In San Antonio.

7    Q.   Was Mr. Zuno hard to locate, sir?

8    A.   No.  I think we made some telephone calls but we located

9    him.

10   Q.   And when you -- did you call Mr. Zuno on the phone, is

11   that how you contacted him?

12   A.   Yes, sir.

13   Q.   And when you contacted Mr. Zuno, did you tell him that

14   James Kuykendall, special agent of the DEA, wanted to speak

15   with him?

16   A.   Yes, sir.  I told him he wanted to visit with him or see

17   him.

18   Q.   And did you explain to him why Agent Kuykendall wanted

19   to speak with him?

20   A.   Yes, sir, that's correct.

21   Q.   And did Mr. Zuno, in fact, voluntarily come to the U.S.

22   to meet with you and Agent Kuykendall?

23   A.   Yes, sir.  He told me that he would be in San Antonio

24   the following week and we left him some telephone numbers to

25   contact us.  And as soon as he arrived in town the following

1286

1   week, he contacted me and I contacted Agent Kuykendall and we

2   arranged to meet.

3   Q.   And where did you and Agent Kuykendall arrange to meet

4   with Mr. Zuno?

5   A.   I think it was at James Coffee Shop there in San

6   Antonio.

7   Q.   And do you have any recollection of the approximate date

8   on which you and Supervising Agent James Kuykendall met with

9   Mr. Zuno in San Antonio?

10  A.   I think it was somewhere towards the end of September.

11  Q.   What year, sir?

12  A.   198-SSS -5, I believe.  No, 1986.  Excuse me.

13  Q.   During your meeting with Agent Kuykendall and Mr. Zuno

14  in San Antonio, Texas -- I believe you said at a restaurant,

15  sir?

16  A.   Yes.  James coffee shop in San Antonio.

17  Q.   Was there anyone present at that meeting other than

18  yourself DEA Jake Kuykendall and Mr. Zuno?

19  A.   No.  Just the three of us.

20  Q.   And approximately -- by the way, were you still a DEA

21  agent at that time?

22  A.   No.  I had resigned approximately 30 days or so before

23  that.

24  Q.   So at approximately how long did that meeting last?

25  A.   I would say probably about an hour, hour and a half.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1287

1   Q.   And during that meeting, did Supervising Agent

2   Kuykendall ask Mr. Zuno any questions?

3   A.   Yes, sir, he asked him a variety of questions, mostly

4   concerning the Lope de Vega address.

5   Q.   And did Mr. Zuno ask for any immunity before answering

6   any of Agent Kuykendall's questions?

7   A.   No, sir.  Not to my knowledge.

8   Q.   But you were present; right?

9   A.   That's correct.

10  Q.   Did Mr. Zuno ask for any protection or security before

11  answering any of Agent Kuykendall's questions?

12  A.   No.

13  Q.   Did Mr. Zuno ask to be paid any money before answering

14  any of Agent Kuykendall's questions?

15  A.   No.

16  Q.   Did Mr. Zuno ask to have an attorney present before

17  answering any of Agent Kuykendall's questions?

18  A.   No.

19  Q.   Mr. Rodriguez, did Mr. Zuno refuse to answer any of the

20  questions posed to him by Agent Kuykendall?

21  A.   No.  He was very cooperative.

22  Q.   And at the end of the meeting between you, supervising

23  DEA Agent James Kuykendall and Mr. Zuno, did Agent Kuykendall

24  make any attempt to arrest or detain Mr. Zuno in any way?

25  A.   No, sir.

1288

1      MR. BLANCARTE:  Thank you, Mr. Rodriguez.

2   I have no further questions on direct.

3   THE COURT:  You may cross-examine.

4   MR. RUBIN:  I have no questions.

5                    CROSS-EXAMINATION

6

7   BY MR. CARLTON:

8   Q.   How long were you in Guadalajara, Agent Rodriguez?

9      MR. BLANCARTE:  Objection; asked and answered.

10      THE COURT:  Not by him.

11      THE WITNESS:  Approximately three months.

12   Q.   BY MR. CARLTON:  So sometime in April?

13   A.   Yes.  Either late April or early May.

14   Q.   Of 1985?

15   A.   Yes, sir.

16   Q.   And after that time, you had no direct involvement in

17   Operation Leyenda, did you?

18   A.   No.  No, sir.

19   Q.   During the time that you were in Guadalajara, you didn't

20   review all of the files on this case, did you?

21   A.   No, sir.  There were numerous files.

22   Q.   Didn't even review all of Agent Camarena's files, the

23   investigative files, did you?

24   A.   No, sir.

25   Q.   So you wouldn't know if there were any files of Agent

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1289

1  Camarena mentioning Ruben Zuno Arce or Humberto Alvarez

2  Machain?

3  A.   That's correct, sir.

4  Q.   Likewise you wouldn't know if there were any other files

5  by other investigating agents that mentioned either of those

6  two defendants.

7  A.   That's correct.

8  Q.   If you in the course of your investigation had found a

9  file of Agent Camarena mentioning Ruben Zuno Arce, would that

10 have been in your opinion worth following up on?

11       MR. BLANCARTE:   Objection; calls for speculation,

12 Your Honor.

13       THE COURT:   Overruled.

14       You may answer.

15       THE WITNESS:   What was the question again?

16 Q.   BY MR. CARLTON:   If in the course of your investigation

17 you had encountered a file of Agent Camarena mentioning Ruben

18 Zuno Arce as a target of your investigation, in your opinion

19 would that have been worth following up on?

20 A.   Yes, sir.   We were following all the leads that came

21 across.   And Jaime Kuykendall would --

22       THE COURT:   I think you've answered the question.

23 Q.   BY MR. CARLTON:   You retired in the DEA when?

24 A.   I left in DEA in 1986.

25 Q.   Why?

1290

1   A.   I had a transfer.

2              MR. BLANCARTE:  Objection; relevance.

3              THE COURT:  Overruled.

4              THE WITNESS:  I had a transfer dispute with my

5   office in San Antonio.

6   Q.   BY MR. CARLTON:  What's your present employment?

7   A.   I own and operate a small beer and barbecue place in San

8   Antonio.

9   Q.   Do you recall signing a declaration dated August 18th,

10  1989, in this case?

11  A.   Beg your pardon?

12  Q.   Do you recall signing a declaration dated August 18th,

13  1989, for filing in this case?

14  A.   What type of declaration?

15             THE COURT:  Show the witness what you're referring

16  to.  Hand it to the clerk.

17             MR. CARLTON:  Hand it to the clerk, Your Honor?

18             THE COURT:  Yes.

19             THE WITNESS:  It wouldn't do any good because I

20  don't have my glasses.  I can't see a thing.

21  Q.   BY MR. CARLTON:  Isn't it correct --

22  A.   You can tell me what it is and I'll tell you what....

23  Q.   -- that you filed a declaration dated August 18th, 1989,

24  in which you stated that you first met Ruben Zuno Arce

25  socially in the late 1970's?

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1291

1  A.    That's probably correct.  70's, 80's, I don't recall.

2  Q.    If you were to look at the back page of that document in

3  front of you, sir.

4  A.    (Witness complies.)

5  Q.    Can you recognize your signature there?

6  A.    Yes, sir.  I can see that.

7        MR. CARLTON:  May I have a moment, Your Honor?

8        MR. BLANCARTE:  Objection, Your Honor; that's

9  improper impeachment.  He's never denied signing that

10 declaration.

11       THE COURT:  Overruled.

12       MR. CARLTON:  Your Honor, I'd like to mark this

13 exhibit as 118 and move its admission.

14       THE COURT:  For what purpose?

15       MR. CARLTON:  The purposes of impeachment.

16       THE COURT:  Well, you've only referred to one item

17 in it.

18       MR. CARLTON:  That's correct.

19       THE COURT:  Do you intend to refer to others?

20       MR. CARLTON:  Not at this point.

21       THE COURT:  Well, we'll defer that until later.

22 Q.    BY MR. CARLTON:  You didn't review all of the items

23 seized in searches while you were in Guadalajara, did you?

24 A.    All the items?  No, huh-unh.

25 Q.    Nor did you participate in all of the raids.

1292

1   A.   No, sir.

2   Q.   And you did not have available to you all of the

3   information that was available to the investigators at the

4   time.

5   A.   No, not all.

6   Q.   Since leaving Guadalajara, you have not had regular

7   access to the information developed in this investigation,

8   have you?

9   A.   No, sir.

10   Q.   Now, if you know, Agent Kuykendall was not directly

11   involved in the investigation when you met with him in San

12   Antonio in 1986, was he?

13   A.   I'm not sure what his status was.  He was still, uh, in

14   government service.  He was still with the DEA.

15   Q.   But he was no longer in Guadalajara, was he?

16   A.   No.  I believe he was back in Laredo, Texas.

17   Q.   Now, would you say in the course of your work as a DEA

18   agent that it's essential to many successful investigations

19   to work with confidential informants?

20   A.   Yes, sir.

21   Q.   So that the DEA could not pursue its functions

22   effectively without them.

23   A.   That's correct.

24   Q.   And isn't it also correct that in some investigations

25   the only evidence you're able to develop is through informants?

1293

1    A.   They're a necessary evil, yes, sir.

2    Q.   Do you know an individual named Jesse Gonzales?

3            MR. BLANCARTE:   Objection; beyond the scope of

4    direct, relevance.

5            THE COURT:   Overruled.

6            THE WITNESS:   Out of San Antonio?

7            THE COURT:   Well, the question was do you know a

8    person by that name.

9            THE WITNESS:   Yes, sir, I do.

10   Q.   BY MR. CARLTON:   How do you know him?

11   A.   Well, I know several Jesse Gonzalez.   I know one out of

12   San Antonio.

13   Q.   And who is that?

14           THE COURT:   Jesse Gonzales.

15           (Laughter.)

16   Q.   BY MR. CARLTON:   How do you know the individual in San

17   Antonio?

18   A.   He is, he works for the Bexar County district clerk's

19   office, I believe.   If that's the one that you're referring to.

20   Q.   Do you recall preparing a DEA-6 report dated April 24th,

21   1985, in relation to this investigation?

22   A.   I might have.

23   Q.   Yes.   Let me ask, do you recall how many DEA-6 reports

24   you did prepare in relation to the investigation?

25   A.   Well, there were several of them, I believe.   Some in

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1294

1    Guadalajara, some in Texas.

2    Q.    And do you recall writing in a report dated April 24th,

3    1985, that during the time period March 1st to March 4th,

4    1985, a subject called Jesse --

5              MR. BLANCARTE:  Objection; hearsay, Your Honor.

6    And relevance.

7              THE COURT:  Overruled.  Let's hear the question

8    first.

9              MR. CARLTON:  -- Jesse or Jesus Gonzalez LNU

10   has visited an individual named Gonzalez Aerola in Nueva

11   Rosita.

12             MR. BLANCARTE:  Objection, Your Honor.  The

13   witness hasn't indicated he needs his recollection refreshed,

14   Your Honor.  And relevance.

15             MR. CARLTON:  I'm asking if he recalls writing it.

16             THE WITNESS:  Give me some more details and I'll

17   tell you if I --

18   Q.    BY MR. CARLTON:  (Reading:)

19                  Jesus Gonzalez was driving a late model

20           Red-Black ford Bronco, license number unknown, and

21           carried Durango state police credentials in his

22           name.

23             Do you recall writing that?

24             MR. BLANCARTE:  Same objection.  Relevance and

25   materiality, Your Honor.

1295

1    THE COURT:  It doesn't appear to be relevant at

2    this point.  Is there some point to this?

3    MR. CARLTON:  Relates to the witness list, Your

4    Honor.  To other individuals on their witness list.

5    THE COURT:  It's not relevant.

6    MR. CARLTON:  May I have just a moment?

7    (Pause in proceedings.)

8    Q.   BY MR. CARLTON:  Do you know whether Ruben Zuno Arce was

9    a suspect at the time that you were in Guadalajara in

10   relation to the kidnapping of Agent Camarena?

11   MR. BLANCARTE:  Objection; relevance as to who was

12   a suspect.

13   THE COURT:  Overruled.

14   THE WITNESS:  Would you repeat your question, please.

15   Q.   BY MR. CARLTON:  Do you know whether Ruben Zuno Arce was

16   a suspect in relation to the kidnapping of Enrique Camarena

17   when you were in Guadalajara?

18   A.   He was not as far as I -- to my knowledge.

19   MR. CARLTON:  May I approach the witness, Your

20   Honor?

21   THE COURT:  You may hand that to the clerk.

22   (Discussion held off the record between

23   Mr. Medvene and Mr. Carlton sotto voce.)

24   MR. CARLTON:  Pardon me, Your Honor.

25   THE COURT:  Hand it to the clerk.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1296

1   Q.   BY MR. CARLTON:   Do you recognize that handwriting, sir?

2   A.   No, sir, I sure don't.

3          THE COURT:   Any further questions?

4          MR. CARLTON:   Just a moment, Your Honor.

5          (Discussion held off the record between

6          prosecuting attorneys sotto voce.)

7   Q.   BY MR. CARLTON:   Sir, have you ever worked as a private

8   investigator?

9   A.   Yes, sir, I have.

10   Q.   Have you ever worked as a private investigator for Ruben

11   Zuno Arce?

12   A.   No, sir, I have not.

13   Q.   Do you still work as a private investigator?

14   A.   From time to time.   I haven't worked as a private

15   investigator for a while.

16          MR. CARLTON:   Nothing further, Your Honor.

17          THE COURT:   Any further questions?

18          MR. BLANCARTE:   Yes.   Briefly, Your Honor.

19

20                    REDIRECT EXAMINATION

21   BY MR. BLANCARTE:

22   Q.   Mr. Rodriguez, after you and Agent Kuykendall met with

23   Mr. Zuno in San Antonio in 1986, did you have occasion to

24   speak with Agent Kuykendall again regarding that meeting?

25   A.   After -- yes, I spoke to him on several occasions after,

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1297

1   after the meeting with Zuno.

2   Q.    And isn't it true that when you spoke to Agent

3   Kuykendall, he told you there was no evidence that Ruben Zuno

4   was involved --

5              MR. CARLTON:  Objection; hearsay.

6              MR. MEDRANO:  Objection.

7              MR. BLANCARTE:  Excuse me.

8              There was no evidence that Ruben Zuno Arce was

9   involved in the abduction of Agent Camarena in any way?

10             MR. CARLTON:  Objection; hearsay.

11             THE COURT:  Overruled.

12             You may answer that.

13             THE WITNESS:  He indicated to me that, that, uh,

14   there was no evidence.

15   Q.    BY MR. BLANCARTE:  You mentioned that confidential

16   informants are necessary.  Isn't it also necessary to

17   independently corroborate what confidential informants tell

18   you, sir?

19   A.    That's the usual procedure, yes.

20   Q.    And why is it necessary?

21             MR. CARLTON:  Asked and answered, Your Honor.

22             THE COURT:  Sustained.

23   Q.    BY MR. BLANCARTE:  Mr. Rodriguez, when you were working

24   as a special agent for the DEA in Eagle Pass, Texas, or any

25   of your other assignments, did you receive any --

1298

1    Didn't you, in fact, receive a sustained superior

2  performance award for your service as an agent?

3  A.    Yes, sir, I did.

4  Q.    And while you were a DEA agent in Eagle Pass, Texas,

5  isn't it correct that you were responsible and accredited

6  with a 300 percent increase in productivity out of that

7  office in terms of narcotics seizures and arrests?

8          THE WITNESS:  That's correct.

9          MR. CARLTON:  Objection; irrelevant.

10          THE COURT:  Sustained.

11          MR. BLANCARTE:  No further questions.

12          THE COURT:  All right.  We will take our morning

13  recess at this time.

14          THE CLERK:  Please rise.

15          (Recessed from 10:53 a.m. until 11:05 a.m.)

16          THE COURT:  Call your next witness.

17          Swear the witness.

18          THE CLERK:  Please.

19

20          WILLIAM J. CANALEZ,

21  called as a witness on behalf of the defendant, having been

22  first duly sworn, was examined and testified as follows:

23          THE CLERK:  Please raise your right hand.

24          You do solemnly swear that the testimony you may

25  give in the cause now pending before this Court shall be the

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1299

1   truth, the whole truth, and nothing but the truth, so help

2   you God?

3                 THE WITNESS:  I do.

4                 THE CLERK:  Please be seated.

5                 MR. BLANCARTE:  Your Honor, before we proceed, may

6   I ask --

7                 THE CLERK:  State your full name for the record

8   and spell your last name.

9                 THE WITNESS:  William J. Canalez, C-a-n-a-l-e-z.

10                 MR. BLANCARTE:  Before proceeding, may I ask

11   Ms. Fulginiti assist with the exhibits in the same manner

12   that the government's able assistant did.

13                 THE COURT:  Yes.

14                 Proceed.

15                 MR. BLANCARTE:  Thank you, Your Honor.

16

17                          DIRECT EXAMINATION

18   BY MR. BLANCARTE:

19   Q.   Mr. Canalez, what is your educational background

20   briefly, please.

21   A.   I am a college graduate of the University of Arizona at

22   Tucson, Arizona.

23   Q.   And do you have any background in the military, sir?

24   A.   Yes, sir, I was -- I served in the U.S. armed forces,

25   U.S. Army.

1300

1    Q.   And do you have any employment history and experience in

2    law enforcement?

3    A.   Yes, sir, I do.  I was a special agent for the Federal

4    Bureau of Investigation and I was also an investigator and

5    compliance officer for the U.S. Department of Labor.

6    Q.   And in becoming a special agent for the FBI, did you

7    have any special training or academy training?

8              MR. MEDRANO:  Objection; relevance, Your Honor.

9              MR. BLANCARTE:  It's a foundation for his

10   experience.

11             THE COURT:  Overruled.

12   Q.   BY MR. BLANCARTE:  You may answer the question, sir.

13   A.   In order to become a special agent of the FBI, you have

14   to go through the academy, the FBI academy in Quantico,

15   Virginia, and I did that.

16   Q.   And what type of training did you receive at the FBI

17   academy?

18             THE COURT:  I don't think we need that, counsel.

19             MR. BLANCARTE:  Thank you, Your Honor, I'll

20   proceed.

21   Q.   While you were with -- how long were you with the FBI,

22   sir, total?

23   A.   Twelve years.

24   Q.   And briefly what type of work did you do for the FBI

25   while you were an agent?

1301

1    A.    I did criminal investigations.

2    Q.    Any particular kind?

3    A.    Organized crime work, fraud work, like that.

4    Q.    Are you trained in surveillance techniques, sir?

5    A.    Yes, sir.

6    Q.    And have you ever worked as a private investigator, sir?

7    A.    Yes, sir.

8    Q.    And have you ever been employed as a private

9    investigator in this case?

10   A.    Yes, sir.

11   Q.    And is it correct that you were employed by counsel for

12   Mr. Ruben as a private investigator in this case?

13   A.    Yes, sir.

14         THE COURT:  Mr. Zuno?

15         MR. BLANCARTE:  Yes, sir.  Mr. Zuno.

16   Q.    And were you given a specific assignment with regard to

17   this case, Mr. Canalez?

