93-50311

FILED

JUN 18 1993

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    HONORABLE EDWARD RAFEEDIE JUDGE PRESIDING

4    — — — — —

5

6    UNITED STATES OF AMERICA,         )
                                        )
7                   Plaintiff,          )
                                        )
8            vs.                        )   Case No. CR-87-422-ER
                                        )
9    RAFAEL CARO-QUINTERO, et al.,      )   ORIGINAL
                                        )
10                  Defendants.         )
     _____ )

11

12

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                 LOS ANGELES, CALIFORNIA

17                 MONDAY, MARCH 1, 1993

18

19

20

21

22            MARY TUCKER, CSR 9308
                 Official Court Reporter
23                 429-D U.S. Courthouse
                   312 North Spring Street
24              Los Angeles, Calif. 90012
                      213/687-0530

25



FORM LASER BOND A PENGADINDY 1-800-631-6889

2

1    APPEARANCES:

2

3        For the Plaintiff:

4            TERREE A. BOWERS
             United States Attorney
5            ROBERT BROSIO
             Assistant United States Attorney
6            Chief, Criminal Division
             JOHN CARLTON
7            Assistant United States Attorney
             MANUEL MEDRANO
8            Special Assistant United States Attorney
             312 North Spring Street
9            Los Angeles, California   90012

10

11       For the Defendant:

12           JAMES E. BLANCARTE
             MARY FULGINITI
13           JEFFER, MANGELS, BUTLER & MARMARO
             2121 Avenue of the Stars
14           10th Floor
             Los Angeles, California   90067
15                 - and -
             EDWARD M. MEDVENE
16           JACK R. LUELLEN
             MITCHELL, SILBERBERG & KNUPP
17           11377 West Olympic Boulevard
             Los Angeles, California   90064

18

19

20

21

22

23

24

25

3

1   LOS ANGELES, CALIFORNIA; MONDAY, MARCH 1, 1993; 3:00 PM

2            THE CLERK:   CR-87-422, United States of America v.

3   Ruben Zuno-Arce.

4            Counsel, please state your names for the record,

5   please.

6            MR. CARLTON:   Good afternoon, Your Honor.   John

7   Carlton and Manuel Medrano on behalf of the United States.

8            MR. MEDVENE:   Good afternoon, Your Honor.   Ms.

9   Fulginiti and Messrs. Blancarte, Luellen and Medvene for

10   Mr. Zuno.   Mr. Zuno is present.

11            THE COURT:   The Court has read and considered a

12   number of motions filed on behalf of Mr. Zuno.   And I will

13   go through them and give my tentative decision on each one,

14   explain the reasons, and then I will permit counsel to be

15   heard.

16            The first motion, is a motion for a judgment of

17   acquittal, which the Court has read and considered all of

18   the papers submitted in this matter by both the defendant

19   and the government.   And the Court's tentative conclusion

20   is that a judgment of acquittal is inappropriate in this

21   case and should be denied.

22            The evidence presented at the trial supports the

23   defendant's conviction of Counts Three, Four, Six and Seven

24   of the indictment, if viewed in the light most favorable to

25   the government, which is the standard by which a motion for

4

1   judgment of acquittal should be viewed.

2           The further part of the standard is that if any

3   rational trier of fact could have found the essential

4   elements of the crime beyond a reasonable doubt.

5           The Court, viewing the evidence in that light, can

6   say that any rational trier of fact could have found that

7   the essential elements of the crime have been proved beyond

8   a reasonable doubt.

9           In convicting Mr. Zuno for Counts Three and Four

10  under 18 USC 1959(a)5 and (a)1, the government presented

11  eyewitness direct testimony of the defendant's direct

12  participation in the membership in the Guadalajara

13  narcotics cartel.

14          Moreover, the jury was presented with evidence

15  indicating Defendant Zuno's attendance at several meetings

16  as part of a conspiracy to kidnap and murder Agent

17  Camarena.

18          This evidence similarly supports the conviction of

19  the defendant under Counts Six and Seven for conspiracy and

20  the kidnapping of Agent Camarena.

21          Although the defendant may have introduced

22  contradictory evidence, it is within the exclusive province

23  of the jury to determine the credibility of the witnesses

24  and to resolve evidentiary conflicts.

25          It must be assumed that the jury resolved all such

5

1  matters in a manner which supports the verdict.  That is

2  after all what they did, is render a verdict against the

3  defendant.

