1102
FILED
MAY 25 1993
CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY RB DEPUTY

UNITED STATES OF AMERICA

CENTRAL DISTRICT OF CALIFORNIA

THE HON. EDWARD RAFEEDIE, JUDGE PRESIDING

THE UNITED STATES OF AMERICA,
Plaintiff,
vs.
RAFAEL CARO-QUINTERO,
RUBEN ZUNO-ARCE,
HUMBERTO ALVAREZ-MACHAIN,
Defendants.

90-50459

NO. CR-87-422-(G)-ER

REPORTER'S TRANSCRIPT OF PROCEEDINGS
December 10, 1992

APPEARANCES:

FOR THE PLAINTIFF:
United States Attorney
BY: JOHN CARLTON, Asst.
MANUEL MEDRANO, Asst.
U.S. Courthouse, Room 1443
312 N. Spring Street
Los Angeles, California 90012
(213) 894-0619

FOR DEFENDANT ZUNO-ARCE:
EDWARD MEDVENE
JAMES BLANCARTE
MARY FULGINITI
Los Angeles, California 90067
(310) 201-3545

FOR DEFENDANT MACHAIN:
ALAN RUBIN
Los Angeles, California 90064
(310) 473-6447

ORIGINAL

LUCILLE M. LITSHEIM, CSR 2409
Official Federal Reporter
(213) 894-6613

INDEX



| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| ROMERO, Rene (Continued) | | 1104 | | | |
| | | 1138 | 1172 | | |
| (Continued) | | | 1177 | | |
| SEPULVEDA, Reynaldo | 1183 | 1188 | 1197 | 1198 | |
| BERRELLEZ, Hector | 1200 | 1215 | 1229 | 1230 | |



EXHIBITS



| EXHIBIT NO: | MARKED FOR IDENTIFICATION | RECEIVED IN EVIDENCE |
|---|---|---|
| 150, 151 | | 1249 |
| 162 | | 1213 |
| 167, 168 | | 1249 |
| 180 | | 1249 |

LOS ANGELES, CALIFORNIA; THURSDAY, DECEMBER 10, 1992; 9:30 A.M.

-oOo-

RENE LOPEZ ROMERO,

having been previously sworn, resumed the stand and testified further through the Spanish interpreter as follows:

(Jury present.)

THE COURT: Good morning.

MR. MEDVENE: Good morning.

MR. RUBIN: Good morning.

MR. CARLTON: Good morning.

MS. FULGINITI: Good morning.

MR. MEDRANO: Good morning.

THE COURT: Do you have any further questions for this witness?

MR. MEDVENE: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. MEDVENE:

Q. Did you ever tell Jorge Godoy about what you yesterday referred to as your problem?

THE INTERPRETER: As your what, counsel?

Q. BY MR. MEDVENE: "Problem."

A. To whom?

Q. Jorge Godoy.

A. No, sir, I haven't seen him.

Q. Did you ever talk with Jesus Pacitos about what you called yesterday was your problem?

A. Jesus who?

Q. Pacitos?

A. I don't know any such person.

Q. Do you know whether the same person that made arrangements for you to come to the United States also made arrangements for Mr. Godoy to come to the United States?

A. No. I wouldn't be able to tell you. I don't know anything about that.

Q. You don't know if it was the same person or not?

THE COURT: That's what he said, counsel.

Q. BY MR. MEDVENE: Do you know whether the same person that made arrangements for Mr. Lira to come to the United States --

THE INTERPRETER: Mr. Who, sir.

Q. BY MR. MEDVENE: Mr. Lira, also made arrangements for you?

A. No. I don't know. I don't even know if Mr. Lira is here.

Q. Now, the first payment you received from the DEA was March 25th, 1992; is that correct, sir?

A. I don't remember the exact date.

MR. MEDVENE: The parties will stipulate, Your

Honor, the first date was March 25th, 1992.

THE COURT: Very well. Then you may accept that fact.

Q. BY MR. MEDVENE: If that is the date of the first payment, does that refresh your memory that your first meeting with the DEA was sometime in early March of 1982?

A. March of '82?

Q. Yes.

THE COURT: '82?

MR. MEDVENE: Excuse me. Excuse me. March of '92.

THE WITNESS: It would be around, uh, the middle of February when I got here.

Q. BY MR. MEDVENE: Place before you what has been marked 406, the first page. For purposes of refreshing your recollection, could you look at line 10, Initial Debriefing of Cooperating Individual, March 5th, 1992 --

MR. MEDRANO: Objection, Your Honor.

Q. BY MR. MEDVENE: -- and ask if that refreshes your recollection that your first meeting with the DEA where you gave any information was March 5th, 1992?

MR. MEDRANO: Objection. No indication witness reads English. And, in addition, lack of foundation that the witness needs memory refreshed at all, Your Honor.

THE COURT: This is something that should be

stipulated to, not be the cause of a lot of waste of time.

Was that the first meeting or the first --

MR. MEDRANO: May I consult with Mr. Medvene for a moment, Your Honor?

MR. MEDVENE: Yes.

(Pause in proceedings.)

MR. MEDVENE: The parties have stipulated, Your Honor, that March 5th was the initial debriefing of this witness.

THE COURT: Very well.

Q. BY MR. MEDVENE: Now, you told us yesterday, sir, you first came to this country in January of 1992. What did you do between January and March 5th?

MR. MEDRANO: Objection; misstates. He indicated he came in February.

THE COURT: Well.

MR. MEDVENE: The record will be what it is. I don't --

THE COURT: Yes. The testimony is what it was.

Are you asking him what he did between the time he arrived here and March 5th?

MR. MEDVENE: Yes, sir.

THE COURT: That is the question.

Mr. Interpreter.

THE INTERPRETER: Pardon me, Your Honor?

Q. BY MR. MEDVENE: The question is, sir, what did you do between the time you first arrived in the United States and March 5th?

A. What I did was that I was interviewed by the agents of the DEA. I started to give them information.

Q. Now, on March 5th, the initial debriefing, you told them that you were with the Jalisco state police until the middle of 1984. Is that correct?

A. Yes.

Q. And that while with the Jalisco state police, you worked with Comandante Gonzalez-Gonzalez and Antonio Ochoa.

A. Yes.

Q. And after you left Jalisco state police, you became a bodyguard for Mexican drug lord Ernesto Fonseca; is that correct?

A. Yes.

Q. And at the initial meeting, you didn't give any further details. Is that correct?

A. The only thing I said there.

Q. Was what I said the only thing you said at that meeting?

A. What meeting are you referring to?

Q. At your initial meeting with the DEA representatives, the total of what you said is what you've just told us; is that correct?

A. Yes. What was said yesterday.

Q. Sir, my question is -- and you're free to look at exhibit 406, what's marked as 6558, and have the interpreter read it to you if you want, but the totality of what you said to the DEA representatives at this first meeting on March 5th was just what you've just told us; is that correct, sir?

A. Well, since I was debriefed on several occasions, I don't know if it was exactly on that date that I told them that.

Q. Is it your best memory that what you told them on that occasion was no more or no less than what you've just told us?

MR. MEDRANO: Objection; vague and ambiguous.

THE COURT: Very confusing, that question.

MR. MEDVENE: Okay.

THE COURT: I think you should move on here, counsel. We're not getting anywhere.

Q. BY MR. MEDVENE: Now, is it correct, sir, that April 15th of 1992 was the first occasion where you tell the DEA representatives of anything about a meeting at the Las Americas Hotel, and if you'd like to refresh your recollection, I direct you --

THE COURT: Well, he can't.

MR. MEDVENE: I'm sorry, Your Honor.

THE COURT: Let him answer the question.

Q. BY MR. MEDVENE: Was that the first time?

A. I don't know if, in fact, it was at that meeting; that I spoke to that meeting.

Q. Would you look, sir, for purposes of refreshing your recollection, to the exhibit in front of you, page 6528, and please read -- and we'll have the interpreter go over for you the first three lines where there's reference to a date and a meeting.

(Pause in proceedings for reading in Spanish.)

A. Yes, in fact, that is.

Q. What is?

A. Exactly. Exactly? I don't know if it was exactly on that date.

Q. Is it also correct, sir, that it was that date, some 40 days after you first spoke with the DEA, that you first mentioned the meeting at Ernesto Fonseca's house where there was some reference to an AK-47?

A. Well, at different times that I would see the agents, I would give them information, I would say, about everything.

Q. My question, sir, is it correct that it was on that occasion some 40 days after you met the agents that you for the first time recounted anything about this alleged meeting at Ernesto Fonseca's house?

A. I don't know exactly if it may have been 40 days later or 8 days later because I saw those agents many times.

Q. I direct your attention, sir, to the same exhibit, page 6531, for purposes of refreshing your recollection and ask the interpreter to read under date, Date Prepared, what date

it says, and also make reference to the synopsis of three or four sentences talking about the Ernesto Fonseca meeting.

THE INTERPRETER: Excuse me, counsel, what do you want me to read?

MR. MEDVENE: I want you to read the synopsis where it talks about the meeting and the date the report was prepared. I'd like you to read that to him to see if that refreshes his recollection. Where it says Date Prepared, April 15th.

THE INTERPRETER: On 6531?

MR. MEDVENE: On 6531.

THE INTERPRETER: Where does it say "Date Prepared"?

MR. MEDVENE: I'm sorry.

May I approach, Your Honor?

Date Prepared. Synopsis.

THE INTERPRETER: Oh. Up to where? Up to the end of that sentence?

MR. MEDVENE: Yes.

(Pause in proceedings for reading in Spanish.)

THE WITNESS: Yes. That is true, I told them about that. But I don't remember the exact date.

Q. BY MR. MEDVENE: And is it true, sir, that the first time you made any reference to the meeting at 114 Tonala and people there was also about 40 days after you first met the

DEA on April 15th?

A. I also let them know about a meeting that occurred at that house.

Q. And sometime after that you first told them about this alleged Mariachi meeting; is that true?

A. The thing is on different occasions I would tell them everything, whenever I would see them.

Q. My question is: Is it true that that was about a month and a half after you first started talking to them that you told them about this alleged Mariachi meeting?

A. Well, no, I don't remember that because I would speak -- I would give them all of the information on different occasions.

Q. You knew, didn't you, sir, that from the first time you met the agents on March 5th, they wanted you to provide all the information that you had about the kidnapping; isn't that correct?

A. That they prohibited me?

Q. Didn't the agents the first time that they met you way back in early March, say, "Please tell us everything you know about the kidnapping and anybody that was at any meetings or any information you have about the kidnapping"?

A. From the very beginning when I arrived, they asked me to give them information about everything.

Q. Now, is it true, sir -- we're now talking about the

Mariachi meeting. You mentioned you didn't remember the date. Could you look, to refresh your recollection, at page 6536 and would you look at Date Prepared, sir, April 16th, and under 10, Report Re Debriefing of Mariachi Meeting.

Does that refresh your recollection that that's the first time you told the agents anything about that alleged meeting?

(Pause in proceedings for reading in Spanish.)

THE WITNESS: Yes, I did tell them about that.

Q. BY MR. MEDVENE: At that time?

A. I don't remember the date, I don't remember the day.

Q. Is it your best recollection it was about that time?

A. No. We would speak about different meetings and different events.

Q. Is it true, sir, that it was some 35 days after you first started talking to the DEA representatives that you made any claim that Ruben Zuno was at 881 Lope de Vega on February 7th?

MR. MEDRANO: Objection to the form of the question, Your Honor. The witness indicates he doesn't recall the date.

THE COURT: He has indicated that.

MR. MEDVENE: Different question, Your Honor.

THE COURT: Well, ask the witness if he remembers when he first told them the information.

Q. BY MR. MEDVENE: Did you, sir, on April 9th tell the agents for the first time that you saw Ruben Zuno at 881 Lope de Vega on February 7, 1985?

A. From when I first arrived, I started giving them information about everything and about everybody who had arrived.

Q. Would you please look at the document marked 6514. Under Date Prepared, April 9th, and under item 10, debriefing of events at 881 Lope de Vega.

If you could interpret that.

And does that refresh you that that's approximately the time that you first told the agents that you saw Ruben Zuno on February 7th?

THE INTERPRETER: Is that where it says 3, counsel?

MR. MEDVENE: I'm sorry.

THE INTERPRETER: Where am I supposed to read?

MR. MEDVENE: April 9. The date under 8 and 10, Debriefing.

THE COURT: All right, counsel, you don't need to approach here.

MR. MEDVENE: Under item 8 up at the top, Mr. Interpreter, on the right-hand side, three lines down. See, it says Date Prepared.

THE INTERPRETER: Okay, it says Date Prepared.

And then what?

MR. MEDVENE: Three lines down it says Report Re

Debriefing Events. It says 10.

Up at the top, sir.

THE INTERPRETER: I see it starts with Bodyguards, I don't know --

MR. MEDVENE: Sir, up at the top. Item No. D, the top of the page.

THE INTERPRETER: I don't know what you're asking for.

MR. MEDVENE: You see where it says item 8, sir?

THE INTERPRETER: No, I don't.

MR. MEDVENE: You just read Date Prepared.

THE INTERPRETER: Yes.

MR. MEDVENE: Under that is item 9.

May I approach, Your Honor, it will just take one second?

THE COURT: All right.

(Mr. Medrano turns page of report.)

THE INTERPRETER: Sorry.

(Pause in proceedings for reading in Spanish.)

THE COURT: What is your question?

MR. MEDVENE: Oh.

Q. My question is, does that refresh you that the first time that you claimed to the DEA agents that Mr. Zuno was at 881 Lope de Vega on February 7th was some 35 days after you first started talking to him?

A. From the very first day that I arrived here, I started giving them information about everything and everyone.

Q. Did you give them the information about 881 Lope de Vega on or about April 9th of 1992?

A. I don't remember the exact date but I did give them that information.

Q. Does that document refresh your recollection?

A. Well, no, since I spoke to them on several occasions, it really doesn't.

Q. Could you explain, sir, to us how you're able to remember with such precision --

THE COURT: Counsel, that sounds like an argument.

MR. MEDRANO: Objection as to form.

THE COURT: Not a question.

MR. MEDVENE: It was going to be a question.

THE COURT: It's an argument. You can argue it when the time comes.

Q. BY MR. MEDVENE: You'd made some reference yesterday to a man who said the DEA might be able to help you with your problem. When did you first tell this individual you had a problem?

A. Well, he knew about it from the news and since he knew me, then all the names came to light.

Q. He knew your problem was you were involved in the kidnapping of Enrique Camarena?

A. Exactly. Because all of that was published and all those names came out of the media.

Q. Now, how long prior to the time that -- strike that.

How long before the time that he called you and told you that DEA might be able to help you with your problem had you last seen or spoken to this individual?

MR. MEDRANO: Objection; vague and ambiguous, Your Honor, compound.

THE COURT: Sustained. And you went into this yesterday and I'm not going to have repetition.

MR. MEDVENE: Fine.

Q. Were you ever assigned, sir, to Mascota in the course of your work for the state judicial police?

THE INTERPRETER: Where, counsel?

Q. BY MR. MEDVENE: Mascota.

A. Yes.

Q. And when was this?

A. Approximately it must have been around April of '84.

Q. And how long were you assigned to Mascota?

A. About three months.

Q. And while there, were you in the course of your official duties involved in a road block where you were stopping vehicles that might have marijuana?

A. Well, it wasn't really a road block. We set up surveillance on the crossroad from Mascota to Talpa.

Q. And as a police officer, you realized it would be important to get all the details of any one that you found that had marijuana; isn't that correct?
A. Exactly.
Q. And the ordinary practice of a police officer would be to collect these details and write them down in a report; isn't that true?
A. That's true. That's what one should do.
Q. And what one ordinarily would do would be to write down the kind of car that was involved.
A. Well, the proper thing to do is to detain that vehicle, to detain those drivers and to detain the individuals and everybody responsible.
Q. Now, in the course of making your report, you would put down the license number of the car involved; is that correct?
A. Yes.
Q. The make of the car?
A. All of the features on the vehicle and the person.
Q. Now, what was the license number of the state bed truck that you claimed you saw?
A. Well, since no vehicle and no persons were detained at that time, no data was gathered either.
Q. So you didn't write down license number, make or model of car?
THE COURT: Counsel. He's just answered that

question. No data, he said.

Q. BY MR. MEDVENE: Did you make any notes yourself to help refresh you about the incident that occurred so many years ago?

THE COURT: You mean at that time?

MR. MEDVENE: At that time.

THE WITNESS: About that incident?

Q. BY MR. MEDVENE: Yes. Any notes?

A. No. Because, as I said before, since no vehicle or persons or anyone were detained, no data were gathered.

Q. Since that time, during the eight years, have you written anything down to help refresh you on that incident and who you saw or if it happened?

A. Well, no, it's only in my memory.

Q. Now, during the three months in Mascota, who else, if anyone, did you stop on the road and arrest for transporting marijuana?

A. Before that incident at the crossroads, one person was stopped.

Q. What was his name?

A. I don't recall.

Q. What was he driving?

A. He was driving a pickup.

Q. Do you know the license of it?

A. No.

Q. Do you remember any other incident where you stopped

anybody that was driving a car or truck with marijuana?

A. The only outstanding incidents that occurred there were when he stopped that person with the marijuana and then the incident with the truck at the crossing of Talpa Mascota.

Q. How about Yahualica? You went to work there after Mascota?

A. Yes.

Q. Did you prepare any reports showing you stopped anyone that was involved in transporting marijuana?

A. No. Not at the town of Yahualica.

Q. You told us yesterday about a meeting at the Las Americas Hotel.

A. Yes.

Q. When was that meeting?

A. Well, more or less around the end of October or beginning of November of '84.

Q. Now, was your function at that meeting to be a guard?

A. Yes.

Q. You had your gun?

A. Yes.

Q. And is it correct that your general function for Mr. Fonseca was to be a guard?

A. Yes, that is so.

Q. And isn't it also true that as a guard, you spent all your time outside the hotel?

A. We were outside the hotel.

Q. And you were outside the hotel the whole time that you claim this meeting was going on; isn't that correct?

A. Yes.

Q. And how many guards were there with guns like yourself that were outside the hotel guarding?

A. Well, there were many. The whole hotel was surrounded by bodyguards.

Q. How many?

A. From what I saw, approximately 20 of what I saw.

Q. You were one of these 20 guards guarding the outside of the hotel; is that it?

A. Yes.

Q. And there are all these military and police people inside the hotel that you'd told us about yesterday; is that correct?

A. I saw them leave there.

Q. Now, what were you guarding all these military and police people against, you and these 19 other guards that were outside with your guns?

