11-115

1    A    AGENT ROSALES.

2              MR. CAMPOS:  YOUR HONOR, THAT IS IRRELEVANT.

3              THE COURT:  I AGREE THAT IT IS.

4    Q    BY MS. BARRERA:  OKAY.  WELL, LET'S TALK ABOUT WHAT

5    HE DID TELL YOU AND SEE WHAT YOU BELIEVED AND WHAT YOU

6    DIDN'T BELIEVE.  YOU DIDN'T BELIEVE MR. LOPEZ ALVAREZ WHEN

7    HE TOLD YOU THAT ENRIQUE CAMARENA WAS ON THE TAKE, DID

8    YOU?

9    A    NO, I DIDN'T.

10   Q    HE TOLD YOU THAT, DIDN'T HE?

11   A    YES, HE DID.

12   Q    BUT YOU DIDN'T BELIEVE THAT?

13   A    NO, I DIDN'T.

14   Q    AND MR. LOPEZ ALVAREZ ALSO TOLD YOU THAT ENRIQUE

15   CAMARENA HAD GIVEN AN IMMIGRATION VISA TO AN INFORMANT

16   NAMED REYES, DIDN'T HE?

17   A    YES, MA'AM.

18   Q    DID YOU BELIEVE THAT?

19   A    YES.

20   Q    YOU DID BELIEVE THAT?

21   A    YES.

22   Q    MR. LOPEZ ALVAREZ TOLD YOU THAT ENRIQUE CAMARENA HAD

23   GIVEN A VISA FOR LIFE TO VARIOUS FEDERALES, FEDERAL AGENTS

24   OF MEXICO, DIDN'T HE?

25   A    YES, HE SAID THAT.

11-116

1    Q    AND DID YOU BELIEVE THAT?

2    A    YES, MA'AM.

3    Q    AND IN TERMS OF CHECKING WITH INTELLIGENCE, HAVE YOU

4    CHECKED TO SEE WHETHER IT IS TRUE IF ENRIQUE CAMARENA GAVE

5    A LIFE-LONG VISA TO VARIOUS FEDERAL AGENTS OF MEXICO?

6    A    NO, MA'AM.

7    Q    SO THAT IS SOMETHING YOU JUST CHOSE TO BELIEVE

8    WITHOUT LOOKING INTO IT ANY FURTHER?

9    A    I DIDN'T HAVE TO BELIEVE IT.  IT WAS A STATEMENT TO

10    ME.

11    Q    AND YOU CHOSE TO BELIEVE THAT.  CORRECT?

12    A    YES.

13    Q    BUT YOU DIDN'T CHECK ON IT ANY FURTHER?

14    A    NO, I DIDN'T.

15    Q    MR. REYNOSO, YOU HAVE BEEN IN A SITUATION WHEN YOU

16    HAVE MADE UP STORIES, HAVE YOU NOT?

17    A    YES, MA'AM.

18    Q    AND YOU HAVE MADE UP STORIES AS AN UNDERCOVER

19    OFFICER.  CORRECT?

20    A    YES, MA'AM.

21    Q    AS AN UNDERCOVER OFFICER, YOU PLAY A PARTICULAR ROLE,

22    WHATEVER IT MIGHT BE, AND YOU TRY TO MAKE SOMEONE BELIEVE

23    THAT IS THE PERSON YOU REALLY ARE.  CORRECT?

24    A    YES, MA'AM.

25    Q    VERY MUCH LIKE AN ACTOR WOULD DO.  CORRECT?

11-117

1    A    YES, MA'AM.

2    Q    AND IN PLAYING THIS PARTICULAR ROLE, WHATEVER IT

3    MIGHT BE, YOU MAKE UP STORIES, DON'T YOU?

4    A    YES, MA'AM.

5    Q    AND YOU SAY THINGS THAT ARE NOT TRUE.  CORRECT?

6    A    YES, MA'AM.

7    Q    AND OTHER THAN YOUR ACTIVITIES AS AN UNDERCOVER

8    OFFICER, HAVE YOU EVER MADE UP A STORY?

9    A    UNDER WHAT CIRCUMSTANCES?

10   Q    ANY OTHER CIRCUMSTANCES?  HAVE YOU EVER MADE UP A

11   STORY OTHER THAN BEING AN UNDERCOVER OFFICER?

12            MR. CAMPOS:  YOUR HONOR, THAT IS IRRELEVANT.

13            THE COURT:  SUSTAINED.

14   Q    BY MS. BARRERA:  IN YOUR CONVERSATIONS WITH FELLOW

15   OFFICERS, YOU HAVE EMBELLISHED FACTS, HAVE YOU NOT?

16            MR. CAMPOS:  AGAIN, YOUR HONOR, IRRELEVANT.

17            THE COURT:  SUSTAINED.

18   Q    BY MS. BARRERA:  IN YOUR PRIVATE DEALINGS, LIKE

19   SOCIALLY, YOU HAVE BEEN IN A SITUATION WHERE YOU HAVE

20   TRIED TO IMPRESS A FEMALE, PERHAPS, HAVE YOU NOT?

21            MR. CAMPOS:  OBJECTION, YOUR HONOR.  IRRELEVANT.

22            THE COURT:  SUSTAINED.

23   Q    BY MS. BARRERA:  YOU HAVE KNOWN PEOPLE THAT MAKE UP

24   STORIES, DON'T YOU?

25            MR. CAMPOS:  OBJECTION AGAIN, YOUR HONOR.

11-118

1        THE COURT:  SUSTAINED.

2    Q    BY MS. BARRERA:  YOU KNEW THAT MR. LOPEZ ALVAREZ WAS

3    MAKING UP STORIES WHEN HE WAS SPEAKING TO YOU?

4    A    NO, I DIDN'T.

5    Q    YOU DID NOT THINK THAT?

6    A    NO, MA'AM.

7    Q    DID IT OCCUR TO YOU THAT HE WAS MAKING UP STORIES AS

8    HE WAS SPEAKING TO YOU?

9    A    YES, MA'AM.

10   Q    IT DID OCCUR TO YOU?

11   A    YES, MA'AM.

12   Q    DID IT OCCUR TO YOU THAT MR. LOPEZ ALVAREZ WAS TRYING

13   TO IMPRESS YOU WITH WHAT BIG A MAN HE WAS?

14   A    HE WAS JUST TELLING ME FACTS.

15   Q    RIGHT.  BUT HE WAS TELLING YOU FACTS TO TRY TO

16   IMPRESS YOU.  ISN'T THAT CORRECT?

17   A    I WAS ASKING QUESTIONS, AND HE WAS ANSWERING.

18   Q    AND YOU WERE PLAYING THE ROLE -- WITHOUT GETTING REAL

19   SPECIFIC, YOU WERE PLAYING THE ROLE OF A CRIMINAL WHEN YOU

20   SPOKE TO MR. LOPEZ ALVAREZ.  ISN'T THAT CORRECT?

21   A    YES, I WAS.

22   Q    SO YOU WERE UNDERCOVER PRETENDING TO BE A CRIMINAL?

23   A    YES, MA'AM.

24   Q    AND YOU KEPT BRINGING UP THE SUBJECT OF ENRIQUE

25   CAMARENA WITH MR. LOPEZ ALVAREZ.  ISN'T THAT TRUE?

11-119

1  A    HE STARTED BRINGING UP THE SUBJECT AT THE BEGINNING.

2  HE OPENED THE DOOR.

3  Q    YOU BROUGHT UP THE SUBJECT OF ENRIQUE CAMARENA,

4  HOWEVER, DIDN'T YOU?

5  A    ORIGINALLY I DID NOT.

6  Q    YOU KEPT ENCOURAGING HIM TO TALK ABOUT THE SUPPOSED

7  CASE ABOUT ENRIQUE CAMARENA.  RIGHT?

8  A    I DIDN'T HAVE TO.  HE TALKED HIMSELF.

9  Q    YOU WOULD ENCOURAGE HIM, WOULD YOU NOT?

10  A    I ASKED HIM QUESTIONS.

11  Q    AND YOU WOULD SAY, "OH, GEE.  REALLY?  WHAT ELSE

12  HAPPENED?"  THINGS LIKE THAT.  RIGHT?

13  A    YES.

14  Q    YOU WERE TRYING TO ENCOURAGE HIM TO KEEP TALKING?

15  A    HE WAS VERY TALKATIVE.

16  Q    YOU FOUND HIM TO BE VERY TALKATIVE?

17  A    YES, MA'AM.

18  Q    YOU FOUND THAT HE LIKED TO EMBELLISH THINGS.  ISN'T

19  THAT TRUE?

20  A    I DON'T KNOW IF HE WAS EMBELLISHING.  HE WAS TALKING.

21  Q    HE NEEDED VERY LITTLE ENCOURAGEMENT FROM YOU TO KEEP

22  TALKING.  ISN'T THAT TRUE?

23  A    HE TALKED.  YES, MA'AM.

24  Q    HAVE YOU EVER KNOWN PEOPLE LIKE THAT THAT FELT THEY

25  HAVE TO KEEP TALKING TO IMPRESS SOMEONE?

11–120

1          MR. CAMPOS:  OBJECTION.  IRRELEVANT, YOUR HONOR.

2          THE COURT:  SUSTAINED.

3     Q    BY MS. BARRERA:  DIDN'T YOU GET THE IMPRESSION, AGENT

4     REYNOSO, THAT MR. LOPEZ WANTED YOU TO THINK HE WAS AN

5     IMPORTANT PERSON?

6          MR. CAMPOS:  OBJECTION.  ASKED AND ANSWERED.

7          THE COURT:  SUSTAINED.

8     Q    BY MS. BARRERA:  IN THE THINGS THAT MR. LOPEZ ALVAREZ

9     TOLD YOU HE WAS SOMEWHAT INCONSISTENT AS HE RELATED THINGS

10    TO YOU, WASN'T HE?

11    A    FROM -- WELL, DIFFERENT MEETINGS, YES, HE WAS.

12    Q    SO HE WOULD TELL YOU ONE THING ONE TIME AND CHANGE IT

13    THE NEXT TIME AND TELL YOU SOMETHING TOTALLY DIFFERENT.

14    ISN'T THAT TRUE?

15    A    NOT TOTALLY DIFFERENT.  MAYBE CHANGE SOME THINGS.

16    Q    AND SOME OF THE THINGS HE WOULD TELL YOU DIDN'T SOUND

17    PROBABLE OR DIDN'T SOUND CONSISTENT WITH COMMON SENSE.

18    ISN'T THAT TRUE?

19    A    REGARDING THIS CASE, MA'AM?

20    Q    YES.

21    A    I DON'T RECALL EVER -- WHAT HE WAS TELLING ME WAS NOT

22    THAT OUT OF THE ORDINARY, WHAT HAPPENED IN THOSE EVENTS.

23    Q    WELL, LET'S TALK OF SPECIFICS THEN.  I BELIEVE YOU

24    TESTIFIED THAT HE TOLD YOU THAT HE WORKED FOR ERNESTO

25    FONSECA.  CORRECT?

11-121

1    A    YES, MA'AM.

2    Q    AND HE ALSO TOLD YOU THAT HE WORKED FOR RAFAEL CARO-

3    QUINTERO.    CORRECT?

4    A    FROM TIME TO TIME, YES, MA'AM.

5    Q    NOW, DIDN'T THAT SEEM INCONSISTENT TO YOU OR UNLIKELY

6    THAT A PERSON WOULD WORK FOR TWO DIFFERENT INDIVIDUALS

7    LIKE THAT?

8    A    NO.  BECAUSE HE ALSO TOLD ME THAT THEY WERE BOTH OF

9    THE SAME ORGANIZATION.

10    Q    BUT YOU DID SOME INVESTIGATION IN TERMS OF WHO

11    ERNESTO FONSECA AND WHO RAFAEL CARO-QUINTERO WERE, DID YOU

12    NOT?

13    A    YES.

14    Q    AND DIDN'T YOUR INFORMATION DISCLOSE THAT BOTH OF

15    THESE INDIVIDUALS WERE NARCOTICS TRAFFICKERS IN MEXICO?

16    A    YES, MA'AM.

17    Q    AND DIDN'T YOUR INVESTIGATION DISCLOSE THAT BOTH OF

18    THOSE INDIVIDUALS WERE MAJOR NARCOTICS TRAFFICKERS IN

19    THEIR OWN RIGHT?

20    A    BOTH OF THEM WERE MAJOR, YES, MA'AM.

21    Q    BOTH OF THEM HAD PEOPLE WORKING FOR THEM.  ISN'T THAT

22    TRUE?

23    A    YES, MA'AM.

24    Q    AND YOU WOULD THINK, BASED ON YOUR EXPERIENCE AS A

25    DEA AGENT AND BASED ON YOUR INVESTIGATION, THAT SOMEONE

11-122

1    WHO IS A MAJOR NARCOTICS TRAFFICKER WOULD EXPECT LOYALTY

2    FROM THE PEOPLE THAT WORKED FOR THEM.  CORRECT?

3    A    THEY EXCHANGE SERVICES IF THAT IS WHAT YOU WANT TO

4    KNOW.  YES, THEY USE EACH OTHER'S PEOPLE.

5    Q    NO.  MY QUESTION TO YOU IS:  AS A DEA AGENT AND BASED

6    UPON YOUR EXPERIENCE, COMMON SENSE WOULD INDICATE THAT

7    THESE MAJOR NARCOTICS TRAFFICKERS WOULD EXPECT LOYALTY

8    FROM THEIR MEN.  ISN'T THAT CORRECT?

9    A    MY EXPERIENCE IS THAT TRAFFICKERS USE OTHER PEOPLE.

10   YES, THEY INTERCHANGE PEOPLE.

11   Q    SO YOUR ANSWER IS NO, YOU WOULDN'T EXPECT THAT?

12   A    IT IS NORMAL PROCEDURE FOR THEM TO USE THEIR

13   SERVICES.

14   Q    SO IF THERE IS GOING TO BE A CONFRONTATION BETWEEN

15   TWO MAJOR NARCOTICS TRAFFICKERS, ONE PERSON MAY END UP

16   HAVING TO DEFEND BOTH MAJOR NARCOTICS TRAFFICKERS.  IS

17   THAT TRUE?

18   A    SOMETIMES.

19   Q    THAT WOULD BE YOUR EXPERIENCE?

20   A    YES, MA'AM.

21   Q    MR. LOPEZ ALVAREZ ALSO TOLD YOU AN INCONSISTENT STORY

22   ABOUT THE AIRPORT INCIDENT INVOLVING HIS FATHER, DIDN'T

23   HE?

24   A    IN WHICH SENSE, MA'AM?

25   Q    WELL, ONE TIME I BELIEVE YOU TESTIFIED HOW HE TOLD

11-123

1    YOU THAT CARO-QUINTERO WAS AT THE AIRPORT WITH HIS GIRL

2    FRIEND, SARA, AND WANTED TO GET MARRIED.  RIGHT?

3    A    TRUE.

4    Q    AND SOMEONE CONTACTED RAUL AND ASKED TO HAVE HIS

5    FATHER, WHO IS A JUSTICE OF THE PEACE, GO TO THE AIRPORT

6    TO MARRY RAFAEL CARO-QUINTERO AND SARA.  CORRECT?

7    A    YES, MA'AM.

8    Q    AND MR. RAUL PICKED UP HIS FATHER, WAS ON HIS WAY TO

9    THE AIRPORT, AND GOT A CALL PRESUMABLY ON THE RADIO AND

10   SAID, "NEVER MIND.  THEY HAVE CHANGED THEIR MINDS."

11            AND SO HE TOOK HIS FATHER BACK HOME, AND HE WENT

12   BACK ON PATROL.  CORRECT?

13   A    HE SAID THAT, YES, MA'AM.

14   Q    AND RELATING TO THAT SAME STORY, THAT LATER ON HE GOT

15   A CALL ON THE RADIO TO GO BACK TO HEADQUARTERS, AND HE

16   WENT BACK TO HEADQUARTERS, AND THEN THERE WAS OTHER

17   INSTRUCTIONS IN TERMS OF WHERE TO GO.  CORRECT?

18   A    YES, MA'AM.

19   Q    NOW, AT YOUR SEPTEMBER 3RD MEETING THAT YOU HAD WITH

20   MR. LOPEZ ALVAREZ, HE TOLD YOU HE WAS ON THE PLANE WITH

21   CARO-QUINTERO, DIDN'T HE?

22   A    HE MENTIONED THAT.  HE NEVER SAID HE WAS ON THE

23   PLANE.  I DON'T RECALL HIM SAYING HE WAS ON THE PLANE.

24   Q    WELL, WOULD IT REFRESH YOUR RECOLLECTION IF YOU COULD

25   LOOK AT THE TRANSCRIPT OF SEPTEMBER 3RD?

11-124

1    A    YES.

2    Q    I BELIEVE IT IS IN FRONT OF YOU.  SEE IF THAT

3    REFRESHES YOUR RECOLLECTION.  LET ME GET THE PAGE NUMBER.

4    IT MIGHT ASSIST YOU.  IF YOU WOULD LOOK AT PAGE 71, ABOUT

5    THE MIDDLE OF THE PAGE.

6    A    YES, MA'AM.

7    Q    ISN'T IT TRUE THAT AT THIS MEETING MR. LOPEZ ALVAREZ

8    SAID -- WITH REFERENCE TO THE FEDERALES, HE SAID, "THEY

9    BACKED DOWN TO US.  THERE WERE ONLY 11 OF US."

10            YOU SAID, "YOU WERE THERE?"

11            HE SAID, "WITH CARO."

12            YOUR QUESTION TO HIM WAS:  "ON THE PLANE?"

13            HIS ANSWER WAS, "YES."  CORRECT?

14   A    YES.  ALSO IT WAS UNINTELLIGIBLE RIGHT AFTER THIS.  I

15   DON'T KNOW WHAT WAS BEHIND THAT.

16   Q    SO IF IT IS UNINTELLIGIBLE, YOU DON'T REALLY RECALL

17   BECAUSE IT IS UNINTELLIGIBLE?

18   A    I DON'T RECALL.  NO, MA'AM.

19   Q    MR. LOPEZ ALVAREZ TOLD YOU WITH REGARD TO THE TORTURE

20   OF ENRIQUE CAMARENA THAT IT HAD LASTED FOR ABOUT 24 HOURS.

21   TRUE?

22   A    MORE OR LESS, YES, MA'AM.

23   Q    DO YOU KNOW THE ABDUCTION OCCURRED FEBRUARY 7 AT

24   ABOUT 2:00 P.M.  CORRECT?

25   A    YES, MA'AM.

11-125

1    Q   AND SO IT WAS INCONSISTENT WHEN MR. LOPEZ ALVAREZ

2    TOLD YOU LATER THAT THE MURDER OF ENRIQUE CAMARENA OR THE

3    DEATH OF ENRIQUE CAMARENA WAS ON FEBRUARY 9.  ISN'T THAT

4    TRUE?

5    A   IN OTHER WORDS --

6    Q   THAT STORY IS INCONSISTENT, ISN'T IT?

7    A   YOU ARE ASKING ABOUT EXACT TIMES?

8    Q   I AM ASKING YOU ABOUT WHAT MR. LOPEZ ALVAREZ TOLD

9    YOU.

10    A   I ONLY ASKED HIM ON THE TIME OF THE TORTURE.  I

11    DIDN'T ASK HIM WHAT TIME WAS THE KIDNAPPING AND WHAT TIME

12    DID HE DIE.  I DON'T KNOW.  THAT WAS APPROXIMATE.

13    Q   BUT WHAT HE TOLD YOU IN REFERENCE TO THE TORTURE WAS

14    THAT MR. CAMARENA WAS TORTURED FOR 24 HOURS?

15    A   YES, MA'AM.

16    Q   AND THEN HE DIED.  ISN'T THAT RIGHT?  ISN'T THAT WHAT

17    HE TOLD YOU?

18    A   YES, MA'AM.

19    Q   AND THEN AT A LATER TIME HE TOLD YOU THAT ENRIQUE

20    CAMARENA HAD DIED FEBRUARY THE 9TH.  RIGHT? ISN'T THAT

21    WHAT HE SAID?

22    A   HE WAS TOLD THAT.  HE DIDN'T --

23    Q   HE TOLD YOU THAT ENRIQUE CAMARENA DIED FEBRUARY 9,

24    DIDN'T HE?

25    A   YES, MA'AM.

11-126

1   Q    OKAY.  NOW I AM ASKING YOU:  ISN'T THAT INCONSISTENT?

2   A    NO, BECAUSE HE WAS REFERRING TO THE TORTURE TIME, NOT

3   TO THE TIME OF LIVING AND DYING.

4   Q    BUT WHAT HE TOLD YOU WITH REGARD TO THE TORTURE WAS

5   HE WAS TORTURED FOR 24 HOURS BEFORE HE DIED.  ISN'T THAT

6   WHAT HE SAID?

7   A    YES.

8   Q    LET'S TALK ABOUT THE STORIES THAT HE TOLD YOU ABOUT

9   THE ABDUCTION OF ENRIQUE CAMARENA.

10  A    YES, MA'AM.

11  Q    FIRST OF ALL, YOU KNOW THAT MR. LOPEZ ALVAREZ DID NOT

12  PARTICIPATE IN THE ABDUCTION.  CORRECT?

13  A    NO, I DON'T KNOW THAT.

14  Q    YOU TOLD THE GRAND JURY THAT MR. LOPEZ ALVAREZ WAS

15  NOT PRESENT AT THE ABDUCTION, DIDN'T YOU?

16  A    THAT IS WHAT HE SAID TO ME.

17  Q    THAT IS WHAT YOU TOLD THE GRAND JURY, DIDN'T YOU?

18  A    I PROBABLY SAID THAT.  I DON'T RECALL.

19  Q    OKAY.  DO YOU HAVE THE GRAND JURY TESTIMONY IN FRONT

20  OF YOU?

21  A    NO, I DON'T, MA'AM.

22         MS. BARRERA:  MAY I HAVE A MOMENT, YOUR HONOR.

23         (PAUSE.)

