IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

- - - -

HONORABLE EDWARD RAFEEDIE, DISTRICT COURT JUDGE PRESIDING

- - - -

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| PLAINTIFF, ) | |
| VS. ) | CASE NO:  CR 87-422(F)-ER |
| JUAN RAMON MATTA-BALLESTEROS ) DEL POZO, RUBEN ZUNO-ARCE, ) JUAN JOSE BERNABE-RAMIREZ, ) AND JAVIER VASQUEZ-VELASCO, ) | |
| DEFENDANTS. ) | VOLUME 13 |

REPORTERS' TRANSCRIPT OF PROCEEDINGS

WEDNESDAY, JUNE 6, 1990

LOS ANGELES, CALIFORNIA

JULIE CHURCHILL, CSR
SUSAN A. LEE, CSR
OFFICIAL REPORTERS
U.S. DISTRICT COURT, 442-C
312 N. SPRING STREET
LOS ANGELES, CA  90012
(213) 626-6353
(213) 617-8227


ENTERED ON COURTRAN
SEP 2 6 1990

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:

GARY A. FEESS,
UNITED STATES ATTORNEY
BY:   MANUEL A. MEDRANO
      JOHN L. CARLTON
ASSISTANT U.S. ATTORNEYS
1200 UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA  90012
(213) 894-0619/894-6682

FOR DEFENDANT JUAN RAMON MATTA-BALLESTEROS DEL POZO:

MARTIN R. STOLAR
MICHAEL J. BURNS, ESQ.
ADOLFO Z. AGUILAR, ESQ.
ATTORNEYS AT LAW
351 NORTH BROADWAY, 4TH FLOOR
NEW YORK, NEW YORK  10013
(212) 219-1919; (213) 855-8888 EXT. 314

FOR DEFENDANT RUBEN ZUNO-ARCE:

MITCHELL, SILBERBERG & KNUPP
BY:   EDWARD M. MEDVENE, ESQ.
      RONALD DI NICOLA, ESQ.
      JAMES BLANCARTE, ESQ.
11377 WEST OLYMPIC BOULEVARD
LOS ANGELES, CALIFORNIA  90064-1683
(213) 312-3150

FOR DEFENDANT JUAN JOSE BERNABE-RAMIREZ:

MARY KELLY
ATTORNEY AT LAW
827 MORAGA DRIVE
BEL AIR, CALIFORNIA   90049
(213) 472-7121
      AND
BRIDGMAN, MORDKIN, GOULD & SHAPIRO, INC.
BY:   MICHAEL S. MEZA, ESQ.
17050 BUSHARD STREET, STE. 200
FOUNTAIN VALLEY, CALIFORNIA  92708
(714) 898-0461; (213) 924-6606

APPEARANCES (CONTINUED):

      FOR DEFENDANT JAVIER VASQUEZ-VELASCO:

          FEDERAL LITIGATORS GROUP
          BY:  GREGORY NICOLAYSEN, ESQ.
          8530 WILSHIRE BOULEVARD, STE. 404
          BEVERLY HILLS, CALIFORNIA 90211
          (213) 854-5135

ALSO PRESENT:

          DOUGLAS KUEHL, SPEC.AGT., D.E.A.
          HECTOR BERRELLEZ, SPEC.AGT., D.E.A.

          SPANISH INTERPRETERS

13-4

LOS ANGELES + CALIFORNIA    WEDNESDAY, JUNE 6, 1990

+ 9:30 A.M.


(JURY PRESENT.)

(WITNESS RESUMED THE STAND.)

THE COURT:  GOOD MORNING.

THE COURTROOM:  GOOD MORNING, YOUR HONOR.

THE COURT:  WOULD THE WITNESS STATE YOUR NAME FOR THE
RECORD, PLEASE?

THE WITNESS:  JOSEPH GONZALES.

THE COURT:  YOU MAY CROSS-EXAMINE THE WITNESS.

DO YOU HAVE ANY CROSS EXAMINATION FOR THIS WITNESS?

MR. NICOLAYSEN:  NOTHING, YOUR HONOR.

MR. STOLAR:  I HAVE NO QUESTIONS.

MS. KELLY:  NO, YOUR HONOR.

THE COURT:  VERY WELL.  THE WITNESS MAY STEP DOWN.

(WITNESS EXCUSED.)

THE COURT:  CALL YOUR NEXT WITNESS.

MR. MEDRANO:  THE GOVERNMENT WOULD CALL JERRY SPENCER
TO THE STAND AT THIS TIME.


JERRY DOUGLAS SPENCER + PLAINTIFF'S WITNESS, SWORN


THE CLERK:  PLEASE BE SEATED.  PLEASE STATE YOUR FULL
NAME AND SPELL YOUR LAST NAME FOR THE RECORD.

13-5

1        THE WITNESS:  YES.  JERRY DOUGLAS SPENCER.  THE LAST

2   NAME IS SPELLED S P E N C E R.

3        THE COURT:  WOULD YOU MOVE THAT MIKE TO THE SIDE OF

4   YOUR FACE A LITTLE, PLEASE.

5        THE WITNESS:  OKAY.

6

7                    DIRECT EXAMINATION +

8   BY MR. MEDRANO:

9   Q.   GOOD MORNING, MR. SPENCER.  WHAT IS YOUR OCCUPATION, SIR?

10  A.   I'M A MEDICAL OFFICER, NAVY PHYSICIAN STATIONED AT THE

11  U.S. NAVAL HOSPITAL IN OKINAWA, JAPAN.

12  Q.   DO YOU HAVE RANK?

13  A.   YES.  I'M A NAVY CAPTAIN.

14  Q.   AND YOU'RE CURRENTLY ASSIGNED IN WHAT COUNTRY?

15  A.   JAPAN.  I HAVE BEEN STATIONED AT THE NAVAL HOSPITAL IN

16  OKINAWA, JAPAN FOR FIVE YEARS.

17  Q.   I'M GOING TO ASK YOU, WITH THE COURT'S PERMISSION, JUST TO

18  MOVE THE MIKE SLIGHTLY TO YOUR RIGHT, SICNE YOU'VE TURNED TO

19  FACE THE JURY WHEN YOU SPEAK, AND ALSO TO SPEAK UP.

20        THANK YOU, DR. SPENCER.

21        WHAT IS YOUR CURRENT POSITION THAT YOU HAVE IN

22  OKINAWA, SIR?

23  A.   I HAVE TWO MAJOR POSITIONS.  I'M THE DIRECTOR OF ANCILLARY

24  SERVICES, WHICH IS AN ADMINISTRATIVE POSITION, WHERE I HAVE

25  RESPONSIBILITY FOR FIVE DEPARTMENTS.

13-6

1           AND I'M ALSO THE REGIONAL MEDICAL EXAMINER FOR THE

2    PACIFIC REGION WHERE I HAVE RESPONSIBILITY FOR ASSISTING IN

3    MEDICOLEGAL INVESTIGATIONS IN GUAM, THE PHILIPPINES, THE

4    REPUBLIC OR KOREA, MAINLY JAPAN, AND OKINAWA.

5    Q.   IN THE PAST, OR CURRENTLY, DO YOU PERFORM AUTOPSIES, DR.

6    SPENCER?

7    A.   YES, I FREQUENTLY PERFORM AUTOPSIES.

8    Q.   NOW, ARE YOU BOARD CERTIFIED?

9    A.   YES, I'M BOARD CERTIFIED IN ANATOMIC PATHOLOGY, CLINICAL

10   PATHOLOGY AND FORENSIC PATHOLOGY.

11   Q.   FOR US LAY PEOPLE, WHAT DO YOU MEAN WHEN YOU SAY BOARD

12   CERTIFIED?

13   A.   BOARD CERTIFIED IN AMERICAN MEDICINE MEANS THAT YOU HAVE

14   PASSED USUALLY A SPECIALTY EXAMINATION ADMINISTERED BY A

15   PARTICULAR SPECIALTY BOARD.

16           THERE ARE A NUMBER OF BOARDS:  AMERICAN BOARD OF

17   SURGERY, AMERICAN BOARD OF INTERNAL MEDICINE.  I HAVE PASSED

18   BOARD CERTIFICATION ADMINISTERED BY THE AMERICAN BOARD OF

19   PATHOLOGY.

20   Q.   NOW, YOU'VE DESCRIBED THREE AREAS THAT YOU'RE BOARD

21   CERTIFIED IN.  CAN I ASK YOU TO ELABORATE ON EACH.

22           WHAT IS ANATOMIC PATHOLOGY?

23   A.   ANATOMIC PATHOLOGY IS A PART OF GENERAL PATHOLOGY.  I NEED

24   TO DEFINE WHAT PATHOLOGY IS.  IT IS THE STUDY OF DISEASE AND

25   DISEASE PROCESSES AND DIAGNOSING DISEASE.

13-7

1    ANATOMIC PATHOLOGY THEN IS THAT PART OF PATHOLOGY

2  THAT EXAMINES TISSUES LIKE SPECIMENS REMOVED AT SURGERY, THAT

3  IS, BIOPSIES, PAP SMEARS AND AUTOPSIES TO MAKE DIAGNOSES.

4    CLINICAL PATHOLOGY, ON THE OTHER HAND, IS LOOKING AT

5  THE VARIOUS SPECIMENS, BODY FLUIDS, URINE AND BLOOD TO MAKE

6  DIAGNOSES.

7  Q.    THERE IS A THIRD CATEGORY, I BELIEVE.  FORENSIC PATHOLOGY.

8    COULD YOU EXPLAIN WHAT THAT IS.

9  A.    FORENSIC PATHOLOGY IS A SUBSPECIALITY WITHIN THE GENERAL

10  FIELD OF ANATOMIC PATHOLOGY WHERE USUALLY AUTOPSIES ARE

11  INVOLVED, AND THE INVESTIGATION OF MEDICOLEGAL DEATHS, THAT IS,

12  DEATHS THAT ARE UNNATURAL, VIOLENT, UNEXPLAINED OR MYSTERIOUS.

13    THE DEATHS WE'RE TALKING ABOUT ARE HOMICIDES,

14  SUICIDES OR ACCIDENTS OR DEATHS WHETHER THE INDIVIDUAL IS NOT

15  UNDER THE CARE OF A PHYSICIAN.

16  Q.    NOW, SIR, WHAT COLLEGE DID YOU GRADUATE FROM DR. SPENCER.

17  A.    I WENT TO UNDERGRADUATE SCHOOL AT KANSAS STATE UNIVERSITY

18  IN MANHATTAN, KANSAS.

19  Q.    AT ANY POINT, SIR, HAVE YOU SERVED AS A FLIGHT OFFICER IN

20  YOUR CAREER?

21  A.    YES, I WAS A NAVAL FLIGHT OFFICER.  UPON GRAUDATION FROM

22  COLLEGE, I WENT INTO THE NAVY AND WAS A LINE OFFICER, BECAME A

23  NAVAL FLIGHT OFFICER OR NAVIGATOR AND FLEW OFF AIRCRAFT

24  CARRIERS FOR FOUR YEARS.

25  Q.    THEREAFTER, WHERE DID YOUR CAREER TAKE YOU?

13-8

1    A.    AFTER I FINISHED MY FIRST FOUR YEARS IN THE NAVY, I WAS

2    RELEASED FROM ACTIVE DUTY AND WENT TO THE UNIVERSITY OF KANSAS

3    MEDICAL SCHOOL, AND GRADUATED FROM THERE IN 1972.

4          THEN I WENT TO THE NAVAL HOSPITAL AT SAN DIEGO AND

5    WAS AN INTERN AND GENERAL PATHOLOGY RESIDENT THERE FROM 1972 TO

6    1977.  I THEN WAS A STAFF PATHOLOGIST AT THE NAVAL HOSPITAL OF

7    SAN DIEGO FROM 1979.

8          I ALSO ATTENDED THE UNIVERSITY OF SAN DIEGO LAW

9    SCHOOL AND GRADUATED FROM THERE IN 1979.  I THEN WAS

10   TRANSFERRED TO WASHINGTON, D.C. WHERE I DID A FELLOWSHIP, A

11   ONE-YEAR TRAINING IN FORENSIC PATHOLOGY, THAT PARTICULAR

12   SUBSPECIALITY, FROM 1979 TO 1980.

13   Q.    WHERE WAS THAT ONE-YEAR FELLOWSHIP THAT YOU CONDUCTED?

14   A.    THE FELLOWSHIP WAS AT THE ARMED FORCES INSTITUTE OF

15   PATHOLOGY, WHICH IS LOCATED AT WALTER REED ARMY MEDICAL CENTER

16   IN WASHINGTON.

17         I DID MOST OF MY TRAINING, HOWEVER, AT THE DISTRICT

18   OF COLOMBIA MEDICAL EXAMINERS OFFICE IN WASHINGTON AND AT THE

19   MARYLAND STATE MEDICAL EXAMINERS OFFICE IN BALTIMORE.

20   Q.    DR. SPENCER, REGARDING FORENSIC PATHOLOGY, WHAT ARE YOUR

21   RESPONSIBILITIES CURRENTLY AT YOUR BASE IN OKINAWA?

22   A.    FOR THE PAST FIVE YEARS, I'VE HAD TO TRAVEL FREQUENTLY TO

23   THE REPUBLIC OF KOREA, PHILIPPINES, GUAM, SOMETIMES TO MAINLAND

24   JAPAN TO CONDUCT AUTOPSIES, TESTIFY IN MILITARY COURT-MARTIALS.

25         ALSO, I REVIEW CASES, THAT IS, AUTOPSIES PERFORMED BY

13-9

1  OTHER PATHOLOGISTS IN THE AREA AND GIVE THEM MY OPINIONS IN

2  THOSE CASES.

3  Q.   CAN YOU GIVE US AN APPROXIMATION IN YOUR CAREER OF HOW

4  MANY AUTOPSIES YOU'VE PERFORMED OR HAVE PARTICIPATED IN, DR.

5  SPENCER?

6  A.   PERFORMED OR PARTICIPATED IN, AT LEAST 1300 TO 1500.

7        WHEN I WAS IN WASHINGTON, D.C., I WAS CHAIRMAN OF THE

8  DEPARTMENT OF FORENSIC SCIENCE, WHERE WE REVIEWED ALL THE

9  MEDICOLEGAL EATHS OCCURRING IN THE SERVICES EACH YEAR.  SO I

10 REVIEWED A LARGE NUMBER AND ALSO PERFORMED A LARGE NUMBER OF

11 AUTOPSIES.

12 Q.   FINALLY, DR. SPENCER, THE APPROXIMATE NUMBER OF TIMES THAT

13 YOU HAVE BEEN QUALIFIED TO TESTIFY IN COURT AS AN EXPERT IN THE

14 AREA OF AUTOPSIES?

15 A.   MORE THAN 100 TIMES.

16       MR. MEDRANO:   YOUR HONOR, AT THIS TIME WITH YOUR

17 PERMISSION, WE WOULD OFFER DR. SPENCER AS AN EXPERT IN THIS

18 AREA.

19       MR. STOLAR:  WE WOULD CERTAINLY ACCEPT HIM AS SUCH.

20       MR. NICOLAYSEN:  SO STIPULATED, YOUR HONOR.

21       THE COURT:  VERY WELL.

22       MR. MEDRANO:  IN THE AREA OF FORENSIC PATHOLOGY, YOUR

23 HONOR.

24       THE COURT:  YES.  ALL RIGHT.

25 BY MR. MEDRANO:

13-10

1    Q.    NOW, I'D LIKE TO DIRECT YOUR ATTENTION, DR. SPENCER, TO

2    ABOUT THE FIRST WEEK OF MARCH OF 1985.

3            IN THAT TIME FRAME, SIR, DID YOU HAVE AN OPPORTUNITY

4    TO TRAVEL TO GUADALAJARA IN THE REPUBLIC OF MEXICO?

5    A.    YES, I WAS CALLED ON THE 6TH OF MARCH AND ASKED TO GO TO

6    GUADALAJARA, MEXICO TO BE AN OBSERVER IN AN AUTOPSY.

7    Q.    WHEN YOU WERE ADVISED OF THIS, DID YOU KNOW OR HAVE AN

8    IDEA OF WHERE YOU WOULD BE GOING TO IN GUADALAJARA?

9    A.    YES.    WHEN I WAS CALLED ON THE EVENING OF THE 6TH OF

10   MARCH, I WAS REQUESTED TO BE AN OBSERVER OF AN AUTOPSY TO BE

11   PERFORMED AT THE INSTITUTE OF FORENSIC MEDICINE AT THE MEDICAL

12   SCHOOL IN GUADALAJARA.

13   Q.    HAD YOU BEEN ADVISED, SIR, AS TO WHETHER OR NOT ANY BODIES

14   HAD BEEN FOUND?

15   A.    YES.   I WAS INFORMED THAT TWO BODIES HAD BEEN FOUND, AND

16   ONE OF THEM WAS THOUGHT TO BE THE DRUG ENFORCEMENT AGENT,

17   ENRIQUE CAMARENA.

18   Q.    DID YOU, IN FACT, TRAVEL TO GUADALAJARA, MEXICO?

19   A.    YES, I WENT THE FOLLOWING DAY ON THE 7TH OF MARCH, AND

20   ARRIVED IN GUADALAJARA EARLY IN THE AFTERNOON.

21   Q.    WHEN YOU ARRIVED THERE, WERE YOU MET BY ANYONE?

22   A.    YES.   I WAS MET BY TWO D.E.A. AGENTS WHO THEN INFORMED ME

23   THAT THE AUTOPSY THAT I WAS TO OBSERVE HAD ALREADY BEEN

24   PERFORMED AND THAT THE BODY HAD BEEN MOVED TO A CITY HOSPITAL.

25   Q.    AND DO YOU KNOW WHAT CITY HOSPITAL THIS BODY HAD BEEN

1   MOVED TO?  IN WHAT CITY?

2   A.    I DON'T KNOW THE NAME OF THE PARTICULAR HOSPITAL.  I WAS

3   JUST TOLD IT WAS A CITY HOSPITAL, AND THE BODIES HAD BEEN MOVED

4   FROM THE INSTITUTE OF FORENSIC MEDICINE.

5   Q.    BUT STILL IN THE CITY OF GUADALAJARA?

6   A.    STILL IN GUADALAJARA.

7   Q.    AT ANY TIME DO YOU HAVE AN OPPORTUNITY TO GO TO THIS CITY

8   HOSPITAL IN GUADALAJARA?

9   A.    YES, I WAS IMMEDIATELY TAKEN FROM THE AIRPORT UPON ARRIVAL

10  TO THE CITY HOSPITAL.

11  Q.    UPON YOUR ARRIVAL, DO YOU HAVE AN OPPORTUNITY TO CONDUCT

12  AN AUTOPSY?

13  A.    YES.  WE WENT TO THE CITY HOSPITAL AND I WAS GIVEN THE

14  OPPORTUNITY TO DO AN AUTOPSY ON ENRIQUE CAMARENA.

15          MR. MEZA:  OBJECTION, YOUR HONOR.  MOVE TO STRIKE THE

16  CONCLUSION.  THERE IS NO FOUNDATION AS TO WHO HE WAS DOING THE

17  YOU AUTOPSY FOR.

18          THE COURT:  DO YOU MEAN BY THAT THE BODIES THAT YOU

19  UNDERSTOOD WAS THOUGHT TO BE CAMARENA?

20          THE WITNESS:  AT THE TIME I ARRIVED, THERE WERE TWO

21  F.B.I. AGENTS WHO HAD JUST COMPLETED THEIR IDENTIFICATION.

22  THEY TOLD ME THEY HAD POSITIVELY IDENTIFIED CAMARENA ON THE

23  BASIS OF FINGERPRINTS.

24          MR. MEZA:  YOUR HONOR, I WOULD OBJECT IF IT IS

25  OFFERED FOR TRUTH.  IF IT IS NOT, THEN THERE IS NO OBJECTION.

13-12

1      THE COURT:  STRIKE THE WITNESS'S LAST ANSWER.  THE

2  JURY WILL DISREGARD IT.

3      THE OBJECTION IS SUSTAINED.

4      MR. MEDRANO:  THANK YOU, YOUR HONOR.

5  BY MR. MEDRANO:

6  Q.   TO YOUR KNOWLEDGE, DR. SPENCER, WOULD YOUR AUTOPSY HAVE

7  BEEN THE FIRST AUTOPSY TO HAVE BEEN PERFORMED ON THAT

8  PARTICULAR BODY?

9  A.   NO.  IN FACT, MY AUTOPSY WAS THE THIRD AUTOPSY THAT WAS

10  PERFORMED.

11  Q.   DR. SPENCER, WAS IT YOUR UNDERSTANDING WHEN YOU PERFORMED

12  THE AUTOPSY THAT THESE WERE THE REMAINS OF ENRIQUE CAMARENA?

13  A.   YES.  IT WAS MY UNDERSTANDING THAT -- THERE WERE TWO

14  BODIES THERE.  IT WAS POINTED OUT TO ME THAT WAS CAMARENA.

15      MR. NICOLAYSEN:  SAME OBJECTION, YOUR HONOR.

16      THE COURT:  THAT IS SOMEWHAT INCONSISTENT WITH THE

17  STIPULATION THAT YOU OFFERED HERE YESTERDAY, BUT THE OBJECTION

18  IS OVERRULED.

19  BY MR. MEDRANO:

20  Q.   DR. SPENCER, UPON YOUR ARRIVAL AT THE HOSPITAL, ARE THERE

21  OTHER INDIVIDUALS ALREADY PRESENT?

22  A.   THERE ARE A NUMBER OF OTHER PEOPLE THERE.  THERE WERE TWO

23  F.B.I. AGENTS, ONE OF WHOM I KNEW FROM WORKING WITH HIM IN THE

24  PAST.

25      THERE WERE A NUMBER OF MEXICAN CIVILIANS, SOME

1    UNIFORMED INDIVIDUALS THAT I ASSUMED WERE MEXICAN POLICE.

2    THERE WERE SOME INDIVIDUALS THAT I KNOW WERE DOCTORS, MEXICAN

3    DOCTORS, AND OTHER PEOPLE I ASSUMED WERE EMPLOYEES OF THE

4    HOSPITAL.

5    Q.    WHEN YOU ENTERED, DID YOU SEE BODIES THAT YOU'RE LED TO?

6    A.    YES.  WELL, I WENT INTO A HALLWAY AND WAS TAKEN INTO THE

7    MORGUE AREA WHERE THE TWO BODIES WERE LOCATED ON ADJACENT

8    AUTOPSY TABLES.

9    Q.    AND DID YOU AT SOME POINT PROCEED TO THE ONE THAT YOU

10   BELIEVED TO BE REMAINS OF CAMARENA?

11   A.    YES.

12   Q.    AND WHEN YOU CAME TO THAT BODY, ANY ARTICLES OF CLOTHING

13   ON THAT SPECIFIC BODY? (SIC)

14   A.    NO, THERE WERE NO ARTICLES OF CLOTHING ON EITHER BODY AT

15   THAT TIME.

16   Q.    NOW, SIR, THESE TWO F.B.I. AGENTS; DO YOU REMEMBER THEIR

17   NAMES?

18   A.    YES.  CARL COLLINS AND JOHN DILLON.

19   Q.    WHEN YOU ARRIVED AT THE HOSPITAL, ARE THEY DOING ANYTHING

20   IN PARTICULAR?

21   A.    YES.  THEY WERE PHOTOGRAPHING CLOTHING THAT HAD BEEN ON

22   THE BODY, ALSO SOME LIGATURES, BROKE LIGATURES.

23         THEY SHOWED THOSE TO ME AT THAT TIME --

24         MR. MEZA:  OBJECTION, YOUR HONOR, AND MOVE TO STRIKE

25   AS A CONCLUSION AS TO THE SOURCE OF THE CLOTHING AND

13-14

1  PHOTOGRAPHS.

2            THE COURT:  OVERRULED.

3            MR. MEDRANO:  GO AHEAD, DR. SPENCER.

4            THE WITNESS:  THEY SHOWED THE CLOTHING TO ME AT THAT

5  TIME AND ALSO WHEN I FINISHED THE AUTOPSY ON THE BODY.

6  BY MR. MEDRANO:

7  Q.   THEY WERE PHOTOGRAPHING THE CLOTHES AND LIGATURES?

8  A.   YES, THEY WERE.

9  Q.   IS IT ONE OF THESE TWO, TO YOUR KNOWLEDGE, THAT WAS ABLE

10  TO DO A FINGERPRINT COMPARISON OF THE REMAINS?

11  A.   YES.

12  Q.   WOULD THAT HAVE BEEN MR. COLLINS OR MR. DILLON, IF YOU

13  KNOW?

14  A.   MY IMPRESSION WAS THEY WORKED ON IT TOGETHER.

15  Q.   NOW, IF COULD YOU DESCRIBE FOR US THE GENERAL STATE THAT

16  YOU FOUND THE TWO BODIES IN THE HOSPITAL?

17  A.   THE TWO BODIES LOOKED SIMILAR.  THEY BOTH HAD MODERATE TO

18  ADVANCED DECOMPOSITION OR DECAY.  IT WAS CLEAR THAT THEY HAD

19  BEEN DEAD FOR SOME TIME, AND THAT THEY HAD LAYED OUT IN A DRY

20  ENVIRONMENT FOR SEVERAL HOURS ANYHOW.

21            THERE WERE A LOT OF DRYING CHANGES.  THE BODIES WERE

22  BROWN TO DARK BROWN IN COLOR, BOTH OF THEM HAD HAD PRIOR

23  AUTOPSIES WHERE THE BODY CAVITIES WERE OPENED, BUT BOTH WERE IN

24  MODERATE TO ADVANCED DECOMPOSITION.

25            THERE WAS A MODERATE ODOR OF DECAY.

1   Q.   DR. SPENCER, ARE YOU FAMILIAR WITH A TERM THAT IS CALLED

2   MUMMIFICATION?

3   A.   YES.

4   Q.   WOULD YOU EXPLAIN THAT?

5   A.   MUMMIFICATION IS ANOTHER WORD FOR DRYING CHANGE.   IN

6   MUMMIFICATION, THE SKIN BECOMES DRY, BROWN, ALMOST LEATHERLIKE.

7   AND BOTH OF THE BODIES IN THE MORGUE, CITY MORGUE, LOOKED LIKE

8   THAT.

9   Q.   THAT IS, WERE CHARACTERIZED BY THIS MUMMIFICATION PROCESS?

10  A.   YES.   THEY BOTH WERE -- THE SKIN WAS VERY DRY AND, AS WE

11  WOULD SAY, MUMMIFIED.

12  Q.   NOW, DID YOU OBSERVE ON EITHER OF THESE TWO BODIES ANY

13  INSECTS OR MAGGOTS OF ANY SORT?

14  A.   NO.   THERE WAS NO FLY LARVAE OR MAGGOTS ON EITHER BODY OR

15  ANY EVIDENCE OF ANY FLY EGGS ON EITHER BODY.

16  Q.   NOW, BASED, DR. SPENCER, ON YOUR OBSERVATION OF THE BODIES

17  IN THEIR MUMMIFICATION STATE AND THE SKIN BEING LEATHERLIKE AND

18  THE ABSENCE OF ANY INSECTS OR MAGGOTS, DID YOU FORM ANY OPINION

19  OR CONCLUSION REGARDING THE TWO BODIES THAT YOU OBSERVED?

20  A.   YES.   WELL, THERE WAS A LOT OF DIRT ON BOTH BODIES, AND

21  BECAUSE OF THE STATE OF THE BODIES, IT WAS CLEAR THEY HAD BEEN

22  DEAD AT LEAST TWO WEEKS, PROBABLY BURIED AWAY FROM ANY INSECT

23  ACTIVITY THAT WOULD HAVE ACCELERATED, CERTAINLY, THE

24  DECOMPOSITION.

25          SO MY IMPRESSION WAS THAT THE BODIES HAD BEEN DEAD AT

13-16

1    LEAST TWO WEEKS AND HAD BEEN BURIED.

2    Q.   NOW, THE ABSENCE OF MAGGOTS OR INSECTS, WHAT DOES THAT

3    INDICATE TO YOU ON THE BASIS OF YOUR EXPERIENCE AND TRAINING?

4    A.   WELL, THE ABSENCE OF INSECTS OR MAGGOTS ON THESE BODIES

5    MEANS THAT INSECTS WEREN'T ABLE TO OBTAIN ACCESS TO THE BODIES.

6    THEY EITHER HAD TO BE IN A ROOM WHERE NO INSECTS COULD GET TO

7    THEM OR BURIED WHERE INSECTS COULD ALSO NOT GET TO THE BODIES.

8           INSECTS, SUCH AS FLY LARVAE, OR MAGGOTS, WILL

9    MARKEDLY ACCELERATE DECOMPOSITION.  AND THESE BODIES LAID OUT

10   IN THE ENVIRONMENT IN GUADALAJARA WOULD HAVE BEEN REDUCED TO

11   SKELETONS IN PROBABLY LESS THAN A WEEK.

12   Q.   PERHAPS THAT WAS MY NEXT QUESTION, DR. SPENCER.

13          ASSUMING NO UNDERGROUND BURIAL, BUT RATHER, THE

14   BODIES JUST BEING LEFT OUT ABOVE GROUND IN THE OPEN, WOULD THE

15   BODIES HAVE BEEN IN A DIFFERENT STATE?

16   A.   YES.  IF THEY HAD BEEN LEFT OUT IN THE OPEN, THEY WOULD

17   HAVE BEEN SKELETONS.

18   Q.   AGAIN, WHY IS THAT?

19   A.   BESIDES THE REGULAR DECOMPOSITION, THE FLY LARVAE AND

20   BEETLES WILL UTILIZE DECAYING BODIES AS FOOD, AND THEY WILL

21   PRETTY RAPIDLY DEVOUR A BODY.  SUCCESSIVE STAGES OF FLIES AND

22   BEETLES.

23   Q.   NOW, RELATED TO THAT, DR. SPENCER, WOULD THE CLIMATE OF

24   THE AREA ALSO HAVE ANY EFFECT ON THIS DECOMPOSITION, IF THE

25   BODIES WERE ABOVE GROUND?

13-17

1    A.    WELL, THE CLIMATE BEING WARM WOULD ALLOW, OF COURSE, FOR

2    FLIES, LOTS OF FLIES TO BE AROUND, AND THAT WOULD BE -- WOULD

3    LED TO ACCELERATED DECOMPOSITION BECAUSE THE FLIES WOULD BE

4    THERE.

5            IF YOU HAD A COLD ENVIRONMENT, LIKE MINNESOTA IN THE

6    WINTERTIME, YOU WOULDN'T HAVE ANY FLIES AROUND SO DECAY OR

7    DECOMPOSITION WOULD BE DELAYED.

8    Q.    NOW, SIR, AT SOME POINT YOU DO HAVE AN OPPORTUNITY TO

9    CONDUCT AN AUTOPSY ON ONE OF THOSE TWO BODIES?

10   A.    YES, I DID.

11   Q.    AND THE ONE THAT YOU UNDERSTOOD TO BE THE REMAINS OF

12   CAMARENA?

13   A.    YES.

14   Q.    NOW, CAN YOU WALK US THROUGH THAT AND TELL US WHAT YOU DID

15   FIRST, DR. SPENCER?

16            MR. STOLAR:  I'M GOING TO OBJECT.  THERE IS NO

17   NECESSITY, IT IS IRRELEVANT, THE CAUSE OF DEATH IS WHAT IS AT

18   ISSUE.

19            THE COURT:  OVERRULED.

20            THE WITNESS:  YES.  WE FIRST DO AN EXTERNAL

21   EXAMINATION; THAT IS, LOOK OVER THE SURFACE OF THE BODY VERY

22   CAREFULLY, WHICH I DID.

23            I QUICKLY NOTICED THERE WAS SEVERE HEAD INJURIES, BUT

24   THEN I WENT TO THE REST OF THE BODY.  THE BODY, AS I HAVE

25   ALREADY MENTIONED, WAS DRY, THE SKIN WAS DRY AND LEATHERLIKE,

13-18

1    BROWN TO DARK BROWN.

2              I WAS PARTICULARLY INTERESTED IN LOOKING FOR ANY

3    BRUISING THAT I COULD FIND, BUT IT IS DIFFICULT IN A BODY THAT

4    IS THIS DECAYED OR DECOMPOSED TO FIND EVIDENCE OF BRUISING.

5    BUT I VERY CAREFULLY TRIED TO FIND EVIDENCE OF BRUISING.

6              I LOOKED AT THE SKIN, AND AT THE VERY DARK AREAS, I

7    HAD A SCALPEL THAT I INCISED.  I MADE AN INCISED WOUND SO I

8    COULD SEE IF THERE WAS EVIDENCE OF BRUISING, BUT BECAUSE OF THE

9    DECAY PROCESS, IT WAS VERY DIFFICULT TO TELL THAT.

10             I THEN LOOKED AT THE INTERNAL ORGANS, THAT IS, THE

11   CHEST AND ABDOMEN.  THERE WAS AN AUTOPSY INCISION EXTENDING

12   FROM THE CHIN DOWN TO THE LOWER ABDOMEN, AND THERE WERE SUTURE

13   MATERIAL, THAT IS, PIECES OF TWINE, IF YOU WILL, THAT HAD BEEN

14   CUT, INDICATING THAT AT THE SECOND AUTOPSY, THE ONE THAT HAD

15   BEEN DONE AT THE INSTITUTE OF FORENSIC MEDICINE, THEY HAD

16   SIMPLY CUT THROUGH THAT AND LEFT IT OPEN.

17             THE INTERNAL ORGANS HAD NOT BEEN REMOVED.  THEY HAD

18   SIMPLY BEEN SLICED NEAR THE NECK REGION, MOVED AND PULLED

19   DOWNWARDS.  THEY WERE NOT REALLY DISSECTED AT ALL.

20             THERE WERE FOUR FRACTURED RIBS ON EACH SIDE.  SOME OF

21   THE RIBS WERE A LITTLE DIFFERENT; THAT IS, THE FRACTURES WERE

22   SIMPLY BENDING-TYPE FRACTURES.  OTHERS WERE IRREGULAR

23   FRACTURES.

24             AGAIN, NONE OF THE INTERNAL ORGANS HAD BEEN

25   DISSECTED, EXCEPT TO PULL THEM DOWN.  AND I INSPECTED THE

13-19

1    HEART.  LUNGS:  THERE WAS NO FOREIGN MATERIAL, NO DIRT OR

2    ANYTHING IN THE AIRWAY, AND NO ABNORMALITY OF THE INTERNAL

3    ORGANS THAT I COULD DETERMINE EXCEPT FOR THE FRACTURES OF THE

4    RIBS, THAT IS FOUR RIBS ON EACH SIDE.

5    Q.   WOULD THAT BE THEN A TOTAL OF EIGHT FRACTURED RIBS.

6    A.   A TOTAL OF EIGHT FRACTURED RIBS, YES.

7    Q.   NOW, JUST TO STOP YOU WHERE YOU'VE REACHED SO FAR, ARE THE

8    INJURIES THAT YOU OBSERVED SO FAR CONSISTENT WITH THE

9    POST-MORTEM TYPE OF INJURIES?

10   A.   YES.  THE RIB FRACTURES COULD BE CONSISTENT WITH

11   POST-MORTEM INJURIES, PARTICULARLY THE TWO RIBS THAT WERE THE

12   BENDING-TYPE FRACTURES.

13        RIB FRACTURES OCCUR FAIRLY READILY AFTER DEATH.  THE

14   RIBS TEND TO LOSE THEIR ELASTICITY OR RESILIENCY AND COULD BE

15   EASILY FRACTURED.  SO THESE COULD HAVE BEEN DUE TO POST-MORTEM

16   INJURIES, YES.

17   Q.   BY THE SAME TOKEN, DR. SPENCER, IS IT POSSIBLE THEY WERE

18   INFLICTED PRIOR TO THAT TIME?

19   A.   YES.  THERE IS -- AT THIS POINT IN TIME WITH THE

20   DECOMPOSITION, IT IS NOT POSSIBLE TO STATE WHETHER THEY

21   OCCURRED POST-MORTEM OR PRIOR TO DEATH; POST-MORTEM BEING AFTER

22   DEATH OR PRIOR TO DEATH.  SIMPLY, WE CAN'T SAY IN SOME CASES

23   LIKE THIS.

24   Q.   DR. SPENCER, YOU MENTIONED HEAD INJURIES.

25   A.   YES.

13-20

1   Q.   CAN I DIRECT YOUR ATTENTION TO THAT AREA.  WERE YOU ABLE

2   TO CONDUCT ANY TYPE OF AUTOPSY OR EXAMINATION AS TO POSSIBLE

3   HEAD INJURIES?

4   A.   YES.   THERE WERE CLEARLY OBVIOUS HEAD INJURIES IN THE FACE

5   REGION AND FRONT PART AND SIDES AND ON THE TOP OF THE HEAD.

6          I'LL BEGIN WITH THE FACE REGION.  ON BOTH SIDES OF

7   THE FACE IN THE JAW REGION, ON THE RIGHT SIDE, THERE WERE TWO

8   FRACTURES THAT EXTENDED THROUGH THE BONE OF THE UPPER JAW.

9          THAT BONE IS CALLED THE MAXILLA, AND THERE WERE TWO

10  FRACTURE LINES THAT EXTENDED ALL THE WAY THROUGH THE JAW BONE,

11  UPPER JAW, THROUGH INTO WHERE THE TEETH ARE.

12         AND THESE TWO FRACTURE LINES ON THE RIGHT CONNECTED

13  WITH ADDITIONAL FRACTURE LINES IN THE ORBITAL BONES.  NOW,

14  BEHIND THE EYES WE HAVE THIN BONES CALLED ORBITAL BONES, AND

15  THEY ALSO HAD MULTIPLE FRACTURES.

16         AND ADDITIONAL FRACTURE LINES EXTENDED UP THE RIGHT

17  FRONT PART OF THE HEAD ON BACK -- THE BONE IN FRONT IS CALLED

18  THE FRONTAL BONE, AND ON BACK TO THE SIDE, THE BONE CALLED THE

19  PARIETAL BONE.

20         LIKEWISE, ON THE LEFT SIDE THERE WAS A FRACTURE

21  THROUGH THE JAW, UPPER JAW AGAIN, THE LEFT MAXILLA.  ONE

22  FRACTURE THIS TIME, NOT TWO.  AND THAT, AGAIN, EXTENDED ALL THE

23  WAY THROUGH THAT BONE, THROUGH THE ORBITAL BONES BEHIND THE

24  EYE, AGAIN UP THROUGH THE LEFT FOREHEAD AND ON BACK TO THE

25  SIDE, THE LEFT SIDE OF THE HEAD.

1       THERE WAS A LARGE FRAGMENT OF THE SKULL MISSING SO

2   THERE WERE MULTIPLE FRACTURES ON THE TOP OF THE HEAD, IN

3   ADDITION.  PLUS, THERE WAS AN OVAL DEFECT THAT RESEMBLED --

4   INITIALLY I THOUGHT IT WAS A GUNSHOT WOUND.

5   Q.   DR. SPENCER, IN ESSENCE, MULTIPLE FRACTURES TO THE SKULL

6   AREA?

7   A.   YES.

8   Q.   NOW, THE FRACTURES -- WELL, THE UPPER CHEEK AGAIN IS

9   CALLED THE MAXILLA?

10  A.   YES, IT IS.  THE UPPER JAW IS CALLED MAXILLA,

11  M A X I L L A.

12  Q.   NOW, THE FRACTURE THAT COMMENCED THERE, ARE YOU SAYING

13  EXTENDED BACK BEHIND THE EYES IN THE ORBITAL AREA?

14  A.   YES.

15  Q.   UP TOWARD THE TOP OF THE SKULL?

16  A.   YES.  THERE WERE AT LEAST TWO BLOWS THAT WOULD HAVE CAUSED

17  THE FRACTURE TO THE RIGHT SIDE.  OTHER THAN THAT, I DON'T KNOW

18  HOW MANY MORE WOULD HAVE CAUSED THE REMAINING FRACTURES.

19  Q.   SO YOU'RE SAYING FRACTURES STARTING IN THE UPPER JAW OR

20  CHEEK, EXTENDING TO THE TOP OF THE HEAD?

21  A.   YES.

22       MS. KELLY:  OBJECTION, YOUR HONOR.  ASKED AND

23  ANSWERED.

24       THE COURT:  OVERRULED.

25       MR. MEDRANO:  I DIDN'T HEAR YOUR ANSWER, SIR.

13-22

1          THE COURT: HE SAID "YES".

2          MR. MEDRANO: THANK YOU, YOUR HONOR.

3     BY MR. MEDRANO:

4     Q.    DR. SPENCER, REGARDING THESE FRACTURES TO THE CHEEK OR

5     MAXILLA BONE, DO YOU HAVE ANY IDEA, SIR, OR ARE YOU ABLE TO

6     ASCERTAIN WHAT DEGREE OF FORCE IS NECESSARY TO INFLICT THAT

7     TYPE OF BREAK OR FRACTURE?

8     A.    THE BONES OF THE MAXILLA OR UPPER JAW, AND THE BONES OF

9     THE FRONT PART OF THE HEAD AND TOP PART OF THE HEAD ARE QUITE

10    THICK, AND THEY WOULD REQUIRE SEVERE FORCE IN ORDER TO CAUSE

11    THOSE FRACTURES.

12    Q.    ANY THOUGHTS OR OPINION AS TO WHAT TYPE OF FORCE OR WHAT

13    TYPE OF INSTRUMENT?

14    A.    WELL, THE TYPE OF INSTRUMENT THAT WOULD USUALLY CAUSE THIS

15    TYPE OF INJURY WOULD BE A HEAVY -- RELATIVELY HEAVY, BLUNT

16    OBJECT THAT WOULD USUALLY BE SWUNG THROUGH AN ARC.

17          THAT IS, SOMEONE HOLDING THE OBJECT AND SWINGING IT

18    THROUGH AN ARC TO CAUSE THESE PARTICULAR INJURIES.

19    Q.    TYPICALLY, SIR, ON THE BASIS OF YOUR EXPERIENCE WITH THESE

20    TYPES OF EXAMINATIONS, WOULD A BLOW TO THAT CHEEK WITH AS

21    CLOSED FIST BE SUFFICIENT FORCE?

22    A.    THE FIST USUALLY WOULD NOT CAUSE THAT PARTICULAR INJURY TO

23    THE MAXILLA. IT MIGHT UP A LITTLE HIGHER WHERE THIS BONE GOES

24    ACROSS, BUT NOT FRACTURE ENTIRELY THROUGH THE MAXILLA ALL THE

25    WAY THROUGH INTO THE TEETH. A FIST WOULD USUALLY NOT DO THAT.

1    Q.    IF NOT A FIST, HOW ABOUT THE USE OF A FOOT?   A KICK?

2    A.    A KICK POSSIBLY COULD CAUSE A FRACTURE.   IT WOULD NOT

3    CAUSE THE FRACTURES OF THE FRONT PART OF THE HEAD OR THE TOP OF

4    THE HEAD, WHICH IS VERY THICK.

5              A KICK MAY CAUSE, FOR EXAMPLE, A FRACTURE TO THE SIDE

6    OF THE HEAD IN THE TEMPLE AREA, CLOSE TO THE EAR WHERE THE BONE

7    IS THINNER, BUT NOT ON TOP OF THE HEAD.

8    Q.    AGAIN, ON THE BASIS OF YOUR EXPERIENCE, DR. SPENCER, DO

9    YOU HAVE ANY VIEWS OR OPINION AS TO WHAT TYPE OF BLUNT

10   INSTRUMENT MIGHT BE RESPONSIBLE FOR THIS TYPE OF BLUNT FORCE?

11   A.    YES.   IN MY EXPERIENCE, IT HAS BEEN A HEAVY, BLUNT OBJECT.

12   THINGS THAT COME TO MIND ARE AN IRON PIPE, A TIRE IRON,

13   SOMETHING THAT IS HEAVY AND FAIRLY HEAVY THAT CAN BE SWUNG

14   EASILY THROUGH AN ARC.

15   A.    NOW, IF I COULD TAKE YOU TO THE REMAINING PORTIONS OF THE

16   SKULL OTHER THAN THE CHEEKS OR MAXILLA.   CAN YOU DESCRIBE THE

17   TYPE OF FRACTURE, IF ANY, THAT CHARACTERIZED THE REMAINING PART

18   OF THE SKULL?

19   A.    WELL, THERE WERE EXTENSIVE FRACTURES, AGAIN AND BOTH

20   SIDES, EXTENDING AGAIN FROM THE FRONT PART ON BACK ACROSS THE

21   SIDE OF THE UPPER PART OF THE SKULL, CALLED THE PARIETAL BONE

22   ON BOTH SIDES.

23              AND THEY WERE FAIRLY LONG.   I CAN'T REMEMBER EXACTLY

24   HOW LONG, BUT VERY EXTENSIVE, PLUS A SEGMENT OF THE SKULL WAS

25   MISSING.

1    Q.    NOW, I BELIEVE YOU'VE INDICATED EARLIER THAT THERE WAS

2    ANOTHER TYPE OF DEFECT THAT YOU INITIALLY THOUGHT WAS A GUNSHOT

3    WOUND.  COULD YOU ELABORATE ON THAT, PLEASE?

4    A.    YES.  WHEN I STARTED MY EXAMINATION AND LOOKED AT THE HEAD

5    INJURIES BEFORE GOING ON TO THE REST OF THE BODY, THERE WAS A

6    DEFECT IN THE TOP LEFT PART OF THE HEAD, JUST TO THE LEFT OF

7    THE MIDPORTION OF THE HEAD, LOCATED IN WHAT IS CALLED THE LEFT

8    PARIETAL BONE.

9              IT WAS AN OVAL TO ROUND DEFECT THAT LOOKED JUST LIKE

10   A GUNSHUT WOUND LOOKS LIKE.  AND THAT WAS MY INITIAL

11   IMPRESSION, AND THEN WHEN I CAME BACK, I PAID A LOT OF

12   ATTENTION TO THAT WHEN I CAME BACK TO THE HEAD INJURIES.

13   Q.    NOW, THIS IS A MISSING PIECE OF BONE?

14   A.    NO, IT WAS ACTUALLY PRESENT.  THE MISSING PART OF BONE WAS

15   ON THE RIGHT SIDE, AS I RECALL.  THIS WAS ON THE LEFT SIDE.  IT

16   WAS JUST TO THE LEFT OF THE MIDLINE, AN OVAL DEFECT THAT LOOKED

17   VERY SIMILAR TO A GUNSHOT WOUND.

18             I THINK THAT CAN BE BEST CHARACTERIZED IN THINKING OF

19   A PANE OF GLASS.  YOU HAVE AN OUTSIDE AND AN INSIDE; JUST LIKE

20   ON THE SKULL THERE IS AN OUTSIDE AND INSIDE.  AND YOU MAY HAVE

21   SEEN WHERE A BULLET OR SOME OBJECT HAS GONE THROUGH A

22   WINDSHIELD OF A CAR AND YOU HAVE A CIRCULAR DEFECT, AND LITTLE

23   PIECES OF GLASS HAVE CHIPPED OFF SO IT IS A LARGER DEFECT FROM

24   THE INSIDE.

25             AND YOU SEE THE SAME THING IN A SKULL WHEN THE BULLET

13-25

1   GOES THROUGH THE SKULL.  THERE IS A DEFECT, CIRCULAR DEFECT,

2   USUALLY ON THE OUTSIDE OF THE SKULL, AND THEN A LARGER

3   CRATER-LIKE DEFECT ON THE INSIDE.

4   Q.   LET ME STOP YOU THERE.  THIS INJURY OR WOUND, IS THERE A

5   SPECIFIC TERM OR DESCRIPTION USED TO IDENTIFY THAT TYPE OF

6   PHENOMENON OR MANIFESTATION?

7   A.   I'M NOT SURE I UNDERSTAND.

8   Q.   LET ME BE MORE SPECIFIC.  ARE YOU FAMILIAR WITH A TERM

9   THAT IS CALLED BEVELING?

10  A.   OH, YES.  BEVELING IS ANOTHER TERM WE USE TO DESCRIBE THE

11  FACT THAT THERE IS A LARGER AREA INSIDE, WHERE A BULLET HAS

12  GONE THROUGH; THAT IS, A LARGER AREA ON THE INSIDE, THE

13  CRATER-LIKE DEFECT ON THE INSIDE AS OPPOSED TO THE OUTSIDE.

14           THIS PARTICULAR DEFECT HAD INTERNAL BEVELING, IT ALSO

15  HAD A SMALL AMOUNT OF EXTERNAL BEVELING; THAT IS, AREAS ON THE

16  OUTSIDE OF THE SKULL WHERE PIECES OF BONE WERE CHIPPED OFF.

17           MR. MEDRANO:  MAY I HAVE JUST ONE MOMENT, YOUR HONOR.

18           (BRIEF PAUSE.)

19  BY MR. MEDRANO:

20  Q.   IS IT A FAIR STATEMENT, DR. SPENCER, THAT OVERALL, TO

21  CHARACTERIZE THE SKULL, IT CONSISTED OF MULTIPLE FRACTURES?

22  A.   YES.

23  Q.   NOW, IN ADDITION TO THE -- STRIKE THAT.

24           YOU USED YOUR ANALOGY OF A WINDSHIELD AND A BULLET

25  GOING THROUGH IT.

13-26

1   A.   YES.

2   Q.   NOW, IF COULD YOU VISUALIZE THAT, AND IF THAT BULLET GOES

3   THROUGH THE WINDSHIELD, IS THE GLASS THAT STILL REMAINS ON THE

4   INSIDE THE INTERNAL BEVELING THAT YOU ARE DESCRIBING FOR US?

5   A.   YES, IT IS.

6   Q.   IN ADDITION TO THE INTERNAL BEVELING, THERE WAS THE

7   EXTERNAL BEVELING, AS WELL?

8   A.   YES.   THERE WAS A CRATER ON THE INSIDE.   THE INTERNAL

9   BEVELING WAS, AS I RECALL, ABOUT THREE-FOURTHS BY THREE-FOURTHS

10  OF AN INCH.

11        AND THERE WERE ALSO CHIPS OF BONE MISSING FROM THE

12  OUTSIDE SURFACE OF THE SKULL, WHICH IS A LITTLE UNUSUAL FOR A

13  BULLET WOUND AND REALLY STARTED ME THINKING MAYBE THIS IS NOT

14  AN INJURY CAUSED BY A BULLET.

15  Q.   BECAUSE OF THE EXTERNAL BEVELING?

16  A.   YES.   I'VE SEEN THAT A COUPLE OF TIMES, THAT IS, BOTH

17  INTERNAL BEVELING AND LITTLE PIECES OF BONE CHIPPED OFF WITH A

18  A CONTACT GUNSHOT WOUND, BUT IT IS UNUSUAL.

19        AND BECAUSE IT WAS UNUSUAL, I DID SOME FURTHER

20  STUDIES TO MAKE SURE THAT IT WAS NOT A GUNSHOT WOUND.

21  Q.   WHY DON'T YOU ELABORATE ON THAT NOW.   WHAT ELSE DID YOU DO

22  TO SATISFY YOURSELF?

23  A.   THE FIRST THING I WANTED TO DO, WHENEVER THERE IS A

24  POSSIBILITY OF A GUNSHOT WOUND, YOU WANT TO RECOVER THE BULLET.

25        AND THE LOCATION OF THE DEFECT WAS SUCH THAT IF IT

13-27

1   WAS A BULLET THAT CAUSED THE DEFECT, IT COULD HAVE GONE RIGHT

2   STRAIGHT DOWN THE SPINAL CANAL WHETHER THE SPINAL CORD IS

3   LOCATED.  AND I REALLY NEEDED AN X-RAY TO DETERMINE WHETHER OR

4   NOT THERE WAS A BULLET IN THE BODY.

5         AND I ASKED IF I COULD GET AN X-RAY WHILE I WAS AT

6   THE CITY HOSPITAL IN GUADALAJARA.

7   Q.   WAS ONE AVAILABLE FOR YOU THERE?

8   A.   NO.  THEY TOLD ME THERE WAS NO X-RAY MACHINES AVAILABLE,

9   SO I THEN RECOMMENDED THAT WHEN THE BODY WAS TRANSPORTED BACK

10  TO -- OR TRANSPORTED TO SAN DIEGO, THAT I BE ALLOWED TO

11  TRANSPORT THE BODY TO THE NAVAL HOSPITAL AT SAN DIEGO, WHERE I

12  TRAINED, TO GET X-RAYS AND MAKE SURE THERE WAS NO BULLET THERE,

13  AND THAT RECOMMENDATION WAS ACCEPTED.

14  Q.   DID YOU, IN FACT, LATER X-RAY THESE REMAINS IN A HOSPITAL

15  IN SAN DIEGO?

16  A.   YES.  THE BODY WAS TRANSPORTED FROM GUADALAJARA TO SAN

17  DIEGO IS THE NEXT DAY, AND AFTER A MEMORIAL SERVICE AT NORTH

18  ISLAND NAVAL AIR STATION, WE IMMEDIATELY TRANSPORTED THE BODY

19  TO THE NAVAL HOSPITAL AT SAN DIEGO.

20         I HAD MADE PRIOR ARRANGEMENTS.  TOTAL BODY X-RAYS

21  WERE TAKEN AT THAT TIME.  NO BULLET WAS FOUND, NO ADDITIONAL

22  FRACTURES OTHER THAN THE FRACTURES OF THE SKULL, MAXILLA, AND

23  THE RIB FRACTURES I ALREADY MENTIONED WERE IDENTIFIED ALSO.

24         OTHER STUDIES I DID WAS THERE WAS SOME SCALP TISSUE

25  THAT HAD NO POWDER RESIDUE.  I TOOK SECTIONS OF THAT AND LOOKED

13-28

1    AT THE SCALP TISSUE UNDER A MICROSCOPE AND FOUND NO SCALP

2    TISSUE.

3            PLUS, I ALSO USED A SOPHISTICATED DEVICE CALLED

4    SCANNING ELECTRON MICROSCOPY TO LOOK FOR METAL FRAGMENTS, AND

5    ALSO THERE WAS NO METAL PRESENT.  SO I CONCLUDED AFTER THOSE

6    ADDITIONAL STUDIES THAT IT WAS NOT A GUNSHOT WOUND.

7            IN FACT, THE INJURIES WERE CAUSED BY A RELATIVELY

8    NARROW OBJECT BEING FORCED THROUGH THE SKULL INTO THE HEAD, NOT

9    A BULLET.

10    Q.    AND THEN WITHDRAWN?

11    A.    AND THEN WITHDRAWN.  THAT WOULD FIT BECAUSE THE OBJECT

12    WOULD CAUSE THE INTERNAL LEVELING AS IT WENT IN, CHIPPING

13    LITTLE PIECES OF THE BONE OFF, AND THEN AS ITS WITHDRAWN, WOULD

14    DRAG OUT PIECES OF BONE ON THE OUTSIDE OFF.  SO SOME OBJECT WAS

15    DRIVEN INTO THE HEAD AND THEN WITHDRAWN.

16    Q.    THAT WOULD EXPLAIN BOTH THE INTERNAL AND EXTERNAL BEVELING

17    TO THAT INJURY?

18    A.    YES, THAT WOULD BE THE EXPLANATION.

19    Q.    GIVE US AGAIN THE SIZE OR DIMENSIONS OF THIS TYPE OF

20    INJURY THAT YOU WERE OBSERVING?

21    A.    THE INJURY, AS I RECALL, WAS ABOUT THREE-EIGHTHS INCH BY

22    THREE-EIGHTHS INCH OR .375 BY .375 INCHES.  IT IS ABOUT THE

23    SAME SIZE OF A .38 CALIBER BULLET.  THAT'S WHY I WAS

24    PARTICULARLY CONCERNED THAT IT MIGHT <AB> A GUNSHOT WOUND.

25    Q.    ON THE BASIS OF YOUR EXPERIENCE, SIR, DO YOU HAVE ANY VIEW

13-29

1  OR OPINION OF WHAT TYPE OF OBJECT COULD CREATE THAT TYPE OF

2  THREE-EIGHTHS-BY-THREE-EIGHTHS INCH HOLE?

3  A.    AGAIN, IT WOULD BE A FAIRLY NARROW CIRCULAR TO OVAL

4  OBJECT.  I'VE SEEN THAT TYPE OF INJURY WHERE SOMEONE HAS BEEN

5  STABBED WITH A PHILLIPS SCREWDRIVER.

6        I HAVE SEEN SOMETHING SIMILAR WHERE ONE WAS STABBED

7  WITH A STILETTO KNIFE, BUT NOT QUITE THAT CIRCULAR.  I HAVE

8  SEEN IT WITH A PHILLIPS SCREWDRIVER.

9  Q.    I BELIEVE YOU MIGHT HAVE ANSWERED THIS, DR. SPENCER, BUT

10  DID YOU OR DID YOU NOT CHECK FOR ANY GUN POWDER RESIDUE IN THAT

11  HOLE AREA?

12  A.    YES.  I DIDN'T SEE ANY VISUALLY, BUT I TOOK SOME TISSUE

13  WITH ME BACK TO WASHINGTON AND SUBMITTED THAT TO MICROSCOPIC

14  EXAMINATION, AND THERE WAS NO GUN POWDER RESIDUE.

15        AND ALSO I DID WHAT I REFERRED TO THE SCANNING

16  ELECTRON MICROSCOPY, AND NO POWDER RESIDUE WAS IDENTIFIED.

17  Q.    DR. SPENCER, IN YOUR OPINION WHAT WAS THE CAUSE OF DEATH

18  THEN OF THE REMAINS OF THE BODY THAT YOU EXAMINED?

19  A.    THE CAUSE OF DEATH WAS MULTIPLE BLUNT FORCE INJURIES IN

20  THE FORM OF FRACTURES OF THE SKULL, PLUS A PENETRATING INJURY

21  OF THE SKULL.

22  Q.    IS THAT PENETRATING INJURY EVER ALSO REFERRED TO AS A

23  PERFORATED INJURY?

24  A.    PENETRATING IS MORE ACCURATE.

25        PENETRATING SIMPLY MEANS IT WENT IN, AND THAT IS LIKE -- A

1   BULLET THAT GOES IN BUT DOESN'T COME OUT IS CALLED PENETRATING.

2           PERFORATING MEANS IT WENT ALL THE WAY THROUGH, THAT

3   IS, FROM ONE SIDE TO THE OTHER SIDE.  BUT PENETRATING IS MORE

4   ACCURATE THAN PERFORATING.

5   Q.   AND WHEN YOU INDICATE MULTIPLE BLUNT FORCE, IN ADDITION TO

6   THAT PENETRATING INJURY, IT WOULD ALSO BE THE REMAINING BLOWS

7   TO THE SKULL?

8   A.   YES.  FRACTURES OF THE SKULL, MULTIPLE FRACTURES OF THE

9   SKULL AND FRACTURES OF THE UPPER JAW ON BOTH SIDES.

10  Q.   AND THE MANNER OF DEATH?

11  A.   THE MANNER OF DEATH WOULD BE HOMICIDE.

12  Q.   THAT MEANS NOT ACCIDENTAL?

13  A.   NOT ACCIDENTAL, AND CERTAINLY NOT SUICIDAL, AND NOT

14  NATURAL.

15  Q.   NOW, DR. SPENCER, IN TERMS OF DEGREES OF FORCE THAT ARE

16  INFLICTED, ARE THERE DIFFERING CATEGORIES OR DIFFERING

17  DESCRIPTIONS AS TO THE TYPE OF FORCE THAT IS INFLICTED?

18  A.   YES.  FORCE CAN BE CLASSIFIED ON THE BASIS OF THE TYPE OF

19  INJURY THAT IS PRODUCED.  IT IS KIND OF DIFFICULT TO QUANTITATE

20  FORCE BECAUSE THAT DEPENDS ON THE SIZE OF THE OBJECT AND THE

21  VELOCITY AND THINGS LIKE THAT.

22          AS FAR AS THE TYPE OF INJURY, FORCE IS CLASSIFIED AS

23  MILD, THAT IS WITH A SIMPLE BRUISE OR BLOOD VESSELS ARE

24  RUPTURED BY THE OBJECT AND YOU HAVE BLEEDING INTO THE TISSUES.

25  SO THAT WOULD BE MILD FORCE.

13-31

1        MODERATE WOULD BE WHERE YOU HAVE A TEAR OR LACERATION

2   TO THE SKIN.  SEVERE WOULD BE WHERE WE HAVE A FRACTURE OF A

3   BONE.

4        SO THIS WOULD BE SEVERE FORCE WITH FRACTURES OF

5   SEVERAL BONES.

6   Q.   IN YOUR OPINION, DOCTOR, FOR THIS BODY, THE TYPE OF FORCE,

7   HOW WOULD YOU CLASSIFY IT?

8   A.   AGAIN, WITH MULTIPLE FRACTURES, IT WOULD BE SEVERE FORCE.

9        MR. MEDRANO:   MAY I HAVE JUST ONE MOMENT, YOUR

10  HONOR?

11       (BRIEF PAUSE.)

12  BY MR. MEDRANO:

13  Q.   DID YOU HAVE A CHANCE TO EXAMINE THE WRISTS OF THE

14  REMAINS, AS WELL?

15  A.   YES, I DID.  I HAD SEEN THE LIGATURES.  I WAS LOOKING FOR

16  EVIDENCE OF BINDING.  I COULD ONLY FIND THE WRIST JOINT AREA

17  WHERE THERE WAS ANY KIND OF DEPRESSIONS.  AND I DIDN'T FIND ANY

18  DEPRESSIONS OR ANY EVIDENCE OF BINDING AWAY FROM THE ACTUAL

19  JOINT AREA.

20  Q.   NO DEPRESSIONS AWAY FROM THAT WRIST AREA OR JOINT AREA?

21  A.   NO DEPRESSIONS AWAY FROM THE WRIST AREA.

22  Q.   THE DEPRESSIONS THAT YOU DID OBSERVE ON THE WRIST AREA,

23  ARE THOSE CONSISTENT WITH THE LIGATURE OR ROPE BINDINGS?

24  A.   YES.  THEY COULD BE CONSISTENT WITH THAT OR JUST THE

25  JOINT.

13-32

1   Q.    DR. SPENCER, A DECOMPOSING OR DECAYING BODY, DOES IT

2   PRODUCE ANY TYPE OF UNIQUE ODOR?

3   A.    YES.  IT IS NOT A PLEASANT ODOR.  IT'S UNPLEASANT,

4   SOMETIMES REFERRED TO AS A SWEET SMELL.  IT IS A UNIQUE ODOR IN

5   THE SENSE OF FOUL SMELLING.  MOST ANIMAL OR HUMAN BODIES SMELL

6   ABOUT THE SAME.

7   Q.    NOW, IS THERE A MEDICAL OR CHEMICAL EXPLANATION FOR THIS

8   PHENOMENON?

9   A.    IT'S PRIMARILY DUE TO THE CHEMICAL MAKEUP OF ANIMALS OR

10  HUMANS BECAUSE OF THE PROTEINS, FATS THAT ARE PRESENT IN THE

11  BODY, CERTAIN CHEMICALS ARE PRODUCED THAT HAVE A DISTINCT ODOR,

12  AND THAT ACCOUNTS FOR THE ODOR OF DECAYING BODIES OR ANIMALS.

13  Q.    THIS ODOR THAT YOU ARE DESCRIBING, IS IT UNIQUE TO ANY

14  OTHER TYPE OF ODOR THAT YOU ARE FAMILIAR WITH BASED ON YOUR

15  EXPERIENCE?

16  A.    NO.  IT'S DIFFERENT FROM DECAYING GARBAGE OR ANYTHING

17  ELSE.

18  Q.    DOES THIS DECAYING ODOR LAST A LONG TIME?

19          MR. STOLAR:  OBJECT TO THE RELEVANCE, YOUR HONOR.

20          THE COURT:  SUSTAINED.

21  BY MR. MEDRANO:

22  Q.    NOW DR. SPENCER, ASSUME IF YOU WILL, A DECOMPOSING BODY

23  THAT HAS CLOTHES ON IT.  AFTER THE FINDING OF THE BODY, WILL

24  THE CLOTHES ALSO MAINTAIN OR HAVE THIS DECAYING ODOR THAT

25  YOU'VE DESCRIBED?

1    A.    YES, THEY WILL.  PART OF THE PROCESS OF DECOMPOSITION

2    INVOLVES PRODUCTION OF A LOT OF DECOMPOSITION FLUIDS.  THESE

3    FLUIDS LEAK OUT AND WILL SOAK OR SATURATE ANYTHING AROUND THEM,

4    INCLUDING CLOTHES.

5    Q.    AND ON THE BASIS OF YOUR EXPERIENCE, IS IT COMMON FOR EVEN

6    YEARS AFTER THE FACT FOR CLOTHES STILL TO HAVE THIS DISTINCT

7    ODOR?

8    A.    CERTAINLY IT CAN HAPPEN THAT THAT ODOR WILL PERSIST FOR A

9    LONG TIME.

10   Q.    EVEN FOR YEARS?

11   A.    YES.

12   Q.    WOULD THIS SATURATION EFFECT THAT YOU'VE DESCRIBED FOR THE

13   CLOTHING ALSO APPLY TO ANY BINDINGS OR LIGATURES THAT WERE ALSO

14   APPLIED?

15   A.    YES.  IF THEY'RE IN CONTACT OR CLOSE TO THE BODY, THEY

16   WOULD BE SATURATED AGAIN WITH DECOMPOSITION FLUIDS.

17   Q.    AND ALSO HAVE A DISTINCT ODOR?

18   A.    YES.

19   Q.    IN ADDITION TO THE CLOTHING AND POSSIBLE LIGATURES, DOES

20   THIS SATURATION PROCESS REGARDING THE FLUIDS ALSO PERTAIN TO

21   THE GEOGRAPHICAL LOCATION WHERE, LET'S SAY, REMAINS MIGHT BE

22   LEFT OR DEPOSITED?

23   A.    YES.  IT WOULD PERSIST FOR A LONG TIME ALSO, UNLESS WASHED

24   AWAY BY RAIN OR SOMETHING.

25   Q.    NOW, SIR, THERE WAS A SECOND BODY NEXT TO THE ONE THAT YOU

13-34

1    BELIEVED TO BE CAMARENA; IS THAT CORRECT?

2    A.    YES, THAT'S CORRECT.

3    Q.    FROM WHERE YOU SIT, WERE YOU ABLE TO LOOK OR EXAMINE THAT

4    BODY?

5    A.    YES.

6    Q.    DID YOU FIND ANY TYPE OF SKULL FRACTURES WITH REGARD TO

7    THE SECOND BODY?

8    A.    INITIALLY, I SAW BOTH BODIES FROM ABOUT 10 FEET AWAY.  I

9    THEN PROCEEDED TO THE BODY THAT WAS IDENTIFIED TO ME AND DID

10   THE AUTOPSY ON THAT BODY.

11   Q.    WELL, AGAIN, LET ME JUST DIRECT YOUR ATTENTION

12   SPECIFICALLY.  ON THE SECOND BODY, ARE YOU ABLE TO OBSERVE ANY

13   KIND OF SKULL FRACTURES?

14   A.    YES.  AFTER I COMPLETED AUTOPSY ON THE FIRST BODY, I THEN

15   WALKED OVER TO THE SECOND BODY AND WAS GOING TO DO

16   APPROXIMATELY THE SAME EXAMINATION THAT I HAD DONE ON THE FIRST

17   BODY, AND I DID NOTICE SOME SKULL FRACTURES.

18              AS I RECALL, THERE WAS ALSO A FRACTURE OF AN ARM, BUT

19   AT THAT POINT IN TIME, I WAS INTERRUPTED BY SOME OFFICIALS WHO

20   SAID THAT I COULD NOT DO AN AUTOPSY ON THAT BODY BECAUSE HE WAS

21   A MEXICAN CITIZEN AND I COULDN'T DO -- I HAD NO AUTHORITY TO DO

22   AN AUTOPSY ON THAT BODY, WHEREAS CAMARENA WAS AN AMERICAN

23   CITIZEN.

24              MR. MEDRANO:  YOUR HONOR, THAT WOULD CONCLUDE THE

25   DIRECT BY THE GOVERNMENT.

13-35

1          THE COURT:  DEFENSE COUNSEL MAY CROSS-EXAMINE THE

2   WITNESS.

3                      CROSS-EXAMINATION +

4   BY MR. STOLAR:

5   Q.   GOOD MORNING, DOCTOR.

6   A.   GOOD MORNING.

7   Q.   YOU INDICATED, I BELIEVE, THAT YOURS WAS TO YOUR KNOWLEDGE

8   THE THIRD AUTOPSY THAT WAS CONDUCTED; IS THAT RIGHT?

9   A.   YES.  AT THE TIME I WAS TRAVELING TO GUADALAJARA, MY

10  UNDERSTANDING WAS I WOULD BE OBSERVINT THE SECOND AUTOPSY.

11  Q.   PRIOR TO YOUR CONDUCTING THE THIRD AUTOPSY THAT YOU

12  TESTIFIED ABOUT, DID YOU HAVE AN OPPORTUNITY TO SPEAK TO ANY OF

13  THE INDIVIDUALS WHO MAY HAVE CONDUCTED THE FIRST TWO AUTOPSIES?

14  A.   NO.  THE FIRST YOU AUTOPSY WAS DONE IN THE STATE OF

15  MICHOACAN WHERE THE BODIES WERE FOUND SOME DISTANCE AWAY FROM

16  GUADALAJARA.

17          THE SECOND AUTOPSY WAS DONE AT THE INSTITUTE OF

18  FORENSIC MEDICINE IN GUADALAJARA, AND THEN MOVED TO THE CITY

19  HOSPITAL.  I DID NOT TALK TO THE MEXICAN PATHOLOGIST THAT DID

20  THE SECOND AUTOPSY.  I DID SEE A REPORT LATER ON OF THEIR

21  AUTOPSY.

22  Q.   DID ALSO SEE A REPORT CONCERNING THE FIRST AUTOPSY?

23  A.   NO, I DID NOT.

24  Q.   HAVE YOU EVER?

25  A.   NO, NOT THAT I RECALL.

1   Q.   DID THE REPORT THAT THE MEXICANS DID AT THE INSTITUTE FOR

2   FORENSIC --

3   A.   INSTITUTE FOR FORENSIC MEDICINE AT THE MEDICAL SCHOOL IN

4   GUADALAJARA.

5   Q.   YOU READ THAT REPORT IN ENGLISH OR SPANISH?

6   A.   THE COPY I RECEIVED WAS IN ENGLISH.

7   Q.   AND DID YOU HAVE ANY REASON TO DISAGREE WITH ANY OF THE

8   FINDINGS OR CONCLUSIONS OF THAT REPORT?

9   A.   I AGREED WITH MOST OF THEIR CONCLUSIONS.  ONE CONCLUSION I

10  COULD NOT AGREE WITH WAS ASPHYXIA.  THEY HAD A DIAGNOSIS OF

11  ASPHYXIA DUE TO SUFFOCATION, WHICH I COULD NOT AGREE WITH THAT

12  DIAGNOSIS.

13  Q.   THAT IS, THAT WAS ONE OF THE CAUSES OF DEATH IN THE

14  MEXICAN AUTOPSY?

15  A.   THEY LISTED THAT AS A CAUSE OF DEATH, IN ADDITION TO THE

16  BLUNT FORCE INJURIES.  THE REASON I COULDN'T AGREE WITH THAT

17  DIAGNOSIS IS BECAUSE HAD NOT OPENED THE AIRWAY, THAT IS, THE

18  TRACHEA, AND I COULDN'T SEE HOW THEY COULD MAKE THAT DIAGNOSIS

19  WITHOUT OPENING THE AIRWAY.

20  Q.   DID YOU OPEN THE AIRWAY?

21  A.   YES.

22  Q.   DID YOU FIND ANY EVIDENCE OF ASPHYXIA?

23  A.   NO.  THERE WAS NO FOREIGN MATERIAL OR ANY DIRT OR ANYTHING

24  LIKE THAT IN THE AIRWAY.

25  Q.   WHAT ABOUT ANY OTHER OPINIONS OR CONCLUSIONS IN THAT

13-37

1  MEXICAN AUTOPSY; ANY OTHER DIFFERENCES?

2  A.    I DON'T RECALL ANY RIGHT NOW.

3  Q.    OKAY.  NOW, YOU GAVE US SOME TESTIMONY CONCERNING THE RIB

4  FRACTURES, IS THAT RIGHT?

5  A.    YES.

6  Q.    WOULD IT BE FAIR TO SAY THAT YOU TOOK A VERY CAREFUL LOOK

7  TO SEE IF THERE WERE ANY CONTUSIONS, THAT IS, BRUISES ON THE

8  SKIN AROUND THE RIBS; IS THAT RIGHT?

9  A.    I INCISED THE RIBS.  IT'S SOMETIMES DIFFICULT TO

10  DISTINGUISH WHETHER OR NOT THERE IS ANY BRUISING THERE OR NOT,

11  PARTICULARLY IN DECOMPOSED BODIES.  I DIDN'T FIND ANY BRUISING.

12  Q.    I NOTE THAT BASICALLY IN YOUR REPORT YOU SAID "NO

13  CONTUSIONS ARE IDENTIFIED; IS THAT RIGHT?

14  A.    YES.

15  Q.    INDEED, YOU CONCLUDED IN YOUR REPORT THAT THE RIB

16  FRACTURES THAT YOU FOUND ON BOTH THE LEFT SIDE AND THE RIGHT

17  SIDE WERE CONSISTENT WITH FRACTURES OCCURING AFTER DEATH; IS

18  THAT RIGHT?

19  A.    I SAID THEY WERE CONSISTENT WITH POST-MORTEM INJURIES,

20  WHICH WOULD BE AFTER DEATH.

21  Q.    RIGHT.  ASSUME THAT THE BODY THAT YOU EXAMINED WAS BURIED

22  IN ONE PLACE, THEN WAS DUG UP POSSIBLY IN A HURRY, POSSIBLY

23  NOT, AND THEN REBURIED IN ANOTHER PLACE, ARE THOSE RIB

24  FRACTURES THEN CONSISTENT WITH ESSENTIALLY SLOPPY HANDLING OF

25  THE BODY IN THAT DIGGING UP AND REBURIAL PROCESS?

13-38

1   A.   THEY CAN HAPPEN IN THAT TYPE OF PROCESS, THAT'S CORRECT.

2   Q.   IN FACT, GIVEN THE FACT THAT YOU FOUND NO CONTUSIONS,

3   WOULDN'T THAT BE A MORE LIKELY RESULT, IF THOSE ARE THE FACTS

4   OF WHAT OCCURRED?

5   A.   WELL, THEY'RE CONSISTENT WITH POST-MORTEM INJURY, BUT WE

6   HAVE A NUMBER OF LIMITATIONS ON WHAT WE CAN SAY.

7        IF RIB FRACTURES OCCUR, FOR EXAMPLE, WHEN SOMEONE'S

8   HEART IS BEATING SLOWLY OR HIS BLOOD PRESSURE IS LOW YOU, MAY

9   NOT HAVE MUCH BLEEDING, SO NO CONTUSIONS.

10       BUT IN GENERAL, WHERE YOU SEE NO BRUISING, IT

11  INDICATES THAT THEY WERE AFTER DEATH.

12  Q.   NOW, THE CIRCULAR DEFECT THAT YOU TESTIFIED ABOUT, THE

13  BEVELING EFFECT, COULD THAT TYPE OF INJURY OCCUR AFTER DEATH?

14  A.   NO.   THAT IS -- THE BONE IS THICKER ON THE SKULL.   IT

15  COULD OCCUR, EXCEPT THE PROBLEM WAS ON THE SCALP AREA, AND ALL

16  AROUND THE TISSUES THERE WAS A LOT OF BRUISING, WHICH INDICATES

17  TO ME IT OCCURED --

18  Q.   PRIOR TO DEATH?

19  A.   -- BEFORE DEATH.

20  Q.   IN THIS CIRCULAR AREA THAT YOU TESTIFIED ABOUT, WAS THERE

21  BRUISING ON THE SCALP?

22  A.   AS I RECALL WHEN I LOOKED AT IT IN THE MICROSCOPE, THERE

23  WAS BRUISING.

24  Q.   WAS THERE ANOTHER HOLE IN SCALP, AS WELL?

25  A.   THERE WAS A LARGE PART OF THE SKULL MISSING.   THERE WAS,

13-39

1    ON THE RIGHT SIDE, IN THE SCALP ITSELF, WHICH WOULD OVERLIE THE

2    OVAL OR CIRCULAR DEFECT, THERE WAS AN X-SHAPED LACERATION.

3    Q.    AGAIN, ASSUMING THAT THE BODIES -- THE BODY WAS BURIED AND

4    THEN DUG UP, AND ASSUME ALSO THAT PART OF THE DIGGING WAS DONE

5    WITH A PITCHFORK TRYING TO LOOSEN THE SOIL, COULD THE INJURIES

6    TO THE TOP OF THE HEAD BE CONSISTENT WITH A PITCHFORK LOOSENING

7    THE SOIL AND GOING IN THERE.

8    A.    AGAIN, THERE WAS BRUISING ON THE SCALP.

9    Q.    FOR BOTH OF THOSE --

10   A.    I WAS TALKING BY THE OVAL DEFECT.

11   Q.    HOW ABOUT THE MISSING PIECE OF SKULL?

12   A.    I COULDN'T REALLY GIVE YOU AN OPINION ABOUT THAT BECAUSE I

13   DIDN'T SEE IT.

14   Q.    OKAY.  THE BLOWS THAT YOU -- OR WHAT APPEARS TO BE THE

15   RESULT OF BLOWS ARE THE JAW FRACTURES AROUND THE FACIAL

16   FRACTURES -- IS THERE ANY WAY THAT YOU CAN DETERMINE WHETHER OR

17   NOT THOSE INJURIES WERE SUSTAINED AT A SINGLE TIME OR OVER A

18   PERIOD OF TIME?

19   A.    NOT REALLY.  SOMETIMES WE CAN WITH SKULL FRACTURES,

20   BECAUSE OF THE WAY THE FRACTURE LINES INTERSECT, WE CAN

21   DETERMINE IF THEY OCCURRED AT DIFFERENT TIMES.  BUT IN THIS

22   CASE, I CAN'T TELL FOR CERTAIN WHETHER THEY OCCURRED OVER A

23   SHORT PERIOD OF TIME OR OVER A LONG PERIOD OF TIME.

24   Q.    WOULD IT BE FAIR TO SAY THAT THE INJURIES THAT YOU SAW FIT

25   WITH A SERIES OF BLOWS OCCURRING AT THE SAME TIME?

1   A.   THEY COULD, YES.

2   Q.   AND IS IT NOT TRUE THAT IN YOUR EXPERIENCE THAT BEATING

3   DEATHS OF THIS NATURE OCCUR WITH A NUMBER OF BLOWS AT THE SAME

4   TIME WHERE THERE IS A RAGE OR ANGER OF THE INDIVIDUAL WHO IS

5   INFLICTING THE BLOWS?

6   A.   YES, IT HAS BEEN MY EXPERIENCE.  BUT AGAIN, IN THIS

7   PARTICULAR CASE, I CAN'T SAY ONE WAY OR THE OTHER.

8   Q.   BUT CERTAINLY WHAT YOU SAW IS TOTALLY CONSISTENT WITH THAT

9   SCENARIO; IS THAT RIGHT?

10   A.   YES.  THAT'S CORRECT.

11   Q.   NOW, YOU SPOKE ABOUT THE -- YOU TOOK SOME SKIN SAMPLES

12   FROM WHERE THAT CIRCULAR DEFECT WAS IN THE SCALP; IS THAT

13   RIGHT?

14   A.   YES.

15   Q.   AND YOU EXAMINED THAT UNDER AN OPTICAL MICROSCOPE FIRST?

16   A.   I EXAMINED THE SECTIONS OF SCALP AFTER THEY WERE PREPARED

17   USING PARAFINE IMBEDDING AND SO ON UNDER A LIGHT MICROSCOPE.

18   Q.   A LIGHT MICROSCOPE.  AND THE LIGHT MICROSCOPE WAS

19   INSUFFICIENT TO GIVE YOU THE INFORMATION YOU NEEDED?

20   A.   NO.  THE ADDITIONAL TEST, ELECTRON MICROSCOPY, WAS IN

21   ADDITION, IF YOU WILL.  WHAT WE LOOKED FOR -- FIRST OF ALL, I

22   DIDN'T SEE ANY POWDER RESIDUE.

23   Q.   RIGHT.

24   A.   THIS INJURY ON THE TOP OF THE HEAD, IF IT WAS CAUSED BY A

25   GUNSHOT WOUND, WOULD LIKELY HAVE BEEN CAUSED BY A CONTACT

13-41

1   GUNSHOT WOUND.

2            THE FACT THAT I HAD THE INTERNAL BEVELING IN THERE --

3   Q.   WAIT A MINUTE.   A CONTACT GUNSHOT WOUND MEANS THE GUN IS

4   PLACED AGAINST THE HEAD?

5   A.   CONTACT MEANS THE GUN IS DIRECTLY IN CONTACT WITH THE HEAD

6   OR OTHER PART OF THE BODY.

7            -- BECAUSE OF THE INTERNAL BEVELING AND EXTERNAL

8   BEVELING, PLUS THE FACT THAT THE SCALP OVERLYING THIS AREA HAD

9   AN X-SHAPED OR CROSS-SHAPED LACERATION, THAT ALSO FIT WITH WHAT

10  YOU WOULD SEE WITH A CONTACT GUNSHOT WOUND.

11  Q.   LET ME STOP YOU THERE.  MY INTEREST IS IN THE DIFFERENCE

12  BETWEEN THE LIGHT MICROSCOPE AND THE SCANNING ELECTRON

13  MICROSCOPE?

14  A.   YES.

15  Q.   EVERYBODY, I THINK, IS FAMILIAR WITH WHAT A LIGHT

16  MICROSCOPE IS.

17  A.   YES.

18  Q.   COULD YOU GIVE US A BRIEF DESCRIPTION OF WHAT A SCANNING

19  ELECTRON MICROSCOPE IS.

20  A.   YES.  I WANT TO BE AS SURE AS POSSIBLE THAT IT WAS NOT A

21  GUNSHOT WOUND.  THIS IS, BY THE WAY, FAR IN EXCESS OF WHAT THE

22  USUAL STUDY WOULD DO, BECAUSE OF THE ABSENCE OF POWDER RESIDUE

23  EVEN ON THE BLACK MICROSCOPIC EXAMINATION.

24            A SCANNING ELECTRON MICROSCOPY, WITH X-RAY

25  DEFRACTION, WILL PICK UP PARTICLES OF NOT ONLY POWDER, BUT

1    PARTICLES OF METAL LIKE LEAD, COPPER.  AND WE LOOKED AT THAT

2    AND FOUND REALLY NO INCREASE, SO THAT THERE IS JUST OATH TEST

3    TO RULE OUT A GUNSHOT WOUND.

4    Q.    I THINK YOU SAID IT WAS A SOPHISTICATED DEVICE?

5    A.    YES.

6    Q.    IS THERE A WAY TO DESCRIBE FOR US IN FAIRLY LAYPERSON'S

7    TERMS WHAT THE DEVICE IS AND WHAT THE DIFFERENCE IS BETWEEN

8    THAT AND THE OPTICAL MICROSCOPE?

9           MR. MEDRANO:  OBJECTION.  RELEVANCE AND BEYOND THE

10    SCOPE OF DIRECT.

11           THE COURT:  OVERRULED.

12           THE WITNESS:  SIMPLY DESCRIBED -- I'M NOT AN ELECTRON

13    MICROSCOPIST -- I'VE SEEN A COUPLE OF THEM, BUT A THIN COATING

14    OF AN ELEMENT, USUALLY GOLD, IS PLACED ON THE SURFACE.

15           AND THEN AN ELECTRON BEAM IS PASSED OFFER AND WITH

16    THAT, THEY GET A VERY CLOSE-UP LOOK AT A VERY HIGH RESOLUTION

17    OF THE OBJECT THAT THEY'RE LOOKING AT.

18           AND WITH X-RAY DEFRACTION, THEY CAN DETERMINE WHAT

19    THE CHEMICAL COMPONENTS ARE OF THAT PARTICULAR OBJECT YOU'RE

20    LOOKING AT.

21    BY MR. STOLAR:

22    Q.    DID YOU, YOURSELF, DO THE S.E.M. TEST?

23    A.    NO, I DID NOT.

24    Q.    SOMEBODY ELSE DID IT FOR YOU AND GAVE YOU THE RESULTS?

25    A.    YES.

1    Q.   WAS THE SCANNING ELECTRON MICROSCOPE ABLE TO DETERMINE THE

2    TYPE OF METAL BITS THAT WERE IN THAT SCALP SECTION?

3    A.   NONE OTHER THAN THE NORMAL CONSTITUENTS THAT WOULD BE IN

4    THE SKULL WERE FOUND.

5    Q.   SO THERE WERE NO METALIC FRAGMENTS IN THE SKULL OR ON THE

6    SCALP TISSUE?

7    A.   NO, NONE WERE IDENTIFIED.

8            MR. STOLAR:  EXCUSE ME ONE MOMENT.

9            (DISCUSSION HELD OFF THE RECORD BETWEEN COUNSEL.)

10   BY MR. STOLAR:

11   Q.   YOU INDICATED THAT YOU HAD A LAW DEGREE; IS THAT RIGHT?

12   A.   THAT IS CORRECT.

13   Q.   ARE YOU ADMITTED TO PRACTICE LAW ANY PLACE?

14   A.   YES.  I'M ADMITTED TO THE BAR IN CALIFORNIA.

15   Q.   AND YOU ALSO WERE A CUM LAUDE GRADUATE AT COLLEGE; IS THAT

16   RIGHT?

17   A.   AT KANSAS STATE UNIVERSITY.

18   Q.   AND YOU SERVED AS A TEACHER OF BOTH FORENSIC SCIENCE AND

19   OF LAW; IS THAT RIGHT?

20   A.   I HAVE HAD -- WELL, AT ONE LAW SCHOOL I TAUGHT A COURSE,

21   YES.

22   Q.   YOU'RE A MEMBER OF SEVERAL PROFESSIONAL SOCIETIES; IS THAT

23   RIGHT?

24   A.   YES.

25   Q.   INCLUDING BAR ASSOCIATIONS?

13-44

1    A.   YES.

2    Q.   AND YOU HAVE PUBLISHED AT LEAST 13 ARTICLES IN JOURNALS OF

3    FORENSIC SCIENCES AND MEDICAL SOCIETY JOURNALS AND THINGS OF

4    THAT NATURE, RIGHT?

5    A.   YES, THAT IS CORRECT.

6    Q.   SCHOLARLY JOURNALS?

7    A.   YES.

8    Q.   YOU HAVE MADE AT LEAST 18 PROFESSIONAL PRESENTATIONS TO

9    VARIOUS PROFESSIONAL SOCIETIES; IS THAT RIGHT?

10   A.   MANY MORE THAN THAT.

11   Q.   MORE THAN ARE ON YOUR CURRICULUM VITAE THAT I HAVE?

12   A.   YES.

13   Q.   AND PRESENT COURSES; IS THAT RIGHT?

14   A.   YES.

15   Q.   INCLUDING ONES IN ADVANCED FORENSIC PATHOLOGY AT THE

16   F.B.I. ACADEMY; IS THAT RIGHT?

17   A.   YES.

18             MR. STOLAR:   THANK YOU, DOCTOR.  I HAVE NOTHING

19   FURTHER.

20                       CROSS-EXAMINATION +

21   BY MR. MEZA:

22   Q.   NOW, DOCTOR, IN CONNECTION WITH THE AUTOPSY THAT YOU

23   PERFORMED ON MARCH 7, YOU PREPARED A REPORT IN CONNECTION WITH

24   THAT; DID YOU NOT?

25   A.   THAT'S CORRECT.

13-45

1   Q.   DO YOU HAVE A COPY OF THAT REPORT AVAILABLE TO YOU OR

2   HANDY?

3   A.   NOT IN THIS ROOM, I DO IN THE WITNESS ROOM.

4   Q.   THE TESTIMONY CONCERNING THE BRUISES IN THE HEAD AREA,

5   ISN'T IT TRUE IN YOUR REPORT THAT YOU INDICATED THAT THERE WERE

6   NO AREAS OF CONTUSIONS OR BRUISES WHICH WERE IDENTIFIED?

7   A.   I THINK I SAID THAT ON THE RIBS.  I'D HAVE TO SEE WHAT I

8   SAID THERE.

9   Q.   IF I WERE TO SHOW YOU A COPY OF YOUR REPORT, WOULD THAT

10  HELP REFRESH YOUR RECOLLECTION?

11  A.   SURE.

12            MR. MEZA:  MAY I APPROACH, YOUR HONOR?

13            THE COURT:  YES.

14            (DOCUMENT TENDERED TO THE WITNESS.)

15            (BRIEF PAUSE.)

16  BY MR. MEZA:

17  Q.   HAVE YOU SEEN THAT PART OF THE REPORT I'M REFERRING TO?

18  A.   YES.

19  Q.   DOES THAT HELP REFRESH YOUR RECOLLECTION?

20  A.   THE AREA THAT YOU POINTED TO IS DOWN TOWARD THE BOTTOM OF

21  THE PAGE?

22  Q.   YES.

23  A.   I SAID THE AREAS OF DARK BROWN DISCOLORATION ON THE

24  EXTREMITIES AND WRISTS AND ANKLE AREAS WERE INCISED.  NO AREAS

25  OF CONTUSIONS OR BRUISES ARE IDENTIFIED.

1          AND THAT'S ON THE EXTREMITIES.  THAT'S ON THE LEGS

2     AND ARMS.  I DIDN'T FIND ANY BRUISES THERE, THAT'S CORRECT.

3     Q.   IS THERE ANYPLACE IN YOUR REPORT THAT INDICATES THERE WAS

4     BRUISING OR CONTUSIONS FOUND IN THE HEAD AREA?

5     A.   LET ME TAKE A LOOK AT THAT PART.  (BRIEF PAUSE.)

6          IT DOESN'T APPEAR THAT I DESCRIBED IT.  I DESCRIBED

7     MAINLY THE SKULL FRACTURES.

8     Q.   YES.  SO THERE IS NOTHING IN YOUR REPORT ABOUT BRUISING IN

9     THE HEAD AREA; IS THAT RIGHT?

10    A.   APPARENTLY I DID NOT REMARK ON IT, NO.

11    Q.   IS THAT CORRECT?

12    A.   NO.

13    Q.   NOW, YOU INDICATED THAT THERE WAS -- AROUND THE WRIST AREA

14    THERE WERE SOME DEPRESSIONS.  DO YOU RECALL THAT TESTIMONY?

15    A.   PARDON ME?

16    Q.   DO YOU RECALL THAT TESTIMONY ABOUT THE DEPRESSIONS IN THE

17    WRIST AREA?

18    A.   YES.  THAT WAS IN THE JOINT AREA.

19    Q.   YES.

20    A.   ISN'T IT TRUE IN YOUR REPORT YOU INDICATED THERE WAS NO

21    EVIDENCE OF DEPRESSIONS AROUND THE WRIST?

22    A.   YES.  I WAS REFERRING TO AWAY FROM THE JOINT AREA.  IN THE

23    JOINT AREA, WHEN YOU MOVE THE HANDS BACK AND FORTH, THERE WERE

24    DEPRESSIONS WHICH WOULD ORDINARILY BE THERE IN THE JOINT

25    ANYHOW.  BUT I FOUND NO DEPRESSIONS AWAY FROM THAT.

13-47

1    Q.    SO YOU'RE SAYING THAT THE DEPRESSIONS THAT WERE IN THE

2    JOINT AREA, YOU EXPECTED TO FIND THOSE AT ANY RATE; IS THAT

3    RIGHT?

4    A.    THAT IS CORRECT.

5    Q.    SO THERE IS NOTHING UNUSUAL ABOUT THOSE DEPRESSIONS; IS

6    THAT RIGHT?

7    A.    THAT IS RIGHT.

8    Q.    NOW, WHEN YOU EXAMINED THE SKULL AREA OF THIS BODY, WAS

9    THERE ANY HAIR?

10    A.    THERE WAS LOOSE HAIR, NOT REALLY ATTACHED, BUT THERE WAS

11    KIND OF LOOSE HAIR LYING -- SOME ON HIS FACE, SOME IN THE

12    CRANIAL CAVITY THAT WAS OPENED.  BUT NOTHING, REALLY, THAT WAS

13    ATTACHED TO THE SKULL OR TO THE SCALP, RATHER.

14    Q.    WAS THIS HAIR IN CLUMPS OR STRANDS?

15    A.    MAINLY IN CLUMPS.

16    Q.    IN YOUR REPORT YOU INDICATED THAT THE HAIR IS ABSENT.

17    WHAT DO YOU MEAN BY THAT?

18    A.    ABSENT AS FAR AS BEING ATTACHED TO THE SCALP.  IT HAD ALL

19    KIND OF BEEN PULLED OUT OR FELL OUT THROUGH DECOMPOSITION

20    CHANGE.

21    Q.    DID YOU NOTICE IF THERE WAS HAIR ON ANY OTHER PARTS OF THE

22    BODY?

23    A.    I DON'T RECALL.

24    Q.    IF THERE HAD BEEN, WOULD THAT HAVE BEEN CONTAINED IN YOUR

25    REPORT?

13-48

1   A.   NOT USUALLY, NO.

2   Q.   NOW, THIS PENETRATION WOUND YOU DESCRIBED, YOU SAID YOU

3   LOOKED FOR A BULLET OR BULLET FRAGMENTS AND COULDN'T FIND ANY,

4   CORRECT?

5   A.   YES.

6   Q.   YOU ALSO INDICATED THAT IN YOUR OPINION THERE HAD BEEN TWO

7   PRIOR AUTOPSIES, CORRECT?

8   A.   THAT IS CORRECT.

9   Q.   IS THERE ANY REASON THAT A BULLET COULD NOT HAVE BEEN

10  REMOVED IN EITHER OF THOSE TWO PROCEDURES?

11  A.   IT IS POSSIBLE.  HAVING RESPONSIBILITY FOR DOING AN

12  AUTOPSY ON MY OWN, I THOUGHT I SHOULD MAKE AS SURE AS POSSIBLE

13  THERE WAS NO BULLET STILL LEFT IN THE BODY, AND THAT'S WHY I

14  REQUESTED THE X-RAYS.

15       I THINK THAT I HAVE ADEQUATELY RULED OUT IF IT IS A

16  GUNSHOT WOUND, AND I DON'T THINK THERE WAS ANY THERE BEFORE.

17  Q.   BUT THERE IS NO REASON -- THERE IS NOTHING TO INDICATE

18  THAT IF THERE WAS A BULLET IN THERE, THAT IT HADN'T BEEN

19  PREVIOUSLY REMOVED IN EITHER OF THE TWO AUTOPSIES; IS THAT

20  CORRECT?

21  A.   THAT IS CORRECT.

22  Q.   THE SECOND BODY THAT YOU STARTED TO LOOK AT, DID YOU EVER

23  GET CLOSE ENOUGH TO PUT YOUR HANDS ON IT?

24  A.   I JUST GOT TO THE BODY AND WAS STARTING TO LOOK AT IT, I

25  WAS STANDING RIGHT IN FRONT OF IT, WHEN I WAS INTERRUPTED.

13-49

1    Q.   DID YOU NOTICE ANY SCARRING ON THAT BODY?

2    A.   NO, I DID NOT.

3    Q.   AND FINALLY, ON BOTH OF THE BODIES, YOU SAID THEY WERE IN

4    A SIMILAR STATE.  WOULD YOU SAY THAT THE FACIAL FEATURES WERE

5    RECOGNIZABLE ON LOOKING AT THEM?

6    A.   THE FACIAL FEATURES WERE NOT RECOGNIZABLE ON EITHER BODY

7    TO ME BECAUSE OF DECOMPOSITION CHANGES, MUMMIFICATION CHANGES

8    RETRACTIONAL LIFTS.

9         CAMARENA WOULD HAVE BEEN EASILY RECOGNIZED ON THE

10   BASIS OF HIS TEETH.

11   Q.   DID YOU DO AN EXAMINATION OF THE TEETH WITH THE DENTAL

12   RECORDS?

13   A.   NO, I HAD THE DENTAL RECORD WITH ME AT THE TIME.

14   Q.   YOU DIDN'T PERFORM THAT EXAMINATION; IS THAT CORRECT?

15   A.   NO, THAT'S CORRECT.

16        MR. MEZA:  THANK YOU.  I HAVE NOTHING FURTHER.

17        THE COURT:  ANY OTHER QUESTIONS BY DEFENSE COUNSEL?

18        MR. NICOLAYSEN:  NOTHING, YOUR HONOR.

19        THE COURT:  ANYTHING FURTHER?

20        MR. MEDRANO:  BRIEFLY, YOUR HONOR.

21        MR. MEZA:  JUST ONE AREA -- I'M SORRY.  CO-COUNSEL

22   SUGGESTED IT.

23             CROSS-EXAMINATION + (CONTINUED)

24   BY MR. MEZA:

25   Q.   IN TERMS OF THE MUMMIFICATION PROCESS, IF THERE HAD BEEN

13

1    SCARRING ON THE SKIN OF EITHER BODY, WOULD THAT HAVE BEEN

2    SOMETHING YOU WOULD HAVE BEEN -- YOU WOULD EXPECT TO READILY

3    OBSERVE?

4    A.    IT DEPENDS ON HOW LARGE THE SCAR IS.  WITH MUMMIFICATION

5    OR DRYING, YOU GET RETRACTIONS.  AND CERTAINLY IT WOULD BE

6    POSSIBLE TO MISS A SCAR IF IT IS NOT TOO LARGE.

7    Q.    IF IT WAS A LARGE SCAR, WOULD YOU EXPECT IT TO RETRACT

8    MORE THAN A SMALLER SCAR?

9    A.    I REALLY CAN'T SAY.  I DON'T THINK TOO MUCH.

10           MR. MEZA:  THANK YOU VERY MUCH.  I HAVE NOTHING

11   FURTHER.

12           THE COURT:  REDIRECT?

13           MR. MEDRANO:  THANK YOU, YOUR HONOR.

14                   REDIRECT EXAMINATION +

15   BY MR. MEDRANO:

16   Q.    TAKING YOU QUICKLY TO THE EIGHT RIB FRACTURES, YOU DO NOT

17   KNOW WHETHER THOSE OCCURRED BEFORE OR AFTER DEATH?

18           THE COURT:  COUNSEL, THAT HAS BEEN COVERED.

19   BY MR. MEDRANO:

20   Q.    THE SKULL AREA, DR. SPENCER, THERE WERE CONTUSIONS IN THE

21   FACE AND SKULL AREA?

22   A.    YES.  EXTENSIVE BRUISING IN THE FACE AND SKULL AREA.

23   Q.    ON THE QUESTION OF SCARS, WITH THE PASSAGE OF TIME AND

24   DECOMPOSITION AND DECAY, WOULD THAT AFFECT ONE'S ABILITY TO

25   READILY SPOT OR IDENTIFY ANY SCARS ON THE BODY OR REMAINS?

13-50

1    SCARRING ON THE SKIN OF EITHER BODY, WOULD THAT HAVE BEEN

2    SOMETHING YOU WOULD HAVE BEEN -- YOU WOULD EXPECT TO READILY

3    OBSERVE?

4    A.    IT DEPENDS ON HOW LARGE THE SCAR IS.  WITH MUMMIFICATION

5    OR DRYING, YOU GET RETRACTIONS.  AND CERTAINLY IT WOULD BE

6    POSSIBLE TO MISS A SCAR IF IT IS NOT TOO LARGE.

7    Q.    IF IT WAS A LARGE SCAR, WOULD YOU EXPECT IT TO RETRACT

8    MORE THAN A SMALLER SCAR?

9    A.    I REALLY CAN'T SAY.  I DON'T THINK TOO MUCH.

10            MR. MEZA:  THANK YOU VERY MUCH.  I HAVE NOTHING

11   FURTHER.

12            THE COURT:  REDIRECT?

13            MR. MEDRANO:  THANK YOU, YOUR HONOR.

14                    REDIRECT EXAMINATION +

15   BY MR. MEDRANO:

16   Q.    TAKING YOU QUICKLY TO THE EIGHT RIB FRACTURES, YOU DO NOT

17   KNOW WHETHER THOSE OCCURRED BEFORE OR AFTER DEATH?

18            THE COURT:  COUNSEL, THAT HAS BEEN COVERED.

19   BY MR. MEDRANO:

20   Q.    THE SKULL AREA, DR. SPENCER, THERE WERE CONTUSIONS IN THE

21   FACE AND SKULL AREA?

22   A.    YES.  EXTENSIVE BRUISING IN THE FACE AND SKULL AREA.

23   Q.    ON THE QUESTION OF SCARS, WITH THE PASSAGE OF TIME AND

24   DECOMPOSITION AND DECAY, WOULD THAT AFFECT ONE'S ABILITY TO

25   READILY SPOT OR IDENTIFY ANY SCARS ON THE BODY OR REMAINS?

13-51

1   A.   CERTAINLY.  THE ENTIRE BODY WAS DARK BROWN WITH LARGE

2   AREAS OF VERY DARK BROWN AREAS.

3          I COULD EASILY MISS A SCAR IF ONE WERE THERE.

4   Q.   THIS WOULD ALSO BE A FUNCTION OF THE MUMMIFICATION ON THIS

5   DATE?

6   A.   YES, AND DECOMPOSITION.

7   Q.   FINALLY, DR. SPENCER, IN TERMS OF WHETHER OR NOT THERE WAS

8   A GUNSHOT WOUND TO THE SKULL, YOU FOUND NO METAL FRAGMENTS?

9   A.   THAT IS CORRECT, NO METAL FRAGMENTS, NO, REALLY,

10  INDICATION THAT IT WAS A GUNSHOT WOUND OTHER THAN THE SHAPE.

11  Q.   AND NO GUN RESIDUE?

12  A.   AND NO GUN POWDER RESIDUE.

13          MR. MEDRANO:  THANK YOU, YOUR HONOR.

14                  RECROSS-EXAMINATION +

15  BY MR. STOLAR:

16  Q.   GUN POWDER RESIDUE COMES FROM THE GUN POWDER BURST OUT OF

17  THE MUZZLE OF A REVOLVER OR RIFLE; IS THAT RIGHT?

18  A.   IT'S PARTICLES OF POWDER, SOME OF THEM BURNS, SMOKE, SOOT,

19  SOME UNBURNED PARTICLES OF POWDER.

20  Q.   RIGHT.  AND THAT WILL NOT APPEAR IF THE DISTANCE BETWEEN

21  THE OBJECT THAT IS SHOT AT AND THE GUN MUZZLE IS TOO FAR; IS

22  THAT RIGHT?

23  A.   THAT IS CORRECT.

24  Q.   WHAT IS THE DISTANCE, APPROXIMATELY, THAT YOU WOULD NOT

25  EXPECT TO FIND IT, SAY, WITH A .38 CALIBER PISTOL?

13-52

1    A.    WITH A .38, ON THE SURFACE YOU WOULD PROBABLY SEE IT MAYBE

2    NOT FURTHER THAN 12 INCHES AWAY.

3            IF THIS WOULD HAVE BEEN A GUNSHOT WOUND, IT WOULD

4    HAVE BEEN A CONTACT.  THE LACERATIONS FIT WITH A GUNSHOT WOUND,

5    AND THEN YOU WOULD FIND THE GUNPOWDER RESIDUE WITHIN THE

6    TISSUES.

7    Q.    BUT IF THE SHOT WERE FROM, SAY, 15 INCHES AWAY, YOU

8    WOULDN'T FIND THE GUN POWDER; WOULD YOU?

9    A.    THAT'S CORRECT.

10            MR. STOLAR:   THANK YOU.

11            THE COURT:   ALL RIGHT, SIR. YOU MAY STEP DOWN.

12            MR. MEZA:   JUST ONE QUESTION, YOUR HONOR?

13            THE COURT:   ALL RIGHT.

14            MR. MEZA:   THANK YOU.

15                    RECROSS-EXAMINATION +

16    BY MR. MEZA:

17    Q.    IF THERE HAD BEEN HAIR ON THE HEAD AT THE TIME OF THE

18    WOUND, ASSUMING IT WAS A GUNSHOT, WAS THERE, MOST OF THE SOOT

19    AND RESIDUE WOULD HAVE BEEN CAUGHT BY THE HAIR, CORRECT?

20    A.    IT DEPENDS ON WHERE THE GUN IS LOCATED IN RELATIONSHIP TO

21    THE HEAD.  IF IT IS SIX INCHES AWAY, THE HAIR WOULD, OF COURSE,

22    PREVENT ANY SOOT OR GUN POWDER RESIDUE FROM REACHING THE

23    SURFACE OF THE SKIN OR SCALP.

24            IF IT IS IN CONTACT, THE SOOT AND GUN POWDER RESIDUE

25    WOULD BE DRIVEN INTO THE SCALP TISSUES.

13-53

1          IT IS TRUE THAT IF IT IS A DISTANCE AWAY, SIX INCHES

2    AWAY, THE HAIR WOULD SHIELD AND PREVENT THE POWDER RESIDUE FROM

3    REACHING IT.

4    Q.    THERE WAS NO HAIR IN THAT AREA, WAS THERE, OF THIS

5    PARTICULAR BODY?

6    A.    ON THE SCALP, IT WOULD ALL FALL OUT BECAUSE OF THE

7    DECOMPOSITION.

8    Q.    THERE WAS NO HAIR THAT YOU COULD ANALYZE FOR GUN POWDER

9    RESIDUE, RIGHT?

10   A.    THAT IS CORRECT.

11             MR. MEZA:   THANK YOU.

12             MR. MEDRANO:   NOTHING FURTHER.

13             THE COURT:   ALL RIGHT.   YOU MAY STEP DOWN.   WE'LL

14   TAKE OUR MORNING RECESS.

15             THE CLERK:   PLEASE RISE.   THIS COURT IS NOW IN

16   RECESS.

17             (JURY EXCUSED.)

18             (BRIEF RECESS.)

19             (JURY PRESENT:)

20             THE COURT:   CALL YOUR NEXT WITNESS.

21             MR. MEDRANO:   AT THIS TIME, YOUR HONOR, THE

22   GOVERNMENT WOULD CALL MR. HARVEY VARENHORST TO THE STAND.

23             THE CLERK:   PLEASE RAISE YOUR RIGHT HAND.

24

25        HARVEY VARENHORST + PLAINTIFF'S WITNESS, SWORN

13-54

1

2          THE CLERK:  PLEASE BE SEATED.  PLEASE STATE YOUR FULL

3    NAME FOR THE RECORD AND SPELL YOUR LAST NAME.

4          THE WITNESS:  YES.  MY NAME IS HARVEY VARENHORST.

5    SPELLING THE LAST NAME:  V, AS IN VICTOR, A  R  E  N  H  O  R

6    S  T.

7                        DIRECT EXAMINATION +

8    BY MR. MEDRANO:

9    Q    GOOD MORNING.  ARE YOU EMPLOYED BY THE DRUG ENFORCEMENT

10   ADMINISTRATION?

11   A    YES, I AM.

12   Q    IN THE CAPACITY OF A SPECIAL AGENT?

13   A    YES, I AM.

14   Q    HOW LONG HAVE YOU SERVED WITH THE D.E.A., SIR?

15   A    FOR MORE THAN 21 YEARS.

16   Q    CURRENTLY, WHAT IS YOUR GEOGRAPHICAL ASSIGNMENT?  WHERE ARE

17   YOU?

18   A    I'M A SUPERVISORY AGENT IN THE CHICAGO FIELD DIVISION.

19   Q    WELL, ARE YOU A GROUP SUPERVISOR, SPECIFICALLY?

20   A    YES, I AM.

21   Q    HAVE YOU EVER SERVED IN THE REPUBLIC OF MEXICO?

22   A    YES, I HAVE.

23   Q    PARTICULARLY IN GUADALAJARA?

24   A    YES, I HAVE.

25   Q    WHEN DID YOU SERVE THERE?

1    A    IT WAS FROM MARCH OF 1982 UNTIL JULY OF 84, 1984.

2    Q    DID YOU EVER KNOW A MAN BY THE NAME OF ENRIQUE CAMARENA

3    SALAZAR?

4    A    YES, I DID.

5    Q    I'D LIKE TO DIRECT YOU TO GOVERNMENT'S EXHIBIT 5 FOR

6    PURPOSES OF IDENTIFICATION.  DO YOU SEE THAT IN FRONT OF YOU,

7    SIR?

8    A    YES, I DO.

9    Q    WOULD YOU TELL US WHAT THAT IS?

10    A    IT'S A PICTURE OF AGENT CAMARENA.

11    Q    HOW IS IT THAT YOU HAD ANY CONTACT WITH OR KNEW ENRIQUE

12    CAMARENA?

13    A    WE WERE BOTH AGENTS IN THE GUADALAJARA OFFICE.  HE WAS

14    ASSIGNED THERE BEFORE I GOT THERE AND HE WAS THERE AFTER I

15    LEFT.

16    Q    AT ANY TIME, SIR, WERE YOU EVER INVOLVED IN A PROCESS WITH

17    SPECIAL AGENT CAMARENA OF TAKING HIS FINGERPRINTS?

18    A    YES, I DID -- YES, I WAS.

19    Q    NOW, WOULD YOU PLEASE EXPLAIN TO US HOW THAT CAME ABOUT?

20    A    THERE WAS A HEADQUARTERS REQUEST THAT WE TAKE THESE -- HAVE

21    HIS FINGERPRINTS TAKEN AND SENT IN, IN ORDER FOR THE ISSUANCE

22    OF NEW D.E.A. IDENTIFICATION, OR CREDENTIALS AS WE CALL THEM.

23    Q    SO WAS THERE SOME REASON FOR PURPOSE FOR TAKING HIS PRINTS?

24    A    I -- I DON'T KNOW.

25    Q    WELL, PERIODICALLY -- STRIKE THAT.

13-56

1          WITH THE D.E.A., DO AGENTS PERIODICALLY HAVE TO

2    GIVE -- TO UPDATE THEIR BACKGROUND TYPE OF INFORMATION ON

3    THEMSELVES?

4    A    YES.   APPROXIMATELY EVERY FIVE YEARS, THEY LIKE TO UPDATE

5    THE AGENTS' PERSONNEL FILES AND BACKGROUND.

6    Q    NOW, IF I CAN DIRECT YOU TO GOVERNMENT'S EXHIBIT 66, WHICH

7    SHOULD BE IN FRONT OF YOU, I BELIEVE, DO YOU SEE THAT?

8    A    YES.

9    Q    AND CAN YOU TELL ME WHAT THAT IS?

10   A    IT'S A FINGERPRINT CARD.

11   Q    AND ARE THEY FINGERPRINTS OF ENRIQUE CAMARENA?

12   A    YES, THEY ARE.

13   Q    AND DID YOU TAKE THE PRINTS?

14   A    YES, I DID.

15   Q    ON WHAT DATE DID YOU TAKE THESE PRINTS FROM AGENT CAMARENA?

16   A    I TOOK THEM ON OCTOBER 21ST 1982.

17   Q    IN WHAT CITY?

18   A    IN GUADALAJARA.

19   Q    ON THAT PARTICULAR -- WELL, IS THAT A FINGERPRINT CARD IN

20   FRONT OF YOU?

21   A    YES, IT IS.

22   Q    AND DOES THE DOCUMENT HAVE ANY OTHER NAME OTHER THAN WHAT I

23   JUST CALLED IT?

24   A    WELL, NORMALLY WHAT HAPPENS, IF I CAN EXPLAIN HOW WE TAKE

25   THEM:   WE TAKE THEM, HE SIGNS IT, AND THEN I SIGN IT, AND HIS

13-57

1    SIGNATURE AND MY SIGNATURE ARE ON THIS CARD HERE.

2    Q    NOW, YOU'VE ANSWERED MY NEXT QUESTION.  THAT'S YOUR

3    SIGNATURE ON THE DOCUMENT?

4    A    YES, IT IS.

5    Q    AND YOU MENTIONED THERE'S A SIGNATURE FOR ENRIQUE CAMARENA?

6    A    YES.

7    Q    WAS THAT SIGNATURE MADE BY ENRIQUE CAMARENA IN YOUR

8    PRESENCE ON GOVERNMENT'S EXHIBIT 66?

9    A    YES, IT WAS.

10   Q    AND AGAIN, EXHIBIT 66, THESE ARE THE FINGERPRINTS THAT YOU

11   TOOK FROM AGENT CAMARENA ON OCTOBER 21, 82?

12   A    CORRECT.  THAT IS RIGHT.

13              MR. MEDRANO:  YOUR HONOR, WE SEEK ADMISSION OF EXHIBIT

14   66 AT THIS TIME.

15              MR. STOLAR:  NO OBJECTION.

16              THE COURT:  MAY BE ADMITTED.

17              (EXHIBIT 66 # RECEIVED IN EVIDENCE.)

18              MR. MEDRANO:  YOUR HONOR, THAT CONCLUDES DIRECT.

19              THE COURT:  ANY CROSS-EXAMINE.

20              MR. NICOLAYSEN:  NO CROSS-EXAMINATION.

21              MR. STOLAR:  I'VE A COUPLE.

22                        CROSS-EXAMINATION +

23   BY MR. STOLAR:

24   Q    YOU INDICATED THAT YOU HAD CONTACT WITH AGENT CAMARENA; IS

25   THAT RIGHT?

13-58

1  A   YES, I DID.  WE WORKED IN THE SAME OFFICE.

2  Q   AND IN FACT, YOU WORKED WITH HIM IN 1984, AS WELL, DID YOU

3  NOT?

4  A   I LEFT THERE IN JULY OF 84; YES, SIR.

5  Q   ALL RIGHT.  YOU WORKED WITH HIM IN IDENTIFYING THE

6  ZACATECAS FIELDS; IS THAT RIGHT?

7  A   WE WORKED UP --

8        MR. MEDRANO:  OBJECTION.  BEYOND THE SCOPE OF DIRECT,

9  YOUR HONOR.  RELEVANCE.

10        THE COURT:  SUSTAINED.

11        MR. STOLAR:  MAY I TAKE HIM AS MY OWN WITNESS FOR A

12  FEW QUESTIONS ON THIS, JUDGE?

13        THE COURT:  WELL, A FEW.  OTHERWISE, YOU CAN CALL HIM.

14  BY MR. STOLAR:

15  Q   YOU WORKED WITH HIM IN IDENTIFYING THE ZACATECAS FIELDS; IS

16  THAT RIGHT?

17  A   ONE OF THEM, I ASSISTED AT THE VERY END OF IT, YES.

18  Q   DIDN'T YOU ALSO, IN JANUARY OF 84, WORK WITH HIM IN

19  DEBRIEFING SOMEBODY WHO TOLD ABOUT 10 SEPARATE GROUPS OF PEOPLE

20  WHO WERE GROWING MARIJUANA FIELDS?  IS THAT RIGHT?

21        MR. MEDRANO:  OBJECTION.  HEARSAY.  OBJECTION TO THE

22  FORM OF THE QUESTION.

23        THE COURT:  SUSTAINED.

24        MR. STOLAR:  NOTHING FURTHER.

25        MR. MEDRANO:  NO REDIRECT, YOUR HONOR.

1          THE COURT:  YOU MAY STEP DOWN.

2          CALL YOUR NEXT WITNESS.

3          MR. MEDRANO:  YOUR HONOR, WE WOULD CALL AT THIS TIME

4    SANDALIO GONZALEZ TO THE STAND, YOUR HONOR.

5          THE COURT:  DOES THIS WITNESS REQUIRE AN INTERPRETER?

6          MR. MEDRANO:  NO, YOUR HONOR.

7          YOUR HONOR, MAY I HAVE AGENT KUEHL PLACE THAT

8    WITNESS'S EXHIBITS IN FRONT OF HIM AT THIS TIME?

9          THE COURT:  YES.

10          MR. MEDRANO:  THANK YOU.

11          (WITNESS SUMMONED TO COURTROOM.)

12          THE COURT:  COME FORWARD, PLEASE.

13          MR. MEDRANO:  PLEASE RAISE YOUR RIGHT HAND.

14

15          SANDALIO GONZALEZ + PLAINTIFF'S WITNESS, SWORN

16

17          THE CLERK:  PLEASE BE SEATED.  PLEASE STATE STATE YOUR

18    FULL NAME FOR THE RECORD AND SPELL YOUR LAST NAME.

19          THE WITNESS:  SANDALIO GONZALEZ, G  O  N  Z  A  L

20    E  Z.

21                    DIRECT EXAMINATION +

22    BY MR. MEDRANO:

23    Q   GOOD MORNING, SIR.  ARE YOU EMPLOYED BY THE DRUG

24    ENFORCEMENT ADMINISTRATION?

25    A   YES, I AM.

1   Q    ARE YOU A SPECIAL AGENT WITH THEM?

2   A    CRIMINAL INVESTIGATOR, YES.

3   Q    AGENT GONZALEZ, HOW LONG HAVE YOU SERVED WITH THE D.E.A.?

4   A    APPROXIMATELY 12 YEARS.

5   Q    CURRENTLY, WHERE ARE YOU ASSIGNED TO?

6   A    I'M ASSIGNED TO THE OFFICE OF SECURITY PROGRAMS OF THE

7   PLANNING AND INSPECTION DIVISION IN D.E.A. HEADQUARTERS.

8           THE COURT:  MOVE THAT SLIGHTLY TO YOUR RIGHT.

9           THE WITNESS:  (ADJUSTS MICROPHONE.)

10          THE COURT:  THAT'S FINE.

11  BY MR. MEDRANO:

12  Q    IN ADDITION TO YOUR D.E.A. EXPERIENCE, HAVE YOU SERVED --

13  DO YOU HAVE ANY OTHER LAW ENFORCEMENT EXPERIENCE?

14  A    YES, I DO.  I WAS A DEPUTY SHERIFF FOR THE COUNTY OF LOS

15  ANGELES AND A POLICE OFFICER FOR CITY OF HUNTINGTON PARK,

16  CALIFORNIA.

17  Q    TOTAL NUMBER OF YEARS WITH OTHER LAW ENFORCEMENT, OTHER

18  THAN D.E.A., HOW MANY?

19  A    SIX.

20  Q    I'D LIKE TO DIRECT YOUR ATTENTION, AGENT GONZALEZ, TO 1985.

21  AT THAT TIME, WERE YOU ASSIGNED OUTSIDE THE UNITED STATES?

22  A    YES, I WAS.  I WAS ASSIGNED TO THE D.E.A. OFFICE IN SAN

23  JOSE, COSTA RICA.

24  Q    SAN JOSE.  IF I CAN ASK YOU TO MOVE THAT JUST TO THE RIGHT.

25          THE COURT:  THIS MIKE, YOU SHOULDN'T BE TOO CLOSE TO

13-61

1    THE MICROPHONE.

2              THE WITNESS:  YES, SIR.

3              THE COURT:  YOU CAN RAISE IT UP ABOVE YOUR MOUTH, AND

4    I THINK IT'LL BE FINE.  TRY THAT.

5              MR. MEDRANO:  AND GO AHEAD AND LEAN BACK AND TRY NOT

6    TO SPEAK DIRECTLY INTO THE MIKE.

7              THE WITNESS:  ALL RIGHT.

8              MR. MEDRANO:  THANK YOU.

9    Q    SAN JOSE, IS THAT THE CAPITAL OF THE COUNTRY OF COSTA RICA?

10   A    YES, IT IS.

11   Q    I TAKE IT THERE'S A D.E.A. OFFICE IN COSTA RICA?

12   A    YES, THERE'S A D.E.A. OFFICE THERE.

13   Q    NOW, WHERE IS IT PHYSICALLY LOCATED, THE D.E.A. OFFICE IN

14   COSTA RICA -- PARDON ME -- IN SAN JOSE?

15   A    IT'S LOCATED AT THE UNITED STATES EMBASSY.

16   Q    NOW, IN 1985, CAN YOU TELL ME SPECIFICALLY, AGENT GONZALEZ,

17   WHAT YOUR POSITION OR TITLE WAS IN COSTA RICA?

18   A    I WAS A CRIMINAL INVESTIGATOR ASSIGNED AS A ASSISTANT

19   ATTACHE TO THE EMBASSY.

20   Q    NOW, I'D LIKE TO DIRECT YOUR ATTENTION, IF I MAY, TO ABOUT

21   APRIL 3 OF 1985.  ON OR ABOUT THIS DATE, DID YOU RECEIVE

22   SPECIFIC INFORMATION THAT LED YOU TO CONDUCT OR TO PURSUE A

23   PARTICULAR INVESTIGATION?

24   A    YES, SIR.

25   Q    WHAT HAPPENED EXACTLY?

13-62

1    A    WE WERE NOTIFIED THAT --

2            MR. STOLAR:  OBJECT TO THE HEARSAY, YOUR HONOR.

3            THE COURT:  OVERRULED.

4            THE WITNESS:  WE WERE NOTIFIED THAT RAFAEL CARO

5    QUINTERO WAS BELIEVED TO BE HIDING IN COSTA RICA.

6    BY MR. MEDRANO:

7    Q    AND ON THE BASIS OF THIS INFORMATION, DID YOU UNDERTAKE

8    SPECIFIC STEPS?

9    A    YES.  YES, WE DID.  WE INITIATED AN INVESTIGATION TO

10   DETERMINE WHERE HE WAS LIVING.

11   Q    NOW, AS PART OF THIS INVESTIGATION, WERE YOU ABLE TO

12   ASCERTAIN A SPECIFIC RESIDENCE IN COSTA RICA?

13   A    WE -- YES, WE DID.

14   Q    THAT YOU BELIEVED TO BE WHERE RAFAEL CARO QUINTERO WAS

15   STAYING?

16   A    YES.

17   Q    AND JUST GIVE US SOME IDEA WHERE THIS RESIDENCE WAS.

18   A    THE RESIDENCE WAS LOCATED OUTSIDE OF THE CITY OF SAN JOSE,

19   NEAR THE INTERNATIONAL AIRPORT.  IT WAS APPROXIMATELY, I WOULD

20   SAY, A QUARTER OF A MILE TO A HALF MILE AWAY FROM THE MAIN

21   LANDING STRIP, FROM THE LANDING FIELD AT THE INTERNATIONAL

22   AIRPORT.

23   Q    A QUARTER OF A MILE FROM THE ACTUAL AIRPORT?

24   A    FROM THE ACTUAL AIRPORT, YES.

25   Q    AFTER MAKING THIS DETERMINATION ABOUT THE EXISTENCE OF THIS

1  HOUSE, IS THERE ANY SURVEILLANCE CONDUCTED OF THIS RESIDENCE IN

2  SAN JOSE?

3  A    YES.  WE -- I WENT WITH COSTA RICAN COUNTERPARTS, CONDUCTED

4  SURVEILLANCE OF THE FRONT ENTRANCE, AND LATER WE WENT UP IN AN

5  AIRCRAFT AND LOOKED THE AREA OVER.

6  Q    AND ALL THIS OCCURS ON APRIL 3 OF 1985?

7  A    YES.

8  Q    NOW, YOU MENTIONED YOUR COSTA RICAN COUNTERPARTS.  CAN YOU

9  BE MORE SPECIFIC AS TO WHO IT WAS THAT YOU APPROACHED FOR

10 ASSISTANCE?

11 A    YES.  WE APPROACHED ALL OF THE SECURITY OR POLICE AGENCIES

12 THAT COULD ASSIST US IN THIS TYPE OF CASE:  THE JUDICIAL

13 POLICE, THE DEPARTMENT OF NARCOTICS, AND THE NATIONAL SECURITY

14 AGENCY.

15 Q    DO YOU KNOW WHAT THE NATIONAL SECURITY AGENCY IS?

16 A    IT WAS ACTUALLY CALLED DIRECCION DE SEGURIDAD.  IT'S A PART

17 OF THE EXECUTIVE BRANCH OF THE GOVERNMENT THERE.

18 Q    DOES -- OR DID IN 1985, WHEN YOU WERE WITH THEM -- THIS

19 NATIONAL SECURITY AGENCY, DID THEY HAVE A SWAT TEAM OF ANY

20 SORT?

21 A    YES.  WE ASKED THEM FOR ASSISTANCE, ASKED THEM TO PROVIDE

22 THE TEAM.

23 Q    APPROXIMATELY HOW MANY MEN DID THE NATIONAL SECURITY AGENCY

24 PROVIDE TO YOU?

25 A    APPROXIMATELY 20 TO -- IT WAS OVER 20 MEN.  I THINK 24, 25

1    MEN.

2    Q    AND WERE THEY A SWAT TEAM OF SORTS?

3    A    YES.  THEY WERE A SPECIALLY TRAINED TEAM.

4    Q    NOW, AGENT GONZALEZ, THIS DATE, ABOUT APRIL 3, IS THIS

5    ABOUT APPROXIMATELY TWO MONTHS AFTER THE DISAPPEARANCE OF AGENT

6    CAMARENA?

7    A    YES, IT WAS.

8    Q    NOW, I'D LIKE TO DIRECT YOUR ATTENTION TO THE FOLLOWING

9    DAY:  APRIL 4.  ON THE MORNING OF APRIL 4, ARE ANY PLANS MADE

10   WITH REGARD TO THE HOUSE THAT YOU'VE IDENTIFIED?

11   A    WELL, THE PLANS WERE -- WE STARTED THEM, ACTUALLY, ON THE

12   AFTERNOON AND EVENING OF THE 3RD, AND WE WENT ON TO THE NEXT

13   DAY.  A WARRANT WAS OBTAINED FOR THE RESIDENCE.

14   Q    WHAT KIND OF WARRANT?

15   A    WELL, A SEARCH WARRANT.

16         AND WE RECEIVED A PHOTOGRAPH OF RAFAEL CARO QUINTERO

17   THAT WAS SENT TO US BY THE MEXICAN FEDERAL JUDICIAL POLICE IN

18   THE DAILY MEXICANA FLIGHT THAT ARRIVED THAT EVENING.

19         THE PILOT BROUGHT THE PHOTOGRAPH TO US, AND WE HELD A

20   BRIEFING WITH THE TEAM THAT WAS GOING TO MAKE THE ENTRY INTO

21   THE RESIDENCE.  WE ADVISED THEM OF THE INVESTIGATION, WHAT WE

22   THOUGHT WE HAD, WHO THE PEOPLE WERE -- YOU KNOW, THAT SORT OF

23   THING -- AND WAITED UNTIL THE NEXT MORNING.

24   Q    AND, NOW, THE NEXT MORNING IS APRIL 4?

25   A    YES.

13-65

1    Q    AND BY THE MORNING OF APRIL 4, TO YOUR KNOWLEDGE, DO YOU

2    HAVE A COSTA RICAN SEARCH WARRANT?

3    A    YES.

4    Q    NOW, WERE THERE ANY TYPE OF TIME CONSTRAINTS AS TO THE

5    EXECUTION OF THIS COSTA RICAN SEARCH WARRANT?

6    A    IT HAD TO BE EXECUTED AFTER 6:00 IN THE MORNING, AFTER

7    DAYLIGHT, BASICALLY.

8    Q    ON APRIL 4TH?

9    A    YES.

10   Q    LET'S GO TO APRIL 4TH, THEN.  WHAT HAPPENS AFTER THESE

11   PRELIMINARY PLANS ARE ESTABLISHED?

12   A    WELL, WE WENT TO THE AREA OF THE AIRPORT AND SET UP A

13   COMMAND POST, IF YOU WILL, AROUND 3:00, 4:00 IN THE MORNING,

14   AND THE ENTRY TEAM TOOK POSITIONS AROUND THE RESIDENCE.

15   Q    DO YOU KNOW APPROXIMATELY WHAT TIME THEY DID THAT?

16   A    OH, THEY WENT IN THERE AROUND 4:00.

17   Q    WHAT HAPPENS NEXT?

18   A    WELL, WE JUST WAITED UNTIL THE DIRECTOR OF NARCOTICS

19   NOTIFIED US THAT THE WARRANT WAS SIGNED.  AND BEFORE THAT,

20   THE -- IT WAS DETERMINED THAT THERE WERE MEXICANS LIVING IN THE

21   HOUSE.

22        AND BASICALLY, AT ABOUT 6:00 IN THE MORNING, THE ENTRY

23   WAS MADE INTO THE HOUSE.  THERE WAS SOME GUNFIRE.  THERE WAS NO

24   ONE HURT.  AND IN ABOUT FIVE TO TEN MINUTES, THE HOUSE WAS

25   SECURED BY THE ENTRY TEAM, AND WE FOLLOWED IN TO CONDUCT AN

1    INVESTIGATION AND TRY TO IDENTIFY THE PEOPLE THAT WERE LIVING

2    IN THERE.

3    Q    NOW, DO YOU AGAIN -- STRIKE THAT.

4         DO YOU YOURSELF ENTER THE HOUSE AFTER THE COSTA RICAN

5    SWAT TEAM HAS SECURED THE HOUSE?

6    A    YES, I DID.

7    Q    AND AFTER THEY'D TAKEN CUSTODY OF ANYONE THAT'S IN THE

8    HOUSE?

9    A    YES.  WHEN I ENTERED THE HOUSE EVERYONE WHO WAS IN THE

10   THERE, WAS IN THE HOUSE, WAS IN CUSTODY, IN HANDCUFFS, EXCEPT

11   ONE PERSON:  THE WOMAN.

12   Q    ALL RIGHT.  CAN YOU TELL US IN DETAIL HOW MANY PEOPLE ARE

13   IN CUSTODY INSIDE THIS RESIDENCE?

14   A    THERE WERE FIVE -- I BELIEVE FIVE MEN IN CUSTODY IN THE

15   RESIDENCE AND ONE FEMALE.

16   Q    WAS THE FEMALE ALSO -- WELL, STRIKE THAT.

17        THE FIVE MEN, WERE THEY HANDCUFFED IN ANY FASHION?

18   A    YES, THEY WERE HANDCUFFED.

19   Q    THE FEMALE, WAS SHE HANDCUFFED?

20   A    NO, SHE WAS NOT.

21   Q    WAS SHE SIMPLY BEING DETAINED?

22   A    YES.

23   Q    AFTER YOUR ENTRY, DID YOU DETERMINE WHETHER OR NOT RAFAEL

24   CARO QUINTERO WAS ONE OF THOSE FIVE MEN THAT HAD BEEN TAKEN

25   INTO CUSTODY?

13-67

1    A    YES, HE WAS ONE OF THE FIVE MEN.

2    Q    TO YOUR KNOWLEDGE, SIR, AT THE TIME OF HIS ARREST, WAS HE

3    USING AN ALIAS?

4    A    YES, HE WAS.

5    Q    WHAT WAS THAT ALIAS?

6    A    MARCOS ANTONIO RIOS VALENZUELA, I BELIEVE.

7    Q    NOW, SUBSEQUENT TO THIS, WAS THERE A SEARCH OF HIS

8    RESIDENCE IN COSTA RICA?

9    A    YES, THERE WAS A SEARCH.

10   Q    DID YOU PARTICIPATE IN ASSISTING WITH REGARD TO THE SEARCH?

11   A    YES, I DID.

12   Q    AGENT GONZALEZ, I DON'T HAVE A MAP HERE, BUT JUST IN --

13   VERY BRIEFLY, CAN YOU GIVE US SOME IDEA OF WHERE COSTA RICA

14   LIES WITH REGARD TO THE UNITED STATES?

15   A    COSTA RICA IS IN CENTRAL AMERICA.  IT IS LOCATED BETWEEN

16   THE COUNTRIES OF NICARAGUA AND PANAMA.

17   Q    NOW, SIR, IF I CAN DIRECT YOU TO GOVERNMENT'S EXHIBIT

18   70 A  -- THESE EXHIBITS SHOULD BE RIGHT IN FRONT OF YOU, AGENT

19   GONZALEZ.

20   A    YES.

21   Q    DO YOU SEE 70 A  IN FRONT OF YOU?

22   A    YES, I DO.

23   Q    CAN YOU TELL ME WHAT THAT IS?

24   A    THAT IS A FRONT VIEW, A PHOTOGRAPH OF THE FRONT OF THE

25   HOUSE WHERE RAFAEL CARO QUINTERO WAS ARRESTED ON APRIL THE 4TH.

13-68

1        MR. MEDRANO:  YOUR HONOR, WE SEEK ADMISSION OF 70 A.

2        MR. STOLAR:  NO OBJECTION.

3        THE COURT:  RECEIVED.

4        (EXHIBIT 70 A  # RECEIVED IN EVIDENCE.)

5   BY MR. MEDRANO:

6   Q   IF I CAN ASK YOU TO HOLD IT UP AND EXPLAIN WHAT'S IN THE

7   PHOTOGRAPH.  YOU CAN HOLD IT UP FOR THE JURY.  THANK YOU.

8   A   THIS IS THE FRONT OF THE HOUSE, LIKE I SAID.  THIS CAR HERE

9   (INDICATING) WAS THE DIRECTOR OF NARCOTICS' CAR; THIS CAR WAS A

10  D.E.A. CAR; THIS ONE, I DON'T KNOW -- I DON'T REMEMBER WHO IT

11  BELONGED TO.  AND THIS WAS TAKEN SHORTLY AFTER THE ENTRY.

12  Q   AND THIS IS THE FRONT OF THE RESIDENCE?

13  A   YES.

14  Q   NOW, IS THIS RESIDENCE ALSO KNOWN AS LA QUINTA?

15  A   IT WAS KNOWN AS LA QUINTA, CALIFORNIA, YES.

16  Q   THAT WAS THE NAME OF THE RESIDENCE?

17  A   YES.

18  Q   IF YOU CAN PUT THAT DOWN --

19  A   (COMPLIES.)

20  Q   -- IF I CAN DIRECT YOU NOW -- WELL, BEFORE YOU MOVE ON, YOU

21  HAD AN OPPORTUNITY TO WALK THROUGH THE HOUSE; IS THAT CORRECT?

22  A   YES, I DID.

23  Q   CAN YOU GIVE US SOME IDEA OF THE SIZE OF THE HOME?

24        THE COURT:  WHAT IS THE --

25        MR. STOLAR:  OBJECTION.  RELEVANCE.

13-69

1          THE COURT:  YES, COUNSEL, WHAT IS THE NEED FOR THIS?

2          MR. MEDRANO:  I'LL MOVE ON, YOUR HONOR.

3    Q    CAN YOU LOOK NOW AT 70 B  AND JUST TELL US WHAT THAT IS?

4    A    THAT IS PHOTOGRAPH OF THE SWIMMING POOL AREA OF THE HOUSE,

5    LOCATED IN THE FRONT, THE FRONT OF THE HOUSE.

6          MR. MEDRANO:  YOUR HONOR, WE SEEK ITS ADMISSION.

7          MR. STOLAR:  OBJECTION.  RELEVANCE GROUNDS.

8          THE COURT:  SUSTAINED.

9    BY MR. MEDRANO:

10   Q    FINALLY, DO YOU HAVE EXHIBIT 73 C  IN FRONT OF YOU?

11   A    YES, I DO.

12   Q    CAN YOU IDENTIFY THAT FOR US?

13   A    THIS IS A PHOTOGRAPH OF THE -- AGAIN, THE RIGHT FRONT OF

14   THE HOUSE, SHOWING A POLICE VEHICLE AND THE REAR MAID'S

15   QUARTERS OR OFFICE AREA OF THE HOUSE.

16         MR. MEDRANO:  YOUR HONOR, WE SEEK ITS ADMISSION.

17         MR. STOLAR:  OBJECTION.  RELEVANCE.

18         THE COURT:  SUSTAINED.

19   BY MR. MEDRANO:

20   Q    DO YOU HAVE, ALSO, IN FRONT OF YOU GOVERNMENT'S EXHIBITS

21   16 A  AND B?

22   A    I DO.

23   Q    CAN YOU IDENTIFY THAT FOR US?

24   A    THIS IS A PHOTOGRAPH OF RAFAEL CARO QUINTERO TAKEN SHORTLY

25   AFTER HIS ARREST.

13-70

1    Q    AND IS THAT --

2    A    16 A.

3    Q    AND IS 16 A  THE SAME INDIVIDUAL THAT WAS ARRESTED AT LA

4    QUINTA, AT THE HOUSE?

5    A    YES, IT IS.

6    Q    YOU CAN PUT THAT DOWN.  THANK YOU.

7         NOW, IN THE SEARCH OF THE HOUSE, SIR, ARE WEAPONS OR

8    FIREARMS FOUND?

9    A    YES, THERE WERE WEAPONS SEIZED.

10    Q    JUST BRIEFLY, CAN YOU DESCRIBE WHAT IT WAS THAT WAS SEIZED

11    AT THE HOUSE?

12         MR. STOLAR:  OBJECTION.  RELEVANCE.

13         THE COURT:  SUSTAINED.

14    BY MR. MEDRANO:

15    Q    IF I COULD DIRECT YOU TO GOVERNMENT'S EXHIBIT 72.  NOW,

16    WOULD YOU IDENTIFY WHAT THAT IS FOR US?

17    A    THIS IS AN AUTOMATIC PISTOL THAT WAS SEIZED AT THE HOUSE.

18    Q    AND WOULD YOU DESCRIBE THE PISTOL, PLEASE?

19    A    IT APPEARS TO BE A .45 AUTOMATIC PISTOL WITH FANCY GRIPS --

20    I BELIEVE THEY APPEAR TO BE DIAMONDS -- AND THE LETTER R  AND

21    THE NUMBER 1 ON THE GRIPS.

22    Q    AND THAT'S ON THE HANDLE ITSELF?

23    A    YES.

24         MR. MEDRANO:  YOUR HONOR, WE SEEK ADMISSION OF EXHIBIT

25    72 AT THIS TIME.

13-71

1          THE COURT:  ALL RIGHT.  THAT MAY BE RECEIVED.

2          (EXHIBIT 72 # RECEIVED IN EVIDENCE.)

3    BY MR. MEDRANO:

4    Q    YOU MAY PUT THAT DOWN.  THANK YOU.

5          NOW, IN ADDITION -- STRIKE THAT.

6          IS JEWELRY FOUND AT THE RESIDENCE, AS WELL?

7    A    YES.

8    Q    IF I CAN JUST DIRECT YOU -- LET ME JUST HAVE ONE MOMENT,

9    YOUR HONOR (PAUSE) -- TO GOVERNMENT'S EXHIBIT 74 B, IF YOU HAVE

10   THAT IN FRONT OF YOU.

11         WOULD YOU IDENTIFY THAT FOR US?

12   A    74 B  IS A PHOTOGRAPH, TAKEN AT THE JUDICIAL POLICE OFFICE,

13   OF WEAPONS AND JEWELRY SEIZED AT LA QUINTA, CALIFORNIA, AND OF

14   MONEY, ALSO.

15         MR. MEDRANO:  YOUR HONOR, WE SEEK ADMISSION OF 74 B

16   AT THIS TIME.

17         MR. STOLAR:  OBJECTION.  RELEVANCE.

18         THE COURT:  SUSTAINED.

19   BY MR. MEDRANO:

20   Q    NOW, SIR, LET ME DIRECT YOU, THEN, TO GOVERNMENT'S EXHIBIT

21   74 A.  CAN YOU IDENTIFY THAT FOR US?

22   A    YES.  THIS IS A PHOTOGRAPH OF JEWELRY THAT WAS SEIZED AT

23   THE QUINTA, CALIFORNIA, ON APRIL 4TH 1985.

24         MR. MEDRANO:  YOUR HONOR, I'LL BE SEEKING ITS

25   ADMISSION --

13-72

1          MR. STOLAR:  OBJECT ON RELEVANCE.

2          MR. MEDRANO:  -- BUT ON THIS, YOUR HONOR, IF I MAY BE

3   HEARD BRIEFLY.

4          THE COURT:  I UNDERSTOOD YOU WANTED TO INTRODUCE

5   EVIDENCE OF THAT BRACELET.

6          MR. MEDRANO:  IT'S IN THAT; THERE, YOUR HONOR.  THAT'S

7   THE REASON FOR IT.

8          MR. STOLAR:  I'LL WITHDRAW.

9          THE COURT:  DON'T YOU HAVE A SEPARATE PICTURE OF IT?

10          MR. MEDRANO:  MAY I HAVE JUST ONE MOMENT, YOUR HONOR?

11          THE COURT:  OR GET IT WITH ANOTHER WITNESS.

12          MR. MEDRANO:  YOUR HONOR, WITH YOUR PERMISSION, YOU

13   ARE CORRECT.  THANK YOU.  MADAM CLERK HAS GOVERNMENT'S EXHIBIT

14   62, WHICH IS THAT SPECIFIC OBJECT, THE PHOTOGRAPH.

15          THE CLERK:  THE PHOTOGRAPH OR IN PLASTIC?

16          MR. MEDRANO:  PHOTOGRAPH.  IT'S A LARGE PHOTOGRAPH,

17   62.

18          (EXHIBIT PROVIDED TO WITNESS.)

19   BY MR. MEDRANO:

20   Q    AGENT GONZALEZ, CAN YOU TELL US WHAT EXHIBIT 62 IS?

21   A    EXHIBIT 62 IS A PHOTOGRAPH OF A BRACELET, APPARENTLY

22   APPEARS TO BE A DIAMOND WITH THE LETTER R  AND THE NUMBER 1.

23   THIS BRACELET WAS SEIZED AT THE QUINTA, CALIFORNIA, APRIL 4TH

24   1985.

25   Q    THAT WAS ONE OF THE ITEMS SEIZED; IS THAT CORRECT?

13-73

1    A    YES.

2              MR. MEDRANO:  MAY I HAVE JUST ONE MOMENT, YOUR HONOR.

3              (PAUSE IN PROCEEDINGS.)

4    BY MR. MEDRANO:

5    Q    AGENT GONZALEZ, AFTER THE ARREST OF RAFAEL CARO QUINTERO,

6    WHAT HAPPENED TO HIM, IF YOU KNOW?

7    A    HE WAS TAKEN INTO CUSTODY BY COSTA RICAN AUTHORITIES, AND

8    THE FOLLOWING DAY OR PERHAPS TWO DAYS LATER -- I DON'T RECALL

9    EXACTLY -- HE WAS TURNED OVER TO THE MEXICAN FEDERAL JUDICIAL

10   POLICE DELEGATION THAT WENT TO COSTA RICA, AND HE WAS FLOWN

11   BACK TO MEXICO.

12   Q    WERE THEY FLOWN BACK WITH MEXICAN LAW ENFORCEMENT

13   OFFICIALS?

14   A    I'M SORRY.  I DIDN'T HEAR THE FIRST PART.

15             THE COURT:  COUNSEL, THAT'S WHAT HE SAID.

16             MR. MEDRANO:  VERY WELL, YOUR HONOR.

17             YOUR HONOR, THAT CONCLUDES THE DIRECT OF THIS WITNESS.

18             THE COURT:  IS THERE ANY CROSS-EXAMINATION OF THIS

19   WITNESS?

20                        CROSS-EXAMINATION +

21   BY MR. STOLAR:

22   Q    LA QUINTA, CALIFORNIA, HAS NO CONNECTION TO JAVIER BARBA

23   HERNDANDEZ'S LA QUINTA RESIDENCE IN GUADALAJARA, TO YOUR

24   KNOWLEDGE, DOES IT?

25   A    NOT TO MY KNOWLEDGE.

13-74

1  Q    YOU INDICATED CARO WAS TAKEN BACK TO MEXICO; IS THAT RIGHT?

2  A    YES.

3  Q    DID YOU TESTIFY AT CARO'S TRIAL IN MEXICO CONCERNING WHAT

4  YOU TESTIFIED TO HERE?

5         MR. MEDRANO:  OBJECTION.  RELEVANCE, YOUR HONOR.

6  BEYOND THE SCOPE.

7         THE COURT:  SUSTAINED.

8  BY MR. STOLAR:

9  Q    HAVE YOU TESTIFIED IN ANY PROCEEDING IN MEXICO CONCERNING

10  WHAT YOU TESTIFIED TO IN THIS TRIAL?

11         MR. MEDRANO:  OBJECTION.  RELEVANCE.

12         THE COURT:  SUSTAINED.

13         MR. STOLAR:  THANK YOU.

14                     CROSS-EXAMINATION +

15  BY MR. MEZA:

16  Q    AGENT, AT THE TIME YOU TOOK CARO INTO CUSTODY, HAD YOU MADE

17  ANY ATTEMPT TO DETERMINE WHETHER OR NOT THERE WERE ANY ARREST

18  WARRANTS GENERATED BY ANY U.S. AUTHORITY FOR CARO'S ARREST?

19         MR. MEDRANO:  OBJECTION.  RELEVANCE, BEYOND THE SCOPE,

20  YOUR HONOR.

21         THE COURT:  SUSTAINED.

22         MR. MEZA:  YOUR HONOR, AS OPPOSED TO CALLING THIS

23  WITNESS BACK --

24         THE COURT:  THE OBJECTION IS SUSTAINED.

25         MR. MEZA:  ALL RIGHT.  THANK YOU.

13-75

1      THE COURT:  IF YOU WANT TO CALL HIM BACK, YOU CAN DO

2  IT.

3      MR. MEZA:  YES.  THANK YOU.

4      THE COURT:  YOU MAY STEP DOWN.

5      CALL YOUR NEXT WITNESS.

6      MR. MEDRANO:  THANK YOU.  MAY I HAVE JUST ONE MOMENT,

7  YOUR HONOR.

8      (GOVERNMENT COUNSEL CONFER OFF THE RECORD.)

9      MR. CARLTON:  YOUR HONOR, THE GOVERNMENT CALLS

10  LAWRENCE VICTOR HARRISON.

11      (WITNESS SUMMONED TO COURTROOM.)

12      THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

13

14      LAWRENCE V. HARRISON + PLAINTIFF'S WITNESS, SWORN

15

16      THE CLERK:  PLEASE BE SEATED.  PLEASE STATE YOUR FULL

17  NAME FOR THE RECORD AND SPELL YOUR LAST NAME.

18      THE WITNESS:  (NO AUDIBLE RESPONSE.)

19      THE CLERK:  PLEASE STATE YOUR FULL NAME FOR THE RECORD

20  AND SPELL YOUR LAST NAME.

21      THE WITNESS:  LAWRENCE VICTOR HARRISON, H  A  R  R  I

22  S  O  N.

23              DIRECT EXAMINATION +

24  BY MR. CARLTON:

25  Q   MR. HARRISON, IS THE NAME YOU JUST GAVE THE NAME YOU WERE

13-76

1   BORN WITH?

2   A    I CAN'T HEAR YOU VERY WELL, SIR.

3   Q    IS LAWRENCE VICTOR HARRISON THE NAME YOU WERE BORN WITH?

4   A    NO, IT ISN'T.

5   Q    AT SOME POINT IN YOUR LIFE, DID YOU ADOPT THAT AS THE NAME

6   YOU WOULD USE?

7   A    YES, I DID.

8   Q    HOW LONG AGO DID YOU DO THAT?

9   A    APPROXIMATELY 25 YEARS AGO.

10  Q    AND YOU'VE USED IT CONTINUOUSLY EVER SINCE?

11  A    YES, I HAVE.

12  Q    YOU'VE USED IT IN ALL YOUR DEALINGS?

13  A    YES, I HAVE.

14  Q    NOW, ARE YOU AN AMERICAN CITIZEN, MR. HARRISON?

15  A    YES, I AM.

16  Q    HAVE YOU -- DID YOU STUDY AT ANY COLLEGES AND UNIVERSITIES

17  IN THE UNITED STATES?

18  A    I ATTENDED CLASSES AT BERKELEY -- UNIVERSITY OF CALIFORNIA

19  AT BERKELEY -- IN THE 1960'S, AND I ALSO ATTENDED CLASSES AT

20  THE BOLT HALL SCHOOL OF LAW.

21  Q    WERE YOU ENROLLED --

22        THE COURT:  YOU SAY YOU ATTENDED CLASSES.  DID YOU

23  GRADUATE?

24        THE WITNESS:  I DID NOT GRADUATE.  I WAS AUDITING

25  CLASSES.  I WAS AN UNREGISTERED STUDENT DURING THE 60'S.

13-77

BY MR. CARLTON:

Q   ALL RIGHT.  DURING WHAT TIME DID YOU ATTEND THESE CLASSES?

A   I BEGAN IN 1965 AND I ENDED IN 1971.

Q   NOW, AT SOME POINT, DID YOU MOVE TO MEXICO?

A   YES, I DID.

Q   WHEN WAS THAT?

A   I FIRST MOVED TO MEXICO IN 1968.  I LIVED THERE OFF AND ON. I CAME BACK FOR CLASSES UNTIL 1971.  I WAS THERE ON SPRING BREAKS, SUMMER VACATIONS.

Q   DID YOU EVENTUALLY MOVE TO MEXICO ON A PERMANENT BASIS?

A   YES, I DID, IN 1971.

Q   AND HOW LONG DID YOU THEN LIVE IN MEXICO?

A   I LIVED IN MEXICO UNTIL THE FIRST PART OF THIS YEAR.

Q   NOW, DURING THE TIME THAT YOU LIVED IN MEXICO, DID YOU OBTAIN SOME EMPLOYMENT THERE?

A   WELL, I BEGAN AS A LAW CLERK FOR A MEXICAN ATTORNEY IN 1971.  THAT ACTUALLY BEGAN IN 1978, BUT ON A VERY TENUOUS BASIS, BECAUSE I HAD TO COME BACK TO THE UNITED STATES.

    FROM 1971 ON, I WORKED FOR HIM FULL TIME AS LAW CLERK. IT WASN'T EMPLOYMENT AT THAT TIME.  IT EVENTUALLY BECAME EMPLOYMENT, BUT --

Q   HOW LONG DID YOU WORK AS A LAW CLERK FOR THIS INDIVIDUAL?

A   UNTIL 1976.

Q   AND WHERE DID YOU WORK?  WHAT CITY?

A   IN GUADALAJARA.

13-78

1   Q   AND DURING THE PERIOD THAT YOU LIVED IN MEXICO, DID YOU

2   LIVE IN GUADALAJARA THAT ENTIRE TIME?

3   A   YES.  I LIVED IN GUADALAJARA MOST OF THE TIME THAT I LIVED

4   IN MEXICO.

5   Q   DID YOU OBTAIN OTHER EMPLOYMENT IN 1976?

6   A   IN 1976, I LEFT THE EMPLOY OF THE ATTORNEY I WORKED FOR AS

7   A LAW CLERK AND I BEGAN DOING WORK FOR C.N.O.P., WHICH IS AN

8   ORGANISM (SIC) OF THE PRI POLITICAL PARTY IN MEXICO.

9   Q   CAN YOU DESCRIBE WHAT IS -- WELL, FIRST OF ALL IS PRI AN

10  ACRONYM?  DOES IT STAND FOR SOMETHING?

11  A   PRI STANDARDS FOR "PARTIDO REVOLUCIONARIO INSTITUCIONAL."

12  IN ENGLISH, THAT WOULD BE "INSTITUTIONAL REVOLUTIONARY PARTY."

13          IT IS AN AN AMALGAMISM OF VARIOUS POLITICAL PARTIES

14  STARTED IN 1927 BY THEN PRESIDENT CALLES.  IT HAD OTHER NAMES

15  TO BEGIN WITH.  IT FINALLY BECAME EVOLVED INTO THE PRI PARTY.

16  IT IS THE DOMINANT POLITICAL PARTY IN MEXICO.

17  Q   AND YOU SAID THAT YOU DID SOME WORK FOR THE C.N.O.P.

18          WHAT IS THAT?

19  A   THE PRI PARTY HAS THREE MAJOR POLITICAL DIVISIONS.  ONE IS

20  A WORKERS' DIVISION, THE EL OBREROS.  ANOTHER IS A FARM

21  WORKERS' OR SMALL FARM OWNERS' ORGANIZATION, KNOWN AS THE

22  CAMPESINO ORGANIZATION.

23          AND THEN THERE IS THE POPULAR SECTOR, THE SECTOR

24  POPULAR.  THE POPULAR SECTOR INCLUDES SMALL BUSINESSMEN AND

25  SOME LARGE BUSINESSMAN.  IT IS EVERYBODY THAT IS NOT INCLUDED

13-79

1    IN THE FIRST TWO CATEGORIES OF WORKERS AND FARMERS.

2    Q    AND IS THAT THE C.N.O.P.?

3    A    THE C.N.O.P. IS THE CONFEDERACION NACIONAL DE

4    ORGANIZACIONES POPULARES:   THE NATIONAL CONFEDERATION OF

5    POPULAR ORGANIZATIONS.

6         THAT INCLUDES VARIOUS LEAGUES OF THE PARTY, ALL

7    PERTAINING TO THE POPULAR SECTOR.  AND THEY HAD A SOCIAL

8    SERVICE LAW OFFICE IN MEXICO IN GUADALAJARA.  I JOINED THAT LAW

9    OFFICE IN 1976 AND DID FREE SOCIAL SERVICE WORK FOR THE PARTY

10   LEAGUE OF THE POPULAR SECTOR FROM THAT TIME ON, UNTIL ABOUT

11   1980.

12   Q    NOW, DURING THE PERIOD THAT YOU WORKED AS AN ATTORNEY FOR

13   THE C.N.O.P., WERE YOU A LICENSED ATTORNEY IN MEXICO?

14   A    THERE WAS NO LICENSING PROCEDURE IN MEXICO AT THAT TIME.

15   EVEN TODAY, MORE THAN 80 PERCENT OF THE ATTORNEYS IN MEXICO ARE

16   NOT YET LICENSED.

17   Q    AND DURING THE PERIOD THAT YOU WORKED IN THE SOCIAL SERVICE

18   LAW OFFICE FOR THE C.N.O.P., DID YOU ALSO HAVE YOUR OWN

19   PERSONAL CLIENTS?

20   A    YES.  LATER ON, AFTER I SETTLED IN AT THE LAW OFFICE THERE,

21   I BEGAN TO HAVE MY OWN PRIVATE CLIENTS, TOGETHER WITH THE

22   SOCIAL SERVICE PRACTICE I WAS DOING THEN.

23   Q    NOW, AT SOME POINT, DID YOU LEAVE YOUR LAW PRACTICE?

24   A    I LEFT MY LAW PRACTICE IN THE LATTER PART OF 1979 AND I

25   MOVED TO ACAPULCO.

1   Q    DID YOU CONTINUE TO MAINTAIN AN OFFICE IN GUADALAJARA AFTER

2   YOU MOVED TO ACAPULCO?

3   A    WELL, THE OFFICE REALLY WASN'T MINE.  IT BELONGED TO THE --

4   IT WAS THE C.N.O.P. OFFICE, AND IT WAS MAINTAINED BY THE HEAD

5   OF THE C.N.O.P. LAW FIRM.

6         BUT I PAID HALF THE RENT AT THAT TIME.  BECAUSE I HAD

7   MY OWN CLIENTS, I CONTINUED TO PAY MY HALF OF THE RENT, YES.

8   Q    AND WHY DID YOU MOVE TO ACAPULCO?

9   A    WELL, I PURCHASED A HOME THERE IN 1974, AND I HAD BEEN

10  RENTING IT OUT TO TOURISTS SINCE THAT TIME.  I REALLY WANTED TO

11  GO AND LIVE THERE.

12        I HAD SOME PROBLEMS IN GUADALAJARA WITH THE D.F.S.,

13  THE DIRECCION FEDERAL DE SEGURIDAD, WITH SOME OF THE CLIENTS

14  THAT I REPRESENTED; AND FOR THAT REASON, I WENT TO ACAPULCO.

15  Q    AND HOW LONG DID YOU STAY IN ACAPULCO?

16  A    I STAYED THERE ABOUT A YEAR.

17  Q    WHAT DID YOU DO AT THE END OF THAT YEAR?

18  A    WELL, I DIDN'T -- I WASN'T THERE THE ENTIRE YEAR.

19  SOMETIME -- I CAME BACK FOR A COUPLE OF MONTHS AND THEN I WOULD

20  GO BACK.  THE TRUTH IS, I GOT BORED THERE AND CAME BACK TO

21  GUADALAJARA BECAUSE I HAD NOTHING TO DO THERE.

22  Q    WHEN DID YOU RETURN TO GUADALAJARA?

23  A    IN THE -- IT WAS SOMETIME DURING 1980, PROBABLY ABOUT THE

24  MIDDLE PART OF 1980, THE EARLY PART OF 1980.

25  Q    AND DID YOU RESUME YOUR LAW PRACTICE?

1    A    WELL, I RETURNED TO THE OFFICE, BUT THE C.N.O.P. HAD

2    DECIDED TO MOVE FROM THAT AREA.  THE TWO FEDERAL DEPUTIES THAT

3    HAD HEADED UP THE OFFICE, NOMINALLY HEADED UP THAT OFFICE, WERE

4    GIVEN OTHER POSITIONS IN THE STATE GOVERNMENT; AND ONE IS THE

5    PRESENT MAYOR OF THE CITY OF ZAPOPANFAR AND THE OTHER IS THE

6    HEAD OF THE EDUCATION DEPARTMENT IN JALISCO.

7         AND SO THEY CLOSED THE OFFICE, AND I DECIDED NOT TO GO

8    ON, BECAUSE MOST OF THE CLIENTS THAT HAD BEEN MINE WERE NO

9    LONGER THERE; THEY KNEW THAT I HAD MOVED THE ACAPULCO.  MY MOVE

10   WAS SUPPOSED TO BE DEFINITE, SO THEY HAD NO REASON TO CONTINUE

11   COMING TO THE OFFICE.  SO I SOLD THE FURNITURE, AND IT WAS

12   MINE, AND I CANCELED THE LEASE.

13   Q    AND AT THIS TIME, THEN, DID YOU DECIDE TO TAKE UP ANOTHER

14   LINE OF WORK?

15   A    WELL, I NEEDED ANOTHER LINE OF WORK.

16        I WAS INTERESTED IN ELECTRONICS.  I'VE ALWAYS BEEN

17   INTERESTED IN ELECTRONICS.  I HAD INSTALLED A TWO-METER V.H.F.

18   COMMUNICATION SYSTEM IN THE CITY OF GUADALAJARA, JUST FOR MY

19   OWN PURPOSES, MY OWN USE.

20        SOME ATTORNEYS AND MEMBERS OF THE POLICE ORGANIZATIONS

21   SAW THIS SYSTEM, THEY SAW THAT IT WORKED, AND THEY BECAME

22   INTERESTED IN IT.  THAT LED ME TO OFFER MY SERVICES TO THEM AS

23   AN ELECTRONICS TECHNICIAN, A COMMUNICATIONS TECHNICIAN.

24   Q    NOW, HOW DID YOU OFFER YOUR SERVICES?

25   A    WELL, I INITIALLY MADE UP A RESUME' LISTING WHAT I'D DONE

1   IN MEXICO SINCE I'D COME AND LISTING WHAT I COULD DO WITH THE

2   COMMUNICATIONS SYSTEMS, AND I CIRCULATED IT AMONG POLICE

3   AGENCIES IN GUADALAJARA.

4   Q    AND DO YOU RECALL ABOUT WHEN THIS WAS THAT YOU CIRCULATED

5   THIS RESUME'?

6   A    THIS WAS THE LAST PART OF 1980, PROBABLY AROUND NOVEMBER OR

7   OCTOBER OR NOVEMBER 1980.

8   Q    WHY DID YOU CIRCULATE THE RESUME' SPECIFICALLY AMONG POLICE

9   AGENCIES?

10  A    WELL, BECAUSE OF MY WORK AS AN ATTORNEY, I HAD KNOWN MANY

11  OF THE POLICE AGENCIES.  I HAD BEEN DEFENDING A MEMBER OF THE

12  D.F.S. -- NOT DEFENDING HIM.  I'D BEEN ACCOMPANYING HIM TO

13  CHAPALA.

14         HE WAS BEING DEFENDED BY ANOTHER ATTORNEY WHO WAS A

15  FRIEND OF MINE.  AND HE WAS HE BEING TRIED ON A CHARGE IN

16  CHAPALA.

17         AND WHILE I WAS RIDING WITH HIM, I NOTICED THAT HE HAD

18  A V.H.F. RADIO THAT DIDN'T RECEIVE VERY WELL.  THEY REALLY HAD

19  SOME PROBLEMS WITH THEIR RADIO COMMUNICATIONS.  SO IT SEEMED

20  LIKE A NATURAL OPPORTUNITY FOR ME.

21  Q    WHAT AGENCIES DID YOU CIRCULATE THE RESUME' TO?

22  A    WELL, GENERALLY I CIRCULATED THE RESUME' WITH ALL THE

23  AGENCIES:  THE STATE JUDICIAL POLICE, THE FEDERAL JUDICIAL

24  POLICE THE D.F.S.

25         AT THE END.  I WAS GIVEN EMPLOYMENT BY A HIGH OFFICIAL

13-83

1   OF THE STATE JUDICIAL -- THE STATE POLICE DEPARTMENT, THE STATE

2   DEPARTMENT OF PUBLIC SECURITY; AND I WAS ALSO GIVEN EMPLOYMENT

3   BY ONE OF THE COMMANDANTS OF THE D.F.S.

4   Q   LET'S JUST GO BACK A BIT.  AS A RESULT OF YOUR CIRCULATING

5   THIS RESUME', DID YOU -- WELL DID ANYONE TAKE YOU UP ON YOUR

6   OFFER?

7   A   YES.  THESE TWO COMMANDANTS THAT I SPOKE OF, ONE OF WHOM

8   WAS A LIEUTENANT COLONEL WHO WAS THE HEAD OF THE SWAT TEAM IN

9   THE JALISCO STATE POLICE DEPARTMENT, AND THE OTHER WAS THE

10  COMMANDANT OF THE DIRECCION FEDERAL DE SEGURIDAD, THE D.F.S.

11  OFFICE IN GUADALAJARA.

12  Q   AND WHO WAS -- LET'S JUST DEAL WITH THE FIRST INDIVIDUAL,

13  THE HEAD OF THE SWAT TEAM.  HE WAS -- WELL, WHO WAS THAT?

14  A   HIS NAME WAS TENIENTE CORONEL ANTONIO GARATE BUSTAMANTE.

15          THE REPORTER:  YOUR HONOR --

16          THE COURT:  PULL THAT DOWN A LITTLE, PLEASE.

17          THE WITNESS:  (ADJUSTS MICROPHONE.)  LIEUTENANT

18  COLONEL ANTONIO GARATE BUSTAMANTE.

19  BY MR. CARLTON:

20  Q   AND WHAT DID YOU DO FOR HIM?

21  A   I DID NORMAL ELECTRONIC SECURITY WORK, WORKED THE SECURITY

22  SYSTEM FOR A HOUSE THAT HE WAS LIVING IN IN THE COLONIA LAS

23  FUENTES, ELECTRIC GATES, ELECTRIC FENCES, TELEVISION REPAIR,

24  CLOSED CIRCUIT TELEVISION INSTALLATION, TAPE RECORDINGS;

25  ANYTHING THAT HE ASKED ME TO DO IN THE ELECTRONICS LINE.

1    Q    AND WHEN WAS IT THAT YOU FIRST WORKED FOR HIM AND PERFORMED

2    THESE THINGS?

3    A    THIS WOULD HAVE BEEN PROBABLY SOMEWHERE AROUND CHRISTMAS

4    1980 OR THE VERY FIRST PART OF 1981.

5    Q    NOW, THEN, TURNING TO THE OTHER INDIVIDUAL YOU IDENTIFIED,

6    THE D.F.S. COMANDANTE?

7    A    HIS NAME WAS MARTINEZ, COMANDANTE MARTINEZ.  I DON'T KNOW

8    HIS FULL NAME, JUST COMANDANTE MARTINEZ.  HE WAS THE HEAD OF

9    THE D.F.S. OFFICE.

10          I ALSO WORKED FOR ANOTHER COMANDANTE CALLED EMILIO

11   ESCANDON, E  S  C  A  N  D  O  N.

12   Q    NOW, IN WHAT OFFICE WAS MARTINEZ A COMANDANTE, WHAT AREA?

13   A    COMANDANTE MARTINEZ WAS THE COMMANDANT OF THE DIRECCION

14   FEDERAL DE SEGURIDAD, THE D.F.S. OFFICE, IN GUADALAJARA.

15          MR. ESCANDON WAS THE COMMANDANT, I THINK, OF THE

16   DURANGO OFFICE.  I JUST DID SOME WORK FOR HIM IN GUADALAJARA.

17   Q    AND WHAT WORK DID YOU DO FOR THOSE INDIVIDUALS?

18   A    ELECTRONIC WORKS.  FOR ESCANDON, I FIXED HIS TELEVISION,

19   THE TELEVISION AT HIS HOUSE, AND I DID SOME WORK ON SOME RADIOS

20   THAT HE HAD WITH HIM.

21          AND FOR COMANDANTE MARTINEZ, ALMOST THE SAME KIND OF

22   WORK THAT I'D DONE FOR LIEUTENANT COLONEL GARATE, WHICH WAS

23   CLOSED CIRCUIT T.V. AND MAINTAINING THE V.H.S. RADIO SYSTEM

24   THAT HE HAD INSTALLED IN GUADALAJARA.

25   Q    NOW, IN RELATION TO THIS V.H.S. RADIO SYSTEM, DID YOU

13-85

1    ACTUALLY CREATE THIS SYSTEM?

2    A    NO, I DID NOT.

3    Q    SO YOU MAINTAINED AN EXISTING SYSTEM?

4    A    WELL, I HAD MADE SOME MODIFICATIONS TO IT, BUT IT WAS

5    ALREADY INSTALLED THERE.

6    Q    DURING -- WELL, WHEN DID YOU BEGIN TO WORK FOR THESE

7    COMANDANTES?

8    A    THIS WAS DURING THE FIRST PART OF 1981.

9    Q    DID YOU OBTAIN ANY ADDITIONAL EMPLOYMENT WITH OTHER LAW

10    ENFORCEMENT PERSONNEL?

11    A    AT THAT TIME, NO.  AS TIME WENT ON AND MY REPUTATION GREW

12    IN THE COUNTRY, I BEGAN TO GET INVITATIONS FROM OTHER

13    COMMANDANTS AROUND THE COUNTRY, AND I WOULD GO AND DO WORK FOR

14    THEM ON PIECEMEAL BASIS, TWO WEEKS HERE, THREE WEEKS THERE, A

15    MONTH IN OTHER PLACES IN MEXICO.  BUT AT THAT PARTICULAR TIME,

16    I WAS BASED IN GUADALAJARA.

17    Q    AND DURING WHAT PERIOD OF TIME, DID YOU PERFORM THIS

18    PIECEMEAL ELECTRONICS WORK FOR LAW ENFORCEMENT AGENCIES?

19    A    BETWEEN THE FIRST PART OF 1981 AND THE LATTER PART OF 1983.

20    I CONTINUED WORKING FOR ONE SPECIFIC COMMANDANT UNTIL 1984,

21    SEPTEMBER OF 1984.

22    Q    NOW, DURING THAT PERIOD, WAS THERE A PARTICULAR AGENCY FOR

23    WHICH YOU PERFORMED MOST OF YOUR WORK?

24    A    FROM 1983 UNTIL 1984, I WAS THE CHIEF OF COMMUNICATIONS FOR

25    THE I.P.S. OFFICE -- THAT'S INVESTIGACIONES POLITICAS Y

13-86

1    SOCIALES; THAT'S POLITICAL AND SOCIAL INVESTIGATIONS OF THE

2    MINISTRY OF INTERIOR OF MEXICO AND THE LOCAL COMMANDANT'S

3    OFFICE OF GUADALAJARA -- FROM THE LATE 19 -- FROM THE MIDDLE OF

4    1983 UNTIL THE END OF 1984.

5    Q    NOW, YOU REFERRED TO, I THINK, THE MINISTRY OF THE

6    INTERIOR.  IN SPANISH IS THAT THE --

7    A    SECRETARIO DE GOBERNACION.

8    Q    AND IS THE I.P.S., WHICH YOU'VE DESCRIBED, IS THAT AN ARM

9    OF THE GOBERNACION?

10   A    D.F.S. AND I.P.S. AT THAT TIME WERE BOTH AGENCIES OF THE

11   MINISTRY OF INTERIOR.

12   Q    NOW, DURING THE PERIOD THAT YOU PERFORMED THIS ELECTRONICS

13   WORK FOR THESE VARIOUS AGENCIES, WERE YOU ISSUED ANY KIND OF

14   CREDENTIALS?

15   A    WELL, I WAS GIVEN WHAT IS KNOWN AS AN OFICIO DE COMISION,

16   AN OFICIO DE COMISION IS A LETTER MADE UP ON THE LETTERHEAD OF

17   THE LOCAL COMMANDANT'S, OFFICE SIGNED BY THE LOCAL COMMANDANT.

18   IT HAS A PICTURE ON IT WITH A SEAL OVER THE PICTURE, A SEAL

19   UNDERNEATH THE NAME OF THE COMMANDANT.

20        IT'S NORMALLY WRAPPED IN PLASTIC AND REDUCED IN SIZE

21   AND PUT INSIDE A BADGE CASE.

22   Q    IS THERE SOME OTHER KIND OF CREDENTIAL?

23   A    THERE IS AN OFFICIAL CREDENTIAL, AGENT'S CREDENTIAL, BUT

24   THOSE ARE ISSUED IN MEXICO CITY AND THEY'RE ACTUALLY ISSUED ON

25   A SPECIAL MACHINE, LIKE THE MACHINERY THAT'S USED IN THE

1    DEPARTMENT OF MOTOR VEHICLES HERE IN CALIFORNIA TO ISSUE

2    LICENSES.  THE PICTURE IS INCORPORATED INTO THE CREDENTIAL.

3    Q    SO WHAT WAS THE AUTHORITY, THE EFFECT OF THE OFICIO DE

4    COMISION THAT YOU WERE --

5    A    THE OFICIO DE COMISION HAD THE SAME EFFECT AS THE NORMAL

6    CREDENTIALS.

7    Q    DID YOU OBTAIN MORE THAN ONE OF THOSE?

8    A    WELL, IN ALL, DURING THE PERIOD FROM 1981 UNTIL 1984, I

9    HELD THREE OFICIOS DE COMISION.

10   Q    CAN YOU DESCRIBE THOSE?

11   A    WELL, THEY'RE LETTERS WRITTEN ON THE LETTERHEAD OF THE

12   LOCAL COMMANDANT'S OFFICE DESCRIBING THE WORK THAT YOU'VE BEEN

13   ASSIGNED; IN MY CASE, COMMUNICATIONS WORK.  THE ONLY -- I WAS

14   THE COMMUNICATIONS TECHNICIAN FOR THE OFFICE.

15   Q    AND WERE ALL OF THOSE OFICIOS D.F.S. OFICIOS?

16   A    NO.  TWO WERE D.F.S. AND ONE WAS I.P.S.

17   Q    NOW, AT SOME POINT, WHILE YOU WERE PERFORMING THIS WORK FOR

18   THESE VARIOUS LAW ENFORCEMENT AGENCIES, DID YOU COME TO PERFORM

19   SOME WORK FOR ERNESTO FONSECA?

20   A    YES, I DID.

21   Q    DO YOU RECALL, WHEN DID YOU FIRST COME TO WORK FOR ERNESTO

22   FONSECA?

23   A    I FIRST WAS INTRODUCED TO ERNESTO FONSECA --

24           THE COURT:  WOULD YOU MOVE AWAY FROM THE MICROPHONE A

25   LITTLE, PLEASE.

13-88

1          THE WITNESS:  SURE.

2          MR. CARLTON:  PERHAPS IF YOU MOVE THE MICROPHONE OFF

3    TO THE SIDE OF YOUR FACE.

4          THE COURT:  EITHER THAT OR RAISE IT UP.  YOU DON'T

5    NEED TO BE RIGHT ON TOP OF IT.

6    BY MR. CARLTON:

7    Q    LET ME REPEAT THE QUESTION:  WHEN YOU DID HE FIRST COME TO

8    WORK FOR ERNESTO FONSECA?

9    A    IN 1981.

10   Q    AND HOW DID THAT COME ABOUT?

11   A    WELL, COMANDANTE MARTINEZ, IN THE LAST PART OF 1981, TOLD

12   ME THAT THEY HAD A COMMUNICATIONS PROBLEM AT A HOUSE THAT WAS

13   OCCUPIED BY SOME COMPANEROS.  THAT MEANS FELLOW OFFICERS, OR

14   PEOPLE THAT WORK TOGETHER.

15         I REPORTED TO THAT HOUSE AND IT TURNED OUT TO BE THE

16   SAME HOUSE THAT HAD BEEN OCCUPIED BY MR. GARATE, IN LAS

17   FUENTES.  AND I REPAIRED SOME RADIOS THAT THEY HAD INSTALLED

18   THERE.

19   Q    NOW, I BELIEVE IF YOU LOOK IN FRONT OF YOU, I'D LIKE YOU

20   TO -- WELL, THERE SHOULD BE TWO PHOTOGRAPHS, MARKED 56 A, AND

21   56 E.

22   A    WHERE IS THE NUMBER?

23   A    THERE'S A YELLOW TAG.  I DON'T BELIEVE THAT'S IT.  IT

24   SHOULD BE JUST BELOW.

25   A    WILL IT HAVE THE EXHIBIT NUMBER?

13-89

1    Q    YES?

2    A    (LOOKS THROUGH EXHIBITS.)

3            THE COURT:  HAVE YOU PLACED THOSE EXHIBITS THERE?

4            MR. CARLTON:  THAT WAS MY UNDERSTANDING.

5            THE WITNESS:  YES, THEY'RE HERE.  THEY'RE ON THE

6    BOTTOM.

7    BY MR. CARLTON:

8    Q    NOW, LOOKING AT 56 A  AND 56 B, DO YOU RECOGNIZE THOSE?

9    A    THESE ARE THE FRONT OF THE HOUSE IN LAS FUENTES, WHERE I

10   DID THE WORK THAT I DESCRIBED.  IT'S AT CIRCUNVALACION SUR NO.

11   113 IN LAS FUENTES.

12   Q    THOSE PHOTOGRAPHS ARE OF THE SAME HOUSE?

13   A    YES.  THERE'S THE SAME THING.  THEY GO LIKE THIS.  (HOLDS

14   PHOTOGRAPHS TOGETHER, SIDE-BY-SIDE.)

15           MR. CARLTON:  YOUR HONOR, I WOULD MOVE AT THIS TIME

16   THAT THOSE TWO BE RECEIVED.

17           THE COURT:  THEY MAY BE RECEIVED.

18           (EXHIBITS 56 A-B # RECEIVED IN EVIDENCE.)

19   BY MR. CARLTON:

20   Q    NOW, DID YOU CONTINUE TO WORK FOR ERNESTO FONSECA AFTER

21   THIS FIRST OCCASION THAT YOU'VE DESCRIBED?

22   A    WELL, ON THAT FIRST OCCASION, I DIDN'T MEET HIM, ACTUALLY.

23   I MET HIM TWO OR THREE DAYS LATER.

24           HE ENTRUSTED ME -- ENTRUSTED TO ME A SYSTEM OF -- A

25   RADIO COMMUNICATION SYSTEM THAT HAD BEEN INSTALLED BY SOMEBODY

13-90

1    ELSE.  IT WAS ACTUALLY A MARINE SHIP-TO-SHORE, HIGH FREQUENCY

2    SYSTEM.  THEY WERE SHIP RADIOS.

3             THE COURT:  THE QUESTION WAS:  DID YOU CONTINUE TO

4    WORK FOR HIM?

5             THE WITNESS:  YES, I DID.  WELL, IN THAT WAY, I

6    CONTINUED TO WORK FOR HIM.  THAT'S WHAT I WAS TRYING TO SAY.

7    BY MR. CARLTON:

8    Q    THEN MY NEXT QUESTION WAS:  WHAT DID YOU DO FOR HIM?

9    A    I TRIED TO MAKE THE RADIOS THAT HE HAD INSTALLED IN HIS

10   HOUSE AND AT VARIOUS RANCHES WORK, BUT THEY WERE OBVIOUSLY

11   UNSUITED TO THE TYPE OF COMMUNICATIONS THAT HE WANTED AND TO

12   THE TERRAIN IN WHICH THEY WERE INSTALLED.  AND, ALSO, THEY HAD

13   BEEN POORLY INSTALLED.  SO IT WAS IMPOSSIBLE.

14            BESIDES THAT, THE RADIOS WERE ALL ON THE FREQUENCIES

15   OF THE TELEPHONE COMPANY HERE IN THE UNITED STATES, THE

16   SHIP-TO-SHORE FREQUENCIES, AND ALSO THE U.S. COAST GUARD, AND

17   THAT DIDN'T SEEM TO BE PEOPLE WITH WHOM HE WANTED TO

18   COMMUNICATE.

19            COURTROOM:  (LAUGHTER.)

20   BY MR. CARLTON:

21   Q    SO BESIDES WORKING ON THIS SHIP-TO-SHORE COMMUNICATIONS

22   SYSTEM, DID YOU DO ANY OTHER KIND OF ELECTRONICS WORK FOR HIM?

23   A    WELL, NOT FOR HIM.  IF YOU SAY "FOR HIM," I DID FOR -- HE

24   HIMSELF AND HIS FAMILY.  I FIXED THE RADIOS AND THEIR

25   TELEVISIONS AND THEIR STEREOS, ANY KIND OF WORK THAT THEY GAVE

13-91

1   ME TO DO, IN THE LINE OF ELECTRONICS.

2   Q    AT SOME POINT, DID YOU -- DID YOU ACTUALLY COME TO LIVE IN

3   ERNESTO FONSECA'S RESIDENCE?

4   A    WELL, IN THE MIDDLE OF 1983, I WAS APPROACHED BY ONE OF MR.

5   FONSECA'S MEN AND ASKED AS TO JOIN THE PEOPLE THAT WORKED WITH

6   HIM, THE ORGANIZATION, OR THE GANG, OR WHATEVER YOU WOULD CALL

7   IT.

8           AT THE SAME TIME, THE COMMANDANT OF THE I.P.S. OFFICE,

9   SERGIO ESPINO --

10          THE COURT:  IS YOUR ANSWER YES, THAT YOU DID COME TO

11  LIVE WITH HIM?

12          THE WITNESS:  YES, I DID.

13          THE COURT:  ALL RIGHT.  THAT'S ALL YOU NEED TO SAY.

14          WE'LL TAKE OUR NOON RECESS AT THIS TIME.

15          THE CLERK:  PLEASE RISE.  THIS COURT IS NOW RECESS.

16          (NOON RECESS.)

17                      ---0---

18

19

20

21

22

23

24

25

13-92

1          LOS ANGELES + CALIFORNIA, WEDNESDAY, JUNE 6, 1990

2                          + 1:30 P.M.

3          (JURY PRESENT:)

4          THE COURT:  YOU MAY CONTINUE.

5

6    LAWRENCE V. HARRISON + PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

7

8                  DIRECT EXAMINATION + (RESUMED)

9    BY MR. CARLTON:

10   Q    MR. HARRISON, I BELIEVE WHEN WE LEFT OFF, YOU TESTIFIED

11   THAT AT SOME POINT YOU CAME TO LIVE IN ERNESTO FONSECA'S

12   RESIDENCE.  NOW, WHEN DID THAT OCCUR?

13   A    THAT OCCURRED IN JULY OF 1983.

14   Q    HOW DID THAT COME ABOUT?

15   A    I WAS INVITED BY A MEMBER OF HIS ENTOURAGE TO JOIN THE

16   GROUP AROUND HIM AT THE SAME TIME THAT THE COMMANDANT OF THE

17   I.P.S. OFFICE IN GUADALAJARA TOLD ME THAT I WOULD BE ASSIGNED

18   TO HELP HE AND HIS PEOPLE ESTABLISH A COMMUNICATIONS SYSTEM IN

19   THE CITY OF GUADALAJARA.

20   Q    WHO WAS THE I.P.S. COMANDANTE WHO TOLD THAT YOU?

21   A    THAT WAS SERGIO ESPINO VERDIN.  HE HADN'T REALLY TAKEN

22   OFFICE AT THAT TIME, BUT HE HAD BEEN APPOINTED AND HE WAS IN

23   GUADALAJARA ORGANIZING THE COMANDANCIA.

24   Q    HAD YOU KNOWN SERGIO ESPINO VERDIN PRIOR TO THAT TIME?

25   A    YES, I HAD.

1    Q    WHEN DID YOU FIRST MEET HIM?

2    A    I MET HIM SOMETIME IN 1982 IN MATAMOROS. HE WAS WITH A

3    GROUP OF AGENTS AROUND QUINTERO BENITEZ, WHO WAS A D.F.S.

4    COMMANDANT IN MATAMOROS. AND AT THAT TIME, I WENT UP AND DID

5    SOME WORK FOR THEM, A COMMANDANT KNOWN AS EL CACHO.

6    Q    AND WHEN WAS IT THAT YOU BECAME AWARE THAT SERGIO ESPINO

7    VERDIN HAD ASSUMED SOME POSITION IN GUADALAJARA?

8    A    HE CAME TO GUADALAJARA IN THE MIDDLE OF 1983. I SAW HIM

9    AND HE TOLD ME THAT HE'D BEEN APPOINTED THE COMMANDANT. I'D

10    ALREADY HEARD THAT.

11         MR. STOLAR:  OBJECT AND MOVE TO STRIKE THE HEARSAY.

12         THE COURT:  OVERRULED.

13         THE WITNESS:  HE TOLD ME HE'D BEEN APPOINTED

14    COMMANDANT. I'D ALREADY HEARD THAT. AND HE TOLD ME THAT --

15    WELL, HE TOLD ME HE'D BEEN APPOINTED TO COMMANDANT.

16    BY MR. CARLTON:

17    Q    ALL RIGHT. SO WHEN YOU MOVED INTO FONSECA'S HOUSE, YOU

18    BEGAN WORKING ON A COMMUNICATIONS SYSTEM FOR HIM?

19    A    YES.

20         THE COURT:  DON'T GET TOO CLOSE TO THE MIKE.

21         THE WITNESS:  YES, SIR. THANK YOU, YOUR HONOR.

22         HE -- FIRST OF ALL, THEY ASKED ME TO DESIGN A

23    COMMUNICATIONS SYSTEM.

24    BY MR. CARLTON:

25    Q    WAS THIS TO BE A COMMUNICATIONS SYSTEM THAT WAS DIFFERENT

1    FROM THE ONE THAT YOU HAD PREVIOUSLY BEEN MAINTAINING FOR HIM?

2    A    YES, IT WAS DIFFERENT.  IT WAS A NEW ONE.

3    Q    AND DID YOU IN FACT DESIGN A SYSTEM FOR ERNESTO FONSECA?

4    A    YES, I DID.

5    Q    DID YOU THEN HAVE OCCASION TO CREATE THIS SYSTEM FOR HIM?

6    A    YES, I DID.

7    Q    AND DURING WHAT PERIOD OF TIME DID IT TAKE YOU TO CREATE

8    THIS RADIO COMMUNICATIONS SYSTEM?

9    A    I DID THE PRELIMINARY MATHEMATICS AND THE PLOTS AND THE

10   EQUATIONS AND EVERYTHING IN JULY.  AND THAT SAME MONTH, THEY

11   SENT ME UP TO THE UNITED STATES TO PURCHASE THE COMPONENTS.

12   Q    THIS IS JULY OF 1983?

13   A    THAT'S RIGHT.

14   Q    DID YOU IN FACT PURCHASE THE COMPONENTS IN THE UNITED

15   STATES?

16   A    YES, I DID.

17   Q    AND DID YOU TAKE THEM BACK TO MEXICO?

18   A    YES, I DID.

19   Q    AND DID YOU THEN PUT THIS SYSTEM TOGETHER?

20   A    YES.

21   Q    COULD YOU, IN A GENERAL FASHION, DESCRIBE THE SYSTEM THAT

22   YOU PUT TOGETHER FOR ERNESTO FONSECA, THE RADIO COMMUNICATIONS

23   SYSTEM?

24   A    IT WAS A V.H.F. COMMUNICATIONS SYSTEM, VERY HIGH FREQUENCY.

25   IT HAD A 74 MEGAHERTZ OFFEST.  IT WAS SITUATED IN CHANNELS THAT

13-95

1    ARE PROPERTY IN MEXICO OF THE SOCIAL SECURITY OFFICE, BUT

2    THEY'RE NOT USED.

3         THAT WAS TO INSURE THAT THEY WOULD NOT BE INTERFERED

4    WITH BY OTHER PEOPLE AND THAT THEY WOULDN'T HAVE ANYBODY ELSE

5    ON THE FREQUENCIES.  THE SEPARATION OF THE FREQUENCIES WAS SO

6    THAT ANYBODY WHO WOULD BE LISTENING TO THE FREQUENT -- TO THE

7    FREQUENCIES WOULD NOT BE ABLE TO HEAR WHO WAS TALKING, THE

8    SEPARATION BETWEEN TRANSMISSION AND RECEPTION.

9         IT CONSISTED OF FOUR REPEATERS AND, INITIALLY, SOME 50

10   RADIOS.

11   Q   NOW, WHEN YOU SAY 50 RADIOS, ARE YOU REFERRING TO HAND-HELD

12   RADIOS?

13   A   IT WAS A SYSTEM THAT WAS DESIGNED TO ELIMINATE THE NEED FOR

14   OUTSIDE ANTENNAS ON THE CARS OR THE HOUSES, SO AS TO ELUDE

15   DETECTION.  IT WAS DESIGNED AROUND SENSITIVE REPEATERS THAT

16   COULD WORK WITH HAND-HELD RADIOS THAT WOULD NOT NEED TO BE

17   INSTALLED ANYWHERE AND WOULDN'T NEED ANY OUTSIDE APPARATUS.

18   Q   SO WERE THESE HAND-HELD RADIOS LOW-POWERED BROADCAST

19   RADIOS?

20   A   WELL, THEIR MAXIMUM OUTPUT IS FIVE WATTS INTO THE INPUT,

21   THE OUTPUT STAGE, THE LAST PART OF THE OUTPUT STAGE, WHICH

22   RESULTS IN AN OUTPUT OF ABOUT FOUR WATTS.

23   Q   WITH THESE RADIOS, JUST THE HAND-HELD RADIOS, WERE YOU ABLE

24   TO COMMUNICATE THROUGHOUT GUADALAJARA?

25   A   YES.  THROUGHOUT GUADALAJARA AND THE SURROUNDING AREA.

Q    WAS IT NECESSARY TO HAVE THESE REPEATERS FOR THAT TO BE POSSIBLE?

A    YES, IT WAS.

Q    AND CAN YOU JUST DESCRIBE IN A GENERAL FASHION, WHAT IS A REPEATER?

A    A REPEATER IS A WHOLE DUPLEX SIMULTANEOUS BROADCAST RADIO THAT IS PUT AT A HIGH OR A COMMANDING LOCATION SO THAT IT MAY RECEIVE BROADCASTS FROM LOW-POWER, LOW-ANTENNA, HAND-HELD OR MOBILE UNITS AND REBROADCAST THE SIGNAL, WITH A GREATER STRENGTH, TO A LARGER AREA.

Q    SO WITHOUT THE USE OF THE REPEATERS, WAS THE RANGE OF THE HAND-HELD RADIOS FAIRLY LIMITED?

A    YES, IT WAS.

Q    HOW LONG YOU DID YOU LIVE IN ERNESTO FONSECA'S RESIDENCE?

A    I LIVED IN HIS RESIDENCE APPROXIMATELY FOUR AND A HALF MONTHS.

Q    UNTIL WHEN?

A    UNTIL JANUARY -- THE END OF JANUARY OF 1984.

Q    NOW, WAS THIS THE RESIDENCE THAT YOU PREVIOUSLY DESCRIBED WHERE YOU WENT TO DO YOUR ORIGINAL WORK FOR HIM?

A    NO, IT WAS NOT.

Q    AND WHERE WAS THE HOUSE THAT YOU ACTUALLY LIVED?

A    IT WAS A HOUSE LOCATED ON TOPACIO AND CUARZO, A HOUSE IN RESIDENCIA LA VICTORIA.

Q    WHILE YOU WERE LIVING IN THIS HOUSE, DID YOU HAVE OCCASION

1   TO SEE ERNESTO FONSECA?

2   A   YES.  I SAW HIM EVERY DAY.

3   Q   NOW, IF YOU WOULD WOULD YOU, PLEASE LOOK AT WHAT HAS BEEN

4   MARKED FOR IDENTIFICATION AS EXHIBIT 17 IN FRONT OF YOU.

5   A   (HOLDS UP EXHIBIT.)

6   Q   DO YOU RECOGNIZE THAT?

7   A   IT'S ERNESTO FONSECA.

8           MR. CARLTON:  I WOULD MOVE THIS THIS BE RECEIVED.

9           THE COURT:  MAY BE RECEIVED.

10          (EXHIBIT 17 # RECEIVED IN EVIDENCE.)

11          MR. CARLTON:  AND REQUEST PERMISSION TO HAVE THE

12  WITNESS SHOW THE PHOTOGRAPH TO THE JURY.

13          THE COURT:  YOU HAVE MAY EXHIBIT THE PHOTOGRAPH.

14          THE WITNESS:  (COMPLIES.)

15  BY MR. CARLTON:

16  Q   NOW, IF YOU WOULD, MR. HARRISON, WOULD YOU PLEASE LOOK AT

17  THE PHOTOGRAPHS THAT HAVE BEEN MARKED -- WELL, STRIKE THAT.

18          WHILE YOU WERE LIVING AT THIS HOUSE -- MAY WE REFER TO

19  IT AS THE CUARZO HOUSE?

20  A   (NO AUDIBLE RESPONSE.)

21  Q   WHILE YOU WERE LIVING AT THE CUARZO HOUSE, WERE YOU BEING

22  PAID BY ERNESTO FONSECA?

23  A   WELL, NOT ON A -- IT WASN'T A REGULAR -- IT WASN'T AS IF I

24  WAS IN HIS EMPLOY, WITH A REGULAR PAYCHECK.  HE WOULD GIVE ME

25  MONEY, AS HE DID EVERYBODY IN CUARZO.

13-98

1       SOMETIMES HE WOULD SEE YOU AND TAKE OUT A LARGE AMOUNT

2    OF MONEY FROM HIS POCKET AND GIVE YOU WHATEVER HE WANTED TO AT

3    THAT TIME.

4    Q    NOW, AFTER THIS COMMUNICATIONS SYSTEM -- WELL, HOW LONG DID

5    IT TAKE TO YOU SET THIS THING UP AND GET IT IN OPERATION?

6    A    IT TOOK ME APPROXIMATELY TWO AND A HALF WEEKS TO BUILD THE

7    FIRST REPEATER.  I BROUGHT IT IN IN PIECES AND BUILT IT MYSELF

8    IN THE KITCHEN OF HIS HOUSE AND THEN I INSTALLED THE ENTIRE

9    SYSTEM.

10   Q    AND WHEN WAS IT RELATIVELY COMPLETE?

11   A    IT WAS COMPLETE BY THE LATTER PART OF SEPTEMBER OF 1984.

12   Q    AFTER THE SYSTEM WAS COMPLETED, DID YOU HAVE SOME

13   CONTINUING DUTIES WITH REGARD TO IT?

14   A    WELL, I HAD A GROUP OF PEOPLE WHO WERE ASSIGNED TO AID ME

15   IN MAINTAINING IT AND REPAIRING ALL THE RADIOS.  THERE WERE A

16   NUMBER OF REPEATER SITES THAT HAD TO BE -- THEY WERE MAINTAINED

17   BY BATTERIES.  WE HAD TO GO AND CHARGE THE BATTERIES AND ALIGN

18   THE REPEATERS AND CHECK THE ANTENNAS DAILY.

19   Q    DID YOU, IN THE COURSE YOUR WORK, IN MAINTAINING THIS

20   SYSTEM, HAVE OCCASION TO MAKE FREQUENT CHECKS ON HOW WELL THE

21   SYSTEM WAS PERFORMING?

22   A    AS THE SYSTEM ENGINEER, I LISTENED TO THE SYSTEM AND HAD

23   FULL CONTROL OF IT 24 HOURS A DAY DURING THE ENTIRE TIME THAT

24   IT WAS INSTALLED AND OPERATED.

25   Q    AND DID YOU NOTICE WHETHER THE RECEPTION ON THE SYSTEM WAS

1    EQUALLY GOOD THROUGHOUT THE CITY?

2    A    SUCH A SYSTEM, THE RECEPTION IS NEVER EQUALLY GOOD IN EVERY

3    AREA.

4    Q    WHY IS THAT?

5    A    BECAUSE OF THE TERRAIN, BECAUSE OF THE PROPAGATION OF THE

6    RADIO WAVES, BECAUSE OF OBSTACLES THAT MAY BE IN THE WAY

7    BETWEEN THE RECEIVER AND THE REPEATER, OR BETWEEN THE

8    TRANSMITTER AND THE REPEATER, OR BOTH.

9    Q    AND WAS IT PART OF YOUR JOB TO CONTINUALLY CHECK THE

10   RECEPTION QUALITY IN DIFFERENT PARTS OF THE CITY?

11   A    YES, IT WAS.

12   Q    AND, WELL, HOW MUCH OF YOUR TIME DID YOU SPEND DOING THAT?

13   A    IT WAS A 24-HOUR-A-DAY JOB.

14   Q    WAS ERNESTO FONSECA SATISFIED WITH THE SYSTEM THAT YOU HAD

15   SET UP FOR HIM?

16   A    WELL, HE WAS SATISFIED THAT IT WAS BETTER COMMUNICATION

17   THAN THEY HAD EVER HAD BEFORE, BUT HE CONSIDERED THAT IT SHOULD

18   BE SOMEWHAT LIKE WHAT HE SAW ON TELEVISION, MAYBE A DICK TRACY

19   WRISTWATCH OR SOMETHING, THAT NEVER BROKE DOWN AND NEVER HAD

20   ANY FADING OR -- HE DIDN'T UNDERSTAND ABOUT RADIOS.

21   Q    AND DID HE BECOME ANGRY WHEN IT DIDN'T WORK QUITE UP TO HIS

22   EXPECTATIONS?

23   A    HE BECAME ANGRY WHEN OTHER MEMBERS OF OTHER POLICE

24   ORGANIZATIONS, WHO HAD A DIFFERENT RADIO SYSTEM, INTIMATED TO

25   HIM THAT THEIRS WAS BETTER.

13-100

1    Q    AND DID HE EXPRESS THAT ANGER TO YOU IN SOME FASHION?

2    A    HE DID, UNTIL HE CHECKED THE TWO SYSTEMS AND FOUND OUT THAT

3    THAT WASN'T TRUE.

4    Q    NOW, DURING THE PERIOD THAT YOU WERE LIVING IN THIS

5    RESIDENCE, WAS ERNESTO FONSECA ALSO LIVING THERE?

6    A    YES, HE WAS.

7    Q    DID HE MAINTAIN AN OFFICE THERE, AS WELL?

8    A    YES.  HE HAD AN OFFICE IN HIS HOUSE.

9    Q    AND DID YOU PERFORM ANY NON-ELECTRONICS TYPE WORK FOR HIM

10   DURING THE PERIOD THAT YOU WERE LIVING AT HIS HOUSE?

11   A    AS I CONSIDERED HIM TO BE A SUPERIOR OFFICER, I DID

12   ANYTHING THAT I WAS ORDERED BY HIM TO DO; BY HIM OR ANY OF THE

13   OTHER GOBERNACION --

14          THE COURT:  YOU'VE ANSWERED THE QUESTION.

15          THE WITNESS:  YES.  THE ANSWER IS YES.

16   BY MR. CARLTON:

17   Q    WHY DID YOU CONSIDER HIM TO BE A SUPERIOR OFFICER?  WHAT DO

18   YOU MEAN BY THAT?

19   A    BECAUSE HE HAD A VALID I.P.S. INVESTIGATOR'S CREDENTIAL

20   FROM MEXICO CITY.

21   Q    DID YOU SEE THAT?

22   A    YES, I DID.

23   Q    WHEN DID YOU SEE IT?

24   A    I SAW IT IN THE FIRST -- LAST PART OF 1983.

25   Q    WHAT WAS THE OCCASION?

13-101

1    A    THEY USED IT TO SNIFF COCAINE IN THEIR OFFICE.

2    Q    ACTUALLY USED THE CREDENTIAL?

3    A    (NODS HEAD UP AND DOWN.)

4    Q    DID YOU HAVE OCCASION TO PERFORM ANY ESCORT SERVICES FOR

5    MR. FONSECA?

6    A    YES, I DID.

7    Q    AND DID HE ORDER YOU TO PERFORM SUCH SERVICES?

8    A    EITHER HE OR ONE OF HIS DEPUTIES DID, YES.

9    Q    HOW FREQUENTLY DID YOU DO THAT?

10   A    I DID IT FOUR TIMES.

11   Q    AND ON THESE OCCASIONS, WHAT WAS IT THAT YOU WERE ORDERED

12   TO DO?

13   A    I AND THOSE WHO WERE ORDERED TO GO WITH ME -- OR I WAS

14   ORDERED TO GO WITH THEM -- WOULD GO IN VEHICLES TO A

15   PREARRANGED MEETING SPOT AND ESCORT A CARAVAN OF VEHICLES BACK

16   TO GUADALAJARA.

17   Q    NOW, DO YOU KNOW WHY YOU WERE ASKED TO DO THIS?

18   A    EVERYBODY WHO WENT ALONG WAS ASKED BECAUSE THEY HAD A VALID

19   CREDENTIAL.

20   Q    AND WHAT WAS THE SIGNIFICANCE OF HAVING A VALID CREDENTIAL?

21   A    TO BE ABLE TO GET THROUGH ROADBLOCKS OR TO JUSTIFY THE USE

22   OF THE RED LIGHT AND SIREN, THE POLICE VEHICLES.

23   Q    ON THESE OCCASIONS WHEN YOU WENT, DID YOU TRAVEL IN

24   AUTOMOBILES?

25   A    YES, WE DID.

13-102

1   Q    HOW MANY?

2   A    BETWEEN ONE AND FOUR AUTOMOBILES IN EACH CARAVAN.

3   Q    AND WHERE DID YOU GO ON THESE OCCASIONS?

4   A    ON ALL FOUR OCCASIONS?

5   Q    YES?

6   A    WE WENT ONCE TO A RANCH CALLED BUENA -- TOWARDS A RANCH

7   CALLED BUENA, THAT WAS OWNED BY ERNESTO; ONCE TO MASCOTA;

8   ONCE -- AND TWICE TO OMECA (PHONETIC).

9   Q    WHERE IS OMECA?

10  A    OMECA IS IN GUADALAJARA.  IT'S IN THE STATE OF JALISCO.

11  IT'S ABOUT 25 MILES DIRECT FROM GUADALAJARA.

12  Q    AND WHERE IN RELATION TO GUADALAJARA IS MASCOTA?

13  A    IT'S IN THE HILLS, ALSO IN JALISCO.  IT'S A LITTLE BIT

14  FARTHER THAN OMECA, IN A DIFFERENT DIRECTION.

15  Q    NOW, WHEN YOU WENT ON THESE ESCORTS, YOU TRAVELED IN A CAR?

16  A    YES, I DID.

17  Q    HOW MANY OTHER PERSONS WENT WITH YOU?

18  A    THERE WERE NORMALLY FOUR PEOPLE IN EACH CAR.

19  Q    NOW, LET'S JUST FOCUS ATTENTION ON THE TRIP TO MASCOTA.  DO

20  YOU RECALL WHEN YOU WERE ASKED TO PARTICIPATE IN THAT INCIDENT?

21  A    IT WAS IN THE LATTER PART OF 1983.  I DON'T REMEMBER THE

22  EXACT DATE.

23         IT SHOULD HAVE BEEN AROUND OCTOBER -- NOVEMBER,

24  OCTOBER; MAYBE THE FIRST PART OF DECEMBER.  THE NIGHTS WERE

25  COLD.

1   Q   HOW MANY CARS WENT THERE, DO YOU KNOW?

2   A   TO MASCOTA?  WE TOOK TWO CARS.

3   Q   DID YOU KNOW WHERE YOU WERE GOING?

4   A   I DIDN'T, NO.

5   Q   AND WERE YOU DISPATCHED FROM ERNESTO FONSECA'S HOUSE?

6   A   YES.

7   Q   WERE YOU TOLD WHAT YOU WERE DOING?

8   A   IT WAS UNDERSTOOD.

9   Q   WHAT DID YOU UNDERSTAND?

10          MS. KELLY:  OBJECTION, YOUR HONOR.  LACK OF

11  FOUNDATION.

12          THE COURT:  OVERRULED.

13          THE WITNESS:  AS I UNDERSTOOD, BY THE WAY THE ORDER

14  WAS GIVEN, THAT WE WERE TO GO AND GIVE ESCORT DUTY.  WE WERE

15  EACH ISSUED A HIGH-POWERED RIFLE, AN AUTOMATIC RIFLE.  AND

16  THERE WERE FOUR OF US IN EACH CAR.  AND WE EACH HAD POLICE

17  CREDENTIALS AND THE CARS HAD RED LIGHTS AND SIRENS AND POLICE

18  INSIGNIA.  AND I UNDERSTOOD IT TO BE ESCORT DUTY.

19  BY MR. CARLTON:

20  Q   SO WHERE DID YOU GO IN THESE CARS?

21  A   WE WENT UP OUTSIDE THE CITY OF MASCOTA, WENT UP THE -- PART

22  OF IT WAS A ROAD THAT WAS BEING WORKED ON, STILL PART OF IT

23  UNPAVED.  AND WE WENT OUTSIDE OF THE CITY OF MASCOTA AND WAITED

24  FOR THE CARAVAN.

25  Q   HOW LONG DID YOU WAIT THERE?

13-104

1    A    ABOUT TWO HOURS.

2    Q    NOW, WHILE YOU WERE WAITING THERE, WAS THERE ANY DISCUSSION

3    AS TO WHERE THIS CARAVAN WAS COMING FROM, THE ONE YOU WERE

4    SUPPOSED TO MEET?

5         MR. STOLAR:  OBJECT TO THE HEARSAY.

6         THE COURT:  IF IT'S ACTUALLY A DISCUSSION, IT'S NOT

7    HEARSAY.

8         THE COURT:  YOU MAY ANSWER YES OR NO.

9         THE WITNESS:  YES.

10   BY MR. CARLTON:

11   Q    AND, YOU HAD THIS DISCUSSION WITH THE OTHER PERSONS WHO

12   WERE WAITING TO ESCORT THE CARAVAN?

13   A    WITH ONE OF THE OTHER PERSONS.

14   Q    AND IN THE COURSE OF THIS DISCUSSION, DID YOU LEARN WHO THE

15   SOURCE OF THE CARAVAN THAT YOU WERE TO MEET WAS?

16        MR. STOLAR:  I OBJECT TO THE HEARSAY.

17        THE COURT:  SUSTAINED.

18   BY MR. CARLTON:

19   Q    WELL, DID THE CARAVAN EVENTUALLY ARRIVE?

20   A    YES, IT DID.

21   Q    WHAT DID IT CONSIST OF?

22   A    IT CONSISTED OF TWO VEHICLES, TWO -- TWO FOUR-WHEEL-DRIVE

23   VEHICLES AND ONE SIX-TON STAKE-BED TRUCK.

24   Q    DID THEY APPEAR TO BE CARRYING ANYTHING?

25   A    THE TRUCK WAS COVERED WITH A TARPAULIN.  I COULDN'T TELL.

1   I ASSUME THAT IT WAS.

2   Q   ONCE THE TRUCKS ARRIVED, WHAT DID YOU DO?

3   A   THE CARS, OUR CARS, FORMED UP IN THE CARAVAN AND WE WENT

4   BACK TO GUADALAJARA.

5   Q   DID YOU LEAVE THE TRUCKS AT SOME POINT?

6   A   WE ALWAYS LEFT THE CARAVANS ONCE WE HAD GOTTEN WITHIN THE

7   AREA OF THE PERIFERICO OF GUADALAJARA, THE ACCESS ROAD AROUND

8   THE CITY OF GUADALAJARA.

9           AND ALWAYS, WHEN WE WERE INSIDE THE CITY, WE COULD GO

10  BACK TO ERNESTO'S HOUSE AND THE TRUCKS WOULD GO WHEREVER THEY

11  WERE GOING.

12  Q   SO DID YOU FOLLOW THIS SAME PROCEDURE ON EACH OF THESE FOUR

13  OCCASIONS?

14  A   YES.

15  Q   NOW, DURING THE PERIOD THAT YOU WERE LIVING AT ERNESTO

16  FONSECA'S RESIDENCE, DID YOU HAVE OCCASION TO SEE OTHER PERSONS

17  THERE BESIDES YOU AND MR. FONSECA?

18  A   YES.

19  Q   DID YOU SEE ANY LAW ENFORCEMENT AGENTS THERE?

20  A   I GENERALLY SAW AGENTS FROM EACH OF THE CORPORATIONS THAT

21  WERE ON DUTY IN THE CITY OF GUADALAJARA.

22  Q   WHEN YOU SAY "CORPORATIONS," WHAT DO YOU MEAN BY THAT?

23  A   I MEAN THE FEDERAL JUDICIAL POLICE, THE STATE JUDICIAL

24  POLICE, THE D.F.S. OFFICE, THE I.P.S. OFFICE, AND THE ARMY, AND

25  SOMETIMES THE FEDERAL JUDICIAL MILITARY POLICE.

13-106

1   Q    WELL, HOW DO YOU KNOW THAT THE PERSONS YOU SAW WERE

2   AFFILIATED WITH THOSE AGENCIES?

3   A    SOME OF THEM WERE FRIENDS OF MINE AND I KNEW WHERE THEY

4   WERE WORKING, AND OTHERS HAD THEIR CREDENTIALS WITH THEM AND

5   WOULD GO ALONG WITH US ON THE CARAVANS.

6        OTHERS WERE ASSIGNED TO SPECIFIC DUTIES WHERE IT WAS

7   NECESSARY THAT THEY TAKE OUT THEIR CREDENTIALS, SHOWING

8   THEMSELVES TO BE MEMBERS OF THOSE CORPORATIONS.

9        AND THE -- AS FAR AS THE ARMY IS CONCERNED, THE CHIEF

10  OF STAFF OF THE 15TH MILITARY ZONE WORE HIS UNIFORM

11  Q    DID YOU SEE ANY BODYGUARDS WHILE AT FONSECA'S HOUSE?

12  A    WELL, ESSENTIALLY EVERYTHING -- EVERYBODY FROM MR. FONSECA

13  ON DOWN WAS A BODYGUARD.

14  Q    SO WERE PERSONS AT THIS RESIDENCE NORMALLY ARMED?

15  A    YES, THEY WERE.

16  Q    WAS THERE A GROUP OF LAW ENFORCEMENT PERSONNEL WHO WERE

17  NORMALLY AT THE HOUSE?

18  A    YES.

19  Q    HOW MANY SUCH PERSONS?

20  A    WELL, IT WAS ON A ROTATING BASIS.  NORMALLY, THERE WERE

21  BETWEEN 30 AND 40 PEOPLE THERE AT ALL TIMES.

22  Q    NOW, IN THE TIME THAT YOU WERE LIVING WITH MR. FONSECA AND

23  WORKING FOR HIM, DID YOU HAVE OCCASION TO SEE HIM MEETING WITH

24  VARIOUS PERSONS?

25  A    YES, I DID.

1    Q    AND ASSOCIATING WITH THEM SOCIALLY?

2    A    YES, I DID.

3    Q    AND BASED UPON YOUR OBSERVATIONS OF THE PERSONS HE MET WITH

4    AND SOCIALIZED WITH, COULD YOU ASCERTAIN ANY SORT OF HIERARCHY

5    IN HIS RELATIONS WITH VARIOUS PERSONS?

6              MR. STOLAR:    OBJECT.    NO FOUNDATION FOR THIS.

7              MR. NICOLAYSEN:    CALLS FOR SPECULATION.

8              MR. STOLAR:    CALLS FOR SPECULATION.

9              THE COURT:    YES.    SUSTAINED.

10   BY MR. CARLTON:

11   Q    ALL RIGHT.    DID YOU NOTICE WHETHER HE TREATED SOME PERSONS

12   DIFFERENTLY THAN OTHERS?

13   A    YES, I DID.

14   Q    AND DID HE AFFORD CERTAIN PERSONS MORE DEFERENCE THAN

15   OTHERS, IN YOUR EXPERIENCE?

16   A    YES.

17   Q    AND IN WHAT WAY WOULD HE AFFORD DEFERENCE TO A PARTICULAR

18   INDIVIDUAL?

19   A    IF I MAY, IT WAS MORE THAT THERE WAS A LACK OF DEFERENCE ON

20   THE PART OF SOME INDIVIDUALS THAT THEY WERE HIS EQUALS.

21   Q    CAN YOU EXPLAIN THAT A LITTLE MORE, WHAT YOU MEAN BY THAT?

22   A    THERE WAS A GROUP OF PEOPLE WHO, LIKE HIM, WERE FROM THE

23   SAME STATE.    THEY SPOKE TO EACH OTHER ON A FAMILIAR BASIS, THEY

24   EACH HAD THEIR OWN RETINUES OF PEOPLE, THEY WERE BOSSES IN

25   THEIR OWN RIGHT, THEY DID NOT TAKE ORDERS FROM EACH OTHER, BUT

1   GAVE ORDERS TO THEIR OWN PERSONAL BODYGUARDS AND SOMETIMES TO

2   THE RETINUES OF THE OTHER BOSSES, AND THEY MET TOGETHER TO MAKE

3   DECISIONS WITHOUT ALLOWING OTHER PEOPLE TO BE PHYSICALLY

4   PRESENT OR CLOSE TO THEM.

5   Q    WELL, WAS THIS A DEFINED GROUP?  CAN YOU IDENTIFY PERSONS

6   IN THAT GROUP?

7   A    YES, I CAN.

8   Q    WHO WERE THEY?

9   A    THERE WERE ERNESTO FONSECA CARRILLO, RAFAEL CARO QUINTERO,

10  MIGUEL ANGEL FELIX GALLARDO, JUAN JOSE ESPARRAGOZA, JAVIER

11  BARBA HERNANDEZ, MANUEL SALCIDO UZETA.

12  Q    NOW, DOES JUAN ESPARRAGOZA HAVE A NICKNAME?

13  A    EL AZUL.

14  Q    AND MANUEL SALCIDO, DOES HE ALSO HAVE A NICKNAME?

15  A    COCHILOCO.

16  Q    AND WERE THESE THE PERSONS WITH WHOM MANUEL FONSECA, IN

17  YOUR EXPERIENCE, TREATED AS EQUALS?

18  A    YES, THEY WERE.

19  Q    DID YOU SEE HIM MEETING PRIVATELY WITH THOSE INDIVIDUALS?

20  A    YES, I DID.

21  Q    HOW OFTEN WOULD HE DO THAT?

22  A    IN MY PRESENCE, I SAW HIM MEETING TOGETHER WITH THEM 20 OR

23  30 TIMES.

24  Q    DID YOU EVER HAVE OCCASION TO BE AT SOCIAL FUNCTIONS WHERE

25  THESE INDIVIDUALS WERE PRESENT?

1    A    YES, I DID.

2    Q    AND WAS THERE SOME DIFFERENTIATTION AT THESE TYPES OF

3    SOCIAL FUNCTIONS IN THE VARIOUS LOCATIONS THAT PEOPLE WHO

4    ATTENDED THE FUNCTIONS COULD ENTER?

5         MS. KELLY:  OBJECTION, YOUR HONOR.  VAGUE AND

6    AMBIGUOUS.

7         THE COURT:  WHAT IS THE OBJECTION?

8         MS. KELLY:  YES, YOUR HONOR.

9         I'M SORRY.  VAGUE AND AMBIGUOUS, THE QUESTION IS

10   VAGUE.

11        THE COURT:  OVERRULED.

12        THE WITNESS:  YES, THERE DEFINITELY WAS THAT TYPE OF

13   SEGREGATION.

14   BY MR. CARLTON:

15   Q    WELL, WHAT KIND OF SEGREGATION WAS IT?  HOW DID IT --

16   A    THE COMMON DENOMINATOR AT THESE PARTIES WAS THE SMOKING OF

17   COCAINE BASE CIGARETTES.  AND THE BOSSES WOULD SMOKE WITH EACH

18   OTHER, AND THE OTHER MEMBERS OF THE RETINUES HAD TO -- THE ONES

19   WHO WEREN'T MAKING THE CIGARETTES OR SERVING THE TABLES OR

20   WAITING ON THEM HAD TO GATHER IN OTHER ROOMS OF THE HOUSE OR

21   THE LOCATION.

22   Q    AND DID YOU SEE THE INDIVIDUALS WHOM YOU'VE JUST IDENTIFIED

23   ENGAGE IN THIS KIND OF ACTIVITY TOGETHER?

24   A    YES, I DID.

25   Q    NOW, HAVE YOU EVER -- WELL, HAVE YOU EVER MET RAFAEL CARO

1    QUINTERO?

2    A    YES, I HAVE.

3    Q    DO YOU KNOW HIM?

4    A    YES, I DO.

5    Q    AND I'D ASK TO YOU LOOK AT SOME PHOTOGRAPHS IN FRONT OF YOU

6    THAT HAVE BEEN MARKED AS 16 A  AND 16 B.

7    A    (SEARCHES THROUGH PHOTOGRAPHS.)

8    Q    I BELIEVE THEY'RE TOGETHER.

9    A    (EXAMINES EXHIBITS.)   YES.

10   Q    DO YOU RECOGNIZE THOSE PHOTOGRAPHS?

11   A    YES.  BOTH OF THESE ARE OF RAFAEL CARO QUINTERO.

12        MR. CARLTON:  YOUR HONOR, IF THESE HAVE NOT ALREADY

13   BEEN RECEIVED, I WOULD MOVE THAT THEY BE RECEIVED AT THIS TIME.

14        THE COURT:  I BELIEVE THEY HAVE BEEN RECEIVED, BUT IF

15   NOT, THEY WILL BE.

16        (EXHIBITS 16 A-B # RECEIVED IN EVIDENCE.)

17   BY MR. CARLTON:

18   Q    DID YOU EVER HAVE OCCASION TO PERFORM ANY ELECTRONICS OR

19   COMMUNICATIONS WORK FOR CARO?

20   A    YES, I DID.

21   Q    WHAT DID YOU DO FOR HIM?

22   A    I ASSISTED IN THE PURCHASE, MAINTENANCE AND INSTALLATION OF

23   A SYSTEM THAT WAS INSTALLED IN QUEVORTAS (PHONETIC), SONORA, IN

24   1982 WITHOUT MEETING HIM; BUT IT WAS HIM, HE LATER TOLD ME.

25   AND THEN HE JOINED WITH ERNESTO IN THE USE OF A SYSTEM THAT I

1    HAD INSTALLED IN 1983 IN GUADALAJARA.

2    Q    WAS THIS THE SYSTEM UTILIZING THE HAND-HELD RADIOS AND THE

3    REPEATERS --

4    A    YES, IT WAS.

5    Q    -- THAT YOU'VE ALREADY DESCRIBED?

6         DID YOU ASSIGN CALL SIGNALS FOR PERSONS TO USE WHEN

7    THEY WERE USING THAT RADIO SYSTEM?

8    A    I DID NOT ASSIGN THE ORIGINAL CALL SIGNALS, BUT I DID

9    ASSIGN THE CALL SIGNALS TO THE GROUP OF RAFAEL CARO QUINTERO

10   AND HIS MEN.

11   Q    WHEN WAS THAT?

12   A    IT WOULD HAVE BEEN NOVEMBER -- PROBABLY NOVEMBER, AROUND

13   NOVEMBER, OF 1983.  THEY ARRIVED AFTER THE ORIGINAL CALL

14   SIGNALS HAD BEEN ASSIGNED.

15   Q    WHAT WAS THE PURPOSE OF THESE CALL SIGNALS?

16   A    TO DISTINGUISH THEM FROM THE PEOPLE WHO WERE ALREADY NAMED,

17   WITH OTHER CALL SIGNALS IN THE SYSTEM.

18   Q    SO HOW WOULD SOMEONE USE A CALL SIGNAL THAT HAD BEEN

19   ASSIGNED TO HIM?

20   A    BY CALLING IT OUT ON THE RADIO.

21   Q    JUST TO LET ANYONE KNOW WHO WAS ON THE OTHER END?

22   A    YES.

23   Q    AND WHAT CALL SIGNAL DID YOU ASSIGN TO CARO.

24   A?   "ERE UNO."

25   Q    IN ENGLISH WHAT WOULD THAT BE?

—

1  A    R   ONE.

2  Q    DID YOU HEAR HIM ACTUALLY USE THAT OVER THE RADIO SYSTEM?

3  A    YES.  HE BECAME QUITE PROUD OF IT.

4  Q    DID YOU EVER SEE CARO AND FONSECA ACTUALLY WORKING

5  TOGETHER?

6  A    YES, I DID.

7  Q    WHEN DID YOU FIRST SEE THEM DOING THAT?

8  A    I SAW THEM LATE IN THE YEAR OF 1982.  I CAME TO THE HOUSE

9  IN LAS FUENTES.

10         YES, I SAW THEM IN 1982.

11  Q    WHAT WERE THEY DOING WHEN YOU CAME TO THAT HOUSE?

12  A    ERNESTO FONSECA SENT TO MY HOUSE -- I LIVED AROUND THE

13  CORNER FROM THAT HOUSE IN LAS FUENTES, AND HE SENT FOR ME TO

14  COME OVER TO HIS HOUSE.

15         WHEN I ARRIVED THERE, HE AND RAFA WERE SITTING AT A

16  DESK MAKING TELEPHONE CALLS, ASKING PEOPLE TO PAY THE MONEY

17  THEY OWED.  THEY WERE TALKING IN SUMS OF 100,000; 200,000; 3 OR

18  400,000 DOLLARS.  THEY MADE VARIOUS CALLS.

19         SOMETIMES MR. FONSECA WOULD DEFER TO TO MR. CARO;

20  SOMETIMES MR. ACUNA WOULD DEFER TO MR. FONSECA.  SOMETIMES THEY

21  WOULD BOTH SPEAK ON THE PHONE CALL TO THE SAME DELINQUENT

22  DEBTOR.

23  Q    AND WAS THIS SOMETHING THAT YOU EVER SAW REPEATED?

24  A    WELL, IT WAS THE MOST STRIKING EXAMPLE, BUT I DID SEE IT

25  REPEATED, IN A LESSER WAY.

1    Q    DID YOU EVER HEAR ERNESTO FONSECA REFER TO CARO AS HIS

2    PARTNER?

3    A    YES, I DID.

4    Q    AND VICE VERSA?

5    A    YES.

6    Q    NOW, DID YOU KNOW MIGUEL ANGEL FELIX GALLARDO?

7    A    YES.

8    Q    HOW DID COME TO MEET HIM?

9    A    I MET HIM THROUGH ERNESTO FONSECA AND RAFAEL CARO QUINTERO.

10   Q    THIS WAS DURING THE PERIOD THAT YOU WERE LIVING WITH

11   FONSECA?

12   A    I HAD MET HIM BEFORE THAT.

13   Q    HOW MANY TIMES AFTER THAT DID YOU MEET HIM?

14   A    IN TOTAL, 20 OR 25.

15   Q    WERE YOU ON A FIRST-NAME BASIS WITH HIM?

16   A    WELL, WE HAD TO SAY "DON," "DON MIGUEL."  IT WASN'T EXACTLY

17   A FIRST NAME.

18   Q    IF YOU WOULD LOOK TO YOUR RIGHT, PLEASE, AT THE PHOTOGRAPH

19   ON THE EASEL, DO YOU RECOGNIZE THAT?

20   A    YES.  THAT IS MIGUEL ANGEL FELIX GALLARDO.

21   Q    NOW, WAS FELIX AMONG THE GROUP THAT YOU PREVIOUSLY

22   DESCRIBED THAT TREATED EACH OTHER AS EQUALS?

23   A    YES, HE WAS.

24   Q    AND HE MET PRIVATELY, IN YOUR EXPERIENCE, WITH CARO AND

25   FONSECA AND THE OTHERS?

13-114

1    A    YES.

2    Q    DID YOU EVER HEAR CARO -- OR LET'S SAY:  DID YOU EVER HEAR

3    FONSECA REFER TO FELIX AS HIS PARTNER?

4    A    YES, I DID.

5    Q    AND DID FELIX EVER DISCUSS WITH YOU WHETHER HE HAD SOME

6    BUSINESS RELATIONSHIP WITH ERNESTO FONSECA?

7    A    NO, HE DID NOT.

8    Q    HOW ABOUT CARO QUINTERO?

9    A    NO.

10   Q    DID ERNESTO FONSECA OBTAIN COCAINE FROM FELIX GALLARDO?

11   A    I BELIEVE HE DID, ON ONE OCCASION, YES, THAT I KNOW OF.

12   Q    WHAT WAS THAT OCCASION?

13   A    IT WAS AN OCCASION IN WHICH A LARGE SHIPMENT OF COCAINE

14   BASE CAME FROM A SOUTHERN LOCATION -- I DON'T KNOW WHERE -- IT

15   LANDED IN GUADALAJARA AND WAS MADE INTO COCAINE AT A WAREHOUSE

16   IN GUADALAJARA.  AND MR. FONSECA TOLD ME THAT THE SHIPMENT HAD

17   BEEN ARRANGED THROUGH A FRIEND OF MIGUEL ANGEL FELIX GALLARDO.

18          MS. KELLY:  YOUR HONOR, I WOULD MOVE TO STRIKE THE

19   WITNESS'S LAST PORTION OF THE TESTIMONY AS NONRESPONSIVE.  I

20   BELIEVE THE QUESTION WAS WHETHER HE KNEW ABOUT A PARTICULAR

21   SHIPMENT THAT BELONGED TO FONSECA.  I DON'T BELIEVE THE

22   WITNESS'S ANSWER WAS RESPONSIVE TO THE QUESTION.

23          THE COURT:  THE MOTION IS GRANTED.  THE ANSWER WILL BE

24   STRICKEN.

25   BY MR. CARLTON:

13-115

1    Q    ALL RIGHT.  DID YOU EVER -- WERE YOU EVER INFORMED AS TO

2    WHERE THIS COCAINE HAD COME FROM?

3    A    JUST THAT IT HAD COME FROM THE SOUTH.

4    Q    AND DID YOU EVER LEARN FROM WHOM IT HAD COME?

5            MS. KELLY:  OBJECTION, YOUR HONOR.  HEARSAY.

6            THE COURT:  SUSTAINED.

7    BY MR. CARLTON:

8    Q    NOW, WAS THERE A TIME -- DID THERE COME A TIME, TO YOUR

9    KNOWLEDGE, WHEN FELIX HAD A DISAGREEMENT OF SORTS WITH FONSECA

10   AND CARO?

11   A    YES.  THERE DID.

12   Q    AND WHEN WAS THAT?

13   A    THE LAST PART OF 1983 AND ALL DURING 1984.

14   Q    DID HE EXPRESS TO WHAT YOU THIS DISAGREEMENT WAS?

15   A    YES, HE DID.

16   Q    WHAT WAS IT?

17           MS. KELLY:  YOUR HONOR, I'M SORRY, BUT VAGUE AND

18   AMBIGUOUS AS TO WHO "HE" IS.

19           THE COURT:  OVERRULED.

20           THE WITNESS:  MR. FELIX GALLARDO TOLD ME THAT BOTH MR.

21   FONSECA AND MR. CARO WERE TOO WILD, THAT THEY WERE ATTRACTING

22   TOO MUCH ATTENTION, AND THAT HE DIDN'T WANT TO BE AROUND THEM;

23   THOUGH HE HAD TO CONTINUE BUSINESS WITH THEM, THAT HE DIDN'T

24   WANT TO BE AROUND THEM ANY LONGER BECAUSE THEY WERE TOO ROWDY.

25           MR. NICOLAYSEN:  OBJECTION, YOUR HONOR.  THAT'S

13-116

1    HEARSAY.  MOVE TO STRIKE.

2            THE COURT:  SUSTAINED.  THE ANSWER IS ORDERED

3    STRICKEN.

4            MR. CARLTON:  YOUR HONOR, CO-CONSPIRATOR'S STATEMENT.

5            THE COURT:  STRICKEN.

6    BY MR. CARLTON:

7    Q    YOU DID YOU KNOW AN INDIVIDUAL NAMED JAVIER BARBA

8    HERNANDEZ?

9    A    YES, I DID KNOW HIM.

10   Q    HOW DID YOU KNOW HIM?

11   A    I HAD KNOWN HIM IN THE 1970'S, WHEN HE WAS A STUDENT

12   ACTIVIST; I KNEW HIM IN THE 1980'S WHEN HE WAS A I.P.S.

13   FUNCTIONARY IN GUADALAJARA; AND I KNEW HIM AT ERNESTO FONSECA'S

14   HOUSE, AS A MEMBER OF MR. FONSECA'S RETINUE, FIRST, AND LATER

15   HIS PARTNER.

16   Q    AND WHEN DID HE FIRST MAKE AN APPEARANCE AT ERNESTO

17   FONSECA'S HOUSE, TO YOUR KNOWLEDGE?

18   A    IN 1983.

19   Q    AND DID YOU SEE HIM THERE THROUGHOUT THE REMAINDER OF THE

20   TIME THAT YOU LIVED AT THE HOUSE?

21   A    YES, I DID.

22   Q    I'D ASK TO YOU LOOK AT WHAT HAS BEEN MARKED AS EXHIBIT 41.

23   A    (COMPLIES.)

24   Q    DO YOU RECOGNIZE THAT PHOTOGRAPH?

25   A    IT'S JAVIER BARBA HERNANDEZ.

1          MR. CARLTON:  I WOULD MOVE THAT THIS BE RECEIVED.

2          THE COURT:  IT MAY BE RECEIVED.

3          (EXHIBIT 41 # RECEIVED IN EVIDENCE.)

4    BY MR. CARLTON:

5    Q    NOW, HOW FREQUENTLY DID YOU SEE HIM AT ERNESTO FONSECA'S

6    HOUSE?

7    A    DAILY.

8    Q    DID YOU EVER HEAR JAVIER BARBA GIVE ANY ORDERS?

9    A    YES, I DID.

10   Q    DID HE GIVE ANY TO YOU?

11   A    YES, HE DID.

12   Q    AND AT SOME POINT, DID YOU NOTICE A CHANGE IN HIS

13   RELATIONSHIP WITH ERNESTO FONSECA?

14   A    YES, I DID.

15   Q    WHAT DID YOU NOTICE?

16   A    I NOTICED THAT FROM BEING HIS LIEUTENANT, HE BECAME HIS

17   EQUAL, OR HIS PARTNER.

18   Q    WHEN DID THIS OCCUR?

19   A    ABOUT IN DECEMBER OF 1983 AND ALL DURING 1984.

20   Q    NOW, YOU'VE DISCUSSED SERGIO ESPINO VERDIN.  AT SOME POINT.

21   DID HE ASSUME AN OFFICIAL POSITION IN GUADALAJARA?

22   A    YES, HE DID.

23   Q    WHEN WAS THAT?

24   A    THAT WAS AROUND SEPTEMBER OR OCTOBER OF 1983.

25   Q    WHAT POSITION DID HE HAVE AT THAT TIME?

1  A    HE ASSUMED THE POSITION OF COMMANDANT OF THE OFFICE OF THE

2  INVESTIGACIONES POLITICAS Y SOCIALES IN GUADALAJARA.

3  Q    THAT'S THE I.P.S.?

4  A    THAT'S RIGHT.

5  Q    DID HE ISSUE YOU AN I.P.S. CREDENTIAL?

6  A    YES, HE DID.

7  Q    DID YOU THEN REPORT TO HIM AS YOUR SUPERIOR?

8  A    YES, I DID.

9  Q    DID HE EVENTUALLY ACQUIRE ANOTHER POSITION IN ADDITION TO

10  HIS POSITION AS I.P.S. COMANDANTE?

11  A    HE WAS THE I.P.S. COMMANDANT AND HE WAS ALSO THE

12  COORDINATOR OF THE GOBERNACION OFFICES IN GUADALAJARA.

13  Q    NOW, CAN YOU DESCRIBE WHAT A COORDINATOR IS, WHAT FUNCTION

14  THAT HAS?

15  A    THE VARIOUS POLICE OFFICES IN GUADALAJARA, OR ANY OTHER OF

16  THE AREAS IN MEXICO, OFTEN MAKE OFFICIAL REQUESTS, ONE TO THE

17  OTHER, SUCH AS ALLOWING GOODS TO GO THROUGH THE CUSTOMS AT THE

18  AIRPORT, ASKING FOR COOPERATION FROM ONE OF THE OTHER POLICE

19  CORPORATIONS.

20         AND SO THAT THE PERSONALITY OF THE PERSON MAKING THE

21  REQUEST SHOULD NOT BE CONFUSED, IT WAS ORDERED THAT ALL SUCH

22  REQUESTS GO THROUGH A UNIFIED SPOKESMAN.  THAT WAS THE

23  COORDINATOR.

24         MR. NICOLAYSEN:   YOUR HONOR, I OBJECT.  LACK OF

25  FOUNDATION AS TO PERSONAL KNOWLEDGE.  HIS KNOWLEDGE APPEARS TO

1    BE BASED ON HEARSAY.  IT CALLS FOR SPECULATION AS TO WHAT OTHER

2    PEOPLE THOUGHT AND THE REASON FOR DECISIONS.

3              THE COURT:  OVERRULED.

4    BY MR. CARLTON:

5    Q    IF YOU WOULD, PLEASE LOOK AT WHAT HAS BEEN MARKED FOR

6    IDENTIFICATION AS EXHIBIT 87?

7    A    (COMPLIES.)

8    Q    DO YOU RECOGNIZE THAT?

9    A    YES, I DO.

10   Q    AND WHAT IS IT?

11   A    COMANDANTE SERGIO ESPINO VERDIN.

12   Q    IT'S A PHOTOGRAPH OF HIM?

13   A    YES.

14             MR. CARLTON:  I WOULD MOVE THAT THIS BE RECEIVED.

15             THE COURT:  IT MAY BE RECEIVED.

16             (EXHIBIT 87 # RECEIVED IN EVIDENCE.)

17   BY MR. CARLTON:

18   Q    DID YOU EVER SEE ESPINO VERDIN AT FONSECA'S HOUSE?

19   A    YES, I DID.

20   Q    HOW FREQUENTLY?

21   A    DAILY.

22   Q    WAS HE ASSIGNED A CALL SIGNAL ON THE RADIO SYSTEM?

23   A    YES, HE WAS.

24   Q    AND HOW WOULD YOU CHARACTERIZE HIS RELATIONSHIP WITH

25   FONSECA, FROM WHAT YOU COULD SEE?

13-120

1   A   THEY WERE VERY CLOSE.

2   Q   DID YOU KNOW AN INDIVIDUAL NAMED VIELMA?

3   A   YES, I DID.

4   Q   WHAT'S HIS FULL NAME?

5   A   COMANDANTE MIGUEL ANGEL VIELMA.

6   Q   AND HOW DID YOU KNOW HIM?

7   A   I HAD KNOWN HIM IN ACAPULCO IN THE 70'S.  I KNEW HIM DURING

8   THE 80'S AS THE D.F.S. COMMANDANT.  I KNEW HIM IN 1983 AS THE

9   COMMANDANT OF THE D.F.S. OFFICE IN ZACATECAS, ZACATECAS.

10  Q   DID YOU PERFORM ANY WORK FOR HIM?

11  A   YES I DID.

12  Q   WHAT DID YOU DO FOR HIM?

13  A   I MAINTAINED HIS PERSONAL COMMUNICATIONS SYSTEM IN HIS

14  HOUSE AT LA CALMA (PHONETIC), I REPAIRED HIS TELEVISIONS AND

15  HIS STEREOS, AND I GAVE HIM CONSULTATION AND REPAIR ON THE

16  D.F.S. NETWORK IN ZACATECAS IN 1983.

17  Q   NOW, DID YOU EVER SEE HIM ASSOCIATING WITH ERNESTO FONSECA?

18  A   YES, I DID.

19  Q   HOW OFTEN?

20  A   EVERY DAY.

21  Q   WELL, WHEN YOU SAY "EVERY DAY," DURING WHAT PERIOD?

22  A   1983 UNTIL 19 -- TILL SEPTEMBER OF 1984, HE WAS IN DAILY

23  CONTACT WITH FONSECA.

24  Q   WAS THIS SOMETIMES BY RADIO?

25  A   ALWAYS BY RADIO.  THAT'S HOW I KNOW HE WAS IN CONTACT.

1   Q   YOU MONITORED HIS RADIO COMMUNICATIONS?

2   A   24 HOURS DAY.

3   Q   NOW, WAS THERE A TIME THAT YOU NOTICED THAT ERNESTO FONSECA

4   AND SOME OF US ASSOCIATES WERE ABSENT FOR EXTENDED PERIODS?

5   A   YES, I WAS.

6   Q   WHEN DID THAT OCCUR?

7   A   JUST AFTER NOVEMBER, THE LATTER PART OF NOVEMBER, AND FROM

8   THAT TIME ON, 1983, THEY BEGAN TO ABSENT THEMSELVES TOGETHER

9   FROM THE HOUSE IN GUADALAJARA.

10   Q   AND WHO WERE THE PERSONS WHO ABSENTED THEMSELVES TOGETHER?

11   A   MR. BARBA, MR. FONSECA, MR. CARO, MIGUEL ANGEL FELIX, AND

12   COCHILOCO.

13   Q   THAT'S MANUEL SALCIDO?

14   A   YES, ALSO KNOWN AS EL GALLO DEL ORO.

15   Q   NOW, DID YOU EVER LEARN WHY THESE INDIVIDUALS WERE ABSENT?

16        MS. KELLY:  OBJECTION, YOUR HONOR.  HEARSAY, LACK OF

17   PERSONAL KNOWLEDGE, AND LACK OF FOUNDATION.

18        THE COURT:  YES.  SUSTAINED.  LAY A FOUNDATION.

19   BY MR. CARLTON:

20   Q   DO YOU KNOW AN INDIVIDUAL NAMED RUBEN ZUNO ARCE?

21   A   YES, I DO.

22   Q   HOW LONG HAVE YOU KNOWN HIM?

23   A   I'VE KNOWN OF HIM AND SEEN HIM FREQUENTLY SINCE THE 1970'S

24   ON.

25   Q   HOW DID YOU COME TO FIRST MEET HIM?

13-122

1    A    WHEN I STARTED STUDYING LAW IN GUADALAJARA, I WAS ASSISTED

2    BY HIS FATHER, DON GUADALUPE, AFTER HAVING GIVEN A SERIES OF

3    CONFERENCES IN A CLUB CALLED PRINCE OMIR (PHONETIC) IN

4    GUADALAJARA.  FROM THAT TIME ON, I KNEW HIM, HIS BROTHERS, FROM

5    MANY CONTACTS IN THE LEGAL SCENE, IN THE POLITICAL SCENE IN

6    GUADALAJARA -- I ALSO WORKED FOR THE POLITICAL PARTY -- AND I

7    SAW HIM MANY TIMES.

8    Q    WHEN WAS THE LAST TIME THAT YOU SAW HIM?

9    A    THE LAST TIME I SAW MR. ZUNO WAS AT A QUINCEANIERO,

10   QUINCEANOS PARTY, FOR ALICIA SANCHEZ FLORES IN 1989.

11   Q    WHAT IS A QUINCEANOS PARTY?

12   A    A COMING OUT PARTY FOR A GIRL, A YOUNG GIRL WHO HAS TURNED

13   15 YEARS OF AGE.

14   Q    I SEE.  NOW, MR. HARRISON, I WOULD ASK YOU TO IT STAND UP,

15   LOOK AROUND THE COURTROOM, AND SEE IF YOU SEE RUBEN ZUNO ARCE.

16   A    I DON'T HAVE TO.  MR. ZUNO IS SITTING RIGHT OVER THERE NEXT

17   TO THE LADY IN WHITE.  HE HAS GLASSES ON.

18        THE COURT:  THE RECORD WILL REFLECT THAT THE WITNESS

19   HAS INDICATED MR. ZUNO.

20   BY MR. CARLTON:

21   Q    NOW, DRAWING YOUR ATTENTION, MR. HARRISON TO THE MONTH OF

22   NOVEMBER IN 1983, DID YOU HAVE OCCASION AT THAT TIME TO ATTEND

23   A PARTY IN GUADALAJARA?

24   A    YES, I DID.

25   Q    AND WHERE DID THIS PARTY TAKE PLACE?

13-123

1    A    THE PARTY TOOK PLACE AT THE HOUSE IN LAS FUENTES ON

2    CIRCUNVALACION SUR, C I R C U N V A L A C I O N,

3    S  U  R, 113, LA COLONIA LAS FUENTES.

4    Q    NOW, IS THIS THE HOUSE YOU PREVIOUSLY DESCRIBED AS BEING

5    THE FIRST HOUSE YOU WENT TO WHEN YOU BEGAN WORKING FOR MR.

6    FONSECA?

7    A    YES.  I INSTALLED THE SECURITY SYSTEM AT THAT HOUSE, FOUR

8    TIMES.

9    Q    DO YOU RECALL WHEN THIS PARTY OCCURRED?

10   A    IT OCCURRED IN THE LATTER PART OF 1983.

11   Q    AND WHAT WAS THE OCCASION?

12   A    I UNDERSTOOD THAT IT WAS BIRTHDAY PARTY FOR RAFAEL CARO

13   QUINTERO.

14            MR. STOLAR:  MOVE TO STRIKE THE HEARSAY.

15            THE COURT:  OVERRULED.

16   BY MR. CARLTON:

17   Q    WHAT -- WELL, WHAT WAS YOUR FUNCTION AT THIS PARTY?

18   A    I WAS SENT BY MR. FONSECA IN THE AFTERNOON -- THE PARTY WAS

19   AT NIGHT.

20            I WAS SENT BY MR. FONSECA IN THE EARLY AFTERNOON TO

21   CHECK ON THE SECURITY SYSTEM, INSTALL SOME COMMUNICATION SETS,

22   TAKE SOME BEER, CASES OF BEER, AND SUPPLIES FOR THE PARTY, AND

23   IN GENERAL MAKE MYSELF HELPFUL.

24   Q    DID YOU REMAIN THERE THEN, UNTIL THE PARTY BEGAN?

25   A    I REMAINED THERE UNTIL ABOUT 12 O'CLOCK MIDNIGHT.

13-124

1    Q    AND WHEN DID THE PARTY BEGIN?

2    A    IT BEGAN AROUND 3 O'CLOCK IN THE AFTERNOON.

3    Q    DO YOU RECALL HOW MANY PEOPLE ARRIVED AT THAT PARTY?

4    A    THERE WERE PROBABLY 175, 200, MAYBE 250 PEOPLE.

5    Q    DID YOU SEE RAFAEL CARO QUINTERO THERE?

6    A    YES, I DID.

7    Q    ERNESTO FONSECA?

8    A    YES.

9    Q    MIGUEL FELIX?

10   A    YES.

11   Q    WERE THERE ANY LAW ENFORCEMENT OFFICERS THERE?

12   A    WELL, ALMOST ALL OF OUR OFFICE, I.P.S., WAS THERE.  THERE

13   WERE 20 OR 30 STATE JUDICIAL POLICE AGENTS; A NUMBER OF FEDERAL

14   JUDICIAL POLICE AGENTS; TWO PEOPLE FROM THE ARMY, IN UNIFORM;

15   PEOPLE THAT WERE NORMALLY AT THESE TYPES OF AFFAIRS -- OF

16   OCCASIONS.

17   Q    DID YOU SEE MR. ZUNO THERE?

18   A    I SAW DON RUBEN GREET MR. CARO AT THE PARTY.

19   Q    NOW, WHAT WAS CARO DOING AT THAT TIME?

20   A    MR. CARO WAS ON TOP OF A HORSE.  HE WAS MAKING A HORSE

21   DANCE.  THEY HAD PURCHASED SOME HORSES THAT HAD BEEN TAUGHT TO

22   DANCE BY THE CABALLERANDO -- A HORSE TRAINER -- OF A FAMOUS

23   MEXICAN SINGER, AND THEY WERE DANCING THESE HORSES TO MUSIC.

24        MR. CARO WAS SMOKING A BASE CIGARETTE AND SEATED ON

25   TOP OF THE HORSE MAKING IT DANCE.  WHEN MR. ZUNO APPEARED, HE

13-125

1   WALKED OVER TO HIM, MR. CARO GOT DOWN OFF THE HORSE, AND THEY

2   EMBRACED EACH OTHER IN AN ABRAZO, WHICH IS A WAY OF GREETING.

3   AND THAT'S WHAT I SAW.

4   Q    DO YOU RECALL ANY CLOTHING THAT MR. ZUNO WAS WEARING AT

5   THAT TIME?

6   A    I REMEMBER THAT I WAS SURPRISED TO SEE DON RUBEN THERE.  HE

7   WAS DRESSED AS -- LIKE A COWBOY, IN A CASUAL OUTFIT, AND HE HAD

8   ON A KIND OF A COWBOY HAT.

9   Q    NOW, DID ANYTHING UNUSUAL HAPPEN AT THAT PARTY THAT YOU

10  REMEMBER?

11  A    A NUMBER OF THINGS.

12       MS. KELLY:  YOUR HONOR, I HAVE AN OBJECTION TO THIS,

13  YOUR HONOR.  RELEVANCE.

14       THE COURT:  OVERRULED.

15  BY MR. CARLTON:

16  Q    DO YOU REMEMBER THERE BEING A LIMOUSINE AT THIS PARTY?

17  A    YES, I DO.

18  Q    AN DO YOU REMEMBER AN INCIDENT CONCERNING THAT LIMOUSINE?

19  A    YES, I DO.

20  Q    WHAT WAS THAT INCIDENT?

21  A    MR. FONSECA HAD TAKEN THE DELIVERY OF AN ARMOR-PLATED

22  LIMOUSINE.  IT WAS A FORD L.T.D.  STRETCH LIMOUSINE FROM MEXICO

23  CITY.

24       HE HAD ORDERED ME TO REMOVE THE U.H.F. RADIO TELEPHONE

25  EQUIPMENT, WHICH WAS GENERALLY USED IN MEXICO CITY, FROM THE

13-126

1   CAR AND TO INSTALL THE V.H.F. EQUIPMENT WHICH IS USED IN

2   GUADALAJARA.  AFTER THAT THE LIMOUSINE WAS TAKEN TO THIS HOUSE

3   AND PARKED IN THE BACKYARD.

4        THEY HAD ASKED ME, MR. FONSECA AND MR. CARO, HAD ASKED

5   ME TO GIVE THEM INFORMATION ON THE BULLETPROOFING IN THE

6   LIMOUSINE.  I OBTAINED THE INFORMATION AND EXPLAINED TO THEM

7   THAT SOME THINGS WERE LACKING ON THE LIMOUSINE.

8        MR. CARO TOOK AN AK-47 RIFLE AND FIRED OFF A ROUND OF

9   BULLETS AT THE WINDSHIELD, WHICH ALL ROCOCHETED OFF, AND HE

10  SAID THAT MY OBJECTIONS WERE UNNECESSARY; THAT AS FAR AS HE WAS

11  CONCERNED, IT WAS GUARANTEED.

12  Q   NOW, DID YOU EVER SEE MR. ZUNO AT MR. FONSECA'S RESIDENCE?

13  A   I SAW DON RUBEN COME THERE ONE TIME.  HE WAS LED INTO THE

14  GATE, THE GATE THAT WAS IN THE GARAGE.  HE WAS TAKEN DIRECTLY

15  TO MR. FONSECA'S OFFICE.  THEY WERE THERE TOGETHER 45 MINUTES,

16  PERHAPS AN HOUR, AND THEN MR. ZUNO LEFT.

17  Q   DO YOU RECALL WHEN THAT OCCURRED?

18  A   IT WAS SOMETIME AFTER NOVEMBER OF 1983.  I WOULD ASSUME

19  THAT IT WAS SOMEWHERE IN THE FIRST PART OF DECEMBER.

20  Q   NOW, ARE YOU FAMILIAR WITH THE RESIDENCE AT 881 LOPE DE

21  VEGA IN GUADALAJARA?

22  A   I'M FAMILIAR WITH THE OUTSIDE OF IT, ITS LOCATION.

23  Q   I WOULD ASK YOU TO LOOK AT SOME PHOTOGRAPHS IN FRONT OF YOU

24  THAT HAVE BEEN IDENTIFIED AS 12 A  AND 12 B.

25  A   (COMPLIES.)  YES.

1   Q   DO YOU RECOGNIZE THOSE PHOTOGRAPHS?

2   A   YES, I DO.

3   Q   WHAT ARE THEY?

4   A   THEY ARE PHOTOGRAPHS OF THE OUTSIDE FRONT OF AND PART OF

5   THE HOUSE, OF THE HOUSE AT LOPE DE VEGA.

6   Q   WAS THERE EVER A TIME WHEN DRIVING PAST THAT HOUSE THAT YOU

7   OVERHEARD A RADIO TRANSMISSION FROM CARO?

8   A   YES, THERE WAS.

9   Q   AND DID YOU NOTICE SOMETHING UNUSUAL ABOUT THAT RADIO

10   TRANSMISSION?

11   A   I NOTICED THAT IT WAS COMING DIRECTLY FROM THAT HOUSE,

12   BECAUSE OF THE MANIPULATIONS THAT I MADE ON MY RADIO.

13   Q   AND WHAT DID YOU NOTICE ABOUT THE TRANSMISSION THAT LED YOU

14   TO THAT CONCLUSION?

15   A   THAT WOULD NEED A TECHNICAL EXPLANATION.  DO YOU WANT THE

16   TECHNICAL EXPLANATION?

17   Q   DID YOU NOTICE ANY CHANGES IN THE STRENGTH OF YOUR

18   RECEPTION?

19   A   YES, I DID.

20   Q   AND AT THAT TIME, WERE YOU LISTENING TO THE HAND-HELD RADIO

21   PORTION OF THE BROADCAST?

22   A   I WAS LISTENING TO ALL PORTIONS OF THE BROADCAST.

23   Q   WELL, DID SOMETHING ELSE HAPPEN AS YOU DROVE PAST THIS

24   HOUSE?

25   A   THE PERSON I WAS WITH TOLD ME THAT --

13-128

1          MR. STOLAR:  OBJECTION.

2          MS. KELLY:  OBJECTION, YOUR HONOR.  HEARSAY.

3          MR. STOLAR:  HEARSAY.

4          THE COURT:  WHAT HAPPENED IS WHAT THE QUESTION WAS,

5    NOT WHAT SOMEBODY TOLD YOU.

6          THE WITNESS:  THAT'S WHAT HAPPENED.

7          COURTROOM:  (LAUGHTER.)

8          THE COURT:  RESTATE YOUR QUESTION.

9    BY MR. CARLTON:

10   Q    WHAT WAS CARO QUINTERO SAYING AS YOU DROVE PAST THE HOUSE?

11         MR. STOLAR:  OBJECTION.  HEARSAY.

12         THE COURT:  OVERRULED.

13         THE WITNESS:  MR. CARO WAS UPBRAIDING ONE OF THE

14   MEMBERS OF MR. FONSECA'S HOUSEHOLD WHO HAD BEEN SENT TO A RANCH

15   CALLED BUENA AS A PUNISHMENT FOR SOMETHING HE HAD DONE IN MR.

16   FONSECA'S HOUSE.

17         THIS MAN HAD LEFT THE RANCH AND COME BACK TO

18   GUADALAJARA, SAYING ON THE RADIO HE HAD COME BACK TO LOOK FOR A

19   TRACTOR PART.  MR. CARO WAS UPBRAIDING HIM FOR LEAVING THE

20   RANCH AND REAPPEARING IN THE CITY OF GUADALAJARA.

21         MR. STOLAR:  MOVE TO STRIKE.  HEARSAY, NOT

22   CONNECTED --

23         THE COURT:  YES, THAT MAY BE STRICKEN.

24   BY MR. CARLTON:

25   Q    IN ANY EVENT, THE PERSON ON THE RADIO YOU IDENTIFIED AS

13-129

1   CARO QUINTERO?

2   A   YES, I DID.

3   Q   NOW, DO YOU KNOW WHEN THIS EVENT OCCURRED?

4   A   IT WAS JANUARY OR FEBRUARY OF 1984.

5   Q   HOW CAN YOU -- WELL, ALL RIGHT.

6       DID YOU HAVE OCCASION TO RETURN TO THAT HOUSE AT A

7   LATER TIME?

8   A   YES, I DID.

9   Q   AND WHY WAS THAT?

10  A   I WAS ASKED TO GO THERE.

11  Q   BY WHOM?

12  A   BY JAVIER BARBA HERNANDEZ.

13  Q   WHEN DID HE ASK YOU TO DO THIS?

14  A   HE ASKED ME IN THE LATTER PART OF AUGUST OF 1984.

15  Q   AND WHAT DID HE ASK YOU TO GO THERE FOR?

16  A   HE ASKED ME TO GO AND SEE ABOUT SOMETHING ABOUT THE GATE

17  SYSTEM THAT WAS AT THAT HOUSE.

18  Q   DID YOU DO THAT?

19  A   YES, I DID.

20  Q   AND WHAT HAPPENED WHEN YOU WENT THERE?

21  A   I KNOCKED ON THE GATE, WHEN A CARETAKER CAME OUT, TOLD ME

22  THAT MR. CARO WASN'T THERE AND THAT I WOULD HAVE TO COME BACK

23  LATER.

24  Q   HAD YOU BEEN SENT TO DO SOME WORK FOR CARO?

25  A   I HAD BEEN SENT TO DO SOME WORK ON THAT HOUSE.  I WAS TOLD

9

1   BY MR. BARBA THAT IT WAS RAFA'S HOUSE, AND WOULD I GO AND LOOK

2   AT THE GATE SYSTEM.

3   Q    NOW, DID THERE COME A TIME WHEN YOU LEFT MR. FONSECA'S

4   RESIDENCE, STOPPED LIVING THERE?

5   A    YES, I DID.  YES, THAT TIME DID COME.

6   Q    WHY WAS THAT?  WHY DID YOU MOVE OUT?

7            MS. KELLY:  OBJECTION, YOUR HONOR.  RELEVANCE.

8            THE COURT:  OVERRULED.

9            THE WITNESS:  I LEFT MR. FONSECA'S RESIDENCE BECAUSE

10  THE TYPES OF DUTIES THAT HE WAS GIVING ME AND THE TIME THAT HE

11  REQUIRED OF ME AT HIS RESIDENCE, THE 24-HOUR-A-DAY BASIS, WERE

12  INCOMPATIBLE WITH THE DUTIES THAT I HAD TO MAINTAIN HIS

13  ELECTRONIC SYSTEM AND ALSO INCOMPATIBLE OF WITH THE ADDITIONAL

14  DUTIES THAT I HAD OF MAINTAINING THE SYSTEMS OF THE D.F.S. AND

15  I.P.S. OFFICES IN GUADALAJARA AT THE SAME TIME.

16  BY MR. CARLTON:

17  Q    WHILE YOU WERE LIVING AT THIS HOUSE, DID MR. FONSECA ALLOW

18  YOU TO SEE YOUR FAMILY?

19  A    VERY LITTLE.

20  Q    SO AFTER YOU MOVED OUT OF THE HOUSE -- WHICH WAS WHEN?

21  A    IN JANUARY OF 1984.

22  Q    -- DID YOU CONTINUE TO PERFORM WORK FOR MR. FONSECA?

23  A    YES, I DID.

24  Q    AND WAS THIS THE SAME KIND OF ELECTRONICS COMMUNICATIONS

25  WORK THAT YOU'VE PREVIOUSLY DESCRIBED?

13-131

1    A    YES, IT WAS.

2    Q    AND HOW LONG DID YOU CONTINUE PERFORMING THAT WORK?

3    A    UNTIL SEPTEMBER THE 11TH OF 1984.

4    Q    NOW, AT SOME POINT PRIOR TO THAT, DID YOU TRY TO EXTRICATE

5    YOURSELF FROM THIS RELATIONSHIP WITH MR. FONSECA?

6    A    MANY TIMES PRIOR TO THAT.

7    Q    AND WHAT WAS IT THAT YOU DID IN ORDER TO EXTRICATE YOURSELF

8    FROM THE RELATIONSHIP?

9    A    I ASKED MR. FONSECA, AND I SENT HIM MESSAGES ON MANY

10   DIFFERENT OCCASIONS, ASKING HIM WHO I COULD GIVE THE EQUIPMENT

11   TO, AND WOULD HE ALLOW ME TO RETIRE FROM HIS SERVICE.

12   Q    WHAT WAS HIS RESPONSE?

13   A    HE NEVER RESPONDED TO ME AT ALL.

14   Q    SO YOU MAINTAINED THIS RADIO EQUIPMENT, CONTINUED TO

15   MAINTAIN IT?

16   A    YES, I DID.  IT WAS MY RESPONSIBILITY.  I HAD BEEN ORDERED

17   TO DO SO, BUT I DIDN'T WANT TO KEEP ON DOING IT.

18   Q    NOW, DID YOU AT SOME POINT LEARN THAT SOMEONE ELSE WAS

19   USING THIS RADIO SYSTEM?

20   A    YES, I DID.

21   Q    WHEN DID YOU LEARN OF THAT?

22   A    IN JULY OF 1984.

23   Q    HOW DID YOU LEARN OF IT?

24   A    PEOPLE -- THERE WERE TWO TYPES OF INTERFERENCES ON THE

25   SYSTEM.  ONE WAS AN ADJACENT CHANNEL INTERFERENCE.  THAT IS,

13-132

1    INTERFERENCE ON A CHANNEL SO CLOSE TO ONE OF THE REPEATER

2    CHANNELS OF OUR SYSTEM THAT IT ACTUALLY BROKE INTO OUR SYSTEM,

3    BUT WAS UNINTELLIGIBLE.

4         AND THE OTHER WAS A DIRECT INTERFERENCE, BY SOMEBODY

5    ACTUALLY BROADCASTING ON OUR CHANNEL AND INSULTING MR. FONSECA

6    AND COMANDANTE SERGIO.

7    Q    DID YOU RECEIVE ANY INSTRUCTIONS OR DIRECTIONS AS A RESULT

8    OF THAT INTERFERENCE?

9    A    YES.  MR. CARO, MR. FONSECA, MR. BARBA HERNANDEZ ORDERED ME

10   ON MANY OCCASIONS TO FIND THE PEOPLE RESPONSIBLE AND PRESENT

11   THEM TO HIM.

12   Q    NOW, WHEN DID YOU RECEIVE THESE INSTRUCTIONS FOR THE FIRST

13   TIME?

14   A    EVERY TIME THERE WAS AN INTERFERENCE.

15   Q    AND THIS CONTINUED OVER WHAT PERIOD OF TIME?

16   A    IT CONTINUED OVER A PERIOD OF ONE TO TWO MONTHS.

17   Q    DID MR. FONSECA BECOME ANGRY WITH YOU ABOUT THIS?

18   A    HE WAS MORE ANGRY AT THE PEOPLE WHO WERE INTERFERING, AND

19   HIS ANGER WAS DIRECTED TOWARDS ME.

20   Q    DID IT ANGER HIM WHEN YOU ASKED TO RETURN THE EQUIPMENT TO

21   HIM?

22        MR. NICOLAYSEN:  YOUR HONOR, OBJECTION.  IRRELEVANT.

23        THE COURT:  SUSTAINED.

24   BY MR. CARLTON:

25   Q    DID YOU EVENTUALLY LOCATE THE SOURCE OF THIS INTERFERENCE?

1    A    I LOCATED BOTH SOURCES OF INTERFERENCE.

2    Q    AND WHAT WERE THEY?

3    A    THE ADJACENT CHANNEL INTERFERENCE WAS A GROUP OF PEOPLE

4    FROM SINALOA, WHO WERE BEING COORDINATED ON THE COMMUNICATIONS

5    CHANNEL BY AN ATTORNEY FROM GUADALAJARA.

6            THE DIRECT CHANNEL INTERFERENCE WAS BEING DONE BY

7    ELEMENTS UNDER THE COMMAND OF PABLO ALLEMAN DIAZ, WHO HAD

8    STOLEN ONE OF MR. FONSECA'S REPEATERS AND INSTALLED IT AS A

9    SWAT TEAM BASE IN GUADALAJARA.

10           MR. NICOLAYSEN:  OBJECTION.  MOVE TO STRIKE AS

11   HEARSAY, YOUR HONOR, AND LACK OF FOUNDATION AS TO PERSONAL

12   KNOWLEDGE AND IT'S IRRELEVANT.

13           THE COURT:  SUSTAINED.  STRIKE THE ANSWER.

14   BY MR. CARLTON:

15   Q    WELL, HOW DID YOU LEARN THAT THIS ATTORNEY HAD THIS RADIO?

16           MR. NICOLAYSEN:  OBJECTION.  ASSUMES A FACT NOT IN

17   EVIDENCE.  YOUR HONOR HAS ALREADY STRICKEN THE ANSWER.

18           MS. KELLY:  YOUR HONOR, ALSO OBJECTION TO THIS OF LINE

19   QUESTIONING AS IRRELEVANT.

20           MR. NICOLAYSEN:  I JOIN IN THAT, YOUR HONOR.

21           THE COURT:  OVERRULED.  WE DON'T TAKE OBJECTIONS TO

22   LINES OF QUESTIONING, JUST TO QUESTIONS.

23           MS. KELLY:  WELL, THEN, YOUR HONOR, I OBJECT TO THE

24   QUESTION ON THE BASIS OF RELEVANCE.

25           MR. NICOLAYSEN:  AND, YOUR HONOR, THE QUESTION WAS

13-134

1    FRAMED BASED ON THE PREVIOUS ANSWER.

2            THE COURT:  WELL, YOU'RE MAKING OBJECTIONS AFTER I'VE

3    SUSTAINED YOUR PRIOR OBJECTION.  THERE HAS BEEN NO NEW

4    QUESTION.

5            MR. NICOLAYSEN:  THERE HAS, YOUR HONOR, AND I'M

6    OBJECTING TO THE NEW QUESTION.

7            THE COURT:  RESTATE YOUR QUESTION, COUNSEL.

8    BY MR. CARLTON:

9    Q    WHEN WAS THE LAST QUESTION YOU WORKED, PERFORMED ANY WORK,

10   FOR ERNESTO FONSECA?

11   A    SEPTEMBER 11TH 1984.

12   Q    DID SOMETHING HAPPEN ON THAT DATE THAT MADE YOU UNABLE TO

13   WORK FOR MR. FONSECA ANY FURTHER?

14   A    YES.

15   Q    WHAT WAS THAT?

16   A    I WAS SURROUNDED BY 50 ELEMENTS OF THE STATE JUDICIAL

17   POLICE OF GUADALAJARA AND AMBUSHED AND SHOT NINE TIMES.

18   Q    NOW, DID THIS HAVE SOMETHING TO DO WITH YOUR EFFORTS TO

19   LOCATE THE INTERFERENCE ON MR. FONSECA'S RADIO SYSTEM?

20           MR. STOLAR:  OBJECTION.

21           MR. NICOLAYSEN:  OBJECTION.

22           THE COURT:  YES.  SUSTAINED.

23   BY MR. CARLTON:

24   Q    AFTER YOU WERE SHOT, WERE YOU TAKEN TO THE HOSPITAL?

25   A    YES, I WAS.

13-135

1    Q    HOW LONG WERE YOU IN THE HOSPITAL?

2    A    ONE MONTH.  A LITTLE BIT OVER ONE MONTH.

3    Q    AND AFTER THAT, WHERE DID YOU GO?

4    A    I WAS TAKEN TO THE INFIRMARY OF THE STATE PRISON IN

5    GUADALAJARA.

6    Q    HOW LONG DID YOU REMAIN THERE?

7    A    FIVE MONTHS MORE.

8    Q    AND WHEN WERE YOU RELEASED?

9    A    IN MAY OF 1985.

10   Q    NOW, WERE SOME CHARGES FILED AGAINST YOU IN RELATION TO THE

11   SHOOTING INCIDENT?

12   A    YES, THEY WERE.

13   Q    AND DID YOU ULTIMATELY RECEIVE A CONVICTION AS A RESULT OF

14   THOSE CHARGES?

15   A    I HAD NOT BEEN CONVICTED UP TO THE TIME THAT I CAME TO THE

16   UNITED STATES.  I UNDERSTAND THAT WHEN IT WAS LEARNED THAT I

17   HAD COME TO THE UNITED STATES, I WAS IMMEDIATELY CONVICTED.

18   Q    WHAT WERE YOUR CONVICTED OF?

19         MR. NICOLAYSEN:  OBJECT, YOUR HONOR.  BASED ON

20   HEARSAY; AND HIS UNDERSTANDING IS IRRELEVANT, AS WELL.

21         THE COURT:  THE OBJECTION IS SUSTAINED.

22   BY MR. CARLTON:

23   Q    DO YOU HAVE ANY PRIOR CONVICTIONS?

24   A    I WAS CONVICTED OF POSSESSION OF MARIJUANA, IN CALIFORNIA,

25   IN 1971.

13-136

1    Q    HOW MUCH MARIJUANA WAS INVOLVED?

2    A    TWO CIGARETTES.

3    Q    WHAT SENTENCE DID YOU RECEIVE?

4    A    PROBATION.

5    Q    NOW, PRIOR TO COMING TO THE UNITED STATES -- WHICH WAS

6    WHEN?

7    A    THREE OR FOUR MONTHS AGO.

8    Q    -- DID YOU HAVE EMPLOYMENT IN MEXICO?

9    A    YES, I DID.

10    Q    WHAT WAS YOUR EMPLOYMENT?

11    A    I WAS THE OWNER AND CHIEF OPERATOR, EXECUTIVE, OF MY OWN

12    COMMUNICATIONS COMPANY.

13    Q    WHAT COMPANY WAS THAT?

14    A    IT'S CALLED OR ARBOLEDAS COMMUNICATION.

15    Q    AND WHAT WAS THE BUSINESS OF THAT COMPANY?

16          THE INTERPRETER:  I DIDN'T HEAR THE LAST NAME OF THE

17    COMPANY.

18          THE WITNESS:  ARBOLEDAS.

19    BY MR. CARLTON:

20    Q    WHAT WAS YOUR POSITION IN THAT COMPANY?

21    A    WELL, IN GENERAL, I WAS THE COMPANY.  I AND MY EMPLOYEES

22    WERE THE COMPANY.

23          I WAS THE -- A COMMUNICATIONS CONSULTANT TO THE

24    CAMPAIGN FOR THE -- THE ELECTION CAMPAIGN FOR GOVERNOR OF

25    JALISCO, A COMMUNICATIONS CONSULTANT TO THE SECRETARY OF

13-137

1   FINANCES OF THE STATE OF JALISCO, COMMUNICATIONS CONSULTANT TO

2   THE SECRETARY OF URBAN RENEWAL OF THE STATE OF JALISCO, A

3   COMMUNICATIONS CONSULTANT FOR THE DEPARTMENT OF POLICE. AND

4   TRANSIT FOR THE STATE OF JALISCO, AND A COMMUNICATIONS

5   CONSULTANT AND OPERATOR FOR VARIOUS MEMBERS OF THE PRIVATE

6   INITIATIVE IN GUADALAJARA.

7   Q    DURING WHAT PERIOD WERE YOU EMPLOYED AS A COMMUNICATIONS

8   CONSULTANT?

9   A    SINCE SEPTEMBER OF 1988, SEPTEMBER OR OCTOBER OF 1988.

10  Q    WHAT WAS YOUR PRIOR EMPLOYMENT?

11  A    I WAS THE VICE-PRESIDENT AND EXECUTIVE OFFICER,

12  COMMUNICATIONS OFFICER, ATTORNEY, AND OPERATING OFFICER OF A

13  LARGE HOUSING DEVELOPMENT COMPANY WITH NINE HOUSING

14  DEVELOPMENTS.

15  Q    NOW, ARE YOU RECEIVED ANY MONEY FROM THE DRUG ENFORCEMENT

16  ADMINISTRATION?

17  A    YES, I HAVE.

18  Q    DO YOU KNOW HOW MUCH?

19  A    NO, I DON'T.

20          MR. CARLTON:  MAY I HAVE A MOMENT, YOUR HONOR?

21          (GOVERNMENT COUNSEL CONFER OFF THE RECORD.)

22  BY MR. CARLTON:

23  Q    MR. HARRISON, DURING THE TIME THAT YOU LIVED IN MEXICO, DID

24  YOU BECOME FLUENT IN SPANISH?

25  A    YES, I DID.

13-138

1    Q    ORAL AND WRITTEN?

2    A    YES.

3    Q    DURING 1985, DID YOU HAVE SOME INVOLVEMENT WITH SOME

4    AIRCRAFT?

5    A    YES, I DID.

6    Q    WHEN WAS THAT?

7    A    I THINK IT WAS JULY OR AUGUST OF 1985.

8    Q    AND WHAT WAS THE NATURE OF THIS INVOLVEMENT?

9    A    I WAS ASKED BY MR. ANTONIO GARATE BUSTAMANTE TO MONITOR THE

10   COMMUNICATIONS OF A NETWORK THAT HAD BEEN SET UP TO RECEIVE

11   AIRPLANES FROM COLOMBIA AND LAND THEM IN THE STATE OF JALISCO.

12            MR. STOLAR:  YOUR HONOR, I OBJECT AND MOVE TO STRIKE

13   THE TESTIMONY.  THIS HAS NOTHING TO DO WITH THE CASE.

14            THE COURT:  WHAT IS THAT?

15            MR. STOLAR:  IT HAS NOTHING TO DO WITH IT.  IT'S

16   IRRELEVANT.

17            THE COURT:  OVERRULED.

18   BY MR. CARLTON:

19   Q    AND HOW MANY TIMES DID YOU HAVE SUCH INVOLVEMENT?

20   A    THE PLANES LANDED TWICE.

21   Q    AND WHAT DID YOU DO IN RELATION TO THESE LANDINGS?

22   A    SET UP COMMUNICATIONS FACILITIES, MONITORED THE ARRIVAL OF

23   THE AIRCRAFT, AND ACCOMPANIED THE -- WHATEVER WOULD COME ON THE

24   AIRCRAFT, TO A RANCH IN DURANGO, AND ASSISTED WITH THE TAKEOFF

25   OF AN AIRPLANE AND REPORTED THE ACTIVITIES TO MR. GARATE

13-139

1    BUSTAMANTE, WHO INFORMED ME THAT IT WAS FOR A POLICE

2    INVESTIGATION.

3    Q    NOW, YOU HAVE BEEN GRANTED USE IMMUNITY, HAVE YOU NOT?

4    A    I CERTAINLY HOPE SO.

5             COURTROOM:   (LAUGHTER.)

6    BY MR. CARLTON:

7    Q    HAVE YOU AND YOUR FAMILY BEEN RELOCATED TO THE UNITED

8    STATES?

9    A    YES.

10   Q    AND WAS THAT WHEN YOU MOVED HERE IN THE LAST FEW MONTHS?

11   A    THAT'S WHEN I WAS TOLD THAT I SHOULD NOT RETURN TO MEXICO,

12   AND I AGREED WITH THAT.

13            MR. CARLTON:  NOTHING FURTHER, YOUR HONOR.

14            THE COURT:   YOU MAY CROSS-EXAMINE THE WITNESS.

15                    CROSS-EXAMINATION +

16   BY MR. NICOLAYSEN:

17   Q    MR. HARRISON, YOU SPOKE A BIT ABOUT YOUR RELATIONSHIP WITH

18   JAVIER BARBA BACK IN THE 1970'S.  IS THAT WHEN IT STARTED?

19            YOU'RE NODDING YOUR HEAD.

20   A    YES.  YES, THAT'S RIGHT.  I'M SORRY.

21   Q    WAS THAT BACK IN SCHOOL, ESSENTIALLY?

22   A    THAT'S WHEN HE WAS IN SCHOOL.

23   Q    WHAT SCHOOL WAS THAT, WOULD YOU KNOW?

24   A    UNIVERSITY OF GUADALAJARA.

25   Q    WAS HE ACTIVE, TO YOUR KNOWLEDGE, IN STUDENT AFFAIRS THERE

13-140

1   AT THE TIME?

2   A   AS FAR AS I KNOW, YES, HE WAS ACTIVE IN STUDENT AFFAIRS.

3   Q   DO YOU HAVE ANY KNOWLEDGE, FROM YOUR EXPERIENCE IN DEALING

4   WITH MR. BARBA, WHETHER HE HAD PROBLEMS WHILE HE WAS IN SCHOOL?

5   A   YES.  I UNDERSTOOD HE HAD A GREAT NUMBER OF PROBLEMS.

6   Q   CAN YOU TELL US ABOUT THOSE?

7           MR. CARLTON:  OBJECTION, YOUR HONOR.  RELEVANCE.

8           THE COURT:  OVERRULED.

9           THE WITNESS:  I WAS AN ASSESSOR TO THE PRESIDENT OF

10  THE FEDERATION OF STUDENTS AT GUADALAJARA, FELIX FLORES GOMEZ.

11  AND I WAS INFORMED ON MANY OCCASIONS BY HIM AND BY MR. BARBA

12  HIMSELF THAT THEY HAD HAD SHOOT-OUTS AT A NUMBER OF PREPARATORY

13  SCHOOLS WHERE HE WAS BACKING CANDIDATES FOR THE PRESIDENCY OF

14  THOSE SCHOOLS.

15  BY MR. NICOLAYSEN:

16  Q   ARE YOU FAMILIAR WITH ANY ONE TYPE OF A COLEGIO TECNOLOGICO

17  OR TECHNOLOGY COLLEGE THAT MR. BARBA WAS EVER ENROLLED IN OR

18  AFFILIATED WITH?

19  A   NO, I'M NOT.  HE MAY HAVE BEEN, BUT I DON'T KNOW.

20          MR. NICOLAYSEN:  THANK YOU.  NOTHING FURTHER.

21          THE COURT:  ANY FURTHER CROSS-EXAMINATION?

22                  CROSS-EXAMINATION +

23  BY MR. MEDVENE:

24  Q   BEFORE THE BEGINNING OF THIS AFTERNOON'S SESSION, YOU SAT

25  IN THE BACK WITH A COUPLE OF GENTLEMEN, DID YOU NOT, SIR?

1   BEFORE COURT CONVENED?

2   A   BEFORE THE BEGINNING OF THE AFTERNOON SESSION?

3   Q   YES?

4   A   YES, THAT'S TRUE.

5   Q   AND YOU LOOKED, TOGETHER WITH THE OTHER GENTLEMEN, TO FIND

6   WHERE MR. ZUNO WAS SITTING; IS THAT CORRECT?

7   A   NO, THAT'S NOT CORRECT.

8   Q   DIDN'T YOU DISCUSS WITH THE OTHER GENTLEMEN WHERE MR. ZUNO

9   WAS SITTING?

10   A   WE WERE NOT TALKING ABOUT MR. ZUNO.

11   Q   YOU WERE LOOKING IN HIS DIRECTION, WERE YOU NOT, WITH THE

12   OTHER PEOPLE THAT WERE WITH YOU?

13   A   NO, WE WERE NOT.

14   Q   NOW, DID YOU, IN THE SUMMER OF 84, FIX THE ELECTRIFICATION

15   OF THE GATE AT LOPE DE VEGA?  IS THAT WHAT YOU'RE SAYING?

16   A   NO, IT IS NOT.

17   Q   WELL, DID YOU SAY IN THE SUMMER OF 84 YOU WENT TO LOPE DE

18   VEGA TO FIX THE ELECTRIC GATE?

19   A   I WAS TOLD TO GO TO LOPE DE VEGA TO LOOK AT THE GATE.  I

20   NEVER GOT TO LOOK AT IT.

21   Q   OH, SO YOU DIDN'T TOUCH THE GATE?  YOU DIDN'T FIX IT OR

22   ANYTHING?

23   A   NO.

24   Q   IS THAT CORRECT, SIR?

25   A   THAT'S CORRECT.

13-142

1    Q    WELL, DID YOU ATTEMPT TO FIX IT?

2    A    AS I TESTIFIED, I WENT THERE AND KNOCKED ON THE GATE.  A

3    CARETAKER CAME OUT AND TOLD ME MR. CARO WAS NOT THERE AND I

4    WOULD HAVE TO COME BACK LATER.  I DID NOT GO BACK.

5    Q    WAS IT AN ELECTRIC GATE?

6    A    SINCE I DIDN'T GET IN, I WOULDN'T KNOW.

7    Q    YOU SAY YOU DIDN'T GET IN.  THE GATE WAS STARING AT YOU?

8    A    I DIDN'T GET IN.  THEY DIDN'T LET ME IN.

9    Q    DID YOU SEE THE GATE, IN FRONT OF THE HOUSE?

10   A    IT WAS GATE, A SLIDING DOOR; BUT I DIDN'T GET IN.

11   Q    THE GATE WASN'T AN ELECTRIC GATE, WAS IT, SIR?

12   A    THE DOOR OF THIS --

13   Q    EXCUSE ME, SIR.

14   A    -- DOOR NEXT TO THE GATE --

15   Q    SIR, MY QUESTION IS:  WAS THE GATE, TO THE BEST OF YOUR

16   KNOWLEDGE, THAT YOU WERE TOLD TO ELECTRIFY OR FIX THE

17   ELECTRIFICATION, WAS IT AN ELECTRIC GATE, TO YOUR KNOWLEDGE?

18          MR. CARLTON:  OBJECTION, YOUR HONOR.  HE HASN'T GIVEN

19   THE WITNESS A CHANCE TO ANSWER HIS LAST QUESTION.

20          THE COURT:  THE WITNESS MAY ANSWER THIS QUESTION.

21          THE WITNESS:  I WAS TOLD GO FIX THE GATE.  NOBODY TOLD

22   ME THE CHARACTERISTICS OF THE GATE.

23   BY MR. MEDVENE:

24   Q    YOU SAY -- YOU WEREN'T A GENERAL REPAIRMAN, WERE YOU, SIR?

25   YOU WERE AN ELECTRICAL EXPERT; IS THAT RIGHT?

1    A    I FIXED A NUMBER OF ELECTRICAL GATES AT THE HOUSES -- THE

2    VARIOUS HOUSES OF MR. FONSECA.  I HAD COME THAT DAY FROM FIXING

3    ONE ELECTRIC GATE, SUCH ELECTRIC GATE, AT ONE OF MR. ERNESTO

4    FONSECA'S HOUSES.

5    Q    AND IT WAS YOUR UNDERSTANDING, SIR, WHEN YOU WERE DIRECTED

6    ALLEGEDLY TO LOPE DE VEGA, YOU WERE TO GO THERE TO FIX THE

7    ELECTRIC GATE WHICH WAS OUT OF ORDER; IS THAT CORRECT, SIR?

8    A    I ASSUMED THAT, BUT I NEVER SAW THE GATE, SO I REALLY DON'T

9    KNOW.

10    Q    WHEN YOU SAY SO YOU ASSUMED THAT, IS THAT WHAT YOU WERE

11    SUPPOSEDLY TOLD, SIR?

12    A    I WAS TOLD BY MR. BARBA TO GO AND FIX THE GATE, TO GO AND

13    LOOK AT THE GATE, THAT THERE WAS SOMEBODY TO TELL ME WHAT WAS

14    WRONG WITH THE GATE.  I NEVER GOT IN.

15    Q    AND YOU UNDERSTOOD IT WAS AN ELECTRIC GATE YOU WERE TO FIX?

16    A    SINCE I HAD JUST COME FROM FIXING AN ELECTRIC GATE, I

17    ASSUMED THAT; BUT I WAS NOT TOLD THAT.

18    Q    AND YOU DON'T KNOW WHETHER IT WAS TRUE OR NOT -- STRIKE

19    THAT.

20         WOULD YOU LOOK AT EXHIBITS 12 A AND B.

21         MAY I APPROACH THE WITNESS, YOUR HONOR?  I JUST WANT

22    TO LOOK AT THE EXHIBIT FOR A MINUTE.

23         (MR. MEDVENE APPROACHES WITNESS STAND AND RETURNS TO

24    LECTERN.)

25    BY MR. MEDVENE:

13-144

1    Q    DO YOU SEE ANY DATES ON A  OR B, SIR?

2    A    YES, I DO.

3    Q    THAT'S NOT AN ELECTRIC GATE.  YOU CAN TELL BY JUST LOOKING

4    AT IT, CAN'T YOU, SIR?

5    A    I CAN'T, NO.  IT'S A SLIDING GARAGE DOOR.  WHETHER IT HAD

6    AN ELECTRIC OPENER OR NOT, I COULDN'T TELL YOU.

7    Q    NOW, WHAT NAME WERE YOU GIVEN AT BIRTH, SIR?

8    A    GEORGE MARSHALL LEYVAS.

9    Q    AND IN THE COURSE OF YOUR LIFETIME, HOW MANY DIFFERENT

10   NAMES HAVE YOU USED?

11   A    TWO.

12   Q    AND WHAT ARE THEY, SIR?

13   A    THE ONE I JUST TOLD YOU AND LAWRENCE VICTOR HARRISON.

14   Q    HAVEN'T YOU ALSO USED, SIR, HARRISON CUMENS, C  U  M  E  N

15   S?  YOU'VE USED THAT NAME, HAVEN'T YOU, SIR?

16   A    NO, I HAVE NOT; NOT IN THE WAY THAT YOU'RE TRYING TO STATE,

17   COUNSEL, NO.

18   Q    YOU'VE USED IT -- I'M ASKING YOU IF YOU EVER USED IT.  I'M

19   NOT ASKING WHAT WAY YOU USED IT.

20        MY QUESTION, SIR IS:  HAVE YOU ON OCCASION USED THE

21   NAME HARRISON CUMENS?  YES OR NO SIR, PLEASE.

22   A    I HAVE USED THE NAME LAWRENCE VICTOR HARRISON CUMENS.

23   Q    HAVE YOU USED THE NAME, SIR, GEORGE MARSHALL DAVIS?

24   A    YES, I HAVE.

25   Q    SO WHEN YOU JUST TOLD US YOU USED TWO NAMES, AND ONLY TWO,

13-145

1   THAT WAS A LIE; IS THAT RIGHT?

2   A    NO, SIR; THAT IS NOT LIE.

3   Q    YOU'VE USED THE NAME GEORGE HARRISON LAWRENCE, ALSO, HAVE

4   YOU NOT, SIR?

5   A    NO, I HAVE NOT.

6   Q    NOW, IS IT TRUE THAT YOU NEVER REGISTERED TO TAKE CLASSES

7   AT BERKELEY?  IS THAT YOUR TESTIMONY.

8   A    THAT'S TRUE.

9   Q    AND YOU AUDITED CERTAIN CLASSES AT BERKELEY; IS THAT RIGHT?

10  A    THAT'S TRUE.

11  Q    AND YOU NEVER REGISTERED TO TAKE CLASSES AT THE LAW SCHOOL

12  AT BOLT; IS THAT TRUE?

13  A    NO, I DID NOT.

14  Q    AND YOU AUDITED A FEW CLASSES THERE?

15  A    YES, SIR.

16  Q    NOW, HOW MANY CLASSES DID YOU AUDIT AT THE UNIVERSITY AT

17  BERKELEY?

18  A    BETWEEN THE CLASSES THAT I ACTUALLY ATTENDED AND THE

19  CLASSES THAT WE WERE GIVEN NOTES AND TAPES -- THERE WERE

20  STUDENTS THAT WOULD ATTEND CLASSES AND TAPE THE LECTURES AND

21  SELL THE TAPES LATER AND SELL THE NOTES LATER -- AS MANY AS I

22  COULD, SIR.

23  Q    I'M NOT DISCUSSING IF YOU GOT NOTES FROM SOMEBODY OR GOT

24  SOMEBODY ELSE'S LECTURE TAPES, SIR.

25       YOU TOLD US YOU ATTENDED CLASSES.  I WANT TO KNOW:

13-146

1   HOW MANY CLASSES DID YOU ATTEND AT BERKELEY?

2   A   I DON'T RECALL.

3   Q   ONE, THREE, FIVE?

4   A   MORE THAN A HUNDRED.

5   Q   AND YOU FINISHED THEM?

6   A   WHAT DO YOU MEAN BY "FINISH THEM," SIR?

7   Q   YOU TOOK THE COURSE AND TOOK THE EXAM?

8   A   YOU WERE NOT ALLOWED TO TAKE THE EXAM IF YOU WERE NOT

9   REGISTERED, BUT THERE WAS A SERVICE PROVIDED BY THE PRI

10  UNIVERSITY THAT THE WOULD PROVIDE THE EXAMINATION FOR THE AUDIT

11  STUDENT.

12  Q   HOW MANY CLASSES DID YOU TAKE AT BOLT, AT THE LAW SCHOOL?

13  A   AS MANY AS I COULD.

14  Q   HOW MANY?

15  A   I COULDN'T TELL YOU.  I COULDN'T TELL YOU A NUMBER.  I

16  DON'T RECALL.

17  Q   BUT YOU DIDN'T TAKE SUFFICIENT FOR A DEGREE?

18  A   IF I WASN'T REGISTERED, I WOULDN'T HAVE BEEN GRANTED A

19  DEGREE ANYWAY.

20  Q   MY QUESTION, SIR, WAS:  YOU DIDN'T TAKE SUFFICIENT

21  COURSES --

22  A   NO, SIR; I DIDN'T.

23  Q   DIDN'T YOU TELL THE GRAND JURY, SIR, THAT -- STRIKE THAT.

24        DO YOU REMEMBER TESTIFYING UNDER OATH BEFORE THE GRAND

25  JURY ON SEPTEMBER 7TH OF 89?

13-147

1    A    YES, I DO.

2    Q    AND YOU DIDN'T TELL THE GRAND JURY YOU AUDITED COURSES AT

3    BERKELEY, DID YOU?

4    A    NO, I DID NOT.

5    Q    YOU TOLD THEM THAT YOU TOOK UNDERGRADUATE COURSES AT

6    BERKELEY BEFORE GOING TO LAW SCHOOL AT BOLT; IS THAT CORRECT?

7    A    I BELIEVE I SAID I DID UNDERGRADUATE WORK AT BERKELEY.

8    Q    THE IMPLICATION OF WHAT YOU TOLD THE GRAND JURY WAS THAT

9    YOU GRADUATED FROM BERKELEY AND THEN WENT TO LAW SCHOOL AT

10   BOLT; IS THAT CORRECT, SIR?

11   A    YES.

12   Q    NOW, THAT WAS A LIE, WASN'T IT, SIR?

13   A    NO, IT WAS NOT.  THE IMPLICATION WAS NOT THAT I HAD

14   GRADUATED.  THE IMPLICATION WAS THAT I HAD GONE TO SCHOOL

15   THERE.  I DID, SIR.

16   Q    NOW, YOU YOU TOLD THE GRAND JURY IN SUBSTANCE THAT YOU

17   HAD -- YOU INITIALLY TOLD THEM THAT YOU HAD YOUR LAW DEGREE

18   FROM BOLT, DID YOU NOT, SIR?

19   A    NO, I DID NOT.

20   Q    I READ YOU, SIR, FROM PAGE 3, LINES 17 AND 18.

21   "Q   MR. HARRISON -- MR. HARRISON, DO YOU HAVE A LAW DEGREE,

22   SIR?

23   "A   YES."

24        WERE YOU THEN ASKED, SIR, QUESTIONS ABOUT:

25     "DID YOU OBTAIN YOUR LAW DEGREE IN THE UNITED STATES?"

13-148

1          AND DID YOU THEN SAY, IN SUBSTANCE, YOU FINISHED UP

2   YOUR STUDIES, BUT YOU DIDN'T GET THE DEGREE BECAUSE, INSTEAD,

3   YOU JUST WENT TO MEXICO?  DID YOU SAY THAT, SIR?

4   A    YES, I DID.

5   Q    BUT YOU HAVEN'T -- HADN'T FINISHED YOUR STUDIES IN A WAY TO

6   MAKE YOU ELIGIBLE FOR A DEGREE AT BOLT, HAD YOU, SIR?

7   A    NO, I HAD NOT.

8   Q    SO YOU DIDN'T TELL THE TRUTH, AGAIN, TO THE GRAND JURY;

9   ISN'T THAT CORRECT.

10  A    NO, THAT'S NOT CORRECT.

11  Q    NOW, YOU TOLD THE GRAND JURY, DID YOU NOT, SIR, THAT YOU

12  FINISHED YOUR -- WHEN WE SAY "BOLT HALL," THAT'S THE LAW SCHOOL

13  AT CAL, UP IN THE SAN FRANCISCO AREA; IS THAT CORRECT?

14  A    IT'S IN BERKELEY.

15  Q    YOU TOLD THE GRAND JURY, SIR, DID YOU NOT THAT --

16          MR. CARLTON:  MAY WE HAVE A PAGE, PLEASE.

17          MR. MEDVENE:  4.

18  Q    -- THAT YOUR STUDIES WERE COMPLETED THERE IN 1967; IS THAT

19  CORRECT, SIR?

20  A    I SAID I FINISHED MY WORK AT BERKELEY.

21  Q    IN 1967; IS THAT CORRECT?

22  A    NO, I DID NOT SAY THAT.

23  Q    DID YOU TELL THE GRAND JURORS THAT YOU STUDIED AT BOLT IN

24  1967?

25  A    YES, I DID.

13-149

1  Q   AND DID YOU THEN TELL THEM YOU IT WENT TO MEXICO IN 1968?

2  A   YES, I DID.

3  Q   AND DID YOU SAY, SIR, THAT YOU RESIDED THERE FROM THAT DATE

4  UNTIL THE DATE OF YOUR TESTIMONY, WHICH WAS SEPTEMBER 7TH OF

5  89?  YOU TOLD THEM THAT, DID YOU NOT?

6  A   NO, I DID NOT.

7       MR. MEDVENE:  I READ, YOUR HONOR, THE GRAND JURY

8  TRANSCRIPT, PAGE 4.

9       I'LL START AT PAGE 3, YOUR HONOR.  PAGE 3, LINE 24, TO

10 PAGE 4, LINE 17:

11 "Q   WHERE WAS IT YOU WERE STUDYING" --

12       I APOLOGIZE, YOUR HONOR.  START AT LINE 20, ON PAGE 3:

13 "Q   NOW, YOU OBTAINED A LAW DEGREE IN THE UNITED STATES?

14 "A   WELL, I WENT UP TO -- I FINISHED MY STUDIES BUT I DID NOT

15 GO AND GET MY DEGREE BECAUSE I WENT TO MEXICO.

16 "Q   AND WHERE WAS IT THAT YOU WERE STUDYING FOR YOUR LAW DEGREE

17 IN THE UNITED STATES?

18 "A   UNIVERSITY OF CALIFORNIA, BERKELEY.

19 "Q   IS THAT ALSO KNOWN AS BOLT LAW SCHOOL?

20 "A   THE LAW SCHOOL REFERRED TO AS BOLT HALL.

21 "Q   DID YOU ALSO DO UNDERGRADUATE WORK?

22 "A   AT BERKELEY?

23 "Q   WHEN DID YOU DO YOUR STUDIES AT BOLT HALL?

24 "A   1967.

25 "Q   AFTER THAT, DID YOU HAVE AN OPPORTUNITY TO DEPART FOR

13-150

1    MEXICO?

2    "A   YES, I DID GO TO MEXICO.

3    "Q   WHAT YEAR DID YOU DO THAT?

4    "A   1968.

5    "Q   DID YOU RESIDE IN MEXICO, THEN, FROM 1968?

6    "A   YES.

7    "Q   AND IN FACT, HAVE YOU RESIDED THERE FROM 1968 TO THE

8    PRESENT?

9    "A   THAT'S CORRECT."

10           NOW, SIR, WHAT NAME DID YOU USE -- STRIKE THAT.

11           DID YOU TELL ANY OF THE TEACHERS THERE AT BOLT YOUR

12   NAME?

13           MR. CARLTON:  OBJECTION, YOUR HONOR.  IRRELEVANT.

14           THE WITNESS:  YES.

15           THE COURT:  OVERRULED.

16   BY MR. MEDVENE:

17   Q   WHAT TEACHERS AND WHAT NAME?

18   A   I DON'T RECALL THE TEACHERS AT BERKELEY.  IT WAS 25 YEARS

19   AGO.

20           THE NAME I USED WHEN I FIRST WENT TO BERKELEY WAS

21   GEORGE MARSHALL DAVIS.  I CHANGED IT TO LAWRENCE VICTOR

22   HARRISON.

23           MANY OF THE TEACHERS DID NOT ATTEND THEIR LECTURES AND

24   SENT TEACHING ASSISTANTS.

25   Q   COULD YOU TELL ME THREE TEACHERS OR TEACHING ASSISTANTS

13-151

1   THAT THAT YOU DEALT WITH WHEN YOU WERE AT THE LAW SCHOOL AT

2   BOLT?

3   A    I DON'T RECALL ANY OF --

4   Q    CAN YOU TELL ME ONE.

5   A    (NO AUDIBLE RESPONSE.)

6   Q    OF ALL THE CLASSES YOU TOOK AT BOLT, YOU CAN'T REMEMBER ONE

7   TEACHER THAT YOU INTRODUCED YOURSELF TO AND MIGHT KNOW YOUR

8   NAME; IS THAT YOUR TESTIMONY?

9   A    YES.

10   Q    LET'S TALK ABOUT BERKELEY, THESE HUNDRED COURSES YOU TOOK.

11          MR. CARLTON:  OBJECTION, YOUR HONOR.  THE TESTIMONY

12   WAS NOT THAT HE TOOK A HUNDRED COURSES.

13          MR. MEDVENE:  IF I MISSPEAK, I APOLOGIZE.

14   Q    HOW MANY COURSES DID YOU TAKE, DID YOU TELL THEM THAT YOU

15   TOOK?

16          THE COURT:  THAT'S BEEN COVERED PREVIOUSLY.

17          MR. MEDVENE:  YES, SIR.  I THINK THAT'S WHAT HE SAID.

18   Q    THE COURSES THAT YOU TOOK, CAN YOU TELL ME THE NAME OR

19   NAMES YOU USED?

20   A    LAWRENCE VICTOR HARRISON, GEORGE MARSHALL DAVIS.

21   Q    AND CAN YOU TELL ME TWO TEACHERS THAT YOU CONVERSED WITH

22   WHO KNEW YOU THERE?

23   A    I CAN'T RECALL THE EVENTS OF 25 YEARS AGO.

24   Q    ONE TEACHER?

25          MR. CARLTON:  OBJECTION.  ASKED AND ANSWERED.

13-152

1          THE COURT:  YOU'VE ALREADY ASKED THAT QUESTION.

2    BY MR. MEDVENE:

3    Q    NOW, WAS YOUR TESTIMONY IN FRONT OF THE GRAND JURY CORRECT

4    THAT YOU WERE IN MEXICO CONTINUALLY FROM 1968 UNTIL AT LEAST

5    THE TIME YOU TESTIFIED BEFORE THE GRAND JURY IN SEPTEMBER OF

6    89, SIR?

7          MR. CARLTON:  OBJECTION, YOUR HONOR.  MISSTATES THE

8    GRAND JURY TESTIMONY, WHICH SPEAKS FOR ITSELF.

9          THE COURT:  WELL, YOU JUST READ THAT TESTIMONY, DIDN'T

10   YOU?

11         MR. MEDVENE:  YES, SIR.  I'M ASKING HIM IF IT'S

12   CORRECT.

13         THE WITNESS:  MAY I ANSWER?

14         THE COURT:  YOU MAY ANSWER.

15   BY MR. MEDEVENE:

16   Q    JUST YES OR NO:  IS IT CORRECT, SIR?

17   A    IS MY GRAND JURY TESTIMONY CORRECT?  YES.

18         I DON'T UNDERSTAND "RESIDE" TO MEAN I WAS THERE 100

19   PERCENT OF THE TIME.

20   Q    WELL, WHAT PERCENTAGE OF THE TIME AFTER 78 DID YOU SPEND IN

21   THE UNITED STATES?

22   A    AFTER 78?  (SHAKES HEAD FROM SIDE TO SIDE.)  THAT I CAN

23   REMEMBER, NONE.  I WAS HERE FOR SIX MONTHS IN 1983.

24   Q    SO FROM 78 TO 81, YOU SPENT NO TIME, IS THAT CORRECT, IN

25   THE UNITED STATES?

13-153

1    A    78 TO 81?

2    Q    YES, SIR.

3    A    DID I LIVE IN THE UNITED STATES?  NO, I DID NOT.

4    Q    MY QUESTION WAS, SIR -- MY QUESTION WAS, SIR:  IS IT

5    CORRECT YOU SPENT NO TIME HERE, THAT YOU WERE LIVING

6    PERMANENTLY AT THAT PERIOD OF YOUR LIVE IN MEXICO?

7    A    I MAY HAVE VISITED THE UNITED STATES BETWEEN 78 OR 81.  I'M

8    NOT SURE.

9    Q    BUT FOR A DAY OR A COUPLE OF DAYS; IS THAT CORRECT, SIR?

10   A    THAT'S RIGHT.

11   Q    YES, SIR?

12   A    YES.

13   Q    OTHER THAN THAT, YOU WERE PERMANENTLY IN MEXICO; IS THAT

14   CORRECT, SIR?

15   A    YES.

16   Q    DIDN'T YOU TELL THIS JURY ABOUT THREE HOURS AGO THAT YOU

17   CAME UP TO THIS COUNTRY BETWEEN 78 AND 81 AND TOOK CLASSES UP

18   AT BERKELEY?

19   A    NO I DID NOT.

20   Q    WHAT WAS THE NAME OF THE ATTORNEY THAT YOU SAY YOU WORKED

21   FOR IN GUADALAJARA FROM 1971 TO 1976?

22   A    LICENCIADO JULIO CESAR MONTOYA ESCOTO.  LICENCIADO JULIO

23   CESAR MONTOYA ESCOTO.

24   Q    AND WHAT WAS HIS ADDRESS?

25   A    HE LIVED ON ARBOLEDA AVENUE IN GUADALARA, IN JARDINES DEL

13-154

1    BOSQUE.

2    Q    IS HE STILL, TO THE BEST OF MY KNOWLEDGE, IN GUADALAJARA?

3    A    NO.  I THINK HE'S IN HEAVEN, SIR.

4    Q    YOU'RE SMIRKING.  IS THAT FUNNY?

5    A    EXCUSE ME?

6    Q    HOW ABOUT -- LET'S SEE IF WE CAN FIND SOMEBODY THAT'S

7    ALIVE, SIR, THAT YOU WORKED WITH.

8         IN 1976 YOU SAID YOU WORKED FOR SOME OFFICE OF THE

9    PRI, OR WERE ASSOCIATED WITH THE PRI; IS THAT CORRECT?

10    A    THAT'S CORRECT.

11    Q    AND WHO WAS IT THAT YOU WORKED WITH?  WHAT INDIVIDUAL?

12    A    I WORKED DIRECTLY WITH A NUMBER OF INDIVIDUALS.  WHICH OF

13    THEM DO YOU WISH TO KNOW ABOUT, SIR?

14    Q    WELL, WAS IT TRUE THAT YOU SHARED THE RENT AT A PARTICULAR

15    BUILDING BETWEEN CERTAIN YEARS?

16    A    COULD YOU BE MORE SPECIFIC?

17    Q    DO YOU NOT UNDERSTAND THE QUESTION, SIR?

18    A    I DON'T KNOW WHICH YEARS YOU'RE TALKING ABOUT, SIR.

19    Q    DID YOU PAY RENT FOR YOUR WORK THAT YOU TOLD US YOU DID AS

20    A LAWYER FOR THIS ORGANIZATION RELATED TO THE PRI?

21    A    YES, I DID.

22    Q    AND WHO DID YOU PAY RENT TO?

23    A    I PAID RENT TO MR. CASTELLIEO, THE OWNER OF THE BUILDING.

24    Q    HOW DO YOU SPELL THAT?

25    A    C  A  S  T  E  L  L  I  E  O, I THINK.

13-155

1        THE COURT:  WE'RE GOING TO TAKE OUR AFTERNOON RECESS

2    AT THIS TIME.

3        THE CLERK:  PLEASE RISE.

4        (JURY ABSENT:)

5        THE CLERK:  YOU MAY BE SEATED.

6        THE COURT:  COUNSEL, YOUR CLIENT HAS WRITTEN A LETTER

7    TO THE COURT.  ARE YOU AWARE OF THAT?

8        MR. STOLAR:  WAS THAT LAST WEEK?

9        THE COURT:  I DON'T KNOW.  I HAVEN'T READ IT.  BUT MY

10   LAW CLERK TELLS ME THAT IT RELATES TO AN INCIDENT IN THE

11   LOCKUP.

12       MR. STOLAR:  YES.  THE INCIDENT TOOK PLACE A WHILE AGO

13   AND IT WAS WRITTEN TO YOU AND TO MR. GOLDMAN AS AN EXPLANATION

14   FOR AN INCIDENT -- AN UNFORTUNATE INCIDENT THAT TOOK PLACE.

15       THE COURT:  WELL, I WAS NOT AWARE OF THE INCIDENT.

16       MR. STOLAR:  I APOLOGIZE FOR --

17       THE COURT:  THE COURT DOES NOT RECEIVE COMMUNICATION

18   FROM DEFENDANTS OR THEIR LAWYERS EX PARTE, SO I'M RETURNING IT

19   TO YOU --

20       MR. STOLAR:  ALL RIGHT.

21       THE COURT:  -- UNREAD.

22       MR. STOLAR:  FINE.

23       THE COURT:  NOW YOU WANTED TO TAKE A MATTER UP WITH

24   THE COURT?

25       MR. STOLAR:  YES.  WE RECEIVED INFORMATION THIS

13-156

1    MORNING THAT MYRON SCHOLBERG, OUR EXPERT ON THE LIGHT

2    MICROSCOPE FROM VIRGINIA, HAS BEEN SUBPOENAED BY THE GOVERNMENT

3    TO APPEAR AS A WITNESS ON THEIR BEHALF ON THE 19TH OF JUNE.

4            A SUBPOENA WAS ISSUED OVER THE SEAL OF THE CLERK OF

5    THIS COURT.  I DO NOT KNOW IF AN APPLICATION WAS MADE TO THE

6    COURT FOR AN OUT-OF-DISTRICT SUBPOENA.  I DO NOT KNOW IF

7    WITNESS FEES WERE TENDERED TO THE MAN.

8            BUT I FIND IT HIGHLY UNUSUAL, HIGHLY IRREGULAR AND A

9    THREAT TO THE DEFENSE AND THE DEFENDANTS' ABILITY TO PREPARE

10   FOR TRIAL THAT THE GOVERNMENT LAYS A SUBPOENA ON AN EXPERT THAT

11   THEY KNOW HAS BEEN RETAINED BY US AND HAS DONE EXAMINATION WORK

12   FOR US.

13           I BRING IT TO THE COURT'S ATTENTION.

14           THE COURT:  IS THIS TRUE?

15           MR. CARLTON:  YES, YOUR HONOR.  A SUBPOENA WAS SERVED.

16   IN THE EVENT THAT MR. STOLAR CHOOSES NOT USE THIS MAN, WE

17   WANTED TO MAKE CERTAIN THAT HE WOULD BE HERE, IN THE EVENT THAT

18   HE MIGHT BE NEEDED TO TESTIFY.

19           MR. STOLAR:  WELL, FOR WHAT PURPOSE,, I MIGHT ASK?

20           MR. CARLTON:  WELL, WE HAVE NO IDEA WHAT MR. SCHOLBERG

21   HAS TO SAY.  NOBODY HAS COMMUNICATED WITH HIM.

22           BUT IN THE EVENT THAT THE ISSUE OF MR. MATTA'S HAIR

23   BECOMES A SIGNIFICANT ISSUE, WE THOUGHT HIS TESTIMONY MIGHT BE

24   PROBATIVE IN THE EVENT THAT HE'S NOT PUT ON BY MR. STOLAR.

25           MR. STOLAR:  I WOULD INDICATE FOR THE COURT THAT

13-157

1    WHATEVER INFORMATION HE HAS, HE HAS GIVEN US AND WHATEVER WORK

2    HE HAS PERFORMED IS WORK PRODUCT AND IS PRIVILEGED, COMPLETELY

3    PRIVILEGED.

4           THE COURT:  WELL, IF IT COMES TO THAT, WRITE A MOTION.

5           MR. STOLAR:  I CERTAINLY WILL.  HOWEVER, MY PROBLEM

6    IS --

7           THE COURT:  THIS PROBLEM SHOULD BE ADDRESSED BY A

8    MOTION TO QUASH THE SUBPOENA.

9           MR. STOLAR:  I UNDERSTAND THAT.  I'M WAITING FOR A

10   COPY OF THE SUBPOENA SO I CAN ATTACH IT.

11          BUT I UNDERSTAND THERE SHOULD BE A LOCAL RULE, AS

12   WELL, THAT INDICATES AN APPLICATION SHOULD BE MADE TO THE COURT

13   FOR AN OUT-OF-DISTRICT SUBPOENA.

14          THE COURT:  WELL, IT'S HIGHLY IRREGULAR, IN MY VIEW,

15   TO SUBPOENA AN EXPERT WITNESS WHO HAS BEEN ENGAGED BY ONE OF

16   THE DEFENDANTS IN THE CASE.  I'VE NEVER HEARD OF THAT.

17          I DON'T UNDERSTAND -- WHO AUTHORIZED THAT:  YOU?

18          MR. CARLTON:  WELL, WE -- YES, WE AUTHORIZED IT.

19          THE COURT:  FOR WHAT PURPOSE?

20          MR. CARLTON:  IN THE EVENT THAT MR. SCHOLBERG'S

21   CONCLUSION IS CONSISTENT WITH OURS -- AND AT THIS POINT I HAVE

22   NO IDEA; WE DO NOT KNOW -- WE WISH TO PRESENT HIS TESTIMONY.

23          THE COURT:  AND DO YOU BELIEVE THAT YOU CAN LAWFULLY

24   DO THIS.

25          MR. CARLTON:  I BELIEVE SO, YOUR HONOR.

13-158

1        THE COURT:  DID YOU INVESTIGATE IT BEFORE YOU DECIDED

2   TO SUBPOENA THIS DOCTOR?

3        MR. CARLTON:  NO, WE DID NOT.

4        THE COURT:  WELL, I THINK YOU SHOULD.

5        MR. CARLTON:  VERY GOOD.  WE WILL.

6        MR. STOLAR:  MAY I ADVISE THE EXPERT THAT THE SUBPOENA

7   MAY BE, IN A SENSE, STAYED ON THAT --

8        THE COURT:  WHAT IS THE DATE THAT HE'S BEEN --

9        MR. STOLAR:  HE WAS SUPPOSED TO BE HERE THE 19TH OF

10  JUNE, THE TUESDAY WE RECONVENE.

11        THE COURT:  YES, YOU MAY AUTHORIZE THAT.  YOU MAY TELL

12  HIM THAT IT IS STAYED UNTIL THE COURT HAS HAD AN OPPORTUNITY TO

13  REVIEW THE MATTER.

14        MR. STOLAR:  THANK YOU.

15        MR. MEDRANO:  YOUR HONOR, ON THAT SUBJECT MAY WE HAVE

16  MR. STOLAR'S REPRESENTATION THAT THE GENTLEMAN IS NOT GOING TO

17  BE OUT OF THE COUNTRY WITHIN THE NEXT MONTH SHOULD HE BE CALLED

18  TO TRIAL?

19        IF HE'S READILY AVAILABLE IN ANOTHER STATE, THERE'S NO

20  OBJECTION AS YET, YOUR HONOR, UNTIL THIS IS RESOLVED.  PERHAPS

21  MR. STOLAR CAN SHED LIGHT ON THAT.

22        MR. STOLAR:  I REALLY CAN'T MAKE THAT REPRESENTATION,

23  YOUR HONOR.

24        DO YOU HAVE ANY IDEA?

25        MR. BURNS:  YOUR HONOR, I HAVE NO KNOWLEDGE ABOUT MR.

13-159

1    STAHLBERG INTENDING TO BE OUT OF COUNTRY AT ALL, AND I JUST

2    SPOKE TO HIM THIS AFTERNOON.

3            MR. MEDRANO:  VERY WELL.

4            THE COURT:  WELL, I THINK THAT THE QUESTION IS WHETHER

5    YOU HAVE A RIGHT TO CALL HIM AT ALL.

6            MR. MEDRANO:  I UNDERSTAND THAT, YOUR HONOR.

7            THE COURT:  AND THAT SHOULD BE INVESTIGATED.

8            MR. MEDRANO:  YES.  WE WILL DO THAT IMMEDIATELY , YOUR

9    HONOR.

10           IF I MAY JUST FLAG SOMETHING ELSE FOR YOU, IT IS

11   COMMONPLACE FOR DEFENSE COUNSEL TO GIVE A SUBPOENA TO

12   GOVERNMENT COUNSEL FOR A GOVERNMENT WITNESS WHO IS AN EXPERT.

13   SO JUST TO SHED LIGHT ON THAT ISSUE YOUR HONOR, IN MY

14   EXPERIENCE IN THIS OFFICE, IT IS NOT PECULIAR OR UNUSUAL TO

15   SUBPOENA THE WITNESS AT A MINIMUM?

16           THE COURT:  WELL, IF IT'S A COMMON PRACTICE, THAT

17   DOESN'T NECESSARILY LEGITIMIZE IT.

18           MR. MEDRANO:  I AGREE, YOUR HONOR.  AND I THINK WHEN

19   WE GET MR. STOLAR'S MOTION TO QUASH, WE WILL DEAL WITH --

20           MR. STOLAR:  IT'S NOT A QUESTION OF MOTION TO QUASH;

21   IT'S A QUESTION OF THEM COMING FORWARD WITH SOME JUSTIFICATION

22   FOR IT, PROBABLY, I TAKE IT, ON A SIMULTANEOUS BASIS WITH THE

23   MOTION TO QUASH.

24           MR. MEDRANO:  I DISAGREE, YOUR HONOR.  AND I MIGHT ADD

25   MR. STOLAR, OTHER THAN SAYING THEY'VE SPOKEN TO THE MAN, DID

13-160

1    NOT AFFIRMATIVELY TELL YOU THEY'VE EVEN CALLED HIM TO TESTIFY.

2         THE COURT:  EVEN IF THEY DON'T CALL HIM TO TESTIFY,

3    YOU STILL HAVE A QUESTION OF YOUR RIGHT TO CALL HIM.

4         MR. MEDRANO:  I UNDERSTAND THAT, YOUR HONOR.  AND

5    AGAIN, I THINK ITS REVERTS BACK TO THE ISSUE OF WHEN, IF WE GET

6    THIS MOTION TO QUASH, WE CAN DEAL WITH IT AT THAT POINT.  BUT

7    WE HAVE NOT RECEIVED ANYTHING FROM MR. STOLAR.

8         THANK YOU.

9         MR. STOLAR:  WELL, IT'S STILL HIGHLY IRREGULAR.

10        THE COURT:  THAT'S ENOUGH.

11        MR. STOLAR:  ALL RIGHT.  THANK YOU.

12        THE COURT:  NOW, LET'S DEAL WITH SOME OF THESE OTHER

13   MATTERS.

14        WE HAVE LEFT UNRESOLVED A QUESTION RELATING TO THE

15   WITNESS ESTELLA FUENTES.  AND IF YOU RECALL, THERE WAS AN

16   OBJECTION MADE TO HER TESTIMONY ON THE GROUNDS OF A PRIVILEGED

17   COMMUNICATION BETWEEN HUSBAND AND WIFE.

18        YOU MADE A LOT OF REPRESENTATIONS IN YOUR MOTION

19   RESPONSE HERE CONCERNING THE RELATIONSHIP SHE HAD WITH HER

20   HUSBAND, IN EFFECT TRYING TO ESTABLISH THAT SHE AND THE HUSBAND

21   HAD BEEN SEPARATED FOR MANY YEARS AND THEREFORE THERE IS NO

22   REASON TO ASSERT OR AFFORD THE PRIVILEGE.

23        NOW, THERE'S NO EVIDENCE OF THAT BEFORE THE COURT

24   OTHER THAN WHAT THE WITNESS TESTIFIED TO, WHICH WAS VERY

25   SKIMPY.

13-161

1    SKIMPY.

2          MR. CARLTON:  IF THE COURT WISHES, WE CAN OBTAIN A

3    DECLARATION FROM HER.  SHE IS IN HOUSTON.  SHE DOESN'T LIVE

4    HERE.  BUT IF THE COURT WISHES A DECLARATION, WE CAN OBTAIN

5    THAT, ALL THAT INFORMATION THAT --

6          THE COURT:  THE ONLY WAY THE COURT CAN DETERMINE THAT

7    THE PRIVILEGE DOES NOT APPLY IS FOR COURT TO MAKE THESE

8    FINDINGS RELATING TO THE RELATIONSHIP BETWEEN THE PARTIES.  IN

9    EFFECT, IT WOULD BE A DETERMINATION THAT THE MARITAL

10   RELATIONSHIP, FOR ALL INTENTS AND PURPOSES, HAD BEEN TERMINATED

11   AT THE TIME THIS COMMUNICATION WAS MADE.

12         AND THE ONLY WAY THE COURT CAN DO THAT IS TO HEAR SOME

13   EVIDENCE FROM WHICH IT CAN BE DETERMINED.

14         MR. CARLTON:  WE WOULD ASK YOUR HONOR THAT WE BE

15   ALLOWED TO CALL MS. FUENTES BACK TO BE QUESTIONED ON THIS

16   ISSUE.

17         THE COURT:  WELL, THAT'S ONE WAY TO DO IT.

18         MR. NICOLAYSEN:  I WOULD ASK IT BE DONE OUTSIDE THE

19   JURY'S PRESENCE, YOUR HONOR.

20         THE COURT:  WELL IT WOULD BE DONE OUTSIDE THE JURY'S

21   PRESENCE.

22         MR. CARLTON:  NO OBJECTION TO THAT.

23         THE COURT:  BUT ARE WE WASTING YOUR TIME HERE?  IS IT

24   YOUR CLIENT'S INTENTION TO GET UP AND CONTRADICT WHAT SHE SAYS?

25         MR. NICOLAYSEN:  MY CLIENT IS NOT GOING TO GET UP AND

13-162

1    CONTRADICT WHAT SHE SAYS, YOUR HONOR.

2           THE COURT:  THEN WHAT IS THE POINT?  I MEAN, WHY CAN'T

3    WE TAKE HER DECLARATION AND YOUR CLIENT CAN SUBMIT A

4    COUNTERDECLARATION?

5           MR. NICOLAYSEN:  BECAUSE I WOULD LIKE TO CROSS-EXAMINE

6    HER ON WHATEVER REPRESENTATIONS ARE IN THE DECLARATIONS?

7    THAT'S THE REASON I WOULD APPRECIATE THE OPPORTUNITY --

8           THE COURT:  DO YOU TAKE THE POSITION IN GOOD FAITH

9    THAT YOUR HUSBAND -- YOUR CLIENT.

10          MR. NICOLAYSEN:  MY CLIENT.

11          COURTROOM:  (LAUGHTER.)

12          THE COURT:  -- THAT YOUR CLIENT, RATHER, THE HUSBAND,

13   WAS STILL ENJOYING A MARITAL RELATIONSHIP WITH THIS WITNESS?

14          MR. NICOLAYSEN:  NO.  I WILL NOT MAKE A GOOD FAITH

15   REPRESENTATION THAT THAT IS TRUE.  HOWEVER, I WILL MAKE A

16   REPRESENTATION, BASED ON MY KNOWLEDGE OF THE CASE, THAT THERE

17   WAS AN EXPECTATION ON THE PART OF MS. FUENTES THAT THEY MIGHT

18   STILL BE ABLE TO REUNIFY AND THAT SHE WAS HOPEFUL THAT THAT

19   WOULD IN FACT OCCUR AND THAT SHE WAS EXPECTING A COMMUNICATION

20   IN NOVEMBER; IT DID NOT COME AS A SURPRISE; AND THAT SHE STILL

21   PRESENTLY HAS THAT EXPECTATION AS OF TODAY.

22          THAT MUCH I CAN MAKE IN GOOD FAITH.

23          THE COURT:  THAT SHE HAD THESE EXPECTATIONS.

24          MR. NICOLAYSEN:  THAT'S MY UNDERSTANDING.

25          THE COURT:  BUT SHE SAYS, THROUGH THE U.S. ATTORNEY,

13-163

1   THAT SHE WAS TRYING TO FIND YOUR CLIENT SO SHE COULD DIVORCE

2   HIM.

3           MR. NICOLAYSEN:  WELL, I REALIZE THAT THERE MAY BE A

4   CONTRADICTION ON WHAT WE'RE HEARING, BUT MY SOURCES ARE CLOSE

5   ENOUGH THAT I FEEL THAT I'M MAKING THIS REPRESENTATION TO THE

6   COURT IN GOOD FAITH.

7           MR. CARLTON:  IT JUST SEEMS TO US, YOUR HONOR, THE

8   EASIEST WAY TO DEAL WITH IT IS CALL HER OUT HERE AND HAVE HER

9   TESTIFY THROUGH AN INTERPRETER.  SHE DOESN'T SPEAK ENGLISH.

10          THE COURT:  THAT IS THE EASIEST WAY TO DO IT, AND

11  THAT'S THE WAY IT SHOULD BE DONE.

12          MR. NICOLAYSEN:  NOW, YOUR HONOR, I WOULD SAY TO THE

13  COURT THAT AS FAR AS BOILERPLATE STANDARDS AS TO THE SPOUSAL

14  COMMUNICATION, I THINK THE GOVERNMENT'S MEMO ESSENTIALLY TRACKS

15  THE LAW CLEARLY; BUT I WOULD STILL OBJECT ON THE ALTERNATE

16  GROUND THAT IT'S IRRELEVANT AND CERTAINLY IS NOT APPROPRIATELY

17  DEEMED A FALSE EXCULPATORY STATEMENT.

18          THERE'S BEEN NO SHOWING BY THE GOVERNMENT THAT THAT

19  WOULD BE A PROPER BASIS.

20          THE COURT:  THAT'S A DIFFERENT MATTER.  COUNSEL.

21          MR. STOLAR:  I AGREE.

22          THE COURT:  YOU'VE RAISED SOMETHING NEW.

23          MR. STOLAR:  EVEN IF YOUR HONOR WERE TO DEEM THE

24  PRIVILEGE TO BE INAPPLICABLE HERE, IN MY JUDGMENT THAT DOESN'T

25  NECESSARILY MAKE THE TESTIMONY ADMISSIBLE.

13-164

1        THE GOVERNMENT HAS SUBMITTED AS AN ALTERNATIVE

2   PROPOSITION THAT IT IS A FALSE EXCULPATORY STATEMENT AND SHOULD

3   BE ADMITTED ON THAT BASIS.  I WOULD OBJECT ON THAT GROUND.

4        THE STATEMENT IS IRRELEVANT AND IS CERTAINLY NOT A

5   FALSE EXCULPATORY STATEMENT.  THE GOVERNMENT HAS NOT BRIEFED

6   THAT PARTICULAR ISSUE.  I DON'T KNOW IF THE GOVERNMENT

7   MAINTAINS THAT THEORY OR NOT.

8        MR. MEDRANO:  YOUR HONOR, WHAT IS UNFAIR AND

9   INAPPROPRIATE HERE IS THE FOLLOWING:  UNDER THE LOCAL RULES

10  COUNSEL IS SUPPOSED TO FILE AN OPPOSITION; OTHERWISE, HE WAIVES

11  IT.

12       WE FILED OUR PAPERS, HE RAISES IT ONLY FOR THE FIRST

13  TIME IN ORAL ARGUMENT WITHOUT FILING ANYTHING ON PAPER.  THAT'S

14  UNFAIR AND THAT'S INAPPROPRIATE.

15       NOW, WE'RE GOING TO SUBMIT WHATEVER YOU NEED.  WE WILL

16  MAKE THE WITNESS AVAILABLE.

17       THE COURT:  WELL, THIS WAS JUST FILED TODAY.

18       MR. MEDRANO:  I UNDERSTAND, YOUR HONOR.  BUT THE POINT

19  IS, GOVERNMENT (SIC) COUNSEL REPRESENTED EARLIER IN COURT TO US

20  THAT HE WASN'T EVEN GOING TO FILE AN OPPOSITION.

21       HE CAN'T HAVE IT BOTH WAYS.  HE CANNOT MAKE THIS

22  ARGUMENT ORALLY WITHOUT FILING HIS PAPERS AS THE GOVERNMENT

23  HAS.

24       MR. NICOLAYSEN:  YOUR HONOR --

25       THE COURT:  JUST A MOMENT.  IF THERE IS NO PRIVILEGE,

1    THE STATEMENT MAY BE ADMITTED.  SO THE ONLY ISSUE IS WHETHER OR

2    NOT THE STATEMENT IS A PRIVILEGED COMMUNICATION BETWEEN

3    SPOUSES.  AND THAT WILL BE DETERMINED AT A HEARING UNDER RULE

4    104 --

5              MR. NICOLAYSEN:  THANK YOU, YOUR HONOR.

6              THE COURT:  -- AS SOON AS THE WITNESS IS PRODUCED.

7              MR. MEDRANO:  YOUR HONOR, THEN, AT YOUR CONVENIENCE,

8    MAY WE MAKE IMMEDIATE ATTEMPTS TO BRING HER OUT HERE AND THEN

9    TRY TO RESOLVE THAT AT YOUR EARLIEST CONVENIENCE?

10             THE COURT:  YOU MAY DO THAT.

11             MR. MEDRANO:  AND IS IT YOUR INCLINATION, YOUR HONOR,

12   TO DO THAT AT 4:30, JUST LIKE THE LAST, SO I CAN PLAN THE

13   TRAVEL OF THE WITNESS?

14             THE COURT:  I WOULD PREFER TO DO IT THAT WAY.

15             MR. MEDRANO:  CERTAINLY, YOUR HONOR.

16             MR. NICOLAYSEN:  YOUR HONOR, MY SCHEDULE -- IF I MAY

17   BE HEARD -- TOMORROW DOES NOT ALLOW --

18             THE COURT:  WELL, I DON'T THINK THEY'RE GOING TO GET

19   HER HERE TOMORROW.  ARE YOU?

20             MR. MEDRANO:  WE'LL CERTAINLY TRY, JUST TO MOVE THINGS

21   ALONG.  WE'LL DO OUR BEST.

22             MR. NICOLAYSEN:  I HAVE A PROFESSIONAL COMMITMENT THAT

23   DOES REQUIRE ME TO BE BACK BY 5:30.

24             I WOULD RESPECTFULLY ASK, YOUR HONOR, IF WE COULD NOT

25   HOLD IT TOMORROW.  ANY OTHER DAY IS FINE, BUT TOMORROW I HAVE

13-166

1   ANOTHER COMMITMENT.

2           THE COURT:  WELL, I HAVE SOME COMMITMENTS MYSELF.

3           COURTROOM:  (LAUGHTER.)

4           MR. MEDRANO:  VERY WELL, YOUR HONOR.  NOT TOMORROW.

5       WHEN WOULD YOU LIKE US TO DO IT, JUDGE?

6           THE COURT:  THAT'S A BROAD QUESTION.

7           COURTROOM:  (LAUGHTER.)

8           MR. MEDRANO:  OTHER THAN TO GO AWAY, YOUR HONOR?

9           COURTROOM:  (LAUGHTER.)

10          THE COURT:  WELL --

11          MR. MEDRANO:  WE'LL BRING HER IN AS SOON AS WE CAN.

12          THE COURT:  -- JUDY, CAN WE DO THIS FRIDAY, OR DO --

13      WE HAVE SOMETHING ELSE SCHEDULED FRIDAY, DON'T WE, AT 4:30?

14          THE CLERK:  NO.

15          THE COURT:  WHAT ABOUT THOSE MOTIONS?

16          THE CLERK:  9:00.

17          THE COURT:  9:00 A.M.?

18          THE CLERK:  9:00 A.M.

19          THE COURT:  ON WHAT DAY?

20          THE CLERK:  FRIDAY.

21          MR. MEDRANO:  YOUR HONOR, A BETTER WAY TO DO IT IS

22      ONCE WE KNOW THE TRAVEL PLANS OF THE WITNESS, WE'LL ADVISE

23      COUNSEL AND MADAM CLERK.  THEN PERHAPS WE CAN SET IT UP AT THAT

24      TIME, BECAUSE I JUST DON'T KNOW WHEN SHE CAN GET OUT HERE.

25          THE COURT:  WELL, THEN, YOU SHOULD TALK TO HER FIRST,

13-167

1    AND LET US KNOW TOMORROW.

2           MR. MEDRANO:  VERY WELL, YOUR HONOR.

3           THE COURT:  NOW, WITH RESPECT TO THIS WITNESS WHO HAS

4    BEEN TESTIFYING, THE DEFENDANT ZUNO HAS FILED A MOTION

5    REQUESTING THAT THE INTERROGATION TAPE WHICH WAS MADE OF HIS

6    INTERVIEW BE PROVIDED TO COUNSEL.

7           MR. MEDVENE:  IT'S BEEN PROVIDED, YOUR HONOR.

8           THE COURT:  IT'S BEEN PROVIDED?

9           MR. MEDVENE:  YES.

10          THE COURT:  SO THAT'S NO LONGER A PROBLEM.

11          MR. MEDVENE:  IT'S NOT A PROBLEM.

12          THE COURT:  ALL RIGHT.  NOW, THERE IS A MOTION FILED

13   TO PROVIDE THE PRESENTENCE REPORT OF JESSE ZUNO, CERVANTES, AND

14   CESAR DE LA PAREA (PHONETIC), AND VICTOR LAWRENCE HARRISON,

15   UNDER BRADY.

16          THE GOVERNMENT'S RESPONSE IS THAT THEY DO NOT HAVE ANY

17   SUCH -- FIRST OF ALL, WHICH OF THESE PEOPLE HAS SUFFERED ANY

18   AMERICAN CONVICTIONS?

19          MR. MEDRANO:  YOUR HONOR, TO THE GOVERNMENT'S

20   KNOWLEDGE, THE ONLY ONE WOULD BE MR. HARRISON, WHO, AS HE

21   ALREADY DESCRIBED ON DIRECT, HAD THAT 1971 TWO-CIGARETTE

22   MARIJUANA ARREST IN 1976.

23          THE COURT:  NONE OF THE OTHER PEOPLE HAVE SUFFERED ANY

24   AMERICAN CONVICTIONS.

25          MR. MEDRANO:  WE'RE NOT OF AWARE OF ANY, YOUR HONOR.

13-168

1   WE'VE RUN THEIR NAMES THROUGH THE SYSTEM AND HAVE FOUND NO RAP

2   SHEETS OF ANY SORT.

3           THE COURT:   YOU DO NOT HAVE POSSESSION OF ANY

4   PROBATION REPORTS THAT HAVE BEEN PREPARED AS TO ANY OF THESE

5   PEOPLE?

6           MR. MEDRANO:   AGAIN, THE ONLY CONVICTION IS FOR

7   HARRISON, AND WE DON'T POSSESS ANY PRESENTENCE OR PROBATION

8   REPORTS.

9           MR. MEDVENE:   IF I MIGHT ASK THROUGH THE COURT IF YOU

10  MIGHT ASK THE GOVERNMENT:   ARE THEY SAYING THERE IS A PROBATION

11  REPORT FOR HARRISON ON THE MARIJUANA CONVICTION?   AND IF SO, I

12  WOULD ASK THAT THE GOVERNMENT EITHER FURNISH THAT OR FURNISH IT

13  TO YOUR HONOR SO WE CAN SEE IF THERE'S ANY BRADY OR GIGLIO

14  MATERIAL THERE.

15          MR. MEDRANO:   YOUR HONOR, I DON'T EVEN KNOW IF ANY

16  EXISTS.   I DON'T HAVE IT.   THE GOVERNMENT DOESN'T HAVE ANY

17  PRESENTENCE OR PROBATION FILE ON LORENZO HARRISON FOR HIS 71

18  CONVICTION.

19          THE COURT:   ALL RIGHT.   THERE'S YOUR ANSWER.

20  THEREFORE, THE MOTION IS IS DENIED.

21          NOW, COUNSEL FOR BERNABE HAS FILED AN APPLICATION FOR

22  AN ORDER PRECLUDING THE INTRODUCTION OF THE EVIDENCE OF

23  UNDERCOVER CONVERSATIONS UNTIL COMPLETION OF EXPERT FORENSIC

24  ANALYSIS.   I'VE READ AND CONSIDERED THE MOTION.   I'M GOING TO

25  DENY THIS MOTION.

13-169

1          IF IT IS NECESSARY FOR YOU TO REOPEN CROSS-EXAMINATION

2    OF THE EXPERT WITNESS, YOU MAY DO THAT.  BUT I DON'T SEE ANY

3    REASON TO DELAY THE PRESENTATION OF THE TESTIMONY.

4          MS. KELLY:  YOUR HONOR, IT WOULD DELAY IT BECAUSE

5    THERE WOULD BE A CHALLENGE TO THE ADMISSIBILITY OF THE TAPES

6    BASED ON A LACK OF AUTHENTICITY, IF INDEED THERE IS SUPPORT FOR

7    IT.

8          THE COURT:  WELL, THE COURT WILL NOT ADMIT THE TAPE

9    UNTIL YOU'VE HAD THE OPPORTUNITY TO DO WHATEVER IT IS YOU NEED

10   TO DO.

11         MS. KELLY:  VERY WELL.  WELL, THAT'S -- ALL RIGHT.

12         THE COURT:  THEREFORE, THIS MOTION IS DENIED, SUBJECT

13   TO WHAT I HAVE SAID.

14         MS. KELLY:  VERY WELL, YOUR HONOR.

15         THE COURT:  NOW, MR. ZUNO HAS FILED A MOTION TO

16   EXCLUDE FROM EVIDENCE STATEMENTS MADE BY HIM TO AGENT

17   KUYKENDALL ON SEPTEMBER 29, 1986.

18         MR. BLANCARTE:  THAT'S CORRECT, YOUR HONOR.

19         THE COURT:  THE COURT HAS READ AND CONSIDERED THIS

20   MOTION.  I DON'T BELIEVE THERE'S AN OPPOSITION FILED TO IT.

21         MR. CARLTON:  WE HAVEN'T HAD AN OPPORTUNITY TO DEAL

22   WITH THAT ONE, YOUR HONOR.

23         THE COURT:  WELL, I THINK THE MOTION IS WELL TAKEN,

24   AND THIS PORTION SHOULD BE EXLUDED.  I DON'T SEE ANY PROBATIVE

25   VALUE, AND THERE MIGHT BE SOME PREJUDICIAL EFFECT.

13-170

1        MR. CARLTON:  WELL, YOUR HONOR, WE BELIEVE THE ISSUE

2   OF WHETHER JAVIER BARBA HAD AN INVOLVEMENT IN THE PURCHASE OF

3   THE HOUSE IS NOT SOMETHING THAT HAD COME UP PRIOR TO THAT.  IN

4   1986, OF COURSE, THE ISSUE WAS WHETHER CARO QUINTERO OWNED THE

5   HOUSE.  AND --

6        THE COURT:  WELL, IN THIS STATEMENT, ALLEGEDLY MR.

7   ZUNO SAYS THAT HE BELIEVED JAVIER BARBA HAD BEEN COURTING THE

8   NIECE OF THE OWNER OF THE KINDERGARTEN, DIRECTLY ACROSS THE

9   STREET FROM 881 LOPE DE VEGA.

10        NOW, WHAT IS THAT PROBATIVE OF?

11        MR. CARLTON:  WELL, YOUR HONOR, THEN IT GOES ON TO

12   SAY, I BELIEVE, THAT HE SPECULATED THAT JAVIER BARBA MAY HAVE

13   SEEN THE FOR SALE SIGN IN THE HOUSE AND MADE INQUIRIES ABOUT

14   THE HOUSE.  NOW --

15        THE COURT:  WELL, WHAT DOES THIS ALL MEAN, COUNSEL?

16   ASSUMING THAT'S TRUE, WHAT DOES IT PROVE?

17        MR. CARLTON:  THE HOUSE SUPPOSEDLY WAS SOLD TO A RUBEN

18   SANCHEZ BARBA, AND FROM THERE WAS USED BY CARO QUINTERO AS THE

19   HOUSE WHERE AGENT CAMARENA WAS INTERROGATED.  WHAT POSSIBLE --

20        THE COURT:  DO YOU THINK THIS PROVIDES SOME LINK TO

21   THIS TRANSACTION.

22        MR. CARLTON:  WE THINK THAT MR. ZUNO'S MENTION OF

23   JAVIER BARBA AS BEING A PERSON INTERESTED IN THE SALE OF THE

24   HOUSE IS ONE THAT IS OF PROBATIVE VALUE AS TO HIS KNOWLEDGE OF

25   WHAT WAS GOING ON IN THE HOUSE.

1    THE COURT:  BUT HE DIDN'T IT DIDN'T SAY HE WAS

2  INTERESTED IN THE SALE OF THE HOUSE.  HE SAID HE HEARD THIS

3  GOSSIP PRIOR TO SANCHEZ BARBA'S PURCHASE OF THE RESIDENCE.  IT

4  IS HIS SPECULATION THAT JAVIER BARBA MIGHT HAVE SEEN THE HOUSE

5  EMPTY WHEN HE VISITED THIS GIRL AND MADE INQUIRIES TO SEE IT

6  WAS FOR SALE.

7    MR. CARLTON:  OUR UNDERSTANDING IS THAT MR. ZUNO HAS

8  ALWAYS MAINTAINED THAT THE HOUSE WAS SOLD TO RUBEN SANCHEZ

9  BARBA AND TO JESUS SANCHEZ BARBA AND THAT IT WAS THEN USED,

10  WITHOUT HIS KNOWLEDGE, BY CARO QUINTERO.

11    HOW JAVIER BARBA FITS INTO THIS IS SOMETHING THAT ONLY

12  MR. ZUNO KNOWS.  HE WAS THE ONE WHO MADE THE SPECULATION.

13    THE COURT:  ALL RIGHT.  THE MOTION IS GRANTED.  IT IS

14  GRANTED WITHOUT PREJUDICE.  IF THERE IS SOME EVIDENCE OFFERED

15  BY THE DEFENDANTS THAT SEEMS TO BE -- THAT MIGHT JUSTIFY THE

16  INTRODUCTION OF THIS AT A LATER TIME, YOU MAY USE IT FOR THE

17  PURPOSE OF IMPEACHMENT.

18    NOW, THE FINAL THING IS THIS BUSINESS ABOUT THE USE OF

19  THE CAMARENA INTERROGATION TAPES.

20    MR. MEDRANO:  YOUR HONOR, ON THAT SUBJECT, I MIGHT

21  REMIND YOU, AGAIN, WE ONLY GOT THE PLEADING YESTERDAY MORNING?

22    THE COURT:  YES.

23    MR. MEDRANO:  I HAVE A DRAFT OF OUR OPPOSITION SITTING

24  IN FRONT OF ME RIGHT NOW.  BY THIS EVENING, WHEN WE GET OUT OF

25  COURT, WE WILL MAKE THE CHANGES AND HAVE IT FOR YOU BY 9:30 IN

1    THE MORNING, OUR OPPOSITION.

2            WE FEEL STRONGLY ABOUT IT AND WE'D LIKE A CHANCE TO

3    GET THE OPPOSITION TO YOU BY TOMORROW MORNING, YOUR HONOR.

4            THE COURT:  ALL RIGHT.  THEN I'LL WITHHOLD RULING

5            MR. STOLAR:  I WOULD LIKE TO JUST SAY --

6            THE COURT:  I'LL TELL YOU MY INCLINATION, IF YOU WANT

7    TO HEAR IT.

8            MR. STOLAR:  WELL, LET ME JUST TELL YOU WHAT -- I HAD

9    A CONVERSATION WITH MR. CARLTON EARLIER --

10            THE COURT:  YES.

11            MR. STOLAR:  -- WHERE, YOU KNOW, I SAID, "I'VE SPOKEN

12    TO ALL DEFENSE COUNSEL, AND I BELIEVE I CAN MAKE A

13    REPRESENTATION, AND WHAT IS IT YOU WANT TO STIP?"  AND HE

14    KICKED OFF A LIST OF FIVE OR SIX ITEMS, WHICH I THINK COVER ALL

15    THE EVIDENTIARY PURPOSES OF THE STIPULATION AND INDEED GIVE UP

16    A LITTLE BIT OF POSSIBLE DEFENSIVE STUFF.  AND I THINK

17    EVERYBODY'S WILLING AND AGREEABLE TO A STIPULATION OF ALL THOSE

18    THINGS THAT HE WANTS.

19            MR. CARLTON:  THIS IS A MIS- --

20            THE COURT:  YOU'LL NEVER PROVE IT BY LISTENING TO

21    THESE OBJECTIONS THAT HAVE BEEN MADE HERE THIS DATE, THIS

22    MORNING IN PARTICULAR.

23            THERE'S ONE COUNSEL IN THIS TRIAL THAT HAS TAKEN A

24    POSITION THAT INDEED THAT MIGHT NOT BE CAMARENA'S BODY AND IS

25    SEEKING TO PROVE IT.

13-173

1          MR. STOLAR:  I'M NOT SURE THAT THAT'S --

2          MR. CARLTON:  MAY I SAY SO TWO THINGS?  ONE, MR.

3    STOLAR'S STATEMENT OUR CONVERSATION IS SOMEWHAT OF A

4    NUSCHARACTERIZATION.  I PREFACED THAT BY SAYING --

5          THE COURT:  I DON'T WANT EVEN WANT TO HEAR IT, SINCE

6    I'M GOING TO RULE ON THIS TOMORROW MORNING.

7          MR. CARLTON:  ALL RIGHT.

8          MR. MEDRANO:  ON THAT SUBJECT, YOUR HONOR, AS YOU

9    YOURSELF INDICATED, POSSIBLY BECAUSE OF TACTICS OF DEFENSE

10   COUNSEL ON CROSS-EXAMINATION, THERE IS SOME ISSUE OF THE

11   IDENTITY OF THE REMAINS OF CAMARENA.  AND, YES, THIS IS ANOTHER

12   GROUND THAT WE WILL SUBMIT IN OUR OPPOSITION FOR YOU TOMORROW

13   AS TO ADMISSION OF THE PLAYING OF THE TAPES?

14         THE COURT:  ALL RIGHT.  THERE ARE NUMBER OF THINGS.

15         ONE IS THE TIMELINESS.  THAT BOTHERS ME, THE FACT THAT

16   THIS IS JUST NOW FILED.

17         ONE IS THAT ONE PARTY FROM THE BEGINNING HAS

18   APPARENTLY TAKEN THE POSITION THAT THIS MIGHT NOT BE THE BODY

19   OF CAMARENA.  THERE HAVE BEEN -- I THINK THAT THE GOVERNMENT'S

20   STRATEGY MIGHT HAVE CHANGED HAD THEY KNOWN THAT -- AS THEY DID

21   IN THE LAST TRIAL, THAT NOBODY WAS CONTESTING WHO THE BODIES

22   WERE AND THAT THEY WERE CAMARENA AND ZAVALA, AND SO FORTH.

23         IN THIS CASE, I'VE HEARD OBJECTIONS CONSTANTLY

24   THROUGHOUT THE TRIAL TO IDENTIFICATION EVIDENCE THAT HAS BEEN

25   MADE DURING THE TRIAL.

13-174

1          SO I'LL LOOK AT THE GOVERNMENT'S OPPOSITION TOMORROW

2     AND I'LL RULE ON IT THEN.

3          MR. MEDRANO:  THANK YOU, YOUR HONOR.

4          THE CLERK:  PLEASE RISE.  THIS COURT IS NOW RECESS.

5          (BRIEF RECESS.)

6          (JURY PRESENT.)

7          THE COURT:  YOU MAY CONTINUE YOUR CROSS-EXAMINATION.

8          MR. MEDVENE:  THANK YOU, YOUR HONOR.

9     BY MR. MEDVENE:

10    Q.    DID YOU STUDY LAW IN MEXICO, MR. HARRISON?

11    A.    DID I STUDY LAW IN MEXICO?  AS A LAW CLERK, YES.

12    Q.    AND WHERE WAS THAT?

13    A.    WITH LICENCIADO JULIO CESAR MONTOYA ESCOTO.

14    Q.    WHAT IS THAT?

15    A.    WHAT IS IT?

16    Q.    YES.

17         MR. CARLTON:  ASKED AND ANSWERED.  OBJECTION.

18         THE WITNESS:  IT IS THE LAW OFFICE WHERE I WORKED AS A

19    LAW CLERK.

20    BY MR. MEDVENE:

21    Q.    WHEN DID YOU MEET-- STRIKE THAT.

22         DID YOU STUDY LAW WITH MR. ZUNO'S FATHER, GUADALUPE?

23    A.    NO, I DID NOT.

24    Q.    YOU NEVER TOOK ANY COURSES WITH HIM AT THE UNIVERSITY?

25    A.    NO, I DID NOT.

13-175

1   Q.   THE INDIVIDUAL THAT YOU SAID YOU WORKED WITH IN THIS LAW

2   OFFICE THAT YOU SAID IS NOW DECEASED, WHO ELSE WORKED IN THAT

3   OFFICE?

4        CAN YOU REMEMBER ANY NAMES NOW?

5   A.   GENERAL JESUS VALDIVIA.

6   Q.   HOW DO YOU SPELL THAT?

7   A.   J E S U S,   V A L D I V I A.

8   Q.   DID YOU WORK WITH THAT INDIVIDUAL FROM '76 TO '81?

9   A.   YES.  HE ALSO WORKED IN THE C.N.O.P. OFFICE.

10  Q.   HOW LONG DID YOU PAY RENT AT TO THIS C.N.O.P. OFFICE.

11  A.   THE LAST TWO YEARS WE WERE THERE.

12  Q.   WHAT YEARS WERE THEY?

13  A.   1979-1980.

14  Q.   DID YOU PAY RENT AFTER THAT?

15  A.   NO, I DID NOT.

16  Q.   DIDN'T YOU INDICATE EARLIER TODAY ON YOUR DIRECT

17  EXAMINATION THAT AFTER YOU WENT TO ACAPULCO, YOU CONTINUED TO

18  PAY RENT?

19  A.   I INDICATED THAT I HAD LEFT THE OFFICE IN THE HANDS OF

20  OTHER PEOPLE, AND WHEN I CAME BACK I CLOSED IT, SOLD THE

21  FURNITURE AND CLOSED IT.

22  Q.   BUT YOU PAID NO RENT AFTER YOU LEFT; IS THAT CORRECT?

23  A.   WELL, I LIQUIDATED THE OFFICE WHEN I CAME BACK, SO I GUESS

24  I DIDN'T PAY RENT IN THE LIQUIDATION.  I DID NOT SEND MONEY

25  FROM ACAPULCO TO PAY THE RENT.  WHEN I CAME BACK, I LIQUIDATED

13-176

1    EVERYTHING.

2    Q.    WHO GOT YOU THE JOB WITH THE P.R.I.?

3    A.    GENERAL JULIO CESAR ESCOTO AND CONSARO (PHONETIC) DE LA

4    TORRE.

5    Q.    AND ARE THEY IN GUADALAJARA NOW?

6    A.    GENERAL MONTOYA ESCOTO, I TOLD YOU, IS DECEASED AND CHARO

7    LA TORRE  --  I DON'T KNOW WHERE HE IS.

8    Q.    HOW MUCH WERE YOU PAID OR WERE YOU PAID?

9    A.    NO.  SOCIAL SERVICE.

10   Q.    YOU WEREN'T PAID ANYTHING?

11   A.    NO.

12   Q.    AND THAT WAS FROM WHAT YEARS?

13   A.    1976 UNTIL 1980.

14   Q.    THAT WAS YOUR FULL-TIME JOB?

15   A.    THAT WAS MY FULL-TIME JOB, YES.

16   Q.    WHAT DID YOU USE THE MONEY FOR?

17   A.    I BOUGHT A HOUSE, I PURCHASED A HOUSE IN 1974 IN ACAPULCO,

18   AND I RECEIVED RENT, MONTHLY RENT ON THE HOUSE.  AND I ALSO HAD

19   MY OWN CLIENTS ASIDE FROM MY SOCIAL SERVICE LAW WORK AT THE

20   C.N.O.P. OFFICE.

21   Q.    WHEN WHEN DID YOU START WORKING FOR DRUG TRAFFICKERS; IN

22   '81 OR BEFORE.

23   A.    I BEGAN WORKING FOR THE POLICE DEPARTMENT IN 1981.

24   Q.    WERE THEY DRUG TRAFFICKERS, TO YOUR KNOWLEDGE?

25   A.    IT SEEMS THAT THAT IS SO, YES.

13-177

1    Q.    SO YOU STARTED WORKING FOR DRUG TRAFFICKERS, TO YOUR

2    KNOWLEDGE, IN ONE FORM OR ANOTHER IN 1981?

3    A.    I BEGAN WORKING FOR THE POLICE DEPARTMENT IN THE FIRST

4    PART OF 1981 THE LAST PART OF 1980.

5    Q.    AND YOU WERE INVOLVED IN HELPING DRUG TRAFFICKING AS EARLY

6    AS '80-'81; IS THAT CORRECT?

7    A.    YES.  I THINK THAT THE POLICE WERE INVOLVED IN DRUG

8    TRAFFICKING.

9    Q.    YOU WERE INVOLVED IN DRUG TRAFFICKING IN '80-'81; IS THAT

10   CORRECT?

11   A.    I ASSUME THAT'S SO, YES.

12   Q.    THAT IS SO; ISN'T IT, SIR?

13   A.    WELL, I PUT IN RADIOS, SIR.

14   Q.    BUT YOU KNEW THEY WERE GOING TO BE USED TO FACILITATE

15   SELLING DRUGS AND MOVING DRUGS; ISN'T THAT CORRECT?

16   A.    WHEN I PUT THEM IN, NO, I DID NOT KNOW THAT.

17   Q.    THERE CAME A TIME IN '80 OR '81 WHEN YOU KNEW WHAT YOU

18   WERE DOING WAS HELPING DRUG TRAFFICKERS PUSH DRUGS; ISN'T THAT

19   CORRECT?

20   A.    YES, THAT IS CORRECT.

21   Q.    AND WHEN YOU WENT TO WORK IN ADDITION TO THE POLICE, FOR

22   MR. FONSECA IN '81, YOU KNEW YOU WERE WORKING FOR A THUG THAT

23   SOLD DRUGS; ISN'T THAT CORRECT?

24            MR. CARLTON:  OBJECTION.  ARGUMENTATIVE.

25            THE COURT:  THAT'S ASKING THE SAME QUESTION IN A

13-178

1    DIFFERENT WAY.  THE WITNESS HAS ANSWERED THAT QUESTION.

2    BY MR. MEDVENE:

3    Q.   NOW, YOU WERE RECEIVING PAYMENT THEN FROM '80-'81 FOR YOUR

4    DRUG WORK, BOTH FROM THE POLICE AND FROM MR. FONSECA; IS THAT

5    CORRECT?

6    A.   I WORKED WITH ELECTRONICS, SIR, AND I DID RECEIVE MONEY

7    FOR IT, YES.

8    Q.   YOUR WORK RELATED TO DRUGS.  YOU RECEIVED MONEY FROM BOTH

9    ERNESTO FONSECA AND FROM THE POLICE DEPARTMENT; ISN'T THAT

10   CORRECT?

11           MR. CARLTON:  OBJECT TO THE COMMENT, YOUR HONOR, THAT

12   PRECEEDED THAT QUESTION.

13           THE COURT:  YES, COUNSEL, THE EVIDENCE WILL SPEAK FOR

14   ITSELF.  THE WITNESS DOES NOT HAVE TO ACCEPT YOUR

15   CHARACTERIZATION.

16   BY MR. MEDVENE:

17   Q.   YOU ASSISTED IN THE MOVEMENT OF DRUGS AND DRUG CONVOYS FOR

18   BOTH THE POLICE AND MR. FONSECA; IS THAT CORRECT, SIR?

19   A.   I DO NOT KNOW THAT TO BE CORRECT.

20   Q.   YOU SAY -- IS IT TRUE THAT THE CONVOYS YOU HAD HELPED GET

21   PAST BLOCKADES TO YOUR KNOWLEDGE WERE DRUG CONVOYS, CONVOYS OF

22   TRUCKS WITH DRUGS IN THEM?

23   A.   TO MY KNOWLEDGE, THEY WERE NOT.  I SUSPECT THAT'S TRUE,

24   BUT I HAVE NO KNOWLEDGE.  I CANNOT AFFIRM THAT.

25   Q.   WELL, WHAT DID YOU THINK WERE IN THE CONVOYS THAT YOU WERE

13-179

1   HELPING MOVE PAST BLOCKADES

2   A.   I THOUGHT THEY WERE DRUGS.

3   Q.   AND YOU WILLINGLY ASSISTED MOVING THE DRUGS BECAUSE YOU

4   GOT PAID FOR THEM; IS THAT CORRECT, SIR?

5   A.   I OBEYED ORDERS.

6   Q.   NOW, YOU WENT FOR ERNESTO FONSECA -- STRIKE THAT.

7         YOU TALKED ABOUT A RADIO SYSTEM THAT YOU SET UP FOR

8   THE VARIOUS DRUG DEALERS THROUGH THE EARLY '80'S; IS THAT

9   CORRECT?

10  A.   NO, SIR, THAT IS NOT CORRECT.

11  Q.   DID YOU SET UP CERTAIN RADIO SYSTEMS FOR DRUG DEALERS IN

12  THE EARLY '80'S?

13  A.   NO, SIR, I DID NOT.

14  Q.   DID YOU SET UP COMMUNICATION SYSTEMS FOR VARIOUS DRUG

15  DEALERS IN THE EARLY '80'S?

16  A.   NO, SIR, I DID NOT.

17  Q.   DID YOU DO CERTAIN WORK FOR THIS FELIX GALLARDO?

18  A.   FOR MR. FELIX GALLARDO IN WHAT YEAR, SIR?

19  Q.   DID YOU DO WORK FOR FELIX GALLARDO IN ANY YEAR?

20  A.   YES, I DID.

21  Q.   AND WAS IT RELATED TO HAVING HIM DEAL IN DRUGS?

22  A.   THE ONLY WORK THAT I DID FOR MR. FELIX GALLARDO WAS I

23  FIXED A TELEVISION SET IN HIS HOME.  WHETHER IT WAS RELATED TO

24  DRUGS, I DON'T KNOW.  I THINK HE WAS JUST WATCHING T.V.

25  Q.   HOW ABOUT MR. FONSECA?

13-180

1   A.   I PUT IN A COMMUNICATIONS SYSTEM FOR HIM IN 1983, AS I

2   TESTIFIED.

3   Q.   AND THAT SYSTEM YOU KNOW HE UTILIZED IN CONNECTION WITH

4   HIS DRUGS ACTIVITIES; IS THAT CORRECT?

5   A.   I SUSPECT THAT WOULD BE SO, YES, SIR.

6   Q.   AND IN CONNECTION WITH THAT SYSTEM, YOU WENT TO THE UNITED

7   STATES TO PURCHASE MATERIALS THAT COULD BE UTILIZED IN CREATING

8   THIS SYSTEM; IS THAT CORRECT?

9   A.   YES, SIR.  I DID DO THAT.

10  Q.   AND IN COMING TO THE UNITED STATES, YOU HAD TO MAKE

11  CERTAIN STATEMENTS -- STRIKE THAT.

12          DID YOU USE AEROMEXICO TO SHIP SOME OF THESE PARTS TO

13  BE UTILIZED IN CONNECTION WITH MR. FONSECA'S DRUG

14  COMMUNICATIONS?

15  A.   YES, I DID.

16  Q.   AND DID YOU LIE TO THE AEROMEXICO PEOPLE ABOUT WHO THESE

17  PARTS WERE FOR?

18  A.   NO, I DID NOT.

19  Q.   WHO DID YOU TELL THEM THEY WERE FOR?

20  A.   I TOLD THEM THEY WERE FOR THE I.P.S. OFFICE IN

21  GUADALAJARA.

22  Q.   THEY WERE FOR MR. FONSECA'S HOME IN GUADALAJARA; ISN'T

23  THAT CORRECT?

24  A.   THEY WERE FOR AN ORGANIZATION, ALL OF WHOSE MEMBERS HAD

25  CREDENTIALS, VALID CREDENTIALS, I MIGHT ADD, FROM THE I.P.S.

13-181

1    OFFICE.

2            THE AEROMEXICO PEOPLE CALLED THE I.P.S. OFFICE, AND

3    IT WAS CONFIRMED TO THEM, AND THE SHIPMENT WAS INDEED RECEIVED

4    BY THE I.P.S. OFFICE IN GUADALAJARA.

5    Q.   BUT YOU KNEW WHEN YOU SPOKE TO THE AEROMEXICO PEOPLE THAT

6    THE PARTS YOU WERE GETTING WERE NOT FOR A LEGITIMATE USE, BUT

7    WERE FOR THE USE OF SETTING UP A DRUG COMMUNICATIONS SYSTEM IN

8    MR. FONSECA'S HOME; ISN'T THAT CORRECT, SIR?

9    A.   I KNEW THEY WERE FOR SETTING UP IN MR. FONSECA'S HOME OR

10   APARTMENT, YES, I DID KNOW THAT.

11   Q.   YOU DIDN'T TELL THE AEROMEXICO PEOPLE THAT; DID YOU, SIR?

12           YES OR NO, SIR?

13   A.   NO, I DID NOT TELL THEM THAT.

14   Q.   NOW, IN ADDITION, DID YOU HAVE TO MAKE CERTAIN STATEMENTS

15   TO THE CALIFORNIA STATE AUTHORITIES IN CONNECTION WITH THE

16   SHIPMENT?

17   A.   NO, I DID NOT.

18   Q.   DIDN'T THE CALIFORNIA STATE AUTHORITIES, TO YOUR

19   KNOWLEDGE, HAVE TO VERIFY CERTAIN THINGS WITH REFERENCE TO

20   THESE RADIOS BEING SHIPPED OUT OF THE COUNTRY?

21           MR. CARLTON:   OBJECTION, YOUR HONOR, CALLS FOR A

22   LEGAL CONCLUSION.

23           THE COURT:   SUSTAINED.

24   BY MR. MEDVENE:

25   Q.   IS IT TRUE, SIR, THAT YOU HAD CONTACT WITH A STORE WHERE

13-182

1    YOU PURCHASED THESE PARTS, AND YOU WERE TOLD YOU NEEDED CERTAIN

2    DATA SO THAT THE CALIFORNIA STATE AUTHORITIES WOULD NOT

3    INTERFERE WITH THE SHIPMENT?

4            MR. CARLTON:  OBJECTION, YOUR HONOR.  HEARSAY.

5            THE COURT:  OVERRULED.

6            THE WITNESS:  I WAS TOLD THAT.  IT WAS

7    COMMUNICATED -- THAT WAS COMMUNICATED TO ME ONCE I WAS BACK IN

8    GUADALAJARA, YES.

9    BY MR. MEDVENE:

10   Q.   AND YOU SENT, IN EFFECT, TO THIS COUNTRY FALSE STATEMENTS;

11   ISN'T THAT CORRECT?

12   A.   NO, SIR, THAT IS NOT CORRECT.

13   Q.   DIDN'T YOU SEND STATEMENTS INDICATING -- STRIKE THAT.

14           YOU SENT STATEMENTS INDICATING THAT THE MATERIALS YOU

15   GOT WERE GOING TO BE UTILIZED FOR A LEGITIMATE PURPOSE; ISN'T

16   THAT TRUE?

17   A.   NO, SIR, THAT'S NOT TRUE.

18   Q.   DO YOU INDICATE IN WHAT YOU SENT TO THIS COUNTRY THAT THE

19   MATERIALS WERE GOING TO BE USED FOR A DRUG OPERATION AT MR.

20   FONSECA'S HOUSE?

21   A.   I SENT NOTHING THIS COUNTRY, SIR.

22   Q.   DID YOU CAUSE ANY STATEMENTS TO BE SENT TO THIS COUNTRY

23   FROM THE I.P.S. OFFICE?

24   A.   THE STATEMENTS WERE CAUSED TO BE SENT BY THE COMANDANTE,

25   LEGITIMATE COMANDANTE OF THE I.P.S. OFFICE.  ONCE I EXPLAINED

13-183

1    THE PROBLEM TO HIM, HE TOOK HIS OWN ACTION, SIR.

2    Q.    AND THE PROBLEM WAS TO GET THE MATERIALS TO SET UP THE

3    DRUG COMMUNICATIONS SYSTEM, THIS COMANDANTE HAD TO PROCURE

4    CERTAIN DOCUMENTS; IS THAT CORRECT?

5    A.    NO, SIR, THAT'S NOT CORRECT.

6    Q.    WHAT DID HE HAVE TO DO?

7    A.    HE DIDN'T HAVE TO DO ANYTHING.  HE ALREADY HAD THE

8    MATERIALS, SIR.  HE HAD THEM IN HIS POSSESSION.  THAT WAS A

9    PROBLEM THAT I EXPLAINED TO HIM, BECAUSE I HAD BEEN TOLD THAT

10   BY THE STORE.  HE TOOK HIS OWN ACTION.

11   Q.    WHAT WAS HIS ACTION, TO YOUR KNOWLEDGE?

12   A.    TO MY KNOWLEDGE, HE MADE UP A STATEMENT SAYING THAT THE

13   SYSTEM HAD BEEN RECEIVED BY THE I.P.S. OFFICE IN GUADALAJARA

14   AND WAS FOR THEIR USE.

15   Q.    AND THAT WAS UNTRUE, TO YOUR KNOWLEDGE; ISN'T THAT

16   CORRECT?

17   A.    IT WAS PARTIALLY UNTRUE, YES.

18   Q.    WHEN YOU SAY IT WAS PARTIALLY UNTRUE, THE MATERIALS WERE

19   TO BE USED BY MR. FONSECA IN HIS DRUG OPERATION AT HIS HOUSE;

20   ISN'T THAT TRUE?

21          ISN'T THAT WHAT THE TRUTH IS?

22   A.    NO, SIR, THAT'S NOT WHAT THE TRUTH IS.

23   Q.    WERE THE MATERIALS THAT THE COMANDANTE WROTE ABOUT THE

24   MATERIALS THAT YOU UTILIZED TO SET UP THE COMMUNICATIONS SYSTEM

25   AT MR. FONSECA'S HOUSE?

13-184

1  A.   YES, THEY WERE.

2  Q.   NOW, FOR HOW MANY YEARS DID YOU WORK -- STRIKE THAT.

3       DID ERNESTO FONSECA HAVE CREDENTIALS OF THE I.P.S.?

4  A.   YES, SIR, HE DID.

5  Q.   AND DID THESE OTHER DRUG TRAFFICKERS, TO YOUR KNOWLEDGE,

6  HAVE THE CREDENTIALS THAT YOU DEALT WITH?

7  A.   ALMOST EVERYBODY I DEALT WITH HAD CREDENTIALS FROM SOME

8  TYPE OF POLICE ORGANIZATION.

9  Q.   AND THEY WERE ALL -- THEY WERE DRUG TRAFFICKERS OR PEOPLE

10 INVOLVED IN TRAFFICKING DRUGS; ISN'T THAT TRUE?

11 A.   THEY WERE PEOPLE WHO WERE RECOGNIZED BY THE LEGITIMATELY

12 EMPOWERED POLICE OFFICIALS OF THE COUNTRY WHERE I WORKED AS

13 POLICE OFFICIALS THEMSELVES.

14      WHERE THE LINE DROPPED OFF FROM BEING POLICE

15 OFFICIALS AND STARTED UP BEING DRUG BARONS OR DRUG TRAFFICKERS,

16 I DIDN'T SUSPECT AT FIRST.

17      AND BY THE TIME I DID SUSPECT IT, IT WAS TOO LATE.  I

18 COULDN'T GET OUT.

19 Q.   WELL, YOU HAD BEEN INVOLVED WITH DRUGS BEFORE YOU EVER

20 WENT TO MEXICO; WEREN'T YOU, SIR?

21 A.   NO, I HAD NOT.

22 Q.   MIGHT A CONVICTION FOR DEALING IN MARIJUANA WHILE YOU

23 WERE -- OR USING MARIJUANA WHILE YOU WERE HERE IN THE UNITED

24 STATES; ISN'T THAT TRUE?

25 A.   I HAD ALREADY GONE TO MEXICO BEFORE THAT CONVICTION, SIR.

13-185

1   Q.   AND YOU CAME BACK TO THE UNITED STATES AND THEN WERE

2   INVOLVED WITH THE MARIJUANA?

3   A.   THAT'S TRUE, SIR.

4   Q.   WELL, BETWEEN '82 AND '84, ISN'T IT TRUE THAT YOU DID WORK

5   FOR CARO QUINTERO THAT INVOLVED HIS DRUG ENTERPRISES?

6   A.   I HAVE NO IDEA WHAT IT INVOLVED.  I DID WORK FOR HIM, YES.

7   Q.   YOU KNEW IT WAS DRUG-RELATED WORK; DID YOU NOT?

8   A.   WITH HIM NO, SIR.  IT WAS WORK.  I NEVER SAW THE SYSTEM

9   EVEN TURNED ON.  I NEVER SAW IT EMPLOYED.

10  Q.   YOU ATTENDED OR WERE PRESENT AT A NUMBER OF MEETINGS

11  YOU'VE TOLD US ABOUT BETWEEN CERTAIN DRUG LORDS; IS THAT

12  CORRECT?

13  A.   YES, SIR, THAT'S TRUE.

14  Q.   AND WHO WERE THOSE PEOPLE?

15  A.   ERNESTO FONSECA CARRILLO, JAVIER BARBA HERNANDEZ, MANUEL

16  SALCIDO, MIGUEL ANGEL FELIX GALLARDO, JUAN JOSE ESPARRAGOZA.

17  Q.   WHERE DID THESE MEETINGS TAKE PLACE?

18  A.   THE MAJORITY OF THEM TOOK PLACE AT THE CUARZO HOUSE, SOME

19  OF THEM TOOK PLACE AT THE LAS FUENTES HOUSE, OTHERS TOOK PLACE

20  AT THE FIESTA AMERICANA HOTEL, OTHERS TOOK PLACE AT

21  RESTAURANTS.

22  Q.   WERE YOU PRESENT AT THESE MEETINGS?

23  A.   I WAS AROUND THEM, YES.  I WAS NOT A PARTICIPANT AT THESE

24  MEETINGS.

25  Q.   AND WHO WERE YOU ASSISTING AT THAT TIME, MR. FONSECA?

13-186

1    A.    THAT DEPENDS ON THE MEETING.  SOMETIMES I WAS THERE AS AN

2    ASSISTANT TO THE COMANDANTE.  SOMETIMES I WAS THERE FOR

3    MR. FONSECA.  SOMETIMES I WAS THERE FOR OTHER COMANDANTES.

4    Q.    AND YOU KNEW THESE PEOPLE WERE MEETING ABOUT THE DRUG

5    TRAFFIC AND SELLING DRUGS; ISN'T THAT TRUE?

6    A,    YES, SIR, IT IS TRUE THAT I KNEW THAT THE ENTIRE

7    GOVERNMENT APPARATUS OF MEXICO AND THE GUADALAJARA AREA AND

8    MANY OTHER AREAS WERE DEALING IN DRUGS.  YES, THAT IS TRUE.

9    Q.    AND YOU WERE GETTING PAID BY DRUG DEALERS?

10   A.    IN THE END, I KNEW I WAS BEING PAID BY DRUG DEALERS, YES,

11   SIR.

12   Q.    YOU KNEW IT IN '80 AND '81; DIDN'T YOU?

13   A.    I DID NOT SUSPECT THE SCOPE OF IT IN '80 AND '81, NO, I

14   DID NOT.

15   Q.    YOU DIDN'T THING MR. FONSECA WAS IN ANY LEGITIMATE

16   BUSINESS WHEN YOU STARTED WORKING FOR HIM IN '81; DID YOU?

17   A.    THE MEMBERS OF THE D.F.S. AND THE I.P.S. WERE OF SUCH

18   DIVERSE BACKGROUNDS, MOST OF THEM HAD CRIMINAL RECORDS, AND IT

19   WAS VERY DIFFICULT TO KNOW WHO WAS DOING WHAT.

20           BY THE TIME I DID KNOW, AS I TOLD YOU, IT WAS TOO

21   LATE FOR ME TO GET OUT.  AND I DEFINITELY DID KNOW WHAT THEY

22   WERE DOING AT A CERTAIN POINT, YES.  YOU'RE DEFINITELY RIGHT.

23   Q.    NOW, WHAT KIND OF WORK WERE YOU DOING WITH RESPECT TO

24   DRUGS WITH MR. GARATE?

25   A.    I NEVER DID ANY WORK WITH RESPECT TO DRUGS WITH

13-187

1    MR. GARATE.

2    Q.    YOU WORKED WITH HIM FROM '81 TO '83?

3    A.    YES, OFF AND ON.

4    Q.    AND MR. GARATE WORKED WITH ERNESTO FONSECA; DID HE NOT?

5    A.    HE DESCRIBED HIMSELF AS ERNESTO FONSECA'S PEOPLE, YES.

6    Q.    AND YOU KNEW HE WAS INVOLVED IN THE DRUG DEALING OF

7    ERNESTO FONSECA; DID YOU NOT?

8    A.    THE SAME ANSWER APPLIES.  THERE CAME A TIME WHEN I KNEW

9    THAT THAT WAS WHAT WAS HAPPENING, YES, THAT'S TRUE.

10   Q.    IT WAS DURING THIS TIME WHEN YOU WERE WORKING WITH GARATE

11   BUSTAMANTE; ISN'T THAT TRUE?

12   A.    YES.  AT THE LATTER PART OF THAT TIME, YES, I DID KNOW IT

13   BY THEN.

14   Q.    NOW, YOU ALSO HELPED, AFTER KNOWING YOU HAD BEEN WORKING

15   WOULD THESE TRAFFICKERS FOR YEARS, AFTER YOU GOT OUT OF PRISON

16   YOU WENT BACK AND WORKED WITH COLOMBIAN TRAFFICKERS; ISN'T THAT

17   TRUE?

18   A.    NO, THAT'S NOT TRUE.

19   Q.    DIDN'T YOU IN '85 OR '86 ASSIST CERTAIN COLOMBIAN

20   TRAFFICKERS IN CONNECTION WITH RADIO COMMUNICATION AND AIRCRAFT

21   AND SMUGGLING IN COCAINE AND MARIJUANA?

22   A.    I ASSISTED IN THAT OPERATION AS A POLICE OPERATIVE, SIR.

23   Q.    AS A POLICE OPERATIVE?

24   A.    YES, SIR.

25   Q.    WHAT DOES THAT MEAN?

13-188

1    A.    THAT MEANS THAT MR. GARATE CAME TO ME AND TOLD ME THAT HE

2    WAS MAKING A POLICE INVESTIGATION, THAT I SHOULD GO AND DO THE

3    WORK THAT HE ORDERED ME TO DO AND REPORT ALL OF IT TO HIM SO HE

4    COULD MAKE A REPORT ON IT TO THE PROPER POLICE AUTHORITIES,

5    WHICH I UNDERSTAND HE DID.

6    Q.    AND WERE DRUGS BROUGHT INTO THIS COUNTRY?

7    A.    I BELIEVE SO.  NO -- INTO THIS COUNTRY, SIR?

8          NO. THEY WERE BROUGHT INTO THE COUNTRY OF MEXICO.

9    Q.    NOW, WERE YOU ASSOCIATED WITH A GROUP CALLED LOS DORMITOS?

10   A.    NO, SIR, I WAS NOT ASSOCIATED WITH THEM; THEY WERE

11   ASSOCIATED WITH MR. FONSECA AND THEY WERE FRIENDS OF MINE.

12   Q.    WE RECEIVED CERTAIN MATERIAL FROM THE GOVERNMENT WHICH

13   SAYS YOU WERE ASSOCIATED WITH A GROUP CALLED LOS DORMITOS.

14         COULD YOU TELL US WHAT LOS DORMITOS IS?

15   A.    LOS DORMITOS WERE GENERAL FACTONS (PHONETIC) IN MR.

16   FONSECA'S HOUSE, AND MR. CARO'S HOUSE.  THEY DID EVERYTHING

17   FROM POLISH THE CARS TO SWEEP OUT THE OFFICE, TO CUT THE LAWN,

18   TO TAKE OUT THE TRASH, TO -- WHATEVER THEY WERE TOLD TO DO,

19   THEY DID.

20   Q.    NOW, INCIDENTALLY, THESE -- STRIKE THAT.

21         THERE WAS A RELATIVELY LARGE NUMBER OF MEETINGS THAT

22   YOU'VE DESCRIBED, IS THAT CORRECT, BETWEEN FELIX GALLARDO AND

23   QUINTERO AND FONSECA AND BARBA HERNANDEZ AND SALCIDO.  THERE

24   WAS A LARGE NUMBER OF MEETINGS THAT YOU WERE AROUND AT THE

25   LOCATIONS YOU'VE TOLD US; IS THAT CORRECT?

13-189

1    A.   YES, SIR.

2    Q.   MR. ZUNO ARCE WAS NOT PRESENT AT ANY OF THOSE MEETINGS,

3    WAS HE?

4    A.   NO, SIR.  HE WAS NOT PRESENT AT ANY OF THOSE MEETINGS.

5    Q.   NOW, WITH RESPECT TO ESPINO VERDIN, HE WAS A COMANDANTE?

6    A.   YES, SIR.  HE WAS THE COMMANDING OFFICER.

7    Q.   AND YOU WORKED WITH HIM; DID YOU NOT?

8    A.   YES, SIR.

9    Q.   AND DID YOU WORK WITH HIM IN CONNECTION WITH A CERTAIN

10   EXTORTION PLAN?

11   A.   NO, SIR I, DID NOT.

12   Q.   DID YOU WORK WITH HIM IN CONNECTION WITH PUTTING IN

13   CERTAIN RADIO COMMUNICATIONS SYSTEMS THAT WERE UTILIZED TO

14   FACILITATE DRUG TRAFFICKING?

15   A.   I BELIEVE SO, YES.

16   Q.   YOU KNEW YOU WERE DOING THAT WHEN YOU WORKED FOR HIM; DID

17   YOU NOT?

18   A.   THERE CAME A TIME WHEN I KNEW EXACTLY WHAT I WAS DOING,

19   SIR.   YES, THAT IS TRUE.

20   Q.   WHAT WERE YOU DOING, SIR, IMMEDIATELY PRIOR TO SEPTEMBER

21   OF 1989?  WHAT KIND OF WORK WERE YOU DOING?

22   A.   SEPTEMBER OF 1989, I WAS A COMMUNICATIONS CONSULTANT.

23   Q.   FOR WHAT COMPANY, SIR?

24   A.   FOR MY OWN COMPANY, COMUNICACION ARBOLERAS, AND I HAD A

25   NUMBER OF CLIENTS, AMONG THEM GOVERNMENT OFFICIALS, FREE PARTY,

1    AND A NUMBER OF PRIVATE COMPANIES ALSO.

2    Q.   WHERE WAS THE OFFICE?   WHERE WAS IT LOCATED?

3    A.   IT WAS LOCATED AT ARBOLERAS 991.

4    Q.   AND THESE FUNCTIONS THAT YOU HAVE TOLD US ABOUT WHERE YOU

5    SAW MR. ZUNO, THE TWO FUNCTIONS, DID YOU AT OR AROUND THE TIME

6    OF THOSE FUNCTIONS MAKE ANY NOTES?

7    A.   NO, SIR, I DID NOT.   I DID NOT SAY THERE WERE TWO

8    FUNCTIONS, I SAID THERE WAS ONE FUNCTION AND ONE MEETING AT AN

9    OFFICE.

10   Q.   YOU MADE NO NOTES OF ANY KIND IN '83 WHEN THIS HAPPENED?

11   A.   NO, I DID NOT, SIR.

12   Q.   PRIOR TO 1989, FOR THAT PERIOD OF FIVE YEARS OR SO, DID

13   YOU TELL ANYONE OF HAVING SEEN MR. ZUNO ALLEGEDLY IN NOVEMBER

14   OF 1983?

15        MR. CARLTON:   OBJECTION, YOUR HONOR, IRRELEVANT.

16        THE WITNESS:   YES, SIR, I DID.

17        THE COURT:   OVERRULED.

18   BY MR. MEDVENE:

19   Q.   DID YOU COOPERATE WITH ANY MEXICAN LAW ENFORCEMENT

20   OFFICIALS AND MAKE ANY OFFICIAL REPORTS OF WHAT YOU SAW?

21   A.   YES, SIR, I DID.

22   Q.   WHO DID YOU REPORT IT TO?

23   A.   I REPORTED IT TO COMANDANTE FLORENTINO VENTURA.

24   Q.   DID YOU CALL ANYONE IN THE D.E.A. OFFICE IN GUADALAJARA

25   AND REPORT IT TO THEM?

13-191

1    A.    NO, SIR.  I HAD NO CONTACT WITH THE D.E.A. OFFICE.

2    Q.    HOW DID YOU FIRST COME TO THE D.E.A. OFFICE OR COME TO

3    CONTACT THEM?

4    A.    I CONTACTED MR. GARATE.

5    Q.    YOU KNOW FLORENTINO VENTURA IS DEAD; DON'T YOU?

6    A.    YES, SIR, I KNOW HE'S DEAD.

7    Q.    DID YOU CONTACT ANYONE ALIVE?

8    A.    HE WASN'T DEAD WHEN I CONTACTED, HIM, SIR.

9    Q.    WELL, HE'S DEAD NOW, ISN'T HE?

10   A.    YES.  PEOPLE DO DIE.

11   Q.    IS THERE ANYONE YOU TOLD ABOUT MR. ZUNO ALLEGEDLY BEING AT

12   THIS MEETING YOU DESCRIBED IN NOVEMBER THAT'S ALIVE NOW THAT

13   YOU SPOKE TO PRIOR TO SEPTEMBER OF '89?

14   A.    YES.  YES, THERE ARE PEOPLE.  IF YOUR QUESTION IS DID I

15   MAKE REPORTS TO THE LEGITIMATE LAW ENFORCEMENT AGENCIES IN

16   MEXICO, NO, SIR, I DID NOT.  I WOULDN'T HAVE.

17        WHO WOULD I REPORT IT TO?

18   Q.    EVERYONE IN MEXICO, IN YOUR VIEW, WAS CORRUPT?

19   A.    EVERYONE I MET AND EVERYONE I SAW, YES, SIR.  NOT EVERY-

20   ONE, NOT THE PEOPLE, NO.  THE LAW ENFORCEMENT APPARATUS AND THE

21   ARMY APPARATUS WERE ALL TOGETHER IN THIS OPERATION, SIR.

22        I WOULD NOT HAVE KNOWN WHO TO REPORT IT TO, FRANKLY.

23   Q.    YOU KNEW THERE WAS A D.E.A. OFFICE IN GUADALAJARA; DIDN'T

24   YOU?  DID KNOW THAT?

25   A.    DID I KNOW THAT?  I SUSPECT THERE IS.  I DON'T KNOW.

13-192

1    NOBODY EVER TOLD ME THERE WAS.

2    Q.    SO YOU DIDN'T KNOW THERE WAS A D.E.A. OFFICE IN

3    GUADALAJARA?

4    A.    I HAD NO DEALINGS WITH THEM.

5    Q.    MY QUESTION IS DID YOU KNOW THERE WAS A D.E.A. OFFICE IN

6    GUADALAJARA?

7    A.    I KNOW THERE IS A CONSULATE.  I SUPPOSE THERE IS A D.E.A.

8    OFFICE THERE.  I HAVE NO PERSONAL KNOWLEDGE OF THAT.

9    Q.    SO YOUR ANSWER IS YOU DID NOT NO DURING THE PERIOD OF TIME

10   FROM 832' --

11            THE COURT:  COUNSEL, WE HEARD HIS ANSWER.

12            MR. MEDVENE:  YES, YOUR HONOR.

13   BY MR. MEDVENE:

14   Q.    WERE YOU IN JAIL, SIR, FROM SOMETIME IN -- STRIKE THAT.

15            DID YOU GO TO PRISON IN MEXICO IN OR ABOUT OCTOBER OF

16   1984?

17   A.    I WENT TO PRISON ON SEPTEMBER 11, 1984, SIR.  NOT TO

18   PRISON, I WAS SENT FIRST TO A JAIL SECTION OF THE CIVIL

19   HOSPITAL.  I WAS LATER TRANSFERRED TO THE PRISON.

20   Q.    AND WERE YOU IN CUSTODY THROUGH SOMETIME IN 1986?

21   A.    I WAS IN CUSTODY DURING A SHORT TIME IN 1986, YES, SIR.

22   Q.    SO WOULD IT BE FAIR TO SAY THAT YOU WERE CONTINUALLY IN

23   CUSTODY FROM SOMETIME IN OR ABOUT SEPTEMBER OF 1984 THROUGH

24   SOMETIME IN 1986?

25   A.    NO, SIR, THAT WOULDN'T BE CORRECT.

13-193

1    Q.    WHAT WOULD BE CORRECT?

2    A.    A CORRECT STATEMENT WOULD BE THAT I ENTERED INTO CUSTODY

3    SEPTEMBER 11, 1984 AND I WAS RELEASED FROM CUSTODY IN MAY OF

4    1985.  I WAS REARRESTED IN 1986 AND I WAS RELEASED IN THE SAME

5    YEAR OF 1986.

6    Q.    WERE YOU ARRESTED, SIR, FOR EXTORTION?

7    A.    YES, I WAS ARRESTED FOR EXTORTION.

8    Q.    AND WERE YOU CONVICTED OF EXTORTION?

9    A.    I DO NOT KNOW, SIR.  I THINK I WAS.

10   Q.    YOU WERE ALSO ARRESTED, WERE YOU NOT, FOR ROBBERY?

11   A.    YES, SIR.  I WAS ARRESTED FOR ROBBERY AND THE ARRAIGNMENT

12   WAS --

13   Q.    AND YOU WERE CONVICTED OF ROBBERY; IS THAT CORRECT, SIR?

14   A.    I BELIEVE I WAS CONVICTED OF ROBBING THE RADIOS OF

15   GUBERNACION I HAD WHEN I WAS SHOT.

16   Q.    YOU WERE CONVICTED OF GANGSTERISM; IS THAT CORRECT?

17   A.    I BELIEVE THAT WAS ONE OF THE CHARGES, TOO.  YES, SIR.

18   Q.    THAT YOU WERE CONVICTED OF?

19   A.    I'M NOT SURE I WAS CONVICTED, BUT I WAS CHARGED WITH THAT,

20   YES.

21   Q.    WERE YOU ALSO CHARGED WITH BEING ILLEGALLY IN THE COUNTRY?

22   A.    YES.

23   Q.    DID YOU HAVE ANY WORK PERMIT OF ANY KIND?

24   A.    NO, I DID NOT.

25   Q.    THE ENTIRETY OF THE PERIOD IN MEXICO, YOU HAD NO WORK

1    PERMIT OF ANY KIND?

2    A.    NO.   I HAD PERMISSION OF THE AUTHORITIES TO BE THERE.

3    Q.    NOW, WHEN IS THE FIRST TIME THAT YOU SPOKE TO ANY AGENT OF

4    THE D.E.A.?

5    A.    I BELIEVE IT WAS IN SEPTEMBER OF 1989.

6    Q.    NOW, WOULD THAT BE THE FIRST TIME YOU MADE ANY REFERENCE

7    TO ANYBODY IN D.E.A. ABOUT THE FACT THAT MR. ZUNO, SOME FIVE

8    YEARS BEFORE, YOU HAD SEEN GREET CARO QUINTERO, ALLEGEDLY?

9    A.    YES.

10    Q.    WHAT OCCURRED -- STRIKE THAT.

11            WHO DID YOU TALK TO PRIOR TO COMING TO THE UNITED

12    STATES AND INDICATING THAT FIVE YEARS PRIOR YOU HAD SEEN

13    MR. ZUNO AT THIS GALLERY?

14    A.    I DID NOT COME HERE TO MAKE THAT TESTIMONY.  I CAME HERE

15    TO TELL EVERYTHING THAT I KNEW.   THAT WAS ONE OF THE THINGS

16    THAT THEY ASKED ME.

17    Q.    WHO DID YOU FIRST CONTACT BEFORE YOU CAME HERE ABOUT

18    COMING HERE?

19    A.    MR. GARATE.

20    Q.    THIS IS THE SAME GARATE BUSTAMANTE THAT WORKED FOR

21    MR. FONSECA?

22    A.    YES, SIR.

23    Q.    AND YOU KNEW HIM THROUGH THE YEARS, DID YOU NOT, FROM '81

24    THROUGH '88?

25    A.    I KNEW HIM FROM THE LATTER PART OF 1980 UP UNTIL THE

13-195

1    PRESENT DATE.

2    Q.    NOW, DID HE CONTACT YOU SOMETIME IN 1989 AND SAY:    "CAN

3    YOU SUPPLY SOME INFORMATION FOR US ABOUT ASSOCIATIONS OF

4    PEOPLE"?

5    A.    NO, SIR, HE DID NOT.    HE SENT SOMEBODY TO ASK IF I WOULD

6    COME TO THE UNITED STATES.

7    Q.    BEING IN JAIL, YOU HAD NO KNOWLEDGE, FIRSTHAND KNOWLEDGE

8    OF ANY OF THE EVENTS THAT LED UP TO THE KIDNAPPING OF ENRIQUE

9    CAMARENA, DID YOU?

10   A.    THE EVENTS THAT LED UP TO IT, YES.    THE EVENTS SURROUNDING

11   THE KIDNAPPING AND MURDER OF ENRIQUE CAMARENA, NO, I HAVE NO

12   KNOWLEDGE.

13   Q.    NOW, WHO DID MR. GARATE SEND DOWN TO YOU SEE YOU?

14   A.    HE DIDN'T SEND DOWN ANYBODY.    I WAS CONTACTED BY AN

15   OFFICIAL OF THE MINISTRY OF THE INTERIOR.    I DON'T RECALL HIS

16   NAME.

17   Q.    WHEN DID HE CONTACT YOU?

18   A.    THE FIRST TIME HE CONTACTED ME WAS MORE OR LESS JULY --

19   SOMETIME AROUND JULY OF 1989.

20   Q.    AND WHERE WERE YOU WHEN HE CONTACTED YOU?

21   A.    I WAS WORKING IN GUADALAJARA.

22   Q.    AND WAS THIS GENTLEMAN FROM GUADALAJARA OR IN THE MINISTRY

23   OF THE INTERIOR IN GUADALAJARA?

24   A.    HE'S A COMANDANTE WITH THE MINISTRY OF THE INTERIOR.

25   Q.    HAD YOU MET HIM BEFORE?

1    A.    YES.

2    Q.    WHAT IS HIS NAME?

3    A.    I DON'T RECALL.

4    Q.    WOULD YOU RECALL HIS FIRST NAME?

5    A.    NO.  I HAVE NO RECALL OF HIS NAME AT ALL.

6    Q.    HOW MANY TIMES HAD YOU MET HIM BEFORE THIS TIME IN JULY OF

7    '89 WHEN HE CALLED YOU?

8    A.    MANY TIMES.

9    Q.    HOW MANY TIMES?

10    A.    MANY, MANY TIMES.

11    Q.    30, 40, 50?

12    A.    I'D SAY A LOT MORE THAN THAT.

13    A.    A HUNDRED?

14    A.    PROBABLY MORE.

15    Q.    AND YOU'VE KNOWN THIS COMANDANTE OVER A PERIOD OF MANY

16    YEARS IN WHICH YOU HAVE HAD 100 OR MORE MEETINGS WITH HIM; IS

17    THAT CORRECT?

18    A.    I THINK I'VE HAD MANY, MANY MORE MEETINGS THAN THAT, YES.

19    Q.    AND YOU DON'T REMEMBER HIS FIRST NAME?

20    A.    I CAN'T SEEM TO RECALL IT.

21    Q.    OR HIS LAST NAME?

22    A.    NO, I JUST RECALL THAT HE'S STILL THERE.

23    Q.    ARE YOU SAYING THAT UNDER OATH YOU'RE GOING TO TELL US YOU

24    DON'T KNOW HIS NAME, EVEN THOUGH YOU DO KNOW HIS NAME; IS THAT

25    WHAT YOU'RE SAYING?

1          MR. CARLTON:  OBJECTION, YOUR HONOR.  ASKED AND

2    ANSWERED.

3          THE WITNESS:  I'M SAYING THAT I DON'T AT THIS MOMENT

4    RECALL HIS NAME, SIR.

5    BY MR. MEDVENE:

6    Q.  YOU'VE TOLD US UNDER OATH YOU DON'T RECALL HIS NAME.  I'M

7    ASKING YOU, SO THE RECORD IS CLEAR, SIR, ARE YOU SAYING YOU

8    DON'T WANT TO TELL ME HIS NAME OR THAT YOU DO NOT RECALL HIS

9    NAME?

10         MR. CARLTON:  OBJECTION.  ASKED AND ANSWERED.

11         THE COURT:  SUSTAINED.

12   BY MR. MEDVENE:

13   Q.  DID THIS PERSON WHOSE NAME YOU DON'T RECALL TELL YOU IN

14   JULY OF 1989 WHY HE WAS CALLING?

15   A.  HE TOLD ME THAT HE HAD CONTACT WITH SOME PEOPLE FROM THE

16   AMERICAN AUTHORITIES AND THAT THEY WANTED TO TALK TO ME.

17   Q.  AND DID YOU SAY YOU WOULD GO TALK TO THEM?

18   A.  AT FIRST I DID NOT SAY THAT, NO.

19   Q.  DID YOU SAY YOU DIDN'T WANT TO TALK TO HIM?

20   A.  YES.  AT FIRST I DID.

21   Q.  IS THIS THE FIRST CONTACT IN JULY OF '89?

22   A.  YES.  I'M NOT SURE OF THE DATE.  IT MIGHT HAVE BEEN A

23   LITTLE BEFORE THAT OR A LITTLE BIT AFTER, BUT IT WAS AROUND

24   THAT TIME.

25   Q.  NOW, DID THIS MAN WHOSE NAME YOU DON'T RECALL, DID HE CALL

13-198

1   YOU AGAIN?

2   A.   YES.

3   Q.   AND HOW LONG AFTER THE FIRST CALL?

4   A.   HE CALLED ME REPEATEDLY.  OVER AND OVER AGAIN.

5   Q.   THE FIRST TIME, DID YOU TELL HIM YOU DON'T HAVE ANY

6   INFORMATION YOU COULD GIVE HIM THAT WOULD BE HELPFUL?

7   A.   NO, I DID NOT.  HE ALREADY KNEW I HAD INFORMATION.

8   Q.   HOW MANY TIMES DID HE CALL YOU IN WHICH YOU SAID YOU WOULD

9   NOT FURNISH INFORMATION?

10   A.   THE TIMES THAT I SAID I DID NOT WANT TO FURNISH

11   INFORMATION AND HAD ALREADY BEEN SHOT AND HAD ALREADY BEEN

12   CLOSE TO DEATH AND DIDN'T WANT TO TAKE THE CHANCE OF DYING

13   AGAIN OR BEING SHOT AGAIN?

14        THERE WERE MANY TIMES.  I DON'T RECALL HOW MANY

15   TIMES.

16   Q.   YOU COULD HAVE COME UP TO THE UNITED STATES WHENEVER YOU

17   WANTED; COULDN'T YOU, SIR?

18   A.   NO, SIR, I COULD NOT.

19   Q.   YOU CAME UP HER IN SEPTEMBER AFTER FIVE YEARS TO TESTIFY

20   IN FRONT OF THE GRAND JURY; DID YOU NOT?

21   A.   I SNUCK UP HERE, SIR.

22   Q.   AND THEN YOU RETURNED BACK TO MEXICO --

23   A.   EVEN THEN, I SNUCK UP HERE IN FEAR OF MY LIFE.

24   Q.   THEN YOU RETURNED BACK TO MEXICO?

25   A.   YES, I SNUCK BACK IN TO MEXICO.

13-199

7

1    Q.    DID YOU SNEAK BACK TO MEXICO FOR A NUMBER OF MONTHS BEFORE

2    YOU CAME BACK UP HERE THIS YEAR?

3    A.    NO, I DIDN'T SNEAK AROUND MEXICO.  I SNUCK IN AND OUT OF

4    THE COUNTRY, BECAUSE THE GUBERNACION PEOPLE WOULD HAVE KNOWN

5    THAT I WAS COMING AND LEAVING.  THEY HAVE A LIST.

6    Q.    HOW MANY TIMES DID THIS MAN IN JULY -- THAT STARTED

7    CALLING IN OR ABOUT JULY OF '89 -- CALL YOU UNTIL YOU SAID YOU

8    WOULD FURNISH CERTAIN INFORMATION?

9    A.    I DID NOT SAY I WOULD FURNISH CERTAIN INFORMATION; I SAID

10   I WOULD FURNISH ANY INFORMATION THAT I HAD, THAT I WOULD FREELY

11   ANSWER ANY QUESTIONS.

12   Q.    WHEN DID YOU FINALLY SAY THAT TO HIM?  AFTER HOW MANY

13   CALLS?

14   A.    I DON'T RECALL HOW MANY CALLS.  IT WAS MANY CALLS.

15   Q.    WHEN DID YOU FIRST TELL HIM, IN WHAT MONTH, THAT YOU WOULD

16   SUPPLY INFORMATION?

17   A.    SEPTEMBER.

18   Q.    AND WHAT THEN HAPPENED?

19   A.    THEN A ROUTE WAS ARRAIGNED FOR ME TO LEAVE MEXICO AND COME

20   AND TALK TO THE AUTHORITIES IN THE UNITED STATES.

21   Q.    WHEN DID YOU FIRST TALK TO GARATE BUSTAMANTE ABOUT THIS?

22   A.    AFTER I WAS ALREADY UP HERE, I ASKED TO BE PUT IN TOUCH

23   WITH HIM.  HE'S AN OLD FRIEND, AND I HADN'T SEEN HIM IN MANY

24   YEARS.

25   Q.    HAD YOU HAD ANY COMMUNICATION WITH HIM BETWEEN THE TIME

13-200

1    THIS PERSON WHOSE NAME YOU CAN'T REMEMBER CALLED YOU IN JULY

2    AND THE TIME YOU COMMUNICATED WITH HIM AFTER YOU HAD BEEN IN

3    THE UNITED STATES?

4    A.    HE HAD TRIED TO CONTACT ME ON A NUMBER OF OCCASIONS OVER

5    THE LAST FIVE YEARS, BUT I HADN'T ANSWERED HIS CALLS.

6    Q.    WHY HADN'T YOU ANSWERED YOUR FRIEND'S CALLS?

7    A.    WELL, THE SAME YEAR I WAS SHOT, SIR, I BEGAN TO LIVE WITH

8    THE WOMAN WHO'S NOW MY WIFE.  I HAD MY FIRST CHILD -- WE HAD

9    OUR FIRST CHILD.  WE NOW HAVE THREE CHILDREN, THERE ARE VERY

10   YOUNG.

11          I HAD BEEN SHOT NINE TIMES.  I ALMOST DIED.  THE MAN

12   WHO WAS WITH ME WAS ASSASSINATED BY THE POLICE IN FRONT OF MY

13   FACE.  I WAS RELUCTANT TO PUT MY FAMILY THROUGH THAT AGAIN.

14          I REALIZED THAT I WOULD BE UNDER A VIRTUAL SENTENCE

15   OF DEATH FOR THE REST OF MY LIFE BY DOING IT.  IT WAS A HARD

16   DECISION TO MAKE.  THAT'S THE TRUTH.

17   Q.    SO YOU MADE YOUR DECISION SOMETIME IN SEPTEMBER?

18   A.    YES.

19   Q.    AND YOU DECIDED THEN TO CALL MR. BUSTAMANTE WHERE YOU

20   HADN'T CALLED HIM BEFORE?

21   A.    I HADN'T TALKED TO MR. BUSTAMANTE AT ALL.  I DECIDED AT

22   THAT TIME TO ACCEPT THE OFFER THAT HAD BEEN EXTENDED TO ME TO

23   TRAVEL TO THE UNITED STATES AND SPEAK WITH THE AUTHORITIES HER.

24   Q.    HAD YOU BEEN TOLD THAT IF YOU GAVE INFORMATION THAT WAS

25   HELPFUL, THAT YOUR FAMILY WOULD BE RELOCATED TO THIS COUNTRY?

1    A.    THERE WERE NO PRECONDITIONS WHATSOEVER.

2    Q.    WHEN DID YOU FIRST FIND OUT THAT YOU WOULD BE PAID IF YOU

3    FURNISHED INFORMATION THAT WOULD BE HELPFUL?

4    A.    I WAS NEVER TOLD THAT I WOULD BE PAID IF I FURNISHED

5    INFORMATION.

6         THE SECOND OR THIRD TIME THAT I CAME UP HERE, THEY

7    TOLD ME THAT I SHOULD NOT GO BACK.  THEY GAVE ME CONVINCING

8    REASONS FOR ME NOT GOING BACK.  I KNEW WHAT THEY WERE SAYING

9    WAS CORRECT BY MY OWN OBSERVATIONS.

10        FROM THAT TIME ON, THEY HAVE PAID MY LIVING EXPENSES,

11   BUT I DID NOT ASK THEM FOR THAT.

12   Q.    WHEN YOU -- WHO WAS THE FIRST PERSON IN THE D.E.A. THAT

13   YOU SPOKE TO?

14   A.    HECTOR BERRELLEZ.

15   Q.    WHEN WAS THAT?

16   A.    IN SEPTEMBER OF 1989.

17   Q.    WHEN IN SEPTEMBER?

18   A.    THE EXACT DATE, I REALLY DON'T KNOW, SIR.  I CAN'T TELL

19   YOU THAT.  IT WAS SOMETIME IN SEPTEMBER OF 1989.

20   Q.    IN LOS ANGELES?

21   A.    I THINK HE MEET ME AT THE BORDER AND WE CAME TO LOS

22   ANGELES, AND I SPOKE TO HIM HERE.

23   Q.    WAS ANYONE ELSE PRESENT AT THE MEETING?

24   A.    THERE WERE OTHER AGENTS.  I'M NOT SURE ALL THE OTHER

25   PEOPLE THAT WERE THERE.

1    Q.    WAS THERE ANYBODY ELSE AT YOUR MEETING WITH HIM?

2    A.    DURING PART OF THE TRIP, MR. GARATE WAS PRESENT.  THEN HE

3    WENT ON TO HIS OWN HOUSE OR WHEREVER HE WENT, AND I CONTINUED

4    ON WITH MR. BERRELLEZ.

5    Q.    SO YOU DID SEE MR. GARATE AT THE SAME TIME YOU FIRST SAW

6    MR. BERRELLEZ?

7    A.    YES.  ON THE FIRST TRIP, I DID.  I ASKED TO SEE HIM.

8    Q.    HAD YOU SPOKEN TO HIM BEFORE THAT?

9    A.    NOT FOR MANY YEARS.

10    Q.    SO THE FIRST TIME SAW HIM IN MANY YEARS WAS AT THE BORDER?

11    A.    YES.

12    Q.    WAS THAT THE FIRST TIME YOU SPOKE TO HIM IN MANY YEARS?

13    A.    I DIDN'T SEE HIM AT THE BORDER, I SAW HIM IN PHOENIX.

14    THERE WAS A TIME -- DURING THE TIME I CAME UP, HE JOINED US

15    SOMEPLACE.  I ASKED SPECIFICALLY IF I COULD SEE HIM.

16    Q.    BUT HADN'T SPOKEN TO HIM IN YEARS UNTIL THE TIME YOU SAW

17    HIM; IS THAT CORRECT?

18    A.    WELL, IT ISN'T EXACTLY CORRECT.  HE HAD CALLED ME ON A

19    NUMBER OF OCCASIONS, AS I TOLD YOU, BUT THE ONE TIME THAT I

20    ANSWERED THE PHONE TO HIM -- THE CALL THAT HE -- THAT HE CALLED

21    ME, I JUST TOLD HIM THAT I HAD NOTHING TO TELL HIM, THAT I

22    COULDN'T -- I MEAN, I DIDN'T LET HIM GET TO FIRST BASE.  I JUST

23    CUT THE CONVERSATION OFF.

24    Q.    SO YOU DID SPEAK WITH HIM?  YOU TOLD US A MOMENT AGO YOU

25    HADN'T SPOKEN WITH HIM FOR MANY YEARS.  DO YOU REMEMBER NOW

13-203

1    THAT YOU HAD SPOKEN TO HIM?

2    A.    NO.   I'M TRYING TO BE HONEST WITH YOU, SIR, AND GET THE

3    WHOLE STORY OUT.   I THINK THAT'S WHAT YOU WANT AND PROBABLY

4    WHAT THE COURT WANTS ALSO, AND THAT'S WHAT I'M TRYING TO DO.

5    Q.    EXCUSE ME, SIR.   MY QUESTION IS YOU TOLD US A FEW MINUTES

6    AGO THAT YOU DID NOT SPEAK TO HIM.

7            DO YOU KNOW REMEMBER HAVING SPOKEN TO HIM BEFORE YOU

8    CAME TO THIS COUNTRY?   JUST YES OR NO, SIR, IF YOU REMEMBER

9    SPEAKING TO HIM BEFORE YOU CAME TO THE COUNTRY?

10   A.    BEFORE I CAME TO THE COUNTRY, YES, MANY TIMES.   I'VE KNOWN

11   HIM FOR YEARS, BUT --

12   Q.    IN THE LAST SEVERAL YEARS BEFORE YOU CAME TO THIS COUNTRY

13   IN OR ABOUT SEPTEMBER OF '89, HAD YOU SPOKEN TO MR. GARATE

14   BUSTAMANTE?

15   A.    HOW MANY "SEVERAL YEARS", SIR?

16   Q.    IN THE THREE YEARS BEFORE SEPTEMBER OF 1989, DID YOU SPEAK

17   TO GARATE BUSTAMANTE?

18   A.    I EXCHANGED GREETINGS WITH MR. GARATE, YES.

19   Q.    AND ON HOW MANY OCCASIONS BETWEEN 1986 AND SEPTEMBER OF

20   1989 DID YOU SPEAK TO GARATE BUSTAMANTE?

21   A.    WELL, YOU'LL HAVE TO HAVE -- I THINK YOU'RE MIXING YOUR

22   DATES UP, SIR.   EXCUSE ME, BUT HE CAME TO THE UNITED STATES IN

23   1986.

24           AFTER HE CAME TO THE UNITED STATES, AFTER HE WAS

25   DISCOVERED WORKING FOR THE D.E.A. IN MEXICO AND BEATEN UP AND

13-204

1    BROUGHT BACK TO THIS COUNTRY --

2              THE COURT:  OBJECTION.  MOVE TO STRIKE, YOUR HONOR.

3    I'VE ASKED THE WITNESS A QUESTION HE HAS NOT RESPONDED TO, YOUR

4    HONOR.

5              THE COURT:  I THINK HE'S TRYING TO GET BEARINGS ON

6    THE DATES.

7              THE WITNESS:  I WANT TO ANSWER YOUR QUESTION IF YOU

8    WOULD JUST TELL ME EXACTLY WHEN YOU'RE TALKING ABOUT.

9    BY MR. MEDVENE:

10   Q.   WHAT I'M TALKING ABOUT, SIR, IS 1986 THROUGH SEPTEMBER OF

11   1989.  HOW MANY TIMES DID YOU SPEAK TO GARATE BUSTAMANTE?

12   A.   I SPOKE TO HIM VARIOUS TIMES IN 1986 BEFORE HE HAD COME TO

13   THE UNITED STATES.  AFTER HE HAD COME TO THE UNITED STATES, I

14   SPOKE TO HIM MAYBE TWICE.

15   Q.   ON THE OCCASIONS IN '86 WHEN YOU SAID YOU SPOKE TO HIM

16   MANY TIMES, DID YOU KNOW HE WAS GOING TO COME TO THE UNITED

17   STATES WHEN YOU SPOKE TO HIM?

18   A.   I HAD NO IDEA HE WAS WORKING WITH THE D.E.A.  NO, I HAD NO

19   IDEA.  NEVER HAD ANY IDEA ABOUT THAT.

20   Q.   WHEN YOU SPOKE TO HIM SEVERAL TIMES AFTER HE CAME TO THIS

21   COUNTRY, YOU KNEW HE WAS WORKING THEN WITH THE D.E.A.; IS THAT

22   CORRECT?

23   A.   IT HAD BEEN PUBLISHED IN THE NEWSPAPER, AND HE HAD

24   ADMITTED IT PUBLICLY IN THE UNITED STATES.

25              AND I DID NOT SAY SEVERAL TIMES, I TOLD YOU MAYBE TWO

13-205

1    TIMES. AND I RELY ON THAT ANSWER, AND I STAND BY IT. THAT WAS

2    THE AMOUNT OF TIMES I SPOKE WITH HIM, BECAUSE HE CALLED WITH

3    ME.

4    Q.   WHEN WERE THE TWO TIMES, SIR, THAT YOU SPOKE TO HIM?

5    A.   HE CALLED ME AT MY OFFICE A COUPLE TIMES. I DON'T KNOW

6    HOW HE GOT THE NUMBER. AS I SAID, I EXCHANGED GREETINGS,

7    "HELLO, HOW ARE YOU? NO, I CAN'T TALK TO YOU", AND I HUNG UP

8    THE PHONE.

9            I UNDERSTOOD YOUR QUESTION TO BE DID I SPEAK TO HIM

10   ABOUT COMING TO THE UNITED STATES? THAT'S WHAT HE CALLED ME

11   ABOUT, BUT I DID NOT SPEAK TO HIM ABOUT THAT IN ANY WAY.

12           I DIDN'T LET HIM GET THAT FAR. I DIDN'T WISH TO

13   SPEAK TO HIM.

14   Q.   WHEN WERE THE TWO TIMES YOU SPOKE TO HIM, SIR?

15   A.   1987, 1988 AT MY OFFICE, AT THE REAL ESTATE COMPANY. THE

16   CALLS WERE PASSED TO ME THROUGH THE RECEPTIONIST TO MY

17   SECRETARY TO ME. THE EXACT DATES, I CAN'T TELL YOU.

18   Q.   NOW, IN 1987 YOU COULD HAVE COME TO THIS COUNTRY; COULD

19   YOU NOT?

20   A.   OH, I SUPPOSE SO.

21   Q.   IN 1988 YOU COULD HAVE FREELY COME TO THIS COUNTRY; COULD

22   YOU NOT?

23   A.   FREELY, NO, SIR, I COULD NOT.

24   Q.   WELL, YOU COULD HAVE COME TO THE UNITED STATES; COULDN'T

25   YOU?

13-206

1    A.   FREELY ON THIS SIDE, NOT SO FREELY ON THAT SIDE.

2    Q.   YOU KNEW MR. GARATE WAS HERE BECAUSE YOU SPOKE TO HIM IN

3    1987; IS THAT YOUR TESTIMONY?

4    A.   THAT'S RIGHT.

5    Q.   BUT YOU DIDN'T COME TO THIS COUNTRY TO SEE HIM IN 1987?

6    A.   NO, I DID NOT.

7    Q.   YOU KNEW HE WAS HERE WHEN YOU SPOKE TO HIM IN 1988?

8    A.   THAT'S RIGHT.

9    Q.   BUT YOU DIDN'T COME IN 1988?

10   A.   NO WAY.

11   Q.   DID YOU SPEAK TO HIM IN 1989 BEFORE YOU CAME HERE?

12   A.   NO, I DID NOT.

13   Q.   BUT ON THE FIFTH OR TENTH OR FIFTEEN CALL FROM THE MAN

14   WHOSE NAME YOU DON'T REMEMBER, YOU DECIDED TO COME TO THIS

15   COUNTRY; IS THAT YOUR TESTIMONY?

16   A.   THAT IS TRUE, SIR.

17   Q.   AND ON THAT OCCASION YOU MET MR. BERRELLEZ AT THE BORDER?

18   A.   YES.

19   Q.   AND DID YOU THERE TALK TO HIM?

20   A.   WELL, WE TALKED TOGETHER, YES.

21   Q.   OKAY.  AND IN A HOTEL OR IN A ROOM?

22   A.   IN A CAR, SIR.

23   Q.   AND WAS ANYONE ELSE PRESENT AT THE CONVERSATION?

24   A.   THERE WERE OTHER AGENTS PRESENT, BUT I DON'T KNOW WHO THEY

25   WERE.

1    Q.    IN THE CAR?

2    A.    YES.  WE WERE IN TWO CARS.  I DON'T -- SOME PEOPLE WERE

3    BEHIND US, AND WE STOPPED OFF AT THE OFFICE WHERE I CAME ACROSS

4    THE BORDER FIRST.  AND THERE WERE OTHER PEOPLE THERE.

5          AND THEN WE GOT IN THE CAR AND DROVE TO PHOENIX, AND

6    THERE WERE OTHER PEOPLE THERE.

7    Q.    I'M JUST TRYING TO CUT THROUGH, SIR, TO YOUR CONVERSATION

8    WITH MR. BERRELLEZ, OR WHOEVER, THE FIRST CONVERSATION YOU HAD

9    AFTER SOME FIVE YEARS WHERE YOU MAKE ANY MENTION OF MR. ZUNO'S

10   NAME.

11         AND I'M TRYING TO FIND OUT WHEN THAT CONVERSATION

12   WAS.  WAS IT AT THE BORDER OR AT A LATER TIME?

13   A.    NO, I DID NOT MENTION MR. ZUNO TO MR. BERRELLEZ.

14         IF I REMEMBER CORRECTLY, THE FIRST TIME THAT I

15   MENTIONED THAT WAS TO MR. MEDRANO AS HE WAS INTERVIEWING ME.

16   Q.    ALL RIGHT.  ALL RIGHT.  SO THE FIRST TIME YOU MENTIONED

17   MR. ZUNO, OR SEEING HIM, OR ANYTHING ABOUT HIM IS WHEN YOU SEE

18   MR. MEDRANO IN THIS BUILDING ON THE 14TH FLOOR?

19   A.    YES, I BELIEVE THAT'S TRUE.

20   Q.    AND THAT DATE WAS WHEN?

21   A.    I DON'T REMEMBER.  I COULDN'T TELL YOU.  SOMEWHERE IN

22   SEPTEMBER.

23   Q.    NOW, HOW MANY TIMES -- STRIKE THAT.

24         YOU HAD SEEN MR. BERRELLEZ AND A VARIETY OF OTHER

25   D.E.A. AGENTS ON A LARGE NUMBER OF OCCASIONS BEFORE YOU SAW

1    MR. MEDRANO; ISN'T THAT CORRECT?

2    A.   NO, SIR, THAT'S NOT CORRECT.

3    Q.   WELL, YOU MET MR. BERRELLEZ AT THE BORDER, CORRECT?

4    A.   THAT IS RIGHT.

5    Q.   AND YOU SPOKE TO HIM AT THAT TIME?

6    A.   YES.  WE EXCHANGED PLEASANTRIES.  HE ASKED ME HOW MY TRIP

7    WAS.  WE WERE TALKING ABOUT THE -- WE WENT AND HAD SOME

8    HAMBURGERS.  WE TALKED ABOUT THE HAMBURGERS.

9    Q.   DID YOU TALK ABOUT THE BALLGAME?

10    A.   THERE WASN'T ANY.  IF THERE WOULD HAVE BEEN, WE PROBABLY

11    WOULD HAVE TALKED ABOUT IT.

12    Q.   DID YOU TALK AT ALL ABOUT WHY YOU CAME UP OR DID JUST TALK

13    ABOUT HAMBURGER AND A PLEASANT CONVERSATION AND YOU NEVER ONCE

14    TALKED ABOUT DRUG DEALING AND DRUG DEALERS IN GUADALAJARA?

15           IS THAT YOUR TESTIMONY?  IS THAT YOUR TESTIMONY, SIR?

16    A.   IT IS MY TESTIMONY THAT MR. BERRELLEZ WAS VERY

17    PROFESSIONAL.  HE HAD CERTAIN TIMES TO TALK TO ME ABOUT WHAT I

18    KNEW, AND DURING THE OTHER TIMES THAT WE SAW EACH OTHER, HE DID

19    NOT TALK TO ME ABOUT THAT.

20    Q.   SO THE FIRST TIME MR. BERRELLEZ SEES YOU, AFTER YOU

21    HAVEN'T GIVEN ANY INFORMATION TO ANY D.E.A. AGENT FOR FIVE

22    YEARS, THEY BRING YOU UP TO THIS COUNTRY AND YOU HAVE

23    HAMBURGERS AND EXCHANGE PLEASANTRIES, BUT NOTHING ABOUT DRUGS;

24    IS THAT YOUR TESTIMONY?

25           MR. CARLTON:   OBJECTION, YOUR HONOR.  ASKED AND

13-209

1    ANSWERED.

2            THE COURT:  THE OBJECTION IS SUSTAINED.

3    BY MR. MEDVENE:

4    Q.   DO YOU HAVE A CONVERSATION WITH MR. BERRELLEZ AFTER YOU

5    COME FOR THE FIRST TIME TO THIS COUNTRY AND MEET HIM AT THE

6    BORDER?

7            MR. CARLTON:  OBJECTION, YOUR HONOR.  AMBIGUOUS.

8            THE WITNESS:  YES, I DID.

9    BY MR. MEDRANO:

10   Q.   AND CAN YOU PLACE WHEN YOU FIRST CAME HERE AS ACCURATELY

11   AS YOU CAN?

12   A.   IT WAS SOMETIME AROUND SEPTEMBER OF 1989.  THE EXACT DATE,

13   I CANNOT TELL YOU.

14   Q.   AFTER YOU FIRST CAME HERE AND BEFORE YOU TESTIFIED BEFORE

15   THE GRAND JURY, DID YOU RETURN TO MEXICO?

16   A.   YES, I DID.  NO, WAIT A MINUTE.  BEFORE I -- BEFORE I

17   TESTIFIED BEFORE THE GRAND JURY?  NO, I DID NOT.

18   Q.   SO YOU CAME HERE, YOU WERE HERE A NUMBER OF DAYS; IS THAT

19   RIGHT?

20   A.   NO.  AS I REMEMBER, IT WAS ONLY TWO OR THREE DAYS.

21   Q.   AND THEN YOU DON'T REMEMBER GOING BACK TO MEXICO PRIOR TO

22   TESTIFYING BEFORE THE GRAND JURY; IS THAT TRUE?

23   A.   I DID NOT GO BACK TO MEXICO PRIOR TO TESTIFYING BEFORE THE

24   GRAND JURY.

25   Q.   YOU TESTIFIED BEFORE THE GRAND JURY AND THEN RETURNED TO

13-210

1    MEXICO?

2    A.    THAT IS TRUE.

3    Q.    NOW, WHERE DID YOU ARRIVE -- STRIKE THAT.

4          YOU SAID YOU WERE ROUTED -- I DON'T MEAN TO MISSTATE

5    YOUR TESTIMONY, BUT YOU CAME OR DID YOU COME FROM GUADALAJARA

6    TO LOS ANGELES OR SAN DIEGO OR WHAT?

7    A.    I FOLLOWED A ROUTE, SIR.

8    Q.    WHAT WAS THE ROUTE?

9    A.    THE PART IN MEXICO, I CAN'T RECALL.  I ONLY KNOW THAT

10   SOMEHOW OR OTHER I ENDED UP IN NOGALES.

11   Q.    YOU DON'T KNOW HOW YOU GOT -- STRIKE THAT.

12         DID YOU START IN GUADALAJARA?

13   A.    I STARTED IN GUADALAJARA, BUT I DON'T RECALL THE ROUTE.

14   Q.    NOW, THIS JUST HAPPENED ABOUT FIVE SIX MONTHS AGO AND YOU

15   DON'T RECALL THE ROUTE YOU TOOK?

16   A.    THAT IS RIGHT.

17   Q.    DO YOU HAVE ANY IDEA IF YOU GOT FROM GUADALAJARA TO

18   NOGALES BY PLANE?

19   A.    I'VE ALREADY STATED I DON'T RECALL THE ROUTE INSIDE

20   MEXICO.

21   Q.    DO YOU KNOW IF IT WAS BY CAR?

22         MR. CARLTON:  OBJECTION, YOUR HONOR.  ASKED AND

23   ANSWERED.

24         THE COURT:  DO AHEAD.  DID YOU COME BY CAR?

25         THE WITNESS:  I CAME BY A ROUTE THAT INVOLVED OTHER

13-211

1    PEOPLE IN MEXICO.  I DON'T RECALL WHO THEY WERE AND I DON'T

2    RECALL --

3              THE COURT:  NOBODY IS ASKING ABOUT THAT.

4              THE WITNESS:  I DON'T RECALL.

5              THE COURT:  DID YOU COME IN A CAR?

6              THE WITNESS:  PART OF THE WAY, YES.

7    BY MR. MEDVENE:

8    Q.   SO YOU REMEMBER COMING PART OF THE WAY IN A CAR; IS THAT

9    YOUR TESTIMONY NOW?

10   A.   (NO AUDIBLE RESPONSE.)

11   Q.   YOU'RE SHAKING YOUR HEAD "YES"?

12   A.   YES, SIR.

13   Q.   WHAT PART WAS IN A CAR; FROM WHERE TO WHERE?

14   A.   I DON'T RECALL.  I WAS THINKING ABOUT SO MANY THINGS THAT

15   I COULDN'T RECALL.

16   Q.   DO YOU THINK YOU HAVE THE RIGHT, AS YOU SIT HERE, TO

17   RECALL WHAT YOU WANT TO RECALL, SIR?

18             MR. CARLTON:  OBJECTION, YOUR HONOR. ARGUMENTATIVE.

19             THE COURT:  SUSTAINED.

20   BY MR. MEDVENE:

21   Q.   WHEN YOU LEFT GUADALAJARA, DID YOU DRIVE OR WERE YOU

22   DRIVEN SOMEWHERE?

23   A.   I DID NOT DRIVE.

24   Q.   WERE YOU DRIVEN OR DON'T YOU RECALL?

25   A.   THE PARTS THAT WERE BY CAR, I'M SURE I WAS DRIVEN.  I

13-212

1    DON'T REMEMBER DRIVING.

2    Q.    DID YOU LEAVE FROM GUADALAJARA BY CAR?

3    A.    I DON'T THINK SO.

4    Q.    DID YOU LEAVE BY PLANE?

5    A.    I DON'T RECALL, SIR.

6    Q.    BY BUS?

7    A.    I DON'T RECALL.

8    Q.    IT'S FIVE MONTHS AGO.  YOU HAVE NO RECOLLECTION OF ANY

9    KIND?

10    A.    I CAN'T SEEM TO BRING IT UP.

11            THE COURT:  WE'LL TAKE OUR AFTERNOON RECESS AT THIS

12    TIME AND RECONVENE TOMORROW MORNING AT 9:30.

13            (JURY EXCUSED.)

14            THE COURT:  (ADDRESSING THE WITNESS.) JUST A MOMENT.

15            NOW, COUNSEL, IT APPEARS TO THE COURT THAT THIS

16    WITNESS IS NOT ANSWERING QUESTIONS FOR SOME UNDISCLOSED REASON

17    OF HIS OWN.

18            DOES THIS WITNESS BELIEVE THAT HE HAS A PRIVILEGE TO

19    WITHHOLD EVIDENCE?

20            MR. CARLTON:  I FRANKLY DON'T --

21            MR. MEDVENE:  EXCUSE ME, IF THE COURT PLEASE -- I

22    DON'T MEAN TO INTERRUPT YOU.  I APOLOGIZE.  COULD THE WITNESS

23    BE EXCUSED, YOUR HONOR?

24            THE COURT:  NO.

25            MR. MEDVENE:  I'M SORRY.  OKAY.

13-213

1          MR. CARLTON:  I'M NOT AWARE THAT THE WITNESS -- WHAT

2    THE WITNESS BELIEVES, AS FAR AS THE PRIVILEGE TO WITHHOLD

3    EVIDENCE.

4          THE COURT:  THE COURT FINDS IT INHERENTLY IMPROBABLE

5    THAT THIS WITNESS DOES NOT KNOW THE MEANS BY WHICH HE CAME TO

6    THE UNITED STATES OR THE ROUTE WHICH HE TOOK.

7          NOW, IF THOSE ARE RELEVANT QUESTIONS, HE IS REQUIRED

8    TO ANSWER THEM.

9          THE WITNESS:  MAY I SPEAK, YOUR HONOR?

10          THE COURT:  YES.

11          THE WITNESS:  THE ROUTE INVOLVES PEOPLE WHO ARE STILL

12    IN MEXICO WHO WILL BE IN CERTAIN DANGER OF DEATH IF I REVEAL

13    THEIR NAMES.

14          I DON'T MIND TELLING THE ROUTE, I JUST CANNOT GIVE

15    OUT THOSE NAMES, BECAUSE THE PEOPLE WILL DIE.  AND THE TRUTH IS

16    THAT THEY -- NOTHING ABOUT THIS TRIAL OR THE INFORMATION ABOUT

17    ANY DEFENDANT OR ANYTHING ABOUT ANY OF MY TESTIMONY WAS EVER

18    DISCUSSED ON THAT ROUTE.  IT WAS JUST A WAY TO GET HERE.

19          THE COURT:  WHAT IS THE RELEVANCE OF THIS ROUTE?

20          MR. MEDVENE:  I'D LIKE TO ADDRESS, YOUR HONOR,

21    OUTSIDE --

22          THE COURT:  WHAT IS THE RELEVANCE OF THESE QUESTIONS

23    YOU HAVE BEEN ASKING THIS WITNESS?

24          MR. MEDVENE:  COULD WE HAVE THE DISCUSSION OUTSIDE

25    THE PRESENCE OF THE WITNESS, YOUR HONOR?

13-214

1        THE COURT: I'VE ALREADY TOLD YOU ABOUT THAT.

2        MR. MEDVENE:  THE QUESTIONS GO TO CREDIBILITY, YOUR

3   HONOR, AND THE WITNESS'S MEMORY.

4        THE WITNESS CLAIMS TO HAVE REMEMBERED A CHANCE

5   ENCOUNTER THAT HAPPENED FIVE YEARS BEFORE, BUT YET, HE

6   APPARENTLY CAN'T REMEMBER HOW HE GOT FROM GUADALAJARA TO

7   WHEREVER.  AND IT GOES TO HIS --

8        THE COURT:  IT'S CLEAR THAT HE REMEMBERS AND DOES NOT

9   WANT TO SAY.  THAT'S THE POINT.

10       MR. MEDVENE:  THE MAN IS UNDER OATH HERE AND THERE IS

11  SOMEBODY ON TRIAL HERE FOR LIFE.  AND THE MAN HAS TO ANSWER.

12  HE CHOSE TO COME HERE AND TESTIFY.

13       THE COURT:  HE HAS TO ANSWER RELEVANT QUESTIONS.

14  I'M ASKING YOU WHAT THE RELEVANCE OF THESE QUESTIONS IS.

15       MR. MEDVENE:  IT GOES TO HIS CREDIBILITY AND IT GOES

16  TO HIS PERCEPTION.

17       MR. MEDRANO:  ON THAT POINT, CLEARLY WHAT HAS --

18       MR. MEDVENE:  IT IS THE SAME THING WITH THE

19  COMANDANTE, YOUR HONOR.  THE MAN REFUSES TO ANSWER.  HE DOESN'T

20  HAVE A RIGHT TO DO THAT.

21       THE COURT:  WHAT COMANDANTE?  WHAT COMANDANTE ARE YOU

22  TALKING ABOUT?

23       MR. MEDVENE:  I'M TALKING ABOUT THE -- I'M SORRY,

24  SIR.  I SHOULDN'T ADDRESS YOU FROM HERE.

25       THE COURT:  JUST KEEP CALM.

13-215

1          (COURTROOM LAUGHTER.)

2          MR. MEDVENE:  I AM CALM.

3          MR. MEDVENE:  THE MAN SAID --

4          THE COURT:  WHAT MAN?

5          THE COURT:  THIS WITNESS.

6          THE COURT:  YES.

7          MR. MEDVENE:  THIS WITNESS SAID THE WAY HE GOT HERE

8    TO THE UNITED STATES -- WHICH NOTHING CAN BE MORE RELEVANT --

9    WHY AFTER FIVE YEARS HE SUDDENLY COMES FORWARD AND REMEMBERS

10   THESE TWO CHANCE MEETINGS.

11          THE MAN SAYS THAT SOME COMANDANTE CALLED HIM, THAT HE

12   MET THE COMANDANTE OVER A HUNDRED TIMES, THAT HE HAS KNOWN HIM

13   FOR YEARS, AND DOESN'T KNOW HIS NAME.

14          NOW, HE SHOULDN'T HAVE A RIGHT TO DO THAT.  WE CAN'T

15   HAVE THAT IN OUR SYSTEM THAT HE CAN DECIDE WHEN HE WANTS TO SAY

16   SOMETHING AND WHAT HE IS NOT.  THEY SHOULDN'T PUT HIM ON THE

17   STAND THEN.

18          IF THEY PUT HIM ON THE STAND, THE MAN HAS TO TALK.

19   AND THEY CAN'T KEEP JAMMING DOWN OUR THROAT THE THREATS.  THE

20   MAN WENT BACK TO MEXICO TWICE.  WE'VE GOT PEOPLE ON TRIAL HERE.

21   IF THEY WANT HIM TO TESTIFY, HE HAS TO TESTIFY.

22          NOW, THE CRITICAL THING IS HOW DID HE GET UP HERE?

23   HE HAS TOLD YOU -- HE IS PUTTING HIS FINGER IN ALL OF OUR

24   EYES-- HE HAS TOLD US HE MET THIS MAN A HUNDRED TIMES, AND HE

25   HAS TOLD AS MUCH AS HE KNOWS HIS NAME, AND HE HAS TOLD YOU HE

1    IS NOT TELLING YOU, JUDGE.  I DON'T THINK HE HAS A RIGHT TO

2    TELL YOU THAT.

3         MR. MEDRANO:  THE GUIDING PRINCIPLE HERE, THOUGH,

4    YOUR HONOR, WITH ALL DUE RESPECT TO MR. MEDVENE, IS RELEVANCE.

5         NOW, WHAT HAS PARADED THIS CASE FROM THE GETGO, YOUR

6    HONOR, HAS BEEN SAFETY FACTORS.  WE JUST DON'T MAKE THIS STUFF

7    UP HERE.

8         THIS MAN HAS STOOD UP HERE IN FRONT OF A CROWDED

9    COURTROOM AND TOLD EVERYONE THAT HE TOOK NINE ROUNDS TO THE

10   BODY, AND THAT IN HIS VIEW, ALL OF THE MEXICAN LAW ENFORCEMENT

11   OFFICIALS WERE CORRUPT AND DIRTY.  NOW, THIS ISN'T A MAN THAT

12   IS JUST BLOWING SMOKE.  HE IS BEING HONEST WITH US.  AND HIS

13   SOLE CONCERN FROM WHAT WE CAN TELL --

14        THE COURT:  WHAT YOU SAYING, THAT HE HAS A PRIVILEGE

15   NOT TO TESTIFY?

16        MR. MEDRANO:  I'M NOT SAYING THAT AT ALL, YOUR HONOR.

17   ALL I ASK YOU TO DO IS TO BE GUIDED BY PROPER RULES OF

18   RELEVANCE.

19        AND THIS MAN HAS COME CLEAN ON VIRTUALLY EVERYTHING,

20   AND MR. MEDVENE IS CAPITALIZING ON TWO COLLATERAL IRRELEVANT

21   FACTORS THAT REALLY HAVE NOTHING TO DO WITH THE TESTIMONY.

22        CLEARLY, MR. HARRISON IS CONCERNED FOR FAMILY, FOR

23   THE SAFETY OF PEOPLE HE KNOWS OR CARES FOR IN MEXICO.  AND

24   THAT'S ALL HE'S TRYING TO TELL YOU.

25        AND BY NO MEANS SHOULD THAT BE CONSTRUED AS ANY

13-217

1    EFFORT BY THE WITNESS TO CIRCUMVENT HIS OATH, YOUR HONOR.

2            THE COURT:   WELL, THE WITNESS CAN ANSWER QUESTIONS

3    ABOUT HOW HE GOT HERE, WHETHER HE CAME BY CAR, WHAT CITIES HE

4    WENT TO WITHOUT GIVING ANYBODY UP.

5            MR. MEDRANO:   I THINK I WOULD AGREE WITH THAT, YOUR

6    HONOR.  AND I THINK IF YOU ASKED MR. HARRISON THAT QUESTION

7    RIGHT NOW, I THINK HE'LL TELL THAT YOU HE'S WILLING TO ANSWER

8    AND I NOTE THAT THE WITNESS IS NODDING HIS HEAD.  BUT THE SOLE

9    ISSUE IS --

10           THE COURT:   THAT'S WHAT YOU WERE BEING ASKED WHEN YOU

11   DIDN'T ANSWER.

12           MR. MEDRANO:   I THINK HIS CONCERN, YOUR HONOR, IS

13   THAT THAT WOULD LEAD TO IDENTITIES OF INDIVIDUALS THAT HELPED

14   HIM GET TO THE UNITED STATES.

15           NOW, I THINK MR. HARRISON WILL INDICATE TO THE COURT

16   RIGHT NOW THAT HE'S FREELY WILLING TO DISCUSS ROUTES OF HOW HE

17   GOT OUT HERE, BUT HE'S RELUCTANT TO GO INTO IDENTITIES, YOUR

18   HONOR.

19           ON THAT, YOUR HONOR, WE WOULD SUBMIT RESPECTFULLY

20   THAT THAT KIND OF INFORMATION, NUMBER 1, IS NOT RELEVANT; AND

21   NUMBER 2, IF HE'S TRYING TO IMPEACH THE WITNESS, IT IS ON

22   SOMETHING THAT IS UTTERLY COLLATERAL, YOUR HONOR.  IT IS.  IT

23   DOESN'T MATTER HOW HE GOT UP HERE, BECAUSE --

24           THE COURT:   WHAT IS THE EFFECT OF THAT?

25           MR. MEDRANO:   THE EFFECT OF THAT, YOUR HONOR -- WELL,

13-218

1    PERHAPS I DON'T UNDERSTAND YOUR QUESTION.

2         THE COURT:  WHAT DO YOU MEAN, IT'S UTTERLY

3    COLLATERAL?  IS THERE SOME RULE THAT PROHIBITS IT?

4         MR. MEDRANO:  VERY MUCH SO, YOUR HONOR.  IN TERMS OF

5    IMPEACHMENT AND UNDER THE RULES OF EVIDENCE, WE HAVE TO BE

6    GUIDED BY IMPEACHMENT ON SOMETHING THAT IS MATERIAL AND

7    RELEVANT.  OTHERWISE, UNDER RULE 403, IF WE START GETTING INTO

8    COLLATERAL MATTERS, YOU HAVE A RIGHT TO KICK THAT STUFF OUT

9    BECAUSE IT'S AN UNDUE WASTE OF THE COURT'S TIME.

10         SO THAT IS THE GUIDING PRINCIPLE FOR IMPEACHMENT.

11    AND I SUGGEST TO YOU RESPECTFULLY THAT EVEN IF HE GAVE YOU THE

12    NAMES, WHICH WE SUGGEST TO YOU IS NOT NECESSARY, WHERE DOES IT

13    LEAD?  WHAT DOES IT LEAD TO?  HOW DOES THAT HELP THE DEFENSE

14    CASE?

15         THIS IS A FISHING EXPEDITION, YOUR HONOR, AND ALL

16    HE'S TRYING TO DO IS SIMPLY EMBARRASS THE WITNESS IN FRONT OF

17    THE JURY AND YOURSELF, WHEN HE HAS COME CLEAN AND TOLD YOU HE'S

18    SIMPLY CONCERNED FOR THE SAFETY OF THESE PEOPLE.  THAT'S THE

19    THE SOLE ISSUE, YOUR HONOR.

20         AND I'M SURE HE'LL TELL YOU RIGHT NOW THAT HE'LL

21    GLADLY DISCUSS THE ROUTES, WHETHER HE DROVE OR FLEW --

22         THE COURT:  THOSE ARE PRECISELY THE QUESTIONS HE

23    DECLINED TO ANSWER.

24         MR. MEDRANO:  I UNDERSTAND, YOUR HONOR.  LET'S ASK

25    THE WITNESS RIGHT NOW, IF YOU WOULD LIKE, IF HE'S INCLINED NOW

13-219

1    TO ANSWER THAT ONCE HE UNDERSTANDS THAT THE IDENTITIES OF THESE

2    PEOPLE IS NOT RELEVANT TO THE PRESENT PROCEEDINGS.

3              MR. MEDVENE:  YOU HAVE A RED HERRING HERE, JUDGE.

4              THE COURT:  I KNOW IT.

5              MR. MEDVENE:  THE MAN LIED HERE.  WHEN WE TESTED HIS

6    CREDIBILITY, THE MAN LIED.  AND HE SAID HE DIDN'T KNOW.  AND IF

7    HE WANTS TO SAY HE LIED, HE CAN SAY HE LIED.  BUT THEY CAN'T

8    JUST OFFER HIM UP HERE FOR WHAT THEY WANT.  THEY HAVE TO STRIKE

9    HIS TESTIMONY IF THEY DON'T WANT HIM TO TESTIFY.

10             AND THE OTHER AREA --

11             THE COURT:  YOU'RE REPEATING YOURSELF HERE.  NOW, DO

12   YOU HAVE SOMETHING NEW THAT YOU WANT TO DISCUSS?

13             MR. MEDVENE:  NO.

14             THE COURT:  ALL RIGHT.  WHEEL RESUME WITH THIS

15   WITNESS TOMORROW MORNING AND YOU MAY RESUME YOUR

16   CROSS-EXAMINATION.

17             I DIRECT THE WITNESS TO ANSWER THESE QUESTIONS THAT

18   HE HAS DECLINED TO ANSWER.  WHETHER OR NOT HE HAS TO DISCLOSE

19   THE IDENTITIES OF ANY PERSONS REMAINS TO BE SEEN.

20             MR. MEDRANO:  VERY WELL, YOUR HONOR.  THANK YOU.

21             MR. MEDVENE:  THANK YOU VERY MUCH, YOUR HONOR.

22             THE CLERK:  PLEASE RISE.  THIS COURT IS NOW IN

23   RECESS.

24             (COURT STANDS IN RECESS UNTIL THURSDAY, JUNE 7, 1990

25   AT 9:30 A.M.)

```
INDEX:   U.S. V. MATTA BALLESTEROS        13-220

                                                          PG    LN
```

```
              (EXHIBIT 66   #   RECEIVED IN EVIDENCE.)       57    17
           (EXHIBIT 70 A    #   RECEIVED IN EVIDENCE.)  BY   68     4
             (EXHIBIT 72    #   RECEIVED IN EVIDENCE.)  BY   71     2
          (EXHIBITS 56 A-B  #   RECEIVED IN EVIDENCE.)       89    18
             (EXHIBIT 17    #   RECEIVED IN EVIDENCE.)       97    10
          (EXHIBITS 16 A-B  #   RECEIVED IN EVIDENCE.)  BY  110    16
             (EXHIBIT 41    #   RECEIVED IN EVIDENCE.)  BY  117     3
             (EXHIBIT 87    #   RECEIVED IN EVIDENCE.)  BY  119    16


              LOS ANGELES   +   CALIFORNIA    WEDNESDAY,      4     1
            JUNE 6, 1990    +   9:30 A.M.                     4     2
     JERRY DOUGLAS SPENCER  +   PLAINTIFF'S WITNESS, SWORN    4    22
         DIRECT EXAMINATION +     BY MR. MEDRANO:   Q.        5     7
          CROSS-EXAMINATION +     BY MR. STOLAR:   Q.        35     3
          CROSS-EXAMINATION +     BY MR. MEZA:   Q.   NOW,   44    20
          CROSS-EXAMINATION +   (CONTINUED)   BY MR. MEZA:   49    23
       REDIRECT EXAMINATION +     BY MR. MEDRANO:   Q.       50    14
       RECROSS-EXAMINATION  +     BY MR. STOLAR:   Q.   GUN  51    14
       RECROSS-EXAMINATION  +     BY MR. MEZA:   Q.   IF     52    15
         HARVEY VARENHORST  +   PLAINTIFF'S WITNESS, SWORN   53    25
         DIRECT EXAMINATION +     BY MR. MEDRANO:   Q        54     7
          CROSS-EXAMINATION +     BY MR. STOLAR:   Q   YOU   57    22
          SANDALIO GONZALEZ +   PLAINTIFF'S WITNESS, SWORN   59    15
         DIRECT EXAMINATION +     BY MR. MEDRANO:   Q        59    21
          CROSS-EXAMINATION +     BY MR. STOLAR:   Q   LA    73    20
          CROSS-EXAMINATION +     BY MR. MEZA:   Q   AGENT,  74    14
       LAWRENCE V. HARRISON +   PLAINTIFF'S WITNESS, SWORN   75    14
         DIRECT EXAMINATION +     BY MR. CARLTON:   Q   MR.  75    23
              LOS ANGELES   +   CALIFORNIA, WEDNESDAY, JUNE  92     1
            JUNE 6, 1990    +   1:30 P.M.            (JURY   92     2
       LAWRENCE V. HARRISON +   PLAINTIFF'S WITNESS,         92     6
         DIRECT EXAMINATION +   (RESUMED)  BY MR. CARLTON:   92     8
          CROSS-EXAMINATION +     BY MR. NICOLAYSEN:    Q   139    15
          CROSS-EXAMINATION +     BY MR. MEDVENE:   Q       140    22


      YOU TO GOVERNMENT'S  EXHIBIT  5 FOR PURPOSES OF        55     5
      YOU TO GOVERNMENT'S  EXHIBIT  66, WHICH SHOULD BE      56     6
          ON GOVERNMENT'S  EXHIBIT  66?   A   YES, IT        57     8
     WAS.  Q   AND AGAIN,  EXHIBIT  66, THESE ARE THE        57    10
     WE SEEK ADMISSION OF  EXHIBIT  66 AT THIS TIME.         57    13
                       (  EXHIBIT  66 # RECEIVED IN         57    17
     PLACE THAT WITNESS'S  EXHIBIT  S IN FRONT OF HIM AT     59     8
      YOU TO GOVERNMENT'S  EXHIBIT    70 A  -- THESE         67    17
           70 A  -- THESE  EXHIBIT  S SHOULD BE RIGHT IN     67    18
                       (  EXHIBIT  70 A  # RECEIVED IN      68     4
     FINALLY, DO YOU HAVE  EXHIBIT  73 C  IN FRONT OF        69    10
```

INDEX:   U.S. V. MATTA BALLESTEROS       13-220

|                              |          |                            | PG  | LN |
|------------------------------|----------|----------------------------|-----|----|
| OF YOU GOVERNMENT'S          | EXHIBIT  | S  16 A  AND B?    A        | 69  | 20 |
| YOU TO GOVERNMENT'S          | EXHIBIT  | 72.  NOW, WOULD YOU         | 70  | 15 |
| WE SEEK ADMISSION OF         | EXHIBIT  | 72 AT THIS TIME.           | 70  | 24 |
| (                            | EXHIBIT  | 72 # RECEIVED IN           | 71  | 2  |
| -- TO GOVERNMENT'S           | EXHIBIT  | 74 B, IF YOU HAVE          | 71  | 9  |
| THEN, TO GOVERNMENT'S        | EXHIBIT  | 74 A.  CAN YOU             | 71  | 20 |
| HAS GOVERNMENT'S             | EXHIBIT  | 62, WHICH IS THAT          | 72  | 13 |
| 62.             (            | EXHIBIT  | PROVIDED TO WITNESS.)      | 72  | 18 |
| CAN YOU TELL US WHAT         | EXHIBIT  | 62 IS?    A    EXHIBIT     | 72  | 20 |
| EXHIBIT 62 IS?    A          | EXHIBIT  | 62 IS A PHOTOGRAPH OF      | 72  | 21 |
| WILL IT HAVE THE             | EXHIBIT  | NUMBER?     Q    YES?      | 88  | 25 |
| A    (LOOKS THROUGH          | EXHIBIT  | S.)                THE     | 89  | 2  |
| HAVE YOU PLACED THOSE        | EXHIBIT  | S THERE?                   | 89  | 3  |
| (                            | EXHIBIT  | S 56 A-B # RECEIVED        | 89  | 18 |
| FOR IDENTIFICATION AS        | EXHIBIT  | 17 IN FRONT OF YOU.       | 97  | 4  |
| YOU.    A    (HOLDS UP       | EXHIBIT  | .)    Q    DO YOU          | 97  | 5  |
| (                            | EXHIBIT  | 17 # RECEIVED IN          | 97  | 10 |
| COURT:  YOU HAVE MAY         | EXHIBIT  | THE PHOTOGRAPH.            | 97  | 13 |
| A    (EXAMINES               | EXHIBIT  | S.)    YES.    Q    DO     | 110 | 9  |
| WILL BE.         (           | EXHIBIT  | S 16 A-B # RECEIVED        | 110 | 16 |
| HAS BEEN MARKED AS           | EXHIBIT  | 41.    A                   | 116 | 22 |
| (                            | EXHIBIT  | 41 # RECEIVED IN          | 117 | 3  |
| FOR IDENTIFICATION AS        | EXHIBIT  | 87?    A    (COMPLIES.)    | 119 | 6  |
| (                            | EXHIBIT  | 87 # RECEIVED IN          | 119 | 16 |
| WOULD YOU LOOK AT            | EXHIBIT  | S 12 A AND B.             | 143 | 20 |
| WANT TO LOOK AT THE          | EXHIBIT  | FOR A MINUTE.             | 143 | 22 |

## REPORTERS' CERTIFICATION

WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS FOR THE UNITED

STATES DISTRICT COURTS, HEREBY CERTIFY THAT THE FOREGOING IS A

CORRECT TRANSCRIPT FROM THE RECORD OF THIS DATE'S PROCEEDINGS

IN THE ABOVE-ENTITLED MATTER.

*Julie A. Churchill*                                DATED:   JUNE  6 , 1990
JULIE A. CHURCHILL, CSR
OFFICIAL COURT REPORTER

*Susan A. Lee*                                      DATED:   JUNE  6 , 1990
SUSAN A. LEE, CSR
OFFICIAL COURT REPORTER

U.S.A. V. MATTA BALLESTEROS