FILED 1498

MAY 25 1993

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

90-50459

1    UNITED STATES OF AMERICA

2    CENTRAL DISTRICT OF CALIFORNIA

3    THE HON. EDWARD RAFEEDIE, JUDGE PRESIDING

4    THE UNITED STATES OF AMERICA, )
                                    )
5              Plaintiff,           )
                                    )
6         vs.                       )   NO. CR-87-422-(G)-ER
                                    )
7    RAFAEL CARO-QUINTERO,          )
          RUBEN ZUNO-ARCE,          )
8         HUMBERTO ALVAREZ-MACHAIN, )
                                    )
9              Defendants.          )
     _____)

10

11              REPORTER'S TRANSCRIPT OF PROCEEDINGS
                        December 15, 1992
12                      AFTERNOON SESSION

13

14   APPEARANCES:

15   FOR THE PLAINTIFF:          United States Attorney
                                 BY:  JOHN CARLTON, Asst.
16                                    MANUEL MEDRANO, Asst.
                                 U.S. Courthouse, Room 1443
17                               312 N. Spring Street
                                 Los Angeles, California  90012
18                               (213) 894-0619

19   FOR DEFENDANT ZUNO-ARCE:    EDWARD MEDVENE
                                 JAMES BLANCARTE
20                               MARY FULGINITI
                                 Los Angeles, California  90067
21                               (310) 201-3545

22   FOR DEFENDANT MACHAIN:      ALAN RUBIN
                                 Los Angeles, California 90064
23                               (310) 473-6447

24                               LUCILLE M. LITSHEIM, CSR 2409
                                 Official Federal Reporter
25                               (213) 894-6613

ORIGINAL

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

```
 1                              INDEX

 2                                                        VOIR
     WITNESSES:        DIRECT    CROSS    REDIRECT   RECROSS   DIRE
 3
     ARCE, Zuno
 4   (Continued)       1499      1517

 5

 6

 7

 8

 9

10                            EXHIBITS

11                                       MARKED          RECEIVED
                                          FOR               IN
12   EXHIBIT NO:                      IDENTIFICATION     EVIDENCE

13   183                                                   1547
     412-B                                                 1499
14   413                                                   1500
     414                                                   1501
15   415                                                   1502
     419                                                   1504
16

17

18

19

20

21

22

23

24

25
```

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1499

1    LOS ANGELES, CALIFORNIA; TUESDAY, DECEMBER 15, 1992, 1:35 P.M.

2                              --oOo--

3              (Jury present.)

4              THE COURT:  You may continue.

5              MR. BLANCARTE:  Thank you, Your Honor.

6

7                        ZUNO ARCE,

8    having been previously sworn, resumed the stand and testified

9    through the interpreter further as follows:

10                   DIRECT EXAMINATION (Continued)

11

12   BY MR. BLANCARTE:

13   Q.   Mr. Zuno, as soon as it's handed to you I'd like you to

14   take a look at what's been marked exhibit 412-B for

15   identification.

16              Do you recognize what is depicted on exhibit

17   412-B, sir?

18   A.   Yes, I can recognize it clearly.

19   Q.   And please briefly tell us what that is.

20   A.   Also's a small carpentry shop that I have -- that I had,

21   well, that I have in Mascota.

22              MR. BLANCARTE:  I ask that that be admitted, Your

23   Honor.

24              THE COURT:  It may be admitted.

25              (Received in Evidence Exhibit No. 412-B.)

1   Q.   BY MR. BLANCARTE:   Now I'd ask you to direct your

2   attention to what has been marked as defendant's exhibit 413

3   for identification.

4   A.   (Witness complies.)

5   Q.   Do you recognize what is on that photo, sir?

6   A.   Yes.

7   Q.   And could you tell us briefly what that is.

8   A.   It's what used to be a shop to build boxes for

9   agricultural products.  My son Pepe had it there at the ranch.

10  Q.   That is your business or your son  Pepe's business?

11  A.   It's my son  Pepe's business.

12  Q.   And that business is located on the property you've

13  described as Rancho LaJoya?

14  A.   Yes.  I lent them the piece of land there so he could

15  set up his own business.

16           MR. BLANCARTE:   Thank you.

17           I ask that that be admitted, Your Honor, exhibit

18  414.

19           THE COURT:   It may be admitted.

20           (Received in Evidence Exhibit No. 413.)

21  Q.   BY MR. BLANCARTE:   And now, Mr. Zuno, I'd ask that you

22  look at what's been marked for identification as defendant's

23  exhibit 415.

24  A.   (Witness complies.)

25  Q.   I'm sorry.  Strike that, Your Honor, there is a

1501

1    mistake.  I believe I just admitted exhibit 413 - is that

2    it? - and I'd like him to look at exhibit 414.

3    A.    (Witness complies.)

4    Q.    Do you recognize what is depicted on exhibit 414, sir?

5    A.    Yes.

6    Q.    What is it, sir?

7    A.    I recognize it.

8          It's the location where the machinery for the

9    canning factory used to be located at.

10   Q.    And is that -- Strike that.  That cannery factory

11   business, was that still in operation in 1984-1985?

12   A.    No.

13   Q.    When did it close, sir?

14   A.    In the year 1982, end of 1982 beginning of '83, due to

15   the great economic crisis that the country had.

16          MR. BLANCARTE:  Thank you.

17          Your Honor, I'd ask that exhibit 414 be admitted,

18   sir.

19          THE COURT:  It may be admitted.

20          (Received in Evidence Exhibit No. 414.)

21   Q.    BY MR. BLANCARTE:  And now, Mr. Zuno, I direct your

22   attention to exhibit 415.

23   A.    (Witness complies.)

24   Q.    And do you recognize what is on exhibit 415, sir?

25   A.    My gas station.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1502

1   Q.   And when did you -- did you have that gas station

2   constructed, sir, or was it already built?

3   A.   No; I constructed it, I built it.

4   Q.   And approximately when, sir?

5   A.   At the beginning, I started building it on the 5th of

6   January, 1984.  No, excuse me, it was 1985.  And I had to

7   have it finished due to the fact that the payment inspectors

8   were coming to see it on the 5th of May.

9   Q.   And just for a second I'd like to refer you back to what

10  has been marked and admitted as exhibit 414 on the easel,

11  Mr. Zuno.

12  A.   (Witness complies.)

13  Q.   -- which has been identified as the old cannery business.

14       Do you see some furniture inside that warehouse

15  section?

16  A.   Yes.

17  Q.   If you know, is that the kind of furniture that they

18  built in the little wood shop?

19  A.   Yes.  Out of pine lumber.

20       MR. BLANCARTE:  Thank you.

21       Now going back to exhibit 415, I'd ask that that

22  be admitted, Your Honor.

23       THE COURT:  It may be admitted.

24       (Received in Evidence Exhibit No. 415.)

25  Q.   BY MR. BLANCARTE:  And now, sir, I'd like to direct your

1503

1    attention to what's been marked as exhibit 420.  Do you

2    recognize what's depicted on exhibit 420, sir?

3    A.    Yes.

4    Q.    And what is that?

5    A.    It's the secondary technical school in Mascota.

6    Q.    And do you have any personal knowledge of when that

7    school was constructed?

8    A.    If I'm correct about this, it was constructed in 1969-1970.

9    Q.    And just to get to the point, sir, were you part of a

10   group of people from Mascota who organized to try and get

11   that school built?

12   A.    Yes.

13            MR. BLANCARTE:  Moving on to exhibit 419-F, if we

14   could just have the prior exhibit put on the easel for the

15   jury.  It was admitted.

16            MS. FULGINITI:  (Complies.)

17            THE COURT:  Counsel, let's move on.  This is

18   dragging on.

19            MR. BLANCARTE:  Yes, sir, I'm almost done, Your

20   Honor.

21   Q.    Do you recognize what is marked as exhibit 419?

22   A.    Yes.

23   Q.    And what is it, sir?

24   A.    It's the kindergarten in Mascota.  It's the federal

25   kindergarten.

