FILED

1010

MAY 25 1993

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY_____ DEPUTY

1               UNITED STATES OF AMERICA

2           CENTRAL DISTRICT OF CALIFORNIA

3        THE HON. EDWARD RAFEEDIE, JUDGE PRESIDING

90-50459

4   THE UNITED STATES OF AMERICA, )
                                  )
5              Plaintiff,         )
                                  )
6              vs.                )    NO. CR-87-422-(G)-ER
                                  )
7   RAFAEL CARO-QUINTERO,         )
       RUBEN ZUNO-ARCE,           )
8      HUMBERTO ALVAREZ-MACHAIN,  )
                                  )
9              Defendants.        )
    _____)

10

11          REPORTER'S TRANSCRIPT OF PROCEEDINGS
                    December 9, 1992
12                 AFTERNOON SESSION

13

APPEARANCES:

14

FOR THE PLAINTIFF:          United States Attorney
15                          BY:  JOHN CARLTON, Asst.
                                 MANUEL MEDRANO, Asst.
16                          U.S. Courthouse, Room 1443
                            312 N. Spring Street
17                          Los Angeles, California  90012
                            (213) 894-0619
18

FOR DEFENDANT ZUNO-ARCE:    EDWARD MEDVENE
19                          JAMES BLANCARTE
                            MARY FULGINITI
20                          Los Angeles, California  90067
                            (310) 201-3545
21

FOR DEFENDANT MACHAIN:      ALAN RUBIN
22                          Los Angeles, California 90064
                            (310) 473-6447
23

ORIGINAL

24                          LUCILLE M. LITSHEIM, CSR 2409
                            Official Federal Reporter
25                          (213) 894-6613

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1011

1          INDEX

2   WITNESSES:          DIRECT    CROSS    REDIRECT    RECROSS    VOIR
                                                                 DIRE

3   LOPEZ, Rene
    (Continued)        1012      1063

4

5

6

7

8

9

10

11                      EXHIBITS

12                                  MARKED        RECEIVED
                                    FOR           IN
13  EXHIBIT NO:                     IDENTIFICATION  EVIDENCE

14  146                                            1016
15  172                                            1014

16

17

18

19

20

21

22

23

24

25

1012

1    LOS ANGELES, CALIFORNIA; WEDNESDAY, DECEMBER 9, 1992, 1:30 P.M.

2                          -oOo-

3

4                          RENE LOPEZ ROMERO,

5    having been previously sworn, resumed the stand and testified

6    further as follows:

7              (Jury present.)

8              THE COURT:  Do we have any further questions for

9    this witness?

10             MR. MEDRANO:  Your Honor, with the court's

11   permission, at the first recess we'll provide to Madam Clerk

12   the exhibits referenced by this witness and at this time

13   we'll seek the admission of the exhibits described thus far

14   by this witness.

15             THE COURT:  Just proceed with the examination.

16             MR. MEDRANO:  Very Well, Your Honor.

17

                DIRECT EXAMINATION (Continued)

18

19   BY MR. MEDRANO:

20   Q.   Mr. Lopez, with Agent Kuehl's assistance, could I ask

21   you you to look at exhibit 7, I believe.

22             Can you tell me what that is, sir?

23   A.   That is Ernesto's house called El Campamento.

24   Q.   Thank you.  Now, sir, are you familiar with the

25   residence that is referred to as La Oficina?

1013

1   A.   Yes.

2   Q.   Directing your attention to the fall of 1984, did you

3   ever accompany Fonseca in the direction of that residence?

4   A.   Yes.

5   Q.   Where did you start from before you went to La Oficina?

6   A.   We went up, out of the house of Ernesto Fonseca.

7   Q.   And when Fonseca left, was he accompanied by other

8   bodyguards as well?

9   A.   Yes.

10  Q.   Now, where did you leave to?  Where did you go to?

11  A.   We went to the crossroads, Tonala/Puente Grande.

12  Q.   What happened there, sir?

13  A.   There we met with another vehicle.

14  Q.   And who was in that vehicle, if you recall?

15  A.   Ernesto Piliado and his group.

16  Q.   What happens at that intersection?

17  A.   At that intersection Samuel Ramirez Razo ordered for the

18  bodyguards to remain in the carryall.  And to be on the alert

19  on that intersection.

20  Q.   Did Razo and Fonseca leave?

21  A.   Razo, Fonseca and also Jorge Godoy.

22  Q.   Did the rest of your bodyguards remain at that

23  intersection?

24  A.   Yes, only Piliado's group left with Ernesto Fonesca

25  Carrillo.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1014

1    Q.    In what direction did Fonseca go to?

2    A.    They went toward the town of Tonala.

3    Q.    How long did you and the remaining bodyguards stay at

4    your intersection location?

5    A.    For approximately two hours.

6    Q.    At any point did Fonseca and his people rejoin you?

7    A.    Yes.

8    Q.    And what direction did Fonseca come from when he

9    rejoined you?

10   A.    From the town of Tonala.

11   Q.    And thereafter where did you go with Fonseca?

12   A.    From there we went to the Venus Hotel, which is owned by

13   Ernesto Fonseca.

14   Q.    Now, Mr. Lopez, still directing your attention to the

15   fall of 1984, at any point did you ever accompany Fonseca to

16   another residence in the Tonala?

17   A.    Yes, to a ranch of, Javier Barba.

18          MR. MEDRANO:  If I can ask Agent Kuehl to put 172

19   in front of you.

20   Q.    Do you recognize what that is, sir?

21   A.    That's the entrance to the ranch of Javier Barba.

22          MR. MEDRANO:  Move the admission of 172, Your

23   Honor.

24          THE COURT:  It may be admitted.

25          (Received in Evidence, Exhibit 172.)

1015

1    Q.   BY MR. MEDRANO:   Did another bodyguard also accompany

2    Fonseca to that Tonala residence?

3    A.   Yes.

4    Q.   Now, Mr. Lopez, at this ranch were there animals at this

5    ranch?

6    A.   Yes, they had some wild animals and -- in cages.   And

7    they had a feeding lot for bulls.

8    Q.   After you arrived at this residence at Tonala, what did

9    you end up doing?

10   A.   We went to play pool.

11   Q.   Where exactly?

12   A.   Inside the same residence, in front of the living

13   quarters.

14   Q.   Did some of the other bodyguards as well -- play pool as

15   well?

16   A.   Some of them did.

17   Q.   Now, was Jorge Godoy with you playing pool?

18   A.   No.

19   Q.   Where was Godoy?

20   A.   He went into the house.

21   Q.   Afterwards, sir, did you end up leaving this residence

22   at Tonala?

23   A.   Yes.

24   Q.   And did you leave with Fonseca?

25   A.   Yes.

1016

1   Q.   Now if I can direct your attention, sir, are you

2   familiar with a residence located on Hidalgo Avenue or

3   street?

4   A.   Yes.

5   Q.   And if I can direct your attention to early February of

6   1985, were you present at Hidalgo at or about that time?

7   A.   Yes.

8   Q.   Was Fonseca there?

9   A.   Yes.

10           MR. MEDRANO:   If I can ask 146 to be put in front

11   of the witness.

12   Q.   Do you recognize what that is, sir?

13   A.   That's the residence of Avenida Hidalgo belongs to

14   Ernesto Fonseca.

15           MR. MEDRANO:   Seek its admission, Your Honor.

16           THE COURT:   It may be admitted.

17           (Received in Evidence, Exhibit No. 146.)

18   Q.   BY MR. MEDRANO:   Sir, while you were at that house, at

19   any point do the other people begin arriving at the Hidalgo

20   house?

21   A.   Yes.

22   Q.   People from different agencies?

23   A.   Different government agencies.

24   Q.   Can you tell me who you saw from what agencies?

25   A.   From the military, Arrevalo Gardoqui, Dionisio Santoyo,

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1017

1  Jorge Garma.  That's it.

2  Q.   Anyone from the Federal Policia there ?

3  A.   Also from the Federal Police.

4  Q.   Who, Mr. Lopez?

5  A.   Juan Gilberto Hernandez Parra, Migeul Aldana, Manuel

6  Ibarra, Alfonso Vasquez.  Sergio Espino Verdin, Armando Pavon

7  Reyes.  That's all.

8  Q.   Did you see any persons arrive who were politicians?

9  A.   Yes.

10  Q.   Who?

11  A.   Enrique Alvarez Del Castillo, Manuel Valles Diaz, Ruben

12  Zuno Arce, Carlos Acevez Fernandez.

13  Q.   Were there any state prosecutors you saw arrive?

14  A.   From the state DA's office?

15  Q.   Correct.

16  A.   Yes.  From the DA's office, Edgar Levy Gallardo, Armando

17  Cuellar, Jorge Larios.

18  Q.   Were there traffickers that you saw arrive as well, sir?

19  A.   Yes.

20  Q.   Who?

21  A.   Rafael Caro-Quintero.  Ernesto Fonseca was also there.

22  Felix Gollardo, Manuel Salcido, Sergio Salcido, Avelardo

23  Fernandez, Javier Barba, Jorge Fonseca.  That's all.

24  Q.   And was Samuel Razo there as well?

25  A.   Yes.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1  Q.   When these people initially arrived, where did they --

2  where did they get together or gather?

3  A.   First of all they got together in the living room of the

4  house.

5  Q.   Okay.  At any point did any of the people leave the

6  living room?

7  A.   Yes.  All of these important people went to the bedroom

8  of Ernesto Fonseca.

9  Q.   All of these people or some of them?

10          MR. MEDVENE:  Asked and answered.

11          THE COURT:  Sustained.

12  Q.   BY MR. MEDRANO:  Can you tell me who you saw go to that

13  bedroom.

14          MR. MEDVENE:  Asked and answered.  He said all of

15  these people went.  He just identified 30 or more people.

16          MR. MEDRANO:  The response is ambiguous, Your

17  Honor, I just want to clarify it.

18          THE COURT:  It's not ambiguous.

19          What is it you want to ask the witness?  To name

20  the people that went in there?

21          MR. MEDRANO:  Yes, Your Honor.

22          THE COURT:  He has named them.

23          MR. MEDRANO:  Very well.

24  Q.   Do you recall, sir, how long these people met in that

25  bedroom?

1    A.    More or less an hour and a half, two hours.

2    Q.    Incidentally, is this a large bedroom?

3    A.    Yes.

4    Q.    What happened after that meeting ended in the bedroom?

5    A.    Afterwards they went out and remained in the living

6    room.

7    Q.    At any point did you see any of these individuals leave

8    this residence of, uh -- this particular residence?

9    A.    Yes.

10   Q.    Who?

11   A.    Like Arevalo Gardoqui, Dionisio Santoyo.  Jorge Garma

12   just let them out when the DA's -- people from the DA's

13   office left.

14   Q.    Go ahead, I'm sorry.

15   A.    Edgar levy Gallardo, Armando Cuellar, Jorge Larios.

16   Q.    Did you ever see Ruben Zuno leave the residence?

17   A.    Yes, Ruben Zuno, and Enrique Alverez del Castillo.

18   Q.    I'd like to direct your attention now, Mr. Lopez, to the

19   date of February 7, 1985.  You're familiar with the residence

20   located at 881 Lope de Vega?

21   A.    Yes.

22   Q.    On February 7th, did have you a chance to go to Lope de

23   Vega?

24   A.    Yes.

25   Q.    With Ernesto Fonseca?

1020

1  A.   Yes.

2  Q.   Where did you depart from before you went to Lope de

3  Vega?

4  A.   From Ernesto Fonseca's house.

5  Q.   Do you recall -- well, strike that.

6       Approximately how many vehicles did you take to go

7  from Fonseca's house to Lope de Vega?

8  A.   Four vehicles.

9  Q.   When you left Fonseca's residence, did you know where

10 you were going?

11 A.   No.  Ernesto Fonseca just told us we were going to run

12 an errand.

13 Q.   When you arrived at Lope de Vega, had you ever been at

14 that residence before?

15 A.   No.

16 Q.   Indeed, had you ever even heard of the residence before

17 February 7th?

18 A.   No.

19 Q.   If I can ask you to look at government exhibit 13-A.

20 Can you tell me what that is?

21 A.   That's the front part of Lope de Vega.

22       MR. MEDRANO:   Thank you, Agent Kuehl.

23 Q.   When your group arrived, where were the vehicles put at

24 Lope de Vega?

25 A.   In the back area, close to the courts.

1021

1    Q.    What kind of courts?

2    A.    There was a basketball court.   Ping-pong.   There were

3    several.

4    Q.    When you arrived at 881 Lope de Vega with Fonseca, was

5    anyone else already present at that house?

6    A.    Yes.

7    Q.    Who?

8    A.    Ernesto Piliardo Garza was there.   Victor Manuel Lopez

9    Razon, Manuel Ruvalcaba, El Tatano, Rafael Caro-Quintero, El

10   Fantasma, La Changa.

11   Q.    Are you familiar with someone --

12   A.    Several people.

13   Q.    Okay.   Are you familiar with someone by the name of El

14   Batman?

15   A.    Sometimes we would get him mixed up, they would call him

16   -- we would call him El Fantasma or El Batman, but it was

17   the same person.

18   Q.    Mr. Lopez, when you arrived at this residence, where did

19   Fonseca go?

20   A.    He met in the garden close to a pool and an umbrella

21   that they had there.   He met with the other traffic- -- drug

22   traffickers.

