*88-5462*
*88-5421*

1  UNITED STATES DISTRICT COURT

2  CENTRAL DISTRICT OF CALIFORNIA

3  - - -

4  HONORABLE EDWARD RAFEEDIE, JUDGE PRESIDING

5  - - -

6  UNITED STATES OF AMERICA,           )
                                       )
7           PLAINTIFF,                 )
                                       )
8      VS.                             )      NO. CR 87-422(A)-ER
                                       )
9  JESUS FELIX-GUTIERREZ,             )
   RAUL LOPEZ-ALVAREZ,                )
10 RENE MARTIN VERDUGO-URQUIDEZ,      )
   ET AL.,                            )
11         DEFENDANTS.                )
   _____)

12

13

14

15  REPORTER'S TRANSCRIPT OF PROCEEDINGS

16  LOS ANGELES, CALIFORNIA

17  AUGUST 1, 1988, 3:00 P.M.

18

19  *FILED*

20  *MAR - 6 1989*

21

22  *CLERK, U.S. DISTRICT COURT*        B. THOMAS, CSR, RPR
    *CENTRAL DISTRICT OF CALIFORNIA*    OFFICIAL COURT REPORTER
    *BY _____ DEPUTY*
23                                      406 U.S. COURTHOUSE
                                        312 NORTH SPRING STREET
24  *VOLUME 6*                          LOS ANGELES, CALIFORNIA  90012
                                        (213) 629-4874
25  *Title 28*                          CSR NO. 2683

*Copy*

1  APPEARANCES:

2      FOR PLAINTIFF:

3          ROBERT C. BONNER
           UNITED STATES ATTORNEY
4          ROBERT L. BROSIO
           ASSISTANT UNITED STATES ATTORNEY
5          CHIEF, CRIMINAL DIVISION
           JIMMY GURULE
6          ASSISTANT UNITED STATES ATTORNEY
           MAJOR NARCOTICS SECTION
7          ROEL CAMPOS
           ASSISTANT UNITED STATES ATTORNEY
8          1400 UNITED STATES COURTHOUSE
           312 NORTH SPRING STREET
9          LOS ANGELES, CALIFORNIA  90012

10     FOR DEFENDANT FELIX-GUTIERREZ:

11         OVERLAND, BERKE, WESLEY, GITS,
            RANDOLPH & LEVANAS
12         BY:  DONALD C. RANDOLPH, ESQ.
                MARCIA A. MORRISSEY, ESQ.
13         2566 OVERLAND AVENUE
           SEVENTH FLOOR
14         LOS ANGELES, CALIFORNIA  90064

15         BARRY TARLOW, ESQ.
           9119 SUNSET BOULEVARD
16         LOS ANGELES, CALIFORNIA  90069

17     FOR DEFENDANT LOPEZ-ALVAREZ:

18         PETER M. HORSTMAN
           FEDERAL PUBLIC DEFENDER
19         BY:  YOLANDA M. BARRERA
           CHIEF DEPUTY FEDERAL PUBLIC DEFENDER
20         ELSA LEYVA
           DEPUTY FEDERAL PUBLIC DEFENDER
21         SUITE 1503, UNITED STATES COURTHOUSE
           312 NORTH SPRING STREET
22         LOS ANGELES, CALIFORNIA  90012-4758

23

24  [CONTINUED NEXT PAGE]

