UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

HONORABLE EDWARD RAFEEDIE, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA, ]
]
PLAINTIFF, ]
]
VS. ] NO. CR 87-422(A)-ER
]
JESUS FELIX-GUTIERREZ, ]
RAUL LOPEZ-ALVAREZ, ]
RENE MARTIN VERDUGO-URQUIDEZ, ]
ET AL., ]
]
DEFENDANTS. ]

FILED
CLERK, U.S. DISTRICT COURT
JUN 21 1988
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

MONDAY, JUNE 6, 1988

10:00 A. M.

ENTERED ON COURTRAN
JUL 28 1988

Title 28
Copy

VELMA B. THOMAS, CSR, RPR
OFFICIAL COURT REPORTER
406 U. S. COURT HOUSE
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA 90012
(213) 629-4874
CSR NO. 2683

246

APPEARANCES:

FOR PLAINTIFF:

ROBERT C. BONNER
UNITED STATES ATTORNEY
ROBERT L. BROSIO
ASSISTANT UNITED STATES ATTORNEY
CHIEF, CRIMINAL DIVISION
JIMMY GURULE
ASSISTANT UNITED STATES ATTORNEY
MAJOR NARCOTICS SECTION
ROEL CAMPOS
ASSISTANT UNITED STATES ATTORNEY
1400 UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA 90012

FOR DEFENDANT JESUS FELIX-GUTIERREZ:

OVERLAND, BERKE, WESLEY, GITS, RANDOLPH & LEVANAS
BY: DONALD C. RANDOLPH, ESQ.
2566 OVERLAND AVENUE
SEVENTH FLOOR
LOS ANGELES, CALIFORNIA 90064

BARRY TARLOW, ESQ.
9119 SUNSET BOULEVARD
LOS ANGELES, CALIFORNIA 90069

FOR DEFENDANT RAUL LOPEZ-ALVAREZ:

PETER M. HORSTMAN
FEDERAL PUBLIC DEFENDER
BY: YOLANDA M. BARRERA
CHIEF DEPUTY FEDERAL PUBLIC DEFENDER
ELSA LEYVA
DEPUTY FEDERAL PUBLIC DEFENDER
SUITE 1503, UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CALIFORNIA 90012-4758

FOR DEFENDANT RENE MARTIN VERDUGO-URQUIDEZ:

MICHAEL PANCER, ESQ.
625 BROADWAY
SUITE 1135
SAN DIEGO, CALIFORNIA 92101

MORE

APPEARANCES:   [CONTINUED]

    FOR DEFENDANT RENE MARTIN VERDUGO-URQUIDEZ:

        JUANITA R. BROOKS, ESQ.
        108 IVY STREET
        SAN DIEGO, CALIFORNIA  92101

    OFFICIAL SPANISH INTERPRETERS:

        BARBARA MORALES
        CAL NORMAN

# I N D E X

| MOTIONS | PAGE |
| --- | --- |
| By Defendant Gutierrez: Second Supplemental, for Discovery, and Defendant Verdugo for Discovery of Brady Material | 3 |
| Court's Ruling | 25 |
| By Defendant Gutierrez: Disclosure of Independent Source; Request for Evidentiary Hearing | 28 |
| Court's Ruling | 39 |
| By Defendant Gutierrez: Clarification of Discovery Order | 40 |
| Court's Ruling | 43 |
| By Defendant Gutierrez: To Sever | 43 |
| Court's Ruling | 49 |
| By Defendant Gutierrez: To Disclose All Prior and Future Ex Parte Documents Filed by the Government | 49 |
| Court's Ruling | 50 |
| By Defendant Verdugo: To Dismiss for Violation of Extradition Treaty | 52 |
| Court's Ruling (Motion Continued) | 58 |
| By Defendant Verdugo: For Pretrial Hearings re Authenticity and Admissibility of Tape Recording and the Accuracy of Plaintiff's Proposed Description | 61 |
| Court's Ruling (Motion Continued) | 66 |
| By Defendant Verdugo: Compel I.D. of Informants and Foundational Information | 68 |
| Court's Ruling | 72 |
| By Defendant Verdugo: Submit Questionnaire to Prospective Jurors | 74 |
| Court's Ruling | 80 |
| By Defendant Verdugo: Compel Voice Exemplars | 81 |
| Court's Ruling | 81 |
| By Defendant Verdugo: Intention to Use Evidence | 84 |
| Court's Ruling | 84 |
| By Defendant Verdugo: Discovery of Grand Jury Proceedings | 90 |
| Court's Ruling | 91 |

I N D E X [Continued]

| MOTIONS | PAGE |
|---|---|
| By Defendant Verdugo: Suppress Evidence and Request for Evidentiary Hearing | 92 |
| Court's Ruling | 92 |
| By Defendant Verdugo: For Depositions | 96 |
| Court's Ruling | 101 |
| By Defendant Verdugo: For Severance of Defendants and Counts for Trial | 110 |
| Court's Ruling | 114 |
| By All Defendants: Bills of Particulars | 114 |
| Court's Ruling | 120 |
| By Defendant Gutierrez: For Sanctions or Alternatively for a Continuance | 135 |
| Court's Ruling | 137 |

LOS ANGELES, CALIFORNIA, MONDAY, JUNE 6, 1988, 10:00 A. M.

THE CLERK: Item No. 5, Criminal 87-422(B), United States of America vs. Rene Martin Verdugo and others.

Counsel, please state your names for the record.

MR. RANDOLPH: Good morning, Your Honor. Donald Randolph on behalf of Jesus Felix-Gutierrez.

MR. TARLOW: Good morning, Your Honor. Barry Tarlow also appearing on behalf of Mr. Felix.

MR. RANDOLPH: Also with me is an associate, Mary O'Keefe.

MR. GURULE: Good morning, Your Honor. Jimmy Gurule and Roel Campos appearing on behalf of the United States.

MS. LEYVA: Elsa Leyva and Yolanda Barrera appearing for Raul Lopez-Alvarez.

MR. PANCER: Good morning, Your Honor. Michael Pancer and Juanita Brooks appearing for Rene Verdugo, who is not present. His appearance has been waived. He is in custody in San Diego.

THE COURT: All right. Well, we have a number of motions here filed by the Defendant Verdugo as well as by the Defendant Felix-Gutierrez and other motions which have been joined in by other defendants. I have read and considered each of the motions that has been filed as well as the opposition. What I plan to do, since I

don't intend to devote the entire day to argument on this case and I assume that by your motions you have put your best foot forward by your motions, I will announce my tentative rulings on the motions and the reasons for these rulings, and then I will give you an opportunity to respond. I don't want you to be reiterating what you have stated in writing because it has been carefully considered.

We will take these in the order in which they have been filed here. The first motion is a motion by the Defendant Felix-Gutierrez called a Second Supplemental Motion for Discovery, and this is a motion that also deals with the Defendant Verdugo for discovery of Brady material, which has been joined in by all defendants.

I have to say that some of these motions constitute an abuse of the Court because they seem to be rehashing and reiterating matters which we have already gone over before and have previously been decided. They have been disguised to appear to be something else, but they really address the same issues in some instances that have been addressed before. This Court has held two hearings on discovery matters, and the discovery motion deadline has passed. The Defendant Verdugo files his motion as a Motion for Discovery under Brady.

Defendant Felix files his motion as a Second Supplemental Motion, thereby attempting, I assume, to have the filing relate back to the original discovery motion.

The Government states that it is well aware of its continuous duty under Brady and will continue to comply with those requirements.

The Defendant Verdugo's Motion for Discovery of Reports, Memoranda, and Other Documents Prepared by Camarena and relating to undercover contacts by Camarena in the Republic of Colombia or elsewhere and reflecting a motivation on behalf of individuals in Colombia for retaliation against Camarena, the Government's response to this request indicates that they know of no such documents. If there are such documents and they qualify as Brady material, then they should be provided, and the Government has advised the Court that it is well aware of its duty and will continue to comply with those requirements.

The second request is for all reports, memos, et cetera, relating to undercover contact by Camarena, whether or not such reports are prepared by Camarena, relating to suspects in Colombia or elsewhere with a motive to retaliate against Camarena. Again, the Government's response is that no such documents are known to exist.

Request No. 3 requests all reports, et cetera, in the possession of the U. S. Government reflecting the identity of suspects with a motive for retaliation against Camarena.

Why is it necessary to file this? Can you tell me why you filed these requests?

MR. PANCER: Oh, yes, Your Honor. I can tell the Court that under the law of Brady as we understand it, it is absolutely necessary that we make a specific request for what we consider to be Brady information; and if we don't delineate exactly what the Brady information might be, and the Government comes across it, then they don't have to give it to us.

Also, Your Honor, we may disagree with the Government about what is Brady information. While they understand their case from a particular position and a particular point of view, they don't understand the defense point of view. So it is absolutely incumbent upon us, Your Honor, to be specific in our Brady request, and that is just what we have done, and I don't think, Your Honor, that we could have done anything different and effectively represented our client.

We are not trying to rehash anything that has already been decided, Your Honor. As I understand it, certainly what Your Honor is referring to now is a new

matter, and, Your Honor, quite candidly, if the Court will look at the Government's response to that specific item, you will see why we have to be so specific. The item that Your Honor is referring to is our request for reports that could give us information as to other persons who are suspects in the crime, and the Government in their response says explicitly that the only people who were suspects in the crime about whom they have reports are those persons named in the indictment.

Now, Your Honor, as a matter of fact, that is absolutely not true. There are other persons who we know that the Government suspects as being involved in this crime and who I believe they have memoranda and reports about, who are not named in this indictment. There are persons who are named --

THE COURT: Well, just a moment. You have answered my question.

MR. PANCER: Thank you, Your Honor.

THE COURT: Question 3 is for all reports in the possession of the U. S. Government reflecting the identity of suspects with a motive for retaliation against Camarena. The Government denies any such information is known to the Government at this time and suggests that this request is overbroad in any event. But they deny having any such information now.

No. 4 requires all reports, et cetera, in the possession of the United States reflecting that Camarena was not acting in the official performance of his duties in the City of Guadalajara or that he performed his duties in an improper manner, and the response again is that there was no such documents or any such information.

Requests 5 and 6 address all reports relating to the joint participation of U. S. law enforcement agents with Mexican law enforcement agents in the investigation of the case, in the kidnapping of Defendant Verdugo, and in the kidnapping of Matta Ballesteros and other suspects in this case.

The Government states that internal memoranda are not discoverable and that there is no authority for this request.

It is the Court's view that joint participation of the United States and a foreign country is only relevant where a defendant seeks to suppress evidence based upon an unconstitutional search and seizure. The Fourth amendment applies to searches by foreign authorities in their own countries only where the United State's participation in the investigation is so substantial that the action is a joint venture between U. S. and foreign officials.

In this case Verdugo argues that such evidence

can be used to prove governmental misconduct and that Verdugo was illegally seized in Mexico. Brady held that the due process clause requires the Government to disclose evidence favorable to an accused where the evidence is material either to guilt or punishment. Brady vs. Maryland is of course 83 Supreme Court. The evidence requested in this motion is not exculpatory; rather, it appears to be collateral. The discovery motion cut-off date has passed and this motion could have been made prior to the cut-off date. Defendant has failed to state any authority for granting the motion.

Now, in Requests 7 through 11 the defendant requests all Department of Justice correspondence relating to the transfer of the Grand Jury investigation and the indictment from the Southern District of California to the Central District, including all documents in the possession of the U. S. Attorney's Office in the Southern or Central District of California, the District of Columbia, or the Department of Justice in Washington. The documents are sought in order to support the defendant's claim that the case was transferred to this district because the Government was dissatisfied with Judge Irving's rulings in the Southern District.

Well, first, the Government says it is not aware of any such documents. Second, if there are any

such documents, the defendant would not be entitled to internal documents reflecting governmental policy or strategy.

It is my view that this request should be denied for the following reasons: The defendant must produce some evidence tending to support its claim that its due process rights have been violated due to governmental forum shopping. The defendant points to the fact that the Grand Jury investigation in this case was transferred from the District of Columbia Grand Jury to the Southern District of California, and the indictment was returned in this district after Judge Irving of the Southern District granted a motion to suppress. The defendants further point to the Government's motion for a low-numbered transfer to Judge Rymer as evidence that the Government was attempting to have a particular judge decide this case.

There is a serious question as to whether defendants in fact -- the law is that the only time a defendant's due process rights are violated by forum shopping, if at all, is where the choice of forum is outcome determinative. That is, there is a prejudgment in the case and a determinative judgment will be made in the forum which is said to be resulting from forum shopping.

In this case the prosecution's choice of forum

has no effect on the substantive law to be applied in the case. Moreover, the Government has indicated it is not aware of any such documents. When the Court rules upon defendant's Motion to Dismiss pursuant to improper forum shopping, it will consider defendant's Request for Discovery. However, if the facts alleged do not give rise to relief, then the discovery issue is moot. This business about low-numbered transfer, which is required by the local rules, is nothing at all sinister, and it is the Government's responsibility to file a low-number request when it is believed that the case is related to another case.

Now, Items 12 and 13, Disclosure of Identity of Other Suspects in the Camarena Investigation, this is a matter that will be covered in the Motion for the Bill of Particulars.

Defendant Gutierrez' Supplemental Motion for Discovery. The defendant requests evidence reflecting the involvement of Matta Ballesteros and Jose Contreras-Subias in the murder of Agent Camarena. The defendant argues that this information is Brady material. The defendant argues that the information is favorable to the defendant because newspaper stores have reported that the Government believes that Matta Ballesteros' drug ring planned and carried out the murder of Camarena.

Thus, there may be evidence exonerating Caro-Quintero, and therefore Gutierrez, because he is charged with an aider and abettor.

The Government states that it is not aware of any Brady information at this time.

The Court's point of view is that the Government has acknowledged its obligation under Brady and therefore must provide information favorable to the defendants. However, if there is no such information at this time, it can be inferred from this response that evidence that Matta's alleged crime organization was involved in the kidnapping and murder of Camarena does not indicate that Caro-Quintero's alleged crime organization was not involved. If there is such information available, then the Government must carry out its obligation under the Brady case.

That would be the intention of the Court with respect to this Motion for Discovery.

MR. RANDOLPH: May I respond briefly, Your Honor.

THE COURT: Very briefly.

MR. RANDOLPH: First I assume -- the Court didn't mention that Felix Gutierrez' motion fell in the category of being filed late, and I think the Court probably took note of the fact that the article to which

we made reference was dated April 7th, and we filed the motion within a few days thereafter.

I think the Court is correct that the Government has stated they do not have any Brady material, but Felix is in a different category than any other co-defendants. In order to prove Felix guilty, the Government must first prove that Caro-Quintero is guilty of the murder.

In the article which we cited and attached as an exhibit to our motion, the Government states as follows, and I am quoting:

> "U. S. Intelligence points to him (Matta), if not for the actual murder, then for the planning and direction of it. . . that it was Matta's Padrino drug organization in Guadalajara" -- that was involved.

In the indictment before this Court, my client is alleged to have been a member, not of the Matta Padrino drug organization, but of the Caro-Quintero narcotics enterprise. These are two separate and distinct organizations, the defense believes, if indeed they exist at all.

And to the extent the Government has information, or as they say in the newspaper article by the Government's

spokesmen U. S. Intelligence that it was Matta and his organization that was responsible, then that is Brady material, Your Honor, because it would be exculpatory of Mr. Felix; if it was Matta's organization that was responsible and not Caro-Quintero unless it is the Government's position, as some people laughingly believe in the public, that every drug organization that has any name whatsoever in Mexico is somehow responsible and that they were all focusing on this incident at once.

THE COURT: The quote that you gave there states he either caused or directed the murder of Camarena.

MR. RANDOLPH: It says, "if not for the actual murder," Your Honor. That is the quote I am focusing on.

THE COURT: All right. If not for the actual murder, what else?

MR. RANDOLPH: Then for the planning and direction of it.

THE COURT: All right. Planning and direction of it.

MR. RANDOLPH: Yes, sir. If the Government has information, which it appears they do, in their intelligence that it was Matta who was involved in any or all of these things, that information would be Brady material as exculpatory of Felix.

THE COURT: It isn't exculpatory if this fellow

directed the murder and it was done by the other people.

MR. RANDOLPH: If indeed they are including Caro-Quintero as being part of Matta's drug organization, the Padrino drug organization in Guadalajara, and if the Government is intending to prove that Caro-Quintero and Matta's Padrino drug organization were one and the same, and they have evidence of that fact, then it would be less exculpatory.

However, Your Honor, that is not the truth; and if the Government has information that Matta's organization is over here and Caro-Quintero's is here, then you have Brady material.

THE COURT: Do you have any such information?

MR. GURULE: No, Your Honor. If either Matta Ballesteros or Contreras-Subias were to be indicted in connection with the murder of the Special Agent Camarena, they would be indicted in this indictment or a superseding indictment and would be charged as co-conspirators.

MR. RANDOLPH: Let me address that, Your Honor.

THE COURT: Well, is there any need to?

MR. RANDOLPH: Yes.

THE COURT: Why?

