1  ROBERT C. BONNER
   United States Attorney
   ROBERT L. BROSIO
2  Assistant United States Attorney
   Chief, Criminal Division
3  ROEL C. CAMPOS
   Assistant United States Attorney
4  Major Narcotics Section
        1400 United States Courthouse
5       312 North Spring Street
        Los Angeles, California 90012
6       Telephone:  (213) 894-6682

7  Attorneys for Plaintiff
   United States of America
8

ORIGINAL

ORIGINAL

FILED
CLERK, U.S. DISTRICT COURT

OCT 18 1988
4'.20

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

9              UNITED STATES DISTRICT COURT

10         FOR THE CENTRAL DISTRICT OF CALIFORNIA

11 UNITED STATES OF AMERICA,        )   NO. CR 87-422(B)-ER
                                    )
12              Plaintiff,          )   GOVERNMENT'S SENTENCING
                                    )   MEMORANDUM
13         v.                       )
                                    )   Raul Lopez
14 RENE MARTIN VERDUGO-URQUIDEZ,    )   Sentencing:  October 24, 1988
   RAUL LOPEZ-ALVAREZ,             )                1:30 p.m.
15 JESUS FELIX-GUTIERREZ,          )
                                    )   Rene Martin-Verdugo-Urquidez
16              Defendants.         )     and Jesus Felix-Gutierrez
                                    )   Sentencing:  October 26, 1988
17 _____ )                1:30 p.m.

18      The government respectfully submits its sentencing memorandum,

19 providing its recommendations as to all three defendants.

20      DATED:    October 1ʃ, 1988.

21                           Respectfully submitted,

22                           ROBERT C. BONNER
                             United States Attorney
23

ENTERED ON COURTRAN
OCT 26 1988

24 /

25 /

26 RCC:jcrdd

S/S

27

28

ROBERT L. BROSIO
Assistant United States Attorney
Chief, Criminal Division

JIMMY GURULE
Assistant United States Attorney
Major Narcotics Section

ROEL C. CAMPOS
Assistant United States Attorney
Major Narcotics Section

    Attorneys for Plaintiff
    United States of America

2

# TABLE OF CONTENTS

|  |  | PAGE |
|---|---|---|
| TABLE OF AUTHORITIES |  | iii |
| SENTENCING MEMORANDUM |  | 3 |
| I. RECOMMENDATION |  | 3 |
| | A. Rene Verdugo-Urquidez and Raul Lopez-Alvarez | 3 |
| | B. Jesus Felix-Gutierrez | 6 |
| II. FACTUAL BACKGROUND FOR SENTENCING |  | 6 |
| | A. Rene Verdugo-Urquidez | 6 |
| | 1. Chief Lieutenant to Caro-Quintero | 6 |
| | 2. Losses To The Caro-Quintero Enterprise Caused By or Attributed To DEA | 8 |
| | 3. Rene Verdugo's Role In The Kidnappings And Murders | 10 |
| | 4. Rene Verdugo's Admissions | 11 |
| | B. Raul Lopez-Alvarez | 13 |
| | 1. Admissions Regarding Working For Caro-Quintero and Fonseca | 13 |
| | 2. Lopez-Alvarez's Admissions Regarding His Participation In The Kidnapping And Murder of SA Camarena | 14 |
| | 3. Lopez-Alvarez's Admissions Regarding His Being An Accessory After The Fact | 15 |
| | C. Jesus Felix-Gutierrez | 16 |
| III. PUBIC CONFIDENCE DEMANDS A SEVERE SENTENCE | | 18 |

## TABLE OF CONTENTS (Continued)

PAGE

IV.   APPLICABLE LAW                                        19

      A.   A Sentencing Judge May
           Consider Any Trustworthy
           Information                                      19

      B.   The Court Has The Authority
           To Impose A True "Life"
           Sentence On Raul Lopez-Alvarez
           And Rene Verdugo-Urquidez By
           Mandating A Minimum Parole
           Eligibility Date                                 22

           1.  Legislative History                          22

V.    CONCLUSION                                            25

TABLE OF AUTHORITIES

PAGE(S)

CASES:

Towsend v. Burke,
      334 U.S. 736 (1948)                              19

United States v. Ashley,
      555 F.2d 462 (5th Cir. 1977)                      21

United States v. Barker,
      771 F.2d 1362 (9th Cir. 1985)                     22

United States v. Bowdach,
      561 F.2d 1160 (5th Cir. 1977)                     21

United States v. Gwaltney,
      790 F.2d 1378 (9th Cir. 1986),
      cert. denied, 107 S. Ct. 1337 (1987)              24

United States v. Marcello,
      423 F.2d 993 (5th Cir. 1970),
      cert. denied, 398 U.S. 959                        21

United States v. Nunn,
      525 F.2d 958 (9th Cir. 1976)                      21

United States v. O'Driscoll,
      761 F.2d 589 (10th Cir. 1985)                     24

United States v. Tucker,
      404 U.S. 443 (1978)                               20, 21

United States v. Whitworth,
      No. 86-1256, filed September 1, 1988              4, 24, 25

Williams v. New York,
      337 U.S. 241 (1949)                               21

Williams v. Oklahoma,
      358 U.S. 576 (1959)                               20

STATUTES:

18 U.S.C. § 3                          5, 6

18 U.S.C. § 1111                       5, 22

18 U.S.C. § 1201(a)(5)                 5

18 U.S.C. § 1201(c)                    5, 22

18 U.S.C. § 1405(b)(1) (1976)          22

18 U.S.C. § 1952B                      4, 22

18 U.S.C. § 3577                       20

18 U.S.C. § 4201                       22

18 U.S.C. § 4205(a)                    3, 22, 24

18 U.S.C. § 4205(b)                    3, 5, 24, 25

18 U.S.C. § 4205(b)(1)                 22, 23

18 U.S.C. § 4205(b)(2)                 22

18 U.S.C. § 4208                       23

1

## SENTENCING MEMORANDUM

2

I

3

## RECOMMENDATION

4

A.   Rene Verdugo-Urquidez and Raul Lopez-Alvarez

5    For their participation in the kidnapping, torture and murder

6    of Drug Enforcement Administration (DEA) Special Agent (SA)

7    Enrique Camarena and of DEA informant Alfredo Zavala-Avelar, the

8    government respectfully requests that the court impose "true" life

9    sentences upon Rene Verdugo-Urquidez and Raul Lopez-Alvarez.  The

10   crimes for which they were convicted are so heinous that if

11   capital punishment were available under federal law, the

12   government would seek the death penalty.  However, as the court is

13   aware, imposing a "straight" life sentence as prescribed under

14   federal law will result in the prisoners being eligible for parole

15   in ten (10) years.  (18 U.S.C. § 4205(a)).  The government

16   strongly maintains that both Verdugo-Urquidez and Lopez-Alvarez

17   should not be provided the opportunity for parole.  The gravity of

18   their crimes and the need to protect the public demands that they

19   be imprisoned for the rest of their lives.

20   As discussed more fully below, Congress has provided district

21   courts under 18 U.S.C. § 4205(b) a sentencing option that enables

22   a district court to render a "true" life sentence.  Under Section

23   4205(b), a district court may impose a sentence for a term of

24   years, and designate a minimum term which must be served before

25   the prisoner shall be eligible for parole.  That statute also

26   provides that the minimum term cannot exceed more than one-third

27   of the maximum sentence imposed.  It is settled in the Ninth

28                                   3

Circuit that harsh sentences imposing a very long minimum term for parole eligibility are proper when the crimes are grave.

In fact, the government's recommendation is based upon a very recent Ninth Circuit case, <u>United States v. Whitworth</u>, No. 86-1256, filed September 1, 1988 (appellant Jerry Whitworth was convicted for espionage as part of the infamous "Walker Spy Ring") (see Exhibit A).  In <u>Whitworth</u>, the Ninth Circuit approved of a sentence consisting of 180 years for each of seven counts of espionage (1,260 years plus 17 years for tax violations).  The court ordered that 365 years of that sentence were to run consecutively, and provided for a minimum period of sixty (60) years before parole eligibility would accrue.

Accordingly, the government respectfully recommends that the following sentences be imposed as to Verdugo-Urquidez and Lopez-Alvarez:

> COUNT ONE: [Violation Of 18 U.S.C. § 1952B
>         - Violent Crimes In Aid Of
>         Racketeering Activity (As to
>         the kidnapping and murder of
>         Special Agent Enrique
>         Camarena).]
>         **--A Term of 180 years.--**
> COUNT TWO: Violation Of 18 U.S.C. § 1952B
>         - Violent Crimes In Aid Of
>         Racketeering Activity (As to
>         the kidnapping and murder of
>         Captain Alfredo Zavala-Avelar).

4

                          --A Term of 180 years.--

COUNT THREE:    Violation Of 18 U.S.C. §

                1201(c):  Conspiracy To Kidnap

                A Federal Agent.

                --A Term of 180 years.--

COUNT FOUR:     Violation Of 18 U.S.C. §

                1201(a)(5):  Kidnapping a

                Federal Agent.

                --A term of 180 years.--

COUNT FIVE:     Violation Of 18 U.S.C. § 1111:

                Felony Murder.

                --A term of 180 years.--

As to Raul Lopez-Alvarez only:

COUNT SEVEN:    [Violation Of 18 U.S.C. § 3 -

                Accessory After The Fact.]

                --A term of ten years,

                   consecutive.--

     The government recommends (1) that the

Court order that 360 years of the sentences for

Counts One and Two be served consecutively by

Verdugo-Urquidez and Lopez-Alvarez and that the

sentence on three, four and five run

concurrently:  for a total of 900 years,

(2) that Lopez-Alvarez also serve Count Seven

(10 years) consecutively to Counts One and Two,

and (3) that Verdugo-Urquidez and Lopez-Alvarez

not be eligible for parole for sixty (60)

years, pursuant to 18 U.S.C. § 4205(b).

                          5

B.   Jesus Felix-Gutierrez

It is respectfully recommended that as to Jesus Felix-Gutierrez, aka, CACHAS, the court impose the maximum sentence under the statute:

COUNT SIX:      Violation Of 18 U.S.C. § 3 -
                Accessory After the Fact
                **--A term of 10 years**
                **consecutive to his current**
                **sentence.--**

II

## FACTUAL BACKGROUND FOR SENTENCING

The court presided over an eight week trial and considered over 100 motions and accompanying briefs in this case. Consequently, the government will not seek to present anew all of the evidence adduced at trial.  Instead, the government will seek only to summarize the role of each defendant in the crimes as supported by the evidence.

A.   Rene Verdugo-Urquidez

1.   Chief Lieutenant to Caro-Quintero

The evidence presented at trial showed very clearly that Rene Verdugo-Urquidez was a chief lieutenant in the Rafael Caro-Quintero narcotics enterprise.  Verdugo was in charge of smuggling into the United States thousands of pounds of marihuana for Caro-Quintero and the enterprise.  The evidence showed that Verdugo directed one operation in which a Sikorsky helicopter transported individual loads of over 4,000 pounds of marihuana to a remote area near Casa Grande, Arizona.  In that operation alone,

6

1   from late 1983 until late 1984, Verdugo smuggled approximately
2   132,000 pounds of marihuana for the enterprise.  (33 loads x 4,000
3   pounds, per testimony of David Dieter and Eugene Hollestelle).

4       Verdugo told David Dieter, who acted as an accountant and
5   radio operator for the helicopter flights, that the Casa Grande
6   operation was only one of several other smuggling operations that
7   he supervised.  Verdugo also told Dieter that one particular
8   customer owed him over $25,000,000 for marihuana.  Verdugo also
9   told to Dieter that he was "Rafa's No. 2 man."  Similarly, he told
10  Manuel Cretin that because of the amount of marihuana he moved for
11  Caro-Quintero, he had a "preference" as to the marihuana he
12  obtained from Caro-Quintero's fields.

13      The evidence clearly showed that Verdugo socialized with
14  Caro-Quintero (attended New Year's Eve party in January 1985, per
15  Laurie Glenn's testimony).  Verdugo and his wife were also very
16  close to Manuela, Caro-Quintero's sister.  Verdugo's wife went on
17  shopping sprees with Manuela (per Dieter and Hollestelle's
18  testimony) and Verdugo and his wife had dinner with Manuela in
19  Guadalajara in January, 1985.  (per Laurie Glenn's testimony).

20      Therefore, Rene Verdugo held a special position with
21  Caro-Quintero -- that of a chief lieutenant, responsible for
22  smuggling into the United States much of Caro-Quintero's marihuana
23  and that of being a close confidant, a person he socialized with
24  and who would be entrusted with family members such as his
25  sister.  Consequently, as discussed below, Verdugo's presence in
26  Guadalajara and his presence at Caro-Quintero's residence at the
27  same time that SA Camarena was being tortured and interrogated is

28                              7

1  compelling evidence that he was there to participate in the
2  interrogation of SA Camarena.  In fact, the forensics evidence
3  showed that Verdugo was in the very room at Caro-Quintero's
4  residence where Camarena and Zavala were interrogated and
5  tortured.  Verdugo's presence in the torture room with Camarena
6  demonstrated his participation in the crimes.

7      Verdugo was a logical choice for Caro-Quintero to entrust
8  overseeing portions of the interrogations and a person who also
9  had a major stake in learning what information DEA possessed about
10  the organization and about Verdugo specifically.  As discussed
11  below, two days prior to SA Camarena's kidnapping, Verdugo's
12  helicopter operation was "busted."

13      2.    Losses To The Caro-Quintero Enterprise Caused By or
14            Attributed To DEA

15      The evidence showed that DEA (through the direct efforts of SA
16  Camarena and his informant Capt. Zavala) caused millions of
17  dollars of losses to the Caro-Quintero narcotics enterprise in May
18  of 1984 near the city of Zacatecas, Mexico by seizing ten (10)
19  tons of marihuana, 6,500 pounds of marihuana seed (enough
20  marihuana seed to plant 6,500 acres of marihuana) and by
21  disrupting the harvest.  In the arrests and seizures pertaining to
22  Zacatecas, SA Camarena's true identity as a DEA undercover agent
23  was revealed to members of the Caro-Quintero organization.

