1  GARY A. FEESS
   United States Attorney
2  ROBERT L. BROSIO
   Assistant United States Attorney
3  Chief, Criminal Division
   MANUEL A. MEDRANO
4  Assistant United States Attorney
   Major Narcotics Section
5      1400 United States Courthouse
       312 North Spring Street
6      Los Angeles, California 90012
       Telephone:  (213) 894-0619
7
   Attorneys for Plaintiff
8  United States of America

9              UNITED STATES DISTRICT COURT

10         FOR THE CENTRAL DISTRICT OF CALIFORNIA

11 UNITED STATES OF AMERICA,        )   NO. 87-422(C)-ER
                                    )
12              Plaintiff,          )   RETURN TO PETITION FOR WRIT OF
                                    )   HABEAS CORPUS; MEMORANDUM OF
13         v.                       )   POINTS AND AUTHORITIES;
                                    )   DECLARATIONS OF MANUEL A.
14 RAFAEL CARO-QUINTERO, et al.,    )   MEDRANO AND RICHARD M.
                                    )   CASILLAS
15              Defendants.         )
                                    )
16 _____)

17      Plaintiff, United States of America, through its counsel of

18 record, Assistant United States Attorney Manuel A. Medrano, hereby

19 files its return to petitioner's application for writ of habeas

20 corpus.  This return is based on the attached Memorandum of Points

21 and Authorities, the attached Declarations of Manuel A. Medrano

22 and Richard M. Casillas, the files and records in this case, and

23 such other matter as the court may properly consider at the time

24 of the hearing on this motion.

25      DATED:   September 13, 1989.

26                            Respectfully submitted,

27                            GARY A. FEESS
                              United States Attorney
28

ROBERT L. BROSIO
Assistant United States Attorney
Chief, Criminal Division

MANUEL A. MEDRANO
Assistant United States Attorney
Major Narcotics Section

Attorneys for Plaintiff
United States of America

- 2 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I

### PRELIMINARY STATEMENT

On August 9, 1989, the Immigration and Naturalization Service ("INS") office in San Antonio, Texas, detained Ruben Zuno-Arce ("Zuno") pending a hearing to determine if he was an excludable alien pursuant to 8 U.S.C. § 1182(a)(23). On August 10, 1989, this court issued a material witness arrest warrant for Zuno, which was served on Zuno on August 11 while he was in INS custody in San Antonio. On August 11 Zuno was brought before a United States Magistrate in San Antonio, who ordered Zuno held without bail pending a hearing to be held in Los Angeles on August 14, 1989. Thereafter Zuno was immediately transferred from San Antonio to Los Angeles. (Casillas Declaration at ¶ 2). On August 14, 1989, Zuno made his first appearance in Los Angeles, and the matter was continued to August 18, 1989. On August 18 the court ordered Zuno detained while the government obtained use immunity to place Zuno before a federal grand jury.

On August 24, after receiving use immunity, Zuno testified before a grand jury for approximately three hours. (Medrano Declaration at ¶3). The government did not complete its examination of Zuno. On August 28 the court ordered the continued detention of Zuno without bail, and further ordered the government to conclude its grand jury examination of Zuno prior to September

- 3 -

5, the date scheduled for the next status conference in this matter.  On August 31 Zuno concluded his testimony before the grand jury.  (Id.).

On September 5, 1989, at 1:30 p.m., the court found that Zuno was not a material witness in the matter of United States v. Juan Jose Bernabe-Ramirez, CR 87-422(C)-ER, currently scheduled for trial on October 3, 1989.  The court further ordered Zuno's release from the material witness arrest warrant.  (Id.).

On this same date at approximately 4:30 p.m., the court held a second status conference after allegations by counsel for Zuno that the United States Attorney's Office in Los Angeles, after the court's decision to release Zuno from the material witness arrest warrant, had contacted the INS office in San Antonio and directed them to continue to detain Zuno on immigration grounds.  After a hearing, the court found that the allegations were meritless, and that the court lacked jurisdiction over what was now an INS immigration matter.  (Id.).  INS officials thereafter took custody of Zuno, and he was transported and arrived in San Antonio late Wednesday, September 6, 1989.  (Casillas Declaration at ¶3).

The instant petition for writ of habeas corpus is simply an attempt by counsel for Zuno to resurrect an issue that has already been disposed of by the court.  Relying solely on speculation and conjecture, counsel for Zuno continues to assert allegations of government misconduct which, as described below, are meritless.

- 4 -

II

## ARGUMENT

A.   COUNSEL'S ALLEGATIONS OF GOVERNMENT MISCONDUCT ARE MERITLESS

1.   Counsel for Zuno Cannot Rely on an Undisclosed
     "Confidential Informant" As the Basis for Allegations of
     Government Misconduct

In an extraordinary move, counsel for Zuno uses as the foundation for allegations of government impropriety information that a "Confidential Informant in San Antonio, believed reliable, had stated that Mr. Ruben Zuno-Arce was being held in San Antonio at the request of the U.S. Attorney's Office in Los Angeles," and that the United States Attorney's Office had sought Zuno's continued INS detention in order to have time to seek a perjury indictment against Zuno before he left the country.   (Declaration of Edward M. Medvene p. 1, filed in support of writ of habeas corpus).   There is no case law or statutory support for proceeding in a petition for writ of habeas corpus by way of undisclosed confidential informant information.   On the contrary, Central District of California Local Rule 7.5.2 mandates that the factual basis for motions must be set forth in affidavits.

2.    Zuno was Indicted Simply Because He Perjured Himself
        Before a Federal Grand Jury; Thus His Allegations of
        Government Misconduct Are Meritless

On Tuesday, September 5, 1989, at approximately 1:30 p.m., the court ordered Zuno released from the material witness arrest warrant.   (Medrano Declaration at ¶3).

At approximately 4:30 p.m., the court held a status conference to consider allegations by counsel for Zuno that the government, in an effort to circumvent the court's release order, had directed the San Antonio INS office to detain Zuno.  Counsel for the government vehemently denied this allegation, and advised the court that Zuno's continued detention was due to a San Antonio INS detention order that had issued on August 9, and which pre-dated the August 10 material witness arrest warrant.  Government counsel also advised the court that INS Deputy District Director Gary Renick in San Antonio had advised government counsel that District Director Richard M. Casillas wanted Zuno returned to San Antonio to face an exclusion hearing.  (Id.).

The court also heard testimony from Los Angeles INS Deputy District Director Don Looney, who advised that the San Antonio INS detention of Zuno had pre-dated the material witness arrest warrant issued from Los Angeles on August 10.  Deputy District Director Looney also advised the court that INS proceedings were still pending in San Antonio, and that the San Antonio INS office wanted Zuno immediately returned to San Antonio for resolution of those proceedings.  (Id.).

- 6 -

The court thereafter found that there was no basis for Zuno's allegations of misconduct.  The court also found that Zuno's continued detention was due to a preexisting INS hold.  The court concluded that since it lacked jurisdiction to resolve any INS immigration issues regarding Zuno, and since INS had the appropriate statutory machinery for dealing with this issue, the court would not interfere with the INS proceedings.  (Id.).

