1   EDWARD M. MEDVENE
    JAMES E. BLANCARTE
2   RONALD A. DINICOLA
    MITCHELL, SILBERBERG & KNUPP
3   11377 West Olympic Boulevard
    Los Angeles, California 90064
4   (213) 312-2000

5   Attorneys for Defendant

6

7

8

9                    UNITED STATES DISTRICT COURT

10                   CENTRAL DISTRICT OF CALIFORNIA

11

12  UNITED STATES OF AMERICA,        )
                                     )   CASE NO. CR 87-422(E)-ER
13              Plaintiff,           )
                                     )   APPENDIX OF EXHIBITS TO NOTICE
14       vs.                         )   OF MOTION AND MOTION OF
                                     )   DEFENDANT RUBEN ZUNO-ARCE FOR
15  RAFAEL CARO-QUINTERO,            )   RELEASE PENDING TRIAL;
         aka "Rafael"                )   MEMORANDUM OF POINTS AND
16       aka "El Grenas",            )   AUTHORITIES IN SUPPORT THEREOF
         aka "Rafa"                  )
17  ERNESTO FONSECA-CARRILLO,        )
         aka "Don Neto",             )   Date  :  December 18, 1989
18  RUBEN ZUNO-ARCE,                 )   Time  :  3:30 p.m.
    JUAN JOSE BERNABE-RAMIREZ,       )   Place :  Courtroom of
19  JUAN GILBERTO HERNANDEZ-         )            Judge Rafeedie
    PARRA, JAVIER VASQUEZ-           )
20  VELASCO, EZEQUIEL GODINEZ-       )   [Trial Date:  February 20, 1990]
    CERVANTES, JAVIER BARBA-         )
21  HERNANDEZ, SERGIO ESPINO-        )
    VERDIN, INES                     )
22  CALDERON-QUINTERO                )
     aka "Rolando Cervantes",        )
23  ARMANDO PAVON-REYES,             )
    ALBINO BAZAN-PADILLA             )
24                                   )
                Defendants.          )
25  _____ )

26

27  ENTERED ON COURTRAN

28       JAN - 2 1990

Tab

A. Reporter's Partial Transcript of Proceedings,
   September 12, 1989, Case No. CR 89-741-RMT;

B. Memorandum Order re Bail by Judge Takasugi, filed on
   September 15, 1989 in Case No. CR 89-741-RMT;

C. Release Order and Bond Form signed by Ruben Zuno-Arce
   acknowledging conditions of release;

D. Statement of Assistant United States Attorney
   Adam Schiff reprinted in Article from Santa Barbara New
   Press, September 27, 1989;

E. Statement of Mexican Attorney General Enrique Alvarez
   reprinted in Article from Los Angeles Times,
   December 13, 1989;

F. Declaration of Art Rodriguez in Support of Ruben Zuno-
   Arce's Reply to Designation of Material Witness; Demand
   for Evidentiary Hearing (originally filed in Case No.
   CR 87-422(C)-ER on August 16, 1989);

G. Declarations and Exhibits in Support of Motion in
   Opposition to Designation of Material Witness
   (originally filed in Case No. CR 87-422(C)-ER on
   August 16, 1989);

1

2   H.   Notice of Motion and Motion of Defendant Ruben Zuno-
3        Arce for Release Pending Trial; and Memorandum of
4        Points and Authorities in Support Thereof (originally
5        filed in Case No. CR 89-741-RMT on September 11, 1989);
6

7   I.   Appendix of Declarations in Support of Defendant Ruben
8        Zuno-Arce's Motion for Release Pending Trial
9        (originally filed in Case No. CR 89-741-RMT on
10       September 11, 1989);
11

12  J.   Declaration of Peter Magaro and James E. Blancarte in
13       Support of Defendant Ruben Zuno-Arce's Motion for
14       Release Pending Trial (originally filed in Case No.
15       CR 89-741-RMT on September 11, 1989);
16

17  K.   Opposition of Ruben Zuno-Arce to Government's Motion to
18       Vacate District Court's Order Granting Bail; and
19       Declaration of James E. Blancarte (originally filed in
20       United States Court of Appeals for the Ninth Circuit
21       Case No. 89-50454 on September 17, 1989);
22

23  L.   Order of United States Court of Appeals for the Ninth
24       Circuit filed September 26, 1989;
25

26  M.   Declaration of James E. Blancarte (originally filed in
27       the United States Court of Appeals for the Ninth
28       Circuit Case No. 89-50454 on September 17, 1989);

3

N.        Declaration of Edward M. Medvene (originally filed in

          Case No. CR 89-741-RMT on November 18, 1989).


Dated:  December 15, 1989            EDWARD M. MEDVENE
                                     JAMES E. BLANCARTE
                                     RONALD A. DINICOLA
                                     MITCHELL, SILBERBERG & KNUPP


                                     By _____
                                         Ronald A. DiNicola
                                     Attorneys for Ruben Zuno-Arce

4

**EXHIBIT A**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

− − −

HONORABLE ROBERT M. TAKASUGI, JUDGE PRESIDING

− − −

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| VS. ) | NO. CR 89−741−RMT |
| ) | |
| RUBEN ZUNO−ARCE, ) | |
| ) | |
| DEFENDANT. ) | |

REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

TUESDAY, SEPTEMBER 12, 1989

ROBBI JOY
OFFICIAL COURT REPORTER PRO TEM
518 U.S. COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CA  90012
(213) 622−5391

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:

GARY A. FEESS
UNITED STATES ATTORNEY
MANUEL A. MEDRANO
ASSISTANT U.S. ATTORNEY
1400 UNITED STATES COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CA   90012
(213) 894-0619

FOR THE DEFENDANT:

EDWARD M. MEDVENE, ESQ.
MITCHELL, SILBERBERG & KNUPP
11377 W. OLYMPIC BOULEVARD
LOS ANGELES, CA   90064
(213) 312-2000

INDEX OF PROCEEDINGS PAGE

TUESDAY, SEPTEMBER 12, 1989
PARTIAL TRANSCRIPT:

HEARING RE DEFENDANT'S BAIL MOTION                    4

1           LOS ANGELES, CALIFORNIA; TUESDAY, SEPTEMBER 12, 1989

2                   1:30 P.M. SESSION

3                     - - - -

4         THE CLERK: CR 89-741-RMT, U.S.A. VERSUS

5 RUBEN ZUNO-ARCE.

6         MR. MEDRANO: GOOD AFTERNOON, YOUR HONOR.

7 FOR THE UNITED STATES, MANUEL MEDRANO AND ADAM SHIFF.

8         THE COURT: GOOD AFTERNOON.

9         MR. MEDVENE: MSSRS. DINICOLA, GAUT, BLANCARTE,

10 AND MEDVENE FOR ZUNO-ARCE. ZUNO-ARCE IS PRESENT NOW.

11         THE COURT: GOOD AFTERNOON.

12         MR. MEDVENE: GOOD AFTERNOON.

13         (PAUSE.)

14         THE COURT: ARE ALL COUNSEL IN RECEIPT OF THE

15 PRETRIAL SERVICES REPORT?

16         MR. MEDVENE: YES, SIR.

17         MR. MEDRANO: YES, YOUR HONOR.

18         THE COURT: VERY WELL. LET ME SEE WHETHER I CAN

19 SUMMARIZE THE DEFENSE POSITION IN THIS MATTER.

20         MR. ZUNO-ARCE, A WELL-KNOWN, HIGHLY-RESPECTED,

21 FORMER HIGH-RANKING GOVERNMENT OFFICIAL OF MEXICO WAS

22 ORIGINALLY ARRESTED AND DETAINED AS A MATERIAL WITNESS IN THE

23 TRIAL INVOLVING THE MURDER OF AGENT CAMARENA.

24         HE CONTENDS THAT HIS ONLY LINKAGE TO THIS

25 INCIDENT WAS THAT HE WAS A FORMER OWNER OF A RESIDENCE WHERE

1   THE AGENT WAS APPARENTLY TORTURED.

2                    AND FOLLOWING THE HEARING BEFORE THE

3   HONORABLE EDWARD RAFEEDIE OF THIS COURT, IT WAS DETERMINED

4   THAT MR. ZUNO-ARCE WAS NOT A MATERIAL WITNESS, AND HIS RELEASE

5   WAS ORDERED FORTHWITH.  AND APPARENTLY, ACCORDING TO THE

6   CONTENTIONS OF THE DEFENDANT, THE U.S. ATTORNEY'S OFFICE HERE

7   CONCEDED LACK OF EVIDENCE TO SUPPORT ITS EARLIER ALLEGATION

8   AND ON THE RECORD AGREED TO DO NOTHING FURTHER TO RETAIN OR

9   INTERFERE WITH THE RELEASE OF THE DEFENDANT.

10                   TWO DAYS LATER, MR. ZUNO-ARCE CHARGED WITH

11  PERJURY BEFORE THE GRAND JURY.  THE DEFENDANTS FURTHER CONTEND

12  THAT MR. ZUNO-ARCE HAD PREVIOUSLY COOPERATED WITH THE U.S.

13  OFFICIALS, AND THAT APPARENTLY IS SUPPORTED BY THE PRETRIAL

14  SERVICES REPORT REGARDING THE CAMARENA CASE.  AND I BELIEVE

15  THAT WAS IN 1987 THAT HE HAD TRAVELED TO SAN ANTONIO, TEXAS,

16  AND VOLUNTARILY MET WITH GOVERNMENT AGENTS TO DISCUSS THAT

17  CASE AND THAT SINCE 1987 HE HAS REGULARLY TRAVELED INTO THE

18  UNITED STATES.

19                   A FORMER DEA AGENT, MR. ARTHUR RODRIGUEZ, A CLOSE

20  FRIEND OF AGENT CAMARENA, HAS STATED THAT MR. ZUNO-ARCE WAS

21  NEVER SUSPECTED OF DRUG ACTIVITIES, WAS NOT A PARTICIPANT IN

22  THE MURDER AND HAD NO ASSOCIATIONS WITH QUINTERO OR CARILLO.

23  HE HAS NO PREVIOUS CRIMINAL HISTORY, AND THAT SPECIAL AGENT

24  JAIME KUYKENDALL, THE FORMER HEAD OF THE GUADALAJARA OFFICE OF

25  THE DEA, HAD NEVER SUSPECTED THE DEFENDANT OF ANY INVOLVEMENT

1     IN DRUG TRAFFICKING.

2           WE HAVE A SUBSTANTIAL NUMBER OF DECLARATIONS

3     FILED IN THIS COURT SUPPORTING THE HONESTY AND INTEGRITY OF

4     MR. ZUNO-ARCE; THAT FOLLOWING THE GRAND JURY PROCEEDING IN

5     WHICH MR. ZUNO-ARCE TESTIFIED, THE ASSISTANT UNITED STATES

6     ATTORNEY, A.MR. GURULE, HAD CONCEDED THAT THE DEFENDANT

7     APPEARED TO BE TELLING THE TRUTH.

8           FOLLOWING THE RELEASE OF MR. ZUNO-ARCE BY ORDER

9     OF JUDGE RAFEEDIE, THE DEFENDANT WAS INSTEAD TAKEN TO THE INS

10    PURSUANT TO A DETENTION ORDER, AND WE DO HAVE AN AFFIDAVIT BY

11    MR. CASILLAS INDICATING THAT HIS DETENTION DECISION TO DETAIN

12    THE DEFENDANT WAS NOT PROMPTED NOR ENCOURAGED BY ANY MEMBER OF

13    THE U.S. ATTORNEY'S OFFICE IN THE CENTRAL DISTRICT.

14          DEFENDANTS FURTHER CONTEND THAT ASSISTANT UNITED

15    STATES ATTORNEY, MR. MANUEL MEDRANO, HAD AGREED THAT HIS

16    OFFICE WOULD TAKE NO FURTHER ACTION TO INTERFERE WITH

17    MR. ZUNO-ARCE'S RELEASE.

18          ONE DAY AFTER MR. ZUNO-ARCE WAS TAKEN TO SAN

19    ANTONIO PURSUANT TO THE INS DETENTION, HE WAS INDICTED FOR

20    PERJURY IN THE INSTANT CASE.

21          DEFENDANTS FURTHER AGREE TO WAIVE EXTRADITION AND

22    FURTHER CONTEND THAT THERE IS NO DANGER TO THE COMMUNITY AND

23    EMPHASIZE THE FACT THAT PERJURY IS, ALTHOUGH A SERIOUS CRIME,

24    IS NOT OF THE TYPE WHERE THERE SHOULD BE AN ORDER OF

25    DETENTION.

1          LET'S HEAR FROM THE GOVERNMENT.  THEN I WILL

2     ALLOW THE DEFENSE NATURALLY TO RESPOND.

3          MR. MEDRANO:  THANK YOU, YOUR HONOR.

4     MANUEL MEDRANO FOR THE UNITED STATES.  GOOD AFTERNOON.

5          YOUR HONOR, 75 PERCENT OF WHAT THE COURT STATED

6     IS ACCURATE IN TERMS OF THE BARE ESSENTIAL FACTS, BUT I FEEL

7     IT IMPORTANT TO BRING OUT A FEW MORE FACTS TO GET THE FULL

8     PICTURE, YOUR HONOR, BECAUSE THIS IS AN ISSUE WE HAVE BEEN

9     DEALING WITH FOR QUITE A WHILE NOW, AND THAT ISSUE BEING THESE

10    BASELESS AND FALSE ALLEGATIONS OF GOVERNMENT IMPROPRIETY AND

11    MISCONDUCT.

12          YOUR HONOR, I HEREBY STATE AS AN OFFICER OF THE

13    COURT THAT NO SUCH ACTIVITIES OCCURRED, AND IT IS FOR THAT

14    REASON I JUST WANT TO SPELL OUT A FEW IMPORTANT FACTS FOR THE

15    COURT'S CONSIDERATION.

16          WHAT COUNSEL FOR ZUNO REPEATEDLY FAILS TO PUT IN

17    HIS PAPERS EVERY TIME HE FILES SOMETHING WITH THE COURT -- AND

18    THERE HAVE BEEN ENUMERABLE FILINGS, YOUR HONOR.  I'D LIKE TO

19    POINT THAT OUT -- IS THE FOLLOWING:

20          .          FIRST OF ALL, YOUR HONOR, WHEN MR. RUBEN

21    ZUNO-ARCE WAS INITIALLY DETAINED, IT WAS BY THE INS OFFICE OUT

22    OF SAN ANTONIO.  OUR OFFICE AND THE DEA HAD ABSOLUTELY

23    NOTHING TO DO WITH THAT, YOUR HONOR, AND THAT WAS ON

24    AUGUST 9.  THEY THEN CALL US WHEN THEY DO A COMPUTER CHECK AND

25    FIND THAT ZUNO-ARCE IS ON THE DEA COMPUTER LIST OF PURPORTED

1    NARCOTICS TRAFFICKERS.

2            WE NOW KNOW THAT HE'S IN INS CUSTODY, SO ON
3    AUGUST 10TH WE SEEK AND OBTAIN FROM JUDGE RAFEEDIE A MATERIAL
4    WITNESS ARREST WARRANT, YOUR HONOR, AND THAT'S ON AUGUST 10TH.
5    THAT'S IMMEDIATELY FAXED TO THE INS OFFICE IN SAN ANTONIO, THE
6    MARSHALS TAKE CUSTODY, AND HE'S IMMEDIATELY BROUGHT OUT TO LOS
7    ANGELES BECAUSE A MATERIAL WITNESS ARREST WARRANT WOULD HAVE
8    PRECEDENCE OVER ANY INS PROCEEDING, YOUR HONOR.

9            SO THEN THE FOLLOWING HAPPENS -- AND IT'S VERY
10   UNUSUAL, BECAUSE WE HAVE REPEATED ALLEGATIONS OF MISCONDUCT BY
11   THE GOVERNMENT WHEN IN FACT, THE GOVERNMENT, THE DEA AND THE
12   INS HAVE BENT OVER BACKWARDS TO ACCOMMODATE A GENTLEMAN LIKE
13   MR. ZUNO-ARCE WHO, BUT FOR HIS WEALTH, YOUR HONOR, AND BUT FOR
14   HIS WELL-PUBLICIZED POLITICAL CONNECTIONS BOTH IN MEXICO AND
15   THE UNITED STATES, WOULD NOT BE RECEIVING THIS FAVORABLE TYPE
16   OF TREATMENT.

17           BE THAT AS IT MAY, HE'S BROUGHT OUT TO LOS
18   ANGELES.  THEN JUDGE RAFEEDIE ORDERS THE FOLLOWING, IN
19   ESSENCE:  BECAUSE THE GOVERNMENT ADVISED THAT IT WOULD BE
20   SEEKING IMMUNITY FROM THE DEPARTMENT OF JUSTICE TO GIVE HIM
21   IMMUNITY, BECAUSE ZUNO-ARCE THROUGH HIS ATTORNEYS TOLD US THAT
22   HE WOULD NOT TESTIFY WITHOUT SUCH A GRANT OF USE IMMUNITY.

23           SO WE OBTAIN THAT IMMUNITY, YOUR HONOR, VIRTUALLY
24   OVERNIGHT.  AND BELIEVE ME, YOUR HONOR, IN THE SIX YEARS I
25   HAVE BEEN IN THIS OFFICE, TO DO THAT WITH DOJ IS LIKE MOVING A

1    MOUNTAIN. BUT WE DID IT FOR MR. ZUNO-ARCE AND AT THE

2    INSISTENCE OF HIS ATTORNEYS.

3              THE COURT: PERHAPS A FEW MOUNTAINS?

4              MR. MEDRANO: YES, YOUR HONOR, INDEED.

5              SO THEN WE PROCEED AT THE DIRECTION OF JUDGE

6    RAFEEDIE -- AND THIS WAS OUR INTENT ANYWAY -- AND THAT WAS TO

7    PUT ZUNO-ARCE IN FRONT OF A FEDERAL GRAND JURY.

8              NOW WE DO THAT, YOUR HONOR, AS PROMPTLY AND AS

9    EXPEDITIOUSLY AS POSSIBLE. NOW, LET ME POINT THIS OUT TO THE

10   COURT, BECAUSE AGAIN MR. MEDVENE'S PAPERS DISTORT WHAT REALLY

11   HAPPENED IN THIS CASE.

12             YOUR HONOR, IN MY FORMER CAPACITY BEFORE I WENT

13   BACK INTO THE NARCOTICS UNIT, I WAS THE DEPUTY CHIEF OF THE

14   CRIMINAL COMPLAINTS UNIT. I OVERSAW AND SUPERVISED THE 14

15   FEDERAL GRAND JURIES IN THE CENTRAL DISTRICT OF CALIFORNIA.

16             BY DIRECTIVE OF JUDGE MANUEL REAL, YOUR HONOR, A

17   FEDERAL GRAND JURY CAN ONLY COME IN ONE DAY A WEEK, AND IN

18   ADDITION, YOUR HONOR, THEY CAN ONLY BE BROUGHT IN ON THE DAY

19   TO WHICH THEY WERE ASSIGNED. AND THIS IS JUDGE REAL'S

20   DIRECTIVE TO THE UNITED STATES ATTORNEY'S OFFICE.

21             SO IT'S ON FRIDAY, ON A FRIDAY, THAT JUDGE REAL

22   ORDERED US TO IMMEDIATELY PUT MR. ZUNO IN FRONT OF A GRAND

23   JURY. WE HAVE A GRAND JURY THAT'S BEEN DOING A COMMON

24   INVESTIGATION FOR TWO YEARS, YOUR HONOR, AND THEY MEET ON

25   WEDNESDAYS. WHEN WE REALIZED WE HAD TO PUT HIM IN FRONT OF

1    THE GRAND JURY, WE GET ON THE PHONE AND TRY TO REACH EVERY

2    SINGLE INDIVIDUAL, AND WE COULD NOT GET QUORUM FOR A WEDNESDAY

3    GRAND JURY.

4              SO ONCE AGAIN, IN AN EFFORT TO ACCOMODATE

5    MR. ZUNO AND HIS COUNSEL, WE USE A THURSDAY, THE FOLLOWING

6    DAY, GRAND JURY, AND ON AUGUST 24 ZUNO-ARCE MAKES HIS FIRST

7    GRAND JURY APPEARANCE FOR APPROXIMATLEY THREE HOURS.

8              THE EXAMINATION IS NOT COMPLETED, YOUR HONOR, AND

9    THEREFORE HE HAS TO BE BROUGHT BACK IN ANOTHER WEEK ON THE

10   FOLLOWING THURSDAY, AUGUST 31. AND THAT'S NOT BY CHOICE OF MY

11   OFFICE, YOUR HONOR, BUT RATHER BECAUSE THAT GRAND JURY CAN

12   ONLY COME IN ONCE A WEEK ON THEIR ASSIGNED DAY. SO WE HAVE TO

13   WAIT UNTIL THE FOLLOWING THURSDAY, AND ON AUGUST 31 ZUNO-ARCE

14   IS BROUGHT BACK, AND THE GRAND JURY EXAMINATION IS FINISHED.

15             AND THEN THE FOLLOWING OCCURS, JUDGE: WE GO BACK

16   BEFORE JUDGE RAFEEDIE. NOW IT'S SEPTEMBER 5, A TUESDAY, LAST

17   WEEK. WE COME INTO COURT AT 1:30. JUDGE RAFEEDIE BY THEN HAS

18   READ AND EXAMINED THE GRAND JURY TRANSCRIPTS FOR RUBEN

19   ZUNO-ARCE, AND IT WAS HIS ORDER AND FINDING THAT HE FINDS THE

20   MAN IS NOT A MATERIAL WITNESS AND SHOULD BE RELEASED FROM THAT

21   WARRANT.

22             WELL, THAT'S THE ORDER. MY CO-COUNSEL,

23   MR. JIMMY GURULE AND I GO TO LUNCH, AND THEN WE COME BACK TO

24   HYSTERICAL MESSAGES FROM MEDVENE AND COMPANY SAYING THAT

25   SOMEHOW THE U.S. ATTORNEY'S OFFICE HAS NOW CALLED THE

1   SAN ANTONIO INS OFFICE AND TOLD THEM TO HOLD ON TO RUBEN

2   ZUNO-ARCE IN A FASHION TO CIRCUMVENT JUDGE RAFEEDIE'S RELEASE

3   ORDER.

4           ALL OF THAT IS FALSE, YOUR HONOR.  WE REFUTED

5   THAT ON SEPTEMBER 5, AND I REFUTE IT AGAIN TODAY.  AND THAT'S

6   WHY I PROVIDED FOR THE COURT THE DIRECTOR OF THE INS IN

7   SAN ANTONIO, MR. RICHARD CASILLAS, AND HE STATES UNDER OATH,

8   YOUR HONOR, THAT THE INS IN SAN ANTONIO AT ALL TIMES ACTED

9   UNILATERALLY, THEY WERE NEVER THE FOOT SOLDIER OF THE U.S.

10  ATTORNEY'S OFFICE OUT OF LOS ANGELES.  SO THEY DID WHAT THEY

11  DID WITHOUT ANY PROMPTING FROM MY OFFICE, YOUR HONOR.

12          SO I HOPE THAT FINALLY LAYS TO REST ANY

13  SUGGESTIONS, FALSE SUGGESTIONS I MIGHT ADD, OF MISCONDUCT OR

14  IMPROPRIETY BY THE UNITED STATES ATTORNEY'S OFFICE.

15          ONE MORE THING I NEED TO CLARIFY BEFORE THE

16  COURT, YOUR HONOR.  MR. MEDVENE AND COUNSEL MISREPRESENT THE

17  AGREEMENT REACHED ON SEPTEMBER 5 WITH COUNSEL.  WE AGREED IN

18  ESSENCE AS FOLLOWS:

19          THAT IN LIGHT OF JUDGE RAFEEDIE'S RELEASE ORDER

20  AND SINCE ZUNO HAD RECEIVED A TRIAL SUBPOENA TO TESTIFY IN THE

21  UPCOMING CAMARENA TRIAL, FOR JUAN JOSE BERNABE-RAMIREZ, THAT

22  IN ORDER TO EXTRADITE AND ARRANGE ZUNO'S RETURN TO THE UNITED

23  STATES TO TESTIFY PURSUANT TO THAT SUBPOENA, I, MR. MEDRANO,

24  COULD TELEPHONICALLY CALL MR. MEDVENE, AND IN THAT FASHION WE

25  WOULD ARRANGE FOR ZUNO'S RETURN TO THE UNITED STATES AND WORK

1   OUT THE INS DIFFICULTIES.

2           AT NO TIME, YOUR HONOR, DID MY OFFICE ENTER ANY

3   TYPE OF AGREEMENT -- AND INDEED IT WOULD BE ABSURD TO DO SO --

4   THAT HE COULD NOT BE HELD ON ANY OTHER GROUNDS. WHAT I AGREED

5   TO ON THE RECORD, YOUR HONOR, IS THAT WE WOULD DO NOTHING TO

6   INTERFERE NOW WITH THE INS PROCEEDINGS. AND IN FACT WE

7   DIDN'T, AND IN FACT HE WAS TRANSPORTED OVERNIGHT, YOUR HONOR,

8   A PROCESS THAT USUALLY TAKES UP TO TWO WEEKS, IN ORDER TO

9   ACCOMMODATE MR. ZUNO-ARCE.

10          SO HERE'S THE BOTTOM LINE, YOUR HONOR, AND I JUST

11  WANT TO LAY THESE ABSURD ISSUES TO REST ONCE AND FOR ALL.

12  WHEN ZUNO-ARCE WAS BROUGHT TO LOS ANGELES PURSUANT TO THAT

13  MATERIAL ARREST WARRANT, HE WAS GIVEN USE IMMUNITY, YOUR

14  HONOR, AT HIS INSISTENCE. AND AFTER THAT, HE HAD ONLY ONE

15  SINGULAR UNEQUIVOCAL OBLIGATION, AND THAT WAS TO SIMPLY TELL

16  THE TRUTH. HE HAD BEEN ADVISED BY MYSELF AND HIS OWN COUNSEL,

17  MR. MEDVENE, THAT IF HE DID NOT DO SO BEFORE THE FEDERAL GRAND

18  JURY, JUDGE, HE WOULD BE PROSECUTED FOR PERJURY.

19          SO WHAT HAPPENS? HE LIES. NOT ONCE, NOT TWICE,

20  BUT REPEATEDY. AND AS A RESULT, HE IS INDICTED BY THE FEDERAL

21  GRAND JURY, AND NOW THERE ARE ALL THESE FALSE ALLEGATIONS BY

22  COUNSEL THAT SOMEHOW THIS WAS A RUSE OR SOME MISCONDUCT BY THE

23  U.S. ATTORNEY'S OFFICE TO CIRCUMVENT JUDGE RAFEEDIE'S ORDER.

24          PLAINLY, YOUR HONOR, THAT IS NOT THE CASE. WHAT

25  I WOULD LIKE TO DO, YOUR HONOR, WITH THE COURT'S PERMISSION

1    AND IF THIS IS THE RIGHT TIME, IS SIMPLY GET INTO NOW WHAT

2    REALLY IS THE HEART OF THE MATTER HERE, AND THAT SIMPLY IS

3    WHETHER OR NOT ZUNO IS A FLIGHT RISK.

4              AND MAY I GO AHEAD AND DELVE INTO THAT, YOUR

5    HONOR?

6              THE COURT:  YES, PLEASE.

7              MR. MEDRANO:  I WOULD HIGHLY RECOMMEND THAT WE

8    SIMPLY TURN TO THE IMPARTIAL ARBITER THAT EXISTS HERE, AND

9    THAT IS THE PRETRIAL SERVICES.

10             WHEN ZUNO-ARCE WAS INITIALLY BROUGHT TO LOS

11   ANGELES PURSUANT TO THE MATERIAL WITNESS ARREST WARRANT, AT

12   THAT EARLY TIME HE WAS DEEMED A SEVERE FLIGHT RISK, AND

13   DETENTION WAS HIGHLY RECOMMENDED -- NO -- IN FACT, PLAINLY

14   RECOMMENDED BY THE PRETRIAL SERVICES.

15             NOW WE COME BACK, THERE HAS BEEN FURTHER REVIEW

16   BY THE PRETRIAL OFFICER, AND THE SAME RECOMMENDATION IS, YOUR

17   HONOR, AND I'LL STRONGLY RESPECT THAT THE COURT SHOULD ADOPT

18   THAT POSITION FOR THE FOLLOWING REASONS:

19             NOW MR. ZUNO-ARCE IS A MAN OF INCREDIBLE WEALTH,

20   YOUR HONOR.  HE HAS INCREDIBLE PROPERTY IN MEXICO.  HE IS

21   PLAINLY A MILLIONAIRE TWICE OVER.  HE OWNS A CANNING PLANT,

22   ARGRICULTURAL FIELDS, LUMBER MILLS, GASOLINE STATIONS.  HE HAS

23   A LOT OF POWER AND A LOT OF WEALTH, YOUR HONOR.

24             HE RESIDES SOLELY IN MEXICO.  HE WORKS SOLELY IN

25   MEXICO.  99.9 PERCENT OF ANY FAMILY IS SOLELY IN MEXICO.  HE

1    HAS NO TIES TO THE CENTRAL DISTRICT OF CALIFORNIA.  AND IT IS

2    OUR POSITION, YOUR HONOR, THAT FACT, HIS WEALTH, IN

3    CONJUNCTION WITH THE FOLLOWING, THAT THIS MAN HAS READILY

4    ADMITTED FOR EVERYONE THE FOLLOWING:

5          HE IS VERY WELL-CONNECTED IN MEXICO WITH

6    HIGH-RANKING MEXICAN GOVERNMENT OFFICIALS.  HE IS RELATED --

7    HE IS THE BROTHER-IN-LAW OF EX-PRESIDENT OF MEXICO LUIS

8    ECHEVERRIA, WHO WAS THE PRESIDENT FROM 1970 TO 1976 IN MEXICO.

9    HE IS INTIMATE FRIENDS WITH THE PAST AND CURRENT PRESIDENTS OF

10   THE REPUBLIC OF MEXICO, YOUR HONOR.

11         NOW THIS FACT CONCERNS US, BECAUSE HIS WEALTH, IN

12   CONJUNCTION WITH HIS CLOSE AND INTIMATE CONTACT WITH THESE

13   HIGH-RANKING GOVERNMENT OFFICIALS, MILITATES IN FAVOR OF ONLY

14   ONE DECISION, AND THAT IS, IF WE CUT HIM LOOSE TODAY, YOUR

15   HONOR, I ASSURE YOU WE WILL NOT SEE HIM AGAIN.

16         NOW MR. MEDVENE, THROUGH HIS PAPERS, HAS

17   SUGGESTED THE FOLLOWING:  THAT, WELL, EXTRADITION IS ALWAYS A

18   VIABLE ALTERNATIVE SHOULD THE COURT DECIDE TO RELEASE

19   MR. ZUNO-ARCE AND THEN HE RUNS AWAY.  WELL, YOUR HONOR, LET ME

20   LAY THAT POSSIBILITY TO REST BY STATING THE FOLLOWING:

21         I AM THE COUNSEL ON THE CAMARENA MURDER

22   INVESTIGATION, YOUR HONOR, A CASE THAT HAS BEEN GOING ON FOR

23   FIVE YEARS, A CASE THAT HAS AT EVERY POSSIBLE TURN AND AVENUE

24   BEEN STONE-WALLED AND FORESTALLED BY THE MEXICAN GOVERNMENT.

25   THAT GOVERNMENT HAS DONE ABSOLUTELY NOTHING TO ASSIST THE

1  UNITED STATES IN THE PROSECUTION OF THE PERPETRATORS OF THAT

2  HEINOUS CRIME.

3  AND I CAN ASSURE THIS COURT THAT THEY WILL

4  CERTAINLY NOT DO ABSOLUTELY ANYTHING TO HELP US EXTRADITE

5  ZUNO-ARCE BACK TO THE UNITED STATES ON SOMETHING LIKE PERJURY

6  WHEN THEY HAVE FAILED TO DO SO FOR FAR MORE SERIOUS AND

7  DESPICABLE CRIMES LIKE THE ABDUCTION, THE TORTURE, AND THE

8  MURDER OF DEA AGENT SPECIAL CAMARENA.

9  SO I SUGGEST STRONGLY, YOUR HONOR, THAT THAT IS

10  NOT A VIABLE ALTERNATIVE. IT IS PREPOSTEROUS TO EVEN SUGGEST

11  THAT, I WOULD STATE TO THE COURT.

12  YOUR HONOR, LET ME JUST CLOSE BY STATING THAT

13  WHAT IS NOT AT ISSUE, YOUR HONOR, IS ANY LONGER, BECAUSE I

14  FEEL WE HAVE REBUTTED IT AT THIS POINT BEFORE THE COURT. AND

15  JUST AS A DIGRESSION, WE HAVE STILL AND WILL FILE TODAY OR

16  TOMORROW OUR PAPERS OPPOSING A WRIT OF HABEAS CORPUS THAT

17  MR. MEDVENE HAS FILED BEFORE JUDGE RAFEEDIE WITH REGARD TO

18  THIS ENTIRE INS ISSUE AND THESE FALSE ALLEGATIONS OF

19  GOVERNMENT MISCONDUCT.

20  THAT IS NO LONGER AT ISSUE, YOUR HONOR. LET'S

21  PUT THAT ASIDE, BECAUSE FRANKLY IT IS NOT RELEVANT. ALL THAT

22  MATTERS IS WHETHER ZUNO-ARCE IS GOING TO COME BACK TO YOUR

23  COURT ON NOVEMBER 7 AT 9:00 IN THE MORNING TO FACE THREE

24  COUNTS OF PERJURY.

25  NOW I HAVEN'T HAD AN OPPORTUNITY TO REVIEW THE

1    GUIDELINES, YOUR HONOR, TO SEE WHAT MANDATORY TIME SHALL BE

2    IMPOSED, BUT IT IS MY PRESUMPTION THAT IT IS NOT A

3    SIGNIFICANT -- IT IS MY PRESUMPTION THAT IT IS NOT A

4    SIGNIFICANT SENTENCE WOULD ISSUE TO MR. ZUNO-ARCE IF AND WHEN

5    HE IS CONVICTED FOR MAKING REPEATED FALSE STATEMENTS BEFORE

6    THE GRAND JURY.

7            AS A RESULT, YOUR HONOR, WE WOULD RESPECTFULLY

8    SUBMIT THAT ZUNO-ARCE IS AND REMAINS A PROFOUND FLIGHT RISK

9    AND THAT THERE IS ABSOLUTELY NO VIABLE REASON OR CONTENTION

10   BROUGHT UP BY COUNSEL FOR MR. ZUNO WHICH WOULD PROVIDE A BASIS

11   FOR RELEASING HIM PENDING HIS NOVEMBER 7 TRIAL IN THIS MATTER.

12           AND, YOUR HONOR, UNLESS THE COURT HAS SPECIFIC

13   QUESTIONS, WE WOULD SUBMIT ON THAT BASIS.

14           THE COURT:  THANK YOU VERY MUCH.

15           RESPONSE, IF ANY.

16           MR. MEDVENE:  YES.

17           WE WOULD ASK YOUR HONOR TO DISREGARD, WITH THE

18   EXCEPTION OF THE STATEMENT ABOUT THE DECLARATION FILED BY

19   MR. CASTILLO, VIRTUALLY EVERYTHING THAT THE PROSECUTOR HAS

20   STATED, BECAUSE HE'S DONE NOTHING UNDER OATH, HE SUBMITTED NO

21   DECLARATIONS OF ANY KIND, HE'S PRESENTED NO EVIDENCE OF ANY

22   KIND TO SUBSTANTIATE HIS CONTENTION THAT ZUNO-ARCE IS A FLIGHT

23   RISK OR ANYTHING ELSE, YOUR HONOR.

24           NOW IT'S OUT OF ORDER, BUT MR. MEDRANO MADE A

25   STATEMENT ABOUT WHAT HE SAID OR WHAT HE DIDN'T SAY, AND I WILL

1   READ YOU FROM A TRANSCRIPT, SO WE KNOW WHAT HE DID SAY ON

2   SEPTEMBER WHEN JUDGE RAFEEDIE ORDERED MR. ZUNO-ARCE RELEASED.

3           I READ YOU FROM PAGE 29:

4               "MR. MEDVENE:     .

5               --  LINE 2 --

6               "THAT IS OUR UNDERSTANDING, BUT

7           I TAKE IT WITH THAT THAT THE

8           GOVERNMENT WILL FORTHWITH RETURN HIM

9           TO MEXICO AND NOT -- IT WILL ONLY BE

10          SUBJECT TO THEM NOT PLACING ANY OTHER

11          HOLDS.

12              "THE COURT:   THERE IS NOTHING,

13          AS FAR AS I KNOW, AS FAR AS HIS BEING

14          BROUGHT TO THIS COURT AS A MATERIAL

15          WITNESS, THERE IS NOTHING TO PREVENT

16          HIM FROM GOING BACK TO MEXICO OR GOING

17          ANYWHERE ELSE.

18              "MR. MEDVENE:    IF THE

19          GOVERNMENT AGREES, HE WILL BE

20          FORTHWITH TRANSPORTED BACK.  WE

21          CERTAINLY WILL AGREE TO WHAT

22          MR. MEDRANO SAID, WHICH IS THAT I

23          AGREED TO BEFORE.  I JUST DON'T WANT

24          ANOTHER SITUATION LIKE THIS, YOUR

25          HONOR.

1              "THE COURT:

2          -- LINE 16 --

3              OH, THE REPORTER SAYS, "THE COURT:", BUT IT'S ME,

4     YOUR HONOR.

5                    LINE 16, I QUOTE:

6              "I'M SORRY, YOUR HONOR.  DOES

7          MR. MEDRANO ON THE RECORD AGREE?  I

8          ASSUME HE AGREES, BUT I JUST THINK

9          IT'S REALLY IMPORTANT.  DOES HE AGREE,

10         BECAUSE I DIDN'T HEAR ANYTHING?

11.                  LINE 20:

12             "MR. MEDRANO:  NO PROBLEM WITH

13         THAT, YOUR HONOR."

14             NO PROBLEM WITH WHAT?  NO PROBLEM WITH HIS

15    RETURNING FORTHWITH TO MEXICO AND NOT PUTTING ANY HOLDS.  NOW

16    THAT'S WHY IT'S NECESSARY TO GET DECLARATIONS FROM THESE

17    PEOPLE, YOUR HONOR.

18             LET ME GIVE YOU A BRIEF HISTORY OF WHAT'S GOING

19    ON HERE AND WHAT'S SAID AND WHAT'S NOT SAID.  FIRST, TO PUT

20    WHERE WE ARE INTO CONTEXT.

21             ZUNO-ARCE HAS BEEN IN CUSTODY CONTINUOUSLY,

22    INCLUDING TODAY, FOR SOME 35 DAYS.  PRIOR TO AUGUST 9TH OF

23    THIS YEAR, WE HAVE STATED, THEY HAVE NOT REFUTED, THAT HE WAS

24    HELD IN SAN ANTONIO PER DEA PUTTING IN THE COMPUTER THAT HE

25    WAS WANTED HERE.  THAT'S WHY HE WAS HELD.  INS DIDN'T HAVE

1   ANYTHING IN SAN ANTONIO.  I WILL EXPLAIN THAT IN A MINUTE, AND

2   IT'S NOT REFUTED.

3                INS IN SAN ANTONIO PICKED ZUNO-ARCE UP ON

4   AUGUST 9, BECAUSE DEA HERE AND THE U.S. ATTORNEY'S OFFICE HERE

5   WANTED HIM PICKED UP.  THEY HELD HIM.  HE HAD COUNSEL -- THIS

6   IS ALL DECLARATIONS.  I'M NOT JUST TALKING LIKE THEY TALK.

7   I'M TALKING ABOUT DECLARATIONS UNDER OATH, JUDGE.

8                COUNSEL FOR ZUNO-ARCE GOES TO INS ON AUGUST 9TH

9   AND SAYS, "WHAT EVIDENCE DO YOU HAVE?"

10               INS SAYS, "WE'RE WAITING.  WE THINK HE'S A

11  NARCOTIC TRAFFICKER.  WE'RE WAITING."

12               WHAT ARE THEY WAITING FOR?  THEY'RE WAITING TO

13  GET IT FROM DEA HERE.

14               NOW WHAT HAPPENS NEXT?  THEY HAVE A MATERIAL

15  WITNESS ARREST WARRANT SIGNED BY JUDGE RAFEEDIE TO TRANSPORT

16  HIM BACK BASED ON THE SAME ASSERTION, SOMEHOW INVOLVED IN THE

17  TORTURE/MURDER AND NARCOTIC TRAFFICKER.

18               JUDGE RAFEEDIE SIGNS THE ORDER TO TRANSPORT IT

19  BACK TO.  INS STILL DIDN'T FILE CHARGES AUGUST 9TH, AUGUST

20  10TH._ THEY GET HIM BACK HERE ON AUGUST 9TH.  WE TRY TO GET

21  HIM OUT.  THE COURT SAYS, "NO, LET'S LET THE GOVERNMENT HAVE A

22  CHANCE TO GET HIS TESTIMONY."

23               THE GOVERNMENT WAITS UNTIL AUGUST 24TH, 22 DAYS

24  FROM THE TIME THEY PICK HIM UP, TO START HIS TESTIMONY BEFORE

25  THE GRAND JURY.  THEY HOLD HIM IN JAIL AS A MATERIAL WITNESS

1  NOT YET CHARGED WITH ANY CRIME.  FOR 22 DAYS THEY HOLD HIM IN

2  JAIL.

3  THEN WHAT DO THEY DO?  WE FINALLY FORCE -- WHEN

4  JUDGE RAFEEDIE SAYS, "GET HIM IN FRONT OF A GRAND JURY, AND I

5  WANT TO KNOW WHEN YOU GET HIM THERE AND REPORT BACK TO ME ON

6  MONDAY," THEY GET HIM IN FRONT OF A GRAND JURY FOR HOW LONG?

7  TWO HOURS.  THEY START AT 2:00 O'CLOCK IN THE AFTERNOON.  THEY

8  DON'T START UNTIL LATER THAN 2:00, THEY BREAK AT 5:00.

9  AND WE SAY, "PLEASE KEEP GOING.  HE WILL ANSWER

10  EVERY QUESTION YOU HAVE."

11  "NO, WE CAN'T.  THE COURT REPORTER HAS TO LEAVE."

12  THEY THEN WAIT ANOTHER WEEK TO GO WITH THE GRAND

13  JURY.  THEY REPRESENT THEY'VE GOT A LOT OF TESTIMONY.  THEY

14  START AT 9:00, THEY'RE DONE BY 11:30.  HE ANSWERS EVERY

15  QUESTION.

16  WE SAY UNDER OATH THAT GURULE, THE PROSECUTOR IN CHARGE

17  SAYS TO JIM LARNKARDIN (PHONETIC) IN ANSWER TO HIS QUESTION,

18  "WE'RE SATISFIED.  HE'S ANSWERED EVERY QUESTION.  HE'S

19  TESTIFIED TRUTHFULLY."

20  NOW THAT'S UNDER OATH, AND THEY DON'T DENY IT.

21  IT'S UNDER OATH, AND THEY DON'T DENY IT.

22  THEN WHAT HAPPENS?  THEY STILL DON'T WANT TO

23  RELEASE HIM, AND THEY GO IN FRONT OF JUDGE RAFEEDIE ON

24  SEPTEMBER 5TH WHEN HE'S BEEN HELD FOR SOME 27 DAYS.

25  AND THEY SAY THAT, "JUDGE RAFEEDIE, WE STILL WANT

1   TO HOLD HIM, BECAUSE WE THINK HE'S A FLIGHT RISK AND HE'S A

2   MATERIAL WITNESS."

3            THEY SUBMIT IN CAMERA THINGS TO JUDGE RAFEEDIE

4   WHICH WE STILL HAVEN'T SEEN, AND EVEN THOUGH THEY SUBMIT

5   WHATEVER THEY WANT IN CAMERA AND THE GRAND JURY TRANSCRIPT TO

6   JUDGE RAFEEDIE, JUDGE RAFEEDIE RELEASES HIM AND SAYS IN

7   ESSENCE, HE'S EITHER NOT A MATERIAL WITNESS OR WE ARE GOING TO

8   RELEASE HIM, AND HE'LL COME BACK UNDER SUBPOENA. JUDGE

9   RAFEEDIE DIDN'T SPELL THAT OUT. HE JUST RELEASED HIM

10  FORTHWITH.

11           THE GOVERNMENT SAT THERE, WE SAY, KNOWING THERE

12  WAS AN INS HOLD AND THEY WERE GOING TO INSTITUTE IT. WHAT

13  THEY DIDN'T TELL YOU AND WHAT THEY ADMITTED IN OPEN COURT,

14  BECAUSE WE PRESSED THEM -- YOU KNOW, WE'RE -- IT'S HARD

15  BECAUSE WE DON'T HAVE ALL THE INFORMATION, BUT WE PRESSED THEM

16  BECAUSE WE HAD A LITTLE INFORMATION AND DEA AGENT KEEL

17  (PHONETIC), WHO'S HERE, ADMITTED THAT HE CALLED DEA IN

18  SAN ANTONIO AND TOLD DEA IN SAN ANTONIO THAT JUDGE RAFEEDIE

19  HAD RELEASED.

20           .     NOW WE SAY THE COURT CAN TAKE JUDICIAL NOTICE

21  THAT THE DEA AGENT DOING THAT WITH THE KNOWLEDGE OF U.S.

22  ATTORNEY'S OFFICE IT'S DONE FOR ONE PURPOSE, SO DEA -- SAN

23  ANTONIO CALLS DEA -- CALLS INS SAN ANTONIO, THEY INSTITUTE THE

24  HOLD. AND THEN WE STARTED THE WHOLE THING WITH THE HOLD, AND

25  THEN THEY TRANSPORT HIM.

1    NOW BETWEEN AUGUST 9TH AND THE DAY THEY GET HIM

2    BACK, JUDGE, WHICH IS BALLPARK SEPTEMBER 6-7, STILL HAVEN'T

3    FILED CHARGES, STILL I TAKE IT WAITING TO HEAR FROM

4    LOS ANGELES.

5    WE GO IN ON APPROXIMATELY AUGUST 7TH OR 8TH WHEN

6    THEY'VE TAKEN HIM BACK NOW TO SAN ANTONIO, STILL NO CHARGES,

7    AND THEY SAY THEY'RE WAITING WORD. WAITING WORD, WE SAY, FROM

8    LOS ANGELES. THAT'S WHAT WE CLAIMED. THERE'S NO DENIAL UNDER

9    OATH.

10   WHAT HAPPENS THEN IS THEY FILE A PERJURY, WHICH

11   I'M GOING TO TALK ABOUT IN A MINUTE, AND THEN THEY FILE AN INS

12   CHARGING DOCUMENT, THE INS CHARGING DOCUMENT IN SUBSTANTIALLY

13   THE SAME WORDS AS THEY GOT THEIR MATERIAL WITNESS WARRANT ON,

14   "WE THINK HE'S A NARCOTIC TRAFFICKER. HE'S EXCLUDABLE."

15   WHAT THEY THEN DID, AND THEY DON'T SAY IN THEIR

16   DECLARATION OR MR. MEDRANO DOESN'T SAY, IS THEY THEN CLOSED

17   THAT INS HEARING. YESTERDAY, I BELIEVE OR DAY BEFORE

18   YESTERDAY -- I THINK YESTERDAY -- THEY TOLD THE ADMINISTRATIVE

19   LAW JUDGE, "WE'RE CLOSING THE HEARING AGAINST ZUNO-ARCE."

20   SO THERE'S NO PENDING HEARING, AS WE UNDERSTAND

21   IT, AGAINST ZUNO-ARCE.

22   NOW LET'S LOOK AT THE INDICTMENT. I THINK THIS

23   IS REALLY IMPORTANT, BECAUSE ONE OF THE THINGS UNDER 3142 YOU

24   LOOK AT, AS YOUR HONOR KNOWS, IS THE CHARGE. BUT MORE

25   IMPORTANTLY, LET'S THINK ABOUT WHEN THEY FILED THE CHARGE.

1        THE TESTIMONY THEY CLAIM IS FALSE IS A

2   THREE-COUNT INDICTMENT. COUNT ONE IS ON AUGUST 24TH YOU SAY

3   YOU DIDN'T KNOW QUINTERO, AND YOU KNEW HIM. COUNT TWO IS ON

4   AUGUST 24TH YOU SAY YOU DIDN'T KNOW FONSECA, AND YOU KNEW HIM.

5   COUNT THREE IS ON AUGUST 31 AGAIN YOU SAID YOU DIDN'T KNOW

6   QUINTERO, AND YOU KNEW HIM.

7        NO MOVE FOR AN INDICTMENT, JUDGE. THEY HAD THAT

8   GRAND JURY COME IN. IN TWO WEEKS, NO MOVE FOR AN INDICTMENT

9   ON THE AUGUST 24 STUFF, NONE UNTIL JUDGE RAFEEDIE'S ORDER.

10  THAT MOVE -- AND WE'LL TALK ABOUT VINDICTIVE PROSECUTION IN A

11. MINUTE, AND I THINK YOU SHOULD CONSIDER IT FOR THE PURPOSE OF

12  RELEASE.

13        THE COURT: WHAT WAS THE DATE OF THAT GRAND JURY

14  PROCEEDING?

15        MR. MEDVENE: THE FIRST GRAND JURY, AUGUST 24TH,

16  WHERE HE SAYS, "I DON'T KNOW A, I DON'T KNOW B." AND THEY

17  CLAIM THOSE TWO ARE FALSEHOODS.

18        THE GRAND JURY, A WEEK LATER, ALL HE DOES IS SAY,

19  "I DON'T KNOW A AGAIN."

20        I MEAN, THAT'S THE TOTALITY, NOT "YOU DID BAD

21  THINGS WITH A, JUST YOU DON'T KNOW HIM."

22        NOW, THEY FILED THIS INDICTMENT. WE THINK THAT

23  THERE IS AN APPARENT APPEARANCE OF VINDICTIVENESS, WHICH IS

24  IMPORTANT FOR THE DETENTION STATUS. THERE IS AN APPEARANCE OF

25  VINDICTIVENESS UNDER THE CASES, BECAUSE THEY DIDN'T FILE UNTIL

1     AFTER JUDGE RAFEEDIE'S RELEASE ORDER.  AND WHAT THEY'RE ABOUT

2     IS THEY DO IT NOW, AND THEY TRANSPORT HIM BACK TO SAN ANTONIO,

3     AND SAN ANTONIO SAYS, "WE HAVE NO CHARGES.  WE'RE WAITING

4     WORD," AND IN THE INTERIM THEY FILE, "YOU DIDN'T KNOW A, YOU

5     DIDN'T KNOW B."

6               NOW, WHAT DIDN'T THEY FILE?  AND WE THINK THIS IS

7     IMPORTANT TOO.  HE DENIED BEING A NARCOTIC TRAFFICKER.  HE

8     DENIED BEING AT THE SCENE.  HE DENIED ANY PARTICIPATION IN ANY

9     BADNESS.  HE DENIED BEING AN INTERMEDIARY WITH ANY POLITICAL

10    FIGURES, WITH BAD NARCOTIC FIGURES OR ANYTHING ELSE.

11              THEY DIDN'T INDICT HIM ON ANY OF THOSE GROUNDS.

12    IF HE'S A NARCOTIC TRAFFICKER, INDICT HIM FOR BEING A NARCOTIC

13    TRAFFICKER.  IF HE DID SOMETHING TERRIBLE TO AGENT CAMARENA,

14    INDICT HIM FOR THAT.  BUT THEY DIDN'T DO THAT, YOUR HONOR, AND

15    I WOULD THINK THAT YOU CAN CONSIDER THAT.

16              NOW, IF WE LOOK AT THE FACTORS THAT THEY CAN

17    CONSIDER, WE ARE TALKING THE NATURE -- OH, FIRST ON THE

18    INDICTMENT ITSELF.  ONE ON VINDICTIVENESS.  IT'S THE ARGUMENT

19    I JUST MADE, JUDGE; THAT THEY COULD HAVE FILED IT, THAT THEY

20    WAITED UNTIL JUDGE RAFEEDIE'S ORDER.

21              TWO, THE NATURE OF THE CHARGES.  THEY DIDN'T

22    CHARGE THESE OTHER TERRIBLE, BAD THINGS, AND IF THEY HAD HE'S

23    A NARCOTIC TRAFFICKER, WHICH IS THEORETICALLY WHY SAN ANTONIO

24    WANTS HIM, WHY DIDN'T THEY CHARGE HIM?

25              IN ADDITION TO THAT, I THINK ON THE INDICTMENT

1    ASIDE FROM WEAKNESS, THEY HAVEN'T PRESENTED TO YOU, IN CAMERA

2    OR ANYWHERE ELSE, SUBSTANTIATION FOR THE ALLEGED LIES.  HOW

3    ARE THEY GOING TO PROVE HE KNOWS FONSECA?   HOW ARE THEY GOING

4    TO PROVE THAT HE KNOWS THE OTHER GENTLEMAN, QUINTERO?

5               THEY'VE PRESENTED NOTHING TO YOU.  THERE ARE

6    CASES THAT SAY --

7               THE COURT:  THAT'S BECAUSE YOU OPPOSED THE

8    IN-CAMERA FILING.

9               MR. MEDVENE:  THE IN-CAMERA FILING -- JUDGE, THEY

10   DON'T LISTEN TO US WHEN WE OPPOSE IT.  WE OPPOSED IT IN FRONT

11   OF JUDGE RAFEEDIE.

12              THE COURT:  I UNDERSTAND.

13              MR. MEDVENE:  IT'S A NEW WORLD.  THEY GIVE THE

14   COURT WHATEVER THEY WANT, AND THEY DON'T LET US SEE IT.  EVEN

15   OUR OWN GRAND JURY TRANSCRIPT WE CAN'T SEE.

16              THEY DIDN'T GIVE YOU ANYTHING.  ON THE RECORD OR

17   OFF THE RECORD, THEY HAVEN'T GIVEN YOU ANYTHING.  THEY COULD

18   GIVE YOU A SUMMARY.  THEY DIDN'T GIVE THAT TO YOU.

19              IN ADDITION TO THE NOT SUBSTANTIATING THE CHARGE,

20   IN ADDITION TO THE VINDICTIVENESS ARGUMENT, WE HAVE A

21   MATERIALITY ARGUMENT, BECAUSE UNDER THE NINTH CIRCUIT CASES

22   THEY'RE GOING TO HAVE TO SHOW SOME IMPEDING OF THE GRAND JURY

23   PROCESS.

24              WHAT QUESTIONS DIDN'T THEY ASK THAT THEY WOULD

25   HAVE ASKED IF HE SAID, "I KNOW FONSECA"?  WE HAVEN'T SEEN A

1    GRAND JURY TRANSCRIPT.  WE AGREED TO BE A WITNESS.  WE

2    PRESENTED THAT MATERIAL TO THE COURT.

3         WE THINK THEY ASKED EVERY OTHER QUESTION THEY

4    ASKED, SO THEY CAN'T SHOW UNDER THE NINTH CIRCUIT TEST WE

5    DON'T THINK IT IMPEDED THEM -- THAT THEY DIDN'T ASK THINGS

6    THEY COULD HAVE ASKED.

7         SO, WE TALK ABOUT NATURE AND CIRCUMSTANCES, WE

8    TALK ABOUT WEIGHT OF THE EVIDENCE.  THERE IS NO INDICATION AT

9    ALL THAT THE MAN'S -- THE EVENTS CERTAINLY DOESN'T HAVE

10   ANYTHING TO DO WITH DRUGS, NOTHING TO DO WITH VIOLENCE.

11        PRETRIAL SERVICES SAYS AN EXEMPLARY RECORD, AND

12   THE OLD PRETRIAL SERVICES REPORT SAYS, "LOOK, THE FELLOW IS

13   HONEST.  DEA WANTED HIM BEFORE.  HE VOLUNTARILY WENT FROM

14   MEXICO TO SAN ANTONIO.  HE COULD HAVE BEEN CHARGED WITH THE

15   OFFENSE.  HE VOLUNTARILY CAME UP AND SPOKE TO THE HEAD OF THE

16   DEA, THAT THE HEAD OF THE DEA SAID THAT HE BELIEVED HE WAS

17   HONEST, THAT HE ANSWERED EVERY QUESTION."

18        THAT'S TWO PEOPLE THAT ARE INVESTIGATING THE

19   CAMARENA MURDER WHO SAID THE GUY IS BEING HONEST, HE'S NOT A

20   NARCOTIC TRAFFICKER.  THERE IS NO STATEMENT FOR 25 DAYS FROM

21   THE U.S. ATTORNEY'S OFFICE THAT THAT'S FALSE, THAT WE

22   MISREPRESENTED.

23        WE THINK THAT -- YOU'VE BEEN KIND TO US, JUDGE,

24   AND WE KNOW --

25        THE COURT:  I COVERED THAT IN THE SUMMARY, DID I

1    NOT?

2              MR. MEDVENE: YES, SIR.

3              THE COURT: AND I ASSURE YOU THAT I READ THE

4    SUPPLEMENTAL BRIEF INCLUDING MR. BLANCARTE'S DECLARATION.

5              MR. MEDVENE: ALL RIGHT, SIR.

6              WE WOULD SAY IN CLOSING, YOUR HONOR, THAT WE

7    THINK ZUNO-ARCE SHOULD BE RELEASED ON HIS OWN RECOGNIZANCE,

8    YOUR HONOR. HE'S BEEN IN JAIL 30-ODD DAYS. WE THINK, IF YOU

9    DON'T WANT TO DO THAT, A REASONABLE BOND SHOULD BE SET, BUT

10   HE'LL BE BACK. HE SAID HE'LL BE BACK; HE'LL BE BACK. IF YOU

11   WANT A BOND, YOU'LL HAVE A BOND.

12             BUT IN TERMS OF THE INS, YOUR HONOR, WE SAY THAT

13   YOU CAN SET A BOND THAT'S SUFFICIENT TO COVER THE INS HOLD.

14   ALL THE INS HEARING IS ABOUT, JUDGE, IS CAN HE STAY IN THE

15   COUNTRY. HE'S WILLING TO LEAVE THE COUNTRY. HE'S WILLING,

16   BEFORE HE COMES BACK INTO THE COUNTRY, TO HAVE A HEARING

17   WHEREVER INS WANTS HIM TO HAVE A HEARING. SO I MEAN, THE INS

18   IS JUST ABOUT HIM LEAVING, AND HE WANTS TO LEAVE.

19             WE MIGHT MENTION, YOUR HONOR, THE JACKSON CASE

20   845 F.2D 1262, WHERE THE PRETRIAL DETENTION ORDER ISSUED BY

21   THE COURT, BY THE TRIAL COURT, THE NINTH CIRCUIT SAID THAT THE

22   GOVERNMENT FAILED TO MEET THEIR BURDEN, AND EVEN THOUGH IT WAS

23   A CASE WHERE YOU HAD A PRESUMPTION THAT INVOLVED NARCOTICS,

24   UNLIKE OURS WHERE YOU HAVE A PRESUMPTION, IT JUST SAID THAT

25   THE GOVERNMENT DIDN'T PRESENT EVIDENCE OF THE OFFENSE. AND

1   THEY HAVEN'T PRESENTED IT HERE.

2          SO WE SAY CLEARLY, YOUR HONOR, THE GOVERNMENT'S

3   PRESENTED NO REASON WHY THE MAN SHOULDN'T BE LET OUT ON HIS

4   OWN RECOGNIZANCE OR ON BOND, AND WE SAY IN THE INS MATTER THAT

5   YOUR HONOR HAS THE AUTHORITY TO RELEASE HIM, PERMIT HIM TO GO

6   BACK TO MEXICO, MAKE HIM STAY IN THE UNITED STATES IF THAT'S

7   WHAT YOU HAVE TO FEEL, SO HE CAN BE WITH HIS WIFE AND FAMILY

8   FAMILY AND HE CAN PREPARE FOR THE DEFENSE OF THE TRIAL.

9          AND WE'LL AGREE TO LEAVE THE GOVERNMENT OF MEXICO

10   AND HAVE A HEARING BEFORE WE EVER COME BACK AGAIN -- BEFORE HE

11.   EVER COMES BACK AGAIN.

12          THANK YOU, YOUR HONOR.

13          THE COURT:   THANK YOU VERY MUCH.

14          MR. MEDRANO:   YOUR HONOR?

15          THE COURT:   VERY BRIEFLY, PLEASE.

16          MR. MEDRANO:   YES.   THANK YOU, SIR.

17          BRIEFLY, YOUR HONOR, JUST ON THE ISSUE OF FILING

18   OF OPPOSITION BY THE GOVERNMENT, LET ME POINT OUT THAT THERE

19   WAS NO SATISFACTION OF THE 24-HOUR RULE FOR BAIL ISSUES.   I

20   RECEIVED THEIR PAPERS MIDDAY YESTERDAY.   I DIDN'T WANT TO

21   CAUSE A FUSS AND ASK FOR THE 24 HOURS SINCE I KNOW THEY WANTED

22   TO GET IT ON CALENDAR AS SOON AS POSSIBLE.

23          SO IT'S FOR THAT REASON, YOUR HONOR, THAT IT WAS

24   ONLY THAT PARTICULAR AFFIDAVIT WE WERE ABLE TO SUBMIT TO YOU.

25          I WOULD LIKE TO POINT OUT, YOUR HONOR, THAT IF

1    THE COURT HAS ANY CONCERNS ABOUT THIS, BY TOMORROW WE SHOULD

2    BE FILING OUR RESPONSE TO THEIR WRIT OF HABEAS CORPUS BEFORE

3    JUDGE RAFEEDIE WHICH CONTAINS THE VERY DECLARATIONS WHICH ARE

4    MISSING BEFORE THIS HEARING, YOUR HONOR, WHICH MYSELF AND THE

5    SAME CASILLAS DECLARATION REBUT ANY ALLEGATIONS OF IMPROPRIETY

6    BY THE GOVERNMENT.

7              FINALLY, YOUR HONOR, MR. MEDVENE GOES ON AT

8    LENGTH ABOUT PROBLEMS OR FLAWS WITH THE NATURE OF THE

9    INDICTMENT.  I WOULD LIKE TO POINT OUT, YOUR HONOR, THAT THAT

10   IS NOT REALLY A BAIL ISSUE, BUT GOES TO A PRETRIAL RULE 12

11   MOTION.  IF COUNSEL WISHES TO ATTACK THE VALIDITY OF THE

12   INDICTMENT THAT ISSUED BY THE FEDERAL GRAND JURY, THAT'S THE

13   PROPER FORM FOR THAT, YOUR HONOR, NOT TODAY BEFORE YOURSELF

14   AS TO A BAIL ISSUE.

15             OTHER THAN THAT, YOUR HONOR, WE WOULD

16   RESPECTFULLY SUBMIT AT THIS TIME.

17             THE COURT:  THANK YOU VERY MUCH.

18             NATURALLY, WE ARE ALL CONCERNED ABOUT THE --

19   GROSSLY CONCERNED ABOUT BRINGING TO JUSTICE THE RUTHLESS

20   KILLERS OF AGENT CAMARENA AND THOSE RESPONSIBLE FOR

21   INTRODUCING ILLEGAL CONTROLLED SUBSTANCE INTO THIS COUNTRY,

22   AND THERE IS EVERY JUSTIFICATION IN I SUPPOSE DIRECTING OUR

23   UTMOST ENERGIES IN BRINGING TO JUSTICE THOSE RESPONSIBLE FOR

24   THESE MATTERS.

25             THE KEY, HOWEVER, IS THE WORDS "BRINGING PERSONS

1    ·TO JUSTICE," AND I DON'T THINK THIS IS THE TIME TO INJECT ANY

2    HYSTERIA.  THERE IS A CONCERN, AS EXPRESSED IN THE PRETRIAL

3    SERVICES REPORT, REGARDING THE FLIGHT RISK ISSUE.  THE

4    PRETRIAL SERVICES OFFICER INDICATED, AND I QUOTE:

5                    "THERE IS NO INDICATION IN THIS

6                    MATTER THAT THE DEFENDANT DOES POSE OR

7                    EVER HAS POSED A DANGER TO THE

8                    COMMUNITY.  HE HAS VOLUNTARILY

9                    APPEARED AT THE REQUEST OF THE DEA IN

10                   SAN ANTONIO IN THE PAST.  HE DID SO

11                   WITHOUT KNOWING WHETHER HE WOULD BE

12                   FACING CHARGES HIMSELF.  AND HE WAS

13                   APPARENTLY COOPERATIVE."

14                   TO SAY THAT BAIL IS NOT AVAILABLE TO A PERSON WHO

15   IS A CITIZEN OR RESIDENT OF A FOREIGN COUNTRY HAS BEEN DEALT

16   WITH IN VARIOUS APPELLATE DECISIONS.  IT'S A VERY DIFFICULT

17   PROBLEM.  I HAVE LABORED OVER THIS ISSUE FOR QUITE A FEW

18   HOURS, AND MY ORDER IS AS FOLLOWS:

19                   THAT MR. ZUNO-ARCE MAY BE RELEASED ON AN

20   APPEARANCE BOND OF $200,000 WITH CASH DEPOSIT OF TEN PERCENT,

21   WITH AN AFFIDAVIT OF SURETY, JUSTIFICATION AND THE DEEDING OF

22   THE PROPERTY, ONE, IN THE NAME OF DEFENDANT'S COUSIN WHO

23   RESIDES IN BALDWIN PARK AS MORE FULLY EXPRESSED IN THE

24   PRETRIAL SERVICES REPORT, AND THE OTHER, A LONG-TIME FRIEND

25   WHO RESIDES IN SAN ANTONIO, TEXAS.

1            WITH RESPECT TO THE CONDITIONS OF RELEASE,

2   MR. ZUNO-ARCE WILL SIGN A DOCUMENT WAIVING EXTRADITION.  I AM

3   FULLY AWARE OF THE CONCERNS YOU HAVE EXPRESSED, MR. MEDRANO.

4            PRETRIAL SUPERVISION, INTENSIVE SUPERVISION.  AND

5   THOSE WILL BE THE CONDITIONS OF BAIL.

6            MR. MEDRANO:  YOUR HONOR, MAY I BRIEFLY BE HEARD

7   ON ONE SPECIFIC POINT WITH THE COURT'S PERMISSION?

8            THE COURT:  OF COURSE.

9            MR. MEDRANO:  YOUR HONOR, I SAY THE FOLLOWING

10  WITH THE GREATEST DEFERENCE TO THE COURT.  I JUST WANT TO

11  THROW IT OUT FOR THE COURT'S CONSIDERATION.

12           AS EVIDENCED FROM MY PRESENTATION THUS FAR, YOU

13  CAN IMAGINE THE SIGNIFICANCE OF THIS DEFENDANT TO THE

14  GOVERNMENT OF THE UNITED STATES, YOUR HONOR.

15           AND WOULD THE FOLLOWING BE POSSIBLE -- AND I

16  THROW IT OUT BECAUSE I THINK THAT MY BOSSES AND MY IMMEDIATE

17  SUPERIORS WOULD HAVE WANTED ME TO DO SO, YOUR HONOR, AND, IN

18  FACT, I ALSO FEEL THIS IS APPROPRIATE -- AND THAT IS A

19  POSSIBLE STAY OF THIS COURT'S ORDER FOR AT LEAST 72 HOURS,

20  NUMBER ONE, FOR ME TO SPEAK TO THE UNITED STATES ATTORNEY AS

21  TO WHETHER OR NOT WE DESIRE TO PERHAPS RAISE THIS WITH THE

22  NINTH CIRCUIT COURT OF APPEALS.

23           IT IS NOT SOMETHING THAT I -- AND AGAIN, YOUR

24  HONOR, I SAY THAT WITH THE GREATEST RESPECT --

25           THE COURT:  I UNDERSTAND THAT.

1         MR. MEDRANO: IT'S JUST SUCH A FUNDAMENTALLY

2  IMPORTANT MATTER, YOUR HONOR, THAT I WOULD ASK IF IT WOULD BE

3  POSSIBLE TO HAVE THAT MINIMAL STAY AND THAT IF, AFTER -- AND I

4  WILL IMMEDIATELY THIS AFTERNOON MEET WITH MY SUPERIORS. IF IT

5  IS THEIR DETERMINATION, YOUR HONOR, THAT WE WILL NOT GO UP TO

6  THE NINTH CIRCUIT, I WOULD IMMEDIATELY CALL THE COURT'S CLERK,

7  ADVISE YOU OF SUCH, AND THEN THE ORDER AS PREVIOUSLY STATED

8  WOULD IMMEDIATELY KICK IN, YOUR HONOR.

9         I ASK RESPECTFULLY IF THAT WOULD BE A POSSIBILITY

10  IN THIS CASE --

11         THE COURT: I WILL GRANT THE STAY UNTIL NOON

12  TOMORROW.

13         MR. MEDRANO: VERY WELL. THANK YOU, YOUR HONOR.

14  TURN.

15         THE COURT: THANK YOU VERY MUCH.

16         (PROCEEDINGS CONCLUDED.)

17         - - - -

18         C E R T I F I C A T E

19  I CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE AND
ACCURATE TRANSCRIPTION OF MY STENOGRAPHIC NOTES IN THE

20  ABOVE-ENTITLED MATTER.

21

22  _Robbi Joy_    DATED: _9-19-89_

23  ROBBI JOY

24

25



**Exhibit B**

FILED

SEP 15 1989

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,      )      No. CR 89-741-RMT
                               )
              Plaintiff,       )      MEMORANDUM AND
                               )      ORDER RE BAIL
     vs.                       )
                               )
RUBEN ZUNO-ARCE,               )
                               )
              Defendant.       )
_____)

     A hearing for bail review was held on September 12,
1989, with Mitchell, Silberberg and Knupp, by Edward M. Medvene,
Esq., appearing on behalf of defendant Ruben Zuno-Arce, and
Manuel A. Medrano, Esq., Assistant United States Attorney,
appearing on behalf of the United States.

          Facts

          In 1985, Special Agent Enrique Camarena of the DEA was
murdered.  During the investigation, defendant Ruben Zuno-Arce, a
Mexican citizen then residing in Mexico, was asked to come to
San Antonio, Texas, to discuss the Camarena matter with the
agents of the DEA.  According to the Declaration of former DEA
Agent Art Rodriguez, defendant voluntarily left Mexico, arrived

                              -1-

1 | in San Antonio, Texas, and cooperated in the investigation.
2 | Defendant Zuno-Arce did attend several such meetings in Texas.
3 | Agent Rodriguez believed that defendant would voluntarily testify
4 | if called to do so.

5 | On August 9, 1989, while in San Antonio, Texas,
6 | defendant was arrested as a purported material witness in a trial
7 | of certain individuals charged with the Camarena murder.  That
8 | case was assigned to the Honorable Edward Rafeedie of this
9 | Central District.  Mr. Zuno-Arce then testified before the Grand
10 | Jury.  Assistant United States Attorney Jimmy Gurule acknowledged
11 | at the completion of Zuno-Arce's testimony that the proceeding
12 | "went well" and Zuno-Arce appeared to be "truthful."

13 | On September 5, 1989, following an in camera review of
14 | Zuno-Arce's Grand Jury testimony, Judge Rafeedie found defendant
15 | not to be a material witness and ordered his immediate release.
16 | The only link between Zuno-Arce and the Camarena murder was that
17 | the incident occurred at a residence which was previously owned
18 | by Zuno-Arce but sold on two subsequent occasions.  In other
19 | words, when the murder occurred, the subject property had twice
20 | changed ownership from the time Zuno-Arce was the owner.

21 | Though Zuno-Arce was ordered released as a material
22 | witness, he was delivered to the custody of the Immigration and
23 | Naturalization Service ("INS") pursuant to a detention order
24 | served on Zuno-Arce in Texas on August 10, 1989.  The detention
25 | was purportedly placed to exclude Zuno-Arce because of his
26 | involvement with narcotics.

27 | On September 7, 1989, a Grand Jury Indictment was
28 | returned against Zuno-Arce for three counts of perjury alleged to

-2-

1   have occurred during his Grand Jury testimony.  An examination of
2   the Indictment discloses that Zuno-Arce lied with respect to his
3   acquaintance with certain individuals.  This court has been
4   assigned to preside over this perjury indictment.

5       Agents Rodriguez and Kuykendall, former head of the
6   Guadalajara Office of the DEA, do not view Zuno-Arce as being
7   involved in narcotics trafficking and/or in the Camarena murder.

8       The defendant is 59 years old and is represented to be a
9   well known and respected business man and former high-ranking
10  government official from Mexico.

11      No evidence was presented to substantiate the
12  government's claim that Zuno-Arce was other than a law abiding
13  citizen of Mexico.  Zuno-Arce has no prior criminal history.

14      Defendant has submitted numerous declarations attesting
15  to his honesty and integrity.  Two U.S. citizens, a friend and a
16  relative, have come forth to pledge their real properties to
17  secure Zuno-Arce's future court appearances.

18      Discussion

19      This court finds no indiction that Zuno-Arce poses a
20  danger to the community.  The only issue remaining is whether he
21  is viewed as a substantial flight risk, i.e., whether there are
22  conditions or combination of conditions which will reasonably
23  assure defendant's appearance in this charge of perjury.

24      To directly address this issue, it is necessary to look
25  beyond the present charges of perjury to examine the subject
26  matter involved in the questions posed to Zuno-Arce before the
27  Grand Jury.  The subject matter, narcotics involvement and
28  knowledge of the Camarena murder, will bear upon our concern of

-3-

1   the likelihood of defendant's future presence in court.  Despite

2   the views of former DEA Agents Rodriguez and Kuykendall of

3   defendant's noninvolvement, the government, without presenting

4   any evidence to the contrary, seeks his detention.  Zuno-Arce has

5   not been indicted for narcotic trafficking or for his complicity

6   in the Camarena murder.  Although he was arrested on a material

7   witness warrant, Judge Rafeedie was not convinced and therefore

8   ordered his release.

9        The only factor which may militate against his release

10   is Zuno-Arce's citizenship in Mexico.  Mere alienage could not

11   support a detention without bail.  Accordingly,

12        IT IS ORDERED that defendant is released on an

13   Appearance Bond in the sum of $200,000, with a 10% deposit, fully

14   justified and secured by two real properties equal to the sum of

15   the bond.  As a condition of release, Zuno-Arce is ordered to

16   sign a document waiving extradition.

17        IT IS FURTHER ORDERED that intensive pretrial

18   supervision shall be imposed as an additional condition.

19        Dated: _September 15, 1989_

20

21

                        ROBERT M. TAKASUGI

22                       United States District Judge

23

24

25

26

27

28

-4-

**Exhibit C**

ATTACHMENT A

# UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

*Release* No. D 0581

WHEN BAIL IS FIXED, VERIFY HERE:

BAIL FIXED BY COURT FOR DEFENDANT

Ruben Zuno-Arce

IN CASE NO. 89-741

IN THE AMOUNT OF $ 200,000.00

CLERK, U.S. DISTRICT COURT

By: _____ Deputy Clerk

Violation of Title 18 Section 1623

UNITED STATES OF AMERICA, **Plaintiff**

vs.

RUBEN ZUNO-ARCE **Defendant**

| CASE NUMBER | |
|---|---|
| COMPLAINT | INDICTMENT/INFORMATION |
| | CR 89-741-RMT |

**TYPE OF BOND**

☐ PERSONAL RECOGNIZANCE (Signature only — no dollar amount)
☐ UNSECURED APPEARANCE BOND IN AMOUNT OF $ _____
XX APPEARANCE BOND IN AMOUNT OF $ 200,000.00
XX WITH CASH DEPOSIT (amount or %) _____ 20,000
☒ WITH AFFIDAVIT OF SURETY (NO JUSTIFICATION) [Form CR4]
☒ WITH JUSTIFICATION AFFIDAVIT OF SURETY [Form CR-3]
** ☒ AND WITH DEEDING OF PROPERTY     or ☐
☐ COLLATERAL BOND IN AMOUNT OF $ _____
(Cash or Negotiable Securities)
☐ CORPORATE SURETY BOND IN AMOUNT OF $ _____
(Corporate Surety Bond requires separate form)

**PRE-CONDITIONS TO RELEASE** Marcela Orozco, Antonio & Marina

*Deeding of property by Juan &
Zuno, Salvador J. Soto and Lucila Soto & Lopez property - no lot
☐ You are to surrender to the Clerk of Court all passports issued to you and not apply for the issuance of a passport during the pendency of
this case.
☐ Bail is subject to Nebbia Hearing.

box
require
on this
propert
in Wil-
mington.

### ADDITIONAL CONDITIONS OF RELEASE

☐ Travel restricted to _____
☐ You are to reside with _____
☒ Pretrial Services supervision.                    [ X ] Intensive
☐ You are not to use illegal drugs and are to cooperate with Pretrial Services in a drug treatment and testing program.
☐ You are to participate in a residential drug/alcohol treatment program as approved by Pretrial Services.
☐ Other conditions: U.S. Atty office should have the opportunity to review the Lopez
property prior to the posting of the Lopez property for security.

### GENERAL CONDITIONS OF RELEASE

I will appear in person in accordance with any and all directions and orders relating to my appearance in the above-entitled matter as may be given or issued by the Court or any judicial officer thereof, in that Court or before any Magistrate thereof, or in any other United States District Court to which I may be removed or to which the case may be transferred.

Next ordered appearance is at *U.S. District Court (Central Distr)* Nov. 7, 19__ __ a.m.
[Place]                                    9:00 (date)                [Date/Time]     p.m.

I will abide by any judgment entered in this matter by surrendering myself to serve any sentence imposed and will obey any order or direction in connection with such judgment as the Court may prescribe.

I will not leave the State of California except upon order of this Court, and I will immediately inform the Court, the United States Attorney and my counsel in writing of any change in my residence address or telephone number so that I may be reached at all times.

I will not commit a Federal, State, or local crime during the period of release.

I will not intimidate any witness, juror or officer of the court or obstruct the criminal investigation in this case in violation of Title 18 USC Section 1503 and 1510. Additionally, I will not tamper with, harass or retaliate against any alleged witness, victim or informant in this case in violation of Title 18 USC Section 1512 and 1513. [See other side for penalties]

I further understand that violation of any of the general and/or additional conditions of release as given on the face of this bond may result in a revocation of release, an order of detention and a prosecution for contempt as provided in Title 18 USC 401 which could result in a possible term of imprisonment and/or a fine. [See other side for penalties and sanctions]

If I fail to obey and perform any of these conditions, the bond may be forfeited to the United States of America. If said forfeiture is not set aside, summary judgment may be entered in this Court against myself and each surety, jointly and severally, for the bond amount, together with interest and costs, and execution may be issued or payment secured as provided by the Federal Rules of Criminal Procedure and other laws of the United States, and any cash security or deposit previously posted in connection with this bond may be forfeited.

### ACKNOWLEDGEMENT OF DEFENDANT

AS A CONDITION OF MY RELEASE ON THIS BOND, PURSUANT TO TITLE 18 OF THE UNITED STATES CODE, I HAVE READ OR HAVE HAD INTERPRETED TO ME AND UNDERSTAND *THE GENERAL CONDITIONS OF RELEASE* AND THE *ADDITIONAL CONDITIONS OF RELEASE* AS CHECKED ABOVE AND THE *ADVICE TO DEFENDANT* AS PRINTED ON THE BACK OF THIS FORM AND AGREE TO COMPLY WITH ALL CONDITIONS OF RELEASE IMPOSED ON ME & TO BE BOUND BY THE PROVISIONS OF LOCAL CRIMINAL RULES 5.2, 5.4 & 5.5 INCORPORATING LOCAL CIVIL RULE 24.6.

FURTHERMORE, IT IS AGREED & UNDERSTOOD THAT THIS IS A CONTINUING BOND INCLUDING ANY PROCEEDING ON APPEAL OR REVIEW] WHICH SHALL CONTINUE IN FULL FORCE & EFFECT UNTIL SUCH TIME AS DULY EXONERATED.

DATE: Oct. 11, 89   X _____    (33_) x 6
Defendant's Signature                    Telephone Number

X _____
Address (please print)                    City, State and Zip Code

DATE: _X 6/7/11/89_   X _____   (___) X _____
                        Defendant's Signature                    Telephone Number

X _Rancho La Jolla_, _____, _____ X _____
                        Address [please print]                  City, State and Zip Code

☐ Check if interpreter is used: I have interpreted into the _____ language the above conditions of
release & the advice to defendant [see other side] & have been told by the defendant that he or she understands the conditions of release
& advice.

                                        DATE: _____   _____
                                                              Interpreter's signature

APPROVED: _____                          DATE: _____
            United States Magistrate

IF CASH DEPOSITED: RECEIPT # _121432_              FOR: $ _20,700 00_
            [This bond may require surety agreements and affidavits pursuant to Local Criminal Rules 5.2 or 5.3]

                CENTRAL DISTRICT OF CALIFORNIA RELEASE ORDER AND BOND FORM

CR:1 (3/85)

ORIGINAL — YELLOW COPY            WHITE — DEFENDANT COPY            PINK — PRETRIAL SERVICES

**Exhibit D**

*Santa Barbara News-Press, Wednesday, September 27, 1989*

# U.S. blocks the release of key figure in drug case

**By Linda Deutsch**
Associated Press

LOS ANGELES — The government Tuesday in keeping the brother-in-law of former Mexican President Luis Echeverria in prison despite orders from a federal judge and an appeals court for his release on $200,000 bail.

Meanwhile, the byzantine path of Ruben Zuno Arce's case became more complicated as a prosecutor disclosed in court that the multimillionaire businessman was involved in the murder of two Mexican police officers in 1978.

It was intervention by the Immigration and Naturalization Service that ultimately kept Zuno imprisoned, however. After the U.S. 9th Circuit Court of Appeals on Tuesday upheld a U.S. District Judge Robert Takasugi's release order, Assistant U.S. Attorney Adam Schiff said the INS had placed a hold order on Zuno.

Schiff said INS officials in San Antonio, Texas, want Zuno for a hearing on whether he should be excluded from the United States as a drug trafficker. He said they were willing to proceed with that hearing in Los Angeles but would not allow Zuno's release.

Takasugi said he had no jurisdiction to act in the INS matter.

> *'It wouldn't make sense for the INS to throw out (of the country) someone who will be prosecuted criminally here.'*
>
> **ADAM SCHIFF,**
> **ASSISTANT U.S. ATTORNEY**

Zuno is charged with perjury before a grand jury and has been in federal prison for 49 days.

When he was first arrested Aug. 9, authorities claimed he was a material witness in the torture-murder of U.S. drug agent Enrique Camarena, and he was held for a month without criminal charges.

Zuno's attorneys, who at one point offered to post $20,000 of their own money to secure his release, called his continued incarceration outrageous.

Defense attorney Edward Medvene suggested the government was using the INS proceeding as a subterfuge to hold Zuno in the United States.

But outside court, Schiff said, "It wouldn't make sense for the INS to throw out (of the country) someone who will be prosecuted criminally here."

The defense's final move was the filing of a writ of habeas corpus seeking Zuno's release in spite of the INS action. Takasugi took that under submission.

Meanwhile, Schiff claimed that Zuno was involved in the 1978 slaying of two Mexican police officers. He cited the incident as an indication of Zuno's deep ties to the Mexican government and proof that he was allowed to go home.

He noted that the Mexican government has never extradited one of its citizens.

However, Zuno's lawyers told Takasugi that their client did not shoot anyone and was never charged. Medvene said the incident occurred after Zuno's father, then the governor of Jalisco state, was kidnapped.

"Some people tried to kill him and his bodyguards became involved," Medvene said of Zuno's connection to the murders.

He suggested that the bodyguards, killed the police officers while defending Zuno. But Schiff said the bodyguards have since been slain and cannot be questioned about the case.

---

## Workers

Continued from Page A-1

bills "put a widely crumbling, nationally disrespected system back on its feet."

Among the other key features of the plan Deukmejian signed are:

- An increase in payments to the family of a worker killed on the job to $25,000 from $20,000 and an 8 percent increase in the money paid to workers who are partially disabled because of an injury.
- More judges to hear workers' compensation claims and increased use of arbitration to speed the processing of claims. Insurers would pay a 10 percent penalty for late payment of claims.
- Incentives for injured workers undergoing rehabilitation to return to work sooner.
- Limits on costly "stress" claims by creating a higher standard of proof that the stress actually resulted from the worker's job.
- Reductions on "doctor shopping" by cutting down the number of medical evaluations of a worker's injury and creation of a panel of state medical evaluators.

Changes in the workers compensation system have been a long time coming.

Employers have groused for years that the contributions they make to pay for the system are some of the highest in the nation and workers complain the benefits they receive are among the lowest.

The package that Deukmejian signed Tuesday is a scaled-back version of the plan he first presented in April that would have doubled benefits over three years and made drastic changes in the workers compensation bureaucracy. That plan had the blessing of _____ labor _____ and

---

Soviets

several long-standing Soviet proposals for more ambitious arms control agreements than ".

duce poison gas had signed a total-ban treaty — a process he predicts

---

**Absolute**
**FREE**
**IT WILL**

by P.

Author of 23 Health Boo
Woman & American Healt
der of Health Movement &

Highly respected Health C
Stars, World Champion Ath
healthier, happier lives!

"My life was saved at a..."
Lecture    Jack LaLanne

**SEPT. 28 - T**

**BETHANY CONGRE**
**556 North**
**Santa Barba**
For Information

**Quali**
**tailor**
**kitch**

Our quality cabinet
properly tailored for
kitchen then install
precise craftsmen.
attractive results are
to the excellence of
cabinets and the sp
care we take in plea
you. Just ask our m
customers.

**The**
**Cabinet**
**Design**
**Center**

**EXHIBIT A**

**Exhibit E**

WEDNESDAY, DECEMBER 13, 1989   A3

# Drug Lord Convicted in Camarena's 1985 Murder

**■ Narcotics:** He draws a prison term of 40 years. A Mexican judge sentences his "enforcer" and 23 others in the U.S. drug agent's killing.

**By HECTOR TOBAR**
TIMES STAFF WRITER

Mexican drug lord Rafael Caro-Quintero and more than 20 members of his drug ring were convicted and sentenced by a Mexican judge to up to 40 years in prison for the 1985 killing of U.S. drug agent Enrique Camarena, authorities announced Tuesday.

Caro-Quintero, 37, and Ernesto Rafael Fonseca-Carrillo, 58, the "enforcer" for Quintero's organization, were found guilty and sentenced to 40 years each for directing the killings of Camarena and his Mexican pilot, Alfredo Zavala Avelar.

The two apparently were killed in retaliation for their raids on Caro-Quintero's marijuana plantations.

According to Mexican Atty. Gen. Enrique Alvarez, the sentences were handed down shortly after noon by Judge Tomas Hernandez Franco of the 4th Criminal Court in Guadalajara. The men were tried earlier this year, but in Mexico convictions are announced only when-sentencing is complete.



Associated Press
Rafael Caro-Quintero

The sentences convictions of kidnaping weapons and weapons smuggling brought Caro-Quintero's total sentences to 40 years and Fonseca-Carrillo's to 194. The sentences are to be served concurrently, Alvarez told a news conference in Mexico City.

Caro-Quintero and Fonseca-Carrillo will be required to serve only 40 years of the sentences under a clause in Mexico's Constitution that prohibits longer terms for a single conviction.

However, before Caro-Quintero begins to serve the sentence handed down Tuesday, he must first complete a 34-year term imposed on an earlier conviction.

Fonseca-Carrillo must also serve a 13-year sentence on an earlier conviction before he begins his 40-year term for the Camarena slaying, Alvarez said.

Twenty-three other Mexican nationals were convicted and sentenced along with Caro-Quintero and Fonseca-Carrillo on lesser offenses related to the Camarena killing. Their terms ranged from the maximum 40 years to 1 year, 4 months and 15 days.

Since the convictions are drug-related, Alvarez ruled out the possibility that Caro-Quintero and Fonseca-Carrillo may be released before their combined terms of 74 years and 53 years, respectively, are up.

Ruben Zuno Arce, a Mexican arrested as he arrived in Los Angeles on Saturday on charges that he was involved in the Camarena killing, was not one of the 23 others sentenced in Guadalajara Tuesday.

"We have absolutely nothing against Zuno Arce," Alvarez told reporters.

The government will also confiscate property—including real estate, vehicles, and weapons—belonging to Caro-Quintero and Fonseca-Carrillo, and the two convicted drug dealers must pay unspecified fines, Alvarez said.

The Mexican government has refused requests to extradite Caro-Quintero to the United States. It remained unclear Tuesday what effect his conviction in Mexico would have on efforts to prosecute him in this country.

Camarena and Zavala were kidnaped Feb. 7, 1985, in Guadalajara. Their bullet-

**Please see CAMARENA, A32**

Exhibit C

# CAMARENA: 25 Mexicans Convicted in Killing

Continued from A3

riddled bodies, showing signs of torture, were found March 5 wrapped in plastic bags in a shallow grave on a ranch about 60 miles from Guadalajara.

* Caro-Quintero has been identified by U.S. authorities as the head of one of Mexico's largest drug operations, reportedly directing a narcotics empire that at one time employed more than 5,000 workers.

Just before they were murdered, Camarena and his pilot had been

following some of Caro-Quintero's most lucrative marijuana plantations. One raid at a plantation north of Chihuahua resulted in the seizure of more than 350 million worth of marijuana.

Mexican authorities said Caro-Quintero had repeatedly sworn revenge against Camarena for the raid.

In Los Angeles, 16 men have been indicted in federal court in connection with the Camarena murder. Two other Mexican nationals, Rene Verdugo Urquides,

one of Caro-Quintero's top lieutenants, and Raul Alvarez-Lopez, a Mexican state police officer, were each sentenced in Los Angeles federal court in October, 1988, to life plus 240 years in prison for their roles in the murder.

The same court sentenced Jesus Felix Gutierres, former owner of a Los Angeles-area seafood company, to 10 years for his conviction in the killing.

Times Mexico City bureau assistant Christine MacDonald contributed to this story.

**Exhibit F**

EDWARD M. MEDVENE
JAMES E. BLANCARTE
RONALD A. DI NICOLA
KEVIN E. GAUT
MITCHELL, SILBERBERG & KNUPP
11377 West Olympic Boulevard
Los Angeles, California 90064
(213) 312-2000

Attorneys for Ruben Zuno-Arce

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

  vs.

RAFAEL CARO-QUINTERO,
et al.

    Defendants.

CASE NO. 87-422(C) - ER

DECLARATION OF ART RODRIGUEZ IN
SUPPORT OF RUBEN ZUNO-ARCE'S
REPLY TO DESIGNATION OF
MATERIAL WITNESS; DEMAND FOR
EVIDENTIARY HEARING

Date: August 18, 1989
Time: 4:00 p.m.
Place: Courtroom 1

FILED

AUG 1 - 1989

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

077

# DECLARATION OF ART RODRIGUEZ

I, Art Rodriguez, hereby declare as follows:

1. For a period of 13 years, from approximately 1974 until 1986, I was an agent in the United States Drug Enforcement Agency ("DEA"). From 1974 to 1983, I was stationed as a DEA Agent in San Antonio, Texas. From 1983 to 1986, I was stationed as a DEA Agent in Eagle Pass, Texas.

2. I was a close personal friend of Kiki Camerana. I met Kiki in 1974 at the DEA Academy when we were both receiving training to become DEA Agents. I maintained a close personal relationship with Kiki throughout our careers with the DEA.

3. In early 1985, I was notified that Kiki Camerana was missing. I immediately volunteered to go to Guadalajera to assist in the investigation of his disappearance. For approximately three months, from February through April of 1985, I was temporarily assigned by the DEA to the Guadalajera office. During that time, I participated in the DEA investigation of Kiki Camerana's murder.

4. In the course of my participation in the DEA investigation of the Camerana murder, I had personal knowledge

1

078

1    of the persons suspected to have been in any way involved with
2    Caro-Quintero or in the Camerana murder. I have never, at any
3    time, heard or believed that Mr. Zuno-Arce was even suspected of
4    being in any way involved with Caro-Quintero or in the Camerana
5    murder.

6

7         5.   As a DEA Agent stationed in Texas, I was familiar
8    with the names of many suspected narcotics traffickers in
9    Mexico. I have never, at any time, heard or believed that
10   Mr. Zuno-Arce was even suspected by anyone with DEA or with any
11   other law enforcement agency of being in any way involved in
12   illegal narcotics trafficking.

13

14        6.   I know Mr. Zuno-Arce personally. I met him
15   socially in the late 1970's while he was living in San Antonio.

16

17        7.   At the time of the Kiki Camerana murder
18   investigation, Mr. Jaime Kirkendahl was the DEA Agent in charge
19   of the DEA's Guadalejara office. In 1987, Mr. Kirkendahl was
20   the Special Agent in charge of the DEA office in Laredo, Texas.

21

22        8.   In 1987, Mr. Kirkendahl requested that I contact
23   Mr. Zuno-Arce in Mexico and ask him to come to the United States
24   to meet with Mr. Kirkendahl. Mr. Kirkendahl wished to ask
25   Mr. Zuno-Arce some questions about the Lope de Vega residence.
26   In 1987, I did telephone Mr. Zuno-Arce as Mr. Kirkendahl had

27

28                              2

1   requested. In response to my call, Mr. Zuno-Arce voluntarily
2   came to San Antonio from Mexico in 1987 to meet with
3   Mr. Kirkendahl.

4

5       9. I was present at one meeting, which resulted from
6   my telephone call, between Mr. Kirkendahl and Mr. Zuno-Arce.
7   The meeting occurred in San Antonio in 1987. Mr. Kirkendahl and
8   Mr. Zuno-Arce may have had additional meetings at which I was
9   not present. During the meeting I attended, Mr. Kirkendahl
10  questioned Mr. Zuno-Arce about the Lope de Vega residence.
11  Mr. Zuno-Arce voluntarily answered all the questions asked of
12  him.

13

14      10. Mr. Kirkendahl later told me that he had checked
15  the facts provided to him by Mr. Zuno-Arce and that he was
16  satisfied that Mr. Zuno-Arce had been giving truthful answers.

17

18      11. Based on the fact that, in 1987, Mr. Zuno-Arce
19  voluntarily came from Mexico to meet with Mr. Kirkendahl in San
20  Antonio, I believe that Mr. Zuno-Arce is a man of his word and
21  would voluntarily testify at trial if requested to do so.

22

23      I declare under penalty of perjury that the foregoing
24  is true and correct.

25

26      Executed this _18_ day of August, 1989 at Los Angeles,
27  California.

28

        Art Rodriquez

# VERIFICATION

**STATE OF CALIFORNIA, COUNTY OF**

I have read the foregoing _____
_____ and know its contents.

☒ **CHECK APPLICABLE PARAGRAPH**

☐ I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐ I am ☐ an Officer ☐ a partner_____☐ a_____ of_____,

a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason. ☐ I am informed and believe and on that ground allege that the matters stated in the foregoing document are true. ☐ The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐ I am one of the attorneys for _____.

a party to this action. Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

Executed on_____, 19____, at_____, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____              _____
Type or Print Name                         Signature

## PROOF OF SERVICE
1013A (3) CCP Revised 5/1/88

**STATE OF CALIFORNIA, COUNTY OF   LOS ANGELES**

I am employed in the county of_____ **LOS ANGELES** _____, State of California.

I am over the age of 18 and not a party to the within action; my business address is:___ **11377 W. Olympic Blvd.**

On   **8/18**  , 19 **89** , I served the foregoing document described as **DECLARATION OF ART RODRIGUEZ IN SUPPORT OF RUBEN ZUNO-ARCE'S REPLY TO DESIGNATION OF MATERIAL WITNESS; DEMAND FOR EVIDENTIARY HEARING** _____ on **the interested parties** _____ in this action

☒ by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list:
by placing ☐ the original ☒ a true copy thereof enclosed in sealed envelopes addressed as follows: ·

> **Jimmy Gurule, Assistant U.S. Attorney**
> **Major Narcotics Division**
> **312 N. Spring Street, 14th Floor**
> **Los Angeles, CA 90012**

☐ **BY MAIL**

☐ *I deposited such envelope in the mail at _____, California. The envelope was mailed with postage thereon fully prepaid.

☐ As follows : I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at _____ California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on_____, 19____, at_____, California.

☒ **(BY PERSONAL SERVICE)** I delivered such envelope by hand to the offices of the addressee.

Executed on____ **August 18** ____, 19 **89** , at ____ **Los Angeles** ____, California.

☐ (State)   I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☒ (Federal)   I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

**Donna McGee**
_____              _____
Type or Print Name                         Signature

STUART S EXBROOK TIMESAVER (REVISED 5/1/88)
NEW DISCOVERY LAW 2030 AND 2031 C.C.P.
May be used in California State or Federal Courts

*BY MAIL SIGNATURE MUST BE OF PERSON DEPOSITING ENVELOPE IN MAIL SLOT BOX OR BAG)
**(FOR PERSONAL SERVICE SIGNATURE MUST BE THAT OF MESSENGER)

81

**Exhibit G**

EDWARD M. MEDVENE
JAMES BLANCARTE
RONALD A. DiNICOLA
KEVIN E. GAUT
MITCHELL, SILBERBERG & KNUPP
11377 West Olympic Boulevard
Los Angeles, California 90064
(213) 312-2000

Attorneys for Ruben Zuno-Arce

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | CASE NO. CR 87-422(C) - ER |
|---|---|---|
| Plaintiff, | ) | DECLARATIONS AND EXHIBITS IN SUPPORT OF MOTION IN OPPOSITION TO DESIGNATION OF MATERIAL WITNESS |
| vs. | ) | |
| RAFAEL CARO-QUINTERO, et al., | ) | Date:   August 21, 1989 |
| Defendants. | ) | Time:   1:30 p.m. |
| | ) | Place:  Courtroom 1 |

**TABLE OF**
**DECLARATIONS AND EXHIBITS**

1.  Declaration of Jeremiah Handy, Sworn August 15, 1989

2.  Declaration of Able Villarreal, Sworn August 15, 1989

3.  Declaration of Mrs. Maria Enriqueta Guitron Velasco, Sworn August 16, 1989

4.  Declaration of Lic. Arturo Velazquez Lopez, Sworn August 16, 1989

5.  Declaration of Salvador Soto-Luna, Sworn August 16, 1989

6.  Declaration of Jaime Flore, Sworn August 16, 1989

7.  Declaration and Report on Police Record of the State of Jalisco State Attorney Generals Office for Mexico, Sworn August 15, 1989

8.  Letter From Chief of Police, C. Paulino Canales Castellon, Chief of Police for Municipality of Moscato, Jalisco, Mexico

9.  Letter From the Mayor of the Municipality of Moscato, Jalisco, Mexico, C.P.T. Hugo O. Montes Guzman

10. Declaration and Deed of Transfer of Property

11. Express News, San Antonio, Texas, August 15, 1989

i.

**EXHIBIT 1**

ZDCJBR801

## DECLARATION OF JEREMIAH HANDY

I, Jeremiah Handy, the undersigned, hereby declare as follows:

1.    I am an attorney at law, duly licensed to practice in the State of Texas, being admitted to do so in 1965. I know all of the following facts of my own personal knowledge, and if called and sworn as a witness, could and would competently testify thereto.

2.    In 1966, I was appointed an Assistant United States District Attorney for the Western District of Texas.  I later became the Chief of the Criminal Section of the United States Attorney's Office for the Western District, Texas.  I held that position for approximately 10 years before becoming Chief of the Civil Section, for the Western District.  I held the latter position from 1979 to 1982.  I was later acting United States Attorney for Nevada.  Since 1982, I have been in private practice in San Antonio, Texas.  I have resided in San Antonio since 1966.

3.    I was introduced to Mr. Ruben Zuno-Arce through my friend, Abel Villereal, in approximately 1979.  From approximately 1979 to 1983, Mr. Zuno-Arce resided in San Antonio.  I met with him on a social basis while he resided in San Antonio and continued to do so after he stopped living in

ZDCJBR801

1

2  San Antonio.  Over the past 10 years I have met with him
3  socially on more than 20 occasions.

4

5          4.    To the best of my knowledge, Mr. Zuno-Arce has
6  always traveled from Mexico to San Antonio by commercial
7  airliner.  To my knowledge, Mr. Zuno-Arce has always used that
8  name and has never tried to hide his true identity.

9

10         5.    To the best of my knowledge, when visiting
11 San Antonio, Mr. Zuno-Arce almost always stays at the residence
12 of Jesse Gonzalez, a Deputy County Clerk for County of Bexar,
13 Texas.  Mr. Gonzalez is well known in the San Antonio
14 community.  I know Mr. Gonzalez' reputation in San Antonio.  He
15 has a reputation for honesty and integrity.  In his position as
16 Deputy Clerk, Mr. Gonzalez is bonded and is responsible for the
17 financial affairs and financial well being of the County court
18 system.

19

20         6.    To the best of my knowledge Mr. Zuno-Arce has
21 never been involved in narcotics trafficking and I have heard
22 nothing to indicate otherwise.

23

24         7.    I acted as attorney for Mr. Zuno-Arce during the
25 removal hearing in San Antonio, Texas, held on Friday,
26 August 11, 1989.  While waiting for that hearing to commence, I
27 overheard Chief Inspector Garry Rennik of the Immigration and
28 Naturalization ("INA") tell a Drug Enforcement Adminstration

ZDCJBR801

("DEA") agent that Mr. Zuno-Arce had visited the United States on at least 5 separate occasions in 1989 alone.  The DEA agent with whom Chief Inspector Rennick spoke had earlier been introduced to me, but I can no longer recall his name.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 15th day of August, 1989, at Los Angeles, California.

JEREMIAH HANDY

**EXHIBIT 2**

1

2 ## DECLARATION OF ABEL VILLARREAL

3

4 I, ABEL VILLARREAL, hereby declare as follows:

5

6 1.  I am, and for more than 30 years have been, a
7 resident of San Antonio, Texas.  For the past 30 years, I have
8 been self-employed as a general contractor in San Antonio.  I
9 know all the following matters of my own personal knowledge and,
10 if called and sworn as a witness, could and would competently
11 testify thereto.

12 2.  I have known Mr. Ruben Zuno-Arce for approximately
13 10 years.  I first met Mr. Zuno-Arce in San Antonio in 1978 or
14 1979.  From about 1978 to 1983, Mr. Zuno-Arce owned and resided
15 in a San Antonio condominium.  During that period, I regularly
16 saw Mr. Zuno-Arce on a social basis and I frequently met him for
17 dinner or lunch.  On occasion, I was also entertained by
18 Mr. Zuno-Arce at his San Antonio condominium.  To the best of my
19 knowledge, while living in San Antonio, Mr. Zuno-Arce was working
20 with Morris Jaffey, a prominent San Antonio businessman.

21

22 3.  Mr. Zuno-Arce sold his San Antonio condominium in
23 about 1983.  Since Mr. Zuno sold his San Antonio condominium, I
24 estimate that Mr. Zuno-Arce has visited San Antonio on more than
25 10 occasions.  On most of the occasions that Mr. Zuno-Arce has
26 visited San Antonio, I have met with him for lunch, dinner or
27 some other social occasion.  Most of Mr. Zuno-Arce's visits have
28 lasted at least a few days.  I also visited Mr. Zuno-Arce at his

residence in Mascota, Jalisco shortly after he sold his San Antonio residence.

4. To the best of my knowledge, Mr. Zuno-Arce has always travelled from Mexico to San Antonio by commercial airliner. To the best of my knowledge, he has always travelled under and used only his own name and has never tried to hide his identity.

5. To the best of my knowledge, since selling his condominium and while visiting San Antonio, Mr. Zuno-Arce has almost always stayed with Jesus Gonzalez. Jesus Gonzalez is the Deputy County Clerk of Bexar County, Texas. I know Mr. Gonzalez personally. To my knowledge, he has lived in San Antonio for more than thirty years. I am familiar with his reputation in San Antonio. He has a reputation as a very honest man.

6. To my knowledge, Mr. Zuno-Arce has never engaged, anywhere or at anytime, in any kind of illegal drug activity. I have never heard anyone even suggest that Mr. Zuno has engaged in any kind of illegal drug activity.

I declare under the penalty of perjury that the foregoing is true and correct. Executed this ꞌ ꞇꞁ day of August, 1989 at Los Angeles, California.

ABEL VILLARREAL

**EXHIBIT 3**

## DECLARATION OF MARIA ENRIQUETA GUITRON VELASCO

I, Maria Enriqueta Guitron Velasco, hereby declare as follows:

1. I am, and for approximately 11 years have been, married, to Ruben Zuno-Arce. I know all the following facts of my own personal knowledge and, if called and sworn as a witness, could and would competently testify thereto.

2. My husband is 59 years old. We have two children, a 6-year old boy and a 3-year old girl.

3. During the early part of our marriage my husband and I resided in Mexico and then from approximately 1978 until 1982 we resided in San Antonio, Texas.

4. After leaving San Antonio, my husband and I went to live with my mother in Mascota, Jalisco, Mexico. We lived with my mother while we were waiting for our house to be built. After living with my mother for approximately two years, we moved into a new house on ranch property at the outskirts of Mascota.

5. My husband is a legitimate, respected and successful businessman involved in the lumber, agricultural and automobile service station industries in the city of Mascota and in the state of Jalisco, Mexico. He grows mangos, guavas, corn,

1

1  cactus, and vegetables on our ranch. He also purchases wood from
2  forests in Jalisco and manufactures wooden boxes used to crate
3  vegetables. The crate manufacturing operation is located on our
4  ranch. My husband uses the wooden boxes to crate the vegetables
5  he grows, and he also sells boxes to other local businesses. In
6  addition my husband owns and manages an autobile service station
7  in Mascota, Jalisco, Mexico.

9      6.  Since our return to Mascota from our prior
10  residence in San Antonio, Texas, my husband and I have travelled
11  to the United States an average of at least one or two times a
12  year. When we travel to the United States, we always bring my
13  children and my mother. When travelling to the United States, we
14  go to San Antonio, where we have numerous friends and
15  acquaintences.

17      7.  Occasionally, my husband makes trips by himself to
18  the United States. This year, he has made several trips to
19  San Antonio by himself.

21      8.  On August 11, my husband, my children and I were
22  making one of our regular visits to San Antonio, Texas. My
23  husband was seized by federal agents and is still being detained.
24  He was then brought to Los Angeles. I wish my husband to return
25  to my children and me to avoid further trauma to our family. In
26  addition, it is clear to me that his businesses will suffer
27  irreparable harm from lack of management and direction if he is
28  not released soon.

2

1          9.   I have 8 cousins and an aunt who live in the

2     Central District which is part of this court's jurisdiction.

3

4          10. Neither my husband nor I have ever been involved

5     directly or indirectly, in illegal drug activity of any kind

6     whatsoever.

7

8          I declare under penalty of perjury that the foregoing

9     is true and correct.  Executed this 16th day of August, 1989, at

10    Los Angeles, California.

11

12

13                        Maria Enriqueta Guttron Velasco

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                 3

**EXHIBIT 4**

## DECLARTION OF LIC. ARTURO VELAZQUEZ LOPEZ

I, Lic. Arturo Velazquez Lopez, hereby declare as follows:

1.   I know all the following facts of my own personal knowledge and, if called and sworn as a witness, could and would competently testify thereto.

2.   I am a Mexican citizen and an attorney at law duly licensed to practice law in the Republic of Mexico.

3.   I am a personal friend and professional colleague of Ruben Zuno-Arce.  I have known Ruben Zuno-Arce for approximately 31 years.  During that period of time I have acquired personal knowledge of the fact that, Mr. Zuno-Arce has been and continues to be a legitimate, respected and successful businessman in the lumber, agricultural and automobile service station industries in the city of Mascota and in the state of Jalisco, Mexico.

4.   At no time during the 31 years I have known Ruben Zuno-Arco have I known him to be involved, directly or indirectly, in illegal drug or narcotics activities of any kind whatsoever.

1

1    I declare under penalty of perjury that the foregoing

2  is true and correct.  Executed this 16th day of August, 1989,

3  at Los Angeles, California.

4

5

6    LIC. ARTURO VELAZQUEZ LOPEZ

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

**EXHIBIT 5**

## DECLARATION OF SALVADOR SOTO-LUNA

I, Salvador Soto-Luna, hereby declare as follows:

1.     I know all of the following facts of my own personal knowledge and, if called and sworn as a witness, could and would competently testify thereto.

2.     I am married to Lucia Soto who is a a cousin to Mr. Ruben Zuno-Arce.  Lucia Soto and I were married approximately 5 years ago.  My wife and I own a house in Pomona, California.  I have lived in the United States for approximately 19 years.  I am a legal resident alien in possession of a "green card" entitling me to live and work in the United States.

3.     During my 19 years in the United States, I lived 2 years in Los Angeles and the last 17 years in Pomona, California.

4.     My wife and I have 4 children -- boys aged 18, 17 and 13 and a 10-year old girl.  All of our children are enrolled in schools of the Pomona Unified School District were my family and I maintain our permanent residence.

5.     I work as a foreman for Faberge, Inc., in Pomona, California and I have a 19 year employment history with that company.

1

1          6.    I estimate that the house that I own with my wife

2    in Pomona, California is worth approximately $90,000 to

3    $100,000.  There are first and second mortgages on the house in

4    the total amount of $32,000.  My wife and I are willing to make

5    all the equity in the house available as collateral on a bond for

6    the benefit Mr. Ruben Zuno-Arce. .

7

8          I declare under penalty of perjury that the foregoing

9    is true and correct.  Executed this 16th day of August, 1989, at

10   Los Angeles, California.

11

12

13                              SALVADOR SOTO-LUNA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                2

**EXHIBIT 6**

## DECLARATION OF JAIME FLORES

I, Jaime Flores, hereby declare as follows:

1.    I know all the following facts of my own personal knowledge and, if called and sworn as a witness, could and would competently testify thereto.

2.    I am a cousin to Ruben Zuno-Arce.  I have lived in the United States for 13 years.  I possess a "green card" entitling me to live and work in the United States.  I have been married for 8 years.  I have 5 children, ages 3, 11, 11, 12 and 13.

3.    I, along with Jose Huerta, own a house located at 3637 Athol Street, Baldwin Park, California.  There are no outstanding mortgages against the house.  I estimate the value of the house to be $130,000.

4.    I am employed as a construction worker for Marina Construction, which has its headquarters in Irvine, California.

5.    I am willing to make all the equity in the house available as collateral on a bond for the benefit of my cousin Ruben Zuno-Arce.  Mr. Huerta has told me he will consent to so using the house.

1

1      I declare under penalty of perjury that the foregoing

2  is true and correct.  Executed this 16th day of August, 1989, at

3  Los Angeles, California.

4

5      _____

6                    JAIME FLORES

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 7**

```
UNITED MEXICAN STATES    )
STATE OF JALISCO         )
CITY OF GUADALAJARA      )  SS:
CONSULATE GENERAL OF THE )
UNITED STATES OF AMERICA )
```

I, _____ Doreen T. Soler _____, _____ Consul of the
United States of America at Guadalajara, Jalisco, Mexico,
duly commissioned, and qualified, do hereby certify that
* * * * * * * * * Enrique Romero Gonzalez * * * * * * * * * * * *
whose true signature and official seal are, respectively
subscribed and affixed to the annexed document, was on the
14th day of ___ August ____, 19 89, the date thereof, _____
Secretary General of the State of Jalisco, Mexico at Guadalajara.
_____
_____

duly commissioned and qualified, to whose official acts
faith and credit are due.


IN WITNESS THEREOF I have hereunto set my hand and affixed
the seal of the Consulate General of the United States of
America at Guadalajara, Jalisco, Mexico, this 15th day of
___ August _____, 19 89.


                         _Doreen T. Soler_
                         Consul of the United States
                              of America

—— El C. Licenciado Enrique Romero González, Secretario General de Gobierno, C E R T I F I C A : Que el C. LICENCIADO JUAN PEÑA RAZO, es Sub-Procurador General de Justicia en el Estado, y son auténti——cos la firma y el sello de autorizar que anteceden.

Guadalajara, Jal., Agosto, 14 de 1989.

ENRIQUE ROMERO GONZÁLEZ.

Se pagó el derecho correspondiente según recibo Oficial
No. N-4794802-4 de Agosto 14 de 1989.



# PROCURADURIA GENERAL DE JUSTICIA
## DEL ESTADO DE JALISCO



*DIRECCION GENERAL DE SERVICIOS PERICIALES.*

OFICIO:   5703/89.

ASUNTO:   SE INFORMA SOBRE
ANTECEDENTES.

HONORABLE EDWARD RASEEVIE
UNITED STATES DISTRICT JUDCE
CENTRAL DISTRICT OF CALIFORNIA
P R E S E N T E :

Por este conducto nos dirigimos a Usted -
para hacer de su conocimiento, que de acuerdo con la peti
ción hecha por el C. LIC. VICENTE ZUÑO ARCE, hacemos cons
tar que el C. LIC. RUBEN ZUÑO ARCE, con domicilio en el -
Rancho la Jolla Municipio de Mascota, Jalisco, no cuenta-
ni registra Antecedente Penal alguno en los Archivos de -
esta Procuraduría General de Justicia en el Estado de Ja-
lisco.

Lo anterior para su conocimiento y efec---
tos legales procedentes.

A T E N T A M E N T E
"SUFRAGIO EFECTIVO. NO REELECCION"
Guadalajara, Jalisco 14 de Agosto de 1989.
EL DIRECTOR GENERAL DE SERVICIOS PERICIALES



LIC. DANIEL FUENTES BEJARANO.

DIRECCION GENERAL DE
SERVICIOS PERICIALES

C E R T I F I C O.
C. SUB-PROCURADOR GENERAL DE JUSTICIA EN EL EDO. JALISCO.

LIC. JUAN PEÑA RAZO.

American Consulate General
Guadalajara, Jalisco, Mexico

F-PG-1

UNITED MEXICAN STATES    )
STATE OF JALISCO         )
CITY OF GUADALAJARA      ) SS:
CONSULATE GENERAL OF THE )
UNITED STATES OF AMERICA )


I, _____ John M. Finkbeiner, Jr. _____ Vice Consul of the
United States of America at Guadalajara, Jalisco, Mexico, duly commissioned
and qualified, do hereby certify that Fernando Alvarez Juarez, whose true
signature and official seal are, respectively, subscribed and affixed to
the annexed document, was on the ___15th___ day of ___August___ 1989,
the date thereof, translator at Guadalajara, Jalisco, Mexico.

For the contents of the foregoing document I assume no responsibility.

IN WITNESS WHEREOF I have hereunto set my hand and affixed the seal of the
Consulate General of the United States of America at Guadalajara, Jalisco,
Mexico, this _15th_ day of _____August_____ , 1989 .

Vice Consul of the United
States of America

Guadalajara, Jalisco
August 15, 1989

This is a true and exact translation of a no criminal record
letter issued by the Attorney General's Office in the State
of Jalisco on behalf of LIC. RUBEN ZUNO ARCE, which to the
letter reads as follows:

\#     \#     \#     \#     \#     \#     \#     \#     \#     \#

On the top margin a coat of arms and a letterhead which read:

"United Mexican States.- EXECUTIVE BRANCH OF THE STATE
GOVERNMENT."

STATE OF JALISCO STATE ATTORNEY GENERAL'S OFFICE. - Ge-
neral Director of Investigation Services.

The body of the No Criminal Record Letter reads: - - - - - -

Notification No. 5703/89
Subject:  REPORT ON POLICE RECORD

HONORABLE EDWARD RASEEVIE
UNITED STATES DISTRICT JUDGE
CENTRAL DISTRICT OF CALIFORNIA

E S Q U I R E :

we are hereby addressing your lordship to duly inform
you that in accordance and pursuant to the petition made by
LIC. RUBEN ZUNO ARCE, currently domiciled at Rancho La Jolla,
County of Mascota, State of Jalisco, he has no criminal re-
cord on file in the archives of this Attorney General's Of-
fice for the State of Jalisco.

The foregoing statement for your information and for
whatever legal effects which may apply.

R E S P E C T F U L L Y,

"EFFECTIVE SUFFRAGE-NO REELECTION"
Guadalajara, Jalisco; August 14, 1989
THE GENERAL DIRECTOR OF INVESTIGATION SERVICES

An Illegible Signature
LIC. DANIEL FUENTES BEJARANO

I DO SO CERTIFY;
C. ASSISTANT ATTORNEY GENERAL FOR THE STATE OF JALISCO

An Illegible Signature
LIC. JUAN PENA RAZO

A stamped seal of office which reads: - - - - - - - - -

"United Mexican States.- STATE ATTORNEY GENERAL'S OFFICE.-

JALISCO.- DIRECTOR GENERAL OF INVESTIGATION SERVICES."

A second stamped seal of office which reads:

"United Mexican States.- STATE ATTORNEY GENERAL'S OFFICE.-

On the back of the instrument the following certification:

--- The C. licenciate Enrique Romero Gonzalez, Secretary Ge-
neral of Government, C E R T I F I E S :  That C. LICENCIATE
JUAN PENA RAZO, is the Assistant State Attorney General for
the State of Jalisco, and that the foregoing signature and
seal of office are both authentic.

Guadalajara, Jal., August 14, 1989

An Illegible Signature
LIC. ENRIQUE ROMERO GONZALEZ

Payment of corresponding fees executed as per official
receipt No. N-4784802-4 dated August 14, 1989

A stamped seal of office which reads: - - - - - - - - -

"United Mexican States.- STATE EXECUTIVE BRANCH OF GOVERN-
MENT.- JALISCO.-"

       ♦     ♠     ♠     ♣     ♣     ♣     ♣     ♣     ♠     ♣     ♣

Translated in the city of Guadalajara, Jalisco, Mexico, on
August 15, 1989 by the authorized translator, Fernando
Alvarez Juarez. We assume no responsibility whatsoever for
the contents, origin, nor validity of the translated document.

**TRADUCCIONES PROFESIONALES**
Fernando Alvarez Juárez
TRADUCTOR AUTORIZADO
LOPEZ COTILLA No 1770 1 — TEL, 26-31-44
Registro Federal de Causantes UOVP-000000-000
GUADALAJARA, JALISCO, MEXICO.

**EXHIBIT 8**



| | |
|---|---|
| DEPENDENCIA | COMANDANCIA DE POLICIA |
| NUM. DE OFICIO | 1761 |
| EXPEDIENTE | 09/989 |

**PRESIDENCIA MUNICIPAL**
**DE**
**MASCOTA, JAL.**
TEL. 91-338-6-00-62
COD. POST. 48000

ASUNTO: Certificación Carta de Policía.

A QUIEN CORRESPONDA.



C. PAULINO CANALES CASTELLON, Comandante en funciones de la Policía Municipal, que suscribe.,

C E R T I F I C A

Que el C. LIC. RUBEN ZUNO ARCE, quien es Vecino del Rancho "La Jolla" de este Municipio de Mascota, Jalisco, cuya fotografía aparece al margen es persona que ha observado buena conducta por lo que en el Archivo de esta Comandancia no tiene antecedentes penales.

SE extiende la presente constancia en la Ciudad de Mascota, Jalisco, para los fines legales correspodientes a los doce días del Mes de Agosto de Mil Novecientos Ochenta y Nueve.

C. 

{TRANSLATION}

AGENCY  Police
              Department
DOCUMENT NO. 1761
FILE  09/989

SEAL:
MUNICIPAL PRESIDENCY
        OF
MASCOTA, JAL.
TEL. 91-338-6-0052
COD. POST. 46900

SUBJECT: POLICE LETTER
              CERTIFICATION

TO WHOM IT MAY CONCERN.

C. PAULINO CANALES CASTELLON, the undersigned Chief of the
Municipal Police,

### CERTIFIES:

That the Licentiate Ruben Zuno Arce, who is a resident of the "La
Jolla" Ranch of this Municipality of Mascota, Jalisco, whose
photograph appears at the margin, is a person who has observed
good conduct, therefore, has no criminal priors in this
Department.

This certification is issued in the city of Mascota, Jalisco, for
its corresponding legal purposes on the twelfth day of the month
of August of nineteen hundred and eighty-nine.

                    {Illegible Signature}
                    C. Paulino -Illegible-

SEALS:
At the left margin:
A black square.  Partially overimposing a round "-Illegible-
-Police-(?) Mascota, Jal."
At the lower right margin:
A round seal partially overimposing the signature.
The seal reads:
"-Illegible- of -Police-(?) Mascota, Jal."

# BiLingual Services

## DECLARATION OF INTERPRETER/TRANSLATOR

I, the undersigned, state:  I am an official interpreter and translator for the Superior Court in and for the County of Los Angeles, State of California:  I am familiar with the English and Spanish languages;  I have translated the attached documents from Spanish to English and the foregoing is a true and correct translation of said document.

I certify (or declare) under penalty of perjury, that the foregoing is true and correct.

Executed on _1-16-89_ at Long Beach, California.

                              H&          TORRES - COMAS
                                 Certified Interpreter
                                 State of California
                              County of Los Angeles


_____
Signature

2060 Cedar Avenue, Long Beach 90806

1888 Century Park East, Suite #10, Los Angeles, California 90067

**EXHIBIT 9**

AUG-15-'89 TUE 15:42 ID:M S & K LIT & LAB      TEL NO:213 312 3787        #818 P04



DEPENDENCIA PRESIDENCIA
MUNICIPAL
NUM. DE OFICIO  1760
EXPEDIENTE  232989

**PRESIDENCIA MUNICIPAL**
**DE**
**MASCOTA, JAL.**
TEL. 91-338-6-00-52
COD. POST. 46900

ASUNTO: ACREDITACION DE PERSONALIDAD.

A QUIEN CORRESPONDA.

        C.P.T. HUGO O. MONTES GUZMAN, Presidente
Municipal de este Municipio que suscribe.,

        H A C E        C O N S T A R:

        Que el C. LIC. RUBEN ZUNO ARCE, es Vecino
de esta Ciudad de Mascota, Jalisco y su domicilio par-
ticular es domicilio conocido Rancho "La Volla" de es-
te Municipio de Mascota, persona honorable en todos sus
conceptos; en virtud de que es Profesionista, Indus- -
trial, Agricultor y Ganadero. Cuya Fotografía se en- -
cuentra al margen.

        Además el LIC. RUBEN ZUNO ARCE es el pre-
sidente del Consejo de Colaboración Municipal de este-
Municipio de Mascota, Jalisco y es miembro del Comité-
ADEFAR; persona que ha atacado abiertamente la droga -
dicción y el narcotráfico en esta Población..

        Para los fines legales correspondientes -
se extiende la presente en la Ciudad de Mascota, Jalis
co a los doce días del Mes de Agosto de Mil Novecien -
tos Ochenta y Nueve.



P.T. HUGO O. MONTES GUZMAN.



25

{TRANSLATION}

AGENCY  <u>Municipal</u>
<u>Presidency</u>
DOCUMENT NO. <u>1760</u>
FILE <u>22/7989</u>

SEAL:
MUNICIPAL PRESIDENCY
OF
MASCOTA, JAL.
TEL. 91-338-6-0052
COD. POST. 46900

SUBJECT: CHARACTER REFERENCE

TO WHOM IT MAY CONCERN.

C.P.T. Hugo O. Montes Guzman, the undersigned Municipal President
of this Municipality,

CERTIFIES

That the Licentiate Ruben Zuno Arce is a resident of this City of
Mascota, Jalisco and his private residence is known as "La Jolla"
Ranch of this Municipality of Mascota, an honest person in every
respect; in virtue of his being a professional, a business person,
a farmer and cattle rancher.  Whose photograph appears at the
margin.

Further, Licentiate Ruben Zuno Arce is the president of the
Municipal Collaboration Council of this Municipality of Mascota,
Jalisco and is a member of the ADEFAR Committee; a person who has
openly attacked drug addiction and drug trafficking in this town.

For its corresponding legal purposes, this (document) is issued in
the City of Mascota, Jalisco on the twelfth day of August,
nineteen hundred and eighty-nine.

{Illegible Signature}
-C.P.-(?) T. Hugo O. Montes Guzman

SEALS:
A round seal partially overimposing
the signature over, which reads:
"Municipal Presidency, Mascota, Jal."
At left margin:
A black square.  Partially overimposing a round "-Illegible-
-Police-(?) Mascota, Jal."

# BiLingual Services

DECLARATION OF INTERPRETER/TRANSLATOR

I, the undersigned, state:  I am an official interpreter and translator for the Superior Court in and for the County of Los Angeles, State of California:  I am familiar with the English and Spanish languages;  I have translated the attached documents from Spanish to English and the foregoing is a true and correct translation of said document.

I certify (or declare) under penalty of perjury, that the foregoing is true and correct.

Executed on _8-16-89_ at Long Beach, California.

HORTENSIA M. TORRES - COMAS
Certified Interpreter
State of California
County of Los Angeles

_____
Signature

27

**EXHIBIT** 10

Con las constancias que presento, extendidas por el
Juez Tercero de Distrito en Materia Penal en el Esta
do de Jalisco, queda plena y legalmente probado:
QUE VENDI a RUBEN SANCHEZ BARBA, para la sociedad legal
que tiene constituida con MARIA DORA GONZALEZ DE BARBA,
los lotes de terreno 12, 13 y 14 sobre los cuáles está
construida la casa número 580 de la calle de Tormenta
en Guadalajara, Jalisco, venta que hice  el día 11 on
ce de Enero de 1985.-
Presento copia certificada de dicha escritura.
Igualmente con las constancias que presento, debidamen
te certificadas, demuestro qué:
RUBEN SANCHEZ BARBA Y MARIA DORA GONZALEZ DE BARBA,-
(esposa de Rubén Sánchez Barba), han confesado ante
el Juez III de Distrito Penal en Guadalajara, Jalisco,
qué ELLOS SON LOS DUEÑOS DEL CITADO INMUEBLES desde-
11 once de Enero de 1985.-
Demuestro en consecuencia con tales documentos que
vendí la casa y terrenos descritos en tal escritura
de compra-venta a las personas que se citan, quienes
reconocieron ante autoridades federales de México que
que ellos, son los propietarios de tal inmueble.-

{TRANSLATION}

With the evidence I present, issued by the Third Distric Judge in Criminal Matters in the State of Jalisco, it is fully and legally proven:

That I sold to Ruben Sánchez Barta, for the benefit of the corporation which he is jointly involved with María Dora Gonzalez de Barta, lots 12, 13 and 14, over which the house number 580 on Tormenta Street in Guadalajara, Jalisco, is constructed.  Sale made by me on the 11th of January of 1985.

I introduce into evidence a certified copy of said Deed.  At the same time that I present this evidence, duly certified, I show that:

Ruben Sánchez Barta and Maria Dora Gonzalez de Barta, (wife of Ruben Sánchez Barta), have acknowledged in front of The Third Distric Judge, in Criminal Matters in Guadalajara, Jalisco, that they are owners of the afore mentioned property since the 11th of January of 1985.

Consequently, I show by means of such documents that I sold the house and lots described in said sale transaction Deed to the persons herein mentioned, who have acknowledged to the Federal authorities of Mexico that they are in fact, the owners of said property.

# BiLingual Services

DECLARATION OF INTERPRETER/TRANSLATOR

I, the undersigned, state:  I am an official interpreter and translator for the Superior Court in and for the County of Los Angeles, State of California:  I am familiar with the English and Spanish languages;  I have translated the attached documents from Spanish to English and the foregoing is a true and correct translation of said document.

I certify (or declare) under penalty of perjury, that the foregoing is true and correct.

Executed on  _8-16-89_  at Long Beach, California.

HORTENSIA M. TORRES - COMAS
Certified Interpreter
State of California
County of Los Angeles

_Signature_

2060 Cedar Avenue, Long Beach  90806

1888 Century Park East, Suite #10, Los Angeles, California  90067

30

GOBIERNO DEL ESTADO DE JALISCO
TESORERIA GENERAL
DIRECCION DE CATASTRO
AVISO DE TRANSMISIONES PATRIMONIALES

FOLIO No. 260843

COMPROBANTE PROVISIONAL SUJETO A VERIFICACION

LIQUIDADORA No. 1
NUMERO DE CUENTA 71,443   MUNICIPIO Guadalajara, Jalisco.
CLAVE CATASTRAL 04-629-02

X-90872

SI ACOMPAÑAN:

DESLINDE ☐   AVALUO BANCARIO ☒   '85 FEB 28 0-50 CERTIFICADO DE NO ADEUDO ☐

NOMBRE DEL NOTARIO: LIC. FRANCISCO MARQUEZ HERNANDEZ   NUMERO DEL NOTARIO 1
NATURALEZA DEL ACTO O CONCEPTO DE LA ADQUISICION:   COMPRA-VENTA.

LUGAR Y FECHA DE OTORGAMIENTO: Amaca, Jalisco, Enero 11 de 1985.   ESCRITURA NUM. 539

TRANSMITENTE: Lic. RUBEN ZUNO ARCE
DOMICILIO: Lope de Vega 881 Fracc. Jardines del Bosque, Guad. Jal
GENERALES: Mexicano, divorciado, Licenciado en Economía, mayor de

ADQUIRENTE: Doctor Rubén Sánchez Barba
DOMICILIO: Av. Vallarta 3216 Guadalajara, Jalisco.
GENERALES: Nacido el 1 de Mayo de 1925 en Teputitlán, Jal; cuando
de Profesión, Mayor de edad.

CLASIFICACION DEL INMUEBLE TRANSMITIDO: URBANO ☒ CONST. ☒ SALDIO ☐ RUSTICO ☐

UBICACION, MEDIDAS Y LINDEROS: Una Fracción del Inmueble formado por los lo
13 y 14 Y lo en ollos construido, ubicada en la manzana 34 de
Turmenta 580, antes Zacatecas, colonia Sud-Pacifico, ubicada al
te de Guad. Jal. Dentro del Mpio. de Zapopan, Jalisco, con las
las colindancias: NORTE 39.33 Mts con doña Carmen Affa Vda. de
SUR 39.33 Mts con Luis y Ma del Caspar Riando; ORIENTE 29.50
calle de su ubicación Y PONIENTE 22.50 Mts con la señora Doña
su Vda. de Zuno con superficie de 864.71 M2.

PROCEDENCIA Y ANTECEDENTES DE PROPIEDAD: El inmueble lo adquirió el vendedor
critura Pública 507 de fecha 11-1-85 ante el notario No.
de Registro, consolidando la totalidad del mismo, viet
dación de la Sociedad Legal de su Matrimonio y Divorcio, me
nimiento con su ex-esposa Ruth Moreno Rubino de Zuno. Juici
4636/77. Juz. 8/o. Civ. de ciudad.

LO TRANSMITIDO CONSTITUYE: PROPIED. ☐   RESTO ☐   TOTALIDAD ☒   EN RELACION CON EL TITULO INMUE

| VALORES | | | |
|---|---|---|---|
| FISCAL | EN LA OPERACION | EN AVALUO | VALOR REQUIERE |
| $ 200,174.00 | $ 755,920.00 | $ 755,920.00 | $ 1'779,375 |

LIQUIDACION.

| | | IMPORTE |
|---|---|---|
| IMPUESTO AL ESTADO AL | % Notario Impuesto sobre Transmisiones Patrimoniales | |
| IMPUESTO AL MUNICIPIO | PSi no exceder la base gravable del valor de cinco | 0.00 |
| RECARGOS AL | Veces el salario mínimo general elevado al año, según | |
| MULTA | Art. 115 de la Ley de Hacienda Municipal en el Edo. | |
| | TOTAL | 0.00 |

DISPOSICIONES APLICABLES EN CASO DE EXENCION:
Artículo 115, Ley de Hacienda Municipal

Amacal, a 11 de Enero

EN CASO DE ESCRITURA PRIVADA   EN CASO DE ESCRITURA PU

TRANSMITENTE   CONYUGE DEL TRANSMITENTE   EL NOTARIO

NOMBRE Y FIRMA   NOMBRE Y FIRMA

ADQUIRENTE



44

44

Lic. Francisco Marquez Hernández
Notario Público No. 1

NUMERO 539 QUINIENTOS TREINTA Y NUEVE.

----EN Ameca, Jalisco, a los 11 once días del mes
Enero de 1985 mil novecientos ochenta y cinco, ante
mí, Licenciado FRANCISCO MARQUEZ HERNANDEZ, Nota-ri-
Público Número 1 Uno de este Municipalidad, compare-
cieron, por una parte el señor Licenciado RUBEN ZUNO
ARCE; y por la otra el señor RUBEN SANCHEZ BARBA, a-
quienes doy fé de conocer, concertuandolos con capa-
cidad contractual, manifestándolos que al corriente
del pago del impuesto sobre la Renta y sin demanda
nelp en el acto dijeron: Que han celebrado un contra-
to de COMPRA-VENTA, mismo que sujetan bajo las siguientes
guientes. - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - C L A U S U L A S - - - - - - - - -
----PRIMERA.- El señor Licenciado RUBEN ZUNO ARCE
por su propio derecho V E N D E y al señor RUBEN
SANCHEZ BARBA, QUIEN                para la Sociedad Legal
de su Matrimonio Civil con la señora María Rosa Gon-
ález de Sánchez, libre de          gravamen y al corriente
del Impuesto Predial, obligandose el vendedor al sa-
ver del comprador, el                  cimiento para el caso de
eviccion, UNA FRACCION DEL INMUEBLE formada
etc (?) dos (?) 13 trece y 14 catorce y
construida, ubicados en la Manzana 24 veinticuatro que
tre de la calle Termetas, cated con trece
quinientos ochenta, con 12 veintiseis metros con 40
tanta Sud-Pacifico; al oeste al Sur-Oeste de la ciu-
dad, de Cuarta fza, y se         dentro del Municipio de
Ameca, Jalisco, con los siguientes colindancias:
NORTE 39.33 treinta y nueve metros con treinta y
tres centímetros con la                          doña Carmen Arce y
Un de Zuno; SUR 39.33 treinta y nueve met
treinta

da, de, zune ir SUR 39,33 treintay nueve metros con —
treinte r tres centimetres con los señores uip
nuel Casper Blanda, ORIENTE 29.50 veintinueve metros
con cincuenta centimetres con la calle de su ubica-
ción, antes Zacatecas y PONIENTE 22.50 veintidos m—

31

siete. Testimonio que acompaño para su incorporación
conjuntamente.- - - - - - - - - - - - - - -

- - - - -TERCERA.- El precio valor de la operación, se fi
jó en la cantidad de $ 755,520.00 SETECIENTOS CIN- - - -
CUENTA Y CINCO MIL QUINIENTOS VEINTE PESOS, MONEDA -
NACIONAL, valor que la parte vendedora confiesa ha-
ber recibido de la parte compradora a su entera sa-
tisfacción con anterioridad a éste acto.- - - - - -

- - - - -CUARTA.- Manifiestan las partes, que en la pre-
sente operación no existe error, lesión, ni enrique-
cimiento ilegítimo y que si por inexacta apreciación
lo hubiere, renuncian expresamente al beneficio resi
prece y a la acción de nulidad que por éste concept
establecen los artículos 2149 dos mil ciento cuaren-
ta y nueve, 2151 dos mil ciento cincuenta y una r
lativos del Código Civil del Estado.- - - - - - - -

- - - - -QUINTA.- Los gastos que origine la Escritura y
su legalización serán por cuenta de la parte compr-
- - - - - - - - - - - - - - - - - - - - - - - - -

- - - - - -YO EL NOTARIO, HAGO CONSTAR: - - - - - -

- - - -a).- Que los otorgantes bajo protesta legal de
decir verdad manifestaron ser: Mexicanos, nacidos el
10 diez de Julio de 1930 mil novecientos treinta en
la ciudad de Guadalajara, Jalisco, 1 primero de Mayo
de 1925 mil novecientos veinticinco en Tepatitlán,
Jalisco, divorciada y casado, Licenciado en Economía
y Médico de Profesión, con domicilio en la calle Lo
pe de Vega 881 ochocientos ochenta y uno y finca - -
3,216 tres mil doscientos dieciseis de la calle Va-
llarta de la ciudad de Guadalajara, Jalisco, y tran-
sitoriamente en ésta ciudad.- - - - - - - - - - - -

- - - -b).- Que las partes me manifestaron que el inmu
ble no se encuentra afectado por declaratoria alguna

ble no se encuentre afectado por declaratoria alguna de las relativas de la Ley General de Asentamientos Humanos, ni al correspondiente del Estado de Jalisco -----c).- Que en cuanto al impuesto al VALOR AGREGADO.

32

32

tros con cincuenta centímetros con propiedad de la

señora Doña Carmen Arce Viuda de Zuno; con una super-

ficie de 884.71 OCHOCIENTOS OCHENTA Y CUATRO METROS

SETENTA Y UN CENTIMETROS CUADRADOS.

----Para mayor identificación del inmueble, las par-

tes me exhibieron planos, agregando un ejemplar al

Libro de Documentos de éste Tomo.

---SEGUNDA.- El inmueble lo adquirió el vendedor en

Escritura pública Número 2,643 dos mil seiscientos

cuarenta y tres de fecha 31 treinta y uno de Julio

de 1976 mil novecientos setenta y seis, ante la re-

del Notario Público Suplente Número 1 Uno de la Muni

cipalidad de Guadalajara, Jalisco, Licenciado Pastor

Padilla Padilla, otorgada por los esposos Luis Gas-

par Rianda y María Cristina Silva Castillo de gaspar,

Manuel Gaspar Rianda y Olga Gallardo de Gaspar, Auro-

ra, Joaquín Francisco, José Antonio, María del Rosa-

rio, María Luisa, Rodolfo Gregorio, Angélica y María

del Carmen de apellidos Gaspar Echegaray y María

Echegaray Viuda de Gaspar, ...

de las 3 tres últimas inscrita ...

ciente setenta, páginas 209 doscientos nueve del ...

bre 1,630 mil seiscientos treinta, de la Sección Pri-

mera, de la Segunda Oficina, número de orden 47,061

diente cuarenta y siete mil sesenta y uno del Regis-

tro Público de la Propiedad de esta ciudad, manifes-

tando el vendedor señor Licenciado JOSE ZUNO Arce

el inmueble que se enajena en Escritura pública 537,

quinientos treinta y siete, otorgada ante el suscri-

to Notario, y que contiene la protocolización de la

liquidación de su Sociedad Legal de su Matrimonio,

de conformidad al convenio celebrado dentro del Jui-

la conformidad al convenio celebrado dentro del Jui-
cio de Divorcio por Mutuo Consentimiento, tramitado
ante el Juzgado Octavo de lo Civil de la ciudad de
Guadalajara, Jalisco, bajo expediente 4636/77 cuatro
mil seiscientos treinta y seis diagonal setenta y --

33

...la protesta de decir verdad, manifiesta el compra-
dor, que el inmueble lo seguirá usando como casa-ha-
bitación, por lo que considera no estar en el caso
de pagar dicho tributo.- En atención a lo anterior y
advertido que de no ser así, el impuesto en cuestión
deberá trasladarse al adquirente por separado del
valor bien, materia de éste instrumento.- El suscri-
to Notario se abstiene de toda retención, cálculo y
entero al respecto.- - - - - - - - - - - - - - - - -
- - - -d).- Bajo protesta legal de decir verdad, mani-
fiesta el comprador, que el inmueble no colinda con
otro que haya adquirido en los últimos 24 veinticua-
tro meses, solicitando se aplique a su favor el to-
tal de la reducción que le concede la Ley del Impues-
to Sobre Adquisición de Inmuebles.- - - - - - - - - -
- - -Que se tomaron los datos del Título de Propiedad,
Colinde Catastral, Avalúo Bancario, Constancia de
no Adeudo de la Cuenta 71,443 setenta y un mil cua-
trocientos cuarenta y tres del Sector Urbano, los
que hoy he tener a la vista.- - - - - - - - - - - - -
- - L E I D A , por Mí, el Notario, en alta voz ás-
te Instrumento, he impuesto a los otorgantes de las
consecuencias legales traslativas de dominio que pro-
ducirá la Escritura y necesidad de su registro la
firman en punto de las 17.00 diecisiete horas del
mismo día de su otorgamiento.- Firmado.- Rúbrica ile
gible.- Firmado.- R. Sánchez S.- Firmado.- Licencia-
do Francisco Márquez Hernández.- Rúbrica ilegible.-
El Sello de Autorizar.- - - - - - - - - - - - - - - -
- - - - - - NOTA MARGINAL DEL PROTOCOLO.- - - - - - -
- - - -Bajo los números del 682 seiscientos ochenta y
dos al 687 seiscientos ochenta y siete, corre el li-
bro de Documentos de éste Tomo; Aviso al Archivo de-



dos al 68% seiscientos ochenta y siete, acerca al il
uro de Documentos de éste Tomo: Aviso al Archivo de
Instrumentos Públicos, Preventivo, Transmisión de Do
minio exento del pago del Impuesto al Fisco del Esta
do, acompañado del Plano, Avalúos Bancario y Aviso al

34

34



TEL NO: 213 312 3787    #817 P08

Lic. Francisco Márquez Hernández
Notario Público No. 3
Ameca, Jal., México

3.-

Fisco Federal, exento del pago del impuesto.- Ameca, Jalisco, Abril 19 diecinueve de 1985 mil novecientos ochenta y cinco.- firmado.- Licenciado Francisco Márquez Hernández.- Rúbrica ilegible.- El sello de Autorizar.- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

- - - - NOTA DEL IMPUESTO SOBRE LA RENTA.- - - - - -

- - - No se inserta la NOTA, en virtud de acompañarse copia autorizada de la misma, exigida por el ISR del impuesto.- - - - - - - - - - - - - - - - - - - - - - - - - - - -

- - - SE SACO DE SU MATRIZ ESTE PRIMER TESTIMONIO PARA SUS USOS LEGALES A FAVOR DE LA PARTE COMPRADORA, SEÑOR RUBEN SANCHEZ DARSA, VA EN... (TRES) FOJAS UTILES DEBIDAMENTE COTEJADAS Y CORREGIDAS, DE LO CUAL DOY FE.

- - - AMECA, JALISCO, ABRIL 19 DIECINUEVE DE 1985 MIL NOVECIENTOS OCHENTA Y CINCO.

{TRANSLATION}

LIC. FRANCISCO MARQUEZ HERNANDEZ
NOTARY PUBLIC NO.I

---Number 539 - Five Hundred and Thirty Nine -
---In Amoca, Jalisco, on the 11 eleventh day of the month of
January of 1985, nineteen hundred and eighty-five, Licentiate
Francisco Márquez Hernández, Notary Public Number 1, one, of this
Municipality, appeared before me, For one party Mr. Licentiate
Ruben Zuno Arce, and for the other, Mr. Ruben Sánchez Barba, whom
I attest knowing, and consider to have good contractual capacity,
stating to be current with their Income Tax payments and without
showing me at present, stated on the record that they have entered
into a sale transaction contract, which is subject to the
following:

- - - - - - - - - - - C L A U S E S - - - - - - - - - - - - - - - - -

---Firstly- Licentiate, Ruben Zuno Arce, on his own behalf, sells,
and Mr. Ruben Sanchez Barba, buys, for the legal partnership of
his civil marriage to Mrs. Dora Gonzalez de Sanchez, presently
free of liens, up to date with land taxes, commiting the seller to
indemnify the buyer against eviction, a fraction of the real
property, composed of lots 12, twelve, 13, thirteen, and 14,
fourteen and (illegible) they constructed, located on block 34
(thirty-four) of Tormenta Street, numbered 580 five hundred and
eighty, Zacatecas Street and prior, to the Sud-Pacifica Colony,
situated to the south-west of the City of Guadalajara, Jalisco,
withing the Municipality of (illegible) Jalisco, with the
following borders:

North: 39.33 thirty-nine meters and thirty-three centimeters with
Mrs. Carmen Arce, Zuno's widow; South: 39.33 thirty-nine meters
and thirty-three centimeters with Mr. Luis and Mr. Manuel Gaspar
Rienda; East: 29.50 twenty-nine meters and fifty centimeters with
the street of its location, before Zacatecas and West, 22.50
twenty-two meters and fifty centimeters with the property with
Mrs. Carmen Arce, Zuno's widow, with an area of 884.71, eight
hundred and eithty-four square meters and seventy-one square
centimeters.

---For better identification of the real property, the parties
presented me with plans, and a copy was added to the Book of
Documents of this Volume,---

-Second.- The real property was acquired by the seller in the Public Deed Number 2,643, two-thousand six-hundred and fourty-three, dated 31, thirty-first of July of 1976, nineteen hundred and seventy-six, before the attestment of substitute Notary Public Number 1, one, of the Municipality of Guadalajara, Jalisco, Licentiate Pastor Padilla Padilla, granted by the spouses Luis Gaspar Rianda and Maria Cristina Silva Castillo of -Illegible- Manuel Gaspar Rianda and Olga Gallardo de -Illegible- Aurora, Joaquin Francisco, Jose Antonio, Maria del Rosario, Maria Luisa, Rodolfo, Felipe, Ana Rocio, Maria del Carmen with the last names Gaspar Echegaray; -Illegible- Echegaray, widow of Gaspar and representing the last three; registered under number 160, one hundred and sixty, page 209, two-hundred and nine of the book 1,630, one thousand, six hundred and thirty of the First Section, of the Second Office, order number 147,061, one hundred and forty-seven thousand and sixty-one of the Property Registrar's Office of that city, -Illegible- the seller, Licentiate Ruben Zuno Arce, the real property that -Illegible- in public Deed 537, five hundred and thirty-seven, granted before the uncersigned Notary, which contains the recording of the protocol of the dissolution of his marriage partnership, in accordance with the agreement celebrated during the Divorce proceedings by Mutual Agreement, performed before the Eighth Court of Civil Matters of the City of Guadalajara, Jalisco, under File 4636/77 four thousand six-hundred and thirty-six, slash, seventy seven.

SEALS and MARKINGS:
First page:
At the left margin: A round seal which reads:
"-Illegible- MARQUEZ HERNANDEZ
NOTARY PUBLIC
AMECA, JAL.
UNITED MEXICAN STATES."

PARTIAL SEAL: ILLEGIBLE:
Rubrics

OVER THE BODY OF THE DOCUMENT:
Rubrics

37

NOTARY PUBLIC NUMBER 1
-ILLEGIBLE- JAL. -ILLEGIBLE-

Accompanying statement to be jointly incorporated-----------
---Third--- the value priced for the operation was set in the
amount of $755, 520.00 Seven hundred and fifty-five thousand,
five-hundred and twenty, national money, value which the selling
party acknowledges having received from the buying party to his
full and complete satisfaction prior to this proceedings.-----
---Fourth--- Both parties manifest that in the present operation
there are no errors, injury, or illegal profits and if there were,
inexact appreciation, they renounce expressly to the mutual
benefit, and to the nullity that these terms established in
articles 2149 two-thousand and one-hundred and fifty-one and
(illegible) of the Civil Code of the state.--------------------
---Fifth---the expenses which arise from this Deed and its
legalization will be at the expense of the buyer.--------------

- - - - - - - - - I, THE NOTARY, CERTIFY - - - - - - - - - - - - - -
---(a)-That the issuers, under oath, stated being Mexicans, born
on the 10 tenth of July of 1930 nineteen hundred and thirty in the
city of Guadalajara, Jalisco, 1, first of May of 1925 nineteen
hundred and twenty five in Tepatitlán, Jalisco, divorced and
married, Licentiate in Economics and a Medical Doctor by
profession with address on Lope de Vega Street 881 eight-hundred
and eighty-one, rural property 3,216 three-thousand two-hundred
and sixteen on Vallarta Street of the city of Guadalajara, Jalisco
and a transient in this city-----------------------------------
---(b) that the parties stated that the real property has not been
affected by the provisions of the General Settlement Laws, or by
the State of Jalisco.------------------------------------------
---(c) with respect to the Aggregate Value, (Illegible) to tell
the truth, states to the buyer, that the real property will
continue to be used for personal dwelling which is not considered
to be (illegible) in the case of paying said tax. With respect to
the previously mentioned and informed, in the case of if not being
so, the tax in question will be transferred to the buyer
separately (from the value, regarding this matter). The
(illegible) Notary abstains from all amounts withheld, estimate
and whole.-----------------------------------------------------
---d--- Under oath, the buyer states that the property does not
border with another that he might have acquired in the last 24
twenty-four months, requesting that the reduction granted by the
Property Acquisition Tax Law, would be applied in his favour.----
----That the facts taken from the Title of Property (illegible),
Banking appraisal, Certificate of non-debt for account number
71,443 seventy-one thousand, four hundred and forty-three from the
Urban sector, which I attest having viewed.--------------------
HAVING READ IT, I, the Notary, by means of verbal expression, have
informed the issuers of the legal consequences of conveying
ownership which will be produced by the Deed, and of the need of
its registry, signed at 17.00 seventeen hundred hour of the same
day of its issuance.  Signed -Rubric, illegible. - Signed. - R.
Sanchez B. - signed Licentiate Francisco Vásquez Hernández.
-Rubrics, illegible- the authorizing seal ----------------

38

-----------------MARGINAL NOTE OF PROTOCOL------------------

----Under the numbers from 682 six hundred and eighty-two, to 687
six hundred and eighty-seven, I add to the Book of Documents of
this Volume:  I notify the Public Document Files, preventive,
transfer of ownership exempted from paying National Treassury
Taxes, plans attached, Bank Appraisals, and Notification
                    LIC. FRANCISCO MARQUEZ HERNANDEZ
                        NOTARY PUBLIC NO. 1
                    -AMECA-(?) JAL., MEXICO

3-   The National Treassury, exempted from paying the tax. -Amoca,
Jalisco, April 19 nineteen of 1985 nineteen hundred and
eighty-five. -Signed- Licentiate Francisco Márquez Hernández
-Rubrics illegible-
The Seal of Authorization --------------------------------
- - - - - - - - NOTE ON THE PROPERTY TAX - - - - - - - - - - - - -
-----The note has not been inserted because - the authorized copy
of the same is attached, exempted from the payment of the
tax.-------------------------------------------------------
----THIS FIRST TESTIMONY HAS BEEN REMOVED FROM THE ORIGINAL
DOCUMENT TO BE USED FOR LEGAL PURPOSES IN FAVOR OF THE BUYER, MR.
RUBEN SANCHEZ BARBA, IT IS IN 3 (THREE) OFFICIAL PAGES, ADEQUATELY
CHECKED AND CORRECTED, TO WHICH I CERTIFY----- AMECA, JALISCO,
APRIL 19 NINETEEN, OF 1985, NINETEEN HUNDRED AND EIGHTY FIVE.-----

-Illegible-                    BOTTOM RIGHT OF PAGE:
{Signature}                    Seal of:  Francisco Vásquez Hernández
                                         Notary Public
                                         No. 1
                                         AMECA, JALISCO
                                         UNITED STATES OF MEXICO

39.

# BiLingual Services

DECLARATION OF INTERPRETER/TRANSLATOR

I, the undersigned, state:  I am an official interpreter and translator for the Superior Court in and for the County of Los Angeles, State of California:  I am familiar with the English and Spanish languages;  I have translated the attached documents from Spanish to English and the foregoing is a true and correct translation of said document.

I certify (or declare) under penalty of perjury, that the foregoing is true and correct.

Executed on  _8-16-89_  at Long Beach, California.

HORTENSIA M. TORRES - COMAS
Certified Interpreter
State of California
County of Los Angeles

Signature

2060 Cedar Avenue. Long Beach  90806

1888 Century Park East. Suite #10. Los Angeles. California  90067

46

{TRANSLATION}

GOVERNMENT OF THE STATE OF JALISCO

GENERAL TREASURY
REAL ESTATE OWNERSHIP DEPARTMENT
NOTICE OF PATRIMONIAL TRANSACTIONS

FOLIO NO. 28084-0-(?)
(Illegible)

Temporary Proof
Subject to Verification

-Illegible- No. 1
Account Number 71, 443
Cadastral Code 04-629-02

Municipality Guadalajara
Jalisco

{Handwritten F-90872}

Attached:

'85 Feb. 28-8 : 58

Delimitation____Banking AppraisalX__Certificate of non-debt____

Name of Notary: Licentiate Francisco Marquez Hernandez
Number of Notary __1__

Nature of Act or Type of Acquisition: Sales Transaction

Place and Date of Issuance: -Amoce-(?) Jalisco,
January 11, 1985.

Transfering Party: Licentiate Ruben Zuno Arce

Address: Lope de Vega -881-(?)
District Jardines del Bosque,
Guadalajara, Jalisco

General Information: Mexican, divorced, with a degree in
Economics -adult-(?)

Adquiring Party: Doctor Ruben Sanchez Barba.

Address: Av. Vallarte 3216 Guadalajara, Jalisco

General Information: Born May 1, 1925 in
-Illegible- Jal.
-Illegible- of profession, Adult.

CLASSIFICATION OF THE TRANSFERRED PROPERTY:

-Illegible- x Const. x Empty (Lot) ___ Rustic (Rural)___

42

LOCATION, DIMENSIONS and BOUNDARIES: A sector of the property made up by lots 13 and 14 and that built on them, located on block 34 of Tormenta 580, previously Zacatecas, Sud-Pacifica Colony located at the -illegible- of Guad. Jal. within the Municipality of Zepopan, Jalisco, with the boundaries: North 39.33 mts. with Doña Carmen Arce, widow of (sic) South 39.33 mts. with Luis and -Manuel-(?) Gaspar-Riande-(?), East 29.50 Street of its location and West 22.50 mts. with Mrs. Doña -Illegible-Widow of Zuno, with an area of 884.71 M2.

ORIGIN OR PRIORS REGARDING THE PROPERTY: The real property was acquired by the seller -illegible- Public deed 537 dated 11-1-85 before the undersigned No. -Illegible- of (the.) Registry consolidating its totality -illegible- of the Legal Partnership of his Marriage and Divorce -illegible- with his ex-wife Ruth-Moreno-(?) -Rubino-(?) de Zuno. -Illegible-. 4636/77- -8th-(?) Civ. Court (of) this City.

THE TRANSMITTED (PROBLEM) CONSTITUES

Fraction _____     Rest _____     Whole X

In relationship with the title -illegible-

Values

| FISCAL | OF THE OPERATION | OF THE APPRAISAL |
|--------|------------------|------------------|
| $200,174.00 | $755,520.00 | $755,520.00 |

ILLEGIBLE VALUE
$1,779.375

                        LIQUIDATION                          AMOUNT

| | | AMOUNT |
|---|---|---|
| State Tax to the | % | $ |
| Taxes to the Municipality | % | $0.00 |
| Charges to the | | $ |
| Fine | | $0.00 |

                                          TOTAL

{OVERIMPOSE & STAMPINGS:}

No- illegible - tax on Patrimonial Transfers for not exceeding the -illesible- base of the value of five times the minimum general salary calculated on a yearly basis according to Art. 115 of the Law of -(illegible)- Municipal in the State.

                    Overimposed:
                    {Illegible Rubrics}

43

APPLICABLE PROVISIONS IN CASE OF EXEMPTION:

Article 115, Municipal Finance Law.

-Illegible- on the 11 of January.

In case of private deed:

TRANSFERING PARTY                    SPOUSE OF TRANSFERING PARTY

_____          _____
Name and Signature                   Name and Signature

                    ACQUIRING PARTY

                                1985 {Handwritten}

                    _____
                    Name and Signature

{TO THE RIGHT OF THE ABOVE}

In case of -public-(?) deed:

The Notary:
{Rubrics}
      {Illegible}
      Francisco M. -Illegible-
      MAHP - 4106

                    _____
                    Name and Signature

Contributing (Party) Value $10.00

{Seals and Stamping}

At the left margin:

Vertical Stamping:

Note: It is not - illegible - proof without the certification of
the -illegible- machine seal and authorizing signature.
Overimposed horizontal stamping:

At the right margin:
Illegible partial seal.

44

# BiLingual Services

---

DECLARATION OF INTERPRETER/TRANSLATOR

I, the undersigned, state:  I am an official interpreter and translator for the Superior Court in and for the County of Los Angeles, State of California:  I am familiar with the English and Spanish languages;  I have translated the attached documents from Spanish to English and the foregoing is a true and correct translation of said document.

I certify (or declare) under penalty of perjury, that the foregoing is true and correct.

Executed on _____ at Long Beach, California.

HORTENSIA M. TORRES - COMAS
Certified Interpreter
State of California
County of Los Angeles

_____
Signature

2060 Cedar Avenue, Long Beach  90806

1888 Century Park East, Suite #10, Los Angeles, California  90067

45

**EXHIBIT 11**



**SUNDAY**

August 13, 1989
San Antonio, Texas

**FINAL**

75¢

# Express-News

San Antonio's quality newspaper—largest circulation in South Texas

# Zuno's hometown shocked by arrest

By WILFREDO RAMIREZ
Express-News Staff Writer

News of the arrest of Ruben Zuno Arce in San Antonio rocked the town of Mascota, Mexico, where he is a civic leader sought for favors by both friends and foes.

If Zuno, 59, is found guilty of drug dealing, as U.S. agents allege, he will be the Robin Hood of the western Sierra Madre.

The brother-in-law of former Mexican President Luis Echeverria Alvarez, son of a late governor of Jalisco state and a wealthy agribusinessman, Zuno has been able to get things accomplished without ever being elected to office.

He has built roads and schools and brought potable water to communities needed in nooks and crannies of the mountainous region of Mascota, between Guadalajara and Puerto Vallarta. Many people say some of these projects were made with his own money, not government funds secured through his influence.

### Source of money

The question that seems to hit a raw nerve is where he gets the money to do all that.

His wife, Enriqueta Gaitron de Zuno, during a brief telephone interview from Mascota, swore that "Ruben earned everything with the sweat of his forehead."

One of the town's cynics and skeptics quipped, "Gee, he must have a lot of sweat!"

But even City Councilman Ramon Heredia, whose opposition National Action Party (P.A.N.) could benefit politically from the downfall of a power broker loyal to the ruling party, said he was shocked and saddened by news of Zuno's arrest Wednesday outside a San Antonio grocery.

### Surveillance

Zuno had flown into town Wednesday to buy aircraft parts and raised a "red flag" in a government computer when he cleared the immigration desk.

He was allowed to pass, but was put under surveillance while the INS investigated why a computer registered Zuno as an "excludable alien"

ㄩ.

San Antonio, August 13, 1989     F

# Zuno praised as civic leader by friends, family in Mexico

Continued from 1-A

and a suspect in drug trafficking.

On Wednesday night, federal agents arrested him with a court order saying he is wanted as a witness in Los Angeles, where a trial is to begin next week against one of 10 suspects in the Rafael Caro Quintero gang.

Three gang members have been convicted in the 1985 kidnap and torture slaying of U.S. Drug Enforcement Administration agent Enrique Camarena Salazar.

A federal judge in San Antonio ordered that Zuno be taken there as a material witness to the crime.

Zuno remained in Medina County Jail in Hondo on Saturday awaiting his transfer.

No charges have been presented against him; still, he has been identified in DEA papers as having links to drug lords, which was sufficient for the Immigration and Naturalization Service to detain him.

"It was a total surprise. People are glued to their TV during the newscasts. He's a respected businessman here," Heredia said.

He acknowledged that a few people in town — he calls them rumormongers and artists (those burned with envy) — say the arrest only confirms that something strange was going on at the Zuno ranch, La Joya, and that they are not surprised that one more grower fell victim to what they call "the cancer," the temptation of growing marijuana in the rich and remote plains of the Sierra Madre.

"But I dare them to come forward and present evidence in a court of law. You have to understand that he has helped a lot of people, but in doing things, he had to undo others or step on people's toes," Heredia said.

"They say a small town is a big hell, so you'll find serpent tongues."



UNITED STATES

MEXICO

Pacific Ocean   Gulf of Mexico

Puerto Vallarta

Guadalajara
Mascota

500 miles

Mascota is considered marijuana country. It's not only fertile, but also tucked away in the Sierras. The only road leading to it is as old and rocky that it is worse than a gravel road, said Hugo Montes Guzman, the municipal president, an office that combines the duties of city mayor and county judge.

Montes, speaking by phone from Mascota, also was shocked by news of Zuno's arrest, especially because the only concrete allegation aired so far against Zuno has to do with the house where Camarena died.

The allegation is that Zuno said a house to the DEA agent's kidnappers and torture members. The other allegation — that he may have visited the house and seen Camarena during the 30-hour torture — has yet to be documented in court.

The house, which had been the main residence of Zuno's father, the late Gov. Guadalupe Zuno Hernandez, was abandoned after the 1974 alleged kidnapping of the elder Zuno by the Communist League 23 of September.

The family, in a statement released Friday in Guadalajara, sticks by the story that the house was sold two years before the kidnapping. DEA documents say Zuno sold his fa-

ther's house three weeks before the kidnapping.

Meanwhile, Montes tells of several good deeds in Mascota credited to Zuno: the secondary school, the agricultural vocational school, the technical school, the water pipeline into town, land for the kindergarten and more.

Zuno is the appointed chairman of the county's Advisory Council on Community Improvements and a lead adviser to the regional committee of the ruling Revolutionary Institutional Party, Montes said.

"I'm in shock. The whole town is disgusted. How could they do this to him, one of Mascota's most civic-minded citizens?" Montes asked, crying foul, calumny and slander.

"If anything, he's the leader of the anti-narcotic effort here," he added, citing Zuno as the army's No. 1 scout. "He is an enemy of drug lords.

"Besides, he's got no need. He comes from well-to-do families. They've always had wealth. Imagine, as son of a governor and brother-in-law of a president, who needs drugs? The business opportunities open up to you," Montes said.

Zuno's connection to Echeverria, whose wife is Zuno's sister, was not the first door of opportunity opened to him. Zuno's father was governor in the 1920s and founded the University of Guadalajara, where the slain were student leaders.

The Zuno family statement, made through his nephew, Jose Guadalupe Zuno Cuellar, a Jalisco state legislator, is a stern denial of the charges and a prediction that Zuno will be vindicated.

The strongest reaction came from Zuno's wife, reached at her home, who denied the allegations vehemently and questioned the honesty and integrity of the U.S. authorities



Ruben Zuno Arce remained in Medina County Jail in Hondo on Saturday.

as well as the legality of the arrest.

She said, "Is that American justice? Let me speak as a woman, as a citizen of Mascota, not as a wife or mother.

"They (U.S. authorities) are treating him as the worst thing to offer set foot on the U.S. — though he has not been charged — and that's bad, the image Mascota has of him.

"Here in Mexico we badmouth our police, but they are worse there (in the United States)."

Asked why someone with the connections and background of Zuno, who moved from Guadalajara, would choose such a remote place as Mascota to settle, Mrs. Zuno professed ignorance, but made a passing reference to opal mines.

Enriqueta is Zuno's second wife. They have two children, aged 3 and 6.

The Rev. Vidal Salcedo, the town's Catholic pastor and unofficial historian, said the opal — and gold and silver — mines may have lured Zuno to Mascota two decades ago.

But the opal mining did not pan out. Zuno stuck to gold and silver mining, but mostly to ranching and the growing, canning and exporting of peppers, tomatoes and guava, the area's No. 1 legal agriculture product.

Staff Writer Mary Jane Seder contributed to this story.

1

2                              PROOF OF SERVICE
                            (Re: PERSONAL SERVICE)

3       STATE OF CALIFORNIA          )
                                     ) ss.
4       COUNTY OF LOS ANGELES        )

5              I am employed in the County of Los Angeles, State of
        California.  I am over the age of 18 and not a party to the
6       within action;  my business address is 11377 West Olympic
        Boulevard, Los Angeles, California 90064.
7

8

9              On August 16, 1989, I served the foregoing document
        described as:

10      DECLARATIONS AND EXHIBITS IN SUPPORT OF MOTION IN OPPOSITION TO
        DESIGNATION OF MATERIAL WITNESS
11

12      on the interested parties in this action by placing a true copy
        thereof enclosed in sealed envelope(s) addressed as follows:

13                              GARY A. FEESS
                            United States Attorney
14

15                            ROBERT L. BROSIO
                        Assistant United States Attorney
16                          Chief, Criminal Division

17                             JIMMY GURULE
                        Assistant United States Attorney
18                          Major Narcotics Section

19                     1400 United States Courthouse
                            312 North Spring Street
20                      Los Angeles, California  90012

21             I caused such envelope(s) to be delivered by hand to
        the offices of the addressee.
22

23             .
               Executed this 16th day of August, 1989, at
24      Los Angeles, California.

25

26             I declare that I am employed in the office of a member
        of the bar of this court at whose direction the service was
27      made.

28                              _____
                                PATRICIA WEST MORROW

**PROOF OF SERVICE**
[PERSONAL DELIVERY]


STATE OF CALIFORNIA          )
                             ) ss.
COUNTY OF LOS ANGELES        )

      I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action;  my business address is 1093 Broxton Avenue, #685, Westwood Village, California 90024.


      On August 16, 1989, I served the foregoing document described as:

DECLARATIONS AND EXHIBITS IN SUPPORT OF MOTION IN OPPOSITION TO DESIGNATION OF MATERIAL WITNESS

on the interested parties in this action by delivering by hand a true copy thereof enclosed in a sealed envelope to the offices of the addressee as follows:

**GARY A. FEESS**
United States Attorney

**ROBERT L. BROSIO**
Assistant United States Attorney
Chief, Criminal Division

**JIMMY GURULE**
Assistant United States Attorney
Major Narcotics Section

1400 United States Courthouse
312 North Spring Street
Los Angeles, California   90012

      Executed this 16th day of August, 1989, at Los Angeles, California.


      I declare under penalty of perjury that the foregoing is true and correct.


_____

LUIZ X-PRESS SERVICES

**Exhibit H**

EDWARD M. MEDVENE
JAMES E. BLANCARTE
RONALD A. DiNICOLA
KEVIN E. GAUT
MITCHELL, SILBERBERG & KNUPP
11377 West Olympic Boulevard
Los Angeles, California 90064
(213) 312-2000

Attorneys for Defendant Ruben Zuno-Arce

FILED

SEP

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF ......
BY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

                Plaintiff,

      vs.

RUBEN ZUNO-ARCE,

                Defendant.

) Case No.  89-741
)
) NOTICE OF MOTION AND MOTION OF
) DEFENDANT RUBEN ZUNO-ARCE FOR
) RELEASE PENDING TRIAL; AND
) MEMORANDUM OF POINTS AND
) AUTHORITIES IN SUPPORT THEREOF
)
) [APPENDIX FILED CONCURRENTLY]
)
)

Date:  September 11, 1989
Time:  9:00 a.m.
Dept:

1     TO:   UNITED STATES ATTORNEY GARY A. FEES, AND

2           ASSISTANT UNITED STATES ATTORNEY MANUEL MEDRANO

3

4           PLEASE TAKE NOTICE that on September 11, 1989, at 9:00

5     a.m., or as soon thereafter as counsel can be heard in the

6     above-entitled Court located at 312 North Spring Street, Los

7     Angeles, California  90012, defendant Ruben Zuno-Arce will move

8     for an order releasing him from custody.  This motion will be

9     made pursuant to 18 U.S.C. Section 3141, et seq. on the grounds

10    that Mr. Zuno-Arce's release is appropriate on his own recogni-

11    zance or, in the alternative, subject to reasonable conditions.

12

13          This motion is based on this Notice of Motion, the

14    accompanying Memorandum of Points and Authorities in support

15    hereof, the accompanying appendix of exhibits filed concurrently

16    herewith, and upon such other and further evidence as may be

17    presented at or prior to the hearing of this Motion.

18

19    Dated:  September 11, 1989         EDWARD M. MEDVENE
                                         JAMES E. BLANCARTE
20                                       RONALD A. DiNICOLA
                                         KEVIN E. GAUT
21                                       MITCHELL, SILBERBERG & KNUPP

22

23          .                           By: _____
                                            Ronald A. DiNicola
24                                          Attorneys for Ruben Zuno-Arce

25

26

27

28

                                    1

1    MEMORANDUM OF POINTS AND AUTHORITIES

2

3    I.

4    INTRODUCTION

5

6    The indictment of Ruben Zuno-Arce for perjury is the

7    latest development in an emerging pattern of highly irregular

8    government conduct that began with the August 9, 1989 arrest of

9    Mr. Zuno-Arce in San Antonio as a purported material witness.

10   Now four weeks later, with the government's initial sweeping

11   allegations of drug trafficking still unsubstantiated and

12   otherwise discredited, Mr. Zuno-Arce remains in United States

13   custody, separated from his family and young children, and still

14   a victim of questionable prosecutorial zeal.

15

16   Mr. Zuno-Arce, 59, a well known and respected former

17   high ranking government official from Mexico, was originally

18   arrested and imprisoned, without being charged, because he

19   purportedly was a material witness in the trial of certain

20   defendants alleged to have murdered DEA agent Kiki Camerana.

21   The Government's only substantiated purported link between Mr.

22   Zuno-Arce and the Camerana murder was a matter of public

23   record: Mr. Zuno-Arce at one time owned the Lope de Vega

24   residence, located in Guadalajara, Mexico.  The Camerana murder

25   allegedly occurred at the Lope de Vega residence, after Mr.

26   Zuno-Arce sold it.  Mr. Zuno-Arce sold the Lope de Vega

27   residence to someone who in turn sold that house to Caro-

28

2

1  Quintero, a drug trafficker allegedly responsible for Camerana's
2  murder.

4      In seizing Mr. Zuno-Arce, the Government otherwise
5  relied upon conclusory, unsubstantiated allegations that Mr.
6  Zuno-Arce was engaged in illegal narcotics activities.  After
7  consuming some three weeks to complete a mere four hours of
8  grand jury testimony, and when pressed by Judge Rafeedie to
9  substantiate their claims that Mr. Zuno-Arce was a material
10  witness, the attorneys for the government were unable to point
11  to a single item of grand jury testimony to substantiate their
12  allegation that Mr. Zuno-Arce associated with, or acted as an
13  intermediary for, narcotics traffickers.  The government failed
14  to present any other evidence to support such allegtions despite
15  ample time to do so.

17      On September 5, 1989, after reviewing Mr. Zuno-Arce's
18  grand jury testimony, Judge Rafeedie ruled that he was not a
19  material witness and ordered his immediate release.  In effect,
20  the government conceded the lack of evidence to support its
21  earlier allegations when it voluntarily entered into an
22  agreement on the record that it would do nothing further to
23  detain; or interfere with the release of, Mr. Zuno-Arce.  Barely
24  two days later in a transparent and desperate prosecutorial act
25  designed to circumvent Judge Rafeedie's release order, Mr.
26  Zuno-Arce was charged with three counts of perjury.

3

1    Given the strong presumption in favor of bail,
2    Zuno-Arce should be released on his own recognizance because he
3    is simply not a flight risk. It is undisputed that Mr.
4    Zuno-Arce was available to and has previously been cooperative
5    with U.S. officials. In 1987, for example, after the Camarena
6    indictments, Mr Zuno-Arce voluntarily met with government agents
7    to discuss the Camarena case. He has, to the government's
8    knowledge, regularly traveled to the United States since 1987.
9    He has traveled by commercial airliner, under his own name, and
10   has made no effort to disguise his identity. As these facts
11   demonstrate, Mr. Zuno-Arce is simply not a flight risk.

12

13   Each of the enumerated factors in 18 U.S.C. Section
14   3142 favor releasing Mr. Zuno-Arce on his own recognizance. Mr.
15   Zuno-Arce has been charged only with perjury with respect to
16   three isolated statements made in response to open-ended and
17   imprecise questioning over a period of four hours. The weight
18   of the evidence is slight at best. The government has yet to
19   present any proof to substantiate its allegations of perjury.
20   The objective facts show that government's allegations are but a
21   pretext to defeat Judge Rafeedie's order requiring Mr.
22   Zuno-Arce's immediate release. A former DEA Agent, Art
23   Rodriguez, a close personal friend of Agent Camarena, has
24   testified that, to his knowledge, Mr. Zuno-Arce was never been
25   suspected by the DEA of any drug trafficking, of any
26   participation in the Camarena murder, or of being any way
27   associated with Rafael Caro-Quintero or Ernesto Fonseca-Carillo.
28

4

1           In his home country, Mr. Zuno-Arce is a former high
2   ranking government official and a successful businessman. He is
3   a family man, who has two young children, ages two and three.
4   Mr. Zuno-Arce has an excellent reputation for truthfulness,
5   reliability and integrity. Several prominent Mexican citizens
6   have submitted declarations attesting to Mr. Zuno-Arce's
7   honesty. Mr. Zuno-Arce has no prior criminal history whatsoever
8   involving alcohol or drugs. Neither former DEA Agent Rodriguez
9   or Agent Jaime Kuykendall, former head of the Guadalajara
10  office, have ever suspectd Mr. Zuno-Arce of any involvement in
11  drug trafficking.

12

13          The central thrust of the government's opposition to
14  Mr. Zuno-Arce's release is that he is a citizen of Mexico. This
15  is patently insufficient to justify his confinement without
16  bail. Finally, there is absolutely no evidence to suggest that
17  Mr. Zuno-Arce is a danger to the community. The government has
18  failed to present any evidence at all, let alone clear and
19  convincing evidence, as required, that Mr. Zuno-Arce is a danger
20  to the community.

21

22          At a minimum, Mr. Zuno-Arce should be released subject
23  to reasonable conditions to assure his presence. He owns real
24  property in Mexico valued at between $1.5 and $2 million. Mr.
25  Zuno-Arce is prepared, if necessary, to pledge these assets as
26  surety to guarantee his return for trial. Similarly, a number
27  of Mr. Zuno-Arce's friends and relatives in the United States
28

                            5

1    and Mexico are prepared to do the same.  These assets provide

2    adequate security to insure Mr. Zuno-Arce's appearance at trial.

3

4                                      II.

5                          FACTUAL BACKGROUND

6

7            Mr. Zuno-Arce's sudden arrest while vacationing in

8    this country, his subsequent imprisonment without bail and

9    abusive treatment at the hands of United States officials is

10   indicative of a pattern of highly questionable prosecutorial

11   manuevering that can be summarized as follows:

12

13           (1)  On August 9, 1989, Mr. Zuno-Arce was arrested in

14   San Antonio as a purported material witness in the prosecution

15   of Juan Jose Bernabe Ramirez in Los Angeles, who had been

16   charged in connection with the 1985 kidnapping and murder of DEA

17   Agent Enrique Camarena Salazar.

18

19           (2)  On August 13, 1989, Mr. Zuno-Arce was forcibly

20   transported to Los Angeles.

21

22           (3)  On August 18, 1989, Judge Edward Rafeedie ordered

23   that Mr. Zuno Arce be detained without bail as a material

24   witness pending his appearance before a federal grand jury

25   notwithstanding the fact that:

26

27

28

                                      6

1   (a) The government affidavit in support of Mr.
2   Zuno-Arce's designation as a material witness, later charac-
3   terized by Judge Rafeedie as "admittedly very marginal,"
4   contained broadsweeping and unsubstantiated allegations that Mr.
5   Zuno-Arce was a known drug trafficker who associated with drug
6   traffickers and had knowledge relevant to the Camarena case.
7   The affidavit was based entirely upon unspecified statements
8   from unnamed informants of unproven reliability. TR. (August
9   18, 1989) at p. 21.

10

11   (b) Counsel for Mr. Zuno-Arce was denied access
12   to certain purported evidence presented in camera and was thus
13   denied any meaningful opportunity to challenge its validity.
14   The government failed entirely to address or refute well-
15   recognized authorities indicating that the Court's consideration
16   of the in camera filing was erroneous. These authorities are
17   also set forth in Mr. Zuno-Arce's contemporaneously filed motion
18   to prevent the consideration of such in camera evidence in these
19   proceedings.

20

21   (c) At the time of his arrest, the government
22   knew that Mr. Zuno Arce was available to and had previously been
23   cooperative with U.S. officials. The government knew Mr. Zuno-
24   Arce met voluntarily in 1987, after the Camarena indictments,
25   with Special Agent Jaime Kuykendall, the former head of the DEA
26   Guadalajara office. The government knew that Mr. Zuno-Arce
27   regularly traveled to the United States for pleasure purposes by
28

7

1    commercial airliner, under his own name, making no effort to
2    disguise himself. Yet the government never asked Mr. Zuno-Arce
3    to make himself voluntarily available for testimony.

4

5              (d)  The government possessed readily available
6    and less onerous methods to procure and preserve Mr. Zuno-Arce's
7    testimony.

8

9              (4)  Although the Court's decision to detain Mr. Zuno-
10   Arce was premised upon a specific order that the government move
11   expeditiously to procure Mr. Zuno-Arce's testimony, it took the
12   government some three weeks from the date of Mr. Zuno-Arce's
13   arrest to complete barely four hours of grand jury testimony.
14   Mr. Zuno-Arce was brought before the grand jury on two separate
15   occasions.  The first session was on August 24, 1989, and was
16   limited to just over two hours because the court reporter had to
17   leave and the government refused to make alternative
18   arrangements to continue the session.  Though Mr. Zuno-Arce was
19   available each and every day at any time and for as long as
20   necessary, the government inexplicably waited a week (until
21   August 31, 1989) to bring him back before the grand jury, again
22   for about two hours, to complete his testimony.

23              -

24              (5)  Each time Mr. Zuno-Arce appeared before the grand
25   jury he cooperated fully, and as Assistant United States
26   Attorney Jimmy Gurule conceded at the completion of the second
27   session, the proceeding "went well" and Mr. Zuno-Arce appeared

28

8

1  to be "truthful."  Mr. Zuno Arce's testimony simply confirmed

2  what the government had known for many years -- he previously

3  owned the Guadalajara residence on Lope de Vega Street in which

4  Agent Camarena was allegedly held and tortured, he once was a

5  high ranking Mexican government official, and his brother-in-law

6  is the former president of Mexico.  Mr. Zuno-Arce's immunized

7  testimony negated any showing that he was a material witness.

8

9       (6)  On September 5, 1989, following in camera review

10  of Mr. Zuno-Arce's grand jury testimony, Judge Rafeedie ordered

11  his immediate release.  The Court found that Mr. Zuno-Arce was

12  not a material witness in the Bernabe Ramirez case.  The Court

13  stated, "the involvement and relationship of this witness to the

14  Lope de Vega property in no way justifies continued deten-

15  tion.... I order his release forthwith."  TR. (Sept. 5, 1989),

16  p. 11-12.

17

18       (7)  After the Court ordered that Mr. Zuno-Arce be

19  released forthwith, he was delivered instead to the custody of

20  the Immigration and Naturalization Service ("INS") pursuant to a

21  detention order served on Mr. Zuno-Arce in San Antonio, Texas,

22  on Wednesday, August 10, 1989.

23

24       (8)  At the insistence of counsel for Mr. Zuno-Arce, a

25  second hearing was convened on September 5, 1989 at which

26  Assistant United States Attorney Jimmy Gurule represented that

27  his office had nothing to do with the continued detention of Mr.

28

9

1  Zuno-Arce and that the detention was a result of independent
2  action on the part of the INS. Assistant United States Attorney
3  Manuel Medrano entered into an agreement on the record with
4  undersigned counsel and represented to the Court that the United
5  States Attorneys Office would take no action prospectively to
6  interfere with Mr. Zuno-Arce's release from custody.
7
8       (9)  A representative from the INS stated that Mr.
9  Zuno-Arce would be transported immediately to San Antonio and a
10  hearing on Mr. Zuno-Arce's exclusion would be held no later than
11  the following day, Wednesday, September 6, 1989.
12
13      (10)  Mr. Zuno-Arce was not transferred to San Antonio
14  until late in the day on September 6.
15
16      (11)  Counsel for Mr. Zuno-Arce subsequently learned
17  that the INS in San Antonio delayed initiating the proceedings
18  there on the advice and at the request of the United States
19  Attorneys Office in Los Angeles.  This was contrary to the
20  agreement and representations made by Messrs. Gurule and Medrano
21  in open Court on September 5, 1989.
22
23    -  (12)  On September 7, 1989, the United States filed a
24  three count perjury indictment against Mr. Zuno-Arce in Los
25  Angeles.  Mr. Zuno-Arce had testified before the grand jury in
26  response to open-ended and imprecise questioning that to the
27  best of his knowledge he had never met or spoken to Rafael Caro
28

10

1   Quintero, and that he did not know Ernesto Fonseca Carrillo.
2   The United States now alleges that this testimony is false.
3

4       In conclusion, the government's initial sweeping
5   allegations against Mr. Zuno-Arce have never been
6   substantiated. The government has not and cannot establish any
7   association on the part of Mr. Zuno-Arce with narcotics
8   traffickers. The attorneys for the government are unable to
9   point to a single item of grand jury testimony or any other
10  evidence to substantiate their contentions that Mr. Zuno-Arce
11  associated with, or acted as an intermediary for, narcotics
12  traffickers. Unable to prove its allegations or to establish an
13  alternative basis to continue to hold Mr. Zuno-Arce, the
14  government has now created a pretext to continue to hold Mr.
15  Zuno-Arce and to circumvent Judge Rafeedie's order by charging
16  him with perjury. As hereinafter set forth and in light of the
17  history of this case, Mr. Zuno-Arce should be released on his
18  own recognizance and brought to a speedy trial.
19

20              III.
21      MR. ZUNO-ARCE SHOULD BE RELEASED
22          ON HIS OWN RECOGNIZANCE
23
24      A defendant must be released on his own recognizance,
25  or at minimum released subject to reasonable conditions, unless
26  the Government proves that he is a flight risk or a danger to
27  the community. 18 U.S.C. § 3142. It is well settled that
28

                    11

1 | "[o]nly in rare circumstances should release be denied," and
2 | that any "[d]oubts regarding the propriety of release should be
3 | resolved in favor of the defendant." United States v. Motamedi,
4 | 767 F.2d 1403, 1405 (9th Cir. 1985).

6 | 18 U.S.C. § 3142(g) sets forth various factors the
7 | Court must consider in determining whether Mr. Zuno-Arce is a
8 | flight risk or danger to the community. Each of these factors
9 | argue in favor of releasing Mr. Zuno-Arce on his own
10 | recognizance.

12 | A.   Mr. Zuno-Arce Is Not A Flight Risk.

14 | The Government has the burden of proving by a
15 | preponderance of the evidence that Mr. Ruben Zuno-Arce poses a
16 | flight risk such that no condition or combination of conditions
17 | will reasonably assure his presence at trial. United States v.
18 | Winsor, 785 F.2d 755 (9th Cir. 1986); United States v. Motamedi,
19 | supra.  Mere opportunity for flight is not a sufficient ground
20 | for pretrial detention. United States v. Himler, 797 F.2d 156,
21 | 162 (3d Cir. 1986).  Similarly, mere assertion of risk of flight
22 | is not sufficient; rather, specific facts must be presented to
23 | give the Court probable cause to believe that a true risk of
24 | flight exists.  Bacon v. United States, 449 F.2d 933, 943 (9th
25 | Cir. 1971); United States v. Melenslez-Cairon, 790 F.2d 984, 993
26 | (2d Cir. 1986).

12

1          Here, consideration of the factors set forth in

2    Section 3142(g) show that Mr. Zuno-Arce is not a flight risk:

3

4          1.   Character:

5

6          Mr. Zuno-Arce is a former high office holder in

7    the Federal Government of Mexico.  His father was the founder of

8    the University of Guadalajara, and an educator, statesman and

9    politician.  Mr. Zuno-Arce is married and has two young

10   children, aged six and three.  He is a prominent businessman in

11   the Mexican State of Jalisco, who owns a gas station, canning

12   plant, lumber mill and extensive farm lands.

13

14         Mr. Zuno-Arce has an excellent reputation for

15   truthfulness, reliability, and integrity.  Several Mexican

16   citizens, including the Mayor and police chief in his home town

17   of Moscota, have submitted declarations attesting to his

18   excellent reputation.  Mr. Zuno-Arce resided for some years in

19   San Antonio and has also submitted declarations from residents

20   of that town, including a former DEA agent, Art Rodriguez, which

21   attest to his honesty and reliability.

22

23         2.   Past Conduct; Record Concerning Past Appearances:

24

25         Mr. Zuno-Arce has a history of cooperating with

26   United States Government officials.  Two years ago, in 1987, Mr.

27   Zuno-Arce, at the request of the DEA, voluntarily came from his

28

13

1 home in Mexico to meet with DEA agents in San Antonio, Texas, to

2 discuss his former ownership of the Lopa de Vega residence and

3 any other information he might have helpful to the Government's

4 investigation of the Camerana murder. During his meeting with

5 the DEA, Mr. Zuno-Arce fully answered all questions asked of

6 him. Art Rodriguez, who, while a DEA agent, attended meetings

7 with Mr. Zuno-Arce, has testified that Mr. Zuno-Arce answered

8 fully and truthfully all questions he was asked.

9

10 Since meeting with the DEA in 1987, at which time

11 he was aware the Government considered him a potential witness

12 in the Camerana case, Mr. Zuno-Arce has, to the Government's

13 knowledge, regularly travelled to the United States. He has

14 travelled by commercial airliner, under his own name, and has

15 made no effort to disguise his identity. He has therefore

16 manifested willingness to submit to United States jurisdiction.

17

18 3. Weight Of The Evidence:

19

20 The Government has thus far come forward with no

21 competent evidence to show that Mr. Zuno-Arce lied when he told

22 the Grand Jury that he had not met Caro-Quintero or certain of

23 Caro-Quintero's alleged associates. In fact, when Mr. Zuno-Arce

24 was giving his Grand Jury testimony, and before Judge Rafeedie

25 ordered Mr. Zuno-Arce released, U.S. Attorney Jimmy Gurule told

26 Mr. Zuno-Arce's counsel that he believed Mr. Zuno-Arce had

27 testified truthfully in front of the Grand Jury.

28

14

1  Moreover, Mr. Zuno-Arce's allegedly perjurious
2  statements were made on August 24, 1989, more than 13 days
3  before the September 5 hearing at which Mr. Zuno-Arce was
4  released. Yet, the Government never sought to indict Mr. Zuno-
5  Arce until after September 5 when he was released by Judge
6  Rafeedie. On September 5, after Judge Rafeedie had ordered Mr.
7  Zuno-Arce's release, the U.S. Attorney's office first requested
8  that the INS, which had no legitimate basis for holding Mr.
9  Zuno-Arce, detain him until the U.S. Attorney's office could
10 procure a perjury indictment. The U.S. Attorney plainly sought
11 the indictment, on paltry or no evidence, for the ulterior
12 purposes of defeating Judge Rafeedie's order requiring Mr. Zuno-
13 Arce's immediate release and of detaining Mr. Zuno-Arce in the
14 United States.

15

16 The facts profferred by Mr. Zuno-Arce confirm that
17 the Government's charges have no eviden.airy support and were
18 filed for an ulterior purpose. Art Rodriguez was a close
19 personal friend of Kiki Camerana's who, while a DEA agent,
20 volunteered to work and did work on the DEA's investigation of
21 the Camerana case. Although he completed his work on the DEA
22 Camerana investigation in 1985, Art Rodriguez continued, until
23 at least 1987, to communicate with Jaime Kuykendall, the DEA
24 agent who headed the Camerana investigation. Mr. Rodrigue has
25 testified that, to his knowledge, Mr. Zuno-Arce was never
26 suspected by the DEA of any drug trafficking or of any
27 participation in the Camerana murder. Certainly if, as the
28

15

1  Government contends, Mr. Zuno-Arce was a narcotics trafficker
2  who knew Camerana's murderer, Caro-Quintero, Mr. Rodriquez would
3  know.  Instead, Mr. Rodriquez supports Mr. Zuno-Arce's testimony
4  that Mr. Zuno-Arce is not a narcotics trafficker and has never
5  known or fraternized with Caro-Quintero.
6
7  Moreover, the Government's contention that Mr.
8  Zuno-Arce knows Caro-Quintero and certain of his associates is
9  particularly suspect in light of the Government's failure to
10 provide any supporting statement whatsoever from DEA agent Jaime
11 Kirkendall, who not only headed the Camerana murder
12 investigation but conducted the 1987 interviews of Mr. Zuno-Arce
13 in San Antonio.  If Mr. Zuno-Arce truly were a confederate of
14 Caro-Quintero or his associates, Mr. Kuykendall, who interviewed
15 Mr. Zuno-Arce at length in 1987, would know.  The fact that the
16 Government has filed no reports whatsoever from Jaime Kuykendall
17 s telling evidence that Mr. Zuno-Arce does not in fact know
18 Caro-Quintero or any of his alleged associates.
19
20 Finally, the Government has a history of making
21 unsupported allegations against Mr. Zuno-Arce.  Given that
22 history, the Court should view the Government's newest perjury
23 allegations with extreme skepticism.  Thus, the Government
24 initially alleged that Mr. Zuno-Arce was a narcotics trafficker
25 implicated in the Camerana murder.  But to date, the Government
26 has proferred no evidence and obtained no testimony from Mr.
27 Zuno-Arce to support those allegations.  The Government also has
28

16

1 never attempted to indict Mr. Ruben Zuno-Arce on those
2 allegations.

3

4 Indeed, the Government has been unable even to sustain
5 its lesser allegations that Mr. Zuno-Arce, even if not himself
6 implicated in the Camerana murder, is at least a material
7 witness in the trials of the Camerana defendants. The
8 Government caused Mr. Zuno-Arce to be imprisoned for 26 days,
9 and examined him twice in front of the Grand Jury, only to have
10 Judge Rafeedie conclude that Mr. Zuno-Arce had no material
11 testimony to offer.

12

13 The Government's perjury charges are as unsupportable
14 as its claims that Mr. Zuno-Arce is a material witness or
15 implicated in the Camerana murder. The lack of evidence
16 supporting the Government's perjury charges is, by itself, an
17 adequate basis for releasing Mr. Zuno-Arce pending trial. See,
18 e.g., United States v. Jackson, 845 F.2d 1262 (5th Cir. 1988).
19 (Reversing district court detention order, Fifth Circuit rules
20 that defendant must be released where Government has failed to
21 introduce any persuasive evidence that defendant committed crime
22 charged.)

23 •

24 4. Nature And Circumstances Of Offense Charged:

25

26 Mr. Zuno-Arce has been charged only with perjury,
27 and only with respect to three isolated statements out of more
28

17

1 | than four hours of Grand Jury testimony. The fact that Mr.

2 | Zuno-Arce has been charged with perjury, rather than a more

3 | serious crime, also argues against Mr. Zuno-Arce's being a

4 | flight risk. Perjury does not establish a "prima facie case for

5 | the assumption that [defendant] is likely to flee." United

6 | States v. Honeyman, 470 F.2d 473, 475 (9th Cir. 1972).

7 |

8 |        5.  Community Ties:

9 |

10 |        Mr. Zuno-Arce has strong ties to both Los Angeles

11 | and San Antonio. He has several relatives in Southern

12 | California who have proven their confidence in his integrity and

13 | reliability by offering their homes as collateral for any

14 | bond. In addition, Mr. Zuno-Arce has lived and has numerous

15 | friends in San Antonio, Texas. Those friends also have promised

16 | to pledge their houses and property in support of Mr. Zuno-

17 | Arce's release. They have, in addition, offered affidavits

18 | attesting to his excellent reputation.

19 |

20 |        6.  Criminal History; History Relating To Drug And

21 | Alcohol Abuse:

22 |

23 |        .   A.  Mr. Zuno-Arce has no criminal history

24 | whatsoever.[1]  In addition, he has no history whatsoever of any

25 |

26 | [1]  In front of the Grand Jury, the Government questioned
27 | Mr. Zuno-Arce about an incident in which Mr. Zuno-Arce's
     | bodyguard, in Mr. Zuno-Arce's presence, killed two men whom
28 |

18

1    alcohol or drug abuse. These factors therefore also argue in

2    favor of finding that Mr. Zuno-Arce is not a flight risk.

3

4          B.   Mr. Zuno-Arce May Not Be Detained Solely Because

5 He Is An Alien.

6

7          The Government relies almost entirely upon the

8 fact that Mr. Zuno-Arce is a Mexican citizen in arguing that he

9 is a flight risk. While alienage is a factor that the Court may

10 considered, it does not "point conclusively to a determination"

11 that a defendant is a flight risk; and a defendant may not be

12 detained pending trial simply because he is an alien. United

13 States v. Motamedi, 767 F.2d at 1408. See also, e.g., Truong

14 Dinb Hung v. United States, 439 U.S. 1326, 99 S.Ct. 16, 58

15 L. Ed. 2d 33 (1978) (Justice Brennan, rejecting lower court

16 argument that defendant should be detained because he is an

17 alien, orders convicted defendant released pending resolution of

18 appeal.); United States v. Honeyman, 470 F.2d at 474 (Ninth

19 Circuit overrules district court, which denied bail based on

20 Government argument that defendant, as an alien, was likely to

21

22

23 the bodyguard believed might be attempting to kidnap or harm
Mr. Zuno-Arce. As Mr. Zuno-Arce explained at length in his

24 Grand Jury testimony, attempts to kidnap or injure existing
or former Government officials were and are common in

25 Mexico, and existing or former Government officials like Mr.
Zuno-Arce often have bodyguards as protection from

26 kidnappings or physical harm. Indeed, it is well known that
Mr. Zuno-Arce's own father was a kidnap victim. Mr. Zuno-

27 Arce was ever charged with any crime whatsoever in
connection with the killing of the two men.

28

1   flee. Court found other factors led to conclusion that

2   defendant was not a flight risk).

3

4       In any event, Mr. Zuno-Arce may agree to be extradited

5   from Mexico if he does not voluntarily appear. In United

6   States v. Paterson, 780 F.2d 883 (10th Cir. 1986), the Tenth

7   Circuit ruled that a convicted Canadian defendant should be

8   released pending resolution of his appeal. The Court stated:

9

10          "The only facts which might arguably
           support the district court's finding that
11         defendant is a flight risk relate to his
           Canadian citizenship and ties to that
12         country. However, Canada is not an
           uncivilized country, and we have
13         extradition treaties with Canada that are
           routinely honored. In addition,
14         defendant agreed to waive extradition.
           Thus, a provision for bail in an amount
15         sufficient to reimburse the government if
           it did have to seek extradition would be
16         sufficient to secure appellant's
           appearance. Thus, his Canadian
17         citizenship, standing alone, is not a
           suffcient basis for finding that he
18         presents a risk of flight." 780 F.2d at
           888.
19

20

21      Here, as in Paterson, appropriate arrangements may be

22   made if necessary for Mr. Zuno-Arce to waive extradition.

23       •

24          C. Mr. Zuno-Arce Poses No Danger To The Community.

25

26      Unless the Government proves by "clear and

27   convincing" evidence that Mr. Zuno-Arce poses a danger to the

28   community, he must be released. 18 U.S.C. § 3142(f).

20

1      Here, the Government has no evidence, let alone
2  any "clear and convincing" evidence, that Mr. Zuno-Arce would
3  pose a danger to the community if released. Mr. Zuno-Arce has
4  been charged only with lying in three isolated statements made
5  during the course of more than four hours of what the Government
6  implicitly admits was otherwise truthful Grand Jury testimony.
7  Moreover, the Government's evidence that Mr. Zuno-Arce committed
8  perjury is paltry or non-existent, and the Government's charges
9  appear to have been brought for ulterior purposes.
10

11      In fact, there is no evidence whatsoever that Mr.
12  Zuno-Arce, who has been characterized by several witnesses as a
13  man of utmost integrity and trustworthiness, would lie to anyone
14  if released. In any event, perjury is not a crime of violence,
15  and the mere chance that Mr. Zuno-Arce might lie again if
16  released does not justify detaining him. "[P]erjury, while a
17  serious offense, is not of a type that indicates that the
18  defendant is a danger to the community." United States v.
19  Honeyman, 470 F.2d at 474. 475. See, also, e.g., United
20  States v. Himler, 797 F.2d 756 (3d Cir. 1986) (where defendant
21  was charged with using false identification, likelihood that
22  defendant, if released, would repeat such criminal wrongdoing
23  was "not the type of danger to the community which will support
24  an order of detention under the Bail Reform Act of 1984").
25

26      Other than the speculative possibility that Mr. Zuno-
27  Arce might repeat the crime with which he has been charged (but
28

21

1  has not committed), the Government cannot identify any other

2  realistic community danger posed by Mr. Zuno-Arce.

3

4                              IV.

5           AT MINIMUM, MR. ZUNO-ARCE SHOULD BE

6        RELEASED SUBJECT TO REASONABLE CONDITIONS

7

8           Although Mr. Zuno-Arce should be released on his own

9  recognizance, the Court should at minimum release him subject to

10  reasonable bail or other conditions.

11

12           Mrs. Zuno-Arce has filed a declaration setting forth

13  that she and her husband own real property, in Mexico, worth

14  between $1.5 and $2 million dollars.  The Zuno-Arces' real

15  property constitutes almost all their net worth; they have very

16  few liquid assets.  The Zuno-Arces are prepared, if necessary,

17  to pledge their entire real property as security for Mr. Zuno-

18  Arce's return for trial.  In addition, several of the Zuno-

19  Arces' friends and relatives, who reside in Los Angeles and San

20  Antonio, have filed declarations stating their promise to pledge

21  their real property, located in those cities, as security for

22  Mr. Zuno-Arce's return.  The Court may, if necessary, fashion

23  from these assets reasonable security for Mr. Zuno-Arce's return

24  for trial.

25

26

27

28

                              22

V.

CONCLUSION

Mr. Zuno-Arce should be released on his own recognizance pending trial.

Dated:   September 11, 1989     Respectfully submitted,

EDWARD M. MEDVENE
JAMES E. BLANCARTE
RONALD A. DiNICOLA
KEVIN GAUT
MITCHELL, SILBERBERG & KNUPP

By _____
   Ronald A. DiNicola

Attorneys for Ruben Zuno-Arce

23

**Exhibit I**

EDWARD M. MEDVENE
JAMES E. BLANCARTE
RONALD A. DINICOLA
KEVIN E. GAUT
MITCHELL, SILBERBERG & KNUPP
11377 West Olympic Boulevard
Los Angeles, California 90064
(213) 312-2000

Attorneys for Defendant Ruben Zuno-Arce

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 89-741 |
| | ) | |
| Plaintiff, | ) | APPENDIX OF DECLARATIONS IN SUPPORT OF DEFENDANT RUBEN ZUNO-ARCE'S MOTION FOR RELEASE PENDING TRIAL |
| vs. | ) | |
| | ) | |
| RUBEN ZUNO-ARCE | ) | |
| | ) | Date: September 11, 1989 |
| Defendants. | ) | Time: 9:00 a.m. |
| | ) | Dept: |

## DECLARATION OF JESSE GONZALEZ

I, JESSE GONZALEZ, hereby declare as follows:

1.     I know all of the following facts of my own personal knowledge and, if called and sworn as a witness, could and would competently testify thereto.

2.     I have been personally acquainted with RUBEN ZUNO-ARCE SINCE 1977. During that time I have always known him to be reliable and trustworthy.

3.     During those 12 years in the United States, I lived in San Antonio, Texas, and have seen and visited with him frequently. He has visited my home and family. I am also acquainted with his wife and family.

4.     I am employed at the County Clerk's office, Bexar County, Texas for seven years.

5.     I estimate that the house that my wife and I own in San Antonio, Texas is worth approximately $70,000.00. There are no mortgages on the house. My wife and I are willing to make all the equity in the house available as collateral on a bond for the benefit of MR. RUBEN ZUNO-ARCE.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 11th day of September, 1989 at San Antonio, Texas.

JESSE GONZALEZ

## DECLARATION OF MARIA ENRIQUETA GUITRON VELASCO

I, Maria Enriqueta Guitron Velasco, hereby declare as follows:

1. I am, and for approximately 11 years have been, married, to Ruben Zuno Arce. I know all the following facts of my own personal knowledge and, if called and sworn as a witness, could and would competently testify thereto.

2. My husband Ruben Zuno Arce and I own our own home and ranch in the city of Mascota, State of Jalisco, Republic or Mexico, as well as other properties in the State of Jalisco, Republic of M'exico.

3. I am informed and believe that the real properties that my husband and I own in Mascota and in the State of Jalisco, Republic of Mexico, have an approximative total value of between $1'500,000. and $2'800,000. Dollars ( U.S. ) We do not have any mortgages nor do we owe any money on any of these properties. The above mentioned properties represent almost our entire net worth. Our liquid assets are only a minor part of our total net worth which we use for the on-going operating expenses of my husband's ranch, automobile service and repair station and lumberyard business enterprises.

4. My husband Ruben Zuno Arce and I are willing to make all of the equity in the above-mentioned real properties available as collateral on a bond for the release and benefit of Mr. Ruben Zuno Arce.

I declare penalty of perjury that the foregoing is true and correct. Executed this 10th day of September, 1989, at Mexico City, Republic of Mexico.

Maria Enriqueta Guitron Velasco

**GRUPO AUTOMOTRIZ ECONOMICO, S.A. DE C.V.**

COMPRA-VENTA Y COMISION DE AUTOMOVILES USADOS

Niños Héroes 2050    Tels. 15-40-40, 16-06-33 y 30-05-13

Guadalajara, Jal.

## DECLARTICN OF MR. MIGUEL HERNANDEZ GUARDADO

I, Miguel Hernández Guardado, hereby declare as follows:

1.  I know all the following facts of my own personal knowledge and, if called and sworn as a witness, could and would competently testify thereto.

2.. I am a Mexican citizen and own an automobile dealership in Guadalajara, Jalisco, México.

3.  I am a personal friend of Mr. Ruben Zuno Arce.  I have known Ruben Zuno Arce for approximately 41 years.  During that period of time I have acquired personal knowledge of the fact that, Mr. Zuno Arce has been and continues to be a legitimate, respected and successful businessman in the lumber, agricultural and automobile service station industries in the city of Mascota and in the state of Jalisco, Mexico.

4.  At no time during the 41 years I have known Ruben Zuno Arce have I known him to be involved, directly or indirectly, in illegal drug or narcotics activities of any king whatsoever.

I subscribe this declaration for any legal purpose that could be used for..

Guadalajara, Jalisco, México  10th of September 1986.

MIGUEL HERNANDEZ GUARDADO
Niños Heroes 2050
Guadalajara, Jalisco, México.
Tel. 15-40-40

DECLARATION OF ING. RICARDO IBARRA NAVARRO


I, RICARDO IBARRA NAVARRO, herby declare as follows:


1.- I know all the following facts of my own personal know-
ledge and, if called and sowrn as a witness, could and would
competently testify thereto.

2.- I am a Mexican citizen and Engineer, as well as an agri-
culture and fruit grower in the State of Colima in México.

3.- I have been a personal friend of Ruben Zune-Arce for the
last 36 years. For this long period of time I have acquired per
sonal knowledge of the fact that, Mr. Zuno Arce has been and —
clntinues to be a legitimate, respected and successful business
man in the lumber, agricultural and automobile service station
industries in the city of Mascota and inithe State of Jalisco,
México.

4.- At no time dur ng the 36 years I have known Ruben Zuno-
Arce have I known him to be involved, directly or indereotly,
in illegal drug or narcotics activities of any king whatsoever.


                          Guadalajara, Jalisco, Mexico September --, 1989


Zaragoza # 670
Tecoman, Colima.
Telef. 4- 1560

                              ENGINEER RICARDO IBARRA NAVARRO

DECLARATION OF SR. JOSE LUIS LOPEZ JIMENEZ

I, JOSE LUIS LOPEZ JIMENEZ, herby declare as follows:

I.- I know all the following facts of my personal knowledge and, if called and swoern as a witness, could and would completently testify thereto.

2.- I am a mexican citizen, Law Student, and businessman, who have known, and am a personal friend of Ruben Zuno Arce for 36 years; During these time I know for a fact that Mr. Zuno Arce has been and continues to be a legitimate, respected citizen as well as a successful businessman in lumber, agricultural and automobile service station industries in the city of Mascota and in the State of Jalisco, Mexico.

3.- At no time during the 36 years I have known Ruben Zuno Arce have I known him to be involved, whatsoever, directly or indirectly in illegal drug ornarcotics activities of any kind.

Guadalajara, Jal, Mexico, September IO, I989

JOSE LUIS LOPEZ JIMENEZ

Virgen # 3946

Frac. La calma

Zapopan, Jal.

Telf. 31-1723

DECLARATDON OF LIC. ARIEL S. LIMON DIAZ.

I, LIC. ARIEL SALVADOR LIMON DIAZ, herby declare as follows:

I.- I know all the following facts of my personal knowledge and, if called and sowrn as a witness, could and would completently testify thereto.

2.- I am a Mexican citizen and an attorney at law, and a business man, and have known Ruben Zuno Arce as a personal friend for 34 years. During all this long time I know for sure, and as a fact that Mr. Zuno Arce has been and continues to be a legitimate, respected citizen as well as a successfull business man in lumber, fruit grower, agriculture etc. in the city of Mascota in the State of Jalisco, Mexico.

3.- At no time during the 34 years I have known Ruben Zuno Arce have I known him to be involved, directly or inderectly in illegal drug or narcotics activities of any kind.

Guadalajara, Jalisco Mextco, September IO, I989.

Calle # 46 No. 1476
Col. Del Country
Telef. 23-8523

LIC. ARIEL SALVADOR LIMON DIAZ.

DECLARATION OF MR. ENRIQUE GONZALEZ VIDRIO

I, ENRIQUE GONZALEZ VIDRIO, herby declare as follows:

I.- I know all the following facts of my personal  knowledge
and, if called and sowrn as a witness, could and would comple-
tently testify thereto.

2.- I am a  Mexican citizenñ an industrial wood manufacturer
who have know, :nd have been a personal friend of Ruben Zuno-
Arce för 34 years; During all this long period of time I know
as a fact that Mr. Zuno Arce has been and continues to be a -
legitimate, respected citizen as well as a successful business
man in lumber, fruit  grower, agriculture etc. in the city of
Mascota in the State of Jalisco, Mexico.

3.- At no time during the 34 years I hve known Ruben Zuno
Arce have I known him to be involved, directly of inderectly
in illegal durg or narcotics activities of any sort.

                    Guadalajara, Jal. Mexico September IO, 1989

Calle 16 y calle 3
Col. Polanco
32-1230                          ENRIQUE GONZALEZ VIDRIO

## DECLARATION OF MR. JOSE DE JESUS RODRIGUEZ ARCE.

I, JOSE DE JESUS RODRIGUEZ ARCE

1.- I know all the following facts of my personal knowledge and, if called and sowern as a witness, could and would completently testify thereto.

2.- I am a Mexican citizen, and have been a governmente employee for the last 33 years - Internal Revenew Department - and have been a personal friend of Ruben Zuno Arce for 45 years, in which I have known for certain that Mr. Zuno Arce has been, and continues to be a legitimate, respected citizen, as well as a successful business man in lumber, agricultural activities, fruit grower etc. in the city of Mascota in the State of Jalisco, Mexico.

3.- At no time during the 45 years I have known Ruben Zuno Arce have I known him to be involved, directly or inderectly in illegal durg or narcotics aetivities of any kind.

Guadalajara, Jalisco Mexteo, September 10, 1989

JOSE DE JESUS RODRIGUEZ ARCE

Toronto # 3130
Col. Providencia.
Guadalajara, Jalisco.
Tel. 42-0830

DECLARATION OF ENGINEER ENRIQUE NIMBRO RODRIGUEZ.

I ENRIQUE NIEMBRO RODRIGUEZ, herby declare as follows:

I, Enrique Niembro Rodrigues, herby declare as follows:

I.- I know all the following facts of my personal knowledge and, if called and sowern as a witness, could and would completently testify thereto.

2.- I am a Mexican citizen, and Engineer, having a timber business in the State of Jalisco, and I have known Ruben Zuno Arce as my personal friend for I8 years; For all this time I know as a fact, that, Mr. Zuno-Arce has been, and is a respected citizen, a successful business man in lumber, in agriculture, a fruit grower et. in the city of Mascota in the State of Jalisco, México.

3.- During the I8 years I have known, personally, know for certain that the has never been involved, directly or inderectly in illegal drug or narcotics activities of any sort.

Guadalajara, Jalisco, Mexico, SeptemberIO, 1989.

8 de Julio # 1419
Col. Morelos.
Tel. 10-3727   ENGINEER ENRIQUE NIEMBRO RODRIGUEZ

*Alberto Orozco Romero*

I, **ALBERTO OROZCO ROMERO,** a mexican citizen, Attorney
at Law, former Gobernor of the State of Jalisco, Former Minister of
the Supreme Court of Justice of the Nation, Former Judge of the Supre-
me Court of Justice of the State of Jalisco, and Magistrate of the same
State of Jalisco, now living at Mar Rojo 1920, in Guadalajara, Jalisco
Mexico, hereby declare to be true the following:

I have known Mr. Ruben Zuno Arce for 28 years as an honest
man, dedicated to his industrial and commercial activities in which he
deals with agriculture, lumber as well as a gas station owner stablished
in Mascota, Jalisco, Mexico.

I have never known that Mr. Ruben Zuno Arce is or have been
involved, directly or indirectly with narcotics or anything related to
it.

I suscribe this d4claration for any legal purposes tnat
could b e applied fror.

Guadalajara, Jalisco, Mexico, September 10th, 1989.

LIC. ALBERTO OROZCO ROMERO

- **A QUIEN CORRESPONDA:**

Distinguidos señores.

Por este medio me permito recomendar en forma amplia y desinteresada al C. Lic. Ruben Zuno Arce, quien es mi amigo personal desde hace 40 años, como una persona de una intachable conducta moral.

Dedicado a diversas actividades productivas y comerciales en el Municipio de Mascota, Jalisco; entre las que puedo mencionar las siguientes:

- Productor de madera
- Agricultor
- Fruticultor
- Propietario de una gasolinera.

Además dada su gran calidad moral, jamás se ha visto o tenido relación alguna con el tráfico y/o consumo de enervantes de cualquier especie.

Se extiende la presente a petición del interesado para los fines legales que él estime y considere necesarios, a los diez días del mes de Septiembre de mil novecientos ochenta y nueve.

A T E N T A M E N T E .

- **A QUIEN CORRESPONDA:**

Distinguidos señores.

Por este medio me permito recomendar en
forma amplia y desinteresada al C. Lic. Ruben Zuno Arce,
quien es mi amigo personal desde hace 40 años, como una
persona de una intachable conducta moral.

Dedicado a diversas actividades productivas
y comerciales en el Municipio de Mascota, Jalisco; entre
las que puedo mencionar las siguientes:

- Productor de madera
- Agricultor
- Fruticultor
- Propietario de una gasolinera.

Además dada su gran calidad moral, jamás se
ha visto o tenido relación alguna con el tráfico y/o
consumo de enervantes de cualquier especie.

Se extiende la presente a petición del
interesado para los fines legales que él estime y conside-
re necesarios, a los diez días del mes de Septiembre de
mil novecientos ochenta y nueve.

A T E N T A M E N T E .



Secretaría de Salubridad y Asistencia

Servicios Coordinados en el Estado de Jalisco

DEPENDENCIA PLASTIC SURGERY INSTITUTE.

SECCION TEACHING DEPARTMENT.

NUMERO DEL OFICIO 8-205

EXPEDIENTE

ASUNTO :

I, MARCELO CASTILLERO MANZANO, M. D. plastic surgeon, now living at 2824 Isala Sumatra St. Guadalajara, Jalisco, México, hereby declare to be true the following :

I am chief on teaching in plastic surgery Institute, and professor on the school of Medicine at the University of Guadalajara, I declare I have known Licenciado Ruben Zuno Arce, for 10 years. I know that he is an honest man dedicated to his business which is lumber, agriculture and gas station, and I know that he has never been involved in any narcotic activities or any other business related to it.

I suscribe this declaration for any legal purposes that could be applied for.

Guadalajara , Jalisco Mexico, September 10th, 1989

MARCELO CASTILLERO MANZANO M . D .

AL CONTESTAR ESTE OFICIO CITENSE LOS DATOS CONTENIDOS EN EL CUADRO DEL ANGULO SUPERIOR DERECHO

Guadalajara, Jalisco the 9th of September 1989

To whom it may concern,

I René Rivial León hereby declare that. I am a personal friend of Rubén Zuno Arce. I have known him for more than 40 years.

During that period of time I have acquired personal knowledge of the fact that, Mr Zuno Arce has been and continues to be a legitimate, respected and successful businessman in the lumber, agricultural and automobile service station industries in the city of Mascota and in the state of Jalisco México.

At no time during the 40 years I have known Rubén Zuno Arce have I known him to be involved, directly or indirectly, in illegal drug or narcotics activities of any kind whatsoever.

I declare that the foregoing is true and correct.

René Rivial León

productos rivial, s.a. de c.v.
tabachin 1254 s.p. 1-754
tel. 12-00-97 con 5 lineas

**pinturas prisa**

**LIC. RAFAEL GARCIA DE QUEVEDO**
Cayena # 2558
Colonia Providencia
Guadalajara, Jal.

        **I, RAFAEL GARCIA DE QUEVEDO**, a mexican citizen, Attorney
at Law, now living at 2558 Cayena St. Colonia Providencia in Guadala-
jara Jalisco, Mexico, hereby declare to be true the following:

        That I was Former Dean of the University of Guadalajara
and as such I met Mr. zuno Arce, which for approximately 28 years. I
know him to be an honest man dedicated to his industrial and commercial
activities in which he deals with agriculture , lumber as well as a - -
gas station owner stablished in  Mascota, Jalisco, Mexico.

        I have never known that Mr. Ruben Zuno Arce is or have - -
been involved, directly or indirectly with narcotics, or anything of the
sort.

        I subscribe this declaration for any legal purposes that
could  be applied for.

            Guadalajara,Jalisco, Mexico, September 10th 1989.

                LIC. RAFAEL GARCIA DE QUEVEDO

**J. JESUS LANDEROS**

I, J. JESUS LANDEROS AMAZOLA, a mexican citizen now living at 2505 Faro St. Bosques de la Victoria, Guadalajara, Jalisco Mexico, - hereby declare to be true the following:

That I was former Mayor of the city of Guadalajara, and I have kn own M r. Ruben Zuno Arce for approximately 45 years. I know him to be an honest man, dedicated to his industrial and commercial activities in which he deals with agriculture, lumber as well as a gas station owner established in Mascota, Jalisco, Mexico.

I have never known that Mr. Ruben Zuno Arce is or have - - been involved, directly or indirectly with narcotics or anything related to it.

I suscribe this declaration for any legal purposes that - - could be applied for.

Guadalajara, Jalisco, Mexico, September 10th 1989.



J. JESUS LANDEROS AMAZOLA

**LIC. FRANCISCO MEDINA ASCENCIO**
SOL 2904 JARDINES DEL BOSQUE
C. P. 44520 GUADALAJARA, JALISCO

I, **FRANCISCO MEDINA ASCENC'O**, a mexican citizen, attorney at Law, former Gobernor of the State of Jalisco, Former Mayor of the - City of Guadalajara, Professor at the School of Economy at the University of Guadalajara, now living at 2904 Sol, Jardines del Bosque, Guadalajara, Jalisco, Mexico.

Mr. Zuno and I met when he was my disciple at the University 40 years ago, and later on he worked for me at City Hall, and when I was Gobernor he was a State Congressman.

With the experience ofknowing Mr. Zuno, I can say that he is an honest man, dedicated to his industrial and commercial activities in which he deals with agriculture, lumber as well as a gas station - - owner established in Mascota, Jalisco, Mexico.

I have never known that Mr. Ruben Zuno Arce is or have been involved directly or indirectly with narcotics or anything of the sort.

I suscribe this declaration for any legal purposes that could be applied for.

Guadalajara, Jalisco Mexico, September 10th 1989.

LIC. FRANCISCO MEDINA ASCENCIO

# Los Angeles Times

Circulation: 1,116,499 Daily / 1,413,79 Sunday

Saturday, September 9, 1989

CC V / 122 Pages  Copyright 1989, The Times Mirror Company Daily 25¢ /

# METRO

Editorials/Letters/Religion

CC/Part II

## Los Angeles Times
A Times Mirror Newspaper

DAVID LAVENTHOL, *Publisher and Chief Executive Officer*

RICHARD T. SCHLOSBERG III, *President and Chief Operating Officer*
SHELBY COFFEY III, *Editor and Executive Vice President*
DONALD H. CLARK, *Executive Vice President, Marketing*

JAMES D. BOSWELL, *Vice President, Employee and Public Relations*
JEFFREY S. HALL, *Vice President*
LAWRENCE M. HIGBY, *Vice President*
WILLIAM A. NIESE, *Vice President and General Counsel*
JAMES B. SHAFFER, *Vice President, Finance and Planning*

GEORGE J. COTLIAR, *Managing Editor*
ANTHONY DAY, *Editor of the Editorial Pages*

Part II/Saturday, September 9, 1989

## Questionable Zeal

If a foreign government were to hold a prominent U.S. citizen in its jails for more than a month without filing charges, and with no possibility of bail, it would provoke anger in this country. Yet that is what the U.S. government did to Ruben Zuno Arce, the brother-in-law of former Mexican President Luis Echeverria.

Zuno Arce was arrested in San Antonio on Aug. 9 after an airport customs inspector found his name on a list of suspected drug traffickers. The Drug Enforcement Administration wanted to question him in connection with the 1985 murder of DEA agent Enrique Camarena. U.S. officials say Zuno Arce sold the Guadalajara house where Camarena was tortured and killed by Mexican drug traffickers only a month before the murder.

As a result of his connection to the Camarena case, a federal magistrate ordered Zuno Arce held without bail as a material witness and transported to Los Angeles, where a federal grand jury is investigating the murder. He testified before the grand jury twice, the last time on Aug. 31. After that, his attorneys demanded his release, arguing that there was no valid reason to hold him.

Federal prosecutors asked U.S. District Judge Edward Rafeedie to hold Zuno Arce until he could testify in the October trial of a suspect in the Camarena murder, but Zuno Arce could be subpoenaed from Mexico, or even be deposed at a U.S. consulate there. Prosecutors also argued that Zuno Arce should be held because of his suspected

ties to drug traffickers, sho  ie with the judge in private some information about Zuno Arce. It was apparently not persuasive, because last Tuesday the judge ordered Zuno Arce released after 26 days in custody.

But Zuno Arce is still in federal custody. After Rafeedie ordered him released, INS officials detained him on an excludable alien and returned him to San Antonio for a deportation hearing, an unusual step considering the routine manner in which most Mexican illegal aliens are repatriated. Before the deportation hearing could be held, however, a federal grand jury finally indicted Zuno Arce—accusing him of lying to the grand jury investigating the Camarena case. Now he will be returned to Los Angeles to face a charge of perjury.

It is apparent that federal prosecutors had no intention of letting Zuno Arce go until they found something to charge him with. Given the outrage of federal agents over the murder of a friend and colleague, the zeal they showed in trying to nail a suspect linked to the case is understandable. It may even prove justified if Zuno Arce is shown to be the drug trafficker federal officials claim he is. But until the government makes its case against Zuno Arce, this matter will have an unpleasant odor to it. For now, the Justice Department's handling of Zuno Arce is reminiscent of the cynical maneuverings of a totalitarian regime, not a democratic nation of laws.

**Exhibit J**

MITCHELL, SILBERBERG & KNUPP
EDWARD M. MEDVENE
JAMES E. BLANCARTE
RONALD A. DINICOLA
KEVIN E. GAUT
MITCHELL, SILBERBERG & KNUPP
11377 West Olympic Boulevard
Los Angeles, California 90064
(213) 312-2000

Attorneys for Defendant

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CASE NO. 89 741 |
| | ) | |
| Plaintiff, | ) | DECLARATION OF PETER MAGARO AND |
| | ) | AND DECLARATION OF JAMES E. |
| vs. | ) | BLANCARTE IN SUPPORT OF |
| | ) | DEFENDANT RUBEN ZUNO-ARCE'S |
| RUBEN ZUNO-ARCE | ) | MOTION FOR RELEASE PENDING |
| | ) | TRIAL |
| Defendants. | ) | |
| | ) | Date:   September 12, 1989 |
| | | Time:   9:00 a.m. |
| | | Place:  Courtroom of Judge |
| | | Tagasuki |


DECLARATION OF JAMES E. BLANCARTE


        I, James E. Blancarte, the undersigned, hereby declare
as follows:


        1.  I am an attorney at law, duly licensed to practice
in the State of California, and before the United States
District Court for the Central District of California.  I am,

through my professional corporation, a partner of the law firm of Mitchell, Silberberg & Knupp, attorneys for Mr. Ruben Zuno-Arce ("Mr. Zuno"). I know all the facts stated in this declaration of my own personal knowledge and if called and sworn as a witness could and would competently testify thereto.

2. On September 5, 1989, I was present, as counsel for Mr. Zuno, at the status/detention hearing before the Honorable Edward Rafeedie, Judge of the District Court for the Central District of California. At that time, Judge Rafeedie ordered that Mr. Zuno be discharged as a material witness and released forthwith, without bond.

3. Upon the Court's Order that Mr. Zuno be discharged and released forthwith, without bond, I went to the U.S. Federal Marshall's Detention Facility (commonly known as the "lock-up") located on the Main Street, ground floor level of the U.S. Federal Courthouse at 312 N. Spring Street, Los Angeles, California 90012. I spoke to the clerk/receptionist and identified myself as counsel for Mr. Zuno. Based on Judge Rafeedie's Release Order, I requested immediate release of Mr. Zuno. The clerk/receptionist confirmed that Mr. Zuno was in the Marshall's lock-up but she did not have authority to release Mr. Zuno.

4. I then asked to speak to her "supervisor." Approximately 3-5 minutes later, two U.S. Marshall's Office

2

1  supervisors came to the window and I again requested that

2  pursuant to Judge Rafeedie's Release Order Mr. Zuno be released

3  immediately. I was told that was "impossible . . . because

4  we're turning him over to INS" I again reminded them that Judge

5  Rafeedie had ordered Mr. Zuno "released forthwith" and the

6  response was "Who are you? Judge Rafeedie's personal

7  messenger?" I reminded the U.S. Marshall's supervisors that I

8  was Mr. Zuno's counsel and that I was entitled to know why the

9  U.S. Marshall's Office was disregarding Judge Rafeedie's Release

10 Order and why Mr. Zuno was being "turned over to INS" The

11 answer was "Because we have a detention order from INS". I asked

12 to see the Immigration and Naturalization Service ("INS")

13 detention order. My request was denied. Approximately 10-15

14 minutes had gone by since the time when Judge Rafeedie had

15 ordered Mr. Zuno released forthwith.

16

17

18         5. I then went directly to the office of Edward

19 Gustaveson, District Director for the INS, Western Region. My

20 partner, Edward Medvene, and Romeo Flores Caballero, Consul

21 General for the Republic of Mexico, went with me to

22 Mr. Gustaveson's office. We asked Mr. Gustaveson to order the

23 immediate release of Mr. Zuno in accordance with Judge

24 Rafeedie's Order. District Director Gustaveson denied our

25 request on the grounds that the INS "hold" on Mr. Zuno was

26 issued out of the INS office in San Antonio, Texas, and not out

27 of his office. Mr. Gustaveson did, however, offer to contact

28 Mr. Richard Casillas, District Director of the INS in San

3

Antonio, Texas and recommend to Mr. Casillas that Mr. Zuno be allowed to return to his home in Mexico with the understanding that he would return to San Antonio, Texas if Mr. Zuno wanted to challenge the INS proceedings being brought there.

6.    INS District Director Gustaveson contacted INS District Director Richard Casillas in San Antonio, Texas and made the above-mentioned recommendation. Mr. Casillas rejected the recommendation on the grounds that Mr. Zuno was a "suspected narcotics trafficker" and as such he had to be brought to San Antonio, Texas for an "exclusion hearing." Mr. Casillas then demanded that Mr. Zuno be turned over to the INS in San Antonio, Texas. However, Mr. Casillas did say that if Mr. Zuno was sent to San Antonio he would hold an "expedited exclusion hearing" and he "might have Mr. Zuno on a plane to Mexico by tomorrow night." District Director Gustaveson then confirmed to me that under the circumstances he had no choice but to turn Mr. Zuno over to the custody of District Director Richard Casillas at the INS office in San Antonio, Texas.

7.    I argued to District Director Gustaveson that after 28 days the Government had failed to produce any evidence whatsoever that Mr. Zuno was involved in narcotics trafficking activities, and that if Mr. Casillas had proof that Mr. Zuno was a narcotics trafficker he would have been obligated to provide that proof to the U.S. Attorney's Office in Los Angeles where Mr. Zuno had been held, without bond, for almost a month while

4

the Grand Jury, the U.S. Attorneys Office, the DEA and other federal agencies conducted an aggressive and exhaustive investigation into that very issue. Mr. Gustaveson said the matter was "out of his hands" and that Mr. Zuno would be "escorted to San Antonio by INS agents the next day."

8. The next day, on Wednesday, September 6, 1989, I flew to San Antonio, Texas (arriving at approximately midnight) on the same flight as Mr. Zuno and his INS "escorts." Despite the late hour, upon arriving at San Antonio International Airport Mr. Zuno was greeted by a large media contingent which included at least 8-10 television camera crews and at least twice as many reporters. I asked one of the members of a local television crew how they knew what time Mr. Zuno was arriving in San Antonio and he said, "INS called everybody and told them what time to be here."

9. The next morning, on Thursday, September 7, 1989, I met with Pete Magaro, the San Antonio immigration attorney of record for Mr. Zuno. Mr. Magaro advised me that as of 10:00 a.m. that morning no INS charging document (commonly known as INS Form I-122) had been filed against Mr. Zuno. Mr. Magaro said that was highly unusual because Mr. Zuno was served with the I-122 charging document on August 10, 1989 (29 days ago) and the I-122 charging documents are always filed with the Immigration Court immediately after they are served on the subject alien (in this case, Mr. Zuno).

5

10. Mr. Magaro then told me that earlier that morning he had also met with the San Antonio INS trial attorneys assigned to the Zuno immigration case who told him that the INS office in San Antonio did not yet have proof that Mr. Zuno was involved in narcotics trafficking, but that the proof "was on its way."

11. Also, upon arriving in San Antonio, Texas, I became aware of local, San Antonio, Texas media and press reports in which INS District Director Richard Casillas and other INS representatives stated, among other things, that:

a. INS has been on the "look-out" for Ruben Zuno-Arce since the late 1970's;

b. INS suspected Ruben Zuno-Arce of being involved in narcotics trafficking activities; and

c. INS District Director Casillas, in highly publicized public ceremonies, had awarded special "commendations" to INS agents for "spotting" Mr. Zuno-Arce upon his arrival at San Antonio International Airport on August 9, 1989.

On September 7, during the course of an interview with Mr. Zuno, I shared the above-mentioned media reports with him. Mr. Zuno reacted by saying that he couldn't understand why Mr. Casillas was saying those things to the media because:

6

a. Mr. Casillas and Mr. Zuno were friends, having known each other on a personal basis for the past several years;

b. If Mr. Casillas and the INS were truly on the "lookout" for him, they would have found Mr. Zuno, on several occasions over the past few years, sitting in Mr. Casillas office at INS because whenever Mr. Zuno had immigration matters to take care of in San Antonio, Mr. Casillas "handled them personally";

c. If Mr. Casillas and INS were truly on the "look-out" for Mr. Zuno, they would have "spotted" him long before August 9, 1989, since Mr. Zuno not only visited San Antonio frequently over the past several years, but in fact, Mr. Zuno had visited San Antonio no less than 5 times from January of 1989 through August 9, 1989;

d. If Mr. Casillas truly suspected Mr. Zuno of being a narcotics trafficker, he wouldn't have fraternized openly with Mr. Zuno during Mr. Zuno's frequent visits to San Antonio, Texas; and

e. If Mr. Casillas and INS truly had proof or evidence that Mr. Zuno was involved in narcotics trafficking activities, why didn't Mr. Casillas provide that proof or

7

evidence to the U.S. Attorney's Office in Los Angeles where that very issue was the subject of an ongoing and exhaustive Federal Grand Jury investigation as well as investigations being conducted by the DEA and other federal agencies.

13. To this date, neither Mr. Casillas nor INS has produced any proof or evidence whatsoever to justify their "detention" of Mr. Zuno from September 5, 1989 through September 8, 1989, their complete disregard of Judge Rafeedie's September 5, 1989 Order that Mr. Zuno be released "forthwith," and their numerous reports to the broadcast media and press in which they accused Mr. Zuno of being a "narcotics trafficker" and of being involved in the Camarena murder (even after Judge Rafeedie's finding and ruling that Mr. Zuno was not even a material witness in that case).

I declare that the foregoing is true and correct.

Executed this 12th day of September, 1989, at Los Angeles, California.

_____
JAMES E. BLANCARTE

8

ZAV6J80110

# DECLARATION OF PETER MAGARO

I, PETER MAGARO, hereby declare as follows:

1.     I am an attorney at law duly licensed to practice in the State of Texas.  My address is 2300 W. Commerce Street, Suite 203, San Antonio, Texas 78207.  I am a private practitioner and have been so engaged for the past 5 years.  Previous to then I was an employee of the U.S. Immigration and Naturalization Service (INS) for 27 years, from February 14, 1957 to March 30, 1984; first as a general staff attorney and then as Chief Legal Officer.  I know all of the following facts of my own personal knowledge and, if called upon I could and would competently testify thereto.

2.     On August 10, 1989, I was engaged to represent Mr. Ruben Zuno-Arce ("Mr. Zuno") before the Immigration Service in San Antonio, Texas.  It was approximately 2:30 p.m. when I visted INS to inquire about the status of Mr. Zuno.  I spoke to Mr. Gary Renick, the INS Assistant District Director for Investigations and asked what my client was charged with.  His response was "section 212(a)(23)."  I then asked if there was any conviction record on Mr. Zuno.  His response was "no."  I then proceeded to interview my client.  At that time INS had not served Mr. Zuno with any charging document ("INS Form I-122") even though he was arrested and detained by INS the day before. After talking to Mr. Zuno, I would estimate at about 3:00 p.m. or

ZAV6JB0110

1  3:30 p.m., I again asked Mr. Renick about INS charging Mr. Zuno
2  and his reply was the papers were being prepared and were not
3  ready yet. I also asked Mr. Renick what evidence INS had against
4  Mr. Zuno and Mr. Renick's reply was that he didn't have it yet,
5  but "it was on its way." INS did not produce any evidence
6  against Mr. Zuno that day and did not file any charging documents
7  against Mr. Zuno-Arce at that time.
8
9
10    3.    The next day, on August 11, 1989, while I was
11  interviewing Mr. Zuno, Mr. Renick handed me a copy of a material
12  witness arrest warrant issued at and signed by a federal judge in
13  Los Angeles, California. Later that same day a federal magis-
14  trate in San Antonio ordered Mr. Zuno's transfer to Los Angeles.
15  At this point INS had not yet produced any evidence against
16  Mr. Zuno and had not filed any charging documents against him. I
17  had no further involvement in Mr. Zuno's immigration case from
18  that point until September 5, 1989.
19
20    4.    On September 5, 1989, I was told that Mr. Zuno had
21  been discharged as a material witness and ordered released,
22  without bond, by a federal judge in Los Angeles, California, but
23  that he would be coming to San Antonio, Texas to answer INS
24  charges. Charges that, to the best of my personal knowledge, had
25  never been filed. The next morning September 6, 1989, I visted
26  the trial attorney's office of INS in San Antonio. I spoke to
27  Mr. Gregory Ball, District Counsel to Howard Van Winkle, the INS
28  trial attorney who was assigned Zuno's case. I asked what were

2

1  the charges made against Mr. Zuno. The response was the same as

2  the one I was given back on August 10, 1989, "drug trafficking."

3  I asked what evidence INS had to support that charge. I was

4  again told that it "was on its way, but had not arrived yet";

5  that it may be oral testimony. Approximately 27 days had now

6  passed since INS first told me, on August 10, 1989, that evidence

7  against Mr. Zuno "was on its way."

8

9

10      5.  That same morning of September 6, 1989, I also

   checked with the Immigration Court to determine if the charging

11 document (INS Form I-122) had ever been filed. I was advised by

12 the Immigration Court that it had never been filed. Later that

13 day, around 2:00 p.m. or 3:00 o'clock I met again with the INS

14 trial attorneys, Mr. Ball and Mr. Van Winkle. I asked again what

15 evidence, if any, did INS have against Mr. Zuno. Again, I was

16 told that it was forthcoming and that it probably be in the form

17 of oral testimony from DEA agents. I then left the INS office

18 and proceeded directly to the Federal Courthouse to file a Writ

19 of Habeas Corpus. I learned later that day that Mr. Zuno had

20 been indicted for perjury by a Federal Grand Jury in Los Angeles.

21

22

23     6.  The I-122 INS charging document was finally filed

   against Mr. Zuno by INS on September 7, 1989, at or about the

24 same time a perjury indictment was filed against Mr. Zuno in Los

25 Angeles. It is my personal and professional experience in my 27

26 years as an INS attorney and thereafter in 5 years of private

27 practice as an immigration specialist that INS custom and

28

        3

ZAV6JB0110

practice is to file the I-122 charging document as soon as possible (and usually within 24 hours, at the latest) after the subject alien is served with the I-122 charging document. INS served Mr. Zuno with the I-122 charging document on August 10, 1989. In Mr. Zuno's case INS did not file the I-122 charging document against Mr. Zuno until September 7, 1989; 28 days after INS first served him with that document.

7. On Monday, September 11, 1989, I received from INS in San Antonio a copy of a motion to the Immigration Court to administratively close Mr. Zuno's file, on the grounds that Mr. Zuno was indicted and was no longer in INS custody. The Immigration Court granted the motion. I did not have an opportunity to oppose the motion or to otherwise respond to it.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of September, 1989 at San Antonio, Texas.

PETER MAGARO



DELEGACION ESTATAL EN JALISCO
DISTRITO DE DESARROLLO  No. VI
LA BARCA, JAL

TO WHOM IT MAY CONCERN:
DECLARATION OF ING. PABLO A. VELARDE MAGAÑA.

I ING. PABLO A. VELARDE MAGAÑA HEREBY DECLARE AS FOLLOWS.

1.- I am a Mexican citizen and an attorney Ing. Agrónomo.

2.- I am a personal friend of RUBEN ZUNO ARCE.  I have known Rubén Zuno Arce for approximately 20 years. During that period of time I have acquired personal knowledge of the tact that, Mr. Zuno-Arce has been and continues to be a legitimate, respected and successful business-man in the lumber, agricultural and automobile service station ins-- dustries in the city of Mascota and in the state of Jalisco, México.



SECRETARIA DE AGRICULTURA Y RECURSOS HIDRAULICOS.
DELEGACION ESTATAL EN JALISCO
DISTRITO DE DESARROLLO RURAL No. VI
LA BARCA, JALISCO

HOJA No. 2;

3.- At no time during the 20 years I have known Rubén Zuno-Arce have i known him to be involved, directly of indirestly, in illegal drug or activities of any kind whatsoever.

4.- I subscribe this declaration for any legal purpose that could be used for.



S. A. R. H.
DISTRITO
DE
DESARROLLO RURAL
No. 072 LA BARCA, JAL.

LA BARCA, JAL., MEXICO 11 OF SEPTEMBER OF 1989.

ING. PABLO A. VELARDE MAGAÑA.
JEFE DE DISTRITO DE DESARROLLO RURAL No. 006



**OFICINA DE
REGLAMENTOS**
OCOTLAN, JAL.

| No. de Oficio | 038 |
| EXPEDIENTE | 08/89 |
| SECCION | REGLAMENTOS |

**ASUNTO:**     **EL INDICADO**

TO WHOM IT CONCERN:
DECLARATION OF MIGUEL SALGADO NUMEROSTRO
REGIDOR PROPIETARIO
JEFE DE LA COMISION DE REGLAMENTOS.

I, MIGUEL SALGADO NUMEROSTRO HEREBY DECLARE AS FOLLOWS:

1.- I am a Mexican citizen and an attorney. FATHER AND CATTLEDEALER

2.- I am a personal friend of RUBEN SENO ARCE, I have known Rubén Za
no Arce for approximately 18 years. During that period of time-
I have acquired personal knowledge of the fact that, Mr. Seno-Arce'
has been and continues to be a legitimate, respected and successful
businessman in the lumber, agricultural and automobile service
station industries in the city of Mascota and in the state of Jali
sco, México.

3.- At no time during the 18 years I have known Rubén Seno-Arce Ha-
ve I known him to be involved, directly or indirectly, in illegal
drug or narcotics activities of any kind whatsoever.

4.- I subscribe this declaration for any legal purpose that could be
used for.

Ocotlán, Jal., 11 of September of 1989.

OFICINA REGLAMENTOS

REGIDOR PROPIETARIO, JEFE DE LA
COMISION DE REGLAMENTOS.
MIGUEL SALGADO NUMEROSTRO.

# UNION DE EJIDOS DE PRODUCCION, COMERCIALIZACION Y SERVICIOS DE R. L.
## "REVOLUCION MEXICANA"

**HIDALGO No. 80**          **COL. EL NUEVO FUERTE**          **OCOTLAN, JAL.**

**REF. U. E. R.- 820129-001**          **REG. AGR. NAL. 350-6931/82**

TO WHOM IT MAY CONCERN:
DECLARATION OF ENRIQUE SALGADO ZARAGOZA

**Ejidos Miembros:**

Santa Clara del Pedregal

San Andrés

El Fuerte

La Muralla

Labor Vieja

San Juan Chico

San Martin de Zula

Paso de la Comunidad

Los Ranchos

Rancho Viejo

El Xoconoxtle

Santa Clara de Zula

I ENRIQUE SALGADO ZARAGOZA HEREBY DECLARE AS FOLLOWS.

1.- I am a Mexican citizen and an attorney. FARMER AND CATTLEDEALER

2.- I am a personal friend and proffesional colleague OF RUBEN ZUNO ARCE. I have known Rubén Zuno Arce for approximately 26 years. During that period of time I have acquired personal knowledge of the tact that, Mr. Zuno-Arce has been and continues to be a legitimate, respected and successful businessman in the lumber, agricultural and automobile service station insudstries in the city of Mascota and in the state of Jalisco, México.

3.- At no time during the 26 years I have known Rubén Zuno-Arce have i known him to be involved, directly of indirestly, in ellegal drug or narcotics activities of any kind whatsoever.

4.- I subscribe this declaration for any legal purpose that could be used for.

11  OF SEPTEMBER  OF  1

MR. ENRIQUE SALGADO ZARAGOZA
PTE. CONSEJO DE ADMINISTRACION
UNION DE EJIDOS "REV. MEX.".



**Club**
**Deportivo**
**Guadalajara,**
**A.C.**

Colomos 2339 A.P. 1124
Tels 30-10-50 62-39-61 42-17-53 y 17 61 41
C.P. 44620 Guadalajara
Jalisco México

SEPTIEMBRE 11 DE 1989

A QUIEN CORRESPONDA
P R E S E N T E

Por este conducto, informo que en lo que conozco al
Sr. Rubén Zuno Arce, es una persona honesta y dedi-
cada al Comercio y a la Agricultura.

Lo anterior para los efectos legales a que de lugar.



A T E N T A M E N T E
"FRATERNIDAD, UNION Y DEPORTE"

L.A.P. MANUEL CORONA DIAZ
DIRECTOR GENERAL

C.c.p. Archivo.



**Rectoría**

## UNIVERSIDAD DE GUADALAJARA

A QUIEN CORRESPONDA.

Por este medio me permito recomendar en forma amplia y desinteresada
al C. Lic. Ruben Zuno Arce,  a quien conozco personalmente desde hace
varios años y quien siempre ha demostrado una intachable conducta.

El Sr. Zuno pertenece a distinguida familia jalisciense con una am-
plia trayectoria universitaria y de servicio para su estado.

Durante el tiempo que tengo de conocerlo y dada su gran calidad moral,
el Sr. Zuno nunca se ha visto  envuelto en delitos contra la salud.

Se extiende la presente a petición del interesado para los fines lega-
les que se estimen necesarios en Guadalajara, Jalisco a los 11 días  -
del mes de septiembre de 1989.

A T E N T A M E N T E
"PIENSA Y TRABAJA"

LIC. RAUL PADILLA LOPEZ
RECTOR.

RECTORIA

**Exhibit K**

1  EDWARD M. MEDVENE
   JAMES E. BLANCARTE
2  RONALD A. DiNICOLA
   KEVIN E. GAUT
3  MITCHELL, SILBERBERG & KNUPP
   11377 West Olympic Boulevard
4  Los Angeles, California 90064
   (213) 312-2000
5
   Attorneys for Ruben Zuno-Arce
6

7

8

9

10                    UNITED STATES COURT OF APPEALS

11                       FOR THE NINTH CIRCUIT

12

13  UNITED STATES OF AMERICA,      )    C.A. Case No. 89-50454
                                   )
14                    Appellant,   )    D.C. Case No. 89-741
                                   )
15            vs.                  )    OPPOSITION OF RUBEN ZUNO-ARCE
                                   )    TO GOVERNMENT'S MOTION TO
16  RUBEN ZUNO-ARCE,               )    VACATE DISTRICT COURT'S ORDER
                                   )    GRANTING BAIL; AND DECLARATION
17                    Appellee.    )    OF JAMES E. BLANCARTE
    _____)
18

19

20

21

22

23

24

25

26

27

28

TABLE OF CONTENTS

Page

I.   INTRODUCTION..................................   2

II.  THE GOVERNMENT HAD ADEQUATE NOTICE OF THE BAIL
     HEARING AND AMPLE OPPORTUNITY TO PROFFER EVIDENCE
     AND FILE A WRITTEN RESPONSE TO MR. ZUNO-ARCE'S
     BAIL MOTION.................................   4

III. JUDGE TAKASUGI DID NOT ERR IN GRANTING MR.
     ZUNO-ARCE REASONABLE BOND...................   8

     A.  The Government Mischaracterizes Judge
         Takasugi's Ruling.......................   9

     B.  The Government Distorts the Evidence
         Presented At The Bail Hearing...........   12

     C.  The Cases Cited By The Government Do Not
         Support Reversal........................   15

IV.  THIS COURT SHOULD NOT CONSIDER THE GOVERNMENT'S
     ELEVENTH-HOUR PROFFER OF EVIDENCE NOT PRESENTED
     BELOW.......................................   18

CONCLUSION.......................................   19

DECLARATION OF JAMES E. BLANCARTE.................   20

i

TABLE OF AUTHORITIES

Page

## Cases

United States v. Acceturro,
   783 F.2d 382 (3d Cir. 1986)........................ 19

United States v. Cardenas,
   784 F.2d 937 (9th Cir. 1986)...................... 15,16

United States v. Geerts,
   629 F. Supp. 830 (E.D. Pa. 1985).................. 17,18

United States v. Mills,
   597 F.2d 693 (9th Cir. 1979)...................... 18

United States v. Montamedi,
   767 F.2d 1403 (9th Cir. 1985)..................... 9

United States v. Perez-Franco,
   839 F.2d 867 (1st Cir. 1988)...................... 16

United States v. Stanford,
   551 F. Supp. 209 (D.C.N.J. 1982).................. 19

United States v. Trosper,
   809 F.2d 1107 (5th Cir. 1987)..................... 17

United States v. Vargas,
   804 F.2d 157 (1st Cir. 1986)...................... 17

United States v. Wind,
   527 F.2d 672 (6th Cir. 1975)...................... 19

United States of America v. Ruben Zuno-Arce,
   (D.C. Case No. 89-741); C.A. Case No. 89-50454).... 20

## Miscellaneous

18 U.S.C. § 3142(e).................................... 16
18 U.S.C. § 3142(h).................................... 9
18 U.S.C. § 3142(i).................................... 9
Federal Rules of Appellate Procedure, Rule 10.......... 18
Moore's Federal Practice, § 210.04[1].................. 18

ii

I.

## INTRODUCTION[1]

After intensive defense efforts to gain the release of Ruben Zuno-Arce (spanning some five weeks and including no less than six hearings culminating in release orders from two federal judges), the Government now presents as a principal argument in support of its current motion that somehow it did not have sufficient time to file a written response to Mr. Zuno-Arce's bail motion and that it was prevented from proceeding by proffer.  In truth, as hereinafter demonstrated, the Government had ample time but chose not to file a written response, nor to proffer evidence of any kind.

Unable to refute considerable defense evidence presented below to sustain Judge Takasugi's order (because it presented none of its own), the Government now resorts to misstating the record below, including the procedural history of the case, and overlooking factors considered by Judge Takasugi in his decision to grant Mr. Zuno-Arce bail.  Judge Takasugi ordered Mr. Zuno-Arce's release only after a detailed consideration of significant defense evidence and subject to very stringent and carefully formulated conditions.

---

[1]  On September 13, 1989, Mr. Zuno-Arce filed an "Opposition... To Government's Motion To Stay Release Order," in support of the District Court's release order.  That Opposition is, by this reference, incorporated herein.

2

1      The Government's opposition presents in excruciating
2   detail irrelevant facts about the tragic murder of DEA Agent
3   Kiki Camerena.  While the murder is disturbing and
4   reprehensible, it has nothing to do with this perjury case.  The
5   Government has failed to show any connection between Mr. Zuno-
6   Arce and the Camerena case.  Mr. Zuno-Arce has denied, under
7   oath, any knowledge of or contact with drug trafficking or the
8   Camerena murder, and the Government has not challenged the
9   truthfulness of his statements in this regard.  Indeed, the
10   Government has conceded that there is no connection between this
11   case and the Camerena murder trials.  At Mr. Zuno-Arce's
12   arraignment, the Government argued, successfully, that this case
13   was not related to the Camerena murder trials and so should not
14   be assigned to Judge Rafeedie who has presided over those
15   trials.
16
17      The Government now attempts to bootstrap its argument
18   that Mr. Zuno-Arce is a flight risk by attempting to present
19   evidence to this Court, in camera, that was never presented to
20   Judge Takasugi.  As the Government knows, it cannot present, and
21   this Court cannot hear, such new evidence at this time.  Even if
22   such evidence were considered, it is not sufficient to justify
23   the continued detention of Mr. Zuno-Arce.  Judge Rafeedie found
24   such in camera evidence insufficient to justify Mr. Zuno-Arce's
25   detention as a material witness.
26
27      In short, the Government's opposition is replete with
28   unsubstantiated arguments and obvious mistatements of the •

                                   3

1   record.  It further demonstrates that the United States Attorney

2   has proceeded with questionable zeal in its efforts to hold Mr.

3   Zuno-Arce.  That zeal has included use of the INS to detain Mr.

4   Zuno-Arce for reasons unrelated to the immigration laws.  Even

5   on this point, the Government misstates the record saying the

6   District Court (presumably Judge Rafeedie) concluded that the

7   INS acted "independently of the U.S. Attorney's Office."

8   Government Brief, p. 4.  In fact, counsel for Mr. Zuno-Arce has

9   raised that very issue in a writ of habeas corpus proceeding

10  before Judge Rafeedie, to which the Government has now

11  responded.  That issue is still sub judice.

12

13                                    II.

14          **THE GOVERNMENT HAD ADEQUATE NOTICE OF THE**

15          **BAIL HEARING AND AMPLE OPPORTUNITY TO PROFFER**

16                  **EVIDENCE AND FILE A WRITTEN**

17          **RESPONSE TO MR. ZUNO-ARCE'S BAIL MOTION**

18

19          The Government completely misrepresents the adequacy of

20  its notice of the bail hearing; its opportunity to respond to

21  Mr. Zuno-Arce's written papers; and its purportedly thwarted

22  efforts to proffer evidence at the bail hearing.  The true facts

23  are recounted below.

24          On September 8, 1989, an identity hearing was held

25  before U.S. Magistrate John Primono in San Antonio, Texas.  At

26  that time, Mr. Zuno-Arce made an oral motion for bail.  The

27  Government opposed the motion and moved for a three-day

28

                                    4

1 continuance of the bail hearing. Magistrate Primono ordered
2 that Mr. Zuno-Arce be returned to California forthwith for
3 arraignment and a bail hearing. Magistrate Primono specifically
4 asked the Assistant United States Attorney present whether the
5 United States would be prepared for an immediate bail hearing
6 upon Mr. Zuno-Arce's return to California. In response, the
7 Assistant United States Attorney represented to Magistrate
8 Primono that he had called Los Angeles and spoken with Assistant
9 United States Attorney Manuel Medrano (the Assistant formerly in
10 charge of this prosecution who subsequently represented the
11 Government at the bail hearing), and had been told by
12 Mr. Medrano that the United States would be prepared to proceed
13 with a bail hearing on Monday, September 11, 1989. See
14 Declaration of James E. Blancarte.

16 On Monday, September 11, 1989, at approximately
17 9:00 a.m., Mr. Zuno-Arce was arraigned in Los Angeles before
18 Magistrate Venetta S. Tassopulos. Mr. Zuno-Arce entered a plea
19 of not guilty, and counsel on his behalf again made an oral
20 motion for bail. Magistrate Tassopulos declined to hear the
21 bail motion and deferred the matter to Judge Takasugi, to whom
22 the case had been assigned. Without objection from the Govern-
23 ment, Magistrate Tassopulos said that a bail hearing should be
24 held the same day.

25 At the conclusion of the arraignment before Magistrate
26 Tassopulos at approximately 10:00 a.m., counsel for Mr. Zuno-
27 Arce went directly to the chambers of Judge Takasugi and filed

5

their written bail motion. Contemporaneously, the Government was personally served at the office of the United States Attorney, located on the 14th floor of the Federal Court building. Without comment from the Government, Judge Takasugi (not defense counsel) thereupon set the matter for a hearing at 9:00 a.m. on Tuesday, September 12, 1989.

At 9:00 a.m., on September 12, 1989, Judge Takasugi again continued the matter without comment by the Government until later the same day at 1:30 p.m.

The Government, having represented in San Antonio that it would proceed with a bail hearing on September 11, 1989, having never moved for a continuance before Magistrate Tassopulos or Judge Takasugi, and having already been the beneficiary of one continuance by Magistrate Primono and two continuances by Judge Takasugi, answered ready at the call of the Court at the afternoon session on September 12. At the actual hearing, the Government neither objected to the proceedings nor moved for a continuance. As stated in the Declaration of James E. Blancarte (and as the transcript will prove), at the hearing the Government neither presented nor proffered any written, oral, or documentary evidence.[3]

---

[3] The Government filed only a partial transcript of the hearing and has mischaracterized what occurred at the hearing in its entirety. Counsel for Mr. Zuno-Arce will request an expedited full transcript and send it to this Court. In the meantime, they have presented the Declaration of James E. Blancarte setting forth what occurred at the hearing.

1    With this factual background, each of the Government's

2 misleading representations is easily rebutted. Thus, the

3 Government says that "when [it] attempted to proceed by proffer,

4 the defense objected to lack of available evidence..."

5 Government Brief, p. at 4. This is simply untrue. The

6 Government never even attempted to proffer any evidence. While

7 Mr. Zuno-Arce would have objected to any in camera, hearsay

8 proffer, he never had to do so.

9

10    Next, the Government says it lacked opportunity to

11 respond to Mr. Zuno-Arce's written bond motion, and states that

12 Mr. Zuno-Arce's counsel violated some local rule or "general

13 order" notice requirement. Government Brief, pp. 5-6. The

14 Government never identifies the source of this purported local

15 rule. Counsel for Mr. Zuno-Arce know of no such rule. In any

16 event, Mr. Zuno-Arce's written brief was filed a full twenty-

17 four hours before the hearing, giving the Government adequate

18 time to respond if it had so chosen. Moreover, the Government

19 was intimately familiar with most, if not all, the arguments

20 contained in the brief, since those same arguments had been

21 incorporated in the papers filed before Judge Rafeedie on the

22 issue of Mr. Zuno-Arce's release as a material witness.

23    Finally, the Government had several days' notice of the

24 bond hearing, which was continued at least three times. The

25 Government simply has no argument that it was precluded by any

26 procedural irregularities from fully presenting its proof or

27 arguments.

28

7

III.

### JUDGE TAKASUGI DID NOT ERR IN GRANTING

### MR. ZUNO-ARCE REASONABLE BOND

The Government wholly mischaracterizes Judge Takasugi's ruling.  The Government argues that Judge Takasugi "made no factual findings."  In fact, Judge Takasugi based his order on careful factual determinations, which this Court may not disturb unless "clearly erroneous."  The Government argues that Judge Takasugi granted bond only because he mistakenly felt compelled to do so by the case law.  In fact, Judge Takasugi properly applied the case law to the factual determinations he made about this defendant.  The Government says Judge Takasugi ordered bond because he misunderstood Mexican reluctance to extradite.  In fact, Judge Takasugi acknowledged on the record the problems with Mexican extradition, but ruled that this defendant was not such a flight risk that impediments to extradition should preclude bond.

The Government's mischaracterizations become obvious upon a review of the entire transcript.  (The Government has filed a partial transcript containing only Judge Takasugi order itself.)  Counsel for Mr. Zuno-Arce are ordering a full expedited transcript, which will be forwarded to this Court immediately upon receipt.  In the meantime, to prevent delay in

8

1   filing these papers, counsel include the Declaration of James E.

2   Blancarte setting forth what occurred at the hearing.

3

4       After attempting to discredit, by mischaracterization,

5   Judge Takasugi's considered ruling, the Government then distorts

6   the evidence presented at the bail hearing (all of it presented

7   by Mr. Zuno-Arce) in an effort to persuade this Court to

8   redetermine the factual issues.  In fact, the evidence presented

9   below amply supported -- indeed, compelled -- Judge Takasugi's

10  factual determinations and order.  Judge Takasugi's factual

11  findings are reviewed under "a deferential, clearly erroneous,

12  standard."  United States v. Motamedi, 767 F.2d 1403, 1405 (9th

13  Cir. 1985).[4]

14

15               A.   The Government Mischaracterizes

16                    Judge Takasugi's Ruling.

17       The Government is incorrect when it says Judge Takasugi

18  made "no factual findings."  Government's Brief, p. at 9.

19  Before ruling, Judge Takasugi carefully considered all evidence

20  proffered by the parties.  He began the hearing by summarizing,

21  for the record, all evidence presented.  Blancarte Decl., ¶8.

22  He supported his ruling by referring to evidence presented by

23  Mr. Zuno-Arce (and confirmed by the findings of pretrial

24

25  _____

26  [4]   Judge Takasugi was not required to make any written findings
    of fact.  18 U.S.C. § 3142(i) requires written findings in a
27  detention order, but § 3142(h) does not require such findings in
    a bail or release order.

28

9

1   services) that, among other things, Mr. Zuno-Arce had an exem-

2   plary reputation for reliability and integrity in Mexico, had

3   voluntarily cooperated with United States DEA agents, had no

4   criminal record, and was not a danger to the community.  See,

5   e.g., Blancarte Decl., ¶ 8; Partial Transcript provided by the

6   Government (hereinafter "Transcript," pp. 5-6).

7

8         Nor is the Government correct that Judge Takasugi

9   mistakenly "felt bound by case law" to require bond where a

10  defendant's foreign residence is the only argument for detaining

11  him.  On the contrary, Judge Takasugi knew foreign residence to

12  be a factor in the bond decision.  On the record, Judge Takasugi

13  acknowledged that setting bail for foreign residents is "a very

14  difficult problem."  Transcript, p. 5.  He did not say, or even

15  intimate, that he was constrained by the case law, alone and in

16  the abstract, to resolve that issue in one way or the other.

17  Judge Takasugi ruled only that in this case, where Mr. Zuno-Arce

18  presented unrebutted evidence of his integrity, reliability,

19  lack of criminal record, cooperativeness with United States DEA

20  agents, and ties to the Los Angeles community, and where the

21  Government had failed to proffer any evidence whatsoever

22  supporting its perjury charge, Mr. Zuno-Arce's return for trial

23  could adequately be assured by a $200,000 bond and a pledge of

24  real property.

25        Nor is the Government correct that Judge Takasugi

26  ordered release only because he mistakenly believed the Govern-

27  ment could, if necessary, extradite Mr. Zuno-Arce from Mexico.

28

10

1   At the hearing, United States Attorney Manuel Medrano explained

2   to Judge Takasugi the problems encountered in extradicting

3   defendants from Mexico.  Blancarte Decl., ¶8.  Judge Takasugi

4   then stated on the record that he was "fully aware of the

5   concerns [Mr. Medrano] had expressed" about Mexican extra-

6   dition.  Transcript, p. 5; Blancarte Decl., ¶9.  In fact, Judge

7   Takasugi implicitly acknowledged that he did not think extra-

8   dition a certainty.  Because he did not think extradition a

9   certainty, Judge Takasugi required the additional stringent bond

10  conditions included in his order.

11

12         In short, Judge Takasugi ordered waiver of extradition,

13  not because he naively believed such waiver was certain to be

14  effective, but rather because he rightfully believed that

15  waiving extradition could not hurt, and might in fact help,

16  ensure Mr. Zuno-Arce's presence at trial.  He was very careful,

17  however, to order other conditions for release that he believed

18  would ensure Mr. Zuno-Arce's return.

19         The Government also argues that, by ordering waiver of

20  extradition, Judge Takasugi somehow acknowledged that Mr. Zuno-

21  Arce was a flight risk.  Absolutely nothing in the record sup-

22  ports that inference.  Waiver of extradition was merely one of a

23  number of conditions which Judge Takasugi ruled would together

24  ensure Mr. Zuno-Arce's return for trial.

25

26

27

28

11

### B. The Government Distorts the
### Evidence Presented At The Bail Hearing.

The Government's brief entirely ignores the significant unrebutted evidence found persuasive by Judge Takasugi in ordering bond: Mr. Zuno-Arce has no criminal record. Mr. Zuno-Arce has never abused drugs or alcohol. Mr. Zuno-Arce has voluntarily come to the United States to meet with DEA agents, and the meetings occurred after the Camerena indictments, at a time when Mr. Zuno-Arce knew he could be subject to process in that case. Mr. Zuno-Arce has a well known and well established reputation for integrity and reliability.

In addition, the Government ignores that it proffered no evidence whatsoever supporting its perjury charge. But Mr. Zuno-Arce presented substantial unrebutted contrary evidence. DEA Agent Rodriguez has testified that Mr. Zuno-Arce was not suspected by the DEA of narcotics trafficking or any association with Caro-Quintero. The Government has never presented any evidence from Jaime Kuykendall -- the head of the DEA Camerena murder investigation, with whom Agent Rodriguez regularly communicated -- disputing Agent Rodriguez' testimony.

The Government misstates the evidence it does not ignore. The Government says Mr. Zuno-Arce "has been found by a grand jury to have committed perjury." Government's Brief, p. 1 (emphasis added). The Government knows that is untrue. The

Grand Jury has only indicted him, and the Government has proffered no evidence to support the perjury charge.

The Government also argues that Mr. Zuno-Arce has no ties to the community and has made only "sporadic" trips across the border.  Government's Brief, p. 10.  That is untrue. Mr. Zuno-Arce lived for four years in San Antonio.  He travels regularly to the United States.  He has relatives in Los Angeles, and close friends in Los Angeles and San Antonio. Mr. Zuno-Arce's relatives in Los Angeles have promised to pledge -- and Judge Takasugi has required they pledge as a condition of release -- their only residence as security for Mr. Zuno-Arce's return.  Mr. Zuno-Arce's close San Antonio friend, Jessie Gonzales, has promised to pledge -- and Judge Takasugi has required he pledge as a condition of release -- his only residence as security for Mr. Zuno-Arce's return.  That these friends and relatives are willing to place their homes on the line for Mr. Zuno-Arce is evidence of Mr. Zuno-Arce's trustworthiness and strong community ties.

The Government also says Mr. Zuno-Arce should be detained because he is "extremely well connected to the highest officials in the Mexican Government" (Government's Brief, pp. 1 and 10).  Mr. Zuno-Arce is the brother-in-law of ex-Mexican President Luis Echeverria, a fact that preoccupies the Government, without explanation.  The true fact is that it has been almost 15 years since Echeverria was President of Mexico, and if anything, Echeverria is at odds with the current "highest

13

officials" of the Mexican Government, having openly supported the opposition candidate to the recently elected President of Mexico.

Except by asserting the unadorned conclusion that no Mexican citizen with political influence would ever return to clear his name of unfounded American charges, the Government nowhere explains how Mr. Zuno-Arce's connection with Mr. Echeverria gives Mr. Zuno-Arce either the incentive or ability to flee. The opposite conclusion is more appropriately drawn. Mr. Zuno-Arce's contacts with high Mexican officials, to the extent he has them, are the product and evidence of his integrity and reliability. He will not sully his good name and that of his distinguished and prominent family by refusing to appear at trial.

Finally, the Government cites the conclusion of the pretrial services report, but ignores its findings. The pretrial services report found:

> -- "there is no indication in this matter that the defendant does pose or has ever posed a danger to the community";

> -- "it appears that the defendant is a substantial and upright honest citizen of Mexico";

14

1      --   "without question, [Zuno-Arce] has voluntarily

2      appeared at the request of the DEA in San Antonio

3      in the past. He did so without knowing whether he

4      would be facing charges against himself and he was

5      apparently cooperative";

6

7      --   Zuno-Arce has relatives in the United States who

8      have pledged their "unqualified support" as well

9      as their "rather modest properties and what

10     appears to amount to be their life savings to

11     secure a bond for [Mr. Zuno-Arce]";

12

13     --   "15 declarations of friends and associates, both

14     financial and political, of the defendant in

15     Mexico have attested to his integrity, his success

16     as a businessman and the respect the defendant has

17     within the community." Blancarte Decl., ¶10.

18

19  Judge Takasugi considered these findings before ordering bail.

20

21            C.   The Cases Cited By The Government

22                Do Not Support Reversal.

23

24     The Government cites various cases in purported support

25  of reversal. All are easily distinguished.

26

27     In United States v. Cardenas, 784 F.2d 937 (9th Cir.

28  1986), defendant had been indicted on very serious narcotics

15

1  trafficking, racketeering, and extortion charges. In addition,

2  the Government had presented evidence that the defendant was a

3  member of a serious drug gang that had "millions of dollars in

4  assets." The District Court ordered defendant detained, and the

5  Appellate Court found inadequate reasons to overrule detention.

6  Here, Mr. Zuno-Arce is charged only with perjury; the Government

7  has not shown any evidence of his association with any drug

8  gang; and Judge Takasugi, after careful consideration of the

9  evidence, ordered bond. Here, the Government, not the defendant

10  as in Cardenas, must show "clear error" in the factual findings

11  below.

12

13  In United States v. Perez-Franco, 839 F.2d 867 (1st

14  Cir. 1988), the Government presented substantial evidence of

15  narcotics trafficking, including a videotape of defendant

16  purchasing heroin. Defendant was employed at a market known to

17  be "a focal point of a heroin distribution network." The weight

18  of evidence was described as "strong." Under 18 U.S.C.

19  Section 3142(e), that evidence created a rebuttable presumption

20  that defendant was a flight risk. Defendant therefore had the

21  burden of overcoming the presumption. The District Court found

22  defendant had not met that burden and, in any event, presented

23  "a danger to the community" because of his narcotics

24  activities. The District Court ordered defendant detained, and

25  the appellate court declined to overrule the District Court's

26  order.

27

28

16

1       Likewise, in both United States v. Vargas, 804 F.2d

2  157, 163 (1st Cir. 1986), and United States v. Trosper, 809 F.2d

3  1107 (5th Cir. 1987), defendant was indicted for narcotics

4  charges; strong evidence was introduced to support the charge;

5  the Section 3142(e) presumption of flight risk applied; and the

6  District Court ordered detention.

7

8       Here, by contrast, the Government has charged Mr. Zuno-

9  Arce only with perjury; no evidence was proffered to support

10  even those charges, much less any more serious ones; the

11  Section 3142(e) presumption does not apply; it is undisputed

12  that Mr. Zuno-Arce is not a danger to the community; and the

13  Government seeks not to confirm a District Court order, but to

14  overrule it.

15      Finally, in United States v. Geerts, 629 F. Supp. 830

16  (E.D. Pa. 1985), defendant was charged with conspiracy to

17  introduce imported merchandise by false statements, which

18  carried a possible 50-year sentence. Defendant's net worth and

19  bond source were not known with certainty. The court stated,

20  "Because the source of defendants' bond money and the amount of

21  defendant's net worth are presently unknown, I am unable to

22  conclude that a bond could reasonably assure defendant's

23  appearance." 629 F.Supp. at 831. Here, Judge Takasugi has

24  ordered the pledge of specifically identified property and has

25  been apprised of Mr. Zuno-Arce's net worth through unrebutted

26  declaration. On the basis of those facts, Judge Takasugi has

27  concluded that the bond and property adequately will assure Mr.

28

17

1  Zuno-Arce's return.  In addition, there is no indication that

2  defendant in Geerts presented any evidence, like Mr. Zuno-

3  Arce's, establishing a reputation for reliability and prior

4  cooperation with law enforcement officials.

5
6      Nothing in any of the Government's cases show that

7  Judge Takasugi acted arbitrarily or decided incorrectly.

8
9                              IV.

10        THIS COURT SHOULD NOT CONSIDER THE

11        GOVERNMENT'S ELEVENTH-HOUR PROFFER

12            OF EVIDENCE NOT PRESENTED BELOW

13      The Government asks this Court to consider in camera

14  evidence it never even attempted to proffer before Judge

15  Takasugi.  The Government could have presented that evidence

16  below.  It failed to do so, and has now waived the opportunity.

17
18      As the Government knows, this Court may not now

19  consider evidence the Government failed to present before Judge

20  Takasugi.  See, e.g., Federal Rules of Appellate Procedure,

21  Rule 10.  (Decision must be rendered on "record" consisting of

22  papers "filed" below and transcripts of proceedings.); United

23  States v. Mills, 597 F.2d 693, 697 (9th Cir. 1979) (court

24  refuses to consider issue of admissibility of evidence not

25  presented below); 9 Moore, Moore's Federal Practice, §210.04[1]

26  ("a reviewing court will not ordinarily take note of matter

27  which was not presented to the district court").

28

                              18

1    This Court must reject the Government's desperate

2    eleventh-hour effort impermissibly to present evidence that it

3    knows this Court may not hear.[5]  In any event, the Government

4    presented in camera evidence to Judge Rafeedie.  After

5    consideration of that evidence, Judge Rafeedie still ruled that

6    Mr. Zuno-Arce was not a material witness in the Camerena murder

7    trials and that he should be released.

8

9                          CONCLUSION

10

11    Based upon the foregoing, the Court should deny the

Government's motion, and dissolve the stay.

12

13    September 17, 1989              Respectfuly submitted,

14                                   EDWARD M. MEDVENE
                                     JAMES E. BLANCARTE
                                     RONALD A. DiNICOLA
15                                   KEVIN E. GAUT
                                     MITCHELL, SILBERBERG & KNUPP
16

17                          By 
                               James E. Blancarte
18

19                          Attorneys for Ruben Zuno-Arce

20

21

22

23    _____

      [5]   Even if the Government could present evidence in this Court,
      the evidence could not be presented in camera, at least not
24    unless a detailed summary of the in camera evidence were sub-
      mitted to counsel for Mr. Zuno-Arce.  See, e.g., United
25    States v. Acceturro, 783 F.2d 382 (3d Cir. 1986) ("reliance on
      in camera evidence is, as a general matter, inconsistent with
26    the Bail Reform Act's procedural protections"); United States v.
      Wind, 527 F.2d 672, 675-676 (6th Cir. 1975) (District Court
27    erred by relying on in camera evidence presented at a bail
      hearing); United States v. Stanford, 551 F. Supp. 209 (D.C.N.J.
28    1982) (due process at minimum requires that defendant in bail
      hearing be provided an accurate, detailed, and complete summary
      of Government's in camera affidavit).

                              19

DECLARATION OF JAMES E. BLANCARTE

I, JAMES E. BLANCARTE, the undersigned, declare:

1.    I am an attorney at law duly licensed to practice in the State of California, before the United States District Court for the Central District of California, and before the United States Court of Appeals for the Ninth Circuit. I am, through my professional corporation, a partner in the law firm of Mitchell, Silberberg & Knupp, attorneys for Mr. Ruben Zuno-Arce in the case of United States of America v. Ruben Zuno-Arce (D.C. Case No. 89-741; C.A. Case No. 89-50454). I know all of the facts stated in this declaration of my own personal knowl-edge and, if called and sworn as a witness, could and would testify competently thereto.

2.    On September 8, 1989, I was present, on behalf of Mr. Zuno-Arce in the above-referenced matter, at the identity hearing held before United States Magistrate John Primono in San Antonio, Texas. At the hearing in San Antonio, co-counsel for Mr. Zuno-Arce, Jeremiah Handy, made an oral motion for bail. The Government opposed the motion and moved for a continuance of the bail hearing. Magistrate Primono ordered that Mr. Zuno-Arce be returned to California forthwith for arraignment and a bail hearing.

20

3.    Magistrate Primono specifically asked the United States Attorney present whether the United States would be prepared for an immediate bail hearing upon Mr. Zuno-Arce's return to California.  The Assistant United States Attorney represented to Magistrate Primono that he had called Los Angeles and spoken with Assistant United States Attorney Manual Medrano and had been told by Mr. Medrano that the United States was prepared to proceed with a bail hearing on Monday, September 11, 1989.

4.    On Monday, September 11, at approximately 9:00 a.m., I was present in Los Angeles, California at the arraignment of Mr. Zuno-Arce before Magistrate Venetta S. Tassopulos.  Mr. Zuno-Arce entered a plea of not guilty, and Edward M. Medvene, co-counsel on his behalf, made an oral motion for bail.  Magistrate Tassopulos declined to hear the bail motion and deferred the matter to Judge Takasugi, to whom the case had been assigned.

5.    At the conclusion of the arraignment, I, and other counsel for Mr. Zuno-Arce, proceeded directly to the chambers of Judge Takasugi and filed therein a written motion for bail. Contemporaneously, counsel for Mr. Zuno-Arce personally served the Government at the 14th-floor office of the United States Attorney.  Without objection from the Government, Judge Takasugi (not defense counsel) thereupon set the matter for a hearing at 9:00 a.m. on Tuesday, September 12, 1989.

21

6. On September 12, 1989, at approximately 9:00 a.m., I was present in Court when Judge Takasugi continued the matter, again without objection from the Government, until 1:30 p.m. that same day in order that pretrial services could complete its report.

7. On September 12, 1989, at approximately 2:30 p.m., I was present in Court when Mr. Zuno-Arce's bail motion came on for hearing. The Government neither objected to the proceedings nor moved for a continuance. The Government neither presented nor proffered any written, oral, or documentary evidence of any kind.

8. Judge Takasugi began the hearing by summarizing all the evidence presented. The Court referred to the evidence presented by Mr. Zuno-Arce that, among other things, Mr. Zuno-Arce had an exemplary reputation for reliability and integrity in Mexico, had voluntarily cooperated with United States DEA agents, had no criminal record, and was not a danger to the community. Thereafter, Assistant United States Attorney Manual Medrano presented argument regarding the difficulties of extra-dicting suspects from Mexico to the United States.

9. I have reviewed the partial transcript of the proceedings attached to the Government's motion. The portion of the transcript in which Judge Takasugi states, "I am fully aware

1  of the concerns you have expressed, Mr. Medrano" (Tr., p. 6,

2  lines 11-18) pertains to the argument of Mr. Medrano regarding

3  extradition.

4

5  10. On September 12, 1989, I received and reviewed the

6  report prepared by pretrial services in connection with

7  Mr. Zuno-Arce's motion for bail. Pretrial services found and

8  set forth in its written report to the Court the following:

9

10  (a) "There is no indication in this matter that

11  the defendant does pose or has ever posed a danger to the

12  community";

13

14  (b) "It appears that the defendant is a

15  substantial and upright honest citizen of Mexico";

16

17  (c) "Without question, [Mr. Zuno-Arce] has

18  voluntarily appeared at the request of the DEA in San

19  Antonio in the past. He did so without knowing whether he

20  would be facing charges against himself and he was

21  apparently cooperative";

22

23  (d) Mr. Zuno-Arce has relatives in the United

24  States who have pledged their "unqualified support," as well

25  as their "rather modest properties and what appears to be

26  their life savings to secure a bond for [Mr. Zuno-Arce]";

27  and

28

23

1

2          (e)   "15 declarations of friends and associates,

3      both financial and political, of the defendant Mexico have

4      attested to his integrity, his success as a businessman and

5      the respect the defendant has within the community."

6

7          I declare under penalty of perjury that the foregoing

8   is true and correct.

9

10         Executed on September *17*, 1989, at Los Angeles,

11   California.

12

13                                    James E. Blancarte
                                      ─────────────────────
14                                      James E. Blancarte

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24

**Exhibit L**

**FILED**

UNITED STATES COURT OF APPEALS

SEP 26 1989

FOR THE NINTH CIRCUIT

CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) No. 89-50454 |
| Plaintiff-Appellant, | ) |
| | ) DC# CR 89-741-RMT |
| | ) Central California |
| vs. | ) |
| | ) |
| RUBEN ZUNO-ARCE, | ) ORDER |
| | ) |
| Defendant-Appellee. | ) |
| | ) |
| | ) |

Before:  FLETCHER, CANBY and O'SCANNLAIN, Circuit Judges

This court's September 13, 1989 order staying the
district court pretrial release order is hereby vacated.

Appellant's motion for revocation of the district
court's release order is denied.  The district court order is
affirmed.

9/19/89SP
CR CAL 9/13/89SP

**Exhibit M**

1  DECLARATION OF JAMES E. BLANCARTE

2

3  I, JAMES E. BLANCARTE, the undersigned, declare:

4

5  1.  I am an attorney at law duly licensed to practice

6  in the State of California, before the United States District

7  Court for the Central District of California, and before the

8  United States Court of Appeals for the Ninth Circuit.  I am,

9  through my professional corporation, a partner in the law firm

10  of Mitchell, Silberberg & Knupp, attorneys for Mr. Ruben Zuno-

11  Arce in the case of United States of America v. Ruben Zuno-Arce

12  (D.C. Case No. 89-741; C.A. Case No. 89-50454).  I know all of

13  the facts stated in this declaration of my own personal knowl-

14  edge and, if called and sworn as a witness, could and would

15  testify competently thereto.

16

17  2.  On September 8, 1989, I was present, on behalf of

18  Mr. Zuno-Arce in the above-referenced matter, at the identity

19  hearing held before United States Magistrate John Primono in San

20  Antonio, Texas.  At the hearing in San Antonio, co-counsel for

21  Mr. Zuno-Arce, Jeremiah Handy, made an oral motion for bail.

22  The Government opposed the motion and moved for a continuance of

23  the bail hearing.  Magistrate Primono ordered that Mr. Zuno-Arce

24  be returned to California forthwith for arraignment and a bail

25  hearing.

26

27

28

20

1    3.    Magistrate Primono specifically asked the United
2    States Attorney present whether the United States would be
3    prepared for an immediate bail hearing upon Mr. Zuno-Arce's
4    return to California.  The Assistant United States Attorney
5    represented to Magistrate Primono that he had called Los Angeles
6    and spoken with Assistant United States Attorney Manual Medrano
7    and had been told by Mr. Medrano that the United States was
8    prepared to proceed with a bail hearing on Monday, September 11,
9    1989.

10

11    4.    On Monday, September 11, at approximately
12    9:00 a.m., I was present in Los Angeles, California at the
13    arraignment of Mr. Zuno-Arce before Magistrate Venetta S.
14    Tassopulos.  Mr. Zuno-Arce entered a plea of not guilty, and
15    Edward M. Medvene, co-counsel on his behalf, made an oral motion
16    for bail.  Magistrate Tassopulos declined to hear the bail
17    motion and deferred the matter to Judge Takasugi, to whom the
18    case had been assigned.

19

20    5.    At the conclusion of the arraignment, I, and other
21    counsel for Mr. Zuno-Arce, proceeded directly to the chambers of
22    Judge Takasugi and filed therein a written motion for bail.
23    Contemporaneously, counsel for Mr. Zuno-Arce personally served
24    the Government at the 14th-floor office of the United States
25    Attorney.  Without objection from the Government, Judge Takasugi
26    (not defense counsel) thereupon set the matter for a hearing at
27    9:00 a.m. on Tuesday, September 12, 1989.

28

21

6. On September 12, 1989, at approximately 9:00 a.m., I was present in Court when Judge Takasugi continued the matter, again without objection from the Government, until 1:30 p.m. that same day in order that pretrial services could complete its report.

7. On September 12, 1989, at approximately 2:30 p.m., I was present in Court when Mr. Zuno-Arce's bail motion came on for hearing. The Government neither objected to the proceedings nor moved for a continuance. The Government neither presented nor proffered any written, oral, or documentary evidence of any kind.

8. Judge Takasugi began the hearing by summarizing all the evidence presented. The Court referred to the evidence presented by Mr. Zuno-Arce that, among other things, Mr. Zuno-Arce had an exemplary reputation for reliability and integrity in Mexico, had voluntarily cooperated with United States DEA agents, had no criminal record, and was not a danger to the community. Thereafter, Assistant United States Attorney Manual Medrano presented argument regarding the difficulties of extra-dicting suspects from Mexico to the United States.

9. I have reviewed the partial transcript of the proceedings attached to the Government's motion. The portion of the transcript in which Judge Takasugi states, "I am fully aware

22

1  of the concerns you have expressed, Mr. Medrano" (Tr., p. 6,

2  lines 11-18) pertains to the argument of Mr. Medrano regarding

3  extradition.

4

5      10.  On September 12, 1989, I received and reviewed the

6  report prepared by pretrial services in connection with

7  Mr. Zuno-Arce's motion for bail.  Pretrial services found and

8  set forth in its written report to the Court the following:

9

10      (a)  "There is no indication in this matter that

11  the defendant does pose or has ever posed a danger to the

12  community";

13

14      (b)  "It appears that the defendant is a

15  substantial and upright honest citizen of Mexico";

16

17      (c)  "Without question, [Mr. Zuno-Arce] has

18  voluntarily appeared at the request of the DEA in San

19  Antonio in the past.  He did so without knowing whether he

20  would be facing charges against himself and he was

21  apparently cooperative";

22

23      (d)  Mr. Zuno-Arce has relatives in the United

24  States who have pledged their "unqualified support," as well

25  as their "rather modest properties and what appears to be

26  their life savings to secure a bond for [Mr. Zuno-Arce]";

27  and

28

23

1

2                    (e)   "15 declarations of friends and associates,

3      both financial and political, of the defendant Mexico have

4      attested to his integrity, his success as a businessman and

5      the respect the defendant has within the community."

6

7          I declare under penalty of perjury that the foregoing

8      is true and correct.

9

10         Executed on September *12*, 1989, at Los Angeles,

11     California.

12

13                                 *James E. Blancarte*

14                                   James E. Blancarte

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit N**

1

2   EDWARD M. MEDVENE
   JAMES E. BLANCARTE

3   RONALD A. DiNICOLA
   TIMOTHY S. BARKER

4   BRIAN M. COLLIGAN
   MITCHELL, SILBERBERG & KNUPP

5   11377 West Olympic Boulevard
   Los Angeles, California 90064

6   (213) 312-2000

7

   Attorneys for Defendant

8   RUBEN ZUNO-ARCE

9

10              UNITED STATES DISTRICT COURT

11            CENTRAL DISTRICT OF CALIFORNIA

12

13   UNITED STATES OF AMERICA   )   CASE NO. CR 89-741 EITT
                       )

14            Plaintiff,   )   DECLARATION OF EDWARD M.
                       )   MEDVENE IN SUPPORT OF:

15     vs.               )
                       )   (A)  MOTION TO DISMISS INDICT-

16   RUBEN ZUNO-ARCE,      )   MENT BASED UPON PROSECUTORIAL
                       )   MISCONDUCT. . .;

17          Defendant.   )
                       )   (B)  MOTION TO DISMISS INDICT-

18   ——————————————————————)   MENT BASED UPON PROSECUTORIAL
                             VINDICTIVENESS;

19

20                          (C)  MOTION TO DISMISS
                          COUNT III OF THE INDICTMENT;

21                          (D)  MOTION FOR DISCLOSURE OF
                          INDICTING GRAND JURY

22           •               TRANSCRIPTS. . .; AND

23                          (E)  MOTION FOR EVIDENTIARY
                          HEARING ON GOVERNMENT'S MOTION

24                          IN LIMINE

25                          Hearing Date: December 4, 1989
                          Time:       1:30 p.m.

26                          Place:     Courtroom 22

27                          [Trial Date: December 12, 1989]

28

1      DECLARATION OF EDWARD M. MEDVENE

2

3           I, Edward M. Medvene, the undersigned, hereby declare

4      as follows:

5

6           1.   I am an attorney at law, duly licensed to practice

7      law before this Court and all the Courts of the State of

8      California.  I am, through my professional corporation, a member

9      of the law firm of Mitchell, Silberberg & Knupp, attorneys for

10     Ruben Zuno-Arce.  I submit this declaration in support of

11     Mr. Zuno-Arce's contemporaneously filed (a) "Motion to Dismiss

12     Indictment Based Upon Prosecutorial Misconduct. . .,"

13     (b) "Motion to Dismiss Based Upon Prosecutorial Vindictiveness",

14     (c) "Motion to Dismiss Count III of the Indictment as

15     Duplicitous", (d) "Motion for Disclosure of Indicting Grand Jury

16     Transcripts. . .," and (e) "Motion for Evidentiary Hearing on

17     Government's In Limine Motion. . ."  I know all of the following

18     facts of my own personal knowledge and, if called and sworn as a

19     witness, could and would competently testify thereto.

20

21          2.   On August 9, 1989, Mr. Zuno-Arce, using a valid

22     border crossing card, was lawfully admitted into the United

23     States at San Antonio, Texas.  (See Reporter's Transcript

24     ("Tr.") September 5, 1989, pp. 14-17, attached hereto as Exhibit

25     "A")  Mr. Zuno-Arce had entered the United States from Mexico

26     many previous times without incident using the same border

27     crossing card.  I am informed and believe that, prior to

28

                                    3

1  Mr. Zuno-Arce's entry into the United States on this occasion,
2  the Drug Enforcement Administration ("DEA") in Los Angeles
3  caused information to be placed into the Immigration and
4  Naturalization ("INS") intelligence computer system regarding
5  Mr. Zuno-Arce. As a consequence, later in the day on August 9,
6  the INS seized Mr. Zuno-Arce. For the reasons set forth here
7  and below, I am informed and believe that the INS was acting at
8  the behest of the DEA. After arresting Mr. Zuno-Arce, the INS
9  failed to file any charging documents against Mr. Zuno-Arce. I
10 am informed and believe that it is the custom and practice of
11 the INS to prepare and file charging documents immediately upon
12 the detention of an excludible alien. The INS subsequently took
13 other steps that indicate it never intended to proceed against
14 Mr. Zuno-Arce.

15

16       3.    On August 11, 1989, the INS Assistant Director for
17 Investigations served Mr. Zuno-Arce's immigration counsel in
18 San Antonio, Peter Magaro, with a copy of a material witness
19 warrant issued by Judge Edward Rafeedie in Los Angeles. Later
20 the same day, a federal magistrate in San Antonio ordered that
21 Mr. Zuno-Arce be transferred to Los Angeles. The INS had not
22 filed any.charging documents as of August 11, 1989, and prepared
23 none prior to Mr. Zuno-Arce's release for transfer to
24 Los Angeles on the material witness warrant. The INS explana-
25 tion was that they were waiting for evidence to come from
26 Los Angeles.

27

28

4

1         4.   On August 16, 1989, after being transported to

2 Los Angeles, Mr. Zuno-Arce filed an opposition to his

3 designation as a material witness and a motion for his immediate

4 release.  On Friday, August 18, Judge Rafeedie held a hearing in

5 order that he might ". . . ascertain the nature and extent of

6 the entire situation."  (Tr., August 18, 1989, p. 3)  The

7 government made an in-camera submission to the Court purporting

8 to set forth in greater detail the materiality of Mr. Zuno-

9 Arce's testimony.  Judge Rafeedie found that there was cause to

10 hold Mr. Zuno-Arce as a material witness.  The Court, however,

11 ordered the government to expedite the immunity procedures so

12 Mr. Zuno-Arce could forthwith be brought before a federal grand

13 jury.

14

15         5.   At the August 18, 1989 hearing, the Assistant

16 United States Attorney handling the matter, Jimmy Gurule, told

17 the Court that "the only potential problem I see and I'll be

18 honest with the Court, would just be notifying the grand jury on

19 short notice and getting a quorum.  Assuming we can get quorum,

20 we'll make telephone calls individually."  (Tr., August 18,

21 1989, p. 34, lines 20-23)  Subsequently, Mr. Gurule informed me

22 that U.S. District Judge Manuel Real had previously ordered that

23 grand jury matters relating to the Camarena investigation be

24 heard before a special grand jury (the "Camarena grand jury").

25 Mr. Gurule said he would attempt to get a quorum of the Camarena

26 grand jury.  Mr. Gurule subsequently informed me that he was

27 unable to get a quorum of the Camarena grand jury for Wednesday,

28

1   August 23, 1989.  Mr. Gurule said he was going to place
2   Mr. Zuno-Arce before the "regular" grand jury which convened
3   each Thursday (the "Thursday grand jury").  He said that
4   Mr. Zuno-Arce would be placed before the Thursday grand jury on
5   August 24, 1989.

6

7           6.    At or around the same time, Assistant United
8   States Attorney Manuel Medrano confirmed the existence of the
9   Camarena grand jury.  He stated that the Camarena grand jury had
10  been investigating the Camarena case for approximately two
11  years.  He confirmed that the Camarena grand jury met when
12  called.  He said he would try to get the Camarena grand jury
13  in on Wednesday.  He further confirmed that the United States
14  Attorney's office was unable to get a quorum for the Camarena
15  grand jury on Wednesday, August 23.  He said for that reason
16  Mr. Zuno-Arce would be brought before the Thursday grand jury.

17

18          7.    I am informed and believe that any and all matters
19  relating to the Camarena investigation would customarily be
20  heard by the Camarena grand jury.  I am further informed and
21  believe that the Thursday grand jury that ultimately heard
22  Mr. Zuno-Arce's testimony on August 24 and August 31 was
23  comprised of individuals who had not previously received
24  evidence on any Camarena-related matters and, as such, would not
25  have known (in the absence of additional evidence) whether
26  Mr. Zuno-Arce was lying when he said he did not know Rafael
27  Caro-Quintero or Ernesto Fonseca-Carrillo, and would not know

28

                                6

1 whether this denial was "material" to the grand jury
2 investigation.

3

4        8.    Prior to Mr. Zuno-Arce's appearing before the
5 Thursday grand jury on August 24, I advised the United States
6 Attorney's Office, and specifically Mr. Gurule, that
7 Mr. Zuno-Arce and his counsel were willing to start as early as
8 possible and continue as long as necessary that day in order to
9 have the grand jury complete its questioning of Mr. Zuno-Arce.
10 Mr. Gurule advised me that he could not start until approxi-
11 mately 2:00 p.m. At approximately 2:30 p.m., Mr. Zuno-Arce was
12 brought before the grand jury. At approximately 5:00 p.m., I
13 was informed by Mr. Gurule that he had not completed questioning
14 Mr. Zuno-Arce. He said Mr. Zuno-Arce would have to appear again
15 before the Thursday grand jury on August 31, 1989. Mr. Gurule
16 said he still had approximately two more hours of questioning
17 for Mr. Zuno-Arce and the court reporter could not stay past
18 5:00 p.m. I protested the fact that absent an order of the
19 Court to the contrary, Mr. Zuno-Arce would continue to be held
20 as a material witness, without charges, and without bail or
21 bond, for another week because the court reporter could not stay
22 past 5:00 p.m. and the United States Attorney had failed to make
23 arrangements for another court reporter. Mr. Gurule offered no

24
25
26
27
28

7

1  resolution in response to my protest but merely said the
2  questioning would be convened the following week and Mr. Zuno-
3  Arce would be held without bond.

5       9.   I was present outside the grand jury room when
6  Mr. Zuno-Arce testified and I remained there until the grand
7  jury adjourned.  I am informed and believe that no other
8  witness, besides Mr. Zuno-Arce, testified under oath before the
9  Thursday grand jury on August 24, 1989.

11      10.  On August 28, 1989, Judge Rafeedie held a status
12 hearing at which the government argued that Mr. Zuno-Arce should
13 not be released from custody because the government had not
14 concluded its questioning before the grand jury.  The government
15 argued that the Court should not release Mr. Zuno-Arce because
16 he remained a material witness and the government feared that he
17 would not report back to testify at the Barnabe-Ramirez trial
18 then set for October 3, 1989.  In fact, I am informed and
19 believe that at the time Mr. Gurule made this statement to the
20 Court, he had already reached an agreement in principal with
21 counsel for Barnabe-Ramirez to continue the Barnabe-Ramirez
22 trial.  I am informed and believe the Government sought to
23 detain Mr. Zuno-Arce indefinitely or at least as long as it took
24 for the Barnabe-Ramirez matter to go to trial, even if that
25 meant several months.  The Barnabe-Ramirez matter was subse-
26 quently continued to December.  Judge Rafeedie concluded the
27 hearing by ordering the government to complete Mr. Zuno-Arce's
28 testimony before the grand jury as soon as possible.

8

1          11.  On August 31, 1989, Mr. Zuno-Arce was again

2  brought before the Thursday grand jury.  He answered all of the

3  government's questions in approximately two hours.  Immediately

4  after Mr. Zuno-Arce completed his testimony, James Blancarte of

5  my office, asked Mr. Gurule in substance whether he was

6  satisfied with Mr. Zuno-Arce's testimony before the grand

7  jury.  Mr. Gurule told Mr. Blancarte that it "went well" and

8  Mr. Zuno-Arce's testimony appeared to be "truthful".  This

9  conversation between Mr. Blancarte and Mr. Gurule was documented

10  in a declaration filed by Mr. Blancarte on September 5, 1989.

11  The statement attributed to Mr. Gurule has never been refuted or

12  denied.  (Declaration of James E. Blancarte, dated September 5,

13  1989, page 18, paragraph (d); filed concurrently with Second

14  Additional Brief of Ruben Mr. Zuno-Arce In Support of (A)

15  Request For Release, and (b) Petition For Disclosure of Grand

16  Jury Testimony).

18          12.  On August 31, 1989 my partner, James Blancarte was

19  present outside the grand jury room when Mr. Zuno-Arce ended his

20  testimony.  I am informed and believe that no other witness,

21  besides Mr. Zuno-Arce, testified under oath before the Thursday

22  grand jury on August 31, 1989.

24          13.  On September 5, 1989, Judge Rafeedie convened

25  another status hearing.  Mr. Gurule again argued that

26  Mr. Zuno-Arce was a material witness in the Barnabe-Ramirez

27  trial and that he should be detained until he testified in that

9

1  trial. Mr. Gurule specifically said, "Your Honor, the
2  government is respectfully requesting that he be detained, that
3  the detention continue; that based upon the government's filings
4  in camera, it is still the government's position that he is a
5  material witness in U.S. versus Barnabe (sic)." (Tr.,
6  September 5, 1989, pp. 3-4) The government argued that
7  Mr. Zuno-Arce remained a flight risk and no condition of bail
8  would insure his appearance at the Barnabe-Ramirez trial. After
9  having considered the government's arguments, the government's
10 in camera filings, and the testimony of Mr. Zuno-Arce before the
11 grand jury, the Court ruled that Mr. Zuno-Arce was not a
12 material witness and there was no basis for continuing to hold
13 him as a witness in the Barnabe-Ramirez case. Neither Messrs.
14 Gurule nor Medrano argued or suggested to Judge Rafeedie that
15 Mr. Zuno-Arce had committed perjury before the grand jury. I
16 requested that the Court release Mr. Zuno-Arce from the
17 courtroom. The Court said this could not be accomplished, but
18 the Court agreed to sign a release order forthwith.

19

20      14. At the conclusion of the September 5 hearing,
21 rather than being released, Mr. Zuno-Arce was taken into the
22 custody of the INS pursuant to a detention order originating
23 from San Antonio. A subsequent hearing was convened later the
24 same day (on September 5) before Judge Rafeedie to inquire about
25 the role of the U. S. Attorney's office in the continued deten-
26 tion of Mr. Zuno-Arce. At this proceeding, Messrs. Gurule and
27 Medrano represented to the Court that they had taken no action

28
                                10

1    and would take no action to interfere with Mr. Zuno-Arce's
2    release, and that Mr. Zuno-Arce's detention was a result of
3    independent action on the part of the INS.  (Tr., September 5,
4    1989, at pp. 21-22)  Mr. Madrano thereupon entered into an
5    agreement on the record with undersigned counsel and represented
6    to the Court that the U.S. Attorney's office would take no
7    action prospectively to interfere with Mr. Zuno-Arce's release
8    from custody.  (Tr., September 5, 1989 at pp. 28-29)  The Deputy
9    District Director of INS in Los Angeles, Bob Looney, was present
10   and represented to the Court that INS in San Antonio had
11   evidence to support the "drug charge" and that the INS '
12   proceedings in San Antonio would be expedited.  (Tr.,
13   September 5, 1989 at pp. 22-23)

14

15            15.  In contrast to the representations made by
16   Messrs. Gurule and Medrano in open court, I am informed and
17   believe that representatives of the U. S. Attorneys Office took
18   steps to prevent Mr. Zuno-Arce's release.  The U. S. Attorney's
19   Office was assisted in this regard by the INS and the DEA.
20   Mr. Gurule conceded that he had spoken to the Assistant District
21   Director of the INS in San Antonio, Gary Renick, and that he had
22   apprised him of the Court's release order.  (Id. at
23   pp. 21-22.)  I am informed and believe that representatives of
24   the U. S. Attorney's Office discussed with Los Angeles DEA Agent
25   Doug Keehl the fact that it was imperative that Mr. Zuno-Arce
26   not be released.  I am further informed and believe that Agent
27   Keehl was told in substance or effect to take steps necessary to

28

                                11

1  prevent Mr. Zuno-Arce's release. Agent Keehl conceded that he
2  called his counterpart in San Antonio, Agent George Delamy, and
3  advised him of Judge Rafeedie's release order. Agent Keehl
4  suggested to Agent Delamy that he contact the United States
5  Marshall's office in Los Angeles and advise them to detain
6  Mr. Zuno-Arce. (Tr., September 5, 1989, pp. 24-25)

7

8  16. At the conclusion of the second September 5, 1989
9  hearing, Mr. Blancarte and I, accompanied by the Consul General
10  for the Republic of Mexico, Romeo Flores Caballero, went to the
11  offices of Edward Gustafson, then District Director of INS,
12  Western Region. Mr. Gustafson was asked if he would order the
13  immediate release of Mr. Zuno-Arce in accordance with Judge
14  Rafeedie's order. Mr. Gustafson said that Mr. Zuno-Arce was not
15  in the custody of the INS in Los Angeles. Mr. Gustafson said if
16  he had jurisdiction, he would release Mr. Zuno-Arce and permit
17  him to return to his home in Mexico with the understanding that
18  he would return to San Antonio or Los Angeles for any INS
19  proceedings. Mr. Gustafson conceded that jurisdiction remained
20  in San Antonio with Richard Casillas, District Director of the
21  INS in San Antonio. Mr. Gustafson agreed to contact Mr.
22  Casillas to determine his desires.

23

24  17. Mr. Gustafson thereupon contacted Mr. Casillas in
25  San Antonio and recommended to Mr. Casillas that he transfer the
26  INS proceeding to Los Angeles and/or that Mr. Zuno-Arce be
27  allowed to return to his home in Mexico in accordance with Judge

28
12

1  Rafeedie's release order. Mr. Gustafson reported that
2  Mr. Casillas rejected the recommendation on the ground that
3  Mr. Zuno-Arce was a suspected narcotics trafficker and had to be
4  brought to San Antonio for an "exclusionary hearing".
5  Mr. Casillas insisted on Mr. Zuno-Arce's return notwithstanding
6  the fact that his office had failed to file any charging
7  documents against Mr. Zuno-Arce between the time Mr. Zuno-Arce
8  was detained and arrested by INS on August 9 and September 5,
9  1989, and had conceded at that time that INS in San Antonio had
10  no evidence against Mr. Zuno-Arce. Ultimately, after Mr. Zuno-
11  Arce's indictment, INS in San Antonio closed its file and agreed
12  to transfer the matter to Los Angeles.

13

14        18.  On Wednesday, September 6, 1989, Mr. Zuno-Arce was
15  returned to San Antonio. Contrary to the representations made
16  by Mr. Looney in open court on September 5, no expedited hearing
17  was held and no charging documents were filed either on
18  September 6 when Mr. Zuno-Arce arrived in San Antonio or on
19  September 7, 1989. Contrary to the representations made by
20  Mr. Lonney in open court, INS did not produce any evidence
21  against Mr. Zuno-Arce then or subsequently up to and including
22  the present. As set forth below and contrary to its
23  representations to Judge Rafeedie, the INS has never presented
24  any evidence of any "drug charge"; and the San Antonio office
25  said on two occassions the evidence was coming from Los
26  Angeles. Yet INS en Los Angeles has never brought any charges
27  notwithstanding the fact that I sent a letter to INS indicating
28

13

1  Mr. Zuno-Arce would return at any time for a hearing.  Again, to
2  this date, no hearing has been set.

3

4         19.  On or about September 7, 1989, the INS Trial
5  Counsel and the Assistant District Director for Investigations
6  in San Antonio informed Mr. Magaro (Mr. Zuno-Arce's San Antonio
7  immigration counsel) that INS in San Antonio did not yet have
8  proof that Mr. Zuno-Arce was involved in narcotics traf-
9  ficking.  For the second time, INS said that the proof "was on
10  its way," and it was coming from Los Angeles.  (Declaration of
11  Pete Magaro in Support of Ruben Zuno-Arce's Motion for Release
12  Pending Trial, filed in Case No. 89-741 RMT on September 12,
13  1989).  Ironically, the evidence was necessary to legitimize the
14  continued detention of Mr. Zuno-Arce in San Antonio at the
15  behest of federal authorities in Los Angeles.

16

17         20.  On or about September 7, 1989, I was advised that
18  a reliable confidential informant in San Antonio had stated that
19  Mr. Zuno-Arce was being held in San Antonio by the INS until the
20  U.S. Attorney's office in Los Angeles could get approval from
21  Washington for a perjury indictment to be filed against
22  Mr. Zuno-Arce before he left the United States.  The information
23  supplied by the confidential informant is corroborated by the
24  fact that, subsequent to the receipt of the information, the
25  U.S. Attorney's office secured an indictment in Los Angeles
26  against Mr. Zuno-Arce for perjury.

27

28

14

1        21.   It is apparent that the INS in San Antonio.
2   facilitated the continued detention of Mr. Zuno-Arce so that an
3   indictment could be obtained in Los Angeles. After the
4   indictment, the INS abandoned its stated desire to proceed
5   against Mr. Zuno-Arce. For example, in marked contrast to his
6   pre-indictment postion, Mr. Casillas told Mr. Magaro on
7   September 15, 1989 that if the Ninth Circuit Court of Appeals
8   decided to permit Mr. Zuno-Arce's release on bond, he was
9   inclined to parole Mr. Zuno-Arce into the United States.
10  (Declaration of Pete Magaro filed in Support of Ruben
11  Zuno-Arce's Petition for Writ of Habeas Corpus, filed in Case
12  No. CV 89-57721 RB(B) on September 28, 1989). The words "parole
13  into the United States" in lay parlance mean Mr. Zuno-Arce would
14  be released so he could travel to Mexico and would be permitted
15  to return to the United States for the purpose of attending any
16  INS proceedings.

18       22.   In addition, on September 26, 1989, in complete
19  repudiation of INS' earlier position, the trial attorney for the
20  INS in San Antonio, Howard VanWinkle, informed Mr. Magaro that
21  INS in San Antonio was willing to transfer venue of the INS
22  proceedings involving Mr. Zuno-Arce to INS in Los Angeles.
23  Subsequently, both counsel filed a joint motion for a change of
24  venue thereby transferring the case to Los Angeles.
25  (Declaration of Pete Magaro filed in Support of Ruben
26  Zuno-Arce's Petition for Writ of Habeas Corpus, filed in Case
27  No. CV 89-57721 RB(B) on September 28, 1989).

15

23.  On or about Thursday, September 7, 1989, the U.S. Attorney's Office in Los Angeles caused the perjury indictment to be brought against Mr. Zuno-Arce, presumably by the Thursday grand jury.  The indictment came twenty-nine days after Mr. Zuno-Arce's original arrest by the INS in San Antonio and two days after Judge Rafeedie's order.

24.  The government was obviously taken by surprise by Judge Rafeedie's "sudden" release of Mr. Zuno-Arce on September 5, 1989.  This fact is confirmed by a report in the Saturday, September 9, 1989 edition of the San Antonio Light which states in pertinent part:

> "A government source close to the investigation admitted late Thursday that [Judge] Rafeedie's sudden release of Zuno in Los Angeles 'caught the (prosecutors) with their pants down' and that federal prosecutors believing that Mr. Zuno would remain in custody without bail – had to rush to fill the legal hole with valid, but 'hastily prepared,' perjury charges."

[Article attached as Exhibit "B"].

25.  On November 8, 1989, I spoke with the reporter who

16

1   wrote the above-referenced article, Frank Levine.  Mr. Levine
2   said that he has "covered" Mexico as a reporter for over twenty
3   years.  He has reported extensively on U.S.-Mexican news
4   events.  I am informed and believe that over the years Mr.
5   Levine has developed a number of news sources that include well
6   placed United States law enforcement officials.  Mr. Levine
7   informed declarant that the source for the above-referenced
8   quote was a well placed source whose information was based upon
9   contact with Los Angeles.  Mr. Levine confirmed that the above
10   quote was a direct and accurate quote.  Mr. Levine refused to
11   reveal his source for the article or the quote.

13       26.  The testimony that the government now claims is
14   perjurious was given on August 24, 1989.  Although Mr. Zuno-Arce
15   also testified on August 31, the relevant testimony was
16   duplicative of that elicited on August 24. If the United States
17   Attorney's Office intended to indict Mr. Zuno-Arce for perjury
18   it had no reason not to do so on or shortly after August 24.
19   I am informed and believe that the government only indicted
20   Mr. Zuno-Arce when it did as a result of Judge Rafeedie's
21   release order and Mr. Zuno-Arce's success in obtaining his
22   liberty. .

24       27.  The indictment charged that Mr. Zuno-Arce lied in
25   front of the grand jury when he said he did not know Mr. Caro-
26   Quintero and Mr. Fonseca-Carrillo.  Although the government has
27   represented to the Courts in Los Angeles on numerous occasions

17

1   that it believes Mr. Zuno-Arce is a narcotics trafficker

2   involved with Messrs. Quintero and Fonseca, as well as with the

3   Camarena torture and murder, the indictment makes no such

4   charges. The indictment does not charge Mr. Zuno-Arce with

5   perjury in connection with his denial that he is a narcotics

6   trafficker or his denial that he is involved in any way with the

7   torture and murder of Agent Camarena, nor does the indictment

8   charge him with any underlying substantive offenses.

9

10      28. On September 12, 1989, at a bond hearing on the

11   perjury charges before Judge Robert M. Takasugi, in open court,

12   I advised Judge Takasugi that at the end of Mr. Zuno-Arce's

13   testimony before the grand jury, Mr. Gurule, who questioned

14   Mr. Zuno-Arce before the grand jury, told Mr. Blancarte that

15   Mr. Zuno-Arce had testified "truthfully". The government did

16   not, at that hearing or at any other time to this day, deny or

17   otherwise refute Mr. Gurule's statement to Mr. Blancarte. (Tr.,

18   September 12, 1989, P. 6, lines 2-7 and P. 20, lines 16-21)

19   (attached hereto as Exhibit "C").

20

21      29. I am informed and believe that the indictment was

22   issued on·or about September 7, 1989 by the Thursday grand jury

23   (not the Camarena grand jury). This is the same grand jury that

24   heard Mr. Zuno-Arce's testimony. Notwithstanding the foregoing,

25   I cannot be absolutely certain which grand jury issued the

26   indictment or if there were any witnesses other than Mr. Zuno-

27   Arce that testified under oath before the indicting grand jury.

28

1    30.  The transcript of Mr. Zuno-Arce's testimony before
2  the Thursday grand jury reveals a pattern of highly improper and
3  unethical questioning.  The questions put to Mr. Zuno-Arce were
4  composed in such a manner as to place before the grand jury
5  unsubstantiated and unsworn "testimony" by the interrogating
6  prosecutor, Mr. Gurule.

7

8    31.  The grand jury questioning focused upon Mr. Zuno-
9  Arce's alleged relationship with Rafael Caro-Quintero and
10 Ernesto Fonseca-Carrillo.  Without proper foundation or
11 substantiation, the following questions (as paraphrased) were
12 put to Mr. Zuno-Arce at the August 24 grand jury proceedings
13 after he denied knowing Mr. Caro-Quintero:

14

15 Q  Let's talk about 1984.  In 1984, were you arrested in the
16    State of Jalisco with Rafael Caro-Quintero?

17

18 A  Not at all.

19

20 Q  . . . Were you ever arrested with Rafael Caro-Quintero?

21

22 A  Never, never.

23

24 Q  If there were police records in Mexico that reflected that,
25    those police records would be incorrect?

26

27 A  They would be incorrect because I had never been arrested in

28
                               19

1    Mexico.

2

3  Q  You are not denying that you now (sic) Rafael Caro-Quintero,

4     are you?

5

6  A  I would like you to specify in that question, what do you

7     mean when you say whether I know Rafael Caro-Quintero?

8

9  Q  You met Rafael Caro-Quintero?

10

11  A  Only through radio, television and newspapers, to the best

12     of my knowledge.  As far as I know, I have never met him

13     personally.

14

15  Q  Pictures have been taken with you and Rafael Caro-Quintero?

16

17  A  I would like to see those photographs because at no time

18     have I knowingly been with him.  Maybe at a party or maybe a

19     meeting, but as far as my having known that he was

20     Caro-Quintero, that is not so.

21

22  Q  Now you are saying you may have met him at a party or

23     meeting?

24

25  A  I don't think that I have ever met him.  This is the best of

26     my knowledge.

27

28

20

1  Q    We are going to attempt to provide you the opportunity to

2       identify these photographs at a later date.

3

4  A    Correct.

5

6           32.   The transcript of the August 24, 1989 proceedings

7  shows no evidence that Mr. Zuno-Arce was arrested in the State

8  of Jalisco or anywhere else with Rafael Caro-Quintero.  In

9  addition, no police records from Mexico that reflected such an

10 arrest were ever introduced.  No pictures were shown

11 Mr. Zuno-Arce with himself and Rafael Caro-Quintero.  Moreover,

12 contrary to Mr. Gurule's assertion that "we are going to attempt

13 to provide you with the opportunity to identify these

14 photographs at a later date", that was never done.  At no time

15 did the government substantiate, clarify, or retract the

16 suggestion that Mr. Zuno-Arce was arrested with Mr. Quintero,

17 that records to that affect existed, or that photographs of Mr.

18 Zuno-Arce together with Mr. Quintero existed.

19

20          33.   At the grand jury proceeding on August 31, 1989,

21 Mr. Zuno-Arce was asked (as paraphrased below) about Mr. Ruben

22 Sanchez-Barba, the man to whom he sold the Lope de Vega

23 residence:

24

25 Q    Wasn't Dr. Ruben Sanchez-Barba murdered shortly after

26      Camarena?

27

28
                                21

1    A    No.  He was detained by the police . . . and released on

2    200,000 pesos.

3

4    Q    You know he is dead now.

5

6    A    I don't have the slightest knowledge of that. . . .

7

8         34.  I am informed and believe that Ruben Sanchez-Barba

9    was never murdered and that the foregoing statement by the

10   Mr. Gurule was false.  The question suggested to the grand jury

11   that the one person who might explain the transaction involving

12   Mr. Zuno-Arce and the Lope de Vega residence had been silenced.

13

14        35.  Declarant is informed and believes that the entire

15   transcript of Mr. Zuno-Arce's testimony before the Thursday

16   grand jury was considered either by that same grand jury or the

17   Camarena grand jury in its deliberations concerning whether to

18   indict Mr. Zuno-Arce.  The transcript contains, in effect,

19   unsubstantiated and unsworn testimony by Mr. Gurule that is not

20   true.  I am informed and believe that the grand jury indicted

21   Mr. Zuno-Arce on the basis of the transcript which contained

22   Mr. Gurule's unsubstantiated and unsworn testimony.

23

24        36.  Based upon all the foregoing, the transcript of

25   the indicting grand jury, the charge to the grand jury, and the

26   attendance records of the grand jury are necessary for me to

27   evaluate the full measure of the improprieties that occurred

28

                                    22

1    during the grand jury proceedings.

2

3           I declare under penalty of perjury that the foregoing

4    is true and correct.

5

6           Executed this ___ day of November, 1989, at

7    Los Angeles, California.

8

9
                                    _____
                                    Edward M. Medvene
10

11

12

13

14

15

16

17

18

19

20

21

22              .

23

24

25

26

27

28
                              23

**Exhibit A**

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE CENTRAL DISTRICT OF CALIFORNIA

3              - - - - - -

4    HONORABLE EDWARD RAFEEDIE, DISTRICT COURT JUDGE PRESIDING

5              - - - - - -

6

7    UNITED STATES OF AMERICA,        )
                                      )
8                      Plaintiff,     )
                                      )
9             vs.                     )   CASE NO:   CR 87-422(C)-ER
                                      )
10   RAFAEL CARO-QUINTERO, et al,     )
                                      )
11                     Defendant.     )
     _____)

12

13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16        TUESDAY, SEPTEMBER 5, 1989
                    1:30 P.M.
17                  4:30 P.M.

18

19

20

21

22                            Julie Churchill, CSR
23                            Official Reporter
                              U.S. District Court, 442-C
24                            312 N. Spring Street
                              Los Angeles, CA  90012
25                            (213) 617-8227

1    <u>APPEARANCES OF COUNSEL</u>:

2           For the Plaintiff: .

3               ROBERT C. BONNER
                UNITED STATES ATTORNEY
4               BY:  JIMMY GURULE, AUSA
                     MANUEL A. MEDRANO, AUSA
5               1200 United States Courthouse
                312 North Spring Street
6               Los Angeles, California  90012
                (213) 894-6579
7
            For the Defendant:
8
                MITCHELL, SILBERBERG & KNUPP
9               BY:  EDWARD M. MEDVENE, ESQ.
                     JAMES E. BLANCARTE, ESQ.
10                   RONALD D'NICOLA, ESQ.
                     KEVIN GAUT, ESQ.
11              11377 West Olympic Boulevard
                Los Angeles, California  90064-1683
12              (213) 312-3150

13

14

15

16

17

18

19

20     ·

21

22

23

24

25

1          LOS ANGELES, CALIFORNIA, TUESDAY, SEPTEMBER 5, 1989

2                                1:30 P.M.

3

4               THE CLERK:  CR 87-422(c)-ER, U.S.A. versus Ruben

5     Zuno-Arce.

6               MR. GURULE:  Good afternoon, your Honor.  Jimmy

7     Gurule and Manuel Medrano appearing on behalf of the United

8     States.

9               MR. MEDVENE:  If the Court please, Messrs.

10    Blancarte, D'Nicola and Medvene for Mr. Zuno-Arce.

11              THE COURT:  Now, the Court ordered a review of this

12    matter after the completion of the witness' grand jury

13    testimony.  I take it that that testimony has now been

14    completed; is that correct, Mr. Gurule?

15              MR. GURULE:  Yes, your Honor.

16              THE COURT:  The Court has been provided with

17    transcript of the testimony of the witness given at the Grand

18    Jury which the Court has reviewed.  In addition, I have

19    reviewed the motions and documents that have been filed by both

20    sides..

21              Now, Mr. Gurule speaking for the government, what

22    do you believe the Court -- what are you requesting that the

23    Court do at this time with respect to Mr. Zuno-Arce?

24              MR. GURULE:  Your Honor, the government is

25    respectfully requesting that he be detained, that the detention

1    continue; that based upon the government's filings in camera,

2    it is still the government's position that he is a material

3    witness in U.S. verses Bernabe.

4              THE COURT:  What is he a material witness in regard

5    to; the Ramierez case?

6              MR. GURULE:  Yes, he is, your Honor.  And that

7    pertains again to 881 Lope de Vega, and that is a central

8    issue.   That will be a central issue in the Bernabe case.  And

9    because based upon undercover video tapes and audio tapes that

10   Bernabe participated in, he made numerous admissions to an

11   undercover agent to the effect that he went to 881 Lope de Vega

12   during the time period that Enrique Camarena was being held

13   there, and that, in fact, he saw Special Agent Camarena held at

14   Lope de Vega.

15             Now, one of the arguments that the defense is

16   likely to raise is well, this is something that he read in the

17   paper, he knew about it through reading the paper.

18             THE COURT:  This question of whether or not the

19   defendant is a material witness in the Ramierez case; is that

20   based upon the testimony he gave at the Grand Jury?

21             MR. GURULE:  Yes, your Honor.  That, coupled with

22   other evidence from other witnesses, FBI forensic witnesses,

23   but it is based in large part upon evidence, testimony that he

24   presented to the Grand Jury.

25             THE COURT:  So you would propose to have the

1    witness detained as a witness in the case of Ramierez which is

2    presently set for trial on October the 3rd --

3            MR. GURULE:  Yes, your Honor.

4            THE COURT:  -- on the theory that he has material

5    evidence in that case and on the theory that he continues to be

6    a flight risk?

7            MR. GURULE:  Yes, your Honor.

8            THE COURT:  No conditions of bail would ensure his

9    appearance for that trial?

10           · MR. GURULE:  Yes, that's correct.  And his

11   flight -- this individual posing a flight risk, I think is --

12   there is even a stronger argument to be made in light of

13   testimony that he has presented before the Grand Jury.

14           THE COURT:  Did you serve upon the defendant the

15   document that you filed with the Court; that is, other than the

16   transcript of Grand Jury --

17           MR. GURULE:  Yes, your Honor.

18           THE COURT:  All right.  All right.

19           Now, if I understood what your case is, you want

20   this witness detained for the Ramierez case.

21           MR. GURULE:  Yes, your Honor.

22           THE COURT:  Based on the testimony he gave and

23   relating to the status of the Lope de Vega property?

24           MR. GURULE:  Yes, your Honor.

25           THE COURT:  Counsel, did you state your appearance

1    here?

2              MR. MEDVENE:  My name is Medvene, your Honor.

3              If the Court please, the witness has been before

4    the Grand Jury on two occasions.  He has answered every

5    question that the government has asked him.  The government has

6    no more questions to ask him.  They could have asked them all

7    on the first occasion.  They held him another week.  They

8    started him -- they started him approximately at 9:00 o'clock

9    and finished before noon.  They could have had him on all

10   afternoon.

11             Our understanding, your Honor, of what

12   Mr. Arce has said in substance is he denies being involved in

13   narcotic trafficking, he denies being an intermediary between

14   narcotics traffickers and government officials, he denies being

15   at the Lope de Vega residence any time after December 23rd,

16   1984.

17             He denies ever knowing or meeting Juan Jose

18   Bernabe-Ramierez.  He denies ever knowing or leaving any other

19   person identified to him as either a defendant or a suspect in

20   the Camarena case, including Rafael Quintero, Ernesto Fonseca-

21   Carrillo, Armando Pavon-Reyes and approximately 120 other

22   persons depicted in photographs shown to him during the grand

23   jury proceedings.

24             He denies knowing anything about the abduction,

25   torture and murder of DEA agent Enrique Camarena or his

1     assistant and pilot Mr. Alfredo Zavala Avelar.

2              Other than public information, including that

3     published by the Press de la Mexico.  Now that's the factual

4     predicate.

5              Now, an additional fact that is of importance, your

6     Honor, and uncontested is the defense statement that the

7     government is prepared to continue the Ramierez trial.  They

8     have an agreement to continue the Ramierez trial.  So at the

9     earliest it will go to trial in October and at the latest it

10    will go to trial this year or next year.

11             Undisputed and never answered by the government are

12    the cases cited making reference to Rule 15, the King case and

13    so forth, that if the government wanted this man's testimony at

14    trial and if he didn't show up pursuant to subpoena, they could

15    videotape his deposition, it would be admissible.  The Ninth

16    Circuit has said it stands all kinds of Constitutional muster.

17    They have chosen not to do that.

18             Now, they're trying to break this man

19    psychologically, your Honor.  The man has been in jail nearly a

20    month, treated worse than a convicted felon, sitting in a small

21    room until a few days ago without a radio, with a toilet and a

22    bed, not even a table.

23             Now, what does the government say this information

24    is, because we've gone a long way from the assertions about

25    narcotic trafficker and this and that.  We have the sworn

1   testimony he's not any of those things, we have the sworn

2   testimony he wasn't in that residence within a couple months of

3   when the dastardly act happened.

4         Now, what do they say?  They have filed a brief and

5   when the government case -- they have given us certain things.

6   What we've gotten is what appears to me to be, with due

7   deference, to be a canned brief on 6(e).  I don't even get to

8   this Grand Jury testimony because it is irrelevant, if he gets

9   out today, which is what ought to happen.

10        But basically, the government has said in their

11  papers submitted to the Ninth Circuit, that what they want this

12  man about is for corroboration -- that forensic evidence that

13  they found, having nothing to do with Mr. Zuno-Arce, that

14  forensic evidence they found was deposited after Caro-Quintero

15  moved into the residence the first week of February.

16        Now, that's why they want it.  It is not a claim

17  that he's there; he has denied that he was there.  He wasn't

18  there.  What they want to show is -- and why would he come up

19  voluntarily from Mexico if they don't want to do the the

20  deposition procedure in that he owned 181 Lope de Vega?

21        There is no question.  He has already said that

22  when he voluntarily came from Mexico to San Antonio.  When the

23  DEA asked him in '87, he said that.  They said they thought he

24  testified honestly about it, that Mr. Zuno has stated that on

25  January 11th he sold the residence to Mr. Barnabe, that he has

1       further stated, according to the government, between May 31,

2       '84 and January 11, '85 that the Lope de Vega residence was

3       unoccupied, that the former tenant moved out of the residence

4       in May of '84.

5                    He further said one or two weeks after the sale he

6       drove by the residence, he observed it was being painted and

7       remodeled.  And I quote from the government brief, I quote:

8

9                         "This would strongly support the

10                        government's theory that the forensic

11                        evidence was deposited after Caro-Quintero

12                        moved into the residence approximately the

13                        first week of February of '85."

14                   I mean talking about a peanut coming out of an

15      elephant roaring, that's why they're holding him for one month?

16      And to have the audacity to say they want to hold him until the

17      end of the trial, knowing they have already made a deal with

18      the defense attorney that the trial isn't even going to go on

19      October 3rd, it's past the point, your Honor -- we say with due

20      deference -- you're sitting up there, you sat on a terrible

21      case, a terrible tragedy.

22                   This man had nothing to do with it.  He had the

23      misfortune of having a house, which months -- the man wasn't

24      even there for a year or so.  He went there one day for the

25      closing, months before.  No evidence there.  He doesn't know

1  Barnabe-Ramierez.  It's a farce, Judge.  I mean, he doesn't

2  know Ramierez, he never met Ramierez.  That's what he said.

3           He went to the house four weeks before the torture

4  and murder, if that's where it took place.  And they say they

5  want him for corroboration.  Well, why would he come and give

6  it?  And if they wanted depositions, why can't they take it?

7           THE COURT:  All right.

8           MR. MEDVENE:  It's enough, Judge.  It's 25 days --

9           THE COURT:  That's enough.

10           MR. MEDVENE:  Yes, sir.

11           THE COURT:  The number of days has nothing to do

12  with it.  We're dealing here with a legal question.  You deal

13  with emotional arguments which have no bearing on this case at

14  all.

15           What happened to your appeal to the Ninth Circuit?

16           MR. MEDVENE:  The Ninth Circuit -- it's sitting --

17  it's sitting in the Ninth Circuit.  The government has asked to

18  put up papers, to submit papers by today which I'm reading

19  from, but I must say, your Honor, that was prior to the time he

20  completed his Grand Jury testimony.

21           THE COURT:  I'm aware of that.

22           MR. MEDVENE:  Yes, sir.

23           THE COURT:  The Court is ready to rule on this

24  matter.

25           I do not believe this witness is a material witness

1  in the Bernabe-Ramierez case, nor do I believe there is any

2  basis for continuing to hold him as a witness in that case.

3  You cannot be held, as suggested in the brief filed by the

4  government, on the theory that there may be some other case

5  that might arise in the future on which he would be a material

6  witness.

7         I believe that the purpose of the detention has

8  been satisfied.  This witness has appeared and testified before

9  the grand jury on two occasions.  The involvement and

10  relationship of this witness to the Lope de Vega property in no

11  way justifies a continued detention.

12         Having in mind the evidence that was presented to

13  me in the original Camarena trial regarding that property and

14  regarding the forensic evidence, I see no need whatsoever, nor

15  do I believe that this testimony of this witness would in any

16  way enhance or contribute or strengthen that testimony.  So

17  insofar as the Bernabe-Ramierez case, I believe this witness

18  has little to offer.  The purpose of this detention has been

19  fully satisfied and it would not be justified to continue

20  further impostion on this witness, further detention for the

21  purpose which has been stated or for the other purpose which

22  has been suggested.

23         The Court does not believe that would be a lawful

24  detention.  Therefore, I now order that this witness be

25  discharged and that he is not material and should be

1    discharged, and I order his release forthwith.

2              MR. MEDVENE:  Thank you very much, your Honor.  May

3    he leave from here?  We'll get his clothes.  We don't want him

4    to go back to jail.  We'll let have get his clothes, Judge,

5    beca se they'll hassle him again.

6              THE COURT:  Well there has to be a release

7    executed.  Don't try too rush things here.  Do things the

8    regular way around here.  I don't know if he's released right

9    now.  He should be able to, but we'll get him -- I'll sign a

10   release as soon as it is presented to me.

11             MR. MEDVENE:  Yes, sir.

12             Can we have the procedure, Judge?  Do you want us

13   to --

14             THE COURT:  The clerk will.

15             MR. MEDVENE:  Thank you very much, your Honor.

16             THE CLERK:  Please rise.  This court is now in

17   recess.

18                        (Which were all the proceedings in

19                         the above-entitled matter.)

20            .

21             C E R T I F I C A T E

22             I certify that the foregoing is a true and correct
     transcription from the stenographic record of these
23   proceedings.

24   *Julie Churchill*
     JULIE A. CHURCHILL, CSR, RPR
25   OFFICIAL COURT REPORTER    DATED: *Sept. 7*    1989

1              LOS ANGELES, CALIFORNIA   TUESDAY, SEPTEMBER 5, 1989

2                               4:30 P.M.

3

4              THE CLERK:   Criminal case 84-422(c)-ER, United

5       States of America versus Ruben Zuno-Arce.

6              Counsel, please state your names for the record,

7       please.

8              MR. GURULE:   Jimmy Gurule and Manuel Medrano

9       appearing on behalf of the government, your Honor.

10             MR. MEDVENE:   Messrs. Blancarte, D'Nicola, Gaut and

11      Medvene appearing for Mr. Arce.

12             THE COURT:   I have ordered this hearing for the

13      following reasons.  After the conclusion of the hearing we held

14      earlier this afternoon when I ordered Mr. Zuno-Arce released,

15      not being a material witness, no further contentions, his

16      counsel came into the Court sometime later and stated to the

17      Court that he had not been released because there was an

18      immigration hold on the defendant.

19             Now, my one and only concern here now is this:   Is

20      this a hold that was solicited by the government in order to

21      prolong the detention of the witness or is this a hold that has

22      been on this witness from the inception of his arrest?

23             MR. GURULE:   The answer to the first question:   Was

24      it solicited by the government; no.  Has this hold been on this

25      witness since early on, actually prior to this court's signing

14

1   a material witness arrest warrant; the answer to that is yes.

2   I would like to just lay out some factual scenario for the

3   court relative to how this has come to my attention, because --

4               THE COURT:  Were you aware of this when you were

5   here this afternoon?

6               MR. GURULE:  I was aware that an INS hold had been

7   placed on Mr. Zuno when he had first come into the country in

8   San Antonio, Texas approximately April the 9th, but to be

9   honest with the Court, I had forgotten about it.

10              THE COURT:  Was he arrested by the INS?

11              MR. GURULE:  Yes, he was.

12              THE COURT:  Originally?

13              MR. GURULE:  Yes, he was.

14              THE COURT:  For what reason; do you know?

15              MR. GURULE:  For an excludability hearing.

16              THE COURT:  In other words, to exclude him as an

17  undesirable alien?

18              MR. GURULE:  Yes, your Honor.

19              THE COURT:  Had he been admitted into the country

20  on a visa, or by what had he made legal entry?

21              MR. GURULE:  He had made legal entry.  It is my

22  understanding your Honor, that he was using a border crossing

23  card.  He had been admitted lawfully in the country at that

24  time.  And after checking the customs service computer referred

25  to as TASS --

1        THE COURT:  Who checked that?

2            MR. GURULE:  INS.  INS said it is a common practice

3    when -- every time an alien is entering the United States -- to

4    check the intelligence computer systems of INS, the Customs

5    Service, and usually DEA, the native system.  If they determine

6    that there is a lookout -- quote, unquote, lookout for that

7    individual because he is determined to be excludable under one

8    of the various categories for excludability, then he may be --

9    they may hold an exclusion hearing or order him --

10           THE COURT:  Your understanding is that he was held

11   in order to determine if he was to be excluded from the

12   country?

13           MR. GURULE:  Yes, your Honor.

14           THE COURT:  Are you familiar with the laws that

15   provide for that?

16           MR. GURULE:  Somewhat.  And what I did, your

17   Honor -- I learned of this, that he was not going to be

18   released forthwith after I came back from lunch.  I received a

19   call from Judy Matthews.  I returned her call.

20           I do not want this Court left with the impression

21   that the United States Attorney's Office, after leaving this

22   courtroom, rushed to INS and said the Judge has ordered him

23   released, now we want you to hold him on something else,

24   because that is clearly, clearly not what happened in this

25   particular case.

1           When I returned to my office after lunch, there was

2   a call from Miss Matthews stating that this case was going to

3   be -- that there was an INS hold on the defendant and we were

4   going to have a status conference tomorrow at 4:30.

5           I called INS to ask an INS representative from San

6   Antonio, because that's where the INS hold has been placed

7   originally, to be here for the hearing tomorrow because I

8   wasn't familiar with all the details and facts surrounding the

9   INS hold.

10          It was at that time that I questioned Joe Banda, an

11  INS agent, regarding the background of why Mr. Zuno was held

12  for excludability, and I was told then for the first time.

13          Under U.S.C. Section 1182, Subsection 23, that an

14  alien may be determined to be excludable if under Subsection 23

15  the consulate office knows or has reason to believe that the

16  alien is or has been involved in illicit trafficking in

17  narcotics, and that when the INS --

18          THE COURT:   What is the language gain?

19          MR. GURULE:   Knows or has reason to believe that

20  the alien has been involved in illicit trafficking in

21  narcotics -- that was my notetaking off of the telephone

22  conversation with the INS agent.

23          There is reason to believe that the witness has

24  been involved in illicit trafficking in narcotics.  That was

25  just my note taking off of the telephone conversation with the

1    INS agent.

2              I followed up with the INS agent if he would

3    expound on that further and was told that Zuno-Arce, when he

4    did come into the country lawfully, that after the INS agents

5    checked the computer, they determined that in the United States

6    Custom Service computer, TASS, Zuno-Arce was documented as

7    being a narcotic trafficker.

8              That upon further checking in the INS computer,

9    that there was a documented entry back in 1979 in the INS

10   computer for narcotics trafficking for Zuno-Arce.

11             And that further, upon checking into the DEA

12   intelligence computer system, referred to as NADIS -- again,

13   Zuno-Arce is documented as being a narcotics trafficker in that

14   computer system, as well.

15             So based upon that, I was told that the District

16   Director of INS in San Antonio revoked the deferred inspection,

17   and at that time Zuno-Arce was taken into custody on an INS and

18   hold without bail on this INS hold. And that it was then to be

19   set for an INS hearing on excludability to see if he could be

20   excluded.

21             My understanding is that if they determine before

22   an immigration judge that there is a sufficient basis -- this

23   report that Zuno-Arce has been involved in narcotics

24   trafficking -- he would be excluded, and therefore, would not

25   be permitted to enter the country legally or obtain an INS

18

1   visa.  And that, again, is the basis for the hold back in early

2   August.

3            THE COURT:  All right.  Counsel, when you came in

4   here this afternoon, you didn't say so directly, but you

5   implied there was some dirty dealing afoot affecting your

6   client and that the purpose of holding this hearing was for me

7   to determine that this hold on this witness was not solicited

8   by the government in order to defeat my prior order of release.

9            It does not sounds like it was.  I do not believe

10   that counsel here had anything at all to do with that.

11            Were you aware that there was such a hold?

12            MR. MEDVENE:  Let me just thank you for holding the

13   hearing now and let me tell you what I was aware of, your

14   Honor.

15            We were aware, because we had read in some press,

16   that there was a hold.  We knew -- we went to the District

17   Director, just chronologically -- that the District Director of

18   the INS has said this afternoon, and the Deputy here, I

19   think -- but he said, the District Director himself, that he

20   would release Mr. Zuno-Arce today, put him on a plane under

21   appropriate supervision so it's clear he leaves subject to his

22   agreement to come back, and do it tonight.

23            That the reason it was --

24            THE COURT:  When did you do this; today?

25            MR. MEDVENE:  Yes, sir, since we left here.  We met

JULIE A. CHURCHILL - OFFICIAL COURT REPORTER

1    with the District Director -- excuse me.

2               MR. BLANCARTE:  It's Gustavson.

3               MR. MEDVENE:  Yes.  Mr. Gustavson.

4               THE COURT:  Gustavson.

5               MR. MEDVENE:  Yes, sir.  We met with him, with the

6    Consulate General of Mexico and Mr. Gustavson.

7               MR. BLANCARTE:  Romeo Flores Caballero, Consulate

8    General of Mexico, was with us.

9               MR. MEDVENE:  Now, basically what he said in my

10   presence was he would let him out tonight subject to making

11   sure he left, subject to his agreement that he come back.

12               THE COURT:  Come back for the exclusion hearing?

13               MR. MEDVENE:  Yes, sir.

14               Now, we also told him that even though Mr. Arce

15   denies any involvement of any kind in narcotics, he wants to

16   withdraw his application just so can go home.  All the hearing

17   is going to do is it will either say you're not excludable and

18   he goes home, or it will say you're excludable and he goes

19   home, and it will save the time of the hearing.  While he

20   didn't do anything wrong, he just wants to go home.

21               At any rate, the District Director said he would

22   let him out but he wanted to check with San Antonio.  He also

23   checked with the United States Attorney's Office.  I was not

24   privy to those conversations, but my understanding and feel

25   from those conversations is the following.

1        What I learned is two things:  One, we're advised

2   that the District Director in San Antonio already has had a

3   press conference saying he's going to get Mr. Arce back.

4        Query:  How would he know what your Honor was going

5   do today unless he spoke to the U.S. Attorney's Office?  In

6   other words, how would he know your Honor released him unless

7   somebody from the United States Attorney's Office or somebody

8   else called him?

9        Secondly, my clear impression -- I could be wrong,

10  I wasn't on the call -- my clear impression was that the United

11  States Attorney's Office said something to and San Antonio to

12  cause them to tell the District Director to hold him and don't

13  let him be released now, because the District Director here was

14  willing to.

15        THE COURT:  Has he now changed?

16        Has Mr. Gustavson said he would not release him?

17        MR. MEDVENE:  Mr. Gustavson says it's really up to

18  Zuno-Arce, and if Zuno-Arce would agree, I would release him

19  today.  And all we're now asking, your Honor --

20        THE COURT:  Well, do you know whether Zuno-Arce has

21  agreed?

22        MR. MEDVENE:  My understanding is Zuno-Arce has not

23  agreed, and the only thing, lastly, your Honor, is this:  We're

24  making -- under the circumstances, all we're talking about is

25  can he leave the country now before or after the hearing?

1      We're making an oral motion in the form of habeas

2  corpus, just saying that -- we're just asking your Honor to set

3  him free on his on recognizance subject to a reasonable bond,

4  subject to him appearing in San Antonio if they want to go

5  ahead with the hearing.

6      What we're telling you and representing under oath,

7  your Honor, is that he'll withdraw his application and all they

8  have to do is send him back, because all the hearing is about

9  is does he get to stay or not and he wants to go home.

10      THE COURT:  You're repeating yourself.

11      MR. MEDVENE:  Yes, sir.  I'm sorry.

12      MR. GURULE:  I did speak with -- I had an

13  opportunity to speak with the Assistant District Director and

14  the INS Director in San Antonio by the name of Gary Renick.

15  Gary Renick told me that he spoke with the District Director,

16  Richard M. Cassias in San Antonio and that Cassias told Renick

17  that he had -- that Cassias, the District Director in San

18  Antonio had been contacted by the press regarding the judge's

19  order releasing the defendant, releasing the witness to be here

20  and asked Cassias what Cassias' position was.

21      Cassias told the press that he wanted Zuno-Arce

22  back for be the excludability hearing.  That is what Renick

23  told me.  Cassias' decision to have Zuno go back for the

24  excludability hearing was a decision totally exclusively made

25  independent of the U.S. Attorney's Office -- anyone from the

JULIE A. CHURCHILL - OFFICIAL COURT REPORTER

1   United States Attorney's Office here in the Los Angeles.  That

2   was a decision made on his part without any input from myself

3   or any other representative from the U.S. Attorney's Office;

4   that's what I have been told secondhand.

5         THE COURT:  Is there a representative here from the

6   INS?

7         MR. GURULE:  I believe Mr. Looney is.

8         MR. LOONEY:  Bob Looney, the Deputy District

9   Director, your Honor.

10         THE COURT:  Come forward.  Can you shed any light

11   on what has transpired between your office and San Antonio?

12         MR. LOONEY:  The two District Directors did confer.

13   Zuno-Arce was served with a charge document at the time of

14   arrest in San Antonio and those documents were subsequently

15   served on the immigration court.  There is a venue issue with

16   the immigration court and the file remains in the possession of

17   San Antonio.  So we did contact San Antonio to determine

18   whether they wanted Mr. Arce returned.  The District Director

19   in San Antonio made it very clear that he has.  So we did

20   contact San Antonio to determine whether they wanted Mr. Arce

21   returned.

22         The District Director in San Antonio made it very

23   clear that he has, in his mind, sufficient evidence to prove

24   this charge of the drug charge.  So, while INS locally may have

25   made a decision the thing is outside our jurisdiction as far as

1    releasing the subject.

2              Our plan is right now is tomorrow morning to

3    transport Zuno-Arce to San Antonio depending upon the decision

4    here, of course, immediately with counsel.  We have made

5    arrangement with his counsel to notify him about the

6    transportation arrangement so they could travel together to San

7    Antonio and have an expedited exclusion hearing in San Antonio.

8              THE COURT:  When you say expedited, you mean within

9    a few days?

10             MR. LOONEY:  Within a day.

11             THE COURT:  Within a day.

12             MR. LOONEY:  If Mr. Arce is willing.  It's up to

13   him.

14             THE COURT:  Well, do you know did the Drug

15   Enforcement Administration have anything to do with contacting

16   the District Director in San Antonio regarding this matter?

17             MR. GURULE:  No.  What I know is that a call was

18   made to DEA in San Antonio to advise them of the the Court's

19   ruling.  And at that time --

20             THE COURT:  Who made that call?

21             MR. GURULE:  Special Agent Doug Keehl of the Drug

22   Enforcement Administration.  He called to advise the DEA in San

23   Antonio of the judge's ruling here.  At that time Special Agent

24   Doug Keehl was advised by a DEA OXEIT TSOT TSERE JOM TSNM

25   outstanding INS hold that was yet remaining in San AITAINA AT

1    Zuno-Arce.

2              THE COURT:  Is Keehl present?

3              MR. GURULE:  Yes, he is.

4              THE COURT:  Have him come forward.

5              THE COURT:  Would you state your name for the

6    record.

7              MR. KEEHL:  Right.  Douglas W. Keehl, K-e-e-h-l.

8              THE COURT:  You're an agent with the Drug

9    Enforcement Administration?

10             MR. KEEHL:  That's correct.

11             THE COURT:  You have been involved in the Camarena

12   investigation; is that true?

13             MR. KEEHL:  That's correct, your Honor.

14             THE COURT:  Did you call the DEA office in San

15   Antonio after the ruling this afternoon releasing Mr. Arce?

16             MR. KEEHL:  Yes, I did, your Honor.

17             THE COURT:  Could you tell me what transpired?

18             MR. KEEHL:  I had spoken with a Special Agent

19   George Delamy at that office.  I advised him of your Honor's

20   ruling.  At that time, Agent Delamy advised me that there was

21   an outstanding hold placed on the witness.

22             Also at that time, he asked me what he should do

23   about it.  I suggested that he contact the United States

24   Marshals here and also advised the Marshals of it and told him

25   to also notify the Marshals.  I told him to tell the Marshals

1    to notify the clerk of their actions.

2              THE COURT:  Then it is your understanding that the

3    DEA office in San Antonio notified the Marshals here of the

4    existence of the hold?

5              MR. KEEHL:  That's the best of my knowledge.  I

6    believe this they did.

7              THE COURT:  Well --

8              MR. MEDVENE:  I might also note, which I didn't

9    originally -- I don't know if this is true or not, your Honor,

10   but it is certainly possible -- at lest in the old days -- the

11   hold could initially be there, having been instituted by the

12   DEA, and that's why the hold was there in the first place.  I

13   don't know if that's true in this case or not.

14             It may well be, but the other curious thing, your

15   Honor, is that the man according to declarations in front of

16   you has been in and out of the country lawfully for five or six

17   or seven times as recently as '87.

18             So what we're saying is that -- and the possibility

19   that the hold was placed by DEA and the call to DEA and their

20   knowledge of it -- and I might also say -- Mr. Blancarte here

21   can attest to this -- he went down to see Mr. Zuno-Arce while

22   we were waiting for the Court order.  And he told me he was

23   advised within ten minutes of when we left your Honor's

24   courtroom by one of the Marshals that there was hold on him.

25             Now, query:  How would the Marshal's Office have

1   known unless somehow word got to them pretty quickly? But

2   putting all that to the side, all we're asking for is bail

3   pending the hearing. That's all we're asking for, to be

4   released tonight subject to coming to the hearing and just

5   focusing on -- all the hearing is going to say is he can stay

6   or not stay, but he wants to go home.

7         THE COURT: First of all, there is the question of

8   jurisdiction. This matter was before this Court on the return

9   of the Court's arrest of this witness as a material witness.

10   Those proceedings have been going on here for several weeks and

11   were concluded today, and I ruled that he is no longer a

12   material witness and needs not be detained.

13         Now, apparently, there was a preexisting

14   immigration hold on the witness. In fact, as I understand, if

15   I understand correctly what was said here, he was arrested

16   initially by the INS. He was in INS custody and awaiting an

17   exclusion group hearing at the time the material witness

18   warrant issued from this court.

19         Now, in the immigration matters, there is a whole

20   statutory procedure established for the handling of immigration

21   matters. There is a system, a traditional system of

22   immigration law judges to hear and determine these things. I

23   cannot see, frankly -- I cannot say that I know of any

24   authority or law that authorizes me to deal with this

25   immigration matter, which is now what it is.

1    I ordered that this witness be released on bail.

2    Normally, in exclusion hearings, is bail available to

3    witnesses?  They are not.  You're shaking your head.

4          MR. LOONEY:  I'm shaking my head no, your Honor.

5          THE COURT:  The idea is that -- that was my

6    understanding -- that bail is not generally available for

7    people who are detained for exclusionary purposes.

8          Now, since it has been arranged to expedite this

9    matter, it appears that Mr. Zuno-Arce will have to suffer the

10   further inconvenience of this immigration hold until it has

11   been resolved by this exclusionary hearing which we've heard

12   here is going to be accelerated.

13         Therefore, your request for this Court to fix bail

14   is denied.  The Court is without jurisdiction to do so.  This

15   witness was released from the hold of this court but not from

16   the hold of every other court, and that is true every time you

17   release a person who's under a court hold.  You always release

18   them subject to the existence of any other hold.

19         I was not aware of it at the time and did not

20   become aware until you walked in here and told me about it.  So

21   there is -- I cannot provide any release to Mr. Zuno-Arce.  The

22   matter will have to run its course through immigration court.

23         MR. MEDVENE:  Could your Honor also -- we have in

24   front of you so far the oral writ of habeus corpus.

25         THE COURT:  What?

JULIE A. CHURCHILL - OFFICIAL COURT REPORTER

1           MR. MEDVENE:  We have asked to put in front of you

2      now a writ of habeus corpus asking that he be released.

3           THE COURT:  First-of all, you don't put orally

4      submitted papers*-- orally submitted habeus corpus before the

5      Court.  If you want to file a written habeus corpus, you have

6      to file appropriate petitions.  File it with the Court and then

7      it will be assigned to some judge at random to determine.  You

8      don't just walk in and say this is a motion for writ of habeus

9      corpus and expect immediate action.  That's simply not done

10     procedurally or legally or otherwise.  The government has an

11     opportunity to respond to it so it can be heard at all.

12          So that does not provide any basis for relief.

13          MR. MEDRANO:  Good afternoon, your Honor.  A final

14     matter I wanted to bring to the Court's attention.  Prior to

15     the Court's taking the bench, I had an opportunity to speak to

16     Mr. Medvene concerning a couple matters.  One is that his

17     client obviously is still under subpoena for an October 3rd

18     trial date.  And Mr. Medvene and I have informally agreed as

19     follows:  That when the government is ready to bring

20     Mr. Zuno-Arce back with his testimony at trial, that I can

21     arrange that by telephonically contacting Mr. Medvene, who will

22     then work with me to arrange for Mr. Zuno-Arce to return to the

23     Central District for his testimony at trial.

24          But I just wanted to get that out, your Honor,

25     because I think and if Mr. Medvene wants to clarify this

1    somehow, I think that's our understanding at this juncture.

2              MR. MEDVENE:  That is our understanding, but I take

3    it with that, that the government will forthwith return him to

4    Mexico and not -- it will only be subject to them not placing

5    any other holds.

6              THE COURT:  There is nothing, as far as I know, as

7    far as his being brought to this court as a material witness --

8    there is nothing to prevent him from going back to Mexico or

9    going anywhere else.

10             MR. MEDVENE:  If the government agrees he will be

11   forthwith transported back, we certainly will agree to what

12   Mr. Medrano said, which is what I agreed to before.  I just

13   don't want to let it -- I just don't want another situation

14   like this, your Honor.

15             THE CLERK:  Please rise.

16             THE COURT:  I'm sorry, your Honor.  Does Mr.

17   Medrano on the record agree?  I assume he agrees, but I just

18   think it's really important.  Does he agree, because I didn't

19   hear anything.

20             MR. MEDRANO:  No problem with that, your Honor.

21                       (Which were all the proceedings in

22                        the above-entitled matter.)

23

24         C E R T I F I C A T E

25             I certify that the foregoing is a true and correct

JULIE A. CHURCHILL - OFFICIAL COURT REPORTER

1   transcription from the stenographic record of these
    proceedings.

2

3   JULIE A. CHURCHILL, CSR, RPR
    OFFICIAL COURT REPORTER

4   DATED: Sept. 9,        1989

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit B**

SAN ANTONIO LIGHT
SATURDAY
SEPTEMBER 9, 1989

# METRO

BUSINESS INSIDE

# Judge orders Zuno back to Los Angeles

## INS delays hearing until California case is decided

**By FRANK LEVINE**
Staff reporter

The odyssey of Ruben Zuno Arce took another 1,210-mile turn Friday, when a U.S. magistrate in San Antonio forced him to fly back to Los Angeles to face charges that he lied to a federal grand jury.

The order came less than 36 hours after he arrived in San Antonio from Los Angeles, where he had testified before a federal grand jury probing the 1985 slaying of Drug Enforcement Administration agent Enrique Camarena Salazar, in Guadalajara, Jalisco.

"What a waste of taxpayers' money," said Zuno's San Antonio attorney, Jeremiah Handy. "My client is being bounced back and forth like a pingpong ball, under a cloud of unsubstantiated charges – without even the opportunity of posting bail after 30 days in custody."

Zuno, sitting with an interpreter at his side throughout a 20-minute hearing Friday in U.S. district court, fielded questions from U.S. Magistrate John Primomo with a strong, Spanish, "Yes sir," and "No sir," and told the court in a firm tone that he was "in..... cent of any perjury."

But when Primomo outlined the maximum ... penalties of 15 years in prison and fines totaling $750,000 convicted on all counts in the three-count grand jury indictment, a slight shudder swept through Zuno's body.

Handy, fighting to release his client under bond, told the court that a pretrial "bull service" in Los Angeles had determined there would not be a risk of Zuno fleeing the country.

Please turn to ZUNO/B



**RUBEN ZUNO ARCE**

*(Zuno) is being bounced back and forth like a pingpong ball.*

**— ATTORNEY JEREMIAH HANDY**

SAN ANTONIO LIGHT

SATURDAY, SEPTEMBER 9, 1989/B

# ZUNO: To return to Los Angeles

### ZUNO/from B1

"That's why Judge Rafeedie freed him," Handy told Primomo.

But Assistant U.S. Attorney Glen MacTaggert countered that evidence could be produced showing that Zuno was indeed a "flight risk" and that only the originating jurisdiction – the U.S. Central District Court in Los Angeles – could determine whether Zuno should be released on bail.

Primomo agreed, but ordered that the question of Zuno's bail be heard within 72 hours. He confirmed with MacTaggert that Zuno would indeed appear Monday morning in a Los Angeles federal court for a hearing to determine whether he would be granted bail.

The U.S. marshal's office, mean-

while, late Friday said Zuno would be flown to Los Angeles "sometime this weekend." He reportedly was moved late Friday from a federal detention center to the Bexar County Jail.

Zuno was flown to San Antonio Wednesday night, after U.S. District Judge Edward Rafeedie released him Tuesday from his status as a "material witness" in the slaying of Camarena.

A government source close to the investigation admitted late Thursday that Rafeedie's sudden release of Zuno in Los Angeles "caught them (prosecutors) with their pants down" and that federal prosecutors – believing that Zuno would remain in custody without bail – had to rush to fill the legal hole

with valid, but "hastily prepared," perjury charges.

The INS immediately placed a hold on Zuno before he could be processed for release and demanded his immediate return to San Antonio to face an "exclusionary" hearing that had been set for Monday. But in the aftermath of the latest charges and developments in the case, INS officials said Friday that the hearing would be put on hold until the Los Angeles case is resolved.

"It was all just a trick," said Handy following the hearing Friday. "Suddenly the INS has no reason to keep him in San Antonio for a hearing."

**JOHN PRIMOMO**
Orders bail hearing

**Exhibit C**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

— — —

HONORABLE ROBERT M. TAKASUGI, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,      )
                               )
            PLAINTIFF,         )
                               )
      VS.                      )      NO. CR 89-741-RMT
                               )
RUBEN ZUNO-ARCE,               )
                               )
            DEFENDANT.         )
_____)

REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

TUESDAY, SEPTEMBER 12, 1989

ROBBI JOY
OFFICIAL COURT REPORTER PRO TEM
518 U.S. COURTHOUSE
312 NORTH SPRING STREET
LOS ANGELES, CA  90012
(213) 622-5391

1    IN DRUG TRAFFICKING.

2                    WE HAVE A SUBSTANTIAL NUMBER OF DECLARATIONS

3    FILED IN THIS COURT SUPPORTING THE HONESTY AND INTEGRITY OF

4    MR. ZUNO-ARCE; THAT FOLLOWING THE GRAND JURY PROCEEDING IN

5    WHICH MR. ZUNO-ARCE TESTIFIED, THE ASSISTANT UNITED STATES

6    ATTORNEY, A MR. GURULE, HAD CONCEDED THAT THE DEFENDANT

7    APPEARED TO BE TELLING THE TRUTH.

8                    FOLLOWING THE RELEASE OF MR. ZUNO-ARCE BY ORDER

9    OF JUDGE RAFEEDIE, THE DEFENDANT WAS INSTEAD TAKEN TO THE INS

10   PURSUANT TO A DETENTION ORDER, AND WE DO HAVE AN AFFIDAVIT BY

11   MR. CASILLAS INDICATING THAT HIS DETENTION DECISION TO DETAIN

12   THE DEFENDANT WAS NOT PROMPTED NOR ENCOURAGED BY ANY MEMBER OF

13   THE U.S. ATTORNEY'S OFFICE IN THE CENTRAL DISTRICT.

14                    DEFENDANTS FURTHER CONTEND THAT ASSISTANT UNITED

15   STATES ATTORNEY, MR. MANUEL MEDRANO, HAD AGREED THAT HIS

16   OFFICE WOULD TAKE NO FURTHER ACTION TO INTERFERE WITH

17   MR. ZUNO-ARCE'S RELEASE.

18                    ONE DAY AFTER MR. ZUNO-ARCE WAS TAKEN TO SAN

19   ANTONIO PURSUANT TO THE INS DETENTION, HE WAS INDICTED FOR

20   PERJURY IN THE INSTANT CASE.

21                    DEFENDANTS FURTHER AGREE TO WAIVE EXTRADITION AND

22   FURTHER CONTEND THAT THERE IS NO DANGER TO THE COMMUNITY AND

23   EMPHASIZE THE FACT THAT PERJURY IS, ALTHOUGH A SERIOUS CRIME,

24   IS NOT OF THE TYPE WHERE THERE SHOULD BE AN ORDER OF

25   DETENTION.

1   NOT YET CHARGED WITH ANY CRIME. FOR 22 DAYS THEY HOLD HIM IN

2   JAIL.

3   THEN WHAT DO THEY DO? WE FINALLY FORCE -- WHEN

4   JUDGE RAFEEDIE SAYS, "GET HIM IN FRONT OF A GRAND JURY, AND I

5   WANT TO KNOW WHEN YOU GET HIM THERE AND REPORT BACK TO ME ON

6   MONDAY," THEY GET HIM IN FRONT OF A GRAND JURY FOR HOW LONG?

7   TWO HOURS. THEY START AT 2:00 O'CLOCK IN THE AFTERNOON. THEY

8   DON'T START UNTIL LATER THAN 2:00, THEY BREAK AT 5:00.

9   AND WE SAY, "PLEASE KEEP GOING. HE WILL ANSWER

10  EVERY QUESTION YOU HAVE."

11  "NO, WE CAN'T. THE COURT REPORTER HAS TO LEAVE."

12  THEY THEN WAIT ANOTHER WEEK TO GO WITH THE GRAND

13  JURY. THEY REPRESENT THEY'VE GOT A LOT OF TESTIMONY. THEY

14  START AT 9:00, THEY'RE DONE BY 11:30. HE ANSWERS EVERY

15  QUESTION.

16  WE SAY UNDER OATH THAT GURULE, THE PROSECUTOR IN CHARGE

17  SAYS TO JIM LARNKARDIN (PHONETIC) IN ANSWER TO HIS QUESTION,

18  "WE'RE SATISFIED. HE'S ANSWERED EVERY QUESTION. HE'S

19  TESTIFIED TRUTHFULLY."

20  NOW THAT'S UNDER OATH, AND THEY DON'T DENY IT.

21  IT'S UNDER OATH, AND THEY DON'T DENY IT.

22  THEN WHAT HAPPENS? THEY STILL DON'T WANT TO

23  RELEASE HIM, AND THEY GO IN FRONT OF JUDGE RAFEEDIE ON

24  SEPTEMBER 5TH WHEN HE'S BEEN HELD FOR SOME 27 DAYS.

25  AND THEY SAY THAT, "JUDGE RAFEEDIE, WE STILL WANT

1    TO HOLD HIM, BECAUSE WE THINK HE'S A FLIGHT RISK AND HE'S A

2    MATERIAL WITNESS."

3              THEY SUBMIT IN CAMERA THINGS TO JUDGE RAFEEDIE

4    WHICH WE STILL HAVEN'T SEEN, AND EVEN THOUGH THEY SUBMIT

5    WHATEVER THEY WANT IN CAMERA AND THE GRAND JURY TRANSCRIPT TO

6    JUDGE RAFEEDIE, JUDGE RAFEEDIE RELEASES HIM AND SAYS IN

7    ESSENCE, HE'S EITHER NOT A MATERIAL WITNESS OR WE ARE GOING TO

8    RELEASE HIM, AND HE'LL COME BACK UNDER SUBPOENA.  JUDGE

9    RAFEEDIE DIDN'T SPELL THAT OUT.  HE JUST RELEASED HIM

10   FORTHWITH.

11             THE GOVERNMENT SAT THERE, WE SAY, KNOWING THERE

12   WAS AN INS HOLD AND THEY WERE GOING TO INSTITUTE IT.  WHAT

13   THEY DIDN'T TELL YOU AND WHAT THEY ADMITTED IN OPEN COURT,

14   BECAUSE WE PRESSED THEM -- YOU KNOW, WE'RE -- IT'S HARD

15   BECAUSE WE DON'T HAVE ALL THE INFORMATION, BUT WE PRESSED THEM

16   BECAUSE WE HAD A LITTLE INFORMATION AND DEA AGENT KEEL

17   (PHONETIC), WHO'S HERE, ADMITTED THAT HE CALLED DEA IN

18   SAN ANTONIO AND TOLD DEA IN SAN ANTONIO THAT JUDGE RAFEEDIE

19   HAD RELEASED.

20             NOW WE SAY THE COURT CAN TAKE JUDICIAL NOTICE

21   THAT THE DEA AGENT DOING THAT WITH THE KNOWLEDGE OF U.S.

22   ATTORNEY'S OFFICE IT'S DONE FOR ONE PURPOSE, SO DEA -- SAN

23   ANTONIO CALLS DEA -- CALLS INS SAN ANTONIO, THEY INSTITUTE THE

24   HOLD.  AND THEN WE STARTED THE WHOLE THING WITH THE HOLD, AND

25   THEN THEY TRANSPORT HIM.

1

2                          **PROOF OF SERVICE**

3    STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

4            I am employed in the county of Los Angeles, State of
     California.  I am over the age of 18 and not a party to the
5    within action; my business address is 11377 W. Olympic Blvd.,
     Los Angeles, California 90064

6
             On November 13, 1989, I served the foregoing
7    document(s) described as:

8        DECLARATION OF EDWARD M. MEDVENE IN SUPPORT OF
         CONTEMPORANEOUSLY FILED MOTIONS

9
     on the interested parties in this action by placing a true copy
10   thereof enclosed in a sealed envelope addressed as follows:

11           Adam Schiff, Esq.
             U.S. Attorney
12           312 N. Spring Street, 13th Floor
             Los Angeles, CA 90012

13
     ___  (BY MAIL)  I caused such envelope with postage thereon fully
14        prepaid to be placed in the United States mail at Los
          Angeles, California.  Executed on DATE, 1987, at Los
15        Angeles, California.

16   XX  (BY PERSONAL SERVICE)  I caused such envelope to be
         delivered by messenger to the offices of the addressee.
17       Executed on November 13, 1989, at Los Angeles, California.

18   ___  (State)  I declare under penalty of perjury under the laws
          of the State of California that the above is true and
19        correct.

20   XX  (Federal) I declare that I am employed in the office of a
         member of the bar of this court at whose direction the
21       service was made.

22           Executed on November 13, 1989, at Los Angeles, CA.

23

24

25   _____              _____
                                                 Signature
26

27

28

1        PROOF OF SERVICE

2    STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3        I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the

4    within action. My business address is 1093 Broxton Avenue, Westwood Village, California 90024.

5        On December 15, 1989, I served or caused to be served the foregoing document described as:

6

7        APPENDIX OF EXHIBITS TO NOTICE OF MOTION AND MOTION OF DEFENDANT RUBEN ZUNO-ARCE FOR RELEASE PENDING TRIAL; MEMORANDUM OF POINTS

8        AND AUTHORITIES IN SUPPORT THEREOF

9    on the interested parties in this action by delivering a true copy thereof in a sealed envelope to the offices of:

10

11        Manual Medrano
         Assistant United States
12          District Attorney
         312 North Spring Street
13        13th Floor
         Los Angeles, CA

14

    X    (BY MESSENGER) I delivered such envelope personally to
15        the office of the addressee so indicated above.
         Executed on December 15, 1989, at Los Angeles,
16        California.

17        I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

18

19                                  _Luiz Emilio_

20                              LUIS EMILIO

21

22

23

24

25

26

27

28