1  EDWARD M. MEDVENE
   JAMES E. BLANCARTE
2  RONALD A. DiNICOLA
   MITCHELL, SILBERBERG & KNUPP
3  11377 West Olympic Boulevard
   Los Angeles, California 90064
4  (213) 312-2000

5

6  Attorneys for Ruben Zuno-Arce

7

8              UNITED STATES DISTRICT COURT

9         FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11 UNITED STATES OF AMERICA,      )   CASE NO. 87-422(C) - ER
                                  )
12              Plaintiff,        )   DECLARATIONS OF JAMES E.
                                  )   BLANCARTE; RUBEN ZUNO-ARCE; AND
13     vs.                        )   EDWARD M. MEDVENE FILED IN
                                  )   SUPPORT OF RUBEN ZUNO-ARCE'S
14 RAFAEL CARO-QUINTERO,          )   ADDITIONAL BRIEF
   et al.                         )
15                                )   Date:  August 28, 1989
                Defendants.       )
16 _____)   Time:  1:30 p.m.

17                                    Courtroom:  1

18

19

20

21

22

23

24

25

26

27                ENTERED ON COURTRAN
                        SEP
28                            1989



### DECLARATION OF JAMES E. BLANCARTE

I, James E. Blancarte, the undersigned, hereby declare as follows:

1. I am an attorney at law, duly licensed to practice in the State of California, and before the United States District Court for the Central District of California. I am, through my professional corporation, a partner of the law firm of Mitchell, Silberberg & Knupp, attorneys for Mr. Ruben Zuno-Arce. I know all the facts stated in this Declaration of my own personal knowledge and if called and sworn as a witness could and would competently testify thereto.

2. On August 24, 1989, my partner, attorney Edward M. Medvene, and our co-counsel, attorney Jeremiah Handy and I arrived at the United States Federal Marshal's Detention Facility (commonly known as the "lock-up") located on the Main Street, ground floor level of the United States Federal Courthouse at 312 No. Spring Street, Los Angeles, California 90012. Mr. Medvene, Mr. Handy and I identified ourselves as counsel for Mr. Zuno-Arce requesting that we be allowed to meet with our client for the purposes of conducting an attorney interview with Mr. Zuno-Arce.

2

1          **3.** The receptionist/clerk at the lock-up took out a
2  list of prisoners being held at the Marshal's lock-up and after
3  reviewing the list, she told us that our client, Mr. Ruben Zuno-
4  Arce was not on the list. I then advised her that our office
5  had called the Metropolitan Detention Center, U.S. Federal
6  Bureau of Prisons at 10:00 a.m. earlier that same day to confirm
7  whether Mr. Zuno-Arce had already been transported to the U.S.
8  Federal Marshal's lock-up at the Federal Courthouse, and that
9  Metropolitan Detention Center confirmed Mr. Zuno-Arce had been
10  transferred to the Federal Courthouse earlier that morning.

11

12          **4.** The receptionist/clerk said she would check her
13  records again, including the "add-on list" for prisoners being
14  held at the Marshal's Federal Courthouse lock-up. After
15  completing her review, she advised us that Mr. Ruben Zuno-Arce
16  was not on any of her lists including the "add-on list". We
17  then asked her to contact the guards in the lock-up facility so
18  that they could independently confirm, (without regard to a
19  possible clerical error on the list of prisoners and the add-on
20  list), whether Mr. Ruben Zuno-Arce was in fact among the
21  prisoners being detained at the Marshal's lock-up. In response
22  to our request, she pressed the intercom to the Marshal's lock-
23  up and asked out loud "do you guys have a Ruben Zuno-Arce back
24  there?" After a brief pause, a male voice responded stating
25  there was no Ruben Zuno-Arce in the lock-up.

26

27

28                                      3

1          5.   We then asked the receptionist/clerk if she would
2   please have someone go back into the Marshal's lock-up and yell
3   Mr. Zuno-Arce's name out loud to confirm he was not back
4   there.   After some hesitation, she agreed to our request and
5   disappeared into the door that leads to the Marshal's lock-up
6   facility.

7

8          6.   After about one or two minutes, she returned to
9   the front window and advised us that Mr. Zuno-Arce's name had
10  been yelled out loud in the lock-up facility and no had
11  responded to his name.