18   A.    Yes, I was.

19   Q.    And could you generally tell me what that assignment was.

20         THE COURT:  Let me ask you.  You need not speak

21   directly into the mike, you just speak straight ahead and

22   that will be fine; so you don't need to lean over.

23         THE WITNESS:  Okay, thank you, sir.

24         THE COURT:  We hear you fine.  Go ahead.

25         MR. BLANCARTE:  Yes.  Do you have the question or

1302

1   would you like me to repeat it?

2            THE COURT:  What was your assignment?  Is that

3   correct.

4            MR. BLANCARTE:  That's correct, Your Honor.

5            THE COURT:  What were you asked to do?

6            THE WITNESS:  The assignment was to accompany a

7   photographer and an attorney to Guadalajara and Mascota,

8   Mexico, and to conduct some -- to take some video tape, some

9   photographs and conduct some interviews.

10  Q.   BY MR. BLANCARTE:  And those video tapes and photographs

11  and interviews, were these conducted -- where were those

12  conducted, sir?

13  A.   That was done primarily in Mascota, Jalisco, Mexico.

14  Q.   Did you cause those photographs and videos to be taken?

15  A.   Yes, sir.

16  Q.   Mr. Canalez, I'll direct you to what has been marked as

17  the government's exhibit No. 2, which is on the easel and has

18  been previously identified as a map of the State of Jalisco

19  and I'll ask you, if you will, with the court's permission,

20  approach exhibit 2.

21           THE COURT:  You may.

22           THE WITNESS:  (Witness complies.)

23  Q.   BY MR. BLANCARTE:  And maybe I could suggest you come on

24  this side of the jury, please.

25  A.   (Witness complies.)

1303

1    THE COURT:  Actually, it's better on the other
2  side.

3    MR. BLANCARTE:  Better?  Certainly the judge is
4  correct, you can stand on that side.

5    THE COURT:  So the court can see also.  The jurors
6  can see.

7    MR. BLANCARTE:  Yes, that's clearly the best place.
8  Q.   Without making any marks on the government's exhibit,
9  would you please, if you can, indicate where Guadalajara is
10  on that map.  No marks, just if you'll point with your finger.
11  A.   The yellow oval circle right here.
12  Q.   And, sir, if you'll indicate where Mascota Jalisco is on
13  that map without making any mark.
14  A.   Mascota is west.  It's right here.
15  Q.   And can you find on there a town by the name of the
16  Tomatlan?
17  A.   Yes.  It's, Tomatlan is also west of Guadalajara, west
18  of Moscato -- or Mascota and at somewhat south near the coast.
19  It's right here.
20  Q.   And on the governments's exhibit that you're pointing
21  to, is there some kind of legend that indicates the scale in
22  miles or kilometers, sir?
23  A.   It indicates what appears to be two inches is equal to
24  40 kilometers, which would be approximately 24 miles.
25  Q.   And from looking at exhibit, government's exhibit No. 2,

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1304

1    can you give us your best approximation of the distance in a

2    straight line from Guadalajara to Mascota.

3    A.    Approximately a hundred miles.   That's very rough.

4    Q.    And can you also indicate on government's exhibit 2,

5    using that scale on that map, the approximate distance from

6    Mascota to Tomatlan?

7    A.    About 48 miles.

8    Q.    Thank you, Mr. Canalez.   If you would please return to

9    the witness stand.

10   A.    (Witness complies.)

11   Q.    Mr. Canalez, I'll ask that you look at what has been

12   marked for identification as defendant's exhibit 409.

13   A.    (Witness complies.)

14   A.    You have the wrong side.   This is what you want.

15   Q.    Would you please tell us what exhibit 409 is, sir.

16   A.    It's a map of the State of Jalisco, Mexico and of, uh,

17   (pause) it's primarily a map of the State of Jalisco and some

18   surrounding states.

19   Q.    And is that a map which duplicates the map which you've

20   been referring to, which is government's exhibit No. 2?

21   A.    Yes, sir.   Different scale.

22   Q.    Would you please mark with an X -- you've got a red pen.

23   Would you mark with a red X within a circle where Guadalajara

24   is on government's (sic) exhibit 409, please.

25   A.    (Witness complies.)   All right.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1305

1    Q.    Now if you would mark on that same exhibit with a red X

2    within a circle where Mascota is, please.

3    A.    (Witness complies.)  All right.

4    Q.    And, sir, do you see Tomatlan on defendant's exhibit

5    409?

6    A.    Yes, sir.

7    Q.    Would you mark that with just a circle and no X within

8    the circle.

9    Q.    Sir, does government's (sic) exhibit 409 also contain a

10   legend with a scale of distance as the one on government's

11   exhibit No. 2?

12   A.    Yes, sir, it does.

13   Q.    Thank you.

14         MR. BLANCARTE:  Your Honor, I would ask that

15   exhibit 409 be moved into evidence.

16         THE COURT:  It may be admitted.

17      (Received in Evidence Exhibit No. 409.)

18   Q.    BY MR. BLANCARTE:  Mr. Canalez, I'd now like to direct

19   your attention to defendants Zuno's exhibit number -- strike

20   that.

21         Let me take you back to your trip from Guadalajara

22   to Mascota.  Is that the trip you made in your investigative

23   trip that you testified to earlier?

24   A.    Yes, sir.

25   Q.    And how did you travel from Guadalajara to Mascota?

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1306

1   A.   We traveled by vehicle, a suburban, a 4-wheel.

2   Q.   And approximately how long did it take you to travel

3   from Guadalajara to Mascota?

4   A.   It was approximately five hours.

5   Q.   And that five hours is one way?

6   A.   Yes, sir.  Five hours from Guadalajara to Mascota.

7   Q.   And would you, please, can you describe the road that

8   connects Guadalajara from Mascota.

9   A.   Leaving Guadalajara, it's a -- it was a paved road in

10  the City of Guadalajara, four lanes at times.  As you got to

11  the outskirts of Guadalajara, it became a two-lane road.  It

12  stayed a two-laned paved road until approximately the area of

13  the town of Ameca.  That's A-m-e-c-a.

14  Q.   Okay.

15  A.   At that --

16  Q.   May I interrupt you for just a second.

17        With the court's permission, if you'll approach

18  government's exhibit No. 2 and indicate, if you can, where

19  the town of Ameca is.

20        May he, Your Honor?

21        THE COURT:  (Nods head up and down.)

22        THE WITNESS:  (Witness complies.)  Ameca is west

23  of Guadalajara, right about here.

24  Q.   BY MR. BLANCARTE:  And is there any indication on

25  government's exhibit 2 which you recognize to illustrate that

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1307

1  there is a paved road that connects Guadalajara to Ameca?

2  A.   From Guadalajara to Ameca, it's a red -- a red line and

3  there is a symbol that shows that it's 70, so I would assume

4  that would be highway 70.  And it says it's a paved road,

5  paved highway.

6  Q.   And would you then direct your attention to the road, if

7  any, that connects Ameca to Mascota.

8  A.   Ameca is here, Mascota is here.  It would appear that

9  this is the road (indicating) along these lines.  And that's

10  a broken red line, the open space is white.

11  Q.   Could you see on the legend what the indication is for a

12  broken red line road?

13  A.   It's right here.  It says "Camino con revestimiento"

14  and I'll leave it up to the translator to tell me what

15  "revestimiento" is supposed to mean.

16  Q.   Thank you.

17  A.   Road with --

18  Q.   Could you then return to the witness stand, please.

19       Could I ask you to show the witness exhibit 409

20  briefly again.

21       MS. FULGINITI:  (Complies.)

22  Q.   BY MR. BLANCARTE:  Could you locate the town of Ameca on

23  exhibit 409 and mark that with a circle and no X in it.

24  A.   (Witness complies.)

25  Q.   On exhibit 409 do you see a line indicating a road

1308

1    connecting Ameca to Mascota?

2    A.    Yes, sir.

3    Q.    And do you see any kind of a legend that would tell you

4    what type of road that is?

5    A.    The only legend I see that appears to be referring to

6    this road from Ameca to Mascota is a legend that has

7    "Revestida" on it.

8    Q.    Okay.  Is there a line that indicates a road connecting

9    Mascota to Tomatlan?

10   A.    Yes, sir.

11   Q.    Thank you.

12         You can take the exhibit.

13         Mr. Canalez, I interrupted you when you were

14   describing the road from Guadalajara to Mascota.  You, I

15   think, were about to answer a question.  I'll rephrase it or

16   repose the question.

17         In your investigative trip from Guadalajara to

18   Mascota, was there a paved road from Ameca -- did that paved

19   road continue from Ameca to Mascota, from your personal trip

20   on that road?

21   A.    I believe the paved road stopped shortly after we left

22   Ameca.

23   Q.    Would you please describe the road that connects Ameca

24   to Mascota based on your traveling that road.

25   A.    At the very best, it was a two-lane dirt road.  At the

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1309

1  very worst, and much of the trip was close to being the

2  worst, it was one lane with many, many, many holes, small

3  ravines, small canyons in the road, in the dirt road caused

4  by rain, running water.  It was an extremely rough, rough

5  road.  I hadn't been on a road like that since I was a young

6  person.  And that's a long time ago.

7  Q.   Did you, in fact, have to detour around some of these

8  ravines and holes that you described?

9  A.   Oh, yes, sir.  Yes, sir, we definitely had to.  We drove

10  very slowly through many parts of it.

11        The road was dry.  We went through some -- we

12  crossed some what would be creek areas and you could see the

13  water in the creek.  But the road was dry.  But it was a dirt

14  road and it was just in horrible, horrible condition, ugly

15  road.

16  Q.   How long did it take you to travel from Ameca on this --

17  strike that.

18        Was the road between Ameca and Mascota a straight

19  road, sir?

20  A.   No, sir.

21  Q.   What type of -- what kind of road was it?

22  A.   It -- there were many turns in it.  Towards the latter

23  part of the trip between Ameca and -- and Mascota, we started

24  climbing, we started going over hills or mountains and so

25  there were many turns.  It was curvy.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1310

1   Q.   So by the time you reached Mascota, you had traveled an

2   elevation up into mountains?

3   A.   Yes, sir.

4   Q.   Did you encounter, to your recollection, any vehicles

5   coming in the opposite direction on the dirt road that

6   connects Ameca to Mascota?

7   A.   I believe I remember one instance --

8   Q.   Just yes or no.

9   A.   Yes.  Yes, we did.

10   Q.   And to your recollection did you ever have to pull over

11   to one side or did the other vehicle pull over because it was

12   impossible for two vehicles to pass at the same time?

13   A.   Yes, sir.  I do recall that.

14   Q.   Okay.  How long did it take you to drive from Ameca to

15   Mascota?

16   A.   My best estimate would be about three and a half hours.

17   Q.   And is it correct that even though it is the approximate

18   same distance, from what you've shown us on the map, between

19   Guadalajara and Ameca, which took you one and a half hours,

20   even though it's the same distance from Ameca to Mascota,

21   that took you three and a half for approximately the same

22   distance; is that correct?

23        THE COURT:  That's what the witness has said.

24        MR. BLANCARTE:  Thank you.

25   Q.   Based on your personal experience in having taken that

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1311

1    trip to -- that road from Guadalajara to Mascota, how long

2    would it take to make an uninterrupted no-stops round trip

3    from Guadalajara to Mascota and from Mascota to Guadalajara?

4    A.    Well, assuming our trip was a five-hour trip, which that

5    is about what it was, and that the return trip was about the

6    same time, that's -- that's a ten-hour trip.  And the person

7    driving us drove faster than I thought the driver should

8    drive.  Not unsafely but still faster.

9    Q.    Focusing on this area, if you had gone to Tomatlan,

10   could you have made that same trip in ten hours?

11   A.    Not from what I can recall, no, sir.  Not if the road

12   from Mascota to Tomatlan is the same as it is from Ameca to

13   Mascota.

14   Q.    Now, Mr. Canalez, I'd like to direct your attention to

15   what has been marked as defendant Zuno's exhibit No. 416.

16   And without showing it to the jury, because it's only been

17   marked for identification at this point, I'll ask if you can

18   look at that photograph.

19         Do you recognize that photograph, sir?

20   A.    Yes, sir.

21   Q.    And is that one of the photographs that you caused to be

22   taken during your investigative trip to Mascota that you've

23   been telling us about?

24   A.    Yes, sir.

25   Q.    And what is depicted in that photograph as you recollect

1312

1  from your trip?

2  A.    It depicts part of the town of Mascota and a sign which

3  says "Mascota" and 13,000 population, population 13,000.

4  Q.    To your personal knowledge and recollection of your

5  investigative trip, is that the main entrance into Mascota

6  from the dirt road you described?

7  A.    That's the only place where I saw the sign, yes, sign

8  for the town of Mascota, yes.

9  Q.    Thank you.

10              (Discussion held off the record between

11              Mr. Medvene and Mr. Blancarte sotto voce.)

12              MR. BLANCARTE:   Your Honor, I would like to

13  request the exhibit 416 be moved into evidence.

14              MR. MEDRANO:   Objection; relevance grounds, Your

15  Honor.

16              THE COURT:   It may be received.

17              (Received in Evidence Exhibit No. 416.)

18              MR. BLANCARTE:   And I'll ask that it be placed on

19  the easel so that the jury can see it.

20              THE COURT:   Ask your next question.

21              MR. BLANCARTE:   Yes, sir.

22  Q.    I'd like to direct your attention, Mr. Canalez, to what

23  has been marked as government's exhibit 411 -- I'm sorry,

24  strike what I said.  It's defense exhibit 411.

25  A.    Yes, sir.

1313

1    Q.    Do you recognize that photo, sir?

2    A.    Yes, sir.

3    Q.    And would you -- is that one of the photos you caused to

4    be taken during your investigative trip to Mascota?

5    A.    Yes, sir.

6    Q.    And what is depicted in that photograph?

7    A.    It's a photograph of a stable area, a place to house,

8    house or maintain, some animals.  It's in a part of -- that

9    property was known as LaJoya.

10   Q.    Okay.  If you will return that exhibit, move that

11   exhibit down.

12              MS. FULGINITI:  (Complied.)

13              MR. BLANCARTE:  Would you put the first exhibit on

14   the easel, please.  Thank you.

15   Q.    Now, Mr. Canalez, I'd like to now direct your attention

16   to defendant Zuno's exhibit 412-A and ask that you look at

17   that without showing it to the jury.

18   A.    (Witness complies.)  Yes, sir.

19   Q.    Is that a photograph that you caused to be taken during

20   your investigative trip to Mascota?

21   A.    Yes, sir.

22   Q.    And what is depicted on that photograph?

23   A.    It's a (pause) warehouse, open -- open air warehouse

24   with a brick wall and a broken down pickup truck next to it.

25   Q.    Thank you.

1314

1    Let me ask you to take one last look at that

2   exhibit.  Is that a picture that also depicts something from

3   your investigative trip that was referred to as a wood shop,

4   a carpenter shop?

5   A.    Yes, sir, that's a wood shop.  And inside - it really

6   can't be seen - is one small machine that unless you were

7   there, you wouldn't recognize it was a machine used to cut

8   wood.

9   Q.    And you were there; is that correct?

10  A.    Yes, sir.

11  Q.    Thank you.

12         Now I'd like to direct your attention to what has

13  been marked as defendant Zuno's exhibit 412-B and ask you if

14  that is a photograph that you caused to be taken as part of

15  your investigative trip to Mascota?

16  A.    Yes, sir.

17  Q.    And what is depicted on that exhibit?

18  A.    This is the inside of this open air warehouse that I

19  referred to and this shows some woodworking, some machinery

20  used to manufacture, to construct wooden furniture, objects.

21  Q.    Was that open warehouse that you on your trip referred

22  to as a wood shop or carpenter shop?

23  A.    Yes, sir.

24  Q.    Thank you.

25         And now, Mr. Canalez, I'd like to refer your

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1315

1    attention to defendant Zuno's exhibit No. 414.   Is that a

2    photograph that you caused to be taken during your

3    investigative trip to Mascota?

4    A.   Yes, sir.

5    Q.   And what is depicted on that photograph?

6    A.   This is the enclosed -- this is a much -- it's a

7    different building.   It's a warehouse, it's enclosed, and it

8    has a large open area in the foreground, and in the

9    background are some of the furniture, wood, the chairs and

10   tables that had been prepared in the subsequent photograph.

11   Q.   At the time you caused that photograph to be taken, was

12   that referred to as the cannery?

13   A.   Excuse me, sir?

14   Q.   At the time you caused that photograph to be taken, was

15   that building referred to as the cannery?

16   A.   The cannery?

17   Q.   Yes.

18   A.   I was not familiar with that name, sir, I'm sorry.

19   Q.   Thank you.

20        I'd like to direct your attention to defendant

21   Zuno's exhibit 413.   Is that a photograph that you caused to

22   be taken during your investigative trip to Mascota?

23   A.   Yes, sir.

24   Q.   And what is depicted on exhibit 41- -- uh, 413?

25   A.   This is an open air warehouse that's on the property,

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1316

1    umm, that is referred to as LaJoya and there are approx- --

2    this shows a machine with some wooden blocks that have been

3    cut and stacked.

4    Q.    Thank you.

5          And now I'd like to direct your attention to

6    defendant Zuno's exhibit 415.   Is that a photograph you

7    caused to be taken during your investigative trip?

8    A.    Yes, sir.

9    Q.    And what is depicted on that photograph?

10   A.    There is a gas station.   There is a building, a gas

11   station; one pump at the main gas station and a second pump

12   some 20 or 30 yards away.

13   Q.    Thank you.

14         And now if I could direct your attention to

15   defendant Zuno's exhibit 419.   Is that a picture you caused

16   to be taken on the same trip?

17   A.    Yes, sir.

18   Q.    What is depicted on that photograph?

19   A.    This is a building and this building is referred to as

20   the kindergarten.   It's a school, kindergarten level.

21   Q.    Thank you.

22         I refer your attention to defendant Zuno's exhibit

23   420.   That is a photograph that you caused to be taken in

24   Mascota?

25   A.    Yes, sir.

1317

1    Q.    What is depicted on exhibit 420?

2    A.    This is the -- this is also a school.  It's a larger

3    building.   There are two large trees in front of it -- or

4    three trees in front of it, and they're encircled by a

5    rectangular wall which you can sit on.   This is a 7th and 8th

6    grade level school.

7    Q.    Thank you.

8             And now I'd like to direct your attention to

9    defendant Zuno's exhibit No. 418-A.   Is that a photograph

10   that you caused to be taken?

11   A.    Yes, sir.

12   Q.    And what is depicted on exhibit 418-A?

13   A.    This is a photograph of a mural that was on a wall near

14   the entrance to the 7th/8th grade school and it shows one

15   man, very large, dark coat and tie.

16             MR. MEDRANO:  I am going to object to the

17   description, Your Honor.