4      So based on the testimony offered at trial, a

5  rational trier of fact could have found the essential

6  elements of conspiracy to kidnap and murder Drug

7  Enforcement Agent Camarena beyond a reasonable doubt,

8  therefore, this motion, in the view of the Court, should be

9  denied for those reasons.

10     We have three separate motions filed under Rule

11  33.  The first is a motion under Rule 33 for a new trial

12  based upon the verdict being against the weight of the

13  evidence.

14     Well, I think by what I have just said, I do not

15  believe the verdict to have been against the weight of the

16  evidence.  In fact, the verdict would be well-supported by

17  the evidence presented if the evidence is believed.  And

18  the jury believed it.

19     The Court's conclusion is that a new trial should

20  not be granted on the grounds that the verdict is against

21  the weight of the evidence.

22     Now, Federal Rule 33 provides that the Court may

23  grant a new trial to a defendant if required in the

24  interest of justice, and places the burden on a defendant

25  in a motion for new trial to persuade the Court that the

6

1 conclusion reached by the jury was a miscarriage of

2 justice.  The Court does not reach that conclusion.

3       So the Court finds that with respect to this

4 motion, none of the grounds raised by the defendant meet

5 the standard required for the granting of a new trial based

6 on the verdict being against the weight of the evidence.

7       There is another 33, these could have been

8 combined probably because this motion is close to the other

9 motion.  It is again under Rule 33.  And in this motion the

10 defendant asks the Court to grant a new trial because it is

11 required in the interest of justice.  However, for a new

12 trial to be granted, the evidence must preponderate

13 sufficiently heavily against the verdict that a miscarriage

14 of justice has occurred.

15       The Court's view is that the evidence does not do

16 so in this case.  In fact, it is the Court's view that it

17 preponderates in favor of the verdict rather than against

18 it.

19       The Court finds that having weighed the evidence

20 and considered the credibility of witnesses, the jury's

21 verdict is supported by the evidence presented by the

22 government at trial.  And that the verdict is not contrary

23 to the weight of the evidence.  And that this motion also,

24 in the view of the Court, should be denied, this motion for

25 new trial under Rule 33.

7

1        The final motion is a motion also brought under

2  Rule 33, and it is based on the claim that the government

3  has failed to disclose Brady material.

4        The Court has read and considered all of the

5  papers submitted in this matter, as it has in all of the

6  other motions, and tentatively concludes as follows:  The

7  failure to disclose Brady material requires reversal only

8  if there is a reasonable probability that had the evidence

9  been disclosed to the defense, the result of the proceeding

10  would have been different.  The reasonable probability is a

11  probability sufficient to undermine confidence in the

12  outcome of the trial.

13        Looking at the evidence provided to the defendant

14  by the disclosure of documents ordered by the Court, the

15  Court is unable to find that there is any such probability

16  that the result would have been different.

17        First, I have to note, that the Court's main

18  impetus in providing the discovery at the time that it did

19  was to enable the defendant to see based on that discovery

20  whether or not they could during the two months that have

21  passed, two and a half months since the defendant was

22  convicted, whether indeed investigation of those factors

23  set forth in those reports could produce some new evidence

24  or some evidence that might have been available and is

25  found at this time.

8

1    I have to note that since that date nearly three

2 months ago, the defendant has not come forward with any

3 evidence, has not shown how this might have helped his

4 case, in the form of statements or declarations or

5 affidavits by parties which suggests that any of the

6 persons named by the informants would exculpate the

7 defendant Zuno in any manner.

8    The defendant is required to convince the Court

9 under this ruling, that is under the state of the law, that

10 the evidence withheld would have led to a different result

11 at the trial.  Aside from mere speculation, the defendant

12 has not done so.

13    And the defendant could potentially extract four

14 pieces of evidence from the disclosed documents.  Sara

15 Cosio's alleged involvement with Agent Camarena, the

16 presence of Dr. Kosonoy at 881 Lope de Vega, the alleged

17 statements of El Changa, and the alleged statements of

18 Alfonso Velasquez.

19    Early in this trial before the trial began, I

20 ordered the government to disclose to the defendant the

21 names of all percipient, non testifying witnesses.  My

22 purpose in doing so was that I believed in fairness that

23 the defendant should know all of the people who allegedly

24 witnessed any of the criminal acts charged.