A. Well, the truth is, what we could say, that the security was, well, just simply an order or mandate from Ernesto Fonseca.

Q. Well, did you know, sir, as you and the 20 other people with guns were outside the hotel, what you were guarding all

these military and police that were inside the hotel from?

A. Well, at one time it was said that on those occasions we would be protecting them against other drug traffickers.

Q. So you had -- strike that.

Are you saying that you had some of the --

THE COURT: Well, he said what he said. No need to rephrase it. Ask your next question.

Q. BY MR. MEDVENE: Well, what drug traffickers were you protecting all the drug traffickers that were in the meeting against?

A. Well, at one time it was commented that they had enemies who were drug traffickers.

Q. Now, is it correct, sir, that when you first saw these people come out to get their cars after this meeting, your job was to be looking around for other drug traffickers who might be coming to attack these drug traffickers?

A. Well, my real job, the truth is, was to protect Ernesto Fonseca.

Q. So your job wasn't to record each and every person that was coming out of the hotel to get in their car. That wasn't your job, to see who that was, was it?

A. No.

Q. Would you say you have a photographic memory?

MR. MEDRANO: Objection to the question, Your Honor.

THE COURT: Overruled.

THE WITNESS: What's the question?

Q. BY MR. MEDVENE: Would you characterize your memory as a photographic memory?

A. (Pause.) Well, thanks to the good Lord, I've always had a good memory.

Q. Are you saying that you were able in the split seconds it would take somebody to walk out of --

THE COURT: Counsel.

MR. MEDRANO: Objection.

THE COURT: Restate that question, if you have a question.

Q. BY MR. MEDVENE: Is it correct, sir, that the amount of time it would take somebody to walk out of the hotel and get into their car would be a matter of a few seconds?

A. Well, let's talk about minutes.

Q. And in connection with protecting Mr. Fonseca, you were able to make a mental note of some 30 people coming out of the hotel. Is that correct?

MR. MEDRANO: Argumentative form of the question.

THE COURT: Sustained.

Q. BY MR. MEDVENE: Were you able to recall all the people that came out of the hotel in those moments it took them to come out of the hotel and get in their car?

A. That is a fact. Those and other people. Because they were people we saw every day.

Q. You saw them every day and so for that reason you were able to remember all 30 people that came out of the hotel that particular meeting; is that correct?
A. That is a fact, yes.
Q. You made reference to the Hidalgo residence that was a -- or Hidalgo.
THE INTERPRETER: Is that Hidalgo?
MR. MEDVENE: Yes, sir.
THE WITNESS: Yes.
Q. BY MR. MEDVENE: There's some meeting where you make reference to Mariachi's; is that correct?
A. Yes.
Q. Did you know that Mr. Godoy first claimed he attended any meetings some seven months after he first started talking to the DEA in about April of 1992?
MR. MEDRANO: Objection. Speculation.
THE COURT: Objection is sustained.
Q. BY MR. MEDVENE: You have spoken to Mr. Godoy since you've been in this country, haven't you?
MR. MEDRANO: Asked and answered.
THE COURT: Sustained.
Q. BY MR. MEDVENE: At the Hidalgo residence meeting, was your job again providing security --
A. Yes.
Q. -- and standing outside the residence?

A. Whether I was providing security outside the residence?
Q. You were providing security outside the residence, weren't you?
A. No. Within the residence.
Q. Didn't you tell the representatives of the DEA on April 16th that you and other state police personnel and enforcers remained outside the residence providing security?
A. No. All of us were inside the residence.
Q. To refresh your recollection, would you look at page 6536.
MR. MEDRANO: Objection, Your Honor; he doesn't need his memory refreshed.
THE COURT: Sustained.
Q. BY MR. MEDVENE: Did you see about 20 people meeting in the living room?
A. More or less.
Q. And did you overhear any of the conversation the people were having?
A. Well, at the Hidalgo house when they went into the bed-room, at that time we didn't hear any of that conversation.
Q. Did 20 people or more get up from the living room and all walk into the bedroom?
A. Yes.
Q. What did you overhear anyone say in the living room, if anything, about why all the people should get up and go into

the bedroom?
A. No, we didn't hear any comments.
Q. Did they sit on the bed in the bedroom, these 20 people who were before sitting on the chairs in the living room?
A. I don't know where they may have sat.
Q. Do you have any idea why everybody would get up from the living room and go into the bedroom?
MR. MEDRANO: Objection. Asked and answered, Your Honor.
THE COURT: Sustained.
Q. BY MR. MEDVENE: Now you've spoken about Lope de Vega.
A. Yes.
Q. Yesterday you walked up to a diagram and pointed out certain things. Is it true, sir, that before yesterday someone went over with you that diagram and where to point out?
A. Well, let's see. I don't really understand your question.
Q. Remember yesterday getting out of the witness chair and walking over to a diagram?
A. Yes.
Q. Before you got off the witness stand yesterday to walk over to that diagram, hadn't someone told you, "You're going to be shown a diagram" and where to point?
A. No. I don't know. I know that house.
Q. Was that the first time you saw that diagram yesterday

when you got off the stand?

A. Yes, sir.

Q. Did you speak with anyone in preparation for your -- strike that.

Did you speak to anyone about your testimony in the last 40 days?

A. I don't remember exactly how many days before.

Q. How many different times did you speak with people about the subject matter of your testimony?

A. About giving them information?

Q. About the subject matter of your testimony, about what you were going to be asked and what you were going to answer.

A. No. I don't understand your question.

Q. Before testifying yesterday, people told you, did they not, that you were going to be asked certain questions in court?

A. No.

Q. Did you speak to anybody in the last month where you discussed any of the things you've talked about yesterday and today?

A. Since I came here, I've been giving them information. I don't know about what I had to tell them, I have been giving them information about what I knew.

Q. You've been giving information and you've been getting money; isn't that correct?

THE COURT: Asked and answered. Asked and answered.

MR. MEDVENE: We didn't go through the payments, I believe, Your Honor. I might have gone through it but I don't think I went through --

THE COURT: You did. Ask your next question.

Q. BY MR. MEDVENE: Do you remember in the last three weeks talking to anybody about the facts that you were going to be questioned about?

A. No, nobody told me what questions I was going to be asked or what I had to say. I gave them information.

Q. Did you -- when you were at the Lope de Vega house, did you listen to any of the interrogation of Enrique Camarena?

A. Yes.

Q. And the interrogation was being tape recorded, to your knowledge, wasn't it?

A. I didn't notice that. Whether they'd written or anything. The thing is, I didn't see if they were taking notes or recording.

Q. But the drug traffickers let you go into the room and sit and watch the interrogation; is that right?

A. Yes. Nobody asked for anything there.

Q. Were you changing ash trays there, going in because a lot of people were smoking?

A. Yes.

Q. How many times were you in and out of the interrogation room because you had to change the ash trays?

A. In the room where they had the meeting?

Q. Well, you told us you were in the interrogation room. How many times were you in and out of that room changing ash trays?

A. The interrogation room? I don't understand.

Q. You've told us you were in the interrogation room when Mr. --

THE COURT: Counsel, restate that. The room where the agent was?

Q. BY MR. MEDVENE: The room where the agent was being questioned, how many times were you in and out of that room changing the ash trays of people?

A. No, no, no. The room where they had the agent? There was no meeting, they were interrogating him there. Ernesto Fonseca and two of his people.

THE COURT: Well, the question is how many times was he in that room? How many times had he left and came back?

THE WITNESS: Once.

Q. BY MR. MEDVENE: Now, no one said, in substance, did they, sir, that "We know from our own means the DEA is going to stop drug trafficking in Jalisco but we want you to hear it from the agent's own mouth"? No one said that, did they?

A. Well, at that time, no, no. I don't understand.

Q. Did you hear anyone say, "We know from our own means the

DEA is going to stop drug trafficking in Jalisco, but I want you to hear it from his own mouth"?

A. Ruben Zuno said that.

Q. And he said that to Caro-Quintero?

A. To several drug traffickers that he had close to him at the meeting.

Q. And didn't Caro-Quintero say, "Well, what are you talking about? I know it's Enrique Camarena because he arrested Manuel Chavez, my lieutenant, in May of 1984"?

MR. MEDRANO: Objection. This is argumentative, it's compound, it's vague and ambiguous.

THE COURT: The objection is sustained.

Q. BY MR. MEDVENE: Was there any discussion by Caro Quintero about he knew who Enrique Camarena was as of May of 1984?

A. Well, I didn't find out about that, about whether Rafael Caro-Quintero knew who Enrique Camarena was.

Q. Now, at the time of the meeting at Mr. Fonseca's house that you say occurred in about November of 1984 -- (Pause.) Excuse me. At the meeting at Mr. Fonseca's house, yes. Was the topic of that meeting finding out who the DEA agent was so he could be identified and then kidnapped?

MR. MEDRANO: Your Honor, objection. Which meeting? What timeframe? There's many.

THE COURT: Sustained.

Q. BY MR. MEDVENE: At the meeting at Ernesto Fonseca's house that you say was held in November of 1984.

MR. MEDRANO: Objection.

THE COURT: What is the question now?

MR. MEDRANO: The witness said --

THE COURT: Are you asking the witness what was discussed at that meeting?

MR. MEDVENE: Yes. I'm asking him if the topic of conversation there was the identification of the DEA agent who was causing problems so he could be picked up and kidnapped.

MR. MEDRANO: Objection, Your Honor. Counsel is reading from the report. The witness' testimony is fall of '84. It's still unclear.

THE COURT: Your question is? Again, counsel, restate your question. Identify the meeting that you're talking about.

Q. BY MR. MEDVENE: You claim that --

THE COURT: And try to be concise, you know. These convoluted questions are what I think are creating some of the problems. Short questions are better than long ones.

MR. MEDVENE: Yes, sir.

Q. Were you at a meeting in 1984 at the residence of Ernesto Fonseca?

A. Yes.

Q. And at that meeting was the general topic of conversation finding out who the DEA agent was so he could be kidnapped?
A. Well, only Rafael Caro-Quintero told Enrique Alvarez del Castillo what was happening with that person that they had put him in charge of.
Q. The did Caro-Quintero tell Enrique Castillo that they should be the ones to identify the DEA agent?
A. That is a fact, that the politicians and the government should -- that is, that Caro-Quintero said to Enrique Alvarez that they were the ones who had to do the job. That he didn't want to become famous that they should make themselves famous.
Q. My question is, sir, did Caro-Quintero tell Enrique Alvarez del Castillo they should identify who the agent is?
A. Yes.
Q. And did Caro-Quintero, according to you, say, "Huh, we are trying to find out who he is"?
A. No. Enrique Camarena said that they had all the data and they had all of -- the person located.

MR. MEDRANO: Your Honor.

Q. BY MR. MEDVENE: Did you just tell us, sir, that you said that Rafael Caro-Quintero told del Castillo that they ought to try to find out who the agent is?
A. Yes, Caro-Quintero said that to Alvarez Castillo. Alvarez Castillo said yes they had all of the data, they had all of it located but they wanted to make sure that all of

the data were correct. Alvarez Castillo had apparently sent all of his people to investigate that; that they were only missing, to make sure -- for the politicians to make sure that those data were correct, to then give them to the drug traffickers.

That's when Caro-Quintero said that they had to do that job. That they didn't want for them to make him famous, that they should make themselves famous.

Q. Well, was the discussion at the meeting, "We have to find out who the agent is"? Or was it discussion, "We already know who the agent is"?

MR. MEDRANO: Objection. This is asked and answered, Your Honor.

THE COURT: Sustained.

Q. BY MR. MEDVENE: Did you hear at any of these other meetings you attended anybody talk about, "If we know who the agent is, why are we having meeting after meeting after meeting discussing who is the agent"?

MR. MEDRANO: Objection, improper question.

THE COURT: Sustained.

Q. BY MR. MEDVENE: Did you hear any discussion at any of these other meetings about, "Why don't we get on with the kidnapping if we know who the agent is"?

MR. MEDRANO: This is argumentative, Your Honor.

THE COURT: Sustained.

Q. BY MR. MEDVENE: Did you hear anyone identify the agent as Enrique Camarena?
A. No. At no time was his name mentioned.
Q. Well, didn't somebody in a very early meeting say that, "We know this person is going to soon be going to the United States, going to be transferred"?
A. Well, the only comment was that they were going to transfer, that they were going to move that person. But I don't know to where.
Q. So at an early meeting, then, from what you heard while you were walking in and out with the ash trays, you knew that they knew who the agent was. Isn't that correct?
MR. MEDRANO: Asked and answered, calls for speculation.
THE COURT: You may answer. Overruled.
THE WITNESS: What was the question?
Q. BY MR. MEDVENE: At a very early meeting that you claim you attended in about October, isn't it true that, from what you overheard, it seemed the people knew who the agent was that was causing all of the problems?
MR. MEDRANO: Objection. That calls for speculation, Your Honor.
THE COURT: Yes.
You've asked him that question and he has answered.
MR. MEDVENE: Pardon, Your Honor.

(Pause in proceedings.)

Q. BY MR. MEDVENE: Your motive in coming to the United States, sir, some seven years after the kidnapping, was you were afraid you were going to be killed?

A. It was not just fear. Ernesto Fonseca had already given the order for me to be killed. I learned about that from colleagues that I ran into in the streets.

Q. When did you first learn about it?

A. These colleagues were surprised to see me alive --

Q. My question, sir, is when did you first start --

(Spanish speaking.)

THE COURT: Wait. Let him finish the answer.

THE WITNESS: During all of those seven years there was news; my name came out in the news. And then I found out that many of our colleagues who had been involved in that matter with the DEA agent had been killed.

Q. BY MR. MEDVENE: Well, is the first time you knew that you might be killed 1985?

A. From Fonseca's arrest to date.

Q. Now, why -- Mr. Fonseca was arrested in about April of 1985; isn't that correct?

A. Yes.

Q. Now, if you had any information that Mr. Zuno did anything wrong, why didn't you come to the United States in 1987, '88, '89, '90, '91? Any of those years?

A. I was not familiar with the United States system. I believed that it was the same as the Mexican one.

Q. Well.

A. Until later I found out about the system of government that existed here and that here if you acted truthfully, the government here would act pursuant to law.

Q. So you learned that even though you participated in the murder of seven people, you could come here and make a deal --

MR. MEDRANO: Argumentative.

Q. BY MR. MEDVENE: -- so you'd get immunity. Is that what you learned about the system?

MR. MEDRANO: Objection; argumentative.

THE COURT: Sustained.

Q. BY MR. MEDVENE: Well, did you learn, sir, in the course of your finding out about our system, that you could be involved in the physical kidnapping of Mr. Camarena, in the killing of four --

MR. MEDRANO: Your Honor.

MR. MEDVENE: -- missionaries and be given immunity?

MR. MEDRANO: Objection.

THE COURT: The objection is sustained.

Q. BY MR. MEDVENE: You don't want to go back to Mexico; is that correct, sir?

A. I have not thought about that now.

Q. Is it true, sir, that your understanding of your deal is

you're provided protection and security and money until -- strike that. That your deal is you're provided protection, security, money and the right to live in this country as long as you testify Mr. Zuno is involved in the kidnapping; isn't that correct, sir?

MR. MEDRANO: Asked and answered yesterday.

THE COURT: Yes. Sustained.

Q. BY MR. MEDVENE: Your understanding that your continuing to stay in this country is dependent upon your testifying as you did the last two days; is that correct, sir?

MR. MEDRANO: Objection; asked and answered yesterday.

MR. MEDVENE: It's not been asked and answered specifically.

THE COURT: Well, he may answer that.

THE WITNESS: What was the question?

THE COURT: See, the convoluted questions are a problem, counsel.

Q. BY MR. MEDVENE: Is it your understanding you can continue to remain in the United States if you testify as you did yesterday and today?

A. I understand that to be, well, the agents have all the time been telling me --

MR. MEDVENE: Thank you. I have nothing further.

THE INTERPRETER: That question was not finished.

MR. MEDVENE: I'm sorry.

THE COURT: Let the witness finish his answer.

MR. MEDVENE: I'm sorry.

THE WITNESS: That only if here I were to tell the truth could they help me with my problem.

MR. MEDVENE: Thank you, Your Honor.

THE COURT: You may cross-examine the witness.

CROSS-EXAMINATION

BY MR. RUBIN:

Q. Mr. Lopez, you worked for Ernesto Fonseca for a period of seven months; is that correct?

A. Approximately.

Q. And during those seven months, you were involved in three separate instances of kidnapping, torture and murder; isn't that right?

MR. MEDRANO: Objection, Your Honor. That misstates the testimony of this witness.

THE COURT: The witness may answer the question.

THE WITNESS: What was the question?

Q. BY MR. RUBIN: Sir, in seven months you were involved in three separate instances of kidnap, torture and murder; isn't that correct?

A. What do you mean by "kidnapping"?

Q. Well, we'll go through that. Sir --

(Spanish speaking.)

MR. MEDRANO: He is still answering the question, Your Honor.

THE COURT: Let the witness finish.

MR. RUBIN: I'll be happy to let him.

THE WITNESS: What were you telling me about? That I was involved in what?

Q. BY MR. RUBIN: Three separate instances of kidnap, torture and murder.

A. What do you mean by "involved"?

Q. Well, the Mexican couple, the two Mexican people that you spoke of on direct examination, you were there when they were being held against their will; true?

A. Of whom?

Q. Do you recall your testimony on direct examination about your presence when two Mexican individuals were being held and questioned and a plastic bag put over their head? Do you remember that?

A. Yes.

Q. And when did that incident occur?

A. In November of '84.

Q. And you were present when that Mexican couple was being held, weren't you?

A. When they were detained? No.

THE COURT: We'll take our morning recess at this

time. The jury will be excused.

THE CLERK: Please rise.

(Jury excused at 10:43 a.m.)

THE COURT: You may step down.

THE CLERK: You may be seated.

THE COURT: Now Mr. Rubin, I want to remind you that it is not necessary to repeat what has already been extensively covered by Mr. --

MR. RUBIN: I understand that.

THE COURT: And do you not have license to do that simply for emphasis.

MR. RUBIN: Your Honor, I am not trying to do that but I don't think this particular line has been gone into.

THE COURT: Well, once facts have been elicited, regardless of who has elicited them, they are in the record, they may be used and argued about.

MR. RUBIN: I understand.

THE COURT: And I consider it a waste of time to duplicate. Bear that in mind.

MR. RUBIN: I understand it. I bear it in mind, Your Honor.

THE COURT: Now you wanted to take up something with the court?

MR. CARLTON: Yes, Your Honor. There are several matters. We expect that when the cross-examination of this

witness is concluded, that we would like to deal with the interrogation tape issue and we wanted to discuss with you how you best thought it fit. We have a stipulation --

THE COURT: All right.