24  Q    BY MS. BARRERA:  I CAN SHOW THIS TO YOU IF YOU WOULD

25  LIKE, BUT LET ME SEE IF MY READING WILL REFRESH YOUR

11-127

1    RECOLLECTION.  DO YOU RECALL THE JUROR ASKING YOU:

2         "Q   DID HE" -- REFERRING TO MR. LOPEZ

3         ALVAREZ -- "TELL YOU THAT HE KNEW THE NAMES OF

4         OTHER PEOPLE THAT WERE" --

5              END OF QUESTION.

6              AND YOUR ANSWER:

7         "A   HE WAS PART OF THE ORGANIZATION, AND HE WAS

8         WITH THEM DURING THE TIME THAT THESE EVENTS TOOK

9         PLACE.  HE WASN'T PRESENT AT THE KIDNAPPING

10        HIMSELF, NO."

11             DO YOU REMEMBER SAYING THAT TO THE GRAND JURY?

12   A    YES, MA'AM.

13   Q    SO AT LEAST ON DECEMBER 10, 1987, YOU DID NOT BELIEVE

14   THAT MR. LOPEZ ALVAREZ WAS PRESENT DURING THE ABDUCTION?

15   A    I DIDN'T KNOW AT THAT TIME IF HE WAS OR NOT.

16   Q    YOU DID NOT BELIEVE THAT HE WAS AT THAT TIME.

17   CORRECT?

18   A    RIGHT.

19   Q    MR. LOPEZ ALVAREZ DID NOT GIVE YOU ANY DETAILS ABOUT

20   THE ABDUCTION, DID HE?

21   A    I NEVER ASKED HIM FOR ANY DETAILS, NO.

22   Q    AND HE DID NOT GIVE YOU ANY DETAILS.  RIGHT?

23             MR. CAMPOS:  THAT MISSTATES THE EVIDENCE, YOUR

24   HONOR.

25             THE COURT:  OVERRULED.

11-126

1    Q    BY MS. BARRERA:  HE DID NOT GIVE YOU ANY DETAILS OF

2    THE ABDUCTION?

3    A    NO, MA'AM.

4    Q    OTHER THAN THAT IT HAPPENED?

5    A    THAT'S CORRECT.

6    Q    HE GAVE YOU NO NAMES OF PEOPLE?

7    A    I NEVER ASKED HIM ANY, NO.

8    Q    HE DID TELL YOU, I BELIEVE, THAT SOME MEN HAD GONE UP

9    TO ENRIQUE CAMARENA AND FLASHED SOME CREDENTIALS, I

10    BELIEVE, DIRECCION FEDERAL SEGURIDAD.  IS THAT CORRECT?

11    A    I BELIEVE THE DIRECCION FEDERAL SEGURIDAD, YES.

12    Q    AND HE ALSO TOLD YOU THAT THESE MEN TOLD ENRIQUE

13    CAMARENA, "WE ARE GOING TO TAKE YOU TO OUR COMMANDER TO

14    TALK TO HIM."  CORRECT?

15    A    YES, MA'AM.

16    Q    AND THAT IS WHAT RAUL LOPEZ ALVAREZ TOLD YOU HAPPENED

17    AT THE KIDNAPPING.  RIGHT?

18    A    I BELIEVE HE DID.

19    Q    YOU SAID THAT YOU HAVE DONE SOME INTELLIGENCE WORK

20    WITH REGARD TO WHAT MR. LOPEZ ALVAREZ TOLD YOU.  NOW, WITH

21    REGARD TO THAT PARTICULAR AGENT, DID YOU SPEAK WITH AGENT

22    KUYKENDALL?

23            MR. CAMPOS:  YOUR HONOR, THAT CALLS FOR HEARSAY.

24            MS. BARRERA:  I AM ONLY ASKING IF HE SPOKE TO

25    HIM, YOUR HONOR.

11-129

1          THE COURT:  RESTATE YOUR QUESTION.

2          MS. BARRERA:  THANK YOU.

3     Q    HAVE YOU SPOKEN TO AGENT KUYKENDALL WITH REGARDS TO

4     HIS KNOWLEDGE ABOUT THE ABDUCTION OF ENRIQUE CAMARENA?

5     A    DIRECTLY ABOUT THIS CASE, MA'AM?

6     Q    EXCUSE ME?

7     A    ARE YOU ASKING AFTER I TALKED TO MR. LOPEZ?

8     Q    AT ANY TIME.

9     A    I HAVE TALKED TO AGENT KUYKENDALL.

10    Q    AND YOU HAVE SPOKEN TO AGENT KUYKENDALL ABOUT THE

11    DETAILS THAT HE KNOWS ABOUT THE ABDUCTION?

12    A    NO, MA'AM, I DID NOT.

13    Q    WELL, YOU KNOW NOW AS YOU SIT HERE TODAY THAT IS NOT

14    HOW THE ABDUCTION OF ENRIQUE CAMARENA OCCURRED.  ISN'T

15    THAT TRUE?

16    A    THAT'S CORRECT.

17    Q    SO YOU KNOW NOW HE WAS LYING TO YOU, THAT HE WAS

18    MAKING UP THAT STORY WHEN HE TOLD YOU THAT.  CORRECT?

19    A    HE WAS JUST NOT TELLING ME ALL THE FACTS.  THAT IS

20    ALL.

21    Q    WELL, HE WASN'T TELLING YOU -- EXCUSE ME.

22          HE MADE UP A STORY ABOUT INDIVIDUALS FLASHING

23    CREDENTIALS AND SAYING THAT WE ARE GOING TO TAKE YOU TO

24    SPEAK TO OUR COMMANDER.  CORRECT?

25    A    MORE OR LESS, YES, MA'AM.

11-130

1  Q    THE ANSWER IS YES?

2  A    YES, MA'AM.

3  Q    MR. LOPEZ ALVAREZ ALSO TOLD YOU THAT WITH REGARDS TO

4  THE ABDUCTION THAT THE REASON THAT ENRIQUE CAMARENA WAS

5  KIDNAPPED WAS BECAUSE THE DRUG TRAFFICKERS IN GUADALAJARA

6  WANTED TO FIND OUT WHAT HE KNEW ABOUT THEM.  RIGHT?

7  A    YES.

8  Q    AND SPECIFICALLY DIDN'T MR. LOPEZ ALVAREZ TELL YOU

9  ABOUT A STORY ABOUT ENRIQUE CAMARENA GOING TO A PARTY ON

10  FEBRUARY THE 4TH, THREE DAYS BEFORE HE WAS ABDUCTED?

11  A    YES, HE MENTIONED THAT.

12  Q    IN FACT, HE TOLD YOU THAT ENRIQUE CAMARENA WENT TO A

13  PARTY, AND HE WAS PLAYING A ROLE, AN UNDERCOVER ROLE OF A

14  DRUG BUYER.  CORRECT?

15  A    MR. LOPEZ BELIEVED THAT, YES.

16  Q    AND MR. LOPEZ TOLD YOU THAT THAT IS WHY ENRIQUE

17  CAMARENA WAS PICKED UP THREE DAYS LATER BECAUSE THE

18  INDIVIDUALS AT THE PARTY, THE DRUG TRAFFICKERS, CALLED

19  COLOMBIA AND FOUND OUT THAT ENRIQUE CAMARENA WAS NOT A

20  LEGITIMATE BUYER OF DRUGS.  CORRECT?

21  A    MR. LOPEZ SAID THAT WAS ONE OF THE REASONS, YES,

22  MA'AM.

23  Q    YOU DIDN'T BELIEVE THAT, DID YOU?

24  A    NO, MA'AM.

25  Q    NOW, WHEN HE TOLD YOU THIS STORY THAT YOU DIDN'T

11-131

1  BELIEVE, DIDN'T THAT MAKE YOU WONDER WHETHER OR NOT THE

2  REST OF WHAT MR. LOPEZ ALVAREZ WAS TELLING YOU WAS ALSO

3  MADE UP?

4  A    MA'AM, WE WERE IN A BUSINESS RELATIONSHIP, AND EVEN

5  IN MY UNDERCOVER CAPACITY, I WAS NOT ABLE TO QUESTION HIM

6  EXACT NAMES, DAYS AND TIMES.  IT WOULD SEEM UNCLEAR AND

7  UNFAIR.  IT WOULD MAKE ME OUT AS A POLICE OFFICER.  IF I

8  ASKED HIM TO GIVE ME THE SPECIFIC TIME OF DAY, HE WOULD

9  NOT TELL ME THE TRUTH.

10  Q    MR. REYNOSO, THAT IS NOT MY QUESTION TO YOU.  MY

11  QUESTION IS:  WHEN HE TOLD YOU THIS FANTASTIC STORY ABOUT

12  ENRIQUE CAMARENA GOING TO A PARTY FEBRUARY 4TH AND POSING

13  AS A DRUG BUYER AND THE PEOPLE THERE CALLING COLOMBIA AND

14  FINDING OUT THAT ENRIQUE WAS NOT A DRUG BUYER, AND

15  THEREFORE THAT IS WHY HE WAS KIDNAPPED, WHEN YOU HEARD

16  THIS FANTASTIC STORY, DIDN'T THAT MAKE YOU WONDER WHETHER,

17  GEE, HE WAS JUST MAKING UP STORIES AS HE WENT ALONG?

18  A    I DIDN'T THINK IT WAS THAT FANTASTIC OF A STORY,

19  FIRST OF ALL.  THERE WAS A POSSIBILITY OF HIM GOING

20  UNDERCOVER.  I DIDN'T HAVE A CHOICE AT THAT TIME NOT TO

21  BELIEVE HIM, ANYWAY.

22  Q    BUT YOU KNEW THAT ENRIQUE CAMARENA HAD NOT GONE

23  UNDERCOVER THREE DAYS BEFORE?

24  A    NO, I DIDN'T KNOW IT THEN.

25  Q    YOU KNOW IT NOW?

11-132

1   A    I KNOW IT NOW, YES, MA'AM.

2   Q    BY THE WAY, WITH REGARDS TO THE STORY THAT MR. LOPEZ

3   ALVAREZ TOLD YOU ABOUT INDIVIDUALS GOING UP TO ENRIQUE

4   CAMARENA AND SHOWING HIM BADGES AND SAYING, "WE ARE GOING

5   TO TAKE YOU TO THE COMMANDER" -- THAT STORY APPEARED IN

6   THE MEXICAN NEWSPAPER, DIDN'T IT?

7            MR. CAMPOS:  OBJECTION, YOUR HONOR.  WHETHER IT

8   DID OR DIDN'T APPEAR IN THE NEWSPAPER IS IRRELEVANT.

9            MS. BARRERA:  I WILL REPHRASE THE QUESTION, YOUR

10  HONOR.

11  Q    HAVE YOU READ ANY MEXICAN NEWSPAPERS RELATING TO THIS

12  CASE?

13  A    YES.

14  Q    AND ONE OF THE ARTICLES THAT APPEARED IN THE MEXICAN

15  NEWSPAPER WAS ABOUT INDIVIDUALS GOING UP TO ENRIQUE

16  CAMARENA AND SHOWING HIM BADGES.  IS THAT CORRECT?

17           MR. CAMPOS:  IT IS IRRELEVANT, YOUR HONOR.

18  OBJECTION.

19           THE COURT:  THE OBJECTION IS SUSTAINED.

20  Q    BY MS. BARRERA:  LET'S TALK ABOUT WHEN MR. LOPEZ

21  ALVAREZ TOLD YOU WITH REGARD TO THE HOUSE AT LOPE DE VEGA.

22  FIRST OF ALL, YOU KNEW THAT MR. LOPEZ ALVAREZ WAS NOT AT

23  THE HOUSE AT LOPE DE VEGA, DIDN'T YOU?

24  A    NO, I DIDN'T KNOW THAT.

25  Q    BASED ON WHAT HE TOLD YOU, YOU COULD TELL HE WAS

11-133

1    MAKING UP STORIES ABOUT LOPE DE VEGA, COULDN'T YOU?

2    A    NO, I COULDN'T TELL.

3    Q    HE GAVE YOU A SCARCITY OF DETAILS ABOUT WHAT HAPPENED

4    AT LOPE DE VEGA, DIDN'T HE?

5    A    AGAIN, I WASN'T QUESTIONING HIM ABOUT HIS CORRECT

6    KNOWLEDGE OF WHAT HE KNEW.  HE WAS JUST TELLING ME THIS.

7    Q    YES, AND MY QUESTION IS:  HE DIDN'T GIVE YOU VERY

8    MANY DETAILS ABOUT LOPE DE VEGA?

9    A    I WAS NOT ASKING FOR DETAILS, NO, MA'AM.

10   Q    MY QUESTION, HOWEVER, IS:  HE DIDN'T GIVE YOU VERY

11   MANY DETAILS?

12   A    NO.

13   Q    WHAT HE DID TELL YOU, HOWEVER, WAS THAT ENRIQUE

14   CAMARENA HAD BEEN BEATEN WITH A PIPE OF SOME SORT ALL OVER

15   HIS BODY.  RIGHT?

16   A    YES, MA'AM.

17   Q    AND HE SAID HE WAS BEATEN ON THE HEAD, THE FACE, AND

18   THE STOMACH.  RIGHT?

19   A    YES, MA'AM.

20   Q    AND THAT IS ALL HE TOLD YOU ABOUT THE BEATING.  ISN'T

21   THAT TRUE?

22   A    YES, MA'AM.

23   Q    NOW, THAT STATEMENT THAT I HAVE JUST SAID, THAT

24   ENRIQUE CAMARENA WAS BEATEN ALL OVER HIS BODY, THAT IS

25   CONSISTENT WITH JUST A GENERAL STORY.  ISN'T THAT TRUE?

11-134

1           MR. CAMPOS:  OBJECTION TO THE FORM OF THE

2    QUESTION, YOUR HONOR.  IT IS VAGUE AND AMBIGUOUS.

3           THE COURT:  RESTATE YOUR QUESTION.

4    Q    BY MS. BARRERA:  YOU HAVE BEEN AN AGENT FOR THREE

5    YEARS.  CORRECT?

6    A    YES, MA'AM.

7    Q    AND IN THOSE THREE YEARS -- STRIKE THAT.

8           AT THE TIME THAT THIS INVESTIGATION WAS GOING

9    ON, THAT IS, WHEN YOU WERE SEEKING MR. LOPEZ ALVAREZ, YOU

10   HAD BEEN A DEA AGENT FOR TWO YEARS.  RIGHT?

11   A    YES, MA'AM.

12   Q    BUT YOU HAD ALSO BEEN A POLICE OFFICER BEFORE YOU

13   WERE A DEA AGENT FOR SIX AND A HALF YEARS.  CORRECT?

14   A    YES, MA'AM.

15   Q    SO YOU HAD EXPERIENCE IN TERMS OF QUESTIONING

16   INDIVIDUALS.  CORRECT?

17   A    CORRECT.

18   Q    AND JUST BECAUSE SOMEBODY SAID SOMETHING, YOU

19   WOULDN'T NECESSARILY ASSUME THAT WHAT THEY WERE SAYING WAS

20   TRUE.  CORRECT?

21   A    DEPENDING ON THE CIRCUMSTANCES, YES, MA'AM.

22   Q    AND AS A POLICE OFFICER IF SOMEONE CAME IN AND SAID,

23   "I COMMITTED A MURDER," YOU WOULDN'T ASSUME JUST BASED ON

24   THAT, THAT THEY MUST BE TELLING YOU THE TRUTH.  CORRECT?

25   A    I CANNOT ASSUME HE IS LYING, EITHER.

11-135

1    Q    YOU CAN'T ASSUME ANYTHING ON THE BASIS OF THAT.

2    CORRECT?

3    A    RIGHT.

4    Q    YOU WOULD HAVE TO DO INVESTIGATION?

5    A    YES, MA'AM.

6    Q    THAT PERSON COULD BE CRAZY?

7    A    YES.

8    Q    THAT PERSON COULD BE A PATHOLOGICAL LIAR.  RIGHT?

9    A    YES.

10    Q    IT COULD BE SOMEONE WHO IS A PUBLICITY HOUND?

11    A    YES.

12    Q    IT COULD BE SOMEONE COVERING UP FOR SOMEONE ELSE.

13    RIGHT?

14    A    YES, MA'AM.

15    Q    I MEAN, THERE IS ANY NUMBER OF REASONS AS TO WHY

16    SOMEONE WOULD SAY SOMETHING LIKE THAT.  RIGHT?  EVEN TO A

17    POLICE OFFICER?

18    A    YES.

19    Q    AND THEN IT COULD BE THE TRUTH?

20    A    YES.

21    Q    NOW, ONE OF THE METHODS THAT YOU USE IN TERMS OF

22    CHECKING OUT WHAT THAT PERSON HAS TOLD YOU, THIS

23    HYPOTHETICAL PERSON, IS THAT YOU ASK THEM FOR DETAILS.

24    ISN'T THAT TRUE?

25    A    IN A REGULAR INVESTIGATION, YES, MA'AM, YOU DO DO

11-136

1   THAT.

2   Q    AND IF THEY KNOW DETAILS ABOUT WHAT HAPPENED, THEN

3   THERE IS MORE OF A CHANCE THAT MAYBE THEY ARE TELLING YOU

4   THE TRUTH.  RIGHT?

5   A    YES, MA'AM.

6   Q    OKAY.  SO MY QUESTION TO YOU IS:  BASED ON YOUR

7   EXPERIENCE AS A POLICE OFFICER IN THIS CASE, IN THE

8   ENRIQUE CAMARENA INVESTIGATION, SOMEONE IS SAYING THAT HE

9   WAS BEATEN ALL OVER HIS BODY, YOU DON'T CONSIDER THAT A

10  LOT OF DETAIL, DO YOU?

11  A    AGAIN, I AM GOING TO REFER BACK TO MY EXPERIENCE AS A

12  POLICE OFFICER.  IN AN UNDERCOVER CAPACITY, I DO NOT

13  QUESTION PEOPLE AS TO DETAILED TIMES AND EVENTS.

14       IF I WAS SPEAKING TO MR. LOPEZ AS A POLICE

15  OFFICER, AND HE KNEW I WAS A POLICE OFFICER, I WOULD

16  QUESTION HIM TO CLARIFY THE POINTS.  I WAS NOT REQUESTING

17  THAT CLARIFICATION.  THEREFORE, WHATEVER HE GAVE ME WAS

18  OPEN TO INVESTIGATION.  YES, MA'AM.

19  Q    I UNDERSTAND THAT YOU WEREN'T INTERROGATING HIM.  I

20  THINK MY QUESTION IS NOT CLEAR.

21       MY QUESTION TO YOU IS:  MR. LOPEZ ALVAREZ OR

22  ANYONE SAYING THAT ENRIQUE CAMARENA WAS BEATEN ALL OVER

23  HIS BODY -- THAT STATEMENT YOU DO NOT CONSIDER A STATEMENT

24  INVOLVING A LOT OF DETAILS, DO YOU?

25  A    NO, IT IS NOT A DETAILED STATEMENT.  THAT IS CORRECT.

11-137

1  Q    SO THAT IS HIS STORY THAT IS CONSISTENT WITH A

2  GENERAL STORY, CORRECT, OF SOMEONE HAVING GENERAL

3  KNOWLEDGE OF WHAT HAPPENED.   CORRECT?

4           MR. CAMPOS:   OBJECTION TO GENERAL AND SPECIFIC

5  STORIES, YOUR HONOR.   THAT IS A CHARACTERIZATION.

6           THE COURT:   SUSTAINED.

7  Q    BY MS. BARRERA:   WHAT MR. LOPEZ ALVAREZ TOLD YOU

8  ABOUT THE BEATING OF ENRIQUE CAMARENA WAS INFORMATION THAT

9  WAS PRETTY WELL KNOWN IN GUADALAJARA AND THE UNITED

10  STATES.   IS THAT CORRECT?

11           MR. CAMPOS:   CALLS FOR SPECULATION AND HEARSAY,

12  YOUR HONOR.   I OBJECT.

13           THE COURT:   SUSTAINED.

14  Q    BY MS. BARRERA:   WHAT HE TOLD YOU WAS INFORMATION

15  THAT APPEARED IN NEWSPAPERS, ISN'T IT?

16           MR. CAMPOS:   SAME OBJECTION.

17           THE COURT:   WHAT IS THE OBJECTION?

18           MR. CAMPOS:   SPECULATION AND HEARSAY, YOUR

19  HONOR.

20           THE COURT:   SUSTAINED.

21  Q    BY MS. BARRERA:   MR. LOPEZ ALVAREZ DIDN'T TELL YOU,

22  DID HE, THAT ENRIQUE CAMARENA'S RIBS HAD BEEN BROKEN?

23  A    I DON'T REMEMBER HIM SAYING THAT.

24  Q    IF HE HAD SAID THAT, THAT IS PROBABLY SOMETHING YOU

25  WOULD HAVE REMEMBERED, ISN'T IT?

11-138

1   A    PROBABLY, YES, MA'AM.

2   Q    YOU KNOW THAT ENRIQUE CAMARENA'S RIBS WERE BROKEN.

3   RIGHT?

4   A    YES, MA'AM.

5   Q    MR. LOPEZ ALVAREZ ALSO TOLD YOU INCONSISTENT STORIES

6   ABOUT WHAT HAPPENED TO ENRIQUE CAMARENA AFTER THE TORTURE,

7   DIDN'T HE?

8   A    I DON'T RECALL WHICH INCONSISTENT STORY UNLESS YOU

9   REFRESH MY MEMORY.

10  Q    OKAY.  SURE.  DIDN'T HE AT ONE TIME TELL YOU THAT

11  ENRIQUE CAMARENA WAS TAKEN OUT OF THE HOUSE AT LOPE DE

12  VEGA, AND HE WAS PUT IN A VEHICLE AND BURIED ALIVE?

13  DIDN'T HE TELL YOU THAT?

14  A    FIRST OF ALL, HE NEVER USED LOPE DE VEGA, IF I MIGHT

15  CLARIFY THAT.  HE STATED THAT HE WAS REMOVED OUT OF THE

16  HOUSE UNCONSCIOUS.  YES, HE DID SAY THAT.

17  Q    AND HE SAID THAT HE WAS BURIED ALIVE AFTER THAT,

18  DIDN'T HE?

19  A    I BELIEVE HE REFERRED TO THE PILOT AS BEING BURIED

20  ALIVE, NOT CAMARENA.

21  Q    MAYBE IT WOULD REFRESH YOUR RECOLLECTION IF YOU WOULD

22  LOOK AT THE TRANSCRIPT FOR OCTOBER 15, PAGE 33, FROM THE

23  TOP TO THE MIDDLE OF THE PAGE.

24  A    YES, MA'AM.

25           THE COURT:  I WANT TO REMIND THE JURY AGAIN THAT

1    THESE TRANSCRIPTS THAT THE WITNESSES ARE ASKED TO LOOK AT

2    ARE NOT NECESSARILY THE EVIDENCE IN THE CASE.  WHAT IS THE

3    EVIDENCE IS WHAT THE WITNESS MIGHT TESTIFY ABOUT, NOT THE

4    REPORTS, TRANSCRIPTS, OR ANY OTHER THING.  IT IS THE

5    TESTIMONY OF THE WITNESSES YOU MUST LISTEN TO.

6              THE WITNESS:  YES, MA'AM.

7    Q   BY MS. BARRERA:  DOES THIS REFRESH YOUR RECOLLECTION

8    AS TO WHAT MR. LOPEZ ALVAREZ TOLD YOU?

9    A    YES, IT DOES.

10   Q    AND WHAT HE TOLD YOU WAS THAT MR. CAMARENA WAS TAKEN

11   OUT OF THE HOUSE AND BURIED ALIVE?

12   A    HE SAYS, "I BELIEVE HE WAS BURIED ALIVE."  HE DIDN'T

13   SAY THAT HE WAS BURIED ALIVE.

14   Q    IN FACT, MOST OF THE TIME THAT HE TOLD YOU THINGS, HE

15   SAID, "I BELIEVE," DIDN'T HE?

16   A    NO.

17   Q    THIS IS ONE INSTANCE THAT HE SAID THAT?

18   A    HE SAYS IT RIGHT HERE, YES, MA'AM.

19   Q    AND YOU KNOW THAT IS NOT TRUE.  RIGHT?  YOU KNOW THAT

20   ENRIQUE CAMARENA WAS NOT BURIED ALIVE.  CORRECT?

21   A    THAT'S CORRECT.

22   Q    AND DID YOU KNOW IT AT THE TIME WHILE YOU WERE

23   SPEAKING TO MR. LOPEZ ALVAREZ?

24   A    YES.

25   Q    SO YOU KNEW THAT WHEN MR. LOPEZ ALVAREZ TOLD YOU

11-140

1    THAT, THAT HE WAS FABRICATING.   TRUE?

2    A    NO.  HE SAID HE BELIEVED THAT.  HE DIDN'T SAY HE

3    KNEW.

4    Q    BUT YOU KNEW THAT THAT WAS NOT TRUE.  CORRECT?  THAT

5    IS ENRIQUE CAMARENA WAS NOT BURIED ALIVE?

6    A    THAT WAS HIS OPINION.

7    Q    AND SO SINCE YOU KNEW IT WASN'T TRUE, THAT GAVE YOU A

8    CLUE AS TO THE FACT THAT MR. LOPEZ ALVAREZ MUST NOT HAVE

9    BEEN THERE WHEN ENRIQUE CAMARENA WAS TORTURED AND KILLED.

10   ISN'T THAT TRUE?

11   A    NO.

12   Q    IF HE BELIEVED THAT ENRIQUE CAMARENA WAS TAKEN OUT OF

13   THE HOUSE AND BURIED ALIVE, AND IF THAT WASN'T TRUE, HE

14   COULDN'T HAVE BEEN THERE.

15   A    MR. LOPEZ ALVAREZ NEVER TOLD ME HE PARTICIPATED IN

16   THE BURIAL OF ENRIQUE CAMARENA, SO HE COULDN'T KNOW THAT.

17   Q    HE ALSO DIDN'T TELL YOU THAT HE WAS AT THE HOUSE OF

18   LOPE DE VEGA, DID HE?

19   A    HE SAID THAT IN THIS PARTICULAR INSTANCE HE SAW

20   MR. ENRIQUE CAMARENA BEING TAKEN OUT OF THE HOUSE, SO I

21   ASSUME HE DID.

22   Q    BUT DIDN'T YOU JUST TELL US THAT HE SAID HE BELIEVED

23   THAT?

24   A    HE BELIEVED HE WAS BURIED ALIVE.  HE DIDN'T SAY HE

25   BELIEVED WHEN HE SAW CAMARENA BEING TAKEN OUT OF THE

1    HOUSE.

2    Q    OKAY.  SO WHAT HE TOLD YOU WAS THAT HE SAW CAMARENA

3    BEING TAKEN OUT OF THE HOUSE ALIVE?

4    A    CORRECT.

5    Q    AND MR. LOPEZ ALVAREZ DIDN'T TELL YOU THE LOCATION OF

6    THE BODY?  THAT HE KNEW ABOUT THE LOCATION OF THE BODY,

7    DID HE?

8    A    HE JUST MENTIONED THE HOUSE.

9    Q    IN FACT, AT ONE POINT DIDN'T MR. LOPEZ ALVAREZ TELL

10   YOU THAT ENRIQUE CAMARENA HAD BEEN BURIED AT THE SAME

11   PLACE WHERE HE HAD BEEN TORTURED?

12   A    YES, MA'AM.

13   Q    YOU KNEW THAT WASN'T TRUE, ALSO, DIDN'T YOU?

14   A    NO, I DIDN'T KNOW.

15   Q    YOU KNOW IT NOW.  RIGHT?

16   A    I AM NOT 100 PERCENT SURE.  I DON'T KNOW IT NOW, NO.

17   Q    YOU DON'T?

18   A    NO.

19   Q    YOU DON'T KNOW WHERE THE BODIES WERE BURIED AFTER

20   THEY LEFT THE HOUSE AT LOPE DE VEGA?

21   A    WE DON'T KNOW EXACTLY WHERE THEY WERE BURIED.

22   Q    SO MR. LOPEZ ALVAREZ TOLD YOU AT LEAST TWO STORIES

23   ABOUT THE BODIES, DIDN'T HE?

24   A    WHICH ONE WAS THE OTHER STORY?

25   Q    ONE WAS THAT HE WAS WALKED OUT OF THE HOUSE AND PUT

11-142

1  IN A VEHICLE AND DRIVEN AWAY, AND HE BELIEVED THAT HE WAS

2  BURIED ALIVE.  THAT IS ONE STORY, ISN'T IT?

3  A    YES, MA'AM.

4  Q    AND THE OTHER STORY WAS THAT HE WAS TORTURED AND

5  BURIED IN THE SAME HOUSE.  ISN'T THAT TRUE?

6  A    THERE WAS INFORMATION THAT WE KNEW THAT THAT COULD BE

7  POSSIBLE.

8  Q    BUT I AM SAYING THAT MR. LOPEZ ALVAREZ TOLD YOU BOTH

9  STORIES, DIDN'T HE?

10  A    YES.

11  Q    AT ONE OF THE TIMES HE WAS TALKING ABOUT THE BODIES,

12  MR. LOPEZ ALVAREZ TOLD YOU THAT THE BODIES HAD BEEN TAKEN

13  OUT OF THE HOUSE WHEN THEY HAD BEEN TORTURED AND WERE

14  TAKEN TO A PLACE IN MICHOACAN.  RIGHT?

15  A    YES, HE DID SAY THAT.

16  Q    AND HE TOLD YOU THAT THIS WAS DONE THE EARLY MORNING

17  HOURS.  RIGHT?

18  A    YES.

19  Q    AND YOU KNEW THAT COULDN'T POSSIBLY BE TRUE, ALSO.

20  RIGHT?

21  A    NO, I DON'T KNOW THAT..

22  Q    WELL, YOU KNEW THAT THE BODIES WERE FOUND IN

23  MICHOACAN ABOUT 5:00 OR 5:30 P.M.  DIDN'T YOU KNOW THAT?

24  A    I KNOW WHEN THE BODIES WERE FOUND.  I DON'T KNOW WHEN

25  THE BODIES WERE TAKEN THERE.

11-143

Q    YOU KNOW THE BODIES WERE FOUND AT ABOUT 5:00, 5:30

P.M.  RIGHT?

          MR. CAMPOS:  COULD WE HAVE A DATE, YOUR HONOR.

          THE COURT:  CLARIFY AS TO WHAT TIME.

Q    BY MS. BARRERA:  DO YOU KNOW THAT THE BODIES WERE

FOUND AT APPROXIMATELY 5:30 P.M. SOMETIME IN MARCH -- I

BELIEVE, MARCH 5, 1985?

A    YES, MA'AM.

Q    AND YOU KNOW THAT THERE WAS A SEARCH FOR THE BODIES

IN THAT SAME AREA BEFORE 5:00 P.M. ON THAT DATE.  CORRECT?

A    IF I RECALL, THE BODIES WERE NOT FOUND AT 5:00 P.M.

THEY WERE FOUND EARLY IN THE MORNING HOURS.

Q    THAT IS THE INFORMATION YOU HAVE?

A    THAT I HAVE, YES, MA'AM.

Q    SO LET'S ASSUME FOR A MINUTE THAT THE BODIES WERE

FOUND AT 5:30 P.M.  THEN WHAT MR. LOPEZ ALVAREZ TOLD YOU

ABOUT THE BODIES GOING OUT EARLY MORNING HOURS IS

INCORRECT.  TRUE?

          MR. CAMPOS:  YOUR HONOR, THAT IS A NON SEQUITUR.

          THE COURT:  SUSTAINED.

Q    BY MS. BARRERA:  YOU DID NOT PARTICIPATE IN THE

SEARCH FOR THE LOCATION OF THE BODIES IN MICHOACAN, DID

YOU?

A    THAT IS CORRECT.  I DIDN'T.