1504

1    Q.    And were you involved in a committee of people from

2    Mascota who got together to try to get that built?

3    A.    That's right.

4              MR. BLANCARTE:   Thank you.

5              May that be admitted, Your Honor?

6              THE COURT:   It may be admitted.

7              (Received in Evidence Exhibit No. 419.)

8    Q.    BY MR. BLANCARTE:   Mr. Zuno, referring your attention

9    back to the video tape we saw, to your personal knowledge,

10   that didn't depict all your properties that you talked about

11   and didn't show the, for example, the guava trees or the

12   lemon trees; is that correct?

13   A.    That's true.  You didn't see any part of the orchards.

14   Q.    So it was just a brief summary of some of the things

15   we've discussed; is that correct.  Or a summary?

16   A.    That's right.

17   Q.    Thank you.

18             Mr. Zuno, prior to becoming a permanent resident

19   of Mascota in 1982, you knew people in Mascota and your wife

20   Mrs. Zuno was from there so you had been there before; is

21   that correct?

22             MR. CARLTON:   Object to the form of the question,

23   Your Honor.

24             THE COURT:   Yes.  Restate your question.

25   Q.    BY MR. BLANCARTE:   Prior to becoming a permanent resident

1505

1    of Mascota in 1982, you had -- had you ever been to Mascota?

2                THE COURT:  Is that really relevant, counsel?

3                MR. BLANCARTE:  Just brief, Your Honor, I just

4    want to establish that before becoming a permanent resident,

5    he had been there.

6                THE COURT:  Is that relevant?

7                MR. BLANCARTE:  That's where he met his wife.

8    Okay.  We'll move on.

9                THE COURT:  Move on.

10               MR. BLANCARTE:  Thank you.

11   Q.   Once you became a permanent resident of Mascota in 1982,

12   did you ever go back to Guadalajara, Mr. Zuno?

13   A.   Not to live but I would go on occasions.

14   Q.   Okay.  Any approximation about how often or an average?

15   A.   Well, sometimes within a month I would go once, maybe

16   twice.  I would principally go mainly to go see my mother or

17   to take my children to specialists, to doctors.

18   Q.   Was there ever any months where you didn't go at all, sir?

19   A.   Yes; many.

20   Q.   And while you were there, is it correct that you visited

21   with your mother and family?

22   A.   Yes.  My mother at that point was already very ill and

23   that was mainly why I went over to see her.  In fact, my

24   mother died five years ago.

25   Q.   And on your trips to Guadalajara, did you ever see friends?

1506

1       MR. CARLTON:  Objection; relevance.

2       THE COURT:  Sustained.

3   Q.   BY MR. BLANCARTE:  Did you ever see anybody other than

4   family when you were in Guadalajara?

5   A.   Well, no, I wouldn't go specifically to visit them, but

6   I would run into people that I knew in Guadalajara.

7   Q.   Did you ever get together with them?

8       MR. CARLTON:  Objection, Your Honor; relevance.

9       THE COURT:  Sustained.  Sustained.

10      MR. BLANCARTE:  Thank you, Your Honor.

11  Q.   Let me take you back to Mascota, Mr. Zuno.  After

12  becoming a -- after 1982 at any time was there a big

13  celebration that took place in Mascota?

14  A.   That's right.

15  Q.   And what was that celebration, sir?

16  A.   The centennial, the celebration when the City of Mascota

17  was raised from the level of a town to a city.

18  Q.   And were you involved in any way in the centennial?

19  A.   Yes, that's right.

20  Q.   What was your involvement?

21  A.   In a committee that was set up in September of '84, I

22  was the person in charge of public relations.

23  Q.   And briefly what were you duties during that -- Strike

24  that.

25      When did the centennial end, the centennial

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1507

1    celebration?

2    A.    In the end, at the end of March of 1985.

3    Q.    And briefly what were your duties or responsibilities

4    regarding the centennial?

5    A.    Well, I organized the cultural events, sports events,

6    social events.

7    Q.    And were those all -- Strike that.

8          And in addition to those general responsibilities

9    regarding the centennial, in the month of February of 1985,

10   were there any additional responsibilities that you had in

11   Mascota?

12   A.    That's right.

13   Q.    And what were those responsibilities?

14         May I withdraw the question, Your Honor.

15         THE COURT:  You may.

16         MR. BLANCARTE:  Withdraw the question.

17   Q.    What was at the event?  Was there an event in February

18   of 1985 that was different from the centennial?

19   A.    Well, it was not really separate, it was part of the

20   celebrations, but the month of February was made out to be

21   the whole month, the month of the flag.

22   Q.    The flag of Mexico, the national flag?

23   A.    The Mexican flag, yes.

24   Q.    And with regard to that event, did you have any

25   responsibilities?

1508

1    A.    Of course.

2    Q.    And what were they briefly?

3    A.    Very briefly.  Every day at 8:00 o'clock in the morning

4    we would start raising the flag at the city hall building and

5    immediately after that we would go to the Plaza de Los

6    Danderas.  And I had the responsibility that I was in charge

7    of that to end up doing that at the monument on the outskirts

8    of town on the way to Puerto Vallarto it was a monument

9    raised on behalf of my father.

10   Q.    And would you do this alone or were there other people

11   there?

12   A.    No.  We had agreed that on each one of those days one

13   distinguished member of our town would accompany us, somebody

14   from the business community, from the industry, from the

15   church, some well-known member of the community.  And

16   invariably on every one of those days I would take my young

17   child, Jose Alberto who was around one years old more or less.

18   Q.    And did Mrs. Zuno ever go with you?

19   A.    Many times.

20   Q.    Mr. Zuno, I am going to take you now back to the period

21   of the 1980's.  During the 1980's did you hold any position

22   of any kind with the government of Mexico, state, federal,

23   any kind?

24   A.    No.

25   Q.    During the 1970's did you hold any position or office of

1509

1    any kind with any part of the government of Mexico?

2    A.   Yes.

3    Q.   And what was that position?

4    A.   I was the executive representative of the CONASUPO

5    committee for development of social welfare or benefit.

6    Q.   That was called CONASUPO?

7    A.   No.  The commission was a subdivision of CONASUPO.  It

8    was a very small part of it.

9    Q.   Okay, thank you.

10        And when did you leave -- when did you stop your

11   involvement with that commission?

12   A.   On the 2d of November of 1976.

13   Q.   And after you left that commission, did you ever again

14   at any time ever hold any other public office or position

15   with any part of the government of Mexico, state, federal,

16   local, any part?

17   A.   No, not any more.

18   Q.   So in the period from around 1984, 1985, how long had it

19   been since you had held any position or office whatsoever of

20   any kind with the government of Mexico?

21            MR. CARLTON:  Asked and answered, Your Honor.

22            MR. BLANCARTE:  I did not ask that question.

23            THE COURT:  Overruled.

24            THE WITNESS:  Between eight or nine years.

25   Q.   BY MR. BLANCARTE:  Thank you.

1510

1    Mr. Zuno, do you know anyone by the name of

2  Enrique Alvarez Castillo?

3  A.    I know who he is.

4  Q.    Okay.  And is he a close personal friends of yours?

5  A.    No.  I never had a friendship, a personal relationship

6  with him, not ever.

7  Q.    And but you saw him.  Did you ever see him in person?

8  A.    Yes, of course.

9  Q.    Okay.  And do you know anyone by the name -- do you know

10  Manuel Ibarbra Herrera?

11  A.    Yes, I do know him.

12  Q.    And was he a close personal friend of yours?

13  A.    No.  We developed somewhat of a limited friendship.

14  Q.    And how did you know Manuel Ibarbra Herrera?

15  A.    I met him in 1963.  When he was the chief of labor

16  rights, agrarian rights, in the department that dealt with

17  agrarian issues and colonization.

18  Q.    And briefly what was the occasion of meeting him in

19  that -- was it 1963?