23   Q.    What is the next thing that happens?

24   A.    Once they had met with the drug traffickers there, all

25   of the bodyguards were in the patio on one side of them.

1022

1    Q.    At any point, Mr. Lopez, does someone arrive at this

2    house?

3    A.    Yes.  A person about 30 years old, blonde, who later on

4    I found out it was an employee of the American Consulate.

5    Q.    What happens with this -- when this consulate employee

6    arrived at the house?

7    A.    When this person arrived to the house, met with Samuel

8    Ramirez Razo, because Samuel Ramirez Razo was also there in

9    the patio, this person from the consulate told Samuel Ramirez

10   Razo that the information he had given to him, that they were

11   correct.  That the information was correct.  The information

12   was precise.

13   Q.    What's the next thing that happens, Mr. Lopez?

14   A.    Then Samuel Ramirez Razo and this person from the

15   consulate went toward where the drug traffickers were meeting

16   there next to the umbrella and the pool and Samuel Ramirez

17   Razo told Rafael Caro-Quintero that the information that they

18   had been given was correct, everything was fine.

19          Then Ernesto Fonseca replied and told Samuel

20   Ramirez Razo, "Well, okay, form the operation, Comprade."

21   Q.    What's the next thing that happens then, Mr. Lopez?

22   A.    Then after, Avelardo Fernandez and Javier Barba met with

23   Samuel Ramirez Razo because among the three of them they each

24   started selecting their group to perform the operation.

25   Q.    Now, who are the individuals that will be selecting

1023

1   people for the operation?

2   A.   Samuel Ramirez Razo selected Torres Lepe, myself, and

3   the person from the consulate.   Javier Barba, he selected

4   from his group the brothers we called Los Tierras Libres,

5   freelanders, Eliseo and Antonio.

6         He also selected the El Italiano and another one

7   named El Nino.

8   Q.   Okay.

9   A.   Avelardo Fernandez selected three persons whose name I

10  don't remember but we used to call them Los Dormidos.

11  Q.   Now, at any point do you or others depart from 881 Lope

12  de Vega?

13  A.   Yes.

14  Q.   How many vehicles are taken?

15  A.   Four.

16  Q.   What were they?

17  A.   A van carryall.  A Gran Marquis.  An Atlantic.   An LTD

18  Ford.

19  Q.   Ramirez Razo, what vehicle did he get into?

20  A.   On the Atlantic.

21  Q.   Anyone with him in that car?

22  A.   The person from the consulate and Torres Lepe.

23  Q.   And did the remaining individuals get into the remaining

24  three vehicles?

25  A.   Yes.  I took the LTD.

1024

1    Q.    Now, do these vehicles leave together from Lope de Vega?

2    A.    Well, when we left, we were going to take different

3    routes.

4    Q.    So what happens next, Mr. Lopez?

5    A.    Then we left toward Avenida Chapultepec.

6    Q.    So what happens?

7    A.    On one of the side streets Samuel Ramirez Razo stopped

8    his Atlantic.  I stopped behind him with my LTD.

9    Q.    Samuel Ramirez Razo ordered me to leave the LTD parked

10   on that street.

11   Q.    Did you do so?

12   A.    Yes.

13   Q.    And then what happened to you after that?

14   A.    I got on the Atlantic.

15   Q.    With Ramirez Razo?

16   A.    Yes.

17   Q.    Who is driving the Atlantic?

18   A.    Samuel Ramirez Razo.

19   Q.    Now where did your vehicle proceed to then, Mr. Lopez?

20   A.    We went on Avenida Chapultepec towards La Libertad

21   Street.

22   Q.    And ultimately where did you arrive?

23   A.    We continued on La Libertad until we got to Progreso.

24   Q.    Did you end up parking the car at any position?

25              THE COURT:  Are you going somewhere with this,

1025

1    counsel?  Let's get to the point.

2              MR. MEDRANO:  Very well.

3    Q.   What building did you arrive at, Mr. Lopez?

4    A.   We parked in front of the building of the American

5    Consulate.

6    Q.   Now tell us what happens when you're parked near the

7    consulate.

8    A.   Samuel Ramirez Razo ordered me to get off.  I opened the

9    door and I got off but I did not move from the vehicle.  From

10   that place we could see Javier Barba.  He was towards the

11   east, parked.

12             Then the person that was with him from the

13   consulate told Samuel Ramirez Razo, "Look, the person will be

14   coming out on Progreso Street or through the door of La

15   Libertad Street."  But then the person from the consulate

16   emphasized to Samuel Ramirez Razo that he was sure he would

17   be coming out from the door of La Libertad Street.

18   Q.   What is the next thing that happens?

19   A.   Then Samuel Ramirez Razo ordered me to stand on the

20   sidewalk away from the vehicle.  And a few minutes later a

21   person exited the American Consulate exactly through the door

22   of Libertad Street.  Then the person from the consulate that

23   was with Samuel Ramirez Razo told him, "Look, that is the

24   person."

25             The person who was exiting the consulate crossed

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1026

1    Libertad Street.   Samuel Ramirez Razo got out of the Atlantic

2    telling me, "Come," signaling with his hand.   Just at the

3    time as the person from the consulate arrived to the

4    sidewalk, Samuel Ramirez Razo confronted him.

5    Q.    At that very moment where are you in relation to Razo

6    and the man that has been intercepted?

7    A.    I was about two, three meters from them.

8              MR. MEDRANO:   Now if I can ask Agent Kuehl to show

9    government exhibit 5 to the witness.

10   Q.    Do you recognize that man, sir?

11   A.    Yes.   That is the person who exited the American

12   Consulate.

13   Q.    And did you later learn his name?

14   A.    Enrique Camarena Salazar.

15   Q.    Now what happened once Camarena is intercepted?

16   A.    Samuel Ramirez Razo, showing him a credential from the

17   federal directorate, told Enrique Camarena, "The commander

18   wants to see you."   Then Enrique Camarena replied to Samuel

19   Ramirez Razo, "When the commander wants to see us, he

20   sends --" and he just let him get that far.

21             Samuel Ramirez Razo took out his gun, and with the

22   credential and the gun, he just let him talk that far.

23             Samuel Ramirez Razo shut his credentials, placed

24   his left hand on the right shoulder of Camarena, I put my

25   right hand on the left shoulder of Camarena --

1027

1   Q.    Where --

2   A.    -- and we headed him to the Atlantic.

3   Q.    Now, this entire time, where is the consulate employee?

4   A.    He remained in the Atlantic.

5   Q.    What happens when Camarena is taken back to the

6   Atlantic?

7   A.    We placed him in the back seat.  I went through the

8   right door in to the back, Camarena came in, and then Samuel

9   Ramirez Razo.

10  Q.    So was Camarena between the two of you in the back?

11  A.    Between Samuel Ramirez Razo and myself, he was sitting

12  in the middle.

13  Q.    Okay.  Did anyone sit in the front of the Atlantic?

14  A.    The person -- the person from the consulate sat in the

15  driver's seat.

16  Q.    Was there anyone in the front passenger seat?

17  A.    There was Torres Lepe.

18  Q.    Okay.  Now what happens once everyone is in the

19  Atlantic, Mr. Lopez?

20  A.    Afterwards Samuel Ramirez Razo told Camarena to duck

21  down.  Samuel Ramirez Razo placed his shoulder on Camarena's

22  head.  Samuel Ramirez Razo got hold of his walkie-talkie and

23  informed the other colleagues who were there in the

24  operation, "We're taking the person.  Let's go."

25  Q.    Did your vehicle then leave the vicinity of the U.S.

1028

1   Embassy?

2   A.   Yes.

3   Q.   Where did you go to, Mr. Lopez?

4         THE COURT:   Now you said U.S. Embassy.   Is that

5   what you meant?

6         MR. MEDRANO:   I misspoke, Your Honor.   Excuse me.

7   Q.   The consulate building.

8   A.   American Consulate.

9   Q.   Did you leave that area?

10  A.   Yes.   We went over toward Lope de Vega.

11  Q.   When you arrived at Lope de Vega, where was the Atlantic

12  put?

13  A.   Inside the house of Lope de Vega, in the garden.

14  Q.   Through what gate did you enter Lope de Vega?

15  A.   On the side gate of the house.

16  Q.   Now, what happens once the Atlantic is inside the Lope

17  de Vega area?

18  A.   Later El Italiano, who was there -- in other words, all

19  of the -- all of us who were in the operation were already

20  there.   We got out of our vehicles.   El Italiano brought to

21  Samuel Ramirez Razo a bag with bandages.

22        Samuel Ramirez Razo did not get Camarena out of

23  the back seat, he just got out; in other words, Samuel

24  Ramirez Razo got out of the vehicle and started to blindfold

25  Camarena.

1029

1    Q.   With these bandages?

2    A.   Yes.

3    Q.   And when you returned to Lope de Vega, were many of

4    these previously mentioned people still in that patio area?

5    A.   Yes.

6    Q.   Did that include Caro and Fonseca?

7    A.   Yes.

8    Q.   What's the next thing that happens, Mr. Lopez?

9    A.   Once Camarena was blindfolded, Samuel Ramirez Razo

10   directed him, because obviously he couldn't see at this time,

11   and took him to the umbrella where the drug traffickers were

12   meeting, had gathered.

13   Q.   And then?

14   A.   Then he walked towards where the drug traffickers were

15   and Samuel Ramirez Razo told Rafael Caro-Quinterro, "Didn't

16   you say it couldn't be done, Compa?  Except you don't have

17   any confidence," no faith, one of those words he used, "to

18   see that we are able to."

19          Rafael Caro-Quintero while embracing Enrique

20   Camarena, told him, "I told you I was going to have you in my

21   hands, you son of a bitch."

22   Q.   Where -- strike that.

23          Is Camarena taken anywhere within the Lope de Vega

24   residence?

25   A.   Yes.  Rafael Caro-Quintero took him to the bedroom.  We

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1030

1    call that bedroom the maid's bedroom.

2              MR. MEDRANO:  Your Honor, may I have Agent Kuehl

3    put up the diagram just briefly.

4              THE COURT:  Yes.

5              (Pause in proceedings.)

6              MR. MEDRANO:  With the court's permission, may I

7    have Mr. Lopez just point to where --

8              THE COURT:  Yes.

9    Q.   BY MR. MEDRANO:  Mr. Lopez.

10   A.   Can I stand up?

11             THE COURT:  You may step down and point.

12   Q.   BY MR. MEDRANO:  Mr. Lopez, could you point on that

13   diagram where Camarena was taken to by Caro-Quintero?

14   A.   This part here.

15   Q.   Okay.  You can sit down.

16             THE COURT:  Indicate where the witness pointed.

17             MR. MEDRANO:  I'm sorry, Your Honor.  He pointed

18   to the portion of the diagram referenced as "guest room."

19             Thank you.

20   Q.   Mr. Lopez, after Camarena was walked -- or, taken into

21   that room that you just described, did you ever enter that

22   room?

23   A.   Yes.

24   Q.   When you enter the room, can you tell us who you find

25   inside?

1031

1   A.   When I went into that bedroom, Jorge Fonseca was there,

2   Pedro, the one we called El Urco, and El Fantasma.

3   Q.   Was Camarena in that room?

4   A.   Yes.   He was seated at the bed.

5   Q.   Is he still blindfolded?

6   A.   Yes.

7   Q.   At any point in your presence, Mr. Lopez, is Enrique

8   Camarena questioned?

9   A.   Yes.   Jorge Fonseca started questioning him there.

10   Q.   Can you tell us what you heard, please.

11   A.   Jorge Fonseca grabbed Enrique Camarena from his right

12   arm and made him kneel down.   Jorge Fonseca said to Enrique

13   Camarena, "What's your name?"

14        Enrique Camarena replied, "Enrique Camarena

15   Salazar."

16        Jorge Fonseca asked him what was his line of

17   business or who was he.   Enrique Camarena told him he was a

18   DEA agent.

19        Jorge Fonseca asked him,  "Okay, explain to me

20   what does DEA mean?"

21        Enrique Camarena told him, "DEA means it's an

22   agency against narcotics from the United States."

23        Then Jorge Fonseca told Enrique, "How many of you

24   are there?   How many are here?   Where is your office?"

25        Enrique Camarena told him, "There's several of

1032

1  us.  And we don't have a set office because we are sent from

2  one place to the other."

3          Then Jorge Fonseca kicked him -- gave a hard kick

4  on the chest to Enrique Camarena that even knocked him down

5  to the floor, telling him, "You are going to tell me, son of

6  a bitch."

7          Then Pedro, "El Urco," was behind Enrique Camarena

8  and Pedro grabbed him and just raised him, brusquely pushed

9  him.

10 Q.   So that he was back on his knees?

11 A.   Yes.  So he would go back to his position.

12 Q.   What happened next, Mr. Lopez?

13 A.   Then Enrique Camarena told Jorge Fonseca, "Hey, Jorge,"

14 he told him, "I want to talk to Rafael Caro-Quintero."  He

15 said, "I know that he and I can understand each other.  I can

16 give him the information he needs."

17         Jorge Fonseca said to Enrique, "Who told you that

18 Rafael Caro-Quintero was here?"

19         Enrique repeated that he could give him the

20 information, that Caro-Quintero and himself understood each

21 other well.  And Enrique told him he could be better used

22 alive than dead.

23 Q.   At any time, sir, are Camarena's hands tied in your

24 presence?