25

```
 1   APPEARANCES [CONTINUED]:

 2        FOR DEFENDANT VERDUGO-URQUIDEZ:

 3             MICHAEL PANCER, ESQ.
               625 BROADWAY
 4             SUITE 1135
               SAN DIEGO, CALIFORNIA  92101
 5
               JUANITA R. BROOKS, ESQ.
 6             108 IVY STREET
               SAN DIEGO, CALIFORNIA  92101
 7
          SPANISH INTERPRETERS:
 8
               IRMA GARCIA
 9             JOSE OROZCO

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

PROCEEDINGS                                                          PAGE

Defendant's motion for supplemental                                  16
discovery

        Court's Ruling                                               18

Defendants' motion to prevent Agent                                  19
Kuykendall from testifying at trial to a number
of matters

        Court's Ruling                                               20

Defendant Felix-Gutierrez' motion to preclude any                    23
testimony regarding the use by the defendant of the
alias Francisco Morua

        Court's Ruling                                               24

Defendants' motion that the Court order disclosure                   24
of DEA reports of narcotic seizures and the eradi-
cation of marijuana fields in Zacatecas and
Chihuahua, Mexico

        Court's Ruling                                               24

Defendant Verdugo-Urquidez' motion in limine to                      35
exclude evidence

        Court's Ruling                                               36

Defendant Verdugo-Urquidez' motion to review reports                 36
of names of individuals with major responsibility
in the Caro-Quintero organization

        Court's Ruling                                               40

1    LOS ANGELES, CALIFORNIA; MONDAY, AUGUST 1, 1988, 3:00 P. M.

2          THE CLERK:   Item No. 5, Criminal 87-422,

3    United States of America vs. Raphael Caro-Quintero.

4          Counsel, please state your names for the record.

5          MR. GURULE:   Good afternoon, Your Honor.

6    Jimmy Gurule and Roel Campos appearing on behalf of the

7    United States.

8          MS. LEYVA:   Good afternoon, Your Honor.

9    Elsa Leyva and Yolanda Barrera for Raul Lopez-Alvarez,

10    who is present.

11          MR. PANCER:   Michael Pancer for Rene Verdugo,

12    who is present.

13          MR. RANDOLPH:   Good afternoon, Your Honor.

14    Donald Randolph on behalf of Jesus Felix, who is present.

15          And with the Court's permission, Your Honor,

16    I would like to call to counsel table Attorney Marcia

17    Morrissey, who is present in the courtroom.  Her notice

18    of appearance as co-counsel assisting in this case was

19    filed with the Court.

20          THE COURT:   All right.

21          Well, I want to review some of these pending

22    motions and dispose of them to the extent possible or

23    discuss their present status.

24          There has been a motion on which we had a

25    prior hearing for the exclusion of foreign records for

1    the failure of the Government to give proper notice of

2    the intent to use these foreign records.  These relate

3    to the notices dated July 8 and July 11.  At the last

4    hearing we had I ordered the Government to file sworn

5    declarations establishing good cause for the delay of

6    this notice, which to my knowledge has not been done.

7           Is that right?

8           MR. GURULE:  That has been prepared, Your Honor,

9    and it is being typed, and we can have that filed for you

10   tomorrow before noon.

11          THE COURT:  Can you tell me basically what the

12   contents of the declarations are regarding the justifica-

13   tion for the notice having been given on July 8 and

14   July 11 when the material was available as early as

15   February or March?

16          MR. GURULE:  Certainly, Your Honor.  Basically

17   what happened was that the Government did early on in

18   the investigation attempt to obtain certification of

19   foreign records for the appropriate documents.  We did

20   receive certifications on most of the foreign records

21   out of Costa Rica, but the form itself of the certifica-

22   tion that we received did not follow the statutory

23   requirements under 18 USC 3505.

24          Simply what had happened was that the appropriate

25   Government offices where certain public records were being

1    kept sent us the records with a stamp from that particular

2    public office saying that these were in fact certified

3    true and correct copies of originals from their files.

4    But under 18 USC 3505 the requirements are more extensive

5    than that.  It is not enough to just certify the document

6    as being a copy of the original.  It basically must follow

7    a certain format.  There must be a certification that

8    states that the documents are records, number one, kept

9    in the regular course of business; number two, that they

10   are kept by someone who knows the procedures of the

11   office.

12            THE COURT:  What is the point here?

13            MR. GURULE:  The point is that the Government

14   attempted to obtain them in the certified form that was

15   required.  When we received them from the foreign country,

16   they did not satisfy the requirements of --

17            THE COURT:  What was done?

18            MR. GURULE:  Then we had to go back and have

19   our agents in Costa Rica follow up with these particular

20   different agencies and offices, and there are a number

21   of them, and some of them we were able to obtain.  Others

22   were more difficult in terms of locating the particular

23   custodian or owner of the business to obtain the appropriate

24   certification.  In one particular instance the owner of

25   the business could not be found, and there were numerous

1   calls placed to him, and he was unavailable.  And finally

2   when we were able to reach him, sit him down, and take

3   him the appropriate certification, then we did obtain

4   that and filed the entire package at once, not piecemeal.

5            THE COURT:  That is what this declaration will

6   contain evidence of?

7            MR. GURULE:  Yes, Your Honor.  The efforts and --

8            THE COURT:  Well, I will have to defer ruling

9   on that until I have had an opportunity to see it and

10  counsel has had an opportunity to see it.

11           Let's get these things in when I ask for them.

12  We need to have them.

13           This second motion deals also with these ledgers.

14  There is a motion to exclude the ledgers against

15  Mr. Gutierrez.  I have already indicated that I am deferring

16  ruling on this until a proper foundation is laid.  If the

17  Government lays a proper foundation for the use of the

18  ledgers, they may use them.  If not, they may not.

19           Now, on this issue we have two witnesses which

20  the defendants have asked to be excluded because of the

21  willingness to stipulate to their testimony.  The

22  defendants, however, have been vague as to what facts

23  they are willing to stipulate to with respect to

24  Mrs. Camarena and this gentleman, Garciabueno.  Therefore,

25  in order for the Court to determine whether it is

1   appropriate to exclude the testimony of these witnesses,

2   the defendants should file and serve on the Government

3   an offer to stipulate setting forth specifically all

4   facts to which they are willing to stipulate.  When that

5   has been done, the Government will either agree to those

6   stipulated facts, or the Government will submit a state-

7   ment and serve it of relevant facts which they believe

8   these two witnesses would be able to testify to that

9   are not covered by the proposed stipulation.

10          In that way the Court will be able to determine

11   whether or not it would be proper to exclude these wit-

12   nesses.

13          MR. PANCER:  Your Honor, I thought, and I may

14   be wrong, that you had ordered the Government to prepare,

15   when we discussed this, a stipulation that would cover

16   their testimony and submit it to us.  I thought that is

17   what you did.  Co-counsel here is nodding.  They have

18   never done that, Your Honor.  Not that there is anything

19   wrong with this procedure, Your Honor, but you ordered

20   them to file something so we could look at it and sign