MR. RANDOLPH: Your Honor, we have a new phrase that has become apparent in the 1980's, and especially in 1988. That is deniability. What apparently

is going on is that people who are investigating Matta in Washington, D. C., and are making statements that he is responsible for the death of Camarena are withholding either by choice or by design information from Mr. Gurule so that he can stand up and say, "Your Honor, I don't know anything about Mr. Matta being responsible for the death of Camarena." And he can look Your Honor in the eye and say that that is true.

We have one Government, Your Honor, and just because Washington, D. C. believes that Matta is the guilty party, and Mr. Gurule believes that Caro-Quintero is, that is Brady material within the hands of the Government, and we should be entitled to that, and the Government should have to make a submission to this Court that they have no information whatsoever that the Government, the United States Government, not Mr. Gurule, that this statement that their representative made to the press in Washington, D. C., has any truth to it whatsoever.

I think that is the minimum of what Brady should require.

THE COURT: All right.

MR. PANCER: Your Honor, may I inquire. Your Honor has given some tentative rulings, and I understand that Your Honor doesn't want a great deal of argument on the tentative rulings. I don't know what little argument

Your Honor wants. We would like to offer argument in response to the Government's motions. Mr. Randolph has argued, and I have some words to say on a related subject.

THE COURT: Well, keep in mind -- you know, we were going to finish these, I hope, by noon today. Keep in mind that the Court has carefully considered your best arguments already that are contained in the documents which you have filed. So if you are just going to reiterate those, it serves no purpose. If you have something new that should be considered, I would be glad to hear it.

MR. PANCER: All right. What I have is by way of response to their motions, Your Honor, and if now would be an appropriate time to go to at least one of your tentative rulings, I would like to do it now, Your Honor.

THE COURT: Which one?

MR. RANDOLPH: Before we get sidetracked, I'd ask the Court to make an order that the Government tell the Court whether they have any information that Matta was the one who perpetrated the crime. They can answer "yes" or "no," but as long as they are speaking for what they know here in Los Angeles and for what the United States Government knows at this time.

THE COURT: What about that?

MR. GURULE: Well, the question -- the critical

2

question is not whether Matta committed the crime but whether Caro-Quintero didn't commit the crime, whether this other organization independent of the Caro-Quintero organization committed the crime, and as to that question the answer to that is no. The Government has no information that would undercut the indictment that the Government has filed alleging that the Caro-Quintero organization and members of the Caro-Quintero organization directly participated and caused the kidnapping and murder.

THE COURT: Does the Government have any information that this other man, Matta Ballesteros, was involved in that murder?

MR. GURULE: There is some information that he may have participated along with members of the Caro-Quintero organization, and that is why my earlier statement, Your Honor, was that if in fact Matta Ballesteros were to be indicted -- if there were sufficient evidence, which at this point the Government is not maintaining there is, he would be indicted in this indictment in a second superseding indictment as a co-conspirator, not in a separate indictment.

THE COURT: Why shouldn't the information that you have be provided to the defendants?

MR. GURULE: Because it is an ongoing investigation at this point in time, Your Honor, and there are

other individuals -- the name Contreras-Subias has also come up. It is an ongoing investigation, and the Government feels that to go ahead and disclose that information would undermine this ongoing investigation as to those two individuals.

And the Government further maintains that it is not Brady because it does not in any way undercut Jesus Felix-Gutierrez' involvement as an accessory after the fact. It does not in any way tend to undercut the Government's position or the Government's theory in that respect.

MR. RANDOLPH: The defense in this case will be, Your Honor, not only did Jesus Felix not aid and abet Caro-Quintero, but that Caro-Quintero himself did not commit the crimes he is accused of. We submitted last week a declaration by Caro-Quintero under oath to that effect.

MR. GURULE: That should be dispositive.

MR. RANDOLPH: Excuse me, Your Honor. Our defense will be that other persons committed this crime, not Caro-Quintero. To the extent that the Government now has information that indeed other persons committed this crime, that is Brady material. That is the defense of the case.

THE COURT: Well, the Government is ordered to

submit to the Court in camera the information it has regarding these other people for consideration as to whether or not it should be disclosed.

MR. RANDOLPH: May that be within ten days, Your Honor.

THE COURT: That should be within five days.

MR. RANDOLPH: Thank you very much.

MR. PANCER: If I may, Your Honor. As I said, my remarks are related to what was just being discussed.

If the Court will recall, when we asked for No. 3 in our discovery motion, that was memoranda and reports dealing with others with motives or others who are suspects in the Camarena murder, and the Government's response, Your Honor, was that all of the suspects are named in this indictment.

Now, what the Court has just heard is that that statement that the Government made in its motion is in fact not true, that Mr. Ballesteros apparently is a suspect, and it was a newspaper article that prompted us to make that specific discovery request.

Again, the Government states in their response that there are no other suspects in the response to the discovery motion, but in their response to the severance motion, on page 12, the Government states:

"Furthermore, the Government

maintains that numerous other individuals who have yet to be indicted are suspects in the kidnapping and the murder."

Now, Your Honor, when they respond to one motion, they say there are no other suspects, other than named in the indictment; and when they are responding to another motion, they say that there are other suspects.

I think, Your Honor, if we just speed through these motions, we will not hold the Government accountable at least to a consistent position, whether it is right or wrong.

Your Honor, I would ask that all other suspects, all reports related to other suspects be turned over to the defense.

The way Mr. Gurule would defend this case, he wouldn't consider it Brady material. The way we are going to defend this case, it is Brady material. We are going to use it in our defense, and we don't have to allow the Government to decide the nature of our defense or to decide what is Brady material, and I would ask, Your Honor, that the reports, considering as they state in response to our severance motion that numerous other individuals are suspects, be turned over to the defense, Your Honor.

THE COURT: What about that?

MR. GURULE: Briefly, Your Honor, in a sense what Mr. Pancer is asking for is information or reports that the Government has regarding unindicted co-conspirators. The subject is Brady, and the legal authority for such a request is Brady. Now, if there are unindicted co-conspirators, that in and of itself does not constitute Brady material, and Mr. Pancer has not set forth or articulated why that would constitute Brady material.

Now, in the Bill of Particulars the Government has responded to that specific request, the disclosure of unindicted co-conspirators, and that is discussed at length in the Government's response relative to that. It is the Government's position that other unindicted co-conspirators does not constitute Brady.

If there was somebody else who was driving the vehicle that was used to kidnap Special Agent Camarena and that individual was not named in the Government's second superseding indictment, the fact that he is not named as an unindicted co-conspirator does not constitute Brady material, and there is no proffer, there is no specific or reasonable argument in support of that. Again, it is just a blanket fishing-type expedition.

MR. PANCER: First, Your Honor, we have to deal with their response in which they say that there are no other suspects and there are no reports. First I think

we have to find out if there are other suspects and there are other reports. I can think of a number of ways in which that information would be Brady, but first we have to get to the threshold information.

U. S. vs. Bibero allows the defense to decide what is Brady in terms of how it intends to present its case. I am not saying that every single one of those reports will turn out to be Brady. Your Honor, given the long statement that was taken by one of the co-defendants in this case, if there are other suspects, that could well undermine that statement which the Government intends to try to introduce in this case to prove some of the elements in this case.

But, Your Honor, I think first we have to find out if there are such reports. In that regard, Your Honor, I have discussed with Mr. Gurule the statement by Mr. Dougherty, the spokesman for the Department of Justice, in the newspaper that Mr. Ballesteros was a suspect. First I was told that that information was not correct, that he was not a suspect, that further checking would be done. Upon further checking Mr. Gurule told me much what he has told the Court here today, that if he is a suspect, he is a suspect along with and not in any way inconsistent with the Caro-Quintero organization.

I asked then that we have an affidavit by

Mr. Dougherty or have Mr. Dougherty here, and I understood that something like that was going to happen, either to have an affidavit by Mr. Dougherty stating on what reports he relied when he made his statement to the papers that Mr. Ballesteros was a suspect or an affidavit to the effect that there were no reports; and if none of that was going to happen, we wanted him here so he could explain to Your Honor why he slandered Mr. Ballesteros in the press of this country by saying he was a suspect.

I don't know if an affidavit is here. I would inquire through the Court if the Government intends to follow through on that or a representation that they were going to obtain something for the defense in writing.

THE COURT: Did you say that you would?

MR. GURULE: What I said that I would do is contact Mr. Dougherty, which I have done, in an attempt to put together a declaration. I have not been able to put together a declaration simply because of the time constraints relative to attempting to get in the Government's opposition. That declaration could be provided.

I would detail to the Court that based upon my conversation again with Mr. Dougherty, that the Government's position remains the same, that there is nothing inconsistent with Mr. Matta Ballesteros being a suspect in this case and the indictment which the Government has filed

with the Court. Again, if he were to be indicted, he would be indicted as a co-conspirator in this case under the same theory.

THE COURT: What if he wasn't to be indicted?

MR. GURULE: If he wasn't to be indicted?

THE COURT: Yes.

MR. GURULE: Basically that would mean that the Government simply did not have enough evidence to prove the crime against him.

THE COURT: Aren't these people entitled to know what the evidence is that you have against him?

MR. GURULE: Not if it is not Brady, not if it is not material, and that is what the United States Supreme Court in Brady has defined or articulated in terms of exculpatory material. It must be exculpatory --

THE COURT: Who decides that?

MR. GURULE: Initially the Government decides that. Initially the Government looks at the information and determines whether or not it is material in terms of exculpating the defendant.

Now, if there were a challenge, if the defense then comes in with a substantial showing that yes, it is -- now, we are talking about something specific, not just some general allegation that is unsupported -- then the appropriate procedure, and there is substantial case authority

for this proposition, it would be submitted in camera for the judge to make the ultimate determination of whether or not it is material.

THE COURT: All right. That is enough argument. You provide the declaration that you promised to the defendant within ten days. My inclination at this time is to deny those motions that have been filed without prejudice, and upon examination of the material I directed you to file with the Court within five days and this declaration from this individual, that matter may be reconsidered.

MR. PANCER: Your Honor, does that include information they have concerning other -- reports they have concerning other suspects?

THE COURT: Does what include?

MR. PANCER: Your order that --

THE COURT: My order related to what Mr. Randolph requested.

MR. PANCER: As to our Request No. 3, that is, reports relating to other suspects, which again we still haven't resolved which of their positions they are adopting here in court, which of the positions they took in the motion papers, there either are other suspects or there are not other suspects.

Assuming there are, that they stand by what

they said in response to the severance motion, would Your Honor require that at least those reports be submitted to Your Honor?

MR. GURULE: What is being requested now is the information regarding unindicted co-conspirators. The Ninth Circuit has held, consistently held, that the Government is not required to disclose the identity of unindicted co-conspirators.

This is an attempt, furthermore, to identify cooperating witnesses who are unidentified co-conspirators that may be testifying on behalf of the Government. That is one concern that the Government has.

Secondly, again there is no specific showing as to why or how information regarding unindicted co-conspirators would constitute material evidence to exculpate the defendant. It is a fishing expedition. Brady does not require disclosure in that instance.

MR. PANCER: Your Honor, we are requesting that it be presented in camera. I don't see how the Government's position is valid.

THE COURT: Well, I think they can be presented to the Court in camera, and the Court will decide, after reviewing that evidence, and determine whether or not there should be any change in this order.

MR. PANCER: And for whatever assistance it may

be to the Court, Your Honor, if they do have information concerning Mr. Ballesteros, I will state that the defense would have information that would be evidence that would be Brady because we will have evidence then that that is a totally separate organization. So given the evidence that the defense has that maybe the Government somehow doesn't have -- although I find that hard to believe -- we have evidence that that would be a totally separate organization. So anything that would indicate that Mr. Ballesteros is involved we are contending would be Brady, which is part of the problem with the Government deciding what is Brady because it maybe doesn't know everything that we know, and that is why we are --

THE COURT: Well, it is also part of the problem with the defendants deciding what is Brady and is a device for obtaining what they are otherwise not entitled to. So there is a balancing that has to be done by the Court.

MR. PANCER: I understand, Your Honor.

MR. GURULE: Could we have ten days, Your Honor, on the request regarding disclosure of information regarding the unindicted co-conspirators?

THE COURT: Ten days. All right.

MR. GURULE: Thank you, Your Honor.

THE COURT: Now we have a motion by

Felix-Gutierrez for disclosure of independent source and a request for evidentiary hearing. No other defendant has joined in this motion. The Court has read and considered this motion and the opposition to it, and it is the Court's tentative ruling to deny the request for an evidentiary hearing except as to the statement that Felix was in Arizona for a meeting, unless the Government is unable to authenticate and lay a foundation for admission of the supporting documentation. In other words, the documentation which the Government has submitted suggests that they had this information prior to any discussions with Mr. Gutierrez. They have submitted reports and so forth, and this circuit permits the Court to consider this matter on the basis of evidence submitted in the form of affidavits. Whether or not these reports and other documents, which have not been authenticated and for which no foundation has been laid, are adequate is the question I have in mind. The Government should either make such a showing or prepare for an evidentiary hearing on these matters.

But the Government has submitted evidence which shows that it had prior independent knowledge of facts contained and statements made by the Defendant Felix, except with respect to statements concerning a meeting in Arizona.

Subject to the Court's comments that these are

not in the form of competent evidence at the present time, they may be placed in that form; then it would support the Court's finding that there have been independent sources for this information.

You see, the cases that are permitted in the Ninth Circuit for the Government to meet its burden of proof as to the existence of independent prior sources talk of affidavits, which would be sworn testimony, which we do not have here. We have a sworn testimony by an agent, who says that this is what these reports contain, but I am not sure that is sufficient.

MR. GURULE: I am a little unclear as to the Arizona issue, Your Honor.

THE COURT: Well, the Arizona issue is this. An evidentiary hearing would have to be held to determine whether Felix made any statements about a meeting in Arizona, which seems to be in dispute. That is No. 1.

Secondly, whether this information was useful to the Government's investigation leading to the indictment in this case; and, finally, if the information was helpful, whether the Government has an independent source for that information.

MR. GURULE: Your Honor, the Government has submitted -- and this is for my clarification. I want to make sure I am clear as to the Court's concern. The

Government has submitted a declaration by Special Agent Doug Kuehl. Special Agent Kuehl was present at the interview. So relative to Special Agent Kuehl's declaration, that is not hearsay as to what he heard and what he understood.

THE COURT: Yes.

MR. GURULE: And he stated in his declaration that he vaguely recalls a very general reference to an Arizona meeting, and as to that Arizona meeting there was no information or specific information as to where in Arizona, when in Arizona, what date, who was present at the meeting, or what actually transpired at the meeting. And then Special Agent Kuehl in his declaration went on to say that that particular information proved to be of absolutely no value to the investigation because of its vague and general nature.

Now, if the Court is requesting something in addition to that --

THE COURT: Not on that. I have said that there should be an evidentiary hearing on that issue because, first, there is a dispute as to whether or not there were any statements made. The defendant claims through the document he filed that this is how the Government ties him in with other defendants, mainly Ines Calderon.

MR. GURULE: But in fact, Your Honor, there is also the declaration or the DEA-6 report involving the interview of a Billy Molina, and that exhibit basically states -- that is an independent source from which the Government learned of Jesus Felix' involvement in a narcotics organization with Ines Calderon-Quintero. So we have provided the Court an independent source for that information.

MR. RANDOLPH: That is not a proper affidavit, Your Honor. That is a statement of someone else who claims they took a statement from a third party.

THE COURT: You didn't raise that point in your --

MR. RANDOLPH: I am sorry?

THE COURT: You didn't raise that point.

MR. RANDOLPH: I think, Your Honor, it is in our reply. We sought to strike all of the incompetent evidence and certain portions of the declarations of Mr. Kuehl and others.

THE COURT: In any event, I deny the motion except -- for an evidentiary hearing and find that the Government can establish, if they do so by proper affidavit; and if they do not, then the question is open that there were independent sources for all the information except the Arizona meeting, and the Court would hold a hearing

on that -- not at this time -- but sometime in the future if the parties wish to pursue it. It does not appear to be of much moment. But if the parties wish to pursue it, the Court will hold an evidentiary hearing.

MR. RANDOLPH: Would that be a hearing scheduled as soon as possible, Your Honor?

THE COURT: Well, it will be scheduled when the Court determines it is appropriate to schedule it.

MR. RANDOLPH: Then I would like to direct my comments, Your Honor, to the other aspects of Your Honor's ruling with the exception of that particular point.

The Government has argued in its briefs that where documents are submitted to the Court and they demonstrate a prior knowledge that a Kastigar hearing is not required. That may be the law in the Eleventh Circuit and the Third Circuit, but it is not the law in the Ninth Circuit, and they are simply -- they have simply misled the Court in that regard.

MR. GURULE: Excuse me, Your Honor. Is Mr. Randolph just intending to rehash the arguments included in his papers, or is there something in addition? I have that concern.

MR. RANDOLPH: Your Honor, --

THE COURT: I am glad you are looking out for the Court. I am capable of doing that myself.

The Ninth Circuit permits the Government to meet its burden of proof as to the existence of independent, prior sources through affidavits. The name of the case is Crowson, 828 Fed.2nd, at 1429.