24      In November, 1984, DEA further caused a massive seizure of
25  marihuana from the Caro-Quintero enterprise in the state of
26  Chihuahua near the cities of Bufalo and Chilecote.  Testimony
27  indicated that over 10,000 tons of marihuana (the largest ever

28                              8

1  recorded) were seized and eradicated, causing losses in the
2  billions of dollars.  The operation involved approximately 8,000 -
3  10,000 field workers and the harvest was completely disrupted.

4      On February 5, 1985, two days before SA Camarena was
5  kidnapped, Rene Verdugo's Sikorsky helicopter (Casa Grande)
6  operation was discovered and terminated by the joint effort of
7  U.S. Customs (aerial surveillance) and local and state authorities
8  in Arizona.  The helicopter crashed and was abandoned in Arizona
9  away from the drop site, where the ground crew was arrested and
10  the marihuana load was seized.  As the government argued at trial,
11  that was the "straw that broke the camel's back."  Verdugo
12  certainly reported the discovery of the helicopter operation to
13  Rafael Caro-Quintero late on February 5 or in the early morning of
14  February 6, 1985.  Consequently, Caro-Quintero, Verdugo, Ernesto
15  Fonseca and other bosses decided to initiate a plan to kidnap a
16  DEA agent to determine what DEA knew about the Caro-Quintero
17  enterprise and about other drug traffickers in Mexico.  They chose
18  SA Camarena because they knew of his involvement in the Zacatecas
19  seizures and believed him to be involved in the other seizures.
20  Indeed, the purpose of the kidnapping was evident from the
21  questions of SA Camarena on the interrogation tapes introduced
22  into evidence.

23      Rene Verdugo-Urquidez, along with the "invincible"
24  Caro-Quintero and other members of the enterprise, suffered
25  substantial losses from the foregoing seizures and the termination
26  of the helicopter operation.  The motive for the crime was clearly
27  established.

28                                  9

3.   Rene Verdugo's Role In The Kidnappings And Murders

On February 7, 1985, at approximately 4:50 p.m. (about two hours after Camarena's kidnapping), Rene Verdugo checked into the Hyatt Regency in Guadalajara, Mexico.  On that evening of February 7, Verdugo went to Caro-Quintero's residence at 881 Lope de Vega. (shown by matching phone numbers called from his hotel room and the residence).  Verdugo was also at Caro-Quintero's residence the following day.  (testimony of Gomez-Espana).  Forensics evidence as well as other evidence introduced at trial showed that SA Camarena and Capt. Zavala were interrogated and tortured at that residence.

In one portion of the interrogation tapes, SA Camarena's interrogators demanded that he provide them information about who else "goes around with" Caro-Quintero.  (Copia 2, Ln. 148).  At that point, SA Camarena, in obvious pain from the beating and torture that he had been subjected to, responded that a person named "Rene Verdugo" helped Caro-Quintero distribute marihuana in Mexicali.  (Copia 2, Lns. 151-155).  The interrogator was immediately very interested and demanded more information. Significantly, at that point, there occurred a long pause on the interrogation tape (Copia 2, Ln. 156) and then a new interrogator resumed the questioning.  The new interrogator specifically wanted to know about Rene Verdugo and asked "That Rene, what is he like?"  (Copia 2, Ln. 163).$\frac{1}{}$

_____

1/   SA Camarena on the interrogation tapes refers to the previous interrogator, confirming the change of interrogators.  (Copia 2, Ln. 182).

10

The government submits that the pause on the interrogation tape was caused by the interrogator leaving to discuss with Rene Verdugo what DEA and Camarena knew about his particular role in the organization. When the new interrogator arrived, he was acting for Verdugo. Verdugo, after all, was a "higher-up" and could direct others to perform tasks for him. The government further submits that very likely Verdugo entered the guesthouse at that point to listen to SA Camarena's responses during the torture-interrogation.

Verdugo's active participation in the interrogation and detention of SA Camarena was also shown by the forensics evidence. A hair from Verdugo's head was found in the guesthouse. Two of SA Camarena's hairs were also in the guesthouse, along with one hair of Sergio Espino-Verdin. Sergio Espino-Verdin's voice was recognized by two witnesses as that of the principal interrogator of SA Camarena. Further, carpet fibers that matched the carpeting from the guesthouse were also found on the corpse of Captain Zavala. Accordingly, the guesthouse was the interrogation and torture chamber for SA Camarena. The presence of Verdugo's hair in the guesthouse indicated that Verdugo was present and that he participated in the interrogation of SA Camarena.

4.    Rene Verdugo's Admissions

Jorge Gomez-Espana testified that on February 8, 1985 (the day after SA Camarena was kidnapped) he went to Caro-Quintero's residence at 881 Lope de Vega. (At that time SA Camarena and Captain Zavala would probably still have been at 881 Lope de

11

1  Vega).  Gomez-Espana went there with an associate of
2  Caro-Quintero's.  Gomez-Espana's purpose in going to
3  Caro-Quintero's house was to assure Caro-Quintero that he was not
4  an informant for the DEA.  Gomez-Espana testified that he waited
5  in the kitchen while his friend went to the patio/swimming pool
6  area to speak to Caro-Quintero to clear up the misunderstanding.
7  Gomez-Espana testified that he heard Caro-Quintero's voice from
8  the pool area while in the kitchen.  Gomez-Espana also saw
9  automatic weapons and other firearms in the hallway against the
10  walls.

11     As Gomez-Espana and his friend left the house, Rene Verdugo
12  joined them.  Rene Verdugo was accompanied by another individual.
13  Verdugo, who knew Gomez-Espana, asked for a ride back to the
14  hotel.  While in the car, Verdugo asked Gomez-Espana why he had
15  gone to Caro-Quintero's house.  Gomez-Espana explained that he had
16  gone to 881 Lope de Vega to clear up a "problem" with
17  Caro-Quintero, i.e., that he was not a DEA informant.

18     At that point, Verdugo said to Gomez-Espana, "That's not a
19  problem."  Looking at his companion, Verdugo added, "Today, we
20  took care of a problem, didn't we, comandante?"

21     Obviously, Verdugo was referring to SA Camarena and Captain
22  Zavala.  Gomez-Espana also testified that he asked Verdugo whether
23  he would have a drink with him that evening.  Verdugo declined,
24  explaining that he was "tired and sleepy."  That, of course, was
25  consistent with his having participated the previous evening in
26  the interrogation of SA Camarena at 881 Lope de Vega and returning
27  to the hotel room at 3:00 a.m. (indicated by hotel charges).

28                                12

1   Eugene Hollestelle, the foreman of Verdugo's helicopter ground
2   crew, also testified that, while in a car with Verdugo, he
3   overheard Verdugo tell Donald Walters that "the narc was crying
4   and begging for mercy." The "narc," of course, referred to by
5   Verdugo was SA Camarena.

6       B.   Raul Lopez-Alvarez

7   The evidence against Raul Lopez presented at trial consisted
8   of admissions that he made to three different individuals:  DEA
9   Special Agents Abel Reynoso, Sal Leyva, and Jose Reyes-Garcia.  Of
10  course, Raul Lopez-Alvarez also made many incriminating admissions
11  to SA Reynoso that were ruled inadmissible in the instant case.
12  As the court is also aware, Raul Lopez-Alvarez was previously
13  found guilty of conspiring to kidnap a federal agent and of
14  conspiring to murder a federal agent in a trial before Judge
15  Rymer.  In his post-arrest statement, Lopez-Alvarez stated that he
16  was "directly" involved in the murders of two Americans, Radelat
17  and Walker in Guadalajara (a medical student and a journalist, who
18  disappeared and whose remains were later found buried), and that
19  Lopez-Alvarez also stated he was "indirectly" involved in the
20  murder of Americans who were religious missionaries in Guadalajara.

21      1.   Admissions Regarding Working For Caro-Quintero and
22          Fonseca

23  Raul Lopez-Alvarez stated to both SA Abel Reynoso and to
24  Reyes-Garcia that he was an ex-State of Jalisco policeman
25  stationed in Guadalajara, Mexico.  Evidence was also presented and
26  was not disputed that several of Lopez-Alvarez fellow officers
27  were arrested for their participation in SA Camarena's

28                          13

1   kidnapping.  Lopez-Alvarez also stated to both SA Abel Reynoso and
2   Reyes-Garcia that he worked for both Caro-Quintero and Fonseca.
3   Not admitted into evidence were Lopez-Alvarez's admissions to
4   SA Reynoso during an undercover meeting that he was a "hitman" for
5   Caro-Quintero and Fonseca and Lopez-Alavarez's statements to Abel
6   Reynoso that he had personally participated in three other
7   killings for the narcotics organization.  One of those killings
8   involved the kidnapping of a Mexican comandante from a hotel.
9   Lopez-Alvarez told SA Reynoso that he participated in torturing
10  and killing that comandante.

11      Lopez-Alvarez also exhibited great knowledge of how to conduct
12  a kidnapping and how to torture an individual using various
13  techniques.  Those statements were also ruled inadmissible in the
14  instant case.

15      It was established without dispute during the trial that many
16  police officials in Guadalajara, such as Lopez-Alvarez, were on
17  the payroll of the drug traffickers.

18          2.    Lopez-Alvarez's Admissions Regarding His
19                Participation In The Kidnapping And Murder of
20                SA Camarena

21      Raul Lopez-Alvarez told SA Reynoso that he was with the group
22  that was watching Camarena.  He also told SA Reynoso that he
23  participated in beating SA Camarena by using hot iron bars.
24  Lopez-Alvarez explained to Reyes-Garcia that he went to the
25  American Consulate on February 7, 1985 with a group of men.
26  Lopez-Alvarez told Reyes-Garcia that Camarena was initially shown
27  police credentials and tricked into going with the abductors.

28                          14

1 Lopez-Alvarez told Reyes-Garcia that they took Camarena to the
2 residence of Caro-Quintero. Lopez-Alvarez told Reyes-Garcia that
3 he stayed there for a time guarding Camarena and participating in
4 his beating. Lopez-Alvarez then left Caro-Quintero's residence.

5 Lopez-Alvarez told both Reynoso and Reyes-Garcia that he later
6 returned to Caro's residence with Ernesto Fonseca. It was at that
7 time that Fonseca slapped Caro-Quintero because SA Camarena was
8 near death and Fonseca thought that Caro-Quintero had gone too
9 far. The videotape of Lopez-Alvarez's account of that incident
10 was played to the jury.

11 SA Reynoso bluntly asked Lopez-Alvarez during their undercover
12 meeting whether he was actually guilty of the kidnapping and
13 detention of SA Camarena. Lopez-Alvarez replied that he was
14 guilty, but that he never admitted his guilt or told "on his
15 bosses" when arrested by Mexican authorities. SA Reynoso
16 testified that Lopez-Alvarez was very proud of his ability to
17 withstand the interrogation tactics of the Mexican police.

18 Lopez-Alvarez made his admissions to Reyes-Garcia while in
19 prison in 1985 and later repeated the same events when visiting
20 with him at Reyes-Garcia's home in Guadalajara on two separate
21 occasions.

22          3.    Lopez-Alvarez's Admissions Regarding His Being An
23                Accessory After The Fact

24 Raul Lopez-Alvarez provided SA Reynoso a long and very
25 detailed account of what occurred on February 9, 1985. The
26 videotape played to the jury included that account. In essence,
27 Lopez-Alvarez admitted that he was guilty of being an accessory

28                               15

1   after the fact. Lopez-Alvarez stated that when he arrived with
2   the Mexican Federal Judicial Police (MFJP) at the Guadalajara
3   airport, he telephoned Ernesto Fonseca. He asked Fonseca to radio
4   and warn Caro-Quintero that the MFJP were at the airport to arrest
5   Caro-Quintero. Caro-Quintero at that point was in his private jet
6   waiting to be cleared for take-off. Lopez-Alvarez stated to SA
7   Reynoso that he positioned himself behind the MFJP officers and
8   the DEA agents so that Lopez-Alvarez and his comandante could
9   shoot them in the back if a violent confrontation developed.

10      Corroborating Lopez-Alvarez's statements were his post-arrest
11  statements to SA Sal Leyva. SA Leyva asked Lopez-Alvarez if he
12  recognized him. After initially saying "no," Lopez-Alvarez
13  agreed, stating "you were with Comandante Brisolo at the
14  Guadalajara airport." Lopez-Alvarez added that SA Leyva and
15  Brisolo were in a yellow [Chevrolet] Celebrity car. SA Leyva
16  testifed that indeed that was true.

17      Lopez-Alvarez also told SA Reynoso that he would have fired
18  upon the MFJP and DEA agents from the back to aid Caro-Quintero's
19  escape. Lopez-Alvarez explained that Caro-Quintero saw him and
20  his comandante and that Caro-Quintero knew they were ready to
21  support him if a shoot out occurred.

22      C.   Jesus Felix-Gutierrez

23      The evidence at trial established that Jesus Felix-Gutierrez
24  ("Cachas") was a very major drug trafficker within the
25  Caro-Quintero organization. Felix-Gutierrez trafficked both
26  marihuana that was supplied by Caro-Quintero and trafficked
27  cocaine. With respect to the cocaine, the evidence showed that

28                                  16

Felix-Gutierrez used Caro-Quintero's airfields and protection and
security system to move the cocaine through Mexico and into the
United States.

The evidence also showed without dispute that Felix-Gutierrez
used Costa Rica as a base of operations to transport cocaine from
South America for distribution in the United States.  The evidence
showed that Felix-Gutierrez made dozens of trips to Costa Rica
from 1979 through 1985.  Felix-Gutierrez even attempted to buy the
Playboy Club in San Jose, Costa Rica with other members of the
Caro-Quintero organization.

Consequently, Felix-Gutierrez was a logical choice to arrange
a safe haven for Caro-Quintero after the kidnapping and murder of
SA Camarena.  In fact, the evidence showed that Felix-Gutierrez
travelled to Costa Rica and directed the purchases of two houses
for Caro-Quintero approximately two weeks prior to the kidnapping.