The only misconduct that has occurred in this case is that of counsel for Zuno, who continues to make baseless allegations, and disingenuously distorts and misrepresents the record.  For example, in an astounding admission, counsel for Zuno admitted knowing of the existence of the San Antonio INS hold.

THE COURT:          All right.  Counsel, when you came in
                    this afternoon, you didn't say so
                    directly, but you implied there was
                    some dirty dealing afoot affecting
                    your client and that the purpose of
                    holding this hearing was for me to
                    determine that this hold on this
                    witness was not solicited by the
                    government in order to defeat my
                    prior order of release.

                    It does not sound like it was.  I do
                    not believe that counsel here had
                    anything at all to do with it.

- 7 -

1    <u>Were you aware that there was</u>

2    <u>such a hold?</u>

3

4    MR. MEDVENE:        Let me just thank you for holding

5                       the hearing now and let me tell

6                       you what I was aware of, your

7                       Honor.

8

9                       <u>We were aware, because we had</u>

10                      <u>read in some press that there was</u>

11                      <u>a hold.</u>

12   Transcript of Proceedings on September 5, 1989, at p. 18 (Emphasis

13   added).[1]/

14       Other misrepresentations characterize the petition for writ of

15   habeas corpus.  Counsel for Zuno falsely states that the

16   government entered into an agreement on the record that no action

17   would be taken to interfere with Zuno's release from custody.  In

18   fact, the agreement which counsel for the government and Zuno

19   entered into was that since Zuno was still under a subpoena to

20   testify at the October 3, 1989, trial of Juan Jose

21   Bernabe-Ramirez, the government could arrange for Zuno's presence

22   in Los Angeles simply by telephonically contacting Zuno's counsel,

23   Ed Medvene.  The government also agreed to place no other material

24   witness holds on Zuno, and to expedite Zuno's transfer from Los

25   Angeles to San Antonio for resolution of the INS proceeding.  (<u>Id.</u>

26   at ¶4).

27   _____

28   1/  A copy of the transcript is attached as Exhibit "A".

- 8 -

1    At no time was there an agreement on the record that Zuno would

2    not be indicted for criminal activity.[2/]

3        The government has expressly refuted Zuno's allegations that

4    the government has engaged in misconduct in its dealings with

5    Zuno.   Zuno's initial detention on August 9, 1989 (prior to the

6    August 10 material witness arrest warrant issued by the court),

7    was decided by the San Antonio INS office.   (Casillas Declaration

8    at ¶ 2, 5; Medrano Declaration at ¶5).   After the court's

9    September 5 order releasing Zuno from the material witness arrest

10   warrant, San Antonio INS District Director Richard M. Casillas

11   ordered that Zuno be immediately returned to San Antonio to hold a

12   hearing on whether he should be admitted or excluded from the

13   United States on the grounds of alleged narcotics trafficking.

14   (Casillas Declaration at ¶3).   While Zuno's INS immigration

15   hearing was pending, the San Antonio INS office received notice on

16   September 7 that Zuno had been indicted for perjury in Los

17   Angeles.   Thereafter, at approximately 5:30 p.m., on September 7,

18   the United States Marshal's Service took custody of Zuno.   (Id. at

19   ¶4).

20       Contrary to Zuno's claims, at no time has the San Antonio INS

21   office taken any steps to delay or protract the INS proceedings

22

23

24   _____

25   2/  On the contrary, after the grant of use immunity, counsel for
     the government and Zuno advised Zuno that he could be indicted for
26   perjury if he failed to tell the truth while testifying before a
     federal grand jury.
27
                                  - 9 -
28

1    regarding Zuno.$^{3/}$ All decisions regarding the immigration

2    status of Zuno in San Antonio have been made unlaterally by

3    District Director Casillas. (Id; Medrano Declaration at ¶5). At

4    no time has the United States Attorney's Office in Los Angeles

5    requested or directed the San Antonio INS office to take any

6    action, or fail to take any action, regarding Zuno's INS detention

7    in San Antonio. (Casillas Declaration at ¶ 5; Medrano Declaration

8    at ¶ 5).

9      Through his petition for writ of habeas corpus Zuno endeavors

10   to resurrect an issue that has already been addressed by the

11   court. The only new "fact" Zuno can now point to is his

12   indictment for three counts of perjury before a federal grand jury

13   -- a fact of which Zuno cannot now complain in light of

14   admonitions to him prior to his testimony before the grand jury.

15   Zuno was repeatedly advised by counsel for the government, and his

16   own counsel, that in return for immunity from prosecution, Zuno's

17   only obligation was to tell the truth when testifying, and that

18   his failure to do so could subject him to charges of perjury.

19   Zuno failed to tell the truth under oath, and he now faces perjury

20   charges for his knowing and concious decision to lie.

21      If Zuno seeks to challenge the validity of the indictment,

22   then the proper forum for that issue is a pretrial motion under

23

24

25   3/ Zuno and his counsel have received extraordinarily favorable
       treatment since August 9 when Zuno was initially arrested. For
26   example, Zuno has been transported on an expedited overnight basis
       between San Antonio and Los Angeles on three ocassions, a process
27   that typically takes one to two weeks. (Casillas Declaration at
       ¶5).

28

1   Fed. R. Crim. P. 12 asserting defects in the indictment. $\underline{4/}$

2   Otherwise, the instant petition is meritless, and should be

3   rejected by the court.

4       3.    This Court Lacks Jurisdiction Over Zuno's Habeas Petition

5           Counsel for Zuno readily admits that jurisdiction over

6   Zuno's habeas corpus petition normally should be in San Antonio

7   where the original (and pending) INS hold issued.  Yet Zuno argues

8   that since the government allegedly delayed Zuno's release from

9   INS custody, the court should use its discretion to exercise

10  jurisdiction over the instant petition.  However, as shown in

11  subsection 2, supra, the government has not engaged in

12  gamesmanship.  Thus any attack on the INS hold of Zuno should be

13  directed to a federal court in San Antonio.

14          Finally, the cases cited by Zuno for the proposition that a

15  writ of habeas corpus can issue to release an alien from INS

16  detention are inapposite.  None of the cases cited by Zuno involve

17  a situation where, as in the instant matter, the pending INS hold

18  was superseded by federal criminal charges, thus rendering the INS

19  detention moot.

20                                  III

21                              CONCLUSION

22          For the foregoing reasons, the government respectfully submits

23  that Zuno's petition for writ of habeas corpus should be denied.

24

25

26  _____

27  4/   The perjury indictment against Zuno has been assigned to the
    Honorable Robert M. Takasugi.  A trial date of November 7, 1989,
28  has been set.

                                - 11 -

1

## DECLARATION OF MANUEL A. MEDRANO

2

I, Manuel A. Medrano, hereby declare as follows:

3

1.    I am an Assistant United States Attorney assigned to the

4

Criminal Division of the United States Attorney's Office for the

5

Central District of California.    I am government counsel in the

6

matter of United States v. Bernabe-Ramirez, CR 87-422(C)-ER,

7

currently scheduled for trial on October 3, 1989.