12

13         7.   At about that time, a U.S. Federal Marshal
14  appeared at the window alongside the receptionist/clerk and
15  asked us what the problem was.   By this time, 15 minutes had
16  elapsed since our arrival at the Marshal's lock-up facility.
17  The  U.S. Federal Marshal then asked us what the problem was.
18  We told the Marshal that we were there, as counsel for Mr. Ruben
19  Zuno-Arce to conduct an attorney interview with him prior to his
20  appearance before the U.S. Federal Grand Jury and that we had
21  been told Mr. Zuno-Arce was not at the lock-up.   We told the
22  Marshal that to the least of our knowledge there was no where
23  else our client could see since he had been transported from the
24  Metropolitan Detention Center to the Federal courthouse earlier
25  that morning.   The Marshal reviewed all the same prisoner lists
26  that had been previously reviewed by the receptionist/clerk and

27

28                                    4

1 then told us that Mr. Zuno-Arce did not appear on any of those
2 lists, including the "add-on list".

3

4          8.   We then told the U.S. Marshal that we had spent
5 the last half-hour trying to locate Mr. Zuno-Arce that it was
6 now almost 2:00 p.m. and that our client was scheduled to appear
7 before the U.S. Federal Grand Jury at 2:00 p.m. that
8 afternoon.   The Marshal responded by saying that Mr. Zuno-Arce
9 was probably already "up at the grand jury".   We again reminded
10 the Marshal that we had been present at the lock-up facility
11 since at least 1:30 p.m. and that it was unlikely that Mr. Zuno-
12 Arce had been sitting up in the grand jury room since that time.

13

14          9.   The Marshal then disappeared into the lock-up
15 facility and about one minute later, he reappeared at the front
16 window and told Mr. Medvene, Mr. Handy and me that Mr. Zuno-Arce
17 would be brought to Interview Room No. 1 and that we should
18 direct ourselves to that Room.   Mr. Medvene, Mr. Handy and I
19 went to Room No. 1 and waited there for approximately one minute
20 without any appearance by Mr. Zuno-Arce.   Mr. Medvene and Mr.
21 Handy then returned to the front window to follow-up on whether
22 in fact Mr. Zuno-Arce had been located and whether he would be
23 brought to Interview Room No. 1 as had been indicated by the
24 Marshal.

25

26

27

28                                      5

10. I stayed in Interview Room No. 1 while Mr. Medvene and Mr. Handy returned to the front window. While Mr. Medvene and Mr. Handy were gone, the door to Room No. 1 was opened by a U.S. Federal Marshal who then brought Mr. Zuno-Arce into the room. I asked Mr. Zuno-Arce what time he had been transported from the Metropolitan Detention Center to the Marshal's lock-up facility at the U.S. Federal Courthouse. Mr. Zuno-Arce told me that he was brought to the Marshal's lock-up facility at the Courthouse at approximately 9:00 a.m. earlier that morning.

11. I asked Mr. Zuno-Arce if he had been present at the Marshal's lock-up facility the entire time from 9:00 a.m. until the time he was brought into the interview room. Mr. Zuno-Arce said "yes" and that he in fact had been held in a detention room immediately adjacent to Interview Room No. 1 for most of that time.

12. I then asked Mr. Zuno-Arce whether any Marshal or any other person had yelled his name out loud at any time while he was in the Marshal's lock-up and more specifically, within the last one-half hour. He said that he had not heard his named yelled out loud at any time during his detention at the Marshal's Facility.

6

ZCIRAD767

13. At this point, Mr. Zuno-Arce had been in Interview
Room No. 1 for approximately one to two minutes when the door to
the room 1 was opened by a U.S. Federal Marshal wearing a dark
blue "jumpsuit" uniform. The U.S. Federal Marshal was a male,
caucasian, approximately 5'9" to 5'10" with dark brown hair,
dark brown eyes, and a moustache. The U.S. Marshal yelled out
"Ruben Zuno-Arce?!". Before Mr. Zuno-Arce could respond and
while we were still trying to talk to him the U.S. Marshal
raised his voice to the level of scream as he called out
Mr. Zuno-Arce's name again. The Marshal's scream was threaten-
ing, aggressive, menacing and totally hostile to the point where
I and the other two attorneys feared that Mr. Zuno-Arce was
about to be hit.

14. The U.S. Marshal then took Mr. Zuno-Arce to the
room without striking him.

15. It was now almost 2:00 p.m. and Mr. Medvene,
Mr. Handy and I went back to the front window of the Marshal's
Detention Facility. At the window, Mr. Medvene spoke to a
different U.S. Federal Marshal who was present at the window and
advised him that we had been at the facility since 1:30 p.m. and
had been told that Mr. Zuno-Arce was not present even though Mr.
Zuno-Arce had confirmed that he had been there not only since
1:30 p.m., but in fact since 9:00 a.m. earlier that day; that it
had been represented to us by various personnel of the U.S.