18             THE COURT:  You need not describe it.

19             MR. BLANCARTE:  That's fine, thank you.

20             THE WITNESS:  All right.

21   Q.    BY MR. BLANCARTE:  I'd like to now direct your attention

22   to defendant Zuno's exhibit 418-B.   Is that a photograph that

23   you caused to be taken during your investigative trip?

24   A.    Yes, sir.

25   Q.    And what is it, without describing in detail?

1318

1    A.    This is a part of a mural from a previous exhibit.

2    Q.    Is it a closeup version of the prior exhibit you

3    identified?

4    A.    Yes, sir.  It's a closeup version of part of the prior

5    exhibit.

6    Q.    Thank you.

7    A.    The previous exhibit.

8    Q.    And now I direct your attention to defendant Zuno's

9    exhibit 418-C.  Is that a photograph that you caused to be

10   taken during your trip?

11   A.    Yes, sir.

12   Q.    And what is depicted there?

13   A.    This is also a closeup of the mural.

14   Q.    Thank you.

15         Now if you will please direct your attention to

16   defendant Zuno's exhibit 421.

17   A.    (Witness complies.)

18   Q.    Strike that, sorry.  Defendant's exhibit, yes, 421.  I'm

19   sorry, that's correct, 421.  Is that a photograph that you

20   caused to be taken?

21   A.    Yes, sir.

22   Q.    And what is depicted on exhibit 421?

23   A.    This is a plaque that was above a door inside this

24   school, the 7th-8th grade school.

25   Q.    Thank you.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1    Now I'd like to direct your attention to defendant

2  Zuno's exhibit 417.

3  A.    (Witness complies.)

4  Q.    Is that also a photograph that you caused to be taken in

5  Mascota?

6  A.    Yes, sir.

7  Q.    And what is depicted on exhibit 417?

8  A.    This is a part of the town of Mascota which is called

9  Plaza de las Danderas.

10  Q.    What do you see on that photograph?

11  A.    A stone monolith holding a pole, which would be a flag

12  pole.

13  Q.    Flag pole.  Thank you.

14    And one last exhibit, Mr. Canalez.  I'd like to

15  direct your attention to defendant Zuno's exhibit 410, which

16  is in the form of a VHS video cassette.

17  A.    Yes, sir.

18  Q.    Do you recognize exhibit 410?

19  A.    Yes, sir.

20  Q.    And what is exhibit 410?

21  A.    This is a video tape cassette of Mascota and the home of

22  Mr. Zuno.

23  Q.    Did you cause that video tape to be taken during your

24  investigative trip to Mascota?

25  A.    Yes, sir.

1320

1   Q.   And do you see any mark or signature of yours that

2   indicates that that is the tape that you caused to be taken?

3   A.   Yes, sir.

4   Q.   What is that mark or --

5   A.   Well, I have a date, December 11th, 1992, with my

6   initials.

7   Q.   That's your handwriting?

8   A.   Yes, sir.

9   Q.   Thank you.

10          Just a moment.

11          Mr. Canalez - thank you, Ms. Fulginiti - based on

12   your investigative trip to Mascota --

13          By the way, when did you take this trip?

14   A.   The trip was taken in April of 1990, about the middle of

15   April of 1990.

16   Q.   And based on your investigative trip to Mascota, what

17   kind of town is Mascota?

18   A.   It's a small -- it's a town of approximately 10,000,

19   13,000 people.  It's a small town.  It was as if you had

20   stepped back in time 40 to 50 years when you went into the

21   town.

22   Q.   Is it a --

23          Well, by the way, Your Honor, I'd like to have the

24   video tape as defendant's exhibit 410 moved into evidence,

25   please.

1321

1    MR. MEDRANO:  Your Honor, may we be heard at the

2    recess on these items?

3    THE COURT:  Yes.

4    MR. BLANCARTE:  Very well.

5    Q.   I am sorry, you stated that is a rural town or a --

6    rural town, is that what you say?

7    A.   Yes.  It's a rural and agricultural town.  It's

8    surrounded by open areas, land that is cultivated.  There is

9    nothing around it except fresh air, animals.

10   Q.   While you were in Mascota on your investigative trip in

11   1990, did you visit a residence which was the home of

12   Mr. Ruben Zuno?

13   A.   Yes, sir.

14   Q.   Uh-huh.  And from your recollection of that trip, was

15   Mr. Zuno's residence located on a ranch?

16   A.   Mr. Zuno's residence was, could be referred to as a

17   ranch, yes, sir.

18   Q.   Did anyone refer to that ranch by name?

19   A.   They may have, sir.  If they did, I've forgotten what

20   the name was.

21   Q.   Does the name LaJoya refresh your recollection?

22   A.   Oh, yes, sir, LaJoya.  But I, I thought of LaJoya as the

23   area a little south of his ranch, but I guess LaJoya....

24   Q.   The home, Mr. Zuno's home was located on that property;

25   correct?

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1322

1    A.   Yes, sir.

2    Q.   Did you go to the home of Mr. Zuno?

3    A.   Yes, sir.

4    Q.   Would you please describe that home from the outside.

5    A.   One story, brick.  Basically two rectangular buildings,

6    not large.  And an open area between the two buildings which

7    were connected by a narrow walkway.  The area that you walked

8    into where the main door was was primarily where they --

9    where the family would sleep.  And from there they would go

10   through the walkway to the other rectangular area, and that

11   was more of a living room/kitchen/sitting room area.

12   Q.   And based on your having gone to that home and viewed it

13   from the outside, would you say that was a luxury home, sir?

14          MR. MEDRANO:  Objection; relevance, Your Honor.

15          THE COURT:  Sustained.

16   Q.   BY MR. BLANCARTE:  How would you characterize the home

17   you saw, sir?

18          MR. MEDRANO:  Same objection, Your Honor.

19          THE COURT:  Sustained.

20          We will take our noon recess at this time and

21   reconvene at 1:30.

22          THE CLERK:  Please rise.

23          THE COURT:  The jury may be excused.

24          THE CLERK:  Please rise.

25          (Jury excused at 11:50 a.m.)

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1323

1    THE COURT:  You may step down.

2    THE WITNESS:  Thank you.

3    THE CLERK:  You may be seated.

4    THE COURT:  Now, you wanted to take up something

5    with the court?

6    MR. MEDRANO:  May I address these particular

7    exhibits, Your Honor?

8    THE COURT:  Well, if that's what you wanted to

9    take up.

10   MR. MEDRANO:  Yes, Your Honor, very briefly.

11   Your Honor, under rule, Federal Rule of Evidence

12   404(a), a character of a person's -- evidence of a person's

13   character is only relevant if it's a pertinent trait to this

14   case.  You saw those photographs, Your Honor, and among the

15   things that the photograph depicts are buildings with the

16   plaque "Zuno Arce" on them, maybe some plaza with his name on

17   it, murals that depict the family of Zuno.

18   Where I think all this is headed -- and let me

19   just tell you my thought -- is that this is going to be

20   presented as some type of character evidence that Zuno is a

21   good man.  Now, that is specifically prohibited by Rule

22   404(a), Your Honor, and it's on that basis we object to the

23   admission of those exhibits that are offered for that purpose.

24   The plaque photograph, photographs of the mural,

25   several murals, Your Honor, so we'd object to all those

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1324

1   because they're not relevant and 404-A doesn't allow it.

2          THE COURT:  What is the purpose of these

3   exhibits?  What are you offering them for?

4          MR. BLANCARTE:  Yes, Your Honor.  First of all, we

5   have not moved them into evidence or asked --

6          THE COURT:  I know you haven't.

7          MR. BLANCARTE:  And we have other witnesses who

8   will be testifying to these exhibits.

9          THE COURT:  But ultimately you expect to move them

10  into evidence.  I don't think you had them made up simply to

11  show --

12         MR. BLANCARTE:  You're absolutely correct, Your

13  Honor.

14         THE COURT:  -- that this witness was a tourist

15  into Mexico.

16         MR. BLANCARTE:  That's correct.  We intend to move

17  them into evidence.

18         THE COURT:  For what purpose?

19         MR. BLANCARTE:  We intend to show the type of

20  evidence that the government has showed as to the housing.

21  The foundation the government has laid as to housing,

22  residences that they have attributed --

23         THE COURT:  You want to show that his residence is

24  not consistent with those of the traffickers.

25         MR. BLANCARTE:  That's correct, Your Honor.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1325

1    THE COURT:  And therefore he lived a more moderate

2    life style.

3    MR. BLANCRTE:  That's correct, Your Honor.

4    THE COURT:  Well, is that not character evidence

5    or isn't it under 404(b)?

6    MR. BLANCARTE:  It is not character evidence.

7    It's relevant and foundational as to the points elicited by

8    the government in their case in chief.

9    THE COURT:  Well, let's hear the rest of the

10   testimony regarding it, then I'll move on the admissibility.

11   Now I want to have a further hearing on the Rule

12   29 motion in a few moments.  But before I do, I want -- the

13   document that you filed this morning does not address an

14   issue that is very important to the court and I want you to

15   address it because your theory of this case changes from time

16   to time.

17   What is the government's theory here regarding --

18   Let me ask it this way:  Do you contend that the defendant

19   Alvarez was a member of the conspiracy prior to the kidnapping?

20   MR. CARLTON:  (Standing.)

21   THE COURT:  That is to say, he was a knowledgeable,

22   willing conspirator, joined the conspiracy with the intent to

23   help carry out the kidnapping, murder and torture?

24   MR. MEDRANO:  May I have a moment?

25   MR. CARLTON:  May I have just a moment, Your Honor?

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1326

1    (Discussion held off the record between

2    prosecutors sotto voce.)

3         MR. CARLTON:  Your Honor, the government's

4    evidence concerning the defendant's participation in this

5    particular conspiracy derives from the events on February

6    7th, 1985 and thereafter.

7         THE COURT:  Therefore I take it to mean that all

8    of the conspiracy charges against this defendant are based on

9    the events that occurred on February the 7th at Lope de Vega

10   and thereafter.

11        MR. CARLTON:  Well, Your Honor, the evidence of

12   the defendant's association with the cartel and his prior

13   involvement with them certainly precedes that date.

14        THE COURT:  I understand that.  I am not discussing

15   association by the defendant with other members of the cartel.

16   I am asking, the evidence on which you rely to establish that

17   this defendant was a member of these two conspiracies that

18   are alleged in the indictment is based upon events that

19   occurred prior to February 7th or February 7th and after.  I

20   think you've answered that.

21        MR. MEDRANO:  May I just have one moment for

22   clarification, Your Honor?

23        (Discussion held off the record between

24        prosecutors sotto voce.)

25        MR. CARLTON:  Your Honor, based on the events and

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1327

1  the evidence that occurred on February 7th, I think it's

2  possible to argue, and the government certainly intends to

3  argue, that he had some involvement or prior knowledge of

4  what was going on.  And this particular --

5          THE COURT:  Well, does that mean that based on

6  those events as shown by the evidence, that you feel they

7  establish that he was in on the intent to kidnap and murder

8  from the beginning?

9          MR. CARLTON:  From what point, we cannot say, Your

10  Honor.  But I certainly think it's reasonable to infer from

11  Machain's presence at the house when Camarena arrived and

12  from his presence in the meeting at Lope de Vega that night,

13  that he had prior knowledge of what was going.

14          THE COURT:  Well, you said the evidence of his

15  presence at the house when -- who arrived?

16          MR. CARLTON:  When Camarena was brought to the

17  house shortly -- immediately thereafter, after Lopez came out

18  of the guest house, he saw Machain in the main residence.

19  And then later on, of course --

20          THE COURT:  Who saw?

21          MR. CARLTON:  Lopez Romero saw him.

22          THE COURT:  All right.  Well, he did testify to

23  seeing the defendant at the residence.

24          Now, let me ask this question.  You have one

25  conspiracy here which charges this defendant with conspiracy

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1   to kidnap, torture and murder Enrique Camarena.  Now, if it

2   is based upon the facts that occurred after the kidnap, are

3   you saying that events that occurred after the kidnapping are

4   a basis which can form the evidentiary basis for finding that

5   he was a member of the conspiracy to kidnap?

6           MR. CARLTON:  Well, Your Honor, the kidnapping

7   continued all the way through the holding.  Kidnapping

8   includes holding of Agent Camarena, it's not simply the act

9   of taking him off the street and putting him in the house.

10  The whole sequence of events while he was being held against

11  his will at this house is part of the kidnapping.

12          THE COURT:  All right.  Now let me ask this, then.

13  Is it your theory of this case that this defendant was a

14  knowledgeable member of this conspiracy with guilty knowledge

15  and intending to help the other conspirators carry out at

16  least one object of the conspiracy - which was to kidnap,

17  torture or murder, or all three - that that is based upon the

18  evidence that the defendant gave a shot of Lidocaine to Agent

19  Camarena for the purpose of reviving him so that he could be

20  interrogated further?

21          MR. CARLTON:  That is certainly one of the

22  conclusions that can be drawn from the evidence, Your Honor.

23          THE COURT:  Well, what other conclusion do you

24  think the evidence -- what other rational, I mean, keeping in

25  mind that Rule 29 requires the court to view your evidence in

1    the light most favorable to your case and to make all

2    favorable inferences, what other evidence was there that

3    supports any other theory?

4                MR. CARLTON:  Well, Your Honor, I believe the

5    conspiracy charge under 1959 also referenced section 2,

6    aiding and abetting.

7                THE COURT:  All right.  But that requires the same

8    degree of knowledge --

9                MR. CARLTON:  That's right.

10               THE COURT:  -- as the conspiracy would require

11   itself, and the same intent.

12               MR. CARLTON:  But certainly the doctor could have

13   done several things to assist in this process.  One of them --

14               THE COURT:  No, not what he could have done.  What

15   does the evidence show in your view that he did.

16               MR. CARLTON:  The evidence shows that Dr. Alvarez

17   Machain was present at 881 Lope de Vega on February 7th of

18   1985 to assist the traffickers with his medical skills in

19   relation to the interrogation of Agent Camarena.

20               THE COURT:  Where is the evidence of his purpose --

21               MR. CARLTON:  The evidence of the purpose is from

22   several sources --

23               THE COURT:  -- to assist the traffickers with

24   Camarena?  Where is the evidence of the purpose?

25               The only evidence of how he came to be there is

1330

1   presented by your witness, which is the defendant's statement

2   of how he came to be there.  There is no other evidence of

3   why he was there or how he came to be there.

4            According to the statement that he gave to the

5   agent, he went there with Espana Gomez for, because Espana

6   Gomez wanted to see Camarena about his suspicions that he was

7   an informant for the DEA.

8            MR. RUBIN:  Excuse me, Your Honor, you mean

9   Caro-Quintero, not Camarena.  You said he wanted to see --

10           THE COURT:  Quintero.  Yes.  Caro-Quintero.

11           MR. CARLTON:  May I summarize the evidence?  Would

12   you like me to do that at this point?

13           THE COURT:  No, I'd like you to respond to my

14   question.  You've done that in the paper that you filed but

15   it isn't as clear as....  I want you to tell me specifically

16   what evidence supports the notion that he was there to assist

17   the traffickers.

18           MR. CARLTON:  Okay.

19           One.  Lopez Romero puts him at a meeting that

20   evening where the main conspirators are talking about what

21   they've just done.  They're sitting in the living room.

22   Dr. Alvarez Machain is present in the living room while they

23   talk about how Mr. Zuno says that he wanted the others to

24   hear it from the DEA's agent's own mouth.  Later on in the

25   evening there's talk about hiding the body, taking care of

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1331

1    the action, making sure that it was covered up and how this

2    has resolved their problem and they might do it again to

3    resolve other problems.

4            The government submits that the people who were

5    involved in this conspiracy would not have allowed into that

6    meeting as a mere spectator, having no involvement, Dr. Machain.

7    He was in that living room participating or sitting in on

8    that conversation and he was there for a purpose.  The

9    purpose is reflected from the fact that when Camarena first

10   arrived at the house, there is Dr. Machain waiting in the

11   house.  Later in the evening when the meeting is held, there

12   is Dr. Machain, he is still at the house.

13           The tapes show that Camarena was beaten, he was

14   tortured, he was in pain, he had trouble breathing, difficulty

15   speaking.  The tapes show that the interrogators were aware

16   of his physical condition, that they were concerned with his

17   physical condition.  At some point where he has pain in his

18   ribs and he asks for it to be bandaged, one of the inter-

19   rogators says, "Look at his condition, see," and at that

20   point the tape is turned off.  Now something --

21           Certainly they were concerned with his ability to

22   continue at that point.  They turned off the tape for a

23   reason.  We think it's a logical and reasonable inference

24   that the reason was to tend Agent Camarena.

25           Now, who is present at 881 Lope de Vega to do

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1332

1    that?  We know that Alvarez Machain is there.  We know that

2    he has the skills to do that.  We know that he is sitting in

3    the kitchen at some point that evening cleaning his syringes.

4            Now, why would one clean syringes?  Because they'd

5    either been used or he intended to use them.  He could have

6    used them, according to the defense for --

7            THE COURT:  Are you saying we have to infer from

8    the evidence that they were used on Agent Camarena rather

9    than on the other people at the house?

10           MR. CARLTON:  If he had -- well, we also have, let

11   me point out, the syringe itself found with traces of

12   Lidocaine.

13           THE COURT:  We don't know it's the syringe itself,

14   do we, from the evidence?

15           MR. CARLTON:  Well, we have a syringe with traces

16   of Lidocaine in it.  That syringe just happens to have been

17   found in the very location where Agent Camarena was

18   tortured.  It contains traces of Lidocaine and B-1.

19           There is no evidence that anybody else, any of the

20   other traffickers received injections of Lidocaine.  And even

21   if this syringe could have been used to inject someone else,

22   like one of the traffickers, with Lidocaine, it strains

23   coincidence that this would have been done, the syringe would

24   have been found in the filthy, dirty guest house where the

25   torture took place.  The traffickers would reasonably have

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1333

1   been injected with their pepper-uppers in the nice house, the

2   residence.

3          But even in they had been injected with vitamins,

4   this syringe contained the traces of the vitamins and the

5   Lidocaine.  That is consistent with it having been reused.

6   That is consistent with the doctor sitting in the kitchen

7   washing the syringes, trying to clean them out, like he might

8   have reused them.

9          Let's consider the post-arrest statement.  Here's

10  a man who when accused of being in the Lope de Vega house in

11  1986 never denies that he was there.  He is told that the DEA

12  has evidence that 50 to 60 people were there and could he

13  identify the photographs, and he says -- and puts the agent

14  off several times that he'd like to cooperate but somehow he

15  never does.  When he gets up here, he makes a statement.

16  Now he knows that there are too many people at Lope de Vega -

17  and the evidence is shown that there were many, many people

18  there - for him to credibly say that he was not there.  So he

19  admits that he was at Lope de Vega.  But what he doesn't say

20  is what he did while he was there.

21          According to his own statement, he is simply

22  wandering through the house looking through bedrooms on

23  various occasions for no good purpose while this torture and

24  interrogation is going on.  That is not reasonable.