25    And in compelling the government to produce the

9

1  names of those people was to assist the defendant to

2  investigate the possibility that among these non percipient

3  witnesses, because if they were percipient and the

4  government wasn't calling them, there is always a

5  possibility that they would have favorable evidence to

6  offer in favor of a defendant.  And that is the reason the

7  Court ordered that their names and identites be disclosed.

8          In regard to Sarah Cosio and El Changa, the

9  defendant had access to their names prior to this latest

10  disclosure, because they were among the list of percipient

11  and non testifying witnesses that was disclosed to the

12  defendant long before the trial.

13          So the failure to disclose, in the view of the

14  Court, did not have adverse affect, but for the defendant's

15  failure to pursue the witnesses further.

16          The Brady case does not give the defendant a right

17  to have the government construct the defense and identify

18  defense witnesses.

19          Where the defendant prior to trial had within

20  their knowledge the information by which they could have

21  ascertained the alleged Brady material, there is no

22  violation by the government.

23          As far as the percipient witnesses of Velasquez

24  and Kosonoy are concerned, they would merely provide

25  defendant with further evidence to attempt -- well, first

10

1   let me say about these alleged witnesses, and I have in

2   mind that these reports that were ordered disclosed were

3   hearsay on hearsay.

4          It is extremely unlikely that anybody who was

5   present at 881 Lope de Vega, who either witnessed or

6   participated in what took place there, and who is

7   unindicted, it is extremely unlikely that such a person

8   would come forward to testify and make the statements that:

9   Yes, he was present while Agent Camarena was being

10  tortured.  And, yes, he would testify on behalf of a

11  defendant.

12         I dare say that that is probably the reason that

13  we have had no evidence of such witnesses coming forward,

14  either from the list of witnesses previously provided to

15  the defendant or since the end of the trial with respect to

16  the information provided.

17         Even if these witnesses were to come forward, the

18  net effect would be to offer conflicting evidence to that

19  offered by the two government witnesses, Rene Lopez-Romero

20  and Jorge Godoy.

21         The defendant certainly impeached these witnesses

22  extensively at the trial, showing their history and their

23  participation in various crimes, and sufficiently

24  challenged their credibility.

25         I don't know that had a witness come forward and

11

1  stated or contradicted what their testimony was, whether it

2  would have made any difference.

3      Now, with regard to Alfonso Velasquez.  His

4  statements are not material in that a failure to inculpate

5  the defendant does not infer favorable testimony.

6      That was held in United States v. Brian in the

7  Ninth Circuit in 1989.  But Velasquez' failure to name Zuno

8  as one of the persons at Lope de Vega does not alone

9  exculpate Mr. Zuno.

10     Defendant has not provided this Court -- well, let

11 me put it this way:  This event at 881 Lope de Vega was

12 prolonged over a two day period.  We don't know exactly

13 when this witness was there, whether he was there at a time

14 early on or later on.  It is not really very helpful to

15 show that he did not inculpate the defendant by the

16 statements that he made.

17     So the Court will not infer exculpatory testimony

18 sufficient to undermine the confidence in the jury's

19 verdict, which is the standard.

20     So it would be the Court's view that this motion

21 as well should be denied.

22     Did you wish to be heard, Counsel?

23     MR. MEDVENE:  Yes, I do, Your Honor.  Thank you.

24     Your Honor, we submit to you that under Rule 33

25 there is a miscarriage of justice if the verdict is allowed

12

1    to stand.  Something --

2              THE COURT:  Tell me what it is.

3              MR. MEDVENE:  What is --

4              THE COURT:  A miscarriage of justice is usually

5    obvious to a Court.

6              MR. MEDVENE:  Let me tell you why I believe it's

7    obvious, Your Honor.

8              There are two key components that the prosecution

9    case rests on.  If either of which falls, I suggest the

10   verdict must fall.

11             The first component is that there was credible

12   evidence that the kidnapping meetings occurred.  The

13   government put forth a witness, basically Godoy, who was a

14   witness that claims the kidnapping meetings occurred.

15             Now, what is critical here, and it's a rare

16   situation, Your Honor, and we have gone over the transcript

17   thoroughly.  What the record shows is this:  Putting aside

18   that it took six to seven years for this witness to come

19   forward, putting that to the side for the moment, putting

20   aside the fact that it took him seven months of talking

21   about Zuno before he first claimed he was at a kidnapping

22   meeting, putting those things to the side, before anyone

23   focused on the fact that we would get discovery showing

24   this witness did not even work for Fonseca or attend

25   meetings in November and December of 1984, this witness

13

1   clearly and unequivocally identified the kidnapping

2   meetings in question as meetings he attended in November

3   and December.  There is no question about that.