MR. CARLTON: -- and a transcript and we'd like to communicate the transcript in some fashion to the jury. There are several ways to go about doing that.

THE COURT: Well, I would like you to try to agree on the way to do it. I am not going to decide how you want to do that.

MR. CARLTON: What we would like --

THE COURT: If you cannot reach a satisfactory stipulation, it may be that you need to play the tape.

MR. CARLTON: Well, we'll discuss that --

Well, may I confer for just a moment, Your Honor.

THE COURT: Well, I prefer you do it on your own time.

MR. CARLTON: All right. I hadn't heard -- I told them several options. I haven't heard any objection to any of them.

THE COURT: Were there other things you wanted to take up?

MR. MEDRANO: Yes.

MR. CARLTON: A couple of other things. There was a motion we filed on November 16th concerning the

admissibility of a deed 538.

THE COURT: What?

MR. CARLTON: Deed 538 concerning 881 Lope de Vega.

THE COURT: What was it you filed?

MR. CARLTON: Motion in limine regarding the admissibility of that document. An opposition was filed to its relevance.

THE COURT: Wasn't there a ruling on that?

MR. CARLTON: No, there's been no ruling on that. I just bring that to the court's attention. And we have another document --

THE COURT: Wait a minute.

MR. CARLTON: -- which we recently received and I'd like to file a motion in limine regarding the admissibility of that as well.

THE COURT: First, you wish to admit -- to have the court admit into evidence - what? - the document relating to the purchase and sale of --

MR. CARLTON: Correct, Your Honor.

THE COURT: -- 881 Lope de Vega?

MR. CARLTON: Yes.

THE COURT: Now, these were admitted before, in the last trial, weren't they?

MR. CARLTON: This is essentially the same document or part of the same documents that the defense admitted,

except that the documents we have proffered were obtained from the public registry of the state of Guadalajara and bear various file stamps and notations from that office. The deed that was admitted in the last trial is virtually identical.

THE COURT: Well, who is objecting here? Is there an objection to these?

MR. CARLTON: There's been an objection on the basis of relevance but no other objection.

THE COURT: Well, is that your objection, relevance?

MS. FULGINITI: Well, our objection is twofold. One is relevance; because we find the government has just asked that the deed be admitted without giving any explanation of the relevance. We contend the sale of the house is not an issue and it should not be an issue, that it's a legitimate sale. We've given the court much evidence regarding the legitimacy of the sale and the court has actually declined to allow the Government to introduce any evidence regarding this sale until it produces evidence to the court showing that the sale was in some way not legitimate.

They presented no evidence to us except the deed. It is our belief they're going to misuse the deed in some way to somehow explain that the sale was not legitimate when we see no evidence; to the contrary, that the sale was nothing but a legitimate sale.

MR. CARLTON: I believe Your Honor has ordered us to not present argument before the jury without first presenting you evidence that the sale was illegitimate.

THE COURT: That is correct.

Now, what is the relevance of the sale?

MR. CARLTON: The relevance is severalfold, Your Honor. First of all, these documents show -- this document and in conjunction with the additional document which we would like to submit to the court show that --

THE COURT: What additional document?

MR. CARLTON: Well, there is another motion I would like to file regarding another deed concerning this property.

If Your Honor will give me a moment, I'll explain the sequence.

THE COURT: Well, if you will get to the point.

MR. CARLTON: Okay, the point is this --

THE COURT: Tell me what you have and why it's relevant.

MR. CARLTON: The sale by Ruben Zuno Arce to Ruben Sanchez Barba was affected by deed 538, of which was drawn up the Notary of Jalisco Ameca on January 11.

The document that we have that we've provided to you says a couple of things: That Ruben Zuno acquired the title to that property in his own name by virtue of a deed

537. This document was not filed with the public registry until June of 1985, which was many, many months after the sale. You can see from the various stamps that it was submitted on various dates between January and June.

Also Ruben Zuno, by virtue of deed 537, didn't even have final title to the property in his own name until April 19th of 1989. Deed 537, which gave him the right to sell 538, wasn't filed with the public registry and finalized until June 4th and it was --

THE COURT: Well, what is the point?

MR. CARLTON: The point of all of this, Your Honor, is that there is a question regarding Ruben Zuno's chronology as to exactly what happened. He says that the sale was finalized on January 11th of 1985. We contend that the sequence of events having --

By the way, Mr. Zuno went and filed a declaration with the public registry in June, I believe it was, to correct an impropriety with one of the deeds that prevented its being filed and registered. So that this whole sequence shows that there was a continuing collaboration between Mr. Zuno and somebody, Ruben Sanchez Barba, or whomever, going on many months after the murder, months after the house was revealed to be the murder site when it was opened up for investigation and revealed in all of the --

We believe that this continuing series of actions

and Mr. Zuno's prior representations as to exactly when everything happened contributes to our argument that the sale was not exactly legitimate.

One last thing. In his statement to Mr. Kyrkendall, Ruben Zuno has contended that the price of the property was 70 million pesos paid by two checks from Ruben Sanchez Barba. Deed 538, which is virtually identical to the copy which he submitted in the last trial, says, as I understand it, 4,597,000 pesos was the price.

Now, all of this information, we believe, is relevant to the jury's determination as to whether this was an arm's length transaction.

MS. FULGINITI: Your Honor, if I may be heard briefly on this.

THE COURT: Yes.

MS. FULGINITI: It's our position that the government at the previous trial had argued that not only that we owned the house with Caro-Quintero at some point in time but they argued to the jury also that we used it to disguise a middleman and in reality sold the house to Caro-Quintero. This is at most spec -- I mean, it is by no means evidence that we actually sold the house to Caro. And the fact that the date on the deed itself says January 11 and the stamp is later stamped is evidence basically of what we've been contending: That on January 11 is when the notary

and the document was finalized with the parties. The fact that it was recorded later in Mexico, the recordation doesn't always happen on the same day, it happens many months later.

And the bottom line --

THE COURT: Well, I'll rule on this. It sounds to me like this is probably relevant and may be admitted. But I'll rule on it.

MR. CARLTON: May I file the additional motion?

THE COURT: Pardon?

MR. CARLTON: May I file the additional motion regarding the deed 537?

THE COURT: You may.

MR. CARLTON: Thank you.

THE COURT: You don't need permission to file a motion on this. I want these things brought out that are in dispute.

MR. CARLTON: Well, I understood your order was that we had to have your permission before filing additional motions.

THE COURT: Well, yes. But it's also my order that evidentiary problems are to be anticipated and dealt with so that we don't impinge on the jury's time. I don't -- so that I will rule on these things in due course.

MR. BLANCARTE: Your Honor, just briefly. You had mentioned that you were not going to allow evidence that was

not connecting evidence. The confusion and the time delay that is going to result from this red herring on the deed is going to take up an inordinate amount of time and it is only going to cause confusion with the jury, because in Mexico it's very clear that if you have a divorce - which Mr. Zuno had in 1977 - and you're holding title to property, until that divorce is finalized, there may not be an official recording of deed.

In this case the fact that the money changed hands with a notary, which, in Mexico, someone with higher authority and power than a lawyer, took the documents and notarized them on January 11 of 1985, and that because of the type of recording system they have in Mexico, the date stamp actually comes some time after the notary blesses it, puts melted wax on it and otherwise signs off on the document, is only going to cause confusion, waste of time and is not connecting evidence.

The government was not able to show and to this date has not presented this court with any evidence that this is a connecting issue or even that Caro-Quintero was somehow involved.

They interviewed Dr. Ruben Sanchez Barba in 1985. They brought him to this country. They brought Jesus Sanchez Barba, his brother, the two principles --

THE COURT: Well, you're arguing the same motion.

I am not going to have two attorneys argue the same motion. I'll rule on this in due course.

MR. BLANCARTE: Just that --

THE CLERK: Please rise. The court stands in recess.

(Recessed from 10:53 a.m. to 11:09 a.m.)

(Jury present.)

THE COURT: You may continue.

Q. BY MR. RUBIN: Mr. Lopez, it is -- isn't it true that you participated in three separate instances of kidnap, torture and murder during your employment as Ernesto Fonseca's bodguards?

THE INTERPRETER: Counsel, during what?

Q. BY MR. RUBIN: During the time that you were employed as Ernesto Fonseca's bodyguard?

A. Yes. I was actually involved because I was with Ernesto Fonseca. But I want to emphasize that I have never killed anybody nor have I tortured anybody the way they did.

Q. And with regard to the first one, Mexican couple, your job was to make sure they didn't leave?

THE COURT: Counsel, this is not permissible. There is no need to go into the detail. The witness has stated what his involvement was.

Q. BY MR. RUBIN: Now during --

You indicated you were familiar with how mineral

water was used by the drug traffickers as a torture device. How did you become familiar with that?

A. Through some colleagues in the agency when I was with the judicial agency.

Q. Now, when you were present with the Mexican couple, did you ever consider going to get help to stop them from being tortured?

A. I don't understand your question.

Q. Well, you suggested one alternative to stopping the torture was that they could be killed. Did you ever --

MR. MEDRANO: Objection; misstates the testimony, Your Honor. Objection.

Q. BY MR. RUBIN: Did you ever --

THE COURT: Objection is sustained. Make your question precise.

Q. BY MR. RUBIN: At that time did it ever occur to you to go to officials or somebody --

THE COURT: It's irrelevant if it occurred to him; he didn't do it, so let's get on with it.

Q. BY MR. RUBIN: And when you were present when the four American Jehova Witnesses missionaries were kidnapped, tortured, murdered, you didn't go get help for them, either, did you?

A. Well, I didn't do it because if I were to do it, I would be killed.

Q. Sir, you knew, did you not, from the newspaper that the Americans were looking to solve the crime of the disappearance of these American missionaries and you didn't go to the American Consulate for help, did you?

A. No.

Q. And isn't it true that the American Consulate could have offered you the same protection against being killed as they're giving you now?

MR. MEDRANO: That calls for speculation, Your Honor.

THE COURT: Yes. Sustained.

Q. BY MR. RUBIN: Now, you found out soon after you joined Ernesto Fonseca that he was a drug trafficker, did you not?

A. Yes, I found out later that he was a drug trafficker.

Q. How soon after you joined him as his bodyguard did you find out he was a drug trafficker?

A. Well, about a month, a month and a half.

Q. In fact, you found out he was one of the biggest drug traffickers in Mexico; true?

A. Well, not so much that; but I did know he was a drug trafficker.

Q. Well, he was the boss and everybody treated him like he was the boss, didn't they?

A. Everybody treated him like a commander, like a gentleman.

Q. And, sir, as a police officer, you knew that narcotics

trafficking -- as a former policeman, you knew that narcotics trafficking was illegal in Mexico; true?

THE INTERPRETER: Excuse me, counsel.

Q. BY MR. RUBIN: It's true that as a former police officer you knew that drug trafficking was illegal in Mexico?

A. Yes, it has been so all the time.

Q. And despite the fact that you knew you were breaking the law by being part of this drug trafficking enterprise, you continued to work for Ernesto Fonseca; correct?

A. Yes. Because at different times I wanted to ask questions to find out actually what those people were doing --

Q. Well, did you consider --

A. -- and --

Q. Go ahead.

A. And several people told me not to make any questions because I could be killed. Including several times I wanted to just, umm, depart from them. But it was no longer possible because I found out that other colleagues who had tried to leave had been killed.

Q. And so if anybody tried to do something that Ernesto Fonseca didn't like or tried to leave him, he would kill them?

A. Yes.

Q. What type of gun -- well, strike that.

It's fair to say that, is it not, your job as bodyguard was more than running errands. Isn't that true?

A. Well, later on it was more than running errands; for example, when the Camarena thing happened.

Q. In fact,, your job was to protect -- as you said, your job was to protect Ernesto Fonseca; true?

A. Yes.

Q. And, sir, if someone had tried to arrest or kill Ernesto Fonseca, you were prepared to kill that person in defense of him, were you not?

A. If he ordered me, yes.

Q. And what kind of weapon did you carry when you were protecting Ernesto Fonseca?

A. A .38 super.

Q. Did you have other weapons that you had access to if you needed to use them, such as AK 47's or AR 15's?

A. AK-47 or AR-15. They had all sorts of weapons there.

Q. Did you ever use those weapons?

A. No.

Q. By the way, were there, other than the three incidents of kidnap and torture and murder that you were involved in that you've already testified to, were there any others that you were involved in in the seven months that you worked for Ernesto Fonseca?

A. No.

Q. Now, I'd like to turn your attention to the interviews with the government agents when you came to the United States.

Now, in your first interview on March 5th, 1992, you never even mentioned Dr. Humberto Alvarez Machain; isn't that correct?

A. Ever since I arrived to the United States, I started give information to the agents about everything.

Q. Well, I want to -- I'd like to go through it interview by interview, if you could remember.

On March 5th, that interview, you never mentioned a single word about Dr. Alvarez Machain being involved in Camarena, did you?

MR. MEDRANO: Objection. Asked and answered previously.

MR. RUBIN: He didn't answer the question.

THE COURT: You may answer the question.

THE WITNESS: I don't remember at that time if I told him about Alvarez Machain.

Q. BY MR. RUBIN: Now, you had a second interview with them on April -- with the government agents on April 9th of 1992; isn't that right?

A. Well, I don't remember exactly the dates. I had several interviews with them.

Q. Well, you've been blessed with a good memory. Are you now able to remember the dates?

THE COURT: The witness has answered that question, counsel.

Q. BY MR. RUBIN: Do you remember what month?

A. Well, I arrived in February. And since that date on, I have been informing them.

Q. Well, putting aside what the actual date was, do you recall having an interview with the agents concerning what happened at 881 Lope de Vega in Guadalajara?

A. Yes.

Q. And this interview was specifically on the issue of the abduction interrogation and torture of Enrique Camarena; true?

A. Yes.

Q. And isn't it true in that interview they specifically focused on the events that occurred on February 7th and February 8th of 1985?

A. Well, not specifically on that. They would ask me about everything I had lived through.

Q. And they wanted you to give -- and they wanted you to give them as much detail as you could remember; is that correct?

A. Exactly. They told me to inform them about everything I remembered and everything I had lived through during....

Q. Well, was this --

A. Well, during the time I was with Ernesto Fonseca and part of my previous jobs.

Q. Now, when you say things you lived through, was this a particularly stressful period of time that you lived through?

A. How? I don't understand your question.

Q. I'll rephrase it.

And isn't it true that -- by the way that first interview where you were really talking about the events at Lope de Vega, do you recall how many hours it took?

A. Well, no, I don't remember how many hours.

Q. It took several hours, though, didn't it?

A. Well, during all the interviews, it was hours, not minutes. Hours.

Q. And isn't it true that in that interview in April, you never once mentioned that you saw Dr. Machain clean the syringes in the kitchen?

A. Ever since the time I have arrived, I've informed them of everything that has happened.

Q. So if they didn't put it in their report of that interview, they must have just left it out or forgot about it?

MR. MEDRANO: That calls for speculation. Objection.

THE COURT: Sustained.

Q. BY MR. RUBIN: In fact, sir, isn't it true that in that first interview, the only thing you said about Dr. Machain is that you allegedly saw him in the dining room, whereas yesterday you testifed you saw him in the living room?

A. I actually saw him in the dining room and in the kitchen of the house, and in the living room.

Q. Well, all rooms. He was in all three of those rooms?

A. Yes.

Q. Walking around in all of them; is that correct?

A. No. For example, he was in the kitchen, in the living room. At other times when he went out of the kitchen.

Q. Now, when the government wanted to interview you about what happened, did they contact you to come in for an interview or did you call them up and say, "Hey, I remembered something and I'll come in and talk"?

A. They would contact me and call me.

Q. And it's true, is it -- and they called you and then you would come into the office and be interviewed?

A. Well, I was interviewed in different parts: Hotels, parking lot, different places.

Q. Now, isn't it true that in June of 1992 the government called you in for an interview?

A. Well, I don't remember dates since there were several interviews.

Q. Now, on June 29th you were interviewed by DEA agents; correct?

A. I repeat once again that the dates I don't remember. Since we had several interviews, I don't remember the dates.

Q. Now, and isn't it true that at that interview in June, only six months ago, was the first time you ever mentioned anything about Dr. Machain and syringes?

MR. MEDRANO: Objection, Your Honor. The witness states he doesn't recall the dates of interviews so how can

he focus on June?

THE COURT: Yes. Restate your question.

Q. BY MR. RUBIN: Isn't it true that at a later interview than your first interview, that you -- that that was the first time you ever mentioned anything about Dr. Machain cleaning syringes?

A. Well, I don't remember which interview or which month.

Q. And do you recall an interview where Dr. Machain was a specific focus of the interview? All they wanted to know was what you knew about Dr. Machain.

A. Well, no. When they interviewed me, they wanted to know about everything.

Q. Now, prior to any of the interviews, did they ever show you any items for you to identify or look at? Other than photographs.

A. What was that? I didn't understand your question.

Q. Well, for example, did the government ever tell you that they were interested in any information you might have about Dr. Machain and syringes?

A. Well, that information I gave to them.

Q. Did they ever advise you that they were particularly interested in that information?

A. They were interested in all the information I was giving them.

Q. Did they ever show you any syringes?

A. No.

Q. Now, you testified that you came to the United States because you had a problem; is that correct? Strike that.

You came to the United States and agreed to cooperate with the government to solve your problem; is that right?

A. Yes.

Q. In fact, that problem had two parts to it, did it not? One, that you might be killed in Mexico by Fonseca. And the second part was that you might be kidnapped by the DEA for your participation.

MR. MEDRANO: Objection to the form of the question. It's compound, calls for speculation, Your Honor.

THE COURT: Overruled.

THE WITNESS: Well, I decided to come to the United States risking to be detained by the DEA agents, but I preferred to be detained here in the United States than to be killed over there in Mexico.

Q. BY MR. RUBIN: Well, sir, you also knew that Dr. Machain had been kidnapped from Mexico and brought to the United States?

MR. MEDRANO: Objection. Calls for speculation, lack of foundation.

THE COURT: Overruled.

You may answer.

THE WITNESS: Through the media.

Q. BY MR. RUBIN: It was a big story in the newspaper, wasn't it, in Mexico?

A. Well, I didn't hear much about that.

Q. But you were aware of it, were you not?

THE COURT: He answered that.

Q. BY MR. RUBIN: And so at the time that you decided to cooperate with the government, you had really two problems. One in Mexico being killed and one was being kidnapped by the DEA to stand trial; correct?