Q    AND THAT WOULD ACCOUNT, I TAKE IT, FOR YOU NOT

11-144

1    KNOWING THE DETAILS ABOUT THE BODIES.  CORRECT?

2    A    YES, MA'AM.

3    Q    I AM GOING TO SIDETRACK A LITTLE BIT HERE AND TALK

4    ABOUT SOMETHING ELSE.  YOU SAID THAT MR. LOPEZ ALVAREZ

5    GAVE YOU A TAPE OF A SONG CALLED "BLACK MARQUE," OR

6    SOMETHING LIKE THAT.

7    A    HE SHOWED ME A TAPE.  YES, MA'AM.

8    Q    AND THIS IS A REGULAR TAPE.  ISN'T THAT TRUE?

9    A    YES.  IT WAS A REGULAR TAPE.

10    Q    IT IS SOMETHING YOU CAN BUY AT --

11    A    ANY STORE.

12    Q    AND HAVE YOU LISTENED TO THIS SONG?

13    A    NO, MA'AM, I HAVEN'T.

14    Q    SO YOU DON'T KNOW WHAT IS CONTAINED IN THE SONG OR

15    WHETHER THERE IS ANY TRUTH TO IT OR NOT?

16    A    NO.

17    Q    YOU REFERRED TO IT AS A CORRIDO SONG.  WOULD YOU TELL

18    US WHAT A CORRIDO SONG IS.

19    A    IT IS A VERY POPULAR TYPE OF SONG.  USUALLY IS ABOUT

20    SOMETHING EVENTFUL, MAJOR EVENT, THAT HAPPENS IN MEXICO

21    THAT MAJOR WRITERS WILL WRITE SOMETHING ABOUT.

22    Q    SO THE SONG WRITERS IN MEXICO LIKE TO DO THAT; THEY

23    LIKE TO MAKE UP STORIES ABOUT EVENTS THAT HAPPENED?

24    A    YES, MA'AM.

25    Q    ESPECIALLY WHEN SOMETHING IS SENSATIONAL?

11-145

1    A    YES, MA'AM.

2    Q    AND THEY MAY NOT ALWAYS BE ACCURATE.  RIGHT?

3    A    YES, MA'AM.

4    Q    AND IN FACT MOST OF THE TIME IT IS KIND OF BUILT UP

5    WITH SOME TRUTH AND SOME FICTION?

6    A    YES.

7    Q    AND THE SONG WRITERS MAY NOT NECESSARILY BE PRIVY TO

8    THE REAL INFORMATION IN THE CASE?

9    A    IT IS JUST A MUSICAL.  YES, MA'AM.

10    Q    I NEGLECTED TO MENTION WHAT MR. LOPEZ ALVAREZ TOLD

11    YOU ABOUT MR. ZAVALA.  YOU KNOW WHO HE IS.  RIGHT?

12    A    YES, MA'AM.

13    Q    HE DIDN'T TELL YOU VERY MUCH ABOUT MR. ZAVALA,

14    EITHER, DID HE?

15    A    VERY BRIEFLY.

16    Q    IN FACT, ALL HE TOLD YOU ABOUT MR. ZAVALA WAS THAT

17    MR. ZAVALA WAS KIDNAPPED, TORTURED, AND KILLED?

18    A    YES.

19    Q    AND WHEN THAT IS ALL THAT HE COULD TELL YOU ABOUT

20    MR. ZAVALA, THAT DIDN'T MAKE YOU WONDER IF MR. LOPEZ

21    ALVAREZ WAS MAKING UP STORIES FOR YOUR BENEFIT?

22    A    NO, MA'AM.

23    Q    HE TOLD YOU THAT MR. ZAVALA WAS SHOT IN THE HEAD.

24    ISN'T THAT TRUE?

25    A    I BELIEVE HE SAID THAT, YES.

11-146

1    Q    AND YOU KNEW THEN THAT THAT WAS NOT TRUE.  RIGHT?

2    A    I DIDN'T HAVE THE -- AT THAT TIME I DIDN'T KNOW.

3    Q    YOU KNOW --

4    A    NO, I DIDN'T KNOW.

5    Q    YOU KNOW NOW THAT THAT WAS NOT TRUE.  CORRECT?

6    A    THAT'S CORRECT.

7    Q    DURING YOUR CONVERSATIONS WITH MR. LOPEZ ALVAREZ, HE

8    TOLD YOU THAT HE HAD BEEN PICKED UP BY THE MEXICAN FEDERAL

9    JUDICIAL POLICE IN CONNECTION WITH THIS CASE.  RIGHT?

10   A    YES, MA'AM.

11   Q    AND WHAT HE TOLD YOU ACTUALLY WAS THAT HE WAS

12   ARRESTED BECAUSE HE WAS WITH THE ONES WHO WERE WATCHING

13   ENRIQUE CAMARENA?

14   A    YES, MA'AM.

15   Q    AND HE ALSO TOLD YOU ABOUT HOW HE HAD BEEN TORTURED

16   AND BEATEN BY THE MEXICAN JUDICIAL POLICE.  CORRECT?

17   A    YES, MA'AM.

18   Q    AND HE TOLD YOU THAT NOTWITHSTANDING THESE BEATINGS

19   HE HAD NOT CONFESSED TO INVOLVEMENT IN THE KIDNAP,

20   ABDUCTION, TORTURE AND KILLING OF ENRIQUE CAMARENA.

21   RIGHT?

22   A    EXACTLY.

23   Q    I BELIEVE YOUR TESTIMONY WAS THAT HE WAS VERY PROUD

24   OF THAT.  RIGHT?

25   A    YES, MA'AM.

11-147

1    Q    AND THAT HIS BOSSES WERE VERY PROUD OF HIM.  RIGHT?

2    A    YES, MA'AM.

3    Q    HE ALSO TOLD YOU, DIDN'T HE, THAT HIS SUPPOSED BOSSES

4    HAD CONFESSED TO BEING INVOLVED IN THE KILLING OF

5    CAMARENA?

6    A    I DON'T RECALL HIM SAYING THAT, NO, MA'AM.

7    Q    WELL, YOU KNOW THAT TO BE A FACT, DON'T YOU?

8    A    YES, MA'AM.

9    Q    YOU KNOW THAT ERNESTO FONSECA AND CARO-QUINTERO AND

10   EVERYONE ELSE ARRESTED ALONG WITH THEM HAVE ADMITTED TO

11   SOME INVOLVEMENT?

12   A    YES, MA'AM.

13   Q    AND YOU KNOW FROM YOUR INVESTIGATION OF MR. LOPEZ

14   ALVAREZ, EVEN THOUGH HE WAS TORTURED, ALWAYS MAINTAINED

15   THAT HE WAS NOT INVOLVED IN THE KIDNAPPING, THE ABDUCTION,

16   TORTURE, AND THE KILLING OF ENRIQUE CAMARENA?

17            MR. CAMPOS:  YOUR HONOR, THAT CALLS FOR

18   SPECULATION AND HEARSAY.

19            MS. BARRERA:  BASED ON HIS INVESTIGATION, YOUR

20   HONOR.  NO SPECULATION.

21            THE COURT:  THE OBJECTION IS SUSTAINED.

22   Q    BY MS. BARRERA:  SO MR. LOPEZ ALVAREZ TOLD YOU THAT

23   EVEN THOUGH HE HAD BEEN TORTURED AND NOT CONFESSED, HE WAS

24   GOING TO TELL YOU ABOUT HIS ASSAULT?

25   A    HE WAS TELLING ME WITHOUT ME ASKING HIM, YES.

11-148

1   Q   MR. LOPEZ ALVAREZ ALSO TOLD YOU, DID HE NOT, ABOUT

2   THE COMMANDER NAMED GONZALEZ-GONZALEZ WHO WAS TORTURED TO

3   DEATH, DIDN'T HE?

4   A   YES, MA'AM.

5   Q   AND HE TOLD YOU HOW HE WAS FORCED TO SIT AND LISTEN

6   AS HIS COMMANDER IS BEING TORTURED TO DEATH. RIGHT?

7   A   I DON'T RECALL HIM TELLING ME THAT HE WAS FORCED TO

8   LISTEN, NO.

9   Q   DO YOU RECALL HIM TELLING YOU THAT THIS COMMANDER WAS

10   KILLED BY THE MEXICAN FEDERAL JUDICIAL POLICE DURING THEIR

11   INTERROGATION?

12   A   MR. LOPEZ SAID THAT, YES.

13   Q   AND YOUR INVESTIGATION HAS CONFIRMED THAT, HAS IT

14   NOT?

15   A   THAT THE COMMANDER GONZALEZ-GONZALEZ WAS KILLED BY

16   THE MEXICAN FEDERAL POLICE?

17   Q   YES.

18   A   I DON'T KNOW THAT, MA'AM.

19   Q   YOU DON'T KNOW.

20         LET'S TALK ABOUT WHAT MR. LOPEZ ALVAREZ TOLD YOU

21   WITH REGARDS TO THE GOING TO THE AIRPORT. DO YOU REMEMBER

22   THAT PART OF YOUR TESTIMONY?

23   A   YES, MA'AM.

24   Q   NOW, WHEN MR. LOPEZ ALVAREZ TOLD YOU THAT, IT WAS

25   ESSENTIALLY AN ACCURATE RECOUNTING WITH A LOT OF

1    EMBELLISHMENT.  ISN'T THAT TRUE?

2    A    I DIDN'T THINK IT WAS EMBELLISHMENT.

3    Q    AGAIN, HE TOLD YOU TWO DIFFERENT VERSIONS, DIDN'T HE,

4    AS TO WHAT HAPPENED?

5    A    WHICH ONE, MA'AM?

6    Q    WELL, AT ONE POINT DIDN'T HE TELL YOU THAT -- I THINK

7    WE HAVE GONE THROUGH THIS.  HE TOLD YOU ABOUT HIS FATHER

8    AND TAKING HIM TO THE AIRPORT AND THEM CHANGING THEIR

9    MINDS.  AND ANOTHER TIME HE SAID HE WAS AT THE AIRPORT

10   WITH CARO-QUINTERO.  RIGHT?  SO HE TOLD YOU TWO DIFFERENT

11   STORIES WITH REGARD TO THE AIRPORT?

12   A    I BELIEVE THEY ARE THE SAME STORIES, JUST DIFFERENT

13   CIRCUMSTANCES.

14   Q    OKAY.  THE SAME EVENT, BUT HE IS TELLING YOU TWO

15   DIFFERENT VERSIONS OF WHERE HE WAS.  ISN'T THAT TRUE?

16   A    NO.

17   Q    WELL, AT ONE POINT HE IS SAYING THAT HE WAS IN THE

18   CAR DRIVING OVER THERE, AND ANOTHER TIME HE IS SAYING THAT

19   HE WAS WITH CARO-QUINTERO AT THE AIRPORT.

20   A    HE DIDN'T SAY HE WAS WITH CARO.  HE WENT TO THE

21   AIRPORT TO MEET CARO-QUINTERO.

22   Q    THAT IS WHAT HE SAID ON THE TAPE THAT WE LOOKED AT

23   JUST A FEW MINUTES AGO?

24   A    YOU ONLY ASKED ME ABOUT A WHOLE CONVERSATION.  THERE

25   IS MORE TO IT THAN JUST THAT.

11-150

1    Q    BUT THE QUESTION YOU POSED TO HIM IN THAT TAPE WAS,

2    "WERE YOU THERE WITH CARO-QUINTERO ON THE PLANE?"  AND HIS

3    ANSWER WAS, "YES."

4         ISN'T THAT TRUE?

5    A    WHEN HE WAS REFERRING TO THAT, YES.

6    Q    NOW, THE MAIN STORY THAT HE TOLD YOU -- LET'S TALK

7    ABOUT THE STORY ABOUT HIS FATHER AND SO ON.  HIS

8    RECOUNTING OF THE FACTS DIDN'T REALLY MAKE SENSE TO YOU,

9    DID IT?

10   A    I HAD NO REASON NOT TO BELIEVE HIM.

11   Q    YOU DIDN'T BELIEVE EVERYTHING HE TOLD YOU.  RIGHT?

12   A    I DIDN'T HAVE REASON NOT TO BELIEVE WHAT HE TOLD ME,

13   NOT EVERYTHING.

14   Q    YOU HAD NO REASON TO DOUBT THAT PORTION?

15   A    I JUST LISTENED TO HIM, MA'AM.

16   Q    HE TOLD YOU THAT CARO-QUINTERO WAS AT THE AIRPORT.

17   DID HE TELL YOU WHAT TIME CARO-QUINTERO WAS AT THE

18   AIRPORT?

19   A    NO, MA'AM.

20   Q    AND HE INDICATED TO YOU THAT TWO HOURS LATER, AFTER

21   HE WAS SUPPOSED TO TAKE HIS FATHER AND THEN THE FATHER

22   DIDN'T GO, TWO HOURS LATER HE IS ON HIS WAY TO THE AIRPORT

23   WITH THE DEA AGENTS AND THE MEXICAN FEDERAL JUDICIAL

24   POLICE.  IS THAT CORRECT?

25   A    YES, MA'AM.

11-151

1    Q    AND IN THOSE TWO HOURS HE TOLD YOU QUITE A FEW THINGS

2    THAT HAPPENED, DIDN'T HE?

3    A    NO, MA'AM.

4    Q    DIDN'T HE TELL YOU THAT CARO-QUINTERO CHANGED HIS

5    MIND SO HE DROVE HIS FATHER HOME?  DIDN'T HE TELL YOU

6    THAT?

7    A    HE DID TELL ME HE DROVE HIS FATHER HOME.

8    Q    HE WAS CONTACTED; THEN FORGET IT; AND HE WENT ON

9    PATROL?

10   A    YES.

11   Q    AND THEN HE WENT BACK TO HEADQUARTERS.  RIGHT?

12   A    THAT IS WHAT HE SAID, YES, MA'AM.

13   Q    THEN HE SAID HE WAS ADVISED BY THE GROUP SUPERVISOR,

14   I GUESS, THAT THE MEXICAN FEDERAL JUDICIAL POLICE NEEDED

15   SOME HELP.  RIGHT?

16   A    YES, MA'AM.

17   Q    AND THEY DECIDED THEY WANTED TO GO TO LUNCH.  THEY

18   WERE GOING TO HAVE LUNCH.  RIGHT?

19   A    THAT IS CORRECT.

20   Q    AND HE TOLD YOU THEY WENT TO LUNCH.  RIGHT?

21   A    YES.

22   Q    AND AFTER LUNCH, THEY KEEP GETTING CALLS FROM THE

23   MEXICAN FEDERAL JUDICIAL POLICE.  SO THEY DECIDE TO GO

24   ALONG WITH THEM.  RIGHT?

25   A    RIGHT.

11-152

1    Q    AND HE SAID THAT ALL OF THAT HAPPENED IN TWO HOURS?

2    A    HE WAS JUST ESTIMATING, YES, MA'AM.

3    Q    AND YOU KNOW FROM YOUR INVESTIGATION THAT THINGS

4    COULDN'T HAVE HAPPENED THAT WAY BECAUSE THE CALL THAT

5    PAVON-REYES RECEIVED, THE COMMANDER OF THE MEXICAN FEDERAL

6    JUDICIAL POLICE, TO GO TO THE AIRPORT --

7            MR. CAMPOS:  YOUR HONOR, EXCUSE ME.  OBJECTION.

8    THERE IS NO EVIDENCE WITH RESPECT TO THIS FROM THE

9    TESTIMONY OF THIS WITNESS.

10            MS. BARRERA:  YOUR HONOR, HE INDICATED THAT HE

11    SPOKE TO OTHER OFFICERS AND DID FOLLOW-UP INVESTIGATION ON

12    EVERYTHING THAT MR. LOPEZ ALVAREZ TOLD HIM.  SO MY

13    QUESTION IS AS TO THIS FOLLOW-UP INVESTIGATION WITH

14    REGARDS TO THE AIRPORT.

15            THE COURT:  RESTATE YOUR QUESTION.

16            MS. BARRERA:  THANK YOU, YOUR HONOR.

17    Q    YOU KNEW THAT WHAT MR. LOPEZ ALVAREZ TOLD YOU COULD

18    NOT BE TRUE BECAUSE FROM YOUR INVESTIGATION YOU KNEW THAT

19    PAVON-REYES HAD RECEIVED A CALL FROM THE AMERICANS TO RUSH

20    TO THE AIRPORT.  ISN'T THAT TRUE?

21            MR. CAMPOS:  CALLS FOR HEARSAY, AND IT IS BEYOND

22    THE SCOPE OF THE DIRECT, YOUR HONOR.

23            THE COURT:  SUSTAINED.

24    Q    BY MS. BARRERA:  WITHOUT TELLING ME WHAT IT IS THAT

25    YOU WERE TOLD, ISN'T IT TRUE, MR. REYNOSO, THAT THE

11-153

1    INFORMATION RECEIVED BY PAVON-REYES WAS EVERYTHING

2    HAPPENED VERY QUICKLY THERE.  ISN'T THAT TRUE?

3            MR. CAMPOS:  OBJECTION AGAIN, YOUR HONOR.  IT

4    STILL CALLS FOR HEARSAY, AND IT IS SPECULATIVE.

5            MS. BARRERA:  I AM MERELY ASKING HIM --

6            THE COURT:  THE OBJECTION IS SUSTAINED.  THE

7    FORM OF THE QUESTION IS IMPROPER.

8    Q    BY MS. BARRERA:  MR. LOPEZ ALVAREZ TOLD YOU THAT HE

9    CALLED UP ERNESTO FONSECA TO TRY TO GET MR. FONSECA TO

10   WARN CARO-QUINTERO AT THE AIRPORT.  RIGHT?

11   A    YES, MA'AM.

12   Q    AND IN FACT HE TOLD YOU THAT HE SPOKE TO MR. FONSECA.

13   RIGHT?

14   A    I BELIEVE HE SPOKE TO SOMEONE WORKING FOR

15   MR. FONSECA.  I DON'T BELIEVE HE SAID DIRECTLY TO

16   MR. FONSECA.

17   Q    DO YOU WANT TO LOOK AT -- LET ME FIND THE PAGE -- I

18   BELIEVE IT IS PAGE 87.

19   A    YES, MA'AM.

20   Q    MAYBE YOU CAN LOOK AT THAT.

21   A    I HAVE IT.

22   Q    HE SAID HE SPOKE TO -- TAKE A LOOK AT THAT.

23   A    YES, MA'AM.

24   Q    MR. LOPEZ ALVAREZ TOLD YOU THAT HE NOTIFIED DON NETO.

25   CORRECT?

11-154

1    A    RIGHT.   YES, MA'AM.

2    Q    NOW, YOU KNEW THAT THAT WAS AGAIN A STORY THAT

3    MR. LOPEZ ALVAREZ WAS MAKING UP, DIDN'T YOU?

4    A    NO.

5    Q    YOU DIDN'T REALLY THINK IT WAS POSSIBLE FOR SOMEONE

6    OF MR. LOPEZ ALVAREZ'S -- WHAT HE CLAIMED TO BE HIS

7    POSITION -- TO BE SPEAKING WITH THE HEAD BOSS OF THE

8    PERSONS IN CHARGE OF GUADALAJARA, DID YOU?

9    A    IT IS POSSIBLE.

10   Q    I BELIEVE YOUR TESTIMONY IS THAT MR. FONSECA WAS A

11   MAJOR DRUG TRAFFICKER, AND HE WAS PRACTICALLY RUNNING THE

12   CITY OF GUADALAJARA.   RIGHT?

13   A    THAT'S CORRECT.

14   Q    AND HE HAD A LOT OF MEN WHO WORKED FOR HIM?

15   A    TRUE.

16   Q    DO YOU THINK IT IS POSSIBLE FOR ANYONE TO JUST

17   BASICALLY PICK UP THE PHONE AND SPEAK TO DON NETO?

18   A    MR. LOPEZ TOLD ME THAT HE WAS A VERY ACCESSIBLE MAN.

19   Q    MR. LOPEZ ALVAREZ COULD HAVE CALLED DON NETO FROM HIS

20   CAR, COULDN'T HE?

21   A    HE COULD HAVE, YES.

22   Q    HE HAD A RADIO IN HIS CAR.   RIGHT?

23   A    YES, MA'AM.

24   Q    AND HE TOLD YOU THAT THE REASON HE WAS CALLING UP DON

25   NETO WAS BECAUSE DON NETO HAD A RADIO TO CALL CARO-

11-155

1    QUINTERO?

2    A    YES, MA'AM.

3    Q    THAT DIDN'T MAKE YOU DOUBT THAT MR. LOPEZ ALVAREZ WAS

4    MAKING UP STORIES?

5    A    NO, IT DIDN'T.  THE POLICE ALSO MONITOR THE

6    FREQUENCIES, AND SO IT MAKES SENSE.

7    Q    AND IF THEY WOULD HAVE MONITORED HIS FREQUENCIES,

8    THEY WOULD HAVE MONITORED MR. FONSECA'S FREQUENCY.

9    CORRECT?

10    A    IT IS POSSIBLE.

11    Q    MR. FONSECA WASN'T EVEN IN TOWN ON FEBRUARY 9.  ISN'T

12    THAT TRUE?

13    A    I DON'T KNOW.

14    Q    YOUR SUBSEQUENT INVESTIGATION HAS NOT DISCLOSED THAT

15    MR. FONSECA WAS NOT IN TOWN ON FEBRUARY 9?

16    A    I DIDN'T CHECK THAT.

17    Q    YOU HAVEN'T  CHECKED IT AT ALL?

18    A    NO.

19    Q    EVEN ASSUMING THAT YOU BELIEVE EVERYTHING THAT

20    MR. LOPEZ ALVAREZ TOLD YOU, ISN'T IT TRUE, MR. REYNOSO,

21    THAT WHAT MR. LOPEZ ALVAREZ TOLD YOU WAS THAT HE WASN'T AT

22    THE HOUSE WHEN ENRIQUE CAMARENA HAD BEEN TORTURED, THAT HE

23    WAS NOT AT THE HOUSE?

24    A    WELL, HE DID SAY HE WAS PRESENT.  YES.

25    Q    WHAT HE TOLD YOU WAS HE ARRIVED AT THE HOUSE WITH DON

11-156

1    NETO FONSECA.  RIGHT?

2    A    IN THAT PARTICULAR EVENT, YES, MA'AM.

3    Q    WHAT DO YOU MEAN ABOUT THAT PARTICULAR EVENT?  DO YOU

4    MEAN THAT PARTICULAR STORY?

5    A    FOR THAT PARTICULAR EVENT HE WAS REFERRING TO.

6    Q    HE DID TELL YOU, DID HE NOT, THAT HE SHOWED UP TO THE

7    HOUSE WITH ERNESTO FONSECA?

8    A    YES, HE DID.

9    Q    HE TOLD YOU THAT BY THE TIME HE AND MR. FONSECA AND

10   ALL THE OTHER MEN THAT HE CLAIMED WERE WITH HIM SHOWED UP

11   THAT ENRIQUE CAMARENA WAS DYING.  RIGHT?

12   A    HE SAID THAT, YES.

13   Q    AND THAT IS WHEN HE DESCRIBED THE STANDOFF BETWEEN

14   ERNESTO FONSECA AND RAFAEL CARO-QUINTERO.  RIGHT?

15   A    CORRECT.

16   Q    WHERE MR. FONSECA HAD SLAPPED MR. CARO-QUINTERO

17   BECAUSE HE HADN'T HANDLED THE SITUATION PROPERLY?

18   A    YES.

19   Q    THAT IS WHAT HE TOLD YOU, ANYWAY?

20   A    YES, MA'AM.

21   Q    MR. LOPEZ ALVAREZ DID NOT TELL YOU THAT HE ABDUCTED

22   OR KIDNAPPED ENRIQUE CAMARENA, DID HE?

23   A    I NEVER ASKED HIM.

24   Q    HE DID NOT TELL YOU THAT, DID HE?

25   A    NO, MA'AM.

11-157

1    Q    AND HE DID NOT SAY THAT HE TORTURED ENRIQUE CAMARENA,

2    DID HE?

3    A    NO, HE NEVER SAID THAT.

4    Q    AND HE NEVER TOLD YOU THAT HE INTERROGATED ENRIQUE

5    CAMARENA, DID HE?

6    A    THAT'S CORRECT.  HE NEVER SAID THAT.

7    Q    AND HE DID NOT TELL YOU THAT HE KILLED ENRIQUE

8    CAMARENA, DID HE?

9    A    THAT'S CORRECT.

10   Q    IN FACT, HE EVEN TOLD YOU THAT HE DID NOT SEE ENRIQUE

11   CAMARENA?

12   A    WHEN?

13   Q    DID HE MAKE THAT STATEMENT TO YOU, THAT HE DID NOT

14   EVEN SEE ENRIQUE CAMARENA?

15   A    I DON'T KNOW WHEN HE SAID THAT STATEMENT.  I DON'T

16   RECALL.

17   Q    LET ME TRY TO REFRESH YOUR RECOLLECTION.  DO YOU

18   REMEMBER MR. LOPEZ ALVAREZ TELLING YOU THAT HIS FRIEND WAS

19   IN ON THIS, REFERRING TO ENRIQUE CAMARENA, BUT HE WASN'T

20   EVEN THERE, THAT LUCK SIMPLY HAD IT THAT HE WASN'T THERE?

21   A    I BELIEVE HE SAID THAT ON THE VERY FIRST MEETING,

22   YES, MA'AM.

23   Q    YOU MENTIONED IN THE BEGINNING THAT AS AN EXPERIENCED

24   POLICE OFFICER YOU DO NOT ACCEPT A PERSON'S WORD JUST

25   BECAUSE THEY SAY SOMETHING.  RIGHT?

11-158

1    A    RIGHT.

2    Q    AND THAT WAS TRUE IN THIS CASE.  RIGHT?

3    A    NO.

4    Q    YOU DIDN'T ACCEPT HIS WORD JUST BECAUSE MR. LOPEZ

5    ALVAREZ SAID SOMETHING, DID YOU?

6    A    I WAS JUST LISTENING TO HIM.

7    Q    AND YOU DID SOME SUBSEQUENT INVESTIGATION.  RIGHT?

8    A    YES.

9    Q    IN YOUR SUBSEQUENT INVESTIGATION DID YOU LOOK AT THE

10   DECLARATIONS OF THE SUSPECTS THAT WERE INTERROGATED IN

11   MEXICO AND FIND OUT THAT NONE OF THEM IMPLICATED MR. LOPEZ

12   ALVAREZ AS AN ABDUCTOR?

13            MR. CAMPOS:  OBJECTION, YOUR HONOR.  COUNSEL IS

14   GETTING IN ELEMENTS THAT ARE CLEARLY HEARSAY.

15            THE COURT:  THE OBJECTION IS SUSTAINED.

16   Q    BY MS. BARRERA:  DID YOU SPEAK TO ANY OF THE SUSPECTS

17   THAT WERE ARRESTED IN MEXICO?

18   A    NO, MA'AM.

19   Q    HAVE YOU SPOKEN TO ANY OF THE AGENTS THAT HAVE SPOKEN

20   TO THE SUSPECTS IN MEXICO?

21   A    NO, MA'AM.

22   Q    YOU HAVE NOT SPOKEN TO AGENT KUYKENDALL ABOUT THE

23   INTERROGATION?

24   A    NO, MA'AM.

25   Q    AND YOU HAVE NOT SPOKEN TO AGENT CASTILLO ABOUT THE

11-159

1    INTERROGATION OF THE SUSPECTS IN MEXICO?

2    A    NO, MA'AM.

3    Q    WEREN'T YOU INTERESTED TO FIND OUT WHETHER ANY OF

4    THESE INDIVIDUALS HAD INCRIMINATED MR. LOPEZ ALVAREZ?

5            MR. CAMPOS:  OBJECTION, YOUR HONOR.

6    ARGUMENTATIVE.

7            THE COURT:  THE OBJECTION IS SUSTAINED.

8            MS. BARRERA:  YOUR HONOR, COULD I HAVE A MOMENT.

9            (PAUSE.)