20  A.    In '63.

21  Q.    What was that about?

22  A.    I went to the agrarian department by orders of my

23  father, by instructions of my father, because he had a piece

24  of property around Guadalajara there that he was having

25  problems with.  It was -- it was an ebb effected illegally by

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1511

1    the governor Jalisco.  And my father had sent a letter to

2    President Lopez Mateos wherein he explained the whole matter.

3    And so my father was asked to send someone personally to the

4    agrarian department to look into the matter personally.

5    Q.    I'm sorry.  After that did Manuel Ibarbra Herrera become

6    a close personal friend of yours?

7    A.    No.  I saw him for a matter of maybe around six months

8    when I was going on a regular basis to Mexico City to deal

9    with my father's land problem, to solve the situation,

10   because the president finally acknowledged my father's rights

11   to the property.  And after that, I only saw him a couple of

12   times.

13   Q.    And that six-month period, was that in 1963, sir?

14   A.    Yes, it was in 1963.

15   Q.    In or about March of 1985, didn't you get a call from

16   Manuel Ibarbra Herrera at your-- didn't you get a call from

17   him?

18   A.    That's correct, at Rancho LaJoya.

19   Q.    And what did Mr. Manuel Ibarbra Herrera say to you, sir?

20   A.    He told me, well, he first asked me whether the house

21   located on the street Lope de Vega, whether that belonged to

22   my brother Alvaro.

23        MR. BLANCARTE:  Just a point of clarification,

24   Your Honor.  Was the answer that he asked him if it was or he

25   told him that it was.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1512

1    THE WITNESS:  No.  He asked me whether it belonged
2    to him.
3    Q.   BY MR. BLANCARTE:  Whether it belonged to whom?  Whether
4    Lope de Vega belonged to whom?
5    A.   See, I haven't finished my answer.  Out of respect for
6    her, I'm waiting for her to finish translating before I
7    finish my answer.
8    Q.   Okay.  Please give us your complete answer again, sir.
9    A.   He asked me -- he asked me whether the house belonged to
10   my brother Alvaro.  I says that it didn't.  That my brother
11   Alvaro's house, that his house faces on Villa Street.  And
12   then he asked me whether the house belonged to me.  And I
13   said, "No, it's not mine.  But it used to belong to me."  And
14   he said, "Why is that?"  And I said, "Because I sold it to
15   Dr. Ruben Sanchez Barba."
16   Q.   Excuse me, is that what you said or that is what he
17   said?
18   A.   No.  I told him that.
19   Q.   Okay.  And what did he say then?
20   A.   He said, "Well, then who does the house belong to?"  I
21   told him I sold it to Dr. Ruben Sanchez Barba through the
22   notary public Francisco Maequez Hernandez.
23   Q.   Okay.  And what happened then?
24   A.   Dr. Ruben Sanchez Barba was arrested.
25   Q.   But your conversation with Manuel Ibarbra Herrera ended;

1513

1    is that correct?

2    A.    Yes.  He only said, "Thank you very much."  No.  He also

3    asked me when had the house been sold, and I told him when.

4    Q.    Okay.  Do you know, Mr. Zuno, do you know personally

5    anyone by the name of Miguel Aldana?

6    A.    I met him once.

7    Q.    And what year was that?

8    A.    In 1983.

9    Q.    And did he become a close personal friend of yours?

10   A.    I never had a friendship with him.

11   Q.    Do you know anyone by the name -- do you know personally

12   anyone by the name of Manuel Bartlett Diaz?

13   A.    I know who he is but I'd never met him personally.

14   Q.    And how do you know who he is?

15   A.    Because he was a secretary of Governacion in my country

16   and he comes to be the second man after the president of the

17   republic.

18   Q.    So did you know him from the media or how did you know

19   him?

20   A.    Through radio, through television, the press.

21   Q.    And did you know anyone by the name of the Arrevalo Gar

22   Doki.  Personally did you know Arrevalo Gar Doki?

23   A.    No.  I never met him personally.

24         Also I only knew of him through the radio,

25   television and the printed press.

1514

1  Q.   Mr. Zuno, you've heard the name Caro-Quintero in the
2  course of this trial, haven't you?
3  A.   Thousands of times.
4  Q.   And you heard in the press and on television in the
5  80's, didn't you?
6  A.   There was a huge scandal when he was arrested in the
7  press, on radio, on TV, everywhere.
8  Q.   Mr. Zuno, did you ever see Rafael Caro-Quintero at any
9  party where he was riding on a horse, dancing horse, any kind
10  of a horse?
11  A.   Never.
12  Q.   Mr. Zuno, you've heard the name Ernesto Fonseca Carrillo
13  in the course of this trial, haven't you?
14  A.   I've also heard it many, many times.
15  Q.   And you heard he had multiple houses; is that correct?
16  A.   That's right.
17  Q.   Mr. Zuno, were you ever in any of Ernesto Fonseca's
18  houses at any time?
19  A.   Never, never.
20  Q.   Mr. Zuno, in December of 1984 and precisely on or about
21  December 23d of 1984, did you go inside the house at Lope de
22  Vega?
23  A.   That was the last time that I went into that house.  It
24  was December 23d, 1984.  That was the last time.
25  Q.   And why did you go into the house at Lope de Vega on

1515

1   December 23rd, 1984?

2   A.   Because the day before that I had come to a verbal

3   agreement on the sale with Dr. Ruben Sanchez Barba.  And he

4   had asked me to take out all of the furniture.  The little

5   bit that was left there, that was all very torn down,

6   destroyed, with the exception of a dining room table with

7   chairs.  And a living room set, which was a sofa and two

8   chairs, but it didn't have any cushions, it was just wood.

9   And he asked me to take everything out that was in there.

10          And so on the 23d, I hired a truck and we came

11  over and took everything out of the house and I never went

12  back again into the house.

13  Q.   And did you know the buyer of Lope de Vega, who I think

14  you said is Ruben Sanchez Barba, did you know him before he

15  purchased the house at Lope de Vega?

16  A.   No, I didn't know he existed.

17  Q.   And one name that I forgot to ask you.  Do you

18  personally know another person Javier Barba Hernandez?

19  A.   No, I didn't know him.

20  Q.   And, Mr. Zuno, were you ever present -- you heard the

21  testimony of witness Jorge Gadoy in this courtroom, didn't

22  you?

23  A.   That's right.

24  Q.   Mr. Zuno, were you ever present at any of the incidents

25  or meetings that Jorge Gadoy testified about in this courtroom?

1516

1    A.    No, never.

2    Q.    And you heard the testimony of another witness in this

3    trial, Rene Lopez Romero; is that correct, sir?

4    A.    That's correct, I heard him.

5    Q.    And were you ever, Mr. Zuno, were you ever present at

6    any of the incidents or meetings that Rene Lopez Romero

7    testified about in this courtroom?

8    A.    Never.  What they testified to is absolutely false.

9    Q.    Mr. Zuno, before -- Strike that.

10         Did you ever see Jorge Gadoy before the day he

11   walked into this courtroom, anywhere?  Did you ever see him?

12   A.    Never.  Never in my whole life.

13   Q.    Did you ever see Rene Lopez Romero at any time anywhere

14   before you saw him walk into this courtroom and identify

15   himself by name?

16   A.    No, never, never.

17   Q.    Mr. Zuno, were you ever a member of what has been called

18   the Guadalajara drug cartel?

19   A.    Never.

20   Q.    Mr. Zuno, were you ever present at any meeting or get-

21   together anywhere where the kidnapping of Agent Enrique

22   Camarena was ever planned or discussed?

23   A.    Never.

24   Q.    Mr. Zuno, did you ever participate in any way any time

25   in the kidnapping abduction of Agent Camarena?

1517

1    A.    Never.

2           MR. BLANCARTE:  Your Honor, I have no further

3    questions for Mr. Zuno.

4           THE COURT:  You may cross-examine the witness,

5    Mr. Carlton.

6           THE INTERPRETER:  Your Honor, may I get a glass of

7    water?

8           THE COURT:  Yes.

9

                         CROSS-EXAMINATION

10

11   BY MR. CARLTON:

12   Q.    Mr. Zuno, what was the period that you had this position

13   with CONASUPO?