25 A.   Yes.

1033

Q.   Who did that?

A.   Jorge Fonseca ordered Pedro, he told him, "Tie his hands."  Then El Fantasma went to the bedroom -- I mean, the bathroom of that bedroom and took out some curtain cords.  In between El Fantasma and Pedro, they tied Enrique Camarena's hands in the back.

Q.   At any point in that room are any articles of clothing of Camarena removed?

A.   Yes.  Pedro removed Enrique Camarena's shirt.

Then Jorge Fonseca was smoking a cigarette and Enrique Camarena asked if he could have a few puffs or if he could have a cigarette, something like that he said.  Then Jorge Fonseca told Enrique, "Where do you want it, you son of a bitch?"  and burning him several occasions in all parts of the body with the cigarette.

Then the spark would go off.  He would puff it again to revive the spark and continued burning Enrique with his cigarette.

Q.   Mr. Lopez, what did you do after observing this?

A.   I told El Gueron, "Hey, Gueron" -- we used to call Jorge Fonseca 'El Gueron' -- "why are you beating this person so much?  He is telling you -- he's answering everything right."

Q.   What was --

A.   I told him, "I don't know why you're doing all this mess."

1034

1   Q.   What was Gueron's response?

2   A.   Then El Gueron turned to me and said, "Why are you

3   getting into this, you son of a bitch?"  And Gueron told me,

4   "You better get out of here."

5              And then I went out of the bedroom.

6   Q.   Where did you go to, Mr. Lopez?

7   A.   I went there to the patio of the house.

8   Q.   Did you speak to anyone in the patio?

9   A.   There I met Ernesto Piliado, who had been my leader

10  group in the judicial of the state, and I told him, I told

11  Ernesto Piliado, "You know what?  Jorge Fonseca is beating up

12  this person too much."

13             Then Ernesto Piliado went to see Ernesto Fonseca

14  and Piliado told Ernesto Fonseca, "Sir, why don't you allow

15  me and my group to investigate the DEA agent?"  He said that

16  El Gueron was beating him up too much.  And Ernesto Fonseca

17  didn't like this at all.

18             Ernesto Fonseca talked to Samuel Ramirez Razo and

19  told Samuel Ramirez Razo and Ernesto Piliado to go to see

20  what was going on in the bedroom with the DEA agent.  And to

21  take him out because we were going to take him with us.

22  Q.   So did Piliado and Samuel Ramirez Razo go anywhere then?

23  A.   They went in to the bedroom where Enrique Camarena was.

24  Q.   Approximately how long were they in that bedroom?

25  A.   For a few minutes.

1035

1   Q.    Could you hear anything from that bedroom when they were

2   in there?

3   A.    No.

4   Q.    What happens next, Mr. Lopez?

5   A.    After Ernesto Piliado and Samuel Ramirez Razo came out,

6   Ernesto Piliado told me that they had already tied his hands

7   and his feet and they were giving him Tehuacanes.

8   Q.    What is Tehuacanes, sir?

9   A.    In other words, that's the natural, umm, drink.

10  Q.    Is it a mineral water?

11  A.    Mineral water, yes.

12  Q.    And what is that used for?

13  A.    We use it in Mexico for some investigations.

14  Q.    And how is it used?

15  A.    It's like a soda pop.  It's got gas.  And you shake it

16  and with the gas pressure, you place it in the nose.  And the

17  person is tied up, so he's receiving everything through the

18  nose.

19  Q.    Mr. Lopez, is Fonseca also advised by Piliado of what he

20  had observed in the bedroom?

21  A.    Yes.

22  Q.    What happens next?

23  A.    Then Rafael Caro-Quintero was coming out of the bedroom

24  and Ernesto Fonseca told Caro-Quintero, "We're going to take

25  the person."  Rafael Caro-Quintero said to Ernesto, "Wait,

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1036

1  wait, Compadre, nothing's happening."

2            Then Rafael Caro-Quintero took Ernesto Fonseca

3  towards the kitchen of the house.

4  Q.   Did anyone go with those two to the house?

5  A.   He was -- they were being followed by Samuel Ramirez

6  Razo.

7  Q.   Now, those three men, do they go into the house?   Where

8  do they go exactly in relation to the house?

9  A.   They were at the door toward the kitchen.

10  Q.   Could you see them from your location?

11  A.   Yes.   We were in the patio and we didn't remove our

12  vision from Ernesto Fonseca.

13  Q.   Now, were all three men talking?

14  A.   Yes.

15  Q.   Were they arguing?

16  A.   You could see them gesturing but you couldn't hear.

17  Q.   What happens next, Mr. Lopez?

18  A.   Then the three of them came back to the umbrella -

19  Ernesto Fonseca, Samuel Ramirez Razo and Rafael Caro-Quintero

20  - and when they were halfways, I saw that from the kitchen

21  or the living room Alvarez Machain was coming out.

22  Q.   Now where did you see him?

23  A.   Well, from the door where they were there arguing.   And

24  he went in again.

25  Q.   Now, with the court's permission, if I can ask the

1037

1    witness to stand.

2              Do you see Dr. Alvarez in this courtroom,

3    Mr. Lopez?

4    A.   Yes.   It's the gentleman with the blue sweater.

5              THE COURT:   Indicating the defendant Machain --

6    Alvarez, rather.

7              Be seated, please.

8    Q.   BY MR. MEDRANO:   Now, are you familiar with a man by the

9    name of La Changa?

10   A.   Yes.

11   Q.   When all this is going on, do you see La Changa at Lope

12   de Vega?

13   A.   Yes.

14   Q.   Tell me what happens.

15   A.   La Changa approached Samuel Ramirez Razo and told him

16   that Ruben Zuno Arce --

17             MR. MEDVENE:   Excuse me.   Objection; hearsay.

18   Talking about some third party conversation.

19             MR. MEDRANO:   It's co-conspirator's statement.

20             MR. MEDVENE:   Some enforcer, allegedly.

21             THE COURT:   The objection is overruled.

22   Q.   BY MR. MEDRANO:   Tell us what La Changa said.

23   A.   La Changa approached Samuel Ramirez Razo and told him

24   that there was also other important people who wanted to know

25   if they were going to give ground to this person - in other

1038

1    words, if they were going to kill him - so he could talk to

2    them in order to interrogate him.

3             Samuel Ramirez Razo responded to La Changa, "I

4    don't know anything about that, ask Rafael Caro-Quintero."

5    Q.   Now, Mr. Lopez, as all this is transpiring, how would

6    you describe Ernesto Fonseca's demeanor?

7    A.   Well, he was worried, nervous.  Yes, you could see that

8    he was worried, nervous.

9    Q.   At any time, Mr. Lopez, do you see the arrival of anyone

10   else at Lope de Vega?

11   A.   Yes.  The bodyguards of Rafael Caro-Quintero came in

12   with a person.  He was also blindfolded.

13   Q.   Where was this person taken to?

14   A.   To another bedroom, right next to where they had

15   Camarena.

16            MR. MEDRANO:  And with the court's permission, may

17   I just have Mr. Lopez indicate where he was taken to, Your

18   Honor?

19            THE COURT:  Yes.

20   Q.   BY MR. MEDRANO:  Mr. Lopez, can you stand for a moment

21   and indicate where this other man was taken to.

22   A.   This area here more or less.

23            MR. MEDRANO:  Pointing, Your Honor, again to the

24   guest room area on diagram exhibit 81.

25            THE COURT:  All right.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1039

1    Q.    BY MR. MEDRANO:  Did you know who this man was,

2    Mr. Lopez?

3    A.    No.

4    Q.    Were you later advised who he was?

5    A.    Yes.

6    Q.    Who was it?

7    A.    That it was Enrique Camarena Salazar's pilot.

8    Q.    When that man is taken to that guest room area, do you

9    ever go back into that room again?

10   A.    No.  Just when we were about to leave, we heard that

11   person moan as if he was being --

12            MR. RUBIN:  Objection; relevance.

13            THE COURT:  Overruled.

14            MR. MEDRANO:  I didn't hear the answer.

15            THE WITNESS:  When we were about to leave that

16   place, through the window you could hear that person moaning

17   as if he was being beaten.

18   Q.    BY MR. MEDRANO:  Mr. Lopez, at any point does Ernesto

19   Fonseca depart from 881 Lope de Vega?

20   A.    Yes.  We left the area.

21   Q.    Did other guards of Fonseca leave as well?

22   A.    Yes, also.

23   Q.    Where did you go to?

24   A.    We went to Ernesto Fonseca's house.

25   Q.    How long were you at that house?

1040

1    A.    We were there approximately four -- four hours.

2    Q.    Incidentally, what time did you arrive at Fonseca's

3    house?

4    A.    We must have arrived at 5:00, 6:00 p.m.

5    Q.    At any point -- well, strike that.

6          What happens next, sir, now that you're at this

7    residence of Fonseca?

8    A.    He went into his bedroom and we stayed there around the

9    house.

10   Q.    At any point did Fonseca ever leave that house?

11   A.    Yes.

12   Q.    Approximately what time?

13   A.    It must have been around 6:00, 7:00 more or less.

14   Q.    Did Fonseca leave with his bodyguards?

15   A.    Yes.

16   Q.    Did Fonseca tell you where he was going?

17   A.    No.  That we were just going to run an errand.

18   Q.    At the point that he is leaving, how would you describe

19   Fonseca's demeanor?

20   A.    Well, you could see that he was nervous.  Yes, he looked

21   nervous.

22   Q.    When you arrived -- strike that.

23         Did you go to 881 Lope de Vega with Fonseca?

24   A.    Yes.

25   Q.    Were people present already when you got there?

1041

1   A.   Yes.

2   Q.   Upon arrival, where did Fonseca go?

3   A.   He went into the living room of the house.

4   Q.   Did anyone go with him?

5   A.   Samuel Ramirez Razo and Commander Gabriel Gonzalez.

6   Q.   When he is inside the house, where did you stay?

7   A.   There in the patio with the other bodyguards.

8   Q.   What happened next?

9   A.   Then Samuel Ramirez Razo came out to the patio and told

10  Ramiro Perez Arrellano to go with him.

11  Q.   Where did they go?

12  A.   They went in the house, to the living room.

13  Q.   What happens next?

14  A.   Next, a few minutes later, Samuel Ramirez Razo came out

15  again and order Guadelupe Fernandez and myself to take ash

16  trays to the living room.

17  Q.   Did you do that, Mr. Lopez?

18  A.   Yes.  We went to the kitchen, picked up some ash trays

19  and took them to the living room.

20  Q.   Now when you entered the living room, were people

21  already present in that room?

22  A.   Yes.

23  Q.   Were pe- -- sorry.

24           Were there people from different agencies there?

25  A.   Yes.  From different government agencies.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1042

1    Q.    Was anyone from the military there?

2    A.    There was Arevalo Gardoqui, Vinicia Santoya.  A general

3    or commander from the State of Zacatecas by the name of

4    Salas.  Jorge Guarma.

5    Q.    Were there any politicians in that room when you walked

6    in?

7    A.    Yes.

8    Q.    Who?

9    A.    Manuel Bartlett Diaz, Enrique Alvarez del Castillo,

10   Ruben Zuno Arce, Carlos Arcevez Fernandez.

11   Q.    Any federal agents?

12   A.    Yes.

13   Q.    Who?

14   A.    Juan Gilberto-Hernandez Parra, Migeul Aldana, Manuel

15   Ibarra, Armando Pavon Reyes, Alfonso Vasquez, Sergio Espino

16   Verdin.

17   Q.    Were the state prosecutors present in the living room as

18   well?

19   A.    DA people from the state.  Edgar Levy Gallardo, Armando

20   Cuellar, Jorge Larios.

21   Q.    Tell me what traffickers, if any, were in that living

22   room.

23   A.    There was Ernesto Fonseca, Rafael Caro-Quintero, Felix

24   Gallardo, Manuel Salcido, Sergio Salcido, Avelardo Fernandez,

25   Javier Barba, Jorge Fonseca.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1043

1    Q.    Finally, were there any representatives of the DFS

2    there?

3    A.    Yes.

4    Q.    And their names, if you recall.

5    A.    There was Jorge Salazar, Eliseo Soto Martinez, Ruiz

6    Velasco, "El Ruso," "El Nino," "El Chava."  That's all.

7    Q.    Mr. Lopez, when you walked into that living room with

8    the ash trays, did you see Dr. Alvarez Machain there?

9              MR. RUBIN:  Objection; leading.

10             THE COURT:  Overruled.

11             THE WITNESS:  Yes.  When I went into the kitchen.

12   Q.    BY MR. MEDRANO:  My question is, though, did you see him

13   in the living room?

14   A.    Yes.

15   Q.    Now, after -- strike that.

16             Just one moment, Your Honor.

17             Your Honor, might this be a good place to break or

18   would you like me to continue?

19             THE COURT:  No.  Just continue and I'll let you

20   know.

21             MR. MEDRANO:  Very well.

22   Q.    When you were in that living room, Mr. Lopez, did you

23   overhear any conversation?

24   A.    When I went to put in the ash trays, because we would

25   pick up the dirty ash trays and put down some clean ones, you

1044

1    could hear a remark that Ruben Zuno was telling to the drug

2    traffickers.  "The same way you guys heard" -- excuse me.