21   it, and they never did.

22          THE COURT:  I think this procedure is better.

23   Originally the Government has indicated to the Court

24   that it intended to call Mrs. Camarena to show the time

25   of the abduction, which I don't think is in dispute and

1   which has been covered by other witnesses; that Camarena's

2   voice appears on the tapes, which the defendants have

3   indicated they are willing to stipulate to and which

4   does not appear to be in dispute; and, three, that her

5   testimony will help to authenticate the tape.

6           Now, these are the three things that they have

7   mentioned.

8           MR. PANCER:  Yes, Your Honor.  What I thought

9   is that No. 3, her testimony would help authenticate

10  the tape, I think what that means is that it would help

11  authenticate the tape because she could testify that

12  that is her husband's voice on the tape.

13          But I think the facts they wanted stipulated

14  to was the time he was supposed to meet her and, two,

15  that his voice appears on the tape.  We are willing to

16  do that.

17          Then whether the tape is authentic or not --

18  we are stipulating it is his voice.  We are giving them

19  a leg up.  Mrs. Camarena couldn't say that the tape is

20  authentic.  All she could say is that his voice appears

21  on the tapes.

22          MR. GURULE:  Well, that is not quite correct.

23  Relative to the issue of authenticity, in addition to

24  the fact that she can identify the voice as being her

25  husband's voice, there are some other statements on the

1    tape, some responses by Special Agent Camarena, that

2    would be unique to her knowledge that she would be able

3    to say yes, that was going on with my husband at this

4    particular point in time.  For instance, there is a

5    reference made on the tape with Mr. Camarena saying,

6    "I am leaving the Guadalajara office; I am being trans-

7    ferred to another office."  She would know about that.

8         THE COURT:  We have also already had evidence

9    of that, and it does not appear to be disputed.

10        MR. GURULE:  That was just an example.  The

11   second example would be that there were some statements

12   where Special Agent Camarena said that he was having

13   some problems -- on the interrogation tape he said, "I

14   am having some problems with my checking account."  He

15   says, "They haven't been depositing my checks, and my

16   checks are bouncing."  I know I am paraphrasing, but

17   basically that was the sum and substance of that.

18        THE COURT:  And that is to prove that it is

19   his voice on the tape?

20        MR. GURULE:  Well, no, she would be able to

21   say both:  that it was his voice on the tape and that

22   the checks were bouncing, that they were having these

23   particular problems with their checking account.

24        THE COURT:  What does that prove?

25        MR. GURULE:  Well, I think it proves that it

1    is not somebody else that is being interrogated.  I think

2    this particular fact that he is mentioning where they

3    are claiming something about money, he is saying, "Well,

4    look, my checks are bouncing."

5            If the argument is that the tape isn't authentic,

6    that means -- I think the other side of that argument

7    is that somebody has fabricated this or spliced the tape

8    or pieced it together.

9            Our argument is that, no, this is an authentic

10   tape.  This is authentic, and by that I mean --

11           THE COURT:  In other words, Special Agent Camarena

12   is being interrogated by the people who kidnapped him?

13           MR. GURULE:  This is another way to show that

14   this is a particular unique fact to Mr. Camarena that

15   Mr. Camarena would only know, and his wife, and I think

16   she would be able to buttress that point of authenticity.

17   That is only one point of many that we are seeking to

18   use to prove up the authenticity.

19           MR. PANCER:  Your Honor, what could be better

20   for the Government than for us to say that is him on the

21   tape.  That is Enrique Camarena's voice on the tape making

22   the statements that they have his voice making on the

23   tape.  We are willing to give them that.  That is what

24   they want to introduce all of this for, to show that it

25   is he, and we are willing to stipulate that it is he

1    making those statements.

2            MR. GURULE:  The Government understands, and

3    certainly that is significant.  I am just saying that

4    there are one or two additional points that we would

5    want to have --

6            THE COURT:  We will follow the procedure that

7    I have stated.

8            Now, this motion to exclude photographs, where

9    are the photographs?  Are they with the clerk?

10           MR. GURULE:  In the Court's trial book there

11   are photocopies, but we will bring the --

12           THE COURT:  I want to see the photographs that

13   the motion to exclude concerns.

14           MR. GURULE:  We will bring those down this

15   afternoon and leave them with the clerk.

16           THE COURT:  You have basically given four

17   reasons for the admissibility of these.  You said that

18   it was to lay foundation for forensic evidence.

19           MR. GURULE:  That is correct.

20           THE COURT:  Are you referring to the evidence

21   that the medical examiner already has given?

22           MR. GURULE:  No, not really, Your Honor.  That

23   is separate.  The forensic evidence has again to deal

24   with the carpet fibers, the hair, and the burial shroud

25   and the blindfold tape and the rope bindings.  We are

1    going to have a witness --

2         THE COURT:  What do the photographs show in

3    that regard that would help lay a foundation?

4         MR. GURULE:  In that regard, Your Honor, the

5    photographs are actually going to show the corpses

6    of Special Agent Camarena and Captain Zavala side by

7    side in the open field area where they were first dis-

8    covered actually with the blindfold and the gag, and

9    they are going to show the corpses with the bodies

10   bound with the rope bindings and covered with the tarp.

11        And to follow that up, for instance, from the

12   burial shroud in which Special Agent Camarena's body

13   was found, we intend to match that material to material

14   that was actually taken from Lope De Vega.  It is important,

15   obviously, that that burial sheet was around the body.

16   That is the significance of it.

17        THE COURT:  That isn't in dispute.  It has

18   been testified to by other witnesses.

19        MR. GURULE:  Well, I don't know that it has

20   been -- I don't know that it hasn't been disputed or

21   that there is no dispute.

22        MR. LEYVA:  Your Honor, there is no dispute,

23   and if necessary we will stipulate that those are the

24   sheets, that those are the cords, that those are the

25   blindfolds or gags that were found with the body or

6-12

1   on the body.  There is no dispute as to that.

2          THE COURT:  Well, sometimes you tell me that

3   there is no dispute, and your cross-examination suggests

4   otherwise.  If there is no dispute, there is no dispute.

5          MS. LEYVA:  There is no dispute, Your Honor.

6          MR. PANCER:  I don't think a question was asked

7   of the coroner or the person who conducted the autopsy.

8          THE COURT:  There have been areas in which

9   there has been cross-examination inconsistent with the

10  statement that there is no dispute.

11         MS. LEYVA:  Your Honor, in fact there has been

12  clothing that they have submitted photographs of, which

13  we have all agreed that that is the clothing that belonged

14  to that particular body.  There is no dispute that the

15  clothing, the sheets, the bindings were not with the body

16  they say it was with, and I believe that is the purpose

17  of the photographs.

18         THE COURT:  Of course, the other three things

19  that you have said was the purpose of these photographs

20  to ID the victim, that doesn't seem to be in dispute.

21  The victim has been identified by the medical examiner

22  and by fingerprint evidence according to him.

23         The cause of death has been established by

24  the examiner.  The nature of the wounds have been