MR. RANDOLPH: I have the Crowson case before me, Your Honor. In that case the only mention -- the Crowson case was cited to the Rogers case in that one paragraph that is taken out of Crowson and the Court has just cited.

THE COURT: Well, what is the point of all this?

MR. RANDOLPH: The point is, Your Honor, --

THE COURT: These reports indicate, unless you are contending they were fabricated, that this information was known and reported through official channels long before the conversation with Mr. Gutierrez.

MR. RANDOLPH: I have two points to make, Your Honor. First, with respect to the Crowson dicta that you have just cited, in Crowson itself, a Ninth Circuit case in 1987, defense counsel was allowed to examine -- cross-examine both the affiants who presented information in the Crowson case. They had a hearing with examination, and the defendant had an opportunity to respond. They had a hearing. So the statement that has been -- that the Government focused on in the Crowson case was simply referring

to that they can present affidavits, but not that affidavits are sufficient to complete the entitlement to the hearing.

Crowson itself had an independent hearing. They had an opportunity to challenge the affiants, and that is what we are asking for here. Crowson cites back to Rogers, and Rogers was a case involving bankruptcy immunity, which is not the type of immunity that is before the Court today.

So Zielezinski, which is the Ninth Circuit case upon which they all rely, states unequivocally that only a hearing can establish that the command of the Fifth Amendment has been satisfied.

Your Honor, the Government has misled the Court when it stated in its papers that a hearing could be satisfied by the submission of affidavits. It is simply not the law in the Ninth Circuit. The only thing that can be --

THE COURT: Do you have any other law that stands for what you just said?

MR. RANDOLPH: Well, Crowson and Zielezinski are the Ninth Circuit cases which stand for that proposition, Your Honor, and that is what they both say, and neither of them say affidavits in and of themselves are sufficient to satisfy the requirement. The Government says that. The Third Circuit and the Eleventh Circuit appear to say

that. The Ninth Circuit says otherwise.

THE COURT: All right. That is sufficient.

MR. RANDOLPH: I will submit on that, Your Honor.

THE COURT: All right.

MR. RANDOLPH: With respect to whether there are other factual issues which the Court should direct its attention to, let me take them briefly. There were three points. The Government said that my client's admission that he had an association with Ms. Calderon, they need not present any independent evidence of that because it is simply false, and that he knew that Caro-Quintero distributed marijuana.

They claim that his statement is self-serving and is of no value to them. But the Government has a 1952(b) count before this Court, and it is incumbent on the Government to present evidence that Mr. Felix was a member of Ms. Calderon's criminal enterprise, and his statement would be supportive of that particular information.

So they must prove by independent source, again competent evidence, Your Honor, evidence which this Court can consider that an independent source existed.

The meeting in Arizona, the Court has agreed with the defendant in that regard. I will skip that one.

The Government again says with respect to my client's statement that he did learn of the Camarena torture and kidnapping, the Government says that the defendant learned this in other ways, and his statement is self-serving and false.

That is not what Zielezinski requires them to answer. What that Court requires them to answer is that they had that information, which will be an element of the case they must prove, that they had that by an independent source. They did not present any evidence whatsoever of that independent source to this Court.

Finally, we have the meeting, Your Honor, in Costa Rica with Celman Barrenechea. That one they did submit. That is the only one the defense will concede they submitted an independent source on.

Again they had two in camera submissions regarding my client's statements about Werner Lotz. The defense believes in good faith that Werner Lotz will be a witness against the defendant in this case, that he is one of the confidential informants that the Government is hoping to present. The Government has presented in camera submissions regarding Werner Lotz.

Under the case law that governs in the Ninth Circuit, in camera submissions which are grand jury transcripts, may be presented to the Court for its

consideration. In fact, all of the cases cited in camera submissions were only Grand Jury transcripts.

Your Honor, if they submitted anything else other than in camera transcripts, then the defense should be able to respond to those.

What we have here, Your Honor, and the importance of the hearing is highlighted in the Crowson case, and it is something that is not in any of the briefs, and I would like to finish with that particular point right now. In Crowson the issue before the Ninth Circuit was an unusual one. You had a situation where the same prosecutor and agents who received and presented the immune testimony then turned around and indicted the defendant in that case, and the first thing that the Ninth Circuit noted in Crowson was that that was not in compliance with the United States Attorney's Manual, which recommends that prosecutions be handled by an attorney unfamiliar with the substance of the compelled testimony, or in that case the immune testimony.

The Ninth Circuit felt strong enough, even though it was dicta, that say that the United States Attorney should be wary not to jeopardize reasonable and well-supported prosecution efforts and promote appeals, such as in Crowson, by failing to observe the manual's recommendations.

The point of this is that although the Ninth Circuit wouldn't go so far as to say there is a per se rule that the person that received the immune testimony couldn't turn around and prosecute it, they thought that a high standard should be applied. Crowson found not only that they couldn't use the testimony for evidentiary purposes but they should also look out for non-evidentiary use, and that brings us to the timing of when the Government received the information from independent sources, which we don't have yet, about each of these items that Jesus Felix has raised. If the Government received that information at any time after February of '87, before February '87, and, if so, what was the substance. The defense believes that the Government has been in communication with Werner Lotz both before and after February 1987.

One of the questions that the hearing would clear up once and for all, Your Honor, is whether Werner Lotz was confronted with a statement as follows:

Mr. Lotz: Mr. Felix has stated to the Government that he was indeed in Costa Rica with you in March of 1985. Are you now prepared to make a statement regarding what information you have about Costa Rica in March of 1985?

If, for example, Your Honor, Mr. Lotz says, after being confronted with that kind of an immunized

testimony, will --

THE COURT: Counsel, I cannot permit this argument. You are going on and on, and you are going to deprive all of these other attorneys of an opportunity to be heard. Make your points succinctly and stop.

MR. RANDOLPH: I am trying to give the Court an example.

THE COURT: You are not helping. This is not very helpful.

MR. RANDOLPH: Well, I guess, then, the bottom line is, Your Honor, that the Ninth Circuit calls for an evidentiary hearing with competent evidence. The affidavits, as the Court has noted, are incompetent, and I would ask the Court to set a hearing and have them produce with testimony and with competent evidence and with persons whom I can subpoena to that hearing and then have a hearing as to whether there is an independent source.

They have got the burden, Your Honor, and they haven't met the burden.

THE COURT: All right, counsel. Stop.

MR. RANDOLPH: I will stop.

THE COURT: The Government is ordered to file proper affidavits and serve them on the defendant. The defendant is then to file, if he desires to have an evidentiary hearing, a request with the Court to set an evidentiary

hearing. Any request that you make of this Court, whether it be for evidentiary hearing or for the right to cross-examine these affiants, has got to be supported by authority that binds this Court. So I expect you to do that.

MR. RANDOLPH: I will, Your Honor.

THE COURT: After I have received that, then I will determine what to do with it, whether or not to hold a hearing or what the scope of it will be.

MR. RANDOLPH: Thank you very much, Your Honor.

Your Honor, may I address the Court. I brought to the clerk's attention before this morning that I had moved -- oh, I am just advised that that has been handled. Thank you very much.

THE COURT: The Defendant Gutierrez has also filed a Motion for Clarification of Discovery Order, which the Court has read and considered, and it is the Court's tentative conclusion that both of the requests made by the defendant here should be denied. At the prior hearing the Court granted the Government's request for a protective order and denied the defendant's request for disclosure of the witness list because of danger to the witnesses and defendant's failure to make a sufficient showing of the need for disclosure.

The order will not be limited as the defendant now requests so that the Government must disclose the witness

list to defense counsel. My ruling applied to defense counsel. This issue has been dealt with previously. You come back in here now asking for disclosure of the witness list to defense counsel. What did you think I was ruling on the last time?

MR. RANDOLPH: Your Honor, I think the Court has misunderstood what we have asked for. We are not asking for the witness list. In fact, we are not asking for witnesses at all. We are asking for the names of those persons who the Government does not intend to call.

THE COURT: I know what you are asking for, counsel.

MR. RANDOLPH: I am sorry. I thought the Court was asking me a question.

THE COURT: As for your request that the Government prove that all claimed informants are truly informants, there is no authority for such a request to place upon the Government the burden of proving that they are abiding by the Court's order. In fact, the defendant's request is contrary to the method established by the Supreme Court in the Roviaro case. It is the defendant, not the Government, that bears the burden of showing that disclosure of a confidential informant would be relevant and helpful. To require the Government to prove in an in camera hearing before opposing counsel that an individual

is a confidential informant would have the effect of revealing the informant's identity to opposing counsel, which is the issue we dealt with the last time. When I said they did not have to disclose the identity, I meant to opposing counsel or anyone else. Moreover, there is no evidence that the Government has violated this Court's order. It has provided the defendants with a list of non-confidential, percipient witnesses that will not testify at the trial, and the fact that the defendant's counsel has a hunch that the Government is violating a court order is not sufficient grounds for ordering such a hearing. So it is my intention to deny both of these requests contained in this motion for clarification.

MR. RANDOLPH: This will be brief, Your Honor. Our request is made on more than just a hunch. This indictment spans the years 1983 through 1985, maybe more. It covers Mexico, Colombia, Costa Rica, the Central District of California, and elsewhere, wherever that is. The events involved the distribution of multi-ton quantities of marijuana and cocaine and torture and murder and escape from a foreign country.

The point is that since 1985, Your Honor, the defense believes in good faith that the Government has interviewed and has come up with hundreds -- hundreds -- if not thousands, of percipient witnesses to any of these

events that are contained in the indictment. We can do this by simple arithmetic.

THE COURT: You said, "brief." You are already launching into a big episode, counsel.

MR. RANDOLPH: I will be no longer than 30 seconds, Your Honor.

THE COURT: I am going to terminate your argument.

MR. RANDOLPH: May I have 30 seconds, Your Honor?

THE COURT: No, you may not. The motion is denied.

MR. RANDOLPH: Your Honor, if I could have just less than a minute, I can finish what I have to say, and the Court would be satisfied.

THE COURT: Well, I assume you said what you had to say in your papers. I read those very carefully.

MR. RANDOLPH: Your Honor, I asked Mr. Gurule to provide a number, whether it be a thousand --

THE COURT: Counsel, I have said that the argument is over. We are moving to the next motion, which is Felix' Motion to Sever.

The Court has read and considered the Defendant Felix-Gutierrez' Motion to Sever and the opposition to it, and the Court is of the tentative conclusion that this

motion should be denied. Joinder of defendants is appropriate under Rule 8(B) because the indictment alleges that defendants participated in the same series of acts or transactions. In this circuit the term "transactions" is given a flexible interpretation, and Rule 8 is construed broadly in favor of initial joinder. Whether or not multiple offenses joined in an indictment constitute a series of acts or transactions turns on the degree to which they are related. Defendant's argument that accessory-after-the-fact offenses must be deemed separate and distinct from the substantive offenses is not well taken in the context of Rule 8(B). The question is whether there is a relation between the offenses, not whether criminal acts are separate and distinct for purposes of double jeopardy. In this case the Defendant Felix is alleged to have been an accessory after the fact in furtherance of an enterprise of which he is alleged to be a participant. Moreover, there is a substantial overlap of evidence since a separate trial on the accessory count must include proof of these substantive counts. There is more than a sufficient nexus for joinder under Rule 8(B).

The defendant cannot show prejudice as a result of joinder of the substantial overlap of evidence which would occur if he was tried separately. Defendant's offer to provide detailed stipulations on overlapping factual

disputes does not convince the Court that severance should be granted. We are on the eve of trial, and there have not been any discussions with Government as to such stipulations, and nothing of substance has been submitted to the Court.

Finally, the defendant's request for severance based on Bruton is frivolous. The defendant's counsel is directed to Richardson vs. Marsh, which is a United States Supreme Court case, 1987, for a discussion of the limited scope of the Bruton doctrine.

That is the Court's view of this severance motion, which I will deny.

Do you wish to be heard?

MR. TARLOW: Yes, Your Honor, briefly if I may.

Your Honor, I'd like to first comment -- I want to pass the 8(B) problem and comment on one matter that the Court did not cover in its tentative ruling, and then on the Bruton problem.

Your Honor, I have read Richardson vs. Marsh, as well as the Court, I am sure, has considered Cruz vs. New York, which was decided at the very same time.

In Richardson the difficulty with the proposition that is being advanced to the Court is that the Government has not offered you any case which stands for the proposition that where you have a strenuously disputed issue in a criminal

case, and that issue is established by the co-defendant's statement, that is not Bruton. There is nothing in Richardson, Your Honor, which says that at all. We are not talking here about a bank robbery case, for example, where everyone admits that the bank was robbed. We are talking here about the circumstances and reasons why and who killed Mr. Camarena and how and why it was done.

The Court has tried enough cases certainly to realize that it would be impossible for this jury with whatever instructions you give -- and that is the holding in Cruz vs. New York, that those instructions didn't work in 1987 in the Supreme Court. How can this Court tell the jury as to Mr. Lopez-Alvarez -- consider what he said; consider how he said Mr. Camarena died; consider what he said about why he died, and use that to decide if he is guilty in the underlying facts of the offense.

Now come to Mr. Felix-Gutierrez, and you decide those very same questions, but absolutely disregard what you have used for the other defendant.

There is no case that I have seen, and there is nothing in Richardson vs. Marsh, which says that Bruton only applies to the name of the defendant. That is all that matters. I would suggest to the Court that this is a very real problem and something that needs to be dealt with.

The second point that I would like to touch on, Your Honor, has to do with prejudice from the joinder itself in joining an accessory after the fact. There is a case recited before the Court, Sampol, and I don't want to belabor any of the points that were in the pleading, but if there is a case which could be as close to this case, of what we have in this case, other than the name is not Felix, I think the Sampol case is it. In Sampol, as Your Honor probably knows, there was an ambassador who was blown up by some organization. The Court, first of all, was extremely concerned about Mr. Sampol, who was charged with an accessory-after-the-fact type of crime -- misprision, I believe -- but the same type of offense, and yet he is named in the count as a member of the organization responsible for the bombing of the ambassador and yet he is not charged with that offense. It is the very same thing we have in this case.

The Court in the case, and I don't want to go through the case, talks about in substance that the horrendous kind of evidence that is going to be admitted before the jury, which is in some sense irrelevant to Mr. Sampol's liability other than the fact that there was a murder and Mr. Camarena was killed, that evidence establishes elements as to Mr. Felix, but as to his guilt, his guilt can only be predicated upon whether he helped

Mr. Camarena, and the prejudicial kind of evidence, Your Honor, regarding torture, regarding murder, is something which in essence has little to do with his guilt.

How Mr. Camarena died, why he died, the details of all of it are something which, although disputed, we would be willing to do away with to avoid this kind of prejudice.

The Sampol case, Your Honor, talks about the disparity in the evidence, that is, that all of the prior evidence in Sampol, all the evidence about the bombing, had nothing to do with Mr. Sampol.

Likewise in this case. All of the evidence about the murder has nothing to do with Mr. Felix as far as him being a participant.

Sampol talks about the situation in that case being a classic example of Rule 14 prejudice and using the words "spillover prejudice" or "prejudice of guilt by association." The Court talks about it being almost an understatement, and I think we have that same situation in this case.

I would submit it based on that, Your Honor. Thank you.

THE COURT: All right.

Do you wish to respond briefly?

MR. GURULE: I would just add that Mr. Tarlow

said there was nothing in Richardson that would support the Government's proposition. I think the Richardson case is dispositive of this case. Without going into much detail, I would remind the Court that that was also a murder case. It was also a felony murder case and robbery case. The Court held there that the statement by Williams, who didn't testify, not incriminating directly any of the other defendants was admissible and that severance wasn't justified just because it was an admission by a co-conspirator who did not testify at trial. I think that case is exactly dispositive.

THE COURT: You know, if you read these cases, the rule is that joinder is a preferable way to go in the interests of judicial economy, and it should be the rare exceptional case where a defendant is severed from other defendants, and this in my view is not such a case.

MR. TARLOW: May I respond to that one point, Your Honor, just briefly?

THE COURT: No. The motion is denied.

We have another motion here by Defendant Felix-Gutierrez to disclose all prior and future ex parte documents filed by the Government and a joinder in it by Verdugo.

First let me say that I don't encourage the filing of ex parte documents. I prefer not to. Anything

that is filed with the Court that affects this case or any defendant, or might, should be done on noticed motion. There are instances provided by law for ex parte filings dealing with administrative matters and others that must be kept confidential that are permitted. The Ninth Circuit has expressly authorized in camera review for the purpose of ruling on a motion for disclosure of a confidential informant's identity, for example. No other documents filed ex part even remotely affect defendant's interest. These are administrative filings which must be kept confidential, but do not contain any information concerning any of the defendants or having anything to do with the merits of the case.

Therefore, the Court will deal with this matter in this way: Before the Government files any ex parte motion with this Court, it should first present to the Court an affidavit describing in general terms what the filing is that it intends to make and why it is necessary and wait for permission from the Court to do so before filing anything ex parte.

MR. TARLOW: Your Honor, do we have the opportunity to respond to what the Government submits? Assuming we feel the reasons are inappropriate, do we have time to file a response with the Court saying why we don't think that submission should be given?