Felix-Gutierrez admitted to Arturo De la Torre that he
thereafter arranged the flight and hired the pilot to fly
Caro-Quintero out of Mexico to Costa Rica to avoid arrest, after
the bodies of Camarena and Zavala were discovered.  Moreover,
testimony from Mr. Celman Barenechea established that, immediately
after Caro-Quintero arrived in Costa Rica, Felix-Gutierrez was
with Caro-Quintero in Costa Rica, staying with him at one of the
houses that he had bought for him (La Quinta).  Finally, evidence
of flight was introduced at trial establishing that
Felix-Gutierrez learned of Caro-Quintero's arrest in Costa Rica
and learned that he, "Cachas," was suspected of arranging the
flight for Caro-Quintero.  The evidence showed that

17

Felix-Gutierrez immediately fled to Reno, Nevada.  In Reno, Felix-Gutierrez also had a portion of his tattoo indicating "Cachas" removed from his shoulder.

Consequently, Felix-Gutierrez was proven guilty as an accessory after the fact by his actions in arranging to fly Caro-Quintero out of Mexico to avoid arrest and by his actions in comforting and assisting him in Costa Rica to help him also avoid apprehension.

## III

### PUBIC CONFIDENCE DEMANDS A SEVERE SENTENCE

Since man first established laws, murder has been considered to be the worst of crimes.  The crime of murder has always commanded the most severe punishment.  In the case at hand, there is no room for leniency or mercy or even for thoughts of rehabilitation.  Aggravating the two murders was that SA Camarena and Captain Zavala were intentionally and systematically tortured (beaten to death) to coerce them to tell what information DEA had about the Caro-Quintero organization.  The torture/murders were also a calculated retaliation for the damage DEA had caused to the organization.  In the end, the murders were simply an item of business to these defendants:  simply "business as usual" to preserve and promote the organization's ability to smuggle thousands of pounds of narcotics into the United States.  These crimes show graphically that members of this narcotics organization, such as the defendants in this case, will use any form of barbarism to protect their narcotics profits.

18

1   The defendants in this case obviously believed that they were
2   entirely above the laws of any country or any civilized society.
3   They certainly believed they were above the laws of God.  It is
4   important in a case such as this to demonstrate that, in our
5   community, no person, no matter how powerful, no matter how rich,
6   can wantonly destroy human life without receiving appropriate
7   retribution.  The government submits that in a case such as this
8   the severest possible sentence should be imposed.  Only in this
9   manner can the public's confidence in our criminal justice system
10  be maintained.  Moreover, other members of organized drug
11  trafficking rings must receive the message that when they are
12  brought to justice, our courts will not tolerate their savage acts.

13                              IV

14                        APPLICABLE LAW

15  A.    A Sentencing Judge May Consider Any Trustworthy
16        Information

17      It is axiomatic that the sentencing judge can receive
18  virtually any type of accurate, trustworthy[2/] information in
19  order to arrive at an appropriate sentencing.  This principle has
20  been reduced to statutory form by the Congress:

21              No limitation shall be placed on the
            information concerning the background,
22          character, and conduct of a person convicted of
            an offense which a court of the United States
23          may receive and consider for the purpose of
            imposing an appropriate sentence.

24

25

26  _____
    2/  A sentence that is based on "materially untrue" information
27  may violate the due process clause.  Towsend v. Burke, 334 U.S.
    736 (1948).
28                              19

18 U.S.C. § 3577.

The United States Supreme Court has endorsed this principle in describing the discretion a federal district judge has in imposing sentence and in receiving information relevant to sentencing:

> [A] trial judge in the federal judicial system generally has wide discretion in determining what sentence to impose. It is also true that before making that determination, a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come . . . . [A] sentence imposed by a federal district judge, if within statutory limits, is generally not subject to review.

United States v. Tucker, 404 U.S. 443, 446-47 (1978). The Court has specifically noted that hearsay evidence may be considered:

> [O]nce the guilt of the accused has been properly established, the sentencing judge, in determining the kind and extent of punishment to be imposed, is not restricted to evidence derived from the examination and cross-examination of witnesses in open court but may, consistently with the Due Process Clause of the Fourteenth Amendment, consider responsible unsworn or "out-of-court" information relative to the circumstances of the crime and to the convicted person's life and characteristics.

Williams v. Oklahoma, 358 U.S. 576, 578 (1959). In a broader pronouncement, the Court had earlier described the judge's duty to receive wide-ranging information at sentencing:

> A sentencing . . . judge is not confined to the narrow issue of guilt. His task within fixed statutory or constitutional limits is to determine the type and extent of punishment after the issue of guilt had been determined. Highly relevant -- if not essential -- to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts

20

1
2
3

                individualizing punishment have made it all the
                more necessary that a sentencing judge not be
                denied an opportunity to obtain pertinent
                information by a requirement of rigid adherence
                to restrictive rules of evidence properly
                applicable to the trial.

4  Williams v. New York, 337 U.S. 241, 247 (1949) [footnote omitted].

5      The Fifth Circuit has reaffirmed this principle, and has

6  expressly applied it to certain types of information.  See, e.g.,

7  United States v. Bowdach, 561 F.2d 1160, 1175 (5th Cir. 1977)

8  (sentencing judge may consider evidence of charges not resulting

9  in conviction, and facts disclosed in a trial that resulted in an

10  acquittal or reversal on appeal); United States v. Ashley, 555

11  F.2d 462, 466 (5th Cir. 1977) (hearsay, including that springing

12  from confidential informants, may be received); United States v.

13  Nunn, 525 F.2d 958, 960 (9th Cir. 1976) (sentencing court may

14  treat its belief that defendant perjured himself as factor in

15  imposing sentence); United States v. Marcello, 423 F.2d 993, 1012

16  (5th Cir. 1970), cert. denied, 398 U.S. 959 (court may consider

17  defendant's activities other than criminal convictions, including

18  relations with police and public authorities, position in the

19  community, and other factors).

20      In short, the types of evidence that may be considered by a

21  federal district judge at sentencing are extremely broad as long

22  as the evidence is not based on erroneous information, or on

23  constitutional infirmities such as a conviction obtained when the

24  defendant was not provided with counsel.  See, United States v.

25  Tucker, supra, at 443, 447-49.

26      The Ninth Circuit has also consistently followed those

27  principles:  "It is generally accepted that trial courts are

28

1 accorded virtually unfettered discretion in imposing sentence.
2 While there are exceptions, a sentence is not subject to appellate
3 review if it is within statutory limits." United States v.
4 Barker, 771 F.2d 1362, 1364 (9th Cir. 1985).

5     B.    The Court Has The Authority To Impose A True "Life"
6           Sentence On Raul Lopez-Alvarez And Rene Verdugo-Urquidez
7           By Mandating A Minimum Parole Eligibility Date

8     The allowable sentence under the statutes for which
9 Lopez-Alvarez and Verdugo-Urquidez were convicted is "imprisonment
10 for any term of years or for life." 18 U.S.C. §§ 1201(a),
11 1201(c), 1111, and 1952(B). The court has three sentencing
12 options. They are: (1) a straight sentence with the possibility
13 of parole after service of one-third of the term or after serving
14 ten years of a life sentence, 18 U.S.C. 4205(a); (2) an
15 indetermine sentence, where the court sets the maximum term with
16 no minimum, 18 U.S.C. § 4205(b)(2); and, (3) a sentence with a
17 specified minimum period before being eligible for parole and a
18 term of years (or a maximum term) of confinement. 18 U.S.C. §
19 4205(b)(1).

20     Section 4205(b)(1) sentences are lawful when the court finds
21 that such a sentence is require to achieve "the ends of justice
22 and best interest of the public." 18 U.S.C § 1405(b)(1) (1976).

23          1.    Legislative History

24     In 1976, Congress enacted the Parole Commission and
25 Reorganization Act ("1976"), which revised the existing sentencing
26 and parole provisions of the federal criminal code. The 1976 Act,
27 codified at 18 U.S.C § 4201 et seq., established the United States

28                                    22

Parole Commission and revamped the procedures whereby a federal
prisoner becomes eligible for parole.

In Section 4205(b)(1), Congress provided as follows:

> (b) Upon entering a judgment of conviction, the
> court having jurisdiction to impose sentence,
> when in its opinion the ends of justice and
> best interest of the public require that the
> defendant be sentenced to imprisonment for a
> term exceeding one year, may (1) designate in
> the sentence of imprisonment imposed a minimum
> term at the expiration of which the prisoner
> shall be eligible for parole, which term may be
> less than but shall not be more than one-third
> of the maximum sentence imposed by the
> court, . . ."

Although the legislative history concerning the adoption of
the 1976 Act is silent to his point, when Congress first enacted
the foregoing form of sentencing in 1958, [See Act of August 25,
1958, Pub.L.85-572, § 3, in former 18 U.S.C. § 4208], the Senate
Report urged as follows:

> The purpose of this section is to provide
> the court with optional procedures which will
> enable it to impose sentences which may be
> indetermine in nature. This would permit the
> court, at its discretion, to share with the
> executive branch the responsibility for
> determining how long a prisoner should actually
> serve.

23

Senate Report No. 2013, 85th Cong.2d.Sess.1 reprinted in 1958 U.S. Code, Cong. & Ad. News 3891, 3892 (emphasis added).

In United States v. Gwaltney, 790 F.2d 1378 (9th Cir. 1986), cert. denied, 107 S. Ct. 1337 (1987), the Ninth Circuit approved the type of sentence under 18 U.S.C. § 4205(b) that the government urges.  The court in Gwaltney found that Judge Rymer's sentence of 90 years, with a minimum parole period of 30 years, was appropriate:  "§ 4205(b) plainly provides the sentencing judge alternatives to the automatic [parole] eligibility of § 4205(a)." Gwaltney, 790 F.2d at 1387.  In fact, Ninth Circuit recently held in United States v. Whitworth, at 10588, (see Exhibit A) that the Gwaltney decision is the law of the circuit and that such sentences are properly within the discretion of the trial court.

The government's recommended sentence is in line with the sentences imposed by other trial courts for grave and horrifying crimes.  In Gwaltney, Judge Rymer's sentence of 90 years with a minimum period to parole of 30 years, was for a crime of murder and rape.  Perhaps more analogous is the case of United States v. O'Driscoll, 761 F.2d 589 (10th Cir. 1985).  In O'Driscoll, the defendant robbed and beat the owner of a pawnshop, drove to a shopping center where he forced the driver of a car at gunpoint to leave with the defendant and his girlfriend in the victim's car. Defendant O'Driscoll then took the victim to a remote area and shot him 10 times so that the victim would not later identify the defendant.  O'Driscoll had also been convicted of prior bank robberies.  The trial judge in O'Driscoll, sentenced O'Driscoll to 300 years in prison, with eligibility for parole not to accrue

24

1    until his service of 99 years, under 18 U.S.C. § 4205(b). That

2    sentence was upheld by the Tenth Circuit. In the case at hand the

3    facts are at least as shocking as in O'Driscoll and certainly

4    threaten the community by promoting drug trafficking even more

5    than the activities of O'Driscoll.

6        In Whitworth, the Ninth Circuit approved Judge Vukasin, Jr.'s

7    sentence of 180 years in each of seven counts of espionage,

8    designating sixty (60) years as the period before parole

9    eligiblity would accrue. The government submits that the crimes

10   in this case are at least as serious as the crimes of espionage.

11   As previously indicated, in the case at hand, two human beings

12   were brutally and savagely murdered, whereas no one lost their

13   life in the Whitworth case. Moreover, the government submits that

14   the damage done by these defendants in promoting an enormous drug

15   trafficking operation also constitutes a threat to national

16   security and requires the same type of severe response as in

17   Whitworth.

18                                    V

19                              CONCLUSION

20       For the foregoing reasons, the government respectfully urges

21   the court to impose at a minimum the sentences recommended.

22

23

24

25

26

27                                   25

28

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee,*<br><br>v.<br><br>JERRY ALFRED WHITWORTH,<br>*Defendant-Appellant.* | No. 86-1256<br>D.C. No.<br>CR 85-552-JPV<br>OPINION |

Appeal from the United States District Court
for the Northern District of California
John P. Vukasin, Jr., District Judge, Presiding

Argued and Submitted
November 13, 1987—San Francisco, California

Filed September 1, 1988

Before: Cecil F. Poole, Robert Boochever and
David R. Thompson, Circuit Judges.

Opinion by Judge Boochever

---

## SUMMARY

### Criminal Procedure

Appeal from conviction for espionage and tax evasion.
Affirmed in part, reversed in part, and remanded. The court
upheld the espionage conviction and held that the fines
imposed for filing false tax returns exceed the statutory limit.

Appellant Jerry Whitworth, alleged participant in the infa-
mous "Walker Family Spy Ring," appeals his conviction for

10545

EXHIBIT A

espionage and tax evasion. Whitworth was accused of selling classified Navy communications and cryptographic material to the Soviet Union through coconspiratory John Walker, Jr. Whitworth's defense was based on a lack of knowledge that the information passed to Walker was being relayed to the Soviet Union. The jury found Whitworth guilty. He received a cumulative term of 365 years in custody, a fine of $410,000 and a minimum of 60 years in custody before eligible for parole.

[1] Before and during trial, Whitworth filed discovery requests. [2] Judge Vukasin announced that all discovery orders had been complied with. Some of these discovery rulings were based on in camera review of the material [3] Although in camera screening prevented Whitworth from knowing exactly which statements the court allowed the government to withhold, it was nevertheless incumbent upon him to make at least some kind of record for this court's review. Whitworth did not do so. [4] Where tax evasion flows directly from other criminal activity and such evasion results in large part from the necessity of concealing the illegal proceeds of that activity, joinder of the substantive and tax charges is proper. [5] Whitworth contends that he desired to testify concerning the espionage counts but wanted to assert his privilege against self-incrimination with respect to the tax evasion charges. He failed to meet his burden of demonstrating that he has important testimony to give concerning some counts and a strong need to refrain from testifying on others.