8

2.    On August 9, 1989, the Immigration and Naturalization

9

Service ("INS") in San Antonio, Texas, took Ruben Zuno-Arce into

10

custody as an excludable alien on the ground of narcotics

11

trafficking.    On August 10, 1989, the Honorable Edward Rafeedie

12

issued a material witness arrest warrant for Zuno.    On August 14,

13

1989, Zuno made his first appearance in Los Angeles.

14

3.    On August 24 and 31, 1989, after receiving use immunity,

15

Zuno testified before a federal grand jury in Los Angeles.    On

16

September 5, 1989, at approximately 1:30 p.m., the court found

17

that Zuno was not a material witness regarding the pending

18

criminal case against Juan Jose Bernabe-Ramirez, and ordered that

19

Zuno be released from the material arrest warrant.    On this same

20

date, at approximately 4:30 p.m., the court held a status

21

conference regarding the immigration status of Zuno.    Counsel for

22

Zuno alleged that the United States Attorney's Office in Los

23

Angeles, after the court's earlier order to release Zuno as a

24

material witness, had telephoned the San Antonio INS office and

25

directed INS officials to continue to detain Zuno.    Counsel for

26

the government, and Los Angeles INS Deputy District Director Don

27

Looney, advised the court that the San Antonio INS detention of

28

1    Zuno had pre-dated the material arrest warrant that had issued out

2    of Los Angeles on August 10. Deputy District Director Looney

3    further advised the court that INS proceedings were still pending

4    in San Antonio, and the San Antonio INS office requested that Zuno

5    be immediately transported back to San Antonio for disposition of

6    those proceedings. The court then found that because of the

7    preexisting INS hold on Zuno, it lacked jurisdiction to resolve

8    any INS immigration issues regarding Zuno.

9       4.    Ed Medvene, counsel for Zuno, and I agreed on the record

10    on September 5 that Zuno had been served with a subpoena to

11    testify at the trial of Bernabe-Ramirez, and the government could

12    secure Zuno's presence at trial by telephoning Medvene to arrange

13    for Zuno's return to the United States. The government also

14    agreed to place no other material witness holds on Zuno, and to

15    expedite Zuno's transfer from Los Angeles to San Antonio so he

16    could address the INS hold. (The latter in fact occurred --

17    Zuno's last Los Angeles appearance was at approximately 4:30 p.m.

18    Tuesday, September 5; San Antonio INS officials have advised me

19    that he arrived the following day, September 6, in San Antonio.)

20       5.    The decision to detain Zuno on August 9, 1989, in San

21    Antonio was made unilaterally by San Antonio INS officials. At no

22    time have I, or any representative of my office, requested or

23    /

24

25    /

26

27    /

28

- 13 -

directed the San Antonio INS office to take any action, or fail to take any action, regarding Zuno.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __13__ day of September, 1989, at Los Angeles, California.

MANUEL A. MEDRANO



**U.S. DEPARTMENT OF JUSTICE**

Immigration and Naturalization Service

---

727 E. Durango Suite A 301
San Antonio, Texas 78206

### DECLARATION OF RICHARD M. CASILLAS

| | | |
|---|---|---|
| The State of Texas | ) | Before me the undersigned Richard M. Casillas and having authority on this day personally appeared and having been duly sworn deposes and says: |
| County of Bexar | ) | |

I, Richard M. Casillas, hereby declare as follows:

1. I am the District Director with the Immigration and Naturalization Service ("INS") for the INS office in San Antonio, Texas. In that capacity I supervise INS matters and have jurisdiction over a seventy-eight county area.

2. On August 9, 1989, the San Antonio INS office detained Ruben Zuno-Arce ("Zuno") because he was deemed an excludable alien pursuant to 8 U.S.C. § 1182(a)(23). On August 10, 1989, a federal district judge in Los Angeles issued a material witness arrest warrant for Zuno. This warrant was served on Zuno on August 11 while he was in INS custody in San Antonio. With its issuance, the material witness arrest warrant took precedence over the San Antonio INS hold. On August 11 Zuno was brought before a United States Magistrate in San Antonio, who ordered Zuno held without bond pending a hearing in Los Angeles on August 14. Zuno was immediately transferred from San Antonio to Los Angeles.

3. On Tuesday, September 5, 1989, a federal district judge in Los Angeles ordered Zuno released from the material witness arrest warrant. However, since there was a still pending INS hold on Zuno, I directed that Zuno be immediately returned to San Antonio to hold a hearing on whether Zuno should be admitted or be excluded from the United States on the grounds of alleged narcotics trafficking. Zuno arrived in San Antonio late Wednesday, September 6.

4. INS exclusion hearing charging documents (INS Form I-110 and I-122) were not filed Thursday morning, September 7, because counsel for Zuno in San Antonio requested until 2:30 p.m. that day in order to meet with Zuno. Since Zuno's attorney did not appear at 2:30 p.m. on 9-07-89, charging documents were filed with the Immigration Court at 3 p.m. Even if the charging documents were filed at 8:00 a..m. on September 7; under normal court procedures, the earliest possible time Mr. Zuno could have been scheduled for a hearing was the afternoon of September 8. Subsequently on September 7, my office received notice that Zuno had been indicted for perjury in Los Angeles, and at approximately 5:30 p.m. on September 7, the United States Marshal Service took custody of Zuno.

5. At no time has my office taken any steps to delay or protract the INS proceedings regarding Zuno in San Antonio. On the contrary, Zuno has received unusually favorable treatment, as evidenced by his overnight expedited transportation between San Antonio and Los Angeles, a process that typically takes one to two weeks. All decisions regarding the immigration status of Zuno in San Antonio have been made unilaterally by me. The United States Attorney's Office in Los Angeles has never requested or directed my office to take any

action, or failed to take any action, regarding Zuno's INS detention in San Antonio.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _11th_ day of September 1989, in San Antonio, Texas.

RICHARD M. CASILLAS

Sworn to and subscribed before me this 11th day of September A.D. 1989.

Notary Public in and for Bexar County Texas.

my commission expires 12-12-92

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

3                   - - - - - -

4      HONORABLE EDWARD RAFEEDIE, DISTRICT COURT JUDGE PRESIDING

5                   - - - - - -

6

7    UNITED STATES OF AMERICA,           )
                                         )
8                        Plaintiff,      )
                                         )
9            vs.                         )   CASE NO:   CR 87-422(C)-ER
                                         )
10   RAFAEL CARO-QUINTERO, et al,        )
                                         )
11                       Defendant.      )
     _____    )

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              TUESDAY, SEPTEMBER 5, 1989
                         1:30 P.M.
17                       4:30 P.M.

18

19

20

21

22
                                 Julie Churchill, CSR
23                               Official Reporter
                                 U.S. District Court, 442-C
24                               312 N. Spring Street
                                 Los Angeles, CA  90012
25                               (213) 617-8227

Ex. "A"

1 | APPEARANCES OF COUNSEL:

2 |     For the Plaintiff: .