7

ZCIRAD767

1   Marshal's Office that they had checked all records and in fact
2   had yelled out Mr. Zuno-Arce's name in an attempt to confirm
3   whether he was present at the Marshal's lock-up facility and had
4   been told that he was not there; that at approximately
5   1:55 p.m., Mr. Zuno-Arce was finally allowed to meet with us for
6   only 2 minutes, and that at the end of those 2 minutes, a guard
7   (who we described to the U.S. Marshal) had verbally abused our
8   client using extreme aggressive, hostile and intimidating
9   language.  The U.S. Marshal said he would "look into it".
10
11          16.  Mr. Medvene, Mr. Handy and I then took the
12   elevator up to the 14th floor where we were told the grand jury
13   would be meeting.  We were then allowed to meet briefly with Mr.
14   Zuno-Arce.  Mr. Zuno-Arce was shaken by the Marshal's assault
15   and verbal abuse.  I tried to help him claim down and regain his
16   composure before he entered the Grand Jury Room and after a
17   couple of minutes he seemed to be able to proceed.
18
19          17.  Mr. Zuno-Arce was before the U.S. Federal Grand
20   Jury from approximately 2:30 p.m. until approximately 5:00 p.m.
21   later that day.  At about 5:00 p.m., the Grand Jury stopped
22   questioning Mr. Zuno-Arce and we were told by U.S. Assistant
23   Attorney Jimmy Gurule that he was not through questioning Mr.
24   Zuno-Arce and that the Grand Jury would reconvene again on
25   Thursday, August 31, 1989 because he still had approximately 2
26   more hours worth of questions to ask Mr. Zuno-Arce.
27
28                              8

1           18.  Prior to our client appearing before the Grand

2  Jury, we had advised the U.S. Attorneys' Office and Mr. Gurule

3  that Mr. Zuno-Arce and his counsel were willing to stay as long

4  as necessary that day in order to have the grand jury complete

5  their questioning of Mr. Zuno-Arce.  Mr. Gurule advised us that

6  that would not be possible because the court reporter could not

7  stay past 5:00 p.m.  We immediately protested the fact that

8  absent an order to the contrary by the Court, Mr. Zuno-Arce

9  would continue to be held as a material witness, without

10  charges, and without bail or bond, for another week with only 2

11  hours of testimony still to be taken because the court Reporter

12  could not stay past 5:00 p.m. and the U.S. Attorney had failed

13  to make arrangements for another court reporter.  The Assistant

14  U.S. Attorney offered no resolution in response to our protest

15  of these facts.

17           19.  We then asked for an opportunity to meet with

18  Mr. Zuno-Arce.  We were told that we could not meet with

19  Mr. Zuno-Arce at that time because he was being transported

20  immediately from the U.S. Federal Courthouse back to the

21  Metropolitan Detention Center.

23           20.  After meeting briefly with Mr. Medvene, Mr. Handy

24  and Mr. Zuno-Arce's wife and family, Mr. Jeremiah Handy and I

25  went to the Metropolitan Detention Center to visit Mr. Zuno-

26  Arce.  Mr. Handy and I arrived at the Metropolitan Detention

28                                9

ZCIRAD767

1  Center at approximately 5:55 p.m. and "signed in" on the

2  attorney visitors log of the Metropolitan Detention Center at

3  approximately 6:00 p.m.  Mr. Handy and I were then escorted to

4  the 8th floor of the Metropolitan Detention Center (commonly

5  known as "Eight North") where we were told to wait in a

6  interview room until Mr. Zuno-Arce was "brought up".

7

8       21.  After waiting approximately 15 minutes, we asked

9  the senior officer in charge of Eight North whether Mr. Zuno-

10 Arce would be arriving soon.  The officer said that she did not

11 know but that she would check to see whether Mr. Zuno-Arce had

12 arrived at the Metropolitan Detention Center from the U.S.

13 Federal Courthouse.  The officer got on the phone and called the

14 inmate receiving center to confirm whether Mr. Zuno-Arce had

15 arrived from the U.S. Federal Courthouse.  She then told us that

16 Mr. Zuno-Arce had not yet arrived.

17

18      22.  At approximately 6:30 p.m., we again asked the

19 senior officer to please check to see whether Mr. Zuno-Arce had

20 arrived at the facility.  She got on the phone again and called

21 the prisoner receiving section and was told that he was not

22 there and that he had not arrived.  At our request, she then

23 followed up with a call to the inmate processing center, which

24 she advised us was where all prisoners coming into the facility

25 from the Courthouse or from any other place from outside the

26 facility were taken for "processing" back into the institu-

27

28                              10

ZCIRAD767

1    tion.   The officer then told us that the processing center had
2    advised her that Mr. Zuno-Arce was not there.