25          He never says that he is giving medical attention

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1  to anybody.  If he had been doing something such as simply

2  giving a vitamin injection, which didn't have anything to do

3  with Camarena, don't you think that he would have said that?

4          I think that a jury could reasonably infer that if

5  he had a plausible explanation for being at the house and

6  seeing Camarena, he would have given that plausible

7  explanation.  But he didn't.  All he did was say that he was

8  wandering through the house.  He omitted to say what he was

9  doing there.

10          And based on all of the other evidence, when you

11  consider it in its totality, giving all of the reasonable

12  inferences and considering it in the light most favorable to

13  the government, I would submit that this is a case that cries

14  out to go to the jury.

15          THE COURT:  What are the effects of the evidence

16  that there was another doctor there --

17          MR. CARLTON:  May I have just a moment.

18          THE COURT:  -- who was administering to Camarena?

19          MR. CARLTON:  Your Honor, the only evidence that

20  there might have been another doctor there comes from

21  Dr. Machain's own post-arrest statement.

22          THE COURT:  You presented it as part of your case.

23          MR. CARLTON:  We presented it -- pardon me?

24          THE COURT:  You presented it as part of your case.

25          MR. CARLTON:  Certainly.  But you have to view the

1335

1   evidence in the light most favorable to the government.

2   First of all, it's the government's position that this

3   reference to another doctor is part of the self-serving

4   attempt to put the blame on somebody else and not talk about

5   what he was actually doing there.  When you resolve the

6   conflicts in the evidence in favor of the government, as you

7   have to do in a Rule 29 motion, that falls away.

8           THE COURT:  All right.

9           MR. MEDRANO:  Your Honor, can I just add one

10  additional thing?

11          In support of the government's theory that the

12  doctor was there to assist the cartel by treating Camarena, a

13  reminder of the testimony of George Gadoy, who said that he

14  observed Machain treating a member of the cartel for a

15  gunshot wound.  So in addition to treating people with the

16  vitamins, he would also assist the cartel by helping people

17  who had been hurt or injured.  And in light of that, Your

18  Honor --

19          THE COURT:  Well, this man appears to have two

20  relationships with these people.  He had a social relation-

21  ship and he had a professional relationship; that is, he

22  ministered to them as a medical doctor.  Now you're also

23  saying he had a criminal relationship with these people.

24  And this is the point that we're discussing now.

25          MR. MEDRANO:  Yes, sir.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1336

1    THE COURT:  What evidence supports a conclusion

2    that he had this criminal relationship; that he knew what was

3    happening and intended to help further the object?

4    Isn't it sheer speculation to say, when you talk

5    about giving him Lidocaine where no Lidocaine was found,

6    where no sign of any injection was found on the body of

7    Camarena, isn't it the wildest speculation to say that he was

8    there for that purpose - that he gave Lidocaine to a body

9    that shows no evidence of Lidocaine - and infer from that the

10   purpose for which it was given?  In fact, you are specific

11   enough to indicate that this was given because of the

12   fibrillation of the heart, of which there is no evidence.

13   This is all pure supposition, isn't it?

14   MR. MEDRANO:  Well, Your Honor, it isn't when it's

15   predicated on the very facts that you've heard.  Fibrillation

16   arrythmia of the heart, Dr. Barton was brought in to you to

17   explain that that physical abuse can cause that.

18   THE COURT:  If he objected to the evidence of that

19   witness, I would have sustained it.  Because you do not by

20   putting on an expert witness, discussing how medicine affects

21   a heart and what medicine is used for you, do not prove by

22   that that it was in fact done in this case.  That is the

23   mischief of that evidence.  I would have kept it out, if it

24   had been objected to, without first a showing that there had

25   been a use of Zylocaine -- or, Lidocaine on Agent Camarena

1337

1 and that he'd had a fibrillating heart.

2 You're presenting this expert witness to say this

3 could be used for that purpose hoping that the jury will draw

4 an inference that, in fact, the medication was administered.

5 MR. CARLTON:  Your Honor, there is no doubt in the

6 record that Agent Camarena was undergoing excruciating pain

7 and that that pain was interfering with his ability to talk.

8 That is clear on the tapes.

9 If Dr. Machain injected Agent Camarena with

10 Lidocaine to relieve that pain to enable him to continue to

11 talk, it amounts to the same thing.

12 THE COURT:  Yes.  If he did.  That is what you are

13 supposed to prove, isn't it?

14 MR. CARLTON:  And the evidence is sufficient to

15 support a reasonable inference that that is, in fact, what

16 happened or what he was there for.

17 THE COURT:  Well, that is the issue.

18 Do you wish to be heard here?

19 MR. RUBIN:  Yes, briefly, Your Honor.

20 Your Honor, everything the government just said is

21 exactly what the court says:  Speculation, supposition, bald-

22 faced assertions without proof.

23 THE COURT:  Well, except your client was there.

24 MR. RUBIN:  That's correct.  If you accept the

25 inference --

1338

1    THE COURT:  Well, you have to accept that evidence.

2    MR. RUBIN:  That's true.

3    THE COURT:  That he was there, that he was in the

4    living room with these traffickers, that he was washing out

5    syringes in the kitchen.

6    MR. RUBIN:  That is true, Your Honor.  But mere

7    presence, mere presence at the scene of a crime is

8    insufficient to convict.  Even knowledge of a conspiracy and

9    a crime taking place is not -- is insufficient to convict.

10   The law is clear about that.

11   If he is sitting in the living room and he hears

12   him -- hears everyone saying what they're hoping to do to

13   Camarena and they're going to kidnap him and he sits there

14   and doesn't participate, he may have complete knowledge of it

15   but he's not guilty of any crime for joining the conspiracy.

16   To join the conspiracy, you have to have some sort of

17   affirmative active participation, aiding and abetting.  And

18   nobody -- no evidence shows that.

19   Lopez Romero, first of all, timewise indicated

20   they were back with Camarena at 2:30 and saw Dr. Machain at

21   3:30.  So he didn't come right after.  So putting that aside,

22   all he said was he saw him in the house.

23   You're back to mere presence.  Why he might have

24   been allowed in the house to sit in the house, is irrelevant.

25   As long -- they may have thought he wouldn't say anything.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1339

1    THE COURT:  Well, but it's not irrelevant if it

2    supports the inference, as the government suggested, that he

3    was in on the whole thing, otherwise he would not have been

4    admitted into these confidential discussions.

5    MR. RUBIN:  He was there.  The only evidence why

6    he was there is in the post-arrest statement, for innocent

7    reasons, and they may have felt free to talk in front of him

8    for whatever reason but it doesn't show that he did anything.

9    And particularly when you get to medical skills, throughout

10   this case --

11   The government now is trying to sort of waffle on

12   their case.  Throughout this case they said repeatedly what

13   they accused him of is giving Camarena an injection of

14   Lidocaine to stop or relieve a heart arrythmia.

15   There is no evidence that Enrique Camarena got an

16   injection of anything by anybody.  There is no evidence that

17   he had a heart arrythmia at any time.  He may have been in

18   pain.  That doesn't indicate that you have a heart arrythmia.

19   Let me check my notes.

20   There was plenty of -- As far as that syringe,

21   Your Honor, his fingerprints aren't on it, there is no evi-

22   dence that that syringe has anything to do with Dr. Machain

23   whatsoever.

24   THE COURT:  This house was unoccupied, apparently.

25   Or maybe it was occupied between the time that the incident

1    occurred on February 7th and 8th and the time that it was

2    first discovered to be the house in which the incident had

3    taken place, sometime in April, April 15th, I believe.  That

4    is over two months after the fact.  Does that weaken the

5    presence of this syringe?  I mean, does that establish --

6            We had a case here recently in this circuit which

7    they reversed a murder conviction because the fingerprints of

8    the defendant on the weapon, which was a bat that was used to

9    bludgeon the victim, as I recall the case, the defendant's

10   fingerprints were on it and on the turnstile in the store.

11   And the Ninth Circuit said that was insufficient because it

12   is not known when those were placed on it.  It could have

13   been before, it could have been after, it could have been a

14   long time ago.

15           MR. CARLTON:  Well, Your Honor, we know -- Sorry.

16           THE COURT:  Now, here we have a syringe found two

17   months after the fact in this house, which had not been under

18   the control of the authorities, presumably, for that period

19   of time between February 8th and April the 15th, and the test

20   is could a rational jury -- This is the test that the law

21   requires me to apply.  Could a rational jury find beyond a

22   reasonable doubt that that syringe was used by this defendant

23   to inject Agent Camarena with Lidocaine?

24           MR. CARLTON:  Yes, Your Honor.  The government

25   submits that that is a perfectly rational conclusion for a

1  jury to infer.  We know that events were happening in that

2  guest house at that very location that were calling for the

3  application of Lidocaine; that is, Agent Camarena's torture.

4  We know that the doctor was there but we also --

5           THE COURT:  Well, is it necessary -- strike that.

6  Go ahead and wrap it up quick.

7           MR. CARLTON:  The evidence also indicates that the

8  house was, in fact, unoccupied after that, that it would have

9  been left there.

10          THE COURT:  Was occupied, you say?

11          MR. CARLTON:  Pardon me?

12          THE COURT:  There is evidence to show the house

13 was occupied?

14          MR. CARLTON:  Was not occupied.

15          THE COURT:  What is the evidence?

16          MR. CARLTON:  The evidence is that Caro-Quintero

17 first --

18          Of all THE COURT:  Caro-Quintero went to Costa

19 Rico.

20          MR. CARLTON:  He took off with his group.

21          THE COURT:  That proves the house was not

22 occupied?

23          MR. CARLTON:  Well, he was the person occupying

24 the house.  Lopez Romero never saw it before and never saw it

25 again and he going around with Ernesto Fonseca.  Those

1342

1   were the two people involved in the house.

2           THE COURT:  All right.

3           MR. MEDRANO:  But, Your Honor --

4           THE COURT:  One last word there, counsel.

5           MR. RUBIN:  Thank you, Your Honor.

6           Your Honor, it's absolutely, in my judgment,

7   impossible for a rational jury to say there is proof beyond a

8   reasonable doubt that that injection, that that syringe was

9   used by Dr. Machain to inject Enrique Camarena when it's two

10  months old, his fingerprints aren't on it, other people in

11  the house got injections of vitamins.  Vitamins are in it.

12          And most important of all, there is not one single

13  bit of evidence that Camarena ever got an injection of anything

14  at any time for any purpose whatsoever.

15          MR. CARLTON:  Your Honor, it's too coincidental

16  that the syringe was found in the very location where Agent

17  Camarena was tortured.  And all of this has to be considered

18  in its totality.  You can't single out one piece of evidence

19  and just look at that.

20          THE COURT:  That's true.  All right.  I'll

21  reconvene in about five minutes and announce my ruling.

22          THE CLERK:  Please rise.

23          (Recess taken from 12:20 to 12:32 P.M.)

24          THE COURT:  I have considered the evidence

25  presented at the trial of this case and have reviewed the

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1343

1   brief submitted by the government of defendant with respect

2   to the Rule 29 judgment of acquittal motion.  That rule

3   provides that the court shall order the entry of judgment of

4   acquittal of one or more offenses charged in the indictment

5   or information after the evidence on either side is closed

6   "if the evidence is insufficient to sustain a conviction of

7   such offenses."

8           The standard which has developed for the

9   application of that rule is that the motion -- the standard

10  for a Rule 29 motion is to assess whether, when viewed in the

11  light most favorable to the government, as I have attempted

12  to do in this case - that is, the evidence must be viewed in

13  the light most favorable to the government and every

14  favorable reasonable inference that can be made in favor of

15  the government - that evidence must be considered in that

16  light and the evidence must be sufficient for a rational jury

17  to find the defendant guilty beyond a reasonable doubt.

18          So the question is, on the basis of the evidence

19  presented by the government in this case, could a rational

20  jury on the basis of that evidence find this defendant guilty

21  beyond a reasonable doubt?

22          The charges against this defendant are as follows:

23              Count III charges that the defendant

24      Machain -- Alvarez, rather, unlawfully and knowingly

25          conspired to knowingly and intentionally kidnap,

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1344

1    torture, interrogate and murder Special Agent

2    Enrique Camarena Salazar in violation of 18

3    United States Code Section 1959(a)5.

4        This section requires the proof of several

5    elements in the jury instructions but the one I think that

6    we're concerned with here is whether this defendant was a

7    member of the conspiracy, either was at the outset or became

8    a member at some later time, knowing at least one of its

9    objects and intending to help accomplish it.  The objects, as

10   I have stated, are to kidnap, torture, interrogate and murder

11   Special Agent Enrique Camarena.

12       The government has this morning told us that this

13   conspiracy charge together with all the other charges are

14   basically based on the events of February the 7th and 8th;

15   namely, the presence of the defendant at that house, the

16   testimony of the witness that he was seen washing syringes,

17   the testimony that a syringe was found sometime in April,

18   over two months after the fact, at this same location.

19   From this the government said, and other things that they

20   mentioned, that the jury can find beyond a reasonable doubt

21   that the defendant knowingly and intentionally conspired with

22   these other people to kidnap, torture, interrogate and murder

23   Special Agent Enrique Camarena as is charged in Count III.

24       The problem with this is that where there is

25   evidence in the record, one, that no one was able to find any

1345

1 signs of injections on the body of Camarena; two, they were

2 not able to discern or discover the presence of any

3 Lidocaine; that the jury then is asked to infer that not only

4 was there Lidocaine injected into Agent Camarena but that

5 this defendant did it, and it is basically based entirely

6 upon the fact that he was present at this house and was seen

7 with syringes.

8         The elements of proof for a conspiracy.  That is,

9 once the elements of proof of a conspiracy have been

10 established, which they have been in this case - that is, a

11 conspiracy has been established for the Rule 29 purposes -

12 evidence establishing beyond a reasonable doubt must be shown

13 to connect the defendant with the conspiracy, even though the

14 connection is slight, is sufficient to convict him with

15 knowing participation.

16         In my view, I've looked at this evidence in every

17 way that I can.  I cannot help but conclude that the

18 government theory that this man is here to be charged and

19 presented to the jury with these conspiracies here - the

20 conspiracy to kidnap, the conspiracy to kidnap, torture and

21 murder - has been what is troubling me here.

22         The argument that you made and the evidence that

23 you referred to is that you may suspect this happens and you

24 may have a hunch that it happened, but cases should not go to

25 the jury based on suspicions or hunch.  Here you have the

1346

1 added evidence of all of the massive conspiracy involving

2 government, involving law enforcement and involving traffic-

3 kers.  There's been no evidence presented that this defendant

4 is a trafficker as such; that he stood to benefit in any way

5 or was harmed in any way by the things that happened in

6 Zacatecas.

7          So the court is of the view that there is

8 insufficient evidence, when viewed in the light most

9 favorable to the government, for a reasonable jury to find

10 that the defendant Machain was a conspiracy member and

11 intended to accomplish any of the objectives of the

12 conspiracy.  There is suspicion and there may be hunches but

13 there is no proof that he participated in the kidnapping of

14 Camarena or that he even knew about it.

15          You talked about his presence with these people at

16 times and places.  That is not enough in and of itself to be

17 sufficient to prove membership in a conspiracy, as you well

18 know.  You have shown that he knew the members of the

19 Guadalajara drug cartel through his treatment of cartel

20 members as a doctor; you have presented evidence to show that

21 he often administered medical aid to members.  The government

22 has shown his presence at 881 Lope de Vega and his

23 association with members of the cartel.  And you may even

24 have shown that he knew what was happening.  But that in

25 itself, knowledge of a conspiracy, is not enough.

1347

1       The mere presence and association with cartel

2   members is not enough to find that Machain was a participating

3   member of the conspiracy.  So to prove that he was a

4   participating member of the conspiracy, you have, uh, (pause)

5   presented this theory that because he is a doctor, because he

6   used syringes, because he was seen with syringes, he must

7   have administered syringes to Camarena, he must have

8   administered Lidocaine because he had heart fibrillations.

9       Well, there is no proof of any of those things:

10  That he administered him, that he had heart fibrillations,

11  that any Lidocaine was found on the body of Camarena.

12      There is not sufficient proof.  The presence of a

13  syringe containing Lidocaine and vitamin B-1 found two months

14  after the events at issue is inconclusive for a Rule 29

15  motion.  You're asking this jury to speculate.  If you submit

16  this, there has to be stronger evidence than you have

17  offered.  To ask that a man be found guilty of murder,

18  kidnapping and torture on this evidence just does not rise to

19  the level of proof that should be required even to get the

20  case to the jury.

21      Even the aiding and abetting requires that the

22  aider and abettor participate with guilty knowledge.  And

23  this is based largely on the same theory:  That there was an

24  administration of Lidocaine to the defendant -- to Camarena

25  in order to help revive him so that he could be interrogated

1348

1  further.  This is whole cloth, the wildest speculation and

2  not fairly inferable and no rational jury in my view could

3  make a beyond a reasonable doubt finding that this defendant

4  could be guilty of any of these crimes charged because he

5  administered to Agent Camarena a shot of Lidocaine which

6  prolonged his life so that he could be interrogated further

7  and thereby was assisting the cartel in its conspiracy.  That

8  is simply not sufficient evidence in an American court to

9  present this to the jury and to permit the wildest speculation.

10       Now it's true that this defendant may be guilty of

11  what you say.  And I know that you feel that he is, perhaps,

12  and these DEA's feel that he is.  But I have in mind that

13  when this man was abducted from Mexico, you didn't even have

14  this evidence about his being present there, about washing

15  syringes, so that it seems to me that when he was indicted

16  that the evidence was the fact of his association with these

17  other traffickers, probably through the witness Harrison, and

18  that a syringe was found on April the 15th.

19       I simply do not believe that this evidence is

20  sufficient to withstand the Rule 29 motion on any of these

21  counts and that is the ruling of the court.

22       The judgment -- the motion for judgment of

23  acquittal is granted and this defendant is ordered discharged.

24       All right.

25       MR. RUBIN:  Your Honor, two ministerial matters.

1349

1   First of all, could we ask the court to

2   further order the marshals to take Dr. Alverez

3   Machain immediately to MDC so the paperwork for

4   his processing could begin now rather than later

5   in the day.

6   Secondly, I would ask the court to

7   allow Mr. Hoffman or myself to accompany him

8   through the discharge process from MDC.  And

9   Third, I would ask the court to

10   order that the marshal during the day provide

11   Dr. Alvarez Machain with the means, the financial

12   means, if necessary, to get a one way plane ticket

13   back to Guadalajara.

14   THE COURT:  All of those requests are denied.

15   MR. MEDRANO:  Your Honor, may I just raise another

16   thing?  Needless to say, I'm sure there will be some

17   attendant press in light of the court's ruling.  My concern

18   immediately is with this jury.  What are the court's thoughts

19   in terms of any statements at this point?  He doesn't --

20   THE COURT:  Well, I intend to instruct the jury

21   that this defendant is no longer a defendant in the case;

22   that they are not to be concerned with that, to discuss the

23   reasons why or why he is not a defendant in the case, but

24   their job is to determine whether the evidence that you have

25   presented is sufficient under the law to convict Mr. Zuno.