4   And we can go through the transcript quickly.   Only when

5   the prosecution realized, months later, months after April

6   of '92, in December of '92 when they realized through

7   discovery, we got a hold of Godoy's confession where Godoy

8   admitted he was not working for Fonseca in November and

9   December, was a change made in the Godoy testimony.

10          Now Godoy tries to move from the confession by

11  saying he was tortured or whatever, but on the stand, on

12  cross-examination in front of Your Honor, Godoy admitted he

13  was not working for Fonseca in November and December of '84

14  or January of '85.  And we have the cite for that.

15          Now with that in mind, the government had no way

16  to go but to try to move Godoy from saying the meetings

17  occurred in November and December and have him say they

18  occurred earlier.

19          And for the first time at this time trial, and you

20  must remember, Your Honor, this is at a time when

21  Cervantes, and only Your Honor would know this because of

22  the pleadings filed with Your Honor and the government,

23  this is at a time when Cervantes is no longer a viable,

24  credible government witness, as substantiated by the fact

25  they didn't call him.  Circumstantially supportable they

14

1  didn't call him.

2          They know they don't have a witness.  They know

3  you called this case to trial.  They have nobody to place

4  in the kidnapping meetings because they know Cervantes is

5  not who he claimed to be.  We spelled it all out.  And they

6  confirm it by not calling him.

7          So they get Godoy.  Seven months later, if you can

8  believe this in your experience, seven months later, after

9  they've questioned him for seven months, they no longer

10  have Cervantes, and all of the sudden he implicates Zuno as

11  being at kidnapping meetings.

12          Now, what do they then do?  He puts him at the

13  meetings in November and December.  They find out getting

14  closer to the trial date, we've asked for and got a hold of

15  his confession, where it says he wasn't working for Fonseca

16  then and didn't attend meetings then.

17          For the first time at trial there is no D.E.A.

18  report on this.  He claims that contrary to what he told

19  the D.E.A., he moved the meetings back to September and

20  early October.  So he tells the D.E.A. the first meeting

21  was late October, early November.  He testifies on direct,

22  late September, early October.  No reason for the change.

23          On cross we bring him back to October, early

24  November.  And then he says he testified incorrectly to the

25  D.E.A.

15

1          The second meeting is cleaner.  The second meeting

2    he tells Agent Levya the latter part of November of '84.

3    And I have the cites.  On direct he says two weeks after

4    that earlier date, and on cross we bring him back, he says

5    the latter part of November approximately.  That's the

6    December 8th transcript, page 66.

7          Now we know independently he is not working for

8    him then.  He didn't attend meetings then.

9          The third meeting at 114 Tonala, he tells Leyva,

10   cause we know from Leyva and we get from the witness, late

11   November early December.  We know he is not working for him

12   then.

13         He tries to cheat in his testimony for the first

14   time saying it happened in October, but we get from him on

15   cross late November, early December, approximately.

16   December 8 transcript, page 66.

17         The fourth meeting, the Oficina meeting, he tells

18   Leyva beginning of December.  With no reason for changing

19   he then has that on direct the beginning of December, when

20   we know it can't be.  He is not working for Fonseca the

21   beginning of December.  We get on cross the beginning of

22   December.

23         Now he admits he was not working for Fonseca in

24   November and December of '84 and January of '85 due to the

25   bad back.  They didn't know he had that, but he had that.

16

That is the December 8th transcript, page 13.

So it is never this clean, Judge.  You got the man making it up.  He makes it up after meeting for seven months.  And have you ever seen a case where it is as hot as this case?  When they are questioning him about Zuno, he is giving them stuff about Zuno.  For seven months he doesn't put him in a kidnapping meeting.  And then he puts him at one November and December.  We are then able to prove he is not working for Fonseca.  He moves it with no explanation.  No D.E.A. report about it.

He never said he was changing it until he got on the stand at trial.

Now, the government -- I mean that's pretty impressive.  So the government says, "Well, let's take a look at this seven months."  Did it really take him seven months?  And did it really take Godoy and forty days and four or five meetings?  And this fellow Godoy says he met for 20 occasions with the D.E.A.  And the first time is seven months later.  I mean, that strains anybody's belief.

The government says, "Well, maybe he told him at the second meeting."  And we got the transcript and we are talking to Godoy:  "Is it correct, sir, to the best of your recollection, all you mentioned at the second meeting is something about seeing Mr. Zuno at a party, but nothing about kidnapping; is that correct?"  "Yes."  December 8,

17

1    page 41.