A. Yes.

Q. And in one agreement with the government, you took care of both problems. All you had to do was testify for them.

A. Well, I, uh -- What was your question?

Q. You were able to take care of both problems with one agreement: To cooperate and testify against these defendants; true?

A. Well, as far as -- I don't know what you mean by "deal".

Q. Well, you have an agreement with the government, don't you?

A. The only thing they told me is to tell the truth. Ever since I had a connection with them, that is what they've been repeating. If I lied at any time, they could arrest me.

Q. Now, you understand, however, that they believe the truth to be that the defendants are involved in the case?

MR. MEDRANO: Objection, Your Honor; that calls

for speculation.

MR. RUBIN: I asked for his understanding.

THE COURT: Sustained.

Q. BY MR. RUBIN: Sir, in your own mind do you believe that the government would have given you immunity, $3,000 a month, a work permit, permission to live in the United States if you had told them that these defendants were not involved?

MR. MEDRANO: Objection; calls for speculation.

MR. RUBIN: I asked about in his own mind.

THE COURT: The objection is sustained. It's an argumentative question.

Q. BY MR. RUBIN: Now, did you know an individual named Raul Lopez Alvarez?

A. Yes.

Q. Was he present at the Lope de Vega on February 7th or February 8th?

A. 7-8. Yes.

Q. And had you heard what had happened to him -- well, strike that. What was his position? Well, let me rephrase it. I'll strike that.

He had a job similar to yours, didn't he, with Fonseca?

A. He was an agent of the judicial of the state.

Q. Well, he helped Fonseca, did he not?

A. He offered protection to Fonseca Carrillo.

Q. Was he involved in the kidnapping of Agent Camarena as you were?
A. No.
Q. Now, Mr. Lopez, how much education do you have?
A. I went to the third grade in high school.
Q. How many years of schooling is that, third grade in high school?
A. It's six and three, nine.
Q. And during these events in 1985 that you described in such detail, did you take any notes about what was going on?
A. No.
Q. And when you were interviewed by the DEA agents, did they help you jog your memory of these events that happened so many years ago?
A. No. I gave them the information.
Q. Now, so far under the deal that you have with the government, you've earned about $30,000 -- you've been paid about $30,000; is that correct?
A. Well, exactly, I have not counted what they've given me. I carry no sort of, well, accounting of what they have given to me.

(Discussion between Mr. Rubin and the prosecutors sotto voce.)

MR. RUBIN: Your Honor, parties will stipulate that he's received $30,000.

THE COURT: Very well.

You may accept that as a fact.

Q. BY MR. RUBIN: Mr. Lopez, how many years -- based on what you were earning, your average earnings when you were working in Mexico, how many years would it take you to earn the equivalent of 30,000 American dollars in Mexico?

MR. MEDRANO: Objection, Your Honor; relevance.

THE COURT: Sustained.

Q. BY MR. RUBIN: Now going to the events of February 7th and February 8th of 1985. Could you turn your attention to those? Do you know an individual named Ramon Lira?

A. Yes.

Q. And what was his position or how do you know him?

A. He was also an agent of the judicial of the state.

Q. Was he one of Mr. Fonseca's bodyguards?

A. Rather he would help Ernesto Fonseca.

Q. And he participated in the abduction of Enrique Camarena?

A. In the abduction? No.

Q. Was he present at Lope de Vega that you saw on the days you were there?

A. Yes.

Q. Was he -- were you near him and did he stay near you during those days?

A. Well, we were there in the house.

Q. Now, you said that a consulate employee came to the house and had discussions about the DEA agent; is that correct?

A. Yes. That's right. But I want to emphasize that I didn't know specifically that he was an employee.

Q. Well, they said they were from the consulate?

A. Yes. That that person came from there. But I don't know what was his position there.

Q. It was your understanding, however, from what you heard, that that person did have some position in the United States Consulate?

A. Well, yes.

Q. Now, could you describe -- how tall was this --

This person had blond hair, you say. Was it man or a woman?

A. It was a man.

Q. And how tall was this man?

A. Well, about 180, I believe.

THE COURT: 180?

Q. BY MR. RUBIN: Is that in centimeters?

A. Meter and centimeters.

Q. And how much did the person weigh?

A. Well, he was thin. I couldn't tell you exactly how much he weighed.

Q. Less than 150 pounds?

A. What's the equivalent of a pound to a kilo?

Q. Okay. That would be less than -- (Pause.) Less than 60 kilos.

A. I believe more or less.

Q. Is the person an American or a Mexican?

A. Well, he spoke Spanish very well but I don't know if he was an American or Mexican.

Q. Now -- and this is the person who during the kidnapping actually fingered Enrique Camarena, said "That's him"; is that correct?

A. Yes.

Q. And during your interviews that you had with the government, did the government ever show you the photographs -- show you photographs of all the employees of the U.S. Consulate in Guadalajara at that time?

A. That who showed me what?

Q. During your interviews when you were giving all the information to the government this year, did any of the agents show you a set of photographs of the people who worked at the consulate so that they could try and identify who this person was?

A. Well, at one time they showed me an album of photographs.

Q. But to your knowledge, you don't have any knowledge whether they showed you any photographs of the consulate employees, do you?

A. Well, no. There were several photographs.
Q. Did you ever identify -- were you ever able to identify the person from any of the photographs?
A. No. On the photographs they had there, he wasn't there.
Q. He was there?
THE COURT: He was not.
MR. RUBIN: I'm sorry.
Q. He was not there?
A. No.
Q. And during the interviews, did the agents ever ask you to describe or identify this person more than in the kind of detail that I just asked you?
A. No. The same details. How tall he was, the color of his skin.
Q. Now, going back to the events of February 7th and February 8th, what time of the day did you arrive at Lope de Vega?
A. It must have been about 10:30, I believe.
THE COURT: In the morning or afternoon?
THE WITNESS: In the morning.
THE COURT: Or evening?
Q. BY MR. RUBIN: Now, when you saw -- when you say you saw Dr. Machain when you were at the patio in the house, what time was it then?
A. It must have been, umm, 3:00, 3:30.

Q. Isn't it true, Mr. Lopez, that in no statement that you ever gave prior to testifying today did you ever say that you had seen Dr. Machain while you were on the patio?

A. Yes, I saw Dr. Machain for the first time when I was in the patio.

Q. Sir, my question to you was: Isn't it true that you never said that to any agent at any meeting prior to testifying today?

THE COURT: You mean yesterday.

MR. RUBIN: Excuse me. Yesterday.

Q. Prior to testifying yesterday.

A. What was that again? I didn't understand your question.

THE COURT: Well, the question is: Did you tell the agents before you came to court here that you had seen Dr. Machain when you were in the patio?

THE WITNESS: Yes. During the interviews that I had with them, I told them all that.

Q. BY MR. RUBIN: Now, when you saw Dr. Machain, what was he wearing?

A. Well, exactly, I don't remember, because I saw him from the patio to the kitchen.

Q. When you saw him later in the evening, what was he wearing?

A. He was wearing dark clothing.

Q. Anything else that you can remember?

A. Well, when I saw him in the kitchen, he had his medical bag, black.

Q. And is that all -- and is that all that you can remember about what he was wearing?

A. Yes. Regarding his clothing, yes.

Q. During those two days, what kind of vehicles did you see at Lope de Vega? And by that I mean the makes and models.

A. I saw Gran Marquis, carry-all van, Atlantic. That's all.

Q. Did you ever see any trucks there?

A. Trucks?

Q. Yeah. Did you ever see any trucks there?

A. Pickup?

Q. Any kind of trucks.

A. Well, a truck we called the pickup.

Q. Did you ever see any ambulances or anything like that there?

A. No.

Q. Now, during the evening when you were testifying about overhearing these conversations in the living room, am I correct that you changed the ash trays three different times?

A. In Lope de Vega?

Q. Yes. Three different times you changed them?

A. Yes.

Q. And during what period of time did you change these ash trays three times?

THE COURT: Well.

Q. BY MR. RUBIN: Was it within an hour, within two hours, within three hours?

A. Well, it was hours but I don't remember how many between.

Q. What kind of ash trays were these?

A. Well, glass ash trays, crystal.

Q. And did you see Dr. Machain smoking?

A. I don't remember.

Q. And were people during the day smoking crack cocaine?

A. They would smoke it all the day, every time they had a meeting.

Q. And who did you see smoking crack cocaine?

A. Several persons.

Q. Do you remember any names?

A. No. Specifically, Samuel Ramirez Razo, Ernesto Fonseca, Felix Gallardo, Javier Barba, Avelardo Fernandez. In other words, there were several who would smoke that.

Q. Was Bartlett Diaz smoking crack cocaine?

A. (Pause.) I don't remember but I do remember he was drinking wine.

Q. Was the governor of Jalisco, Enrique Alvarez del Castillo, smoking crack cocaine?

A. I don't remember if he was smoking but I did see him drinking wine.

Q. Now, when you allegedly saw Dr. Machain cleaning the

syringes, he was using water; is that correct?

A. Yes.

Q. And was this the water from the sink, the tap water that he was cleaning them out with?

A. Yeah, he had the water running, yes.

Q. And how many syringes was he cleaning at the time?

A. Well, the ones I saw, uh, on one side of the rack.

Q. How many?

A. There were several.

Q. More than 10?

A. Well, I think, I couldn't tell you exactly the amount. There were six, eight, I don't.....

Q. Were they big syringes, little syringes? Describe them.

A. The syringes that I've seen, the regular ones, I don't know about big ones or little ones.

Q. Are you able to describe them in any way?

A. Well, they were disposable. Well, syringes, like plastic.

Q. Now, did you ever -- what time did you go to sleep that night?

THE COURT: What night are you referring to?

Q. BY MR. RUBIN: Excuse me. The night of February 7th.

A. We retired at dawn.

Q. And did you ever see Dr. Machain leave?

A. No.

Q. When you looked at the syringes that he was supposedly

cleaning, were there any needles with them?

A. Yes, the syringes had needles.

Q. And how big were the needles?

A. I just saw when he was cleaning, just squirting water with one.

Q. How long was the needle?

A. Well, I can't -- I can't really tell in centimeters very well.

Q. When he finished cleaning the syringes, did he put them back in bags or was he just in the process of cleaning them at the time?

A. I just saw him cleaning them.

MR. RUBIN: May I have a moment, Your Honor?

(Pause in proceedings.)

Q. BY MR. RUBIN: Now later on you talk about a meeting where you picked up the telephone and heard Ernesto Fonseca talking. Is that correct?

A. I heard Rafael Caro-Quintero, not Ernesto Fonseca.

Q. I'm sorry. But you picked up the telephone. What I'm saying, you did pick up the telephone.

A. Yes. At Ernesto Fonseca's house.

Q. And was Mr. Fonseca there when you picked up the telephone?

A. Yes. It could be heard that he also picked it up.

Q. And isn't it true that the bodyguards were always sent

away when business was being discussed among the bosses?

A. At times.

Q. And had Mr. Fonseca ever given you permission to listen in on his telephone calls?

A. No.

Q. In fact, isn't it true that if Mr. Fonseca had caught you listening in on his telephone calls, he might have killed you?

A. Yes, it is very possible, sir.

Q. Was there any particular reason why you risked your life to listen in on this telephone call? Or was it just curiosity?

A. No. It's just curiosity because the telephone rang several times.

MR. RUBIN: I have no further questions.

THE COURT: Is there any redirect?

MR. MEDRANO: Just briefly, Your Honor.

THE COURT: Well, could you do it in a few minutes?

MR. MEDRANO: I think I can. If you'd like me to.

REDIRECT EXAMINATION

BY MR. MEDRANO:

Q. Mr. Lopez, when you arrived in Southern California, you were interviewed many times by DEA agents?

A. Yes.

Q. And have you been interviewed continuously since you arrived to the present date?

A. Yes.

Q. Did you ever write any of the reports referenced by defense counsel?

A. No, I never wrote any report.

Q. Did you ever review any reports written by any DEA agents?

A. No.

Q. Did you ever tell the agents what to write in the reports?

A. No. I would just provide them with the information.

Q. Now would you answer the questions that were asked of you?

MR. MEDVENE: Objection; leading and suggestive Your Honor. He said he was asked for everything he knew from the first interview.

MR. MEDRANO: I'm trying to clarify that.

THE COURT: The objection is overruled.

THE INTERPRETER: Excuse me, counsel.

Q. BY MR. MEDRANO: Were you asked the questions asked of you?

THE COURT: I think you misspoke, counsel.

MR. MEDRANO: Did I?

THE COURT: Restate your question.

Q. BY MR. MEDRANO: Would you answer -- would you answer the questions that were asked by the agents?

A. Yes.

Q. Would you only meet with the agents when they called you to meet with them?

A. Yes.

Q. When you were interviewed, did you cover different topics?
A. On different occasions then we would talk about all of the topics.
Q. Mr. Lopez, let me take you to the Mexican couple incident.
Did you kidnap that couple?
MR. RUBIN: Objection.
MR. BLANCARTE: Objection; asked and answered.
THE COURT: Yes, sustained.
Q. BY MR. MEDRANO: Were they at that house when you got there?
MR. BLANCARTE: Objection.
MR. RUBIN: Objection. We can't go into detail.
MR. BLANCARTE: And it was asked and answered.
THE COURT: The objection is sustained.
Q. BY MR. MEDRANO: Did you interrogate those people?
MR. RUBIN: Objection. Asked and answered and no details.
THE COURT: Overruled.
THE WITNESS: The man, I did.
Q. BY MR. MEDRANO: Did you kill that couple?
A. No.
Q. Do you know what happened to the couple?
A. No, I don't know what that couple's fate may have been.
Q. If four Jehova's Witnesses, did you kill those people?
A. No, sir. In my life I have never killed anybody. In

THE COURT: Overruled.

THE WITNESS: That is, Ernesto Fonseca had several groups. In each group he had for them something. For instance one of them was for killing people. Those were the ones we knew as "the sleeping ones." He had another group for torture. And another group for delivering money. And I was of the group who only served him personally.

Q. Mr. Lopez --.

THE COURT: Well, just a moment. We'll take our noon recess at this time and reconvene at 1:30. The jury will remember the admonition that I have repeatedly given to you.

THE CLERK: Please rise.

(Lunch recess at at 12:07 p.m.)

LOS ANGELES, CALIFORNIA; THURSDAY, DECEMBER 10, 1992; 1:35 PM

RENE LOPEZ ROMERO,

having been previously sworn, resumed the stand and testified further as follows:

(Jury present.)

THE COURT: You may continue.

REDIRECT EXAMINATION (Continued)

BY MR. MEDRANO:

Q. Mr. Lopez, when you would be with Fonseca at any one of his residences --

THE INTERPRETER: Excuse me, counsel, I didn't hear.

Q. BY MR. MEDRANO: When you would be with Fonseca at any one of his residences, would it be Fonseca who gave the order that he would be leaving?

MR. MEDVENE: Objection; outside the scope, Your Honor.

THE INTERPRETER: The answer was yes.

THE COURT: Overruled.

Q. BY MR. MEDRANO: When you and the guards would go with Fonseca, would you usually know where you were going at that moment?

A. No. We would always just say we were going on an errand.

Q. Let me just briefly take you to Las Americas, that meeting. People other own Fonseca, did they have their own bodyguards?

THE COURT: That's already been covered in your direct examination.

MR. MEDRANO: I'll move on, Your Honor.

Q. Now, you told the defense counsel that you saw those people every day when you were discussing the Las Americas meeting. Who were you referring to when you said you saw them every day?

A. He asked me if I saw all of these important people, as he said, from the government, and politicians. Well, not every day but we'd see them often.

Q. Finally, Mr. Lopez, let me direct you to February 7th when Camarena is being interrogated. Now, did you take ash trays into that room?

MR. MEDVENE: Asked and answered, Your Honor.

THE COURT: Sustained.

Q. BY MR. MEDRANO: Were you in that room to observe?

THE INTERPRETER: Excuse me, I didn't hear the decision on that.

MR. MEDRANO: Sustained.

THE COURT: Never mind.

THE INTERPRETER: Oh.

Q. BY MR. MEDRANO: Were you there -- (Pause.)

Mr. Lopez, when you would take in clean ash trays, what room would you take them into?

MR. MEDVENE: Objection; asked and answered.

THE COURT: Sustained.

MR. MEDRANO: This is for clarification, Your Honor.

THE COURT: There's no need for clarification.

MR. MEDRANO: If I may just have one moment.

(Discussion held off the record between prosecuting attorneys sotto voce.)

MR. MEDRANO: That concludes the direct.

THE COURT: Is there any recross within the --

MR. RUBIN: No recross.

MR. MEDVENE: No, Your Honor.

THE COURT: Very well. You may step down.

Call the next witness.

MR. CARLTON: Your Honor, the parties have entered into a stipulation.

THE COURT: I will ask the jury to pay careful attention to the stipulation, recognizing that this is an agreement between all of the parties and these facts that they have agreed upon you may consider as evidence in this case.

MR. CARLTON: Copias 2 and 4 marked as exhibits 148 and 149 are audio tape recordings of the interrogation and torture of Special Agent Enrique Camarena. They were

made between February 7th, 1985, and February 9th, 1985, at 881 Lope de Vega, Guadalajara, Jalisco, Mexico.

Copias 2 and 4 were obtained by the DEA from the Mexican authorities on August 27, 1985. Copias 2 and 4 are entirely in Spanish.

Exhibit 150 is a true and accurate Spanish transcription of copia 2.

Exhibit 151 is a true and accurate Spanish transcription of copia 4.

Exhibit 152 is a true and accurate English translation of exhibit 150.

And exhibit 153 is a true and accurate English translation of exhibit 151.

Each question which appears on exhibit 152 - the English translation of copia 2 - and exhibit 153, the English translation of copia 4, is labeled capital I, which denotes the voice of the interrogator. Each response on exhibits 152 and 153 is labeled with a capital C, which denotes the voice of Agent Camarena.

Each question and each response has also been sequentially numbered on exhibits 152 and 153. The questions and responses have been numbered 1 through 327 on exhibit 152 and 1 through 754 on exhibit 153.

Besides the voice of Agent Camarena, two other voices have been identified on the interrogation tapes. One

voice is that of Rafael Caro-Quintero. His voice is identified as the interrogator on exhibit 153 from lines 135 through 193, inclusive, and lines 197 through 199, inclusive.

Another identifiable voice is that of Sergio Espino Verdin. Espino Verdin is the primary interrogator on the tapes. His voice is identified as that of the interrogator on exhibit 152 at lines 1 through 157, inclusive; 169 through 197, inclusive; and 203 through 326, inclusive.