10   Q    BY MS. BARRERA:  MR. REYNOSO, DID YOU DO ANY FOLLOW-

11   UP AT ALL WITH REGARDS TO WHETHER OR NOT MR. LOPEZ ALVAREZ

12   HAD EITHER ABDUCTED MR. CAMARENA OR BEEN INVOLVED IN THE

13   CAMARENA AFFAIR AT ALL?

14   A    MA'AM, MY ORIGINAL APPROACH TO MR. LOPEZ WAS AT A

15   DIFFERENT LEVEL.

16   Q    I UNDERSTAND THAT.  MY QUESTION TO YOU IS:  DID YOU

17   DO ANY INVESTIGATION AT ALL WITH --

18   A    IF YOU WILL LET ME ANSWER, I WILL EXPLAIN IT.

19   Q    GO AHEAD.

20   A    NO.  AT THAT TIME I DID NOT FOLLOW UP BECAUSE I WAS

21   INVOLVED IN THE OTHER INVESTIGATION, BUT THE FACTS WERE

22   COMING OUT AS MR. LOPEZ WAS TELLING ME.

23   Q    SO YOUR ANSWER TO MY QUESTION -- I AM SORRY.

24   A    I DID RECORD IT ON REGULAR REPORTS, AND OTHER AGENTS

25   CHECKED IT OUT FOR ME.  I AM NOT THE ONLY AGENT ON THIS

11-160

1    INVESTIGATION.

2    Q    I UNDERSTAND THAT.  BUT MY QUESTION TO YOU IS:  DID

3    YOU DO ANY INVESTIGATION WHATSOEVER TO TRY TO CONFIRM OR

4    TO REJECT ANY OF THE STATEMENTS THAT MR. LOPEZ ALVAREZ

5    MADE TO YOU?

6           MR. CAMPOS:  ASKED AND ANSWERED, YOUR HONOR.  HE

7    SAID WHAT HE DID.

8           MS. BARRERA:  IT REQUIRES A YES OR NO ANSWER,

9    YOUR HONOR, WHICH I HAVE NOT GOTTEN.

10          THE COURT:  RESTATE YOUR QUESTION.

11   Q    BY MS. BARRERA:  MR. REYNOSO, HAD YOU THEN OR HAVE

12   YOU NOW DONE ANY INVESTIGATION, ANY FOLLOW-UP

13   INVESTIGATION, TO TRY TO CONFIRM OR TO REJECT ANYTHING

14   THAT MR. LOPEZ ALVAREZ TOLD YOU DURING YOUR MEETINGS WITH

15   HIM?

16   A    OTHER AGENTS HAVE DONE THAT, YES, MA'AM.

17   Q    BUT YOU HAVE NOT DONE THAT?

18   A    NO, MA'AM.

19          MS. BARRERA:  THANK YOU.  NO FURTHER QUESTIONS.

20

21

22

23

24

25

11-161

1          THE COURT:  ANY MORE QUESTIONS OF THIS WITNESS?

2          MS. BROOKS:  I HAVE ONE, YOUR HONOR, I'D LIKE TO

3    CLEAR UP.

4          THE COURT:  ALL RIGHT.

5          MS. BROOKS:  THANK YOU.

6                    CROSS EXAMINATION

7    BY MS. BROOKS:

8    Q    SIR, I BELIEVE YOU TESTIFIED -- THE PROSECUTOR ASKED

9    YOU A QUESTION EARLY IN YOUR DIRECT TESTIMONY ABOUT

10   WHETHER MR. LOPEZ SAID THAT THE TWO INDIVIDUALS HE WAS

11   ARRESTED WITH WERE INVOLVED IN THE KIDNAPPING.  DO YOU

12   REMEMBER THAT?

13   A    YES, MA'AM.

14   Q    AND YOUR ANSWER WAS THAT HE SAID YES, THEY WERE THE

15   ACTUAL KIDNAPPERS?

16   A    THEY WERE A PART OF THE KIDNAPPERS.

17   Q    BUT YOU DIDN'T HAPPEN TO TELL US WHO THOSE TWO

18   INDIVIDUALS WERE.

19   A    NO.  HE NEVER DID MENTION ANY NAMES TO ME.  NO,

20   MA'AM.

21   Q    OKAY.  DO YOU KNOW FOR A FACT -- YOU ARE NOT TALKING

22   ABOUT MR. VERDUGO OR MR. FELIX, ARE YOU?  I MEAN, YOU KNOW

23   THAT HE WASN'T ARRESTED WITH EITHER OF THESE GENTLEMEN?

24   A    I KNOW THAT, YES, MA'AM.

25   Q    OKAY.  THEY WERE TOTALLY DIFFERENT PEOPLE DOWN IN

11-162

1   MEXICO THAT HE WAS ARRESTED WITH?

2   A    I BELIEVE SO, YES.

3   Q    YOU DIDN'T MEAN TO LEAVE US WITH THE INFERENCE THAT

4   YOU WERE TALKING ABOUT MR. VERDUGO OR MR. FELIX?

5   A    NO, MA'AM.

6           MS. BROOKS:  THANK YOU.

7           THE COURT:  ANY OTHER QUESTIONS?

8           MR. TARLOW:  I'D LIKE TO TAKE UP A MATTER WITH

9   THE COURT AT SOME TIME BEFORE -- I HAVE NO QUESTIONS.

10          THE COURT:  THAT IS ALL I ASKED.

11          DO YOU HAVE ANY REDIRECT EXAMINATION?

12          MR. CAMPOS:  YES, YOUR HONOR.

13                      REDIRECT EXAMINATION

14  BY MR. CAMPOS:

15  Q    NOW, SPECIAL AGENT REYNOSO, WHEN DEFENDANT LOPEZ TOLD

16  YOU THAT SPECIAL AGENT CAMARENA LASTED 24 HOURS DURING HIS

17  TORTURE, HE DIDN'T GIVE YOU ANY INFORMATION AS TO WHEN

18  THAT TORTURE BEGAN, DID HE?

19  A    NO, SIR.

20  Q    NOW, SIMILARLY -- IN FACT, YOU WERE ASKED BY COUNSEL

21  FOR THE DEFENDANT LOPEZ ABOUT WHEN YOU LEARNED -- ABOUT

22  WHEN LOPEZ LEARNED THAT THE DEFENDANT -- OR THAT SPECIAL

23  AGENT CAMARENA HAD DIED, WHICH WAS ON THE 9TH.  DO YOU

24  REMEMBER SHE ASKED YOU ABOUT THAT?

25  A    YES, SIR.

11-163

1    Q    OKAY.  AND IN FACT DIDN'T YOU TESTIFY THAT YOU

2    LEARNED ABOUT THAT SITUATION FROM DEFENDANT LOPEZ'S POST-

3    ARREST STATEMENT?

4    A    THAT IS CORRECT, SIR.

5    Q    AND THAT INFORMATION WAS ONLY THAT HE LEARNED THAT

6    CAMARENA HAD DIED, AND HE LEARNED THAT ON THE 9TH?

7    A    YES, SIR.  HE STATED IN HIS POST-ARREST STATEMENT

8    THAT GONZALEZ-GONZALEZ HAD TOLD HIM THAT CAMARENA HAD BEEN

9    KILLED BY THE PEOPLE.

10   Q    HAD BEEN KILLED, BUT HE DIDN'T GIVE A TIME WHEN HE

11   HAD BEEN KILLED?

12   A    NO, SIR.  HE NEVER SAID THE TIME OR THE DATE.

13        MS. BARRERA:  OBJECTION.  NO FOUNDATION FOR THIS

14   AGENT TO TESTIFY REGARDING THIS, YOUR HONOR.  I DO NOT

15   BELIEVE HE WAS PRESENT.

16        THE COURT:  THE OBJECTION IS SUSTAINED, AND THE

17   ANSWER MAY BE STRICKEN.

18        MR. CAMPOS:  YOUR HONOR, I ONLY SOUGHT TO

19   CLARIFY A POINT.

20        THE COURT:  THE OBJECTION IS SUSTAINED.

21        MR. CAMPOS:  VERY WELL.  I WILL MOVE ON.

22   Q    YOU WERE ALSO ASKED ABOUT WHETHER SPECIAL AGENT

23   CAMARENA HAD GIVEN VISAS TO MEMBERS OF THE MEXICAN FEDERAL

24   JUDICIAL POLICE.  IN FACT, ISN'T THAT A COMMON COURTESY

25   THAT DEA SOMETIMES DOES FOR OTHER OFFICIALS THAT THEY WORK

11-164

1    WITH IN FOREIGN COUNTRIES?

2    A    YES, SIR, IT IS A VERY COMMON PRACTICE FOR OTHER

3    FOREIGN OFFICIALS TO OBTAIN VISAS FOR ENTRY INTO THE

4    UNITED STATES.

5    Q    NOW, DEFENDANT LOPEZ TOLD YOU THAT HE SPOKE WITH DON

6    NETO, THAT IS ERNESTO FONSECA, ON VARIOUS OCCASIONS, DID

7    HE NOT?

8    A    YES, SIR.

9    Q    IN FACT, DIDN'T HE TELL YOU THAT HE HAD DON NETO'S

10   PERMISSION TO BE UP IN LOS ANGELES TO BE INTERACTING WITH

11   YOU?

12   A    YES, SIR.

13   Q    AND ON ANOTHER OCCASION DIDN'T HE TELL YOU THAT HE

14   HAD OBTAINED DON NETO'S PERMISSION TO COME BACK AND

15   CONTINUE TALKING WITH YOU?

16   A    MR. LOPEZ TOLD ME THAT WHATEVER BUSINESS HE HAD TO

17   TAKE UP WITH ME HE HAD TO TAKE UP WITH DON NETO AND WITH

18   CARO FIRST, AND HE HAD OBTAINED THEIR PERMISSION TO

19   CONTINUE NEGOTIATING WITH ME.

20   Q    SO AS A MEMBER OF HIS ORGANIZATION, HE HAD ACCESS TO

21   DON NETO, ERNESTO FONSECA.  CORRECT?

22   A    CORRECT.

23        MS. BARRERA:  OBJECTION TO THE FORM OF THE

24   QUESTION, AND I MOVE THAT THE ANSWER BE STRICKEN.

25        THE COURT:  WHAT IS THE OBJECTION TO THE FORM OF

11-165

1    THE QUESTION?

2              MS. BARRERA:  THE OBJECTION, YOUR HONOR, IS THAT

3    MR. CAMPOS SAID THAT HE HAD AS IF IT WERE A FACT RATHER

4    THAN HE SAID, AND THIS AGENT HAS TESTIFIED HE HAS DONE NO

5    INVESTIGATION.  HE IS BASING HIS TESTIMONY --

6              THE COURT:  ALL RIGHT.

7              YOU KEEP DOING THAT, COUNSEL.  PHRASE YOUR

8    QUESTIONS PROPERLY.

9              MR. CAMPOS:  I WILL CONCENTRATE EVEN HARDER.

10   Q    IN FACT, DEFENDANT LOPEZ TOLD YOU THAT HE HAD

11   OBTAINED PERMISSION FROM ERNESTO FONSECA TO COME UP TO LOS

12   ANGELES A SECOND TIME?

13   A    YES, HE DID SAY THAT.

14   Q    AND HE TOLD YOU, DID HE NOT, THAT HE HAD OBTAINED

15   CARO-QUINTERO'S PERMISSION AS WELL?

16   A    YES, HE DID SAY THAT.

17   Q    NOW, DEFENDANT LOPEZ-ALVAREZ TOLD YOU AT ONE POINT

18   THAT WE, THAT IS, "WE" MEANING SEVERAL PEOPLE BESIDES

19   HIMSELF, HEATED IRON PIPES?

20              THE COURT:  COUNSEL, YOU HAVE COVERED THIS ON

21   DIRECT EXAMINATION.

22              MR. CAMPOS:  VERY WELL, YOUR HONOR.  I WILL MOVE

23   ON.

24   Q    YOU WERE ALSO TOLD BY DEFENDANT LOPEZ, AS BROUGHT UP

25   BY HIS COUNSEL, ABOUT MEMBERS OR SOME INDIVIDUALS SHOWING

11-166

1    BADGES TO SPECIAL AGENT CAMARENA.  IS THAT CORRECT?

2    A    RIGHT, SIR.

3    Q    YOU DON'T HAVE ANY INFORMATION IN YOUR FILES THAT

4    INDICATES THAT ISN'T TRUE, DO YOU?

5    A    NO, I DON'T.

6         MR. CAMPOS:  MAY I HAVE A BRIEF MOMENT, YOUR

7    HONOR?

8         (DISCUSSION OFF THE RECORD.)