14   A.    Starting on the 7th of December of 1970, up until the

15   end of December of 1976.

16   Q.    So that was during the period that your brother-in-law

17   Luis Echeveria was governor of Mexico?

18   A.    That's right.

19   Q.    And CONASUPO is an agency of the Mexican federal

20   government?

21   A.    It's a commercial company in which the federal

22   government has an interest.

23   Q.    And its function is, at least in part, to deliver food

24   to people throughout the country, correct?

25   A.    Only on very special occasions.

1518

1    Q.   Now, your father was at one time the governor of the

2    State of Jalisco?

3    A.   Yes.  From 1923 to 1926.

4    Q.   And he had some involvement in founding the Autonomous

5    University of Guadalajara, didn't he?

6    A.   No.  You're wrong.

7    Q.   Did you have any involvement with that institution?

8    A.   No.  Let me answer so that you will know that you're

9    saying something that is a lie.

10           My father was a founder of the University of

11   Guadalajara, not the founder of the Autonomous University of

12   Guadalajara.  That's a totally different university from what

13   the University of Guadalajara is.

14   Q.   Now, there's some monument, is there not, in the City of

15   Mascota to your father?

16   A.   Yes.  There is a bust of my father on a stone monument

17   on a wall.

18   Q.   And what is that for?

19   A.   Because he opened up the first road, which it happens to

20   be the same and only road to Mascota, the first dirt road

21   where the first car drove into Mascota.  In 1923, I don't

22   think I'm wrong about that because I read about that many

23   times.  I think that the first day that an automobile went

24   into that region was the 3d and the 4th of June of 1923.

25   Q.   Now, are you or have you been a member of the advisory

1519

1    counsel on community improvements in the Mascota area?

2    A.   I don't know of an organization that's called that.

3    Q.   Do you have some -- or, have you had some involvement

4    with the PRI in that area?

5    A.   Yes, many, many times.

6    Q.   What involvement did you have with the PRI?

7    A.   We participated in the various campaigns for the local

8    representative, the federal representative to the House of

9    Representatives and the mayor of the city, just like it's

10   everybody's obligation to be involved in that.

11   Q.   When you lived in Guadalajara, did you also participate

12   in PRI activities?

13   A.   I was a candidate to a local representative in 1963.

14   Q.   Did you participate --

15   A.   And I served in that position from '63 to '64.  I began

16   serving in that position the 1st of February of 1963.  And I

17   was a representative to the municipality headed by La Barca,

18   Jalisco, like the county seat.

19   Q.   Did you assist other PRI candidates with their

20   elections.  Candidates?

21   A.   Where?

22   Q.   Anywhere?

23   A.   Yes, in the area of Mascota.

24   Q.   So you were fairly active politically?

25   A.   Like other millions of Mexicans.

1520

1   Q.   How is it you know Enrique Alvarez Castillo?

2   A.   Because he became a candidate to the government of the

3   State of Jalisco and he was elected as governor of Jalisco.

4   Q.   When was this?

5   A.   That was at the end of 1982 and, if I'm not wrong about

6   this, he took his office on the 1st of March of 1983.  That's

7   the beginning of the six-year period when there is a change

8   of guards of the politicians.

9   Q.   So you knew him when he was the governor?

10  A.   Yes.

11  Q.   Now, are you familiar with a ranch known as the El

12  Porvenir ranch?

13  A.   I know many ranches called El Porvenir.

14  Q.   Do you know of a ranch El Porvenir in the State of

15  Coahuila?

16  A.   That's correct.  It belongs to my son Ruben.  He's an

17  engineer in animal sciences.  He graduated from the

18  University of Tucson in Arizona.

19  Q.   How large is that ranch?

20  A.   1,000 hectares.

21  Q.   And a hectare is about - what? - two and a half acres?

22  A.   2.2.  It's the smallest, the smallest ranch in the whole

23  of the northern part of the State of Coahuila.  All the other

24  ranches are 10-, 20,000 hectares.  He has only 1,000 hectares.

25  Q.   How many children in total do you have?

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1521

1    A.    Two with Marie Endecato, Jose Victor who is nine years

2    old, Maria Ester is six years old.  And with my first wife, I

3    have three -- three daughters and three sons.

4    Q.    And do any of these other children own ranches besides

5    El Porvenir?

6                MR. BLANCARTE:  Your Honor, objection; relevance,

7    materiality.  We've sort of allowed this.

8                THE COURT:  No.  Overruled.

9                THE WITNESS:  No.  No one else.

10   Q.    BY MR. CARLTON:  Do any of them own properties in

11   Guadalajara?

12   A.    Pepe lives in a house that he rents.  Ruth Libertad

13   lives in her house.

14               THE COURT:  If the answer is no, the answer is no.

15               THE WITNESS:  No.

16   Q.    BY MR. CARLTON:  Have you ever heard of a Rancha Moreno

17   in Nueva Rosita?

18   A.    Never.

19   Q.    Now let's talk about the property at 881 Lope de Vega.

20   When did you acquire that property?

21   A.    That property was gifted to me by my mother and my

22   father and it was made out -- it looks like a sale.  I began

23   to build a house there in 1969 and I finished building it in

24   1970 and then I moved.  I moved in there with my ex-wife and

25   my six children.

1522

1    Q.   Now, when you first acquired this property, it was

2    acquired by you and your wife as community property, wasn't it?

3              MR. BLANCARTE:  Objection; relevance, Your Honor.

4              THE COURT:  Sustained.

5    Q.   BY MR. CARLTON:  Before you could sell the house in

6    1985, you had to acquire that house in your own name as an

7    individual, didn't you?

8              MR. BLANCARTE:  Objection; relevance again.

9              THE COURT:  Overruled.

10             THE WITNESS:  Yes.  Because I had already divorced

11   my wife.

12   Q.   BY MR. CARLTON:  And prior to that, prior to some point

13   when you acquired it in your own name, you had owned it as

14   community property; correct?

15             MR. BLANCARTE:  Objection as before, relevance and

16   materiality.

17             THE COURT:  Well, I think it is relevant now.  He

18   may answer.

19             THE WITNESS:  Everything that I acquired within

20   the time of my marriage was held in community property

21   because we were married under the law of community property.

22   Q.   BY MR. CARLTON:  And how was it you put this property,

23   881 Lope de Vega, in your name as an individual?

24             MR. BLANCARTE:  Objection; relevance.  The court

25   has previously ruled on this point.

1523

1    THE COURT:  Overruled.

2    THE WITNESS:  Can you repeat that again?

3    Q.   BY MR. CARLTON:  How was it that you were able to put it

4    in your own name?

5    A.   Because in the divorce decree it stated in there which

6    properties were to remain as holdings of my wife and which

7    properties I was to keep.

8    Q.   And this property wasn't finally registered in your name

9    until June of 1985, was it?

10   MR. BLANCARTE:  Objection; relevance, materiality,

11   assumes facts not in evidence.

12   THE COURT:  Overruled.

13   THE WITNESS:  That plot was always registered to

14   my name.  The procedure that was carried out in front of the

15   notary public was that the house should be registered under

16   my own name due to the divorce decree and that a copy of the

17   sales contract should be attached to that.  The divorce was

18   final in 1977.

19   Q.   BY MR. CARLTON:  Because this house could not be sold by

20   you until it was registered in your own name; isn't that

21   correct?

22   A.   No.  The house was already registered under my name.

23   Q.   By what date?

24   A.   When my father turned over the deed to me.

25   Q.   In your name as community property; correct?

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1524

1   A.   That's right.  But it was already registered under my

2   name.

3   Q.   And before you could sell it in January of 1985, you

4   were required to have it reregistered in your name as an

5   individual; correct?

6           MR. BLANCARTE:  Assumes facts not in evidence as

7   to the dates.

8           THE COURT:  He is not assuming any facts.  He is

9   asking the witness.

10          MR. BLANCARTE:  He is just characterizing the

11  witness' testimony, Your Honor.