3              "The way that we had told you guys that the DEA

4    was going to get rid of the drug trafficker in Jalisco, we

5    wanted you to hear it from his mouth."  In other words,

6    referring to the DEA agent.

7    Q.   So that --

8    A.   Then we went out of the living room, we returned back to

9    the patio.

10   Q.   What did you do next, Mr. Lopez?

11   A.   A few minutes later Samuel Ramirez Razo came out again

12   and he ordered us again, Guadelupe Fernandez and myself, to

13   go and take ash trays back into the living room.

14   Q.   Now, at any point did you have a chance to go back into

15   the kitchen?

16   A.   Yes.  Because we would take the dirty ash trays to the

17   kitchen and we would pick up clean ones.

18   Q.   So what happens after you receive this order from

19   Ramirez Razo?

20   A.   We went in, took clean ash trays to the living room.

21   And while we were picking up the dirty ash trays, we could

22   hear Arevalo Gardoqui also making remarks with the drug

23   traffickers.

24   Q.   What did he say?

25   A.   Arevalo Gardoqui said that he wanted the bodies to be

1045

1   properly buried.  He wanted the job to be done right, to hide
2   them well where they couldn't be found.
3          Then we went back out to the patio.  Torres Lepe
4   was also there in the patio.  Then I invited him to dinner.
5   We went and had dinner there in the kitchen, a tongue that
6   had been prepared by Eliseo Soto.
7   Q.   Then what happened?
8   A.   Then we went out of the kitchen in to the patio.  I went
9   back to the kitchen to get a drink.
10  Q.   Did you see anyone in the kitchen when you are there to
11  get a drink?
12  A.   When I picked up the drink from the refrigerator and
13  when I was coming out of the kitchen, I saw that Dr. Alvarez
14  Machain was there.  He was doing something there with some
15  syringes.  He was sort of washing syringes or something there
16  in the sink.  He had, umm, a black bag with him.  One of
17  those medical bags.
18  Q.   Now, you're saying he was cleaning them.  How was he
19  cleaning them?
20  A.   Well, when I went by there, I saw him put water and
21  pressing them again, something like that, like pumping them.
22  Q.   What happens next, Mr. Lopez?
23          MR. BLANCARTE:  Objection, Your Honor; the form of
24  counsel's question allows for ongoing narrative.
25          THE COURT:  That's true.  The form of the question

1046

1   is inappropriate.  See if you can frame a more specific

2   question.

3            The court will take its afternoon recess at this

4   time.  The jury may be excused.

5            THE CLERK:  Please rise.

6            (Jury excused at 2:45 p.m. )

7            THE COURT:  You may step down.

8            THE CLERK:  You may be seated.

9            THE COURT:  Now, counsel, you wanted to take up

10  something with the court.  You, counsel.

11           MR. RUBIN:  Yes.  Yes, Your Honor, I wanted to.

12           THE COURT:  By the way, let me ask you, we do not

13  take up things that will interrupt the testimony to the jury,

14  so you have to anticipate these things and bring them up at

15  the recess.

16           MR. RUBIN:  Well --

17           THE COURT:  Fortunately we were able to reach the

18  recess before the matter.

19           MR. RUBIN:  I anticipated we would, Your Honor,

20  because Mr. Medvene has his cross as well.

21           THE COURT:  All right.  Now what is it?

22           MR. RUBIN:  Your Honor, during my cross-

23  examination I wanted to make sure I could appropriately

24  mention something in front of the jury and that is that in my

25  cross-examination I intend to make reference to the timing of

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1047

1    certain statements that this witness had made to the DEA;

2    specifically that much of the information that he gave to the

3    DEA came 14 days after the Supreme Court decided Dr. Alvarez

4    Machain's case.

5              I intend to argue to the jury that the timing of

6    this new improved information that he gave to the DEA and

7    coming on the heels of the Supreme Court's decision, is

8    suspicious and calls it, the information, into question,

9    credibility.  But before I mentioned the Supreme Court

10   decision, I wanted to make sure that I could appropriately

11   say that.

12             MR. MEDRANO:  Your Honor, just briefly.  The

13   problem with that, Your Honor, is, as you know, both in this

14   trial and the past trial, the way these witnesses are

15   interviewed is this information of which Mr. Rubin is

16   alluding to, although dated perhaps after the Supreme Court

17   decision on the DEA-6, would have been elicited from the

18   interview before that date.

19             Now, if he starts doing that, we are compelled in

20   our rebuttal case, perhaps, then to put on witnesses to

21   establish that this information, in fact, was elicited prior

22   to the Supreme Court resolution.

23             The second point, Your Honor, is it doesn't help

24   one way or the other.  It's sort of a tangential issue that

25   doesn't add -- doesn't benefit the jury.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1048

1   MR. RUBIN:  Excuse me, Your Honor, the --

2   THE COURT:  Well, just a moment.  I really don't

3   think the Supreme Court decision has anything to do with this

4   case.  Now to the extent that the evidence shows some

5   coincidence in timing of other events, you can deal with

6   that.

7   Are you talking about arguing this or asking the

8   witness about his knowledge of the Supreme Court decision?

9   MR. RUBIN:  Well, it depends how his questions

10  come out, because I don't know what the government agents may

11  have said to them or what dates they said to him or did they

12  mention something to him at meeting time.

13  THE COURT:  You may ask him what was said to him.

14  MR. RUBIN:  But it seems to me, Your Honor, the

15  date of this -- the first time in any DEA-6 this witness

16  mentions any cleaning of the syringes, the DEA-6 is dated

17  June 29th.  That is 14 days after the Supreme Court decision.

18  That strikes me as highly --

19  THE COURT:  You may go into that.  You may

20  indicate what the dates were but I don't see any relevance in

21  introducing the Supreme Court decision into it.

22  MR. RUBIN:  Fine.

23  THE COURT:  I want to stay away from that.

24  MR. MEDRANO:  May I raise something else with the

25  court at this juncture?  To get a sense --

1    THE COURT:  Are you finished with what you had?

2    MR. RUBIN:  Yes, Your Honor.

3    THE COURT:  All right.

4    MR. MEDRANO:  To get a sense of what limitations,

5   if any, the court will impose on defense counsel's cross-

6   examination, the court may be aware - and certainly the

7   defense counsel are because we provided it to them in Giglio

8   information - the fact that this witness has knowledge of the

9   disappearance and ultimate murder of four Jehova Witnesses in

10  December 1984.  Now, this witness did not harm anybody but

11  was present when other interrogators were questioning these

12  American individuals.

13   Now, I don't know what the court --

14    THE COURT:  What is your point?

15    MR. MEDRANO:  Well, my point, Your Honor, is we

16  have evidence, and it would be part of our theory of the

17  case, that not only the disappearance and murder of the four

18  missionaries but the murders of Radelat and Walker and an

19  abundance of other crimes of violence, Your Honor, were a

20  result of the crooks, the traffickers, confusing civilians

21  for DEA agents.  That's why Radelat and Walker were

22  murdered.  And, unfortunately, why the four American Jehova

23  Witnesses were murdered.

24   I would hope, too, Your Honor, the cross-

25  examination on this issue would be somewhat circumscribed

1050

1  because to the extent the defense counsel opens the door

2  dramatically, it's our position that we should be allowed to

3  put on other evidence to establish there were not only this

4  but other retaliatory acts.

5            THE COURT:  Well, how would that affect the

6  credibility of this witness?  Presumably this would be

7  impeachment testimony of this witness.

8            MR. MEDRANO:  And I agree with that, Your Honor.

9            THE COURT:  How would the putting on evidence of

10  other murders affect that?  It does not rehabilitate the

11  witness, does it?

12            MR. MEDRANO:  Because as opposing counsel is very

13  good at is through the form of the questions and the limiting

14  fashion of his questions, to not bring out the fact that the

15  people were confused with DEA, that's why they were

16  murdered.  If I know opposing counsel, they'll dance around

17  that subject heavily and suggest that this person was

18  involved in those crimes.

19            THE COURT:  Just a moment.  You're exhibiting the

20  same sort of paranoia we heard from defense counsel yesterday.

21  Let's wait until the questions are asked.

22            MR. MEDRANO:  Very Well, Your Honor, I just want --

23            THE COURT:  I think it's appropriate to question

24  the witness about his participation, isn't it?  And if he

25  omits anything that needs to be clarified, you may ask the

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1051

1   witness about it.

2            MR. MEDRANO:  Well, Your Honor.

3            THE COURT:  I don't want to get this jury or this

4   court involved in dealing with other crimes committed by this

5   organization or --

6            MR. MEDRANO:  Uh-huh.

7            THE COURT:  --  Radelat and Walker or the four

8   missionaries.

9            MR. MEDRANO:  Exactly.  Well, the question is the

10  403 detail.

11           THE COURT:  Maybe we should hear from Mr. Medvene

12  as to what his intentions are.

13           MR. MEDVENE:  My intention is to go into it.  The

14  prosecutor went into it.  In his questioning of this witness,

15  the prosecutor specifically asked this witness if he were

16  present when the people were kidnapped and he elicited from

17  this witness that --

18           MR. MEDRANO:  No.

19           MR. MEDVENE:  -- there were these two people that

20  were kidnapped.  But, at any rate, it seems to us we're

21  permitted to go into it.

22           THE COURT:  To what?  Elicit details?  You're not

23  permitted to elicit details.  You can't do that even for a

24  witness who has been convicted of a felony.

25           MR. MEDVENE:  Your Honor.

1    MR. MEDRANO:  Your Honor, by the way, the incident

2  referenced by Mr. Medvene was a Mexican couple, it has

3  nothing to do with these four Americans.  I want to clarify

4  that.

5    MR. MEDVENE:  You mean the prosecutor is putting

6  on an incident of torture, and this guy could kill this

7  Mexican couple, and he thinks that's relevant, but we can't

8  ask the person his involvement in kidnapping the four Latter

9  Day Saints?

10    MR. MEDRANO:  Your Honor, the relevance --

11    MR. MEDVENE:  What relevance does it have to bring

12  in two Mexican citizens and they were kidnapped?  They

13  brought that in, we didn't bring that in.  In fact, we

14  objected to it and you overruled it.

15    THE COURT:  What is the relevance of it?

16    MR. MEDRANO:  The relevance, Your Honor, is part

17  of an MO, or method of operation, for interrogators, among

18  other things, besides beating someone up, was the use of bags

19  for suffocation.  The court is well aware, I hope, by now

20  that we find at Lope de Vega approximately six to eight

21  plastic cleaners bags with the fingerprints of Dr. Machain.

22  That is the reason it was elicited, Your Honor, for no other

23  reason; that's the reason it's relevant.  And, of course, you

24  are aware that Dr. Machain --

25    THE COURT:  Well, you may examine this witness on

1053

1  his direct testimony that he gave.  You may include evidence

2  about his involvements or knowledge of this, these events,

3  but I am not going to have a run-away inquiry.

4          MR. MEDVENE:  No, sir.

5          THE COURT:  In great detail or anything else.

6          MR. MEDVENE:  No, sir.  I just intended to ask

7  maybe three or four questions in that area about what he did

8  and where he was and did he participate.

9          MR. RUBIN:  Your Honor, I should point out that

10 some detail, I think, is relevant in this sense:  This

11 witness has said in the Camarena episodes, has given the

12 totally self-serving testimony that, "I really had nothing to

13 do with the kidnapping, I was just there.  I really had

14 nothing to do with the beating but I was watching it, I was

15 just there."  And he is just there doing nothing.

16         THE COURT:  What is the point here?

17         MR. RUBIN:  The point is that I think we can go

18 into the kidnapping of the missionaries to see if he is going

19 to give the same kind of testimony and to argue that this

20 can't be true, that he is just there for that thing.

21         THE COURT:  You heard the limitation that I placed

22 on that.  You may inquire about it but I am not going to

23 allow a lot of detail.

24         MR. RUBIN:  Very well, Your Honor.

25         MR. MEDRANO:  Thank you, Your Honor.

1054

1     THE CLERK:  Please rise.

2     Court stands in recess.

3     (Recess from 2:57 p.m. To 3:10 p.m.)

4     (Proceedings held in jury's presence.)

5     THE COURT:  Any further questions for this

6   witness?

7     MR. MEDRANO:  Yes, Your Honor.

8     THE COURT:  Proceed.

9   Q.   BY MR. MEDRANO:  Mr. Lopez, after seeing Machain in the

10  kitchen, did you ever go back to the living room?

11  A.   I went back to the patio again.

12  Q.   After that did you have a chance to go back to the

13  living room?

14  A.   Yes, a few minutes later.

15  Q.   For what purpose?

16  A.   For what purpose?  Samuel Ramirez Razo came out again.

17  He went out to the patio, and once again he ordered Guadelupe

18  Fernandez and myself.  At that time he was smoking a base

19  cigarette and he offered it to everyone.  Only Samuel Ramirez

20  Raza gave it a few puffs.  Then Samuel Ramirez Razo order

21  Guadelupe Fernandez and myself to go back again to the living

22  room to take clean ash trays.

23  Q.   Did you go back to the living room?

24  A.   Yes.

25  Q.   When you were in that living room, did you ever overhear

1055

1    any other conversation, Mr. Lopez?

2    A.    We heard a conversation from Manuel Bartlett Diaz.

3    Q.    What did you hear?

4    A.    Manuel Bartlett Diaz was telling Rafael Caro-Quintero,

5    "Just the same way that this problem was resolved, we're

6    going to resolve all the others and there's not going to be

7    any problems."