25  graphically described.

6-13

1    The issue remains whether the foundation for

2  forensic evidence is of such probative value that it

3  is outweighed by the prejudicial fact, and based on

4  what you have said here in court, I am unable to follow

5  the need for these photographs as a foundation for

6  forensic evidence.

7    MR. GURULE:  Well, the Government has not

8  received from defense counsel any stipulation or any

9  request or offer to stipulate on those particular items.

10  These are detailed items.  It is not enough for the

11  defense to come in and say, "Well, gee, we stipulate to

12  all the forensics."

13    Wait a minute.  It is much more complex than

14  that.  We are talking about the burial shroud, and the

15  significance of the burial shroud is number one and was

16  removed from the body.

17    Number two, the carpet fibers found on the

18  burial shroud.

19    Number three, that those carpet fibers that

20  were found on the burial shroud matched carpet fibers

21  that were found in Lope De Vega.

22    Number four, that those carpet fibers match

23  a particular carpet in a particular room within that

24  residence at Lope De Vega.

25    THE COURT:  Well, that is why I suggested the

1   procedure I did with respect to the other two witnesses.

2   If you are going to stipulate to evidence in order to

3   exclude it, then you should set forth the specific facts

4   to which you are willing to stipulate.  You can't do so

5   for some purpose and exclude the evidence unless the other

6   facts, if they are relevant, are also stipulated to.

7           MR. GURULE:  Now, the only thing I would add

8   in addition, Your Honor, is that relative to that par-

9   ticular point, assuming the defense and the Government

10  are able to reach a detailed -- and it will be an extensive

11  detailed stipulation relative to each of the items of

12  forensics evidence, which are numerous -- the Government

13  does not intend that to be likewise perceived as a

14  stipulation relative to the testimony of the forensics

15  experts who are going to be testifying to that particular

16  evidence.

17          The reason for that is to go ahead and say

18  that a carpet fiber is found on the corpse or, say, that

19  a particular hair taken from the body matches a hair

20  found at the house, I think, without further explanation

21  by the expert as to what that means and the significance

22  of the matching characteristics --

23          THE COURT:  We are not talking about fibers.

24  We are talking about these photographs.

25          MR. GURULE:  I understand.  I just didn't

1   want there to be confusion and then have it be misunder-

2   stood that that means the Government is stipulating to

3   FBI expert testimony on the significance and the compari-

4   sons and the opinions relative to that evidence itself.

5          But as to the photos, I think that we could

6   prepare a detailed stipulation and work that out.

7          MS. LEYVA:  Your Honor, with respect to the

8   photographs, we would of course need to see the specific

9   photographs they plan to introduce.  We have seen hundreds

10  of photographs.  We have not been told specifically which

11  photographs they seek to introduce, and I think upon

12  being able to see the photographs --

13         THE COURT:  Then how is it that you filed a

14  motion to exclude them if you don't know which ones they

15  are?

16         MS. LEYVA:  Because there are a lot of photo-

17  graphs of the corpse, Your Honor, which they did tell

18  us they planned to introduce.  Out of all of the photo-

19  graphs, they didn't say, "These two," although they were

20  all pretty graphic and pretty gory.

21         But, Your Honor, with respect to the photographs,

22  if we can reach an agreement, we will certainly file a

23  stipulation and advise the Court of what we are going to

24  stipulate to.

25         One matter that we cannot stipulate to, Your

1   Honor, would be what the expert would testify about.

2   That is something that the expert can do, but what the

3   photographs will show is something we can stipulate to.

4          THE COURT:  I want you to produce to the Court

5   all photographs that you plan to offer into evidence.

6          MR. GURULE:  We will have those here this

7   afternoon, Your Honor.  I will have somebody bring them

8   downstairs as soon as we leave here.

9          THE COURT:  There is a motion by the defendant

10  called a motion for supplemental discovery, which asks

11  the Court to order the Government to provide Brady

12  material, which I certainly don't think is necessary.

13  The Government understands its obligation to provide

14  Brady material.

15          But specifically defendants request that drawings

16  by police artists based on eyewitness descriptions be

17  provided to the defendants, and also they seek the discovery

18  of the identity and address of the police artist.

19          First, is there any such -- are there any such

20  things?

21          MR. GURULE:  There are two drawings that the

22  chauffeur, the disputed witness who was placed under

23  hypnosis, that were prepared based on information that

24  he gave after he was placed under hypnosis.

25          The Government has never maintained that any

1    of these three individuals were the actual, physical

2    abductors of Special Agent Camarena, and these particular

3    composite drawings were the composite drawings of individuals

4    who physically kidnapped Special Agent Camarena.

5          So we maintain the position that we are not

6    saying that these individuals actually committed the

7    abduction, and therefore these composite drawings are

8    of people that the Government is still investigating

9    and hopes to bring to justice and is not Brady, and we

10   think that would improperly interfere with an ongoing

11   investigation relative to these individuals.

12         THE COURT:  Well, you know that the Government's

13   failure to disclose evidence favorable to a defendant

14   who specifically requests it violates the defendant's

15   due-process rights when the evidence is material to

16   guilt or punishment.

17         MR. GURULE:  Certainly, Your Honor.

18         THE COURT:  Now, the Government is not required

19   under Brady to disclose neutral or inculpatory evidence,

20   and the Government should be -- your position is that

21   these are in no way related to the question of the

22   defendants' -- that they are in no way exculpatory?

23         MR. GURULE:  That is correct.  It would be

24   different if the Government were standing here or in

25   opening statement said that there will be evidence to

1  show that any of the three defendants did the actual,

2  physical kidnapping.  We have never maintained that.

3          These composite sketches are of people who

4  the chauffeur has identified as being the physical

5  kidnappers.

6          So the fact that they are not any of these

7  defendants is not inconsistent with our case and would

8  not serve to exculpate them relative to the charges they

9  stand charged with.

10         MS. LEYVA:  Your Honor, contrary to Mr. Gurule's

11  statement, in the supplemental bill of particulars he

12  did state that Mr. Lopez-Alvarez was a lookout or otherwise

13  assisted in the kidnapping.  If this eyewitness has not

14  been able to identify Mr. Lopez-Alvarez, then it certainly

15  is exculpatory.  And just because the Government at this

16  point has not made a statement to the jury that Mr. Lopez-

17  Alvarez was present, the information prior to trial was

18  that that is what they expected to show, and that is what

19  they have filed with their supplemental bill of particulars.

20         That is why, if the composite drawing does not

21  match Mr. Lopez-Alvarez' description, it is exculpatory.

22         MR. GURULE:  Just briefly --

23         THE COURT:  Just a moment.  This motion is

24  denied.

25         The next motion is one filed by the defendants

1   to prevent Agent Kuykendall from testifying at trial to

2   a number of matters.  It appears to me that this is moot

3   since he has already completed his direct testimony and

4   is now being cross-examined.

5           Isn't that right?

6           MS. LEYVA:  Your Honor, if I may, I believe