THE COURT: Well, my intention is to have them file with the Court an affidavit setting forth their reasons for what they intend to do, not to serve it on counsel. The Court will determine whether or not it is appropriate. If it isn't, I will not permit it to be filed. If it requires notice, I will direct them to give notice.

MR. TARLOW: You are saying that the affidavit itself will be under seal?

THE COURT: Yes.

MR. TARLOW: I am sorry. I misunderstood.

MR. GURULE: Your Honor, does that pertain to defense counsel in terms of any in camera filings by defense counsel? Does the same procedure apply for defense counsel?

THE COURT: Well, I suppose it should, but the defense counsel do not usually file ex parte requests with the Court.

MR. GURULE: But there have been, I think, at least three in camera filings by Mr. Pancer to date that the Government is obviously unaware of. So there is a track record of defendant's filing in camera documents with the Court.

THE COURT: Well, that motion is not before me. What is before me is the defendant's motion requiring

you to give notice, and that is the way I have dealt with it.

Now, the Defendant Verdugo has filed a motion to dismiss for violation of the extradition treaty in the Caro-Quintero case. One of the bases of this is still the subject of another motion to be ruled on but based upon the motion that has been filed with the Court to dismiss the first superseding indictment for violation of the extradition treaty, the due process issue is still in question in another motion to be heard at the next session of the motions.

Now, on the merits of this motion, the Court intends to deny it for these reasons: First, the Government's attempt to invoke collateral estoppel is unpersuasive. There can be no collateral estoppel in the absence of a final judgment. Since the Government has presented no evidence of a final judgment in United States vs. Verdugo, the defendant's motion must be decided on its merits.

The defendant, on the basis of the showing that is made here, cannot show a violation of due process, although I understand that that question is still the subject of another motion based on additional facts.

MR. PANCER: Your Honor, I have a very important document that relates to this motion that was just delivered to me by the Assistant United States Attorney on Friday

in San Diego. I presented a copy to counsel. I think the Court should have it.

THE COURT: What is it?

MR. PANCER: Your Honor, it is a letter from the U. S. Attorney in San Diego that says that he has been -- in summation that he has been authorized to inform myself and Judge Irving that a communication was received from the Mexican Government. It is a protest, a formal protest, by the Government of Mexico, that relates to the manner in which Mr. Verdugo was taken into custody in Mexico, actually kidnapped in Mexico.

THE COURT: When was that received?

MR. PANCER: Could I present the letter I have from the assistant to the clerk?

THE COURT: Yes. Hand it to the clerk.

MR. GURULE: The record should reflect that I just received that literally a minute ago and I have not had an opportunity to review it.

MR. PANCER: Your Honor, while I am up here, may I borrow one of these chairs?

THE COURT: Yes.

MR. PANCER: Your Honor, as to when notice was given to the Government, I was informed by Mr. Reese, who gave me that letter, that he spoke to Mr. Gurule concerning this matter.

THE COURT: Well, what is the significance of this in your view?

MR. PANCER: Well, Your Honor, the Government responded to our motion concerning the violation of extradition treaty, and I have their response in front of me. On page 4 of their response they say, "Absent an objection or protest by Mexico, Defendant Verdugo has no standing to raise a violation of international law."

What I have just given Your Honor is proof that there has been a protest by the Government.

THE COURT: All right. Having been a protest, what does that mean? What do you think the Court should do because of this protest?

MR. PANCER: I think the Court should do just what the Government states on page 5 of their response, that in effect if there is a protest by the Government, then the defendant has a right to raise an objection based on a violation of international law. That is what they say at page 5 of their brief, page 6 of their brief, page 7 of their brief.

THE COURT: Are you saying that based on the violation of an extradition treaty that the defendant is entitled to a dismissal of the indictment?

MR. PANCER: Your Honor, what we are arguing in this motion is that, based upon a violation of the

extradition treaty, the defendant can only be brought to trial on charges that existed at the time he was brought into the United States. All of the cases say that if there is an extradition treaty, you can only be prosecuted on those charges which existed at the time you are extradited.

We are saying, Your Honor, now that the Government of Mexico has filed a protest, that we are entitled to the protection of the extradition treaty. The Government essentially holds forth the same position in their brief when they are looking at the cases that they cite in their brief.

THE COURT: All right. Here is what we will do with this. The matter should be rebriefed in light of this information on the question of what effect this should have on the motion to dismiss which is pending before the Court.

MR. GURULE: May I just comment on that briefly, Your Honor. There are two issues that the Government addressed in its opposition. The first is standing. This letter goes to the standing issue.

THE COURT: All right.

MR. GURULE: But even if there is standing, that doesn't mean there has been a violation of the extradition treaty.

The second argument that the Government makes in its opposition is that where the extradition treaty has not been invoked, i.e., it has not been an extradition request for the defendant, the extradition treaty does not apply, and there has been no violation of the extradition treaty.

In support of that proposition, the Government cited numerous Ninth Circuit cases. The Government has cited United States vs. Valot, 625 Fed.2nd 308, Ninth Circuit, 1980. The Government has further cited Stevenson vs. United States, 381 Fed.2nd 142, Ninth Circuit, 1967. The Ninth Circuit in both of those cases has expressly stated, and if I may quote from the Valot case:

> "This Court has held that where no demand for extradition was made by the United States" --

There was not in this case; there was no demand.

> "-- and defendant is deported by the authorities of the other country which is a party to the treaty, no extradition has occurred and failure to comply with the extradition treaty does not bar the prosecution."

The Ninth Circuit again cites the Stevenson case and further cites another Ninth Circuit case, United


States vs. Lovato at 520 Fed.2nd 1270.

Briefly the Stevenson case --

THE COURT: Well, the Ker case involved an extradition treaty.

MR. GURULE: That is correct.

THE COURT: That is a Supreme Court case in which Ker sought a writ of error from the Supreme Court of Illinois on the grounds that his indictment, trial, and conviction for larceny violated the United States-Peru extradition treaty. He complained that he had been forcibly removed from Peru by an agent of the United States Government in violation of the extradition treaty. The Supreme Court rejected the proposition that the extradition treaty had given Ker a right not to be forcibly removed from Peru. The Court explained that the treaty contained no language which said that a party fleeing from the United States to escape punishment is entitled to asylum. As a result the Court held that the terms of the extradition treaty had not been violated and the defendant could be tried.

MR. GURULE: That is exactly correct, Your Honor. The Ninth Circuit has likewise cited the Ker case in numerous of these cases.

THE COURT: The Ninth Circuit follows both Ker and Frisbie, unless the Government engages in conduct

shocking to the conscience.

MR. PANCER: I agree, Your Honor. I think it has to be rebriefed because I don't think in any of those other cases there was a protest filed by the offended government, and I think it should be rebriefed. We will touch on it at the next motion hearing, and there are other motions relating to it. I would ask that this be put off until then.

THE COURT: What is the date of the next motion hearing?

MR. GURULE: June 20, Your Honor.

I would just add, because I don't believe there is anything to be rebriefed, that even if there has been a formal protest, all that means is that the defendant has standing. It doesn't meant that there has been a violation.

THE COURT: Well, apparently they just received this, so they should have an opportunity to see what they can find on it, and there will be no harm in the matter being continued to the next hearing date. What is the date?

MR. PANCER: June 20.

THE COURT: This motion will be continued to June the 20th for further briefing. The moving party should file a supplemental brief by the 13th of June. The response

should be filed by -- strike that. The response or opposition should be filed by the 17th.

MR. PANCER: In that regard would Your Honor order that we be given a copy of the protest and the United States Government's response to request for information from the Government of Mexico just submitted to Your Honor.

THE COURT: You have a copy of the protest.

MR. PANCER: No, we don't, Your Honor. What I gave Your Honor is a request from the Government of Mexico for information. Apparently the U. S. Government sent something to the Government of Mexico, and then based on that the Government of Mexico filed a protest. We only know that there was one because the letter from the Assistant U. S. Attorney in San Diego so informed us. He also informs us that he will make that public when the State Department files its response to Mexico, and since we don't know when that will be and I don't know that they move so quickly, I would like to have a copy of the protest filed by the Government of Mexico, which is a matter of public information in the sense that we are permitted to talk about it here in court and, too, a copy of whatever the United States Government sent in response to the request from the Government of Mexico that caused the Government of Mexico to file that protest.

THE COURT: Well, first, do you have access -- do you have a copy of the protest that was filed by Mexico?

MR. GURULE: No, I don't, Your Honor.

THE COURT: Can you get it?

MR. GURULE: I can certainly attempt to get it. I would imagine that it was filed back in Washington, D. C.

THE COURT: The United States' response?

MR. GURULE: I don't have a copy of the response. I assume that was made by our Office of International Affairs. I will contact them in Washington to see if they have a copy of the formal protest and our response.

THE COURT: Provide copies to the defendants.

MS. BARRERA: Excuse me for interrupting, Your Honor. Yolanda Barrera for Raul Lopez-Alvarez. I am scheduled to argue a case before the Court of Appeals at 1:30. I have requested priority from the Court of Appeals, and I will be the first called. So I would request permission from this Court to be allowed to go at this time.

THE COURT: Do you have a motion pending?

MS. BARRERA: We do have two motions, Your Honor, and we did join in several of the others. However, Ms. Leyva can remain. She is also attorney of record. Mr. Lopez-Alvarez is agreeable to my leaving and Ms. Leyva remaining.

THE COURT: That is fine.

MR. BARRERA: Thank you, Your Honor.

THE COURT: Now, the Defendant Verdugo has filed a motion for pretrial hearing regarding the authenticity and admissibility of tape recordings and the accuracy of the Government's proposed transcripts.

The Court has read and considered this motion as well as the opposition, and this motion is joined in by the Defendant Felix-Gutierrez and Lopez-Alvarez.

In this circuit authenticity and general trustworthiness are the basis of a proper foundation for the admission of recordings. The burden is on the offering party, the Government, to make a prima facie showing of authenticity. The Court has reviewed all the evidence submitted by the parties and has determined that, based upon this evidence, the Court has made a prima facie showing of authenticity. However, the Court will need to review the actual tapes, and either the parties must present a transcript on which they can both agree, that is, a stipulated transcript, or the Government's transcript must be submitted and the defendants' differing translations, if any, must also be submitted so that the Court can understand what the dispute is. In this way the Court would be able to determine whether the recordings taken as a whole can

be understood and appear trustworthy. Based solely upon a review of the Government's transcript, the recordings appear to be trustworthy and coherent and, therefore, of probative value.

The Government has met its burden as to authentication concerning place and time. The declarations of DEA agents authenticate the tapes by distinctive characteristics pursuant to Rule 901(b)(4).

The contents of the recordings, in conjunction with other contextual evidence offered by the Government, constitute a prima facie showing that the tapes were made at 881 Lope De Vega between February 7 and 9, 1985, and that the subject of the interrogation was Agent Camarena. This finding is supported by the voice identification offered for purposes of authentication pursuant to Rule 901(b)(5).

The defendants have offered no evidence of tampering. Defendants are not entitled to an evidentiary hearing merely because they request one and because they claim that there was an opportunity for tampering and that certain anomalies in the tape may indicate tampering. There must be some affirmative evidence of bad faith or tampering in order to justify an evidentiary hearing on the issue. Evidence of tampering should have been filed, if there is any, with the Court upon filing of the motion.

Therefore, the defendants' motion for an evidentiary hearing would be denied. However, the Government must provide the Court with the papers, and the parties must provide transcripts of what they view as their interpretation of the tapes so that the Court can determine whether the tapes are audible, coherent, and probative.

MS. BROOKS: Your Honor, if I might respond briefly to that. In our moving papers we state that before our expert can do any further tests or reach any definitive conclusions or opinions, there were certain items of information he needed. We requested of the Government that information for sending the tape recordings to our expert. The Government refused to provide us with any information regarding how the tape recordings were made, regarding how the tape recordings were obtained by the Government, and so forth. We did not have that information until the Government filed their response to our motion. That is why we were unable to provide the Court with our motion with an affidavit from our expert because our expert was unable to go any further without the information from the Government.

We would ask the opportunity, since it took this motion to get the Government to get back the information, to now be able to provide the Court with an affidavit from our expert, which, I believe, will indicate

there were tamperings of the tape recordings or certainly a good possibility of it, and for Your Honor to then determine whether we have rebutted what Your Honor has found to be the Government's prima facie showing of authenticity and reliability.

We would have done it beforehand had the Government simply cooperated and given us the information. Instead we had to resort to the filing of a formal motion.

THE COURT: Well, the information is that they don't know who made the recordings or what equipment was used or the other things that your expert said he needed to know -- the type of room it was in and that sort of thing.

Do you now have that information?

MS. BROOKS: Now our expert knows he is dealing with copies of recordings that we don't know --

THE COURT: He has known it was a copy right along, hasn't he?

MS. BROOKS: We didn't know whether these were first-generation copies. We did not know how these copies were made. We had no idea as to the recording process of even the copies. We had no idea whether we would in fact have eventual access to the originals.

THE COURT: Well, you know, you could have had your expert proceed simply on the tape itself and

provide some finding for the Court, and he could have withheld reservation, stated that he needed the other information to be fully sure of his opinion. In any event, what is it you are requesting?

MS. BROOKS: We are requesting, Your Honor, an opportunity now that the Government has responded, to file an affidavit with the Court at the same time that we file the transcripts with the Court by our expert, and the Court to reserve ruling on the reliability of the tape recording until you have had that opportunity to review the affidavit and transcript.

THE COURT: Do any of the other defendants object to this?

MR. RANDOLPH: No, Your Honor.

MS. LEYVA: No, Your Honor.

MR. GURULE: Your Honor, I would add that this is a disingenuous argument at least relative to the copies of the tapes. Mr. Pancer requested -- first of all, Mr. Pancer has known from the beginning that the Government only had copies. Mr. Pancer requested first-generation copies of the tapes in his formal request for the tapes. First-generation copies were given to Mr. Pancer so that the examination could be completed. There is nothing contained in the Government's opposition that responds in any direct way relative to beyond that

as to the room, as to the temperature, type of equipment, type of tapes, et cetera, because again, as the Government's papers show, it wasn't the Government who made the recording of the interrogation.

This is simply an attempt to come in here at the 11th hour seeking to delay the process and to bring in an affidavit by their expert that they could have brought in weeks ago, if not months ago.

THE COURT: Well, let me say that I am ruling on the authenticity of the tapes as far as the showing that has been made. In that respect that is fine as far as the Court is concerned.

With respect to the admissibility of the tape recordings, that of course requires some further finding, and I assume that what you wish to submit relates to that issue.

MS. BROOKS: Yes, Your Honor.

THE COURT: All right. We can continue this for hearing to the 20th of June, and you will submit any additional or supplemental information according to the same schedule I have previously given you on the other matter.

MS. BROOKS: Yes, we will, Your Honor.

THE COURT: That is by the 13th and the response by the 17th.

MS. BROOKS: Thank you, Your Honor.

Your Honor, I don't want to take the Court out of order, but we might be able to expedite matters. There is a similar situation in regard to our motion for notice of Government's intention to use evidence at trial. All we were asking for there was notice of their intent to therefore have an opportunity to file motions in limine regarding the admissibility of the evidence they intended to introduce.

The Government in their response went a step farther and argued not only what they intended to introduce, but the admissibility of it. We would like an opportunity to respond to that by way of a motion in limine. Specifically --

THE COURT: Well, I am not dealing with this business raised in their response to the motion. It is not a motion regarding the admissibility, and the Court does not rule on those, on the admissibility, at this time.

MS. BROOKS: Thank you, Your Honor.

THE COURT: I wanted to point that out when I got to that motion because that isn't properly before the Court.

MS. BROOKS: Thank you very much, Your Honor.

MR. TARLOW: Your Honor, have you just dealt with that 12(d) motion, or are you going to do it --

THE COURT: Which motion is that?

MR. TARLOW: The one that Ms. Brooks was just talking about, the request for notice of what evidence they were going to put in.

THE COURT: No, I haven't dealt with it. I haven't got to it yet.

We have a motion by Verdugo to compel identity of the informants and foundational information, which is joined by Felix-Gutierrez.

The Court has read and considered this motion and the opposition to it, and this is the Court's tentative ruling and reasoning. The Court's tentative ruling is that this motion should be denied for the following reasons:

When the Government makes a specific showing of the need for concealment of a witness/informant, the identity of a witness/informant, the defendant must make a specific showing of need for disclosure of the witness/informant. Then you can balance the one against the other. The Court must determine whether the Government's interest in withholding the informer's identity prior to trial outweighs the defendants' interest in preparing his case for trial.

Defendant has not shown that it requires pre-trial disclosure of the informant, identified as CI-1, prior to trial. Defense counsel will have an

opportunity during cross-examination to determine whether or not Verdugo was present during a 1983 meeting between Felix and CI-1, and counsel will also have an opportunity to determine whether or not CI-1 can place Verdugo at any meeting concerning marijuana trafficking. As to other informants. No showing of specific need has been made. The effort has been addressed to this CI-1.