[6] Not erroneous was the court's finding that Whitworth knowingly and voluntarily waived his Miranda rights concerning statements he made to FBI agents the day of his arrest. [7] Judge Vukasin correctly found scant support for Whitworth's argument that the FBI agents employed coercive measures in order to obtain Whitworth's consent to the search of his residence. [8] There was probable cause to issue the subsequent search warrants and they were sufficiently narrow in scope. [9] The presence of a catch-all provision at the

end of the warrants did not render them overbroad. [10] Further, demonstrating that an affidavit contained falsities omissions is insufficient to require a *Franks* hearing. A inquiry must be made to determine whether the affidav purged of those falsities and supplemented by the omission would not be sufficient to support a finding of probable caus [11] More troubling is Whitworth's second claim, that th government's intentional omission of the search of th mobile home when it applied for a search warrant of the sar premises eleven days later precluded a finding of probab cause.

[12] It is not proper for law enforcement officials to will hold information regarding prior searches of the same pren ises from magistrates considering warrant applications. taint is feared, the better practice is to advise the magistral that an earlier consent search had been conducted and pr vide the reasons why a warrant is still required. [13] Howeve omission of the search did not necessitate a *Franks* hearin; First, there is no evidentiary conflict to be resolved in a hea ing. Second, Whitworth made no substantial showing that th facts relied on by the district court in determining the mater ality of the omission was incorrect. [14] Whitworth argu that the trial court erred by admitting into evidence the fou anonymous "RUS letters" received by the FBI. [15] The go ernment offered sufficient proof linking Whitworth to th RUS letters to meet the authentication standard. [16] Th government's case against Whitworth centered around th testimony of Walker, his coconspirator and leader of the esp onage ring. [17] Whitworth cites three examples of undue lin itation on cross-examination. [18] The record indicates the Walker was subjected to extensive cross examination an recross-examination. During trial, evidence of his sever teen-year espionage career, the recruiting of his family an best friend to spy, and his plea agreement was fully explorec [19] On a related matter, under the opening the door doctrin the introduction of inadmissible evidence by one party allow an opponent, in the court's discretion, to introduce evidenc

on the same issue to rebut any false impression that might have resulted from the earlier admission.

[20] On cross-examination, Whitworth's counsel asked Walker whether he had suspicions regarding Whitworth's sincerity after the poor deliveries. This called for an answer within Walker's personal knowledge. The question of redirect, in contrast, related to what Walker believed *Whitworth* knew about the buyer's identity. The door was never opened for such an inquiry. [21] The error, however, was harmless. [22] Whitworth was convicted of six counts of delivering national defense information to a foreign government in violation of 18 U.S.C. § 794(a). [23] It contains a state of mind element which does not on its face require a defendant to know that he is delivering defense information to a specific foreign nation.

[24] The jury was presented with overwhelming evidence on which to conclude that Whitworth was aware of the identity of the buyer of the classified information. [25] Judge Vukasin fined Whitworth $100,000 on each of four counts of filing false tax returns. Only two were unauthorized. [26] Whitworth challenges his sentences. [27] It is required that an investigation and report be prepared by the court's probation service before the sentence's imposition. [28] The decision to dispense with the investigation and report in this case did not undermine the sentencing process in any way. [29] The court did not improperly order Whitworth to serve sixty years in prison before becoming eligible for parole. [30] Whitworth suggests that he was less culpable than his coconspiratory, Walker, and should not have received a greater prison term than Walker. [31] A sentence is generally not subject to appellate review if it is within statutory limits. The exception is when a codefendant had received a more severe sentence because he chose to stand trial rather than plead guilty. [32] The exception is inapplicable here. [33] Viewed in the abstract, the 365-year prison term, with little prospect of

parole, would appear harsh. This sentence, however, is not disproportionate to Whitworth's crimes.

## COUNSEL

Alan M. Caplan, Bushnell, Caplan & Fielding, San Francisco, California, for the defendant-appellant.

Sanford Svetcov, Assistant United States Attorney, San Francisco, California, for the plaintiff-appellee.

## OPINION

BOOCHEVER, Circuit Judge:

Jerry A. Whitworth, alleged participant in the infamous "Walker Family Spy Ring," appeals his conviction for espionage and tax evasion. Whitworth was accused of selling classified Navy communications and cryptographic material to the Soviet Union through coconspirator John A. Walker, Jr. between 1975 and 1984. Whitworth was found guilty on twelve counts of a thirteen-count indictment in July 1986 following a four-month jury trial. United States District Court Judge John P. Vukasin, Jr. sentenced him to 365 years prison, without the possibility of parole for sixty years, and fined him $410,000.

Whitworth challenges his conviction on numerous grounds. He contends that (1) the government failed to comply with his discovery requests; (2) his espionage and tax evasion counts should not have been joined for trial; (3) his *Miranda* rights were violated; (4) he did not voluntarily consent to a search of his residence; (5) subsequent search warrants were overbroad and issued without probable cause; certain letters signed "RUS" were not properly authenticated

before being admitted into evidence; (7) erroneous evidentiary rulings were made during trial; (8) the evidence was insufficient to convict him for espionage; (9) certain tax fines were unauthorized; and (10) his prison sentence was excessive and in violation of his eighth amendment rights.

Although we conclude that a statement by Walker was improperly admitted at trial, the government's evidence against Whitworth was overwhelming and the error was harmless. Whitworth's conviction, his prison sentence, and three of his five tax fines therefore are affirmed. The fines imposed for filing false tax returns for 1979 and 1980 exceeded the statutory limit, however, and we reverse that portion of the judgment and remand to the district court for redetermination. Because our discussion of many of the issues is dependent on the facts, we shall relate them in some detail.

I.

Whitworth worked as a radioman on board the U.S.S. *Niagara*, a communications ship, and the U.S.S. *Ranger*, an aircraft carrier, between 1968 and 1970. Radiomen operate the communication centers aboard ships. The Navy uses cryptography in an attempt to conceal the content of the numerous directives, operation orders, and other messages sent and received at sea. Through this computerized process, the text of a communication is put in a form that is intelligible only to its intended recipients.

Modern cryptographic systems consist of "logic," a mathematical coding, formula, and "keying material," computer input in the form of cards, tapes, or printed material that alters the settings within the cryptographic logic. The keying material is changed each day and is subject to rigid custodial standards to provide maximum security. Whitworth, who was trained as a technical controller and held a top-secret

security clearance, was privy to classified communications and cryptographic material.

Whitworth attended radioman instructor school in San Diego in 1970 following his tour of duty aboard the U.S.S. *Ranger*. There, Whitworth first met Walker, who at the time was the school's chief instructor. The men soon became best friends. In February 1973, Whitworth was granted a transfer to Diego Garcia Island, a new communications center in the Indian Ocean. He served as a radioman at Diego Garcia until opting to be discharged from the Navy in June 1974. Whitworth then returned to San Diego and worked part-time as a commercial pilot.

By 1974, Walker had been selling cryptographic material and other Navy secrets to the Soviet Union for six years. He "began to contemplate [Whitworth] as a possible recruit to help me in the spying business." Walker testified that he finally made his "sales pitch" to Whitworth in September 1974 in a San Diego restaurant:

We went to a secluded portion of the bar ... and I told him I was interested in using him on an illegal activity, and that even discussing it was illegal. ...

He was excited and was interested in hearing what I had to say.... So I told him I'd been involved in selling classified material for a number of years, and it was profitable, and I could build him into the — into the sale. ...

He responded affirmatively, that he would be interested.... [H]e was mostly curious as to who the buyers were. I told him it was — that I wasn't sure. I was working with people I had met, possibly could have been organized crime, Mafia, but that the buyers were allied countries, such as Israel, or private defense organizations, such as Jane's Fighting Ships.

Whitworth, who was a civilian at the time, agreed to rejoin the Navy and steal messages and cryptographic material for delivery to Walker. The classified information was to be passed on to the buyers by Walker and Whitworth was to be paid one-half of the cash proceeds. Whitworth was expected to receive $2,000 to $4,000 per month for spying. Despite numerous inquiries by Whitworth about the identity of the buyers, Walker said that he never told him that they were dealing with the Soviet Union.

Whitworth reenlisted in the Naval Reserve in October 1974 and rejoined the regular Navy one month later in order to attend an advanced satellite communications training school in New Jersey. In February 1975, shortly before graduating from satellite school and commencing a second tour of duty at the Diego Garcia communications station, Whitworth met with Walker in Norfolk, Virginia. Walker paid Whitworth a $4,000 "inducement" and instructed him "to try to photograph or assemble cryptographic material and anything else sensitive that came across his desk."

Whitworth used his position as supervisor of the Diego Garcia technical control facility to assemble and photograph classified messages and cryptographic material. In April 1976, Whitworth again met Walker in Norfolk and delivered the material he had stolen during his one-year assignment at the communications center. Walker paid Whitworth $18,000 for the delivery from cash Walker had received from his Soviet contact.

Between June 1976 and July 1978, Whitworth worked aboard the aircraft carrier U.S.S. Constellation and supervised the use of cryptographic equipment and material. Whitworth continued to copy classified information and, while on leave, personally delivered it to Walker in August 1976, January, April, August, and November 1977, and February and July 1978. Whitworth received a total of $76,000 while working on the Constellation. Walker, whose spy role was limited

to that of go-between after retiring from the Navy in 1976, relayed the material to the Soviets semiannually through a series of package "drops" and face-to-face meetings. He received cash and instructions in exchange.

Whitworth next served on the U.S.S. Niagara Falls, a supply ship, in August 1978. During his one-year tour as chief radioman, Whitworth was the custodian of a large amount of cryptographic material used on a number of ships. He photographed classified information and delivered it to Walker in September and December 1978 and May and August 1979 in exchange for $24,000.

Whitworth requested shore duty and was assigned to the Alameda, California Naval Air Station in September 1979. He was in charge of the telecommunications center at Alameda for most of the next three years.[1] Whitworth made deliveries to Walker in January, June, and November 1980, July 1981, and January and September 1982. Sporadic payments totaling $210,000 were made by the Soviets through Walker. This included a $100,000 payment in June 1980 covering deliveries made from the Niagara Falls and an additional $10,000 in July 1981 for a van Whitworth used to photograph cryptographic material in the parking lot of the Alameda Air Station.

Following shore duty, Whitworth worked on board the aircraft carrier U.S.S. Enterprise between October 1982 and his retirement in October 1983. He delivered classified messages and cryptographic material from the Enterprise in June 1983, but no money was exchanged. Whitworth met Walker in July 1983 and January 1984, but again was not paid. At a meeting in Vienna in February 1984, Walker told his Soviet contact that Whitworth, though retired from the Navy, was looking for a civil service job with classified information access so

[1] While at Alameda, Whitworth was temporarily assigned to the Naval Communications Station at Stockton, California for a three-month period

that he could continue spying. The contact informed Walker that the messages delivered the previous June were photographed out-of-focus and unusable.

Whitworth, who had retained copies of the classified messages he stole from the *Enterprise*, rephotographed the illegible ones. He gave them to Walker in Norfolk in April 1984, shortly before a scheduled drop with the Soviets near Washington, D.C. Walker included these messages in the drop, along with other classified Navy documents supplied by his son, Michael, whom Walker had recruited into the spy ring in '83. Although Walker picked up money in the exchange, he was instructed that Whitworth was not to be paid. Whitworth was shocked by this news, and reminded Walker that he had not yet been paid for an entire year of messages from the *Enterprise*.

Three weeks later, the San Francisco FBI office received a typewritten letter dated May 7, 1984, which stated:

Dear Sir:

I have been involved in espionage for several years, specifically I've passed along Top Secret Crypto-graphic Keylists for military communications, Tech Manuals for same, Intelligence Messages, and etc.

I didn't know that the info was being passed to the USSR until after I had been involved a few years and since then I've been remorseful [sic] and wished to be free. Finally I've decided to stop supplying material - my contact doesn't know of my decision. Originally I was told I couldn't get out without approval, this was accompanied with threats. Since then I believe the threats were a bluff.

At any rate the reason for this letter is to give you Bureau an opportunity to break what probably [sic] is

a significant espionage system. (I know that my contact has recurited [sic] at least three other members that are actively supplying highly classified material). (I have the confidence of my contact).

I pass the material to my contact (a US citizen) who in turn passes the material to a contact overseas (his actual status - KGB or whatever - I don't know). That is not always the case tho, sometimes US locations are used. A US location is always used to receive instructions and money.

If you are interested in this matter you can signal me with an Ad in the Los Angeles Times Classified Section ..... What I would expect to cooperate is *complete immunity* from prosecution and absolutely no public disclosure of me or my identity. I will look for an Ad in *Monday editions only* for the next four weeks. . . .

Sincerely,

RUS

The FBI responded by placing an ad in the Times on May 21 requesting "RUS" to call or write and stating that it was "considering your offer."

A second "RUS letter," dated May 21, 1984, stated:

I saw your note today and was encouraged, however, I'm not going to call for obvious reasons. I'll admit that my most earnest desire is to talk to someone (like yourself) about my situation, but I feel that I'm unable to trust any kind of personal contact - phone included. . . .

* * * *

It would certainly be nice for people in my predicament to have a means of confidential consultation with someone in a position of authority without the possibility of arrest.

My contact will be expecting more material from me in a few months, if I don't I'm not sure what his response will be. I'm going to come clean with him at that time (assuming no deal is made with you) and tell him I'm finished with the "business". And then get on with my life.

More info on him: he has been in "the business" for more than 20 years and plans to continue indefinitely. . . .

The FBI offered to meet with RUS in ads placed on June 4 and 11. In a third letter, postmarked June 18, RUS declined the meeting, and stated that he would write again "in a week or two."

The FBI did not hear from RUS and placed an ad on August 13, 1984, suggesting a meeting at "a neutral site," Ensenada, Mexico. RUS responded that day with a fourth and final letter.

I saw your note in todays [sic] LA Times. Since my last note to you I've done a lot of serious thinking and have pretty much come to the conclusion that it would be best to give up on the idea of aiding in the termination of the espionage ring previously discussed.