3 |         ROBERT C. BONNER
            UNITED STATES ATTORNEY
4 |         BY:   JIMMY GURULE, AUSA
                  MANUEL A. MEDRANO, AUSA
5 |         1200 United States Courthouse
            312 North Spring Street
6 |         Los Angeles, California   90012
            (213) 894-6579
7 |

      For the Defendant:
8 |
            MITCHELL, SILBERBERG & KNUPP
9 |         BY:   EDWARD M. MEDVENE, ESQ.
                  JAMES E. BLANCARTE, ESQ.
10 |              RONALD D'NICOLA, ESQ.
                  KEVIN GAUT, ESQ.
11 |        11377 West Olympic Boulevard
            Los Angeles, California  90064-1683
12 |        (213) 312-3150

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1:30 P.M.

THE CLERK:   CR 87-422(c)-ER, U.S.A. versus Ruben Zuno-Arce.

MR. GURULE:   Good afternoon, your Honor.   Jimmy Gurule and Manuel Medrano appearing on behalf of the United States.

MR. MEDVENE:   If the Court please, Messrs. Blancarte, D'Nicola and Medvene for Mr. Zuno-Arce.

THE COURT:   Now, the Court ordered a review of this matter after the completion of the witness' grand jury testimony.   I take it that that testimony has now been completed; is that correct, Mr. Gurule?

MR. GURULE:   Yes, your Honor.

THE COURT:   The Court has been provided with transcript of the testimony of the witness given at the Grand Jury which the Court has reviewed.   In addition, I have reviewed the motions and documents that have been filed by both sides.

Now, Mr. Gurule speaking for the government, what do you believe the Court -- what are you requesting that the Court do at this time with respect to Mr. Zuno-Arce?

MR. GURULE:   Your Honor, the government is respectfully requesting that he be detained, that the detention

1   continue; that based upon the government's filings in camera,

2   it is still the government's position that he is a material

3   witness in U.S. verses Bernabe.

4           THE COURT:   What is he a material witness in regard

5   to; the Ramierez case?

6           MR. GURULE:   Yes, he is, your Honor.   And that

7   pertains again to 881 Lope de Vega, and that is a central

8   issue.   That will be a central issue in the Bernabe case.   And

9   because based upon undercover video tapes and audio tapes that

10  Bernabe participated in, he made numerous admissions to an

11  undercover agent to the effect that he went to 881 Lope de Vega

12  during the time period that Enrique Camarena was being held

13  there, and that, in fact, he saw Special Agent Camarena held at

14  Lope de Vega.

15          Now, one of the arguments that the defense is

16  likely to raise is well, this is something that he read in the

17  paper, he knew about it through reading the paper.

18          THE COURT:   This question of whether or not the

19  defendant is a material witness in the Ramierez case; is that

20  based upon the testimony he gave at the Grand Jury?

21          MR. GURULE:   Yes, your Honor.   That, coupled with

22  other evidence from other witnesses, FBI forensic witnesses,

23  but it is based in large part upon evidence, testimony that he

24  presented to the Grand Jury.

25          THE COURT:   So you would propose to have the

1    witness detained as a witness in the case of Ramierez which is

2    presently set for trial on October the 3rd --

3              MR. GURULE:  Yes, your Honor.

4              THE COURT:  -- on the theory that he has material

5    evidence in that case and on the theory that he continues to be

6    a flight risk?

7              MR. GURULE:  Yes, your Honor.

8              THE COURT:  No conditions of bail would ensure his

9    appearance for that trial?

10             MR. GURULE:  Yes, that's correct.  And his

11   flight -- this individual posing a flight risk, I think is --

12   there is even a stronger argument to be made in light of

13   testimony that he has presented before the Grand Jury.

14             THE COURT:  Did you serve upon the defendant the

15   document that you filed with the Court; that is, other than the

16   transcript of Grand Jury --

17             MR. GURULE:  Yes, your Honor.

18             THE COURT:  All right.  All right.

19             Now, if I understood what your case is, you want

20   this witness detained for the Ramierez case.

21             MR. GURULE:  Yes, your Honor.

22             THE COURT:  Based on the testimony he gave and

23   relating to the status of the Lope de Vega property?

24             MR. GURULE:  Yes, your Honor.

25             THE COURT:  Counsel, did you state your appearance

1    here?

2              MR. MEDVENE:  My name is Medvene, your Honor.

3              If the Court please, the witness has been before

4    the Grand Jury on two occasions.  He has answered every

5    question that the government has asked him.  The government has

6    no more questions to ask him.  They could have asked them all

7    on the first occasion.  They held him another week.  They

8    started him -- they started him approximately at 9:00 o'clock

9    and finished before noon.  They could have had him on all

10   afternoon.

11             Our understanding, your Honor, of what

12   Mr. Arce has said in substance is he denies being involved in

13   narcotic trafficking, he denies being an intermediary between

14   narcotics traffickers and government officials, he denies being

15   at the Lope de Vega residence any time after December 23rd,

16   1984.

17             He denies ever knowing or meeting Juan Jose

18   Bernabe-Ramirez.  He denies ever knowing or leaving any other

19   person identified to him as either a defendant or a suspect in

20   the Camarena case, including Rafael Quintero, Ernesto Fonseca-

21   Carrillo, Armando Pavon-Reyes and approximately 120 other

22   persons depicted in photographs shown to him during the grand

23   jury proceedings.

24             He denies knowing anything about the abduction,

25   torture and murder of DEA agent Enrique Camarena or his

1    assistant and pilot Mr. Alfredo Zavala Avelar.

2             Other than public information, including that

3    published by the Press de la Mexico. Now that's the factual

4    predicate.

5             Now, an additional fact that is of importance, your

6    Honor, and uncontested is the defense statement that the

7    government is prepared to continue the Ramierez trial. They

8    have an agreement to continue the Ramierez trial. So at the

9    earliest it will go to trial in October and at the latest it

10   will go to trial this year or next year.

11             Undisputed and never answered by the government are

12   the cases cited making reference to Rule 15, the King case and

13   so forth, that if the government wanted this man's testimony at

14   trial and if he didn't show up pursuant to subpoena, they could

15   videotape his deposition, it would be admissible. The Ninth

16   Circuit has said it stands all kinds of Constitutional muster.

17   They have chosen not to do that.

18             Now, they're trying to break this man

19   psychologically, your Honor. The man has been in jail nearly a

20   month, treated worse than a convicted felon, sitting in a small

21   room until a few days ago without a radio, with a toilet and a

22   bed, not even a table.

23             Now, what does the government say this information

24   is, because we've gone a long way from the assertions about

25   narcotic trafficker and this and that. We have the sworn

1    testimony he's not any of those things, we have the sworn

2    testimony he wasn't in that residence within a couple months of

3    when the dastardly act happened.

4            Now, what do they say?  They have filed a brief and

5    when the government case -- they have given us certain things.