4         23.   From 6:30 p.m. on, we made periodic requests that
5    the senior officer try to locate Mr. Zuno-Arce.  On each such
6    occasion, the senior officer complied with our request by making
7    phone calls which ended with our being told Mr. Zuno-Arce could
8    not be located.  She then indicated that she could not confirm
9    whether Mr. Zuno-Arce might still be at the Federal Courthouse,
10   but that it was unlikely he was still there given the normal
11   timing and procedures for transporting prisoners back to the
12   Metropolitan Detention Center after their appearances in Court
13   or before the Grand Jury.  She also explained to us that she
14   found it difficult to understand where Mr. Zuno-Arce could be
15   given that the inmate receiving section and the inmate
16   processing section both had denied that he was present in either
17   of those parts of the Metropolitan Detention Center.

19        24.   We then advised the senior officer that we were
20   concerned for the safety of our client given that no one seemed
21   to know where he was.  We also advised the senior officer that
22   we would not be leaving the Metropolitan Detention Center until
23   they located Mr. Zuno-Arce and until we had an opportunity to
24   see him and speak with him.

1      25.  At 8:00 p.m., approximately two hours after we had

2  "signed-in" to the Metropolitan Detention Center, Mr. Zuno-Arce

3  was brought to the interview room where we had been told to wait

4  for him.  I then asked Mr. Zuno-Arce what time he had been

5  transported from the U.S. Federal Courthouse to the Metropolitan

6  Detention Center.  Mr. Zuno-Arce said he had been brought from

7  the U.S. Federal Courthouse to the Metropolitan Detention Center

8  at approximately 6:00 p.m.  I asked him how he knew the

9  approximate time he had been transported from the U.S. Federal

10  Courthouse and the approximate time had arrived at the

11  Metropolitan Detention Center.  Mr. Zuno-Arce told me that he

12  had looked at a wall clock in the U.S. Marshal's lock-up

13  facility at about the time he was being transported to the

14  Metropolitan Detention Center and had noticed that it was

15  approximately 5:55 p.m. and that he calculated that it took a

16  bout 5 minutes for him to be placed in a van and transported to

17  the Metropolitan Detention Center.

18

19      26.  I then asked Mr. Zuno-Arce where he had been from

20  the time he arrived at the Metropolitan Detention Center at

21  approximately 6:00 p.m. until he was brought into the interview

22  room at approximately 8:00 p.m.  Mr. Zuno-Arce told me that he

23  was kept in the van with the windows closed and no air

24  conditioning where it was uncomfortably hot for approximately 5

25  to 10 minutes before he was actually brought into the

26  Metropolitan Detention Center.  Then he was let out of the van

27

28                                    12

1  and brought into the center where he was placed in a large room
2  in the prisoners receiving intake section.

3

4       27.   Mr. Zuno-Arce then said that about 10 minutes
5  later, at approximately 6:10 p.m., an M.D.C. guard whose name-
6  plate identified him as "Officer Cass" approached and ordered
7  him to stand against the wall, pointing to a specific spot.
8  According to Mr. Zuno-Arce, Officer Cass then grabbed him by the
9  wrists which were handcuffed behind his back and shoved him
10  against the wall.   Mr. Zuno-Arce said he tried to tell Officer
11  Cass that he was hurting him and causing him great pain to areas
12  of his upper arms and shoulders where Mr. Zuno-Arce had
13  undergone surgery.   Officer Cass ignored Mr. Zuno-Arce and after
14  removing the handcuffs from Mr. Zuno-arce's wrists, Officer Cass
15  ordered him to "strip".

16

17       28.   After the "strip search" was completed and while
18  Officer Cass was away, momentarily, another M.D.C. guard told
19  Mr. Zuno-Arce to move to a different spot a few feet from where
20  Officer Cass had ordered him to stand.   Mr. Zuno-Arce complied
21  with the second officer's command.   When Officer Cass returned
22  he noticed that Mr. Zuno-Arce was no longer standing on the spot
23  where he had ordered him to stand and Officer Cass grabbed Mr.
24  Zuno-Arce forcefully by the arm yelling "I thought I told you to
25  stand over here".   The other guard told Officer Cass "I told him
26  to move over there".   Officer Cass immediately became irritated

27

28                                13

1 but did not say anything to the other guard. Instead, he shoved
2 Mr. Zuno-Arce toward the elevator lobby and yelled "You mother
3 fucker, I know who you are. You may have a deal with the mother
4 fuckin' judge, but we don't make deals here you lousy mother
5 fucker".