1350

1    That's what I intend to instruct them.

2         MR. MEDVENE:  Could you also instruct, Your Honor,

3    that the fact you have made this decision doesn't mean --

4         THE COURT:  Well, I am not going to tell them I

5    made any decision.

6         MR. MEDVENE:  But the fact --

7         THE COURT:  I am just going to tell them he is no

8    longer a defendant in the case and they need not consider,

9    discuss, or speculate why.

10        MR. MEDVENE:  But I would ask that something be

11   said about the fact he is no longer a defendant does not in

12   any way affect the guilt or innocence of Mr. Zuno.  In other

13   words, we don't want an adverse inference to Mr. Zuno because

14   Dr. Machain is not here any longer, and I just ask you

15   instruct the jury the fact he is not here is not to be taken

16   into consideration.

17        THE COURT:  That is what I said I am going to

18   instruct the jury on.  I am going to instruct this jury that

19   they are to consider this case against your client based on

20   evidence that has been presented without discussing the

21   presence or action of the other defendant nor in discussing

22   why he may not be here.  So I think that's covered.

23        MR. MEDVENE:  Well, I am just asking if you would

24   consider saying something to the effect that just because

25   Dr. Machain is not here does not mean Mr. Zuno is guilty or

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1351

1   innocent, it's completely a separate matter.

2           It's implied in what you said but I am wondering

3   if you could say something so that it's clear to them that

4   Dr. Machain's absence doesn't affect any possible guilt of

5   Mr. Zuno and they have to evaluate the witnesses in front of

6   Zuno with respect to Mr. Zuno know.

7           THE COURT:  Well, I will tell them they may not

8   draw any inference with respect to the remaining defendant

9   whether he is guilty or not guilty but they decide that on

10  the basis of the evidence after the trial is over.

11          MR. MEDVENE:  Yes, sir.

12          THE CLERK:  Please rise.

13          (Lunch recess at 12:50 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1   LOS ANGELES, CALIFORNIA; MONDAY, DECEMBER 14, 1992; 1:30 PM

2                       --oOo--

3                   WILLIAM J. CANALEZ,

4   having been previously sworn, resumed the stand and testified

5   further as follows:

6               (Jury present.)

7               THE COURT:  Ladies and gentlemen of the jury,

8   before we begin, I want to advise the jury that the defendant

9   Alvarez is no longer a defendant in this case.  This case now

10  is solely against the defendant Mr. Zuno Arce.

11              In deciding the case against Mr. Arce, you are not

12  to discuss or consider why Mr. Alvarez is not a defendant in

13  this case.  That's totally irrelevant, should not be

14  discussed or considered, nor can you draw any inference from

15  it that this defendant is either guilty or not guilty.  It is

16  simply your job, as it always has been, to determine whether

17  or not the evidence presented in this case establishes the

18  charges against Mr. Zuno.  That is what you must decide.

19              You must do that without either discussing or

20  considering or wondering why the other defendant is no longer

21  in the case.  That's simply not to be discussed or considered.

22              All right.  Do you have any further questions for

23  this witness?

24              MR. BLANCARTE:  Yes, Your Honor, briefly.

25

1353

1    DIRECT EXAMINATION (Continued)

2    BY MR. BLANCARTE:

3    Q.   Mr. Canalez, when you were inside the ranch house at

4    LaJoya, what did you see?

5              MR. MEDRANO:  Relevance, Your Honor.

6              MR. BLANCARTE:  Your Honor, we're just trying to

7    lay a foundation.

8              MR. MEDRANO:  Relevance.  As to what?

9              THE COURT:  The objection is sustained.

10             MR. BLANCARTE:  May I be heard very briefly, Your

11   Honor?  The government has abundance of evidence --

12             THE COURT:  I know.  I heard that before.  The

13   objection is sustained.

14   Q.   BY MR. BLANCARTE:  Did you, Mr. Canalez, have an

15   opportunity to walk or otherwise tour the property at LaJoya?

16   A.   Yes, sir, I did.

17   Q.   And was part of your assignment in Mascota to personally

18   view and inspect properties or businesses either owned or

19   operated by Mr. Zuno at some time?

20   A.   Yes, sir, it was.  We walked through and observed --

21             THE COURT:  Just a minute.  I think you've

22   answered the question.

23             THE WITNESS:  -- the property.

24   Q.   BY MR. BLANCARTE:  When you walked the property at the

25   ranch known as LaJoya, did you see, did you see any

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1354

1    businesses there on the property itself?

2    A.    Yes, sir, there was, there was some indication --

3              MR. MEDRANO:  Relevance, Your Honor.

4              THE WITNESS:  Indication of businesses.

5    Q.    BY MR. BLANCARTE:  What did --

6              THE COURT:  You may answer that.

7    Q.    BY MR. BLANCARTE:  What did you see, sir?

8    A.    I saw a warehouse affair where it was like a carpentry

9    shop and there was some machines in the carpentry shop, wood

10   had been cut and stacked and so forth, and stacked, piled up.

11   It was an open air warehouse affair for carpentry workshop.

12   Q.    Was it a modern facility?

13   A.    No, sir, it was not.  That's not modern at all.  Per the

14   North American standards, per our standards here in the

15   United States, there really wasn't much that was modern.  It

16   was rustic, rural, very farmlike, dating back maybe to what

17   we might see here in the states, in the rural areas of the

18   United States, 20-30 years ago.

19             MR. MEDRANO:  I object to the latter part, Your

20   Honor.  Lack of foundation, irrelevant.

21             MR. BLANCARTE:  He's the person who saw it, Your

22   Honor.

23             THE COURT:  Let's go on.  Overruled.

24   Q.    BY MR. BLANCARTE:  Did you see any other structures or

25   facilities on the ranch property?

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1355

1    A.    Yes, sir.   North -- (Pause.)   Actually I guess it was in

2    a southern, in a direction -- southerly direction from the

3    house, there was an open area and then there were quite a few

4    structures.   There was a house that was broken down and just

5    animals were living in it.   There was some, another structure

6    that had functioned as stables but it was not in any

7    condition to function as stables.   There was another struc-

8    ture that had functioned, apparently, as a structure where

9    cows would be milked, a dairy farm stalls.   And adjacent to

10   that were some rooms where, I guess, the workers might have

11   slept at one time.   In that same area as was where the

12   carpentry shop or the woodworking area was located.

13          And then there were some troughs off to the side

14   in sort of a pen-like affair for what would have been pigs at

15   one time or hogs.   But everything was dilapidated or pretty

16   much broken down and was not in use and apparently had not

17   been in use for quite sometime.

18   Q.    From your personal knowledge of being on the premises,

19   what was the main function of the ranch?   What kind of ranch

20   was it?

21   A.    It appeared to be a ranch that was devoted to farming,

22   growing things out of the earth.

23   Q.    What were the products that you personally witnessed as

24   being the farm products that were being grown there?

25   A.    Guavas, peaches, peach trees.   That was primarily what

1356

1  was planted at the time.  There was -- there was several

2  acres of those planted, and we toured that area.  There were

3  scattered -- there were other scattered plantings but none

4  that would have been of what appeared to be a marketable

5  area, maybe more of a to produce food for the house.

6  Q.   Was this operation a large operation like the ones we

7  see in the U.S., with the combines and that type of operation?

8  A.   No, sir, it was not.

9  Q.   What type was it?

10 A.   This, this was an operation run by a family who, like

11 any farming family, who might have help from their own

12 friends or workers and might bring workers in to assist in

13 the harvest.

14 Q.   When you first approached the property, the ranch house

15 of Mr. Zuno there at LaJoya, was it right on the main road

16 leading into Mascota?

17 A.   No, sir.  His ranch house was on a small hill.  Now, I

18 come from country where, you know, a hill is small.

19              THE COURT:  Well.

20              THE WITNESS:  A small hill.

21              THE COURT:  Well, you answered the question.

22              MR. BLANCARTE:  Thank you.

23              THE WITNESS:  A small hill.

24 Q.   BY MR. BLANCART:  As you approached the property of the

25 ranch house, was it surrounded by high walls or security

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1357

1   fences?

2          MR. MEDRANO:   Leading, Your Honor.

3          MR. BLANCARTE:   I'll withdraw the question.

4   Q.   Was there anything surrounding the perimeter of the

5   property as you approached the ranch house?

6   A.   No, sir.   It was an unpaved dirt road that took you up

7   to a small hill and there were no gates, there were no walls,

8   there were no obstacles.   Anyone could have driven up that

9   road to the property.   That dirt road came directly from

10  Mascota.

11  Q.   And when you visited the property, the ranch house, was

12  there any closed security, TV security type devices?

13  A.   I didn't observe any.   There was a television set inside

14  the house but it was a normal television set that anyone

15  would have.

16  Q.   Were there any armed guards protecting the property, sir?

17  A.   No, sir.

18  Q.   Did you have occasion during your investigative trip to

19  Mascota to visit any other properties or businesses outside

20  the ranch property of Mr. Zuno's?

21  A.   Yes, sir, I did.

22  Q.   Please describe what you saw.   Or visited.

23  A.   In the -- in the City of Mascota on what would be the

24  outlying area of Mascota, we visited this large warehouse

25  that was an enclosed warehouse that was used at that time for

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1358

1   young people to have dances on the weekends.  It was used for

2   social functions.  In one area or one corner of this

3   warehouse was a -- were chairs that were stacked up and

4   tables.  And outside of this warehouse, there was another

5   open air warehouse much smaller than the one -- than the

6   enclosed one, and this was also a carpentry type of business,

7   woodworking, and this is apparently -- and there were

8   machines inside this open air warehouse.

9           And this is apparently where the chairs and the

10  tables had been constructed and this was on a street on the

11  outskirts of Mascota, but in Mascota itself, and you can just

12  go right up to it.

13  Q.    Please describe the carpentry woodworking shop that you

14  observed.

15          MR. MEDRANO:  Objection; relevance, Your Honor.

16          THE COURT:  Sustained.

17  Q.    BY MR. BLANCARTE:  Was the warehouse abandoned and empty?

18  A.    The warehouse was empty at the time and appeared as if

19  there was no work going on currently at that time.

20  Q.    Uh --

21  A.    It did not appear to be a modern warehouse or carpentry

22  operation.

23  Q.    The exhibit which you had viewed earlier, which was the

24  video cassette you identified as having your initials on it,

25  does that video cassette accurately depict the places you

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1359

1    personally visited in Mascota?

2    A.    It depicts some of the places, yes.  What is on the tape

3    accurately describes and depicts it, yes.

4              MR. BLANCARTE:  May I have just a moment, Your

5    Honor?

6              (Discussion held off the record between

7              Mr. Medvene, Miss Fulginiti and Mr. Blancarte

8              sotto voce.)

9              MR. BLANCARTE:  No further questions on direct,

10   Your Honor.

11             THE COURT:  You may cross-examine the witness.

12
                    CROSS-EXAMINATION
13

14   BY MR. MEDRANO:

15   Q.    Mr. Canalez, where do you currently reside, sir?

16   A.    I reside in Thousand Oaks, California.

17   Q.    Can you tell us the time period that you have been

18   employed by Mr. Zuno as an investigator?

19   A.    Uh, it was (pause) during the month of April of 1990 for

20   approximately four or five days.  That was the trip to

21   preparation and the debriefing and the trip to Mexico and the

22   debriefing.  And I did three or four or five hours of work

23   for him February of that year.  I guess that might have been

24   preparatory.

25   Q.    February of the same year?

1360

1   A.    Of 1990, yes.  Other than that, that's it.

2   Q.    So February as well as April 9th?

3   A.    There was less than a day's worth.  I forget what it was.

4   Q.    And, of course, you were reimbursed for your services by

5   Mr. Zuno for your employment?

6   A.    I was reimbursed by the law firm.

7   Q.    My question is yes or no, were you reimbursed?

8            MR. MEDVENE:  Objection, Your Honor.  That wasn't

9   his question.

10            THE COURT:  He was attempting to answer your

11   question.

12            THE WITNESS:  I was reimbursed by the law firm of

13   Mr. Medvene.

14   Q.    BY MR. MEDRANO:  Now, you took these photographs in

15   April of '90; correct?

16   A.    Yes, sir.

17   Q.    All the photographs that you have described for us in

18   your direct examination?

19   A.    I didn't take them but, yes, yes, sir, they were all

20   taken at that time, yes.

21   Q.    But you were present when they were taken?

22   A.    Yes, sir.

23   Q.    And you photographed or the person with you photographed

24   what you were instructed to photograph; correct?

25   A.    What he was instructed to photograph, yes, sir.

1361

1    Q.    While you were in Mascota reviewing Mr. Zuno's assets,

2    you saw aircraft belonging to Zuno as well; correct?

3    A.    No, sir.

4              MR. MEDRANO:  Just one moment, Your Honor.

5              (Discussion held off the record between

6              prosecutors sotto voce.)

7    Q.    BY MR. MEDRANO:  Now, Mr. Canalez, the items depicted in

8    the photographs, you do not know what they looked like in 1985;

9    correct?

10   A.    That's correct, sir.

11             MR. MEDRANO:  That concludes cross.

12             THE COURT:  Any redirect?

13             MR. BLANCARTE:  No redirect, Your Honor.

14             THE COURT:  You may step down.

15             Call your next witness.

16             MS. FULGINITI:  Ricky Canales.

17             THE CLERK:  Please raise your right hand.

18
                         RICKY CANALES,
19

20   called as a witness on behalf of the defendant, having been

21   first duly sworn, was examined and testified as follows:

22             THE CLERK:  Please raise your right hand.

23             THE COURT:  One moment.

24             Does this witness need an interpreter?

25             THE INTERPRETER:  Yes, Your Honor.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1362

1  THE CLERK:  Please raise your right hand.

2  MARIA CANALES,

3

4  called as a witness on behalf of the defendant, having been

5  first duly sworn through the interpreter, was examined and

6  testified as follows:

7  THE CLERK:  You do solemnly swear that the

8  testimony you may give in the cause now pending before this

9  Court shall be the truth, the whole truth, and nothing but

10  the truth, so help you God?

11  THE WITNESS:  I do so swear.

12  THE CLERK:  Please be seated.

13  State your full name for the record and state your

14  last name.

15  THE WITNESS:  My full name is Maria, Behenia*

16  Canales Mecedo.

17  DIRECT EXAMINATION

18

19  BY MS. FULGINITI:

20  Q.   Ms. Canales, are you related to Mr. Bill Canales who

21  just testified?

22  A.   No, none.

23  Q.   Ms. Canales, where were you born?

24  A.   In Atencio*, Jalisco.

25  Q.   And where did you grow up?

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1363

1   A.   In the City of Mascota, Jalisco.

2   Q.   Did you go to school in Mascota?

3   A.   Yes, I did my studies in Mascota.

4   Q.   Did you complete secondary school in Mascota?

5   A.   Yes.  I finished my secondary schooling in Mascota and I

6   did a short vocational school study course for two years.

7   Q.   What did you study in vocational school?

8   A.   I studied to become a private accountant or an assistant

9   to an accountant.

10   Q.   Ms. Canales, do you know a man by the name of Ruben Zuno

11   Arce?

12   A.   Yes, sir, I do know him.

13   Q.   Do you see him here in court?

14   A.   Yes.

15   Q.   Would you please point him out.

16   A.   Of course.  That's him.

17        THE COURT:  Indicating the defendant.

18   Q.   BY MS. FULGINITI:  I'd like to direct your attention to

19   the year 1982.  Did you ever work for Mr. Zuno during that

20   year?

21   A.   Yes, did I work for him at that time.

22   Q.   What month did you begin?

23   A.   I started to work in the month of October of 1982.

24        THE COURT:  '80 what?

25        THE INTERPRETER:  '82.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1364

1  THE COURT:  '82.

2  Q.   BY MS. FULGINITI:  Where did you work for him?

3  A.   I worked at the offices of the Rancho LaJoya.  The

4  offices were located in the City of Mascota.

5  Q.   And what were you employed as?

6  A.   I started out as his personal secretary.  That was for

7  about a year approximately.

8  Q.   Did you continue to work for him after you were his

9  secretary?

10  A.   Yes.  After that I became assistant accountant.

11  Q.   How long were you employed as assistant to the

12  accountant for Mr. Zuno?

13  A.   Four years approximately.

14  Q.   Briefly, what were your duties as his receptionist?

15  A.   Well, as a receptionist, MY duties were to place calls

16  on behalf of the Cinsaro* Ruben Zuno Arce or different people

17  that he indicated to me to place calls to.  I would also help

18  out the one that was formerly the assistant to the accountant

19  to carry out different duties such as the payroll and to make

20  out receipts.

21  Q.   Now, at some point you testified that you were promoted

22  to being assistant to the accountant.  What were your duties

23  as the assistant to the accountant?

24  A.   My duties included doing the payroll for the workers and

25  also paying the employees.  To pay out bills, such as

1365

1    telephone bills, electricity; to pay for parts for

2    replacement parts for maintenance of his machinery, such as

3    his tractors, things like that.  And to make out different

4    payments to different providers that he owed to.

5    Q.    Did you make any payments to the government?

6    A.    Yes.  I would pay the taxes.

7    Q.    Now, you testified that you would pay the employees.

8    Which employees?

9    A.    I would pay the employees of Rancho LaJoya.  And also

10   the ones that worked at Rancho el Way Lota.  Also the

11   administration employees and the employees of the gas station

12   LaJoya.

13   Q.    Now these ranches, Rancho LaJoya and Rancho Way Lota,

14   did you ever see these ranches?

15   A.    Yes.

16   Q.    Could you please describe Rancho LaJoya.

17            MR. MEDRANO:  Relevance, Your Honor.

18            MS. FULGINITI:  If I can have just a little bit of

19   leeway.

20            THE COURT:  All right, go ahead.

21            THE WITNESS:  Rancho LaJoya is located on the dirt

22   road that leads to Guadalajara.  It's there to one side,

23   that's where Mr. Zuno's house is and it's planted in wide

24   olive groves.

25   Q.    BY MS. FULGINITI:  And could you please describe Rancho

1366

1    a Way Lope.

2    A.    The Rancho el La Way Lota is right across from the river

3    called el La Way Lota.   And they also planted it with guava

4    groves.

5    Q.    Were there any other vegetables or anything else planted

6    on Rancho el Way Lota?

7    A.    Yes.   During the right season, they would plant

8    vegetables, such as tomatoes, onions, radishes and different

9    vegetables.

10   Q.    Now, these vegetables and fruits, were they sold to the

11   public?

12   A.    Yes, to the public.

13   Q.    Including the guava?

14   A.    Including the guavas.

15   Q.    Now, you testified you paid employees of the gas station.

16   Was this gas station opened to the public?

17   A.    Yes, it was gasoline for public consumption.

18   Q.    Now, when you were the assistant to the accountant, did

19   you ever receive any payments that were made to the company?