2            Godoy ultimately testifies that April of '92 is

3    the first time he makes the claim Zuno's at a kidnapping

4    meeting, that is seven months later.

5            Romero tells the D.E.A. same thing as Godoy, as

6    Godoy's friend, this November, December; and at trial he

7    doesn't remember when the meetings happened.

8            And Leyva was crystal clear, as clean as he could

9    be, as clean as he could be.  We went down every D.E.A.

10   report of Godoy's and every one of Lopez', and he said,

11   "That's when he made the statement."

12           We went through each report, and we said, "Is

13   there any reference in there to Zuno being at any meeting?"

14   Boom.  Boom.  Boom.  Boom.  Boom.  Till seven months later,

15   finally the first reference.  And he then tries to waffle

16   and they try to rehabilitate him a bit, "Maybe he mentioned

17   it somewhere?"  "He might have.  He might have."

18           But then he falls back the other way and says,

19   "Look, I was asking him about specific things."  Giving the

20   impression:  I didn't ask him about was Zuno at meetings,

21   kidnapping meetings, till I had time to do that, that was

22   seven months later.

23           Now that just strains belief.  They got Zuno

24   socializing at parties.  This badness, that badness, but no

25   kidnapping meetings for seven months.

18

1    So you have Leyva tying in the testimony that the

2    first time he tells him is seven months later and the first

3    time he tells him, all the meetings are in November and

4    December.

5    And we know independently from the Mexican

6    confession and from Godoy on the stand, he wasn't working

7    for Fonseca November and December, and attended no meetings

8    in November and December.

9    Now, that's pretty good.  I mean that's really

10   pretty good.  It doesn't get much cleaner than that.  We

11   got a tough case with the jury.  We are arguing 33.  We are

12   not saying -- I am not arguing 29.  I'm not saying there is

13   not sufficient and they couldn't argue.

14   But I'm saying as a 13th juror, miscarriage.  And

15   something that's unarticulated, and I just want to say it.

16   They cite Tibbs saying, U.S. Supreme Court, saying in a

17   closely contested case, conflicting testimony, same

18   evidence, the trial judge can grant a 33; but gosh darn it,

19   if that jury comes back the next time, same evidence, he

20   doesn't have to grant the 33.

21   I say to you, Judge, the critical words in Tibbs

22   are the "same evidence".  We have totally different

23   evidence in this case.  The connecting evidence, there was

24   no Cervantes.  If anything, this is a stronger case for

25   looking at it like you did the last time.  There is an

19

1  honest to gosh miscarriage here.  These men made it up.

2        We will tell you in a minute how Cervantes even

3  strengthens our case.  They're contradictory to

4  Cervantes.  We don't have the same evidence here at this

5  trial.  It's not what <u>Tibbs</u> is talking about.  We got

6  different evidence and contradictory evidence to the first

7  trial.

8        And why do I say that?  Godoy says he was with

9  Fonseca at all the meetings.  He says, you remember

10  Cervantes says there was a baptism meeting in September of

11  '84.  He never attended any baptism meeting.  Better than

12  that, he says he attended the Javier Barba wedding

13  celebration.  You remember that's when Cervantes says the

14  meeting was.

15        He says he was there, and he says there was no

16  kidnapping meeting there.  So he is contradictory to

17  Cervantes.

18        In addition, Cervantes is improbable because

19  Cervantes has one meeting in February, early February, and

20  this fellow has another meeting in early February with

21  different people and different discussions.  Directly

22  contradicts Cervantes.  And more than that, they don't know

23  who Cervantes is.  One of them didn't know who Cervantes

24  was.

25        But Diaz, Castillo and Gardoqui are not at the

20

1   Cervantes meetings.  They are present on Godoy's meeting.

2   Matta, the main co-conspirator, is present at the Cervantes

3   meetings.  He is not present at the Godoy meetings.

4           But the critical thing here is, under _Tibbs_ we

5   got completely different evidence.

6           I know if I were sitting as a trial judge I would

7   say, "Hey, look, the guy got a break once."  It's not

8   really a break.  It was right you did what you did.  It's

9   right you did what you did.  But the implicit point is,

10  "Hey, fellow, I did it once.  You got another trial.  You

11  got twelve new jurors."