The voice of Espino Verdin is also identified as that of the interrogator on exhibit 153 at lines 107 through 133, inclusive; 250 through 252, inclusive; 258; 272 through 360, inclusive; 378 through 463, inclusive; and 470 through 754 inclusive.

From the beginning of copia 2 to the copia 4, Agent Camarena's voice grows progressively weaker.

THE COURT: Now does that correctly state the stipulation?

MR. MEDVENE: It does, Your Honor.

MR. RUBIN: It does, Your Honor.

THE COURT: Very well. You may accept those stipulated facts as evidence in the case.

MR. CARLTON: Your Honor, the parties have also agreed that transcripts of exhibits 152 and 153 can be distributed to the jurors in the box and that they can now take the time to read those transcripts, with the permission

of the court.

THE COURT: No. We will not do that.

MR. CARLTON: The parties have also agreed in the alternative that an agent can assume the identity of Agent Camarena for purposes of a reading back and forth of the transcript.

THE COURT: I don't think we need to do that. If the transcript is in evidence, the jury will be able to read and consider it during the deliberation.

MR. CARLTON: Very well, Your Honor.

THE COURT: Call your next witness.

MR. CARLTON: The government calls Reynaldo Sepulveda.

REYNALDO SEPULVEDA,

called as a witness on behalf of the plaintiff, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please raise your right hand.

You do solemnly swear that the testimony you may give in the cause now pending before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

THE CLERK: Please be seated. State your full nail for the record and spell your last name.

THE WITNESS: My name is Reynaldo Sepulveda, S-e-p-u-l-v-e-d-a.

DIRECT EXAMINATION

BY MR. CARLTON:

Q. Mr. Sepulveda, what is your present employment?

A. I'm employed by American Air Lines as a corporate security representative.

Q. Were you ever employed by the DEA?

A. Yes, I was.

Q. During what period?

A. From 1970 to June of this year.

Q. And during the period you were employed by the DEA, were you ever assigned to the investigation into the kidnapping and murder of Agent Camarena?

A. Yes, sir, I was.

Q. During what period was that?

A. Well, the initial period from '85 to about '86, '87. Then I'd get called in once in awhile for different tests.

Q. Are you familiar with an individual named Humberto Alvarez Machain?

A. Yes, I am.

Q. Have you ever spoken to him?

A. Yes, I have.

Q. When was the first time that you spoke to him?

A. The first time I spoke to him was January 26th of 1986.
Q. And how was it that you were able to speak to him at that time?
A. A phone call was initiated to him, from San Diego where I was at, by Jose Jesus Sanchez Barba and then he put me on the phone and I spoke to Dr. Machain.
Q. And to where was this call placed?
A. Guadalajara.
Q. And what was said during this conversation with Alvarez Machain?
A. I told Dr. Alvarez Machain that I was a DEA agent, that I was investigating the Camarena investigation, and that I understood that he had been at the home at 881 Lope de Vega.

I told him that I was interested in talking to him because I understood that he had been there, and I was interested in showing him some photographs and getting him to tell me who had been at the house and for what reason, what was their purpose for being there.
Q. And what was his response?
A. He told me that he -- he would come up to San Diego to talk to me. He said that at the present time that he was very, very busy at the clinic where he worked at and that he couldn't get a substitute to help him. So he said that in the next few days, or next few weeks or so, he would be able to come see me in San Diego.

Q. Did he do that?
A. No, he didn't.
Q. Did you have another telephone conversation with him?
A. I spoke to him probably about three or four other times in the next two or three weeks. Then I made several other phone calls and spoke to other persons at the house who told me they didn't know where he was at.
Q. What was the substance of your other telephone calls to him?
A. To ascertain if he would come up and talk to me in San Diego.
Q. What was his response?
A. Well, the initial two or three times, maybe four times, he was very receptive to coming up to San Diego and talk to me.
Q. And were there other occasions when you called down there and spoke with someone other than --
A. Yes.
Q. -- Alvarez Machain?
A. Yes, I did.
Q. And what was the substance of those calls?

MR. RUBIN: Objection; calls for hearsay.

THE COURT: Sustained.

Q. BY MR. CARLTON: Did you ask for -- well, strike that.

Did Alvarez Machain ever come to the United States in response to your telephone callS?

A. No, he didn't.
Q. During any of these calls, did he deny being at Lope de Vega, 881 Lope de Vega?
MR. RUBIN: Objection; irrelevant.
THE COURT: Overruled.
Q. BY MR. CARLTON: During any of these telephone conversations that you had with him, did he deny being at 881 Lope de Vega while Agent Camarena was there?
A. No, he didn't.
Q. Have you ever met Humberto Alvarez Machain?
A. Yes, sir, I have.
Q. When was that?
A. April the 3d, 1990.
Q. Where was that?
A. In El Paso, Texas.
Q. Where in El Paso?
A. At the Executive terminal at the airport in El Paso.
Q. Did you speak with him at that location?
A. No. I spoke to him later at the DEA office.
Q. Where did you speak to him?
A. At the DEA office.
Q. Pardon me?
A. At the DEA office in El Paso.
Q. How much later?
A. Oh, probably 20 minutes later.

Q. What was the substance of your conversation with him at that point?
A. My initial substance of the conversation was to advise him of his right against several incrimination and his right to counsel.
Q. Did you do so?
A. Yes, sir, I did.
Q. What was his response?
A. He acknowledged he understood and he stated that he wished to cooperate with us, meaning the team that was there.
Q. And was an interview of Alvarez Machain conducted at that point?
A. Yes, it was.
Q. Did you participate in that entire interview?
A. No, sir, I didn't.
Q. At some point during the interview, did you take Alvarez Machain to the restroom?
A. Yes, I did. It was right after he was advised of his rights and then I told him that I had spoken to him on the phone before and he stated, "Well, you must be Mr. Sepulveda," and I said that I was and he said, "Well, I need to go to the bathroom real bad." So I walked him into the bathroom and after he was done there, came back. And on the way back to the interview room, he stopped and got a drink of water from one of the fountains.

Q. Then did he say anything else during that period?
A. No. When we got back to the interview room, I asked him if he'd take his clothes off because we were going to photograph him. So he disrobed and took all his clothes off, and I got somebody from the office to take some photographs of him.
Q. What was the purpose of that?
A. Just to show there were no bruises or marks or anything; that he wasn't mistreated, maltreated, that he had no signs of injury.
Q. Did you see any signs of maltreatment?
A. No, sir.

MR. CARLTON: Nothing further at this time, Your Honor.

THE COURT: You may cross-examine the witness.

MR. RUBIN: May I have a moment, Your Honor?

(Discussion held between Mr. Rubin and Dr. Machain through the interpreter sotto voce.)

CROSS-EXAMINATION

BY MR. RUBIN:
Q. Agent Sepulveda, when you called Dr. Machain in Guadalajara in 1986, were you able to lo- -- obviously you were able to locate him; correct?
A. That's right, yes, sir.

Q. And how did you find out where he was?

A. His cousin made the phone call. His cousin is Jose Jesus Sanchez Barba. At least he said he was.

Q. In fact, Dr. Machain was at his medical clinic; is that correct?

A. I don't know where he was. I believe that phone call went to his residence.

Q. And to your knowledge had Dr. Machain ever changed his residence or medical clinic after -- the location of the medical clinic after the events of Lope de Vega?

MR. CARLTON: Objection. Lack of foundation, Your Honor, speculation.

MR. RUBIN: Asking him if he knows.

THE COURT: Sustained. You can lay a foundation for that.

MR. RUBIN: That's what I am trying to do. I asked him if he knows.

THE COURT: Well, you asked the ultimate question without the foundation.

Q. BY MR. RUBIN: Did the DEA ever try and locate Dr. Machain with telephone books or address books or anything like that?

A. During what period of time, sir?

Q. In the --

THE COURT: At any time.

Q. BY MR. RUBIN: At any time.

A. Well, I can only speak for myself. We were active in trying to locate him up to that point. But I'm not sure whether we ever located him or not.

Q. Did you ever visit his medical clinic?

A. No, sir.

Q. In fact, the doctor told you he was director of his medical clinic and couldn't get anybody to take his place; isn't that true?

A. Well, he told me he was very busy. He didn't tell me he was director or anything like that.

Q. And it's true, is it not, that when Dr. Machain couldn't, didn't come up to the United States -- well, strike that. When he was coming to the --

When you would ask him to come to the United States, were you planning to arrest him if he came across the border?

A. If he is arrestable, certainly. But I wanted to hear his story first, of course, and find out what he had to say.

Q. In fact, a warrant had been issued for his arrest when you were calling to try to get him to come to the United States. True?

A. I don't think so.

Q. So it's also true, isn't it, that because the DEA couldn't persuade Dr. Machain to come to the United States, that the DEA then arranged a plan to kidnap him to bring him

to the United States; correct?

A. I don't know. By that time I had left the operation.

Q. Well, Agent Sepulveda, you were there in El Paso on April 3d, 1990; isn't that true?

A. I was there because that's where I was stationed, yes.

Q. And was Dr. Machain coming voluntarily to the United States?

A. No, sir.

Q. In fact, he was kidnapped from his office in Mexico by Mexicans hired by the DEA -- or at the behest of the DEA?

MR. CARLTON: Objection; beyond the scope. Lack of foundation.

THE COURT: Overruled.

Q. BY MR. RUBIN: Isn't that true?

A. I at that time didn't have any -- I wasn't privy to what was going on during -- or about this operation.

I had moved -- I had been transferred to El Paso and I wasn't privy to what was going on in this investigation at that time.

Q. Well, you saw him. You knew he wasn't coming voluntarily; true?

A. Right.

Q. And you saw -- did you see the plane land?

A. Yes, sir.

Q. And he came out with other Mexicans bringing him out of

the plane and giving him to the DEA in El Paso, Texas; true?

A. Well, your characterization is probably not correct but he was in the plane. He walked out of the plane, nobody forced him out of the plane or anything like that.

Q. And isn't it also true that you have no personal knowledge of what may have trans- -- strike that.

Do you know the day that Dr. Machain was kidnapped from his office?

A. No, sir.

Q. And so it's also true you don't have any personal knowledge as to what may have happened to him and how he may have been treated by the Mexicans who kidnapped him between the time he was kidnapped and by the time he arrived in El Paso, Texas, do you?

A. I don't know what happened, no.

Q. And, sir, isn't it also true that you know from your experience as a law enforcement officer that there are techniques of torturing people and mistreating people which don't leave marks on their body?

A. I've never seen any such techniques.

Q. Well, sir, would electric shock applied to your shoes leave a mark on your body, if you know?

MR. CARLTON: Objection. Lack of foundation, Your Honor.

THE COURT: Sustained.

Q. BY MR. RUBIN: And do you know -- and I assume you have no idea how much food or water Dr. Machain had been given during the trip to El Paso.
A. No, sir, I don't.
Q. Now, where were you stationed at the time of this interview in April of 1990?
A. In El Paso.
Q. In El Paso, Texas, does the DEA have a lot of Spanish speaking individuals?
A. Employees? We had --
Q. Well, I mean in custody or arrested. Of those arrested, are a good number of them Spanish speaking?
A. I would say so, yes.
Q. And to that effect, the DEA keeps waiver of rights forms -- well, strike that. You know what a waiver of rights form is, do you not?
A. Never seen one.
Q. Well, the DEA has a printed form, does it not, advising the defendants of their rights; is that true?
A. They may. I have never used one. I've never used one.
Q. So you never used one. How many years were you with the DEA?
A. Twenty-two.
Q. And in 22 years, you never used a waiver form to have somebody sign --

A. No, sir.
Q. -- to give clear consent of their rights?
A. No, sir.
Q. So you have no knowledge of whether there was one in Spanish.
A. Well, I know that there wasn't one during that particular date.
Q. Well, I'm talking about generally. Does the DEA office in El Paso, Texas, have Spanish language waiver of rights forms?
A. Not that I know of.
Q. What percentage -- and this is despite the fact that -- they didn't keep such forms despite the fact that they had so many in number of --

MR. CARLTON: Objection; argumentative.

THE COURT: What is your objection?

MR. CARLTON: Argumentative.

THE COURT: Well, that's not.

Finish the question.

Q. BY MR. RUBIN: What percentage of the people you arrested in El Paso spoke Spanish?

THE COURT: That is an objectionable question if you know the grounds.

MR. CARLTON: Well, that's asked and answered. Asked and answered, Your Honor.

THE COURT: Overruled.

(Laughter.)

Q. BY MR. RUBIN: If you can answer quickly before they figure out the objection.

MR. MEDRANO: Relevance.

THE COURT: Yes, it's irrelevant. The objection is now sustained.

(Laughter.)

Q. BY MR. RUBIN: During the questioning of Dr. Machain, was he ever -- in addition to having his clothes taken off, was he ever put into a small cell or room?

A. No, I wouldn't call it small, but there was two holding cells right next to the interview room where we were interviewing. And at times when there was no -- not going to be anybody placed inside that empty room, he would be placed into that cell.

Q. And how big was that cell?

A. Oh, I would say it's probably -- (pause) probably about 12 by 7, 12 by 8, something like that.

Q. Any furniture in it?

A. There's some chairs in there.

Q. Were you present when Dr. Machain's signature on a waiver of rights form was ultimately obtained?

A. No, sir.

Q. And what time did Dr. Machain arrive in El Paso?

A. If I remember correctly, somewhere around 4:00 o'clock in the afternoon.

Q. And what time did his interrogation begin?

A. Well, we started talking to him, uh, probably about 20 minutes later.

Q. And how long in advance did you know that Dr. Machain's kidnappers were going to deliver him in El Paso on April 3d?

A. I learned about it that morning.

Q. So it would be fair to say that you had a number of hours to prepare for this interview that you were going to have with Dr. Machain; correct?

A. What's there to prepare? I mean --

Q. The question is you did have a number of hours -- whatever preparations you had to make, you did have a number of hours?

THE COURT: Counsel. The next question. It's been asked and answered.

Q. BY MR. RUBIN: As to that day, did you have any contact with Dr. Machain. When I say "that day," I mean April 3d, 1990.

A. I didn't hear the first part of the question.

Q. After April 3d, 1990, did you have any further contact with Dr. Machain?

A. I appeared at a removal hearing several days later.

Q. And that was a procedure to transfer him to Los Angeles?

A. That's correct.

Q. Were you the person in charge of transferring him to Los Angeles for the DEA?

A. The marshals normally do that.

Q. At any time did you advise the marshals or anybody else that the person you had in custody was somebody named Juan Gonzalez Sanchez?

A. No, sir.

MR. RUBIN: I have nothing else, Your Honor.

THE COURT: Any redirect?

REDIRECT EXAMINATION

BY BY MR. CARLTON:

Q. At any time at the El Paso airport, did you see Dr. Alvarez Machain mistreated in any way?

A. No, sir.

Q. At any time in the El Paso office of the DEA, did you see him being mistreated in any way?

A. No, sir.

Q. Did you see anyone shouting at him?

A. No, sir.

Q. Was he allowed to undress himself?

A. Yes, sir.

MR. CARLTON: Just a moment, Your Honor.

(Discussion held off the record between

prosecutors sotto voce.)

Q. BY MR. CARLTON: Did he appear to have all of his faculties about him?

A. He appeared normal to me, sir.

MR. CARLTON: Nothing further, Your Honor.

RECROSS-EXAMINATION

BY MR. RUBIN:

Q. Agent Sepulveda. When he was being questioned, how many agents were there questioning him at any particular time?

A. Well, I wasn't in the interview room all the time but the only person that I remember interviewing him would be Mr. Berrellez.

Q. Just one person?

A. Agent Berrellez, yes.

Q. And during the telephone conversations that you had with Dr. Machain, at any time did he say that he was involved in the killing of Agent Camarena?

A. I don't think the subject ever came up. It came up that he had been in Lope de Vega --

Q. Did he ever --

A. -- during the time that Enrique Camarena was there.

Q. You were asked did he ever deny. Did he ever say that he was there?

A. No. Well, he -- I'm sorry?

Q. At any of those telephone conversations.

A. No. He never said he was there.

MR. RUBIN: I have nothing.

MR. CARLTON: May I reopen one question?

At any time when you were in the presence of Humberto Alvarez Machain, did he complain to you about any mistreatment?

THE WITNESS: No, sir.

MR. CARLTON: Nothing further.

THE COURT: You may step down.

Call the next witness.

MR. CARLTON: The government calls Hector Berrellez.

HECTOR BERRELLEZ,

called as a witness on behalf of the plaintiff, having been first duly sworn, was examined and testified as follows:

THE CLERK: Please raise your right hand.

You do solemnly swear that the testimony you may give in the cause now pending before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

THE CLERK: Please state your name for the record, spell your last name. Be seated.

THE WITNESS: Yes. My name is Hector H-e-c-t-o-r. My last name is Berrellez spelling B, as in boy, -e-r-r-e-l-l-e-z.

DIRECT EXAMINATION

BY MR. CARLTON:

Q. Agent Berrellez, are you employed by the DEA?

A. Yes, sir, I am.

Q. How long have you been employed by the DEA?

A. Nineteen years, sir.

Q. What is your present assignment?

A. I am a group supervisor. I supervise the group known as Operation Leyenda, which has been delegated the investigative responsibility for the kidnap, torture and murder of Special Agent Camarena.

Q. How long have you had that assignment?

A. I first came to be assigned to Operation Leyenda in January of 1989.

Q. Now, while you were the head of Operation Leyenda, had you met an individual named Humberto Alvarez Machain?

A. Yes, sir. I arrested him.

Q. And when was that?

A. That was in April the 3d of 1990.

Q. Where did that occur?

A. That arrest took place in El Paso, Texas, sir.

Q. Did you have some involvement in his arrival in El Paso?
A. Yes, sir, I did.
Q. Generally what was that?
A. I was the person that talked to some Mexican people through an intermediary and I arranged for this person to be brought to the United States by those Mexican individuals.
Q. And that was how he arrived there on April 3d?
A. Yes, sir.
Q. Now, where at the El Paso airport on April 3d did you first see him?
A. It was at the Executive terminal, sir, of the airport.
Q. What was he doing when you first saw him?
A. The first time I saw him, he was exiting from an airplane, walking down the steps of the -- of the plane.
Q. What was his demeanor at the time?
A. He appeared to smile and didn't appear to be nervous.
Q. Was he accompanied by anybody?
A. Yes. There was a Mexican gentleman in the plane.
Q. Did they come down the stairs with you?
A. Only one did, sir.
Q. Was anyone with you?
A. Yes. With me were special agents Manuel Martinez and Delbert Salazar. And there were also some immigration officials present. There was a customs agent there and another person.