9         MR. CAMPOS:  NOTHING FURTHER, YOUR HONOR.

10        MS. BARRERA:  BRIEFLY, YOUR HONOR.

11                    RECROSS EXAMINATION

12   BY MS. BARRERA:

13   Q    WHEN MR. LOPEZ-ALVAREZ TOLD YOU THAT HE HAD

14   PERMISSION TO HAVE HIM SPEAK TO YOU FROM DON NETO AND

15   CARO-QUINTERO, YOU KNEW THAT THOSE TWO INDIVIDUALS WERE IN

16   PRISON IN MEXICO.  CORRECT?

17   A    YES, MA'AM.

18   Q    AND NOBODY FOLLOWED MR. LOPEZ ALVAREZ TO SEE IF IN

19   FACT HE WOULD GO TO THE PERSON TO GO TALK TO THESE PEOPLE.

20   ISN'T THAT CORRECT?

21   A    THAT'S CORRECT.

22   Q    AND IN FACT YOU FIGURED HE REALLY WASN'T TALKING TO

23   THESE PEOPLE.  ISN'T THAT TRUE?

24   A    NO.

25   Q    SIR, IT IS A COMMON PRACTICE FOR DEA AGENTS TO GIVE

11-167

1   LIFELONG VISAS TO FEDERAL OFFICIALS OF ANOTHER COUNTRY.

2   IS THAT CORRECT?

3   A    DEA DOES NOT GIVE VISAS.  THE STATE DEPARTMENT DOES.

4   Q    OKAY.  I THOUGHT YOUR ANSWER TO MR. CAMPOS WAS YES,

5   IT IS A COMMON PRACTICE FOR DEA TO DO THAT.  IS THAT

6   INCORRECT?

7   A    DEA ASSISTS INDIVIDUALS TO OBTAIN VISAS.  I DIDN'T

8   SAY THEY GAVE THE VISAS, MA'AM.

9   Q    DEA CANNOT DO THAT?

10  A    THEY CAN ASSIST SOMEBODY TO OBTAIN VISAS.

11  Q    OKAY.  SO ENRIQUE CAMARENA COULD NOT HAVE GIVEN A

12  LIFELONG VISA TO ANYONE.  CORRECT?

13  A    NO, BUT HE COULD ASSIST SOMEBODY IN GETTING ONE.

14  Q    BUT YOU SAID HE COULDN'T DO IT.  RIGHT?

15  A    THAT'S CORRECT.

16  Q    AND EVEN IF -- LET'S TALK ABOUT ASSISTING SOMEONE IN

17  GETTING A VISA.  IS IT A COMMON PRACTICE TO ASSIST THE

18  GETTING OF LIFELONG VISAS TO CONFIDENTIAL INFORMANTS AS

19  WELL AS GOVERNMENT OFFICIALS?

20  A    I DON'T KNOW THAT.

21          MR. CAMPOS:  YOUR HONOR, I AM GOING TO OBJECT ON

22  RELEVANCE.

23          MS. BARRERA:  THAT WAS PART OF HIS TESTIMONY,

24  YOUR HONOR.

25          THE COURT:  WELL, IT IS STILL NOT VERY RELEVANT

11-168

1    TO ANYTHING.

2         MS. BARRERA:  YOUR HONOR, IT IS IN DIRECT

3    RESPONSE TO THEIR QUESTION OF IT BEING A COMMON PRACTICE.

4         THE COURT:  IT HAS ALREADY BEEN COVERED BY BOTH

5    OF YOU.

6         MS. BARRERA:  THANK YOU.  I WILL MOVE ON.

7    Q    WITH REGARDS TO MR. LOPEZ ALVAREZ NOT GIVING YOU ANY

8    INDICATION OF WHEN THE TORTURE OF ENRIQUE CAMARENA BEGAN

9    OR ENDED, THAT WAS JUST ANOTHER EXAMPLE OF THE SCARCITY OF

10   DETAILS THAT HE WAS GIVING YOU WITH REGARD TO THIS CASE.

11   ISN'T THAT TRUE?

12   A    MA'AM, AGAIN I WAS NOT QUESTIONING MR. LOPEZ.  I WAS

13   UNDERCOVER.  HE WAS VOLUNTEERING INFORMATION, AND I COULD

14   NOT ASK HIM TO A CERTAINTY THAT THIS IS EXACTLY WHAT

15   HAPPENED.  NO.

16   Q    IT'S BEEN MADE CLEAR THAT YOU WERE NOT INTERROGATING.

17   MY QUESTION IS:  THAT WAS JUST ANOTHER EXAMPLE OF THE

18   SCARCITY OF DETAILS HE WAS GIVING YOU.  ISN'T THAT TRUE?

19        MR. CAMPOS:  ASKED AND ANSWERED, YOUR HONOR.

20        THE COURT:  YES, IT HAS BEEN.

21        MS. BARRERA:  NOTHING FURTHER.  THANK YOU, YOUR

22   HONOR.

23        THE COURT:  ALL RIGHT.

24        YOU MAY STEP DOWN.

25        THE WITNESS:  THANK YOU, YOUR HONOR.

11-169

1        THE COURT:  I WILL REMIND THE JURY AGAIN THAT

2    THE TESTIMONY OF THIS WITNESS CONCERNING WHAT MR. LOPEZ

3    SAID TO HIM, THE STATEMENTS MADE TO HIM BY MR. LOPEZ, BOTH

4    DURING DIRECT AND CROSS-EXAMINATION IS LIMITED FOR

5    CONSIDERATION BY YOU TO MR. LOPEZ.  THAT IS, IT MAY NOT BE

6    CONSIDERED AS EVIDENCE AGAINST THE OTHER TWO DEFENDANTS.

7        THE JURY MAY BE EXCUSED FOR OUR AFTERNOON

8    RECESS.

9        (THE JURY LEFT THE COURTROOM AND

10        PROCEEDINGS IN OPEN COURT.)

11        THE COURT:  YOU HAVE SOMETHING YOU WISH TO TAKE

12    UP WITH THE COURT?

13        MR. TARLOW:  WELL, YOUR HONOR TOOK UP, I

14    BELIEVE, MOST OF THE DIFFICULTY I WAS HAVING.  I WAS

15    TRYING TO BE SURE THAT NOTHING THAT THE WITNESS SAID IS

16    ADMITTED AS TO MY CLIENT SO THAT I WOULDN'T HAVE A NEED TO

17    CROSS-EXAMINE.  I DON'T UNDERSTAND THAT ANYTHING WAS.

18        THE COURT:  WELL, I THINK THE JURY HAS BEEN WELL

19    INSTRUCTED ON THAT.

20        MR. TARLOW:  BUT, YOU SEE, THERE IS ANOTHER PART

21    OF THE TESTIMONY WHERE HE STARTS TAKING THINGS THAT

22    MR. LOPEZ SAID, AND HE ASKED HIM ABOUT HIS INVESTIGATION

23    AND WHAT HE FOUND, AND WELL, I FOUND OUT THESE PEOPLE

24    CONFESSED AND THAT KIND OF THING, WHICH I OBJECTED TO AND

25    WAS OVERRULED.  BUT I WANT TO BE SURE THAT THEY ARE

11-170

1   INSTRUCTED THAT THAT DOESN'T HAVE ANYTHING TO DO WITH US,

2   EITHER.  I DON'T KNOW WHY IT COULD COME IN ANYWAY, BUT

3   ASSUMING THAT IT COMES IN FOR SOME PROPER PURPOSE FOR

4   MR. LOPEZ TO SEE IF HE IS MAYBE NOT TELLING THE TRUTH, IT

5   STILL DOESN'T CONCERN US IN OUR EXAMINATION, AND IT SEEMS

6   TO ME I HAVE --

7            THE COURT:  WELL, I AM SATISFIED THAT ALL THE

8   TESTIMONY GIVEN IN NO WAY IMPLICATES YOUR CLIENT IN

9   ANYTHING.  I DON'T KNOW WHAT YOUR CONCERN IS.

10           MR. TARLOW:  WELL, CAN WE JUST TELL THE JURY

11  THAT?

12           THE COURT:  I AM NOT GOING TO TELL THE JURY

13  THAT.  THAT IS NOT MY --

14           MR. TARLOW:  NO, NOT THAT IT DOESN'T IMPLICATE

15  HIM, THAT IT IS NOT GOING TO BE USED.  NOT WHAT MR. LOPEZ

16  SAID, BUT ANYTHING ELSE THAT HE DID --  THAT THIS WITNESS

17  DID OR SAID.

18           THE COURT:  THE JURY HAS BEEN FULLY INSTRUCTED.

19  I AM SATISFIED THAT THE INSTRUCTION IS ADEQUATE.

20           MR. PANCER:  I HAVE ANOTHER MATTER, YOUR HONOR.

21           THE COURT:  WHAT IS IT?

22           MR. PANCER:  WE RECEIVED LAST NIGHT JENCKS ON A

23  NUMBER OF WITNESSES.  I HAVEN'T HAD A CHANCE TO GO THROUGH

24  IT.  I DON'T KNOW HOW MANY WITNESSES WE RECEIVED JENCKS ON

25  LAST NIGHT.  I UNDERSTAND, YOUR HONOR, THAT THERE IS NO

11-171

1   REQUIREMENT IN TERMS OF PROVIDING JENCKS, BUT I WOULD ASK

2   THAT THE GOVERNMENT STICK BY WHAT I THOUGHT WAS THE

3   COURT'S GENERAL ORDER THAT THE GOVERNMENT GIVE US 48

4   HOURS' NOTICE BEFORE A WITNESS IS CALLED.

5          THE REASON I RAISE THIS NOW IS THAT I WAS TOLD

6   THAT THE GOVERNMENT MAY GET TO A WITNESS BY THE NAME OF

7   BROWN TODAY.  YOUR HONOR, I NEVER HEARD OF THAT PERSON IN

8   MY LIFE UNTIL LAST NIGHT WHEN I RECEIVED SOME DISCOVERY

9   AND FLIPPED THROUGH IT.  I HAVEN'T READ THE DISCOVERY.  I

10  HAVE NO IDEA WHAT IT IS ABOUT.  I OBJECT TO THAT WITNESS

11  BEING CALLED NOW.  WE MAY HAVE IN LIMINE MOTIONS

12  CONCERNING THAT WITNESS'S TESTIMONY, YOUR HONOR, AND WE

13  NEED 48 HOURS AT LEAST AS TO THE NAME OF A WITNESS.  I

14  HAVE NO IDEA WHO THIS PERSON IS AND WHAT THEY WOULD

15  TESTIFY TO.

16         THE COURT:  ARE YOU CALLING SUCH A WITNESS?

17         MR. GURULE:  WE MAY, YOUR HONOR, IF WE GET TO

18  THAT POINT.  WE HAVE TWO ADDITIONAL WITNESSES THAT WE

19  INTEND TO CALL WHOSE JENCKS HAS BEEN DISCLOSED FOR, I

20  WOULD THINK, SINCE THURSDAY OR FRIDAY OF LAST WEEK.

21         THE COURT:  WHEN DID YOU DISCLOSE THE JENCKS ON

22  BROWN?

23         MR. GURULE:  WE CALLED MR. PANCER YESTERDAY AT

24  NOON.  THE ENTIRE JENCKS ON HIM CONSISTS, BESIDES HIS

25  PRIOR CONVICTION, PROBABLY 15 PAGES, 15 PAGES OF REPORTS.

11-172

1    WE MAY OR MAY NOT GET TO HIM, JUST DEPENDING ON WHAT

2    HAPPENS WITH THE LAST TWO WITNESSES.  IF WE DON'T, THEN WE

3    WILL GET TO HIM TOMORROW, AND I THINK THAT WOULD GIVE

4    DEFENSE COUNSEL PLENTY OF TIME.

5            THE ONLY OTHER THING I WOULD ADD, YOUR HONOR, IS

6    THAT WE ARE TRYING TO FACILITATE AND DISCLOSE A GREATER

7    AMOUNT OF THE JENCKS MATERIAL SO THAT WE DON'T RUN INTO

8    THESE PROBLEMS.  WHAT WE DID YESTERDAY IS WE DISCLOSED

9    PROBABLY TEN WITNESSES, WE THINK WITNESSES THAT WILL TAKE

10   US UP INTO THE END OF THE WEEK AND MAYBE EVEN INTO THE

11   FOLLOWING WEEK.

12           BUT THAT IS THE PLAN, THAT IS THE INTENTION SO

13   THAT WE DON'T RUN INTO THESE PROBLEMS WHERE WE ARE MOVING

14   ALONG FASTER THAN WE THOUGHT, AND THEN WE FIND OURSELVES

15   IN THE POSITION WHERE WE ARE CALLING A WITNESS AN

16   AFTERNOON OR A DAY EARLIER THAN WE THOUGHT WE WOULD BE.

17           BUT AS OF YESTERDAY WE HAVE DISCLOSED AT LEAST

18   TEN ADDITIONAL WITNESSES THAT WILL TAKE US THROUGH THE END

19   OF THE WEEK.

20           MR. PANCER:  TOMORROW THEY INTENDED TO CALL, AS

21   I UNDERSTAND IT, A NUMBER OF WITNESSES WHOSE JENCKS I GOT

22   LAST NIGHT.  MS. LEYVA SAID SHE GOT HER FIRST DELIVERY OF

23   DISCOVERY YESTERDAY AT 5:00 O'CLOCK.  I CAME UP AS SOON AS

24   I GOT OUT OF THE COURT TO GET THAT DISCOVERY, BUT I DID

25   NOT GET IT UNTIL LAST NIGHT, YOUR HONOR.

11-173

1    NOW, I WOULD REQUEST THAT THE GOVERNMENT BE

2  FORCED TO ADHERE TO THE 48-HOUR RULE.

3    I WAS ABLE TO GET READY FOR ONE WITNESS, AND I

4  WOULD BE GLAD TO TELL THE GOVERNMENT WHO THAT IS.  I CAN

5  PROBABLY GET READY FOR ANOTHER WITNESS THAT WE HAVE SOME

6  EXPECTATION MIGHT BE HERE TOMORROW, ALTHOUGH WE DIDN'T GET

7  NOTICE; BUT I WOULD ASK THAT THIS COURT ENFORCE THAT 48-

8  HOUR RULE BECAUSE IT SEVERELY PREJUDICES US, YOUR HONOR,

9  IF WE DO NOT.

10    MR. GURULE:  WE DISCLOSED IT.  WE CALLED

11  MR. PANCER YESTERDAY AT NOON.  IF WE HAVE TO CALL ANY OF

12  THESE ADDITIONAL WITNESSES TOMORROW, WE THINK THAT IF IT

13  IS NOT WITHIN THE 48 HOURS LIMIT, IT WILL BE WITHIN 36

14  HOURS OF THE 48-HOUR LIMIT.  IF WE END UP CALLING BROWN

15  TOMORROW MORNING AT 9:30, AND WE HAVE CALLED HIM AT NOON

16  TO LET HIM KNOW, WITHIN A COUPLE OF HOURS EITHER WAY IT IS

17  NOT A SITUATION WHERE WE ARE DISCLOSING IT AN HOUR BEFORE

18  WE ARE PUTTING HIM ON THE STAND.

19    MR. PANCER:  EXCUSE ME, YOUR HONOR.

20    THE COURT:  JUST A MOMENT.  GIVE THEM THE

21  MATERIAL 48 HOURS BEFORE THE WITNESS TESTIFIES.

22    MR. GURULE:  WE ARE TRYING TO.  WE WILL, YOUR

23  HONOR.

24    THE COURT:  DO IT.

25    MR. GURULE:  WE HAVE ATTEMPTED TO DO THAT, AND

11-174

1    WE WILL TRY HARDER, YOUR HONOR.

2              THE COURT:  ALSO AT THE CLOSE OF TODAY I WANT

3    YOU TO NOTIFY THEM WHICH WITNESSES YOU INTEND TO CALL

4    TOMORROW.

5              MR. GURULE:  WE WILL.

6              MR. PANCER:  I WOULD ASK THAT BROWN NOT BE

7    CALLED TODAY, YOUR HONOR, AND NOT TOMORROW AND AT LEAST

8    NOT UNTIL THE TIME WE HAVE HAD THE 48 HOURS' NOTICE.

9              I WOULD SAY, YOUR HONOR, THAT I ASKED MR. KUEHL

10   WHEN HE CALLED ME, "WHO IS IN THE DISCOVERY?"  AND HE

11   SAID, "I DON'T KNOW.  I JUST DELIVER IT."  AND I

12   UNDERSTAND THAT HAS BEEN THEIR POSITION.  THE AGENTS WON'T

13   TELL US.  NO ONE TOLD ME.  I DIDN'T KNOW --

14             THE COURT:  WELL, YOU HAVE HAD THIS SINCE LAST

15   NIGHT.  WHEN DID YOU FIND OUT THIS WITNESS WAS GOING TO

16   TESTIFY?

17             MR. PANCER:  BROWN THEY TOLD ME TODAY AT THE

18   LAST BREAK.  SO PROBABLY AT 1:30 HE SAID THEY MAY GET TO

19   HIM TODAY.

20             THE COURT:  ALL RIGHT.  HE SAID THAT THAT

21   MATERIAL IS VERY SHORT.  WHY CAN'T YOU ACQUAINT YOURSELF

22   WITH IT.  IF YOU CAN DEMONSTRATE TO ME THERE IS A PROBLEM

23   THAT YOU NEED TIME FOR, THEN I WILL CONSIDER IT, BUT I AM

24   SIMPLY NOT GOING TO DO IT BECAUSE THERE WASN'T QUITE 48

25   HOURS UNLESS THERE IS SOME PREJUDICE.

11-175

1          MR. PANCER:  WELL, YOUR HONOR, HE AT LEAST CAN'T

2    TESTIFY TODAY, I ASSUME.

3          THE COURT:  WELL, HE MAY TESTIFY TODAY UNLESS

4    YOU CAN TELL ME WHY NOT.

5          MR. PANCER:  YOUR HONOR, I HAVEN'T READ THE

6    DISCOVERY.

7          THE COURT:  WELL, READ IT.

8          MR. PANCER:  THEY ARE ABOUT TO CALL ANOTHER

9    WITNESS.  I HAVE GOT TO PAY ATTENTION, YOUR HONOR.  I

10   CAN'T WITHDRAW FROM THIS TRIAL WHILE WITNESSES ARE

11   TESTIFYING TO READ DISCOVERY.

12         THE COURT:  YOU SAID YOU HAD THIS MATERIAL

13   YESTERDAY.

14         MR. PANCER:  YOUR HONOR, SO LAST NIGHT I

15   PREPARED FOR GOMEZ ESPANA, PREPARED FOR SKIP HOLLESTELLE.

16   WE HAVE BEEN WORKING AROUND THE CLOCK, YOUR HONOR.  THEY

17   DIDN'T GIVE ME AN ORDER OF WITNESS LIST.  I WAS ADVISED

18   THAT BROWN WOULD BE CALLED BECAUSE I THOUGHT BASED ON HOW

19   THEY WERE PRESENTING THE CASE THAT GOMEZ ESPANA WOULD BE

20   CALLED, SO I AM READY FOR THAT WITNESS.  LET THEM CALL

21   MR. ESPANA.

22         THE COURT:  ALL RIGHT.  TAKE A LOOK AT THAT

23   MATERIAL DURING THE RECESS, AND LET ME KNOW IF THERE IS

24   ANYTHING IN IT THAT YOU THINK REQUIRES ADDITIONAL TIME.

25         MR. TARLOW:  YOUR HONOR, I REQUEST AN

11-176

1   EVIDENTIARY RULING FROM THE COURT ABOUT THIS NEXT SERIES

2   OF WITNESSES AND ASK THE COURT TO THINK ABOUT IT.  I GOT

3   THE SAME DISCOVERY, WHICH IS ABOUT A THOUSAND OR 1500

4   PAGES.  I HAVE SORTED IT OUT.  IT SEEMS TO BE ABOUT

5   MR. VERDUGO AND HIS MARIJUANA DEAL, WHICH HAS NOTHING TO

6   DO WITH MY CLIENT.  IF THAT IS ADMITTED FOR SOME LIMITED

7   PURPOSE, I WOULD REQUEST THAT THERE BE AN INSTRUCTION, A

8   RULING, SO I CAN FIGURE OUT WHAT TO DO WITH THESE TEN

9   WITNESSES AND WHAT TO DO WITH THIS 1500 OR THOUSAND PAGES

10  OF MATERIAL.

11          I AM NOT SURE WHAT MR. VERDUGO'S MARIJUANA

12  DEALINGS HAVE TO DO WITH MY CLIENT.  MAYBE THEY PROVE AN

13  ENTERPRISE ALLEGATION.  THAT IS WHAT THE GOVERNMENT IS

14  OFFERING IT FOR, AND IF THAT IS WHAT THEY WANT TO USE IT

15  FOR, LET THE COURT TELL THE JURY ABOUT THAT, AND I CAN

16  WORK ON SOMETHING ELSE.

17          BUT WE HAVE GOT TO AT LEAST HAVE SOME IDEA OF

18  WHAT WE ARE GOING TO HAVE THIS EVIDENCE FOR.

19          MS. LEYVA:  WE WOULD JOIN IN MR. TARLOW'S

20  OBJECTION, YOUR HONOR.

21          MR. GURULE:  THE GOVERNMENT IS BEING PLACED IN

22  THE POSITION OF HAVING TO TELL THE DEFENSE ATTORNEYS WHAT

23  ITS WITNESSES ARE GOING TO SAY BEFORE THEY TAKE THE STAND.

24          MR. TARLOW:  YOUR HONOR --

25          MR. GURULE:  YOUR HONOR, I KNOW OF NO CASE

11-177

1    AUTHORITY --

2              MR. TARLOW:  I AM NOT SAYING --

3              MR. GURULE:  -- NO LEGAL PROPOSITION REQUIRING

4    US TO DO THAT.  WE HAVE GIVEN THEM THE JENCKS FOR THE

5    ENTIRE REST OF THE WEEK AS OF YESTERDAY, YOUR HONOR.

6    THERE ARE GOING TO BE WITNESSES TAKING THE STAND ON

7    FRIDAY, AND THEY GOT THE JENCKS MONDAY NIGHT.  I THINK

8    THAT IS MORE THAN FAIR.

9              THE ONLY THING THAT I WOULD ADD IN ADDITION IS

10   THAT EACH OF THESE WITNESSES THAT WERE DISCLOSED YESTERDAY

11   WERE ALL CONFIDENTIAL INFORMANT WITNESSES, AND AGAIN IT IS

12   THAT CONCERN THAT THE GOVERNMENT HAS RELATIVE TO THEIR

13   SAFETY AND SECURITY THAT IS CAUSING THE GOVERNMENT TO BE

14   SO CAUTIOUS RELATIVE TO DISCLOSING THEIR NAMES, THEIR

15   IDENTITIES, ET CETERA.

16             THE COURT:  WE HAVE COVERED THIS IN A MOTION.

17             MR. TARLOW:  THAT WAS FOR A LIMITED PURPOSE.

18   THE GOVERNMENT SAYS THEY WANT TO USE THIS TO PROVE THE

19   ENTERPRISE.  NOW, IF THAT IS SO, I THINK THE JURY SHOULD

20   BE TOLD.

21             I DON'T WANT THE GOVERNMENT TO TELL ME ANYTHING.

22   I AM SAYING THAT I HAVE LOOKED AT THESE 1500 PAGES.  I

23   HAVE STUDIED THEM, AND IT APPEARS TO ME THAT THEY ARE

24   OFFERING IT AS TO MR. VERDUGO'S MARIJUANA DEAL.  I AM JUST

25   MAKING A RELEVANCY OBJECTION IN CLAIMING THAT IF IT IS

11-178

1    BEING PUT IN FOR SOME LIMITED PURPOSE, TELL THE JURY.

2           MR. GURULE:  IT IS BEING INTRODUCED FOR THE

3    ENTERPRISE PURPOSE, BUT THE ENTERPRISE EVIDENCE IS

4    EVIDENCE THAT GOES TO EACH OF THESE DEFENDANTS, NOT JUST

5    TO MR. VERDUGO.  THE EXISTENCE OF A NARCOTICS ENTERPRISE

6    AND THEIR VARIOUS ROLES IN IT IS RELEVANT EVIDENCE AS TO

7    EACH OF THE DEFENDANTS.  IT IS NOT LIMITED JUST TO

8    MR. VERDUGO.

9           THE COURT:  YOU HAD A RULING ON THIS CONCERNING

10   YOUR CLIENT THAT THE EVIDENCE OF THE ENTERPRISE WAS RULED

11   TO BE RELEVANT AS TO YOUR CLIENT TO ESTABLISH BOTH

12   MOTIVATION AND INTENT.

13          MR. TARLOW:  BUT HE HAS NOTHING TO DO WITH THIS.

14   THAT RULING, YOUR HONOR, DEALT WITH WHETHER MY CLIENT WAS

15   DEALING CONTRABAND WITH MR. CARO-QUINTERO IN SOME WAY.  WE

16   ARE GOING TO GET TO THAT WHEN WE GET TO HIS EVIDENCE.

17   THIS IS EVIDENCE OF MARIJUANA DEALING BY MR. VERDUGO, AND

18   IT HAS NOTHING TO DO WITH HIM.  HE NEVER LAID EYES ON

19   MR. VERDUGO OR ANY OF THESE DEALINGS BEFORE.  SO THAT IT

20   PRESENTS A DIFFERENT QUESTION.

21          THE COURT:  THAT IS ENOUGH DISCUSSION.  MAKE

22   YOUR OBJECTION WHEN THE EVIDENCE IS OFFERED.

23          MR. TARLOW:  I WANTED THE COURT TO THINK ABOUT

24   IT SO YOU CAN DECIDE WHAT YOU ARE GOING TO DO.

25          MR. PANCER:  ON ANOTHER SUBJECT MATTER, YOUR

11-179

1   HONOR, WE HAVE REQUESTED COPIES OF THE PROBATION REPORTS

2   FOR THE CONFIDENTIAL INFORMANTS, AND WE WERE RELYING ON

3   THE CASE OF U.S. VERSUS STRIFLER AT 87-1078, 87-1081.  IT

4   IS A NINTH CIRCUIT CASE DECIDED JULY 11.  I HOPE THAT I AM

5   GIVING THE COURT THE RIGHT CITE.  THERE WERE TWO CASES

6   THAT CAME DOWN ABOUT THE SAME TIME, BUT THE CASE I AM

7   RELYING ON SAID THAT I AM ENTITLED TO THOSE REPORTS.  NOW,

8   I WROTE TO MR. GURULE VERY EARLY ON IN THIS CASE THAT I

9   THINK WE ARE ENTITLED TO THEM.

10          I WOULD TELL YOUR HONOR THAT IT WOULD SOLVE A

11   LOT OF MY TIME PROBLEMS IF I GET THEM BECAUSE THE

12   BACKGROUND INVESTIGATION THAT THE PROBATION DOES IS THE

13   EXACT, SAME KIND OF BACKGROUND THAT I WOULD WANT TO DO

14   WITH A WITNESS LIKE BROWN, WHO I HAD NEVER HEARD OF.

15          THE COURT:  I AM FAMILIAR WITH THIS CASE

16   REGARDING PROBATION REPORTS.  WHAT IS YOUR UNDERSTANDING

17   OF WHY THAT ENTITLES YOU TO A WITNESS'S PROBATION REPORT?

18          MR. PANCER:  IT WAS MY UNDERSTANDING THAT THE

19   CASE TALKED ABOUT CONFIDENTIAL INFORMANTS WHO ARE

20   TESTIFYING IN COURT.  IT SAID THAT THE DEFENSE WAS

21   ENTITLED TO THE PROBATION REPORT IF THEY HAVE BEEN

22   CONVICTED OF AN OFFENSE AND WE ARE TO EFFECTIVELY CROSS-

23   EXAMINE THE WITNESS AND CONFRONT THE WITNESS AND

24   ADEQUATELY REPRESENT THE CLIENT.

25          THE COURT:  WHAT IS THE NUMBER OF THE CASE?

11-180

1          MR. PANCER:  87-1078 -- I TOOK IT FROM DAILY

2     TRANSCRIPT, YOUR HONOR -- 87-1078, 87-1081, A NINTH

3     CIRCUIT CASE DECIDED JULY 11, 1988.

4          THE COURT:  WHAT IS THE NAME OF IT?

5          MR. PANCER:  STRIFLER, S-T-R-I-F-L-E-R.

6          YOUR HONOR, MY ONLY CAVEAT IS THAT TWO CASES

7     ADDRESSING THIS ISSUE CAME DOWN AT THE SAME TIME.  I HAD

8     TO CALL BACK TO MY OFFICE FOR THE CITE.  I HOPE I AM

9     GIVING THE COURT THE CORRECT CITE.

10          THE COURT:  IT DOESN'T SOUND RIGHT.

11          MR. PANCER:  WELL, I AM GOING TO TRY TO DOUBLE

12     CHECK.  I HAVEN'T HAD TIME.  I DID NOT KNOW WE WERE GOING

13     TO GET TO THESE WITNESSES UNTIL LATE LAST NIGHT.

14          MR. GURULE:  WE WILL TAKE A LOOK AT THAT CASE,

15     YOUR HONOR.  I AM NOT AWARE OF ANY CASE AUTHORITY STANDING

16     FOR THAT PROPOSITION.  I AM AWARE OF CASES THAT STAND FOR

17     THE PROPOSITION THAT A PRESENTENCE REPORT IS NOT JENCKS

18     MATERIAL TO BE DISCLOSED OF THE WITNESS.  BUT I WILL GET A

19     COPY OF THAT CASE, AND I WANT TO BE HEARD OBVIOUSLY ON

20     WHETHER OR NOT THE GOVERNMENT'S OBLIGATION EXTENDS THAT

21     BROADLY TO HAVE TO DISCLOSE CONFIDENTIAL PRESENTENCE

22     INVESTIGATION REPORTS.

23          THE ONE MATTER I WOULD LIKE TO BRING UP TO THE

24     COURT IS THAT WE HAVE HAD FOUR WITNESSES NOW THAT THE

25     DEFENSE COUNSEL HAVE ASKED THAT THEY REMAIN.  BASICALLY

11-181

1    THEY HAVE RESERVED THEIR RIGHT TO CROSS-EXAMINE THEM, AND
2    ALL OF THOSE WITNESSES ARE EITHER FROM OUT OF THE STATE OR
3    OUT OF THE COUNTRY, AND THE CLAIM AT THAT TIME WAS THAT
4    THEY HAD JUST RECEIVED THE JENCKS MATERIAL THE DAY BEFORE
5    OR TWO DAYS BEFORE, AND THEY NEEDED ADDITIONAL TIME.

6        NOW, RELATIVE TO SPECIAL AGENT DALE STINSON AND
7    BOBBY CASTILLO, I BELIEVE THEY TESTIFIED WEDNESDAY OR
8    THURSDAY OF LAST WEEK.  THE DEFENSE COUNSEL HAVE NOW GOT
9    APPROXIMATELY UNDER A WEEK TO PREPARE FOR THEIR TESTIMONY;
10   AND THEN THE C.I., GUADALUPE GOMEZ, WHO WAS THE SUBJECT OF
11   THESE ZACATECAS FIELDS, AND THE C.I. WHO TESTIFIED
12   REGARDING THE CHIHUAHUA FIELDS OPERATIONS, HE TESTIFIED
13   ROUND THE MIDDLE OF LAST WEEK AND WE JUST WANT TO KNOW IF
14   WE ARE GOING TO HAVE TO KEEP THESE WITNESSES HERE
15   INDEFINITELY, OR IF THERE IS A DATE CERTAIN THAT THE
16   DEFENSE WILL BE CALLING THEM TO CROSS-EXAMINE THEM.

17       MS. LEYVA:  YOUR HONOR, WITH RESPECT TO AGENTS
18   CASTILLO AND STINSON, THOSE ARE THE TWO VOICE
19   IDENTIFICATION PEOPLE WHO TESTIFIED ABOUT IDENTIFICATION
20   OF VOICES, AS THE COURT IS AWARE, WE RECEIVED FOUR FULL
21   CASSETTE TAPES OF INTERROGATIONS WITH SOME OF THEM BEING
22   THE VOICES OF ESPINO-VERDIN AND RAFAEL CARO-QUINTERO.  WE
23   HAVE BEEN LISTENING TO THOSE TAPES.  WE HAVE BEEN
24   PREPARING FURTHER CROSS-EXAMINATION, AND WE ARE CONSULTING
25   WITH EACH OTHER AS TO THE FURTHER CROSS-EXAMINATION THAT

11-182

1   WILL BE CONDUCTED OF THOSE WITNESSES.

2            WE ARE NOT PREPARED TO CROSS-EXAMINE THEM AT

3   THIS TIME.  WE ARE ASKING THEM TO BE HELD UNTIL WE ARE

4   READY TO CROSS-EXAMINE THEM.  THE GOVERNMENT APPEARS TO

5   HAVE PLENTY OF WITNESSES FOR THIS WEEK.  THE COURT WILL BE

6   OUT OF SESSION NEXT WEEK, AND WE EXPECT BY THE WEEK OF THE

7   22ND WE WILL BE ABLE TO CROSS-EXAMINE.

8            PERHAPS THEY COULD BE RELEASED AT THIS TIME SO

9   THAT THEY ARE NOT HANGING AROUND THE COURTHOUSE, BUT WE DO

10  ASK THAT THEY BE MADE AVAILABLE THE WEEK OF THE 22ND OF

11  AUGUST.

12           THE COURT:  WHAT ABOUT THE OTHER WITNESSES?

13           MR. TARLOW:  ONE IS THE CONFIDENTIAL INFORMANT

14  THEY NEVER CALLED.  IS THAT CORRECT, YOUR HONOR?

15           THE COURT:  I DON'T KNOW.

16           MR. TARLOW:  THE CONFIDENTIAL INFORMANT THAT

17  THEY DIDN'T CALL THAT AGENT KUYKENDALL'S TESTIMONY WOULD

18  BE BASED ON, AND ALL THAT WE COULD DO WITH HIM WOULD BE TO

19  GET HIM DURING OUR CASE.  HE HAS NEVER HIT THE STAND YET.

20           MS. LEYVA:  YOUR HONOR, HE HAS BEEN SUBPOENAED.

21  MR. PANCER MET WITH HIM AND ASKED HIM TO COME BACK TO

22  COURT AND GAVE HIM A SUBPOENA TO RETURN THE WEEK OF

23  AUGUST 22ND AND TO BE IN CONTACT WITH EITHER THE AGENTS OR

24  WITH OURSELVES TO BE ABLE TO KNOW WHAT EXACT DATE WE WILL

25  NEED HIM BECAUSE WE DO NOT KNOW WHEN THE GOVERNMENT WILL

11-183

1    CONCLUDE ITS CASE.  BUT HE HAS BEEN SUBPOENAED.

2            THE COURT:  YOU WANT HIM AS A DEFENSE WITNESS?

3            MS. LEYVA:  THAT IS CORRECT.

4            MR. TARLOW:  AND THE FELLOW FROM ZACA -- ZACA

5    SOMETHING OR FROM BUFALO, WE HAVEN'T BEEN ABLE TO FIND OUT

6    ANYTHING.

7            MR. GURULE:  YOU SEE, THAT IS JUST THE POINT,

8    YOUR HONOR.  WE HAVE AGENTS TESTIFY IN THE MIDDLE OF LAST

9    WEEK, AND NOW THEY ARE SAYING THAT THEY NEED UNTIL THE

10   22ND OF THIS MONTH TO GO AHEAD AND PREPARE THEIR CROSS-

11   EXAMINATION.  THEN WE HAVE A WITNESS THAT TESTIFIES, AND

12   THEY GET THE JENCKS A DAY OR TWO DAYS BEFORE, AND THEY ARE

13   STILL NOT READY TO CROSS-EXAMINE THAT WITNESS A WEEK AFTER

14   HE HAS TESTIFIED, AND IT IS JUST KIND OF A FISHING

15   EXPEDITION.  LET'S HOPE AND SEE IF WE ARE ABLE TO FIND

16   SOMETHING ON THESE WITNESSES TO PROLONG THIS THING

17   INDEFINITELY.

18           THE COURT:  IT SEEMS TO ME THAT YOU ARE TAKING

19   AN UNDUE AMOUNT OF TIME WITH RESPECT TO THESE TWO AGENTS,

20   WHO WERE REALLY VOICE IDENTIFICATION WITNESSES.

21           MS. LEYVA:  YOUR HONOR, FOR THE COURT'S

22   INFORMATION, WE RECEIVED FOUR CASSETTE TAPES WITHOUT ANY

23   DESCRIPTION OF WHAT VOICES OTHER THAN THERE WOULD BE CARO-

24   QUINTERO'S VOICE AND ESPINO-VERDIN'S VOICE, AND WE HAVE

25   HAD TO LISTEN AND TRACK DOWN.  THEY ARE IN SPANISH, AND WE

11-184

1   HAVE NOT BEEN PROVIDED A TRANSCRIPT EITHER IN SPANISH OR

2   IN ENGLISH, AND IT HAS BEEN A TEDIOUS PROCESS, YOUR HONOR.

3            IN ADDITION, YOUR HONOR, WE HAVE NOT JUST BEEN

4   SITTING AROUND WASTING OUR TIME.  EVERY NIGHT WE ARE

5   RECEIVING STACKS AND STACKS OF JENCKS.  WE ARE EXPECTED TO

6   BE PREPARED TO CROSS-EXAMINE THE WITNESSES ON A DAY'S

7   NOTICE, AND I JUST DON'T BELIEVE WE ARE BEING UNDULY

8   DILATORY IN PREPARING THIS CASE.  WE ARE DOING AS MUCH AS

9   WE CAN EVERY SINGLE NIGHT AND EVERY WEEKEND, IN ADDITION

10  TO CONSULTING WITH OTHER COUNSEL SO THAT WE WILL OVERLAP

11  OUR CROSS-EXAMINATION.  WE HAVE PROMISED THE COURT WE

12  WOULD DO THAT.  I THINK THE COURT IS AWARE THAT WE HAVE

13  BEEN DOING THAT.

14           IT IS NOT UNREASONABLE TO ASK THAT THESE TWO

15  AGENTS BE ALLOWED TO RETURN AT SOME FUTURE POINT.  WE

16  DON'T NEED THEM HANGING AROUND THIS COURTROOM.  WE ARE

17  ASKING THAT THEY BE AVAILABLE THE WEEK OF THE 22ND.  WE

18  THINK WE CAN PREPARE WHAT WE NEED IN ORDER TO DO THE

19  CROSS-EXAMINATION, AND, YOUR HONOR, I CAN REPRESENT TO THE

20  COURT THAT COUNSEL HAS BEEN AS DILIGENT AS THEY CAN.  WE

21  JUST CANNOT DO MORE WITH 24 HOURS IN A DAY.

22           MR. TARLOW:  THERE ARE OTHER DISCOVERY MOTIONS I

23  FILED TODAY REGARDING MISSING TAPES -- TAPE OR TAPES --

24  AND WE NEED THAT MATERIAL TO EXAMINE THESE AGENTS AS WELL.

25           THE COURT:  WHAT MISSING TAPE?

11-185

1    MR. TARLOW:  WELL, WE GOT THIS TRANSCRIPT THAT

2    APPEARED ON FRIDAY WHICH IS OBVIOUSLY MADE FROM A TAPE

3    RECORDING.  WE NEED THAT TAPE RECORDING TO DEAL WITH

4    CROSS-EXAMINING THESE WITNESSES ABOUT THE VOICE

5    IDENTIFICATION.

6    THE COURT:  WELL, THERE IS NO TAPE, AS I

7    UNDERSTAND IT.

8    MR. TARLOW:  WELL, IF THAT IS -- MAYBE YOUR

9    HONOR UNDERSTANDS THAT AND KNOWS SOMETHING THAT WE DON'T

10   KNOW, AND THAT IS PART OF OUR REQUEST FOR A HEARING TO

11   FIND OUT WHETHER THERE IS A TAPE AND TO LOCATE IT AND GET

12   IT HERE.

13   MR. GURULE:  WE RECEIVED MR. TARLOW'S MOTION ON

14   THE TAPE AND MR. PANCER'S MOTION THIS MORNING.  AS A

15   MATTER OF FACT, I THINK WE RECEIVED --

16   THE COURT:  WELL, WE ARE WAITING TO GET SOME

17   OPPOSITION.

18   MR. GURULE:  WE JUST RECEIVED THOSE THIS

19   MORNING.  THERE ARE PROBABLY THREE OR FOUR MOTIONS, AND WE

20   WOULD ASK FOR SOME ADDITIONAL TIME, BECAUSE OF THE

21   COMPLEXITY OF THE ISSUES INVOLVED IN THOSE MOTIONS, TO

22   RESPOND.

23   MR. TARLOW:  I AM NOT AT ALL ASKING THAT

24   MR. GURULE HAVE HIS RESPONSE IN TODAY.  I AM NOT SAYING

25   THAT AT ALL.  I AM POINTING OUT TO THE COURT THAT THE

11-186

1    VOICE IDENTIFICATION OVERLAPS WITH THAT QUESTION.

2            THE COURT:  THESE TWO AGENTS SHOULD SIMPLY BE

3    EXCUSED SUBJECT TO RECALL WHEN THEY ARE NEEDED.  THEY

4    DON'T HAVE TO HANG AROUND HERE.

5            MR. GURULE:  FINE.

6            THE COURT:  I DON'T KNOW WHY THEY SHOULD BE

7    INCONVENIENCED.

8            THIS OTHER WITNESS SHOULD BE EXCUSED UNTIL THE

9    DEFENDANTS NEED HIM FOR THEIR DEFENSE.

10           MR. GURULE:  AND RELATIVE TO THE WITNESS THAT

11   TESTIFIED REGARDING CHIHUAHUA, HE HAS TESTIFIED, AND HE

12   HAS BEEN AVAILABLE FOR CROSS-EXAMINATION.  THEY HAVE HAD

13   HIS JENCKS MATERIAL NOW FOR APPROXIMATELY A WEEK.

14           THE COURT:  WHAT DO YOU NEED HIM FOR?

15           MR. TARLOW:  WELL, I DON'T HAVE ANY IDEA WHO THE

16   PERSON IS, QUITE FRANKLY, YOUR HONOR.  I HAVEN'T HAD TIME

17   TO GO TO CHIHUAHUA AND FIND OUT ANYTHING ABOUT HIM OR

18   ABOUT HIM BEING HERE.  I WOULD ASSUME --

19           THE COURT:  I AM NOT GOING TO GIVE YOU TIME TO

20   GO TO CHIHUAHUA.

21           MR. TARLOW:  WELL, I DON'T HAVE MUCH INTEREST IN

22   GOING TO CHIHUAHUA, EITHER, YOUR HONOR.  I AM NOT SURE

23   WHAT IT IS EXACTLY, BUT I AM NOT SURE I WANT TO GO THERE.

24           BUT, IN ANY EVENT, I HAD ASSUMED THAT WITH ALL

25   OF THESE WITNESSES THAT WE DIDN'T HAVE THEM JUST SITTING

11-187

1    AROUND.  IN OTHER WORDS, I THOUGHT THEY WOULD BE ON 24-

2    HOUR CALL OR A FOUR-DAY CALL OR SOMETHING LIKE THAT.  WE

3    DON'T NEED THE AGENTS SITTING HERE, OR HIM, EITHER, BUT WE

4    DO NEED TIME TO FIND OUT SOMETHING ABOUT THESE PEOPLE.

5         IT IS SOMEHOW UNFAIR THAT THE GOVERNMENT PUTS

6    ALL OF THIS TOGETHER, AND WE GET TWO DAYS.

7         THE COURT:  THAT IS ENOUGH CONVERSATION.  THESE

8    PEOPLE NEED TO BE AVAILABLE UNTIL THEY ARE ABLE TO BE

9    EXAMINED.  THAT IS ALL THERE IS TO IT.  AND THAT IS CAUSED

10   IN PART BY THIS CLOSE-TO-THE-VEST HANDING OUT OF MATERIAL.

11         WE ARE IN RECESS.

12         MR. PANCER:  YOUR HONOR, HOW LONG DO WE HAVE FOR

13   OUR BREAK?

14         THE COURT:  TEN MINUTES.

15         (RECESS FROM 3:15 P.M. UNTIL 3:25 P.M.)