12          THE COURT:  No, he's not referring to his

13  testimony.  Simply asking him a question.

14          The witness may answer if he knows.

15          THE WITNESS:  Yes.

16  Q.   BY MR. CARLTON:  And do you know when that process was

17  completed?

18  A.   No, I don't remember.

19          MR. CARLTON:  Your Honor, may I have something

20  presented to the witness?

21          THE COURT:  Yes.

22          MS. FULGINITI:  Can we see it?

23          MR. BLANCARTE:  Let us see.

24          MR. CARLTON:  May I approach the clerk?

25          THE COURT:  Yes.

1525

1       (Discussion held off the record between

2       Mr. Carlton and defense attorneys.)

3       MR. MEDVENE:  Your Honor, I think this exhibit has

4   already come before you some time ago and you've already ruled.

5       THE COURT:  Let's take our afternoon recess at

6   this time.

7       THE CLERK:  Please rise.

8       (Jury excused at 2:30.)

9       THE CLERK:  You may be seated.

10      THE INTERPRETER:  Your Honor, the witness is

11  asking if --

12      THE COURT:  You may step down.

13      MR. MEDVENE:  If the court please -- if the court

14  please, this issue was previously before you.  The issue was

15  and it was raised in --

16      THE COURT:  I remember.

17      MR. MEDVENE:  -- a, I believe, limine motion.

18      THE COURT:  I remember the issue.

19      MR. MEDVENE:  And the question was --

20      THE COURT:  That was before this witness

21  testified.  That was whether or not that could be presented

22  in and of itself as an exhibit in this case.  Now these are

23  supposedly the official deeds to the property and the

24  documents surrounding the transfer of the properties.  Don't

25  you think they're entitled to ask this witness about it?

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1526

1    MR. MEDVENE:  No.  Because the critical point that

2    Your Honor focused on was the relevance of it.  And Your

3    Honor determined that it would be improper for the government

4    to make any argument because of these deeds; that the sale of

5    the house had anything to do with Caro-Quintero, unless the

6    government had some evidence that Caro-Quintero was some way

7    involved in the purchase.

8            The whole issue was depending on the dates of the

9    deeds.  The government wants to show a late date on the deed,

10   even though the money was transferred January 11th and the

11   keys were transferred.  And then the issue was could they

12   argue from that that maybe there wasn't a sale?  And, Your

13   Honor, in effect, asked the government, do you have any

14   evidence from which to make that argument?  And they said, no

15   and it was for that reason you kept it out.  For that reason

16   we didn't bring up witnesses on the painting of the house

17   after the transfer.

18           THE COURT:  All right.

19           MR. MEDVENE:  And whatever --

20           THE COURT:  You made your point.

21           MR. MEDVENE:  I'm sorry.

22           THE COURT:  That's enough.

23           What do you say to that?

24           MR. CARLTON:  Your Honor, I think that we should

25   be entitled to explore the witness' understanding of the

1527

1   transactions and the actions that he took in furtherance of

2   it.  And that's what we're doing at this point.  There's some

3   signatures and various things of his that I'd like to get

4   into and see how he was involved.

5              THE COURT:  The witness may be asked about the

6   exhibit.

7              Now you filed something under seal yesterday.

8              MR. CARLTON:  Mr. Medrano can address that.

9              MR. MEDRANO:  Yes.  Yes, that's correct, Your

10  Honor.

11             THE COURT:  Asking the court to determine whether

12  you have to disclose this.

13             MR. MEDRANO:  We felt it's not required to, Your

14  Honor, but to err on the side of caution, we thought we'd at

15  least submit it to you.  It is our --

16             THE COURT:  Is it true that that information was

17  obtained on April 24th, 1991?  That is the date the agent

18  obtained it?

19             MR. MEDRANO:  There is two parts to it.  April

20  of '91 there's a limited --

21             THE COURT:  September.

22             MR. MEDRANO:  Or whatever the date.  Well, there's

23  two interviews done.

24             THE COURT:  Two interviews and they're both in 1991.

25             MR. MEDRANO:  And one is in April, I believe, Your

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1528

1  Honor.

2          THE COURT:  Well, you're saying this just came

3  into your knowledge on the 10th of this month.

4          MR. MEDRANO:  The second part.  The second FBI.

5          THE COURT:  What about the first part?

6          MR. MEDRANO:  Well, the first part we knew of,

7  Your Honor, but there's nothing in that is disclosable in any

8  way, so it was a moot issue.  So it was only with the second

9  interview in September that we thought we'd at least advise

10 you of it, because it's our sense that it's irrelevant and

11 it's not disclosable under any theory.  But begin, to err on

12 the side of caution we felt it was our obligation to at least

13 apprise you of it, Your Honor.

14         THE COURT:  Well, I'm looking at it and I'll make

15 a ruling on it shortly.

16         MR. MEDRANO:  Very well, Your Honor.

17         Incidentally, Your Honor, of course it's all moot

18 now in light of your ruling yesterday with regard to the

19 doctor.  That's what it pertained to.

20         THE COURT:  Well, some of it does.

21         MR. MEDRANO:  Entirely, Your Honor.  You'll see

22 when you read it.

23         THE COURT:  I have read it.  It does not entirely

24 relate to him only.

25         MR. MEDRANO:  Very well.

1529

1    THE COURT:  When did you have that information, by

2    the way, that related to the doctor?

3    MR. MEDRANO:  There's the April DEA-6 of '91, we

4    had that.

5    THE COURT:  You had it since then?

6    MR. MEDRANO:  Yes, of course, Your Honor, because

7    that's what the date on the DEA-6 says.

8    THE COURT:  And how is it that you just now

9    submitted it to the court?

10   MR. MEDRANO:  Because the second information that

11   surfaced Thursday night, once we got out of court Thursday

12   afternoon, that's the portion that concerned us and that's

13   why we wanted you to have that, Your Honor.  It's the second

14   portion that is even arguably -- it's not disclosable under

15   any theory but it's the second -- the FBI report that we just

16   learned of late Thursday night, as can you tell from our

17   pleading.

18   THE COURT:  How is it that you just learned of it

19   Thursday night?  That it related to an interview done

20   September 9, 1992.

21   MR. MEDRANO:  That's when we were apprised of it,

22   myself and Mr. Carlton, Your Honor, that's correct.

23   MR. CARLTON:  Your Honor, we learned of this

24   through the Department of Justice in Washington, D.C.  That

25   interview in September was conducted by the FBI, another

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1530

1    agency, unrelated to this investigation and it was only

2    through this round-about process that word of that interview

3    in September got back to us on the 10th, or whenever,

4    whatever day it is.

5              MR. MEDRANO:  Thursday night.

6              THE COURT:  Well, Thursday night.  You didn't file

7    it until yesterday.

8              MR. MEDRANO:  Your Honor, we had -- that's

9    correct.  We got it Thursday night.  We drafted the pleading

10   and then we filed it with you Monday morning along with the

11   Rule 29 papers, both at 8:00 o'clock in the morning.

12             MR. MEDVENE:  We would ask formally on the record

13   to see it, Your Honor.  We would also --

14             THE COURT:  What?

15             MR. MEDVENE:  We would ask to see the information,

16   what it is.

17             THE COURT:  Well, that's the question, whether

18   you're entitled to see it.

19             MR. MEDVENE:  We would also ask Your Honor to ask

20   them why, if it wasn't received for so long a period of time,

21   if they know why it was received at the time they received it

22   just at this point in the trial, that it just happened or --

23   because that may go to what knowledge was or what information

24   they had and why they had it at a particular time.

25             You know, why did it just come at that time right

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1531

1    in the middle of the trial.  It sounds curious.

2              THE CLERK:  Please rise.

3              (Recessed at 2:37 p.m.)

4              (Jury present at 2:55 p.m.)

5              THE COURT:  You may continue.

6              MR. MEDRANO:  Your Honor, may I ask the court to

7    present this to the witness?