8              Rafael Caro-Quintero replied to Manuel Bartlett,

9    "Don't worry, Compa, you're going to go as far as we want

10   you to.  We need you up there.  Just tell us what you need

11   and we'll give it to you."

12   Q.    Who was that that said that?

13             MR. RUBIN:   Objection, Your Honor.

14             THE COURT:   Overruled.

15             THE WITNESS:   Caro-Quintero told that to Manuel

16   Bartlett Diaz.

17   Q.    BY MR. MEDRANO:   Mr. Lopez, when Bartlett spoke, did

18   people have difficulty understanding him?

19             MR. MEDVENE:   Objection; calls for conclusion.

20             THE COURT:   Sustained.

21   Q.    BY MR. MEDRANO:   At any point, Mr. Lopez, did you exit

22   the living room again?

23   A.    Yes.  We went back to the patio again.

24   Q.    Subsequently at any point does anyone start leaving 881

25   Lope de Vega?

1056

1   A.   Yes, people started leaving there.

2   Q.   Do you recall approximately what time they started

3   leaving?

4   A.   Around 11:00, more or less.

5   Q.   When these people left, were they carrying anything?

6   A.   Yes, several of them were carrying briefcases and we

7   knew those briefcases, when they were carried, they contained

8   money.

9   Q.   Now --

10              MR. RUBIN:   Objection; calls for speculation.

11              THE COURT:   Overruled.

12  Q.   BY MR. MEDRANO:   At any point does Fonseca leave 881

13  Lope de Vega?

14  A.   Yes.

15  Q.   Approximately what time?

16  A.   That was early in the morning, 1:00 or 2:00 a.m.

17  Q.   Where did Fonseca go to?

18  A.   He went to his house.

19  Q.   Which house was that?

20  A.   On Hidalgo Avenue.

21  Q.   Did Fonseca stay at that residence at Hidalgo that

22  evening?

23  A.   Yes, he spend the rest of the morning there.

24  Q.   So now are we at the morning of February 8?

25  A.   Yes.

1057

1    Q.   Did you and the other bodyguards also stay at Hidalgo?

2    A.   Yes.

3    Q.   That morning of February 8th, are there any telephone

4    calls to the Hidalgo residence?

5    A.   Yes, there must have been around seven or eight, more or

6    less.  The phone rang.  And since it rang in other occasions,

7    I felt tempted to pick it up.

8    Q.   Did you pick it up?

9    A.   Yes.

10   Q.   Did you hear who was on the line?

11   A.   Yes.  When I picked it up, I think Ernesto had picked

12   it up already.  And you could hear the voice of Rafael

13   Caro-Quintero, he was telling Ernesto Fonseca, "Comprade, we

14   want you to come here to Lope de Vega because what was to

15   happen already did."

16   Q.   After that phone call, did Fonseca leave the Hidalgo

17   house?

18   A.   Yes.

19   Q.   Did he take you and other bodyguards?

20   A.   He told the bodyguards to go and, "We should go and see

21   what those sons of bitches have done."

22   Q.   When he said that, was he angry?

23   A.   Yes, he was already angry.

24   Q.   Thereafter did you return to Lope de Vega?

25   A.   Yes.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1058

1    Q.    What happened when you got to Lope de Vega?

2    A.    When we got to Lope de Vega, outside of the house we

3    parked the vehicles.  Ernesto Fonseca got out of his Gran

4    Marquis and went into the house off Lope de Vega.   Then

5    Samuel Ramirez Razo went in, also into the house.  But he

6    came out shortly thereafter.

7           Samuel Ramirez Razo came out smoking a base

8    cigarette and he leaned on the Gran Marquis of Ernesto

9    Fonseca.  We, the bodyguards, approached Samuel Ramirez Razo

10   and also there were bodyguards of Rafael Caro-Quintero, El

11   Fantasma and La Changa.  El Fantasma was making a comment to

12   Samuel Ramirez Razo, telling him that they had gone too far

13   and pointing to La Changa.

14          El Fantasma told Samuel Ramirez Razo, "This son of

15   a bitch, he went too far.  With a bar he hit him on his head

16   and stuck it."

17          Then Ernesto Fonseca came out very quickly from

18   the house at Lope de Vega, followed by Javier Baldivar.

19   Q.    Now when Fonseca exits the house, was he still angry?

20   A.    Yes.  He came out even more angry.

21   Q.    What does he do?

22   A.    Javier Baldivar followed after Mr. Fonseca and Javier

23   Baldivar told Mr. Fonseca, "Wait a minute Comprade."  Ernesto

24   Fonseca replied to Javier Baldivar, "You're going to take

25   care of that mess, sons of bitches."

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1059

1   Q.   Fonseca, after that, did he leave Lope de Vega?

2   A.   Yes.  He got into his Gran Marquis and sped away.

3   Q.   Did you and the other bodyguards follow him?

4   A.   Yes.

5   Q.   And where did Fonseca go to?

6   A.   Once again to his house at Avenida Hidalgo.

7   Q.   I'd like to direct your attention to the latter part of

8   February of 1985, Mr. Lopez.  Are you familiar with the

9   residence called the Loma Bonita Apartments?

10   A.   Yes.

11   Q.   At this date were you at those apartments with Fonseca?

12   A.   Yes.

13   Q.   And were other bodyguards of Fonseca there?

14   A.   Yes.

15   Q.   At any point, Mr. Lopez, did you have to leave the Loma

16   Bonita Apartments?

17   A.   Yes.  Because I had a problem at my house with my

18   family.

19   Q.   What was the problem?

20   A.   Well, I had talked on the phone with my wife and she

21   told me she was having some problems with some gang members

22   that would gather in the neighborhood and would bother the

23   family during every night.

24   Q.   Did you decide to rejoin your family then?

25   A.   I mentioned this to Samuel Ramirez Razo.  I told him --

1060

1   I mentioned the problem that I had with my family.  Samuel

2   Ramirez Razo told me that at that time I couldn't leave

3   because Ernesto Fonseca was busy.

4   Q.   Mr. Lopez, did you then ask Fonseca permission to leave?

5              MR. RUBIN:  Objection.

6              THE COURT:  Sustained.

7   Q.   BY MR. MEDRANO:  Did you leave that residence at some

8   point?

9   A.   Yes.

10  Q.   Did you take anyone with you?

11  A.   I took Jorge Godoy and Jorge Hernandez La Petunia.

12  Q.   And the three of you left that residence?

13             MR. RUBIN:  Objection; asked and answered.

14             THE COURT:  Sustained.

15             THE WITNESS:  "Si."

16  Q.   BY MR. MEDRANO:  Where did you go?

17  A.   We went toward my house.

18  Q.   And did you ends up dropping the other two people off?

19             MR. RUBIN:  Objection; relevance.

20             THE COURT:  Sustained.

21             MR. MEDRANO:  I'll move on, Your Honor.  If I may

22  have just a moment.

23  Q.   Mr. Lopez, after this problem with your family, did you

24  rejoin Ernesto Fonseca?

25  A.   Yes.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1061

1   Q.   Directing you to the month of March of 1985, were you

2   with Fonseca that month?

3   A.   Yes.

4   Q.   Did Fonseca stay at different residences?

5            THE INTERPRETER:   Excuse me, counsel?

6   Q.   BY MR. MEDRANO:   Did Fonseca stay at different

7   residences?

8   A.   Yes.

9   Q.   Approximately how many?

10  A.   About eight approximately.

11  Q.   At any point, sir -- strike that.

12           Directing you to April of 1985, did Fonseca ever

13  go to Puerto Vallarta?

14  A.   Yes.

15  Q.   Did you and the other bodyguards go with him?

16  A.   Yes.

17  Q.   Did Jorge Godoy go with you?

18  A.   Yes.

19  Q.   In Puerto Vallarta, were any of these individuals

20  arrested?

21  A.   They were all arrested.

22  Q.   Were you arrested?

23  A.   No.

24  Q.   Were you able to escape?

25  A.   Yes.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1062

1  Q.   After that, sir, did you return to the City of

2  Guadalajara?

3  A.   Yes.

4  Q.   And you stopped working for Fonseca?

5  A.   No, because I heard through the media they had been

6  arrested.

7  Q.   But you were no longer working for them?

8  A.   No.

9          MR. MEDRANO:  One moment, Your Honor.

10         (Pause in proceedings.)

11  Q.   When was it, Mr. Lopez, that you arrived in Los Angeles

12  from Mexico?

13  A.   Well, I arrived the beginning of '92, the first month

14  of '92.

15  Q.   Did you arrive with your family?

16  A.   Yes.

17  Q.   And have you been in Southern California since then?

18  A.   What was that?

19  Q.   Have you been in Southern California since you arrived

20  in January?

21  A.   Yes.

22         MR. MEDRANO:  May I just have one moment, Your

23  Honor?  Just about done.

24         (Pause in proceedings.)

25  Q.   BY MR. MEDRANO:  Mr. Lopez, after arriving in Los

1063

1   Angeles, were you given immunity for your testimony?

2   A.   Yes.

3   Q.   Are you currently receiving money from the United

4   States?

5   A.   Just to eat with my family.

6   Q.   And how much are you getting?

7   A.   They're giving me three dollars -- $3,000 a month.

8           MR. MEDRANO:  One moment, Your Honor.

9           (Pause in proceedings.)

10          MR. MEDRANO:  That concludes direct, Your Honor.

11          THE COURT:  You may cross-examine the witness.

12

                        CROSS-EXAMINATION

13

14  BY MR. MEDVENE:

15  Q.   When did you last see Jorge Godoy?

16  A.   I don't remember exactly which month.

17  Q.   See him this month?

18  A.   No.

19  Q.   You know he testified yesterday, don't you?

20          MR. MEDRANO:  Objection; relevance, Your Honor.

21          THE COURT:  Sustained.  Strike that.

22          You may answer.

23          Do you understand the question?

24          THE WITNESS:  Could you repeat it, please.

25  Q.   BY MR. MEDVENE:  You know he testified yesterday, don't

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1064

1   you?

2   A.   Through the media.

3   Q.   Well, you had spoken to him about the fact that you and

4   him were both going to testify; isn't that correct?

5   A.   No.   We have never done that because that was forbidden

6   for us.

7   Q.   Now, you knew when you went to work for Ernesto Fonseca

8   he was a drug dealer; isn't that correct?

9   A.   Yes.

10  Q.   You knew he sold cocaine in large quantities, and

11  marijuana; correct?

12  A.   Who?

13  Q.   Ernesto Fonseca.

14  A.   I never saw him deal with cocaine or marijuana.

15  Q.   But you knew he was a drug dealer when you went to work

16  for him.

17  A.   Afterwards, eventually, I did find out that he was a

18  drug dealer but when he was introduced to me, he was

19  introduced as commander of the federal judicial.

20  Q.   Well, you knew shortly after -- strike that.

21          As a -- strike that.

22          You were dismissed from the police force when?

23  A.   More or less in September of '84.

24  Q.   Now you knew at that time that Ernesto Fonseca was a big

25  drug dealer, didn't you?

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1065

1   A.   No.

2   Q.   Well, you knew Mr. Godoy, did you not?

3   A.   Yes.

4   Q.   And you worked with him in the police force.  We were

5   colleagues in the judicial of the state.

6   Q.   And you knew Mr. Godoy went to work for Mr. Fonseca.

7   A.   Afterwards I joined them, I saw him.  After a few months.

8   Q.   And you knew Mr. Godoy on behalf of Mr. Fonseca would

9   bribe public officials to protect his drug enterprise, didn't

10  you?

11  A.   Could you repeat the question.

12  Q.   You knew Mr. Godoy and Sammy Razo on behalf of

13  Mr. Fonseca would bring large amounts of money to officials

14  to bribe them in connection with Mr. Fonseca's drug

15  organization; isn't that correct?

16  A.   I didn't realize, I didn't notice if they were sent

17  money or not.

18  Q.   Now you said something about when you were introduced to

19  Mr. Fonseca, something about a corporation.  Did you think

20  Mr. Fonseca ran some corporation, making machinery of some

21  sort or canned goods of some sort, Mr. Lopez, when you went

22  to work for him?

23          MR. MEDRANO:  Objection, Your Honor; argumentative

24  and calls for speculation.

25          THE COURT:  Overruled.

1   THE WITNESS:  What was that again?

2  Q.   BY MR. MEDVENE:  When you went to work for Mr. Fonseca,

3  did you think he ran some corporation that made machinery of

4  some kind or canned goods of some kind?

5  A.   No.  They introduced him to me as commander of the

6  federal judicial and I was going to be his "medrina."

7  Q.   You were to be his enforcer, weren't you?

8  A.   No.  Just to run his errands.

9  Q.   With a gun?

10  A.   Yes, I was armed.

11  Q.   And you were armed by him; isn't that true?

12  A.   Yes.

13  Q.   And you knew after a short time that Mr. Fonseca killed

14  people, didn't you?

15  A.   Well, not him particularly.  He had people to do it.

16  Q.   Uh-huh.  Now, you and Mr. Godoy were two of those people

17  that helped in kidnapping and torturing folks for him; isn't

18  that right?

19  A.   We never kidnapped anybody.  He had his special people

20  to do that.

21  Q.   Well, you told us this afternoon you helped kidnap

22  Enrique Camarena, didn't you?

23  A.   Well, yes, I did help but I didn't know I was going --

24  we were going to kidnap a person, since they always sent us

25  to talk to some people, to some commanders.