7   that the Government may be recalling Agent Kuykendall

8   for other matters that he has not testified to on direct,

9   so I would think that this motion is not moot.  We do

10  not know if he will at some point later on in the trial

11  testify as to these matters.  Perhaps that is something

12  that the Government can address.

13          THE COURT:  Well, he has already testified to

14  some of them, hasn't he?  He has testified to Manuel Chavez,

15  for example?

16          MR. GURULE:  That is exactly --

17          THE COURT:  The discovery of Camarena, to the

18  existence of the narcotics enterprise.

19          MR. GURULE:  That is correct, Your Honor, and

20  that testimony has been received by the Court, and the

21  Government --

22          THE COURT:  Why is that an issue here?

23          MR. GURULE:  This witness -- or Agent Kuykendall

24  will not be testifying as to Garciabueno, but I believe

25  that is a separate -- strike that.

1    THE COURT:  I have already ruled on that insofar

2  as whether or not that witness can testify.  It depends

3  upon whether the stipulated facts the Government would

4  need is acceptable to the defendants.  The stipulated

5  relevant facts would substitute for his testimony.  That

6  is the same procedure that we are going to do with

7  Mrs. Camarena.  The defendants are to indicate first what

8  they are willing to stipulate to, and then you are to

9  respond to show what other relevant facts are not covered

10  by the stipulation that requires a presentation of the

11  witness.  If those are not worked out by stipulation, then

12  probably the witness will testify assuming the facts are

13  relevant.

14    We still have this question of the Kastigar

15  hearing.

16    MR. PANCER:  Excuse me, Your Honor.  I am sorry.

17  On this same motion there was --

18    THE COURT:  Which same motion?

19    MR. PANCER:  On the one related to Agent

20  Kuykendall.  He is still going to be back and he is going

21  to testify -- there is going to be cross-examination, plus

22  the Government intends to bring him back to testify as

23  to the facts surrounding the murder and kidnap investigation

24  in Mexico.  So he is not done.

25    He mentioned some things in his grand jury

1   testimony about some random murders and an attack of

2   Agent Knapp's car in Mexico.  I believe the Government

3   does not intend to ask him questions concerning those

4   events.

5           MR. GURULE:  Your Honor, the Government filed

6   an opposition to defendants' motion, and that was filed

7   on July 27, and in the Government's opposition the

8   Government did state that the Government did not intend

9   to elicit from Special Agent Kuykendall any testimony

10  regarding Roger Knapp's car being shot up.

11          THE COURT:  That should be good enough then.

12          MR. GURULE:  And the random murders.  There

13  was murders of two Jehovah Witnesses and murders of

14  Radalat and Walter.  That would not be elicited through

15  this witness.

16          MR. PANCER:  Fine.  Thank you, Your Honor.

17          THE COURT:  Now, on June the 20th the Court

18  held that the Government has proven a prior independent

19  source for all statements except Felix' statement concerning

20  a meeting in Arizona.  So an evidentiary hearing is

21  required in order to assure that the Government has not

22  used this information in its case against the Defendant

23  Felix.

24          The Defendant Felix has filed a proposed order,

25  which states that the Government is prohibited from

1    introducing at trial any evidence related to a meeting

2    in Arizona.  He argues that the Government has stated

3    that it does not plan to introduce such evidence.

4          If the Government is willing to stipulate to

5    the proposed order, then there will not be a need for

6    an evidentiary hearing.

7          MR. GURULE:  As the Government stated early

8    on in its opposition to the Kastigar motion, the Government

9    did not take -- as a matter of fact, that particular

10   subject was so vague and so general, it had no value

11   whatsoever to this investigation.  It was not the basis

12   of any lead in this investigation.

13         The Government does not intend to introduce

14   any testimony that Raphael Caro-Quintero and Jesus

15   Felix-Gutierrez -- and I make that distinction; those

16   two individuals -- attended a meeting in Arizona.

17         THE COURT:  Well, does that take care of this

18   problem?

19         MR. RANDOLPH:  It would seem to, Your Honor,

20   with the exception that counsel is careful to exclude

21   any other persons, and I think the Court will note in

22   the declaration of Jesus Felix that he indicated that

23   there were other people aside from himself at the

24   meeting, and obviously we are concerned that Werner Lotz

25   is going to testify that Jesus Felix attended a meeting

1  in Arizona with Daniel Fowlie and Raphael Caro-Quintero,

2  and that information was obtained from Jesus Felix.

3          If the Government is saying that they will

4  not introduce any evidence relating to the meeting in

5  Arizona, which is what the proposed order says, then

6  I think that will take care of the question of the

7  Kastigar hearing.

8          MR. GURULE:  I thought that is what I just said.

9  I will say it again.  The Government does not intend to

10  introduce any evidence of a meeting in Arizona where

11  the Defendant Jesus Felix was present with Raphael

12  Caro-Quintero or Dan Fowlie or Werner Lotz.

13          THE COURT:  Anyone else?

14          MR. GURULE:  I can't think of any meeting in

15  Arizona, Your Honor, so I would say that that is --

16          THE COURT:  If that is the case, then I don't

17  think we need to worry about a Kastigar hearing.

18          MR. RANDOLPH:  I see, Your Honor.

19          THE COURT:  We have a motion, I believe, here

20  that has not yet been ruled upon, which was filed by

21  Mr. Felix-Gutierrez to preclude any testimony regarding

22  the use by the defendant of the alias Francisco Morua

23  because of late disclosure.

24          MR. GURULE:  I believe that one has been ruled

25  upon, Your Honor.

1  THE COURT:  Did I rule on that?

2  MR. RANDOLPH:  I don't think so, Your Honor.

3  I think what the Court ruled is that I should file an in

4  camera submission as to what the prejudice would be to

5  the defense, and I have done so last week.

6  THE COURT:  You have done that?

7  MR. RANDOLPH:  Yes, Your Honor.  It is a very

8  brief document.  I have a copy here if you don't have

9  one before you.

10  THE COURT:  It is in here.  Just a moment.

11  MR. RANDOLPH:  It is about six pages long,

12  Your Honor.

13  [Pause.]

14  THE COURT:  I have read the in camera submission

15  in support of defendant's motion for sanctions and to

16  exclude this evidence, and the motion is denied.

17  On this last motion, a good deal of this has

18  been ordered already by the Court.  The defendants move

19  the Court to order disclosure of DEA reports of narcotic

20  seizures and the eradication of marijuana fields in

21  Zacatecas and Chihuahua, Mexico.  I believe I ordered

22  that done Friday.

23  MR. GURULE:  You did, Your Honor, and it was

24  disclosed on Sunday, both the Zacatecas and Chihuahua.

25  THE COURT:  And secondly, any debriefings in

1   Mexico of suspects that may contain Brady material;

2   thirdly, the portions of the grand jury testimony of

3   Special Agent James Kuykendall that were deleted from

4   the transcripts; and, fourth, any reports relating to

5   hypnotized witnesses, which I assume the only hypnotized

6   witness was the chauffeur.

7           MR. GURULE:  That is correct, Your Honor.

8           THE COURT:  That has been provided.

9           MR. GURULE:  That has been provided.  We have

10  not been able to find the audio cassette recording, and

11  we continue to look for that.  When we find that or are

12  able to track it down, we will disclose that as well.

13          THE COURT:  And now, on June 6th the court

14  ordered the Government to file in camera any statements

15  or DEA reports involving unindicted co-conspirators

16  in order for the Court to examine the material and

17  determine whether they contain any Brady material.  The

18  Court is still reviewing those at this time.