Finally, there does not appear to be any basis for defendant's request for foundational information. Defendants bear the burden of showing specific need for disclosure, and they cannot sidestep the Court's protective order by having the Government produce information which would disclose the identity of the informants. The Government's privilege, which has been ruled upon by the Court, under Roviaro, all communications and documentation which would tend to reveal the identity of the informant is protected.

So, as I understand it, all of the Government's informants will testify at trial. Therefore, their identity will be disclosed and their statements will be made available pursuant to the Jencks Act at the time that I previously ordered that they should be. Thus, there is no need for the Court to make the Roviaro balancing test at this time because the identities will be revealed at the time of trial.

In a case called United States vs. Bonilla, Ninth Circuit, the Court stated that although the defendant was entitled to learn the informant's identity because the informant was a percipient witness to the criminal transactions underlying the indictment, he was not entitled to have the information produced in advance of trial.

So that is basically the Court's position on that.

MR. PANCER: I have no additional argument, Your Honor. I have two points I'd like to try to pin down. One is that there are certain persons who testified in prior trials that were related to Rene Verdugo or off-shoots of his indictment, and these witnesses are already in the witness protection program. They are already known as possible witnesses in the sense that there were many of them and, Your Honor, if a witness is already known to be an informant, already known to be protected, then I would think Your Honor, at least in the interests of saving court time, because we may have breaks when these witnesses come, to get transcripts or to review or to do investigation, that at least, Your Honor, the Government could provide the names of those witnesses.

THE COURT: Well, that is not a subject of this motion.

MR. PANCER: Your Honor, it is limiting --

THE COURT: It is a subject of the motion in a sense, but there is no information provided showing a specific need. That has to be done before disclosure can be compelled.

MR. PANCER: Your Honor, we may not have a right for it in that sense, but I am saying that Your Honor may wish for us to have it just in terms of getting this trial over sometime this year. It will certainly make things move along. I don't see that there is any downside to the Government giving us that.

MR. GURULE: Well, there is a downside, Your Honor, because the narcotics organization that we are dealing with and the history of violence that comes with this narcotics organization creates the real concern, not only for the safety of the witnesses, but for the safety of the family of the witnesses, the parents of the confidential informants, the brothers, sisters of the confidential informants. It is not just that particular person that the concern is limited to.

So while a witness can be -- a witness can be intimidated in a number of respects directly or indirectly. He can be gotten to, so to speak, through his family, and that is a real concern that the Government has here as well.

THE COURT: Getting back to the motion, the

Court is denying the motion.

MR. PANCER: I understand. So every informant is going to be a witness. In other words, we don't have to worry about informants that they have the information from who are not going to be called?

In other words, they are all going to be witnesses? May I ask.

MR. GURULE: That is our position.

THE COURT: Maybe we should adjourn at this time.

MR. RANDOLPH: Your Honor, I have two motions that I am prepared to argue.

THE COURT: Which motions?

MR. RANDOLPH: The motion for bill of particulars, Your Honor.

THE COURT: Yes.

MR. RANDOLPH: Then we have a motion for sanctions and/or a continuance.

THE COURT: Well, I don't know what you want me to do. Do you want me to work straight through lunch? Is that it?

MR. RANDOLPH: Well, Your Honor, I think Mr. Verdugo has a number of motions. Perhaps the Court can hold Mr. Felix'. My sentencing can't take more than 20 minutes. I could be back here by 2:00 o'clock. If you

could hold those until after 2:00 o'clock.

MR. TARLOW: If Your Honor doesn't have lunch, do the rulings get better or worse? If you could give us that information, we could decide what to do.

THE COURT: We move faster.

We will adjourn until 1:30.

[Recess from 12:10 p.m. until 1:30 p.m.]

LOS ANGELES, CALIFORNIA, MONDAY, JUNE 6, 1988, 1:30 P.M.

- - -

THE COURT: Are all defendants and counsel in the United States vs. Caro-Quintero present as heretofore announced?

MS. LEYVA: Ms. Yolanda Barrera is not here. I am here representing Mr. Lopez-Alvarez, Your Honor.

THE COURT: The two defendants are present with their counsel.

MR. GURULE: The Government is present, Your Honor, with Jimmy Gurule and Roel Campos appearing.

THE COURT: All right. The next motion is the motion of Defendant Verdugo for severance.

MS. BROOKS: Your Honor, might that matter be trailed? Mr. Pancer is going to argue that, and he is in another courtroom. He will be here. I am prepared to argue several of the other motions.

THE COURT: There is a motion here to submit questionnaire to prospective jurors.

MS. BROOKS: I am ready on that, Your Honor.

THE COURT: I do not like these questionnaires, and most of those questions, with the exception of four or five, are areas that will be covered by the Court during a voir dire examination, and I don't see any reason

to grant the questionnaire. This case is just like any other case, and I don't think we should establish special procedures for it.

MS. BROOKS: Certainly I would prefer not to have a questionnaire and to be able to observe the jurors' demeanor during voir dire. The reason we submitted a questionnaire in this case is because there has been extensive pre-trial publicity. My experience with this particular questionnaire is that I was co-counsel in the case of United States vs. De Lorean that was tried in Detroit last year. We used the questionnaire in that case, and surely we saved hundreds of court hours in cutting down on the voir dire that was necessary based on the pre-trial publicity. It was a questionnaire that was agreed to by both the defendant and the prosecution, and the Court stated afterward that the judge was very happy to have been able to use the questionnaire, and it really saved a lot of manhours.

The questionnaire was originally developed in the NFL case before Judge Pregerson and used almost verbatim -- that is, the questionnaire that is submitted to Your Honor was used almost verbatim by Judge Takasugi in the first De Lorean trial. It was just recently used by Judge Fernandez in that high-publicity Mafia case. It was used in Connecticut in a high-publicity Mafia case

and again in Detroit and, I know, across the country.

I certainly understand Your Honor's position. It is just that we were trying to assist the Court in cutting down. My experience has been on these high-publicity cases that to be able to voir dire --

THE COURT: Well, this isn't really a high-publicity case. I mean, I am very well read. I read several newspapers a day and magazines, and I have seen very little about this case. There was a lot about the Camarena murder several years ago, but not much recently.

MS. BROOKS: Well, certainly, Your Honor, it is going to pick back up again now that we are in motions and certainly at the time of trial. There was the kidnapping of Matta Ballesteros that was highly publicized. Again that was linked to the Camarena case. Mr. Verdugo's name appeared in that article. There was Mr. Subias' arrest, and again I believe that some of the defendants' names appeared in those articles, and this is very recent publicity.

THE COURT: Well, the only questions relating to a juror's prior knowledge of the case are Questions 59 to 65.

MS. BROOKS: Your Honor, peripherally, the other questions asking jurors what they watch as far as news programs and what magazines they read and newspapers

they read also go to that. It is my experience that a juror may not have a direct recollection when they first look at the case, and they will put that down; and yet they check off that they read a particular magazine that has had many, many articles, and after a little more probing the juror starts to remember.

That is exactly what we experienced in Detroit. A juror would say, "I have read nothing about this case." And then it turns out that they read the "Detroit Free Press" every day where there had been many articles on the De Lorean case. They were asked about that, and then they would say, "Oh, yes, I do remember a little something."

"What do you remember?"

"Well, I remember it had something to do with embezzlement."

"Well, what about it?"

"Well, I think he stole $8.5 million."

"Well, what else?"

"Well, apparently from his motor company."

And it went from there, and it turned out that the juror with a little prodding actually remembered everything.

And the danger is, Your Honor, that they are scared when they come in. They are absolutely petrified. There is this huge courtroom and the majesty of the Court.

They are not used to publicly speaking. They are not used to being questioned. They --

THE COURT: You have made your point.

MS. BROOKS: They freeze, and the questionnaire stops them from doing that.

MS. LEYVA: Your Honor, may I briefly add something regarding the questionnaire. The questions that we submitted on behalf of Mr. Lopez-Alvarez as additional questions in addition to what has been filed by Mr. Verdugo are questions that were asked of the jurors in the case pending before Judge Rymer, and they were specific to that case.

However, the situation, I think, is very similar in this case, the types of questions that we have proposed, and what we found, Your Honor, was that in answering the questions on paper and in private the jurors really did open up in terms of whether they thought that the defendants, because of their background, were either more likely or less likely to commit crimes of violence, for example, or whether that particular juror had had any incidents that would cause them to be uncomfortable in sitting in a trial where kidnapping or torture or murder were to be described, and those individuals were taken at sidebar and questioned about what they had noted down in the questionnaire in a manner that I think both protected

their privacy interests and in a manner that allowed them to open up and allowed defense counsel and the Government to exercise their peremptory challenges wisely. We were not dealing with challenged jurors based on that information. In fact, the Government did so as well, and I think it is a very useful tool, and it is efficient.

The jurors took about 45 minutes to an hour to fill it out. As soon as they were copied, we were all given copies, and we worked through them as fast as we could, and jury selection was very efficient, I think, in that case, and for that reason, Your Honor, I would strongly urge the Court to consider such a questionnaire. I think it is fair to both sides, and I think we will get through it much quicker and in a manner that is protective of the jurors' privacy interests as well.

MS. BROOKS: Your Honor, just one other point I wanted to make, which is that there are several Ninth Circuit cases where Courts have been reversed for failure to ask certain questions in voir dire.

THE COURT: You are free to submit your questions for voir dire.

MS. BROOKS: Excuse me, Your Honor, --

THE COURT: A lot of these questions would be appropriate for voir dire.

MS. BROOKS: What happens, Your Honor, when

we submit them to the Court in that fashion, there are these arguments at sidebar, and nothing is getting done. The questionnaire is resolved in advance. Questions are put to the jurors, and we are told in Ninth Circuit case law that we then have no room to complain about the voir dire process.

THE COURT: Do you wish to be heard?

MR. GURULE: Your Honor, it is the Government's position that voir dire by the Court is sufficient and that a questionnaire is unnecessary. Mr. Campos and I were the prosecutors who prosecuted the Raul Lopez-Alvarez case before Judge Rymer, and we do not share the same opinion that Ms. Leyva does.

THE COURT: Well, I don't share your optimistic view of it from your own description. It sounds like a cumbersome procedure.

I agree perhaps that a questionnaire developed limited to Questions 59 through 64, which deal with knowledge of the case and pre-trial publicity, might be appropriate; but as far as the other questions, I would deny that. So the ruling is that I deny your motion for this questionnaire, but I will consider a motion, which is to be agreed upon by the parties, concerning Questions 59 through 64.

MS. BROOKS: Your Honor, if there are other questions that we can support by case law, will Your Honor

consider those in our submission for the questionnaire?

THE COURT: What do you mean "supported by case law"? Do you mean I am required to do it?

MS. BROOKS: Yes, Your Honor.

THE COURT: The case law says that I must?

MS. BROOKS: Well, basically.

THE COURT: Well, I'd like to see that.

MS. BROOKS: Thank you, Your Honor.

THE COURT: When you submit your request, you can include that.

MS. BROOKS: Thank you, Your Honor.

THE COURT: Now, we have from Defendant Verdugo's motion to compel voice exemplars. The Court has read the motion and considered it as well as the opposition to it. This is my tentative conclusion with respect to Mr. Gomez. I would grant the motion, but I would tailor the order to protect the Government's interest in confidentiality. I will explain that in a moment.

With respect to the request to provide exemplars of all Government witnesses, I would deny that and state the reasons. With respect to Mr. Camarena, I would grant that, but the order would also protect the Government's interest of confidentiality.

With respect to Mr. Lopez, that does not appear to be in dispute, and I would grant that.

Now, the Court is inclined to make the following order with respect to the defendant's motion to compel Jorge Gomez-Espana to provide a voice exemplar. The Government must make a voice exemplar if Gomez is a witness/ informant, and the exemplar must be provided to the defendant when the Government identifies Gomez as a witness, if such event ever takes place.

This order balances the interests of the defendant with the Government's interest of protecting the confidentiality of its witnesses' identity prior to trial.

Now, no showing has been made to the Court sufficient to show a particularized need for the voice exemplars of all the Government's witnesses. That request has the effect of disclosing the identity of the Government's informants.

So for those two reasons the Court would deny the motion with respect to all witnesses.

A tape recording of Agent Camarena's voice should be turned over to the defendants' counsel. However, if the Government is not able to mask over the confidential informant's voice -- it has not been explained why you could not do that -- then the Court orders that the tape may only be heard by the defendants' voice expert, and no other person. Defendants, however, should be given an

opportunity to contest the authenticity of the interrogation tape by providing evidence that the voice on the tape is not Agent Camarena, if they can do that. Of course, the defendants will still be required to lay a proper foundation for the voice print evidence. The Court is not ruling on its admissibility or inadmissibility at this time. But general problems associated with the technique of voice print identification may go only to the weight, not to the admissibility, of the evidence. That remains to be seen.

At any rate, the determination on the admissibility of the evidence is best made after the Court has had an opportunity to hear both sides' testimony as to the methodology and techniques that were used.

The Defendant Lopez has not filed an opposition to defendants' request for a voice exemplar and has joined the motion with respect to Gomez and Camarena. The Court is not aware of any reason for denying defendants' request that Lopez provide a voice exemplar.

That would be what I intend to do on this motion.

Do you wish to be heard?

MR. PANCER: Nothing further, Your Honor.

MS. LEYVA: Nothing further.

MR. GURULE: Nothing further, Your Honor.

THE COURT: All right.

Defendant Verdugo's motion for notice of intention to use evidence. The Court has read and considered that motion. Now, as I understand it, Mr. Verdugo moves pursuant to Federal Rules of Criminal Procedure 12(D) for notice of the evidence that the Government intends to use against him in its case in chief at trial and identification of the methods by which the Government obtained this evidence.

In the Government's notice of intent to introduce evidence at trial, it appears that the Government has adequately responded to defendants' motion.

It does not appear that there is anything left for the Court to do with respect to this motion.

At the conclusion of its notice, the Government requests that the Court rule on the admissibility of a similar bad act by the Defendant Raul Lopez. This matter has not been raised by the Government in a properly noticed motion and will not be ruled upon at this time. The issue is raised by Verdugo as an alternative motion in his motion to sever and will be dealt with on June 20th. So we will reserve ruling on that issue on the admissibility of his prior acts until that time.

Does anyone wish to be heard on this?

MR. TARLOW: Your Honor, we joined in that

and also filed a motion that is related to that and perhaps was not covered --

THE COURT: What is the motion?

MR. TARLOW: It is a request to disclose the prior bad acts so that we can file an in limine motion to try and exclude them.

THE COURT: I haven't seen that yet unless it is in this stack. What about this motion?

MR. TARLOW: It really relates to this motion, and we could cover it now. I don't know if it is in the rest of your stack or not. However the Court wants to proceed.

THE COURT: Prior bad acts on the part of whom?

First, do you have any intention of introducing evidence of prior bad acts of -- which defendant? Verdugo?

MR. TARLOW: No. I'm interested in Mr. Felix.

THE COURT: Felix-Gutierrez.

MR. TARLOW: What the motion asked for was for the Government to tell us any wrongful conduct they intend to introduce against Mr. Felix apart from the murder/kidnapping conduct so we can file a meaningful motion with the Court or make an objection before opening statements or before the trial in order to exclude it.

THE COURT: What about that?

MR. GURULE: The Government does intend to

introduce similar acts regarding narcotics transactions, narcotics trafficking by Defendant Felix between as early as --

THE COURT: What specifically are the acts? Possession?

MR. GURULE: Possession, possession with intent to distribute, distribution, and importation of controlled substances, specifically cocaine and marijuana.

THE COURT: Does that comprise all of the bad acts you would expect to introduce?

MR. GURULE: There will be in addition some evidence regarding false passports, traveling with a false passport, traveling under an assumed and different names other than his true name.

THE COURT: Anything else?

MR. GURULE: And possession of weapons, illegal weapons. Specifically at the time of his arrest he was armed with a .45 caliber handgun.

THE COURT: All right. You will be offering these as being permissible under the rules of evidence.

Do you now know what they are?

MR. TARLOW: No, Your Honor. I mean, I know the last thing that he told Court, that is, he is going to offer that he was armed with an illegal weapon at the time of his arrest.

THE COURT: Possession of an illegal weapon.

MR. TARLOW: At the time of his arrest. That is correct. I know what that is, and obviously I can file some meaningful points and authorities with relation to that.

The general statement that at some point in time he possessed with the intent to distribute or imported some cocaine or marijuana really doesn't give me enough to intelligently brief that for the Court. I don't want to just simply submit some boilerplate regarding prior acts, but I would like to tailor what I submit to the Court to what the conduct is. If the Government would tell us where, when, and how he committed the crimes in not any great detail. I am not interested in the witnesses. But three years before in Los Angeles either related to this or not related to this, he possessed cocaine with the intent to sell, then I could file a meaningful motion; but in just looking at what you have been told -- possession with intent to distribute or importation of cocaine, I think there is no way that I can brief that and help the Court without some kind of detail.

For example, that he had a false passport -- where, when, and how? Ten years before?

THE COURT: Why do you need to know that if you simply wish to move to exclude that evidence as not

being relevant in this case?