To think I could help you and not make my own involvement known to the public, I believe is naive. . . . I have great difficulty in coming forth, par-

ticularly, since the chances of my past involvement ever being known is extremely remote, as long as I remain silent. . . .

The above notwithstanding, I'll think about a meeting in Ensenada. Funds are not the problem.

My contact is pressing for more material, but so far no real problems have occurred. I haven't explicitly told him, I'm no longer in the business.

The government contended at trial that Whitworth authored the RUS letters. After unsuccessfully challenging their admissibility into evidence, Whitworth's counsel conceded the issue in closing argument, stating bluntly: "I'm not going to quibble with you about the postmarks or the typewriter ball or the stamps or the envelopes or the paper. The writer of the RUS letters was Jerry Whitworth."

On August 14, one day after sending the final RUS letter to the FBI, Whitworth wrote to Walker and announced his "resignation" from espionage. This decision was relayed at a face-to-face meeting with the Soviets in January 1985, who assured Walker that Whitworth would still be paid for the year's worth of messages from the *Enterprise*. Walker told Whitworth in a February letter that payment was forthcoming. He expected a large amount of cash in the Soviets' next drop, scheduled for May 1985 near Washington D.C.

That drop was never completed. Walker's ex-wife, Barbara, who had been aware of his spying activities since shortly after they began in 1968, finally reported Walker to the FBI in November 1984. Walker's daughter, Laura, provided corroborating information, and an investigation commenced in early 1985. A telephone wiretap revealed that Walker had a trip planned for May 19, 1985, and the FBI conducted full-scale surveillance of him that day.

Walker was observed driving in rural Montgomery County, Maryland for a number of hours. He was arrested at a motel early the next morning, May 20, after a package he left near a utility pole was found to contain classified Navy documents stolen by his son, Michael, two letters from Whitworth, and a letter from Walker to a Soviet agent referring to Whitworth by a code letter. Soviet diplomat Aleksey Tkachenko also was seen near the drop point on May 19, but apparently alerted to the surveillance, he neither attempted to pick up Walker's package nor delivered one of his own.

A search of Walker's home pursuant to a warrant on May 20 uncovered additional evidence, including cryptographic material, classified documents and communications, travel records, and a miniature camera. Whitworth's handwriting and fingerprints were found on numerous items. That same day, FBI agents Peterson and McElwee spoke with Whitworth at his mobile home in Davis, California. Peterson informed Whitworth of Walker's arrest for espionage, asked if he knew about it, and accused him of being involved. Stunned, Whitworth replied, "you're talking about some serious stuff."

Whitworth was given *Miranda* warnings and signed a written waiver. He talked about his relationship with Walker in a narrative manner for approximately ninety minutes. During this discussion, Whitworth's wife, Brenda, was heard arriving home. When Whitworth requested to see her, the agents stated that they preferred to complete the interview without interruption and that other agents were waiting to talk with Brenda separately. FBI Agents Griego and Ambrosavich questioned Brenda about Walker outside the mobile home before taking her to a local restaurant.

Agents Peterson and McElwee continued to interview Whitworth. Peterson produced one of the RUS letters and accused Whitworth of writing it. When asked whether he was familiar with the letter, Whitworth said he did not want to

answer the question. Peterson requested consent to search the residence; Whitworth replied that he would like to "speak with someone first." Peterson next asked if he would take a polygraph examination. Whitworth responded by invoking his right to counsel, and the agents halted their questioning.

Peterson then called the FBI's Sacramento office for instructions on how to proceed. Whitworth, who was sitting with McElwee in an adjacent room, asked him what was likely to happen. McElwee replied that the agents' superiors might authorize them to arrest Whitworth or seek a search warrant. McElwee said he believed that sufficient cause existed to issue a warrant and that if one was sought, the mobile home would have to be secured in the interim to prevent the destruction of evidence.

At that point, Whitworth said that he would allow the agents to search the mobile home. McElwee explained that because of his earlier refusal, accepting Whitworth's "consent" could be problematic and would require a supervisor's approval. An FBI official in Sacramento was contacted by telephone, and twenty minutes later the agents were given permission to accept Whitworth's consent. Whitworth then signed a written consent form and a search was conducted. Among the items seized was a Monday edition of the Los Angeles Times and an unfinished letter that Whitworth was writing to Walker when the agents arrived.

The mobile home was searched again eleven days later, on May 31, 1985. This search, conducted pursuant to a warrant, uncovered two miniature cameras, seventy-six unused rolls of film, another Monday edition of the Times, and a copy of a telegram from Whitworth to Walker. On June 5, a commercial storage unit rented by Whitworth also was searched pursuant to a warrant.

Whitworth was arrested on June 3, 1985. He was the fourth and final member of the "Walker Family Spy Ring" to be

taken into custody, following John Walker, his son Michael, and his brother Arthur, who worked for a defense contractor. In December 1985, a third superseding indictment charged Whitworth with one count of conspiracy to deliver national defense information to a foreign government, 18 U.S.C. § 794(c); six counts of delivery of national defense information to a foreign government, 18 U.S.C. § 794(a); one count of unlawfully obtaining national defense information, 18 U.S.C. § 793(b); four counts of making false tax returns, I.R.C. § 7206(1); and one count of conspiracy to defraud the United States, 18 U.S.C. § 371.

Whitworth's espionage and tax counts were consolidated. The district court considered a number of pretrial motions, and trial began on March 24, 1986 amid extensive national publicity. The government's key witness was Walker, who testified in accordance with an October 1985 plea agreement.[2] Whitworth's defense was based on a lack of knowledge that the information passed to Walker was being relayed to the Soviet Union. On July 24, after deliberating for ten days, the jury found Whitworth guilty on each count of the indictment except that of unlawfully obtaining national defense information, on which no verdict was returned.

On August 28, the court sentenced Whitworth to 180 years in prison on each of the seven espionage counts, three years on each of the four tax evasion counts, and five years on the conspiracy to defraud the government count. Fines of $100,000 on each of the tax evasion counts and $10,000 on the conspiracy to defraud count were also imposed. The court ordered some of the prison terms to be served concurrently

[2] In exchange for cooperating with the government's prosecution of Whitworth and promising to testify truthfully at trial, Walker received indeterminate life sentences on two espionage counts and ten years on a third count. He will be eligible for parole after ten years, and did not face tax evasion charges. The government also promised to recommend a sentence of no more than twenty-five years for Michael Walker, who also pled guilty.

and others consecutively. Summarizing, Judge Vukasin announced that he was sentencing Whitworth, who was forty-seven years old at the time, to "a cumulative term of 365 years in custody, a total fine of $410,000 . . . [and] a minimum of 60 years in custody before he will be considered eligible for parole. The court did not impose this sentence lightly." Whitworth filed a timely notice of appeal.

II.

On appeal, Whitworth alleges numerous errors by the district court. Few of these claims call for extended analysis, and none requires reversal of his espionage and tax evasion convictions.

A. Discovery

[1] Before and during trial, Whitworth filed discovery requests pursuant to Fed. R. Crim. P. 16, the Jencks Act, 18 U.S.C. § 3500 (1982), and the Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83 (1963). Whitworth's initial motion, filed in September 1985, requested discovery in eighteen broad areas. His second motion, in January 1986, contained fifteen requests. The court granted the motions to a large extent, and the government made extensive disclosures. Whitworth contends that he was denied due process and a fair trial by the government's failure to comply fully with these requests and by the procedure used by the court to determine that certain material was not discoverable.

Rule 16(a)(1)(A) allows a defendant to inspect and copy "the substance of any oral statement which the government intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogation b any person then known to the defendant to be a government agent." Similarly, the Jencks Act permits discovery of statements by government witnesses relating to their trial testimony. 18 U.S.C. § 3500(b). Under *Brady*, the prosecution is

required to disclose "evidence favorable to an accused upon request . . . where the evidence is material either to guilt or to punishment." 373 U.S. at 87. This includes evidence relating solely to the credibility of a key government witness. *Giglio v. United States,* 405 U.S. 150, 154-55 (1972).

We review for an abuse of discretion the application of Rule 16, *United States v. Givens,* 767 F.2d 574, 583 (9th Cir.), *cert. denied,* 474 U.S. 953 (1985), and the Jencks Act, *United States v. Augenblick,* 393 U.S. 348, 355 (1969). Alleged *Brady* violations are reviewed de novo and require reversal only where there is a reasonable possibility that the evidence withheld could have materially affected the verdict. *United States v. Lehman,* 792 F.2d 899, 901 (9th Cir.), *cert. denied,* 107 S. Ct. 232 (1986).

[2] Before considering Whitworth's third discovery request, filed in May 1986, Judge Vukasin announced that "all discovery orders heretofore issued by this court in connection with this case have been complied with." With the exception of one meritless objection,[3] Whitworth did not challenge the district court's decisions on his first two motions. Some of these earlier discovery rulings were based on in camera review of the material. Whitworth did not object to this procedure; and in fact *requested* it in his third motion, which sought additional disclosures. On appeal, however, Whitworth contends that his rights were violated by this process because it left him "in the blind" with no way of knowing whether the court's rulings on his final request were correct.

[3] Although we realize that the *in camera* screening pro-

_____

[footnote] Whitworth claimed that a statement he made to Barbara Walker in the 1970's was discoverable under Rule 16. The court correctly found that disclosure would be required, if at all, only under the Jencks Act, because the statement was not made "in response to interrogation by any person then known . . . to the defendant to be a government agent." Fed. R. Crim. P. 16(a); *United States v. Hoffman,* 794 F.2d 1429, 1432 (9th Cir. 1986).

vented Whitworth from knowing exactly which statements the court allowed the government to withhold, it was nevertheless incumbent upon him to make at least some kind of record for our review. Whitworth did not make an objection or request a ruling from Judge Vukasin regarding the procedure. He likewise has failed to even suggest the source or subject of any statement to which he was entitled. Given this record and the discovery that was allowed, we find no error.

**B.  Joinder and Severance**

Whitworth claims that the eight espionage counts and five tax counts charged in his indictment were misjoined for trial. Under Fed. R. Crim. P. 8(a), offenses may be joined if they are either (1) of the same or similar character; (2) based on the same act or transaction; or (3) based on two or more acts or transactions connected together or constituting parts of a common scheme or plan. Misjoinder of charges is a question of law reviewed de novo. *United States v. Smith,* 795 F.2d 841, 850 (9th Cir. 1986), *cert. denied,* 107 S. Ct. 1964 (1987).

In a pretrial motion, Whitworth argued that the tax offenses were not congruent with the espionage conspiracy because they were distinct in time and based on evidence from different witnesses. Yet he acknowledged that the money allegedly received in exchange for classified information was the same as that involved in the tax charges. The government contended, and the district court agreed, that the offenses were performed as part of a common plan and that proof of the tax counts was inextricably intertwined with the proof of the espionage charges.

[4] Judge Vukasin correctly noted that where tax evasion flows directly from other criminal activity and such evasion

results in large part from the necessity of concealing the illegal proceeds of that activity, joinder of the substantive and tax charges is proper under Rule 8(a). *See United States v. Bennett*, 702 F.2d 833, 835 (9th Cir. 1983); *United States v. Kenny*, 645 F.2d 1323, 1344 (9th Cir.), *cert. denied*, 452 U.S. 920 (1981). Whitworth's reliance on *United States v. Halper*, 590 F.2d 422 (2d Cir. 1978), is misplaced because it was conceded in that case that "the sums charged in the income tax evasion indictment were not the same funds embraced in the Medicaid fraud indictment." *Id.* at 429.

Having found that initial joinder was proper, we address the related issue of whether the court abused its discretion by denying Whitworth's pretrial motion for severance. Fed. R. Crim. P. 14 provides in part:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

In *United States v. Armstrong*, 621 F.2d 951, 954 (9th Cir. 1980), we stated that "joinder is the rule rather than the exception." A denial of severance will be upheld absent a showing that "joinder was so manifestly prejudicial that it outweighed the dominant concern with judicial economy and compelled exercise of the court's discretion to sever." *Id.*; *accord Smith*, 795 F.2d at 850; *Kenny*, 645 F.2d at 1345.

[5] Whitworth contends that he desired to testify concerning the espionage counts but wanted to assert his privilege against self-incrimination with respect to the tax evasion charges. To justify severance on this ground, a defendant must demonstrate that he has important testimony to give concerning some counts and a strong need to refrain from tes-

tifying on others. *Armstrong*, 621 F.2d at 954; *United States v. Nolan*, 700 F.2d 479, 483 (9th Cir.), *cert. denied*, 462 U.S. 1123 (1983). We agree that Whitworth failed to meet this burden. His defense to the espionage charges was based on a lack of knowledge that the Soviet Union was the buyer of the stolen messages and cryptographic material. It would not have been inconsistent with this strategy for Whitworth to be cross-examined regarding receipt of the unreported cash.

C. *Miranda* Violations

Whitworth also submits that statements made to FBI agents at his mobile home on May 20, 1985, the day of Walker's arrest, were taken in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and thus were inadmissible at trial. The district court denied Whitworth's suppression motion following a three-day evidentiary hearing in December 1985. Whitworth and FBI agents Peterson, McElwee, and Griego testified at the hearing, and a declaration by Whitworth's wife, Brenda, was received.

The court based its ruling on two grounds. First, it found that *Miranda* warnings were simply unnecessary in this case because Whitworth was not "in custody" at the time he spoke to the agents. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). Second, assuming that Whitworth was subjected to custodial interrogation, the court concluded that he was adequately apprised of his rights and made the statements voluntarily. Because the record discloses a valid waiver by Whitworth, we need not address the "custody" question. *United States v. Barrett*, 703 F.2d 1076, 1087 (9th Cir. 1983).