6    What we've gotten is what appears to me to be, with due

7    deference, to be a canned brief on 6(e).  I don't even get to

8    this Grand Jury testimony because it is irrelevant, if he gets

9    out today, which is what ought to happen.

10           But basically, the government has said in their

11   papers submitted to the Ninth Circuit, that what they want this

12   man about is for corroboration -- that forensic evidence that

13   they found, having nothing to do with Mr. Zuno-Arce, that

14   forensic evidence they found was deposited after Caro-Quintero

15   moved into the residence the first week of February.

16           Now, that's why they want it.  It is not a claim

17   that he's there; he has denied that he was there.  He wasn't

18   there.  What they want to show is -- and why would he come up

19   voluntarily from Mexico if they don't want to do the the

20   deposition procedure in that he owned 181 Lope de Vega?

21           There is no question.  He has already said that

22   when he voluntarily came from Mexico to San Antonio.  When the

23   DEA asked him in '87, he said that.  They said they thought he

24   testified honestly about it, that Mr. Zuno has stated that on

25   January 11th he sold the residence to Mr. Barnabe, that he has

1    further stated, according to the government, between May 31,

2    '84 and January 11, '85 that the Lope de Vega residence was

3    unoccupied, that the former tenant moved out of the residence

4    in May of '84.

5        He further said one or two weeks after the sale he

6    drove by the residence, he observed it was being painted and

7    remodeled.   And I quote from the government brief, I quote:

8

9            "This would strongly support the

10           government's theory that the forensic

11           evidence was deposited after Caro-Quintero

12           moved into the residence approximately the

13           first week of February of '85."

14       I mean talking about a peanut coming out of an

15   elephant roaring, that's why they're holding him for one month?

16   And to have the audacity to say they want to hold him until the

17   end of the trial, knowing they have already made a deal with

18   the defense attorney that the trial isn't even going to go on

19   October 3rd, it's past the point, your Honor -- we say with due

20   deference -- you're sitting up there, you sat on a terrible

21   case, a terrible tragedy.

22       This man had nothing to do with it.   He had the

23   misfortune of having a house, which months -- the man wasn't

24   even there for a year or so.   He went there one day for the

25   closing, months before.   No evidence there.   He doesn't know

1    Barnabe-Ramierez.  It's a farce, Judge.  I mean, he doesn't

2    know Ramierez, he never met Ramierez.  That's what he said.

3            He went to the house four weeks before the torture

4    and murder, if that's where it took place.  And they say they

5    want him for corroboration.  Well, why would he come and give

6    it?  And if they wanted depositions, why can't they take it?

7            THE COURT:  All right.

8            MR. MEDVENE:  It's enough, Judge.  It's 25 days --

9            THE COURT:  That's enough.

10           MR. MEDVENE:  Yes, sir.

11           THE COURT:  The number of days has nothing to do

12   with it.  We're dealing here with a legal question.  You deal

13   with emotional arguments which have no bearing on this case at

14   all.

15           What happened to your appeal to the Ninth Circuit?

16           MR. MEDVENE:  The Ninth Circuit -- it's sitting --

17   it's sitting in the Ninth Circuit.  The government has asked to

18   put up papers, to submit papers by today which I'm reading

19   from, but I must say, your Honor, that was prior to the time he

20   completed his Grand Jury testimony.

21           THE COURT:  I'm aware of that.

22           MR. MEDVENE:  Yes, sir.

23           THE COURT:  The Court is ready to rule on this

24   matter.

25           I do not believe this witness is a material witness

1    in the Bernabe-Ramierez case, nor do I believe there is any

2    basis for continuing to hold him as a witness in that case.

3    You cannot be held, as suggested in the brief filed by the

4    government, on the theory that there may be some other case

5    that might arise in the future on which he would be a material

6    witness.

7           I believe that the purpose of the detention has

8    been satisfied.  This witness has appeared and testified before

9    the grand jury on two occasions.  The involvement and

10   relationship of this witness to the Lope de Vega property in no

11   way justifies a continued detention.

12          Having in mind the evidence that was presented to

13   me in the original Camarena trial regarding that property and

14   regarding the forensic evidence, I see no need whatsoever, nor

15   do I believe that this testimony of this witness would in any

16   way enhance or contribute or strengthen that testimony.  So

17   insofar as the Bernabe-Ramierez case, I believe this witness

18   has little to offer.  The purpose of this detention has been

19   fully satisfied and it would not be justified to continue

20   further impostion on this witness, further detention for the

21   purpose which has been stated or for the other purpose which

22   has been suggested.

23          The Court does not believe that would be a lawful

24   detention.  Therefore, I now order that this witness be

25   discharged and that he is not material and should be

1    discharged, and I order his release forthwith.

2          MR. MEDVENE:  Thank you very much, your Honor.  May

3    he leave from here?  We'll get his clothes.  We don't want him

4    to go back to jail.  We'll let have get his clothes, Judge,

5    because they'll hassle him again.

6          THE COURT:  Well there has to be a release

7    executed.  Don't try too rush things here.  Do things the

8    regular way around here.  I don't know if he's released right

9    now.  He should be able to, but we'll get him -- I'll sign a

10    release as soon as it is presented to me.

11          MR. MEDVENE:  Yes, sir.

12          Can we have the procedure, Judge?  Do you want us

13    to --

14          THE COURT:  The clerk will.

15          MR. MEDVENE:  Thank you very much, your Honor.

16          THE CLERK:  Please rise.  This court is now in

17    recess.

18                (Which were all the proceedings in

19                the above-entitled matter.)

20

21        C E R T I F I C A T E

22        I certify that the foregoing is a true and correct
transcription from the stenographic record of these
23    proceedings.

24    *Julie Churchill*

      JULIE A. CHURCHILL, CSR, RPR
25    OFFICIAL COURT REPORTER    DATED: *Sept. 7*   1989

1          LOS ANGELES, CALIFORNIA   TUESDAY, SEPTEMBER 5, 1989

2                    4:30 P.M.

3

4          THE CLERK:  Criminal case 84-422(c)-ER, United

5  States of America versus Ruben Zuno-Arce.

6          Counsel, please state your names for the record,

7  please.

8          MR. GURULE:  Jimmy Gurule and Manuel Medrano

9  appearing on behalf of the government, your Honor.

10         MR. MEDVENE:  Messrs. Blancarte, D'Nicola, Gaut and

11  Medvene appearing for Mr. Arce.

12         THE COURT:  I have ordered this hearing for the

13  following reasons.  After the conclusion of the hearing we held

14  earlier this afternoon when I ordered Mr. Zuno-Arce released,

15  not being a material witness, no further contentions, his

16  counsel came into the Court sometime later and stated to the

17  Court that he had not been released because there was an

18  immigration hold on the defendant.

19         Now, my one and only concern here now is this:  Is

20  this a hold that was solicited by the government in order to

21  prolong the detention of the witness or is this a hold that has

22  been on this witness from the inception of his arrest?