7      29.   While Officer Cass and Mr. Zuno-Arce were in the
8 elevator lobby, a female guard arrived and Officer Cass turned
9 to her and said "Do you know who this mother fucker is?" Before
10 she could answer Officer Cass said "I hate this mother
11 fucker...this thing." When the elevator arrived, Officer Cass
12 grabbed Mr. Zuno-Arce from the handcuffs which secured his arms
13 behind his back and pulled him forcefully into the elevator
14 after the elevator arrived on the 4th floor of the Metropolitan
15 Detention Center.  Officer Cass shoved Mr. Zuno-Arce into the
16 room.   Before closing the door, Officer Cass told Mr. Zuno-Arce
17 "We're gonna show you what protective custody is like; we're
18 gonna show you how we protect people like you you mother
19 fucker."  Mr. Zuno-Arce said he was then left in the room on the
20 4th floor until approximately 8:00 p.m. when he was brought to
21 the 8th floor.  Upon arriving at the 8th floor, he was taken
22 into the interview room where attorney Jeremiah Handy and I were
23 waiting to meet with him.  Mr. Zuno-Arce then told Attorney
24 Handy and me all the facts and information set forth above.

28                          14

1     30. Mr. Zuno-Arce has been held prisoner and detained
2     without bond since August 9, 1989; a period of time now
3     totalling approximately twenty days. During the first 6 days of
4     his incarceration, he was only allowed to shower two times; he
5     was not allowed to have any books or magazines of any kind for
6     approximately the first 10 to 12 days of his incarceration, and
7     he was not allowed to see his wife or have visits from her for
8     approximately the first 8 days of his incarceration.

10          I declare that the foregoing is true and correct.

12          Executed this 28 day of August, 1989, at Los Angeles,
13    California.

15          _____
      James E. Blancarte

28                              15

## DECLARATION OF RUBEN ZUNO-ARCE

I, Ruben Zuno-Arce, the undersigned, hereby declare as follows:

1.  I am 59 years old.  My wife's name is Maria Enriqueta Guitron Velasco.  My wife Maria and I have two children, a six-year old boy and a three-year old girl.  My family and I are citizens of the Republic of Mexico.  I know all the facts stated in this Declaration of my own personal knowledge and if called and sworn as a witness I could, subject to the advice of my counsel, competently testify to the facts set forth in this Declaration.

2.  I have been held prisoner in the United States by U.S. Federal law enforcement and detention authorities since August 9, 1989 and am still being so held, without criminal charges of any kind whatsoever being filed against me.

3.  Throughout my incarceration I have been treated as though I was a convicted, sentenced and dangerous criminal, despite the fact my status is that of being designated by the U.S. Attorney's Office, against my objection, as a Material Witness in this case.

1        4.   During the first 6 days of my incarceration, I was

2   only allowed to shower twice.  During the first 10 to 12 days of

3   my incarceration, I was not allowed to have any books or

4   magazines of any kind whatsoever, and during the first seven to

5   eight days of my incarceration I was not allowed to see or visit

6   with my wife or any other member of my family.

7

8        5.   From Sunday, August 12, 1989 through the present,

9   I have been incarcerated at the Metropolitan Detention Center,

10  U.S. Federal Bureau of Prisons ("M.D.C.") in the

11  disciplinary/special housing unit on the eighth floor, (commonly

12  known as "Eight-North") of the M.D.C.  During my incarceration,

13  I have been verbally and physically abused, including, but not

14  limited to the following ways:

15

16        a.   I have been pushed, shoved and pulled from my

17  wrists by U.S. Federal Prison Detention personnel while

18  handcuffed behind my back;

19

20        b.   I have been subjected to aggressive,

21  threatening, menacing and obscene verbal abuse by U.S. Federal

22  Prison Detention personnel and by members of the U.S. Marshal's

23  office;

24

25        c.   I have been assaulted by U.S. Federal Prison

26  Detention personnel and U.S. Federal Marshals; and

27

28                          17

1          d.   I have been denied, from time to time, the
2    opportunity to meet with my attorneys, all as more fully set
3    forth herein.