20   A.    Yes.

21   Q.    And what kind of payments did you receive?

22   A.    I would receive the payments for, well, like when they

23   sold the guavas and vegetables and also when people buy

24   gasolines from the gas station, they would pay for it.

25   Q.    And what would you do with these payments?

1367

1   A.   Well, with those payments, if I needed to pay a bill,

2   like an electricity bill or some kind of a bill that was

3   overdue, I would pay the bills out of that.  I had authority

4   to use the money to pay those bills.  Or I would also take it

5   to make up the total amount needed to pay the salaries, for

6   example.

7   Q.   Did you also deposit some payments to the bank?

8   A.   Yes.  On a daily basis, normally the gas -- the money

9   for the gasoline was deposited into a bank.

10   Q.   And which bank is that?

11   A.   Banco May.

12   Q.   Now, Ms. Canales, is there a safe in the office that you

13   worked in?

14   A.   Yes.

15   Q.   And did you have access to it?

16   A.   Yes, I had access to it.

17   Q.   Are you familiar with the contents kept in the safe?

18   A.   Yes.

19   Q.   Could you please describe the contents kept in the

20   safe.

21   A.   What was kept there were the deeds to the Rancho LaJoya.

22   He kept it there.  He had the birth certificates for his

23   children.  He also had notes on loans that he owed to the

24   bank, to Banco Wedal*.

25   Q.   Did you ever see any large sums of money in the safe in

1368

1    cash?

2    A.    No, never.

3    Q.    Now you said that you saw some notes or loans in the

4    safe.  Are you familiar with the types of business loans that

5    were reflected in these documents?

6              THE INTERPRETER:  Excuse me, Your Honor.  I lost

7    the last part of the question.  The types of loans.

8    Q.    BY MS. FULGINITI:  I'm sorry.  Are you familiar with the

9    type of business loans reflected in the documents?

10             MR. MEDRANO:  Objection; calls for hearsay, Your

11   Honor.

12             MS. FULGINITI:  I'm asking if she is familiar.

13             MR. MEDRANO:  And lack of foundation.

14             THE COURT:  The fact that she is familiar is not

15   hearsay.  Now if she is asking for the contents, that may be

16   hearsay.

17             (Spanish speaking.)

18             THE WITNESS:  Yes.

19   Q.    BY MS. FULGINITI:  Was Mr. Zuno at the office on a daily

20   basis?

21   A.    Yes.

22   Q.    Now, was Mr. Zuno, to your knowledge, involved in any

23   civic activities?

24   A.    Yes, he did participate in that.

25   Q.    Could you just briefly explain some civic activities he

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1369

1  participated in.

2             MR. MEDRANO:  Objection.  Hearsay grounds

3  enumerated during the break, the previous break, Your Honor.

4             THE COURT:  Hearsay was not one of them.

5             MR. MEDRANO:  No.  Rule 404 and rule 405 grounds,

6  character --

7             THE COURT:  The objection is sustained.  Not

8  relevant.

9             MS. FULGINITI:  If I could just have a moment,

10  Your Honor.

11             (Discussion held off the record between

12             Ms. Fulginiti and Mr. Medvene sotto voce.)

13  Q.   BY MS. FULGINITI:  Do you recall a centennial that took

14  place in Mascota?

15  A.   Yes.

16  Q.   And did it take place in approximately February of 1985?

17  A.   Approximately in '85.  It was either '84 or '85, I'm not

18  absolutely sure.

19  Q.   And do you know Mr. Zuno -- are you familiar with

20  Mr. Zuno's involvement with that centennial celebration?

21             MR. MEDRANO:  Relevance, Your Honor.

22             THE COURT:  Overruled.

23             THE WITNESS:  Yes.  He was one of the main leaders

24  of it because he was the one that started, initiated the

25  whole thing.  He organized it.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1370

1    Q.   BY MR. FULGINITI:  To your knowledge, was Mr. Zuno one

2    of the persons in charge of the activities?

3    A.   He was the main person in charge.

4    Q.   Would you please just briefly describe some of the

5    activities that he organized that you're familiar with.

6              MR. MEDRANO:  Objection; relevance.

7              THE COURT:  Sustained.

8    Q.   BY MS. FULGINITI:  Are you familiar with any activities

9    Mr. Zuno was involved to assist the townspeople of Mascota?

10             MR. MEDRANO:  Objection; relevance.

11             THE COURT:  Sustained.

12   Q.   BY MS. FULGINITI:  Just going back briefly to the time

13   period of the centennial, do you recall if Mr. Zuno was there

14   primarily on a daily basis?

15   A.   Yes, he was there every day.

16   Q.   And what was he doing?

17             MR. MEDRANO:  Objection; relevance.  Relevance,

18   Your Honor.

19             THE COURT:  You may answer.

20             THE WITNESS:  He was in charge along with the

21   other participants in the group, for example, the mayor of

22   the city.  They were taking charge of step-by-step organizing

23   everything that was being done.  For example, the sports

24   events.  And he was in charge, he was carrying out all the

25   arrangements for the festivities, like the parades and the

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1371

1  sports matches, all of those things, like I said before.

2  Q.   BY MS. FULGINITI:  Ms. Canales, did Mr. Zuno receive any

3  telephone calls in his office?

4          MR. MEDRANO:  Objection as to timeframe.

5  Ambiguous.

6  Q.   BY MS. FULGINITI:  During the time period when you

7  worked for him.

8  A.   Yes, he would get calls.

9  Q.   Would he close his door when he spoke on the phone?

10  A.   No.

11  Q.   Did he ever instruct anyone to leave his office when he

12  was speaking on the phone?

13  A.   No, never.

14  Q.   Would he ever take phone calls at the receptionist's

15  phone?

16  A.   He normally answered them there because he was not all

17  the time locked up in his office, he would be walking around.

18  Q.   Did Mr. Zuno also meet with people at his office?

19  A.   Yes.

20  Q.   Once again during the time period that you worked for him?

21  A.   Yes.

22  Q.   To the best of your knowledge, Ms. Canales, during the

23  entire time period you worked for Mr. Zuno, did he ever meet

24  with anyone in his office or speak with anyone who identified

25  himself as Rafael Caro-Quintero?

1372

1    A.    No.

2    Q.    How about Ernesto Fonseca Carrillo?

3    A.    Neither.

4    Q.    Javier Barba Hernandez?

5    A.    No.

6    Q.    Felix Guerro?

7    A.    No.

8    Q.    Sammy Russo?

9    A.    No.

10   Q.    Manuel Saucedo Enrique Cortioco*?

11   A.    No, neither.

12   Q.    To the best of your knowledge, did he ever place any

13   telephone calls to any of the individuals I've just named?

14   A.    No, never.

15   Q.    Ms. Canales, do you know if Mr. Zuno traveled openly in

16   Mascota with his family?

17   A.    Yes, out openly.

18   Q.    Did you ever see him with any bodyguards?

19   A.    No, never.

20   Q.    Now, during this time period of 1982 to 1987, did you

21   ever go to Mr. Zuno's home?

22   A.    Yes.

23   Q.    Did you ever see any bodyguards around his house?

24   A.    No.

25   Q.    Are there any walls around his house?

1373

1    A.    No, none.

2    Q.    Were there any secured gates?

3    A.    No.

4    Q.    Now, Ms. Canales, are you familiar with the types of

5    cars Mr. Zuno owned during that time period while you worked

6    for him?

7    A.    Yes.

8    Q.    And what types of cars did he own that you're familiar

9    with?

10                 MR. MEDRANO:   Objection; relevance.

11                 THE COURT:   Overruled.

12                 THE WITNESS:   He had a Bronco, I believe it was

13   blue in color.   And a pickup truck, it was brown.

14   Q.    BY MS. FULGINITI:   Did you ever see a white pickup truck

15   around his house or the businesses?

16   A.    No.

17   Q.    To the best of your knowledge, did Mr. Zuno own a white

18   pickup truck?

19   A.    No.

20   Q.    Did Mr. Zuno drive his own vehicles?

21   A.    Yes, he drove them.

22   Q.    Did Mr. Zuno ever have a chauffeur, to the best of your

23   knowledge?

24   A.    No.

25   Q.    Did you ever see anyone driving Mr. Zuno around?

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1374

1    A.    No.

2    Q.    Did you ever see Mr. Zuno with a cellular phone?

3    A.    No.

4    Q.    Did you ever see Mr. Zuno with a walkie/talkie?

5    A.    No.

6    Q.    What kind of phones were in his office?

7    A.    It was a regular phone.  He had two phones but only one

8    telephone line.

9    Q.    And Ms. Canales, finally, did you ever see Mr. Zuno

10   using drugs of any kind?

11   A.    No.

12          MS. FULGINITI:  Thank you.

13          THE COURT:  You may cross-examine the witness.

14                      CROSS-EXAMINATION

15

16   BY MR. MEDRANO:

17   Q.    Ms. Canales, until what date did you work for Ruben

18   Zuno?

19   A.    Until 1987.

20   Q.    Now, during the time that you worked for him, Zuno

21   occasionally was out of town; correct?

22   A.    Well, he did go out because he had his relatives, his

23   family in Guadalajara, but most of the time he spent there

24   regularly at the office.

25   Q.    And, of course, on occasion he went to the City of

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1375

1    Guadalajara?

2    A.    Well, I don't know.

3    Q.    So, sometimes he would go out of town and you didn't

4    know where he was going.

5    A.    Of course.  I wasn't always with him.

6    Q.    Now, Zuno Arce in Mascota was regarded as a very

7    important man; correct?

8              MS. FULGINITI:  Objection; relevance, Your Honor.

9              THE COURT:  Overruled.

10             THE WITNESS:  Not an important man, it's only that

11   he helped out a lot of the poor people.  But not an important

12   man.  And they care for him a lot because he helped the poor

13   people a lot.

14   Q.    BY MR. MEDRANO:  And because of that, he was regarded as

15   an important man in Mascota?

16             MR. MEDVENE:  Objection, asked and answered, Your

17   Honor.

18             THE COURT:  Sustained.

19   Q.    BY MR. MEDRANO:  Can you tell me how many people Zuno

20   employed.

21   A.    I can tell you approximately.  25 to 30.

22   Q.    Zuno also owns aircraft; correct?

23   A.    I don't know.

24   Q.    But you handled his books, though, didn't you?

25   A.    Yes, but I never saw any documents that stated that he

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1376

1    was the owner of an aircraft.

2    Q.   But you did see other documents that showed other

3    businesses; right?

4    A.   No, never.

5    Q.   You are aware, are you not, that Zuno when he walked

6    around carried a gun on his hip?

7              MR. MEDVENE:  Objection, Your Honor; assuming

8    facts not in evidence.  This is improper.  There is no

9    evidence of that at all.

10             THE COURT:  Overruled.

11             The counsel that did the examination should make

12   the objections.  The objection is overruled.

13             THE WITNESS:  No, I never saw him with a gun.

14   Q.   BY MR. MEDRANO:  You were not always with Zuno at his

15   ranch LaJoya; correct?

16   A.   No.

17   Q.   So there might have been guards with him on times, on

18   some occasions when you were not there; correct?

19             MS. FULGINITI:  Objection, Your Honor.  This is

20   pure speculation.

21             THE COURT:  Yes, sustained.

22   Q.   BY MR. MEDRANO:  Do you know a man by the name of

23   Humberto san Detas*?

24             MS. FULGINITI:  Objection, Your Honor; outside the

25   scope, relevance.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1377

1    THE COURT:  Overruled.

2    THE WITNESS:  Humberto san Dejas.  I don't

3    remember.

4    Q.   BY MR. MEDRANO:  He is an employee of Mr. Zuno; correct?

5    MS. FULGINITI:  Objection, Your Honor.  She said

6    she doesn't remember.

7    THE COURT:  Well, she may answer.

8    THE WITNESS:  I don't know.  When I started

9    working there, no.

10   Q.   BY MR. MEDRANO:  Now, the other people that you knew in

11   Mascota, they would refer to Zuno as don Ruben; correct?

12   MS. FULGINITI:  Objection, relevance, Your Honor.

13   THE COURT:  Overruled.

14   THE WITNESS:  No, Padrone Ruben.

15   Q.   BY MR. MEDRANO:  They would call him Padrone?

16   A.   No.

17   Q.   They would call him just Ruben?

18   A.   His friends would call him Ruben or just simply Le

19   Senor.

20   Q.   And you also would call him Ruben; is that correct?

21   A.   Le sincero.

22   Q.   The Mascota centennial, Ms. Canales, that event in fact

23   occurred in March of 1985; isn't that true?

24   A.   Like I said before, I don't remember exactly.  It's been

25   a long time.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1378

1    Q.   You don't remember the exact month, huh?

2    A.   Not the month.  The year, I think it was 1985.

3    Q.   Ms. Canales, in the May 1990 proceedings, did you not

4    come up here to testify, did you?

5             MS. FULGINITI:  Objection, Your Honor; relevance.

6             THE COURT:  Sustained.

7             MR. MEDRANO:  May I have just one moment, Your

8    Honor.

9             THE COURT:  Yes.

10            (Discussion held off the record between

11            prosecutors sotto voce.)

12   Q.   BY MR. MEDRANO:  Ms. Canales, where do you presently

13   reside?  What city?

14            MS. FULGINITI:  Objection, Your Honor; relevance.

15            MR. MEDVENE:  Relevance.

16            THE COURT:  Overruled.  I think the witness has

17   testified, I think, to that.

18            MS. FULGINITI:  It wasn't asked, Your Honor.  I

19   just asked where she was born, the area of Mascota where she

20   grew up.

21            THE COURT:  What is the objection?

22            MS. FULGINITI:  Relevance, Your Honor.

23            THE COURT:  Sustained.

24   Q.   BY MR. MEDRANO:  What is your current employment?

25            MS. FULGINITI:  Objection.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1379

1    THE COURT:  Strike that.  You may ask the first

2    question and the second.

3    Q.   BY MR. MEDRANO:  Where do you currently reside,

4    Ms. Canales?

5    A.   In Los Angeles.

6    Q.   And what is your current employment?

7    MS. FULGINITI:  Relevance, materiality.

8    THE COURT:  Overruled.

9    THE WITNESS:  I take care of my child.

10   Q.   BY MR. MEDRANO:  So you do not work outside the home;

11   correct?

12   A.   No.

13   Q.   What year was it that you left Mascota to come to Los

14   Angeles?

15   A.   It's been approximately three-four years.

16   Q.   Can you tell us who contacted you initially in order for

17   you to come here to testify?

18   A.   Well, I know Mrs. Enriqueta because -- through one of my

19   sisters because we lived at a ranch that used to belong to

20   her father, and we keep in touch with her but not because of

21   (Spanish speaking).

22   And so I told her, I found out that way and I told

23   her that if I could be helpful in any way, that I was

24   available and then Mr. Blanca contacted me and that's how I

25   came to be here.

1380

1  Q.    So you reached out to Mr. Zuno's wife; correct?

2  A.    Yes.  Because we talked about it and I said if I can

3  help out in any way, I'm here.

4          MR. MEDRANO:  Just a moment, Your Honor.

5          That concludes cross.

6          THE COURT:  Any further questions?

7          MS. FULGINITI:  Nothing, Your Honor.

8          THE COURT:  You may step down.

9          Call the next witness.

10         MR. MEDVENE:  Salvador Leyva.

11

12                 SALVADOR LEYVA,

13  called as a witness on behalf of the defendant, having been

14  first duly sworn, was examined and testified as follows:

15         THE CLERK:  Please raise your right hand.

16         You do solemnly swear that the testimony you give

17  in the cause now pending before this Court shall be the truth,

18  the whole truth, and nothing but the truth, so help you God?

19         THE WITNESS:  I do.

20         THE CLERK:  Please be seated and state your full

21  name for the record and spell your last name.

22         THE WITNESS:  Salvador Leyva, L-e-y-v, as in

23  Victor, -a.

24         MR. MEDVENE:  Madame clerk, would you be good

25  enough to place 404 and 406 in front of Mr. Leyva?

1381

1                           DIRECT EXAMINATION

2    BY MR. MEDVENE:

3    Q.    Mr. Leyva on -- strike that.  You're a DEA agent,

4    Mr. Leyva?

5    A.    I'm a special agent for the Drug Enforcement Adminis-

6    tration, yes, sir.

7    Q.    And you were involved in the investigation of Agent

8    Camarena?

9    A.    That's correct.

10   Q.    On August 30, 1991, you and Agent Berrellez interviewed

11   Jorge Gadoy in Los Angeles; is that correct?

12   A.    That's correct.

13   Q.    And you prepared a report of that interview.

14   A.    (Pause.)  That is correct.

15   Q.    And the report you prepared, is it called a DEA-6?

16   A.    That is correct.

17   Q.    And a DEA-6 is an official report of the DEA?

18   A.    That's correct.

19   Q.    And its kept and maintained in the DEA file?

20   A.    That's correct.

21   Q.    And your practice was to put in the report the pertinent

22   or relevant information that you extracted from the interview;

23   is that correct?

24   A.    To the best of my recollection, there was not a full

25   interview, it was just a -- What I reported in that specific

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1382

1    report that you mention is just a contact with the subject

2    that you just mentioned.

3    Q.    My question, sir, is -- I'm talking generally about when

4    you do a DEA-6, is it your practice in the report to put down

5    the pertinent and relevant information that you obtain during

6    the course of the interview?

7    A.    Some of the information, yes, sir.

8    Q.    You put down the information that you deem relevant and

9    pertinent; isn't that correct, sir?

10   A.    Not all of it, no, sir.

11   Q.    You put down some that you think is pertinent and other

12   information you purposely do not put down; is that what

13   you're saying?

14   A.    I try to summarize what I gather in the report that

15   reflects -- it's not a transcript.

16   Q.    But you try to put in the report what you deem pertinent;

17   isn't that true?

18   A.    Sometimes.

19   Q.    And you try to make the report as accurate as possible;

20   isn't that true?

21   A.    That's correct.

22   Q.    And the report is a way to help you at a later date to

23   recall the information you receive.

24   A.    That's correct.

25   Q.    And it's to help you recall what -- when you receive the

1383

1   information.  That's correct also, isn't it, sir?

2   A.    That's correct.

3   Q.    And it's also a way to disseminate the information you

4   receive to others to help further whatever investigation

5   you're working on?

6   A.    Not necessarily.

7   Q.    Now I want to have placed before you a series of

8   documents marked 404.

9           (Pause in proceedings.)

10          THE CLERK:  404.

11          MR. MEDVENE:  404 and 406, thank you, ma'am.

12          THE CLERK:  406.

13  Q.    BY MR. MEDVENE:  Now you have in front of you 404, sir,

14  what's been marked 404?

15  A.    Yes, sir.

16  Q.    Is it true that on August 30, 1991, you prepared a DEA-6

17  with reference to your interview of Jorge Gadoy?

18  A.    That is correct.

19  Q.    And in the report you noted that it was the initial or

20  first briefing of Mr. Gadoy; is that correct?

21  A.    (Pause.)

22  Q.    I direct you to line 10 if your recollection needs

23  refreshing, sir.