12          But, Judge, it is a different case.  It's not the

13  same case.  And the case they presented this time compounds

14  the badness of the first case.  We proved Cervantes was

15  made up.  They gave us these guys.  On a Saturday and

16  Sunday we get the stuff.  We got to cross-examine them the

17  next week.  And implicitly I think we are able to show, you

18  are able to show, I wasn't good enough in front of the jury

19  with the killings and the drugs.  I just wasn't good

20  enough.

21          But, gosh, I got to be good enough in front of you

22  that:  How could it be?  How could he place the meetings in

23  November and December and say he wasn't working for them,

24  and then he tries to move them back without an explanation?

25          And you got all this other stuff.  Seven months,

21

1  does that make sense to Your Honor?  Forty days where he is

2  talking about Zuno, but never mentions kidnapping.

3       THE COURT:  Counsel, you are repeating a lot of

4  points now.  I think you have about made your point,

5  haven't you?

6       MR. MEDVENE:  Additionally, Your Honor, what was

7  said at each meeting intrinsically we are saying doesn't

8  make any sense.  We will just hit two or three areas.

9       One, there was the alleged discussion at the

10 meetings about, the first meeting, the testimony is by

11 Aldana, "We know who the agent is.  Pick him up."

12      The second, third and fourth meetings, all the

13 testimony is about, allegedly, these people are talking

14 about, "Who is the agent?"

15      It intrinsically, academically doesn't make any

16 sense.  How can they know who the agent is and then they

17 are talking at the second, third and fourth meeting, they

18 have to explain why they haven't picked him up?  What is

19 his name?  They said they know his name.

20      We know they know his name from Kuykendall's

21 testimony, who said that they were well aware that Enrique

22 Camarena was the agent in charge, was working at Zacatecas,

23 had infiltrated, knew Chavez, Chavez knew Quintero.  They

24 knew who he was.  And that Kuykendall and Camarena attended

25 a meeting with the attorney general so they knew who he

22

1    was.

2            So the conversations make no sense.  "We know who

3    he is.  He won't take a bride."  Next three conversations,

4    "Who is he?"

5            Also the conversations where he said at the first

6    couple meetings, allegedly Aldana and Ibarra, I think, or

7    Aldana and Castillo were supposed to find out who is this

8    agent and identify the agent.

9            The last meeting they say, the third or fourth

10   meeting, he testifies to, he says, "No.  It's not Aldana

11   and Castillo.  It is Fonseca and Quintero who were supposed

12   to find out who the agent was."

13           There were many things like that.  There were 30

14   people going into somebody's bedroom to have a discussion.

15           How about the fourth meeting?  Judge, how could

16   there be a fourth meeting?  You have two things.  One, the

17   witness at all times places it in December.  And he has

18   told us he wasn't there in December.  He didn't work for

19   them.

20           More than that, you have Salvador Lopez, an

21   independent lawyer, not cross-examined on this point, that

22   said there couldn't have been a meeting at Oficina because

23   Oficina is not owned by Javier Ibarra-Hernandez.  It's

24   owned by people I know, and Javier Ibarra-Hernandez and

25   these bad guys were never there.  You got independent

23

1    reasons why there was no Oficina meeting.

2            Putting to the side the meetings, I submit to you

3    that's enough.  Putting that to the side, the other part of

4    the government's case, if we win on the meetings, we have a

5    Rule 33 and a new trial for the first time.

6            If you think we lose on the meetings and there is

7    not enough injustice and you want to put it together, they

8    have to prove he is in the Cartel.  And as, Your Honor,

9    pointed out:  Three and four he has to be in the Cartel,

10   and if we can knock out three and four that he is not in

11   the Cartel, I think six and seven should go because you

12   lose your motive and the drug evidence shouldn't have come

13   in.

14           Now, what do you have?  I'm not going to go

15   through it all.  But in the brief we laid out about six

16   different areas that their testimony broke into.  The focus

17   of the investigation:  You have Kuykendall, Gomez,

18   Guadalupe Gamez, and Lugo.  One confidential informant,

19   three agents, who told you about their infiltration,

20   investigation.   Gamez was at the highest level.  No

21   mention of Zuno of any kind.

22           Two, the absence of reference to Zuno in any drug

23   raids.  You have Zacatecas.  You have Bufalo.  You had

24   Padrino, the cocaine transaction.  You have Retamoza

25   testifying, the cousin Felix-Gallardo, in the intermost

24

1   circle.   No mention of Zuno of any kind.

2            On the drug meetings, many drug meetings of all

3   the dealers, and Harrison overhearing thousands of

4   conversations, no mention of Zuno of any kind.