Q. Now when Alvarez Machain reached the bottom of the stairs, what happened next?

A. When he reached the bottom of the stairs, he put his hand up to try to shake my hand - and I would not shake his hand - telling me that he was Dr. Humberto Alvarez Machain. I told him that I knew who he was. And I told him that I was a DEA special agent and that I was arresting him for the murder of Camarena.

Q. And what happened at that point?

A. At that point he told me that he was here because he wanted to cooperate and resolve the situation. I told him that we should not talk there, that we would be going to the DEA office where we could talk there and that there we would, you know, we could talk. I says, "Don't tell me anything now, we're going to get in the car and we're going to transport you to the DEA office and there we will talk."

Q. And is that what you did?

A. Yes, sir.

Q. Where in the DEA office did you take Alvarez Machain?

A. We took him to an interview room where there was prisoner processing equipment, such as fingerprint cards and that type of thing. There was also a couple of holding cells there, sir.

Q. At some point was he advised of his rights?

A. Immediately upon arrival in that room, Special Agent Ray

Sepulveda advised him of his constitutional rights per Miranda, that he had a right to remain silent and that he had a right to counsel and he had a right to stop the interview at any time if he needed counsel.

Q. And what was his response?

A. He indicated to us that he understood his rights. I also asked him, "Are you sure you understand your rights? This is very important in this country that you understand the rights that you are being guaranteed here." And he stated that he did understand.

Q. Did he interrupt at any point --

A. No, sir.

Q. -- during the advisement of rights?

A. No, sir.

Q. Going back to the airport for a moment. Were Alvarez Machain's hands bound in any way as he came off the airplane?

A. Absolutely not, sir.

Q. Did he walk steadily?

A. Yes, sir.

Q. Now, after he had been advised of his rights, did he agree to waive those rights?

A. Yes, sir, he did.

Q. What did he say?

A. He said that he was here to cooperate; that he wanted to resolve his problem, and that he would talk to us.

Q. Ask you at this point to look around the courtroom and if you can identify anyone in the courtroom who --

THE COURT: Do we need to go through this?

MR. CARLTON: Very well, Your Honor, I'll proceed.

Q. After he agreed to waive his rights, what happened?

A. I started asking him questions, sir.

Q. And did he respond to those questions?

A. Yes, sir.

Q. What was it you asked him?

A. I asked him if he had been at the 881 Lope de Vega house when our agent was tortured, interrogated and murdered. And he told me he had been there on two occasions.

Q. Did he say anything further?

A. Yes. I asked him what he was doing there, how he got there. I wanted more details. And he related more details to me as to how he got there and who was present and so forth.

Q. What was it he said?

A. He told me that on the day that Camarena was at the house, that he had accompanied two gentlemen to 818 Lope de Vega. He told me that he had accompanied a person by the name of Jorge Gamez -- Gomez Espana and a person by the name of Guillermo Chavez Sanchez.

He told me that they had gone to the house because Caro-Quintero had accused Gomez, Mr. Gomez Espana of being a DEA informant, and he wanted to talk to Gomez Espana. And he

told me that's why they had gone to the house on that date.

Q. Did he say what happened when they arrived at the house?

A. Yes, sir, he did.

Q. What was that?

A. He stated that upon arrival at the house, that the gentleman by the name of Guillermo Chavez Sanchez told him to stay in the car there, that he would go into the house, talk to Rafael Caro-Quintero and try to work out something for Mr. Gomez Espana.

He told me that in fact this gentleman went into 881 Lope de Vega and while the person was inside, he, Humberto Alvarez Machain, got out of the car and started walking to 881 Lope de Vega and upon approaching the house, he saw DFS, Direccion Federal de Seguridad, Commander Jorge Munoz Rios standing guarding the door and he was approaching the house; that Munoz Rios cautioned him to be quiet.

He stated that as he was walking towards the house, that Mr. Chavez Sanchez had walked out and told he and Mr. Gomez Espana that he had talked to Rafael Caro-Quintero and that he had resolved the problem with Rafael Caro-Quintero thinking -- or, you know, he being told that Mr. Gomez Espana was a DEA informant.

He stated that it was safe, that all three could go into the 881 Lope de Vega. In fact, Mr. Machain told me that they did, in fact, all three go inside the house; that

they had gone already to the kitchen where they had mingled with other people. And I asked him who the people were that were present and he told me that he had seen Rafael Caro-Quintero there -- excuse me, not there at the kitchen but he had seen Ernesto Fonseca Carrillo, Javier Barba, Miguel Juarez and others in that kitchen area. And that he had continued to walk through the house after he served himself some food, and had gone to a bedroom where he saw Rafael Caro-Quintero interrogating a person, a person who he later found out was Enrique Camarena, our special agent.

He stated that when he was inside the room there, that Camarena was fully dressed and that he was sitting on a bed, just kind of like looking down, but that he didn't appear to have been tortured at that time.

He stated that he walked out of the bedroom and went back to the kitchen area and that sometime shortly thereafter the three that had arrived, he, Gomez Espana and Chavez Sanchez, had left for that day.

Q. Now, when you spoke with defendant Alvarez Machain on April 3d, did he tell you whether he had returned to the house at Lope de Vega on another occasion?

A. Yes. He told me that on the following day he alone had gone back to 881 Lope de Vega and that he had gone into the same bedroom where they were holding Special Agent Camarena and that when he had walked into the bedroom this time, the

special agent Camarena was in very bad shape; that he was laying on the bed in his underwear, unconscious, and appeared to be in very, very bad shape.

He stated that he saw a doctor there, a doctor who he told me was a person by the name of Juan Mejia Monge, taking Special Agent Camarena's vital signs at the time, and that this doctor had approached him there and said -- and had told Mr. Machain that Camarena was in very bad shape.

Q. Did he tell you what he did? What he, Humberto Alvarez Machain, did at that point?

A. I recall that he told me that at some point Rafael Caro-Quintero had requested that Dr. Machain take this other doctor, Mejia Monge, to his residence to get clothes because this doctor, this other doctor, was going to accompany Caro-Quintero out of the country into Costa Rica.

Q. Did Alvarez Machain say whether he complied with those instructions?

A. Yes. He told me that he did as Caro-Quintero had instructed him and took the other doctor to his residence where the doctor got clothing which he put into a suitcase, and that he then drove this doctor to the airport, the Guadalajara Municipal Airport.

He told me that while they were loading the suitcases on to this jet belonging to Rafael Caro-Quintero, that somebody had informed him that a special group of

Mexican federal judicial police agents were getting ready to come upon him. And when he got that information, that he, Alvarez Machain, got in the vehicle that he had been driving and he sped and hid behind a hangar.

He told me that from the hangar he could see what was going on and he could see that the MFJP agents were pointing weapons at Rafael Caro-Quintero's entourage, and vice versa; that also Caro-Quintero's bodyguards were pointing long rifles at the MFJP agents.

He stated that he could see or hear that the Caro-Quintero bodyguards were identifying themselves as DFS agents to the MFJP. He stated that he stayed back there. And once he saw that the situation kind of pulled down and weapons were no longer being pointed at each other, that he went back and rejoined Caro-Quintero's group.

And he also told me that he had been there and seen when Caro-Quintero had paid MFJP Commander Armando Pavon Reyes 60,000 pesos, I believe it was.

Q. Sixty million pesos?

A. Or 60 million, excuse me. I'm sorry, 60 million pesos.

Q. Tell us what happened at that point.

A. He had told me that at that point Commander Armando Reyes permitted everybody to leave -- permitted, excuse me, Caro-Quintero to leave, fly off, escape and that he and others returned back to Guadalajara.

Q. Now, who was present with you while defendant Machain made the statement?

A. Present in the room while I was interviewing Dr. Machain was Special Agent Monroe Martinez and Special Agent Delbert Salazar.

Q. Are you familiar with an individual named Antonio Garate Bustamonte?

A. Yes, sir, I am.

Q. Was he present for this interview?

A. No, sir, he was not.

Q. Where was he?

A. He was remaining in the bay area of the DEA building. He didn't come in to the interview room while we were talking with him.

At one point, I remember, Machain wanted to speak to Mr. Garate and we let him come in and briefly talk to him and then -- by the door, by the way, and then he went back to the bay area where he had been sitting.

Q. At any point during the interview did anybody in your presence threaten defendant Alvarez Machain?

A. Absolutely not, sir.

Q. Did anyone hit him or --

A. Sir, we don't do that in this country. We never mistreat anybody here, sir.

Q. Did anyone shout at him?

A. No, sir.

Q. At some point did he ask for something to drink?

A. Yes, sir, he did.

Q. What was done?

A. He told me that he was thirsty. I asked him if he was hungry and if he wanted something to eat. Initially he said that he was just thirsty, that he wanted something to drink. And at that point I dispatched Special Agent Delbert Salazar to go somewhere and get some soft drinks. I believe they were Pepsi's or Cokes.

Q. Okay. And did he bring them back?

A. Yes, sir, he did. He brought five or six of them back and the doctor drank two of them.

Q. At some point during this interview did you dispatch some of your agents to find a written advisement of rights form?

A. Yes, sir. I wanted to use one of those advisement of rights forms in Spanish and I asked for one, and there was none at the office. There wasn't one available.

Later a special agent came into the office and he happened to have one in his briefcase which he provided to us and I used.

Q. When you say you used it, what did you do with it?

A. Well, I filled it out and I advised Dr. Machain of his rights again and he could read them in Spanish, in his own

native language, where he could understand. And he did so and he signed it.

Q. And at that point did you ask him to do something else?

A. Yes. I told him that here in this country he had to go to the nearest magistrate to be arraigned. However, I told him that he could waive that right if he wanted -- preferred to be arraigned in Los Angeles. And he told me that that would be all right with him, that he would -- he would agree to waiving going before a magistrate in El Paso and would agree to be transported to Los Angeles or he could appear before a magistrate.

I also advised him that he had a right to an identity hearing and that should also take place in El Paso. However, if he waived that, he could, you know, have the identity hearing here in Los Angeles. And he stated that he would agree to waive that also.

Q. Would you look at what has been marked as exhibit 162 in front of you.

A. (Witness complies.) Yes, sir.

Q. Do you recognize that?

A. Yes, sir. This is the advice of rights in Spanish and the same one that I filled out that day and the same one that Mr. Machain read and, after acknowledging that he understood all these rights in Spanish, he signed it.

Q. Now did you ask him to write anything on the bottom of

that form?

A. Yes, sir. I told him that if he would be kind enough to write what he had told me had occurred at 881 Lope de Vega on the same form. And I told him that he didn't have to, that he could volunteer.

Since he wanted to cooperate, I said, "Well, you can cooperate and, if you want to cooperate, you can write here what you told me" and he stated, "Fine, I'll go ahead and write it." In fact he did. He wrote some information on this form where his rights can be seen, yes, sir.

Q. And did that information summarize what he told you previously?

A. Very, very small summary of what he had told us, yes, sir.

Q. Did you fill in the date on that form?

A. Yes, sir, I did.

Q. And is there something incorrect about that?

A. Yes. I was thinking of the month where it says "day" and I wrote "4" instead of the 3d day of April.

Q. So that --

A. My mistake, sir.

MR. CARLTON: May I have just a moment, Your Honor?

(Pause in proceedings.)

THE COURT: Now, these interviews you conducted

with him, were they in the Spanish language or the English language?

THE WITNESS: Your Honor, everything was in Spanish. And I speak Spanish fluently, Your Honor.

MR. CARLTON: Your Honor, I move the admission of 162 at this time.

THE COURT: All right, it may be admitted.

(Received in Evidence Exhibit No. 162.)

Q. BY MR. CARLTON: Are you familiar with an individual named Jorge Godoy?

A. Yes, sir, I am.

Q. Are you familiar also with agreements made between him and the government?

A. Yes, sir, I am.

Q. Were you present when he came across the border into the United States?

A. Yes, sir. I was at the border to receive him.

Q. And when he came across the border, did he have an agreement of immunity with the United States government?

A. No. He did not, sir.

Q. Do you know when that agreement was given to him?

A. That agreement was not given to Mr. Godoy until he had been here two months in this country and after having talked with me on numerous occasions, sir.

Q. Are you familiar with an individual named Rene Lopez?

A. Yes, sir, I am.

Q. Likewise are you familiar with the agreements that he has made with the United States government?

A. As in Mr. Godoy's case, Mr. Lopez was not given immunity when he arrived in San Diego. His immunity was not granted to him until he had been here over a month and only after he had talked to me on numerous occasions.

MR. CARLTON: Your Honor, may I ask permission for one of the interpreters to read into the record in English the short Spanish statement that the defendant Alvarez Machain has written on the bottom of exhibit 162?

THE COURT: Yes, he may.

THE INTERPRETER: (Translating:)

I went to the Lope de Vega house with Mr. Guillermo Chavez and Mr. Gomez Espana, because I wanted to speak with Gomez Espana, with Caro-Quintero. When I arrived at the house with Dr. Juan Mejia Monge, Rogelio Munoz, Caro-Quintero, Los Carlitos, I went in and I saw in a bedroom El Senor. Afterwards I found out that it was Mr. Camarena and he was given medical services by Mr. Juan Mejia Monge.

On the next day I went back to the Lope de Vega house. This time I saw that Mr. Juan Mejia Monge was taking care of the same gentleman,

aforementioned gentleman, checking his pupils and vital signs and he commented that he appeared to be in very poor health. Present were Fonseca, Los Carlitos, Caro-Quintero, Guillermo Chavez and some other people whose names I do not remember.

MR. CARLTON: Just one moment, Your Honor.

(Discussion held off the record between prosecutors sotto voce.)

MR. CARLTON: Nothing further, Your Honor.

THE COURT: You may cross-examine the witness. Do you have any questions?

MR. MEDVENE: No, sir.

CROSS-EXAMINATION

BY MR. RUBIN:

Q. Special Agent Berrellez, you indicated on direct examination that the DEA would never mistreat anybody. Is that correct?

A. We are not allowed in this country to mistreat anybody, sir.

Q. And, sir --

A. We don't do that here.

Q. And, sir, I take it, then, that you do not consider kidna- -- arranging for the kidnap of a Mexican national from his country and brought forcibly to the United States or a

foreign country to be mistreatment. Is that correct?

A. Well, I asked that he be brought to this country and I told the people that were participating that I would not tolerate Dr. Machain to be mistreated.

I gave specific orders that he was not to be tortured. And I even went as far as to tell them, "If I find out that that man was hurt in any way, I will not accept him." And that's why we photographed him and I checked him on his arrival, to satisfy myself that this man had not been tortured or abused. And I gave those specific orders.

Q. Sir, the very -- is it your belief, then, that the very fact that he was kidnapped, a foreign national, out of his homeland and brought to a foreign country at your arrangements with Mexican nationals, is not mistreatment?

MR. CARLTON: Objection. Argumentative.

THE COURT: Yeah. The objection is sustained.

Q. BY MR. RUBIN: I take it, sir, then that if Iraqi hired the Mafia to kidnap Norman Schwartzkopf to take him back to Iraq citizens, that wouldn't be mistreatment?

MR. CARLTON: Objection; irrelevant.

THE COURT: Sustained.

Q. BY MR. RUBIN: Now, the people that kidnapped -- Well, let me go back.

This plan to kidnap him, whose idea was this originally to kidnap Dr. Machain? Was it yours?

MR. CARLTON: Objection; irrelevant.

THE COURT: Yes. Sustained.

Q. BY MR. RUBIN: Agent Berrellez, did you ever get any approval from the President or the Attorney General to launch this operation to kidnap Dr. Machain?

A. I was told that the Attorney General's Office of the United States of America had authorized this operation. And me, being an agent and a servant of this country, proceeded to do just as I was told.

Q. But it was your department that investigated the initial plan, isn't it?

A. Sir, I have no idea who instigated it. I just follow orders, sir.

Q. And it's true, is it not, that for five months you planned the kidnap- -- Let me strike that.

At any time before the kidnapping, did you ever seek extradition from Mexico of Dr. Machain?

A. Mexico has never extradited any of its citizens, sir. I never did.

Q. Sir, my question to you was did you ever seek extradition?

A. No, I did not.

Q. And there is an extradition treaty between the United States and Mexico, isn't there?

MR. CARLTON: Objection; calls for legal

conclusion.

THE COURT: Counsel, you will remember the limited purpose for which this evidence is permitted.

I will instruct the jury this evidence of the kidnapping is to be considered only by the jury insofar as it bears on the voluntariness of the defendant's statement.

MR. RUBIN: Now --

THE COURT: Just a moment.

MR. RUBIN: I'm sorry.

THE COURT: That is the purpose of it. The jury is not to consider it for any other purpose in determining the facts of this case or whether these charges have been proved. But it may consider it on the issue of voluntariness of the defendant's statement.

Q. BY MR. RUBIN: Now, Agent Berrellez, do you know the identities of the people who actually kidnapped Dr. Machain?

A. I know the identity of maybe one or two, yes, sir.

Q. And the person who arranged the kidnapping on your behalf was Antonio Garate Bustamante; is that correct?

A. Under my orders and instructions, yes, sir.

Q. And is this the same Garate Bustamante that I believe Mr. Harrison testifed was a drug trafficker?

A. It is the same Tony, Antonio Bustamonte, yes, sir.

Q. And it's your information as DEA that he was a drug trafficker?

MR. CARLTON: Objection; irrelevant, lack of foundation.

THE COURT: Sustained.

Q. BY MR. RUBIN: Now, you don't know, then, that all the people -- the kinds of people that Mr. Bustamonte hired to kidnap Dr. Machain, do you?

A. No, I don't, sir.

Q. One, you do know Mr. Sosa is a former police officer in Mexico; correct? Or worked for the police in Mexico?

A. I know that now, yes, sir.

Q. You don't know what they may have done to Dr. Machain on the trip from the time they kidnapped him from his office until the time they brought him to El Paso, do you?

A. I was told that nothing was done to him, sir. That's what I know.

Q. Personal knowledge. You have no personal knowledge, do you, sir, of what happened?

A. Only what I was told.

Q. And how long -- how many years did you spend in Mexico?

A. I was assigned in Mexico as the agent in charge of the Mazatlan Sonora Law Office for approximately a year and a half.

Q. And in your experience there in Mexico, do you understand that Mexican police officers sometimes tortured their prisoners?

A. It was common knowledge that that was done, sir.

Q. And there's also ways of torturing people, for example, soda water up their nose, that doesn't leave marks on people; isn't that true?

MR. CARLTON: Objection; lack of foundation.

MR. RUBIN: I'm asking him if he knows.

THE COURT: Overruled on that ground.

MR. CARLTON: Irrelevant.

THE COURT: Sustained.