16         THE COURT:  SWEAR THE NEXT WITNESS, PLEASE.

17         SALVADOR LEYVA, PLAINTIFF'S WITNESS, SWORN

18         THE CLERK:  PLEASE BE SEATED.

19         PLEASE STATE YOUR FULL NAME FOR THE RECORD AND

20   SPELL YOUR LAST NAME.

21         THE WITNESS:  SALVADOR LEYVA, L-E-Y-V-A.

22                   DIRECT EXAMINATION

23   BY MR. CAMPOS:

24   Q    WHAT IS YOUR -- WILL YOU TELL THE JURY WHAT YOUR

25   CURRENT PROFESSION AND OCCUPATION IS?

11-188

1   A    YES, SIR.  I AM A SPECIAL AGENT FOR THE UNITED STATES

2   DRUG ENFORCEMENT ADMINISTRATION.

3   Q    SPECIAL AGENT LEYVA, HOW LONG HAVE YOU BEEN A SPECIAL

4   AGENT WITH THE DRUG ENFORCEMENT ADMINISTRATION?

5   A    FOR ABOUT FIVE YEARS.

6   Q    AND WERE YOU IN LAW ENFORCEMENT BEFORE YOU WERE A

7   SPECIAL AGENT FOR THE DEA?

8   A    YES, SIR.  I SPENT APPROXIMATELY THREE YEARS WITH THE

9   LOS ANGELES POLICE DEPARTMENT, AND BEFORE THAT WITH THE

10  U.S. CUSTOMS AS AN INSPECTOR.

11  Q    HAVE YOU HAD OCCASION TO BE ASSIGNED IN MEXICO DURING

12  YOUR TIME AS A SPECIAL AGENT WITH THE DEA?

13  A    YES, I WAS.

14  Q    WHAT YEARS HAVE YOU BEEN ASSIGNED TO MEXICO?

15  A    THE FIRST TIME I WAS ASSIGNED IN MEXICO WAS IN 1985,

16  FEBRUARY 1985.

17  Q    FEBRUARY OF 1985?

18  A    THAT'S CORRECT.

19  Q    AND WOULD YOU DESCRIBE WHERE AND WHAT TYPE OF

20  ASSIGNMENT YOU HAD IN FEBRUARY OF 1985?

21  A    AT THE TIME I WAS ASSIGNED TO MEXICO IN A SPECIAL

22  OPERATION IN ACAPULCO, GUERRERO, MEXICO.

23  Q    WERE YOU INVOLVED WITH THE ERADICATION OF MARIJUANA,

24  THAT PARTICULAR PROGRAM?

25  A    THAT IS CORRECT, YES.

11-189

1    Q    AND WAS ONE OF YOUR SUPERVISORS OR PEOPLE YOU

2    COORDINATED WITH SPECIAL AGENT CHARLIE LUGO?

3    A    THAT IS CORRECT.

4    Q    AND ARE YOU CURRENTLY ASSIGNED TO MEXICO?

5    A    YES, I AM.

6    Q    NOW, IN FEBRUARY OF 1985, AFTER THE DISAPPEARANCE OF

7    SPECIAL AGENT CAMARENA, DID YOU RECEIVE SOME SPECIAL

8    ASSIGNMENT?

9    A    YES.  AT THE TIME I WAS -- AS I MENTIONED TO YOU

10   BEFORE, I WAS IN ACAPULCO, AND I RECEIVED A CALL FROM OUR

11   MAIN OFFICE IN MEXICO CITY.

12   Q    WHAT, IF ANYTHING, WERE YOU DIRECTED TO DO?

13   A    THEY DIRECTED ME TO LEAVE ACAPULCO IMMEDIATELY

14   BECAUSE --

15          THE COURT:  JUST A MOMENT.  BE CAREFUL JUST TO

16   ANSWER THE QUESTION.  THE QUESTION WAS WHAT DID THEY

17   DIRECT YOU TO DO.  YOU SAID TO LEAVE ACAPULCO.  WE DON'T

18   NEED TO KNOW WHY.

19          THE WITNESS:  THANK YOU, YOUR HONOR.

20   Q    BY MR. CAMPOS:  DID THEY DIRECT YOU TO LEAVE

21   ACAPULCO?  DID SOMEONE FROM MEXICO CITY WITHIN THE DEA

22   ORDER YOU TO GO TO A PARTICULAR PLACE?

23          MS. LEYVA:  OBJECTION, YOUR HONOR, TO SOMEONE IN

24   MEXICO CITY.  MAY WE HAVE AN IDENTIFICATION?

25          THE COURT:  OVERRULED.

1    Q    BY MR. CAMPOS:  SOMEONE IN YOUR HEADQUARTERS WHO

2    WOULD BE IN CHARGE OF ASSIGNING YOU?

3    A    YES.

4    Q    WHERE DID YOU GO?

5    A    I WENT TO MEXICO CITY.

6    Q    ALL RIGHT.  AND DID YOU RECEIVE SOME BRIEFINGS THERE

7    ABOUT THE DISAPPEARANCE OF SPECIAL AGENT CAMARENA?

8    A    YES.

9    Q    AND AFTER THAT, DID YOU GO SOMEWHERE ELSE?

10   A    YES.  I WENT TO GUADALAJARA, MEXICO.

11   Q    WHEN DID YOU ARRIVE IN GUADALAJARA, MEXICO?

12   A    THE MORNING OF THE 9TH, FEBRUARY 9, 1985.

13   Q    THAT IS FEBRUARY 9, 1985?

14   A    THAT'S CORRECT.

15   Q    DID YOU GO TO GUADALAJARA WITH ANY OTHER AGENTS?

16   A    YES, CHARLIE LUGO.

17   Q    THAT IS SPECIAL AGENT CHARLIE LUGO?

18   A    THAT'S CORRECT.

19   Q    NOW, WHEN YOU WENT TO GUADALAJARA, WHERE DID YOU GO

20   WHEN YOU ARRIVED THERE?

21   A    WE ARRIVED AT THE AIRPORT, AND WE WENT TO THE

22   AMERICAN CONSULATE IN GUADALAJARA.

23   Q    AND THAT IS WHERE THE DEA OFFICE IS IN GUADALAJARA?

24   A    YES, SIR.

25   Q    AND AT SOME POINT DID YOU PROCEED TO THE MEXICAN

11-191

1    FEDERAL JUDICIAL POLICE?

2    A    YES, SIR.

3    Q    WAS THAT THAT MORNING?

4    A    YES, SIR.  APPROXIMATELY 4:00 O'CLOCK IN THE MORNING

5    THAT MORNING, YES.

6    Q    4:00 O'CLOCK THAT MORNING?

7    A    CORRECT.  THAT IS WHEN WE ARRIVED AT GUADALAJARA AND

8    WENT TO THE CONSULATE AND WENT TO THE MFJP.

9    Q    YOU ARE SAYING 4:00 A.M.?

10   A    THAT'S CORRECT.

11   Q    THEN WHEN YOU WENT TO THE -- IS THIS THE OFFICE OF

12   THE MFJP IN GUADALAJARA THAT YOU WENT TO?

13   A    YES.

14   Q    DID YOU MEET WITH SOMEONE THERE?

15   A    WE MET WITH THE COMANDANTE PRIMER ARMANDO PAVON.

16   Q    ALL RIGHT.  IS THAT ARMANDO PAVON-REYES?

17   A    YES.

18   Q    YOU SAID PRIMER.  WHAT DOES THAT MEAN?

19   A    THAT MEANS THAT HE IS THE HIGHEST AUTHORITY IN THAT

20   AREA, AND HE REPORTS DIRECTLY TO MEXICO CITY.

21   Q    LITERALLY TRANSLATED IT MEANS FIRST COMANDANTE?

22   A    YES, SIR.

23   Q    AND ARE YOU A SPANISH SPEAKER?

24   A    YES, SIR.

25   Q    AND YOU SPEAK SPANISH FLUENTLY?

11-192

1    A    YES, SIR.

2    Q    WHAT DID YOU TALK ABOUT IN TERMS OF THE SUBJECT

3    MATTER WITH FIRST COMANDANTE PAVON-REYES?

4    A    BASICALLY I WAS REQUESTED TO INVESTIGATE THE

5    DISAPPEARANCE OF SPECIAL AGENT ENRIQUE CAMARENA.

6    Q    AND WAS THE COMANDANTE, THAT IS, PAVON-REYES, WAS HE

7    THERE AT THE HEADQUARTERS WHEN YOU ARRIVED?

8    A    TO THE BEST OF MY RECOLLECTION, HE GOT THERE A FEW

9    MINUTES THEREAFTER.

10   Q    HE ARRIVED SOMETIME AFTER YOU ARRIVED?

11   A    CORRECT.

12   Q    AND THEN YOU HAD THIS MEETING WITH HIM?

13   A    YES.

14   Q    NOW, DID SOME PLAN DEVELOP FROM THIS MEETING?

15   A    HE --

16        THE COURT:  WELL, ALL HE ASKED YOU IS IF THERE

17   WAS A PLAN DEVELOPED.

18        THE WITNESS:  YES.

19   Q    BY MR. CAMPOS:  SOME PLAN OF ACTION THAT YOU WERE

20   GOING TO TAKE?

21   A    YES, SIR.

22   Q    AND DID THAT INVOLVE DISCUSSIONS BETWEEN YOU -- THAT

23   IS, THE DEA AGENTS THAT WERE THERE AND HIM?

24   A    YES.

25   Q    AND DID THAT TAKE A VERY LONG PERIOD OF TIME?

11-193

1    A    MOST OF THE MORNING.

2    Q    MOST OF THE MORNING TO DEVELOP YOUR PLAN?

3    A    THAT'S CORRECT.

4    Q    AND DID YOU AT SOME POINT DO SOMETHING AS A RESULT OF

5    YOUR AGREEMENT ON A PLAN THAT MORNING?

6    A    YES, I DID.

7    Q    WHAT DID YOU DO?

8    A    HE REQUESTED FOR ME TO RENT APPROXIMATELY TEN OR MORE

9    VEHICLES.

10    Q    WHEN YOU SAY VEHICLES, DO YOU MEAN CARS?

11    A    YES, SIR.

12    Q    AND DID YOU DO SO?

13    A    YES.  FROM THE --

14            THE COURT:  THAT IS IT.  HE ASKED IF YOU DID SO.

15            THE WITNESS:  YES, SIR.

16    Q    BY MR. CAMPOS:  DID YOU GO TO AN AGENCY AND RENT

17    CARS?

18    A    YES, SIR.

19    Q    YOU TOOK CARE OF THAT PARTICULAR ACTIVITY?

20    A    YES, SIR.

21    Q    AND HOW MANY CARS DID YOU ULTIMATELY RENT?

22    A    OVER TEN.

23    Q    DO YOU RECALL WHAT TYPES OF CARS THEY WERE?

24    A    YES, SIR.

25    Q    WHAT WERE THEY?

11-194

1    A    I BELIEVE THEY WERE CELEBRITIES.

2    Q    CHEVROLET CELEBRITIES?

3    A    CORRECT.

4    Q    AND ONCE YOU HAD ARRANGED TO RENT TEN OR MORE

5    CHEVROLET CELEBRITIES, WHAT DID YOU DO?

6    A    WE TOOK THEM BACK TO THE MFJP OFFICE.

7    Q    WHEN YOU SAY WE, DO YOU MEAN YOU AND OTHER AGENTS?

8    A    YES, SIR.

9    Q    WHAT HAPPENED AFTER YOU TOOK THOSE TEN OR SO CARS

10   BACK TO THE MFJP OFFICE?

11   A    COMANDANTE PAVON DIRECTED ME TO GET IN ONE OF THE

12   VEHICLES AND TO FOLLOW HIM AND HIS PERSONNEL TO WHEREVER

13   HE WAS GOING.

14   Q    AND WERE THERE GOING TO BE -- WERE YOU TRAVELING WITH

15   OTHER DEA AGENTS?

16   A    NO, SIR.

17   Q    SO YOU WENT INTO ONE PARTICULAR CAR.  IS THAT

18   CORRECT?

19   A    YES, SIR.

20   Q    AND THE FIRST COMANDANTE, PAVON-REYES, WENT IN

21   ANOTHER CAR?

22   A    YES, SIR.

23   Q    NOW, DID YOU KNOW WHERE YOU WERE GOING?

24   A    NO, SIR.

25   Q    DID ANY OTHER DEA AGENT AT THAT PARTICULAR TIME KNOW

11-195

1    YOUR DESIGNATION?

2    A    NOT TO MY KNOWLEDGE.

3    Q    AND WAS THIS A SURPRISE TO YOU?

4    A    YES.

5    Q    AND WHAT HAPPENED THEN AFTER YOU WERE TOLD TO GET

6    INTO A PARTICULAR CAR AND FOLLOW THE FIRST COMANDANTE?

7    A    WE FOLLOWED COMANDANTE BRISOLO.  HE WAS IN THE FIRST

8    CAR, AND I WAS IN THE SECOND CAR.

9    Q    OKAY.  NOW, YOU SAID BRISOLO?

10   A    I AM SORRY.  PAVON.

11   Q    DO YOU MEAN PAVON-REYES?

12   A    THAT'S CORRECT.

13   Q    WERE YOU DRIVING?

14   A    NO.  NO, I WAS NOT.

15   Q    WHO WAS DRIVING THE CAR THAT YOU WERE IN?

16   A    TO THE BEST OF MY RECOLLECTION, IT WAS COMANDANTE

17   ESPINO.

18   Q    ANOTHER COMANDANTE?

19   A    YES, SIR.

20   Q    HOW MANY DEA AGENTS WENT IN THIS GROUP OF CARS?

21   A    APPROXIMATELY FOUR.

22   Q    EXCUSE ME.  I WAS JUST TRYING TO FINISH MY QUESTION.

23   HOW MANY DEA AGENTS WENT TO FOLLOW -- WENT IN THE CARS

24   FOLLOWING THE FIRST COMANDANTE, PAVON-REYES?

25   A    ABOUT FOUR.

11-196

1    Q    WAS THIS -- COULD WE DESCRIBE THIS AS A CONVOY OR A

2    CARAVAN?

3    A    IT WAS A CARAVAN.

4    Q    SO YOU HAD MORE THAN TEN CARS.  IS THAT CORRECT?

5    A    THAT IS CORRECT.

6    Q    THAT WERE FOLLOWING THE COMANDANTE PAVON-REYES?

7    A    THAT IS CORRECT.

8    Q    AND YOU DIDN'T KNOW AT THIS PARTICULAR POINT WHERE

9    YOU WERE GOING?

10   A    THAT'S CORRECT.

11   Q    AND TO YOUR KNOWLEDGE, NONE OF THE OTHER AGENTS KNEW

12   THE DESTINATION?

13   A    THAT'S CORRECT.

14   Q    ALL RIGHT.  NOW, DID YOU IN FACT FOLLOW COMANDANTE

15   PAVON-REYES?

16   A    YES.

17   Q    AND DID YOU AT SOME POINT REACH SOMEPLACE?

18   A    YES.

19   Q    WHERE WAS THAT?  WHERE DID YOU GO?

20   A    WE WENT TO THE GUADALAJARA INTERNATIONAL AIRPORT.

21   Q    ALL RIGHT.  WHAT HAPPENED AFTER YOU GOT TO THE

22   GUADALAJARA INTERNATIONAL AIRPORT?

23   A    AS SOON AS WE ARRIVED TO THE AIRPORT, COMANDANTE

24   PAVON EXITED THE VEHICLE THAT HE WAS IN AND SHOUTED "CORTE

25   LA TUCHO," WHICH MEANS CHAMBER A ROUND.

11-197

1          THE COURT:  IT MEANS WHAT?

2          THE WITNESS:  CHAMBER A ROUND.

3          THE COURT:  WHO DID HE SHOUT THIS TO?

4          THE WITNESS:  HE JUST SHOUTED IN THE DIRECTION

5   TO WHERE I WAS STANDING AND ABOUT 50 --

6          THE COURT:  TOWARDS THE CARAVAN?

7          THE WITNESS:  THAT IS CORRECT, SIR.

8   Q    BY MR. CAMPOS:  LET'S MAKE ONE THING CLEAR.  IN THESE

9   OTHER CARS THAT WERE FOLLOWING COMANDANTE REYES, WERE

10  THERE OTHER MEXICAN FEDERAL JUDICIAL POLICE?

11  A    YES, SIR.

12  Q    WERE THERE OTHER STATE JUDICIAL POLICE?

13  A    YES, SIR.

14  Q    AND ONCE EVERYBODY GOT TO THE AIRPORT, DID EVERYONE

15  LEAVE THEIR CARS AND GET OUT?

16  A    YES, SIR.

17  Q    AND SO WHEN PAVON-REYES SHOUTED IN YOUR DIRECTION TO

18  LOAD A ROUND, WAS HE GIVING THAT INSTRUCTION TO THE OTHER

19  MEN THAT WERE UNDER HIS COMMAND?

20  A    THAT IS CORRECT.

21  Q    AND DID PEOPLE -- WAS HIS ORDER FOLLOWED AS FAR AS

22  YOU COULD TELL?

23  A    YES, IMMEDIATELY.

24  Q    AND YOU COULD HEAR THE SOUNDS OF THE ROUNDS BEING

25  CHAMBERED?

11-198

1   A    YES, SIR.

2   Q    NOW, WHAT DID YOU DO AT THIS POINT?

3   A    NOTHING.  I JUST DIDN'T KNOW WHAT WAS HAPPENING.

4   Q    WHAT DID YOU SEE COMANDANTE PAVON-REYES DO?

5   A    HE RAN ACROSS -- WE WERE IN THE HANGAR AREA, AND HE

6   RAN AND EVERYBODY FOLLOWED, AND I FOLLOWED.

7   Q    AND ABOUT HOW MANY MEN WERE FOLLOWING COMANDANTE

8   PAVON-REYES AT THIS POINT?

9   A    I WOULD SAY 40, POSSIBLY 50.

10  Q    AND THAT INCLUDED THE FOUR DRUG ENFORCEMENT

11  ADMINISTRATION AGENTS?

12  A    THAT IS CORRECT.

13  Q    NOW, HOW WERE THE MFJP OFFICERS ARMED AT THIS

14  PARTICULAR JUNCTURE?

15  A    THEY HAD SEMI-AUTOMATIC WEAPONS, RIFLES.  I BELIEVE

16  THEY ARE R-15.

17  Q    IS THAT AR-15?

18  A    AR-15, YES, SIR.

19  Q    NOW, SOME MEMBERS OF THE JURY MAY NOT BE FAMILIAR

20  WITH THE TERMS AUTOMATIC OR SEMI-AUTOMATIC.  WHAT DOES

21  SEMI-AUTOMATIC MEAN?

22  A    BASICALLY A SEMI-AUTOMATIC WEAPON IS THE TYPE OF

23  WEAPON THAT EVERY TIME YOU PRESS THE TRIGGER WITH YOUR

24  FINGER, IT WILL DISCHARGE A BULLET, BASICALLY.

25  Q    SO IT IS NOT A MACHINE GUN?

11-199

1    A    NO.

2    Q    THAT WOULD BE A FULLY AUTOMATIC WEAPON?

3    A    YES, SIR.

4    Q    WHICH WOULD MEAN IF YOU PRESS THE TRIGGER, MANY

5    ROUNDS WOULD COME OUT?

6    A    THAT'S CORRECT.  A BURST.  IT WILL JUST CONTINUE.

7    Q    CONTINUE UNTIL IT EMPTIES THE CHAMBER?

8    A    THAT'S CORRECT.

9    Q    AS OPPOSED TO A SEMI-AUTOMATIC, WHICH MEANS ONE ROUND

10   PER SQUEEZE OF THE TRIGGER?

11   A    THAT'S CORRECT.

12   Q    ALL RIGHT.  YOU TOLD US THAT EVERYONE STARTED RUNNING

13   FOLLOWING COMANDANTE PAVON-REYES.  WHERE DID EVERYBODY GO?

14   A    PEOPLE JUST MOVED ALL OVER THE PLACE BEHIND

15   COMANDANTE PAVON-REYES.  I WAS DIRECTLY BEHIND COMANDANTE

16   PAVON, SO I COULDN'T SEE THE PEOPLE BEHIND ME.  SO I TOOK

17   COVER.

18   Q    WELL, DID YOU HEAR THEIR FOOTSTEPS?

19   A    YES.  EVERYONE WAS RUNNING IN ONE DIRECTION.

20   Q    DID THERE COME A TIME WHEN COMANDANTE PAVON-REYES

21   STOPPED?

22   A    YES, SIR.

23   Q    AND DID YOU STOP NEAR HIM?

24   A    RIGHT BEHIND HIM.

25   Q    WHERE WERE YOU AT THIS PARTICULAR JUNCTURE?

11-200

1    A    WE WERE STILL IN THE AIRPORT AT THE HANGAR AREA WHERE

2    THEY PARK THE PLANES.

3    Q    YOU WERE AT A HANGAR AREA?

4    A    HANGAR, THAT'S CORRECT.

5    Q    NOW, I THINK IT MIGHT HELP AT THIS POINT.  YOU HAVE

6    SOME PHOTOGRAPHS IN FRONT OF YOU.  WOULD YOU SEE IF YOU

7    HAVE PHOTOGRAPHS GOVERNMENT'S EXHIBIT 126-A AND B.

8    A    YES, SIR, I DO.

9    Q    ALL RIGHT.  AND DO YOU RECOGNIZE WHAT THOSE TWO

10   PHOTOGRAPHS ARE?

11   A    YES, SIR, I DO.

12   Q    WHAT ARE THEY?

13   A    THIS IS A PICTURE OF -- AN AERO PICTURE OF THE

14   GUADALAJARA INTERNATIONAL AIRPORT.

15   Q    WHEN YOU SAY AERO, DO YOU MEAN A PHOTOGRAPH TAKEN

16   FROM THE AIR?

17   A    THAT IS CORRECT.

18   Q    NOW, DO EITHER OF THOSE TWO PHOTOGRAPHS SHOW THE

19   HANGAR THAT YOU AND THE REST OF THE MEN FOLLOWED

20   COMANDANTE PAVON-REYES?

21   A    YES, SIR, BOTH.

22   Q    ALL RIGHT.  WHICH -- I BELIEVE IT IS B.  DOES B

23   INDICATE -- IS THAT A CLOSER SHOT OF THAT?

24   A    YES, SIR.

25   Q    WOULD YOU PULL THAT OUT, PLEASE?

11-201

1    A    (WITNESS COMPLIES.)

2            MR. CAMPOS:  THE GOVERNMENT WOULD OFFER THOSE

3    TWO EXHIBITS SO THAT THE WITNESS MAY USE THEM.

4            THE COURT:  THEY MAY BE RECEIVED.

5            MR. CAMPOS:  THANK YOU, YOUR HONOR.

6    Q    NOW, CAN YOU SHOW THE JURY WITH 126-B WHERE IT WAS

7    THAT COMANDANTE PAVON-REYES AND YOU TOOK YOUR POSITIONS

8    INITIALLY IN THE HANGAR?

9    A    YES, SIR.

10   Q    HOLD THAT UP AND --

11   A    FROM HERE?

12           THE COURT:  YOU MAY STAND UP IF YOU WANT TO.

13           MS. LEYVA:  YOUR HONOR, MAY I MOVE SO I CAN SEE

14   THE DESCRIPTION?

15           THE COURT:  YES, YOU MAY.

16           MS. LEYVA:  THANK YOU, YOUR HONOR.

17           THE WITNESS:  CAN YOU SEE IT?

18           THE JURY:  (COLLECTIVELY) YES.

19           THE WITNESS:  WE WERE RIGHT HERE (POINTING.)

20           MR. CAMPOS:  ALL RIGHT.  MAY THE RECORD

21   INDICATE, YOUR HONOR, THAT THE WITNESS HAS USED A LIGHT

22   LASER TYPE OF POINTER, AND HE POINTED TO THE SECOND LONG

23   BUILDING FROM THE BOTTOM, WHICH IS A HANGAR?

24           THE COURT:  PERHAPS YOU COULD HAVE THE WITNESS

25   MARK HIS INITIALS ON IT.

11-202

1       MR. CAMPOS:  VERY WELL, YOUR HONOR.  I HAVE A

2   PEN -- I THINK THERE ARE SOME MARKING PENS UP THERE.

3   Q    DO YOU SEE ANY?

4   A    YES, I SEE A GREEN ONE.

5   Q    WOULD YOU MARK THAT AND CIRCLE IT AND PUT YOUR

6   INITIALS BESIDE THE CIRCLE WHERE YOU POINTED?

7   A    (WITNESS COMPLIES.)

8       THE COURT:  WHAT INITIALS HAVE YOU PUT THERE?

9       THE WITNESS:  S.L.

10  Q    BY MR. CAMPOS:  THANK YOU.  NOW, DID YOU KNOW THIS

11  HANGAR FROM ANY PRIOR WORK ON YOUR PART?

12  A    NO, SIR.

13  Q    AGAIN WOULD YOU HOLD IT UP AND TELL THE COURT AND THE

14  LADIES AND GENTLEMEN OF THE JURY WHAT OCCURRED AFTER

15  COMANDANTE PAVON-REYES STOPPED AT THAT POINT THAT YOU HAVE

16  MARKED ON THIS PHOTOGRAPH?

17  A    COMANDANTE PAVON STOPPED RIGHT HERE AND IN THIS AREA

18  RIGHT HERE WHERE I AM POINTING.

19  Q    INDICATING -- MAY THE RECORD SHOW HE IS INDICATING

20  BETWEEN THE TWO HANGARS FROM THE BOTTOM OF THE PHOTOGRAPH.

21  A    THAT IS WHERE THE PLANE WAS -- A PLANE WAS LOCATED.

22  Q    A PARTICULAR PLANE WAS LOCATED THERE?

23  A    YES.

24  Q    WHAT KIND OF A PLANE WAS IT?

25  A    IT WAS A JET FALCON.

11-203

1    Q    IT WAS A FALCON JET?

2    A    THAT IS CORRECT.

3    Q    THAT DOESN'T MEAN A LOT TO MOST LAY PEOPLE.  IS THAT

4    A PRIVATE JET?

5    A    YES, IT IS A PRIVATE JET.

6    Q    IN FACT, IN THINK IF YOU LOOK AT GOVERNMENT'S EXHIBIT

7    127-A, THERE MAY BE AN EXHIBIT TO HELP INDICATE WHAT THAT

8    JET LOOKED LIKE.

9    A    YES, SIR.

10    Q    NOW, IS THAT A PHOTOGRAPH OF THE JET YOU SAW THERE

11    THAT DAY?

12    A    YES, SIR.

13            MR. CAMPOS:  YOUR HONOR, I WOULD OFFER THAT IN

14    EVIDENCE.

15            THE COURT:  THAT MAY BE RECEIVED.

16            MR. CAMPOS:  THANK YOU, YOUR HONOR.

17    Q    NOW, WOULD YOU HOLD THAT UP AND SHOW THE LADIES AND

18    GENTLEMEN OF THE JURY WHAT THAT PLANE LOOKED LIKE?

19    A    (WITNESS COMPLIES.)

20            THE COURT:  SHOW IT OVER HERE, TOO.

21    Q    BY MR. CAMPOS:  SHOW IT TO DEFENSE COUNSEL, ALSO.

22    A    (WITNESS COMPLIES.)

23    Q    YOU CAN PUT THAT DOWN.

24            THAT WAS POINTED TOWARD THE RUNWAY AREA?

25    A    YES, SIR, IT WAS POINTED IN THIS DIRECTION

11-204

1    (POINTING).