8              THE COURT:  Yes.

9              THE CLERK:  (Hands document to witness.)

10   Q.   BY MR. CARLTON:  Mr. Zuno, would you please look at that

11   document and in particular at the page that's marked with the

12   small yellow piece of paper.

13   A.   There's two.

14   Q.   I believe that the page has marked has "133" at the

15   upper right-hand corner.  Do you recognize that document?

16   A.   Yes.

17   Q.   What is it?

18   A.   It was a request made to the civil registry of real

19   estate, or property registration, to include a notation on

20   the sales contract that was granted to me by my mother,

21   Mrs. Carmen V' Zuno for the property on which I later

22   constructed the house at 881 Lope de Vega.

23   Q.   And this document was signed by you on June 3d of 1985;

24   correct?

25   A.   Yes, sir.

1532

1    Q.   And this was all in relation to the process you had

2    started of getting this house into your name as an individual.

3    A.   That's right.

4    Q.   And the deed that registered this house in your name as

5    an individual wasn't registered until June 4th of 1985,

6    correct?

7            THE INTERPRETER:  Your Honor, I think I

8    mistranslated the last question.

9            THE COURT:  Restate the question.

10           THE INTERPRETER:  The previous question, the one

11   before this one.

12           THE COURT:  Do you remember what that was?  Let me

13   have the reporter read it.

14           (Record read.)

15           THE INTERPRETER:  I misinterpreted, Your Honor.

16           THE COURT:  Will you interpret it correctly now.

17           THE INTERPRETER:  Yes.

18           (Spanish speaking.)

19           THE WITNESS:  No.  What happened is that when I

20   sold the house to Dr. Sanchez Barba, as it appears here

21   below, and that I signed that on the 11th of January and from

22   that point on I no longer had any responsibility and the

23   notary public continued taking care of the process of

24   registering that property to Dr. Ruben Sanchez Barba.

25           And then my notary told me that my divorce decree

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1533

1  had not been registered in the public registry of properties

2  and so we figured out that it was based on -- it was due to

3  negligence on the part of my attorney who handled my divorce

4  because he was supposed to have completed all of those

5  procedures.  We found out about that when he tried to register

6  the property because they told him that "Mr. Zuno appears

7  here as being married and you say that he's single."  And so

8  this official request was filed so that I could -- so that

9  the house could be registered to the person that I had

10  officially sold it to.

11           I also want to clear something else up.  In Mexico

12  during the time of President Lopez Portillo, he signed a

13  decree.  He signed a decree stating that the buyer, after he

14  got the signature of the seller, the buyer was the one in

15  charge of carrying out all of the procedures and doing

16  everything to get the property registered.  The buyer, not

17  the seller.

18  Q.   BY MR. CARLTON:  But you signed that page number 133 on

19  June 3d, 1985; correct?

20  A.   Yes.  To correct the negligence on the part of my

21  attorney who handled my divorce.

22  Q.   Now, how much were you paid for this property?

23  A.   70 million pesos.

24  Q.   Isn't it correct that you received 4,597,000 pesos?

25  A.   No.  I was paid 70 million pesos.  I was handed the

1534

1    money in two checks.  One check was for 34 1/2 million

2    pesos.  That was signed by Ruben Sanchez Barba on the day

3    that we consummated the sale.  And the other one was made out

4    by his brother, it was for 35 1/2 million pesos.  He didn't

5    have enough money, so they made out another check.  They

6    handed them both to me.  I was paid 70 million pesos.

7    Q.   Now, you had a deed drawn up to reflect this sale,

8    didn't you?

9    A.   No.  From that point on, it's in the hands of the

10   buyer.  The buyer gets together with the notary public and

11   they come to some agreement to record and assess value of the

12   property.  And that's something they do between them so that

13   the buyer won't have to pay taxes on the property.  That was

14   up to the buyer.

15   Q.   So are you saying that you never appeared before the

16   notary public Francisco Marquez Hernandez in Ameca in January

17   of 1985 to complete this sale?

18   A.   No, I never said that.

19   Q.   And if the deed -- if the deed says that, it's incorrect?

20        MR. BLANCARTE:  Objection.  Question is vague and

21   ambiguous as to what the deed is saying.

22        THE COURT:  Overruled.

23        You may answer.

24        THE WITNESS:  What page?

25        MR. CARLTON:  That's not what I'm talking about,

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1535

1  not that deed.

2      It's the deed concerning your sale to Ruben

3  Sanchez Barba --

4      THE COURT:  Well, counsel, I do sustain the

5  objection to that question.  The witness has testified to

6  his -- the money that he sold the property for and you're

7  asking him a hypothetical question.

8      MR. CARLTON:  Very well, Your Honor.

9  Q.   How was it that you came to sell this property to Ruben

10  Sanchez Barba?

11  A.   I was handed the house back on the 30th of May of 1984

12  from Sergio Virgen, Selio Velasco Vihap who I had rented the

13  house out to.

14  Q.   You testified you never knew Ruben Sanchez Barba before

15  this?

16  A.   Yes, but I haven't finished answering the last question.

17  You asked me a question and I haven't finished answering the

18  whole question.  Please allow me to finish the whole answer.

19      He turned over the house to me on the 30th of May

20  and the house was in bad disrepair.  I didn't have any money

21  to make repairs to it to either be able to rent it out or to

22  sell it outright, and so one day while I was at Mascota,

23  Mr. Jose Martin Barba called me up - that was on the 18th of

24  December of 1984 - and he asked me whether I wanted to sell

25  the house that was semi-empty.  And I told him that, yes, I

1536

1    was interested in selling the house.

2            He told me that he had a cousin who bought and

3    sold the properties, homes, and that he wanted to buy it from

4    me.  And so I told him -- Well, he asked me when could I go

5    personally to Guadalajara and I told him that I needed to be

6    in Guadalajara on the 22d of December because I was going to

7    pick up the gifts for the -- toys for my children and the

8    gifts for my wife and my mother-in-law.  And to buy the

9    guajoloto, the turkey, for the Christmas dinner.

10           And so we agreed to meet at 10:00 o'clock in the

11   morning outside of the house.  And I got there on the 22d and

12   Jose Martin Barba was there and he said to me, this is Dr.

13   Jose Sanchez Barba, my cousin, and I greeted him.  And at

14   that point Jose Sanchez Barbara arrived.  That was his

15   brother.  I didn't know him, either.  And then Ruben said to

16   me, "I am the brother of Inocenio Sanchez Barba," who's a man

17   who's very well-known in Guadalajara.

18           MR. CARLTON:  Your Honor, I think he's answered

19   the question.

20           THE COURT:  I think you answered the question.

21   But when you ask a question "How did you come to buy or sell

22   this property" that invites a narrative answer.  So be more

23   specific.

24   Q.   BY MR. CARLTON:  Did you know Jose Martin Barba before

25   this?

1537

1   A.   Yes, of course.

2   Q.   And you weren't looking for buyers for this house at the

3   time, were you?

4   A.   I had spoken to some people to find out if they were

5   interested.   Among the people I spoke to was a young man who

6   was married to one of my nieces.

7   Q.   Do you own an airplane?

8   A.   At this point, yes, I do own a plane.

9   Q.   How long have you owned this airplane?

10   A.   From around November of 1984 to this date.

11   Q.   Is it just one airplane that you own?

12   A.   Only that plane, that small plane from that date to now.

13   And I've never flown it.

14   Q.   So during this period, that period, you never owned any

15   other aircraft?

16   A.   No.

17   Q.   Now, in Mexico are you required to register aircraft,

18   airplanes that you own?

19   A.   That's right.

20   Q.   How often do you have to do that?

21   A.   To register the plane?   Only once.

22   Q.   And when is that?

23   A.   When one buys it.

24   Q.   And you say you bought this airplane in 1984?

25   A.   Yes.   It was a small plane that had had an accident.   I

1538

1    bought it because the owner, the owner had cashed in the

2    insurance and he had spent the money for the insurance and he

3    no longer had the money and he sold it to me.  He sold it to

4    me very cheaply, for $5,000.