1067

Q.   So when you went up and you walked up to Enrique Camarena and you put your hand on him and you heard the other man say, "Come over to the car," you didn't know you were going to kidnap him; is that what you're telling us?

A.    Not.  Because not until the moment that we grabbed Enrique Camarena by the arm, then I realized it.

Q.   You got out of the car and went over to Enrique Camarena, didn't you?

A.    Yes.

Q.   Now, did some vision come to you or had somebody told you before that that you were to get out of the car and physically grab Enrique Camarena?

            MR. MEDRANO:  Objection; argumentative, compound.

            THE COURT:  What is that?

            MR. MEDRANO:  Argumentative and compound.

            THE COURT:  Overruled.

            THE WITNESS:  Well, what was the question?

Q.   BY MR. MEDVENE:  Didn't you tell us earlier today, sir, that you overheard a conversation with a consular employee where there was a discussion about kidnapping Enrique Camarena that day?

A.    I never heard kidnapping, I never heard the word "kidnap."

Q.   Did you hear a conversation that day with somebody from the consulate in which there was some discussion about a DEA

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1068

1   agent and where he could be found?

2   A.   Yes, but at that time I didn't know what DEA was, if it

3   was a corporation or -- I had no idea what DEA meant.

4   Q.   Didn't you know when you left in the car, you were going

5   to physically take somebody and take them somewhere they

6   didn't want to go?

7   A.   They did that very frequently.

8   Q.   "They," being Fonseca's people, very frequently would go

9   and grab people that didn't want to be grabbed and take them

10  places they didn't want to go?

11  A.   Yes.  The special people that Ernesto Fonseca had which

12  he would order for somebody to be picked up.  And whoever

13  didn't want to go, they would force him.  But he didn't kill

14  everybody.

15  Q.   Just killed some.  Some he let live and some he killed,

16  is that it?

17  A.   Well --

18  Q.   Is that right?

19  A.   -- yes, but Ernesto Fonseca didn't do that.

20  Q.   No.  He had people like you do it.

21  A.   I just went with him as a bodyguard.

22  Q.   You just followed orders to make a living; is that it?

23  A.   That's right.

24  Q.   So in order to make some money, if Mr. Fonseca said

25  kidnap or torture or maim or kill, you would do it because

1069

1    you had  to make some money for you and your family; isn't

2    that right, Mr. Romero?

3    A.   What did you say, sir?

4    Q.   If Mr. Fonseca said kidnap somebody or take them or do

5    something to them, you would do it because you wanted to earn

6    your salary, you needed money?

7    A.   Fonseca never gave me orders to arrest or kidnap anybody

8    except Enrique Camarena.

9    Q.   Now, when these two folks that were bothering

10   Mr. Fonseca came to the house, you said, "Kill them," didn't

11   you?

12   A.   No.   Because Samuel Reyes Razo was giving him an awful

13   torture.

14   Q.   Didn't you say "Why torture, just let him die"?

15   A.   He was suffering.

16          THE INTERPRETER:  Excuse, me counsel.

17   Q.   BY MR. MEDVENE:  Didn't you tell us this morning that

18   you said, "Let's not torture them, let's kill them both"?

19   Isn't that what you said?

20   A.   No, I didn't simply say that.  But since he was

21   torturing him so much and, with the torture, he was going to

22   be killed....

23   Q.   So you said it would be easier to kill him.

24   A.   Not easier, but torturing a person like that and killing

25   them with suffering....

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1070

1   Q.   I understand.  So it would be better to kill them to

2   take them out of their suffering.  Was that it, Mr. Romero?

3   A.   Well, actually, if he is torturing him and he is going

4   to kill him anyways, why make him suffer.

5   Q.   So in order to spare these two people that were walking

6   down the street, this man and woman, in order to spare them

7   some pain, you suggested that they be killed?

8            MR. MEDRANO:  This is asked and answered, Your

9   Honor.

10           THE COURT:  Sustained.

11  Q.   BY MR. MEDVENE:  You did say "Kill them," though, didn't

12  did you, sir?

13           MR. MEDRANO:  Asked and answered, Your Honor.

14           THE COURT:  Sustained.

15  Q.   BY MR. MEDVENE:  Now, you were involved in the holding

16  of four Jehova's Witness missionaries in early December of

17  1984; isn't that correct, sir?

18  A.   Yes.

19  Q.   That's two men and two women.

20  A.   Yes.

21  Q.   And you were involved in having them undress and be

22  tortured; isn't that so?

23  A.   Well, no.  I was involved not even in the detention;

24  because when we got there, they had already been detained.

25  Q.   But you were there when they ordered the women into a

1071

1  room and were ordered to undress and were tortured; isn't

2  that so?

3          MR. MEDRANO:  Your Honor, I object to this line of

4  questioning.

5          THE COURT:  Overruled.

6          THE WITNESS:  Yes, I saw them be undressed.

7  Q.  BY MR. MEDVENE:  And tortured.

8  A.  Well, yes, they did torture them and, uh....

9  Q.  You are not a stranger to torture, because when Enrique

10  Camarena was being tortured, you sat down and had a meal of

11  beef tongue; didn't you tell us that, sir?

12          MR. MEDRANO:  Objection; argumentative and

13  compound.

14          THE COURT:  Yes.  Sustained.

15  Q.  BY MR. MEDVENE:  Now after the torture, Mr. Romero,

16  people were lined up by the side of the grave and killed and

17  put in one grave; isn't that right, sir?

18  A.  I saw the grave but I didn't see when they were shot; I

19  just heard.

20  Q.  And did you get your paycheck from Mr. Fonseca that

21  month for your work for him?

22  A.  Well, he didn't have a date to pay us.

23  Q.  How much did you get from Mr. Fonseca each month there

24  in '84 for -- and '85 for being involved in these kinds of

25  things you're telling us about?

1072

1   A.   I didn't have an exact amount.  Sometimes he would give

2   us 50, 80, 30.

3   Q.   About how much in -- Do you know the conversion rate

4   then in American dollars from Mexican pesos?

5   A.   Well, at that time.

6   Q.   What was the American equivalent of what you made a

7   month for this torturing and maiming?

8            MR. MEDRANO:  Objection; lack of foundation.

9            THE COURT:  Restate your question.

10  Q.   BY MR. MEDVENE:  What was your -- what did you make a

11  month, approximately?

12  A.   We didn't have a set amount.

13  Q.   Could you tell me in approximate amount what you made a

14  month?

15  A.   Well, 30, sometimes 40, sometimes 50.  We didn't

16  have....

17  Q.   Is that about $50 American a month?

18            MR. MEDRANO:  Objection, Your Honor; lack of

19  foundation --

20            THE COURT:  This witness --

21            MR. MEDRANO:  -- as to conversion rate.

22            THE COURT:  Objection is overruled.

23  Q.   BY MR. MEDVENE:  How much did you make the month the

24  American Jehovah Witnesses were killed?  What did you make

25  that month?

1073

1 A.   Well, I don't -- I really don't remember.

2 Q.   You had an awfully precise memory earlier when the

3 prosecutor was questioning you.  Do you remember any amount

4 of money that you received from Mr. Fonseca in 1984?

5          MR. MEDRANO:  Objection; argumentative, Your

6 Honor.

7          THE COURT:  Overruled.

8          THE WITNESS:  Can I answer?

9          THE COURT:  Yes.

10          THE WITNESS:  I repeat once again, we didn't have

11 a set salary with him.

12 Q.   BY MR. MEDVENE:  Ask you for the last time and then I am

13 going to move on.

14          Can you tell me approximately how many -- how much

15 in American dollars you received in 1984 from Mr. Fonseca?

16          MR. MEDRANO:  Objection; asked and answered.

17          MR. MEDVENE:  He has not answered one --

18          THE COURT:  No.  He may answer.

19          THE WITNESS:  In '84?

20 Q.   BY MR. MEDVENE:  Yes, sir.

21 A.   Well, listen, approximately from '84 and '85 that I was

22 with him, I must have received about a million, umm, Mexican

23 pesos.  During all the time that I spent with him.

24 Q.   Is that more or less than a couple thousand dollars U.S.?

25 A.   No.  It's about some $500 --

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1074

1   Q.   All the time with him for all this --

2   A.   -- or less.

3   Q.   -- that you told us about, you received about $500?

4   A.   A little less.

5   Q.   And now, am I correct, you're receiving $3,000 a month?

6   A.   Yes.

7   Q.   Now, you said after Mr. Fonseca was arrested, you

8   escaped.  Is that correct?

9   A.   Yes.

10   Q.   And are you still an escapee in Mexico?

11   A.   Escapee?  I've never been called that.

12   Q.   Well, did you ever turn yourself in in Mexico and say,

13   "Here I am.  I know that I'm -- that you want to arrest me"?

14   A.   Well, no, because it was never mentioned I was going to

15   be arrested.

16   Q.   Now, you also, while a Jalisco state policeman, accepted

17   a bribe, didn't you?

18   A.   What are you referring to?

19   Q.   Referring to a payment of -- a payment that you received

20   so you wouldn't -- strike that.

21        I'm talking about a payment that you received when

22   you were a policeman so you would violate your oath of trust.

23   A.   But that payment I --

24        I really don't understand your question.

25   Q.   Didn't you -- didn't you receive a payment from somebody

1075

1    from whom you had confiscated a weapon?  They gave you some

2    money so you'd forget about it?

3    A.   Oh, yes.

4    Q.   So you knew you were violating an oath at that time but

5    you violated the oath because you wanted the money?

6    A.   I wouldn't call it an oath because we don't go through

7    an oath when we are going to join a corporation.

8    Q.   You took money and you accepted a bribe in violation of

9    your duties; isn't that correct?

10    A.   Yes.

11    Q.   Now, isn't it true, sir, that if you took money from

12    Mr. Fonseca for the things you said and you accepted a bribe,

13    you would tell untruths for money?

14    A.   Well, no.  Why should I lie?  That was the only problem

15    that I had with the judicial of the state.

16    Q.   If you'd murder and maim for money, you'd lie for money,

17    wouldn't you?

18           MR. MEDRANO:  Objection, Your Honor.  There is no

19    evidence.

20           THE COURT:  You're arguing with the witness,

21    counsel.

22    Q.   BY MR. MEDVENE:  Now after, after you escaped from

23    Puerto Vallarta, where did you go?

24    A.   I went to Guadalajara Jalisco.

25    Q.   And did you work there?

1076

1  A.   No.

2  Q.   Were you in Guadalajara Jalisco the remainder of the

3  year 1985?

4  A.   No.  I went around to little towns.

5  Q.   Did you work at all in 1986?

6  A.   Yes.

7  Q.   And how much money did you make American equivalent in

8  all of 1986?

9  A.   About some $300.

10  Q.   For the year of '86?

11  A.   Yes.

12  Q.   And how about '87, sir, how much did you earn American

13  for the year '87?

14  A.   Well, I don't remember any more exactly.

15  Q.   You told us about so many people at meetings, can't you

16  remember approximately how much you earned in 1987?  Not

17  exact amounts.

18          MR. MEDRANO:  Argumentative; badgering the

19  witness.

20          THE COURT:  Sustained.

21  Q.   BY MR. MEDVENE:  Can you tell us approximately how much

22  you earned in 1987, sir?

23  A.   Well, no, I don't really remember because I just went

24  into business and the sales were different.

25  Q.   Was it less than $300 for the year 1987?

1077

1   A.   Well, in dollars, I wouldn't know because I wouldn't

2   make the exchange.

3   Q.   Well, you told us in 1986 it was about $300 for the

4   year.  Was it approximately the same amount in 1987?

5                  MR. MEDRANO:  Objection; asked and answered.

6                  THE COURT:  Overruled.

7                  THE WITNESS:  Well, let's say, yes, more or less.

8   Q.   BY MR. MEDVENE:  And about the same in 1988?

9   A.   Well, every year it was different.

10  Q.   You can tell me whatever it was, sir.  Tell me

11  approximately what it was in 1988.  More or less than $500

12  American for the whole year?

13  A.   Well, no, no, I can't actually say the amount that I

14  earned.

15  Q.   Could you tell me approximately.  Was it more or less

16  than $500 American for the year?

17  A.   No.  I really don't.  I had a small business.  It was

18  more my business, I really didn't keep any accounting.

19  Q.   Could you tell me any amount within any range that you

20  earned in 1988?

21  A.   No, no.  I'm not certain.

22  Q.   How about 1989, more or less than $500.

23  A.   Well, no, no, no, I actually didn't keep accounting of

24  any sort.

25  Q.   Could it have been as little as $200 for the whole year

1078

1   1989?

2   A.   Well, actually, I can't tell you.  I would lie to you if

3   I mentioned an exact amount.

4   Q.   Doesn't have to be exact, just approximate.

5   A.   Well, let's say some, uh, (pause) $2,000 a month.

6   Q.   Huh?

7   A.   $2,000 a month.

8   Q.   You're saying from $300 --

9        THE COURT:  Well, he said what he said.

10  Q.   BY MR. MEDVENE:  So you made $2,000 a month when?

11  A.   During the time that I was in business.

12  Q.   Uh-huh.  Now, were you charged, Mr. Lopez, with obstruc-

13  tion of justice when you were in the state police force?