19          The defendants' objections to the deletion

20  of portions of the grand jury testimony, the Government

21  response that the only matters deleted were locations

22  of DEA offices in Mexico for security reasons, which is

23  appropriate; names of a confidential informant who will

24  testify at trial and his name will be provided along with

25  his statement, I assume.

6-26

1    Is that right?

2        MR. GURULE:  One moment, Your Honor.

3        [Pause.]

4        MR. GURULE:  Your Honor, there is some question

5   whether or not that witness is going to be called by

6   the Government in light of the testimony of Special Agent

7   Kuykendall.  We will make that name available to the

8   defense.

9        THE COURT:  All right.  That is what they

10  requested.  Names of DEA agents and employees working

11  at the U. S. Consulate in Guadalajara and the instructions

12  given to the Grand Jury by the AUSA and the names of

13  witnesses to be called in the future.

14       The location of the DEA offices is not relevant

15  to Kuykendall's testimony, and I see no reason that those

16  should be disclosed.

17       The identity of the confidential informant

18  will be disclosed before he testifies, and since counsel

19  indicates that he will not testify, his identity will

20  be disclosed and is ordered to be disclosed.

21       The names of witnesses who will testify in

22  the future does not relate to Kuykendall's testimony

23  and is not required.

24       So the only issue -- and, furthermore, these

25  reports that I ordered disclosed last Friday cover a

1  good many of these.  Well, the DEA reports that I ordered

2  disclosed last Friday covered Item 1.

3       The debriefings of the Mexican suspects may

4  contain Brady material.  Those are the materials filed

5  in camera which the Court is reviewing and will rule

6  on in the morning.

7       MR. PANCER:  Your Honor, when -- is that forthwith

8  as to the informant's name?  Your Honor has ordered the

9  informant's name to be revealed that was in the Grand Jury

10  testimony.  Is there a time certain that the Government

11  should reveal that?

12       THE COURT:  I intend for it to be disclosed

13  forthwith.

14       MR. PANCER:  Thank you, Your Honor.

15       THE COURT:  Now, on this hypnosis issue the

16  Court can't rule on that, and apparently the Government

17  is not able to lay the required foundation without this

18  tape or transcript of the questioning that took place

19  by the hypnotist in order for the Court to be able to

20  ascertain whether his testimony was a product of his

21  own recollection or a product of suggestion.  That is

22  what we have to do, and if you are unable to find that --

23       MR. GURULE:  What I would ask the Court to do

24  or ask the Court's permission, I would ask the Court

25  to reserve ruling on that to give the Government additional

1    time to try to find the audio tape itself and then be

2    allowed at that time to call that witness out of order,

3    and prior to calling that witness, having the voir dire

4    by the Court at that time.

5          THE COURT:  Well, I think that we couldn't

6    do anything else until that is done.

7          MR. GURULE:  We will continue to look, Your

8    Honor, and as soon as we find it we will come back to

9    the Court and address that issue.

10         THE COURT:  All right.

11         I think it is important that we talk a little

12   bit about what is Jencks Act statements.  The defendants

13   tend to view that rather broadly, much broader than it

14   really is.  The Jencks Act compels disclosure of oral

15   or written substantially verbatim statements adopted by

16   a witness testifying for the Government that relates to

17   their testimony.  That is in 18 U.S. Code 3500.  Only

18   statements of a Government witness that relate to that

19   witness' testimony must be disclosed.

20         It is now well established, however, that

21   individual notes and reports of agents of the Government

22   who testify for the Government made in the course of a

23   criminal investigation are the proper subject of inquiry

24   and may be subject to production under the Jencks Act.

25   Such notes and reports may be a written statement made

1   by said witness and signed or otherwise adopted or approved

2   by him.

3           It is the function of the Court to decide the

4   issue of producibility, that is, whether the notes in

5   question constitute a statement within the meaning of

6   the Act.

7           The entire investigative file is not a statement

8   under the Act.  That is very clear.  It is made clear in

9   the Blackfoot case.

10          Now, after reviewing the Grand Jury transcript

11  of Agent Gonzalez, the defendants make the following

12  discovery request:  DEA reports of searches and seizures

13  in Mexico because such reports may well contain Jencks

14  material.

15          Are there any Jencks Act statements contained

16  in these DEA reports?

17          MR. GURULE:  No, Your Honor.

18          THE COURT:  As I have defined it?

19          MR. GURULE:  No, Your Honor.

20          THE COURT:  Now, there is a request for reports

21  concerning debriefings of suspects in Mexico.  Are those

22  the matters that I have in camera at the present time?

23          MR. GURULE:  Yes, Your Honor.

24          THE COURT:  Now, the third request concerns

25  interrogations and confessions of suspects in Mexico on

1   the basis that these reports may contain Brady material,

2   and these are the statements of eyewitnesses that the

3   Government does not intend to call at trial.  If the

4   Government is in possession of statements made by

5   percipient witnesses who will not testify at trial, then

6   the defendants are entitled to this material.  The Court

7   has already so ruled in conjunction with the Roviero

8   motion.

9           Are there any such statements made by percipient

10  witnesses who will not testify at trial?

11          MR. GURULE:  Some of those, Your Honor, actually

12  fall under the category of suspects that the Government

13  has filed in camera with the Court, and the Government

14  has taken the position that it continues to be an ongoing

15  investigation, and the Government is reluctant to go

16  ahead and disclose the identity of these particular

17  individuals for fear that they will realize that they

18  are the subjects of ongoing U. S. investigations.

19          THE COURT:  Well, this business of ongoing

20  investigation, this investigation has been in progress

21  for three and a half years.  Are you saying that these

22  matters are still being actively investigated?

23          MR. GURULE:  Absolutely, Your Honor, and I say

24  that sincerely to the Court.  We have agents who are

25  still aggressively and actively pursuing leads in the

1   hopes of arresting some of these people in the United

2   States.   DEA feels very strongly about this case and is

3   dedicated -- preserves a strong dedication and commitment

4   to this case to see that these people are brought to

5   justice.

6           Those have been disclosed to the Court.

7           MS. LEYVA:   Your Honor, if I may, with respect

8   to those types of statements by suspects in Mexico,

9   certainly if they have confessed or have been interrogated

10  about the Camarena murder, certainly they know that they

11  are a target of the investigation, and therefore I do not

12  think that is a basis for withholding the disclosure of

13  those reports.   They must certainly know that the

14  Government -- the United States is interested in pursuing

15  any leads.

16          THE COURT:   The final request is for omitted

17  portions of the Grand Jury transcript.

18          What portions have been omitted besides the

19  ones we have already covered?

20          MR. GURULE:   In Agent Gonzalez' testimony in

21  his transcript before the Grand Jury, they were very

22  similar in terms of employees working at the consulate

23  that he identified, other witnesses that actually

24  Joyce Karlin, who was the Assistant United States Attorney

25  who conducted the Grand Jury questioning of this particular

1    witness, may have mentioned, and any instructions given

2    to the Grand Jurors.

3         I would add that there were very few --