MR. TARLOW: Well, for example, I think the false passport is relatively simple. The Government says they want to offer evidence that he had a false passport. Let's assume that evidence is ten years before; you have one kind of relevancy analogy. If the evidence is --

THE COURT: Well, don't you think that when you file your motion their response will have to indicate the relevancy of this evidence and they will have to explain why it is being offered, what its relevance is, and the proximity of the events in this case so that you will know?

MR. TARLOW: Well, what happens in that scenario, Your Honor, is, I file something which is general, saying I want to exclude this stuff, I can't say anything that helps you very much.

THE COURT: There is not much to say when you are excluding bad acts. You simply say that it is contrary to the law to allow prior bad acts unless they otherwise qualify, and you ask the Court to exclude them, and that shifts the burden to the Government to have to justify the --

MR. TARLOW: If that is the way the Court feels I should proceed, that is fine.

The only thing is, I read the transcript of the first hearing and saw where the Court said that you wanted specific points and authorities, not general ones.

THE COURT: That was in relation perhaps to the disclosure of the informant. This is an evidentiary motion.

MR. TARLOW: That is fine, Your Honor. I will file a motion to exclude it, and then the Government can say what they are and why they are admissible, and then I can file a response saying why I think their position is wrong. That is perfectly agreed.

MR. GURULE: Your Honor, I would like the record to reflect one thing, that a lot of what Mr. Tarlow is asking for he has received via discovery. Specifically, when he talks about the -- or comments about the use of the false passport, we have disclosed through discovery Customs declarations showing exit and entry in Costa Rica to Los Angeles, Mexico, Panama, et cetera. The specific dates are on those Customs declarations, the date of the travel, the exit, and the entry, and the countries involved. He certainly has that type of detailed information, along with hotel records that show use of a false name, the cities, the dates, et cetera. Again, it is very specific, and I think a lot of what Mr. Tarlow is looking for is in the discovery.

MR. TARLOW: Your Honor, I have looked through the 2,000-some pages of discovery. But that is the very purpose of Rule 12(D). I shouldn't have to guess what they

are going to use. 12(D) says to tell us so we can make an intelligent objection.

THE COURT: He has told you.

MR. TARLOW: Did you want us to set that for the 20th, Your Honor?

THE COURT: No. That should be closer to the date of trial, the in limine motions involving evidentiary questions.

We have a motion by the Defendant Verdugo for discovery of Grand Jury proceedings. The Court has read and considered this motion and the opposition to the motion, and the motion makes several different requests.

First, the Government states that there has been no order authorizing extension of the Grand Jury and no relevant Grand Jury testimony which has not been transcribed. These are two of the requests.

I assume that is the case. Is that true?

MR. GURULE: That is correct, Your Honor.

THE COURT: The Government has agreed to disclose, and the Court finds that disclosure is permissible, of the following things: records setting forth the method by which the Grand Jury was impaneled and notice of the dates and times in which the Grand Jury heard testimony concerning the investigation of Verdugo.

Mr. Verdugo seeks a variety of items the disclosure

of which entails the disclosure of the identity of the Grand Jurors. Particularly, he seeks the names or symbols of the Grand Jurors and roll sheets of the jurors' attendance. None of these materials is discoverable. Verdugo has failed to demonstrate a particularized need for such items. The asserted need that is stated is based on a speculative allegation of Grand Jury bias. Such speculation is insufficient to show a particularized need, and any asserted need is outweighed by the Court's obligation to protect the secrecy of the Grand Jury proceedings.

There is, furthermore, a presumption of regularity in the Grand Jury proceedings. Making disclosure of this information to determine whether a quorum participated in voting is unnecessary.

There is also sought by this motion a variety of items, the disclosure of which would reveal the identity of witnesses that appeared before the Grand Jury. Specifically, Mr. Verdugo seeks all subpoenas issued, copies of all Grand Jury testimony, and notice of whether other Grand Jury transcripts were presented to the Grand Jury returning the indictment. The basis for each of these requests is a generalized allegation of prosecutorial misconduct.

With respect to Mr. Verdugo's request for the subpoenas and the copies of the Grand Jury transcripts,

this allegation is completely unsubstantiated.

With respect to Mr. Verdugo's request for notice of whether other transcripts were presented to the Grand Jury, Mr. Verdugo's allegation of prosecutorial misconduct based on the introduction of hearsay evidence is contrary to the law.

Finally, Mr. Verdugo requests disclosure of all individuals to whom the Government has provided Grand Jury testimony pursuant to Rule 6(E)(3)(C)(2). This request will be examined by the Court when it rules on Mr. Verdugo's motion for Rule 6(E) sanctions, which I understand is set on June the 20th.

That is the view of the Court respecting this question. Do you wish to be heard?

MR. PANCER: Nothing further, Your Honor.

THE COURT: Defendant Verdugo's motion to suppress evidence and request for an evidentiary hearing. This is filed by Mr. Verdugo only. There is no joinder. The Court has read and considered this motion, and for the reasons which I will state to you in a moment, the Court's tentative decision is to deny the motion. The reasons are these.

The only issue before the Court is whether evidence concerning Defendant Verdugo's hair samples should be suppressed. The question of whether an evidentiary

hearing is necessary is a matter left to the discretion of the trial court. In the context of a motion to suppress, an evidentiary hearing is required if the moving papers are sufficiently detailed, specific, and non-conjectural to persuade the Court that contested issues of fact going to the validity of the search or seizure are in question.

In this case the Defendant Verdugo's claim that his arrest was pretextual is unsupported by specific and detailed factual allegations and is contradicted by the Grand Jury's indictment in this case pending in the Southern District of California. Furthermore, the active prosecution of the case belies the contention that it is pretextual. The defendant's arrest was made pursuant to a valid arrest warrant, which certifies that the arrest was based upon probable cause that an illegal act had occurred, and there was probable cause to believe that the defendant had committed the offense.

The Fourth Amendment requires only that the arrest be based upon probable cause. The fact that the Mexican officers did not obtain a Mexican warrant is not significant under the Fourth Amendment. As long as the arrest was based upon probable cause, and the arrest warrant issued in the Southern District of California certifies that there was probable cause to arrest Defendant Verdugo, then the arrest was reasonable under the Fourth Amendment.

Moreover, even if the arrest was not based upon probable cause, Defendant Verdugo consented to the Grand Jury's request that he provide hair samples. Defendant's consent, if voluntary, precludes suppression of the evidence. In this case the defendant has failed to allege that his consent was not voluntary, so there is no need for an evidentiary hearing on the issue of voluntariness. But even if consent was involuntary, the arrest was reasonable so the subsequent taking of hair samples does not constitute the fruit of an unlawful arrest.

MR. PANCER: If I may very briefly, Your Honor. It is our position -- first as to the voluntariness, I spoke with the attorney who was representing Mr. Verdugo at the time he went back to the Grand Jury in Washington, D. C., and it was at that time, I understand, that the hair sample was taken. His attorney at that time was an attorney by the name of Howard Frank, who practices law in San Diego, California. But I have been told by Mr. Frank, and I would like to make it a matter of record as an offer of proof, that Mr. Verdugo's counsel, Mr. Frank, was told by Mr. Wilson, the Assistant United States Attorney handling the case, that a hair sample would be obtained; that Mr. Verdugo could give the hair sample, or he could be taken to a Court or a judge, and a judge would order that the hair sample be given. Based on Mr. Frank's understanding

of the state of the law, the defendant did not have a right to refuse to give a hair sample, that is, that the Court could forcibly have the hair sample taken.

And rather than cause the Government to take Mr. Verdugo before the Court and to expedite the matter, he gave it without going before the Court.

It would be our position that is still not a voluntary giving when you give the hair sample, or you are told you either give the hair sample or you go to a judge and the hair sample will be ordered and forcibly taken. In other words, you can have a choice.

As to the issue of the arrest, Your Honor, we are saying that Mr. Verdugo was arrested in Mexico. He wasn't arrested in the United States. We believe, Your Honor, that U. S. agents were involved in that illegal arrest in Mexico.

It is true that once he came to the United States, they did have a warrant and they did have probable cause here in the United States, but they arrested him illegally in Mexico because they did not arrest him in accordance with either the laws of Mexico or in accordance with the laws of the United States as they apply to the extradition treaty, Your Honor.

THE COURT: Do you wish to be heard?

MR. GURULE: Just to the effect that there

is no evidence before the Court regarding any lack of consent.

THE COURT: That is true. There isn't. I am not sure that the purported evidence here would amount to that in view of the fact that the man was represented by an attorney at the time of the proceedings.

The motion is denied.

MR. PANCER: Your Honor, I understand that Your Honor trailed the severance motion until I could get here. I appreciate that.

THE COURT: Yes. We will call that.

Defendant Verdugo has filed a motion for depositions, joined in by Felix-Gutierrez and Lopez-Alvarez. The Court has read and considered, and subject to some further clarification, would grant a deposition of Caro-Quintero to the Defendant Felix. He is the only one that would be entitled to it for these reasons. The Defendant Felix has belatedly submitted the purported declaration of Caro-Quintero, who states that Felix did not assist him in traveling from Mexico to Costa Rica in 1985. The attorney who took the declaration states that Caro-Quintero manifested an acceptance and willingness to be deposed regarding this matter, but in error this willingness to be deposed was not included in the declaration.

First, Caro-Quintero is unavailable to testify at trial. That is the first requirement. The second, as a witness to acts which the Defendant Felix is alleged to have committed, he is a material witness. Finally, his declaration reveals that he has evidence favorable to the Defendant Felix.

The Defendants Verdugo and Lopez have failed to file any declaration supporting their requests for depositions; therefore, those requests are denied.

Now, the one problem I have is, how do I know -- I'd like to know what the proof is that this is a genuine declaration. How was it obtained?

MR. RANDOLPH: I can make that representation. Counsel for Jesus Felix have retained a Mexican attorney by the name of Jorje Celes, and his declaration is before the Court in the packet we submitted. He, at our request, personally met with Caro-Quintero on the date that Caro-Quintero's declaration is signed, and that is when that declaration was done. It was signed, I think, about a week ago, Your Honor.

Subsequent to that time, when I discussed it with him over the phone, he indicated that -- I discussed with him that Caro-Quintero, although verbally he stated he would be prepared to submit to the deposition, that was inadvertently excluded.

I asked him to go back the next day, and the jailer wouldn't give him access to Caro-Quintero the next day. That is why I included his declaration as well.

I had him Fax those declarations directly to my office from Mexico, which he did. I asked him to mail the originals to our office, which he has, and as soon as they are received, I will submit them and file them separately with the Court.

THE COURT: All right. Now, you understand that by granting a motion I don't guarantee that you can have the deposition because many countries have laws about depositions being taken in their country. I don't know if you are aware of that or whether you have looked into it.

MR. RANDOLPH: We have done some preliminary checking, Your Honor, but I assume that the United States State Department won't throw any obstacles in our way, and in this case hopefully they will not, and we are hoping that the Mexican government will also cooperate.

MR. GURULE: That does raise a certain point of logistics. As the Court may or may not be aware, Rafael Caro-Quintero is presently in custody in Mexico City on Mexican charges.

THE COURT: That is what I understood from his declaration.

MR. GURULE: Stemming from the kidnap and murder of Enrique Camarena. I have done a little preliminary investigation, and what I have been told is that a foreign deposition of Rafael Caro-Quintero could in fact be used in the pending Mexican proceedings against him. I think that that is one primary concern.

The second is, since there are pending judicial proceedings, we would need to obtain the judicial authority, the authority of the presiding judge over the case to permit a video-taped deposition with the full breadth of cross-examination that the Government would be requiring. If the Mexican authorities or the Mexican presiding judge does not give that authority, that might not be attainable.

Now, the other point that I raise, and I will just leave it at this, is that this case has been pending for five months, and we are getting declarations of Rafael Caro-Quintero dated last Friday. It has taken five months to get the declaration, and we have a trial date coming up, and the Government would certainly be prejudiced, substantially prejudiced, if this case were delayed months and months in an attempt --

THE COURT: And that is because of the late request and because there is no assurance that this deposition can be taken and because the offer of proof that is made here is not of great significance in the overall number

of charges, that is, it is a small part of what this defendant is charged with.

I would not expect to delay the trial because you have run into logistical problems getting the deposition. You have asked for it, and I grant it subject to your being able to work it out and get it done.

MR. RANDOLPH: Your Honor, I appreciate --

THE COURT: If you can't, we will proceed without it.

MR. RANDOLPH: I appreciate that. Two points I would like to make, Your Honor.

One is that the Court is incorrect in saying that the statement that Caro-Quintero made is only directed to one aspect of my client's case. In fact, if the one statement that is contained in his declaration that Jesus Felix did not assist him in traveling to Costa Rica from Mexico, if that indeed is accepted by the jury, for all of the charges my client will be found not guilty because the only thing he is charged with is aiding and abetting -- I am sorry -- being an accessory after the fact in assisting Caro-Quintero getting from Mexico to Costa Rica. If the jury believes Caro-Quintero over whatever confidential informants the Government presents, my client will be found not guilty. So it is not an insignificant fact. It is the most significant fact.

The second thing I'd like to say is that the Government stands up today and says that we have been tardy in pursuing our investigation when they presented the last packet of materials pursuant to this Court's discovery order last week or a week and a half ago, some almost eight weeks after you gave them a cut-off date of March 31st to present their discovery materials.

So I think to the extent the Government is allowed to file -- to not comply with this Court's orders, we should be given some leeway in terms of trying to do our investigation in Mexico while we are receiving packets of material and discovery from the Government almost eight weeks after you ordered it to be turned over. We are doing the best we can, Your Honor, and we will proceed at pace in making sure we pursue this investigation.

THE COURT: The motion is granted under the terms and conditions I have stated.

MR. GURULE: May I make one last point on that issue, and it is a concern that the Government has also relative to the Defendant Jesus Felix' presence in Mexico when the deposition is taken. Rule 15 does provide for the defendant to be transported to the location where the deposition is to be taken by the U. S. Marshals. Now, that raises all kinds of nightmares in terms of safety and security and flight and escape risks and so

on, and that is one other reason that the Government would argue that it is not in the quote-unquote interests of justice, which is the standard again, because of that safety consideration.

THE COURT: I don't recall seeing that point raised in your response.

MR. GURULE: Well, actually, it is interesting. Our hands were tied relative to our response because when the initial response was made, there was no specific deposition that was included in Mr. Pancer's papers. Basically it was a notice of intent to take somebody's deposition sometime, and the Government wasn't informed as to who that person or persons were to be or where.

THE COURT: You understood that they were of foreign nationals, didn't you?

MR. GURULE: Well, I mean that was certainly one possibility.

THE COURT: Well, you know, that is a different matter. We have Mr. Gutierrez serving a sentence in this country faced with these unlitigated charges in this case. Is it your intention to have the defendant present in Mexico during the taking of this deposition?

MR. RANDOLPH: If the law doesn't provide for it, Your Honor, or if it is a problem because he is in custody here in the United States, of course we will take

it without him being present.

THE COURT: Well, I would hope so. I would change my order if not.

MR. RANDOLPH: Your Honor, may I make one other point. That is that we are not untimely in this. This motion to request depositions, which was joined in by Mr. Pancer, was filed well before the April 15 motion date. Today is the day for the hearing. Today is the day it was to be decided.

THE COURT: All right.

MR. RANDOLPH: Incidentally, we also filed the translation of the declaration of Ernesto Fonseca-Carrillo, and we have asked that we be allowed to take his deposition as well in Mexico.

THE COURT: When did you file that?

MR. RANDOLPH: It is attached to the declaration you have before you. It is right after Jorje Celes' declaration.

THE COURT: Don't you have a motion here complaining about the Government's late filing of things?

MR. RANDOLPH: Yes, I did, Your Honor.

THE COURT: And you asked that they not be considered if filed late?

MR. RANDOLPH: Unless there is some reason that is inherent in the filing, Your Honor, as to what it

is that has been filed. We just obtained this information.

THE COURT: Well, what -- when did you file this?

MR. RANDOLPH: This was filed last week.

THE COURT: No. This other person that you wish to depose, his affidavit?

MR. RANDOLPH: It was filed at the same time as the Caro-Quintero one that you just ruled on.

MR. GURULE: The Government received it Friday, Your Honor, of last week. It was when the Government received the declarations, and it was attached to the same batch of declarations that the Caro-Quintero declaration was.

THE COURT: Well, does this affidavit show that this witness is unavailable?

MR. RANDOLPH: It does, Your Honor.

THE COURT: Is he in custody?

MR. RANDOLPH: It does, and he also states --

THE COURT: Is he in custody?

MR. RANDOLPH: He is, in Mexico.

THE COURT: And under a charge there in Mexico?

MR. RANDOLPH: He is. He is a co-defendant in this case, Your Honor.

THE COURT: What is the materiality of his evidence?

MR. RANDOLPH: First, he states that he did not -- even though he is a co-defendant in this case, Your Honor, that he is innocent of the charges and that he did not have any involvement in the case, and he will contradict Government's witnesses who presumably will come in and testify that indeed that is not so. And he was a percipient witness, obviously, Your Honor.

THE COURT: What evidence does he offer that would benefit your client?