The issue whether a defendant knowingly and voluntarily waives his *Miranda* rights involves a factual inquiry into the totality of the circumstances and the defendant's state of mind. *United States v. Doe*, 819 F.2d 206, 209 (9th Cir. 1985). We review the trial court's finding for clear error. *Id.*

McElwee testified that he and Peterson arrived at Whitworth's residence at approximately 11:30 a.m., and that they sat down at a table with Whitworth at 11:38. Whitworth agreed to talk to the agents after Peterson informed him of Walker's arrest and accused him of being involved in espionage. Before any questions were answered regarding his relationship with Walker, however, Whitworth was informed of his *Miranda* rights both orally and in writing. An interview report filed by Peterson indicated that Whitworth signed a waiver form at 11:50 a.m.—twelve minutes after sitting down with the agents, and did not ask to speak with a lawyer until 1:38 p.m. McElwee added that in accordance with *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), all questioning ceased when Whitworth requested counsel, and resumed only when Whitworth asked what the FBI office was likely to advise the agents to do.

Whitworth acknowledged reading and signing the *Miranda* waiver at 11:50 a.m., but testified that the agents had been in his house for thirty to sixty minutes by then. Whitworth said he believed he had no option at that point other than to sign the form because the agents "were putting a great deal of pressure on me continuously and psychologically I was beaten down and when I signed I signed for relief not from free will." He also recalled asking for a lawyer as soon as Peterson accused him of being involved in espionage with Walker.

[6] Judge Vukasin, presented with conflicting facts, credited the testimony of Peterson and McElwee over that of Whitworth in making his findings. He found that *Miranda* warnings were given "almost immediately" after Peterson's initial accusatory remark, and that Whitworth's later statements "were apparently made voluntarily." Although he did not specifically address the request for counsel, "[i]mplicit in the district judge's denial of the suppression motion was a finding that he believed the agent's direct testimony that [the defendant] initiated the conversation." *United States v. Most,* [...] 2d [...], [...] (9th Cir. 1986). The court's finding that

Whitworth knowingly and voluntarily waived his *Miranda* rights is not clearly erroneous and we hold that his statements were properly admitted.

### D. Consent Search

A warrantless search of Whitworth's residence was conducted on May 20, 1985, the day he was interviewed by the FBI. Whitworth claims that he was subjected to "psychological warfare" by the agents and that his consent to the search was involuntary. He challenges the district court's denial of his pretrial motion to suppress the items seized.

In *United States v. Al-Azzawy,* 784 F.2d 890 (9th Cir. 1985), *cert. denied,* 476 U.S. 1144 (1986), we discussed the standards to be applied in reviewing consent searches:

> The government has the burden of demonstrating that consent to a warrantless search was voluntary. Voluntariness is a question of fact to be determined from all the surrounding circumstances. A trial court's finding on voluntariness should not be overturned unless it is clearly erroneous.

*Id.* at 895 (citations omitted). Consent to search is "voluntary" if it is "the product of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte,* 412 U.S. 218, 225 (1973) (quoting *Culombe v. Connecticut,* 367 U.S. 568, 602 (1961)). When viewing the surrounding circumstances, "there is no single controlling criterion." *United States v. Agosto,* 502 F.2d 612, 614 (9th Cir. 1974) (per curiam).

[7] Judge Vukasin found "scant support" for Whitworth's argument that the agents employed patently coercive measures in order to obtain his consent to the search. Although the court acknowledged that Whitworth experienced a degree of discomfort while talking to the agents and being separated

from his wife, it determined that no threats were made, no weapons were drawn, *Miranda* warnings were given, and Whitworth was told that he was not under arrest. He also read and signed a waiver form stating that consent to search was not required, and testified that he was aware of this right.

McElwee's statement indicating that a search warrant would likely be sought and the mobile home secured could not have, by itself, rendered Whitworth's consent involuntary as a matter of law. *Agosto*, 502 F.2d at 614; *see United States v. Salvador*, 740 F.2d 752, 757 (9th Cir. 1984), *cert. denied*, 469 U.S. 1196 (1985). Judge Vukasin rejected the notion that Whitworth or his wife were threatened with unreasonable detention if he refused to consent. *Cf. United States v. Chihrvee*, 622 F.2d 992, 994 (9th Cir. 1980). In view of the surrounding circumstances, we affirm the district court's finding that the authorization to search was voluntary.

F. Search Warrants

Searches of Whitworth's residence and a commercial storage unit were conducted by the FBI pursuant to warrants on May 31 and June 5, respectively. Whitworth claims that these warrants were issued without probable cause and were overbroad. The government maintains that the warrants were valid, but admits that reference to the earlier consent search of the mobile home was intentionally omitted from the supporting affidavits submitted to the magistrate.

In *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court stated that a magistrate's finding of probable cause is to be given great deference:

The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay informa-

tion, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

*Id.* at 238-39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)); *United States v. Calabrese*, 825 F.2d 1342, 1348-49 (9th Cir. 1987). This court reviews de novo whether a warrant describes the items to be seized with sufficient particularity. *United States v. Fannin*, 817 F.2d 1379, 1381 (9th Cir. 1987).

[8] Based on all of the information presented to the magistrate, we are convinced that there was probable cause to issue the search warrants and that they were sufficiently narrow in scope. The affidavit supporting each warrant quoted statements by two informants that Walker admitted being involved in an espionage ring that included a Navy associate named Gerry or Jerry "Wentworth." Both informants claimed to have personal knowledge of Walker's activities and to have been trusted with confidences by him. Their testimony was corroborated by Arthur Walker, who told FBI agents that Whitworth was involved in espionage. The affidavits also referred to the contents of the intercepted drop package, the search of Walker's house, the "RUS letters," and statements by Whitworth and his wife.

[9] A warrant need not describe the objects of a search in elaborate detail. *United States v. Hayes*, 794 F.2d 1348, 1354 (9th Cir. 1986), *cert. denied*, 107 S. Ct. 1289 (1987). The magistrate authorized the agents in this case to search for fifteen types of evidence relating to the crimes of espionage and fraud against the United States. The supporting affidavit was attached to and incorporated by reference in both warrants. Given the reasonable specificity of the warrants and affidavits regarding the items described and the offenses alleged, the presence of a "catch-all" provision at the end of the war-

rants allowing seizure of "other information or objects showing violations of the above statutes" did not render them overbroad. *Fannin,* 817 F.2d at 1383-84; *see United States v. Spilotro,* 800 F.2d 959, 964, 967 (9th Cir. 1986).

A finding of facial validity of the search warrants does not end our inquiry. Whitworth further contends that he was improperly denied an evidentiary hearing pursuant to *Franks v. Delaware,* 438 U.S. 154 (1978), to challenge the veracity of certain factual statements in the affidavits supporting the warrants. In *Franks,* the Court held that:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

438 U.S. at 155-56.

Similarly, a defendant is entitled to a *Franks* hearing upon a "substantial showing that the affiant intentionally or recklessly omitted facts required to prevent technically true state-'its in the affidavit from being misleading." *United States v. Stanert,* 762 F.2d 775, 781 (9th Cir.), *modified,* 769 F.2d 1410 (1985). The issue is whether a *Franks* hearing is required is a mixed question of law and fact reviewed de novo. *United States v. Dozier,* 826 F.2d 866, 869 (9th Cir. 1987).

Whitworth argues that the magistrate was purposely misled in two ways. First, he points to paragraph 16 of both affidavits, quoting an unnamed "friend" of Whitworth's in Honolulu who said he "has been with Whitworth on many occasions over the years, has discussed stocks and bonds with Whitworth, and has sailed on his boat." The friend told FBI

agents that Whitworth "seemed to have plenty of money" while enlisted in the Navy, that his sailboat had "the latest gadgets," and that he doubted Whitworth's explanation that the extra money came from stock deals. Whitworth maintains that he has never owned a sailboat, and that this false statement undermines paragraph 16 and the entire affidavit.

[10] The district court, while assuming for purposes of argument that reliance on the Hawaiian informant constituted false statements by the affiant FBI agents, nevertheless concluded that paragraph 16 was not material to the warrant in this case. We agree. Demonstrating that an affidavit contained falsities or omissions is insufficient to require a *Franks* hearing. Further inquiry must be made to determine if the information was necessary to the magistrate's issuance of the warrant; that is, whether "the affidavit purged of those falsities and supplemented by the omissions would not be sufficient to support a finding of probable cause." *Stanert,* 762 F.2d at 782; *see Franks,* 438 U.S. at 171-72; *see also United States v. Burnes,* 816 F.2d 1354, 1357 (9th Cir. 1987).

[11] More troubling, however, is Whitworth's second claim, that the government's intentional omission of the search of the mobile home when it applied for a search warrant of the same premises eleven days later precluded a finding of probable cause. Judge Vukasin denied Whitworth's request for a *Franks* hearing on this ground in December 1985 following the suppression hearing. A supplemental motion on the same issue was denied in March 1986.

Whitworth contends that this court's decision in *Filippelli v. United States,* 6 F.2d 121 (9th Cir. 1925), mandates a finding that the warrant authorizing the second search of his residence was illegal. In that case, defendant was arrested and convicted for violating the National Prohibition Act. A search warrant for Filippelli's apartment had been issued and executed on October 25, 1923, based on an affidavit alleging a sale of "jackass" brandy on October 9. A second warrant for

the same premises was issued by the same commissioner to the same officers on November 5. It was based on an affidavit charging a sale of wine on October 17. A still and a large quantity of liquor were seized in the second search. Evidence from both searches was introduced at trial over objection. *Id.* at 122.

Filippelli argued, *inter alia*, that the second search was unlawful because the warrant was based on conduct alleged to have occurred before issuance of the first warrant. The court agreed:

We see no defect of form or substance in the first search warrant, or in the affidavit upon which it was based; but, in our opinion, the second search warrant was unauthorized and illegal. . . .

We do not hold or intimate that a second search warrant may not issue in any case after a prior search of the premises, when based on a sale or sales consummated before the first search; but, to authorize a second search, some showing must be made beyond the mere sale of intoxicating liquor antedating the first search. As already stated, a search warrant is authorized for a specific purpose, not as a punishment for crime, and when that purpose has been accomplished the right of search is gone. Courts must presume, in the absence of some showing to the contrary, that officers perform their duties and properly execute the processes placed in their hands. . . .

*Id.* at 125.

Although two warrants were involved in *Filippelli* while the first search of Whitworth's residence was based on consent, he suggests that the 1925 decision prohibits all consecutive searches of the same place absent a showing of intervening probable cause. Under his view, the government's omission

of the first search was material because a magistrate, aware that agents had searched the mobile home eleven days earlier and had already seized evidence of espionage and tax evasion, would not find probable cause to conduct a second search.

The government claims that it did not inform the magistrate about the consent search as a matter of strategy because it was afraid of "tainting" the second search. Although it purposely ignored the items previously seized in making its probable cause showing for the warrant, the government reasoned that the mere reference to an earlier search might somehow be found to have been a basis for the magistrate's decision. In the event that the consent search later was determined to be invalid, the government sought to ensure that the warrant-based search would not be affected.

[12] We do not believe it is proper for law enforcement officials to withhold information regarding prior searches of the same premises from magistrates considering warrant applications. If "taint" is feared, the better practice is to advise the magistrate that an earlier consent search had been conducted and provide the reasons why a warrant is still required. The affiant could affirmatively state that nothing obtained in the first search is being relied on in seeking the warrant. At that point, the magistrate can properly evaluate the situation and determine whether probable cause still exists.

We acknowledge that the seriousness of the charges in this case, the government's burden of proof in warrantless search situations, and Whitworth's initial refusal to consent to the search may have led the government to be specially cautious in this case. Yet it hardly bears repeating that under the careful balance struck by the fourth amendment, "it is the magistrate who must determine independently whether there is probable cause." *Franks*, 438 U.S. at 165.

[13] Notwithstanding our disapproval of the government's strategy, we agree with the district court that omission of the

search did not necessitate a *Franks* hearing. First, there is no evidentiary conflict to be resolved in a hearing. It is admitted that there was a prior search that was omitted from the affidavit. Second, Whitworth made no substantial showing that the facts relied on by the district court in determining the materiality of the omission was incorrect. Whitworth basically raises a legal argument that the second search was barred by *Filippelli.* That case is distinguishable by its own language. The court did not establish a *per se* rule against consecutive searches in *Filippelli,* but "presume[d], in the absence of some showing to the contrary, that officers perform their duties and properly execute the processes placed in their hands." 6 F.2d at 125.

The government has argued persuasively that the consent search in this case was not performed as thoroughly as a warrant-based search would have been, so that there still was probable cause for the subsequent search. During the initial search, the agents were working under time constraints and the possibility that Whitworth, who was present and initially had refused permission, would withdraw his consent. As a result, FBI inventory sheets for the first search reveal only twenty entries for items seized. Sheets for the second search, in contrast, contain approximately 220 entries. Moreover, Whitworth admitted at the suppression hearing that he did not believe the consent search was performed thoroughly.

On these facts, the failure to disclose the limited consent search could not have affected the decision to issue the warrant. The government's application was extensive and did not rely on any of the evidence seized earlier. We believe that "the affidavit, once . . . supplemented, would provide a magistrate with a substantial basis for concluding that probable cause existed." *Stanert,* 762 F.2d at 782.

## F.  The "RUS Letters"

[14] Whitworth next argues that the trial court erred by admitting into evidence the four anonymous "RUS letters"

Case 3:07-cv-02000-H-... Document 265-... Filed 09/12/08 Page 46 of 63 ... Page ID #:44865

...earing. First, there is no
a hearing. It is admitted
. omitted from the affida-
stantial showing that the
determining the materi-
ct. Whitworth basically
nd search was barred by
ble by its own language.
rule against consecutive
], in the absence of some
perform their duties and
l in their hands." 6 F.2d

asively that the consent
ned as thoroughly as a
n, so that there still was
arch. During the initial
er time constraints and
vas present and initially
draw his consent. As a
first search reveal only
s for the second search.
220 entries. Moreover,
on hearing that he did
rformed thoroughly.

ose the limited consent
cision to issue the war-
is extensive and did not
er. We believe that "the
ld provide a magistrate
ng that probable cause

ie trial court erred by
nymous "RUS letters"

received by the FBI during the summer of 1984. It should be noted that his pretrial objection to admissibility appears to have been waived during closing argument when counsel frankly admitted that Whitworth wrote the letters, although questioning their probative value. In any event, we find that the court did not err by admitting the letters.