23         MR. GURULE:  The answer to the first question:  Was

24  it solicited by the government; no.  Has this hold been on this

25  witness since early on, actually prior to this court's signing

1   a material witness arrest warrant; the answer to that is yes.

2   I would like to just lay out some factual scenario for the

3   court relative to how this has come to my attention, because --

4           THE COURT:  Were you aware of this when you were

5   here this afternoon?

6           MR. GURULE:  I was aware that an INS hold had been

7   placed on Mr. Zuno when he had first come into the country in

8   San Antonio, Texas approximately April the 9th, but to be

9   honest with the Court, I had forgotten about it.

10          THE COURT:  Was he arrested by the INS?

11          MR. GURULE:  Yes, he was.

12          THE COURT:  Originally?

13          MR. GURULE:  Yes, he was.

14          THE COURT:  For what reason; do you know?

15          MR. GURULE:  For an excludability hearing.

16          THE COURT:  In other words, to exclude him as an

17  undesirable alien?

18          MR. GURULE:  Yes, your Honor.

19          THE COURT:  Had he been admitted into the country

20  on a visa, or by what had he made legal entry?

21          MR. GURULE:  He had made legal entry.  It is my

22  understanding your Honor, that he was using a border crossing

23  card.  He had been admitted lawfully in the country at that

24  time.  And after checking the customs service computer referred

25  to as TASS --

1          THE COURT:  Who checked that?

2          MR. GURULE:  INS.  INS said it is a common practice

3    when -- every time an alien is entering the United States -- to

4    check the intelligence computer systems of INS, the Customs

5    Service, and usually DEA, the native system.  If they determine

6    that there is a lookout -- quote, unquote, lookout for that

7    individual because he is determined to be excludable under one

8    of the various categories for excludability, then he may be --

9    they may hold an exclusion hearing or order him --

10          THE COURT:  Your understanding is that he was held

11   in order to determine if he was to be excluded from the

12   country?

13          MR. GURULE:  Yes, your Honor.

14          THE COURT:  Are you familiar with the laws that

15   provide for that?

16          MR. GURULE:  Somewhat.  And what I did, your

17   Honor -- I learned of this, that he was not going to be

18   released forthwith after I came back from lunch.  I received a

19   call from Judy Matthews.  I returned her call.

20          I do not want this Court left with the impression

21   that the United States Attorney's Office, after leaving this

22   courtroom, rushed to INS and said the Judge has ordered him

23   released, now we want you to hold him on something else,

24   because that is clearly, clearly not what happened in this

25   particular case.

1        When I returned to my office after lunch, there was

2   a call from Miss Matthews stating that this case was going to

3   be -- that there was an INS hold on the defendant and we were

4   going to have a status conference tomorrow at 4:30.

5        I called INS to ask an INS representative from San

6   Antonio, because that's where the INS hold has been placed

7   originally, to be here for the hearing tomorrow because I

8   wasn't familiar with all the details and facts surrounding the

9   INS hold.

10       It was at that time that I questioned Joe Banda, an

11  INS agent, regarding the background of why Mr. Zuno was held

12  for excludability, and I was told then for the first time.

13       Under U.S.C. Section 1182, Subsection 23, that an

14  alien may be determined to be excludable if under Subsection 23

15  the consulate office knows or has reason to believe that the

16  alien is or has been involved in illicit trafficking in

17  narcotics, and that when the INS --

18       THE COURT:  What is the language gain?

19       MR. GURULE:  Knows or has reason to believe that

20  the alien has been involved in illicit trafficking in

21  narcotics -- that was my notetaking off of the telephone

22  conversation with the INS agent.

23       There is reason to believe that the witness has

24  been involved in illicit trafficking in narcotics.  That was

25  just my note taking off of the telephone conversation with the

1    INS agent.

2            I followed up with the INS agent if he would

3    expound on that further and was told that Zuno-Arce, when he

4    did come into the country lawfully, that after the INS agents

5    checked the computer, they determined that in the United States

6    Custom Service computer, TASS, Zuno-Arce was documented as

7    being a narcotic trafficker.

8            That upon further checking in the INS computer,

9    that there was a documented entry back in 1979 in the INS

10   computer for narcotics trafficking for Zuno-Arce.

11           And that further, upon checking into the DEA

12   intelligence computer system, referred to as NADIS -- again,

13   Zuno-Arce is documented as being a narcotics trafficker in that

14   computer system, as well.

15           So based upon that, I was told that the District

16   Director of INS in San Antonio revoked the deferred inspection,

17   and at that time Zuno-Arce was taken into custody on an INS and

18   hold without bail on this INS hold.  And that it was then to be

19   set for an INS hearing on excludability to see if he could be

20   excluded.

21           My understanding is that if they determine before

22   an immigration judge that there is a sufficient basis -- this

23   report that Zuno-Arce has been involved in narcotics

24   trafficking -- he would be excluded, and therefore, would not

25   be permitted to enter the country legally or obtain an INS

1    visa.  And that, again, is the basis for the hold back in early

2    August.

3         THE COURT:  All right.  Counsel, when you came in

4    here this afternoon, you didn't say so directly, but you

5    implied there was some dirty dealing afoot affecting your

6    client and that the purpose of holding this hearing was for me

7    to determine that this hold on this witness was not solicited

8    by the government in order to defeat my prior order of release.

9         It does not sounds like it was.  I do not believe

10   that counsel here had anything at all to do with that.

11        Were you aware that there was such a hold?

12        MR. MEDVENE:  Let me just thank you for holding the

13   hearing now and let me tell you what I was aware of, your

14   Honor.

15        We were aware, because we had read in some press,

16   that there was a hold.  We knew -- we went to the District

17   Director, just chronologically -- that the District Director of

18   the INS has said this afternoon, and the Deputy here, I

19   think -- but he said, the District Director himself, that he

20   would release Mr. Zuno-Arce today, put him on a plane under

21   appropriate supervision so it's clear he leaves subject to his

22   agreement to come back, and do it tonight.

23        That the reason it was --

24        THE COURT:  When did you do this; today?

25        MR. MEDVENE:  Yes, sir, since we left here.  We met

1    with the District Director -- excuse me.

2              MR. BLANCARTE:  It's Gustavson.

3              MR. MEDVENE:  Yes.  Mr. Gustavson.

4              THE COURT:  Gustavson.

5              MR. MEDVENE:  Yes, sir.  We met with him, with the

6    Consulate General of Mexico and Mr. Gustavson.

7              MR. BLANCARTE:  Romeo Flores Caballero, Consulate

8    General of Mexico, was with us.

9              MR. MEDVENE:  Now, basically what he said in my

10   presence was he would let him out tonight subject to making

11   sure he left, subject to his agreement that he come back.

12             THE COURT:  Come back for the exclusion hearing?

13             MR. MEDVENE:  Yes, sir.

14             Now, we also told him that even though Mr. Arce

15   denies any involvement of any kind in narcotics, he wants to

16   withdraw his application just so can go home.  All the hearing

17   is going to do is it will either say you're not excludable and

18   he goes home, or it will say you're excludable and he goes

19   home, and it will save the time of the hearing.  While he

20   didn't do anything wrong, he just wants to go home.