4

5          6.   On Monday, August 14, 1989, I was being held at
6    the U.S. Federal Marshal's detention facility (commonly known as
7    the "lock-up") located on the Main Street, ground floor level of
8    the United States Federal Courthouse at 312 North Spring Street,
9    Los Angeles, California 90012.  I was incarcerated at that
10   facility until approximately 1:30 P.M. when I was taken to the
11   courtroom of U.S. District Court Judge Edward Rafeedie.  At that
12   time, I first met Mr. James E. Blancarte who identified himself
13   as an attorney retained, on my behalf, by my wife.  Mr.
14   Blancarte told me he had been down at the Marshal's lock-up
15   since approximately 1:05 p.m. earlier that afternoon asking to
16   be allowed to speak with me.  He asked me if I had been in the
17   marshal's lock-up prior to being brought to Judge Rafeedie's
18   courtroom.  I told Mr. Blancarte "yes", and that I had in fact
19   been in the lock-up since _____ a.m.  Mr. Blancarte then asked
20   me whether anyone had advised me that an attorney was there to
21   see me.  I told him "no".

22

23         7.   After the hearing in Judge Rafeedie's courtroom, I
24   was returned to the Marshal's lock-up and subsequently
25   transferred from there back to the M.D.C.  Later that same
26   afternoon, I was visited there by my attorney, Mr. Blancarte,
27

28                                18

1  and advised by him that my wife Maria had not been allowed to
2  visit me. In fact, thereafter my wife was not allowed to see or
3  visit me until August ___, 1989, a period of ___ days from the
4  date I was first incarcerated by U.S. Federal Detention
5  authorities. It is my understanding and belief that until
6  Saturday, August 26, 1989, my wife has had extreme difficulty
7  being allowed to see and visit me, requiring intervention and
8  assistance from my attorneys in order to finally be allowed to
9  see and visit me.

10

11        8.  From August 9, 1989 through August 14, 1989, I was
12  only allowed to shower 2 times. From the first date of my
13  detention and incarceration until approximately 10 to 12 days
14  later I was not allowed to have books or magazines of any kind
15  whatsoever.

16

17        9.  On Friday, August 25, 1989, at approximately 9:00
18  A.M., I was transported from the M.D.C. to the U.S. Marshal's
19  lock-up at the U.S. Federal Courthouse. I arrived at the lock-
20  up at approximately 9:05 a.m. I was in the Marshal's lock-up
21  from approximately 9:05 a.m. until approximately 1:55 p.m. that
22  afternoon when I was placed in a small interview room and I saw
23  my attorneys, James E. Blancarte, Mr. Edward Medvene and Mr.
24  Jeremiah Handy for about 2-3 minutes. Upon entering the
25  interview room, my attorneys immediately asked me how long I had
26  been at the Marshal's lock-up facility. I told them that I had
27

28                              19

1    been there since about 9:05 a.m. that morning.  My attorneys

2    then told me that they had been at the Marshal's lock-up for at

3    least a half hour (since 1:30 p.m.) trying to meet with me, only

4    to be told that I was not present at the Marshal's lock-up

5    facility.  My attorneys then asked me whether anyone had advised

6    that my attorneys were trying to meet with me.  I told them

7    "no".  My attorneys then told me that they had asked that my

8    name be yelled out loud by detention personnel to confirm

9    whether I was in the lock-up, and that upon calling out my name

10   no one in the lock-up responded.  I told them that no one had

11   yelled out my name at any time since I arrived at the Marshal's

12   lock-up facility.

13

14            10.  Approximately two to three minutes had gone by

15   since I had first been placed in the interview room with my

16   attorneys when the door to the interview room was opened by a

17   caucasian, male guard dressed in a dark blue Marshal's

18   "jumpsuit" uniform.  The guard yelled my name loudly, while my

19   attorneys attempted to speak with me.  Before I could even

20   acknowledge the guard and while my attorneys were still talking

21   to me, the Marshal raised his voice to a full scream, yelling

22   out my name in the most aggressive, threatening and intimidating

23   way that I had ever been subjected to in my life.  I feared that

24   the Marshal was about to strike me so I turned my back to my

25   attorneys and quickly stepped out of the interview room at the

26   command of the guard who then slammed the door behind me while

27

28                                  20

1   my attorneys were still trying to talk to me.  By this time I
2   was thoroughly intimidated and fearful of being hurt or
3   otherwise abused further by the guard and I could not even
4   concentrate on my imminent appearance before the Grand Jury.  My
5   only thought was to  be alert to respond to any command that the
6   guard might give me in order to avoid any excuse for being hurt
7   or abused further by him.

9        11.   The guard then took me by elevator to one of the
10  upper floors of the U.S. Courthouse for my appearance before the
11  U.S. Federal Grand Jury.  Before appearing in front of the Grand
12  Jury, I was allowed to see my attorneys for a few minutes and
13  they tried to help me regain my composure.