24  A.    That's correct.

25  Q.    And is it correct, sir, that Ruben Zuno's name does not

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1384

1    appear in that report?

2    A.    That's correct.

3    Q.    Now, did you next interview -- Strike that.

4          And Mr. Berrellez was with you when you spoke to

5    Mr. Gadoy; is that correct?

6    A.    That's correct.

7    Q.    And Mr. Berrellez approved your report.  Look at line 14

8    if your recollection needs refreshing.

9    A.    Yes.  He normally approved my reports, yes.

10   Q.    And he approved this report?

11   A.    That's correct.

12   Q.    Now, your next interview with Jorge Gadoy along with

13   Mr. Berrellez was September 3d, was it not, sir?

14          If your recollection needs refreshing, you might

15   look at the next page.

16   A.    Yes, sir.

17   Q.    And did you prepare a DEA-6 of that interview?

18   A.    That is correct, sir, yes.

19   Q.    And is it correct, sir, that there is no statement in

20   that debriefing report that Ruben Zuno was present at any

21   meeting at the Los Americas Hotel where there was any

22   discussion of the kidnapping of Enrique Camarena?

23   A.    We didn't discuss that, sir.

24   Q.    My question is, sir, is it true that there is no

25   statement in that report that Ruben Zuno was present in 1984

1385

1    or any other date at any meeting at the Los Americas Hotel

2    where the kidnapping of Enrique Camarena was allegedly

3    discussed?  Is that correct, sir?

4    A.    In this report, no mention of that.

5    Q.    Is it also true in that report there's no mention that

6    Ruben Zuno was present at any meeting at Ernesto Fonseca's

7    house where the kidnapping of Enrique Camarena was allegedly

8    discussed?

9    A.    That's correct.

10   Q.    And no meeting at 114 Tonala where the kidnapping was

11   originally discussed?

12   A.    That's correct.

13   Q.    And no meeting at a place called Offisina some several

14   blocks away where the kidnapping was allegedly discussed?

15   A.    That's correct.

16   Q.    Was your next interview, sir, of Mr. -- excuse me.  And

17   your report again was approved by Agent Berrellez?

18   A.    That's correct.

19   Q.    Your next interview of Mr. Gadoy was on October 22d,

20   1991; is that correct, sir?

21   A.    (Pause.)  Well, I have one here that says October 8th.

22   Q.    That wasn't an interview.  That was a photo session,

23   wasn't it, sir?  What I'm asking you is your next interview

24   with Mr. Gadoy, was that on October 22d?

25   A.    Well, I was present on the October 7th also, so.... Are

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1386

1    you referring to that one?

2    Q.   No.  I'm referring to did you interview along with Agent

3    Berrellez Mr. Gadoy on October 22d?

4    A.   Yes, sir.

5    Q.   And you wrote a DEA briefing report of that meeting; is

6    that correct, sir?

7    A.   That's correct, sir.

8    Q.   And is it correct in that debriefing report there is no

9    statement that Mr. Gadoy claimed Mr. Zuno was at any meeting

10   in 1984 in the Los Americas Hotel where the kidnapping of

11   Enrique Camarena was discussed?

12   A.   That was done separately.

13   Q.   My question is, sir, is it true --

14   A.   Oh, I see.

15   Q.   -- in this October 22d report that there's no statement

16   that Mr. Gadoy claimed that Mr. Zuno was at any meeting in

17   1984 in the Los Americas Hotel where the kidnapping of

18   Enrique Camarena was discussed; is that correct?

19   A.   Not in this report.

20   Q.   And is it correct, sir, that there is no statement in

21   that report indicating Mr. Gadoy claimed that Mr. Zuno was at

22   any meeting in Ernesto Fonseca's house in 1984 or 1985 where

23   allegedly the kidnapping of Enrique Camarena was discussed?

24   A.   That's correct.

25   Q.   And there was no meeting -- strike that.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1387

1        And is it true there is nothing in that report to

2   indicate that Mr. Gadoy said Mr. Zuno was at any meeting at

3   114 Tonala where there was any discussion of kidnapping?

4   A.    That is correct.

5   Q.    And nothing to indicate that Mr. Zuno was present at the

6   Offisina address when allegedly the kidnapping was discussed?

7   A.    That's correct.

8   Q.    Now -- and Agent Berrellez again approved that report?

9   A.    That's correct.

10  Q.    Let's go next to your next interview with Mr. Gadoy,

11  sir, which was April 4th of 1992.  Is that correct?

12  A.    I have April 7th.

13  Q.    If you look at April 7th, I direct you, sir, to page

14  6510 at the top and see if that refreshes you that your next

15  meeting with Mr. Gadoy was April 4th.  And you might look at

16  the first line.  Up at the top of the page, at each page

17  there is a number.

18  A.    6510 you said?

19  Q.    I'm sorry, Officer Leyva.

20  A.    I don't have 6510, sir.

21  Q.    Do you have a report at the top says the date prepared

22  April 8th?

23  A.    April 8, 6500, that's it.

24  Q.    Yes, sir, 6500.  And look on the first line.  Does that

25  refresh you that you met with Jorge Gadoy on April 4th, 1992?

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1388

1   A.   Yes, sir.

2   Q.   And you met with him with Agent Berrellez?

3   A.   That's correct.

4   Q.   And is it true on that occasion, on April 4, 1992, there

5   is nothing in the report that indicates that Mr. Gadoy said

6   Ruben Zuno was present at any alleged meeting at the Los

7   Americas Hotel where the kidnapping of Enrique Camarena was

8   allegedly discussed?

9   A.   I don't have a copy of that report you mention, April

10  4th.

11  Q.   The April 4th meeting you recorded in the DEA-6; isn't

12  that correct?

13  A.   Well, I see.  Yes.  Yes.

14  Q.   And the DEA-6 was prepared on April 8?

15  A.   That's correct.

16  Q.   And that report is - what? - in the upper right-hand

17  corner is page 6500?

18  A.   That's correct.

19  Q.   Is it true, sir, that there is nothing in that report

20  that indicates that Mr. Gadoy said that Ruben Zuno was

21  present at any meeting at the Los Americas Hotel at any time

22  where any kidnapping was discussed?

23  A.   That's correct.

24  Q.   And there is nothing in that report to indicate

25  Mr. Gadoy said that Ruben Zuno was ever present at Ernesto

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1389

1   Fonseca's home when any kidnapping was discussed?

2   A.    That's correct.

3   Q.    And nothing in that report to indicate that Mr. Gadoy

4   said that Mr. Zuno was present at any meeting at 114 Tonala

5   where the kidnap was allegedly discussed?

6   A.    That's correct.

7   Q.    And nothing in that report to show that Mr. Zuno was at

8   any meeting of the Offisina address where the kidnapping was

9   allegedly discussed?

10  A.    That's correct.

11  Q.    Now moving next to -- and again Mr. Berrellez, or, I'm

12  sorry, Agent Berrellez approved that report?

13  A.    That's correct.

14  Q.    Next did you next meet with Mr. Gadoy on April the 6th

15  of 1992?

16  A.    (Pause.)

17  Q.    That's the page 6492, sir.  To refresh your recollection,

18  there is a report dated April 10.

19  A.    Yes.

20  Q.    Do you have it?

21  A.    Yeah, April 10.

22  Q.    Does looking at that report refresh you, if you need

23  refreshing, that you next met with Mr. Gadoy on April 6 of

24  1992?

25  A.    That's correct.

1390

1   Q.   And you prepared a DEA report of that meeting on April

2   10th of 1992?

3   A.   That's correct.

4   Q.   And is it correct that again there is no reference in

5   the report that Mr. Gadoy gave any claim that Mr. Zuno was

6   present at any meeting at the Los Americas Hotel where the

7   kidnapping was allegedly discussed?

8   A.   That's correct.

9   Q.   And no claim that Mr. Zuno was present at any meeting at

10  Ernesto Fonseca's house when the kidnapping was allegedly

11  discussed?

12  A.   That's correct.

13  Q.   And no claim that Mr. Zuno was present at any meeting at

14  114 Tonala where the kidnapping was allegedly discussed?

15  A.   That's correct.

16  Q.   And no claim that Mr. Zuno was at Offisina at any time

17  when the kidnapping was allegedly discussed; correct?

18  A.   That's correct.

19  Q.   Is that correct?

20  A.   That's correct.

21  Q.   And, again, Agent Berrellez approved that report?

22  A.   That's correct.

23  Q.   Now is it true, sir -- and I direct your attention now

24  to the April 7th report which starts at page 6502 and I

25  direct you to page 6503, so look wherever you want.

1       Is it true in that report Mr. Gadoy claimed there

2   was a meeting at the Los Americas Hotel and at that meeting

3   said that -- said that Ernesto Fonseca and Caro-Quintero had

4   instructed Miguel Aldana Ibarra to attempt to bribe the DEA

5   agent?

6       THE COURT:  What is the question?

7   Q.   BY MR. MEDVENE:  Do you recall if the person you were

8   interviewing made that statement, Mr. Gadoy?

9   A.   I forgot your question, I'm sorry, can you --

10  Q.   Yes.  Did Mr. Gadoy on that occasion say that at a

11  meeting at the Los Americas Hotel Ernesto Fonseca and

12  Caro-Quintero instructed Miguel Aldana to attempt to bribe

13  the DEA agent?  Did he say that?

14  A.   Yes, sir.

15  Q.   And did Mr. Gadoy say that Mr. Aldana said that he had

16  tried to bribe the DEA agent and the DEA agent refused?

17  A.   That's correct.

18  Q.   Now, I direct you, sir, to further in the interview and

19  ask if on that occasion, April 7, you discussed a meeting

20  that Mr. Gadoy claimed occurred at Mr. Fonseca's house, a

21  meeting involving an AK-47?

22  A.   We had discussed this meeting and other meetings from

23  the beginning.

24  Q.   Excuse me, sir?

25  A.   I'm sorry.

1392

1    Q.    I'm asking you if you discussed on April 7 with

2    Mr. Gadoy a meeting at Fonseca's house?

3    A.    If it's possible?  Yes, it's possible.

4    Q.    Okay.  I direct you to page 6506 for purposes of

5    refreshing your recollection.

6    A.    Yes, sir.

7    Q.    Does that refresh your recollection that on April 7th

8    you discussed with Mr. Gadoy a meeting at Mr. Fonseca's

9    house?

10   A.    That's correct.

11   Q.    And Mr. Gadoy claimed that this meeting happened after

12   the Los Americas meeting; is that correct, sir?

13   A.    Well, about the same time, both.  Says October/November

14   and then it says November.

15   Q.    Doesn't he say here, sir, didn't he say the Los Americas

16   meeting was in October or November and the Mr. Fonseca

17   meeting was the latter part of November?

18   A.    That's correct.

19   Q.    And didn't he tell you with this meeting later in time

20   at Mr. Fonseca's house, didn't he claim that Caro-Quintero --

21   Strike that.

22          Didn't he tell you that Alvarez del Castillo had

23   inquired of Caro-Quintero and Ernesto Fonseca as to what

24   progress they had made in locating the DEA agent?  Didn't he

25   tell you that?  And I direct you, sir, to page 6507, the

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1393

1 second and third line.

2 A.    (Witness complies.)   Okay.   Can you repeat the question,

3 please.

4 Q.    Did Mr. Gadoy at this meeting at Mr. Fonseca's house

5 that followed the Los Americas meeting claim that Enrique del

6 Castillo inquired of Caro-Quintero and Ernesto Fonseca as to

7 what progress they had made in locating the DEA agent?

8 A.    That's correct.

9 Q.    And didn't he tell you that Caro-Quintero and Fonseca

10 said that it was their understanding that del Castillo's

11 people would first have to identify and locate the agent?

12 A.    That's correct.

13 Q.    And didn't he claim that del Castillo said that he had

14 people trying to identify or pick out who the agent was?

15 A.    That's correct.

16 Q.    And didn't he claim that Caro-Quintero then told del

17 Castillo, they needed the identification to locate and pick

18 up the agent?

19 A.    That's correct.

20 Q.    Now, at the -- is it true, and I direct you to page

21 6440, that at a meeting, that Mr. Gadoy told you about on

22 April 7th, 1992, at 114 Tonala, he claimed that it was agreed

23 by all that the agent should be identified?

24         And I direct you, sir, to page 6441, the fourth

25 paragraph, last sentence, if your memory needs refreshing.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1394

1    A.    What was your question again, sir?

2    Q.    Is it true, sir, that Mr. Gadoy told you on April 7th

3    that after the Los Americas meeting and after the Fonseca

4    meeting there was another meeting at 114 Tonala?  Isn't that

5    what he told you?

6    A.    That's correct.

7    Q.    And did he tell you at that meeting at 114 Tonala, that

8    everyone agreed that the agent should be identified?

9          I direct you to paragraph four on page 6441.

10   A.    Well, it says that, umm, he overheard Bartlett Diaz

11   state that it was time to move on the agent because he was

12   causing a lot of problems.  And that they all agree, it was

13   agreed by all, that the agent should be identified, located

14   and picked up as soon as possible.

15   Q.    Thank you, sir.

16         Is it true that Mr. Gadoy then claimed that

17   following the Tonala meeting, there was a meeting at a place

18   he identified as Offisina?

19   A.    That's correct.

20   Q.    And he claimed the Offisina meeting followed the 114

21   Tonala meeting.  Is that correct?

22   A.    That's correct.

23   Q.    And he said that the meeting occurred in November or

24   December of 1984.  If you need refreshing, sir, you might

25   look at page 6509, the second line.

1395

1    A.   That's correct.

2    Q.   Did he claim, sir, that at that meeting Alvarez de

3    Castillo said, in effect, "Do you know who the agent is?"

4    And Ernesto Fonseca replied, "We are working on it"?

5    A.   (Pause.)  What part of the report are you reading?  I

6    can't find that, sir.

7    Q.   About eight to ten lines down from the top of the page,

8    sir?

9    A.   Top of page 3?  I mean, paragraph three?

10   Q.   On top of page 2, sir.

11   A.   All right.  (Pause.)  Okay.  And Castillo entered the

12   living room area where all the individuals were gathered.

13   Q.   You're reading from the report, sir?

14   A.   Yes.  The lines that you have mentioned.

15        And he was overheard by Mr. Gadoy, Mr. Alvarez

16   Castillo state in a firm and angry manner, "Que pasa?  Que no

17   puiden con" --

18        THE COURT REPORTER:  I don't speak Spanish.

19        THE WITNESS:  In English, "What's going on?  Can't

20   you deal with the American DEA agent?  If not, let me know so

21   my people can handle it."

22   Q.   BY MR. MEDVENE:  And did Ernesto Fonseca say, "We are

23   working on it"?

24   A.   That's correct, sir.

25   Q.   You don't have any independent memory of exactly what

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1396

1  was said, I guess, without looking at the report, do you?

2  A.    That's correct, sir.

3  Q.    And did Ernesto Fonseca go on to say that, "We haven't

4  located the person yet, we don't know who the person is yet"?

5  A.    He says, "We're working on it.  We already killed some

6  Americans and we haven't located the right person."

7  Q.    And allegedly Mr. Gadoy claims that then Mr. Zuno said

8  something about, they're working on it, they're trying to

9  find out who the agent is; isn't that correct?

10 A.    That Mr. Zuno interdicted and said, Mr. Zuno directing

11 his conversation to Alvarez Castillo, says, "They're working

12 on it.  Give them the correct -- give them the correct

13 details so they can locate him."  So they can locate him,

14 quote-unquote.

15 Q.    You're again reading from the report because you don't

16 have any memory; isn't that correct, sir?

17 A.    That is correct.

18 Q.    Even as an experienced agent, it's hard to have memory

19 of correct conversations, even ones that occur within the

20 last year; is that correct?

21        MR. CARLTON:  Objection; leading question, Your

22 Honor.  Argumentative.

23        THE COURT:  Sustained.

24        Well, overruled.  You may lead the witness.

25        THE WITNESS:  What was the question?  Your

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1397

1    question.

2    Q.   BY MR. MEDVENE:  You're looking at the report and

3    reading from it because even as an experienced agent, you

4    have problems remembering what Mr. Gadoy said even a year

5    ago; isn't that true?

6    A.   No, sir, not true.

7    Q.   Did Mr. -- and you don't have to read then right now

8    for me Mr. Leyva.  Did Mr. Aldana say -- Strike that.

9         Did Mr. -- Well, your -- did Mr. Zuno allegedly

10   say -- I've asked you not to read it Mr. Leyva because you

11   told me you remembered.

12        Did Mr. Zuno allegedly say to Mr. Aldana, "Why

13   can't you provide me with who the agent is?"

14   A.   Well, basically Mr. Zuno said to -- directing your

15   attention to Aldana, he said, "You, too, Aldana, why haven't

16   you given the details?"

17   Q.   And Mr. Aldana said, "I'm working on it, I have people

18   working on trying to figure out who the agent is"?

19   A.   That's correct.

20   Q.   That's what Mr. Gadoy said?

21   A.   No.

22   Q.   That's what Mr. Aldana said?

23   A.   That's what Mr. Gadoy claims Mr. Aldana said, that's

24   correct.

25   Q.   Now, let's move from Mr. Gadoy, if we can, to Mr. Romero

1398

1   Lopez.  Mr. Lopez Romero.  And did you and Agent Berrellez

2   interview him in Los Angeles on March 5th of 1992?

3              You don't have to look at it right now, sir.  Do

4   you remember whether you did or not?

5   A.   I can't recall.  You said March 5th, sir?

6   Q.   Yes, sir.

7   A.   I'm sorry.

8   Q.   Yes, sir.

9   A.   (Pause.)  I can't recall without looking at it.

10  Q.   Okay.  You can look at it.  It's exhibit 406, it's 6558.

11  Does that refresh you that on March 5th, 1992, you inter-

12  viewed, along with Agent Berrellez, Lopez Romero?

13  A.   What was the number?  65 what?

14  Q.   6558, sir.

15  A.   (Pause while locating page.)  I have through -57.  6557.

16  I don't have 6558.

17              THE COURT:  We haven't taken a recess this

18  afternoon because I intend to adjourn at 4:00 o'clock.

19  Q.   BY MR. MEDVENE:  Do you have 6558 in front of you, sir?

20  A.   Yes, sir.

21  Q.   Does that refresh you that you and Agent Berrellez

22  interviewed Lopez Romero on March 5th, 1992?

23  A.   Yes, sir.

24  Q.   And you prepared a DEA-6 of that interview?

25  A.   That's correct.

1399

1    (Discussion held off the record between

2    Mr. Medvene and Mr. Carlton sotto voce.)

3  Q.   BY MR. MEDVENE:   And you prepared on March 5th, 1992, a

4  DEA-6 of that interview; is that correct?

5  A.   That's correct.

6  Q.   And is it correct, sir, that you indicated in your

7  report that it was the initial, the first DEA briefing of

8  Lopez Romero?

9  A.   That's correct.

10  Q.   And is it is correct, sir, that Zuno Arce's name does

11  not appear in that report?