5            Payoffs, you have Guadalupe Gamez talking about

6   payoffs to officials every twenty or thirty days.   No

7   reference to Zuno of any kind.

8            Searches by Ayala, Gonzalez, Clements, nothing

9   that came up on Zuno.   Not in the phone book.   Not

10  anywhere.   No reference of any kind.

11           They are pretty thin against what they have on it,

12  Judge.   He would have showed up if he is in the Cartel.

13  They have some alleged socialization, if you believe Godoy

14  and Harrison.   Your Honor pointed out last time, even if

15  you believe socialization, socialization isn't being in the

16  Cartel.

17           You have Quintero allegedly at the Lope de Vega

18  house when Zuno is not there making phone calls, which we

19  think Harrison was undermined on where the calls came from.

20  Did they come from there?   Sergio Virgen was living there

21  and said no such thing happened.   We know Zuno-Arce wasn't

22  there.

23           And, lastly, the only direct thing they have are

24  two things:   One, a marijuana truck that stopped, you

25  remember, and the other is the hand drawn map.

1        On the marijuana truck, we think we substantially

2   impeached, no such truck, whatever; but at worse it's an

3   independent truck.   No tie of that truck and that

4   marijuana, if there was a such a thing, to the Cartel.

5        On the hand drawn map, lastly, testimony you can't

6   do that trip in ten hours.   That's all they have against

7   this mass -- against a couple of weeks of evidence of

8   people in the highest ranks of the Cartel where you would

9   have thought Zuno's name would be referenced once.   It

10  never came up once.

11       And nothing on standard of living, nothing on big

12  house, nothing on money transfers, nothing on ostentatious

13  anything.

14       You got no tie, no forensic tie of anything.   No

15  phone calls.   No anything.

16       You've been patient with me, Your Honor, on the 29

17  and 33.   I will just touch Brady, if I might.

18       THE COURT:   All right.

19       MR. MEDVENE:   Brady breaks down into two parts.   I

20  will do it fast.   One is Cosio and the other he wasn't at

21  meetings, or whatever.

22       On the Cosio part, this is a little overly

23  aggressive, but I don't think the government really fights

24  the Brady part of it, that's it is exculpating or

25  potentially exculpatory because Cosio really undermines the

26

1    government's theory.  It knocks out the relevance of the

2    Cartel, et cetera.

3           And, Your Honor comes back, as the government did,

4    that's fine, if that's the way you see it.  You said,

5    "Well, it's not, in effect it's not material or where are

6    you going with it?"

7           Where we are going with it is, we would be

8    entitled to cross-examine -- we couldn't argue it.  We got

9    it the day of closing.  You know when we got it.  So the

10   point is:  We couldn't investigate for trial; but more than

11   that, we could have questioned witnesses about this theory.

12   It's a totally contradictory theory.  And the theory has

13   some substance to it.

14          The substance is this:  It's not a made up theory

15   if you look at the evidence.  These guys are thugs.  They

16   are like hired killers.  They see the Latter-Day Saints,

17   they see the Mexican couple.  They just kill people.  La

18   Langosta, they kill Radelat.  They are not like into lots

19   of conversations.  Forty-seven meetings like they claim

20   happened here.  They're into doing it.  And that's kind of

21   what the Cosio theory is about.  Kind of doing it.  A guy

22   like Quintero gets upset.  Says, "Pick him up and slap him

23   around."

24          We think we should have been able to do

25   investigation on it, and certainly we should have been able

27

1    to raise it at trial as an alternative theory.

2         The other point Your Honor makes is, "Hey, you got

3    the name, Fellow.  You got it."  Judge, we got the name

4    with 74 other names and there was no identification.  We

5    all know Cosio is the lady friend of Quintero.  And we all

6    know that she flies off to Costa Rica with him from where

7    ever she flies off from, Guadalajara or where ever she

8    flies off from.  That we know.

9         But we have no idea of this theory that they hit

10   us right before the closing argument.  We think, we think

11   we are clearly entitled to it.  They can't sit with that.

12        Talking about sitting, in the D.E.A. report or

13   this FBI report, they're sitting with testimony and we

14   didn't know until we went to trial about Primavera Park,

15   why the first case got reversed, and what would happen when

16   the bodies were buried.