(Laughter.)

Q. BY MR. RUBIN: Now, when Dr. Machain got to El Paso, he didn't sign a waiver form until four to five hours after the questioning began; isn't that right?

A. He had been advised of his right and the legal requirement had been satisfied and he didn't sign that form until I could obtain it four hours later, that's correct, sir.

Q. Sir, my question to you was: He didn't sign it for four to five hours, did he?

A. That's what I testifed, sir.

Q. And you knew for more than a day that your people who you had arranged to kidnap him were going to drop him off in El Paso, did you not?

A. I found out around 10:00 p.m. the night of April 2d, sir, here in Los Angeles.

Q. And so you knew -- Well, strike that.

And in your experience as a DEA officer, a DEA agent, you know that post-arrest statements can be a very important piece of evidence in a trial; correct?

A. Very important, yes, sir.

Q. And isn't it true you wanted to make sure to advise them of their rights; correct?

A. I always advise them of their rights, sir.

Q. And you always try to do this in writing, don't you, so there is no dispute, and get a signature where they sign?

A. I didn't understand your question.

Q. Isn't it true that as a procedure you try to get the consent and waiver of their rights in writing? That's why you use the waiver form, isn't that true?

A. It's not, uh, done all the time. It's done whenever we can do it. A lot of times we're out in the field, we don't have these forms. The legal requirement is that a person when he is arrested --

MR. RUBIN: Object. Move to strike the legal requirement.

THE WITNESS: -- is advised of his constitutional rights.

THE COURT: Well, finish your answer.

THE WITNESS: We don't carry these forms with us all the time. Whenever we are in an office or where we have a form accessible, we use it. A lot of times we're out in

the field or we're working in mountainous areas and different types of environment, and streets, we don't have this form. We meet the legal requirements by advising the person verbally that they have a right to remain silent, that they have a right to counsel and that they can terminate the interview and stop talking to us at any moment they want. So when we can, and we have a form available, absolutely, we use it.

THE COURT: I think you've answered the question.

THE WITNESS: Thank you, sir.

(Laughter.)

Q. BY MR. RUBIN: Sir, you know that in many cases, do you not, from your experience, that whether a person actually gave consent is an issue and disputed, don't you?

A. Is it disputed?

Q. Yes.

A. Yes. As it's being done here, sir.

Q. And it's true that a written waiver form provides you with -- ostensibly provides you with better proof?

A. Yes, it's evidence. It's very good when we can do it.

Q. And this was the Camarena case, isn't it? A very important investigation to the DEA, was it not?

A. Extremely important to us.

Q. And it's true, though, that you left your Los Angeles office without making sure that you had a waiver form to sign?

MR. CARLTON: Objection; argumentative,

irrelevant.

THE COURT: Yes. Sustained.

MR. RUBIN: Your Honor, that goes to the time lag for the -- If I can address that.

THE COURT: The objection is sustained. You may ask another question.

Q. BY MR. RUBIN: Sir, is it true that the only reason that there was a four-hour delay between the time you started questioning Dr. Machain and the time you actually signed a waiver of rights form is that you couldn't find a form in Spanish someplace in the office?

A. That is correct, sir.

Q. And you didn't bring one with you, did you?

A. I don't carry those in my briefcase, sir.

Q. Did you ever call your office to have them fax one for you?

A. I don't know that we have one in the group right now, sir.

Q. You didn't think that was important?

A. I don't know if we had one or not.

Q. Now, in fact, isn't it true that in a previous statement, previous declaration --

Could I have a moment, Your Honor? Strike that.

You recall you gave a declaration, you filed a declaration in May of 1990 in this case.

A. Yes, sir, I did.

Q. And isn't it true that at that time you stated -- I am

trying to find the paragraph -- at page 19, line 8 and following. I'm reading from the transcript. I don't know what paragraph in the declaration but isn't it true in the declaration you stated:

> We transferred Humberto Alvarez Machain to the El Paso DEA field where he was advised of his constitutional rights in Spanish by Special Agent Ray Sepulveda. Alvarez Machain was also given a copy of his constitutional rights in Spanish which I observed him read and sign.

Didn't you say that in your declaration?

A. That's correct.

Q. And you just admitted the fact that there was a four-hour break in those two events; is that correct?

A. I am stating what I know, sir. And I didn't misstate that in that declaration either, sir.

Q. Isn't it true, you stated the fact that was a four-hour break between the time Special Agent Ray Sepulveda was alleged to have given him his rights?

THE COURT: It's been asked and answered.

Q. BY MR. RUBIN: And was it your opinion that this four and a half -- the reason you left it out is because this four and a half hour break wasn't important?

MR. CARLTON: Objection; argumentative, Your Honor.

THE COURT: Sustained.

Q. BY MR. RUBIN: Now this interview that you had, was it tape recorded?
A. No, sir, it was not.
Q. And the fact that calls -- strike that. Does the DEA have a regulation prohibiting you from tape recording?
A. We don't have a regulation that prohibits us and we don't have an order that says we always have to, either, sir.
Q. In fact, at one point Mr. Harrison's interview was tape recorded; right?
MR. CARLTON: Objection; irrelevant.
THE COURT: Sustained.
Q. BY MR. RUBIN: Now, isn't it true, Agent Berrellez, that if we had had a tape recording of this interview, there would be no dispute as to what questions were asked, how they were asked, and what was actually said?
MR. CARLTON: Objection; argumentative, speculation.
THE COURT: Sustained.
Q. BY MR. RUBIN: You chose -- You had the option of tape recording it if you wanted to; correct?
MR. CARLTON: Asked and answered.
THE COURT: Overruled.
THE WITNESS: I had that option. I had the option of having him write his statement, also, as he did, sir.
Q. BY MR. RUBIN: And does the DEA have tape recorders?

A. A lot of them, sir.

Q. But you chose not to tape record this statement of a suspect in the Camarena case; correct?

THE COURT: Asked and answered.

Q. BY MR. RUBIN: Well, did you choose that specifically?

THE COURT: Asked and answered.

Q. BY MR. RUBIN: Now, is it fair to say that what Dr. Machain wrote down on the waiver form four and a half hours after he was questioned is a lot less than what you've testifed he said during that time; isn't that true?

A. Not a lot less. It is a summary of what he told me.

Q. Well, is there any mention about the airport in this handwritten statement?

MR. CARLTON: Objection, Your Honor; the statement speaks for itself.

THE COURT: Yes, the statement speaks for itself.

Q. BY MR. RUBIN: Now, at any point during the statement did Dr. Machain ever state that he had given an injection to Enrique Camarena?

A. No, sir, he never said that.

Q. At any point during the statement did Dr. Machain say that he did anything to Enrique Camarena?

A. He never said he did anything to Enrique Camarena, that is correct, sir.

Q. And, in fact, the most he ever said in his statement was

that he saw Enrique Camarena; correct?
A. Yes, sir.
Q. And isn't it also true that he told you that he didn't know who that person was until sometime later?
A. That is also right, sir.
Q. And I take it Dr. Machain never told you he got on the plane to escape out of Lope de Vega?
A. No, he told me that Caro-Quintero and others did; that he went back to Guadalajara, sir.
Q. He went back to his home and continued to practice medicine in Guadalajara; true?
A. I don't know. He didn't tell me that, sir.
Q. And, in fact, isn't it true that during his statement, Dr. Machain told you that he saw Enrique Camarena getting medical treatment from another doctor?
A. He didn't say he was being administered -- being administered medical treatment other than Camarena was being checked; that his pupils were being checked and that his blood pressure was being taken. But I don't recall him telling me that anybody was actually treating or aiding him.
Q. Just to clarify, the person who was going to speak to Caro-Quintero was Gomez Espana. Initially Gomez Espana wanted to clear up the understanding that Gomez Espana had with Caro-Quintero?
A. The way I understood it was that Caro-Quintero was

suspecting Gomez Espana of being a DEA informant and that they were going there to try to convince Caro that Gomez Espana was not, in fact, a DEA informant.

Q. In fact, sir, wasn't why they were going there -- Isn't what Dr. Machain told you was that Gomez Espana went there because Gomez Espana wanted to talk to Caro-Quintero, not Dr. Machain. Isn't that what he said?

A. Well, it's kind of the way I understood it because, as he stated, Gomez Espana never went into the house. He stayed outside in the car until he got safe passage in there.

Q. Sir, you don't know what happened in Lope de Vega, do you? Strike that.

You had that statement, his handwritten statement translated, didn't you, on your own?

A. I don't --

Q. The DEA had it translated?

A. I believe that somebody did. I didn't.

Q. And, in fact, didn't that translated statement say:

> I went to Lope de Vega because -- the house of Mr. Guillermo Chavez and Mr. Gomez Espana, because Gomez Espana wanted to talk with Caro-Quintero.

Isn't that what it says, his handwritten statement?

A. I believe that's what it says, yes, sir.

MR. RUBIN: Can I have a moment, Your Honor?

(Pause in proceedings.)

Q. BY MR. RUBIN: It's also true that he told you that his only function the second day he came back was to give somebody a ride to the airport, the doctor -- the other doctor?

A. That's what he alleged.

Q. Isn't that what he stated?

A. That's what he -- yes. Yes, sir.

MR. RUBIN: I have nothing else.

THE COURT: Any redirect examination?

REDIRECT EXAMINATION

BY MR. CARLTON:

Q. Agent Berrellez, at any time in your presence did defendant Machain complain that he'd ever been mistreated?

MR. RUBIN: Objection; asked and answered.

THE COURT: Overruled.

THE WITNESS: I asked him if he had been tortured. He told me that he had not, that nobody tortured him. I asked him if he had any operations, cuts or anything. He told me he had a little nick or something, I don't recall which finger, just a little nick, and he showed it to me, where he had caught his hand on the airplane door.

I asked him if he felt okay. He told me that he

did. I told him that I wanted him to undress because I wanted to check him and I wanted to insure for myself that this man had not been subjected to torture. And I did that.

MR. CARLTON: One moment, please, Your Honor.

(Discussion held off the record between prosecutors sotto voce.)

MR. RUBIN: I have a few questions, Your Honor.

MR. CARLTON: Nothing further.

RECROSS-EXAMINATION

BY MR. RUBIN:

Q. Agent Berrellez, isn't it true, the next day Dr. Machain started complaining of chest pains?

A. Yes. He complained to somebody in the jail there, the El Paso jail, that he was having some type of pain in his chest, yes, sir.

Q. And, in fact, he was then taken to a hospital because he was complaining of chest pains?

A. Absolutely. I wanted him transported there to a hospital immediately, sir.

Q. But it was true, he was taken to a hospital; correct?

A. Yes, sir. Immediately.

Q. And let me ask you about the waiver of the magistrate, appearance in the magistrate's court.

You had discussed that with Mr. Medrano in

advance, about getting that waiver; correct?

A. No, sir, I had not.

THE COURT: That's outside the scope.

MR. RUBIN: Your Honor, may I ask permission to reopen? Because I just neglected one area of questions.

THE COURT: All right.

Q. BY MR. RUBIN: Sir, do you remember testifying under oath on October 19th, 1992?

A. Yes, sir, I am aware that I did.

Q. And you took the same oath then that you took today; correct?

A. Just like I'm doing now, sir, yes.

Q. At page 24, line 17.

Isn't it true you were asked the following questions and you gave the following answers:

"Now did you have any discussions with anybody as to whether you should obtain a waiver form of the fifth -- of his appearance before a magistrate?

"Answer: Yes, sir, I did.

"Question: Who did you discuss that with?

"Answer: I discussed it with AUSA Manuel Medrano, sir."

A. That is exactly correct. And I didn't do it before I left for El Paso, I did it while there in El Paso. I

consulted with Mr. Medrano and we talked about it at that time. I testified so at that time; I am also testifying the same way today, yes, sir.

Q. And, sir, isn't it true that you handwrote out the waiver form?

A. That I did?

Q. Right.

A. That's correct, sir.

Q. And with that waiver form, isn't it true that you could have held Dr. Machain there for a long time for questioning --

MR. CARLTON: Objection.

MR. RUBIN: -- you wouldn't have had to go before a court.

MR. CARLTON: Irrelevant.

THE COURT: Sustained.

Q. BY MR. RUBIN: Did you ever think -- well, you speak Spanish fluently; true? Correct?

A. Yes, sir, I do.

Q. And how many times do you think you've given the advice of rights?

MR. CARLTON: Objection; irrelevant.

THE COURT: Sustained.

Q. BY MR. RUBIN: At any time did you attempt to just write out the advice of rights rather than wait four and a half hours to get the form?

MR. CARLTON: Objection; asked and answered.

THE COURT: Sustained.

MR. RUBIN: Nothing further.

THE COURT: We'll take our afternoon recess at this time. The jury may be excused.

THE CLERK: Please rise.

(Jury excused at 2:52 p.m. )

THE CLERK: You may be seated.

THE COURT: We have some motions regarding evidence that I want to rule on at this time. First, there is a motion by the defendant Zuno to exclude the testimony of Armando Godinez-Godinez. The court believes that motion should be granted and that testimony should be excluded.

The testimony is regarding events that occurred alleging a sale of marijuana in 1986, which is long after the events in this case. The court views this as irrelevant with respect to the case in chief. This evidence may have some pertinence, depending on the state of the record, for rebuttal purposes. But in the view of the court, this is not proper evidence to be introduced in the government's case in chief; therefore, it will be excluded.

The other witness to which the defendant seeks to have the testimony excluded is the testimony of Guillermo Florez, who allegedly will testify that in November 1984 he participated with the military in the eradication of

marijuana fields located in Mascota, Jalisco, Mexico. That persons arrested at the marijuana field advised that the marijuana belonged to the defendant Ruben Zuno Arce. After being confronted by the military, the defendant Zuno paid a bribe to avoid being arrested for growing marijuana.

The court believes that parts of this testimony is admissible and parts are not. The part of the testimony wherein this witness will quote fieldhands as stating that the marijuana fields belong to Ruben Zuno Arce is clearly hearsay and is inadmissible to prove that the fields belong to Zuno Arce, that is, to Ruben Zuno Arce.

This witness, however, may testify to the remainder of -- that is, to anything to which he was percipient, anything that he may have seen and observed of the presence of Ruben Zuno Arce and the events that occurred at that time.

I believe that the state of the record permits this evidence, makes it relevant and the bulk of the objection here by the defendant is that it goes rather to the weight of the evidence rather than its admissibility.

So that is the ruling of the court. That is not subject to any further argument, I've heard your argument already.

MR. BLANCARTE: Point of clarification, Your Honor.

THE COURT: Yes.

MR. BLANCARTE: Does that apply to all the hearsay that --

THE COURT: No hearsay. I said that, I think.

Statements, hearsay statements wherein these field-hands purport that the fields belonged to Ruben Zuno Arce are not admissible.

MR. BLANCARTE: And there are statements made by the supposed mayor of Mascota that the marijuana belongs to Mr. Zuno.

THE COURT: That would be hearsay as well.

MR. MEDVENE: If the court please, just so you're clear, Your Honor, the bribe testimony, we believe, is based on hearsay and in addition to that is --

THE COURT: Well, he may not testify to any bribe. He may testify to what he saw.

MR. MEDVENE: Okay.

THE COURT: And if a bribe can be inferred from that, that's the way it must be. He may not say it. Unless he observed the bribe being given.

MR. MEDVENE: Well, what we're saying, Your Honor, the charge, of course, as Your Honor knows, is the kidnapping and murder. There is no allegation about bribes here. And whether or not there was a bribe has nothing to do with the key point in the case. So you have a prior bad act that is really not a similar act for purposes of what the issue in

the case is.

THE COURT: Counsel, I remind you there's been multiple testimony relating to bribes in this case, so I'm not certain that this --

MR. MEDVENE: Not --

THE COURT: -- so I'm not certain, if this is a bribe, it's different than the others.

MR. MEDVENE: Not by Mr. Zuno for my purpose, A. And B, it's a prior bad act of this defendant.

THE COURT: All right.

MR. MEDVENE: In other words, Your Honor, there is no testimony of bribes by defendants that are on trial. And if you permit this, you have an act, a bribe that is not associated with what we're talking about here, which is: What connection would that bribe have which we're saying didn't happen with the kidnapping? There is no tie at all.

THE COURT: That is the ruling of the court.

MR. MEDVENE: Yes, Your Honor.

MR. MEDRANO: Point of clarification, Your Honor. I assume what is not hearsay is Mr. Florez's testimony that when he saw that Zuno was not arrested, he asked his supervisor, "Why has that man not been arrested?" I assume he can state that because he is here to testify to that. That is not hearsay.

MR. MEDVENE: That is clearly hearsay, Your Honor.

THE COURT: No. That should be excluded.

MR. MEDRANO: Very well, Your Honor.

MR. MEDVENE: Thank you.

MR. CARLTON: Your Honor, just to notify the court that after Mr. Florez, we have no further witnesses in our case in chief and I expect that we will be resting at that time. I would like to reserve some time to go over all of the documentary exhibits and make sure that we've done that.

THE COURT: Well, you may rest subject to the exhibits. I will just have you meet with the clerk with the other counsel and look over the exhibits. And unless it is brought to my attention on the record that an exhibit is in dispute, I will deem there to be no objection to any of the exhibits that have been discussed by the witnesses.

MR. CARLTON: Would that include the two deeds that we talked about earlier?

THE COURT: That is the other item that I want to rule on at this time. Is that exhibit A, the deed?

MR. MEDVENE: May I address you before you rule, Your Honor?

THE COURT: Well, I want to give you my tentative ruling.

MR. MEDVENE: Yes, sir.

THE COURT: And I've been addressed extensively by your colleagues on this --

MR. MEDVENE: I understand.

THE COURT: -- so I don't know that it requires anything further.

It is the court's view that this exhibit is admissible. It is an exhibit that is a certified copy of a deed from the files of the Office of the Public Registry of Real Property in Guadalajara, Jalisco, Mexico. The deed regards the sale of 881 Lope de Vegas from Ruben Zuno Arce to Ruben Sanchez Barba. It is a public record which is self-authenticating under Federal Rules of Evidence 9024. Likewise the public records hearsay exception, Federal Rule of Evidence 8038 also applies.

This state of the record is such that this is relevant evidence. Here again you are arguing the weight -- your colleague argued basically the weight of it. But I think the state of the record permits this and it is relevant.

MR. MEDVENE: Your Honor, the relevance -- the lack of relevance is that it has no tie to any involvement with Caro-Quintero. And this is what we wanted to --

THE COURT: Then how can it hurt you?

MR. MEDVENE: Because -- and I think that is the appropriate question. Because if you permit this in, we anticipate --

THE COURT: Well, that is the weight that I'm

talking about. You're addressing the weight, you're interpreting the evidence.