2    Q    INDICATING TOWARD THE RUNWAY AREA ON THE PHOTOGRAPH,

3    126-B.  ALL RIGHT.  WHAT OCCURRED AT THIS PARTICULAR

4    JUNCTURE?

5    A    COMANDANTE PAVON, AFTER HE WAS RUNNING, HE STOPPED

6    AND THERE WERE A GROUP OF PEOPLE POINTING SOME WEAPONS

7    TOWARDS COMANDANTE PAVON, AND I AND THE REST OF THE

8    MEXICAN POLICE OFFICERS WERE STANDING.

9    Q    THERE WAS A GROUP OF MEN POINTING WEAPONS IN THAT

10   DIRECTION?

11   A    YES.  I WOULD SAY SEVEN, EIGHT.  I CAN'T RECALL THE

12   NUMBER.

13   Q    WHAT TYPE OF WEAPONS DID THESE PEOPLE HAVE.

14   A    THEY HAD A WEAPON THAT IS CALLED AK-47, WHICH ARE

15   MADE IN RED CHINA AND ALSO IN RUSSIA, AND THEY ARE FULLY

16   AUTOMATIC.

17   Q    THEY ARE MACHINE GUNS, IN OTHER WORDS?

18   A    MACHINE GUNS.

19   Q    DID THEY HAVE ANY PARTICULAR TYPE OF CANISTER FOR THE

20   BULLET CONTAINERS?

21   A    YES.  THERE WAS A DRUM, A VERY DISTINCTIVE DRUM, THAT

22   THIS PARTICULAR WEAPON CARRIES, AND IT IS A ROUND DRUM

23   THAT HOLDS ABOUT 100 ROUNDS.

24   Q    HOW MANY?

25   A    ABOUT 100.  THEY HAVE TWO TYPES -- 170 AND 100

11-205

1   ROUNDS, AND THIS WAS THE HUNDRED.  BECAUSE OF THE SIZE I

2   COULD TELL.

3   Q    YOU MAY RESUME YOUR SEAT THERE ON THE WITNESS STAND.

4   I DIDN'T MEAN TO HAVE YOU STAND.

5           IF IT IS USEFUL, YOU MAY USE THAT EXHIBIT AGAIN,

6   BUT I THINK YOU MIGHT AS WELL RESERVE YOUR STRENGTH.

7           NOW, IN YOUR OPINION, DID THESE PEOPLE HAVE MORE

8   FIRE POWER THAN THE MEXICAN FEDERAL JUDICIAL POLICE AND

9   THE STATE POLICEMEN?

10  A    THERE WAS NO QUESTION ABOUT THAT.  THERE WAS NO --

11  THEY -- YES, THEY DID.

12  Q    IN OTHER WORDS, THEY COULD PUT MORE ROUNDS AND MORE

13  BULLETS IN THE AIR THAN YOU COULD AND THE GROUP THAT WAS

14  SUPPORTING COMANDANTE PAVON-REYES?

15  A    YES, SIR.

16  Q    WHAT OCCURRED AT THIS PARTICULAR POINT?

17  A    THERE WAS A LOT OF SHOUTING.  COMANDANTE PAVON AND

18  SOME MFJP PERSONNEL WERE YELLING, "DROP YOUR WEAPONS.

19  DROP YOUR WEAPONS."  AND THE GROUP THAT WAS FACING

20  COMANDANTE PAVON, THEY WERE ALSO SCREAMING TO OUR GROUP,

21  "NO.  YOU DROP YOUR WEAPONS."  AND THERE WAS A STANDOFF

22  WITH THE WEAPONS.

23  Q    AND WEAPONS WERE POINTING AT BOTH GROUPS?  EACH

24  GROUP, IN OTHER WORDS, WAS POINTING WEAPONS AT THE OTHER?

25  A    YES, SIR.

11-206

1    Q    AND DID COMANDANTE PAVON-REYES DO ANYTHING AT THIS

2    POINT?

3    A    NO.  THE SHOUTING CONTINUED UNTIL -- NO.

4    Q    ALL RIGHT.  THEN HOW WAS THIS RESOLVED IF IT WAS

5    RESOLVED?

6    A    ONE OF THE MEMBERS OF THE OPPOSITE GROUP THAT WAS

7    FACING US SHOUTED AND ASKED, "WHO IS IN CHARGE?"

8         AND THAT IS WHEN COMANDANTE PAVON SAID, "I AM IN

9    CHARGE.  I AM PRIMER COMANDANTE PAVON."

10    Q    ALL RIGHT.  AND DID ANYTHING HAPPEN AFTER COMANDANTE

11    PAVON IDENTIFIED HIMSELF AS THE PERSON IN CHARGE?

12    A    COMANDANTE PAVON APPROACHED THE PERSON THAT ASKED THE

13    QUESTION, LATER IDENTIFIED AS RAFAEL CARO-QUINTERO.

14    Q    YOU LATER LEARNED THAT THAT PERSON WAS RAFAEL CARO-

15    QUINTERO?

16    A    YES, SIR.

17         MS. LEYVA:  YOUR HONOR, OBJECTION.  LACK OF

18    FOUNDATION.  AND AS TO THIS WITNESS'S ANSWER, I MOVE TO

19    STRIKE.

20         THE COURT:  THE MOTION IS DENIED.

21    Q    BY MR. CAMPOS:  DO YOU KNOW RAFAEL CARO-QUINTERO?

22    A    YES, SIR.

23    Q    IN FACT YOU DO HAVE A PHOTOGRAPH IN FRONT OF YOU THAT

24    WOULD CORRESPOND TO RAFAEL CARO-QUINTERO?

25    A    YES, SIR.

11-207

1    Q    WOULD YOU LOOK AT THAT PHOTOGRAPH AND TELL US WHAT

2    EXHIBIT IT IS?  IS THAT A EXHIBIT 129?

3    A    YES, SIR.

4    Q    IS THAT THE PERSON THAT WAS THERE AT THE AIRPORT THAT

5    MET WITH PAVON-REYES?

6    A    THIS IS RAFAEL CARO-QUINTERO, YES.  THIS IS THE

7    PERSON WHO WAS THERE AT THE AIRPORT.

8    Q    HE WAS THE PERSON THAT ASKED WHO WAS IN CHARGE?

9    A    YES.

10   Q    IS HE THE PERSON THAT MET WITH PAVON-REYES?

11   A    YES, SIR.

12          MR. CAMPOS:  YOUR HONOR, THE GOVERNMENT WOULD

13   OFFER EXHIBIT 129 IN EVIDENCE.

14          THE COURT:  THAT MAY HAVE BEEN PREVIOUSLY

15   RECEIVED, BUT IF NOT, IT WILL BE.

16          MR. CAMPOS:  THANK YOU, YOUR HONOR.

17   Q    WHAT DID YOU SEE THEM DO?  AND I AM TALKING ABOUT

18   PAVON-REYES AND RAFAEL CARO-QUINTERO.

19   A    COMANDANTE PAVON APPROACHED RAFAEL CARO-QUINTERO.

20   THEY TALKED FOR A FEW SECONDS.  THEN THEY SMILED, LAUGHED,

21   SHOOK HANDS AND EMBRACED, AND AGAIN THEY TALKED FOR A

22   MINUTE.

23   Q    WERE THEY DOING THIS IN FRONT OF YOU?

24   A    YES, SIR.

25   Q    IN BETWEEN THE HANGARS?

11-208

1    A    YES, SIR, BETWEEN THE HANGAR WHERE I WAS STANDING AND

2    THE PLANE, THE FALCON PLANE.

3    Q    DID THEY WALK OFF IN A DIRECTION AT SOME POINT?

4    A    NO.    COMANDANTE PAVON DID.

5    Q    THIS WAS AFTER HE HAD THIS DISCUSSION WITH RAFAEL

6    CARO-QUINTERO?

7    A    YES, SIR.

8    Q    DID YOU FOLLOW COMANDANTE PAVON-REYES?

9    A    EVENTUALLY, YES.

10   Q    AND WHERE DID COMANDANTE REYES GO WHEN YOU SAW HIM,

11   IF YOU SAW HIM?

12   A    COMANDANTE PAVON WENT TO -- IF I CAN REFER TO ONE OF

13   YOUR EXHIBITS.

14   Q    YES.    IS THAT EXHIBIT 126-B?

15   A    YES, SIR.

16   Q    THE SAME PHOTOGRAPH YOU USED BEFORE TO DESCRIBE WHAT

17   WAS OCCURRING?

18   A    YES, SIR.

19   Q    ALL RIGHT.

20          MS. LEYVA:    YOUR HONOR, MAY I AGAIN MOVE.

21          THE WITNESS:    AFTER THEY TALKED FOR A WHILE,

22   COMANDANTE PAVON LEFT THE AREA AND WALKED TO THIS OFFICE

23   (POINTING) WHERE THEY KEEP THE TELEPHONES AND

24   COMMUNICATIONS OF THEIR MFJP.

25   Q    BY MR. CAMPOS:    WOULD YOU CIRCLE THE ITEM ON THE

11-209

1   PHOTOGRAPH THAT YOU DESCRIBE AS THIS OFFICE AND PUT NO. 2

2   ON THERE IN A CIRCLE AND PUT YOUR INITIALS BESIDE IT, WITH

3   THE COURT'S PERMISSION?

4   A    (WITNESS COMPLIES.)

5   Q    DID YOU FOLLOW -- YOU SAID YOU FOLLOWED HIM.  DID YOU

6   GO INTO THAT BUILDING AS WELL?

7   A    YES, I DID.  COMANDANTE PAVON LEFT.  IT IS A

8   BUILDING, AND THERE IS A STAIRS TO GO TO THE OFFICE

9   UPSTAIRS.  HE LEFT TWO AGENTS BLOCKING THE MAIN DOOR AND

10  WENT IN, AND I SAT IN THE OFFICE NEXT TO WHERE HE WAS

11  MAKING A PHONE CALL.

12  Q    YOU SAW HIM MAKING A PHONE CALL?

13  A    YES, SIR.

14  Q    YOU MAY SIT DOWN AGAIN.

15       WITHOUT TELLING US WHAT, COULD YOU OVERHEAR THE

16  CONVERSATION?

17  A    JUST HIS REPLIES.

18  Q    HIS REPLIES.  AND SO WERE YOU ABLE TO UNDERSTAND WHAT

19  HE WAS TALKING ABOUT?

20       MS. LEYVA:  OBJECTION, YOUR HONOR.  THIS AGENT

21  HAS JUST TESTIFIED HE COULD ONLY HEAR THE REPLIES.

22       THE COURT:  WELL, HE WAS ASKED IF HE WAS ABLE TO

23  UNDERSTAND.

24       MS. LEYVA:  THAT CALLS FOR SPECULATION, YOUR

25  HONOR.

11-210

1          THE COURT:  THE WITNESS MAY ANSWER THE QUESTION.

2          THE WITNESS:  I UNDERSTOOD THE REPLIES, BUT I

3    COULDN'T UNDERSTAND WHAT THEY WERE TALKING ABOUT.

4    Q    BY MR. CAMPOS:  I SEE.  WHAT DID COMANDANTE PAVON-

5    REYES DO AFTER YOU SAW HIM AND HEARD HIM TALKING ON THIS

6    TELEPHONE INSIDE THE OFFICE?

7    A    HE DIDN'T KNOW I WAS THERE.  HE TALKED FOR A WHILE

8    AND EXITED THE OFFICE WHERE HE WAS.  THE DOOR WAS OPEN.

9    Q    DID YOU GO UP TO HIM AT THIS POINT?

10   A    I KIND OF MET HIM HALFWAY, AND HE WAS VERY SURPRISED

11   TO SEE ME THERE.

12   Q    DID YOU ASK ANY QUESTIONS OF HIM?

13   A    I WAS ATTEMPTING TO.  HE LOOKED AT ME IN SURPRISE AND

14   JUST WALKED VERY FAST AGAIN BACK TO WHERE THE FALCON WAS

15   PARKED.

16   Q    SO HE WOULDN'T ALLOW YOU TO APPROACH HIM?

17   A    NO.  THAT WAS MY IMPRESSION.

18   Q    DID YOU FOLLOW HIM BACK TO THE FALCON JET?

19   A    YES.

20   Q    WHAT DID YOU SEE AFTER YOU WALKED BACK TOWARD THE

21   FALCON JET?

22   A    AGAIN COMANDANTE PAVON APPROACHED RAFAEL CARO-

23   QUINTERO.  AGAIN THEY TALKED FOR A WHILE, SMILED, EMBRACED

24   THEMSELVES, AND THEY WALKED BEHIND THE TAIL OF THE FALCON.

25   Q    THE FALCON JET?

11-211

1    A    YES.  AND THEY TALKED FOR A FEW MINUTES.

2    Q    ALL RIGHT.  NOW, COULD YOU DESCRIBE AT THIS

3    PARTICULAR TIME WHAT TYPES OF CLOTHES RAFAEL CARO-QUINTERO

4    WAS WEARING?

5         MS. LEYVA:  OBJECTION, YOUR HONOR.  LACK OF

6    RELEVANCY.

7         THE COURT:  THAT IS SUSTAINED.

8         MR. CAMPOS:  YOUR HONOR, WHAT HE WAS WEARING AND

9    HIS JEWELRY WILL BE TIED UP AT A PARTICULAR POINT.

10         THE COURT:  THEN I WILL RECEIVE IT SUBJECT TO

11    STRIKING IF I FIND IT NECESSARY.

12         MR. CAMPOS:  THANK YOU, YOUR HONOR.  IT WILL BE

13    BRIEF.

14    Q    WHAT TYPE OF JEWELRY WAS HE WEARING?

15    A    HE WAS -- RAFAEL CARO-QUINTERO WAS WEARING A

16    BRACELET, TO THE BEST OF MY RECOLLECTION, ON HIS RIGHT

17    HAND.  I MEAN IT WAS ABOUT FIVE, SIX INCHES IN WIDTH WITH,

18    I WOULD SAY, A COUPLE OF HUNDRED DIAMONDS AND RUBIES AND

19    ALSO JUST A LOT OF JEWELRY, HEAVY, HEAVY, FLASHY JEWELRY.

20    Q    WITH RESPECT TO THE BRACELET, DID THE BRACELET HAVE

21    ANY KIND OF A MONOGRAM OR INDICATION ON IT?

22    A    TO THE BEST OF MY RECOLLECTION, IT HAD AN "R" AND I

23    BELIEVE A "1."

24    Q    ALL RIGHT.  WILL YOU LOOK AT WHAT HAS BEEN MARKED AS

25    GOVERNMENT'S EXHIBIT 131.

11-212

1   A    (WITNESS COMPLIES.)

2   Q    DO YOU HAVE THAT IN FRONT OF YOU, SIR?

3   A    YES, SIR, I DO.

4   Q    AND DO YOU RECOGNIZE WHAT THAT ITEM IS?

5   A    YES, SIR, I DO.

6   Q    WHAT IS THAT ITEM?

7   A    THIS IS THE BRACELET THAT RAFAEL CARO-QUINTERO WAS

8   WEARING WHEN I SAW HIM AT THE AIRPORT.

9   Q    THAT IS A PHOTOGRAPH OF THE BRACELET HE WAS WEARING?

10  A    THAT'S CORRECT.

11          MR. CAMPOS:  YOUR HONOR, THE GOVERNMENT WOULD

12  OFFER THAT PHOTOGRAPH, YOUR HONOR.

13          MS. LEYVA:  YOUR HONOR, OBJECTION UNTIL THEY CAN

14  TIE UP THIS TESTIMONY.  RELEVANCY.

15          THE COURT:  DOES IT HAVE SOME RELEVANCE?

16          MR. CAMPOS:  CARO-QUINTERO --

17          THE COURT:  YOU COULD OFFER IT LATER.

18          MR. CAMPOS:  VERY WELL, YOUR HONOR.

19  Q    WHAT ELSE HAPPENED, IF ANYTHING, AFTER PAVON-REYES,

20  THE COMANDANTE, AND RAFAEL CARO-QUINTERO EMBRACED AND

21  WALKED BACK AROUND THE BACK OF THE FALCON JET?

22  A    RAFAEL, HIS DEMEANOR CHANGED FROM BEING WORRIED

23  BECAUSE YOU COULD SEE HIS FACIAL EXPRESSIONS BEFORE.  BY

24  THIS TIME HE WAS RELAXED, LAUGHING, SMILING.  HE GOT INTO

25  THE JET.  THE DOOR WAS OPEN.  HE REMOVED A BOTTLE OF

11-213

1   CHAMPAGNE, OPENED IT.

2           BY THIS TIME THE JET WAS TAXIING VERY SLOWLY,

3   AND HE CAME RIGHT IN FRONT OF US AND JUST TOASTED AND

4   SAID, "NEXT TIME, MY SONS" -- WELL, THIS WAS IN SPANISH --

5   (WITNESS RECITES A SPANISH PHRASE), WHICH MEANS, "NEXT

6   TIME, MY SONS, BRING BETTER WEAPONS."  AND HE DRANK AND

7   DEPARTED.

8   Q    WAS HE IN THE JET WHEN HE DID THIS?

9   A    YES, SIR.

10  Q    AND HE STUCK HIS HEAD OUT THE DOOR?

11  A    HE WAS STANDING RIGHT IN FRONT OF THE DOOR, AND THE

12  JET WAS TAXIING VERY SLOWLY, AND THE DOOR WAS NOT TOUCHING

13  THE GROUND.

14  Q    ALL RIGHT.  AND IN FACT WAS THE JET ALLOWED TO LEAVE?

15  A    YES, SIR.

16  Q    AND WHAT DID YOU DO?

17  A    AT THIS TIME WHEN THIS WAS HAPPENING, COMANDANTE

18  PAVON WAS WALKING TOWARDS WHERE I WAS, AND I ASKED HIM,

19  "WHO IS THAT GUY?  WHO IS THAT MAN?"

20          AND COMANDANTE PAVON TOLD ME, "OH, IT IS AN OLD

21  FRIEND OF MINE.  IT IS COMANDANTE ROGELIO MUNOZ."  THAT

22  WAS ABOUT IT.

23  Q    BUT IN FACT IT WASN'T TRUE?

24  A    THAT'S CORRECT.  LATER WE FOUND OUT.

25  Q    THAT THAT WAS RAFAEL CARO-QUINTERO.  ALL RIGHT.  DID

11-214

1    YOU RETURN FROM THE AIRPORT AT THAT PARTICULAR TIME?

2    A    YES.  I RETURNED WITH COMANDANTE BRISOLO, COMANDANTE

3    ESPINO, AND SOMEBODY ELSE.  I CAN'T RECALL THE NAME.

4    Q    AND YOU WERE TRAVELING IN ONE OF THE CELEBRITIES THAT

5    HAD BEEN RENTED?

6    A    YES.  I BELIEVE A YELLOW CELEBRITY.

7         THE COURT:  YOU HAVE ANSWERED.

8         THE WITNESS:  YES, SIR.

9    Q    BY MR. CAMPOS:  DO YOU RECALL THE COLOR OF THAT CAR?

10        IT IS RELEVANT, YOUR HONOR, AND WE WILL TIE THAT

11   UP.

12        THE COURT:  IF IT IS NOT RELEVANT, YOU SHOULD

13   NOT ASK.

14        MR. CAMPOS:  I AM SAYING THAT IT IS RELEVANT,

15   YOUR HONOR.

16        THE COURT:  ALL RIGHT.

17        MR. CAMPOS:  WE WILL TIE IT UP IN A FEW MINUTES.

18   Q    WHAT COLOR WAS IT?

19   A    YELLOW.

20   Q    THANK YOU.  DID YOU HAVE FURTHER DISCUSSIONS ABOUT

21   THIS INCIDENT, WITHOUT GOING INTO THE DETAILS OF WHAT WAS

22   SAID, WITH THESE COMANDANTES IN THE CAR?

23   A    YES, SIR.

24   Q    NOW, FURTHER INVESTIGATION WAS DONE WITH RESPECT TO

25   THIS INCIDENT, I TAKE IT, BY DEA.  IS THAT CORRECT?

11-215

1   A    THAT'S CORRECT.

2   Q    DID YOU PERSONALLY PARTICIPATE IN SOME OF THIS

3   INVESTIGATION?

4   A    I PARTICIPATED IN A LOT OF INVESTIGATIONS, YES.

5   Q    DID YOU HAVE ANYTHING TO DO AT ALL WITH INVESTIGATING

6   ANYTHING THAT PAVON-REYES MAY HAVE DONE?

7   A    NO, SIR.

8   Q    NOW, I AM GOING TO TAKE YOU FORWARD.  THIS WAS

9   FEBRUARY THE 9TH, 1985, THAT YOU HAVE JUST DESCRIBED.

10  CORRECT?

11  A    THAT'S CORRECT.

12  Q    DID THERE COME A TIME LAST YEAR WHEN YOU SPOKE TO AN

13  INDIVIDUAL NAMED LOPEZ-ALVAREZ?

14  A    YES, SIR.

15  Q    IS THAT PERSON HERE IN THE COURTROOM TODAY?

16  A    YES, SIR.  HE IS WEARING A LIGHT BROWN SUIT, BLUE

17  SHIRT, AND BLUE STRIPED TIE, SITTING NEXT TO AN ATTORNEY I

18  BELIEVE, WHOSE LAST NAME IS LEYVA.

19       THE COURT:  INDICATING THE DEFENDANT MR. LOPEZ-

20  ALVAREZ.

21       MR. CAMPOS:  THANK YOU, YOUR HONOR.

22  Q    NOW, DID YOU ENCOUNTER -- DID YOU MEET DEFENDANT RAUL

23  LOPEZ-ALVAREZ AFTER HE HAD BEEN ARRESTED IN THE UNITED

24  STATES?

25  A    YES, SIR.

11-216

1    Q    AND HAD RAUL LOPEZ-ALVAREZ AGREED TO GIVE A STATEMENT

2    AFTER HIS ARREST?

3        MS. LEYVA:  OBJECTION.  LACK OF FOUNDATION AS TO

4    THIS WITNESS.

5        MR. CAMPOS:  WELL, IT IS BACKGROUND, YOUR HONOR,

6    TO WHAT HE DID.  IT SHOWS A STATE OF MIND AND WHY HE DID

7    WHAT FOLLOWED.

8        THE COURT:  THE OBJECTION IS SUSTAINED.

9    Q    BY MR. CAMPOS:  DID YOU SPEAK TO HIM?

10   A    YES, SIR.

11   Q    WHAT DID YOU TELL HIM?

12   A    I ASKED HIM WHETHER HE RECOGNIZED ME.

13   Q    DID HE SAY SOMETHING BACK TO YOU?

14   A    HE LOOKED AT ME BRIEFLY, JUST LOOKED AT ME AND LOOKED

15   AWAY AND SAID, "NO."

16   Q    THEN DID HE SAY ANYTHING MORE TO YOU?

17   A    I THEN ASKED HIM, "DO YOU REMEMBER WHEN CARO-QUINTERO

18   ESCAPED FROM GUADALAJARA AT THE AIRPORT?"

19        HE THEN TURNED BACK TO ME AND LOOKED AT ME, AND

20   HE SAID, "OH, YES.  YOU WERE WITH COMANDANTE BRISOLO, AND

21   A YELLOW CAR THAT DAY."

22        SO I SAID, "YES, I WAS THERE."

23   Q    ALL RIGHT.  DID YOU HAVE ANY FURTHER CONVERSATION

24   WITH DEFENDANT RAUL LOPEZ?

25   A    NO.  THAT WAS IT.

11-217

1          MR. CAMPOS:  MAY I HAVE A BRIEF MOMENT, YOUR

2   HONOR?

3          (DISCUSSION OFF THE RECORD.)