5    Q.    What --

6    A.    And I figured that with another $40,000 or so, I could

7    fix it up and then sell it for a hundred or a $150 and make a

8    profit on that.

9    Q.    When you registered that -- Excuse me, Mr. Zuno.  I

10   think you answered that.

11              When you register an airplane, do you have to

12   write down what your residence is?

13   A.    Yes.

14   Q.    So this airplane is registered to you at a particular

15   location; correct?

16   A.    Well, this plane, I haven't registered it because I

17   haven't fixed it up, I haven't repaired it.  It's sitting in

18   a hangar.  It still needs the engine and it needs the

19   propellor and other things.

20   Q.    Isn't it correct that this aircraft has the numbers or

21   the identifying number or letters of XBBAW?

22              THE INTERPRETER:  The letters again?

23   Q.    BY MR. CARLTON:  XBBAW.

24   A.    No.

25   Q.    Have you ever owned an aircraft identified in that

1539

1    manner?

2    A.    Yes.   I sold it in 1982 to I had Yanaro Cecivid Montes.

3    Q.    In 1982?

4    A.    Yes.

5    Q.    Do you know where that aircraft was registered at the

6    time that you sold it?   What location was on the registration?

7                   THE INTERPRETER:   You mean what address.

8                   THE COURT:   Yes.   That's what you're asking.

9                   MR. CARLTON:   I didn't hear that, sorry.

10                  THE INTERPRETER:   You mean what address?

11   Q.    BY MR. CARLTON:   Yes, what address?

12   A.    No, I don't know.   I signed the documents over to

13   Tinajero Ramos when he paid me for it.   I sold it to him for

14   $10,000.   And after that I never learned whether he registered

15   or did not register it.   Or what address he wrote down on the

16   registration, I don't know.

17   Q.    At the time you sold it, it was registered to you at 881

18   Lope de Vega, wasn't it?

19                  MR. BLANCARTE:   Objection, Your Honor; relevance,

20   materiality, we've gone a long way in this line of questioning.

21                  THE COURT:   Well, the witness may answer the

22   question.

23                  THE WITNESS:   Yes.   Because I had registered that

24   plane, umm, I don't think I'm wrong about this, I think it

25   was 1977, 1976, sometime around there.

1540

1   Q.   BY MR. CARLTON:  Isn't it also correct, Mr. Zuno, that

2   that aircraft was registered in your name at that location as

3   late as June of 1985?

4   A.   I have no idea.

5   Q.   Do you know an individual named Alberto Velasco Garcia?

6   A.   Alberto Velasco Garcia?

7   Q.   (Nods head up and down.)

8   A.   I know a lot of people named Velasco but the name

9   Alberto doesn't ring anything.

10  Q.   When you -- Strike that.

11          Do you on occasion rent aircraft?

12  A.   No.  Well, at one time, umm, sometime between 1969

13  and '73 to '74, I was a partner in a business called

14  Servicios Aeros Jalisco.  Servicios Aerogecutivos Jalisco.

15  It was a business that didn't go well.  The small planes that

16  we had, had three or four accidents.

17          THE COURT:  The question was whether you had

18  rented a plane at any time.

19          THE WITNESS:  Well, yes, the company that I had an

20  interest in in between 1970 and 1973 and I was a very minor

21  partner in the corporation.

22  Q.   BY MR. CARLTON:  You occasionally do fly airplanes to

23  the United States, don't you?

24  A.   Yes, I used to fly planes into the United States.

25  Q.   Including the one that you own?

1541

1           MR. BLANCARTE:  Objection.  Vague as to which

2    plane he's talking about now.

3           THE COURT:  There's only one.

4           MR. BLANCARTE:  No.  There's been testimony as to

5    one that doesn't fly, has never flown and then --

6           THE COURT:  He asked including the one he owns, he

7    said.

8           MR. BLANCARTE:  He testified --

9           THE COURT:  I think he's only testified to owning

10   one.

11          MR. BLANCARTE:  He testified as to owning two.

12          MR. CARLTON:  I can clarify.

13   Q.   Mr. Zuno, have you ever flown the plane that you

14   acquired in 1984 to the United States?

15   A.   No.  Because it is has been in an accident.  It had

16   landed without the nose gear and it was missing --

17          THE COURT:  All right.  You've answered the

18   question.

19   Q.   BY MR. CARLTON:  Now, when you spoke with Inspector

20   Boras in 1989 you told her that you flew the plane to the

21   United States, didn't you?

22   A.   But it was not that one.

23   Q.   Do you have another plane?

24   A.   No.  It was this other one.  It was borrowed, the one

25   that I had sold to Cecilio Montes later on.

1542

1    Q.    In 1982?

2    A.    I sold it to him in '82.

3    Q.    Have you owned property in the United States?

4              MR. BLANCARTE:  Objection; relevance and

5    materiality.

6              THE COURT:  Overruled.

7              THE WITNESS:  A small condominium, a tiny little

8    house in San Antonio, Texas.

9    Q.    BY MR. CARLTON:  Was that at 11622 Cap Rock in San

10   Antonio?

11   A.    It was 11- -- 11622 at that address.

12   Q.    And you lived in San Antonio for a period of time,

13   didn't you?

14   A.    I would come and go.  I would come and go, every week,

15   every two weeks.

16   Q.    For what period of time?

17   A.    Four years.

18   Q.    Now, the INS inspector, Mrs. Boras, asked you whether

19   you had ever had any problems with the Mexican government or

20   their agencies and --

21             MR. BLANCARTE:  Objection; relevance and the court

22   has previously ruled that this is not an area that the court

23   wanted to get into.  It's irrelevant and immaterial.

24             THE COURT:  The objection is sustained.

25             MR. CARLTON:  Your Honor, it goes to the witness'

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1543

1    credibility, just as --

2            THE COURT:  Well, then, you should ask the

3    question in a different way.

4    Q.   BY MR. CARLTON:  Mr. Zuno, did you tell Mrs. Boras in

5    1989 that the only problems you've ever had with the Mexican

6    government or its agencies was that the Mexican guerillas in

7    Mexico had given you some problems as it says here, "When my

8    father was a member of the ex-president of Mexico" --

9            MR. BLANCARTE:  Objection.  He's reading the

10   testimony, Your Honor.

11           THE COURT:  Well, the objection is sustained.

12   Q.   BY MR. CARLTON:  Did you say this to Mrs. Boras, Mr. Zuno,

13   in response to the question:  Have you ever had any problems

14   with the Mexican government or their agencies?

15           Yes.  With the Mexican guerillas in Mexico.

16           MR. BLANCARTE:  Your Honor has sustained this

17   objection.

18           THE COURT:  The objection is sustained to this

19   question.

20   Q.   BY MR. CARLTON:  Did you tell Mrs. Boras why you had

21   moved to San Antonio?

22           MR. BLANCARTE:  Same objection.  The court

23   sustained this.

24           THE COURT:  Sustained.

25           MR. CARLTON:  May I have just a moment, Your Honor?

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1544

1     (Discussion held off the record between

2     prosecutors sotto voce.)

3   Q.   BY MR. CARLTON:  During the time that you lived in the

4   United States, Mr. Zuno, you acquired a Texas driver's license,

5   did you not?

6   A.   That's right.

7   Q.   And Social Security card?

8   A.   Yes.

9   Q.   Bank accounts?

10     MR. BLANCARTE:  Objection; relevance, materiality.

11     THE COURT:  Overruled.

12     MR. BLANCARTE:  Beyond the scope.

13     THE COURT:  Overruled.

14     THE WITNESS:  One account at the bank.

15   Q.   BY MR. CARLTON:  What caused you to return to Mexico

16   after living in the United States off and on for four years?

17     MR. BLANCARTE:  Objection; relevance, materiality,

18   outside the scope.

19     THE COURT:  Sustained.

20   Q.   BY MR. CARLTON:  Isn't it true, Mr. Zuno, that you had a

21   personal grudge against Enrique Camarena?