14  A.   Accused of what?

15  Q.   Charged with obstruction of justice.

16       (Discussion between Mr. Blancarte and

17       Mr. Medvene sotto voce.)

18  Q.   BY MR. MEDVENE:  "Abuso de proceso."

19  A.   I do not understand the words.  I do not understand the

20  phrase.

21  Q.   Were you -- was a criminal charge filed against you in

22  connection with a shooting of a state police colleague?

23  A.   For me?  That I shot?

24  Q.   A state police colleague that was shot.  Were you

25  charged with some offense in Mexico in connection with that?

1079

1   A.   Oh, about the problem of my friend, my colleague?  When

2   he shot a person, when he confronted fire with a person?

3   Q.   Now, were you charged with an offense in connection with

4   that, charged with violating your duty?

5   A.   Yes.  "Abuso de autoridad."

6   Q.   Were you ever questioned by the Mexican authorities in

7   connection with the kidnapping of Enrique Camarena?

8   A.   No.

9   Q.   To your knowledge, was there ever any -- strike that.

10          Did you know that Mr. Godoy had been questioned?

11          MR. MEDRANO:  Objection, Your Honor; relevance,

12   lack of personal knowledge.

13          THE COURT:  Sustained.

14   Q.   BY MR. MEDVENE:  You knew that DEA was looking for any

15   one that had information about the participants in the

16   Enrique Camarena kidnapping as early as 1985; isn't that

17   correct, sir?

18   A.   No.

19   Q.   Did you know an offer had been made for any one that had

20   information about who planned the kidnapping?

21   A.   No.

22   Q.   You knew that Ruben Zuno Arce had been charged with

23   planning the kidnapping; isn't that true?

24   A.   That Ruben Zuno Arce had what?

25   Q.   Had been charged with being a participant in the

1080

1   planning.  Is that true?

2   A.   I heard it on the news when he was detained for the

3   first time here in the United States.

4   Q.   And so it's -- strike it.

5            And you knew then that the -- strike that.

6            You knew that -- strike that.

7            Was that sometime in or about the summer of 1989?

8   A.   More or less.

9   Q.   You knew, did you not, from the news accounts that there

10  was to be a trial about that charge approximately May of

11  1990; isn't that correct?

12  A.   Well, no.  I was informed through the news only.

13  Q.   But you knew through the news that there was to be a

14  trial in about May of 1990; isn't that true?

15  A.   No.  Something like a trial?  No.

16  Q.   Did you follow the matter in the news?

17  A.   Well, yes.  Because I had no other means of

18  communication nor information.

19  Q.   And you knew, from your listening to the news and

20  reading the news, that as of May of 1990, Hector Cervantes

21  Santos was the only individual who said Ruben Zuno was at a

22  planning meeting?

23            MR. MEDRANO:  Objection, Your Honor; this is

24  improper in that the point --

25            THE COURT:  Restate your question, counsel.

1081

1    Q.   BY MR. MEDVENE:  From your reading in the paper and what

2    you heard in the press, isn't it true that you knew as of May

3    of 1990 that the only individual --

4                MR. MEDRANO:  Your Honor, I object to this

5    question.  The question is improper.

6                THE COURT:  Let him finish the question.

7    Q.   BY MR. MEDVENE:  That the only individual that claimed

8    Ruben Zuno was at any meeting where a kidnapping was

9    discussed was a person named Hector Cervantes Santos?

10               MR. MEDRANO:  Your Honor, renew our objection to

11   the form.

12               THE COURT:  What is the ground?

13               MR. MEDRANO:  Irrelevant and beyond the scope of

14   direct, Your Honor.

15               THE COURT:  The objection is overruled.

16               You may answer that.

17               THE WITNESS:  Could you repeat the question.

18   Q.   BY MR. MEDVENE:  From your reading in the paper and

19   listening on TV, or whatever, did you know in mid 1990 that

20   the only individual that said that Ruben Zuno was at any

21   meeting where the planning of Enrique Camarena was allegedly

22   planned was a man named Hector Cervantes Santos?

23   A.   I didn't realize about that notice, that information.

24   Q.   Did you ever hear of Hector Cervantes Santos?

25   A.   No.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1082

1    Q.   Did you ever meet Hector Cervantes Santos?

2              MR. MEDRANO:  Objection, Your Honor; asked and

3    answered.

4              THE COURT:  Sustained.

5    Q.   BY MR. MEDVENE:  Hector Cervantes Santos was never at

6    any of these meetings that you've testified about over the

7    last couple of days, was he, sir?

8    A.   What was that again?  These "last couple of days"?

9    Q.   You've testified about a number of meetings the last

10   several days.  My question is:  Is it correct that Hector

11   Cervantes Santos was not at any of those meetings?

12             MR. MEDRANO:  Objection, Your Honor.  Witness says

13   he doesn't know this man.

14             THE COURT:  Well, that is the point here.  You

15   have to state first that he knows who you are talking about.

16   Ask him that.

17   Q.   BY MR. MEDVENE:  Were you ever introduced at any of the

18   meetings you've talked about over the last couple of days to

19   anybody named Hector Cervantes Santos?

20   A.   No.  I don't know him.

21             THE COURT:  All right, let's move on here.

22             MR. MEDVENE:  Yes, sir.

23   Q.   When did you -- strike that.

24             You came to the United States in what month?

25   A.   At the first few months of this year.

1   Q.   Did you know at that time that the DEA had any interest

2   in talking to anyone who had information about the kidnapping?

3   A.   Well, I didn't find out such thing as persons.  I came

4   here -- Do you want to know why I came here?

5   Q.   Did you while you were in Mexico -- strike that.

6           While you were in Mexico, did you speak with any-

7   one about the fact that you had any information about meet-

8   ings where the kidnapping of Enrique Camarena was planned?

9   A.   Someone -- (Pause.)  Who are you referring to?

10          THE COURT:  Anyone.  He asked you if you discussed

11  with anyone that you had information about this case while

12  you were in Mexico.

13          THE WITNESS:  I talked to the supervisor of DEA.

14  Q.   BY MR. MEDVENE:  Supervisor where?

15  A.   Well, here in the United States.  The DEA.

16  Q.   The question was in Mexico, did you talk --

17          While you were in Mexico before you came to the

18  United States in January of this year, did you talk to anyone

19  about whether or not you had any information regarding plan-

20  meetings with respect to Agent Camarena's kidnapping?

21  A.   If I talked to somebody?

22          THE COURT:  That's the question.

23  Q.   BY MR. MEDVENE:  Yes.  Yes, sir.

24  A.   Just on the telephone, I talked to the supervisor,

25  Hector Berrellez.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1084

1   Q.   And did you talk to him -- strike that.

2              Were you in Mexico when you spoke to him?

3   A.   Yes.

4   Q.   And when was that phone call?

5   A.   Well, I don't remember the exact date in '92.  The first

6   month of '92.

7   Q.   My initial question, sir, was while you were in Mexico,

8   did you talk to anyone about your claim that you had any

9   information about any meetings where the kidnapping of

10  Enrique Camarena was planned?

11  A.   Well, the reason I decided to come was through a friend

12  who told me.

13  Q.   Are you saying that you did speak to someone in Mexico?

14             THE COURT:  That's what he said, counsel.

15  Q.   BY MR. MEDVENE:  Okay, who was the friend?

16             MR. MEDRANO:  Your Honor, I'd object.

17             THE COURT:  Well, if the witness is willing to

18  answer, let him.

19             MR. MEDRANO:  Your Honor, it's the same ground as --

20             THE COURT:  Well.

21             You may answer.

22             THE WITNESS:  That friend told me that the DEA

23  agents could help me in my problem.

24  Q.   BY MR. MEDVENE:  What problem was that?

25  A.   Because I also had been involved in the murder of

1085

1    Enrique Camarena Salazar.

2    Q.   And your friend told you that he knew somebody you could

3    call so you could get immunity if you would give testimony

4    about somebody?

5    A.   Well, my friend didn't talk to me about immunity, he

6    just told me that if I spoke the truth, they could help me.

7    And if I were to lie to them, the first lie they caught me

8    in, they could also arrest me.

9    Q.   Your friend told you if you gave them the information

10   that they wanted, you would not be charged in the Camarena

11   murder that you were involved in; isn't that true?

12   A.   Well, not talking about details, deep details.  We

13   didn't talk about that.

14   Q.   The friend said, "If you have the right kind of

15   testimony, you can get out of this thing.  You can get out of

16   this murder you were involved in"; isn't that correct, sir?

17            MR. MEDRANO:  Asked and answered, Your Honor.

18            THE COURT:  Overruled.

19            THE WITNESS:  No, he just told me if I were to

20   tell them the truth in what I had lived through.  But at no

21   time did he tell me that I would be free of the

22   responsibility of the murder.

23   Q.   BY MR. MEDVENE:  Well, what problem did you have in

24   Mexico?  Was the Mexican government looking for you to

25   prosecute you, to your knowledge, about the Camarena

1086

1   abduction?

2   A.   Well, my motivation mostly was that I decided to come to

3   the United States because I had realized that -- through all

4   the time that had gone by, I could realize through the media

5   that a lot of people were being killed whom I knew had been

6   involved in the murder of Enrique Camarena.   In other words,

7   it was no longer detaining us but everybody was being killed.

8   Q.   You knew that the DEA --

9            If the court please, I don't know what question he

10  is answering.

11           THE COURT:   Well, he's answered the question.

12  Pose the next question.

13  Q.   BY MR. MEDVENE:   You knew that the DEA had gone to

14  Mexico and kidnapped somebody accusing them of the events and

15  you were afraid they're going to come and kidnap you because

16  you were involved; isn't that true?

17           MR. MEDRANO:   Objection, Your Honor; calls for

18  speculation, lack of personal knowledge.

19           THE COURT:   You may answer it.

20           THE WITNESS:   I didn't find out that they had gone

21  to kidnap anybody.   I just heard on the news that DEA was not

22  finished with investigation.

23  Q.   BY MR. MEDVENE:   And you were afraid that you would be

24  picked up by the DEA and arrested and charged with a murder

25  that you were involved in.   Isn't that true?

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1    A.    Well, I was rather afraid that they were going to kill

2    me over there in Mexico.  Because Ernesto Fonseca had ordered

3    me murdered.  And they were doing all of this to hide

4    politicians --

5    Q.    Well --

6    A.    -- because of all these people that had been involved.

7    Q.    Well, what --

8    A.    Because there's no equity in the government when they do

9    their arrests according to who's guilty.

10   Q.    Well, we're six years later and you said that your

11   friend indicated that you could -- the DEA could help solve

12   your problem.  Your problem was you were worried the DEA

13   would arrest you and charge you with the murder of Enrique

14   Camarena; isn't that correct?

15          MR. MEDRANO:  That's been asked and answered.

16          THE COURT:  Sustained.

17   Q.    BY MR. MEDVENE:  What was the name of your friend?

18          MR. MEDRANO:  Objection to that.

19          THE COURT:  Yes, sustain the objection.  I'll

20   hear you on it later, if you wish.

21          MR. MEDVENE:  You didn't sustain it, you said it

22   was up to the witness, Your Honor.

23          THE COURT:  That's all right.  Just proceed.

24   Q.    BY MR. MEDVENE:  Was it the same friend that Mr. Godoy

25   had spoken to?

1088

1          MR. MEDRANO:  Objection; lack of personal
2     knowledge, lack of foundation.
3          THE COURT:  Well, if the witness knows, he may
4     answer.
5          THE WITNESS:  Do I answer?
6          THE COURT:  Yes.
7     Q.   BY MR. MEDVENE:  Yes.
8     A.   Could you repeat the question again.
9          (Pause in proceedings.)
10         THE COURT:  The question was:  Do you know if your
11    friend also spoke to Mr. Godoy?
12         THE WITNESS:  No, I don't know.
13    Q.   BY MR. MEDVENE:  Do you know who called Mr. Godoy and
14    got him to come up here?
15    A.   No, I don't know.
16    Q.   So you don't know if it's the same person that called
17    you or not.
18         THE COURT:  He's already answered that.
19    Q.   BY MR. MEDVENE:  Okay.  Where did you know this person
20    from?  From the state police?
21    A.   No, that person was never in the judicial of the state.
22    Q.   Well, what was his position?  Or if you could tell me
23    something about him.
24    A.   He worked at a bar.
25    Q.   And he told you, didn't he, that the DEA was paying

1089

1  money and giving housing in the United States to certain

2  people.  That's correct, isn't it?

3  A.   He didn't tell me anything about that.

4  Q.   He just told you the DEA could solve your problem.

5  A.   That they could help me.  Not "solve it," help me.

6         MR. MEDVENE:  May I approach the witness, Your

7  Honor.  May I approach the witness just to hand him this

8  exhibit?

9         THE COURT:  Yes.

10 Q.   BY MR. MEDVENE:  I place before you, sir, 164.

11        Previously agreed to, Your Honor, as Hector

12 Cervantes Santos.

13        Do you know that individual?

14 A.   No.

15 Q.   Never saw him at any of the meetings that you've told us

16 about the last two days?

17        THE COURT:  You've already asked that question.

18 He's answered that question previously.

19        MR. MEDVENE:  Not with the picture in front of

20 him.

21        THE COURT:  Well, are you asking him if he ever

22 saw that face?

23        MR. MEDVENE:  Yes.  I'll change it.

24 Q.   Did you ever see anyone with that face at any meetings

25 you talked about the last couple of days?