4         THE COURT:  All of this material regarding

5    reports concerning debriefings of suspects or interro-

6    gation and confessions of suspects in Mexico, those

7    are all part of the in camera submission that you made?

8         MR. GURULE:  The suspects, Your Honor, the

9    unindicted co-conspirators, yes.  That was the Court's

10   order.  The unindicted co-conspirators have been filed

11   with the Court in camera -- those reports, and some of

12   those reports do include debriefings in Mexico.

13        THE COURT:  There are statements made by

14   percipient witnesses who will not testify at trial.

15        MR. GURULE:  Yes, Your Honor.  I will make

16   the distinction that the Court ordered unindicted

17   co-conspirators.  There are some Mexican confessions

18   of indicted defendants that are not present in this

19   particular case.  For instance, there is a confession

20   statement made by Raphael Caro-Quintero.  There is a

21   confession statement made by Ernesto Fonseca, who is

22   charged in this case, and, I believe, there is one by

23   Espino-Verdin, who is charged in this case as well.

24   The Government does have those statements.

25        THE COURT:  What is your position regarding

1  the disclosure of those statements?

2      MR. GURULE:  The Government's position is that

3  none of those statements tend to -- none of those state-

4  ments are statements where they say that Raul Lopez-Alvarez

5  didn't have anything to do with it.  We are taking the

6  position that they are materially exculpating of any of

7  these defendants.  None of those statements say that

8  Jesus Felix didn't have anything to do with arranging

9  the flight.  None of those say that Raul

10 Lopez-Alvarez didn't participate in the kidnapping and

11 murder.

12      There may be some self-serving statements by

13 various individuals where they deny their own involvement

14 or admit their involvement to one extent or another, but

15 the Government takes the position that that is not Brady.

16 That does not tend to exculpate any of these defendants.

17      MS. LEYVA:  Your Honor, our position with respect

18 to that is, if you have individuals that are admitting

19 that they participated either in the kidnapping or the

20 murder, and they discussed the individuals who did

21 participate and they did not discuss Mr. Lopez-Alvarez,

22 that is certainly exculpatory.  Given that they did

23 discuss who was involved and just because they did not

24 mention that someone was not involved does not mean that

25 it is not exculpatory.  There are a lot of people who

1  would not have been involved, and their names would

2  not have been mentioned.

3          Therefore, our position, Your Honor, is that

4  that would be Brady material, and we are entitled to

5  it.

6          THE COURT:  Well, can you find me some authority

7  to that effect?

8          MS. LEYVA:  I think Brady is the authority,

9  Your Honor.

10          THE COURT:  There may be some specific cases

11  dealing with it.

12          MS. LEYVA:  Your Honor, I will check again,

13  and I will certainly research it, but I believe Brady

14  is sufficient for our position.  I will certainly submit

15  to the Court any other authority that I can --

16          THE COURT:  Well, these statements should be

17  submitted to the Court for in camera review.

18          MR. GURULE:  Fine, Your Honor.

19          MR. RANDOLPH:  Briefly, Your Honor, there is

20  a second basis upon which we should be authorized to

21  receive those statements.  The Government knows by now

22  that these people will not be attending the trial and

23  testifying as witnesses; therefore, they are percipient

24  witnesses to one or more events in this case, and the

25  statements have been turned over to the Court or will

1  be.  Since they will not be testifying and they are

2  percipient witnesses, they fall within the Court's order

3  way back last March that those statements should be turned

4  over to counsel.

5       So I think irrespective of Brady we should be

6  entitled to get those statements.

7       THE COURT:  Well, I want to see them first.

8       Finally, there was a matter, a motion, that

9  was made in chambers last week, and I have reviewed in

10 camera the matters necessary to rule on that motion.

11      It is the Court's view that those should be

12 disclosed to the defense.  That is the order.

13      Now, something was filed here today as a motion

14 in limine, filed by counsel for Mr. Verdugo to exclude

15 from evidence two statements contained in the discovery

16 issued to counsel on Sunday.  One is a statement that

17 the confidential informant is quoted as stating that he

18 heard a comment by one Juvenal Gomez-Barajas to the

19 effect that Rene Verdugo was involved in smuggling mari-

20 juana by helicopter into Arizona, and the other statement

21 is that Rene Verdugo was at a party in the Zacatecas area.

22      MR. PANCER:  Your Honor, --

23      THE COURT:  You made this motion?

24      MR. PANCER:  Yes.  Now, it appears that the

25 Government won't be calling this informant, and one of

1    the grounds of objection as to the first statement was

2    that it would be hearsay if it came in certainly through

3    an agent.  I don't know that the Government intends to

4    try to do that, Your Honor.

5            THE COURT:  Let us find out.

6            Do you intend to try to introduce it as evidence?

7            MR. GURULE:  We do not intend to introduce it

8    as hearsay.  If it were to be introduced, it would not

9    be introduced as hearsay.

10           MR. PANCER:  Fine, Your Honor.  That was the

11   main basis of the objection.  Now, if they are going to

12   call a person who has first-hand knowledge, obviously

13   I would have problems objecting.

14           THE COURT:  Yes.  That takes care of that.

15           Finally, there is a motion filed today, which

16   I assume the Government has not had an opportunity to

17   respond to, but I suggest that it might be easier to just

18   bring these up and discuss them rather than go through

19   the problem of filing motions.

20           Defendant Verdugo here requests that he be

21   allowed to review any reports that detail or reveal the

22   names of individuals who have major responsibility in

23   what the Government refers to as the Raphael Caro-Quintero

24   organization.  The Government has offered to supply these

25   reports, but a  time certain has not been set for the

1    delivery of the reports, and the request is made that

2    the Court order the reports to be made available forthwith.

3         Do you know about this?

4         MR. GURULE:  Well, I do, but I think this par-

5    ticular statement in here is a little broader certainly

6    than what I had responded to, and it appears that

7    Mr. Pancer is taking the position that the Government

8    stated in its opening statement that Rene Verdugo was

9    a right-hand man of Caro-Quintero.  Therefore, they want

10   any and every report of anyone who has a position higher

11   up in the Caro-Quintero organization, and I think that

12   particular position is extremely broad.  I think that

13   if it turns out that Rene Verdugo was the left-hand man,

14   not the right-hand man, or somebody else was at the same

15   level as Rene Verdugo on the distribution end -- and

16   I want to make a distinction between distribution and

17   cultivation.  The Government is taking the position that

18   he was a primary marijuana distributor for the

19   Caro-Quintero organization.  That is not materially

20   exculpatory of the defendant.

21        If somebody else was distributing just as

22   much as he was or a little more than Rene Verdugo was,

23   but, nevertheless, Rene Verdugo was distributing tons

24   and tons and tons of marijuana on behalf of the Caro-

25   Quintero organization, the Government shouldn't have

1    to follow this fishing expedition that Mr. Pancer is --

2         THE COURT:  Well, that is what it seems to me

3    to be, is a fishing expedition based on a statement made

4    by counsel in his opening statement, which is not evidence.

5    It is up to them to connect your client to this organi-

6    zation, and the evidence that they present will determine

7    the degree.  Whether he is a right-hand man or not, that