MR. RANDOLPH: To the extent, Your Honor, that the Government has witnesses who will claim that he and Caro-Quintero are jointly involved in the abduction and torture and murder of Camarena, he states unequivocally that all the statements against him in that regard, that he was acting in concert with other people, including Caro-Quintero, that those statements are false. That information may be used either directly or to impeach witnesses who testify for the Government.

MR. GURULE: His statement obviously is very different from the Caro-Quintero statement. In the Caro-Quintero, the declaration there is he says that Jesus Felix did not assist, aid and abet, or act as an accessory after the fact, or words to that effect.

In the Fonseca-Carrillo declaration there is none of that. In fact, even if he was found innocent

of the charges against him, that would not serve to exculpate the Defendant Jesus Felix in any way but relative to whether or not he arranged the flight out of Mexico to Costa Rica and then assisted him in Costa Rica upon his arrival.

THE COURT: Well, this favorable testimony has not been interpreted in this circuit, in the Ninth Circuit, but there have been cases that have stated that the materiality prong -- the statute requires a reasoned basis for expecting that the testimony may exonerate him.

I don't think that the showing that has been made with respect to this other witness is sufficient. Therefore, your motion is granted only as to Caro-Quintero.

MR. RANDOLPH: Your Honor, may that be granted without prejudice to attempt to get a more detailed statement from Ernesto Carrillo as to what he might have to say that might exonerate my client?

THE COURT: The answer is no.

MR. TARLOW: Your Honor, may I have a moment to discuss something with Mr. Randolph.

MR. PANCER: While he is doing that, Your Honor, may I just say that while we join in that request for depositions -- we filed the original motion -- we didn't get the affidavit from Caro-Quintero, but clearly

it would be exonerating as to my client Rene Verdugo based on the Government's theory of the case. So we would ask for leave to be present at those depositions and join in the request for depositions.

MR. GURULE: I am sorry. I didn't mean to interrupt.

MR. PANCER: We are still trying to obtain depositions. Part of the problem, Your Honor, is that the Government hasn't told us much about the case, so we are continuing to do investigation. I am hopeful we may obtain affidavits on which we can base requests for depositions, and we are going to continue to do it, Your Honor, and we will lodge them with the Court.

THE COURT: At the present time I have ruled that you are not entitled for the reasons that I have stated.

MR. PANCER: To --

THE COURT: To take depositions.

MR. PANCER: But Mr. Caro-Quintero's deposition, Your Honor?

THE COURT: Yes.

MR. PANCER: We can or cannot?

THE COURT: Cannot.

MR. PANCER: Only Mr. --

THE COURT: He is the only one that filed a

motion that meets the requirements.

MR. PANCER: Well, I filed a motion. I didn't file the affidavit.

THE COURT: Well, that is what is required.

MR. PANCER: But it is the witness' affidavit, not counsel's affidavit. In other words, we can assume that the witness will testify in accord with his affidavit no matter who is asking him the questions.

THE COURT: The witness gave specific testimony regarding Mr. Gutierrez. He said nothing about your client.

MR. PANCER: That is correct. He also said that he himself was not involved in the murder of Mr. Camarena; and if that is true, then it would undermine -- and if the jury does believe that is true, then clearly it would undermine a number of the witnesses the Government intends to call.

THE COURT: The motion is denied.

MR. RANDOLPH: May I clarify one point on that, Your Honor. The Court has stated that -- I am not sure that it stated. If the law otherwise allows my client to be present in Mexico, even though he is in custody in the United States, is it the Court's ruling that notwithstanding he might legally be there, if we then wish to exercise his legal right to be there, then the Court would deny the motion?

THE COURT: Well, you told me you did not wish to exercise that.

MR. RANDOLPH: I hope I did not misstate, Your Honor. What I tried to say is that if he is not lawfully allowed to be there because of his current custodial situation, we would of course go without him. But if he is otherwise lawfully allowed to be there, we would ask that he be allowed to be there unless the Court said that that is the condition of taking the deposition.

THE COURT: Well, you make that decision. If you decide that you want to have him be there, then you file another motion with proper authorities.

MR. RANDOLPH: All right. We will do that. Thank you, Your Honor.

THE COURT: With proper authorities.

MS. LEYVA: Your Honor, briefly with respect to Mr. Lopez-Alvarez, the same with Mr. Pancer in respect to Mr. Verdugo, and that is that Caro-Quintero's declaration also affects Mr. Lopez-Alvarez, although it has been filed by Mr. Gutierrez, and that is the declaration states that he did not order or participate in the killing of Camarena. Now, that is relevant to one of the counts that Mr. Lopez-Alvarez has been charged with, and that is the aiding and abetting or accessory after the fact.

THE COURT: I told you what the rules are.

You failed to file any declaration supporting your request for depositions and therefore I am denying it. I don't understand what your point is. You haven't filed a declaration.

MS. LEYVA: Your Honor, my point is that the declaration that has been filed on behalf of Felix-Gutierrez also goes to Mr. Lopez-Alvarez, and on that basis we are also asking that we be permitted to be at that deposition of Caro-Quinteros.

THE COURT: Well, if nothing, I am consistent. That is the same request Mr. Pancer made, and therefore the same ruling obtains. Denied.

MS. LEYVA: Fine, Your Honor.

THE COURT: Now, we have a motion by the Defendant Verdugo for severance of defendants and counts for trial. The Court has read and considered this motion carefully and has reviewed both the points and authorities and the opposition that has been filed on behalf of the Government. The Court's tentative conclusion is that this motion should be denied for these reasons.

First, Bruton does not require severance in this case which has already been discussed with the other counsel, because the co-defendant's statements are not facially incriminating. Defendant's argument that the co-defendant Lopez' statements are inferentially incriminating

does not trigger the narrow exception to the general rule that a jury instruction may be able to cure prejudice created through joinder. In this case a cautionary instruction that Lopez' statements are to be considered by the jury only against Defendant Lopez will cure any prejudice.

The Court will consider Defendant Verdugo's motion to exclude the statements pursuant to defendant's separately filed motion to exclude, and not at this time.

Evidence that Defendant Lopez agreed to murder a U. S. Customs Agent, if admitted, will not require severance. Any prejudicial effect can be neutralized by careful cautionary jury instructions, which I would invite counsel to prepare and submit in the event that we need it. There is no reason why the jury would not be able to follow the Court's instruction in this case.

Severance is not required because co-defendant Lopez might offer exculpatory evidence on behalf of Defendant Verdugo. Defendant Verdugo has failed to show that Lopez would testify and that he would testify no matter when his case is set for trial, either before or after. Moreover, the defendant has failed to show that such testimony would be favorable to the defendant. The evidence does not show that Defendant Verdugo was not a member of the alleged narcotics enterprise or that he

did not participate in the kidnapping and murder of Agent Camarena.

In order to justify severance of counts, defendant must show that he has important testimony to give on some counts and a strong reason to refrain from testifying on those he wants severed. The defendant must tangibly demonstrate how defending against all counts simultaneously would prejudice his defense. Specifically, the defendant must explain what evidence he would proffer with respect to each charge and why a joint trial would prevent him from taking the stand. A defendant who testifies at trial waives his Fifth Amendment privilege and may be cross-examined on matters made relevant by his direct testimony. The scope of the defendant's waiver is co-extensive with the scope of relevant cross-examination. The ultimate issue in fixing the scope of cross-examination is whether the Government's questions are reasonably related to the subjects covered by the defendant's testimony.

In this case defendant's alleged involvement with the Caro-Quintero narcotics enterprise is relevant to the murder and kidnapping charge because it relates to the defendant's motive or intent. Evidence that the defendant participated in the enterprise is necessary to establish the purpose of the Defendant Verdugo's alleged presence at 881 Lope De Vega on February 7, 1985. Therefore,

evidence of Verdugo's involvement in the enterprise is relevant and independently admissible as to the murder and kidnapping counts.

If the trial on the murder and kidnapping counts is held first, as we must assume for purposes of this motion, then testimony elicited on cross-examination concerning defendant's activities in the Caro-Quintero enterprise would be admissible at the later trial.

As the Court stated in Nolan, that is United States vs. Nolan, which is a Ninth Circuit case, Cert denied by the United States Supreme Court in 1983, "Every time a defendant decides whether to testify, he must weigh the possibility that the testimony he gives will later be used against him."

Defendant Verdugo cannot show prejudice due to joinder because evidence of Verdugo's participation in the Caro-Quintero enterprise would be admissible in the kidnapping and murder trial. Therefore, such evidence could be elicited during cross-examination in the murder and kidnapping trial and then admitted in a subsequent trial on Counts I and II. As a result the defendant is not prejudiced by reason of this joinder.

The Defendant Verdugo is not entitled to severance from co-defendant Felix because the jury will be able to compartmentalize the evidence relating to Felix.

The defendant is not entitled to severance pursuant to Kotteakos -- that is the name of the case -- because the indictment refers to the Caro-Quintero narcotics enterprise, and not conspiracy. So first of all the RICO statute appears to present an appropriate analogy because Section 1952(b) incorporates RICO's definition of racketeering activity and of a concept of an enterprise as embodied in RICO. RICO was intended to authorize the single prosecution of a multi-faceted, diversified conspiracy through the creation of a new statutory concept called the enterprise. RICO redefined the objective of the conspiracy as actions in furtherance of the enterprise's affairs, and not merely as fulfillment of a discrete criminal act. The indictment in this case alleges that defendants, through participation in predicate acts, such as marijuana and cocaine trafficking, acted with the intention of furthering the enterprise's affairs.

For all of these reasons severance is not, in the view of the Court, appropriate.

MR. PANCER: Your Honor, I have nothing further. I would ask to be excused. I have a matter in another court. That was the last motion I was concerned with.

THE COURT: All right.

Now, we have a motion filed on behalf of all defendants for bills of particulars in the Caro-Quintero

case -- Defendants Verdugo-Urquidez, Felix-Gutierrez, and Lopez-Alvarez. They have brought separate motions for bills of particulars. Mr. Verdugo makes 22 requests for information by a bill of particulars. Felix makes 13 requests, and Lopez-Alvarez makes 28.

I want to first discuss this legal framework under which we are operating. Rule 7(f) provides that the Court may direct the filing of a bill of particulars. A motion for a bill of particulars may be made before arraignment or within ten days after arraignment or at such later time as the Court may permit. The function of a bill of particulars is to provide defendant with information about the details of the charge against him if necessary to the preparation of his defense and to avoid prejudicial surprise at trial. A defendant can be sufficiently advised of the nature of the charge without requiring the Government to go into matters of detail. However, the sole issue before the Court in determining whether to grant a bill of particulars is whether the defendant has received adequate notice of the charges against which he must defend so that he may adequately prepare his defense and avoid unfair surprise at trial.

The Court has broad discretion in determining whether a motion for a bill of particulars should be granted. The Government and the defendants have each cited

cases which arguably support their positions with respect to each request for a bill of particulars.

But as Professor Wright points out precedent may be found which supports or rejects virtually every request for a bill of particulars. The usefulness of the citations provided in the moving and opposition papers is further diminished by the lack of detail in the description of the indictments found in the written opinions. So standing alone without information as to the details of the indictment, they are not too helpful. But a review of Ninth Circuit authority, on which the Government heavily relies, may be useful in determining what kind of information the defendant has a right to receive.

The most recent Ninth Circuit case discussing a bill of particulars is United States vs. Ryland, 806 Fed.2nd 941, Ninth Circuit, 1986, certiorari denied 107 Supreme Court 2199. Ryland was convicted of various conspiracy charges and of violating the RICO statute. On appeal Ryland complained that his request for a bill of particulars had been denied. The Court of Appeals held that Ryland's argument regarding the denial of a bill of particulars misconstrues the purpose of the bill of particulars. A defendant is not entitled to know all the evidence the Government intends to produce, but only the theory of the Government's case. He is not entitled

to know the content of the testimony of each of the Government's witnesses before trial.

The Ninth Circuit's decision in Di Cesare vs. United States, 765 Fed.2nd 890, 1985, analyzes more thoroughly than Ryland a request for a bill of particulars. Di Cesare and Flannery entered conditional guilty pleas after being indicted on various drug charges. They appealed their convictions on the ground, among others, that the District Court had erroneously denied their motion for a bill of particulars. They had requested a bill for three reasons: to obtain the names of any unknown co-conspirators, to determine the exact date on which the conspiracy allegedly began, and to delineate all other overt acts that comprised the charged activity. The Court said that these reasons, however, do not warrant a bill of particulars. Moreover, neither one of these people specified any prejudice or surprise resulting from denial of the bill.

There are a number of other cases -- United States vs. Long. There was an appeal of a conviction on the ground of denial of a bill of particulars. The Court said:

> "A motion for a bill of particulars is appropriate where a defendant requires clarification in order to prepare a defense. It is denied to apprise the defendant of

the specific charges being presented to minimize the danger of surprise at trial, to aid in preparation, and to protect against double jeopardy. Long alleges that the indictment lacked specificity. As a result he argues that he was severely hampered in his preparation and ability to present an adequate defense.

"In determining if a bill of particulars should be ordered in a specific case, a Court should consider whether the defendant has been advised adequately of the charges through the indictment and all other disclosures made by the Government. Full discovery will obviate the need for a bill of particulars. A review of the record in this case reveals that Long's counsel advised the District Court that full discovery had been made."

In a case called United States vs. Giese, the Court stated that there is no requirement in conspiracy cases that the Government disclose even all the overt acts in furtherance of a conspiracy. The appellant's request for when, where, and how of every act in furtherance of

the conspiracy was equivalent to a request for complete discovery of the Government's evidence, which is not a purpose of the bill of particulars. A defendant is not entitled to know all the evidence the Government intends to produce but only the theory of the Government's case.

So the Court's analysis in this case begins with an appraisal of the information which the Government has provided the defendants through the indictment and possibly information furnished through discovery. The indictment gives the defendants information beyond the bare minimum needed to sustain against a challenge.

The requests for bills of particulars by Verdugo -- I am going to just give you the ones that I believe are appropriate to grant, and the others are all inappropriate in the framework that I have just discussed with you.

In the number one request by Verdugo, he seeks in his first request a bill compelling the Government to specify any racketeering activity not alleged in Count I which the Government intends to introduce at trial to establish the elements of Count I.

The Government implies in its opposition to this request that the defendant's request is analogous to a request for a listing of all overt acts which the Government might seek to prove in a conspiracy case.

As I have already said, the Government is not required to disclose all overt acts of a defendant.

A request for a bill of particulars specifying racketeering activity may be distinguishable from a request for a bill of particulars specifying overt acts. Under conspiracy law knowledge of an overt act is not essential to proving a conspiracy. Under Section 1952(b) of Title 18 knowledge of racketeering activity is presumably an essential element of the offense. 1952(b), under which the defendants are charged in Counts I and II of the indictment, provides that one who engages in murder and kidnapping, among other things, in order to maintain or increase one's position in a racketeering enterprise is guilty of an offense. While no case has defined the elements of Section 1952(b), the defendant's contemporaneous knowledge of the enterprise's racketeering activity is undoubtedly an essential element of the offense.

Since the offense requires that the defendant knows about an act of racketeering activity, the defendant is entitled to be apprised fully of any racketeering act engaged in by the enterprise which the Government intends to rely upon in order to prove defendant's contemporaneous knowledge.

So I would grant this first request.

I would deny the second request, which seeks

date, time, and place of the alleged conspiracy. I have already discussed the case of Di Cesare vs. United States, which states that the defendant need no greater specificity to prepare his case than is alleged in the indictment.

I would deny No. 3, which seeks date, time, and place when each other co-conspirator allegedly joined the conspiracy.

No. 4 seeks the present whereabouts -- names and present whereabouts of all members of the Caro-Quintero narcotics enterprise who were present during the kidnapping of Camarena. The defendant is not entitled to this information, except he is entitled to seek information as to his presence at the kidnapping. If it is the Government's theory that he was present or participated in it, he ought to know about it.

In other words, is he charged as a principal or as an aider and abettor? If he is charged as a principal, then he ought to know. On the other hand, if he is charged as an aider and abettor, he is entitled to know the theory. The indictment alleges both and combines them in one indictment.

Now, in respect to this, the defendant is not entitled to a response in full since the Government is under no obligation to provide him with a witness list. The defendant may be entitled to information under this request

to the extent he seeks information about his presence. It is unclear from a reading of Counts I, II, and III whether the Government is proceeding on the theory that Verdugo-Urquidez participated as a principal in the kidnapping of Camarena or whether the Government bases its charges on the theory that the defendant is liable as a conspirator or as an aider and abettor. Ninth Circuit precedent entitles a defendant to information about the theory of the Government's case. That is basically what it is -- whether both or one or the other.

The defendant is entitled arguably and probably should be to notice of the overt acts he allegedly took, he himself took, in furtherance of the conspiracy or the crime in order to avoid unfair surprise at trial.

I would deny the No. 5 request for the reasons previously discussed.

No. 6 is a request for the names and present whereabouts of all persons known to be present and alleged to have participated in the torture, interrogation, and murder of Camarena. For the reasons previously stated, the defendant is not entitled to that.