The first letter stated, "I have been involved in espionage for several years. . . . I didn't know that the info was being passed to the USSR until after I had been involved a few years." RUS disclosed various facts about "a significant espionage system," and offered additional information in exchange for immunity from prosecution. The letters thus were highly probative of the central issue in the case, whether Whitworth participated in Walker's spy conspiracy. They also constituted the only direct evidence admissible at trial showing that Whitworth was aware he was passing information to the Soviet Union. *See infra* at 38.

[15] Whitworth claims that the government's offer of proof linking him to the RUS letters did not meet the authentication standard of Fed. R. Evid. 901(a). This rule provides that the "requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evidence is admissible under Rule 901(a) "once a prima facie case has been made on the issue. At that point the matter is committed to the trier of fact to determine the evidence's credibility and probative force." *United States v. Johnson,* 637 F.2d 1224, 1247 (9th Cir. 1980) (citations omitted). Sufficiency of authentication is reviewed for abuse of discretion. *United States v. Feldman,* 788 F.2d 544, 556 (9th Cir. 1986), *cert. denied,* 107 S. Ct. 955 (1987).

After reviewing the government's lengthy offer of proof, Judge Vukasin concluded that a prima facie showing had been made. He found that the espionage conspiracy described in the RUS letters contained numerous points in common

with facts known about the Walker Family Spy Ring. The government submitted twenty-three of these comparisons, which were properly considered: "[A] document or telephone conversation may be shown to have emanated from a particular person by virtue of its disclosing knowledge of facts known peculiarly to him." Fed. R. Evid. 901 advisory committee's note Example (4).

The court's ruling is supported by other evidence. First, postmarks on the RUS letters corresponded to Whitworth's location on the days they were mailed. Second, RUS instructed the FBI to respond to his letters in the classified section of Monday editions of the Los Angeles Times. When Whitworth's mobile home was searched, two copies of the Times were found, and both were Monday editions. Third, it was disclosed that "RUS," with a single "S," was the nickname Whitworth used to refer to Russ Salvi, a Navy friend, in memos. Finally, we note that the first RUS letter was written only three weeks after Whitworth was advised that he would not be paid for material he had delivered to Walker from the U.S.S. Enterprise.

Judge Vukasin also was presented with evidence of style similarities between Whitworth's writings and the RUS letters based on psycholinguistic analysis, but expressly declined to consider it. Whitworth's claim that this method is unreliable is therefore irrelevant and we express no view on the matter. Two other arguments against admissibility were properly rejected. The RUS letters, while damaging, did not constitute a "confession," and no hearing on voluntariness was required. We agree with the court that the "ultimate purpose of the letters . . . was not confessional. Rather, they may be viewed as the opening bid in a game which RUS eventually concluded was not worth the candle." Likewise, the probative value of the letters was not substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403.

Family Spy Ring. The
of these comparisons,
document or telephone
nanated from a particu-
owledge of facts known
advisory committee's


other evidence. First,
onded to Whitworth's
nailed. Second, RUS
etters in the classified
Angeles Times. When
ed, two copies of the
day editions. Third, it
gle "S," was the nick-
Salvi, a Navy friend,
t RUS letter was writ-
was advised that he
l delivered to Walker


ith evidence of style
ngs and the RUS let-
out expressly declined
his method is unreli-
ress no view on the
admissibility were
le damaging, did not
ng on voluntariness
at the "ultimate pur-
al. Rather, they may
hich RUS eventually
ewise, the probative
/ outweighed by the
. 403.

## G.   Examination of Witnesses

The district court made numerous evidentiary rulings during the trial on the permissible scope of examination of witnesses and the admissibility of statements. Whitworth alleges that his sixth amendment right to effective cross-examination was abridged or his case otherwise prejudiced by many of these decisions, especially those involving John Walker.

A trial court's limitation on the scope of cross-examination and its evidentiary rulings are reviewed for abuse of discretion. *United States v. Poschwatta,* 829 F.2d 1477, 1481, 1483 (9th Cir. 1987), *cert. denied,* 108 S. Ct. 1024 (1988). We cannot merely substitute our judgment for that of the district court to reverse under this standard, but must have a definite and firm conviction that the court committed a clear error of judgment in the conclusion it reached upon a consideration of the relevant factors. *See United States v. Ruffen,* 780 F.2d 1493, 1495 (9th Cir.), *cert. denied,* 107 S. Ct. 462 (1986).

[16] The government's case against Whitworth centered around the testimony of Walker, his coconspirator and leader of the espionage ring. Walker described with some detail a series of twenty-three meetings he and Whitworth had between February 1975 and April 1984. Whitworth received a total of $332,000 in exchange for cryptographic material and other classified Navy information, which Walker relayed to the Soviet Union. Given that Walker's credibility was essential to the government's case, Whitworth contends that the district court should have allowed the broadest possible cross-examination. The government insists that this in fact was done, and any legitimate damage that Whitworth intended to do to Walker's credibility was accomplished.

"This court has repeatedly expressed its concern that defense counsel be given maximum opportunity to impeach the credibility of key government witnesses." *United States v.*

*Williams,* 668 F.2d 1064, 1070 (9th Cir. 1981). The right to cross-examination is not absolute, however:

> On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20 (1985) *(per curiam)* (emphasis in original).

*Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986); *see also United States v. Dadanian,* 818 F.2d 1443, 1449 (9th Cir. 1987).

[17] Whitworth cites three examples of undue limitation on cross-examination. First, inquiry was not permitted into whether Walker asked his wife, Barbara, to engage in prostitution to pay debts. The court found this to be a specific instance of conduct that was irrelevant to untruthfulness and therefore inadmissible under Fed. R. Evid. 608(b). The court also sustained on relevancy grounds an objection to a follow-up question regarding Barbara's participation in a drop in 1971. Finally, while cross-examination was permitted regarding Walker's membership in the Klu Klux Klan, Whitworth was not allowed to inquire into Walker's racial views or enter a photograph of him in Klan regalia into evidence. The court found the evidence to be irrelevant or, if relevant, to be unfairly prejudicial under Fed. R. Evid. 403.

[18] We do not believe that Judge Vukasin abused his discretion. The record indicates that Walker was subjected to

1981). The right to
/er:

1 wide latitude
is concerned to
ss-examination
other things,
the issues, the
is repetitive or
observed earlier
e guarantees an
mination, not
whatever way,
e might wish."
20 (1985) (*per*

579 (1986); *see also*
.43, 1449 (9th Cir.

undue limitation on
iot permitted into
to engage in prosti-
is to be a specific
untruthfulness and
l. 608(b). The court
jection to a follow-
ation in a drop in
s permitted regard-
x Klan, Whitworth
acial views or enter
vidence. The court
if relevant, to be
03.

sin abused his dis-
r was subjected to

extensive cross-examination and recross-examination over a
four-day period. During trial, evidence of his seventeen-year
espionage career, the recruiting of his family and best friend
to spy, and his plea agreement was fully explored. Inquiry also
was permitted into alleged marital infidelity and Walker's
purported suggestion that his daughter, Laura, get an abor-
tion so that she could remain in the Army and begin spying
for him. In short, the jury was given ample opportunity to
despise Walker and discredit his testimony. *See Batchelor v.
Cupp*, 693 F.2d 859, 865 (9th Cir. 1982), *cert. denied*, 463
U.S. 1212 (1983).

[19] On a related matter, Whitworth claims that numerous
irrelevant or speculative statements by Walker were improp-
erly admitted at trial. One allegation requires our attention.
During redirect examination, Walker was asked whether he
ever had "suspicions or apprehensions that Mr. Whitworth
knew that the real buyers were the Soviets?" After a defense
objection was overruled, Walker answered affirmatively. He
stated that his belief was based on "[c]ommon sense, sir. It
made no sense that a friendly government or a criminal ele-
ment would buy cryptographic material."

The question clearly asked Walker to speculate about Whit-
worth's state of mind. The government argues, however, that
the door to exploring Walker's "apprehensions or suspicions"
was opened by Whitworth's counsel on cross-examination. It
refers to a colloquy where Walker was asked whether he
thought that Whitworth's delivery of certain poor-quality
information in late 1981 and in 1983 was intentional:

Q:  At this point in time, did you begin to develop
any apprehensions or suspicions that he might
be pulling your leg a little bit or stringing you
along?

A:  I had minor suspicions, yes.

* * * *

Q: Did you begin to suspect or question any further during this period what was going on in his head with respect to your relationship?

A: Yes, I did.

Q: What precisely went through your mind at that point, if you recall?

A: I was concerned that he was attempting to pull the classic ripoff or blackmail the Soviets by saving this stack of secret messages.

Under the rule of curative admissibility, or the "opening the door" doctrine, the introduction of inadmissible evidence by one party allows an opponent, in the court's discretion, to introduce evidence on the same issue to rebut any false impression that might have resulted from the earlier admission. *See United States v. Segall,* 833 F.2d 144, 148 (9th Cir. 1987); *United States v. Makhlouta,* 790 F.2d 1400, 1402-03 (9th Cir. 1986); I J. Wigmore, Evidence § 15 (Tillers rev. 1983). The doctrine does not permit the introduction of evidence that is related to a different issue or is irrelevant to the evidence previously admitted. McCormick on Evidence § 57 (3d ed. 1984).

[20] The district court abused its discretion in admitting the statement. On cross-examination, Whitworth's counsel asked Walker whether *he* had suspicions regarding Whitworth's sincerity after the poor deliveries. This called for an answer within Walker's personal knowledge. The question on redirect, in contrast, related to what Walker believed *Whitworth* knew about the buyer's identity. The door was never opened for such an inquiry.

[21] This testimony should not have been presented to the jury. We nevertheless conclude that the error was harmless

question any fur-
as going on in his
tionship?


your mind at that


ttempting to pull
il the Soviets by
ssages.


ility, or the "opening
inadmissible evidence
court's discretion, to
e to rebut any false
om the earlier admis-
.2d 144, 148 (9th Cir.
0 F.2d 1400, 1402-03
nce § 15 (Tillers rev.
e introduction of evi-
or is irrelevant to the
nick on Evidence § 57


scretion in admitting
Whitworth's counsel
ions regarding Whit-
ies. This called for an
edge. The question on
at Walker believed
entity. The door was


been presented to the
e error was harmless

and a new trial is not required. The admission of Walker's opinion evidence in this case did not amount to a constitutional error. *See United States v. Cox,* 633 F.2d 871, 876 (9th Cir. 1980), *cert. denied,* 454 U.S. 844 (1981). When a nonconstitutional error is involved, a defendant's conviction will be reversed only if it is more probable than not that it materially affected the verdict. *United States v. Rhodes,* 713 F.2d 463, 475 (9th Cir.), *cert. denied,* 464 U.S. 1012 (1983).

Whitworth's defense to the espionage charges was based on a lack of knowledge that the classified information he supplied to Walker was being relayed to the Soviet Union. Walker's challenged statement, while contradicting this theory, could have had little effect on the verdict because it was merely cumulative. Standing alone, the first RUS letter supplied the jury with overwhelming direct evidence that Whitworth knew the identity of the buyers. Although Walker testified that he never told Whitworth that they were dealing with the Soviet Union, the jury could have inferred Whitworth's knowledge from the surrounding circumstances. For example, Walker testified that he and Whitworth agreed as a "cover story," in the event that they were arrested, "to explain that the material was being sold to a friendly nation or ally." In addition, Walker stated that Whitworth often asked about Soviet spies that had been caught, and requested that Walker find out "from the buyers of our material" what they had done wrong.

As a final evidentiary matter, Whitworth alleges additional errors by the district court regarding the examination of various witnesses. He contends that cross-examination of government witness Michael O'Connor and direct examination of defense witness Laurie Robinson were improperly restricted. Whitworth also argues that government witnesses Gerald Richards, Arthur Walker, Lynn McShane, Jennifer Anderson, Beverly Gansberger, and John Barron were allowed to testify to irrelevant matters. Upon a review of the record, we

Case 2:87-cr-00422-JAK Document 3684 Filed 10/18/88 Page 53 of 63 Page ID #:44972

find that the court did not abuse its discretion in its rulings regarding these witnesses.

## H. Sufficiency of the Evidence

Whitworth challenges the sufficiency of the evidence on the espionage charges. He argues that the government failed to prove beyond a reasonable doubt that he knew the information was going to the Soviet Union.[4] A criminal conviction is supported by sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original); *United States v. Vaccaro,* 816 F.2d 443, 454 (9th Cir.), *cert. denied,* 108 S. Ct. 295 (1987).

[22] Whitworth was convicted of six counts of delivering national defense information to a foreign government in violation of 18 U.S.C. § 794(a) (1976), which provides:

> Whoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation, communicates, delivers, or transmits . . . to any foreign government . . . either directly or indirectly, any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, note, instrument, appliance, or information relating to the national defense, shall be punished by death or by imprisonment for any term of years or for life.

He was also convicted of one count of conspiring with Walker to violate section 794(a). 18 U.S.C. § 794(c).

---

[4]Whitworth does not challenge the sufficiency of the evidence on the tax evasion charges.

RTH

:retion in its rulings

f the evidence on the
overnment failed to
e knew the informa-
iminal conviction is
ter viewing the evi-
ie prosecution, *any*
e essential elements
*Jackson v. Virginia,*
in original); *United*
h Cir.), *cert. denied,*

:ounts of delivering
government in vio-
h provides:

believe that it is
States or to the
unicates, deliv-
government . . .
ument, writing,
tograph, photo-
ip, model, note,
n relating to the
by death or by
or for life.

spiring with Walker
l(c).

the evidence on the tax

---

UNITED STATES V. WHITWORTH      10583

[23] Section 794(a), which contains a state of mind element, does not on its face require a defendant to know that he is delivering defense information to a specific foreign nation. In Whitworth's indictment, however, the espionage counts expressly charged that he intended for the defense information "to be used to the injury of the United States and to the advantage of a foreign nation, that is, the Union of Soviet Socialist Republics." The district court rejected the government's argument that this language was surplusage, and concluded that proof of specific intent to aid the Soviet Union would be required to convict Whitworth.