21             At any rate, the District Director said he would

22   let him out but he wanted to check with San Antonio.  He also

23   checked with the United States Attorney's Office.  I was not

24   privy to those conversations, but my understanding and feel

25   from those conversations is the following.

1    What I learned is two things:  One, we're advised

2    that the District Director in San Antonio already has had a

3    press conference saying he's going to get Mr. Arce back.

4         Query:  How would he know what your Honor was going

5    do today unless he spoke to the U.S. Attorney's Office?  In

6    other words, how would he know your Honor released him unless

7    somebody from the United States Attorney's Office or somebody

8    else called him?

9         Secondly, my clear impression -- I could be wrong,

10   I wasn't on the call -- my clear impression was that the United

11   States Attorney's Office said something to and San Antonio to

12   cause them to tell the District Director to hold him and don't

13   let him be released now, because the District Director here was

14   willing to.

15        THE COURT:  Has he now changed?

16        Has Mr. Gustavson said he would not release him?

17        MR. MEDVENE:  Mr. Gustavson says it's really up to

18   Zuno-Arce, and if Zuno-Arce would agree, I would release him

19   today.  And all we're now asking, your Honor --

20        THE COURT:  Well, do you know whether Zuno-Arce has

21   agreed?

22        MR. MEDVENE:  My understanding is Zuno-Arce has not

23   agreed, and the only thing, lastly, your Honor, is this:  We're

24   making -- under the circumstances, all we're talking about is

25   can he leave the country now before or after the hearing?

1          We're making an oral motion in the form of habeus

2    corpus, just saying that -- we're just asking your Honor to set

3    him free on his on recognizance subject to a reasonable bond,

4    subject to him appearing in San Antonio if they want to go

5    ahead with the hearing.

6          What we're telling you and representing under oath,

7    your Honor, is that he'll withdraw his application and all they

8    have to do is send him back, because all the hearing is about

9    is does he get to stay or not and he wants to go home.

10          THE COURT:  You're repeating yourself.

11          MR. MEDVENE:  Yes, sir.  I'm sorry.

12          MR. GURULE:  I did speak with -- I had an

13    opportunity to speak with the Assistant District Director and

14    the INS Director in San Antonio by the name of Gary Renick.

15    Gary Renick told me that he spoke with the District Director,

16    Richard M. Cassias in San Antonio and that Cassias told Renick

17    that he had -- that Cassias, the District Director in San

18    Antonio had been contacted by the press regarding the judge's

19    order releasing the defendant, releasing the witness to be nere

20    and asked Cassias what Cassias' position was.

21          Cassias told the press that he wanted Zuno-Arce

22    back for be the excludability hearing.  That is what Renick

23    told me.  Cassias' decision to have Zuno go back for the

24    excludability hearing was a decision totally exclusively made

25    independent of the U.S. Attorney's Office -- anyone from the

1   United States Attorney's Office here in the Los Angeles. That

2   was a decision made on his part without any input from myself

3   or any other representative from the U.S. Attorney's Office;

4   that's what I have been told secondhand.

5           THE COURT:  Is there a representative here from the

6   INS?

7           MR. GURULE:  I believe Mr. Looney is.

8           MR. LOONEY:  Bob Looney, the Deputy District

9   Director, your Honor.

10          THE COURT:  Come forward.  Can you shed any light

11  on what has transpired between your office and San Antonio?

12          MR. LOONEY:  The two District Directors did confer.

13  Zuno-Arce was served with a charge document at the time of

14  arrest in San Antonio and those documents were subsequently

15  served on the immigration court.  There is a venue issue with

16  the immigration court and the file remains in the possession of

17  San Antonio.  So we did contact San Antonio to determine

18  whether they wanted Mr. Arce returned.  The District Director

19  in San Antonio made it very clear that he has.  So we did

20  contact San Antonio to determine whether they wanted Mr. Arce

21  returned.

22          The District Director in San Antonio made it very

23  clear that he has, in his mind, sufficient evidence to prove

24  this charge of the drug charge.  So, while INS locally may have

25  made a decision the thing is outside our jurisdiction as far as

1    releasing the subject.

2             Our plan is right now is tomorrow morning to

3    transport Zuno-Arce to San Antonio depending upon the decision

4    here, of course, immediately with counsel.  We have made

5    arrangement with his counsel to notify him about the

6    transportation arrangement so they could travel together to San

7    Antonio and have an expedited exclusion hearing in San Antonio.

8             THE COURT:  When you say expedited, you mean within

9    a few days?

10            MR. LOONEY:  Within a day.

11            THE COURT:  Within a day.

12            MR. LOONEY:  If Mr. Arce is willing.  It's up to

13   him.

14            THE COURT:  Well, do you know did the Drug

15   Enforcement Administration have anything to do with contacting

16   the District Director in San Antonio regarding this matter?

17            MR. GURULE:  No.  What I know is that a call was

18   made to DEA in San Antonio to advise them of the the Court's

19   ruling.  And at that time --

20            THE COURT:  Who made that call?

21            MR. GURULE:  Special Agent Doug Keehl of the Drug

22   Enforcement Administration.  He called to advise the DEA in San

23   Antonio of the judge's ruling here.  At that time Special Agent

24   Doug Keehl was advised by a DEA OXEIT TSOT TSERE JOM TSNM

25   outstanding INS hold that was yet remaining in San AITAINA AI

1    Zuno-Arce.

2                    THE COURT:  Is Keehl present?

3                    MR. GURULE:  Yes, he is.

4                    THE COURT:  Have him come forward.

5                    THE COURT:  Would you state your name for the

6    record.

7                    MR. KEEHL:  Right.  Douglas W. Keehl, K-e-e-h-l.

8                    THE COURT:  You're an agent with the Drug

9    Enforcement Administration?

10                   MR. KEEHL:  That's correct.

11                   THE COURT:  You have been involved in the Camarena

12   investigation; is that true?

13                   MR. KEEHL:  That's correct, your Honor.

14                   THE COURT:  Did you call the DEA office in San

15   Antonio after the ruling this afternoon releasing Mr. Arce?

16                   MR. KEEHL:  Yes, I did, your Honor.

17                   THE COURT:  Could you tell me what transpired?

18                   MR. KEEHL:  I had spoken with a Special Agent

19   George Delamy at that office.  I advised him of your Honor's

20   ruling.  At that time, Agent Delamy advised me that there was

21   an outstanding hold placed on the witness.

22                   Also at that time, he asked me what he should do

23   about it.  I suggested that he contact the United States

24   Marshals here and also advised the Marshals of it and told him

25   to also notify the Marshals.  I told him to tell the Marshals

1    to notify the clerk of their actions.

2              THE COURT:  Then it is your understanding that the

3    DEA office in San Antonio notified the Marshals here of the

4    existence of the hold?

5              MR. KEEHL:  That's the best of my knowledge.  I

6    believe this they did.