15        12.   My appearance before the Grand Jury began at
16  approximately 2:30 p.m. and ended at approximately 5:00 p.m.
17  later that day.  At that time, I was taken to the U.S. Marshal's
18  lock-up on the ground floor of the U.S. Federal Courthouse.
19  While being held in the lock-up, I noticed that the other
20  prisoners had been given sandwiches.  I told one of the guards
21  that I had not eaten since earlier that morning, and he said I
22  could go ahead and have a sandwich.  As I was about to eat the
23  sandwich, another guard came into the room and yelled at me to
24  drop the sandwich and go with him.  I tried to tell him that I
25  had not eaten, but he just yelled at me to "drop it" and
26  "move!"  I dropped the sandwich and was escorted by the guard to

28                                  21

1    the van that transported me back to the M.D.C.

2

3          13.   Before leaving the Marshal's lock-up, I noticed
4    the clock on the wall indicated the time to be approximately
5    5:50 p.m.   By the time I was placed in the van and transported
6    to the M.D.C., I estimate it was approximately 6:00 p.m.   I was
7    held in the van with the windows rolled up and no air
8    conditioning for approximately 10 to 15 minutes before being
9    taken from the transport van to the M.D.C. intake/reception
10   section.

11

12         14.   Upon entering the M.D.C., I was placed in a large
13   room and then approached by a male, black guard whose nameplate
14   identified him as "Officer Cass."   Officer Cass yelled loudly
15   for me to stand on a certain spot as he grabbed and pulled me
16   from my wrists while they were handcuffed behind my back.   He
17   then pushed me against the wall.   I tried to tell Officer Cass
18   that he was hurting me and that I had surgery to my arms and
19   shoulder which made his pulling and shoving even more painful
20   but he just yelled for me to "shut up" as he began to remove my
21   handcuffs.   He then ordered me to take off all my clothes for a
22   strip search.

23

24         15.   After I was strip-searched, and while Officer Cass
25   was away momentarily, another guard came by and told me to move
26   to another spot against the wall.   I complied.   Officer Cass

27

28                                  22

1  returned and noticed that I was no longer on the spot he had

2  ordered me to stand on.  Officer Cass began yelling and swearing

3  at me but was interrupted by the other guard who told Officer

4  Cass that I had moved from the spot at his instruction.  Officer

5  Cass became visibly agitated but did not say anything to the

6  other guard.  Instead, he turned to me and grabbed my arms,

7  violently pulling them back behind me causing me great pain as

8  he began to handcuff me again.  I again tried telling Officer

9  Cass that I had had surgery on each of my arms and shoulders and

10  that he was hurting me very badly, but he ignored me and cuffed

11  me more tightly than I had been cuffed at any time during my

12  period of incarceration, causing me additional pain.  I decided

13  to not say anything further to Officer Cass because I was

14  convinced that in his agitated state, he would simply cause me

15  even more harm and pain.

16

17        16.  Officer Cass then grabbed me by my arms and pushed

18  me towards the elevator lobby.  As he shoved me towards the

19  lobby, Officer Cass yelled at me, stating "You mother fucker.  I

20  know who you are.  You may have a deal with the mother fucking

21  Judge, but we don't make deals here!"  While we were waiting for

22  the elevator to arrive, a female guard joined us in the elevator

23  lobby.  Officer Cass turned to the female guard and told him,

24  "You know who this mother fucker is?"  Before the female guard

25  could answer, Officer Cass told her, "I hate this mother

26  fucker.  I hate this thing."  The elevator then arrived and

27

28                                  23

1   Officer Cass pushed me into the elevator again causing me pain

2   in my arms and shoulders which were still aching from his prior

3   use of force in moving me around.

4

5       17.  The elevator then took us to the fourth floor of

6   the Metropolitan Detention Facility where I was then placed in a

7   room by Officer Cass.  It is my estimate that by this time it

8   was approximately 6:20 p.m. to 6:30 p.m.  As Officer Cass was

9   about to close the door, he turned to me and said, "You mother

10  fucker, I hate you and we're going to show you how we're going

11  to protect you while you're here you lousy mother fucker.  We're

12  gonna show you what protective custody is like."  Officer Cass

13  then closed the door and left me in the room from approximately

14  6:30 p.m. until approximately 8:00 p.m. when I was taken up to

15  the eighth floor and placed in a room where my attorneys,

16  Jeremiah Handy and Jim Blancarte, were waiting to meet with me.

17

18      18.  Upon entering the interview room on the eighth

19  floor, Mr. Blancarte asked me how long I had been in the

20  M.D.C.  I told him that I had arrived at the detention facility

21  about 2 hours earlier at approximately 6:00 p.m.  Mr. Blancarte

22  then told me that he and attorney Jeremiah Handy had been at the

23  detention facility since 6:00 p.m. and had been told for the

24  last 2 hours that I was not at the detention facility and could

25

26

27

28                                  24

1   not otherwise be located.  I then told my attorneys about the

2   physical and verbal abuse I had received from Officer Cass.