12  A.   That's correct.

13  Q.   And is it correct, sir, that in that report it does not

14  mention the Los Americas Hotel or any meetings at that Los

15  Americas Hotel?

16  A.   That is correct.

17  Q.   There's no reference to any alleged meeting at Ernesto

18  Fonseca's house that Lopez Romero attended; is that correct?

19  A.   That's correct.

20  Q.   There is no reference to any alleged meeting at 114

21  Tonala that Mr. Lopez Romero allegedly attended?

22  A.   That's correct.

23  Q.   There is no reference to any second meeting at 114

24  Tonala that Mr. Lopez Romero allegedly attended?

25  A.   That's correct.

1400

1   Q.   Now, you and Agent Berrellez next interviewed Lopez

2   Romero on April 9th of 1982; is that correct, sir?

3   A.   That's correct.

4   Q.   And you prepared a DEA-6 of that interview --

5   A.   That's correct.

6   Q.   -- is that right?

7   A.   That's right.

8   Q.   And is it correct, sir, that there is no statement in

9   the April 9 DEA-6 you prepared indicating that Mr. Lopez

10  Romero said that Mr. Zuno was at any meeting at the Los

11  Americas Hotel?

12  A.   Los Americas was not covered in this report.

13  Q.   My question, sir, is:  Is it true that in the April 9th

14  debriefing, you did after your conversation with Lopez

15  Romero, there is no reference in that report --

16  A.   That's correct.

17  Q.   -- to the fact Mr. Zuno was allegedly at any meeting at

18  the Los Americas Hotel where the kidnap was purportedly

19  discussed?

20  A.   No meetings were discussed.

21  Q.   Is that correct, sir, what I said?

22  A.   I'm sorry, sir, your question?

23  Q.   My question is:  Is it true in the DEA-6 you prepared

24  after your meeting with Mr. Lopez Romero on April 9th,

25  there's no reference to the DEA-6 to any claim by Lopez

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1401

1    Romero that Mr. Zuno was present at any meeting of the Los

2    Americas Hotel where any kidnapping was allegedly discussed?

3    A.    That's correct.

4    Q.    At any meeting at Ernesto Fonseca's house where the

5    kidnapping was allegedly discussed?

6    A.    That's correct.

7    Q.    And no meeting at 114 Tonala where the kidnapping was

8    allegedly discussed?

9    A.    That's correct.

10   Q.    And Agent Berrellez approved this report, did he not?

11   A.    Yes, sir.

12   Q.    You next met with Lopez Romero on April 14th; is that

13   correct, sir?

14   A.    Yes, sir.

15   Q.    And you did a DEA-6 report of that interview?

16   A.    That's correct, sir.

17   Q.    And is it correct, sir, that there is no reference in

18   the interview you did of your April 14th meeting that at that

19   date Lopez Romero made any claim that Mr. Zuno was at any

20   meeting at the Los Americas Hotel where the kidnapping of

21   Enrique Camarena was discussed?

22   A.    That's correct.

23   Q.    He made no reference to any meeting of Ernesto Fonseca

24   house where the kidnapping was allegedly discussed?

25   A.    That's correct.

1402

1    Q.   He made no reference to any meeting at 114 Tonala where

2    the kidnapping was allegedly discussed?

3    A.   That's correct.

4    Q.   Agent Berrellez approved that report?

5    A.   Yes, sir.

6    Q.   I take you, sir, lastly, to Lopez Romero's discussion

7    with you on April 15th, 1992, about a meeting at Ernesto

8    Fonseca's house and ask you if on that occasion he claims

9    that he overheard -- Let's see if you remember this without

10   looking, Agent Leyva.

11           MR. CARLTON:   Objection to the comment, Your

12   Honor.

13           MR. MEDVENE:   No, no, the witness was looking

14   down.   I'm asking him to look at me.

15           MR. MEDRANO:   Objection, Your Honor.   This is

16   gamesmanship, Your Honor.   We'd object.

17           MR. MEDVENE:   No.

18           THE COURT:   Just calm down.   State your question.

19   Q.   BY MR. MEDVENE:   I'd ask --

20           THE COURT:   Do you have the question in mind?

21           THE WITNESS:   No, Your Honor.

22   Q.   BY MR. MEDVENE:   Let me ask it, Agent Leyva.

23           Did Lopez Romero on April 15th claim that at this

24   meeting at Ernesto Fonseca's house, he overheard Caro-Quintero

25   tell Alvarez del Castillo that they should be the ones that

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1403

1    should identify and locate the DEA agent?  Did he claim that

2    that was said by Caro-Quintero at that meeting at Ernesto

3    Fonseca's house?

4    A.    I would like to refresh my memory.

5    Q.    Because you don't remember?

6    A.    I would --

7    Q.    It's okay if you don't remember.  Is that why you want

8    to refresh your memory?

9    A.    I remember part of it but I would like to be more

10   specific.

11   Q.    Sure.  Sure.  It's page 6582, sir.  First paragraph, but

12   you can look at anything.

13   A.    What was your question, again, sir?

14   Q.    My question was:  Did Lopez Romero claim that at this

15   meeting at Ernesto Fonseca's house he heard Caro-Quintero

16   tell Alvarez del Castillo that they should be the ones that

17   should identify and locate the DEA agent?

18   A.    That's correct.

19   Q.    And did he claim he overheard Alvarez del Castillo say

20   they are attempting to locate the DEA agent?

21   A.    To the best of my recollection, that's correct.

22            MR. MEDVENE:  I have nothing further.  Thank you,

23   sir.

24            THE COURT:  Do you have any questions for this

25   witness?

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1404

1    MR. CARLTON:  Yes, Your Honor.

2               CROSS-EXAMINATION

3

4    BY MR. CARLTON:

5    Q.   Agent Leyva, did you prepare all of the debriefing

6    reports for Jorge Gadoy and Rene Lopez?

7    A.   Yes, sir.

8    Q.   And in any of those reports, did you purport to put down

9    everything that they told you about all subjects?

10   A.   No, sir.

11   Q.   What was your approach to preparing these reports?

12   A.   Well, it was a different approach with each individual.

13   Mr. Gadoy when he came to the United States --

14             MR. MEDVENE:  Objection, Your Honor, this is

15   broader.  The question was what was your approach in

16   preparing the reports.

17             THE COURT:  Yes, the question was what was your

18   approach.

19   Q.   BY MR. CARLTON:  Let's look at particular reports.

20   Turning to, I believe it is, exhibit 404, the reports

21   concerning Mr. Gadoy, if you'd look at the report dated

22   August 30th, 1991.

23   A.   (Witness complies.)

24   Q.   What was your purpose in preparing that?

25             MR. MEDVENE:  Objection; relevance, materiality.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1405

1  Relevance, materiality.

2            THE COURT:  The purpose was in preparing it?  You

3  may answer that.

4  Q.   BY MR. CARLTON:  The initial debriefing report.

5  A.   That was only to notify our headquarters office that we

6  had a possible witness and that we were going to be spending

7  some time with that person, and that's about it.

8  Q.   When you interviewed him on that date, was it a full

9  interview of everything that he knew?

10 A.   No, sir.

11 Q.   Did you attempt in this report to write down everything

12 he told you?

13 A.   No, sir.

14 Q.   Moving along to the report dated September 3d, 1991 --

15 A.   Yes, sir.

16 Q.   -- the background report.  Did you have a particular

17 purpose in preparing this report, something you wanted to

18 write down in particular?

19 A.   We wanted to make Mr. Gadoy feel comfortable with us, so

20 we started with his background, very low key, and we went

21 from the moment he entered the police work -- the police force,

22 I'm sorry, and then how he came about to work for Mr. Fonseca.

23 But it was his background.

24 Q.   And was it your intention to limit the interview to that

25 subject?

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1406

1   A.   That is correct, sir.

2   Q.   And on the other interviews that you had with Mr. Gadoy,

3   did you also limit the interviews to particular subjects?

4        MR. MEDVENE:  Objection; leading and suggestive.

5        THE COURT:  Sustained.

6   Q.   BY MR. CARLTON:  On the October 22d, 1991, report,

7   concerning the La Langosta restaurant, during that interview

8   did you ask Mr. Gadoy about everything he knew?

9   A.   No, sir.  We knew --

10       MR. MEDVENE:  Objection.  Asked and answered.

11  He's just answered the question.

12       THE COURT:  He has answered.

13       MR. MEDVENE:  I think he answered "no," sir.  I

14  think he answered no.

15       THE COURT:  He answered the question.

16       MR. MEDVENE:  Yes.

17  Q.   BY MR. CARLTON:  Did you focus your interview on this

18  one subject?

19  A.   Yes, sir.

20  Q.   And likewise on the report dated April 8, 1992, concer-

21  ning the money delivery to Enrique Alvarez del Castillo, did

22  you focus your interview to that one subject?

23       MR. MEDVENE:  Objection; asked and answered.

24       THE COURT:  Sustained.

25  Q.   BY MR. CARLTON:  During the interview of that report,

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1407

1    did you question Mr. Gadoy about everything he knew?

2    A.    No, sir.  Well, we --

3              MR. MEDVENE:  Asked and answered.

4              THE COURT:  Sustained.

5    Q.    BY MR. CARLTON:  Did you limit your questioning in some

6    way?

7    A.    Yes, sir.

8    Q.    In working through each of the reports that you prepared

9    concerning Jorge Gadoy, did you limit your questioning in

10   some fashion?

11   A.    Yes, sir.  To a specific area, La Langosta, La Cu

12   Casino, Marojo or La Marina.  We had another meeting at 114

13   Los Americas, money delivery, in order to facilitate in

14   chronological order if possible the questioning.  So it would

15   be in order, this is the way we did it.

16   Q.    And did you follow that same procedure in interviewing

17   Rene Lopez Romero?

18   A.    That is correct, sir.

19   Q.    In these reports did you attempt to create a verbatim

20   transcript of what was told to you?

21   A.    A DEA-6 is not --

22              THE COURT:  Well --

23              MR. MEDVENE:  Objection.

24              THE WITNESS:  -- not a verbatim.

25              MR. MEDVENE:  Objection.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1408

1    THE WITNESS:  I'm sorry.

2    MR. MEDVENE:  Calls for a narrative and not

3    responsive to the question so far.

4    THE COURT:  He asked if you intend.  Can you

5    answer that yes or no?

6    THE WITNESS:  What was your question?  I'm sorry.

7    THE COURT:  Did you intend to create a verbatim

8    transcript.

9    THE WITNESS:  No, sir.

10   Q.   BY MR. CARLTON:  Are these summaries of what you were

11   told?

12   MR. MEDVENE:  Objection; leading.

13   THE COURT:  Overruled.

14   THE WITNESS:  They were summaries of the conversa-

15   tions and the briefings that we had with Mr. Gadoy and

16   Mr. Rene Lopez.

17   MR. CARLTON:  May I have just a moment, Your

18   Honor?

19   Q.   Do you recall the first time that Jorge Gadoy mentioned

20   the name Ruben de Lasar* to you?

21   A.   Yes, sir.

22   Q.   When was that?

23   A.   The first meeting.

24   Q.   And Rene Lopez Romero?

25   A.   The same thing.  The first meeting through the minutes

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1409

1    that we had and that's why we --

2              MR. MEDVENE:  Objection.  Starting a narrative,

3    Your Honor.  The question was when did he first mention it.

4              THE COURT:  Well, yes.  You've answered the

5    question.

6    Q.   BY MR. CARLTON:  And was the chronology of your-- Well,

7    what determined the chronology of your interviews with these

8    individuals, the subjects that you dealt with?

9    A.   To keep the -- to facilitate these people to remember,

10   we tried to keep it in order of chronology.  Just used common

11   sense.

12             MR. CARLTON:  Nothing further, Your Honor.

13                      REDIRECT EXAMINATION

14

15   BY MR. MEDVENE:

16   Q.   Mr. Zuno was the subject of your investigation when you

17   interviewed Mr. Gadoy for the first time August 30, 1991;

18   isn't that true?

19   A.   We had several subjects, sir; we still do.

20   Q.   But Mr. Zuno was one of them, wasn't he?

21   A.   One of them, yes, sir.

22   Q.   And isn't it true that under ordinary circumstances, if

23   you're interviewing somebody and they make reference to an

24   individual like Ruben Zuno, you would have put his name in

25   the report?

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1410

1    A.    No, sir.

2    Q.    So he mentioned the name but you didn't put in the

3    report; is that what you are saying?

4    A.    That is correct.

5    Q.    Well, would it be easier or harder for you to remember

6    whether he mentioned the name if you recorded it in the

7    report?

8          MR. CARLTON:  Objection.  Irrelevant, Your Honor,

9    speculative.

10         THE COURT:  Sustained.

11   Q.    BY MR. MEDVENE:  Is there a reason you can recall now --

12   Strike that.  When you interviewed Lopez Romero in March

13   of '92, you knew there was a pending case to be tried against

14   Mr. Zuno; is that correct?

15   A.    That's correct.

16   Q.    And Ruben Zuno's name does not appear in the March 5th

17   report which is your summary of what you claimed a Mr. Lopez

18   Romero said; isn't that true?

19         MR. CARLTON:  Asked and answered, Your Honor.

20         THE COURT:  Yes.  Sustained.

21         MR. MEDVENE:  I have nothing further, Your Honor.

22         THE COURT:  Any further questions?

23         MR. CARLTON:  No, Your Honor.

24         THE COURT:  All right.  You may step down.

25         THE WITNESS:  Thank you, Your Honor.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1411

1    THE COURT:  Next witness.

2    MR. MEDVENE:  If the court please, we had planned

3    on this time reading in the certain testimony.  That was the

4    subject of a motion, Your Honor, by the government.

5    MR. MEDRANO:  Your Honor, we just were served with

6    this motion this morning.

7    THE COURT:  Well, this is not the time then to do

8    that.  Do you have a witness here you can call?

9    MR. MEDVENE:  Yes, Your Honor.

10    MR. MEDRANO:  Your Honor, before the witness comes

11    in, may we either address the court very briefly outside the

12    presence of the jury or recess at this time.  It's a very

13    urgent matter, Your Honor.

14    THE COURT:  To do what.

15    MR. MEDRANO:  It's a very urgent matter that we

16    address the court at this moment.

17    THE COURT:  Does it relate to this witness?

18    MR. MEDRANO:  No, Your Honor.

19    THE COURT:  Well the answer is no.  Bring the

20    witness in, we'll adjourn in a few minutes.

21    MR. MEDRANO:  It relates to the court's ruling at

22    the noon hour, Your Honor.

23    THE COURT:  Well, we could take that up later, if

24    you want.

25    Well, let's adjourn at this time.  The jury will

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1412

1   be excused until tomorrow at 9:30.  Ladies and gentlemen,

2   please keep in mind your duty not to discuss this case with

3   each other or with anyone else, not to form or express any

4   opinion or conclusion about this case until it has been

5   submitted to you, not to read or watch or hear anything about

6   this case.  And if you generally listen to the radio on your

7   way home, why, don't listen to the news.  That is the best

8   way to avoid it.  If you hear something turn it off or change

9   the station.  Become a music listener.  You may be excused.

10            THE CLERK:  Please rise.

11            (Jury excused at 3:44 p.m.)

12            THE CLERK:  You may be seated.

13            THE COURT:  Now, counsel, what is it?

14            MR. MEDRANO:  Thank you for doing that, Your

15   Honor.  I've been requested on behalf of Attorney General

16   William Barr, the court stay its order releasing Dr. Machain

17   for the following reason:  The Department of Justice, Your

18   Honor, as we speak, is considering its various options, which

19   may or may not include the possibility of a writ of

20   mandamus.  For that reason, Your Honor, we'd ask the court,

21   we'd implore the court just to stay the matter for a couple

22   of days until the Department of Justice reviews what options

23   it has with regard to the court's ruling at around 1:00

24   o'clock today.

25            THE COURT:  The motion is denied.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1413

1    MR. MEDRANO:  Very well.

2    THE COURT: Is that it, counsel?

3    MR. MEDRANO:  Well, on another subject, Your

4    Honor.  We would ask the court to request of opposing counsel

5    if they would provide to us now, as opposed to the day of

6    trial, the list of witnesses and the order for tomorrow.

7    When we did our witnesses, Your Honor --

8    THE COURT:  Yes.  The same rule applies to --

9    MR. MEDVENE:  Yes, sir.

10   THE COURT:  -- applies to you as applies to them.

11   MR. MEDVENE:  Yes, sir, we told him them all.

12   I'm kind of surprised.  We gave to them the

13   witness list about two or three weeks ago.  Contrary to what

14   they did, we tried to tell them any new witnesses.

15   I just told John who the witnesses would be

16   tomorrow.  I told him there are witnesses from Mexico

17   tomorrow; we don't know who but we are calling them tonight.

18   You know, we were getting stuff over the weekend

19   on their main witnesses.

20   THE COURT:  You don't know who the witnesses are

21   that you brought up from Mexico?

22   MR. MEDVENE:  We don't know who actually arrived.

23   But we're going to tell them tonight who arrived and we've

24   told them our next witness.

25   THE COURT:  They should know all the witnesses

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1414

1    that you intend to call tomorrow.

2              MR. MEDVENE:  We told them every witness we know

3    now and I spoke to John Hoffman.

4              MR. MEDRANO:  There is a problem.  They told us at

5    a minimum who the possible witnesses are.  And they're not

6    telling us when they expect them in L.A., either tonight or

7    tomorrow morning, or at what times.

8              They had two days' notice as respects our

9    witnesses and the witness list we got from them was a handful

10   of names.  Now this is three times as many names with no

11   rhyme or reason to it and we'd like the names for now as

12   opposed to calling them in the morning.

13             MR. MEDVENE:  We gave them the next named

14   witnesses of which we knew three weeks ago.  They gave us our

15   stuff on Gadoy and Lopez on Saturday and Sunday.  We're not

16   going to play that game.

17             MR. MEDRANO:  He's talking Jencks, I am talking

18   witness order.  I just want the names.

19             THE COURT:  Just a moment.

20             You tell him every potential witnesses.

21             MR. MEDVENE:  Yes, sir.

22             THE COURT:  Whether you call them or not, who you

23   intend to call tomorrow --

24             MR. MEDVENE:  We've done that, to the best of my

25   knowledge.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1415

1    THE COURT:  -- and you do it now.

2    MR. MEDVENE:  I have already done that.  I told

3 John Hoffman here.

4    MR. MEDRANO:  That is not what is happening but

5 we'll rest on it.

6    MR. MEDVENE:  That is just not right.  He can ask

7 Mr. Hoffman.

8    THE COURT:  All right.

9    THE CLERK:  Please rise, the court is adjourned.

10   (Adjourned at 4:47 p.m.)

11            --oOo--

12 I certify that the foregoing is a correct transcript of the

13 proceedings held in the above-entitled matter.

14

15

16 DATE: May 1, 1993

17            LUCILLE M. LITSHEIM
             U.S. Court Reporter
18           CSR NO. 2409

19

20

21

22

23

24

25

LUCILLE M. LITSHEIM, U.S. COURT REPORTER