17        They were sitting with a report that they didn't

18   give us saying the bodies were buried, the source said the

19   bodies were buried on somebody else's land.  On somebody

20   else's land.  I mean, that's as bad as what they did with

21   Dr. Machain.

22        They specifically said the bodies are on the land

23   of "X".  I have it here.  Now, they at that time were

24   wanting to argue in front of you, and we went back and

25   forth until you ruled, they wanted to argue that the bodies

1    were buried on Zuno owned land.  They are sitting with one

2    of these two reports that says the bodies were buried on

3    somebody else's land.  They didn't turn that over.  That's

4    a pretty tough view of Brady.

5             So we are saying it is not right.  It's a big

6    case, but Marquis of Queensberry rules.

7             The other part, little more speculative by us, but

8    I don't think we fall under <u>Brian</u>, and we suggest it's

9    Brady.

10            I mean to think the Cosio stuff is clean.  I think

11   the government concedes it's clean.  It's just a question

12   of when we get one of 74 names without identification of a

13   theory, is that good enough?

14            The other stuff on the witnesses, here is why it

15   is different than <u>Brian</u>, then I'm done.  <u>Brian</u>, I think

16   what the Ninth Circuit is talking about is, an overall

17   assertion that, "Hey, every witness that the government

18   talks to, if they don't mention your guy, your defendant,

19   that's not Brady.  They don't have to turn it over."

20            We are not talking about that.  We are talking

21   about in the heat of this investigation when the D.E.A.

22   agents working this case, talked to this source, and they

23   said, "Who was at Lope de Vega?"  And they're going to

24   trial against us.  And we are the only live ones they are

25   going against, against us and Machain.  It strains belief

29

1    that they wouldn't say, "Was Zuno there?"

2           They are not going to say Zuno was there in April

3    of '91 when you're about ready to grant the motion.

4           And is there any declaration by the agents that

5    did the interviewing or by the FBI agent that they didn't

6    ask is Zuno there?  This isn't Brian.  This is not all

7    witnesses.  We are not asking for that.  We are saying

8    witnesses that talked about who is at Lope de Vega when

9    they're making a claim.

10          Knowing they got a witness who maybe is going to

11   say Zuno is there, wouldn't they ask them if Zuno was

12   there?  We are saying we are entitled to that and we should

13   have been able to run that out and should have been able to

14   cross-examine, at a minimum, the agents about it, and the

15   agent's knowledge of these people and the fact that they

16   wouldn't have put Zuno there.

17          You have been kind with your time, Your Honor.

18          THE COURT:  Counsel, do you wish to be heard?

19          MR. CARLTON:  Your Honor, the points have been

20   made in the written papers and argued in great detail in

21   the written papers.  I won't address each of them

22   specifically.

23          I will say that since Mr. Zuno's arrest in

24   December of 1989, he and his counsel have been provided

25   with thousands and thousands of pages of discovery.  Much

30

1    of that discovery consists of reports of the incidents

2    surrounding this case and the events that happened, and

3    have identified many, many people who conceivably would

4    have had percipient information about this.

5         Statements by persons who were present at Lope de

6    Vega identifying other people who were present have been

7    presented to them.

8         Many names have been given to the defense over the

9    years, including the list of 74 names that Your Honor

10   alluded to.

11        And Mr. Zuno has had every incentive from day one

12   to find some alternative theory to blame Agent Camarena's

13   kidnapping and murder on and it doesn't exist.

14        There is no such theory.  He hasn't been able to

15   come up with it.  In all of these years the only thing that

16   they have been able to latch on to is this FBI report, and

17   I believe Your Honor's analysis of that is exactly correct.

18   It's immaterial.  It's multiple layers of hearsay.  There

19   is no basis for finding a reasonable probability that

20   access to that document would have in any way affected the

21   outcome of this case.

22        Your Honor is well aware that two juries have

23   found Mr. Zuno to be guilty.  Twenty-four people have been

24   convinced of his guilt.  Not one person has been convinced

25   that he is not guilty.

31

1   And yet despite that, the defense is constantly

2   coming back saying there has been a miscarriage of

3   justice.   There has been a miscarriage of justice.

4   Your Honor, I submit, the facts show exactly the

5   opposite.   There has been no miscarriage of justice.   This

6   man is convicted because he is guilty and the verdict

7   should stand.

8   THE COURT:   The rulings of the Court as previously

9   announced will stand.   All motions are denied.

10   (Proceedings adjourned.)

11   *   *   *   *   *   *

12   I, MARY TUCKER, CSR, do hereby certify that

13   the foregoing transcript is true and correct.

14

15

16   *Mary Tucker*                    6-17-93

17   MARY TUCKER, CSR                    DATE

18

19

20

21

22

23

24

25