MR. MEDVENE: No, no, it is not a question of weight. You ought not to be able to make an argument that is not based on fact.

The government knows the evidence in their file is it was an arm's length transaction. They want to try to argue from this there's some connection to Caro-Quintero. They have no witness that says there's any connection to Caro-Quintero. They have Jesus Sanchez Barba, they have a grand jury transcript, and we can't get the witness up here who says it's an arm's length transaction. He ought to be able --

THE COURT: Is this the same witness who testifed before? There was a witness who testifed on this before, wasn't there?

MR. MEDVENE: No. There was one witness, Gomez Espana, who they're not putting on who I understand--

THE COURT: Well, you produced the witness who testifed about this at the last trial.

MR. MEDVENE: We couldn't get anybody up from Mexico. I mean, the long and the short of it --

THE COURT: Well, the government -- Didn't the buyer or real estate man testify about that transaction?

MR. MEDVENE: No. We couldn't get him up from

Mexico.

THE COURT: I recall hearing a witness testify.

MR. MEDVENE: Gomez Espana was the closest witness that we had and he was the one the government didn't call. He tried to show the house and tried to sell the house.

THE COURT: Just a minute. You said that they know this is an arm's length transaction.

MR. MEDVENE: Well, they, to the best of my knowledge, have no evidence other than this deed from which to argue.

THE COURT: Well, this deed is a public record in Mexico, why can't they argue what they want to argue because of the existence of this deed?

MR. BLANCARTE: Your Honor, the reason they can't is because of the confusion they're trying to cause with a document which shows -- an authenticated document, that is not an issue. They will argue that the date stamp on the deed they're trying to put before the court is in June of 1985 and that there's an inference to be drawn that because of that late date, there is some type of coverup that Mr. Zuno is trying to engage in to close over any --

THE COURT: Well, why can't they argue that?

MR. BLANCARTE: Because the date stamp is irrelevant to the transaction.

THE COURT: How do we know that?

MR. BLANCARTE: May I answer briefly? Because the

person buying the property is obligated to pay the certification tax that is required for the document to be recorded. If the buyer delays in not paying that certification tax, whether it's one week, one month or six months, the date stamp won't go on until this document here, which is part of their exhibit --

THE COURT: Well, look, counsel --

MR. BLANCARTE: The confusion --

THE COURT: The fundamental assertions of counsel are not evidence and may not be considered by the court as evidence.

MR. BLANCARTE: The only point we're making --

THE COURT: So, you're asking me to accept that on face value; that is, on faith that this is a -- and use that as a basis for excluding this exhibit which otherwise seems to be relevant.

MR. BLANCARTE: Just two points, Your Honor. One is that Your Honor made it very clear on numerous occasions that this trial was not going to be one in which evidence would be introduced that was not connecting.

In this case they have not been able to produce one witness who connects the transaction to Caro-Quintero. This is not connecting evidence. That's really the bottom line point.

They have no -- It's pure speculation.

THE COURT: You say it's not connecting evidence. It connects the defendant to the house where this alleged torture and murder took place.

MR. BLANCARTE: It does not connect him to Caro-Quintero in any way. It connects him to Ruben Sanchez Barba, the buyer. Ruben Sanchez Barba and Jesus Sanchez Barba were interviewed at length by the government. In '85-'86 they took their statements. Their statements are in the file. And the statements of the buyers of Lope de Vega which the government elicited are that Mr. Zuno sold the house to them and they did not know who they, in turn, were going to sell the house to.

THE COURT: Did you ever investigate what counsel is saying about the law there in Mexico; that it is up to the buyer to record this and if the buyer delays that, that does not negate the arm's length?

MR. CARLTON: We have attempted, Your Honor, to obtain --

THE COURT: What?

MR. CARLTON: -- an expert in Mexican real estate law and have been unable to get anyone to come up and do that.

THE COURT: Well, didn't you --

MR. CARLTON: This deed, Your Honor - can I just explain - should be considered also in relation to deed 537, which was the other deed that we submitted today. That deed

is the deed whereby Ruben Zuno acquired the right to sell the property. And that didn't become final until April or June. Ruben Zuno Arce was filing declarations correcting the lot size in relation to deed 537 as late as June and that is in --

THE COURT: When was that deed? That was prior to the events in this case, wasn't it?

MR. CARLTON: Deed 537 was executed on the same day that 538 was.

THE COURT: Which was in January.

MR. CARLTON: January 11.

THE COURT: All right. That is a month before the Camarena incident.

MR. CARLTON: That's when they were signed.

Neither one of these deeds were effectuated by filing with the public registry. And it says in the deed they have to be filed with the public registry. Neither one of them was filed with the public registry and finalized until June.

Actions were being taken by Zuno and by Ruben Sanchez Barba long after this piece of property had become notorious. And the government contends that this continuing series of actions by people, at least one of whom should not have wanted to continue with this.

THE COURT: Well, but you're inferring that just from the existence of the deed and the dates, you haven't

investigated the legal aspects that have been mentioned by counsel.

MR. CARLTON: We can show, Your Honor, that based on deed 537 that Ruben Zuno executed a declaration correcting deed 537 on June 4th, I believe it was, because deed 537 had previously been rejected. All right?

There's also, you'll see in the deeds, certifications by the -- I believe the notary or someone in the public registry, as to each copy of this deed that is given out to be taken to the public registry. And it shows that a copy of deed 537, I believe, wasn't even requested. The first certified copy wasn't given out until April 19th. That is right after this deed --

THE COURT: All right.

All right. I've now changed my view of this. I believe if you are intending to use this, these deeds, for the purpose of challenging this transaction from the defendant Zuno to the other individual, that it was encumbent upon to you produce evidence in this court; that is, evidence that is authoritative on which the jury may rely about the legal aspects of this case and what it means. Otherwise you're just presenting a deed here, a document, and placing your own interpretation upon it.

And I think that under those circumstances, the deeds and documents standing alone are not sufficient.

MR. MEDRANO: But, Your Honor.

THE COURT: It ought to be explained by someone who knows about them if the purpose of them was to show that this was not an arm's length transaction.

MR. CARLTON: One point, though, Your Honor. With that ruling, you're essentially accepting everything Mr. Blancarte says as accurate.

THE COURT: No, I'm not accepting anything. I am just saying that presented in the void that you seek to present it, it allows you to place on it any interpretation you wish without any evidence in the record to justify it. That's the reason that I think it is unfair to produce it under those circumstances. And I think you should have had an expert in Mexican law that would explain the significance of these things.

MR. CARLTON: Your Honor.

MR. RUBIN: There is --

MR. CARLTON: One final point. We think it's significant that the parties were going forward with the transaction and making affirmative effortS to go forward with the transaction even after this house became so notorious. Either Ruben Sanchez Barba was a legitimate purchaser, as the defense was arguing at the last trial --

Remember, they submitted the very document as evidence in the last trial, arguing that it was sold to Ruben

Sanchez Barba. If that was a legitimate sale, why would they have gone go forward with the purchase after this house became tied in with this horrible murder?

THE COURT: What?

MR. CARLTON: If it wasn't the house -- I'm sorry.

THE COURT: Who went ahead with the purchase?

MR. CARLTON: It appears from the deed that Ruben Sanchez Barba did.

THE COURT: Why would he? Perhaps the payments of money of the house is a reason he would go ahead with it. Why wouldn't he go ahead with it?

MR. CARLTON: Certainly the government believes, Your Honor, that after their house was revealed to be such a notorious location, that a legitimate arm's length buyer would do everything he could to pull out of it. But this person went forward with it. And the explanation, it seems to the government -- and we should be able to argue he went forward with it because he was supposed to be on the record.

THE COURT: I do not believe it is admissible.

MR. MEDVENE: The court please, one last thing. Could you, because we won't have a chance to talk to you again, could you after the government closes, would you consider -- because we didn't know they were going to close today. Would you please consider permitting us to open our case on Monday? Because we have to get people up here from

Mexico, Your Honor. They're not right here. Our first notice they were going to close today was today. And we'll represent to Your Honor that we'll be done next week.

THE COURT: Who is we? You and Mr. Rubin?

MR. MEDVENE: I don't want to represent for Mr. Rubin but I think that we'll both be done next week.

MR. RUBIN: I think it will go --

THE COURT: Do you have any witnesses that you can produce?

MR. RUBIN: They're on their way.

THE COURT: All your witnesses aren't from out of state, are they?

MR. RUBIN: You mean tomorrow --

One is not that I know of but I don't know if I can produce him because he is a doctor and needs notice and I haven't spoken to him. I didn't assume or anticipate that I would be asked to call witnesses tomorrow and I didn't talk to him and was not prepared for them to rest.

I assumed Mr. Medvene would be putting on his case first and we'd be going towards the end of next week. I figure what happened --

The government decided to rest, as is their right but we got caught out of schedule.

THE COURT: You don't have any witnesses that you can call?

MR. MEDVENE: Well, we can call Gomez Espana today and we asked the court to hold him here. He was, I understood, here for the government. I mean, the government made their choice to close today, that is their case, we didn't know it was going to happen. He is here. We could put him on to start.

THE COURT: Well, I think it would be useful to do that. I don't want to lose time.

MR. MEDVENE: Or if we could put our case on together and start Monday morning. We are not going to take a week. And we really didn't have notice until today.

THE COURT: Well, I don't want to lose a day.

MR. MEDVENE: Well, you'd really be picking up days because we weren't going to start until Monday and we're picking up on Monday.

MR. RUBIN: My estimate how long it will take is about a week. It may spill over one day to the next week. That would be my best estimate.

THE COURT: Well, you fellows have used up the recess now, we might as well reconvene.

Well, I'll think about that. We'll reconvene in a few minutes.

THE CLERK: Please rise.

The court stands in recess.

(Recessed from 3:13 p.m. until 3:24 p.m.)

THE COURT: You can finish with this witness.

MR. MEDRANO: Your Honor, Mr. Rubin is not in the courtroom.

MR. MEDVENE: Your Honor, I'll go out.

(Pause in proceedings.)

THE COURT: I thought he finished his examination.

MR. CARLTON: Yes. He is finished, Your Honor.

THE COURT: Well, you may step down.

THE WITNESS: Thank you.

THE COURT: Call your next witness.

MR. CARLTON: Your Honor, the government has no more witnesses. I would like at this time to identify three exhibits, the stipulations that have been read into the record. I understand those should be marked, and we have marked the stipulation regarding the testimony of Mrs. Enrique Camarena as exhibit no. 167; the stipulations 2 through 5 as exhibit 168; and the stipulation regarding the tape recordings of the interrogation of Enrique Camarena as exhibit 180. And at this time I would move the admission of these exhibits as well as the other exhibits, the two English translations of the copias.

THE COURT: Yes. The exhibits may be received.

(Received in Evidence Exhibits No. 167, 168, 180, 150, 151.)

MR. CARLTON: And at this point the government

rests reserving the right to review exhibits.

THE COURT: Yes, all right.

Well, ladies and gentlemen, this trial is moving much more quickly than we thought and therefore there are a number of witnesses that are being called that are coming in from out of state and they will not be available until Monday. So we will adjourn this case until Monday morning.

We'll reconvene at the same time on Monday morning. It now appears that we may finish this case before Christmas. So I am going to excuse you at this time and ask you to keep in mind the admonition that I have repeated to you before and we will see you on Monday.

THE CLERK: Please rise.

(Jury excused at 3:26 p.m.)

THE CLERK: You may be seated.

MR. MEDVENE: If the court please, may we ask just out of an abundance of caution that Gomez Espana, who I understand is in the witness room, just be asked in and ordered back for Monday?

THE COURT: Yes. He is ordered back for Monday.

MR. MEDVENE: Do you need him here?

THE COURT: There is no problem with that, is there?

MR. MEDRANO: We'll communicate that to Mr. Espana, who is right outside, Your Honor.

THE COURT: All right.

MR. RUBIN: Your Honor, I'd inquire of the court. I'd like to, obviously, make a Rule 29 motion to the court for judgment of acquittal.

THE COURT: As to what count?

MR. RUBIN: All counts, sir. Shall I be heard now, Your Honor?

THE COURT: Well, I would prefer that you write this up, both of you. Firstly, I think that the government should write up what the evidence is they believe that establishes that it is sufficient to send this case to the jury on each of the counts charged against this defendant.

Now, I will point out to you here my recollection of the evidence so that you can address it. This defendant is charged in one count with conspiracy to commit a violent act in furtherance of a racketeering enterprise or a criminal enterprise.

Now there's been evidence placing him at certain meetings and showing his association with certain people. There's been evidence that -- certainly we've had no direct evidence here that Camarena was injected with anything at the time in question. There is some circumstantial evidence, that I recall, the witness, expert witness testified to Lidocaine found in his remains.

Isn't that correct?

MR. RUBIN: No, Your Honor, there was no testimony.

THE COURT: There was no evidence of that?

MR. RUBIN: No.

THE COURT: Then the only evidence that I have heard, then, is that this defendant was on the premises at that time; that he was seen by the witness rinsing a needle and -- What do you call those?

MR. RUBIN: Syringe.

THE COURT: Syringe. That he was seen rinsing it with water. And the syringe that was found to have traces of Lidocaine was not found until several months after -- Well, maybe not several months but some considerable time after the Camarena incident.

So the lead here is that the syringe which was found at Lope de Vegas, I think it was in -- what? March or April?

MR. RUBIN: April.

MR. MEDRANO: In April.

THE COURT: April. And which contained traces of Lidocaine --

MR. RUBIN: And vitamin B, Your Honor.

THE COURT: -- and vitamin B is the same syringe that this witness observed on February 7th.

So there is a serious -- if the theory against

this defendant is that he administered Lidocaine for the purpose of keeping the defendant alive, there is no evidence of that being the purpose, assuming there's indirect evidence that maybe he could have been injected.

MR. MEDRANO: You may recall as well, Your Honor, that Mr. Lopez Romero testifed about one pre-abduction meeting where I think in the living room with many other defendants was Dr. Machain. He was present for that pre-abduction meeting as well. So I just wanted to advise the court of that.

MR. RUBIN: Absolutely not, Your Honor. My recollection is he was not present at any pre-abduction meeting.

MR. MEDRANO: My memory differs.

THE COURT: Do you have the transcripts of that witness' testimony?

MR. MEDRANO: He just testified, Your Honor, yesterday, so of course not.

THE COURT: Well, has somebody ordered that or not?

MR. RUBIN: We've ordered the cross, Your Honor, not the direct. But if the court will authorize --

THE COURT: Well, in any event, to prove the conspiracy charge in this case, as you know, mere presence or association is not enough. There must be some proof to

support the conclusion that this defendant was a willful member of this community -- of this conspiracy, rather; that he joined it knowing what its objective was, and helped them to carry it out with the intention of doing so.

The objective here was to commit the violent act in furtherance of the conspiracy, the violent act being the kidnapping and murder.

I want you to point out -- I want you to file with me all of the evidence, that is, the paper pointing to the evidence that you believe justifies -- and I don't mean in a general way, I mean specific evidence that you feel justifies sending this case to the jury on any of the counts that have been filed against this defendant. I would like to have you do that by Monday.

And I want you to file your motion under Rule 29 in writing.

MR. RUBIN: By Monday?

THE COURT: By Monday, yes, sir.

MR. RUBIN: I will do that.

THE COURT: Now, you have in mind what the court's concerns are.

MR. CARLTON: Yes, I believe we do.

THE COURT: The sufficiency of the evidence to establish a prima facie case for each of these counts against this defendant.

MR. CARLTON: I understand, Your Honor.

THE COURT: And I want you to point to it specifically. If you can get it from the reporter's transcript, this evidence that you think is in there, I would like to see it.

MR. MEDVENE: Uh.

THE COURT: Do you wish to make a motion also?

MR. MEDVENE: We would make the Rule 29 motion without argument, Your Honor, but we'd also remake the motion, I believe we made it earlier but a motion based on due process grounds of dismissal in that -- and double jeopardy in that the government on a former occasion prosecuted this exact case on the basis of one witness who they presented as a witness who attended kidnapping meetings.

We think the government's none calling of that witness is implicit admission that that witness that they put on was not credible. We don't think they should have a right at two bites at the apple. We think that witness contradicts in a sense the witnesses they put on this time. And --

THE COURT: Well, I remember his testimony. He does not in any way contradict this testimony. He simply testifies to two other meetings that occurred, that's the wedding reception and a baptism at which he places at least one defendant there.

MR. MEDVENE: Well, he testifies to three other

meetings. He testifies to a --

THE COURT: Well, but the point is this.

MR. MEDVENE: Whatever it is. But you have a witness in this case saying that he saw him.

THE COURT: You want me to conclude that because they didn't call him, he wasn't credible? I want to remind you that the jury thought he was credible and convicted your client, and that your client asked and received a new trial.

MR. MEDVENE: Well, I understand, Your Honor.

THE COURT: Which I think forecloses the claim of double jeopardy.

MR. MEDVENE: But, Your Honor -- but the point is that evidence was developed that the witness was not credible from Mexico; that he was a made up witness, that he didn't have that job. That's why we're saying that the witness was not put on.

THE COURT: But I remind you that you presented that evidence to the jury as well.

MR. MEDVENE: No. No, no. We never had that evidence. In other words, we found the man in Mexico who actually held the job and said this person didn't exist but we didn't find him until afterwards.

THE COURT: But you had other people who testified that he didn't have that job and didn't live in that house as they said he did and couldn't attend the meeting; but he was

believed nevertheless by the jury.

MR. MEDVENE: You're right, there was those witnesses, but not the exact witness that didn't have the job but it's made for the record.

THE COURT: All right.

MR. MEDVENe: At any rate, it's just made for the record, Your Honor.

THE COURT: The Rule 29 motion of defendant Zuno is denied. And the other motion is denied as well. I'll rule on the Rule 29 motion of Dr. Alvarez on Monday.

So get those, and don't -- make sure they get it in our hands. Don't file them with the clerk's office, bring them right here and give them to the law clerk by 8:00 o'clock on Monday morning.

MR. RUBIN: The law clerk or the court clerk, Your Honor?

THE COURT: Pardon?

MR. RUBIN: The law clerk or the court clerk?

THE COURT: Whoever you can find. Preferably the law clerk.

THE CLERK: Please rise.

This court stands in recess.

(Adjourned at 4:37 p.m.)

--oOo--

I certify that the foregoing is a correct transcript of the

proceedings held in the above-entitled matter.

DATE: December 17, 1992

LUCILLE M. LITSHEIM
U.S. Court Reporter
CSR NO. 2409