4          MR. CAMPOS:  NOTHING FURTHER AT THIS TIME, YOUR

5   HONOR.

6          THE COURT:  YOU MAY CROSS-EXAMINE THE WITNESS.

7          MS. LEYVA:  YES, YOUR HONOR.

8                       CROSS EXAMINATION

9   BY MS. LEYVA:

10  Q    THIS INCIDENT THAT OCCURRED AT THE AIRPORT, YOU ARE

11  AWARE THAT IT WAS REPORTED IN THE MEXICAN NEWSPAPERS.

12  CORRECT?

13         MR. CAMPOS:  OBJECTION.  IRRELEVANT.

14         THE COURT:  IS HE PRESENTLY AWARE THAT IT WAS?

15         MS. LEYVA:  THAT IS CORRECT.

16         MR. CAMPOS:  OBJECT ON THE BASIS OF HEARSAY,

17  YOUR HONOR.

18         THE COURT:  YOU MAY ANSWER THE QUESTION.

19         THE WITNESS:  I CAN'T RECALL SEEING IT -- THE

20  ARTICLE THAT YOU ARE REFERRING TO.

21  Q    BY MS. LEYVA:  HOW LONG WERE YOU IN GUADALAJARA

22  INVESTIGATING THE DISAPPEARANCE OF AGENT CAMARENA?

23  A    I WOULD SAY CLOSE TO SIX MONTHS.

24  Q    AND DURING THE SIX MONTHS THAT YOU WERE IN

25  GUADALAJARA, ISN'T IT TRUE THAT THE INCIDENT INVOLVING

11-218

1    CARO-QUINTERO AND PAVON-REYES AT THE GUADALAJARA AIRPORT

2    WAS REPORTED IN THE PRESS IN MEXICO?

3    A    PERHAPS, YES.  I CAN'T RECALL SEEING ANYTHING

4    SPECIFICALLY.

5    Q    OKAY.  JUST ONE MOMENT.

6         DO YOU RECALL TESTIFYING BEFORE THE GRAND JURY

7    REGARDING THIS MATTER ON APRIL 1ST, 1987?

8    A    YES, I DO.

9    Q    AND DO YOU RECALL TELLING THE GRAND JURY THAT IT ALSO

10   WAS IN ALL THE NEWSPAPERS THAT COMANDANTE PAVON AND SO

11   FORTH BECAUSE OF THIS INCIDENT?

12   A    I RECALL SAYING THAT REGARDING COMANDANTE PAVON BEING

13   INCARCERATED.

14   Q    AND THE INCIDENT YOU WERE TALKING ABOUT WAS PAVON-

15   REYES ALLOWING CARO-QUINTERO TO LEAVE THE AIRPORT.

16   A    THAT IS CORRECT.

17   Q    AND SO YOU ARE AWARE THAT THIS INCIDENT AT THE

18   AIRPORT WAS REPORTED IN THE PRESS IN MEXICO?

19             MR. CAMPOS:  I THINK THAT QUESTION HAS BEEN

20   ASKED AND ANSWERED.

21             THE COURT:  SUSTAINED.

22             MS. LEYVA:  WELL, HE HASN'T ANSWERED THE

23   QUESTION, YOUR HONOR.

24             THE COURT:  I THINK HE HAS.

25   Q    BY MS. LEYVA:  WHEN YOU ARRIVED IN GUADALAJARA ON

11-219

1    FEBRUARY 9, YOU SAID YOU ARRIVED WITH AGENT LUGO?

2    A    CHARLIE LUGO.

3    Q    CHARLES LUGO.  AND YOU WENT TO THE AMERICAN CONSULATE

4    AND THEN MET WITH ARMANDO PAVON-REYES.  CORRECT?

5    A    AT THE MFJP OFFICE.

6    Q    WHEN YOU WENT TO THE MFJP OFFICE, YOU MET WITH

7    COMANDANTE PAVON-REYES?

8    A    THAT IS CORRECT.

9    Q    AND YOU FORMULATED A PLAN AS TO HOW YOU WERE GOING TO

10   FIND ENRIQUE CAMARENA.  CORRECT?

11   A    THAT'S CORRECT.

12   Q    AND PART OF YOUR PLAN IN FINDING ENRIQUE CAMARENA WAS

13   TO GO AND SEARCH ALL THE NARCOTICS TRAFFICKERS' HOMES.

14   CORRECT?

15   A    I CAN'T RECALL THAT SPECIFICALLY.

16   Q    YOU DON'T RECALL WHETHER YOU WERE GOING TO BE

17   INVOLVED IN SEARCHING THE TRAFFICKERS' HOMES THAT DAY?

18   A    THAT IS CORRECT.

19   Q    WERE YOU AWARE THAT OTHER AGENTS WERE GOING TO GO

20   WITH THE FEDERAL POLICE TO SEARCH THE HOMES OF DRUG

21   TRAFFICKERS?

22   A    AGENTS DO NOT SEARCH HOUSES IN MEXICO.  IT IS THE

23   MEXICAN FEDERAL POLICE WHO DO THAT.

24   Q    YOU WERE AWARE THAT PART OF THE PLAN WAS FOR THE

25   MEXICAN FEDERAL JUDICIAL POLICE TO GO TO SEARCH THE HOME

11-220

1   OF NARCOTICS TRAFFICKERS AS PART OF THE PLAN TO FIND

2   ENRIQUE CAMARENA.  CORRECT?

3           MR. CAMPOS:  IT HAS BEEN ASKED AND ANSWERED.

4   AND I ALSO OBJECT ON RELEVANCY.

5           MS. LEYVA:  HE HASN'T ANSWERED THE QUESTION.

6           THE COURT:  OVERRULED.

7           YOU MAY ANSWER THE QUESTION.

8           THE WITNESS:  I DON'T THINK THAT WAS THE

9   SPECIFIC PLAN.

10  Q    BY MS. LEYVA:  YOU TALKED ABOUT A PLAN WITH PAVON-

11  REYES.  CORRECT?

12  A    THAT IS CORRECT.

13  Q    AND YOU MUST HAVE HAD SOME SPECIFICS IN YOUR PLAN.

14  CORRECT?

15  A    NO.  THERE WAS NO SPECIFICS.

16  Q    SO YOU ARE TELLING US THAT YOUR MEETING WITH THE

17  FIRST COMMANDER OF THE MEXICAN FEDERAL JUDICIAL POLICE,

18  WHO HAS BEEN ASSIGNED TO INVESTIGATE THE DISAPPEARANCE

19  OF ENRIQUE CAMARENA, BUT YOU DID NOT HAVE ANY SPECIFIC

20  PLANS?

21  A    THEY DIDN'T HAVE ANY SPECIFIC PLANS.

22  Q    DID YOU PROPOSE SPECIFIC PLANS TO THEM?

23  A    WE TALKED ABOUT A LOT OF PLANS, YES.

24  Q    WAS ONE OF THOSE PLANS TO GO AND SEARCH THE HOMES OF

25  THE DRUG TRAFFICKERS?

11-221

1    A    NOT TO MY RECOLLECTION.

2    Q    YOU WERE NOT PRESENT DURING SUCH A CONVERSATION?

3    A    I AM NOT PRIVY TO THAT CONVERSATION THAT YOU ARE

4    TALKING ABOUT.

5    Q    THAT IS WHAT I AM ASKING, IF YOU WERE PRESENT AT THAT

6    CONVERSATION.

7    A    I DON'T KNOW IF IT EXISTED.  I AM SORRY.  THAT

8    CONVERSATION.

9    Q    HOW LONG DID YOUR MEETING WITH PAVON-REYES LAST

10   REGARDING YOUR PLAN TO INVESTIGATE THE DISAPPEARANCE OF

11   ENRIQUE CAMARENA?

12   A    A COUPLE OF HOURS, I GUESS.  I CAN'T RECALL

13   SPECIFICALLY.

14   Q    WHEN YOU SAY A COUPLE OF HOURS, ARE WE TALKING ABOUT

15   TWO HOURS, FOUR HOURS, OR SIX HOURS?

16   A    I WILL SAY THAT WE WILL TALK, HE HAD -- HE WILL MAKE

17   PHONE CALLS, WE WOULD LEAVE THE OFFICE AND COME BACK.  SO

18   IT WAS NOT A MEETING WHEREBY YOU SIT DOWN AND TALK FOR TWO

19   HOURS OR THREE HOURS.  IT WAS -- SO TO BE SPECIFIC IT

20   WOULD BE VERY HARD FOR ME TO SAY.

21   Q    DO YOU KNOW ABOUT WHAT TIME YOU GOT TO THE MFJP

22   OFFICES?

23   A    ON THE 9TH?

24   Q    ON THE 9TH.

25   A    I WOULD SAY ABOUT 4:00 A.M., TO THE BEST OF MY

11-222

1   RECOLLECTION.

2   Q    AND ABOUT WHAT TIME DID YOU FINISH YOUR PLANNING

3   SESSION WITH PAVON-REYES?

4   A    I LEFT AFTER ABOUT AN HOUR AND A HALF OR TWO HOURS.

5   OTHER AGENTS STAYED THERE.  WE HAD PEOPLE AT ALL TIMES IN

6   HIS OFFICE.  SO PERSONALLY I WAS THERE POSSIBLY TWO HOURS.

7   Q    AND AT NO TIME DURING THE TIME YOU WERE WITH PAVON-

8   REYES DISCUSSING YOUR PLAN, DID HE TELL YOU ABOUT GOING TO

9   THE AIRPORT?

10  A    THAT'S CORRECT.

11  Q    DO YOU KNOW WHETHER HE TOLD ANY OTHER AGENTS ABOUT A

12  PLAN TO GO TO THE AIRPORT?

13  A    NO, I DO NOT.

14  Q    OTHER AGENTS MAY HAVE KNOWN OF THE PLAN?

15  A    I HAVE NO IDEA, MA'AM.

16  Q    NOW, IN ADDITION TO YOURSELF, THERE WERE OTHER DEA

17  AGENTS THAT ENDED UP AT THE AIRPORT.  CORRECT?

18  A    THAT IS CORRECT.

19  Q    THERE WERE ABOUT THREE OTHER DEA AGENTS?

20  A    ABOUT THREE WITH ME, POSSIBLY FOUR.

21  Q    SO THERE WAS A TOTAL OF MAYBE FOUR DEA AGENTS GOING

22  TO THE AIRPORT?

23  A    THAT'S CORRECT.

24  Q    AND YOU WERE IN A CAR WITH COMANDANTE BRISOLO,

25  COMANDANTE ESPINO, AND ASUNCIADO CALVEDA.  CORRECT?

11-223

1   A    CORRECT.

2   Q    NOW, COMANDANTE ESPINO, IS THAT ESPINO-VERDIN?

3   A    TO THE BEST OF MY RECOLLECTION, THAT IS HIM.

4   Q    HAVE YOU LOOKED AT PHOTOGRAPHS OF SERGIO ESPINO-

5   VERDIN?

6   A    NO, I HAVE NOT.

7   Q    YOU HAVE NOT BEEN SHOWN PHOTOGRAPHS TO CONFIRM YOUR

8   IDENTIFICATION OF SERGIO ESPINO-VERDIN?

9   A    THAT'S CORRECT.

10  Q    AND YOU WERE IN THE CAR THAT WAS FOLLOWING PAVON-

11  REYES TO THE AIRPORT.  CORRECT?

12  A    THAT IS CORRECT.

13  Q    AND SO YOU HAD ABOUT NINE OR TEN CARS BEHIND YOU

14  GOING TO THE AIRPORT.  CORRECT?

15  A    APPROXIMATELY, OR MORE.

16  Q    NOW, WHEN DID YOU LEARN THAT STATE JUDICIAL POLICE

17  OFFICERS WERE IN THAT CONVOY?

18  A    I LEARNED THAT BEFORE WE LEFT THE MFJP.

19  Q    SO BEFORE YOU LEFT, YOU LEARNED FROM PAVON-REYES?

20  A    THAT IS CORRECT.

21  Q    THAT HE HAD REQUESTED ASSISTANCE FROM THE STATE

22  JUDICIAL POLICE?

23  A    YES, MA'AM.

24  Q    AND BEFORE YOU LEFT, DID YOU MEET THOSE OFFICERS?

25  A    NO.  I SAW COMANDANTE GONZALEZ AND YOUR DEFENDANT.

11-224

1   Q    AND WHERE DID YOU SEE THEM?

2   A    TO THE BEST OF MY RECOLLECTION, I SAW THEM WALKING

3   AROUND WHEN WE WERE GETTING READY TO FOLLOW COMANDANTE

4   PAVON.

5   Q    THIS WAS AT THE MEXICAN FEDERAL JUDICIAL POLICE

6   OFFICES?

7   A    THAT IS CORRECT.

8   Q    CAN YOU RECALL WHAT DEFENDANT RAUL LOPEZ-ALVAREZ WAS

9   WEARING?

10  A    NO, MA'AM.

11  Q    WAS HE IN A REGULAR POLICE UNIFORM?

12  A    NO, MA'AM.

13  Q    DO YOU RECALL WHAT WEAPON HE MAY HAVE HAD?

14  A    NO, MA'AM.

15  Q    DID YOU SEE ANY OF THOSE AR-15'S IN HIS ARMS?

16  A    EVERYONE WAS CARRYING WEAPONS, SO --

17  Q    I AM ASKING DID YOU SEE AN AR-15 IN HIS ARMS?

18  A    I CAN'T RECALL.

19  Q    THE AR-15 IS A PRETTY BIG WEAPON, ISN'T IT?

20  A    IT IS LARGE, YES.

21  Q    AND YOU DO NOT RECALL WHETHER HE HAD SUCH A WEAPON IN

22  HIS ARMS.  CORRECT?

23          MR. CAMPOS:  ASKED AND ANSWERED, YOUR HONOR.

24          THE COURT:  SUSTAINED.

25  Q    BY MS. LEYVA:  DID YOU SEE THE CAR THAT COMANDANTE

11-225

1    GONZALEZ AND MR. LOPEZ-ALVAREZ BOARDED?

2    A    NO.

3    Q    DID YOU SEE WHERE THEY MAY HAVE BEEN IN THE CONVOY?

4    A    NO.

5         MS. LEYVA:  MAY I HAVE JUST A MOMENT, YOUR

6    HONOR?

7         (PAUSE.)

8    Q    BY MS. LEYVA:  DID YOU HAVE ANY INFORMATION ABOUT

9    ANYONE ELSE THAT MAY HAVE BEEN WITH MR. LOPEZ-ALVAREZ?

10   A    I AM SORRY.  I DIDN'T UNDERSTAND.

11   Q    DO YOU HAVE ANY INFORMATION ABOUT ANY OTHER

12   INDIVIDUAL THAT WAS WITH RAUL LOPEZ-ALVAREZ?

13   A    NO.

14   Q    HOW MANY PEOPLE FROM THE STATE JUDICIAL POLICE WERE

15   PART OF THE CONVOY?

16   A    I DON'T KNOW.

17   Q    SO YOUR ONLY INFORMATION WAS THAT COMANDANTE GONZALEZ

18   AND RAUL LOPEZ-ALVAREZ WERE FROM THE STATE JUDICIAL

19   POLICE?

20   A    THEY ARE THE ONLY TWO THAT I SAW.  I DIDN'T SEE

21   ANYBODY ELSE.

22   Q    OKAY.  BEFORE YOU GOT TO THE AIRPORT, ALL OF THE CARS

23   STOPPED FOR GAS.  CORRECT?

24   A    THAT IS CORRECT.

25   Q    AND WHEN THE CARS STOPPED FOR GAS, DID YOU GET OUT OF

11-226

1    THE CAR?

2    A    NO, I DID NOT.

3    Q    YOU REMAINED AT ALL TIMES?  DID ALL THE CARS STOP FOR

4    GAS?

5    A    NO, NOT ALL.  I REMEMBER COMANDANTE PAVON STOPPED FOR

6    GAS.  WE WAITED FOR HIM.  WE WEREN'T GETTING GAS, BUT HE

7    DID GET GAS.

8    Q    DID THE LINE BEHIND YOU ALSO SLOW DOWN AND WAIT FOR

9    PAVON-REYES?

10   A    YES, MA'AM.

11   Q    NOW, ARE YOU AWARE OF COMANDANTE GONZALEZ'S POSITION

12   WITHIN THE STATE JUDICIAL POLICE?

13   A    NOW?

14   Q    NO, NOT NOW.  HE IS DEAD.  AT THAT TIME?

15   A    AT THE TIME I THINK HE WAS A COMANDANTE.  I DIDN'T

16   KNOW WHETHER HE WAS PRIMER OR SECOND.  PERHAPS I DON'T

17   UNDERSTAND YOUR QUESTION.

18   Q    DID YOU KNOW WHAT HIS POSITION WAS WITHIN THE STATE

19   JUDICIAL POLICE?

20   A    I WAS TOLD HE WAS A COMANDANTE.

21   Q    BUT YOU WERE NOT TOLD WHAT SUPERVISION OR WHAT ROLE

22   HE PLAYED WITHIN THE STATE JUDICIAL POLICE?

23   A    NO.

24   Q    COMANDANTE COULD BE A GROUP SUPERVISOR OF JUST A

25   SMALL SECTION OF THE WHOLE DEPARTMENT.  CORRECT?

11-227

1    Q    COULD BE.

2    Q    AND A COMANDANTE CAN ALSO BE A HEAD OF AN OFFICE THAT

3    OVERSEES SEVERAL GROUPS EACH WITH THEIR OWN SUPERVISOR.

4    CORRECT?

5    A    COULD BE.

6    Q    BUT YOU ARE NOT AWARE OF WHAT POSITION COMANDANTE

7    GONZALEZ EXACTLY HAD?

8    A    THAT IS CORRECT.

9    Q    NOW, YOU SAID YOU WERE SURPRISED THAT YOU WERE GOING

10   TO THE AIRPORT AND WASN'T TOLD WHY.  DIDN'T YOU HAVE A

11   PLAN TOGETHER WITH PAVON-REYES?

12   A    NO, WE DIDN'T.

13   Q    SO YOU JUST ASSUMED THAT IF HE TOLD YOU TO GO

14   SOMEWHERE, IT MUST BE RELATED TO ENRIQUE CAMARENA?

15   A    THAT IS CORRECT.

16   Q    AND YOU WEREN'T QUESTIONING WHAT WAS GOING ON IN

17   TERMS OF INVESTIGATION?

18   A    THAT IS CORRECT.

19   Q    AND SO WERE YOU THEN JUST BASICALLY TAGGING ALONG TO

20   SEE WHAT WAS DONE?

21   A    TAGGING ALONG?  WE WERE WITH THEM TRYING TO FIND OUT

22   WHERE AGENT CAMARENA WAS.

23   Q    BUT THEY WEREN'T TELLING YOU WHERE YOU WERE GOING.

24   RIGHT?

25   A    THEY DIDN'T TELL US.  RIGHT.

11-228

1    Q    BEFORE YOU GOT INTO THE CARS, DID ANYONE MAKE ANY

2    KIND OF GENERAL ANNOUNCEMENT TO THE GROUPS, "GET IN THE

3    CARS BECAUSE THIS IS WHERE WE ARE GOING AND ALL OF YOU

4    FOLLOW IN LINE"?

5                MR. CAMPOS:  ASKED AND ANSWERED, YOUR HONOR.

6                THE COURT:  OVERRULED.

7                THE WITNESS:  COMANDANTE PAVON JUST SHOUTED TO

8    GET IN THE CARS AND FOLLOW ME.  WE FOLLOWED HIM.

9    Q    BY MS. LEYVA:  SO NO ONE IN THE WHOLE GROUP TO THE

10   BEST OF YOUR RECOLLECTION WAS TOLD WHERE YOU WERE GOING?

11   A    NOBODY QUESTIONED COMANDANTE PAVON.

12   Q    NOW, WHERE WERE YOU WHEN YOU WERE TOLD THAT YOU WERE

13   TO GET IN THE CAR?

14   A    I WAS OUTSIDE OF THE OFFICE NEXT TO COMANDANTE PAVON,

15   THE MFJP OFFICES.

16   Q    YOU WERE STANDING -- WHEN YOU SAY OUTSIDE, DO YOU

17   MEAN IN A CORRIDOR OR OUT IN THE STREET?

18   A    OUT IN THE STREET.  RIGHT OUTSIDE.

19   Q    WERE YOU STANDING OUTSIDE ON THE STREET WITH OTHER

20   AGENTS?

21   A    AGENTS AND -- YES.

22   Q    WERE THERE ANY AGENTS, DEA AGENTS, STILL INSIDE WITH

23   PAVON-REYES MAKING ANY PLANS?

24   A    I HAVE NO IDEA.

25   Q    THE AGENTS THAT WENT TO THE AIRPORT, THOSE AGENTS

11-229

1    WERE ALL OUTSIDE WITH YOU ON THE STREET?

2    A    TO THE BEST OF MY RECOLLECTION, YES.

3    Q    AND ABOUT WHAT TIME WAS IT THAT PAVON-REYES SAID,

4    "ALL OF YOU GET IN THE CAR."

5    A    POSSIBLY AROUND 3:00 P.M., CLOSE TO.

6    Q    YOU WERE TOLD TO GET IN THE CAR.  HOW FAR DID YOU

7    HAVE TO GO TO GET INTO CARS?  WHERE WERE THE CARS?

8    A    THEY WERE PARKED RIGHT THERE IN FRONT OF THE

9    SIDEWALK.

10   Q    YOU HAD TEN CARS LINED UP?

11   A    THEY WERE ALL OVER THE PLACE, BUT RIGHT IN FRONT,

12   BLOCKING TRAFFIC.  YES.

13   Q    AND YOU HAD BEEN OUTSIDE ON THE STREET FOR HOW LONG?

14   A    I CAN'T RECALL.

15   Q    WAS IT 15 MINUTES, OR WAS IT AN HOUR?

16   A    I CAN'T RECALL.

17   Q    WAS IT TWO HOURS?

18   A    I CAN'T RECALL.

19   Q    DO YOU RECALL WHEN YOU LEFT THE OFFICE, THE MFJP

20   OFFICE, MEETING WITH COMANDANTE PAVON?  DO YOU RECALL

21   THAT?

22   A    I RECALL THAT, YES.

23   Q    AND WHAT TIME WAS THAT?

24   A    IT HAD TO BE BEFORE 3:00 P.M., CLOSE TO 3:00 P.M.

25   Q    YOU HAD INITIALLY GOTTEN TO THE MFJP OFFICES ABOUT

11-230

1  4:00 IN THE MORNING.  CORRECT?

2  A    AROUND THAT TIME.

3  Q    AT ABOUT 3:00 P.M. YOU WERE STANDING OUTSIDE ON THE

4  SIDEWALK BEING TOLD TO GET INTO CARS.  CORRECT?

5  A    THAT IS CORRECT.

6  Q    DID YOU GO TO LUNCH?

7  A    NO, MA'AM.  I DON'T THINK SO.

8  Q    FROM 4:00 O'CLOCK UNTIL 3:00 P.M. YOU HADN'T EATEN.

9  CORRECT?

10  A    THAT IS CORRECT.

11  Q    AND YOU CAN'T RECALL HOW LONG YOU WERE OUT THERE?

12  A    THAT IS CORRECT.

13  Q    DO YOU KNOW WHEN THE CARS GOT OUT ON THE STREET?

14  A    I DON'T UNDERSTAND THE QUESTION.

15  Q    DID THE STREET GET FILLED WITH ALL OF THESE CARS

16  DURING THE TIME YOU WERE STANDING OUT ON THE SIDEWALK?

17  A    NO, MA'AM.  I WAS DIRECTED BY COMANDANTE PAVON TO

18  OBTAIN SOME VEHICLES.  I THEN WENT ACCOMPANIED BY OTHER

19  AGENTS AND MFJP FEDERAL AGENTS PERSONNEL TO A RENTAL

20  OFFICE, RENTED THE VEHICLES, AND THEN WE TOOK TRIPS TAKING

21  THE VEHICLES TO THE MFJP OFFICE.

22  Q    DO YOU RECALL THE TIME YOU WENT AND RENTED THE

23  VEHICLES?

24  A    IT TOOK US A LONG TIME.  I WOULD SAY AROUND NOON OR

25  1:00 O'CLOCK.  IT TOOK US A COUPLE OF HOURS MINIMUM TO

11-231

1    OBTAIN THAT AMOUNT OF VEHICLES AND THE PAPERWORK.

2    Q    SO IT TOOK YOU A COUPLE OF HOURS TO OBTAIN

3    APPROXIMATELY TEN CARS.  IS THAT CORRECT?

4    A    THAT IS CORRECT.

5    Q    AND YOU AND THREE OTHER AGENTS TOOK TURNS BRINGING

6    THE CARS.  CORRECT?

7    A    NO.

8    Q    I AM SORRY.  YOU AND MFJP POLICE OFFICERS ARE THE

9    ONES THAT TOOK TURNS BRINGING THE CARS.  RIGHT?

10   A    THAT IS CORRECT.  SOME PEOPLE --

11   Q    PARDON?

12   A    SOME OTHER AGENTS, PERSONNEL, ASSISTED ME.  FEDERAL

13   AGENTS, I GUESS.

14   Q    HOW FAR AWAY WAS THAT CAR RENTAL AGENCY FROM THE SPOT

15   WHERE YOU DELIVERED THE VEHICLES?

16          MR. CAMPOS:  OBJECTION.  IRRELEVANT, YOUR HONOR.

17          MS. LEYVA:  YOUR HONOR, IT IS RELEVANT TO WHAT

18   THIS AGENT DID THAT DAY AND THE TIME.  WE DID NOT GET THAT

19   INFORMATION.

20          THE COURT:  WELL, YOU MAY ANSWER THE QUESTION.

21          HOW MUCH MORE DO YOU HAVE OF THIS WITNESS?

22          MS. LEYVA:  I THINK I STILL HAVE ANOTHER 15 OR

23   20 MINUTES.

24          THE COURT:  YOU MAY ANSWER THE QUESTION.

25          THE WITNESS:  I CAN'T RECALL.

11-232

1    THE COURT: WE WILL ADJOURN AT THIS TIME AND

2    TAKE OUR RECESS. PLEASE KEEP IN MIND, LADIES AND

3    GENTLEMEN, YOUR DUTY NOT TO DISCUSS THIS CASE WITH EACH

4    OTHER OR WITH ANYONE ELSE, AND NOT TO ALLOW ANYONE ELSE TO

5    DISCUSS IT WITH YOU AND NOT TO WATCH ANY TELEVISION OR

6    RADIO BROADCASTS REGARDING THIS TAPE OR READ ANY

7    NEWSPAPERS CONCERNING IT.

8    WE WILL RECONVENE TOMORROW MORNING AT 9:30.

9    KEEP IN MIND THAT WE WILL BE OFF NEXT WEEK. I MENTIONED

10   THAT TO YOU AT THE BEGINNING OF THE TRIAL. WE WILL NOT BE

11   IN SESSION ON THIS CASE NEXT WEEK. YOU MAY BE EXCUSED

12   NOW.

13   (THE JURY LEFT THE COURTROOM AND

14   PROCEEDINGS IN OPEN COURT.)

15   THE COURT: COUNSEL FOR THE GOVERNMENT, I WANT

16   YOU TO ADVISE THE DEFENDANTS OF ALL WITNESSES YOU INTEND

17   TO CALL TOMORROW, AND DO THAT EVERY DAY.

18   MR. GURULE: YES, YOUR HONOR.

19   THE COURT: AT THE CLOSE OF THE DAY.

20   MR. GURULE: YES, YOUR HONOR.

21   (AT 4:40 P.M. AN ADJOURNMENT WAS TAKEN UNTIL

22   WEDNESDAY, AUGUST 10, 1988, AT 9:30 A.M.)

23   - - -

24   I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT

25   TRANSCRIPT OF THE PROCEEDINGS HAD ON THE RECORD

11-233

1        IN THE ABOVE-ENTITLED MATTER.

2

3        *Velma B. Thomas*        *June 1, 1989*

4        OFFICIAL REPORTER           DATE