22   A.   No, I didn't know him.  I didn't know anything about him.

23   Q.   Had you ever heard his name before?

24   A.   I had heard the name Enrique Camarena but it was Enrique

25   Camarena Barreto, a personal friend of mine, not the name

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1545

1   Enrique Camarena Salazar.

2   Q.   Did you ever mention the name Enrique Camarena to anyone

3   before, let's say, in 1982?

4   A.   Enrique Camarena, yes, but it was Enrique Camarena

5   Barreto, I said that to many people.  He was one of my very

6   closest friends, ever since my childhood in Guadalajara.

7   Q.   Isn't it true, Mr. Zuno, that you blamed Enrique

8   Camarena Salazar for a search that was conducted on your

9   airplane on March 13th of 1982?

10  A.   That's false.

11  Q.   Was your plane searched on that date?

12  A.   Where?

13  Q.   As it entered the United States?

14  A.   Every time I entered into the United States, the customs

15  inspectors would come around and search.  And many times they

16  would bring dogs and have them smell around and bring them

17  into the plane.  That didn't happen once, it happened many

18  times.  Most of the times that I entered into the United States.

19  Q.   Do you recall flying a Cessna StationAire airplane

20  bearing the serial number N-2677-U?

21  A.   Engineer?

22  Q.   StationAire.

23  A.   No.

24  Q.   You've never flown that aircraft?

25  A.   No, I haven't flown it.

1546

1   Q.   Did you ever talk with an individual named Alberto

2   Velasco Garcia about a search to which one of your aircraft

3   was subjected?

4   A.   No, never.

5   Q.   Do you know an individual named Armundo Pavon Reyes?

6   A.   I've only heard that name here during the trial and also

7   in Mexico when Caro-Quintero escaped through the airport in

8   Guadalajara, because that name also was brought out in many,

9   many reports in the TV and the radio and on the printed press.

10  Q.   You built the house at 881 Lope de Vega, didn't you?

11  A.   That's right.

12  Q.   And did you install the gun racks in one of the bedrooms?

13  A.   Well, one was for -- Well, it wasn't for guns.  It was

14  for rifles and shotguns, sports guns.  And another one was a

15  sort of cupboard for idols for archeological finds that we

16  found.

17            MR. CARLTON:  May I have just a moment, Your Honor?

18            THE COURT:  Yes.

19            (Discussion held off the record between

20            Mr. Carlton and the DEA agent sotto voce.)

21            MR. CARLTON:  Nothing further, Your Honor.

22            THE COURT:  Any redirect?

23            MR. BLANCARTE:  We have no further questions of

24  Mr. Zuno.

25            THE COURT:  All right, you may step down.

1547

1   THE WITNESS:  Thank you.  (In English.)

2   MR. MEDVENE:  The defense rests.

3   THE COURT:  Very well.  Is there any rebuttal

4   evidence on behalf of the government?

5   MR. MEDRANO:  May I have just one moment, Your

6   Honor?

7   (Discussion held off the record between

8   prosecutors sotto voce.)

9   MR. CARLTON:  Your Honor, at this time I would

10  move the admission of an exhibit which I have marked as 183,

11  which is one of the deed, deed 538 as part of our rebuttal

12  evidence, the deed reflecting the sale from Mr. Zuno to Barba.

13  THE COURT:  All right.  That may be admitted.

14  MR. CARLTON:  May I present it to the clerk?

15  THE COURT:  Yes.

16  (Received in Evidence Exhibit No. 183.)

17  THE COURT:  Is there any witnesses to be called?

18  MR. CARLTON:  We have no witnesses to call, Your

19  Honor.  There is one matter that I would like to have some

20  time to look into, which is a document that has come up as a

21  result of Mr. Zuno's testimony just now.  But I -- as to

22  whether that document is admissible.  But other than that, we

23  have no witnesses and nothing else.

24  THE COURT:  Is there any other surrebuttal for the

25  defendants?

1548

1      MR. MEDVENE:  There is none, Your Honor.

2      THE COURT:  All right.  Well, then I advise the

3  jury that the evidence in this case is now over and the next

4  order of business will be to hear the argument of counsel

5  regarding this case.  We will do that tomorrow.  The court

6  must discuss first the instructions of the law with counsel

7  in this case, and so tomorrow we will begin the argument.

8      Now, let me admonish you again that when you go

9  home, you should not discuss this case with each other or

10 with anyone else, not to form or express any opinion or

11 conclusion about the case and to avoid reading, listening to

12 or watching any news events that might appear regarding this

13 case, make a concerted effort to do so.

14     You may be excused.  We will reconvene tomorrow

15 morning at the usual time.

16     THE CLERK:  Please rise.

17     (Jury excused at 3:33 p.m.)

18     THE COURT:  Now, counsel, have you submitted to

19 the court a joint set of instructions in accordance with the

20 court's instructions?

21     MR. MEDRANO:  Your Honor, proposed instructions

22 were submitted to the defense some time ago.  This morning I

23 received some objections and responses.  It appears to both

24 of us that there are almost no disagreements, and we can

25 discuss that shortly after court today and I think deliver

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1549

1    agreed instructions to you -- well, first thing in the

2    morning at the latest.  But perhaps even as early as this

3    afternoon.

4             THE COURT:  Well, I think we need to have them

5    today.  What are the disagreements?

6             MR. MEDRANO:  Since we only received the objections

7    this morning, I've only had a chance to glance at them.  I'm

8    not sure there are any significant disagreements.

9             THE COURT:  Are there any disagreements with the

10   sets of instructions proposed by the government?

11            MS. FULGINITI:  Your Honor, some of the objections

12   were due to the fact that Dr. Machain has now been dismissed

13   from the case.  We just wanted to edit some instructions.

14            THE COURT:  Well, those would have to be cleaned

15   up then.

16            MR. MEDRANO:  That's been done.

17            MS. FULGINITI:  There are also some others that

18   are not applicable because he is no longer a defendant in

19   this case.  There was a witness' statement instruction.  I am

20   speaking off of the top of my head, I apologize, because I

21   don't have a copy in front of me.  I served it and didn't

22   bring a copy with me.

23            There's also two others.  I believe it's 41 and 42,

24   which is a felony murder which we are not charged with but

25   Dr. Machain was charged with.  I really don't think there

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1550

1    will be much disagreement.  John and I wanted to get together.

2             THE COURT:  What I want to you do is remain here

3    and we'll iron out everything that you can and then report to

4    me, I will be in chambers, what, if any, disputes there are

5    so we can settle them this evening.

6             MR. CARLTON:  Your Honor, I think the copies are

7    up in our office.  Can we confer up there and come back down?

8             THE COURT:  Yes, you can go.

9             MR. MEDVENE:  We're adding one other instruction,

10   Your Honor - we waited until the conclusion of the government's

11   case - a missing witness instruction that we believe we're

12   entitled to.  It's the stock Devitt & Blackmar instruction and —

13            THE COURT:  Did you read the notes under that

14   instruction to see if it's recommended to give or not to give.

15            MR. MEDVENE:  I hope that we have read the notes.

16   I didn't personally read them but I have the message and I

17   will read them now.

18            THE COURT:  Well, you may submit it.

19            MR. MEDVENE:  Yes, sir.  May I approach the clerk?

20            THE COURT:  Yes.

21            THE COURT:  I'll be standing by to hear from you.

22            MR. CARLTON:  Thank you.

23            THE CLERK:  Please rise.  Court is in recess.

24            MR. MEDRANO:  Your Honor.

25            MR. CARLTON:  Can we confer with the clerk just to

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1551

1    clarify the exhibit list?

2              THE COURT:  Yes.  Yes, do that.

3              (Recessed at 3:36 p.m.)

4                        --oOo--

5    I certify that the foregoing is a correct transcript of the

6    proceedings held in the above-entitled matter.

7

8

9    DATE:_____

10                          _____
                            LUCILLE M. LITSHEIM
                            U.S. Court Reporter
11                          CSR NO. 2409

12

13

14

15

16

17

18

19

20

21

22

23

24

25