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1090

1    A.   I don't remember having seen him.

2    Q.   Now, when did this friend first talk to you about your

3    talking to the DEA?   In what month?

4    A.   The first months of '92.

5    Q.   Was it after your friend talked to you that you decided

6    to come to the United States in January of 1992?

7    A.   Yes.

8    Q.   Had you talked to anyone from the DEA before coming to

9    the United States in January of '92?

10   A.   With people from DEA?

11   Q.   Yes.

12   A.   Before I came, I talked to the supervisor on the phone.

13   Hector Berrellez.

14   Q.   And what did you say to him and what did he say to you?

15   A.   He told me if I could cooperate with the investigation

16   only if I told him the truth.

17   Q.   If you would cooperate, did he tell you that you would

18   not be prosecuted in this country for your direct involvement

19   in the kidnapping of Enrique Camarena?

20   A.   He didn't tell me that.

21   Q.   Did he tell you if you came to this country, you would

22   not be arrested?

23   A.   No.   If I told him the truth, they could help me.

24   Q.   So you would not be arrested depending on what you told

25   them; is that correct, sir?

1091

1  A.   They didn't tell me that.  They only told me if I could

2  cooperate with the truth and what I had lived through.

3  Q.   Did they tell you whether or not you would be arrested

4  when you came here?

5  A.   No.  We didn't talk about an arrest.

6  Q.   When did you first find out you weren't going to be

7  arrested?

8  A.   Not till the present time, I have not found out.

9  Q.   When did you first find out you were going to get paid?

10 A.   About a month -- During the first days that I arrived

11 here.

12 Q.   You were told that you would be paid $3,000 a month?

13 A.   Yes.

14 Q.   You were told that you'd be able to stay permanently in

15 the United States?

16 A.   They haven't talked to me about that.

17 Q.   Is it your understanding that you can stay as long as

18 the DEA says it's okay for you to stay?

19 A.   Well, yes; until they tell me.

20 Q.   So if they tell you, you can stay; and if they tell you

21 to go, you have to leave this country, that's your under-

22 standing; right?

23 A.   Well, actually, yes.

24 Q.   And you get your $3,000 a month until DEA decides you

25 don't get $3,000 a month any more; isn't that right?

1092

1    A.    Well, they haven't said anything about that, only that

2    they were going to pay $3,000 a month.

3    Q.    And when this is all over, your understanding is you'll

4    be able to stay in this country and work; isn't that true?

5    A.    Well, I actually -- I haven't, I haven't thought about

6    that decision.

7    Q.    Do you work?

8    A.    No.

9    Q.    Just get money and you stay home?

10   A.    Yes.

11   Q.    You were told that when this is all over, even though

12   you were involved in the kidnapping, torture and murder of

13   five Americans, the four Latter Day Saints and Enrique

14   Camarena, there would be no charges filed against you; isn't

15   that true?

16   A.    Well, I don't know if I'll be charged later but I'd

17   prefer to be arrested here than there in Mexico.

18   Q.    Your hope is that you're not charged.  That's certainly

19   correct, isn't it?

20   A.    Well, that is what I ask God.  I am sorry of having done

21   what -- of having been involved in this.

22   Q.    Now, in January of 1992 did you talk to any

23   representative of the DEA and tell him anything of your

24   knowledge in this matter?

25              THE COURT:   That is not a very clear question.

1093

1    MR. MEDVENE:  No, it's not a good question.  Let
2    me withdraw it.
3    Q.   Did you -- strike that.
4    THE COURT:  Are you asking him if he gave
5    information?
6    MR. MEDVENE:  Yes, sir.
7    Q.   In front of you, sir, is -- Ms. Reporter --
8    THE COURT:  Don't charge into the well without
9    permission, counsel.
10   MR. MEDVENE:  I'm sorry, I just want to see the
11   number.  Could you tell me --
12   THE CLERK:  406.
13   MR. MEDVENE:  406, Your Honor.
14   Q.   Do you remember, sir, when you first spoke to anyone
15   from the DEA about the facts of this case?
16   A.   Well, as soon as I arrived, I started talking to them.
17   Q.   Now, exhibit 406, the first document, it's dated March
18   5th, 1992.  Do you see that in front of you, just to refresh
19   your recollection?
20   MR. MEDRANO:  Your Honor, there is no indication
21   the witness reads English.
22   THE COURT:  Sustained.
23   What is your question?
24   MR. MEDVENE:  Ms. Reporter -- or, excuse me, Ms.
25   Clerk, I would like --

1094

1    THE COURT:  Counsel, there is no reason for the

2    witness to read it.  If you have a question, ask him.

3    Q.  BY MR. MEDVENE:  Wasn't March 5th of 1992 the first time

4    you gave any information to the DEA?  Does that refresh your

5    recollection?  I show you 406.

6    THE COURT:  Just a moment.  Let the witness answer.

7    MR. MEDVENE:  Yes, sir.

8    THE WITNESS:  Well, no.  As soon as I arrived,

9    they started asking for information.

10   Q.  BY MR. MEDVENE:  And who did you meet with in addition

11   to Mr. Berrellez?

12   A.   With Agent Salvador Leyva.

13   Q.   How many meetings did you have with Salvador Leyva

14   and/or Mr. Berrellez in January of 1992?

15   A.   Well, we met several times.

16   Q.   Several times in January of 1992?

17   A.   Well, during all the time that has gone by.

18   Q.   I'm talking about January of '92, yourself meeting with

19   Mr. Leyva and Mr. Berrellez, how many meetings?

20   A.   Well, I don't remember.  There were several.

21   THE COURT:  We will take our evening recess at

22   this time and reconvene this case tomorrow morning at 9:30.

23   The jury will be good enough to remember the admonition that

24   I have repeated to you throughout the trial and to follow

25   that admonition carefully.  The jury may be excused.

1095

1      THE CLERK:  Please rise.

2      (Jury excused at 4:30 p.m.)

3      THE CLERK:  You may be seated.

4      MR. MEDRANO:  Could we excuse the witness, Your

5   Honor?

6      THE COURT:  Yes.  The witness may be excused.

7      Please be seated.

8      You wanted to take something up with the court?

9      MR. MEDVENE:  Your Honor, we were given certain

10   Jencks material, the first document dated March 5th of '92.

11   It was our understanding this was the first meeting with the

12   witness.  And the witness has now said he started meeting in

13   January and, as far as we got, I believe he said he met a

14   couple of times in January.

15      The first document we have is March 5th of '92.

16   I ask through the court if the government would respond to

17   were there any earlier meetings and is there any other

18   Jencks, or explanation for why there is no Jencks?

19      MR. MEDRANO:  Your Honor, first let me state that

20   all the Jencks has been provided to Mr. Medvene.  There were

21   interviews January-February and obviously the agents didn't

22   draft their reports until starting March.  So that would

23   explain that.

24      THE COURT:  All right.  You accept that?

25      MR. MEDVENE:  Well, uh.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1096

1    THE COURT:  Now, this is not something that the

2    court can --

3    He says that he's given you all the Jencks

4    material.

5    MR. MEDVENE:  But the difficulty is, Judge, that

6    in the ordinary course with all other witnesses, they started

7    paying them when they start seeing them.  This witness they

8    start paying March 25th of '92.  The first report is March

9    5th.  It's our belief --

10    THE COURT:  Well, you're free to call the agents

11    and ask them about it, counsel.

12    MR. MEDVENE:  Well, then we may lose this witness.

13    THE COURT:  I don't think you are going to lose

14    the witness.

15    MR. RUBIN:  Your Honor, I have one matter I'd like

16    to put on.

17    Your Honor, I would request -- In light of the

18    fact we couldn't make the request earlier because we just got

19    the Jencks material, I would request the government provide

20    to us all the copies of photographs of all the employees of

21    the American Consulate at that time so we can question this

22    witness about the person he said allegedly was at that

23    meeting and see if there is such a witness at the consulate.

24    We'd potentially call that person, if he can be

25    identified, as an impeachment witness against this witness.

1097

1  But in order to do that process, I'd ask the government to

2  provide photographs of all the employees at the American

3  Consulate at that time.

4          THE COURT:  This is not the time to make a

5  discovery request.

6          MR. RUBIN:  Your Honor, we didn't know about this

7  until two days ago when they complied with the Jencks Act.

8  How could we make a discovery request without knowing --

9          THE COURT:  Well, your request is denied.

10          MR. MEDVENE:  If the court please, before you

11  leave the bench -- I'm sorry.  See, we just got this stuff

12  Sunday afternoon, Your Honor.  And we would ask that if the

13  government has any notes, that they either give us the

14  investigator notes or give them to Your Honor.  Because there

15  is no magic in typing up the notes and putting it in the DEA-6.

16          THE COURT:  What notes are you talking about?

17          MR. MEDVENE:  Well, if they spoke to this witness

18  it strains credulity that they wouldn't have taken some notes

19  if they met with him in January or February.  The first thing

20  we have is March, so we'd like to know did they speak to him

21  before.

22          Now, possibly the witness is mistaken and the

23  first meeting is in March but if they spoke to him in January

24  or February, we're entitled to know if they have any notes.

25  I mean, it's only fair.

LUCILLE M. LITSHEIM, U.S. COURT REPORTER

1098

1    THE COURT:  Do you wish to be heard on this?

2    MR. MEDRANO:  Your Honor, what I need to ascertain

3    with certainty to advise everybody is the exact date when

4    this witness arrived.  I think it's mid February and perhaps

5    the witness is just mistaken as to when he came.  I can find

6    that out and apprise Mr. Medvene of that information.

7    I just don't know off the top of my head.  I'd

8    have to speak to the case agents and find out when he came.

9    MR. MEDVENE:  Whatever the February notes then are,

10   and anything before March 5th.  I mean, we're entitled to it;

11   we're getting the stuff --

12   THE COURT:  No, you're not entitled to anything

13   except what Rule 16 says you're entitled to.  Now if you want

14   to brief the issue and submit something, let me see it.

15   Don't bring me these off-the-cuff disputes and demands.

16   MR. MEDVENE:  Well, judge --

17   THE COURT:  Brief the law that says you're entitled

18   to what you are asking for and let them respond to it.

19   MR. MEDVENE:  Your Honor, under Jencks; the

20   witness has taken the stand.  We're just asking for --

21   THE COURT:  The government has represented they've

22   given you all the statements made by this witness.  Now

23   you're asking for more than that.

24   MR. MEDVENE:  We're saying, Your Honor, to ask

25   them directly:  Do they have any notes?  When did he arrive?

1099

1    Did they talk to him?

2              THE COURT:  Well, before I do that, you provide me

3    with some authority that you're entitled to what you're

4    asking for.

5              And you do the same.

6              MR. RUBIN:  That's fine, Your Honor.  For purposes

7    of the record, though, since we are not getting photographs

8    during the investigation, I would formally move the court for

9    a continuance of the trial to give us time to investigate

10   this employee of the consulate and gain a possible

11   impeachment witness.

12             THE COURT:  What difference does that make to

13   anything, this employee of the consulate?

14             MR. RUBIN:  Well, sir -- excuse me, Your Honor,

15   this employee --

16             THE COURT:  As I understand, the evidence is that

17   he is the one that pointed out Camarena.  So what?

18             MR. RUBIN:  Well, this person --

19             THE COURT:  How does that help your defense to

20   know who this person is --

21             MR. RUBIN:  There may not be such a person.

22             THE COURT:  -- or a picture of him?

23             MR. RUBIN:  There may not be such a person.

24             THE COURT:  What difference does it make?  A

25   kidnapping occurred.  I mean, that is not in dispute.  You

1100

1   told the jury that.

2        MR. RUBIN:  Your Honor, the credibility of this

3   witness is certainly in dispute and if he is identifying

4   somebody as an employee of the American Consulate who doesn't

5   exist, that certainly impeaches his credibility.  If there is

6   such a witness that does exist and that person could be called

7   as a witness and say that those conversations never happened --

8        THE COURT:  By the same token, you could make that

9   same request of every witnesses he's identified or talked

10  about.  And you would want the government to produce pictures

11  of these people?

12       MR. RUBIN:  No.

13       THE COURT:  I consider that a collateral matter.

14       MR. RUBIN:  This witness was also at Lope de Vega,

15  directly there.

16       THE COURT:  I understand that.

17       MR. RUBIN:  Well, not every person they talked

18  about was at Lope de Vega.  This is a percipient witness to

19  those events on those two days.

20       THE COURT:  I don't see your theory about this at

21  all.  If you want to write it up and submit it, I'll consider

22  it.

23       MR. MEDVENE:  Could we meet -- in other words,

24  could the government -- It may be academic.  Maybe the first

25  interview was in March but I think we're entitled to it if it

1101

1  was before then.

2          THE COURT:  I've said all I'm going to say about

3  it at this time.

4          MR. MEDVENE:  Yes, Your Honor.

5          THE CLERK:  Please rise.

6          This court stands in recess.

7          (Adjourned at 4:37 p.m.)

8                    --oOo--

9  I certify that the foregoing is a correct transcript of the

10  proceedings held in the above-entitled matter.

11

12

13  DATE: December 16, 1992

14          LUCILLE M. LITSHEIM
          U.S. Court Reporter
          CSR NO. 2409

15

16

17

18

19

20

21

22

23

24

25

LUCILLE M. LITSHEIM, U.S. COURT REPORTER