8    doesn't mean anything.

9         MR. PANCER:  Well, here is the thing, Your Honor.

10   If what the Government is saying is, all we are going to

11   do is put on evidence as to what Rene Verdugo did, and

12   we are going to say that that is enough to argue to the

13   jury that therefore he had to have known what was going

14   on, that is one thing.

15        But when they say they are going to categorize

16   him in the eyes of the jury, which is what they intend

17   to do.  They intend to argue to the jury, as they have

18   said in opening statement, that he was the right-hand

19   man, the number one man, then, Your Honor, if they have

20   information that other people really were the right-hand

21   man, the number one man, on an equal level with

22   Rene Verdugo or above, then clearly, Your Honor, if I

23   had those reports, I would argue to the jury that this

24   isn't the number one man.  It is this other person who

25   is identified in the Government's reports.

1    So, Your Honor, in that sense it is clearly

2 Brady material because it is material to our defense,

3 and I can represent to the Court that we would introduce

4 it as evidence of anybody who really was the number one

5 man.  It certainly is not Rene Verdugo, Your Honor.  We

6 would like to introduce evidence to the jury that --

7    THE COURT:  It is not an element of a crime

8 that they prove that your client was the number one man

9 or the number two man.  They do not have to do that.

10 It is not necessary.  That is not part of the case.

11 You do not have to disprove that he was the number one

12 man.

13    MR. PANCER:  Your Honor, I believe I do to

14 win this case.  If the jury thinks that he is the number

15 one man, this case --

16    THE COURT:  Winning the case is not a criteria

17 for whether or not you are entitled to discovery.

18    MR. PANCER:  No.  It is whether or not it is

19 exculpatory according to Brady.  According to Brady,

20 Your Honor, if it will materially assist the defendant

21 and tend to exculpate him, I believe we have a right

22 to it; and I tell the Court that this information is

23 material to the defense of my client, and I need it

24 to put on his defense.  Your Honor, if it wasn't, the

25 Government would give it to me.  If it wasn't going to

1   help me, then they would have no problem with it.  But

2   it will help us with our defense, and it will tend to

3   exculpate my client, Your Honor.

4           THE COURT:  This motion is denied.

5           Now, with respect to the motion that we dis-

6   cussed in chambers last week, I expect counsel to live

7   up to the promises of their words stated in chambers and

8   their assurances.

9           MR. PANCER:  We will, Your Honor.

10          MR. RANDOLPH:  Yes, Your Honor.

11          THE COURT:  I think that is all.

12          MR. PANCER:  Your Honor, there was one matter

13  that came up at the end of Mr. Gonzalez' testimony.  If

14  you will recollect, Mr. Tarlow found out that Agent

15  Gonzalez relied on his reports when he said that

16  Felix Gallardo worked with Raphael Caro-Quintero.  He

17  said that they did a lot of joint operations, and this

18  was in order to -- I am not exactly sure what the purport

19  was of his testimony; I can only surmise.

20          Anyhow, Mr. Tarlow said, "Well, is that based

21  on reports?" Mr. Gonzalez basically said, "Yes."

22  Mr. Tarlow said, "I'd like those reports."

23          Your Honor said, "Well, if you are making a

24  request for production of records, now isn't the time to

25  do it."

6-41

1    I would think now must be the time to do it.

2  Your Honor, we would like the reports that Agent Gonzalez

3  said he relied on in his testimony in which he gave

4  certain conclusions to the jury about the relationship

5  of Miguel Felix Gallardo to Raphael Caro-Quintero.

6    THE COURT:  Are there any such reports?

7    MR. CAMPOS:  Well, Your Honor, --

8    THE COURT:  First of all, I don't recall whether

9  the witness said that.

10    MR. CAMPOS:  Your Honor, what he said, and

11  Mr. Pancer has it slightly wrong, was that he relied on

12  the normal things that agents do, which were debriefings

13  of informants, direct evidence that he himself obtained

14  in terms of other debriefings, and I think he said that

15  there might be some reports as well.

16    In any event, this whole issue is sort of a

17  collateral issue, Your Honor, that they are trying to

18  deal with.  They are basically saying that there is

19  another trafficker out there besides Caro-Quintero, and

20  somehow this other trafficker, because he participated

21  in some way, exculpates their clients, and that has

22  nothing to do with the situation.  That is not true at

23  all.

24    Because some other trafficker might have a

25  motive to kill or to retaliate against Agent Camarena

1   doesn't mean that Caro-Quintero in the situation that

2   we have here in this case did not have the motive, and

3   that is of course what the Government's burden is, and

4   that is what the Government's case is all about.

5          So I don't think whether this particular individual,

6   Felix Gallardo, or Trafficker X or Trafficker Y or

7   Trafficker Z down the line -- I mean, where do we stop?

8   I don't think this is justified in terms of receiving

9   reports without any more showing of materiality.

10         THE COURT:  Well, you have alleged an enterprise

11  in this case, and you have tried to show the connection

12  and relationship between this Gallardo and the other organi-

13  zation, which you contend is the organization responsible

14  for the kidnapping and murder in this case.

15         MR. CAMPOS:  Well, we responded to that --

16         THE COURT:  The defendants have some interest

17  in showing that it may have been some other organization.

18  You have to then overcome that and try to show that these

19  people did business together and were tied together and

20  therefore should be deemed part of the same organization.

21         Now, the defendants are asking, what is the

22  basis for this conclusion?  You said that the witness

23  has stated that the basis are the usual things that

24  agents rely on, including reports, and I asked if there

25  were any reports that would establish the relationship

1   between these two.  Are there?

2          MR. CAMPOS:  I think there are, Your Honor.  As

3   I stand here before the Court I can't represent to the

4   Court that I have five or six or one or two or anything

5   particularly in mind, but it is my understanding that

6   there are reports of joint activity.

7          THE COURT:  Well, you know, if the Court knows

8   what is going on in these cases -- and frankly, I don't

9   like to be in the middle.  The defendants are asking too

10  much, and I know the reason.  The Government doesn't want

11  to give things for the same reason or other reasons.  But

12  what I am trying to do here is provide the necessary

13  objectivity, but I don't want this to be going on through-

14  out the trial, which apparently it is going to.  There

15  has to be a time when it is over with, and you put on

16  your case and let the jury decide it.

17         If there are reports of that type, then you

18  should provide them to the Court to review in camera.

19         MR. CAMPOS:  Certainly, Your Honor.

20         MR. PANCER:  Another ground for turning over

21  the reports, of course, is that this is something that

22  the witness reviewed prior to testifying.

23         THE COURT:  I didn't hear that.

24         MR. CAMPOS:  That was not established in the

25  testimony.

6-44

1    MR. PANCER:  Well, the agent is here.  Possibly
2    we could call him, Your Honor.  If it wasn't established,
3    I think we should find out and he is present in court.
4    THE COURT:  Submit the reports to the Court.
5    MR. GURULE:  We will have those for the Court
6    in the morning, Your Honor.
7    THE COURT:  All right.  We will adjourn.
8    MR. RANDOLPH:  Thank you, Your Honor.
9    [Proceedings concluded.]
10    I hereby certify that the foregoing is a correct
11    transcript of the proceedings had on the record
12    in the above-entitled matter.
13
14    _Velma B. Thomas_          _2/17/89_
15    OFFICIAL REPORTER            DATE
16
17
18
19
20
21
22
23
24
25