In No. 7 the defendant seeks information as to the manner in which defendant participated in the murder of Camarena. Well, this again goes to the issue of whether he was a principal or aider and abettor. The defendant

is not entitled to know the evidence which the Government will present. On the other hand, if the Government intends to proceed solely on the theory that the defendant aided and abetted a kidnapping, the defendant should be entitled to know that that is the theory. I don't believe that he is entitled to acts which the Government contends constitutes aiding and abetting. That would be providing the evidentiary basis for the claim. Aiding and abetting is sufficient to put the defendant on notice.

No. 8 is denied because defendant is not entitled to the names of the co-conspirators.

No. 9 is denied. As long as the defendant has notice of the Government's theory of this case, failure to provide this information will not lead to unfair surprise at trial.

No. 10, defendant seeks names and present whereabouts of all persons allegedly known to be present when Caro-Quintero allegedly ordered the kidnapping of Camarena. Defendant is not entitled to obtain names of unknown conspirators.

No. 11 should be denied for the same reason. The defendant seeks the names and present whereabouts of members of the enterprise.

No. 12 is denied. The Government is not required to disclose how an overt act furthered the conspiracy.

No. 13 is denied for the same reasons set forth in the previous one. The Government is not required to disclose the manner in which the defendant furthered the conspiracy by going to the site of Camarena's alleged torture.

No. 14 is denied. That is a request of where, when, and how of every act, and that is beyond the scope of a bill of particulars.

No. 15 is denied. The Government need not delineate all overt acts that comprise the charged activity.

No. 16 is denied also. The defendant is not entitled to a detailed accounting of evidence which he seeks.

No. 17 is denied for the same reason as the previous one, as 16.

No. 18, the defendant seeks the theory of prosecution of defendant for violating Title 18, Section 1111(a) and information as to whether the Government intends to introduce evidence that the defendant participated in the murder of Camarena. The defendant is entitled to know whether the Government intends to rely solely upon the defendant's alleged role in the kidnapping of Camarena, that is, a felony murder theory, or whether the Government will seek to prove that the defendant participated directly in the murder. The defendant is entitled to the theory

of the Government's case.

No. 19 is denied. The defendant is not entitled to know the content of the evidence which the Government will present.

No. 20 is denied. The defendant seeks to compel the Government to specify whether it will seek to prove first or second degree within the allegations of Count 5. The Government need not answer this request for information since under any theory of the case the defendant is chargeable with first degree murder. 18 U.S.C. 1111(a) states that every murder committed in the perpetration of any kidnapping is murder in the first degree.

No. 21 is denied for the reasons discussed in the previous analysis of No. 20.

No. 22 seeks to compel the Government to specify all actions and circumstances supporting the element of malice. If the Government is relying upon the felony murder theory, the underlying felony establishes the requisite malice. That is from the case of United States vs. Lilly, Ninth Circuit, 1975. If the Government is not relying upon the felony murder rule, it is nonetheless not required to marshal its evidence before trial for the benefit of the defendant.

That concludes the rulings on the Verdugo

bill of particulars.

With respect to the Lopez request the defendant there is entitled to specification of whether the Government contends that the defendant kidnapped or aided and abetted in the kidnap. This request should be granted -- that is, the theory of the Government's case against Lopez. That would be No. 5 which would be granted.

No. 9 is again a request for specification of the theory, whether it is a direct murder or aided and abetted the murder. This should be granted. The defendant is entitled to know the theory.

No. 10 should be granted. The defendant's request should be granted to seek specification of whether the Government contends that the defendant transported or aided and abetted in the transportation of the bodies. If the Government proceeds on the theory that the defendant aided and abetted the alleged crimes or on the theory that defendant is an accessory after the fact, the indictment may be a little skimpy on the information, and to avoid the possibility of unfair surprise at trial, that should be clarified.

Incidentally, counsel who are waiting on these other civil matters, I must apologize for this delay, but we will be getting to you very shortly. We are almost finished.

The defendant in No. 11 seeks information as to the manner in which the defendant participated in the murder/kidnapping of Camarena. If the Government is proceeding on the theory that Lopez was a principal, further specification of the manner in which he participated is unnecessary. Defendant is not entitled to know the evidence which the Government will present. If, on the other hand, the Government intends to proceed solely on the theory that the defendant aided and abetted in the kidnap and murder, that is sufficient to put the defendant on notice without a specification of the acts which the Government contends constitute aiding and abetting. The defendant will be on notice, and the Court does not view that as involving surprise.

No. 12 I would deny for reasons I have already stated.

13 and 14 are also denied. 15 and 16 and 17 and 18 are denied.

19 also is denied as well as 20.

21, 22, 23, 24, 25, 26, 27, and 28 are denied as not being within the scope of a bill of particulars.

The Defendant Felix-Gutierrez has filed 13 requests, all of which are denied for a bill of particulars, mostly because of the same reasons that I have already discussed.

That would be the ruling of the Court on the bill of particulars.

MS. BROOKS: Your Honor, may I be heard on just one item on Mr. Verdugo's. That would be Item 17.

THE COURT: Yes.

MS. BROOKS: Thank you. Your Honor, Item No. 17 should have read just like Item No. 18, which the Court granted, in relation to the murder. Item 17 is in relation to the conspiracy -- actually 16 is in relation to the conspiracy to kidnap. 17 is in relation to the substantive kidnapping offense. We phrased it to specify the manner. It would have been more appropriate to have said to specify the Government's theory as to how Rene Verdugo participated in the conspiracy to kidnap and the kidnapping. We are completely in the dark as to that. We have no idea of what the Government's theory is as to Mr. Verdugo's participation.

If they are saying mere presence in Guadalajara at the time of the kidnapping is their theory, that is fine. If they could just tell us that. We are not asking for his actions. We are asking for the Government's theory, which the Court did grant in relation to the murder.

THE COURT: Well, you are entitled to the Government's theory.

MS. BROOKS: That is what we are asking for.

I apologize to the Court. We didn't word 16 and 17 properly. It should have read just as 18 did, which is to specify the theory of the prosecution only in relation to Counts 3 and 4 instead of Count 5, the murder.

THE COURT: All right. The theory may be provided, also as to that account.

MS. BROOKS: Thank you, Your Honor.

MR. GURULE: Is the theory, Your Honor, regarding principal versus aider and abettor? When we leave the courtroom, I don't want there to be a misunderstanding between Ms. Brooks and myself as to what the Court is requiring the Government to do here. I don't want that to be misinterpreted as the manner, and then the Government having to detail all of its evidence that it has regarding --

THE COURT: You don't have to give any evidence. I have already said that.

MR. GURULE: Fine, Your Honor.

THE COURT: This relates to what count?

MS. BROOKS: Counts 3 and 4, Your Honor, the conspiracy to kidnap and the kidnapping. We are asking for the Government's theory of prosecution.

THE COURT: When you say the "theory of prosecution," the theory is that your client was a member of the conspiracy.

MS. BROOKS: Unfortunately we have no idea

what the Government's theory is behind that.

THE COURT: Well, you mean you don't have the evidence on which they rely to prove it?

MS. BROOKS: We don't know principal. We don't know aider and abettor. We don't know whether it was mere presence.

THE COURT: You know, in a conspiracy you are not talking about aider and abettor. We are talking about it was knowledgeable membership in a conspiracy.

MS. BROOKS: I understand that, Your Honor. Our problem is there is nothing in the indictment to indicate how Mr. Verdugo is involved in the conspiracy to kidnap, and in the 2500 pages of discovery that we have received in relation to Mr. Verdugo, it is less than a quarter inch that pertains to him.

THE COURT: I deny your request, as I have already indicated previously.

MS. BROOKS: On 16?

THE COURT: It appears to be a request for evidentiary theory.

MS. BROOKS: And, Your Honor, on Item 17 our request would be --

THE COURT: Denied.

MS. BROOKS: Again as to principal or aider and abettor in relation to the kidnapping?

THE COURT: Well, that would be granted as to whether or not he is an aider and abettor or principal.

MS. BROOKS: Thank you, Your Honor.

MS. LEYVA: Your Honor, briefly with respect to Lopez-Alvarez, Requests Nos. 7 and 8 are also requests for theory of the case as to whether he is alleged to be a principal or an aider and abettor, and I would request of the Court that the Court reconsider the denial.

THE COURT: In No. 7 the defendant seeks the names of all -- it is referred to as other members of the enterprise. Is that the one?

MS. LEYVA: No, it is not. It is page 3 of our motion.

THE COURT: Well, what number?

MS. LEYVA: Nos. 7 and 8.

THE COURT: What number is the request?

MS. LEYVA: The request, Your Honor, is No. 7 and No. 8, and they appear on page 3.

MR. GURULE: I think the Court may be looking at Mr. Felix-Gutierrez' request. It would be Mr. Lopez' request.

THE COURT: All right. Let me look at that. Lopez-Alvarez, No. 7.

MS. LEYVA: No. 7 and No. 8.

THE COURT: No. 7 is that the defendant seeks

specification as to whether the Government contends that the defendant participated in the torture or aided and abetted the torture.

Well, this is the same request the other defendants have made. You are asking for the theory of the prosecution, whether it is as an aider and abettor or a principal?

MS. LEYVA: Yes, and that goes to Requests No. 7 and No. 8, Your Honor.

THE COURT: That may be specified as to whether the theory of the prosecution is as an aider and abettor or as a principal as to both No. 7 and No. 8.

MS. LEYVA: Your Honor, and the other matter with respect to the portions that the Court has granted, will the Court give us a date when we will receive the specifications of the Government so that we may proceed with our investigation.

THE COURT: Ten days. The Government is ordered to file and serve the bill of particulars in ten days.

MR. GURULE: Thank you, Your Honor.

MR. RANDOLPH: May I, Your Honor? With respect to one of ours, it has the phrase "and elsewhere." That phrase appears in the indictment where they refer to the accessory after the fact actions of Jesus Felix.

The Government states: "From in or about February 1985 to April 4, 1985, in Mexico, Costa Rica, and elsewhere."

Our problem is that we don't know whether to investigate activity in Mexico, Costa Rica, or the rest of the world, and at least they were able to be more specific in the general allegations.

In No. 3 of the indictment they say that the Caro-Quintero narcotics enterprise engaged in activities in Mexico, Colombia, Costa Rica, and the Central District of California.

I will submit all the others, Your Honor, but with respect to "and elsewhere," we need a little more specificity so we know where to be focusing our investigation. We don't know if we need the United States, Colombia. We just don't know.

10

THE COURT: The Court adopts its stated tentative ruling without change.

MR. GURULE: May I inquire as to just one item that the Government is required to disclose, Your Honor. This is again for clarification so I don't have to come back to the Court and seek further clarification.

As to Defendant Verdugo's motion for bill of particulars, and only as to Item No. 1, which the Court granted, and that is the disclosure of other racketeering activity, now, is the Court saying there that the Government

has to disclose other racketeering activity which the Government intends to introduce as to Verdugo, in other words, other racketeering activity that Defendant Verdugo participated in that is not specified in the indictment? Is the Court saying --

THE COURT: Well, the request was for a bill of particulars to compel the Government to specify any racketeering activity not alleged in Count I which the Government intends to introduce at trial to establish the elements of Count I.

MR. GURULE: So, in that sense, what is being requested is racketeering activity which relates to any other co-defendant in the case even if it is not, per se, being admitted as to Defendant Verdugo. For instance, if there is racketeering activity for narcotics trafficking activity, to really put it in its layman terms, or narcotics activity that the Defendant Jesus Felix is involved in, specifically 404(b) type of activity that is not specified in the indictment, then the Court would be saying that the Government has to disclose that in advance, and I don't believe that that is the law in the Ninth Circuit, and again I think it would go back to basically having to disclose all of its evidence of any narcotics --

THE COURT: You don't need to disclose all

the evidence, just your theory on the charges against this defendant on the racketeering charges.

MR. GURULE: Just the theory.

THE COURT: Yes.

MR. GURULE: Thank you, Your Honor.

MR. RANDOLPH: With respect to that one, Your Honor, would the Court entertain making the same order with respect to racketeering activity alleged against Jesus Felix?

THE COURT: No, unless you made that request. I have ruled on all the requests that were made, and I don't want anymore of this off-the-cuff business.

You filed a motion for sanctions or alternatively for a continuance for non-compliance with the Court's discovery order. What is that about?

MR. RANDOLPH: Well, Your Honor, the Government was ordered by the Court on or about, I believe, March 21, to comply with the discovery orders and produce discovery to the defendants on or before March 31.

As we noted in our motion for sanctions, Your Honor, on four different occasions up to and including a week ago, the Government has submitted over 100 pages of discovery that they should have disclosed by March 31. This discovery fell within the Court's order, and it contained -- a vast majority of the material was in the

Government's possession for several months, if not for several years. The Government did not see fit to respond to our motion and provide the Court with an explanation as to why they didn't timely comply with the Court's discovery orders.

We ask for sanctions, the sanction being -- the most severe sanction would be not only the discovery, but none of the information contained therein could be used against the Defendant Felix.

Since this motion is being brought before the trial, that is why we included the alternate sanction that the Court grant the Defendant Felix sufficient time to integrate the belated discovery into Defendant Felix' investigation, which is ongoing, as the Court knows, and grant us a comparable period of time within which to complete our investigation because of the Government's inability or what have you to comply with the Court's orders.

THE COURT: Well, first let me hear from you on this.

MR. GURULE: Your Honor, as the Court can well appreciate, in light of the fact that the indictment was returned actually five months ago to the day, the investigation in this case has not remained static, and there have been additional witnesses since the return

of the indictment, since the cut-off date that the Court has given the Government for discovery; and based on additional evidence that has come to the Government's attention, additional witnesses that have agreed to testify for the Government, it has generated additional discovery.

I am not saying that -- I don't mean to be misunderstood that every item of discovery that has been disclosed after the cut-off date is new evidence, but certainly a good portion of that evidence is new evidence.

Secondly, there have been items that have come to our attention after Mr. Campos and I have somewhat debated whether they arguably constituted Brady. For instance, there have been a number of FBI fingerprint reports that turned out to be negative, in other words, they did not match -- the fingerprints found at Lope De Vega did not match the defendant's.

We made a decision after the fact to err on the side of caution and to disclose that documents as possibly being Brady.

THE COURT: All right.

MR. GURULE: So there is certainly nothing dilatory in that regard, and that has happened on occasion as well.

THE COURT: Well, the motion for sanctions is

denied. I propose to -- the present trial date is June 28. Is that right?

MR. RANDOLPH: It is, Your Honor.

THE COURT: In view of the fact that we have another wave of motions to resolve on the 20th and some of the rulings that have been made today, the Court is of the view that this case should be continued for a brief time for trial. I will insist that it proceed at that time, and I will expect it to proceed, and there will not be any change. That date would be July 19.

MR. RANDOLPH: May I address that, Your Honor?

THE COURT: Is there a problem with the date?

MR. RANDOLPH: Yes, there is, Your Honor.

THE COURT: What is the problem?

MR. RANDOLPH: Two problems. First, in our reply on the motion for sanctions --

THE COURT: Tell me what the problem is.

MR. RANDOLPH: Two problems, Your Honor. First, I don't think that July 19 -- my investigation into how long the out-of-country depositions will take advises me that it is going to take approximately 60 days to complete that process.

The second thing is that I am trailing for trial, as I pointed out, in State Court, and I have two trials.

THE COURT: Counsel, I was prepared to go ahead with this case on June 28.

MR. RANDOLPH: I understand that.

THE COURT: If you would prefer that, we can still do it. July 19 is the best I can do for you.

MR. RANDOLPH: May I respond to what the Government said.

I think that Mr. Gurule is being less than candid in his statement that a good portion of the evidence --

THE COURT: You may not respond.

MR. RANDOLPH: Well, he is not being truthful with the Court.

THE COURT: You may not respond. If you wish the date to remain as presently set on June 28, we will leave it set on the 28th.

MR. RANDOLPH: I don't --

THE COURT: If you wish to have it continued to July 19, I am prepared to do that.

MR. RANDOLPH: Would the Court consider an additional week? That would give me 60 days to complete the deposition of Caro-Quintero.

THE COURT: July 19. The present trial date will be vacated and continued to July the 19th.

MR. GURULE: Thank you, Your Honor.

THE COURT: If there is nothing further, we

will adjourn.

MR. RANDOLPH: Your Honor, there is one further matter. Mr. Gurule stood up in court earlier today and started to what I would characterize as a tirade about the alleged violence in activities of members of this organization, which was unspecified. I would ask the Court either to have Mr. Gurule place before the Court and counsel some evidence of the violence and the organization which he is referring to or else sanction him. Please admonish Mr. Gurule --

THE COURT: Counsel, you are wasting my time. What counsel said is not evidence. It is not viewed by the Court as evidence. I pay no attention to these kinds of assertions. I pay less attention to the type of incrimination you are engaged in now. It is not helpful in getting this case finished.

We are going to adjourn at this time.

MR. RANDOLPH: Thank you, Your Honor.

(Proceeding concluded.)

I hereby certify that the foregoing is a correct transcript of the proceedings had on the record in the above-entitled matter.

Velma B. Thomas 6/20/88

Official Reporter Date