On June 27, 1986, the government filed an emergency petition for writ of mandamus, requesting that we order the district court to instruct the jury that knowledge of the government to which the information was delivered was not an element of section 794(a) and need not be shown. In an unpublished order, the court denied the petition, stating that the formulation of jury instructions was within the court's discretion and extraordinary circumstances did not exist to warrant review prior to the end of trial. *United States v. United States District Court,* No. 86-7383 (9th Cir. July 2, 1986).

Although the jury convicted Whitworth on seven of the eight conspiracy counts[5] despite the heightened proof requirement, the government has renewed the surplusage issue on appeal. It relies on *United States v. Miller,* 471 U.S. 130 (1985), where the Court held that a variance between the scheme to defraud set out in the defendant's mail fraud indictment and the government's proof at trial did not violate the grand jury clause of the fifth amendment. In determining that the defendant could be convicted for a criminal plan narrower than that contained in the indictment but fully included within, the Court noted:

---

[5]No verdict was returned on one count of unlawfully obtaining national defense information, 18 U.S.C. § 793(b) (1976).

As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime. . . .

Convictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment. A part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as "a useless averment" that "may be ignored."

*Id.* at 136 (quoting *Ford v. United States,* 273 U.S. 593, 602 (1927)).

[24] We need not determine whether the description of the Soviet Union as the "foreign nation" in the indictment was surplusage. Whitworth received the instruction he requested and the jury, in finding him guilty, resolved the issue in the government's favor. This verdict was supported by substantial evidence. As discussed earlier in our harmless error analysis, *supra* at 37-38, the jury was presented with overwhelming evidence on which to conclude that Whitworth was aware of the identity of the buyer of the classified information. The convictions therefore are affirmed.

I.   Tax Fines

[25] In addition to prison terms, Judge Vukasin fined Whitworth $100,000 on each of four counts of filing false tax returns under 26 U.S.C. § 7206(1) and $10,000 on one count of conspiracy to defraud the United States under 18 U.S.C. § 371. Whitworth claims that the fines imposed pursuant to section 7206 exceeded the statutory limit in effect at the time the offenses were committed and must be reversed. Although

nts of the offense
y and clearly set
grand jury is not
t the indictment
is of committing

stained as long as
d corresponds to
n the indictment.
ary to and inde-
ense proved may
averment" that

s, 273 U.S. 593, 602

he description of the
a the indictment was
ruction he requested
lved the issue in the
upported by substan-
harmless error analy-
d with overwhelming
itworth was aware of
ed information. The

Vukasin fined Whit-
ts of filing false tax
10,000 on one count
tes under 18 U.S.C.
mposed pursuant to
t in effect at the time
e reversed. Although

the government has conceded this issue, we conclude that only two of these fines were unauthorized.

Whitworth was charged with filing false returns for the 1979 through 1982 tax years. The maximum fine allowable under section 7206 was increased from $5,000 to $100,000 by the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, § 329(a), 96 Stat. 324, 618 (1982). Section 329(e) of the Act provides that the increased fines apply to offenses committed after the date of enactment, September 3, 1982. *Id.* § 329(e), 96 Stat. at 619.

Whitworth submits that the tax evasion counts at issue involve acts occurring prior to that date. This is simply wrong. The relevant event under section 7206(1) is the making and signing of a tax return "which he does not believe to be true and correct as to every material matter." Whitworth filed amended returns, and those for the 1981 and 1982 tax years were not filed until the summer of 1984. These returns thus fall within the effective date of the 1982 amendments to section 7206, and the court was authorized to fine Whitworth a maximum of $100,000 on each of the two counts.

Because the amended returns for the 1979 and 1980 tax years were filed in 1981, the fine on each of those counts was limited to $5,000. 26 U.S.C. § 7206 (1976). Accordingly, we affirm the district court's imposition of fines for the 1981 and 1982 tax returns, but reverse and remand for redetermination of the fines imposed for 1979 and 1980.

J.   Sentencing

Title 18 U.S.C. § 794 provides that a defendant convicted of espionage "shall be punished by death or by imprisonment for any term of years or for life."[6] The district court imposed

[6]The death penalty provision in section 794 was held unconstitutional in *United States v. Harper*, 729 F.2d 1216 (9th Cir. 1984). The court found that the statute contained no legislated guidelines to control the fact finder's discretion. *Id.* at 1224-26; *see Gregg v. Georgia*, 428 U.S. 153, 189 (1976).

fixed sentences of 180 years on each of the seven counts under
section 794, three years each on the four tax evasion counts,
and five years on the single count of conspiracy to defraud the
United States. The court ordered 365 years of the sentences
to be served consecutively, and designated that Whitworth
would not be eligible for parole for sixty years pursuant to 18
U.S.C. § 4205(b) (1976).

[26] Whitworth challenges his sentences on four grounds:
(1) the court failed to request a presentence report, (2) the
sixty-year term without parole was unauthorized, (3) his sen-
tence was impermissibly greater than that of John Walker,
and (4) the sentence violated the eighth amendment. We
reject these claims and affirm the district court's judgment.

[27] Fed. R. Crim. P. 32(c)(1) requires that an investigation
and report be prepared by the court's probation service
before the imposition of sentence. The court may waive the
investigation and report if it determines that "there is in the
record information sufficient to enable the meaningful exer-
cise of sentencing discretion, and the court explains this find-
ing on the record." *Id.* After the jury's verdict was issued,
Judge Vukasin stated:

> This case, as everyone acquainted with it well
> knows, is one of the most extensively documented in
> recent memory. Aside from the lengthy pretrial pro-
> ceedings, the trial has witnessed the production of
> materials relating to virtually every aspect of the
> defendant's life; his career; his personality, and
> beliefs. Rarely has a person's life been held out to
> public inspection in quite such a manner. . . .

> It appears to the court that there is literally noth-
> ing a presentence investigation could turn up which
> has not already been well documented, nothing a
> presentence report could relate which is not pres-

en counts under
evasion counts,
:y to defraud the
of the sentences
that Whitworth
s pursuant to 18

n four grounds:
: report, (2) the
zed, (3) his sen-
f John Walker,
mendment. We
rt's judgment.

an investigation
obation service
may waive the
"there is in the
meaningful exer-
plains this find-
lict was issued,

ith it well
amented in
retrial pro-
duction of
ect of the
ality, and
eld out to
. . . .

rally noth-
a up which
nothing a
s not pres-

ently known. The facts of Mr. Whitworth's life are,
at this juncture, almost common knowledge.

The court denied Whitworth's motion to reconsider its deci-
sion on the day of sentencing.

[28] The Fifth Circuit has stated, "Rule 32 denies any judge
the discretion to reduce the hearing on sentence to a meaning-
less formality." *United States v. Long,* 656 F.2d 1162, 1165
(5th Cir. Unit A Sept. 1981). The decision to dispense with
the investigation and report in this case did not undermine
the sentencing process in any way. The court's reasons were
adequately stated on the record. We find no abuse of discre-
tion on these facts.

[29] Whitworth contends that the court improperly ordered
him to serve sixty years in prison before becoming eligible for
parole. We review the legality of a sentence de novo. *United
States v. Arbelaez,* 812 F.2d 530, 532 (9th Cir. 1987) (per
curiam). He relies on 18 U.S.C. 4205(a) (1976), which states
that a prisoner shall be eligible for parole "after serving ten
years of a life sentence or of a sentence of over thirty years,
except to the extent otherwise provided by law." This argu-
ment was rejected in *United States v. Gwaltney,* 790 F.2d
1378 (9th Cir. 1986), *cert. denied,* 107 S. Ct. 1337 (1987),
where a divided panel approved a ninety-year sentence
imposed for murder with a thirty-year minimum parole
period.

The *Gwaltney* panel was faced with reconciling section
4205(a) with the broad discretion given to the sentencing
court in section 4205(b):

[W]hen in its opinion the ends of justice and best
interest of the public require that the defendant be
sentenced to imprisonment for a term exceeding one
year, [the court] may (1) designate in the sentence of
imprisonment imposed a minimum term at the

> expiration of which the prisoner shall become eligible for parole, which term may be less than but shall not be more than one-third of the maximum sentence imposed by the court . . . .

The majority concluded that "§ 4205(b) plainly provides the sentencing judge alternatives to the automatic [parole] eligibility of § 4205(a)." *Gwaltney,* 790 F.2d at 1387. The Eighth and Tenth circuits have reached a similar conclusion. *See Rothgeb v. United States,* 789 F.2d 647, 651-53 (8th Cir. 1986); *United States v. O'Driscoll,* 761 F.2d 589, 596-97 (10th Cir. 1985), *cert. denied,* 475 U.S. 1020 (1986). The First and Seventh circuits have taken the opposite view. *See United States v. Castonguay,* 843 F.2d 51, 56 (1st Cir. 1988); *United States v. Fountain,* 840 F.2d 509, 523 (7th Cir. 1988). *Gwaltney* controls in this case, and Whitworth's argument is without merit.

[30] John Walker pled guilty to three counts of espionage in the United States District Court for the District of Maryland pursuant to his plea agreement and was sentenced to life imprisonment. Under 18 U.S.C. § 4205(a), he will be eligible for parole after serving ten years. Whitworth suggests that he was less culpable than his coconspirator, and should not have received a greater prison term than Walker.

[31] "It is generally accepted that trial courts are accorded virtually unfettered discretion in imposing sentence. While there are exceptions, a sentence is generally not subject to appellate review if it is within statutory limits." *United States v. Barker,* 771 F.2d 1362, 1364 (9th Cir. 1985) (citations omitted). We have recognized such an exception when a codefendant has received a more severe sentence because he chose to stand trial rather than plead guilty. *See United States v. Garrett,* 680 F.2d 650, 652 (9th Cir. 1982); *United States v. Capriola,* 537 F.2d 319, 321 (9th Cir. 1976) (per curiam).

[32] This exception is inapplicable here. Whitworth and Walker, while coconspirators, were not codefendants. The

:come eligi-
an but shall
.imum sen-

ily provides the
ic [parole] eligi-
387. The Eighth
conclusion. *See*
51-53 (8th Cir.
39, 596-97 (10th
). The First and
ew. *See United*
r. 1988); *United*
'th Cir. 1988).
h's argument is

of espionage in
ict of Maryland
ntenced to life
e will be eligible
suggests that he
should not have

ts are accorded
entence. While
not subject to
." *United States*
985) (citations
eption when a
nce because he
*re United States*
*United States v.*
per curiam).

Whitworth and
efendants. The

district court was not required to limit its discretion in sentencing Whitworth because Walker was scheduled to receive indeterminate life terms in the District of Maryland. Judge Vukasin rejected this theory when it was presented to him, stating that "a sentence in which this defendant would be eligible for parole in ten years appears unconscionable to this court, and under no circumstances would this court impose that sentence." And while we need not consider the relative culpability of the spies, as Whitworth requests we do, the court notes that Whitworth kept Walker's espionage operations alive for nearly a decade and himself became a central figure in the scheme because of his access to highly classified material.

Finally, we are convinced that the sentence imposed did not constitute cruel and unusual punishment. The eighth amendment "prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed." *Solem v. Helm*, 463 U.S. 277, 284 (1983); *United States v. Busher*, 817 F.2d 1409, 1414 (9th Cir. 1987). Whitworth, while stating that he has been given, in effect, a life sentence without the possibility of parole, has not explained why this sentence is disproportionate to his crime.

Espionage is one of this nation's most serious offenses. Former CIA Deputy Director George Carver suggested at trial that disclosure of cryptographic material and naval messages to a foreign power over a ten-year period would damage the United States "to an enormous and quite bitterly incalculable degree." He added that "the damage thus done, in my opinion, could significantly, if not irrevocably, tilt the very strategic balance in which our survival as a nation depends." Shortly before sentencing, Judge Vukasin described Whitworth as "one of the most spectacular spies of this century."

[33] Viewed in the abstract, a 365-year prison term, with little prospect of parole, would appear harsh. This sentence, however, is not disproportionate to Whitworth's crimes.

### III.

We affirm Whitworth's convictions for espionage and tax evasion, the prison sentence imposed by the district court, and three of the five fines. We reverse and remand to the court for redetermination of the fines imposed for filing false tax returns for 1979 and 1980.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

## CERTIFICATE OF SERVICE BY MAIL

I, JUDY COLON                        , declare:

That I am a citizen of the United States and resident or
employed in Los Angeles County, California; that my business
address is Office of United States Attorney, United States
Courthouse, 312 North Spring Street, Los Angeles, California
90012; that I am over the age of eighteen years, and am not a
party to the above-entitled action;

That I am employed by the United States Attorney for the
Central District of California who is a member of the Bar of the
United States District Court for the Central District of
California, at whose direction the service by mail described in
this Certificate was made; that on  OCTOBER 18, 1988       , I
deposited in the United States mails in the United States
Courthouse at 312 North Spring Street, Los Angeles, California,
in the above-entitled action, in an envelope bearing the
requisite postage, a copy of:     GOVERNMENT'S SENTENCING
                    MEMORANDUM

addressed to:
                    SEE ATTACHED LIST.

at their       last known address, at which place there is a
delivery service by United States mail.

This Certificate is executed on     OCTOBER 18, 1988     , at
Los Angeles, California.

I certify under penalty of perjury that the foregoing is true
and correct.

ATTACHMENT

UNITED STATES v. RAFAEL CARO QUINTERO, et al.,
NO. CR 87-422(B)-ER

SERVICE BY MAIL

Elsa Leyva, DFPD
Federal Public Defender's Office
312 North Spring Street
15th Floor
Los Angeles, California  90012

Michael Pancer, Esq.
Home Federal Building
625 Broadway
Suite 1135
San Diego, California  92101

Donald C. Randolph, Esq.
2566 Overland Avenue
Suite 700
Los Angeles, California  90064

Barry Tarlow
9119 Sunset Boulevard
Los Angeles, California  90069