7              THE COURT:  Well --

8              MR. MEDVENE:  I might also note, which I didn't

9    originally -- I don't know if this is true or not, your Honor,

10   but it is certainly possible -- at lest in the old days -- the

11   hold could initially be there, having been instituted by the

12   DEA, and that's why the hold was there in the first place.  I

13   don't know if that's true in this case or not.

14             It may well be, but the other curious thing, your

15   Honor, is that the man according to declarations in front of

16   you has been in and out of the country lawfully for five or six

17   or seven times as recently as '87.

18             So what we're saying is that -- and the possibility

19   that the hold was placed by DEA and the call to DEA and their

20   knowledge of it -- and I might also say -- Mr. Blancarte here

21   can attest to this -- he went down to see Mr. Zuno-Arce while

22   we were waiting for the Court order.  And he told me he was

23   advised within ten minutes of when we left your Honor's

24   courtroom by one of the Marshals that there was hold on him.

25             Now, query:  How would the Marshal's Office have

1   known unless somehow word got to them pretty quickly?  But

2   putting all that to the side, all we're asking for is bail

3   pending the hearing.  That's all we're asking for, to be

4   released tonight subject to coming to the hearing and just

5   focusing on -- all the hearing is going to say is he can stay

6   or not stay, but he wants to go home.

7              THE COURT:  First of all, there is the question of

8   jurisdiction.  This matter was before this Court on the return

9   of the Court's arrest of this witness as a material witness.

10  Those proceedings have been going on here for several weeks and

11  were concluded today, and I ruled that he is no longer a

12  material witness and needs not be detained.

13             Now, apparently, there was a preexisting

14  immigration hold on the witness.  In fact, as I understand, if

15  I understand correctly what was said here, he was arrested

16  initially by the INS.  He was in INS custody and awaiting an

17  exclusion group hearing at the time the material witness

18  warrant issued from this court.

19             Now, in the immigration matters, there is a whole

20  statutory procedure established for the handling of immigration

21  matters.  There is a system, a traditional system of

22  immigration law judges to hear and determine these things.  I

23  cannot see, frankly -- I cannot say that I know of any

24  authority or law that authorizes me to deal with this

25  immigration matter, which is now what it is.

9

1            I ordered that this witness be released on bail.

2     Normally, in exclusion hearings, is bail available to

3     witnesses?  They are not.  You're shaking your head.

4            MR. LOONEY:  I'm shaking my head no, your Honor.

5            THE COURT:  The idea is that -- that was my

6     understanding -- that bail is not generally available for

7     people who are detained for exclusionary purposes.

8            Now, since it has been arranged to expedite this

9     matter, it appears that Mr. Zuno-Arce will have to suffer the

10    further inconvenience of this immigration hold until it has

11    been resolved by this exclusionary hearing which we've heard

12    here is going to be accelerated.

13           Therefore, your request for this Court to fix bail

14    is denied.  The Court is without jurisdiction to do so.  This

15    witness was released from the hold of this court but not from

16    the hold of every other court, and that is true every time you

17    release a person who's under a court hold.  You always release

18    them subject to the existence of any other hold.

19           I was not aware of it at the time and did not

20    become aware until you walked in here and told me about it.  So

21    there is -- I cannot provide any release to Mr. Zuno-Arce.  The

22    matter will have to run its course through immigration court.

23           MR. MEDVENE:  Could your Honor also -- we have in

24    front of you so far the oral writ of habeus corpus.

25           THE COURT:  What?

1          MR. MEDVENE:  We have asked to put in front of you

2   now a writ of habeus corpus asking that he be released.

3          THE COURT:  First of all, you don't put orally

4   submitted papers -- orally submitted habeus corpus before the

5   Court.  If you want to file a written habeus corpus, you have

6   to file appropriate petitions.  File it with the Court and then

7   it will be assigned to some judge at random to determine.  You

8   don't just walk in and say this is a motion for writ of habeus

9   corpus and expect immediate action.  That's simply not done

10   procedurally or legally or otherwise.  The government has an

11   opportunity to respond to it so it can be heard at all.

12          So that does not provide any basis for relief.

13          MR. MEDRANO:  Good afternoon, your Honor.  A final

14   matter I wanted to bring to the Court's attention.  Prior to

15   the Court's taking the bench, I had an opportunity to speak to

16   Mr. Medvene concerning a couple matters.  One is that his

17   client obviously is still under subpoena for an October 3rd

18   trial date.  And Mr. Medvene and I have informally agreed as

19   follows:  That when the government is ready to bring

20   Mr. Zuno-Arce back with his testimony at trial, that I can

21   arrange that by telephonically contacting Mr. Medvene, who will

22   then work with me to arrange for Mr. Zuno-Arce to return to the

23   Central District for his testimony at trial.

24          But I just wanted to get that out, your Honor,

25   because I think and if Mr. Medvene wants to clarify this

1   somehow, I think that's our understanding at this juncture.

2            MR. MEDVENE:  That is our understanding, but I take

3   it with that, that the government will forthwith return him to

4   Mexico and not -- it will only be subject to them not placing

5   any other holds.

6            THE COURT:  There is nothing, as far as I know, as

7   far as his being brought to this court as a material witness --

8   there is nothing to prevent him from going back to Mexico or

9   going anywhere else.

10            MR. MEDVENE:  If the government agrees he will be

11   forthwith transported back, we certainly will agree to what

12   Mr. Medrano said, which is what I agreed to before.  I just

13   don't want to let it -- I just don't want another situation

14   like this, your Honor.

15            THE CLERK:  Please rise.

16            THE COURT:  I'm sorry, your Honor.  Does Mr.

17   Medrano on the record agree?  I assume he agrees, but I just

18   think it's really important.  Does he agree, because I didn't

19   hear anything.

20            MR. MEDRANO:  No problem with that, your Honor.

21                        (Which were all the proceedings in

22                         the above-entitled matter.)

23

24            C E R T I F I C A T E

25            I certify that the foregoing is a true and correct

JULIE A. CHURCHILL - OFFICIAL COURT REPORTER

1   transcription from the stenographic record of these
    proceedings.

2

3   JULIE A. CHURCHILL, CSR, RPR
    OFFICIAL COURT REPORTER

4   DATED: _Sept. 7,_        1989

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF SERVICE BY MAIL

I, __Marta Coto_____, declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California; that my business address is Office of United States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction the service by mail described in this Certificate was made; that on ___September 13, 1989___, I deposited in the United States mails in the United States Courthouse at 312 North Spring Street, Los Angeles, California, in the above-entitled action, in an envelope bearing the requisite postage, a copy of: RETURN TO PETITION FOR WRIT OF HABEAS CORPUS; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF MANUEL A. MEDRANO AND RICHARD M. CASILLAS

addressed to:          Ed Medvene, Esq.
                       11377 Olympic Boulevard
                       Los Angeles, CA  90064

at __his____ last known address, at which place there is a delivery service by United States mail.

This Certificate is executed on ___September 13, 1989___, at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.

_____