3

4          I declare, under penalty of perjury, that the

5   foregoing is true and correct.

6

7          Executed this *28* day of August, 1989, at Los Angeles,

8   California.

9

10                              _____

11                              Ruben Zuno-Arce

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                              25

### DECLARATION OF EDWARD M. MEDVENE

I, Edward M. Medvene, the undersigned, hereby declare as follows:

1.   I am an attorney at law, duly licensed to practice in the State of California, and before the United States District Court for the Central District of California.  I am, through my professional corporation, a partner of the law firm of Mitchell, Silberberg & Knupp, attorneys for Mr. Ruben Zuno-Arce.  I know all the facts stated in this Declaration of my own personal knowledge and if called and sworn as a witness could and would competently testify thereto.

2.   On Friday August 18, 1989, I appeared at the bond hearing before this Court as lead co-counsel for Mr. Zuno-Arce.  At the end of said hearing, and after this Court ordered Mr. Zuno-Arce held, without bond, as a material witness in this case, I requested, among other things, that "...if we [Zuno-Arce] were to expend, pay for, whatever cost there were, and if they were satisfactory to the government, that we could house him somewhere so he would be secure and wouldn't leave."  (See Reporter's Transcript of Proceedings, Friday, August 18, 1989, at pg. 36, lns. 13-16).

26

1   3. This Court responded, stating "The Court has no

2 objection to that.  If you can work out some agreement with the

3 government, I have no objection to alternate housing or

4 confinement so long as it meets the requirements of all

5 concerned and ensures the -- that they are safe and secure

6 quarters."  (See Id. at pg. 36, lns. 17-21).

7

8   4. I then spoke with Assistant U.S. Attorney Jimmy

9 Gurule who told me there was no alternate housing or confinement

10 that would be acceptable to the government.

11

12   5. Mr. Zuno-Arce has, since the August 18, 1989 bond

13 hearing date (and for 5 days prior thereto), been imprisoned in

14 the disciplinary/special housing, unit of the Metropolitan

15 Detention Center, U.S. Federal Bureau of Prisons (commonly known

16 as "M.D.C. Eight-North"), among the most dangerous of all

17 convicted criminals held in the custody of the U.S. Federal

18 Bureau of Prisons.

19

20   6. Our client, Mr. Zuno-Arce is not a convict or a

21 dangerous criminal.  He has not ever been charged or indicted.

22 He is and at all times relevant herein has been, at most, and

23 against his objections, a material witness.

24

25    I declare that the foregoing is true and correct.

26

27

28         27

ZCIRAD768

1          Executed this 28 day of August, 1989, at Los

2    Angeles, California.

3

4                                        _____
                                              Edward M. Medvene
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27
                                   28
28

1            PROOF OF SERVICE

2

3    STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

4            I am employed in the County of Los Angeles, State of
     California.  I am over the age of 18 and not a party to the
5    within action; my business address is:  1093 Broxton Ave., #685,
     Westwood Village, Calif.  90024.

6

7            On August 28, 1989, I served the foregoing documents
     described as:

8
             DECLARATIONS OF JAMES E. BLANCARTE; RUBEN ZUNO-ARCE;
9            AND EDWARD M. MEDVENE FILED IN SUPPORT OF RUBEN ZUNO-
             ARCE'S ADDITIONAL BRIEF
10
     on the interested parties in this action by delivering a true
11   copy thereof in a sealed envelope to the offices of:

12           Gary A. Feess, United States Attorney
             Robert L. Brosio, Assistant United States Attorney
13             Chief, Criminal Division
             Jimmy Gurule, Assistant United States Attorney
14           1400 United States Courthouse
             312 No. Spring Street
15           Los Angeles, California  90012

16   ___ (BY MAIL)  I caused such envelope with postage thereon fully
         prepaid to be placed in the United States mail at Los
17       Angeles, California.

18    X  (BY PERSONAL SERVICE)  I delivered such copy by hand to the
         offices of the addressee.  Executed on August 28, 1989, at
19       Los Angeles, California.

20   ___ (State)  I declare under penalty of perjury under the laws
         of the State of California that the foregoing is true and
21       correct.

22    X  (Federal)  I declare that I am employed in the office of a
         member of the Bar of this Court to make such service, at
23       whose direction the service was made.

24

25                           _____
                                  L. X-Press
26

27

28